JUDGE CEDARBAUM

12 CIV 8886

**ANDREW M. CALAMARI**
Regional Director
Securities and Exchange Commission
New York Regional Office
3 World Financial Center, Room 400
New York, NY 10281
(212) 336-0080 (Todd Brody)

RECEIVED
DEC 06 2012
U.S.D.C. S.D.N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
SECURITIES AND EXCHANGE COMMISSION,    :
                                                               :
                        Plaintiff,                             :
                                                               :    ECF CASE
            - against -                                        :
                                                               :
Guy M. Jean-Pierre                                             :
    (a/k/a Marcelo Dominguez de Guerra),                       :
                                                               :
                        Defendant.                             :
                                                               :
------------------------------------------------------------ x

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against defendant Guy M. Jean-Pierre, a/k/a Marcelo Dominguez de Guerra ("Jean-Pierre" or "Defendant") alleges, as follows:

## SUMMARY

1. This action charges Jean-Pierre with engaging in a fraudulent scheme to issue attorney opinion letters that facilitated the transfer of restricted microcap shares on Pink OTC Markets Inc. ("Pink Sheets"), (now named OTC Markets Group Inc.), after Pink Sheets had banned him from issuing opinion letters in relation to Pink Sheet stocks. Pink Sheets is a financial marketplace trading platform that provides price and liquidity information for nearly 10,000 securities. Jean-Pierre sought to evade the Pink Sheet ban by writing letters using his niece's identity and falsifying her signature without her knowledge or consent.



GOVERNMENT
EXHIBIT
3
17-cr-0008-WJM

2. Pink Sheets banned Jean-Pierre from issuing attorney opinion letters on April 21, 2010. Within two weeks, he convinced his niece, an attorney licensed in the states of California (inactive) and Texas (active), to provide him with three copies of her signature, a copy of her driver's license, and acquiescence in forming a company called Complete Legal Solutions, LLC ("Complete Legal").

3. Once Jean-Pierre formed Complete Legal, he began issuing various types of attorney opinion letters under its letterhead on behalf of at least eleven companies that traded publicly on Pink Sheets, falsely bearing his niece's signature. Jean-Pierre did not stop until April 2011, when his niece informed him that she was the subject of a bar complaint in connection with a subset of the attorney opinion letters he had issued using her name.

## VIOLATIONS

4. By virtue of the conduct alleged herein, (a) Defendant, directly or indirectly, has engaged in acts, practices, and courses of business that constitute violations of Sections 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)]; and (b) Defendant has engaged in acts, practices, and courses of business that constitute violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

5. Unless the Defendant is permanently restrained and enjoined, he will again engage in acts, practices, and courses of business similar to those set forth in this Complaint.

## JURISDICTION AND VENUE

6. The Commission brings this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C §§ 78u(d), 78u(e), and 78aa]. The Defendant, directly or indirectly,

has made use of the means and instrumentalities of interstate commerce or the mails in connection with the acts, practices, and courses of business alleged in this Complaint.

7. This Court has subject matter jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

8. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391. Certain of the transactions, acts, practices and courses of business alleged herein occurred in this district. Specifically, during the relevant period, Jean-Pierre drafted and submitted letters to Pink Sheets, which is headquartered in this district.

**DEFENDANT**

9. Jean-Pierre, age 53, formerly a resident of Pompano Beach, Florida, is a licensed attorney in the states of New York (delinquent), California (delinquent), and Florida (active). Jean-Pierre currently resides in the Dominican Republic. On or about August 22, 2011, Jean-Pierre changed his name to Marcelo Dominguez de Guerra, but continues to use his former name, Jean-Pierre, on certain official documents like his U.S. passport.

10. Jean-Pierre earned his law degree from Columbia Law School in 1985. From 1985 through 1990, Jean-Pierre worked as a corporate and securities associate at two well-established law firms. Thereafter, Jean-Pierre spent the years 1991 through 1995 working for the Federal Deposit Insurance Corporation.

11. From 2004 through 2007, Jean-Pierre worked for a Florida-based firm where he wrote more than fifty attorney opinion letters opining on the legality of removing restrictive legends from stock certificates.

12. In 2007, Jean-Pierre began his own law firm, Jean-Pierre and Jean-Pierre, LLC, and continued to issue attorney opinion letters to Pink Sheets and transfer agents concerning the

adequacy of various issuers' publicly-filed financial information and to transfer agents concerning the legality of removing restrictive legends from stock certificates.

13. On April 21, 2010, Pink Sheets banned Jean-Pierre from rendering legal opinions, concluding that "the repeated missing information and inconsistencies in the issuer's disclosure make it obvious that you have not been performing the diligence necessary to continue writing such letters to Pink OTC Markets."

## OTHER RELEVANT ENTITY

14. Complete Legal was a Florida corporation incorporated by Jean-Pierre on May 3, 2010, and dissolved by Jean-Pierre on June 10, 2011. Complete Legal's principal place of business was El Paso, Texas and it purported to provide consulting legal services within the U.S. and abroad.

## FACTS

15. The Pink Sheets ban would have had a devastating impact on Jean-Pierre's law practice. Once Jean-Pierre was banned by Pink Sheets, transfer agents began refusing to accept attorney opinion letters by him concerning the legality of removing restrictive legends from stock certificates.

16. Consequently, around the time the Pink Sheet ban issued Jean-Pierre hatched a plan to continue issuing attorney opinion letters using a corporation called Complete Legal and his niece's identity. At the time, Jean-Pierre's niece was an attorney licensed to practice in Texas, and she was looking for work. Jean-Pierre told his niece about his work issuing attorney opinion letters and offered to pay her to assist him with this work.

17. Before they could begin, Jean-Pierre requested that they form a corporation and that his niece send him three copies of her signature and a copy of her driver's license that he said he needed for the formation of Complete Legal.

18. Jean-Pierre's niece complied with Jean-Pierre's requests, and on May 3, 2010, Jean-Pierre incorporated Complete Legal, sending his niece copies of the incorporation documents. But Jean-Pierre never requested that his niece do any legal work in connection with Complete Legal or otherwise, and his niece never received compensation for any legal work on behalf of Complete Legal.

19. After incorporating Complete Legal, Jean-Pierre used it and his niece's identity to continue his prior practice of issuing attorney opinion letters. Each of these letters contained fraudulent statements, including the false representation that his niece was the signatory. Although her signature appears at the bottom of these letters, Jean-Pierre's niece did not write them and had no communications with anyone concerning the representations made in them.

20. Each letter included contact information for Complete Legal that would make it difficult for recipients of the letter to contact his niece. For example, some letters listed a false address for Complete Legal that was a corrupted version of the address of his niece's post office box. Other letters list a post office box in Deerfield Beach, FL, close to where Jean-Pierre both worked and resided at the time.

21. In addition, the phone number often listed on the letters for Complete Legal belonged to an associate of Jean-Pierre's. Another phone number listed for Complete Legal on another of the letters was registered to Jean-Pierre himself. The domain name for the email address listed was registered to Jean-Pierre, and Jean-Pierre's niece had no access to that account.

5

### A. The Attorney Letter Agreements

22. Just days after incorporating Complete Legal, between Friday, May 7, 2010, and Tuesday, May 11, 2010, Jean-Pierre affixed his niece's signature to twelve attorney letter agreements concerning twelve separate issuers[1] and submitted them to Pink Sheets (the "Attorney Letter Agreements"). Each of these Attorney Letter Agreements bore a fax stamp indicating that they were transmitted from Jean-Pierre's law firm, Jean-Pierre & Jean-Pierre, LLC.

23. By fraudulently affixing his niece's signature to the Attorney Letter Agreements, Jean-Pierre made it appear to Pink Sheets that his niece represented, among other things, that she:

   a. Desire[d] to prepare, or assist in the preparation of, information that is posted on the OTC Disclosure and News Service by, or on behalf of," the issuer;

   b. Consent[ed] to the posting of a Letter prepared by [her] by or on behalf of the issuer from time to time through the OTC Disclosure and News Service";

   c. "That there [were] no legal or regulatory restrictions of any kind that would prohibit any such posting";

   d. Agreed to "notify Pink OTC Markets in the event that [she] cease[d] for any reason to provide such services for the Issuer that would call for the preparation of a Letter in connection with information published by the Issuer in connection with information published by the Issuer through the OTC Disclosure and News Service"; and

   e. Represented that "the document review and other duties required by The Guidelines for Letters with Respect to Adequate Current Information [had] been competently performed in connection with the preparation of each Letter posted through the OTC Disclosure and News Service; and that each Letter conforms to the Guidelines."

---

1    Please see Appendix A for a list of issuers.

24. Without these representations by a licensed and duly authorized attorney, Pink Sheets would not permit that attorney to post an attorney opinion letter on Pink Sheets on the issuer's behalf.

25. But Jean-Pierre's niece did not make any of these representations. Instead, Jean-Pierre fraudulently affixed his niece's signature to these letters without her knowledge or consent in order to make it appear that a licensed and duly authorized attorney was making these representations to Pink Sheets.

### B. The Adequate Current Information Letters

26. On May 7, 2010, Jean-Pierre affixed his niece's signature to attorney opinion letters for at least three issuers[2] (the "Adequate Current Information Letters") and submitted them to Pink Sheets for posting on Pink Sheets' website. Each of the Adequate Current Information Letters contained a series of representations purportedly made by Jean-Pierre's niece in support of the falsehood that a licensed and duly authorized attorney was issuing a valid opinion that the relevant issuer had "made adequate current information publicly available within the meaning of Rule 144(c)(2) under the Securities Act."

27. Specifically, the letters falsely represented, among other things, as follows:

   a. Jean-Pierre's niece was "retained by [the issuer] for the purpose of rendering this letter to ... [Pink Sheets]."

   b. Jean-Pierre's niece "consent[s] to having this letter posted by the Issuer, and to have it published, accompanying their disclosure in the Pink Sheets News Service."

   c. "In connection with rendering this opinion, [Jean-Pierre's niece] ha[s] investigated such matters and examined such documents as [she] deemed necessary."

---

2   Please see Appendix A for a list of issuers.

7

d. "Nothing came to [Jean-Pierre's niece's] attention during the course of [her] investigation that led [her] to conclude that any such documents were not genuine or authentic or that the facts set forth therein were not true."

e. Jean-Pierre's niece "viewed the information (the 'Information') filed by the Company on www.pinksheets.com."

f. Jean-Pierre's niece "ha[d] been in communication with ... the Company's transfer agent, and ha[d] confirmed the number of shares of the Issuer issued and outstanding ... is consistent with the corporate records of the Issuer."

g. Jean-Pierre's niece "personally met with management of the Issuer and a majority of the directors of the Issuer and reviewed the Information published by the Issuer on the Pink Sheets News Service and discussed the Information with management of the Issuer and a majority of the directors thereof."

h. Jean-Pierre's niece is "of the opinion that the Information (i) constitutes 'adequate current public information' concerning the Securities and the Issuer and 'is available' within the meaning of Rule 144(c)(2) under the [Securities] Act, (ii) includes all of the information that a broker-dealer would be required to obtain from the Issuer to publish a quotation for the Securities under Rule 15c2-11 under the Securities Exchange Act of 1934, (iii) complies as to form with the Pink Sheets Guidelines for providing Adequate Current Information."

28. Without these representations by a licensed and duly authorized attorney, Pink Sheets would not grant the issuer the improved status of being an "OTC Pink Current Information" issuer. Instead, the issuer would be tagged on Pink Sheets' website with a red "STOP" sign by its ticker symbol, the moniker of "OTC Pink No Information" and a large warning that, "[t]his company may not be making material information publicly available." In addition, adequate current public information with respect to an issuer must be available in order for certain selling security holders to comply with the Rule 144 [17 C.F.R. § 240.144] safe harbor which establishes several explicit ways to avoid falling into the expansive definition of statutory underwriter and therefore being precluded from qualifying for the exemption from registration codified in Section 4(1) of the Securities Act [15 U.S.C. § 77d(1)].

29. But Jean-Pierre's niece did not make any of these representations. Instead, Jean-Pierre fraudulently affixed his niece's signature to these letters in order to make it appear that a licensed and duly authorized attorney was making these representations.

### C. The Transfer Agent Letters

30. Between May 11, 2010, and April 28, 2011, Jean-Pierre also sent at least 111 attorney opinion letters falsely bearing his niece's signature on behalf of nine issuers[3] to transfer agents opining either that the restrictive legend should be removed from a pre-existing stock certificate or that a newly issued stock certificate should be issued without restrictive legend pursuant to either Rule 144 or Rule 504 of the Securities Act (collectively, the "Transfer Agent Letters"), at least 32 of which were sent to the relevant transfer agent from Jean-Pierre's email address.

31. Jean-Pierre issued the Transfer Agent Letters using his niece's name because, once he was banned by Pink Sheets, transfer agents would no longer accept attorney opinion letters from him. In fact, upon receipt of a Transfer Agent Letter from Jean-Pierre's email address penned in his niece's name, one transfer agent warned the issuer that Jean-Pierre was on the Pink Sheets Prohibited Attorneys List but noted that, because the attorney opinion letter was not written by him, they would agree to accept it nonetheless.

---

3    Please see Appendix B for a list of issuers.

9

32. Jean-Pierre sent at least 106 attorney opinion letters to transfer agents claiming compliance with the Rule 144 safe harbor. For example, Jean-Pierre sent attorney opinion letters to Cloud Centric Systems, Inc.'s transfer agent purporting to be from Complete Legal and purportedly signed by his niece dated September 14, 2010, and December 20, 2010, opining that newly issued shares of Cloud Centric should be represented by stock certificates without restrictive legends (collectively, the "Cloud Centric Letters"). In total, the Cloud Centric Letters resulted in the removal of restrictive legend from stock certificates representing 350 million shares of Cloud Centric stock.

33. The Transfer Agent Letters purported to be signed by his niece, reflected the name of no other licensed and duly authorized attorney, and states that "[w]e are admitted to practice law in the State of Texas," which Jean-Pierre's niece was, but Jean-Pierre was not. Thus, although the Transfer Agent Letters use the plural pronouns "we" and "our" as opposed to the singular "I" and "my" when describing the maker of the various representations within the letters, the representations within the Transfer Agent Letters are designed to appear that they were being made by Jean-Pierre's niece.

34. Each of the Cloud Centric Letters contained the following misrepresentations:

   a. Jean-Pierre's niece sent this letter to the issuer's transfer agent "pursuant to the request of [the Issuer]."

   b. "In [Jean-Pierre's niece's] opinion and based on the information and rationale set forth below, an exemption from registration regarding the aforementioned removal of the restrictive legend and sale in the marketplace is available under Rule 144 of the Act."

   c. Jean-Pierre's niece is "of the view that the Shareholder has met the applicable six-month holding period ... applicable to the Shares insofar as the Debt Holder and Shareholder cumulatively held the Indebtedness as of the Record Date."

    d. Jean-Pierre's niece "relied on representations of the representatives of the Company that from the date of its original incorporation to the date of this opinion, the Company has been and continues to be an operating entity...."

    e. Jean-Pierre's niece "understand[s] that (i) the Debt Holder is not now (or has ever been such at any time during the ninety (90) days preceding the date of this opinion) an affiliate or control person of the Company; and (ii) the Converted Shares represent less than ten percent (10%) of the total number of shares of the Company currently issued and outstanding."

35. One of these Transfer Agent Letters, a letter dated October 29, 2010, requested that the restrictive legend be removed from a certificate representing 1.6 million shares of US Farms, Inc. (OTC: USFM) issued to Jean-Pierre's law firm, Jean-Pierre & Jean-Pierre, LLC.

36. Jean-Pierre sent at least five attorney opinion letters to transfer agents purporting to be from Complete Legal and purportedly signed by his niece opining that newly issued shares should be represented by stock certificates without restrictive legends pursuant to Rule 504 of Regulation D. For example, on May 31, 2010, Jean-Pierre sent an attorney opinion letter to Shots Spirits Corporation's transfer agent purporting to be from Complete Legal and purportedly signed by his niece opining that 50 million newly issued shares of Shot Spirits should be represented by stock certificates without restrictive legends pursuant to Rule 504 of Regulation D (the "Shot Spirits 504 Letter").

37. The Shot Spirits 504 Letter contained the following misrepresentations:

    a. Jean-Pierre's niece sent this letter to the issuer's transfer agent "pursuant to the request of [the Issuer]."

    b. Jean-Pierre's niece "examined originals or copies, certified or otherwise identified to our satisfaction, of such certificates, corporate records or other documents, including the Subscription Agreement and the various representations of the parties therein. We have made inquiries of the Purchaser and officers of the Company with respect to the Subscription Agreement and the proposed issuance of the Shares, and we have made such examinations of law or fact as we have deemed necessary or appropriate for the purpose of this opinion."

11

    c. Jean-Pierre's niece is "of the opinion that: ... The Purchaser is (i) an accredited investor ...; and (ii) is purchasing the Shares for its own account and was not formed for the specific purpose of acquiring the Shares...."

    d. Jean-Pierre's niece is "of the opinion that: ... the Purchaser is not an affiliate or control person of the Company and the Shares, when issued, will be validly issued, fully paid and non-assessable."

    e. Jean-Pierre's niece is "of the opinion that: ...the Purchaser is not (i) the Issuer, (ii) an underwriter of the Issuer with respect to the Shares ... or (iii) an affiliate of the issuer ..., and the Shares may be issued without a restrictive legend and sold in a public market by the holder thereof without registration under the Securities Act."

    f. Jean-Pierre's niece "relied on information obtained from public officials, officers of the Company and other sources, and we represent that all such sources were believed to be reliable. We have relied upon the Company's assurances that it shall make reasonable inquiry to determine that the prospective Purchaser has a legitimate investment intent in purchasing the Shares, and the Purchaser's representations as to its net worth and investment intent."

38. Without these representations by a licensed and duly authorized attorney, the transfer agents would not have removed the restrictive legends from the stock certificates and the shares would not have been permitted to be sold in the public markets.

39. But Jean-Pierre's niece did not make any of these representations. Instead, Jean-Pierre fraudulently affixed his niece's signature to these letters without her knowledge or consent in order to make it appear that a licensed and duly authorized attorney was making these representations.

40. Jean-Pierre charged approximately $500 for each attorney opinion letter.

41. Jean-Pierre's niece never received any compensation from Jean-Pierre in connection with the issuance of the attorney opinion letters.

### D. Bar Complaints Lead to Complete Legal's Dissolution.

42. On March 27, 2011, a Texas state bar complaint was filed against Jean-Pierre's niece for filing fraudulent attorney opinion letters (the "TX Complaint"). A California state bar complaint followed based on the same facts (the "CA Complaint").

43. Both the TX and CA Complaints were dismissed in or around September 2011 upon Jean-Pierre's niece explaining that Jean-Pierre acted without her knowledge and consent. As part of defending herself against the TX and CA Complaints, Jean-Pierre's niece requested that Jean-Pierre dissolve Complete Legal. Jean-Pierre complied and dissolved Complete Legal on June 10, 2011.

44. On February 18, 2011, a Florida state bar grievance was filed against Jean-Pierre for filing fraudulent attorney opinion letters (the "FL Grievance"). The FL Grievance led to a Notice of Finding of Probable Cause for Further Disciplinary Proceedings being issued against Jean-Pierre on April 19, 2012. On or about October 10, 2012, the Florida state bar filed a complaint against Jean-Pierre with the Supreme Court of Florida.

### FIRST CLAIM FOR RELIEF

### Violation of Section 17(a) of the Securities Act

45. The Commission re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 44 of this Complaint.

46. By engaging in the acts and conduct alleged herein, Jean-Pierre has, directly or indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, in the offer or sale of securities issued by the Issuers has:

    a. Employed devices, schemes, and artifices to defraud;

13

 b. Obtained money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

 c. Engaged in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

47. By reason of the foregoing, Jean-Pierre, directly or indirectly, singly or in concert, has violated and unless enjoined will continue to violate Section 17(a) of the Securities Act [15 U.S.C § 77q(a)].

## SECOND CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) thereunder

48. The Commission re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 44 of this Complaint.

49. By engaging in the acts and conduct alleged herein, Jean-Pierre, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities issued by the Issuers, has:

 a. Employed devices, schemes, and artifices to defraud;

 b. Made untrue statements of material fact, or has omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

    c. Engaged in transactions, acts, practices, and courses of business which operated as a fraud or deceit.

50. By reason of the foregoing, Jean-Pierre, directly or indirectly, singly or in concert, has violated and unless enjoined will continue to violate Section 10(b) of the Exchange Act [15 U.S.C § 78j(b)] and Rule 10b-5 thereunder [C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

**WHEREFORE** the Commission respectfully requests that the Court grant the following relief:

### I.

A final judgment permanently restraining and enjoining Jean-Pierre, his agents, servants, employees, and attorneys, and all persons in active concert or participation with him who receive actual notice of the final judgment by personal service or otherwise, and each of them, from future violations of Sections 17(a) of the Securities Act [15 U.S.C § 77q(a)].

### II.

A final judgment permanently restraining and enjoining Jean-Pierre, his agents, servants, employees, and attorneys, and all persons in active concert or participation with him who receive actual notice of the final judgment by personal service or otherwise, and each of them, from future violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### III.

A final judgment ordering Jean-Pierre to disgorge his ill-gotten gains, plus prejudgment interest.

IV.

A final judgment ordering Jean-Pierre to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

V.

A final judgment enjoining and restraining Jean-Pierre from participating in the offering of any penny stock pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)].

VII.

Such other and further relief as the Court deems appropriate.

Dated: New York, New York
       December 6, 2012

                                              Respectfully submitted,

                                        By:   _____
                                              Andrew M. Calamari
                                              Regional Director
                                              Todd Brody (BrodyT@sec.gov)
                                              Barry Kamar (KamarB@sec.gov)
                                              Megan R. Genet (GenetM@sec.gov)
                                              Securities and Exchange Commission
                                              3 World Financial Center, Room 400
                                              New York, New York 10281-1022
                                              Telephone (212) 336-0080 (Todd Brody)

Of Counsel:   David Rosenfeld
              Steven G. Rawlings

## Appendix A

### List of Issuers for Which Jean-Pierre Submitted Attorney Letter Agreements With His Niece's Forged Signature

|     | Issuer Name | Ticker Symbol | Date submitted |
| --- | --- | --- | --- |
| 1.  | Cloud Centric Systems, Inc. | CLDR | 5/7/2010 |
| 2.  | Cannon Exploration, Inc. | CNEX | 5/10/2010 |
| 3.  | Centriforce Technology Corp. | CNFO | 5/7/2010 |
| 4.  | Connectyx Technologies Holdings Group, Inc. | CTYX | 5/10/2010 |
| 5.  | Golden Dragon Holdings, Inc. | GDHI | 5/10/2010 |
| 6.  | Green Bridge Industries, Inc. | GRBG | 5/11/2010 |
| 7.  | IJJ Corp. | IJJP | 5/11/2010 |
| 8.  | Kendall Square Research Corp. | KSQR | 5/7/2010 |
| 9.  | Real Paper Displays, Inc. | RPPR | 5/7/2010 |
| 10. | Shot Spirits Corp. | SSPT | 5/11/2010 |
| 11. | 3D Eye Solutions, Inc. | TDEY | 5/11/2010 |
| 12. | Therma-Med, Inc. | THRA | 5/10/2010 |

### List of Issuers for Which Jean-Pierre Submitted Adequate Current Information Letters With His Niece's Forged Signature

|     | Issuer Name | Ticker Symbol | Date Submitted |
| --- | --- | --- | --- |
| 1.  | Cloud Centric Systems, Inc. | CLDR | 5/7/2010 |
| 2.  | Kendall Square Research Corp. | KSQR | 5/7/2010 |
| 3.  | Real Paper Displays, Inc. | RPPR | 5/7/2010 |

## Appendix B
## List of Issuers for Which Jean-Pierre Submitted
## Attorney Opinion Letters With His Niece's Forged Signature

| Date Range | Issuer | # Letters | # Shares | # Emailed from Jean-Pierre's Email Address | AOL Type(s) |
|---|---|---|---|---|---|
| 9/13/10 | Apple Rush Co., Inc. | 1 | 40,000,000 | 1 | Rule 144 |
| 5/11/10 – 4/28/11 | Artfest International, Inc. | 71 | 69,243,164,790 | 29 | Rule 144 |
| 8/17/10 – 9/22/10 | Black Dragon Resource Companies | 8 | 3,010,000,000 | -- | Rule 144 |
| 8/10/10 – 11/24/10 | China Food Services | 7 | 327,000,000 | -- | Rules 144 & 504 |
| 9/14/10 – 12/20/10 | Cloud Centric, Inc. | 2 | 350,000,000 | 1 | Rule 144 |
| 5/14/10 | Emerging Healthcare Solutions, Inc. | 5 | 2,500,000 | -- | Rule 144 |
| 5/31/10 | Shot Spirits Corp. (a subsidiary of Cloud Centric, Inc.) | 1 | 50,000,000 | -- | Rule 504 |
| 8/13/10 – 1/19/11 | Tivus, Inc. | 12 | 20,500,000 | -- | Rule 144 |
| 9/30/10 – 12/2/10 | US Farms, Inc. | 4 | 3,766,278 | 1 | Rule 144 |
| **TOTALS** | | **111** | **73,046,931,068** | **32** | |

18