UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

GUY M. JEAN-PIERRE
(A/K/A MARCELO DOMINGUEZ DE GUERRA)

Defendant.

12-cv-8886 (LGS) (HBP)
ECF CASE

---

DECLARATION OF MEGAN R. GENET
IN SUPPORT OF PLAINTIFF
SECURITIES AND EXCHANGE COMMISSION'S
PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

I, Megan R. Genet, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1. I am a member of the bar of this Court and an attorney for Plaintiff Securities and Exchange Commission (the "Commission"). I make this Declaration in support of the Commission's proposed findings of fact and conclusions of law against defendant Guy M. Jean-Pierre a/k/a Marcelo Dominguez de Guerra ("Jean-Pierre").



GOVERNMENT
EXHIBIT
7
17-cr-00008-WJM

2. Attached to this Declaration are the following exhibits, each of which is a true and correct copy of the document described:

| Exhibit Number | Description |
| --- | --- |
| A | Docket for this action (as of March 12, 2014) |
| B | Summons & Complaint filed in this action (December 6, 2012) and Affidavit of Service thereof (March 13, 2013) |
| C | Investigative Testimony Transcript of Jean-Pierre In the Matter of Alternative Green Technologies, Inc., pp. 69, 87-89 (NY-8142) (October 18, 2011) |
| D | Order on the Florida Bar's Motion for Default, No. SC12-2727 (Fl. Supr. Ct. Sept. 6, 2013) |
| E | Certificate of Default filed in this action (March 13, 2013) |
| F | 12 Attorney Letter Agreements Jean-Pierre submitted to Pink Sheets with Dinwoodie's forged signature |
| G | 109 Attorney Opinion Letters Jean-Pierre issued for submission to transfer agents opining that the restricted legends could lawfully be removed from certificates representing more than seventy-three million shares with Dinwoodie's forged signature |
| H | 3 Adequate Current Information Letters Jean-Pierre submitted to Pink Sheets for posting on Pink Sheets' website with Dinwoodie's forged signature |

## FACTS

**Procedural History**

3. The Commission commenced this action on December 6, 2012. (Exhibit A.) On December 13, 2013, the Commission personally served Jean-Pierre with the summons and complaint in this action (the "Complaint"), as well as a copy of the Southern District of New York's Electronic Case Filing Rules & Instructions. (Exhibits A, B.) The summons notified Jean-Pierre that failure to timely answer the Complaint will result in entry of a default judgment. (Exhibit B.)

2

4. Since service was effected, Jean-Pierre has made no attempt to respond to the Commission's complaint or address this Court. At the request of the Commission, the Clerk of the Court entered a Certificate of Default as to Jean-Pierre on March 13, 2013. (Exhibit E.) Jean-Pierre still failed to respond. On May 13, 2013, Judge Schofield issued an Order for Initial Pretrial Conference setting an initial conference date for June 28, 2013. (Exhibit A.) Not only did Jean-Pierre continue in his failure to respond to the Complaint but he also failed to appear before the Court for the ordered initial conference. On November 4, 2013, Judge Schofield issued an Order to Show Cause for Plaintiff Securities and Exchange Commission's Motion for a Default Judgment with a return date of December 19, 2013 at 11:15a.m. (Exhibit A.) Once again, Jean-Pierre failed to respond to the Complaint or appear before the Court, as ordered.

5. Jean-Pierre's non-response is particularly egregious in light of his background. As alleged in the complaint, Jean-Pierre earned his law degree from Columbia Law School in 1985 and was admitted to the bar in the states of New York, California, and Florida.[1] (Exhibit B ¶¶ 9-10.) From 1985 through 1990, Jean-Pierre worked as a corporate and securities associate at two well-established law firms. (Exhibit B ¶ 10.) Thereafter, Jean-Pierre spent the years 1991 through 1995 working for the Federal Deposit Insurance Corporation. (Id.)

**The Complaint's Uncontested Allegations and Underlying Evidence Concerning Damages**

6. From 2004 through April 2010, Jean-Pierre earned his living issuing attorney letters to Pink OTC Markets Inc. ("Pink Sheets") (now named OTC Markets Group Inc.) and transfer agents concerning the adequacy of various issuers' publicly-filed financial information

---

[1] At the time of filing, Jean-Pierre was delinquent in his New York and California bar memberships but an active member of the Florida bar. (Exhibit B ¶ 10.) Since then, in or around August 2013, Jean-Pierre was disbarred by the Florida Bar. (Exhibit D.)

and to transfer agents concerning the legality of removing restrictive legends from stock certificates. (Exhibit B ¶¶ 11-12.)

7. On April 21, 2010, Pink Sheets banned Jean-Pierre from rendering attorney opinion letters concluding that "the repeated missing information and inconsistencies in the issuer's disclosure make it obvious that you have not been performing the diligence necessary to continue writing such letters to Pink OTC Markets." (Exhibit B ¶ 13.) This ban would have had a devastating impact on Jean-Pierre's law practice, causing both Pink Sheets and transfer agents to refuse to accept attorney opinion letters from him. (Exhibit B ¶ 14.)

8. Within two weeks of the Pink Sheets ban, Jean-Pierre convinced his niece, an attorney licensed in the states of California (inactive) and Texas (active), to provide him with three copies of her signature, a copy of her driver's license, and acquiescence in forming a company called Complete Legal Solutions, LLC ("Complete Legal"). (Exhibit B ¶ 2.)

9. Once Jean-Pierre formed Complete Legal, he began issuing various types of attorney letters under its letterhead on behalf of at least nineteen companies that traded publicly on Pink Sheets, falsely bearing his niece's signature. (Exhibit B ¶¶ 3, 22, 26, 30.) Altogether, Jean-Pierre issued at least 124 attorney letters falsely bearing his niece's signature. (Id.) Jean-Pierre did not stop until April 2011, when his niece informed him that she was the subject of a bar complaint in connection with a subset of the attorney opinion letters he had issued using her name. (Exhibit B ¶ 3.) Each of these letters contained fraudulent statements, including the false representation that his niece was the signatory. (Exhibit B ¶ 19.) Although her signature appears at the bottom of these letters, Jean-Pierre's niece did not write them and had no communication with anyone concerning the representations made in them. (Exhibit B ¶ 19.)

4

10. Each letter included contact information for Complete Legal that would make it difficult for recipients of the letter to contact his niece. (Exhibit B ¶ 20.) For example, some letters listed a false address for Complete Legal that was a corrupted version of the address of his niece's post office box. (Id.) Other letters listed a post office box in Deerfield Beach, FL, close to where Jean-Pierre both worked and resided at the time. (Id.) In addition, the phone number often listed on the letters for Complete Legal belonged to an associate of Jean-Pierre's. (Exhibit B ¶ 21.) Another phone number listed for Complete Legal on other of the letters was registered to Jean-Pierre himself. (Id.) The domain name for the email address listed was registered to Jean-Pierre, and Jean-Pierre's niece had no access to that account. (Id.)

11. Between Friday, May 7, 2010, and Tuesday, May 11, 2010, Jean-Pierre affixed his niece's signature to twelve attorney letter agreements concerning twelve separate issuers and submitted them to Pink Sheets (the "Attorney Letter Agreements"). (Exhibits B ¶ 22 and F.) Without these representations by a licensed and duly authorized attorney, Pink Sheets would not permit that attorney to post an attorney opinion letter on Pink Sheets on the issuer's behalf. (Exhibit B ¶ 24.) But Jean-Pierre's niece did not make any of these representations. (Exhibit B ¶ 25.) Instead, Jean-Pierre fraudulently affixed his niece's signature to these letters without her knowledge or consent in order to make it appear that a licensed and duly authorized attorney was making these representations to Pink Sheets. (Id.)

12. On May 7, 2010, Jean-Pierre affixed his niece's signature to attorney opinion letters for at least three issuers (the "Adequate Current Information Letters") and submitted them to Pink Sheets for posting on Pink Sheets' website. (Exhibit B ¶ 26 and H.) Each of the Adequate Current Information Letters contained a series of representations purportedly made by Jean-Pierre's niece in support of the falsehood that a licensed and duly authorized attorney was

5

issuing a valid opinion that the relevant issuer had "made adequate current information publicly available within the meaning of Rule 144(c)(2) under the Securities Act." (Id.) Without these representations by a licensed and duly authorized attorney, Pink Sheets would not grant the issuer the improved status of being an "OTC Pink Current Information" issuer. (Exhibit B ¶ 28.) Instead, the issuer would be tagged on Pink Sheets' website with a red "STOP" sign by its ticker symbol, the moniker of "OTC Pink No Information" and a large warning that, "[t]his company may not be making material information publicly available." (Id.) In addition, adequate current public information with respect to an issuer must be available in order for certain selling security holders to comply with the Rule 144 [17 C.F.R. § 240.144] safe harbor which establishes several explicit ways to avoid falling into the expansive definition of statutory underwriter and therefore being precluded from qualifying for the exemption from registration codified in Section 4(1) of the Securities Act [15 U.S.C. § 77d(1)]. (Id.) But Jean-Pierre's niece did not make any of these representations. Instead, Jean-Pierre fraudulently affixed his niece's signature to these letters in order to make it appear that a licensed and duly authorized attorney was making these representations. (Exhibit B ¶ 29.)

    13.    Between May 11, 2010, and April 28, 2011, Jean-Pierre also sent at least 109 attorney opinion letters falsely bearing his niece's signature on behalf of nine issuers to transfer agents opining either that the restrictive legend should be removed from a pre-existing stock certificate or that a newly issued stock certificate should be issued without restrictive legend pursuant to either Rule 144 or Rule 504 of the Securities Act (collectively, the "Transfer Agent Letters"). (Exhibit B ¶ 30.) Jean-Pierre issued the Transfer Agent Letters using his niece's name because, once he was banned by Pink Sheets, transfer agents would no longer accept attorney opinion letters from him. (Exhibit B ¶ 31.) In fact, upon receipt of a Transfer Agent Letter from

Jean-Pierre's email address penned in his niece's name, one transfer agent warned the issuer that Jean-Pierre was on the Pink Sheets Prohibited Attorneys List but noted that, because the attorney opinion letter was not written by him, they would agree to accept it nonetheless. (Id.) Without these representations by a licensed and duly authorized attorney, the transfer agents would not have removed the restrictive legends from the stock certificates and the shares would not have been permitted to be sold in the public markets. (Exhibit B ¶ 38.) But Jean-Pierre's niece did not make any of these representations. (Exhibit B ¶ 39.) Instead, Jean-Pierre fraudulently affixed his niece's signature to these letters without her knowledge or consent in order to make it appear that a licensed and duly authorized attorney was making these representations. (Id.)

14. One of these Transfer Agent Letters, a letter dated October 29, 2010, requested that the restrictive legend be removed from a certificate representing 1.6 million shares of US Farms, Inc. (OTC: USFM) issued to Jean-Pierre's law firm, Jean-Pierre & Jean-Pierre, LLC. (Exhibit B ¶ 35.)

15. Jean-Pierre testified that he charged $500-$750 for each attorney letter. (Exhibit B ¶ 40; Exhibit C pp. 69 line 6-11, 87 line 20 – 88 line 6, 89 line 3-13.) Jean-Pierre's niece never received any compensation from Jean-Pierre in connection with the issuance of the attorney opinion letters. (Exhibit B ¶ 41.)

16. Jean-Pierre's conduct stopped only after two state bar complaints were filed against Jean-Pierre's niece for filing fraudulent attorney opinion letters (the "Bar Complaints"). (Exhibit B ¶ 42.) Both Bar Complaints were dismissed in or around September 2011 upon Jean-Pierre's niece explaining that Jean-Pierre acted without her knowledge and consent. (Exhibit B ¶ 43.)

17.  On February 18, 2011, a Florida state bar grievance was filed against Jean-Pierre for filing fraudulent attorney opinion letters (the "FL Grievance"). (Exhibit B ¶ 44.) The FL Grievance led to a Notice of Finding of Probable Cause for Further Disciplinary Proceedings being issued against Jean-Pierre on April 19, 2012. (Id.) On or about October 10, 2012, the Florida state bar filed a complaint against Jean-Pierre with the Supreme Court of Florida. (Id.) In or around August 2013, Jean-Pierre was disbarred by the Florida Supreme Court. (Exhibit D.)

## LAW

**Jean-Pierre Violated Section 17(a) of the Securities Act and**
**Section 10(b) of the Exchange Act and Rule 10b-5 thereunder**

18.  To state a claim under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder, the SEC must allege that a defendant (1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device, or engaged in any deceptive act, practice, or course of business; (2) with scienter; (3) in connection with the purchase or sale of securities. To state a claim under Section 17(a) of the Securities Act of 1933 ("Securities Act"), the SEC must allege that a defendant (1) obtained money or property by means of a material misrepresentation or a material omission as to which he had a duty to speak, or employed any device, scheme, or artifice to defraud, or engaged in any transaction, practice, or course of business which operates deceptive act, practice, or course of business; (2) in the offer or sale of securities. Section 17(a)(2) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder create liability for a material misrepresentation or omission while Section 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder create what courts call "scheme liability" for those who, with scienter, engage in deceitful conduct. See SEC v. Lee,

720 F. Supp. 2d 305, 334 (S.D.N.Y. 2010); U.S. v. Finnerty, 533 F.3d 143, 148 (2d Cir. 2008). Under Rule 10b-5(b), "the maker of the statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." Janus Capital Group, Inc. v. First Derivative Traders, 131 S. Ct. 2296, 2302 (2011).

19. Jean-Pierre's conduct constitutes fraud under both the misrepresentation and scheme liability theories. By falsely affixing his niece's name to the Attorney Letter Agreements, Adequate Current Information Letters, and Transfer Agent Letters, and submitting them to Pink Sheets and various transfer agents, Jean-Pierre misrepresented who was signing the letters and who was making the representations contained in them and thereby violated Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder. SEC v. Greenstone Holdings, Inc., 2012 WL 1038570, at *5-6 (S.D.N.Y. Mar. 28, 2012) (deeming misstatements in attorney opinion letters to be an appropriate predicate for liability under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder). Jean-Pierre was the "maker of the statement[s]" within the letters because it was he who had the "ultimate authority" over the statements included within the letter. Janus Capital Group, 131 S. Ct. at 2302. Likewise, by falsely affixing his niece's names to the Transfer Agent Letters and submitting them to various transfer agents, Jean-Pierre misrepresented who was signing the letters and making representations contained in them and thereby violated Section 17(a)(2) of the Securities Act.

20. Additionally, Jean-Pierre's use of Complete Legal and his niece's signatures were part of a fraudulent scheme whereby he employed fraudulent devices – the forged Attorney Letter Agreements, Adequate Current Information Letters, and Transfer Agent Letters – to defraud in contravention of Section 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder in an effort to circumvent the ban

imposed upon him by the Pink Sheets. Cohen v. Prudential-Bache Secs., Inc., 713 F.Supp. 653, 662 (S.D.N.Y. 1989).

**Damage Calculations Under the Default Judgment Standard**

21. Jean-Pierre has not responded to the Complaint after the Commission properly served him on December 13, 2013. (Exhibit A.) Jean-Pierre also failed to appear for the Court's ordered initial pretrial conference date. (Id.) Consequently he has defaulted in this action. (Exhibits A, E.) Jean-Pierre's default is more egregious because he is an attorney who was previously admitted to the bars of three states. (Exhibit B ¶ 9.)

22. Where, as here, a "party fails to respond [to an action] ... the court is ordinarily justified in entering a judgment against the defaulting party." Bermudez v. Reid, 733 F.2d 18, 21 (2d Cir. 1984). Upon a defendant's default, the Court should "accept[] as true all of the factual allegations of the complaint, except those relating to damages." Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981); Schwartz-Liebman Textiles v. Last Exit Corp., 815 F. Supp. 106, 107 (S.D.N.Y. 1992) ("A default judgment entered on well-pleaded allegations of a complaint establishes a defendant's liability").

23. "[T]he quantum of damages remains to be established by proof unless the amount is liquidated or susceptible of mathematical computation." Flaks v. Koegel, 504 F.2d 702, 707 (2d Cir. 1974). The Court does not need to make this determination through a hearing. Adkins v. Teseo, 180 F. Supp. 2d 15, 17 (D.D.C. 2001). Instead, it "may rely on detailed affidavits or documentary evidence to determine the appropriate sum." Id. The Commission is "entitled to all reasonable inferences from the evidence offered." Au Bon Pain Corp., 653 F.2d at 65.

**Disgorgement by Jean-Pierre**

24. The Commission seeks a total of $61,500 in disgorgement, which constitutes the

proceeds that Jean-Pierre received from the issuance of the 124 attorney letters attached hereto. (Exhibits F, G, H.)

25. The "primary purpose of disgorgement as a remedy for violation of the securities laws is to deprive violators of their ill-gotten gains, thereby effectuating the deterrence objectives of those laws." SEC v. First Jersey Secs., Inc., 101 F.3d 1450, 1474 (2d Cir. 1996). A district court has broad discretion not only in determining whether to order disgorgement, but also in calculating the amount to be disgorged. Id. at 1474-75. Further, the Commission is not required to establish with certainty the amount to be disgorged; rather, the Commission's burden is to come forward with a "reasonable approximation of profits causally connected to the violation." SEC v. First Jersey Secs., Inc., 890 F.Supp. 1185, 1211 (S.D.N.Y. 1995), rev'd on other grounds, 101 F.3d 1450 (2d Cir. 1996); SEC v. First City Fin. Corp., 890 F.2d 1215, 1231 (D.C. Cir. 1989). "[D]isgorgement need only be a reasonable approximation of profits causally connected to the violation. So long as the measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created the uncertainty." SEC v. Warde, 151 F.3d 42, 50 (2d Cir. 1998).

26. Here, Jean-Pierre issued at least 124 attorney letters to which he affixed his niece's signature. (Exhibits F, G.) Jean-Pierre testified that he charged $500-$750 for each attorney letter. (Exhibit B ¶ 40; Exhibit C pp. 69 line 6-11, 87 line 20 – 88 line 6, 89 line 3-13.) Assuming Jean-Pierre received $500 for each of the attorney letters, his total profits would equal at least $61,500. No amount of these monies sought has been paid.

**Prejudgment Interest**

27. The Commission is generally entitled to prejudgment interest on any disgorgement amount awarded. The Court has discretion as to whether to grant prejudgment

11

interest, and the appropriate interest rate thereon. See First Jersey, 101 F.3d at 1476. In deciding whether an award of prejudgment interest is warranted, a court should consider (i) the need to fully compensate the wronged party for actual damages suffered, (ii) fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court. Id. In an enforcement action brought by a regulatory agency, the remedial purpose of the statute takes on special importance:

> When the SEC itself orders disgorgement, which as discussed above is designed to strip a wrongdoer of its unlawful gains, the interest rate it imposes is generally the IRS underpayment rate .... That rate reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from its fraud.

Id. (internal citations omitted). Accordingly, the Commission respectfully requests that the Court award it prejudgment interest on the total disgorgement amount of $61,500. As of March 12, 2014, prejudgment interest on this amount is $5,713.80.

**Civil Monetary Penalty**

28.   "[B]ecause disgorgement represents merely a return of ill-gotten gains," courts recognize that "an additional monetary penalty is necessary to appropriately punish and deter ... fraudulent activities." SEC v. Forest Res. Mgmt. Corp., No. 09 Civ. 0903, 2010 WL 2077202, at *2 (S.D.N.Y. May 18, 2010). Factors for the Court to consider when determining whether to impose a civil penalty on a defendant include, among other things, '(1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; and (4) whether the defendant's conduct was isolated or recurrent.'" Id. at *2.

29.   Jean-Pierre's conduct warrants the maximum penalty. He intentionally affixed his niece's signature to attorney letters in an effort to evade the Pink Sheets ban against him.

This conduct was deliberate and recurring, causing, among other things, the removal of the restricted legends from stock certificates representing in excess of 73 billion shares.

30. Section 20(d) of the Securities Act, 15 U.S.C. §§ 77t(d)(2)(C), and Section 21(d) of the Exchange Act, 78u(d)(3)(B)(iii), authorize civil penalties for each violation in an amount ranging up to $7,500 (first tier), $75,000 (second tier), and $150,000 (third tier) against a natural person for violations occurring during the time period at issue. 15 U.S.C. §§ 77t(d), 78u(d); 17 C.F.R. § 201.1004. Alternatively, civil penalties for each violation can equal the defendant's gross pecuniary gain as a result of the violation. Third tier penalties are appropriate for violations of any provision of the Securities Act and Exchange Act that involves "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and where the violations also resulted in "substantial losses" or created a significant risk to other persons. Id. The facts support the imposition of third-tier penalties against Jean-Pierre.

31. In interpreting the statutory language "for each such violation" some courts look at how many fraudulent acts were committed by the defendant. Thus, in SEC v. Pentagon Capital Mgmt. PLC, 725 F.3d 279, 288 fn.7 (2nd Cir. 2013), the court calculated penalties by counting each late trade as a separate violation. And in SEC v. Elliot, 2012 U.S. Dist. LEXIS 832992, at *27-30 (S.D.N.Y. June 12, 2012), the court counted each transaction in unregistered securities. By this approach, the civil penalties could be up to 124 times $150,000, as each of the 124 attorney letters Jean-Pierre issued constituted a separate violation of the securities laws. Alternatively, the civil penalties could be 19 times $150,000 representing the 19 companies for whom Jean-Pierre drafted attorney letters.

32. Other courts hold that a defendant can receive a penalty for each statutory violation. One case where this method was recently clarified is SEC v. Murray, 2013 U.S. Dist.

LEXIS 32460, at *14-15 (E.D.N.Y. Mar. 6, 2013) (adopting SEC v. Ehrenkrantz King Nussbaum, Inc., 2013 U.S. Dist. LEXIS 32461 (E.D.N.Y. Feb. 14, 2013). Under this theory, because the SEC brought two statutory claims against Jean-Pierre (Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder), the Court can penalize him by twice the statutory amount. Under this theory, the Court could impose a two-time penalty against him.

33.  Finally, in SEC v. Glantz, 2009 U.S. Dist. LEXIS 95350 (S.D.N.Y. Oct. 12, 2009), the court multiplied the penalty by the number of victims. Similarly, in SEC v. Milan Capital Group, Inc., 2001 U.S. Dist. LEXIS 11804, at *8-9 (S.D.N.Y. Aug. 14, 2001), the court multiplied the penalty by each of the 200 defrauded investors. While the number of investors who were harmed by the fraudulent letters cannot be calculated, the Court could find that the 19 companies that hired Complete Legal were harmed by his actions. Under this theory, the Court could penalize Jean-Pierre 19 times $150,000.

**Permanent Prohibition from Penny Stock Offerings**

34.  In injunctive proceedings, the district court is authorized by statute to order a permanent penny stock bar "against any person participating in, or, at the time of the alleged misconduct, who was participating in, an offering of penny stock." 15 U.S.C. § 77t(g) (2010). The attorney letters Jean-Pierre drafted related to nineteen companies, all of which were "penny stocks" within the meaning of the Exchange Act since they did not sell at or above five dollars per share and had average revenue of less than $6 million, and net tangible assets of under $2 million. 15 U.S.C. § 78c(51)(A); 17 C.F.R. § 240.3a51-1. (Exhibit B Appendices A-B.) The standard for imposing a penny stock bar essentially mirrors that for imposing an officer-or-director bar. SEC v. Universal Exp., Inc., 475 F. Supp. 2d 412, 429 (S.D.N.Y. 2007). These

factors include: (1) the egregiousness of the underlying securities law violation; (2) the defendant's repeat offender status; (3) the defendant's role or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur.

35. As discussed above, <u>supra</u> pp. 6-20, Jean-Pierre constructed the scheme to make it appear that a duly licensed attorney was issuing attorney letters when in reality it was he who issued those letters in contravention of the Pink Sheets ban against him doing so. Jean-Pierre had a high level of scienter, offended repeatedly in the face of the ban against him, used his position as an attorney and a family member to gain the ability to use his niece's identity, and received all of the proceeds of the fraud. Plus, Jean-Pierre has given every indication that his conduct would recur were he to have the opportunity. These factors all weigh in favor of this Court granting a permanent penny stock bar against him.

Dated: March 12, 2014

            By:   /s/ Megan R. Genet
                  Megan R. Genet
                  Attorney for Plaintiff
                  SECURITIES AND EXCHANGE COMMISSION
                  3 World Financial Center
                  New York, NY 10281-1022
                  (212) 336-0182