UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X

SECURITIES AND EXCHANGE           :
COMMISSION,
                                  :
                    Plaintiff,         12 Civ. 8886 (LGS)(HBP)
                                  :
     -against-                         REPORT AND
                                  :    RECOMMENDATION
GUY M. JEAN-PIERRE, a/k/a
"Marcelo Dominguez de Guerra,"    :

                    Defendant.    :

------------------------------------X


          PITMAN, United States Magistrate Judge:


          TO THE HONORABLE LORNA G. SCHOFIELD, United States

District Judge,


I.   Introduction


          On December 19, 2013, the Honorable Lorna G. Schofield,

United States District Judge, referred this matter to me to

conduct an inquest concerning the SEC's damages in connection

with its claim against Defendant Guy M. Jean-Pierre, a/k/a

"Marcelo Dominguez de Guerra" (Docket Item 13).  The inquest was

ordered as a result of Jean-Pierre's failure to respond to Judge

Schofield's Order to show cause why a default judgment should not

be entered as a result of Jean-Pierre's failure to answer or move

with respect to the complaint in this matter (Docket Item 12).


GOVERNMENT
EXHIBIT
8
1 7-cr-00008-WJM

Pursuant to the Order of Reference, I issued a Scheduling Order on January 9, 2014, directing the SEC to serve and file proposed findings of fact and conclusions of law, along with evidentiary materials supporting its claim for damages, by March 10, 2014 (Docket Item 14 at ¶ 1). My January 9, 2014 Scheduling Order further directed Jean-Pierre to submit responsive materials by April 10, 2014. Specifically, my Order provided:

> Defendant shall submit his response to Plaintiff's submission, if any, no later than April 10, 2014. IF DEFENDANT (1) FAILS TO RESPOND TO PLAINTIFF'S SUBMISSIONS, OR (2) FAILS TO CONTACT MY CHAMBERS BY APRIL 10, 2014 AND REQUEST AN IN-COURT HEARING, IT IS MY INTENTION TO ISSUE A REPORT AND RECOMMENDATION CONCERNING DAMAGES ON THE BASIS OF PLAINTIFF'S WRITTEN SUBMISSIONS ALONE WITHOUT AN IN-COURT HEARING. See Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105, 111 (2d Cir. 1997); Fustok v. ContiCommodity Services Inc., 873 F.2d 38, 40 (2d Cir. 1989) ("[I]t [is] not necessary for the District Court to hold a hearing, as long as it ensured that there was a basis for the damages specified in a default judgment.").

(Docket Item 14 at ¶ 2) (emphasis in original).

On or about March 12, 2014, the SEC filed its proposed findings of fact and conclusions of law, along with supporting affidavits and exhibits (Docket Item 15). To date, I have received nothing from Jean-Pierre, nor has Jean-Pierre contacted my chambers in any way to request additional time or to request an in-court hearing.

Accordingly, on the basis of the Complaint and the SEC's submissions, I respectfully recommend that the your Honor make the following findings of fact and conclusions of law.

## II. Findings of Fact

1. Jean-Pierre earned his law degree from Columbia Law School in 1985 and was admitted to the bar in the states of New York, California and Florida (Complaint, dated Dec. 6, 2012 (Docket Item 1) ("Compl.") ¶¶ 9-10;[1] Declaration of Megan R. Genet in Support of Plaintiff Securities and Exchange Commission's Proposed Findings of Fact and Conclusions of Law, dated March 12, 2013 (Docket Item 15) ("Genet Decl.") ¶ 5). From 1985 through 1990, Jean-Pierre worked as a corporate and securities associate at two well-established law firms (Compl. ¶ 10; Genet Decl. ¶ 5). Thereafter, Jean-Pierre worked for the Federal Deposit Insurance Corporation from 1991 through 1995 (Compl. ¶ 10; Genet Decl. ¶ 5).

---

[1]Because defendant has defaulted, all the allegations of the Complaint, except as to the amount of damages, are taken as true. Bambu Sales, Inc. v. Ozak Trading Inc., 58 F.3d 849, 854 (2d Cir. 1995); Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992); Trans World Airlines, Inc. v. Hughes, 449 F.2d 51, 70 (2d Cir. 1971), rev'd on other grounds, 409 U.S. 363 (1973); Wing v. East River Chinese Rest., 884 F. Supp. 663, 669 (E.D.N.Y. 1995); Deshmukh v. Cook, 630 F. Supp. 956, 959 (S.D.N.Y. 1986) (Conner, D.J.).

2.   From 2004 through 2010, Jean-Pierre earned his living issuing attorney opinion letters to Pink OTC Markets Inc., ("Pink Sheets"), now known as OTC Markets Group Inc., and to transfer agents concerning the adequacy of various issuers' publicly filed financial information and by issuing attorney opinion letters to transfer agents concerning the legality of removing restrictive legends from stock certificates.   From 2004 through 2007, Jean-Pierre worked for a Florida-based firm where he wrote more than fifty attorney opinion letters addressing the legality of removing restrictive legends from stock certificates (Compl. ¶¶ 11-12; Genet Decl. ¶ 6).

3.   On April 21, 2010, Pink Sheets banned Jean-Pierre from issuing attorney opinion letters, finding that "the repeated missing information and inconsistencies in the issuer's disclo- sure make it obvious that [Jean-Pierre has] not been performing the diligence necessary to continue writing such letters to Pink OTC Markets" (Compl. ¶ 13; Genet Decl. ¶ 7).   This ban necessar- ily had a serious impact on Jean-Pierre's law practice; as a result of this ban, neither Pink Sheets nor transfer agents would accept attorney opinion letters authored by Jean-Pierre (Compl. ¶ 15; Genet Decl. ¶ 7).

4.   Within two weeks of the issuance of Pink Sheets' ban, Jean-Pierre convinced his niece, an attorney admitted to

4

practice in California and Texas, to agree to the formation of a company called Complete Legal Solutions, LLC ("Complete Legal") and to provide him with three copies of her signature and a copy of her driver's license (Compl. ¶ 2; Genet Decl. ¶ 8).

   5. Once Jean-Pierre formed Complete Legal, he began issuing various types of attorney letters on its letterhead on behalf of at least nineteen companies that traded publicly on Pink Sheets; all of the letters falsely bore copies of Jean-Pierre's niece's signature which had been affixed to the letters without her knowledge or consent (Compl. ¶¶ 3, 22, 26 & 30; Genet Decl. ¶ 9). Jean-Pierre never requested that his niece actually perform any legal work in connection with Complete Legal and she never received any compensation for performing any legal work for Complete Legal (Compl. ¶ 18). In total, Jean-Pierre issued at least 124 attorney letters falsely bearing his niece's signature (Compl. ¶¶ 3, 22, 26 & 30; Genet Decl. ¶ 9). Jean-Pierre did not stop issuing such letters until April 2011 when his niece in-formed him that a bar complaint had been filed against her in connection with some of the attorney opinion letters he had falsely issued in her name (Compl. ¶ 3; Genet Decl. ¶ 9). Each of these letters contained fraudulent statements, including the false representation that Jean-Pierre's niece was the signatory (Compl. ¶ 19; Genet Decl. ¶ 9). Although a facsimile of Jean-

Pierre's niece's signature does appear at the foot of these letters, she did not write them and had no communication with anyone concerning the representations made in the letters (Compl. ¶ 19; Genet Decl. ¶ 9).

6.   The fraudulent letters issued by Jean-Pierre included contact information for Complete Legal that was apparently designed to make it difficult for recipients to contact Jean-Pierre's niece (Compl. ¶ 20; Genet Decl. ¶ 10).  For example, some letters provided a false address for Complete Legal that was a corrupted version of the niece's post-office box (Compl. ¶ 20; Genet Decl. ¶ 10).  Other letters listed a post office box in Deerfield Beach, Florida, close to what was then Jean-Pierre's residence and office (Compl. ¶ 20; Genet Decl. ¶ 10).  In addition, the telephone number provided for Complete Legal in many of the letters belonged to an associate of Jean-Pierre (Compl. ¶ 21; Genet Decl. ¶ 10).  Other letters provided a telephone number for Complete Legal that was registered to Jean-Pierre himself (Compl. ¶ 21; Genet Decl. ¶ 10).  The domain name for the email address listed was registered to Jean-Pierre, and Jean-Pierre's niece had no access to the email account (Compl. ¶ 21; Genet Decl. ¶ 10).

7.   Between Friday, May 7, 2010 and Tuesday, May 11, 2010, Jean-Pierre drafted twelve attorney letter agreements

concerning twelve separate issuers and submitted them to Pink Sheets (the "Attorney Letter Agreements"); each of these letter Agreements bore a facsimile of Jean-Pierre's niece's signature (Compl. ¶ 22; Genet Decl. ¶ 11 & Ex. F thereto).  Without the representations in the Attorney Letter Agreements by a licensed attorney, Pink Sheets would not permit that attorney to post an attorney opinion letter on Pink Sheets on an issuer's behalf (Compl. ¶ 24; Genet Decl. ¶ 11).  In truth and in fact, Jean-Pierre's niece did not author or make any of the representations contained in the Attorney Letter Agreements (Compl. ¶ 25; Genet Decl. ¶ 11).  Instead, Jean-Pierre fraudulently affixed a facsimile of his niece's signature to these letters without her knowledge or consent in order to make it appear that a licensed attorney other than Jean-Pierre himself was making the representations to Pink Sheets (Compl. ¶ 25; Genet Decl. ¶ 11).

8.   Among other things, the Attorney Letter Agreements misrepresented that:

a.   Jean-Pierre's niece desired to prepare, or assist in the preparation of, information that is posted on the OTC Disclosure and News Service by, or on behalf of, the issuer;

b.   Jean-Pierre's niece consented to the posting of a Letter prepared by her by or on behalf of the issuer from time to time through the OTC Disclosure and News Service;

7

      c.   "That there were no legal or regulatory restric-
tions of any kind that would prohibit any such
posting;"

      d.   Jean-Pierre's niece agreed to "notify Pink OTC
Markets in the event that [she] cease[d] for any
reason to provide such services for the Issuer
that would call for the preparation of a Letter in
connection with information published by the Is-
suer in connection with information published by
the Issuer through the OTC Disclosure and News
Service" and

      e.   Jean-Pierre's niece stated that "the document
review and other duties required by The Guidelines
for Letters with Respect to Adequate Current In-
formation had been competently performed in con-
nection with the preparation of each Letter posted
through the OTC Disclosure and News Service; and
that each Letter conforms to the Guidelines."

(Compl. ¶ 23)

      9.  On May 7, 2010, Jean-Pierre affixed a facsimile of
his niece's signature to attorney opinion letters for at least
three issuers (the "Adequate Current Information Letters") and
submitted them to Pink Sheets for posting on Pink Sheets' website
(Compl. ¶ 26; Genet Decl. ¶ 12 & Ex. H thereto).  Each of the
Adequate Current Information Letters contained a series of
representations purportedly made by Jean-Pierre's niece in
support of the misrepresentation that a licensed attorney (other
than Jean-Pierre) was issuing a valid opinion that the relevant
issuer had "made adequate current information publicly available
within the meaning of Rule 144(c)(2) under the Securities Act"
(Compl. ¶ 26; Genet Decl. ¶ 12 & Ex. H thereto).  Without these

representations by a licensed attorney, Pink Sheets would not grant the issuer the enhanced status of being an "OTC Pink Current Information" issuer, and the issuer would have been tagged on Pink Sheets' website with a red "STOP" sign by its ticker symbol, marked with the legend "OTC Pink No Information" and the large warning that, "[t]his company may not be making material information publicly available" (Compl. ¶ 28; Genet Decl. ¶ 12).  Adequate current public information concerning an issuer must be available in order for certain selling security holders to comply with the "safe harbor" provisions of Rule 144, 17 C.F.R. § 240.144, and thereby avoid falling into the expansive statutory definition of an underwriter (Compl. ¶ 28; Genet Decl. ¶ 12).  In truth and in fact, Jean-Pierre's niece did not make any of the representations contained in the Adequate Current Information Letters; instead, Jean-Pierre fraudulently affixed a facsimile of his niece's signature to these letters in order to make it appear that a licensed attorney (other than himself), had made these representations (Compl. ¶ 29; Genet Decl. ¶ 12).

10.   Among other things, the Adequate Current Information Letters misrepresented that:

a.   Jean-Pierre's niece was "retained by [the issuer] for the purpose of rendering this letter to . . . [Pink Sheets]."

b.   Jean-Pierre's niece "consent[s] to having this letter posted by the Issuer, and to have it pub-

lished, accompanying their disclosure in the Pink Sheets News Service."

c.   "In connection with rendering this opinion, [Jean-Pierre's niece] ha[s] investigated such matters and examined such documents as [she] deemed necessary."

d.   "Nothing came to [Jean-Pierre's niece's] attention during the course of [her] investigation that led [her] to conclude that any such documents were not genuine or authentic or that the facts set forth therein were not true."

e.   Jean-Pierre's niece "viewed the information (the 'Information') filed by the Company on www.pinksheets.com."

f.   Jean-Pierre's niece "ha[d] been in communication with . . . the Company's transfer agent, and ha[d] confirmed [that] the number of shares of the Issuer issued and outstanding . . . is consistent with the corporate records of the Issuer."

g.   Jean-Pierre's niece "personally met with management of the Issuer and a majority of the directors of the Issuer and reviewed the Information published by the Issuer on the Pink Sheets News Service and discussed the Information with management of the Issuer and a majority of the directors thereof."

h.   Jean-Pierre's niece is "of the opinion that the Information (i) constitutes 'adequate current public information' concerning the Securities and [that] the Issuer and 'is available' within the meaning of Rule 144(c)(2) under the [Securities] Act, (ii) includes all of the information that a broker-dealer would be required to obtain from the Issuer to publish a quotation for the Securities under Rule 15c2-11 under the Securities Exchange Act of 1934, (iii) complies as to form with the Pink Sheets Guidelines for providing Adequate Current Information."

(Compl. ¶ 27).

11.   Between May 11, 2010, and April 28, 2011, Jean-Pierre also sent to transfer agents at least 109 attorney opinion letters on behalf of nine issuers purporting to be authored by his niece and falsely bearing a facsimile of his niece's signature; these letters expressed an opinion that either a restrictive legend should be removed from a pre-existing stock certificate or a newly issued stock certificate should be issued without a restrictive legend pursuant to either Rule 144 or Rule 504 of the Securities Act (collectively, the "Transfer Agent Letters") (Compl. ¶ 30; Genet Decl. ¶ 13).  Jean-Pierre issued the Transfer Agent Letters using his niece's name, because, once he was banned by Pink Sheets, transfer agents would no longer accept attorney opinion letters signed by him (Compl. ¶ 31; Genet Decl. ¶ 13). In fact, upon receipt of a Transfer Agent Letter from Jean-Pierre's email address but ostensibly written by his niece, one transfer agent warned the issuer that Jean-Pierre was listed on the Pink Sheets Prohibited Attorneys List but noted that, because the attorney opinion letter was not written by him, the transfer agent would accept it nonetheless (Compl. ¶ 31; Genet Decl. ¶ 13).  Without the representations in these letters by a licensed attorney (other than Jean-Pierre), the transfer agents would not have removed the restrictive legends from the stock certificates and the shares would not have been permitted to be sold in the

public markets (Compl. ¶ 38; Genet Decl. ¶ 13).   In truth and in
fact, Jean-Pierre's niece did not make any of the representations
in the letters described above (Compl. ¶ 39; Genet Decl. ¶ 13).
Instead, Jean-Pierre fraudulently affixed a facsimile of his
niece's signature to these letters without her knowledge or
consent in order to make it appear that a licensed attorney
(other than himself) was making these representations (Compl. ¶
39; Genet Decl. ¶ 13).

12.   For example, Jean-Pierre sent attorney opinion
letters dated September 14 and December 20, 2010 to the transfer
agent of Cloud Centric Systems, Inc. which purported to be from
Complete Legal and which bore a facsimile of his niece's signa-
ture (the "Cloud Centric Letters").   The Cloud Centric Letters
opined that stock certificates for newly issued shares of Cloud
Centric should not bear any restrictive legends and resulted in
the removal of a restrictive legend from certificates represent-
ing 350 million shares of Cloud Centric stock (Compl.   ¶ 32).

13.   Among other things, the Cloud Centric Letters
misrepresented that:

      a.   Jean-Pierre's niece was sending the letter to the
           issuer's transfer agent "pursuant to the request
           of [the Issuer]."

      b.   "In [Jean-Pierre's niece's] opinion and based on
           the information and rationale set forth [in the
           letter], an exemption from registration regarding
           the aforementioned removal of the restrictive

> legend and sale in the marketplace [was] available
> under Rule 144 of the [Securities] Act."
>
> c.   Jean-Pierre's niece held "the view that the Share-
> holder has met the applicable six-month holding
> period . . . applicable to the Shares insofar as
> the Debt Holder and Shareholder cumulatively held
> the Indebtedness as of the Record Date."
>
> d.   Jean-Pierre's niece "relied on representations of
> the representatives of the Company that from the
> date of its original incorporation to the date of
> [the letter], the Company has been and continues
> to be an operating entity . . . ."
>
> e.   Jean-Pierre's niece "understand[s] that (i) the
> Debt Holder is not now (or has ever been such at
> any time during the ninety (90) days preceding the
> date of th[e] opinion) an affiliate or control
> person of the Company; and (ii) the Converted
> Shares represent less than ten percent (10%) of
> the total number of shares of the Company cur-
> rently issued and outstanding."

(Compl. ¶ 34).

14.   One of these Transfer Agent Letters, dated October
29, 2010, requested that the restrictive legend be removed from a
certificate representing 1.6 million shares of US Farms, Inc.
(OTC: USFM) that were issued to Jean-Pierre's law firm, Jean-
Pierre & Jean-Pierre, LLC (Compl. ¶ 35; Genet Decl. ¶ 14).

15.   Jean-Pierre testified that he charged $500-$750
for each of the attorney letters described above (Compl. ¶ 40;
Genet Decl. ¶ 15 & Ex. C thereto at pages 69 line 6-11, 87 line
20, 88 line 6, 89 line 3-13).   Jean-Pierre's niece never received
any compensation from Jean-Pierre in connection with the issuance

13

of the attorney opinion letters bearing a facsimile of her signature (Compl. ¶ 41; Genet Decl. ¶ 15).

16.   Jean-Pierre stopped issuing the letters described above only after two state bar complaints were filed against his niece for issuing fraudulent attorney opinion letters (the "Bar Complaints") (Compl. ¶ 42; Genet Decl. ¶ 16).   Both Bar Complaints were dismissed in approximately September 2011 when Jean-Pierre's niece explained that Jean-Pierre issued the letters with facsimiles of her signature without her knowledge and consent (Compl. ¶ 43; Genet Decl. ¶ 16).

17.   On February 18, 2011, a Florida state bar grievance was filed against Jean-Pierre for issuing fraudulent attorney opinion letters (the "Fla. Grievance") (Compl. ¶ 44; Genet Decl. ¶ 17).   The Fla. Grievance led to a Notice of Finding of Probable Cause for Further Disciplinary Proceedings being issued against Jean-Pierre on April 19, 2012 (Compl. ¶ 44; Genet Decl. ¶ 17).   On or about October 10, 2012, the Florida state bar filed a complaint against Jean-Pierre with the Supreme Court of Florida (Compl. ¶ 44; Genet Decl. ¶ 17).   In approximately August 2013, Jean-Pierre was disbarred by the Florida Supreme Court (Genet Decl. Ex. D).

18.   Jean-Pierre, directly or indirectly, has made use of the means of and instrumentalities of interstate or foreign

14

commerce or the mails in connection with the foregoing acts
(Compl. ¶ 6).

19. By virtue of the foregoing acts Jean-Pierre
facilitated the transfer of restricted securities; Jean-Pierre's
misrepresentations permitted shares of restricted stock to be
sold in public markets (Compl. ¶¶ 1, 38).

III. Conclusions
     of Law

     A. Jurisdiction
        and Venue

20. Plaintiff brings this action pursuant to Sections
20(b), 20(d) and 22(a) of the Securities Act, 15 U.S.C. §§
77t(b), 77t(d) and 77v(a), and Sections 21(d), 21(e)and 27 of the
Securities Exchange Act, 15 U.S.C. §§ 78u(d), 78u(e) and 78aa.

21. This Court has subject matter jurisdiction pursu-
ant to Section 22 of the Securities Act, 15 U.S.C. § 77v, and
Section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa.

22. Venue is proper in this District pursuant to 28
U.S.C. § 1391. The attorney opinion letters drafted by Jean-
Pierre and described in the foregoing paragraphs were submitted
to Pink Sheets, which is headquartered in the Southern District
of New York (Compl. ¶ 8). Venue is also established in this

District as a result of Jean-Pierre's failure to raise a timely objection to venue.  Fed.R.Civ.P. 12(h)(1).

B. Jean-Pierre's Liability
   under Sections 17(a) and 10(b)

23.  To prove a claim under Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), the SEC must establish that a defendant (1) obtained money or property by means of a material misrepresentation or a material omission as to which he had a duty to speak, or employed any device, scheme or artifice to defraud or engaged in any transaction, practice or course of business which operates as a deceptive act, practice or course of business; (2) in the offer or sale of securities.  To prove a claim under Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, the SEC must establish that a defendant (1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device or engaged in any deceptive act, practice or course of business; (2) with scienter; (3) in connection with the purchase or sale of securities. Section 17(a)(2) of the Securities Act, Section 10(b) of the Securities Exchange Act and Rule 10b-5(b) create liability for a material misrepresentation or omission while Section 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Securities

16

Exchange Act and Rules 10b-5(a) and (c) thereunder create what courts have called "scheme liability" for those who, with scienter, engage in deceitful conduct. See SEC v. China Ne. Petroleum Holldiongs Ltd., 12 Civ. 8696 (NRB), 2014 WL 2767121 at *8 (S.D.N.Y. Mar. 27, 2014) (Buchwald, D.J.). When liability is alleged under Rule 10b-5(b), "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." Janus Capital Grp., Inc. v. First Derivative Traders, --- U.S. ---, 131 S. Ct. 2296, 2302 (2011).

24. Jean-Pierre's conduct constitutes fraud under both the misrepresentation and the scheme liability theories. By falsely affixing his niece's name to the Attorney Letter Agreements, Adequate Current Information Letters and Transfer Agent Letters and submitting them to Pink Sheets and various transfer agents, Jean-Pierre misrepresented the authorship of the letters and the representations set forth in those letters. He, therefore, violated Section 17(a)(2) of the Securities Act and Section 10(b) of the Securities Exchange Act and Rule 10b-5(b) thereunder. SEC v. Greenstone Holdings, Inc., 10 Civ. 1302 (MGC), 2012 WL 1038570 at *5-*6 (S.D.N.Y. Mar. 28, 2012) (Cedarbaum, D.J.) (deeming misstatements in attorney opinion letters to be an appropriate predicate for liability under

Section 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder).  Jean-Pierre was the "maker of [the] statement[s]" in the letters because he had the "ultimate authority" over the contents of the letters.  <u>Janus Capital Grp., Inc. v. First Derivative Traders</u>, <u>supra</u>, 131 S. Ct. at 2302.

25.  Additionally, Jean-Pierre's use of Complete Legal and his niece's signatures were part of a fraudulent scheme whereby he employed fraudulent devices -- the forged Attorney Letter Agreements, Adequate Current Information Letters and Transfer Agent Letters -- to defraud in contravention of Section 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Securities Exchange Act and Rules 10b-5(a) and (c), thereunder, in an effort to circumvent the ban imposed upon him by the Pink Sheets.  <u>Cohen v. Prudential-Bache Secs., Inc.</u>, 713 F. Supp. 653, 662 (S.D.N.Y. 1989) (Kram, D.J.).

C.  <u>Jean-Pierre Is in Default</u>

26.  Jean-Pierre has responded to neither the complaint (Genet Decl. Ex. A) nor my Order setting a schedule for the making of submissions in connection with the inquest. Jean-Pierre has also failed to appear for the Court's ordered initial pretrial conference date (Genet Decl. Ex. A).  Jean-Pierre is, therefore, in default.

18

27.  Jean-Pierre's default establishes liability but
not damages.  See Bermudez v. Reid, 733 F.2d 18, 21 (2d Cir.
1984); Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d
Cir. 1981); Flaks v. Koegel, 504 F.2d 702, 707 (2d Cir. 1974);
Schwartz-Liebman Textiles v. Last Exit Corp., 815 F. Supp. 106,
107 (S.D.N.Y. 1992) (Mukasey, D.J.).

     D.  Disgorgement by Jean-Pierre

28.  As disgorgement, the Commission seeks a total of
$61,500 -- the compensation that Jean-Pierre received for the
issuance of the 124 attorney letters submitted to me by the SEC
(Genet Decl. Exs. F, G & H).

29.  The "primary purpose of disgorgement as a remedy
for violation of the securities laws is to deprive violators of
their ill-gotten gains, thereby effectuating the deterrence
objectives of those laws." SEC v. First Jersey Secs., Inc., 101
F.3d 1450, 1474 (2d Cir. 1996).  A court has broad discretion not
only in determining whether to order disgorgement, but also in
calculating the amount to be disgorged.  SEC v. First Jersey
Secs., Inc., supra, 101 F.3d at 1474-75.  The SEC is not required
to establish with certainty the amount to be disgorged; rather,
the SEC need only come forward with "a reasonable approximation
of profits causally connected to the violation.  So long as the

measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created the uncertainty." SEC v. Warde, 151 F.3d 42, 50 (2d Cir. 1998) (internal citation and quotation marks omitted).

30.  Here, Jean-Pierre issued at least 124 attorney letters to which he fraudulently affixed a facsimile of his niece's signature (Genet Decl. Exs. F &nd G).  Jean-Pierre testified that he charged $500-$750 for each attorney letter (Compl. ¶ 40; Genet Decl. Ex. C at 69, 87-89).  Assuming Jean-Pierre received $500 for each letter -- the low end of what he admitted he received for each letter -- his total profits would equal at least $62,000.

31.  In order to prevent Jean-Pierre from profiting from his wrongdoing, he should be ordered to disgorge these funds.

E.  Prejudgment Interest

32.  The SEC is generally entitled to prejudgment interest on any disgorgement amount awarded.  The Court has discretion as to whether to grant prejudgment interest, and the appropriate interest rate thereon.  See SEC v. First Jersey Secs., Inc., supra, 101 F.3d at 1476.

> In deciding whether an award of prejudgment interest is warranted, a court should consider (i) the need to

> fully compensate the wronged party for actual damages
> suffered, (ii) . . . fairness and the relative equities
> of the award, (iii) the remedial purpose of the statute
> involved, and/or (iv) such other general principles as
> are deemed relevant by the court.

See SEC v. First Jersey Secs., Inc., supra, 101 F.3d at 1476

(citations and internal quotation marks omitted).  In an enforce-

ment action brought by a regulatory agency, the remedial purpose

of the statute takes on special importance:

> When the SEC itself orders disgorgement, which as
> discussed above is designed to strip a wrongdoer of its
> unlawful gains, the interest rate it imposes is gener-
> ally the IRS underpayment rate . . . .  That rate
> reflects what it would have cost to borrow the money
> from the government and therefore reasonably approxi-
> mates one of the benefits the defendant derived from
> its fraud.

SEC v. First Jersey Secs., Inc., supra, 101 F.3d at 1476 (inter-

nal citations omitted).

33.  Accordingly, I recommend that the Commission

should be awarded prejudgment interest on the total disgorgement

amount of $61,500.  No later than fourteen (14) days from the

date of this Report and Recommendation, the SEC is to submit a

revised interest calculation that identifies the interest rate

used and the period of time for which interest is calculated.

F.  Civil Monetary Penalty

34.  "[B]ecause disgorgement represents merely a return

of ill-gotten gains," courts have recognized that "an additional

21

monetary penalty is necessary to appropriately punish and deter .
. . fraudulent activities." SEC v. Forest Res. Mgmt. Corp., 09
Civ. 903 (JSR), 2010 WL 2077202 at *2 (S.D.N.Y. May 18, 2010)
(Rakoff, D.J.).  Factors for the Court to consider when determin-
ing whether to impose a civil penalty on a defendant include,
among other things, "'(1) the egregiousness of the defendant's
conduct; (2) the degree of the defendant's scienter; (3) whether
the defendant's conduct created substantial losses or the risk of
substantial losses to other persons; (4) whether the defendant's
conduct was isolated or recurrent; and (5) whether the penalty
should be reduced due to the defendant's demonstrated current and
future financial condition.'" SEC v. Forest Res. Mgmt. Corp.,
supra, 2010 WL 2077202 at *2, quoting SEC v. Opulentica, LLC, 479
F. Supp. 2d 319, 331 (S.D.N.Y. 2007) (Holwell, D.J.).

       35.  Jean-Pierre's conduct warrants a severe penalty.
He intentionally affixed his niece's signature to attorney
letters in an effort to evade the Pink Sheets ban against him.
This conduct was pre-meditated, deliberate and recurring, and,
among other things, caused the removal of the restricted legends
from stock certificates representing in excess of 73 billion
shares.

       36.  During the time period of Jean-Pierre's viola-
tions, Section 20(d)(2)(C) of the Securities Act, 15 U.S.C. §§

77t(d)(2)(C), and Section 21(d) of the Securities Exchange Act,

78u(d)(3)(B)(iii), authorized civil penalties for each violation

in an amount ranging up to $7,500 (first tier), $75,000 (second

tier) and $150,000 (third tier) against an individual.  15 U.S.C.

§§ 77t(d), 78u(d); 17 C.F.R. § 201.1004.  Alternatively, the

statute also authorizes civil penalties for each violation equal

to the defendant's gross pecuniary gain resulting from the

violation.

> Second Tier penalties are only appropriate if the
> violation involved "fraud, deceit, manipulation, or
> deliberate or reckless disregard of a regulatory re-
> quirement."  15 U.S.C. § 77t(d)(2)(B); 17 C.F.R. §
> 201.1003.  Third Tier penalties add a requirement that
> the violations directly or indirectly resulted in
> substantial losses or created significant risk of
> losses to other persons.  15 U.S.C. § 77t(d)(2)(C)(II).

SEC v. Elliot, 09 Civ. 7594 (KBF), 2012 WL 2161647 at *11

(S.D.N.Y. June 12, 2012) (Forrest, D.J.).  The SEC has offered no

evidence that Jean-Pierre's conduct resulted in actual losses to

others or created a significant risk of losses to others.  Thus,

I conclude that second-tier penalties against Jean-Pierre are

appropriate.

37.  When calculating a civil monetary penalty, some

courts and judges interpret the statutory language "for each such

violation" by looking at the number of fraudulent acts that were

committed by the defendant.  For example, in SEC v. Pentagon

Capital Mgmt. PLC, 725 F.3d 279 (2d Cir. 2013), the defendants

were found to have violated Section 17(a) of the Securities Act and Section 10(b) of the Securities Exchange Act by backdating orders for mutual fund shares, thereby obtaining the shares with illegal pricing information.[2]  The Court of Appeals found no error in treating each backdated purchase order as a separate violation for the purpose of calculating the appropriate civil penalty.  SEC v. Pentagon Capital Mgmt. PLC, supra, 725 F.3d at 288 n.7.  In SEC v. Elliot, supra, 2012 WL 2161647 at *11, the civil penalty was calculated by counting each transaction in unregistered securities as a separate violation.[3]  If this approach were used, Jean-Pierre could face civil penalties of up to 124 times $75,000, or $9,300,000, because each of the 124 attorney letters Jean-Pierre issued constituted a separate violation of the securities laws.  Alternatively, the civil penalties could be 19 times $75,000 or $1,425,000, representing the 19 companies for whom Jean-Pierre drafted attorney letters.

---

[2]Ordinarily, shares in a mutual fund are priced based on the net asset value of the fund, as next calculated after the receipt order.  17 C.F.R. § 270.22c-1(a).  By backdating the orders, defendants were able to take advantage of price information that would not otherwise have been available to them.

[3]However, because this method resulted in a sum that the Elliot court found was "unduly penalizing" when applied to second-tier penalties, the court imposed only first-tier penalties.  2012 WL 2161647 at *11.

38.   Other judges have held that a defendant can receive a penalty for each statutory violation.   This method was recently used in SEC v. Murray, 05-CV-4643 (MKB), 2013 WL 839840 (E.D.N.Y. Mar. 6, 2013), following SEC v. Ehrenkrantz King Nussbaum, 05 Civ. 4643, 2012 WL 893917 (E.D.N.Y. Mar. 15, 2012). Under this theory, because the SEC brought two statutory claims against Jean-Pierre -- Section 17(a) of the Securities Act and Section 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder -- the Court can penalize him by twice the statutory amount or $150,000.

39.   Finally, in SEC v. Glantz, 94 Civ. 5737 (LAP), 2009 WL 3335340 at *6 (S.D.N.Y. Oct. 13, 2009) (Preska, D.J.), the court suggested that it is appropriate to consider the number of victims in determining the amount of the civil penalty. Similarly, in SEC v. Milan Capital Grp, Inc., 00 Civ. 0108 (DLC), 2001 WL 921169 at *3 (S.D.N.Y. Aug. 14, 2001) (Cote, D.J.), the court multiplied the penalty by each of the 200 defrauded inves-tors.   Here, however, the number of investors, if any, who were harmed by the fraudulent letters prepared Jean-Pierre cannot be calculated.[4]

--------

[4]The SEC claims that each of the 19 companies for which Jean-Pierre wrote fraudulent letters was harmed by his actions. The SEC does not explain how these companies were harmed, and, therefore, I reject this aspect of the SEC's argument.

40.   I recommend that a civil monetary penalty of
$75,000 for each of the 19 companies for which Jean-Pierre wrote
letters, or $1,425,000, be imposed.   Given the absence of evi-
dence of substantial monetary gain by Jean-Pierre and the absence
of evidence of any monetary loss to innocent third parties, I
conclude that any higher amount would be excessive.   If my
recommendations are accepted, Jean-Pierre will be faced with a
judgment in excess of $1,480,000 for conduct that netted him less
than $100,000.   Although Jean-Pierre's conduct deserves no
sympathy, a judgment of more than 15 times his gain is sufficient
punishment.   See generally SEC v. Elliot, supra, 2012 WL 2161647
at *11.

G.   Permanent Prohibition
     from Penny Stock Offerings

41.   In injunction proceedings, the district court is
also authorized by statute to enter a permanent injunction
"against any person participating in, or, at the time of the
alleged misconduct, who was participating in, an offering of
penny stock." 15 U.S.C. § 77t(g).   The attorney letters
Jean-Pierre drafted related to nineteen companies, all of which
were "penny stocks" within the meaning of the Securities Exchange
Act because they did not sell at or above five dollars per share
had an average revenue of less than $6 million and had net

26

tangible assets of under $2 million.  15 U.S.C. § 78c(a)(51)(A);
17 C.F.R. § 240.3a51-1 (Compl. Appendices A-B.)

 42. The standard for imposing a penny stock bar
essentially mirrors that for imposing an officer-or-director bar.
SEC v. Universal Express, Inc., 475 F. Supp. 2d 412, 429
(S.D.N.Y. 2007) (Lynch, D.J.), aff'd sub nom., SEC v. Altomare,
300 F. App'x 70 (2d Cir. 2008) (summary order).  These factors
include:  (1) the egregiousness of the underlying securities law
violation; (2) the defendant's repeat offender status; (3) the
defendant's role or position when he engaged in the fraud; (4)
the defendant's degree of scienter; (5) the defendant's economic
stake in the violation; and (6) the likelihood that misconduct
will recur.  SEC v. Patel, 61 F.3d 137, 141 (2d Cir. 1995)
(internal quotations and citations omitted).

 43. As discussed above, supra ¶¶ 6-19, Jean-Pierre
constructed the scheme to make it appear that a duly licensed
attorney was issuing attorney letters when in reality it was he
who issued those letters in contravention of the Pink Sheets ban
against him doing so.  Jean-Pierre had a high level of scienter,
offended repeatedly in the face of the ban against him, used his
position as an attorney and a relative to gain the use of his
niece's identity and received all of the proceeds of the fraud.
In addition, Jean-Pierre has given every indication that his

conduct would recur were he to have the opportunity.   These factors all weigh in favor of the issuance of a permanent penny stock bar against him.

## IV.  Conclusion

Accordingly, for all the foregoing reasons, I  respectfully recommend that judgment be entered against Jean-Pierre as follows:

    1.  $62,000 representing disgorgement of Jean-Pierre's ill-gotten gain;

    2.  Prejudgment interest on the figure representing disgorgement;

    3.  A civil monetary penalty in the amount of $1,425,000 and

    4.  A life time bar against participating in any form in an offering of penny stock.

I further direct that within fourteen (14) days from the date of this Report and Recommendation, the SEC is to submit a revised interest calculation that sets forth an express statement of the interest rate used and the period of time for which interest is sought.

V.   <u>OBJECTIONS</u>

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report to file written objections.  <u>See also</u> Fed.R.Civ.P. 6(a).  Such objections (and responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the Chambers of the Honorable Lorna G. Schofield, United States District Judge, 40 Centre Street, Room 201, New York, New York 10007 and to the Chambers of the undersigned, 500 Pearl Street, Room 750, New York, New York 10007.  Any requests for an extension of time for filing objections must be directed to Judge Schofield.  FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS **WILL** RESULT IN A WAIVER OF OBJECTIONS AND **WILL** PRECLUDE APPELLATE REVIEW.  <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985); <u>United States v. Male Juvenile</u>, 121 F.3d 34, 38 (2d Cir. 1997); <u>IUE AFL-CIO Pension Fund v. Herrmann</u>, 9 F.3d 1049, 1054 (2d Cir. 1993); <u>Frank v. Johnson</u>, 968 F.2d 298, 300 (2d Cir.

1992); <u>Wesolek v. Canadair Ltd.</u>, 838 F.2d 55, 57-59 (2d Cir.

1988); <u>McCarthy v. Manson</u>, 714 F.2d 234, 237-238 (2d Cir. 1983).

Dated:   New York, New York
         December 3, 2014

                                    Respectfully submitted,


                                    _____
                                    HENRY PITMAN
                                    United States Magistrate Judge

Copies mailed to:

Todd D. Brody, Esq.
Megan R. Genet, Esq.
Securities and Exchange Commission
200 Vesey Street
Brookfield Plaza
New York, New York   10281-1022

Mr. Guy M. Jean-Pierre
Suite 275
433 Plaza Real
Boca Raton, Florida   33432

Mr. Guy M. Jean-Pierre
8 Viña es Del Mar
Santo Domingo Este
Santo Domingo, Dominican Republic