# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Case No. 17-cr-00008-WJM(s)

UNITED STATES OF AMERICA,

        Plaintiff,

v.

1.     GUY M. JEAN-PIERRE,
        a/k/a Marcello Dominguez de Guerra,

        Defendant.

---

## SUPERSEDING INDICTMENT
18 U.S.C. §371
18 U.S.C. §1343
18 U.S.C. §1341
18 U.S.C. §1349
18 U.S.C. §1956
15 U.S.C. §§ 78j(b), 78ff
17 C.F.R. §240.10b-5
18 U.S.C. §981(a)(1)(C)
18 U.S.C. §982(a)(1)
18 U.S.C. §2

---

The Grand Jury charges that:

## COUNT 1
### (Conspiracy to Defraud & Commit Offenses)

1.     Beginning as early as in or about March 25, 2011 and continuing at least through in or about May 15, 2014, the exact dates being unknown, in the State and District of Colorado, and elsewhere, the defendant,

## GUY M. JEAN-PIERRE,
### a/k/a Marcello Dominguez de Guerra,

did knowingly and willfully conspire, combine and agree with William J. Sears and Scott M.

Dittman, and with other persons both known and unknown,

(a) to defraud the United States and one of its agencies, the United States Securities and Exchange Commission ("SEC"), by impeding, impairing, defeating and obstructing the lawful governmental functions of the SEC; and

(b) to commit the following offenses against the United States:

(i) securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5 [Rule 10b-5];

(ii) willful violations of Section 5 of the Securities Act of 1933, Title 15, United States Code, Sections 77e(a) and 78ff(a);

(iii) mail fraud, in violation of Title 18, United States Code, Section 1341; and

(iv) wire fraud, in violation of Title 18, United States Code, Section 1343.

### Background

At all times material to this Supeseding Indictment:

2. The defendant, GUY M. JEAN-PIERRE, a resident of South Florida and later the Dominican Republic, was an attorney licensed to practice law in the States of Florida and New York. Defendant JEAN-PIERRE's law practice focused primarily on providing legal advice and services to, or in connection with, small companies with low or minimal market capitalization whose stock was publicly traded (such companies hereinafter, "microcap companies"). His legal work concerned mainly corporate and securities transactions relating to these companies and to persons and entities who worked for or with these companies.

3. OTC Link was an electronic inter-dealer stock quotation system, operated as an internet platform by OTC Markets Group, Inc. (hereinafter, collectively "OTC Link"), that published stock quotes and other stock transaction information posted by securities broker-

dealers and was typically used by broker-dealers to display quotes and make markets in securities of publicly traded microcap companies whose securities were traded in the over-the-counter markets. Such companies did not have to meet any requirements in order to have their stocks quoted on the OTC Link system, and any reporting or disclosure by companies whose stocks were quoted on the system was voluntary. However, the OTC Link system organized and classified the securities of the companies quoted on its system into several distinct marketplaces or "market tiers," depending, in large part, on the nature, quality and extensiveness of the corporate and financial disclosures a company provided to OTC Link. The "market tiers" were designed to provide investors some indication as to the quality and level of information about the companies on the OTC Link system, and companies that provided limited or no information were placed in market tiers reserved for stock issuers that prospective investors were advised to consider with caution. The type of information that participating companies were encouraged to provide to OTC Link typically included quarterly and annual financial statements and quarterly and annual reports, in a prescribed format, providing disclosure, among other things, about the officers, directors, control persons and significant beneficial owners of the company's stock. These quarterly and annual submissions were uploaded to OTC Link's website, where they were readily accessible to the investing public and subject to wide dissemination through financial media outlets.

4. "OTC Pink" was the market tier that OTC Link reserved for the stocks of companies with the lowest levels of financial disclosures, financial standards and market capitalization and the tier in which stocks of most microcap companies typically traded. Companies within this tier, in order to avoid having OTC Link issue cautionary warnings with respect to the trading of their stock (that included "Yield" and "Stop" sign traffic symbols),

would have to satisfy a set of financial and corporate disclosure requirements published by OTC Link in written guidelines. For companies without audited financial statements, these guidelines included the requirement that a licensed attorney prepare and have submitted, initially and periodically thereafter, on OTC Link's platform a letter that represented, among other things, that the attorney had examined the particular company's corporate records and the written disclosures posted by the company on the OTC Link platform; that the attorney had personally met with and reviewed the posted disclosures with management of the company and a majority of its directors; and that, in the attorney's opinion, the posted disclosures constituted "adequate current public information" concerning the company and its securities within the meaning of applicable federal securities regulations and included all of the information that broker-dealers would be required to possess under federal securities regulation in order to publish stock quotes of the company's securities in connection with public trading of the securities (said letters hereinafter referred to as "Current Information Letters").

5. The SEC was an independent agency of the executive branch of the United States Government whose duties included regulating and monitoring the trading of securities and the reporting of financial and other information by publicly held corporations within the United States.

6. The Financial Industry Regulatory Authority, Inc. ("FIRNA") was a non-profit, non-governmental regulatory organization entrusted with overseeing and assisting the SEC in the regulation of certain securities brokerage firms and securities exchange markets.

7. Under the federal securities laws, the securities of companies traded in the United States could not be bought and sold in public transactions unless first registered with

the SEC or considered exempt from registration pursuant to one of several defined statutory or regulatory provisions. Such registration typically involved providing to the SEC and making available to the investing public certain specified information about the company, its financial situation, its operations and its principals and officers, in a prescribed form filed with the SEC that typically included a prospectus made available to potential investors. Securities that were unregistered, and not otherwise exempt from registration, were considered restricted securities that were not eligible for lawful public re-sale, and the certificates evidencing these securities typically bore a legend providing notice of this status.

8. One of the exemptions from registration recognized under the federal securities laws (codified by the SEC as Rule 144, 17 C.F.R. § 230.144, and hereinafter referred to as "the Rule 144 registration exemption") generally allowed holders of unregistered securities, not already unrestricted at the time of receipt, to resell them in public transactions, without limitation, after having held the securities for a specified period. This holding period, in the case of companies that were not subject to certain prescribed periodic SEC reporting requirements, was one year. Holders of unregistered, restricted securities who were deemed to be "affiliates" could resell these securities in public transactions after meeting the specified holding period, but only if they met certain additional regulatory requirements, and only then in limited numbers of shares over specified periods of time (*i.e.*, in public sales subject to "volume restrictions"). An "affiliate," for the purpose of this regulatory exemption from registration, was considered to be someone who directly, or indirectly through one or more intermediaries, controlled, or was controlled by, or was under common control with the issuing company. Such "control" was defined to mean "the possession, direct or indirect, of

5

the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise."

9.     Both non-affiliate and affiliate holders of unregistered securities, upon satisfying their respective requirements for the regulatory exemption from registration would typically have had to have the stock transfer agent for the issuing company remove the restrictive legends on the certificates of their securities, before the securities could be eligible for resale in a public transaction.   To accomplish this, the holders would have had to have secured the consent of the issuing company and would have had to have provided documentation to the stock transfer agent demonstrating that the requirements for exemption from registration had been met.

10.     Among the documentation that stock transfer agents typically required to be submitted to them before removing the restrictive legends on the certificates of unregistered securities was a letter from a licensed attorney in good standing setting forth their written opinion that the regulatory requirements for exemption from registration had been met. These letters (hereinafter, "Rule 144 Attorney Opinion Letters") would also typically be required by broker-dealers before accepting unregistered stock for deposit in securities brokerage accounts and made available for public trading.

11.     Until in or about April 2010, a significant portion of defendant JEAN-PIERRE's law practice consisted of submitting attorney opinion letters to OTC Link, stock transfer agents and securities broker-dealers. These letters included Current Information Letters to OTC Link on behalf of microcap companies who were his clients and Rule 144 Attorney Opinion Letters to transfer agents and broker-dealers on behalf of clients who sought to publicly sell their unregistered securities.

12.     On or about April 21, 2010, OTC Link banned JEAN-PIERRE from issuing Current Information Letters to it and refused to accept such letters authored by him, based on OTC Link's finding that JEAN-PIERRE had not been performing the requisite diligence in connection with their preparation.   As a result of this ban, stock transfer agents stopped accepting opinion letters authored by JEAN-PIERRE as well.

13.     Coconspirator William J. Sears was a resident of Thornton, Colorado whose principal occupation over the years was providing public relations and promotional services to microcap companies that sought to have their stocks publicly traded in various non-exchange, over-the-counter markets.     In 2007, Coconspirator Sears was convicted in the Southern District of New York of one count of conspiring to commit federal securities fraud and commercial bribery and one count of federal securities fraud (Case No. 04-cr-556-swk).

14.     Microcap Management LLC ("Microcap") was a Nevada limited liability company formed by Coconspirator Sears, with its primary business address in Colorado. Coconspirator Sears was, among other things, the beneficial owner and manager of Microcap and controlled Microcap.   Coconspirator Sears primarily conducted his stock public relations and promotional business through Microcap over the years. Coconspirator Sears and Microcap had been clients of defendant JEAN-PIERRE and engaged JEAN-PIERRE, among other things, to prepare Rule 144 Attorney Opinion Letters to facilitate Sears' acquisition, deposit and public trading of unregistered stock he received from microcap companies in exchange for his public relations and promotional work on their behalf.

15.     Bayside Realty Holdings, LLC ("Bayside") was another Nevada limited liability company formed, controlled and operated by Coconspirator Sears, in fact, but which

was held out to be managed and owned by a blood relative family member (hereinafter, "Family Member A") residing in North Carolina.

16.     Coconspirator Scott M. Dittman was a resident of Elizabeth, Colorado and later Boyertown, Pennsylvania.   From October 1991 until April 1995, Coconspirator Dittman practiced as an accountant and for two years, from 1995 to 1997, had been a certified public accountant licensed in the State of California. Thereafter, Coconspirator Dittman was principally self-employed in various businesses, including real estate development, construction and, beginning in or about 2010, medical marijuana. Coconspirators Dittman and Sears were brothers-in-law, Sears being married to Dittman's sister.

17.     FusionPharm, Inc. ("FusionPharm") was a Nevada corporation with its principal place of business at first in Denver, Colorado and later in Commerce City, Colorado. Prior to March 2011, FusionPharm had been known by a variety of names and had been beneficially owned and operated by a number of persons over the years. Although not registered with the SEC, over the years, the corporation's stock had been quoted on OTC Link and had been publicly traded over-the-count under stock ticker symbols associated with these various names.   In or about November 2010, Coconspirator Sears, working with defendant JEAN-PIERRE, negotiated for control of the corporation (which, at the time was a dormant entity known as Baby Bee Bright Corporation) to be turned over to Coconspirators Sears and Dittman.

18.     With this change in control and ownership, FusionPharm's principal business became the development, manufacture and sale of steel shipping containers retrofitted and refurbished for use as hydroponic growing pods, branded as "PharmPods," for indoor plant cultivation, primarily cannabis. Coconspirator Dittman, the architect of this business plan, was

held out to be the founder, chief executive officer and sole director of FusionPharm but, in fact, operated FusionPharm, and pursued and developed its business, together and in concert with Coconspirator Sears, and the two coconspirators together beneficially held and controlled the majority of the shares of FusionPharm's common and preferred stock, which was convertible into the company's common stock.

19.     In OTC Link disclosure documents filed in December 2011 and in March 2012, defendant JEAN-PIERRE was described as FusionPharm's corporate secretary and, at times its legal counsel, as well as one of its paid employees. From its inception as FusionPharm and continuing at least through in or about August 2013, however, JEAN-PIERRE functioned as the company's *de facto* general counsel and provided legal advice and services in connection with the company's corporate and securities matters.

20.     Meadpoint Venture Partners, LLC ("Meadpoint") was a Nevada limited liability company formed by Coconspirator Sears and was held out to be FusionPharm's exclusive distributor of PharmPods, marketing, in particular, to customers interested in using the pods for cannabis cultivation.   Meadpoint shared FusionPharm's business addresses, shared employees with FusionPharm and was operated out of the same premises as used for FusionPharm.   Coconspirator Sears was identified as Meadpoint's managing member, and Meadpoint was operated by both Coconspirators Sears and Dittman together in conjunction with the operations of FusionPharm.

21.     VertiFresh, LLC ("VertiFresh") was a Delaware limited liability company jointly owned and controlled together by Coconspirators Sears and Dittman.   Vertifresh was held out to be a licensee of FusionPharm's technology and growing methods whose principal business purportedly involved using FusionPharm PharmPods to grow non-cannabis produce

(primarily, lettuce) for sale to restaurants and retail food outlets. Vertifresh shared

FusionPharm's business addresses, shared employees with FusionPharm and was operated out

of the same premises as used for FusionPharm.

22.     Following its name change in or about March 2011, FusionPharm's common

stock continued to be publicly traded in the over-the-counter markets and, beginning in or

about early April 2011, was quoted on the OTC Link under the stock symbol "FSPM"

corresponding to its new name.   Using this system, securities broker-dealers made a market

in and facilitated public, over-the-counter trading in its stock.   FusionPharm undertook to,

and regularly did, upload to the OTC Link's website, and thereby made available to the

investing public, quarterly and annual financial statements and reports providing information

about its performance, its financial condition and the identities of its officers, control persons

and significant stockholders. Current Information Letters were regularly posted as well in

connection with these periodic filings.

23.     Throughout all times material to this Superseding Indictment, none of

FusionPharm's securities were registered with the SEC, and the only way that its securities

could be traded over-the-counter or in other public transactions was through securities

transactions that qualified for exemption from registration with the SEC. Nor during any

times material to this Superseding Indictment was FusionPharm considered an SEC reporting

company.

### **Manner and Means of the Conspiracy**

24.     It was part of the manner and means of carrying out the conspiracy that:

A.      Coconspirator Sears, with the knowledge and advice of defendant

JEAN-PIERRE, would cause shares of preferred stock of FusionPharm held in the name of

Microcap to be converted into shares of FusionPharm common stock and deposited into brokerage accounts established in the name of Microcap. Coconspirator Sears would induce brokers overseeing these accounts to consider and treat these common shares as unrestricted securities that could be immediately sold in the public securities markets by falsely representing to them that neither he nor Microcap was an affiliate of FusionPharm or a control person of the company. Coconspirator Dittman facilitated the deposit of these shares, and their treatment as unrestricted securities, by executing FusionPharm officer certificates and other documentation affirming that Microcap was not an affiliate of FusionPharm.

   B. With the knowledge and advice of defendant JEAN-PIERRE, Coconspirator Sears would then cause the remainder of these preferred shares to be transferred from Microcap's name into the names of family members or entities held in the name of family members, in order to make it appear that neither he nor Microcap had shareholdings in FusionPharm in such amounts as to deem either Sears or Microcap to be affiliates or control persons under the federal securities laws or to trigger their disclosure as significant shareholders under the reporting guidelines established by OTC Link. Coconspirator Sears would thereafter cause portions of the FusionPharm preferred shares that had been transferred into the names of these family members and entities, in turn, to be converted into additional common shares of FusionPharm that could be publicly sold later on or that he and Coconspirator Dittman could later use to raise funds for the company in private sales to select FusionPharm investors.

   C. Coconspirator Sears, working in coordination with another individual (hereinafter, "Individual A"), would thereafter cause the FusionPharm common shares that had been deposited into the Microcap brokerage accounts to be sold in the public securities

markets and, in consultation with Coconspirator Dittman and with the knowledge and approval of defendant JEAN-PIERRE, would deposit significant portions of the proceeds of these FusionPharm stock sales into operating bank accounts of FusionPharm – both directly and through a series of transactions involving Bayside, Meadpoint or Vertifresh – so that the money could then be used to capitalize and operate the company, as well as be used for the coconspirators' own financial support.

25.     In October 2011, FINRA was in the process of conducting an investigation, among other things, of trading activity involving the common stock of FusionPharm, including sales of that common stock that were being conducted by or on behalf of Microcap through brokerage accounts. On or about October 5, 2011, an investigator for FINRA telephonically contacted Coconspirator Scott Dittman to set up a telephone interview to discuss FusionPharm and its securities trading activities.   The FINRA investigator interviewed Coconspirator Dittman about these and related subjects the following day.   As a part of the manner and means of carrying out the conspiracy, Coconspirator Dittman, in that interview and in follow up communications with the FINRA investigator, represented, in words and substance, among other things, that Coconspirator Sears' role at FusionPharm was limited to being a part-time salesman; that he was unaware of Coconspirator Sears having owned or sold any FusionPharm stock; that Coconspirator Sears no longer owned Microcap; and that he would undertake to produce written confirmation of this to FINRA.

26.     As a further part of the manner and means of carrying out the conspiracy, and attempting to do so, and in order to deflect FINRA's inquiry about FusionPharm stock sales by Sears and Microcap, Coconspirators Sears and Dittman and defendant JEAN-PIERRE undertook the following:

A.     On or about October 19, 2011, defendant JEAN-PIERRE, at Coconspirator Sears' request, prepared a stock purchase agreement and incorporated assignment of interest, back dated to May 9, 2011, that purported to convey to Individual A, as of the May 9th date, all ownership interest that Coconspirator Sears had had in Microcap, and to transfer to Individual A all right and title in all Microcap brokerage accounts.

B.     A short while thereafter, Coconspirator Sears signed and backdated these documents and caused Individual A to do the same. However, Coconspirator Sears continued to maintain and exercise control over Microcap, its brokerage accounts and affairs as before.

C.     Defendant JEAN-PIERRE then drafted a letter, acting in his capacity as FusionPharm's corporate secretary, responding to the FINRA investigators' renewed requests for follow up written information about Coconspirator Sears, the Microcap stock sales and the change in ownership of Microcap.   In this letter, defendant JEAN-PIERRE characterized Coconspirator Sears as "a prior owner of Microcap" and indicated, in words and substance, in material part, that the requests concerning Conspirator Sears and Microcap constituted non-company information that Coconspirator Dittman was not authorized to produce to FINRA; that FusionPharm was not, in any event, in possession of the requested written information concerning Sears, Microcap or its new owner; and that FINRA should direct further requests for this information to Microcap.

D.     On or about November 30, 2011, defendant JEAN-PIERRE provided a draft of the letter for review by Conspirators Dittman and Sears, and following their review and approval, defendant JEAN-PIERRE sent this letter to the FINRA investigator in the form of an email.

27.     It was a further part of the manner and means of carrying out the conspiracy, in order to generate additional FusionPharm common stock that could immediately be sold, without registration and without limitation, into the public securities markets, that Coconspirators Sears and Dittman, together with defendant JEAN-PIERRE, did and caused the following to be done:

A.     Over the course of June 2012 through in or about December 2012, with the knowledge, advice and approval of defendant JEAN-PIERRE, Coconspirators Sears and Dittman, working together with another individual (identified hereinafter as, "Coconspirator A"), fabricated promissory notes and incorporated credit line agreements, in order to portray some of the money that had previously been deposited into FusionPharm's bank accounts from the Microcap FusionPharm stock sales as loans from Bayside and Meadpoint that had been extended to FusionPharm over a year before.

B.     Coconspirators Sears and Dittman and Coconspirator A further fabricated documentation making it appear that FusionPharm had drawn down on the supposed credit lines established with Bayside and Meadpoint by specified amounts, and they assembled bank records to offer substantiation for these supposed earlier credit line drawdowns.

C.     As part of an initial failed effort to sell one of these supposed debt obligations – the indebtedness to Bayside – to a prospective outside investor, the coconspirators, working with defendant JEAN-PIERRE, portrayed the debt obligation as a straightforward promissory note and provided the prospective investor a due diligence package consisting of a version of the fabricated back-dated promissory note, together with

the fabricated draw down requests and other, fabricated back-dated documents that defendant JEAN-PIERRE helped prepare depicting prior corporate actions.

   D. Coconspirators Sears and Dittman and Coconspirator A, in the final iterations of these fabricated promissory notes and supporting documents, made it appear that the supposed debt evidenced by these notes could be converted in whole or in pieces, at the election of the noteholders, into shares of FusionPharm common stock at a specified conversion rate of one FusionPharm share for every penny of debt supposedly still owed on the notes by FusionPharm.

   E. Coconspirator Dittman, on behalf of FusionPharm, and Coconspirator Sears, on behalf of Meadpoint and acting for Family Member A on behalf of Bayside, executed the backdated promissory notes and documents.

   F. Coconspirator Sears then generated packets of documents that Sears caused to be presented to FusionPharm's stock transfer agent, over a series of months, in order to effectuate the conversion of portions of the supposed debt held by Bayside and Meadpoint into shares of FusionPharm common stock. The packets typically included the following:

- convertible promissory notes that he and Coconspirator Dittman had backdated;

- the backdated draw down requests that Coconspirator Dittman had signed on behalf of FusionPharm;

- copies of bank account statements showing deposits to FusionPharm's accounts corresponding to the draw down requests;

- letters from Bayside and Meadpoint (depending on the entity exercising the conversion), for signature by Family Member A for Bayside and Sears for Meadpoint, falsely representing that the entities were not affiliates of FusionPharm;

15

- additional statements of non-affiliation for Bayside and Meadpoint (again depending on the entity exercising the conversion), reiterating that neither entity was a FusionPharm affiliate and additionally representing that neither Family Member A, in the case of Bayside, and Coconspirator Sears, in the case of Meadpoint, was an officer, director, control person or holder of more than ten percent of the securities of FusionPharm;

- a FusionPharm officer's certificate, signed by Coconspirator Dittman, representing that neither Bayside nor Meadpoint (depending on the entity making the conversion) were affiliates of FusionPharm and were outsiders to the company and management, with no other method of control over the company, and that the convertible promissory notes that were the vehicles for the conversion were valid obligations of the company;

- additional letters signed by Coconspirator Dittman reiterating that Bayside and Meadpoint were not affiliates of the company.

G.1.     Defendant JEAN-PIERRE, using the foregoing submissions prepared for the FusionPharm stock transfer agent, as part of this process, would prepare Rule 144 Attorney Opinion Letters opining that the shares of FusionPharm stock being converted from the supposed Bayside and Meadpoint debt could be issued as unrestricted, free-trading shares, without the need for a restrictive legend, because of Bayside's and Meadpoint's supposed non-affiliate status and because the one year holding and the other requirements for a registration exemption under SEC Rule 144 had been met.

G.2.     Defendant JEAN-PIERRE would then transmit the Rule 144 Attorney Opinion Letters, together with some or all of the documentation that had been submitted to the FusionPharm stock transfer agent, to an attorney in California whom he had previously recruited to sign Rule 144 Attorney Opinion Letters and other opinion letters on defendant JEAN-PIERRE's behalf generally (said attorney hereinafter, the "California Attorney").

G.3.     The California Attorney would then retype the Rule 144 Attorney Opinion Letters on his own letterhead and, upon signing them in his own name, would return the completed letters to defendant JEAN-PIERRE, who, in turn, would forward them to

Coconspirator Sears for submission to FusionPharm's stock transfer agent. Coconspirator Sears would then present the completed Rule 144 Attorney Opinion Letters to the transfer agent, completing the process.

G.4.    Through these false portrayals of Bayside and Meadpoint as non-affiliates of FusionPharm and the promissory notes to them as bona fide convertible indebtedness held for a requisite period of time, FusionPharm's stock transfer agent was induced into issuing certificates of hundreds of thousands of shares of FusionPharm common stock that could be immediately sold into the public securities markets without limitation.

28.    It was a further part of the manner and means of carrying out the conspiracy that Coconspirator Sears thereafter caused a substantial portion of the common shares issued to Bayside and Meadpoint as a result of these supposed debt conversions to be deposited into brokerage accounts set up in the names of Bayside and Meadpoint and then caused these shares to be sold in the public securities markets.   The Rule 144 Attorney Opinion Letters prepared by defendant JEAN-PIERRE and retyped by the California Attorney would be presented to the brokerage firms, as necessary, in order to facilitate the deposit of these shares.

29.    As a part of the manner and means of carrying out the conspiracy, the unrestricted common shares issued to Meadpoint as a result of the supposed debt conversions would, alternatively, be sold in private transactions to other individuals, who would, in turn, sell the shares into the public securities market.   Additionally, remaining portions of the supposed Bayside convertible debt would be sold outright to other individuals who then converted the purchased debt into free trading, unrestricted common shares of FusionPharm stock and then publicly sold the shares.   In each of these instances, the conversions would be

facilitated by Rule 144 Attorney Opinion Letters prepared by defendant JEAN-PIERRE, retyped by the California Attorney and submitted by Coconspirator Sears to the stock transfer agent.

30.     It was a further part of the manner and means of carrying out the conspiracy that Coconspirator Sears, in consultation with Coconspirator Dittman and with the counsel and approval of defendant JEAN-PIERRE, would arrange for a substantial portion of the proceeds realized from the stock and debt sales resulting from the supposed FusionPharm debt to Bayside and Meadpoint to be deposited either directly or indirectly into FusionPharm's operating bank accounts so that these funds could also be used to further capitalize and support the operations of the company and for other purposes.

31.     As a part of the manner and means for carrying out the conspiracy, Coconspirator Dittman, in consultation and in coordination with Coconspirator Sears, defendant JEAN-PIERRE and others, caused FusionPharm to account for some of the funds received back to FusionPharm from the Microcap, Meadpoint and Bayside sales of FusionPharm stock as payments to FusionPharm for or relating to sales of its PharmPods, which sales Coconspirator Dittman then caused FusionPharm to book in its accounting records as revenues realized by the company. The stock proceed deposits were claimed, in particular, to be payments by Meadpoint, acting in its supposed capacity as FusionPharm's purported exclusive PharmPod distributor, for PharmPods that were being manufactured for and sold to FusionPharm customers in arms-length transactions but that had not yet been delivered to those customers or purported Meadpoint payments in anticipation of sales of PharmPods that Coconspirators Dittman and Sears were still negotiating with prospective FusionPharm customers.

32.     As a further part of the manner and means for carrying out the conspiracy, Coconspirator Dittman, in consultation and in coordination with Coconspirator Sears and others, also sought to use purported dealings with Vertifresh as a basis to claim and book additional revenues for FusionPharm.   Conconspirators Dittman and Sears, with the assistance of defendant JEAN-PIERRE, caused contracts and related documentation to be drafted that purportedly depicted a licensing agreement between FusionPharm and Vertifresh, pursuant to which Vertifresh agreed to pay $750,000 to FusionPharm over the course of three years in exchange for the purchase of a series of PharmPods and the right to use FusionPharm's growing methods and technology to cultivate and sell non-cannabis produce in three distinct geographic regions.   Based on this purported agreement, Conconspirator Dittman then caused FusionPharm to book the entire licensing agreement amount as FusionPharm revenues in a single year, 2012.

33.     It was a further part of the manner and means of carrying out the conspiracy that Coconspirators Dittman and Sears would cause these transactions and revenue figures to be reported in quarterly and annual financial statements uploaded to, and made available to the investing public on, OTC Link's website. Coconspirator Dittman, working in concert with Coconspirator Sears and Coconspirator A, and in consultation with defendant JEAN-PIERRE, would cause the financial statements and the quarterly and annual reports to omit facts revealing that Meadpoint, Vertifresh and FusionPharm were all under the common control of Coconspirators Dittman and Sears and the revenues generated as a result of these transactions were between related parties.   Coconspirator Dittman, in concert with Coconspirator Sears, and in consultation with defendant JEAN-PIERRE, would further cause FusionPharm to affirmatively represent in these reports that there were, in fact, no related party transactions

with immediate family members and significant beneficial owners of FusionPharm stock and would cause these reports to conceal completely Coconspirator Sears' involvement in the company and his beneficial ownership of its stock.

34.     As a further part of the manner and means of carrying out the conspiracy, in connection with the posting of these quarterly and annual reports to the OTC Link website, defendant JEAN-PIERRE would and did prepare a series of corresponding Current Information Letters that stated and indicated, among other things, that the letter's author had reviewed FusionPharm's current and past annual and quarterly OTC Link submissions and that in the author's opinion the information disclosed in these findings constituted "adequate current information," within the meaning of the federal securities law, concerning FusionPharm and its securities.   Defendant JEAN-PIERRE would and did pass these letters along to the California Attorney for the California Attorney to retype onto his own letterhead. Defendant JEAN-PIERRE would then transmit the retyped Current Information Letters to Coconspirators Dittman and Sears, who would upload them onto the OTC Link website.

## Overt Acts

35.     In furtherance of the conspiracy and to effect the objects thereof, one or more overt acts were carried out by at least one coconspirator in the State and District of Colorado and elsewhere, which overt acts included the following:

A.     On or about March 25, 2011, an Issuer Company-Related Action Notification form was filed with the FINRA providing notice of a name change to, and stock symbol change with respect to, FusionPharm, identifying Coconspirator Dittman and Family Member A as the sole officers and directors of the company, and representing, among other things, that none of the company's officers, directors or parties related to the company were the subjects

of pending, adjudicated or settled civil or criminal action related to fraud or securities violations.

B.      On or about April 11, 2011, Coconspirator Sears sent a letter to a representative of FusionPharm's stock transfer agent in Las Vegas, Nevada surrendering a stock certificate evidencing the ownership of 185,0000 FusionPharm preferred shares and requesting that a portion of the shares evidenced by this certificate be converted into 80,000 shares of FusionPharm common stock in the name of a limited liability company in Orlando, Florida and 65,000 shares of FusionPharm common stock in the name of Microcap and that the balance of the remaining preferred shares, 183,550, be transferred to a company in Thornton, Colorado.

C.      On or about April 21, 2011, Coconspirator Dittman sent an email to a number of people, bearing the subject "Fusion Pharm," announcing that he had recently "partnered with [his] brother-in-law William Sears" and that "we have acquired and moved our operations into a publicly traded company: Fusion Pharm, Inc."

D.      On or about May 2, 2011, Coconspirator Sears sent documents to an employee at Oppenheimer, & Co., Inc., including a letter directing that 65,000 shares of FusionPharm common stock be deposited into the brokerage account of Microcap Management and representing that Microcap Management was neither a control person nor an affiliate of FusionPharm.

E.      On or about July 8, 2011, defendant JEAN-PIERRE sent Coconspirator Sears an email attaching a draft of a FusionPharm Information and Disclosure Statement to review.

F.       On or about July 18, 2011, defendant JEAN-PIERRE sent an email to Coconspirator Dittman to set up a meeting between Coconspirator Dittman and the California

Attorney.

G.     On or about October 6, 2011, Coconspirator Dittman had a telephone conversation with a FINRA investigator during which he described Coconspirator Sears as a part-time salesman for FusionPharm and stated that he was unaware that Coconspirator Sears owned or was selling FusionPharm stock.

H.     On or about October 10, 2011, defendant JEAN-PIERRE traveled to Denver, Colorado to meet with Coconspirators Sears and Dittman.

I.     On or about October 19, 2011, defendant JEAN-PIERRE sent Coconspirator Sears an email, with the subject described as "Proposed Agreement re purchase of MicroCap," attaching a document dated May 9, 2011 and entitled, "Agreement for the Purchase of Ownership Interest."

J.     On or about November 3, 2011, Coconspirator Dittman had another telephone conversation with the same FINRA investigator during which he stated that Coconspirator Sears no longer owned Microcap or any FusionPharm stock.

K.     On or about November 30, 2011, defendant JEAN-PIERRE emailed the FINRA investigator a written response to the investigator's requests for further information about Microcap, Coconspirator Sears and the purported change in ownership of Microcap.

L.     On or about June 4, 2012, Coconspirator Sears forwarded an email from Coconspirator A transmitting as an attachment a draft promissory note and credit line agreement for Bayside and stating that Coconspirator A would draft "the drawdown requests to match the dates and amounts of the deposits."

M.     On or about June 6, 2012, Coconspirator A sent Coconspirator Sears an email, bearing the subject "Bayside Loan Documents", transmitting, as a series of attachments,

proposed loan drawdown requests and draft promissory notes and credit line agreements, and stating, "Bill, Let's get these signed up. Meadpoint's to follow in a separate email."

N.      On or about June 6, 2012, Coconspirator A sent Coconspirator Sears a subsequent email, bearing the subject "MeadPoint Loan Documents," transmitting, as a series of attachments, proposed loan drawdown requests and draft promissory notes and credit line agreements.

O.      On or about June 11, 2012, defendant JEAN-PIERRE, responding to a forwarded email from Pacific Stock Transfer Company ("PSTC") advising that the transfer agent did not have a copy of certificate of designation for FusionPharm's Series A convertible preferred stock, emailed Coconspirator Sears with the following message: "OK! Well then, we have to create one embodying the governing terms and add the language in the certificate that, under no circumstances, will one be able to convert for more than 9.9% of the outstanding common stock of the Company."

P.      On or about June 20, 2012, Coconspirator A emailed Coconspirators Sears and Dittman and defendant JEAN-PIERRE a proposed due diligence package for a prospective FusionPharm debt purchaser that included nonconvertible versions of purported promissory notes held by Bayside and Meadpoint and several backdated purported documents for FusionPharm, including a backdated Certificate of Designation of FusionPharm Series A convertible stock.

Q.      On or about November 26, 2012, Coconspirator A sent an email to Coconspirator Sears attaching drafts of convertible promissory notes for Bayside and Meadpoint and advising that the "Notes work with the existing draw down requests."

R.     On or about December 12, 2012, Coconspirator Sears sent an email to a representative of FusionPharm's stock transfer agent transmitting a convertible promissory note in favor of Bayside, notifying the transfer agent that "Bayside has chosen to exercise its option to convert into shares [sic]," and that "Bayside [was] a family members [sic] company and I am assisting them [sic] as I am familiar with all parties."

S.     On or about December 27, 2012, Coconspirator A sent Coconspirator Dittman an email stating, "We are in need of a letter which confirms the end of the drawdowns under the Bayside promissory note," and advising that Coconspirator A had drafted such a letter for Coconspirator Dittman's signature.

T.     On or about January 7, 2013, Coconspirator Sears sent an email to a representative of FusionPharm's stock transfer agent, with subject identified as "Bayside Note FSPM," transmitting a Rule 144 Attorney Opinion Letter prepared by defendant JEAN-PIERRE and signed by the California Attorney; FusionPharm bank account statements "which reflect funding;" and a "[c]losing letter that closed the note."

U.     On or about January 30, 2013, Coconspirator Sears sent an email to Coconspirator A and Coconspirator Dittman attaching a draft of a licensing agreement between Vertifresh and FusionPharm that defendant JEAN-PIERRE had previously reviewed and edited, and advising, "This is the one we should work thru [sic]."

V.     On or about April 11, 2013, Coconspirator Sears sent an email to a representative of FusionPharm's stock transfer agent, with subject identified as "Meadpoint Venture Partners FSPM," stating that he was attaching a series of documents, including "a notice to convert," the "[o]riginal note," a "letter of opinion," and a "Non Affiliate declaration," and transmitting scanned versions of the described documents, which included a

Rule 144 Attorney Opinion Letter prepared by JEAN-PIERRE and retyped and signed by the California Attorney.

W.     On or about August 5, 2013, Coconspirator Dittman sent an email to an individual considering making an investment in FusionPharm proposing, in part, that some of the funds for the contemplated investment involve the individual's purchase of "part of the existing note payable from FusionPharm to Meadpoint Venture Partners."

X.     On or about the dates set forth below, the following written submissions for FusionPharm were posted to OTC Link's website portal:

| Overt Act | Date | Document |
|-----------|------|----------|
| X.1 | 7/21/11 | FusionPharm Information and Disclosure Statement for the period ended June 30, 2011 (posted as "Initial Company Information and Disclosure Statement") |
| X.2 | 7/22/11 | Current Information Letter |
| X.3 | 12/29/11 | FusionPharm Information and Disclosure Statement for the period ended September 30, 2011 |
| X.4 | 12/30/11 | Current Information Letter |
| X.5 | 3/31/12 | FusionPharm Annual Information and Disclosure Statement for the period ended December 31, 2011 |
| X.6 | 4/10/12 | Current Information Letter |
| X.7 | 6/12/12 | FusionPharm Quarterly Report for the period ended March 31, 2012 (revised) |
| X.8 | 6/14/12 | Current Information Letter |

Y.     The wire transmissions described and set forth in Counts 2 through 16 of this Superseding Indictment are incorporated herein by reference and realleged as individual overt acts done in furtherance of the conspiracy.

Z.     The mailings and deliveries described and set forth in Counts 17 through 20 of this Superseding Indictment are incorporated herein by reference and realleged as individual overt acts done in furtherance of the conspiracy.

AA.    The securities transactions described and set forth in Counts 21 through 23 of this Superseding Indictment are incorporated herein by reference and realleged as individual overt acts done in furtherance of the conspiracy.

In violation of Title 18, United States Code, Section 371.

**COUNTS 2 – 16**
**(Wire Fraud)**

36.    The allegations contained in paragraphs 1 through 35 of this Superseding Indictment are hereby realleged as if set out in full and incorporated by reference in these counts of the Superseding Indictment.

37.    At all times material to these counts, OTC Link required attorneys who wished to post Current Information Letters on its website to complete an attorney letter agreement with respect to each company for which the attorney undertook to prepare such letters. The attorney letter agreement required the attorney, among other things, to comply with certain prescribed written guidelines in preparing the Current Information Letters. These guidelines included the requirement that, if the letters relied on the work of another attorney, that counsel be identified and that counsel's own letters accompany the Current Information Letters. These guidelines also included the requirement that the authoring attorney state, to the best of counsel's knowledge, whether the company, and its shareholders owning more than five percent of the company's securities, or counsel him or herself, were under federal or state regulatory investigation for any violation of federal or states securities laws.

38.    On or about December 6, 2012, the SEC commenced a federal civil enforcement action in the Southern District of New York alleging that defendant JEAN-PIERRE had committed various federal securities violations in connection with misappropriating Jean-Pierre Relative A's identity and, without her knowledge, preparing a

series of Current Information Letters, Rule 144 Attorney Opinion Letters, and similar securities opinion letters in her name and forging her signature on these letters (Case No. 12-cv-8886).

39.     From at least in or about March 2011 and continuing at least through in or about August 2013, the exact dates being unknown to the Grand Jury, in the State and District of Colorado, and elsewhere, the defendant,

**GUY M. JEAN-PIERRE,**
**a/k/a Marcello Dominguez de Guerra,**

together with, and aiding and abetting, others known and unknown to the Grand Jury, devised and intended to devise a scheme and artifice to defraud the SEC, FusionPharm's stock transfer agent, OTC Link, and individuals and entities who invested in FusionPharm and its securities in private transactions and were involved in the public trading of its common stock.

40.     It was a part of the scheme and artifice to defraud that defendant JEAN-PIERRE assisted and advised in the preparation of backdated documents that falsely portrayed deposits of proceeds from the sale of FusionPharm common stock as convertible debt obligations owed to Bayside and Meadpoint.

41.     It was a further part of the scheme and artifice to defraud that defendant JEAN-PIERRE misrepresented, and assisted in the misrepresentation of, Microcap, Bayside and Meadpoint, and falsely portrayed these entities as non-affiliates of FusionPharm in Rule 144 Attorney Opinion Letters and related documents that were submitted to FusionPharm's stock transfer agent, in connection with efforts to convert supposed debt obligations to unrestricted shares of FusionPharm common stock, and in connection with efforts to deposit unrestricted common shares held in the names of these entities into brokerage accounts.

42.     As a further part of the scheme and artifice to defraud, defendant JEAN-PIERRE prepared, assisted in the preparation of and reviewed and approved quarterly and annual disclosure documents and financial statements and incorporated notes posted to OTC Link's website that, among other things, concealed the role of Coconspirator William Sears in the business of FusionPharm; his status as a *de facto* officer of FusionPharm and his joint control with Coconspirator Scott Dittman of its business affairs; his beneficial ownership of preferred and common shareholdings in FusionPharm; and that concealed and obfuscated related party transactions between FusionPharm, Meadpoint and Vertifresh that were claimed as the basis for FusionPharm's reported revenues.

43.     It was a further part of the scheme to defraud that defendant JEAN-PIERRE prepared Current Information Letters that falsely represented that the quarterly and annual disclosure documents and financial statements and incorporated notes uploaded on behalf of FusionPharm constituted adequate current information about FusionPharm and its securities within the meaning of applicable federal securities laws.

44.     It was a further part of the scheme to defraud that defendant JEAN-PIERRE would prepare these letters and the Rule 144 Attorney Opinion Letters for the California Attorney to sign and to represent as his own work product, and to serve as a primary conduit with the California Attorney for the information supporting the contents of these letters and the opinions conveyed in them.   The letters themselves would fail to disclose defendant JEAN-PIERRE's role and involvement in the preparation of the letters and, after December 2012, the fact that he was the subject of a federal civil law enforcement action alleging wrongdoing with respect to precisely the same type of attorney opinion letters.

## Wire Transmissions In Execution of the Scheme

45.     On or about the dates enumerated as to each count below, in the State and District of Colorado, and elsewhere, for the purpose of executing the aforesaid scheme and artifice to defraud and for obtaining money and property by false and fraudulent pretenses, representations and promises, and attempting to do so, the defendant,

**GUY M. JEAN-PIERRE,**
**a/k/a Marcello Dominguez de Guerra,**

did knowingly transmit and cause to be transmitted in interstate commerce, and did aid and abet others to cause to be transmitted, from or to a place within the State of Colorado to or from the places outside of Colorado, by means of wire communications, certain writings, signals and sounds, representing and constituting the following:

**The Uploads of FusionPharm Quarterly And Annual Reports to OTC Link.**

| COUNT | DATE | WIRE TRANSMISSION |
|---|---|---|
| 2 | 8/14/12 | Electronic transmission to OTC Link website portal www.otciq.com of FusionPharm Quarterly Report for the period ended June 30, 2012 |
| 3 | 11/15/12 | Electronic transmission to OTC Link website portal www.otciq.com of FusionPharm Quarterly Report for the period ended September 30, 2012 |
| 4 | 3/6/13 | Electronic transmission to OTC Link website portal www.otciq.com of FusionPharm Annual Information and Disclosure Statement for the period ended December 31, 2012 |
| 5 | 7/5/13 | Electronic transmission to OTC Link website portal www.otciq.com of FusionPharm Quarterly Report for the period ended March 31, 2013 |
| 6 | 8/20/13 | Electronic transmission to OTC Link website portal www.otciq.com of FusionPharm Quarterly Report for the period ended June 30, 2013 |
| 7 | 8/20/13 | Electronic transmission to OTC Link website portal www.otciq.com of FusionPharm Supplemental Information - OTC Pink Basic Disclosure Guidelines |

| | | Questionnaire |
|---|---|---|

**The Uploads of FusionPharm Current Information Letters to OTC Link.**

| COUNT | DATE | WIRE TRANSMISSION |
|---|---|---|
| 8 | 8/16/12 | Electronic transmission to OTC Link website portal www.otciq.com of FusionPharm Current Information Letter |
| 9 | 3/11/13 | Electronic transmission to OTC Link website portal www.otciq.com of FusionPharm Current Information Letter |
| 10 | 7/5/13 | Electronic transmission to OTC Link website portal www.otciq.com of FusionPharm Current Information Letter |
| 11 | 8/23/13 | Electronic transmission to OTC Link website portal www.otciq.com of FusionPharm Current Information Letter |

**The Submission of FusionPharm Rule 144 Attorney Opinion Letters to PSTC And Brokers.**

| COUNT | DATE | WIRE TRANSMISSION |
|---|---|---|
| 12 | 12/13/12 | Email from Sears to PSTC attaching Rule 144 Attorney Opinion Letter re: issuance of 140,000 common shares of FusionPharm common stock to Bayside |
| 13 | 3/7/13 | Email from Sears to PSTC attaching five Rule 144 Attorney Opinion Letters re: issuance of common shares of FusionPharm stock to five investors pursuant to a Securities Transfer Agreement for the sale of the Bayside note. |
| 14 | 4/11/13 | Email from Sears to PSTC attaching Rule 144 Attorney Opinion Letter re: issuance of 475,000 common shares of FusionPharm common stock to Meadpoint |
| 15 | 8/19/13 | Email from Sears to Scottsdale broker attaching Rule 144 Attorney Opinion Letter re: issuance of 500,000 common shares of FusionPharm common stock to Meadpoint |
| 16 | 8/30/13 | Email from Sears to PSTC attaching the last page of the signed Rule 144 Attorney Opinion Letter re: issuance of |

| | | 1,500,000 common shares of FusionPharm common stock to three individuals, each receiving 500,000 shares, related to the conversion of the Meadpoint note. |
|---|---|---|

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNTS 17 -20
### (Mail Fraud)

46.     The allegations contained in paragraphs 1 through 35 of this Superseding Indictment are hereby realleged as if set out in full and incorporated by reference in these counts of the Superseding Indictment.

47.     On or about the dates enumerated as to each count below, in the State and District of Colorado, and elsewhere, for the purpose of executing the aforesaid scheme and artifice to defraud and to obtain money and property by means of false and fraudulent material pretenses and representations, and attempting to do so, the defendant,

**GUY M. JEAN-PIERRE,**
**a/k/a Marcello Dominguez de Guerra,**

did knowingly cause, and aid and abet others to cause, the following matters and things to be sent and delivered by a commercial interstate carrier, according to the direction thereon:

| **COUNT** | **DATE** | **MAIL MATTER** |
|---|---|---|
| 17 | 7/25/12 | Federal Express Envelope, Tracking No. 800575942347, addressed to PSTC in Las Vegas, Nevada, containing FusionPharm Stock Cert. 7385 for 40,000 shares in the name of individual shareholder T.A., together with a stock power, a Rule 144 Attorney Opinion Letter, an officer's certificate, stock purchase agreement, debt settlement agreement, and instruction letters from Microcap and T.A. |
| 18 | 8/1/12 | Federal Express Envelope, Tracking No. 798688446223, addressed to William Sears in Colorado, containing FusionPharm Stock Cert. 11176 issued to Microcap for 40,000 shares |

| 19 | 1/18/13 | Federal Express Envelope, Tracking No. 794557022916, addressed to William Sears in Colorado, containing FusionPharm Stock Certificate 11208 issued to Bayside for 140,000 shares |
| 20 | 8/15/13 | Federal Express envelope, Tracking No. 796476186341, addressed to William Sears in Colorado, containing FusionPharm Stock Cert. 11227 issued to Meadpoint for 500,000 shares |

In violation of Title 18, United States Code, Sections 1341 and 2.

### COUNTS 21 – 23
**(Securities Fraud)**

48.     The allegations contained in paragraphs 1 through 35 of this Superseding Indictment are hereby realleged as if set out in full and incorporated by reference in these counts of the Superseding Indictment.

49.     From at least in or about April 2011 and continuing until at least in or about August 2013, the exact dates being unknown to the Grand Jury, in the State and District of Colorado, and elsewhere, the defendant,

**GUY M. JEAN-PIERRE,**
**a/k/a Marcello Dominguez de Guerra,**

with others known and unknown to the Grand Jury, willfully and knowingly, by the use of means and instrumentalities of interstate commerce, and the mails, did aid, abet, counsel, induce, and cause others to, directly and indirectly use and employ manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b 5, by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and

would operate as a fraud and deceit upon other persons and entities, all in connection with the purchase and sale of FusionPharm common stock.

50.     On or about the dates set forth below, as to each of the enumerated Counts, in the State and District of Colorado, and elsewhere, by use of the means or instrumentalities of interstate commerce, and in furtherance of this scheme to defraud and course of business, the defendant, GUY M. JEAN-PIERRE, did aid and abet, and counsel and induce the following securities transactions to be executed in brokerage accounts held in the names of Microcap, Bayside and Meadpoint:

| Count | Approx. Date | Securities Transaction |
|-------|--------------|------------------------|
| 21 | 10/18/12 | Sale of 5,036 shares of FusionPharm common stock held in a brokerage account in the name of Microcap at Scottsdale Capital Advisors |
| 22 | 2/4/13 | Sale of 2,085 shares of FusionPharm common stock held in a brokerage account in the name of Bayside at Scottsdale Capital Advisors |
| 23 | 5/14/13 | Sale of 21,676 shares of FusionPharm common stock held in a brokerage account in the name of Meadpoint at Scottsdale Capital Advisors |

In violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5 [Rule 10b-5]; and Title 18, United States Code, Section 2.

## COUNTS 24 – 28
### (Attempted Wire Fraud)

51.     The allegations contained in paragraphs 1 through 35 of this Superseding Indictment are hereby realleged as if set out in full and incorporated by reference in these counts of the Superseding Indictment.

52.     From on or about February 26, 2016 and continuing until on or about April 29, 2016, the exact dates being unknown to the Grand Jury, in the State and District of Colorado, and elsewhere, the defendant,

**GUY M. JEAN-PIERRE,**
**a/k/a Marcello Dominguez de Guerra,**

devised, and intended and attempted to devise, a scheme and artifice to defraud the SEC, OTC Link, and individuals and entities involved in the purchase and sale of securities of microcap companies in the public, over-the-counter securities markets, including, without limitation, stock transfer agents and securities brokerage firms.

## Background

53.     In or about 2014, defendant JEAN-PIERRE was disbarred from the practice of law in the State of Florida. On or about February 2, 2016, the State of New York disbarred JEAN-PIERRE as well, and, at that point, JEAN-PIERRE was no longer licensed to practice law in the United States.

54.     In or about February 2016, a cooperating witness (hereinafter, the "CW") residing in Colorado who was a prior client and business associate of defendant JEAN-PIERRE, at the direction of federal law enforcement agents and as part of an authorized undercover operation, presented defendant JEAN-PIERRE with a business proposal to resume the contemplated business of Vertifresh (*i.e.*, the cultivation of non-cannabis products through hydroponic growing pods) and, in connection therewith, to transform Vertifresh into a company with publicly traded securities through the acquisition of, and merger with, a dormant publicly traded microcap company.   The CW, at the direction of federal law enforcement agents, advised defendant JEAN-PIERRE that the contemplated principal owner and head of the newly constituted company, a Federal Bureau of Investigation Special Agent

acting in an undercover capacity (hereinafter, the "FBI UCA"), did not want to be publicly associated with the company, but rather intended to operate the business through a figurehead, and that the CW, who would be part of the business, did not want his involvement disclosed as well.

55.     In furtherance of the undercover operation, defendant JEAN-PIERRE was offered the opportunity to assist in the development of this business plan and, in particular, asked to find ways to obtain free-trading stock in the newly constituted company that the FBI UCA and the CW could sell once the dormant company had been acquired and its securities available for trading.

## The Scheme

56.     As part of the intended scheme and artifice to defraud, defendant JEAN-PIERRE, in collaboration with the CW, devised and assisted in devising a plan to secure free trading shares in the contemplated publicly traded company that involved the preparation of a backdated purported promissory note, convertible at the option of the holder, into common stock.   The plan entailed portraying bank deposits for cash that the CW claimed to have received in the past from various unrelated business dealing as loan funds from the FBI UCA that, in turn, would be evidenced by the purported debt instrument. It further involved describing and depicting the FBI UCA and CW as consultants to the newly constituted company, so as to provide a cover and explanation for their involvement in the business without betraying their status as control persons and affiliates of the company. The plan further contemplated ultimately presenting a finalized convertible promissory note, together with supporting documentation, including a Rule 144 Attorney Opinion Letter that defendant JEAN-PIERRE would undertake to procure from an amenable attorney.

57.     As a part of the intended scheme and artifice to defraud, over the course of March 30, 2016 through April 23, 2016, defendant JEAN-PIERRE drafted and provided the CW the following documents to show the FBI UCA and as templates to be completed and used upon the acquisition of the dormant publicly traded company:

A.     Two versions of a draft convertible promissory note for $50,000, identifying Vertifresh as the maker of the note, the first dated February 28, 2015 and representing that, between February 28, 2013 and February 28, 2015, the note holder had transferred a total of $50,000 to Vertifresh, and the second dated April 21, 2015 and representing that the note holder, now identified as the FBI UCA's purported company (identified herein as "TII") had transferred that same sum to Vertifresh prior to the April 21, 2015. Both draft instruments purported to allow the note holder, at its election, to convert portions of the outstanding balance of the purported debt into common shares of Vertifresh.

B.     A draft non-affiliation letter representing, among other things, that the FBI UCA's purported company, TII, was not and had never been an affiliate of Vertifresh, in its prior form, or as the reconstituted publicly traded company, within the meaning of SEC Rule 144.

C.     A draft Rule 144 Attorney Opinion Letter opining that common shares to be converted from debt that TII supposedly held pursuant to the convertible promissory note qualified for the Rule 144 registration exemption because, among other things, the debt had been held by TII for the requisite length of time and TII was understood not to be an affiliate of the reconstituted, publicly traded company.

D.     A draft consulting agreement between a consulting company to be formed by defendant JEAN-PIERRE and CW and Vertifresh, and intended as an instrument

to describe their contemplated involvement with Vertifresh.

        E.      A draft purchase and assignment agreement intended as an instrument to convey 50% of the FBI UCA's purported ownership interest in TII to an entity to be formed by defendant JEAN-PIERRE and the CW so that the latter two could supposedly have legal entitlement to half of the proceeds of the sale of the common stock to be garnered from the debt conversions under the contemplated convertible promissory note.

        58.      It was a further part of the scheme and artifice to defraud that defendant JEAN-PIERRE undertook to locate and enlist an attorney who could prepare and finalize the contemplated Rule 144 Attorney Letter based on the information to be provided by defendant JEAN-PIERRE and under his guidance and supervision.

        59.      As a further part of the scheme and artifice to defraud, defendant JEAN-PIERRE met with the CW and the FBI UCA in Miami, Florida over the course of April 28 and April 29, 2016 to explain the plan and proposal, to make refinements to the plan and proposal, and to review with the FBI UCA the foregoing documents that he had prepared and sent to the CW.

**Wire Transmissions In Execution of the Scheme**

        60.      On or about the dates enumerated as to each count below, in the State and District of Colorado, and elsewhere, for the purpose of executing the aforesaid scheme and artifice to defraud and for obtaining money and property by false and fraudulent pretenses, representations and promises, and attempting to do so, the defendant,

**GUY M. JEAN-PIERRE,**
**a/k/a Marcello Dominguez de Guerra,**

did knowingly transmit and cause to be transmitted in interstate and foreign commerce from a place outside the United States to a place within the State of Colorado, by means of wire

37

communications, certain writings, signals and sounds, representing and constituting the

following:

| COUNT | DATE | WIRE TRANSMISSION |
|---|---|---|
| 24 | 3/30/16 | Email from JEAN-PIERRE to the CW attaching a document entitled CMC/Vertifresh Consulting Agreement |
| 25 | 4/1/16 | Email from JEAN-PIERRE to the CW attaching a document entitled Convertible Promissory Note, dated February 28, 2015 |
| 26 | 4/23/16 | Email from JEAN-PIERRE to the CW attaching a document entitled Convertible Promissory Note, dated April 21, 2015, and a document entitled Non-Affiliation Letter |
| 27 | 4/23/16 | Email from JEAN-PIERRE to the CW attaching a document entitled Purchase And Assignment Agreement |
| 28 | 4/24/2014 | Email from JEAN-PIERRE to the CW attaching a document identified by file name "Form of Debt Conversion opinion.docx" |

All in violation of Title 18, United States Code, Sections 1343, 1349 and 2.

## COUNT 29
**(Money Laundering)**

61.     The allegations contained in paragraphs 1 through 35 of this Superseding

Indictment are hereby realleged as if set out in full and incorporated by reference in this count

of the Superseding Indictment.

62.     From on or about April 22, 2016 and continuing through on or about April 27,

2016, in the State and District of Colorado, and elsewhere, the defendant,

**GUY M. JEAN-PIERRE,**
**a/k/a Marcello Dominguez de Guerra,**

with the intent to conceal and disguise the location, source, ownership and control, of property

believed to be the proceeds of specified unlawful activity, did knowingly conduct and attempt

to conduct a financial transaction affecting interstate and foreign commerce involving property represented by a person at the direction of a federal official authorized to investigate violations of Title 18, United States Code, Section 1956, to be proceeds of specified unlawful activity, to wit: securities fraud, in violation of Title 15 United States Code, Sections 78j(b) and 78ff(a), and 17 C.F.R. Section 240.10b-5, and wire fraud, in violation of Title 18, United States Code, Section 1343, which financial transaction involved the mailing, receipt and deposit of a cashier's check drawn on 1st Bank in the amount of $5,000 and made payable to Guy M. Jean-Pierre and represented to be the proceeds of the sale of common stock of FusionPharm, Inc.

All in violation of Title 18, United States Code, Sections 1956(a)(3)(B) and 2.

## FORFEITURE ALLEGATION

63.     The allegations contained in Counts 1 through 23 of this Superseding Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to the provisions of 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

64.     Upon conviction of the offenses alleged in Count 1 of this Superseding Indictment, involving the conspiracy to commit of violations of Title 18, United States Code, Section 1343, Title 18, United States Code, Section 1341, Title 15, United States Code, Sections 78j(b) and 78ff(a), all in violation of Title 18, United States Code, Section 371; Counts 2 through 16, involving violations of Title 18, United States Code, Section 1343; Counts 17 through 20, involving violations of Title 18, United States Code, Section 1341, and Counts 21 through 23, involving an offense involving the sale of securities, the defendant,

**GUY M. JEAN-PIERRE,**
**a/k/a Marcello Dominguez de Guerra,**

shall forfeit to the United States, pursuant to Title 18, United States Code, Section

981(a)(1)(C), and Title 28, United States Code, Section 2461(c) any and all of the defendant's

right, title and interest in all property constituting and derived from any proceeds the

defendant obtained directly and indirectly as a result of such offenses, including a money

judgment in the amount of proceeds obtained by him in the conspiracy and through the above

enumerated offenses, less the amount recovered from directly forfeitable assets.

      65.     Upon conviction of the offense alleged in Count 29 of this Superseding

Indictment involving violations of Title 18, United States Code, Section 1956, the defendant,

**GUY M. JEAN-PIERRE,**
**a/k/a Marcello Dominguez de Guerra,**

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1),

any and all of the defendant's right, title and interest in all property, real or personal, involved

in or traceable to property involved in such offense, including a money judgment in the

amount of the proceeds obtained as a result of the offense, namely, $5,000.

      66.     If any of the property described above, as a result of any act or omission of the

defendant:

        a)     cannot be located upon the exercise of due diligence;
        b)     has been transferred or sold to, or deposited with, a third
                 party;
        c)     has been placed beyond the jurisdiction of the Court;
        d)     has been substantially diminished in value; or
        e)     has been commingled with other property which
                 cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p),

as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property.

A TRUE BILL:

Ink signature on file in Clerk's Office
FOREPERSON

ROBERT C. TROYER
ACTING UNITED STATES ATTORNEY

By:   s/Kenneth M. Harmon
        Kenneth M. Harmon
        Assistant United States Attorney
        U.S. Attorney's Office
        1801 California Street, Suite 1600
        Denver, CO   80202
        Telephone: (303) 454-0100
        Fax:   (303) 454-0402
        E-mail:   kenneth.harmon@usdoj.gov