1

1     IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF COLORADO
2
      Criminal Action No. 17-cr-0008-WJM
3
      UNITED STATES OF AMERICA,
4
          Plaintiff,
5
      vs.
6
      GUY M. JEAN-PIERRE,
7
          Defendant.
8
      ------------------------------------------------------------
9
                  REPORTER'S TRANSCRIPT
10                   (Status Conference)
11
      ------------------------------------------------------------
12        Proceedings before the HONORABLE WILLIAM J. MARTINEZ,
13    Judge, United States District Court for the District of
14    Colorado, commencing at 1:34 p.m., on the 4th day of
15    August, 2017, in Courtroom A801, United States Courthouse,
16    Denver, Colorado.
17
18                      APPEARANCES
19        KENNETH M. HARMON, Assistant U.S. Attorney, 1801
      California Street, Suite 1600, Denver, Colorado 80202,
20    appearing for the plaintiff.
21        KIRKLAND L. BRUSH, Attorney at Law, 155 East Boardwalk
      Drive, Suite 400, Fort Collins, Colorado 80525, appearing
22    for the defendant.
23                  MARY J. GEORGE, FCRR, CRR, RMR
                901 19th Street, Denver, Colorado 80294
24          Proceedings Reported by Mechanical Stenography
                Transcription Produced via Computer
25

P R O C E E D I N G S

1       (Call to order of the court at 1:34 p.m.)

2       THE COURT:  We're on the record in criminal case

3   No. 17 cr 008, United States of America versus Guy

4   Jean-Pierre, also known as Marcelo Dominguez de Guerra.

5       I'll take appearances of counsel.

6       MR. HARMON:  Good afternoon, Your Honor.  Kenneth

7   Harmon on behalf of the United States.  And seated at the

8   Government's counsel table to my immediate right is Special

9   Agent Kate Funk with the Federal Bureau of Investigation;

10  to my far right is Postal Inspector Robert Barnett, with

11  the United States Postal Inspector Service, the postal

12  inspector.

13      THE COURT:  All right.

14      MR. BRUSH:  Good afternoon, Your Honor.  Kirk

15  Brush here with the defendant, who's present in custody

16  seated at the table.

17      THE COURT:  All right.  Good afternoon to all five

18  of you.

19      All right.  We're here for a status conference to

20  discuss the current state of the speedy trial deadlines in

21  this case given the filing of a superseding indictment in

22  this case.  And I understand that the defendant had his

23  initial appearance and arraignment on the superseding

24  indictment today.

1          MR. BRUSH:  That's correct, Your Honor, and the

2    plea was not guilty to all counts.

3          THE COURT:  Okay.  Mr. Harmon, I'm going to

4    commend you on an excellent status report.  I really feel

5    I'm on top of this case and all the issues relevant to

6    speedy trial rights.

7          MR. HARMON:  Thank you, Your Honor.  I had the

8    benefit of talking to Mr. Brush as well, so helped out --

9    he helped me out on that.

10          THE COURT:  Thank you to the two of you.  The time

11    and effort that you put into it was well worth it.

12          Let me just make a couple of comments.  It seems

13    to me that unless Mr. Brush gets about eight cocounsel, I

14    don't see how this case is going to trial by -- on October

15    13th.  You're looking at discovery materials in excess of a

16    million pages and, amongst other things, and also notably,

17    I think this case -- and I'll just put it on the record --

18    it's notable to me that the defendant personally is seeking

19    to inspect documents, himself.  And given all of the

20    restrictions on a defendant being able to retain copies of

21    discovery materials and make copies of documents from the

22    discovery material, that request that's being accommodated

23    by the Government, itself, is going to add significant

24    pretrial time to this case, in my view, depending on how

25    large the subset of discovery materials that's referenced

 1    in the status report is made available to the defendant.

 2              And, Mr. Brush, maybe you can help illuminate me

 3    on that.  Are we talking about one percent of the million

 4    pages, 20 percent?  What are we talking about that your

 5    client is telling you that he needs to review himself,

 6    personally?

 7              MR. BRUSH:  Your Honor, what I've discussed with

 8    Mr. Harmon is that I would certainly want that batch of

 9    subset of the discovery to be -- to include anything where

10    my client's named or mentioned in the audio, whatever it

11    may be, and anything that -- regardless of his name being

12    mentioned, anything that would be within the world of

13    documents or other evidence they might be offering in

14    evidence either on direct or rebuttal.

15              The number of pages has to do with, I think, the

16    Government's trying to bring in everything concerning the

17    overall conspiracy, not all of which is alleged to have

18    involved directly this particular person.  So there --

19    I'm -- I'm sure Mr. Harmon can discuss that more.  There

20    are some things, such as travel brochures, that wound up in

21    some SEC documents that we got, things of that -- you know,

22    probably aren't relevant to anything, but . . .

23              THE COURT:  I understand there's probably -- you

24    know, probably not every stick of paper in the million page

25    discovery universe is -- is material or relevant to the

1    charged conduct, but we're still talking about a 28-count

2    superseding indictment that, as Mr. Harmon has

3    characterized it, effectively brings together the counts of

4    what had been -- or could be -- could have been prosecuted

5    as three separate cases into one.  There's a lot here.

6        MR. BRUSH:  There is.  And I'm not able to say

7    exactly what I think what the approximate count of that

8    would be or percentage of that would be because Mr.

9    Harmon's really got to decide what it is that he would like

10   to put into evidence.  My only request that it include

11   everything that might show up in the evidence.  And --

12       THE COURT:  I understand.  While I have you up at

13   the lectern, the -- this was not a joint, although I'm

14   finding out now that counsel had consulted with each other

15   before it was filed and it ends the -- the report ends with

16   Mr. Harmon's representation to me that you discussed the

17   contents with him and you are aware of the contents, but

18   there's nothing in here that tells me what you agree with,

19   what you disagree with, how strongly you agree or disagree.

20   So give me some sense of where you stand on all this.

21       MR. BRUSH:  I don't challenge any of the facts set

22   out concerning the amount of discovery, speedy trial

23   calculations, that sort of thing.  I'm in the position

24   where I'm not able to, on behalf of this defendant, agree

25   to any further exclusion of time within speedy trial beyond

1    day 1 today starting the 70 days, so . . .

2              THE COURT:  All right.

3              MR. BRUSH:  I know that's a difficult situation

4    for the Court to address, but --

5              THE COURT:  Well, I mean, I hear what you're

6    telling me.  I think it's completely unrealistic for your

7    client to be taking that position.  It's absurd in this --

8    in these circumstances.

9              MR. BRUSH:  If I may, Your Honor, in his defense,

10   for whatever reasons -- and I know we had some time when

11   we -- both the prosecution and defense kind of backed off

12   of further pretrial preparation efforts in hopes of --

13   during that first 90 days the Court gave us, in hopes of

14   maybe resolving the case by agreement and just,

15   unfortunately, it didn't happen.

16             THE COURT:  Right.

17             MR. BRUSH:  But the other side of this is this

18   investigation goes back five years and -- and the defendant

19   was arrested in the first few months of April or so of

20   2016.  And from his point of view, since after he finished

21   serving some jail time in New York, he was brought here.

22   He was thinking, oh, they'll have everything and we can get

23   this over with whatever way as quickly as possible.

24             THE COURT:  But not before I get to review the

25   certain subset of the discovery.

1          MR. BRUSH:  That is true.  That's important for

2     him to be able -- this is -- I'm sure the Court has run

3     across this in drug cases where the prosecution provides

4     one of these redacted type discovery at the jail for the

5     defendants to be -- because it's so voluminous, it's not

6     really practical for the counsel to come out and do this --

7          THE COURT:  That's not novel to this case, but I

8     think Mr. Harmon's correct when he says that whatever --

9     whether we're talking about a thousand pages, 25,000,

10    100,000 of the million, there's a process that needs to go

11    through in terms of review for material that necessarily,

12    for privacy and other reasons, must be redacted from these

13    documents and otherwise.

14          So it sounds to me like your client's trying to

15    have his cake and eat it, too.  He wants to force the

16    Government to go to trial within 10 weeks from today, but

17    he wants to be able to force them to go through the

18    document review and redaction process to allow him to

19    inspect these documents at his facility in -- as he sees

20    fit.  I mean, I think those are inconsistent positions to

21    be taking.

22          MR. BRUSH:  And I --

23          THE COURT:  Because if he really wanted to go to

24    trial in 10 weeks, he would say, I don't want -- I don't

25    need to see anything else, our negotiations are dead in the

1    water, I want to go to trial 10 weeks from today and not

2    another day.  But that's not what he's saying.

3              MR. BRUSH:  And I think it's his hope that within

4    the next, I don't know, no more than 30 days, that the

5    redacted version would be available to him so he would at

6    least have a chance to go over it --

7              THE COURT:  Again, doesn't -- are we talking about

8    500 pages or 125,000 pages?

9              MR. BRUSH:  I do not know.

10             THE COURT:  Mr. Harmon will have an opportunity to

11   chime in, but it's -- the way it was described in terms of

12   what your client is looking for, I doubt that we're talking

13   about a minuscule portion.  I don't think it's probably a

14   large portion of it, but I don't think it's a couple

15   hundred pages.

16             MR. BRUSH:  I would agree it's going to be in the

17   thousands rather than the hundreds.

18             THE COURT:  Anything else you wanted to tell me in

19   terms of your position on the representations the

20   Government has made in this case -- in this case -- in this

21   status report?  Specifically what I'm referring to there is

22   the Government's representations and contentions as to why

23   a tolling of the Speedy Trial Act would be warranted in

24   this case.

25             I understand that your client is not allowed --

1   has instructed you not to agree to it, but give me more, if

2   you have any more, in terms of your reasoning and

3   contention as to why such an extension -- or such a tolling

4   period should not be granted.

5            MR. BRUSH:  Your Honor, and, again, I don't

6   dispute the factual information contained in the status

7   report.  I would, as an additional piece of information

8   that I don't think has been put in, the Court's willingness

9   to allow me to have Mr. Dimris convert the data to a more

10   search friendly format has been tremendously helpful.

11            THE COURT:  I just signed off on another e-Voucher

12   about 10 minutes ago.

13            MR. BRUSH:  I appreciate it, Your Honor.  And I

14   know it's a lot of money, but I appreciate that.  I can't

15   tell you what a difference it makes in the office.

16            THE COURT:  No, I think it was a reasonable

17   request because without it -- I mean, if we're going to do

18   the old-fashioned paper review, you'd -- we would be

19   looking at months --

20            MR. BRUSH:  Sure.

21            THE COURT:  -- of review.

22            MR. BRUSH:  So I can tell the Court that from the

23   point of my ability to review the discovery, certainly time

24   is nice to have, but with the 70-day limit, I would be able

25   to do a pretty good job of locating those matters that

1    would be relevant to the counts.

2         Right now, my staff is going through -- as we

3    speak, going through discovery and batching discovery with

4    each count so we have that tied together.  So it's -- it is

5    doable, more doable on my side.  Obviously the defendant's

6    having to get started and that's the issue the Court has

7    brought up.

8         THE COURT:  Well, the superseding indictment was

9    returned -- what day was it returned, Mr. Harmon?

10        MR. HARMON:  July 13, Your Honor.

11        THE COURT:  July 13.  So we're all of three weeks

12   post superseding indictment, so I don't think your staff,

13   unless you have a very large staff, has gotten too far in

14   that project.

15        MR. BRUSH:  It's not large, but --

16        THE COURT:  Okay --

17        MR. BRUSH:  -- very efficient with the

18   searchability of it.

19        THE COURT:  Okay.

20        MR. BRUSH:  Thank you.

21        THE COURT:  Anything else?

22        MR. BRUSH:  No, Your Honor.  Thank you.

23        THE COURT:  Okay.  Mr. Harmon, I'll let you take

24   the lectern and you can respond to the colloquy I've had

25   with counsel and anything else you would like to state

1    relevant to this matter.

2            MR. HARMON:  Thank you, Your Honor.  I respect Mr.

3    Brush's experience and professional judgment, and we've had

4    collegial relationships but, respectfully, I don't know if

5    he is aware of what he's getting into.  You know, I

6    mentioned in the pleadings that there were three cases.

7    You know, I've got to apologize, effectively there could be

8    a fourth case and here's the reason why:  It was abrogated

9    in the superseding indictment, but the reasons for all of

10   the conduct that's alleged emanate from problems that Mr.

11   Guy Jean-Pierre got into with -- in -- before 2012 that

12   culminated in the enforcement action that the SEC brought

13   in 2012.

14           We made an access request to the SEC in New York

15   for the evidence in that case, which includes sworn

16   testimony of the defendant.  We've given over that, but we

17   have yet to get all of that.

18           Now, we're going to try to provide to the Court

19   and to the jury the full extent of the defendant's conduct

20   to show his mens rea, his lack of good faith, his bad faith

21   in undertaking this, and that's going to necessarily get us

22   into even this fourth case, which is the SEC case.

23           THE COURT:  So are you saying -- let me interrupt

24   you -- that if there's a potential fourth case, are you --

25   is there a potential second superseding --

1          MR. HARMON:  No.  No, there's not.

2          THE COURT:  All right.

3          MR. HARMON:  So it is conduct that very much

4    informs and is intertwined -- potentially intertwined with

5    the conduct that is charged, and let me tell you why:  The

6    SEC case that was brought in 2012 involved the defendant's

7    hijacking and misappropriation of his niece's identity and

8    the use of her law license to write these letters.  Well,

9    that tells you why he ended up having to do certain things

10   in the charged case, and I think it's relevant under

11   Rule 404(b) of the Federal Rules of Evidence -- of

12   Evidence, but it's also relevant because some of these

13   letters -- at least one of these letters make their way

14   into being used in the charged conduct.

15          Mr. Guy Jean-Pierre was actually a witness under

16   oath in the investigation leading up to this.  We're

17   giving -- we have given over what we've got so far, but we

18   haven't seen everything that the SEC gave us, so I'm --

19          THE COURT:  Why is that?

20          MR. HARMON:  Well, it's still being amassed.  Now

21   I think I've got the most important things.  I think I've

22   got what, to me, the most important things are the

23   defendant's own testimony and the exhibits that were used,

24   and I provided that to him.

25          But I did want to make sure Mr. Brush understood

1    that we're going to bring into the -- into play conduct

2    that precedes the charged conduct.  And I think he's aware

3    of this, but when we talk about three cases, we're actually

4    talking about conduct involving a fourth case as well, so

5    it adds even more to the complexity.

6          In fact, Mr. Brush and I kind of talked about

7    this, whether or not it should be kept in and out of the

8    case.  And if we do do motion practice, something that may

9    be a luxury for the parties if we don't get some exclusion

10   from the 70 days, that very well -- that very well could be

11   an issue in this case as to what can get in and what cannot

12   get in.  I can understand Mr. Brush, with the luxury of

13   time, could fashion some arguments about this.

14         The only -- one of the things I do want to say,

15   Your Honor, is sometimes we kind of get hung up in the

16   details, but sometimes it's best to understand, you know,

17   where experienced practitioners are coming from and what

18   they really think it takes to prepare on a case.

19         And maybe it was fortuitous, but on my way over to

20   court I saw that -- what was filed in another case, the

21   other case that you have involving this matter, one of the

22   defendants.  A solo practitioner, a CJA counsel member who

23   has, I think, a similar practice to Mr. Brush, just filed a

24   motion to get a second lawyer on the case, an experienced

25   securities lawyer, docket entry 109.

1          THE COURT:  The lawyer for -- Mr. Dubois, a lawyer

2     for Mr. Sears.

3          MR. HARMON:  Yes.

4          THE COURT:  The Sears and Dittman case.

5          MR. HARMON:  Right.  For Mr. Dittman, he's already

6     pled guilty and made that decision, but he wants a

7     lawyer -- a second pair of eyes and a second lawyer just to

8     defend on the sentencing aspect of it.  So that kind of

9     gives us some indication of another practitioner's take on

10    this case, a fellow who came into the case not too much

11    before Mr. Brush did.  He came in December.

12         THE COURT:  Right.

13         MR. HARMON:  Now, I do want to -- I'm happy to

14    answer specific -- any questions the Court might have, but

15    I do want to comment on a couple of things that Mr. Brush

16    said.  His client is right that the -- he was arrested in

17    Miami last April.  He was not arrested on a federal case,

18    he was arrested on the state case.

19         THE COURT:  A New York case, right?

20         MR. HARMON:  On the New York case.  That was

21    actually a case that was a case that was adopted by

22    New York State from the SEC's 2012 case.  At the time, we

23    have the complaint, but we weren't ready to go.  One of the

24    things we wanted to button up, and one of the reasons that

25    you have -- I believe you have this case as well as the

1    Dittman and Sears case, is we had to finish up the case on

2    Sears and Dittman because the resolution of that case

3    affects how we would proceed and prepare for this case.

4            Now, if Your Honor will recall, Mr. Dittman -- Mr.

5    Sears, excuse me, made it through his plea in November; Mr.

6    Dittman took a little bit of time.  It wasn't until January

7    that Mr. Dittman finally entered his plea.

8            Now, it turns out that we felt it wasn't proper to

9    yank Mr. Jean-Pierre out of Rikers Island in state custody,

10   bring him here before we had gotten things buttoned up with

11   Mr. Dittman, only to either have him shipped back or

12   whatnot.

13           So we brought the case and -- the first case when

14   we knew that Mr. Dittman and Mr. Sears had resolved their

15   cases and when Mr. Jean-Pierre was done with his time in

16   Rikers Island.

17           Now, what we did is what we thought was a

18   responsible course, which was to present the first case to

19   Mr. Jean-Pierre and his counsel so that he would see what

20   the simplest case was, so that we could see if we could

21   work something out, because I think the parties actually do

22   have, from a logical perspective, a pretrial resolution to

23   this case.  Whether it's pursued or not, you know, we are

24   not supposed to intrude --

25           THE COURT:  Right.

1          MR. HARMON:   -- in those affairs with the Court --

2          THE COURT:   But it sounds like you've been making

3    efforts.

4          MR. HARMON:   Right, we have.  And, frankly, that

5    is why Mr. Brush asked for the 90 days, acknowledged in his

6    pleading that the case was complex, said in his motion that

7    he wasn't sure whether he would need more time, but he

8    wanted at least 90 days to get his arms around the case,

9    and those 90 days is what was required so that Mr. Brush

10   could intelligently discuss the case with us in a reverse

11   proffer.

12         Now, I thought it was very telling when I got to

13   that reverse proffer just how much of the discovery the

14   defendant had been through at that point.  By that point he

15   had available to him, through Mr. Brush, 10 hours of under-

16   -- nine hours of meeting tapes for the 2016 undercover

17   investigation and two hours of recorded calls beforehand.

18         We tried to play him a couple of snippets as part

19   of this reverse proffer.  He made it through one of them,

20   he didn't want to hear the rest.  And to this day, I'm not

21   sure he's heard a single one.  So if we talk about -- if we

22   talk about what this defendant in custody will have to do

23   just to hear the most damning and incriminating evidence in

24   the 2016 case, he is going to have to go through nine hours

25   of meeting tapes in 2016, preceded by two hours of calls.

1   That's just a fraction of what would be the evidence that

2   we would be prepared to show in court.

3          Now I'm not saying we're going to play all nine

4   hours in court, but I -- as I told Mr. Brush this morning,

5   if I were a defense lawyer, I wouldn't want to take the

6   position, which almost is what the position I'm hearing

7   now, is, Just give me what you intend to show, I don't

8   really care about hearing the rest of it.

9          If I were a defense lawyer doing an effective job,

10  I would say, if my client is on a recording, I want to hear

11  every single minute of that recording.  Well, there's 11

12  hours of that that this defendant has not yet heard and he

13  has not even finished the transcript.

14         THE COURT:  And that is just for the 2016 case.

15         MR. HARMON:  That's right.  That's right.

16         THE COURT:  Did the earlier cases have similar

17  volumes of recordings, if any?

18         MR. HARMON:  The earlier cases have 10 hours of

19  undercover recordings, but with Dittman and Sears.

20         THE COURT:  Okay.

21         MR. HARMON:  Not with Mr. Guy Jean-Pierre, and I

22  don't think he's mentioned in that, but, frankly, as I told

23  Mr. Brush, if I were in his position and I wanted to be

24  effective, I would want to hear a good portion of what

25  those cooperators had to say on tape because I would want

1    to be armed with it and be ready to impeach them in

2    cross-examination when and if they took the stand.

3            Now, is he going to have a chance to do that?  Is

4    Mr. Guy Jean-Pierre going to have a chance to do that?  Are

5    they going to get through effective discovery or is this

6    simply tactical gamesmanship on the part of not Mr. Brush,

7    but Mr. Guy Jean-Pierre?  I don't know.  The Court has the

8    tools to examine that question *in camera ex parte* without

9    me being here.  But what I see from the record is what Mr.

10   Brush saw back when he first made this motion that it's a

11   complex case worthy of extra exclusions of time, and I

12   think the Court should entertain an exclusion of time for

13   all the reasons I set forth in my status report and for the

14   reasons Mr. Brush referenced in his motion to continue.

15           THE COURT:  Okay.  What are we talking about?  How

16   much does the Government believe it reasonably needs in

17   terms of additional time to prepare for this case --

18   prepare for trial?

19           MR. HARMON:  I'm cognizant that Mr. Brush's client

20   is in prison and I don't think this case should go into the

21   next year.  I would love to get it tried before

22   Thanksgiving, but I need every minute and every day of that

23   time into November, and I think the process needs every

24   minute and every day of that time to get us into

25   November.

1          THE COURT:  Let me tell you what I would prefer,

2     is that I think that's not realistic from what you've told

3     me in your report.  I'd much prefer to have a single motion

4     that I can grant that takes us to realistically where we

5     think we're going to be in a trial as opposed to having

6     piecemeal motions, if I gave you 60 days now, then you file

7     for another 60, another 90.  So that's my preference.

8          So hearing that, do you want to give me another

9     period of time that you think would be reasonable here?

10          MR. HARMON:  I'd like to get it done by the end of

11     the year.  I can make a motion into -- that gets us to the

12     end of the year.

13          THE COURT:  Okay.  So if October 13th is the

14     current speedy trial deadline based on today's

15     arraignment -- or initial appearance entered -- it was an

16     initial appearance and an arraignment?

17          MR. BRUSH:  It was arraignment, yes.

18          THE COURT:  So we're looking at -- if we do a

19     90-day, that could get us into -- the deadline would be

20     early or middle of January.  It doesn't mean we have to do

21     the trial in January, but we could try to get it done in

22     December.

23          I understand Mr. Brush's predicament in terms of

24     the instructions that he has from his client that he's

25     opposed to such a motion.

1          Let me just look at my calendar here.

2          MR. HARMON:  Your Honor, do you want me to stay at

3     the podium or do you want me to resume my seat?

4          THE COURT:  You can resume --

5          MR. HARMON:  I can stand, I'm -- it's healthier

6     that way, but I don't want to be presumptuous standing up

7     here before the Court --

8          THE COURT:  That's okay.  You can return to your

9     seat.  How long of a trial do you think, Mr. Harmon, we

10    would need to do this case?

11         MR. HARMON:  I think the Government would want 10

12    days to put its case in, and I understand that there's

13    going to be a defense case and rebuttal, so I'm thinking

14    three weeks.

15         THE COURT:  Whoa.

16         MR. HARMON:  Now if Mr. Brush says he's not going

17    to put on a case, then I can put my case on in two weeks.

18         THE COURT:  All right.  Mr. Brush, from your

19    perspective, how long?

20         MR. BRUSH:  I certainly don't see that I would be

21    taking anything -- neither the amount of time that the

22    Government would put on its case.  I might need probably

23    just three or four days, maximum, so -- it would be two

24    weeks total?

25         THE COURT:  No.

1          MR. BRUSH:  Actually three weeks.  Three weeks

2    with the weekends.

3          THE COURT:  Three-week criminal trial.  My God.

4          MR. HARMON:  And, Judge, I don't mean to

5    interrupt.  Our job, and what we're going to do with the

6    time that you're going to give us, is to try to hone down

7    this case.  That's kind of what we do is we talk to all the

8    witnesses, we see which ones are more effective to use in

9    court and which ones are less, so we're going to pare that

10   down, but what I wanted -- what I didn't want to do is go

11   in and say it's going to be a one-week trial and we have

12   you in court with us and a jury twice or three times that

13   length.

14         THE COURT:  Right.  The problem, of course, is

15   that, you know, we're down a judge, we don't have -- even

16   when we're at full complement, we don't have enough judges

17   here and, my God, my docket -- my trial schedule this year

18   is . . .

19         And I'm just looking at criminal trials that I

20   think may go because, obviously, I would bump any civil

21   trials to accommodate this matter.

22         Well, first, let me say on the record, obviously I

23   need to -- we would have to get something in writing

24   because I think the statute requires it in terms of

25   findings, but I would grant a motion under 3161 of the

1    Government for a 90-day tolling of the Speedy Trial Act.

2           I'm just looking here as a practical matter, given

3    my other older -- significantly older criminal cases that I

4    think may have a high likelihood of going, whether we could

5    get that done.

6           Mr. Brush, you said -- now I always hear from

7    defense counsel, I'm going to need three or four days, and

8    then they end up taking two hours or putting on no

9    evidence.  Give me the best realistic estimate you think

10   you would take to put on whatever defense you would

11   anticipate putting on.

12          MR. BRUSH:  Depends -- of course, as the Court

13   knows, this is always the situation, depending on what can

14   be brought out in cross-examination, maybe a day.  I just

15   have to see what could be brought.  And part of that is

16   because of the uncertainty with the discovery that's still

17   coming forward on, as I understand, the witnesses that are

18   being debriefed at this time, or at least discuss -- things

19   discussed with them, that sort of thing, the type of

20   defense that I foresee for the defendant in this case is

21   not a -- an expert witness type of defense or a battle of

22   experts, that sort of thing.  I think that a lot of the

23   objective facts are not in dispute.  The question is what

24   do they mean when they're placed in evidence.

25          THE COURT:  Okay.  This is what I'm going to do.

1    And I think the parties need to understand that if I have

2    conflicting criminal trials, obviously I can't try them

3    both at the same time and it may be that one would have to

4    be -- I would have to seek the assistance of one of my

5    colleagues to do one of them and it might be this one, so

6    I'm just putting counsel on notice of that because

7    there's -- everyone wants a piece of me and there's only so

8    much to go around.

9            So what I'm going to do is set this for a 13-day

10   trial beginning December 4th and concluding on December

11   20th, assuming, Mr. Harmon, from what -- given your

12   request, that works for your schedule.

13           MR. HARMON:  I'm sorry, Your Honor?

14           THE COURT:  I'm assuming, given your request, that

15   that works on your schedule.

16           MR. HARMON:  We'll make it work, yes.

17           THE COURT:  All right.  Mr. Brush?

18           MR. BRUSH:  Yes, Your Honor, that works fine.

19           THE COURT:  All right.

20           MR. BRUSH:  If I may, Your Honor, just -- I know

21   the Court will -- probably would refer this motion to the

22   magistrate anyway, one of the things I anticipate doing,

23   which should not delay anything about the pretrial

24   preparation, is given that this is a nonviolent, nondrug

25   offense, I intend to file a motion for reconsideration of

1    bond to, possibly, halfway house or something of that

2    nature, which might help in some ways, at least, with

3    things, but . . .

4            THE COURT:   I won't hold you to it, but what is

5    your initial response for the Government?

6            MR. HARMON:   Sure, Your Honor.   The defendant

7    is -- although he's a dual citizen, he relocated to the

8    Dominican Republic, he has no real abiding ties either to

9    this district, and his ties to the remainder of the country

10   are tenuous at this point, he has no job here, so we would

11   vigorously oppose that motion.

12           THE COURT:   Okay.   You believe him to be a flight

13   risk?

14           MR. HARMON:   Absolutely.

15           THE COURT:   Has he surrendered his passport, Mr.

16   Brush?

17           MR. BRUSH:   Your Honor, I have those in my

18   office -- I say "those" because there was one under his

19   first name and the other that's been canceled, and also the

20   current name, and I would have, of course, surrendered

21   those --

22           THE COURT:   Didn't Judge Varholak order you to do

23   that today?

24           MR. BRUSH:   No, because there was no bond set or

25   anything today, no discussion of any of that, those sort of

1    things.

2            THE COURT:  Okay.  All right.  Okay.  Well, I

3    mean, given the fact that your client is a citizen of

4    another country --

5            THE DEFENDANT:  Your Honor, if I may, I am not a

6    citizen of any country other than the United States.

7            THE COURT:  Okay, sir, please.

8            THE DEFENDANT:  But we should not allow the

9    prosecutor to say something that he's incorrect and if

10   you --

11           THE COURT:  Let your lawyer speak for you here,

12   sir, please.

13           MR. BRUSH:  I think what the defendant's getting

14   at is that he came -- he's actually from the country of

15   Haiti.  He and his parents came here when he was young, and

16   he's not really been realistically a citizen of Haiti

17   during that time.

18           THE COURT:  What country does he hold a passport

19   from?

20           MR. BRUSH:  The United States, Your Honor.  He is

21   a United States citizen.  Having been born in Haiti, but --

22           THE COURT:  Okay.  All right.  Okay.  Well, what

23   I'm -- what I'm saying is, Mr. Brush and Mr. Jean-Pierre,

24   you should know that -- first of all, if you're going to be

25   seeking a reconsideration of a detention order from a

1   magistrate judge, it's my understanding that I would have

2   to -- I can't have the magistrate judge review his or her

3   own decision for detention, so I would have to hear that.

4              MR. BRUSH:  And that will be perfectly acceptable,

5   Your Honor.  I wasn't sure how that would work.

6              THE COURT:  I'm saying I would have to do that,

7   and I would not -- obviously not prejudging anything, but

8   you could be certain that if I do grant it, a surrender of

9   the passport would be absolutely required.

10             MR. BRUSH:  Certainly, Your Honor.

11             THE COURT:  Okay.  We'll set this -- I may be

12   repeating myself -- but a 13-day jury trial beginning

13   November -- or December 4th, concluding December 20.  In

14   terms of a final trial preparation conference, does 10:00

15   on Wednesday, November 22d, work for the Government?

16             MR. HARMON:  I want to say yes, Your Honor.  I

17   don't have a calendar in front of me.  When is that in

18   relation to Thanksgiving?

19             THE COURT:  That's the day before Thanksgiving.

20             MR. HARMON:  I'll make it work.

21             THE COURT:  That's what I'm doing in the morning,

22   in case you might be doing something in the afternoon.

23             MR. BRUSH:  That's fine for defense, Your Honor.

24             THE COURT:  All right.  We'll set this for a final

25   trial preparation conference on November 22d, 2017.  The

1    last thing we're going to need to do is I have plenty of

2    orders where I have granted ends of justice continuances

3    requested by the defendant under a different provision

4    under 3161, and I don't know that we have an order that I

5    can use under this specific provision that the Government

6    has used.

7            You may know about my trial schedule with other

8    cases and we're up to our eyeballs in work so, Mr. Harmon,

9    I'm going to ask you to submit to my chambers a proposed

10   draft order that sets forth the factual findings and --

11   factual findings for your -- the granting of your motion

12   and sets forth the setting of the trial date and trial

13   preparation conferences as I've set forth.  How much time

14   would you need for that?

15           MR. HARMON:  Well --

16           THE COURT:  Whatever you need.

17           MR. HARMON:  I want to make sure it's the proper

18   order because this, obviously, is an issue that you don't

19   see every day --

20           THE COURT:  Right.

21           MR. HARMON:  I would ask for a week to do that.

22           THE COURT:  I'll give you two weeks.

23           MR. HARMON:  Okay.  I'll take it.

24           THE COURT:  All right.  Government counsel is

25   directed to file -- you can just e-mail it to chambers, you

1    don't have -- because it's just a draft that we will work

2    off of, you can just e-mail to chambers that draft proposed

3    order granting the Government's motion for a 90-day tolling

4    of the Speedy Trial Act under Section 3161, and we will use

5    that and get that entered promptly after.  And that will

6    help us a lot and I would personally very much appreciate

7    that.

8            MR. HARMON:  I will do my best, Your Honor.

9            THE COURT:  All right.  Okay.  Is there anything

10   else that we need to contend with today?

11           MR. HARMON:  Nothing from the Government.

12           MR. BRUSH:  Your Honor, I missed the time on

13   November 22d for the pretrial.

14           THE COURT:  What did I say, Deb?

15           COURTROOM DEPUTY:  10:00.

16           THE COURT:  Okay.  10:00 a.m.  That way you can

17   start your Thanksgiving a little bit earlier than Thursday,

18   you can start in the afternoon, but at least I'll have you

19   for the morning.

20           Anything else for the defendant at this time?

21           MR. BRUSH:  No, Your Honor.

22           THE COURT:  All right.

23           MR. BRUSH:  No, Your Honor.  Thank you.

24           THE COURT:  The defendant is remanded to the

25   custody of the United States Marshal.  Thank you.  That

1     will be all.

2          (Proceedings concluded at 2:10 p.m.)

3                    *     *     *     *     *

4                    REPORTER'S CERTIFICATE

5

6          I certify that the foregoing is a correct transcript

7     from the record of proceedings in the above-entitled

8     matter.

9          Dated at Denver, Colorado, this 8th day of August,

10    2017.

11

12

13

14    _                                                    _

15                    MARY J. GEORGE, FCRR, CRR, RMR

16

17

18

19

20

21

22

23

24

25