1

1            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO

2     Case No. 17-CR-00008-WJM-1

3     -------------------------------------------------------

4     UNITED STATES OF AMERICA,

5          Plaintiff,

6     vs.

7     GUY M. JEAN-PIERRE,

8          Defendant.
      _____

9

10            Proceedings before NINA Y. WANG, United States

11    Magistrate Judge, United States District Court for the

12    District of Colorado, commencing at 1:55 p.m., February 9,

13    2017, in the United States Courthouse, Denver, Colorado.

14    _____

15            WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

16    ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

17    _____

18                    APPEARANCES

19            KENNETH HARMON, Attorney at Law, appearing for

20    the Plaintiff.

21            KIRK BRUSH, Attorney at Law, appearing

22    for the Defendant.

23    _____

24       ARRAIGNMENT, DISCOVERY, AND DETENTION HEARING

25

2

```
 1              P R O C E E D I N G S

 2              (Whereupon, the within electronically recorded

 3     proceedings are herein transcribed, pursuant to order of

 4     counsel.)

 5              THE COURT:  The next matter I have is 17-cr-8-WJM,

 6     United States of America vs. Guy Jean-Pierre.  Could I have

 7     appearances of counsel, please.

 8              MR. HARMON:  Good afternoon, Your Honor.

 9              Kenneth Harmon on behalf of the United States and

10     together with me at counsel table is the FBI case agent

11     Special Agent (inaudible).

12              THE COURT:  Good afternoon, Mr. Harmon.

13              MR. BRUSH:  Good afternoon, Your Honor.  Kirk Brush

14     here with the defendant, who is present in custody in the

15     middle of the first row in the jury box.

16              THE COURT:  Good afternoon, Mr. Brush, and good

17     afternoon, Mr. Jean-Pierre.

18              I believe we are here for an arraignment,

19     discovery, and detention hearing, so Mr. Brush, does your

20     client wish to have further advisement of his constitutional

21     rights and a formal reading of the charges against him?

22              MR. BRUSH:  Your Honor, we will waive all those

23     formalities.  The Court was kind enough to advise him fully

24     when we were here a few days ago and it's a very simple

25     indictment, so we do not need to have the formal arraignment.
```

3

1    We just enter a plea of not guilty to the indictment.

2           THE COURT:  All right.  The record will reflect

3    that the defendant Guy Jean-Pierre has waived any further

4    reading of the charges against him and formal -- sorry,

5    formal reading of the charges against him and further

6    advisement of his rights and that he has entered a plea of

7    not guilty to the one count of the indictment against him,

8    and the record will reflect that he is now arraigned.

9           All right.  So let's go to the discovery portion of

10   the proceeding.  Mr. Brush, have you received a copy of your

11   client's criminal history?

12          MR. BRUSH:  Your Honor, that's not in the discovery

13   report.  The pretrial officer advised me that there was only

14   the New York case mentioned in the report.  There is nothing

15   else, so there is no other.  So I am aware of the New York

16   history.

17          THE COURT:  All right.  So I'll put today's date

18   with that.  Mr. Harmon, when will the Government be prepared

19   to make disclosures?

20          MR. HARMON:  Your Honor, I would ask for three

21   weeks because although the indictment is straightforward, the

22   specified unlawful activity that's referenced involves a

23   complicated fraud case that Mr. Guy Jean-Pierre is a target

24   of and there is ongoing investigation about.  So we would

25   need three weeks to kind of amass all that evidence and get

1    it to Mr. Brush.

2           THE COURT:  All right.  So that's March 2, 2017.

3    Mr. Brush, how long do you think you need to make reciprocal

4    disclosures?

5           MR. BRUSH:  Two weeks after that, Your Honor.

6           THE COURT:  So that will be March 16, 2017.  Here

7    are your speedy trial dates.  30 days is March 10, 2017; 70

8    days is April 17, 2017; and 90 days is May 7, 2017.  You all

9    are proceeding before Judge Martinez as your presiding judge,

10   so after this arraignment you should proceed to his Chambers

11   or contact his Chambers to set further pretrial dates and a

12   trial date in this matter.

13          And then are we ready to proceed to the detention

14   portion of this proceeding?

15          MR. BRUSH:  Yes, Your Honor.

16          THE COURT:  And, Mr. Harmon, what is the

17   Government's position with respect to detention?

18          MR. HARMON:  We believe that the pretrial detention

19   is in order.  I would ask the Court to take judicial notice

20   of the Pretrial Services Report, but also take judicial

21   notice of the criminal complaint affidavit in its unredacted

22   form and I would be prepared to put on further evidence.

23          THE COURT:  All right.  Mr. Brush, what is your

24   client's position with respect to detention?

25          MR. BRUSH:  Your Honor, not because he believe he's

1   a flight risk at all, but just as a practical matter, we

2   agree with pretrial recommendation of bond -- unsecured bond

3   with placement here in a halfway house.  This defendant does

4   not have any funds or assets to travel back and forth.  The

5   closest family would be in Florida and just is not practical

6   for him to go anywhere else, so he would like to be here

7   under the conditions of pretrial.

8           I would like to advise the Court of something that

9   I just learned of and I believe the pretrial officer was

10   advised of when she talked with the defendant's ex-wife

11   fairly recently also.  The defendant's mother is apparently

12   in the hospital, quite possibly dying from consequences of

13   a -- she's in her 90s, apparently --

14           THE COURT:  Okay.

15           MR. BRUSH:  -- and has a fairly short string on the

16   do-not-resuscitate order, some kind of -- last word I had

17   this morning from the ex-wife is that tomorrow they would be

18   pulling the ventilator, or the aids that are apparently on

19   her now in the hospital in Florida.

20           I advised the defendant of that fact, the whole

21   situation for the first time this morning and asked him if he

22   felt like he could still proceed in this case and he says he

23   can.  He may be somewhat emotional, but he feels like we

24   should go ahead and proceed.  So, you know, if there needs to

25   be a hearing because of the disagreement over what to do,

6

1    we're ready to go forward with that at this time.

2            If bond is allowed, I would like to address the

3    possibility of travel with the Court because of these

4    circumstances.

5            THE COURT:  All right.  Thank you, Mr. Brush.

6            All right, Mr. Harmon, when you're ready to

7    proceed.

8            MR. HARMON:  Your Honor, we would call Special

9    Agent -- FBI Special Agent Carlos Medina.

10                       CARLOS MEDINA,

11   having been first duly sworn, was examined and testified as

12   follows.

13           THE COURT:  Thank you.  Please be seated and state

14   and spell your name for the record.

15           THE WITNESS:  My name is Carlos R. Medina,

16   M-E-D-I-N-A.

17           MR. HARMON:  May I inquire?

18           THE COURT:  Yes, you may proceed, Mr. Harmon.

19           MR. HARMON:  Thank you.

20                    DIRECT EXAMINATION

21   BY MR. HARMON:

22       Q    How are you employed, sir?

23       A    I'm a special agent with the Federal Bureau of

24   Investigation.

25       Q    How long have you been a special agent with the

1    FBI?

2         A    Approximately 8 1/2 years.

3         Q    Where do you currently work?

4         A    Here in Denver.

5         Q    How long have you been here in Denver?

6         A    Since April of 2014.

7         Q    Where did you work before that, the FBI?

8         A    I worked -- I worked for five years in Puerto Rico.

9         Q    What do you currently do for the FBI here in

10   Denver?

11        A    I work on the complex financial crimes squad

12   commonly referred to as white collar.

13        Q    How long have you been doing that type of work?

14        A    Since April of 2014.

15        Q    As a result of working these cases, have you become

16   familiar with the defendant Guy Jean-Pierre in this case

17   seated in the jury box?

18        A    I have.

19        Q    How did you become familiar with him?

20        A    I have been a participant in the investigation and

21   I have reviewed some materials.

22        Q    Now, is this a criminal investigation that started

23   with an investigation of a small capitalized company called

24   Fusion Farm?

25        A    That's correct.

8

1       Q      And is that investigation described in a criminal

2   complaint affidavit?

3       A      Yes, it is.

4       Q      Now, what particularly was your involvement as it

5   relates to Mr. Guy Jean-Pierre in this investigation?

6       A      I was involved in an undercover operation to -- to

7   bring Mr. Guy Jean-Pierre into the United States.

8       Q      Is that commonly called a lure operation?

9       A      That's correct.

10      Q      L-U-R-E?

11      A      Correct.

12      Q      Okay.  And when did that operation take place?

13      A      Between February and April of 2016.

14      Q      Okay.  And did that operation ultimately lead to an

15  encounter with Mr. Guy Jean-Pierre in the United States?

16      A      It did.

17      Q      Where was that?

18      A      That was in Miami, Florida.

19      Q      When?

20      A      April, mid-April 2016.

21      Q      Okay.  And did that -- what happened at the end of

22  that operation?

23      A      Mr. Jean-Pierre was arrested on a warrant out of

24  the state of New York.

25      Q      Was that related to the investigation you were

1    working or was that related to a prior matter that -- a

2    criminal matter?

3         A    That's a prior and separate criminal matter.

4         Q    Okay.  Now, did that -- as a result of the

5    undercover operation, were there criminal charges that were

6    brought?

7         A    Yes.

8         Q    Okay.  And are those charges set forth in the

9    criminal complaint and a supporting affidavit?

10        A    They are.

11        Q    And also in the pending indictment in this case?

12        A    That's correct.

13        Q    Are you familiar with the complaint and the

14   affidavit?

15        A    Yes.

16        Q    And does that complaint and affidavit -- does the

17   affidavit specifically provide a summary of the underlying

18   Fusion Farm investigation and outline of the undercover

19   operation and the events that led to Mr. Guy Jean-Pierre's

20   arrest, including his background?

21        A    It does.

22        Q    And as a result of working the case, generally did

23   you become familiar with, both Mr. Guy Jean-Pierre's

24   professional and personal background?

25        A    Yes.

1      Q     Okay.  And can you just tell us the types of things

2 you looked at to become familiar with his background

3 professional and personal?

4      A     Yes.  So I mentioned there was previous

5 investigations out of the state of New York and the

6 Securities and Exchange Commission.  The SEC had to look into

7 him as well, so we reviewed some of their materials.

8      Q     Well, let's go through some things.  As a result of

9 working the Fusion Farm investigations, did you see e-mail

10 communications between Mr. Guy Jean-Pierre and principals of

11 Fusion Farm?

12     A     Yes.

13     Q     And did those e-mails describe the things that

14 Mr. Guy Jean-Pierre was doing for Fusion Farm?

15     A     Yes.

16     Q     And are some of those things described in outline

17 form in the criminal complaint affidavit?

18     A     They are.

19     Q     Okay.  And you said also there was an SEC

20 investigation; is that correct?

21     A     That's correct.

22     Q     That was out of the state of New York?

23     A     That's correct.

24     Q     And did that result in a civil enforcement lawsuit

25 that was brought against him?

1        A    Yes.

2        Q    Did you review the materials or did others review

3    the materials and you reviewed with them the materials for

4    the SEC investigation and complaint?

5        A    Yes.

6        Q    Okay.  And were the SEC attorneys who were involved

7    in that case, were they spoken with and did they give then

8    information in this regard as well?

9        A    Yes.

10       Q    Did Mr. Guy Jean-Pierre testify in connection with

11   an investigation by the SEC?

12       A    He did.

13       Q    Did you review that testimony?

14       A    Yes.

15       Q    And did the investigation deal, as well, with

16   alleged fraudulent letters that were issued under the name of

17   a woman called Leslie Dinwoody (ph)?

18       A    That's correct.

19       Q    Okay.  And did that information ultimately make its

20   way to the New York County District Attorney's Office?

21       A    That's correct.

22       Q    And did that lead to criminal charges being brought

23   against Mr. Guy Jean-Pierre?

24       A    Yes.

25       Q    Okay.  And are those the criminal charges that you

1    indicated he was arrested on?

2        A    That's correct.

3        Q    Were there also Florida Bar proceedings that were

4    had with respect to Mr. Guy Jean-Pierre?

5        A    There were.

6        Q    And did that involve the same allegations that were

7    the basis of the SEC complaint and the New York State

8    indictment?

9        A    Yes.

10       Q    And did you review materials or did others review

11   and relate to you their summary of materials that were

12   developed in the disciplinary proceedings that the Florida

13   Bar -- the Florida Bar had with respect to Mr. Guy

14   Jean-Pierre?

15       A    Yes.

16       Q    And did all of this relate to accusations and

17   allegations that Mr. Guy Jean-Pierre basically took over the

18   identity of Ms. Dinwoody and forged documents and opinion

19   letters?

20       A    That's correct.

21       Q    And as well, did you also look at government

22   databases and other records to get some background about

23   Mr. Guy Jean-Pierre?

24       A    Yes.

25       Q    Now, have you reviewed, in particular, the criminal

1    complaint affidavit?

2         A    Yes.

3         Q    And based on what you know from the case, is that a

4    fair summary of the historical investigation and the

5    undercover operation that grew out of it?

6         A    Yes.

7         Q    Okay.

8              MR. HARMON:  Your Honor, at this time I would ask

9    for judicial notice to be taken, but I can tender the

10   affidavit to the agent to make sure that we're talking about

11   the same thing.  I've marked it as Exhibit 1.

12             THE COURT:  You may go ahead and present it.

13             MR. HARMON:  May I approach?

14             THE COURT:  Yes.

15             MR. HARMON:  I've given a copy of this to the

16   defense lawyer.  Actually, let me give you the original,

17   Agent, and I'll take back a copy.

18        Q    (By Mr. Harmon) Is that the affidavit that you

19   reviewed and found to be accurate?

20        A    Yes.

21        Q    Now, based on what you've learned in the

22   investigation, can you kind of outline for us Mr. Guy

23   Jean-Pierre's personal background.  Where and when was he

24   born?

25        A    We learned that he was born in Haiti in 1959.  He

14

1    does make his way to Massachusetts.  He goes to school in

2    Massachusetts at Amherst College and later becomes a U.S.

3    citizen at some point, a resident first and then a citizen.

4         Q    And to your knowledge, does he have dual

5    citizenship?

6         A    That's my understanding, yes.

7         Q    Okay.  And what countries does he have citizenship

8    with?

9         A    The United States and Haiti.

10        Q    Now, after graduating college, did he go to law

11   school?

12        A    He did.

13        Q    And where did he go and did he get a degree?

14        A    Yes.  He went to Columbia Law School in New York.

15        Q    Okay.  Did he graduate from that law school?

16        A    Yes.

17        Q    Did he practice law after that?

18        A    He did.

19        Q    Sketch out for the Court what you learned about his

20   legal career.

21        A    After Columbia University, he moved out to

22   California for -- for a couple of years and then moved back

23   to the New York region, New Jersey and New York to practice.

24        Q    Was he licensed in California at one point when he

25   went out there?

1          A     He was licensed at one point, yes.

2          Q     And then what happened to that license?

3          A     My understanding is that he let it lapse.

4          Q     Okay.  When he moved to New York, did he continue

5     to practice law?

6          A     Yes.

7          Q     What type of practice did he have?

8          A     He practiced securities law.

9          Q     Okay.  And corporate law, as well?

10         A     Corporate law.

11         Q     Was he a member of the New York Bar?

12         A     Yes, he became.

13         Q     Did he work in any other ways, other than in

14    private practice while in New York?

15         A     At some point he worked in the public sector for

16    the government as well.

17         Q     Okay.

18         A     FDIC, I believe.

19         Q     And at some point did he relocate from New York?

20         A     Yes.

21         Q     Where did he go?

22         A     To south Florida.

23         Q     And approximately when did he move to south

24    Florida?

25         A     That was approximately in 1999, 2000.

```
1          Q     Okay.  Did you learn what he did professionally

2    once he got to South Florida?

3          A     He was a consultant at that point in Florida.  He

4    was not an attorney yet in Florida so he did some consultant

5    work for kind of these small cap companies.

6          Q     Small cap publicly traded companies?

7          A     Yes.

8          Q     And do you know what type of work that was?

9          A     Like a consulting legal work.

10         Q     Okay, okay.  Did it involve opinion letters?

11         A     It did.

12         Q     Okay.  Ultimately, did he become a member of the

13   Florida Bar?

14         A     He does.  He becomes a member of the Florida Bar in

15   approximately 2004.

16         Q     And what type of legal work does he do at that

17   point once he becomes a member of the Florida Bar?

18         A     He continues to work in the penny stock circles

19   issuing opinion letters, attorney opinion letters.

20         Q     Now, were there any particular type of opinion

21   letters that he worked on for these penny stock companies?

22         A     Yes.

23         Q     Describe them to us, please.

24         A     There are at least two types.  One of them, the

25   attorney -- you know, it's called Current Information Letter
```

1    where the attorney attests that the information available on

2    these public companies for the public to review and rely on

3    is adequate and accurate.  The other type of letters, what's

4    known as a Rule 144 letter, in those types of letters the

5    attorney opines on the legality of lifting certain

6    restrictions on stock certificates.

7         Q    Okay.  Was this work actually described in court

8    proceedings that were brought by the SEC?

9         A    They were.

10        Q    Did the judge make some findings about them and

11   describe the proceedings?

12        A    Yes.

13        Q    Would they be a more accurate -- would they be an

14   accurate description of what he was doing?

15        A    Yes.

16        Q    Let me show you what we've marked as Government's

17   8.

18             MR. HARMON:  May I approach?

19             THE COURT:  Yes, you may.

20             MR. HARMON:  Would the Court like a copy of this

21   one?

22             THE COURT:  Yes, please.  Thank you.

23        Q    (By Mr. Harmon) Now, you recognize this document,

24   Government's 8?

25        A    I do.

1          Q     What is it?

2          A     It's a summary essentially that the Court in

3     Florida put together.

4          Q     Was this the Court in New York, Southern District

5     of New York?

6          A     Oh, I'm sorry, yes.  New York.

7          Q     Okay.  This was a report recommendation that a

8     magistrate did -- judge did at some point to make findings

9     for a district court judge, correct?

10         A     That's correct.  This relates to the SEC matter.

11         Q     Okay.  And ultimately the district court adopted

12    these findings?

13         A     Correct.

14         Q     Okay.  Now, I'm going to ask you about these a

15    little bit later on, but at this point did -- as part of the

16    findings, was there a description by this magistrate judge of

17    Mr. Guy Jean-Pierre's practice --

18         A     Yes.

19         Q     -- while he was in Florida and what he was

20    basically doing?

21         A     Yes.

22         Q     Okay.  Take a look at page 4.

23         A     Okay.

24         Q     Is that set forth in paragraph 2?

25         A     That's correct.

```
1        Q     Okay.  Can you read that to us?

2        A     Yes.

3        Q     Please do.

4        A     From 2004 through 2010 Guy Jean-Pierre earned a

5    living -- earned his living issuing attorney opinion letters

6    to Pinko TC Markets, Incorporated, commonly referred to as

7    pink sheets, in quotes, now known as OTC Markets Group, and

8    to transfer agents concerning the adequacy of various issues,

9    publicly filed information, financial information and by

10   issuing attorney opinion letters to transfer agents

11   concerning the legality of removing restricted legends from

12   stock certificates from 2004 through 2007.  Jean-Pierre

13   worked for a Florida-based firm where he wrote more than 50

14   attorney opinion letters addressing the legality of removing

15   restricted legends from stock certificates.

16       Q     Now, are these the opinion letters that you refer

17   to basically being the substance of Mr. Guy Jean-Pierre's

18   practice from 2004 to 2010?

19       A     That's correct.

20       Q     Essentially, two types of opinion letters for penny

21   stock companies, correct?

22       A     That's correct.

23       Q     Was one of them commonly known as a common

24   information -- current information letter that would go to

25   OTC Markets?
```

1          A     Yes.

2          Q     And that helped OTC Markets classify the penny

3   stock in its clearinghouse to determine what tier it should

4   be and how it should trade?

5          A     That's correct.

6          Q     And the other were these, what was called a Rule

7   144 Opinion Letter that would help the transfer agent

8   determine whether to lift restrictions on stock certificates

9   so the stocks could be traded publicly?

10          A     That's correct.

11          Q     Now, did there come a time -- well, let me show you

12   as well.

13          Did you obtain a resume of Mr. Guy Jean-Pierre that

14   outlines his professional background?

15          A     Yes.

16          Q     And did Mr. Guy Jean-Pierre at some point provide

17   testimony about his background?

18          A     Yes.

19          Q     And did he acknowledge that this resume was an

20   accurate recitation?

21          A     Yes, he did.

22          MR. HARMON:  May I approach.

23          THE COURT:  Yes, you may.

24          Q     (By Mr. Harmon) Let me show you Government's 2.  Do

25   you recognize that?

1        A    Yes.

2        Q    What is it?

3        A    It is a resume of Guy Jean-Pierre.

4        Q    Is that the resume that Mr. Guy Jean-Pierre was

5   questioned about in SEC testimony and acknowledging that?

6        A    That's correct.

7            MR. HARMON:  Your Honor, I have a courtesy copy for

8   the Court of Government's 2.  And as a matter of housekeeping

9   at this point, I would move today admit for this proceeding

10   Government's 1 and 2.

11            MR. BRUSH:  No objection for purposes of this

12   proceeding, Your Honor.

13            THE COURT:  All right.  So just let me be sure.

14            Mr. Harmon, the report recommendation is 1.

15            MR. HARMON:  The report recommendation is

16   Government's 8.  I'm actually going to refer to it later on

17   in the testimony.

18            THE COURT:  Okay.

19            MR. HARMON:  I just needed to refresh the witness's

20   memory --

21            THE COURT:  All right.

22            MR. HARMON:  -- and I wanted to make sure that we

23   had a very precise understanding of these letters since we

24   got into a very technical area of the securities laws.

25            THE COURT:  All right.

22

1          MR. HARMON:  Tell me when I should proceed, Your

2     Honor.

3          THE COURT:  You can proceed, Mr. Harmon.

4     Q     (By Mr. Harmon) Now, did there come a time, based

5     on your understanding, that Mr. Guy Jean-Pierre's practice

6     was altered or changed by a particular event?

7     A     Yes.

8     Q     Tell us what that event was and when approximately

9     it took place.

10    A     In 2010, the OTC Markets banned Guy Jean-Pierre

11    from issuing these attorney letters or accepting these

12    attorney letters from him.

13    Q     So they would no longer accept what we've called

14    these current information letters?

15    A     That's correct.

16    Q     How did that impact Mr. Guy Jean-Pierre's practice

17    with respect to this other type of letter, the Rule 144

18    transfer agent letter?

19    A     It meant that the transfer agents were not going to

20    accept attorney letters prepared by him.

21    Q     So at that point with that ban, he was no longer

22    deemed eligible to provide either types of opinion letters,

23    either to the OTC Markets or the transfer agents; is that

24    fair?

25    A     That's correct.

23

1          Q      Did you learn how Mr. Guy Jean-Pierre responded to

2    that ban and the consequent -- the bar with the transfer

3    agents on providing opinion letters to them?

4          A      Yes.

5          Q      Tell us about that.

6          A      Yes.  We learned that after the OTC ban,

7    Mr. Jean-Pierre creates another company with his niece that

8    basically, you know, was in a continue doing -- continue

9    issuing these attorney letters.

10         Q      How long after the ban that was issued by OTC

11   Markets did this new entity get created, approximately?

12         A      Within the month.

13         Q      Okay.  And what was the name of this new entity?

14         A      Complete Legal Solutions.

15         Q      Okay.  And who was the person specifically that was

16   going to be part of this new entity with Mr. Guy Jean-Pierre?

17         A      It was his niece and you referred to her earlier.

18         Q      Well, what's her name?

19         A      Lindsay.

20         Q      Leslie?

21         A      Leslie.

22         Q      Dinwoody?

23         A      Dinwoody, yes.

24         Q      Okay.  And did you learn about her background in

25   relation to Mr. Guy Jean-Pierre, specifically how she was

24

1    related?

2          A    Yes.

3          Q    Tell us about that.

4          A    She is his niece, her father is Guy's brother.

5          Q    Okay.  And what was her status at the time -- well,

6    whose idea was it to form this Complete Legal Solutions and

7    what was the proposal to Ms. Dinwoody?  Did she talk about

8    that with the investigators?

9          A    She did.  She spoke to the SEC and she told the SEC

10   that it was Guy Jean-Pierre's idea to open Complete Legal

11   Solutions.

12         Q    And was that -- and did she describe what she

13   understood the business purpose of this entity was going to

14   be, what was going to be done?

15         A    To -- to offer these services that ultimately

16   result in attorney opinion letters.

17         Q    Basically, the same type of work that Mr. Guy

18   Jean-Pierre had been doing in the past, but was banned on

19   doing when he got the OTC ban in April of 2010, correct?

20         A    That's correct.

21         Q    Okay.  And did she say whether she agreed to -- how

22   she responded to this proposal?

23         A    She told SEC investigators she agreed, but that she

24   never saw any work.

25         Q    Okay.  Were there, in fact, letters thereafter that

1   were on Complete Legal Solutions letterhead that purported to

2   have her name and signature on?

3         A    Yes.

4         Q    Okay.  And did there come a time that these letters

5   became the subject of scrutiny?

6         A    Yes.

7         Q    How did that come about and when?

8         A    In approximately 2010, the --

9         Q    Well, 2010 was when the ban happened --

10        A    Yes.

11        Q    -- so taking April -- are we talking 2011?

12        A    Yes.

13        Q    Okay.  Early 2011?

14        A    Yes.

15        Q    All right.  Tell us about that.

16        A    Ms. Dinwoody is contacted by the Bar Association in

17   Florida about what appears to be her activity with Complete

18   Legal Solutions in issuing these attorney letters.

19        Q    Does somebody bring a grievance against her and

20   against Mr. Guy Jean-Pierre concerning these letters?

21        A    Yes.

22        Q    And do you know generally, without getting into

23   names, who that person was?

24        A    Yes.  She was an attorney in south Florida.

25        Q    Okay.  And did she have basically concerns that

1    Mr. Guy Jean-Pierre was actually still doing this work that

2    he was banned from, but just using Complete Legal Solutions

3    under his niece's name?

4         A    That's correct.

5         Q    Okay.  As a result of that, what happened with

6    these grievances?  Now, this was a particular grievance that

7    was made to the Florida Bar, not the Association, but the

8    Florida Bar disciplinary people?

9         A    That's correct.

10        Q    All right.  What happened?

11        A    They start their own investigation, but ultimately

12   refer it to the New York SEC office.

13        Q    Okay.  So that the SEC could investigate as well?

14        A    That's correct.

15        Q    Did there come a time when the SEC questioned Guy

16   Jean-Pierre?

17        A    Yes.

18        Q    Okay.  When did they first question him and in what

19   form and where?

20        A    He was questioned in approximately October of 2011

21   and they had some difficulty --

22        Q    Where was it?

23        A    In south Florida.

24        Q    Okay.  And was there another time that he testified

25   as well?

27

```
1         A    Yes.

2         Q    And was that -- when was that?

3         A    That was approximately December of 2012.

4         Q    All right.  Let's talk about the first time first.

5         A    Okay.

6         Q    That was also Florida, right?

7         A    That's correct.

8         Q    October 2011?

9         A    Correct.

10        Q    In what proceeding was he called to testify?

11        A    He was called as a witness in a case that the SEC,

12   you know, was looking into.

13        Q    Was it a case involving a penny stock company?

14        A    Yes.

15        Q    And why was Mr. Guy Jean-Pierre being called at

16   that time?

17        A    He -- their investigation revealed that he was the

18   attorney writing letters, these opinion letters.

19        Q    And did you -- did he actually provide testimony

20   and was it transcribed?

21        A    He did and it was.

22        Q    Okay.  Did you review the testimony?

23        A    Yes.

24        Q    Did the subject of what names he went under come up

25   in that testimony?
```

1      A    It was.

2      Q    When he was subpoenaed, what name was he subpoenaed

3  on?

4      A    Guy Jean-Pierre.

5      Q    Okay.  When he testified, was he asked about what

6  names he used?

7      A    Yes.

8      Q    And what did he say?

9      A    In 2011, he did indicate that he had recently

10  changed his name to Marcelo Dominguez de Guerra.

11      Q    And did he say whether the name change process was

12  complete or whether it was ongoing?  Who did he change his

13  name with at that point?

14      A    He had registered the name change with Broward

15  County, Florida.

16      Q    Okay.

17      A    He reported during that SEC testimony that the name

18  change was essentially done, but he hadn't gotten around to

19  change the name, for instance, with the Florida Bar.

20      Q    Okay.  And did he say why he changed that name?

21      A    He said that he traveled to the Dominican Republic

22  often and people had a difficult time pronouncing his name

23  Guy, so changed his name.  He liked the way Marcelo sounded.

24      Q    With -- in the Dominican Republic?

25      A    That's correct.

1     Q    Okay.  Now, at one point was he -- did he

2   characterize his name change as something that was done on

3   impulse in relation to a recent divorce?

4     A    That's correct, he did mention that.

5     Q    Now, did the SEC, or anybody who was investigating

6   him at that time, look into whether this actually happened,

7   whether he did make a name change with Broward County?

8     A    They asked him if, you know, what evidence and

9   he --

10    Q    Well, did they find records?

11    A    Yes.

12    Q    Okay.  When -- and according to the records that

13  they found, when did Mr. Guy Jean-Pierre change his name with

14  Broward County, the state county that he was living in?

15    A    Gosh.

16    Q    Do you have notes?

17    A    I do have notes.

18    Q    So this isn't a memory test.  If you need to

19  look at your notes --

20    A    Yeah.

21    Q    -- go ahead and do that, okay?

22    A    Thank you.

23    Q    I'm sure the magistrate judge would be appreciative

24  if you just look at your notes and we can move along.

25    A    Yes.

1      Q      We've got a crowded court today and a crowded

2    docket.

3            How about August 2012; does that sound about right?

4      A      Sounds about right.

5      Q      Okay, all right.

6            Now, during the testimony, did Mr. Guy Jean-Pierre

7    discuss where he was living and what was going on with his

8    law practice at the time?

9      A      Yes.  He said that he traveled often to the

10   Dominican Republic and -- I'm sorry, we're talking about the

11   2011?

12     Q      Yes.  We're going to take this step by step.  Right

13   now we're talking about 2011, the first time he testifies in

14   front of the SEC.  You said that he had recently made a name

15   change?

16     A      Correct.

17     Q      You acknowledged it sounded right that the name

18   change was recorded with Broward County in August of 2011,

19   three months before, but he hadn't gotten around to telling

20   the Florida Bar about that name change?

21     A      Yeah.  He did say he was seeking residency in the

22   Dominican Republic.

23     Q      Where was it -- did he say where he was living at

24   the time, though?  Did he have -- where was his residence at

25   that time?  Was he still living in Florida?

31

1        A    No.

2        Q    All right.  Do you need to have your memory

3    refreshed at all on this thing?

4        A    Yes.

5        Q    Now, do you see -- do you recall him saying

6    basically he moved from one particular town in south Florida

7    to another as part of the divorce?

8        A    I don't recall that.

9        Q    Okay.  Had the change of -- had he established

10   residency permanently in --

11       A    Not permanently.  He was seeking it.

12       Q    Okay.  What about his law practice at that time?

13   What was going on with that, according to his testimony?

14       A    It was -- it was ongoing.  He had an office in

15   south Florida.

16       Q    Okay.  So he still had an office in south Florida?

17       A    That's correct.

18       Q    Still seeing clients?

19       A    Yes.

20       Q    Did the subject of Complete Legal Solutions and the

21   letters that were written in Ms. Dinwoody's name, did that

22   come up during his testimony?

23       A    It did.

24       Q    All right.  And what did the -- was the SEC asking

25   why these letters were done?

1        A    Yes.

2        Q    And how did Mr. Guy Jean-Pierre respond at that

3    time?

4        A    At that time he pleaded the Fifth, he took the

5    Fifth.

6        Q    Okay.  After that did the SEC --

7             MR. BRUSH:  I'm sorry, I did not understand the

8    answer.

9             THE WITNESS:  He took the Fifth.

10        Q    (By Mr. Harmon) Did the SEC subsequently question

11    Mr. Guy Jean-Pierre again?

12        A    Yes.

13        Q    And that was in December 2012?

14        A    That's correct.

15        Q    Okay.  Where was that -- where did that testimony

16    take place?

17        A    That was also in south Florida, in Miami.

18        Q    So it was testimony, right?

19        A    Yes.

20        Q    Okay.  And in connection with what?

21        A    It may have been in the same case again, where a

22    matter that they were looking into where Mr. Pierre was the

23    attorney.

24        Q    It was the same matter?

25        A    It was.

1        Q     It was deposition testimony at that time?

2        A     That's correct.

3        Q     Okay.  And can you tell us how the SEC came to

4   arrange his testimony?  Were there any difficulties?

5   Describe that for us.

6        A     Yes.  The SEC reports that they had difficulty in

7   contacting Mr. Pierre.  The contact information that had been

8   provided during the 2011 testimony was, you know, not working

9   for them; they were unsuccessful in reaching him.  At some

10  point in early December of 2012, they are -- the SEC is

11  notified; they're made aware that Mr. Pierre has entered the

12  country and they attempt to serve him.

13       Q     Did you and Ms. Bunk (ph) talk to an SEC attorney

14  that was involved in the investigation in the taking of that

15  testimony?

16       A     Yes.

17       Q     And is that person's name Meghan Janette (ph) at

18  the SEC in New York?

19       A     That's correct.

20       Q     Okay.  Did she describe to you how, prior to the

21  December 2012, testimony phone calls that were -- that were

22  being made to numbers that were given by Mr. Pierre, but they

23  were not being returned?

24       A     That's correct.

25       Q     Mail was being sent to addresses that he had

1   listed, but it was not being accepted?

2        A    That's correct.

3        Q    And e-mails were not being responded to?

4        A    Correct.

5        Q    And at that point, did the SEC -- was the SEC able

6   to see Mr. Guy Jean-Pierre at his offices?  Did he still

7   have -- were they able to find him at his law offices?

8        A    They were unable to find him.

9        Q    As a result, did they end up getting an

10  investigator to try to find his whereabouts?

11       A    Yes.

12       Q    And did that investigator at some point find out

13  that Mr. Guy Jean-Pierre had traveled back from the Dominican

14  Republic to Miami?

15       A    That's correct.  That's what occurred in early

16  December of 2016.

17       Q    Did Mr. Guy Jean-Pierre show up voluntarily for

18  this 2012 December deposition or was he subpoenaed?

19       A    He was subpoenaed.

20       Q    Tell us how he ended up getting subpoenaed and

21  where was he found.

22       A    Well, the SEC investigator, the service processor,

23  found him and located him at a youth hostel in Miami and did

24  report back to the SEC that it took multiple attempts to try

25  and confirm that he was there and find him.

1          Q     Okay.  So he was having a hard time locating him

2     and then finally found him at a youth hostel in Miami?

3          A     That's correct.

4          Q     Did he actually provide testimony?

5          A     Yes.

6          Q     Okay.  And did you review that testimony?

7          A     Yes.

8          Q     At the time that he provided the testimony, where

9     did the matter with respect SEC New York stand concerning

10    Complete Legal Solutions?  I believe you said it had been

11    referred to the SEC by Florida Bar authorities, correct?

12         A     That's correct.

13         Q     Had the SEC made a determination at this point what

14    to do about this -- these allegations concerning Complete

15    Legal Solutions and Guy Jean-Pierre?

16         A     They had.

17         Q     And what did they decide to do at that point, that

18    Mr. Guy Jean-Pierre came in to testify?

19         A     They filed suit against Mr. --

20         Q     They had a complaint that they filed?

21         A     That's correct.

22         Q     And that was against Mr. Guy Jean-Pierre?

23         A     That's correct.

24         Q     But when he was called to testify, he was called as

25    a witness in connection with this ongoing case about a penny

1    stock company that he acted as a lawyer on, fair?

2        A    Yes.

3        Q    At the time that he came in to testify, had he yet

4    been served with the complaint?

5        A    No.

6        Q    Or did it happen later?

7        A    It happened later.

8        Q    When did that happen?

9        A    During the testimony.

10       Q    At the conclusion of the testimony?

11       A    That's correct.

12       Q    Now, did you see the complaint?

13       A    Yes.

14       Q    Okay.  And are you aware of the basic allegations

15   of the complaint?

16       A    Yes.

17       Q    Can you summarize them for us?

18       A    Yes.  They -- they were referred to by the Florida

19   Bar so the allegations include the fraudulent use of Lindsay

20   [sic] Dinwoody's named affixed on these attorney letters.

21       Q    Did they identify letters that were -- had her name

22   on them?

23       A    Yes.

24       Q    Okay.  And did they allege whether she knew about

25   her name and her signature on these letters?

1          A     Yes.  After speaking with her, they learned that

2     she had no knowledge of these letters.

3          Q     And did the allegations basically set forth that

4     Mr. Guy Jean-Pierre -- these allegations, that is -- that he

5     had basically misappropriated, used, and forged her name on

6     over a thousand -- on over 100 opinion letters?

7          A     That's correct.

8          Q     And did the timeframe that was being discussed go

9     from approximately May 2011 through April 2012?

10         A     Yes.

11         Q     Now, have you seen the complaint?

12         A     Yes.

13               MR. HARMON:  May I approach, Your Honor.

14               THE COURT:  Yes.

15         Q     (By Mr. Harmon) Let me show you Government's 3.

16     Let me ask you if you recognize that.

17               MR. HARMON:  I'll give a copy to the Court.

18               THE COURT:  Thank you.

19         Q     (By Mr. Harmon) Do you recognize that document?

20         A     Yes.

21         Q     What is it?

22         A     It's the SEC complaint against Mr. Jean-Pierre.

23         Q     Is that the one with the allegations about Mr. Guy

24     Jean-Pierre's misappropriating his niece's identity to forge

25     over 100 opinion letters?

38

```
 1        A    Yes.

 2             MR. HARMON:  I move for the admission of 3.

 3             THE COURT:  So admitted.

 4             MR. BRUSH:  For purposes of this hearing, no

 5   objection, Your Honor.

 6        Q    (By Mr. Harmon) Now, you reviewed the deposition

 7   testimony of Mr. Guy Jean-Pierre?

 8        A    Yes.

 9        Q    Did the subject of his name come up again?

10        A    It did.

11        Q    Okay.  Tell us about what happened -- what he said

12   about his name at this point.

13        A    In the December 2012 interview with the SEC, he

14   identified himself as Marcelo de Guerra.

15        Q    What's his official name, though, at this point?

16        A    Marcelo is what he said in 2011.

17        Q    What --

18        A    Marcelo --

19        Q    You've seen official records.

20        A    Marcelo Dominguez de Guerra.

21        Q    What did he change it to -- what did he change it

22   to with Broward County at that point?

23        A    Marcel Dominguez de Guerra.

24        Q    And when he stated his name on the record, what

25   name did he use?
```

39

1          A     He used Marcelo.

2          Q     Okay.  And did he discuss whether or not he was

3    using, what name he was using with people and what

4    circumstances?

5          A     Yeah.  He did say that people still call him Guy

6    and he was okay with that.

7          Q     Did he indicate where specifically he was using

8    this new name and where he wasn't using this new name?

9          A     He used it in the Dominican Republic because that's

10   where folks had difficulty pronouncing his name.

11         Q     But in other respects, he was still being known as

12   Guy and he was using it as Guy?

13         A     That's correct.

14         Q     Okay.  Did you come up with -- did you do an

15   investigation to determine whether or not he was using --

16   what name he was using in an official capacity at that point?

17         A     Yes.

18         Q     And did you come up with some examples of what name

19   he was using in official capacities?

20         A     Yes.

21         Q     Well, tell us about that.

22         A     Well, as early as November of 2012, there are --

23   there are letters from one of the customer companies that he

24   was doing work for that identified him as Guy Jean-Pierre.

25         Q     Okay.  So you worked on the Fusion Farm

1   investigation?

2        A    Yes.

3        Q    Was Fusion Farm still holding him out by his new

4   name or his old name?

5        A    Under the name Guy Jean-Pierre.

6        Q    Okay.  And that -- so he was being held out as

7   being a person associated with Fusion Farm?

8        A    That's correct.

9        Q    And how was he being identified?

10       A    As the corporate secretary.

11       Q    Okay.  And legal counsel at one point?

12       A    At one point.

13       Q    Okay.  And was this in correspondence that went to

14   regulators?

15       A    Yes.

16       Q    And was this in correspondence -- was this in

17   documents that would have been made available to the

18   investing public over the OTC platform?

19       A    Yes.

20       Q    And how about FINRA?  Do you know what FINRA is?

21       A    I know they're a regulatory agency.

22       Q    At some point in his capacity as counsel for Fusion

23   Farm, did Mr. Guy Jean-Pierre respond to FINRA concerning an

24   inquiry they were making about Fusion?

25       A    Yes.

1        Q     And what name did he use in that connection?

2        A     The name Guy Jean-Pierre.

3        Q     Have you uncovered some instances where he used

4    this name in official capacities?

5        A     Yes.

6              MR. HARMON:  And let me show, with you the Court's

7    permission.  May I approach?

8              THE COURT:  Yes.

9        Q     (By Mr. Harmon) Let's start with Government's 4.

10   And what is that?

11       A     This is a letter --

12       Q     An e-mail?

13       A     I'm sorry, an e-mail, yes.

14       Q     Is this the e-mail to the FINRA investigator?

15       A     That's correct.

16             MR. HARMON:  I would move for the admission of

17   Government 4.

18       Q     (By Mr. Harmon) What date is it?

19       A     It is dated November 30, 2011.

20       Q     And is that after the name change?

21       A     Yes.

22       Q     Okay.

23             MR. HARMON:  At this time I move for admission of

24   Government's 4.

25             THE COURT:  Mr. Brush, any objection?

1            MR. BRUSH:  If I may just have a moment, Your

2    Honor.

3            MR. HARMON:  And I'm sorry, Your Honor.  I forgot

4    to give the Court a copy.

5            MR. BRUSH:  For the purposes of this hearing, I

6    assume for the fact that it's signed or indicated it comes

7    from Guy Jean-Pierre, I have no objection to the document for

8    that purpose.

9            THE COURT:  Okay, all right.  Government 4 is

10   admitted.

11       Q    (By Mr. Harmon) How about Government 5; do you

12   recognize that?

13       A    Yes.

14       Q    What is that?

15       A    This is a letter written on Fusion Farm letterhead

16   to the state of Nevada updating changes to company officers

17   where Mr. Guy Jean-Pierre is again identified.

18           MR. HARMON:  Okay.  I would move for the admission

19   of 5.

20           MR. BRUSH:  For the same reason, I'm assuming it's

21   to show that he is listed as Guy Jean-Pierre, I have no

22   objection.

23           THE COURT:  So admitted.

24       Q    (By Mr. Harmon) Do you recognize Government 6?

25   It's an excerpt of a document.  Do you recognize what

43

1    document it is?

2         A    Yes.

3         Q    Is this one of the documents -- is this an OTC

4    filing that Fusion Farm made so that investors could see what

5    was going on with the company?

6         A    That's correct.

7         Q    And is there a page describing Mr. Guy Jean-Pierre?

8         A    There is.

9         Q    How is he describing what the name is used for?

10        A    He's identified as Guy and Jean-Pierre, corporate

11   secretary and legal counsel.

12             MR. HARMON:  Okay.  I would move for the admission

13   of that document as well, Your Honor.

14             MR. BRUSH:  No objection for the same reason, Your

15   Honor.

16             THE COURT:  So admitted.

17        Q    (By Mr. Harmon) During the deposition that took

18   place in December 2012, did the subject of where Mr. Guy

19   Jean-Pierre was living and what he was doing, did that come

20   up in testimony?

21        A    It did.

22        Q    Where did he say he was living at this time?

23        A    He was living in the Dominican Republic.

24        Q    Okay.  And what did he say about his travels, if

25   any, to the United States?

44

1        A    He said they were -- they were periodic.  He would

2    return to the -- he had a virtual office at that point he

3    told the SEC in south Florida.

4        Q    Okay.  A virtual law office?

5        A    Yes.

6        Q    And what did he describe going on at this virtual

7    law office?

8        A    When he would come into town, he would pick up

9    mail, meet with a client if --

10       Q    And how regularly was he picking up mail, according

11   to his characterization?

12       A    He said he would -- he would come, if not monthly,

13   maybe every other month.

14       Q    Did he basically acknowledge that the mail was

15   stacking up?

16       A    Yes.

17       Q    And when he came to the United States, did he say

18   where he would stay?

19       A    He said different youth hostels or different

20   hostels in the area.

21       Q    How about hotels, as well?

22       A    Yes.

23       Q    Okay.  So these were not permanent locations he was

24   staying at?

25       A    No.

1       Q    And at that point did he have actually a permanent

2    residence in the United States?

3       A    No.  He said he was living in the Dominican

4    Republic.

5       Q    Now, you testified that he was served with the

6    lawsuit concerning Complete Legal Solutions at the end of his

7    testimony.  During the testimony, was he questioned about

8    that lawsuit?

9       A    I'm sorry?

10       Q    During that testimony, was he questioned about that

11    lawsuit?

12       A    Yes.

13       Q    Okay.  Was he asked whether he knew about the

14    lawsuit?

15       A    Yes.

16       Q    Did he say whether he -- even though he had not

17    been served, did he know about the lawsuit?

18       A    He did say that he found out.

19       Q    How did he find out?

20       A    He told the SEC that his brother had notified him

21    via fax.

22       Q    Okay.  So this was before he actually made it to

23    the hostel and the process server was looking for him?

24       A    This would have been in 2012.

25       Q    Right, okay.  Now, did he say at one point that he

1    was surprised that the SEC was able to track him down and

2    subpoena him during that deposition?

3         A    Yes.

4         Q    Are you familiar with what happened with the SEC

5    case after Mr. Guy Jean-Pierre was served with process?

6         A    Yes.

7         Q    Did he defend himself and appear at all?

8         A    He did not.

9         Q    Okay.  Well, did he answer the complaint?

10        A    No.

11        Q    Did he make any court filings?

12        A    No.

13        Q    Did he show up at any court proceedings?

14        A    No.

15        Q    Were there attempts made to notify him of the court

16   proceedings?

17        A    According to the SEC, multiple attempts, yes.

18        Q    Okay.  And were you on the phone with the SEC

19   attorney who was in charge of this case?

20        A    Yes.

21        Q    And discussed with her what attempts were made to

22   notify him of court proceedings?

23        A    Yes.

24        Q    Describe that for the Court.

25        A    All the contact information that he had provided,

47

1    physical address, e-mail, telephone numbers, were -- were not

2    working.  They weren't valid.

3        Q    So is it a fair understanding that you got from the

4    SEC attorney that they would try call him at the number that

5    they had for him?

6        A    That's correct.

7        Q    But there was no response?

8        A    Correct.

9        Q    That they would try the e-mail that he had

10   previously provided in testimony sessions, but there was no

11   response?

12       A    They would bounce back, yes.

13       Q    That they would try to mail him at the addresses he

14   had previously provided, but the mail was returned?

15       A    That's correct.

16       Q    What ended up happening in this case?

17       A    The SEC issued a default judgment.

18       Q    Well, now does the SEC do a default judgment or

19   does the Court?

20       A    The Court, yes.

21       Q    A court noted his default?

22       A    That's correct.

23       Q    And entered the judgment pursuant to that default?

24       A    Yes.

25       Q    And in connection with determining what the

1   judgment should be, did the Court take submissions from the

2   SEC about what the facts were and make findings of facts?

3       A    Yes.

4       Q    Okay.  And did you see those documents?

5       A    Yes.

6           MR. HARMON:  May I approach, Your Honor?

7           THE COURT:  Yes.

8           MR. HARMON:  I might go a little bit out of order.

9       Q    (By Mr. Harmon) Let's start with Government's 9.

10  Do you recognize that document?

11          MR. HARMON:  I'm going to hand a copy to the Court.

12          THE COURT:  Thank you.

13      A    Yes.

14      Q    (By Mr. Harmon) Is that a docket sheet for the

15  case?

16      A    Yes.

17      Q    Does that reflect the events that took place in the

18  case and when things were scheduled and Mr. Guy Jean-Pierre's

19  nonappearance?

20      A    That's correct.

21          MR. HARMON:  I would move for the admission of 9.

22          THE COURT:  Any objection?

23          MR. BRUSH:  No objection, Your Honor.

24          THE COURT:  So admitted.

25      Q    (By Mr. Harmon) Government 7, let me ask you to

49

1   take a look at that.  Do you know what that is?

2              MR. HARMON:  A copy for the Court.

3              THE COURT:  Thank you.

4       A    Yes.

5       Q    (By Mr. Harmon) Is that a declaration that the lead

6   attorney submitted in support of proposed findings of fact,

7   including conclusions of law?

8       A    That's correct.

9       Q    And does that affidavit basically outline the facts

10  that the SEC found that they presented in support of default

11  judgment in the damages that they sought?

12      A    Yes.

13             MR. HARMON:  I would move for the admission of 7.

14             THE COURT:  Any objection?

15             MR. BRUSH:  If I could have just a moment, Your

16  Honor.  No objection, Your Honor.

17             THE COURT:  All right, so admitted.

18      Q    (By Mr. Harmon) Government's 8, we have shown that

19  to you before for a limited purpose, and you may still have

20  it.

21      A    I believe so.

22             MR. HARMON:  And I believe I gave the Court a copy

23  of that.  If not, I will hand the Court --

24             THE COURT:  Government 8?

25             MR. HARMON:  Government 8.

1          THE COURT:  Yes, I have a copy.

2      Q    (By Mr. Harmon) Is that the report and

3   recommendation that was prepared by the magistrate judge

4   setting forth the proposed findings?

5      A    That's correct.

6      Q    Now, all these -- these documents, these

7   declarations --

8          MR. HARMON:  Sorry, I move for the admission of

9   Government 8 at this time, Your Honor.

10         MR. BRUSH:  No objection.

11         THE COURT:  So admitted.

12     Q    (By Mr. Harmon) Both those documents, Government 7,

13  Government 8, do they basically summarize factually what was

14  found to have happened with respect to Complete Legal

15  Solutions, what Mr. Guy Jean-Pierre did, what his niece did

16  or didn't know?

17     A    Yes.

18     Q    Do they also indicate Mr. Guy Jean-Pierre, at least

19  in the report and recommendation, failure to appear, do they

20  indicate his failure to appear --

21     A    Yes.

22     Q    -- at the proceedings?

23          Now, we've talked about the SEC case.  Are you

24  familiar with what happened with the Florida Bar matters,

25  once grievances were made?  And you said the Florida Bar

1    investigated.  Did there come a time that the Florida Bar

2    actually made a formal complaint against Mr. Guy Jean-Pierre?

3        A    Yes.

4        Q    And was it basically for the same -- based on the

5    same allegations that the SEC made?

6        A    That's correct.

7        Q    And by the way, was the niece the subject of

8    disciplinary proceedings at some point?

9        A    Those were dropped.

10        Q    Okay.  Is that also summarized in the SEC report

11    and recommendations?

12        A    That's correct, it's noted.

13        Q    How did Mr. Guy Jean-Pierre respond to the Bar

14    inquiries, and how did that response change over time?

15        A    Yeah.  My understanding is he -- he did respond to

16    the Florida Bar inquiries early on, but there did come a time

17    where he didn't respond to the Florida inquiries (inaudible).

18        Q    And did that time come after the formal complaint

19    was made?

20        A    That's correct.

21        Q    Okay.  At some point did he just stop appearing and

22    responding?

23        A    Yes.

24        Q    And was that reflected in or about June of 2013?

25        A    That's correct.

1      Q    Okay.  Did the -- was the -- were the Bar

2   authorities able to find them after that point?

3      A    No.

4      Q    Okay.  Did they try to send him mail after that

5   point?

6      A    Yes.

7      Q    And what happened with that mail?

8      A    There was no response.

9      Q    Okay.  Was it returned undeliverable?

10     A    I don't recall.

11     Q    Okay.  Was -- what happened with the Bar

12   proceedings ultimately?

13     A    Ultimately they moved to disbar.

14     Q    Was he held in default?

15     A    He was.

16     Q    All right.

17          MR. HARMON:  I would like to approach the witness

18   again and show him another exhibit, Your Honor.

19          THE COURT:  Yes.

20     Q    (By Mr. Harmon) Let me show you Government's 10 and

21   I'll give a copy to the Court.  Do you recognize that

22   document?

23     A    Yes.

24     Q    What is it?

25     A    It is the order on the Florida Bar's Motion for

53

1     Default in the case against Mr. Jean-Pierre.

2          Q     Does it indicate when it was lodged?

3          A     It was September of 2013.

4          Q     Okay.

5                MR. HARMON:  I would move for the admission of 10?

6                THE COURT:  Any objection?

7                MR. BRUSH:  No objection, Your Honor.

8                THE COURT:  So admitted.

9          Q     (By Mr. Harmon) Does it indicate -- well, read the

10    second paragraph of the order, please.

11         A     The respondent, that paragraph?

12         Q     Yes.

13         A     The respondent has failed to appear before this

14    Court despite numerous orders to do so.

15         Q     Now, you referenced at the beginning of your

16    testimony a New York State case that was brought, an arrest

17    warrant that Mr. Guy Jean-Pierre was arrested on as a result

18    of a lure operation.  Let's talk about that investigation.

19               How -- did you know how the New York's County

20    District Attorney got involved in the case, got involved in

21    looking at Mr. Guy Jean-Pierre?

22         A     The SEC referred the matter to them.

23         Q     Okay.  Was this after they filed their own

24    complaint?

25         A     Yes.

54

1       Q    Okay.  And do you know how the New York County

2   District Attorney proceeded?

3       A    Yes.

4       Q    Did they do some investigation?

5       A    That's correct.

6       Q    Okay.  And did -- as part of that investigation,

7   did the prosecutor personally interview the niece?

8       A    Yes.

9       Q    Okay.  And when about did that take place?

10       A    2013, February 2013.

11       Q    Okay.  And when the prosecutor talked to the niece,

12   did the niece indicate -- was it more than one time that the

13   prosecutor talked to the niece?

14       A    Yes.

15       Q    Did the niece indicate whether or not she had told

16   any family member that she had been questioned by a criminal

17   prosecutor?

18       A    She told her father.

19       Q    Okay.  So she acknowledged telling her father that

20   she was being questioned about Guy Jean-Pierre in connection

21   with a criminal case by a New York state prosecutor?

22       A    That's correct.

23       Q    And that father, again what is his relationship is

24   to Guy Jean-Pierre?

25       A    His brother.

55

1        Q     How many brothers does Guy Jean-Pierre have?

2        A     At least one.

3        Q     Okay.  Is that the same brother that would have

4    tipped Mr. Guy Jean-Pierre off to this civil SEC complaint

5    prior to him being found at a youth hostel in Miami in

6    December of 2012?  Is that the same brother?

7              MR. BRUSH:  I'll object to the question as not

8    based on anything in evidence so far from this witness.

9              THE COURT:  Sustained.

10       Q     (By Mr. Harmon) Do you know if that's the same

11   brother?

12       A     I do not know if it's the same brother.

13             MR. HARMON:  At this point, Your Honor, I think

14   it's appropriate just to note that the defendant has reported

15   in the Pretrial Services Report that he has only one brother,

16   so I would ask the Court to take notice of that.

17             THE COURT:  All right.

18       Q     (By Mr. Harmon) What happened as a result of the

19   criminal investigation?  Was an indictment issued?

20       A     Yes.

21       Q     Okay.  And did they charge felonies or

22   misdemeanors?

23       A     Felonies.

24       Q     How many felonies?

25       A     36-count indictment.

56

1          Q      How many felonies?

2          A      36.

3          Q      36?  What type of felonies?

4          A      Fraud, identity theft.

5          Q      Falsifying business records?

6          A      That's correct.

7          Q      Forgery?

8          A      Yes.

9                 MR. HARMON:  May I approach, Your Honor?

10                THE COURT:  Yes.

11         Q      (By Mr. Harmon) Let me show you Government's 11.

12   Do you recognize that document?

13         A      Yes.

14         Q      What is it?

15         A      This is the indictment, the New York state

16   indictment.

17         Q      And is the substance of that indictment basically

18   about the same matter that the SEC had charged in its civil

19   complaint?

20         A      That's correct.

21         Q      The same matter that the Florida disciplinary

22   authorities were pursuing against Mr. Guy Jean-Pierre as

23   well?

24         A      That's correct.

25         Q      The misappropriation of his niece's identity?

57

1  A Yes.

2  Q At the time that the arrest warrant -- the

3 indictment was made and the arrest warrant was issued, did

4 anybody know where Mr. Guy Jean-Pierre -- anybody that was in

5 the New York State County Prosecutor's Office, did they know

6 where he was?

7  A They didn't know where he was.  They had learned

8 from the SEC that he had reported he was living in the

9 Dominican Republic.

10  Q Did they know where in the Dominican Republic he

11 was?

12  A Santo Domingo.

13  Q Are you speculating or is that the -- is that the

14 place where he got his passport or is that --

15  A That's where he got his passport.  He was in the

16 Dominican Republic.

17  Q Did you recall any seeing any address for him?

18  A I'm not recalling it.

19  Q Okay.  Is it because they didn't know of any

20 address for him?

21  A I don't know.  I don't recall if he provided one

22 during testimony.

23  Q Okay.  Well, what did they do?  Did they go and try

24 to find him at a particular address or did they look for

25 help?

1     A    They sought help.  The New York State asked for the

2    U.S. Marshals to try and locate him.

3     Q    Okay.  If they had known his address, would they

4    have been asking the marshals for help to locate him?

5     A    No.

6     Q    Is that a fair -- is it a fair understanding, that

7    they had no clue where he was in the Dominican Republic?

8     A    That's correct.

9     Q    Do you know what a Red Notice is?

10    A    Yes.

11    Q    What is a Red Notice?

12    A    It's a fugitive database --

13    Q    Is it --

14    A    -- system.

15    Q    Is it an alert, is it a communication sent out to

16    Interpol advising that a fugitive is being sought and asking

17    to be notified if he crosses a border into a country that's a

18    correspondent and part of the Interpol network?

19    A    That's correct.

20    Q    Okay.  So if Mr. Guy Jean-Pierre had traveled back

21    to the United States and the Red Notice was issued and

22    working, would authorities have been notified of that

23    crossing?

24    A    Yes.

25    Q    Do you know if there was any alerts made, once that

59

1    Red Notice was issued?

2          A    There had not been any alerts.

3          Q    Okay.  Do you know how long that Red Notice had

4    been out there prior to the undercover operation?

5          A     Prior to the undercover operation, two years,

6    approximately.

7          Q    Let's go to the undercover operation.

8               At the time of the undercover operation, prior to

9    getting information from a confidential informant, did the

10   colleagues you were working with know where Guy Jean-Pierre

11   was?

12         A    No.

13         Q    Did the SEC know where Guy Jean-Pierre was?

14         A    No.

15         Q    Did they have a judgment at that point?

16         A    Yes.

17         Q    Did the New York State criminal authorities know

18   where Guy Jean-Pierre was?

19         A    No.

20         Q    Now, the undercover operation, is that described in

21   the criminal complaint affidavit?

22         A    It is.

23         Q    And in summary, basically did a confidential

24   informant come forward and say that he had been dealing with

25   Guy Jean-Pierre in the Dominican Republic and would be able

1    to bring him back to the United States?

2         A    Yes.

3         Q    Did that confidential informant discuss with your

4    colleagues in this criminal case whether or not Guy

5    Jean-Pierre was aware of a pending federal investigation of

6    Fusion Farm?

7         A    Yes.

8         Q    And is that discussed in this affidavit?

9         A    Yes.

10         Q    And according to this affidavit, did the CI

11    indicate that he had told Guy Jean-Pierre about a criminal

12    investigation?

13         A    That's correct.

14         Q    And he told Guy Jean-Pierre that Fusion Farms

15    premises had been the subject of a search warrant and

16    criminal process?

17         A    That's correct.

18         Q    Now, I'm not going to ask you to rehash what

19    happened in the undercover investigation.   That's basically

20    described in the affidavit, fair?

21         A    Yes.

22         Q    But there were recorded conversations of

23    interactions between the confidential informant and Mr. Guy

24    Jean-Pierre?

25         A    Yes.

1          Q      Have you either listened to them or seen summaries

2    of them?

3          A      Yes.

4          Q      Did these records include telephone calls?

5          A      Yes.

6          Q      And were those calls leading up to a meeting in

7    Miami?

8          A      That's correct.

9          Q      And did they include recordings of the actual

10   meetings that took place in Miami?

11         A      Yes.

12         Q      Over what period of time were the meetings?

13         A      The meetings in Miami?

14         Q      Yes.

15         A      Mid-April 2016.

16         Q      Was it over a two-day period?

17         A      Correct.

18         Q      Okay.  During these recordings, did the subject of

19   Mr. Guy Jean-Pierre getting paid for the work he was going to

20   be offered as part of this undercover operation, did that

21   come up?

22         A      It did.

23         Q      Okay.  And did he discuss how he wanted payment to

24   be made to him?

25         A      He did.

1        Q     And what did he say?

2        A     He said he wanted to be paid in the Dominican

3   Republic.

4        Q     And did he say why he wanted to be paid in the

5   Dominican Republic?

6        A     Yes.  He wanted to avoid having that money seized

7   as part of the SEC.

8        Q     Did he reference judgments in the recorded

9   conversations?

10       A     He references judgments, yes.

11       Q     Wanting to avoid the money being taken on an SEC

12   judgment, fair?

13       A     That's correct.

14       Q     Okay.  Did the subject in these conversations come

15   up about where Mr. Guy Jean-Pierre was and what he was doing

16   at that time?

17       A     Yes.

18       Q     And what did he say?

19       A     He said that he had been living in the Dominican

20   Republic for three years, for the last three years; that he

21   had a three-year-old child and he was doing some missionary

22   work.

23       Q     Okay.  Did he indicate whether he was still

24   practicing law or involved with corporate work with penny

25   stock companies?

63

1        A    He was not.  He wasn't doing much other than the

2    missionary work.

3        Q    So he basically said he was doing missionary work,

4    and other than the work that was being offered to him from

5    the undercover, he was out of that business?

6        A    That's correct.

7        Q    Fair?

8        A    Yes.

9        Q    Okay.  Now, at the time of his arrest, was Mr. Guy

10   Jean-Pierre in possession of any computing device?

11       A    Yes, he was.

12       Q    What was he in possession of?

13       A    A laptop computer.

14       Q    Okay.  Did your colleagues ultimately get a warrant

15   to search that laptop computer?

16       A    Yes.

17       Q    And among the documents that they recovered from

18   the laptop computer, did they recover any documents involving

19   corporate -- any corporate documents involving penny stock

20   companies?

21       A    Yes.

22       Q    And did they look at the metadata on those

23   documents?

24       A    Yes.

25       Q    And by the way, did those documents involve

64

1    corporations and entities other than Fusion Farm?

2        A    Other than Fusion Farm, yes.

3        Q    Other than the matters that were being addressed in

4    the undercover?

5        A    Yes.

6        Q    So these were separate penny stock matters that

7    were found on his computer?

8        A    Yes.

9        Q    And according to the metadata, how recently had

10   those documents been worked on?

11       A    As recent as 2016 -- 2016.

12       Q    Now, you mentioned that he said that he had been in

13   the Dominican Republic for three years; is that right?

14       A    That's correct.

15       Q    Was this something he said on one occasion or

16   multiple occasions?

17       A    On multiple occasions.

18       Q    Okay.  Was there a discussion about where this

19   meeting should be taking place?  Were there discussions on

20   where exactly they should meet?

21       A    Yes.

22       Q    Okay.  And did Mr. Guy Jean-Pierre make a proposal

23   originally about where the meeting should be?

24       A    Yes.  Originally before they agreed on south

25   Florida, he proposed the Bahamas, Nassau.

65

1      Q     And did he discuss at some point whether he was

2   really interested in coming back to south Florida,

3   independent of just having this meeting?

4      A     No.  In fact, he mentioned at some point that he

5   planned on never coming back to the United States.

6      Q     Okay.  So he indicated that the only reason he was

7   there was to have this meeting?

8      A     Correct.

9      Q     Now, did your colleagues look at government

10  databases to see whether or not -- to try to get some sense

11  on whether or not he was being accurate when he said -- that

12  is, Guy Jean-Pierre -- that he had been -- he had been out of

13  the United States for approximately three years?

14     A     Yes.

15     Q     What did they look at?

16     A     Travel records.

17     Q     What did the records show as far as the last

18  scheduled travel of Mr. Guy Jean-Pierre?

19     A     The last scheduled travel of that that they could

20  identify -- and I should say it's unconfirmed, but what they

21  saw is an outbound scheduled flight was about three years

22  earlier from Fort Lauderdale to the Dominican Republic.

23     Q     Okay.

24     A     2013, maybe July -- July 2013.

25     Q     And there were no -- did your colleagues interact

1    with customs border protection and the records of that case?

2         A    Yes.

3         Q    Okay.  And did they find any entries back into the

4    United States during that time?

5         A    No records of reentry.

6         Q    Do you -- are you familiar with what happened to

7    Mr. Guy Jean-Pierre after his arrest, where he went?

8         A    Yes.

9         Q    Where did he go?

10        A    He was transported to New York for -- on the New

11   York State warrant.

12        Q    Did he go there at his own liberty or did he go

13   there in custody?

14        A    In custody.

15        Q    Okay.  And when he got there, was he released on

16   his own recognizance or did he stay in custody?

17        A    He stayed in custody.

18        Q    Are you familiar with a place called Rikers Island?

19        A    Yes.

20        Q    What is it?

21        A    That's where he was remanded to.

22        Q    Okay.  And how long did he remain at Rikers Island?

23        A    Up until last week.

24        Q    Okay.  Up until he was released into federal

25   custody?

67

1          A     Yes.

2          Q     Okay.  And were -- does Rikers Island, if you know,

3    do they monitor phone calls of their inmates?

4          A     They do.

5          Q     And do they record those calls?

6          A     Yes.

7          Q     And were those recordings sought by your colleagues

8    in this case?

9          A     Yes.

10         Q     And were they monitored?

11         A     Yes.

12         Q     Were they reviewed?

13         A     Yes.

14         Q     As part of those calls, did you learn about Mr. Guy

15   Jean-Pierre wanting to get things given to him and why he

16   wanted to get certain things?

17         A     Yes.

18         Q     Tell us about that.

19         A     Yeah.  He -- at some point he says he would really

20   like to get his phone because he -- he wants to contact

21   somebody in the Dominican Republic.

22         Q     And what was the purpose of wanting to contact

23   people in the Dominican Republic, according to these recorded

24   calls?

25         A     Yeah.  According to the calls, he wants to contact

68

1     this individual to facilitate a rent payment for him in the

2     Dominican Republic.

3         Q     By the way, when he talked to the CI during the

4     Miami meeting, did he indicate what his long-term plans were

5     about the Dominican Republic, whether he wanted to say there

6     or go someplace else?  What did he say?

7         A     He didn't -- he didn't want to come back to the

8     U.S. originally.

9         Q     He wanted to stay in the Dominican?

10        A     That's correct.

11        Q     Now, did the subject of working for the church come

12    up in any of these calls?

13        A     Yes.

14        Q     Tell us about that.

15        A     Yeah.  He is indicating to one of the callers that

16    he wants to continue work for the Mormon church.

17        Q     And he had indicated in the undercover that he had

18    been doing missionary work someplace?

19        A     That's correct.

20        Q     Where?

21        A     In the Dominican Republic.

22        Q     Okay.  And he said he wanted to do that work going

23    forward if he were released from prison?

24        A     Yes.

25        Q     Okay.  Do you know him to be associated with any

1    other church activities outside the Dominican Republic?

2        A    No.

3        Q    Now, the pending indictment against Mr. Guy

4    Jean-Pierre, have you reviewed that?

5        A    Yes.

6        Q    And does that -- does the charging language in that

7    indictment allege that Mr. Guy Jean-Pierre conducted a

8    financial transaction in proceeds that were represented to be

9    part of the sale of common stock of Fusion Farm?

10       A    Yes.

11       Q    Okay.  Are you familiar with Mr. Guy Jean-Pierre's

12   role in selling -- in arranging for Fusion Farm stock to be

13   sold?

14       A    Yes.

15       Q    Okay.  What was his basic role?

16       A    In issuing these attorney opinion letters.

17       Q    Okay.  So he helped to clear that stock, the Fusion

18   Farm stock, so it could be sold into the public markets?

19       A    That's correct.

20       Q    And he is alleged to have been working with the

21   principals of Fusion Farm to do that?

22       A    That's correct.

23       Q    And was there money identified that was the result

24   of these fraudulent stock sales?

25       A    Yes.

1        Q      How much money are we talking about?

2        A      $12 million.

3        Q      All right.  And so he is directly implicated in

4    facilitating $12 million worth of --

5        A      That's correct.

6        Q      -- Fusion Farm stock sales?

7        A      Yes.

8        Q      And the allegation that's being investigated, is

9    that -- those were fraudulent transactions?

10       A      That's correct.

11       Q      The fraudulent nature of them, is that identified

12   in the criminal complaint affidavit?

13       A      Yes.

14              MR. HARMON:  One moment, Your Honor.

15              THE COURT:  All right.

16       Q      (By Mr. Harmon) Have you come across a name Marcelo

17   Prado (ph) in this case?  Not Marcelo Dominguez de Guerra;

18   Marcelo Prado.

19       A      Yes.

20       Q      Do you recall chronologically how that first

21   name -- how that name first came up?

22       A      It was in -- in SEC testimony that the name comes

23   up.

24       Q      During that SEC testimony, did Mr. Guy

25   Jean-Pierre -- was it Mr. Guy Jean-Pierre's testimony?

1          A     Yes.

2          Q     And did he describe who Marcelo Prado was?

3          A     Yes.

4          Q     And what did he describe Mr. Marcelo Prado to be?

5          A     He indicated Marcelo Prado was someone who worked

6    in his office.

7          Q     As a paralegal?

8          A     Yes.

9          Q     Did the name Marcelo Prado come up as recently as

10   this past year, the summer of 2016?

11         A     The name Marcelo did come up, yes.

12         Q     And was it linked to records to Marcelo Prado?

13         A     Yes.

14         Q     All right.  Walk the Court through how that name

15   came up.

16         A     Well, the CI in the case received a phone call and

17   the caller identified himself by the name Marcelo.  They had

18   a brief conversation.  The CI takes note of the number and it

19   comes back to a law firm in south Florida.

20         Q     Did the CI basically report the substance of this

21   phone call to federal law enforcement authorities?

22         A     Yes.

23         Q     Did he report it to the FBI?

24         A     He did.

25         Q     Was a record made of what he said the caller said?

1        A    Yes.

2        Q    All right.  I don't want a guessing game here.  Do

3   you have that record with you?

4        A    I do.

5        Q    Pull it out, please.

6        A    There are two calls.

7        Q    Let's talk about the first one.  Tell us when it

8   happened.

9        A    The first call happened in late July 2016.

10       Q    Okay.  Was that before or after Mr. Guy -- Guy

11  Jean-Pierre made it to Rikers Island?

12       A    That was after.

13       Q    By the way, do you know whether Mr. Guy Jean-Pierre

14  mentioned in conversation -- in recorded conversations what

15  he knew about the circumstances that led to his arrest?  Did

16  he talk about that in the recorded conversation?

17       A    He did.

18       Q    What did he say?

19       A    He mentions that the CI set him up.

20       Q    He knew that the CI had set him up?

21       A    That's what he says.

22       Q    Now, tell us what this fellow Marcelo said to him,

23  according to the CI, in July of 2016.

24       A    Correct.  Let's see.  So the caller asked for the

25  CI by name.  The caller said that he was -- the caller said

73

1   he was supposed to meet with Guy Jean-Pierre in April and

2   never heard from him.  The CI kept the individual on the line

3   by telling him that he met with Jean-Pierre in April and that

4   Guy Jean-Pierre had been arrested after their meeting.  The

5   CI led the caller to believe that he did not know why

6   Jean-Pierre was arrested after being processed through United

7   States Customs without any issues.  The caller hung up after

8   identifying himself as Marcelo.

9        Q    Okay.  And you said that the subscriber records

10   then further identified where the call came from?

11        A    That's correct.

12        Q    And what did it show?

13        A    To a law firm in south Florida.

14        Q    Is that a law firm that was linked to Guy

15   Jean-Pierre?

16        A    I don't know that for sure.

17        Q    To Marcelo Prado?

18        A    Yes.

19        Q    Okay.  Now, did the CI understand that this caller

20   was questioning why he was only arrested -- why he wasn't

21   arrested at the border and why he was only arrested after

22   having met with the CI?

23        A    Yes, that appears from his conversation.

24        Q    (Inaudible).

25        A    Yes.

1      Q     Was that of concern to the CI?

2      A     Yes.  He took it in a threatening manner?

3      Q     Is that why the CI -- according to the CI, is that

4  why he advised the authorities about this call?

5      A     That's correct.

6      Q     Did there come a time that the CI advised the

7  authorities of a second call that was of concern to him?

8      A     Yes.

9      Q     Okay.  When was that?

10      A     That occurred on September -- in September of 2016,

11  early September.

12      Q     Was a record made of that call?

13      A     Yes.

14      Q     All right.  And who was that call made from?  Was

15  it known?

16      A     It's an unknown number.

17      Q     Okay.  So was it an unsubscribed number, basically?

18      A     Yeah.  It comes up as unknown.

19      Q     Okay.  And the CI, what did he say the caller said

20  to him at that time?

21      A     The CI said that the caller said -- there is some

22  expletives.

23      Q     Well, I want you to read it to us --

24      A     Okay.

25      Q     -- and tell us exactly the words that were used.

1        A    Okay.  The caller said, You fucking dead, you rat,

2    the feds can't help you.

3            MR. HARMON:  May I have a moment, Your Honor.

4            THE COURT:  Yes.

5            MR. HARMON:  I have no further questions.

6            THE COURT:  All right.  Mr. Brush, before you

7    proceed, I'm going to take a quick break and I'll be right

8    back.

9            (Recess was taken.)

10           THE COURT:  All right.  We are back on the record

11   in the United States vs. Guy Jean-Pierre, 17-cr-08.  Thank

12   you very much for accommodating that short break.  I'm sorry,

13   I've been fighting a cold all week and I'm afraid if I don't

14   get some liquid in me, I'm going lose my voice.

15           So you may proceed when you're ready, Mr. Brush.

16           MR. BRUSH:  Thank you, Your Honor.

17                       CROSS-EXAMINATION

18   BY MR. BRUSH:

19       Q    So Agent Medina, you indicated that back in 2011,

20   2012, that this defendant, under whichever of his two names,

21   did voluntarily go and testify at the SEC matter?  Nobody had

22   to arrest him and bring him there?

23       A    He was not arrested, no.

24       Q    All right.  And, in fact, even when they were

25   having a little bit of trouble finding him, once they got him

1    subpoenaed, just a civil subpoena, he shows up?

2         A    He did show up.

3         Q    And he testified --

4         A    That's correct.

5         Q    -- on a deposition?  And obviously some things came

6    out, as you mentioned, that were in that deposition or the

7    other testimony, that were accusatory of him having done

8    things maybe that they believed he shouldn't have done,

9    right?

10        A    That is correct.

11        Q    Violations of SEC rules, criminal matters, whatever

12   it is.  And he -- in fact, you said he asserted the Fifth

13   Amendment?

14        A    Correct.

15        Q    Something briefly came up about his Haitian

16   citizenship, and I think it's undisputed that he was born in

17   Haiti, but he has been in the United States since he was

18   junior high age, 1970 or so?  He would have been 12, 11 years

19   old, 12 years old?

20        A    He has been here for a long time, yes.

21        Q    So as far as overall your investigation, there is

22   nothing about, as I understand at least, nothing about

23   Haitian travel documents, Haitian family, Haitian anything?

24   It is all Dominican Republic, as far as if it's not in the

25   United States?

```
 1        A     During one of the recordings, he did say that he
 2   traveled from the Dominican Republic to Haiti as late as
 3   2016.
 4        Q     Just for a visit of some kind?
 5        A     He just said he went to Haiti at one point.
 6        Q     No indication of a residence there?
 7        A     No.
 8        Q     Thank you.
 9              You got into the fact that he had officially
10   changed his name in the Broward County court system?
11        A     That's correct.
12        Q     And at some point in 2011, I believe it was.  But
13   then some of the documents that have been offered as exhibits
14   show that the name that he is primarily indicted under, the
15   Guy Pierre name -- Jean-Pierre name, were still on some
16   business documents, some communications he had.  So he wasn't
17   hiding his other name?  It was still being used at his
18   understanding, at his agreement, at least, correct?
19        A     He was using his --
20        Q     So this is not a case where you're saying that, Oh,
21   this guy changed his name so that nobody would know about his
22   other name?
23        A     He changed his name and he continued to use the
24   other name as well.
25        Q     Okay.  There was a lot of questions asked of you
```

1   about, Well, he didn't show up to file a complaint in the

2   civil -- SEC civil suit; he didn't respond when the default

3   judgment was going to be taken?  He just basically didn't --

4   didn't take part in that civil suit?  He got served

5   ultimately with papers, civil papers?

6        A    He did get served, yes.

7        Q    And the documents that have been offered into

8   evidence show no indication of any contempt of court or court

9   order that he has to show up at the SEC case?  Just like any

10  other civil case, if you don't show up, bad things could

11  happen?

12       A    That's correct.

13       Q    But he wasn't avoiding arrest in that case, true?

14       A    I'm not aware of the arrests yet.  There was a

15  pending arrest at the time.

16       Q    Out of that case?

17       A    Yes.

18       Q    The SEC case was strictly civil?

19       A    Right.

20       Q    So if he didn't show up, he just suffered the

21  consequences financially and reputation-wise and loss of the

22  ability to get involved in SEC matters, I assume?

23            Now, you mentioned when the SEC turned over the

24  criminal aspect of their investigation to the prosecution

25  authorities in New York, that this defendant's niece told you

1    that her father, his brother, that she had told her father

2    about being questioned by the criminal authorities in New

3    York?

4         A    That's correct.

5         Q    So you have reason to believe that word probably

6    got back to this defendant, New York prosecutors are involved

7    in this now; it's not just the SEC anymore?

8         A    Correct.

9         Q    And you mentioned this 36-count indictment, that's

10   the same one that he got -- when he did show up in April 2016

11   he got taken to New York to face?

12        A    Correct.

13        Q    And the ultimate result was one misdemeanor count

14   conviction, ten months in jail, less good time?

15        A    Correct.

16        Q    Because that's over with?

17        A    Yes.

18        Q    And whoever the informant was had some business

19   dealings where he apparently knew where this defendant was

20   living at the time over the last year or two?

21        A    Right.

22        Q    And that informant indicated that he had told this

23   defendant -- during this investigation period before any

24   return to this country by this defendant, that the informant

25   had told him about the criminal investigation of Fusion Farm?

80

1        A    Correct.

2        Q    The very company that he's listed on as corporate

3    secretary and was writing opinion letters for, all that sort

4    of thing?  So he knew about that criminal investigation, too?

5        A    Correct.

6        Q    So when he came back here, he knew about the New

7    York -- as far as you could tell anyway, he knew about the

8    criminal investigation in New York --

9        A    Correct.

10       Q    -- that the niece had apparently passed on word

11   about?  He knew about the criminal case against Fusion Farm.

12   He certainly knew about the SEC judgment.  That's one reason

13   he wasn't coming back to have a bank account here where all

14   his money got seized, right?

15       A    Correct.

16       Q    So he knew about all that stuff.  And now he's got

17   a young child there; he is doing some missionary work for the

18   Mormon church.  Proposed Nassau, Bahamas as a place to meet,

19   but whatever -- well, for the reason that the informant knew

20   it needed to be here, he came back to Florida.  Knowing about

21   all this other stuff, he came back.  He didn't have a -- he

22   came back on the passport and his new name, right?

23       A    Correct.

24       Q    That everybody knew about since 2011?

25       A    That's correct.

 1          Q     He hadn't gotten some third name in Dominican or

 2     whatever to hide the first two names?

 3          A     We're not aware.

 4          Q     And the phone calls from Rikers Island that were,

 5     as is typical in jail phone calls, he talks about needing to

 6     get his rent paid in the Dominican Republic and that he hopes

 7     to get back to doing his missionary work for the Mormon

 8     church, start his life back up there when he gets out?

 9          A     He just said he wanted to continue to work for the

10     church.

11               MR. BRUSH:  That's all the questions I have, Your

12     Honor.

13               THE COURT:  All right, thank you.

14               Mr. Harmon, anything further with this witness?

15               MR. HARMON:  Nothing further, Your Honor.

16               THE COURT:  All right.  Thank you, Agent Medina,

17     you may step down.

18               THE WITNESS:  Thank you.

19               THE COURT:  All right.  Counsel, I'll -- do you

20     have anyone else you want to call, Mr. Harmon?

21               MR. HARMON:  No, Your Honor.

22               THE COURT:  All right.  I will hear brief argument

23     and then we will move on.

24               MR. HARMON:  May I proceed?

25               THE COURT:  Yes, you may.

1             MR. HARMON:  So the undisputed facts are this

2    defendant is a dual national, a Haitian and a United States

3    naturalized citizen.  He has absolutely no ties to the state

4    of Colorado.  He has some ties that have lapsed over time

5    with relatives in Florida.  He has made it clear, and the

6    evidence has shown, that his heart and the heart strings that

7    compel him to act are in the Dominican Republic, not the

8    least of which is a three-year-old son by a woman there and

9    some life's work, missionary work, which he has said in the

10   undercover communication was what was driving him forward,

11   not the practice of law, even though documents were recovered

12   saying, despite that, he is actually still doing some type of

13   corporate work.

14             Here is the basic point, Your Honor.  He has got

15   those ties there.  It's clear from the chronology that he

16   intended to be in the Dominican Republic throughout; that the

17   only reason he came to Miami was for this meeting.  It's also

18   clear, I think if you hear that testimony and read the

19   complaint, that he took a calculated gamble, as we all do in

20   life.  He needed and wanted money, and he had a person he had

21   dealt with for a very long time.  And so he took a gamble

22   that that guy wasn't a confidential informant working with

23   the FBI, and he lost on that gamble.  But that doesn't mean

24   that he came back to the United States because he wasn't

25   unconcerned with a criminal case.  He just gambled that the

1     CI wouldn't be an operative of the federal government.

2              Now, it's clear that he structured his activities

3     in such a way that he wanted to avoid legal process, both

4     civil, the SEC judgments; criminal, the New York state case,

5     which I think we have a good circumstantial case to show he

6     was aware of; and the federal criminal case, not the least of

7     which is a case that involves massive exposure.

8              And I guess the basic commonsense point is this.

9     If this man didn't care enough to defend a hard-earned degree

10    from an Ivy League institution, a sterling pedigree, going to

11    the best law firms, doing the best work, if he was willing to

12    throw that away and not appear and defend himself, if he was

13    willing not to appear and defend himself in the SEC case,

14    what makes you think he's going to show up on his own

15    volition to a criminal case where he is (inaudible) a

16    guideline exposure that involves upwards of $12 million.  You

17    the calculated bet if you allow him to go out on those

18    conditions.

19             I will say this.  I think it boils down to the

20    defendant's -- the defense will urge you that there are

21    conditions to -- will assure his appearance, if he were

22    released.  I think they're going to bank on a halfway house.

23    I'll tell you, I think the commonsense reality is this.  He

24    can be put in the charge nominally of the probation office

25    which will offload the supervision on the halfway house.  He

84

1    will be told to come and go according to a curfew.  God knows

2    what he will be doing for a living in the state of Colorado

3    where he has no ties, and we will bank on or take a

4    calculated risk, he will show up every day and go back to his

5    bed space at night.

6            There is nothing that would prevent him, however,

7    from getting in a car and driving thousands of miles across

8    the Mexican border and using one of the two names that he

9    uses interchangeable, whichever name at the strategic moment

10   may be to his advantage.

11           And I think it's clear from the testimony that he

12   didn't stick with one name; he would use whatever name was

13   helpful to him.  He said, came up with some ludicrous

14   explanation about why he wanted the name Marcelo Dominguez de

15   Guerra.  He said it was because people couldn't pronounce the

16   name Guy Jean-Pierre in the Dominican Republic; but when it

17   came to making money and continuing on with his professional

18   work, he allowed the name Guy Jean-Pierre to be used.  So he

19   used those two names, at least, to his tactical advantage.

20   And there is nothing to believe that he wouldn't continue to

21   use those two names to his tactical advantage in negotiating

22   his way outside the state of Colorado, across the border and

23   back to the Dominican Republic, where we would have

24   considerable effort to get him back.

25           And the commonsense reality is, it took a whole

1    entire, elaborate undercover operation to get him back to the

2    United States after three years of looking for him in the

3    first place.  So we're taking a calculated risk that we won't

4    have to do that again.

5         Unless the Court has any questions, that's

6    basically my argument.  And I thank you for your time and

7    patience.

8         THE COURT:  Thank you, Mr. Harmon.

9         Mr. Brush.

10        MR. BRUSH:  Your Honor, of course, this is not a

11   presumption of detention-type charge, and while we are

12   dealing with a person who has interest both as a U.S. citizen

13   and is with some new family and missionary work and such in

14   the Dominican Republic, it's again not where he made any name

15   change to hide who he was.

16        He knew, from the witness's testimony, knew, or it

17   appeared that he knew about all the problems that he was

18   facing here and still came back.  And after almost a year,

19   ten months now, in Rikers, and then in federal custody, he is

20   not in a position to have any assets or in any way of

21   traveling anyplace.  It just seems like the risk here is

22   pretty minimal for this defendant to even -- even if he

23   wanted to leave, to be able to leave.

24        He is now facing the issue also of his mother being

25   in a hospital, possibly in her last few days of life.  So he

 1   has some reason to try to get his life established and

 2   address all these things and get them behind him and move on.

 3          He is a man in his late 50s now and not somebody

 4   that's likely to be able to just move around in Mexican

 5   cartels or any other of those other kind of things that

 6   people might go to Mexico for.

 7          So I would ask the Court to, based on the nature of

 8   the current charges, which is $5,000 cashier's check money

 9   laundering, and the testimony by the agent, which I thought

10   was very fair in terms of the things that showed that this

11   defendant was showing up at times when he was subpoenaed or

12   after he knew of problems that had come up, and let this

13   defendant have a chance to be supervised through pretrial and

14   a halfway house.

15          I don't know his work skills.  As an attorney, of

16   course, he's not allowed to use here, but hopefully he can

17   find some kind of work to keep him occupied if nothing else

18   while he is on bond.  I would ask you to let him out on bond.

19          If you do, I would also ask for maybe an

20   anticipatory consideration of a furlough, if his mother does

21   pass away, and even travel; if not, if she's still in the

22   hospital, to be able to see her at this kind of critical

23   time.  Again, I have no records to prove that she's in the

24   hospital.  I can try to obtain that if the Court wants.

25          I do have his passports, both the old one that is

1    no longer valid under the Jean-Pierre name and the current

2    one that shows he used that passport when he came through the

3    Florida airport to come here this time when he got arrested

4    last April.  So he wasn't -- it's right there stamped,

5    leaving the Dominican Republic, entering the United States on

6    that date, April 28, 2016.  So I don't see him being that

7    much of a -- an identity dodger.

8             So we would request the same things that are in the

9    pretrial report.

10            THE COURT:  All right.  Thank you very much.

11            The record commences this day -- this 9th day of

12   February 2017, before Magistrate Nina Y. Wang.  We're here

13   today on Criminal Case Number 17-cr-08-WJM, United States of

14   America vs. Guy M. Jean-Pierre.  The matter comes before the

15   Court on the Government's request to detain the defendant Guy

16   Jean-Pierre pending trial in this matter.

17            In considering this request, I'm guided by several

18   general principles.  First, at all times the defendant is

19   entitled to the presumption of innocence.  Nothing that takes

20   place in this hearing or that I set forth in my findings is

21   intended or should be construed to effect that presumption.

22   Rather the purpose of this hearing is to determine whether or

23   notwithstanding that presumption of innocence the defendant

24   should be detained pending trial.

25            Second, under the Bail Reform Act, pretrial

88

1    detention is an exceptional step.  Under the Act, the

2    defendant must be released prior to trial, unless a judicial

3    officer finds that no condition or combination of conditions

4    exist that will reasonably assure the appearance of the

5    defendant or reasonably assure the safety of anyone -- any

6    other person in the community.  That Act requires that the

7    least restrictive conditions be imposed that are necessary to

8    provide those reasonable assurances, but if I cannot find any

9    conditions that will reasonably assure the appearance of the

10   defendant as required or the safety of persons in the

11   community, then I'm required by the Act to order the

12   defendant be held in custody.

13           In this case, the Government seeks to detain the

14   defendant on the ground that he is a risk of flight, and

15   he -- they argue several reasons that he is a risk of flight.

16           Because they are moving under that -- under the

17   basis that the defendant presents a risk of flight, the

18   Government must show, by a preponderance of the evidence,

19   that no conditions or combination of conditions will

20   reasonably assure the defendant's presence as required.  In

21   this case as noted by defense counsel, the presumption of

22   detention does not apply.

23           And I now turn to the specific four factors that

24   the Act requires me to consider under 18 U.S.C. 3142(g).

25           One, the nature and circumstances of the alleged

1    offense; two, the weight of evidence against the defendant;

2    three, the history and characteristics of the defendant.

3    This includes defendant's physical and mental condition,

4    family ties, employment, length of residence in the

5    community, community ties, past conduct, criminal record,

6    history of drug and alcohol abuse, record of appearance at

7    prior court proceedings, and whether the defendant was on

8    conditional release of some sort at the time of the new

9    alleged offense; and four, the nature and seriousness of the

10    danger to others and the community.

11        I've considered all the evidence of these factors

12    and I've also given due consideration of the recommendation

13    of pretrial services, which in this case is to release the

14    defendant on a $10,000 unsecured bond and to the custody of a

15    residential reentry center; but based on the evidence in the

16    hearing, I find that the Government has met its burden of

17    showing that detention is required based on a risk of flight.

18        In particular, I find that the defendant in this

19    case has two aliases; that even in his initial appearance, he

20    requested from this Court to be referred to by his new name,

21    Marcelo Dominguez de Guerra, despite the indictment in this

22    case; that he was arrested in the Southern District of New

23    York and not in the District of Colorado, only after an

24    undercover operation occurred; that he has had residence

25    undisputed in the Dominican Republic since at least 2013 and

1    that he has a minor child at that time; and that he has been

2    unemployed since 2012; that he has a valid passport, although

3    his counsel represents that he has custody of the passport at

4    this time; that he has not lived in the United States since

5    2013; that he does not maintain any ties to the Southern

6    District of Florida; and that he doesn't have any current

7    stable living condition in Colorado or any employment in

8    Colorado to keep him in this.

9           And while the Court is sympathetic that the

10   defendant's mother is gravely ill and in the hospital, even

11   if the Court were to grant bond in this matter, which does

12   not seem appropriate, given the risk of flight, the Court

13   would not be in a position to grant furlough at this time to

14   proceed to allow the defendant to be in Florida.

15          Accordingly, this Court finds that it is

16   appropriate to detain defendant pending the trial in this

17   matter.

18          Mr. Jean-Pierre, you will be remanded to the

19   custody of the United States Marshal and, Counsel, I will

20   enter an order of detention later this afternoon.

21          Counsel, is there anything further on this matter?

22          MR. HARMON:  Nothing from the Government, Your

23   Honor.

24          THE COURT:  Mr. Brush?

25          MR. BRUSH:  Nothing from the defense, Your Honor.

1    All right.  Thank you very much.  I believe that ends our

2    1:30 docket.

3              (Whereupon, the within hearing was then in

4    conclusion at 3:33 p.m.)

5

6

7

8    I certify that the foregoing is a correct transcript to the

9    best of my ability to hear and understand the audio recording

10   and based on the quality of the audio recording from the

11   above-entitled matter.

12

13   /s/ Dyann Labo                    December 29, 2017

14   Signature of Transcriber              Date

15

16

17

18

19

20

21

22

23

24

25

**PATTERSON TRANSCRIPTION COMPANY**
scheduling@pattersontranscription.com

92

```
 1                          INDEX

 2

 3    PLAINTIFF'S WITNESS                    PAGE

 4    Carlos Medina

 5    Direct Examination by Mr. Harmon      6

 6    Cross-Examination by Mr. Brush        75

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**PATTERSON TRANSCRIPTION COMPANY**
scheduling@pattersontranscription.com