# EXHIBIT A

AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address,*

An HP Laptop (Serial # CNDOV8180D) that was inventoried by the Miami Police Incident at the arrest of GUY JEAN-PIERRE, aka Marcelo Dominguez de Guerra, in Miami, FL on April 28, 2016. The laptop is currently being stored at the Miami Police Dept., located at 400 NW 2nd Avenue, Miami, Florida under AC#16042299

Case No. 16 mj 3033 - White

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

An HP Laptop (Serial # CNDOV8180D) that was inventoried by the Miami Police incident to the arrest of GUY JEAN-PIERRE, aka Marcelo Dominguez de Guerra, in Miami, Florida an April 28, 2016. The laptop is currently being stored at the Miami Police Department, located at 400 NW 2nd Avenue, Miami, Florida under AC#16042299 SEE ATTACHMENT A

located in the _____ Southern _____ District of _____ Florida _____ , there is now concealed *(identify the person or describe the property to be seized):*

SEE ATTACMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code Section 1343 | Wire Fraud |
| Title 18, United States Code Section 1956 | Money Laundering |

The application is based on these facts:

SEE ATTACHMENT AFFIDAVIT

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days. _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Embert S. Kule-Thomas, Special Agent, FBI

*Printed name and title*

Sworn to before me and signed in my presence.

Date. July 29, 2016

*Judge's signature*

City and state: Miami, Florida

Patrick A. White, U.S. Magistrate Judge

*Printed name and title*

## AFFIDAVIT

I, Embert S. Kule-Thomas, being first duly sworn, hereby depose and state as follows:

1.     I have been a Special Agent of the Federal Bureau of Investigation (FBI) since August 2014 and have been assigned to Miami, Florida since January 2015.   My duties and responsibilities primarily include the investigation of criminal matters particularly related to white collar crime.  My education includes a Bachelor's of Science degree in Business Administration – Accounting from University of Maryland College Park, five months of training at the FBI Academy, and various other continuing education classes provided by the FBI.   I have received training and instruction in the field of investigation of white collar crime and have had the opportunity to participate in investigations relating to complex financial crimes.

2.     Since in or about December 2013, Special Agents of the FBI, Postal Inspectors of the United States Postal Inspection Service (USPIS), and Internal Revenue Service Criminal Investigation (IRS-CID) Special Agents have been involved in a federal criminal investigation in the District of Colorado of activities and conduct arising from and relating to the operations of FusionPharm, Inc. ("FusionPharm"), an erstwhile publicly traded, microcap or "penny stock" company, headquartered in Commerce City, Colorado, and, in particular the conduct of two individuals (Targets 1 and 2) who constituted principals of the business and were de facto partners, concerning federal criminal securities, mail fraud, wire fraud, money laundering and tax offenses. As set forth below, during the course of the investigation, one of the principals of FusionPharm, Target 1, provided information about GUY JEAN-PIERRE, a/k/a Marcelo Dominguez de Guerra, a disbarred lawyer, who formerly acted as the company's counsel, and Target 1 agreed to cooperate in an undercover investigation of JEAN-PIERRE.  This affidavit is submitted in support of an application for the issuance of a search warrant for an HP laptop used by JEAN-PIERRE on April

1

29, 2016, which is currently in the custody of the Miami Police and further described in Attachment A hereto, based, in substantial measure, on the evidence developed as a result of this undercover investigation. Based on this and other evidence in the FusionPharm investigation, as summarized below, I submit that there is probable cause to believe that JEAN-PIERRE engaged in a wire fraud scheme, in violation of 18 U.S.C. §1343, and that he conducted and attempted to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity—namely, proceeds of securities fraud, wire fraud, mail fraud, and related offenses committed, among others, by Target 1, as aided and abetted by JEAN-PIERRE with the intent to conceal or disguise the nature, location, source, ownership and control of such property, in violation of Title 18, United States Code, Sections 1556(a)(3) and 2. Because JEAN-PIERRE at times relevant to this investigation worked as an attorney, procedures (including the use of a "filter" or "taint" team) will be employed during the execution of the search warrant to ensure that attorney-client privileges are not violated.

3.     The facts in this affidavit are based upon my communications with other federal agents who have personal knowledge of the events and circumstances described herein, interviews other federal agents involved in the FusionPharm and undercover investigations have conducted, other agents' review of consensually made and monitored recorded telephone calls and recorded conversations involving JEAN-PIERRE, other agents' review of bank account and other records acquired during the criminal investigation of this matter, and, with respect to FusionPharm, evidence developed in a parallel civil investigation conducted by the U.S. Securities and Exchange Commission (SEC). This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of the knowledge of or investigation into this matter.    Unless specifically indicated otherwise, all conversations and

2

statements described in this affidavit are related in substance and in part only. I am familiar with and attest to all of the facts and information stated in each of the paragraphs herein to the best of my knowledge and belief.

### Overview Of The FusionPharm Investigation

4.      The investigation of FusionPharm and its principals, Targets 1 and 2, commenced in or about December 2013, with a tip to the SEC from an SEC whistleblower. The focus of the investigation has been whether certain federal criminal offenses, including securities fraud, wire fraud, and money laundering, have been committed in relation, among other things, to the financial reporting and other disclosures made concerning FusionPharm, from the company's inception in early 2011 through in or about May 2014, in relation to the sale of FusionPharm common stock to the investing public during this time frame.

5.      Targets 1 and 2 are related by marriage. Target 1 has been involved in a number of suspicious microcap stock transactions over the last decade, and was arrested in 2004 and later convicted in the Southern District of New York (Case No. 04-cr-556-SWK), in connection with his penny stock activities, on one count of conspiracy to commit securities fraud and commercial bribery, and one count of securities fraud. Target 2, a former CPA and business consultant for a national accounting firm, functioned as the President, CEO, and the sole director of FusionPharm.

6.      A search was conducted of FusionPharm's business premises in May 2014, pursuant to a federal search warrant issued in the District of Colorado. From a review of electronic and paper records recovered in that search and other evidentiary sources (including, but not limited to, emails acquired from various email accounts, interviews of former and current FusionPharm employees, and proffer interviews of Targets 1 and 2), investigators in this case have concluded

3

that Targets 1 and 2, with the assistance of JEAN-PIERRE, orchestrated a systematic plot to defraud investors out of millions of dollars by implementing the following steps:

(a)     Targets 1 and 2 created a series of affiliated entities owned, operated and controlled by Targets 1 and 2;

(b)     They intentionally hid Target 1's control of FusionPharm and his criminal history from the investing public;

(c)     Using these entities, through fraudulent press releases and their financial releases, they further misled investors into believing that FusionPharm was generating sizeable revenue and generating a profit, when, in reality, the overwhelming majority of the money flowing through these entities was generated through sales of stock they engineered and made through their affiliated entities;

(d)     The stock sales were accomplished via a series of lies and misrepresentations that concealed the ownership and control of FusionPharm by Targets 1 and 2 and the stock being sold, thereby circumventing federal securities statutes and regulations proscribing the sale and distribution of unregistered securities by issuers and underwriters; and

(e)     As a result of these stock sales, Targets 1 and 2 reaped over twelve million dollars in FusionPharm stock proceeds.

7.     FusionPharm marketed itself as the creator and manufacturer of what it called the "PharmPods cultivation container system," featuring standard ISO steel shipping containers that FusionPharm "repurposed for use in indoor plant cultivation." The PharmPods, which housed growing lights and hydroponic growing equipment, were, at times, marketed by Targets 1 and 2

as vehicles to get fresh produce, such as lettuce, quickly and efficiently to restaurants and local groceries in urban markets. However, over time, the PharmPods were primarily marketed to cannabis growers in the United States and Canada. In or about late 2010, Targets 1 and 2 acquired a dormant publicly traded shell company, Baby Bee Bright Corporation, whose stock was traded over the counter on what was commonly known as "pink sheets" through OTC Markets Group ("OTC Markets"), a financial marketplace operating an Internet based trading platform.

8.     The FusionPharm stock scheme involved the creation and use of multiple shell companies, including entities called Meadpoint Venture Partners, LLC and Bayside Realty Holdings, LLC, which were jointly controlled by Targets 1 and 2 and used as conduits to take FusionPharm stock controlled by Targets 1 and 2 that was restricted from public sale and transform that stock into stock that could be publicly bought and sold over the counter.  Some of the FusionPharm common stock that was the subject of the scheme were the restricted shares received by Targets 1 and 2 when they obtained the dormant shell company, Baby Bee Bright Corporation. Other FusionPharm common stock used in the scheme were shares that they essentially invented or created for themselves by creating, with the advice and assistance of JEAN-PIERRE, bogus promissory notes that were convertible into shares of FusionPharm as repayment of purported loans made to FusionPharm by the shell entities Meadpoint and Bayside. In order to convert these shares into free trading stock, Targets 1 and 2, again with the help and advice of JEAN-PIERRE, exploited a particular regulatory exemption from federal securities registration for the shares, a registration "safe harbor" available under the Securities and Exchange Commission's (SEC) Rule 144. In order to avail themselves of the "safe harbor" in a way that afforded them the opportunity to sell FusionPharm stock without volume limitations, Targets 1 and 2, along with JEAN-PIERRE,

5

presented and prepared various documents for FusionPharm Inc.'s stock transfer agent[1] to, among other things, demonstrate compliance with SEC Rule 144. In particular, to avoid the volume limitations and allow unlimited share sales, Targets 1 and 2 had the purported sellers of the shares -- the shell entities they formed – demonstrate that they were not "affiliates" of FusionPharm. They also falsely represented that the shares had been in the hands of these non-affiliates for at least a year.

9.      Under the Securities Act, Rule 144, an "affiliate" is defined as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with the issuer." In turn, Rule 405 of the Securities Act defines "control" to mean "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise." As a result, the idea of "control" is critical to determining whether an individual or entity is an affiliate and, in turn, in determining whether that individual or entity can sell its unregistered shares all at once or over time without regard to the volume of shares offered into the market or whether it is limited in parsing out those shares in limited volume over specific time frames prescribed by securities regulation.

10.     The documents prepared by Targets 1 and 2, with the assistance of JEAN-PIERRE, falsely represented and concealed Target 1's role and involvement in the company, among other things, and ultimately convinced the transfer agent that the shares nominally held by the shell entities could be sold without a restrictive legend that would advise purchasers that the shares were restricted from public resale. The convertible notes that they created for Meadpoint and Bayside,

---

[1] A transfer agent is assigned by a publicly traded company to keep track of the individuals and entities that own the company's stocks and bonds.

the instruments through which they issued themselves more FusionPharm shares, were backdated to make it appear that the SEC Rule 144 one-year holding requirement had been met. The presentations of these documents involved wire communications that involved the State of Colorado, from where Targets 1 and 2 operated, the State of Florida, from where JEAN-PIERRE operated, and the State of Nevada, where the FusionPharm stock transfer agent was located.

### Background Of Guy JEAN-PIERRE

11.     Until in or about 2013, Guy JEAN-PIERRE was engaged in the practice of law in the United States, having at one point been licensed in the states of New York, Florida and California. In approximately 2007, JEAN-PIERRE started his own legal practice in Boca Raton, Florida, focusing on transactional and securities law matters and functioning as outside general counsel to small and medium-sized businesses. A significant aspect of JEAN-PIERRE's legal practice entailed preparing opinion letters, one type of which would be presented by his microcap, penny stock clients to the OTC Markets opining that there was adequate "current information" publicly available about these companies, and another type of opinion letter that would be presented to the stock transfer agents of these companies. These latter letters were used to help demonstrate to the transfer agent that the SEC Rule 144 registration "safe harbor" exemptions had been met, so that stocks held by certain prospective shareholders seeking to sell their shares in the public markets need not be designated as "restricted" or "control" shares and could be publicly sold without SEC registration. (These opinion letters are hereafter referred to as "Rule 144 Attorney Opinion Letters.")

12.     On or about April 21, 2010, OTC Markets banned JEAN-PIERRE from issuing opinion letters finding that the companies that were the subjects of these letters were making

incomplete and inconsistent disclosures and that JEAN-PIERRE was not performing the due diligence necessary to opine about the disclosures. As a result of the ban, stock transfer agents also would no longer accept Rule 144 Attorney Opinion Letters from JEAN-PIERRE.

13.     Following the OTC Markets ban, JEAN-PIERRE legally changed his name to "Marcelo Dominguez de Guerra," and, in December 2012, the SEC brought a civil suit against JEAN-PIERRE in the Southern District of New York (Case No. 12-cv-08886), alleging that he had committed securities fraud, over the course of May 2010 through April 2011, by causing to be issued over 100 fraudulent Rule 144 Attorney Opinion Letters in connection with the shares of nine different microcap companies, and by causing other types of fraudulent opinion letters to be submitted to OTC Markets on behalf of three microcap companies. The SEC's complaint alleged that, following his April 2010 OTC Markets ban, JEAN-PIERRE continued to submit opinion letters to the OTC Market in the name of his niece, a recently admitted lawyer. JEAN-PIERRE failed to defend the case and appeared to stop actively practicing law in South Florida by 2013. Government database records reflect that JEAN-PIERRE left south Florida for the Dominican Republic at about that time, as part of an apparent relocation to that country. On March 10, 2015, the Southern District of New York entered a default judgment against JEAN-PIERRE, ordering that he be obligated to pay over $1.49 million in disgorgement and civil penalties.

### JEAN-PIERRE's Involvement With FusionPharm And The Fraudulent Scheme

14.     The evidence developed in the investigation of FusionPharm to date reflects that, over the course of late 2010 through in or about August 2013, JEAN-PIERRE acted as FusionPharm's *de facto* general counsel. In early filings with OTC Markets, JEAN-PIERRE was listed as the company's Secretary and Legal Counsel. Email records reflect, and accounts by

8

witnesses confirm, that JEAN-PIERRE reviewed the fabricated and backdated convertible notes. Both records and witness accounts also reflect that JEAN-PIERRE essentially "ghost wrote," for the letterhead and signature of another attorney, opinion letters submitted on behalf of FusionPharm to OTC Markets and Rule 144 Attorney Opinion Letters to the FusionPharm transfer agent for sale of shares by the shell entities. Target 1, in proffer interviews, has confirmed that JEAN-PIERRE would have been aware of Target 1's extensive involvement in FusionPharm when JEAN-PIERRE prepared and caused to be submitted these opinion letters opining that the shell entities formed by Target 1 were not FusionPharm affiliates.

### The Undercover Operation

### Target 1 Becomes A Confidential Informant

15.    In February 2016, as part of pre-indictment plea discussions, Target 1 submitted to a proffer of his information about the matters under investigation. At the conclusion of the proffer, Target 1 revealed that he had been in periodic contact with JEAN-PIERRE since the warranted search of FusionPharm's premises in May 2014 and that, over this time, JEAN-PIERRE was still acting as an attorney and had periodically solicited him for legal work involving securities and corporate matters with which Target 1 may be involved. Target 1 confirmed that JEAN-PIERRE had relocated to the Dominican Republic. He further related that JEAN-PIERRE was aware of the federal criminal investigation of FusionPharm and that Target 1 was a target of this investigation but that Target 1, as part of a ruse, had told JEAN-PIERRE that the investigation was turning into a tax investigation that Target 1 was in the process of resolving. Target 1 advised that he had recently had some discussions with JEAN-PIERRE regarding possible legal work that could be done concerning raising capital in the public securities markets; that the two had had preliminary

discussions about setting up an offshore account to hold payments that they both hoped to receive from the work; and that they had discussed a tentative meeting in the United States to further explore their opportunities.

16.    Target 1 agreed to act as a Confidential Informant (CI) in initiating and pursuing further contact with JEAN-PIERRE in an undercover capacity under the direction of agents working on the FusionPharm investigation.

## The Undercover Calls And Email Communications

17.    Over the course of late February 2016 through late April 2016, Target 1, now acting as a CI, and operating out of Colorado, engaged in a series of recorded telephone calls and exchanged a series of emails with JEAN-PIERRE in the Dominican Republic.   In these communications, Target 1, acting pursuant to law enforcement directions, advised JEAN-PIERRE that he and another individual, an FBI Special Agent acting in an undercover capacity (hereinafter, the FBI-UC), whom he introduced as his investor in various investment ventures, were seeking to resurrect and develop the hydroponic produce business that had previously been marketed by FusionPharm through a shell entity called Vertifresh LLC. Target 1 explained to JEAN-PIERRE that the FBI-UC had provided Target 1 with various amounts of cash in the past, but now the *investor needed some return on the funds provided to Target 1. Their contemplated vehicle for* accomplishing this, Target 1 related to JEAN-PIERRE, would be through the acquisition of a publicly traded shell company that they hoped to merge with Vertifresh LLC, followed by their sale of shares in the newly constituted company into the public securities markets. Target 1 also stated that Target 1 and the FBI-UC would be running Vertifresh but they both needed to be kept off the company paperwork due to "bumps" or problems in their respective pasts.   In order to do

this, they would use a friend of the FBI-UC's to be listed in name only on company documents as Vertifresh's Chief Executive Officer, someone described as a "beard" (hereinafter "INDIVIDUAL A"). Target 1 advised JEAN-PIERRE that the two were looking for JEAN-PIERRE to prepare corporate documents and do the legal work necessary to facilitate the process once the shell company was identified. More importantly, Target 1 explained, they were looking for JEAN-PIERRE's help in identifying ways to obtain free-trading stock once the shell company was identified and the necessary paperwork was filed to get Vertifresh publicly traded on the OTC market. JEAN-PIERRE agreed to undertake this engagement and agreed, as part of it, to prepare a series of documents in draft form that would be presented to the FBI-UC at a meeting in Miami, Florida that was ultimately scheduled for the end of April 2016. As illustrated in the email and recorded conversations listed below, Target 1 worked with JEAN-PIERRE to come up with mechanisms, including a series of false and misleading documents that JEAN-PIERRE undertook to draft, to conceal Target 1's and FBI-UC's role with the company and provide Target 1 and the FBI-UC access to free-trading stock circumventing securities laws once the shell company was acquired.

18.    On March 3, 2016, Target 1 had a recorded conversation with JEAN-PIERRE. During this call Target 1 laid out his plan for Vertifresh. Target 1 told JEAN-PIERRE that Target 1 and FBI-UC would be running Vertifresh but could not be considered "affiliates" because Target 1 needed to get money out of the market through the sale of Vertifresh's stock once a publicly traded shell was acquired and taken over by Vertifresh. He further related that the FBI-UC had a "buddy" who would come on as Vertifresh's CEO but would simply act as their "beard."[2] JEAN-

---

[2] It is understood from debriefings and conversations with Target 1 leading to the undercover operation that the term "beard", as used by him in conversation, refers to a person who would essentially act as a nominee. This term was

PIERRE recommended setting up a consulting agreement between Vertifresh and the FBI-UC to avoid the FBI-UC being perceived to be a decision-maker. They discussed using a convertible note to enable Target 1 and the FBI-UC to get free trading stock soon after the shell is acquired (similar to what JEAN-PIERRE had done with Targets 1 and 2 in relation to the FusionPharm scheme, as discussed above). In this connection, JEAN-PIERRE asked Target 1 how old was the debt that would be used as the basis for the convertible promissory notes, and, at the time, Target 1 indicated that the debt was between him and the FBI-UC and was a couple of years old but all based on "handshakes."[3] Target 1 told JEAN-PIERRE that both Target 1 and the FBI-UC do not want the stock they are issued to be in their own names. In discussing his contemplated role, JEAN-PIERRE reminded Target 1 that he was no longer a securities lawyer but could only act as a "consultant." He assured Target 1, however, that he would look for an attorney who would cooperate with them in the same way as the attorney who JEAN-PIERRE had found and used in connection with JEAN-PIERRE's work for FusionPharm (specifically the opinion letters that were written and submitted to OTC Markets and FusionPharm's transfer agent), mentioning that attorney by name.[4]

---

regularly used by Target 1 in conversations with others involved in the FusionPharm scheme and appeared to be a term understood by JEAN-PIERRE.

[3] The two would revisit this topic in later conversations, during which Target 1 would consistently advise JEAN-PIERRE that the debt that would be used for the convertible promissory notes was actually less than a year old but that he would use deposits from other deals involving Vertifresh in order to be in a position to demonstrate with a transfer agent, doing due diligence on a request to convert shares to free-trading status, that the debt upon which the conversion was claimed to be based was actually over one year old, one of the predicates under SEC Rule 144, as discussed above, in order to meet the regulatory exemption from SEC stock registration.

[4] As discussed above (paragraph 14), evidence in the ongoing investigation of Target 1 and Target 2 and the scheme involving FusionPharm reflects that JEAN-PIERRE recruited and essentially ghost-wrote opinion letters in relation to FusionPharm using the name of this particular attorney.

19.   On March 11, 2016, the following email was composed by Target 1, at the direction of federal law enforcement agents, and transmitted to JEAN-PIERRE covering this, among other subjects:

> …Just want to make sure we are on the same page… As soon as we have a confirmed shell, we are going to want to get Vertifresh going since, as you know, we both have cash in this deal that we need to get out. Plus, we both need to sell some of our stock to put back in Vertifresh to get things going and build it. The CEO of Vertifresh is going to be [INDIVIDUAL A]. [FBI-UC] and I are going to be running things but [INDIVIDUAL A] will be on the paper. As soon as the shell is confirmed, we are going to need to get shares to [FBI-UC] and me….So, as you know you are going to be the man for all things legal and otherwise. A one stop shop. As discussed we will need all the paperwork to get Vertifresh up and trading, Opinion Letters, OTC letters, etc. Can you also draft the agreements necessary to get the stock in place for [FBI-UC] and me? With respect to this, which route should we take? You mentioned a friendly lawsuit or just do notes? I'll leave that with you to decide as long as the end result is the same.[3]

20.   On March 30, 2016, Target 1 had a recorded conversation with JEAN-PIERRE. They discussed JEAN-PIERRE drafting the convertible note between Vertifresh and the FBI-UC without the specific dates and amounts. Target 1 told JEAN-PIERRE that the debt amount was about $50,000. On March 31, 2016, the following email was composed by Target 1 to summarize and clarify the call on March 30, 2016, at the direction of the agents, and transmitted to JEAN-PIERRE covering this, among other subjects:

> …You will put together a convertible note….I'll need have this prior to our call with [FBI-UC] on Monday. When should we date the doc for? In addition the total amount of the note is for $50,000 as discussed. This will be the table that we will all eat off of so to speak. [FBI-UC] will get half of it and you and I will split the other half. Can we boiler plate the opinions and non affiliate docs? I know its premature however when we meet

---

[3] Based on work in this investigation, including debriefings of Target 1, it is understood that the term "friendly lawsuit" is a common reference to an alternative path towards acquiring—or generating—common stock in microcap companies that is then converted into free-trading shares through the SEC Rule 144 registration exemption process. Under this approach, a financial obligation of the stock issuer, i.e., the microcap company, to the putative shareholder is acknowledged and an "agreement" struck between the two to discharge the obligation and exonerate the debt through its conversion into shares of the issuer's common stock. The discharge or compromise of the obligation in this manner is essentially ratified by a Court as part of a settlement of a lawsuit brought against the issuer to honor the financial obligation.

with him I want to show him all were waiting for is him!....Good thing is all the work will be done and it will be nothing but plugging in numbers and symbols."

21.     As the contemplated meeting approached, JEAN-PIERRE prepared and emailed Target 1 a series of draft documents he proposed to review with the FBI-UC. On April 1, 2016, JEAN-PIERRE, through his email account advisor@dlbusinesshelp.com, sent Target 1 a document entitled "Convertible Promissory Note". In the email, JEAN-PIERRE wrote, "This morning, I was totally focused on trying to get you at least a proposed Convertible debt instrument before your call later on today with [FBI-UC], it's attached hereto." The draft Convertible Promissory Note listed Vertifresh, LLC as the "Issuer" with the Investor listed as "Name". Notably, the effective date of the agreement was listed as February 28, 2015 and stated that "between February 28, 2013 and the Issuance Date, the Holder transferred to the Issuer US Dollars in the aggregate amount of $50,000". The note also included a section documenting the conversion rights of the lender.

22.     On April 4, 2016, Target 1 had another recorded conversation with JEAN-PIERRE. During this conversation, Target 1 stated the funds provided by the FBI-UC were provided in cash with some of it coming in during 2015 and some in 2016. Target 1 assured JEAN-PIERRE that he had "bank statements back in 15" that can identify "cash to backstop all that from other funds". JEAN-PIERRE replied, "Right" and to make sure that the documentation is more than a year old.

23.     On April 5, 2016, the following email was composed by Target 1, at the direction of agents, and transmitted to JEAN-PIERRE covering this, among other subjects:

> The company name that [FBI-UC] will be using is [FBI-UC's business]. Signing for Vertifresh will be [INDIVIDUAL A]. Let's have all the opinions and 144 non affiliate docs template'd with names filled in. In addition just make the note for .01. No one will take a sub penny stock anymore so .01 is fine.... We need a doc that ties [FBI-UC's business] to us for half of the note. As discussed I like the guy however were talking about a lot of money here and you and I need to be paid no matter what. ...I know you were concerned about the authentication for the T/A being the cash payments and the timing of

such. I have other deposits from different deals that I can point to and use for authentication purposes when the time comes to submit to the T/A.[6]

24.     On April 6, 2016, Target 1 had another recorded conversation with JEAN-PIERRE and the FBI-UC. The FBI-UC, Target 1, and JEAN-PIERRE discussed JEAN-PIERRE drafting all the template documents so that the FBI-UC could review the documents when they were in Miami. They scheduled the Miami trip for the end of April.

25.     On   April   6,   2016,   JEAN-PIERRE,   through   his   email   account advisor@flbusinesshelp.com, sent Target 1 an email stating, among other things:

> Just wanted to tell you that I finally had success getting an attorney who would be able to handle the 144 opinion letter (assuming of course that everything is in order with respect to the Note and back-up documentation).

26.     On April 14, 2016, the following email was composed by Target 1, at the direction of agents, and transmitted to JEAN-PIERRE covering this, among other subjects:

> Ok, to outline what is left to do prior to our meeting as promised to [FBI-UC]:...As for the note date, I have a cash deposit into Vertifresh's bank account on April 21, 2015, that we can use as proof of funding. It's not from [FBI-UC], but since it's cash, we should be able to tie it to the note, right?...An agreement tying up [FBI-UC's business] for 50% of the note. The other is ours. How you making it with offshore company name for us? Well need something by the meeting I imagine."

27.     On April 17, 2016, Target 1 had another recorded conversation with JEAN-PIERRE. During this call they discussed again the terms to be included in the convertible note and how to portray and substantiate the debt that would be claimed as the basis for the note. Target 1 told JEAN-PIERRE that he "got money even recently that I am just throwing in the note," and JEAN-PIERRE responded, "I hope that nobody is on the phone listening to this. Ok." He then laughed. Target 1 reiterated he had "backup paperwork from other stuff but the numbers are the same". JEAN-PIERRE suggested that the note amount be changed from the even number of

---

[6] T/A is referring to the Transfer Agent.

$50,000. As the call concluded, Target 1 reminded JEAN-PIERRE to "template" the Rule 144 Attorney Opinion Letters. JEAN-PIERRE responded affirmatively but cautioned Target 1 that he could not guarantee that the attorney he would find for them would use JEAN-PIERRE's format and that JEAN-PIERRE, in fact, hoped that this attorney would use his own format rather than that of JEAN-PIERRE.[7]

28. On April 23, 2016, JEAN-PIERRE, through his email account advisor@flbusinesshelp.com, sent Target 1 an email stating, "Please find the attached revised note together with the proposed conversion docs. Obviously there are some holes to be filled and they should be obvious. Let's talk about them later." The email included a revised Convertible Promissory Note with a new backdated Issuance date of April 21, 2015 and the FBI-UC's Business name that was provided to JEAN-PIERRE on April 5, 2016. The note stated that "On or before the Issuance Date, the Holder [FBI-UC] transferred to the Issuer [Vertifresh, LLC] US Dollars in the aggregate amount of $50,000". Per the prior recorded conversations and emails exchanges, JEAN-PIERRE knew this fact to be untrue and that TARGET 1 was using the convertible note to get free-trading stock without meeting the required holding period. In the same email, JEAN-PIERRE also included a template for the Non-Affiliation letter stating that the [FBI-UC business] "not now and, during the preceding three months and has not been or never an affiliate of the Company as that term is defined by Rule 144 of the Act". JEAN-PIERRE knew this statement was untrue because he had been told by Target 1 that the FBI-UC would be running Vertifresh with Target 1, thus, making him an affiliate.

---

[7] At this juncture, with this comment, JEAN-PIERRE presented a mixed message concerning his intended use of the attorney who he would involve in the Vertifresh scheme. As discussed below, this topic would be squarely addressed in JEAN-PIERRE's meetings with the FBI-UC and Target 1 in Miami, Florida and JEAN-PIERRE's long-term objectives for how the attorney and his name would be used would be clarified in those meetings.

29. On April 23, 2016, JEAN-PIERRE, through his email account advisor@flbusinesshelp.com, sent Target 1 a second email stating, "I just realized I had neglected to send you the proposed agreement tying us to [FBI-UC business]; I'm forwarding it to you now." JEAN-PIERRE attached a document titled "Purchase and Assignment Agreement" that, in summary, granted Target 1 and JEAN-PIERRE a 50% interest in the FBI-UC's business for the purchase price of $1.00 allowing them to share in the proceeds of the convertible note.

30. JEAN-PIERRE identified an attorney in Nashville, Tennessee who would sign the 144 Attorney Opinion Letters. On April 24, 2016, JEAN-PIERRE, through his email account advisor@flbusinesshelp.com, sent Target 1 two separate emails stating, among other things:

> Everyone does their opinion differently. I can certainly put together an opinion and send you that tomorrow but the lawyer's opinion will most certainly look very different....I definitely want to keep him very much arms-length, that I'm contacting him to do opinions just like any other client....I decided to send you the sketch if what the 144 debt conversion would look like if I were still in the business of writing opinions.[1]"

JEAN-PIERRE included a draft of an Attorney Opinion Letter that could be used to issue shares to FBI-UC's Business from the convertible note. This letter again stated that FBI-UC's Business, the shareholder, had met the required holding period and was not an affiliate of the issuer, both facts JEAN-PIERRE knew to be false based on the recordings described above.

31. On April 25, 2016, Target 1 had another recorded conversation with JEAN-PIERRE. During this call, they discussed again the contemplated role of the Nashville attorney. JEAN-PIERRE did not tell the attorney that he used to be an attorney. JEAN-PIERRE indicated

---

[1] During the meeting in Miami, JEAN-PIERRE stated that his goal was to eventually be drafting the 144 Attorney Opinion Letters for Veritfresh and then submitting them to the Nashville attorney for his signature.

that he wanted to protect the Nashville attorney from being seen as a "shell for Guy Jean-Pierre".[9]
JEAN-PIERRE said "If there is a problem you know with me, with you, with anybody else, that's
fine. But I don't want them to say to some guy who doesn't even know what's going on, say hey
you're tainted because you know you and Guy Jean-Pierre are colluding on committing crimes".
JEAN-PIERRE said that he did not want to write the Attorney Opinion Letters because of the
issues he had in the past with writing Attorney Opinion Letter's that were signed by another
Attorney.[10]

32.    As their conversations unfolded about the Vertifresh, LLC plan, Target 1 and
JEAN-PIERRE renewed their discussions about how the two would be paid for their work.  In this
regard, on March 3, 2016, during a recorded phone call, the two discussed how, given their
respective situations, it would be difficult for them to hold stock in their own names, and they
discussed possibly setting up a Panamanian corporation to hold stock and cash that they both hoped
to receive from their "consulting work." They returned to this subject during a recorded telephone
conversation on March 24, 2016. During this conversation, Target 1 questioned JEAN-PIERRE as
to how he preferred to get paid in relation to services that would be performed in connection with
the plan to turn Vertifresh LLC into a publicly traded company and sell its shares. JEAN-PIERRE
responded by stating "mostly cash, I am trying to put together [] an offshore company" and that
"cash is better but if it is a really good deal [] some stock down the line is also valuable [] it's a
good combination." Six days thereafter, in another recorded call, JEAN-PIERRE told Target 1 that

---

[9] These are the literal words used by JEAN-PIERRE in the recorded conversation. From its context, your affiant
understands JEAN-PIERRE to be conveying that he wanted to avoid having the Nashville attorney perceived as a
mere nominee or conduit for JEAN-PIERRE.

[10] These past issues, as discussed above, included JEAN-PIERRE's use of his niece's name and credentials, giving
rise to the SEC civil enforcement action in New York, and similar use of another attorney in relation to FusionPharm.
This second attorney has been the subject of questioning by the SEC in its parallel investigation of FusionPharm and
Target 1 and JEAN-PIERRE had previously discussed the fact of pending federal investigations of FusionPharm.

he had an account for himself "here in the DR" and that he would prefer to receive payment in the

Dominican Republic because of his situation in the United States and that he would not want to

get "a couple of dollars" only to have it taken due to a judgment, an apparent reference to the

pending SEC default judgment.

33.     On March 31, 2016, an email was composed by Target 1, at the direction of agents,

and transmitted to JEAN-PIERRE covering this, among other subjects:

> Have you identified a place for us to set up our financial house down there? If not when?
> Were going to need this immediately after we meet. For obvious reasons neither you or I
> want to show income/securities holdings here. I'll need you to walk me thru it, ... In
> addition there is some urgency on my side as I need to move some cash that a friend is
> holding for me. Ill sleep better knowing it is getting a tan so to speak.

34.     On April 4, 2016, Target 1 had another recorded call with JEAN-PIERRE. He

explained to JEAN-PIERRE that he wanted nothing in the United States "because of this IRS thing

I can still have nothing here."     During this call, at the direction of agents working on the

undercover investigation, Target 1 brought up his reference in the March 31 email to his urgent

need to move cash. Target 1 explained to JEAN-PIERRE that the money was given to the friend

to hold as a "just in case situation and unfortunately just in case came up" and that the money

consists of "the last of the stock money that I got out of Scottsdale[14] so I am sittin with a bit of

cash and I need put it somewhere so I need you to... I need to get it out sooner than later." Target

1 then reiterated that he was going to be meeting with the IRS in May to discuss settlement and

that Target 1 "can't have this cash in the United States" and that he "dare not touch it, I can't have

him give me anything [] because I cannot connect the dots here."     Upon hearing this, JEAN-

PIERRE responded, "Right, right, right, right, no, understood."     Towards the end of the

---

[14] "Scottsdale" is a reference to a brokerage firm in which Target 1 had an account that he used to deposit and hold
some of the FusionPharm stock once restrictions had been lifted on the stock certificates by the FusionPharm stock
transfer agent.

conversation, Target 1 returned to the subject of the cash he needed to move; he asked JEAN-PIERRE if he has a trust account or another "mechanism" in the Dominican Republic where the cash can be "housed" because Target 1 had "a couple hundred K here and its got to go." JEAN-PIERRE replied, "I have my own account down here, let me see [] what I can do" and that he was going to speak to a lawyer in the Dominican Republic on an unrelated matter and that he (JEAN-PIERRE) was going to see what the lawyer suggested.

35.     At the agents' direction, Target 1 sent a confirmatory email on April 5, 2016, stating, in part:

> The last bit of FSPM[12] stock sales cash I have needs to be moved. My buddy has been great holding it but I want it where its safe. I'll gladly pay an administration fee for such services initially and ongoing. I suggest a yearly based on the amount. Be best if it was something like a trust account of yours as I know you and feel safe. Or something of that nature. As long as it's safe!

> JEAN-PIERRE responded by email the following day, stating, "I'm still working on the

trust account issue here. I'm hoping to have an answer soon."

36.     On April 15, 2016, JEAN-PIERRE emailed Target 1 with the following information:

> With respect to a trust account, I still have not been able to get hold of that lawyer. It seems almost like he's avoiding me in any event. For initial small amounts and until I can get the equivalent of a trust account set up, if you trust me, we can use the regular bank account I have here in the DR. I'm including that info below. We will need it in any case because that's probably where I will want to get paid anyway if things work out.

> Guy M. Jean Pierre

> Banco Popular Dominicano

---

[12] "FSPM" refers to the stock ticker symbol for FusionPharm common stock in the OTC markets.

Acct# 768192916

SWIFT number BPDODOSXXXX

37.      Two days later, Target 1 and JEAN-PIERRE had another recorded telephone conversation. During the call, Target 1 asked JEAN-PIERRE to update him on JEAN-PIERRE's progress in helping Target 1 to move FusionPharm stock proceeds that Target 1 had ostensibly parked with his "friend," informing JEAN-PIERRE that the source of the money was from "the very first bit of conversions [] I did with Bayside and Meadpoint with you in the beginning of 2013."[13] Target 1 reiterated that this was money that the U.S. Government was attempting to seize and that Target 1 accordingly wanted to "get it out of here" as soon as possible. JEAN-PIERRE responded by suggesting that they could use his personal account in the Dominican Republic for the time being. Target 1 indicated that he would start with a $10,000 transfer, that could be used to set up a permanent account in the Dominican Republic, and that the total amount that Target 1 wanted to move to the Dominican Republic would be approximately $250,000. The two then turned to the subject of JEAN-PIERRE's expected payment for these services, which Target 1 characterized as an "Admin Fee." JEAN-PIERRE responded, "How does 5% sound?" The two then agreed to a 5% fee that JEAN-PIERRE could begin to take out of the first money transfer installment, together with whatever funds he would need in order to create the second corporate account in the Dominican Republic. JEAN-PIERRE then referenced the bank account information that he had emailed to Target 1 two days before.

---

[13] This reference is to the backdated, fabricated convertible promissory notes discussed above that falsely depicted loan funds as having been provided by Meadpoint and Bayside to FusionPharm that had, as one of their purported features, the ability to convert tranches of debt reflected by the notes into FusionPharm common stock at predetermined conversion rates.

38.     The conversation then transitioned to how to transfer the remaining "$240,000.00." Target 1 advised JEAN-PIERRE that he could wire the remaining $240,000.00 directly to the corporate account for which JEAN-PIERRE will be the administrator in the Dominican Republic but questioned JEAN-PIERRE on "how should I do that, should I do that in one shot, should I do it in pieces, I know nothing about banking in the DR." JEAN-PIERRE responded by stating "I think pieces [] is generally better because [] big amounts certainly would grab somebody's attention." JEAN-PIERRE said he would speak with a lawyer "on Monday" to learn the dollar thresholds for the wire transfers.

39.     On April 22, 2016, JEAN-PIERRE advised Target 1 in a recorded call that it would take a little over a month to form the corporation and an additional two weeks to set up the corporate bank account. He estimated that it would take approximately a week if they wanted to set up a personal account in the Dominican Republic to hold money. Target 1, acting on the agents' directions, then steered the conversation to the possibility of transferring funds through a cashier's check. JEAN-PIERRE reacted by stating that "he [the third party in the United States] can't do a wire, I take it," to which Target 1 responded, "I think he is worried about how it's going to look, in wiring the money out, to keep it really on the down low and quiet so to speak" and that the third party holding the money thinks that having cashier's checks drawn on the account and then overnighting it to JEAN-PIERRE "optically looks better, for you know, the purposes of why we are doing this." JEAN-PIERRE responded that Bank of America is a big bank that accepts any form of currency and that Bank of America has a correspondent relationship with Banco Popular, which would clear the cashier's check. Following the call, JEAN-PIERRE texted to Target 1 an address for a Federal Express location in the Dominican Republic to which Target 1 could mail the check.

40.    On that day, an FBI Special Agent involved in the undercover investigation purchased a cashier's check from 1st Bank in the amount of $5,000.00, made payable to "Guy M. Jean Pierre." The cashier's check was purchased from the 1st Bank branch located at 4350 Wadsworth Blvd, Wheat Ridge, CO 80033. The cashier's check was subsequently mailed from a FedEx location at 3545 Quebec Street, Denver, Colorado 80207 to the attention of "Marcelo Dominguez de Guerra" at Av Padre Ramon Dubert 15, Jared Metropolitanos, Santiago, Dominican Republic, 452. The address in the Dominican Republic is associated with a FedEx World Service Center.

41.    In a follow-up recorded phone call later that day, Target 1 told JEAN-PIERRE that the check was on its way and to expect it on April 26th. Target 1 reminded JEAN-PIERRE that his person in the United States holding the money wanted to use cashier's checks "for the purpose of, you know, everybody looking" and "to keep it on the down low, keep the radar." Though he remarked that wire transfers were quicker, JEAN-PIERRE acknowledged the concern and stated that they would figure it out. The two concluded the conversation by discussing at length Target 1's need ultimately to have a "secondary account" held in the name of someone close to JEAN-PIERRE, so that there is a "one step disconnect" after the money is sent to JEAN-PIERRE, and the logistics and obstacles in performing the scheme. JEAN-PIERRE responded that he thought "a disconnect [] is generally good" and that he had someone in mind who could be good. He told Target 1 that he would talk to Banco Popular to see how quickly it could do this.

42.    On April 26, 2016, JEAN-PIERRE told Target 1 that he had been unsuccessful in opening up the secondary account at the bank in the Dominican Republic because he is considered a foreigner and that the bank was requesting additional documentation. He acknowledged receiving the $5,000 cashier's check and depositing the money in an existing bank account located

in the Dominican Republic. He told Target 1 that, following his return from his Miami trip to see Target 1 and the FBI-UC, he would continue his efforts to open a secondary account to which to transfer the remainder of the funds that Target 1 would be sending.

### The Miami, FL Meetings And JEAN-PIERRE's Arrest

43.     On April 28, 2016, JEAN-PIERRE arrived in Miami, Florida from the Dominican Republic. He was met at the airport by Target 1 and followed by a team of surveillance agents to a hotel where hotel reservations had been booked for the two. On the way to the hotel, in conversation that was recorded and monitored, the two revisited the subject of the $250,000 in purported FusionPharm stock proceeds that Target 1 was ostensibly seeking to move offshore. JEAN-PIERRE told Target 1 that he had found an individual whose name would be used for the secondary account and that it was the aunt of JEAN-PIERRE's son who owns a business and was a hairdresser in the Dominican Republic. Target 1 reiterated that he was going to want to keep the majority of the money in the Dominican Republic because he's "got the DOJ, I got the FBI [] I have every alphabet gang so far in my business [] and all they are trying to do is run around and freeze up every bit of cash, every piece of stock that came out of FusionPharm that we did." He went on to state that there is still an SEC and a criminal investigation related to FusionPharm and that the U.S. Government is saying that Target 1 was too close to the company as an affiliate and that the money he was trying to move offshore was from "the first transactions that we did" related to the conversions of the Meadpoint and Bayside notes into FusionPharm stock that Target 1 sold into the market in 2013. Target 1 told JEAN-PIERRE that the U.S. Government knows about the conversions and is trying to figure how to get its hands on the money. Target 1 said that the third party holding the funds from the conversions of the notes is beginning to freak out and does not

want to hold the money any longer. JEAN-PIERRE asked how quickly the money needs to be moved, to which Target 1 responded, "I want to get it done yesterday."

44.     The subject of these funds came up twice more that day.  While waiting in a hotel bar before a planned dinner with the FBI-UC, JEAN-PIERRE told Target 1 that his son's aunt would be used for the secondary account. Target 1 said that the Justice Department and FBI were trying to put "their hands on everything FusionPharm" and that they know about every trade and how it went down. Target 1 went on to state that "they know I did not get that money, but they know it was my stock." JEAN-PIERRE responded by asking if the U.S. Government knows that the third party has the money, to which Target 1 said, "yeah, but they can't put their hands on it yet, they can't connect that link yet. "JEAN-PIERRE then asked whether "they don't know about your relationship with him" and Target 1 responded, "no not yet." The two agreed to begin doing wire transfers to the Dominican Republic and that the next transaction would be $25,000.  Target 1 said that he would send the money to JEAN-PIERRE and that he, in turn, would transfer the money to the aunt's account to create a "disconnect." Later in the evening, during a break in the dinner meeting with the FBI-UC, Target 1 asked JEAN-PIERRE about the cashier's check that had been sent to JEAN-PIERRE. JEAN-PIERRE confirmed that the check had been drawn on 1st Bank in Colorado and was for $5,000.

45.     The following morning, while in route to the FBI-UC's hotel suite for a breakfast meeting, Target 1 confirmed with JEAN-PIERRE that JEAN-PIERRE's "sister-in-law" would be holding the money for an additional 1% fee. Target 1 stressed the importance for needing internet access to the secondary account and wanting to see his money.

46.     During the breakfast meeting, Target 1, the FBI-UC and JEAN-PIERRE also discussed their progress and next steps regarding Vertifresh and getting free-trading stock. Towards the onset of the meeting, Target 1 advised the FBI-UC that JEAN-PIERRE brought his laptop so that they can make changes. JEAN-PIERRE was observed by investigators removing the laptop from his backpack and powering up the device.

47.     JEAN-PIERRE explained to the FBI-UC the SEC "loophole" that allows lenders to obtain stock in a company through aged debt   JEAN-PIERRE again suggested changing the amount of the debt reflected in the convertible note from $50,000 to a less "round" number. Target 1 said that JEAN-PIERRE had his laptop and could make the changes to the document to reflect something "less flat and obvious". In reviewing this SEC "loophole," JEAN-PIERRE further explained that the convertible feature of the debt would have to have been included at the time that the debt instrument was effective. In response to this, Target 1 reiterated his plan to use money from other deals as proof that Target 1 provided the funds over a year ago. Target 1 then asked if "papering the debt after the fact [would be] ok," in response to which JEAN-PIERRE indicated in words and substance that "it's not so ok," in that "your paperwork" has to "appear clean." JEAN-PIERRE also suggested using five or six deposits to use as proof of the funding of the loan.

48.     JEAN-PIERRE then turned to another requirement of the "SEC loophole," demonstrating that the putative sellers of the Vertifresh shares were not, in fact, its "affiliates." In this connection, he provided additional instructions on how Target 1 should structure his conversations with the transfer agent so that he would not be perceived as part of management, suggesting that INDIVIDUAL A contact the transfer agent and say that he is "too busy to get in the details" and to work with Vertifresh's consultant, Target 1.  JEAN-PIERRE said that he liked

26

the "optics" of having it appear that Target 1 was working with the transfer agent casually and not like it was planned that Target 1 would be the transfer agent contact from the beginning.

49.   JEAN-PIERRE provided Target 1 and FBI-UC further guidance on how to keep the FBI-UC from being considered an affiliate, instructing the FBI-UC not to own anywhere close to 10% of the company's stock and not to "appear" to have any position with the company at all. At that point, Target 1 interjected and asked, "Appear? Whether you are or not is irrelevant," to which JEAN-PIERRE responded, "Right, right". The FBI-UC then reminded JEAN-PIERRE that INDIVIDUAL A was going to be Verifresh's CEO in name only and that the FBI-UC would control INDIVIDUAL A and that INDIVIDUAL A did not know "jackshit" about what was going on. JEAN-PIERRE responded to this with one word: "Excellent." He then explained that he would not communicate this "fact" to the Nashville attorney.

50.   Target 1 and the FBI-UC also clarified JEAN-PIERRE's long-term plans as to how the Nashville attorney would be used. Target 1 asked JEAN-PIERRE if he thought he would eventually be able to draft the Rule 144 Attorney Opinion Letters himself and have the Nashville attorney simply review and sign them. JEAN-PIERRE replied, "Eventually, it's a good start." Later in the meeting, the FBI-UC asked JEAN-PIERRE, "So you are going to be the point guy between us and the attorney and then plus do all the other stuff," to which JEAN-PIERRE responded, "Right," adding that the attorney would (at some point) need to just put his name on the Opinion Letters.

51.   JEAN-PIERRE was using a laptop during the breakfast meeting and appeared to be updating the documents that he drafted prior to the meeting to include the convertible promissory note.

27

52.     Immediately following the breakfast meeting, JEAN-PIERRE was arrested in Miami on an outstanding warrant issued on an indictment brought in the State of New York, New York County, arising from the facts and circumstances at issue in the SEC's civil case in the Southern District of New York.   At the time of his arrest, JEAN-PIERRE had a backpack containing the HP laptop that he was using to edit documents during the breakfast meeting. According to a Property List provided by the Miami Police, the HP laptop, further described in Attachment A, was taken incident to arrest and is currently being held by the Miami Police Department.

53.     On May 2, 2016, agents working on the undercover case, obtained a copy of the 1st Bank $5,000 cashier's check that had been sent to the Dominican Republic and made payable to Guy M Jean-Pierre. The agents confirmed that the check had cleared and the funds paid by 1st Bank. On or about April 27, 2016, the check was presented for payment by Bank of America, the correspondent bank for the Dominican Republic bank where JEAN-PIERRE maintained his personal account.

54.     In my training and experience, if a person is traveling with a laptop and using it for business-like activity that computer tends to be the person's primary computer for other uses, such as email. Here, since JEAN-PIERRE used an HP laptop to update documents on the morning of his arrest, and since he was sending and receiving emails as late as April, 2016, it is likely that the HP laptop was also used to send and receive emails and that evidence of those emails will be on that computer.

## Electronic Storage And Forensic Analysis

55.     Based on my consultation with those who have specialized knowledge of computers and other electronic devices, I understand that computers and electronic storage media can store information for long periods of time, even if the computer user has "deleted" them. Similarly, items that have been viewed via the Internet are typically stored for some period of time on the device used to access the Internet. Likewise, email evidence can be found on a computer, especially where emails have been sent or received from that computer in the near past. These items can remain on a computer for the life of the computer if the data is not overwritten. There is no way to determine if deleted items remain on a computer without conducting careful forensic search of the computer using forensic tools. This information can sometimes be recovered with forensic tools.[14]

56.     There is probable cause to believe that things that were once stored on such devices may still be stored there, for at least the following reasons:

(a)     Based on information provided to me by those who have specialized knowledge of computers and other electronic devices, I understand that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer,

---

[14] It should be noted, in this regard, that during the course of the undercover communications described above, JEAN-PIERRE at one point explained to Target 1 that it had taken him some time to prepare the documents that Target 1 was seeking from him because JEAN-PIERRE had "lost his pin drive" on which he claimed to have stored "all of his documents" and that he therefore had to "start from scratch." Your affiant's best understanding of the use of the phrase "pin drive" is that it is an apparent reference to a USB memory flash drive.

the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

(b)     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

(c)     Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drive—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible for a user to delete this information.

(d)     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." Forensic review may also disclose when and by whom the Internet was used to conduct searches, view material, and communicate with others via the Internet or email or other online media.

57.     As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described in the warrant, but also forensic evidence that establishes how the devices seized and imaged were used, the purpose of their use, who used them, and when. There is probable cause to

believe that this forensic electronic evidence might be on the HP laptop computer that is the subject of this application because:

(a)    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.   Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times that the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.  This information can be recovered months or even years after they have been downloaded onto the storage medium, deleted, or viewed.

(b)    Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

(c)    A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

(d)    The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence

is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

(e)     Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

(f)     Your Affiant knows that when an individual uses an electronic device to aid in the commission of a crime, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain evidence or is an instrumentality because here, JEAN-PIERRE used the HP computer to conduct criminal activity on the morning of his arrest. Therefore, it is both an instrumentality of the crime as well as a probable repository for evidence of it. It is likely to contain evidence from his document drafting on the morning of his arrest as well as documents he may have drafted during other stages of the crimes. Furthermore, because he was using his email advisor@ffbusinesshelp.com_ to send and receive correspondence about and in furtherance of the crimes, it is likely that he used the HP computer for that email use. Therefore, it is likewise likely that the HP computer will contain evidence from those emails and others like them. Last, the computer will likely have information about its user and information relevant to the user's identity, activities relevant to the planning and execution of the crimes discussed in this Affidavit as well as information about his state of mind while committing them such as Internet searches, correspondence with others about the crimes, and documents relating to them.

(g)     Your Affiant also knows that those who engage in criminal activity will attempt to conceal evidence of the activity by hiding files, by renaming the format, (such as saving a .pdf image file as a .doc document file) or by giving them deceptive names such that it is necessary to view the contents of each file to determine what it contains.

(h)     A single compact disk can store dozens of images and hundreds of pages of text. The size of the electronic storage media (commonly referred to as a hard drive) used in home computers has grown tremendously within the last several years. Thumb drives with a capacity of 32 gigabytes are not uncommon. Hard drives with the capacity of 500 gigabytes up to 3 terabytes are not uncommon. These drives can store thousands of images and videos at very high resolution, and they can store hundreds of thousands of documents and emails. Only with careful laboratory examination of electronic storage devices is it possible to recreate the evidence trail.

## Need To Review Evidence Over Time And To Maintain Entirety Of Evidence

58.     Your Affiant recognizes the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in Attachment B in order to prevent unnecessary invasion of privacy and overbroad searches. Your Affiant advises it would be impractical and infeasible for the Government to review the mirrored images of digital devices that are copied as a result of a search warrant issued pursuant to this Application during a single analysis. Your Affiant has learned through practical experience that various pieces of evidence retrieved from digital devices in investigations of this sort often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops. In other words, the weight of each individual piece of the data fluctuates based upon additional

investigative measures undertaken, other documents under review and incorporation of evidence into a consolidated whole. Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed. The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum. Due to the interrelation and correlation between pieces of an investigation as that investigation continues, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original. In the past, your Affiant has reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations. Your affiant has learned from that experience, as well as other investigative efforts, that multiple reviews of the data at different times is necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in Attachment B. In order to obtain the full picture and meaning of the data from the information sought in Attachments A and B of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation. As such, your Affiant respectfully requests the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time. As with all evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

59.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, copying, and reviewing the contents of the HP

computer consistent with the warrant. The warrant I am applying for would authorize a later examination and perhaps repeated review of the HP or information from a copy of the HP laptop consistent with the warrant. The examination may require authorities to employ techniques, including, but not limited to, computer-assisted scans of the entire medium, which might expose many parts of the HP laptop to human inspection in order to determine whether it is evidence and contains evidence as described by the warrant.

## Procedures For Addressing And Handling Potentially Privileged Attorney Communications

60.     As set forth above, although currently not licensed to practice law as an attorney in the United States, JEAN-PIERRE may have actively practiced law as recently as mid-2013. Further, he was not formally disbarred from the practice of law in the State of New York until earlier this year. While the communications involving JEAN-PIERRE that are the subject of the FusionPharm and undercover investigations are not, it is believed, covered by current, valid attorney-client privileges,[13] the possibility that JEAN-PIERRE had communications with clients or putative or potential clients in the past several years concerning legal advice and that those communications could arguably be deemed privileged cannot, at this point, be ruled out. Further, it also remains possible that older communications reaching back to when JEAN-PIERRE actively engaged in the practice of law may be stored on the HP laptop computer that is the subject of this

---

[13] The "clients" of the communications involving the recent undercover investigation were Target 1 and FBI-UC. JEAN-PIERRE's discussions with them concerned the commissions of new crimes. Similarly, the evidence developed in the FusionPharm investigation reflects that JEAN-PIERRE's communications with FusionPharm and its principals were primarily, if not exclusively, for the purpose of orchestrating and implementing the fraudulent scheme that is the subject of that ongoing investigation. Further, it is understood that the current counsel for FusionPharm has waived privileges with respect to any communications between JEAN-PIERRE and FusionPharm and its principals, employees and agents acting on behalf of FusionPharm.

search warrant application and that these communications may be deemed to constitute privileged attorney-client communications.

61.     In order to address the possibility that the HP laptop computer could contain privileged attorney-client communications, a government "filter" or "taint" team, consisting of federal agents and a federal prosecutor not assigned to the FusionPharm and undercover investigations, will be established to filter out any communications that may contain attorney-client privileged communications and segregate them from your affiant and other agents and prosecutors involved in the investigations.   In order to assist and facilitate this process, the "filter" or "taint" team will be provided with JEAN-PIERRE's names and all names that he was known to use in his practice of law, as well as the names of any attorneys or para-professionals with whom he was known to have engaged in the practice of law.  Records suspected of containing valid, non-waived attorney-client privileged communications will not be shared with your affiant or other agents or prosecutors involved in the pending investigations until the issue of privilege with respect to these communications has been resolved.

### Search Technique

62.     Based on the foregoing, and consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, law enforcement personnel will execute the search of the HP laptop computer pursuant to this warrant as follows:  Searching the laptop for the items described in Attachment B may require a range of data analysis techniques.  In some cases, it is possible for agents and analysts to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence.  In other cases, however, such techniques may not yield the evidence

described in the warrant, and law enforcement may need to conduct more extensive searches to locate evidence that falls within the scope of the warrant. The search techniques that will be used will be only those methodologies, techniques and protocols as may reasonably be expected to find, identify, segregate and/or duplicate the items authorized to be seized pursuant to Attachment B to this affidavit.

## Conclusion

63.     Based on my training and experience as a Special Agent, all of the foregoing constitutes probable cause to believe that:

(a)     JEAN-PIERRE has committed wire fraud, in violation of Title 18, United States Code, Section 1343, through, among other things, the drafting and then emailing of draft documents, including the backdated Convertible Note, the 144 Attorney Opinion Letter and the Non-Affiliation Letter, containing material misrepresentations meant to conceal Target 1 and FBI-UC's role within Vertifresh;

(b)     From March 2016 through April 2016, JEAN-PIERRE, a/k/a Marcelo Dominguez de Guerra, conducted and attempted to conduct financial transactions represented to be proceeds of a specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(3)(B); and

(c)     On the Attachment A - Item to be Searched, which is attached hereto and incorporated herein by reference, is likely to be both an instrumentality of crimes and a container of evidence of these crimes, as described in Attachment B, which is attached hereto and incorporated herein by reference.

## Request For Sealing

64.    Your affiant requests that the Court order that the instant Application For A Search Warrant and all documents in support of and related to the instant Application For A Search Warrant, including the Affidavit, the related Search And Seizure Warrant, the Order To Seal, and related documents, be sealed until further order of the Court. These documents discuss and/or refer to an ongoing criminal investigation that is neither public nor known to all of the targets and subjects of the investigation.

65.    Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize such investigation, in that the targets and subjects may intimidate witnesses, flee the jurisdiction, or destroy or tamper with evidence that is relevant to the investigation.

FURTHER AFFIANT SAYETH NAUGHT.

ERNEST S. KULE-THOMAS
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn and subscribed to before me this 29th day of July, 2016.

PATRICK A. WHITE
UNITED STATES MAGISTRATE JUDGE

Certified to be a true and
correct copy of this document on file
Steven M. Laurmore, Clerk
U.S. District Court
Southern District of Florida
By _____ Deputy Clerk
Date 7-29-16

38

## ATTACHMENT A

### Description Of Item To Be Searched

An HP Laptop (Serial # CND01818BD) that was inventoried by the Miami Police incident to the arrest of GUY JEAN-PIERRE, aka Marcelo Dominguez de Guerra, in Miami, Florida on April 29, 2016. The laptop is currently being stored at the Miami Police Department, located at 400 NW 2nd Avenue, Miami, Florida under AC#16005289.

## ATTACHMENT B

### Description Of Items To Be Searched And Seized

The following items and information related to the scheme and activities that are described and are the subject of the affidavit in support of this warrant (which affidavit is incorporated by reference herein), which items constitute evidence and/or instrumentalities of violations of Title 18 United States Code, Sections 371, 1341, 1343, 1956, 1957 and 2, and the following items relating to the electronic storage, access and retrieval of such items:

1. Computer software, consisting of digital information, which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, optical, or other digital form. It commonly includes programs to run operating systems, applications (like word processing, networking, graphics, accounting, presentations or spreadsheet programs), utilities, compilers, interpreters, and communications program;

2. Computer passwords and other data security devices, that is, a string of alphanumeric characters designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programmable code. A password usually operates as a sort of digital key to "unlock" particular storage data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, destroy or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it;

3. Evidence of who used, owned, or controlled the computer hardware, computer software, or computer passwords at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

4. Evidence of software that would allow others to control the computer hardware, computer software, or computer passwords, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

5. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the computer hardware, computer software, or computer passwords;

6. All records relating to or constituting, or arising from communications, transactions or contemplated transactions with the individuals described as "Target 1" or the "FBI-UC" in the affidavit accompanying this application and warrant, which affidavit is incorporated by reference herein, including, without limitations, emails, text messages, text notes,

memoranda, spreadsheets, drafts and final versions of opinion letters, contracts, agreements, promissory notes, corporate governance documents, shareholder consent forms, and stock certificates. Such records shall further include records, materials, communications used in the preparation of these documents.

7. All records relating to or constituting, or arising from communications, transactions or contemplated transactions with or relating to FusionPharm, Vertifresh, LLC, Bayside Realty, LLC, Meadpoint Ventures, the individuals described as "Target 1" or "Target 2" in the affidavit accompanying this application and warrant, which affidavit is incorporated by reference herein, including, without limitations, emails, text messages, text notes, memoranda, spreadsheets, drafts and final versions of contracts, agreements, promissory notes, corporate governance documents, shareholder consent forms, and stock certificates. Such records shall further include records, materials, communications used in the preparation of these documents. Such records shall further include "current information letters" and other written submissions to OTC Markets, and records, materials, communications used in the preparation of such submissions. Excluded from this category are any items constituting valid, non-waived privileged attorney-client communications;

8. In relation to any of the items sought in paragraphs 6 and 7 above, any and all correspondence or communications (in any iterations, including drafts) in whatever format (including electronic images of envelopes, letters, papers, email messages, chat logs, electronic messages, and other digital data files) and attachments, excluding, however, any items constituting privileged attorney-client communications;

9. In relation to any of the items sought in paragraphs 6 and 7 above, any and all records concerning securities transactions, including transfer agent records and correspondence and communications involving transfer agents, and brokerage or bank account records reflecting securities transactions or proceeds of such transactions;

10. Bank records, including bank statements, financial statements, cancelled checks, deposit tickets, receipts for cashier's checks, money orders, traveler's checks, records relating to wire transfers, loans, brokerage statements, and credit card information;

11. All computer files that act as "address books" or other list of correspondents and contacts;

12. Records and information related to foreign and domestic travel.

13. Records of Internet activity, including Internet Protocol addresses, firewall logs, transactions with Internet hosting providers, co-located computer systems, cloud computing services, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses pertaining to violations of Title 18 United States Code, Sections 371, 1341, 1343, 1956, 1957 and 2 or that show who used, owned, possessed, or controlled the computer.

14. Descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to violations of Title 18 United States Code, Sections 371, 1341, 1343, 1956, 1957 and 2.

15. Evidence of who used, owned, or controlled the computer to commit or facilitate the commission of the crimes described, or at the time the things described in this warrant were created, edited, or deleted, including photographs, videos, logs, call logs, phonebooks, address books, contacts, IP addresses, registry entries, configuration files, saved usernames and passwords, documents, calendars, browsing history, search terms, metadata, user profiles, e-mail, e-mail contacts, messages (text or voice), instant messaging logs, file structure and correspondence.

16. Evidence of software that may allow others to control the computer, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security provisions or software designed to detect malicious software or unauthorized use of the device, and evidence of the lack of such malicious software.

17. Evidence of the attachment to the computer of other storage devices or similar containers for electronic evidence.

18. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the computer.

19. Evidence of how and when the computer was used or accessed to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

20. Contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage.

## Search Procedure

1. Law enforcement personnel will first make an exact duplicate of the hard drive contained on the laptop computer.

2. A "filter" or "taint" team, as described in paragraphs 60 and 61 of the accompanying Affidavit, will be employed to review and segregate records and items containing privileged attorney-client communications.

3. Law enforcement personnel will then review all information and records contained on the computer to determine the information to be seized by law enforcement personnel pursuant to Attachment B.

4. With respect to any information or records that appear exclusively to be related to criminal acts other than the violations set forth herein will not be further examined unless and until a search warrant is applied for and issued for evidence of any such separate criminal act.