IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No.  17-cr-00008-WJM

UNITED STATES OF AMERICA,

Plaintiff,

v.

GUY JEAN-PIERRE

Defendant.

---

## GOVERNMENT'S MEMORANDUM IN SUPPORT OF ITS *JAMES* PROFFER

---

The United States of America (the government), by Jeremy Sibert, Assistant United States Attorneys, submits this memorandum in support of its *James* proffer, in response to this court's order  submits the following proffer of co-conspirators statements which may be offered at trial pursuant to Fed. R. Evid. 801(d)(2)(E). By including statements in this proffer, the government is not conceding that such statements or utterances are only admissible, and may only be offered, under Rule 801(d)(2)(E). The statements may be admissible for other reasons, such as not being "statements" under Fed. R. Evid. 801, not being hearsay, not being offered for the truth of the matter asserted, or they may fall within another hearsay exception. The inclusion of a statement or utterance in this proffer does not serve to pull that statement within the ambit of Fed. R. Evid. 801(d)(2)(E) if a different basis for admission exits.

Additionally, in some cases within the proffer, the government has identified particular bases for introduction or specific rules of evidence that pertain to a statement.  This is not to say

that these are the only methods for introduction of the statement and that no other pertinent rules or bases for admission exist. To the contrary, the government's identification of a particular rule of evidence or basis for admission within this proffer does not foreclose all other legitimate bases. Nor does this proffer disqualify the admission of a statement on alternate grounds from those listed.

The government advises the Court and counsel that its investigation is ongoing and may yet reveal additional statements which fall within the purview of Fed. R. Evid. 801(d)(2)(E). There are no current trial dates at this time. Since a pretrial hearing is not required under federal law, the government respectfully requests permission to supplement this proffer if additional co-conspirators' statements are discovered during trial preparation. *See Bourjaily v. United States*, 483 U.S. 171, 183-84 (1987) (Supreme Court held that the Constitution did not require pretrial inquiry into the reliability of statements that satisfy the requirements of Rule 801(d)(2)(E)); *see also United States v. Gonzalez-Montoya*, 161 F.3d 643, 648-49 (10th Cir. 1998)(while Tenth Circuit expresses a preference for *James* hearings, they are not required.)

The statements contained within this proffer have been previously disclosed to the defense. The government advises the Court and counsel that the statements listed herein are not exact or verbatim quotes. The government is submitting the general nature of statements and conversations while maintaining their essential components.

This proffer demonstrates the existence of the charged conspiracy to commit securities fraud, among other types of fraud, for the duration of this conspiracy, and its participants.

The government has concurrently filed a *James* Proffer which includes a preliminary log of out of court statements made during the course of the conspiracy and in furtherance of the

conspiracy which the government intends to offer at trial.  This proffer is related solely to co-conspirators statements the United States intends to offer at trial pursuant to Fed. R. Evid. 801(d)(2)(E). This proffer is not intended to be a full accounting of all statements the United States plans to introduce into evidence at trial. There may be additional statements known to the government that are not contained within this submission because those statements are admissible under other rules of evidence, such as non- hearsay admissions by a party opponent under Fed. R. Evid. 801(d)(2)(A), or the hearsay exceptions contained within *Federal Rules of Evidence* 803 and 804.

After review of these pleadings, the government respectfully requests that the Court find that a hearing on Jean-Pierre's *James* motion "is not necessary to resolve the provisional admissibility of the Government's proposed co-conspirator statements in this case . . . . ." *United States v. Yurek,* No. 15-cr-394-WJM, 2017 WL 283544, at *1 (D. Colo. June 30, 2017).

## THE LAW CONCERNING RULE 801(d)(2)(E)

1.     According to the Federal Rules of Evidence, "[a] statement is not hearsay if [it] is offered against a party and is . . . a statement by a coconspirator of a party during the course of and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). Statements are admissible pursuant to Rule 801(d)(2)(E) if a court finds, by a preponderance of the evidence, three things: that (1) a conspiracy existed; (2) the declarant and Jean-Pierre were both members of the conspiracy; and (3) the statements were made in the course of and in furtherance of the conspiracy.  *United States v. Alcorta,* 853 F.3d 1123, 1137 (10th Cir. 2017); *Bourjaily v. United States*, 483 U.S. 171, 181 (1987).  The government must prove these preliminary facts by a preponderance of the evidence.  *United States v. Perez,* 989 F.2d 1574, 1577 (10th Cir. 1993) (en

banc).

2.      In making these determinations, a court "is not bound by evidence rules, except those on privilege." *See* Fed. R. Evid. 104(a), 1101(d)(1); *Bourjaily*, 483 U.S. at 178-79.   The court "may consider both independent evidence and the statements themselves when making" the Rule 801(d)(2)(E) findings.  *United States v. Rutland,* 705 F.3d 1238, 1248 (10th Cir. 2013); *Bourjaily*, 483 U.S. at 180 ("there is little doubt that a co-conspirator's statements could themselves be probative of the existence of a conspiracy and the participation of both Jean-Pierre and the declarant in the conspiracy"); *United States v. Owens*, 70 F.3d 1118, 1124 (10th Cir. 1995) (same).

3.      To determine whether a conspiracy existed, the government is not required to show that a formal or explicit agreement existed.  *United States v. Arutunoff*, 1 F.3d 1112, 1116 (10th Cir. 1993)*,* but it must provide evidence of four things: (1) an agreement between two or more people to break the law; (2) knowledge by those people of the essential objectives of the conspiracy; (3) knowing and voluntary participation in the conspiracy; and (4) interdependence among the conspirators, *United States v. Sells*, 477 F.3d 1226, 1235 (10th Cir. 2007).

4.      To determine the second factor, the connection of the declarant and Jean-Pierre to the conspiracy, at most there must be "some independent evidence linking Jean-Pierre to the conspiracy." *Alcorta,* 853, F.3d at 1142.  However, the independent evidence "need not be 'substantial.'" *Id.*  A court may presume that a defendant is a knowing participant in a conspiracy when he acts in furtherance of the conspiracy's objective.  *United States v. Rogers,* 556 F.3d 1130, 1138–39 (10th Cir.2009).

5.      As to Jean-Pierre's knowledge of the essential objectives of the conspiracy, the

government is not required to prove that a conspirator knows all other conspirators, or all the details of the conspiracy. *United States v. Smalls,* 423 F.3d 1164, 1182 (10th Cir. 2005).  Nor must the government prove that a conspirator knew of or participated in every aspect of the conspiracy, *United States v. Eads*, 191 F.3d 1206, 1210 (10th Cir. 1999).  A coconspirator statement is also admissible even if the declarant is uncharged. *Champagne Metals v. Ken Mac Metals, Inc.*, 458 F.3d 1073, 1081 n.5 (10th Cir. 2006).

6.      In determining the third factor, that the statement was made during the course of and in furtherance of the conspiracy, several rules apply.  First, the focus is on whether the declarant's intent in making the statement was to advance the conspiracy, not whether the statement actually advanced the conspiracy. *Perez*, 989 F.2d at 1578.  To determine this, the court must examine the nature of the statement and its context. *Id.* at 1579.  Second, there is no requirement that the statement be made by one conspirator to another. *United States v. Williamson*, 53 F.3d 1500, 1519 (10th Cir. 1995).

7.      Examples of statements made in furtherance of a conspiracy include but are not limited to:

a.      Statements which in any way promote the objective(s) of a conspiracy. *Rutland,* 705 F.3d at 1252; *United States v. Townley*, 472 F.3d 1267, 1273 (10th Cir. 2007) (citation omitted).

b.      Statements which reveal the existence of a conspiracy. *United States v. Garcia*, 994 F.2d 1499, 1505 (10th Cir. 1993);

c.      Statements which are intended to recruit potential coconspirators or to otherwise induce others to assist in carrying out the objectives of the conspiracy. *Perez*, 989

5

F.2d at 1578;

d.      Statements which identify a conspirator or the role of a conspirator. *Rutland*, 705 F.3d at 1252; *Townley*, 472 F.3d at 1273;

e.      Statements which explain important events in the conspiracy.  *Rutland*, 705 F.3d at 1252; *Townley*, 472 F.3d at 1273;

f.      Statements of future intent that set transaction integral to the conspiracy in motion and maintain the flow of information among the co-conspirators.  *United States v. Roberts,* 14 F.3d 502, 514-15 (10th Cir. 1993).

g.      Statements which are designed to advise co-conspirators of the progress of the conspiracy and keep them abreast of activities associated with the conspiracy.  *Townley*, 472 F.3d at 1273; *Perez*, 989 F.2d at 1578;

h.      Statements which are intended to assure the listener of a conspirator's ability to consummate a particular transaction.  *Rutland*, 705 F.3d at 1252;

i.      Statements which are designed to gain the trust of other conspirators or potential conspirators, to reassure trustworthiness, or to allay suspicions or fears.  *Townley*, 472 F.3d at 1273; *Rutland*, 705 F.3d at 1252.

j.      Statements which are intended to control damage to the conspiracy that are made during the course of the conspiracy.  *Cf. Alcorta,* 853 F.3d at 1139; *United States v. Griggs*, No. 08-cr-00365-MSK, 2012 WL 628595, at *5 (D. Colo. Feb. 27, 2012) (unpublished);

k.      Statements which prompt the listener to respond in a way that facilitates carrying out the activities of the conspiracy.  *Perez*, 989 F.2d at 1578;

l.      Statements which conceal the objective of the conspiracy.  *Rutland*, 705

6

F.3d at 1252-53.

m.  Statements that outline the general history of the conspiracy.  *United States v. Stratton*, 779 F.2d 820, 828 (2nd Cir. 1985).

n.  Statements designed to give directions to facilitate the objectives of the conspiracy. *United States* v. *Townley*, 472 F.3d at 1273 (10th Cir. 2007); *see also United States v. Massa*, 740 F.2d 629, 638 (8th Cir. 1984)

o.  Statements between coconspirators which provide reassurance, which serve to maintain trust and cohesiveness among them, or which inform each other of the current status of the conspiracy. *Townley*, 472 F.3d at 1273, citing *Smith*, 833 F.2d at 219; *see also Echeverry*, 759 F.2d at 1457.

p.  Statements that prompt the listener to respond in a manner that facilitates carrying out the activities of the conspiracy; statements that prompt further action on the part of conspirators.  *United States v. Rahme*, 813 F.2d 31, 35 (2nd Cir. 1987); *Roberts,* 14 F.3d at 515.

q.  Statements intended to enhance a co-conspirator usefulness to the conspiracy.  *United States v. Tarantino*, 846 F.2d 1384, 1412 (D.C. Cir. 1988).

r.  Statements to new or prospective members of a conspiracy that explain the conspiracy. *United States v. Monroe*, 866 F.2d 1357, 1363 (11th Cir. 1989); *United States v. Turner*, 871 F.2d 1574, 1580 (11th Cir. 1989).

s.  Statements that set in motion acts that are an integral part of the conspiracy.

*United States v. Paris*, 827 F.2d 395, 400 (9th Cir. 1987).

t.   Statements that indicate payments, or demands for payment, made to accomplish activities of the conspiracy.  *United States v. Esacove*, 943 F.2d 3, 5 (5th Cir. 1993).

u.   Statements concerning the collection of debts. *United States v. Meeks*, 857 F.2d 1201, 1203 (8th Cir. 1988).

v.   Statements to facilitate avoidance of detection. *United States v. White*, 563 F.3d 184, 192 (6th Cir. 2009); *United States v. Watson*, 525 F.3d. 583, 587 (7th. Cir 2008).

Although not all of these examples may have relevance to this case, the size of this list is illustrative of the broad interpretation given to statements in furtherance of a conspiracy.

## A.  OFFERED EVIDENCE CONCERNING THE CONSPIRACY

**<u>Identifying the Co-Conspirators</u>**

8.      The evidence described below will demonstrate that the conspiracy charged in Count 1 of the Superseding Indictment began in or around March 25, 2011 and continued through in or about May 15, 2014.  Guy Jean-Pierre, William Sears and Scott Dittman were members of the conspiracy who have been charged with conspiracy.  Unindicted coconspirators Cliff Bodden, Tod DiTommaso, and Richard Scholz were also members of the conspiracy.

(a)      Defendant Jean-Pierre

Jean-Pierre was a resident of South Florida and later the Dominican Republic, and was an

attorney licensed to practice law in the States of Florida and New York.  His law practice focused primarily on providing legal advice and services, to, or in connection with, small companies with low or minimal market capitalization whose stock was publicly traded (microcap companies).   His legal work concerned mainly corporate and securities transactions relating to microcap companies, including submitting Current Information Letters to OTC Markets and Rule 144 Attorney Opinion Letters to transfer agents and brokers so his clients could sell their unregistered shares.   In April 2010,  OTC Markets barred him from writing any further Current Information Letters on behalf of microcap companies due to his lack of due diligence regarding these companies.  From 2011 through September 2013, Jean-Pierre functioned as FusionPharm's *de facto* general counsel and provided legal advice and services in connection with the company's corporate and securities matters.

(b)     William Sears (Sears)

Sears is a resident of Thornton, Colorado, and had previously been primarily involved in the business of providing public relations and promotional services to microcap companies that sought to have their stocks publicly traded in various non-exchange, over-the-counter markets. Sears was convicted in federal court in the Southern District of New York of one count of conspiring to commit securities fraud and commercial bribery and one count of securities fraud and was sentenced in 2007. Thereafter, Sears primarily conducted his stock public relations and promotional business through Microcap Management, LLC ("Microcap"), a Nevada limited liability company that he formed.  He had a prior relationship with Jean-Pierre, where Jean-Pierre assisted him with securities related work.  He also conducted some of his business affairs through a second Nevada limited liability company,

Bayside Realty Holdings, LLC ("Bayside"), which he formed and operated in the name of a blood relative family member (hereinafter, "FamilyMember A").  He has pleaded guilty to conspiracy to commit security fraud and false income tax return which were charges relating to the conspiracy described in the indictment and in this proffer.

   (c)  Scott Dittman (Dittman)

   Dittman, a resident of Elizabeth, Colorado and later Boyertown, Pennsylvania, had been trained and practiced as an accountant from 1991 until 1995, when he quit working as an accountant and went into real estate development and construction. He became a Certified Public Accountant in 1991. His license with the State of California expired in April 1997. Co-defendant Dittman and Sears are brothers-in-law; Sears is married to Dittman's sister.  Dittman became self-employed in various businesses to include real estate development, construction, and, beginning in 2010, medical marijuana.

   (d)  Cliff Bodden

   Cliff Bodden was born in the Cayman Islands and moved to Brooklyn, NY around 1972. After completing high school and serving in the US Army, Bodden obtained his Series 7 registration and began working as a salesman for JW Gant in South Florida.  Later, Bodden moved to Atlanta, Georgia, where he was a broker for Bear Stearns & Co. Bodden first met Sears at Camelot Securities in 1994.  Their relationship remained over the years and Sears would use Bodden if he needed assistance with the drafting of business plans and other business related documents.   Bodden was first introduced to defendant Jean-Pierre through Sears in 2010. Boden began working for FusionPharm in 2011. His initial responsibilities included preparing a business plan and then moved into bookkeeping, preparing the financial statements, and

reconciling records, to include shareholder's equity, and creating various business documents.

       (e)     Tod DiTommaso

Tod DiTommaso is an attorney practicing law in California.  He was recruited by defendant Jean-Pierre to sign documents, Current Information Letters and Rule 144 Attorney Opinion Letters, prepared by Jean-Pierre and submit to the OTC Markets and transfer agents/brokers between 2010 and 2013.

       (f)     Richard Scholz

Richard Scholz was born and raised in New York and received an Associate's Degree in Business Management from Nassau Community College.  From 2000-2007, Scholz gained experience as a marketing representative where he would cold call brokers to generate interest in different companies' stocks.  Scholz began to work for Sears in March 2011 to help promote FusionPharm stock.

       9.     The sources of information relied upon for this proffer include 1) reports and transcripts of interviews with Dittman and Sears, and of witnesses; 2) email, phone, and skype communications between the members of the conspiracy 3) undercover video recordings of conversations by members of the conspiracy 4) bank records to include checks 5) business records to include invoices, notes, convertible promissory notes, and financial statements 6) publicly disclosed records to include quarterly and annual reports to OTC Markets and 7) financial records and stock related paperwork submitted to transfer agents and brokers, and 8) opinion legal letters.  Although this proffer describes significant aspects of and acts associated with the conspiracy, it does not purport to describe every aspect of the conspiracy or every act taken in furtherance of it.

## Overview of the Conspiracy

## Coconspirators Sears and Dittman Start FusionPharm with the Assistance of Defendant Jean-Pierre

10.     In or about 2010, Dittman conceived of a business to develop, manufacture and sell steel shipping containers refurbished for use as hydroponic growing pods ("PharmPods,") for indoor plant cultivation, primarily cannabis. He partnered with William Sears (Sears) to develop this business and, in particular, enlisted Sears to assist in promoting the business, marketing its products finding investment capital, and manage the stock side of the business.   The business was conducted through FusionPharm, Inc. ("FusionPharm"), with its principal place of business at first in Denver, Colorado and later in Commerce City, Colorado.

11.     Sears and the CEO for a company named Baby Bee Bright Corporation ("Baby Bee Bright") began discussions about Sears and Dittman taking over Baby Bee Bright.  The purpose of the takeover was for Dittman and Sears to transform Baby Bee Bright, a company whose stock was already quoted on OTC Link, operated by OTC Markets Group, Inc. ("OTC Link"), into FusionPharm, Inc.[1]  This takeover would allow FusionPharm to become a publicly traded company without going through the expensive and time consuming process required to do an initial public offering.  Sears and the Baby Bee Bright CEO ultimately agreed that Dittman and Sears would receive 99% of the company's convertible preferred shares at

---

[1]     At the time, the common stock of Baby Bee Bright, like the common stock of many publicly traded microcap companies, was not traded on a registered national securities exchange but rather directly between two parties, typically securities broker-dealers, using inter-dealer quotation services offered through internet platforms such as OTC Link.

no cost while the Baby Bee Bright CEO retained 1% as his compensation for the transaction. On November 15, 2010, Baby Bee Bright's shareholders executed a written consent acknowledging, among other things: (a) the resignation of Baby Bee Bright's CEO; and (b) the appointment of Dittman and, at Sears' direction, Family Member A as directors.   Family Member A was appointed to act as director, in part to avoid disclosure of Sears' involvement and his prior conviction for securities fraud.

12.     Prior to November, 2010, Dittman had been aware that Sears had a prior felony conviction.  Sears and Dittman discussed Sears' prior felony conviction with transactional and securities lawyer defendant Jean-Pierre and were advised by that lawyer that Sears' felony conviction would have to be disclosed to the market if Sears was given an officer or director title in the company and, over the course of time, they were further advised by defendant Jean-Pierre that Sears' formal involvement with FusionPharm would need to be limited in various ways to avoid running afoul of the federal securities laws or triggering disclosure obligations under the federal securities laws.

13.     Defendant Jean-Pierre assisted both Dittman and Sears in establishing FusionPharm from Baby Bee Bright, clearly showing that Jean-Pierre knew that Sears and Dittman were partners.   For example, there are communications between Sears and Jean-Pierre where they are having communications about acquiring the shell for Baby Bee Bright.  In the skype message Jean Pierre and Sears state, "Good! Also, I believe you mentioned before that there was a deal with a company you just acquired that you wanted to move pretty quickly." Sears replies, "Yes!!!, Just got the termination agreement from a shareholder to who had options at a crazy low price.  This would have killed any would be deal.  I now have power of atty on the

shell and am moving forward on it. I'll be traveling tomorrow and back on Friday. (Houston) lets get together on Monday." Jean-Pierre replies back, "Sounds good! Are you going to be able to make this way in the next two weeks?"  Sears replies, "Not next week the following for sure." Jean Pierre responds, "Great! And let's talk on Monday about the shell."

14.     On January 25, 2011, as part of the plan to turn over control of Baby Bee Bright to Sears and Dittman, the Baby Bee Bright CEO transferred 1.3 million of the existing 1.5 million Baby Bee Bright preferred shares to a single person LLC owned and controlled by Dittman.  At the beginning of March, Sears and Dittman initiated a 200-1 reverse split of stock affecting only the common shares of FusionPharm, thus greatly increasing the ownership value of the preferred shares.  Before the reverse split, Dittman owned 40.3% of the company through his 1,300,000 preferred shares.  After the split, he owned 86.1% of the company.   Sears sent the transfer agent an email stating that Jean-Pierre was handling the reverse [split] with FINRA, and Jean-Pierre was copied on that email.  In addition, Jean-Pierre wrote a letter to NASDAQ about the stock split.  On March 16, 2011, the Baby Bee Bright CEO then transferred 185,000 Baby Bee Bright preferred shares to Microcap, an entity controlled by Sears, providing Sears 18,520,000 common shares or 12.3% of total shares.   After this transfer, Sears and Dittman owned approximately 98.4% of FusionPharm's outstanding stock.   The former owner of Baby Bee Bright held onto 15,000 preferred shares equivalent to 1% of the company.  All other shareholders had a total of 1,041,352 common shares, resulting in less than 1% of ownership in the company (actual was .7%).  After receiving the 185,000 preferred shares, Sears contacted Jean-Pierre notifying him that he was over the ten percent threshold making him an affiliate, just based on the number of shears he had in his

name.  As arranged with Sears, the Baby Bee Bright CEO retained 15,000 preferred shares as his compensation for the transaction.

15.     On March 25, 2011, Dittman and Sears filed a notification of name change with the Financial Industry Regulatory Authority ("FINRA") to change Baby Bee Bright's name and stock symbol to FusionPharm's name and stock symbol.  Jean-Pierre filed papers with the NV Secretary of State to amend Baby Bee Bright's articles of incorporation to reflect the new name of FusionPharm.  Also, Jean-Pierre emailed the transfer agent stating that he is representing Baby Bee Bright in the corporate action of FINRA, regarding the transfer from Baby Bee Bright to FusionPharm.  After FINRA approved this form, all Baby Bee Bright shares were converted to FusionPharm shares.  The FINRA notification form was signed by Dittman in his capacity as President of FusionPharm and identified Sears as the company's "Administrative Officer."  Family Member A was listed as treasurer and secretary of former Baby Bee Bright and the newly formed FusionPharm.

16.     Around this time, Sears and Dittman enlisted the services of an associate of Sears, Cliff Bodden, to assist in preparing materials for FusionPharm.  Dittman and Sears requested that Bodden prepare, among other things, FusionPharm business plans including financial projections for the company.  For example, on March 10, 2011, Sears emailed Bodden and cc'd Dittman, asking Bodden to "please start communicating with regard to putting a business/plan/powerpoint/offering documents together."  About a month later, on April 5, 2011, Dittman emailed Bodden with specific financial projections to assist in the preparation of FusionPharm's business plan. The projections included PharmPod sales estimates for the company for the upcoming fiscal years that forecasted the number of pods that were expected to be sold in

each of these years, as follows with the translated corresponding sales revenue figures at an average price of $32,500 per pod: (a) Fiscal Year ("FY") 2011: 30 pods ($975,000); (b) FY 2012: 60 pods ($1,950,000); and (c) FY 2013: 100 pods ($3,250,000).

17.     Dittman and Sears operated FusionPharm as business partners, and held themselves out as such to numerous individuals and investors.  On April 21, 2011, Dittman sent an email to numerous individuals notifying them that he "recently partnered with [Sears] and [we] have acquired and moved [our] operations into a publicly traded company: FusionPharm."  Dittman would identify Sears as his "partner" in FusionPharm to numerous individuals through in-person communications and emails.  In short, during the Relevant Period, Sears and Dittman worked in tandem regarding the critical decisions concerning FusionPharm's management and operations, with the assistance of defendant Jean-Pierre, and Sears was primarily responsible for FusionPharm's capital formation and investor relations. At no point, however, was Sears included on any FusionPharm disclosures to the investing public as having any involvement with FusionPharm.

18.     Following the conversion of shares and name change to FusionPharm, Dittman and Sears, initially with the assistance of Bodden, undertook thereafter regularly to post certain prescribed written disclosures for FusionPharm on the OTC Link internet platform.  These submissions typically included financial statements, together with financial statement notes, and quarterly and annual reports, which reports included information, among other things, about the officers, directors, and control persons and significant beneficial owners of the company's stock.[2]

---

2       Reporting on the OTC Link platform was voluntary on the part of the companies whose stock was listed for trading but the degree and nature of the disclosures provided by the companies determined the "market tier" in which the company would be classified by the internet platform. Higher level tiers required more comprehensive disclosures.

Throughout the Relevant Period, no mention was made in any of FusionPharm's financial statements, notes, or quarterly and annual reports, that Sears, or any of the entities through which he conducted business, was an affiliate of, or related party to FusionPharm.

19.      Defendant Jean-Pierre assisted Sears, Dittman, and Bodden with these disclosure statements to OTC Link.  Jean-Pierre worked with Sears regarding FusionPharm's disclosure statements which never disclosed Sears as an affiliate, that he had a criminal conviction, or his family ties to Dittman.  Jean-Pierre sent Sears a message stating, "Sounds good!  I should still be here.  We can go over everything else regarding FusionPharm's disclosure statement."  Jean-Pierre would send drafts of the disclosure statements to Sears stating, "Take a look at the attached draft. Make sure all the information is accurate…Let's hopefully try to finalize the proposed disclosure statement hopefully over the weekend and in any event no later than the end of [t]he business day on Monday."  In another email, Sears forwards Dittman an email where he sends Jean-Pierre the disclosure statement for July for his review, clearly indicating the close working relationship regarding FusionPharm matters between Dittman, Sears, and Jean-Pierre.

20.      In connection with the posting of these quarterly and annual reports to the OTC Link website, defendant Jean-Pierre would and did prepare a series of corresponding Current Information Letters that stated and indicated, among other things, that the letter's author had reviewed FusionPharm's current and past annual and quarterly OTC Link submissions and that in the author's opinion the information disclosed in these findings constituted "adequate current

---

Companies that provided limited or no information were placed in market tiers that OTC Link reserved for stock issuers that prospective investors were advised to approach with caution.  OTC Link provided written guidelines for the type of information contemplated in these quarterly and annual reports.  The disclosures made by companies whose securities were listed on the OTC Link platform were readily accessible to the investing public and were widely disseminated through financial media outlets.

information," within the meaning of the federal securities law, concerning FusionPharm and its securities.  Defendant Jean-Pierre passed these letters along to Tod DiTommaso who placed the letters onto his own letterhead and signed them, without doing any due diligence with any of the officers or employees of FusionPharm.3  Defendant Jean-Pierre would then transmit the retyped Current Information Letters to William Sears, who would upload them onto the OTC Link website, knowing that the disclosures and letters to OTC Markets misstated the truth about Sears' involvement, criminal history, ownership/control of FusionPharm shares and family ties to FusionPharm.  Jean-Pierre charged FusionPharm $500 for each letter.  He paid DiTommaso $175 for DiTommaso to sign the letters.

**Sears Served as *de facto* Officer for FusionPharm with the Defendant Jean-Pierre's Knowledge**

21.     Even though Sears was never identified in FusionPharm's financial and other disclosures as having a formal role with the company, he was integral to the company's operations. As FusionPharm began its actual operations in the Spring of 2011, Sears was identified in some of FusionPharm's documents as being an officer of the company; he was alternatively classified as

---

3 OTC Markets provide an Attorney Letter Agreement that must be signed and sent with each Current Information Letter.  The Attorney Letter Agreement states that each letter must conform to The Guidelines for Letters with Respect to Adequate Current Information, which is attached to the Agreement as Exhibit A and B.  The Guidelines require the lawyer submitting the letter to identify counsel if the letter relies on work of another counsel and that work be attached.  In this case, Tod DiTommaso's letters never indicated that his letter was a result of a "ghostwritten" letter from defendant Jean-Pierre.  Further, Jean-Pierre never disclosed this information to OTC Markets even though he was FusionPharm's corporate counsel and was familiar with the requirements of the Attorney Letter Agreement.  In addition, the Guidelines require that counsel submitting the letter(i) personally met with management and a majority of the directors of the Issuer, (ii) reviewed the Information, as amended, published by the Issuer through the OTC Disclosure and New Service and (iii) discussed the Information with management and a majority of the directors of the Issuer.  Tod DiTommaso, met with Scott Dittman one time and then relied on Jean-Pierre for any information regarding the Current Information Letters, to include the draft letter.  The only significant change from the letters submitted to DiTommaso from Jean-Pierre to the one that was filed with OTC Markets was that DiTommaso's letterhead and signature were attached.

the company's "Vice President" "Director of Financial Operations" and/or "Investor Relations Director" in other documents.  Jean-Pierre, who was listed as the firm's Corporate Secretary and Legal Counsel, as well as one of its paid employees, knew of Sears' undisclosed roles within FusionPharm.

22.     In addition to being identified on initial company documents as an officer, from the time of FusionPharm's organization as a company in Spring 2011 and through at least late 2013 (when FusionPharm hired a contractor to serve as part-time Chief Financial Officer), Sears handled many day-to-day responsibilities typically reserved in other companies for a Chief Financial Officer.  For example, Sears: (a) managed incoming investor checks and paperwork; (b)  served as FusionPharm's primary contact with the company's transfer agent[4] in connection with FusionPharm common stock transactions; (c) signed payroll checks for FusionPharm employees from FusionPharm account(s); (d) made pitches to a number of investors on FusionPharm's behalf; (e) at times aided in drafted, revised, and posted FusionPharm press releases; (f) was the sole signor (along with his Mother) on FusionPharm's bank account for a majority of 2011, and (g) drafted certain FusionPharm corporate documents, such as written board of director consent for Sears and others to convert their preferred FusionPharm shares for sale.  Sears also had and used a FusionPharm email address and, from at least November 2011 to January 2012, received a salary from FusionPharm.  In addition to all of his roles, Sears was the primary contact with Jean-Pierre regarding the company's corporate and security matters via emails, skype, or phone calls.  Sears' controlling role with FusionPharm was not hidden from Jean-Pierre.  Sears paid Jean-Pierre for

---

4       A transfer agent is assigned by a publicly traded company to keep track of the individuals and entities that own the companies' stocks and bonds.

legal services he provided to FusionPharm signing the majority of the checks from the FusionPharm bank account.  On May 31, 2011, Sears asked Jean-Pierre to assist with trademark registration for "us".  On July 17, 2011, Sears asked Jean-Pierre to review and advise on a 506[5] document he was drafting for FusionPharm.  On October 17, 2011, Sears emailed Jean-Pierre a draft trustee agreement, that was never finalized, stating it was "for both my interests in FS and Scotts in meadpoint."   Jean-Pierre often received the FusionPharm financial statements and disclosures from Sears.

**Sears Sold FusionPharm Stock Through Microcap for the Benefit of Sears, Dittman and FusionPharm with the Assistance of Defendant Jean-Pierre**

23.    Federal securities laws require that every offer or sale of a security by a company such as FusionPharm needs to be registered with the Securities and Exchange Commission ("SEC") or exempt from registration.  FusionPharm was not registered with the SEC.  Accordingly, throughout the Relevant Period, any lawful issuance of securities, including convertible notes, preferred and common stock, would have needed to be exempt from registration.  Further, any of these exempt offerings would have required that the shares associated with the issuance be "restricted," or limited in the manner and amount in which they could be sold after issuance.   For example, restricted securities would have needed to be held by the owner for a certain amount of time (the "holding period") before they could be freely transferrable to a third party.  Additionally, shares held by individuals or entities that could direct or control the direction of a company's management

---

5 Rule 506 is a widely used Regulation D exemption for conducting private placements.

or policies - classified as "affiliates" - were subject to additional regulations under federal securities laws, such as limitations on how many shares they can sell during a given time period.[6]

24.     Dittman and Sears knew that unrestricted or "free trading" shares of FusionPharm could be sold into the market or to be used as negotiating tools.  Unrestricted shares would be more marketable to investors as they could immediately sell the shares without having to satisfy any holding period.  With knowledge and advice of defendant Jean-Pierre, Sears used the preferred shares acquired by Microcap to fund FusionPharm's operations and to financially support themselves.[7]  Because Sears was a *de facto* affiliate throughout the Relevant Period, sales of his preferred shares were accomplished while avoiding registration with the SEC and in violation of the otherwise applicable restriction requirement on newly issued shares.

25.     The securities transactions were realized in stages.  Sears initially converted 1,450 preferred shares to 145,000 free-trading shares of FusionPharm common stock on April 15, 2011. He then caused Microcap to transfer the remaining preferred shares (183,550 preferred shares) to

---

6 An affiliate of an issuer is a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer.

The term person when used with reference to a person for whose account securities are to be sold in reliance upon this section includes, in addition to such person, all of the following persons:

(i) Any relative or spouse of such person, or any relative of such spouse, any one of whom has the same home as such person;

(ii) Any trust or estate in which such person or any of the persons specified in paragraph (a)(2)(i) of this section collectively own 10 percent or more of the total beneficial interest or of which any of such persons serve as trustee, executor or in any similar capacity; and

(iii) Any corporation or other organization (other than the issuer) in which such person or any of the persons specified in paragraph (a)(2)(i) of this section are the beneficial owners collectively of 10 percent or more of any class of equity securities or 10 percent or more of the equity interest.

7     Dittman benefited from some of the sales of Sears' preferred shares in that (1) his FusionPharm salary was sometimes traceable to proceeds of these sales, (2) FusionPharm's operations were financed by round-tripped proceeds from many of these sales; and (3) he received compensation from Meadpoint in 2012 traceable to proceeds of these sales.

a company owned by an immediate family member (identified herein as "Family Member B"), although Sears continued to beneficially own the stock.  Thus, Sears was able to avoid being disclosed in FusionPharm's financial disclosure documents as a 10% shareholder of the company's preferred stock, and an affiliate of FusionPharm based on his stock ownership.  After using Family Member B's company to convert small tranches of FusionPharm preferred shares to common stock, Sears caused the remaining 178,760 preferred shares to be transferred to another family member (hereinafter, "Family Member C") on July 29, 2011.[8]  Similarly, Sears then used Family Member C as a proxy for his stock ownership, instructing him to transfer as needed small tranches of preferred shares to Microcap (or other entities controlled by Sears), which Sears, in turn,  caused to be converted into common stock and sold into the market.   Dittman knew about this arrangement.    Sears did this in order to conceal his true share ownership, as he continued to beneficially own these shares throughout the Relevant Period.

26.    All told, between April 28, 2011 and December 10, 2012, Sears, in consultation with Dittman and Jean-Pierre, converted 14,270 of the 185,000 preferred shares into 1,427,000 shares of FusionPharm common stock.   Sears sold 675,000 shares of these shares into the secondary market through Microcap, netting approximately $1.6 million in proceeds.  Before being able to sell these shares, the broker required a Rule 144 Attorney Opinion Letter in order to meet the registration exemption under SEC Rule 144 to ensure the proper requirements have been met, including the affiliation status.  Sears used a Rule 144 Attorney Opinion Letter that he received from Jean-Pierre.  This letter included the signature of Jean-Pierre's niece, Leslie Dinwoodie. The

---

8        Both Family Members B and C were also relatives of Dittman.

letter was written by Jean-Pierre and included the signature of his recently barred niece without her knowledge.  Dinwoodie did not draft or sign the letter provided to and used by Sears.  Jean-Pierre knew Sears was affiliated with FusionPharm.   Sears and Dittman agreed that Sears would use some of the remaining 752,000 FusionPharm common stock shares as part of their efforts to raise funds for the company's operations and to finance construction of pods.  Investors were told that such shares would be unrestricted and thus could be immediately traded.[9]

27.     FusionPharm's transfer agent and brokers were the gatekeepers for the stock and required to do necessary due diligence for transactions to include assessing the holding period and the affiliate status for the involved parties. , Microcap's sale of these unregistered shares was based on false statements by Dittman, Sears, and Jean-Pierre about Sears' affiliation with, and his ability to control certain aspects of, FusionPharm.   For example, Dittman signed and submitted a FusionPharm Officer's Certificate attesting to, among other things, that Sears and, derivatively, Microcap, were not affiliates of FusionPharm.  Similarly, Sears and Dittman submitted documents to the transfer agent and broker that claimed Microcap (Sears) was not an affiliate of FusionPharm, even though Sears handled many responsibilities typically reserved in other companies for an officer or director.  Jean-Pierre lied about Sears' affiliation status in a Rule 144 Attorney Opinion Letter he drafted for DiTommaso's signature in June, 2012, and again in July, 2012.  Sears, Jean-

---

9       For example, on May 12, 2011, Dittman emailed Sears with various proposals to a prospective investor, including "[w]e will throw you 1 million shares of free trading paper, in 100,000 share tranches (so they are immediately liquid) while we draw down the line ($100k for 100,000 shares)."  Eight days later, on May 20, 2011, Sears emailed a potential financier and cc'd Dittman. In the email, Sears claimed that "instead of doing the whole wait for a registration statement thing, we have gone to some shareholders and have been able to put together enough stock to do a transaction with free trading paper."  The "shareholders" referenced in Sears' email referred to his own company, Microcap.

Pierre, and Dittman hid Sears' role with FusionPharm in order to have the transfer agent remove the restricted legend on the stock certificates and sell the shares as free trading.

28.     Dittman and Jean-Pierre also misrepresented facts about Sears' stock ownership and transactions to FINRA.  In early October 2011, FINRA investigated Microcap's significant sales of FusionPharm stock.  During that investigation, Dittman represented to FINRA that Sears was only a "part time salesman" at FusionPharm and that Dittman was unaware that Sears owned any FusionPharm stock and, therefore, was unaware he was selling FusionPharm stock.  During that time period, Sears sent a message to Jean-Pierre indicating that the FINRA investigation "is a new division of FINRA only enacted post Madoff" indicating that Sears is aware of the investigation and that Dittman, Sears and Jean-Pierre are working on how to resolve the matter. Dittman emailed Sears asking if they need to get Guy [Jean-Pierre] involved at this point concerning the FINRA investigation.  Sears messaged Jean-Pierre to call Scott [Dittman] to discuss the FINRA investigation.   On October 19, 2011, Sears, with the assistance of Jean-Pierre, backdated a fraudulent document stating that Microcap Management, including the broker accounts, had been transferred to Richard Scholz for $10.00.  Scholz stated that he signed the Agreement for the Purchase of Ownership Interest, a document Jean-Pierre assisted in drafting, which was back dated to May 9, 2011 after receiving an email from Sears on October 19, 2011. Scholz did not receive any compensation from Sears for doing this and did not pay the $10.00 purchase price as reflected in the agreement.  In a later interview, on November 3, 2011, Dittman indicated to FINRA staff that Sears "no longer owns Microcap Management" and that Sears owned no "FusionPharm stock."  But only weeks earlier, on September 6, 2011 and September 13, 2011, Dittman and Sears emailed each other details about Microcap's trading, that relied on the Rule 144

Attorney Opinion Letter.  Later, Dittman and Jean-Pierre email regarding what was submitted to FINRA in March 2011, of which some of the information is forwarded to the FINRA investigator to include the facts that it was Sears and the former owner of Baby Bee Bright discussing the company's transition.  Later in November 2011, the FINRA investigator emailed Dittman and copied Jean-Pierre, requesting that Dittman call him to discuss an explanation of who your brother-in-law William Sears sold his entity Microcap Management to.  Dittman requested from Jean-Pierre a conversation before they call the FINRA investigator.  Jean-Pierre responded to FINRA via a letter/email stating essentially that William Sears is no longer the owner of Microcap.  A short time after, Jean-Pierre was paid twice by Sears from a Microcap bank account. And then in 2012, Jean-Pierre drafted two Rule 144 Attorney Opinion Letter for Microcap on behalf of Sears illustrating his knowledge that Sears maintained control of Microcap throughout the Relevant Period to include during the inquiry by FINRA.

### Sears and Dittman Use Affiliated Entities to Increase Access to Free-Trading Shares with Jean-Pierre Knowing that Fabricated Information was being Used

29.    Dittman and Sears used entities owned by Sears to increase their access to FusionPharm stock.  Two of these entities, Microcap and Bayside, were, as discussed above, entities that Sears had previously been used in connection with earlier business affairs. Two new entities, VertiFresh, LLC ("VertiFresh") and Meadpoint Venture Partners ("Meadpoint"), were formed in connection with efforts to sell FusionPharm's PharmPods and license its business methods and technology.  Meadpoint was additionally used, in part to secure additional FusionPharm stock. (The four entities are hereafter collectively referred to as the "Facilitating Entities".)

30.     In addition to Sears' control over these entities, the Facilitating Entities shared other connections to FusionPharm.  Among other things, Meadpoint's and VertiFresh's principal places of business were 4360 Vine Street in Denver, CO – the same address as FusionPharm for most of the Relevant Period.  VertiFresh and Meadpoint also shared the same workspace and employees with FusionPharm.  And the Facilitating Entities paid over $40,000 for shipping containers (the raw materials for PharmPods) that went to FusionPharm.

31.     Dittman was also affiliated with, and acted on behalf of, VertiFresh and Meadpoint. Regarding VertiFresh, materials sent to potential VertiFresh investors identified Dittman as a Director of the company.  Dittman edited and reviewed these materials before they were sent to potential investors.  Dittman also made a presentation on VertiFresh's behalf with Sears to the Denver Office of Economic Development JumpStart BizPlan Awards contest in 2012.  The PowerPoint presentation Dittman and Sears used at the presentation identified Dittman as VertiFresh's Director.  Moreover, some company organization documents reflected that Dittman was the CEO and Chairman of Board for VF Management, Inc., VertiFresh's sole managing member.

32.     Regarding Meadpoint, a draft of the company's shareholder agreement, never executed, identified Dittman as a 50% owner of the company.[10]  Dittman also received tens of thousands of dollars in purported compensation as a 1099 worker of the company, and drafted investor materials on Meadpoint's behalf.  Dittman later identified himself on an application to the Colorado Medical Marijuana Enforcement Division as a "consultant" to Meadpoint.  At no point

---

10      The draft Meadpoint Shareholder Agreement was sent in an email from Sears to Dittman on November 14, 2011.

did FusionPharm disclose to investors that Dittman had any affiliations with VertiFresh or Meadpoint.

33.     As a named officer of FusionPharm, Dittman's ownership share and transactions in FusionPharm stock were disclosed on FusionPharm's financial disclosures filed on, and made available to investors via, OTC Link.   However, by facilitating the sale of FusionPharm shares through Microcap, Bayside, and Meadpoint, Dittman's, along with Sears' involvement and interest in those stock transactions remained undisclosed to investors.   Jean-Pierre, Dittman, and Sears knew and assisted in hiding these sales from investors by what was placed in the disclosure statements to OTC Link.   For example, the quarterly disclosure statement due for September 30, 2011 clearly involved the input from Dittman, Sears, and Jean-Pierre.    Jean-Pierre in an email provided feedback to Sears on the statement of changes in stockholder's equity and the notes to the financial statements, which were forwarded to Dittman from Sears.    After that email, Jean-Pierre sent Sears a draft of the 9/2011 disclosure statement where Sears is not disclosed, which is forwarded onto Dittman.   After further review, Jean-Pierre sent FusionPharm's Information and Disclosure statement for September 30, 2011 financials to Sears and Dittman.   After sending the Disclosure Statement to Sears and Dittman, Jean-Pierre sent a drafted Current Information Letter for the September 30, 2011 FusionPharm statements to Tod DiTommaso.   Two days later, Dittman sent an email to DiTommaso, Jean-Pierre, and Sears saying a new opinion letter is necessary for updated posting.   Jean-Pierre responded back to Sears saying he sent the revised [signature of Tod DiTommaso] OTC Markets opinion earlier today, did you receive it??? And Sears replies back, "Yes, it should be uploaded."

34.     Prior to 2012, Sears requested from Jean-Pierre sample promissory notes.   Jean-Pierre sent Sears a sample non-convertible promissory note and sample convertible promissory note (lender could convert portions of the note for shares of FusionPharm stock).   Sears wrote Jean-Pierre in requesting that these promissory notes be completed when he stated, "I want to try and have that promissory note wrapped up today. Hey Guy…any luck with that promissory note."

35.     In 2012, when FusionPharm did not have any money, Bodden, Sears, and Jean-Pierre met in Florida to discuss how to raise money for FusionPharm and a potential deal they were working on.  Proof of the meeting came from an email Bodden sent Jean-Pierre on May 30, 2012, stating, "Guy Bill [William Sears] is in route to Orlando right now and when he lands I'll get a time for you. Cliff."

36.     Following the meeting, Bodden prepared two separate notes (one for Bayside and one for Meadpoint) for *non-convertible* lines of credit.   On June 4, 2012, Bodden emailed Sears a draft Bayside non-convertible promissory note and credit line agreement, writing that he (Bodden) would also draft drawdown requests to match the dates and amounts of previously made deposits into FusionPharm's accounts.  Between June 5, 2012 and June 6, 2012, Bodden drafted six drawdown requests totaling $177,000 and sent the requests to Sears.  The final non-convertible note and credit line agreement ("Bayside Non-Convertible Note") was then signed on June 6, 2012 with a purported $275,000 line of credit.  However, the Bayside Non-Convertible Note signatures (Dittman on behalf of FusionPharm and Family Member A on behalf of Bayside, acting as Sears' surrogate) were backdated to May 2, 2011.

37.     To justify the "drawdowns," Sears attached deposit slips for nine previous bank deposits totaling approximately $171,000.  In reality, all but one of the various deposits listed as

purported drawdowns actually came from Microcap, and the funds are traceable to Microcap sales of FusionPharm stock. Dittman signed these drawdown requests on June 6, 2012; the dates on the requests, however, were earlier in time and matched when funds actually had been disbursed to FusionPharm.

38. Following a similar pattern, on June 19, 2012, Bodden emailed Sears a draft of the Meadpoint non-convertible promissory note and credit line agreement for signature, with a credit limit of $200,000 ("Meadpoint Non-Convertible Note"). As with the Bayside Non-Convertible Note, Dittman signed the Meadpoint Non-Convertible Note on or about June 19, 2012, when the Note bore a date of June 15, 2011. Sears signed on Meadpoint's behalf and also backdated his signature. FusionPharm attached deposit slips for $88,000 of deposits, although again the money actually came from Microcap stock sales. Once again, Dittman signed drawdown requests that bore earlier dates to match the dates on which funds actually had been disbursed to FusionPharm.

39. Evidence shows that Jean-Pierre was assisting and/or knew of the existence of these non-convertible promissory notes as of June 20, 2012. An email from Bodden to Dittman with Jean-Pierre and Sears copied included a due diligence package that contained both non-convertible notes for Bayside and Meadpoint. In addition, Sears sent an email to Jean-Pierre and Bodden stating, "Circle the wagons and get the rest of our outstanding docs wrapped up. I want to get funded this week", illustrating his intent to fund FusionPharm with the proceeds from this transaction, circumventing securities laws.

40. Five months later, on November 26, 2012, Bodden emailed Sears new drafts of the Bayside and Meadpoint notes now documented as *convertible* notes, writing "[t]he Notes work with the existing drawdown requests." (hereinafter referred to as the "Meadpoint Convertible

Note" and "Bayside Convertible Note" respectively). The Bayside Convertible Note, signed by Dittman on FusionPharm's behalf on or about November 26, 2012 but bearing a date of May 2, 2011, was a 10% Convertible Promissory Note and Line of Credit Agreement in the amount of $275,000 with a conversion rate of $0.01/share. Similarly, the Meadpoint Convertible Note was also signed by Dittman on FusionPharm's behalf on or about November 26, 2012 but bore a date of June 15, 2011, and was a 10% Convertible Promissory Note in the amount of $275,000 with a conversion rate of $0.01/share.[11] The $0.01/share conversion rate was a massive discount on the stock price at the purported date of the loan. For example, on May 2, 2011, FusionPharm's stock was trading at approximately $1.30 and on June 15, 2011, FusionPharm's stock was trading at $2.98. This discount was far greater than any other investor was receiving from FusionPharm at the time and raises obvious concerns about the validity of the transaction.

41.     The notes were changed because Sears wanted to sell portions of the notes to potential buyers whom he had identified. By changing the non-convertible notes to convertible ones, Sears and Dittman could present the notes to FusionPharm's transfer agent for conversion of the debt into FusionPharm common stock. Additionally, by backdating the notes, Dittman and Sears were able to mislead the transfer agent into believing that: (1) all debt obligations reflected in the backdated notes were intended to be convertible at the time that FusionPharm incurred the debts; (2) the debt obligations always had been convertible; (3) the backdated notes constituted contemporaneously created written evidence of the debt obligations reflected therein; and (4)

---

[11]     The date (changed to December 8, 2011) and amount ($275,000 to $88,000) of the Meadpoint Convertible Note would be further revised at later dates.

consequently that the applicable holding period required by the federal securities laws had been satisfied.

**Sears and Dittman Convert Notes into Free Trading**
**FusionPharm Shares and Raise Millions with the Assistance of Defendant Jean-Pierre**

42.     After Dittman signed the backdated Bayside Convertible Note, Sears immediately converted debt into FusionPharm shares.  On December 6, 2012, Bayside submitted a Notice of Conversion to FusionPharm to convert $1,400 of the debt into 140,000 FusionPharm common shares.  The package that Sears submitted to the transfer agent contained several false documents, including: (1) the backdated Bayside convertible note and drawdown requests/deposit detailed above; (2) a letter from Bayside attesting that Bayside was not an affiliate (signed by Family Member A); (3) a separate Statement of Non-Affiliate from Bayside (signed again by Family Member A); and (4) a FusionPharm Officer's Certificate, Written Consent, and letter signed by Dittman stating that Bayside (and derivatively Sears) were not affiliates and that the Bayside Convertible Note was a valid obligation of the company as opposed to round-tripped[12] stock sale proceeds.[13]

43.     Jean-Pierre drafted the required Rule 144 Attorney Opinion Letter for this conversion knowing that certain requirements, including the holding period and volume limitation,

---

12     "Round tripping" occurs when a company provides an individual or entity with access to the company's stock with the understanding that a portion of the proceeds derived from the sale of such stock will be returned to the company. The practice is not unlawful *per se*.  However, such "round tripping" may run afoul of the federal securities laws if the stock proceeds that are generated from securities transactions that involve unregistered securities that are not deemed lawfully exempt from registration.  The "round tripping" may, under certain circumstances, also be required to be disclosed under the federal securities law or accounting principles.

13     The evidence establishes that Dittman and Sears also created the misimpression that Sears had no affiliation with Bayside.  On December 17, 2012, Sears emailed the FusionPharm transfer agent claiming that Bayside was a "family member['s] company" and that he would be the "point person" for the transaction.  Dittman was cc'd on the email and followed up by writing the transfer agent to "[p]roceed with haste as directed" by "Mr. Sears."

in order to meet the registration exemption under SEC Rule 144 were not met, considering Jean-Pierre knew the same notes were non-convertible as of June 20, 2012.  Jean-Pierre sent an email to Tod DiTommaso in December 2012 stating, "Attached please find a proposed Debt Conversion Opinion Letter for FSPM together with the accompanying back-up documentation.  Please prepare as soon as possible…"  Tod DiTommaso retyped the letter on his letterhead and added his signature and forwarded the letter back to Jean-Pierre.  Initially, the Attorney Opinion Letter raised concerns with the transfer agent a few different times, due to inaccuracies within the materials submitted.  Sears received several emails from the transfer agent regarding these inaccuracies and forwarded them to Bodden and Jean-Pierre to fix.  Regarding the issues with the Attorney Letter, Sears reached out to Jean-Pierre to inquire about the letter stating, "how is my document?"  Jean-Pierre responds back that Sears should receive it in the morning and "he would reach out to DiTommaso in about 45 mins to an hour when he should be in the office and get back to Sears."  Sears replies, "Awesome!"  This email was followed up with another email by Jean-Pierre attaching another revised opinion letter where Jean-Pierre stated to DiTommaso, "It took a little bit longer than I thought because I wanted to make sure we touched all the bases and therefore made more changes than I initially imagined."  Tod DiTommaso retyped the letter on his letterhead and added his signature and forwarded the letter back to Jean-Pierre, who then forwarded it to Sears.  Jean-Pierre skyped with Sears asking if he "received the letter."

44.     Contrary to these representations made to transfer agent and broker by Sears, Jean-Pierre knew that Sears was an affiliate due to his ownership of Bayside and control of FusionPharm.  Sears' affiliate status also meant that Bayside needed to abide by the volume restrictions mandated by federal securities laws.  Specifically, Bayside could not sell more than

1% of the FusionPharm's outstanding common stock shares during a three-month period.  As of 12/31/2012, FusionPharm had approximately 3,001,650 common shares outstanding, meaning Bayside could only sell a maximum of approximately 30,016 shares during this period and still comply with the federal securities laws.  However, Sears sold all 140,000 of Bayside's shares during this period, thus violating the volume restrictions.

45.     On February 5, 2013, Sears sold the remainder of the Bayside Convertible Note to an investment group.  Sears received $250,000 from the investment group in consideration for the remaining debt that FusionPharm purportedly owed Bayside under the backdated note.  In order to ensure that the five investors in the investment group immediately received unrestricted shares, Dittman and Sears again made statements to the transfer agent concerning ownership of Bayside that masked Sears' *de facto* control of Bayside.  Again, Jean-Pierre was part of hiding the fact that Sears was an affiliate of FusionPharm when selling the Bayside note.   Jean-Pierre was sent an email from Sears that included the required documents for the sale of the note.  In addition, knowing Sears control status at FusionPharm and his control of Bayside, Jean-Pierre drafted all five of the Attorney Opinion Letters for the sale to the five individual buyers of the note.  Jean-Pierre sent those letters to Tod DiTommaso along with an Officer's Certificate signed by Dittman falsely stating that Bayside was not affiliate of FusionPharm.  These letters and the Officer Certificate were then submitted to the transfer agent and relied upon to issue the shares from the note as free-trading.

46.     Once Sears sold the remainder of the Bayside debt, Sears, Jean-Pierre, Bodden and Dittman turned to utilizing the Meadpoint Convertible Note.  Between March 2013 and April 2014, Sears, though Meadpoint, converted $42,450 of purported debt into 4.245 million FusionPharm

common shares.  Sears, with Dittman's knowledge, sold approximately 3.2 million of those shares in the market.  Jean-Pierre drafted two Attorney Opinion Letters for Meadpoint falsely stating that Meadpoint (Sears) was not an affiliate of FusionPharm.  Jean-Pierre sent the first Attorney Letter in an email in March of 2013 and the second was sent around August 13, 2013.

47.     The Meadpoint conversions were documented similarly to the Bayside conversion. The packages that Sears submitted to the transfer agent included similar false documents, including: (1) the backdated Meadpoint Convertible Note and deposit details listed above; (2) a letter from Meadpoint attesting that it was not an affiliate (signed by Sears); (3) a separate Statement of Non-Affiliate from Meadpoint (signed by Sears); (4) a FusionPharm Officer's Certificate, Written Consent, and letter (all signed by Dittman) stating that Meadpoint (and derivatively Sears) were not affiliates and that the Meadpoint Convertible Note was a valid obligation of the company.  As with the Bayside converted shares, the backdated nature of the Meadpoint Convertible Note misled the transfer agent into believing the holding period had been satisfied as to all debt obligations reflected in the Note.  In addition, Jean-Pierre drafted and had the Attorney Opinion Letters signed and dated by Tod DiTommaso, knowing that the holding period and affiliate status were fabricated in each of those letters.

48.     FusionPharm's transfer agent emailed Dittman in February 2014 in response to one of the Meadpoint conversion requests.  The transfer agent employee wrote that he had concerns about the conversion because Sears requested the conversion on Meadpoint's behalf, and the transfer agent had Sears listed as an Administrative Officer of FusionPharm.  Dittman falsely responded to the transfer agent that Sears had never been employed by FusionPharm (when, in truth and in fact, he had been employed directly by FusionPharm for 3 months in 2011 expressly

as a named employee and thereafter continued to work at FusionPharm during the Relevant Period) and was not an affiliate. Meadpoint was, however, an affiliate based on Sears' control of both FusionPharm and Meadpoint.

49.     As with the Bayside Convertible Note, Sears and Dittman also used the Meadpoint Convertible Note to obtain cash from outside investors. Rather than selling debt, however, Sears converted $15,000 of debt under the Meadpoint Convertible Note into 1.5 million shares of FusionPharm common stock. Sears, with some assistance from Dittman and Jean-Pierre, then sold the 1.5 million shares to three investors in August 2013 for $184,831. Sears emailed Jean-Pierre stating, "Guy it would seem I need another letter of opinion for the note. Please reference Meadpoint converting it into the Name of Richard Scholz as in the documents." These three investors received unrestricted shares based on Dittman's, Jean-Pierre's and Sears' false representations to FusionPharm's transfer agent.

50.     From May to December, 2013, Meadpoint received approximately $273,210 in proceeds from the sale of stock derived from the Meadpoint Convertible Note, and an additional $184,831 from the three investors detailed above, for a total of $458,041. The majority of these funds were routed back to FusionPharm in sham transactions reported as PharmPod sales.

51.     In 2014, after the passage of Amendment 64 in Colorado, legalizing recreational usage of marijuana, FusionPharm's share price and trading volume spiked.[14]  From January through May, 2014, Meadpoint received $9.9 million in proceeds from the sale of stock derived

---

14      The average price of FusionPharm shares from May 2011 through December 2013 was $1.46; the average share price from January 2014 until the SEC suspended trading on May 16, 1014 was $4.28. Average trading volume during the two periods was 20,773, and 781,800 respectively.

from the Meadpoint Convertible Note.  While some of this amount was transferred to FusionPharm in 2014, the majority – approximately $8.7 million - was seized by the government in May 2014.

52.    In total, from approximately April 28, 2011 through May 8, 2014, Sears, in consultation with Dittman, Jean-Pierre, and Bodden, sold more than 4 million shares of FusionPharm stock through the Facilitating Entities and acquired more than $12.2 million in stock sale proceeds: $2.2 million prior to the passage of Amendment 64; $9.9 million in the months immediately following the passage of Amendment 64.  Jean-Pierre acted as Sears' and Dittman's securities attorney, which included the drafting of Current Information Letter for OTC Markets on behalf of FusionPharm, the drafting and review of disclosure statements that outlined FusionPharm's ownership, directors, controllers, family member ties, criminal histories, and financials, and the drafting of Rule 144 Attorney Opinion Letters to transfer agents and brokers concealing Sears role an affiliate of FusionPharm.

### FusionPharm Falsely Reports Proceeds from Stock Sales as Revenue, and Fails to Disclose Sears and Facilitating Entities as Affiliated and Related Parties

53.    In addition to the funds Dittman and Sears used for their own personal benefit, they also round-tripped over a million dollars of stock sale proceeds back to FusionPharm, most of which was booked as company revenue, and the rest as loans.  In this manner, Dittman and Sears consistently transferred a portion of a given week's trading proceeds to FusionPharm.  On certain occasions, they even used a formulaic breakdown for the proceeds.

54.    Dittman and Sears used the stock sale proceeds transferred to FusionPharm to sustain FusionPharm's business.  Much of the funds were portrayed as involving transactions with Meadpoint and VertiFresh.  As their business operations got underway, Dittman and Sears had agreed to form entities to act as intermediaries with respect to FusionPharm's ultimate customers,

one entity devoted to customers whose intended use of the PharmPods was in connection with the cannabis cultivation and the other with respect to a business devoted to using the PharmPods for growing non-cannabis produce (primarily, lettuce). Meadpoint was formed for the former purpose and held out as FusionPharm's 'exclusive distributor' of PharmPods. VertiFresh was formed ostensibly for the latter purpose and, as Dittman and Sears started growing lettuce in PharmPods that they kept at FusionPharm's business premises, they began to market sale of this produce to local restaurants and retailers under the name "VertiFresh." As indicated above, the affairs and operation of all three entities – FusionPharm, Meadpoint and VertiFresh – were comingled and all three entities were jointly operated, as a matter of fact, by Sears and Dittman in concert, with Jean-Pierre and Bodden understanding the corporate structure.

**Vast Majority of FusionPharm's Revenue from Facilitating Entities**

55.    From 2011 through the June 30, 2013, FusionPharm reported approximately $1,292,732 in revenue[15]. Jean-Pierre drafted the Current Information Letters for each of these reporting periods stating that the information provided was "adequate current information". The vast majority of the revenue recognized during this time period came from Sears' FusionPharm stock sales and the sale of the Bayside note. In its 2012 Annual Report, FusionPharm claimed $808,398 in revenue. FusionPharm stated that $750,000 of this revenue resulted from a license agreement with VertiFresh. As detailed above, Sears and Dittman owned and/or controlled both entities (a fact never disclosed to investors), meaning the transaction was essentially one party

---

15    In the 2013 Annual Report, FusionPharm adjusted the 2012 revenue from $808,398 to $303,398 by writing down $500,000 of the revenue associated with Vertifresh agreement.

transacting with itself.  During the Relevant Period, VertiFresh only generated nominal revenue from lettuce sales.

56.     The financial disclosures made available to investors via OTC link never disclosed Sears' role with FusionPharm or any of the Facilitating Entities. They also never disclosed Dittman's role with the Facilitating Entities.

### Summary

57.     FusionPharm was a struggling business from 2011 through 2013.  While it was clear that Sears and Dittman were partners to anyone close to the company including Jean-Pierre, they made a decision, with the assistance of Jean-Pierre to not disclose Sears' role as an affiliate of FusionPharm.  They did this for three reasons: If Sears was disclosed as a controller of FusionPharm, 1) they would also have had to disclose his criminal history; 2) he would not have been able to sell FusionPharm stock in excess of the affiliate volume limits; and 3) would not have been able to route those proceeds back to the Company as purported convertible loans and revenue without disclosure as related party.  In order to enact their plan to not disclose Sears, they needed Jean-Pierre to provide the necessary opinion letters hiding Sears's role in order to get Sears' stock cleared through the brokers and transfer agents and submit Current Information Letters to OTC Markets stating that their filings contained adequate current information.

### B.  Description of Statements in Furtherance of the Conspiracy

58.     The chart attached to this proffer, entitled *James* Log (Exhibit 1), summarizes coconspirator statements made in furtherance of the conspiracy charged in Count 1 of the Superseding Indictment and described in this proffer. The letters following the 801(d)(2)(E) entries in the "Bases for Admission" column refer to the subparagraphs of paragraph 7 above,

page 5 (Exhibit 2, Quick Sheet for Purposes), which identify purposes for which the coconspirator statements may be offered.

59.     The statements in the log are the ones that the government identified as potential conspirator statements that could be admitted pursuant to Rule 801(d)(2)(e).  However, to provide some context for many of these statements, government counsel included in the log entries statements which are not hearsay under the Rules of Evidence.

60.     Additionally, some statements may not fall under Fed. R. Evid. 801(d)(2)(E) because they are not hearsay. This may be for a variety of reasons. The conversations may not be "statements" for hearsay purposes because nothing was asserted.[16]  Further, statements are not "hearsay" if they are not offered for the truth of the matter asserted.[17]  *See United States v. Cesareo-Ayala*, 576 F.3d 1120, 1128-1130 (10th Cir. 2009). Statements that are untrue; statements that are used to establish verbal acts; or statements that show the effect on the listener or hearer are not hearsay. *United States v. Schmidt*, 2007 WL 1237975, * 1 (D. Colo. 2007)(J. Blackburn). Likewise, statements that provide context and completeness to a defendant's admission are not excluded as hearsay. *United States v. McDowell,* 918 F.2d 1004, 1007 (1st Cir.1990) ("Nor can a defendant, having made admissions, keep from the jury other segments of the discussion reasonably required to place those admissions into context."); *see also United States v. Gutierrez-Chavez,* 842 F.2d 77, 81 (5th Cir.1988) (holding that statements on tape

---

16 A "statement" is an oral or written assertion, or nonverbal conduct intended as an assertion.  Fed. R. Evid 801 (a).

17 "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.  Fed. R. Evid 801(c).

recording were admissible "for the limited purpose of putting the responses of the [defendant] in context and making them intelligible to the jury and recognizable as admissions").  The government may offer some of these statements, or at least some portion of the statements, as verbal acts or directions rather than as assertions of fact.  As such, these statements would not be covered by the hearsay rules.  *See* Fed. R. Evid. 801(a); *United States v. Jackson*, 88 F.3d 845, 847-48 (10th Cir. 1996).  Questions are also generally not hearsay because they are not intended as assertions.  *Jackson*, 88 F.3d at 848.

If statements qualify as non-hearsay admissions under Fed. R. Evid. 801(d)(1) or (d)(2)(A)-(D), rather than co-conspirator statements under Fed. R. Evid. 801(d)(2)(E), they need not be included in a *James* proffer. Similarly, even if a statement is hearsay, it may be admissible under a hearsay exception found in Fed. R. Evid. 803 or 804, including business records, such as transfer agents and OTC Markets records.  Therefore, the statement need not be addressed here as a co-conspirator statement. And "direct testimony of a conspirator ... describing his participation in the conspiracy and the actions of others is not hearsay." *United States v. Townley*, 472 F.3d 1267, 1273 (10th Cir. 2007), quoting *United States v. Mobile Materials, Inc.,* 881 F.2d 866, 871 (10th Cir.1989).

61.    The government has culled from the interviews of cooperating defendants and witnesses those statements it submits were made during the course of and in furtherance of the conspiracy.  However, much of these interviews are narratives and therefore are not offered pursuant to Rule 801(d)(2)(E).  *See Perez,* 989 F.2d at 1578 ("statements relating to past events, even those connected with the operation of the conspiracy where the statement serves no immediate or future conspiratorial purpose," is not in furtherance of the conspiracy); *Roberts,* 14

F.3d at 514-15 ("narrative declarations of past events are not 'in furtherance'").

62.    Respectfully submitted this 18th day of May, 2018.


ROBERT TROYER
United States Attorney


*/s/ JEREMY SIBERT*
Jeremy Sibert
Assistant U.S. Attorney
1801 California Street, Suite 1600
Denver, Colorado  80202
(303) 454-0100
FAX: (303) 454-0403
Email: jeremy.sibert@usdoj.gov
Attorney for the government

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 18th day of May 2018, I electronically filed the foregoing **UNITED STATES' James Log** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following email addresses:

Clifford Barnard
Attorney for the Defendant


*s/Jeremy Sibert*
JEREMY SIBERT
Assistant United States Attorney
1801 California Street, Suite 1600
Denver, Colorado 80202
Telephone: (303) 454-0100
Facsimile: (303) 454-0406
Jeremy.Sibert@usdoj.gov