**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Criminal Case No. 17-cr-008-WJM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

**1.    GUY M. JEAN-PIERRE,**
      a/k/a Marcello Dominguez de Guerra,

      Defendant.



---

### FINAL JURY INSTRUCTIONS

---

### PART I: GENERAL INSTRUCTIONS & EVIDENTIARY CONSIDERATIONS

Members of the Jury:

In any jury trial there are, in effect, two judges. I am one of the judges, you are the other. I am the judge of the law. You, as jurors, are the judges of the facts. I presided over the trial and decided what evidence was proper for your consideration. It is also my duty at the end of the trial to explain to you the rules of law that you must follow and apply in arriving at your verdict.

In explaining the rules of law that you must follow, first, I will give you some general instructions which apply in every criminal case—for example, instructions about burden of proof and insights that may help you to judge the believability of witnesses. Then I will give you some specific rules of law that apply to this particular case and, finally, I will explain the procedures you should follow in your deliberations, and the possible verdicts you may return. These instructions will be given to you for use in the

jury room, so you need not take notes.[1]

---

[1] Tenth Circuit Criminal Pattern Jury Instructions § 1.03.

## JURORS' DUTIES

In reaching your decision as to the facts, it is your sworn duty to follow all of the rules of law as I explain them to you.

You have no right to disregard or give special attention to any one instruction, or to question the wisdom or correctness of any rule I may state to you. You must not substitute or follow your own notion or opinion as to what the law is or ought to be. It is your duty to apply the law as I explain it to you, regardless of the consequences. However, you should not read into these instructions, or anything else I may have said or done, any suggestion as to what your verdict should be. That is entirely up to you.

You are not to be concerned with the wisdom of any rule of law stated by me. It would be a violation of your oath to base your verdict on anything other than the law as presented in these instructions and the facts as you find them. Counsel may properly refer to some of the governing rules of law in their arguments. If there is any difference between the law as stated by counsel or in the exhibits, and that stated by me in these instructions, my instructions prevail. The law contained in these instructions is the law that must govern your deliberations in this case.

Finally, it is your duty to base your verdict solely upon the evidence, without prejudice or sympathy. That was the promise you made and the oath you took.[2]

---

[2] Tenth Circuit Criminal Pattern Jury Instructions § 1.04.

## EVIDENCE—DEFINED

You must make your decision based only on the evidence that you saw and heard here in court.  Do not let rumors, suspicions, or anything else that you may have seen or heard outside of court influence your decision in any way.

The evidence in this case includes only what the witnesses said while they were testifying under oath and the exhibits that I allowed into evidence.

Nothing else is evidence.  The lawyers' statements and arguments are not evidence.  Their questions and objections are not evidence.  My legal rulings are not evidence.  And my comments and questions are not evidence.

During the trial, I did not let you hear the answers to some of the questions that the lawyers asked.  I also ruled that you could not see some of the exhibits that the lawyers wanted you to see.  You must completely ignore all of these things.  Do not even think about them.  Do not speculate about what a witness might have said or what an exhibit might have shown.  These things are not evidence, and you are bound by your oath not to let them influence your decision in any way.[3]

---

[3] Tenth Circuit Criminal Pattern Jury Instructions § 1.06.

## DIRECT AND CIRCUMSTANTIAL EVIDENCE

There are, generally speaking, two types of evidence from which a jury may properly determine the facts of a case.  One is direct evidence, such as the testimony of an eyewitness.  The other is indirect or circumstantial evidence, that is, the proof of a chain of facts which point to the existence or non-existence of certain other facts.

As a general rule, the law makes no distinction between direct and circumstantial evidence.  The law simply requires that you find the facts in accord with all the evidence in the case, both direct and circumstantial.

While you must consider only the evidence in this case, you are permitted to draw reasonable inferences from the testimony and exhibits, inferences you feel are justified in the light of common experience.  An inference is a conclusion that reason and common sense may lead you to draw from facts which have been proved.  By permitting such reasonable inferences, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts which have been established by the testimony and evidence in this case.[4]

---

[4] Tenth Circuit Criminal Pattern Jury Instructions § 1.07.

5

## INDICTMENT IS NOT EVIDENCE

The Defendant has been charged by the Government with violation of federal laws. The charges against the Defendant are contained in the second superseding indictment. The indictment is simply the description of the charges made by the Government against the Defendant; it is not evidence of anything. The Defendant pleaded not guilty to the charges and denies committing the offenses. He is presumed innocent and may not be found guilty by you unless all twelve of you unanimously find that the Government has proved his guilt beyond a reasonable doubt.[5]

---

[5] Fed. Jury Prac. and Instr. § 1.

## **SEPARATE CRIMES**

A separate crime is charged in each count of the indictment.  You must separately consider the evidence on each count and return a separate verdict.

Your verdict as to any one count, whether guilty or not guilty, should not influence your verdict as to any other count.[6]

---

[6] Stipulated Instruction #12.

## CAUTION—CONSIDER ONLY CRIMES CHARGED

You are here to decide whether the Government has proved beyond a reasonable doubt that the Defendant is guilty of the crimes charged. The Defendant is not on trial for any act, conduct, or crime not charged in the indictment.

It is not up to you to decide whether anyone who is not on trial in this case should be prosecuted for any of the crimes charged. The fact that another person also may be guilty is no defense to a criminal charge.

The question of the possible guilt of others should not enter your thinking as you decide whether this defendant has been proved guilty of the crimes charged.[7]

---

[7] Stipulated Instruction #13.

## **BURDEN OF PROOF**

The Government has the burden of proving the Defendant guilty beyond a reasonable doubt.  The law does not require a defendant to prove his innocence or produce any evidence at all.  The Government has the burden of proving the Defendant guilty beyond a reasonable doubt, and if it fails to do so, you must find the Defendant not guilty.

Proof beyond a reasonable doubt is proof that leaves you firmly ~~convicted~~ *Convinced WJM* of the Defendant's guilt.  There are few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt.  It is only required that the Government's proof exclude any "reasonable doubt" concerning the Defendant's guilt.  A reasonable doubt is a doubt based on reason and common sense after careful and impartial consideration of all the evidence in this case.  If, based on your consideration of the evidence, you are firmly convinced that the Defendant is guilty of the crimes charged, you must find him guilty.  If on the other hand, you think there is a real possibility that he is not guilty, you must give him the benefit of the doubt and find him not guilty.[8]

---

[8] Tenth Circuit Criminal Pattern Instructions § 1.05.

## RECORDED CONVERSATIONS

During trial, you heard sound recordings of certain conversations.  These conversations were legally recorded; they are a proper form of evidence and may be considered by you as you would any other evidence.

Sometimes these recordings contained captioning.  Captions are not evidence. They were given to you only as a guide to help you follow what was being said.  The recordings themselves are the evidence.  If you noticed any differences between what you heard on the recordings and what you read in the captions, you must rely on what you heard, not what you read.  If you could not hear or understand certain parts of the recordings, you must ignore the captions as far as those parts are concerned.[9]

---

[9] Tenth Circuit Pattern Jury Instructions—Criminal § 1.40 (modified).

## **SUMMARIES AND CHARTS**

Exhibit 409 was shown to you as a demonstrative to help explain the evidence in this case.  Its only purpose is to help explain the evidence.  This summary is not evidence or proof of any facts.[10]

---

[10] Stipulated Instruction #8.

## CREDIBILITY OF WITNESSES

You are not required to accept all of the evidence as true or accurate.  You are the sole judges of the credibility or "believability" of each witness and the weight to be given to the witness's testimony.  An important part of your job will be making judgments about the testimony of the witnesses who testified in this case.

You should think about the testimony of each witness you have heard and decide whether you believe all or any part of what each witness had to say, and how important that testimony was. In making that decision, I suggest that you ask yourself a few questions:

- Did the witness impress you as honest?
- Did the witness have any particular reason not to tell the truth?
- Did the witness have a personal interest in the outcome in this case?
- Did the witness have any relationship with either party?
- Did the witness seem to have a good memory?
- Did the witness clearly see or hear the things about which he/she testified?
- Did the witness have the opportunity and ability to understand the questions clearly and answer them directly?
- Did the witness's testimony differ from the testimony of other witnesses?

When weighing the conflicting testimony, you should consider whether the discrepancy has to do with a material fact or with an unimportant detail.  And you should keep in mind that innocent misrecollection—like failure of recollection—is not uncommon.

In reaching a conclusion on particular point, or ultimately in reaching a verdict in

this case, do not make any decisions simply because there were more witnesses on one side than on the other.[11]

---

[11] Tenth Circuit Criminal Pattern Jury Instructions § 1.08 (modified).

## CO-CONSPIRATOR—INFORMANT

A co-conspirator is someone who joined with another person in committing a crime, voluntarily and with common intent.  The testimony of a co-conspirator may be received in evidence and considered by you, even though it is not supported by other evidence.  You may decide how much weight it should have.

You are to keep in mind, however, that co-conspirator testimony should be received with caution and considered with great care.  You should not convict a defendant based on the unsupported testimony of an alleged co-conspirator, unless you believe the unsupported testimony beyond a reasonable doubt.

An informant is someone who provides evidence against someone else for a personal reason or advantage.  The testimony alone, if believed by the jury, may be of sufficient weight to sustain a verdict of guilt, even though not corroborated or supported by other evidence.  You must examine and weigh an informant's testimony with greater care than the testimony or evidence acquired as a result of actions of an ordinary witness.  You must determine whether the informant's testimony has been affected by self-interest, by an agreement he has with the Government, by his own interest in the outcome of the case, or by prejudice against a defendant.

You should not convict a defendant based on the unsupported testimony of an informant, unless you believe the unsupported testimony or evidence beyond a reasonable doubt.[12]

---

[12] Stipulated Instruction #17.

## ACCOMPLICE—CO-DEFENDANT—PLEA AGREEMENT

The Government has called as witnesses alleged accomplices, William Sears and Scott Dittman, who were identified as co-conspirators in the conspiracy alleged in the indictment. The Government has entered into plea agreements with them. Plea bargaining is lawful and proper, and the rules of the court expressly provide for it.

An alleged accomplice, including one who has entered into a plea agreement with the Government, is not prohibited from testifying. On the contrary, the testimony of an alleged accomplice may, by itself, support a guilty verdict. You should never convict a defendant upon the unsupported testimony of an alleged accomplice, unless you believe that testimony beyond a reasonable doubt. The act that an accomplice has entered a guilty plea to the offense charged is not evidence of the guilt of any other person.[13]

---

[13] Stipulated Instruction #18.

## NON-TESTIFYING DEFENDANT

The Defendant did not testify and I instruct you that you cannot consider his decision not to testify as evidence of guilt.  You must understand that the Constitution of the United States grants to a defendant the right to remain silent.  That means the right not to testify.  That is a constitutional right in this country, it is very carefully guarded, and you should understand that no presumption of guilt may be raised and no inference of any kind may be drawn from the fact that a defendant does not take the witness stand and testify.[14]

---

[14] Tenth Circuit Pattern Jury Instructions—Criminal § 1.08.1.

## IMPEACHMENT BY PRIOR CONVICTION

The testimony of a witness may be discredited or impeached by showing that the witness previously has been convicted of a felony, meaning a crime punishable by imprisonment for a term of years, or of a crime of dishonesty.  A prior conviction does not mean that a witness is not qualified to testify, but is merely one circumstance that you may consider in determining the credibility of the witness.  You may decide how much weight to give any prior felony conviction or crime of dishonesty that was used to impeach a witness.[15]

*Instruction Not Given  WJM  29 Jan 2019*

---

[15] Tenth Circuit Pattern Jury Instructions—Criminal  § 1.12.

## SIMILAR ACTS

You have heard evidence of other wrongful acts engaged in by the Defendant. You may consider that evidence only as it bears on the Defendant's intent, preparation, plan, or knowledge with respect to the crimes charged here, and for no other purpose. Of course, the fact that the Defendant may have previously committed an act similar to the one charged in this case does not mean that the Defendant necessarily committed the act charged in this case.[16]

---

[16] Tenth Circuit Pattern Jury Instructions—Criminal § 1.30.

## **EXPERT WITNESS**

In some cases, such as this one, scientific, technical, or other specialized knowledge may assist the jury in understanding the evidence or in determining a fact in issue. A witness who has knowledge, skill, experience, training or education, may testify and state an opinion concerning such matters.

During the trial you heard the testimony of Alex Scoufis, Steven Thel, and Erik Gerding, who were designated as expert witnesses. You are not required to accept their opinions. You should consider opinion testimony just as you consider other testimony in this trial. Give opinion testimony as much weight as you think it deserves, considering the education and experience of the witness, the soundness of the reasons given for the opinion, and other evidence in the trial.[17]

---

[17] Tenth Circuit Pattern Jury Instructions—Criminal  § 1.17 (modified).

## **TESTIFYING UNDER A PSEUDONYM**

I allowed a Federal Bureau of Investigation Undercover Agent (FBI UCA-1) to testify under a pseudonym (fictitious name) at trial. You may not consider the use of pseudonym by FBI UCA-1 in your deliberations.[18]

---

[18] Stipulated Instruction #22.

## **NUMBER OF WITNESSES**

The weight of the evidence is not necessarily determined by the number of witnesses testifying to the existence or nonexistence of any fact.  You may find that the testimony of a small number of witnesses as to any fact is more credible than the testimony of a larger number of witnesses to the contrary.

You are not bound to decide any issue of fact in accordance with the testimony of any number of witnesses that does not produce in your minds belief in the likelihood of truth, as against the testimony of a lesser number of witnesses or other evidence producing such belief in your minds.

The test is not which side brings the greater number of witnesses or takes the most time to present its evidence, but which witnesses and which evidence appeal to your minds as being most accurate and otherwise trustworthy.[19]

---

[19] 3 Fed. Jury Prac. & Instr. § 104.54 (5th ed.).

21

## **LAWYERS' OBJECTIONS**

The lawyers for both sides objected to some of the things that were said or done during the trial. Do not hold that against either side. The lawyers have a duty to object whenever they think that something is not permitted by the rules of evidence. Those rules are designed to make sure that both sides receive a fair trial.

Do not interpret my rulings on their objections as any indication of how I think the case should be decided. My rulings were based on the rules of evidence, not on how I feel about the case.[20]

---

[20] Sixth Circuit Criminal Pattern Jury Instructions § 1.09.

## **PART II: ELEMENTS OF CRIMES CHARGED**

That concludes the part of my instructions explaining your duties and the general rules that apply in every criminal case.  Now I will explain the elements of the crimes charged in this case.

## COUNT 1: CONSPIRACY ELEMENTS

The Defendant is charged in count 1 with a violation of Title 18, United States Code, Section 371. This statute makes it a crime to conspire to commit an offense against the United States or to defraud the United States or an agency of the United States, in this case the Securities and Exchange Commission.

As alleged in the indictment, the defendant is charged with conspiring with William J. Sears, Scott M. Dittman and with other persons to commit securities fraud, a violation of Rule 10b-5 of the Securities and Exchange *Commission* and to defraud the United States Securities and Exchange Commission by impeding, impairing, defeating or obstructing its lawful functions.

To find the Defendant guilty under count 1, you must be convinced that the Government has proved each of the following beyond a reasonable doubt:

*First*: the Defendant agreed with at least one other person to commit securities fraud, or to violate Rule 10-b(5), as described later in these instructions, or to defraud the SEC, by impeding, impairing, defeating or obstructing its lawful functions;

*Second*: at least one of the conspirators engaged in at least one overt act furthering any of the conspiracy's objectives;

*Third*: the Defendant knew the essential objective of the conspiracy;

*Fourth*: the Defendant knowingly and voluntarily participated;

*Fifth*: there was interdependence among the members of the conspiracy; that is, the members, in some way or manner, intended to act together for their shared mutual benefit within the scope of the conspiracy charged.

### Conspiracy—Agreement

A conspiracy is an agreement between two or more persons to accomplish an

unlawful purpose. It is a kind of "partnership in criminal purposes" in which each member becomes the agent or partner of every other member.  Once a person becomes a member of a conspiracy, he is held legally responsible for the acts of the other members done in furtherance of the conspiracy, even though he was not present or aware that the acts were being committed. An agreement to violate the law can be inferred by the conduct of the parties, as well as the facts and circumstances of the case. Likewise, the jury may infer that a defendant is a knowing and voluntary participant in a conspiracy when he acts in furtherance of the conspiracy's objectives. But mere similarity of conduct among various persons, and the fact they may have associated with each other, and may have assembled together and discussed common aims and interests, does not necessarily establish proof of the existence of a conspiracy.

The evidence in the case need not show that the members entered into any express or formal agreement. Nor is it necessary that the evidence show that the members stated between themselves what their object or purpose was to be, or the details thereof, or the means by which the object or purpose was to be accomplished. In order to establish proof that a conspiracy existed, the evidence must show beyond a reasonable doubt that the members in some way or manner, or through some contrivance, expressly or impliedly came to a mutual understanding to try to accomplish a common and unlawful plan.

**Overt Acts**

The Government must prove that at least one overt act was committed by at least one co-conspirator.  An overt act is an act done in furtherance of the conspiracy. An overt act does not itself have to be unlawful. A lawful act may be an overt act of a

25

conspiracy if it was done for the purpose of carrying out the conspiracy.  The

Conspirators        wJm

Government is not required to prove that each of the ~~Defendants~~ personally did one of

the overt acts.  The Government need only prove that at least one of the co-

conspirators, including uncharged co-conspirators, committed at least one overt act in

furtherance of the conspiracy.

### Membership in Conspiracy

If you conclude from the evidence beyond a reasonable doubt that a conspiracy

as charged did exist, then you must next determine whether the Defendant was a

member of that conspiracy, that is, whether the Defendant participated in the conspiracy

with knowledge of its unlawful purposes and in furtherance of its unlawful objectives.  In

determining whether the Defendant was a member of the conspiracy, the jury must

consider only his acts and statements.  The Defendant cannot be bound by the acts or

declarations of other participants until it is established that a conspiracy existed, and

that he was one of its members.  And mere association, standing alone, is inadequate.

However, the jury may infer the presence of a conspiracy from the Defendant's conduct

and other circumstantial evidence indicating coordination and concert of action.

### Interdependence

To be a member of the conspiracy, the Defendant need not know all of the other

members or all of the details of the conspiracy, nor the means by which the objects

were to be accomplished.  Each member of the conspiracy may perform separate and

distinct acts.  It is necessary, however, that for the Defendant to be a member of the

conspiracy, the Government must prove beyond a reasonable doubt that he was aware

of the common purpose and was a willing participant with the intent to advance the

purposes of the conspiracy. In other words, while a defendant need not participate in all

the acts or statements of the other members of the conspiracy to be bound by them, the acts or statements must be interdependent so that each member of the conspiracy depends upon the acts and statements of the other conspirators to make the conspiracy succeed.

### Extent of Participation

The extent of a defendant's participation in the conspiracy is not relevant to whether he is guilty or not guilty. A defendant may be convicted as a conspirator even though he plays a minor part in the conspiracy.

### Unanimity of Theory

Your verdict must be unanimous. Count 1 accuses the Defendant and/or his co-conspirators of committing several overt acts in furtherance of the conspiracy. The Government does not have to prove all of these different acts for you to return a guilty verdict on count 1. But in order to return a guilty verdict, all twelve of you must agree upon which of the listed acts, if any, the Defendant and/or his co-conspirators committed *and* that at least the Defendant and/or his co-conspirators committed at least one of the acts listed.[21]

---

[21] Stipulated Instruction #25, as revised by ECF No. 200-1.

## COUNTS 2–16 AND 24–28: WIRE FRAUD ELEMENTS

The Defendant is charged in counts 2–16 and 24–28 with wire fraud, in violation of Title 18, United States Code, Section 1343, or with aiding and abetting wire fraud, in violation of Title 18, United States Code, Section 2(a).  Specifically, counts 2–16 address aiding and abetting wire fraud only, while counts 24–28 address both wire fraud itself and, alternatively, aiding and abetting wire fraud.

The law regarding wire fraud makes it a crime to use interstate wire communication facilities in carrying out a scheme to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or attempting to do so.

To find the Defendant guilty on any of counts 24–28, you must be convinced that the Government has proved each of the following beyond a reasonable doubt:

*First*: the defendant devised or intended to devise a scheme to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises, or attempting to do so;

*Second*: the Defendant acted with specific intent to defraud;

*Third*: the Defendant used interstate wire communications facilities, or caused another person to use interstate wire communications facilitates for the purpose of carrying out the scheme;

*Fourth*: the scheme employed false or fraudulent pretenses, representations, or promises that were material.

A "scheme to defraud" is conduct intended to or reasonably calculated to deceive persons of ordinary prudence or comprehension. A "scheme to defraud" includes a

scheme to deprive another of money, property or the intangible right of honest services.

An "intent to defraud" means an intent to deceive or cheat someone.

A representation is "false" if it is known to be untrue or is made with reckless indifference as to its truth or falsity. A representation would also be "false" when it constitutes a half truth, or effectively omits or conceals a material fact, provided it is made with intent to defraud.

A false statement is "material" if it has a natural tendency to influence, or is capable of influencing, the decision of the person or entity to which it is addressed.

What must be proved beyond a reasonable doubt is that the Defendant devised or intended to devise a scheme to defraud that was substantially the same as the one alleged in the indictment, and that the use of a wire was closely related to the scheme, in that the Defendant sent a wire or caused a wire to be transmitted in an attempt to execute or carry out the scheme. To "cause" interstate wire communications facilities to be used is to do an act with knowledge that the use of the wire facilities will follow in the ordinary course of business or where such use can reasonably be foreseen.

### Aiding and Abetting Wire Fraud

Title 18, United States Code, Section 2, provides: "Whoever commits an offense against the United States, or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." This law makes it a crime to intentionally help someone else commit a crime.

Under counts 2–16, the Defendant is charged only with aiding and abetting the commission of wire fraud.

Under counts 24–28, in addition to being charged with wire fraud itself, the Defendant is alternatively charged with aiding and abetting wire fraud.

To find the Defendant guilty of aiding and abetting wire fraud under any of counts 2–16 or 24–28, you must be convinced that the Government has proved each of the following beyond a reasonable doubt:

*First*: someone else committed wire fraud as charged in the indictment, under the elements described previously; and

*Second*: the Defendant intentionally associated himself in some way with the crime and intentionally participated in it as he would in something he wished to bring about.  This means that the Government must prove that the Defendant consciously shared the other person's knowledge of the underlying criminal act and intended to help that person.

The Defendant need not perform the underlying criminal act, be present when it is performed, or be aware of the details of its commission to be guilty of aiding and abetting.  But a general suspicion that an unlawful act may occur or that something criminal is happening is not enough.  Mere presence at the scene of a crime and knowledge that a crime is being committed are also not sufficient to establish aiding and abetting.

## DEFINITIONS OF WIRE FRAUD TERMS

The use of interstate wire or radio (wireless) communications are considered a use of an interstate wire communications facility.

Interstate communications are communications that cross state lines.

A "wire communication" includes telephone calls, electronic signals sent by wire (such as a fax or a financial wire), the use of the internet to send a message (such as an e-mail), and communicating with a website via the internet.

The phrase "transmits by means of wire, radio, or television communication in interstate commerce" means to send from one state to another by means of telephone or telegraph lines or by means of radio or television.

The phrase "transmits by means of wire, radio, or television communication in interstate commerce" includes a telephone conversation by a person in one state with a person in another state.

The use of a wire, radio, or television communication facility in interstate commerce is an essential element of the offense of wire fraud. But the Government need not prove that the Defendant or another person specifically decided that he would further, advance, or carry out the scheme or plan to defraud through wire, radio, or television communications. The Government must prove beyond a reasonable doubt, however, that a transmission by a wire, radio, or television communication facility in interstate commerce was, in fact, used in some manner to further, advance, or carry out the scheme to defraud. The Government must also prove that the use of the wire, radio, or television communication in interstate commerce would follow in the ordinary course of business or events or that the use of the wire, radio, or television communication

facility in interstate commerce by someone was reasonably foreseeable.

It is not necessary for the Government to prove that the information transmitted by means of wire, radio, or television communication in interstate commerce itself was false or fraudulent or contained any false or fraudulent pretense, representation, or promise, or contained any request for money or thing of value. The Government must prove beyond a reasonable doubt, however, that the use of the wire, radio, or television communication in interstate commerce furthered, or advanced, or carried out, in some way, the scheme or plan to defraud.[23]

---

[23] Stipulated Instruction #27 (modified).

## COUNTS 17–20: MAIL FRAUD ELEMENTS

The Defendant is charged in counts 17–20 with aiding and abetting mail fraud in violation of Title 18, United States Code, Section 1341 and Title 18, United States Code, Section 2(a).

The law regarding mail fraud makes it a crime to use the mails in carrying out a scheme to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations or promises, or attempting to do so. And, as I mentioned before, Title 18, United States Code, Section 2 makes it a crime to intentionally help someone else commit a crime.

To find the Defendant guilty of aiding and abetting mail fraud under any of counts 17–20, you must be convinced that the Government has proved each of the following beyond a reasonable doubt:

*First*: someone else committed mail fraud as charged in the indictment; and

*Second*: the Defendant intentionally associated himself in some way with the crime and intentionally participated in it as he would in something he wished to bring about. Just as before, this means that the Government must prove that the Defendant consciously shared the other person's knowledge of the underlying criminal act and intended to help that person.

As I stated previously, the Defendant need not perform the underlying criminal act, be present when it is performed, or be aware of the details of its commission to be guilty of aiding and abetting. But a general suspicion that an unlawful act may occur or that something criminal is happening is not enough. Mere presence at the scene of a crime and knowledge that a crime is being committed are also not sufficient to establish

aiding and abetting.

The first element of aiding and abetting mail fraud requires the Government to prove that someone else committed mail fraud. To find as much, you must be convinced that the Government has proved each of the following beyond a reasonable doubt:

*First*: someone else devised or intended to devise a scheme to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises, or attempted to do so;

*Second*: that person acted with specific intent to defraud;

*Third*: that person mailed something, or caused another person to mail something through a commercial interstate carrier for the purpose of carrying out the scheme; and

*Fourth*: the scheme employed false or ^fraudulent pretenses, representations, or promises that were material. WJM

A "scheme to defraud" is conduct intended to or reasonably calculated to deceive persons of ordinary prudence or comprehension. A "scheme to defraud" includes a scheme to deprive another of money, property or the intangible right of honest services.

An "intent to defraud" means an intent to deceive or cheat someone.

A representation is "false" if it is known to be untrue or is made with reckless indifference as to its truth or falsity. A representation would also be "false" when it constitutes a half truth, or effectively omits or conceals a material fact, provided it is made with intent to defraud.

A false statement is "material" if it has a natural tendency to influence, or is capable of influencing, the decision of the person or entity to which it is addressed.

What must be proved beyond a reasonable doubt is that the person devised or intended to devise a scheme to defraud that was substantially the same as the one alleged in the indictment, and that the use of the mails was closely related to the scheme, in that the person either mailed something or caused it to be mailed in an attempt to execute or carry out the scheme. To "cause" the mails to be used is to do an act with knowledge that the use of the mails will follow in the ordinary course of business or where such use can reasonably be foreseen even though the Defendant did not intend or request the mails to be used.[24]

---

[24] Stipulated Instruction #28, as revised by ECF No. 200-3 (modified).

## COUNTS 21–23: SECURITIES FRAUD ELEMENTS

Counts 21–23 charge the Defendant with committing securities fraud in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5, or aiding and abetting this offense, in violation of Title 18, United States Code, Section 2(a).

These laws make it a crime to willfully employ a device, scheme, or artifice to defraud, willfully make statements or material omissions, or willfully engage in a transaction or course of business which operated or would operate as a fraud and deceit on any person, in connection with the purchase or sale of any security.

To find the Defendant guilty of this crime under any of counts 21–23 you must be convinced that the Government has proved each of the following beyond a reasonable doubt:

*First*: the Defendant knowingly and willfully (a) employed any device, scheme, or artifice to defraud; or (b) made any untrue statement of a material fact; or (c) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (d) engaged in a transaction, practice, or course of business which operated or would operate as a fraud and deceit on any person;

*Second*: the Defendant did so in connection with the purchase or sale of securities;

*Third*: the Defendant made use of, or caused the use of, (a) any means or instrumentality of interstate commerce, or (b) of the mails, or (c) of any facility of any national securities exchange, in connection with the purchase or sale of securities; and

*Fourth*: the defendant acted with the intent to defraud.

Information is "material" if there is a substantial likelihood that a reasonable investor would have considered it important in deciding whether to buy, sell, or hold a security and at what price to buy, sell, or hold the security. In other words, there must be a substantial likelihood that a reasonable investor would have viewed the information at issue as significantly altering the total mix of information available. Materiality of information is judged as of the time the information is used to trade.

A person uses information in connection with trading a stock or options when that information is a factor, however small, in his or her decision to buy or sell the stock or option. You may find that a person's conduct was "in connection with the purchase or sale of securities" even if there was no evidence that other purchasers or sellers were harmed.

"Intent to defraud" in the context of the securities laws means to act knowingly and with the intent to deceive. For a person to have acted with the intent to defraud means that he must have known of the fraudulent nature of the scheme and acted with intent that it succeed.

The question of whether a person acted knowingly and with the intent to defraud is a question of fact for you to determine like any other fact question. This question involves one's state of mind.

The term "instrumentality of interstate commerce" means instruments, devices, and means of conducting trade, commerce, transportation, or communication among any two states. Instrumentality of interstate commerce includes the use purely within one state of a telephone or any other instrument used in the conduct of interstate

commerce.

The term "facility of a national securities exchange" includes any property or services maintained by Over the Counter Markets.

It is not necessary that the defendant be directly or personally involved in the use of an instrumentality of interstate commerce or use of any facility of a national security exchange. It is enough for you to find that the defendant was an active participant in a scheme and took steps or engaged in conduct that he knew or could reasonably foresee would naturally and probably result in the use of an instrumentality of interstate commerce or use of a facility of a national securities exchange. This includes placing a telephone call, e-mail, or an order to a brokerage firm to buy or sell securities.

It is not necessary that the communication over the instrumentality of interstate commerce concern any fraudulent material or anything criminal or objectionable. The matter communicated may be entirely innocent so long as it is in furtherance of a scheme to defraud or fraudulent conduct.

The use of an instrumentality of interstate commerce need not be central to the execution of the scheme and may even be incidental to it. All that is required is that the use of an instrument of interstate commerce bore some relationship to the object of the scheme or fraudulent conduct.

Each specific use of an instrumentality of interstate commerce in furtherance of a scheme to defraud constitutes a separate and distinct criminal offense.

**Aiding and Abetting Securities Fraud**

The Defendant is alternatively charged with aiding and abetting the commission of securities fraud, again under Title 18, United States Code, Section 2. To find the Defendant guilty of aiding and abetting securities fraud under any of counts 21–23, you

must be convinced that the Government has proved each of the following beyond a reasonable doubt:

*First*: someone else committed securities fraud as charged in the indictment; and

*Second*: the Defendant intentionally associated himself in some way with the crime and intentionally participated in it as he would in something he wished to bring about. As before, this means that the Government must prove that the Defendant consciously shared the other person's knowledge of the underlying criminal act and intended to help that person.

Again, the Defendant need not perform the underlying criminal act, be present when it is performed, or be aware of the details of its commission to be guilty of aiding and abetting. But a general suspicion that an unlawful act may occur or that something criminal is happening is not enough. Mere presence at the scene of a crime and knowledge that a crime is being committed are also not sufficient to establish aiding and abetting.[25]

---

[25] Court's own formulation based on Government's Disputed Instruction #29, as revised by ECF No. 201-1; Defendant's Disputed Instruction #A; and 2B Fed. Jury Prac. & Instr. §§ 62:05 & 62:07 (6th ed.).

## DEFINITION OF "IN CONNECTION WITH THE PURCHASE OR SALE OF ANY SECURITY"

Counts 21–23 of the indictment allege certain types of fraudulent conduct "in connection with the purchase or sale of any security." The Government must prove beyond a reasonable doubt, therefore, that there were purchases or sales of securities and that the "fraud or deceit" described in the indictment had some relationship to or was connected with these sales or purchases.

The Government need not show, however, that the Defendant, or anyone associated with him bought or sold the securities in question.

It is sufficient to establish that there were purchases or sales or both and that the conduct was of the type that would cause reasonable investors to rely and that some did so rely.[26]

---

[26] Stipulated Instruction #30.

## DEFINITION OF "THE USE OF ANY MEANS OR INSTRUMENTALITY OF INTERSTATE COMMERCE OR OF THE MAILS, OR OF ANY NATIONAL SECURITIES EXCHANGE"

The term "interstate commerce" as used in these instructions means trade or commerce in securities or any transportation or communication relating to such trade or commerce among the several states.

This element of the crime charged may be established if the Government proves beyond a reasonable doubt that any means or instrumentality of interstate transportation or communication, including the mails, or the facilities of a national securities exchange were, in fact, used in the scheme or that such use was reasonably foreseeable.

In this regard, however, it is not necessary for the Government to prove that the Defendant personally used any means or instrumentality of interstate commerce or the mails, or used a national exchange, or that such use was contemplated or intended by anyone involved in any scheme. It is sufficient for the Government to prove that the Defendant set forces in motion which foreseeably resulted in such use.

The matter, material, or information mailed, transported, or communicated need not itself contain a fraudulent representation or request money, but must be a part of the overall scheme.[27]

---

[27] Stipulated Instruction #31.

## DEFINITIONS UNDER SECURITIES LAWS

The securities laws relevant to this case have a number of definitions that you must know.

Security:  The term "security" means any note, stock, security-based swap, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

Restricted Security:  The term restricted securities means securities acquired directly or indirectly from the issuer, or from an affiliate of the issuer, in a transaction or chain of transactions not involving any public offering.

Sale or Sell:  The term "sale" or "sell" shall include every contract of sale or disposition of a security or interest in a security, for value. The term "offer to sell", "offer for sale", or "offer" shall include every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value.

Person:  The term "person" means an individual, a corporation, a partnership, an association, a joint-stock company, a trust, or any unincorporated organization subdivision thereof.

Issuer:  The term "issuer" means every person who issues or proposes to issue any security.

Underwriter:  The term "underwriter" means any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the

distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking. As used in this definition, the term "issuer" shall include, in addition to the definition of "issuer" above, any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer.[28]

---

[28] Stipulated Instruction #33, as revised by ECF No. 200-4.

## RULE 144

Rule 144 under the Securities Act provides certain requirements for resellers to avoid being classified as an underwriter. These rules vary on whether or not an individual is classified as an "affiliate." Rule 144(a)(1) defines an "affiliate" to mean "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with the issuer." Rule 405 under the Securities Act defines "control" to mean "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise."

If a person is considered an affiliate, additional requirements must be met in order to sell securities since the securities will be termed "restricted securities" since the securities are acquired directly or indirectly from the issuer, or from an affiliate of the issuer, in a transaction or chain of transactions not involving any public offering. The additional requirements include a holding period, limitation on amount of securities sold, manner of sale, and requirement for brokers' transactions to include a reasonable inquiry.[28]

---

[28] Government's Proposed Instruction #32 & Defendant's Proposed Instruction #B (modified).

## COUNT 29: MONEY LAUNDERING ELEMENTS

The Defendant is charged in count 29 with money laundering, in violation of Title 18, United States Code, Section 1956(a)(3)(B), or aiding and abetting this offense, in violation of Title 18, United States Code, Section 2(a).

This law makes it a crime to knowingly use what is represented to be the proceeds of specified unlawful activity to conceal or disguise the nature, location, source, ownership or control of the property believed to be the proceeds of specified unlawful activity.

To find the Defendant guilty under count 29, you must be convinced that the Government has proved each of the following beyond a reasonable doubt:

*First*: the Defendant conducted or attempted to conduct a financial transaction, or the Defendant aided and abetted others to conduct or attempt to conduct a financial transaction;

*Second*: the financial transaction involved property that was represented by a person acting at the direction of, or with the approval of, an agent of the United States, to be the proceeds of specified unlawful activity;

*Third*: the financial transaction was believed by the Defendant to be the proceeds of wire fraud or securities fraud;

*Fourth*: the Defendant conducted, or aided and abetted others to conduct the financial transaction or the attempted financial transaction with the intent to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of wire fraud or securities fraud.

The term "conducts" includes initiating, concluding, or participating in initiating or

45

concluding, a transaction.

The term "financial transaction" means: (A) a transaction involving the use of a financial institution that is engaged in, or the activities of which affect, interstate commerce in any way or degree; or (B) a transaction that in any way or degree affects interstate commerce, and that involves: (1) the movement of funds by wire or other means; or (2) one or more monetary instruments; or (3) the transfer of title to any real property, vehicle, vessel, or aircraft.

The term "proceeds" means any property derived from or obtained or retained, directly or indirectly, through specified unlawful activity, including the gross receipts of such activity.

"Interstate commerce" means commerce or travel between the states, territories or possessions of the United States, including the District of Columbia. It is not necessary that the Defendant have intended or anticipated an effect on interstate commerce. All that is necessary is that the natural and probable consequence of the acts the Defendant took would be to affect interstate commerce.

**Aiding and Abetting Money Laundering**

The Defendant is alternatively charged with aiding and abetting the commission of money laundering under the same statute mentioned previously, Title 18, United States Code, Section 2.

To find the Defendant guilty under count 29 of aiding and abetting money laundering, you must be convinced that the Government has proved each of the following beyond a reasonable doubt:

*First*: someone else committed money laundering as charged in the indictment; and

*Second*: the Defendant intentionally associated himself in some way with the crime and intentionally participated in it as he would in something he wished to bring about. Once more, this means that the Government must prove that the Defendant consciously shared the other person's knowledge of the underlying criminal act and intended to help that person.

The Defendant need not perform the underlying criminal act, be present when it is performed, or be aware of the details of its commission to be guilty of aiding and abetting. But a general suspicion that an unlawful act may occur or that something criminal is happening is not enough. Mere presence at the scene of a crime and knowledge that a crime is being committed are also not sufficient to establish aiding and abetting.[30]

---

[30] Stipulated Instruction #34.

## **KNOWINGLY**

When the word "knowingly" is used in these instructions, it means that the act was done voluntarily and intentionally, and not because of mistake or accident.

Although knowledge on the part of the Defendant cannot be established merely by demonstrating that the Defendant was negligent, careless, or foolish, knowledge can be inferred if the Defendant deliberately blinded himself to the existence of a fact.

Knowledge can be inferred if the Defendant was aware of a high probability of the existence of the fact in question, unless the Defendant did not actually believe the fact in question.[31]

---

[31] Stipulated Instruction #23.

## **PROOF OF KNOWLEDGE OR INTENT**

The intent of a person or the knowledge that a person possesses at any given time may not ordinarily be proved directly because there is no way of directly scrutinizing the workings of the human mind. In determining the issue of what a person knew or what a person intended at a particular time, you may consider any statements made or acts done or omitted by that person and all other facts and circumstances received in evidence which may aid in your determination of that person's knowledge or intent.

You may infer, but you are certainly not required to infer, that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted. It is entirely up to you, however, to decide what facts to find from the evidence received during this trial.

No matter what you infer, you must remember that the burden is always on the Government to prove the elements of the offense charged beyond a reasonable doubt.[32]

---

[32] Stipulated Instruction #24.

## **CAUTION—PUNISHMENT**

If you find the Defendant guilty, it will be my duty to decide what the punishment will be.  You should not discuss or consider the possible punishment in any way while deciding your verdicts.[33]

---
[33] Stipulated Instruction #35.

## PART III: DELIBERATION AND VERDICT FORM

That concludes the part of my instructions explaining the law that applies in this case.  Now let me finish up by explaining some things about your deliberations in the jury room and your possible verdicts.

## DUTY TO DELIBERATE

After the parties' closing statements, the bailiff will escort you to the jury room and provide each of you with a copy of the instructions that I have just read. Any exhibits admitted into evidence will also be placed in the jury room for your review.

When you go to the jury room, you should first select a foreperson, who will help to guide your deliberations and will speak for you here in the courtroom. The second thing you should do is review the instructions. Not only will your deliberations be more productive if you understand the legal principles upon which your verdict must be based, but for your verdict to be valid, you must follow the instructions throughout your deliberations.

To reach a verdict, whether not guilty or guilty on any particular count, all of you must agree. Your verdict must be unanimous. Your deliberations will be secret. You will never have to explain your verdict to anyone.

You must consult with one another and deliberate in an effort to reach agreement if you can do so. Each of you must decide the case for yourself, but only after an impartial consideration of the evidence with your fellow jurors. During your deliberations, do not hesitate to reexamine your own opinions and change your mind if convinced that you were wrong. But do not give up your honest beliefs solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

The Court has prepared a Verdict Form for your convenience. It reads as follows:

**[Explain the Verdict Form]**

After you have deliberated and consulted with each other, the foreperson will

write the unanimous answer of the jury in response to each question on the Verdict Form.

Only one copy of this Verdict Form will be provided to you.  If you make an error on the Form, please tell the bailiff.  The bailiff will destroy the erroneous form and a blank form will be provided.[34]

---

[34] Tenth Circuit Pattern Jury Instructions—Criminal § 1.23 (2011) (modified).

## **COMMUNICATION WITH THE COURT**

If you want to communicate with me at any time during your deliberations, please write down your message or question and give it to the bailiff, who will bring it to my attention. I will respond as promptly as possible, either in writing or by having you return to the courtroom so that I can address you orally. I caution you, however, that with any message or question you might send, you should not tell me any details of your deliberations or indicate how many of you are voting in a particular way on any issue.

Let me remind you again that nothing I have said in these instructions, nor anything I have said or done during the trial was meant to suggest to you what I think your decision should be. That is your exclusive responsibility.[25]

---

[25] Tenth Circuit Pattern Jury Instructions—Criminal § 1.44.

## PART IV: THE INDICTMENT

The portions of the indictment that you will need to assist your deliberations are reproduced below for your convenience.

You will note that the indictment charges that crimes were committed on or about specified dates. The Government must prove beyond a reasonable doubt that the Defendant committed the crime reasonably near the specified date.[35]

Some counts of the indictment may accuse a defendant of violating the same statute in more than one way. In other words, the indictment may allege that the statute in question was violated by various acts which are in the indictment joined by the conjunctive "and," while the statute and the elements of the offense are stated in the disjunctive, using the word "or." In these instances, it is sufficient for a finding of guilt if the evidence established beyond a reasonable doubt the violation of the statute by any one of the acts charged. In order for you to return a guilty verdict, however, all twelve of you must agree that the same act has been proven.[36]

Remember, the indictment is not evidence. You may not rely on anything said in the indictment to find the Defendant guilty on any charge, and you must not let the indictment influence your weighing of the evidence. You are receiving the indictment simply to help you understand what you are deliberating about when you consider each count.[37]

---

[35] Stipulated Instruction #10.

[36] Stipulated Instruction #11.

[37] Court's own formulation.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Criminal Case No. 17-cr-008-WJM

UNITED STATES OF AMERICA,

     Plaintiff,

v.

1.    **GUY M. JEAN-PIERRE**,
     a/k/a Marcello Dominguez de Guerra,

    Defendant.

---

## SECOND SUPERSEDING INDICTMENT

The Grand Jury charges:

## COUNT 1
(Conspiracy to Commit Securities Fraud)

1.    Beginning as early as on or about March 25, 2011 and continuing at least through on or about May 15, 2014, the exact dates being unknown, in the State and District of Colorado, and elsewhere, the defendant, GUY M. JEAN-PIERRE, a/k/a Marcelo Dominguez de Guerra, did knowingly and willfully conspire, combine and agree with Coconspirators WJS and SMD, and with other persons both known and unknown, (a) to defraud the United States and one of its agencies, the United States Securities and Exchange Commission ("SEC"), by impeding, impairing, defeating and obstructing the lawful governmental functions of the SEC; a (b) to commit the following offenses against the United States: (i) securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5 [Rule 10b-5].

56

Background

2.      FusionPharm, Inc. ("FusionPharm") was a corporation with its principal place of business in Denver, Colorado and later in Commerce City, Colorado. Although not registered with the SEC, the corporation's stock had been quoted on the OTC Link and had been publicly traded. In or about November 2010, Co-conspirator WJS, working with defendant JEAN-PIERRE, negotiated for control of the corporation, Baby Bee Bright Corporation, to be turned over to Co-conspirators WJS and SMD.

3.      With this change in control and ownership, FusionPharm's principal business became the development, manufacture and sale of steel shipping containers retrofitted and refurbished for use as hydroponic growing pods, branded as "PharmPods," for indoor plant cultivation, primarily cannabis. Co-conspirator SMD was held out to be the founder, Chief Executive Officer and sole Director of FusionPharm but, in fact, operated FusionPharm, and pursued and developed its business, together with Co-conspirator WJS, and the two Co-conspirators together beneficially held and controlled the majority of shares of FusionPharm's common and preferred stock.

4.      In disclosure documents filed in December 2011 and in March 2012 on the OTC Link website, defendant JEAN-PIERRE was described as FusionPharm's Corporate Secretary and, at times its Legal Counsel, as well as one of its paid employees. From its inception as FusionPharm through in or about August 2013, JEAN-PIERRE functioned as the company's de facto General Counsel and provided legal advice and services in connection with the company's corporate and securities matters.

5.      In October 2011, the Financial Industry Regulatory Authority, Inc. ("FINRA") was in the process of conducting an investigation, among other things, of trading activity

involving the common stock of FusionPharm, including sales of that common stock that were being conducted by or on behalf of Microcap Management, LLC ("Microcap"), an entity formed by Co-conspirator WJS. The brokerage account records relating to these stock sales included Rule 144 Attorney Letters authored by defendant JEAN-PIERRE's niece, Relative A. On or about October 5, 2011, an investigator for FINRA telephonically contacted Co-conspirator SMD to set up a telephone interview to discuss FusionPharm and its securities trading activities. The FINRA investigator interviewed SMD about these and related subjects the following day. As a part of the manner and means of carrying out the conspiracy, Co-conspirator SMD, in that interview and in follow up communications with the FINRA investigator, represented, in words and substance, among other things, that Co-conspirator WJS' role at FusionPharm was limited to being a part-time salesman; that he was unaware of WJS having owned or sold any FusionPharm stock; that WJS no longer owned Microcap; and that he would undertake to produce written confirmation of this to FINRA.

<u>Manner and Means of the Conspiracy</u>

6.      As a further part of the manner and means of carrying out the conspiracy, and attempting to do so, and in order to deflect FINRA's inquiry about FusionPharm stock sales by WJS and Microcap, Co-conspirators WJS and SMD and defendant JEAN-PIERRE undertook the following:

A.      On or about October 19, 2011, defendant JEAN-PIERRE, at WJS' request, prepared a stock purchase agreement and incorporated assignment of interest, back dated to May 9, 2011, that purported to convey to another individual ("Individual A") as of the May 9th date, all ownership interest that conspirator WJS had had in Microcap, and to transfer to Individual A all right and title in all Microcap brokerage accounts for the purchase price of $10.00. Individual

A worked with Co-conspirator WJS to sell Co-conspirator WJS' FusionPharm stock.

      B.     A short while thereafter, Co-conspirator WJS signed and backdated these documents and caused Individual A to do the same.

      C.     On or about November 30, 2011, Defendant JEAN-PIERRE, acting in his capacity as FusionPharm's Corporate Secretary, then drafted a letter responding to the FINRA investigators' renewed requests for follow up written information about WJS, the Microcap stock sales and the change in ownership of Microcap. Defendant JEAN-PIERRE provided a draft of the letter for review and approval by SMD and WJS, and following their review and approval, defendant JEAN-PIERRE sent this letter to the FINRA investigator in the form of an email. In this email, defendant JEAN-PIERRE characterized WJS as "a prior owner of Microcap" and indicated, in words and substance, in material part, that the requests concerning WJS and Microcap constituted non-company information that SMD was not authorized to produce to FINRA; that FusionPharm was not, in any event, in possession of the requested written information concerning WJS, Microcap or its new owner; and that FINRA should direct further requests for this information to Microcap.

      7.     It was a further part of the manner and means of carrying out the conspiracy, in order to generate additional FusionPharm common stock that could immediately be sold, without registration and without limitation, into the public securities markets, that Co- conspirators WJS and SMD, together with defendant JEAN-PIERRE, did and caused the following to be done:

      A.     Over the course of June 2012 through in or about December 2012, with the knowledge, advice and approval of defendant JEAN-PIERRE, Co-conspirators WJS and SMD, working together with another individual (identified hereinafter as, "Co-conspirator A"), fabricated promissory notes and incorporated credit line agreements, in order to portray some of

the money that had previously been deposited into FusionPharm's bank accounts from the Microcap FusionPharm stock sales as loans from Bayside Realty Holdings, LLC ("Bayside"). Bayside was an entity controlled and operated by Co-conspirator WJS that was held out to be managed and owned by a blood relative family member (hereinafter "Family Member A"), and Meadpoint Venture Partners ("Meadpoint"), an entity set up and controlled by Co-conspirator WJS, that had been extended to FusionPharm over a year before.

B.      Co-conspirators WJS and SMD and Co-Conspirator A fabricated documentation making it appear that FusionPharm had drawn down on the supposed credit lines established with Bayside and Meadpoint by specified amounts, and they assembled bank records to offer substantiation for these supposed earlier credit line drawdowns.

C.      As part of an initial failed effort to sell one of these supposed debt obligations – the indebtedness to Bayside -- to a prospective outside investor, the Co-conspirators, working with defendant JEAN-PIERRE, portrayed the debt obligation as a straightforward promissory note and provided the prospective investor a due diligence package consisting of a version of the fabricated back-dated promissory note, together with the fabricated draw down requests and other, fabricated back-dated documents that defendant JEAN-PIERRE helped prepare depicting prior corporate actions.

D.      Co-conspirators WJS and SMD and Co-Conspirator A, in the final iterations of these fabricated promissory notes and supporting documents, made it appear that the supposed debt evidenced by these notes could be converted in whole or in pieces, at the election of the noteholders, into shares of FusionPharm common stock at a specified conversion rate of one FusionPharm share for every penny of debt supposedly still owed on the notes by FusionPharm.

E.     Co-conspirator SMD, on behalf of FusionPharm, and Co-conspirator WJS, on behalf of Meadpoint and acting for Family Member A on behalf of Bayside, executed the backdated promissory notes and documents.

F.     Co-conspirators WJS then generated packets of documents that WJS caused to be presented to FusionPharm's stock transfer agent, over a series of months, in order to effectuate the conversion of portions of the supposed debt held by Bayside and Meadpoint into shares of FusionPharm common stock. The packets typically included the following:

- convertible promissory notes that Co-conspirators WJS and SMD had backdated;

- the backdated draw down requests that SMD had signed on behalf of FusionPharm;

- copies of bank account statements showing deposits to FusionPharm's accounts corresponding to the draw down requests;

- letters from Bayside and Meadpoint (depending on the entity exercising the conversion), for signature by Family Member A for Bayside and WJS for Meadpoint, falsely representing that the entities were not affiliates of FusionPharm;

- additional statements of non-affiliation for Bayside and Meadpoint (again depending on the entity exercising the conversion), reiterating that neither entity was a FusionPharm affiliate and additionally representing that neither Family Member A, in the case of Bayside, and WJS, in the case of Meadpoint, was an officer, director, control person or holder of more than ten percent of the securities of FusionPharm;

- a FusionPharm officer's certificate, signed by SMD, representing that neither Bayside nor Meadpoint (depending on the entity making the conversion) were affiliates of FusionPharm and were outsiders to the company and management, with no other method of control over the company, and that the convertible promissory notes that were the vehicles for the conversion were valid obligations of the company;

- letters signed by SMD reiterating that Bayside and Meadpoint were not affiliates of the company.

G.     Defendant JEAN-PIERRE, using the foregoing submissions prepared for the FusionPharm stock transfer agent, as part of this process, would prepare Rule 144 Attorney

Opinion Letters opining that the shares of FusionPharm stock being converted from the supposed Bayside and Meadpoint debt could be issued as unrestricted, free-trading shares, without the need for a restrictive legend, because of Bayside's and Meadpoint's supposed non-affiliate status and because the one year holding and the other requirements for a registration exemption under SEC Rule 144 had been met.

H.    Defendant JEAN-PIERRE would then transmit the Rule 144 Attorney Opinion Letters, together with some or all of the documentation that had been submitted to the FusionPharm stock transfer agent, to an attorney in California whom he had previously recruited to sign Rule 144 Attorney Opinion Letters and other opinion letters on JEAN- PIERRE's behalf generally (said attorney hereinafter, the "Co-conspirator B").

I.    Co-conspirator B would then retype the Rule 144 Attorney Opinion Letters on his own letterhead and, upon signing them in his own name, would return the completed letters to defendant JEAN-PIERRE, who, in turn, would forward them to Co-conspirator WJS for submission with FusionPharm's stock transfer. Co-conspirator WJS would then present the completed Rule 144 Attorney Opinion Letters to the transfer agent, completing the process.

J.    Through these false portrayals of Bayside and Meadpoint as non- affiliates of FusionPharm and the promissory notes to them as bona fide convertible indebtedness held for a requisite period of time, FusionPharm's stock transfer agent was induced into issuing certificates for hundreds of thousands of shares of FusionPharm common stock that could be immediately sold into the public securities markets without limitation.

8.    It was a further part of the manner and means of carrying out the conspiracy that Co-conspirator WJS thereafter caused a substantial portion of the common shares issued to

Bayside and Meadpoint as a result of these supposed debt conversions to be deposited into brokerage accounts set up in the names of Bayside and Meadpoint and then caused these shares to be sold in the public securities markets. The Rule 144 Attorney Opinion Letters prepared by JEAN-PIERRE and retyped by Co-conspirator B would be presented to the brokerage firms, as necessary, in order to facilitate the deposit of these shares.

9.     As a part of the manner and means of carrying out the conspiracy, the unrestricted commons shares issued to Bayside and Meadpoint as result of the supposed debt conversions would, alternatively, be sold in private transactions to other individuals, who would, in turn, sell the shares into the public securities market. Additionally, remaining portions of the supposed Bayside and Meadpoint convertible debt would be sold outright to other individuals who then converted the purchased debt into free trading, unrestricted common shares of FusionPharm stock and then publicly sold the shares. In each of these instances, the conversions would be facilitated by Rule 144 Attorney Opinion Letters prepared by defendant JEAN-PIERRE, retyped by Co-conspirator B and submitted by Co-conspirator WJS to the stock transfer agent.

10.    As a further part of the manner and means of carrying out the conspiracy, defendant JEAN-PIERRE in consultation with Co-conspirators SMD, WJS, and Co-conspirator A, a business associate of WJS, would cause the financial statements and the quarterly and annual reports that were posted to OTC Link website to omit facts to include that Meadpoint, Vertifresh, LLC ("Vertifresh"), and FusionPharm were under the common control of Co-conspirators SMD and WJS, criminal convictions of beneficial owners of FusionPharm, related party transactions with immediate family members and significant beneficial owners of FusionPharm stock, and Co-conspirator WJS' involvement in the FusionPharm and his beneficial ownership of its stock. Vertifresh was a limited liability company jointly owned and controlled

by Co-conspirators WJS and SMD. In connection with the posting of these quarterly and annual reports to the OTC Link website, defendant JEAN-PIERRE would and did prepare a series of corresponding Current Information Letters that stated and indicated, among other things, that the letter's author had reviewed FusionPharm's current and past annual and quarterly OTC Link submissions and that in the author's opinion the information disclosed in these findings constituted "adequate current information," within the meaning of the federal securities law, concerning FusionPharm and its securities. JEAN-PIERRE would and did pass these letters along to Co-conspirator B for Co-conspirator B to retype onto his own letterhead. JEAN-PIERRE would then transmit the retyped Current Information Letters to Co-conspirators SMD and WJS, who would upload them onto the OTC Link website.

Overt Acts

11.      In furtherance of the conspiracy and to effect the objects thereof, one or more overt acts were carried out by at least one co-conspirator in the State and District of Colorado and elsewhere, which overt acts included the following:

A.      On or about September 1, 2010, defendant JEAN-PIERRE sent a Skype message to Co-conspirator WJS that acknowledges Co-conspirator WJS' making a deal with a company he just acquired and Co-conspirator WJS acknowledging his acquisition of the company to defendant JEAN-PIERRE.

B.      On or about March 25, 2011, an Issuer Company-Related Action Notification form was filed with the FINRA providing notice of a name change to, and stock symbol change with respect to, FusionPharm, identifying SMD and Family Member A as the sole officers and directors of the company, and representing, among other things, that none of the company's officers, directors or parties related to the company were the subjects of pending,

64

adjudicated or settled civil or criminal action related to fraud or securities violations.

      C.     On or about July 8, 2011, defendant JEAN-PIERRE sent Co- conspirator WJS an email attaching a draft of a FusionPharm Information and Disclosure Statement to review.

      D.     On or about July 18, 2011, defendant JEAN-PIERRE sent an email to Co-conspirator SMD to set up a meeting between SMD and Co-conspirator B.

      E.     On or about October 5, 2011, Co-Conspirator WJS sent defendant JEAN-PIERRE a Skype message stating, "This is a new division of FINRA only enacted post Madoff" after a FINRA investigator reached out to Co-conspirator SMD on the same day.

      F.     On or about October 6, 2011, Co-conspirator SMD had a telephone conversation with a FINRA investigator during which he described Co-conspirator WJS as a part-time salesman for FusionPharm and stated that he was unaware that WJS owned or was selling FusionPharm stock.

      G.     On or about October 10, 2011, defendant JEAN-PIERRE traveled to Denver, Colorado to meet with Co-conspirators WJS and SMD.

      H.     On or about October 19, 2011, defendant JEAN-PIERRE sent Co-conspirator WJS an email, with the subject described as "Proposed Agreement re purchase of MicroCap," attaching a document dated May 9, 2011 and entitled, "Agreement for the Purchase of Ownership Interest."

      I.     On or about November 3, 2011, Co-conspirator SMD had another telephone conversation with the same FINRA investigator during which he stated that Co-conspirator WJS no longer owned Microcap or any FusionPharm stock.

      J.     On or about November 7, 2011, Co-conspirator WJS sent defendant

JEAN-PIERRE a Skype message stating, "In addition please call scott on skype as to the Finra guy".

K.      On or about November 30, 2011, defendant JEAN-PIERRE emailed the FINRA investigator a written response to the investigator's requests for further information about Microcap, WJS and the purported change in ownership of Microcap.

L.      Sometime around May, 2012, Coconspirator WJS and Conspirator A met with defendant JEAN-PIERRE in Florida to discuss the financing of FusionPharm.

M.      On or about June 20, 2012, Conspirator A emailed Co-conspirators WJS and SMD and defendant JEAN-PIERRE a proposed due diligence package for a prospective FusionPharm debt purchaser that included nonconvertible versions of purported promissory notes held by Bayside and Meadpoint.

N.      On or about November 26, 2012, Co-Conspirator A sent an email to Co-conspirator WJS attaching drafts of convertible promissory notes for Bayside and Meadpoint and advising that the "Notes work with the existing draw down requests."

O.      On or about December 12, 2012, Co-conspirator WJS sent an email to a representative of FusionPharm's stock transfer agent transmitting a convertible promissory note in favor of Bayside, notifying the transfer agent that "Bayside has chosen to exercise its option to convert into shares [sic]," and that "Bayside [was] a family members [sic] company and I am assisting them [sic] as I am familiar with all parties."

P.      On or about December 27, 2012, Co-Conspirator A sent Co-conspirator SMD an email stating, "We are in need of a letter which confirms the end of the drawdowns under the Bayside promissory note," and advising that Co-Conspirator A had drafted such a letter for SMD's signature.

Q.      On or about January 7, 2013, Co-conspirator WJS sent an email to a representative of FusionPharm's stock transfer agent, with subject identified as "Bayside Note FSPM," transmitting a Rule 144 Attorney Opinion Letter prepared by defendant JEAN- PIERRE and signed by Co-conspirator B, FusionPharm bank account statements "which reflect funding" and a "[c]losing letter that closed the note."

R.      On or about the dates set forth below, the following written submissions for FusionPharm were posted to OTC Link's website portal:

| Overt Act | Date | Document |
|-----------|------|----------|
| R.1 | 7/21/11 | FusionPharm Information and Disclosure Statement for the period ended June 30, 2011 (posted as "Initial Company Information and Disclosure Statement) |
| R.2 | 7/22/11 | Current Information Letter |
| R.3 | 12/29/11 | FusionPharm Information and Disclosure Statement for the period ended September 30, 2011 |
| R.4 | 12/30/11 | Current Information Letter |
| R.5 | 3/31/12 | FusionPharm Annual Information and Disclosure Statement for the period ended December 31, 2011 |
| R.6 | 4/10/12 | Current Information Letter |
| R.7 | 6/12/12 | FusionPharm Quarterly Report for the period ended March 31, 2012 (revised) |
| R.8 | 6/14/12 | Current Information Letter |

S.      The wire transmissions described and set forth in Counts 2 through 16 of this Second Superseding Indictment are incorporated herein by reference and re-alleged as individual overt acts done in furtherance of the conspiracy.

T.      The mailings and deliveries described and set forth in Counts 17 through 20 of this Second Superseding Indictment are incorporated herein by reference and re-alleged as individual overt acts done in furtherance of the conspiracy.

U.      The securities transactions described and set forth in Counts 21 through 23 of this Second Superseding Indictment are incorporated herein by reference and re-alleged as

individual overt acts done in furtherance of the conspiracy.

In violation of Title 18, United States Code, Section 371.

## COUNTS 2 – 16
(Wire Fraud)

12.     The allegations contained in paragraphs 2 through 11 of this Second Superseding Indictment are hereby re-alleged as if set out in full and incorporated by reference in these counts of the Second Superseding Indictment.

13.     At all times material to these counts, OTC Link required attorneys who wished to post Current Information Letters on its website to complete an Attorney Letter Agreement with respect to each company for which the attorney undertook to prepare such letters. The Attorney Letter Agreement required the attorney, among other things, to comply with certain prescribed written guidelines in preparing the Current Information Letters. These guidelines included the requirement that, if the letters relied on the work of another attorney, that counsel be identified and that counsel's own letters accompany the Current Information Letters.  These guidelines also included the requirement that the authoring attorney state, to the best of counsel's knowledge, whether the company, and its shareholders owning more than five percent of the company's securities, or counsel him or herself, were under federal or state regulatory investigation for any violation of federal or states securities laws.

14.     On or about December 6, 2012, the SEC commenced a federal civil enforcement action in the Southern District of New York alleging that defendant JEAN-PIERRE had committed various federal securities violations in connection with misappropriating Jean-Pierre Relative A's identity and, without her knowledge, preparing a series of Current Information Letters, Rule 144 Attorney Opinion Letters, and similar securities opinion letters in her name and forging her signature on these letters (Case No. 12- cv-8886).

15.     From at least in or about March 2011 and continuing at least through in or about August 2013, the exact dates being unknown to the Grand Jury, in the State and District of Colorado, and elsewhere, the defendant, GUY M. JEAN-PIERRE, a/k/a Marcelo Dominguez de Guerra, together with, and aiding and abetting, others known and unknown to the Grand Jury, devised and intended to devise a scheme and artifice to defraud the SEC, FusionPharm's stock transfer agent, OTC Link, and individuals and entities who invested in FusionPharm and its securities in private transactions and were involved in the public trading of its common stock.

16.     It was a further part of the scheme and artifice to defraud that defendant JEAN-PIERRE misrepresented, and assisted in the misrepresentation of, Microcap, Bayside and Meadpoint, and falsely portrayed these entities as non-affiliates of FusionPharm in Rule 144 Attorney Opinion Letters and related documents that were submitted to FusionPharm's stock transfer agent, in connection with efforts to convert supposed debt obligations to unrestricted shares of FusionPharm common stock, and in connection with efforts to deposit unrestricted common shares held in the names of these entities into brokerage accounts.

17.     As a further part of the scheme and artifice to defraud, defendant JEAN- PIERRE prepared, assisted in the preparation of and reviewed and approved quarterly and annual disclosure documents and financial statements and incorporated notes posted to OTC Link's website that, among other things, concealed the role of WJS in the business of FusionPharm; his status as a de facto officer of FusionPharm and his joint control with SMD of its business affairs; and his beneficial ownership of preferred and common shareholdings in FusionPharm; and that concealed and obfuscated related party transactions between FusionPharm, Meadpoint and Vertifresh that were claimed as the basis for FusionPharm's reported revenues.

18.     It was a further part of the scheme to defraud that defendant JEAN-PIERRE

prepared Current Information Letters that falsely represented that the quarterly and annual disclosure documents and financial statements and incorporated notes uploaded to OTC Link's website on behalf of FusionPharm constituted adequate current information about FusionPharm and its securities within the meaning of applicable federal securities laws.

19.     It was a further part of the scheme to defraud that defendant JEAN-PIERRE would prepare these letters and the Rule 144 Attorney Opinion Letters for Co-conspirator B to sign and to represent as his own work product, and to serve as a primary conduit with Co-conspirator B for the information supporting the contents of these letters and the opinions conveyed in them. The letters themselves would fail to disclose defendant JEAN-PIERRE's role and involvement in the preparation of the letters and, after December 2012, the fact that he was the subject of a federal civil law enforcement action alleging wrongdoing with respect to the same type of attorney opinion letters.

Wire Transmissions in Execution of the Scheme

20.     On or about the dates enumerated as to each count below, in the State and District of Colorado, and elsewhere, for the purpose of executing the aforesaid scheme and artifice to defraud and for obtaining money and property by false and fraudulent pretenses, representations and promises, and attempting to do so, the defendant, GUY M. JEAN- PIERRE, a/k/a Marcelo Dominguez de Guerra, did knowingly transmit and cause to be transmitted in interstate commerce, and did aid and abet others to cause to be transmitted, from or to a place within the State of Colorado to or from the places outside of Colorado, by means of wire communications, certain writings, signals and sounds, representing and constituting the following:

**The Uploads of FusionPharm Quarterly and Annual Reports to OTC Link.**

| COUNT | DATE | WIRE TRANSMISSION |
|---|---|---|
| 2 | 8/14/12 | Electronic transmission to OTC Link website portal www.otciq.com of FusionPharm Quarterly Report for the period ended June 30, 2012 |
| 3 | 11/15/12 | Electronic transmission to OTC Link website portal www.otciq.com of FusionPharm Quarterly Report for the period ended September 30, 2012 |
| 4 | 3/6/13 | Electronic transmission to OTC Link website portal www.otciq.com of FusionPharm Annual Information and Disclosure Statement for the period ended December 31, 2012 |
| 5 | 7/5/13 | Electronic transmission to OTC Link website portal www.otciq.com of FusionPharm Quarterly Report for the period ended March 31, 2013 |
| 6 | 8/20/13 | Electronic transmission to OTC Link website portal www.otciq.com of FusionPharm Quarterly Report for the period ended June 30, 2013 |
| 7 | 8/20/13 | Electronic transmission to OTC Link website portal www.otciq.com of FusionPharm Supplemental Information - OTC Pink Basic Disclosure Guidelines Questionnaire |

**The Uploads of FusionPharm Current Information Letters to OTC Link.**

| COUNT | DATE | WIRE TRANSMISSION |
|---|---|---|
| 8 | 8/16/12 | Electronic transmission to OTC Link website portal www.otciq.com of FusionPharm Current Information Letter |
| 9 | 3/11/13 | Electronic transmission to OTC Link website portal www.otciq.com of FusionPharm Current Information Letter |
| 10 | 7/5/13 | Electronic transmission to OTC Link website portal www.otciq.com of FusionPharm Current Information Letter |
| 11 | 8/23/13 | Electronic transmission to OTC Link website portal www.otciq.com of FusionPharm Current Information Letter |

**The Submission FusionPharm Rule 144 Attorney Opinion Letters to Pacific Stock Transfer Co. ("PSTC").**

| COUNT | DATE | WIRE TRANSMISSION |
|---|---|---|
| 12 | 12/13/13 | Email from WJS to PSTC attaching Rule 144 Attorney Opinion Letter re: issuance of 140,000 common shares of FusionPharm common stock to Bayside |
| 13 | 3/7/13 | Email from WJS to PSTC attaching five Rule 144 Attorney Opinion Letter re: issuance of common shares of FusionPharm common stock to Bayside for five specified investors |
| 14 | 4/11/13 | Email from WJS to PSTC attaching Rule 144 Attorney Opinion Letter re: issuance of 475,000 common shares of FusionPharm common stock to Meadpoint |
| 15 | 8/19/13 | Email from WJS to Scottsdale attaching Rule 144 Attorney Opinion Letter re: issuance of 500,000 common shares of FusionPharm common stock to Meadpoint |
| 16 | 8/30/13 | Email from WJS to PSTC attaching Rule 144 Attorney Opinion Letter re: issuance of 1,500,000 common shares of FusionPharm common stock to Meadpoint to three individuals, each to be allocated 500,000 shares a piece |

In violation of Title 18, United States Code, Sections 1343 and 2.

COUNTS 17 – 20
(Mail Fraud)

21.     The allegations contained in paragraphs 2 through 11 of this Second Superseding Indictment are hereby re-alleged as if set out in full and incorporated by reference in these counts of the Second Superseding Indictment.

22.     On or about the dates enumerated as to each count below, in the State and District of Colorado, and elsewhere, for the purpose of executing the aforesaid scheme and artifice to defraud and to obtain money and property by means of false and fraudulent material pretenses and representations, and attempting to do so, the defendant, GUY M. JEAN- PIERRE, a/k/a Marcelo Dominguez de Guerra, did knowingly cause, and aid and abet others to cause, the following matters and things to be sent and delivered by a commercial interstate carrier,

according to the direction thereon:

| COUNT | DATE | MAIL MATTER |
|-------|------|-------------|
| 17 | 7/25/12 | Federal Express Envelope, Tracking No. 800575942347, addressed to PSTC in Las Vegas, Nevada, containing FusionPharm Stock Cert. 7385 for 40,000 shares in the name of individual shareholder T.A., together with a stock power, a Rule 144 Attorney Opinion Letter, an officer's certificate, stock purchase agreement, debt settlement agreement, and instruction letters from Microcap and T.A. |
| 18 | 8/1/12 | Federal Express Envelope, Tracking No. 798688446223, addressed to WJS in Colorado, containing FusionPharm Stock Cert. 11176 issued to Microcap for 40,000 shares |
| 19 | 1/18/13 | Federal Express Envelope, Tracking No. 794557022916, addressed to WJS in Colorado, containing FusionPharm Stock Certificate 11208 issued to Bayside for 140,000 shares |
| 20 | 8/15/13 | Federal Express envelope, Tracking No. 796476186341, addressed to WJS in Colorado, containing FusionPharm Stock Cert. 11227 issued to Meadpoint for 500,000 shares |

In violation of Title 18, United States Code, Sections 1341 and 2.

## COUNTS 21 – 23
### (Securities Fraud)

23.     The allegations contained in paragraphs 2 through 11 of this Second Superseding Indictment are hereby re-alleged as if set out in full and incorporated by reference in these counts of the Second Superseding Indictment.

24.     From at least in or about April 2011 and continuing until at least in or about August 2013, the exact dates being unknown to the Grand Jury, in the State and District of Colorado, and elsewhere, the defendant, GUY M. JEAN-PIERRE, a/k/a Marcelo Dominguez de Guerra, with others known and unknown to the Grand Jury, willfully and knowingly, by the use of means and instrumentalities of interstate commerce, and the mails, did aid, abet, counsel, induce, and cause others to, directly and indirectly use and employ manipulative and deceptive

devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon other persons and entities, all in connection with the purchase and sale of FusionPharm common stock.

25.     On or about the dates set forth below, as to each of the enumerated Counts, in the State and District of Colorado, and elsewhere, by use of the means or instrumentalities of interstate commerce, and by use of a national securities exchange, and in furtherance of this scheme to defraud and course of business, the defendant, GUY M. JEAN-PIERRE, did aid and abet, and counsel and induce the following securities transactions to be executed in brokerage accounts held in the names of Microcap, Bayside and Meadpoint:

| Count | Approx. Date | Securities Transaction |
|---|---|---|
| 21 | 10/18/12 | Sale of 5,036 shares of FusionPharm common stock held in a brokerage account in the name of Microcap at Scottsdale Capital Advisors |
| 22 | 2/4/13 | Sale of 2,085 shares of FusionPharm common stock held in a brokerage account in the name of Bayside at Scottsdale Capital Advisors |
| 23 | 5/14/13 | Sale of 21,676 shares of FusionPharm common stock held in a brokerage account in the name of Meadpoint at Scottsdale Capital Advisors |

In violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5 [Rule 10b-5]; and Title 18, United States Code, Section 2.

## COUNTS 24 – 28
(Wire Fraud)

26.     From on or about February 26, 2016 and continuing until on or about April 29, 2016, the exact dates being unknown to the Grand Jury, in the State and District of Colorado, and elsewhere, the defendant, GUY M. JEAN-PIERRE, a/k/a Marcelo Dominguez de Guerra, devised, and intended to devise, a scheme and artifice to defraud the SEC, OTC Link, and individuals and entities involved in the purchase and sale of securities of microcap companies in the public, over-the-counter securities markets, including, without limitation, stock transfer agents and securities brokerage firms.

a.     As part of the scheme and intended scheme that when presented with an opportunity to engage in securities fraud by one of the coconspirators named in Count 1, above, who was then acting as an undercover operative (CW) of the Federal Bureau of Investigation, the defendant accepted the opportunity to assist in the transformation of Vertifresh into a company with publicly traded securities through the acquisition of, and merger with, a dormant publicly traded microcap company which was represented to the defendant as owned and operated by an undercover FBI agent (FBI UCA).

b.     As part of the scheme and intended scheme, defendant JEAN-PIERRE, in collaboration with the CW, devised and assisted in devising a plan to secure free trading shares in the contemplated publicly traded company that involved the preparation of a backdated purported promissory note, convertible at the option of the holder, into common stock. The plan entailed portraying money that the CW had supposedly received in the past on behalf of Vertifresh as loan funds from the FBI UCA that would be evidenced by the purported debt instrument. It further involved describing and depicting the FBI UCA and CW as consultants to the newly constituted company, so as to provide a cover and explanation for their involvement in

the business without betraying their status as control persons and affiliates of the company. The plan further contemplated ultimately presenting a finalized convertible promissory note, together with supporting documentation, including a Rule 144 Attorney Opinion Letter that defendant JEAN-PIERRE would undertake to procure from an amenable attorney.

27.     On or about the dates enumerated as to each count below, in the State and District of Colorado, and elsewhere, for the purpose of executing the aforesaid scheme and intended scheme and artifice to defraud, the defendant, GUY M. JEAN-PIERRE, a/k/a Marcelo Dominguez de Guerra, did knowingly transmit and cause to be transmitted in interstate and foreign commerce from a place outside the United States to a place within the State of Colorado, by means of wire communications, certain writings, signals and sounds, representing and constituting the following:

| **COUNT** | **DATE** | **WIRE TRANSMISSION** |
|---|---|---|
| 24 | 3/30/16 | Email from JEAN-PIERRE to the CW attaching a document entitled CMC/Vertifresh Consulting Agreement |
| 25 | 4/1/16 | Email from JEAN-PIERRE to the CW attaching a document entitled Convertible Promissory Note, dated February 28, 2015 |
| 26 | 4/23/16 | Email from JEAN-PIERRE to the CW attaching a document entitled Convertible Promissory Note, dated April 21, 2015, and a document entitled Non-Affiliation Letter |
| 27 | 4/23/16 | Email from JEAN-PIERRE to the CW attaching a document entitled Purchase And Assignment Agreement |
| 28 | 4/24/16 | Email from JEAN-PIERRE to the CW attaching a document identified by file name "Form of Debt Conversion opinion.docx |

All in violation of Title 18, United States Code, Sections 1343 and 2.

<u>COUNT 29</u>
(Money Laundering)

28.     The allegations contained in paragraphs 2 through 11 and 26 through 27 of this Second Superseding Indictment are hereby re-alleged as if set out in full and incorporated by reference in this count of the Second Superseding Indictment.

29.     From on or about February 26, 2016 and continuing through on or about April 29, 2016, in the State and District of Colorado, and elsewhere, the defendant, GUY M. JEAN-PIERRE, a/k/a Marcelo Dominguez de Guerra, with the intent to conceal and disguise the location, source, ownership and control, of property believed to be the proceeds of specified unlawful activity, did knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce involving property represented by a person at the direction of a federal official authorized to investigate violations of Title 18, United States Code, Section 1956, to be proceeds of specified unlawful activity, to wit: securities fraud, as charged in counts 22-23, in violation of Title 15 United States Code, Sections 78j(b) and 78ff(a), and 17 C.F.R. Section 240.10b-5, and wire fraud, as charged in counts 12, 14-15, in violation of Title 18, United States Code, Section 1343, which financial transaction involved the mailing, receipt and deposit of a cashier's check drawn on First Bank in the amount of $5,000 and made payable to Guy M. Jean-Pierre and represented to be the proceeds of the sale of common stock of FusionPharm, Inc.

All in violation of Title 18, United States Code, Sections 1956(a)(3)(B) and 2.