IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Criminal Case No.  17-cr-00008-WJM

UNITED STATES OF AMERICA,

        Plaintiff,

v.

GUY JEAN-PIERRE

        Defendant.

_____

**GOVERNMENT'S AMENDED POST TRIAL STATEMENT OF THE CASE**
_____

The United States of America (the government), by Jeremy Sibert, Assistant United States Attorneys, submits this post trial statement.

During the course of defendant Jean-Pierre's twelve day trail the following information was put into evidence via witnesses' testimony or documents, not necessary in the order outlined below.

### Background
### Personal Background of Jean-Pierre.

Until in or about 2014, Guy M. Jean-Pierre was actively and overtly engaged in the practice of law in the United States, having at one point been licensed in the state of Florida. Defendant Jean-Pierre was the managing member of Jean-Pierre and Jean-Pierre, a Boca Raton based law firm specializing in corporate transactional and securities law matters for small and medium-sized businesses.  From 2004-2008, defendant Jean-Pierre was a managing member of

Gold Coast Professional Services where he took a lead role in various securities related matters and corporate transactions such as mergers, corporate finance, acquisitions or divestitures. Defendant Jean-Pierre was a Senior Attorney for the Federal Deposit Insurance Corporation and was an associate with Skadden, Arps, Slate, Meagher & Flom. He received his law degree at Columbia University School of Law and his BA degree from Amherst College.

Jean-Pierre's small private practice in South Florida, focused on representing and providing legal services to penny stock publicly traded companies. A significant portion of his practice entailed preparing and issuing certain types of opinion letters on behalf of these companies.

One type of opinion letter that Jean-Pierre would prepare would be a "current information" letter that would be presented to OTC Markets Group, Inc. ("OTC Markets"), a company operating an internet based, electronic marketplace trading platform where the quotes for the stocks of these companies would be listed and trades in their stocks arranged among market makers in the stock. In these letters, Jean-Pierre would opine that there was adequate "current information" publicly available about these companies, a factor that OTC Markets would consider in classifying or grading the stock of these companies for investors on its website.[1]

A second type of opinion letter that Jean-Pierre routinely prepared and issued in connection with his work for these penny stock companies was presented to their stock transfer agents. These letters opined that the stocks held by certain prospective shareholders seeking to

---

[1] Without such a representation by a licensed attorney, OTC Markets would issue a warning on its website, next to a red "Stop" sign symbol, advising investors that the particular company whose stock was being quoted may not be making material information about itself publicly available.
The attorney opinion about adequate current information also had bearing with a company's stock transfer agent, in connection with determining whether shares of the company that were not registered with the SEC could nonetheless be publicly traded based on meeting a "safe harbor" exemption from registration recognized under SEC Rule 144, 17 C.F.R. §240.144, the subject matter of the second type of opinion letter discussed below.

sell their shares in the public markets need not be designated as "restricted" shares and could be publicly sold without registration with the United States Securities and Exchange Commission ("SEC") because the shareholder had satisfied certain regulatory requirements, under SEC Rule 144, 17 C.F.R. §240.144, to be afforded a "safe harbor" from registration. The basic "safe harbor" requirements that allowed unlimited stock sales included that the holder, and prospective seller, not be deemed an "affiliate" within the meaning of the regulation, typically someone who was an officer, director, large shareholder or a person involved in the control and management of the company. (These opinion letters are hereafter referred to as "Rule 144 attorney opinion letters.")

On or about April 21, 2010, OTC Markets banned Jean-Pierre from issuing opinion letters for submission to it, finding that the companies that were the subject of these letters were making incomplete and inconsistent disclosures and that Jean-Pierre was not performing the due diligence necessary to opine about the disclosures. Witness Liz Hesse testified in detail about defendant Jean-Pierre's ban. As a result of the ban, stock transfer agents would no longer accept opinion letters from Jean-Pierre as well. Pacific Stock Transfer Agent Ms. Claiborne testified about the list of attorneys that were subjected to heightened review, to include defendant Jean-Pierre.

### The Historical Case Concerning Fusion Pharm.

Since in or about December 2013, FBI-Denver, IRS-CID and USPIS, in conjunction with the United States Attorney's Office, and under the auspices of a federal grand jury in the District of Colorado, investigated whether certain federal criminal offenses, including securities fraud, wire fraud, and money laundering, have been committed in relation, *inter alia*, to the financial reporting and other disclosures made concerning Fusion Pharm from the company's inception, in

late 2010, through in or about May 2014 and in relation to the sale of Fusion Pharm common stock to the investing public during this time frame. The primary targets of the investigation were the company's founders and co-partners, Scott Dittman, a former accountant, and his brother-in-law, William Sears, a career penny stock promoter who was convicted of felony securities fraud related offenses in the Southern District of New York in 2007 (Case No. 04-cr-00556). Both, Sears and Dittman, have plead guilty to conspiring to commit securities fraud before Judge Martinez. In addition, Sears plead guilty to filing a false tax return regarding Fusion Pharm.

Operating out of Denver, Colorado, Fusion Pharm, during these years endeavored to establish a business that would obtain and retrofit steel shipping containers so that they could be used to grow plants hydroponically. Fusion Pharm would then seek to resell these repurposed shipping containers, which Fusion Pharm called "pharm pods," to hydroponic growers. The pharm pods were, at times, marketed by Sears and Dittman as effective vehicles to get fresh produce, such as lettuce, quickly and efficiently to restaurants and local groceries in urban markets. Over time, however, the pharm pods were primarily marketed to marijuana or cannabis entrepreneurs in Colorado and other states where the sale of marijuana was being legalized.

Evidence gathered in the investigation indicated that Sears and Dittman conspired, among other things, to conceal Sears' role and involvement in the management and operation of Fusion Pharm, as well as his beneficial ownership of a significant portion of its stock, from securities regulators and the investing public. They also pursued a scheme to fabricate revenues for Fusion Pharm, so that they could portray the company as enjoying progressive and consistent growth. The fraudulent revenue scheme entailed, among other things, booking as revenues funds that Sears was depositing into the company's accounts from the sale of Fusion Pharm stock he held in the name of two of his shell companies (Microcap Management and Bayside Realty) and

portraying the funds either as proceeds that Fusion Pharm was receiving from the sale of pharm pods to Meadpoint Ventures, a sham pharm pod distributorship set up using another shell entity, or as licensing fees that Fusion Pharm was receiving from Vertifresh, LLC, yet another sham entity formed by Sears and portrayed to the public as a company that was undertaking to develop and exploit the Fusion Pharm "pharm pod technology" to grow and distribute fresh produce. Bayside Realty was supposedly owned by Sears' mother, Sandra Sears.

As part of the scheme, Sears and Dittman funneled Fusion Pharm shares to Meadpoint and Bayside Realty by falsely portraying the entities as lenders to Fusion Pharm who held promissory notes that were convertible, at the election of the lender, into Fusion Pharm common stock. Dittman and Sears, working with others, falsely depicted some of the stock sales proceeds that Sears was depositing into the company's accounts as loan funds and prepared backdated promissory notes that reflected that this debt could be convertible into Fusion Pharm common stock. This fabricated paper work was presented to Fusion Pharm's transfer agent in connection with securing unrestricted Fusion Pharm common stock that Sears, in turn, deposited into brokerage accounts and then sold.

As a final part of the scheme, in order to lift restrictions on the Fusion Pharm stock that Sears was undertaking to sell through his various shell entities,[2] Dittman and Sears prepared and presented various documents to Fusion Pharm's transfer agent that falsely represented and depicted the entities as not being affiliates of Fusion Pharm, thereby concealing from the transfer agent Sears' role and involvement in the company and his connections to and control of the shell

---

[2] The shell entities – Microcap Management, Bayside Realty, Meadpoint Ventures and Vertifresh, LLC – are hereinafter, at times, collectively referred to as the "Sears' entities."

entities that were the nominal seller of the stock. These documents, together with Rule 144 attorney opinion letters, convinced the transfer agent to remove the restrictive legend on the Fusion Pharm shares that Sears and Dittman were undertaking to sell and allowed public sales of the stock to proceed without the securities first being registered with the SEC.

Through use of these machinations, Sears and Dittman were able to liquidate and realize in excess of $12 million in stock sales proceeds prior to a warranted search of Fusion Pharm's offices premises in May 2014, as a result of evidence gathered in the investigation to that date, and the suspension of public trading in Fusion Pharm's stock at that same time by the SEC. To date, agents working the Fusion Pharm investigation, together with the United States Attorney's Office, have been able to locate, seize and otherwise restrain approximately $8.9 million of these proceeds.

### Guy M. Jean-Pierre's Connection to Fusion Pharm and Role in the Scheme.

Evidence gathered in the historical investigation to date reflected that Jean-Pierre had extensive involvement in a broad range of aspects of Fusion Pharm's development as a company and its operations and that he acted as a *de facto* general counsel to Fusion Pharm and Sears and Dittman, from its inception in late 2010 through in or about fall 2013. During this time, he provided legal advice and assistance to Sears, in particular, in connection with efforts to liquidate the Fusion Pharm shares held in the names of the various shell entities.

Jean-Pierre was introduced to Sears in or about 2009 and, prior to his involvement with Fusion Pharm, assisted Sears in his efforts to convert into free trading status shares of common stock that Sears would receive from various microcap companies as compensation for his promotional work for them. Jean-Pierre prepared the requisite Rule 144 attorney opinion letters to facilitate lifting the restrictions on these shares so that they could be publicly traded.

In about November 2010, Sears recruited Jean-Pierre to assist him and Dittman in connection with taking over the shell company, Baby Bee Bright, through which Fusion Pharm became a publicly traded company.  Jean-Pierre prepared the requisite corporate documents and did other work to facilitate the transfer of control and ownership of the shell to Dittman.  Emails introduced into evidence and other documents and witnesses reflected that Jean-Pierre assisted Fusion Pharm in various ways thereafter, including through the preparation of corporate governance records and records relating to the capital structure of the company.  This evidence showed that Jean-Pierre was involved in the review of private placement memoranda that was issued to prospective Fusion Pharm investors.  Jean-Pierre was involved in reviewing financial statements and narratives and factual questionnaires about the company that were submitted to OTC Markets and posted on its website for the investing public to review.  None of these disclosure materials indicated that Sears was part of the company, had an ownership interest in Fusion Pharm, or displayed his criminal conviction for securities fraud.  None of these disclosure materials reflected that entities controlled by Sears and Dittman were involved in financing and sales transactions with the company.  Finally, none of these materials indicated that Dittman and Sears were selling Fusion Pharm stock and using the proceeds as a basis for revenue recognition.  Several witnesses testified about defendant Jean-Pierre's role regarding the OTC disclosures, including Sears, Dittman, Bodden, Kocinski, and DiTommaso.

Emails, witnesses, and other documents showed that Jean-Pierre was involved in the review of the backdated convertible notes that were used as a pretext to issue Fusion Pharm stock to Sears through Meadpoint Ventures and Bayside Realty.  The convertible notes were first indicated on corporate records in 2013 and backdated to 2011.  Cliff Bodden testified about the two trips that he and Sears made to Florida to discuss these notes with defendant Jean-Pierre in

person. Jean-Pierre was aware that prior to the creation of these back dated notes, none of the notes prior to 2013 were convertible. Further, Jean-Pierre knew that Sears controlled Bayside and Meadpoint and that Sears was going to receive a very favorable convertible rate of one cent per one share of Fusion Pharm stock even though the price of the stock was above a dollar. Evidence showed that both Bayside and Meadpoint paid Jean-Pierre for his legal work and several of those checks were signed by William Sears.

In addition to his review of the OTC disclosures and financials, defendant Jean-Pierre assisted Dittman in efforts to mislead the U.S. Financial Industry Regulatory Authority ("FINRA") in 2011 in connection with its inquiries into Fusion Pharm shareholdings that Sears maintained through Microcap. Jean-Pierre drafted a Rule 144 letter that stated Sears was not an affiliate of Fusion Pharm, knowing that Sears was an affiliate. This Rule 144 letter allowed Sears to remove the restricted legend off the stock certificates and trade Fusion Pharm shares from his Microcap brokerage accounts. Following his April 2010 OTC Markets ban, Jean-Pierre enlisted his niece, a newly minted attorney, to form a law partnership with him specializing in preparing these attorney letters but that, after getting copies of her signature and driver's license, he never engaged her to do any legal work. Instead, Jean-Pierre authored the letters in his niece's name and forged her signature to them. Jean-Pierre's fraudulent acts of signing his niece's name, allowed his Rule 144 letter that he wrote for Sears regarding Microcap's ownership of Fusion Pharm shares to go undetected with the transfer agents and brokerage firms. In addition, Jean-Pierre fraudulently drafted a backdated sale's agreement regarding Sears selling Microcap to a Richard Scholz for ten dollars in order to mislead FINRA's investigation. Jean-Pierre drafted this agreement to be effective as of May 2011 even though it was not discussed or drafted until October 2011. The evidence presented showed that Jean-Pierre knew that Sears

was the owner of Microcap from 2011 through 2013, including two Rule 144 letters and packages that Jean-Pierre sent DiTommaso for signature.  Jean-Pierre was listed as the company's corporate secretary and "legal counsel" on

Fusion Pharm's written submissions to OTC Markets from July 2011 through August 2013, identified itself as having an outside counsel, Tod A. DiTomasso.  Throughout this time, DiTomasso was identified as the author of "current information" letters submitted on Fusion Pharm's behalf to OTC Markets, the letters being signed by DiTomasso and on his letterhead.  Further, Fusion Pharm's transfer agent's and brokerage records reflect that DiTomasso was the purported author of numerous Rule 144 attorney opinion letters that were submitted throughout this time in order to lift trading restrictions on Fusion Pharm stock sold by the Sears' entities, as well as restrictions on other stock sold in private transactions to Fusion Pharm investors.  These letters too were on DiTomasso's letterhead and signed by him.  DiTomasso, during testimony indicated that the Rule 144 attorney opinion letters and "current information opinion letters" that he signed were all prepared by Guy Jean-Pierre, who hired and paid him for the letters, and that he simply reviewed materials that Jean-Pierre provided to him in support of the opinion letters and copied the letters authored by Jean-Pierre onto his own letterhead.  DiTomasso's main contact person within the Fusion Pharm chain was Guy Jean-Pierre.  Defendant Jean-Pierre would contact DiTomasso when a current information letter or Rule 144 letter was needed by Fusion Pharm and then provide him the supporting documents, along with a drafted letter for his signature.

**Guy M. Jean-Pierre's Legal Problems and Relocation to the Dominican Republic.**

While in the midst of assisting Sears and Dittman in these various ways with Fusion

Pharm, Jean-Pierre became the subject of civil and regulatory actions arising from his efforts to circumvent the OTC Market's April 2010 ban against him and to continue his penny stock securities law practice as it had been before the ban.  These actions led to civil complaints to be filed against defendant Jean-Pierre by the SEC and the Florida Bar.  Jean-Pierre's niece also became the subject of various state bar grievances and SEC investigations based upon defendant Jean-Pierre's fraudulent use of her name, signature, and status as a licensed attorney.  On or about August 12, 2011, in the midst of these challenges, Jean-Pierre legally changed his name to "Marcelo Dominguez de Guerra."  Information available to federal investigators in this case indicated that Jean-Pierre had permanently relocated to the Dominican Republic.

## The Undercover Investigation
### Origins of the Undercover Investigation.

Beginning in or about January 2016, the United States Attorney's Office entered into pre-indictment plea discussions with counsel for Dittman and Sears.  One of the terms of a pre-indictment disposition under discussion was possible cooperation by the Fusion Pharm principals against their confederates in the historical investigation.  Jean-Pierre was identified as a central potential subject of anticipated assistance and, pursuant to the pre-indictment discussions, Dittman and Sears agreed to provide proffers of their information about Jean-Pierre's involvement in Fusion Pharm.

As part of this arrangement, William Sears gave his proffer over the course of a two day period in February 2016.  During the proffer sessions, Sears confirmed, *inter alia*, the role that Jean-Pierre had played in the Fusion Pharm scheme, as had been adumbrated in the email communications and other records obtained in the investigation.  Sears stated that Jean-Pierre had been well aware of the extent of Sear's role and involvement in Fusion Pharm and his control and ownership of the Fusion Pharm stock that Sears, with Jean-Pierre's assistance, was

10

selling through the Sears' entities. Sears indicated that Jean-Pierre knew of these factual circumstances, in particular, when he was preparing the "current information" opinion and Rule 144 letters for OTC Markets, Fusion Pharm's transfer agent, and Sears' brokers. He indicated as well that he and Dittman had regularly consulted with Jean-Pierre about the disclosures that they were (and were not) making in the financial statements and narrative submissions about the company that were posted on the OTC Markets website.

At the conclusion of this two day proffer session, Sears stated that he knew that Jean-Pierre was residing in the Dominican Republic[3] and that he had been in periodic contact with Jean-Pierre since May 2014, when the search warrant was conducted of Fusion Pharm's business premises. Sears related that over this period Jean-Pierre was still providing legal services and would occasionally solicit Sears for work. Sears further related that, in the weeks leading up to his proffer, he responded to these solicitations by discussing a particular investment venture that Sears claimed to be considering and for which he could use legal assistance. Sears recounted that he told Jean-Pierre at that time that he knew of a particular promising microcap company that was struggling to raise funds, and a particular large investor in the company seeking a return on the money he had invested in the company, and that Sears saw an opportunity to approach the company to do an initial public offering on its behalf, for which Sears would enlist Jean-Pierre to do the legal work. Sears said that Jean-Pierre responded favorably to the opportunity and agreed to meet with Sears and the purported investor in the United States, tentatively set for Miami, Florida, to further discuss the opportunity. Sears acknowledged that, though the company he had

---

[3] Jean-Pierre apparently confirmed his relocation to the Dominican Republic, in recent recorded conversations with the FBI CI, in connection with discussing his impending trip to Miami, Florida. During the conversation, Jean-Pierre made reference to the fact that he had not been back to South Florida and the United States in three years and was looking forward to seeing friends and family there.

in mind was real and was seeking investment capital, his proposal to Jean-Pierre (and the investor who came with it) was a ploy that Sears had devised on his own, as part of an overall offer to assist the government in the Fusion Pharm investigation and to secure for himself a more favorable pre-indictment disposition of his case.[4] Sears indicated that he had put Jean-Pierre off for the time being, claiming that the "investor" would be in Europe for the next several weeks.

In the ensuing days, an undercover investigation, involving a modified proposal, was devised and eventually approved by DOJ. The plan retained as its ultimate goal a meeting between Sears and Jean-Pierre in Miami, Florida, and included an FBI undercover agent as the interested "investor," but now focused on enlisting Jean-Pierre to do legal work in connection with Vertifresh, one of shell companies Sears and Dittman had used in the Fusion Pharm scheme.

**The Undercover**

Beginning in late February 2016 and continuing through April 2016, Sears, acting under the direction and supervision of agents, had a series of recorded telephone calls and exchanged a series of emails with Jean-Pierre. In these communications, Sears advised Jean-Pierre that plans for the initial public offering that he had previously mentioned are on hold but that Sears and his investor are seeking to resurrect and develop the hydroponic produce business that had previously been marketed through Vertifresh. Sears has "explained" to Jean-Pierre that his investor, "EJ," had provided Sears various amounts of cash over the past several years for use in

---

[4] These claims have credence. As part of the resolution of his criminal case in the Southern District of New York, Sears apparently worked in an undercover capacity with the FBI and, in exchange for his efforts, received a significantly reduced sentence in consideration of his cooperation. Neither prosecutors in the United States Attorney's Office nor the agents involved in the Fusion Pharm investigation were aware of the pre-proffer contacts and discussions between Sears and Jean-Pierre, and neither prosecutors nor agents encouraged or suggested to Sears directly or through counsel that he should undertake to pursue a path of 'anticipatory assistance' with Jean-Pierre or any other potential target. Sears was aware of the SEC case against Jean-Pierre.

various contemplated investment projects but now needed to see some return on the money that he had placed with Sears.  Sears explained their vehicle for accomplishing this would be the sale of stock in a reconstituted company that would go public through the acquisition of a publicly traded shell company and a reverse merger of Vertifresh into that shell company.  Sears told Jean-Pierre that his investor was working on obtaining the shell company and that the two are looking for Jean-Pierre to prepare the corporate documents and do the legal work necessary to facilitate a reverse merger.  More importantly, Sears explained, they are looking for Jean-Pierre's help in converting restricted shares that Sears and his investor would get from the reverse merger into free-trading shares that they could immediately sell in the public securities market.  Sears has further made clear that Sears and EJ plan to actively manage and control the reconstituted company going forward and that the documents effectuating the stock conversions and sales would need to conceal their involvement in the business and connections to the transactions.

Jean-Pierre, in response, proposed that the free trading shares in the reconstituted company be generated in a way similar to how Sears obtained some of his free trading stock in Fusion Pharm, *i.e.*, by characterizing EJ's previous funds to Sears as loans from a shell company to Vertifresh that had been contemporaneously secured by promissory notes that were convertible into Vertifresh stock.  As had been done in the Fusion Pharm scheme, documents exercising these conversions would then be prepared and submitted to the transfer agent for the reconstituted, publicly traded company, together with Rule 144 attorney opinion letters that would opine that the shares that were the result of the conversions met the Rule 144 "safe harbor" exemption from securities registration (and, in particular, were held in the hands of "non-affiliates") and so could be issued without restriction and eligible for sale in the public securities markets.  Jean-Pierre, in lawfully recorded conversations, has agreed to prepare the

necessary documents, including the Rule 144 opinion letters, and to find an attorney who would purportedly author and sign the letters. He has agreed to accept payment for this work through a combination of cash payments from EJ and through transfer to him of some of the free trading shares that result from these machinations.

During these recorded conversations, Sears further explained to Jean-Pierre that the two would need to meet with EJ in Miami to explain the overall plan and how the transactions would work. In order to facilitate these discussions, Jean-Pierre agreed to prepare and send to Sears in advance of meeting EJ drafts of some of the documents which would be used for the transactions, so that the two could review them in discussions with EJ in Miami.   Jean-Pierre recently emailed Sears a set of the requested documents, in draft form, including a draft of the contemplated convertible notes and a draft of a Rule 144 attorney opinion letter. He has also emailed Sears the name of a Nashville, Tennessee attorney, in response to his earlier promise to Sears to come up with another "Tod DiTomasso" for the transactions.

Sears' recorded conversations with Jean-Pierre also gave rise to discussion about having Jean-Pierre act as a money launderer for funds that he has been led to believe are some of the remaining proceeds of the Fusion Pharm stock sales that he helped facilitate for Sears.  While discussing payment arrangements for his contemplated services on the reverse merger scheme involving Vertifresh and EJ, Jean-Pierre had mentioned that he wanted the cash component of his compensations wired to a bank account he maintained in the Dominican Republic. He indicated that he wanted to use this account so that he could avoid having the funds seized by the SEC as part of its efforts to collect on its default judgment against him. Sears related that, as part of their pre-proffer discussions, the two had also toyed with the idea of setting up offshore accounts to jointly hold and manage the money that they expected to earn together. Sears

continued to raise the subject of possibly opening offshore accounts for this purpose during the recorded undercover conversations with Jean-Pierre.

Following this latest conversation about offshore accounts, agents supervising Sears directed him to approach Jean-Pierre about hiding money in the Dominican Republic for Sears as well.  Sears, acting on their directions, told Jean-Pierre that both the IRS and the SEC were searching for funds that Sears had made from the Fusion Pharm stock sales and that, although a significant portion of these proceeds had been located and seized, Sears still had a sizable amount of the money (at one point represented to be approximately $250,000) that had not been found.  Sears told Jean-Pierre that he had been parking these funds with a friend in Colorado but that both he and the friend were getting nervous about the arrangement and that Sears decided that it would be better to move the funds out of the United States. Agents directed Sears to ask Jean-Pierre to park these stock proceeds in a Dominican bank account.  Agents further directed Sears to ask Jean-Pierre to first deposit the money into his own bank account and then move the funds to a second account to be set up in the name of a nominee.  Jean-Pierre has agreed to so in exchange for a fee of five percent of the funds placed with him.  FBI agents have arranged for a cashier's check in the amount of $5,000 to be sent to Jean-Pierre by federal express as part of an initial, test transaction.  Sears has been directed to get written confirmation from Jean-Pierre that these funds have been deposited to Jean-Pierre's Dominican bank account and then to have Jean-Pierre identify the nominee account in which the funds (minus Jean-Pierre's commission) will be parked and to provide Sears with internet access to the account.  Sears, had these things accomplished prior to Jean-Pierre's contemplated travel to the United States.

### The Lure Back to the United States

As a continuation to the undercover operation, the final part was to lure Jean-Pierre to Miami, Florida to meet with Sears and EJ, portrayed by an FBI undercover agent. An airline ticket was purchased for Jean-Pierre to travel to Miami, Florida, arriving early Thursday evening, April 28, 2016. When Jean-Pierre's arrived at MIA, agents working the case conducted twenty-four hour surveillance on Jean-Pierre until the time of his arrest. Jean-Pierre was picked up at the airport by an undercover agent acting as an Uber driver and William Sears. Sears was wired to record all conversations he had with Jean-Pierre in the ride from the airport to the hotel. Once they arrived at the arranged hotel, Jean-Pierre checked in and met back up with Sears a short time later where both of them walked to a nearby restaurant to meet the FBI undercover agent for dinner. Surveillance agents were in place at the restaurant, and the dinner meeting was audio recorded. After dinner, Jean-Pierre arrived back at the hotel and remained under surveillance until the next morning's planned breakfast meeting between himself, Sears, and "EJ".

On April 29, 2016, a breakfast meeting was held in one of the hotel rooms between Jean-Pierre, Sears, and "EJ" to discuss the "Vertifresh" ploy in detail, including the paperwork. This meeting was audio and video recorded. During the meeting, Jean-Pierre discussed several aspects of the securities law required to have restricted shares become free and clear so they could be traded. Sears and Jean-Pierre "explained" the reverse merger plan to the FBI undercover agent, and Jean-Pierre provided an overview of the securities laws and how they would use the Rule 144 regulatory exemption from registration to secure free trading shares in the newly constituted company. During the conversations, Jean-Pierre tutored Sears and the undercover agent how to portray themselves as consultants to the new company, so that they could justify their involvement in the company without having to acknowledge their control and affiliate status. Jean-Pierre and Sears also reviewed in detail the documents that Jean-Pierre had

prepared as part of the scheme, and at one point, Jean-Pierre recommended changing the amount of the bogus promissory note from its stated amount, $50,000, to a less round figure, in order to avoid drawing suspicion.  He further assured the Sears and the undercover agent that he would be able to manage the Tennessee attorney and would be a filter for the information that the attorney would receive about the business and the people in control of it.  Both Sears and the FBI undercover agent reiterated to Jean-Pierre that the undercover agent and Sears would be the real persons in control of the company and that person who would be identified in the corporate records as the head of the company – whose name Jean-Pierre inserted in the draft documents that he emailed – "knew jack shit" about the company.  In response to this, Jean-Pierre said, "Excellent," and indicated that the Tennessee attorney would not learn anything differently from him about the portrayed arrangement.

Once enough evidence was presented that Jean-Pierre knew that he would facilitate the required fraud to circumvent the securities' laws, defendant Jean-Pierre was placed under arrest for an outstanding warrant out of New York, NY.

### Indictment, Trial Outcome, and Sentencing Guideline

The defendant Guy M. Jean-Pierre was charged in a 28-count second superseding indictment with violations of federal criminal laws:  one count of conspiracy to commit mail, wire and securities fraud, 20 counts of wire fraud, 4 counts of mail fraud, 3 counts of securities fraud and one count of money laundering.  The indictment also contains a forfeiture allegation regarding the proceeds of the alleged frauds.  The jury returned a guilty verdict on every count of the indictment, except for Count 12 were defendant Jean-Pierre was found not guilty.

**Guidelines for The Historical Case (Counts 1- 23, except for Count 12)**

1. Base guideline for the conspiracy offense to be charged is U.S.S.G. Section 2X1.1(a), which adopts the base offense level from the guideline for the substantive offenses which are the objects of the conspiracy, plus any adjustments from such guideline for intended offense conduct that can be established with reasonable certainty. The base guideline for the substantive offenses is U.S.S.G. Section 2B1.1

2. Base Offense Level: Offense level is **7**, because the wire and mail fraud substantive charged offenses carry a maximum term of imprisonment of 20 years or more.

3. Specific Offense Characteristic 2B1.1(b)(1), applies in this case because there was a loss resulting from the offense conduct. However, that loss reasonably cannot be determined, so the gain that resulted from the offense conduct should instead be used as an alternative measure of loss for the purpose of determining this offense characteristic. See U.S.S.G. Section 2B1.1, comment. (n.3(B)). The gain that resulted from the offense conduct corresponds to the total in proceeds realized from the sale of Fusion Pharm common stock and debt securities convertible into common stock through Microcap Management, LLC; Bayside Realty Holdings; and Meadpoint Venture Partners, LLC, which is approximately $12,204,172, greater than $9,500,000 but not more than $25,000,000, which would increase the offense score **20 levels**, pursuant to U.S.S.G. Section 2B1.1(b)(1)(K).

4. Specific Offense Characteristic 2B1.1(b)(2)(A) applies because the offense conduct involved 10 or more victims, and was committed through mass marketing, increasing the Offense Level by **2 Levels**.

5. The offense conduct involved sophisticated means, within the meaning of Specific Offense Characteristic 2B1.1(b)(10)(C), warranting an additional **2 Level** increase in Offense Level score, pursuant to this provision.

6. Specific Offense Characteristic 2B1.1(b)(19)(A) applies, increasing the offense score another **4 levels**, because the offense conduct involved a violation of securities law and, at the certain times of the offense conduct, defendant Jean-Pierre was identified as the Corporate Secretary of FusionPharm, and was the de facto general counsel throughout his involvement, qualifying him as an officer and director of a publicly traded company.

7. Defendant Jean-Pierre arguably abused a position of trust or, alternatively, used a special skill, thereby increasing his Offense Level score **2 additional levels**, pursuant to U.S.S.G. § 3B1.3.

8. The Total Offense Level for these counts would therefore be Level **37**.

**Guidelines for Other Counts To Be Charged (Counts 24 – 29):**

These counts, which arise out of the 2016 undercover operation, arguably may be considered to constitute separate and distinct offense groups for the purposes of Multiple Count adjustments. However, the total offense levels for any such groups would be 9 or more levels lower than the total offense level for the historical case offense group, disqualifying the undercover group or groups of counts an offense level adjustment. U.S.S.G. § 3D1.4(c)

9. Jean-Pierre has a New York State misdemeanor conviction that resulted in a one year jail sentence, carrying 2 criminal history points, and hence classifying Jean-Pierre in Criminal History Category II.

10. The corresponding advisory sentencing guideline range would be **235 to 293 months**.

Respectfully submitted this 19th day of February, 2019.

                                            JASON R. DUNN
                                            United States Attorney

                                            */s/ JEREMY SIBERT*

                Jeremy Sibert
                Assistant U.S. Attorney
                1801 California Street, Suite 1600
                Denver, Colorado  80202
                (303) 454-0100
                FAX: (303) 454-0403
                Email: jeremy.sibert@usdoj.gov
                Attorney for the government

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of February 2019, I electronically filed the foregoing; Government's Post Trial Statement, with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following email addresses:

 Clifford Barnard
 Attorney for the Defendant


                *s/Jeremy Sibert*
                JEREMY SIBERT
                Assistant United States Attorney
                1801 California Street, Suite 1600
                Denver, Colorado 80202
                Telephone: (303) 454-0100
                Facsimile: (303) 454-0406
                Jeremy.Sibert@usdoj.gov