1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF COLORADO

3      Criminal Action No. 17-cr-0008-WJM

4      UNITED STATES OF AMERICA,

5      Plaintiff,

6      vs.

7      GUY M. JEAN-PIERRE, a/k/a MARCELO DOMINGUEZ de GUERRA,

8      Defendant.

9      ------------------------------------------------------------
              REPORTER'S PARTIAL TRANSCRIPT OF WILLIAM SEARS
10                       (Jury Trial, Day 2)
                            Volume II
11     ------------------------------------------------------------

12     Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

13     Judge, United States District Court for the District of

14     Colorado, on the 15th day of January, 2019, in Courtroom

15     A801, United States Courthouse,

16
                            APPEARANCES
17
           JEREMY S. SIBERT and ROBERT M. BROWN, Assistant U.S.
18     Attorneys, 1801 California Street, Suite 1600, Denver,
       Colorado 80202, appearing for the plaintiff.
19
           CLIFFORD J. BARNARD, Attorney at Law, 4450 Arapahoe
20     Avenue, Suite 100, Boulder, Colorado 80303, AND
           THOMAS E. GOODREID, Attorney at Law, 1801 Broadway,
21     Suite 1400, Denver, Colorado 80202, appearing for the
       defendant.
22

23                  MARY J. GEORGE, FCRR, CRR, RMR
                  901 19th Street, Denver, Colorado 80294
24              Proceedings Reported by Mechanical Stenography
                    Transcription Produced via Computer
25

1           P R O C E E D I N G S

2               (This is a transcript of the testimony of William

3       Sears)

4               (Jury was present at 9:11 a.m.)

5                       *       *       *       *       *

6               THE COURT:  Good morning, ladies and gentlemen of

7       the jury.  Welcome back to day 2 of our jury trial.  Sorry

8       we're 27-some minutes later than we thought to get to you.

9       There were several matters that I needed to discuss with

10      the lawyers outside of your presence.  That's -- the law

11      requires that.  Unfortunately, those matters can't be

12      avoided.  So, again, as I've mentioned earlier in the

13      preliminary instructions, I need to ask for your patience.

14      And these kinds of interruptions we'll try to keep to a

15      minimum but they may occur with some frequency during the

16      trial.  So, again, remember the importance of why we're

17      here and I ask for your patience.

18              All right.  Mr. Sears, I remind you that you

19      remain under oath.

20              THE WITNESS:  Yes, sir.

21              THE COURT:  All right, Mr. Sibert, you may resume

22      your examination.

23              MR. SIBERT:  Thank you, Your Honor.

24                  DIRECT EXAMINATION (Continued)

25      BY MR. SIBERT:

Direct - Sears

1    Q.   All right.  Good morning, Mr. Sears.

2    A.   Good morning.

3    Q.   We left off talking about several e-mails regarding

4    you sending e-mails to Mr. Guy Jean-Pierre.  Do you recall

5    that?

6    A.   Yesterday.

7    Q.   And a lot of those e-mails dealt, you would agree,

8    with the fact with your role with FusionPharm?

9    A.   Yes, sir.

10   Q.   Okay.  And, in addition, the fact that some of those

11   e-mails dealt with the acquisition that you were making

12   with Baby Bee Bright to acquire that shell company.

13   A.   The acquisition that the company was making, yes, sir.

14   Q.   And that company eventually became FusionPharm; is

15   that right?

16   A.   I'm sorry, say that again.

17   Q.   That company eventually became FusionPharm.

18   A.   Yes, sir.

19   Q.   All right.  Now, you stated -- I might -- I did ask

20   you where you lived today.  Where were you living in

21   2011-2014?

22   A.   Thornton, Colorado.

23   Q.   Okay.  And now with FusionPharm, did you have an

24   office within the corporation space?

25   A.   I had a workspace.

1    Q.   Okay.  And where was that workspace located?

2    A.   Several different places.

3    Q.   Can you tell me where these were?

4    A.   Which years, sir?

5    Q.   Why don't we start 2011.

6    A.   2011 would have been 4360 Vine Street.

7    Q.   Vine Street?

8    A.   Yes, sir.

9    Q.   Is that here in Denver, Colorado?

10   A.   Yes, it is.

11   Q.   All right.  And did you have an office there?

12   A.   I had a workspace.

13   Q.   And go ahead and tell me about the next workplace that

14   you had --

15   A.   It was on Wynkoop Street.  I don't remember the exact

16   address.

17   Q.   And where is Wynkoop Street?

18   A.   In Denver, Colorado.

19   Q.   Okay.  And were there any other locations?

20   A.   Yes.  Then I went back to 4360 Vine Street on my own.

21   And then I went to the office in Commerce -- it was a

22   warehouse I built in -- I put together in Commerce City,

23   and I don't remember the exact address on that.

24   Q.   Okay.  But all these in either Commerce City or

25   Denver, Colorado?

Direct - Sears

1   A.   Yes, sir.

2   Q.   When you were conducting these e-mails that we

3   discussed yesterday, where were you usually working on

4   these e-mails before you sent them?

5   A.   It could be home, it could be any one of those

6   offices.  I'm on the run a lot, so it could have been . . .

7   Q.   So fair to say somewhere either in Denver or Thornton,

8   Colorado, or Commerce City?

9   A.   Somewhere in the state of Colorado, yeah.

10  Q.   Where was Mr. Guy Jean-Pierre's office?

11  A.   The one office I know about was in Deerfield Beach,

12  Florida.

13  Q.   Okay.  So not here in Colorado?

14  A.   Not here in Colorado.

15  Q.   All right.  Now, in front of you is Exhibit 226.

16          MR. SIBERT:  And, Your Honor, these are still the

17  same block that have been stipulated to and offered into

18  evidence.

19          THE COURT:  226, yeah, I see that there.  That's

20  why I think Mr. Goodreid's suggestion from yesterday would

21  be helpful in -- even though you are going to break these

22  up into smaller pieces, as I instructed you to yesterday,

23  instead of listing them in the order that they are going to

24  come up in your script, list them in alphanumeric order,

25  because it's much easier -- much, much, easier for me, for

Direct - Sears

1    my courtroom deputy, for defense counsel to follow along

2    and keep track of what you're referring to.

3         You've already got these 25 in, but in the future

4    let's keep those in alphanumeric order.

5         MR. SIBERT:  Yes, sir.  And so the Court knows and

6    the defense did inform me, I did send a list last night,

7    and for today's witness the ones I've submitted, they are

8    going to agree that these have all been stipulated to.

9         THE COURT:  All right.  Good.

10   BY MR. SIBERT:

11   Q.   Okay.  So now do you recognize Government Exhibit 226?

12   A.   Yes, I do, sir.

13   Q.   And can I please have it on the screen and published

14   to the jury.

15        And I would ask the Court for all these exhibits

16   to be published to the jury.

17        THE COURT:  All right.

18   BY MR. SIBERT:

19   Q.   Okay.  Again, sir, can you tell me who wrote this

20   e-mail?

21   A.   I did, sir.

22   Q.   Okay.  Who are you sending it to?

23   A.   Scott Dittman.

24   Q.   Okay.  And what's the reference about?

25   A.   Reservation Confirmation.

51

Direct - Sears

1    Q.   Do you know who you are making a reservation

2    confirmation about?

3    A.   To whom?  Mr. Guy Jean-Pierre.

4    Q.   Okay.  And why would you have to do a reservation for

5    Mr. Guy Jean-Pierre?

6    A.   To bring him into Denver, Colorado.

7    Q.   And where are you bringing him in from?

8    A.   I don't remember, but this should say.

9              Fort Lauderdale, Florida.

10   Q.   And that would be consistent with where his office

11   is --

12   A.   Yes, sir.

13   Q.   -- at the time?

14   A.   Yes, sir.

15   Q.   Okay.  Now, why were you bringing Mr. Guy Jean-Pierre

16   from Florida to Colorado?

17   A.   There was a multitude of reasons, all business

18   related.

19   Q.   And what business was this related to?

20   A.   Some of my personal business and FusionPharm.

21   Q.   And you were bringing him in to talk about business

22   for FusionPharm.  What was his role with FusionPharm?

23   A.   He was the corporate secretary.

24   Q.   Was he anything else?

25   A.   General counsel.

Direct - Sears

1   Q.   All right.  Can you look at -- you can take down 226.

2   And can you please look at Exhibit 382.  Okay.

3        Do you have 382 in front of you there?

4   A.   Yes, I do.

5   Q.   And what is 382?

6   A.   It's an e-mail.

7   Q.   Okay.  And who's writing the e-mail?

8   A.   I am, sir.

9   Q.   And who are you writing the e-mail to?

10  A.   Guy Jean-Pierre.

11  Q.   Okay.  What is this e-mail about?

12  A.   It's subject:  Trustee agreement.

13  Q.   Okay.  And what are you asking -- can I have this

14  brought up a little bit, please.  To the second page.  I'm

15  sorry, can you go back to the first page.

16       I'm circling on the screen here the second

17  sentence, if you look on your screen.  Second sentence of

18  that e-mail says, "This would be for both my interests in

19  FS and Scotts in meadpoint."

20       What is FS to you?

21  A.   FusionPharm.

22  Q.   And who is Scott to you here?

23  A.   My brother-in-law.

24  Q.   Okay.  And he was the CEO of FusionPharm?

25  A.   Yes, he was.

Direct - Sears

1   Q.   And in this e-mail, what are you discussing about

2   Scott's interests, in what company?

3   A.   Meadpoint.

4   Q.   And you're sending a document.  What are you sending

5   Guy Jean-Pierre?

6   A.   It's a declaration of trust in respect of shares.

7   Q.   And regarding these two companies, correct?

8   FusionPharm, Meadpoint?

9   A.   Specifically -- yeah, in this e-mail, yeah.

10  Q.   And then you're asking -- what are you asking Mr. Guy

11  Jean-Pierre to do?

12  A.   To review it.

13  Q.   And what else?

14  A.   Make any appropriate changes.

15  Q.   Can I have that down, please.  Could I have

16  Exhibit 372-Q.

17       Can you please look at 372-Q in front of you.

18  A.   Yes, sir.

19  Q.   All right.  Again, can you explain to the jury what

20  372 is.

21  A.   It is an e-mail.

22  Q.   Okay.  And let's keep going.  Who wrote the e-mail?

23  A.   I wrote the e-mail.

24  Q.   And who are you writing the e-mail to?

25  A.   Andrew Duke and Scott Dittman.

54
Direct - Sears

1   Q.   What's this e-mail concerning?

2   A.   It says my curriculum vitae.

3   Q.   And do you know whose curriculum vitae that's about?

4   A.   Guy Jean-Pierre.

5   Q.   All right.  And, in fact, that CV is attached; is that

6   correct?

7   A.   Yes, sir.

8   Q.   All right.  Can you please look at page 3.  I'm just

9   going to circle here on the top.  Would you please tell the

10   jury what Mr. Guy Jean-Pierre's representing to you

11   regarding his securities experience -- his security

12   attorney experience?

13   A.   Yes.  It says, "Corporate and Securities Attorney for

14   over 20 years with significant experience in a number of

15   substantive areas including the following:

16         "General Corporate -- General Corporate, Contracts

17   and Compliance.

18         "International and Business Development.

19         "Securities and Corporate Finance.

20         "Transactions including Mergers and Acquisitions."

21   Q.   Can I have page 4, please.  And I'm going to circle

22   his education.

23         Where did Mr. Guy Jean-Pierre represent to you he

24   went to school?

25         Can I have this blown up, please.

Direct - Sears

1    A.   Columbia University School of Law -- New York,

2    New York, and also Amherst College, Amherst,

3    Massachusetts.

4    Q.   And where was he barred?

5    A.   Barred admissions Florida, 2004; New York, 1989;

6    California 1986.

7    Q.   What does that mean to you, the bar admissions?

8    A.   Meaning you're not allowed to practice.

9    Q.   To your understanding it means he's not allowed to

10   practice?

11   A.   I don't really -- I'm not a lawyer, it's tough for

12   me -- I don't know if bar means you got in trouble -- no,

13   bar admissions, he's allowed to practice in Florida,

14   California, and New York.  My bad, I had that wrong.

15   Q.   Fair point.  Could I have Exhibit 372-T, please.

16        Okay.  Can you tell the jury what Exhibit 372 is.

17   A.   It is an e-mail.

18   Q.   Okay.  And let's keep going here.  Who's it from?

19   A.   It's from myself.

20   Q.   And who are you e-mailing to?

21   A.   Guy Jean-Pierre.

22   Q.   Okay.  And what are you asking Mr. Pierre to do?

23   A.   To give it a quick eye.

24   Q.   A quick eye of what?

25   A.   To look over the document.

Direct - Sears

1    Q.   And do you know what this document is?

2    A.   It is a subscription agreement.

3    Q.   Can I have page 3 of the attachment, please.  May I

4    have the top blown up, please, where it says Subscription

5    on page 3.  And page 3, please.

6         Is this page 3?

7    A.   Yeah, that's page 3.

8    Q.   Can you tell the jury what this subscription agreement

9    was for?

10   A.   It is to subscribe for common stock of FusionPharm.

11   Q.   Okay.  And describe what you're doing here with the

12   common stock.

13   A.   This was -- it was to raise capital for the company.

14   The company was looking to raise capital.

15   Q.   Okay.  And what company are we talking about?

16   A.   FusionPharm.

17   Q.   Can I have page 4, please.  And can you scroll up,

18   please.  Keep going, please.

19        Do you know how many shares you were looking at

20   here to raise?

21   A.   No, I don't.

22        MR. SIBERT:  Your Honor, may I have a minute?

23        THE COURT:  You may.

24   BY MR. SIBERT:

25   Q.   Sorry.  Can I have page 3 again.  Can I have the top

1    again right under "Ladies and Gentlemen."  I'm going to

2    circle this on the screen.

3          Does that refresh your memory of how many shares

4    you need that you're trying to raise?

5    A.   In this particular document.  There was many versions

6    of this.

7    Q.   Okay.  What does the document says?

8    A.   It says "of up to 4 million shares."

9    Q.   Does that refresh your memory?

10   A.   That's what the document says, sir.  I don't remember

11   the . . .

12   Q.   So this wasn't the only one that you were raising

13   shares for?

14   A.   The company had circulated a bunch of these

15   FusionPharm.

16   Q.   All right.  It was Mr. Guy Jean-Pierre that was

17   helping you with these documents?

18   A.   Yes, sir.

19   Q.   Can I have 372-U.

20         Do you have 372-U in front of you?

21   A.   Yeah, okay.  372 -- yes, I do.

22   Q.   Okay.  Can you tell the jury what Government

23   Exhibit 372-U is.

24   A.   It is another e-mail.

25   Q.   Okay.  And can you describe what the e-mail consists

Direct - Sears

1      of -- who's making it and who's receiving it?

2      A.    I'm sending the e-mail, Mr. Dittman is receiving the

3      e-mail.

4      Q.    And what is -- what does this involve?

5      A.    This is -- the subject is a 504, and there's an

6      attachment that is a FusionPharm Offering Memorandum Rule

7      504.

8      Q.    And that would be an initial offering document; is

9      that correct?  504?

10     A.    I don't know.

11     Q.    Look at the date, Mr. Sears.

12     A.    Yeah, I see the date.

13     Q.    It's the beginning of FusionPharm; would you agree

14     with me on that, at least?

15     A.    It's in that year, yeah, the end of the year.

16     Q.    Could I have Government Exhibit 372-CC.

17           Do you recognize Government Exhibit 372-CC?

18     A.    Yes.

19     Q.    Okay.  What is it?

20     A.    It is another e-mail.

21     Q.    Okay.  And who wrote the e-mail?

22     A.    I wrote the e-mail.

23     Q.    And who are you writing it to?

24     A.    Scott Dittman.

25     Q.    Okay.  And what is the subject?

Direct - Sears

1    A.    Contact.

2    Q.    All right.  Now, if you look down here, there's

3    another e-mail.  Would you agree with that?

4    A.    Yes, sir.

5    Q.    Okay.  And there's the -- can you see what I'm

6    circling?  "Guy"?

7    A.    Yes.

8    Q.    And who's Guy?

9    A.    Mr. Guy Jean-Pierre.

10   Q.    Okay.  And who's writing Mr. Guy Jean-Pierre in this

11   e-mail?

12   A.    Scott Dittman.

13   Q.    All right.  And can you scroll up, please.  Okay.

14         Again, down here, I'm circling on the screen,

15   there's another e-mail chain.  Who wrote that e-mail?

16   A.    I did.

17   Q.    Okay.  And who are you writing it to?

18   A.    Guy Jean-Pierre.

19   Q.    And what are you asking him -- what are you writing

20   him here in this e-mail?

21   A.    He had contacted me and I said I would make contact

22   that evening because I was traveling.

23   Q.    Okay.  And what e-mail is this?

24   A.    *Guy@fusionpharminc.com*.

25   Q.    Keep scrolling up, please.  Okay.  A little bit -- I'm

Direct - Sears

1    sorry, can you go back to that first page.  Down.  Thank

2    you.  Can you focus in on this middle, please.

3    A.   Yes, sir.

4    Q.   Do you recognize who's writing this -- this e-mail?

5    A.   Yes, I do.

6    Q.   Who's writing that?

7    A.   Mr. Guy Jean-Pierre.

8    Q.   Okay.  What does "DR" mean to you?

9    A.   The Dominican Republic.

10   Q.   And how do you know that?

11   A.   Because I know Mr. Jean-Pierre lived in the Dominican

12   Republic for a period of time.

13   Q.   And this is back in 2012; is that correct?

14   A.   Yes, sir.

15   Q.   Okay.  And whose phone number is 1-829-372-3750?

16   A.   I don't know for a fact, but I would imagine from the

17   e-mail it was his number down in the DR.

18   Q.   Did you ever call Mr. Guy Jean-Pierre down in the DR?

19   A.   Yes, sir.

20   Q.   Do you remember what phone number you used?

21   A.   No.

22   Q.   Does that phone number look familiar?

23   A.   Honestly, no.  I just don't remember the number, sir.

24   Q.   Could I have Government Exhibit 40, please.

25            Okay, sir, do you recognize Government Exhibit 40?

Direct - Sears

1    A.    Yes, I do.

2    Q.    And what is Government Exhibit 40?

3    A.    It is another -- it's an e-mail.

4    Q.    Okay.  And can we describe to the jury about who is

5    sending and who's receiving the e-mail.

6    A.    I'm sending the e-mail, and a gentleman by the name of

7    John at Mazda of Lakewood is receiving the e-mail.

8    Q.    Who else is receiving the e-mail?

9    A.    Kelly Blume at FusionPharm.

10   Q.    Who is Kelly Blume?

11   A.    Kelly Blume was an employee of FusionPharm.

12   Q.    And the e-mail is dated January of 2012; is that

13   correct?

14   A.    Yes, it is.

15   Q.    Can you go to the first page of the attachment for me,

16   please, on the screen.  Can you blow up that first page,

17   please.  First page.  Can you please blow up the top.

18            It states here that Ms. Blume is the office

19   manager; is that correct?

20   A.    She was for a period of time, as far as I knew.

21   Q.    For FusionPharm.

22   A.    Yes, sir.

23   Q.    Okay.  Did you know Ms. Blume in 2011?

24   A.    Yes, I did.

25   Q.    Where was she working?

1    A.    FusionPharm.

2    Q.    This says January 30th, 2012.  She was still the

3    office manager.

4    A.    She was the office manager on and off.  They went

5    through a few.

6    Q.    How big was FusionPharm, Mr. Sears?

7    A.    Not very big, not a big company.

8    Q.    Well, tell the jury:  Who worked at FusionPharm?

9    A.    I don't remember everybody.  There was an Andrew Duke,

10   there was a lot of people come and going and a lot of -- a

11   lot of additional --

12   Q.    Who do you remember?

13   A.    I remember Andrew Duke, Frank Falconer, Kelly Blume.

14   I can't remember the other woman's name.  Paula Von

15   Steklenberg, Brian Cook, and there was a whole bunch of

16   consultants, subcontractors, and things to that effect.

17   Q.    Were there -- how many employees total approximately?

18   A.    Couldn't tell you.  It varied from month to month.

19   Q.    Okay.

20   A.    Gino Rodriguez was there in the very beginning.

21   Q.    Let's hit the big targets.  Who was the CEO?

22   A.    Scott Dittman.

23   Q.    Who was your legal counsel and corporate security?

24   A.    Guy Jean-Pierre.

25   Q.    Who helped you with your financials and put together

Direct - Sears

1    the annual and quarterly reports?

2    A.    A few different people put the company's --

3    Q.    Who did you travel to Florida with?

4    A.    Who did I travel to Florida with?

5    Q.    In 2011 -- excuse me, 2012 and 2013.

6    A.    Could you be more specific, sir?  I made a lot of

7    trips to Florida.

8    Q.    Who did you travel with to Florida to see Mr. Guy

9    Jean-Pierre?

10   A.    Cliffe Bodden.

11   Q.    Who helped you with the quarterly and annual reports?

12   A.    Excuse me?

13   Q.    Who sent you e-mails with your quarterly and annual

14   reports?

15   A.    Cliffe Bodden sent the e-mails with the quarterly and

16   annual reports for FusionPharm.

17   Q.    From the summer of 2011 all the way up through,

18   essentially, the first quarter of 2013?

19   A.    No -- Cliffe disappeared for a while, so there was a

20   period of time that I remember Scott was all aggravated

21   because he had to do it all -- do it all.

22   Q.    So if I showed you all these e-mails where he's

23   sending you quarterly reports, you would still say he

24   disappeared?

25   A.    He did disappear for a while.  Could have been '11 or

Direct - Sears

1    '12.  I mean, it was a long time -- a long time.

2    Q.   How many officers and directors did FusionPharm have?

3    A.   Two, that I recall.  Maybe three.

4    Q.   Who were they?

5    A.   Scott Dittman and Guy Jean-Pierre.

6    Q.   And do you remember, what was your role at

7    FusionPharm?

8    A.   I had many different roles.  I had a very small -- I

9    had a small role in the sales and marketing for about a

10   year and a half, almost -- about a year and a half.

11          MR. SIBERT:  Your Honor, I would request to

12   approach the witness to provide him his plea agreement in

13   this case in order to refresh his memory.

14          THE COURT:  Okay.  Why don't you hand it to the

15   courtroom deputy, who will hand it to the witness.

16          MR. SIBERT:  And the defense has a copy of this,

17   but obviously I have not shown them this this morning.

18          MR. GOODREID:  Your Honor, I'm not sure -- I don't

19   object to the witness having the document, but I'm not sure

20   as of the moment there's a question pending that would

21   require or enable his recollection to be refreshed.  Maybe

22   that's --

23          THE COURT:  I thought -- my reading of the -- my

24   realtime here is the question pending is:  What was the

25   witness's role at FusionPharm?  And the witness answered

Direct - Sears

1   that for about a year and a half, he had a small role in

2   sales and marketing.  I'm assuming the plea agreement will

3   refresh his recollection as to other roles he had with the

4   company.

5          MR. SIBERT:  Right --

6          THE COURT:  And if that's the case, I think it's

7   appropriate.  He can review the document, put it down, and

8   then testify from his refreshed recollection.

9          MR. SIBERT:  Thank you, Your Honor.

10          THE COURT:  Go ahead, Mr. Sibert.

11          MR. SIBERT:  Thank you.

12          THE COURT:  Is there a specific part -- I recall

13   this being a lengthy plea agreement.  Is there a specific

14   part you want him to review before he puts it down and

15   testifies?

16          MR. SIBERT:  So the Court understands, I've tabbed

17   several pages, but I've given him the opportunity to -- on

18   the highlighted section of this page.

19          THE COURT:  All right.

20          MR. GOODREID:  Which page would that be?  May I

21   inquire?

22          THE COURT:  All right.  You may.

23          MR. SIBERT:  I didn't memorize the pages.

24          THE COURT:  What page are you on, Mr. Sears?

25          THE WITNESS:  I'm on page 20, sir.

Direct - Sears

1           THE COURT:  20?

2           THE WITNESS:  Yes, sir.

3           THE COURT:  All right.

4   BY MR. SIBERT:

5   Q.   Does that refresh your memory?

6   A.   I don't see how it applies to what you're asking.  If

7   you're a shareholder of a company, it doesn't mean you have

8   a role in it.

9           MR. SIBERT:  Your Honor, I would ask --

10          THE WITNESS:  It says, "Sears was able to avoid

11  being disclosed in FusionPharm's financial disclosure

12  documents as a 10 percent shareholder of the company's

13  preferred stock and in affiliated FusionPharm based on his

14  ownership."

15          Ownership doesn't give you a role because you have

16  stock in a company.

17          THE COURT:  Is there another --

18          MR. SIBERT:  Thank you, Your Honor.

19          THE COURT:  All right.

20  BY MR. SIBERT:

21  Q.   So your memory is at least refreshed now that you had

22  ownership in FusionPharm; is that correct?

23  A.   That is correct.

24  Q.   And you were an affiliate.

25          MR. GOODREID:  Objection.  Leading.

Direct - Sears

 1          THE COURT:  Sustained.
 2    BY MR. SIBERT:
 3    Q.   Based upon refreshing your memory, what were you with
 4    FusionPharm?
 5    A.   Based on the questions you're asking prior, the
 6    Government said that I was an affiliate of the company.
 7    Q.   Did you sign that document?
 8    A.   Yes, I did.
 9    Q.   Did you tell this Court under oath that all the facts
10    in there were true and accurate?
11    A.   Yes, I did.
12    Q.   Did you object to the fact that you were an affiliate
13    in that document?
14    A.   Not in that document, sir.
15    Q.   But now you're having difficulties today saying it?
16    A.   I --
17          MR. GOODREID:  Objection --
18          THE WITNESS:  I didn't have --
19          MR. GOODREID:  Objection.  Leading.
20          THE COURT:  That's overruled.  You may answer.
21          THE WITNESS:  Thank you.
22          I've had objections with that from the very start,
23    sir.  There are legal opinions that say I'm not, there are
24    ones that say I am.  The Government says I am, so here I
25    am.

Direct - Sears

1          MR. SIBERT:  Your Honor, at this time I would ask

2     to be allowed to treat this witness under Rule 615 under

3     the Federal Rules of Evidence.

4          THE COURT:  Does the plea agreement to which he

5     stipulated state that he was an affiliate of FusionPharm?

6          MR. SIBERT:  It does.

7          THE COURT:  All right.  He's now denied that.  For

8     this limited part of the examination, you may examine by

9     leading questions.

10         MR. SIBERT:  And can I have -- can I approach,

11    Your Honor?  Briefly.  I would ask about judicial notice.

12         THE COURT:  All right.

13       (Discussion at sidebar)

14         THE COURT:  Okay.

15         MR. SIBERT:  Thank you, Your Honor.  As you can

16    see, my star witness is going a little haywire on me, but

17    the legal definition under the securities law --

18         THE COURT:  Lower your voice.

19         MR. SIBERT:  Sorry.  The legal definition under

20    securities law of an affiliate is a control person.  I can

21    ask him that.  I probably won't get that, but I would ask

22    the Court to instruct the fact that based upon an

23    affiliation -- I'm going to get a hiccup here because he's

24    going to say he's not a lawyer and he's going to sidebar me

25    about that, so I mean -- the rule --

Direct - Sears

1          THE COURT:  Isn't that why you would have --

2          MR. SIBERT:  Sure.  I have my expert, yes --

3          THE COURT:  -- your expert to say an affiliate is

4   a control person?  I don't think this person is competent

5   to testify --

6          MR. SIBERT:  I agree with the Court.

7          THE COURT:  All right.  Okay.

8          MR. SIBERT:  I'll work around it.

9          THE COURT:  All right.

10          MR. SIBERT:  Sorry.

11          THE COURT:  Okay.

12       (End of discussion at sidebar)

13          THE COURT:  All right.  You may resume, Mr.

14   Sibert.

15          MR. SIBERT:  Thank you.  And thank you for that

16   time.

17   BY MR. SIBERT:

18   Q.   Sir, just to quickly recap, what you've testified here

19   to under oath is that you had ownership in FusionPharm, and

20   you are saying regardless of what your plea agreement is,

21   that you were not an affiliate of FusionPharm?

22   A.   Once again, what I was saying -- what I did say is

23   some would say I was and some would say I wouldn't.  As I

24   sit here today, I'm quite confused about it, so --

25   Q.   I'm asking you not what others said and what --

Direct - Sears

1    A.    And I'm telling you I'm not sure.

2    Q.    So you have no clue what -- even though you had

3    ownership you don't understand your role, even though you

4    had ownership of FusionPharm of what --

5    A.    I understand my role, sir.  I think the question was

6    you're trying to -- am I an affiliate or not.  And as I

7    answered, some would say I was and some would say I wasn't.

8    Legal minds.  So that's -- I'm quite confused.

9    Q.    Well, you're familiar with the Rule 144 letter, would

10   you agree with me on that?

11   A.    Yes, I am, sir.

12   Q.    And what does the 144 letter usually say about

13   shareholder?

14   A.    144 legend can be removed after one year and a

15   shareholder cannot have more than 10 percent of a company.

16   I believe that would be subject to some other rules and

17   regulations with regard to liquidation.

18   Q.    Do you know if the 144 says that a shareholder can be

19   an affiliate or not an affiliate?

20   A.    It doesn't go into the definition of affiliate or

21   nonaffiliate on a certificate, it just says anybody owning

22   more than 10 percent, sir.

23   Q.    Okay.  All right.  So let's get back to this document,

24   page 2.  This second paragraph.

25   A.    I'm sorry, sir, which exhibit did you want me to look

Direct - Sears

1    at?

2    Q.   It's Government's Exhibit 40, page 2.  I'm circling

3    the second paragraph on the screen.  Can I have that blown

4    up, please.

5    A.   Okay.

6    Q.   So we just went through a lot of questions about your

7    role at FusionPharm and you're obviously confused.  But

8    obviously it's fair to say you were getting paid a

9    salary?

10   A.   Yes, sir.

11   Q.   And what was your salary?

12   A.   It varied, but tried to keep it at 5,000 a month.

13   Q.   Okay.  What's your salary, according to this document?

14   A.   It says 5,000.

15   Q.   And that's since January 2011 through March 1st, 2012.

16   A.   That's what the e-mail says.

17   Q.   And that's with FusionPharm.

18   A.   Yes, sir.

19   Q.   And the first page, please.

20        You're the one sending the e-mail, correct?

21   A.   Yes, I am, sir.

22   Q.   Okay.  Can I have Exhibit 229, please.

23        And, again, sir, can you -- do you recognize

24   Government Exhibit 229?

25   A.   I don't have it in my thing here.

Direct - Sears

1    Q.   It's on your screen right there.

2    A.   I know, but I want to make sure that it's the one that

3    I signed, sir, with all due respect.

4         Yes, I do.

5    Q.   And what is Government Exhibit 229?

6    A.   It is an e-mail.

7    Q.   Okay.  And, again, sir, who wrote the e-mail?

8    A.   I wrote the e-mail.

9    Q.   And who were you writing the e-mail to?

10   A.   Andrew Duke.

11   Q.   Okay.  And who was Andrew Duke?

12   A.   Andrew Duke was an employee of FusionPharm.

13   Q.   Okay.  And, in fact, there's Andrew Duke's

14   FusionPharm's address, correct?

15   A.   Indeed, sir.

16   Q.   E-mail address.

17   A.   Yes, sir.

18   Q.   And what are you telling Andrew Duke in this e-mail?

19   A.   I was telling him I was disturbed about an e-mail and

20   I wanted to separate our other business interests from

21   FusionPharm.

22   Q.   But you're actually saying, "Let's part ways in

23   regards to your business with FusionPharm"; isn't that

24   right?

25   A.   Yes, because I was doing other business with him and

Direct - Sears

1    other deals.

2    Q.   In fact, it's right here; is that correct?

3    A.   Yes, "Let us part ways with regard to our business

4    regarding FusionPharm and continue our friendship."

5    Q.   So part of your role was that you could tell people to

6    part ways from the company.

7              MR. GOODREID:  Objection --

8              THE WITNESS:  No, that's --

9              MR. GOODREID:  Objection.  Leading.

10             THE COURT:  Sustained.

11   BY MR. SIBERT:

12   Q.   Did you have the ability to let people go from

13   FusionPharm?

14   A.   No, I did not.

15   Q.   So based upon this e-mail, you're not telling -- what

16   are you telling Mr. Duke, then, in this e-mail?

17   A.   I really don't recall.  I don't think it was our

18   business regarding FusionPharm, that's between he and I.

19   As I said, Andrew and I had a few other transactions and

20   companies we were dealing with at that time, and I didn't

21   want it to muddy everything else.

22   Q.   What does "part ways" mean to you?

23   A.   To part ways, go separate ways.

24   Q.   Was Mr. Duke allowed to work at FusionPharm anymore?

25   A.   I have no idea.  I don't recall this e-mail precisely.

74
Direct - Sears

1    Q.   Is that your phone number at the bottom of that

2    e-mail?

3    A.   Yes, it is.

4    Q.   Can I have Government Exhibit 372-II.

5         Do you recognize Government Exhibit 372-II?

6    A.   Yes, sir.

7    Q.   Okay.  And who wrote this e-mail?

8    A.   I wrote it.

9    Q.   And who are you writing it to?

10   A.   Mr. Cliffe Bodden.

11   Q.   Okay.  He's here now working with you regarding

12   FusionPharm.

13   A.   Yes.  He was working -- yes.

14   Q.   So he's not disappeared.

15   A.   Not on that day.

16   Q.   Okay.  Right below your e-mail, who's sending that

17   e-mail?

18   A.   Cliffe Bodden.

19   Q.   And who's he sending that e-mail to?

20   A.   Guy Jean-Pierre.

21   Q.   Can you scroll up a little bit on that e-mail, please.

22   Right there, please.

23        Okay.  And at the bottom, there's another e-mail;

24   is that correct?

25   A.   Yes, sir.

75

Direct - Sears

1    Q.   Okay.  And who's sending that e-mail?

2    A.   Guy Jean-Pierre.

3    Q.   And who's he sending it to?

4    A.   Myself.

5    Q.   Okay.  And what's the subject?

6    A.   Certificate of designation.

7    Q.   Okay.  And what is the e-mail discussing that Mr. Guy

8    Jean-Pierre is sending you?

9    A.   Judging by the e-mail, it says there was no

10   certificate of designation and I'll have to create one.

11   Q.   And what else is he talking about here?

12   A.   He's talking about one of the language -- he's talking

13   about the language in the sent certificate saying that no

14   one will be able to convert for more than 9.9 percent of

15   the outstanding common stock of the company.

16   Q.   So it's fair to say he's talking to you about

17   certificate designation and the stock in FusionPharm?

18   A.   Yes, sir.

19   Q.   Is Scott Dittman on that e-mail?

20   A.   I don't see him on this particular one, no, sir.

21   Q.   Can I have Government Exhibit No. 372-MM.  Okay.

22        Again, sir, do you recognize Government Exhibit

23   372-MM?

24   A.   Yes, I do.

25   Q.   Okay.  And the same questions:  Who is the e-mail

1    written from and to?

2    A.    The e-mail was written from myself to Mr. Cliffe

3    Bodden.

4    Q.    Okay.  And, again -- and you would agree with me that

5    Mr. Cliffe Bodden has not disappeared at this time.

6    A.    Apparently not.

7    Q.    And this is June 18th, 2012?

8    A.    Yes, it is, sir.

9    Q.    Okay.  And this is regarding -- what's the subject?

10   A.    Form D.

11   Q.    And what's the attachment?

12   A.    It's a Form D.

13   Q.    And who creates the Form Ds?

14   A.    Individuals, lawyers.

15   Q.    What's the e-mail say, Mr. Sears?  You attached this.

16   You just testified --

17   A.    You didn't say who did create, you said who does.  I'm

18   trying to answer your questions as specifically as I can.

19   Q.    What did you write on the attachment?

20   A.    It says Form D, sir.

21   Q.    What does it say before that?

22   A.    "As discussed, attached please find the bare-bones SEC

23   Form D.  Let's go over it in an hour or so."

24   Q.    What does the SEC mean to you?

25   A.    The Securities and Exchange Commission.

Direct - Sears

1   Q.   And was this for FusionPharm?  Take your time and look

2   at the attachment.  Does that refresh your memory?

3   A.   No, it doesn't.  But -- okay.  It would appear it

4   would be for a corporation -- or a company or --

5   Q.   Is Mr. Scott Dittman on that e-mail?

6   A.   No, he's not, sir.

7   Q.   Okay.  Can I have Exhibit 254, please.  Can I have the

8   top blown up.  Thank you.

9        Okay, sir, do you recognize Government Exhibit

10  254?

11  A.   No, I don't.  This one I didn't initial.

12  Q.   Can you look on your screen.  It's on the screen as

13  well.

14  A.   I see the screen, but this is not one I initialed so I

15  can't honestly say I looked at it or perused it.

16  Q.   Who wrote the e-mail?

17  A.   It says I did.

18  Q.   Do you recognize the e-mail address?

19  A.   Yes, I do.

20  Q.   Whose e-mail address is that?

21  A.   That would be my e-mail address.

22  Q.   Okay.  And who are you sending the e-mail to?

23  A.   Sending the e-mail to Mr. Cliffe Bodden.

24  Q.   And do you know Mr. Cliffe Bodden?

25  A.   Yes, I do know who Mr. Cliffe Bodden is.

Direct - Sears

1   Q.   And is that his e-mail?

2   A.   That was one of them, yes.

3   Q.   Can you scroll up on that exhibit to this point right

4   here, please.

5        Do you see an e-mail there in the middle of that

6   screen?

7   A.   Yes, I do.

8   Q.   And who's the e-mail from?

9   A.   That's from Mr. Bodden.

10  Q.   To who?

11  A.   To myself.

12  Q.   And what is Mr. Bodden telling you?

13  A.   He's telling me not to use my nonaffiliated

14  FusionPharm because it could create a problem because Mr.

15  Jean-Pierre -- well, that's what he told me to do.

16  Q.   Okay.  So the communication, if I understand

17  correctly, is that Mr. Bodden -- what is Mr. Bodden saying

18  how to respond to Mr. Nick?  Who is Nick?

19  A.   It was a gentleman by the name of Nick Maleno.

20  Q.   And did you communicate with Mr. Nick Maleno?

21  A.   Yes, I did.

22  Q.   Okay.  And so what is Mr. Bodden telling you in this

23  e-mail?

24  A.   Not to use the FusionPharm e-mail.

25  Q.   Well, let's read it all correctly.

                         Direct - Sears

1    A.    "Make sure you correspond with Nick only through your

2    nonfusion affiliated e-mail."

3    Q.    Affiliated e-mail?

4    A.    Indeed, sir.

5    Q.    Can you go back up to the top, please, and scroll in.

6          And what are you telling Cliffe here?

7    A.    I said yes -- this one -- I said, "Yes, indeed... I

8    only did this as a response to you.  I never use this one.

9    Only you do... MoMo."

10   Q.    And what are you talking about there?

11   A.    I'm talking about -- can I explain the whole situation

12   or you --

13   Q.    I'm asking you a question.  What --

14   A.    Talking about the nonaffiliated FusionPharm e-mail

15   that I shouldn't have used after I was told that it was

16   stuck on my computer, and when I hit the button it goes to

17   a default --

18   Q.    You had a FusionPharm e-mail on your computer?

19   A.    At one time I did, yes, sir.

20   Q.    And you actually -- would you -- you're agreeing with

21   Mr. Bodden here, correct?

22   A.    Absolutely.

23   Q.    And the date of this is June 19th, 2012?

24   A.    Yes, it is.

25   Q.    May I please have Government Exhibit 372-OO.  Okay.

                          Direct - Sears

1    We just went through some e-mails in June.  Here we are at
2    the end of June 2012.  Do you recognize Exhibit 372 zero
3    zero -- or excuse me, OO?
4    A.   Yes, I do.
5    Q.   Can you tell the jury what it is?
6    A.   It is another e-mail.
7    Q.   From who?
8    A.   Myself.
9    Q.   What e-mail account are you using?  What e-mail
10   account are you using?
11   A.   My FusionPharm e-mail.
12   Q.   So would you agree with me what you just testified
13   back in June 11th, 2012, the exhibit we just looked at, how
14   many weeks had gone by now?
15   A.   It looks like about a week and a half.  And I was
16   still on the same computer apparently.
17   Q.   You're using the same e-mail.
18   A.   It happens.
19   Q.   Who are you e-mailing to?
20   A.   Scott Dittman.
21   Q.   CEO of FusionPharm?
22   A.   Yes, sir.
23   Q.   What e-mail are you using?  You sent him an e-mail.
24   A.   It's the same e-mail.  I'm sorry, I --
25   Q.   What e-mail are you e-mailing Scott Dittman to?

Direct - Sears

1    A.    The FusionPharm e-mail.

2    Q.    And what's the subject?

3    A.    Forwarding a FSPM Thaden opinion letter.

4    Q.    Okay.  And we've been through this yesterday.  What is

5    FSPM?

6    A.    It's the trading symbol for FusionPharm, Inc.

7    Q.    And then it says Thaden opinion letter, right?  LTR.

8    What does that mean to you?

9    A.    It's an opinion letter based on securities.

10   Q.    Who writes the opinion letter?

11   A.    This particular one was Mr. Jean-Pierre.

12   Q.    And so FusionPharm Thaden opinion letter, would you

13   agree with that?

14   A.    Yes, sir.

15   Q.    And then you have attached.  What's attached to this

16   e-mail?

17   A.    It is a letter of opinion.

18   Q.    Who did you send all your letter of opinions to when

19   they needed to either be reviewed or drafted?

20   A.    Depending on the period of time, this --

21   Q.    On 2011 to 2013.

22   A.    The beginning of '13 would be Guy Jean-Pierre.

23   Q.    May I have Government's Exhibit 372-PP.  All right.

24          Can you tell the grand -- do you see that -- do

25   you have Government Exhibit 372-PP in front of you?

Direct - Sears

1    A.   Yes, I do.

2    Q.   And what is it?

3    A.   It is an e-mail -- it's an e-mail.

4    Q.   Okay.  And, sir, who wrote the e-mail?

5    A.   I wrote the e-mail.

6    Q.   All right.  And who did you send it to?

7    A.   I sent it to Scott Dittman.

8    Q.   Okay.  So now we're using the *williamjsears.com*

9    address; is that correct?

10   A.   Yes, sir.

11   Q.   But we're still sending an e-mail to Scott Dittman

12   under his FusionPharm address; is that correct?

13   A.   Absolutely.

14   Q.   And what are you attaching to the e-mail?

15   A.   An exclusive licensing agreement.

16   Q.   For what?

17   A.   For my company Vertifresh.

18   Q.   Your company Vertifresh?

19   A.   My company Vertifresh.

20   Q.   Can I have Government Exhibit 372-RR.  Before we get

21   to that, can I have that taken down, please.

22        Can you tell the jury what role Mr. Guy

23   Jean-Pierre played with the Vertifresh agreement.

24   A.   Business lawyer.

25   Q.   What does that mean?

Direct - Sears

1    A.   Handling any -- any legal -- any legal needs for the
2    company.
3    Q.   Did you write the agreement?
4    A.   No, I did not.
5    Q.   Who wrote the agreement?
6    A.   I don't know.  I think it was a boilerplate.
7    That's -- possibly Cliffe pulled down.
8    Q.   Did you have anyone review the agreement?
9    A.   Yes.
10   Q.   Who?
11   A.   I had Mr. Stuart Leudan review the agreement and also
12   Guy Jean-Pierre.
13   Q.   Can I have Exhibit 372-RR up, please.
14        Okay, sir, do you have 372-RR in front of you?
15   A.   Yes, I do.
16   Q.   Do you recognize this?
17   A.   Yes.
18   Q.   Okay.  And can you tell the jury what it is.
19   A.   It is another e-mail.
20   Q.   Okay.  And who wrote the e-mail?
21   A.   I did.
22   Q.   Do you like going to the dentist, sir?
23   A.   Excuse me?
24   Q.   Do you like going to the dentist?  When I asked you
25   for a document, could you describe what the document is and

Direct - Sears

1  who wrote it and who sent it?

2  A.   Sure.

3  Q.   Thank you.

4  A.   Not a problem.

5  Q.   And who did you send it to?

6  A.   I sent it to Scott Dittman.

7  Q.   Okay.  Again, we're looking at these e-mails.  You're

8  not using your FusionPharm e-mail on that; is that

9  correct?

10 A.   No, I am not.

11 Q.   What e-mail are you using?

12 A.   *william@williamjsears.com.*

13 Q.   And what e-mail are you sending it to for Scott

14 Dittman?

15 A.   *scottdittman@fusionpharminc.com.*

16 Q.   Okay.  And what are you telling the CEO of FusionPharm

17 to do here?

18 A.   I'm asking him to inform me about a specific

19 certificate.

20 Q.   You're not asking him to send something to the

21 transfer agent?  Look on your screen, sir, I circled.  I

22 made it easy for you.

23 A.   Yes, I am.

24 Q.   What are you telling Scott Dittman to do?

25 A.   Telling him I would like to be informed when

Direct - Sears

1    certificate number 11156 in the name of Morningstar

2    Holdings is presented for transfer.

3    Q.   Sir, please read the line underneath "Scott."

4    A.   "Please send to Amanda Martin at Pacific Stock

5    Transfer."

6    Q.   So you can't tell what your role is here today, yet

7    you're telling the CEO.  What are you telling the CEO of

8    FusionPharm stock to do?

9    A.   Inform me about a transfer.

10   Q.   You're not telling him to send something?

11   A.   Apparently I am.  I don't remember the transaction,

12   sir.  I don't know what --

13   Q.   You would at least agree with me that the chief

14   executive officer is the boss of a company?

15   A.   Absolutely.

16   Q.   I'll take Government Exhibit 372 -- excuse me, 372-TT.

17        Do you recognize Government Exhibit 372-TT?

18   A.   Yes, I do.

19   Q.   All right.  Can you tell the jury what this is about.

20   A.   The subject matter is about issuances.  It says, "Guy,

21   please find attached letter to the transfer agent dated

22   last year.  The issuances were to be for two-year 144 as

23   this was an employee issuance.  Can you make sure the

24   transfer agent is aware of this and it is on the books as

25   such.  Many thanks in advance."

Direct - Sears

1   Q.   Okay.  What are "issuances"?

2   A.   To issue securities.

3   Q.   What are "securities"?

4   A.   Shares in a public company.

5   Q.   Okay.  All right.  Let's go back to the top questions.

6   You wrote this e-mail?

7   A.   Yes, I did.

8   Q.   You're e-mailing.  Who are you e-mailing?

9   A.   I'm e-mailing Mr. Guy Jean-Pierre and carbonning Scott

10  Dittman.

11  Q.   Okay.  And what e-mail are you sending to the CEO of

12  FusionPharm?

13  A.   *william@williamjsears.com.*

14  Q.   What e-mail are you using for the CEO?

15  A.   *sdittman@fusionpharminc.com.*

16  Q.   Again, this is your phone number?

17  A.   Yes, it was.

18  Q.   And so what are you directing Mr. Guy Jean-Pierre to

19  do in this e-mail?

20  A.   I'm asking Mr. Jean-Pierre to -- actually, I'm

21  conveying to Mr. Jean-Pierre to check on the transfer of

22  the securities.

23  Q.   Read that second sentence.

24  A.   "Can you make sure the transfer agent is aware of this

25  and it is on the books as such."

Direct - Sears

1    Q.    So in your mind, did you want Mr. Guy Pierre to call

2    the transfer agent?

3    A.    That's what I was probably instructed to do.

4    Q.    Can I have Government Exhibit 396.  I'm sorry, 372-YY.

5          Okay, sir, do you recognize Government

6    Exhibit 372-YY?

7    A.    Yes, I do, sir.

8    Q.    Okay.  And what is Government Exhibit 372-YY?

9    A.    It is an e-mail from myself at

10   *william@williamjsears.com*.  It was sent on December 11th,

11   2012.  It was to Scott Dittman.  It was forwarding leasing

12   and financing documentation.

13   Q.    And what's attached to the e-mail?

14   A.    Would be a propaganda from a company that did

15   leasing -- or did leasing financing.

16   Q.    Can you scroll down that, please, to where -- let me

17   circle.  Thank you.  I'm sorry, can you bring it up a

18   little bit.

19         Now, you have that document in front of you, I

20   also have it on the screen.  The e-mail below, who wrote

21   that e-mail?

22   A.    Guy Jean-Pierre.

23   Q.    Okay.  And to refresh your memory, can you take a look

24   at what Mr. Guy Jean-Pierre is e-mailing.

25   A.    He's -- excuse me, he's e-mailing the information

1    about a company that does equipment financing.  He's

2    basically -- he's saying that it would be equipment

3    financing and it's a loan of some sort that I -- that's

4    what he's saying.

5    Q.   So what is Mr. Guy Jean-Pierre e-mailing you and the

6    CEO about?

7    A.   Financing for equipment.

8    Q.   Okay.  For what company?

9    A.   This would be for both Vertifresh and FusionPharm.

10   Q.   Thank you.  Okay.  Can I have Government Exhibit 396.

11        Do you have 396 in front of you?

12   A.   Yes, I do, sir.

13   Q.   What is that?

14   A.   That is another e-mail.  It's from myself at my

15   Vertifresh e-mail.  It was sent on Thursday, February 28th,

16   2013.  It was to Scott Dittman at his FusionPharm e-mail,

17   and it's forwarded -- I'm forwarding the amended and

18   reinstated articles of incorporation.

19   Q.   Okay.  So the highlight here, you now have a new

20   e-mail address; is that correct?

21   A.   Yes, I do, sir.

22   Q.   And that's your -- what company are you saying that

23   e-mail is related to?

24   A.   Vertifresh.

25   Q.   Okay.  Can you scroll to the middle of that document,

Direct - Sears

1    please.  A little bit down.  I'm sorry, can you scroll to

2    where it begins with, "Guy" -- right there, thank you.

3           Now, below your e-mail, who's sending you -- who's

4    sending you an e-mail?

5    A.   Guy Jean-Pierre.

6    Q.   Is Scott Dittman on the e-mail that he's sending?

7    A.   No, he is not.

8    Q.   Okay.  And at the bottom e-mail there, that's you

9    e-mailing Guy; is that correct?

10   A.   Yes, it is, sir.

11   Q.   And nowhere is Scott Dittman copied on that e-mail?

12   A.   No, he is not.

13   Q.   And just to confirm, these are the two e-mails for Guy

14   Jean-Pierre; is that correct?

15   A.   Yes, sir.

16   Q.   And what does Series A Preferred mean to you?

17   A.   A series of security.

18   Q.   And that means stock?

19   A.   Yes, sir.

20   Q.   Okay.  Can I have Government Exhibit 397.

21          Do you have Government Exhibit 397 in front of

22   you?

23   A.   Yes, I do, sir.

24   Q.   What is Government Exhibit 397?

25   A.   It is an e-mail that was forwarded -- I was

Direct - Sears

1   forwarding.  It's from myself *@williamjsears.com*, Monday,

2   March 4th, 2013, to Mr. Dave Roy, references forwarding

3   FSPM.

4   Q.   So I circled on the screen there, you have -- what's

5   the date?

6   A.   March 4th.

7   Q.   All right.  And, sir, I'm sorry, I know the testimony

8   is long and can get a little warm in this courtroom --

9   A.   That's okay.

10   Q.   -- but I need you to speak up.

11   A.   Not a problem.

12   Q.   Can you go to page 2 of that e-mail, please.

13   A.   Yes, sir.

14   Q.   Can you blow this section up, please.  Can you scroll

15   down a little bit.  Okay, thank you.

16           Who's sending you an e-mail based upon page 2 of

17   this document?

18   A.   There's two, but Guy Jean-Pierre.

19   Q.   And that's to you; is that correct?

20   A.   Yes, sir.

21   Q.   Can you look on the screen.  Can you read what I

22   circled there.

23   A.   Yes.  It says, "Also pass on my apologies to Mr. Roy

24   and Mr. Dittman.  I think their e-mails probably went to

25   spam since I don't often receive e-mails from them and my

Direct - Sears

1      website manager had changed something.  I can't recall the

2      word in my web mail to filter out unwanted e-mails."

3      Q.   So what is Mr. Guy Jean-Pierre telling you about

4      e-mails that he receives from Mr. Scott Dittman?

5      A.   That I'm usually the go-between for communications

6      through them in corporate matters.  That's why all the

7      e-mails say "forward."

8      Q.   What does this say right here?

9      A.   "Since I don't often receive e-mails from them."

10     Q.   Who's "them"?

11     A.   Mr. Roy and Mr. Dittman.

12     Q.   Thank you.

13     A.   You're welcome.

14     Q.   Can I have Government Exhibit 372-GGG.  That's triple

15     G.

16          Do you recognize Government Exhibit 372-GGG?

17     A.   Yes, I do, sir.

18     Q.   Okay.  Can you tell the jury what that is.

19     A.   It's an e-mail from myself.  E-mail address was at

20     *william@williamjsears.com*.  It was Friday, April 26th,

21     2013, was to Scott Dittman at his FusionPharm e-mail

22     address.  Subject matter is:  I'm forwarding a PPM working

23     draft.  And attachment is a revised FusionPharm Reg D

24     offering memorandum.

25     Q.   Now, can you scroll up on that e-mail, please.  Can

Direct - Sears

1    you -- thank you.

2            Okay.  There's a below e-mail in that chain; is

3    that correct?

4    A.   Yes, sir.

5    Q.   Okay.  Who sent you -- who is sending that e-mail?

6    A.   Mr. Jean-Pierre.

7    Q.   And who's that e-mail to?

8    A.   Myself.

9    Q.   Okay.  Now, this says April 26th, 2013; is that

10   correct?

11   A.   Yes, it is.

12   Q.   Okay.  And what e-mail is Mr. Sears using?

13   A.   He --

14   Q.   I'm sorry, what --

15   A.   Mr. Guy Jean-Pierre.

16   Q.   What e-mail is Mr. Jean-Pierre using?

17   A.   This is why I kept it.  William --

18   *wsears@fusionpharminc.com.*

19   Q.   Your FusionPharm e-mail address?

20   A.   The old FusionPharm e-mail, yes, sir.

21   Q.   Okay.  Is -- now, the subject, what's the subject

22   here?

23   A.   Forward PPM working draft.

24   Q.   And what does "PPM" mean?

25   A.   Private placement memorandum.

93
Direct - Sears

1  Q.   Okay.  So -- and what is Mr. Pierre telling you about
2  the private placement?
3  A.   "Work in progress.  Call me as soon as possible."
4  Q.   Is Mr. Scott Dittman on that e-mail?
5  A.   No, he is not.
6  Q.   Can you go back to the top.  Okay.  And can I --
7  A.   What's at the top --
8  Q.   Can I have Government Exhibit 397 brought back up,
9  please.
10      Now, can you take a look at 397 again.
11 A.   Yes, sir.
12 Q.   We just discussed this exhibit, correct?
13 A.   Uhm-hum.  Yes, we did.
14 Q.   And you would agree with me that page 2 is the
15 indication where Mr. Guy Jean-Pierre doesn't receive many
16 e-mails from Scott Dittman.
17 A.   Yes, sir.
18 Q.   And can you just scroll up a little bit.  Keep going.
19 Good.  Can you focus in on here, please.
20      What's the date?
21 A.   February 25th, 2013.
22 Q.   Okay.  Can I have page 2, please.  Okay.  Can you
23 please focus there.
24      Again, what's the date here?
25 A.   February 25th, 2013.

Direct - Sears

1  Q.   When did Mr. Guy Jean-Pierre start doing work for

2  FusionPharm?

3  A.   The end of 2010.

4  Q.   And this is now February 25th, 2013?

5  A.   Yes, sir.

6  Q.   And that's the date he's telling you he doesn't

7  receive many e-mails from Scott Dittman?  Just look down

8  the e-mail.

9  A.   Yes, sir.

10  Q.   Can I have Government Exhibit 372-PPP.

11         Do you have that in front of you?

12  A.   Yes, I do.

13  Q.   Do you recognize that document?

14  A.   Yes, I do.

15  Q.   All right.  And can you tell me, essentially, what is

16  that document?

17  A.   It is an e-mail sent from *william@williamjsears.com*,

18  which is myself.  It was sent Friday, September 13th, 2013,

19  at 8:45.  It was to Scott Dittman at FusionPharm, Inc.

20  Subject:  Copy paste to Joanna.

21  Q.   Okay.  And who is -- do you know who Joanna is?

22  A.   She would have been an individual at a stock transfer

23  agency.

24  Q.   Okay.  Can you scroll up there, please.  I'm sorry,

25  come back to the top.

Direct - Sears

1        Is this another example of you drafting an e-mail

2   for Mr. Scott Dittman?

3   A.    I can't sit here and say as I said -- as I sit here

4   today that it was me drafting the e-mail.  I might have

5   just been forwarding what I was told to do.

6   Q.    Well, who's sending the e-mail?

7   A.    I'm sending the e-mail.

8   Q.    And who are you sending it to?

9   A.    Sending it to Mr. Dittman.

10  Q.    And who's it addressed to in the body of the e-mail?

11  A.    Joanna.

12  Q.    And, again, who's that?

13  A.    That would be myself.

14  Q.    And your phone number.

15  A.    Yes, sir.

16  Q.    All right.

17        THE COURT:  All right, Mr. Sibert, why don't we

18  pause there for our morning break.

19        MR. SIBERT:  Perfect.  Thank you.

20        THE COURT:  Ladies and gentlemen of the jury, I

21  need to take a 20-minute break for this morning, given some

22  other matters I need to attend to.  So we will be in recess

23  for 20 minutes.

24      (Jury left the courtroom at 10:20 a.m.)

25        THE COURT:  All right, Mr. Sears, again, I need to

Direct - Sears

1     advise you, since you're in the middle of your testimony, I

2     direct you not to speak with any of the lawyers during the

3     recess.

4          (Recess 10:21 a.m.)

5          (Proceedings were held outside the presence of the

6     jury at 10:49 a.m.)

7          THE COURT:  Before we bring in the jury, Mr.

8     Sibert, I just want to clarify what you're intending to do

9     with these exhibits.  You know, we got those two e-mails

10    you sent to chambers yesterday evening.  They appear to be

11    different.  One you're talking about a first block, second

12    block, third block.  That was the e-mail sent at 6:11 p.m.

13    And then at 10:47 p.m., you sent another e-mail talking

14    about a first batch, second batch, third batch.  So I'm

15    confused -- oh, and then I get a handwritten list with more

16    than -- with more exhibit numbers.  So which is it going to

17    be?

18         MR. SIBERT:  Well, Your Honor, I apologize.  I'm

19    trying to do my best to meet the Court's needs and defense

20    counsel needs.

21         THE COURT:  Well, I'm not asking for anything

22    extraordinary here, sir.  All I'm asking is let's just take

23    them in chunks, you know, half a dozen at a time, maybe

24    even more, as long as everybody knows what's coming, we get

25    it on the record.

97

Direct - Sears

1          It's just that yesterday when you just sprung

2     those 25 on us, all mixed up in alphanumeric order, and --

3     and defense counsel didn't even know whether, in fact, they

4     were stipulated, that's what I'm trying to avoid.

5          So, you know, I would recommend that, as you've

6     done already, you give defense counsel advance notice of

7     which you're going to use, they can make sure that, in

8     fact, those exhibits are stipulated to, and then you move

9     for their admission in batches, and that's very easy to do.

10          My question is:  I have two e-mails with two

11     different groupings, so which -- and then the handwritten

12     one from earlier -- so which are we going to use, which are

13     we going to go with?

14          MR. SIBERT:  The next ones we're going to use are

15     the ones that are in numerical order that the Court

16     requested that they be made in.  So during the break, I put

17     the next batch in numerical order.

18          THE COURT:  So the handwritten one.

19          MR. SIBERT:  The handwritten note.

20          THE COURT:  Okay.  So, all right, does defense

21     counsel have a copy of this?

22          MR. GOODREID:  I do, Your Honor.  And my

23     understanding, to address the Court's question, is we've

24     been driving off the 6:11 e-mail, with the respect to the

25     blocks that you mentioned.  And I think the handwritten, as

Direct - Sears

1    I understand, is just the first block on the 6:11 e-mail,

2    put in numerical order is my understanding.

3              THE COURT:  Okay.  So what --

4              MR. GOODREID:  And we're good with all this.

5              THE COURT:  What do we do with the later e-mail?

6    Do we just ignore that, Mr. Sibert?

7              MR. SIBERT:  That's going to be for another

8    witness.  I was trying to give some advance notice.

9              THE COURT:  Oh, another -- okay.  Oh, that's not

10   clear from the -- okay.  Well, then we'll put this aside

11   for now.

12             All right.  Okay.  Let's bring in the jury.

13         (Jury was present at 10:53 a.m.)

14             THE COURT:  All right.  Mr. Sears, I remind you

15   you remain under oath.

16             Mr. Sibert, you may resume your examination.

17             MR. SIBERT:  Okay.  Thank you, Your Honor.

18   BY MR. SIBERT:

19   Q.   Sir, could you please look at Exhibits 158 through

20   166.

21   A.   I don't have those in front of me.  Okay.  Yes, I have

22   them.  Yes, sir.

23   Q.   Do you recognize those exhibits?

24   A.   Yes, those are checks.

25   Q.   Can I have Exhibit 158, please, on the screen.  Thank

Direct - Sears

1    you.

2          Okay, sir, can you please look at your screen

3    here.  I'm showing you what's been marked 158.  Whose

4    signature is that?

5    A.    That is mine.

6    Q.    Who are you making this check out to?

7    A.    Jean-Pierre & Jean-Pierre.

8    Q.    And why double names?

9    A.    That was the name of the law firm.

10   Q.    And essentially how much?

11   A.    $2,500.

12   Q.    And where is this check made out of?

13   A.    Bayside Realty Holdings.

14   Q.    What's the address?

15   A.    4920 Morton Road, New Bern, North Carolina.

16   Q.    I'm going to need you to slow down a little bit.

17   A.    4920 Morton Road, New Bern, North Carolina.

18   Q.    Can you make out the bank?

19   A.    Wells Fargo.

20   Q.    And, finally, the date?

21   A.    10-14-2011.

22   Q.    Was this for a FusionPharm expense?

23   A.    I don't recall.

24   Q.    Was your mother involved with FusionPharm?

25   A.    For a very short period of time.  No, she was

Direct - Sears

1    involved -- yes, for a very short period of time.

2    Q.   What was her role?

3    A.   She was a placeholder as a corporate secretary because

4    you needed two directors at that time.

5    Q.   What were her duties?

6    A.   She had none.

7    Q.   So is it fair -- she didn't have any duties?

8    A.   Not at FusionPharm, no.  She was a placeholder, sir.

9    Q.   What is a placeholder?

10   A.   A placeholder.

11   Q.   What does that mean?

12   A.   I don't know how to describe it to you.  It was just

13   someone that needed to be on the paperwork for a short

14   period of time until the proper individual was -- it was

15   only for the reorg of the shell, actually, because it was

16   Baby Bee Bright, it went to FusionPharm, so while that

17   transition was happening, my mother was corporate

18   secretary.

19   Q.   Okay.  So as corporate secretary, what were her

20   duties?

21   A.   Once again, she didn't do anything, sir.  She was a

22   placeholder.

23   Q.   Is it fair to say you just used her name?

24   A.   As a placeholder at that time, yeah, because the deal

25   hasn't -- hadn't consummated yet.

Direct - Sears

1    Q.   Did she ever come out here to Denver, Colorado, and

2    work for FusionPharm?

3    A.   No.  To see me, but not to work for FusionPharm.

4    Q.   Fair point.

5    A.   Thank you.

6    Q.   Did Guy Jean-Pierre know that you were -- were you

7    involved in Bayside?

8    A.   In the very beginning, yeah.

9    Q.   Did --

10   A.   When I set up the account --

11   Q.   -- your mother know that?

12        MR. GOODREID:  Objection.  Calls for speculation.

13        THE COURT:  If you know.

14        THE WITNESS:  I don't recall.

15        THE COURT:  Okay.

16   BY MR. SIBERT:

17   Q.   166, please -- I'm sorry, 159.  Okay.

18        Again, sir, I'm showing you what's marked

19   Government Exhibit 159.  Do you recognize this?

20   A.   Yes, I do.

21   Q.   And who signed that check?

22   A.   I did.

23   Q.   Okay.  And what does this state down here in the

24   memo?

25   A.   "January payment."

Direct - Sears

1    Q.   To who?

2    A.   Jean-Pierre & Jean-Pierre.

3    Q.   And what's the date?

4    A.   3-12-12.

5    Q.   And, again, who's making the payment?

6    A.   Bayside Realty Holdings.

7    Q.   Can I have Government Exhibit 160.

8         I'm showing you Government Exhibit 160.  Do you

9    recognize Government Exhibit 160?

10   A.   Yes.  It's a check.

11   Q.   Okay.  I'm showing you the date here.

12   A.   5-14-12.

13   Q.   All right.  And then what does the memo say here?

14   A.   "Adams Letter of Opinion."

15   Q.   What does "Adams Letter of Opinion" mean to you?

16   A.   An individual to whom he did a letter of opinion.

17   Q.   Okay.  And are you talking about a legal letter of

18   opinion?

19   A.   Yes, sir.

20   Q.   So what was Mr. Guy Jean-Pierre being paid for?

21   A.   To write a letter of opinion on securities, I would

22   imagine.

23   Q.   And who signed the check?

24   A.   I did.

25   Q.   And who wrote the check?

Direct - Sears

1    A.   Bayside Realty Holdings.

2    Q.   Can I have 161, please.

3         And I'm showing you Government Exhibit 161.  Who's

4    writing the check?

5    A.   Bayside.

6    Q.   And to who?

7    A.   Jean-Pierre & Jean-Pierre.

8    Q.   And who signed the check?

9    A.   I did.

10   Q.   And what's the date?

11   A.   5-25-12.

12   Q.   Can I have Government Exhibit 162.

13        Okay, sir, do you recognize Government Exhibit

14   162?

15   A.   Yes, I do.

16   Q.   Okay.  And what's the date of that check?

17   A.   6-20-12.

18   Q.   Okay.  Again, who wrote the check?

19   A.   Bayside Realty Holdings.

20   Q.   And who signed the check?

21   A.   I did.

22   Q.   Okay.  And who are you paying?

23   A.   Jean-Pierre & Jean-Pierre.

24   Q.   Can I have Government Exhibit 163.

25        Okay.  Now, what's the date of this check --

Direct - Sears

1   A.   7-8-12.

2   Q.   I'm sorry, say that again.

3   A.   July 8th, 2012.

4   Q.   Okay.  And who is writing out the check?

5   A.   Bayside Realty Holdings.

6   Q.   Okay.  Who is signing the check?

7   A.   I did.

8   Q.   Okay.  Now, let's look down here at the memo.  What

9   does the memo say?

10  A.   "Abbott 144."

11  Q.   And what does that mean to you, "Abbott 144"?

12  A.   That would be securities.

13  Q.   What do you mean by securities?

14  A.   Well, 144 rule is a rule that's put on securities.

15  Q.   So why would you pay Mr. Jean-Pierre -- pay him $500

16  for a securities Rule 144?

17  A.   Because it was a transfer.  That particular one was a

18  transfer of private securities to another individual.

19  Q.   Okay.  So what exactly is a 144, based upon this

20  check?

21  A.   Probably, if my memory serves me correctly, to have a

22  letter of opinion drawn to remove the 144 legend.

23  Q.   Okay.  So it was another legal letter?

24  A.   Yes, sir.

25  Q.   Can I have the next exhibit, please, 16- -- I think

1    it's 3.  Excuse me, 164.

2           I'm showing you 164.  What's the date now?

3    A.   11-18-12.

4    Q.   Okay.  And where is the check being ran out of?

5    A.   The company that's writing the check is Bayside Realty

6    Holdings.

7    Q.   Okay.  Who signed the check?

8    A.   I did, sir.

9    Q.   Okay.  And who's getting paid?

10   A.   Jean-Pierre & Jean-Pierre.

11   Q.   Okay.  And how much?

12   A.   $500.

13   Q.   How much did you charge Mr. Jean-Pierre to write legal

14   letters?

15   A.   I didn't charge him to write legal letters.

16   Q.   Okay.  How much did you pay Mr. Jean-Pierre to write

17   your legal letters?

18   A.   It depended.  Usually it was, I think, 500 a letter.

19   Q.   How much is this check for?

20   A.   $500.

21   Q.   How much was 163 -- Exhibit 163 for?

22   A.   $500.

23   Q.   And what's the memo say there?

24   A.   Excuse me?

25   Q.   What does the memo say on 163?

Direct - Sears

1   A.   Memo says "Abbott 144."

2   Q.   Okay.  Can I have Exhibit 165.

3        Okay.  Again, sir, what's the date of this check?

4   A.   3-6-13.

5   Q.   Okay.  And who signed the check?

6   A.   I did.

7   Q.   And who are you paying?

8   A.   Jean-Pierre & Jean-Pierre.

9   Q.   And where is the check being ran out of?

10  A.   Bayside Realty Holdings.

11  Q.   Okay.  And, finally, can I have Exhibit 166.

12       And what's the date of this check?

13  A.   8-19-13.

14  Q.   Okay.  And who signed the check?

15  A.   It's written from Bayside Realty Holdings.  I signed

16  the check.

17  Q.   Okay.  And who's being paid?

18  A.   Jean-Pierre & Jean-Pierre.

19  Q.   And for how much?

20  A.   $500.

21  Q.   Okay.  Who controlled Bayside Realty Holding?

22  A.   Depending on -- depends on what time period.

23  Q.   Okay.  Who lives in New Bern, North Carolina?

24  A.   My mother does.

25  Q.   Can I have Government Exhibit 16 -- I'm sorry, 158.

Direct - Sears

1          Okay.  This was the first check I showed you.

2     What's the date of that?

3     A.   10-14-11.

4     Q.   Okay.  Can I have Government Exhibit 166.

5          And what's the date of the last check I showed

6     you?

7     A.   8-19-2013.

8     Q.   So for over almost two years, who paid Jean-Pierre

9     from Bayside Realty Holding?

10    A.   From the checks that you produced, Bayside Realty

11    Holdings paid them.

12    Q.   Who signed the checks?

13    A.   I signed the checks.

14    Q.   All right.

15          MR. SIBERT:  Your Honor, at this time, the

16    Government would like to admit into evidence another batch

17    of exhibits.

18          THE COURT:  All right.

19          MR. SIBERT:  And as previously provided to defense

20    counsel and this Court, the Government would like to

21    introduce in numerical order for the purposes of putting

22    into evidence 170, 171, 173 through 175, 177, 249, 258,

23    372.  And there are several letters that we're going to

24    submit for 372.  And those include C as in Charlie, E as in

25    echo, F as in foxtrot, R as in Romeo, X as in X-ray, B as

Direct - Sears

1    in bravo bravo, D as in Delta Delta, F as in foxtrot

2    foxtrot, G as in golf golf, H as in hotel hotel, K as in

3    kilo kilo, Q as in Quebec Quebec, V as in Victor Victor, C

4    as in Charlie Charlie Charlie --

5              THE COURT:  So triple C.

6              MR. SIBERT:  Yes, sir.

7              THE COURT:  All right.

8              MR. SIBERT:  E as in echo echo echo, H as in hotel

9    hotel hotel, India [sic] as in India India India, K as in

10   kilo kilo kilo, and O as in Oscar Oscar Oscar.

11             THE COURT:  And what about -- go ahead.

12             MR. SIBERT:  And in addition to those, 384, 385,

13   391, 398, 399.  I need to make a correction, I'm actually

14   misreading my own handwriting here.  I need to strike 372

15   Victor Victor and replace that with 372 uniform uniform.

16             THE COURT:  So UU instead of VV.

17             MR. SIBERT:  Yes, sir.

18             THE COURT:  All right.  And all these have been

19   stipulated to with respect to admissibility?

20             MR. SIBERT:  They have, Your Honor.

21             MR. BARNARD:  Your Honor, if I may.  175 was not

22   on the original list and has not been stipulated to.  175

23   is not on last night's list and hasn't been stipulated to.

24             THE COURT:  All right.

25             MR. SIBERT:  And, Your Honor, Mr. Barnard is

Direct - Sears

1    correct.  That was actually an added exhibit after the

2    stipulation process, so I apologize.

3            THE COURT:  All right.  Well, then I'm going to

4    keep it out right now.  You're free to move for its

5    admission subject to an objection from the defendant at

6    another time.

7            All right.  Given the stipulation of the parties,

8    the following Government exhibits are admitted into

9    evidence:  170, 171, 173, 174, 177, 249, 258, 372-C, e, F,

10   R, X, BB, DD, FF, GG, HH, KK, QQ, UU -- two Us -- CCC, EEE,

11   HHH, III, KKK, OOO, 384, 385, 391, 398, and 399.  All

12   right.  Those are all in evidence.

13           (Government's Exhibits received)

14           MR. SIBERT:  Your Honor, again, I have those

15   exhibits printed out.  I don't know if the Court agrees

16   with my practice, but --

17           THE COURT:  So you select -- you pulled these out

18   from the binders and organized them in this fashion?

19           MR. SIBERT:  That's correct, Your Honor.

20           THE COURT:  All right.  So hand them to my

21   courtroom deputy and she'll give them to the witness as

22   they become appropriate to do so.

23           MR. SIBERT:  Okay.  Thank you very much.

24   BY MR. SIBERT:

25   Q.   Okay.  Sorry.

Direct - Sears

1          Can I please have Government Exhibit 372-C
2     published for the jury.
3          And also, sir, can you please look at Government
4     Exhibit 372-C.  Have you had a chance to look at that?
5     A.   Yes, I have.
6     Q.   Do you recognize what Government Exhibit 372-C is?
7     A.   It is an e-mail.
8     Q.   Okay.  Can you tell the jury what the e-mail -- who
9     wrote the e-mail and who received the e-mail.
10    A.   The e-mail is from *william@williamjsears.com* sent
11    Wednesday, July 20th, 2011.  It was to Scott Dittman at
12    FusionPharm, Inc.
13    Q.   All right.  Can you please scroll down on Government
14    Exhibit 372-C.
15    A.   And Scott's other e-mail.  Okay.
16    Q.   Okay.  Now, there's -- obviously the first e-mail of
17    this chain is below that e-mail, would you agree with me?
18    A.   Yes, sir.  The top one, it's my -- no -- yes, the
19    bottom one, July 12th.  Yes, sir.
20    Q.   All right.  So who -- what e-mail -- who's writing
21    that e-mail and to --
22    A.   I am, sir, from *william@williamjsears.com*.
23    Q.   Here you're writing the e-mail to?
24    A.   Guy Jean-Pierre.
25    Q.   All right.  And what's the subject matter?

Direct - Sears

1    A.    "FSPM Disclosure Statement_6 30 11."

2    Q.    Okay.  And, again, FusionPharm disclosure statement,

3    would you agree with that?

4    A.    That's what it says, sir.

5    Q.    Okay.  And what is the disclosure statement?

6    A.    A statement that discloses the structure and situation

7    of a company.

8    Q.    And who do you have to disclose that to?

9    A.    That gets -- it depends on -- you know, it could be

10   the FCC, could be FINRA, could be OTC BB --

11   Q.    Let's talk --

12   A.    -- depending on where --

13   Q.    Let's talk about FusionPharm in this statement.

14   A.    That would be the OTC bulletin board news service.

15   Q.    What does OTC stand for?

16   A.    Over-the-counter.

17   Q.    Okay.  And it says, 06-30-11.

18   A.    Yes, sir.

19   Q.    What does that date mean to you, basically --

20   A.    That would be the period ending June 30th, 2011.

21   Q.    And you're sending this disclosure statement to Mr.

22   Guy Jean-Pierre?

23   A.    Indeed, I am.

24   Q.    Do you know who drafted the initial information and

25   disclosure statements for FusionPharm?

Direct - Sears

1    A.   I don't remember off the top of my head.

2    Q.   All right.  Well, this e-mail is, you would agree with

3    me, on July 12th, 2011, correct?

4    A.   Yes, sir.

5    Q.   Okay.  Now, did you ever transfer stock -- FusionPharm

6    stock to any family members around this time?

7    A.   I don't recall.

8    Q.   Did you ever transfer FusionPharm stock to any of your

9    family members?

10   A.   Yes, I have.

11   Q.   And what family members did you transfer FusionPharm

12   stocks to?

13   A.   To my brother-in-law, Robert Dittman.

14   Q.   What is La Di Da?

15   A.   That was a corporation that my younger brother-in-law

16   was supposed to take over to receive said stock.  Never

17   managed to, so it was eventually put into his personal

18   name.

19   Q.   Okay.  And, sir, you're married; is that correct?

20   A.   Indeed, I am.

21   Q.   Who are you married to?

22   A.   Sandra Sears, my wife.

23   Q.   So your wife and mother have the same name; is that

24   correct?

25   A.   And the same middle initial.

Direct - Sears

1    Q.   Okay.  All right.  Did you ever transfer preferred
2    shares to La Di Da?
3    A.   Yes, I did.
4    Q.   Okay.  So you transferred -- and do you recall how
5    many preferred shares, roughly?
6    A.   No, I don't.
7    Q.   Do you have an estimate?
8    A.   Don't want to guess, sir.
9    Q.   Do you want to refresh your memory?
10   A.   If you feel it's relevant, please do.
11           MR. SIBERT:  Your Honor, may I refresh this
12   witness's memory regarding the preferred shares?
13           THE COURT:  What are you going to be using?  What
14   document do you have?
15           MR. SIBERT:  I'm sorry, Your Honor, his plea
16   agreement.
17           THE COURT:  The plea agreement again?  All right.
18   Hand it to my courtroom deputy, she'll hand it to the
19   witness.
20           MR. SIBERT:  And this has been shown to the
21   defense counsel.
22           THE COURT:  All right.  Well, I'm assuming they
23   have a copy.
24           MR. SIBERT:  I have also shown them the page.
25           THE COURT:  Okay.

Direct - Sears

1    BY MR. SIBERT:

2    Q.   Does that refresh your memory?

3    A.   Not really, but okay.

4    Q.   It doesn't refresh your memory?

5    A.   Not the exact number of shares, but it is what it is.

6    Go ahead.

7    Q.   Okay.

8         MR. BARNARD:   Your Honor, can I ask the witness to

9    speak more directly --

10         THE WITNESS:   I said -- I'm sorry, it is what it

11    is, but go ahead.

12    BY MR. SIBERT:

13    Q.   Sir, I'm not asking a question.   I just need --

14    A.   And I'm answering it.   I don't recall the transaction

15    fully, but if that's what it says, okay, let's assume it

16    is.

17         MR. SIBERT:   Your Honor, the Government would ask

18    for the witness to be able to read paragraph I believe 15

19    on page 20 of his plea agreement for past recollection

20    reported.

21         THE COURT:   Is there an objection?

22         MR. GOODREID:   Well, if counsel is asking him to

23    read it himself, I think that's perfectly fine.   The

24    document, itself, doesn't come substantively in as

25    evidence.   It's designed to refresh his recollection.

Direct - Sears

1    Either it does or it does not.

2            THE COURT:  That's how I understood you were using

3    this document.  He's reviewed it.  And, actually, once you

4    reviewed it, Mr. Sears, you should put it down, turn it

5    over, so you're not reading from it.

6            But -- so the request for the witness to read from

7    this document is denied.  The objection, rather, is

8    sustained.

9            MR. SIBERT:  Can I take the document back, again,

10   Your Honor?

11           THE COURT:  Sure.

12   BY MR. SIBERT:

13   Q.   All right.  To recap, you transferred preferred shares

14   to your wife's company and to your brother-in-law, Robert

15   Dittman.

16   A.   Yes.  Due to the wife's company was to be Robert

17   Dittman's.

18   Q.   And after attempting to refresh your memory, under

19   oath you don't recall approximately how many preferred

20   shares?

21           MR. GOODREID:  Objection.  Asked and answered

22   repeatedly.

23           THE COURT:  I'll let it go this one more time.

24           Go ahead, sir.

25           THE WITNESS:  Well, it says 1,000 something, 400.

Direct - Sears

1    There's three different numbers in there.

2    BY MR. SIBERT:

3    Q.   All right.  Well, it's fair to say that if you look at

4    the attachment of Government Exhibit 372-C, none of those

5    transfers to either your wife's company or to Robert

6    Dittman are in it; is that correct?

7            MR. GOODREID:  Objection.  Leading.

8            THE COURT:  Sustained.

9    BY MR. SIBERT:

10   Q.   Are there any transfers to your family members in

11   document 372-C?

12   A.   It wouldn't be in 372-C because 372-C is a company --

13   Q.   That's not my question.  Is it in this document?

14   A.   No, it's not in here because it wasn't supposed to be

15   in here.

16   Q.   It's not in the document?

17   A.   No, it's not, because it didn't have to be.

18   Q.   Thank you.  And you sent this document to Mr. Guy

19   Jean-Pierre to review?

20   A.   Indeed.  I would have forwarded this document to him

21   because it says "forwarded."

22   Q.   Now, may I have you look at Government Exhibit 384.

23   Do you recognize Government Exhibit 384?

24   A.   Yes, sir.

25   Q.   And what is Government Exhibit 384?

Direct - Sears

1   A.   It is an e-mail sent from myself, from William Sears

2   at FusionPharm, Inc., Tuesday, July 12th, 2011, to

3   *scottdittman@fusionpharminc.com*.  Subject:  Forward:

4   Information and Disclosure Statement.

5   Q.   And so this is after you forwarding the disclosure

6   statements to Guy Jean-Pierre, correct?

7   A.   No, this one is before -- was that the one we just

8   looked at?  This one says July 20th and this one that

9   you're asking says July 1st, so that would be before.

10  Unless I'm misunderstanding your question.

11  Q.   What's the date on the e-mail?

12  A.   Which one, sir?

13  Q.   Government Exhibit 384.

14  A.   384 is July 12th.

15  Q.   Thank you.

16  A.   Thank you.

17  Q.   Okay.  And, again, recalling this is -- the date is

18  July 12th, 2011; what e-mail are you using?

19  A.   *wsears@fusionpharminc.com*.

20  Q.   And based upon your prior testimony, that's the same

21  e-mail you used in 2013?

22  A.   Yes.

23  Q.   And also 2012?

24  A.   Yes.  I did say that.

25  Q.   Government Exhibit 372-E.

Direct - Sears

1          MR. GOODREID:  Counsel, E?

2          MR. SIBERT:  E.

3    BY MR. SIBERT:

4    Q.   Do you recognize Government Exhibit 372-E?

5    A.   Yes.  It is an e-mail.  It's from myself using my

6    *william@williamjsears.com* e-mail, Sunday, July 17th, 2011.

7    It's to Guy Jean-Pierre at the law firm of Jean-Pierre, and

8    Guy Jean-Pierre Yahoo, carbon copy to Scott Dittman at

9    FusionPharm, Inc.

10   Q.   And what are you writing Mr. Guy Jean-Pierre?

11   A.   It says, "Scott lands in LAX at one thirty.  So if the

12   Lawyer can meet him somewhere close to the airport it would

13   be ideal."

14          I'm e-mailing Mr. Jean-Pierre obviously to

15   coordinate a meeting.

16   Q.   And who are you coordinating the meeting with?

17   A.   The lawyer, I -- if my recollection serves me would be

18   with Anthony DiTommaso.

19   Q.   Okay.  Can I have Government Exhibit 372-F.  And can I

20   have the middle, please, of that exhibit.

21          Do you recognize the -- first, do you recognize

22   Government Exhibit 372-F?

23   A.   Yes, it's an e-mail from myself at the FusionPharm,

24   Inc., e-mail, Monday, July 18th, 2011, to Scott Dittman,

25   FusionPharm, Inc., and I'm forwarding an e-mail to Guy

Direct - Sears

1    Jean-Pierre.

2    Q.   And I focused in on your screen on the middle part of

3    that e-mail.

4    A.   Yes, sir.

5    Q.   And what is that discussing?

6    A.   It's discussing that he left me a note on Skype

7    detailing the attorney in question was amenable to meeting

8    the next day at 2:30 p.m. by the airport.  And he's leaving

9    it up to Mr. Dittman to propose where they should meet.

10   Q.   Okay.  So based upon the prior exhibit that we just

11   looked at and this exhibit, who was in charge of

12   coordinating the meeting?

13   A.   I don't know who was in charge of coordinating.  I was

14   definitely part of it, but I was forwarded the e-mail.

15   Q.   Okay.  You were part of coordinating.  Who else was

16   part of coordinating the meeting?

17   A.   Yes, sir.  Mr. Dittman and Mr. Jean-Pierre.

18   Q.   And this was a meeting with who?

19   A.   I -- I believe Anthony DiTommaso.

20   Q.   Can I have Exhibit 385, please.

21        Can you please look at Government Exhibit 385.  Do

22   you recognize Government Exhibit 385?

23   A.   Yes, it's an e-mail, and it was from

24   *guy@lawfirmofjeanpierre*, it was sent Monday, July 18th,

25   2011, it was to Scott Dittman at

1    *scottdittman@fusionpharminc.com*, and the subject matter was

2    "Meeting with attorney RE Pink Sheets Opinion letter."

3    Q.   Okay.  And can you discuss the body of that e-mail.

4    A.   It looks like the time and place for the -- Mr.

5    Dittman and Mr. DiTommaso to meet were confirmed, and Mr.

6    Dittman received Mr. DiTommaso's telephone number in case

7    there was any problems with their coordination.

8    Q.   Okay.  And what is Mr. Scott Dittman's telephone

9    number?

10   A.   It says here 303-419-6352.

11   Q.   All right.  Can I have Government Exhibit 372-QQ.  Do

12   you recognize Government Exhibit 372-QQ?

13   A.   Yes, I do, sir.  It's an e-mail sent from myself,

14   *william@williamjsears.com*, Wednesday, July 20th, 2011, to

15   Scott Dittman at his FusionPharm e-mail.  Also he is cc'd

16   at his personal e-mail, *echomesscott@yahoo*.  Subject is

17   "FSPM Disclosure Statement 6 30 11," and there's an

18   attachment to it.

19   Q.   And what's the attachment?

20   A.   Excuse me -- yes, I was forwarding the -- the

21   attachment was the information and disclosure statement for

22   the period ended June 30th, 2011, so --

23   Q.   Can you please scroll down, please, on that exhibit.

24   Okay.  Who's this e-mail from?

25   A.   From myself.

Direct - Sears

1   Q.   Okay.  And who are you e-mailing to?

2   A.   Hold on one second.  I'm e-mailing to

3   *guyjeanpierre@yahoo.com*,

4   guyjeanpierre@lawfirmofguyjeanpierre.com.

5   Q.   And what are you e-mailing?

6   A.   The FSPM disclosure statement of 6-30-11.

7   Q.   What are you asking him to review?

8   A.   Review and advise.

9   Q.   Can I have exhibit Government Exhibit 372-R.

10          Okay.  Can you look at this.  Do you have 372-R in

11  front of you?

12  A.   Yes, I do, sir.

13  Q.   And what is 372-R?

14  A.   It is an e-mail sent from myself using my FusionPharm

15  e-mail address.  And it was sent on Thursday, October 27th,

16  2011.  It was to Scott Dittman at FusionPharm, Inc., carbon

17  copy was Andrew Duke at FusionPharm, Inc.  Subject was

18  forwarding a Revised NCND agreement, and the attachment was

19  an FSPM Non Circumvention document.

20  Q.   Okay.  And can you scroll -- excuse me, give me a

21  second, Your Honor.

22          Can you scroll down that e-mail, please.

23          Okay, sir, can you look on your screen here.

24  A.   Yes, sir.

25  Q.   Now, there's a chain, like we've been reviewing.  Who

Direct - Sears

1     sent that e-mail?

2     A.   From *guy@lawfirmofjeanpierre.com*.

3     Q.   And to who?

4     A.   Sent it to myself.

5     Q.   And what's the subject --

6     A.   At the e-mail address listed.  Subject is "Revised

7     NCND Agreement, FusionPharm."

8     Q.   Okay.  And what is Mr. Guy Jean-Pierre telling you?

9     You can look on your screen, sir.  Just read the bottom.

10    A.   I understand that.  I'd like to look at the document,

11    too, please.

12    Q.   Okay, sir --

13    A.   "Please find revised NCND agreement.  Call me if you

14    wish to discuss."

15    Q.   So Mr. Guy Jean-Pierre's forwarding you the revised

16    agreement.

17    A.   He's -- excuse me?

18    Q.   He's forwarding you the revised agreement.

19    A.   Yes, sir.

20    Q.   Again, this is his office location, correct?

21    A.   Yes, sir.

22    Q.   Can I have Government Exhibit 170.

23         Do you recognize Government Exhibit 170?

24    A.   Yes, I do, sir.

25    Q.   Okay.  What is 170?

Direct - Sears

1    A.   It is an e-mail.  It's from myself at

2    *william@williamjsears.com*, sent on November 28th, 2011.  It

3    was to Scott Dittman at his FusionPharm e-mail, Guy

4    Jean-Pierre at his Yahoo.com e-mail, and carbon copied was

5    Mike Kocinski, an accountant at *mikekosinski@aol.com*, and I

6    am forwarding the financial statements.

7    Q.   Okay.  So the subject's "Financial Statements,"

8    correct?

9    A.   Yes, sir.

10   Q.   All right.  And in the body here, what are you telling

11   those -- Mr. Dittman and Mr. Guy Jean-Pierre and Mr.

12   Kocinski about what -- what's your message to them?

13   A.   This was -- if you notice the font is different.  This

14   was a cut-and-paste that Mr. Kocinski had sent to me to

15   give to Mr. Scott to have re-reviewed the finanical --

16   Q.   I'm not asking you what you wrote in the body --

17   A.   I'm telling you what I wrote in the body of the

18   e-mail, and I cut and paste what's in there.  It says,

19   "Good afternoon.  Please remember the statement of changes

20   in stockholder's equity and the notes to financial

21   statements.  The notes to the statement " --

22             MR. SIBERT:  Your Honor --

23             THE WITNESS:  -- "of cash flows are" --

24             THE COURT:  Hold on.  Let him finish his answer.

25             THE WITNESS:  --  "are:  Row 123 and 126 must be a

Direct - Sears

1   negative number because it was the purchase from the

2   company.  Row 128 must be in capitol letters.  Row 133 -

3   must be $40,160.29.  Kindly contact us if you require

4   anything further."

5         And that one says Guy Jean-Pierre, Regards.

6   Q.   So pick up from where you were.  Mr. Guy Jean-Pierre

7   wrote a long e-mail suggesting changes; is that correct?

8   A.   On that one, yes.

9   Q.   About the financial statements in November -- around

10  the time frame of November 28, 2011.

11  A.   Yes, he did write an e-mail.

12  Q.   All right.  So now let's go back up to the top of the

13  e-mail.  And I asked you just to read what you wrote the

14  group that you e-mailed to.

15  A.   I was forwarding --

16  Q.   What did you write, sir?

17  A.   I was forwarding the e-mail, and I said, "I think we

18  have some issues to address," referencing the e-mail that

19  was sent.

20  Q.   All right.  So that's what you wrote.

21  A.   That is what I wrote, yes, sir.  Thank you.

22  Q.   Can I have Government Exhibit 391.  Can you bring that

23  back up large, please.

24        Sir, I want you to look at your screen.  Do you

25  recognize Government Exhibit 391?

Direct - Sears

1    A.   Yes, I do.

2    Q.   All right.  I circled something on the screen there.

3    Do you recognize what I circled?

4    A.   Yes.

5    Q.   What is that?

6    A.   It is an e-mail.

7    Q.   Okay.  From who --

8    A.   From *guyjeanpierre@fusionpharminc.com*.

9    Q.   To who?

10   A.   To Mr. William Sears *@fusionpharminc.com* on December

11   5th, 2011.  Subject:  Re:  "FSPM Information and Disclosure

12   Statement."

13   Q.   Okay.  And what's the date of the e-mail?

14   A.   December 5th, 2011.

15   Q.   Okay.  And what is Mr. Guy Jean-Pierre telling you in

16   his e-mail?

17   A.   Find a draft of the proposed disclosure statement.

18   Q.   Okay.  And what is he asking you to do?

19   A.   "Take a look and give me a call so that we can

20   discuss."

21   Q.   So Mr. Jean-Pierre wanted you to call him and discuss

22   this document.

23             MR. GOODREID:  Objection.  Calls for speculation.

24             THE COURT:  And it's leading.  Sustained.

25   BY MR. SIBERT:

Direct - Sears

1    Q.   Did you ever call Mr. Guy Jean-Pierre to talk about

2    that statement that he -- like he requested?

3    A.   I don't recall, sir.  It was 2011.  If it was anything

4    detailed about financial statements, no, or disclosure, I

5    wouldn't have made that call.

6    Q.   Can I have Government Exhibit 372 -- excuse me, 171.

7         All right, sir, you have 171 in front of you?

8    A.   Yes, I do, sir.

9    Q.   And what is that?

10   A.   That is an e-mail from -- the heading of it is from

11   *william@williamjsears.com*, Thursday, December 22d, 2011.

12   It is to Scott Dittman and Guy Jean-Pierre.  Mr. Dittman is

13   using his FusionPharm e-mail, Mr. Jean-Pierre is using both

14   his law firm at Jean-Pierre and *guy@fusionpharminc.com*.

15   The subject is a forward, referring to financial statements

16   of FusionPharm.

17   Q.   Okay.  And for what quarter is that?

18   A.   That would be third quarter 2011, it says.

19   Q.   Okay.  And then can you scroll down, please.

20   A.   Uhm-hum.

21   Q.   Not so far.  A little bit up, please.

22        All right.  Can you look on your screen.  I'm

23   circling an e-mail here.  Who's Mike Kocinski?

24   A.   Mike Kocinski was the old CPA for the Baby Bee Bright

25   Corporation, which Scott chose to keep on board because he

Direct - Sears

1   was familiar with the company's financial status.

2   Q.   And he sent you this e-mail, is that correct?

3   A.   That's right.

4   Q.   And then what is he stating in his body about what he

5   is sending?

6   A.   He's sending attached the financials of 9-30-2011,

7   along with the shareholders' statement and notes.  He's

8   made some changes to the notes and would suggest that I

9   have Scott review note No. 8 on a shareholders' info, he

10   doesn't have the latest shareholder list with him, and to

11   make the necessary changes.

12   Q.   So as you testified, if you go to the top, you are

13   forwarding his e-mail; is that correct?

14   A.   Yes, sir.

15   Q.   You're forwarding all his attachments.

16   A.   Yes, sir.

17   Q.   And you sent those attachments to Scott Dittman and

18   Mr. Guy Jean-Pierre.

19            MR. GOODREID:  Objection.  Leading.

20            THE COURT:  Sustained.

21   BY MR. SIBERT:

22   Q.   Who did you send the attachments to?

23   A.   I sent these attachments to Scott Dittman and Guy

24   Jean-Pierre.

25   Q.   Can I have Government Exhibit 372-X.  Okay.  Can you

Direct - Sears

1    scroll down, please.  All right.

2          Do you recognize Government Exhibit 372-X?

3    A.   Yes, I do, sir.

4    Q.   All right.  Can you look at your screen, please.  I'm

5    circling an e-mail -- who's that e-mail from?

6    A.   That e-mail is from *guy@fusionpharminc.com*, it was

7    sent Friday, December 23d, 2011, it was to myself, Scott

8    Dittman, Guy Jean-Pierre.  I would -- and the subject

9    matter was:  "9_30_11 Information and disclosure

10   statement."

11   Q.   And what is Guy Jean-Pierre writing you?

12   A.   It says, "Please see attached."  Note that he has

13   added language to section B of the MD&A, item 16.  If

14   that's okay, he thinks he's -- we're good to go.

15   Q.   So he's -- what quarter information and disclosure

16   statement is Mr. Guy Jean-Pierre sending you?

17   A.   That would be the third quarter of 2011, I believe.

18   Q.   And when does that quarter end?

19   A.   9-30-2011.

20   Q.   Can I have Government Exhibit 372-BB.

21         Do you have 372-BB there?

22   A.   Yes, I do.

23   Q.   Do you recognize Government Exhibit 372-BB?

24   A.   Yes, I do, sir.

25   Q.   Okay.  And can you tell the jury -- scroll it up.

Direct - Sears

1    372-BB.  Let me move on for a second.

2             Can I have Exhibit 372-DD.  Can you look at that

3    one.  Keeping 372-BB on the side.  Do you have 372-DD in

4    front of you.

5    A.    Yes, I do, sir.

6    Q.    And do you recognize what that is?

7    A.    Yes, sir.  It is an e-mail.  It is from

8    *guy@lawfirmofjeanpierreinc.com*, it was sent Wednesday,

9    March 14th, 2012.  It was sent to myself at

10   *william@williamjsears.com*.  Scott Dittman was cc'd at

11   *fusionpharm.com*.  The subject is FSPM - Oxford Capital

12   opinion letter.

13   Q.    Okay.

14   A.    And --

15   Q.    What is attached to that e-mail?

16   A.    An opinion letter for Oxford Capital.

17   Q.    What does Mr. Guy Jean-Pierre state in that e-mail?

18   A.    "Attached please find the FSPM - Oxford Capital pin

19   letter.  I am still awaiting the non-affiliation form for

20   Mr. Adams.  Give me a call when you have a chance.  Guy

21   Jean-Pierre."

22   Q.    Can we try to get up 372-BB again.  Okay.  Okay, let's

23   take a look at Government Exhibit 173.

24             Do you recognize Government Exhibit 173?

25   A.    Yes, I do.

Direct - Sears

1    Q.   Okay.  What is Government Exhibit 173?

2    A.   It is an e-mail from myself,

3    *william@williamjsears.com*, to Mike Kocinski,

4    *mkocinski@aol.com*, Scott Dittman at his FusionPharm e-mail.

5    Subject was 12-31-12 financials.  Date was Sunday, March

6    25th, 2012.

7    Q.   All right.  Now you took over Baby Bee Bright in the

8    early part of 2011; is that correct?

9    A.   I would say midyear.

10   Q.   Okay.

11   A.   More midyear.

12   Q.   But before 2012.

13   A.   Oh, yeah.

14   Q.   And you just --

15   A.   You said 2012 or '11 Baby Bee Bright.  I'm sorry, sir.

16   I just want to be correct.

17   Q.   Well, let me ask you:  When did you take over Baby Bee

18   Bright to make it FusionPharm?

19   A.   I can't say I ever really took over Baby Bee Bright,

20   quite frankly, to use your phrase.  But I adminned the

21   company from mid-'11 to the end of 2011.

22   Q.   All right, so 2011.  And this e-mail is from 2012; is

23   that correct?

24   A.   Yes, sir.

25   Q.   In fact, the end of 2012.

Direct - Sears

1    A.   Yes, sir.

2    Q.   All right.  And you're still talking to the old

3    financial person under Baby Bee Bright; is that correct?

4    A.   Yes, sir.

5    Q.   You're actually sending him an e-mail?

6    A.   Yes, sir.

7    Q.   All right.  Did you deal with Mr. Kocinski regarding

8    getting financials reviewed?

9    A.   Yes.  I was the go-between between him and Scott

10   Dittman.

11   Q.   All right.  This was for FusionPharm; is that right?

12   A.   That is right, sir.

13   Q.   All right.  Can I have Government Exhibit 177.

14        Do you recognize Government Exhibit 177?

15   A.   Yes, sir, I do.

16   Q.   Okay.  And can you tell the grand jury what -- excuse

17   me, the jury what this is about?

18   A.   This e-mail is sent from myself at

19   *william@williamjsears.com*, Thursday, June 7th, 2012.  It

20   was sent to Scott Dittman at FusionPharm, Guy Jean-Pierre

21   at FusionPharm, Guy Jean-Pierre Yahoo, and Guy Jean-Pierre

22   at the law firm of --

23        THE COURT:  Mr. Sears.  When you're reading the

24   document, it's human nature, we all do it, when we read

25   from documents, we speak much faster than we do in normal

                     Direct - Sears

1    speech.

2              THE WITNESS:  Sorry.  I apologize.

3              THE COURT:  So slow down when you read from the

4    document.

5              THE WITNESS:  I apologize, Your Honor.

6              And under the subject matter, I was forwarding

7    FSPM financial statements as of 3-31-12.

8    BY MR. SIBERT:

9    Q.   Okay.  And so what quarter would those financial

10   statements go to?

11   A.   Excuse me?

12   Q.   What quarter would those financial statements go to?

13   A.   That would be the first quarter -- the end of the

14   first quarter of 2012.

15   Q.   And these are the FusionPharm financial statements?

16   A.   Yes, sir.

17   Q.   Can you scroll down, please, on this document.

18             Sir, if you can look to your screen.  Can you

19   discuss the e-mail that -- just below the one you just

20   discussed.

21   A.   That one, it's another e-mail and from Mike Kocinski

22   at his AOL e-mail address.  It was sent Thursday, June 7th,

23   2012.  It is to *guy@fusionpharminc.com*.  Myself was copied,

24   at *fusionpharminc.com*, and also my

25   *william@williamjsears.com*.  Scott Dittman was carbon copied

Direct - Sears

1    also at his *fusionpharminc.com*, and his subject was FSPM

2    financial statements as of 3-31-12.

3    Q.   Okay.  Since you were copied on this e-mail, what is

4    Mr. Kocinski telling you in the body of the e-mail?

5    A.   I don't really know because it says, "Dear sir, I am

6    the accountant that assisted with the preparation of the

7    financial statements."

8         I don't really under -- I don't know.

9    Q.   Okay.  Well, he's --

10   A.   He's saying he's the accountant that assisted with the

11   financial statements.

12   Q.   For what company?

13   A.   FusionPharm.

14   Q.   And for what period?

15   A.   For 3-31-12.

16   Q.   And how is he saying they were prepared?

17   A.   He said he prepared the statements in accordance to

18   GAAP.  He's -- okay.

19   Q.   Can I have Exhibit -- can you please look at

20   Government Exhibit 174.

21        Do you recognize Government Exhibit 174?

22   A.   Yes, sir.  It is an e-mail.  It's from myself at

23   *william@williamjsears.com* and it was sent to

24   *guy@fusionpharminc.com*.

25   Q.   Sir, can you please follow the Court's instruction and

Direct - Sears

1    just slow down, and keep your volume up.

2    A.    It was sent to *guy@fusionpharminc.com*, carbon copied

3    was Mike Kocinski at his AOL e-mail.  The subject is FSPM,

4    and it's dated Tuesday, April 3d, 2012.

5    Q.    Okay.  And what are you writing in the body of this

6    e-mail?

7    A.    I am asking the gentlemen to communicate directly so I

8    am not the go-between.

9    Q.    And what are you asking them to communicate about?

10   A.    The preparation of the financial statements for the

11   company.

12   Q.    And for what report?

13   A.    For the 12-31-12 financial statements.

14   Q.    Would that be the annual report for 2012?

15   A.    An annual report, I believe, was a different filing.

16   I don't remember.

17   Q.    Okay.

18   A.    I think they are two different filings, sir.

19   Q.    And you provided phone numbers; is that correct?

20   A.    That's right.

21   Q.    And what is Mr. Guy Jean-Pierre's phone number?

22   A.    305-929-3652.

23   Q.    Can I have Government Exhibit 372-FF.  I'm going move

24   on from that one, Your Honor.  Some of these files are

25   large and they don't come up on the screens.  Can I have

Direct - Sears

1    Government Exhibit 372-GG.

2            Do you recognize Government Exhibit 372-GG?

3    A.   Yes, I do.  This is an e-mail that is sent from myself

4    at my *william@williamjsears.com* e-mail.  It was sent

5    Tuesday, June 5th, 2012.  It was to

6    *scottdittman@fusionpharminc.com*.  The subject was

7    forwarding FSPM.  The attachment is FusionPharm, Inc.,

8    shareholder report common, 3-31-12.

9    Q.   And so if I understand this e-mail right, what are you

10   forwarding to Mr. Scott Dittman?

11   A.   A shareholder report.

12   Q.   For what company?

13   A.   FusionPharm, Inc.

14   Q.   Can you go down a little bit on this document, please,

15   on the screen.

16   A.   Yes, sir.

17   Q.   The e-mail below, who wrote that e-mail?

18   A.   It is from William Sears at *william@williamjsears.com*.

19   It was sent Wednesday, May 23d, 2012, to Guy Jean-Pierre,

20   *guymjeanpierre@yahoo.com*, also his *guy@fusionpharminc.com*

21   e-mail.  Carbon copied was Mr. Cliffe Bodden at

22   *cbodden@gscventures* on Microsoft, and the subject was FSPM

23   forward.

24   Q.   Okay.  And when you say William Sears, you're talking

25   about yourself.

Direct - Sears

1    A.   Yes, sir.

2    Q.   I just want to make sure there's not another William

3    Sears.  And FSPM is FusionPharm?

4    A.   Yes, sir.

5    Q.   All right.  Please, to the staff, Government Exhibit

6    175 has not been introduced into evidence, so if you can

7    please take it down so the jury can't see it.

8         Can you please --

9         MR. GOODREID:  Your Honor, I'll make this easy.

10   The Government -- excuse me, the Government -- the defense

11   stipulates to the admission of this document.

12        THE COURT:  All right.  Excellent.  Given the

13   stipulation, Government Exhibit 175 is admitted into

14   evidence and may be published to the jury.

15        (Government's Exhibit 175 received)

16   BY MR. SIBERT:

17   Q.   Thank you.  Can I please have that brought back up.

18   Thank you.

19        Can you take a look at Government Exhibit 175.

20   A.   Yes, sir.

21   Q.   Okay.  Can you tell the jury what this e-mail

22   references.

23   A.   The reference is financials.  It's sent from myself,

24   which is *william@williamjsears.com*.  It was to Michael

25   Kocinski, *mikekocinski@aol.com* --

Direct - Sears

1    Q.    And what are you telling Mike?

2    A.    The subject is the financials and it was June 7th,

3    2012.   "Mike, Just need it as you did last quarter as this

4    is now required every quarter."

5    Q.    So in this e-mail, who's providing directions to Mike?

6    In this e-mail.

7    A.    Apparent -- in this particular e-mail, apparently

8    from -- I am.

9    Q.    Can I have Government Exhibit 372-HH.

10        Do you recognize Government Exhibit 372-HH?

11   A.    Yes, I do.

12   Q.    Okay.   What is that?

13   A.    It is another e-mail sent from

14   *william@williamjsears.com*.   I sent it on Thursday, June

15   7th, 2012.   It was sent to *scottdittman@fusionpharminc.com*,

16   *guy@fusionpharminc.com*, *guymjeanpierre@yahoo.com*,

17   *guyjeanpierre@lawfirmofjeanpierre.com*.   Subject was

18   forwarding FSPM financial statements as of 3-31-12.

19   Q.    Okay.   Can you scroll down that e-mail, please.   Okay.

20        And can you look at your screen.

21   A.    Yes, sir.

22   Q.    And you are cc'd on that e-mail; is that correct?

23   A.    Yes, myself and Mr. Dittman.

24   Q.    Okay.   And who wrote the e-mail?

25   A.    Michael Kocinski.

Direct - Sears

1    Q.   And who's he writing the e-mail to?

2    A.   *guy@fusionpharminc.com*.

3    Q.   Okay.  Can I have Government Exhibit 249.

4         Do you have 249 in front of you

5    A.   Yes, I do, sir.

6    Q.   Okay.  And what is that exhibit?

7    A.   That is an e-mail.  It was from myself,

8    *william@williamjsears.com*, Tuesday, June 12th, 2012.  It

9    was to Mr. Cliffe Bodden at gscventure dot on -- on

10   Microsoft.com.  The subject was forwarding FSPM OTC market

11   opinion letter.

12   Q.   And can you look down that e-mail.  I'm circling it on

13   the screen.  What are you forwarding, based upon the e-mail

14   below?

15   A.   I was forwarding from Mr. -- from

16   *guy@lawfirmofjeanpierre.com* on June 11th, 2012, sent to

17   myself, *william@williamjsears.com*.  Subject matter,

18   Forward:  "FSPM OTC market's opinion letter."  And --

19   Q.   So based upon this e-mail, who sent you the FSPM OTC

20   market's opinion letter?

21   A.   Guy Jean-Pierre.

22   Q.   And what does Mr. Guy Jean-Pierre tell you in the body

23   of his e-mail?

24   A.   "Attached please find the FSPM OTC's markets opinion

25   letter together with accompanying signature page.  Call me

Direct - Sears

1    if you wish to discuss."

2    Q.   Can I have Government Exhibit 32 -- excuse me, 372-KK.

3          Do you recognize Government Exhibit 372-KK?

4    A.   Yes, I do, sir.

5    Q.   All right.  Can you describe to the jury what

6    Government's Exhibit 372-KK is.

7    A.   It is an e-mail from myself,

8    *william@williamjsears.com*.  It was sent Thursday, June

9    14th, 2012, it was to *sdittman@fusionpharminc.com*.  It says

10   forward:  "FSPM OTC Markets Opinion Letter."  It has an

11   attachment that says "FusionPharm's OTC Markets Opinion

12   Letter."

13   Q.   Okay.  And based upon you being involved with these

14   e-mails, what does the OTC markets letter mean?

15   A.   It's a letter stating that the attorney has reviewed

16   all the documentation that is going to be uploaded to the

17   news service and is in agreement with it.

18   Q.   Okay.  Can you scroll down there, please.

19          Sir, if you look at your screen, who wrote this

20   e-mail?

21   A.   *guy@lawfirmofguyjeanpierre.com*.

22   Q.   Okay.  And who did he write this to?

23   A.   To myself.

24   Q.   Okay.  And what was the subject?

25   A.   Forward:  "FSPM OTC's Markets Opinion Letter."

Direct - Sears

1    Q.   Okay.  And so just like the last exhibit, or exhibit

2    back, it's Mr. -- who's sending you opinion letters?

3    A.   Guy M. Jean-Pierre.

4    Q.   So based upon reviewing these exhibits, these are --

5    what firm are these opinion letters for?

6    A.   FusionPharm, Inc.

7    Q.   And who is not on the e-mail that is being sent from

8    Mr. Guy Jean-Pierre that has a role with FusionPharm?

9    A.   It's a chain.  Mr. Dittman wasn't on that one.  It's a

10   chain.  It was forwarded.

11   Q.   Okay.

12   A.   Okay.

13   Q.   So Mr. Jean-Pierre doesn't send any letters to Scott

14   Dittman?

15   A.   He sends them to everybody.

16   Q.   Okay.  Well, in the last couple of exhibits we just

17   reviewed, who did he send them to?

18   A.   Excuse me?

19   Q.   Who did he send them to in the last couple of exhibits

20   we just went over?

21   A.   Myself.

22   Q.   And not Mr. Scott Dittman.

23   A.   No, he didn't.

24   Q.   And can I please have Government Exhibit 258.

25            Do you recognize Government Exhibit 258?

Direct - Sears

1   A.   Yes, I do.

2   Q.   And what is Government Exhibit 258?

3   A.   It is an e-mail from myself using

4   *william@williamjsears.com*.  It was sent Tuesday, August

5   7th, 2012.  It was to Cliffe Bodden at a GSC Venture e-mail

6   address, Guy Jean-Pierre at *guymjeanpierre@yahoo.com*,

7   *guyjeanpierre@lawfirmofjeanpierre.com*.  Forward:  "FSPM

8   6-30-12 share holders list."

9   Q.   Okay.  So what quarter would this shareholders list be

10  for?

11  A.   6-30-12 would be the end of the second quarter, I

12  believe.

13  Q.   And can you scroll up on that e-mail, please.  Thank

14  you.  Can you scroll a little bit -- so we have -- there.

15  Okay.

16          Sir, if you look at your screen, who received the

17  e-mail I just circled?

18  A.   I did.

19  Q.   And who is that from?

20  A.   Amanda Martin.

21  Q.   Okay.  And who is Amanda Martin?

22  A.   She's a clerk at Pacific Stocks Transfer, I would

23  imagine.

24  Q.   Okay.  Why would she be e-mailing you?

25  A.   Because I would have asked her for something.

Direct - Sears

1    Q.   Okay.  And what --

2    A.   It says "I have attached the common shareholder report

3    you requested for Fusion Pharm, Inc."

4    Q.   Okay.  So you asked Ms. Martin for the FusionPharm

5    shareholders' report for the end of June 2012.

6            MR. GOODREID:  Objection.  Leading.

7            THE COURT:  Sustained.

8    BY MR. SIBERT:

9    Q.   All right.  What shareholders -- okay.  What did you

10   ask to be sent from Ms. Martin?

11   A.   Shareholder report.

12   Q.   For what time period?

13   A.   6-30 -- hold on -- 6-30-2012.

14   Q.   Okay.  And for what company?

15   A.   FusionPharm, Inc.

16   Q.   So you're the person that contacted the transfer

17   agent?

18   A.   Apparently so.  I've had contact with that transfer

19   agent for six years prior.

20   Q.   Okay.

21   A.   And many other companies.

22           MR. SIBERT:  Your Honor, can the witness not go

23   further than what's asked.

24           THE COURT:  Mr. Sears, just answer the questions

25   that's posed.

Direct - Sears

1    BY MR. SIBERT:

2    Q.   Can I have Government Exhibit 372-CCC.

3         Do you have Government Exhibit 372-CCC in front of

4    you?

5    A.   Indeed, I do, sir.

6    Q.   And what is Government Exhibit 372-CCC?

7    A.   It is an e-mail sent from myself using the

8    *wsears@vertifresh.com* e-mail address.  It was sent

9    Wednesday, February 27th, 2013.  It was addressed to Guy

10   Jean-Pierre, which was *guyjeanpierre@yahoo.com*, a

11   *michaelkocinski@aol.com*, Scott Dittman, which is

12   *sdittman@fusionpharminc.com*, and subject was 12/31s.

13   Q.   And what are you telling Guy in your e-mail?

14   A.   I'm telling him that Michael's going through the

15   financials now and he is going to send him the e-mail once

16   he's satisfied.

17   Q.   And how long -- how long of a term was that?

18   A.   Oh, I also put in the e-mail, "Should be 48 hours."

19   Q.   Can I have Government Exhibit 372-EEE.

20        Do you recognize Government Exhibit 372-EEE?

21   A.   Yes, I do, sir.

22   Q.   Okay.  What is that?

23   A.   It's an e-mail from myself using the *vertifresh.com*

24   e-mail address.  It was sent on Tuesday, March 5th, 2013,

25   and was to *scottdittman@fusionpharminc.com*.  Subject matter

Direct - Sears

1   was "FSPM Debt Conversion Opinions Update."

2   Q.   Okay.  What's the date of it again?

3   A.   March 5th, 2013.

4   Q.   And what's the subject?

5   A.   "Debt Conversion Opinions Update."

6   Q.   For what company?  I'm asking you what does this

7   subject say --

8   A.   From Bayside Realty Holdings.

9   Q.   What does the subject say on the line of the e-mail?

10  Look at your screen, sir.  What did I circle?  Sir, look at

11  your screen.

12  A.   I see it.

13  Q.   Okay.  What company is it --

14  A.   Forward:  "FusionPharm Debt Conversion Opinions

15  Update."

16  Q.   Can you scroll up, please.  A little more.

17       Now, sir, can you look at your screen here?  I

18  just circled an e-mail.  Who's sending that e-mail?

19  A.   *guymjeanpierre@yahoo.com.*

20  Q.   Okay.  What is Mr. Guy Jean-Pierre telling you in that

21  e-mail?

22  A.   He sent three of the opinion requests with full backup

23  documentation for three companies to Mr. DiTommaso, as

24  expected -- I've got to read it off the sheet, the screen's

25  too fuzzy, my friend.

Direct - Sears

1           Three opinions by Wednesday.  He might even have

2    them tomorrow.  With respect to the remaining two, StarCity

3    and Vera, he hasn't been able to send it because it appears

4    he doesn't have the STAs pertaining to those two

5    purchasers.  And he's asking me to send him some missing

6    documentation.

7    Q.   So --

8    A.   And then he was going to send them with full backup to

9    Mr. DiTommaso.

10   Q.   Who was Mr. Guy Jean-Pierre communicating with

11   regarding this missing documentation?

12   A.   Myself.

13   Q.   Okay.  Can you look at your screen here and look at

14   the e-mail.

15   A.   Uhm-hum.

16   Q.   And who sent that e-mail?

17   A.   I sent that e-mail.

18   Q.   To who?

19   A.   To Guy Jean-Pierre.

20   Q.   Okay.  And what is the subject line?

21   A.   The debt conversion opinions.

22   Q.   For what company?

23   A.   FusionPharm, Inc., and Bayside Realty Holdings.

24   Q.   Okay.  And there's no -- is the CEO from FusionPharm

25   on this e-mail?

1    A.    No, it is not.

2    Q.    And what's your body here?

3    A.    I just sent it all again.

4    Q.    What do you mean by that?

5    A.    Probably means he might have got it before.

6    Q.    Okay.  Well, what do you mean, sent -- just sent all

7    again?

8    A.    I imagine he would have -- I -- to guess, I would have

9    sent him the full documentation and I re-sent it, whatever

10   I sent him prior.

11   Q.    So you sent him documentations?

12   A.    Yeah.

13   Q.    Can you scroll back up, please.

14         Sir, can you look at your screen.  Can you bring

15   this e-mail . . .

16         This is the e-mail after the e-mail you sent Mr.

17   Guy Jean-Pierre that you sent it all again, correct?

18   A.    I need look at the dates.

19         Yeah.  Yes, March 5th, it's after the 4th.  Yeah.

20   Q.    Okay.  And who did he send the e-mail to?

21   A.    *williamsears@vertifresh.com*.

22   Q.    Did he send it to Mr. Scott Dittman?

23   A.    No.

24   Q.    Okay.  And, again, what's the subject line?

25   A.    The debt conversion opinion letters updates for the

Direct - Sears

1    Bayside and FusionPharm.

2    Q.   What are the letters before the debt?

3    A.   Subject:  RE:  "FSPM Debt Conversion Opinions."

4    Q.   As you testified under oath, FSPM is FusionPharm.

5    A.   Indeed, sir.

6    Q.   Okay.  And what is Mr. Guy Jean-Pierre telling you?

7    A.   He received, and everything has been sent to Mr.

8    DiTommaso for final review and execution.  "Absent unusual

9    circumstances, we should have all five opinions Wednesday,

10   maybe even tomorrow if the gods are smiling."

11         Then he goes on to say in another paragraph:  On a

12   related note, he does have the Roy opinion letter on hand.

13   Will forward to me and Mr. Roy when he's received payment.

14   Q.   So when will Mr. Guy Jean-Pierre send you the Roy

15   letter?

16   A.   When he receives payment for it from Mr. Roy or

17   whomever who's paying him.

18   Q.   And then you have five opinions that I'm underlining

19   here on your screen.

20   A.   Uhm-hum.

21   Q.   What do you mean -- what do you believe the opinion to

22   be?

23   A.   To deposit or transfer any securities on the OTC

24   markets.  In the stock market in general, you need a legal

25   letter of opinion to do so, otherwise it's useless.  So

Direct - Sears

1   anything having to do with securities that's in a physical

2   form, it has to accompany a letter of opinion.

3   Q.   And so you have Mr. Jean-Pierre's talking to you about

4   opinion letters.

5   A.   Yes, sir.

6   Q.   And this is dealing with the subject of FSPM debt

7   conversion opinion letters.

8   A.   Yes.

9   Q.   And this date is March 5th, 2013.

10  A.   Yes, sir.

11  Q.   And so we're dealing with debt of FusionPharm based

12  upon the subject, but no Scott Dittman on the e-mail.

13  A.   No Scott Dittman.  He was representing the debtholder,

14  also.

15  Q.   Can I have Government Exhibit 398.

16       Do you recognize Government Exhibit 398?

17  A.   Yes, I do.

18  Q.   Okay.  What is 398?

19  A.   398 is an e-mail that is from myself using the

20  Vertifresh e-mail.  It was sent Friday, March 8th, 2013.

21  It was sent to Scott Dittman sdittman@fusionpharminc.

22  Subject matter, forward:  "FSPM OTC's Markets Opinion

23  Letter."  The attachment was "FusionPharms OTC Markets

24  Letter" of 3-7-13.

25  Q.   Can you please zoom in on the screen to that second

Direct - Sears

1    e-mail.

2           All right, sir, can you look at what I'm circling

3    on the screen.  Who's sending that e-mail?

4    A.   Yes, sir.  The e-mail is coming from the address of

5    *marcelo1@the deallawyer.com*.  The date is March 6th, 2013.

6    It's to myself using the Vertifresh e-mail.  And the

7    subject, once, again is forward:  "FSPM OTC Markets Opinion

8    Letter."

9    Q.   Okay.  And who is Marcelo 1?

10   A.   That would be, to my knowledge, Mr. Guy Jean-Pierre.

11   Q.   Okay.  And, again, what is Mr. Guy Jean-Pierre asking

12   you or telling you in this e-mail?

13   A.   Mr. Sears -- he's telling me that I should see the

14   FSPM OTC markets opinion letter that he attached.  "Kindly

15   advise if anything further is required.  Thank you as

16   always."

17   Q.   And, again, what's your understanding about what a

18   markets opinion letter is in this e-mail?

19   A.   In this e-mail, markets opinion letter would be an

20   opinion letter that is provided to the news service company

21   to verify the information that is being given to said news

22   service company.

23   Q.   And what are -- what is the opinion letter supposed to

24   verify?

25   A.   Pretty much the -- everything about the company.  Is

Direct - Sears

1   it in good standing, financials, shareholder equity.  Just

2   everything about the -- they have a boilerplate form that's

3   filled out and the lawyers have to verify it all.

4   Q.   Do you know if that disclosure has to be true?

5   A.   I would imagine so, yes.

6   Q.   And, again, is Mr. Dittman e-mailed this FSPM OTC

7   markets opinion letter from Mr. Guy Jean-Pierre?

8   A.   No.  Not on that specific e-mail that you're --

9   Q.   Can I have Government Exhibit 372-HHH.

10        Do you recognize Government Exhibit 372-HHH?

11   A.   Yes, I do.

12   Q.   And what is that?

13   A.   That is an e-mail.  It is sent from myself using

14   *wjsears66@icloud.com*.  It was sent Friday, June 28th, 2013,

15   to Scott Dittman at *dittman@fusionpharminc.com*.  Subject is

16   forward:  "Pink Sheets filing for FSPM."  The attachment is

17   an "FSPM Officers and Director Questionnaire."

18   Q.   Okay.  Do you know who sent you those attachments

19   before you forwarded it on to Mr. Scott Dittman?

20   A.   It says from *marcelo1@thedeallawyer.com*.

21   Q.   And as you testified just previously, who's that?

22   A.   Mr. Guy Jean-Pierre.

23   Q.   And here's another phone number, is that correct, from

24   Mr. Guy Jean-Pierre?

25   A.   That's the same one as previously in the document, I

Direct - Sears

1    would imagine so.

2    Q.   Okay.  Could I have Government Exhibit 399.

3             THE COURT:  Before we do that, Mr. Sibert, why

4    don't we pause there for our lunch recess.

5             MR. SIBERT:  Thank you, Your Honor.

6             THE COURT:  Ladies and gentlemen of the jury, we

7    are going to take our lunch recess now.  I ask you to be

8    back in the jury deliberation room by 1:15.  We will resume

9    at 1:20.  I have a matter to raise with the lawyers, so the

10   lawyers will stay put, but the jury is released until 1:20.

11        (Jury left the courtroom at 12:09 p.m.)

12            THE COURT:  All right, Mr. Sears, same drill as

13   before:  Don't speak with any of the lawyers.  I ask you to

14   be back outside the courtroom here by 1:15.  You're

15   released for now.

16            THE WITNESS:  Thank you.

17            THE COURT:  Okay.  I am prepared to rule on the

18   issue of the admissibility of the evidence the Government

19   has summarized with respect to the Florida disbarment of

20   the defendant, as well as his SEC suspension.

21            There are two events at issue here:  the state of

22   Florida disbarment of the defendant and the SEC's

23   suspension of the defendant's privilege to practice before

24   the commission.  I see each of these two from -- I see each

25   of these from two perspectives:  First, the reasons

Direct - Sears

1    underlying the action and, second, the action, itself.

2           I will first address the reasons underlying the

3    Florida disbarment.  According to the case of *United States*

4    *v. Irving*, 665 F.3d 1184, Tenth Circuit opinion from 2011

5    at page 1212, the Court states, "If the contested evidence

6    is intrinsic to the charged crime, then Rule 404(b) is not

7    even applicable."

8           As I understand the Government's proffer, the

9    allegations that eventually led to the defendant's Florida

10   disbarment are allegations also at issue in this case,

11   specifically concerning opinion letters that the defendant

12   wrote related to FusionPharm.  So those matters are

13   intrinsic and Rule 404(b) analysis in my view is not

14   necessary.

15          As to the disbarment itself, this, again, can be

16   broken up into two subissues:  the investigation and the

17   actual disbarment.  Neither one, in my view, is a prior

18   crime, wrong, or other act by the defendant, so, again,

19   Rule 404(b) analysis is unnecessary.  But the defendant

20   also makes a relevancy objection and an objection under

21   Rule 403 of undue prejudice.

22          Concerning the investigation, to the extent a

23   witness's testimony cannot be understood without bringing

24   out the witness's knowledge of the bar investigation and

25   understanding of it, the witness may testify about his or

Direct - Sears

1   her understanding of those matters.  In my view, that is

2   relevant and not unduly prejudicial because that

3   understanding is based on matters intrinsic to the crimes

4   being prosecuted here.  But I find that the outcome of the

5   investigation, namely, the disbarment, itself, is unduly

6   prejudicial because it shows another official body finding

7   the defendant in the wrong on matters directly related to

8   this prosecution.

9        With respect to the SEC suspension, I will first

10  address the underlying reasons and the suspension, itself.

11  As to the underlying reasons, my understanding of the

12  Government's proffer is that the Florida disbarment was the

13  reason.  So I will exclude it for the same reason I

14  excluded the disbarment directly.  As for the fact of an

15  SEC investigation, it may come in to the extent a witness's

16  testimony cannot be understood without bringing out the

17  witness's knowledge of the investigation.  But the

18  Government must be very careful about asking for the

19  witness's understanding of the reasons for the

20  investigation.  If the immediate reason was the Florida

21  disbarment, that may not come in.  But if the witness

22  understood the reasons behind the Florida disbarment, that

23  is, the suspect opinion letters, that witness's

24  understanding of those opinion letters is admissible.

25        As to the outcome of the SEC's investigation,

Direct - Sears

1    itself, I again find it unduly prejudicial.  It is, again,

2    another official body finding the defendant in the wrong on

3    matters directly related to this prosecution.

4         With respect to the Government's arguments about

5    recordings it intends to play of the defendant saying

6    something to the effect that he is no longer a securities

7    lawyer, the Government has not convinced me that these

8    recordings will be incomprehensible without also

9    understanding the defendant's disbarment or suspension.  I

10   therefore find that the probative value of that evidence is

11   outweighed by the undue prejudice already mentioned if the

12   jury were to learn of the fact of disbarment or the fact of

13   suspension.

14        Finally, I note that the defendant's papers,

15   specifically ECF 164, contain a timeliness objection.  That

16   objection is grounded in Rule 404(b)(2)'s notice

17   requirement as well as my orders about pretrial disclosure

18   of Rule 404(b) evidence.  But the matters related to the

19   Florida disbarment and the SEC suspension are either

20   intrinsic to the prosecution or not the defendant's own

21   prior crimes, wrongs, or acts.  So in my view, Rule 404(b)

22   and associated notice requirements do not apply.  For this

23   reason, I am overruling the defendant's timeliness

24   objection.

25        In a moment, my judicial assistant will bring out

                          Direct - Sears

1    a copy of this order for each of you so that you have it in

2    written form.  That you're getting it in written form is

3    not an invitation for me to hear more argument on this

4    issue.  I ruled -- I have ruled and we will not revisit

5    these issues any further.

6              All right.  We will be in recess until 1:20.

7         (Recess at 12:16 p.m.)

8                        AFTERNOON SESSION FSPM

9         (Jury was present at 1:26 p.m.)

10             THE COURT:  Mr. Sears, I remind you you remain

11   under oath.

12             THE WITNESS:  Yes, sir.

13             THE COURT:  Mr. Sibert, you may resume your

14   examination.

15             MR. SIBERT:  Thank you, Your Honor.

16   BY MR. SIBERT:

17   Q.   Sir, I want to try to have you go back -- I was having

18   some issues before lunch when it came to some of these

19   larger exhibits.  Could you please look at Exhibit 372-BB,

20   and can I have that brought up on the screen.

21   A.   Yes, sir.  It's not on the screen but I have it here.

22   Sorry.

23   Q.   Can I have it --

24             COURTROOM DEPUTY:  Are you guys plugged in back

25   there?  There we go.

Direct - Sears

1    BY MR. SIBERT:

2    Q.   Okay.  Sorry about that, Your Honor.

3         Do you recognize Government Exhibit 372-BB?

4    A.   Yes, sir.

5    Q.   Okay.  Now, what is this?

6    A.   This is an e-mail from myself using the

7    *william@williamjsears.com* e-mail, and it was sent on

8    Tuesday, January 3d, 2012.  It was to Scott Dittman at

9    *fusionpharminc.com*, and also carbon copy to

10   *guy@fusionpharminc.com*.  Subject matter was forward:  "FSPM

11   12-30-11."  Attached is a FusionPharm, Inc., shareholder

12   report dated 12-31-2011.

13   Q.   Okay.  Now, this is something that you forwarded on to

14   Mr. Dittman, and who else was cc'd to this?

15   A.   Beth Looker and Leslie Eldridge.

16   Q.   Okay.  Who's cc'd on the top of this?

17   A.   *guy@fusionpharminc.com*.

18   Q.   Okay.  At the time period that you said was for 12-30

19   at 2011; is that correct?

20   A.   That's correct, sir.

21   Q.   That would be the end of the year 2011.

22   A.   Yes, sir.

23   Q.   Okay.  And it's a shareholders report; is that

24   correct?

25   A.   Yes, sir.

                        Direct - Sears

1    Q.   All right.  Now you have that attachment in front of
2    you; is that right?
3    A.   Yes, sir.
4    Q.   Can you just approximately -- you might be able to see
5    a page number -- do you know how many pages that
6    shareholders list is?
7    A.   Last page says 138.
8    Q.   Okay.  Do you know if you're listed anywhere in that
9    shareholders list?
10   A.   No, I do not.
11   Q.   Could you look to see if you are.
12           THE COURT:  You want him to look through 138
13   pages?
14           MR. SIBERT:  It's in alphabetical order, Your
15   Honor.
16           THE COURT:  All right.
17           THE WITNESS:  No, I do not see my personal name
18   listed in this report.
19   BY MR. SIBERT:
20   Q.   Okay.  Thank you.  Can you please look at Government
21   Exhibit 372-FF.
22           And may I have that on the screen, please.  And
23   can you blow up the front part.  Thank you.
24   A.   Excuse me.
25   Q.   Do you have 372-FF there?

Direct - Sears

1    A.   Yes, I do.

2    Q.   And can you tell the grand -- or the jury what that

3    is?

4    A.    This is an e-mail from myself using the

5    *william@williamjsears.com* address.  It was sent on

6    Wednesday, May 23d, 2012, at 9:36 in the morning.  It was

7    to Scott Dittman at FusionPharm, Inc., also Guy

8    Jean-Pierre, which was *guyjeanpierre@yahoo.com*, and also

9    the *guy@lawfirmofjeanpierre&jeanpierre.com.*

10   Q.   What's the subject?

11   A.   Forward:  "FSPM."

12   Q.   And what is attached?

13   A.   "FusionPharm, Inc., shareholder common 12-31-11."

14   Q.   And the date, as you stated, was May 23d, 2012,

15   correct?

16   A.   Yes, sir.

17   Q.   All right.  Now, are you -- do you know if at times

18   financials were always at the precise time when a quarter

19   or the annual ended?

20   A.   Nothing was ever precise.

21   Q.   Was there a lag time?

22   A.   Usually, there always is.

23   Q.   When it -- when it came to filing disclosures?

24   A.   Yes.

25   Q.   And so if you're looking at the date of the

Direct - Sears

1    shareholders report, that would be the end of 2011,

2    correct?

3    A.    One second, please.  Yes, through 12-31-11.

4    Q.    Okay.  So it covers a couple of months.

5    A.    Yes, sir.

6    Q.    Can you look at page 13 of that shareholders list.

7    A.    Yes, sir.

8    Q.    Can you zoom in on where I circled?

9          Okay.  You can look on your screen here, I'm

10   circling as well.  Based upon that report, how many common

11   shares does Bayside hold?

12   A.    It holds a total of 210 active, 40,000 restricted.

13   It's 210, but 40,000 of them are restricted.

14   Q.    170,000 freely tradable?

15   A.    That's what it says.

16   Q.    And this -- based upon this report, this was the same

17   time that you were writing checks to Mr. Guy Jean-Pierre,

18   correct?

19   A.    As a signer of the checking account, yes.

20   Q.    And if we go back to the top page here, Mr. Guy

21   Jean-Pierre got a copy of the shareholder report.

22   A.    Yes, sir.

23   Q.    Can I have Exhibit -- can you please look at Exhibit

24   372-UU .

25   A.    Okay.

Direct - Sears

1    Q.   Okay.  Sir, do you recognize Government Exhibit

2    372-UU?

3    A.   Yes, I do.

4    Q.   And could you describe to the jury what this exhibit

5    is.

6    A.   It is an e-mail from *guy@lawfirmofjeanpierre.com*.  It

7    was sent Monday, November 26th, 2012.  It is to myself

8    using the *william@williamjsears.com* address.  Carbon copied

9    is Scott Dittman using *fusionpharminc.com* e-mail.  The

10   subject matter is "Pink Sheets Opinion Letters, Officers

11   Certificate and Other Letters."  Attached is a forwarded

12   message referring to Pink Sheets opinion letter and other

13   matters, FSPM officers and director questionnaire.

14   Q.   All right.  And we've had discussions based upon this

15   e-mail.  What do you believe the opinion letter is

16   attached?

17   A.   On this one -- okay, this one would probably be for a

18   end-of-quarter.

19   Q.   And that would go to where?  The opinion letter.

20   A.   Pink Sheets, the OTC markets new service.

21   Q.   And that's the legal opinion letter?

22   A.   Yes.

23   Q.   Okay.  And I just want you to look here on the first

24   couple of lines.  Where does Mr. Guy Jean-Pierre state he

25   is?

Direct - Sears

1    A.    In Santo Domingo in the Dominican Republic.

2    Q.    And what is Mr. Guy Jean-Pierre asking for in this

3    second paragraph that I circled?

4    A.    If possible, have the person who prepared the

5    financials send him an e-mail stating that he or she has

6    prepared it and that it was done in accordance with GAAP.

7    Q.    Do you know why Mr. Guy Jean-Pierre would request

8    that?

9    A.    I believe it's required.

10   Q.    Required for what?

11   A.    For the -- whatever document that they're uploading to

12   OTC.  Whoever's going to be certifying the financials.

13   Q.    Okay.  So why would the corporate counsel and legal

14   secretary -- or, excuse me, corporate secretary and legal

15   counsel need the accounting information?

16   A.    Maybe he forgot.  I don't know.

17   Q.    Who was drafting the disclosures?

18   A.    Excuse me?

19   Q.    Who was drafting your disclosures?

20   A.    Mr. Jean-Pierre.

21   Q.    Okay.  I think I was stopped before lunch.  Could you

22   look at Exhibit 399?

23         And could I have 399 up, please.

24   A.    Okay, I've got it.

25   Q.    All right.  Could you -- do you recognize this

1    exhibit?

2    A.   Yes, I do.  It is an e-mail.  It's from myself using

3    *williamjsears.com*, sent on Friday, the 28th -- June 28th,

4    2013, to Mr. Dittman at FusionPharm, Inc.  Subject matter

5    is Forward:  "Pink Sheets Opinion Letter and other

6    matters."  Attachment was:  "FSPM Law Firm Attorney

7    Letter."

8    Q.   Okay.  And can we scroll down this, please.  Okay.

9         And the e-mail that came before that, who's

10   sending that e-mail?

11   A.   *guy@lawfirmofjeanpierre.com*.

12   Q.   Okay.  And who's he sending it to?

13   A.   Myself and Mr. Dittman.

14   Q.   Okay.  And essentially the same subject?

15   A.   Yeah, referencing Pink Sheet's opinion letter and

16   other matters.

17   Q.   And what was Mr. Guy Jean-Pierre telling you in this

18   e-mail?

19   A.   He's saying given the urgency, he has begun preparing

20   the backup documentation and proposed Pink Sheets opinion

21   letter for Mr. DiTommaso's signature letter, even though he

22   won't be able to secure a signed opinion without prior

23   payment therefore.

24   Q.   And, again, it's your reference that the Pink Sheets

25   opinion letter -- where are those disclosed?

                        Direct - Sears

1     A.    On the OTC -- on the OTC Pink Sheets new service.

2     Q.    And who's able to view those letters once they're

3     posted?

4     A.    The public.

5     Q.    Can I have Exhibit 372-III.

6           Do you have that in front of you?

7     A.    Yes, I do.

8     Q.    Okay.  And can -- do you recognize that document?

9     A.    Yes, sir.

10    Q.    And can you tell the jury what that document is.

11    A.    This is an e-mail sent from myself using

12    *wjsears66@icloud.com*.

13    Q.    Let me just stop you there.  That's a different e-mail

14    account that I haven't seen before; is that correct?

15    A.    I mentioned it a couple of times in this testimony --

16    Q.    Okay.  Very well.  I'm sorry.

17    A.    That's okay.  It was sent Saturday, June 29th, 2013.

18    It was to Scott Dittman to his FusionPharm address.

19    Subject:  Forward:  "FSPM Pink Sheets Quarterly Report."

20    Q.    Okay.  And then if you can concentrate on this e-mail,

21    please.  Okay.  Do you recognize the e-mail that's below

22    that?

23    A.    Yes, sir.

24    Q.    Okay.  And what is that e-mail?

25    A.    It says it's from *marcelo1@thedeallawyer.com*.  It was

1    sent on June 29th, 2013, sent to myself at the

2    *wjsears66@icloud.com* address.  The subject was "FSPM Pink

3    Sheets Quarterly Statement."  Excuse me, report.

4    Q.    Okay.  Now, a couple of questions.  We had talked

5    about this, but, again, who's Marcelo 1?

6    A.    Marcelo 1 would be Mr. Guy Jean-Pierre.

7    Q.    Okay.  And, again, he's sending you FusionPharm Pink

8    Sheets quarterly report?  He's sending that to you, not

9    Scott Dittman.

10   A.    Indeed he is, in this particular e-mail.

11   Q.    And what is Mr. Guy Jean-Pierre telling you here?

12   A.    To his knowledge, he still hasn't received the

13   documents from Mr. Dittman.  He called him a couple of

14   times yesterday but he did not pick up and didn't return

15   the calls.  Maybe I can try to track them down for him and

16   let him know.

17   Q.    So when he -- it's fair to say -- who would he call if

18   he couldn't get ahold of Mr. Dittman?

19   A.    Like everybody else, they would call me.

20   Q.    Okay.

21   A.    I was the --

22   Q.    And then let's look at this phone number here.  Whose

23   phone number is that?

24   A.    That would be Mr. Guy Jean-Pierre's.

25   Q.    All right.  Government Exhibit 372-KKK.

Direct - Sears

1    A.   Okay.  I have it.

2    Q.   Can we start down in the middle of this document, the

3    front page.  Right there.  Thank you.

4         Can you look on your screen here, sir.

5    A.   Yes, sir.

6    Q.   I assume you recognize this document as one you

7    reviewed?

8    A.   Yes, sir.

9    Q.   Okay.  And can you talk about the e-mail that I just

10   circled on the screen.

11   A.   The e-mail is from Scott Dittman -- yeah,

12   *scottdittman@yahoo.com*.  Its date was June 30th, 2013.  And

13   it says to *scottdittman@fusionpharminc.com* twice.  The

14   subject is forward:  Financials.  Reply to

15   *scottdittman@yahoo.com*.  And it says "Guy, Here are the

16   financials.  They will be uploaded to the OTC markets

17   today.  Thank you for your assistance.  Always, Scott."

18        And it looks like there was an attachment of a

19   quarterly report.

20   Q.   Can we start from the top again, please.

21   A.   From *william@williamjsears.com*, sent Sunday, June

22   30th, 2013, at 7:10 p.m.  It was sent to

23   *scottdittman@fusionpharminc.com*, cc'd was Guy Jean-Pierre

24   at *guyjeanpierre@yahoo*, *guy@lawofficeofjeanpierre.com*,

25   *marcelo1@thedeallawyer.com*, and Bill Sears at

Direct - Sears

1    *fusionpharminc.com.*  Subject is "Financials."

2    Q.   Did you post the financials for FusionPharm on the OTC

3    Pink web page?

4    A.   Sometimes I would upload them.

5    Q.   Do you know whose account the OTC Pink -- what page

6    for FusionPharm it was listed under?

7    A.   No, I don't.

8    Q.   Okay.  At this time, do you know where your

9    brother-in-law, Scott Dittman, is living?

10   A.   June 30th, '13.  Franktown, maybe.  I don't -- I don't

11   recall.  He's moved a couple of times.

12   Q.   You're married to his sister.

13   A.   Yeah.

14   Q.   Okay.

15   A.   So I'm going to keep track of him three or four times?

16   The guy's moved around a bit.  I don't remember.  He moved

17   two times in one year.  I don't know if it was Franktown or

18   Castle Pines, sir.

19   Q.   Where is Franktown?

20   A.   That would be in Colorado.

21   Q.   Okay.  Where is Castle Rock?

22   A.   That would be in Colorado.

23   Q.   Okay.  Anywhere else besides Colorado?

24   A.   He had moved to Pennsylvania, but I'm unsure of the

25   exact date of that.

Direct - Sears

1    Q.   Can I have Government Exhibit 372-OOO.

2         Do you recognize Government Exhibit 372-OOO?

3    A.   Yes, sir, I do.

4    Q.   Okay.  Let's just look down here in the middle.  Can

5    you zoom in on the middle e-mail.

6         All right.  Do you recognize the e-mail that's in

7    the middle?

8    A.   Yes, I do.

9    Q.   Okay.  And who was sending that e-mail?

10   A.   *advisor@flbusinesshelp.com*.

11   Q.   Who do you know *advisor@flbusinesshelp.com* would be?

12   A.   Mr. Guy Jean-Pierre.

13   Q.   And who is he sending the e-mail to?

14   A.   He's sending it to myself using the

15   *wjsears66@icloud.com* e-mail account.

16   Q.   And, again, what is Mr. Guy Jean-Pierre requesting?

17   A.   Subject:  "RE:  6-30-13."  And he's saying, "Okay.

18   Please have Mr. Dittman sign the attached questionnaire and

19   get it back to me ASAP.  Then I should be able to get you

20   the opinion by Friday.  Thank you, as always."

21   Q.   Do you know what he's talking about regards to

22   "opinion"?

23   A.   Probably for a quarterly financial.

24   Q.   Which would end when?

25   A.   On the 6-30-2013s.

Direct - Sears

1    Q.   Can we just go to the top.

2         And, sir, as you stated, essentially where is this

3    e-mail sent from and to?

4    A.   It is sent from -- at the top, from

5    *williamjsears66@icloud.com*, and was sent Wednesday, August

6    21st, 2013, to *scottdittman@fusionpharminc.com*.  Subject

7    matter was forward:  "6-30-2013."  Attached:  "FSPM

8    Officers and Directors Questionnaire."

9    Q.   Okay, sir, we just went through over 20-some documents

10   and essentially a lot of these documents -- who forwarded

11   these documents on to Mr. Dittman?

12   A.   Excuse me?

13   Q.   Who would forward -- who would forward the documents

14   on --

15   A.   I would.

16   Q.   Okay.  And where would you get all these documents?

17   A.   From Mr. Jean-Pierre.

18   Q.   And what do these documents essentially detail

19   regarding the e-mails --

20   A.   Overall --

21   Q.   Subjects --

22   A.   -- condition of the company from financial to

23   whatever, it would seem.

24   Q.   And how about disclosures to OTC?

25   A.   Yes.  That's part of the quarterly reports.

Direct - Sears

1   Q.   So if I understand you correctly, you would agree with

2   me that most of these deals with financials and what was

3   being disclosed to OTC.

4   A.   Yes, sir.

5   Q.   All right.

6            MR. SIBERT:  Your Honor, at this time, I'm going

7   to move to my fourth batch of exhibits that have been

8   stipulated to.

9            THE COURT:  All right.  One second.

10           MR. SIBERT:  The good news is the piles are

11  getting smaller.

12           THE COURT:  So are we reading off your --

13           MR. SIBERT:  How about I -- these are actually in

14  order.  It would be --

15           THE COURT:  Hold on.  Are we using the listing

16  from your 6:11 p.m. e-mail from yesterday?

17           MR. SIBERT:  Yes, sir.

18           THE COURT:  So which block -- you called them

19  blocks.  What block are you on now?

20           MR. SIBERT:  The one that starts with Exhibit 140.

21           THE COURT:  They begin -- okay.  So your second

22  block.  All right.  Go ahead.

23           MR. SIBERT:  So at this time, the Government would

24  like to introduce Exhibit 140, Exhibit 141, 142, Exhibit

25  143, and Exhibit 144 into evidence.

Direct - Sears

1           THE COURT:  And these are stipulated to?

2           MR. SIBERT:  Yes, Your Honor.

3           THE COURT:  All right.  Given the stipulation of

4    the parties, Government Exhibits 140, 141, 142, 143, and

5    144 are admitted into evidence and may be published to the

6    jury.

7           (Government's Exhibits 140 thru 144 received)

8           MR. SIBERT:  And, Your Honor, may I approach your

9    courtroom deputy with the next package?

10          THE COURT:  Yes, you may.

11          MR. SIBERT:  Thank you.

12   BY MR. SIBERT:

13   Q.   Okay, sir, can you please take a look at Government

14   Exhibit 140.

15          And may I have that brought up on the screen.

16   A.   Yes, sir.

17   Q.   Do you recognize Government Exhibit 140?

18   A.   Yes, I do.

19   Q.   And what is Government Exhibit 140?

20   A.    It is an e-mail sent from myself.  It doesn't detail

21   which e-mail address.  Sent Tuesday, April 19th, 2011, to

22   Guy Jean-Pierre and no e-mail address was listed.  Carboned

23   to *guymjeanpierre@yahoo.com*, and *richscholz@gmail.com*.

24   Subject matter was "FSPM" and attachments are scans of

25   "Dahlman Resignation and BBYB Preferred Stock Origin."

Direct - Sears

1   Q.   So essentially you're writing an e-mail to Mr. Guy
2   Jean-Pierre; is that correct?
3   A.   Yes, sir.
4   Q.   And attached being copied on this e-mail is a Mr. Rich
5   Scholz; is that right?
6   A.   Yes, sir.
7   Q.   Okay.  What do you mean by -- who is your associate,
8   Mr. Richard Scholz?
9   A.   A long-time friend.
10  Q.   Okay.  And what are you asking Mr. Guy Jean-Pierre to
11  provide to him?
12  A.   A letter of opinion, I would imagine.  I can't see --
13  yes, letter of opinion.  A letter of opinion for this
14  securities deposit.
15  Q.   When you say "securities deposit," what do you mean?
16  A.   He had a paper certificate and wanted to put it into
17  the system whereas you have to have a letter of opinion to
18  do so.
19  Q.   Okay.  Does that mean shares of stock?
20  A.   Yes, sir.
21  Q.   Can you look at the third sentence here.  I
22  highlighted it for you.  Where did those shares of stock
23  derive from?
24  A.   They were derived from the preferred Series A of Baby
25  Bee Bright Corporation.

Direct - Sears

1   Q.   Okay.  And where are those shares transferred to at
2   one time?
3   A.   The shares were transferred to Microcap Management as
4   free trading, and Microcap did the same to Prestige for
5   services.
6   Q.   All right.  Can we have Exhibit 141.
7        Sir, could you please take a look at Exhibit 141.
8   A.   Yes, sir.  I have it.
9   Q.   All right.  Can we have the middle -- thank you.
10       Okay.  Sir, if you could look on your screen here,
11  I just circled an e-mail.  Would you tell the jury what
12  that e-mail is about.
13  A.   It is an e-mail from *guy@lawfirmofjeanpierre.com*.  It
14  was dated October 19th, 2011.  It was to myself at
15  *william@williamjsears.com*.  And the subject matter is:
16  "Proposed Agreement referencing purchase of MicroCap."
17  Q.   So it's -- what type of agreement is this?
18  A.   An agreement to purchase a corporation.
19  Q.   Whose corporation?
20  A.   My corporation, MicroCap Management.
21  Q.   Okay.  So you're selling your corporation?
22  A.   Yes, the interest in the company.
23  Q.   And who's doing the paperwork to help you sell that
24  corporation?
25  A.   Guy Jean-Pierre.

1    Q.   Okay.  At this time, you state in this e-mail was

2    October 19th, 2011.

3    A.   Yes, sir, the specific e-mail.

4    Q.   Was this at the time of the FINRA inquiry into

5    FusionPharm?

6    A.   I have no idea.

7    Q.   Do you know if Mr. Guy Jean-Pierre knew anything about

8    the FINRA inquiry?

9         MR. GOODREID:  Objection.  Calls for speculation.

10        THE COURT:  If you know.

11        THE WITNESS:  I don't recall at this time.

12   BY MR. SIBERT:

13   Q.   Let's look at    e 7 of this agreement.

14        Can you blow up article 1, paragraph 1.

15        You stated you were selling your company; is that

16   correct?

17   A.   Yes.

18   Q.   What were you -- how much were you selling your

19   company for?

20   A.   I don't recall.  It wasn't much.

21   Q.   Why don't you read paragraph 1.

22   A.   $10.

23   Q.   Can I have page 12, please.

24        In addition to selling your company for $10, if

25   you look at your screen, what else were you selling with

                      Direct - Sears

1    that company for $10?  Sir, I've circled it on the screen

2    for you.  What was included in the sale?

3    A.    That's not a signed agreement.

4    Q.    I'm just saying --

5    A.    Because I'm just saying, if we're going to talk about

6    a document, I want to be clear, sir.

7    Q.    What's in this document?

8    A.    That particular document says, "including any and all

9    brokerage accounts in the name of MicroCap to Richard

10   Scholz."

11   Q.    Thank you.

12   A.    That's why it wasn't signed.

13   Q.    Could I have Government Exhibit 142.

14         Do you recognize Government Exhibit 142?

15   A.    Yes, sir, I do.

16   Q.    Okay.  And what is Government Exhibit 142?

17   A.    From myself.  It was sent Tuesday, November 8th, 2011,

18   *richardscholz@gmail.com* is the recipient.  The subject says

19   "Docs."  Attachment, "Company purchase RS.pdf; Share

20   Purchase Agreement RS.pdf."

21   Q.    Okay.  Can we go to page 6 of the attachment, please.

22   A.    Yes, sir.

23   Q.    It's going to come up on your screen, sir.  Whose

24   signature is on that page?

25   A.    That would be mine.

Direct - Sears

1    Q.   Can I have Government Exhibit 143, please.  I'm sorry,

2    I want to go back to that.  Can I go back to that real

3    quick?  And page 6 again.  And can you zoom in on the

4    signatures.  Go to page 1, please, of the attachment.  Can

5    you zoom in on the top here, please.

6              Could you tell me the date that this agreement was

7    made?

8    A.   The 9th of May, 2011.

9    Q.   So correct me if I'm wrong, we just looked at an

10   agreement that Mr. Guy Jean-Pierre sent you on October

11   19th, 2011 --

12   A.   Uhm-hum.

13   Q.   -- and we just looked at your signed agreement that's

14   dated --

15   A.   Uhm-hum.

16   Q.   -- November 9, 2011.  Or, excuse me, May --

17   A.   May 9th, 2011.

18   Q.   -- 9th, 2011.  You would agree with me that November

19   and October come after --

20   A.   Absolutely.

21   Q.   You would agree with me that May comes before October?

22   A.   Absolutely.

23   Q.   Can I have Exhibit 144.  Can you please blow up the

24   whole e-mail.

25              Do you recognize this exhibit?

Direct - Sears

1    A.    Yes, I do.

2    Q.    And what is this exhibit?

3    A.    This is an e-mail from myself.  It was sent Thursday,

4    February 7th, 2013.  It was to *casskri1120@aol.com*, which

5    is my mother's e-mail address.  Carbon copied was

6    *richscholz@gmail.com*.  Subject matter is "Scottsdale."

7    Q.    Okay.  So right here I'm circling on the screen for

8    you, whose e-mail is that?

9    A.    That would be my mother's.

10   Q.    And that's Ms. Sandra Sears?

11   A.    Yes, sir.

12   Q.    Who is Scottsdale?

13   A.    That would have been Scottsdale Capital Advisor, a

14   broker/dealer in Scottsdale, Arizona.

15   Q.    A brokerage house.

16   A.    Yes, sir.

17   Q.    All right.  And based upon your understanding, what is

18   does a brokerage do -- a brokerage house like Scottsdale?

19   A.    As in all brokerage houses, they do many things,

20   mostly in the financial sectors.  They can buy and sell

21   stocks, bonds, provide banking services.

22   Q.    What are you telling your mom to do in this e-mail?

23   A.    I'm giving her explicit instructions on how to dial a

24   number because she's blind in one eye, and instruct her how

25   to empower Richard to trade the account for her.

Direct - Sears

1   Q.   Let's just work through this.  What do you mean by

2   here, "Dial this number, they will answer the phone

3   'Trading'"?

4   A.   That's the brokerage house's number, sir.

5   Q.   And what are you instructing your mom to do here?

6   A.   To identify herself with a specific account number so

7   they know who they're talking to.

8   Q.   Okay.  The account number is what?

9   A.   It looks to be from this one, 154204611.

10  Q.   Okay.  And that account number goes to account --

11  A.   I'm not sure.

12  Q.   -- regarding Bayside?

13  A.   Bayside.

14  Q.   You wrote this e-mail, right?

15  A.   Yes, indeed.

16  Q.   Okay.  And then you tell her what?

17  A.   "Tell them that you want to place a sell order."

18  Q.   So essentially you're telling her to sell Bayside

19  stock?

20  A.   Yes.  When Richard instructs her to do so, as he

21  had -- he's a stock trader; that's what he does.

22  Q.   And you can -- you compare it to what?

23  A.   Excuse me?

24  Q.   You compare selling stock to what?

25  A.   To keep it simple for her understanding "like ordering

1   pizza," tell them what you want and that's what you will

2   get.

3   Q.   And this is your phone number down here?

4   A.   Yes, that was my number down there.

5   Q.   And this is Mr. Richard Scholz's phone number?

6   A.   Yes.

7   Q.   And can I have Exhibit 143.

8        Do you recognize Exhibit 143?

9   A.   Yes, sir.

10  Q.   Okay.  And what is Exhibit 143?

11  A.   It is an e-mail sent from myself, sent Monday, June

12  18th, 2012, to *richscholz@gmail.com*.  Subject matter is

13  "FSPM."  And the attachments are "M&C Due Diligence

14  6-18-12."

15  Q.   Again, FSPM is what?

16  A.   Oh, it's the trading symbol for FusionPharm, Inc.

17  Q.   And what does "M&C due diligence" mean?

18  A.   Give me a second, I'm familiarizing myself with the

19  e-mail.  M&C is a brokerage firm called Moors & Cabot in

20  Boca Raton.

21  Q.   What does "due diligence" mean?

22  A.   Background.

23  Q.   What do you mean by "background"?

24  A.   Background.  What it is that you're sending, just due

25  diligence, if you're looking into something.

Direct - Sears

1    Q.   About what?

2    A.   You would do your due diligence, that is a term that

3    can be used for anything, sir.  This particular e-mail

4    would be for, obviously, things that the brokerage firm

5    would have requested.

6    Q.   So --

7    A.   Or he requested.

8    Q.   -- is it dealing with documents with FusionPharm?

9    A.   It's dealing with certificates from MicroCap and

10   FusionPharm, yes, sir.

11           MR. SIBERT:  All right, Your Honor, at this time,

12   the Government would like to move for more exhibits to be

13   admitted into evidence.  I think this would be batch 3 on

14   my 6:00 e-mail last night.

15           THE COURT:  What did you call it, the third block?

16           MR. SIBERT:  I believe so.

17           THE COURT:  Okay.

18           MR. SIBERT:  I have them in order, too.

19           THE COURT:  These are not in order -- in

20   alphanumeric order in the e-mail.

21           MR. SIBERT:  Right, I have them in numerical order

22   here.

23           THE COURT:  Have you given your listing in

24   alphanumeric order to defense counsel so they can follow

25   along?

                          Direct - Sears

 1          MR. SIBERT:  I haven't yet, no.

 2          MR. BARNARD:  Your Honor, we reviewed them in the

 3    order -- in the e-mail --

 4          THE COURT:  Okay.

 5          MR. BARNARD:  -- and found them all to be

 6    appropriate and stipulated.

 7          THE COURT:  Stipulated?  Okay.

 8          MR. BARNARD:  Yes.

 9          THE COURT:  So actually for our records, though,

10    Mr. Sibert, so the courtroom deputy can follow along more

11    easily and keep track of what's coming in, why don't you

12    move the exhibits you have called third block in your

13    e-mail, but do it in alphanumeric order.

14          MR. SIBERT:  Yes, sir.

15          THE COURT:  All right, go ahead.

16          MR. SIBERT:  It's 69, 70, 74, 77, 81, 82 --

17          THE COURT:  Slow down.

18          MR. SIBERT:  -- 133, 155, 156, 245, 252, 268, 269,

19    270, 271, 272, 274, 372 and this will include several

20    subcategories.  Those are NN --

21          THE COURT:  You mean subcategories -- these are

22    separate exhibits but with 372 being the first numbers in

23    that exhibit?

24          MR. SIBERT:  Yes, sir.

25          THE COURT:  All right.  Go ahead.

1           MR. SIBERT:  372-NN, 372-XX, 372 alpha alpha

2    alpha --

3           THE COURT:  I think you can just say the letters.

4           MR. SIBERT:  Sure.  372-BBB, 372-DDD, 372-MMM, and

5    400.

6           THE COURT:  All right.  Given the stipulation of

7    the parties, the following government exhibits are admitted

8    into evidence and may be published to the jury:  69, 70,

9    74, 77, 81, 82, 133, 155, 156, 245, 252, 268, 269, 270,

10   271, 272, 274, and 372-NN, XX, AAA, BBB, DDD, MMM, and 400.

11        (Government's Exhibits received)

12           THE COURT:  Go ahead, counsel.

13           MR. SIBERT:  Your Honor, may I approach your

14   courtroom deputy --

15           THE COURT:  Yes, go ahead.

16           MR. SIBERT:  -- to swap?

17   BY MR. SIBERT:

18   Q.   Okay, sir, can you please take a look at Government

19   Exhibit 245.

20   A.   Yes, sir.

21   Q.   Do you recognize Government Exhibit 245?

22   A.   Yes, I do.

23   Q.   And can you tell the jury what that is.

24   A.   That is an e-mail sent from myself from

25   *wsears@fusionpharminc.com*, sent Monday, June 4th, 2012.

Direct - Sears

1   It's to Scott Dittman using his FusionPharm e-mail address.

2   I'm forwarding a draft note agreement, attach promissory

3   note, credit line agreement.

4   Q.   Okay.  And let's just go to the middle of that first

5   page there.  Do you recognize the e-mail from Mr. Cliffe

6   Bodden?

7   A.   Yes, I do.

8   Q.   He reappears in this e-mail.

9   A.   He reappears.  He's like Harry Houdini.

10  Q.   And who is he sending an e-mail to?

11  A.   He's sending it to myself using the

12  *wsears@fusionpharminc.com* e-mail.

13  Q.   And he sends you an e-mail to your FusionPharm e-mail

14  address?

15  A.   Yeah, even if he told me not to use it, yes, sir.

16  Q.   So this is after -- as you just stated, this is after

17  the date that Mr. Bodden said "don't use this e-mail

18  address;" is that what you just said?

19  A.   I think so.  I'll have to research the dates, but I

20  think so.

21  Q.   Okay.  And --

22  A.   Just so many e-mail addresses that everyone was using,

23  who could keep track.

24  Q.   The subject is draft note agreement; is that

25  correct?

Direct - Sears

1   A.   It is -- excuse me?

2   Q.   What's the subject?

3   A.   Forward:  Draft note agreement.

4   Q.   No, no, I'm talking about the one that Mr. Bodden had

5   sent you.

6   A.   Subject:  Draft note agreement.

7   Q.   Okay.  And then let's look at the date here.  What's

8   the date?

9   A.   June 4th, 2012.

10  Q.   And you would not argue with me that that's the year

11  of 2012.

12  A.   It says 2012.

13  Q.   And at the top of the e-mail -- can I get to the top

14  of the page, please -- again using your FusionPharm e-mail

15  account, who do you forward it to?

16  A.   Scott Dittman.

17  Q.   And essentially, again, what's attached?

18  A.   I'm forwarding a draft note agreement.

19  Q.   And you did it the same day.

20  A.   Yes, sir, a couple of minutes after, to be exact.

21  Q.   Can I have Exhibit 252.

22       Do you recognize Exhibit 252?

23  A.   Yes, I do.

24  Q.   And what is Exhibit 252?

25  A.   It is an e-mail from *william@williamjsears.com*, sent

1   on Sunday, June 17th, 2012, to Cliffe Bodden at GSC

2   Ventures on *microsoft.com*.  Subject is "FSPM."

3   Q.   All right, let's work from the bottom of the first

4   page here.  Can I have that brought up a little bit,

5   please.

6        If you look on the screen, I'm circling an e-mail

7   from you.  Can you tell the jury about that e-mail.

8   A.   I don't remember it exactly, what it's pertaining to,

9   but it says, "Guys, Circle the wagons and get the rest to

10  our outstanding dove wrapped up."

11  Q.   Okay.  And you say, "guys" in there.  Who are you

12  referring to as "guys"?

13  A.   The original message was from myself to Guy M.

14  Jean-Pierre, to Guy Jean-Pierre, to Cliffe Bodden.  Subject

15  was:  "FSPM June 17th, 2012."

16  Q.   So essentially about 12 days after the previous

17  e-mail.  About.

18  A.   Yeah, roughly.

19  Q.   And then here's the e-mail from Mr. Bodden, correct?

20  A.   Yes, sir.

21  Q.   And what's Mr. Bodden's response there?

22  A.   "Dove?"

23  Q.   And then you follow up with?

24  A.   "Docs.  Duh."

25  Q.   So you're correcting yourself?

Direct - Sears

1    A.   It would appear so.

2    Q.   So you're sending further docs to Mr. Guy Jean-Pierre?

3    A.   Yes, sir.

4    Q.   And with the subject "FusionPharm."

5    A.   Yes.

6    Q.   Can I have Government Exhibit 372-NN.  Can you start

7    from the bottom, please, on the screen.

8         Have you had an opportunity to look at Government

9    Exhibit 372-NN?

10   A.   Yes, I have.

11   Q.   Okay.  And do you recognize that document?

12   A.   Yes, I do.

13   Q.   All right.  Can you look on the screen and look at the

14   e-mail I just circled.

15   A.   Yes, sir.

16   Q.   Okay.  Could you tell the jury what that e-mail is

17   about.

18   A.   The e-mail is subject:  "Revised Articles and

19   Certificate of Designation of Series A Preferred Stock."

20   It was to me.  Sent on a Tuesday, June 19th, 2012, from

21   *guy@lawfirmofjeanpierre.com*.

22   Q.   All right.  So do you know what Mr. Guy Jean-Pierre

23   did with this certificate of designation of preferred

24   stock?

25   A.   I don't recall.  Change it, create it.  I don't know.

Direct - Sears

1    I don't remember.

2    Q.   You would agree with me he revised it?

3    A.   Yes.

4    Q.   And then what are you supposed to do if you have any

5    questions?  Or I guess I should say, when you have time.

6    A.   Give him a call when I have time.  He said, "Here's

7    the" -- "Attached please find the revised articles and

8    Certificate of Designation of Series A Preferred Stock,"

9    period.

10   Q.   And this is --

11   A.   "Also, give me a call as soon as you have a chance."

12   Q.   Okay.  And this is two days after the last exhibit we

13   just looked at.

14   A.   Yes, it is.

15   Q.   Can you go to the top of that exhibit for me, please.

16        And to remain consistent, what do you do once you

17   receive the e-mail from Guy Jean-Pierre?

18   A.   This is -- e-mail would be from myself,

19   *wsears@fusionpharminc.com*.  It was sent on Tuesday, July

20   19th at 2:12.  It was to Cliffe Bodden at GSCC Venture.

21   Subject:  Forward:  "Revised Articles and Certificate of

22   Designation of Series A Preferred Stock."  Attachment was

23   untitled something, and "Amended and Restated Articles."

24   Q.   372-XX.  And can you start at the bottom for me,

25   please.  Bring it out.  Bring it out a little bit more.

Direct - Sears

1          All right.  Can you look at Exhibit 372-XX.

2     A.   Yes.

3     Q.   Do you recognize that document?

4     A.   Yes, I do.

5     Q.   All right, sir, can you look on your screen.  I want

6     to discuss the e-mail that I just circled.  Who's writing

7     that e-mail?

8     A.   *guy@lawfirmofjeanpierre.com.*

9     Q.   And who is he sending it to?

10    A.   *wsears@vertifresh.onmicrosoft.com.*

11    Q.   That would be you?

12    A.   Yes, sir.

13    Q.   And what's the subject on there?

14    A.   "FSPM-Bayside."

15    Q.   So FusionPharm dash Bayside?

16    A.   Yes, sir.

17    Q.   Okay.  And what is Mr. Guy here telling you in his

18    letter -- or his e-mail?

19    A.   He's saying, "As discussed, attached please find the

20    non-affiliation form and officer's certificate to be signed

21    by the managing member of Bayside and Mr. Dittman,

22    respectively.  Once I received the attached properly

23    executed and arrangements have been made for payment, we'll

24    be able to proceed with the requested opinion in short

25    order."

Direct - Sears

1    Q.   Okay.  Can you stop right there?  So as you just read,

2    "as discussed," what conversations did you have with Mr.

3    Guy Jean-Pierre before this?

4    A.   I can't recollect, sir.  It was 2012.

5    Q.   But you would agree there was a prior conversation --

6    A.   Yes, sir, absolutely.

7    Q.   Now, he's e-mailing you -- can you read this third

8    paragraph?

9    A.   "Also, as we discussed on Friday, I think, please send

10   me copies of the evidence of funds disbursed by Bayside

11   (and other noteholders, if any.)  Once we have everything,

12   we should be able to turn around the opinion pretty

13   quickly.  Thank you much, as always."

14   Q.   He's asking you about Bayside; is that right?

15   A.   Indeed, he is.

16   Q.   He's actually asking you for evidence from Bayside,

17   correct?

18   A.   Yes, he is.

19   Q.   As you testified, your mother was a placeholder and

20   Bayside wasn't yours.

21   A.   No, I testified that I was on Bayside in the very

22   beginning and then resigned.  My mother was a placeholder

23   in FusionPharm, I said, sir.

24   Q.   I'm sorry, I'm mistaken.  From the very beginning,

25   that's correct.

Direct - Sears

1          Well, if you look at the top of the e-mail, this
2    is December 2012.
3    A.    Okay.
4    Q.    It's not the beginning anymore.
5    A.    My mother owns the company and?
6    Q.    So why would Mr. Guy Jean-Pierre be reaching out to
7    you for documents from Bayside?
8              MR. GOODREID:  Again, objection --
9              THE WITNESS:  This -- I'll answer that one.
10             THE COURT:  Hold on.
11             MR. GOODREID:  Objection.  Based on speculation.
12             THE COURT:  Hold on.  Only if you know.
13             THE WITNESS:  You've listened to tapes on Sunday.
14   Nobody can -- no disrespect, sir, you can't understand him.
15   My mother's 71 years old.  How is she supposed to
16   understand him on the phone?
17   BY MR. SIBERT:
18   Q.    Well, sir, you testified your mother had no duties?
19   A.    Besides a holding company, it holds securities.
20   That's what this is:  A note, convertible note.  Debt turns
21   into stock, stock can be sold.
22   Q.    So this is about a convertible note?
23   A.    That's what I would imagine this would be.  What else
24   would they be talking about debt and debtholders for, sir?
25   Q.    Okay.  And this is in 2012.

Direct - Sears

1    A.    Indeed.   December 8th is what the top of the page

2    says.

3    Q.    Can I have Government Exhibit 69, please.   Can we

4    start at the bottom.   Can you blow that up, please.

5          All right, sir, do you recognize Government

6    Exhibit 69?

7    A.    Yes, I do.

8    Q.    And let's start at the bottom here.   Do you recognize

9    that e-mail?

10   A.    Yes, I do.

11   Q.    Okay.   And what is that e-mail?

12   A.    That is Sandra Sears at *sandrasears1120@gmail.com*.

13   Q.    And who -- what Sandra Sears are we talking about?

14   A.    That would be my mother.

15   Q.    Okay.   That's a different e-mail address than before?

16   A.    It's gmail and they had acquired AOL, so I think she

17   had to do both or something like that.   I don't know, to be

18   honest with you.   For some reason she switched and then she

19   went back, so I don't know.

20   Q.    And who is she sending this e-mail to?

21   A.    Ms. Joanna DiBella.

22   Q.    Do you know who Ms. Joanna DiBella is?

23   A.    Yes, she's a security compliance supervisor at

24   Pacific -- was at Pacific Stock Transfer.

25   Q.    And this is regarding -- you're cc'd on this e-mail;

                            Direct - Sears

1    is that correct?

2    A.   That is correct.

3    Q.   And what is the e-mail -- or, excuse me, what is the

4    subject?

5    A.   Subject matter is the convertible note.

6    Q.   What is the date of that e-mail?

7    A.   December 24th, 2012.

8    Q.   And what does your mom tell Ms. DiBella?

9    A.   "Please find attached the revised letter of an

10   opinion," which means there was one previous.  "I have

11   already sent all the other docs" to you -- "docs you

12   requested.  Any chance of getting this out today?"

13   Q.   All right.  Well, you're cc'd on this e-mail, so what

14   does it mean to you by "letter of opinion"?

15   A.   It would be a letter of opinion to take paper

16   instrument, whether it's debt -- which is what this is

17   talking about -- and/or equity, being stocks, and deposit

18   them into -- get them into freely traded form to be entered

19   into the system.

20   Q.   So what kind of letter is this?

21   A.   A letter of opinion, sir.

22   Q.   Okay.  Is that a legal letter?

23   A.   Yes, it would be.

24   Q.   And -- all right.  Now, you've testified that your mom

25   didn't have a role, she's 71 years old, she's blind in one

Direct - Sears

1   eye, and you actually had to advise her about how to sell

2   stock in a prior e-mail because you made it easy for her

3   like ordering pizza?

4           MR. GOODREID:  Objection.  That is an

5   extraordinarily compound question.

6           MR. SIBERT:  I didn't even ask the question.

7           THE COURT:  I don't think I've heard the beginning

8   of the question.  There's just a lot of prefatory

9   comment.

10           MR. GOODREID:  Then I modify my objection to

11   counsel's testifying, Your Honor.

12           THE COURT:  Let's start the question over and get

13   to the point.

14           MR. SIBERT:  Okay.  I was just refreshing the

15   witness about his mother.

16           THE COURT:  I think he knows his mother well.

17   BY MR. SIBERT:

18   Q.   So was your mother involved now with getting revised

19   letter of legal opinions to sell stock?

20   A.   Let's be clear:  We talked about my mother's

21   involvement in FusionPharm.  So you take that and you put

22   that aside.  We're talking about Bayside Realty Holdings

23   here, which is a holding company, which was a debtholder to

24   FusionPharm.

25           In order to do so, she has to go over documents.

                        Direct - Sears

1     And, no, it is not easy dealing with her at all on

2     anything.  You'll see that soon enough.

3     Q.   My question was:  Did your mother work with a lawyer

4     to get a legal opinion letter?

5     A.   That's your question.  Yes, she did.

6     Q.   Who did she work with?

7     A.   She worked with Guy Jean-Pierre, sir.

8     Q.   Okay.  Let's go to the top here, please -- or middle,

9     I should say.

10         Do you recognize that e-mail there, sir, that I

11    circled on the screen?

12    A.   Yes, I do.

13    Q.   Okay.  What is that e-mail?

14    A.   That is an e-mail dated December 26th, 2012, from a

15    Ms. Joanna DiBella *@pacificstocktransfer.com*, and she

16    wrote, "Good afternoon Sandra, I have reviewed the

17    documents submitted by counsel and there is still not a

18    clear discussion of Rule 144(d)(3) and how it applies to

19    this transaction.  I also need to know if you are

20    requesting that we use your credit card to pay for your

21    transaction."

22    Q.   All right.  So fair to say that there's an issue here

23    with the Rule 144 legal letter.

24    A.   She is the security supervisor, yes, sir.

25    Q.   Okay.  And I just want to backtrack here real quick.

Direct - Sears

1    You testified that your mother worked with Guy Jean-Pierre

2    to get legal letters.  And as you had testified prior, we

3    went through the documents 158 through 166 where you paid

4    Mr. Guy Jean-Pierre to write attorney letters.  Do you

5    recall those documents?

6    A.   Yes, I do.

7    Q.   So if Ms. -- you are -- do you assist your mother?

8    A.   Always.  If she ever asks me to, I would.

9    Q.   So you're writing checks from Bayside.

10   A.   I was a signer.

11   Q.   And your mother's using the lawyer that you used, Mr.

12   Guy Jean-Pierre, correct?

13   A.   She -- indeed.

14        Do you know -- if you know, before I get the

15   objection, if Mr. Guy Jean-Pierre knew that you were

16   assisting his mother with Bayside?

17   A.   Absolutely.

18   Q.   Can you come down to the top of that e-mail for --

19   again.  Thank you.

20        Okay.  Let's just talk about the beginning here.

21   How do you wrap up this chain of e-mails?

22   A.   Excuse me?

23   Q.   Okay.  Let's start from the top.  Who wrote the

24   e-mail?

25   A.   Okay.

Direct - Sears

1    Q.   My question is:  Who wrote the e-mail?

2    A.   I heard you.  It's from myself at

3    *william@williamjsears.com*.  It was sent Wednesday, December

4    26th, 2012 --

5    Q.   Okay.  Stop.  Who did you send the e-mail to?

6    A.   That was the next line.  To Joanna DiBella,

7    *joanna@pacificstocktransfer.com*.

8    Q.   Okay.  Stop.  Same subject as down below, correct?

9    A.   Yes, sir.

10   Q.   Okay.

11   A.   Convertible note.

12   Q.   And now you are answering essentially for the company

13   that your mother runs; is that right?

14            MR. GOODREID:  Objection; leading.

15            THE COURT:  Sustained.

16   BY MR. SIBERT:

17   Q.   Is your mother --

18            THE COURT:  Hold on, counsel.  Hold on, Mr. Sears.

19   Let's rephrase.

20   BY MR. SIBERT:

21   Q.   Is your mother answering this e-mail?

22   A.   That particular one I am.  This was a very confusing

23   transaction --

24   Q.   You are --

25   A.   It took three months to finish, so you can't just say

Direct - Sears

1    that without going into --

2            MR. GOODREID:  Objection, Your Honor.  If counsel

3    will allow the witness to finish his answer before cutting

4    him off.

5            THE COURT:  Hold on, folks.

6            Mr. Sibert, let the witness complete his answer.

7            Are you done, sir?

8            THE WITNESS:  Yes.  Thank you, Judge.

9            THE COURT:  All right.

10   BY MR. SIBERT:

11   Q.   So the issues that your mother was having with the

12   transfer agent, who was the person that replied back to

13   them?

14   A.   That particular e-mail was myself.

15   Q.   Thank you.

16   A.   You're welcome.

17   Q.   Government Exhibit 70.  Okay.

18           So we just talked about the first e-mail that you

19   responded back to Mr. -- Mrs. DiBella on December 26th,

20   2012.  Do you recognize Government Exhibit 70?

21   A.   Yes.

22   Q.   And --

23   A.   70, correct.

24   Q.   70.

25   A.   Yes.

Direct - Sears

1    Q.   And can you pull up that section for me, please.

2         Who sent you an e-mail later on December 26th,

3    2012?

4    A.   Ms. Joanna DiBella.

5    Q.   And, again, what is Ms. Joanna DiBella talking about

6    here?

7    A.   She's talking about the original note that's dated

8    2011 that includes additional funds received all the way

9    through December.  The attorney states Rule 144(d)(3) is a

10   holding period discussion in one sentence --

11        THE COURT:  Slow down.

12        THE WITNESS:  Sorry.

13        THE COURT:  Go ahead.

14        THE WITNESS:  Now it says, "Rule 144(d)(3)

15   discusses the tacking of one security to another and we

16   need him to" clarify -- "clearly discuss this area and how

17   it relates to the promissory note and additional funding so

18   that he clearly defines what parameters of the Rule 144 he

19   is replying about."

20   Q.   Okay.  Thank you.

21   A.   And she asks for payment on the transaction again.

22   Q.   Okay.  So let's look at this real quick.  What is the

23   issue with this transfer?

24   A.   Some legal phrase that he -- that the lawyer would

25   have needed to clarify.  She wanted it written down in a

Direct - Sears

1    certain way, obviously.

2    Q.   And who's the lawyer?

3    A.   Mr. Guy Jean-Pierre.

4    Q.   All right.  And now she's asking you about payment

5    regarding this transaction, right?

6    A.   Uhm-hum.

7    Q.   Why would she be asking you about payment for your

8    mother's company?

9    A.   Because my mother would have given her authorization

10   to talk to me to handle it because it was too confusing to

11   her.

12   Q.   Okay.

13   A.   This is confusing to everybody.

14   Q.   Can you go down to the top of the e-mail.  Okay.

15        Now, who responds back to Mrs. Joanna DiBella's

16   e-mail

17   A.   I did.

18   Q.   All right.  And then let's just look at the body here.

19   Based upon her e-mail, where were you going to forward her

20   comments?

21   A.   To the lawyer --

22   Q.   To who?

23   A.   "So I just forwarded your comments to the lawyer."

24   Q.   So who's the lawyer?

25   A.   Mr. Guy Jean-Pierre.

Direct - Sears

1    Q.   Isn't the lawyer Mr. DiTommaso?

2    A.   Mr. Guy Jean-Pierre, Mr. DiTommaso, it's the same

3    person.  All my correspondences went directly to Guy

4    Jean-Pierre.

5    Q.   Again, subject is the convertible notes?

6    A.   Yes, it is.

7    Q.   And the date is late in 2012, correct?

8    A.   That would be December 26th, 2012, sir.

9    Q.   Could I have Exhibit 268.

10        Do you recognize Government Exhibit 268?

11   A.   Yes, I do.

12   Q.   Okay.  Can we please start at the bottom.

13   A.   From Ms. Joanna DiBella, December 26th, 2012, to

14   myself, William at William J. Sears.  Subject is

15   "Convertible Note."

16   Q.   And this is the same e-mail that we just spoke about;

17   is that correct?

18   A.   I'm sorry, I'm just buried in paper here.  I'm trying

19   to --

20   Q.   Take your time.  It was --

21   A.   Yes, December 26th, 2012.

22   Q.   Okay.  Now, go to the top.  Can I have the top,

23   please.  Okay.  And who do you -- oh, I'm sorry.

24        And in the middle here, what do you do with this

25   e-mail?

Direct - Sears

1    A.   I'm sending an e-mail to Mr. Jean-Pierre letting him

2    know I need to get this paperwork done because the TA is an

3    idiot.

4    Q.   Is that a person that you said that was head of

5    compliance, you're now calling an idiot?

6    A.   Right.  And she quit 30 days after.  She got the same

7    package five times and then was -- quit slash fired.

8    Q.   Okay.  But you're --

9    A.   It was a bit of a debacle.

10   Q.   You're not forwarding this to Mr. DiTommaso at all,

11   are you?

12   A.   No, I am not.

13   Q.   And then eventually you forward this on to Mr. Bodden;

14   is that correct?  It's right there at the top --

15   A.   It's not -- yes, *rbodden@meadpoint.onmicrosoft.com*.

16   Q.   And who is C. Bodden?

17   A.   That would be C. Randy Bodden.  That would be Cliffe

18   Bodden.

19   Q.   Do you know why he goes by Randy?

20   A.   Like everybody else with all their e-mails, I have no

21   idea.

22   Q.   Can I have Government Exhibit 269.

23        Do you recognize Government Exhibit 269?

24   A.   Yes, I do.

25   Q.   Can you please blow up this.

Direct - Sears

1              Who's this e-mail from?

2    A.   This e-mail is from *guy@lawfirmofguyjeanpierre.com.*

3    Q.   And when is that sent?

4    A.   December 27th, 2012.

5    Q.   And who is it to?

6    A.   *william@williamjsears.com.*

7    Q.   No Sandra Sears?

8    A.   No.

9    Q.   No Scott Dittman?

10   A.   No.  It's the same convertible note.

11   Q.   So the two owners of these companies aren't even

12   e-mailed by the corporation's lawyer.

13   A.   The corporation was the -- the lawyer was acting

14   independently of the corporation.  They were retained --

15   Q.   That's not my question how he was acting.  My

16   question --

17   A.   That was my answer.

18   Q.   My question is:  He was listed as the legal counsel

19   for the corporation, right?

20   A.   Yes, he was --

21              MR. GOODREID:  Objection.  Leading.

22              THE WITNESS:  For the corporation, yes.

23              MR. GOODREID:  Excuse me.  Objection.  Leading.

24              THE WITNESS:  Sorry.

25              THE COURT:  Sustained.

Direct - Sears

1    BY MR. SIBERT:

2    Q.   Okay.  Who was listed -- let's --

3    A.   I need a break for a minute.

4    Q.   Who was listed as the legal counsel for FusionPharm?

5    A.   Sorry, I'm not being rude, Judge, I --

6              THE COURT:  I didn't hear what you said.

7              THE WITNESS:  I said I'm not being rude, I just

8    need a second, sir.

9              THE COURT:  All right.

10             THE WITNESS:  Thank you.

11             THE COURT:  Let's dial down the temperature a

12   couple of degrees on both ends here, and let's wait for

13   each side -- each person to finish before the other one

14   starts.

15             THE WITNESS:  Okay.  I'm sorry.  Please.

16   BY MR. SIBERT:

17   Q.   Who was listed in 2011 disclosures, and as you

18   testified, the legal counsel for FusionPharm?

19   A.   Guy Jean-Pierre.

20   Q.   And now my question was simple:  The legal counsel

21   that you just testified to as being the counsel for

22   FusionPharm, and also as you testified being the counsel

23   for Bayside, neither your mother or Scott Dittman is

24   e-mailed regarding this issue with the transfer agent in

25   December 2012.

Direct - Sears

1    A.    On this particular e-mail, no.  None of them are on

2    this particular e-mail.

3    Q.    Thank you.  It went to you.

4    A.    Because I -- yes.  Yes, it went to me.

5    Q.    And, again, the subject is very clear, it's regarding

6    the same thing that we've been discussing, correct?  The

7    convertible note?

8    A.    I'm sorry.  I was looking at a different -- yes, sir.

9    Yes, sir.

10   Q.    Okay.  And what is Mr. Guy Jean-Pierre telling you in

11   his response?

12   A.    He thought about it last night and he was going to

13   send -- I'm sorry, I am going too fast -- "I thought about

14   it last night and I was going to send you a perfunctory

15   e-mail about the holding period of Rule 144 being one year

16   from the date of the first payment for the security

17   acquired and since the last trunch was more than a year

18   ago, there should be no issue."

19          Then it goes into -- do you want me to read the

20   rest or did you just want that?

21   Q.    Well, if you can summarize, that would be easier.

22   A.    I'd prefer not to summarize it because it goes into

23   legal terms.  Basically it's saying he's confused, doesn't

24   know what the TA is talking about either.  And it is his

25   view that -- opining counsel there's no tacking of one

Direct - Sears

1    security to another in this instance.  So, in fact,

2    arguably Rule 144(d)(3) does not specifically apply at all

3    to this note.

4         That is the -- one of the reasons it took so long

5    to resolve the change with opining counsel.

6    Q.   Okay.  And essentially he states right here at the

7    top, the date the payment for the security acquired.  Is

8    that right?

9    A.   Yes.

10   Q.   Can we go to the top of this e-mail.

11   A.   Did --

12   Q.   And essentially what do you do with Mr. Guy

13   Jean-Pierre's e-mail that he sent you?

14   A.   I forwarded it to Randy Bodden -- Cliffe Bodden.

15   Q.   That's Cliffe Bodden?

16   A.   Yes, sir.

17   Q.   All right.  But you didn't forward it to the two

18   owners of the companies.

19   A.   Not this specific e-mail, no.

20   Q.   Thank you.

21   A.   You're welcome.

22   Q.   Can I have Exhibit 270, please.  Okay.

23        Do you recognize Government Exhibit 270?

24   A.   Yes, I do.

25   Q.   All right.  And can you tell me what Government

Direct - Sears

1   Exhibit 270 is.

2   A.   It is a Sears resignation letter.

3   Q.   Okay.  And who's it from?

4   A.   It's from Randy Bodden -- Cliffe Bodden.

5   Q.   Okay.  To who?

6   A.   To give to my mother.

7   Q.   No, no.  Who's he sending the e-mail to?

8   A.   He's sending it to me.

9   Q.   Okay.  And what's the subject?

10  A.   "Resignation Letter."

11  Q.   Okay.  And what's attached?

12  A.   A template for a resignation letter.

13  Q.   And so who drafted, based upon this e-mail, the letter

14  of resignation?

15  A.   Mr. Bodden was putting together end-of-year due

16  diligence for the company at the time and Mr. Dittman had

17  misplaced my mother's letter of resignation, so this was

18  the replacement letter for said letter.

19  Q.   All right.  I'm just asking a very simple question.

20  A.   And I answered you --

21  Q.   Who drafted the letter?

22  A.   That particular one, unsigned, is Cliffe Bodden, I

23  would imagine.

24  Q.   Okay.  And what is Mr. Bodden telling you to do with

25  the letter?

Direct - Sears

1    A.    "Please have this signed and that should complete the

2    package."

3    Q.    And what's the date of this?

4    A.    That would be December 27th, 2012, sir.

5    Q.    So the day after Christmas, you have three or four

6    e-mails regarding this convertible note and the issues that

7    you're having with the transfer agent, and then two days

8    later, Mr. Bodden is -- is drafting a letter for what?

9         MR. GOODREID:   Your Honor, I object to the form of

10   the question.   Counsel's testifying and just throwing

11   something at the end to make the question.   It's not a

12   proper question.   It's multipally compound.

13        THE COURT:   Hold on.   Let me look.   I don't think

14   it's a compound question, I think there's a single

15   question.   But, again, there's all this prefatory comment,

16   Mr. Sibert, in the beginning of your question that I think

17   may confuse the record and confuse the witness.   So let's

18   rephrase and try to have crisper questions.

19        MR. SIBERT:   Okay.   Thank you, Your Honor.

20   BY MR. SIBERT:

21   Q.    How many e-mails on the 26th of December were you

22   involved in regarding this convertible note?

23   A.    I would have no idea.

24   Q.    Sir, you just went through them.

25   A.    There may be more.   If you asked me how many e-mails I

Direct - Sears

1    went through, that would be a proper question, and I will
2    count them for you --
3    Q.   How many did you go through today?
4    A.   -- if you'd like.
5              THE COURT:  One at a time, gentlemen.
6              THE WITNESS:  In what?  December 26th or -7th?
7    BY MR. SIBERT:
8    Q.   I asked you December 26th.
9    A.   One so far -- in front of me I have one.
10   Q.   You were only -- you only responded one time?
11   A.   Rephrase the question.  How many e-mails on December
12   26th did I what?
13   Q.   Were you involved in regarding this issue with Pacific
14   Stock Transfer Agency.
15   A.   Which issue?  The e-mail we were talking about had to
16   do --
17   Q.   With the --
18   A.   Excuse me, with the letter of resignation.  Now you're
19   going back to this one.  I'm getting a little confused.
20   Q.   How many times did you -- were either cc'd or wrote an
21   e-mail on the 26th of December, 2012, regarding the issue
22   that you were having with Ms. Joanna DiBella from Pacific
23   Stock Transfer regarding the issue of the Rule 144 opinion
24   letter?
25   A.   One that I can see that I have in my hand.

Direct - Sears

1    Q.   Only one time?

2    A.   That's the only one I see.

3    Q.   Okay.

4    A.   Unless I'm missing something.  Hold on.

5         268 -- okay that's December 27th.  I only see one

6    on the 26th, sir, unless I'm missing something.

7    Q.   All right, let's move on.  Back to this exhibit.

8    A.   What the hell was that for?

9    Q.   How many days went by before you received a draft of a

10   resignation letter for a Ms. Sandra Sears from the one time

11   that you responded to the issue that we just discussed?

12   How many days went by?

13   A.   Can you rephrase "the issue"?  As in the -- I

14   apologize, it's getting late, I'm starting to fade, I got

15   sugar problems.  Just say it again.

16   Q.   Do you need a break?

17   A.   No.

18   Q.   Okay.  The issue that we discussed on December 26th

19   dealing with the Pacific Stock Transfer agent, Ms.

20   DiBella --

21   A.   And the 144 transaction.

22   Q.   That's correct.

23   A.   Okay.

24   Q.   How many days went by from you dealing --

25   A.   One.

Direct - Sears

1    Q.   How many?

2    A.   One.

3    Q.   Thank you.

4    A.   All right.

5    Q.   May I have Exhibit 271.

6         MR. SIBERT:  I would lead but I would be objected

7    on.  I told the Court I would lead quicker, but I would be

8    objected on.

9         THE COURT:  Well, that's the Rules of Evidence.

10        MR. SIBERT:  I hear you, Judge, I thank you,

11   though.

12   BY MR. SIBERT:

13   Q.   Can I have Exhibit 271, please.

14        Have you reviewed that?  Have you --

15   A.   I'm sorry, did you --

16   Q.   Do you recognize that document?

17   A.   Yes, I do.  Yes, I do.

18   Q.   All right.  Let's start down at the bottom again.

19   Okay.  Who's sending the e-mail?

20   A.   Ms. Joanna DiBella.

21   Q.   And what's the date?

22   A.   December 27th, 2012.

23   Q.   And who's receiving the e-mail this time?

24   A.   Myself and Mr. Dittman.

25   Q.   Okay.  And what is Mrs. DiBella discussing?

Direct - Sears

1    A.   "Good evening, counsel's response is below.  The

2    subject is under missing documents."

3    Q.   Okay.  What is she discussing in the e-mail she's

4    sending you?

5    A.   She's talking about the factual inaccuracies in the

6    opinions, such that it could not be relied upon.  The

7    relevant facts that are outlined in the opinion don't match

8    the documents, materials, for the transaction.

9    Specifically Mr. DiTommaso opines that the indebtedness was

10   incurred on or about May 2d, 2011, which Mr. DiTommaso

11   refers to as record date.  However, the face of the note is

12   clear the full amount of the note was not lent to the

13   issuer on that date.

14        "Further, the draw down notices that were

15   presented to us are all on different dates (save the first

16   one that was dated May 2d, 2011).  Mr. DiTommaso" also

17   "opines that the holding period commences on the date when

18   the full purchase price or other consideration has been

19   paid.  He then goes on to opine that the holding period

20   commenced as of the Record Date.  As just" plain -- "As

21   just explained that is incorrect.

22        "We need some evidence that the monies were

23   actually lent to the company on the dates indicated by the

24   drawdown notices."  She'll be out of the office tomorrow

25   and back on Monday.

Direct - Sears

1   Q.   Do you know why Ms. -- Mrs. DiBella would give you

2   such a long e-mail about the legal issues in these opinion

3   letters when you weren't part of Bayside or FusionPharm?

4   A.   Because I was speaking for the debtholder being my

5   mother.  It's --

6   Q.   At the top --

7   A.   -- Bayside.

8   Q.   Okay.  What do you do when you receive that e-mail

9   from the Pacific Stock Transfer agent?

10  A.   I sent it to Guy Jean-Pierre and Randy Bodden.

11  Q.   And you sent it essentially about 15 minutes after you

12  received it?

13  A.   Yes, sir.

14  Q.   On the same date, December 27th, 2012?

15  A.   Yes, sir.

16  Q.   Can I have the e-mail from Ms. DiBella.

17         THE COURT:  Can we have a number so the record's

18  clear.

19         MR. SIBERT:  Just down below, Your Honor.

20         THE COURT:  All right.

21  BY MR. SIBERT:

22  Q.   So Mrs. DiBella specifically states Mr. DiTommaso in

23  her response to you on behalf of your mother.

24  A.   Uhm-hum.

25  Q.   And to your brother-in-law, Scott Dittman.

Direct - Sears

1    A.   Yes, sir.

2    Q.   And if you're acting in the best interests of your

3    mother, why didn't you send it to Mr. DiTommaso instead of

4    Mr. Guy Jean-Pierre?

5    A.   Excuse me?  Why would I -- I just didn't hear the back

6    part of it.

7    Q.   If you were acting on behalf of your mother for her

8    best interests, why would you send Mrs. Joanna DiBella's

9    issues that she's having with the transfer of stock from

10   two companies that you're not involved in to Mr. Guy

11   Jean-Pierre instead of the lawyer that she specifically

12   states in her response back to you?

13   A.   Because I have done nothing but send all my paperwork

14   to Mr. Guy Jean-Pierre whom worked in concert with Mr.

15   DiTommaso.  I sent Mr. DiTommaso one e-mail maybe and spoke

16   to him once for a very brief period of time a number of

17   years ago.

18   Q.   Can I have Government Exhibit 272.

19        Do you recognize Government Exhibit 272?

20   A.   Yes, sir.

21   Q.   All right.  Let's just start down at the bottom so

22   there's no confusion.  What are you doing at the bottom of

23   this e-mail?

24   A.   I'm forwarding the e-mail to Randy Bodden.

25   Q.   Can you go to the middle of 272 for me.

1    A.   Yes, sir.

2    Q.   And here I circled it for you so you know what I'm

3    talking about.

4    A.   Uhm-hum.

5    Q.   Okay.  What is Mr. Bodden telling you?

6    A.   He's telling me that she's "seeking additional

7    information in light that the face value of the note is

8    less than the sum of drawdowns made thereunder - presenting

9    the possibility that the note is still open and therefore

10   the full purchase price of the note hasn't been paid," and

11   the issue of not having dealt with the promissory note

12   funded in installments.

13        As he remembers in a "Capitoline due diligence

14   included a Letter of Authorization terminating the credit

15   line. . ."  "I think that should be referenced in the

16   opinion letter as a means of providing payment in full

17   under the terms of the note."

18        Do you want me to read the rest of this?

19   Q.   No, let's just look at the top now.  Can you tell the

20   jury what you mean by "Gee, that conversation sounds

21   familiar"?

22   A.   It just seemed like common sense to me that if a note

23   is open, you have to close the note regardless of the

24   amount that was drawn down on it, just like a line of

25   credit.  If you're given a line of credit for a hundred,

 1    you only use 75, if the note is done it's done.  That was

 2    the piece of paper she was obviously looking for.

 3    Q.   So we're still on December 22d --

 4    A.   -7th.

 5    Q.   -7th.  Who are you e-mailing your response to?

 6    A.   Randy Bodden and Guy Jean-Pierre and Scott Dittman.

 7    Q.   Now, can I have Government Exhibit 372-AAA.  Okay.

 8    Can you focus in on the top here, please.

 9         Okay.  Do you recognize Government Exhibit

10    372-AAA?

11    A.   Yes, I do.

12    Q.   And what is it?

13    A.   It is an e-mail.

14    Q.   Okay.  And would you describe what the e-mail is.

15    A.   The e-mail is a forward -- I'm forwarding a board

16    resolution.  Attachment says "Board Resolution - Appointing

17    Officers."

18    Q.   All right.  And who are you sending this to?

19    A.   I'm sending it to Scott Dittman.

20    Q.   Can we go down here, please, in the e-mail.

21         Who sent you the draft of the board resolution?

22    A.   Randy Bodden.

23         MR. SIBERT:  Your Honor, may I have a minute?

24         THE COURT:  You may.  While you're doing that, I

25    just want to clarify something for the record so it's

                        Direct - Sears

1      crystal clear.

2              Mr. Sears, Randy Bodden and Cliffe Bodden are the

3      same person?

4              THE WITNESS:  Yes, sir.

5              THE COURT:  All right.

6      BY MR. SIBERT:

7      Q.   Okay, can we go back to Exhibit 272, please.  Is there

8      a page 2 for this?  Okay.  Thank you.

9              All right.  Can we look at Exhibit 342-BBB.  Do

10     you recognize Exhibit 372-BBB?

11     A.   Yes, I do.

12     Q.   Okay.  Can we focus in at the bottom of this e-mail.

13             Okay.  Sir, do you recognize this e-mail?

14     A.   Yes, I do.

15     Q.   Okay.  And who's this e-mail from?

16     A.   This is from myself.

17     Q.   Are you Eric Miller?

18     A.   No, I'm --

19     Q.   Are you looking at your screen?

20     A.   I am not.  I'm not trying to be rude, but I can't see

21     it.  It's fuzzy, for the 10th time, so I have to look at

22     the page.

23     Q.   That's okay, sir.

24     A.   It's not okay because you keep --

25     Q.   I actually --

Direct - Sears

1    A.   -- speaking to me very rude.

2    Q.   Can you look at the bottom of the e-mail where it

3    states, "From Eric Miller"?  Do you see that?

4    A.   Yes, now I see it clearly.  Thank you.

5    Q.   Okay.  You wrote that e-mail.  And what does that

6    e-mail concern?

7    A.   Mr. Eric Miller wrote it.  He wrote it to myself.  It

8    says Bayside Realty Holdings.

9            THE COURT:  Can you speak into the mic.

10           THE WITNESS:  Yes, I'm sorry.  The e-mail says,

11   "Bill, please carve up with file in to 4 or five pieces.

12   It is when an individual EMAIL exceeds 10 megs that it gets

13   booted.  Send 5 emails and we should be fine."

14   Q.   All right.  So who is Mr. Eric Miller?

15   A.   He is a -- an investment advisor at Scottsdale

16   Capital.

17   Q.   And let's just go to the top of the e-mail.  Who's

18   writing that e-mail?

19   A.   I'm writing that e-mail.

20   Q.   To who?

21   A.   To Eric Miller.

22   Q.   From Scottsdale Capital?

23   A.   Yes, sir.

24   Q.   And, again, you're working with the subject and

25   attachment.  What is the subject and what is the

Direct - Sears

1    attachment?

2    A.   The subject is "Bayside Realty Holdings" and the

3    attachment is an account opening form, I would imagine, for

4    Alpine, which is a very complicated document.

5    Q.   Okay.

6    A.   Hence having to be broken up into four or five

7    different attachments.

8    Q.   What is DSR?  And I highlighted it underneath your

9    screen.

10   A.   Trying to remember.  I can't remember.  It's some kind

11   of background deposit security.  I don't know, it's some

12   kind of form to be filled out when you're making a deposit.

13   Q.   What is --

14   A.   It's an abbreviation.

15   Q.   What is SDA?

16   A.   I don't remember what they mean.  I'm sorry.

17   Q.   What is cert?

18   A.   That would indicate a stock certificate.

19   Q.   And stock power?

20   A.   Would be a document that is needed to deposit said

21   security certificate.

22   Q.   And corporate res for deposit?

23   A.   A corporate resolution defining that transaction.

24   Q.   Okay.  Again, do you know why Mr. Eric Miller from

25   Scottsdale Capital would be contacting you about your

1    mother's company, Bayside?

2    A.    Yes.  Because it's a very complicated document and my

3    mother is old and is showing signs of slipping over the

4    last couple of months, so I had to pick up the pace.

5    Q.    Okay.  And the date of this is January 22d, 2013.

6    A.    Yes.

7    Q.    Okay.

8    A.    Oh, she's going to --

9    Q.    And are you coordinating a deposit at Bayside deposit

10   into Scottsdale on --

11   A.    Indeed, I am, sir.

12   Q.    -- this day?

13            All right.  Can we flip back to 372-AAA, page 2.

14            Sir, I have it on the screen here for you.

15   A.    Okay.

16   Q.    Okay.  On the document that you forwarded to your

17   brother-in-law Scott Dittman, who's named as the secretary?

18   A.    Guy M. Jean-Pierre.

19   Q.    Thank you.  Can I have Exhibit 274.

20            Do you recognize Exhibit 274?

21   A.    Yes, I do.

22   Q.    And can you just go down to the bottom of this e-mail.

23   A.    Yes, sir.

24   Q.    Why are you sending an e-mail to Mr. Bodden?

25   A.    Subject matter is "FSPM - Bayside - StarCity."  I

                         Direct - Sears

1    believe in looking at this, this would be the sale of the

2    Bayside note to sell it --

3    Q.   So you're now selling your note for your mother's

4    company?

5    A.   Yes.  To end the transactions, yes.

6    Q.   And the date is around January 23d, 2013?

7    A.   Yes, sir.

8    Q.   Can you go to the top of that, please.  That document.

9    Thank you.

10            Again, why are you forwarding -- why are you doing

11   a forward to your brother-in-law, Scott Dittman, at

12   FusionPharm?

13   A.   Because the securities are from FusionPharm that

14   Bayside is holding and the -- the security owner should

15   know if a note can be sold or not.  I don't recall exactly,

16   but I think there were terms and conditions that the

17   company had to approve the sale so he would have to know.

18   Q.   Do you know if Mr. Guy Jean-Pierre was involved with

19   this Bayside note?

20   A.   Yes, he -- yes, I do, sir.

21   Q.   And what was his involvement?

22   A.   I believe from -- he helped -- the note sale or the

23   note itself, sir, to be clear?

24   Q.   I'm asking about Mr. Guy Jean-Pierre's involvement

25   with the Bayside note in the sale.

Direct - Sears

1    A.    In the sale.  Yes, he was involved in the sale.

2    Q.    And how was he involved?

3    A.    He was the attorney that put all the paperwork and

4    coordinated with the gentleman by the name of Mr. Wayne

5    Coleson.  Wayne Coleson --

6              THE COURT:  Can you stay close to the mic --

7              THE WITNESS:  Sorry.  Wayne Coleson represented

8    the purchasers.  And it was five different ones, I think,

9    five or six.

10   BY MR. SIBERT:

11   Q.    And since you're acting on behalf of your mother, I

12   assume, who did you work with when it came to the legal

13   issues of the sale of the note?

14   A.    Mr. Jean-Pierre.

15   Q.    And how about the creation of the note?

16   A.    That was between Mr. Bodden and Mr. Jean-Pierre.

17   Q.    Could I have Government Exhibit 74.

18         Can you look at Government Exhibit 74.

19   A.    Go ahead.

20   Q.    Do you recognize that document?

21   A.    Says "BSRH Note LOP.pdf."

22   Q.    And do you know what BSRH note LOP means?

23   A.    Probably Bayside Realty Holdings note.  LOP would be

24   letter of opinion, I'm guessing.

25   Q.    Letter of opinion?

221

Direct - Sears

1    A.    Yes, sir.

2    Q.    Do you know who signed that letter of opinion?

3    A.    Not off the top of my head without looking at it.

4    Q.    And who are you sending it to?

5    A.    Sending it to Ms. Joanna DiBella and I am carbon

6    copying Scott Dittman.

7    Q.    Could I have Government Exhibit 77.

8          Do you recognize Government Exhibit 77?

9    A.    Hold on one second, sir.  Yes, I do.

10   Q.    Okay.  Can you describe to me what Government Exhibit

11   77 is.

12   A.    This is an e-mail from myself using the Vertifresh

13   e-mail.  It was sent Thursday, April 11th, 2013.  It's to

14   Joanna at Pacific Stock Transfer, carbon copy to Scott

15   Dittman at FusionPharm.  The subject is "Meadpoint Venture

16   Partners FSPM."  Attachment, "J DiBella doc."

17   Q.    What are you telling Ms. DiBella in this e-mail?

18   A.    I'm asking her to find all the documentation that we

19   spoke about the week prior.

20   Q.    Okay.  And why are you sending all this documentation

21   to Ms. DiBella?

22   A.    This looks like a note and a note to convert.

23   Q.    Do you know what note it is?

24   A.    It would be the Meadpoint Venture Partners note, sir.

25   Q.    And essentially Meadpoint, that's your company; is

                          Direct - Sears

1    that correct?

2    A.   Yes, sir.

3    Q.   And essentially did your company loan FusionPharm

4    money?

5    A.   Originally the notes came from myself or one of my

6    companies, and when it was time to go ahead back in 2011, I

7    believe it was, to start to rectify the books of the

8    company, that was the trip that Mr. Jean-Pierre came out

9    on, I believe it was September or October --

10              MR. SIBERT:  Your Honor, I'm going --

11              THE WITNESS:  I can't just --

12              THE COURT:  Hold on.  Hold on.

13              THE WITNESS:  -- give you bits and pieces.  You

14   got to --

15              THE COURT:  Hold on.

16              THE WITNESS:  Sorry.

17              MR. SIBERT:  I'm going to ask that the witness is

18   not being responsive to the question.

19              THE COURT:  All right.  We've gone through this

20   before, Mr. Sears.

21              THE WITNESS:  Yes, sir.

22              THE COURT:  Please answer the question that's

23   posed and -- why don't we do this:  Why don't we take our

24   afternoon break.  Mr. Sibert, you can think about how you

25   might want to rephrase that question.

Direct - Sears

1          We're going to take a 15-minute break.  I have a

2     matter that I want to raise with the lawyers briefly, but

3     we'll let the jury start their recess.

4          (Jury left the courtroom at 3:05 p.m.)

5          THE COURT:  Mr. Sears, once again, you're in the

6     middle of your testimony, so I'm directing you not to

7     confer with any of the lawyers during the break.  You may

8     step down now for the recess.

9          All right.  I want to address the motion made

10    earlier this morning by the Government, which I took under

11    advisement, that being the motion to discharge Juror Tyler

12    Robinson.  What I've decided to do is when we recess for

13    the day at 5:00 or a little thereafter, I'm going to have

14    Mr. Robinson stay in the courtroom.  I'm going to ask him

15    questions about what it was that he was concerned about

16    yesterday when he spoke with my courtroom deputies, because

17    we -- right now, since I didn't talk to him yesterday we

18    have nothing on the record as to what his views and

19    concerns were yesterday.

20         I'm going to ask him questions regarding whether

21    his phase of anxiety has passed and whether he has

22    reconsidered his position as to whether he could, if the

23    evidence supported it, return a verdict of guilty against

24    the defendant on one or more of the counts.

25         I'm going to allow counsel -- both counsel to

Direct - Sears

1    question Mr. Robinson, and then I'm going to make a ruling

2    on the Government's motion to discharge him.

3            All right.  We will be in recess for 15 minutes.

4            MR. SIBERT:  Thank you, Your Honor.

5        (Recess 3:07 p.m.)

6        (Jurors were present at 3:27 p.m.)

7            THE COURT:  Mr. Sears, I remind you you remain

8    under oath.

9            THE WITNESS:  Yes, sir.

10           THE COURT:  Mr. Sibert, you may resume your

11   examination.

12           MR. SIBERT:  Okay, thank you, Your Honor.

13   BY MR. SIBERT:

14   Q.   Sir, let's go back here real quick and look at -- do

15   you have Government Exhibit 372-DDD in front of you?

16           MR. GOODREID:  I'm sorry, what --

17           MR. SIBERT:  372 David David David.

18           THE WITNESS:  I don't have the hard copy, but I

19   can try and make it out on the screen.

20   BY MR. SIBERT:

21   Q.   All right, let's just -- can we blow it up for Mr.

22   Sears.

23   A.   Okay.  Go ahead.

24   Q.   All right.  Now, obviously do you recognize the fact

25   that this is an e-mail that was sent by you?

Direct - Sears

1    A.    Yes.

2    Q.    And to who?

3    A.    Scott Dittman at FusionPharm, Inc.

4    Q.    And what is the subject of this e-mail?

5    A.    FSPM Vera.

6    Q.    Okay.  And we know what FSPM is, but what is Vera?

7    A.    Vera is a purchaser of the Bayside Realty note.

8    Q.    And, again, the date of this e-mail is in March 2013,

9    correct?

10   A.    March 1st, yes.

11   Q.    Okay.  And essentially, based upon your prior

12   testimony, I'm assuming that you forwarded this e-mail on

13   to Mr. Dittman?

14   A.    Yes, it says forward:  "FSPM Vera," yes, it does.

15   Q.    Can we just blow up this part of the exhibit.

16         Now, do you recall receiving this e-mail from Mr.

17   Guy Jean-Pierre?

18   A.    I see it.

19   Q.    Okay.  And can you take a minute and look at it?

20   A.    Okay.

21   Q.    And can you describe to me what is going on in this

22   e-mail.

23   A.    This would be saying he's attached a proposed

24   officer's certificate revis- -- regarding the five, or

25   four, conversions.  He looked pretty closely and what I

Direct - Sears

1    sent purportedly titled "Vera" seems to actually be a

2    duplicate of SGI, which I believe was another purchaser.

3    "Please send me the agreement and conversion notice for

4    Vera.  If, on the other hand, there are only 4 converting

5    shareholders, please advise."

6    Q.   And, again, so this is going towards the legal opinion

7    letters that are required for these types of conversions?

8    A.   Yes, sir, they are.

9    Q.   And so Mr. Guy Jean-Pierre sends them to you, and who

10   do you forward them to?

11   A.   Scott Dittman.

12   Q.   All right.  Now, let's look at Government Exhibit 77

13   again.  Now, as you recall before we were taking a break --

14   this afternoon's break, you had described that this was

15   information that you were sending to Ms. Joanna DiBella at

16   Pacific Stock Transfer -- Transfer Agency regarding the

17   sale of the note; is that correct?

18   A.   That is correct.

19   Q.   And that's the Meadpoint note; is that right?

20   A.   Yes, it is.

21   Q.   Now, you are -- you were the owner at the time of

22   2013 -- April 11th, 2013, you were the owner of Meadpoint;

23   is that right?

24   A.   As my memory serves, yes, I believe so.

25   Q.   Okay.  And during that -- during some time prior to

1    that -- and how long did you own Meadpoint for?

2    A.    I don't recall.

3    Q.    You don't know how long you owned the company?

4    A.    No, I've had many companies, sir.

5    Q.    Did you ever give FusionPharm a loan when you were

6    controlling Meadpoint?

7    A.    Yes.

8    Q.    Where did you get the funds --

9    A.    Hold on, hold on, hold on.  I don't recall exactly

10   how -- if I could explain the transaction, or -- I can't

11   just answer your question that way, because you're going to

12   hammer me for not answering it clearly.

13   Q.    My question is -- the answer --

14   A.    I'm trying.

15   Q.    The answer was fine the first time.

16   A.    Well, there's more to it.

17   Q.    If you have to switch your answer, that's fine, too.

18   My question is:  When you owned Meadpoint, did you ever

19   loan FusionPharm -- did you ever provide FusionPharm a

20   loan?

21   A.    Meadpoint wound up being the beneficiary, and I would

22   have to check the notes to see if it came from Meadpoint or

23   not.  I can't recall, I can't --

24   Q.    So you can't recall if you --

25   A.    Because as I explained in my previous testimony, the

Direct - Sears

1      note was mine and I split it up into two entities.  That's

2      the answer.  I'm sorry, it's not cut and dry.

3      Q.    Okay.  So you definitely gave some kind of loan

4      though.

5      A.    Yes, I did, yes.

6      Q.    Where did you get the money to provide the loan?

7      Where did you get the money to provide --

8      A.    From the bank.

9      Q.    -- the loan?

10     A.    From the bank.

11     Q.    And where did you get the money that you put in the

12     bank?

13     A.    From the sale of securities.

14     Q.    What securities?

15     A.    Various securities, but mostly FusionPharm.  Mostly

16     FusionPharm securities.

17     Q.    Okay.  So if I follow your testimony correctly --

18     A.    Uhm-hum.

19     Q.    -- the money that you received from selling

20     FusionPharm stock, you used to provide FusionPharm a loan?

21              MR. GOODREID:  Objection.  Leading.

22              THE COURT:  Sustained.

23     BY MR. SIBERT:

24     Q.    What money did you use to provide FusionPharm its

25     loan?

Direct - Sears

1    A.    Money that was derived from the sale of securities

2    from the debt settlement agreement from Fred Dahlman to be

3    exact, I believe.

4    Q.    And how did you get that money from -- you got

5    securities from Fred Dahlman; is that correct?

6    A.    Yes, sir, free-trading securities.

7    Q.    Where did you get the money then?

8    A.    I'm sorry, I'm not following your question.

9    Q.    What did you do with those securities?

10   A.    Oh, okay.  I sold the securities and then after

11   settlement day I had capital.

12   Q.    And those securities -- those stocks from Baby Bee

13   Bright became FusionPharm's --

14             MR. GOODREID:  Objection.  Leading.

15             THE COURT:  I don't know if that was a question,

16   but to the extent it was, it's sustained.  Let's rephrase.

17   BY MR. SIBERT:

18   Q.    What did Baby Bee Bright stock become?

19   A.    Baby Bee Bright stock became -- well, Baby Bee Bright,

20   the company, became FusionPharm.

21   Q.    Okay.  And my question is:  What happened, then, to

22   the stock?

23   A.    Any stock that shareholders would have had at that

24   time would have been converted into FusionPharm.

25   Q.    Now, you sold the Meadpoint note; is that right?

Direct - Sears

1    A.   I don't recall.  I think -- no, I don't think I sold

2    the Meadpoint note.  I'm pretty sure I kept the Meadpoint

3    note and that was one that I used to liquidate into the

4    markets.  The Bayside note was sold sometime in the

5    beginning of '13.

6    Q.   Well, let me rephrase my question.  Did you ever sell

7    a portion of the Meadpoint note?

8    A.   I don't recall.  I might have.

9    Q.   All right.  Can I have Exhibit 400 up, please.

10        Do you recognize Government Exhibit 400?

11   A.   Yes, I do.

12   Q.   Okay.  And what is Government Exhibit 400?

13   A.   Exhibit 400 is an e-mail.  Do you want me to go

14   through the whole heading or . . .

15   Q.   Yeah.  Could you, please.

16   A.   Yeah.  It is an e-mail sent from myself using the

17   *william@williamjsears.com* e-mail.  It was sent Thursday,

18   August 8th, 2013.  I sent it to *guyjeanpierre@yahoo.com*,

19   guy@lawfirmofjeanpierre.com and *marcelo1@thedeallawyer.com*,

20   and Mr. Dittman at the FusionPharm was copied.  The subject

21   was "Meadpoint Letter of Opinion," and the attachment was

22   JoannaDiBelladoc.pdf.

23   Q.   And what are you asking Mr. Guy Jean-Pierre to provide

24   you in this e-mail?

25   A.   I said, "It would seem I would need another letter of

Direct - Sears

1    opinion for the note.  Please reference Meadpoint
2    converting it into the Name of Richard Scholz as in the
3    documents."
4    Q.   Does this refresh your memory about you selling any
5    portion of the Meadpoint note?
6    A.   Yes, it does.  It doesn't refresh my memory, but --
7    because I can't honestly say I recall it, but . . .
8    Q.   Well --
9    A.   It is here.
10   Q.   Why would you need a legal letter -- an opinion
11   letter -- a legal opinion letter regarding Mr. Richard
12   Scholz with the Meadpoint?
13   A.   Once again, any type of security to be deposited into
14   the system or being accepted by a brokerage firm and/or
15   bank is going to require a legal letter of opinion.
16   Q.   Okay.  Did you give Mr. Scholz shares for free
17   concerning Meadpoint?
18   A.   I don't recall.  I might have.
19   Q.   Do you often give away your shares for free?
20   A.   Sometimes.
21   Q.   Do you give away your corporations for free?
22   A.   Depends on what's in them.
23   Q.   Do you know if you gave away your Meadpoint note for
24   free to Mr. Richard Scholz?
25   A.   I don't recall.

Direct - Sears

1   Q.   Can I have Government Exhibit 155.

2          Do you recognize Government Exhibit 155?

3   A.   Yes, I do, sir.

4   Q.   What is Government Exhibit 155?

5   A.   That is an e-mail sent from myself using

6   *william@williamjsears.com* e-mail, was sent Tuesday, August

7   13th, 2013, and it was sent to a Mr. Myron Thaden, carbon

8   copy with Scott Dittman FusionPharm, Inc.

9   Q.   And who is Mr. Thaden?

10  A.   Myron Thaden is a friend of mine, and he was

11  ultimately an investor in a company.

12  Q.   And how did he invest -- in what company?

13  A.   This particular August 13, '13, that would have been

14  Meadpoint, I believe.

15  Q.   Let's start at the bottom here.  Who's that an e-mail

16  from?

17  A.   From Mr. Thaden.

18  Q.   Okay.  And who's that to?

19  A.   Scott Dittman, and myself is carboned.

20  Q.   And what's the subject?

21  A.   FSPM.

22  Q.   And that's FusionPharm?

23  A.   Indeed, it is, sir.

24  Q.   Okay.  And what is Mr. Thaden telling you in this

25  e-mail?

Direct - Sears

1    A.   He thinks he's finally negotiated the terms for an

2    early maturity date liquidation.  More difficult is the --

3    it is more expensive than he originally anticipated.  That

4    being said, he wants to proceed.  And below he's giving the

5    information of his broker to accept certificates.

6    Q.   Okay.  What's he saying about the funds here?

7    A.   He said, "As I recall the funds go directly to

8    FusionPharm, Inc., which will use, 50,000 for marketing and

9    promotion for future sales of pods and" audits -- "for

10   Audits and legal fees associated with taking FSPM from the

11   pink sheet to the OTC Bulletin Board.  The remaining 50K

12   will be used to purchase part of the existing note owed by

13   Fusion to "Meadpoint" -- "Meadpoint will be used to

14   purchase part of the existing note by" -- I don't know.

15   I'm getting confused here, I'm sorry.

16        Which -- "Meadpoint Venture Partners is going to

17   use those funds to purchase two fully functional pods from

18   FSPM for 50K to be placed in the new showroom.  In return I

19   will receive 1 million shares of FusionPharm, Inc.,

20   unencumbered," yadi-yadi-yada.

21        "My attorney suggested the agreement be between

22   the parties stating exactly that.  Please send draft."

23   Q.   Okay.  So right here, the purchase part of the

24   existing note, does that refresh your memory at all?

25   A.   As in purchasing part of the existing note?  Yes, it

234
Direct - Sears

1    does.

2    Q.    For Meadpoint?

3    A.    Yes, sir.

4    Q.    So you would now testify that you recall that a

5    portion of the Meadpoint note was sold?

6            MR. GOODREID:  Objection.  Leading.  And counsel

7    is testifying, "you would do the following."

8            THE COURT:  Sustained.

9    BY MR. SIBERT:

10   Q.    When I asked you before, and I just refreshed your

11   memory, did you sell a portion of the Meadpoint?

12   A.    Yes, I did.

13   Q.    So let's talk about:  What did you -- can I have this

14   taken down, please.

15            Where did the proceeds from the sale of the

16   Meadpoint note go?

17   A.    To Meadpoint Venture Partners.

18   Q.    And that's you?

19   A.    Yes, that was me.

20   Q.    Okay.  Can you put down that document.  And look at me

21   while I'm asking questions.  We're not going to focus on

22   the document right now.

23   A.    Yeah, it was me.

24   Q.    And when you got the majority of the funds, what did

25   you do with those funds?

Direct - Sears

1    A.    I went ahead and built a showroom and warehouse which

2    housed harem pods.  I would say a month later I had a grand

3    opening for that warehouse also.

4    Q.    Whose warehouse was it?

5    A.    It's my warehouse.  I leased it --

6    Q.    What company leased the warehouse?

7    A.    Meadpoint Venture Partners used the warehouse and

8    ultimately FusionPharm took it over.

9    Q.    So the money went --

10   A.    To Meadpoint.

11   Q.    If I'm understanding you correct, you sold the

12   Meadpoint -- a portion of the Meadpoint note.

13   A.    That's right, sir.

14   Q.    All right.  Where did you place that money?

15   A.    It should have gone to the Meadpoint Venture

16   Capital -- Venture Partners account.  And if I remember

17   correctly, I went ahead and bought some equipment and

18   warehouse and leasehold a building in Commerce City that

19   ultimately FusionPharm took over.

20   Q.    And did you ever give tours of that warehouse?

21   A.    Absolutely.

22   Q.    And what uniform did you wear when you gave those

23   tours?

24   A.    It could have been a pharm pod uniform due to the fact

25   that I had the exclusive rights to sell the product.

Direct - Sears

1    Q.   Okay.  And so you're essentially making a deal with

2    FusionPharm with Meadpoint; is that right?

3    A.   In what sense, sir?

4    Q.   You're the owner of Meadpoint?

5    A.   Yes.

6    Q.   And you're making some type of deal with FusionPharm

7    concerning this warehouse.

8    A.   Yes.  My exclusive agreement was to expire the

9    following April, which was only a couple of months away,

10   and they were going to take it over and reimburse me

11   supposedly for all the expenses that I had put into the

12   warehouse.

13   Q.   So you're making a deal with your brother-in-law?

14   A.   I'm making a deal with a public company FusionPharm,

15   who happens to be my brother-in-law, yeah.

16   Q.   And he's the CEO?

17   A.   Yes, he is.

18   Q.   Can I have Exhibit 156, please.  Can we focus on the

19   top, please.

20        All right.  Do you recognize Government Exhibit

21   156?

22   A.   Yes, I do.

23   Q.   And what is this?

24   A.   This is an e-mail.

25   Q.   And who's the e-mail from and to?

237

Direct - Sears

1   A.   It's from Myron Thaden to myself and Mr. Dittman.

2   Q.   And what is the subject of the e-mail?

3   A.   "Drafting an agreement."

4   Q.   All right.  And what's the date of this e-mail?

5   A.   August 14th, 2013.

6   Q.   Okay.  And essentially what is Mr. Thaden telling you

7   when he says, "Bill"?

8   A.   He wants to take half of his investment and have half

9   the securities in his name and the other half in his wife's

10  name.

11  Q.   Do you know a reason why he would want to do that?

12  A.   They're married, they live under the same roof.  I

13  have no idea.

14  Q.   Okay.  Can I have Exhibit 372-MMM.

15       Have you had a chance to look at this document?

16  A.   Yes, I did, sir.

17  Q.   And do you recognize this document?

18  A.   Yes, I do.

19  Q.   Let's start at the bottom.  I've circled it.  It's on

20  your screen.  The bottom e-mail.

21       Again, it's from *advisor@* -- I'm having trouble

22  reading this -- *fbusinesshelp.com*.

23  A.   Yes, sir.

24  Q.   Okay.  And who's it to?

25  A.   Myself.

Direct - Sears

1    Q.   Okay.  And who is sending you that e-mail?

2    A.   Mr. Guy Jean-Pierre.

3    Q.   And is that another e-mail associated to Mr. Pierre --

4    Jean-Pierre?

5    A.   Yes, sir.

6    Q.   And what is Mr. Guy Jean-Pierre telling you in this

7    e-mail?

8    A.   He reviewed the note again and everything seems fine

9    and exactly as we discussed earlier.  He does, however,

10   have a question for me on the original note and wanted to

11   plan on discussing it about 2:00 p.m. my time if it was

12   convenient.

13   Q.   Do you know what note he's talking about in his

14   e-mail?

15   A.   Well, subject matter says forward forward:  "FSPM SGI

16   STA," I would imagine August 2013 would have to be

17   something to do with Bayside because those were the

18   investors that bought the note.

19   Q.   Sir, I need you to make sure you speak into the mic.

20   A.   I apologize.

21   Q.   We have a reporter.  I need to hear you, the jury

22   needs to hear you, the judge needs to hear you, and counsel

23   need to hear you, so just make sure you speak into that.

24        Okay.  And let's go up to the top here in the

25   e-mail.  I'm sorry, can we just go back down real quick.

Direct - Sears

1        And that's -- do you recognize that address?

2    A.   Now I don't recognize that particular address.  Not

3    Pompano.

4    Q.   Whose address do you believe that to be?

5    A.   I believe that to be Mr. Jean-Pierre's.

6    Q.   And that would include the phone numbers?

7    A.   Yes, sir.

8    Q.   And the fax number?

9    A.   The phone number, yes.  The fax number I never paid

10   attention to, honestly.

11   Q.   Okay.  Let's go to the top of the e-mail.  Okay.  And

12   once you received the e-mail from Mr. Guy Jean-Pierre, what

13   did you do with the e-mail?

14   A.   I forwarded it.

15   Q.   To who?

16   A.   Mr. Scott Dittman.

17   Q.   And why are you forwarding an e-mail from Guy

18   Jean-Pierre about the Bayside note?

19   A.   Because Bayside is holding securities in the public

20   company that Mr. Dittman is the CEO of.  I believe there

21   were terms in the note that said that the company had to

22   approve the sale of the note.  So, of course, he would have

23   to be copied in any and all things to do with the sale or

24   liquidation of the note.

25   Q.   Okay.  And this is during the same time frame, about

                            Direct - Sears

1   five days before the e-mail that you just discussed

2   regarding the Meadpoint note being sold.

3            MR. GOODREID:  Objection.  Leading.

4            THE WITNESS:  This --

5            THE COURT:  Sustained.

6   BY MR. SIBERT:

7   Q.   How many days before --

8   A.   It -- well, go ahead.  Ask your question.

9   Q.   What's the date of this e-mail?  What's the date of

10  this e-mail?

11  A.   Which one are you talking about now?  The August 19th,

12  2013?

13  Q.   Government Exhibit --

14  A.   372-MMM?

15  Q.   That's correct.

16  A.   It's August 19th.

17  Q.   Okay.  And what's the date of the e-mail that you were

18  discussing the sale, which is Exhibit 155?

19  A.   August 13th.  August 13th.

20  Q.   How many days in between the 15th and the 13th?

21  A.   That would be five.

22  Q.   There's five days between the 15th and the 13th?

23  A.   Two -- actually, it's not the 15th and the 13th, it's

24  the 19th.  Isn't it?  372-MMM is August 19th, and August

25  13th.

Direct - Sears

1   Q.   You're correct.  Five days?

2   A.   Yeah.

3   Q.   I'm sorry, it's wrong on my list.

4   A.   I was like, I know it's hot in here, but I can still

5   count.  I thought I got it wrong.

6   Q.   Can I have Exhibit 133, please.  All right.

7        Can you take a look at Government Exhibit 133.

8   A.   Yes, sir.

9   Q.   Do you recognize Government Exhibit 133?

10  A.   Yes, I do.

11  Q.   Let's focus on the bottom first.  Can you explain what

12  you're e-mailing to *144stock@scottsdalecapital.com*?

13  A.   The e-mail says, "This morning you will be" -- "This

14  morning you will be receiving the certificate and stock

15  power for the attached SCA named document."  I don't know

16  what that is.  "The other attachment is just the forwarded

17  thread from the last deposit.  I am drawing down from the

18  same note you already have on file.  Hopefully I got this

19  right the first time.  Thank you."

20  Q.   Okay.  I guess we need to go down one more.  If you

21  look at the screen, the one I'm circling.

22  A.   Okay.

23  Q.   What are you e-mailing the broker about?

24  A.   I was e-mailing Mr. Ashton saying I was wanting to

25  open -- I was planning to open an account with his firm.

Direct - Sears

1    Q.   For what?

2    A.   For Meadpoint Venture Partners.

3    Q.   And this is in April of 2013?

4    A.   April 12th.

5    Q.   And can we just go to the top.  Once you received an

6    e-mail back, you forwarded another e-mail to Scottsdale; is

7    that correct?

8    A.   This bottom one says April 12th and the top one's

9    August 19th.  I'm sorry, I'm not following, sir.

10   Q.   All right.  Well, let's just talk about the August

11   19th, 2013, e-mail.  What are you e-mailing Scottsdale

12   Capital there about?

13   A.   I'm letting them know that they will be receiving a

14   certificate and a stock power for the attached SCA named

15   document.  And I said the other attachment is just

16   forwarded from a thread, from the last deposit.

17        I'm sorry, I'm just not following the document.

18   Q.   What do you mean by "hopefully I got it right the

19   first time"?

20   A.   Probably exactly what I said.  Hopefully I got it

21   right the first time.  There seems to be so many problems

22   with notes and deposits and lawyers and they always need

23   something else, these brokerage firms.  And no matter what

24   you send them, they always need something else.  So I

25   was -- hopefully I was trying to be efficient.

1  Q.  All right.  If you look on the screen there, I circled

2  the subject.  What's the subject say?

3  A.  Forward:  "Meadpoint Venture Partners FSPM."

4  Q.  So Meadpoint is you.

5  A.  Right.

6  Q.  And FusionPharm is your brother-in-law.

7  A.  FusionPharm is the security that I'm referencing in

8  the deposit of the certificate.

9  Q.  Okay.

10  A.  Which my brother is the CEO of, yes.

11  Q.  Thank you.  All right.  Can we look at Government

12  Exhibit 81.

13        Do you recognize this exhibit, sir?

14  A.  No, I don't.  It looks --

15  Q.  Who wrote the e-mail?

16  A.  It looks like it could be mine, but I didn't initial

17  this one, so I didn't -- I don't remember it.

18  Q.  Okay.  Well, we'll just work off -- is that your

19  e-mail address?

20  A.  Indeed, it is.

21  Q.  You've said that several times, right?

22  A.  Yes, sir, I did.

23  Q.  All right.  And when is the e-mail sent?

24  A.  Tuesday, August 27th, 2013.

25  Q.  And who are you sending the e-mail to?

                        Direct - Sears

1   A.   Joanna at Pacific Stock Transfer.

2   Q.   And what's the subject?

3   A.   MDPT, which would be Meadpoint.

4   Q.   And what are you attaching to the e-mail?

5   A.   The FSPM share to "Scholz, Thayden, Thayden, 8-26-13."

6   Q.   And can we look at Government Exhibit 82.  Do you

7   recognize Government Exhibit 82?

8   A.   Yes, I do.

9   Q.   And what is that?

10  A.   That is a e-mail.

11  Q.   And from who?

12  A.   Ms. Joanna DiBella at Pacific Stock Transfer.

13  Q.   All right.  Let's blow it up.

14       And what is Ms. DiBella telling you?

15  A.   Asking me for everything that I forgot that I thought

16  I was so efficient about in the first e-mail.  She needs

17  the following:  The note, the agreements between me and the

18  shareholders, an opinion letter that needs to be discussed,

19  the transaction, statements of nonaffiliation, documents

20  for Richard, instructions for delivery.

21  Q.   Okay.  All right.  I need to bring back up 156,

22  please.  Can you look at Government Exhibit 156.

23  A.   Yes, I have it, sir.

24  Q.   Sir, if you look on your screen -- can you blow that

25  up, please -- what is Mr. Thaden telling you?

Direct - Sears

1    A.   He's telling me -- he said, "You guys figure it out.

2    I just want to satisfy the broker of the trust where the

3    funds are coming from and where the" funds -- "stock

4    certificates are going into."

5    Q.   And that's Mr. Thaden to you; is that correct?  You're

6    Bill.

7    A.   Yes.

8    Q.   Okay.  And --

9    A.   Why would he want to satisfy the broker where the

10   funds are coming from?  That's his money --

11   Q.   What's your response back to Mr. Thaden?

12   A.   "Ok I have got it down on the paperwork.  Now as far

13   as the free, with 1 million shares in your name solely, you

14   would be subject to a trickle rule.  Basically considered

15   an insider.  We have only 5.6 issued and outstanding and 1

16   million puts you over the 10 percent realm.  So you need a

17   second company or persons name.  In addition, I'll need the

18   tax ID/SSN for the transfer agent.  I'll have it all

19   wrapped up next week.  Thank you."

20   Q.   And so Mr. Thaden couldn't take control of the note --

21   that portion of the note himself?

22   A.   He could have.

23   Q.   But then he would be over 10 percent.

24   A.   He's legally still over 10 percent because he and his

25   wife are together under the same roof, he still falls under

Direct - Sears

1    144, sir, so he decided to split it up.

2    Q.   But he split it up -- what I'm saying here is you were

3    advising him about that?

4    A.   Excuse me?

5    Q.   You were advising him about that?

6    A.   I was advising him because he wanted free trading

7    shares in an earlier e-mail is what he was asking for that

8    if he did indeed take it in his name, he would be subject

9    to a restriction.

10   Q.   Okay.  And who wrote the legal opinion letters for the

11   sale -- for the sale of the Meadpoint note?

12   A.   At this time, there was two legal opinions that were

13   written; one was by Mr. Jean-Pierre, the other one was

14   another securities lawyer.

15   Q.   So at least one was written by Mr. Guy Jean-Pierre?

16   A.   Yes.

17        MR. SIBERT:  Okay.  Your Honor, at this time, the

18   Government would like to introduce the next set of

19   exhibits, which is three exhibits.

20        THE COURT:  How have you labled that in your

21   e-mail?

22        MR. SIBERT:  I believe it's the fourth one.  It

23   starts with Exhibit 383.

24        THE COURT:  Oh, you called the fourth block.

25   Okay.  Go ahead.

                         Direct - Sears

1            MR. SIBERT:  Your Honor, at this time, the

2    Government would like to introduce Government Exhibits 383,

3    107, 393.

4            THE COURT:  And these are stipulated?

5            MR. SIBERT:  They are, Your Honor.

6            THE COURT:  All right.  Given the stipulation of

7    the parties, Government Exhibits 383, 107 and 393 are

8    admitted into evidence and may be published to the jury.

9        (Government's Exhibits 383, 107 and 393 received)

10           MR. SIBERT:  May I approached your courtroom

11   deputy to --

12           THE COURT:  Yes.

13           MR. SIBERT:   Thank you.

14   BY MR. SIBERT:

15   Q.   Okay, sir, can you please look at Government Exhibit

16   383.

17           MR. SIBERT:  Your Honor, may I have a moment?

18           THE COURT:  You may.

19   BY MR. SIBERT:

20   Q.   Do you recognize Government Exhibit 383?

21   A.   Yes, I do.  Yes, I do.

22   Q.   Okay.  And what is Government Exhibit 383?

23   A.   It is an e-mail, sir.

24   Q.   Okay.  And what does the e-mail -- who sent the

25   e-mail?

Direct - Sears

1    A.    I sent the e-mail.

2    Q.    To who?

3    A.    Scott Dittman.

4    Q.    And what's the date?

5    A.    June 20th, 2011.

6    Q.    Okay.  And what is the subject about?

7    A.    Stock.

8    Q.    Okay.  Can you please explain to the jury what you're

9    writing in this e-mail to Mr. Scott Dittman.

10   A.    I'm writing to Mr. Dittman, I'm saying, "I guess I

11   read it wrong.  The cert for 182,050, it was late when I

12   pulled it out on Friday evening.  Any way, the deal will be

13   structured whereas we can have some free anyway.  It's just

14   something we need.  Sandy has the memory key."

15   Q.    Okay.

16   A.    I have no idea what this is on.

17   Q.    Do you understand what cert is?

18   A.    Yeah, it's a certificate.

19   Q.    Okay.  And so you're talking about a certification for

20   182,050.  What is 182,050?

21   A.    I'm not sure.  I would imagine it would probably be

22   for an amount of shares.

23   Q.    Okay.  Well, what's the subject of this e-mail?

24   A.    Stock.

25   Q.    And so you testified before, certification means

Direct - Sears

1   certifications for securities or stock.

2   A.   Sure, right.

3   Q.   Right?  So what do you believe 182,050 is?

4   A.   I just said, stock.

5   Q.   So you used the word, "we" correct?

6   A.   Yes, I did.

7   Q.   Have some free anyway.  What do you mean by "free

8   anyway"?

9   A.   That was probably -- I mean, I don't remember the

10  exact doc that we have -- there was many suitors flying

11  around at that time.  The only thing that I can remember

12  that that could be pursuant to was somebody trying to

13  purchase the company or take control of the company.  And

14  any time you do something to that effect, you want to make

15  sure that you have some equity that could be liquidated in

16  case they run the company into the ground.

17  Q.   Are you talking --

18  A.   That's just speculation because I don't remember this

19  document.

20  Q.   Are you --

21  A.   I'm just trying to help you out.

22  Q.   Are you talking about free shares?

23  A.   Indeed, sir.

24  Q.   Free stocks to be able to trade?

25  A.   Yes, sir.

Direct - Sears

1    Q.   And you said "we" --

2    A.   Yes.

3    Q.   -- that means you and who else?

4    A.   I -- me -- I don't know.  I don't remember the exact

5    transaction, sir.

6    Q.   Who is the e-mail to?

7    A.   It says to Scott Dittman.

8    Q.   What account are you using for Mr. Dittman?

9    A.   His FusionPharm account.

10   Q.   There's no one else on that e-mail, correct?

11   A.   No, there is not.

12   Q.   Can I have Government Exhibit 107.  Can you blow up

13   that top -- thank you.

14        Do you recognize Government Exhibit 107?

15   A.   One second, sir.  Yes, I do.

16   Q.   Okay.  And what is Government Exhibit 107?

17   A.   It is an e-mail.

18   Q.   And who wrote the e-mail?

19   A.   I'm writing it from yet another e-mail address at

20   *wjsears@gmail.com*.

21   Q.   Okay.  And who are you writing the e-mail to?

22   A.   Leslie at Pacific Stock Transfer.

23   Q.   And what are you -- what's the subject?

24   A.   "FSPM Preferred Stock Certificate."

25   Q.   FusionPharm preferred stock certificate?

Direct - Sears

1    A.   Yes, sir.

2    Q.   And what are you telling Ms. Leslie in your e-mail

3    there?

4    A.   That "The below shareholder has yet to receive his

5    certificate.  I was asked to follow up on it.  Was it sent

6    Fed Ex?"

7    Q.   Okay.  And who is Robert Dittman?

8    A.   That would be my brother -- other brother-in-law.

9    Q.   All right.  And so why are you contacting Pacific

10   Stock Transfer Agency about a certificate -- a stock

11   certificate for a Robert Dittman regarding FusionPharm?

12   A.   Once again, just like Mr. Kocinski and many of the

13   other things that went along with the public shell, I had

14   the relationship so we are the initial contact for.  So I

15   was the one that beared the duty of being Radar O'Reilly

16   and having to communicate all these messages.

17   Q.   You said bear the duty.  Who's bearing that duty?

18   A.   For some reason, everybody wanted me to always have to

19   communicate with these people.  It's like in the military,

20   you know -- you know what a glue man is?

21   Q.   Sir, I'm asking you a question.

22   A.   I'm answering your question.

23   Q.   Okay.  Well, you say "everyone."  Who do you mean by

24   "everyone"?

25   A.   Mr. Dittman, Mr. Jean-Pierre, Mr. Kocinski.  Anything

Direct - Sears

1    that had to do with anything that was previous to

2    FusionPharm.  Because I had already had the relationships,

3    everybody assumed that I should just keep going ahead and

4    communicating because I was the one that started it with

5    them before FusionPharm, you know, existed.

6    Q.   No one forced you to do this; is that right?

7    A.   No, sir.

8    Q.   Can I have Exhibit 393.

9         Do you recognize Exhibit 393?

10   A.   Yes, I do.

11   Q.   Okay.  And what is Exhibit 393?

12   A.   It is an e-mail.

13   Q.   Okay.  And from who?

14   A.   From myself using the William J. Sears account.

15   Q.   To who?

16   A.   Scott Dittman, FusionPharm.

17   Q.   On what date?

18   A.   That was on July 2d, 2012.

19   Q.   What are you talking to Scott Dittman about?

20   A.   I'm letting him know about a gross total amount of

21   capital.

22   Q.   Why don't you go into details about what you're

23   telling him about capital.

24   A.   Telling him how much -- how much was raised and

25   what -- what would be taken out and what I would be able to

Direct - Sears

1    pay.

2    Q.   So you're essentially, again -- this subject, what is

3    the subject?

4    A.   "Cash."

5    Q.   Okay.  Now, what is the 25 -- what is minus RS?

6    A.   That would be Richard Scholz's fee.

7    Q.   Is that $6,279?

8    A.   I would believe it is.

9    Q.   And why are you telling the CEO of FusionPharm that

10   Mr. Richard Scholz is being paid?

11   A.   I have no idea why I told him.  I think I was giving

12   him full disclosure as to how much money I had to pay him.

13   At this point, I believe I would have owed him money for

14   harem pods that needed to be built.

15   Q.   Did you ever --

16   A.   So he was constantly asking me for money to pay my

17   bill.

18   Q.   Okay.  So did you have a relationship with Mr. Richard

19   Scholz?

20   A.   Absolutely.  I've known Mr. Scholz since 1999.

21   Q.   Did you have a relationship with him here at this

22   date?

23   A.   Indeed, I did, sir.

24   Q.   So do you know, was Mr. Richard Scholz doing -- what

25   was -- what type of work was Mr. Richard Scholz doing?

254

Direct - Sears

1    A.    Advertising and marketing.

2    Q.    For what?

3    A.    For the company.

4    Q.    And what was his -- what was he being paid to

5    advertise for the company?

6    A.    PharmPods.

7    Q.    No, I said:  What was he being paid to advertise for

8    the company?

9    A.    Cash.

10   Q.    Okay.  How much?

11   A.    Depended.

12   Q.    Depended on what?

13   A.    Depended on his performance.

14   Q.    Was it percentage or salary?

15   A.    It varied.  His -- you know, his bills varied each

16   month on what he did and how he did.

17   Q.    Okay.  And who was he advertising for?

18   A.    PharmPods.

19   Q.    Is that a company?

20   A.    It was the brand that I was representing that I had

21   the exclusive license to under Meadpoint.  I had the

22   exclusive license to sell the HID containers under

23   Meadpoint.

24   Q.    Okay.  So you had a licensing agreement to sell; is

25   that right?

Direct - Sears

1    A.   That's right.  Exclusive.

2    Q.   And who gave you that exclusive licensing agreement?

3    A.   The public company that owns the product, FusionPharm.

4    Q.   So your brother-in-law, Scott Dittman, provided you

5    exclusive right to sell his containers?

6    A.   Yes, he did.  I paid for it.

7    Q.   All right.  Sir, can --

8         MR. SIBERT:  Actually, Your Honor, I've got --

9    we're coming towards the end of the exhibits here.  I have

10   one exhibit which I guess would be batch No. 5, which is

11   Exhibit 372-P --

12        THE COURT:  Is it stipulated?

13        MR. SIBERT:  It is, Your Honor.

14        THE COURT:  All right.  Given the stipulation of

15   the parties, Exhibit 372-P is admitted into evidence and

16   may be published to the jury.

17        (Government's Exhibit 372-P received)

18        MR. SIBERT:  Your Honor, may I approach the

19   witness.  This is the one that he signed and reviewed.

20        THE COURT:  All right.  Hand it to Ms. Frank.

21        MR. SIBERT:  I will.  Thank you.

22   BY MR. SIBERT:

23   Q.   Do you recognize Government Exhibit 372-P?

24   A.   Yes.

25   Q.   All right.  Now, let's focus on the bottom of the

Direct - Sears

1    e-mail, on the first page.  And it's up on your screen, so

2    we don't get confused.

3    A.    That's okay, it's the same document.

4    Q.    Okay.  Now, do you know who a Todd Kramer is?

5    A.    Yes, I do.

6    Q.    Who is Todd Kramer?

7    A.    He is a senior regulatory analyst.

8    Q.    For who?

9    A.    For FINRA.

10   Q.    And what is FINRA?

11   A.    It's an acronym for something.

12   Q.    Do you know what FINRA does?

13   A.    They regulate the stock market.

14   Q.    And do you know what particular stock market?

15   A.    The entire stock market.  Every broker/dealer has to

16   deal with them.

17   Q.    And according to this e-mail, Mr. Kramer sent an

18   e-mail to your brother in law, Scott Dittman; is that

19   right?

20   A.    Yes, it is.

21   Q.    And what is he asking from Mr. Dittman?

22   A.    He's asking for Mr. Dittman to -- he's requesting some

23   more documents.  He wants all documents pertaining to his

24   acquisition of Baby Bee Bright and transfer agent

25   shareholders and positions report from a specific date of

Direct - Sears

1    March 1st, 2011, to September 30, 2011.

2    Q.   Okay.  Let's go back up to D.  What else is he asking

3    under D?

4    A.   Any correspondence with former CEO Fred Dahlman and

5    William Sears pertaining to the acquisition, including

6    e-mails, et cetera.  D would be terms of acquisition also,

7    he was asking for.

8    Q.   Okay.  And also let's look at this important one.  How

9    about legal opinions?

10   A.   Legal opinions, that would be C.

11   Q.   Contracts?

12   A.   B.

13   Q.   And what's A?

14   A.   Signed agreements, A.

15   Q.   All right.  So looking for various documents.

16   A.   Yes, he is.

17   Q.   All right.  Can we go to the top of the e-mail,

18   please.  And if you look on the screen here, just the top

19   of that e-mail we just went over, that was sent on what

20   date?

21   A.   October 7th, 2011.

22   Q.   And then at 8:34 a.m.; is that right?

23   A.   Yes, sir.

24   Q.   Two minutes later on the same date, what do you

25   receive from your brother-in-law, Scott Dittman?

Direct - Sears

1    A.   It will be 12 minutes later, I get an e-mail from

2    Scott Dittman saying, FYI, need to get involved -- I need

3    to get Guy involved at this point.

4    Q.   What does FYI mean?

5    A.   For your information.

6    Q.   And what is Mr. Dittman asking you?

7    A.   Does he -- should he get, you know, Guy Jean-Pierre

8    involved at this point?

9    Q.   Okay.  Well, he didn't play any role in FusionPharm.

10   Why would the CEO be e-mailing you about a FINRA

11   investigation where a request from FINRA -- why would he be

12   e-mailing you asking you "Do we need to get the corporate

13   legal lawyer involved?"

14   A.   He was e-mailing me because I was the one that put the

15   deal together for him and Fred Dahlman in the first place.

16   Therefore, Mr. Dittman has no experience at that time

17   whatsoever in the securities industry or running a public

18   company and he's asking my opinion if he should get the

19   corporate lawyer involved.

20   Q.   And this is your FusionPharm e-mail address, right?

21   A.   Yes, it is.

22   Q.   Now, we went through some testimony earlier about

23   MicroCap.  You sold that MicroCap company approximately two

24   weeks, is that correct, from that date of the e-mail?

25   A.   That was earlier in the day, sir.  I don't know the

                        Direct - Sears

1    dates.  Say it is.

2    Q.   All right.  Well, can you recall the date that this is

3    October 7th, 2011?

4    A.   I sure can.

5              MR. SIBERT:  Your Honor, I believe this is batch

6    6, starts with Government Exhibit 372-EEE.

7              THE COURT:  All right.  Go ahead.

8              MR. SIBERT:  And these have been stipulated to.

9    372-EEE, Exhibit 115, Exhibit 124, Exhibit 85.

10             THE COURT:  All right.  Given the stipulation of

11   the parties, Government Exhibits 372-EEE, 115, 124, and 85

12   are admitted into evidence and may be published to the

13   jury.

14        (Government's Exhibits 372-EEE, 115, 124, and 85

15   received)

16             MR. SIBERT:  May I approach your courtroom deputy

17   and hand the witness the documents?

18             THE COURT:  You may.

19             MR. SIBERT:  Thank you.

20   BY MR. SIBERT:

21   Q.   Okay, sir, can you please look at Government Exhibit

22   372-EEE.

23   A.   Yes, sir.

24   Q.   Do you recognize that document?

25   A.   Yes, I do.

Direct - Sears

1    Q.   All right.  Let me go ahead and -- can we go down to

2    the second page, please.  All right.  Let's start from the

3    second page of this document.  Now I'm going to circle --

4    can we have that blown up?  Shrink it a little bit.

5            Okay, sir, can you look on your screen here?

6    A.   I'm looking.

7    Q.   All right.  Do you recognize that e-mail?

8    A.   Yes, I do.

9    Q.   Okay.  And what is that e-mail pertaining to?

10   A.   That is an e-mail from the corporate lawyers Stuart

11   Leudan, to myself talking about opening up a bank account,

12   I should need the following.  And he goes into detail of

13   the documents that I will need to do so.

14   Q.   All right.  And why is Mr. Stuart e-mailing you about

15   a bank account?

16   A.   Because he set up the corporations to operate, so I

17   guess he was being thorough and let me see if I sent him

18   something prior.

19   Q.   What corporation are we talking about?

20   A.   That would be Vertifresh and its whole -- and its --

21   and VF Management, Inc.  I think Vertifresh was a wholly

22   owned subsidiary of VF Management.  I don't remember how

23   Stuart set it up, sir.  They were intertwined somehow.

24   Q.   Can we move this up a little bit, please.  To the top

25   of page 2.

Direct - Sears

1          Okay, sir, this is an e-mail being sent by you; is
2   that correct?
3   A.   Yes, sir.
4   Q.   To Mr. Stuart Leudan?
5   A.   Yes, sir.
6   Q.   And what are you just inquiring in there?
7   A.   It says, subject:  "RE Vertifresh."  There are no
8   attachments.
9   Q.   And this date is about March 9th, 2012?
10  A.   That's what it says.
11  Q.   Page 1, please, at the bottom.  Okay.
12          Just real quick, you have an e-mail again from Mr.
13  Stuart Leudan; is that correct?
14  A.   Yes, sir.
15  Q.   And who's he sending that e-mail to me?
16  A.   Myself.  And carboned Scott Dittman.
17  Q.   Again about Vertifresh?
18  A.   No, it was *william@williamjsears.com* is what it says.
19  To.
20  Q.   Okay, but cc, Scott Dittman?
21  A.   Yes, sir.
22  Q.   Can you go up, please.  Over this e-mail.  And just
23  down a little bit.
24          That's an e-mail by you; is that correct?
25  A.   Yes, sir.

Direct - Sears

1    Q.    March 22d, 2012?

2    A.    Yes, sir.

3    Q.    And who are you sending that e-mail to?

4    A.    *guy@fusionpharminc.com.*

5    Q.    Do you recall what you're sending him there?

6    A.    No, I don't.  I'm sorry.

7    Q.    What's the subject?

8    A.    Excuse me, sir?

9    Q.    What is the subject?

10   A.    Subject?

11   Q.    I circled it for you on the screen.

12   A.    I've got two circles.  Oh, forward:  "Vertifresh."

13   Q.    Okay.  Let's look at this e-mail.  Who's that e-mail

14   from?

15   A.    *guy@fusionpharminc.*

16   Q.    To who?

17   A.    *william@williamjsears.com.*

18   Q.    And what's the subject?

19   A.    "Vertifresh."

20   Q.    Okay.  And what is he sending you?

21   A.    "Attached please find the draft of the proposed SPA.

22   Call me if you wish to discuss."

23   Q.    What is SPA?

24   A.    Stock purchase agreement, I would imagine.

25   Q.    Okay.  So it was Mr. Guy Jean-Pierre that drafted this

1    agreement?

2    A.   It would appear so.

3    Q.   Do you recall the terms of the agreement?

4    A.   No, I do not, sir.

5    Q.   Okay.  Can you just go down to the top of this e-mail,

6    please.

7         And, finally -- finally, you get the FusionPharm

8    Dittman stock purchase agreement regarding Vertifresh; is

9    that correct?

10   A.   Yes.

11   Q.   And you're sending the e-mail --

12   A.   Yes.

13   Q.   -- to your brother-in-law, Scott Dittman?

14   A.   No, this document's for Robert Dittman, though.

15   Q.   Well, who are you sending it to?

16   A.   I sent it to Scott Dittman, but the document's for

17   Robert, as I look at it.

18   Q.   Do you have the document in front of you?

19   A.   Yeah, it's right here.

20        MR. SIBERT:  Your Honor, may I have a minute?

21        THE COURT:  You may.

22   BY MR. SIBERT:

23   Q.   All right, let's look at page 3 of the attachment.

24   A.   Okay.

25   Q.   Now, you stated earlier Vertifresh was your company;

Direct - Sears

1    is that right?

2    A.   Yes, it was.  For a period of time.

3    Q.   All right.  Can you focus in up here, please.

4         Now, this -- as you just testified to, this is the

5    stock purchase agreement that was sent to you by Mr. Guy

6    Jean-Pierre; is that right?

7    A.   Yes, sir.

8    Q.   All right.  And essentially the agreement is for --

9    why don't you just read the underlining that I'm writing

10   here on the screen.

11   A.   VF Management, Inc., the owner of Vertifresh as

12   seller, the seller, Robert -- seller and Robert L. Dittman,

13   an individual.

14   Q.   So it's a purchase agreement between you, Vertifresh,

15   and Robert Dittman?

16   A.   VF Management, Inc., Vertifresh, and Robert Dittman,

17   yes, sir.

18   Q.   And this is what Mr. Robert Dittman would be

19   purchasing; is that correct?

20           MR. GOODREID:  Objection.  Leading.

21           THE WITNESS:  No.

22           THE COURT:  Sustained.

23   BY MR. SIBERT:

24   Q.   Okay.  Sir, what does this state in the line that I

25   just circled on your --

Direct - Sears

1    A.   You said the purchaser is purchasing.  The purchaser

2    is the owner of 175,480 shares, the shares of Class A

3    preferred stock of FusionPharm.  He owns it, he's not the

4    purchaser, sir.

5    Q.   I stand corrected.  So who owns 175,480 Class A shares

6    of FusionPharm?

7    A.   Robert Dittman.

8    Q.   That's your other brother-in-law?

9    A.   Indeed, it is.

10   Q.   What do the terms mean in the paragraph that I just

11   circled that starts with, "Whereas, purchaser"?

12   A.   It says, "The purchaser desires to purchase 50 percent

13   of the ownership of the seller's ownership interest sold

14   and the company and the seller desires to sell said

15   ownership interest sold to purchaser in exchange for the

16   shares and upon further terms and conditions herein set

17   forth."

18   Q.   So correct me if I'm wrong, but if I understand what

19   you said, Mr. Robert Dittman is going to purchase 50

20   percent of your company, Vertifresh, for all 175,000

21   preferred Class A shares of FusionPharm?  Is that right?

22   A.   In this particular document, that's not executed,

23   there's a couple of copies of this, that went around that

24   got changed like all the other documents we ever did a

25   zillion times.

Direct - Sears

1    Q.   I'm asking about the documents in front of you.

2    A.   That's what this particular document says, yes, sir.

3    Q.   And so it was -- who drafted this document that made

4    the agreement that 50 percent of Vertifresh would be owned

5    by Robert Dittman for the equivalent of 17 million common

6    shares of FusionPharm stock?

7    A.   No, it's for 175,480 shares.

8    Q.   Of preferred.

9    A.   Which is -- okay.

10   Q.   All right.  Now, you know that --

11   A.   I'm just going by what the document said.

12   Q.   Do you know about a reverse split?

13   A.   I'm familiar with the term.

14   Q.   Do you know about a reverse split in FusionPharm?

15   A.   I'm familiar with it.

16   Q.   Do you recall what this reverse split was?

17   A.   No, I don't.

18   Q.   All right.

19   A.   It was pretty heavy, though.  It had to be.

20   Q.   What do you mean by heavy?

21   A.   I mean, the previous company had 190 bazillion shares,

22   so it had to be heavy.

23   Q.   I don't understand the terms of gravity and weight

24   when it comes to investments.  What do you mean by heavy?

25   Can you give me an explanation --

                         Direct - Sears

1    A.    Had to be a large reverse, very hard reverse --
2              THE COURT:  You need to speak into the mic.
3              THE WITNESS:  It had to be a large reverse.
4    BY MR. SIBERT:
5    Q.    Okay.  And can you describe to me what you mean "large
6    reverse."
7    A.    Large reverse -- to keep the numbers simple, if
8    there's, you know, a thousand shares and you want to do a
9    10 to 1, simple math tells you it's -- how many do you have
10   if you reverse it?
11   Q.    Okay.  So can you give me an example?  If you had 10
12   preferred shares, according to your example, how many
13   common shares would you have?
14   A.    It all depends on what the -- the -- the certificate
15   of designation would define what the preferred converted
16   into common would be.  So whatever that number is, that was
17   just math.  So that's probably how you're getting your 17
18   million whatever it is once it's converted.
19   Q.    All right.  Do you know essentially what one preferred
20   share was worth in FusionPharm in common stock?
21   A.    I don't remember off the top of my head.  It was
22   either 2 or -- anywhere from 2 to 10 was the norm, I --
23   Q.    Two to 10 shares?
24   A.    Yeah, 2 to 10 shares.
25   Q.    Okay.

Direct - Sears

1    A.    Yeah.  It's pretty common.

2    Q.    Okay.  Can you please look at Government Exhibit 115.

3    A.    Yes, sir.

4    Q.    Do you recognize this document?

5    A.    Yes, I do.

6    Q.    Okay.  And can we -- what is this document?

7    A.    This is an e-mail sent from myself on July 31st, 2012,

8    to a Joslyn at Pacific Stock Transfer.  The subject matter

9    is FSPM cert.

10   Q.    And can we scroll down, please.  I'm sorry, can you go

11   back to the top.

12         Do you know what the document was scanned?

13   A.    Judging by its body, it says, "Please find attached

14   the complete due diligence file for the transfer.  Page

15   eight is the one you were looking for.  Many thanks in

16   advance."

17   Q.    I want to go back.  Can you please bring up -- let me

18   check the list real quick before I show it to the jury,

19   Your Honor.

20         Your Honor, I'd like to show the jury Exhibit 92;

21   however, I'm not sure if that's been -- I know it's been

22   stipulated to, but it has not been offered, I don't

23   believe, at this point.

24         THE COURT:  Ms. Frank, do you show that being in?

25         COURTROOM DEPUTY:  I believe that it was

Direct - Sears

1    yesterday.

2              THE COURT:  92?

3              COURTROOM DEPUTY:  Yes.

4              MR. SIBERT:  She would probably know better than I

5    would at this point.

6              THE COURT:  That's her job to keep track of that.

7    That's why we had you slow down when you were rattling off

8    those numbers.

9              MR. SIBERT:  I appreciate that.  Thank you.  Thank

10   you.

11   BY MR. SIBERT:

12   Q.   Can you -- can you scroll up to the second page of

13   this exhibit.

14             Can you zoom in here, please.  Okay.  May I have a

15   moment, Your Honor?

16             THE COURT:  You may.

17             MR. SIBERT:  Your Honor, I'm going to move on.

18   BY MR. SIBERT:

19   Q.   Can I have -- can we please look at Government Exhibit

20   124.

21             Sir, can you look at that exhibit.

22   A.   Yes, sir.

23   Q.   And do you recognize this exhibit?

24   A.   Yes, I do.

25   Q.   Okay.  And what is this exhibit?

Direct - Sears

1    A.    This is an e-mail.

2    Q.    Okay.  And what is the e-mail about?

3    A.    My e-mail is from myself at the william -- sorry,

4    *williamjsears.com* address.  It was sent Friday, August

5    10th, 2012, to *144stock@scottsdalecapital.com*, which is the

6    broker/dealer.  Subject:  "FSPM Deposit - Microcap

7    Management."

8    Q.    All right.  Can you look at the e-mail that Craig sent

9    you from Scottsdale Capital?  Do you have that section

10   blown up?

11         Okay.  And what is Craig D'Mura asking you about

12   in his e-mail?

13   A.    "I want to confirm we received the issuer

14   certification letter and that you deposit" -- your "deposit

15   is pending final legal review.  As a clarifying point, are

16   you or your company engaged in any type of stock promotion

17   activity with respect to FSPM?"

18   Q.    All right.  So you faded off there at the end.

19   A.    "Are you and your company engaged in any type of stock

20   promotion activity with respect to FSPM?"

21   Q.    And so essentially FSPM is FusionPharm?

22   A.    Yes, sir.

23   Q.    All right.  Can we go back to the top.

24         And we're talking about MicroCap here; is that

25   correct?

Direct - Sears

1    A.    That's right.

2    Q.    And your answer to his question?

3    A.    "No!!! On both."

4    Q.    And can I have Exhibit 85.

5          Do you recognize Government Exhibit 85?

6    A.    Yes, I do.

7    Q.    Let's start at the bottom.  Who's e-mailing you?

8    A.    A Ms. Lisa Upham.

9    Q.    Okay.  And what's the subject?

10   A.    "Issuances."

11   Q.    Okay.  And what is she asking you in the e-mail?

12   A.    The payment isn't making the balance in full, "but

13   here's a statement before I run the card payment so you can

14   make it current."

15   Q.    All right.  And how much is open?

16   A.    $918.86.

17   Q.    So what does this regard referring to payment with

18   Pacific Stock Transfer agency?

19   A.    I don't know the exact trans- -- what the transfer was

20   for directly, but if -- are you talking about the existing

21   balance?

22   Q.    Well, maybe a better question is:  Why would Mrs. Lisa

23   Upham be e-mailing you regarding payment?

24   A.    Because when I first took over -- or was going to take

25   over the Baby Bee Bright shell before Scott Dittman and

Direct - Sears

1    FusionPharm existed, I was owed a tremendous amount of
2    money, and part of the deal was for me to squash down the
3    debt, so I negotiated the debt down from about $45,000 to
4    maybe 4- to 5 grand.
5         Regardless of what happened with that vehicle, I
6    guaranteed that I would pay that debt, so that debt
7    followed me.
8    Q.   Do you have to pay the transfer agency?
9    A.   Excuse me?
10   Q.   Do you have to pay the transfer agency?
11   A.   As an individual?
12   Q.   Did you pay the transfer agency?
13   A.   Many times.
14   Q.   And is that what she's inquiring about?
15   A.   That's what she's inquiring about, sir.
16   Q.   Can you go up top, please.
17        And essentially here -- do you recognize that
18   e-mail?
19   A.   That is my e-mail.
20   Q.   And you're e-mailing Lisa Upham again?
21   A.   Yes, sir.
22   Q.   And what are you providing her when you're writing
23   "654"?
24   A.   A CCV code on the back of my credit card.
25   Q.   And that's like the three-digit code that allow for

Direct - Sears

1    someone to use a credit card?

2    A.   Yes, sir.

3    Q.   Okay.  Sir --

4         MR. SIBERT:  Your Honor, at this time, the

5    Government would like to move batch 8 of the exhibits that

6    were sent last night and it begins with Exhibit 389-A, and

7    I believe it runs through 389-D.

8         THE COURT:  And these are all stipulated to?

9         MR. SIBERT:  They are, Your Honor.

10        THE COURT:  All right, given the stipulation of

11   the parties, Government Exhibits 389-A, B, C, and D are

12   admitted into evidence and may be published to the jury.

13      (Government's Exhibits 389-A through 389-D received)

14        MR. SIBERT:  Your Honor, may I approach your

15   courtroom deputy to provide the documents?

16        THE COURT:  Yes.

17        MR. SIBERT:  Thank you.

18   BY MR. SIBERT:

19   Q.   Okay, sir, do you recognize Government Exhibits 389-A

20   through 389-D?

21   A.   I only see -- yes, I do.

22   Q.   Okay.  And it --

23   A.   Well --

24   Q.   -- what are those documents?

25   A.   These are transcriptions.

274

Direct - Sears

1  Q.   Of what?

2  A.   Of a conversation.

3  Q.   And how was the conversation being communicated?

4  A.   This, I believe, is -- this -- this, I believe, is via

5  Skype.  Excuse me.

6  Q.   So when you say "via Skype," do you mean Skype

7  messages?

8  A.   Yes, sir.

9  Q.   Okay.  Could you just blow up -- thank you.

10        Sir, can you look at the screen?  Who is

11  wjsears66?

12  A.   I would assume it is myself.

13  Q.   All right.  Well, I don't want you to assume anything.

14  Can you look through these Skype messages and --

15  A.   There's a couple of different names that I recognize

16  that would have been mine, but that's why I'm saying

17  "assume."  There's a few of them here, sir.

18  Q.   Sir, do you recall reviewing these documents about two

19  days ago?

20  A.   I recall -- this was one of the very last ones and

21  skimming through it.

22  Q.   Did you mark that document?

23  A.   Yes, I did.  It was the very last one I did on that

24  day.

25  Q.   Okay.  Does that refresh your memory at all?

Direct - Sears

1    A.   I remember skimming through it.

2    Q.   So do you know who wjsears66 is?

3    A.   I would assume it is myself.

4    Q.   How about Mr. Don Marcusi?

5    A.   I would assume it is Mr. Jean-Pierre.

6    Q.   Why would you make that assumption based upon what you

7    see in this document?

8    A.   Because there are other screen names, for lack of a

9    better term, that I recall that were his.

10        THE COURT:  Can we get the exhibit -- the font

11   increased so that the jury can read the exhibit?

12        MR. SIBERT:  Yes, sir.  Can you increase that,

13   please.

14   BY MR. SIBERT:

15   Q.   Can you focus in on this area?

16   A.   Oh, much nicer.

17   Q.   Yeah.  Sorry about that, Your Honor.

18        So we just went through some questions regarding

19   essentially -- let's just talk about this.  This is the

20   name I was talking about, wjsears66; is that correct, the

21   name that I asked you about?

22   A.   Yes, it is.

23   Q.   And you're assuming that's you?

24   A.   Yes, sir.

25   Q.   When were you born?

Direct - Sears

1   A.   May 13th, 1966, sir.

2   Q.   And have you had a chance -- these are the messages;

3   is that correct?

4   A.   Yes.

5   Q.   Have you had a chance to review those messages?

6   A.   I perused them.

7   Q.   Does that help your memory --

8   A.   I didn't read every page and every message, sir, no.

9   Q.   The ones that you read, does that help your memory?

10  A.   Yes.  This sounds like a conversation that I would

11  have had.

12  Q.   Okay.  And who would you -- who would you have had the

13  conversation with?

14  A.   Guy Jean-Pierre.

15  Q.   And how do you know that's Mr. Guy Jean-Pierre?

16  A.   I don't know him as that screen name.  I'm assuming by

17  the familiarity of the message, itself.

18  Q.   Is there anyone else that you would have had a

19  conversation like in this exhibit?

20  A.   It sounds like -- it reads like a conversation I would

21  have had with Mr. Jean-Pierre.

22  Q.   So to the best of your memory, this is Mr.

23  Jean-Pierre's chat initiator?

24  A.   Yes, I believe that would be fair to say, sir.

25  Q.   Or maybe I'm not using the correct terminology.

Direct - Sears

1    A.    I don't know what it is either.

2    Q.    But is it confirmed as --

3    A.    Chat log.

4    Q.    Chat logs, chat --

5    A.    I'm guessing.

6    Q.    Okay.  Can you look at Exhibit 389-B.  And can we have

7    it blown up again?  Kind of the same thing.

8          Okay.  Do you know who billysears66 is?

9    A.    That's another one that I assume would be me.

10   Q.    And, again, same name from 389-A; is that correct?

11   A.    Yes, sir.

12   Q.    Okay.  And you would agree that billysears66 is under

13   the Chat Initiator; is that right?

14   A.    Yes, sir.

15   Q.    And this would be the message part, correct?

16   A.    Yes, it would.

17   Q.    And what is the message?

18   A.    Guy.

19   Q.    Is that Guy?

20   A.    Guy, as in Gee.

21   Q.    Can I have 389-C.  Same thing, please.  All right.

22         If you look on your screen there, do you know who

23   trader5280 is?

24   A.    That would have been mine.

25   Q.    That's yours?

Direct - Sears

1    A.    That one I remember.

2    Q.    You remember that one?

3    A.    Yes, I do.

4    Q.    Do you know who elcommandante1 is?

5    A.    Yes, Mr. Guy Jean-Pierre.

6    Q.    Okay.

7           MR. SIBERT:  Your Honor, there's three documents I

8    would like to show from another package.  They've already

9    been admitted into evidence.  It's a brief couple of

10   questions on these documents again.  May I approach your

11   courtroom deputy to hand to the witness?

12          THE COURT:  Yes, go ahead.

13          MR. SIBERT:  Thank you.

14          THE COURT:  So for clarity of the record, why

15   don't we identify which of the exhibits you just handed to

16   Ms. Frank.

17          MR. SIBERT:  Yes, Your Honor.  It's going to be

18   Government Exhibit 77, 81, and 133.

19          THE COURT:  All right.

20          MR. SIBERT:  Can I have 77 up again, please.

21   BY MR. SIBERT:

22   Q.   Sir, we talked about this e-mail, and I'm just going

23   to ask you a pretty -- real -- when you were sending that

24   e-mail to Mrs. -- *joanna@pacificstocktransfer.com*, where is

25   Pacific Stock Transfer?

Direct - Sears

1    A.   As my memory serves me, I believe it's in Las Vegas,
2    Nevada.
3    Q.   Okay.  Do you recall ever sending this e-mail in the
4    state of Nevada to Pacific Stock Transfer?
5    A.   I'm sorry?
6    Q.   Did you send this e-mail when you were in the state of
7    Nevada?
8    A.   I honestly couldn't tell you.
9    Q.   Did you ever do business from Nevada with Pacific
10   Stock Transfer on April 11th, 2013?
11   A.   I honestly don't recall, sir.
12   Q.   Where would you likely have sent this e-mail from?
13   A.   I have no -- I don't know.
14   Q.   Well, you testified --
15   A.   A computer, my house, my car.
16   Q.   Where is your house?
17   A.   Thornton, Colorado.
18   Q.   Is that where you sent most of your e-mails?
19   A.   April 11th, '13.  It would have either been in my home
20   if it was earlier in the morning, during the day -- '13 --
21   I probably would have been at 4360 Vine Street, I believe,
22   in April of '13.
23   Q.   So either from your home in Thornton or in your office
24   in Denver?
25   A.   Or Commerce City, would have been my desk at Commerce

Direct - Sears

1    City.

2    Q.    And those are all in Colorado?

3    A.    Yes, sir.

4    Q.    Okay.  Can you look at Government Exhibit 81.  August

5    of 2013.  Where were you doing most of your e-mails?

6    A.    That probably would have been 4360 Vine Street,

7    Commerce City.

8    Q.    And Vine Street in Commerce City, that's Colorado?

9    A.    Yes, sir.  Sorry.  Vine Street would have been --

10   that's my mistake.  Vine Street is in Denver, not Commerce

11   City.  My mistake.

12   Q.    Okay.  But either way, from Colorado?

13   A.    Yes, sir.

14   Q.    And then this is to Pacific Stock Transfer; is that

15   correct?

16   A.    Yes, sir.

17   Q.    As you just testified, that's in Nevada?

18   A.    I believe so, yes, as I remember.

19   Q.    Can I have Government Exhibit 133.  Okay.  As you just

20   stated, this is an e-mail from August 13th, 2013.  I

21   believe you said you would either be on Vine Street in

22   Denver, Colorado, or your home?

23   A.    This is August 19th, sir.

24   Q.    August 19th --

25   A.    Right.

Direct - Sears

1    Q.   -- 2013?

2    A.   This one is August 27th.  Okay.  Go ahead.

3    Q.   And hopefully you didn't move, but based upon your

4    previous answer, you would be working out of the Vine

5    Street; is that right?

6    A.   If my memory serves me correctly, yes.

7    Q.   Or your home in Thornton?

8    A.   Yes, sir.

9    Q.   Both in Colorado?

10   A.   Yes, sir.

11   Q.   And where is Scottsdale Capital?

12   A.   Arizona.  Scottsdale, Arizona.

13   Q.   Thank you.

14   A.   You're welcome, sir.

15            MR. SIBERT:  Your Honor, may I approach?

16            THE COURT:  All right.  Counsel, all approach,

17   please.

18        (Sidebar conference held)

19        (This is the conclusion of the testimony of Mr. Sears

20   for the day)

21                  *     *     *     *     *

22                            **INDEX**

23   Item                                                  PAGE

24                  GOVERNMENT'S WITNESSES

25     **WILLIAM SEARS**
       Direct Examination by Mr. Sibert            47

<pre>
 1                        GOVERNMENT'S EXHIBITS

 2      EXHIBITS:       Offered    Received   Refused    Stipulated

 3      69              180        181

 4      70              180        181

 5      74              180        181

 6      77              180        181

 7      81              180        181

 8      82              180        181

 9      85              259        259

10      107             247        247

11      115             259        259

12      124             259        259

13      133             180        181

14      140             169        170

15      141             169        170

16      142             169        170

17      143             169        170

18      144             169        170

19      155             180        181

20      156             180        181

21      245             180        181

22      252             180        181

23      268             180        181

24      269             180        181

25      270             180        181
</pre>

GOVERNMENT'S EXHIBITS

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|-----------|---------|----------|---------|------------|
| 271 | 180 | 181 | | |
| 272 | 180 | 181 | | |
| 274 | 180 | 181 | | |
| 170 | 107 | 109 | | |
| 171 | 107 | 109 | | |
| 173 | 107 | 109 | | |
| 174 | 107 | 109 | | |
| 181 | 107 | 109 | | |
| 249 | 107 | 109 | | |
| 259 | 107 | 109 | | |
| 372-C | 107 | 109 | | |
| 372-E | 107 | 109 | | |
| 372-F | 107 | 109 | | |
| 372-P | 252 | 253 | | |
| 372-R | 107 | 109 | | |
| 372-X | 107 | 109 | | |
| 372-BB | 107 | 109 | | |
| 372-DD | 107 | 109 | | |
| 372-FF | 107 | 109 | | |
| 372-GG | 107 | 109 | | |
| 372-HH | 107 | 109 | | |
| 372-KK | 107 | 109 | | |
| 372-NN | 180 | 181 | | |

GOVERNMENT'S EXHIBITS

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|-----------|---------|----------|---------|------------|
| 372-QQ | 107 | 109 | | |
| 372-UU | 107 | 109 | | |
| 372-XX | 180 | 181 | | |
| 372-AAA | 180 | 181 | | |
| 372-BBB | 180 | 181 | | |
| 372-CCC | 107 | 109 | | |
| 372-DDD | 107 | 109 | | |
| 372-EEE | 259 | 259 | | |
| 372-HHH | 107 | 109 | | |
| 372-III | 107 | 109 | | |
| 372-KKK | 107 | 109 | | |
| 372-MMM | 180 | 181 | | |
| 372-OOO | 107 | 109 | | |
| 383 | 247 | 247 | | |
| 384 | 107 | 109 | | |
| 385 | 107 | 109 | | |
| 389-A | 273 | 273 | | |
| 389-B | 273 | 273 | | |
| 389-C | 273 | 273 | | |
| 389-D | 273 | 273 | | |
| 391 | 107 | 108 | | |
| 393 | 247 | 247 | | |
| 398 | 107 | 109 | | |

285

```
 1                        GOVERNMENT'S EXHIBITS

 2       EXHIBITS:        Offered   Received  Refused   Stipulated

 3       399              107       109

 4       400              180       181

 5

 6

 7                    *       *       *       *       *

 8                        REPORTER'S CERTIFICATE

 9

10           I certify that the foregoing is a correct transcript

11       from the record of proceedings in the above-entitled

12       matter.

13           Dated at Denver, Colorado, this 11th day of July, 201.

14

15

16

17       _                                                      _

18                    MARY J. GEORGE, FCRR, CRR, RMR

19

20

21

22

23

24

25
```