286

1                    IN THE UNITED STATES DISTRICT COURT

2                      FOR THE DISTRICT OF COLORADO

3      Criminal Action No. 17-cr-0008-WJM

4      UNITED STATES OF AMERICA,

5      Plaintiff,

6      vs.

7      GUY M. JEAN-PIERRE, a/k/a MARCELO DOMINGUEZ de GUERRA,

8      Defendant.

9      ------------------------------------------------------------
               REPORTER'S PARTIAL TRANSCRIPT OF WILLIAM SEARS
10                          (Jury Trial, Day 3)
                                Volume III
11     ------------------------------------------------------------

12          Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

13     Judge, United States District Court for the District of

14     Colorado, commencing at 8:51 a.m., on the 16th day of

15     January, 2019, in Courtroom A801, United States Courthouse,

16     Denver, Colorado.

17
                                APPEARANCES
18
            JEREMY S. SIBERT and ROBERT M. BROWN, Assistant U.S.
19     Attorneys, 1801 California Street, Suite 1600, Denver,
       Colorado 80202, appearing for the plaintiff.
20
            CLIFFORD J. BARNARD, Attorney at Law, 4450 Arapahoe
21     Avenue, Suite 100, Boulder, Colorado 80303, AND
            THOMAS E. GOODREID, Attorney at Law, 1801 Broadway,
22     Suite 1400, Denver, Colorado 80202, appearing for the
       defendant.
23

24                  MARY J. GEORGE, FCRR, CRR, RMR
                 901 19th Street, Denver, Colorado 80294
25             Proceedings Reported by Mechanical Stenography
                  Transcription Produced via Computer

Direct - Sears

1          P R O C E E D I N G S

2          (In open court in the presence of the jury at 8:51

3     a.m.)

4               THE COURT:  Good morning, ladies and gentlemen of

5     the jury.  Welcome back to day 3 of our jury trial.

6               Mr. Sears, I remind you you remain under oath.

7               THE WITNESS:  Yes, sir.

8               THE COURT:  Mr. Sibert, you may resume your

9     examination.

10              MR. SIBERT:  All right.  Thank you.  Good morning,

11    Your Honor.  Thank you.

12                   DIRECT EXAMINATION (Continued)

13    BY MR. SIBERT:

14    Q.   Good morning, Mr. Sears.

15    A.   Good morning, sir.

16    Q.   Can we have Government Exhibits 18 -- excuse me, let's

17    start -- I'm sorry, Government Exhibit 12 brought up on the

18    screen.  Excuse me.  I meant -- I meant to say Government

19    Exhibit 74, which has been admitted.

20              Okay, sir, again, along the question that we kind

21    of ended yesterday regarding where you did most of your

22    work, which was either in the Thornton area or downtown

23    Denver area.  Can you take a look at 74 again.

24    A.   Can I have the hard copies also?

25    Q.   I don't have -- you're going to have to rely on the

Direct - Sears

1    screen today.  I can try --
2    A.    It's a little fuzzy for me.
3          THE COURT:  We can get him the hard copy from the
4    court binder.
5          THE WITNESS:  That would be great, thank you.
6          Yes, sir.
7    BY MR. SIBERT:
8    Q.    Okay.  Do you recognize Government Exhibit 74 now?
9    A.    Yes, sir.
10   Q.    Okay.  And essentially that's just an e-mail that we
11   talked about yesterday?
12   A.    Okay.
13   Q.    That you sent.
14   A.    Okay.
15   Q.    Is that correct?
16   A.    Yes.
17   Q.    Okay.  And essentially as we discussed yesterday, you
18   sent these e-mails when you were either in your Thornton
19   home office or downtown Denver; is that consistent?
20   A.    Yes, sir.
21   Q.    And this went to Pacific Stock Transfer?
22   A.    Yes, sir.
23   Q.    All right.  Now, can you look at Government Exhibit
24   6 -- or 72.
25   A.    Okay.

Direct - Sears

1  Q.   Okay.  Can you look at page 16 for me in that exhibit.

2       Can I have 16 on the screen.

3  A.   Okay.  Okay.

4  Q.   Okay.  And I'm looking here, and I circled it on your

5  screen.  That's an e-mail from you to Ms. Joanna DiBella;

6  is that correct?

7  A.   Yes, sir.

8  Q.   Okay.  And, again, Ms. Joanna DiBella is an employee

9  at Pacific Stock Transfer agency.  Yes, sir.

10      THE COURT:  Hold on, Mr. Sibert.  Yes, Ms. Sewell.

11      THE JUROR:  We do not have that on our screens.

12      COURTROOM DEPUTY:  I do not have that admitted.

13      THE COURT:  That's correct, Your Honor.  This

14 exhibit has not been admitted into evidence or published,

15 so I just need the witness to testify about it before it

16 will be entered into evidence later.

17      THE COURT:  Okay.  I have just assumed that it had

18 been, that you were -- are you going to be using any other

19 exhibits that are not already in evidence?

20      MR. SIBERT:  I've got to check my list, but this

21 is one that I know of, and I think this might be the only

22 one for this morning.  I will be offering more exhibits.

23      THE COURT:  Right.  But you -- okay.  Check your

24 list because you need to know what you're going to start

25 examining on that isn't in evidence yet.  Ms. Frank caught

Direct - Sears

1    it, I didn't.  But that's why these exhibits don't go up on

2    the screen for the jury yet.

3            So I'm assuming then there's not a stipulation to

4    this exhibit; is that correct?

5            MR. SIBERT:  There is not, Your Honor.

6            THE COURT:  All right.  Lay your foundation and

7    see if there's an objection.

8    BY MR. SIBERT:

9    Q.   Okay.  All right.  Good morning, sir.  I need you to

10   look either at the binder or the screen, and on page 16.

11   Do you recognize who sent this e-mail?

12   A.   It looks to be myself.

13   Q.   Okay.  And how do you know that?

14   A.   Well, it does bear my e-mail address.

15   Q.   Okay.  And who did you send it to?

16   A.   It would be Joanna DiBella.

17   Q.   Okay.  And who's Ms. Joanna DiBella?

18   A.   She's an employee over at Pacific Stock Transfer.

19           MR. SIBERT:  And, Your Honor, I guess I should

20   offer this into evidence.  I'm looking at my list now, and

21   I apologize, this has been stipulated to.  So I would ask

22   we move for admission into evidence.

23           THE COURT:  For the entirety of 72?

24           MR. SIBERT:  Yes.  For the entirety of the

25   exhibit.

Direct - Sears

1              THE COURT:  Okay.  Given the stipulation of the

2       parties, Exhibit 72 is admitted into evidence and may be

3       published to the jury.

4              (Government's Exhibit 72 received)

5              MR. SIBERT:  Thank you, Your Honor.  I apologize

6       for that.

7              THE WITNESS:  Excuse me, do I get to look at these

8       prior?

9       BY MR. SIBERT:

10      Q.   I'm asking about page 16.  And you can go through the

11      exhibit, sure.

12      A.   This isn't one that I saw, then.

13      Q.   Okay.  So we were just discussing this e-mail; is that

14      correct?

15      A.   Yes, sir.

16      Q.   And, again, where was your place of business when you

17      were doing your e-mails?

18      A.   At that time, December 13th, 2012, that would have

19      been 4360 Vine Street, as my memory serves.

20      Q.   Okay.  That's Denver, Colorado?

21      A.   Yes, it is.

22      Q.   Okay.  And, again, Pacific Stock Transfer is in --

23      A.   Las Vegas, Nevada.

24      Q.   Thank you.  And can I have page 17 of this exhibit.

25      And can I just have the top of it.

Direct - Sears

1          Can you see page 17 in your binder there?

2     A.    This was Exhibit 72?

3     Q.    Exhibit 72, page 17.

4     A.    Yes, sir.  Excuse me, yes, I do.

5     Q.    Okay.  Do you recall what -- after looking at page 17,

6     do you recall what Ms. DiBella was requesting from you from

7     Pacific Stock Transfer Agency?

8     A.    No, I do not.

9     Q.    All right.  Can you look at page -- essentially, can

10    you look at page 18.  Thank you.

11          Again, I'm circling on the screen here, this is a

12    e-mail from you; is that correct?

13    A.    Yes, it would appear to be.

14    Q.    All right.  If you look at your screen -- I've blown

15    it up for you -- what are you e-mailing Ms. DiBella about

16    at Pacific Stock Transfer?

17    A.    I'm e-mailing Ms. DiBella about a convertible note

18    between Bayside Holdings and FusionPharm, Inc.

19    Q.    Why would you be e-mailing her about a note from

20    Bayside Holdings and FusionPharm?

21    A.    As I explained yesterday, my mother is quite old, and

22    this is a very complicated transaction.  Due to her age

23    she's not really all there.  Shortly after that, if my

24    memory serves me, the note was sold at a discount so I

25    didn't have to deal with this mess anymore.

Direct - Sears

1    Q.   Okay.  So back to my question:  You were contacting

2    Ms. Joanna DiBella about selling the Bayside note?

3    A.   No, actually this -- this particular e-mail was in a

4    conversion.

5    Q.   Okay.  What's a conversion?

6    A.   Excuse me?

7    Q.   What is a conversion?

8    A.   Conversion is when you take a -- when you have debt

9    and you can convert it into equity as per the note that was

10   signed.

11   Q.   And so could you tell me who's getting equity --

12   equity as part of this note?

13   A.   Bayside Realty Holdings.

14   Q.   Okay.  And what are they getting?

15   A.   They're getting stock, sir.

16   Q.   For what -- do you remember the price of that stock?

17   A.   No, I don't.

18   Q.   Why don't you look through that exhibit and see if it

19   refreshes your memory.

20            THE COURT:  How many pages is this exhibit?

21            THE WITNESS:  It's War and Peace.

22            THE COURT:  Sorry?

23            THE WITNESS:  It's large.

24            THE COURT:  Large?  Why don't we save some time.

25   If you want to direct him to a particular page, see if his

Direct - Sears

1    memory's refreshed.

2              MR. SIBERT:  Your Honor, I'll come back to it.

3              THE WITNESS:  I'm sorry, I didn't . . .

4    BY MR. SIBERT:

5    Q.   All right, sir, before we start going to some further

6    evidence, I just want to ask you some follow-up questions.

7    Well, let me show you an exhibit that was being tendered

8    yesterday, has been stipulated to, and offered into

9    evidence, which is Government Exhibit 236.

10             THE COURT:  Is that in evidence or -- I'm not

11   clear what you just said.

12             MR. SIBERT:  This is the one I approached with

13   yesterday.

14             THE COURT:  Okay.

15             MR. SIBERT:  I think the Court reserved the ruling

16   about admitting it into evidence.

17             THE COURT:  You're saying it's stipulated to now?

18             MR. SIBERT:  It's been stipulated to.

19             THE COURT:  Well --

20             MR. GOODREID:  Your Honor, maybe I misunderstand.

21   I don't agree with that.  I wonder if we would approach

22   very briefly.

23             THE COURT:  Didn't we talk about this yesterday?

24             MR. GOODREID:  We did.

25             THE COURT:  Why do we have to have a sidebar on

Direct - Sears

1    the same exhibit?  Do you stipulate to it or not?

2         MR. GOODREID:  No.

3         THE COURT:  All right.  If there's no stipulation,

4    you need to lay a foundation so you don't draw an

5    objection.

6         MR. SIBERT:  Okay.  My misunderstanding, Your

7    Honor, because based upon what was said to the Court --

8         THE COURT:  He just said he's not stipulating.

9         MR. SIBERT:  Okay.  So he's changing his mind.

10        THE COURT:  Whatever.

11        MR. SIBERT:  May I approach your courtroom deputy?

12        THE COURT:  Why can't we just use the exhibits in

13   the binders?

14        MR. SIBERT:  Because the attachment's 900 pages.

15   As the Court requested, I printed out the relevant page so

16   the witness can have it.

17        THE COURT:  All right.

18   BY MR. SIBERT:

19   Q.   This is not published to the jury now, so can I have

20   236 up on the screen, please.

21        Okay.  Sir, I just handed you what's been marked

22   as Government Exhibit 236.  Do you recognize that document?

23   A.   Yes, I do.

24   Q.   Okay.  And essentially could you describe what the

25   first page of that document is.

Direct - Sears

1    A.    It's a e-mail, sir.

2              MR. SIBERT:  Okay.  And I apologize, Your Honor,

3    let me give you the pages that are relevant to the

4    attachment -- or document 236.

5              THE COURT:  Let me pull the binder first.

6              All right.  In my binder it's a three-page -- it's

7    a three-page exhibit.  Mr. Sibert, it's a three-page

8    exhibit, right?

9              MR. SIBERT:  Yes.

10             THE COURT:  All right.   --

11             MR. SIBERT:  I just want to make sure I had the

12   right exhibit from what we discussed yesterday, which is a

13   900-page document.

14             THE COURT:  Well, I don't recall you bringing in a

15   900-page document up to the bench yesterday.

16             MR. SIBERT:  I would not have.

17             THE COURT:  Yeah, you brought up -- I think what

18   you -- I didn't look at the label, but I believe what we

19   were referring to at the end of the day yesterday at the

20   sidebar was 236; isn't that correct?

21             MR. SIBERT:  That's correct, Your Honor.

22             THE COURT:  And that's a three-page exhibit.

23             MR. SIBERT:  That's right.

24             THE COURT:  All right.  Are you done laying your

25   foundation?

                        Direct - Sears

1           MR. SIBERT:  No, sir.

2           THE COURT:  All right, go ahead.

3           MR. SIBERT:  I just wanted to make sure the Court

4    has everything.

5           THE COURT:  Yeah, I have it.

6    BY MR. SIBERT:

7    Q.   Okay.  So can you tell me what the first page of the

8    document 236 is.

9    A.   It's an e-mail.

10   Q.   Okay.  And who sent the e-mail?

11   A.   I did.  I --

12   Q.   And how do you know that?

13   A.   It does bear my e-mail address.

14   Q.   Okay.  And who did you send it to?

15   A.   Mr. Cliffe Bodden.

16   Q.   Okay.  And can you look through that e-mail, including

17   the attachment.

18   A.   Yes, sir.

19   Q.   And does that e-mail and attachment reflect what you

20   sent on -- in March of 2011?

21   A.   That e-mail -- I'm familiar with this e-mail, it's

22   been brought to my attention before.  This e-mail --

23   Q.   I'm just asking --

24   A.   I'm answering the question.  This e-mail I forwarded

25   without even opening, like I did many of them.

Direct - Sears

1    Q.    So you --

2    A.    Like I did many e-mails, sir.

3    Q.    But that's an e-mail that you wrote.

4    A.    No, that's an e-mail that I forwarded.

5    Q.    Okay.

6    A.    I was not the originator of this e-mail.  I just want

7    to be clear about that.

8    Q.    An e-mail that you forwarded.

9    A.    That's right.

10              MR. SIBERT:  Your Honor, at this time the

11   Government would move for admission of Government Exhibit

12   236.

13              THE WITNESS:  Do we have the original e-mail that

14   predecessed --

15              THE COURT:  All right, Mr. Sears.

16              THE WITNESS:  I'm sorry.

17              MR. GOODREID:  Your Honor, I want to be clear on

18   the offer, which is -- what we object to is the attachment

19   to the e-mail, not the face of the e-mail.

20              THE COURT:  Right.  The e-mail, itself, is seven

21   words.

22              MR. GOODREID:  Right.

23              THE COURT:  So it's the letter that's attached

24   you're objecting to.

25              MR. GOODREID:  Right.

Direct - Sears

1      THE COURT:  And your basis for your objection.

2      MR. GOODREID:  A, it's hearsay -- and, again, Your

3  Honor, I haven't checked whether this is in the James log

4  or not, I apologize, sorry for that -- A, it's hearsay, and

5  B, we object on relevance.

6      THE COURT:  I'm going to sustain the objection to

7  pages 2 and 3.  This is not the appropriate witness to get

8  this -- those two pages in through.  He's not the author of

9  that attachment.

10      MR. SIBERT:  It goes to the state of the mind and

11  why --

12      THE COURT:  The objection's sustained.

13      MR. SIBERT:  Thank you, Your Honor.

14      THE COURT:  You can try again with a different

15  witness.

16      MR. SIBERT:  That's fine.  Can I publish the first

17  page?

18      THE COURT:  You may.  So the record is clear, page

19  1 of Exhibit 236 is admitted into evidence.

20      (Government's Exhibit 236, page 1, received)

21  BY MR. SIBERT:

22  Q.   All right, sir, just for the jury, can you just

23  describe the first page and what is shown on the first page

24  at 236.

25  A.   It's from myself using the *william@williamjsears.com*

300

Direct - Sears

1    e-mail, Monday, March 14th, 6:18 p.m., to Cliffe Bodden at

2    *gsccventure.com.*

3    Q.   And, again, the year is 2011?

4    A.   2011.

5    Q.   All right.  Now, sir, can you -- if you take that

6    down, please.

7            Sir, why did you stop using Mr. Guy Jean-Pierre as

8    the corporation for FusionPharm's lawyer?

9    A.   That wasn't my decision to stop using Mr. Jean-Pierre

10   for FusionPharms --

11   Q.   All right.  Well, you used --

12   A.   -- so that's a question that Mr. Dittman could answer.

13   Q.   Okay.  Well, you stopped using him for Microcap.

14   Would you agree with that?

15   A.   Yes, I do.

16   Q.   How about Meadpoint?

17   A.   Yes.

18   Q.   How about Vertifresh?

19   A.   Yes.

20   Q.   Okay.  Why did you stop using Mr. Guy Jean-Pierre?

21   A.   Because I was informed that he may have some

22   regulatory issues.

23   Q.   And what do you mean by "regulatory issues"?

24   A.   Just SEC inquiry.

25   Q.   Okay.  Were there any other inquiries?

Direct - Sears

1    A.   I'm not too sure, sir.

2    Q.   How about a Florida bar complaint?

3    A.   I heard rumor of such.

4    Q.   Okay.  And how about an SEC --

5              MR. GOODREID:  Your Honor, I object based on the

6    Court's ruling yesterday.

7              THE COURT:  Yeah, and leading.  Sustained.

8    BY MR. SIBERT:

9    Q.   What did you know about the SEC?

10             MR. GOODREID:  Same objection.

11             THE COURT:  Sustained.

12   BY MR. SIBERT:

13   Q.   Okay.  You said inquiries about the SEC.  What do you

14   mean by that?

15             MR. GOODREID:  Same objection.

16             THE COURT:  Well, you have to be very careful

17   here, Mr. Sibert, based on the rulings.  I think you've

18   established that there's an SEC -- there was an SEC

19   inquiry.  I think to go much beyond that we risk some

20   problems.  So --

21   BY MR. SIBERT:

22   Q.   Was it an SEC complaint?

23             MR. GOODREID:  Same objection, Your Honor.

24             THE COURT:  That I'm going to overrule.  You can

25   answer.

Direct - Sears

1              THE WITNESS:  I don't recall.

2    BY MR. SIBERT:

3    Q.   Okay.  But essentially you stopped using Mr. Guy

4    Jean-Pierre because he was facing some type of regulation

5    within the practice of law --

6              MR. GOODREID:  Objection.  Leading.

7              MR. SIBERT:  -- practice of law.

8              MR. GOODREID:  Leading.

9              THE COURT:  Sustained.

10   BY MR. SIBERT:

11   Q.   So why did these inquiries with the SEC lead you to

12   not use Mr. Guy Jean-Pierre?

13   A.   It's usually a general practice.  Anybody that has any

14   kind of an inquiry or anything to that effect, you take a

15   step back and take a look at things.

16   Q.   So why did you take a step back and take a look at

17   things?

18   A.   That was under advice of counsel that I did that.

19   Q.   Did -- would his inquiry have any effect with your

20   companies?

21   A.   Excuse me?

22   Q.   Would his inquiry with the SEC have any effect with

23   your companies?

24   A.   I think anybody who has an inquiry that has anything

25   to do with the SEC, the SEC will have a problem with

Direct - Sears

1    anybody.  That's what I feel, sir.

2    Q.   Now, did Mr. Guy Jean-Pierre know about your prior

3    criminal history?

4    A.   Yes, he did.

5    Q.   So he knew you had a conviction in 2007 for security

6    fraud?

7    A.   Yes, he did.

8    Q.   Did you have any other jobs when you were working,

9    either with or for FusionPharm, including your entities

10   under Microcap, Meadpoint, your assistance with your mother

11   with Bayside --

12   A.   Vertifresh.

13   Q.   -- or Vertifresh?

14   A.   Not that I can recall.

15   Q.   So during the time of 2000 -- essentially the end of

16   2010 through 2014 time frame, those companies and

17   Vertifresh -- or, excuse me, FusionPharm, those were your

18   main concentration for employment?

19   A.   I believe so.

20   Q.   Did you do any other work with Mr. Guy Jean-Pierre

21   between the same time frame, 2010 through the time at --

22   actually, let me ask you this:  When did you stop using Mr.

23   Guy Jean-Pierre?

24   A.   I don't remember.  Some time between end of '12,

25   beginning of '13, in that time frame.  I can't give you --

Direct - Sears

1    I don't remember exact dates, sir.

2    Q.   Okay.

3    A.   It was '12, '13.  I remember I got a memo August '13,

4    the end of August, that I think I looked for about a month

5    or two.

6    Q.   You said August 2013?

7    A.   Is when I got a new lawyer.  And I remember looking

8    for a couple of months, so . . .

9    Q.   So somewhere around after the new year of 2013?

10   A.   Could have been before, could have been after.  I'm

11   not exactly sure.

12   Q.   Okay.  And did you work with any other -- did Mr. Guy

13   Jean-Pierre do any other work for you besides your

14   affiliations with FusionPharm, Meadpoint, Microcap,

15   Vertifresh, and your assistance with your mother on

16   Bayside?

17   A.   I don't remember.  That's a long time ago and there

18   was a lot of old -- I don't recall.

19   Q.   Okay.

20   A.   Sounds like I had a lot on my plate at that time, so I

21   wouldn't imagine so, but I don't recall.

22   Q.   But you remember seeing documents that said there were

23   several drafts?

24          MR. GOODREID:  Objection.  Leading.

25          THE COURT:  Sustained.

                          Direct - Sears

1    BY MR. SIBERT:
2    Q.   Do you recall that you were telling me about other
3    drafts of documents?  Do you recall those answers that you
4    were giving me?
5    A.   No.  Other drafts of which documents?  What are
6    you --
7    Q.   For example, the e-mails?
8    A.   Yeah.
9    Q.   You said there was another e-mail; isn't that what you
10   stated?
11           MR. GOODREID:  Objection.  Leading.
12           THE WITNESS:  No, not this e-mail that I just went
13   over.
14           THE COURT:  Sustained.
15   BY MR. SIBERT:
16   Q.   All right.  Now, did you submit any of the OTC filings
17   for FusionPharm?
18   A.   I uploaded them to the news service, yes.
19   Q.   And essentially could you describe how you -- how one
20   goes about uploading a file to OTC?
21   A.   Just like you would Dropbox, sir.  You log in, you hit
22   the button, it uploads, and you're done.
23   Q.   Okay.  Well, I'm not very familiar with computers or
24   uploading documents, and I'm not sure how familiar the jury
25   is or counsel --

                        Direct - Sears

1              MR. GOODREID:  Objection to counsel testifying.

2              THE COURT:  Overruled.

3    BY MR. SIBERT:

4    Q.   So could you please describe in detail the steps one

5    would take to go ahead and upload files to the public

6    website for OTC.

7    A.   Everybody have a Dropbox or have ever uploaded a file

8    to your Facebook or any other kind of profile, it's exactly

9    like that.  You have your PDF file, you log into the

10   website, you hit upload, and that's pretty much it.  Under

11   the section that you want to upload that particular file

12   to, of course.

13   Q.   How would one upload -- excuse me, how would one enter

14   the website or the over-the-counter markets?

15   A.   Via computer.

16   Q.   Okay.  And can anyone enter the -- do you have to have

17   an account?

18   A.   Of course.

19   Q.   Okay.  Can you describe to me what it takes to enter

20   into your account for OTC?

21   A.   It's going to the website, putting in whatever the

22   name is, and then there's a password.

23   Q.   Okay.  So you just --

24             THE COURT:  Mr. Sears, you're fading.

25             THE WITNESS:  I'm sorry.

Direct - Sears

1          THE COURT:  You need to speak into the mic.
2     BY MR. SIBERT:
3     Q.   So you just testified that you uploaded some of the
4     OTC filings for FusionPharm.
5     A.   Yes, sir.
6     Q.   Okay.  Do you recall whose account -- essentially
7     whose name it was on there for the OTC account?
8     A.   I would imagine FusionPharm.  I mean, I don't recall.
9     I had originally set one up for the company back in 2010
10    when it was Baby Bee Bright, then FusionPharm took it over
11    when it became FusionPharm, so I don't know.
12    Q.   So how did you know how to log on to file these
13    documents?
14    A.   Because it says to use your password and log on.  It's
15    a very simple site, sir, it's self-explanatory.  It's just
16    like AOL.
17    Q.   Okay.  So FusionPharm, you stated it was turned over
18    to FusionPharm, if I understand you correctly.
19    A.   Yes.
20    Q.   So how did you know how to upload documents for
21    FusionPharm?
22    A.   What are you asking me?  I just answered that.
23    It's -- you upload the document and that's it.
24    Q.   So did you have the password?
25    A.   Of course.  That's how you get into the site, sir.

Direct - Sears

1    Q.   And did you know whose name the account was under for

2    FusionPharm?

3    A.   I don't recall.

4    Q.   What was the login name?  Did you have --

5    A.   I couldn't tell you.

6    Q.   But at the time you had all that?

7    A.   It was written down for me.

8    Q.   And when you uploaded these documents to the OTC

9    markets, where were you uploading these documents from?

10   A.   Depending on where I was at the time, I would imagine,

11   wherever that office was.

12   Q.   So somewhere here in Denver, Colorado, within the

13   three offices that we discussed?

14   A.   Yeah, probably.

15   Q.   Okay.  So we discussed in the last two days the types

16   of reports that have to be filed with the OTC.  And you

17   recall testifying to quarterly and annual reports; is that

18   right?

19   A.   Yes, sir.

20   Q.   All right.  Now, do you recall any of the ones that

21   you filed to OTC?

22   A.   Excuse me?

23   Q.   Do you remember which quarterly reports you filed?

24   A.   I don't remember any quarterly reports that I uploaded

25   to the OTC.  Basically it was done, they told me to upload

it, it was ready, and that was it.

Q. Who uploaded the attorney opinion letters?

A. Depends on who would have uploaded the financials with them. Wherever they were acquired, that would usually be part of a report. So I didn't do them all, so which one are you talking about?

Q. All right. Well, we can go down the list. How about August 14, 2012?

A. Couldn't tell you, sir.

Q. Okay. How about November 15th, 2012?

A. I wouldn't know what I did last week.

Q. How about March 6th, 2013?

A. Couldn't tell you.

Q. How about 7 -- July 5th, 2013?

A. Maybe.

Q. How about August 20th, 2013?

A. I'm not going to be able to sit here and tell you any given day from four years ago that I uploaded something, sir.

Q. You just asked me to tell you --

A. Well, you were going to go down that path anyway, so . . .

Q. All right. So it was either you that uploaded the documents; do you know who else could have uploaded the documents?

Direct - Sears

1    A.    Mr. Dittman, could have been Kelly Blume, and -- I

2    don't remember, I think Stuart Leudan did one or two.  I

3    can't think of anybody off the top of my head, anybody else

4    that's --

5    Q.    So those four people.

6    A.    Yeah.

7    Q.    Yourself, Mr. Scott Dittman, Mrs. Kelly Blume, and you

8    said someone else --

9    A.    Stuart Leudan.  He was a corporate attorney for a

10   while.  He was in town.  Maybe there was another office

11   woman, I can't remember her name, that Scott had.  I don't

12   know.  That's the best I can do with that.

13   Q.    Okay.  And do you recall any of these regarding the

14   current information letters?

15   A.    Excuse me?

16   Q.    Do you recall any of the dates regarding the current

17   information opinion letters?

18   A.    No, sir.  All I can tell you is the current

19   information documentation would probably be accompanied by

20   the end of year financials, so there wouldn't be many of

21   those.  Those usually go part and parcel, if I remember

22   correctly.

23   Q.    Now, eventually there was a search warrant conducted

24   in 2014.  Do you recall that?

25   A.    Yes, I do.

Direct - Sears

1    Q.   Okay.  Did you ever discuss that search warrant with
2    Mr. Guy Jean-Pierre after it was conducted?
3    A.   Not to my recollection, because it was sealed for a
4    very, very long time.  Nobody saw it.
5    Q.   So you never discussed the event that -- you knew
6    about the search --
7    A.   I discussed the event, sir.  I don't -- you asked me
8    about the warrant, specifically.
9    Q.   Okay.  So let me be a little bit more particular.
10   A.   Please.
11   Q.   Why don't you tell the jury what happened with the
12   search warrant.
13   A.   Could you care to elaborate?  What happened with the
14   search warrant?
15   Q.   Okay.
16   A.   I'm not trying to be difficult, but what do you mean
17   "what happened with the search warrant?"
18   Q.   Now, Mr. Sears, you're not difficult.
19   A.   Thank you.
20   Q.   Did you -- did FusionPharm -- was FusionPharm
21   searched?
22   A.   Indeed, it was.
23   Q.   By law enforcement?
24   A.   Indeed it was.
25   Q.   And do you know what happened as a result of that

Direct - Sears

1    search?

2    A.    No, that's what we're trying to figure out.

3    Q.    Okay.  Did you tell Mr. Guy Jean that FusionPharm was

4    searched by the FBI?

5    A.    Indeed I did.

6    Q.    Okay.  And that was after the search had occurred?

7    A.    Yes, sir.

8    Q.    Sir, I want to turn your attention now to Government

9    Exhibit 1, 1-A, 1-B, when you have a moment.

10          Your Honor, may I approach your courtroom deputy.

11   These are dealing with electronic evidence that the

12   Government's going to try to introduce, which was reviewed

13   for the sake of essentially preparation for entry into

14   evidence.

15          THE COURT:  What exhibit are we talking about?

16          MR. SIBERT:  1, 1-A, 2, and these will also

17   include the 320-A series, the 322 series.

18          THE COURT:  What do you mean by the 320-A series?

19          MR. SIBERT:  So it goes 320-A, B, C --

20          THE COURT:  All right.  So the exhibits that begin

21   with 320.

22          MR. SIBERT:  That's correct, Your Honor.

23          THE COURT:  And then 322?

24          MR. SIBERT:  322.

25          THE COURT:  All right.  What else?

313

                          Direct - Sears

1              MR. SIBERT:  350, 351.  And there's a lot of clips

2       under --

3              THE COURT:  So what grouping are these exhibits

4       coming under from the e-mail you sent to defense counsel

5       and my chambers yesterday?

6              MR. SIBERT:  These weren't stipulated to so

7       nothing was sent.

8              THE COURT:  Oh, okay.  None referenced in the

9       e-mail.  All right.  These are all -- none -- let me state,

10      none of these have been stipulated that you're referencing

11      now.

12             MR. SIBERT:  That's correct, Your Honor.

13             THE COURT:  All right.  Do you have any after 351?

14             MR. SIBERT:  Yes, sir.

15             THE COURT:  Go ahead.

16             MR. SIBERT:  358, and there's a series under 358,

17      360, 361, 362 and the series of videos under 363-A, and

18      that goes from A to I.

19             THE COURT:  All right.  Since none of these are

20      stipulated to, you are going to need to lay the foundation

21      of each one of these.  So what -- I'm trying to understand

22      what is the efficiency we gain by you listing 14 disputed

23      instructions ahead of time.

24             MR. SIBERT:  Because they're all videorecordings

25      that have been reviewed and listened to by this witness.

Direct - Sears

1          THE COURT:  Okay.

2          MR. SIBERT:  And he can articulate that what is on

3     these DVDs are his -- is what are in the clips in the

4     videos and recordings.

5          THE COURT:  All right.  So all of these exhibits

6     that you've just listed are included in the DVD that you

7     have in your hand?

8          MR. SIBERT:  The two DVDs, yes, sir.

9          THE COURT:  Two DVDs.  All right.  Well, go ahead

10    and hand them to Ms. Frank.  You want her to give them to

11    the witness, I take it.

12         MR. SIBERT:  Thank you.

13    BY MR. SIBERT:

14    Q.   And just to be very clear on the record, Your Honor,

15    the DVD does not have Exhibit 1 -- 1-A or 1-B, but those

16    were reviewed by this witness prior to him taking the

17    stand.

18         THE COURT:  1, 1-A and 1 -- oh, so now you're

19    adding 1-B?

20         MR. SIBERT:  Yes, sir.

21         THE COURT:  All right.  Well, okay, go ahead.

22         MR. SIBERT:  Thank you, Your Honor.

23    BY MR. SIBERT:

24    Q.   All right, sir, essentially you've been provided two

25    DVDs there.

Direct - Sears

1    A.   Yes.

2    Q.   Do you recognize those DVDs?

3    A.   Yes.

4    Q.   Okay.  And how do you recognize them?

5    A.   They appear to be the ones that I reviewed on the

6    19th.

7              THE COURT:  You need to speak into the mic, sir.

8              THE WITNESS:  They appear to be the ones I

9    reviewed on the 19th.

10             Sorry, Your Honor

11   BY MR. SIBERT:

12   Q.   What do you mean by "appear"?  How do you know that?

13   A.   I have -- there's a sticker on there with my signature

14   and the date.

15   Q.   And when did you sign and date that?

16   A.   The 13th of this month.  That would have been

17   Sunday.

18   Q.   All right.  Let me make it easy:  Did you do it before

19   or after watching the videos and hear the recordings?

20   A.   After.

21   Q.   All right.  And then do you recall sitting and

22   listening to further phone calls that were on my -- on the

23   Government's computer?

24   A.   Yes, sir.

25   Q.   And did you listen to all the clips of the phone

Direct - Sears

1    calls?

2    A.    I believe so, yes, sir.

3    Q.    Okay.  And the Government showed you those clips were

4    marked as Government Exhibit 2; is that correct?

5    A.    I don't remember that specific exhibit, sir, but --

6    Q.    All right.  Did you watch a video of you and some

7    undercover FBI agents at a warehouse?

8    A.    Yes, I did.

9    Q.    Okay.  And did that video truly and accurately reflect

10   what occurred on that day?

11   A.    Yes, it did.

12   Q.    And you were in that video?

13   A.    Indeed I was.

14   Q.    And also prior to going through these exhibits with

15   the Government on the 19th of January, these were also

16   provided to you ahead of time; is that right?

17   A.    Well, they attempted to provide them ahead of time.  A

18   lot of the files and clips that we were provided, some of

19   them were encrypted so we didn't really get to see them

20   all.

21   Q.    So you're testifying today you didn't get to see them

22   all?

23   A.    Some of them were encrypted, the disks that you sent

24   over to Mr. Bornstein, so we looked at them at your office.

25   Q.    Okay.  So the ones that you were having issues with,

Direct - Sears

1    we looked at my office?

2    A.   Yes, sir.

3    Q.   All right.  But you actually came to our office and

4    picked up the disks; is that right?

5    A.   Yes, I did.

6    Q.   And you took them to your lawyer's office?

7    A.   Yes, I did.

8    Q.   All right.  And you and your lawyer both stated that

9    you reviewed everything in addition to what you couldn't

10   see.

11   A.   That we could, yes, sir.

12   Q.   It's the foundation.

13          MR. SIBERT:  All right.  At this time, the

14   Government would like to move into evidence Government

15   Exhibit 2-A through F.

16          THE COURT:  All right.  Just so I understand what

17   we're doing here, 2-A through F, are those video files that

18   are on the DVD?

19          MR. SIBERT:  These were not -- yes, the clips were

20   on the DVDs.  Yes, sir.

21          THE COURT:  2-A through 2-F?

22          MR. SIBERT:  Right.

23          THE COURT:  So how will you divide -- how are you

24   going to separate out these files on the DVD?  I mean, how

25   is --

Direct - Sears

1           MR. SIBERT:  I don't understand --

2           THE COURT:  We have the exhibit lists where you

3    have a description of certain recordings.  I'm assuming

4    those are separate video files on the DVD.

5           MR. SIBERT:  That's correct.

6           THE COURT:  So we could -- let's just assume I

7    allowed this to be entered into evidence, we could go

8    directly into the DVD to that file that contains 2-A

9    through 2-F?

10          MR. SIBERT:  They are already uploaded onto the

11   computer, and they are already in the exhibit books on

12   disk, so if the jury wants to see them if they're admitted,

13   they're on the disk.

14          THE COURT:  All right.

15          MR. SIBERT:  So for the sake of flipping the disk

16   out, they've been uploaded.

17          THE COURT:  All right.  Now, let me ask Mr.

18   Goodreid, I'm assuming you've had an opportunity to review

19   these video files.

20          MR. GOODREID:  Yes, Your Honor, and I have a

21   number of objections if the Court would entertain.

22          THE COURT:  Okay.  Let's specifically just stay

23   2-A through 2-F.

24          MR. GOODREID:  That's my understanding, Your

25   Honor, we're talking about just Exhibit 2 -- I mean, all

Direct - Sears

1       the numbers we just talked about.

2                 THE COURT:  Right.

3                 MR. GOODREID:  Yes.  So, No. 1, I did not -- I

4       suppose this could be cleared up -- No. 1, I did not hear

5       this witness -- Mr. Sibert asked him if he had watched the

6       video.  I don't know that he ever linked that specifically

7       to Exhibit 2.  So that maybe can be clarified but he said

8       he watched video, he didn't say that's Exhibit 2-A, B, C,

9       D, E.  That's number 1.

10                No. 2, I also did not hear this witness say that

11      he reviewed the transcripts, that the transcripts matched

12      in fact what was on the video in his view.  That's No. 2.

13                THE COURT:  Now, the -- are we talking about the

14      captions?  Because we heard at the trial preparation

15      conference that one or more of these video files have

16      captioning in the file, itself.  Is that what --

17                MR. GOODREID:  I'm sorry, Your Honor, that is what

18      I mean, yes.  Yes.  The captioning.  I didn't hear him talk

19      about that in his view the caption accurately reflected

20      what was on the video.

21                THE COURT:  Okay.

22                MR. GOODREID:  And then, thirdly, as to that very

23      point, defense objects to the synced videos for this

24      reason.  It's one thing to have an audio or a video in a

25      transcript on the side that is an aid to what's on there;

Direct - Sears

1    however, at the point that it gets synced on there, that's

2    essentially telling the jury, "Here's what the people are

3    saying," as opposed to the real evidence is the audio or

4    the video that the jury, themselves, can decide what's on

5    there.

6         The point that it gets synced in there, that's

7    saying that's what they are saying; that may not be

8    accurate.  So we object to the synced video, as you call it

9    the -- Your Honor, you referred to it as the closed

10   captioning, we object to it being presented in that form.

11        THE COURT:  All right.  My understanding from the

12   trial preparation conference discussion was the captioning

13   was included because of the poor audio quality of these --

14   of this file and -- is that an accurate -- am I remembering

15   our discussion at the conference on this issue correctly?

16   Mr. Sibert?

17        MR. SIBERT:  Your Honor, my understanding is

18   that's correct.  And also I believe the fact that Mr. Guy

19   Jean-Pierre has a strong accent, that it would assist.  And

20   also goes to the weight.

21        THE COURT:  Okay.

22        MR. GOODREID:  Your Honor, may I respond on that?

23        THE COURT:  You may.

24        MR. GOODREID:  Well, Your Honor, the very fact

25   that the audio or -- I guess it's not video, the audio

Direct - Sears

1    quality is poor, or that the defendant can't be understood

2    goes to the heart of that objection.  It's like having a

3    painting that's blurry and then suddenly, you can't exactly

4    tell what it is, but then the Government has placed

5    language in there to say, "Oh, here's what this is a

6    picture of."

7         Same thing with the audio, "We can't really tell

8    what he's saying, but we'll tell you what he's saying."

9         I think that's impermissible.

10        THE COURT:  All right.  Do we have someone that

11   could testify as to listening to the audio and then

12   preparing the captioning as accurately as he or she could

13   and could testify that it's an -- the captioning is an

14   accurate captioning of the audio that's included in these

15   files?

16        MR. SIBERT:  I do have that.  And I can also maybe

17   ask this witness that question, since he actually listened

18   to them, and was also looking at the caption as the video

19   was playing.

20        THE COURT:  All right.  Okay.  Let's put that

21   aside for a moment.  Mr. Goodreid had a good point in terms

22   of tying this witness to his observation of the video

23   specifically as to Exhibit 2, which is the 2-A through 2-F.

24   I don't believe that you connected that.

25        What was your second objection?  I'm sorry.

Direct - Sears

1           MR. GOODREID:  Your Honor, my second objection was
2    that I didn't hear him say that the closed captioning,
3    based upon his review, matched what he actually saw or
4    heard in --
5           THE COURT:  Right.  Why don't you ask those
6    questions.
7           MR. SIBERT:  I can follow up.  And just so the
8    Court understands, and counsel also understands, Exhibits
9    1, 1-A, 1-B will be moved for admission, too.  We did not
10   plan to publish those to the jury because they're the whole
11   video.  Exhibits 2-A through 2-F are just clips of the
12   whole video.
13          THE COURT:  I understand.
14          MR. SIBERT:  Thank you.
15          THE COURT:  Why don't you ask the questions that
16   still remain to be asked with respect to the foundation.
17          MR. SIBERT:  Yes, sir.
18   BY MR. SIBERT:
19   Q.   Mr. Sears, now, back to the -- I have to ask you some
20   follow-on questions.  Now, you came into the United States
21   Attorney's Office this past Sunday; is that right?
22   A.   Yes, sir.
23   Q.   And who were you -- who was with you?
24   A.   My attorney, Mr. Peter Bornstein.
25   Q.   Okay.  And essentially what was the purpose of that

Direct - Sears

1    meeting?

2    A.   Pretrial prep, to look over some documents.

3    Q.   Okay.  And those were all the documents that you

4    signed and dated that we went through in the last two days?

5    A.   Most of them.  Some of them -- yeah.

6    Q.   Okay.

7    A.   Most.

8    Q.   And then also besides documents, what did you -- what

9    were you asked to do?

10   A.   Review video.

11   Q.   Okay.  And could you describe to the Court what this

12   video is.

13   A.   The video was of a -- a day down in Miami Beach with

14   regard to a meeting with Mr. Jean-Pierre and some

15   undercover agents --

16            THE COURT:  Can you speak into the mic, sir.

17            THE WITNESS:  I said it was a meeting that was

18   coordinated in Miami Beach, Florida, with myself, Mr.

19   Jean-Pierre, and some agents that worked for the federal

20   government.

21   BY MR. SIBERT:

22   Q.   All right.  And did you watch any other video?

23   A.   Yes, I did.

24   Q.   All right.  What was that video?

25   A.   That video was of an undercover agent that came into

                            Direct - Sears

1      4360 Vine Street one day.

2      Q.   Okay.

3      A.   I saw clips of it.

4      Q.   And that video was provided to you also as a whole; is

5      that correct?

6      A.   Yes, sir.

7      Q.   And did the clips meet what you watched in the whole

8      video?

9      A.   I watched so much.  I would imagine so.  I would guess

10     so, yeah.

11     Q.   Okay.  And did you get a chance to also see what we've

12     been calling the caption underneath --

13     A.   Yes, I did.

14     Q.   Okay.  And based upon you watching the video and

15     hearing yourself -- were you in that video?

16     A.   Yes, I was.

17     Q.   You were speaking in that video?

18     A.   Yes, I was.

19     Q.   And you were also speaking in the video in Miami; is

20     that right?

21     A.   Yes, I was.

22     Q.   And did the caption accurately reflect what you were

23     saying?

24     A.   To my recollection, yes.

25     Q.   And --

1           THE COURT:  What about what the other folks in the

2     video were saying?  I think we need to establish that.

3           MR. SIBERT:  Do you want me to ask the question

4     or --

5           THE COURT:  Yeah, I'm suggesting that's another

6     foundation question you need to ask.

7           MR. SIBERT:  All right.  Well . . .

8     BY MR. SIBERT:

9     Q.   And, sir, in that video -- let's talk about the video

10    at the warehouse.  Okay?

11    A.   Okay.

12    Q.   That was in the time frame of May 2014.

13    A.   Uhm-hum.

14    Q.   Is that right?

15    A.   Yes.

16    Q.   And you stated there was undercover agents; is that

17    right?

18    A.   Yes.  Yes, sir.

19    Q.   Did they speak in the video?

20    A.   Yes, they did.

21    Q.   And did the caption accurately reflect what they were

22    saying in the video?

23    A.   Yes.

24    Q.   And also there was Scott Dittman in that video; is

25    that correct?

Direct - Sears

1    A.   Yes, he was.

2    Q.   And did that caption reflect what Scott Dittman was

3    saying?

4    A.   Yes, sir.

5    Q.   Now, let's go down to the Miami video, okay?  Who

6    was -- well, let's do this.  Who was in the room of that

7    video?

8    A.   It was myself, another agent, and Mr. Guy Jean-Pierre.

9    Q.   Okay.  And there was an undercover agent in that room;

10   is that right?

11   A.   Yes, sir.

12   Q.   Did the video accurately reflect what that agent was

13   saying?

14   A.   It appeared to be, yes.

15   Q.   And the caption underneath?

16   A.   It appeared to be, yes.

17   Q.   And how about what you were saying?

18   A.   It appeared to be.

19   Q.   Okay.  And --

20   A.   I'm sorry, it was just a very difficult thing for me

21   to watch, so my attention was --

22   Q.   You have a personal interest.

23   A.   Yeah.

24   Q.   Brought back bad memories.

25   A.   Yeah.  And huge regrets, yeah.

327
Voir Dire - Sears

1    Q.   And then also you stated Mr. Guy Jean-Pierre was in
2    that video; is that right?
3    A.   Yes, he was.
4    Q.   And did that caption accurately reflect what the
5    defendant said?
6    A.   To the best of my memory.
7    Q.   All right.  So just dealing with Exhibits 1, which was
8    the full DVD, and the clips that deal with Exhibit 2 and
9    all the subparts, based upon your viewing, did the video
10   accurately reflect what occurred that day when it was
11   recorded?
12   A.   I'm sorry.
13   Q.   Did the video accurately -- did it show what occurred
14   on the day it was recorded?
15   A.   Yes.
16        MR. SIBERT:  Your Honor, I move the Government
17   Exhibits 1, 1-A, 1-B and 2-A through 2-F.
18        MR. GOODREID:  Your Honor, may I voir dire briefly
19   on this?
20        THE COURT:  All right, you may.
21                    VOIR DIRE EXAMINATION
22   BY MR. GOODREID:
23   Q.   Mr. Dittman, I want to ask you just specifically about
24   the --
25   A.   Mr. Sears, sir.

Voir Dire - Sears

1    Q.    Sorry.

2    A.    That's okay.

3    Q.    Beg your pardon.  Mr. Sears, I'm going to ask -- Mr.

4    Dittman is somebody entirely different.  You're entirely

5    right.

6          Mr. Sears, I want to ask you about just

7    specifically your viewing of the -- can we call it the

8    Miami undercover operation.  You know what I'm referring

9    to?

10   A.    Yes, sir.

11   Q.    And that would be the recordings and the videos of

12   your discussions with the FBI agents and also with Mr.

13   Jean-Pierre; is that right?

14   A.    Yes, sir.

15   Q.    Okay.  Now, you indicated that you went through these

16   videos and looked at the closed captioning as you were

17   listening and watching the videos, right?

18   A.    Yes, sir.

19   Q.    And you said that you thought they were generally

20   accurate, right?

21   A.    Yes, sir.

22   Q.    But you, yourself, did not prepare the closed

23   captionings, did you?

24   A.    No, sir.

25   Q.    And you also indicated in the testimony earlier today

Voir Dire - Sears

1    that Mr. Jean-Pierre is very difficult to understand; isn't
2    that right?
3    A.   Yes.
4    Q.   And so can you say conclusively, even though you
5    reviewed it, that the closed captioning accurately reflects
6    what Mr. Jean-Pierre was saying in those audios and videos,
7    even though he's very difficult to understand?
8    A.   I can't say word for word, sir.
9          MR. GOODREID:  Your Honor, in light of that, I
10   maintain my objection, at least, Your Honor -- let me
11   narrow the objection:  at least with respect to the Miami
12   undercover stuff.  I would withdraw my objection to the
13   other audio and video.
14          THE COURT:  All right.  This is what I'm going to
15   do:  I am going to overrule those objections.  These files
16   will be allowed to be played to the jury but I'm going to
17   instruct the jury as follows, both orally and then you'll
18   get a written instruction to this effect in the final set
19   of instructions.  And that is:  The evidence consists of
20   the video you're going to see and the audio you're going to
21   hear.  The captioning you should not consider as evidence.
22   To the extent what you hear is different from what is in
23   the caption, what you hear is the evidence and is what you
24   should give weight to and not what's in the caption.
25          All right?  And I will include that in the final

1    set of jury instructions.  With that instruction to the
2    jury, 2-A and 2-F are admitted into evidence and may be
3    published to the jury.
4         (Governement Exhibits 2-A through 2-F received)
5              ^ MR. SIBERT:  And that also includes Exhibits 1,
6    1-A and 1-B.  Those are the full audios and video.
7              THE COURT:  Mr. Goodreid?
8              MR. GOODREID:  Well, I just want to be clear here,
9    Your Honor.  My understanding of what Mr. Sibert said is
10   that Exhibits 2 -- meaning the whole series --
11             THE COURT:  Right.
12             MR. GOODREID:  -- is a subset of 1.  Is that
13   correct, Government counsel?
14             MR. SIBERT:  So to be clear, Exhibit 1 is just
15   audio.  Exhibits 1-A, 1-B because of the length of the
16   video and audio and the space, are the complete video and
17   audio into two disks.
18             THE COURT:  All right.  What is the relevance of
19   the entirety of the -- let me ask that question again.
20             I'm assuming you selected 2-A through 2-F, the
21   excerpts from the video files that is Exhibit 1, 1-A and
22   1-B because it's relevant to the examination of this
23   witness.  So what is the relevance of all the remainder of
24   that -- of that -- of those video files?
25             MR. SIBERT:  To prevent the defense from arguing

1    that we're hiding something from the jury.  If the jury

2    wants to go back and look, they can look at the whole

3    video.

4            THE COURT:  All right.  Well, it sounds like a

5    completeness argument.  We talked about this at the

6    pretrial -- at the trial preparation conference.  I'm going

7    to not allow 1, 1-A or 1-B into evidence based on that.  If

8    the defendant and his counsel believe for some reason 2-A

9    and 2-F have been cherrypicked in such a way that they want

10   other portions of those files to come into evidence, then

11   they can bring that to my attention and we can reconsider

12   it at that point, but I don't hear them making that

13   argument right now.

14           So that request, that is preliminarily, at least,

15   rejected, and we will stick with 2-A through 2-F.

16           MR. SIBERT:  Okay.  Thank you, Your Honor.

17           MR. GOODREID:  Your Honor, if I may, just while

18   we're on this.

19           THE COURT:  Yeah.

20           MR. GOODREID:  I mean, I will tell the Court right

21   now that our position is actually we agree with the

22   Government that 1 -- the 1s, shall we call them, that they

23   should come into evidence in the event that the jury, under

24   the rule of completeness, wants to have an expanded view of

25   what happened, they would have that opportunity to do so.

Direct - Sears

1          THE COURT:  All right.  Well, then that was not

2     what I understood what you -- I thought you were arguing

3     against the rest of this coming in and that you were not

4     agreeing with the completeness argument.

5          MR. GOODREID:  No, and if I -- if I was not clear

6     on that, Your Honor, I apologize.

7          THE COURT:  Okay.  So the defendant -- let's just

8     be clear.

9          MR. GOODREID:  Yeah.

10          THE COURT:  The defendant does take the position

11    that in order for the completeness of the -- of these

12    files, that it is in the interest of justice that the

13    complete video files come into evidence.

14          MR. GOODREID:  That is correct, Your Honor.

15          THE COURT:  All right.  Okay.  Well, then, there's

16    no -- that is another way of saying there's no objection to

17    that request, so Exhibits 1, and 1-A and 1-B are also

18    admitted into evidence and may be published to the jury.

19        (Government's Exhibits 1, 1-A and 1-B received)

20          MR. SIBERT:  Okay, thank you.

21          THE COURT:  All right.

22              DIRECT EXAMINATION (Continued)

23    BY MR. SIBERT:

24    Q.  All right, sir, I want to turn your attention now to

25    2014.  Particularly when the undercover agents came over to

Direct - Sears

1    your warehouse with FusionPharm.  Do you recall that day?

2    A.   Yes.

3    Q.   All right.  And could you describe to the jury

4    essentially what the role of the undercover agents were

5    making to you as a representative of FusionPharm.

6    A.   I wasn't a representative of FusionPharm.  I was not

7    even supposed to be there that day.  I don't -- I was just

8    asked to take somebody for a tour of the lettuce pod that

9    we had just gotten back up and running.

10   Q.   All right.  Well, how did you introduce yourself and

11   what were -- what did you begin talking about?

12   A.   I don't recall.

13   Q.   Don't worry, we'll watch it.

14   A.   Please.

15   Q.   All right.

16        Can I have clip 2-A published and played for the

17   jury.

18        THE COURT:  Now, do you want them to be putting on

19   their headphones?

20        MR. SIBERT:  Yes, thank you, Your Honor.  I

21   appreciate that.  I guess I need to put on my headphones,

22   too.  This is new.

23        THE COURT:  Do what you need to do.

24        MR. SIBERT:  Thank you.  So at this time, Your

25   Honor, I would ask for a break to make sure everyone's

Direct - Sears

1   headphones are working.  And if I can warn the parties,

2   anything that is said or moved or paper shuffled will be

3   picked up and it comes very loud in the headphones.

4           THE COURT:  Okay.  What do you mean take a break

5   to see if the headphones are working?

6           MR. SIBERT:  I don't want to take a break, I just

7   want to make sure everyone has headphones on.  And I think

8   maybe the Court as well.

9           THE COURT:  Okay.

10          MR. SIBERT:  Including the witness.

11          THE COURT:  Yes.  All right.

12          MR. SIBERT:  So -- but no music listening.

13          THE COURT:  All right.  So let's do this.

14  Let's -- let's -- why don't we play like 15 seconds and

15  stop and then I'll ask the members of the jury if they're

16  not hearing the audio on these files.

17          MR. SIBERT:  Okay.  And just a little instruction,

18  there's a power button on the side of the headphones.  You

19  hold it down, the light should turn green.  If it's not

20  green, press Power button again to cycle through the colors

21  until it is green.  So green means go.

22          THE COURT:  So hold down the power.

23          MR. SIBERT:  Right.  And it should turn green.

24          THE COURT:  The green light should come on?

25          MR. SIBERT:  The green light should come on.

Direct - Sears

1           COURTROOM DEPUTY:  It's on the right side of your
2      headphone, Your Honor.
3           MR. SIBERT:  You have the green light, Your Honor.
4      And then volume control is on the side of the headphones.
5           THE COURT:  Okay.  But where does the light come
6      on --
7           MR. SIBERT:  You have the light on.  I saw it from
8      here.
9           THE COURT:  Hold on.
10          MR. SIBERT:  I can't see it because the knob on
11     it.
12          THE COURT:  The power button is on one and, one --
13     okay.
14          THE WITNESS:  It's on the right side of your
15     headphone, sir.  Keep turning.  Keep turning.
16          THE COURT:  Where does the light come on?
17          THE WITNESS:  You just punched it.  You just
18     rotate it --
19          THE COURT:  Oh, okay, got it.  So do we have to
20     be holding down this power --
21          MR. SIBERT:  No, once the green light is on you've
22     got power for 35 hours.
23          THE COURT:  Okay.  Now I got a flashing blue
24     light.
25          MR. SIBERT:  Judge, you need some assistance?  I

Direct - Sears

1    will be happy to come up and help you.

2              THE COURT:  No.  No.

3              MR. SIBERT:  Just hit the power again.

4              THE COURT:  Okay.  Oh, there it goes.

5              MR. SIBERT:  You're good now.  Green is good.  All

6    right.

7              MR. SIBERT:  I'm trying not to date you, Your

8    Honor.  I'm trying my best here.

9              THE COURT:  Okay.

10             MR. SIBERT:  All right.  So does the court

11   reporter need one?

12             THE COURT:  No, she is not going to be

13   transcribing this.

14             MR. SIBERT:  Okay.  Thank you.  May I inquire to

15   the Court if the jury is good to go.

16             THE COURT:  Sorry, what?

17             MR. SIBERT:  May I inquire into the Court if the

18   jury is good to go?

19             THE COURT:  Does everybody have a green light on?

20   Okay.

21             Like I said, Mr. Sibert, let's do 15 seconds and

22   stop.

23        (Video played)

24             THE COURT:  Let's stop.  Whoa.  That's way too

25   loud, at least for me.  How do you reduce the volume?

1          MR. SIBERT:  So right where you have the power,
2    there's a volume to the left front.
3          THE COURT:  Okay.
4          MR. SIBERT:  It says volume minus, volume plus.
5          THE COURT:  So that -- anybody in the jury not --
6    did everybody hear the volume?  Anybody did not?
7          All right.  Go ahead.
8          MR. SIBERT:  Can I start backwards again?
9          THE COURT:  Sure.
10          MR. SIBERT:  Thank you.
11        (Video played)
12          MR. SIBERT:  That's the end of the first clip.
13          THE COURT:  Okay.
14          MR. SIBERT:  Okay.  So I'm just going to follow up
15    with some questions here.
16          THE COURT:  Okay.
17          MR. SIBERT:  Just for the Court's knowledge, this
18    will be kind of the routine.
19          THE COURT:  Okay.
20          MR. SIBERT:  Thank you.  I appreciate your
21    patience.
22          THE COURT:  And I think it would also help for the
23    record, like is that 2-A that we just heard?
24          MR. SIBERT:  I'm sorry, sir, that was 2-B.
25          THE COURT:  Okay.  Well, I'm glad I asked the

Direct - Sears

1   question.  You should -- you should state on the record --
2         MR. SIBERT:  I'm sorry, let me check.  I'm sorry.
3         It was 2-A, Your Honor.
4         THE COURT:  Okay.  You should state on the record
5   which sub-exhibit or -- yeah, sub, let's call it a
6   sub-exhibit, 2-A, which clip it was that we just saw before
7   you then ask questions -- about it.
8         MR. SIBERT:  Yes, sir.
9         THE COURT:  -- and it's clear for the record.
10        MR. SIBERT:  Yes, sir.  Thank you.
11        THE COURT:  All right.
12  BY MR. SIBERT:
13  Q.   Okay.  And as the Court just instructed, sir, we just
14  watched clip 2-A in the exhibit list.  Now I'd like to
15  follow along with some questions there.  Now you just
16  watched that video, correct?
17  A.   Yes, I did, sir.
18  Q.   Who was the blond gentleman with the gray
19  sweatshirt?
20  A.   That was my brother-in-law, Scott Dittman.
21  Q.   Okay.  And where did this video occur?
22  A.   43 -- no, that was 5850 -- I can't remember --
23  Commerce City.
24  Q.   Okay.  And could you describe the building that you
25  were --

Direct - Sears

1   A.   I was in the industrial warehouse.

2   Q.   That was the warehouse?

3   A.   Yeah.

4   Q.   And you came -- and where did you come out of when you

5   started speaking to the --

6   A.   The back of the warehouse.

7   Q.   Excuse me?

8   A.   Back of the warehouse.

9   Q.   Were you in an office?

10  A.   It was an office space, yeah.  Yeah.

11  Q.   And there was a female that was in the background on a

12  computer.  Do you know who that was?

13  A.   Uhm-hum.  Yes, that's my cousin, Amber.

14  Q.   Amber.  And what did Amber do?

15  A.   A little bit of everything.

16  Q.   She had an office?

17  A.   She had a desk.

18  Q.   Okay.  Well, was it -- was it in the open or was there

19  an office?

20  A.   It was an office space.

21  Q.   Okay.  Now, when you came out of the office, could you

22  describe to the jury what you were wearing there.

23  A.   I was wearing a PharmPods T-shirt, which was the brand

24  and the equipment that I had the exclusive rights to sell

25  for a couple of years.

Direct - Sears

1    Q.   Right.  Exclusive right to sell for who?

2    A.   FusionPharm.

3    Q.   And who was the CEO of FusionPharm?

4    A.   Scott Dittman, my brother-in-law.

5    Q.   Now, Mr. Dittman made a statement in there that you're

6    not around that often; is that right?

7    A.   That was correct at that time.

8    Q.   Okay.

9    A.   My licensing agreement was winding down and was --

10   expired sometime in April and I chose not to re-up.  I

11   couldn't afford it.  And the lettuce pod was put back on

12   line by the younger brother, Robert Dittman, so I was just

13   helping him set that back up.

14   Q.   Okay.  All right.  So then you were talking about some

15   investment or offshore accounts; is that right?

16   A.   No, not my offshore accounts.  I believe the

17   undercover agent brought something up about offshore and I

18   recognized some of the names that I'd read and knew about

19   from years gone by.

20   Q.   Okay.  Did the video help you refresh your memory

21   about who the undercover FBI agents were acting as?

22   A.   No, it didn't at that moment.

23   Q.   Okay.  All right.

24   A.   Probably investors -- I mean, probably investors, I

25   would imagine; somebody wanting to do something.

Direct - Sears

1    Q.   Okay.  Well, let me ask you a different question.

2    Would you speak to anyone that entered your office space?

3    A.   You have no idea how many people walked into that

4    office space.

5    Q.   Well, let me ask you a different question.  Who

6    brought those people into your office space?

7    A.   I don't recall.  I came out of the back, if you see

8    the video.  I don't know who brought them in.  Scott was in

9    the back, too, so I don't know how they got in there.

10   Q.   Your testimony was Scott Dittman was in the back?

11   A.   It seems from the video he was.  I mean, I don't know

12   where he came from in the video.  You guys are just

13   watching it as I did.

14   Q.   You came out of the back room, you would agree with me

15   on that?

16   A.   Yes, sir, absolutely.

17   Q.   And you would also -- well, what was your morning like

18   that morning after watching that video?

19   A.   I have no idea.  I don't remember.

20   Q.   You don't remember after watching that video?

21   A.   What, what my morning was like?

22   Q.   Yes.

23   A.   No, I don't remember what my morning was like.

24   Q.   You don't recall talking about all of the phone calls

25   you got?

Direct - Sears

1    A.   No, I don't.

2    Q.   After just watching that video.

3    A.   I didn't hear anything about all the phone calls I

4    got.  I didn't --

5    Q.   Do you need to watch it again?

6    A.   If you want to queue it up, please feel free.

7         I -- sorry, sir, I'm not being difficult, I

8    don't --

9         THE COURT:  No, you --

10        THE WITNESS:  I talk fast in general and I don't

11   listen to myself, so --

12        THE COURT:  You just testify to what you recall

13   and what you know.

14        THE WITNESS:  Let's rewind it.

15        MR. SIBERT:  All right.  At this time, Your Honor,

16   the Government would like to play Government's Exhibit 2-B,

17   which is the second clip for Exhibit 2.

18        THE COURT:  All right.

19      (Video played)

20        THE COURT:  Mr. Sibert, I did something and now

21   it's just flashing blue.

22        THE WITNESS:  Just hit the button again until you

23   see the green.  There you go.

24        MR. SIBERT:  I wish he was as easy with me as he

25   is with you.

Direct - Sears

1        THE COURT:  Okay.

2        THE WITNESS:  He's nice to me.

3   BY MR. SIBERT:

4   Q.   So -- all right.  So let's just talk about that video.

5   You got a clear understanding of that video?

6   A.   Absolutely.

7   Q.   Memory's good?

8   A.   Quite entertaining, yes, sir.

9   Q.   All right.  So you talked about -- you were talking

10  about some stocks and places to invest; would you agree

11  with me?

12  A.   Yes.  Yes.  He asked about offshore, so I was

13  answering his question, yes.

14  Q.   Okay.  And at the end of that video there, we kind of

15  see a checkered -- a gentleman wearing a checkered coat

16  with kind of slicked-back black hair?

17  A.   Yes.

18  Q.   Is that one of the undercover agents?

19  A.   That's the only guy, yeah, that I can remember.

20  Q.   Okay.  And so you talk about Boca.

21  A.   Yes, sir.

22  Q.   What do you mean by "Boca"?

23  A.   Boca Raton, Florida, sir.

24  Q.   Where is Mr. Guy Jean-Pierre's office located?

25  A.   Deerfield Beach, Florida.

                        Direct - Sears

1    Q.   Where?

2    A.   Deerfield Beach, Florida.

3    Q.   Okay.  And then your brother-in-law, Scott Dittman,

4    seems to be leaving there; is that correct?

5             MR. GOODREID:  Objection.  Leading.

6             THE COURT:  Sustained.

7    BY MR. SIBERT:

8    Q.   What's your brother-in-law doing in there?

9    A.   I don't recall.

10   Q.   You don't recall after watching that video?

11   A.   I didn't hear -- does anybody else hear what he said

12   he was doing that day?  He was going somewhere, obviously.

13   I don't recall.  He said later on that day he was going to

14   the airport, but not at that moment.

15   Q.   Okay.  Well, do you know why he was going to the

16   airport?

17   A.   To go home.

18   Q.   And where was his home?

19   A.   At that point was Pennsylvania.

20   Q.   Okay.  So the CEO for FusionPharm lived in

21   Pennsylvania?

22   A.   Yes.

23   Q.   Okay.  And, in fact, do you remember -- what did Mr.

24   Dittman ask you to do when he was leaving that day?

25   A.   I didn't hear that part, no.

1    Q.   Just missed it?

2    A.   Do you want to play it again?  I'll listen to it and

3    then I can answer your question and we can get on with

4    this.

5         MR. SIBERT:  Your Honor, I ask permission to play

6    again.

7         THE COURT:  Sure, go ahead.

8         THE WITNESS:  Walked them around, toured the back.

9    Anything --

10   BY MR. SIBERT:

11   Q.   Are you answering me?  Hold on --

12   A.   I'm trying to save time.  Walked him around.  Walked

13   the guy around, toured the back, something like that,

14   maybe.

15   Q.   Sir, let me explain something --

16   A.   Is that what I heard?

17   Q.   -- you're under oath --

18   A.   I'm trying to answer your question.

19   Q.   -- we're watching a video.

20        MR. GOODREID:  Your Honor, I object to counsel

21   instructing the witness.  I think it's supposed to be a Q

22   and A.

23        THE COURT:  Okay.  Everybody take a deep breath.

24   Don't talk over each other.  My court reporter can only

25   take one voice -- take down one voice at a time.

Direct - Sears

1          So you asked a question.  It was clear to me that
2    the witness didn't understand, or at least didn't remember
3    the part you were asking about.  You asked whether we can
4    replay it and I said yes, so let's replay it.  Or at least
5    the -- if you can chop it up and go to that portion --
6               MR. SIBERT:  I can't chop it up, Your Honor.
7               THE COURT:  Okay.  Well, then replay it.
8               THE WITNESS:  May I --
9               THE COURT:  No.  No question's pending, Mr. Sears.
10   Go ahead.
11              THE WITNESS:  Sorry.
12              MR. SIBERT:  Thank you, Your Honor.  Can we please
13   play for the record 2-B.
14          (Video played)
15   BY MR. SIBERT:
16   Q.   Okay.  For the record, 2-B was played for the second
17   time.
18          Did that refresh your memory?
19   A.   Your question was where was he going, correct?
20   Q.   Well --
21   A.   I didn't hear him say where he was going in that
22   particular clip.  He said something about what he had to do
23   on Friday, but you're asking me where he was going, why I
24   was there.  Am I correct in your question?
25   Q.   Did you know he was going to the airport?

                            Direct - Sears

1    A.   I was supposed to be taking him to the airport later,

2    but I wasn't leaving with him, therefore he wasn't going to

3    the airport at that time, correct.

4    Q.   Do you recall Scott Dittman saying he's trying to get

5    out of there in 35 minutes?

6    A.   I didn't hear that part.  But I heard him say I was

7    going to be taking him to the airport.

8                MR. SIBERT:  Your Honor, at this time, I would

9    ask that we treat this witness under the Rules of Evidence

10   615.

11               THE WITNESS:  Oh, my God, not again.

12               THE COURT:  Mr. Goodreid.

13               MR. GOODREID:  As the other day, I don't see any

14   basis for that.  I mean, my perception is this witness

15   is -- he's trying to do the best he can to answer the

16   questions.  I -- no disrespect to Government counsel, but

17   the questions are not always clear.  If he can't remember,

18   he can't remember.  I mean, I don't know that that makes

19   him hostile.  He has a cooperation agreement with the

20   Government as we have already talked about.  I don't think

21   he's established a basis to lead him under 615.

22               THE COURT:  I agree.  The request is denied.

23   BY MR. SIBERT:

24   Q.   What did Scott Dittman ask you to do there in the

25   video?

1    A.   Walk them around manufacturing.

2    Q.   Okay.  And where was manufacturing?

3    A.   In that warehouse and also across the street.  We had

4    two warehouses.

5    Q.   So was Mr. Scott Dittman going to stay on the

6    property?

7    A.   From what I could see in the video and my memory, he

8    was going somewhere in that moment, or had something to do.

9    I had to walk the gentlemen around myself.

10   Q.   Do you recall that he was buying a house?

11   A.   Yes, I do.

12   Q.   Okay.  And you stated he was buying a house in

13   Pennsylvania?

14   A.   Yes, sir.

15   Q.   So he can't stay in Colorado; would you agree with me?

16   A.   Yes, sir.

17   Q.   So essentially who left you in charge of showing these

18   gentlemen FusionPharm?

19   A.   Scott Dittman.

20        THE COURT:  Why don't we take a pause there, Mr.

21   Sibert.

22        Ladies and gentlemen of the jury, we're going to

23   take our morning recess.  We'll be in recess for 15

24   minutes.  (Jury left at 10:08 a.m.)

25        THE COURT:  Mr. Sears, you know the drill by now.

                            Direct - Sears

1            THE WITNESS:  Yes, sir.

2         (Recess taken 10:09 a.m. to 10:32 a.m.)

3            THE COURT:  Mr. Sears, you remain under oath.

4            And, Mr. Sibert, you may resume your examination.

5            MR. SIBERT:  Okay, thank you, Your Honor.  At this

6    time, the Government would like to play clip 2-C.

7         (Video played)

8    BY MR. SIBERT:

9    Q.   Okay, Mr. Sears, were you able to listen to that

10   video?

11   A.   Yes, sir.

12   Q.   All right.  So how many times did you mention Scott

13   Dittman, approximately, in that video?

14   A.   Two, three.  I don't know.  I didn't -- I wasn't

15   counting.  I don't know.

16   Q.   And you recall saying meatballs?

17   A.   Yes.

18   Q.   A couple of meatballs started this together?

19   A.   Yes.

20   Q.   Who's the meatballs?

21   A.   Scott -- I said that would be myself, Scott.

22   Q.   Okay.  And just to -- so to give a little

23   introduction, when you were outside walking across the

24   driveway there, what was the building you entered?

25   A.   Excuse me?

                    Direct - Sears

1    Q.    What was that building you entered?

2    A.    That was the warehouse across the street.

3    Q.    And then you recall about -- regarding a Rich.

4    A.    I didn't hear myself mention a Rich.

5    Q.    You didn't talk about a Rich?

6    A.    I didn't hear myself mention a Rich.  I'm sorry.

7    Q.    And so essentially now you gave a history there

8    about -- did you provide a history to the investigators?

9    A.    You could call it a history, I guess.

10   Q.    And you started from the beginning.

11   A.    I guess you could say that.

12   Q.    And so it's fair to say you were involved -- when

13   you -- you were involved from the start.

14            MR. GOODREID:  Objection.  Leading.

15            THE COURT:  Sustained.

16   BY MR. SIBERT:

17   Q.    When were you involved?

18   A.    At which part, sir?  It was a -- it was a -- if I can

19   finish -- it was a very constantly -- it was a living

20   business as it revolved, so, yes, I was involved in many

21   aspects of it from the start, yes.

22   Q.    How many times -- how many times did you say "we," do

23   you know on that video?

24   A.    I said "we" a lot and "we" probably would have been my

25   group of people that I was working with Meadpoint and the

Direct - Sears

1    PharmPods and also "we" working with the FusionPharm
2    subcontractors to help improve the technology of the
3    equipment that I had the licensing agreement to.
4    Q.   Sure.  And so you weren't referring to Scott when you
5    said "we" all the time?
6    A.   He would be in the group of people as in "we."  We had
7    engineers and other people, too.  Electricians and --
8    Q.   And you -- but you have seen in the video, how many
9    people did you have total?
10   A.   No, in the video I said it would be 12 max at that
11   time and --
12   Q.   So -- how many people total?
13   A.   He asked for employees, not subcontractors and
14   everything else.
15   Q.   Okay.  But employees at FusionPharm, 12 people total?
16   A.   That would be max at full bore, that's what
17   I believe --
18   Q.   Excuse me?
19   A.   That would be max at full bore.  I believe that's what
20   I said in the video.
21   Q.   All right.  So not a very large company.
22   A.   No.
23   Q.   Easy to know everyone?
24   A.   Absolutely.
25            MR. SIBERT:  Okay.  Can we play clip 2-D.

Direct - Sears

1          (Video played)

2     BY MR. SIBERT:

3     Q.   Okay, sir, you were able to view that video.  And this

4     was video 2-D.  Just have some follow-on questions for

5     that.

6          At one point, can you tell the jury what Scott

7     Dittman was showing those alleged investors from the FBI

8     before they came to the warehouse.

9     A.   Scott Dittman was showing them a piece of property

10    that was going to be an outside project, outside of

11    anything I was doing and he was doing.  It was a brand-new

12    project called Green Acres.  The concept, itself, was to

13    take the units that created a tremendous amount of heat,

14    put them with a thermal exchange unit, and attach a

15    greenhouse on top of it to bring down the costs -- the

16    heating costs.  You know, here in Colorado it gets cold and

17    the heat goes through the roof and that's a cost.  So using

18    a thermal exchange it would be much more efficient to be

19    able to, you know, grow.

20         That concept was to be for cannibas on one side

21    and also leafy greens and specialty microgreens and things

22    to that effect.

23         So that was going to be a separate public deal

24    that our old -- as you heard, our -- yeah.

25    Q.   Your deal.

353
Direct - Sears

1    A.    No, no.  As you saw on the video, it was Richard, Jim
2    Painter, Fred Lerer was going to be the CEO, myself was
3    going to be in it, Scott was going to be involved.  I don't
4    know what capacity he was.
5    Q.    And you mentioned the name Fred Lerer as the lawyer;
6    is that correct?
7    A.    Excuse me?
8    Q.    You mentioned the name Fred Lerer as the lawyer in
9    that video?
10   A.    Yes, he is.
11   Q.    So this is after -- this, again, happened in 2014 in
12   this video.
13   A.    That video you -- what was the date on it?
14   Q.    I'm asking:  Do you remember when the video was made?
15   A.    It was in 2014.
16   Q.    Okay.  And that was after Mr. Guy Jean-Pierre?
17   A.    Yes, sir.  Yes, sir.
18   Q.    So you no longer were working with Mr. Guy
19   Jean-Pierre?
20   A.    To the best of my knowledge, no.
21   Q.    If I recall correctly, it was because of the SEC
22   complaint?
23   A.    Yes.
24   Q.    Okay.  Now, you said in the video, the goal was to run
25   five revenues off one stream, or words to that effect.

Direct - Sears

A.   It's called ancillary income.  You have one business,
you don't want to just be relegated to one set of income.
If something goes wrong at least you have other forms of
income coming in so you can pay your bills because things
just happen in life and businesses.

Q.   And so you also talked about a professor.

A.   Yes, Nicholas Carrell.

Q.   Okay.  And you said you talked to the professor?

A.   Yes.

Q.   Where was this professor from?

A.   CU university, Nicholas Carrell.

Q.   And who went up and talked with this professor?

A.   I spoke with him.  I met him at -- Scott went up and
met with him at CU.  I met him at a football game where we
sat down and spoke for a little period of time.

Q.   And who sat down with him?

A.   I did.

Q.   Anyone else?

A.   No, just me.

Q.   So you and Scott talked to the same professor?

A.   Yes, we did.

Q.   Okay.  About this business.

A.   No.  Not about that business.  That was about a
robotic system that he wanted to put in my lettuce pods.
With Scott being the owner of the technology of course he

Direct - Sears

1    would have to sit with him.

2    Q.   And do you recall how many times you said "we" in that

3    video?

4    A.   I didn't count, sir.  I'm sure it would have been a

5    lot.

6    Q.   And you've mentioned that "We are going to rent

7    everything.  We are going to have a licensing agreements.

8    We're going to have a maintenance contract," and you went

9    on to say a couple more things.

10   A.   That goes with the ancillary income.

11   Q.   Who was the "we"?

12   A.   "We"?  The company that we were talking about, Mr.

13   Lerer, myself, Jim Painter, would be the mother company,

14   itself, that would be selling these units.  If somebody

15   wanted to come in, we would sell them -- once again, we,

16   the group there, would sell them the nutrients that they

17   needed, all the equipment that they needed, you name it,

18   soup to nuts.

19   Q.   So you --

20   A.   We provide everything one-stop shop, turnkey.

21   Q.   You called it ground floor?

22   A.   Excuse me?

23   Q.   You called it the ground floor.

24   A.   What did I call the ground floor, sir?

25   Q.   I'm asking you.  You mentioned this is on the ground

Direct - Sears

1   floor.

2   A.   I don't recall saying the "ground floor."  Maybe the

3   ground floor opportunity.  I don't know what you're

4   referring to.

5   Q.   Okay.  Do you recall investors saying they needed to

6   contact you about putting in capital?

7   A.   Yeah.  That would be for the new company that I was

8   describing.

9   Q.   Okay.  And that had nothing to do with Guy

10  Jean-Pierre.

11  A.   No, sir, it didn't.

12  Q.   Okay.  Now, you went back and you said, "We've been

13  hungry.  We know the business.  We've been there from the

14  beginning."  So not about the new company, what company are

15  you talking about there?

16  A.   Myself, Scott.  That company, individuals.  Because it

17  was a company, I would say --

18  Q.   And then finally, the undercover asked you, "We are

19  talking to the guy that runs the show here."

20          And what was your response?

21  A.   I said "No."  I said, "Let's" -- and then --

22  Q.   The follow-on was "50-50" --

23  A.   And I said no.

24  Q.   -- what was your response?

25  A.   I said "I'm the hand up Mona Lisa's skirt, let's put

Direct - Sears

1    it that way," and I laughed.

2    Q.   Okay.

3    A.   Would you like to know the relevance of that?

4    Q.   No.

5    A.   Oh, okay.  Just make something up.

6    Q.   Was -- just going back to this new -- going back to

7    this new company, I believe you called it Green Acres.

8    A.   Yeah, that was the concept name.  It wasn't an

9    official name.

10   Q.   Okay.  Were they going to use PharmPods, FusionPharm

11   pods?

12   A.   Yeah.  The concept was based on the container model.

13   Q.   So the pods would come from FusionPharm?

14   A.   Probably, yeah.  Through a licensing agreement of some

15   sort.

16          MR. SIBERT:  Okay.  At this time, the Government

17   would like to play 2-E.

18          (Video played)

19          MR. SIBERT:  For the record, that was 2-E.

20   BY MR. SIBERT:

21   Q.   Now, sir, you made a statement there regarding stock

22   and company.  What did you mean by "the day that the stock

23   takes care of the company you have bigger problems"?

24   A.   What I meant was -- prior to that I also -- he talked

25   about -- or I talked about campaigns and public relations,

Direct - Sears

1   a lot of small cap companies in the OTC bulletin board, put

2   out a tremendous amount of press releases and we call that

3   fluff.  They will put out two, three press releases a week

4   to try to hype their stock to get out of their paper.

5          We didn't have that situation, so when you have to

6   sell your stock and actively pump your stock and advertise

7   it, you don't really have much there.  If you take care of

8   your company and you do your business, your stock will take

9   care of itself because the earnings will drive it.

10  Q.   Okay.  Well, you testified previously the fact that

11  when you sold the Meadpoint note, which was stock in

12  FusionPharm --

13  A.   Yes.

14  Q.   -- you put that money back into FusionPharm.

15  A.   No, I put that money into Meadpoint by buying

16  equipment from FusionPharm.  If the money would have been

17  put into FusionPharm directly, that would have been a

18  problem.

19  Q.   And you also say you never put out press releases; is

20  that right?

21  A.   No, there were -- press releases were put out.  The

22  company did put out press releases.  But I think they put

23  14 out in a period of -- how many years?  Four?  Meanwhile,

24  people put 14 out a month.

25  Q.   So what you told the alleged investors in here wasn't

Direct - Sears

1    correct.

2    A.    Excuse me?

3    Q.    What you told the FBI agents in this video was not

4    correct; in fact --

5    A.    In which respect?

6    Q.    That there was no press releases.

7    A.    In regard to the campaigning.  You're taking it out of

8    context.  He's talking about -- he's from New York and he's

9    a player, he's a hedge fund guy and it's an OTC bulletin

10   board stock where people put out, you know -- I don't know

11   if you guys are familiar with that industry -- they put out

12   press releases every other day for whatever reason.

13            So, you know, relevant to the conversation, no, we

14   don't put out press releases, you know.  Nobody -- there

15   was none of that unless it was relevant.

16            MR. SIBERT:  Okay.  Can I play Government Exhibit

17   2-F.

18        (Video played)

19   BY MR. SIBERT:

20   Q.    How much time did you spend at FusionPharm?

21   A.    FusionPharm, Meadpoint, VertiFresh -- you know,

22   FusionPharm owned the technology, you can't just say

23   FusionPharm.

24   Q.    My question is:  How much time did --

25   A.    De minimis time at FusionPharm.  I spent a lot of time

Direct - Sears

1    with Meadpoint and VertiFresh, which were the companies

2    that I was working with and for.

3    Q.   Well --

4    A.   For the relevant period, sir.

5    Q.   You stated in the video seven days a week, 12

6    hours --

7    A.   That's right.  Selling farm pods that I had the right

8    to sell through a licensing agreement through Meadpoint

9    Venture Partners?

10   Q.   With your brother-in-law?

11   A.   My brother-in-law, yes.  He did own the technology.

12             MR. SIBERT:  All right.  Your Honor, at this time,

13   the Government's going to move to admit further exhibits

14   that were -- the foundation was laid, and I believe -- I

15   might be mistaken, but the objections from defense, at

16   least regarding my --

17             THE COURT:  I didn't understand what you --

18             MR. SIBERT:  Let me just go through the exhibits

19   that we're going to introduce.  Government Exhibits 320-A

20   through 320-M.  In addition, 322-A through 322-R.

21             THE COURT:  Are these stipulated?

22             MR. SIBERT:  They are not stipulated.

23             THE COURT:  All right.

24             MR. SIBERT:  But I believe I laid the foundation

25   before, so I'm asking them now.

Direct - Sears

1        THE COURT:  I'm not understanding what you're

2   trying to do.

3        MR. SIBERT:  I'm asking to admit the evidence.

4        THE COURT:  Hold on.  320 and 322, yes, those were

5   among the 12 or so exhibits you informed me in advance that

6   you were going to move into evidence, and then we went to

7   Exhibit 2 with all these video clips, and we admitted 1 and

8   1-A and 1-B.  Now we're back to 320 and 322.  But I don't

9   recall you laying -- even discussing these exhibits or

10   laying any kind of foundation.

11        MR. SIBERT:  All right.  Let me refresh the

12   witness.

13   BY MR. SIBERT:

14   Q.   Sir, were you involved with an undercover operation in

15   2016?

16   A.   Yes, I was.

17   Q.   And what was your role in that undercover operation?

18   A.   To work with the federal government to bring back a --

19   an individual from the Dominican Republic.

20   Q.   And who was the individual?

21   A.   Mr. Guy Jean-Pierre.

22   Q.   Okay.  And what was essentially the plan regarding

23   that operation?

24   A.   The plan was to set up a company and have him put

25   together all the documentation that would be required to

362

Direct - Sears

1    put some notes together and get -- fast-track the company

2    to the markets.

3    Q.   I'm sorry, I missed your answer.  I couldn't hear over

4    the cough.

5    A.   I apologize.  I said the -- the -- his -- his role was

6    to prepare all the paperwork for the company for some

7    insiders, to be able to fast-track it on to the marketplace

8    to liquidate securities.

9    Q.   Okay.  And was this going to be a real company *per se*?

10   A.   No.

11   Q.   What was it going to be?

12   A.   If you could elaborate.  It was an operation.  It

13   wasn't going to be a real company.

14   Q.   Okay.

15   A.   I don't know what you're asking me.

16   Q.   Was the owner of the company -- the true owner of the

17   company going to be disclosed in this operation?

18   A.   No.

19   Q.   Who was going to be the owner?

20   A.   An individual that the undercover agent was going to

21   put in, a friend of his or something like that, if I

22   remember correctly.

23   Q.   Does the name Phil Morgan remind --

24   A.   Morgan, yes.

25   Q.   What does Mr. Phil Morgan know about the company?

Direct - Sears

1    A.   Not too much.  He was going to be a figurehead, so to

2    speak.

3    Q.   Okay.  Who was actually going to control the company?

4    A.   E.J. -- well, there's one agent, E.J., and myself.

5    Q.   Okay.  And what was the company going to be called?

6    A.   The -- you guys chose it to be VertiFresh.

7    Q.   When you say "you guys," who?

8    A.   United States Government, Agent Funk, and the other

9    agents.

10   Q.   So law enforcement agents doing the investigation?

11   A.   Yes, sir.

12   Q.   Not myself.

13   A.   Not you.

14   Q.   All right.  Or not any other prior Assistant United

15   States Attorney?

16   A.   Mr. Harmon was involved in it, yeah.  He knew all

17   about it.

18   Q.   Okay.  Good.  So now essentially were you going to be

19   disclosed owners in this company --

20   A.   No.

21   Q.   -- you and E.J.?

22   A.   No.  That was the objective was to not -- have us not

23   be disclosed.

24   Q.   Okay.  What was the purpose for you not to be

25   disclosed?

Direct - Sears

1    A.    Because we -- if I remember correctly, we said we had

2    bumps in the road and didn't want the press and wanted to

3    be able to -- yeah, wanted to be able to liquidate

4    securities and make money.

5    Q.    What did you mean by "bumps in the road"?

6    A.    Investigations, convictions, press.

7    Q.    What types of convictions?

8    A.    Any type of conviction.

9    Q.    And who was going to assist you with the paperwork in

10   this?

11   A.    Mr. Guy Jean-Pierre.

12   Q.    Okay.  And did Mr. Guy Jean-Pierre assist you with

13   this paperwork?

14   A.    Yes, he did.

15   Q.    Okay.  What did he do?

16   A.    He put together templates for all the documents that I

17   was asked to have him procure.

18   Q.    Do you recall some of the templates you asked Mr. Guy

19   Jean-Pierre to put together?

20   A.    It would have been in notes, purchase agreements --

21   wait a second.  Probably some regulatory paperwork for --

22   templates, mostly templates.  They would be boilerplate

23   templates because it was a timing issue.

24   Q.    How about legal opinion letters?

25   A.    Yes, sir.  Yeah, legal opinion letter templates.

365

Direct - Sears

1    Q.   Okay.  Now you talked about notes.  What type of note
2    was going to be set up in this operation?
3    A.   It was going to be an -- it was set up -- the
4    Government wanted me to establish that there was a
5    handshake deal done that needed to be authenticated and --
6    yeah.  It was a hand -- it was a -- it was a cash deal note
7    that I had supposedly taken and that I wanted to be able to
8    put -- the agent, who was the owner, wanted to be able to
9    put that on the books as real debt to be able to get stock.
10   Q.   And so basically falsify the debt?
11   A.   Yes.
12   Q.   In order to be able to sell the stock.
13   A.   Yes.  That was the objective of the operation.
14   Q.   All right.  And you mentioned "note."  Was this note
15   convertible or nonconvertible?
16   A.   It wasn't a note, it was a cash payment that went from
17   one hand to the other, and the Government wanted it to be
18   structured in that way.
19   Q.   Okay.  And how were you going to get paid back?
20   A.   Cash.
21   Q.   And were you going to get any stock equity?
22   A.   Yes, but it wasn't going to be in anybody's name
23   directly.
24   Q.   Why is that?
25   A.   Because the Government said that's the way they wanted

Direct - Sears

1   it.

2   Q.   Okay.  And then so did Mr. Guy Jean-Pierre know

3   about -- about this cash deal that you just discussed?

4            MR. GOODREID:  Objection.  Calls for speculation.

5            THE COURT:  If you know.

6            THE WITNESS:  Yes.

7   BY MR. SIBERT:

8   Q.   In fact, do you recall discussing a holding period?

9   A.   Yes, I do.

10  Q.   Okay.  And do you recall talking about deposits that

11  you had to show proof of?

12  A.   No, that one I don't.  I don't.  It would -- probably

13  it would have come up in the course of a conversation, but

14  I don't remember it exactly.

15           THE COURT:  Who are we talking about in terms of a

16  conversation?  Between the witness and who else?

17           MR. SIBERT:  I was asking him if he recalled

18  deposits.  Cash deposits.

19           THE COURT:  You asked him:  Do you recall

20  discussing a holding period.  With whom does that question

21  reference?

22           MR. SIBERT:  I was referencing him if he

23  regarded -- remembering talking about a holding --

24           THE COURT:  Talking about with whom?

25           MR. SIBERT:  Well, the defendant.

1          THE COURT:  Talking to himself?  Or --
2          MR. SIBERT:  No, the witness and defendant talking
3     together.
4          THE COURT:  Okay.  All right.  Well, I think that
5     was missing in your question.
6     BY MR. SIBERT:
7     Q.   Okay.  Well, I guess -- I guess my question should
8     have been:  Do you remember a discussion regarding a
9     holding period?
10    A.   Vaguely, yes.
11    Q.   And who were you having that discussion with?
12    A.   Mr. Jean-Pierre and the FBI agent.
13    Q.   And do you recall how long the holding period had to
14    be?
15    A.   I don't recall.  I can speculate that any holding
16    period is going to be six months to a year on a company.
17    Q.   And why do you say six months to a year?
18    A.   Six months if you're -- it's six months if you're a
19    12G fully reporting company.  However, if you're a
20    lower-tiered company on the OTC bulletin it is only one
21    year.
22    Q.   All right.  And do you recall what kind of company
23    this was going to be?
24    A.   Brand-new company.
25    Q.   Was it going to be a --

Direct - Sears

1    A.    No, hold on.  Sorry.  It was going to be a shell
2    company.
3    Q.    What do you mean by "shell"?
4    A.    Shell company would be a publicly traded company to
5    where its core business failed.  Technically it could still
6    trade on the exchange even though it has no business
7    whatsoever because traders just keep making the markets to
8    make pennies, and they make a lot of money doing it,
9    actually.  So that's what they call a shell company.
10   Q.    Is that considered lower tier?
11   A.    Yes, that's -- yes, sir, that -- yes.  Very low.
12   Q.    So the holding period would have to be a year?
13   A.    Yes.  Unless it did a registration statement, then it
14   could be immediate.  You do a registration period, there
15   isn't a holding period, your stock is free right out of the
16   gate.  Or if you're minimum of a 12G reporting company,
17   then it's six months.
18   Q.    Do you know how much a registration statement is?
19   A.    It depends on the lawyer.  They can go for 150 grand
20   and they can go for 25 grand.
21   Q.    So expensive?
22   A.    Relatively.  I think the accounting is probably the
23   worst part of it.
24   Q.    All right.  And so you talked about -- did Mr. Guy
25   Jean-Pierre know that this company was going to be a shell

Direct - Sears

1    company?

2    A.   Yes, sir.

3    Q.   And did he know that Phil Morgan was going to be just

4    acting as a disclosed owner?

5    A.   Yes, sir.

6    Q.   Did he know if Mr. Phil Morgan would have any roles --

7    role to play in this or any roles within the company?

8    A.   I'm not really understanding your question to answer

9    properly.  He understood that he didn't have any day-to-day

10   duties.  Mr. Morgan was going to be a figurehead, sir.

11   Q.   So Mr. Guy Jean-Pierre understood that Phil Morgan was

12   a name?

13   A.   Yes, sir.

14           MR. GOODREID:  Your Honor, I'm going to launch a

15   continuing objection to the witness testifying as to what

16   Mr. Jean-Pierre knew unless an adequate foundation is

17   established.

18           THE COURT:  I agree with that objection.  And also

19   watch the leading form of the questions.

20   BY MR. SIBERT:

21   Q.   Who did you -- well, who did you discuss the setup of

22   this company with?

23   A.   The seller company?

24   Q.   The setup.

25   A.   Oh, the setup.  Specifically?  The Government, Mr.

Direct - Sears

1    Jean-Pierre.

2    Q.   Okay.  And when you said "the Government," who do you

3    mean by that?

4    A.   Numerous FBI agents; Mr. Harmon, the old AUSA.

5    Q.   How about E.J.?

6    A.   E.J.  He would be one of the Government agents.

7    Q.   In fact there was a meeting in Miami, correct?

8    A.   Yes, sir, there was.

9    Q.   Was that meeting recorded?

10   A.   Yes, it was, sir.

11   Q.   Okay.  And before that meeting, did you have other

12   meetings with Mr. Guy Jean-Pierre?

13   A.   Yes, I did, sir.

14   Q.   Okay.  And during those meetings, did you wear a wire?

15   A.   Yes, I did, sir.

16   Q.   Okay.  Were those meetings recorded?

17   A.   Yes, they were.

18   Q.   And before those meetings, you did a lot of phone

19   calls; is that correct?

20   A.   Yes, I did, sir.

21   Q.   Okay.  And were those phone calls recorded?

22   A.   Yes, they were.

23   Q.   Okay.  In addition to those phone calls and the

24   recordings and the wire, did you go ahead and do e-mails?

25   A.   Yes, I did, sir.

Direct - Sears

1    Q.   Okay.  And -- all right, I shouldn't say e-mails.  I'm
2    sorry.  Skype messages.
3    A.   As part of the sting?
4    Q.   As part of the undercover.
5    A.   I don't think I did a Skype message with him.
6    Q.   Okay.  How about Google?
7    A.   As an e-mail?
8    Q.   Right.
9    A.   Google.  Yes, e-mail.  There were e-mail messages that
10   had gone back and forth.
11   Q.   And I'm not very techno -- some form of an electronic
12   communication?
13   A.   There would have been e-mails, yes.  Gmail.  The
14   Government had me set up a specific gmail account for -- to
15   send communications.
16   Q.   Okay.  And where was Mr. Guy Jean-Pierre located when
17   you were conducting the phone calls?
18   A.   Dominican Republic.
19   Q.   And you were speaking directly with him?
20   A.   Yes, sir.
21   Q.   And how do you know he was in the Dominican Republic?
22   A.   On the telephone, the reception was horrendous, and I
23   dialed a Dominican Republic number.
24   Q.   And so essentially the phone call part -- the phone
25   calls was essentially one of the first parts of this

Direct - Sears

1    undercover investigation?

2    A.    Yes, sir.

3    Q.    All right.  Now was there anything else besides

4    setting up the shell company regarding laundering of money?

5    A.    Yes.

6    Q.    Okay.  And what did that involve?

7    A.    It involved setting up a -- an account in the

8    Dominican Republic so I could hold money offshore.

9    Q.    So you could hold money offshore?

10   A.    If I remember correctly, that's what they wanted me to

11   do.

12   Q.    Okay.  And why were you looking to hold money offshore

13   based upon this operation?

14   A.    Because I don't trust the Government.

15   Q.    All right.  Did Mr. Guy Jean-Pierre know that you were

16   still under investigation?

17   A.    Absolutely.

18   Q.    Okay.  Did you ever tell Mr. Guy Jean-Pierre why you

19   were going to send him money in the Dominican Republic?

20   A.    Yes.

21   Q.    And what did you say?

22   A.    I was -- this was going to be part of a consulting

23   agreement that we were going to get for setting this whole

24   thing up.

25   Q.    Okay.  So you weren't looking to hide money?

Direct - Sears

A.   Well, there's two facets to this.  There was the
consulting agreement money that was going in there and
there was money that -- as I said before, I was looking to
put money offshore.

Q.   Where were you allegedly -- where did you allegedly
get this money to put offshore?

A.   It's -- the Government wanted me to tell him that the
money was put -- was made from Bayside Realty Holdings and
was money that the Government didn't see, and I was holding
it in a friend's account and he was starting to get
aggravation from his wife so he had to get it out of the
account so I wanted to put the money offshore.

Q.   Okay.  And so if I understood you correctly, you said
it was money that the Government was looking to seize?

A.   Yes.

Q.   Okay.  And why did you have it in a friend's account?

A.   I don't remember what the story was they told me to
say.

Q.   Okay.  And essentially did you talk to Mr. Guy
Jean-Pierre about sending this money to him in the
Dominican Republic?

A.   Yes, sir.

Q.   And what was Mr. Jean-Pierre's response?

A.   He would go ahead and try to set something up.

Q.   Okay.  Was he going to get paid a fee for this?

Direct - Sears

1   A.   Yes, sir.

2   Q.   How much?

3   A.   I don't remember the exact amount, but it was a

4   percentage, I believe.  I could be wrong.

5   Q.   All right.  So I want to go back.  So essentially this

6   undercover operation began with a bunch of recorded phone

7   calls.

8   A.   Yes, sir.

9   Q.   Okay.  And who were those calls between?

10  A.   Myself and Mr. Jean-Pierre.

11  Q.   And have you had an opportunity to review these

12  recorded phone calls?

13  A.   Yes, I have.

14  Q.   And have you had an opportunity to review the clips of

15  these phone calls?

16  A.   Yes, I have.

17  Q.   And do the clips correctly reflect what was on the

18  whole phone call?

19  A.   Yes, sir.

20  Q.   And you recognized your voice on that phone call?

21  A.   I did.

22  Q.   Okay.  Who else did you recognize?

23  A.   Mr. Jean-Pierre.

24       MR. SIBERT:  Your Honor, at this point, the

25  Government would like to move into evidence Government

Direct - Sears

1    Exhibit 320-A through M, and 322-A through R.

2              THE COURT:  All right.  Just so the record is

3    clear, I'm looking from the Government's exhibit list, 320

4    are whole -- are recordings of phone calls; is that

5    correct?

6              MR. SIBERT:  That's correct, Your Honor.

7              THE COURT:  And then 322 are recordings of phone

8    calls with a synced audio and transcript.

9              MR. SIBERT:  That's correct, Your Honor.

10             THE COURT:  So 320 does not have captions; is that

11   correct?

12             MR. SIBERT:  No, sir.

13             THE COURT:  That's not correct or it is correct?

14             MR. SIBERT:  I'm sorry.  I thought you asked if

15   they do not have captions.  320 does not have captions.

16             THE COURT:  Okay.  All right.  Just -- just so we

17   understand what we're dealing with.

18             All right.  Is there an objection to either 320-A

19   through M or 322-A through R?

20             MR. GOODREID:  Your Honor, I realize this is

21   unusual.  May I inquire of Government counsel with respect

22   to 320 if these are excerpts or are these the entirety of

23   the calls?

24             MR. SIBERT:  320 will be the entire -- the whole

25   calls.

376

Voir Dire - Sears

1          MR. GOODREID:  Okay.  Your Honor, may I have just

2     a moment, Your Honor?

3          THE COURT:  You may.

4          MR. GOODREID:  Your Honor, the defense has -- the

5     defense has stalled, Your Honor.

6          Your Honor, with respect to 320, the defense does

7     not have any objection.

8          THE COURT:  All right.

9          MR. GOODREID:  And with respect to 322, I might

10    wonder -- I wonder if I might voir dire on this.

11         THE COURT:  You may.

12                    VOIR DIRE EXAMINATION

13    BY MR. GOODREID:

14    Q.   Mr. Sears, with respect to the exhibits marked 322 --

15    and again these are synced exhibits, closed caption, if you

16    will, do you know what I mean?

17    A.   Yes, sir.

18    Q.   Okay.  When you did a review, did you also have

19    occasion to review whether the syncing accurately matched

20    up with what you were hearing and seeing?

21    A.   I can't honestly say I paid attention to that, sir.

22         MR. GOODREID:  Based on that response, Your Honor,

23    as well as my general objection that I stated earlier in

24    response to the other exhibits with the syncing, we will

25    object to the admission of 322.

Direct - Sears

1        THE COURT:  All right.  With respect to Exhibit

2   320-A through M, there being no objection, that exhibit is

3   admitted into evidence and may be published to the jury.

4        I'm going to overrule the objection to 322-A

5   through R.  That exhibit is also admitted into evidence and

6   may be published to the jury.

7        And as I did before, ladies and gentlemen of the

8   jury, I'm instructing you that the evidence in 322 is the

9   audio conversation, not the synced captioning.  To the

10   extent the captioning does not accurately, in your view,

11   correspond to what you're hearing in the audiotape, the --

12   your view of what the conversations consist of is to

13   prevail and that is the evidence.

14        All right.  With that caveat, those two exhibits

15   are admitted.

16        (Government's Exhibits 320-A through M and 322-A

17   through 322-R received)

18        MR. SIBERT:  Thank you, Your Honor.

19                DIRECT EXAMINATION (Continued)

20   BY MR. SIBERT:

21   Q.   Okay, sir, what we did before, except this is just

22   going to be audio.  I would ask you to listen for each clip

23   and I might have some follow-on questions, okay?

24   A.   No problem.

25        MR. SIBERT:  All right.  Can we please play

Direct - Sears

1    Government Exhibit 322-A, starting at 8 minutes and 30
2    seconds.
3         (Audio played)
4    BY MR. SIBERT:
5    Q.   Did you listen to that clip there, sir?
6    A.   Yes.  Yes, I did.
7    Q.   Okay.  And who are you talking to in that audio?
8    A.   Mr. Guy Jean-Pierre.
9    Q.   Okay.  And what were you talking to him about?
10   A.   The weather at that point.
11   Q.   Okay.  And where were you talking about the weather?
12   A.   In the Dominican Republic, as I understood it.
13   Q.   All right.  And I just want to reach back.  Before
14   this operation started, who -- who was the person -- why
15   did you come to -- let me ask you this question:  How did
16   this operation begin, this undercover?
17   A.   I don't recall.  What do you mean by "how did it
18   begin"?  That sounds like that was the very first phone
19   call.
20   Q.   No, I guess -- let me back up.  Did you go to law
21   enforcement or did law enforcement come to you regarding
22   doing the undercover operation?
23   A.   I would think, if I remember -- if my memory serves me
24   correctly, I believe my lawyer was there, DOJ, which was
25   Mr. Harmon, Agent Funk, and a couple of others.  And I

Direct - Sears

1    believe Mr. Harmon's the one that mentioned something about

2    Guy Jean-Pierre and about how -- "Well, he's not here to

3    defend himself or whatever," and I said, "What if he was?"

4          And I think that was the genesis of it.

5    Q.   Was Mr. Guy Jean-Pierre looking for work -- securities

6    work?

7          MR. GOODREID:  Objection.  Calls for speculation.

8    BY MR. SIBERT:

9    Q.   If you know.

10          THE COURT:  If you know.

11          THE WITNESS:  He was looking for work in

12    general.

13    BY MR. SIBERT:

14    Q.   How do you know that?

15    A.   Because I was in communication with him.

16    Q.   And so were you reaching out to Guy Jean-Pierre about

17    further securities work or was Guy Jean-Pierre reaching out

18    to you?

19    A.   I was keeping Mr. Jean-Pierre in my loop because of

20    the situation that had happened.  So I would, from time to

21    time, call him talking about securities work or any kind of

22    work just so I could keep in touch to know where he was in

23    case I needed him.

24    Q.   And so did you -- were you paying him at this time?

25    A.   I don't recall.  I might have loaned him some money,

Direct - Sears

1    but I don't -- I don't think so.  I don't think so.  I

2    don't think I had paid him in quite some time.  If it was,

3    it was would have just been a couple of hundred dollars

4    maybe once or twice, but I don't think so at that point.

5    Q.   So based upon your conversations with the defendant,

6    did you know his economic -- condition?

7    A.   Yes.

8    Q.   -- at the time?

9    A.   Yes.

10   Q.   What was that?

11   A.   He was not in very good financial shape.

12   Q.   Okay.  So is it fair to say he was looking for work?

13   A.   Yes, sir.

14         MR. SIBERT:  Okay.  I'm going to have to ask

15   Government Exhibit -- excuse me, Government Exhibit 322-B

16   played and, again, starting at 8:30.

17         (Audio played)

18   BY MR. SIBERT:

19   Q.   Okay.  Were you able to hear that whole deal?

20   A.   Yes, sir.

21   Q.   All right.  I just want to cover a couple of pieces

22   about that.  Do you recall where Mr. Guy Jean-Pierre is

23   speaking about Mr. Tod DiTommaso?

24   A.   Yes, sir.

25   Q.   And what did you learn about Mr. Tod DiTommaso from

Direct - Sears

1    Mr. Guy Jean-Pierre?

2    A.   He was agitated and incommunicado.

3    Q.   And why was that?

4    A.   Because the SEC was investigating him and giving him a

5    hard time about his business.

6    Q.   Okay.  And do you recall why the SEC was investigating

7    him?

8    A.   Because of the FusionPharm debacle.

9    Q.   Okay.  Now later on in that audio, you make a

10   statement to Mr. Guy Jean-Pierre, "Like we did at

11   FusionPharm."

12   A.   You mean the one that was scripted by the FBI?  Now I

13   know why you did what you did with that.

14   Q.   Oh, are you upset at me?

15   A.   I'm very upset at you.

16   Q.   All right.  Well --

17           THE COURT:  Let's stop the commentary.  Let's

18   stick to questions and answers.

19   BY MR. SIBERT:

20   Q.   Okay.  Well, you stated the fact "like we did with

21   FusionPharm"; is that correct?

22   A.   As directed by the FBI, yes.

23   Q.   Okay.  And then how did Mr. Guy Jean-Pierre respond?

24   A.   I'm been kind of stymied since that part right there

25   when it clicked, so I can't really remember.  If you want

Direct - Sears

1   to play it again I would be more than happy to listen
2   again, sir.
3   Q.   Okay.  Well, we can get there.
4          So Mr. Guy Jean-Pierre later says that he can get
5   one.  Do you recall that?
6   A.   Get one what, sir?
7   Q.   Do you recall that he says he can get an attorney?
8   A.   Yes, I do.
9   Q.   Okay.  Do you know what Mr. Guy Jean-Pierre meant by
10  that?
11  A.   Yes.  Get another attorney that he can work with.
12  Q.   Okay.  Similar to how it was with Mr. DiTommaso?
13  A.   Yes, sir.
14  Q.   And then at the end there, Mr. Guy Jean-Pierre is
15  asking about the ownership of the shell.  Do you recall
16  that?
17  A.   Yes.
18  Q.   And what percentage was the shell going to be owned by
19  the undisclosed FBI agent and yourself?
20  A.   I didn't -- I don't recall the number.
21  Q.   Do you recall 98 percent?
22  A.   No, but . . .
23          MR. SIBERT:  Okay.  Can we continue playing 322
24  bravo, starting at 14 minutes.
25          (Audio played)

Direct - Sears

BY MR. SIBERT:

Q.   Okay, sir, did you get a chance -- can I start?  Thank you.

        Did you get a chance to listen to that audio clearly?

A.   Yes, I did.

Q.   Okay.  And you inquire about if Mr. Guy Jean-Pierre can arrange the paper where the loan is a convertible note. Do you recall that?

A.   Yes, I do.

Q.   And what was Mr. Guy Jean-Pierre's response to that?

A.   Yeah, he can do that.

Q.   Okay.  And what was required for him to have to be able to do that?

A.   He was looking for aged debt.

Q.   Okay.  And do you know what he meant by that?

A.   Aged debt.

Q.   Besides aged debt, do you know why he would say that?

A.   For a convertible note debt has to be aged.

Q.   Do you know how long?

A.   Approximately one year.  It's much like a 144 subscription.  You go for a 144, it's normally a year from the date that the money goes into the company.

Q.   In fact, Mr. Guy Jean-Pierre states "The note, itself,

Direct - Sears

1    has to be aged, if you know what I mean."

2    A.    From the day that the money goes into the company,

3    yes.

4    Q.    Okay.  But there was no note at this time.

5    A.    No, there wasn't.  The premise was it was a handshake

6    deal and understanding, and it was to be papered up.

7    Q.    So when you say "papered up," it was just to be --

8    A.    Written up, formalized, memorialized.

9    Q.    So written up to meet these requirements?

10    A.    Excuse me?

11    Q.    Written up -- the paper written up to meet these

12    requirements?

13    A.    Yes, sir.

14    Q.    So Mr. Guy Jean-Pierre's telling you essentially the

15    security law, about the debt being aged; is that fair?

16    A.    Yes, sir.

17    Q.    And so he's agreeing to the fact to paper up -- based

18    upon your understanding with the conversations you've had

19    with him in this undercover, he was agreeing to paper up

20    this note that didn't exist to meet the age requirement?

21    A.    Yes, sir.  It --

22    Q.    And then he states -- you were talking about investors

23    when it came to VertiFresh; is that right?  So --

24    A.    Yes.  Yes.

25    Q.    Okay.  And then Mr. Guy Jean-Pierre says, "Well, if

Direct - Sears

1    the investors have a chance to be made whole, they'd be

2    happy to cooperate."

3    A.    Yes.   These were -- meaning these, as I said in the

4    video, these investors were from a couple of years ago,

5    which would have met the requirement of the aged debt, and

6    the fact that it wasn't papered into the convertible, they

7    would be willing to cooperate to do whatever they needed to

8    do to get paid.

9    Q.    To include violating securities laws?

10   A.    Well, I can't honestly say that at that moment because

11   he said aged debt.   I -- at that particular point in the

12   video and the audio, I said they were in for a couple of

13   years.   So at that point, he still thought it was aged

14   debt.

15   Q.    But the note didn't exist.

16   A.    It was a undercover -- you've got to be more clear.

17   Q.    Okay.

18   A.    You're killing me over here.   You're killing me over

19   here.

20   Q.    Was there a note or paper at this point?

21   A.    No, because it didn't exist.   The whole thing didn't

22   exist.   It was a sting.

23   Q.    So based upon your understanding, what was Mr. Guy

24   Jean-Pierre going to do?

25   A.    He was going to paper up a note.

1    Q.   And was the note going to meet the requirements?

2    A.   Yes.

3    Q.   Even though it was being drafted then?

4    A.   Yes.  Because it was aged debt.  That's what he

5    said.

6         MR. SIBERT:  Okay.  Can I have -- can we continue

7    playing 322-B.  And provide the court reporter a second to

8    turn off the transmitter.

9         (Audio played)

10   BY MR. SIBERT:

11   Q.   Okay.  So I want to start -- did you get a chance to

12   listen to that audio clearly?

13   A.   Yes, I did.

14   Q.   I want to start at the end of that.  Who's the one

15   that states that "I need to get my hands on a lawyer like

16   Mr. DiTommaso who will cooperate like Mr. DiTommaso"?

17   A.   Mr. Guy Jean-Pierre.

18   Q.   And he's talking about documents regarding FINRA.

19   What were those documents that you were going to send him?

20   A.   I don't recall documents regarding FINRA.

21   Q.   Not about FINRA, what would be submitted to FINRA?

22   A.   Oh, I would imagine that would be part of the

23   registration requirements to get on the OTC.  There's

24   always some kind of a 211 short form or something to that

25   effect.

Direct - Sears

1    Q.   So was he asking about what the corporation was going
2    to be doing?
3    A.   Not on that clip.
4    Q.   Okay.  And you stated in there, "like he did for Jan
5    and Baby Bee Bright back in the day."  Do you recall that
6    statement?
7    A.   Yes.
8    Q.   Okay.  And as you've testified, Baby Bee Bright was
9    your company eventually?
10   A.   For a short period of time, yes.
11   Q.   And this was also a prior company, Jan?
12   A.   I don't remember which company it was because I don't
13   know Jan.
14   Q.   Okay.  Do you recall what company you said in the
15   audio?
16   A.   No, I don't.
17   Q.   Okay.  But the point being is that you and Mr. Guy
18   Jean-Pierre have -- go back many years?
19   A.   I've known Mr. Jean-Pierre since 2010, I believe.
20   Q.   Okay.  And Mr. Guy Jean-Pierre states that he's not a
21   securities lawyer, he's a consultant, but he can prepare
22   everything.  Do you recall that statement?
23   A.   Yes, sir.
24   Q.   Okay.  So I guess my question would be, why would you
25   continue to use him in this undercover if he's not a

                              Direct - Sears

1     lawyer?

2     A.   Because I was instructed by the FBI to.

3     Q.   Okay.

4     A.   And he used to draw paperwork all the time for us.

5     It's the same price.

6     Q.   All right.  Do you know if Mr. Guy Jean-Pierre had

7     ever changed his name?

8     A.   I found at a later time, yeah.  As a matter of fact,

9     one of the recordings brings that recollection to me.

10    Q.   And, again, this happened in 2016; is that right?

11    A.   Yes, sir.

12    Q.   Do you remember the months?

13    A.   February through April.

14    Q.   So this was after the time that you knew about the SEC

15    complaint against Mr. Guy Jean-Pierre?

16    A.   Yes, sir.

17    Q.   And did his name change after that complaint?

18    A.   Indeed, it did.

19             MR. SIBERT:  Okay.  At this time, can we play

20    Government Exhibit 322-C.

21        (Audio played)

22    BY MR. SIBERT:

23    Q.   Okay.  So that was a brief clip.  Did you get to hear

24    that?

25    A.   Yes, I did.

Direct - Sears

1    Q.   Okay.  And Mr. Guy Jean-Pierre states he's down with

2    his brother in the DR.

3    A.   Yes, sir.

4    Q.   And you state that he was coming across kind of hard

5    to hear; is that right?

6    A.   Yes, sir.

7    Q.   Okay.  And to you, what's the DR mean?

8    A.   The Dominican Republic.

9          MR. SIBERT:  Okay.  Can I please have Government

10   Exhibit 322 played, D, starting at 55 seconds.

11        (Audio played)

12   BY MR. SIBERT:

13   Q.   Who stated that he wanted to get someone like Mr.

14   DiTommaso because he was cool?

15   A.   Mr. Jean-Pierre.

16   Q.   And who stated that Mr. DiTommaso did not do

17   double-checking, accepted things for what they were?

18   A.   Mr. Jean-Pierre.

19   Q.   And just to make clear for the jury, Mr. Guy

20   Jean-Pierre did not know that this was an undercover

21   operation going on.

22   A.   He did not.

23          MR. SIBERT:  Can you continue playing.

24        (Audio played)

25   BY MR. SIBERT:

Direct - Sears

1    Q.   Okay.  So after Mr. Guy Jean-Pierre stated that he
2    needed someone like Mr. DiTommaso because he was cool and
3    did not do a lot of double-checking, he stated that he was
4    trying, trying, trying.  What was he trying to do?
5    A.   Find another individual that would work with him.
6    Q.   And when you say another individual that would work
7    with him, what do you mean by that?
8    A.   Judging by the audio, because of his name, somebody
9    that, you know, would work with him.
10   Q.   Are you talking about a lawyer?
11   A.   Yes, sir.
12   Q.   Okay.  And who states in that video -- who questions
13   in that video how close, "Are you guys to assessing the
14   shell?"
15   A.   Mr. Jean-Pierre.
16   Q.   And when you go on to explain the type of person E.J.
17   is portraying in this operation, Mr. Guy Jean-Pierre, what
18   did he state?
19   A.   I don't recall.
20   Q.   Do you recall he said, "Right, right, right"?
21   A.   Right.  Yes, acknowledging the fact that he understood
22   what type of individual this was.
23   Q.   So no disagreement from Mr. Jean-Pierre?
24   A.   No.
25   Q.   No hesitation?

Direct - Sears

1    A.   No, sir.

2         MR. SIBERT:   May I have 6:40 of that clip played.

3         (Audio played)

4    BY MR. SIBERT:

5    Q.   Okay.  So how did Mr. Guy Jean-Pierre want to be

6    paid?

7    A.   Ultimately, 50-50, half cash and half in stock in the

8    deal.

9    Q.   So stock down the road?

10   A.   Yes, sir.

11   Q.   Okay.  And -- and beginning, how was he going to --

12   how did he want to be paid?

13   A.   In cash.

14        MR. SIBERT:   Okay.  Can I have 322-E played

15   starting at 2:30.

16        (Audio played)

17   BY MR. SIBERT:

18   Q.   Okay, sir, did you get a chance to hear that whole

19   deal?

20   A.   Yes, I did.

21   Q.   All right.  I want to talk to you -- essentially

22   there's one part of the audio in the beginning where you

23   state, "Me and You," regarding the company.

24   A.   Uhm-hum.

25   Q.   Do you recall that part of the video?

Direct - Sears

1    A.    Yes, I do.

2    Q.    Can you tell the jury --

3    A.    Audio.

4    Q.    -- what we're talking about there.

5    A.    Me and You is a company that was a placeholder called

6    C & C, which was going to be a consulting company that he

7    and I were going to have.

8    Q.    Okay.  And when you say "he and I," who do you mean?

9    A.    Mr. Jean-Pierre and myself.

10   Q.    Now, about 4:30, 5:06 in that clip, Mr. Guy Jean asked

11   for you to get evidence of the debt.  Do you recall that?

12   A.    Yes.

13   Q.    And what did you take that to mean?

14   A.    He wanted some kind of documentation or proof that the

15   debt existed.

16   Q.    Okay.  And based upon your understanding, how far back

17   would that debt have to go?

18   A.    I had originally told him it was years in the audio

19   previously.

20   Q.    Okay.  But in this audio, I'm asking now.

21   A.    I don't remember talking about the audio -- I don't

22   remember hearing anything about the debt aged in this

23   audio.  I didn't say anything, I don't think, about that.

24   Q.    Okay.  You don't recall Mr. Guy Jean-Pierre talking

25   about a debt a year out?

Direct - Sears

1    A.    That was the previous audio.  I thought you were

2    talking about this one.

3              MR. SIBERT:  All right.  Let's replay 4:30,

4    starting at 4:30 and we'll stop it at 5:06.

5         (Audio played)

6    BY MR. SIBERT:

7    Q.    Does that refresh at all?

8    A.    Yeah, it doesn't say anything about a year on that.

9    You asked me a specific question that's not on that audio,

10   sir.

11   Q.    Okay.  We'll move on for the audio again --

12   A.    I was trying to answer your question.

13   Q.    -- I  wanted to ask if you recall about equity for the

14   debt.

15   A.    Yes.

16   Q.    Okay.  And what is equity for the debt?

17   A.    Equity at that point would be securities.

18   Q.    And you can get shares of securities?

19   A.    Yes.

20   Q.    So stock.

21   A.    Yes.

22   Q.    So what does that mean?

23   A.    You get stock.

24   Q.    Instead of what?

25   A.    Well, actually, a promissory note can be either/or.

Direct - Sears

It's up to the person that holds the note, they can either
wait and take the interest on the note or they can take
equity.  It's up to the individual as to what they would
want, they have an option.

Q.  Okay.

A.  Much like a mortgage.  You know, it's the same thing,
it's -- it's -- essentially what a mortgage is is
convertible notes.

Q.  Okay.  And you stated they could either get interest
for a promissory note or get equity; is that correct?

A.  That's right, if they're in default.

Q.  So when you're saying "interest," you're meaning
payment back in cash to include the interest for the loan?

A.  I'm just saying payment in general.  And in a -- in --
are you asking me to explain the convertible note or are
you specific to the operation --

Q.  Okay.  I'm just asking --

A.  -- because I'm a little confused right now.

Q.  Okay.  Just follow-up on what you were talking about,
how someone can be paid back for a promissory note.

A.  Promissory note -- that's why they call it a
convertible note, okay?  When you get a convertible note,
it's like your bank giving you against your house.  If you
don't pay your bill, what happens?  They take your house.
It's the same thing.  If the public company doesn't pay its

Direct - Sears

1    bills you as the individual loaning them the money have the

2    opportunity to grab shares, recoup your investment.

3    Q.   So one way to recoup your investment is to get stock.

4    A.   That would be one way, or you can get -- you know, if

5    the company could write you a check and life would be good

6    there, too.

7    Q.   So you could get -- either get paid your loan -- so

8    when you have a promissory note, the person that gives the

9    note can either get paid back cash or stock.

10            MR. GOODREID:  Objection.  Leading.

11            THE COURT:  Sustained.

12   BY MR. SIBERT:

13   Q.   How can an individual or a company that provides a

14   promissory note be paid back?

15   A.   They can be paid back their principal, whatever the

16   amount was, plus the interest, as per the note, or they can

17   exercise the right as they would have in a note to get

18   securities in that company.

19   Q.   And that would be called equity.

20   A.   Yes, sir.

21   Q.   Thank you.

22   A.   Well . . .

23            MR. SIBERT:  Your Honor, I have a few more clips

24   here.  Do you want me to continue or do you want --

25            THE COURT:  Yes.  We'll go till 12:15.

1      MR. SIBERT:  Okay.  Can you please play 322-E
2  starting at 8:45.
3      (Audio played)
4  BY MR. SIBERT:
5  Q.   So you -- sir, did you have a chance to hear that
6  audio?
7  A.   Yes, I did.
8  Q.   And you're talking about $50,000 to be put into shell.
9  A.   Into a debt -- a debt instrument, yes.
10 Q.   Okay.  Can you explain that to the jury.
11 A.   Explain what, sir?
12 Q.   What you were going to do with $50,000 in this
13 operation.
14 A.   It was going to be listed on the books of the company
15 as in a form of an instrument called a convertible
16 promissory note.
17 Q.   On whose books?
18 A.   The company that the FBI directed us to, VertiFresh.
19 Q.   And so essentially VertiFresh is going to have a
20 $50,000 promissory note that they owed?
21 A.   Yes.
22 Q.   Okay.  And who were they going to owe this $50,000
23 promissory note to?
24 A.   Whomever was going to put their name on the document.
25 Q.   And also you stated that E.J. had a buddy that was

Direct - Sears

1  going to be a namesake for the company.

2  A.   Yes.

3  Q.   What did you mean by that?

4  A.   He was just going to be -- have his name on a piece of

5  paper and that was it.

6  Q.   Okay.  And so he would have no official role?

7  A.   No, he wasn't going to be growing any lettuce or

8  delivering the lettuce or anything to that effect.

9  Q.   Or making decisions on behalf of the company?

10 A.   No.

11 Q.   Not managing the company?

12 A.   No.

13 Q.   Not hiring or firing?

14 A.   No.

15 Q.   Not directing --

16 A.   We didn't go that far into it, sir.  He was just to be

17 a placeholder.  You know, we didn't go into the operations

18 of the company.

19 Q.   So you used the name "placeholder" before in your

20 testimony.

21 A.   Excuse me?

22 Q.   You've used the --

23 A.   Oh, yeah, the FBI furnished me with that -- it's a

24 good term.

25 Q.   But you've used "placeholder" before in your testimony

Direct - Sears

1   here before this --

2   A.   Absolutely.

3   Q.   In fact, it was regarding your mother with Bayside; is

4   that right?

5   A.   That would be correct, to the best of my

6   recollection.

7        MR. SIBERT:  Okay.  Can I have 11 -- excuse me,

8   Government Exhibit 322-E played, starting at 11:35.

9        (Audio played)

10       THE WITNESS:  Excuse me, sir, before you ask

11  another question, I'd like to change my -- my answer to his

12  last question was --

13       MR. SIBERT:  Your Honor, I'm --

14       THE WITNESS:  I used the term --

15       THE COURT:  Hold on.

16       THE WITNESS:  -- term Bayside --

17       THE COURT:  Hold on, Mr. Sears.  Mr. Sears.

18  Please.  When I start talking, please stop.

19       THE WITNESS:  Sorry, Your Honor.

20       THE COURT:  You were going to say, Mr. Sibert?

21       MR. SIBERT:  I would ask this witness not to be

22  able to provide any testimony without a question being

23  asked.

24       THE COURT:  All right.  You'll have an

25  opportunity, if defendant's counsel wants to ask you a

Direct - Sears

1    question that  will allow you to explain, you can do it at
2    that time, but there's not a question pending from the
3    prosecutor.
4             THE WITNESS:  It was in response to a previous
5    question.
6             THE COURT:  That's all right.  Okay.  But there's
7    not a question pending right now, so we'll go with the next
8    question, please.
9             MR. SIBERT:  Thank you, Your Honor.
10   BY MR. SIBERT:
11   Q.   Sir, did you have an opportunity to listen to that
12   clip clearly?
13   A.   Yeah.  My head was kind of buzzing because I gave you
14   a wrong answer before so . . .
15   Q.   Do you need it played again?
16   A.   No.  Go ahead, let's -- let's try.
17   Q.   Okay.  Who was talking in that clip?
18   A.   Mr. Jean-Pierre and myself.
19   Q.   Okay.  And who stated that a debt -- a convertible
20   debt was straightforward?
21   A.   Convertible debt was straightforward?  I believe it
22   was Mr. Jean-Pierre.
23   Q.   Okay.  And essentially Mr. Guy Jean-Pierre was asking
24   you for evidence of that debt.  Would you agree with that?
25   A.   Yes, sir.

400

Direct - Sears

1    Q.   And it was Mr. Guy Jean-Pierre -- was it Mr. Guy

2    Jean-Pierre that stated that he wanted this evidence so

3    there would be no questions raised with the SEC?

4    A.   Yes.

5    Q.   And that would include the debt being a year old?

6    A.   Yes.

7              MR. SIBERT:  Okay.  Can we begin again with 322-E,

8    starting at 15:57, playing until the end, which is

9    essentially around 17 minutes.

10             (Audio played)

11   BY MR. SIBERT:

12   Q.   Okay.  So essentially what were you asking Mr. Guy

13   Jean-Pierre to provide you by Friday?

14   A.   Before I answer that question, sir, may I have the

15   opportunity to -- I gave you an incorrect answer, so if

16   it's the truth you're looking for, I think you should have

17   the right answer.

18             MR. SIBERT:  Your Honor, I would ask the witness

19   to be instructed to answer the question.

20             THE COURT:  Okay.  Defense counsel, if they want

21   to, will give you the opportunity to explain your prior

22   answer.  For now, you have to answer the question that's

23   been asked by the prosecutor.

24             THE WITNESS:  Thank you, sir.

25   BY MR. SIBERT:

401

Direct - Sears

1   Q.   Now, did you get a chance to watch -- or listen to

2   that audio?

3   A.   Yes, I did.

4   Q.   Clearly?

5   A.   Pretty clearly.

6   Q.   Okay.  What -- what were you asking Mr. Guy

7   Jean-Pierre to get to you by Friday?

8   A.   Documentation.

9   Q.   And what documentation?

10  A.   Boilerplate templates.

11  Q.   For the convertible debt?

12  A.   For everything.

13  Q.   Do you recall that you specifically asked for

14  convertible debt?

15  A.   Yes.

16  Q.   Okay.  Now, you also inquired -- you asked essentially

17  Mr. Sears what fees he was owed for the legal work.  Do you

18  recall that?

19  A.   Yes.

20  Q.   And --

21         THE COURT:  You mean Mr. Jean-Pierre?

22         MR. SIBERT:  Yes, I'm sorry, Your Honor.

23  BY MR. SIBERT:

24  Q.   Mr. Guy Jean-Pierre.

25  A.   Yeah.

Direct - Sears

1    Q.   You inquired about legal fees; is that right?

2    A.   Yes, I did.

3    Q.   And what was that -- what were those legal fees for?

4    A.   Providing all the documentation.

5    Q.   Okay.  And how did Mr. Guy Jean-Pierre respond to

6    getting you those documents and the legal fees?

7    A.   I don't recall exactly.

8    Q.   Do you recall him saying, "Okay, all right, sounds

9    good"?

10   A.   Quickly.  He led me to believe it would be a quick

11   turnaround.

12   Q.   In fact, he said "Cool," right?

13   A.   I believe so.  I said I believe so.

14   Q.   Okay.  Now, at the end there, he was asking you again,

15   get him the evidence, regarding this convertible debt.

16   Would you agree with me?

17   A.   Yes.

18   Q.   And your response, if I recall correctly, was, that

19   these were handshake cash deals.

20   A.   Yes, sir.

21   Q.   Okay.  And how did Mr. Guy Jean-Pierre respond?

22   A.   He was set back a little bit by it, saying, "Oh,

23   well."

24   Q.   He went "Oooooh," right?

25   A.   Yes.

Direct - Sears

1    Q.   And then essentially you inquired about -- that Mr.
2    Jean-Pierre went on to say that these had to be documented
3    well, right?
4    A.   Yes, sir.
5    Q.   And you inquired as to why?
6    A.   Yes, sir.
7    Q.   And what was his response?
8    A.   I'm sorry, I can't remember.
9    Q.   It was about the transfer agent, right?
10   A.   Yes, I -- it was -- transfer agent was mentioned.
11   Q.   And about someone took a close look?
12   A.   Yes.
13            THE COURT:  Are we done with that clip?
14            MR. SIBERT:  We are, Your Honor.
15            THE COURT:  All right, we're going to take our
16   lunch break.
17            Ladies and gentlemen of the jury, we're going to
18   take a recess until 1:20.
19        (Jury left the courtroom at 12:14 p.m.)
20            THE COURT:  All right, Mr. Sears, same
21   instructions as before.
22            THE WITNESS:  Yes.
23        (Recess taken 12:15 p.m.)
24                    AFTERNOON SESSION
25        (Jury was present at 1:26 p.m.)

Direct - Sears

1          THE COURT:  Mr. Sears, you remain under oath.  Mr.
2     Sibert, you may resume your examination.
3          MR. SIBERT:  Thank you, Your Honor.  And may I
4     request that all the headphones be turned back on.  And
5     we're going to -- I'm going to be asking to play Government
6     Exhibit 322-F.
7          And, Your Honor, you just hold the power button,
8     if you don't have a green light, and then if a different
9     color light comes on, you just hit the power button to go
10    green.
11         THE COURT:  I've got a green light.
12         MR. SIBERT:  I'm just making sure everyone has a
13    green light.  Are you all good?
14         Okay, can we please play 322-F starting at 1:14.
15        (Audio played)
16         MR. SIBERT:  Now can you play Government Exhibit
17    322-F, starting at 4:18.
18        (Audio played)
19    BY MR. SIBERT:
20    Q.   Sir, were you able to hear that video clearly?
21    A.   Yes, I was.
22    Q.   The last two clips that were played?
23    A.   Yes, I did.
24    Q.   What do you mean by Phil Morgan being the beard only?
25    A.   Much like the term "placeholder."

Direct - Sears

1    Q.    Thank you.

2    A.    You're welcome.

3    Q.    When you were talking about having this cash and you

4    needed to move it and it was from stock that you sold, what

5    were you -- what was going on at that point?

6    A.    That was -- if you notice, I was stuttering a lot in

7    that particular one because the FBI was constantly putting

8    notes in front of me.  And, as you know, they scripted this

9    entire thing, so I was -- cash in the account from

10   Scottsdale, a trading account.

11   Q.    And what were you essentially asking Mr. Guy

12   Jean-Pierre to do?

13   A.    To find a home for it offshore.

14   Q.    So essentially hide the cash?

15   A.    Put the cash offshore.

16   Q.    Okay.  And you -- there was talk about the convertible

17   note being in the name of Thor.  Do you remember that?

18   A.    Uhm-hum.

19   Q.    And I need a yes or no.

20   A.    Oh, yes.

21   Q.    Okay.  And what was Thor?

22   A.    It was a company that the FBI made up.

23   Q.    Okay.  And who was going to own Thor?

24   A.    That was going to be beneficially owned by the FBI

25   agent undercover.

Direct - Sears

1   Q.   Okay.  Was that the company that was going to loan
2   VertiFresh the money?
3   A.   I don't recall if it was going to loan the money.
4   That was the one that the -- that the convertible note was
5   going to be put in, so I would imagine that would have been
6   it.
7   Q.   So as you discussed earlier with the promissory notes
8   that could be paid two ways, either through equity or
9   through cashing in -- on the interest --
10  A.   Uhm-hum.
11  Q.   -- what was Thor supposed to get in this undercover
12  operation?
13  A.   The whole premise was to get securities.
14  Q.   So equity.
15       THE COURT:  You have to respond yes audibly.
16       THE WITNESS:  Yes.  Yes.
17  BY MR. SIBERT:
18  Q.   And you mentioned you wanted to have the documents
19  templated, including the 144.  What's a 144 template
20  document?
21  A.   I have never seen a 144 template document.  It was
22  something that was made up.  So I would imagine by the
23  definition of template, it would just have a bunch of basic
24  legal jargon and names to be filled in and amounts later.
25  Q.   Okay.  So the rule -- the number 144 doesn't mean

Direct - Sears

1   anything to you?

2   A.   No, you asked me what a templated 144 was, sir.

3   Q.   I'm asking you a different question now.

4   A.   Thank you.

5   Q.   Does the number 144 mean something to you?

6   A.   Yes, indeed, it does.

7   Q.   And what does it mean to you?

8   A.   It means it's restricted -- it's a restriction on a

9   certificate.

10  Q.   Okay.  So what would be a -- in the concept of this

11  operation -- undercover operation, what were you asking

12  about when you stated a rule -- a 144 template?

13  A.   A letter -- a letter of opinion to remove the

14  restriction, the 144 restriction.

15          MR. SIBERT:  Okay.  At this time, can I get 322 --

16  or, excuse me, 7 -- 322-F starting at 7:43 played.

17          (Audio played)

18  BY MR. SIBERT:

19  Q.   Sir, that last clip, you were, again, talking about

20  getting cash out -- out of here.  Is that the same cash you

21  were talking about previously in the last clip?

22  A.   Yes.

23  Q.   Okay.  Did Mr. Guy Jean-Pierre ever give you any

24  indication that he wouldn't help you with this -- again,

25  this cash offshore?

Direct - Sears

1   A.   That he would not?  I didn't hear.

2   Q.   That he would not help you.

3   A.   No, he didn't.

4        MR. SIBERT:  Okay.  Can I have 322-G played

5   starting at 5:37.

6        (Audio played)

7   BY MR. SIBERT:

8   Q.   Okay, sir.  We hear a new voice in that recording.  Do

9   you know who that new voice is?

10  A.   That was a undercover FBI agent, his name was E.J., in

11  the op.

12  Q.   Okay.  And what did Mr. Guy Jean-Pierre respond to

13  E.J. when there was a request for hopefully future deals?

14  A.   It was -- I don't have it -- I don't remember

15  verbatim, but he was eager to proceed with -- in the

16  future.

17  Q.   And do you know what Mr. Guy Jean-Pierre meant by a

18  "nice clean shell, not having skeletons"?

19  A.   That would be a company that doesn't have any lawsuits

20  or, you know, investigations, or anything to that effect.

21       MR. SIBERT:  Can I have Government Exhibit 322-H

22  played, starting at 4:55.

23       (Audio played)

24  BY MR. SIBERT:

25  Q.   Okay.  So do you know what Mr. Guy Jean-Pierre's

Direct - Sears

1    talking about the last day of the debt?

2    A.   No, I was quite confused at that point.

3    Q.   Okay.  So you don't understand that part?

4    A.   No, I'm still up in the air about that one.

5    Q.   Okay.  And so when you said you got money recently, do

6    you know why Mr. Guy Jean-Pierre said, "Oh, oh, I hope no

7    one is listening to this phone call"?

8    A.   Basically because we were going to -- the entire thing

9    was to get securities and cash out.

10   Q.   And was it your understanding that the debt had to be

11   a year old?

12   A.   Yes.

13   Q.   So if you --

14   A.   All debt should be a year old.

15   Q.   If you got money recently, that would not be a year

16   old?

17   A.   No, that would not be, no, sir.

18   Q.   And so was -- did it seem to you, based upon your

19   hearing of this and talking to him, that Mr. Guy

20   Jean-Pierre was worried when you said you got the money

21   recently?

22   A.   Yes, sir.

23           MR. SIBERT:  Can I have the same clip, 322-H,

24   starting at 7:15.

25           (Audio played)

                            Direct - Sears

1    BY MR. SIBERT:

2    Q.   Sir, were you able to hear that audio clearly?

3    A.   Yes, I was.

4    Q.   Okay.  Do you know why Mr. Guy Jean-Pierre was

5    suggesting an odd number instead of $50,000?

6    A.   No.

7    Q.   You -- do you recall him saying "suspicious"?

8    A.   In the -- yes, in the audio.  Just to keep it as an

9    odd number.  So the impression I got was to -- just --

10   wouldn't get a second eye, I guess.

11   Q.   And you mentioned a 144 nonaffiliate opinion in that

12   audio.

13   A.   Yes.

14   Q.   What did you mean by that?

15   A.   Well, the FBI scripted it and wanted me to put in the

16   non-144 affiliate thing in there.

17   Q.   Well, based upon your past work with Mr. Guy

18   Jean-Pierre and your cooperation with the Government at

19   this point, why would a 144 nonaffiliate be important?

20   A.   Well, because it would mirror the FusionPharm case.

21   They put that in the last minute.

22   Q.   And what do you mean by that?

23   A.   They wanted to look -- it's just my opinion.

24   Q.   Okay.  And --

25   A.   That's what it is.

Direct - Sears

1    Q.   -- who stated that "all the pains in evidence was sent
2    to DiTommaso and I did all the work"?
3    A.   Mr. Guy Jean-Pierre.
4           MR. SIBERT:  Can I have Government Exhibit 322-H
5    played from 3 -- excuse me, from 13:25.
6           (Audio played)
7    BY MR. SIBERT:
8    Q.   Okay.  Were you able to hear clearly that -- clearly
9    that audio?
10   A.   Most of it.
11   Q.   All right.  Did you miss any parts that we need to go
12   back over?
13   A.   I couldn't tell you what I missed until you ask me.
14   Q.   Okay.  Do you recall the point about the
15   Meadpoint-Bayside conversions that you were discussing with
16   Mr. Guy Jean-Pierre --
17   A.   Yeah.  That was carefully scripted by the FBI.  Yeah.
18   Q.   And, Mr. Sears, I understand this whole undercover
19   operation is scripted.
20   A.   I just want to make that clear.  Good.
21   Q.   And so did Mr. Guy Jean-Pierre ever say that that --
22   those conversions didn't happen?
23   A.   No, not to my recollection.
24   Q.   Did he ever disagree with you about those conversions?
25   A.   No.

Direct - Sears

1    Q.   In fact, his answer was "okay."  Do you recall that on

2    the video?

3    A.   Yes.

4    Q.   So no pushback when you were talking about these

5    conversions with Meadpoint and Bayside --

6    A.   No.

7    Q.   -- with Mr. Guy Jean-Pierre?

8    A.   No, sir.

9    Q.   Okay.  And, finally, that video -- that audio ended

10   talking about a trust account.  Do you know what Mr. Guy

11   Jean-Pierre was talking about a trust account in the

12   Dominican Republic?

13   A.   Yes.

14   Q.   And what was he talking about?

15   A.   Setting up a trust account.

16   Q.   For what purpose?

17   A.   Holding money.

18   Q.   And is that the money that you were scripted to get

19   offshore?

20   A.   Yes, sir.

21          MR. SIBERT:  Can I have Government Exhibit 322-H

22   played from 16:16.

23       (Audio played)

24          MR. SIBERT:  Okay.  And can I please have the same

25   Exhibit 322-H played from 19:20.

413

Direct - Sears

1        (Audio played)

2    BY MR. SIBERT:

3    Q.   Who advised you that big amounts could draw attention

4    when it comes to wiring money to the Dominican Republic?

5    A.   Mr. Jean-Pierre.

6             MR. SIBERT:  Can I have Government Exhibit 322-I,

7    played, starting at 3:30.

8        (Audio played)

9    BY MR. SIBERT:

10   Q.   Okay, sir, were you able to hear that audio clearly?

11   A.   Yes, I was.

12   Q.   What did you mean when you stated, "Get the thing in

13   the air"?

14   A.   The cashier's check.

15   Q.   Okay.  And could you just describe to the jury

16   essentially about this cashier's check, your role in it.

17   A.   The -- it started out as 250,000, was going to go into

18   a wire.  And then I got that script changed and we were

19   putting cashier's checks in the air, that was supposed to

20   be in the amount of $10,000.  And then I had to tell him

21   that it was only 5.  And the United States Government had

22   to go ahead and get it into a Fed Ex and get it out to him

23   on the island so he could set up the account and make the

24   deposit.

25   Q.   So your understanding is that there was actually a

414

Direct - Sears

1    check sent to Mr. Guy Jean-Pierre?

2    A.   Yes, sir.

3    Q.   And it was through Fed Ex?

4    A.   One of the carriers.  I can't say it was Fed Ex.  I

5    don't know who they used ultimately, but it was going to be

6    a carrier.

7    Q.   At the end of that audio there, Mr. Guy Jean-Pierre

8    was asking that he could pick something up at Fed Ex?

9    A.   Yes.

10            MR. SIBERT:   Okay.  Can I have Government Exhibit

11   322-J played.

12            (Audio played)

13            MR. SIBERT:   Can we have Government Exhibit 322-K

14   played.

15            (Audio played)

16            MR. SIBERT:   Can I have Government Exhibit 322-L

17   played.

18            (Audio played)

19   BY MR. SIBERT:

20   Q.   Okay, sir, we listened to three clips there.

21   Essentially what is the focus of all three of those clips?

22   A.   Getting money deposited.

23   Q.   Okay.  And as you say "getting money deposited," are

24   you talking about the check that we've discussed --

25   A.   Yes.

                          Direct - Sears

1    Q.   -- the cashier's check?

2    A.   Yes.

3    Q.   Okay.  And then you talk about a tracking number.

4    What were you -- what were you referring to that?

5    A.   Tracking number that would be provided by the courier

6    that was bringing the check to the destination.

7    Q.   Okay.  And when was Mr. Guy Jean-Pierre supposed to

8    take that check?

9    A.   That Tuesday, I believe, from what he said.

10        MR. SIBERT:  Can I have Government Exhibits 322-M

11   played starting at 1:25.

12        (Audio played)

13        MR. SIBERT:  Okay, can I please have Government

14   Exhibit 322-N played from 3:12 to 6:36.

15        (Audio played)

16   BY MR. SIBERT:

17   Q.   Sir, did you get an opportunity to hear that audio?

18   A.   Yes, I did.

19   Q.   Okay.  And who's talking about setting up these

20   opinion letters?

21   A.   Mr. Jean-Pierre.

22   Q.   And do you recall at the end of that clip what Mr.

23   Jean-Pierre's worry was?

24   A.   That part was really fuzzy.  I didn't hear that part

25   too well, sir.

                          Direct - Sears

1    Q.   Was he worried about his name being associated to

2    these opinion letters?

3    A.   Yes.

4         MR. SIBERT:  Can I have Government Exhibit 322-N

5    from 6:52 to 7:10 played.

6         (Audio played)

7    BY MR. SIBERT:

8    Q.   Who inquired about meeting -- there was other

9    documents needed for the shell company?

10   A.   I did.

11   Q.   Okay.  And who responded to you?

12   A.   Mr. Jean-Pierre.

13        MR. SIBERT:  And, finally, can I have Government

14   Exhibit 322-N played from 8:06.

15        (Audio played)

16   BY MR. SIBERT:

17   Q.   Okay.  Who states that the opinion letters were

18   identical "because I wrote them"?

19   A.   Mr. Jean-Pierre.

20        MR. SIBERT:  Can I have Government Exhibit 322-O

21   played.

22        (Audio played)

23   BY MR. SIBERT:

24   Q.   Okay, Mr. Guy Jean-Pierre states that he's been out of

25   the United States for a while.  Do you know what this

1    conversation was about?

2    A.   Yes, him flying to Miami.

3    Q.   Okay.  Can you speak into the mic.  It's hard to hear

4    you.

5    A.   Yes, him flying into Miami.

6    Q.   Okay.  What was the purpose for Mr. Guy Jean-Pierre to

7    be flying into Miami?

8    A.   To meet with E.J.

9    Q.   Okay.  And who else?

10   A.   Myself.

11   Q.   And E.J. is the undercover FBI agent?

12   A.   Yes, he is.

13        MR. SIBERT:  Can I have 322-P played.

14        (Audio played)

15   BY MR. SIBERT:

16   Q.   And, again, sir, what was that conversation

17   essentially about?

18   A.   Banking.

19   Q.   And the cashier's check that was going -- that you

20   wanted Mr. Guy Jean-Pierre to deposit for you?

21   A.   Yes, sir.

22        MR. SIBERT:  Can I have 322 -- let's play 322-R.

23        (Audio played)

24   BY MR. SIBERT:

25   Q.   Okay, sir, in that clip, who indicated that the check

1    was deposited?

2    A.   Mr. Jean-Pierre.

3    Q.   Okay.  Sir -- can we take down the clips?

4         All right.  Now, as you stated previously, did Mr.

5    Guy Jean-Pierre ever make it to Miami?

6    A.   Yes, he did.

7    Q.   Okay.  And can you describe to the jury -- let me --

8    was he picked up?

9    A.   Yes, he was.

10   Q.   Who picked him up?

11   A.   I was a passenger in the seat and a undercover agent

12   from the United States Postal Service was the driver.

13   Q.   Okay.

14   A.   He was posing as an Uber driver.

15   Q.   An Uber driver?

16   A.   Yes.  He was a United States Postal Service employee

17   who was posing as an Uber driver taking me to pick up Mr.

18   Guy Jean-Pierre.

19   Q.   Okay.  Were you wearing a wire at that time?

20   A.   Indeed, I was.

21   Q.   All right.  And now where did you go from the airport

22   once you picked up Mr. Guy Jean-Pierre?

23   A.   Back to the hotel.

24   Q.   Okay.  And did you talk to Mr. Guy Jean-Pierre at the

25   hotel?

Direct - Sears

1   A.   Yes.

2   Q.   Okay.  And during the whole time that you were with

3   Mr. Guy Jean-Pierre, were you wearing a wire?

4   A.   Yes, sir.

5   Q.   Okay.  And then what happened after he got to the

6   hotel?

7   A.   If my memory serves me, we checked in, came down, met

8   in the lobby, and had a conversation.

9   Q.   Okay.

10        THE COURT:  Mr. Sibert, can we establish when this

11   happened?

12        MR. SIBERT:  Absolutely.  My understanding was the

13   witness testified between -- well, let me get --

14   BY MR. SIBERT:

15   Q.   You stated earlier in your testimony that this

16   undercover went essentially from February 2006 to about May

17   2016; is that correct?

18   A.   No.  It was done by April.

19   Q.   Okay.  Finished by April?

20   A.   Yes, sir.

21   Q.   Okay.  Thank you.  And do you recall the time frame of

22   when Mr. Guy Jean-Pierre was picked up at the Miami

23   airport?

24   A.   Roughly, give or -- 5, 6, in that area.

25   Q.   Excuse me?

Direct - Sears

1      A.   5:00 or 6:00 in the afternoon.

2      Q.   Okay.  Do you remember the date?

3      A.   No, I don't.

4      Q.   Do you remember what month?

5      A.   It was April.

6      Q.   Okay.  So was it at the end of the undercover

7      operation?

8      A.   It was the very end of the undercover operation, sir.

9      Q.   Okay.  And this was April 2016?

10     A.   Yes, it was, sir.

11     Q.   All right.  So now once you met Mr. Jean-Pierre down

12     in the hotel lobby, what occurred that night?

13     A.   We had a conversation.

14     Q.   All right.  And what was that conversation about?

15     A.   I don't recall specifics, probably just going over the

16     transaction, the deal, and past histories, and, you know,

17     small talk.

18     Q.   What do you mean by the "transaction deal"?

19     A.   The transaction that we were down there for.

20     Q.   And what was that transaction?

21     A.   The transaction with the undercover FBI agent.

22     Q.   Dealing with the shell company?

23     A.   Dealing with the check, the shell company, yes.

24     Q.   So dealing with the offshore account for the check --

25     A.   Everything that we just talked about.

Direct - Sears

1    Q.   Okay.  And then so you had dinner that night as well?

2    A.   Yes, we did.

3    Q.   And who was at dinner?

4    A.   Myself, Mr. Jean-Pierre, and another undercover agent,

5    his name was E.J.

6    Q.   Okay.  Were you wired for recording?

7    A.   Yes, I was.

8    Q.   And that was for recording?

9    A.   Yes, sir.

10   Q.   And were you wired the whole night?

11   A.   Yes, I was.  Until I was ready to go sleep and then,

12   of course, not.

13   Q.   Okay.  And as part of your preparation here today,

14   you're also given the ability to hear those recordings; is

15   that correct?

16   A.   That is correct.

17   Q.   Okay.  And were you able to listen to those

18   recordings?

19   A.   Yes, I was.

20   Q.   Okay.  And just like in the past few recordings that

21   we just went over, you also got to see the transcript; is

22   that correct?

23   A.   Yes, sir.

24   Q.   Okay.  And did the transcript match the recording?

25   A.   To my recollection, I believe so.

422

Direct - Sears

1    Q.   Okay.  And were you able to listen to the whole

2    recording from the airport up till the end of the night

3    where you went to dinner with Mr. Guy Jean-Pierre and E.J.?

4    A.   There was a lot of dead spots in it, but yeah.  I

5    can't say I listened to every single second because there

6    was a lot of dead time in the car.

7    Q.   Okay.  Where there was no talking?

8    A.   Yes, sir.

9         MR. SIBERT:  So, Your Honor, at this time the

10   Government would like to move for admission Government

11   Exhibit 350.  That would be the entire recording from the

12   Miami airport to the hotel.

13        THE COURT:  One second.  All right, this is an

14   audio file with captions; is that correct?

15        MR. SIBERT:  That's correct, Your Honor -- this --

16   350 is just the audio.  The complete audio.

17        THE COURT:  All right.  Well, okay, what goes

18   along with that, though?

19        MR. SIBERT:  As I stated, Government Exhibit

20   351-A --

21        THE COURT:  I don't think you stated that.

22        MR. SIBERT:  Okay.  351-A through Exhibit 351-H.

23        THE COURT:  You definitely didn't say that.

24   Exhibit 350.  And you're offering 350 and then 351-A

25   through H?

423

Direct - Sears

1          MR. SIBERT:  That's correct.

2          THE COURT:  All right.  So the record is clear,

3    350 is the complete audio file, 351-A through H is the

4    audio file synced with a caption.

5          MR. SIBERT:  That's correct, Your Honor.

6          THE COURT:  All right.  Is there an objection from

7    the defendant?

8          MR. GOODREID:  Yes, Your Honor.  Two-fold.  No. 1,

9    I heard this witness say that he had listened to audio of

10   these events, but I never heard him link that to these

11   exhibits.  That's No. 1.

12         Secondly, I have -- I would restate my earlier

13   objections to the syncing that I've stated in response to

14   earlier document -- or, excuse me, earlier video and audio.

15         THE COURT:  All right.  I think Mr. Goodreid has a

16   point in terms of the testimony of the witness being linked

17   directly to 351-A through H, so I think you have more

18   foundation to lay.

19         MR. SIBERT:  Okay.  Thank you, Your Honor.

20   BY MR. SIBERT:

21   Q.   Essentially the conversation from the airport to the

22   hotel that was recorded, you had stated that you had

23   listened to the recording; is that right?

24   A.   Yes, sir.

25   Q.   Did the recording match what you stated in the

Direct - Sears

1    transportation from the airport to the hotel?

2    A.   To the best of my recollection.

3    Q.   Okay.

4    A.   I wasn't really paying attention to look for that.  I

5    was listening.

6    Q.   Okay.  Was that your voice in the recording?

7    A.   Yes, sir, it was.

8    Q.   Okay.  And then also in the lobby of the hotel, the

9    conversations that you had in the lobby of the hotel with

10   the defendant, did that conversation match the recording?

11   A.   Once again, I was more listening to the conversation

12   as I remember it.  I wasn't paying attention that I had to

13   sync the words.

14   Q.   But nowhere in that recording did you think it was

15   someone else's voice besides yours?

16   A.   That was my voice, sir.

17   Q.   And that would include the ride from the airport to

18   the hotel?

19   A.   I believe so, yes.

20        MR. SIBERT:  Your Honor, at this time I move to

21   admit the previous exhibits that are requested.

22        THE COURT:  All right.  I'm going to overrule the

23   defendant's objections to 351-A through H.  And I assume,

24   as before, there was no objection to 350; is that correct?

25        MR. GOODREID:  That is correct, Your Honor.

Direct - Sears

1          THE COURT:  All right.  So --

2          MR. GOODREID:  Your Honor, I'm sorry, except

3     insofar -- I don't believe 350 has a sync, so no objection.

4          THE COURT:  Yeah, right.

5          MR. GOODREID:  Okay.

6          THE COURT:  350 is just the audio.

7          MR. GOODREID:  Right.

8          THE COURT:  Okay.  So there being no objection,

9     Exhibit 350 is admitted into evidence and may be published

10    to the jury.  I'm going to overrule the defendant's

11    objection to Exhibit 351-A through H.

12          And, again, ladies and gentlemen of the jury, I'm

13    instructing you the evidence here is the audio and the

14    caption is there for your convenience.  And to the extent

15    you believe the caption is not an accurate summary of the

16    audio, the audio is to prevail as that is the evidence.

17    All right.  You may proceed, Mr. Sibert.

18          (Government Exhibits 350 and 351-A through 351-H

19    received)

20          MR. SIBERT:  Your Honor, at the same time the

21    Government -- let me just follow along with some questions

22    regarding Government's Exhibits 357, Exhibits 358-A through

23    N, as in November.

24          THE COURT:  And what do you want to do with these?

25          MR. SIBERT:  I'm going to -- I plan on offering

Direct - Sears

1    them into evidence, if I could just do a little bit more

2    foundation with the witness.

3           THE COURT:  You haven't done any foundation with

4    these exhibits, so go ahead.

5    BY MR. SIBERT:

6    Q.   Okay.  As I stated before, sir, you stated that you

7    were on a wire at the dinner; is that correct?

8    A.   That is correct.

9    Q.   Okay.  And so as you stated before, that recording

10   went through the night; is that right?

11   A.   Yes, sir.

12   Q.   Okay.  And as I also asked, you listened to those

13   recordings, correct?

14   A.   Yes, sir.

15   Q.   Okay.  And did those recordings from that night when

16   you went to dinner with Mr. Guy Jean-Pierre and Mr. -- and

17   E.J., undercover agent, did that recording match the

18   conversation that occurred when you went to dinner?

19   A.   To my memory, yes, sir.

20   Q.   Okay.  At any time when you were listening to that

21   recording, did you have any doubt that that was not you

22   speaking --

23   A.   No.

24   Q.   -- in that recording?

25   A.   No.

427

Direct - Sears

1           MR. SIBERT:  Your Honor, at this time, the

2    Government would like to -- oh, and before I forget.

3    BY MR. SIBERT:

4    Q.   You also listened to the clips of that recording; is

5    that right?

6    A.   Yes.

7    Q.   And those clips had a caption transcript being played

8    with it.

9    A.   Yes.

10   Q.   And did that transcript correctly transcribe what was

11   being said in the recording?

12   A.   Once again, sir, I wasn't paying attention to the

13   transcript.  I was listening to the audio, so I can't . . .

14           MR. SIBERT:  Okay.  Your Honor, at this time the

15   Government would like to move for -- into evidence

16   Government Exhibits 357, 358-A through 358-N.

17           THE COURT:  Any objection from the defendant?

18           MR. GOODREID:  Yes, Your Honor.  Again, on my

19   standard -- I guess we'll call it my syncing objection,

20   but, again, I did not hear this witness link his review to

21   those particular exhibit numbers.  Foundationally.

22           So I -- foundation objection.

23           THE COURT:  All right.  And no objection to 357?

24           MR. GOODREID:  Correct, Your Honor.

25           THE COURT:  All right.  Government Exhibit 357 is

                              Direct - Sears

1     admitted into evidence and may be published to the jury.  I

2     agree with Mr. Goodreid, Mr. Sibert, you need to lay

3     additional foundation with respect to any specific audio

4     files through this witness.

5          (Government's Exhibit 357 received)

6     BY MR. SIBERT:

7     Q.   Okay.  And I apologize, but -- again, sir, you

8     listened to the pieces of the recording regarding the

9     dinner meeting; is that correct?

10    A.   Yes, sir, it is.

11    Q.   Okay.  And, in fact, you did that over at our office

12    on Sunday; is that right?

13    A.   Yes, sir.

14    Q.   Okay.  And did those pieces of the dinner meeting, the

15    clips of the dinner meeting, did they correctly reflect

16    what was on Exhibit 357, which was the entire recording of

17    the dinner meeting?

18    A.   Yes, sir.

19    Q.   And at any point, did you ever have any doubt the

20    voice on those recordings was not yours?

21    A.   No, no doubt, sir.

22          MR. SIBERT:  Your Honor, I, at this time, would

23    like to move into evidence Government Exhibits 358-A

24    through N.

25          THE COURT:  All right.  I'm going to overrule the

Direct - Sears

1    defendant's objection.  Exhibit 358-A through N are
2    admitted into evidence.
3           Members of the jury, the same instruction with
4    respect to the audio and the captioning of that audio.
5       (Government's Exhibits 358-A through 358-N received)
6    BY MR. SIBERT:
7    Q.   And undoubtedly, sir, the next day, did you
8    participate in a breakfast meeting?
9    A.   Yes, I did.
10   Q.   Okay.  Who was at the breakfast meeting?
11   A.   Myself, an undercover agent known as E.J., and Mr. Guy
12   Jean-Pierre.
13   Q.   Okay.  And were you able to watch a recording of that
14   breakfast meeting?
15   A.   Yes, sir.
16   Q.   Okay.  And based upon your watching that recording,
17   did that recording and video correctly reflect what
18   occurred at the breakfast meeting?
19   A.   Yes, it did.
20   Q.   Okay.  And this occurred in Miami?
21   A.   Yes, it did.
22   Q.   Within a Miami hotel room?
23   A.   Yes, sir.
24   Q.   Okay.  And there's actually audio and video; is that
25   correct?

Direct - Sears

1    A.    That is correct.

2    Q.    And were you able to listen and watch both of these --

3    A.    Yes, sir.

4    Q.    -- recordings?

5    A.    Yes, sir.

6    Q.    Okay.  Anything in the recording or audio that was

7    different than what occurred in the hotel room?

8    A.    Not to my recollection.

9    Q.    And you were present in the hotel room?

10   A.    Yes, I was, sir.

11   Q.    And everything that's on that audio and recording was

12   correctly recorded based upon what you stated and did in

13   that hotel room?

14   A.    As to my recollection.

15   Q.    Okay.  And now also you got to watch video clips that

16   also had audio and video of that breakfasting meeting; is

17   that right?

18   A.    Yes.

19   Q.    Okay.  And did those clips match the complete video

20   and audio recording?

21   A.    Yes.

22   Q.    Okay.

23   A.    To the best of my recollection.

24   Q.    And those clips, like we've seen before, and like

25   you've been asked before, had a caption that transcribed

Direct - Sears

1    what was going on of what was being said in that hotel
2    room; is that correct?
3    A.   Yes, sir, it did.
4    Q.   Did that transcription correctly reflect what was
5    being said in the hotel room?
6    A.   Unfortunately, as before, I wasn't paying attention to
7    the transcript, I was busy watching the video, so I can't
8    say that.
9         MR. SIBERT:   Your Honor, at this time the
10   Government would like to move into evidence Government
11   Exhibits 360, 361, 362, 363-A through 363-I.
12        THE COURT:   All right.  And just to clarify the
13   record, for the record 360, 361, 362 are audio and visual
14   files that do not contain captions; is that correct?
15        MR. SIBERT:   So, Exhibit 360 does not have the
16   transcript --
17        THE COURT:   All right.
18        MR. SIBERT:   Government Exhibit 361 is synced with
19   a transcript.  And --
20        THE COURT:   Okay.  There's -- oh, so 361 is the --
21   has the caption with the transcription of the entirety of
22   360?
23        MR. SIBERT:   Yes, sir.
24        THE COURT:   All right.  And is that -- and is 362
25   just the audio -- the video file without the caption?

432
Direct - Sears

1        MR. SIBERT:  Yes, sir.

2        THE COURT:  All right.  All right.  Is there an

3   objection from the defendant to any of these proffered

4   exhibits?

5        MR. GOODREID:  Your Honor, I maintain my syncing

6   objection to 361.  Not to 360.  And if I understood

7   Government counsel correctly, 362 is not synced, so we

8   don't object to that.  And I'm not sure, was there another

9   exhibit after that?

10        THE COURT:  363-A through I.

11        MR. GOODREID:  Oh, and so my syncing objection to

12   those.  So not to repeat that, no objection to 360 and 362.

13   My syncing objection to 361 and the 363 series.

14        THE COURT:  All right.  There being no objection,

15   Government Exhibits 360 and 362 are admitted into evidence

16   and may be published to the jury.

17        Exhibits 361 and 363-A through I are admitted into

18   evidence over the defendant's objection.  The defendant's

19   objections to those two exhibits are overruled.  And,

20   again, members of the jury, same instruction with respect

21   to the captioning transcript of those two exhibits.

22        (Government's Exhibits 360, 361, 362, 363-A thru 363-I

23   received)

24        MR. SIBERT:  May I proceed, Your Honor?

25        THE COURT:  You may.

433

Direct - Sears

1          MR. SIBERT:  Thank you.

2          Can we please have Government Exhibit 358-A

3     played.

4          (Audio played).

5          MR. SIBERT:  I'm sorry, Your Honor.  Can I have

6     the time shown?

7          (Audio played)

8          THE COURT:  Why did we play that twice?

9          MR. SIBERT:  I needed the time to show on my

10    monitor.

11         THE COURT:  Why are we spending trial time, court

12    time, going through this small talk?

13         MR. SIBERT:  Because it is showing -- I'm sorry,

14    Your Honor, I don't believe it is small talk.  I think it

15    shows an introduction --

16         THE COURT:  That's the definition of small talk.

17    Can we just -- I mean, you know, you got -- we don't have

18    the 13 days we originally hoped to have for this trial, we

19    have 11 days.  I'm concerned about the pace that the

20    evidence is coming in, and taking up limited court time on

21    small talk gibberish like this I don't think is advancing

22    anything.

23         So let's get to the files that have what you

24    believe are evidence in support of the Government's counts.

25         MR. SIBERT:  Okay.  Can I please have Exhibit

Direct - Sears

1    358-B played.

2        (Audio played)

3    BY MR. SIBERT:

4    Q.   Okay, sir, can you quickly summarize what that

5    conversation was about.

6    A.   Moving money offshore into a third party account.

7    Q.   Okay.  Now, you stated previously in your testimony

8    that you were working off a script that the FBI wrote you.

9    A.   Yes.

10   Q.   There's no FBI agent in this -- at this part of the

11   recording; is that right?

12   A.   That is correct.

13   Q.   You're on your own?

14   A.   Well, I was coached prior, thoroughly.

15   Q.   But there's no one writing you anything at this

16   point?

17   A.   No.

18   Q.   Okay.  Mr. -- you state that there's 245 left.  What

19   does that mean?

20   A.   That would be from the original 250,000 that was

21   scripted that I was to tell him we sent in the cashier's

22   check for $5,000 now with 245,000.

23   Q.   What did Mr. Guy Jean-Pierre mean when he said 25?  To

24   start with 25?

25   A.   I would imagine $25,000 in a wire transfer.

435
Cross - Sears

1   Q.   All right.

2            MR. SIBERT:  Your Honor, may I have a moment?

3            THE COURT:  You may.

4            MR. SIBERT:  Your Honor, I'll pass the witness.

5            THE COURT:  Cross-examination.

6            MR. GOODREID:  Yes, thank you, Your Honor.

7                         CROSS-EXAMINATION

8   BY MR. GOODREID:

9   Q.   Good afternoon, Mr. Sears.

10  A.   Good afternoon, sir.

11  Q.   Could we pull up Government Exhibit 372-CCC, please.

12           Mr. Sears, are you able to see that clearly or do

13  you need to see it in hard copy?

14  A.   I can see clearly, this particular one.

15  Q.   All right.  Do you see down -- can we scroll down to

16  the middle of the page, please -- where it starts with the

17  language, on January 14th.  I'm sorry, I've got one too

18  many Cs in there, I apologize.  It should be 372-CC.

19  That's my mistake.  Beg your pardon.  Okay.  Okay.  And if

20  we can go to the middle there.

21           Can you see that clearly, Mr. Sears?

22  A.   Yes, I can.

23  Q.   See in the middle there where it says "on January

24  14th, 2012"?

25  A.   Yes.

Cross - Sears

1    Q.   And it says -- and this is an e-mail you got from Mr.
2    Jean-Pierre, right?
3    A.   Yes, sir.
4    Q.   And it says, "also, since" -- you see where it says
5    "since I am still in the DR, you can try to reach me on my
6    cell phone . . . Of course, since I'm going into surgery
7    this morning I doubt they're going to permit me use of my
8    cell phone for a while"?
9    A.   Yes, sir.
10   Q.   You recall the context of that was Mr. Guy Jean-Pierre
11   had been in a serious auto accident; is that right?
12   A.   Yes.
13   Q.   And, in fact, he had suffered a serious head injury as
14   the result of that accident, right?
15   A.   Two cerebral hematomas from what I remember.
16   Q.   Thank you.  Take that down.
17        So do you recall an exchange -- I want to ask you
18   some questions now about the sting operation.  Do you
19   recall an exchange you had with Mr. Sibert on your direct
20   examination where he asked you about the language in one of
21   these recordings about "just like we did with FusionPharm"?
22   A.   Indeed.
23   Q.   Do you remember that?
24   A.   Yes.
25   Q.   And you said that that was -- that the FBI had

Cross - Sears

1    scripted that; isn't that correct?

2    A.    That is right.

3    Q.    Does that mean that you take some disagreement with

4    the sting operation being "just like we did with

5    FusionPharm"?

6    A.    Yes, I take -- yes.

7    Q.    And could you explain that disagreement, please.

8    A.    I believe the entire thing was scripted to be like

9    that, to mirror it, to try to make the FusionPharm ordeal

10   be something that it wasn't, in my opinion.

11   Q.    Okay.  How was it -- how was FusionPharm not like

12   that?

13   A.    Because -- because none of it was premeditated like

14   that.

15   Q.    All right.  And you also said in that exchange with

16   Mr. Sibert that you were upset with the Government.  Could

17   you explain that, please.

18   A.    If you could elaborate on what part, sir.

19   Q.    Well, you were talking about the "just like we did

20   with the FusionPharm," and Mr. Sibert asked you were you

21   upset and you said, "I'm upset with you, sir."

22         What did you mean by that?

23   A.    Well, honestly, when we did our prep on Sunday, this

24   would go a certain way, as I told those -- things were

25   going to go and it was anything but, so . . .

Cross - Sears

1    Q.   And how did it not go the way you thought it was going
2    to go?
3    A.   I was told I was to identify e-mails and there was
4    this, and sign off, and that was the end of it, and we
5    weren't going to worry about content.  And now as I sit
6    here, I feel like I'm the one on trial.
7    Q.   Now you also today on a break said something to Mr. --
8    to Mr. Sibert to the effect that he was off script; isn't
9    that right?
10   A.   Indeed, sir.
11   Q.   And what did you mean by that?
12           MR. SIBERT:  Your Honor, may I approach on this,
13   please?
14           MR. GOODREID:  Judge, I think we're talking about
15   a script --
16           THE WITNESS:  My exact --
17           THE COURT:  Hold on, hold on.
18           THE COURT:  You better have a very good reason for
19   asking for a sidebar.
20        (Discussion at sidebar)
21           MR. SIBERT:  Your Honor, as an officer of the
22   Court, you gave the order to the witness not to discuss any
23   testimony or talk --
24           THE COURT:  Lower your voice.
25           MR. SIBERT:  -- or not talk to any counsel.

Cross - Sears

1          THE COURT:  Right.

2          MR. SIBERT:  As I was leaving for lunch -- or

3   actually the restroom, Mr. Sears held the door open for me.

4   As I walked through the door, Mr. Sears --

5          THE COURT:  Mr. Sibert, please lower your voice.

6          MR. SIBERT:  I wrote you a message.

7          THE COURT:  I got it.

8          MR. SIBERT:  So you know what he said.

9          THE COURT:  And you think this is an appropriate

10  time to raise that --

11         MR. SIBERT:  Absolutely.

12         THE COURT:  -- to break up this cross-examination?

13         MR. SIBERT:  Absolutely.  It's contempt of court.

14  He didn't obey the Court's order.  And now I informed the

15  defense as a -- as a officer of the court that there was a

16  violation of the court order, and now they're turning it

17  around to use it in a cross-examination.  So they're going

18  to use a violation of the Court's order against the

19  Government's case in chief.

20         THE COURT:  Okay.  I don't know how many times I

21  have to tell you to lower your voice.

22         I'll hear from you, Mr. Goodreid.

23         MR. GOODREID:  Your Honor, I can't imagine why

24  this is improper.  We're talking about this witness said

25  that he thought there was a scripted arrangement between

440

Cross - Sears

1    him and the Government.  I'm inquiring about that.  His

2    comment to Mr. Sibert relates directly to the script.

3            THE COURT:  Right.  Okay.  Is this your

4    handwriting?

5            MR. SIBERT:  That's my handwriting, Your Honor.

6            THE COURT:  All right, so I'm -- I don't know if

7    you've seen this.  We might as well put it on the record.

8            So you handed Ms. Frank, my courtroom deputy, this

9    note that she passed to me that you're telling me that this

10   is what the witness, Mr. Sears, told you during the break

11   when you were holding the door open --

12           MR. SIBERT:  When he was holding the door for me.

13           THE COURT:  All right.  Is that correct?

14           MR. SIBERT:  Yes.

15           THE COURT:  Okay.  And the note states, "Why

16   didn't you stick to the script, dickhead?"

17           Now, I'm not happy that that kind of exchange took

18   place, but I don't believe that it is in violation of my

19   order in that the -- my order was directed to any

20   discussion about the substance of his testimony with

21   counsel.  So to have a discussion with you as opposed to

22   having -- to making an ad hominem attack, which, again, I

23   am not agreeing is appropriate and is very inappropriate,

24   but I don't believe it to be a violation of the Court

25   order.

1      And so beyond that, you asked for a sidebar.  I'm
2   assuming you're objecting to the last question.
3          MR. SIBERT:  Right.  I did not want to raise that
4   in front of the jury.  And the reason why is I don't know
5   if he's talking about -- what script he's talking about.
6   And if you're talking about the scripted testimony, then
7   that would be a violation about talking about -- off the
8   bench about testimony.
9          THE COURT:  Mr. Goodreid.
10         MR. GOODREID:  Your Honor, no offense to counsel,
11  I'm not sure he understands that.  I stand on my position.
12  He testified on direct -- he has now talked about a script.
13  I want to know what script he's talking about.  If there's
14  a script between him and the Government on his testimony, I
15  think we're entitled to hear about it.
16         THE COURT:  Right.  I agree.  Did you hear what he
17  just said?
18         MR. SIBERT:  No.
19         THE COURT:  Let me paraphrase it.  You correct me
20  if I'm misstating it.
21         MR. GOODREID:  Please.
22         THE COURT:  Mr. Goodreid believes, and I agree,
23  that the defendant is entitled to know whether the script
24  that he's referring to in the question was a reference to a
25  script that you had for his testimony as opposed to a

Cross - Sears

1    script for the discussion of the events that took place

2    during the --

3            MR. SIBERT:  Okay.  Fair point.  But can we do

4    this outside the presence of the jury?  Because the answer,

5    if it's a script to the testimony, then it does go against

6    your order about discussing testimony.

7            THE COURT:  No, no, no, no.  His question about --

8    when he testified earlier that he was testifying according

9    to the script, right?  And Mr. Goodreid asked, "What script

10   are you talking about?"

11           MR. SIBERT:  So we're not talking -- the way I

12   understood the question was it was after the testimony

13   that Mr. -- that the witness approached Mr. Sibert about

14   the script.  And that's why I asked for a sidebar.

15           THE COURT:  No.  That's not what I'm understanding

16   the question is about.

17           MR. GOODREID:  No.

18           THE COURT:  The question is whether the Government

19   has provided a script for this witness for his testimony.

20           MR. SIBERT:  Okay.  So it has nothing to do, then,

21   about what occurred after we took a break for chow -- for

22   lunch?

23           MR. GOODREID:  Well, look, Judge, I'm sorry, but

24   there's two different issues, again.  Whether this witness

25   disobeyed the Court's order is one question; the substance

Cross - Sears

1    of what he said is a different issue.  In the substance of

2    what he said, even if it violates the Court's order, is

3    fair grounds for cross-examination.  It's his remark.

4              THE COURT:  I agree.  I -- Mr. Sibert, here's the

5    point --

6              MR. SIBERT:  Where did the script come up in

7    testimony?  We didn't talk about testimony, fine.  But the

8    only reference I remember about script --

9              THE COURT:  Lower your voice.

10             MR. SIBERT:  The only time --

11             THE COURT:  Lower your voice.

12             MR. SIBERT:  I'm sorry, it's the Marine Corp in

13   me.

14             THE COURT:  You're not in a Marine Corps base,

15   you're in a courtroom.

16             MR. SIBERT:  I can't yell at a general either, so

17   I apologize.

18             So the only time I remember any point where a

19   script came up besides conversation about getting in and

20   out of evidence, is when he called me dickhead about the

21   script.

22             THE COURT:  No, no.  Then you're not remembering

23   what he had -- he has testified in direct -- in response to

24   direct examination that he was stating things to Mr.

25   Jean-Pierre according to the Government's --

444

Cross - Sears

1          MR. SIBERT:  Oh.

2          MR. GOODREID:  According to the script.

3          MR. SIBERT:  Fair point.

4          THE COURT:  And this is --

5          MR. SIBERT:  I don't think --

6          THE COURT:  No, it's not, but that's not what he's

7      asking about.  He gets to ask whether that is, in fact,

8      what the -- he meant by that script, where's -- or he's

9      referencing some kind of script that the Government has

10     scripted for his testimony in this trial.

11         MR. SIBERT:  Okay, so this -- if this is allowed

12     in, the question that when he was -- when I was leaving the

13     courtroom --

14         THE COURT:  No, this is -- he's not asking

15     anything about --

16         MR. SIBERT:  Are you going to go into about

17     after -- what happened after court?

18         MR. GOODREID:  This is no different than if this

19     witness left the courthouse last night and yelled something

20     at the Government that related to his testimony.  Of course

21     I can inquire about that.  It's relevant, it's on point.

22         MR. SIBERT:  But that's about the testimony.  If

23     you're saying the script was part of the testimony, then

24     that is a violation of your order talking about the

25     testimony.

Cross - Sears

1          MR. GOODREID:  But that doesn't matter.

2          THE COURT:  But that doesn't matter.

3          MR. GOODREID:  That's a different issue.

4          MR. SIBERT:  I think it opens doors.

5          THE COURT:  Okay.  The -- the objection by the

6     Government's overruled.  Are you going to need the question

7     re- --

8          MR. GOODREID:  Please, Your Honor.

9          (End of discussion at sidebar)

10         THE COURT:  All right.  Let's give a minute to Ms.

11    George to find the -- that question so she can reread it.

12         The objection's overruled.

13         (Question read)

14    BY MR. GOODREID:

15    Q.   And when you made that remark to Mr. Sibert, what did

16    you mean, Mr. Sears?

17    A.    My exact words were, "What happened to the script?"

18    And what I meant was when I went in for my pretrial prep, I

19    was asked to go over documents, initial them.  Was that my

20    e-mail address, was it not?  And that was going to be --

21    that's how I was briefed and that's what I -- how I was

22    told this was going to go.

23         And as I sit here on my, whatever this is, second

24    or third day, my head spinning, I don't remember, I feel

25    like I'm the one on trial here, so . . .

Cross - Sears

1    Q.   So to follow up on that, do you feel that in some way

2    the Government has deviated from what they -- what they

3    promised you or what you thought was going to happen in

4    this trial?

5    A.   From what he told me was going to happen here.  I was

6    told I was to review e-mails, was this my e-mail?  They

7    weren't going to go into content.  My lawyer was there with

8    me.  And now I'm Pearl Harbored.

9    Q.   All right, Mr. Sears, let's talk about some of the

10   various -- I know you've heard a lot of -- you've seen a

11   lot of recording, you've seen a lot of audio -- and I say

12   you've seen it, you've seen transcripts, you recall we have

13   been going through the last several hours, don't you?

14   A.   Yes, sir.

15   Q.   Okay.  Do you remember at one point on one of those

16   early -- early calls, there was 322-B, that doesn't

17   necessarily mean anything to you, but there was a

18   discussion between you and Mr. Jean-Pierre about aged

19   debt?

20   A.   Yes, sir.

21   Q.   And you remarked with a response to a question that

22   aged debt, and as long as it was aged appropriately enough,

23   that was fine, right?

24   A.   Yes, sir.

25   Q.   And at the time that you were making the comments

1    to -- or having conversation with Mr. Jean-Pierre, he did

2    not know that the age of the debt was being -- that aged

3    debt, that there was something wrong with that, right?  You

4    didn't tell him that, did you?

5    A.    Not at that point of the conversation, I don't

6    believe.  I think I was still saying it was old, at that

7    point.

8    Q.    That it was old?

9    A.    At that point.

10   Q.    And you also recall the different part of the

11   transcript where he said, "I'm not a securities lawyer, I'm

12   a consultant."  You recall that, don't you?

13   A.    Yes, I do, sir.

14   Q.    And you recall Mr. Sibert asked you some questions

15   about that.

16   A.    Yes.

17   Q.    And you said in response to his questions that -- that

18   people draw up paper for lawyers all the time; isn't that

19   right?

20   A.    That's right, sir.

21   Q.    What did you mean by that?

22   A.    Paralegals draw paperwork for lawyers to sign off on

23   every day, as far as I know.

24   Q.    And in terms of your experience with securities, which

25   is fairly vast, that happens on a regular basis?

Cross - Sears

1    A.    Yes.  Even my defense lawyers that I have had.

2    Q.    Now, you recall -- and, again, I'm sure you don't

3    remember the bartender, but in 322-E when you're having a

4    conversation with Mr. Jean-Pierre, he asked you for

5    evidence of the debt; isn't that right?

6    A.    Yes, sir.

7    Q.    Now, he asked for evidence of the debt, but he didn't

8    say to you, "Hey, I'll just make up all these documents

9    with respect to debt," did he?

10   A.    No, he didn't --

11   Q.    He wanted that information from you, right?

12   A.    Yes, sir.

13   Q.    Now, at another point during your direct

14   examination -- and I believe it was in the context of Mr.

15   Sibert had asked you questions about a placeholder; do you

16   remember that?

17   A.    Indeed I do.

18   Q.    And you asked if you could change your answer to

19   something and you were denied the opportunity at that

20   point.  Was there something that you wanted at this point

21   to change your answer about placeholder or something else

22   in that area?

23   A.    Thank you, yes.  Mr. Sibert wanted to make a point to

24   say that my mother was a placeholder in Bayside Realty

25   Holdings and I had testified to that which, indeed, I did

1    not.  I said it was in FusionPharm in the very beginning

2    when I was taking over the shell to clean it up.  She was a

3    placeholder as a secretary, as I recall, not Bayside.

4    Q.   Now, there was a comment on -- I'm going back now

5    before the sting operation, but you remember some of the

6    videos that took place out at FusionPharm?

7    A.   Yes, sir.

8    Q.   And there was a notable quote that you made in one of

9    those.  You said that you had the -- you were the hand up

10   Mona Lisa's skirt, do you remember that?

11   A.   Yes, sir.

12   Q.   And you asked if you could explain that.  You didn't

13   at that time.  What did you mean by that originally when

14   you said it?

15   A.   Originally, because Scott is the organ grinder, if

16   you're familiar with the monkey and the organ grinder, the

17   monkey is the one that makes everybody laugh and the organ

18   grinder is the one who plays the music and makes it happen,

19   he's running the show, the hand up Mona Lisa's skirt are --

20   I'll have to say it again.

21        A monkey and an organ grinder is the monkey is the

22   entertainment, makes everybody smile, much like a hand up

23   Mona Lisa's skirt, that's what makes her smile.  But the

24   monkey is the monkey.

25   Q.   So you were analogizing to that in this remark?

Cross - Sears

1    A.   Yes, sir.

2    Q.   Okay.  Different topic here now.

3         You noted in response to Mr. Sibert's questions

4    that at some point you stopped using -- in your various

5    corporate endeavors, stopped using Mr. Jean-Pierre as

6    counsel, right?

7    A.   Yes, sir.

8    Q.   And you indicated that you started using a different

9    attorney by the name of Fred Lerer; do you recall that?

10   A.   Yes, I do, sir.

11   Q.   And you certainly recall who Mr. Lerer was, don't

12   you?

13   A.   Yes, I do.

14   Q.   In fact, he's a respected SEC attorney, formerly

15   worked for the SEC --

16        MR. SIBERT:  Objection, Your Honor.  Bolstering

17   the witness -- bolstering the evidence, I should say.  And

18   also to knowledge.

19        MR. GOODREID:  Your Honor, I'm not understanding

20   the objection.  Certainly I'm entitled to inquire of this

21   witness' knowledge of a person he mentioned.

22        THE COURT:  I agree.  Overruled.

23   BY MR. GOODREID:

24   Q.   All right, let me start over.  So you remember who Mr.

25   Lerer was, right?

Cross - Sears

1    A.    Yes, I do.

2    Q.    He's a securities attorney, right?

3    A.    Yes, he is.

4    Q.    An as far as you know, he's a well-regarded securities

5    attorney?

6    A.    Yes, sir.

7    Q.    In fact, Mr. Lerer you know formerly worked for the

8    SEC himself; isn't that right?

9    A.    Yes, sir.

10   Q.    Okay.  And after you no longer were using Mr.

11   Jean-Pierre, you retained Mr. Lerer to write opinion

12   letters for your various corporate entities; isn't that

13   right?

14   A.    That is a fact.

15   Q.    And, in fact, a number of those opinion letters were

16   very similar to what Mr. DiTommaso had written for your

17   entities earlier; isn't that right?

18   A.    Yes, sir.

19            MR. GOODREID:  Your Honor, may I have just a

20   minute?

21            THE COURT:  You may.

22            MR. GOODREID:  Your Honor, certainly I don't want

23   to dictate the Court's schedule, but we're close to a break

24   and I think we could make the rest of the

25   cross-examination, to the extent there is any, very

                          Cross - Sears

1    efficient if we broke at this point, if that would be all
2    right with Your Honor.
3              THE COURT:  Yes, I think that's a good suggestion.
4              All right, members of the jury, we will be in
5    recess for 15 minutes.
6         (Jury left the courtroom at 3:05 p.m.)
7              THE COURT:  Same restrictions during the recess,
8    Mr. Sears.
9              THE WITNESS:  Yes, sir.
10        (Recess 3:06 p.m.)
11        (In the presence of the jury at 3:23 p.m.)
12             THE COURT:  All right, Mr. Sears, once again, you
13   remain under oath.
14             Mr. Goodreid, you may resume your examination.
15             MR. GOODREID:  Thank you, Your Honor.
16                  CROSS-EXAMINATION (Continued)
17   BY MR. GOODREID:
18   Q.   All right.  If we could go back to Exhibit 372-CC,
19   which has been admitted into evidence.  Please be kind
20   enough to pull that up.
21             And, again, you -- can you see that, Mr. Sears?
22   A.   It's really fuzzy, sir.
23   Q.   Well, you recall this is the e-mail I asked you about
24   earlier where you had an exchange with Mr. -- with Mr.
25   Jean-Pierre about the accident he had, right?

Cross - Sears

1    A.   Yes, sir.

2              THE COURT:  Is there a portion you want blown up

3    because it's -- the font's very tiny right now.

4    BY MR. GOODREID:

5    Q.   Well, yes, if we could -- if we could highlight the

6    middle of that -- not highlight, but blow up the middle

7    portion.  That's great.  Thank you, Your Honor.

8              THE COURT:  All right.

9    BY MR. GOODREID:

10   Q.   So you recall me asking you questions about this

11   before the break, don't you, Mr. Sears?

12   A.   Yes, sir.

13   Q.   And you noted that Mr. Jean-Pierre had, as a result of

14   his accident, two subdural hematomas, correct?

15   A.   Yes, sir.

16   Q.   And you can see from this e-mail that the e-mail,

17   itself, is dated January 2012, right?

18   A.   Yes, sir.

19   Q.   And your understanding is the accident that he had was

20   shortly before the time of this e-mail, correct?

21   A.   Yes.  Or some time before.

22   Q.   Some time before.

23   A.   Yeah.

24             MR. GOODREID:  Those are all the questions that I

25   have, Your Honor.

                         Redirect - Sears

1              THE COURT:  All right.  Redirect.

2              MR. SIBERT:  Thank you, Your Honor.

3                        REDIRECT EXAMINATION

4     BY MR. SIBERT:

5     Q.   Okay, Mr. Sears, on cross-examination, you indicated

6     that the FBI had a script for you and what they believed

7     had occurred or took place at FusionPharm.

8              MR. GOODREID:  Objection.  Leading.

9              THE COURT:  I'll -- to speed things up I'll let

10    this one go.  Go ahead.

11    BY MR. SIBERT:

12    Q.   Do you recall those questions?

13    A.   Yeah, I didn't say they had a script, I said it was

14    scripted.  It wasn't a physical script.  They were writing

15    and ad libbing and putting a note in front of me and things

16    to that effect.  It was a very specific way I was to do

17    things.

18    Q.   And you were upset because you felt like they scripted

19    it for what they -- for what they believed occurred at

20    FusionPharm.

21             MR. GOODREID:  Objection.  Leading.

22             THE COURT:  Sustained.

23    BY MR. SIBERT:

24    Q.   Why were you upset about the script?

25    A.   I'll just say because I felt like I was lied to in a

455

Redirect - Sears

1    lot of different ways and we'll leave it at that.
2    Q.   All right.  Well, how were you lied to?
3    A.   The entire ordeal.
4    Q.   And tell me what part --
5    A.   Every part of it.
6    Q.   Okay.  What part --
7    A.   We'll start from the back, you know.  Yourself, on
8    Sunday, telling me what curriculum was going to be
9    supposedly that we were going over, none of which happened.
10   Everything.
11   Q.   Okay.  Well, you responded to Mr. Goodreid's question
12   indicating that you did not believe that FusionPharm was
13   like the script that the FBI was asking you to follow.
14   Isn't that how you responded?
15   A.   No, that's not what I meant.  That's maybe what you're
16   reading.  I think the FBI -- and I can't believe I didn't
17   see this one -- put this whole thing together, my
18   undercover sting to almost try to make it like that's
19   exactly what happened with FusionPharm, hence why they used
20   the names Bayside, why they wanted the names VertiFresh.
21   They could have used any other name.  Why use the same name
22   for a sting?
23          None of it corresponded, none of it -- why do that
24   unless you're trying to set a point or set somebody's state
25   of mind for something?

Redirect - Sears

1    Q.   And that's why you're upset?

2    A.   I'm real upset about it, because one -- one is

3    fiction, and the other one you're saying is real, so you're

4    trying to make them like they're both, you know, one and

5    the same.  It's clearly what you're trying to draw here, so

6    it's, you know -- so I'm upset about it, yeah.  I'm really

7    upset about it.

8    Q.   And you're upset about what they portrayed to be real

9    with what occurred at FusionPharm.

10             MR. GOODREID:  Objection.  Leading.

11             THE WITNESS:  Because that's not what happened at

12   FusionPharm, sorry.

13             THE COURT:  Mr. Sears -- Mr. Sears, when there's

14   an objection, please don't start your answer until I've had

15   an opportunity to rule on it.

16             THE WITNESS:  Yes, sir.

17             THE COURT:  Objection sustained.  Next question.

18   BY MR. SIBERT:

19   Q.   So you stated that you -- you just stated that one was

20   fiction, one was real.  Well, what are you talking about

21   there?

22   A.   Actually, that's probably a bad choice of words.

23   Q.   Okay.  Go ahead and explain yourself.

24   A.   Well, I'd prefer not to at the moment because I

25   probably am not going to come out with the right words

Redirect - Sears

1    and --

2            MR. SIBERT:  I would ask the witness to be -- if

3    he can, respond to my question about what he meant.  And if

4    he has a better indication to what his answer was regarding

5    one was real and one was fiction.

6            THE WITNESS:  I think that you, the Government,

7    set this sting up to show what they feel their version of

8    the events that happened at FusionPharm to make it try to

9    show like it was mimicked in this sting, when that is

10   indeed not the fact.

11   BY MR. SIBERT:

12   Q.   Okay.  In the very beginning of your testimony, you

13   signed the plea agreement in this case -- a plea agreement

14   in your criminal case; is that correct?

15   A.   That is correct.

16   Q.   And you pled guilty to conspiring to commit securities

17   fraud relating to FusionPharm stock trading activity; is

18   that right?

19   A.   That --

20           MR. GOODREID:  Objection.  Beyond the scope.

21           THE COURT:  How is this within the scope of

22   cross-examination?

23           MR. SIBERT:  Your Honor, on cross-examination,

24   counsel got out in direct questioning that this witness was

25   upset because of the sting operation was set up as the FBI

Redirect - Sears

1   thought was of the place -- of the events being taken place

2   at FusionPharm.  And that he thought it was essentially,

3   for lack of a better term, not the correct event.

4            THE WITNESS:  Right.

5            MR. SIBERT:  He's now entered a plea agreement

6   that has the facts, that he's pled true and correct to,

7   regarding the events of his criminal activity with

8   FusionPharm.

9            THE COURT:  I see.  I see.  Overruled.

10  BY MR. SIBERT:

11  Q.   All right.  So -- thank you, Your Honor -- and so

12  you've pled guilty in a written plea agreement regarding

13  your conspiracy, your conspiring, to securities fraud

14  relating to FusionPharm stock; is that right?

15           MR. GOODREID:  Objection.  Leading.

16           THE COURT:  Sustained.

17           MR. SIBERT:  It's essentially the same question.

18           THE COURT:  Sustained.

19           MR. SIBERT:  Your Honor, at this time the

20  Government would move to introduce at least the factual

21  basis in Mr. Sears' plea agreement or the entire plea

22  agreement, and we've marked it as Government Exhibit 446.

23           THE COURT:  Are you sure you want to do that?

24           MR. SIBERT:  Yes, sir.

25           THE COURT:  Is there an objection?

1          MR. GOODREID:  Yes, Your Honor.  I don't entirely
2     understand the basis for admitting it, but we object on any
3     number of grounds, not the least of which is relevance.  He
4     certainly can ask the witness about what's in the document,
5     but it doesn't -- I don't know that it has anything to do
6     with the charges in this case.  It's not proper substantive
7     evidence, it's not relevant.
8          THE COURT:  I think there's another way you can
9     cross-examine this witness about what he stipulated to in
10    his plea agreement without us having to admit the plea
11    agreement into evidence, and I would prefer we go that
12    route.
13    BY MR. SIBERT:
14    Q.   All right.  Well the facts in this, sir, are pages 12
15    through 41; is that correct?
16         THE COURT:  Does he have a copy of the plea
17    agreement with him?
18         MR. SIBERT:  I can give it to the courtroom --
19         THE COURT:  You only have one copy?
20         MR. SIBERT:  I have one copy.  We did not have it
21    marked until the door was opened.
22         MR. GOODREID:  Your Honor, as a matter of
23    professional courtesy, I have a copy I will be happy to
24    give to Government counsel.
25         MR. SIBERT:  Do you want me to hand the witness --

Redirect - Sears

1       THE COURT:  Hold on, hold on, hold on.  Let Mr.
2   Goodreid find his copy.
3       MR. SIBERT:  Thank you.
4       THE COURT:  All right.  And then if you'll hand
5   the original to Ms. Frank, she'll give it to the witness.
6       MR. SIBERT:  And, Your Honor, before I continue,
7   under Rule 805, past recollection recorded, I'm going to
8   ask if this -- either we be allowed to enter the document
9   into evidence or allow this witness to be able to read the
10  factual basis because that's his past recollection reported
11  under Rule 805 where these facts were made at a time and
12  place that were closer to the events and what he's -- that
13  was particularly described in the past.  And that's the
14  whole purpose of Rule 805.
15      THE COURT:  You want him to read all the
16  stipulated facts from his plea agreement?
17      MR. SIBERT:  I don't want him to read it, but if
18  the Court is not going to allow me to enter it in as
19  evidence, then yes.
20      THE COURT:  I'm suggesting -- well, first of all,
21  another problem is I don't have a copy of this exhibit, and
22  if you want to put it into evidence, we need copies for
23  the -- and if I allowed it into evidence, the jury's going
24  to have to see and they're going to have to have copies of
25  it.

Redirect - Sears

1          So what I'm recommending -- that's why I

2     recommended an easier way to do this, which would be to

3     proceed with your cross-examination --

4          MR. SIBERT:  I have a copy for the Court.

5          THE COURT:  All right.  I would like to see that,

6     please.  One second.

7          Well, this is -- the factual stipulations go on

8     for pages and pages, so he's not going to be reading it,

9     the past recollection recorded.  You want to -- you want to

10    offer this into evidence for what purpose?

11         MR. SIBERT:  Past -- well, at this point, I

12    believe the witness has qualified under Rule 615, so I

13    would declare he is adverse, so it would be past

14    recollection recorded under 805, therefore not being

15    hearsay and being allowed to be introduced into evidence to

16    contradict the past testimony that he just provided to the

17    jury.

18         THE COURT:  What about the fact that we don't have

19    copies for the jury?

20         MR. SIBERT:  Well, I think before the jury

21    receives the evidence, it will be very easy to get a copy

22    put into the exhibit binders.

23         THE COURT:  Mr. Goodreid.

24         MR. GOODREID:  Your Honor, I also have -- I

25    maintain my relevance objection.  I also would add the

1    bolstering objection.  This is a written recordation of

2    what apparently -- the witness can subscribe to it or not,

3    but it's basically a written record then in his testimony,

4    that's getting pretty close to be giving a transcript of

5    the testimony.  Your Honor said on the very first day of

6    trial we don't give that to the jury, so . . .

7         THE COURT:  But this is not a transcript of his

8    testimony.

9         MR. GOODREID:  It is a record, Your Honor, of what

10   apparently he thinks happened in his case.

11        THE COURT:  Right.  Okay.  All right.  Well, I'm

12   going to overrule those objections.  You know, I gave you

13   the opportunity to think twice about whether you wanted to

14   do this, but you wanted to proceed, so I'm going to

15   overrule the objection.  How are we going to label this?

16        MR. SIBERT:  I believe the copy the witness has is

17   Government Exhibit 346.

18        THE COURT:  346.  All right.  346 is admitted into

19   evidence.  We don't have copies for the jury at this time.

20   We will have to make -- this evening we'll have to --

21   counsel will have to make copies to add to the Court --

22        MR. SIBERT:  Your Honor, I'm sorry, it's 446.

23        THE COURT:  Exhibit 446 is admitted into evidence.

24        I'm sorry, ladies and gentlemen of the jury, we

25   don't have copies for you at this time, but they -- this

463

Redirect - Sears

1    exhibit will be added to the official court set of exhibits

2    that will be -- go back with you for your deliberation and

3    review.

4        (Government's Exhibit 446 received)

5            THE COURT:  And so the Government will have those

6    additional sets made and added to the court binder and my

7    binder -- well, I guess we can just use this one here.

8    We'll add it, Ms. Frank, this evening.  If you could add

9    this to the bench's set of exhibits so I have a full set

10   here, 446.

11           And you may proceed.

12           MR. SIBERT:  All right, Your Honor.  May I have a

13   moment, please?

14           THE COURT:  Yes.

15           MR. SIBERT:  I don't have any further questions,

16   Your Honor.

17           THE COURT:  We went through all that and now you

18   have no questions?

19           MR. SIBERT:  Yes, sir.  I got in what I need for

20   the evidence.

21           THE COURT:  May this witness be excused?

22           MR. SIBERT:  The witness can be excused, Your

23   Honor.

24           THE COURT:  All right.  For the defendant?

25           MR. GOODREID:  Yes, Your Honor.

464

1          THE COURT:  All right.  All right, Mr. Sears, you

2     are excused.  You may step down.

3          THE WITNESS:  Thank you, sir.

4       (This is the conclusion of Mr. Sears' testimony)

5              *       *       *       *       *

6                            **INDEX**

7     Item                                         PAGE

8                   GOVERNMENT'S WITNESSES

9     **WILLIAM SEARS**
      Direct Examination by Mr. Sibert (Cont'd)    287
10    Voir Dire Examination by Mr. Goodreid        327
      Direct Examination by Mr. Sibert (Cont'd)    332
11    Voir Dire Examination by Mr. Goodreid        376
      Direct Examination by Mr. Sibert (Cont'd)    377
12    Cross-examination by Mr. Goodreid            435
      Redirect Examination by Mr. Sibert           454
13

14                   GOVERNMENT'S EXHIBITS

15    EXHIBITS:      Offered    Received   Refused    Stipulated

16    1              322        332

17    1-A            322        332

18    1-B            322        332

19    2-A            317        330

20    2-B            317        330

21    2-C            317        330

22    2-D            317        330

23    2-E            317        330

24    2-F            317        330

25    72             290        291

<u>GOVERNMENT'S EXHIBITS</u>

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|---|---|---|---|---|
| 236,p.1 | 298 | 299 | | |
| 320-A | 375 | 377 | | |
| 320-B | 375 | 377 | | |
| 320-C | 375 | 377 | | |
| 320-D | 375 | 377 | | |
| 320-E | 375 | 377 | | |
| 320-F | 375 | 377 | | |
| 320-G | 375 | 377 | | |
| 320-H | 375 | 377 | | |
| 320-I | 375 | 377 | | |
| 320-J | 375 | 377 | | |
| 320-K | 375 | 377 | | |
| 320-L | 375 | 377 | | |
| 320-M | 375 | 377 | | |
| 322-A | 375 | 377 | | |
| 322-B | 375 | 377 | | |
| 322-C | 375 | 377 | | |
| 322-D | 375 | 377 | | |
| 322-E | 375 | 377 | | |
| 322-F | 375 | 377 | | |
| 322-G | 375 | 377 | | |
| 323-H | 375 | 377 | | |
| 323-I | 375 | 377 | | |

<u>GOVERNMENT'S EXHIBITS</u>

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|-----------|---------|----------|---------|------------|
| 323-J | 375 | 377 | | |
| 323-K | 375 | 377 | | |
| 323-L | 375 | 377 | | |
| 323-M | 375 | 377 | | |
| 350 | 422 | 425 | | |
| 351-A | 422 | 425 | | |
| 351-B | 422 | 425 | | |
| 351-C | 422 | 425 | | |
| 351-D | 422 | 425 | | |
| 351-E | 422 | 425 | | |
| 351-F | 422 | 425 | | |
| 351-G | 422 | 425 | | |
| 351-H | 422 | 425 | | |
| 357 | 427 | 428 | | |
| 358-A | 427 | 429 | | |
| 358-B | 427 | 429 | | |
| 358-C | 427 | 429 | | |
| 358-D | 427 | 429 | | |
| 358-E | 427 | 429 | | |
| 358-F | 427 | 429 | | |
| 358-G | 427 | 429 | | |
| 358-H | 427 | 429 | | |
| 358-I | 427 | 429 | | |

GOVERNMENT'S EXHIBITS

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|-----------|---------|----------|---------|------------|
| 358-J | 427 | 429 | | |
| 358-K | 427 | 429 | | |
| 358-L | 427 | 429 | | |
| 358-M | 427 | 429 | | |
| 358-N | 427 | 429 | | |
| 360 | 431 | 432 | | |
| 361 | 431 | 432 | | |
| 362 | 431 | 432 | | |
| 363-A | 431 | 432 | | |
| 363-B | 431 | 432 | | |
| 363-C | 431 | 432 | | |
| 353-D | 431 | 432 | | |
| 353-E | 431 | 432 | | |
| 353-F | 431 | 432 | | |
| 353-G | 431 | 432 | | |
| 353-H | 431 | 432 | | |
| 353-I | 431 | 432 | | |
| 446 | 458 | 462 | | |

\*     \*     \*     \*     \*

REPORTER'S CERTIFICATE

     I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

1          Dated at Denver, Colorado, this 11th day of July,

2     2019.

3

4

5

6          MARY J. GEORGE, FCRR, CRR, RMR

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25