1

1     IN THE UNITED STATES DISTRICT COURT

2         FOR THE DISTRICT OF COLORADO

3     Criminal Action No. 17-cr-0008-WJM

4     UNITED STATES OF AMERICA,

5     Plaintiff,

6     vs.

7     GUY M. JEAN-PIERRE, a/k/a MARCELO DOMINGUEZ de GUERRA,

8     Defendant.

9     ------------------------------------------------------------
          REPORTER'S PARTIAL TRANSCRIPT OF SCOTT DITTMAN
10                    (Jury Trial, Day 3)
                        Volume I
11    ------------------------------------------------------------

12

13    Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

14    Judge, United States District Court for the District of

15    Colorado, on the 16th day of January, 2019, in Courtroom

16    A801, United States Courthouse, Denver, Colorado.

17
                        APPEARANCES
18
          JEREMY S. SIBERT and ROBERT M. BROWN, Assistant U.S.
19    Attorneys, 1801 California Street, Suite 1600, Denver,
      Colorado 80202, appearing for the plaintiff.
20
          CLIFFORD J. BARNARD, Attorney at Law, 4450 Arapahoe
21    Avenue, Suite 100, Boulder, Colorado 80303, AND
          THOMAS E. GOODREID, Attorney at Law, 1801 Broadway,
22    Suite 1400, Denver, Colorado 80202, appearing for the
      defendant.
23

24            MARY J. GEORGE, FCRR, CRR, RMR
           901 19th Street, Denver, Colorado 80294
25        Proceedings Reported by Mechanical Stenography
              Transcription Produced via Computer

Direct - Dittman

1        P R O C E E D I N G S

2            (This is a transcript of the testimony of Scott

3    Disttman)

4                *       *       *       *       *

5            THE COURT:  Government may call its next witness.

6            MR. SIBERT:  Your Honor, at this time the

7    Government would like to call Scott Dittman.

8            COURTROOM DEPUTY:  If you'll step up right here.

9    Will you please raise your right hand.

10           SCOTT DITTMAN, GOVERNMENT'S WITNESS, SWORN

11           COURTROOM DEPUTY:  Would you please sit down and

12   scooch your chair there.  And please state your full name

13   and spell it for the record.

14           THE WITNESS:  Excuse me.  Scott Dittman.

15   S-c-o-t-t, D-i-t-t-m-a-n.

16                      DIRECT EXAMINATION

17   BY MR. SIBERT:

18   Q.   Okay, good afternoon, sir.

19   A.   Good afternoon.

20   Q.   Okay.  Sir, can you explain to the jury where you're

21   currently living.

22   A.   Yes.  I live in Oley, Pennsylvania, about an hour

23   north of Philadelphia.

24   Q.   Okay.  Sir, how long have you lived there?

25   A.   We moved to Pennsylvania in 1993.

Direct - Dittman

Q.   Okay.  Have you been residing in Pennsylvania since 1993?

A.   Yes.

Q.   Did you ever reside anywhere in Colorado from 2010 to 2014?

A.   Yes.  I resided in Colorado most of my life before Pennsylvania, and 2010 to 2014, entirely in Colorado.

Q.   Okay.  And so when I asked you did you reside anywhere else besides Pennsylvania, I guess maybe I didn't phrase my question correctly.  But have you always been in Pennsylvania since 1993?

A.   Oh, I'm sorry, I thought you said 2013.  No.  Pennsylvania since 2013.  From 1974 to 2013 with the exception of four years in San Francisco right after college, I was in Colorado the whole time.

Q.   Okay.  And, sir, are you currently working?

A.   I am a semi-employed consultant and a stay-at-home dad.

Q.   Okay.  What do you consult?

A.   I'm consulting currently with an Israeli company on an industrial hemp and lettuce project in the nation of Gibraltar.

Q.   When you say "hemp," can you tell me what you mean by that?

A.   Sure.  Industrial hemp is a plant of the -- from the

Direct - Dittman

1    same family of plants as marijuana.  As people would know

2    that, hemp has no THC, which is the psychoactive compound

3    in marijuana.  It's grown all around the world and legally

4    in the U.S. now.

5    Q.    I'm going to ask you just to slow down.  We have a

6    court reporter here and also I need to hear you, the jury

7    needs to hear you, the parties need to hear you.

8    A.    Understood.

9    Q.    Okay.  All right, sir.  I want to take you back

10   essentially to 2010.  Or, actually, 2010, 2011 time frame.

11   All right?  Did you begin a company known as FusionPharm?

12   A.    I did --

13   Q.    And can you tell the jury what FusionPharm was about.

14   A.    Fusionpharm was a -- what in the beginning we called a

15   cannabis support company.  Our initial business model was

16   providing equipment into the cannabis cultivation space.

17          I invented a product that we called the grow pod.

18   It was a shipping container-based plant-cultivation room.

19   We used them, sold them to cannabis growers in Colorado,

20   eventually across the United States, and up into Canada.

21   Q.    All right.

22   A.    Do you want me to go on to the rest of the --

23   Q.    No.

24   A.    Okay.

25   Q.    You summarized it well.

Direct - Dittman

1        And before you started FusionPharm, can you tell

2   me what -- now, you say you lived four years in

3   San Francisco.  What did you do in San Francisco?

4   A.   I was a -- I worked for Arthur Anderson, which is a --

5   at the time was a Big Eight public accounting firm.  I was

6   a -- my first year I was in audit services and my last 2

7   1/2 years I was in a group called Enterprise Consulting,

8   which was a small business consulting arm.

9   Q.   And by way of education, do you have a -- what's

10  called a CPA?

11  A.   I do -- well, I did have a CPA, yes.

12  Q.   And that's a certified public accountant?

13  A.   Certified public accountant, yes.

14  Q.   You had a CPA?

15  A.   I did.

16  Q.   I assume you don't have a CPA anymore?

17  A.   No.  I received my CPA in, I believe, the end of 1993

18  or the beginning of 1994, and I retired from public

19  accounting in the spring of 1995.

20  Q.   Okay.  And I assume you just didn't keep up your

21  license?

22  A.   Correct, yeah.

23  Q.   All right.  Now, you said that you started the company

24  FusionPharm.  What was your role at FusionPharm?

25  A.   I was the CEO.

Direct - Dittman

1    Q.   Okay.  Did you partner with anyone with -- at

2    FusionPharm?

3    A.   Partner, no.  FusionPharm was a corporation, so I

4    think I need maybe a more specific question.

5    Q.   Okay.  Can you look at Government Exhibit 150.

6    A.   How do I do that?  Oh, sorry, I do --

7    Q.   I'm going to ask for the assistance.

8         It's going to be on your screen.  If you can't see

9    it on your screen, please let me know.

10   A.   I see it.  The beginning of it, anyway.  Okay.

11        MR. SIBERT:  And, Your Honor, I'd like to

12   introduce this into evidence.  This has been stipulated to.

13        THE COURT:  All right.  Given the stipulation of

14   the parties, Government Exhibit 150 is admitted into

15   evidence and may be published to the jury.

16        (Government's Exhibit 150 received)

17        MR. SIBERT:  And, Your Honor, I need to come clean

18   with the Court.  The exhibit numbers I sent last night to

19   the Court and to counsel, I actually forgot my copy here

20   for court, and, unfortunately, can't bring it up on my

21   computer because I'm not hooked up to our web, so I believe

22   counsel had an extra copy.

23        THE COURT:  Well . . .

24   BY MR. SIBERT:

25   Q.   All right, sir, I'm going to show you what's been

Direct - Dittman

1    marked -- you're looking at what's been marked as

2    Government Exhibit 150.  I want you to focus in on the top

3    part of this document.  That's an e-mail, that's the

4    address, subject line; is that correct?

5    A.    Correct.

6    Q.    And who's sending that e-mail?

7    A.    That's me.

8    Q.    Okay.  And this is your FusionPharm e-mail address?

9    A.    It is.

10   Q.    Okay.  And the date of this e-mail is what?

11   A.    April 21st, 2011.

12   Q.    And the subject is what?

13   A.    FusionPharm.

14   Q.    Okay.  And for some reason, you sent it to yourself?

15   A.    Apparently, yes.

16   Q.    And if you look here, if you read that line there --

17   could you read that line there?

18   A.    "Recently, I have partnered with my brother-in-law

19   William Sears, and we have acquired and moved our

20   operations into a publicly traded company:  FusionPharm,

21   Inc."

22   Q.    So you just stated that you didn't partner with anyone

23   and here's a document that you just stated you sent through

24   e-mail where essentially it states that you have just

25   partnered with your brother-in-law, William Sears.  Is that

Direct - Dittman

1   right?

2   A.    It does say that, yes.

3   Q.    Thank you.  And then can I have the second page of

4   that, please.  And that would be the last part, the

5   signature part of that letter -- or document.

6           THE COURT:  Is there a question?

7   BY MR. SIBERT:

8   Q.   I asked him if that's the last part of this document

9   where his signature -- where his name -- where it says

10  "Scott Dittman, CEO"?

11  A.    It appears to be, yes.

12  Q.    Do you need to look at the document?

13  A.    No, I'm assuming that's the second page of the first

14  page.  I trust you.

15  Q.    Okay, sir, based upon that, was your brother-in-law,

16  William Sears, ever paid by FusionPharm?

17          MR. BARNARD:  Your Honor, I object.  I would like

18  a statement as to what "that" is.

19  BY MR. SIBERT:

20  Q.    Okay.  Based upon that press clipping, where there's a

21  document stating from you that you partnered with your

22  brother-in-law, was Mr. William Sears ever paid by

23  FusionPharm?

24  A.    I'm not sure, based on that document, but I do know

25  that he was paid by FusionPharm at one point in 2011, yes.

Direct - Dittman

1    Q.   Okay.  Do you know how much?

2    A.   Not exactly, no.

3    Q.   Did you have a payroll processor at FusionPharm?

4    A.   Yes.

5    Q.   Okay.

6    A.   More than one over the years.

7    Q.   Okay.  Do you know who your payroll processor was in

8    September of 2011?

9    A.   I think it was Paychecks, but I -- I'm not certain.

10   Q.   All right.  Now, essentially could you describe what

11   roles -- did Mr. Sears work at FusionPharm?

12   A.   For a period of time in 2011, as a salesman, yes.

13   Q.   Did he have any other roles?

14   A.   Paid roles at FusionPharm, no.

15   Q.   And -- I'm sorry, did he have payrolls is what you

16   said?

17   A.   Paid roles.  His job.

18   Q.   Okay.  So I'm confused because I just asked you if Mr.

19   Sears got paid and you said yes, and now you're saying he

20   didn't have any paid roles?

21   A.   His paid role was a salesman in 2011.

22   Q.   And that was the only job he had?

23   A.   That he was being paid for, yes.

24   Q.   Okay.  Did he have other jobs that he wasn't being

25   paid for at FusionPharm?

1    A.   He helped the company out in a number of ways, yes.

2    Q.   Can you tell me which ways Mr. Sears helped out the

3    company?

4    A.   Well, he helped to form the company, so from the

5    beginning -- excuse me, Bill was the stock guy.  Stock

6    companies and Pink Sheet stocks are not my background, so

7    Bill and Mr. Jean-Pierre worked together to transition the

8    company that was Baby Bee Bright into the company that

9    became FusionPharm.  That took four or five months from the

10   fall of 2010 until the spring of 2011.

11        Mr. Sears -- he had a number of roles.  Would you

12   like me to just try to run through all of them?

13   Q.   Actually, let's stop there for a second.

14   A.   Okay.

15   Q.   You called your brother-in-law the stock guy.

16   A.   Yes.

17   Q.   What does that mean?

18   A.   Well, it means he was familiar with stocks and

19   publicly traded companies and all of the -- everything that

20   had to do with that side of the business.

21   Q.   Okay.  So how did he impact FusionPharm being the

22   stock guy?

23   A.   Well, he formed the company with Guy.  He handled all

24   the paperwork, handled all the communication with the

25   various government entities.  I'm not sure I actually know

Direct - Dittman

1    what government entities needed to be contacted, but

2    whatever needed to happen in that interim period, he worked

3    with Guy to handle that paperwork.

4         During the time that FusionPharm was in existence,

5    Bill did things -- stock things like handling the paperwork

6    for new investors who were investing in the 144 shares,

7    contacting the transfer agent if we needed -- excuse me --

8    if we needed paperwork or if we needed reports.  So, you

9    know, just about anything stock oriented, I delegated to

10   Bill.

11   Q.   Okay.  Now, you just mentioned that it was Bill and

12   Guy that helped set up the paperwork, and I believe it was

13   regarding the change of corporation entities.

14   A.   Correct.

15   Q.   Okay.  And those corporation entities, were those Baby

16   Bee Bright to FusionPharm?

17   A.   Correct.

18   Q.   Okay.  And when you said "Guy," who are you talking

19   about?

20   A.   Guy Jean-Pierre.

21   Q.   Okay.  Do you see Mr. Guy Jean-Pierre here in the

22   courtroom?

23   A.   I do.

24   Q.   And can you please point him out and identify

25   something he's wearing.

Direct - Dittman

1    A.   Right there in the gray suit with the clean-shaven

2    head.

3    Q.   Okay.  All right.  So now as the stock guy and setting

4    up this corporation -- so it's fair to say that Mr. Sears

5    knew Fusion -- well, did Mr. Sears know that you were going

6    to be the CEO of FusionPharm?

7    A.   Oh, of course.

8    Q.   And did Mr. Guy Jean-Pierre know that you were going

9    to be the CEO of FusionPharm?

10   A.   Yes.

11   Q.   Okay.  Now, do you know who Salt Investments --

12   A.   Salt Investments?

13   Q.   Yes, sir.

14   A.   Yes.

15   Q.   What is Salt Investments?

16   A.   It's an LLC that I owned in my construction and

17   home-building businesses before these entities, before

18   FusionPharm.

19   Q.   Okay.

20   A.   And ultimately I think I held my stock in that entity.

21   Q.   Okay.  So when you say you held your stock, what are

22   you talking about?

23   A.   Well, as the CEO and majority owner of FusionPharm, I

24   had -- I think 1.5 million restricted shares, and rather

25   than holding them in my personal name, I held them in my

Direct - Dittman

1    LLC's name, which was Salt Investments.

2    Q.   Do you recall how many shares you actually had?

3    A.   I think it was 1.5 million, to begin with.  But maybe

4    ended up at 1.47 something.

5              MR. SIBERT:  Can I have a moment, Your Honor?

6              THE COURT:  You may.

7              MR. SIBERT:  Your Honor -- actually, I'll do this

8    this way -- can I have Government Exhibit 61 brought back

9    up?  I believe have page 6.  Make that page 7.

10   BY MR. SIBERT:

11   Q.   Okay, sir, now, you didn't -- you didn't work with the

12   transfer agency during your time with FusionPharm, did you?

13   A.   Well, yes, sometimes.

14   Q.   Sometimes?

15   A.   Yeah.

16   Q.   Who mainly handled the transfer agency?

17   A.   Mostly Bill.

18   Q.   For FusionPharm?

19   A.   Yes.  And Guy.

20   Q.   And who?

21   A.   And Guy.

22   Q.   So just to be clear on the record, when we talk about

23   Guy, we're talking about Mr. Guy Jean-Pierre?

24   A.   Yes.

25   Q.   All right.

1   A.   Would you prefer that I refer to it that way from now

2   on?

3   Q.   If you could.

4   A.   Okay, sure.

5   Q.   I know it's a lot --

6   A.   No, that's okay.

7   Q.   I understand the difficulties.

8   A.   I'll try.

9   Q.   Thank you.

10  A.   You bet.

11  Q.   All right.  So now can you just look here in the

12  middle -- I'm going to have it blown up for you -- okay,

13  does this refresh your memory of how many shares you

14  started out with with FusionPharm?  And if we scroll up, I

15  can show you the date of this letter.

16  A.   No, I don't know that I've ever seen this letter.

17  Q.   Okay.  Are you saying 1.3 million would not be

18  correct?

19  A.   No, maybe 1.3 million is correct.  1.5 total with the

20  other 200,000; yes, I think 1.3 million is correct.

21  Q.   Okay.  And then just to clarify, this address -- does

22  that address have a relationship to you?

23  A.   Yes.  That was my home in Franktown.

24  Q.   Okay.  And did you live there in 2010?

25  A.   I did.

Direct - Dittman

1    Q.    And how long did you live there for?

2    A.    We moved there in -- either 2008 or 2009 until we

3    moved to Pennsylvania, so until 2013.

4    Q.    Thank you.

5    A.    You're welcome.

6    Q.    Okay.  Now, do you know what happened -- you stated

7    1.5 total.  So if 1.3 went to you, do you know where the

8    rest of the 200,000 went of preferred shares?

9    A.    Ultimately, 185,000 to my little brother, Bob, and

10   15,000 to Fred Dahlman kept as part of the transaction.

11   Q.    Okay.  And you said "ultimately."

12   A.    Right.

13   Q.    It finally went to your brother Robert Dittman?

14   A.    Correct.

15   Q.    Where did it -- did it go somewhere else before Mr.

16   Robert Dittman had those shares?

17   A.    I believe it did.

18   Q.    Do you know where?

19   A.    I'm not sure I know the exact order, but subsequent to

20   the investigation, I have been through that quite a number

21   of times, so yes, I do now.

22   Q.    Okay.  And what's your understanding?

23   A.    I think that it went to MicroCap first, then to an

24   entity that my sister owned named -- called La Di Da, and

25   then to my little brother.

Direct - Dittman

1    Q.   Okay.  And do you know who owned MicroCap?

2    A.   My understanding -- it was Billy's company to begin

3    with, but my understanding at the time of FusionPharm was

4    that he had transferred that to a gentleman named Richie

5    Scholz in Florida.

6    Q.   Okay.  Who helped with the distribution of shares when

7    they were transferred from MicroCap to La Di Da to your

8    brother Robert Dittman?

9    A.   Honestly --

10            MR. BARNARD:  Your Honor, I object.  Lack of

11   foundation.

12            THE COURT:  Do you have personal knowledge of how

13   this happened?

14            THE WITNESS:  I don't.

15            THE COURT:  Okay.  Sustained.

16   BY MR. SIBERT:

17   Q.   Now, you stated -- I'll move on here.

18            Now, do you know that Mr. Sears -- we were going

19   through some of his duties.  Did Mr. Sears ever assist with

20   what's considered the business plan for FusionPharm?

21   A.   Yes.  In writing the business plan?

22   Q.   Writing it, revising --

23            MR. BARNARD:  Your Honor, object.  Leading.

24            THE COURT:  Sustained.

25   BY MR. SIBERT:

Direct - Dittman

1   Q.   Did Mr. Sears have any input on the business plan for

2   FusionPharm?

3   A.   Yes.

4   Q.   And what types of activities or inputs did he have

5   with the business plan?

6   A.   Well, the -- I certainly would have consulted Bill

7   about the business plan.  Make no mistake, it was my

8   business plan.  FusionPharm was my invention, my creation,

9   and my company, but I certainly would have consulted him.

10          Ultimately he brought in Cliffe Bodden to help

11  write the business plan, but previous to that, we had hired

12  a professional business plan writer that he suggested.  I

13  don't recall where she was from.  She didn't do a very good

14  job.  And then I think we ultimately ended up with Cliffe

15  helping with the business plan.

16  Q.   Okay.  And I guess you stated -- I just want to make

17  sure it's clear -- that you would -- when you said you

18  would consult with Mr. Sears about the business plan, could

19  you describe to me, essentially, kind of how that would go

20  about?

21  A.   Honestly, I don't remember specifically, but it

22  wouldn't have been at all unusual for me to bounce ideas

23  off of Billy, both as to things I was thinking about doing

24  with the business and, you know, more technical, you know,

25  actual making sure that the business plan, you know, was

Direct - Dittman

1    good type of questions.

2    Q.   Okay.  Now, I guess that brings up another point.  In

3    order for Mr. Sears to be able to provide his input to the

4    business plan for you, Mr. Sears had to know essentially

5    the foundation and building blocks of the company.

6    A.   Certainly.

7    Q.   Did he also have to understand how the company was

8    operating?

9    A.   Operating in what -- I'm not sure exactly I understand

10   that question, sir.

11   Q.   Okay.  Well, was -- let me just ask maybe a little bit

12   more straightforward:  How often was Mr. Sears around

13   either the offices or the facilities, warehouses, at

14   FusionPharm?

15   A.   Quite a lot.

16   Q.   Okay.  And when you say "quite a lot," can you give an

17   example?

18   A.   It varies.  So in the beginning, back in 2011, the

19   first office, it's difficult to say exactly, but he was

20   probably in the office half the time, I would imagine, and

21   even before he officially became a sales employee.  And

22   then as the business progressed and as he ultimately became

23   MeadPoint, then we had co-office space together, so he was

24   in the office virtually all the time.  And that lasted all

25   the way through until the spring of 2014 when he wasn't.

Direct - Dittman

1    Q.   Okay.  And you bring up a good point, MeadPoint.  What

2    was your understanding of MeadPoint?

3    A.   MeadPoint -- as it relates to FusionPharm, MeadPoint

4    was our distribution company.  So we sold containers to

5    MeadPoint and MeadPoint in turn sold containers into the

6    marketplace.  They were like a distributor.

7    Q.   Okay.  And who owned MeadPoint?

8    A.   Billy and his mother, I believe.  In the beginning.

9    Q.   And do you know who was on the official paperwork in

10   the beginning for FusionPharm?

11   A.   On the paperwork for FusionPharm?  Myself.  Other than

12   that page that you just showed me, I'm -- the ownership of

13   FusionPharm would have been all the stockholders and

14   everything else.  There's 835 of them.  I'm not sure I can

15   answer that question directly.

16   Q.   Let me try to tailor my question.

17   A.   Please.

18   Q.   How about corporate paperwork for FusionPharm?

19   A.   Who was on corporate paperwork for FusionPharm?

20   Q.   Yes, sir.

21   A.   Again, are you looking for something specific?  But, I

22   mean, generally myself is the answer to your question.

23   Q.   Okay.  Okay.  Now, in October of 2011, FusionPharm was

24   contacted by FINRA.  Do you recall that?

25   A.   I do.

Direct - Dittman

1    Q.   Okay.  And, essentially, do you recall who contacted

2    you from FINRA?

3    A.   A gentleman named Kramer.

4    Q.   Okay.  And can you explain what Mr. Kramer was

5    contacting you -- did he contact you directly?

6    A.   The first phone call was received by the office by

7    Andy Duke, I believe, but subsequently I spoke to him

8    directly, yes.

9    Q.   Okay.  And what types of questions did Mr. Kramer want

10   to know about FusionPharm through you as the CEO?

11   A.   He asked a lot of questions about FusionPharm and what

12   it did and its products and its customers.  And he asked me

13   a lot of questions about press releases that we had put out

14   up to that point in time, the deals that we had been

15   negotiating, and he was looking for paperwork and backup

16   and support for all of those things.

17         And that he started asking, at the end, questions

18   about the stock and if I knew who was trading the stock.

19   Q.   Okay.  And you just mentioned "the press releases that

20   we were putting out."

21   A.   Yes.  "We" is FusionPharm.

22   Q.   Okay.  I just wanted to clarify that.

23   A.   Understood.

24   Q.   Okay.  And do you recall the questions about did

25   Sandra Sears ever own FusionPharm?

Direct - Dittman

1    A.   I don't believe that was ever asked, no.

2    Q.   Okay.  How about did Mr. Kramer ever ask you about Mr.

3    William Sears' role in FusionPharm?

4    A.   I don't think he did, no.

5    Q.   And do you recall any questions regarding the stock

6    questions that Mr. Kramer was asking you?

7    A.   I do.

8    Q.   And could you tell me what those questions were.

9    A.   He ran through a long list of names, asking me if I

10   knew the names of people.  Presumably, I guess, people who

11   were trying to get the stock.  There must have been two

12   dozen of them, at least.  I didn't know any of them.  And

13   then he asked me about my brother-in-law, Bill Sears.

14   Q.   Okay.  So now you recall the fact that he did ask you

15   about Mr. William Sears.

16   A.   Oh, I'm -- I didn't realize I didn't recall that

17   before.

18   Q.   I asked you if he asked you any questions regarding

19   Mr. Sears.

20   A.   You asked me if he asked questions about Mr. Sears'

21   role in FusionPharm and he did not.

22   Q.   Okay.  I'm sorry.  So he was asking you about Mr.

23   Sears' involvement with selling FusionPharm stock?

24   A.   He asked me that, yes.

25              MR. SIBERT:  Your Honor, again, as we did for the

1    last three days, I have a list -- a laundry list of

2    exhibits that I'll be showing this witness.  I know we're

3    late in the day.

4              THE COURT:  Now, this is the list that you

5    e-mailed to defense counsel and my chambers last night?

6              MR. SIBERT:  Yes, sir.

7              THE COURT:  Okay.  Are there any changes to that?

8              MR. SIBERT:  Right now, there's no changes.

9              THE COURT:  All right.  Well, why don't we just

10   use that tomorrow when we resume the examination with Mr.

11   Dittman.  It is 5:00.

12             MR. SIBERT:  Thank you, Your Honor.  I appreciate

13   that.

14             THE COURT:  All right.  All right, ladies and

15   gentlemen of the jury, we're going to call it a day.

16             Hold tight, sir.

17             THE WITNESS:  Of course.

18             THE COURT:  As I had already mentioned to you

19   twice, and I'll do it again, please do not do any

20   independent research into or discuss with anyone the facts,

21   the law, or the persons involved in this courtroom.  We

22   will be in recess, again, for the same time and resume our

23   trial at the same time as we've done today, at 8:45

24   tomorrow.  I'll ask you to be back in the deliberation room

25   by 8:35.

23

1        We will be in recess until 8:45 tomorrow morning.

2        (Jury left the courtroom at 5:01 p.m.)

3        THE COURT:  All right, Mr. Dittman, since you're

4   in the middle of your testimony, I direct you not to speak

5   with any of the lawyers during the recess between now and

6   tomorrow morning.

7        THE WITNESS:  Understood.

8        THE COURT:  If you'll be back here in the

9   courtroom by 8:35 tomorrow morning.

10        THE WITNESS:  Okay.

11        (Proceedings concluded at 5:02 p.m.)

12

13                           **INDEX**

14   Item                                              PAGE

15                   GOVERNMENT'S WITNESSES

16   **SCOTT DITTMAN**
     Direct Examination by Mr. Sibert                2
17

18

19                   GOVERNMENT'S EXHIBITS

20   EXHIBITS:       Offered    Received   Refused   Stipulated

21   150             6          6

22

23                   *        *        *        *        *

24

25

REPORTER'S CERTIFICATE


     I certify that the foregoing is a correct transcript
from the record of proceedings in the above-entitled
matter.
     Dated at Denver, Colorado, this 27th day of June, 2019




_                                             _
                    MARY J. GEORGE, FCRR, CRR, RMR