1           IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF COLORADO

3   Criminal Action No. 17-cr-0008-WJM

4   UNITED STATES OF AMERICA,

5   Plaintiff,

6   vs.

7   GUY M. JEAN-PIERRE, a/k/a MARCELO DOMINGUEZ de GUERRA,

8   Defendant.

9   ------------------------------------------------------------
        REPORTER'S PARTIAL TRANSCRIPT OF SCOTT DITTMAN
10                   (Jury Trial, Day 4)
                        Volume II
11  ------------------------------------------------------------

12       Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

13  Judge, United States District Court for the District of

14  Colorado, commencing at 9:09 a.m., on the 17th day of

15  January, 2019, in Courtroom A801, United States Courthouse,

16  Denver, Colorado.

17
                        APPEARANCES
18
        JEREMY S. SIBERT and ROBERT M. BROWN, Assistant U.S.
19  Attorneys, 1801 California Street, Suite 1600, Denver,
    Colorado 80202, appearing for the plaintiff.
20
        CLIFFORD J. BARNARD, Attorney at Law, 4450 Arapahoe
21  Avenue, Suite 100, Boulder, Colorado 80303, AND
        THOMAS E. GOODREID, Attorney at Law, 1801 Broadway,
22  Suite 1400, Denver, Colorado 80202, appearing for the
    defendant.
23

24            MARY J. GEORGE, FCRR, CRR, RMR
           901 19th Street, Denver, Colorado 80294
25        Proceedings Reported by Mechanical Stenography
            Transcription Produced via Computer

26

Direct - Dittman

1          P R O C E E D I N G S

2          (This is a transcript of the testimony of Scott

3     Dittman)

4                    *     *     *     *     *

5          (Jury was present at 9:09 a.m.)

6          THE COURT:  Good morning, ladies and gentlemen of

7     the jury.  Welcome back to day 4 of our jury trial.

8          Mr. Dittman, I remind you that you remain under

9     oath.

10          THE WITNESS:  Yes, thank you.

11          THE COURT:  All right.  Mr. Sibert, you may resume

12     your examination.

13          MR. SIBERT:  Okay, thank you, Your Honor.

14                    DIRECT EXAMINATION (Continued)

15     BY MR. SIBERT:

16     Q.   Good morning, sir.  All right.  So we left off

17     yesterday afternoon just doing essentially a little

18     introduction to your role at FusionPharm.  I just want to

19     back up a little bit, and you stated that you worked for

20     Arthur and Anderson in San Francisco; is that correct?

21     A.   Arthur Anderson, yes.

22     Q.   Could you just describe, I guess, a little bit more in

23     detail the type of work that you did for them in the

24     accounting when you were in the accounting world?

25     A.   Sure.  My first year, I worked in San Francisco office

Direct - Dittman

1    in a -- in a group called Audit Services.  We basically

2    went in and did audits of companies.  And after my first

3    year, I transferred into the Oakland office into a group

4    called Enterprise Consulting and we did small business

5    consulting services.

6    Q.   Okay.  And so when you were with the audit group doing

7    the audits of companies, did you have to look through the

8    corporation paperwork?

9    A.   No, not really.  First years pretty much do simple

10   things like bank statements and stuff like that.

11   Q.   Okay.  So financial statements?

12   A.   No, not really.  The -- you know, first years aren't

13   trusted with stuff like that; that's for people who are

14   much further along the line in Arthur Anderson.

15   Q.   Okay.  So how about later when you were in Oakland?

16   A.   Did I ever look at financial statements?

17   Q.   Yes.

18   A.   Sure.

19   Q.   And corporate records?

20   A.   No, not so much.  Not really part of what we did.

21   Q.   Did you ever have to look at the records that were

22   published by the corporations regarding their finances?

23   A.   I'm not sure I understand the question, sir.

24   Q.   Well, like you're familiar with the SEC, correct?

25   A.   Sure.

Direct - Dittman

1    Q.   And corporations need to go ahead and disclose their

2    finances with the SEC.

3    A.   Publicly traded companies, yes.

4    Q.   Okay.  Did you ever look at some of those records

5    during your time when you were working as a CPA?

6    A.   If I did, then not very much.  Enterprise Consulting

7    is a small business service so I don't think we had any

8    public companies.  But certainly Arthur Anderson had lots

9    of public companies.

10   Q.   All right.  Well, to pass the CPA exam you would have

11   to know something about the corporate documents; fair to

12   say?

13   A.   Yes.

14   Q.   All right.

15        MR. SIBERT:  Your Honor, at this time -- this has

16   not been admitted into evidence -- I would like the witness

17   to look at Government Exhibit 374.  374 is a very large

18   document.  I've provided the attachments that we plan to

19   use in this document, if I could get it into evidence, and

20   it starts at page 304 and 305 of document 374.

21        And I provided a copy to the Court along with

22   counsel.  And I can bring it up on the screen.

23        THE COURT:  All right.  So -- all right.  So 374

24   is not stipulated to.

25        MR. SIBERT:  That is not stipulated to.

Direct - Dittman

1          THE COURT:  Okay.  And you are -- you're going to

2     begin a foundation examination with this witness, and it's

3     your goal to admit all of the exhibit or just pages 304 and

4     305?

5          MR. SIBERT:  Just pages 304 and 305 of

6     Exhibit 374.

7          THE COURT:  All right.  Okay.  So do you have them

8     pulled out or should --

9          MR. SIBERT:  Your Honor, I can bring it on the

10    screen for --

11         THE COURT:  Oh, just on the -- all right.  Just

12    dealing with only two pages, that's fine.  Go ahead.

13         MR. BARNARD:  Your Honor, we would stipulate to

14    the admission of those two pages.

15         THE COURT:  All right.  Well, that's helpful.

16         MR. SIBERT:  Makes my job easier.

17         THE COURT:  All right.  Given the stipulation of

18    the parties, pages 304 and 305 only of Exhibit 374 are

19    admitted into evidence and may be published to the jury.

20       (Government's Exhibit 374, pages 304 and 305 received)

21         MR. SIBERT:  Could I have that published, please.

22         THE COURT:  Sure.

23         MR. SIBERT:  Thank you.

24    BY MR. SIBERT:

25    Q.   Sir, can you see the exhibit on the screen that is

1    appearing before you now?

2    A.    I can.

3    Q.    All right.  Now, I just want to -- if you could take a

4    look through.

5         Can you pull up the second page, please.  And go

6    to the signature.

7         Now, that's your signature on that; is that

8    correct?

9    A.    It is.

10   Q.    Okay.  And can we go back to the first page.  And I

11   just want to point out this top part here.

12        All right, sir, this letter is addressed to the

13   Florida Bar.  Do you see that?

14             MR. BARNARD:  Your Honor, object.  Leading.

15             THE COURT:  It's introductory; I'll overrule it.

16             THE WITNESS:  Yes.

17   BY MR. SIBERT:

18   Q.    Okay.  And do you know why you were writing a letter

19   to the Florida Bar?

20   A.    As I recall, Guy had called and was in a disagreement,

21   as he described it, with another lawyer in Florida and he

22   asked me if I would write a letter of recommendation for

23   him.

24   Q.    Okay.  And just for the record, to be clear, when you

25   say "Guy," you're talking about the defendant --

Direct - Dittman

1    A.    Yes, Mr. Jean-Pierre, yes.

2    Q.    And I just want to see -- can you reference what the

3    "RE" is in the letter?

4    A.    The bar complaint file Number 2011-51, 158(17D).

5    Q.    Okay.  And then can you look at the date of the letter

6    for me.

7    A.    April the 7th, 2011.

8    Q.    Okay.  Can you please scroll down to the second

9    paragraph on the first page.  Thank you.

10          Okay.  Now, Mr. Guy Jean-Pierre was the legal

11   counsel, corporate secretary, for FusionPharm; is that

12   correct?

13   A.    Legal counsel, yes; corporate secretary might have

14   come slightly later.

15   Q.    Okay.  So definitely the corporate counsel, then?

16   A.    Yeah, oh, for sure.

17   Q.    The lawyer.

18   A.    Yes, definitely.

19   Q.    Okay.  So let me ask you:  Can you read this sentence

20   here.  I just want to ask you a follow-on question once

21   you're finished.

22   A.    Yes.  "We then contacted Mr. Jean-Pierre and he

23   advised us that he could not furnish the Pink Sheets

24   opinion letter, but could review the Company's disclosure

25   on Pink Sheets to make sure it meets the required

Direct - Dittman

1    guidelines, do all due diligence and make sure everything

2    was ready for an opinion to be issued."

3    Q.   Do you know why Mr. Guy Jean-Pierre could not furnish

4    opinion letters to Pink Sheets?

5    A.   Do I know now or did I know then?

6    Q.   Did you know then?

7    A.   As it was described to me then, it was all part of the

8    same issue that he was having with the bar.

9    Q.   Okay.  Okay.  Can I have the second page, please.

10   Blow up -- thank you.

11          Can you take a look at this sentence.  If you

12   can't see it, I can erase the line.

13   A.   I'm sorry, starting and ending at "providers"?

14   Q.   I'm sorry.  "An associate."

15   A.    "An associate told us said that Pink Sheets said the

16   reason his letters of opinion were not acceptable was that

17   he had been placed on the list of unacceptable providers."

18   Q.   And then?

19   A.   "At that point we began asking questions.  The

20   responses that was given was that he did not answer Pink

21   Sheet inquiries in a timely manner.  This is strange as we

22   thought Pink Sheets was only a third party information

23   service."

24   Q.   Okay.  Now Pink Sheets is essentially OTC markets; is

25   that right?

Direct - Dittman

1    A.    That's correct.

2    Q.    And those were the disclosures that you had to make.

3    What did you have to do with OTC Markets?

4    A.    We had to make an annual disclosure, what's called an

5    information and disclosure statement, once a year.  We

6    actually were making it quarterly, I believe, in 2011.  And

7    quarterly we had to upload financial statements to OTC

8    Markets website.

9    Q.    Okay.  Do you know where your disclosures were placed?

10   A.    I'm not sure I understand the question.

11   Q.    Do you know where OTC placed your disclosures about

12   your company, FusionPharm?

13   A.    On their website.

14   Q.    Okay.  And who could see those disclosures?

15   A.    Anybody.

16   Q.    So it was for public viewing?

17   A.    Yeah.

18   Q.    So the public could learn about your company?

19   A.    Yes.

20   Q.    And learn about your financials?

21   A.    Yes.

22   Q.    Okay.  So now you obviously had a personal interest in

23   the success of your company, FusionPharm?

24   A.    Certainly.

25   Q.    And this was very important to you.

Direct - Dittman

1    A.    Yes.

2    Q.    Were you working any other jobs at the time?

3    A.    Oh, no.

4    Q.    Was this your career at the time?

5    A.    Yes.

6    Q.    All right.  So your corporate counsel, you learn in

7    2011, in April, is having difficulties submitting the

8    paperwork essentially for the platform that shows the

9    public what your company is about; is that fair to say?

10   A.    Yes.

11   Q.    And you still kept Mr. Guy Jean-Pierre as your

12   corporate counsel even after knowing this?

13   A.    Yes.  Well, I mean, we -- at the time, we believed it

14   was a temporary thing that would ultimately get fixed, and

15   Mr. Jean-Pierre had another lawyer partner that he worked

16   with who was capable of signing those, and so they worked

17   together and we were able to get done what we needed to get

18   done.

19   Q.    We'll get back to that.  Okay.  Based upon your

20   experience there; is that correct?  Is that what you're

21   writing there?

22   A.    Yes.

23   Q.    All right.  Well, when did Mr. Guy Jean-Pierre start

24   doing work with FusionPharm?

25   A.    In the fall of 2010.

Direct - Dittman

Q.   Okay.  Well, my understanding is FusionPharm didn't
come into existence until 2011.

A.   Well, that's true, but he handled the transition from
Baby Bee Bright to FusionPharm.

Q.   Okay.  And who handled that transition with Mr. Guy
Jean-Pierre?

A.   Bill Sears, primarily.

Q.   And so when -- I guess a better question is, as I said
before, when did Guy Jean-Pierre start doing work for
FusionPharm?

A.   Well, I don't think FusionPharm came into existence
officially until maybe the 3d of April.  So just before
this letter.

Q.   So just before this letter.  And so based upon the
company that you ran, four days later all that experience
is why you're writing this letter for Mr. Guy Jean-Pierre?

A.   Well, no.  He handled the transition for the previous
six months and as part of this was explained to me at the
time, sir, the complaint that he was dealing with in
Florida with the bar had to do with him overcharging
clients and that was part of the issue.

          I think maybe that's referenced somewhere in the
letter, although I have not seen this letter in a very long
time

Q.   But you just stated it was William Sears and Mr. Guy

Direct - Dittman

1    Jean-Pierre that handled the prior six months --

2    A.   I wasn't completely uninvolved.  I had documents to

3    sign, I needed to know what was going on.  I was -- you

4    know, I was paying attention.  And when we were done,

5    everything, you know, seemed to be handled well.  I had no

6    reason not to recommend Guy at this point in time.

7    Q.   So no more than six months.

8    A.   Yes.  Correct.

9    Q.   Do you know who drafted this letter?

10   A.   Guy drafted the first version.

11   Q.   So you basically signed a letter that was drafted by

12   the defendant in this case?

13   A.   No, I think we modified it somewhat.  Took out things

14   I wasn't comfortable with in the first version.

15   Q.   All right, sir.  Can you take that down.  Thank you.

16        Now, in November 2010, the time frame essentially

17   when Baby Bee Bright was taken over by FusionPharm, who was

18   listed as an officer for FusionPharm?

19   A.   In 2010?  Well, there was no FusionPharm in 2010.

20   Q.   Okay.  Based upon your memory, whenever FusionPharm

21   started, who was listed as officers?

22   A.   Myself and Sandra Sears.

23   Q.   Okay.  And who is Sandra Sears?

24   A.   Bill's mother.

25   Q.   Okay.  And does she work at FusionPharm?

Direct - Dittman

A.    No.

Q.    So can -- why was she listed as an officer?

A.    She was listed for the simple fact that during that transition phase, when the stock certificates were issued, when the first certificates went from being Baby Bee Bright to being FusionPharm, it required two signatures on the certificate and we had to have both a, you know, president's or CEO and the corporate secretary.

Q.    Okay.  So why would you choose William Sears' mother?

A.    For -- Bill recommended it.  It was -- it was a, you know, we'll put her on there until, you know, the company is done formed and we replace her sort of thing.

Q.    But you just testified that it was Mr. Sears working with the defendant, Mr. Guy Jean-Pierre, setting up this corporation.

A.    Yes.

Q.    You were involved.

A.    Yes.

Q.    Okay.  So you have three people that you know that understand this transition process; is that fair?

A.    Correct.

Q.    Why didn't you just put William Sears on the paperwork?

A.    I already knew that Bill was never going to be an officer or director of the company because of his previous

1    felony.

2    Q.   Okay.  And what was his previous -- what was his

3    previous felony?

4    A.   He was -- he pled guilty to a commercial bribery

5    charge, as I understood it, which is, as I understand now,

6    a securities fraud violation, years before I knew him.

7    Q.   Okay.  And did Mr. Guy Jean-Pierre know about that

8    securities violation?

9    A.   Yes.

10        MR. BARNARD:  Objection, Your Honor.

11   Foundation --

12        THE COURT:  Hold on.

13        THE WITNESS:  Sorry.

14        MR. BARNARD:  -- and calls for speculation.

15        THE COURT:  Mr. Dittman, when you hear an

16   objection, please pause --

17        THE WITNESS:  Sorry, sir.

18        THE COURT:  -- let me rule on it before you

19   answer.

20        That objection is -- well, it's sustained insofar

21   as I think you need to lay more foundation that this

22   witness has a basis to have personal knowledge of this.

23        MR. SIBERT:  Okay.

24   BY MR. SIBERT:

25   Q.   Sir, you just stated -- you just wrote a letter of

Direct - Dittman

1   recommendation for Mr. Guy Jean-Pierre based upon your

2   extensive relationship in six months, stating he's a

3   qualified lawyer and you were supporting him against the

4   bar complaint; is that right?

5   A.    Yes.

6   Q.    He was -- what was his role, as you stated before, in

7   FusionPharm?

8   A.    He was the corporate counsel.

9   Q.    And did you consult with him about the corporate

10  paperwork?

11  A.    Yes.

12  Q.    And did that include the names that needed to be on

13  the corporate paperwork?

14  A.    Yes.

15  Q.    Okay.  Did Mr. Guy Jean-Pierre know your concerns

16  regarding Mr. Sears?

17  A.    Yes.

18  Q.    And what advice did Mr. Guy Jean-Pierre provide you

19  about your concerns about William Sears' securities fraud

20  violation -- crime from 2007?

21  A.    That's a broad question.  There's -- I mean --

22  Q.    Did he -- did Mr. Guy Jean-Pierre recommend to put Mr.

23  William Sears down as an officer or director?

24  A.    To put him down as -- to --

25  Q.    To put him in writing as an officer and director.

40

Direct - Dittman

1   A.   No.

2   Q.   And why did he advise you not to do that?

3             THE COURT:  Hold on.

4             MR. BARNARD:  Objection.  Foundation.

5             THE COURT:  That's overruled.  I think sufficient

6   foundation has been laid.

7             If you know.  Don't speculate or guess.

8             THE WITNESS:  Understood.

9             Can you repeat the question?

10  BY MR. SIBERT:

11  Q.   Sure.  You just stated that Mr. Guy Jean-Pierre told

12  you not to put Mr. Sears down as a director or officer of

13  FusionPharm.

14  A.   I'm not sure I would characterize it exactly like

15  that.  We certainly discussed, Bill and Guy and I, and

16  the -- that -- to -- if Bill were to be an officer or

17  director of FusionPharm, that it would require disclosure

18  of his past felony, and that was something that I was

19  simply not willing to have involved with my business,

20  period.  So . . .

21  Q.   And why didn't you want that involved in your

22  business?

23  A.   Why didn't I want to disclose a felon as a officer or

24  director of my business?

25  Q.   Yes.

Direct - Dittman

1    A.   Well, for all of the reasons that you might expect.

2    It's a brand-new business.  It's in the marijuana support

3    industry.  There was a great deal of concern about the

4    federal government in that industry back in 2011.  It's not

5    good for business in general; it certainly is not good for

6    credibility, probably isn't good for the stock.

7         I mean, there's no good reason to put a felon on

8    as an officer or director of a brand-new company.

9    Q.   So one of the concerns was the stock price for your

10   company?

11   A.   It was one of the concerns, certainly.

12   Q.   Now you testified that it was William Sears'

13   suggestion to put Sandra Sears down as the -- as one of the

14   officers or directors, as one of the two names you

15   needed?

16   A.   As I recall, yes.

17   Q.   Okay.  Did Mr. Guy Jean-Pierre know that?

18   A.   I don't know.  I don't recall speaking to Guy about

19   that.

20   Q.   Okay.  Did -- do you know if Mr. Guy Jean-Pierre

21   reviewed the paperwork?

22   A.   I can't say for certain, but I have to believe that he

23   did.  It was a long time ago.

24   Q.   So you are not sure if your corporate counsel reviewed

25   the start-up paperwork for your company?

Direct - Dittman

1   A.   Well, there was a lot of start-up paperwork that was

2   coming back and forth.  I don't know specifically with that

3   piece of paperwork, but I have -- I certainly believe that

4   he did, but I can't tell you that I recall the conversation

5   or the specific time Guy might have sat down and discussed

6   that particular thing in 2011.

7   Q.   All right.  Well, what would you expect your corporate

8   counsel, that you're paying, to do?

9   A.   Sir, I would expect him to have reviewed it.  I have

10  said that.  I just don't recall specifically having that

11  conversation.

12  Q.   But you believe he did?

13  A.   I do believe he did.

14  Q.   Okay, sir, do you recall a reverse split that happened

15  with your company, FusionPharm?

16  A.   Yes.

17  Q.   Okay.  Do you know whose suggestion it was to conduct

18  a reverse split?

19  A.   As I recall, it was Billy and Guy at the time.  That

20  was something that was discussed fairly early on.

21  Q.   Okay.  And, again, when you say "Guy," you're

22  referring to --

23  A.   Yes, sorry.  Mr. Jean-Pierre.  Yes.  Apologies.

24  Q.   That's okay.  Now, do you know what happened with the

25  reverse split in this case?

1   A.   It -- do I know what it was --

2   Q.   Sure.

3   A.   -- the amount?  I believe it was a 200-for-1 reverse

4   split.

5   Q.   Okay.  And can you tell the jury what that means.

6   A.   Yeah.  So in a situation like this one where the

7   publicly traded company like Baby Bee Bright is becoming a

8   new publicly traded company -- I'm going to get some of

9   these figures slightly wrong, but there were somewhere in

10  the neighborhood of 170 million shares of stock of Baby Bee

11  Bright outstanding.  Baby Bee Bright was a company that was

12  on its last breath and it was failing.  The way the

13  transaction worked -- am I giving too much detail or is

14  this okay?

15  Q.   You can keep going.

16  A.   The transition from Baby Bee Bright to FusionPharm

17  with 170 million shares of stock outstanding -- understand

18  that FusionPharm is my business, we are moving it -- we are

19  transitioning Baby Bee Bright into FusionPharm.  Clearly I

20  want to own FusionPharm, this is my business.  If I were to

21  move into FusionPharm and leave 170 million shares

22  outstanding, then I would only -- the very best I could

23  have owned less than half of the company and that wouldn't

24  make any sense.  I would never have done the transaction.

25       So the way these transactions typically work,

Direct - Dittman

1    because those shareholders of the Baby Bee Bright are

2    already -- sorry, I'm looking for a euphemism that doesn't

3    include a curse -- are already in trouble, you know,

4    they're -- basically are not going to get anything because

5    Baby Bee Bright is essentially dead.  You do a reverse

6    stock split to bring that number of shares way down

7    relative to the preferred shares that I would own, so in

8    the end when I took over the company, I owned, in concert

9    with my little brother who got the shares as we discussed

10   yesterday, somewhere around 97 percent of the shares, which

11   it makes sense for me to do the transaction and take over

12   the company, basically.  So the reverse split's necessary

13   to bring the shareholder number down.

14   Q.   Okay, great.  So thank you for that answer.

15   A.   Sure.

16   Q.   So just -- just so I make sure I understand, if you

17   had Baby Bee Bright shares --

18   A.   Uhm-hum.

19   Q.   -- your shares were reduced after the reverse merger

20   -- or reverse split?

21   A.   Yes.

22   Q.   And can you tell me by how many?

23   A.   200-to-1.

24   Q.   So if you had 200 shares, you now own one?

25   A.   Correct.

Direct - Dittman

1   Q.   Okay.  Did the reverse split affect the preferred

2   shares?

3   A.   No.  Preferred shares are exempt from the reverse

4   split.

5   Q.   So this only had to do with common shares?

6   A.   Yes, I believe that's correct.

7   Q.   Okay.  And, again, I assume there was paperwork when

8   it came to the reverse split?

9   A.   I'm sure.

10  Q.   Okay.  Do you know who assisted you with the paperwork

11  in the reverse split?

12  A.   Mr. Jean-Pierre and Bill Sears.

13  Q.   Okay.  Sir, we started out with the attorney letter

14  that you -- or, excuse me, the letter that you wrote on

15  behalf of the defendant to the Florida Bar.  Based upon an

16  April 7th, 2011 -- after that date, was the defendant able

17  to sign the letters that were submitted to the OTC Markets

18  for publication to the public?

19  A.   No; Mr. DiTommaso signed those.

20  Q.   And who was Mr. DiTommaso?

21  A.   He was another attorney that worked with Guy -- with

22  Mr. Jean-Pierre.

23  Q.   Okay.  And did you ever meet Mr. DiTommaso?

24  A.   I did.

25  Q.   Okay.  How many times did you meet him in person?

Direct - Dittman

1    A.    Face to face, one time.

2    Q.    Okay.  And where did this happen?

3    A.    In Los Angeles, where his office was, near the

4    airport.

5    Q.    Okay.  And how long was that meeting?

6    A.    My recollection, a few hours.

7    Q.    Okay.  And do you recall who arranged the meeting for

8    you to meet Mr. DiTommaso?

9    A.    I -- I think Mr. Jean-Pierre.  He certainly made the

10   introduction, so I assume he arranged the meeting.

11   Q.    Okay.  Can you look at Exhibit 385 for me?

12         Can I have 385 brought up?

13         MR. SIBERT:  Your Honor, 385 is -- check my

14   list --

15         THE COURT:  Is it already in, Ms. Frank?

16         COURTROOM DEPUTY:  Yes, it is.

17         MR. SIBERT:  I believe it's already admitted, Your

18   Honor.  Thank you.

19         THE COURT:  It is.

20   BY MR. SIBERT:

21   Q.    Okay.  Can you just blow up the top of that e-mail.

22         Do you recognize who is sending you this e-mail,

23   Mr. Dittman?

24   A.    I do.

25   Q.    And who's sending you the e-mail?

Direct - Dittman

1    A.    Mr. Jean-Pierre.

2    Q.    Okay.  And obviously the date of this e-mail is July

3    18th, 2011?

4    A.    It is.

5    Q.    All right.  And what's the subject?

6    A.    "Meeting with attorney re Pink Sheets Opinion letter."

7    Q.    Essentially can you just take a look at that e-mail

8    for a second.  Okay.  Does that refresh your memory?

9    A.    Yes.

10   Q.    Okay.  Who arranged the meeting?

11   A.    Mr. Jean-Pierre.

12   Q.    And he provided you Mr. Tod DiTommaso's contact

13   information?

14   A.    He did.

15   Q.    Thank you.  Was there a requirement for you to meet

16   with Mr. DiTommaso pursuant to the OTC Markets, basically,

17   policies before documents are posted?

18   A.    Yes.

19   Q.    And you stated that you only met with him one time in

20   person?

21   A.    Correct.

22   Q.    And obviously that was in July 2011?

23   A.    Yes.

24   Q.    Did you conduct any calls with Mr. DiTommaso?

25   A.    Yes.

Direct - Dittman

1    Q.   Do you know how many?

2    A.   Not exactly, but a few.  I generally only spoke to Mr.

3    DiTommaso when we had to post an OTC opinion letter to the

4    OTC Markets' website.  We had --

5    Q.   When you say "a few," what do you mean?

6    A.   I would guess somewhere between three and five.  Every

7    time we had to post one, which would be annually, but we

8    were posting them quarterly in the beginning, mistakenly,

9    apparently, so we might have done that, I'm not sure

10   exactly, four or five times, maybe.

11   Q.   Okay.

12   A.   There's a checklist that he would go through on the

13   phone with me, questions he had to ask, et cetera,

14   et cetera.

15   Q.   Now, did you ever discuss with Mr. DiTommaso regarding

16   the information that was being filed after you met with him

17   in 2011?

18   A.   I'm sorry, I don't understand the question.

19   Q.   Did you ever discuss the disclosures, what was in the

20   disclosures, with Mr. DiTommaso after your meeting in

21   2011?

22   A.   Yes.  Every time we had to put them up, he had a

23   checklist he went through with me on the phone.

24   Q.   Can I have Exhibit 385 up again, please.  And can I go

25   to page 3.  And can you focus in on the bottom.

Direct - Dittman

1    Can you look at that bottom piece there that's
2    blown up on your screen.
3    A.    Yes.
4    Q.    That's an e-mail from you; is that correct?
5    A.    Yes.
6    Q.    And do you know who you're e-mailing?
7    A.    I can't see who -- exactly, I think it's probably
8    above what I can see on my screen.  Somebody at Pacific
9    Stock Transfer, but I don't know who.
10   Q.    Okay.  So a representative from the transfer agency?
11   A.    Yes.
12   Q.    Okay.  What are you telling the transfer agency in
13   this e-mail?
14   A.    To allow Mr. Jean-Pierre access to the company's
15   documents, so the transfer agent share structure.
16   Q.    So essentially you're allowing -- you're essentially
17   providing permission for Mr. Guy Jean-Pierre to represent
18   your company with the transfer agency?
19   A.    Yeah, to get -- for the transfer agency to give Mr.
20   Jean-Pierre information that he's asking for.
21   Q.    Okay.  So since you spoke to Mr. DiTommaso and Mr.
22   DiTommaso's doing the filings, you had to do filings with
23   the transfer agent as well; is that correct?
24   A.    Well, I don't think the -- not really.  I don't think
25   the company did any filings with the transfer agency.

Direct - Dittman

1    Q.   You don't need legal letters for the transfer

2    agency?

3    A.   Legal letters regarding what, exactly, sir?

4    Q.   The sale of stock.

5    A.   Well, maybe.  If you're referring to the conversion --

6    144 conversion letters, the answer is yes, but those aren't

7    company -- you know, the company doesn't request those.

8    Those -- whoever's asking to convert their stock gets those

9    letters and does that outside of the company.

10   Q.   Right.  But brokers rely on those letters; you would

11   agree with me on that.

12   A.   I don't know that I would.  I don't know that a broker

13   would know anything about that letter.  I mean, if -- I'm

14   not being argumentative, sir, but if a shareholder who has

15   restricted 144 stock wants to get his stock into trading

16   stock, they need an attorney opinion letter.

17   Q.   Okay.  Well, is it -- do you know what a broker relies

18   on, like Oppenheimer or Scottsdale?

19   A.   Not exactly, no.

20   Q.   Okay.  So you can't speak about that?

21   A.   Correct.

22   Q.   Do you know what the transfer agent requires when it

23   comes to a party being able to sell shares of your company?

24   A.   Not exactly, but I know the attorney opinion letter is

25   part of the package.

Direct - Dittman

1    Q.   Okay.  And so do you know if Mr. Guy Jean-Pierre ever

2    provided attorney opinion letters to the transfer agency

3    for shares to be sold from your company?

4    A.   I don't believe so.

5    Q.   Do you know why?

6    A.   For the same reason that he wasn't able to sign the

7    information and disclosure statement, I believe.

8    Q.   Okay.  And you knew this in 2011.

9    A.   Yes.

10   Q.   Okay.  So you meet with Mr. DiTommaso for the purposes

11   of being able to meet the lawyer to file the Pink Sheets --

12   or the legal letters to the Pink Sheets or OTC Marketplace,

13   right?

14   A.   Correct.

15   Q.   But then in 2011, same time frame, why did you contact

16   the transfer agent and provide them Guy Jean-Pierre to be

17   able to be contacted regarding legal matters with

18   FusionPharm?

19   A.   Well, because we contact the transfer agent for a lot

20   of things that don't have to do with the attorney opinion

21   letters.  The transfer agent provides the share account --

22   in the early going after the transition, there was a

23   discrepancy in the total number of shares, that it took Guy

24   and Billy, as I recall, six months to sort out with the

25   transfer agency.  I suspect this was actually regarding

Direct - Dittman

1     that, although I can't tell you for sure.

2           There was -- there were a lot of things that we

3     got from the transfer agency:  total number of

4     shareholders, breakdowns by, you know, who owned what --

5     who owned what, and preferred stock, common stock, you

6     know.  There was a lot of information we got from the

7     transfer agency.

8     Q.   Okay.  So Mr. Guy Jean-Pierre would be very familiar,

9     then, based upon his knowledge and what was going on, as

10    you just described, all those things with the transfer

11    agency, about your firm and the stock.

12    A.   I would think so, yes.

13    Q.   Including the parties.

14    A.   Would -- which parties exactly, sorry?

15    Q.   The parties that want to sell stock.  Your stock.

16    FusionPharm stock.

17    A.   That want to convert stock.

18    Q.   Yes.

19    A.   Yeah -- yes.

20    Q.   Okay.  And he would also be familiar with you as the

21    issuer, FusionPharm, of how much stock is on the books.

22           MR. BARNARD:  Objection.  Leading.

23           THE COURT:  Sustained.

24    BY MR. SIBERT:

25    Q.   Would Mr. Guy Jean-Pierre know about the shareholders

Direct - Dittman

1    and the preferred and common stocks?

2           MR. BARNARD:  Objection.  Lack of foundation and

3    calls for speculation.

4           THE COURT:  All right.  If you know, sir.

5           THE WITNESS:  I don't honestly know.  He certainly

6    could know.  He had access to that information.

7           Do I know if Guy ever looked at that in detail?  I

8    don't, particularly.  I mean, it was -- it was part of our

9    financials and he certainly looked at those, but I don't

10   know if Guy specifically, you know, read through reports of

11   shareholders or anything of that nature.

12   BY MR. SIBERT:

13   Q.   Well, would you expect the person that you trusted,

14   worked with the transfer agent as your corporate counsel,

15   to be familiar with that information as the CEO of your

16   company?

17   A.   Familiar, yeah.

18   Q.   Or know it?

19   A.   I don't know about "know it."  It wasn't --

20   Q.   This is your company.

21   A.   I understand, sir, but it's supremely important to

22   understand, you know -- there's 800-and-whatever

23   shareholders and a couple hundred million shares out.  I'm

24   not sure exactly, you know, at what level Guy may have ever

25   needed to review that information.

1    It's not -- for the most part, it's not very

2    important to what we're doing around there day-to-day.

3    Q.   So the people who hold a certain percentage of stock

4    isn't important to you?

5    A.   Oh, that's important.

6    Q.   Because you just testified it was important for you to

7    get all the stock, right?

8         MR. BARNARD:   Your Honor, object.   That's a

9    misstatement of his testimony.

10        THE COURT:   Sustained.

11   BY MR. SIBERT:

12   Q.   You -- correct me if I'm wrong:   What did you say

13   about why you did the reverse split?

14   A.   It was important, yes, that I controlled the majority

15   of the shares of stock, for sure.

16   Q.   All right.   So knowing where the shares of stock go

17   shows who owns the company, controls it.

18   A.   Yes.   But to be not overly simplistic, 98 percent was

19   in the hands of myself and my little brother.   And anything

20   less than 10 percent is of very little concern in the

21   universe of, you know, disclosures in publicly traded

22   companies, so it was pretty easy to know where the stock

23   was.

24        And, again, I'm not being argumentative or simplistic,

25   that's just -- it wasn't the rest of everybody else in the

Direct - Dittman

1    universe that isn't named Scott Dittman and Bob Dittman,

2    you know; it was a couple percent of the shares in the

3    company.

4    Q.   You didn't care about those people.

5    A.   No, of course I cared, they're my shareholders; don't

6    characterize it like that.  I just don't -- it's not

7    germane to the disclosures.  The disclosures, you know,

8    are -- you know, people who are more than 10 percent owners

9    are control people.  And there were only two for the

10   entirety of the time that I owned the company.

11   Q.   So you understand the importance, then, of knowing the

12   volumes, because you had to disclose if you're over 10

13   percent; is that right?

14   A.   That's correct.

15   Q.   And also do you understand the importance of what's

16   considered a holding period?

17   A.   Related to 144?

18   Q.   Yes, sir.

19   A.   Yes.

20   Q.   Okay.  And what's your understanding about that?

21   A.   In our case, I think there are some differences among

22   companies.  I'm not a securities lawyer, but in our case

23   144 stock had a one-year holding period.

24   Q.   Okay.  And who was your securities lawyer?

25   A.   Mr. Jean-Pierre.

Direct - Dittman

1    Q.   Okay.  And that's the person you relied on when it

2    came to issues like the holding period and volume; is that

3    right?

4    A.   Sure.

5    Q.   Okay.  And how about -- let's talk about one other

6    topic, affiliation.  That's another legal term; would you

7    agree with me?

8    A.   Yes.

9    Q.   Okay.  And based upon your layman CEO knowledge, what

10   do you think the definition of "affiliate" is?

11   A.   That's a little -- definition of affiliate is maybe a

12   little more legal than I'm capable of, but I can give you

13   my layman's understanding of affiliate, if you'd like.

14   Q.   No, that's okay.  So we can agree that it's a legal

15   issue.

16   A.   Yes.

17   Q.   And because you were the CEO of FusionPharm, who did

18   you rely on when it came to the legal issues dealing with

19   affiliation of your company?

20   A.   My securities attorneys.

21   Q.   Okay.  And who was one of those attorneys?

22   A.   Mr. Jean-Pierre.

23   Q.   Okay.  And he was your attorney from 2011 through

24   2013.

25   A.   Correct.

57

Direct - Dittman

1    Q.   All right.  Can I have that down -- thank you.

2         All right, sir, can we take a couple of minutes

3    now and walk through essentially how your company posted

4    the financials to the OTC Markets.  So could you explain to

5    the jury essentially how you'd file what you have described

6    as the annual and quarterly reports.

7    A.   Yup.  So OTC Markets has a website.  This changed --

8    not to get too detailed, but it changed somewhere in the

9    course of 2011 to 2014.  In the beginning, they issued you

10   a little -- kind of hard to describe -- a little electronic

11   key, essentially, that had, like, a little small LCD

12   window, and when you needed to upload something to their

13   website, they had a procedure where they would send you a

14   code to your specific key so that somebody couldn't

15   impersonate you and upload stuff to their website or

16   whatever.

17        So you had to have that key and go through -- I'm

18   not sure exactly what procedure you had to go through to

19   get them to send you the signal on the key, then you would

20   input the signal and upload your financials to their

21   website or your disclosure statement.

22   Q.   I guess in today's technology, instead of a card you

23   had a certain key to be able to open whatever account to be

24   able to file.

25   A.   Correct.

Direct - Dittman

1   Q.   Okay.  And then in -- you said that process changed?

2   A.   Yeah.  At some point they stopped having that little

3   electronic key, and I think they actually e-mailed you or,

4   you know, did a text verification or something else.  The

5   little -- you didn't have to know where that key was, which

6   was good because it was hard to keep track of.

7   Q.   So it was essentially saying there was a verification

8   process.

9   A.   Yes.

10  Q.   And part of that verification process to be able to

11  file things on the OTC Marketplace, was a user name and

12  password required?

13  A.   I believe so.  I'm honestly not a hundred percent

14  sure.

15  Q.   Okay.  And do you know what name was registered for

16  the OTC account for FusionPharm?

17  A.   I don't.

18  Q.   Was it your name as the CEO?

19  A.   I don't recall.  I don't know.  I generally didn't

20  upload them.  Billy -- in the beginning Billy uploaded them

21  and later -- well, I think maybe Shane uploaded them in the

22  very beginning, then Billy uploaded them and then Craig

23  Dudley uploaded them.  I don't know that I ever uploaded

24  them personally.

25  Q.   Okay.  So someone in your company uploaded the

Direct - Dittman

1    disclosures annually and quarterly for FusionPharm.

2    A.   Correct.

3    Q.   And essentially FusionPharm met their -- excuse me,

4    met their requirements to be -- for those disclosures that

5    were posted.

6    A.   Yes.

7    Q.   All right.  And so now, did you, as the CEO, provide

8    that -- I guess for lack of a better term, did you give

9    that order for your employees to upload these disclosures?

10   A.   Yes.

11   Q.   Okay.  So Mr. Sears had permission to upload the

12   disclosures?

13   A.   Yes.

14   Q.   And, I'm sorry, you said two other names.  Could you

15   tell me those names?

16   A.   Yes.  Shane Bohlender, he was the CFO of the company

17   in the very beginning, for a quarter or two in September

18   2011 -- or beginning of 2011; and then at the time period

19   from end of 2013 through the raid on the company in May of

20   2014, Craig Dudley was the acting CFO of the company and he

21   handled it then.

22   Q.   Okay.  So at the end of 2013?

23   A.   Yeah.

24   Q.   So essentially both of the times -- both of the times

25   when you stated that Shane Bohlender -- I think his names

Direct - Dittman

1    is what you said --

2    A.    Uhm-hum.

3    Q.    -- and Mr. Dudley --

4    A.    Uhm-hum.

5    Q.    -- was doing the uploading, Mr. Guy Jean-Pierre wasn't

6    corporate counsel for FusionPharm?

7    A.    I'm sorry, did you say wasn't or was?

8    Q.    Was not, during those times.

9    A.    No, when Shane was there he certainly was.

10   Q.    So at least in the beginning?

11   A.    Yeah, Craig would have been after Mr. Jean-Pierre.

12   Q.    Okay.  Now, you had an uploading on July 2d, 2011.

13   A.    Okay.

14   Q.    Do you recall what that would be?

15   A.    Not off the top of my head, no.  It probably would

16   have been July -- I'm sorry, what date?

17   Q.    July 2d, 2011.

18   A.    Probably was first quarter of 2011.

19   Q.    And when does that end?

20   A.    March 30th.

21   Q.    Okay.  And essentially do you know who would have

22   uploaded the OTC disclosures then?

23   A.    I think that was Shane and I.

24   Q.    Shane and you?

25   A.    Yeah.

Direct - Dittman

1    Q.   Okay.  And then after the disclosures are posted, is

2    there a requirement to upload a current information letter?

3    A.   Yes.

4    Q.   And that's the legal letter.

5    A.   Yes.

6    Q.   And so every time -- most of the time when there's a

7    quarterly disclosure, it's followed with the current

8    information letter; is that correct?

9    A.   In the beginning, yes, but then we realized or figured

10   out that we didn't need to do it on a quarterly basis; we

11   only needed to do it at the end of the year.  So I think we

12   did it every quarter in 2011 and then after that only at

13   year-end when it was required.  I believe.

14   Q.   So based upon your postings, there -- there was a

15   current information letter posted on July 22d, 2011.  Do

16   you know what that current information or legal letter

17   would be for?

18   A.   I would imagine that was also for the first quarter of

19   2011.

20   Q.   Okay.  And who would upload those legal letters?

21   A.   That was probably Shane or Shane and I, at that time,

22   as well.  I don't recall, but I would guess.

23   Q.   Okay.  How about December 29th, 2011?

24   A.   Is the question what quarter or who uploaded?  Sorry.

25   Q.   You had an uploaded disclosure statement at that

Direct - Dittman

1    point.

2    A.    Okay.

3    Q.    Do you know what that would be?

4    A.    I would guess that's quarter three, ending September

5    30.

6    Q.    Okay.  And do you know who uploaded that?

7    A.    In that time frame, probably Bill Sears.

8    Q.    Okay.  And that was followed with a current

9    information, or otherwise known as the legal letter, on

10   December 30th, 2011?

11   A.    Same question?

12   Q.    Yes, sir.

13   A.    I would, again, assume Bill Sears.  I don't honestly

14   remember any of these things.  It's not like it was a

15   humongously important, you know -- it wouldn't stop the

16   office to upload an opinion letter or anything, but I would

17   imagine it was Bill because he always kept the key at that

18   point in time.

19   Q.    Okay.  So -- so you're saying it wasn't important.

20   It's not important to make sure that information about your

21   company and that the company's doing things correctly is

22   posted to the open marketplace?

23   A.    No, of course that's important.  The act of uploading

24   it to the website is not earth shattering.  Doing the work

25   and getting the financials done, that's a different matter.

1    Q.   Okay.  But is it important to you to make sure that

2    those disclosures are correct?

3    A.   Of course.

4    Q.   Okay.  As the CEO, wouldn't you want to have the last

5    review of all those disclosures and legal letters?

6    A.   Yeah.  Absolutely.

7    Q.   Okay.  So I guess I'm a little confused because it

8    seems like you just handed this job off, and you're saying

9    it wasn't really important to you if you actually did the

10   uploading?

11   A.   No, sir; what I said was the actual uploading to the

12   website I didn't do myself.  That's in -- in my mind,

13   that's a menial task, you know.  I certainly could have

14   taken the time to figure out how to use the key and sit

15   down at the computer and uploaded the financials to the

16   website.  They weren't uploaded without my knowledge, you

17   know.  Nothing -- you know, there's not a thing that went

18   up there that I didn't authorize.

19          But the actual act of uploading it -- which is

20   what I thought you were asking me, you know.

21   Q.   So what was your verification?  Did you check to make

22   sure things were uploaded?

23   A.   Probably.  Generally, yeah.

24   Q.   That has to be important to you, correct?

25   A.   Sure.

Direct - Dittman

1    Q.   Because if you don't post, you're in violation.

2    A.   Yes.  Well, there's degrees of violation.  The company

3    was in violation for much of 2011, I think, anyway.  It

4    took us a long time to get our stuff together and become

5    current filers, as I recall, and whatnot.

6         But certainly, yes, uploading to OTC Markets

7    was -- and doing our financials and trying to do them on

8    time -- which we were often late because we were always

9    understaffed -- but still, was it important?  Yes, it was

10   definitely important to me.

11   Q.   Okay.  And you bring up a good point.  You were

12   understaffed.  How big was your company in the beginning?

13   FusionPharm.

14   A.   In the very beginning?

15   Q.   Yes, sir.

16   A.   There was me and Shane.

17   Q.   And then after that?

18   A.   Then, you know, Bill came on doing marketing, as we

19   discussed yesterday, or sales for a little while.  And then

20   I hired an outside guy named Gino Rodriguez with a company

21   called MJ Business Solutions to be our distribution

22   partner, but he was not a company employee.

23        The next company employee, I guess, would have

24   been Kelly Blume working part-time for the company.  So,

25   you know, in the beginning there was, you know, two or

                        Direct - Dittman

1    three of us at the most.

2    Q.   And how long did that last?

3    A.   Oh, you know, most of the first year, you know.  In

4    the second year when we made the switch to lettuce, Andy

5    Duke came on, we got a new secretary, we had more people --

6    a few more people then, but the company -- until 2015, you

7    know, the company probably never had more than five, six,

8    seven employees.

9    Q.   Okay.

10             THE COURT:  Mr. Sibert, one second.

11             MR. SIBERT:  Yes, sir.

12             THE COURT:  Ms. Cox, are you with us?

13             THE JUROR:  Yes, I am.  Thank you.

14             THE COURT:  How are you feeling?

15             THE JUROR:  I'm feeling okay.

16             THE COURT:  All right.  But you've got to be --

17             THE JUROR:  I know.

18             THE COURT:  You know, you took an oath -- you have

19   to listen to the evidence and pay attention to the

20   evidence.

21             THE JUROR:  Yes, sir.

22             THE COURT:  All right.  Go ahead.

23             MR. SIBERT:  Thank you, Your Honor.

24   BY MR. SIBERT:

25   Q.   Okay.  Sir, I guess maybe I can -- you don't -- I

1    think it's fair to say that you don't recall every quarter

2    or annual report that was uploaded to OTC, who did it.

3    A.   Specifically, no, correct.

4    Q.   But if I went through the list, would you know if

5    these were the reports that were put on OTC Marketplace?

6    A.   I'm not a hundred percent sure I understand your

7    question.

8    Q.   So if I went through the list of all the reports that

9    were posted, would you know if those were the -- that they

10   were reported at that time frame?

11   A.   Well, not exactly, no.  But I could reasonably observe

12   and assume that they were.  I mean, we filed quarterly, you

13   know.  We didn't always file on time, but there would be a

14   report every quarter, and then information and disclosure

15   statement every year.

16   Q.   And how about the annuals?

17   A.   Same.  Same thing.

18   Q.   All right.  So how about the annual report?  That's a

19   little big bit bigger, would you agree, than the quarterly

20   report?

21   A.   No, same report.

22   Q.   So it wouldn't have more information in it than just

23   the quarterly report?

24   A.   No, I don't think so.  I think it was exactly -- I

25   mean, it was a template, you know.  We just updated it

1    quarter to quarter.  I don't think it was any different at

2    all.

3    Q.   So you just used a template to tell the public about

4    your company?

5    A.   Every company uses a template.  You don't rewrite the

6    report every quarter.  You take last quarters and you

7    update the numbers and you put it out for this quarter.

8    Q.   So it's your opinion that every company just uses a

9    template?

10   A.   Yeah.  I would be shocked if every company didn't use

11   a template, yes.

12   Q.   How would you know that?

13   A.   Well, I worked for Arthur Anderson.  The companies had

14   financial reports.  Whether they were public or not, we

15   were doing financial reports, and every single time, we

16   took last quarter's numbers and we updated it to this

17   quarter's numbers.  No need to rewrite and start from

18   scratch on a quarterly basis.

19   Q.   So kind of going back to the beginning of your

20   testimony, that yes, you did have some experience regarding

21   the financials of the corporations and reporting.

22   A.   Well, yes.  But there's a huge difference between

23   being responsible for -- being a publicly traded company

24   and being a small business that's a -- you know, that's

25   looking for a loan, but yes, when we did audit, we audited

Direct - Dittman

1    financial statements.  That's all we did was audit
2    financial statements.
3    Q.   And what are the financial statements?
4    A.   Balance sheet, income statement, cash flow statement,
5    notes to the financial statements.
6    Q.   Let's talk about the cash flow statement.  What's in
7    the cash flow statement?
8    A.   Well, it's a statement of cash flow, so it shows where
9    you started with cash at the beginning of the time period
10   and all the transactions that affected your cash and what
11   your cash is at the end of the time period.
12   Q.   And one of those big things that affect your cash flow
13   statement is revenue.
14   A.   Yes.  Certainly.
15   Q.   Okay.  And also long-term, short-term debt?
16   A.   Sure.
17   Q.   So it's basically like what you make, what you spend,
18   bottom line.
19   A.   Yeah.  Debt and -- and/or equity would, I think, be
20   the other piece, right.  If you have investors put money
21   in, then you have more cash.  I think those are kind of the
22   pieces.  Operations, debt, equity.
23   Q.   I got a C in accounting.
24   A.   What's that?
25   Q.   I got a C in accounting.

1    A.   I did, too.

2    Q.   All right.  Sir, can I have --

3              MR. SIBERT:  And, Your Honor, let me -- maybe this

4    is a good time to pause before I start getting into some

5    exhibits.  I'd like to move into evidence the following

6    exhibits.  And I sent a new revised list last night.  If

7    the Court doesn't have that, I have one for the Court.

8              THE COURT:  I have that right up here with me.

9    Which section -- now you're calling them sections.  Which

10   section are you going to --

11             MR. SIBERT:  It will be section 2, Your Honor.

12             THE COURT:  All right.  And all of them -- well,

13   we'll list them in a moment, but all of them in this

14   section are stipulated to except for Exhibit 404, and 385,

15   as we've discussed, is already in, so you don't have to

16   re-move its admission.  So --

17             MR. SIBERT:  Yes, sir.

18             THE COURT:  Okay.  Go ahead.  Put it on the

19   record.

20             MR. SIBERT:  So at this time, the Government would

21   like to move for admission into evidence Government Exhibit

22   25, 169, 263, 272 -- or, excuse me, 372-Y, 372-Z, 372-AA,

23   372-SS, 372-VV, as in Victor, 372-WW, 372-ZZ, 372-FFF,

24   372-JJJ, 372-LLL, 372-NNN, 394, 395.

25             THE COURT:  All right.  Given the stipulation of

Direct - Dittman

1    the parties, the following Government Exhibits are admitted

2    into evidence and may be published to the jury:  Exhibits

3    25, 169, 263, 372-Y, 372-Z, 372-AA, 372-SS, 372-VV, 372-WW,

4    372-ZZ, 372-FFF, 372-JJJ, 372-LLL, 372-NNN, 395 -- sorry,

5    394 and 395.

6            (Government's Exhibits received)

7                MR. SIBERT:  May I proceed, Your Honor?

8                THE COURT:  You may.

9                MR. SIBERT:  Thank you, Your Honor.

10   BY MR. SIBERT:

11   Q.   Okay, sir -- can I please have Government Exhibit 169,

12   page 2, please.  Can we start at the bottom.

13            Sir, if for any reason if you can't see that on

14   the screen, please let me know.  We have hard copies and I

15   can blow this up as well.

16   A.   I can see it fine.

17   Q.   Okay.  Thank you.

18            All right, I'm focusing on here.  I'm going to

19   circle this first e-mail.  Essentially, do you know who

20   essentially -- I'm just going to ask you, could you explain

21   the chain with this e-mail based upon the title?

22   A.   Yes.  It's an e-mail from Bill Sears to Mike Kocinski

23   and myself.

24   Q.   Okay.  And who is Mike Kocinski?

25   A.   Mike Kocinski was the outside company accountant, if

1    you will, so he was the accountant for Baby Bee Bright

2    before it became FusionPharm, and I kept him after the

3    transition to review financials and bounce questions off of

4    and things like that.

5    Q.   Okay.  Okay.  And do you know what the conversation is

6    being discussed here in this e-mail?

7    A.   It looks like Bill is asking Mike how his review of

8    the financials are coming because he's looking to get them

9    uploaded before Thanksgiving.

10   Q.   Okay.  Can we move back down -- I guess to the top.

11   Okay.

12         Essentially, I don't have the top of this e-mail,

13   but could you take a look at that body and tell me what

14   that e-mail is regarding.

15   A.   He's responding and talking about his review, letting

16   me know that there should be an accrual for interest income

17   or expense regarding notes, or asking perhaps if we should.

18   And stating that we can do an entry for fourth quarter to

19   reflect any impact that it has on the period 2011.

20   Q.   And you stated "he."  Who do you mean by "he"?

21   A.   Mr. Kocinski.

22   Q.   Can I have page 1, please.

23         And, again, he -- I'm sorry -- again, he forwards

24   this e-mail to both you and Mr. Sears; is that correct?

25   A.   Correct.

Direct - Dittman

1   Q.   And this is your FusionPharm e-mail address?

2   A.   It is.

3   Q.   Keep going up.  Okay.

4        Essentially the top of this exhibit is -- could

5   you describe what the top e-mail is in Exhibit 169.

6   A.   From and to?

7   Q.   Yes, sir.

8   A.   Yeah, so it's from me to Mr. Kocinski, Bill Sears, and

9   Guy.

10  Q.   Okay.  And, again, we know who Mr. Sears is and we

11  know who Mr. Kocinski is.  Guy in this --

12  A.   Mr. Jean-Pierre.

13  Q.   Okay.  And at this point, he has a FusionPharm

14  address -- e-mail address; is that right?

15  A.   Correct.

16  Q.   And, again, this is dated November 23d, 2011?

17  A.   Correct.

18  Q.   Okay.  And then what are you stating here in this

19  first sentence?  What is your message to the group that

20  you're e-mailing?

21  A.   I'm asking Mike to make a series of adjustments to the

22  financials and return them to everybody cc'd on the e-mail.

23  Q.   Why are you cc'ing Mr. Guy Jean-Pierre?

24  A.   Because he's the company's security counsel.  He, I

25  think, was cc'd on all financial reports and things like

Direct - Dittman

1    that, anything that went up to OTC Markets, anything that I

2    needed his input on.

3    Q.   So you are making him aware what's going on in

4    FusionPharm?

5    A.   Sure.

6    Q.   Okay, sir.

7         Can you please -- can I please have 372-Y

8    published.  And we'll start with the first page.

9         Okay, sir, could you explain what 372-Y is.

10   A.   That's an e-mail from myself to Bill and Guy on the

11   information and disclosure statement.

12   Q.   Okay.  Do you know for what disclosure statement?

13   A.   Well, it only says -- in the attachment it says

14   disclosure statement 12-26-2011, which at that time should

15   be the end of quarter 3 financials.

16   Q.   And that's September 30th?

17   A.   Correct.

18   Q.   Okay.  And at this time, you're e-mailing Mr. Sears

19   with his FusionPharm address; is that right?

20   A.   Yes.

21   Q.   Which is different than the e-mail I just -- that you

22   used last time?

23   A.   I think the last one was from him that I replied to,

24   but he certainly had both e-mails.

25   Q.   And here what are you stating to the group that you're

1    e-mailing?

2    A.   That I made some small changes to the disclosure

3    statement, and nothing that I thought we needed to hash

4    out, and I think they're ready to go up, and I presume

5    asking Billy if he's ready to post them.

6    Q.   And so when you do Billy, question mark, are you

7    asking for Billy's input there?

8    A.   I -- it's -- it is possible, but I doubt it.  Billy

9    wasn't, you know, very technical or very into reading

10   details.  I think I'm just asking him more if he's ready to

11   do the posting.

12   Q.   So just read what you write.  Starting with the second

13   sentence.

14   A.   "I think we're good.  Billy?"

15   Q.   All right.

16        Can I have page 10 of that attachment.  Can we

17   just blow up the body.  All right.

18        All right.  Just so you can see it a little bit

19   more, I'll just have it blown up.  Do you recognize what

20   page this is of the quarterly report?

21   A.   No.  Not really.

22   Q.   Okay.  Let me have page 9.  Can you blow that section

23   up?

24        Do you recognize this section now?

25   A.   Yes.

Direct - Dittman

1    Q.   Okay.  And what section is it?

2    A.   Management Structure.

3    Q.   Okay.  And what did you have to disclose based upon

4    what you knew about management structure when it came to

5    filing?

6    A.   The full name, business address, employment history,

7    and board members and other affiliations.

8    Q.   Okay.  And who would assist you if you had any

9    questions about what needed to go into these filings when

10   it came to the management structure?

11   A.   Oh, it could have been Mr. Jean-Pierre or Mr.

12   DiTommaso.  I mean, this is one of the documents that I did

13   go through with Mr. DiTommaso every time it had to go up.

14   Q.   All right.  So you also stated this is something that

15   you would go through with Mr. Guy Jean-Pierre; is that

16   right?

17   A.   Yeah, that's -- yeah.  I'm sorry, I thought I said

18   that, yes.

19   Q.   All right.  So now you're familiar with what we're

20   looking at?

21   A.   I am.

22   Q.   Can we go to page 10.

23            And who's listed here under the management

24   structure of FusionPharm?

25   A.   Myself, Mr. Jean-Pierre, and Andrew Duke.

Direct - Dittman

1    Q.   And how is Mr. Guy Jean-Pierre listed?

2    A.   Corporate secretary.

3    Q.   Okay.  So September 30th, 2011, you list -- in your

4    quarterly report, you list him as corporate secretary.  But

5    you've testified here today from -- and, in fact, you wrote

6    a letter for him in April of 2011 stating that he's the

7    legal counsel for FusionPharm.  Why aren't you listing him

8    truthfully as the corporate counsel?

9    A.   I don't think corporate counsel is an officer

10   disclosure in this section.  Corporate secretary is.

11   Q.   How about legal counsel?

12   A.   I don't -- to my understanding, it's -- that's not

13   required, not part of this section.

14   Q.   Not part of it?

15   A.   Correct.

16   Q.   How sure are you?

17           MR. BARNARD:  Your Honor, I object.  They --

18           THE COURT:  Sustained.

19           MR. SIBERT:  Okay.  Thank you, Your Honor.

20   BY MR. SIBERT:

21   Q.   All right, can I have -- can we go to the next page,

22   please.  Page 11.  Can you blow up section B here.

23           Do you see section B there, sir?

24   A.   I do.

25   Q.   Okay.  What is that?

Direct - Dittman

1    A.   Legal/Disciplinary History.

2    Q.   Okay.  And is there anyone listed in your September

3    30th, 2011, report for your company regarding

4    legal/disciplinary history?

5    A.   No.

6    Q.   Do you know who you would have to list there?

7    A.   Any officer from the previous page, I presume, that

8    had been convicted of a criminal proceeding or named as a

9    defendant in a pending proceeding.

10        You want me to read 2 through 4?  2, 3, and 4?  Do

11   you want me to read those for you?

12   Q.   No, I'm just asking if you have knowledge of what is

13   listed in there.  I'm not asking you to read the document

14   now.  If you knew as the CEO on September 30th, 2011, what

15   was required to be in there.

16   A.   I would know by reading the questions 1, 2, 3, and

17   4.

18   Q.   Can I have page 12.  Please -- can you blow up Family

19   Relationships.

20        Now, under this, you have a disclosure; is that

21   correct?  Under the family relationships section?

22   A.   Yes.

23   Q.   Okay.  And who did you disclose?

24   A.   My little brother.

25   Q.   Okay.  And why are you disclosing him?

Direct - Dittman

1    A.    Because he owns 12 percent of the company stock.

2    Q.    Okay.  Can you tell me why Sandra Sears isn't

3    disclosed here?

4    A.    Because she does not own more than 10 percent of the

5    company stock.

6    Q.    So your understanding is you just have to own stock to

7    be under the disclosure of family relationships?

8    A.    Yes.  As it says here, my understanding, greater than

9    10 percent is the requirement for disclosures.

10   Q.    Okay.  Well, let's look at the next section.  How

11   about Related Party Transactions?

12   A.    Okay.

13   Q.    Do you list anyone there?

14   A.    No.

15   Q.    All right.  Now, do you -- in your opinion, do you

16   think it's important that the public would need to know

17   that another officer that is on the corporate paperwork is

18   essentially Ms. Sandra Sears, your mother-in-law by

19   marriage?

20   A.    I'm sorry, I didn't -- I'm not sure I followed the

21   question.  Could you ask that again?

22   Q.    Yeah.  In your opinion --

23   A.    Uhm-hum.

24   Q.    -- do you think it's important as a CEO of the company

25   that the public should know that your fellow officer/

Direct - Dittman

1   director is Ms. Sandra Sears, your mother-in-law by

2   marriage?

3   A.   I think at this point she's no longer an officer.  Guy

4   had replaced her at this point; that's why he's disclosed

5   as corporate secretary.  Sandra Sears was corporate

6   secretary in the beginning and then Guy replaced her

7   sometime in 2011.  I'm not sure exactly when, but

8   presumably before this date.

9   Q.   Okay.  So Guy replaced Mr. Sears's mother-in-law --

10  A.   Mother.

11  Q.   -- mother.

12          THE COURT:  Why don't we take a pause there, Mr.

13  Sibert, and take our morning break.

14          MR. SIBERT:  All right.  Thank you, Your Honor.

15          THE COURT:  All right.  Ladies and gentlemen of

16  the jury, we will be in recess for 15 minutes.

17      (Jury left the courtroom at 10:18 a.m.)

18          THE COURT:  Mr. Dittman, again, during the recess,

19  do not speak with any of the lawyers.

20      (Recess taken 10:18 a.m.)

21      (Jury entered at 10:39 a.m.)

22          THE COURT:  All right, Mr. Dittman, I remind you,

23  you remain under oath.

24          THE WITNESS:  Yes, sir.

25          THE COURT:  You may resume your examination, Mr.

Direct - Dittman

1    Sibert.

2              MR. SIBERT:  Okay.  Thank you, Your Honor.

3    BY MR. SIBERT:

4    Q.   Okay.  Can I have -- I think we were going through

5    Exhibit 372-Y.  Can I have page 11, please.

6              Okay, sir, I just want to highlight a couple more

7    things here.

8              Can you have that blown up.

9              All right, sir.  The document says, essentially,

10   anyone, an officer or director or a control person of the

11   company, when it comes to the legal and disciplinary

12   history.  All right?  Do you know what control person

13   means?

14   A.   I believe somebody who owns more than 10 percent of

15   the company stock.

16   Q.   Okay.  And where are you getting that definition?

17   A.   From my securities attorneys in the past and from that

18   previous page of the document that asked that question.

19   Q.   Okay.  And when you say "securities attorneys in the

20   past," who are you talking about?

21   A.   Mr. Jean-Pierre, Mr. DiTommaso, Mr. Lerer.

22   Q.   And is there any other definition that you know that

23   regards control person?

24   A.   I don't believe so, no.

25   Q.   So just 10 percent?

Direct - Dittman

1    A.   Yes.

2    Q.   And let me put it this way:  If you had to disclose --

3    if Mr. Sears was put on -- as you testified before, you

4    didn't want to disclose Mr. Sears because of his criminal

5    history.  If he was on the paperwork for FusionPharm, is

6    this the section that you would have to disclose him under?

7    A.   Presuming he was an officer or a control person, the

8    10 percent stock owner, would he need to be disclosed here?

9    Is that the question?

10   Q.   Or director.

11   A.   Yes, I think that's correct.

12   Q.   So essentially Sandra Sears was the director.  You

13   would agree with me on that, right?

14   A.   Director, no; she was the corporate secretary.

15   Q.   Okay.  And so she would be an officer.

16   A.   Yes.

17   Q.   Okay.  So if -- instead of putting Mrs. Sears down, as

18   you stated, she was just put on there as a second person

19   for the paperwork because you didn't want to disclose Mr.

20   William Sears.  If --

21   A.   Oh, wow --

22   Q.   -- Mr. William Sears was posted as a corporate

23   secretary, he would have to be disclosed here.

24   A.   Yes.

25   Q.   Did you ever disclose anyone in all your filings with

1    OTC, anyone from your company relating to a officer,

2    director or control person in this section?  Specifically

3    2011 through 2013.

4    A.   Did we ever -- did I ever disclose -- was there

5    anybody listed in that section, is that the question?

6    Q.   That's right.  Did you ever list a person --

7    A.   I don't believe so, no.

8    Q.   Can I have page 12, please.  And just -- can you blow

9    up those sections.

10           So, again, similar questions:  Family

11   relationships, you disclosed Robert Dittman.  Did you ever

12   disclose any other party in that section?

13   A.   I don't believe so, no.

14   Q.   Okay.  And how about Disclosure of Related Party

15   Transactions?  Did you ever disclose any related party

16   transactions in that section?

17   A.   I don't believe so, no.

18   Q.   And any disclosure of conflicts of interest?

19   A.   I don't believe so, no.

20   Q.   So your -- besides Robert Dittman for the family

21   relationships, no one else was ever disclosed from 2011

22   through 2013 regarding those three sections?

23   A.   I don't believe so, no.

24   Q.   Okay.  And I just want to make sure I understood.  And

25   I think you correctly corrected myself with my question.

Direct - Dittman

1    When it came to the filing of these reports, you stated

2    there was a different person at the end of 2013 that did

3    the filings; is that correct?  Dudley?

4    A.    Yes.   Craig Dudley.

5    Q.    That was at the end of 2013?  2013?

6    A.    He started working for FusionPharm as a rent-a-CFO, if

7    you will, right at the end of 2013 through spring of 2014,

8    and did the -- both the year-end financials 2013 and the

9    first quarter 2014.

10   Q.    Okay.  And this all, you testified, the annuals for

11   2013 wouldn't be reported or published until 2014.

12   A.    Correct.

13   Q.    There's a delay in all the filings.

14   A.    Yeah.  It takes time to close the books and do the

15   work and whatever.  I think you have 90 days after the end

16   of the year, or maybe a little bit more.

17   Q.    Okay.  So usually you have a three-month delay?

18   A.    Give or take.

19   Q.    Give or take?

20   A.    Yeah.

21   Q.    Okay.  And was that -- when Mr. Dudley did those

22   filings, was Mr. Guy Jean-Pierre still your corporate

23   secretary or legal counsel?

24   A.    No.

25   Q.    Okay.  Can I have page 13, please.

Direct - Dittman

1    THE COURT:  Is this still 372-Y?

2    MR. SIBERT:  It is, Your Honor.

3    THE COURT:  Okay.  Thank you.

4    MR. SIBERT:  Thank you.

5  BY MR. SIBERT:

6  Q.   Okay.  So let's just talk up here.  And this is maybe

7  where I also messed up.  And so here you're listing,

8  essentially -- what are you listing under Item 14,

9  beneficial owners?

10 A.   What -- what or who?

11 Q.   Why are you listing, I guess, yourself and Mr. Robert

12 Dittman?

13 A.   Honestly I'm not sure exactly the definition of

14 beneficial owners.  But I believe it has the same, you

15 know, 10 percent threshold, but I'm not a hundred percent

16 sure.

17 Q.   Okay.  And going back to maybe where I messed up.

18 Your concern as a CEO was who had over 10 percent because

19 that is what was required to be reported?

20 A.   Correct.

21 Q.   Okay.  And so I apologize.  Your concern for

22 shareholders deals with the 10 percent volume, because it's

23 important --

24 A.   Disclosure of shareholders, yes.

25 Q.   Okay.  Thank you.  Now, did you know -- I just want to

Direct - Dittman

1    come back to this -- do you know how many shares Mr. Robert

2    Dittman received in the beginning of FusionPharm?

3    A.    Not exactly.  Maybe 185,000?  But maybe 185,000 less a

4    thousand or two.

5    Q.    Okay.  So somewhere in the 180,000.

6    A.    Yes.

7    Q.    So more than the 178,670 listed here.

8    A.    Yes.

9    Q.    Do you know at the time that Robert Dittman either

10   received his 180,000 shares, or above, or at this time when

11   you're doing September 30th quarterly reporting, what

12   FusionPharm's stock was being traded at?

13   A.    I don't --

14   Q.    Price --

15   A.    In terms of the price, I don't.  Maybe around a buck

16   and a half or something at that point.  I don't remember

17   honestly.

18   Q.    Okay.  And as the -- you might be better at this than

19   me -- but 183,000 preferred shares, based upon what we've

20   discussed with the reverse split and conversions here, how

21   many common shares would that be?

22   A.    Preferred shares convert at a hundred to 1, so that

23   would be roughly 17 million common shares.

24   Q.    And in this reporting period?

25   A.    18 -- yes, uhm-hum.

Direct - Dittman

1    Q.   And when you had what you testified to, about 183,

2    give or take a thousand --

3    A.   18 million-ish.

4    Q.   Did Mr. Dittman pay for his stock?

5    A.   Not at FusionPharm.  He invested in my previous

6    businesses that became FusionPharm.

7    Q.   Okay.  And for the record, I said did Mr. Dittman.

8    Since I'm talking to Scott Dittman, I should be clearer.

9    Did Robert Dittman ever pay for the record --

10   A.   No.  Yes, I understood.  No.

11   Q.   And you answered the question.  Did you ever -- did he

12   ever -- did Robert Dittman ever sell the stock for his own

13   benefit?

14   A.   I don't believe so, no.

15   Q.   Did you have any knowledge that Mr. Sears was using

16   shares in the name of Robert Dittman to raise money for

17   FusionPharm?

18   A.   Oh, that's a little --

19        MR. BARNARD:  Your Honor, I object.  Leading.

20        THE COURT:  Sustained.

21   BY MR. SIBERT:

22   Q.   Okay.  Did you -- well, did you know that William

23   Sears was selling Robert Dittman's stocks?

24        MR. BARNARD:  Your Honor, leading again.  And

25   asking -- well, leading.

Direct - Dittman

1       THE COURT:  All right.  Sustained.

2   BY MR. SIBERT:

3   Q.   All right.  Well, did you know -- who was selling

4   FusionPharm stocks?

5   A.   I'm not sure I understand that question --

6   Q.   Let me rephrase that question.

7   A.   Many, many people were selling FusionPharm stock.

8   Q.   In 2011, do you know how FusionPharm was raising

9   money?

10  A.   We raised money in a number of ways.  We raised money

11  through the 504 offering -- I believe it's 504 -- the $1

12  million offering with restricted stock.

13       I raised investment money from a dozen or maybe 20

14  friends and family members.  We raised money from a few

15  random investors.

16  Q.   Now, did you -- so was any of the revenue or proceeds

17  from FusionPharm in 2011 based upon the sale of stock?

18  A.   In a roundabout way, yes.

19  Q.   All right.  And do you know if -- do you know if Mr.

20  William Sears sold any FusionPharm stock?

21       MR. BARNARD:  Your Honor, leading again.

22       THE COURT:  That's not leading.  Overruled.

23       THE WITNESS:  In the 2011 time period?

24  BY MR. SIBERT:

25  Q.   Yes, sir.

1    A.   Yes.   I know that he was selling stock to Richie
2    Scholz in 2011.
3    Q.   Do you know if he ever sold stock that was held by
4    Robert Dittman?
5    A.   Eventually, he did.   Did that happen in 2011?   I'm not
6    entirely sure.
7    Q.   Do you know approximately when he sold the stock that
8    was being held by Robert Dittman?
9    A.   I would -- not exactly, but I would estimate maybe
10   towards the end of 2011 or into 2012.
11   Q.   Okay.   And did the proceeds from the sale of that
12   stock benefit FusionPharm?
13   A.   In a roundabout way, yes.
14   Q.   Now, did Robert Dittman ever loan you money -- I think
15   that's what you stated -- for your previous company?
16   A.   Loan me money, no.   But he invested money in the
17   previous company.
18   Q.   I'm sorry, I misunderstood.   So he never loaned you
19   money?
20   A.   Me personally?
21   Q.   Yes, sir.
22   A.   I don't think so.
23   Q.   How about your companies?
24   A.   In the form of a loan?
25   Q.   In the form of a loan or a note.

                       Direct - Dittman

1    A.   I think he did once.  I don't honestly remember.  It

2    may have been -- it may have been in the form of a note

3    previous to FusionPharm.

4    Q.   Okay.  Do you know how much?

5    A.   Not exactly.  8- to 12,000, somewhere in there.

6    Q.   So 8- to 12,000.  And what was his investment in your

7    previous company?

8    A.   That same number.

9    Q.   So 8- to 12,000?

10   A.   Right.

11   Q.   And he is now in 2011 holding the value of

12   essentially -- you said the stock was trading at $1, about

13   $1 -- let's just low-ball it and say $1 -- he's holding

14   $18 million of shares?

15   A.   No.  The market doesn't work that way.

16   Q.   Okay.  But the -- if he could sell all the shares, it

17   would be worth $18 million?

18   A.   If he could sell them at a dollar, but to --

19   Q.   So for a loan --

20   A.   -- you couldn't --

21   Q.   So for a loan or investment, 8- to $12,000, Robert

22   Dittman got essentially the equivalent of $18 million of

23   shares?

24   A.   No, that's not even remotely correct; I'm sorry.

25   Q.   Well, you just testified that he had 176,000 shares in

Direct - Dittman

1   September 30th quarterly report.

2   A.   Yes, sir, I understand the math.

3   Q.   And you stated -- as -- I hope as a CPA.

4   A.   Thank you.

5   Q.   And then later on -- you stated earlier he had above

6   that, he had 183.  So that's about 7,000 -- 7,000 share

7   difference from September 30th to what you had testified

8   what he received at the beginning.

9   A.   That's okay.  Okay.

10  Q.   All right.  So even if those -- whatever happened with

11  those shares, even with those shares, that's the value of

12  $7,000 based upon the low-balling of the stock price at $1,

13  right?

14  A.   Well, no, not really.  That's -- you know, the reason

15  the answer to your question is not what you're looking for

16  is yes, my little brother owned the equivalent of 18

17  million shares and I owned the equivalent of 130 million

18  shares, but in the stock market as it existed at that point

19  in time, if you sold 10,000 shares, it would drive the

20  stock price down to next to nothing because there was no

21  activity in the stock.

22          For the benefit of the jury the way that market

23  works in the stock market, it's not like -- it's not like

24  we're Apple or something, right?  There's not people out

25  there who understand what FusionPharm is and are buying

Direct - Dittman

1      lots of FusionPharm stock.  FusionPharm stock some days

2      would trade zero; nobody would buy any FusionPharm stock.

3              For the vast majority of the time that's in

4      question here, from 2011 until the end of 2013, FusionPharm

5      was thinly traded all of the time.  So, you know, if

6      anybody tried to sell a lot of stock in the market, number

7      one, there weren't any buyers; and number two, it would

8      just drive the stock down to, you know, next to zero.

9              So, you know, the value of the company at the

10     time, Mr. Sibert, might have been, who knows, it's

11     difficult to value because we barely were making any

12     revenue and whatever, so, you know, you can debate all day

13     whether, you know, three times revenue or something to

14     value the company and, therefore, Bobby's holdings would

15     have been, you know, 10 percent of that number.

16             But there's simply no way -- listen, if I could

17     have sold $136 million worth of stock in 2011, I would have

18     been super happy about that, but it just doesn't work that

19     way.  I'm not trying to be glib, I'm just explaining --

20     Q.    That's fair.  And you're the one running the company,

21     so I'm sure you knew it.  But it's fair to say, though, as

22     you said, you understand math, you gave 12 percent of your

23     company for an $8,000 loan to Robert Dittman.

24     A.    Yeah.  And to my little brother, and for other

25     reasons.

Direct - Dittman

1    Q.   And did you know if Billy Sears was selling stock in

2    2011?  FusionPharm stock?

3    A.   I don't think so.  I mean, he was selling to Richie

4    Scholz and Richie Scholz was selling stock, but I don't

5    think Billy Sears was selling stock in the market in 2011,

6    no.

7    Q.   And you testified about a dollar, and then you went

8    down to zero.  But FusionPharm was never at zero between

9    2011 and 2013.  You would agree with me on that.

10   A.   Certainly.

11   Q.   Okay.  In fact, it went up as high as like 5, $6?

12   A.   No, it did that in 2014, but not in --

13   Q.   It got up to $3, $4?

14   A.   Maybe.  Maybe for one trade or something, maybe for an

15   aberrant trade, but it was not -- the stock was not seldom

16   valued like that.

17   Q.   Okay, sir, let's look at page 13.  And I'm just going

18   to circle here.  This is essentially outside providers in

19   Item 15; is that correct?

20   A.   Yes.

21   Q.   And who's Mak Consulting?

22   A.   That's Mr. Kocinski, the accountant from the previous

23   e-mails.

24   Q.   All right.  Can I just ask, why did you need an

25   outside accounting firm when you have a CPA background?

Direct - Dittman

1    A.   Well, I've been retired as a CPA for 20 years at that

2    point, and it's good to have somebody who's looking at your

3    financials and giving you good advice.  I was never

4    particularly comfortable doing it myself.

5    Q.   Okay.  And here we have the legal counsel listed --

6    the outside legal counsel listed as Mr. Tod DiTommaso.

7    A.   Correct.

8    Q.   Okay.  Can I have 372-AA brought up, please.  Before I

9    show that, can I have that taken down real quick.

10        And, sir, I just want to ask you real quick,

11   you've talked about security lawyers and you've

12   obviously -- we've talked about Mr. DiTommaso and the

13   defendant in this case, Mr. Guy Jean-Pierre, but could you

14   tell the jury essentially who was the person between Mr.

15   Tod DiTommaso and Mr. Guy Jean-Pierre that you received

16   legal advice from?

17   A.   Between Tod DiTommaso and Guy Jean-Pierre?

18   Q.   Yes, sir.

19   A.   I don't think there was anybody between those two.

20   Q.   Well, between Mr. DiTommaso or Mr. Guy Jean-Pierre,

21   who would you go to for legal advice?

22   A.   Oh, Mr. Jean-Pierre.

23   Q.   Okay.  And then essentially the conversations, how

24   would you describe the conversations that you had with Mr.

25   DiTommaso when you had those three or -- three to five

1    phone calls?

2    A.   They were specifically about the information in the

3    disclosure statement form that you put up earlier, so we

4    really just covered the information on the information and

5    disclosure statement.

6    Q.   Okay.  But it didn't really go into depth; would you

7    agree with me on that?

8    A.   Yeah, for the most part, I mean, it wasn't -- most of

9    that information's not very deep.

10   Q.   So it was just overlooking it?

11   A.   Yeah.  I mean, he actually had, like, a form that I

12   think he was required to ask me specific questions about

13   for that thing, so it was -- you know, it was kind of --

14   kind of by rote, you know.  That he would -- he would call,

15   we would go through the same questions every time, go

16   through the disclosure statement and that was that.

17   Q.   I don't want to put words in your mouth.

18           MR. SIBERT:  Your Honor, can I refresh the

19   witness's memory?

20           THE COURT:  With what?

21           MR. SIBERT:  His interview with the Bureau of

22   Investigation dated July 6th, 2017.

23           THE COURT:  All right.  These are notes prepared

24   by the agent?

25           MR. SIBERT:  That's correct.

Direct - Dittman

1          THE COURT:  Mr. Barnard, is there an objection?

2          MR. BARNARD:  Your Honor, I don't believe these

3     are notes that have been adopted by this witness.  I would

4     object.

5          THE COURT:  Yeah.

6          MR. SIBERT:  Your Honor, they're quoted, and my

7     understanding from my recollection, any, any piece of --

8     any material, piece of paper, or anything can -- if it can

9     help the witness refresh his memory can be used.

10          THE COURT:  Right.  It doesn't have to be

11     admissible, that's correct.  Do you have a copy of these

12     agent interview notes, Mr. Barnard?

13          MR. BARNARD:  Your Honor, what was the date of

14     the --

15          MR. SIBERT:  I have a copy for you.

16          MR. BARNARD:  And, Your Honor, I would object

17     to -- there's --

18          MR. SIBERT:  What page are you on?

19          MR. BARNARD:  Okay.

20          MR. SIBERT:  And these reports have, obviously,

21     Your Honor, been provided in discovery.

22          THE COURT:  Right.  But, I mean, you've not

23     previously labeled them as an exhibit, right?  I'm

24     assuming.

25          MR. SIBERT:  That's right, because I don't plan on

Direct - Dittman

1    introducing them into evidence at all.

2            THE COURT:  No, I understand.  But you're

3    requesting to refresh the recollection of the witness and

4    you don't have copies that defense counsel can follow along

5    with, so that's one problem.  And, you know --

6            MR. SIBERT:  Well, Your Honor --

7            THE COURT:  -- part of the -- you know, part of

8    the issue here is if -- you have to anticipate if you're

9    going to be -- if there are certain documents that you may

10   be using for refreshing of recollection that -- I'm willing

11   to forego my copy, I don't really need to have a copy, but

12   at least defense counsel needs to have a copy to see if the

13   examination is appropriate.

14           MR. SIBERT:  Well, I hope for their sake, they

15   knew this witness was going to take the stand and would

16   have a copy of the interviews for their cross-examination.

17           THE COURT:  That's -- you can't expect them to do

18   your job for you.  Are you telling me that's the only copy

19   you have?

20           MR. SIBERT:  With me presently.  Yes, sir.

21           THE COURT:  Okay.  Now, so -- how long are you

22   going to have Mr. Dittman on the stand?

23           MR. SIBERT:  I'm hoping he's finished by lunch.

24           THE COURT:  All right.  So you don't have --

25           MR. SIBERT:  I can do it at lunch, I can get

Direct - Dittman

1   another copy.  Again, they've had them for over a year,

2   these statements.

3           THE COURT:  Do you have them with you -- do you

4   have your copy with you, Mr. Barnard?

5           MR. BARNARD:  Your Honor, I don't have a copy of

6   that interview.  That was dated August 8th or -- I believe

7   it was.

8           MR. SIBERT:  July 6th, 2017.

9           MR. BARNARD:  July 6th, no.

10           THE COURT:  All right.  Why don't we all take a

11   pause.  Why don't you hand that copy to Ms. Frank, I'll ask

12   Ms. Frank to go into chambers and make a copy, and then

13   we'll come back.

14           MR. BARNARD:  Your Honor, before we continue, too,

15   I would object that I don't believe the witness has

16   indicated that he doesn't recall.  So for refreshing a

17   person's recollection, that first requires him not to

18   recall.

19           THE COURT:  That's true.  Although I believe he

20   did state -- well, Mr. Sibert, what was the question that

21   you believe --

22           MR. SIBERT:  Your Honor, let me just -- I'm going

23   to make it very easy.  I don't want to put words in his

24   mouth.  He gave a direct quote when we -- during the

25   investigation.  I just want to refresh on what he told the

Direct - Dittman

1   investigating agency.

2        THE COURT:  Well -- but Mr. Barnard is right.  If

3   you are trying to do this as a refresh recollection, he has

4   to first say that he does not have a present memory of it

5   and then you show him a document -- which I agree does not

6   have to be admissible into evidence -- he reviews it, he

7   turns it over, and then he answers your question.  That's

8   how -- that's how it's generally done.  So what is the

9   question --

10        MR. SIBERT:  The question would be this.

11   BY MR. SIBERT:

12   Q.   Sir, do you recall what you told the FBI agents when

13   it came to your conversations with Mr. DiTommaso in July of

14   2017?  The exact words?

15   A.   That -- that seems like that was quite a long

16   conversation, so I would have to say no.

17        THE COURT:  All right.  Okay.  So --

18        MR. BARNARD:  Your Honor, that's -- that's an

19   end-around in doing this.  It's not whether he recalls a

20   specific statement he made to an agent at some point; it's

21   whether or not the content of the statement is something

22   that he doesn't remember.

23        THE COURT:  Well, I think that's what you were

24   responding to.  You don't recall the content, Mr. Dittman,

25   of your -- you don't recall your answer -- or your

1    statement, rather?

2            THE WITNESS:  There was -- it was kind of a long

3    conversation, Judge.  There was a lot of questions and a

4    lot of answers around Tod DiTommaso, so I don't know

5    specifically what the counsel is referring to, no.

6            MR. BARNARD:  Your Honor, I'm not talking about

7    the recalling the statement to the agent; I'm talking about

8    the content of what the statement, itself, is supposed to

9    be saying.  In other words --

10           THE COURT:  The underlying statement.

11           MR. BARNARD:  Hhm?

12           THE COURT:  The underlying statement.

13           MR. BARNARD:  The underlying statement, yes.

14           THE COURT:  That's a fair point.  It's one

15   thing -- I guess, then, on cross-examination you can

16   examine this witness as to whether what he says he told the

17   agent was, in fact, what he recollects of the underlying

18   statement.  And -- but in any event -- so I'm going to

19   permit it for the limited purpose of refreshing

20   recollection.

21           So why don't you hand the copy to Ms. Frank, we'll

22   all wait here.  She'll make a copy to give to Mr. Barnard,

23   and then we will proceed.

24       (Pause)

25           MR. SIBERT:  Your Honor, I understand the Court's

Direct - Dittman

1    purpose for copying.  Can I receive those copies back?

2             THE COURT:  You'll get your -- well --

3             MR. SIBERT:  All my copies back.

4             THE COURT:  You only gave her one copy.

5             MR. SIBERT:  I know, but when the copies come

6    forward, can I have all the copies back?

7             THE COURT:  We're not going to keep them.  Yeah,

8    you'll get your copy back.

9             MR. SIBERT:  Thank you.  And . . .

10         (Pause)

11            MR. SIBERT:  My -- I should have just asked to

12   hand this to the witness.

13            THE COURT:  Yeah, go ahead.

14   BY MR. SIBERT:

15   Q.   Sir, can you just look at page 2, that first

16   paragraph.  See if that refreshes your memory.

17   A.   Okay.

18   Q.   And does that refresh your memory?

19   A.   Well, I don't specifically recall the part in

20   quotations, but that doesn't -- you know, it's not

21   something that strikes me as at all out of the realm of

22   possibilities.

23            THE COURT:  All right.  Sir, you should review it.

24   Once you're done reviewing it, then turn it over.  You

25   shouldn't be testifying from the document.  You should then

Direct - Dittman

1    testify from your memory as it's refreshed from the

2    document.  All right?

3            THE WITNESS:  Mr. Sibert, we're specifically

4    talking about the quotation, "more cursory than not"?

5            MR. BARNARD:  Your Honor --

6            THE COURT:  Don't read from the document.

7            THE WITNESS:  Sorry, Your Honor.

8    BY MR. SIBERT:

9    Q.   I'm asking you to look at the first paragraph, the

10   sentence that's highlighted and the two sentences

11   underneath.  And as the judge said, don't make any

12   statements until --

13   A.   There are two highlighted sections.

14   Q.   Excuse me?

15   A.   There are two highlighted sections.  I just wanted to

16   make sure --

17   Q.   The first highlighted section on top of the page.

18   A.   And the two sentences next to it?

19   Q.   Yes, sir.

20   A.   Thank you.

21   Q.   Have you had time to refresh your memory?

22   A.   Yes.

23   Q.   I saw that you flipped that document over.  You're not

24   looking at that document anymore.

25   A.   That's correct.

1    Q.   Did that document help refresh your memory?

2    A.   Not really.  I don't remember that specific sentence,

3    but I don't think it's -- it's not unreasonable that I

4    would have said that.  That is more or less how I feel,

5    yes.

6    Q.   And that's how you were describing your testimony

7    before?

8    A.   Yes.

9    Q.   And what was the word?

10         MR. BARNARD:  Your Honor, I'm going to object to

11   "what's the word?"  He said he doesn't recall making that,

12   so it's improper now to use these words --

13         THE COURT:  Yes, I agree.  So his memory's

14   refreshed.  Now with a refreshed memory, if you want to ask

15   him that question again, what is his --

16         MR. SIBERT:  Thank you, Your Honor.

17         THE COURT:  -- present sense, then he can

18   answer.

19         MR. SIBERT:  Thank you.

20   BY MR. SIBERT:

21   Q.   So could you just describe essentially the

22   conversations -- how you -- how you described your

23   conversations with Mr. DiTommaso.

24   A.   Well, we would go through the checklist on the phone

25   and the information on the information and disclosure

1     statement --

2  Q.   I'm not saying what you did, I'm asking how you

3     described it.

4           MR. BARNARD:  Your Honor, I'm -- just to clarify,

5     I am understanding the question is how did he describe it

6     today, is that --

7           THE COURT:  Right.  Sir --

8           THE WITNESS:  I'm sorry, Your Honor.

9           THE COURT:  You've now read this.  Your memory is

10    refreshed --

11           THE WITNESS:  Yes.

12           THE COURT:  Now the question is being re-asked,

13    What is your testimony today?  How would you characterize

14    it today?  And you -- to answer that question, you have the

15    memory you came into the courtroom with, plus what you've

16    read.  With all that together, what is your answer to that

17    question today?

18           THE WITNESS:  Got it.  Yes, they were not

19    enormously in-depth conversations.

20    BY MR. SIBERT:

21  Q.   Fair.  Thank you.  Okay.  Can I have --

22           MR. SIBERT:  And, Your Honor, I'm going to trust

23    the witness, if we could just leave that there

24    overturned --

25           THE COURT:  Or we can have Ms. Frank retrieve it

Direct - Dittman

1    for him.

2         MR. SIBERT:  Thank you.  Can I have Government

3    Exhibit 372-AA published?

4    BY MR. SIBERT:

5    Q.   Do you recognize Government Exhibit 372-AA?

6    A.   Yes.

7    Q.   And let's just start down at the bottom.  Okay.  Here

8    can you tell the jury what e-mail that you're receiving?

9    A.   This is an e-mail from Issuer Services at OTC Markets

10   to myself and Mr. DiTommaso.  Subject is:  "Information

11   Posted to OTC Markets.com for Current Disclosure - Fusion

12   Pharm, Inc., (FSPM)."

13   Q.   And essentially what are they asking here in this

14   first paragraph?

15   A.   They are asking for some additional information

16   required for the attorney opinion letter.

17   Q.   Can you please go to the top of that document and can

18   I just have the bottom part of the top of the e-mail that

19   we just went over.  Can you -- there you go, thank you.

20        I'm sorry; I just forgot to ask you:  What day was

21   this sent?

22   A.   Thursday, December 29, 2011.

23   Q.   What's the time?

24   A.   12:11 p.m.

25   Q.   Can you go to the top, please.  Okay.

Direct - Dittman

1              Do you recognize what e-mail you're sending here

2    at the top?

3    A.    Yes.

4    Q.    And what is it?

5    A.    It is -- I'm forwarding the same e-mail for the

6    request for information.

7    Q.    And same date?

8    A.    Same date, yes.

9    Q.    And 2:04 p.m.

10   A.    Correct, a couple of hours later.

11   Q.    Okay.  And who are you sending it to?

12   A.    To Guy Jean-Pierre and Bill.

13   Q.    And then you're telling them what?

14   A.    It says, "Looks like one more?  Or did you get this

15   already?  See below."

16   Q.    So instead of contacting Mr. DiTommaso here, you

17   e-mail your brother-in-law, William Sears, and Guy

18   Jean-Pierre?

19   A.    Yes.  Looks -- oh.

20   Q.    Can I have document 372-Z.  Or -- excuse me, yeah,

21   372-Z.  Can we go to the top here again, please.  Okay.

22              This is another e-mail from you; is that correct?

23   A.    Yes.

24   Q.    And essentially same date?

25   A.    Same date.

Direct - Dittman

1    Q.   Approximately 12 minutes later?

2    A.   Yes.

3    Q.   And so based upon the body of the language -- of the

4    e-mail that you're sending, what did you do after you

5    received this notification from OTC Markets at 12:11 p.m.

6    on the 29th of December?

7    A.   It appears I must have called them to clarify exactly

8    what they were looking for, and then I sent that

9    information to Bill Sears, Mr. Jean-Pierre, Mr. DiTommaso.

10   Q.   Okay.  Can I have 372-SS.  Start in the middle.

11          Okay, sir, you are receiving an e-mail in this.

12   Do you recognize this e-mail up top here?

13   A.   I do.

14   Q.   And what is this e-mail about?

15   A.   This is Mr. Bodden, Cliffe Bodden, forwarding

16   quarterly report for the period ended June 30, 2012, for

17   review.

18   Q.   Okay.  And he also includes financial statements that

19   end in these two years; is that correct?

20   A.   Yes.

21   Q.   The year back.

22   A.   Yeah, all the financial statements are two-year

23   financial statements.

24   Q.   And what was sent to Mr. Guy Jean-Pierre?

25   A.   Also attached the shareholders list for Guy's review

Direct - Dittman

1    to confirm number of shareholders.

2    Q.   Can you go to the top of the e-mail.  And you're

3    writing an e-mail here; is that correct?

4    A.   Correct.

5    Q.   Okay.  And who are you writing the e-mail to?

6    A.   Mr. Bodden, who sent the first e-mail, and Mr.

7    Jean-Pierre and Mr. Sears.

8    Q.   And what e-mail are you using for Mr. Sears?

9    A.   That's his VertiFresh e-mail.

10   Q.   So you're sending a draft quarterly report to Mr.

11   William Sears at a different company?

12   A.   Yes, apparently.

13   Q.   So why as the CEO would you send a draft quarterly

14   report about your company, a publicly traded company, to

15   your brother-in-law that is now supposedly running a

16   separate company?

17   A.   For the same reason that I sent it to him every

18   quarter before and after that.  He was still updating these

19   things.  He probably posted it.  You know, the fact that I

20   used his VertiFresh e-mail, I mean, he wasn't an employee

21   of FusionPharm in the previous quarters either.  And I'm

22   not saying it's right, I'm just saying it didn't occur to

23   me -- you know, all these things went to Guy and Bill.

24   Q.   Okay.  So do you think the public, in your opinion,

25   would want to know that you're sending draft quarterly

1    reports?  Do you think it's important for the public, in

2    your opinion, that the public should know that you're

3    sending draft quarterly reports to your brother-in-law that

4    is supposedly running a different company?

5    A.    Important for the public?  No, not particularly, but I

6    don't think it's a good idea.

7    Q.    You don't think, in your opinion, that people would

8    want to know that someone else in a different company is

9    reviewing your -- your public disclosures?

10   A.    Well, it wouldn't -- I mean, no, I don't -- for the

11   public -- for the public market?  I don't -- no, I don't

12   really understand why that would be an issue for the

13   public.

14   Q.    Okay.  Well, I guess more importantly, you copy Mr.

15   Guy Jean-Pierre on this e-mail; is that correct?

16   A.    Yes.

17   Q.    And so now, just like you now, he can see what is

18   being sent.

19   A.    Correct.

20   Q.    And do you know that in the -- in the OTC Markets,

21   that relationships regarding in-laws need to be disclosed?

22   A.    No.  I don't -- I'm not certain that that's true.

23   Q.    Okay.  And since you're not certain, were you -- did

24   you know that in 2011-2013?

25   A.    No.  I did not believe that to be the case.

Direct - Dittman

1    Q.   Okay.  And who did you rely on for that not being the

2    case?

3    A.   Mr. Jean-Pierre and Mr. DiTommaso.

4    Q.   But as we discussed, your conversations were not

5    in-depth with Mr. DiTommaso, correct?

6    A.   Other than the one at Panera, correct.

7    Q.   Okay.  And, in fact, you testified earlier that when

8    you sought legal advice -- and I asked specifically, I

9    asked you between Mr. DiTommaso and Mr. Jean-Pierre, you

10   said the legal advice came from Mr. Guy Jean-Pierre.

11   A.   That's true, correct.

12   Q.   And you would think that what needs to be -- would you

13   consider what needs to be put into an OTC report or

14   disclosure to the public, the terms and the understandings,

15   and what parties need to be listed, is that something that

16   you would rely on for -- by Mr. Guy Jean-Pierre?

17   A.   Yes.

18        MR. SIBERT:  I'm sorry, Your Honor, my exhibits

19   dropped here.

20        Have that taken down, please.  Can I have

21   Government Exhibit 372-SS.  I'm sorry -- I'm sorry, I just

22   did that one.  Can I have Government Exhibit 263.

23   BY MR. SIBERT:

24   Q.   Okay.  Let's go and start in the middle of this

25   document.  Okay.  Now, do you recognize this e-mail that

1    I'm circling on the screen?

2    A.    I do.

3    Q.    Okay.  And who's this e-mail -- what's this e-mail

4    about?

5    A.    This is from Cliffe Bodden to myself, Bill Sears, Mike

6    Kocinski, and Mr. Jean-Pierre.  It is -- appears to be a

7    draft quarterly report for September 30, 2012.

8    Q.    Okay.  Now, this is -- did you say Cliffe Bodden?

9    A.    Yes.

10    Q.    Do you know why it is from Randy Bodden?

11    A.    I think Cliffe is his -- the name he goes by.  Randy,

12    I think, is his formal name.

13    Q.    Okay.  So just same person, though?

14    A.    Same person, yes.

15    Q.    So Randy Bodden, Cliffe Bodden --

16    A.    Same guy, yes.

17    Q.    So now, as you stated, we're talking about the

18    quarterly reports, again from September, 2012; is that

19    right?

20    A.    Yes.

21    Q.    And those were the ones we just discussed in the

22    previous exhibit.

23    A.    Okay, yes.

24    Q.    Do you need to look at that exhibit again?

25    A.    No, I'll trust you.  I wasn't paying attention to what

Direct - Dittman

1    time period, but that's -- okay.

2    Q.   Okay.  And do you recall the date of that e-mail from

3    the previous exhibit?

4    A.   December something of -- December -- late December.

5    Q.   All right.  Let's just bring that back up real quick.

6    Can I have Government Exhibit 372-SS.

7    A.   I guess -- is he -- that's a different time period.

8    This is June 30th.  The next one you're on is September 30.

9    Q.   September 30, okay.  But that e-mail was from August

10   8th, 2012?

11   A.   Yes.

12   Q.   Okay.  Can I have 263 again.

13        And now we're in November; is that correct?

14   A.   Yes.

15   Q.   Can you blow -- actually, let me go back down here.

16   So we're talking about the next quarterly report.

17   A.   Yes.

18   Q.   All right.  And that's what's being sent; is that

19   right?

20   A.   Correct.

21   Q.   All right.  And, again, who are the parties that are

22   receiving this?

23   A.   Myself; Mr. Sears; Mr. Kocinski, the accountant; and

24   Mr. Jean-Pierre.

25   Q.   Okay.  And, again, we're using Mr. Sears' VertiFresh

Direct - Dittman

1    e-mail account, correct?

2    A.    Yes.

3    Q.    And VertiFresh is Mr. Sears' company, right?

4    A.    Correct.

5    Q.    All right.  And then we're e-mailing Mr. Guy

6    Jean-Pierre, the defendant in this case, correct?

7    A.    Yes.

8    Q.    No Mr. DiTommaso.

9    A.    No.

10   Q.    Okay.  Can we go to the top, please.  All right.

11         So now do you recall the last exhibit was the

12   August 8th time frame, 2012, correct?

13   A.    Yes.

14   Q.    So this is essentially, oh, roughly three months

15   later.

16   A.    Yes.

17   Q.    Is that correct?

18   A.    That's correct.

19   Q.    And you're writing this e-mail?

20   A.    Yes, I am.

21   Q.    Who are you sending the e-mail to?

22   A.    Mr. Bodden, looks like -- looks like the last one,

23   sir, Mr. Bodden, Mr. Sears, Mr. Kocinski, and Mr.

24   Jean-Pierre.

25   Q.    Okay.  And then regarding -- again, we're using Mr.

1    Sears' VertiFresh e-mail.

2    A.   Yes.

3    Q.   So now we have two quarters where you're disclosing

4    FusionPharm's quarterly reports to your brother-in-law that

5    is with a different company.

6    A.   Yes.

7    Q.   Drafts.

8    A.   Yes.

9    Q.   For your public company.

10   A.   Yes.

11   Q.   And all that is being shown to your corporate counsel

12   that you rely on legal advice with.

13   A.   Yes.

14   Q.   Can I have Government Exhibit 372-VV.  And so let's

15   start down here, please.

16          Now, you're cc'd on the bottom e-mail; is that

17   correct?

18   A.   Yes.

19   Q.   And what does this e-mail -- what is this e-mail

20   about?

21   A.   This is Mr. Kocinski sending a statement that I

22   believe -- that needed to be uploaded to OTC Markets, or

23   maybe included as part of the information and disclosure

24   statement.

25   Q.   Okay.  And who's he sending it to?

1    A.   To Guy and cc'ing myself -- sorry, Mr. Jean-Pierre and

2    cc'ing Bill Sears, myself, and Cliffe Bodden.

3    Q.   Now we're over three months with this e-mail; is that

4    correct?

5    A.   Since the -- since the August e-mail, yes.

6    Q.   Okay.  And so we saw two previous examples that were

7    prior to this e-mail with Mr. William Sears.  Do you recall

8    what that e-mail address was?

9    A.   The last one was his VertiFresh e-mail.

10   Q.   And the one before?

11   A.   Also VertiFresh, I believe.

12   Q.   Okay.  And now you have the outside accountant that

13   you hired e-mailing Mr. William Sears at what e-mail

14   address?

15   A.   The FusionPharm e-mail address.

16   Q.   Three months later from when Mr. Sears was using the

17   VertiFresh e-mail.

18   A.   Yes.

19   Q.   And I guess for this case, who also knows about this?

20   A.   Mr. Jean-Pierre.

21   Q.   I guess -- why is Mr. Sears having a FusionPharm

22   address if he has his own company VertiFresh?

23   A.   I suspect that's a carryover from back in 2011 when he

24   had it.  And I suspect Mr. Kocinski -- probably just was

25   the first thing that filled in when he, you know, started

1  typing the e-mail address, would be my guess.

2  Q.  Okay.  Let's talk about what's being sent.  Could you

3  explain to the jury what is being sent to Mr. Guy

4  Jean-Pierre that you're copied on.

5  A.  It's a -- you want me to read the subject or the

6  e-mailed body or --

7  Q.  Could you just explain what the -- what essentially --

8  if you understand -- I'm assuming you understand GAAP,

9  being the prior CPA, could you --

10  A.  I understand what GAAP is, yes.

11  Q.  Can you tell the jury what Mr. Kocinski is sending you

12  here in the body.

13  A.  Yes, he's sending a statement that states that the

14  financial statements were prepared in accordance with

15  GAAP.

16  Q.  What does that mean to you?

17  A.  That means that he reviewed the financial statements

18  and he thinks they're properly prepared.

19  Q.  And he goes on -- he goes on to say what?

20  A.  "I'm an accountant that has been providing accounting

21  services for over 25 years.  Please let me know if you need

22  anything further."

23  Q.  He's an accountant.  Do you know anything about his

24  background?

25  A.  I don't.

Direct - Dittman

1   Q.   Do you know if he's a CPA?

2   A.   I don't.

3   Q.   You don't know anything about the outside services,

4   accounting service, that you're relying on for your

5   company?

6   A.   I might assume that he's a CPA, but I don't want to

7   say that here as I'm sitting here.  He's running an

8   accounting firm and he was the accounting firm that did it

9   for the previous public company that was the same public

10   company, so I didn't have a whole lot of reason to doubt

11   his credibility coming into it.

12   Q.   Okay.  And can you go to the top of that document,

13   please.  Okay.

14         Essentially this is an e-mail by you; is that

15   correct?

16   A.   Yes.

17   Q.   And that's to Mr. Guy Jean-Pierre?

18   A.   Correct.

19   Q.   Okay.  And then -- only to him; is that correct?

20   A.   Yes.

21   Q.   All right.  And then -- so what are you telling Mr.

22   Guy Jean-Pierre about?

23   A.   Just forwarding the accountant's statement as

24   requested.

25   Q.   Okay.  But if you go down below, we also have him in

Direct - Dittman

1    this e-mail as well, right?

2    A.   Correct.

3    Q.   Did you ever --

4            Can I have that taken down?

5            Did you -- obviously when it comes to accounting,

6    you would agree that there's a lot of documents?

7    A.   In accounting in general?

8    Q.   Yes.

9    A.   Yes.

10   Q.   Okay.  When you're doing more -- so more documents for

11   a company or for an individual filing dealing with

12   accounting purposes?  Based upon your experience.

13   A.   Well, generally, a company, I would say.

14   Q.   Did you ever send, yourself, Mr. Kocinski the

15   documents for him to do the quarterly and annual financial

16   reports?

17   A.   Did I ever send Mr. Kocinski --

18   Q.   FusionPharm corporate documents for him to do the

19   reports, like the one he sent you in this previous exhibit.

20   A.   He didn't -- I never sent him -- he didn't prepare the

21   reports, he only reviewed the reports.

22   Q.   Okay.  So did he have any documents, do you know?

23   A.   He --

24   Q.   Corporate documents?

25   A.   Depend -- I'm not sure what you mean by "corporate

Direct - Dittman

1    documents."  You mean like Articles of Incorporation or are

2    you talking about specific things that are in the

3    financials?  I'm not sure what you mean, Counselor.

4    Q.   Did you ever send him financial documents relating to

5    FusionPharm in the business that happened in between the

6    quarters and at the end of the year for Mr. Kocinski to

7    review and use when he was reviewing your report?

8    A.   Sometimes, but not frequently.

9    Q.   What would you send him?

10   A.   I don't recall specifically.  I recall the -- needing

11   for him to book my depreciation at one point and sending

12   him a list of what was in the depreciable assets.  I don't

13   know -- I don't specifically recall anything else, but if

14   he needed to see something, I certainly would have sent it

15   to him.

16   Q.   So you sent him a list?

17   A.   Well --

18   Q.   At least one time?

19   A.   Anything he wanted to see, you know.  If he asked me

20   for something, I would certainly send it to him.

21   Q.   But he had to ask you; you never took the initiative

22   to send him the financials?

23   A.   Well, I sent him the financial statements, but I

24   didn't send him all the QuickBooks, if that's what you're

25   asking, or the stuff, like that, no.  He wasn't -- he

Direct - Dittman

1    didn't do the detailed accounting.

2    Q.   Okay.  QuickBooks.  What are QuickBooks?

3    A.   QuickBooks are a software program that keeps track of

4    business finances.

5    Q.   Okay.  Essentially the accounting records for a

6    corporation?

7    A.   Yeah.

8    Q.   Now, you're a CPA.

9    A.   I was 20 years ago.

10   Q.   Okay.  All right.  But when you prepared financials,

11   you needed records; would you agree with me on that?

12   A.   Yes.

13   Q.   Did you ever send QuickBooks to Mr. Kocinski?

14   A.   No.

15   Q.   Can I have 372-WW.  I'm going to start down at the

16   bottom.

17        Do you recognize the e-mail at the bottom of the

18   document 372-WW?

19   A.   Yes.

20   Q.   And what is this e-mail?

21   A.   That's an e-mail from myself to Mr. Jean-Pierre.

22   Subject:  "E-mailing officer/director questionnaire,

23   11-14-2012."

24   Q.   Okay.  And essentially the body is, you're saying --

25   you're giving a "thank you" to Mr. Guy Jean-Pierre?

Direct - Dittman

1    A.   Yeah, apparently I'm sending him a draft for him to

2    look at or something he wanted to look at.

3    Q.   And you know that because of the body?

4    A.   Yes.

5    Q.   Mr. DiTommaso's not on this e-mail.

6    A.   That's correct.

7    Q.   Can you go up to the top, please.  And can you tell me

8    what the reference of the e-mail at the top is.

9    A.   I'm sorry, what the reference?  What --

10   Q.   Or can you tell me about the e-mail on the top of this

11   document?

12   A.   Okay.  From myself to Mr. Jean-Pierre, cc'ing Bill

13   Sears, also about the officer/director questionnaire for

14   the same time period.  Maybe when I sent it the first

15   time -- it looks like from the body of the e-mail it wasn't

16   legible so maybe Guy had requested it again.

17   Q.   Okay.  And so you're saying this officer/director

18   questionnaire is relating to FusionPharm?

19   A.   Yes.

20   Q.   Where you're the CEO?

21   A.   Yes.

22   Q.   And logically, you're sending it to your lawyer for

23   the corporation; is that right?

24   A.   Yes.

25   Q.   But you also sent it to your brother-in-law, Mr.

1    William Sears.

2    A.    Yup.

3    Q.    Okay.  So -- and look at the date here, November 29th,

4    2012.

5    A.    Yes.

6    Q.    Again, over, now, almost four months where Mr. Sears

7    is using a VertiFresh e-mail for his company; however, as

8    the CEO, you're still informing your brother-in-law

9    about -- you're still informing your brother-in-law; is

10   that correct?

11   A.    Yes.  That's not his VertiFresh, that's his personal

12   e-mail, but yes.

13   Q.    But you're telling your brother-in-law about what's

14   going on at VertiFresh dealing with the -- your role as a

15   CEO?

16   A.    Well, I'm cc'ing him on the correspondence that

17   ultimately would be going back and forth between Guy and

18   Mr. DiTommaso and whomever, which I often did.  He --

19   Q.    Where is Mr. DiTommaso in this e-mail?

20   A.    He's not included in this one.

21   Q.    All right.  And, in fact, you sent it -- you send this

22   e-mail to your lawyer; so the same e-mail that you're

23   relying on your lawyer, you send to your brother-in-law.

24   A.    He is cc'd, yes.

25   Q.    Can I have page 3, please, of that exhibit.

1          So this is for the end of November, I assume --
2    or, excuse me, the end of September 30th, 2012, that needs
3    to be disclosed.  Can you just tell the jury essentially
4    what you're checking "yes" to.
5    A.   It says, if -- previously it says "Have you read the
6    proposed disclosure statement and accompanying financial
7    statements for the period ended September 30, 2012, for
8    FusionPharm, Inc?  If yes, do you believe, after
9    appropriate due diligence, that all statements and
10   information contained therein are accurate in all
11   respects?"
12   Q.   And you checked yes.
13   A.   Correct.
14   Q.   Can I have 372-ZZ.
15          Okay, sir, can you tell me what this e-mail is
16   about.
17   A.   That is from me to Bill Sears, Cliffe Bodden again,
18   Mr. Jean-Pierre.  The subject is Reg A, and there's an
19   attachment.
20   Q.   And do you know what that attachment is?
21   A.   Presumably the Reg A.
22   Q.   Okay.  Do you know what Regulation A is?
23   A.   At the moment, no.
24   Q.   Okay.  Let me just have page 1 quickly of the
25   attachment.  Does that refresh your memory?

Direct - Dittman

1    A.    Yes.

2    Q.    And what is it?

3    A.    It's a securities offering document.

4    Q.    Okay.  Can I have back the -- thank you.

5          Now, again, let's just talk about who are you

6    sending this securities regulation document to.

7    A.    To Mr. Sears, Mr. Bodden, and Mr. Jean-Pierre.

8    Q.    Okay.  And, again, is Mr. DiTommaso on this e-mail?

9    A.    No.

10   Q.    Okay.  And -- but Mr. Guy Jean-Pierre is; is that

11   right?

12   A.    Yes.

13   Q.    Okay, again, now we're on December 18th, 2012, when

14   you sent this e-mail, right?

15   A.    Yes.

16   Q.    Now we're over four months of the August e-mail that

17   we had VertiFresh for your brother-in-law, Mr. Sears; is

18   that right?

19   A.    Yes.

20   Q.    So now, again, you're e-mailing your brother-in-law at

21   VertiFresh dot -- at VertiFresh; is that right?

22   A.    Yes.

23   Q.    So you're sending him a security regulation form for

24   your brother-in-law at a different company.

25   A.    Yeah.

Direct - Dittman

1    Q.   And that's the same form that you're sending to your

2    corporate counsel at VertiFresh.

3    A.   Yeah.  I suspect that -- I don't know.  I -- I suspect

4    probably that Bill and Cliffe filled it out or wrote it in

5    the first place.

6    Q.   Do you know?

7    A.   Do I know?  No, I don't know.

8    Q.   Let me ask you this question:  When was it that Mr.

9    Guy Jean-Pierre was not FusionPharm's legal counsel?

10   A.   Sometime -- excuse me, sometime in the early -- first

11   half of 2013.

12   Q.   First half of 2013.

13   A.   Yup.

14   Q.   I've got to grab a sip of water, so if you need . . .

15            And -- I'll come back to that time frame.

16            The first half of 2013.  Can I show the witness

17   Exhibit 395.

18            And, sir, if you need -- I'm going to flip through

19   a couple of these pages here, so if you can't see, let me

20   know.  But do you recognize what Government Exhibit 395 is?

21   A.   That is the annual information and disclosure

22   statement for the December 31, 2012.

23   Q.   So this would be the information and disclosure

24   statement that covers the whole 2012 time frame.

25   A.   Correct.

1    Q.   Can I please have page 12.  And can I have the top of

2    it, please.

3            Now, do you need to know what section this is

4    under?

5    A.   I don't think so.

6    Q.   Do you know where Mr. Guy Jean-Pierre is listed as

7    legal counsel?  What section it's under?

8    A.   No, not off the top of my head.

9    Q.   Can I have page 11.  Can I have the bottom of it.

10   Excuse me, I'm sorry, mid-point.

11           Do you remember discussing this previously?

12   A.   I do.

13   Q.   Okay.  Do you recall the section now?

14   A.   I do.

15   Q.   And what section is that?

16   A.   Management Structure and Financial Information.

17   Q.   Okay.  And then -- can I have that next page, please.

18           So I guess my follow-on question is:  Who's listed

19   as your legal counsel?

20   A.   Mr. Jean-Pierre.

21   Q.   And that's different than corporate secretary.

22   A.   It is.

23   Q.   Okay.  Can I have page -- or, excuse me, can I have

24   Exhibit 25.

25           And, again, do you recognize what's been marked as

                         Direct - Dittman

1     Government Exhibit 25?

2     A.    Appears to be the same thing, the December 31st, 2012,

3     information and disclosure statement.

4     Q.    Okay.  Can I have page 11, please.

5           THE COURT:  Hold on, I'm confused.  Why does the

6     same document have two different exhibit numbers?

7           MR. SIBERT:  If the Court would entertain my

8     questioning a little bit more, I believe the Court will --

9     the question will be answered.

10          THE COURT:  All right.  So it's your

11    representation that they're not the same document.

12          MR. SIBERT:  That's correct.

13          THE COURT:  All right.  Go ahead.

14    BY MR. SIBERT:

15    Q.    Okay.  Again, do you recall Section D?

16    A.    I do.

17    Q.    Okay.  And, again, where is your legal counsel in this

18    document?

19    A.    Unless he's below that I can't see, he appears to not

20    be there any longer.

21          THE COURT:  Hold on, hold on.  You're asking him

22    questions to be looking through a document.  Are you -- so

23    that means he needs the actual physical exhibit in front of

24    him if you want him to be looking through a document to see

25    where he finds something.

```
                              Direct - Dittman
```

 1          MR. SIBERT:  Okay.

 2    BY MR. SIBERT:

 3    Q.   Well, let me rephrase my question.  Under part D of

 4    the management structure for FusionPharm, do you have a

 5    legal counsel listed?

 6          MR. BARNARD:  Your Honor, could we have designated

 7    what document we're talking about and what page we're on?

 8    I'm confused.

 9          THE COURT:  All right.  I think with multi-page

10    documents, if you're going to be asking questions that it's

11    not clear what page it's on, I would prefer for the witness

12    to have the paper documents so you have the whole document

13    in front of you.

14          If you need -- if you think in order to answer a

15    question you need to look at the entirety of the document

16    or more of the document than just what's on the screen, go

17    ahead and do so.  So my courtroom deputy is going to get

18    that for you.

19          And to Mr. Barnard's point, Mr. Sibert, what page

20    are we talking about?

21          MR. SIBERT:  As I stated, we're looking at

22    Government Exhibit 25, page 11.

23          THE COURT:  All right.

24          MR. SIBERT:  Or, excuse me, page -- yeah, page 11.

25    Government Exhibit 25.

Direct - Dittman

1          THE COURT:  All right.  Then your question is?

2     BY MR. SIBERT:

3     Q.   Sir, have you had time to review that document as the

4     Court requested?

5     A.   Yes, page 11 and 12, yes.

6     Q.   Page 11 and 12, that's of document 25.

7     A.   Yes.

8     Q.   Okay.  Now, as you testified, is the annual disclosure

9     statement from 2012 in document 25?

10    A.   Yes.

11    Q.   Do you have a legal counsel listed under Directors and

12    Management as we looked at in the prior exhibit?

13    A.   On this one, no.

14    Q.   Who's the only officer and director listed?

15    A.   Myself.

16    Q.   Do you know why Mr. Guy Jean-Pierre was removed from

17    this annual disclosure in 2012?

18    A.   I don't from memory, but I can surmise an answer to

19    that question.

20    Q.   Well, I guess the -- I'm asking you based upon what

21    you remember.  Do you know why he was removed from the

22    annual disclosure of FusionPharm in 2012?

23    A.   No, I don't remember.  I don't remember the change.  I

24    don't remember this, no.

25    Q.   Did it have something to do with the SEC complaint?

Direct - Dittman

1    A.   I would --

2              MR. BARNARD:  Your Honor, object.  Leading.

3              THE COURT:  Sustained.

4    BY MR. SIBERT:

5    Q.   Did you learn anything else besides Mr. Jean-Pierre's

6    issues with the Florida State Bar?

7    A.   Yes.

8    Q.   What did you learn?

9    A.   Yeah, I learned that he had an SEC issue in the early

10   part of 2013.

11   Q.   And as you had testified before, there's a little bit

12   of lag time when it comes to the filing of these

13   documents?

14   A.   Yup.

15   Q.   Do you recall now why Mr. Guy Jean-Pierre was not put

16   in his annual disclosure -- in your annual disclosure

17   statement for FusionPharm?

18   A.   I don't recall it at the time, Mr. Sibert, but, again,

19   I can imagine why he was removed.

20   Q.   And what is your belief of why he was removed?

21   A.   Well --

22             MR. BARNARD:  Your Honor, I object to

23   speculation.

24             THE COURT:  Right.  Don't speculate or guess, sir.

25             THE WITNESS:  Sorry, Your Honor.

1          THE COURT:  Testify from personal knowledge.

2    BY MR. SIBERT:

3    Q.   You can't remember?

4    A.   I don't -- I don't specifically remember.

5    Q.   Okay.

6    A.   No.

7    Q.   Okay.  Can you blow up the Legal Disciplinary Action?

8          Now, you recall this section as well; is that

9    correct?

10   A.   Yes.

11   Q.   Is anyone disclosed under Legal Disciplinary History?

12   A.   No.

13         MR. BARNARD:  Your Honor, which exhibit are we on?

14         MR. SIBERT:  Same exhibit.

15         THE COURT:  I'm assuming we're still on 25.

16         MR. BARNARD:  Still on 25.

17         MR. SIBERT:  We're just right below where we were.

18         THE WITNESS:  No.

19         MR. SIBERT:  Could I have a minute, Your Honor?

20         THE COURT:  You may.

21   BY MR. SIBERT:

22   Q.   Okay, sir, let's go back to Exhibit 25.  I just want

23   to look at page 12.

24         Can you blow up the top, please.

25         All right.  Do we have any disclosures relating to

Direct - Dittman

1   party transactions?

2   A.   No.

3   Q.   And can we go down that page to Beneficial Owners.   Do

4   you see this document here?

5   A.   I do.

6   Q.   Okay.  And can we just look at the preferred shares

7   here.

8   A.   Yes.

9   Q.   Okay.  And who is basically owning all of the

10  preferred shares as the corporation?

11  A.   Still myself and my little brother, Robert Dittman.

12  Q.   All right.  Now you have to sign an officer disclosure

13  statement that these things are correct; is that correct?

14  A.   That's correct.

15  Q.   These disclosures are correct.  And you also sent them

16  to Mike -- you actually pay Mike Kocinski down -- he was in

17  Florida; is that right?

18  A.   Yes.

19  Q.   Did you pay him for his services to review these?

20  A.   Some -- sometimes, yes.

21  Q.   Can you tell me if this math makes sense?

22  A.   No, it looks like an addition error in the bottom

23  column.

24  Q.   Can you go to page 14, please.  I just want to spend a

25  minute here.  You're dealing with -- as you stated before,

Direct - Dittman

1    these disclosure statements deal with revenue and your

2    finances of FusionPharm; is that right?

3    A.    Some of it, yes.

4    Q.    All right.  Well, here you're reporting in 2012 a

5    revenue of $808,000 -- or, excuse me, $808,398.  Is that

6    correct?

7    A.    Yes.

8    Q.    And based upon this report, that's an increase of 255

9    percent from last year.

10   A.    Yes.

11   Q.    Can we please go to page 10 of Government Exhibit 25.

12   Can you zoom in on that.

13         Now, do you see a paragraph F here?

14   A.    I do.

15   Q.    The first sentence states, "The issuer's largest" co

16   company.  When we're talking about the issuer --

17         THE COURT:  It's customer.  Largest customer.

18   BY MR. SIBERT:

19   Q.    Excuse me.  Customer.  Who's the issuer?

20   A.    FusionPharm.

21   Q.    Okay.  And who's FusionPharm's largest customer?

22   A.    VertiFresh.

23   Q.    And as you testified before, VertiFresh is whose

24   company?

25   A.    VertiFresh was owned by Bill Sears.

Direct - Dittman

1    Q.   Okay.  And it accounted for 90.8 percent of your

2    revenue for 2012 is what this statement states; is that

3    correct?

4    A.   Yes.

5    Q.   Can you go up, please.  I need paragraph -- oops,

6    here, I'll circle it.

7         In fact, it states it was March -- when did you

8    enter an exclusive licensing agreement with VertiFresh?

9    A.   March 2012.

10   Q.   So in about 10 months, your brother-in-law's company

11   accounted for 90 percent of your revenue in 2012 for

12   FusionPharm?

13   A.   Yes.

14   Q.   Based upon this document.

15   A.   Yes.

16   Q.   And can we look at Meadpoint.  You entered a licensing

17   agreement with them; is that correct?

18   A.   Yes.

19   Q.   That was even later, in November 2012, correct?

20   A.   Yes.

21   Q.   Meadpoint Venture Partners is the company.

22   A.   Yes.

23   Q.   A company that your FusionPharm entered a licensing

24   agreement into, right?

25   A.   Correct.

Direct - Dittman

1   Q.   Who owns Meadpoint?

2   A.   Bill Sears and his mother, Sandra.  At this point.

3   Q.   I'm sorry, I want to go back to Government Exhibit 25.

4         Can I have page 21 of Government Exhibit 25.

5         Now, sir, do you recognize page 21 of Government

6   Exhibit 25?

7   A.   It appears to be the balance sheet.

8   Q.   Let's blow it up.

9   A.   Yes.  Balance sheet from December 31st, 2012.

10   Q.   And you're familiar with a balance sheet, being a

11   prior CPA, right?

12   A.   Yes.

13   Q.   Okay.  Can we go down to Liabilities and Stockholders

14   Equity.  Can you just tell me what the long-term

15   liabilities are.

16   A.   That's a notes payable to -- do you want to know who

17   to or you just want to know what it is?

18   Q.   I just want to know how the long-term liabilities are

19   listed.

20   A.   As a notes payable.

21   Q.   Okay.  Thank you.

22         Okay.  And then can we go back up, please.  What

23   is cash for FusionPharm?  What is your cash balance for

24   FusionPharm at the end of 2012?

25   A.   $340.

1   Q.   So that's not $340,000.

2   A.   Nope.

3   Q.   $340.

4   A.   All of these numbers are in exact numbers, yes.

5   Q.   So your company in 2012 did not have any cash.

6   A.   It had $340.

7   Q.   And you would -- you would agree with me that's not a

8   lot of cash for a company.

9   A.   That's not a lot of cash for a company.

10  Q.   Okay.  Thank you, sir.

11          Can I have page 10 on that exhibit, please.

12          And, again, remember this section we went through

13  about related party transactions?

14  A.   Yes.

15  Q.   VertiFresh wasn't listed; would you agree with that?

16  A.   Correct.

17  Q.   And neither was Meadpoint?

18  A.   Correct.

19  Q.   Even though you had licensing agreements with

20  VertiFresh and Meadpoint.

21  A.   Correct.

22  Q.   And even though you had -- even though VertiFresh was

23  90 percent of your revenue for 2012?

24  A.   Correct.

25  Q.   Can I ask you:  Where did your brother-in-law get

1   $720,000 to basically pay you -- pay your company as
2   revenue?
3   A.   Was 750,000, not to split hairs, but just so we're
4   accurate.
5   Q.   I'll take the bigger amount.
6   A.   Yeah, exactly.  And the amount that he actually put
7   into the company that he actually paid in that year was
8   only 250,000.  The rest of it is notes receivable that you
9   can see back on the balance sheet of $500,000.
10        So the way this agreement worked, it was a
11  three-location agreement, Colorado being first.  So he paid
12  $250,000 for Colorado and the rest was to be done down the
13  road.
14  Q.   So you're filing revenue for the public to see, for
15  your corporation, you're booking revenue for 2012 that your
16  company doesn't even have.
17  A.   Well, yes, we booked the revenue and the receivable
18  and disclosed the nature of the agreement.  I'll grant you,
19  Mr. Sibert, that we restated this in 2014 when my new CFO,
20  Craig Dudley, thought it was too aggressive.  We went back
21  and voluntarily corrected this before the Government raid,
22  by the way.
23  Q.   Okay.  But at the time your legal counsel is reviewing
24  these documents, as you testified to, you booked over --
25  about $500,000 of revenue that FusionPharm didn't even

Direct - Dittman

1    have.

2    A.   Have, yes.  But that's why you put a receivable on the

3    books.  The question might be better asked "earned" rather

4    than "have."

5    Q.   But how is it booked?

6    A.   It was booked as revenue.

7    Q.   And I think you've answered me, but did your corporate

8    counsel, Mr. Guy Jean-Pierre, review this annual report?

9    A.   I'm sure he did.  I'm sure he was included.

10   Q.   So -- and going back to the money, where did Billy

11   Sears get the $250,000 to pay you in 2012?

12        MR. BARNARD:  Your Honor, foundation.

13        THE COURT:  We'll get to this quicker:  If you

14   know.  Don't speculate or guess.

15        THE WITNESS:  I know that -- I may not be able to

16   say all of it, but I know that most of it came from his

17   sale of FusionPharm stock.

18   BY MR. SIBERT:

19   Q.   So as you already stated, FusionPharm stock wasn't

20   doing -- wasn't lighting up the skies when it came to the

21   price.  In fact, you pushed back when it got up to the 2 to

22   $3 point.  So for Mr. Sears to provide you, would you say a

23   majority of that 250 came from Sears?

24   A.   I'm sure, yes.

25   Q.   Okay.  So essentially, Mr. Sears, just based upon your

1    testimony -- how many shares of stock, approximately, would

2    Mr. Sears had to sell to be able to fund you $250,000?

3    A.   Depends exactly on the price that they were sold,

4    obviously, but if the stock was between a dollar and 2 in

5    that time frame, then it was probably somewhere in there,

6    you know, a hundred to 200,000 shares.

7    Q.   A hundred to 200,000 common shares of FusionPharm

8    stock.

9    A.   Yes.

10   Q.   That he put back into your company, FusionPharm.

11   A.   That he used to purchase assets from the company,

12   which was an important distinction made by Mr.

13   Jean-Pierre.

14   Q.   But that was never disclosed it was your

15   brother-in-law.

16   A.   Correct.

17   Q.   And, again, when you relied on what needed to be filed

18   in the OTC Markets regarding disclosures and to the legal

19   issues, who did you refer it to?

20   A.   Mr. Jean-Pierre.

21   Q.   And would that include related parties?

22   A.   Certainly.  We discussed this one in great detail.

23   Q.   How about related party transactions?

24   A.   Yes.

25   Q.   And what would you describe the licensing agreement

Direct - Dittman

1    between you FusionPharm, and your brother-in-law

2    VertiFresh?

3    A.   I understood it to not qualify as a related party

4    transaction.

5    Q.   And who gave you that advice?

6    A.   Mr. Jean-Pierre.  And other counsel as well.  Mr.

7    DiTommaso didn't disagree when I explained that to him.

8    Q.   Okay.  But like -- as we've talked about, you didn't

9    go into detail with Mr. DiTommaso, did you?

10   A.   When I met with him --

11   Q.   You met with him one time in 2011 --

12           MR. BARNARD:  Your Honor, if the witness can

13   finish his sentence --

14           THE COURT:  Please let him --

15           THE WITNESS:  That's fair.  That would have been

16   before VertiFresh.  That's a fair point.

17   BY MR. SIBERT:

18   Q.   Fair point?

19   A.   Yes.

20   Q.   VertiFresh didn't exist.

21   A.   No, didn't exist, correct.  Well, different issue, but

22   you're correct.

23   Q.   So what are you saying I'm correct on?

24   A.   Yes, I wouldn't have spoken in detail with Mr.

25   DiTommaso about VertiFresh.

Direct - Dittman

1    Q.   So the only legal advisor that you were relying on was
2    your corporate counsel, the defendant, Mr. Guy
3    Jean-Pierre?
4    A.   For VertiFresh, yes.
5    Q.   Can I have Government Exhibit 394.
6         Sir, can you just -- can you just take a look
7    at -- I'm not sure if he can see it, but I'll just kind of
8    blow it up for you.  Can you shrink it in a little bit?
9         Okay.  So do you recall this e-mail?
10   A.   I recall seeing it, yes.
11   Q.   Okay.  And essentially, can you tell the jury what
12   this e-mail is about.
13   A.   This is an e-mail from myself dated Wednesday, the
14   13th of February, 2013, to David Roy, Bill Sears, and Mr.
15   Jean-Pierre.
16   Q.   Okay.  So I'm going to ask you:  No Mr. DiTommaso.
17   A.   No.
18   Q.   Okay.  And, again, we're talking to Mr. William Sears
19   at VertiFresh.
20   A.   Yes.
21   Q.   And we're talking about FusionPharm.
22   A.   Yes, we're talking about Mr. Roy's stock certificate,
23   specifically.
24   Q.   So you're talking to your brother-in-law, that you've
25   now stated at least he's cc'd on this, regarding

Direct - Dittman

1    FusionPharm stock with a Mr. David Roy.

2    A.    Well, yeah, converting Mr. Roy's certificate, yes.

3    Q.    Well -- and then I just want to point out here, who is

4    the legal counsel for FusionPharm?

5    A.    Mr. Jean-Pierre.

6    Q.    And you actually state that to Mr. Roy; is that

7    correct?

8    A.    Yes.

9    Q.    And this is February 2013.

10   A.    Yes.

11   Q.    And, in fact, Mr. David Roy had a previous

12   conversation with Mr. Sears regarding his FusionPharm

13   certificates or stocks.

14   A.    Yeah, I think this is the top of a long-ish string of

15   e-mail, mostly between David Roy and Bill.  I think this

16   is -- I think, as it says here, Bill went on vacation and I

17   tried to jump in.  David Roy is my cousin Chad's business

18   partner and kind of a friend of Bill.

19   Q.    Can I have 372-FF.  Can we focus in on the middle.

20           Do you know who Ms. Martin is from Pacific Stock

21   Transfer?

22   A.    Yes.

23   Q.    Okay.  And let me do this:  Let's go ahead -- do you

24   know what the importance of the e-mail was with Mr. Sears

25   and Ms. Martin?

1    A.    I don't, no.

2    Q.    Okay.  Can we go to the top.

3          Now, you're cc'd on this e-mail; is that correct?

4    A.    Yes.

5    Q.    And do you know why you're being cc'd on this e-mail?

6    A.    Presumably because they're asking the -- or have

7    gotten a shareholder report for the period ending March

8    31st, 2012, from the transfer.

9    Q.    Okay.  Who is Mr. Sears e-mailing?

10   A.    Myself, Mr. Jean-Pierre.

11   Q.    Okay.  And so no Mr. DiTommaso.

12   A.    No.

13   Q.    And, again, we're here in May 2012; is that correct?

14   A.    Yes.

15   Q.    And Mr. Sears is still involved with FusionPharm

16   issues.

17   A.    Yes.

18   Q.    And, sir --

19         MR. SIBERT:  Excuse me, Your Honor; I might have

20   misspoke.  I think I said 372-FF.  That was

21   Exhibit 372-FFF.

22         THE COURT:  All right.  Thank you for that

23   clarification.

24         MR. SIBERT:  I apologize.

25   BY MR. SIBERT:

Direct - Dittman

1    Q.   And as we have seen in several e-mails --

2         Actually, I need -- I'm sorry.  I think my

3    courtroom help actually put up 372-FF.  Can I have 372-FFF.

4    I apologize.  Can I have the middle e-mail, please.

5         Okay.  Here, you're sending an e-mail to a Mike.

6    Do you know who -- oh, Mike Kocinski; is that correct?

7    A.   Yes.  Mike Kocinski, yes.

8    Q.   Okay.  What's this about?

9    A.   Subject is "December 31st, 2012 Financials."

10   Q.   So this would be the -- is this the end of the year of

11   2012 financials or would this be the end of the quarter in

12   September?

13   A.   Well, same thing.  Yes to both questions.  Not

14   September, this is -- this would be 12-31 quarter and

15   annual.

16   Q.   Okay.  And who's being e-mailed?

17   A.   Mr. Sears, Mr. Jean-Pierre, and myself -- no, I'm

18   sorry, that's me sending it to Mr. Kocinski and then cc'ing

19   Bill and Mr. Jean-Pierre.

20   Q.   Right.  And you're actually sending again another

21   draft to Mr. Sears at VertiFresh.

22   A.   Yup.

23   Q.   Can we go to the top, please?

24   A.   Looks, actually, Counselor -- sorry, it looks like I'm

25   responding to something because it's an RE.

Direct - Dittman

1   Q.   You want to go back down and explain?

2   A.   No, I don't know.  I'm just saying that I may be

3   replying to an e-mail that came originally from the -- Bill

4   or Mr. Kocinski with everybody on it.  I'm not sure

5   exactly, just --

6   Q.   Let's look at the body of the e-mail.

7   A.   Uh-huh.  Would you like me to read it?  --

8   Q.   Could you read it?  Yeah.

9   A.   Sure.  "Mike, Great work.  Agree with all changes

10  suggested (updating tables and notes to agree with final

11  financials).  Awaiting the source documents now (I only

12  have it in .pdf) and will forward the same to you and to

13  Guy Jean-Pierre (cc'd here) as soon as they are completed."

14  Q.   Okay.  So, again, acknowledging that you're providing

15  Mr. Guy Jean-Pierre documents regarding the financials to

16  be reviewed.

17  A.   Yes.

18  Q.   All right.  And can we just go to the top.

19       And, again, Mr. Guy Jean-Pierre is sending you an

20  e-mail; is that right?

21  A.   Yes, and cc'ing Mr. Sears.

22  Q.   Okay.  And where is he cc'ing Mr. Sears?

23  A.   VertiFresh e-mail.

24  Q.   So the corporate counsel for FusionPharm is now

25  disclosing draft quarterly reports to Mr. Sears, your

Direct - Dittman

1   brother-in-law, at a different company.

2   A.   Yes.

3   Q.   Do you know why?

4   A.   Because Billy would have been the one who uploaded

5   them once they were done.  Billy tended to play secretary

6   in all of these matters.  All of the financials look, I

7   would assume, exactly like this in terms of e-mail string:

8   myself to Billy to Guy to Mike Kocinski and around and

9   back.

10            THE COURT:  Mr. Sibert, would this be a good time

11   to take a pause for lunch?

12            MR. SIBERT:  It would be a great time for me, Your

13   Honor.

14            THE COURT:  All right.

15            MR. SIBERT:  Thank you.

16            THE COURT:  All right, ladies and gentlemen of the

17   jury, we're going to take our lunch recess.  We will be in

18   recess until 1:15.

19         (Jury left the courtroom at 12:13 p.m.)

20            THE COURT:  All right, Mr. Dittman, same

21   limitation during the lunch recess.

22         (Recess at 12:14 p.m.)

23                     AFTERNOON SESSION

24         (In open court in the presence of the jury at 1:20

25   p.m.)

Direct - Dittman

1          THE COURT:  Mr. Dittman, I remind you you remain

2    under oath.

3          THE WITNESS:  Yes, sir.

4          THE COURT:  Mr. Sibert, you may resume your

5    examination.

6          MR. SIBERT:  Thank you, Your Honor.

7               DIRECT EXAMINATION (Continued)

8    BY MR. SIBERT:

9    Q.   Can I please have Government Exhibit 25, page 30,

10   brought back up.

11        Okay, sir -- excuse me, let me just start from

12   page 1 so that the witness -- again, we've looked at this

13   document.

14        Do you recognize this document?

15   A.   Yes.

16   Q.   Okay.  And it's the disclosure for FusionPharm from

17   2012; is that right?

18   A.   Correct.

19   Q.   Can I have page 30, please.  Just please focus here.

20        Okay, sir, could you just explain to the jury what

21   is stated regarding the notes.  What are the titles of your

22   notes?

23   A.   There's a summary notes payable, and then a breakdown

24   into short-term notes, short-term loans, and notes

25   payable.

                    Direct - Dittman

1    Q.   Okay.  Thank you.  And can I have the top of that

2    page?

3            And what's the title of this page?

4    A.   FusionPharm, Inc., formally Baby Bee Bright

5    Corporation, Notes to Financial Statements (Unaudited),

6    December 31st, 2012.

7    Q.   Okay.  Thank you.  Okay.

8            Can I please have 372-NN.

9            Okay, sir, can you --

10           Thank you -- I'm sorry.  I need 372-NNN.

11           Okay, sir, can you tell me what this e-mail is

12   about, Government Exhibit 372-NNN?

13   A.   It is from myself to Bill Sears, dated August 20,

14   2013.  Subject is "Financials, Quarterly Report,

15   6-30-2013."

16           Would you like me to read it, Counselor?

17   Q.   So let me just go through this.  So now we're in

18   August of 2013?

19   A.   Yes.

20   Q.   Okay.  And are you talking about the quarterly report

21   for June 2013?

22   A.   Yes.

23   Q.   For what company?

24   A.   FusionPharm, I presume.

25   Q.   Did you have any other companies?

Direct - Dittman

1    A.    No.

2    Q.    And what are you asking Mr. Sears to do?

3    A.    "Please read carefully, make sure I updated all the

4    dates from last year (you missed quite a few, smiley face).

5    Let me know if you have the OTC form that needs to be

6    filled out and attached to this."

7    Q.    So essentially the second quarter of 2013 -- 2013, you

8    are still having Mr. William Sears review the financials of

9    FusionPharm?

10   A.    Yes.

11         MR. SIBERT:  Your Honor, so the courtroom deputy

12   knows, I'm going to be asking this witness about Exhibit

13   404.  This has not been stipulated to and is not yet

14   admitted into evidence.

15         THE COURT:  All right.

16   BY MR. SIBERT:

17   Q.    Okay.  Can I please have the witness shown Government

18   Exhibit 404.

19         Okay, so I'm going to blow this up.  If you can't

20   see it, I can request the binder.  Do you know what

21   Government Exhibit 404 is?

22   A.    It appears to be a press release.

23   Q.    Okay.  And what is the press release about?

24         MR. BARNARD:  Your Honor, we are now asking for

25   the witness to talk about a document that's not in evidence

Direct - Dittman

1    yet.

2              THE COURT:  Let's just -- Mr. Dittman, let's

3    describe it generally without going into the contents of

4    the document.

5              THE WITNESS:  Does that mean read the --

6              THE COURT:  Well, just what generally -- just what

7    is this document about, without going into the contents

8    that it contains.

9              THE WITNESS:  Appears to be a press release about

10   the sale of some PharmPods.

11   BY MR. SIBERT:

12   Q.   And for which company?

13   A.   For FusionPharm.

14   Q.   And that's the company that you own.

15   A.   Correct.

16   Q.   And what is the date of the press release?

17   A.   February 6, 2013.

18   Q.   And can you take a look at that press release and tell

19   me if what's written in it, that press release, is correct

20   and accurate.  And if you need the hard copy, I can ask --

21   A.   That might be a little easier, actually.  It's a

22   little blurry in the small print on the screen.

23              Okay.

24   Q.   Have you had a chance to review that?

25   A.   I did.

Direct - Dittman

1    Q.   And does it correctly state what is written in the

2    release?

3    A.   Do you mean do I think the release is accurate?  Is it

4    truthful?  I'm not sure I understand the question.

5    Q.   Yes.

6    A.   I believe so, yes.

7            MR. SIBERT:  Your Honor, at this time the

8    Government would move into evidence Government Exhibit

9    404(b), self-authenticating under 902(6).

10           THE COURT:  Is there an objection?

11           MR. BARNARD:  Your Honor, it is -- it is -- I

12   object as hearsay and I don't believe it is

13   self-authenticating.

14           THE COURT:  I agree.  Sustained.  404 is refused.

15   BY MR. SIBERT:

16   Q.   Okay, sir, did you sell pods in 2013?

17   A.   Yes.

18   Q.   Okay.  And who did you license to sell those pods to?

19   A.   Meadpoint Venture Partners.

20   Q.   Okay.  And who controlled that company?

21   A.   Bill Sears.

22   Q.   Okay.  And who else did you -- did you license to sell

23   containers to anyone else?

24   A.   No.

25   Q.   So just Meadpoint?

Direct - Dittman

1   A.   Yes.

2   Q.   In 2013.

3   A.   In 2013, correct.

4   Q.   How much were the pods being sold for?

5   A.   I don't know exactly.  Would you like me to ballpark?

6            MR. BARNARD:  Your Honor, I believe the witness is

7   still looking at the exhibit.  I would request that that

8   not occur.

9            THE COURT:  Okay.  Why don't you answer the

10  question from your personal knowledge and your memory.  The

11  exhibit that was in front of you, or is in front of you,

12  was not admitted into evidence.

13           THE WITNESS:  Got it.

14           These eight containers that I believe this order

15  is referencing -- there are a variety of -- a variety of

16  use and a variety of sizes here, so these are not all one

17  thing.  So not to be difficult, but I imagine the total was

18  maybe 250,000-ish.

19  BY MR. SIBERT:

20  Q.   For all the containers?

21  A.   Yeah.

22  Q.   Okay.  So how much would the container average price

23  go for?

24  A.   Depended.  So in this particular order, if I have the

25  order right, this would have been to --

1        MR. BARNARD:  Your Honor, I think the witness is

2   confused.  He's still answering a previous question as

3   opposed to the specific question now.

4        THE COURT:  Well, how do you know what he's

5   answering?

6        MR. BARNARD:  Well, I thought he was talking about

7   pursuant to some order, and I don't think we've had a

8   question about any kind of an order.

9        THE COURT:  Right.  We're not referencing any

10  particular specific order.

11       THE WITNESS:  Okay.  Containers on the low end,

12  excuse me, generally speaking, would be in the low $20,000

13  range to start, and 40-foot containers, depending on their

14  configuration and lighting and computer controls and

15  whatever, could push 60,000 or more.

16  BY MR. SIBERT:

17  Q.   Okay.  And this is a price range for the various

18  components that each container provided the customer.

19  A.   Yes.

20  Q.   Okay.  And in this case, you stated you sold some

21  containers to Meadpoint in 2012.

22       Sir, don't look at the document.  Can you close

23  the binder.

24  A.   Sorry.  I thought it was 2013.

25  Q.   And so my understanding is you made some sales of

Direct - Dittman

1   containers in 2012 or 2013.

2   A.   Yes.

3   Q.   Okay.  And what was the average price -- was -- did

4   the price stay the same throughout 2011 through 2013?

5   A.   No.

6   Q.   Okay.  Can you tell me what occurred with the prices.

7   A.   Generally they went up, like everything does, because

8   the containers got more complicated, the better built, et

9   cetera, et cetera.

10  Q.   So a container at your bottom end, lowest level, type

11  of car that is beat up, how much would that go for?

12  A.   Oh, we didn't sell any beat-up ones.  They're all

13  brand-new, but, you know, around 20 grand would be about

14  the -- about the bottom end.

15  Q.   And then as you stated, the highest amount, somewhere

16  in the 60,000 range?

17  A.   Yeah.

18  Q.   Now, you stated there was a sale to Meadpoint.  Do you

19  recall how many containers?

20  A.   I know we sold all of the containers to Meadpoint,

21  then Meadpoint in turn sold them on to the end-use

22  customers.

23  Q.   Do you know how much -- how many containers were sold

24  to Meadpoint?

25  A.   Up until May of 2014, I think the number was 57.

Direct - Dittman

1    Q.   Okay.  Do you know how much in the beginning of 2013,

2    essentially first quarter?

3    A.   Total first quarter?  I don't.  I know -- I mean, I

4    know what I just read off that press release, but I don't

5    know if that was all that was sold in the first quarter.

6    Q.   So 56 containers at the lowest end, $20,000.  Do you

7    know how much money that is?

8    A.   56 at $20,000, right around 1 million 120.

9    Q.   How much?

10   A.   1.12 million.

11   Q.   Okay.  And, again, I think you testified Meadpoint was

12   your brother-in-law's company, Billy Sears's.

13   A.   Yes.

14   Q.   Can I have Exhibit 372-OOO.  Can you start at the

15   bottom?  I'm sorry, can we get to the middle.

16        All right.  Again, do you recognize Advisor --

17   this Advisor e-mail?

18   A.   I don't.

19   Q.   Can we go to the top of the e-mail.

20        Can you tell me about the top of this e-mail.

21   A.   Yeah.  That's Bill Sears and myself.

22   Q.   Okay.  And what is the date?

23   A.   Wednesday, August 21st, 2013.

24   Q.   And what is the subject?

25   A.   "Officers and directors questionnaire, 6-30-13."

1    Q.    Another form that you have to file with OTC regarding

2    your role and the officer and director's roles within

3    FusionPharm?

4    A.    I guess, although honestly I don't know why we would

5    have been filing one in midyear in 2013 since it's an

6    end-of-year document.

7    Q.    All right.  This was forwarded to you; is that

8    correct?

9    A.    Yes, by Mr. Sears.

10    Q.    Okay.  And can we just have the middle, please.

11              And based upon that, you have the e-mail chain

12    here.  Who provided that document to Mr. Sears?

13    A.    Mr. Jean-Pierre.

14    Q.    Okay.  And so how do you know that?

15    A.    Because it's his name in the signature block at the

16    bottom.

17    Q.    So whose e-mail do you think this is?

18    A.    I would assume that's Mr. Jean-Pierre's.

19    Q.    And what is Mr. Guy Jean-Pierre asking Mr. Sears to

20    do?

21    A.    "Have Mr. Dittman sign the attached questionnaire and

22    get it back to me ASP."

23    Q.    Okay.  And it goes on.

24    A.    Yes, sir.  "Then I should be able to get" it -- "get

25    you the opinion by Friday.  Thank you much and, as always."

Direct - Dittman

1    Q.   And do you know what he means by "the opinion"?

2    A.   I don't.  Because of the time of the year, I -- we

3    wouldn't need a -- I'm -- we wouldn't need that form in

4    midyear, so I'm not sure that I do know what.

5    Q.   You wouldn't need the questionnaire -- director's

6    questionnaire form; is that --

7    A.   At midyear, right, I think that's an end-of-year

8    thing.

9    Q.   How about a legal opinion letter?

10   A.   That could be.

11   Q.   And you need those in your quarterly reports?

12   A.   No.  We don't need legal opinion letters at all in the

13   quarterlies.

14   Q.   Okay.

15   A.   I thought you meant for a stock transaction of some

16   nature.

17           MR. SIBERT:  Okay.  Can I have Exhibit 172?

18           And, Your Honor, maybe this is another good time

19   to introduce a batch of exhibits that have all been

20   stipulated to.

21           THE COURT:  All right.

22           MR. SIBERT:  And I'm going to start -- this would

23   be Section 3, and it begins with 19-A, 172, 230, 372-JJ.

24           THE COURT:  All right.  Given the stipulation of

25   the parties, the following Government Exhibits are admitted

Direct - Dittman

1    into evidence and may be published to the jury:  Exhibits
2    19-A, 172, 230, and 372-JJ.
3        (Government's Exhibits 19-A, 172, 230, and 372-JJ
4    received)
5    BY MR. SIBERT:
6    Q.   Okay, sir, can you please take a look at the top of
7    this document.  And describe the e-mail that's being
8    referred to in Government Exhibit 172.
9    A.   It's an e-mail from myself on Wednesday, March 28th,
10   2012 -- excuse me -- to Mr. Kocinski.  The subject is
11   "Financials," and an attachment entitled "FSPM financials,
12   12-31-11."
13   Q.   Okay.  And FSPM is what?
14   A.   That is the ticker symbol for FusionPharm.
15   Q.   Okay.  And so this is essentially for -- we're talking
16   about financials here, for what year?
17   A.   Year-end 12-31-2011.
18   Q.   And can you scroll up, please.
19       What do you mean by having "a large note payable
20   to a friendly company who isn't charging us interest
21   yet"?
22   A.   We had a large note payable to a friendly company,
23   specifically two of Bill Sears or Bill Sears' mother's
24   companies who weren't charging us interest yet.
25   Q.   And do you know what company that is?

Direct - Dittman

1    A.   It would have been Bayside and Meadpoint.

2    Q.   So Bayside or Meadpoint?

3    A.   Correct.

4    Q.   And how would you have known about the Bayside note?

5    A.   Because we had a line of credit with them and we were

6    borrowing money from them.

7    Q.   Okay.  So who did you talk to about borrowing money

8    from that company, Bayside?

9    A.   Meaning on the Bayside side?

10   Q.   Yes.

11   A.   Bill Sears.

12   Q.   So you never spoke to his mother?

13   A.   I spoke to his mother, but -- about the loan from

14   Bayside specifically, I don't recall -- I doubt it.

15   Q.   So you didn't speak to the owner of the company

16   regarding the loan?

17   A.   No, Bill handled all of his mother's stuff.

18   Q.   Is it fair to say that Mr. Sears controlled Bayside?

19   A.   As far as transactions he was dealing with me, yes.

20   Q.   Okay.  Now, just so the jury is clear, in your --

21   could you describe what essentially a note is.

22   A.   Sure.  A note is a -- just like you would have for

23   your car, your house, right?  You borrow money from them,

24   and owe the money, we signed a note.

25   Q.   Thank you.

Direct - Dittman

1    A.    Sure.

2    Q.    Okay.  Can I please have Exhibit 230 published.  And

3    can we start down here at the bottom.

4         Okay, do you know who a Mr. A.R. Duke is?

5    A.    Yes.

6    Q.    And who is that?

7    A.    Andy Duke.

8    Q.    Okay.  Do you know who a Mr. Lawrence Ditkoff is?

9    A.    I do not.

10   Q.    Okay.  And do you recall why Mr. Duke is e-mailing you

11   here?

12   A.    Mr. Duke was hired to raise money, so I presume he was

13   having conversations with somebody about investing in the

14   company.

15   Q.    Could you go to the top of the e-mail.  And at the

16   top, this is your response to Mr. Duke; is that right?

17   A.    Yes.

18   Q.    And essentially what are you telling Mr. Duke about

19   your loans in 2011?

20   A.    The loans specifically that he was asking about, or

21   the loans in general, what I'm saying is the vast majority

22   is a loan received in installments throughout 2011, friends

23   and family loan.

24   Q.    Okay.  That would be Bayside and Meadpoint again?

25   A.    Yes.

Direct - Dittman

1    Q.   Can you go through the previous exhibit again; that

2    would be page 172, and bring up page 4.

3         And do you recognize what page 4 is of Government

4    Exhibit 172?

5    A.   Yes.

6    Q.   And what is it?

7    A.   It's the year-end balance sheet of FusionPharm for the

8    period 12-31-2011.

9    Q.   Okay.  Can you go down here to the liabilities and

10   equity.  And are your -- how is your debt written out?

11   A.   Notes payable - long-term.

12   Q.   And how much are they?

13   A.   $269,497.

14   Q.   And that's the money that your brother-in-law

15   supposedly loaned FusionPharm?

16   A.   I don't think the entire amount is that, but the vast

17   majority, yes.

18   Q.   Can I have Government Exhibit 19-A published.

19        Do you recognize Government Exhibit 19-A?

20   A.   Yes.

21   Q.   Okay.  And what is 19-A?

22   A.   It is the FusionPharm quarterly report for the period

23   ended March 31st, 2012.

24   Q.   Can I have page F-10.

25        Your Honor, may I have a moment?

1          THE COURT:  You may.

2    BY MR. SIBERT:

3    Q.    The pages might not correlate to -- can you scroll

4    down there, please?

5          Okay.  Under section 4, how are your long-term

6    notes titled?

7    A.    Unsecured credit line, including interest at 10

8    percent of 182,697, unsecured credit line including

9    interest at 10 percent of 86,800, for a total of 269,497.

10   Q.    And this is the first quarter of 2012, correct?

11   A.    Correct.

12   Q.    Can the witness please be shown Government Exhibit

13   177.  Can you go down to the bottom of that exhibit.  Okay.

14         Again, do you recall why this e-mail would be sent

15   to Mr. Sears in 2012 under a FusionPharm e-mail address?

16   A.    I am presuming because that's the address Mr. Kocinski

17   had for Bill, the first one that probably came up when he

18   was typing the e-mail address.

19   Q.    Okay.

20   A.    Or actually all of his addresses are there.

21   Q.    What is your accountant sending Mr. Guy Jean-Pierre

22   and Mr. Sears?

23   A.    He is sending the statement that he makes for the

24   information and disclosure form.

25   Q.    Okay.  And what disclosure is this for?

Direct - Dittman

1    A.   Financial statements 3-31-12.

2    Q.   So this would be for the first quarter?

3    A.   Yes.

4    Q.   So you used your outside accountant to review these

5    financials statements --

6    A.   Yes.

7    Q.   -- for the first quarter 2012?

8    A.   Yes.

9    Q.   And what we just looked at in previous exhibits,

10   correct?

11   A.   Yes.

12   Q.   And you're not anywhere e-mailed as a CEO of

13   FusionPharm when the accountant is sending the financial

14   statement.

15   A.   I'm cc'd there on the third e-mail address.

16   Q.   I'm sorry.  Right here.

17   A.   Yes.

18   Q.   But also your accountant has both e-mail addresses for

19   Mr. Sears.

20   A.   Yes.

21   Q.   Can we go to the top, please.

22        And, again, who's writing this e-mail?

23   A.   Bill Sears.

24   Q.   And he's sending it to you?

25   A.   Yes.  And Guy --

Direct - Dittman

1    Q.   Along with who else?

2    A.   Mr. Jean-Pierre.

3    Q.   And no Mr. Dittman regarding the financials?

4    A.   I'm sorry, I missed that last part.

5    Q.   No Mr. Tom DiTommaso when it comes to the financials.

6    A.   Correct.

7    Q.   So, sir, we've looked through several of these e-mails

8    now regarding several of the quarters and annual reports.

9    A.   Uhm-hum.

10   Q.   Nowhere was Mr. DiTommaso ever e-mailed on any of the

11   financials, out of the ones you looked at today.

12   A.   Correct.

13   Q.   He's never been e-mailed any of the financials.

14   A.   Not the ones that we've seen today.

15   Q.   Right.  And so -- so the lawyer that you dealt with,

16   all of -- where were all of the financials sent regarding

17   the legal counsel that you used with FusionPharm?

18   A.   To Mr. Jean-Pierre.

19   Q.   Okay.  And based upon what you know when you were the

20   CEO of FusionPharm, did Mr. Guy Jean-Pierre review the

21   financials?

22   A.   Yes.

23   Q.   Before they were filed.

24   A.   Yes.

25   Q.   Okay.  Can we please go back to Government Exhibit

Direct - Dittman

1    372-NNN.  Can I have page 9, please.

2            Okay.  Now -- we might have to go back.  I'm

3    sorry.  Can we have page 1, just so the witness knows what

4    exhibit we're looking at.

5            We're looking at the quarterly report for

6    6-30-2012.

7    A.    2013.

8    Q.    2013.

9    A.    Yes.

10   Q.    Thank you.  Okay.  Now page 9.  You have a revenue of

11   $330,000.

12   A.    Yes.

13   Q.    Where did that revenue come from?

14   A.    Sale of pods.

15   Q.    Okay.  And is that the pods that were sold to

16   Meadpoint?

17   A.    Well, yes, all the pods went through Meadpoint.

18   Q.    Okay.  Where did Meadpoint, Mr. Sears, get $330,000 to

19   buy the pods?

20           MR. BARNARD:  Objection.  Lack of foundation.

21           THE COURT:  Don't speculate or guess, only if you

22   know.  If you have personal knowledge.

23           THE WITNESS:  Well, it could happen a couple of

24   different ways.  Either from the end customer, themselves,

25   which was very often the case -- most often the case, or if

1    he was financing them, which he did in a couple of cases

2    earlier on in the company -- earlier than this -- he would

3    have probably used money that he got from stock sales to

4    buy the pods and then finance them to the end-use customer.

5    Q.   So stock sales -- what stock sales?

6    A.   FusionPharm.

7    Q.   So he sold your company stock to be able to purchase

8    pods from your company?

9    A.   And --

10   Q.   Is that right?

11   A.   And finance -- well, to finance them to a third party,

12   yeah.  I mean, he didn't hold them, but yes.

13   Q.   But for you to basically sell them to Meadpoint, he

14   used the proceeds of the stock sale.

15   A.   Yes.

16   Q.   And to be clear, FusionPharm stock.

17   A.   So far as I know, yes.

18   Q.   Okay.

19        MR. SIBERT:  Your Honor, at this time, Section 7

20   the Government would move into -- well, my sticker might be

21   wrong.  It should be Section 5.  I'd like to move into

22   evidence Exhibits 100, 123, 151.

23        THE COURT:  All right.  Given the stipulation of

24   the parties, the following Government exhibits are admitted

25   into evidence and may be published to the jury:  100, 123,

Direct - Dittman

1    and 151.

2         (Government's Exhibits 100, 123, 151 received)

3    BY MR. SIBERT:

4    Q.   Okay.  Can we please -- can we please show the witness

5    Government Exhibit 100.

6              Sir, can you tell me about this e-mail that you're

7    sending to Pacific Stock Transfer agency.

8    A.   It's an e-mail from myself to Leslie at Pacific Stock

9    Transfer.  The subject is "cert order."  The date is

10   Monday, May 16th, 2011.  Would you like me to read it?

11   Q.   Well, actually, what I would like you to do is do you

12   mind taking a look at Government Exhibit 100 in the binder

13   and just review it before we go through it.  It should

14   be nine pages.

15   A.   Okay.

16   Q.   Okay.  Can you look at -- can we have the witness

17   shown page 4.

18              Okay, sir, this is a letter that you sent Ms.

19   Leslie Eldridge; is that correct?

20   A.   It is.

21   Q.   Okay.  What is the date of the letter?

22   A.   May 9th, 2011.

23   Q.   And essentially what are you asking within this

24   letter?

25   A.   I'm asking Mrs. Eldridge to issue stock shares from

1    the common treasury.

2    Q.   Okay.  How many shares are you asking the transfer

3    agent to send Todd Abbott?

4    A.   40,000 shares.

5    Q.   Okay.  Can you look at page 5.  And what type of

6    shares are these?

7    A.   Restricted with a standard 144 legend.

8    Q.   Okay.  And what does "restricted shares" mean?

9    A.   Means restricted shares with the 144 legend are non --

10   you can't sell them for one year.  They have a one-year

11   holding period.

12   Q.   Okay.  And can you please look at page 6.  Do you

13   recognize what page 6 is?

14   A.   Yes.

15   Q.   Okay.  What is page 6?

16   A.   It's the written consent of the board of directors in

17   lieu of a special meeting to issue the stock shares from

18   the previous documents.

19   Q.   And can you go down to the bottom of that.

20        Okay.  What's the date of this?

21   A.   May 16th, 2011.

22   Q.   So the board had a meeting on May 16th, 2011?

23   A.   Apparently, yes.

24   Q.   And who are the board of directors?

25   A.   Myself and Sandra Sears.

1    Q.   So you wrote a letter to the Pacific Stock Transfer

2    agency nine days before the board approved the transfer

3    these shares?

4    A.   I don't remember the date of that other letter -- you

5    can show it to me.

6    Q.   May 16th, 2011.

7    A.   Yeah.

8    Q.   Can we go back to page 4.

9    A.   Yup.  It appears so.

10   Q.   Okay.  And you are asking for restricted shares to be

11   issued.  Is that the only type of shares that FusionPharm

12   can issue?

13   A.   Yes.

14   Q.   Can I have the witness -- can I have Exhibit 151 shown

15   to the witness.

16        Okay, sir, I'm just going to start here at the

17   top.  Do you recognize the e-mails in this document?

18   A.   Yes.

19   Q.   Okay.  And who are those e-mails?

20   A.   From myself to Todd Abbott.

21   Q.   And who is Todd Abbott?

22   A.   Todd Abbott is my little brother's best friend.

23   Q.   Okay.  And is that the same Todd Abbott that you

24   requested to receive 40,000 restricted shares?

25   A.   Yes.

Direct - Dittman

1    Q.   Okay.  And what is the date of this e-mail?

2    A.   Wednesday, June 1st, 2011.

3    Q.   Can I please have page 3.  And, I'm sorry, can we just

4    start with page 2.  At the bottom.

5         Right here, that's your e-mail address?

6    A.   Yes.

7    Q.   Okay.  Can I have page 3.  At the top.

8         What are you writing in this e-mail?

9    A.   Sorry, would you like me to read it?

10   Q.   Sorry, do you recognize this e-mail that's coming to

11   you?

12   A.   I assume it's -- yeah, I assume it's the one -- I

13   think that's the one he's sending me actually, right?

14   Q.   Yes, sir.

15   A.   Yes.

16   Q.   And can you tell me why you're writing this e-mail?

17   A.   I'm telling Todd to hold his 144 cert and I was going

18   to meet him to trade it out for a nonrestricted cert the

19   following week.

20   Q.   Okay.  So we just talked about the Exhibit 4 being in

21   May 2011, and I just showed you on page 3 this e-mail that

22   you wrote that started on May 25th, 2011; is that right?

23   A.   Yes.

24   Q.   Okay.

25        THE COURT:  Mr. Sibert, you said Exhibit 4.

1          MR. SIBERT:  I'm sorry, page 4.

2          THE COURT:  Of?

3          MR. SIBERT:  Exhibit 151.  Thank you, Your Honor.

4    BY MR. SIBERT:

5    Q.   Can I have the witness shown Government Exhibit 123.

6    Can I have the whole thing; at least put the signature.

7          Can you see that document, sir?

8    A.   I can see it, but I can't read it, as small as it is

9    on the screen.

10   Q.   Can I have the witness shown Government Exhibit 123 in

11   the binder, please.

12   A.   Okay.

13   Q.   All right.  Have you had time to look at that

14   exhibit?

15   A.   Yes.

16   Q.   And can you tell me why -- based upon reading that

17   last exhibit, why would you swap out Mr. Abbott -- his

18   restricted shares with unrestricted shares?

19   A.   Well, technically I didn't swap out Mr. Abbott's

20   shares.  Bill -- or maybe Richie, I'm not exactly sure --

21   and it wasn't only Mr. Abbott that we did this for.  The

22   situation with this transaction was these guys had invested

23   in my previous company as well, so they'd been invested for

24   a while.

25          When I owed them money, Mr. Abbott had a note

Direct - Dittman

1    payable, as did Mr. Stecklenberg -- and maybe Mr. Vora, I

2    don't remember exactly -- but they had been invested for

3    some time.  The company issued them restricted stock in

4    order to cancel the obligations that were brought into the

5    company.  They wanted free trading shares.  Billy offered

6    to swap their shares out.

7          That's a transaction that I discussed at great

8    length with Billy.  I'm honestly not a hundred percent sure

9    if I discussed that with Mr. Jean-Pierre directly.  I --

10   it's just too long ago, I can't remember.  I'm sure Billy

11   would have told me he discussed it with Guy, but I can't

12   honestly tell you that I discussed it directly with Guy.

13         But Billy traded them out their share certs for

14   certs that they could sell and then Billy held onto them

15   and converted them later.

16   Q.   Okay.  So essentially what you're saying, if I

17   understand you clearly, it was Mr. Sears that provided you

18   40,000 unrestricted shares to swap out with Todd Abbott's

19   restricted shares?

20   A.   Yeah.  And I think in the end Billy actually swapped

21   them out with Todd.  Billy knew Todd as well.  I don't

22   think I actually ever saw Todd -- not that it's

23   important -- I just think Billy actually did it, but I knew

24   it happened.

25   Q.   You knew it happened?

Direct - Dittman

1    A.   Yes.

2    Q.   And that's clear with your e-mails that you sent Mr.

3    Abbott?

4    A.   Oh, yes.

5    Q.   So you knew this swap was going to occur.

6    A.   I did.

7    Q.   Okay.  So did you ever check with Mr. Guy Jean-Pierre

8    if you could swap out restricted shares after just telling

9    me you got to hold those shares for a year?

10   A.   As I said earlier, I don't -- I can't recall that I

11   spoke with Guy directly.  I know that I spoke with Billy.

12   I may have spoken with Guy.  Or I may have spoken with both

13   of them, but I honestly just -- it's just too long ago.

14        I don't know if we all had that call or if I only

15   heard it from Billy that it was okay with Guy.  I can tell

16   you that I felt it was okay with Guy and that was the

17   transaction described to me that Billy can do whatever he

18   wants with his shares and trade them with anybody that he

19   wants.  But I honestly, sir, can't recall if I spoke with

20   Guy directly about that.

21   Q.   Okay.  This is May 2011, correct?

22   A.   Yeah.  That's May 2011 -- well, this is August of

23   2012, but the swap-out is May 2011, yes.

24   Q.   Okay.  Well, you hadn't even owned the firm for a

25   year, FusionPharm.

Direct - Dittman

1    A.   No -- yeah, barely a month.

2    Q.   So barely a month.  And who knew that?

3    A.   I'm sorry?

4    Q.   Who knew that you only owned FusionPharm for about a

5    month?

6    A.   I imagine lots of people.  Is there a --

7    Q.   Did Billy Sears know that?

8    A.   Sure.

9    Q.   So he had FusionPharm shares that he was swapping out?

10   A.   He had free trading shares from a debt settlement

11   agreement with the old company, so he had free trading

12   shares separately from -- they weren't issued by the

13   company -- had nothing to do with the company -- he had

14   free trading shares from a debt settlement agreement with

15   the old company having, you know -- FusionPharm didn't

16   issue him the shares that he is swapping out, he had those

17   shares through another transaction.

18   Q.   Okay, sir.  We've gone through numerous e-mails in

19   your testimony here today.  Who are the -- who are the two

20   people you usually e-mailed about anything regarding

21   FusionPharm?

22   A.   Anything regarding FusionPharm stock or

23   FusionPharm --

24   Q.   All the e-mails we saw today.

25   A.   Well, they were all in one -- I mean, I sent an awful

Direct - Dittman

1    lot of e-mails at FusionPharm, so that's a really broad

2    question that you're asking me.

3    Q.   I'm asking about the e-mails we reviewed today.

4    A.   Okay.  Those are Guy Jean-Pierre and Bill Sears.

5    Q.   And so you would agree with me when it came to the

6    finances, or -- well, you would agree with me -- when would

7    you e-mail Mr. Sears and Guy Jean-Pierre?

8    A.   Oh, any time I had a question about stock,

9    disclosures, anything of that nature.

10   Q.   Okay.  And obviously this is a stock transaction.

11   A.   Yes.

12   Q.   So who do you think you discussed this with?

13   A.   Guy and Billy, like I said, but I can't specifically

14   recall a conversation with Guy on this specific

15   transaction.

16   Q.   Can I have Government Exhibit 123.

17        Now, do you recognize Government Exhibit 123?

18   A.   Yes, I have that in front of me here.

19   Q.   Okay.  This is the letter that you wrote, correct?

20   A.   Yes.

21   Q.   Who's this letter to?

22   A.   Scottsdale Capital Advisors.

23   Q.   And who is Scottsdale Capital Advisors?

24   A.   I believe that's a brokerage firm in Arizona.

25   Q.   Okay.  And what is the subject under "RE:"?

Direct - Dittman

A.    "Security description:  Company:  FusionPharm; number

of shares, 40,000; Certificate No. 11176; Holder Name,

Microcap Management.

Q.    And who is Microcap Management?

A.    Microcap Management was Richie Scholz, was my

understanding.

Q.    So are these the same 40,000 shares, do you know, that

you provided that Mr. Sears swapped Mr. Abbott?

A.    I am guessing that they were.  I would think that they

were, although -- yes, sorry, there it is, right there.

They are the same.

Q.    They're the same, it says it right here, right?

A.    Yes, right, yup.

Q.    Okay.  So this is 2012, correct?

A.    Correct.

Q.    So essentially, just based upon what you told us, how

much would 40,000 shares be worth?

A.    Same answer that we had earlier.  You know, there's a

trading price during the day.  I don't know what it was in

the summer of 2012, but, again, probably between a dollar

and 2, so probably 40- to $80,000.

Q.    Okay.  And as you testified, it was Mr. Sears that did

the swap?

A.    Yes.

Q.    And now the holder is Microcap Management.

1    A.   Yes.

2    Q.   And then, finally, in No. 4 here, what are you stating

3    in your letter to Scottsdale Capital?

4    A.   "The Parties are not, or were not 90 days prior to the

5    sale, a director, officer, or an 'Affiliate' of the Company

6    as that term is used in paragraph (a) of Rule 144 of the

7    Securities Act of 1933, (a person or entity that directly

8    or indirectly through one or more intermediaries, controls,

9    or is controlled by, or is under control with the

10   Company)."

11   Q.   So based upon reading that and being an educated

12   person, what is an affiliate based upon your understanding

13   of the letter you just wrote?

14   A.   What is an affiliate based on my understanding of the

15   letter that I just wrote?

16   Q.   Well, you wrote this letter, correct?

17   A.   Yes.

18   Q.   All right.  So --

19   A.   Yeah.

20   Q.   -- give me the definition of "affiliate" that you

21   described in this letter.

22   A.   An affiliate would be a company that owns more than 10

23   percent of -- or person that owns more than 10 percent of

24   the company stock.  And I'm sure there are other

25   descriptions for "affiliate" that I'm less familiar with.

1    Q.   Can I have this blown up, please.

2         You write "i.e."; is that correct?

3    A.   I'm sorry?

4    Q.   You write, "i.e." in your letter.

5    A.   In Section 4?

6    Q.   In paragraph 4.  You can look on the screen; I even

7    underlined it for you.

8    A.   Oh, yes.  Sorry, I see it.

9    Q.   Okay.  And so you're defining in this sentence

10   "affiliate"; is that right?

11   A.   Yes.  I mean, I'm sure I didn't write this letter, Mr.

12   Sibert, but, I mean, it's a form letter.  I certainly

13   didn't sit down and write all of what you're seeing here,

14   but I signed it for sure.

15   Q.   So do you usually sign letters that you don't read?

16   A.   No, I didn't say I didn't read it; I said I didn't

17   write it.

18   Q.   But based upon this letter, what is an "affiliate"?

19   A.   A person or entity that directly, or indirectly,

20   through one or more intermediaries, controls or is

21   controlled by, or is under control with the company.

22   Q.   If you don't think you wrote this letter, who would

23   have written this letter for you at FusionPharm?

24   A.   Well, I would suspect it either came from Billy or it

25   came from the -- came from Scottsdale as a form letter that

Direct - Dittman

1    they needed to have for their files, would be my guess, but

2    I don't -- you know -- I was probably given it by Bill.

3    Q.   Well, let me ask you this question:  If you had a

4    concern about the legal definition of "affiliate," who

5    would you have gone to?

6    A.   I would have asked Guy.  I didn't have any concern

7    about the definition of "affiliate" as it pertained to Bill

8    Sears or Todd Abbott at this point.

9              MR. SIBERT:  Your Honor, at this time the

10   Government would like to move into evidence -- I'm sorry,

11   I'm just looking at my list here -- section 6, that would

12   be Exhibits 135, 136, 372-S, 372-W, and those have been

13   stipulated to.

14             THE COURT:  All right.  Given the stipulation of

15   the parties, the following Government exhibits are admitted

16   into evidence and may be published to the jury:  135, 136,

17   372-S, and 372-W.

18        (Government's Exhibits 135, 136, 372-S, and 372-W

19   received)

20             MR. SIBERT:  Thank you, Your Honor.

21   BY MR. SIBERT:

22   Q.   Okay.  Can the witness be shown Government Exhibit

23   135.

24             Okay, sir, can we look at the bottom of this

25   document.  Do you recognize this e-mail?

Direct - Dittman

A.    I do.

Q.    Okay.  And can you tell the jury what this e-mail is about.

A.    It's an e-mail from Todd Kramer at FINRA.  Sent Wednesday, October 5th, 2011, to myself.  The subject is "Email from Todd Kramer at FINRA regarding Fusion Pharma" -- it's misspelled, misspoken.

        The e-mail reads, "Mr. Dittman, my name is Todd Kramer and I work at FINRA.  You can check our website listed below, but our role is to regulate the stock markets.

        "We conduct routine reviews of thousands of issuers each year due to a variety of factors including news, price and volume increase, etc.  I have been trying to reach you for a few weeks but up until today I never was able to reach someone at the corporate number.  The telephone number just rang with no way to leave a message.  However, I left a message for you with Andrew Duke today and asked that he pass on my information.

        "I want to set up a time to speak to you about Fusion Pharma this week if possible.  I would think the call would take an hour maximum.  Please contact me so we can schedule the call."

Q.    Okay.  And then the top of that e-mail, you're just responding back to Mr. Kramer; is that correct?

Direct - Dittman

1   A.   Yes.

2   Q.   Can I have page 23, please.

3         Can you just look at that top e-mail and tell me

4   what this e-mail is about.

5   A.   This is an e-mail from myself, dated Monday, November

6   14th, 2011, to Todd Kramer.  The subject is:  "Forward:

7   FSPM Documents," with some attachments that Mr. Kramer had

8   requested, I presume.

9   Q.   Okay.  And you're -- essentially what are you telling

10  Mr. Kramer regarding a Mr. Dahlman?

11  A.   It says, "There was no contract or written agreement

12  with Mr. Dahlman when we changed the entity from Baby Bee

13  Bright to FusionPharm, just a conversation between Mr.

14  Dahlman and William Sears."

15  Q.   Okay.  So essentially the take-over of Baby Bee Bright

16  was negotiated between Mr. Dahlman and Mr. Sears.

17  A.   Yes.

18  Q.   You did not have any involvement in that?

19  A.   No.  I spoke to Mr. Dahlman one time, but it was

20  relatively short and it was after he and Mr. Sears had

21  pretty much completed the negotiations.

22  Q.   Can I have page 25.  Have the bottom blown up.

23  Actually, let's -- can we start from the top.

24         This is a notification form that needs to be sent

25  to FINRA; is that correct?

Direct - Dittman

1    A.   Yes.

2    Q.   And down here is the company information; is that

3    right?

4    A.   Yes.   That's the Baby Bee Bright company information.

5    Q.   Okay.   And what is the address?

6    A.   13762 Colorado Boulevard, Number 124-203, Thornton,

7    Colorado.

8    Q.   And do you recognize this phone number here?

9    A.   I do not.

10   Q.   Okay.   And can you go down to the bottom now.   Okay.

11        You have contact information; is that correct?

12   A.   Yes.

13   Q.   Who's listed there?

14   A.   William Sears.

15   Q.   Okay.   And what is his title?

16   A.   Administrative officer.

17   Q.   Okay.   And who are the officers and directors of this

18   company?

19   A.   Myself as director; myself as president; and Bill's

20   mom as treasurer and secretary; and Bill's mom as director.

21   Q.   So who controls -- does the director and president

22   control the administrative officer, or does the

23   administrative officer control a director or president of a

24   company?

25   A.   Well, the director and president would control an

Direct - Dittman

1    administrative officer in general.

2    Q.    Thank you.  Can the witness be shown 372-P.

3          Okay, sir -- in fact, let me have page 2.

4          Do you recognize the top part of this e-mail?

5    A.    I do.

6    Q.    Okay.  What is this top part in reference to?

7    A.    It is an e-mail from myself, dated Thursday, October

8    6th, 2011, to Todd Kramer.  Subject is "First Docs."  And I

9    appear to be sending him a bunch of documents that he had

10   asked me for in my phone call with him.

11   Q.    Okay.  And can I have page 1, please.  And bottom.

12   Can you go up a little bit.  Thank you.

13         So the next day, what happens in this e-mail?

14   A.    Mr. Kramer, on Friday, October 7th, responding to

15   myself says, "Thank you for the first batch of documents,"

16   and proceeds to request a few more documents, including

17   from the "acquisition of Baby Bee Bright including but not

18   limited to:  signed agreements; contracts; legal opinions;

19   any correspondence with former CEO Fred Dahlman and William

20   Sears"; "terms of the acquisition.

21         "Stock Transfer Agent shareholder position reports

22   for the . . . dates March 1st, 2011, and September 30th,

23   2011."

24   Q.    So Mr. Kramer is specifically asking for some legal

25   opinions and information regarding Mr. Sears; is that

Direct - Dittman

1   right?

2   A.   No, I don't think he's -- oh, well, legal -- I'm not

3   sure if the legal opinions are related to -- I don't know

4   if C is related to D in this context.

5   Q.   I didn't say Guy, I was just asking about legal

6   opinions.

7   A.   I know, but you said "related to Mr. Sears," and the

8   legal opinions is C and the Mr. Sears part is D, and I

9   don't think the two are necessarily related.

10  Q.   Okay.  But he is looking for information regarding

11  both.

12  A.   Yes.

13  Q.   Okay.  This is October 7th, 2011, at 8:34 a.m.

14  A.   Yes.

15  Q.   Can you go to the top of the e-mail.

16       So a few minutes later, who do you e-mail?

17  A.   Bill Sears.

18  Q.   And how many minutes later after you receive the

19  e-mail from Mr. Todd Kramer?

20  A.   12.

21  Q.   Okay.  And what is your question to Mr. Sears?

22  A.   "FYI.  Need to get Guy involved at this point."

23  Q.   And who's Guy?

24  A.   Mr. Jean-Pierre.

25  Q.   And can I please have Government Exhibit 135 shown

Direct - Dittman

1    again.  Page 2.  Can you blow up this, please.

2         What is Mr. Kramer's title at FINRA?

3    A.   Senior Regulatory Analyst, FINRA Office of Fraud

4    Detection and Market Intelligence.

5    Q.   Thank you.  Can I have Government Exhibit 372-S.  Can

6    we start down at the bottom again.

7         And, sir, what is this e-mail about that you're

8    sending to Mr. Kramer?

9    A.   It's from myself on Monday, October 24th, 2011, to

10   Todd Kramer.  The subject is forwarding the report request.

11   "Todd, please find the shareholder requests attached.

12   Working on other doc request and will forward once it's

13   complete.  Best regards."

14   Q.   And the top, please.

15        And what do you do with that e-mail you just sent

16   Mr. Kramer?

17   A.   Well, nine -- looks like nine days later I sent it to

18   Bill on the 3d of November.

19   Q.   Why would you --

20   A.   With an attachment of the shareholders' report.  I

21   don't know if that's the same attachment or not.  I can't

22   see the bottom anymore.

23   Q.   Why would you be sending this to Mr. Sears?

24   A.   Could be a number of reasons.  One, he was -- he and

25   Guy handled the transaction with Baby Bee Bright to

Direct - Dittman

1   FusionPharm.  Two, they're asking specifically about

2   Bill.

3   Q.   Okay.  Can I have Government Exhibit 372-W.  Can we

4   start at the bottom again.

5        Okay.  Do you recognize this e-mail?

6   A.   I do.

7   Q.   Okay.  And who is sending you this e-mail?

8   A.   Guy Jean-Pierre.

9   Q.   And he's using his FusionPharm e-mail address?

10  A.   Yes.

11  Q.   Okay.  And what is he stating in this e-mail to you?

12  A.   He's attaching a letter that he proposed to send to

13  Mr. Kramer, asking me to take a look at it.

14  Q.   Okay.  And can we go to the top of the e-mail, please.

15       And what was your response to his request?

16  A.   "Looks good to me, Guy.  Send away."

17  Q.   All right.  Let me -- and also who's copied on this?

18  A.   Bill Sears.

19  Q.   Can we go down to the bottom, please, of that e-mail.

20       Okay. So essentially in the bottom e-mail there,

21  you're requesting to him to speak with Guy; is that

22  correct?

23  A.   Requesting for Guy to speak to Mr. Kramer.

24  Q.   So what does this mean, "let's talk"?

25  A.   Oh, yeah, well, that's me wanting to talk to Guy, too.

Direct - Dittman

1    Q.   All right.  So when an investigator, Mr. Kramer,

2    contacts your company, who did you go to to inform them

3    about this investigation?

4    A.   Mr. Jean-Pierre.

5    Q.   Okay.  And who else?

6    A.   Bill Sears.

7    Q.   Okay.  And can the witness be shown Government Exhibit

8    136.

9         And, sir, I'm going to ask you to look at the hard

10   copy because it's a few pages.

11        Can he be shown 136, please.

12        Have you had time to read that document?

13   A.   Yes.

14   Q.   Okay.  Can you look at page 7 of that document.

15        Mr. Kramer's e-mailing you in this -- in the top

16   of page 7 of document 136; is that right?

17   A.   Yes.

18   Q.   And who is he requesting information about?

19   A.   Bill Sears.

20   Q.   Okay.  And also what entity is he requesting

21   information about?

22   A.   Microcap Management.

23   Q.   Okay.  And what is he specifically asking you to

24   provide proof about to FINRA?

25   A.   The sale of his entity, Microcap, and how he no longer

1    has ownership of FSPM stock or Microcap Management

2    brokerage accounts.

3    Q.   Okay.  And what's the date of this e-mail?

4    A.   November 14th, 2011.

5    Q.   Can you turn to page 11.

6         Okay, sir, you're cc'd on this e-mail; is that

7    right?

8    A.   Yes.

9    Q.   Who's sending the e-mail?

10   A.   Guy Jean-Pierre.

11   Q.   Okay.  And who's he sending it to?

12   A.   Todd Kramer.

13   Q.   Can you please go down to the sixth paragraph.

14        Sir, can you just read the 6th paragraph and what

15   Mr. Guy Jean-Pierre's response is to Mr. Kramer.

16   A.   "Upon review of the above e-mail message, I found it

17   incredulous that Mr. Dittman would have committed to obtain

18   non-Company information regarding a particular shareholder,

19   in this instance, Microcap Management ("Microcap"), the

20   ownership thereof and corporate action pertaining to such

21   corporate shareholder notwithstanding whatever personal

22   relationship Mr. Dittman may or may not have with a prior

23   owner of Microcap (in this instance, Mr. Sears)."

24   Q.   So essentially what do you mean -- what do you

25   understand that to mean?

                          Direct - Dittman

1          MR. BARNARD:  Your Honor, I object.  This witness'
2     understanding is irrelevant.
3          THE COURT:  You're not asking him what Mr. -- the
4     defendant intended, right?
5          MR. SIBERT:  No, I'm asking what his understanding
6     of what I had him just read means to him as the owner of
7     FusionPharm, with his corporate counsel writing the letter.
8          THE COURT:  All right.  Well, what -- however you
9     understood this letter to mean.  Go ahead.
10          THE WITNESS:  Yeah.  So at this point, we had
11     provided a lot of information to Mr. Kramer at the -- at
12     FINRA, and he continued to ask for more information.  He
13     asked for what he's talking about here and what we read in
14     that previous e-mail for me to provide him documents about
15     the sale of Microcap and that sort of thing.
16          And when I relayed that to Guy, Mr. Jean-Pierre,
17     he kind of found that incredulous and, you know, told me
18     that I could get sued for providing documents like that, if
19     I even had them, which I didn't, and so it's at that point
20     that he wrote this letter back to FINRA.
21     BY MR. SIBERT:
22     Q.   All right.  Because essentially the noncompany
23     information -- based upon your understanding, who is that?
24     A.   Microcap.
25     Q.   Okay.  So the noncompany information being Microcap?

Direct - Dittman

1    A.    Right.

2    Q.    Okay.  And so, therefore, you, as the owner of

3    FusionPharm, could not provide FINRA any information.

4              MR. BARNARD:  Your Honor, I object.  Leading.

5              THE WITNESS:  Right.

6              THE COURT:  Sustained.

7    BY MR. SIBERT:

8    Q.    What was your understanding, since Microcap wasn't

9    your company?

10   A.    Yeah, that I couldn't provide documents that I didn't

11   have and weren't mine to provide in the first place.

12   Q.    Okay.  And at the time of this investigation when it

13   started October 6th, whose company was Microcap?

14   A.    I believe Richie Scholz.

15   Q.    On October 6th of 2011?

16   A.    Yes.

17   Q.    And so going back to Government Exhibit 123, again,

18   we're talking about the 40,000 shares that your

19   brother-in-law, Billy Sears, swapped out with Todd Abbott,

20   correct?

21   A.    Correct.

22   Q.    And those are under the Microcap in 2012, right?

23   A.    Yes.

24   Q.    Okay.

25              MR. SIBERT:  Your Honor, at this time the

Direct - Dittman

1    Government would like to move into evidence section 7 of my

2    list, which are Exhibits 387, 388, 392.

3            THE COURT:  Given the stipulation of the parties,

4    Government Exhibits 387, 388, and 392 are admitted into

5    evidence and may be published to the jury.

6        (Government's Exhibits 387, 388, and 392 received)

7            MR. SIBERT:  Thank you, Your Honor.

8    BY MR. SIBERT:

9    Q.   Can the witness be shown Government Exhibit 387.

10           Okay, sir, this is an e-mail by you; is that

11   correct?

12   A.   Yes.

13   Q.   Okay.  And essentially can you tell me what this

14   e-mail is about in October 18, 2011.

15   A.   Yes, it's an e-mail from myself to Richard Rhodes.

16   The subject is "Skype."  The date is October 8, 2011.  The

17   e-mail reads, "I don't have a camera hooked up to my new

18   monitor, so let's use Billy's computer today.  His Skype is

19   Trader5280."

20   Q.   Okay.  So whose Skype handler's name is trader5280?

21   A.   Apparently Bill Sears.

22   Q.   And can you please look at Government Exhibit 388.

23   Sir, you're receiving this e-mail; is that correct?

24   A.   Yes.

25   Q.   And who are you receiving it from?

1    A.    Mr. Jean-Pierre.

2    Q.    Okay.  And what is Mr. Guy Jean-Pierre telling you in

3    this e-mail?

4    A.    Looks like he's giving me his Skype address.

5    Q.    Okay.  And what is that Skype address?

6    A.    Elcommandante1.

7    Q.    And then you also provide Mr. Guy Jean-Pierre your

8    Skype address; is that correct?

9    A.    Correct.

10   Q.    And what is yours?

11   A.    Scott.dittman2.

12   Q.    Thank you.  Okay, sir, can you look at Government

13   Exhibit 38 -- excuse me, 392.  And, again, I would ask you

14   to look at this as a hard document.  It consists of several

15   pages of Skype messages.

16          Do you recognize that document?

17   A.    No.

18   Q.    Okay.  Well, let's just work through this a little

19   bit.

20          Can you blow up kind of like we did yesterday?

21   Okay.

22          So under here, the author's name is

23   scott.dittman2.

24   A.    Yes.

25   Q.    Is that your Skype?

Direct - Dittman

1    A.   Yes.

2    Q.   Okay.  And do all the pages have scott.dittman2

3    related to these Skype messages in this document?

4    A.   I'm sorry, in the binder?

5    Q.   In the binder.  It's probably about 35 pages.

6    A.   No.

7    Q.   Not as the author, but either as a recipient, author,

8    or profile's name.

9    A.   It's a lot of pages.  Do you want me to look through

10   every single page?

11   Q.   Well, do you deny the fact that Scott D. Dittman is on

12   many of these pages?

13   A.   No -- yes, it definitely is.

14   Q.   Okay.  And would you agree that the ones that have

15   your scott.dittman2 are some type of messages that you

16   either wrote or received?

17   A.   I have no idea, honestly.  I don't -- I've never seen

18   this.  I don't know where it is; I don't know where it came

19   from.

20   Q.   Did anyone else use your Skype account?

21   A.   Not to my knowledge, no.

22   Q.   Okay.  Thank you.

23        Can I have Exhibit 167 shown to the witness.  Can

24   we start at the bottom, please.

25        Sir, I just want to talk about this e-mail here.

Direct - Dittman

1    Who is writing this e-mail?

2    A.   My little brother.

3    Q.   And that's Robert Dittman?

4    A.   Correct.

5    Q.   Okay.  And it's to a Jamey?

6    A.   Jamey Fader, yes.

7    Q.   And you're cc'd as Scott Dittman; is that right?

8    A.   Yes.

9    Q.   I made a mess there.  Is that right?

10   A.   Correct.

11   Q.   Subject:  "VertiFresh," correct?

12   A.   Yes.

13   Q.   Billy Sears e-mailed on this?

14   A.   No.

15   Q.   William Sears?

16   A.   No.

17   Q.   W.J. Sears?

18   A.   No.

19   Q.   Sears@fusionpharm?

20   A.   No.

21   Q.   Sears@vertifresh?

22   A.   No.

23   Q.   Any other e-mails that you knew that Mr. Sears went

24   by?

25   A.   No.

Direct - Dittman

1   Q.   Can you read that first sentence of the second

2   paragraph.

3   A.   "Scott, my brother and William my brother in-law have

4   started a vertical farming company producing mainly leafy

5   greens (not hippy lettuce) named VertiFresh and we all met

6   last week to discuss further entrance into the food market

7   here in Denver."

8   Q.   Okay.  Can we go to the top of that e-mail.

9        COURTROOM DEPUTY:  Just so you're aware, this is

10  not admitted into evidence.

11        THE COURT:  I haven't gotten any objection so far,

12  but --

13        MR. SIBERT:  I can lay the foundation, Your Honor.

14        THE COURT:  Well, let me find out, maybe there's

15  not going to be an objection because I haven't heard any so

16  far.

17        MR. SIBERT:  I believe it's stipulated to.

18        THE COURT:  Okay.

19        MR. BARNARD:  Correct.  No objection.

20        THE COURT:  What exhibit are we talking about?

21        MR. SIBERT:  I'm sorry, Your Honor, 167.

22        THE COURT:  I thought you were going to be

23  examining on 387, 388, and 392.

24        MR. SIBERT:  I already have.

25        THE COURT:  Okay.  167 --

                              Direct - Dittman

1           MR. SIBERT:  Section 4, sir.

2           THE COURT:  Oh, there it is.  Okay.  All right.

3    It is stipulated.  Okay.  So given the stipulation of the

4    parties, Government Exhibit 167 is admitted into evidence

5    and may be published to the jury.

6         (Government's Exhibit 167 received)

7    BY MR. SIBERT:

8    Q.   Let me just go back to that.  Can we start at the

9    bottom again.

10          Again, can you just read this sentence here, as

11   you did before.

12   A.   "Scott, my brother and William my brother-in-law have

13   started a vertical farming company producing mainly leafy

14   greens (not hippy lettuce) named VertiFresh and we all met

15   last week to discuss further entrance into the food market

16   here in Denver."

17   Q.   Okay.  And, again, so the jury can see it -- I'm

18   sorry -- but the subject is VertiFresh.

19   A.   Yes.

20   Q.   That's the company.

21   A.   Yes.

22   Q.   And you're cc'd to this e-mail.

23   A.   Yes.

24   Q.   And it's being sent, as you testified, by your little

25   brother.

Direct - Dittman

1    A.    Yes.

2    Q.    Okay.  And nowhere here, as you testified to, is Mr.

3    William Sears; is that correct?

4    A.    Correct.

5    Q.    Under his various e-mail accounts.

6    A.    Correct.

7    Q.    Including his William Sears VertiFresh account.

8    A.    Correct.

9    Q.    Can you go to the top of the e-mail.

10          Sir, and again, you actually drafted this e-mail;

11   is that correct?

12   A.    Yes.

13   Q.    And you're talking about VertiFresh; is that right?

14   A.    Yes.

15   Q.    And, again, you're e-mailing your little brother; is

16   that right?

17   A.    Yes.

18   Q.    What are you telling -- is it Jamey?

19   A.    Jamey.

20   Q.    Okay, what are you telling Jamey?

21   A.    "Jamey, Bob's brother here.  We had exchanged messages

22   a few times several months back on the same subject.  Now

23   we are actually growing for and shipping to local

24   restaurants.

25          "Would still really value your input and would

Direct - Dittman

1  love to get a sense of 'interest factors' from a high end

2  restaurant perspective."

3  Q.   So your little brother, with you cc'd on the e-mail,

4  states that you and Mr. Sears are starting the company

5  VertiFresh.

6  A.   That's what he says, yes.

7  Q.   Okay.  Nowhere did you decline it.

8  A.   I didn't realize I had to decline everything that was

9  misstated in an e-mail.

10  Q.   Okay.  Well, you actually respond back; isn't that

11  right?

12  A.   I certainly did, yes.

13  Q.   And you actually talk about growing lettuce.

14  A.   Yes, we were growing lettuce.

15  Q.   And you're mentioning the subject VertiFresh.

16  A.   Yes.

17  Q.   And nowhere here is Mr. Sears.

18  A.   The subject -- I responded to the e-mail, he wasn't in

19  the first one, so I did not add his name.  The subject

20  VertiFresh was already the subject, it's just RE:

21  VertiFresh now.

22  Q.   You're now sending e-mails on behalf of your brother's

23  company, VertiFresh.

24  A.   I don't see that I said anything on behalf of

25  VertiFresh in this e-mail.  No.

Direct - Dittman

1    Q.   And, in fact, VertiFresh, as we discussed, was

2    90 percent of your revenue in 2012.

3    A.   That much is true.

4    Q.   Can I have Government Exhibit 19 shown.

5             MR. SIBERT:  And this has been stipulated to, Your

6    Honor.  I don't think it has been put into evidence, so I

7    would like to move into evidence Government Exhibit 19, 40,

8    390.  That's section 8, Your Honor.

9             THE COURT:  Section 8?

10            MR. SIBERT:  Yes, sir.  Sorry.

11            THE COURT:  All right.  Given the stipulation of

12   the parties, Government Exhibits 19, 40, and 390 are

13   admitted into evidence and may be published to the jury.

14        (Government's Exhibit 19, 40, and 390 received)

15            MR. SIBERT:  Your Honor, may I have a moment?

16            THE COURT:  You may.

17            MR. SIBERT:  Actually, I'm okay.  I'm sorry.

18   BY MR. SIBERT:

19   Q.   Can I have -- let me get the hard copy.  I'm sorry.

20   Can I have the witness shown page 13 -- I'm sorry,

21   actually, before we do that, go ahead and just blow that up

22   for me.  Not the top.

23            And what is this document, Government Exhibit 19?

24   A.   It's the annual information and disclosure statement

25   for FusionPharm dated December 31st, 2011.

Direct - Dittman

1  Q.   So the annual -- the annual report being submitted to

2  OTC Markets for 2011?

3  A.   Yes.

4  Q.   Can I have page 13?  Can you blow this up, please?

5       What is your annual salary, sir?

6  A.   $60,000.

7  Q.   Can I have Exhibit 40 shown, please.  Can I have page

8  2 of Exhibit 40.

9       Okay, sir, you stated that Mrs. Blume worked for

10 you; is that correct?

11 A.   She did.

12 Q.   And this is a letter to -- Mrs. Blume is writing on

13 behalf of FusionPharm; is that right?

14 A.   It appears so.

15 Q.   And this is January 30th, 2012?

16 A.   Yes.

17 Q.   Okay.  And how much is Mr. Sears being paid since

18 January 2011 by FusionPharm?

19 A.   According to Ms. Blume, 5,000 per month, but I don't

20 think that's accurate.

21 Q.   Okay.  Well, how much is 5,000 times 12?

22 A.   Excuse me?

23 Q.   How much is 5,000 times 12?

24 A.   60,000.

25 Q.   So that would be the same salary, if this is right, as

1    you were being paid?

2    A.    If it were right, yes.

3    Q.    Can I have Exhibit 390.  Oh, I'm sorry, I'm sorry,

4    let's go back to 40, page 3.

5    A.    Can we go back to that for one second, please?

6    Sorry.

7    Q.    I'm going to show you page 3 of Exhibit 40.  This is a

8    FusionPharm check; is that right?

9    A.    It is.

10   Q.    And it's dated January 27th, 2012; is that right?

11   A.    That's correct.

12   Q.    Whose signature is this?

13   A.    That's mine.

14   Q.    Who's the check made to?

15   A.    Bill Sears.

16   Q.    How much?

17   A.    5,000.

18   Q.    Thank you.  Can I have page 390.  Can we have this

19   blown up, please.  I'm sorry, can you just go up a little

20   bit.

21          You're receiving an e-mail; is that correct?

22   A.    Yes.

23   Q.    And what is this about?

24   A.    It's from Connie Rutherford at Paychex, saying, "Hi,

25   Scott, are the salaries the same for you and William?  Are

Direct - Dittman

1    we okay to date the checks for tomorrow?"

2    Q.   Can you go to the top, please.

3         You replied back, is that correct, in an e-mail?

4    A.   I did.

5    Q.   And your response is what?

6    A.   Yes and yes.

7    Q.   Salaries are the same is what you said, yes?

8    A.   Yes.

9    Q.   Could you please take that down.  Could we go back two

10   exhibits to that letter from Kelly Blume.  I have some

11   follow-up questions here.

12   A.   Okay.

13   Q.   Did Mr. Guy Jean-Pierre know about your

14   brother-in-law's William Sears' felony conviction?

15   A.   Yes.

16   Q.   Did Mr. Guy Jean-Pierre know that Robert Dittman was

17   holding shares of FusionPharm?

18   A.   Yes.

19   Q.   How many times did you meet with Mr. Guy Jean-Pierre

20   in person?

21   A.   Two, maybe three.

22   Q.   And did Mr. Guy Jean-Pierre come out to see

23   FusionPharm in 2011?

24   A.   He did.

25   Q.   Okay.  Was Mr. Sears -- Mr. Williams Sears -- was he

Direct - Dittman

1    selling FusionPharm stock in the year of 2011?

2    A.   I think Richie Scholz was selling stock for Bill Sears

3    in 2011.

4    Q.   All right.  My question was William Sears.

5    A.   My answer is not to my knowledge, no.

6    Q.   Okay.  Was Mr. Sears selling FusionPharm stock in

7    2012?

8    A.   I believe so.

9    Q.   Was he selling FusionPharm stock in 2013?

10   A.   I believe so.

11   Q.   Did Mr. Guy Jean-Pierre know this?

12   A.   Yes.

13   Q.   And how do you know?

14   A.   Because we discussed it many times.

15   Q.   Okay.  So there was an open discussion?

16   A.   Very.

17   Q.   Okay.  And how did those discussions go?

18   A.   From the very beginning, I knew that Billy had had

19   stock from the original transaction between Baby Bee

20   Bright -- excuse me -- between Baby Bee Bright and

21   FusionPharm that he got from a debt settlement from Fred

22   Dahlman.

23        He received some stock out of, I believe my little

24   brother's share, as his fee for transacting the

25   transaction.  And from the very beginning when I first met

Direct - Dittman

1    Mr. Jean-Pierre, we discussed -- I met Richie Scholz on the

2    same trip, I think, that I went to Florida to meet Mr.

3    Jean-Pierre the first time.

4          Mr. Scholz was introduced to me as the broker who

5    would be the -- selling Mr. Sears' stock, and I discussed

6    with Mr. Sears and Guy that transaction.

7    Q.   Okay.  And you raised a good point.  You actually went

8    down to Florida to meet Mr. Guy Jean-Pierre; is that right?

9    A.   I did.

10   Q.   And that was the first time you met him?

11   A.   Yes.

12   Q.   So two times in person definitely; when he came to

13   Colorado, and you went to Florida.

14   A.   Right.

15   Q.   Okay.  And I think we spoke about this earlier, but I

16   just want to make sure I'm clear.  The sale of FusionPharm

17   stocks by your brother-in-law, William Sears, eventually

18   came back to FusionPharm; is that right?

19   A.   In the form of loans from Baby Bee Bright -- or,

20   sorry, from Bayside and Meadpoint, yes.  In the form of the

21   licensing agreement from VertiFresh, yes.

22   Q.   And did Guy Jean-Pierre know about this money coming

23   back --

24   A.   Yes.

25   Q.   He did?

Direct - Dittman

1    A.   Yes.

2    Q.   And let me just -- you raise a good point.  And before

3    I forget to ask you:  The filings that were done, we talked

4    a lot about those in the beginning of your testimony

5    regarding over-the-counter markets.  I know various people

6    file them, including yourself.  Were they all done from

7    FusionPharm's offices here in Colorado?

8    A.   So far as I know, yes.

9    Q.   Well, you talked about this key thing, correct?

10   A.   Correct.

11   Q.   Where was the key kept?

12   A.   Usually in our office in Colorado.  I don't know that

13   it ever left.

14   Q.   Okay.  And all three of the people that you spoke

15   about, including Mr. Sears, did their business in the

16   offices at FusionPharm?

17   A.   Who's the third, I'm sorry?

18   Q.   Mr. Dougherty at the end of 2013?

19   A.   Oh, Mr. Dudley, yes.

20   Q.   Dudley, Sorry.

21   A.   Yes.

22   Q.   So essentially everything -- those three people all

23   did their work out of the offices from FusionPharm in

24   Colorado?

25   A.   Yes.  Mr. Bohlender, in the beginning, was in Arizona

1    most of the time, but came to the office.  If we were

2    filing, he would have been in the office to file.

3    Q.   Okay.  So to the best of your recollection, all the

4    filings occurred from FusionPharm here in Colorado.

5    A.   Yes.

6    Q.   Now, did Mr. Guy Jean-Pierre know that Mr. Sears was

7    VertiFresh, Meadpoint, and essentially acting as Bayside?

8    A.   Yes.

9    Q.   And did Mr. Guy Jean-Pierre also know that Billy was

10   working for FusionPharm to include, essentially, working

11   with the company's financials regarding advances of

12   investors?

13   A.   I'm not sure about that last part.

14   Q.   Or in advance of investors?

15   A.   I'm still not sure I understand the question, sir.

16   Can you try that again?

17   Q.   I'm sorry, I'm getting a little tired.

18        So let me just ask you --

19   A.   I understand.

20   Q.   -- we had a lot of questions regarding these e-mails

21   that went back and forth.  A lot of them dealt with the

22   filings of the disclosures, a lot of them dealt with the

23   financials of the disclosures, what was in the disclosures,

24   member to relating parties, transactions, the criminal

25   history, the officers and directors.  You remember all

Direct - Dittman

1    those questions, right?

2    A.    Yes.

3    Q.    All right.  And then you told me that Mr. Sears also

4    was involved in the stocks, is that right, of FusionPharm?

5    A.    Yes.

6    Q.    Promoting it, marketing it, I think --

7    A.    No.

8    Q.    I think you used the word "marketed."

9    A.    No, he worked -- marketed pods.

10   Q.    Okay.  Marketed pods.

11   A.    Right.

12   Q.    So he had various jobs at FusionPharm.

13   A.    Yes.

14   Q.    Involvement.

15   A.    Yes.

16   Q.    Stocks, marketing for the company, being e-mailed

17   between the corporate lawyer and the CEO on several things.

18   A.    Yes.

19   Q.    So he had a lot of knowledge.

20   A.    Yes.

21   Q.    Did Mr. Guy Jean-Pierre know all that?

22   A.    Yes.

23   Q.    Who was responsible for providing the OTC attorney

24   letters to OTC Marketing for your firm?

25   A.    Mr. DiTommaso.

1    Q.    Okay.  And do you know who drafted those letters?

2    A.    I believe he did, Mr. Jean-Pierre.

3    Q.    And do you know who uploaded those letters?

4    A.    Not necessarily.  It could have been my -- I would

5    suspect Bill, but I'm not certain.

6    Q.    Okay.  And do you know how Mr. Sears received those

7    letters?

8    A.    I would suspect via e-mail.

9    Q.    By who?  Would you have sent the e-mails?

10   A.    Would I have sent e-mails?  If they came to me first,

11   yes.

12   Q.    Do you know how Bill got those letters through e-mail?

13   A.    No.  Specifically, no.

14   Q.    Okay.

15         MR. SIBERT:  Your Honor, may I have a moment,

16   please?

17         THE COURT:  Yes.

18         MR. SIBERT:  Your Honor, I'll pass the witness.

19         THE COURT:  All right.  Why don't we take our

20   afternoon break.  It's going to be a little bit early.

21         Members of the jury, I want to inform you what I

22   told the lawyers first thing this morning, that today we're

23   going to go until 10 to 5:00.  All right?

24         We'll be in recess for 15 minutes.

25         (Jury left the proceedings at 2:58 p.m.)

Direct - Dittman

1          THE COURT:  You know the drill now, Mr. Dittman.

2          THE WITNESS:  Yes, sir.

3      (Recess taken 2:59 p.m.)

4      (Jury entered at 3:18 p.m.)

5          THE COURT:  Mr. Dittman, you remain under oath.

6          MR. SIBERT:  Your Honor, during the break I spoke

7   to counsel.  I forgot to ask three questions and so Mr.

8   Barnard was going to let me --

9          THE COURT:  Okay.

10         MR. SIBERT:  -- carry forward real quick.

11             DIRECT EXAMINATION (Continued)

12   BY MR. SIBERT:

13   Q.   Sir, as part of your testimony here today, you were

14   able to listen to some videos regarding a conversation that

15   occurred in July of 2014 at a Starbucks; is that correct?

16   A.   That's correct.

17   Q.   Okay.  And were you able to view the whole entire

18   video?

19   A.   I was.

20   Q.   And there was two of them; is that right?

21   A.   In Starbucks, yes.

22   Q.   Okay.  And would you tell me who were in the -- who

23   participated in those recordings?

24   A.   Myself and the undercover agent.

25   Q.   Okay.  And were you able to also hear what was in the

1    video?

2    A.   Yes.

3    Q.   Okay.  And I can't remember, was there a caption below

4    the video that transcribed what was being said?

5    A.   I don't know.  There was no -- like closed captioning,

6    like the words?

7    Q.   Yes, sir.

8    A.   No.

9    Q.   What was being said in the Starbucks, what was

10   discussed in the Starbucks in that recording, was that what

11   was said during the day that you met with the undercover

12   agent?

13   A.   Yes.

14   Q.   Okay.  And was there any differences between what

15   happened in the Starbucks and what you saw on the

16   recordings?

17   A.   No.

18           MR. SIBERT:  Your Honor, at this time, the

19   Government would move to admit Government Exhibit 5-A and

20   5-B, which are recordings regarding this meeting at

21   Starbucks.

22           THE COURT:  All right.  Any objection?

23           MR. BARNARD:  Your Honor, if counsel will certify

24   or assure us that there are no captions or syncing on it,

25   there is no objection.  If there is syncing on, it we would

Direct - Dittman

1   object for the same reasons we objected before.

2        MR. SIBERT:  Your Honor, my notes say they are

3   synced.

4        THE COURT:  That they are.

5        MR. SIBERT:  Yes, sir.

6        THE COURT:  Okay.  All right.  Well, the

7   objection's overruled.  The Government Exhibits 5-A and 5-B

8   are admitted into evidence and may be published to the

9   jury.

10        And like I instructed you folks yesterday, the

11   evidence is the oral statements on the file.

12        (Government's Exhibits 5-A and 5-B received)

13        MR. SIBERT:  I'm not going to publish them right

14   now, Your Honor.

15        THE COURT:  All right.

16   BY MR. SIBERT:

17   Q.   And, finally, my last question, would be, sir:  Did

18   you plead guilty to your role involved in the FusionPharm

19   case?

20   A.   I did.  I pled guilty to backdating a modified

21   promissory note.

22   Q.   And was part of that a conspiracy charge regarding

23   securities fraud?

24   A.   It was.

25        MR. SIBERT:  Thank you, Your Honor.

Cross - Dittman

1          THE COURT:  Cross-examination.

2                      CROSS-EXAMINATION

3    BY MR. BARNARD:

4    Q.   Mr. Dittman, we'll begin with talking about a few of

5    the things that were discussed right at the end, and then

6    I'm going to go back more or less to the beginning to

7    yesterday and ask you some questions.  So with regard to

8    one of the last questions you were asked before the break

9    was you were asked did Mr. Jean-Pierre know all of "that,"

10   and then counsel listed a number of different things and a

11   number of different topics and areas.  And you said yes.

12          Now, you only met with Mr. Jean-Pierre on three

13   different occasions?

14   A.   I believe that's correct.

15   Q.   And you talked to him on the telephone how many times?

16   A.   Difficult to say.  So long ago, but probably a few

17   dozen, maybe.  A couple dozen.

18   Q.   And is it from your conversations on the telephone

19   with Mr. Jean-Pierre and your meetings with him that makes

20   it so that you would testify that it is your -- based on

21   your own knowledge that Mr. Jean-Pierre was, in fact, aware

22   of and familiar with all of those different items that --

23   of which counsel spoke?

24   A.   Yes.

25   Q.   So all of those topics were covered.  So you discussed

Cross - Dittman

1    with Mr. Jean-Pierre every one of the financials?

2    A.   Oh, no.  Every financial statement?  No.  No.

3    Q.   How about every one of the quarterlies?  Did --

4    A.   No.

5    Q.   How about the -- the information about whether or not

6    Sears was associated with or owned Meadpoint?

7    A.   Yes.

8    Q.   Okay.  And so you had some discussions with him but

9    not about everything.

10   A.   Correct.

11   Q.   All right.  And we'll get back to some of that.

12           One of the other things that counsel asked you was

13   did Mr. Jean-Pierre know that Mr. Sears was Meadpoint,

14   VertiFresh, et cetera, and that Mr. Sears was working for

15   FusionPharm on, I believe you said, the information

16   documents and things like that, right?  You remember that

17   question somewhat to that effect?

18   A.   Yes.

19   Q.   In the years -- well, let me go back.  Beginning

20   about -- and you tell me when -- beginning about when in

21   2011 and then '12 and '13, was Mr. Sears working for

22   FusionPharm?

23   A.   Working for FusionPharm as an employee or --

24   Q.   Yes.  Working for.  As an employee.

25   A.   As a paid employee?  Probably in part of -- for a few

Cross - Dittman

1    months in 2011 and maybe into the beginning of 2012 based
2    on that check that I just saw, as a paid employee.  But he
3    was -- you know, we shared office space for the vast
4    majority of that time.
5    Q.   Well, Mr. Sears is your brother-in-law.
6    A.   Correct.
7    Q.   And so you would socialize with Mr. Sears as a -- at
8    family affairs.
9    A.   Certainly.
10   Q.   You have had a number of years of contact with him
11   over time.
12   A.   Yes.
13   Q.   And is it fair to say that over the years, you and Mr.
14   Sears have developed somewhat of a friendship relationship?
15   A.   Yes.
16   Q.   So when Mr. Sears was helping you do some of these
17   documents and some of these things, was he being --
18   after -- except for the times you were talking about, was
19   he being paid for them?
20   A.   No.
21   Q.   So would it be fair to say that, in fact, based on
22   your family relationship, friendship, he was helping you
23   out significantly?
24   A.   Yes.
25   Q.   And he, in fact, had somewhat of a financial interest

Cross - Dittman

1    in seeing FusionPharm succeed based on his own businesses,

2    correct?

3    A.   Correct.

4    Q.   Because, in fact, FusionPharm and some of these other

5    businesses, Meadpoint or VertiFresh, were related in their

6    business dealings.

7    A.   Correct.

8    Q.   And, in fact, VertiFresh, for example, was

9    FusionPharm's biggest customer.

10   A.   In 2012, correct.

11   Q.   In 2012.  And I may get back to this as I go through

12   some of the specifics, but counsel was asking you in his

13   examination as to whether or not you disclosed the fact

14   that your biggest customer for FusionPharm was VertiFresh,

15   asking if you disclosed that on your disclosures to the

16   OTC, correct?

17   A.   I think we -- I think we saw the VertiFresh

18   disclosures, I think maybe he was asking if we disclosed

19   Bill Sears specifically.

20   Q.   Right.  And he was asking specifically if you had

21   disclosed him because of VertiFresh being your biggest

22   customer.

23   A.   Correct.

24   Q.   To the best of your understanding and knowledge, were

25   you required to disclose who ran and who owned your

Cross - Dittman

1    customers' companies?

2    A.    No.

3    Q.    At the -- near the end, counsel asked you about Mr.

4    Sears selling FusionPharm stock in 2011 and you said no.

5    And 2012 and '13, you said yes.

6    A.    Correct.

7    Q.    To the best of your knowledge, while Mr. Sears was an

8    employee -- an employee of FusionPharm, did he sell any

9    stock?

10   A.    I honestly don't -- I honestly don't know, sir.

11   That's going to be right near that time frame; right end of

12   2011 and into 2012, and I'm not sure -- I'm just not sure.

13   Q.    When Mr. Sears was receiving some paycheck -- a check

14   of 5,000 --

15           If we could have Exhibit 40, please.  And I

16   believe it's page 3.

17           It says "January 2012 payroll."  Do you remember

18   who prepared this -- this check, itself, and put the

19   January 12, 2000 [sic] payroll?

20   A.    I don't.  But at the time, it was probably -- it was

21   probably Kelly Blume.

22   Q.    And at this time, to the best of your recollection,

23   was Mr. Sears actually on the payroll?

24   A.    Well, based on this, I'd have to say yes, but --

25   Q.    No, I'm asking not based on that; I'm asking based

Cross - Dittman

1    upon your recollection and your knowledge.

2    A.   No, I would think not.  And also -- also just -- if I

3    may, as part of the reason I think that, this is -- a

4    payroll check is for $5,000 and the check is for exactly

5    $5,000 as opposed to having -- you know, having

6    withholdings done and all that kind of stuff.

7    Q.   All right.  To the best of your knowledge, did Mr.

8    Sears receive any paid -- payroll check in December of

9    2011?

10   A.   I don't -- I don't know, sir.

11   Q.   Do you have any belief as to whether or not he was?

12   A.   I would think not, but I'm not certain.

13   Q.   And -- I'm sorry, I didn't mean to cut you off.

14   A.   I said but I'm not certain.

15   Q.   And how about February of 2012, to the best of your

16   recollection?

17   A.   No, I don't think so.

18   Q.   And, in fact, you don't even really remember him being

19   on the payroll in January of 2012.

20   A.   That's correct.

21   Q.   Although it does have your signature --

22   A.   Oh, it does.

23   Q.   It does have your signature on it.

24   A.   Yes.

25   Q.   All right.  Now, when you began both Baby -- when you

Cross - Dittman

1    acquired Baby Bee Right -- Bee Bright and transferred and

2    transformed it into FusionPharm in 2010-'11, this was a

3    real company, wasn't it?

4    A.   Before and after -- you mean as Baby Bee Bright?  As

5    FusionPharm?  What --

6    Q.   Once you became FusionPharm, this was a real company,

7    right?

8    A.   Yes, for sure.

9    Q.   Okay.  So Baby Bee Bright was a shell, or like that.

10   A.   Yes.  Sorry, I know there is a very specific legal

11   term to the word "shell," so I want to be careful not to

12   say something that I know is incorrect, because I was

13   always answering that "shell" question back in the day.

14   Q.   Let me rephrase the question.

15        Baby Bee Bright was really an inactive

16   corporation.

17   A.   Yes.  Yes.

18   Q.   And so you purchased it and then made it into

19   FusionPharm.

20   A.   Correct.

21   Q.   For the purpose of doing a real business.

22   A.   Yes.

23   Q.   You hired people.

24   A.   Yes.

25   Q.   You rented out space.

Cross - Dittman

1    A.    Yes.

2    Q.    You built things.

3    A.    Yes.

4    Q.    You -- you sold items that you built.

5    A.    Yes.

6    Q.    And you discussed at length, with various different

7    people, business plans and how to make your business work.

8    A.    Yes.

9    Q.    So for -- from 2010 until 2014, you were attempting to

10   make this into a viable working company.

11   A.    Oh, yes.

12   Q.    And you were spending your full time on it.

13   A.    More than full time.

14   Q.    Now, do you recall approximately how much total Mr.

15   Sears was paid in salaries as an employee of FusionPharm or

16   while -- yeah, of FusionPharm?

17   A.    I don't.  But I would be surprised if it was, you

18   know, more than $20,000, maybe.

19   Q.    Now, let me go back, then, before we continue on that.

20   Let me go back to one of the earlier items that we were --

21   that was discussed this morning so I can clarify this.  And

22   I'm talking about the distinction between Exhibit 25 -- and

23   I believe you need to have the actual document 25 in front

24   of you to take a look at that.  And Exhibit -- Government

25   Exhibit 395, both of which have been admitted into

Cross - Dittman

1    evidence.

2         COURTROOM DEPUTY:  Sorry, what was the second one?

3         MR. BARNARD:  The first one was 25 and the -- or

4    the other one was 395.

5    BY MR. BARNARD:

6    Q.   And if you could look at both of them next to each

7    other, please.  And I note that both Exhibit 25 and

8    Exhibit 395 state that they are the FusionPharm Annual

9    Information and Disclosure Statement for December 31st,

10   2012.  Correct?

11   A.   Yes.

12   Q.   And that on Exhibit --

13        THE COURT:  Mr. Barnard, do you want to have the

14   jury look at any -- either of these --

15        MR. BARNARD:  I'm about to get there, Your

16   Honor.

17        THE COURT:  Okay.  Just so you know, there's

18   nothing on their screen.

19        MR. BARNARD:  Thank you.

20   BY MR. BARNARD:

21   Q.   And on Exhibit 395, page 12, please.

22        Let me see if we can't just ask this without even

23   looking at it.  On -- you look at 12 and it says Mr. Guy

24   Jean-Pierre was legal counsel, correct?

25   A.   Correct.

Cross - Dittman

1    Q.   And look on the other exhibit, the Exhibit 3 -- 3 --
2    or, excuse me, Exhibit 25.  On 25, he's not listed as legal
3    counsel, correct?
4    A.   Correct.
5    Q.   Which is the one that was submitted as the actual
6    annual information report?
7    A.   I don't know.
8    Q.   Do you -- you were asked by counsel about reasons why
9    maybe Mr. Jean-Pierre was taken off at that time.  And
10   isn't December -- the end of December the time that Mr.
11   Jean-Pierre, in fact, was in a very serious automobile
12   accident?
13   A.   It was.
14   Q.   Could that, or did that, have something to do with why
15   he then, for a period of time, would not be listed as
16   corporate counsel?
17   A.   I don't remember -- excuse me, I don't remember that,
18   sir, but the -- I can't say.  I don't recall that
19   specifically.
20   Q.   So after Mr. Jean-Pierre was no longer corporate
21   counsel, he still did do some advising for you, correct?
22   A.   He did.
23   Q.   And he did some advising for you into the middle of
24   2013.
25   A.   Correct.

Cross - Dittman

1    Q.   Now, when he was doing that, he was not acting as

2    legal counsel anymore, was he?

3    A.   No.

4    Q.   So -- and, in fact, while he was preparing or

5    gathering documents to submit to Mr. DiTommaso, he was not

6    necessarily doing legal work at that point either, was he?

7    A.   Well, maybe not -- you know, no longer as officially

8    FusionPharm's corporate counsel, no.

9    Q.   But he was doing things for them.

10    A.   Yes.

11    Q.   For example, he was gathering documents.

12    A.   Yes.

13    Q.   Gathering information.

14    A.   Yes.

15    Q.   And submitting that information to Mr. DiTommaso.

16    A.   Yes.

17    Q.   And sometimes even preparing drafts.

18    A.   I'm not sure I can speak to that precisely, but it

19    wouldn't surprise me.

20    Q.   Actually, I was speaking very generally about drafts.

21    During that period of time, he -- he created some drafts of

22    different documents for -- for your corporation.

23    A.   Do you have something in particular?  I mean, I

24    wouldn't be surprised, but I'm not sure I could name one.

25    I'm not trying to be difficult, sir; I'm just wanting to be

1    specific.

2    Q.   Well, I guess that would be a question.  Can you name

3    anything that -- can you name any document that, during the

4    year 2012, Mr. Jean-Pierre actually submitted, signed by

5    himself as an attorney, presenting it as an attorney's

6    document?

7    A.   Now you said 2012.  Do you mean 2013?

8    Q.   No, I mean 2012 right now.

9    A.   Sorry.  Submitted himself and signed himself as

10   attorney's document in 2012?  None that I can think of.

11   Q.   And 2013?

12   A.   Same answer.

13   Q.   How about 2011?

14   A.   Probably the same answer.

15   Q.   So isn't it fair to say that a lot of the things that

16   Mr. Jean-Pierre was doing was, in fact, doing paralegal

17   kinds of work?

18   A.   I'm not -- I don't know that I know what a paralegal

19   does so I'm not sure that I can answer that question

20   either.  I'm not trying to avoid the question, I just --

21   I'm just not sure I'm equipped to answer that.

22   Q.   Let me ask it a different way.  It was clerical work,

23   wasn't it, just getting the documents?

24   A.   Some of it was, yes.

25   Q.   Well, let's talk in particular about financial

Cross - Dittman

1    statements.  Mr. Jean-Pierre didn't put the numbers in the

2    financial statements, did he?

3    A.    No.

4    Q.    So he didn't create those?

5    A.    No.

6    Q.    But you asked him to look at them?

7    A.    Yes.

8    Q.    So he reviewed the things that you had -- you or your

9    accountant or somebody else from FusionPharm had prepared.

10   A.    Yes.

11   Q.    And to the best of your information and knowledge with

12   regard to the attorney opinion letters that went to Mr.

13   DiTommaso, that also was what he was doing.  He was

14   submitting the documents and possibly a form letter to Mr.

15   DiTommaso to -- for Mr. DiTommaso to then review and

16   submit.

17   A.    Yes.

18   Q.    And that would include the OTC information documents.

19   A.    Yes.

20   Q.    And on any of the OTC information documents, if there

21   was a requirement to disclose other people who helped to

22   create it, that would be the obligation of Mr. DiTommaso,

23   too, because he signed it, right?

24   A.    I presume so, yes.

25   Q.    On -- if you recall on Exhibit 395, page 12, you were

Cross - Dittman

1    asked about and pointed out that it stated that Mr.

2    Jean-Pierre as legal counsel had a $30,000 annual salary.

3    A.   Yes.

4    Q.   Did Mr. DiTommaso -- excuse me, did Mr. Jean-Pierre --

5    did I say DiTommaso before?  Oh.  Did Mr. Jean-Pierre

6    receive his $30,000 annual salary?

7    A.   No.

8    Q.   Do you know approximately how much from 2010 to the

9    end of 2013 Mr. Jean-Pierre was paid by FusionPharm?

10   A.   I don't exactly, but --

11   Q.   Do you know -- could you give us an estimate or a

12   number over which you're sure it is not?

13   A.   I would be shocked if it was over $15,000.

14   Q.   Do you know whether or not he also received

15   information -- excuse me, received funds from Bayside for

16   writing opinion letters for them?

17   A.   I believe so.

18   Q.   All right.  So if we saw some checks -- I'm sorry, do

19   you know how much Bayside may have paid him?

20   A.   I think he charged $500 for an opinion letter.

21   Q.   And do you know if he paid Mr. DiTommaso, then, any

22   funds out of that?

23   A.   I do not know.

24   Q.   Okay.  You were asked about -- on several occasions,

25   on several documents you were shown places where it talked

1    about disciplinary or legal actions and the -- and on those

2    disclosure statements it was saying "none."

3    A.   Yes.

4    Q.   To -- when you filed those documents, to the best of

5    your knowledge, had anybody already been the subject of

6    disciplinary or legal actions at that time?

7    A.   No.

8    Q.   You were asked about revenues and finances with regard

9    to the December 31st, 2012, disclosure -- information --

10   annual information and disclosure statement.  Do you recall

11   that?

12   A.   I do.

13   Q.   And you were asked about the -- the purchase of items

14   from your brother-in-law's company, from VertiFresh.

15   A.   Purchases from VertiFresh?  Or by --

16   Q.   Excuse me, the sales to VertiFresh.  Thank you.

17   A.   Yes.

18   Q.   To the best of your knowledge, is there anything --

19   there isn't anything illegal to sell a pharm pod to your

20   brother-in-law's company, is it?

21   A.   No.

22   Q.   You were asked -- now we're going back more to the

23   beginning.  You were asked about Sandra Sears being an

24   officer of FusionPharm for a few months in 2011.

25   A.   Yes.

Cross - Dittman

1    Q.   And she was Mr. Sears' mother.

2    A.   Correct.

3    Q.   Do you -- there's nothing illegal in having your

4    brother-in-law's mother as a corporate officer, is there?

5    A.   Not to my knowledge.

6    Q.   Nothing improper on that?

7    A.   Not to my knowledge.

8    Q.   You were asked about a reverse stock split of 200 to 1

9    reverse stock split.

10   A.   Yes.

11   Q.   There's nothing illegal about that, is there?

12   A.   Not to my knowledge, no.

13   Q.   In fact, isn't that a -- a mechanism that is often

14   used in circumstances such as this with corporations?

15   A.   Yeah, I think that's pretty common in reverse

16   purchases like that, yeah.

17   Q.   Now is 200 to 1 unusual?

18   A.   I don't know.  It's my only experience.

19   Q.   All right.  So when you talked to -- excuse me -- you

20   talked to Mr. DiTommaso, I believe you said, every time

21   before you filed one of the necessary documents to either

22   the OTC website or for your financial statements,

23   correct?

24   A.   Yes.

25   Q.   And why did you talk to him?

Cross - Dittman

1    A.   I think that was a requirement, just like meeting a
2    securities attorney in person is a requirement.  I think he
3    was required to go through a checklist with me every time.
4    Q.   And you were calling him to see if he had questions.
5    A.   Yes.
6    Q.   And if he had had questions, you would have then
7    pursued to -- and attempted to get those questions
8    answered?
9    A.   Certainly.
10   Q.   Didn't Mr. DiTommaso on a few occasions, in fact,
11   state that he needed additional documents?
12   A.   I don't honestly recall.
13   Q.   All right.  So with regard to these documents -- and
14   Government's counsel has gone through repeatedly the fact
15   that you were not communicating very often in preparation
16   of filing these different necessary filings -- you weren't
17   in communication with Mr. DiTommaso, but rather you were in
18   communication more often with Mr. Jean-Pierre and/or Mr.
19   Sears.
20   A.   Correct.
21   Q.   And why were you in communication with them as opposed
22   to Mr. DiTommaso at those times -- those preparatory
23   times?
24   A.   Well, because they knew a lot more about the subject
25   matter, a lot more about what was going on.

Cross - Dittman

1    Q.   They were the people that were gathering together the

2    documents to give to Mr. DiTommaso?

3    A.   Sure.

4    Q.   And your brother-in-law was -- was, in effect, helping

5    you out at that -- doing that.

6    A.   Yes.

7    Q.   Partially because of his relationship and partially

8    because of his knowledge about these things.

9    A.   Yes.

10   Q.   Did you consider him -- "him" being Mr. Sears, your

11   brother-in-law, William Sears -- did you consider him to be

12   a person in charge of your FusionPharm company?

13   A.   No.

14   Q.   Did you consider Mr. Sears being a person who could

15   hire or fire somebody in the FusionPharm company?

16   A.   Not without my nod.

17   Q.   Well, so he could recommend somebody.

18   A.   Yes.

19   Q.   But you would have to be doing the hiring or the

20   firing.

21   A.   Yeah, although once or twice, not only Billy but once

22   or twice other people hired people in FusionPharm.  I

23   wasn't the only person, but not without my knowledge or my

24   consent by any -- never.

25   Q.   All right.  Didn't turn out to be a problem?

Cross - Dittman

1    A.    Did it turn out to be a problem?

2    Q.    It didn't turn out to be --

3    A.    No.  No.

4    Q.    All right.  And you said several times that it was

5    your company.

6    A.    Substantially, yes.  I mean, I owned the vast majority

7    of the shares.

8    Q.    Your company because you owned the very large majority

9    of the shares.

10   A.    Yes.

11   Q.    With regard to the issue of affiliation, you were

12   asked what this meant, and you said it was a legal issue

13   and you relied on security attorneys, plural, I believe you

14   said, correct?

15   A.    Yes.

16   Q.    And who -- how many attorneys and what attorneys?

17   A.    Over the years, we had three:  Mr. Jean-Pierre, Mr.

18   DiTommaso, and then Mr. Fred Lerer.

19   Q.    Did any of them disagree as to the definition of an

20   affiliate and affiliation?

21   A.    No, not for anything that we posted in the financials.

22   Q.    With regard to the financials, a number of them were

23   both sent to and from Mr. Kocinski.

24   A.    Yes.

25   Q.    And, in fact, Mr. Kocinski was the person who was

1    responsible for preparing and filling out and putting the

2    information into those financials while he was -- while

3    that was his position.

4    A.    That was mostly me.  He was allowed to review.  I

5    prepared them, or Cliffe for a period of time, Cliffe

6    Bodden prepared them.  Mr. Kocinski reviewed them.  He

7    never prepared them.

8    Q.    And Mr. Jean-Pierre, although he may have reviewed

9    them some, he was not reviewing them to confirm the dollar

10   numbers or the -- those contents?

11   A.    That's correct.

12   Q.    He was not responsible for the numbers on the

13   financials.

14   A.    That's correct.

15   Q.    On many occasions, the counsel for the Government was

16   pointing out the various different people who are on

17   e-mails and numbers of times it was just listed for four or

18   five different people, but it wasn't distinguished between

19   who was actually the recipient and who was the cc on it,

20   correct?  Times it was and times it wasn't, right?

21   A.    Okay, yes.

22   Q.    So when you put the cc's to Mr. Sears, what was the

23   reason for that?

24   A.    With the financials specifically?

25   Q.    Financials, let's start with.

Cross - Dittman

1   A.   Primarily administrative.  I don't really think Billy

2   read them.  He's not an accountant, but he knew, you

3   know -- when the whole thing started, you know, Billy knew

4   the old company, Billy knew Mr. Kocinski, Billy knew Mr.

5   Jean-Pierre, you know, Billy knew everybody, so he just

6   kind of acted as secretary, for lack of a better term.

7   Q.   But not as an employee?

8   A.   Not regarding the financials, no.  Not in that

9   capacity.

10  Q.   Is it against the law to ask your brother-in-law to

11  give you advice?

12  A.   Not to my knowledge.

13  Q.   Counsel asked you a number of times about how you were

14  disclosing this information, financials and otherwise, to

15  your brother-in-law who wasn't a part of your company.  Do

16  you know if there's anything in your corporate minutes or

17  articles of incorporation or any directives from your

18  corporation that would have instructed you not to tell your

19  brother-in-law this information?

20  A.   Not that I'm aware of, no.

21  Q.   And you would be aware of it, wouldn't you, because

22  you were the person who was in charge of doing those

23  things?

24  A.   I didn't read them daily, but I should be, yes.

25  Q.   But to -- do you say with pretty good confidence that,

Cross - Dittman

1    in fact, you didn't violate any duty or any nondisclosure

2    clause by telling your brother-in-law about what -- these

3    different matters?

4    A.    I think that's fair.

5    Q.    And I'm not seeing it here, so I can't tell you

6    exactly where it was, but maybe you can remember and we'll

7    see if we can look at this together.  But there was at one

8    point in one of the communications where you talked about

9    my -- excuse me, your brother, Robert Dittman, talked about

10   how -- how "Scott, my brother, and William my

11   brother-in-law have started a company," right?  Remember

12   that -- that one --

13   A.    VertiFresh.  Yes.

14   Q.    That was your brother who wrote that, not you.

15   A.    Yes.

16   Q.    Although you afterwards said something like yes and

17   yes, or you kind of -- you didn't correct it, did you?

18   A.    Correct.

19   Q.    But was that correct?  Was that true?

20   A.    No.

21   Q.    And what -- what was the truth?  What was the fact?

22   A.    Well, Billy -- Billy started VertiFresh.  FusionPharm,

23   my company, started building shipping containers that could

24   grow lettuce and basil.  In 2012 we got away from --

25   started -- tried to get away from the cannabis industry and

1    focus on vertical farming instead.  And so I modified the

2    containers to grow lettuce and basil.  That's actually what

3    the patent was filed for.

4         And in 2012, I was looking to license the product

5    to growers, and Billy became -- raised his hand, you know,

6    said he wanted to do that, and he became VertiFresh.  And I

7    certainly provided his equipment.  I had certainly tried to

8    sell to other people, too.  I had several other deals that

9    I thought would get done, and they didn't, but that's

10   neither here nor there, but VertiFresh was certainly his

11   company.

12   Q.   So when your brother was saying that you started the

13   company together, that was just a generalization on his

14   part that -- did that trigger anything with you as being an

15   important statement?

16   A.   No.  That was just a mischaracterization on his part.

17   Q.   So --

18        MR. BARNARD:  Your Honor, may I have a moment,

19   please?

20        THE COURT:  You may.

21   BY MR. BARNARD:

22   Q.   Mr. Dittman, did Mr. Jean-Pierre ever receive any

23   stock in FusionPharm as a payment for the work that he did

24   for FusionPharm?

25   A.   No.

Redirect - Dittman

1    Q.   And a final question:  Whose company -- who controlled

2    FusionPharm?

3    A.   I did.

4              MR. BARNARD:  No further questions.

5              THE COURT:  Redirect.

6              MR. SIBERT:  Thank you, Your Honor.

7                       REDIRECT EXAMINATION

8    BY MR. SIBERT:

9    Q.   Okay, Mr. Dittman, you were asked about essentially

10   Mr. Sears' salary, a variety of salaries, regarding Mr.

11   William Sears.  Can I have page -- or Exhibit 390 brought

12   up again.  Can you blow that up.  Thank you.

13             You testified before Ms. Connie Rutherford asked

14   you a question; is that right?

15   A.   Yes.

16   Q.   And one of those questions was:  Is your salary the

17   same as William Sears?

18   A.   Yes.

19   Q.   And what did you reply?

20   A.   Yes.

21   Q.   Okay, sir.  You were asked about essentially what the

22   defendant did when it came to these legal letters either to

23   OTC or to the brokerage house, otherwise known as Rule 144

24   attorney letters.  Do you recall that line of

25   questioning?

Redirect - Dittman

1    A.    Yes.

2    Q.    And you stated that -- correct me if I'm wrong, but

3    that you believe that it was Mr. Guy Jean-Pierre that did

4    the drafting and then later it was Mr. DiTommaso that did

5    the signature.

6    A.    I believe that to be true.

7    Q.    All right.  Well, you knew -- in fact, we went through

8    the years -- counsel went through the years 2011, 2012, and

9    2013; is that right?  Do you recall those lines of

10   questioning regarding the letters?

11   A.    The information disclosure statement letters or the

12   144 stock letters?

13   Q.    Both letters.  Both set of letters.

14   A.    The information disclosure we discussed at length.

15   The opinion letters I don't think we looked at or had a

16   draft of.

17   Q.    Your testimony just regarded towards the legal opinion

18   letters that went to OTC.

19   A.    Those, too, but -- no, the others, too.  I believe it

20   was Guy who drafted the 144 letters, too.

21   Q.    You also knew when you hired Mr. Guy Jean-Pierre --

22   you went down to Florida, right?  You did basically what

23   was considered an interview; is that a good way of saying

24   that?

25   A.    Sure.

Redirect - Dittman

1    Q.   Okay.  And a month after he was hired by you to do

2    legal work, you wrote a letter to the Florida State Bar on

3    his behalf; isn't that right?

4    A.   Yes.

5    Q.   But you also knew at that point he was banned from

6    writing those letters.

7    A.   Yes.  My understanding was that was, you know, some

8    form of paperwork problem technicality that was being

9    repaired at the time.

10   Q.   Okay.  But you understood that you hired a lawyer that

11   could not submit letters on behalf of your firm.

12   A.   Yes.

13   Q.   Now, you talked about Mr. Fred -- I'm sorry, who was

14   the lawyer that you stated, Fred?

15   A.   Lerer.

16   Q.   Lerer.  Now, Mr. Fred Lerer was hired after Mr. Guy

17   Jean-Pierre.

18   A.   Correct.

19   Q.   Okay.  So, in fact, it was when you were under the

20   advice of Mr. Fred Lerer when you reinstated your

21   financials for 2012.

22   A.   That was actually Mr. Dudley's advice.

23   Q.   Okay.  But was that still during the same time as Mr.

24   Fred Lerer?

25   A.   Yes.

Redirect - Dittman

1   Q.   Because Mr. Jean-Pierre was no longer with you; is
2   that correct?
3   A.   Correct.
4   Q.   Can I have Government Exhibit Number 394.
5        Now you were asked some questions about the annual
6   disclosure statements, about why Mr. Guy Jean-Pierre was
7   not listed as a corporate legal counsel on one of those
8   copies.  Do you recall that question?
9   A.   Yes.
10  Q.   And that was 2012's annual report; is that right?
11  A.   Yes, I have it open right here.
12  Q.   All right.  Well, in this e-mail -- this e-mail is
13  dated when?
14  A.   February 13th, 2013.
15  Q.   And who are you stating is the company counsel?
16  A.   Mr. Jean-Pierre.
17  Q.   So that would be after the annual report.
18  A.   Well, the annual report is for December 31st, 2012,
19  but probably wasn't filed until April of 2013, if we did it
20  on time.
21  Q.   But all the way through -- but the annual report only
22  covers 2012.  You would agree with that, right?
23  A.   Yes.
24  Q.   So in 2013, Mr. Guy Jean-Pierre's still your corporate
25  counsel.

238
Redirect - Dittman

1    A.    Yeah.

2    Q.    Even in February.

3    A.    Yeah, well, at least -- yes.  For purposes of doing

4    the 144, yes.

5    Q.    All right.  Now, you stated that Mr. Guy Jean-Pierre

6    came to visit FusionPharm in Denver, Colorado; is that

7    right?

8    A.    Yes.

9    Q.    Was Mr. Sears there when Mr. Guy Jean-Pierre visited

10   Denver, Colorado?

11   A.    Yo.

12   Q.    And correct me if I'm wrong, but it was your

13   brother-in-law, Mr. Sears, that -- who introduced you to

14   Mr. Guy Jean-Pierre?

15   A.    Bill Sears.

16   Q.    And that's when you went down to Florida?

17   A.    Yes.

18   Q.    In 2011.

19   A.    Correct.

20   Q.    Can I have Government Exhibit 159.

21         You stated that Mr. Guy Jean-Pierre, you believe,

22   got paid $500 for an opinion letter; is that right?

23   A.    That's my understanding, yes.

24   Q.    I'm showing you a check for $2500.  Do you see that

25   check?

Redirect - Dittman

1    A.    I do.

2    Q.    All right.  Who signs this check?

3    A.    That looks like Bill Sears.

4    Q.    Okay.  And essentially from Bayside Holding; is that

5    right?

6    A.    That's correct.

7    Q.    All right.  Now, you're the CEO of the company.  Did

8    you know that there was no opinion letters written in

9    January of 2012 when that check was written?

10   A.    I had no idea that check was written, and no, I don't

11   necessarily know when opinion letters are getting written.

12   I don't particularly pay attention to opinion letters.

13   Q.    You would agree that's more than $500?

14   A.    Yes.  That was $2,500, yes.

15   Q.    You were asked some questions about VertiFresh.

16   A.    Yes.

17   Q.    Where was VertiFresh's offices located?

18   A.    Bill's office was in our office, and the containers

19   that they were growing lettuce in were inside of our

20   building.

21   Q.    So you shared office spaces.

22   A.    The entire time, yes.

23   Q.    Do you know how much money Mr. DiTommaso was paid by

24   your firm?

25   A.    I don't.

Redirect - Dittman

1    Q.   So as a CEO, you don't know how much one of your

2    lawyers was being paid?

3    A.   Correct.

4    Q.   Can I have Government Exhibit 25.

5         Again, do you recognize what Government Exhibit 25

6    is?

7    A.   Yes.  I have it open.

8    Q.   And what is it?

9    A.   It's the annual information and disclosure statement,

10   December 31st, 2012.

11   Q.   Can I have page 12.

12        You testified you did not know essentially what

13   was a related party transaction to counsel's question; is

14   that correct?

15   A.   Yeah -- I -- maybe not specifically -- yes.  I don't

16   recall the specific question.

17   Q.   All right.  Well, look right down here.  Can you read

18   Number 5 for me.

19   A.   "Any member of the immediate family (including spouse,

20   parents, children, siblings and in-laws) of any of the

21   foregoing persons."

22   Q.   In-laws.

23   A.   I see that.

24   Q.   William Sears was your brother-in-law.

25   A.   This is true.

Redirect - Dittman

1    Q.   And he did 90 percent of business with you that year

2    with VertiFresh.

3    A.   In 2012, yes.

4    Q.   And it was never disclosed anywhere in there.

5    A.   Correct.

6    Q.   Sir, would your firm have survived if it wasn't for

7    Mr. William Sears selling FusionPharm stock?

8    A.   I think it would have survived.  It would have taken a

9    different trajectory but, yeah, I think it would have

10   survived.

11   Q.   You had 390 -- $340 in that bank account?

12   A.   I understand; the company was always short of cash

13   because it was a start-up in a growing company.  I spent

14   every dollar that the company brought in on growing the

15   company.

16   Q.   Sir, my last question for you is you stated earlier

17   you pled guilty in this case; is that right?

18   A.   Well, in a related case.

19   Q.   Okay.  In a related case.  As you stated, there's

20   nothing against giving advice to your brother-in-law; is

21   that right?

22   A.   So far as I know.

23   Q.   And what charge did you plead guilty to?

24   A.   It was a conspiracy -- conspiracy count.  I don't know

25   exactly.

Redirect - Dittman

1    Q.   Conspiracy to commit securities fraud?

2    A.   Yes.

3    Q.   Who did you conspire with in that plea agreement?

4    A.   I pled guilty to signing a backdated promissory note.

5    Q.   Who did you plead guilty to conspiring with?

6    A.   I'm answering your question, sir.  I was very specific

7    in my plea and I'm not going to misstate what my plea said.

8    Q.   You would agree with me to conspire, you had to do it

9    with someone.

10   A.   That's not how it was explained to me by my attorneys

11   when I pled.

12   Q.   Did you conspire with your brother-in-law, William

13   Sears?

14   A.   No.

15           MR. SIBERT:  Your Honor -- can I have a minute,

16   Your Honor?

17           THE COURT:  You may.

18           MR. SIBERT:  Your Honor, no further questions.

19           THE COURT:  All right.  May this witness be

20   excused?  For the Government?

21           MR. SIBERT:  Yes, sir.

22           THE COURT:  For the defendant?

23           MR. BARNARD:  Yes, Your Honor.

24           THE COURT:  All right.  Mr. Dittman, thank you for

25   your testimony.  You're excused.  You may step down.

243

Redirect - Dittman

1    THE WITNESS:  Thank you, Judge.

2    (This is the conclusion of Mr. Dittman's testimony)

3    *     *     *     *     *

4    **INDEX**

5    <u>Item</u>                                                      <u>PAGE</u>

6    GOVERNMENT'S WITNESSES

7    **SCOTT DITTMAN**
     Direct Examination by Mr. Sibert                      26
8    Cross-examination by Mr. Barnard                      211
     Redirect Examination by Mr. Sibert                   234

9

10

11   GOVERNMENT'S EXHIBITS

12   EXHIBITS:      Offered    Received  Refused   Stipulated

13   5-A            209        210

14   5-B            209        210

15   19             198        198

16   19-A           157        157

17   25             69         70

18   40             198        198

19   100            165        166

20   123            165        166

21   135            178        178

22   136            178        178

23   151            165        166

24   167                       195

25   169            69         70

Redirect - Dittman

GOVERNMENT'S EXHIBITS

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|---|---|---|---|---|
| 172 | 154 | 154 | | |
| 230 | 156 | 156 | | |
| 263 | 69 | 70 | | |
| 372-S | 178 | 178 | | |
| 372-W | 178 | 178 | | |
| 372-Y | 69 | 70 | | |
| 372-Z | 69 | 70 | | |
| 372-AA | 69 | 70 | | |
| 372-JJ | 156 | 156 | | |
| 372-SS | 69 | 70 | | |
| 372-VV | 69 | 70 | | |
| 372-WW | 69 | 70 | | |
| 372-ZZ | 69 | 70 | | |
| 372-FFF | 69 | 70 | | |
| 372-JJJ | 69 | 70 | | |
| 372-LLL | 69 | 70 | | |
| 372-NNN | 69 | 70 | | |
| 374 (304,305) | 29 | 29 | | |
| 387 | 190 | 190 | | |
| 388 | 190 | 190 | | |
| 390 | 198 | 198 | | |
| 392 | 190 | 190 | | |
| 394 | 69 | 70 | | |

245

Redirect - Dittman

1                    GOVERNMENT'S EXHIBITS

2    EXHIBITS:        Offered    Received   Refused    Stipulated

3    395             69         70

4    404             150                   150

5

6                    *       *       *       *       *

7                    REPORTER'S CERTIFICATE

8

9        I certify that the foregoing is a correct transcript

10   from the record of proceedings in the above-entitled

11   matter.

12       Dated at Denver, Colorado, this 3d day of July, 2018.

13

14

15

16   _                                                    _

17                    MARY J. GEORGE, FCRR, CRR, RMR

18

19

20

21

22

23

24

25