UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

Criminal Action No. 17-cr-00008-WJM

UNITED STATES OF AMERICA,

Plaintiff,

v.

1.  GUY JEAN-PIERRE,

> Defendant

---

**GOVERNMENT'S RESPONSE TO DEFENDANT'S REQUEST FOR A BELOW-GUIDELINE SENTENCE**

---

The United States of America, by and through its counsel, Jeremy Sibert, hereby respectfully submits this response in reply to the defendant Jean-Pierre's request for a below-guideline sentence.

To determine a sentence in this case, this Honorable Court must properly calculate the advisory sentencing guidelines as part of its consideration of the factor in Title 18, United States Code, Section 3553(a), in order to determining whether the sentence is "reasonable."  The Tenth Circuit has held that a sentence that is properly calculated under the guidelines is entitled to a rebuttable presumption of reasonableness.  *See United States v. Kristl*, 437 F.3d 1050, 1054 (10th Cir. 2006).  Furthermore, the Tenth Circuit requires only a general statement of reasons when a District Court imposes an in-guideline sentence.  *See United States v. Harry*, 816 F.3d 1268 (10th Cir. 2016).  Sentencing courts are statutorily required to state their reasons for imposing a particular sentence, *see* 18 U.S.C § 3553(c), it is not necessary that a court issue a

comprehensive, detailed opinion. *See Rita v. United States,* 551 U.S. 338, (2007).  The Tenth

Circuit has reversed downward variances where the court gave no reasons for reducing the

offense level.  *See United States v. Hall*, 473 F.3d 1295 (10th Cir. 2007).

     A number of Circuit Courts have observed that the guidelines are the only factor in 18

U.S.C. § 3553(a) that account for all the other factors within the statute.  *See United States v.*

*Jimenez-Beltre*, 440 F.3d 514, 518 (1st Cir. 2006); *United States v. Johnson*, 445 F.3d 339, 343

(4th Cir. 2006); *United States v. Shelton*, 400 F.3d 1325, 1332, note 9 (11th Cir. 2005).  These

Circuit Courts state that the required factors that the Sentencing Commission used in formulating

the Guidelines were mirror images of the factors that District Courts must use under *Booker* and

§ 3553(a).   The Ninth Circuit declare that the Guidelines provide a principal method for

avoiding unwarranted sentencing disparities.  See United States v. Guerrero-Velasquez, 434 F.3d

1193, 1195, note 1 (9th Cir. 2006).  The Seventh Circuit supported the argument that the

Guidelines are a reflection of "the aggregate sentencing experiences of individual judges, the

administrative experience of the Commission, and the input of Congress."  *United States v.*

*Mykytiuk*, 415 F.3d 606, 607 (7th Cir. 2005).

     Due to the nature of this case; the fact that the jury found defendant Jean-Pierre guilty of

28 counts that included Conspiracy to Commit Securities Fraud, Aiding and Abetting Wire

Fraud, Aiding and Abetting Mail Fraud, Securities Fraud, and Money Laundering; to reflect the

seriousness of the offense; to promote respect for the law; and to provide just punishment for the

offense; to afford adequate deterrence to criminal conduct; [and] to protect the public from

further crimes of the defendant a guideline sentence is appropriate.  Defendant Jean-Pierre's

motion for a below-guideline sentence should be denied.

In addressing the defendant Jean-Pierre's reasons for a below-guideline sentence, the government argues the following:

1.  A recommendation of below-guideline sentence of 120 months to avoid a non-disparate sentence with co-conspirators William Sears and Scott Dittman, should be denied.   In *United States v. Davis,* the Tenth Circuit held "a criminal defendant alleging a disparity between his sentence and that of a codefendant is not entitled to relief from a sentence that is properly within the sentencing Guidelines and statutory requirements." 437 F.3d 989, 997 (10th Cir. 2006), *cert. denied*. Moreover, disparity among codefendants is not a consideration required by § 3553(a).  *See United States v. Verdin–Garcia,* 516 F.3d 884, 899 (10th Cir. 2008) (explaining § 3553(a)(6) "requires a judge to take into account only disparities *nationwide* among defendants with similar records and Guideline[s] calculations"). Although it is not improper to consider **co**-defendant disparity, neither is it mandated. *United States v. Smart,* 518 F.3d 800, 804 (10th Cir. 2008) (explaining post-*Gall* "codefendant disparity is not a per se 'improper' factor").

In this case, defendant Jean-Pierre is not similarly situated as co-defendants' William Sears and Scott Dittman.  First, defendant Jean-Pierre is an experienced professional in securities law with many years of practice as a securities lawyer.  As a lawyer, defendant Jean-Pierre had the ethical responsibility and wisdom to follow the law, but instead he chose to commit fraud. Defendant Jean-Pierre was the gatekeeper in the conspiracy when it came to the Rule 144 opinion letters and attorney opinion letters for OTC Markets.  Without Jean-Pierre writing these letters after he reviewed the financials, conversing via email/skype/phone and in person with Scott Dittman and William Sears, reviewing the promissory convertible notes, drafting multiple documents for FUSIONPHARM, and reviewing the packages going to the transfer agents and brokers, none of the stock that Williams Sears controlled would have become unrestricted and

free to trade.   In addition, defendant Jean-Pierre committed fraud by using his own niece's name and signature on a Rule 144 opinion letter further allowed FUSIONPHARM stock to become unrestricted shares that were held by William Sears under the entity of Microcap.  In being the gatekeeper, defendant Jean-Pierre knew that William Sears was the undisclosed owner of FUSIONPHARM, that Sears and Dittman were using the proceeds from the FUSIONPHARM stock sold by Sears to fund FUSIONPHARM, that the sale of FUSIONPHARM shares were the primary source of revenue for FUSIONPHARM, and advised what to disclose and what not to disclose, including William Sears' prior felony conviction, in the required disclosures for OTC Markets.

In addition, even after the conspiracy had ended in 2014, as part of assisting the government for his benefit, William Sears agreed to work undercover with the FBI in luring defendant Jean-Pierre back to the United States.  As part of the undercover, defendant Jean-Pierre agreed to assist in helping William Sears hide money from law enforcement in the Dominican Republic and further assisted with devising a plan to secure free trading shares of a shell company by committing further securities fraud.  At this time, defendant Jean-Pierre was living in the Dominican Republic and was able to produce at least five corporate documents, including a form of debt conversion, purchase and assignment agreement, non-affiliation letter, consulting agreement, and convertible promissory note, which were all similar to the documents he created for FUSIONPHARM.  More importantly, Jean-Pierre was told these documents would be used to hide the true ownership and control of the shell company in the undercover scheme. Finally, this Court was able to witness defendant Jean-Pierre's demeanor and respect for the law in the undercover video in the Miami hotel room, where Jean-Pierre was very happy to know that the named owner of the shell company did not know anything about the business he would be

controlling on paper only.   In addition, the video displayed defendant Jean-Pierre's absolute understanding of securities law and methods to commit fraud and avoid detection.

Jean-Pierre was the gatekeeper to allow thousands of shares of FUSIONPHARM restricted stock to be sold by fraudulently writing opinion letters, which allowed FUSIONPHARM to continue to operate under false pretenses.  Neither, Scott Dittman or William Sears, had the ability to orchestrate a scheme around the securities laws without defendant Jean-Pierre.

2.  Defendant Jean-Pierre's role in the conspiracy and additional undercover operation was not minor.  First, in the undercover operation, there were no other co-conspirators, so Jean-Pierre was the sole target and leader.   Second, Jean-Pierre's role was not minor as compared to Scott Dittman and William Sears.   As stated above, Jean-Pierre was the gatekeeper regarding the opinion letters and current information letters to OTC Markets.  Besides being well educated and experienced in securities law, defendant Jean-Pierre understood the corporate structure at FUSIONPHARM and who was in control of the entities to include FUSIONPHARM, Microcap, Bayside, and Meadpoint.

In determining whether a defendant is a minor-participant the District Court must "focus upon the defendant's knowledge or lack thereof concerning the scope and structure of the enterprise and of the activities of others involved in the offense." *United States v. Calderon-Porras,* 911 F.2d 421, 423 (10th Cir.1990).  The Tenth Circuit further provides guidance in *United States v. Barron*, 97 Fed.Appx. 840, 843 (10th Cir. 2004), 2004 WL 1059822, "[t]he determination whether to apply [U.S.S.G. § 3B1.2] ... involves a determination that is heavily dependent upon the facts of the particular case.... [T]he court, in weighing the totality of the

circumstances, is not required to find, based solely on the defendant's bare assertion, that such a role adjustment is warranted." U.S.S.G. § 3B1.2, Application Note 3(C).

Jean Pierre's conduct also was significantly more egregious due to being a licensed professional.  Defendant Jean-Pierre reviewed the financials, met with the co-defendants, reviewed documents, drafted documents, understood the terms of the note agreements, and knew that the proceeds from the sale of the FUSIONPHARM stock was being placed back into FUSIONPHARM.  He wrote more opinion letters and understood how these letters furthered the scheme. Despite being warned and then banned by OTC Markets, he continued to post false opinion letters by using a non-banned attorneys letterhead and signature.  He falsified his own niece's signature for some of the opinion letters, causing her to answer to the Texas and California Bar.  He did all this with a complete understanding of securities laws and regulations. Further, defendant Jean-Pierre understood how his actions and continued falsification of material information was allowing FUSIONPHARM to continue to survive.

The defense cites a few cases but there are clear distinctions than the facts of this case. First, *United States v. Smart*, 518 F.3d 800 (10th Cir. 2008), is a case dealing with a minor being forced to engage in sexually explicit conduct.  Based on a factual inquiry, the Court found one defendant less culpable than another co-defendant that plead guilty.  Since minor role is fact driven, this Honorable Court should only consider the facts presented in defendant Jean-Pierre's trail and not any holding in the *Smart* case.

Second, the defendant cites United States v. Adelson, 441 F.Supp. 2d 506 (S.D.N.Y 2006), where the Court granted a below guideline sentence to a defendant because the defendant did not participate in the security fraud until its final months.  Again, in this case, defendant Jean-Pierre was found guilty of a conspiracy that lasted from 2011 through 2014, essentially the

same dates for Dittman and Sears.  Unlike *Adelson*, the jury sided with the government in finding defendant Jean-Pierre participated in fraudulent conduct for the entire conspiracy.   Further, this illegal conduct continued with defendant Jean-Pierre into 2016 regarding the money laundering and wire fraud charges.

Defendant Jean-Pierre did not voluntarily cease to participate in criminal activity before its discovery by law enforcement as he argues, citing *United States v. Numemacher*, 362 F.3d 682 (10th Cir. 2004)(a factually different case where the defendant destroys child pornography before learning about the investigation and then cooperated with the FBI).  In this case, defendant Jean-Pierre created, reviewed, and acted on promissory convertible notes that allowed William Sears to convert millions of FUSIONPHARM shares without any restrictions for a very low rate of one cent per share.  These notes were created in 2012 and 2013 and remained valid due to how they were written, specifically the back dating.   Jean-Pierre's conduct in this case, to include drafting, review and submission of documents, demonstrate his ability to foresee that the documents would allow for future actions to further the conspiracy, most noteably future stock sales by William Sears.  The evidence established at trial proved that defendant Jean-Pierre was a member of the criminal conspiracy throughout the timeframe as indicated in the second superseding indictment and made no efforts to withdraw from that conspiracy.  In addition, the defendant fails to meet his burden of establishing withdrawal or abandonment from the conspiracy.  Finally, Jean-Pierre never cooperated with law enforcement but continued willfully and deliberately commiting fraudulent crimes.

Next, defendant cites *United States v. Arutunoff*, 1 F.3d 1112 (10th Cir. 1993) to argue for a below guideline sentence, because like the defendant in *Arutunoff*, he was not involved in all of his co-conspirators efforts to defraud investors, causing the loss figure to overstate the

defendant's culpability.  This argument fails because unlike in *Arutunoff* where the defendant did not know about fraudulent monthly statement to investors, defendant Jean-Pierre knew about the fraudulent disclosures being made to OTC Markets and being released to the public.  In addition, Jean-Pierre knew about concealing William Sears' true role with FUSIONPHARM and continued to submit false opinion letters.  As stated, Jean-Pierre's conduct in this case, to include drafting, review and submission of documents, demonstrate his ability to foresee that the documents would allow for future actions to further the conspiracy, most noteably future stock sales by William Sears.

The defense cites *United States v. Stuart*, 22 F.3d 76 (3d Cir. 1994) in support that Jean-Pierre should receive a minor participant role since his economic gain in the conspiracy was less than Sears and Dittman.  Stuart stated that if monetary tables bears little or no relationship to the defendant's role in the offense and greatly magnifies the sentence, the district court should have the discretion to depart downward.  *Id*. at 83.  In citing this case, the defense fails to discuss any of defendant Jean-Pierre's knowledge of the entire scheme and his essential role in making sure the scheme was able to be committed.

Factors that this Honorable Court should consider regarding § 3B1.2 of the Guidelines in factual determining if Jean-Pierre was less culpable, include (i) the degree which the defendant understood the scope and structure of the criminal activity; (ii) the degree to which the defendant participated in planning or organizing the criminal activity; (iii) the degree to which the defendant exercised decision making authority or influenced the exercise of decision making authority; (iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts; and (v) the degree to which the defendant stood to

benefit from the criminal activity.    *See* U.S.S.G. § 3B1.2, Application Note 3(C).  As for the first four, reasons that have already been stated shows defendant Jean-Pierre's knowledge and substantial role in the fraudulent scheme.

As for the last factor, the degree to which Jean-Pierre stood to benefit is subjective in nature.  Courts have refused a minor participant departure where a defendant traveled to promote an investment fraud scheme and was paid for his six month role even though the scheme continued after the defendant's departure at six months.  *See United States v. Swor*, 728 F.3d 971 (9th Cir. 2013).  In *United States v. Stanley*, 739 F.3d 633 (11th Cir. 2014), the Court denied a minor participant where the defendant was an officer of the company that was involved in a "pump and dump" securities fraud scheme.  That facts of this case show that defendant Jean-Pierre was the corporate secretary of FUSIONPHARM and the "de facto" counsel for the company.  In addition, he was an unmarketable securities lawyer having been banned from writing opinion letters in 2010.  In addition, there were legal complaints made against him which eventually lead to his disbarment in Florida and a SEC civil lawsuit.  Scott Dittman wrote a letter of support for Jean-Pierre in 2011 to the Florida State Bar, essentially before he did any significant work for FUSIONPHARM.  William Sears and Jean-Pierre had a history of past working relationships.  Dittman and Sears knew about Jean-Pierre's legal issues before he was hired and needed his services.  Any securities lawyer that is being investigated by a state bar and the SEC and is banned from writing opinion letters is going to have a difficult time obtaining work from legitimate clients.  Jean-Pierre received at least $500 an opinion letter, along with other payments for doing work for FUSIONPHARM.  This is not bad considering his predicament with his law license and past securities work.

Jean-Pierre did not have a lesser role than Scott Dittman and William Sears.  As argued before, he was the gatekeeper and mastermind of circumventing the securities' law by drafting, reviewing, and overseeing fraudulent documents that he clearly could foresee their usefulness in the future pertaining to FUSIONPHARM.   Unlike United States v. Jimenez-Gutierrez, 491 F.3d 923 (8th Cir. 2007), Jean-Pierre is a higher up, given his qualifications, experience, and key role within this fraudulent scheme.  Finally, based on William Sears' and Jean-Pierre's discussions about being paid in the undercover, one could argue under a sentencing burden that Jean-Pierre did not receive his full allotment for the work he did for FUSIONPHARM due to his increasing legal troubles with his State Bar and the SEC.

3.  This Honorable Court should deny any downward variance based on defendant Jean Pierre's loss of reputation and loss of law license.  First, Jean-Pierre first became in trouble with his law practice before the start of this case when he was banned from writing opinion letters in 2010.   In addition, his disbarment and civil complaint with the SEC occurred during the timeframe of this case, thus Jean-Pierre's actions in this case did not constitute the reasons behind his legal troubles.  His Florida Bar inquiry started in February 2011.  The subject of the Florida Bar inquiry was forging of Jean-Pierre's newly licensed niece's signature.  This initial inquiry became the subject of the SEC case and New York criminal case against Jean-Pierre. The facts of this case became public in 2014 when the FBI conducted search warrants and seizure of FUSIONPHARM bank accounts.

Furthermore, any argument that defendant Jean-Pierre has suffered enough based on losing his legal license, professional reputation, along with receiving a felony conviction, fails. Courts have rejected the "middle class" discount regarding sentences for those that were employed and otherwise have been engaged in lawful economic activity.  *United States v.*

*Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999).  Judges must reframe from sympathizing with criminals that come from similar backgrounds because "[c]riminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime."  *Id*.  The government agrees the Court's statement in *Stefonek* that "[c]riminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime."  *United States v. Stefonek*, at 1038.

In *United States v. Musgrave*, 761 F.3d 602 (6th Cir. 2014), the District Court gave Musgrave a downward variance because the government imposed a similar sentence on its cooperating witness and that he was 60 years old who had no contact with the justice system.  The Sixth Circuit disagreed with the sentencing.  The *Musgrave* Court stated that "[i]n imposing a sentence, the district court must explain, based on permissible considerations, how its sentence " 'meshe[s] with Congress's own view of the crimes' seriousness.' " Id. at 608; *citing United States v. Peppel*, 707 F.3d 627, 635 (6th Cir. 2013) *quoting United States v. Davis*, 537 F.3d 611, 617 (6th Cir. 2008).  The Court further states that the collateral consequences of a defendant's conviction are "impermissible factors" when rendering a sentence that complies with seriousness nature of the crime.  *Id. citing Peppel*, 707 F.3d at 636.  The Court ruled sentencing below the guidelines on the basis of the collateral consequences of a conviction, particularly ones related to public humiliation among the defendant's community, will not reflect the seriousness of the offense or provide just punishment, especially with defendants from a privileged background, including education.  *Id. citing Peppel*, 707 F.3d at 636; and *United States v. Bistline*, 665 F.3d 758, 765-66 (6th Cir. 2012).  Based on the above case law and the fact that Jean-Pierre was in

trouble regarding his law license before the start of this case, this Honorable Court should reject any downward variance due to loss of reputation and law license.

4.   Defendant Jean-Pierre's request for a below-guideline sentence due to his age and arguing that he is unlikely to reoffend, thus poses no danger to the public should be rejected.   In United States v. Lewis, 594 F.3d 1270, 1276-77 (10th Cir. 2010), the District Court (Judge Blackman) declined to vary from the guideline range due to the defendant's age (72) and health, since the guidelines discourage consideration of the defendant's age, unless the defendant is infirm.  The Tenth Circuit did not find error with the District Court's ruling recognizing that the Court has " 'broad discretion to consider individual characteristics like age[,]…[t]hat such gound for a variance is available certainly does not…mean it is compelled.'" *Id.* at 1277, *quoting United States v. Sells*, 541 F.3d 1227, 1238 (10th Cir. 2008).  In that security fraud defendant Lewis received a 330 year sentence for causing investors to lose 40 million.

In addition to the Tenth Circuit, the Court in *United States v. Kerns*, 336 Fed. Appx. 916 (11th Cir. 2009); 2009 WL 1956258, found that a 240 month sentence for a 65 year old defendant reasonable after weighing the seriousness of Kerns' offense and the need to protect the public from security fraud vs. Kerns' advanced age.

The facts in this case show that defendant Jean-Pierre was approximately 52 years old when he became involved in committing the crimes in this case.  The conspiracy in this case lasted approximately four years, making defendant Jean-Pierre approximately 55/56 at the end of the conspiracy.  Defendant Jean-Pierre was well over the age of forty, the age that the Court in United States v. Carmona-Rodriguez, as cited in defendant's brief, states as the age for lower rates of recidivism.  The Court's reasoning is not true in this case.  In 2016, Jean-Pierre was 57 and agreed to assist William Sears with laundering money and additional securities fraud related

offenses in the undercover operation.  Defendant Jean-Pierre was able to orchestrate criminal

conduct on two occasions while living in the Dominican Republic.  Jean-Pierre was found guilty

by the jury on five counts of wire fraud and one count of money laundering.  It is clear from the

evidence (video/recordings) that defendant Jean-Pierre understood that William Sears was in

trouble with the law based on FUSIONPHARM scheme, however, this did not deter him from

committing additional crimes at an older age.  The facts show that defendant Jean-Pierre,

regardless of his age, is likely to reoffend and put the public at risk.

5.  Based on the reasoning in *United States v. Musgrave*, 761 F.3d 602, defendant Jean-

Pierre's request for a below-guideline sentence for being incarcerated for the first time should be

denied.  First, if this Honorable Court sentences defendant Jean-Pierre to time, it would not be

his first time incarcerated.  Defendant Jean-Pierre was convicted of 3rd Degree Forgery

misdemeanor, Falsifying Business Records misdemeanor, and Identity Theft misdemeanor and

served a one year jail sentence.

In addition, the cases that the defense cite where the Courts gave downward variances

had mitigating factors that are not found in this case for defendant facing imprisonment for the

first time.  In *United States v. Collington*, 461 F.3d 805 (6th Cir. 2006), the noted that the

defendant's childhood was outside the heartland since both of his parents died when he was

young and Collington was mistreated by other relatives.  Further, the District Court noted that

the defendant was young at the time of sentencing and could go on to a productive life in society

after serving a 10 year sentence. *Id*.  Also, the Court correctly noted that a large variance requires

a greater explanation by the sentencing court.  *Id*.  In *United States v. Qualls*, 373 F.Supp.2d 873

(E.D. Wis. 2005), the District Court provided a slight downward variance from 188 months to

160 months based on the fact he was considered a career offended and had a minor role in the

conspiracy.  Further, the defendant cooperated with the police in the case, unlike defendant Jean-Pierre who has never offered any cooperation.

As stated, defendant Jean-Pierre knew about the fraudulent scheme, had specialized knowledge of the law, was well educated and employed prior to his criminal activities, and continued knowingly commit crimes after the conspiracy ended.   As the Court noted in Musgrave, " '[o]ne of the central reasons for crating the sentencing guidelines was to ensure stiffer penalties for white-collar crimes and to eliminate disparities between white-collar sentences and sentences for other crimes.'" *United States v. Musgrave*, 761 F.3d at 609, *quoting United Stated v. Davis*, 537 F.3d at 617.  Individuals like Jean-Pierre need to be deterred from committing such serious offenses, especially since fraud related crimes take more thought and control, are committed of a longer time period, and consider "more rational, cool, and calculated than sudden crimes of passion or opportunity."  *Id*. at 609, *quoting United States v. Peppel*, 707 F.3d 637.  Due to Jean-Pierre's role in this case, a variance is not appropriate since this will be his second time in custody if this Honorable Court orders imprisonment.

6.  Defendant Jean-Pierre argues that he deserves a downward variance due to the "more difficult and harsher" conditions at the GEO immigration facility than within the Bureau of Prisons facility.  The defense offers no facts or evidence to support this very general conclusion. Defendant Jean-Pierre never filed any pretrial motions indicating that the GEO immigration facility was harsh or difficult.  In fact, the defense argued that defendant Jean-Pierre was physically and mentally good.  *See* Doc. #71.  The government requests that this Honorable Court deny the defendant's request based on a lack of factual support or evidence.

7.  The government agrees that this Honorable Court needs to impose a sentence that avoids unwarranted sentence disparities among defendants with similar records who have been

found guilty of similar conduct as stated under 18 U.S.C. § 3553(a)(6).  The Tenth Circuit states

that § 3553(a)(6) requires a judge to take into account only disparities ... among defendants "*with*

*similar records and Guideline calculations.*" United States v. Lewis, 594 F.3d 1270, 1276 (10th

Cir. 2010); *quoting United States v. Verdin–Garcia,* 516 F.3d 884, 899 (10th Cir. 2008).  The

Seventh Circuit in United States v. Boscarino, 437 F.3d 634, 638 (7th Cir. 2006) states that

[s]entencing disparities are at their ebb when the Guidelines are followed, for the ranges are

themselves designed to treat similar offenders similarly. That was the main goal of the

Sentencing Reform Act. The more out-of-range sentences that judges impose ..., the more

disparity there will be.  A sentence within a properly ascertained range therefore cannot be

treated as unreasonable by reference to § 3553(a)(6)." *See also*, e.g., *United States v. Babul,* 476

F.3d 498 (7th Cir. 2007); *United States v. Gama–Gonzalez,* 469 F.3d 1109 (7th Cir. 2006).  The

Tenth Circuit ruled that district courts may consider sentencing disparities between codefendants,

stating that "disparate sentences are allowed where the disparity is explicable by the facts on the

record." United States v. Smart, 518 F.3d 800, 810 (10th Cir. 2008); *quoting United States v.*

*Davis,* 437 F.3d 989, 997 (10th Cir.2006) (internal quotations omitted).  When defendants accept

responsibility and assist the government, their downward adjustment for acceptance and

cooperation does not create an unwarranted disparity under § 3553(a)(6).  *See United States v.*

*Haley*, 529 F.3d 1308, 1312 (10th Cir. 2008).

The Tenth Circuit, along with various other Circuits have upheld very high sentences for

those that commit securities fraud, along with other fraud related offenses, and go to trial.  *See*

*United States v. Lewis*, 594 F.3d 1270 (10th Cir. 2010)(330 year sentence for defendant that

committed securities fraud); *United States v. Gordon*, 710 F.3d 1124 (10th Cir. 2013)(188 month

sentence for a former securities attorney); *United States v. Pacheco-Martinez*, 791 F.3d 171 (1st

Cir. 2015)(235 month sentence to deter defendant from illicit pursuits, including security and mail fraud, and money laundering, despite his advanced age); *United States v. Kerns*, 336 Fed.Appx. 916 (11th Cir. 2009) 2009 WL 1956258 (240 month sentence for convictions for conspiracy to commit securities fraud, securities and wire fraud, and money laundering was reasonable even at Kerns advance age and despite the disparity among his co-conspirators/defendants that cooperated with the government.)

In order to avoid unwarranted disparities as required under 18 U.S.C. § 3553(a)(6), the government is requesting that this Honorable Court issue a guideline sentence for defendant Jean-Pierre.  First, Jean-Pierre knew of the severity of his actions based on all of the above argument regarding his knowledge and skill set.   In addition, the crime of committing various fraud, especially security fraud, is very serious because it results robbing people of their money. The defendant's actions when considered with relevant conduct, have had adverse, long-lasting and life changing, ruinous consequences on hundreds of victims.  Innocent people have been traumatized.  Defendant Jean-Pierre showed no remorse, unlike Scott Dittman and William Sears who plead guilty and cooperated with the government by debriefing and testifying.[1]  Instead, Jean-Pierre was willing to continue his criminal conduct when provided the chance in 2016.   As a result of Jean-Pierre's gatekeeper role and mastermind ability to circumvent the securities laws, approximately 12 million of illicit proceeds were generated from investors that did not know about all the underlying fraud within FUSIONPHARM before purchasing the stock.

8.  Defendant Jean-Pierre next argues that he deserves a downward variance based the undercover operation being consider "sentencing entrapment" by indicting that the operation was

---

[1] It should be noted that there were several debriefs with Sears and Dittman due to the inconsistencies of their stories and lack of truth.   The government further indicates that even when testifying under oath, Dittman and Sears still could not be totally truthful or admit responsibility for various actions.

aggressive in nature.  The defense offers no facts or analysis to making this allegation.  The

Tenth Circuit has described "[s]entencing entrapment or manipulation" as a "due process

principle allowing a court to modify a sentence if, considering the totality of the circumstances,

the government's conduct is so shocking, outrageous and intolerable that it offends the universal

sense of justice," such as heavily pressuring the defendant during a sting operation to deal a

higher volume of drugs than he otherwise would, and can be the basis for a downward variance

or departure. *United States v. Martinez,* 482 Fed.Appx. 315, 317 (10th Cir. 2012); quoting

*United States v. Beltran,* 571 F.3d 1013, 1019 (10th Cir. 2009). "Before *Booker,* [the Tenth

Circuit] analyzed claims of sentencing entrapment or manipulation under the rubric of

'outrageous governmental conduct.' " *United States v. Beltran,* 571 F.3d at 1018; quoting *United

States v. Lacey,* 86 F.3d 956, 963 (10th Cir.1996).

      Other federal circuit courts of appeal have adopted varying approaches to claims of

sentencing manipulation as an objection to a sentence. The Sixth and D.C. Circuits categorically

reject the doctrine of sentencing factor manipulation and do not consider such claims, while the

Second, Third, Fourth, Fifth and Seventh Circuits have not expressly accepted or rejected a

defense of sentencing factor manipulation. *United States v. Guest,* 564 F.3d 777 (6th Cir. 2009);

*United States v. Tykarsky,* 446 F.3d 458 (3d Cir. 2006); *United States v. Snow,* 309 F.3d 294 (5th

Cir. 2002); *United States v. Gomez,* 103 F.3d 249 (2d Cir. 1997); *United States v. Walls,* 70 F.3d

1323 (D.C.Cir. 1995); *United States v. Okey,* 47 F.3d 238 (7th Cir. 1995); *United States v. Jones,*

18 F.3d 1145 (4th Cir. 1994).

      In this case, the government's conduct was not so shocking, outrageous, or intolerable to

rise to the level of this Honorable Court using it as a basis for a downward variance.   Prior to the

initiation of the undercover operation, Jean-Pierre had been reaching out to Sears about doing

securities work.  The undercover operation consisted of William Sears asking defendant Jean-Pierre to draft up corporate documents and assist him in a very similar manner as he did with FUSIONPHARM scheme regarding a resurrected business of Vertifresh.   Jean-Pierre was asked to create draft documents, including a promissory convertible note that would be back dated in order to allow "restricted shares" to be "unrestricted" based on the timeline of fraudulent deposits.   Further, Jean-Pierre agreed to assist in recruiting a lawyer to sign off on opinion letters that he would draft.   Jean-Pierre voluntarily provided an overview of the securities laws in detail, and explained to Sears and the undercover agent "EJ" how to portray themselves to the new company in order to avoid any signs of ownership/control.  Jean-Pierre provided other advice to avoid detection from the regulatory agencies and understood that a shell company would be used to hold a large percentage of Vertifresh shares that Sears and EJ would control and sell once Jean-Pierre drafted the right documents and opinions to remove the restricted legends.  The undercover operation did not pressure defendant Jean-Pierre to do anything more than what he had done with FUSIONPHARM.  Nothing in the undercover operation raised to the level of shocking or outrageous to allow such a variance.

9.  This Honorable Court should reject defendant's argument regarding the costs of incarceration to taxpayers.   As the Court stated in *United States v. Angelos*, 345 F.Supp.2d 1227 (D. Utah 2004), cited by defendant Jean-Pierre, deterrence comes with a cost.  In that case, the requested sentence being asked to impose was 61 years.  Incarceration does cost money, but costs do not justify granting a variance.  Even in the second case defendant Jean-Pierre cited, *United States v. Chavez*, 230 F.3d 1089, 1092 (8th Cir. 2000), Judge Bright concurred with the life sentence but expressed his unsatisfactory views of the guidelines and costs that long periods

of incarceration costs.[2]  Even though the Judge was unhappy with the costs, he still judicially confirmed a life sentence.  The needs to reflect the seriousness of the offense, promote respect for the law, "serve the goas of societal deterrence," and protect the public, outweigh the costs that are associated with incarceration.  *Quoting United States v. Davis*, 537 F.3d at 617.

Also, long term investigations into complex fraud and trials cost a lot of the taxpayers' money.  This investigation took several months to conclude and involved traveling around the country to collect evidence and locate witnesses.  This trial lasted several days and involved several witnesses from out-of-state.  The cost for witnesses to travel, be placed in hotels, provided per diem, payments by the government for daycare and medical care for family members who cannot be left alone, expert costs, and other special trial needs become very expensive.  However, the highest cost comes with the victims of the fraud.  The victims' experience in this case will leave a bad taste in their mouths for a lifetime when it comes to investing money into any market.  The highest cost in this case comes from defendant Jean-Pierre's own family, his niece, that he made a victim and witness in this case.  A price can't be determined for the amount of stress that she must have felt when her professional license was at risk due to her uncle's fraudulent conduct and the frustrations that she went through to clear her name.

10.  Finally, the government disagrees that a five year sentence being requested by defendant Jean-Pierre's lawyers is warranted in this case, let alone a time-served sentence that defendant Jean-Pierre is going to request.  The requested sentences made are a "major deviation and variance" from the advisory guideline range and therefore needs "significant justification*."* *See United States v. Lewis*, 594 F.3d at 1276, *quoting* Colorado District Court Judge Blackburn;

---

[2] Judge Bright might have a new opinion based upon the actions of Congress and the passing of the "First Step Act."

*also see United States v. Musgrave*, 761 F.3d at 609 *citing United States v. Aleo*, 681 F.3d 290, 300 (6th Cir. 2012)(explaining that the greater the variance, the more compelling the justification based on § 3553(a) factors must be). Nothing that defendant Jean-Pierre has argued or objected to in the PSR provide such "significant justification" for such a major deviation.

As stated, the seriousness of security, wire, and mail fraud are serious offenses that deem to warrant long sentences due to the harmful and economic damages it causes victims of the crime. As the Court stated in Musgrave, "there is a general policy favoring incarceration for these [economic] crimes" and that the guidelines support the need for stiffer sentences. *United States v. Musgrave*, 761 F.3d at 609. Further, a guideline sentence will avoid unwarranted disparities among similar situated defendants, especially those that refuse to corporate and continue to engage in criminal behavior. The illicit proceeds are amounting to over $12,000,000. These are losses that innocent investors will never be able to obtain, to include their initial investments. Deterrence, especially of those similarly situated or inclined, and protection of the public can only be effected through lengthy incarceration. Based on all the above arguments, case law, facts of this case and findings of the jury, and arguments made in the government's response to the defendant's objections to the PSR, the government is seeking a guideline sentence in this case.

Dated: August 2nd, 2019

Respectfully submitted,

JASON R. DUNN
United States Attorney

By:     s/Jeremy Sibert
        JEREMY SIBERT
        Assistant United States Attorney
        United States Attorney's Office
        1801 California Street, Suite 1600

Denver, Colorado  80202
Telephone: (303) 454-0100
FAX: (303) 454-0403
E-mail: Jeremy.Sibert@usdoj.gov
Attorney for the United States

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd  day of August, 2019, I electronically filed the foregoing **Government's Reply to a Below-Guideline Sentence** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail address:

**Thomas Goodreid**
**Clifford Barnard**

s/Jeremy Sibert
JEREMY SIBERT
Assistant United States Attorney
United States Attorney's Office
1801 California Street, Suite 1600
Denver, Colorado  80202
Telephone: (303) 454-0100
FAX: (303) 454-0403
E-mail: Jeremy.Sibert@usdoj.gov