UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

Criminal Action No. 17-cr-00008-WJM

UNITED STATES OF AMERICA,

Plaintiff,

v.

1. GUY JEAN-PIERRE,

Defendant

## GOVERNMENT'S RESPONSE TO DEFENDANT'S OBJECTIONS TO THE PSR

The United States of America, by and through its counsel, Jeremy Sibert, hereby respectfully submits this response in reply to the defendant Jean-Pierre's objections to the PSR.

1. The Government's loss calculation is based on the gain that resulted from the security fraud conspiracy since loss cannot be reasonably determined due to the number of FusionPharm investors from March 25, 2011 through May 15, 2014, the dates within the Conspiracy Count. Specific Offense Characteristic 2B1.1(b)(1), applies in this case because there was a loss resulting from the offense conduct. However, that loss reasonably cannot be determined, so the gain that resulted from the offense conduct should instead be used as an alternative measure of loss for the purpose of determining this offense characteristic. See U.S.S.G. Section 2B1.1, comment. (n.3(B)). The gain that resulted from the offense conduct corresponds to the total in proceeds realized from the sale of FUSIONPHARM common stock and debt securities convertible into common stock through Microcap Management, LLC; Bayside Realty Holdings; and Meadpoint Venture Partners,

LLC, which is approximately $12,254,173, greater than $9,500,000 but not more than $25,000,000, which would increase the offense score **20 levels**, pursuant to U.S.S.G. Section 2B1.1(b)(1)(K).

The defense objects to the increase of 20 levels, pursuant to § 2B1.1(b)(1)(K) because defendant Jean-Pierre claims that he was excluded from the conspiracy in 2013. As a result of being excluded in 2013, Jean-Pierre argues that the approximately $10 million of the $12,254,173.00 proceeds were not funds obtained in the scope of any agreement between himself and defendants Sears and Dittman, and that the $10 million was not reasonably foreseeable in connection with criminal activity. Defendant Jean-Pierre offers no case law or evidence from the trial to support this objection. The government disagrees with defendant Jean-Pierre's objections.

The jury convicted defendant Jean-Pierre of Count One, Conspiracy to Commit Security Fraud. The Tenth Circuit states that courts after a trial will not weigh conflicting evidence or second-guess the fact-finding decisions of the jury. *United States v. Summers,* 414 F.3d 1287, 1293 (10th Cir.2005). There being no evidence that defendant Jean-Pierre withdrew from the conspiracy, in which the jury found he was a participant in finding him guilty on count one created a presumption that his participation continued and was sufficient to permit a finding of his guilt on the additional counts. *United States v. Flaharty*, 295 F.3d 182, 201 (2d Cir. 2002). Defendant Jean-Pierre's membership in a conspiracy is presumed to continue until he withdraws from the conspiracy by affirmative action. Withdrawal must be shown by evidence that the defendant acted to defeat or disavow the purposes of the conspiracy. If the defendant produces such evidence, the issue of withdrawal goes to the jury, and the government must then prove beyond a reasonable doubt that the defendant did not withdraw from the conspiracy. *United States v. Urbanik,* 801 F.2d 692, 697 (4th Cir.1986) and *United States v. West*, 877 F.2d 281, 289 (4th Cir. 1989). There was no evidence presented by defendant Jean-Pierre attempting to withdraw from the conspiracy since the issue of withdrawal never went to the jury in this case.

"During the existence of a conspiracy, each member of the conspiracy is legally responsible for the crimes of fellow conspirators." *United States v. Russell,* 963 F.2d 1320, 1322 (10th Cir.1992) (citing *Pinkerton v. United States,* 328 U.S. 640, 646–47 (1946)). "In order to withdraw from a conspiracy an individual must take affirmative action, either by reporting to the authorities or by communicating his intentions to the coconspirators." *United States v. Powell,* 982 F.2d 1422, 1435 (10th Cir.1992). "Mere cessation of one's participation in a conspiracy is insufficient to demonstrate withdrawal." *United States v. Hughes,* 191 F.3d 1317, 1321 (10th Cir.1999). The Tenth Circuit continues to emphasize that a conspirator must do more than simply cease participation in the conspiracy to meet the legal standard for withdrawal *See United States v. Randall*, 661 F.3d 1291, 1294 (10th Cir. 2011).

"In order to withdraw from a conspiracy, a conspirator must attempt to undo the wrong that has been done in one of two ways. First, a coconspirator can give authorities information with sufficient particularity to enable the authorities to take some action to end the conspiracy. "Authorities" does not mean just any government official or entity, but rather an official who has some ability to act on the information given in an attempt to end the conspiracy." *United States v. Randall*, 661 F.3d 1291, 1294–95 (10th Cir. 2011)

"A second way that a conspirator can withdraw from a conspiracy is to communicate his withdrawal directly to his coconspirators in a manner that reasonably and effectively notifies the conspirators that he will no longer be included in the conspiracy[.] Communicating such an intent to coconspirators, however, requires more than implied dissociation. It must be sufficiently clear and delivered to those with authority in the conspiracy such that a jury could conclude that it was reasonably calculated to make the dissociation known to the organization. Simply not spending time with coconspirators is not enough to satisfy this standard." *United States v. Randall*, 661 F.3d 1291, 1295 (10th Cir. 2011)

The burden of establishing the abandonment or withdrawal from the conspiracy is firmly on the defendant, Jean-Pierre. *See United States v. Fox,* 902 F.2d 1508, 1516 (10th Cir.1990); *United States v. Parnell,* 581 F.2d 1374, 1384 (10th Cir.1978); and *United States v. Fishman*, 645 F.3d 1175, 1196-97 (10th Cir. 2011). Defendant Jean-Pierre's membership in the criminal conspiracy was ongoing because he never withdrew. *See Smith v. United States*, 568 U.S. 106, 107 (2013). "[A] defendant's membership in the conspiracy, and his responsibility for its acts, endures even if he is entirely *inactive* after joining it." *Id*. at 114. (***Emphasis Added***) Even if defendant Jean-Pierre had withdrawn, his withdrawal does not exonerate him for his past conduct; it can exonerate him only as to future conduct by his coconspirators. *United States v. Hughes*, 191 F.3d 1317, 1323 (10th Cir. 1999) (citation omitted)

The evidence established at trial proved that defendant Jean-Pierre was a member of the criminal conspiracy throughout the timeframe as indicated in the second superseding indictment and made no efforts to withdraw from that conspiracy. In addition, the defendant fails to meet his burden of establishing withdrawal or abandonment from the conspiracy. More importantly, even if the defense had shown a withdrawal in 2013, Jean-Pierre's conduct in this case, to include drafting, review and submission of documents, demonstrate his ability to foresee that the documents would allow for future actions to further the conspiracy, most notably future stock sales by William Sears. Defendant Jean-Pierre's work for FUSIONPHARM was shown to have started in early 2011. Defendant Jean-Pierre represented FUSIONPHARM with its name change, handled FUSIONPHARM's reverse stock split, assisted in setting up the meeting between Scott Dittman and the lawyer Tod DiTommaso, visited FUSIONPHARM in Denver, CO where meetings were held between himself, William Sears, and Scott Dittman, responded to Finra's investigation on behalf of FUSIONPHARM, drafted two disclosure statements and current information letters for OTC Markets on behalf of the company, and was listed as the Corporate Secretary and Legal

Counsel in the 2011 annual report. In addition, Jean-Pierre drafted the fraudulent and backdated agreement to transfer ownership of Microcap Management from William Sears to Richard Scholz. The agreement was drafted by Jean-Pierre in October 2011 and backdated it to May of 2011.

More importantly, in 2011 when FUSIONPHARM did not have funds and was trying to raise capital, William Sears used a Rule 144 opinion letter drafted by Jean-Pierre forging his nieces name and legal license. The opinion letters allowed William Sears to receive unrestricted FUSIONPHARM shares via his company Microcap, which allowed Sears to trade the shares on OTC markets without the public knowing he was affiliated with FUSIONPHARM. Further, Sears, Dittman, Jean-Pierre, and other co-conspirators fraudulently documented the proceeds from the sale of these shares as revenue or/and loans on the disclosures FUSIONPHARM had to make with OTC Pinksheets.

Defendant Jean Pierre's work for FUSIONPHARM continued in 2012. Jean-Pierre assisted in drafting the documents where FUSIONPHARM entered into a $750,000 licensing agreement with Vertifresh. As part of that agreement, Jean-Pierre sent an email to William Sears with a stock purchase agreement to transfer Robert Dittman, Scott Dittman's brother, 175,480 preferred shares of FUSIONPHARM for 50% ownership of Vertifiresh. In addition, Jean-Pierre conducted a legal review of the Vertifresh licensing agreement sent to him by William Sears and prepared a fraudulent share purchase agreement where Robert Dittman transferred 85,365 preferred shares to Vertifresh. In addition, Jean-Pierre helped prepare and review FUSIONPHARM's quarterly and annual reports, and wrote the corresponding three current information letters, that were posted and relied upon by OTC Markets and investors. These reports made fraudulent representations about FUSIONPHARM to include William Sears' role, related party transactions, revenue and stock control.

Defendant Jean-Pierre met with Cliffe Bodden and William Sears in Florida in May 2012 and January 2013 to discuss the need for additional funds and the sale of FUSIONPHARM stock. During the first meeting, they discussed drafting non-convertible note agreements between FUSIONPHARM and lenders, Bayside and Meadpoint (shell companies both controlled by William Sears). These note agreements were documented and backdated to May, 2011 and December, 2011, and signed shortly after the May, 2012 meeting. These loan agreements were sent via email, with Jean-Pierre copied, to an interested investor. In November, 2012, they discussed changing the non-convertible promissory note agreements into convertible promissory note agreements. The parties agreed that the notes would include the conversion rate of $0.01 per share.[1] After having discussed and reviewed the notes, Jean-Pierre drafted 14 attorney opinion letters that allowed unrestricted shares of FUSIONPHARM stock to be fraudulently sold by entities controlled by Sears. The Meadpoint and Bayside convertible promissory notes allowed Sears the option to convert his loans into over 26 million shares of FUSIONPHARM common stock.[2]

In November 2012, Jean-Pierre reviewed the Bayside convertible promissory note, knowing the William Sears controlled the shell company. Jean-Pierre also knew from the note that Bayside/William Sears was receiving a conversion rate of one cent per share of FUSIONPHARM stock. The shares of FUSIONPHARM stock were trading for approximately $1.40 on November, 21, 2012. Thus, making the one cent per share of FUSIONPHARM stock a massive discount that would raise suspicion for any reasonable person, especially a securities lawyer.

In December 2012, William Sears through Bayside converted $1,400 of the Bayside convertible promissory note into 140,000 unrestricted FUSIONPHARM shares, which are

---

[1] During the 2016 FBI undercover operation, Jean-Pierre stated that a convertible feature in a note agreement needed to be part of the original agreement and could not just be added later on in order to obtain stock.

[2] In November, 2012, FUSIONPHARM's stock was trading at approximately $1.50 making the convertible notes worth about $39,000,000.

deposited into Bayside's Scottsdale account. In order to make this conversion, Jean-Pierre wrote the Rule 144 opinion letter stating that Bayside/William Sears was not an affiliate of FUSIONPHARM and that the holding period of 12 months was met, both of which Jean-Pierre knew were false. In emails from Jean-Pierre to Tod Ditommaso, Jean-Pierre attached the Bayside convertible note that indicated the potential value to Bayside/Sears if all the FUSIONPHARM stock was converted. As a result of this conversion and the Rule 144 letter, Bayside/William Sears sold the 140,000 shares of FUSIONPHARM stock for approximately $75,000.00 in proceeds. Defendant received checks from Bayside signed by Sears as payment for his work.

In March 2013, Jean-Pierre drafted the five opinion letters and five revisions of these letters for the sale of the Bayside note where Bayside/William Sears made $250,000.00 and the five parties (SGI/Starcity/Vera/Mauriello/Black Arch) received unrestricted shares of FUSIONPHARM stock. Notably, these investors paid .40 cents a share, forty times what Sears paid. The opinion letters stated that the holding period of 12 months was met, which Jean-Pierre knew was false since the note was created in November of 2012. The FUSIONPHARM stock should have been restricted requiring the purchasers of the note to hold the stock until the 12 month holding period was met. Jean-Pierre's false opinion letters allowed Bayside/William Sears to sell the note at a premium price to investors since the shares were not restricted. Bayside/William Sears funneled the majority of the $250,000 back into FUSIONPHARM.

In early 2013, Jean-Pierre reviewed the Meadpoint convertible promissory note, knowing the William Sears controlled the shell company. As with the Bayside note, Jean-Pierre knew that William Sears was receiving a very favorable conversion rate of one cent per share of FUSIONPHARM stock. The Meadpoint note gave Sears the ability to convert the note into 8.8 million shares, the equivalent of approximately 8.6 million dollars based on the stock price of FUSIONPHARM on March 1, 2013.

As with the Bayside note, Jean-Pierre wrote the Rule 144 opinion letters when Sears/Dittman needed additional funds and had to convert the false debt into stock regarding the Meadpoint note. On April 12, 2013, Meapoint/Sears converted $4,750 of the note into 475,000 unrestricted shares of FUSIONPHARM stock that was transferred into Sears' Scottsdale account. Jean-Pierre coordinated with Ditommaso, emailed Ditommaso the Rule 144 opinion letter and copy of the Meadpoint note knowing that Sears was an affiliate of FUSIONPHARM and Sears was controlling Meadpoint. The opinion letter falsely stated that Meadpoint was not affiliate now or in the last 90 days an affiliate of company. Further, it falsely stated that the one-year holding period was met.

As a result of the fraud, Sears was able to sell the FUSIONPHARM stock for $117,000.00. In August 15, 2013, Meadpoint/Sears converted $5,000 into 500,000 unrestricted shares of FUSIONPHARM stock, which he sold for $156,000. The majority of these funds were used to pay FUSIONPHARM expenses or were funneled back into FUSIONPHARM. Again, Jean-Pierre falsely hid Sears' affiliation status and lied about the one year holding period in his opinion letter.

In September 2013, Meadpoint enters into a share purchase agreement with Richard Scholz and Myron and Sharryn Thaden to sell each individual 500,000 unrestricted shares of FUSIONPHARM stock for $50,000.00 each. Notably, evidence collected in this case indicates that the portion of the Meadpoint note sold to the Thadens was mainly negotiated by Scott Dittman, rather than William Sears. Based on the documentation provided to the Transfer Agent, the Thadens and Scholz were paying approximately $0.10 per share, much more than what Sears and Dittman arranged for themselves through the notes with the assistance of Jean-Pierre and other co-defendants. However, as the evidence showed at trial, Scholz never paid anything to Sears regarding these shares and instead provided the proceeds from selling the shares back to Sears after taking a percentage for himself. Again, Jean-Pierre falsely states in the opinion letter that there is

8

Meadpoint is not now (or anytime during the last 90 days) an affiliate of FUSIONPHARM and that the one-year holding period was met regarding the note in order to make the shares unrestricted. In return, Sears collected proceeds from the sale of the shares. The Thadens made 3 million dollars on this fraudulent transaction when they sold their shares after marijuana became legal in CO.[3] Furthermore, Jean-Pierre never disclosed or prevented this transaction even though the Thaden's combined one million shares of FUSIONPHARM that they received from the sale would have exceeded 10% of FUSIONPHARM's currently issued and outstanding shares, thus likely making the Thaden's subject to the affiliate rules.

In addition to the above transactions, Jean-Pierre drafted two current information letters for OTC markets on behalf of FUSIONPHARM in 2013.

Under the Supreme Court's decision in *Pinkerton v. United States,* 328 U.S. 640, 646–48 (1946), "a defendant [may be held] responsible for the crimes of his co-conspirators, if those crimes are committed to help advance the conspiracy and are within the reasonably foreseeable scope of the conspiracy." *United States v. Irvin,* 682 F.3d 1254, 1274 (10th Cir. 2012); *see also United States v. Rosalez,* 711 F.3d 1194, 1206 (10th Cir.2013) (discussing *Pinkerton* and noting that the Court "explained the basic notion behind coconspirator liability" in that case). Section 1B1.3(a)(1)(B) of the Guidelines makes clear that a participant in a fraudulent scheme "undertaken by the defendant in concert with others" must be held responsible for "all reasonably foreseeable acts and omissions in furtherance of the jointly undertaken criminal activity." This is true regardless of a defendant's direct participation in a specific transaction. *United States v. Sells,* 541 F.3d 1227, 1234 (10th Cir. 2008).

---

[3] The PSR did not address the profit that the Thadens made due to the purchase of FUSIONPHARM shares, which should be included in the "loss" calculations.

As noted, the evidence supports the reasonable inference that defendant Jean-Pierre was an active member of the fraudulent pump-and-dump security conspiracy. His knowledge of the convertible promissory notes, how Sears and Dittman were using the notes to sell shares of FUSIONPHARM stock in order to put the proceeds of the sale of the shares back into FUSIONPHARM, his drafting of the opinion letters required to remove the restrictions, and knowing the amount of shares that were controlled by Sears through his shell entities, it was reasonably foreseeable that Sears and Dittman would continue to sell FUSIONPHARM shares acquired through the convertible promissory notes that Jean-Pierre help create, reviewed, and acted on. Scott Dittman testified that Jean-Pierre knew that the money from the sale of FUSIONPHARM shares associated with the notes was coming back to FUSIONPHARM.

At the end of the conspiracy, 4,065,314 million shares of FUSIONPHARM were sold, netting an $12,254,173 million in proceeds. Meadpoint netted $10,338,925 in net proceeds, plus the 3 million that the Thadens made selling the FUSIONPHARM stock they received in a fraudulent sale. Microcap netted $1,590,118, Bayside netted $325,128.73, and William Sears netted $7,869 as a result of fraudulent sales of FUSIONPHARM stock. During the conspiracy, Jean-Pierre knew that William Sears was an undisclosed affiliate of FUSIONPHARM. He met with co-conspirators to discuss the creation of documents/notes that would allow FUSIONPHARM to collect proceeds through fraudulently selling shares of FUSIONPHARM stock. Jean-Pierre reviewed the notes that provided William Sears very favorable conditions in order to convert "debt" into "stock" so that Sears could sell FUSIONPHARM stock without the public's knowledge that he was associated to FUSIONPHARM. Transfer agents and brokers required opinion letters signed by a licensed attorney in order to remove restrictive legends or issue stock as free trading stock in the transactions discussed above. Jean Pierre used his expertise and experience in securities law to

assist William Sears in concealing his true role with FUSIONPHARM in order to allow Sears access to a massive amount of unrestricted FUSIONPHARM stock.

At no time in this conspiracy, did Jean-Pierre report any of this fraudulent conduct to the appropriate authorities. In fact, one could argue that Jean Pierre did the opposite by avoiding service regarding the SEC and the Florida State Bar. Furthermore, Jean-Pierre never notified his co-conspirators that he was withdrawing from the conspiracy. Dittman testified that Jean-Pierre was still with FUSIONPHARM in 2013. More so, Jean-Pierre is responsible for his acts and any withdrawal does not exonerate him from his work that he did on behalf of FUSIONPHARM, which in this case included the Meadpoint and Bayside notes that resulted in millions of net proceeds. "[T]he Government contends that any question of whether Mr. Jean-Pierre withdrew from the conspiracy early enough to avoid liability is a factual matter for resolution by the jury." United States v. Simms, 15-CR-00080-MSK-GPG, 2015 WL 5210659, at *2 (D. Colo. Sept. 8, 2015). In this case, the jury found Jean-Pierre to be guilty of a security conspiracy with William Sears and Scott Dittman that ran from March 25, 2011 through May 15, 2014.

2. Defendant next argues that his guidelines should not be increased by 2 levels because the "means" that he employed did not rise to the level to qualify as "sophisticated means" pursuant to §2B1.1(b)(10)(c). Again, defendant Jean-Pierre offers no facts, evidence, or case to support his position in objecting to this two level increase.

U.S.S.G. § 2B1.1(b)(10)(C) refers "Sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense," and ordinarily includes "[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts." Id. § 2B1.1, comment. (n.9(B)). "The Guidelines do not require every step of the defendant's scheme to be particularly sophisticated; rather, as made clear by the Guidelines' commentary, the enhancement applies when

the execution or concealment of a scheme, viewed as a whole, is 'especially complex or especially intricate.'" *United States v. Weiss*, 630 F.3d 1263, 1279 (10th Cir. 2010); *see also United States v. Jenkins–Watts*, 574 F.3d 950, 962 (8th Cir.2009) ("Even if any single step is not complicated, repetitive and coordinated conduct can amount to a sophisticated scheme"). The Guidelines prescribe the "sophisticated means" adjustment based on the offense conduct as a whole, not simply the defendant's own personal conduct in perpetrating the offense. *See United States v. Barrington*, 648 F.3d 1178, 1199 (11th Cir. 2011).

In *United States v. McKye*, 638 Fed. Appx. 680 (10th Cir. 2015), cert. denied, 2016 WL 2840457 (U.S. 2016), the Tenth Circuit upheld the District Court applying two-level sentencing enhancement for use of sophisticated means to defendant's sentence for securities fraud, where defendant ran his scheme undetected for five years, used multiple entities to coordinate the fraud, and used newspaper and television ads to attract more investors, and induced individuals to invest in his scheme by deceiving them into believing their investments were collateralized by real property. The crime and means of committing the crime in *McKye* are similar to the means used in this case.

Like in *McKye*, Jean-Pierre, along with co-conspirators Sears and Dittman, used multiple entities to coordinate the securities fraud, assisted in drafting fraudulent press releases, and disclosed fraudulent information, specifically pertaining to their revenue, to OTC Markets, the forum for the public to receive information about microcap companies. They also used a licensed lawyer, not banned to write opinion letters, review fraudulent documents without his knowledge and pay him to place his letterhead and signature on the opinion letters. Jean-Pierre even changed his name to Marcelo Dominguez de Guerra. In addition, this securities fraud went undetected for approximately four years and the undercover operation displayed that defendant Jean-Pierre was willing to continue engaging in securities fraud. Many other circuits have upheld the two-level

sentencing enhancement when securities fraud was committed and various layers of fraud was involved. *See United States v. Regensberg*, 381 Fed.Appx. 60 (2nd Cir. 2010), 210 WL 2501042; *United States v. Bollin*, 73 Fed.Appx. 316, (9th Cir. 2003), 2003 WL 21995421; *United States v. Brennan*, 562 Fed.Appx. 914 (11th Cir. 2014), 2014 WL 1394654; and *United States v. Altomare*, 673 Fed.Appx. 956 (11th Cir. 2016), 2016 WL 7404668.

In this case, defendant Jean-Pierre prepared large numbers of false legal documents and sent them to William Sears to be forwarded to the transfer agents and brokers in order to free up shares of FUSIONPHARM stock for William Sears.  Evidence gathered in the investigation indicated that Jean-Pierre, Sears and Dittman conspired, among others, to conceal Sears' role and involvement in the management and operation of FUSIONPHARM, as well as his beneficial ownership of a significant portion of its stock, from securities regulators and the investing public. They created a scheme to fabricate revenues for FUSIONPHARM, so that they could portray the company as enjoying progressive and consistent growth.  FUSIONPHARM posted a total of approximately $1,659,690 in revenue from 2011 through 2013.  The majority of these funds came in from Sears' sale of FUSIONPHARM stock.  These deals were described in the FUSIONPHARM financial statements, that were reviewed by Jean-Pierre, as PharmPod sales and licensing agreements between FUSIONPHARM and entities controlled by William Sears.  Dittman, Sears, and Jean-Pierre never disclosed Dittman's and Sears' familial relationship, Sears' role with FUSIONPHARM, or his control of a massive amount of FUSIONPHARM stock.  In addition, Sears criminal history was never disclosed.  As stated in Jean-Pierre's trial by the government's expert and employees of OTC Markets, Jean-Pierre had a duty to disclose this information. Bayside Realty was supposedly owned by Sears' mother, Sandra Sears, Microcap was alleged to have been sold to Richard Scholz for ten dollars.

As stated before, in late 2012 and early 2013, Sears and Dittman funneled FUSIONPHARM shares to Meadpoint and Bayside Realty by falsely portraying the entities as lenders to FUSIONPHARM who held promissory notes that were convertible, at the election of the lender, into FUSIONPHARM common stock. Defendant Jean-Pierre discussed with Sears and Cliff Boden a plan to create convertible notes from non-convertible notes in order to make money. Jean-Pierre, Dittman, and Sears, falsely depicted the sale proceeds from sale of FusionPharm stock by Sears as loan deposits from Sears' entities into FusionPharm bank accounts. Further, Jean-Pierre reviewed these notes on several occasions when drafting Rule 144 opinion letters. Sears and Dittman submitted to FUSIONPHARM's transfer agent the Rule 144 opinion letters, drafted by Jean-Pierre and signed by DiTommaso that falsely represented and depicted the entities controlled by Sears as not being affiliates of FUSIONPHARM. They concealed from the transfer agent Sears' role and involvement in FUSIONPHARM and his connections to and control of the shell entity, Bayside. These documents, together with Rule 144 attorney opinion letters, convinced the transfer agent to remove the restrictive legend on the stock and allowed the brokers to publically sell the stock.

3. Next the defendant objects to no reduction being made for his role in the offense and believes that his offense should be decreased by 2 levels because he was a minor participant in the offense under § 3B1.2 of the Guidelines. Application Note 3 states who is accountable under the relevant conduct section for a loss amount (in this case gain amount due to the number of victims) that greatly exceeds the defendant's personal gain from a fraud offense, may receive an adjustment under this guideline. In determining whether a defendant is a minor-participant the District Court must "focus upon the defendant's knowledge or lack thereof concerning the scope and structure of the enterprise and of the activities of others involved in the offense." *United States v. Calderon-Porras,* 911 F.2d 421, 423 (10th Cir.1990). The Tenth Circuit further provides guidance in *United States v. Barron*, 97 Fed.Appx. 840, 843 (10th Cir. 2004), 2004 WL 1059822, "[t]he determination

14

whether to apply [U.S.S.G. § 3B1.2] ... involves a determination that is heavily dependent upon the facts of the particular case.... [T]he court, in weighing the totality of the circumstances, is not required to find, based solely on the defendant's bare assertion, that such a role adjustment is warranted." U.S.S.G. § 3B1.2, Application Note 3(C).

In this case, defendant Jean-Pierre was not a minor participant.  Defendant Jean-Pierre was far more experienced in securities law than co-defendants Sears and Dittman.  Defendant Jean-Pierre graduated from Columbia Law School and worked in the corporate finance department of a national law firm doing buyouts and mergers, financial transactions, and participated in public offerings of debt and equity issues.    He was a member of the California, New York, and Florida Bar.  After working for  the Federal Deposit Insurance Corporation, Jean-Pierre began his law practice and also taught business law and ethics.   Jean-Pierre had a vast background and over 20 years of experience in securities and public/private offerings.  Jean-Pierre had the experience, sophistication, and training to know right from wrong in the context of this case.

Jean Pierre's conduct also was significantly more egregious due to being a licensed professional. He wrote more opinion letters and understood how these letters furthered the scheme. Despite being warned and then banned by OTC Markets, he continued to post false opinion letters by using a non-banned attorneys letterheads and signatures.  He falsified his own niece's signature for some of the opinion letters, causing her to answer to the Texas and California Bar.  He did all this with a complete understanding of securities laws and regulations.   The government acknowledges that Jean-Pierre made less in proceeds than Sears and Dittman, but his options to continue practicing in securities law were limited due to his ban from OTC Markets and a Florida Bar complaint that eventually caused him to be disbarred and sued by the SEC.   Both Sears and Dittman knew of Jean-Pierre's legal troubles before hiring him at FUSIONPHARM.  Dittman went as far as writing a letter of support for Jean-Pierre to the Florida State Bar before he began any

work. Sears and Dittman sought out Jean-Pierre to provide legal services because he was less expensive and helped them to circumvent securities laws. Jean-Pierre made the choice to assist in the fraudulent conduct and receive funds. But for all of the ways Jean-Pierre assisted, committed, and hid the securities fraud in this case, as stated above, the government's view is that the one mitigating factor of receiving less money for his substantial role in the fraudulent scheme does not remove this case from the heartland of the Guidelines. Defendant Jean-Pierre based on the totality of circumstances and the facts of this case should be denied a minor participant role.

Dated: August 2nd, 2019

Respectfully submitted,

JASON R. DUNN
United States Attorney

By: s/Jeremy Sibert
JEREMY SIBERT
Assistant United States Attorney
United States Attorney's Office
1801 California Street, Suite 1600
Denver, Colorado  80202
Telephone: (303) 454-0100
FAX: (303) 454-0403
E-mail: Jeremy.Sibert@usdoj.gov
Attorney for the United States

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of August, 2019, I electronically filed the foregoing **Government's Reply to Defendant's Objections to PSR** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail address:

**Thomas Goodreid**
**Clifford Barnard**

s/Jeremy Sibert
JEREMY SIBERT
Assistant United States Attorney
United States Attorney's Office
1801 California Street, Suite 1600

Denver, Colorado 80202
Telephone: (303) 454-0100
FAX: (303) 454-0403
E-mail: Jeremy.Sibert@usdoj.gov