IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Criminal Action No. 17-cr-0008-WJM

UNITED STATES OF AMERICA,

Plaintiff,

vs.

GUY JEAN-PIERRE a/k/a Marcelo Dominguez de Guerra,

Defendant.

------------------------------------------------------------

REPORTER'S TRANSCRIPT
(Jury Trial, Day 1)
Volume I

------------------------------------------------------------

Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

Judge, United States District Court for the District of

Colorado, commencing at 3:02 p.m., on the 14th day of

January, 2019, in Courtroom A801, United States Courthouse,

Denver, Colorado.

APPEARANCES

JEREMY S. SIBERT and ROBERT M. BROWN, Assistant U.S.
Attorneys, 1801 California Street, Suite 1600, Denver,
Colorado 80202, appearing for the plaintiff.

CLIFFORD J. BARNARD, Attorney at Law, 4450 Arapahoe
Avenue, Suite 100, Boulder, Colorado 80303, AND
THOMAS E. GOODREID, Attorney at Law, 1801 Broadway,
Suite 1400, Denver, Colorado 80202, appearing for the
defendant.

MARY J. GEORGE, FCRR, CRR, RMR
901 19th Street, Denver, Colorado 80294
Proceedings Reported by Mechanical Stenography
Transcription Produced via Computer

```
 1                    P R O C E E D I N G S

 2         (Proceedings were held in open court outside the

 3     presence of the jury at 3:02 p.m.)

 4         (Recess 3:02 p.m. to 3:28 p.m.)

 5         THE COURT:  All right.  We'll wait for all the

 6     jurors to have a notepad.  Does everybody have a notepad?

 7     All right.

 8             Now, with the monitors, obviously they're up now in

 9     an upright position for you to use -- or to view while they

10     are being used by the attorneys during the trial.  It will

11     be much easier for you when you exit and enter the rows,

12     obviously, to put them back down, and then you don't have to

13     shimmy around the monitors.

14             All right.  Opening statement for the Government.

15             MR. SIBERT:  Yes, Your Honor.  Thank you.

16             THE COURT:  All right.  Mr. Sibert, you have 40

17     minutes.

18             MR. SIBERT:  May it please the Court, counsel,

19     ladies and gentlemen of the jury.

20             Confidence.  The market confidence.  When the

21     market confidence is high, the markets are up.  When market

22     confidence is down, the markets drop.  It doesn't matter

23     what markets we're talking about:  New York Stock Exchange,

24     NASDAQ or, in this case, what's better known as the

25     microcap, penny stocks, over-the-counter markets, where
```

stocks are traded for usually under a dollar.  And
confidence is important, and it's based upon a lot of
factors.  And one of these factors for markets to go up or
down is trust; it doesn't matter what size the company is,
it doesn't matter if it's Amazon or a one-person company.
Markets require companies to post things to the public,
things to the investors.  They have to post disclosures,
quarterly, annually, about their directors, about their
officers, about their legal issues, about their finances.
And those postings that the markets require have to be
honest.  You can't hide it, you can't be untruthful, you
can't conceal it.

Each company is responsible for telling the market
what that company is doing in the situation within the
company.  And that's the trust because that's what drives
investments.  That's what people rely on to invest their
money into a company that they think is doing well or could
do well in the future.  It doesn't matter if we're talking
about multi-billion dollar hedge funds that are ran by
brokers in New York City at the feet of the Wall Street, or
if we're talking about the small-town investor on
Main Street of America who's looking at a company that might
have some potential, that might be the next Pier 1, that
might be the next Monster Energy drink.

That trust, those disclosures, that's what's

1   important.  That drives the companies.  It's the central

2   part of the economy.  And when that trust is violated and

3   investors are misled and the brokers who are able to take

4   the stock and take it out and sell it based upon

5   untrustworthy information, or information that was concealed

6   or hidden, investors get hurt and security laws are

7   violated.

8           And those people that cause that dishonesty, those

9   false reports, they have to be held responsible criminally.

10  And that's what this case is about because we need to

11  protect the investors and we need to protect that factor of

12  trust because it's a central fabric that holds our economy

13  together.

14          And Mr. Guy Jean-Pierre is one of those people that

15  need to be held liable for misleading the public, for hiding

16  facts about a company called FusionPharm.  Mr. Guy

17  Jean-Pierre is a very well-educated lawyer from Columbia Law

18  School and worked in the '80s and '90s at some of the top

19  investment banking firms in New York City.  He's had decades

20  of experience in securities law.

21          And in this case, he misled the public with the

22  codefendant in the case, Mr. William Sears, on a company

23  called FusionPharm that was traded on the microcap markets,

24  over-the-counter markets, under Pink Sheets, as they're

25  known, and he misled the public by covering up a FINRA

1    investigation, by falsifying information, what's called

2    opinion legal letters, the letter that has to be written by

3    the corporate lawyers that go to the over-the-counter

4    markets to disclose what is going on in the firm that's

5    posted on the website so the public can view it.

6            And, in addition, they are responsible for writing

7    what's called Rule 144 exception letters.  Essentially

8    telling the transfer companies, the companies that take a

9    certificate in someone's name and transfers it into another

10   name so the broker can take that certificate and trade it,

11   saying the stocks are free and clear of restriction; no one

12   taking this stock is an affiliate or in control of this

13   company or is an insurer or has a relationship with the

14   insurer, the company that's issuing the stock.  And he

15   misled the public by writing 144 letters that the brokers by

16   law rely on to get free trading shares.

17           Can I please have the monitor.

18           So as I stated:  What is this case about?  It's

19   about a banned lawyer, Mr. Guy Jean-Pierre, banned from the

20   over-the-counter markets working with codefendant, and

21   controlling an affiliate of FusionPharm that was not

22   disclosed to the public.

23           As I just stated, Mr. Guy Jean-Pierre was a

24   securities lawyer.  He worked in the field of securities,

25   was banned from the over-the-counter markets from writing

1    any of these letters, and knew that William Sears had a
2    controlling role, a partner in FusionPharm.  He knew Mr.
3    William Sears, the codefendant, from before 2011, before he
4    started working with him with FusionPharm.  And Mr. William
5    Sears is a control owner.  He was a partner with his
6    brother-in-law in FusionPharms.

7         He has a prior security conviction for committing
8    security fraud, and the main thing, he was undisclosed.  The
9    public had no knowledge, it didn't have any knowledge at all
10   that Mr. Sears was part of this company, FusionPharm.

11        As I stated, FusionPharm partner, Mr. William
12   Sears, as I just explained, married Scott Dittman's sister,
13   and began a business with his brother-in-law, Scott Dittman.
14   Scott Dittman has -- is a CPA, but doesn't practice anymore.
15   Mr. Sears was the power behind FusionPharm.  In fact, his
16   own words, when he was asked in an undercover operation,
17   "What is your control of FusionPharm?"

18        "I'm the hand up Mona Lisa's skirt."

19        How did FusionPharm begin?  They acquired a company
20   called Baby Bee Bright that was trading on the
21   over-the-counter markets.  They acquired this company
22   because they don't have to go ahead and do a re-registration
23   of a business.  They take over what's called, essentially, a
24   shell business.  This business Baby Bee Bright had no value.
25   And Mr. Sears convinced a gentleman named Fred Dahlman to go

1    ahead and basically hand over the company.

2         Both, when that happened, received a lot of shares.

3    1.5 million, approximately, shares of Baby Bee Bright, which

4    became FusionPharm after they did a name change.  1.3 stayed

5    in Scott Dittman's name, about 1 point -- well, 185,000

6    preferred shares -- we're going to talk about preferred and

7    common shares and I will be explaining to you the preferred

8    shares are what really control the company.  That stayed

9    under entities that were controlled by William Sears.

10        So it was a way to get a lot of shares.  And unlike

11   a major corporation, penny stock shares, there's thousands

12   of them that they trade, because they're only worth so much.

13        So what happens is they create FusionPharm, and

14   it's the business.  It's a business to take cargo containers

15   and convert them into inside-drone pods for either marijuana

16   or lettuce.  This case is not about marijuana.  This case is

17   about securities fraud, wire fraud, and mail fraud.

18        The business was located in Denver, and then later

19   on in Commerce City.

20        What are over-the-counter markets?  Like I said,

21   over-the-counter markets is essentially the platform for

22   penny stocks.  A way for the small guy to raise capital.  A

23   way for an individual that isn't Bill Gates or isn't Apple,

24   or isn't a large corporation that already has a ton of

25   capital.  It's a way for someone that has a good plan, a

1  business plan, to be able to raise capital and try to get

2  investors to build capital, and over-the-counter markets is

3  that platform.

4  It provides a way that individual investors can get

5  information, can make it efficient, can be informed.  They

6  have various levels.  OX being the best, OB being the

7  middle, pink being the least.  The least amount of stuff you

8  have to disclose.  But you're still required to make honest

9  disclosures.  Just a higher risk.

10  So FusionPharm, based upon their filings with OTH

11  and their registration with OTH, had to make annual and

12  quarterly reports.  These are what's called disclosures.

13  You're going to here this word over and over and over again.

14  That's the information that has to be honest, trustworthy,

15  so the public can go on to the OTC website and read about

16  companies and make an informed decision.

17  Most importantly, you're going to hear from someone

18  from OTC, over-the-counter markets.  They're going to talk

19  about the critical role that the in-house, or hired, lawyers

20  that they rely on, the information they provide in these

21  letters.  It's important because the information that

22  they're saying is correct and honest is what the public's

23  going to rely.

24  The investing -- it says it right here, and this is

25  right from their manual:  The investing public must be able

1    to rely on the integrity, the honesty, the truthfulness, of

2    all in-house and retained lawyers who represent issues.

3    Integrity, honesty, truthfulness.  The opposite of hiding,

4    dishonesty, untruthfulness.

5         So what does that have to do with defendant Guy

6    Jean-Pierre?  Securities fraud, mail, and wire fraud.

7    Ladies and gentlemen, as I stated, you heard a little bit

8    about FusionPharm.  I have to explain to you the facts about

9    FusionPharm, William Sears, Scott Dittman, to have you

10   understand that there was this hidden disclosure of the

11   owner, William Sears; his controlling role, his affiliation,

12   because that is important when it comes to the law.  If

13   someone's an affiliate, a control person, they must be

14   disclosed.

15        So I'm going to explain to you the historical case.

16   Then, along the way, we'll talk about defendant Jean-Pierre

17   and the role that he had with the company and what he did.

18        How are we going to do this?  You're going to hear

19   from numerous witnesses.  You're going to see a ton of

20   evidence.  You're going to see documents, e-mails, messages,

21   transfer agents' paperwork, the paperwork from the company

22   that rely on these letters, the brokerage accounts that

23   relied on Mr. Guy Jean-Pierre's letters.

24        I'm going to warn you right now, some of it is long

25   and dry.  It's 11 days, it's a lot of evidence.  But there's

1    29 counts to this indictment and we have to put in this

2    evidence to meet our burden as the judge explained.

3           But at the end, at the end, I'm going to argue to

4    you that we had proved that William Sears had an affiliation

5    with FusionPharm that was not disclosed to the public and it

6    was Mr. Guy Jean-Pierre, the lawyer, who facilitated --

7    facilitated hiding that from the public through these Rule

8    144 letters and these current information letters, and legal

9    documents.  And he even worked around his own man.

10          But he knew who was in control.  He had a duty to

11   disclose and he chose to commit and -- violate the security

12   laws, and in the aspect of doing that, he also committed

13   wire fraud and mail fraud.

14          Let's talk about some of the examples of control of

15   William Sears.  How do we know that Sears was in control of

16   FusionPharm?  This is what you're going to see.  You're

17   going to see that William Sears was the main point of

18   contact.

19          On two occasions he went to Florida to meet with

20   Mr. Guy Jean-Pierre at his law firm.  Not with the

21   president, CEO, Scott Dittman but along with the financial

22   guy, Cliffe Bodden, and William Sears.

23          Then you're going to see that Mr. William Sears and

24   Guy Jean-Pierre communicated a lot through e-mail.  E-mail

25   has taken over phones, so we're going to introduce a ton of

1    e-mails.  But those e-mails show that it's Guy Jean-Pierre

2    and William Sears communicating three times the amount than

3    Scott Dittman.

4         And let's talk about the most important thing.  Who

5    pays Guy Jean-Pierre for his work?  Well, the checks are all

6    made, most of them, by affiliates of Mr. Sears that

7    controls, or William Sears, himself.  And as you can see in

8    this screen as I pop up some checks, on the top corner, you

9    have FusionPharm, you have to Guy Jean-Pierre, you have

10   William Sears, $2,000.

11        There's another one.  FusionPharm, William Sears,

12   Guy Jean-Pierre.  Here's three.  We'll show you more.

13        The bank account, Wells Fargo.  Look at the number.

14   Remember Wells Fargo.  Remember the check FusionPharm.

15        E-mails, like I said, communications, July 2011.

16   Mr. Sears is e-mailing Guy Jean-Pierre about the

17   corporation, about setting up the corporation and the type

18   of corporation that's going to happen.  On the left they're

19   talking about what type of public corporation they want.

20        The substance isn't important.  What is important

21   right here is who's sending the e-mail, who's receiving the

22   e-mail and what the e-mail's about.  It's William Sears

23   talking about FusionPharm, not Scott Dittman.  Again, second

24   e-mail, William Sears to Guy Jean-Pierre.  Signed by William

25   Sears.  Talking about, "Can you do some registrations for us

1   in these states?"

2          Entities that are set up by Mr. William Sears,

3   controlled by Sears, to be able to sell FusionPharm stock.

4          Why is this important?  Well, when you set up a

5   business like I just said, you need capital, you need money.

6   You need money to run a warehouse, you need a money to pay

7   employees, you need money to go ahead and rent more space,

8   office space.  You need money to pay the corporate's lawyer.

9   You need money to pay yourself as the owner, William Sears.

10          So what FusionPharm did in 2011 was Mr. Sears set

11   up these entities.  First one I'm going to talk about is

12   Bayside.  Who's the owner of Bayside?  Sandra Sears.  Do you

13   know who Sandra Sears is?  His mother.  All right.  Shell

14   corporation.  The only thing that they do is they exist on

15   paper.  9.74 percent of FusionPharm's stock was in that

16   company at the end of 2011.  Sears, through Bayside, was

17   paying Mr. Guy Jean-Pierre for his work at FusionPharm,

18   showing controlling ownership.

19          Other corporations that you're going to hear

20   throughout the course of this trial that Mr. Sears ran,

21   MicroCap Management, Vertifresh, and Meadpoint Venture

22   Partners.  You know who knew all this?  Mr. Guy Jean-Pierre.

23          All right.  So what's Mr. Guy Jean-Pierre's

24   criminal activity in this case?  That's why we're here.  He

25   helped hide the untruthfulness of Sears' role and his

1   affiliation with FusionPharm.  And the big three categories:

2   the FINRA investigation, OTC market legal opinion letters,

3   and the attorney Rule 144 opinion letters.

4           Let's talk about the knowledge.  How does Guy

5   Jean-Pierre know?  He might not know now but he knew then.

6   He knows because he worked with Sears before.  He helped

7   with Baby Bee Bright, the company that they took over.

8   2011, early 2011, Sears and Guy Jean-Pierre worked on

9   setting up FusionPharm with FINRA, with changing the name

10  from Baby Bee Bright to FusionPharm.  Also Mr. Guy

11  Jean-Pierre helped with the fact they did a reverse stock

12  split.  We'll talk about what that is in a minute, but

13  basically you have common shares.  It went from one to

14  two -- it went from -- if you had 200 shares, it went down

15  to 1.  The control went back to Sears.  And none of the

16  first shares were touched, so anyone that had shares in the

17  public got their power -- they lost their power.  He helped

18  do that.

19          October 2011, Mr. Guy Jean-Pierre comes down and

20  visits FusionPharm here in Denver from Florida.  This is not

21  Amazon where we have 50,000 employees.  Scott Dittman,

22  William Sears, Cliffe Bodden, a guy named Mr. Duke, Ms.

23  Blume, and the corporate lawyer, essentially.  At the most

24  in this whole period from 2011 to 2014, maybe 12 people.

25          When you come visit a corporation that size, you

1    know what you know?  You know Sears is running the company.

2    You know he needs to be disclosed.

3         Annual report.  The report that's listed to OTC,

4    over-the-counter markets, to the public.  What is Mr. Guy

5    Jean-Pierre listed as?  Corporate secretary/legal counsel.

6    Mr. Sears and Mr. Dittman spoke often to Guy Jean-Pierre.

7         FINRA.  When you turn on the lights, you know what

8    happens if you have cockroaches?  They scatter.  FINRA

9    inquiry was a turn-on-the-light moment for FusionPharm stock

10   and FusionPharm's owners, Mr. Sears and Mr. Dittman.  FINRA

11   is the investigating agency for small companies.  They come

12   in, they notice there's trading going on with FusionPharm

13   stock in 2011 from a corporation named MicroCap.  Remember,

14   I said MicroCap was whose entity?  William Sears'.

15        So then they contact FusionPharm in October 2011

16   and they speak to Scott Dittman to inquire about William

17   Sears, the brother-in-law's, affiliation with FusionPharm

18   and stock.  Who do they call? Mr. Guy Jean-Pierre.  We have

19   an investigation going on by FINRA, we need legal.  What do

20   we do?

21        Two weeks later, Guy Jean-Pierre drafts the

22   paperwork to get MicroCap out of the name of William Sears

23   and put it into the hands of a gentleman named Richard

24   Scholz for the going price of $10.  The lights came on, the

25   cockroaches scatter.

1          Guy Jean-Pierre responds to FINRA and says, Sears

2     is a prior owner of MicroCap.  Prior owner.  Sold it for

3     $10.  Has nothing to do with it.

4          Follow the money, ladies and gentlemen.  Follow the

5     money.  Guy Jean-Pierre gets paid by MicroCap, signed by

6     who?  William Sears.  If you don't own the company, you're

7     not writing the checks.

8          Drafting of legal letters.  As I stated, he drafted

9     several opinion letters for the over-the-counter markets for

10    the public viewing.  Also the 144 attorney letters that go

11    to the transfer agents.  Those are the people that change

12    and look at the certificates to make sure it could be taken

13    to the brokers and that they're free and they're not

14    restricted to be traded.

15         The brokers in this case are going to be

16    Oppenheimer and Scottsdale.  They rely on these letters to

17    make sure there's no restrictions on the stock.  What Mr.

18    Guy Jean-Pierre did, he conspired to do, was that he

19    wrongfully stated that the shareholder -- in this case the

20    shareholder's going to be William Sears, or an entity that

21    William Sears controls -- held that stock for one year and

22    was not an affiliate or control person of the issuer, the

23    company, FusionPharm.

24         He works around the ban.  Like I said, he was

25    banned from over-the-counter markets and the transfer agents

1    from accepting these letters in 2010.  They wouldn't take

2    his letters anymore.  So what does he do?  He forges a Rule

3    144 letter with his niece's signature on his company's --

4    his legal company's letterhead.  His own niece's signature.

5    You're going to hear from her.

6         And that allowed MicroCap's stock to be traded free

7    of restrictions because it said Mr. Sears was not an

8    affiliate of FusionPharm.  So he got around that one by

9    forging his niece's signature.

10         Then he used the California lawyer named Mr. Tod

11    DiTommaso from 2010 to basically sign the letters with his

12    letterhead on it.  So, here's Mr. Tod DiTommaso.  You're

13    going to hear from him.  And, according to Mr. DiTommaso,

14    around July 2011, FusionPharm, Mr. Guy Jean-Pierre, the

15    corporate legal counsel for that firm, ghost-written

16    letters -- ghost-writed the legal opinion letters for the

17    over-the-counter that gets to the public and the Rule 144

18    letters, the information to the brokers, he used to be able

19    to freely trade the shares saying that there's no

20    affiliation.  He drafts those letters and sends them to Mr.

21    Todd DiTommaso.  Mr. Todd DiTommaso basically puts his

22    letterhead on there and signs them.

23         You're going to get copies of both letters that

24    were sent from Mr. Guy Jean-Pierre and the letters that are

25    signed by Mr. DiTommaso.  Look at them.  There's no

1    substantial differences.  As I stated, he became involved

2    with FusionPharm in 2011.

3          So how did this work?  Mr. Guy Jean-Pierre would

4    draft all the letters, he would send them to Mr. DiTommaso.

5    Mr. DiTommaso received them in e-mail, he would make his

6    letterhead changes and sign.  Over 20 attorney letters were

7    drafted and signed this way.

8          Let's talk about the money again.  Money is what

9    drives the show.  Guy Jean-Pierre got paid $500 per letter

10   from FusionPharm.  Mr. Tod DiTommaso got less than 50

11   percent of that.  He got paid $150 to $175.

12         In the undercover operation that was ran in 2016,

13   Mr. Guy Jean-Pierre's own words, "Mr. Tod DiTommaso doesn't

14   do a lot of double-checking.  He is cool."

15         Untruthful disclosures to the public.  The

16   importance of the case, why we bring these cases:  they're

17   to protect the investors.

18         The legal opinion letters.  Jean-Pierre drafted the

19   OTC markets and legal opinion letters and sent those

20   documents and the required documents that a lawyer needs to

21   review to Mr. Tod DiTommaso, just like the Rule 144 letters.

22   He stated the following:  There are certain requirements

23   that have to be made.  And he said that the financials were

24   reviewed and correct.

25         So every quarter and every year they had to look at

1    the financials of the company and they had to send a letter

2    saying, "These are right."

3            That information was discussed with the management

4    and directors of the company.  That's two people in this

5    case:  Sears and Dittman.

6            You're going to hear from Tod DiTommaso.  He met

7    with Scott Dittman for about 15 minutes one time in

8    California.  Everything else was sent to him by Guy

9    Jean-Pierre.

10           And that there was accurate and current information

11   within the filings and the letters.  That's not true because

12   Sears was never disclosed -- William Sears was never

13   disclosed as being a beneficial owner of FusionPharm, a

14   controlling person, an affiliate, or that he was a related

15   party to these transactions, i.e., Bayside, MicroCap,

16   Meadpoint, Vertifresh.  Nothing in the paperwork going to

17   the over-the-counter markets.  Sears' conviction was

18   missing.  That's required, and at least seven current

19   information legal letters were drafted.  But they needed

20   more money.

21           In 2011, they made about $500,000 by selling shares

22   of stock in FusionPharm.  In 2011-2012 they met with an

23   investor up in New York.  His name was Nick Maloney.  Nick

24   was interested in buying a note, a loan.  He wanted to see

25   what was going on with the company before he invested.  He

1    wanted due diligence.  Guy Jean-Pierre met with Sears and

2    Cliffe Bodden to discuss this process.  The loans from

3    Meadpoint and Bayside in 2011 were nonconvertible.  They

4    were a long-term line of debt.  88,000 for Meadpoint,

5    176,000 for Bayside.  There was no convertible option, which

6    means, in the world of stock, if you take a note or you give

7    a loan, sometimes the people who help fund a company can get

8    stocks in return of getting paid back.  No convertible

9    option in 2012 when Nick Maloney was doing his due diligence

10   for Meadpoint and Bayside.  All the money came from

11   MicroCap.  The sale of money, the sale of stock from

12   Microcap came to fund this.

13          The deal falls through.  He can't prove.  So what

14   happens?  2012.  FusionPharm is out of money at the end of

15   2012.  They have essentially about $340 in cash.  They have

16   no money.  So in November 2012, Bodden and Sears take a trip

17   down to Florida to discuss these notes, Sears's entities,

18   Bayside and Meadpoint.

19          And so what happens is just on paper.  Sears is

20   giving a loan to FusionPharm, his company, to these two

21   entities, Bayside and Meadpoint.  And he has the right to

22   take back -- to get paid back through stock.  And you know

23   how much he gets?  He can get stock for 1 cent.  And he does

24   it because they need to sell more stock and get out there

25   and get more money.

1          The convertible part was not in the 2011 note.

2     They backdated to put the convertible feature in.  The law

3     doesn't allow that.  You can't renegotiate a loan.  When you

4     have a house loan or a car loan, you can't just go to the

5     bank or the dealership and say, "This is what I want."

6          They might work with you some, but you can't tell

7     them what you're going to do now in the future.  That's what

8     they did here, because it was the same people.

9          There's the share price, a dollar 30, a dollar 40,

10    Sears is getting for a penny.

11         2012 notes.  Sears converts the notes and loans to

12    over 1 million shares of FusionPharm stock in January '13

13    through August 2013.  They get money again.  January 2013,

14    he converts $1400 into 14,000 shares of Bayside.  He

15    converts another $4750 of 475,000 shares in FusionPharm

16    stocks; in 2013, he converts another 5,000 to Meadpoint and

17    the Meadpoint note into 500,000 shares.  Remember, he is --

18    on paper he's buying these for a penny, maybe not even that,

19    and he's selling them for the current market price.

20         Sears sells the notes later.  Sells the Bayside

21    note in February 2013 for 40 cents a share.  The stocks are

22    going about 90 cents at that point.  In August 2013, he sold

23    the Meadpoint note for $15,000.  The stock at that time was

24    going for essentially 50 cents.  So he gets it for a penny

25    and he sells it for 40 or 50 cents.

1          What did Guy Jean-Pierre do?  He did all 14 of the
2     required attorney opinion letters stating that the holding
3     period had been met and he did not disclose Sears as the
4     affiliate or controller of these entities, Bayside and
5     Meadpoint.  Remember, 2012 is when they put the convertible
6     feature in, in January -- or excuse me, December or November
7     time frame.  So they would have to wait until November or
8     December 2013 to be able to sell the shares under the law.
9     They didn't wait.  They sold the shares.  They needed the
10    money.
11         They still have to make reports.  They still have
12    to tell the OTC what they're doing.  So they discuss this.
13    And now they still need further money, so they sell the
14    Bayside, as I said, in January 2013 and they sell the
15    Meadpoint later on in 2013.
16         50 percent of the proceeds came from the selling of
17    those notes.  $319,000 of proceeds.  They stayed alive by
18    selling their own shares without telling anyone.  They
19    didn't tell the public what was right.
20         Guy Jean-Pierre drafted the OTC market's opinion
21    letters stating that the financials consulted were accurate
22    and current public informations for the 2012 annual report
23    and for the first two quarters of 2013.  Remember, in 2011,
24    he is saying that there's no convertible option, and then in
25    2012, there's no convertible option until the end.

1        So the guys responsible for looking at the

2   financials knows that there's nothing convertible, but then

3   puts it in at the end of 2012 and the first two quarters of

4   2013.  That's not being honest with the public.  He never

5   discloses Sears' role with FusionPharm in Meadpoint or

6   Bayside.

7        And if that's not enough, ladies and gentlemen of

8   the jury, 2016 rolls around.  Guy Jean-Pierre is in the

9   Dominican Republic, and he's looking for work.  And who does

10  he contact?  William Sears.  William Sears contacts law

11  enforcement and says, "Guy Jean-Pierre wants to do more

12  security work.  He wants to get money.  He'll do what it

13  takes."  Security laws, forget it.  Do what it takes to get

14  paid.

15       And so they run an undercover operation where they

16  set up a shell company to hide the ownership of the true

17  owners.  They put a foreperson out there.  And Guy

18  Jean-Pierre -- and you're going to see a video.  He agrees

19  to do what it takes to draft these legal opinion letters

20  knowing, knowing that the owner that's going to be put on

21  the paper, that's going to be put to the public to see if

22  they want to invest in this company, in the words of the

23  undercover agent, "Doesn't know shit."

24       And how does a very well-educated, experienced

25  securities lawyer respond?  "Excellent.  Excellent."

1          It's not excellent -- it's not excellent for the

2     public not to know the truth to poorly invest their money.

3     It's a violation of law.  It's not excellent to lead brokers

4     down a path that they're bound to follow and say that these

5     shares are not affiliated to the controlling party of the

6     company.

7                COURTROOM DEPUTY:  Two minutes, Mr. Sibert.

8                MR. SIBERT:  And how did those shares go out to the

9     public?  Looks like the volume of trade is going on to

10    create trashing of the stock.  That's called a violation of

11    the securities law.

12               At the end of this case, I'm going to tell and --

13    ask the jury, and we'll work through some of the counts, the

14    only thing excellent that you're going to see in this case

15    is evidence that is going to come out against Guy

16    Jean-Pierre:  the e-mails, the videos, the recordings,

17    messages, and the documents, the transfer agent documents,

18    and the brokerage accounts.

19               They're long, they're dry, but what they'll say is

20    that Mr. Sears was never an affiliate and he always held it

21    for a year, these shares, and he knew that wasn't right.

22    But he submitted that -- those letters anyway.  The public

23    was misinformed and there's victims.

24               It was excellent work done by the investigation in

25    this case and we're going to ask you to return a guilty

1    verdict on all 29 counts for a person that thinks it's

2    excellent to lie to the public.

3              THE COURT:  All right.  Thank you, Mr. Sibert.

4              Opening statement for the defendant.

5              MR. BARNARD:  Your Honor, Mr. Jean-Pierre will

6    reserve his opening statement.

7              THE COURT:  Okay.  All right.  The Government may

8    call its first witness.

9              MR. SIBERT:  Your Honor, at this time the

10   Government would like to call William Sears.

11             Your Honor, do you mind if I push this back?

12             THE COURT:  No, please do so.  Thank you.  And if

13   you could return the lectern to its prior location.

14             MR. SIBERT:  Yes, sir.

15             COURTROOM DEPUTY:  Come around to the witness stand

16   and I'll swear you in.  Please raise your right hand.

17             WILLIAM SEARS, GOVERNMENT'S WITNESS, SWORN

18             COURTROOM DEPUTY:  Please be seated.

19             THE WITNESS:  Thank you.

20             COURTROOM DEPUTY:  Please scoot your chair all the

21   way in.  Speak directly into the microphone.

22             Please state your full name and spell your last

23   name for the record.

24             THE WITNESS:  William Joseph Sears.  S-e-a-r-s.

25             MR. SIBERT:  Your Honor, may I begin?

1          THE COURT:  You may.

2          MR. SIBERT:  Thank you.

3                     DIRECT EXAMINATION

4     BY MR. SIBERT:

5     Q.   All right.  Good afternoon, sir.

6     A.   Good afternoon.

7     Q.   I'm going to ask you, before you begin your -- it's a

8     large courtroom, big ceilings, when you answer questions,

9     I'm going to need you to be loud and I need you to speak

10    into that microphone.  Do you understand?

11    A.   Yes, sir.

12    Q.   Thank you.  All right, sir, can you go ahead and tell

13    the jury where you're currently living.

14    A.   Westminster, Colorado.

15    Q.   Okay.  And are you working right now?

16    A.   Part time.

17    Q.   Okay.  Who's your employer?

18    A.   Self-employed.

19    Q.   What do you do?

20    A.   I'm in the Industrial Hemp Space.

21    Q.   You're in what?

22    A.   Industrial Hemp Space.  Seeds and procurement.

23    Q.   So what do you do in the Industrial Hemp Space with

24    seeds and procurement?

25    A.   Growing small plants into poppy seeds and growing small

1    plants so they can be sold into the market to be planted.

2    Q.   So are you growing marijuana?

3    A.   No, sir.

4    Q.   Just poppy?

5    A.   No, sir.

6    Q.   So herbal?

7    A.   It's industrial hemp, sir.

8    Q.   What is that?

9    A.   It is a different version of the plant that has

10   virtually no psychotropic or psychological effects by using

11   it.  We're using it mainly for hair and fiber.

12   Q.   Are you doing any investment work currently?

13   A.   No, sir.

14   Q.   All right.  Now, in the past you were involved with

15   what's considered MicroCap firms; is that correct?

16   A.   Yes, sir.

17   Q.   Companies?

18   A.   Yes, sir.

19   Q.   Can you name a few of those?

20   A.   Could you elaborate on "companies"?  Companies I worked

21   with or --

22   Q.   Companies that you were involved with, worked with,

23   ran.

24   A.   Meadpoint Venture Partners.  For a while I was --

25   Silver Star Capital Investments.  And I'm drawing a blank at

1   the moment.

2   Q.   All right.  Let's talk about this:  Did you work with

3   your brother-in-law in FusionPharm?

4   A.   Yes, I did.

5   Q.   Okay.  Was that time period essentially around 2011

6   through 2014?

7   A.   Yes, it was.

8   Q.   Now, as part of your role with FusionPharm, you took a

9   plea agreement in your case; is that correct?

10   A.   Yes, I did.

11   Q.   All right.  Can you explain to the jury what your

12   agreement is?  What you pled to and what your plea agreement

13   is.

14   A.   If you could further elaborate.

15   Q.   What did you plead guilty to?

16   A.   I pled guilty to conspiracy to commit securities fraud

17   and income tax.

18   Q.   And that's based upon your role with FusionPharm; is

19   that correct?

20   A.   That was based upon evidence that the Government felt

21   it could prove on there.  I --

22   Q.   And you came in this Court before this judge and pled

23   guilty, correct?

24   A.   Indeed.

25   Q.   No one forced you?

1   A.   No, sir.

2   Q.   You got to read the facts; is that right?

3   A.   Yes.

4   Q.   And were given a chance to tell the Court the facts

5   were correct or wrong; is that right?

6   A.   Yes.

7   Q.   And you told the Court they were right.

8   A.   Yes.

9   Q.   All right.  And that was for your role with

10  FusionPharm.

11  A.   Yes.

12  Q.   Now, when I asked you about your terms of your plea

13  agreement, you got a deal with the Government; is that fair

14  to say?

15          MR. GOODREID:  Objection.  Leading.

16  BY MR. SIBERT:

17  Q.   Did you get a deal with the Government?

18          THE COURT:  Hold on.

19          MR. SIBERT:  I'll rephrase, Your Honor.

20          THE COURT:  Well, are you going to attempt to

21  invoke 615 and examine him as a --

22          MR. SIBERT:  Not yet.

23          THE COURT:  Okay.  All right.

24          MR. SIBERT:  I'll reserve that, if the Court would

25  allow me.

1      THE COURT:  All right.

2      MR. SIBERT:  Thank you, though.

3      THE COURT:  Okay.  Then go ahead and rephrase.

4   BY MR. SIBERT:

5   Q.   What deal did you receive from the Government?

6   A.   A stipulation instead of going through the normal --

7   I'm drawing a blank at the moment --

8   Q.   Did you have an agreement to -- how much imprisonment

9   time you would serve?

10  A.   Yes.

11  Q.   What --

12  A.   It was a mini -- it was a mini-maxi, so to speak.  Five

13  to eight.

14  Q.   Five years to eight years?

15  A.   Indeed, sir.

16  Q.   Okay.  And have you been sentenced yet in that case?

17  A.   No, I have not.

18  Q.   Now, there was a different Assistant U.S. Attorney that

19  you worked your case with besides myself with your lawyers;

20  is that correct?

21  A.   That is correct.

22  Q.   All right.  And that attorney's no longer with the

23  United States Government.

24  A.   To my knowledge --

25  Q.   Is that your understanding?

1   A.   Yes, sir.

2   Q.   All right.  Now, what has the Government asked you to

3   do here today?

4   A.   Tell the truth.

5   Q.   What has the Government promised you for your testimony

6   here today?

7   A.   Nothing.

8   Q.   All right.  Now, can you start -- you were -- you were

9   asked to review some documents; is that correct?

10  A.   Yesterday, yes, sir.

11  Q.   May I have the screens on for everyone except for the

12  jury.  And can I have Exhibit 32 brought up.

13          Your Honor, may I have a moment?

14          THE COURT:  You may.

15          MR. SIBERT:  Your Honor, before we -- I would ask

16  permission, if I can provide a hard copy to the witness and

17  let defense counsel know the exhibit numbers and I will walk

18  through the exhibits.

19          THE COURT:  Well, given what we discussed at the

20  trial preparation conference, are the pages you want to

21  examine the witness on included in the -- in what's in those

22  binders?

23          MR. SIBERT:  They are.  The only problem is we kind

24  of floated around exhibits.  We've had to initial them.  I

25  put together packages for him to look through.  It's just a

1    faster process.

2              THE COURT:  It may be faster but we still have to

3    adhere to the Rules of Evidence --

4              MR. SIBERT:  Most of these have been stipulated.

5              THE COURT:  Hold on, hold on.  We have to follow

6    the Rules of Evidence and you have to move for the admission

7    of the exhibits or portion of the exhibits that you want to

8    have published to the jury.

9              MR. SIBERT:  Very well, Your Honor.

10             THE COURT:  So are you saying that you have your

11   exhibits organized differently than how they are in the

12   binders?

13             MR. SIBERT:  No, Your Honor.

14             THE COURT:  I'm glad that you said that.  So, you

15   referenced Exhibit 32.  I notice from these Government

16   exhibit document that it's stipulated.  Are you moving for

17   its admission?

18             MR. SIBERT:  I'm going to move for Government

19   Exhibit 32, 33, 35, 36, 37, 92, and 238.

20             THE COURT:  Are they all stipulated to with respect

21   to authenticity and admissibility?

22             MR. SIBERT:  My understanding they are.

23             THE COURT:  One second.  Does that comport with the

24   defendant's records?

25             MR. GOODREID:  Your Honor, could I have the

1    reiteration of all those numbers?

2              THE COURT:  Yeah.

3              MR. SIBERT:  Government Exhibit 32, 33, 35, 36, 37,

4    92, 238.

5              MR. GOODREID:  I believe that's correct, Your

6    Honor.  We have stipulated to the admissibility of all of

7    those.

8              THE COURT:  All right.  Given the stipulation of

9    the parties and the Government, the following exhibits on

10   the Government are admitted into evidence and may be

11   published to the jury:  32, 33, 35, 36, 37, 92, and 238.

12        (Government's Exhibits 32, 33, 35, 36, 37, 92, and 238

13   received)

14   BY MR. SIBERT:

15   Q.   All right.  Let's look at Exhibit No. 32.  May I have

16   it published to the jury.

17             All right, sir, you reviewed this exhibit; is that

18   correct?

19   A.   Yes.

20   Q.   It's right there in front of you on your screen, too,

21   if you can't see it in the book.

22   A.   Yes.

23   Q.   I will circle right here.  Whose e-mail is on top of

24   that?

25   A.   That one is mine, sir.

1   Q.   Okay.  And can you, for the record, state what that
2   e-mail is.
3   A.   William -- williamjsears.com.
4   Q.   All right.  And for the purposes of the jury, can I
5   have this blown up, please?  The e-mail section.  The
6   addresses.  And whose e-mail is below that?
7   A.   Fredrick Dahlman.
8   Q.   And who's Fredrick Dahlman?
9   A.   Excuse me, sir?
10  Q.   Who is Fredrick Dahlman?
11  A.   Fredrick Dahlman was the CEO of Baby Bee Bright
12  Corporation.
13  Q.   Can I have 32 taken down.  And can I have Exhibit 33
14  put up.  Can you blow up the e-mail top, please.  Okay.
15           Again, sir, did you get a chance to review
16  Government Exhibit 33?
17  A.   Yes, I did, sir.
18  Q.   And, again, can you tell me whose e-mail addresses
19  those are on the top of that exhibit.
20  A.   The top one is mine and the bottom one is Mr.
21  Dahlman's.
22  Q.   And with this e-mail, you're e-mailmailing Mr. Dahlman;
23  is that correct?
24  A.   Yes, sir.
25  Q.   And you're e-mailing him how -- what are you e-mailing

1    him about?

2    A.   A conversation.

3    Q.   And what's the conversation about?

4    A.   It's about a shareholder transaction.

5    Q.   And what's the shareholder transaction about?

6    A.   Transferring shares.

7    Q.   From what to where?

8    A.   From -- from -- from himself to two other companies.

9    Q.   Government Exhibit 37 -- or, excuse me, 36.

10        Okay, again, sir, you reviewed this document --

11   A.   Yes, sir.

12   Q.   -- 36?

13   A.   Yes, sir.

14   Q.   And whose e-mail addresses are those on top of that?

15   A.   Myself and Mr. Dahlman.

16   Q.   And you're e-mailing Mr. Dahlman; is that correct?

17   A.   Yes, sir.

18   Q.   Okay.  Can I have Exhibit 92.  Can I have it taken down

19   just so the witness can see it on the screen, please.

20        Do you recognize Government Exhibit 92?

21   A.   It's too fuzzy here.  She's going to pull it up for me.

22        Yes, I do.

23   Q.   All right.  Can you please focus back in on the

24   addresses.

25   A.   It was from myself going to various individuals at

1    Pacific Stock Transfer.

2    Q.   Okay.  What's Pacific Stock Transfer?

3    A.   It's a transfer agent.

4    Q.   Okay.  And based upon what you understand, what does a

5    transfer agent do?

6    A.   A transfer agent keeps track of and transfers

7    securities on the behalf of public companies to various

8    investors or individuals.

9    Q.   I want to circle an e-mail address.  I circled what's

10   labeled *guymjeanpierre@yahoo.com*.  Do you recognize that

11   address?

12   A.   Yes, I do.

13   Q.   Whose address is that?

14   A.   Mr. Guy Jean-Pierre's.

15   Q.   Do you see Mr. Guy Jean-Pierre here today in the

16   courtroom?

17   A.   Yes, sir, I do, sir.

18   Q.   Where do you see him sitting?

19   A.   Directly to my 1:00.

20   Q.   Okay.  What is he wearing?

21   A.   He's wearing a brown suit.

22             MR. SIBERT:  Your Honor, may the record acknowledge

23   that this witness has identified the defendant, Mr. Guy

24   Jean-Pierre.

25             THE COURT:  The record will so reflect.

1          MR. SIBERT:  Thank you.

2    BY MR. SIBERT:

3    Q.   Now, I want to circle the top line of this e-mail.  You

4    can look on your screen because I just circled it on the

5    screen.  What does it mean by "Mr. Jean-Pierre is handling

6    the reverse with FINRA"?

7    A.   "Reverse" would be a term for when securities are taken

8    from a greater number to a smaller number and has to work

9    with the regulatory agencies in order to do so properly.

10   Q.   So it was Mr. -- so in your corporation that you're

11   dealing with here in your e-mail, who's doing your legal

12   work?

13   A.   Mr. Jean-Pierre.

14   Q.   And who are you telling that is doing the legal work

15   for your purposes?

16   A.   Everybody was Pacific Stock Transfer.

17          THE COURT:  Mr. Sears, please keep your voice up

18   and speak into the mic.

19          THE WITNESS:  Yes, sir.

20          THE COURT:  Are we doing okay, Ms. Sewell?

21          THE JUROR:  Yeah.

22          THE COURT:  All right.

23          MR. SIBERT:  Your Honor, I can't see the side, so

24   if I need to address that or if I need to be louder, someone

25   please let me know.

1          THE COURT:  Yeah.  So Ms. Sewell, as we discussed

2     before, if you're having issues, raise your hand.

3          THE JUROR:  Okay.

4          THE COURT:  All right?  Okay.

5          MR. SIBERT:  Thank you, Your Honor.

6     BY MR. SIBERT:

7     Q.   Can I have Exhibit 238, please.

8          Do you recognize Government Exhibit 238?

9     A.   Yes, I do.

10    Q.   And what is that document?

11    A.   That is an e-mail, sir.

12    Q.   And, again, can you focus in on the top of that e-mail.

13    A.   Yes.  That is sent from me.

14    Q.   Okay.  And that's your e-mail address,

15    *williamjsears.com*; is that correct?

16    A.   Yes, sir.

17    Q.   Okay.  And who is Mr. Cliffe Bodden?

18    A.   Cliffe Bodden was a consultant.

19    Q.   Okay.  And did he do work for FusionPharm?

20    A.   Yes, he did.

21    Q.   All right.

22         MR. SIBERT:  Your Honor, the next set of exhibits,

23    for defense purposes, I believe these all have been

24    stipulated to as well.

25         THE COURT:  What do you mean for defense purposes?

1          MR. SIBERT:  I'm going -- I have another block of

2     exhibits that I'd like to walk through, so I'm going to see

3     if it's okay if I could say the exhibits so they track.

4          THE COURT:  I'm not getting what you're trying to

5     do.  Are you moving for the admission of --

6          MR. SIBERT:  I'm going to move for the admission of

7     a block, if it's --

8          THE COURT:  Okay.  Sure.

9          MR. SIBERT:  I have six blocks.  I tried to --

10          THE COURT:  Okay.

11          MR. SIBERT:  -- save time.  Exhibit 235, 380,

12     381 --

13          THE COURT:  Slow down.

14          MR. SIBERT:  372-B, 372-D, 372-H, 372-I, 372-J,

15     372-K, 372-L, 372-M, Exhibit 226, Exhibit 382,

16     Exhibit 372-Q, as in Qbert, Exhibit 372-T as in Tom, 372-U

17     as in uniform, 372 Charlie Charlie, CC, Exhibit 40, Exhibit

18     229, Exhibit 372-II, Exhibit 372-M, Exhibit 254,

19     Exhibit 372-OO, Exhibit 372-PP, Exhibit 372-RR,

20     Exhibit 372-TT, Exhibit 372-YY, Exhibit 396, 397, 372-GGG,

21     372-PPP, and Exhibits 158 through 166.

22          THE COURT:  Wow.  One second.  All right, Mr.

23     Sibert, we'll try to plow through this as you have organized

24     it, but in the future, this is way too many -- way, way too

25     many exhibits to try to get in at one time.  I just took

1   two, three minutes after you stopped talking to try to write

2   them down from my realtime here and I don't even know if

3   I've caught them all.  So I think whatever efficiencies you

4   think you may get by doing it this way is going to be offset

5   to a greater degree by us trying to see if we got them all

6   right.  So you're going to need to chop these up into much

7   smaller pieces.  All right?

8          I mean, you -- you will -- we'll just have to take

9   them in -- I see you have them there as -- you have them

10  clipped, but we'll have to do it in smaller chunks.  And you

11  just read off 25 exhibits.  And I don't even know if I wrote

12  them all down right.  I don't know if the courtroom

13  deputy --

14         MR. SIBERT:  Your Honor, I think what will be

15  quicker, I have them already broken out of binders so for

16  your courtroom staff, they can just quickly grab them the

17  next one.

18         THE COURT:  All right.  But it's -- there's one

19  thing about them grabbing it and giving it to the witness,

20  it's an entirely different thing to make sure that their

21  records are accurate in terms of keeping track of everything

22  that you have offered into exhibit and everything -- into

23  evidence and everything that I have received into evidence.

24  So --

25         MR. SIBERT:  Very well.

1          THE COURT:  -- this is just too much.

2          MR. SIBERT:  Yes, sir.

3          THE COURT:  It's just too much.  You need to chop

4     it up.  All right.  So go ahead and hand the courtroom

5     deputies what you have and now we're going to have to take

6     the time to go through this list again to make sure that we

7     got it all here and -- so, now, first off, are you

8     representing to the Court that these are all stipulated to

9     in terms of admissibility and authenticity?

10         MR. SIBERT:  Yes, Your Honor.

11         THE COURT:  All right.

12         MR. SIBERT:  And --

13         THE COURT:  And --

14         MR. SIBERT:  If it would save time, I can go one by

15    one and I can let the Court know what's stipulated to.  It's

16    very easy.

17         THE COURT:  Or two or three or four, but not 20.

18         MR. SIBERT:  Sure.

19         THE COURT:  All right.  Did defense counsel -- were

20    you able to capture all that and do you have -- can you tell

21    me if in your records these are all stipulated to?

22         MR. GOODREID:  Your Honor, I think I captured all

23    of them, although I'm about halfway through the list to be

24    sure that they're stipulated to.

25         THE COURT:  All right.  You see, that's why I think

1    this is not an efficient way to do it, Mr. Sibert.

2            MR. SIBERT:  I'll meet with counsel after today's

3    and we can go through all the stipulations again.

4            THE COURT:  All right.  But --

5            MR. SIBERT:  They've had them for weeks now.

6            THE COURT:  Yeah.  Well, okay, but, you know, I'm

7    trying to get you to understand that my courtroom deputies

8    and I have to keep an accurate record of what's coming in --

9    what's being offered and what's coming in.

10           MR. SIBERT:  All right.  Let me do them in chunks,

11   then.

12           THE COURT:  All right.  Let me wait for Mr.

13   Goodreid to finish going through his list.

14           MR. GOODREID:  Your Honor, I've finished going

15   through all those exhibits and I believe Mr. Sibert's

16   correct, they have all been stipulated to as to authenticity

17   and admissibility.

18           I might say, if I may make a suggestion, to the

19   extent that further chunks are going to come in, if they

20   came in numerical order that would be faster for defense to

21   check them as opposed to sort of jumping around.

22           THE COURT:  That would also be helpful, but I

23   just -- we're not going to take them at chunks of 25 at a

24   time.  It's just -- I mean, this is why we can't do it.

25   Look how long this has taken.

1          All right.  Let me go through what I have, Ms.

2     Frank and Ms. Roberson, if you think I've missed one, or Mr.

3     Sibert, you tell me if I'm missing it.

4          I'm sure I've missed a couple and I'm going to go a

5     little more slowly to make sure we got it all.  All right.

6     The following exhibits have been offered by the Government

7     and based on the stipulation of the parties, they have been

8     received into evidence -- or they are received into

9     evidence:  Exhibits 238, 380, 381, 372-B, 372-H, 372-J,

10    372-K, 372-L, 372-M, 226, 372-Q, 372-T, 372-CC, 40, 229,

11    372-II, 372-MM, 254, 372-OO, 372-PP, 372-RR, 372-TT, 372-YY,

12    396, 397, 372-GGG, 372-PPP, 158 through 166.

13         Ms. Roberson, what did I miss?

14             COURTROOM DEPUTY:  Your Honor, I also have 235,

15    372-D, 372-I.  Mr. Sibert did say 372-K, however, the piece

16    of paper handed to me says 372-KK.  382, and 372-U.

17             THE COURT:  Wow.  I did worse than I thought.  235,

18    372-D, 372-I.  Is it 372-K or KK, Mr. Sibert?

19             MR. SIBERT:  I have K.  It's just K.

20             THE COURT:  All right.  372-K, 382 and 372-U.  Did

21    I catch them all?

22             MR. SIBERT:  372-U.

23             THE COURT:  Yeah.  Ms. Frank?  Did I catch them

24    all?

25             COURTROOM DEPUTY:  Yes, Your Honor.

1          THE COURT:  All right.  Those are all in evidence

2     and you may proceed.

3          (Government's Exhibits received)

4          MR. SIBERT:  Thank you, Your Honor.

5     BY MR. SIBERT:

6     Q.   Can you look at the first exhibit that we just rattled

7     off there, Exhibit 235.

8          THE WITNESS:  Can I -- Your Honor, may I ask a

9     question?

10         THE COURT:  Go ahead.

11         THE WITNESS:  Yesterday I was asked to sign off on

12    these to see them.  Can I refer to these with my signature

13    on them rather than the books?  It just refreshes my memory

14    as to what I went through.

15         THE COURT:  Well, I think you should first look at

16    the exhibits that were handed to you by my courtroom deputy

17    because those are the documents that have been admitted into

18    evidence.  I don't know if what you're holding in your hand

19    has been admitted into evidence or not.

20         THE WITNESS:  Because the other ones didn't have my

21    signature on it and these do.

22         COURTROOM DEPUTY:  I apologize, Your Honor, those

23    are the documents that Mr. Sibert handed me in order based

24    on what he read.

25         THE COURT:  Right.  And -- and so, Mr. Sears, what

1    are you saying?

2              THE WITNESS:  I'm saying these are the documents

3    that I have reviewed and they have my signature and a date

4    bearing on the bottom right-hand corner.  These other ones

5    that have been asked for do not, so it's -- there's a lot of

6    documents to go through.

7              THE COURT:  I think what Mr. Sibert did -- correct

8    me if I'm wrong, Mr. Sibert -- is you pulled from the

9    binders those exhibits that you just -- that we've just

10   listed and admitted into evidence; is that correct?

11             MR. SIBERT:  I tried to do that.  My plan is going

12   to crap.

13             THE COURT:  So, yes, you should refer to what Ms.

14   Roberson just handed you as opposed to what's in the

15   binders.

16             THE WITNESS:  Okay.

17             THE COURT:  Does that make sense?

18             THE WITNESS:  Yes, sir.

19             THE COURT:  Okay.  Go ahead.

20   BY MR. SIBERT:

21   Q.   All right, sir, can you please look at Government

22   Exhibit 235.

23   A.   Yes, sir.  Yes, sir.

24   Q.   All right.  And you reviewed that document; is that

25   correct?

1    A.   Yes, sir.

2    Q.   On the top portion that's blown up, please -- you can

3    look at your screen now.  Again, this is your e-mail; is

4    that correct?

5    A.   Yes, sir.

6    Q.   And has -- who is S. Dittman?

7    A.   Excuse me?

8    Q.   Who is S. Dittman?

9    A.   Scott Dittman.

10    Q.   Okay.  Is that his e-mail address?

11    A.   Yes, it is.

12    Q.   And that's at the FusionPharm address?

13    A.   Yes, sir.

14    Q.   And below that, who's e-mail is that?

15    A.   Cliffe Bodden.

16    Q.   And, again, that's his known address -- e-mail

17    address?

18    A.   One of them, yes.

19    Q.   All right.  Sir, can you take a minute and read that

20    e-mail.

21    A.   Okay.

22    Q.   And what are you talking about in that e-mail?

23    A.   I'm having two gentlemen communicate directly.

24    Q.   Okay.  What about?

25    A.   Putting together a business plan.

1    Q.   For what business?

2    A.   FusionPharm.

3    Q.   And you're sending the e-mail; is that correct?

4    A.   Yes, sir.

5    Q.   All right.  Can I -- can you look at Exhibit 380,

6    please.

7    A.   Okay.

8    Q.   Do you recognize that document?

9    A.   Yes, I do.

10   Q.   And what is that document?

11   A.   That is a document from myself to Scott Dittman.

12   Q.   Could I have 380 on the screen, please.  Can you blow

13   up the e-mail address.

14        Again, now, you have a different e-mail address; is

15   that correct?

16   A.   Yes, I do.

17   Q.   And what e-mail address do I have?

18   A.   That was *wsears@fusionpharminc.com*.

19   Q.   So you held a FusionPharm e-mail address?

20   A.   For a period of time, yes.

21   Q.   And, again, the subject -- what's the subject?

22   A.   Business plan.

23   Q.   All right.  Can I have 372 on the screen, please.  I'm

24   sorry, can you go back to that document, 381.  And can you

25   go down a little bit on the screen.  Can you blow that area

1      up.
2              Okay.  Again, can we just go through this e-mail
3      traffic here.  Who's sending the e-mail?  If you look on
4      your screen.
5      A.    One second.
6      Q.    Sir, I'm asking you about what I circled on the screen.
7      Who's sending the e-mail?
8      A.    Scott Dittman.
9      Q.    And who's he sending it to?
10     A.    Myself and a gentleman by the name of Gino Rodriguez.
11     Q.    And what's the subject?
12     A.    Business plan.
13     Q.    Thank you.  Have that taken down, please.  Can I have
14     Exhibit 381.
15             Can you look at Exhibit 381.
16     A.    Yes.
17     Q.    All right.  Do you recognize that e-mail, sir?
18     A.    Which one, sir?
19     Q.    Exhibit 381.
20     A.    No, which e-mail.
21     Q.    Do you recognize document 381?
22     A.    Yes, I do.
23     Q.    Did you review the document?
24     A.    Yes, I did.
25     Q.    When did you review it?

1    A.   Yesterday.

2    Q.   Okay.  Again, look at your screen there.  Who is the

3    e-mail from?

4    A.   Gino Rodriguez.

5    Q.   And who's it to?

6    A.   Scott Dittman.

7    Q.   And who else?

8    A.   And myself.

9    Q.   And what's the subject?

10    A.   Corporate minutes.

11    Q.   Can I please have Exhibit 372-B on the screen.

12          Sir, can you look at Exhibit 372-B.

13    A.   Yes, sir.

14    Q.   Do you recognize Exhibit 372-B?

15    A.   Yes, I do.

16    Q.   And what is Exhibit 372-B?

17    A.   It's an e-mail.

18    Q.   All right.  Let's look at on the screen again.  Who's

19    it from?

20    A.   Myself.

21    Q.   And what address are you using?

22    A.   *wsears@fusionpharminc.com*.

23    Q.   And who's it to?

24    A.   Mr. Guy Jean-Pierre.

25    Q.   Okay.  He has two e-mail addresses; is that correct?

1   A.   Yes, sir.

2   Q.   What are those addresses?

3   A.   *guymjeanpierre@yahoo.com* and Guy Jean-Pierre -- just

4   *guy@lawfirmofjeanpierre.com.*

5   Q.   And who's cc'd on that e-mail?

6   A.   Scott Dittman.

7   Q.   And what's the subject?

8   A.   Trademarks.

9   Q.   And what's this e-mail about?

10  A.   I'm asking Mr. Jean-Pierre to do some trademark

11  registration work.

12  Q.   And when is this e-mail being sent?

13  A.   May 31st, 2011.

14  Q.   And what trademark registration are you referring to in

15  this e-mail?

16  A.   There was a lot of things going on at that time with

17  several companies, sir.  I mean, it could be one of three or

18  four.

19  Q.   Was it FusionPharm?

20  A.   Quite possibly, sir, yes.  Quite possibly so.  I would

21  imagine so.

22  Q.   Can I have Exhibit 3 -- I'm sorry, 372-D.

23  A.   I'm ready.

24  Q.   All right.  Do you recognize Government Exhibit 372-D?

25  A.   Indeed, I do.

1    Q.    And what is it?

2    A.    It is an e-mail.

3    Q.    And let's look on the screen.  Who wrote the e-mail?

4    A.    I did.

5    Q.    Okay.  And who are you sending the e-mail to?

6    A.    Mr. Jean-Pierre.

7    Q.    And those are the same two e-mail addresses that you

8    just discussed before in a previous exhibit; is that

9    correct?

10   A.    Yes, sir.

11   Q.    And who do you cc on that e-mail?

12   A.    Scott Dittman.

13   Q.    And what's the subject?

14   A.    Subject is 504/506.

15   Q.    What's the date of that e-mail?

16   A.    July 17th, 2011.

17   Q.    And what is the subject matter in the e-mail?

18   A.    504/506.

19   Q.    And what does that mean to you?

20   A.    Those are registration offering circulars to raise

21   capital for companies.

22   Q.    And what company are you talking to Mr. Guy Jean-Pierre

23   about?

24   A.    FusionPharm.

25   Q.    Can I have Exhibit 372-H.

1           Do you have 372-H in front of you?

2    A.    Indeed, I do, sir.

3    Q.    Do you recognize that document?

4    A.    Yes, I do.

5    Q.    Okay.  Another e-mail?

6    A.    Yes, it is.

7    Q.    All right.  Let's look on the screen.  Who sent an

8    e-mail?

9    A.    I am.

10   Q.    And you're using your William J Sears e-mail account?

11   A.    Indeed, I am.

12   Q.    And who are you sending the e-mail to?

13   A.    Mr. Guy Jean-Pierre.

14   Q.    And, again, we've talked about that's his previous

15   e-mail; is that correct?  His law firm e-mail?

16   A.    Yes, it is, sir.

17   Q.    And then we have his Yahoo e-mail, Mr. Guy

18   Jean-Pierre's Yahoo e-mail?

19   A.    Yes, sir.

20   Q.    And who else is on the e-mail?

21   A.    Scott Dittman.

22   Q.    And what e-mail account are you e-mailing him on?

23   A.    From *william@williamjsears.com*.

24   Q.    Okay.  What e-mail are you using for Scott Dittman?

25   A.    *sdittman@fusionpharminc.com*.

1    Q.   What's the subject?

2    A.   It says subject:  Per our conversation RE FSPM.

3    Q.   And what's FSPM?

4    A.   It's the symbol -- trading symbol for FusionPharm, Inc.

5    Q.   So you're sending an e-mail to follow up on a

6    conversation?

7    A.   Yes, sir.

8    Q.   So it's fair to say you had a prior conversation before

9    sending this e-mail?

10   A.   Yes, sir.

11   Q.   With Mr. Guy Jean-Pierre?

12   A.   Yes, sir.

13   Q.   And what are you asking Mr. Guy Jean-Pierre in the

14   e-mail?

15   A.   To look over a purchase package that was sent for

16   review.  Excuse me.

17   Q.   Okay.  Have Government Exhibit 372-I.

18        Have you had a chance to look at Government

19   Exhibit 372-I?

20   A.   Yes, sir.

21   Q.   Okay.  And what is Government Exhibit 372-I?

22   A.   It's an e-mail, sir.

23   Q.   And who is sending the e-mail?

24   A.   I am.

25   Q.   Okay.  Who are you sending the e-mail to?

1    A.    Mr. Guy Jean-Pierre.

2    Q.    And who else?

3    A.    Scott Dittman.

4    Q.    And what's the subject for the e-mail?

5    A.    FSPM.

6    Q.    And what does that stand for?

7    A.    FusionPharm.

8    Q.    And what are you asking Mr. Jean-Pierre to do in this

9    e-mail?

10   A.    To go over some documents and inform with regard to

11   some filings for the company.

12   Q.    And what company are you talking about?

13   A.    FusionPharm.

14   Q.    So Mr. Jean-Pierre assisted you with filing documents

15   to begin FusionPharm?

16   A.    I'm sorry, say that again, sir.

17   Q.    Did Mr. Jean-Pierre assist you with the documents that

18   was required to become FusionPharm?

19   A.    Yes, sir.

20   Q.    And he communicated with you?

21   A.    Yes, sir.

22   Q.    Can I have Government Exhibit 372-J.  Have you had a

23   chance to look at Government Exhibit 372-J?

24   A.    Yes, sir.

25   Q.    What is it?

1   A.   It's an e-mail.

2   Q.   Okay.  And let's go through the line of questioning.

3   Who's sending the e-mail?

4   A.   I am.

5   Q.   And what's the date?

6   A.   August 9th, 2011.

7   Q.   Okay.  And who's it to?

8   A.   Scott Dittman.

9   Q.   And what's the subject?

10   A.   Letter to Robert Taylor.

11   Q.   Okay.  And what's attached?

12   A.   It says BBYB - Taylor Attorney Letter.

13   Q.   Do you know what that means?

14   A.   I have to look at it.

15        Yes, I do, sir.

16   Q.   What does it mean?

17   A.   It's a letter that was written by Mr. Jean-Pierre to

18   Robert Taylor.

19   Q.   And why would Mr. Guy Jean-Pierre be writing a letter

20   to Mr. Robert Taylor that you're e-mailing about, if you

21   know?

22   A.   Because Mr. Taylor was a supposed -- was a shareholder

23   of the predecessor company Baby Bee Bright and was making

24   claims, I believe, on some shares.

25   Q.   So Mr. Taylor's making claims on shares for the company

1   that you now own?

2   A.   Excuse me?

3   Q.   He's making claims on shares for a company that you now

4   own?

5   A.   I would say he's making claims on a company on shares

6   for -- in FusionPharm.

7   Q.   Okay.  And who are you contacting about that?

8   A.   Mr. Guy Jean-Pierre.

9   Q.   Can I have Exhibit 372-K.

10       Have you had a chance to look at 372-K?

11  A.   Yeah.  This is -- I don't have it in this copy.  I have

12  a KK here.  Are they the same, K and KK, or are they two

13  separate documents?

14  Q.   It should be 372-K.

15  A.   I've got a KK here.

16  Q.   Look on your screen.

17  A.   It's different than what I have here.

18       Okay.  Go ahead.

19  Q.   Do you recognize Government Exhibit 372-K?

20  A.   Yes.  The part of the screen that I can see.

21  Q.   All right.  Let's blow up the top part.

22       Do you see where I circled?

23  A.   Yes, sir.

24  Q.   And what -- who is sending the e-mail?

25  A.   I am.

1    Q.   All right.   And what e-mail account are you using?

2    A.   *wsears@fusionpharminc.com.*

3    Q.   Okay.   Who are you sending it to?

4    A.   Mr. Scott Dittman.

5    Q.   All right.   What's the subject?

6    A.   FSPM Form D.

7    Q.   Okay.   And that means FusionPharm's Form D, FusionPharm

8    the company, right?

9    A.   It could have been on behalf of an individual also.   I

10   don't see the rest of the e-mail from these --

11   Q.   Sir, what does FSPM mean?

12   A.   That's the trading symbol.

13   Q.   For what?

14   A.   FusionPharm.

15   Q.   We've been through this, right?   FSPM --

16   A.   I'm trying to answer your question as clearly as I can.

17   Form Ds are required by people and companies, sir.   Just

18   trying to answer the question.

19   Q.   What's the subject?

20   A.   Subject says FSPM.

21   Q.   What does that mean to you?

22   A.   That's a public company FusionPharm.

23   Q.   So FusionPharm Form D.

24   A.   Yes.

25   Q.   That would be fair to say in the subject, right?

1  A.   Okay.

2  Q.   Okay.  Can we have it blown up down here at the bottom,

3  please.

4         Now, this is a -- now, who sent you the e-mail that

5  followed before you sent out your e-mail in that chain of

6  e-mails?

7  A.   What I see on the screen, it came from Guy Jean-Pierre.

8  Q.   What do you see in the document?

9  A.   I'm trying to tell you, one says K and one says KK.

10 That's what I asked the first --

11 Q.   I asked you to look at 372-K.

12 A.   And I explained to you I have the 372-KK.  That doesn't

13 match the screen of the one that's on the screen here.

14 Q.   I think the Court -- the courtroom clerk got you 372-K.

15 A.   Okay.  Go ahead.

16 Q.   You got the document in front of you now, sir?

17 A.   Yes, I have it now in front of me.

18 Q.   You wrote this e-mail, correct?

19 A.   Yes, sir.

20 Q.   All right.  Who sent you an e-mail?

21 A.   Mr. Guy Jean-Pierre.

22 Q.   Look at your screen.  It's blown up right there for

23 you.

24 A.   It's fuzzy.  I'm trying to just read it clearly.

25 Q.   Okay.  And what's Mr. Pierre's e-mail there?

1    A.    *guy@lawfirmofjeanpierre.com.*

2    Q.    What's the date of that e-mail he sent?

3    A.    August 24th, 2011.

4    Q.    And, again, what's the subject matter?

5    A.    FSPM Form D.

6    Q.    So it's fair to say FusionPharm Form D?

7    A.    Yes, sir.

8    Q.    Okay.  And down here I'm circling, do you see that

9    phone number?

10   A.    Yes, sir.

11   Q.    Do you recognize that phone number?

12   A.    Yes, sir.

13   Q.    Whose phone number is that?

14   A.    Mr. Guy Jean-Pierre's.

15   Q.    I want you to look at the language.  Can you read what

16   Mr. Guy Jean-Pierre sends you?

17   A.    It says, "Good afternoon.  Please see attached per your

18   request."

19   Q.    "Per your request," correct?

20   A.    Yes, sir.

21   Q.    Can I have Government Exhibit 372-L.

22              Is 372-L in front of you, sir?

23   A.    Yes, it is, sir.

24   Q.    What is 372-L?

25   A.    It is an e-mail.

1    Q.   And who's the e-mail from?

2    A.   Mr. Guy Jean-Pierre.

3    Q.   And who's it to?

4    A.   Myself and Scott Dittman.

5    Q.   And what's the subject?

6    A.   CPA Taylor Documents.

7    Q.   And, again, what is Mr. Guy Jean-Pierre asking you to

8    do in this e-mail?

9    A.   "Please see attached the documents sent by Robert

10   Taylor.  Give me a call when you have a chance."

11   Q.   So what is he asking you to do?

12   A.   Read the documents and give him a call.

13   Q.   So is it fair to say that you talked to Mr. Guy

14   Jean-Pierre on the phone?

15   A.   Yes, sir.

16            MR. GOODREID:  Objection.  Leading.

17            THE COURT:  You --

18            MR. SIBERT:  615, Your Honor.

19            THE COURT:  Okay.  Well, is there an objection to

20   an examination of this witness by leading questions?

21            MR. GOODREID:  Yes.

22            THE COURT:  Okay.

23            MR. GOODREID:  He is -- first of all, he's their

24   star witness.  I haven't seen any evidence of hostility or

25   adversity by this witness that the Government's had trouble

1    with certain questions, but that doesn't qualify making

2    615 -- I'm sorry.

3           THE COURT:   I'm -- you don't have to say it in that

4    tone.

5           MR. GOODREID:   I'm sorry, Your Honor.

6           THE COURT:   I asked you a question and I'll give

7    you an opportunity to make your position known.

8           MR. GOODREID:   I apologize, Your Honor.  I didn't

9    mean to take that tone with the Court.

10          THE COURT:   All right.  What about that?  The

11   objection is that you've not laid a foundation to lead this

12   question -- lead this witness via leading questions under

13   Rule 615.

14          MR. SIBERT:   Your Honor, first, just for the

15   record, the Government's never labeled this witness as a

16   star witness.

17          Second, I would not -- I would argue that the

18   testimony that was laid out in the very beginning, that this

19   witness has entered a plea agreement with the Government,

20   has pled guilty to this case in a conspiracy to commit

21   security fraud.  And also I would ask the Court to take

22   notice of some of the answers to very simple questions in

23   some of these documents --

24          THE COURT:   All right.

25          MR. SIBERT:   -- that he has been hostile.

1          THE COURT:  I'm going to sustain the objection for

2     now.  I agree with defense counsel that the hostility has

3     not been shown.  The defendant has an agreement --

4     cooperation agreement with the Government to testify and

5     unless and until I see evidence that the witness is

6     testifying falsely, he, in my mind, is not yet hostile to

7     the Government, so you may not examine him by leading

8     questions.

9          So the objection to the 615 request is sustained

10    and the objection to the leading question is sustained.

11    Rephrase.

12          MR. SIBERT:  Thank you, Your Honor.

13    BY MR. SIBERT:

14    Q.   How would you communicate with Mr. Guy Jean-Pierre?

15    A.   Various ways.  Through telephone --

16    Q.   What ways --

17    A.   Excuse me?

18    Q.   What would those ways be?

19    A.   It would be telephone, e-mail, and/or Skype messages

20    sometimes.

21    Q.   And what is Mr. Guy Jean-Pierre asking you -- how is he

22    asking you to communicate in this e-mail?

23    A.   To give him a call telephonically.

24    Q.   And, again, this is the phone number associated with

25    Mr. Guy Jean-Pierre?

1    A.   Yes, sir.

2    Q.   And what numbers would he call you?  Do you recall your

3    phone numbers at the time?

4    A.   No, I don't, sir.  I've changed my phone number four or

5    five different times in the last six years.

6    Q.   Why did you do that?

7    A.   Well, the FusionPharm case has put a lot of scrutiny on

8    my telephone numbers.

9    Q.   Can I have Government's Exhibit 372-M, as in Mike.

10         Do you have 372-M in front of you?

11    A.   Yes, I do, sir.

12    Q.   And what is Government Exhibit No. 372-M?

13    A.   That is an e-mail.

14    Q.   Okay.  And who wrote the e-mail?

15    A.   I did, sir.

16    Q.   And who did you write the e-mail to?

17    A.   Scott Dittman.

18    Q.   And what is the date on that e-mail?

19    A.   September 14th, 2011.

20    Q.   Okay.  And what is the subject of the e-mail?

21    A.   Robert Taylor Letter.

22    Q.   What is attached to the e-mail?

23    A.   FSPM Taylor Attorney Letter.

24    Q.   And what do you state in the e-mail?

25    A.   "FYI, he told Guy it was fine and to ship it out."

1   Q.   Who is Guy?

2   A.   Mr. Guy Jean-Pierre.

3   Q.   And what does "FYI" mean?

4   A.   For your information.

5   Q.   And here's a phone number.  Do you recognize that

6   720-458-0686 number?

7   A.   Yes, I do.

8   Q.   What number is that?

9   A.   FusionPharm.

10   Q.   In fact, your signature -- what company is listed under

11   your name?

12   A.   FusionPharm.

13   Q.   Can I have Exhibit 226.

14           THE COURT:  Why don't we pause there, Mr. Sibert.

15   Call it a day.

16           MR. SIBERT:  Thank you.

17           THE COURT:  All right, ladies and gentlemen of the

18   jury, I ask you to be back in the jury deliberation room by

19   8:35 tomorrow morning.  We will endeavor to resume promptly

20   at 8:45.

21       This will be the first time that you will hear

22   something that I have to advise you of every lunch break and

23   every break at the end of the day.  You'll get sick and

24   tired of hearing me say it but I have to say it, it's part

25   of my job.

1        Please do not do any independent research into or

2   discuss with anyone the facts, the law, or the persons

3   involved in this lawsuit.  The attorneys -- I have to

4   discuss a couple of things with the lawyers so the lawyers

5   will stay put, but for now, we are releasing the jury for

6   the evening.

7        (Jury left the courtroom at 5:03 p.m.)

8        THE COURT:  Two things I want to discuss.  Mr.

9   Sears, because you're in the middle of your testimony, I

10  direct you during the recess not to speak with any lawyers

11  involved in this case.  All right?

12       THE WITNESS:  Yes, sir.

13       THE COURT:  And I need you back in that witness

14  stand by 8:40 tomorrow morning.

15       THE WITNESS:  Yes, sir.

16       THE COURT:  All right.  You are released for today.

17       THE WITNESS:  Thank you.

18       THE COURT:  All right.  I want to discuss with the

19  lawyers a development right before we came back at the

20  afternoon break.  Hopefully it will blow over but I want to

21  advise you of juror in seat No. 9, Tyler Robinson, was

22  having, I guess we could call it, a mild panic attack, all

23  of a sudden realizing that he's now a member of the panel

24  and realizing that his decision could cause someone to lose

25  their liberty, and was wanting to speak with me and claiming

1     that he could not continue with his service.  I asked my

2     courtroom deputies to tell him to take a deep breath, that I

3     had every confidence that he could discharge his duties.

4     But then he still wanted to talk to me and I -- we again

5     calmed him down and I think he looked fairly composed in the

6     box.

7          I was watching him during the -- during the

8     afternoon session -- the second afternoon session, and he

9     seems to have gotten ahold of himself.  I just want to

10    advise you of that.  If tomorrow morning he continues to

11    have these kinds of problems, then I may have to discuss

12    with you the option of releasing him, in which case we'll go

13    forward with one alternate.  So hopefully we won't get

14    there, but I didn't want to surprise you with all this

15    tomorrow.  Hopefully he'll have a good night's sleep and be

16    refreshed and be able to go forward.  All right.

17         We will be in recess until --

18         MR. SIBERT:  Your Honor, may I raise two points

19    that the Court asked me to point out if I thought it might

20    come up?

21         THE COURT:  Right.

22         MR. SIBERT:  I don't know what a witness -- this

23    witness can say if I ask about Mr. Guy Jean-Pierre's

24    situation.  We have the OTC bands, we have the disbarment,

25    we have the SEC, and then we have the filming -- or the

1    conviction in 2016.  I don't think he'll say anything about

2    the 2016 conviction.  However, when I go in his testimony,

3    Mr. Guy Jean-Pierre's role gets diluted through time, and

4    part of that is because, one, OTC, also part of that is

5    because their firm, along with Cliffe Bodden, wrote

6    affidavits to the Florida State Bar knowing that there was a

7    complaint against Mr. Guy Jean-Pierre.  The thing that

8    released him from FusionPharm's work was the SEC complaint.

9         So I would argue to the Court that that might come

10   up.  Now, 404(b), obviously when I was sitting it was more

11   for the 2016 conviction.  The defense raised an objection to

12   the Florida State Bar and the SEC.  I argued that that was

13   more intrinsic to the case because it shows why FusionPharm

14   would not -- basically stop using Mr. Guy Jean-Pierre.  And

15   so I want to put the Court on notice, as I said I would do.

16        I didn't know how this witness would answer it,

17   essentially, until yesterday when one of those issues I

18   wanted to make sure before I put him on the stand that the

19   Court had concerns about.  That was basically the prep I did

20   with him besides going through documents.

21        THE COURT:  All right.  Let me hear from defense

22   counsel your position on this.

23        MR. GOODREID:  Well, Your Honor, we stand on our

24   404(b) objection.  I'm not sure necessarily why the

25   Government has to get into it.  I don't understand why he

1    can't ask, "Did you stop stop doing business with Mr.
2    Jean-Pierre at some point?"
3              And I think he gets through that part without
4    getting into the ramparts, if you will.
5              THE COURT:  I agree.  I think that with some
6    skillful questioning that you can keep this witness from
7    discussing those matters.
8              Did you raise this issue when you prepared him, Mr.
9    Sibert?
10             MR. SIBERT:  To be honest with you, Judge, I didn't
11   prepare this witness.
12             THE COURT:  Oh, I thought you just --
13             MR. SIBERT:  I went through documents to say, "Is
14   this your e-mail?"  And basically I had him sit through for
15   four hours and look through documents.  I didn't question
16   him and I didn't really even talk to him.  We went through
17   videos and everything to make sure he could articulate that
18   he watched it for purposes of getting it into evidence.
19             When I asked him why was -- knowing that 404(b) was
20   an issue, "Why did you release him doing work?"  It was
21   because of the complaint with the SEC, and it's intrinsic
22   because you have stock in this case.  And if you have any
23   lawyer or person in the firm that's having an SEC complaint
24   against him --
25             THE COURT:  Right, but you're not arguing the

1    merits of whether it's appropriate 404(b) evidence or not.

2    What Mr. Goodreid suggested, and I think there's merit to

3    it, is that we can avoid having to deal with the merits of

4    that objection by just steering clear of this issue.

5         Let me throw something out.  Would the -- would

6    defense counsel have an objection -- would the defendant

7    have an objection if we were to ask Mr. Sibert as an officer

8    of the Court to have a very specific discussion with Mr.

9    Sears solely to advise him that he's not to get into these

10   matters so that we don't have an issue where I'm trying to

11   unring a bell or put the toothpaste back in the tube?

12        MR. GOODREID:  I think that's a capital idea,

13   frankly.

14        THE COURT:  All right.  Mr. Sibert, why don't we do

15   that.  I just informed the witness that he can't talk to any

16   lawyers, but I would say -- I asked him to be here by 8:40.

17   Hopefully he'll be here earlier than that.  You're

18   authorized to have a very brief, very limited discussion

19   solely to advise him that you've raised this issue with the

20   Court and that it would be better for everyone and easier

21   for everyone if he avoided these issues.

22        MR. SIBERT:  Understand the role I'm taking.  The

23   Court is ruling against the Government when it comes to the

24   404(b) when it comes to the SEC complaint?  And the reason

25   why I'm asking is I prepared in my own outlines that we feel

1    it's very -- I feel it's relevant in our case and not

2    prejudicial -- overly prejudicial, that the fact that

3    FusionPharm no longer uses a lawyer that they -- you know, a

4    lawyer that helped set up the company, that does all these

5    attorney letters and opinion letters for three years, and

6    then all of a sudden he's off the books.

7              THE COURT:  All right.  So this is the --

8              MR. SIBERT:  I think it's fair to say that --

9              THE COURT:  That's the -- the evidence of the SEC

10   complaint is what you're specifically --

11             MR. SIBERT:  I don't know how he's going to answer.

12   It's either going to be the Florida bar or the SEC

13   complaint.  I will tell him -- I don't even think he knows

14   about the 2016 conviction.  But I will -- right.  So it

15   would just be either the bar -- the Florida bar complaint or

16   the SEC complaint that was the reason why FusionPharm no

17   longer used or hired Mr. Guy Jean-Pierre.

18             THE COURT:  All right.  So I am now hearing you to

19   say something different.  I thought you first said that you

20   wanted to advise me that you had a concern that these issues

21   could come up and that -- but implicit in that is that they

22   might not.

23         Now what you're asking me, though, is to make a

24   ruling specifically as to the SEC complaint and the Florida

25   bar complaint, up or down, as to whether you can get these

1  matters in.

2  MR. SIBERT:  Right.  Because of the fact that this

3  was the lawyer they were using and then all -- so --

4  THE COURT:  What about the other matters, this --

5  you don't know for sure that he doesn't know about this

6  conviction.

7  MR. SIBERT:  I will cover that with him if the

8  Court would allow me, as the Court just stated as an officer

9  of the court.  I will ask him what he knows besides --

10  besides the Florida Bar and the SEC conviction --

11  suspension.

12  THE COURT:  All right.  So let's do this.  I will

13  review the filings on the 404(b) issue this evening.  We'll

14  have a -- I'll give you an oral ruling in the morning on the

15  SEC -- on whether the SEC complaint evidence and/or the

16  Florida bar complaint evidence is or is not appropriate

17  evidence under Rule 404(b).  But we can anticipate that

18  beyond those two specific items, you will have a discussion

19  per my instructions with the witness that he's not to

20  reference anything other than those.

21  And obviously with my ruling -- if the ruling is

22  that the 404(b) -- that these two items are appropriate

23  under Rule 404(b), then obviously you will have your green

24  light to go forward with those -- with those subjects.  If

25  the ruling is that you're not to, then we'll have to take

1     some -- a break at some point and you'll have to have the

2     same kind of discussion with respect to those two matters.

3              MR. SIBERT:  And, Your Honor, so the Court

4     understands correctly, I did my 404(b) out of an abundance

5     of caution with those administrative issues, so I'm arguing

6     to the Court it's intrinsic.  And out of an abundance of

7     caution I informed the defense of 404(b).

8              THE COURT:  I know you're arguing that it's -- it

9     can come in under 404(b) as an appropriate use --

10             MR. SIBERT:  I'm arguing it's not even 404(b).

11             THE COURT:  Well, all right.  That's another way

12    to --

13             MR. SIBERT:  Intrinsic evidence --

14             THE COURT:  I understand.  That's another way to

15    pitch it, that 404(b) doesn't even apply.

16             MR. SIBERT:  Yes.

17             THE COURT:  And that if it does apply, it is an

18    appropriate -- the evidence of these two matters are still

19    appropriate grounds for inquiry under the rule.

20             MR. SIBERT:  That's fair.  Yes.

21             THE COURT:  All right.  So you're raising two

22    alternative arguments there.  Mr. Barnard.

23             MR. BARNARD:  Your Honor, when the Court considers

24    the -- I'm not sure that our pleadings were very clear on

25    this.  One of the things -- the way it's being talked about

1    at this point is sounding like the Florida attorney

2    disbarment is just one point and that the SEC banning is

3    another point.

4         What happened was that there were -- there was,

5    first of all, an investigation and there was a -- with

6    regard to -- to the attorney matter and the disbarment,

7    which is one of the things the Government said they wanted

8    to put in, was proof of the disbarment, which was in 2014,

9    so that's after the fact.

10        So -- so we're talking about two different things.

11   One is an investigation and one is a disbarment.  The same

12   thing is true in the SEC banning, they eventually banned him

13   after 2014 based upon the disbarment.  So -- so the

14   complaint may have been filed earlier, but the actual

15   disbarment and bannings occurred in 2014, well after Mr.

16   Jean-Pierre was no longer working for FusionPharm.

17        And so I -- therefore, even if the Court were to

18   say that Mr. Sears could talk about these matters, he

19   shouldn't be able to talk about the disbarment or the

20   banning that occurred in 2014.

21        THE COURT:  All right.  With the argument you just

22   laid, is that included in your written submissions?

23        MR. BARNARD:  I --

24        MR. SIBERT:  Stipulate to it, Your Honor, because I

25   think Mr. Barnard sums it up right.  I'm just talking about

1    what FusionPharm knew between 2011 to 2013, before -- after

2    the time that Mr. Guy Jean-Pierre was at FusionPharm.  And

3    that would include the complaint, the Florida State Bar that

4    they submitted affidavit letters on his behalf, along with

5    the SEC complaint that happened in 2012 where Mr. Guy

6    Jean-Pierre offered SEC testimony.  And those are the two

7    things I think Mr. Sears would be able to talk about.

8              THE COURT:  All right.  So does that help deal with

9    your issue, Mr. Barnard?  So that we've narrowed down what

10   is the -- what are the categories -- or specific items of

11   evidence that the Government is going to persist in trying

12   to get in?  What Mr. Sibert just said.

13             MR. BARNARD:  That does take care of the second

14   2014 issues with regard to the actual banning and

15   disbarment, yes.

16             THE COURT:  All right.  So to wrap it all up,

17   you'll have the discussion per what I've just authorized you

18   to do, Mr. Sibert, tomorrow morning with this witness with

19   respect to everything other than these two items, that will

20   be before I come out on the bench.  I'll come out on the

21   bench and I'll give you my ruling on whether these two

22   items -- evidence regarding these two items can come into

23   evidence, and then you will tailor your examination of the

24   witness based on that ruling.

25             MR. SIBERT:  And if the Court rules in the

1    Government's favor, we can bring this testimony in about the

2    complaints.  If I could lead, it would be a safer

3    alternative of directing the witness than having something

4    that the witness knows after the fact.

5         THE COURT:  Well, there's a point on that.  There's

6    some merit to that.  What about that, giving the Government

7    leeway specifically just on these two items, assuming that I

8    rule against the defendant in the Government's favor,

9    evidence of these two items can come in that, in order to

10   lessen the risk of other testimony coming in, that the

11   Government can lead on these two points if I rule against

12   the defendant?

13        MR. GOODREID:  Well, I'm not sure, Your Honor.

14   That seems like giving the Government its cake and eating

15   it, too.  And the damage is done as far as the defense is

16   concerned.  Why let them leave it on top?  Maybe I'm missing

17   something.

18        THE COURT:  Only because it's a rifle shot instead

19   of a shotgun in terms of what's going to come in; the other

20   items won't come in.

21        MR. GOODREID:  Yeah, Judge, maybe -- and, I'm

22   sorry, maybe it's late in the day and I'm not getting it.  I

23   thought that was the very purpose Mr. Sibert was going to be

24   talking to him about anyways, to use your phraseology, to do

25   the rifle shot.

1          THE COURT:  Okay.  So that other matters -- well,

2     all right.  I mean, if you're going to -- if you're going to

3     object, I'm going to agree with you and I'm going to sustain

4     that objection.  Again, assuming that the ruling goes

5     against the defendant.  But I think we are taking a little

6     bit of a risk that the items will be a bit broader than what

7     we're hoping and then we'll be in a situation with a

8     limiting instruction.  But then we're going to be trying to

9     unring a bell on that.  But I am -- it is true that we're

10    asking Mr. Sibert to have a discussion that everything else

11    other than these two items are not to be discussed.  I don't

12    know how else we can handle it.

13         MR. GOODREID:  May I make the suggestion, once we

14    get the Court's ruling, we'll get a chance to think about it

15    overnight and maybe we'll give you a more cogent position

16    after the Court's ruling, if that makes sense.

17         THE COURT:  But he needs to know for

18    cross-examination of Mr. Sears tomorrow.  Right, Mr. Sibert?

19         MR. SIBERT:  And discussion.  And I'll put everyone

20    on notice, he's not an easy person to talk to.  He has a lot

21    of answers depending on what day it is.  So as Mr. Goodreid

22    says, he's our star witness, we save the stars for the end,

23    right.  He is a hard witness to control.

24         It was yesterday reviewing these documents --

25         THE COURT:  But my point is Mr. Goodreid -- I'll

1      allow them to respond -- but I don't know that we can do

2      that because the examination --

3              MR. SIBERT:  I've got to talk to him.

4              MR. GOODREID:  You don't anticipate having him on

5      the stand the whole day tomorrow?

6              MR. SIBERT:  He'll be on the stand for a while.  We

7      have videos and evidence to get into --

8              THE COURT:  So you anticipate him being on the

9      stand into Wednesday?

10             MR. SIBERT:  No, I think tomorrow afternoon,

11     hopefully, we're getting him off.

12             THE COURT:  All right.  Well, then, I'll have -- I

13     don't think we can defer the ruling as long as you want, Mr.

14     Goodreid.  We're just going to have to go to with that.

15             MR. SIBERT:  Judge, if the Court needs more time, I

16     can wait on those questions.  I got a lot of e-mails and --

17             THE COURT:  You're telling me you're going to

18     finish with him in the afternoon.

19             MR. SIBERT:  I know, but --

20             THE COURT:  We can't  --

21             MR. SIBERT:  We have a mid-morning break and a

22     lunch break and we have a lot of video.  So there might be

23     some objections or there could be some things --

24             THE COURT:  All right.

25             MR. SIBERT:  -- I can hold off --

1          THE COURT:  Can you hold off on those questions

2     until after lunch tomorrow?

3          MR. SIBERT:  Yes, sir.

4          THE COURT:  All right.  So if I give you my ruling

5     by the beginning of the lunch break, that will work?

6          MR. SIBERT:  Even if you need the lunch hour, I can

7     work with that.

8          THE COURT:  Okay.  Actually, now I didn't know you

9     were going to have him on the stand that long.  Then

10    actually to wait to have this discussion with him, don't

11    have it first thing in the morning.  Wait to get my ruling,

12    and then you'll be more fully informed of what it is he can

13    or cannot go into and then you can have that discussion with

14    him.  I will give you that ruling by the beginning of the

15    lunch break and then you can have that discussion with him

16    during the lunch break and then you can go into what's left

17    of what I have ruled on that you can go into in the

18    afternoon session.

19         MR. SIBERT:  Yes, sir.

20         THE COURT:  All right.

21         MR. SIBERT:  Thank you.

22         THE COURT:  That's how we're going to proceed.  We

23    will be in recess until 8:45 tomorrow morning.

24         (Court adjourned at 5:23 p.m.)

25

78

1                                    **INDEX**

2       Item                                                    PAGE

3                        GOVERNMENT'S WITNESSES

4          **WILLIAM SEARS**
           Direct Examination by Mr. Sibert              25

5

6                        GOVERNMENT'S EXHIBITS

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|-----------|---------|----------|---------|------------|
| 32 | 31 | 32 | | |
| 33 | 31 | 32 | | |
| 35 | 31 | 32 | | |
| 36 | 31 | 32 | | |
| 37 | 31 | 32 | | |
| 40 | 38 | 43 | | |
| 312 | 38 | 43 | | |
| 158 | 38 | 43 | | |
| 1531 | 38 | 43 | | |
| 380 | 38 | 43 | | |
| 381 | 38 | 43 | | |
| 382 | 38 | 43 | | |
| 383 | 38 | 43 | | |
| 384 | 38 | 43 | | |
| 385 | 38 | 43 | | |
| 386 | 38 | 43 | | |
| 226 | 38 | 43 | | |
| 231 | 38 | 43 | | |

| | | GOVERNMENT'S EXHIBITS | | | |
|---|---|---|---|---|---|
| EXHIBITS: | Offered | Received | Refused | Stipulated |
| 238 | 31 | 32 | | |
| 254 | 38 | 43 | | |
| 372-B | 38 | 43 | | |
| 372-D | 38 | 43 | | |
| 372-H | 38 | 43 | | |
| 372-I | 38 | 43 | | |
| 372-J | 38 | 43 | | |
| 372-K | 38 | 43 | | |
| 372-L | 38 | 43 | | |
| 372-M | 38 | 43 | | |
| 372-Q | 38 | 43 | | |
| 372-T | 38 | 43 | | |
| 372-U | 38 | 43 | | |
| 372-CC | 38 | 43 | | |
| 372-II | 38 | 43 | | |
| 372-MM | 38 | 43 | | |
| 372-OO | 38 | 43 | | |
| 372-PP | 38 | 43 | | |
| 372-RR | 38 | 43 | | |
| 372-TT | 38 | 43 | | |
| 372-YY | 38 | 43 | | |
| 372-GGG | 38 | 43 | | |
| 372-PPP | 38 | 43 | | |

1                          GOVERNMENT'S EXHIBITS

2     EXHIBITS:          Offered    Received   Refused    Stipulated

3     382               38         43

4     382               38         43

5     397               38         43

6

7                       *     *     *     *     *

8                        REPORTER'S CERTIFICATE

9

10         I certify that the foregoing is a correct transcript

11    from the record of proceedings in the above-entitled matter.

12         Dated at Denver, Colorado, this 25th day of March,

13    2020.

14

15

16

17    _                                    _

18                   MARY J. GEORGE, FCRR, CRR, RMR

19

20

21

22

23

24

25