IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 17-cr-0008-WJM

UNITED STATES OF AMERICA,

Plaintiff,

vs.

GUY JEAN-PIERRE a/k/a Marcelo Dominguez de Guerra,

Defendant.

------------------------------------------------------------

REPORTER'S TRANSCRIPT
(Jury Trial, Day 2)
Volume II

------------------------------------------------------------

Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

Judge, United States District Court for the District of

Colorado, commencing at 8:50 a.m., on the 15th day of

January, 2019, in Courtroom A801, United States Courthouse,

Denver, Colorado.

APPEARANCES

    JEREMY S. SIBERT and ROBERT M. BROWN, Assistant U.S.
Attorneys, 1801 California Street, Suite 1600, Denver,
Colorado 80202, appearing for the plaintiff.

    CLIFFORD J. BARNARD, Attorney at Law, 4450 Arapahoe
Avenue, Suite 100, Boulder, Colorado 80303, AND
    THOMAS E. GOODREID, Attorney at Law, 1801 Broadway,
Suite 1400, Denver, Colorado 80202, appearing for the
defendant.

MARY J. GEORGE, FCRR, CRR, RMR
901 19th Street, Denver, Colorado 80294
Proceedings Reported by Mechanical Stenography
Transcription Produced via Computer

1                        P R O C E E D I N G S

2              (Proceedings were held in open court outside the

3         presence of the jury at 8:50 a.m.)

4                   THE COURT:  All right.  I understand that counsel

5         wish to raise some matters with me before we bring in the

6         jury.  But I have something to raise with you, so I'm going

7         to do that first.

8                   As I told you yesterday, I'm going to -- because

9         Mr. Sibert asked for it, I'm going to give you a ruling on

10        the issue of the admissibility of two matters -- two items:

11        The Florida disbarment matter and, at least back in

12        chambers, we're dividing up that issue into two parts:  The

13        opinion letters, themselves, as well as the fact of

14        disbarment, and then also the SEC suspension.

15                  We discussed yesterday at length the parties'

16        respective views on the application of Rule 404 and,

17        specifically, 404(b).  Before we prepare our ruling, I want

18        to get from the defendant, apart from the issue of whether

19        404 applies and your position of 404, does the defendant

20        assert any other grounds for objecting to these items of

21        evidence coming in?  Again, other than 404.  Who wants to

22        speak for the defendant?

23                  MR. GOODREID:  Well, Your Honor, I would add -- I

24        would just add one other thing, and that is the relevance

25        objection based upon the timing, as Mr. Barnard described

1    yesterday.  So relevance I would add as well as the 404(b).

2            And I also want to be clear, Your Honor, also

3    within 404(b) is the 403 analysis; I just want to make sure

4    that -- you know, prejudice versus probity, that sort of

5    stuff.

6            THE COURT:  All right.  That's implicit in it, of

7    course, but I think it's incumbent upon you, if you're

8    making an undue prejudice argument -- or objection, you need

9    to expressly make it under 403.

10           MR. GOODREID:  Okay.  So just to be clear, Your

11   Honor, for the record, so three objections, all right?  One

12   is 404(b); two is relevance; and three is the 403, which I

13   think we've articulated in our pleading.  But the short

14   version is the prejudice far outweighs the probity,

15   especially based on the timing of the disbarment, which is

16   prejudicial.  I mean, they've got evidence about him doing

17   this, that and the other, this comes after the fact.  It's

18   prejudicial to say he's a bad guy.

19           What's the probity of him being disbarred after the

20   events that are at issue in this case?  That would be our

21   argument.

22           THE COURT:  Okay.  I'll hear, very briefly, from

23   the Government in response to the relevancy and undue

24   prejudice under the 403 objection.

25           MR. SIBERT:  Yes, sir.  I'll let the Court know,

1    actually, I went back last night and I was listening to some

2    of the undercover tapes and in 2016, actually, Guy

3    Jean-Pierre, himself, is talking about the SEC and the

4    reasons why he doesn't want to have documents under Guy

5    Jean-Pierre.  And he mentions about the letter writing and

6    why he wants to do things a little bit different.

7         So I would offer to the Court that it's the

8    Government's intent to play the evidence of Mr. Guy

9    Jean-Pierre's conversations that he had with the undercover

10   which directly ties back to what he did in FusionPharm from

11   2011 to 2013.  In fact, when he's setting up the shell

12   company, he's making reference to the lady that made the

13   complaint against him -- a Ms. Brenda Hamilton, I think, is

14   her name -- and he actually goes in the fact that the SEC --

15   and also Mr. DiTommaso, he talks about how Mr. DiTommaso had

16   to go through a lot of SEC testimony regarding the fact of

17   the complaint that was made in this case regarding his

18   writing the Rule 144 letter.

19        So I'm going to offer that regardless in this trial

20   based upon opposing party's statement not being hearsay

21   because the defendant made these statements.  And, further,

22   I think it's more relevant, actually, now because even in

23   2016, the state of mind of the defendant --

24             THE COURT:  What is more relevant?

25             MR. SIBERT:  The fact that the SEC complaint is a

1   reason why FusionPharm did not want to keep him working

2   under -- as the attorney -- as the legal counsel or

3   corporate secretary, as it was stated in the financials.

4           Second, I do need to say in 2012, there's two

5   documentations -- we will be getting into this with the

6   witness -- regarding the financials where there's a draft of

7   the 2012 annual report from FusionPharm, and the draft lists

8   Mr. Guy Jean-Pierre as the legal counsel/secretary --

9   corporate secretary.  In the filings he's not listed.  But

10  there's a follow-on e-mail that will state that he is still

11  the legal counsel for FusionPharm.

12          But part of that disclosure was because the -- the

13  lack of disclosure, it was a part because of the

14  complaint -- the SEC complaint that was filed against Mr.

15  Guy Jean-Pierre.

16          SEC complaints are public documents so anyone can

17  go on the SEC -- in fact, today we could even pull up his

18  complaint.  And so anyone of -- the rationale -- or the

19  relevancy of this is if you're running a business and you're

20  running small stock MicroCap funds, if you have a

21  secretary -- or a corporate secretary or legal counsel

22  listed that -- as having at least complaints filed with the

23  SEC, it's not going to help probably investors who look into

24  your firm.  So there's the relevancy.

25          Second, because the fact that 2016 happens, and Mr.

1    Guy Jean-Pierre is now setting up this shell company and

2    basically continued to -- at least our position, continued

3    to commit fraud with documents, or needed to create these

4    shells and convertible notes, his state of mind is that he

5    still is worried about the SEC and the problems.  So he's

6    advising Mr. Sears about some of these issues that were

7    caused because of the SEC and his disbarment.

8         THE COURT:  All right.  That's all well and good,

9    but I don't think you have totally answered my question,

10   which is:  What is the Government's response to -- I think

11   you've addressed relevancy, but the Government's response to

12   the additional objection to the Florida disbarment and the

13   SEC complaint with respect to 403, undue prejudice.

14        MR. SIBERT:  Sir, as you know, the Tenth Circuit

15   case law -- I've cited this in my 404(b) response -- is in

16   favor of the rule of inclusion, not exclusion.  All evidence

17   is prejudicial against a defendant, but --

18        THE COURT:  That's --

19        MR. SIBERT:  But --

20        THE COURT:  That's actually -- please, don't talk

21   over me.

22        MR. SIBERT:  I'm sorry, Your Honor.

23        THE COURT:  Clearly all evidence that would tend to

24   show the guilt of the defendant is prejudicial in that

25   sense.  What I'm talking about is the 403 analysis, which is

1     undue prejudice when comparing the prejudice to the

2     defendant as compared to the probative value of the evidence

3     in support of the Government's case.  And that's what I'm

4     going to give you a couple of minutes to respond to.  If you

5     don't want to respond to it, that's fine, but go ahead.

6            MR. SIBERT:  I'm sorry, Your Honor, I will respond

7     to that.  The probative value outweighs the prejudicial

8     effect in this case, and that's what the Tenth Circuit case

9     law cites and, actually, would like the Courts to facilitate

10    at the District Court level.  The fact here is it's very

11    probative.  This case is about fraud.  The hiding the

12    disclosures, the not telling the truth.

13           The fact that FusionPharm management made the

14    decision not to use a legal counsel because he's going

15    through the complaint process -- which I just stated are

16    public documents -- goes to the point that investors would

17    be scared off, or be a little bit more cautious or fearful

18    if they knew there was a director listed on the financials

19    that was actually going through the complaint process.

20           So it is probative in the fact that it shows the

21    fact that why there's continued fraud in this case.  And

22    part of that fraud is, as I explained in my opening, is the

23    filings.  And we're going to have OTC get up here and tell

24    what needs to be in these disclosures.

25           THE COURT:  That's all well and good, but we're

1   talking specifically about the evidence of the suspension by

2   the SEC and the disbarment from the Florida Supreme Court --

3   the Florida Bar.

4           MR. SIBERT:  Like I said --

5           THE COURT:  And, you know, obviously the

6   defendant's position is, in effect, you're trying to get the

7   jury to see evidence that -- where they will say, "Ah, well,

8   he's already been found guilty by the Florida Bar.  He's

9   already been found guilty by the SEC."  And so, you know,

10  that would tend to support the Government's position that

11  he's guilty in this trial as well.

12          That is the danger of this evidence.  That's

13  what -- why the defendant has objected to it.  And that's

14  what I'm giving you an opportunity to respond to:  How the

15  potential prejudice of these two other forums and

16  jurisdictions coming to this conclusion, the clear prejudice

17  to the defendant, I think, from that, how that's still

18  nonetheless outweighed by the Government's need to have this

19  evidence come in as probative of its counts under the

20  indictment; evidence which I think would strengthen your

21  case that you could not get in any other way, but it sounds,

22  from everything you're summarizing to me, that there's a lot

23  of other ways you can get in all this evidence that you

24  believe establishes the elements of the counts.

25          MR. SIBERT:  If the Court would entertain me for a

1  few more minutes.  2016, in the tapes -- Mr. Guy Jean-Pierre

2  says he is no longer a security lawyer, he's a consultant.

3  All right?  That's very relevant to the fact that he's doing

4  legal work, he's giving himself a different title.  But the

5  fact is he can't be a lawyer anymore and the jury should

6  know why he's saying that.

7         You know, when you have the defendant saying he's

8  something, there's a reason behind that.  And so Mr. Guy

9  Jean-Pierre's putting out the fact that he's acting as a

10  consultant.  I would not be surprised if the defense opens

11  this door and says, He wasn't acting as a securities lawyer,

12  he was just consulting throughout this time.

13         Well, he can't be a lawyer anymore because after

14  2012, that's when he's disbarred.

15         THE COURT:  He can't be a lawyer in Florida.

16         MR. SIBERT:  He can't be a lawyer in Florida and

17  can't practice in front of the SEC, can't file the

18  documents, can't do any of these financial disclosures.  All

19  right?

20         The FINRA, OTC, and the Securities and Exchange

21  Commission are all ran by the 33 Act or 34 Exchange Act that

22  fall under the SEC's regulations.  And so if Mr. Guy

23  Jean-Pierre's putting his name on, it's going to be the red

24  flag.

25         So in -- if I'm going to play a tape where Mr. Guy

Jean-Pierre is untruthfully saying he's not acting as a
lawyer even though he's drafting all these documents, it's
very relevant to explain why he's saying that.

Second, DiTommaso -- is going to be a witness
here -- basically states that the Florida State Bar is
related to the failure of due diligence by Mr. Guy
Jean-Pierre.

So I know the Court asked about -- there's -- I
think there's two arguments here.  And I agree with the fact
that the disbarment and the SEC suspension didn't happen
until after Mr. Guy Jean-Pierre left FusionPharm; however,
what I find is relevant is the fact that you have public
documents, complaints, that anyone can look up, and was
essentially a reason why the management of the firm and the
fact that why witnesses in this case were asked questions by
the SEC and the Florida State Bar regarding Mr. Guy
Jean-Pierre's work.  It's relevant, the fact that if he's
not being -- if he's not following the law as a securities
lawyer, yes, it helps the case because people are -- who
have knowledge of the fact that he was ghost-writing and
doing all the opinion work, knowing the facts what was going
on in the firm, it's really relevant in the fact that it's
evidence that helps corroborate and meets our burden, which
is beyond a reasonable doubt.  That a very impressive
security background lawyer -- we'll get into here this

1     morning -- knew exactly the law, but chose to disclose --

2     chose not to follow it.

3            So I think there's two sections here.  It's

4     relevant to show why witnesses had to do certain things

5     after they would finish their business with FusionPharm,

6     including the California state lawyer:  What happened to you

7     after you ghost-wrote all these letters?

8            Why, I was commissioned to the SEC.

9            Why?

10           They wanted to know what my role in it and what Guy

11    Jean-Pierre was doing.  Okay?  And obviously that lawyer

12    also had to answer the Florida State Bar.

13           THE COURT:  All right.  Okay.  I've heard your

14    argument.  Thank you very much.  We will get a ruling to you

15    by the beginning of the lunch break.

16           What were the matters that counsel needed to raise

17    with me?

18           MR. GOODREID:  Your Honor, on behalf of the

19    defense -- and I hope this doesn't come off as whining, Your

20    Honor -- but as I come off the Court's standing order, the

21    Government is obligated to tell us each day who the

22    witnesses are they're going to call the next day.

23           THE COURT:  Right.

24           MR. GOODREID:  Now we approached Mr. Sibert last

25    night.  He said, of course Mr. Sears is going to continue,

1    probably the FBI undercover is coming after that, that's

2    fine.  After that, the response was, Well, it depends who's

3    here.

4         I don't think that puts us on fair notice.  So all

5    I'm asking for is just sort of the reminder to the

6    Government that they must tell us, as I understand the

7    Court's practice, who they're going to call the next day.

8         THE COURT:  Right.  Well, that -- I don't know how

9    to make it any clearer, Mr. Sibert.  That's my directive.

10   You -- if you have -- if you fairly, and in good faith,

11   believe that X, Y and Z are going to be testifying today,

12   then yesterday evening is when you should have disclosed

13   that to defense counsel.  And we're going to be at this for

14   another 10 days, so I expect that to be the case each

15   evening from here on out.

16        MR. SIBERT:  I would hope an officer of the court

17   on the other side would take my word that Mr. Sears will

18   probably be on the stand all day, like I said.  So I'm sorry

19   that you have to entertain this stuff.

20        THE COURT:  All right.  Okay.  Anything else?  All

21   right.  Let's bring in the jury.

22        MR. SIBERT:  Your Honor, at this time the

23   Government would move an oral motion to with-move Mr.

24   Robinson as a juror in this case.

25        THE COURT:  You're moving to do what?

1      MR. SIBERT:  I'm moving to ask the Court to release

2  Mr. Robinson as a juror in this case.

3      THE COURT:  And your grounds for it are?

4      MR. SIBERT:  My grounds are -- for it is that, one,

5  the Court did an inquiry -- an inquiry with Mr. Robinson --

6      THE COURT:  Actually, to be perfectly clear, I did

7  not speak with Mr. Robinson.  This is information I got from

8  Ms. Roberson and Ms. Frank yesterday afternoon in terms of

9  their discussions with him.

10      MR. SIBERT:  Okay.  I'm not talking about that

11  conversation, I'm talking about during the process of

12  questioning --

13      THE COURT:  Oh, the actual voir dire.

14      MR. SIBERT:  Yes.

15      THE COURT:  Okay.

16      MR. SIBERT:  And the Court did a voir dire and --

17      THE COURT:  Right.

18      MR. SIBERT:  -- the witness under his oath answered

19  the Court's questions.

20      THE COURT:  Right.

21      MR. SIBERT:  And he said he would have no issue

22  with the fact that he could render a judgment in the case,

23  that he was going to be asked to do that.  He was seated as

24  a juror in this case through the process.  He was given

25  another oath that he would follow the Court's instructions

1  and do his various duties as a juror.

2         And as the Court correctly pointed out, I don't

3  know all the details, but we were notified last night after

4  the close of court that Mr. Robinson needed to be spoken to

5  twice.  And I'm sorry it -- I got the impression that the

6  Court did speak to Mr. Robinson --

7         THE COURT:  Okay, well, I -- that was not my intent

8  to give that impression, and if I did, I apologize for that.

9  That was not my --

10        MR. SIBERT:  And I apologize --

11        THE COURT:  But that did not -- just so the record

12  is clear, that did not happen.  I have not spoken directly

13  with this juror.  Let me -- let me -- I'm assuming the

14  defendant objects to this motion?

15        MR. GOODREID:  We do, Your Honor.

16        THE COURT:  All right.  This is what I'm going to

17  do.  I'm not going to rule on it now.  I want to -- as was

18  my intent yesterday, I want to see how this plays out with

19  Mr. Robinson.  If I get any further communication from him

20  that he's having reservations about his ability to return a

21  verdict that might result in the incarceration of an

22  individual, then what I'm going -- what I intend to do is

23  bring him out on his own out here into the courtroom where I

24  will question him and allow the two of you to question him

25  and then, you know, I'll consider your motion renewed at

1     that time and then I'll make a ruling.

2          But at this point, given that my observations of

3     him after that communication was that he seemed to have

4     calmed down and he was taking notes, he seemed very

5     interested during your opening statement, I think that that

6     initial sense of anxiety has passed.  But if it reasserts

7     itself, then definitely I'm going to deal with it.  And if

8     we do excuse him, then we'll have to decide which of the two

9     alternates is going to become one of the 12, and who will

10    remain as the single alternate, then we'll go forward in

11    that regard.  But I'm not --

12          MR. SIBERT:  I'm --

13          THE COURT:  I'm not prepared to rule on your motion

14    at this time.

15          MR. SIBERT:  Can I inquire of the Court of how Mr.

16    Robinson was spoken to?  If it was individually or in front

17    of the other jurors?

18          THE COURT:  Ms. Frank?

19          COURTROOM DEPUTY:  He approached me out in the

20    hallway.  I can't say for sure whether the other jurors

21    heard, but he was out in the hallway secluded from the rest

22    of the jury.  And at that point, Ms. Roberson came up to

23    speak with us both.

24          THE COURT:  Okay.

25          MR. SIBERT:  And my argument to the Court, just so

1      the Court can have some more consideration, it is -- and I
2      need to make a record -- the fact is that if the shoe was on
3      the other foot, if it was a juror that said, "I don't care
4      what the Court instructs me about the indictment.  If
5      there's an indictment in this case, I'm going to find the
6      person guilty," there's no time for wavering at this point.
7              And, unfortunately, once they're in the
8      deliberation room, no one in this court can counsel or --
9      you know, guide that person.  The fact of the matter that
10     he's having hesitations, regardless if he's interested in
11     the case or not, the bottom line is he needs to make a
12     decision and he has to render a judgment --
13             THE COURT:  I understand.  But we're -- Mr. Sibert,
14     I'm starting to notice a pattern here that I think needs to
15     be rectified, as you showed with your unwillingness to
16     accept my initial rulings on the length of opening
17     statement -- which your perseverance paid off -- at some
18     point it's going to start backfiring on you.  You have got
19     to learn to accept my rulings and not try to -- and not
20     argue on them a second and third time.  When I've ruled,
21     I've ruled and we move on.
22             MR. SIBERT:  I move for a motion to --
23             THE COURT:  You made your motion, I told you I'm
24     not prepared to rule on it now and we're moving forward.
25     I'm not going to continue to hear additional argument.

1           MR. SIBERT:  I move for a motion to stay if the
2    Court declines the objection.
3           THE COURT:  A motion to what?
4           MR. SIBERT:  Stay.
5           THE COURT:  To stay what?
6           MR. SIBERT:  So we can appeal to the Tenth Circuit.
7           THE COURT:  Stay the trial?  That's denied.  Let's
8    bring in the jury.
9        (Jury was present at 9:11 a.m.)
10          THE COURT:  Good morning, ladies and gentlemen of
11   the jury.  Welcome back to day 2 of our jury trial.  Sorry
12   we're 27-some minutes later than we thought to get to you.
13   There were several matters that I needed to discuss with the
14   lawyers outside of your presence.  That's -- the law
15   requires that.  Unfortunately, those matters can't be
16   avoided.  So, again, as I've mentioned earlier in the
17   preliminary instructions, I need to ask for your patience.
18   And these kinds of interruptions we'll try to keep to a
19   minimum but they may occur with some frequency during the
20   trial.  So, again, remember the importance of why we're here
21   and I ask for your patience.
22          All right.  Mr. Sears, I remind you that you remain
23   under oath.
24          THE WITNESS:  Yes, sir.
25          THE COURT:  All right, Mr. Sibert, you may resume

Direct - Sears

1    your examination.

2                MR. SIBERT:  Thank you, Your Honor.

3                     DIRECT EXAMINATION (Continued)

4    BY MR. SIBERT:

5    Q.   All right.  Good morning, Mr. Sears.

6    A.   Good morning.

7    Q.   We left off talking about several e-mails regarding you

8    sending e-mails to Mr. Guy Jean-Pierre.  Do you recall that?

9    A.   Yesterday.

10   Q.   And a lot of those e-mails dealt, you would agree, with

11   the fact with your role with FusionPharm?

12   A.   Yes, sir.

13   Q.   Okay.  And, in addition, the fact that some of those

14   e-mails dealt with the acquisition that you were making with

15   Baby Bee Bright to acquire that shell company.

16   A.   The acquisition that the company was making, yes, sir.

17   Q.   And that company eventually became FusionPharm; is that

18   right?

19   A.   I'm sorry, say that again.

20   Q.   That company eventually became FusionPharm.

21   A.   Yes, sir.

22   Q.   All right.  Now, you stated -- I might -- I did ask you

23   where you lived today.  Where were you living in 2011-2014?

24   A.   Thornton, Colorado.

25   Q.   Okay.  And now with FusionPharm, did you have an office

99
Direct - Sears

1    within the corporation space?

2    A.   I had a workspace.

3    Q.   Okay.  And where was that workspace located?

4    A.   Several different places.

5    Q.   Can you tell me where these were?

6    A.   Which years, sir?

7    Q.   Why don't we start 2011.

8    A.   2011 would have been 4360 Vine Street.

9    Q.   Vine Street?

10   A.   Yes, sir.

11   Q.   Is that here in Denver, Colorado?

12   A.   Yes, it is.

13   Q.   All right.  And did you have an office there?

14   A.   I had a workspace.

15   Q.   And go ahead and tell me about the next workplace that

16   you had --

17   A.   It was on Wynkoop Street.  I don't remember the exact

18   address.

19   Q.   And where is Wynkoop Street?

20   A.   In Denver, Colorado.

21   Q.   Okay.  And were there any other locations?

22   A.   Yes.  Then I went back to 4360 Vine Street on my own.

23   And then I went to the office in Commerce -- it was a

24   warehouse I built in -- I put together in Commerce City, and

25   I don't remember the exact address on that.

Direct - Sears

1    Q.    Okay.  But all these in either Commerce City or Denver,

2    Colorado?

3    A.    Yes, sir.

4    Q.    When you were conducting these e-mails that we

5    discussed yesterday, where were you usually working on these

6    e-mails before you sent them?

7    A.    It could be home, it could be any one of those offices.

8    I'm on the run a lot, so it could have been . . .

9    Q.    So fair to say somewhere either in Denver or Thornton,

10   Colorado, or Commerce City?

11   A.    Somewhere in the state of Colorado, yeah.

12   Q.    Where was Mr. Guy Jean-Pierre's office?

13   A.    The one office I know about was in Deerfield Beach,

14   Florida.

15   Q.    Okay.  So not here in Colorado?

16   A.    Not here in Colorado.

17   Q.    All right.  Now, in front of you is Exhibit 226.

18         MR. SIBERT:  And, Your Honor, these are still the

19   same block that have been stipulated to and offered into

20   evidence.

21         THE COURT:  226, yeah, I see that there.  That's

22   why I think Mr. Goodreid's suggestion from yesterday would

23   be helpful in -- even though you are going to break these up

24   into smaller pieces, as I instructed you to yesterday,

25   instead of listing them in the order that they are going to

1    come up in your script, list them in alphanumeric order,

2    because it's much easier -- much, much, easier for me, for

3    my courtroom deputy, for defense counsel to follow along and

4    keep track of what you're referring to.

5              You've already got these 25 in, but in the future

6    let's keep those in alphanumeric order.

7              MR. SIBERT: Yes, sir. And so the Court knows and

8    the defense did inform me, I did send a list last night, and

9    for today's witness the ones I've submitted, they are going

10   to agree that these have all been stipulated to.

11             THE COURT: All right. Good.

12   BY MR. SIBERT:

13   Q.   Okay. So now do you recognize Government Exhibit 226?

14   A.   Yes, I do, sir.

15   Q.   And can I please have it on the screen and published to

16   the jury.

17             And I would ask the Court for all these exhibits to

18   be published to the jury.

19             THE COURT: All right.

20   BY MR. SIBERT:

21   Q.   Okay. Again, sir, can you tell me who wrote this

22   e-mail?

23   A.   I did, sir.

24   Q.   Okay. Who are you sending it to?

25   A.   Scott Dittman.

Direct - Sears

1    Q.   Okay.  And what's the reference about?

2    A.   Reservation Confirmation.

3    Q.   Do you know who you are making a reservation

4    confirmation about?

5    A.   To whom?  Mr. Guy Jean-Pierre.

6    Q.   Okay.  And why would you have to do a reservation for

7    Mr. Guy Jean-Pierre?

8    A.   To bring him into Denver, Colorado.

9    Q.   And where are you bringing him in from?

10   A.   I don't remember, but this should say.

11            Fort Lauderdale, Florida.

12   Q.   And that would be consistent with where his office

13   is --

14   A.   Yes, sir.

15   Q.   -- at the time?

16   A.   Yes, sir.

17   Q.   Okay.  Now, why were you bringing Mr. Guy Jean-Pierre

18   from Florida to Colorado?

19   A.   There was a multitude of reasons, all business related.

20   Q.   And what business was this related to?

21   A.   Some of my personal business and FusionPharm.

22   Q.   And you were bringing him in to talk about business for

23   FusionPharm.  What was his role with FusionPharm?

24   A.   He was the corporate secretary.

25   Q.   Was he anything else?

Direct - Sears

1    A.   General counsel.

2    Q.   All right.  Can you look at -- you can take down 226.

3    And can you please look at Exhibit 382.  Okay.

4         Do you have 382 in front of you there?

5    A.   Yes, I do.

6    Q.   And what is 382?

7    A.   It's an e-mail.

8    Q.   Okay.  And who's writing the e-mail?

9    A.   I am, sir.

10   Q.   And who are you writing the e-mail to?

11   A.   Guy Jean-Pierre.

12   Q.   Okay.  What is this e-mail about?

13   A.   It's subject:  Trustee agreement.

14   Q.   Okay.  And what are you asking -- can I have this

15   brought up a little bit, please.  To the second page.  I'm

16   sorry, can you go back to the first page.

17        I'm circling on the screen here the second

18   sentence, if you look on your screen.  Second sentence of

19   that e-mail says, "This would be for both my interests in FS

20   and Scotts in meadpoint."

21        What is FS to you?

22   A.   FusionPharm.

23   Q.   And who is Scott to you here?

24   A.   My brother-in-law.

25   Q.   Okay.  And he was the CEO of FusionPharm?

Direct - Sears

1    A.   Yes, he was.

2    Q.   And in this e-mail, what are you discussing about

3    Scott's interests, in what company?

4    A.   Meadpoint.

5    Q.   And you're sending a document.  What are you sending

6    Guy Jean-Pierre?

7    A.   It's a declaration of trust in respect of shares.

8    Q.   And regarding these two companies, correct?

9    FusionPharm, Meadpoint?

10   A.   Specifically -- yeah, in this e-mail, yeah.

11   Q.   And then you're asking -- what are you asking Mr. Guy

12   Jean-Pierre to do?

13   A.   To review it.

14   Q.   And what else?

15   A.   Make any appropriate changes.

16   Q.   Can I have that down, please.  Could I have

17   Exhibit 372-Q.

18        Can you please look at 372-Q in front of you.

19   A.   Yes, sir.

20   Q.   All right.  Again, can you explain to the jury what 372

21   is.

22   A.   It is an e-mail.

23   Q.   Okay.  And let's keep going.  Who wrote the e-mail?

24   A.   I wrote the e-mail.

25   Q.   And who are you writing the e-mail to?

Direct - Sears

1   A.   Andrew Duke and Scott Dittman.

2   Q.   What's this e-mail concerning?

3   A.   It says my curriculum vitae.

4   Q.   And do you know whose curriculum vitae that's about?

5   A.   Guy Jean-Pierre.

6   Q.   All right.  And, in fact, that CV is attached; is that

7   correct?

8   A.   Yes, sir.

9   Q.   All right.  Can you please look at page 3.  I'm just

10  going to circle here on the top.  Would you please tell the

11  jury what Mr. Guy Jean-Pierre's representing to you

12  regarding his securities experience -- his security attorney

13  experience?

14  A.   Yes.  It says, "Corporate and Securities Attorney for

15  over 20 years with significant experience in a number of

16  substantive areas including the following:

17          "General Corporate -- General Corporate, Contracts

18  and Compliance.

19          "International and Business Development.

20          "Securities and Corporate Finance.

21          "Transactions including Mergers and Acquisitions."

22  Q.   Can I have page 4, please.  And I'm going to circle his

23  education.

24          Where did Mr. Guy Jean-Pierre represent to you he

25  went to school?

Direct - Sears

1           Can I have this blown up, please.

2    A.   Columbia University School of Law -- New York,

3    New York, and also Amherst College, Amherst,

4    Massachusetts.

5    Q.   And where was he barred?

6    A.   Barred admissions Florida, 2004; New York, 1989;

7    California 1986.

8    Q.   What does that mean to you, the bar admissions?

9    A.   Meaning you're not allowed to practice.

10   Q.   To your understanding it means he's not allowed to

11   practice?

12   A.   I don't really -- I'm not a lawyer, it's tough for

13   me -- I don't know if bar means you got in trouble -- no,

14   bar admissions, he's allowed to practice in Florida,

15   California, and New York.  My bad, I had that wrong.

16   Q.   Fair point.  Could I have Exhibit 372-T, please.

17           Okay.  Can you tell the jury what Exhibit 372 is.

18   A.   It is an e-mail.

19   Q.   Okay.  And let's keep going here.  Who's it from?

20   A.   It's from myself.

21   Q.   And who are you e-mailing to?

22   A.   Guy Jean-Pierre.

23   Q.   Okay.  And what are you asking Mr. Pierre to do?

24   A.   To give it a quick eye.

25   Q.   A quick eye of what?

Direct - Sears

1    A.    To look over the document.

2    Q.    And do you know what this document is?

3    A.    It is a subscription agreement.

4    Q.    Can I have page 3 of the attachment, please.  May I

5    have the top blown up, please, where it says Subscription on

6    page 3.  And page 3, please.

7          Is this page 3?

8    A.    Yeah, that's page 3.

9    Q.    Can you tell the jury what this subscription agreement

10   was for?

11   A.    It is to subscribe for common stock of FusionPharm.

12   Q.    Okay.  And describe what you're doing here with the

13   common stock.

14   A.    This was -- it was to raise capital for the company.

15   The company was looking to raise capital.

16   Q.    Okay.  And what company are we talking about?

17   A.    FusionPharm.

18   Q.    Can I have page 4, please.  And can you scroll up,

19   please.  Keep going, please.

20         Do you know how many shares you were looking at

21   here to raise?

22   A.    No, I don't.

23              MR. SIBERT:  Your Honor, may I have a minute?

24              THE COURT:  You may.

25   BY MR. SIBERT:

Direct - Sears

1    Q.   Sorry.  Can I have page 3 again.  Can I have the top

2    again right under "Ladies and Gentlemen."  I'm going to

3    circle this on the screen.

4        Does that refresh your memory of how many shares

5    you need that you're trying to raise?

6    A.   In this particular document.  There was many versions

7    of this.

8    Q.   Okay.  What does the document says?

9    A.   It says "of up to 4 million shares."

10   Q.   Does that refresh your memory?

11   A.   That's what the document says, sir.  I don't remember

12   the . . .

13   Q.   So this wasn't the only one that you were raising

14   shares for?

15   A.   The company had circulated a bunch of these

16   FusionPharm.

17   Q.   All right.  It was Mr. Guy Jean-Pierre that was helping

18   you with these documents?

19   A.   Yes, sir.

20   Q.   Can I have 372-U.

21       Do you have 372-U in front of you?

22   A.   Yeah, okay.  372 -- yes, I do.

23   Q.   Okay.  Can you tell the jury what Government

24   Exhibit 372-U is.

25   A.   It is another e-mail.

Direct - Sears

1    Q.   Okay.  And can you describe what the e-mail consists

2    of -- who's making it and who's receiving it?

3    A.   I'm sending the e-mail, Mr. Dittman is receiving the

4    e-mail.

5    Q.   And what is -- what does this involve?

6    A.   This is -- the subject is a 504, and there's an

7    attachment that is a FusionPharm Offering Memorandum Rule

8    504.

9    Q.   And that would be an initial offering document; is that

10   correct?  504?

11   A.   I don't know.

12   Q.   Look at the date, Mr. Sears.

13   A.   Yeah, I see the date.

14   Q.   It's the beginning of FusionPharm; would you agree with

15   me on that, at least?

16   A.   It's in that year, yeah, the end of the year.

17   Q.   Could I have Government Exhibit 372-CC.

18        Do you recognize Government Exhibit 372-CC?

19   A.   Yes.

20   Q.   Okay.  What is it?

21   A.   It is another e-mail.

22   Q.   Okay.  And who wrote the e-mail?

23   A.   I wrote the e-mail.

24   Q.   And who are you writing it to?

25   A.   Scott Dittman.

1    Q.   Okay.  And what is the subject?

2    A.   Contact.

3    Q.   All right.  Now, if you look down here, there's another

4    e-mail.  Would you agree with that?

5    A.   Yes, sir.

6    Q.   Okay.  And there's the -- can you see what I'm

7    circling?  "Guy"?

8    A.   Yes.

9    Q.   And who's Guy?

10   A.   Mr. Guy Jean-Pierre.

11   Q.   Okay.  And who's writing Mr. Guy Jean-Pierre in this

12   e-mail?

13   A.   Scott Dittman.

14   Q.   All right.  And can you scroll up, please.  Okay.

15        Again, down here, I'm circling on the screen,

16   there's another e-mail chain.  Who wrote that e-mail?

17   A.   I did.

18   Q.   Okay.  And who are you writing it to?

19   A.   Guy Jean-Pierre.

20   Q.   And what are you asking him -- what are you writing him

21   here in this e-mail?

22   A.   He had contacted me and I said I would make contact

23   that evening because I was traveling.

24   Q.   Okay.  And what e-mail is this?

25   A.   *Guy@fusionpharminc.com.*

Direct - Sears

1    Q.   Keep scrolling up, please.  Okay.  A little bit -- I'm

2    sorry, can you go back to that first page.  Down.  Thank

3    you.  Can you focus in on this middle, please.

4    A.   Yes, sir.

5    Q.   Do you recognize who's writing this -- this e-mail?

6    A.   Yes, I do.

7    Q.   Who's writing that?

8    A.   Mr. Guy Jean-Pierre.

9    Q.   Okay.  What does "DR" mean to you?

10   A.   The Dominican Republic.

11   Q.   And how do you know that?

12   A.   Because I know Mr. Jean-Pierre lived in the Dominican

13   Republic for a period of time.

14   Q.   And this is back in 2012; is that correct?

15   A.   Yes, sir.

16   Q.   Okay.  And whose phone number is 1-829-372-3750?

17   A.   I don't know for a fact, but I would imagine from the

18   e-mail it was his number down in the DR.

19   Q.   Did you ever call Mr. Guy Jean-Pierre down in the DR?

20   A.   Yes, sir.

21   Q.   Do you remember what phone number you used?

22   A.   No.

23   Q.   Does that phone number look familiar?

24   A.   Honestly, no.  I just don't remember the number, sir.

25   Q.   Could I have Government Exhibit 40, please.

Direct - Sears

1    Okay, sir, do you recognize Government Exhibit 40?

2 A. Yes, I do.

3 Q. And what is Government Exhibit 40?

4 A. It is another -- it's an e-mail.

5 Q. Okay.  And can we describe to the jury about who is

6 sending and who's receiving the e-mail.

7 A. I'm sending the e-mail, and a gentleman by the name of

8 John at Mazda of Lakewood is receiving the e-mail.

9 Q. Who else is receiving the e-mail?

10 A. Kelly Blume at FusionPharm.

11 Q. Who is Kelly Blume?

12 A. Kelly Blume was an employee of FusionPharm.

13 Q. And the e-mail is dated January of 2012; is that

14 correct?

15 A. Yes, it is.

16 Q. Can you go to the first page of the attachment for me,

17 please, on the screen.  Can you blow up that first page,

18 please.  First page.  Can you please blow up the top.

19    It states here that Ms. Blume is the office

20 manager; is that correct?

21 A. She was for a period of time, as far as I knew.

22 Q. For FusionPharm.

23 A. Yes, sir.

24 Q. Okay.  Did you know Ms. Blume in 2011?

25 A. Yes, I did.

Direct - Sears

1    Q.   Where was she working?

2    A.   FusionPharm.

3    Q.   This says January 30th, 2012.  She was still the office

4    manager.

5    A.   She was the office manager on and off.  They went

6    through a few.

7    Q.   How big was FusionPharm, Mr. Sears?

8    A.   Not very big, not a big company.

9    Q.   Well, tell the jury:  Who worked at FusionPharm?

10   A.   I don't remember everybody.  There was an Andrew Duke,

11   there was a lot of people come and going and a lot of -- a

12   lot of additional --

13   Q.   Who do you remember?

14   A.   I remember Andrew Duke, Frank Falconer, Kelly Blume.  I

15   can't remember the other woman's name.  Paula Von

16   Steklenberg, Brian Cook, and there was a whole bunch of

17   consultants, subcontractors, and things to that effect.

18   Q.   Were there -- how many employees total approximately?

19   A.   Couldn't tell you.  It varied from month to month.

20   Q.   Okay.

21   A.   Gino Rodriguez was there in the very beginning.

22   Q.   Let's hit the big targets.  Who was the CEO?

23   A.   Scott Dittman.

24   Q.   Who was your legal counsel and corporate security?

25   A.   Guy Jean-Pierre.

Direct - Sears

1    Q.   Who helped you with your financials and put together

2    the annual and quarterly reports?

3    A.   A few different people put the company's --

4    Q.   Who did you travel to Florida with?

5    A.   Who did I travel to Florida with?

6    Q.   In 2011 -- excuse me, 2012 and 2013.

7    A.   Could you be more specific, sir?  I made a lot of trips

8    to Florida.

9    Q.   Who did you travel with to Florida to see Mr. Guy

10   Jean-Pierre?

11   A.   Cliffe Bodden.

12   Q.   Who helped you with the quarterly and annual reports?

13   A.   Excuse me?

14   Q.   Who sent you e-mails with your quarterly and annual

15   reports?

16   A.   Cliffe Bodden sent the e-mails with the quarterly and

17   annual reports for FusionPharm.

18   Q.   From the summer of 2011 all the way up through,

19   essentially, the first quarter of 2013?

20   A.   No -- Cliffe disappeared for a while, so there was a

21   period of time that I remember Scott was all aggravated

22   because he had to do it all -- do it all.

23   Q.   So if I showed you all these e-mails where he's sending

24   you quarterly reports, you would still say he disappeared?

25   A.   He did disappear for a while.  Could have been '11 or

 1   '12.  I mean, it was a long time -- a long time.

 2   Q.   How many officers and directors did FusionPharm have?

 3   A.   Two, that I recall.  Maybe three.

 4   Q.   Who were they?

 5   A.   Scott Dittman and Guy Jean-Pierre.

 6   Q.   And do you remember, what was your role at FusionPharm?

 7   A.   I had many different roles.  I had a very small -- I

 8   had a small role in the sales and marketing for about a year

 9   and a half, almost -- about a year and a half.

10        MR. SIBERT:  Your Honor, I would request to

11   approach the witness to provide him his plea agreement in

12   this case in order to refresh his memory.

13        THE COURT:  Okay.  Why don't you hand it to the

14   courtroom deputy, who will hand it to the witness.

15        MR. SIBERT:  And the defense has a copy of this,

16   but obviously I have not shown them this this morning.

17        MR. GOODREID:  Your Honor, I'm not sure -- I don't

18   object to the witness having the document, but I'm not sure

19   as of the moment there's a question pending that would

20   require or enable his recollection to be refreshed.  Maybe

21   that's --

22        THE COURT:  I thought -- my reading of the -- my

23   realtime here is the question pending is:  What was the

24   witness's role at FusionPharm?  And the witness answered

25   that for about a year and a half, he had a small role in

Direct - Sears

1       sales and marketing.  I'm assuming the plea agreement will

2       refresh his recollection as to other roles he had with the

3       company.

4                   MR. SIBERT:  Right --

5                   THE COURT:  And if that's the case, I think it's

6       appropriate.  He can review the document, put it down, and

7       then testify from his refreshed recollection.

8                   MR. SIBERT:  Thank you, Your Honor.

9                   THE COURT:  Go ahead, Mr. Sibert.

10                  MR. SIBERT:  Thank you.

11                  THE COURT:  Is there a specific part -- I recall

12      this being a lengthy plea agreement.  Is there a specific

13      part you want him to review before he puts it down and

14      testifies?

15                  MR. SIBERT:  So the Court understands, I've tabbed

16      several pages, but I've given him the opportunity to -- on

17      the highlighted section of this page.

18                  THE COURT:  All right.

19                  MR. GOODREID:  Which page would that be?  May I

20      inquire?

21                  THE COURT:  All right.  You may.

22                  MR. SIBERT:  I didn't memorize the pages.

23                  THE COURT:  What page are you on, Mr. Sears?

24                  THE WITNESS:  I'm on page 20, sir.

25                  THE COURT:  20?

Direct - Sears

| | |
|---|---|
| 1 | THE WITNESS:  Yes, sir. |
| 2 | THE COURT:  All right. |
| 3 | BY MR. SIBERT: |
| 4 | Q.   Does that refresh your memory? |
| 5 | A.   I don't see how it applies to what you're asking.  If |
| 6 | you're a shareholder of a company, it doesn't mean you have |
| 7 | a role in it. |
| 8 | MR. SIBERT:  Your Honor, I would ask -- |
| 9 | THE WITNESS:  It says, "Sears was able to avoid |
| 10 | being disclosed in FusionPharm's financial disclosure |
| 11 | documents as a 10 percent shareholder of the company's |
| 12 | preferred stock and in affiliated FusionPharm based on his |
| 13 | ownership." |
| 14 | Ownership doesn't give you a role because you have |
| 15 | stock in a company. |
| 16 | THE COURT:  Is there another -- |
| 17 | MR. SIBERT:  Thank you, Your Honor. |
| 18 | THE COURT:  All right. |
| 19 | BY MR. SIBERT: |
| 20 | Q.   So your memory is at least refreshed now that you had |
| 21 | ownership in FusionPharm; is that correct? |
| 22 | A.   That is correct. |
| 23 | Q.   And you were an affiliate. |
| 24 | MR. GOODREID:  Objection.  Leading. |
| 25 | THE COURT:  Sustained. |

Direct - Sears

1    BY MR. SIBERT:

2    Q.   Based upon refreshing your memory, what were you with

3    FusionPharm?

4    A.   Based on the questions you're asking prior, the

5    Government said that I was an affiliate of the company.

6    Q.   Did you sign that document?

7    A.   Yes, I did.

8    Q.   Did you tell this Court under oath that all the facts

9    in there were true and accurate?

10   A.   Yes, I did.

11   Q.   Did you object to the fact that you were an affiliate

12   in that document?

13   A.   Not in that document, sir.

14   Q.   But now you're having difficulties today saying it?

15   A.   I --

16             MR. GOODREID:  Objection --

17             THE WITNESS:  I didn't have --

18             MR. GOODREID:  Objection.  Leading.

19             THE COURT:  That's overruled.  You may answer.

20             THE WITNESS:  Thank you.

21             I've had objections with that from the very start,

22   sir.  There are legal opinions that say I'm not, there are

23   ones that say I am.  The Government says I am, so here I am.

24             MR. SIBERT:  Your Honor, at this time I would ask

25   to be allowed to treat this witness under Rule 615 under the

Direct - Sears

1       Federal Rules of Evidence.

2               THE COURT:  Does the plea agreement to which he

3       stipulated state that he was an affiliate of FusionPharm?

4               MR. SIBERT:  It does.

5               THE COURT:  All right.  He's now denied that.  For

6       this limited part of the examination, you may examine by

7       leading questions.

8               MR. SIBERT:  And can I have -- can I approach, Your

9       Honor?  Briefly.  I would ask about judicial notice.

10              THE COURT:  All right.

11          (Discussion at sidebar)

12              THE COURT:  Okay.

13              MR. SIBERT:  Thank you, Your Honor.  As you can

14      see, my star witness is going a little haywire on me, but

15      the legal definition under the securities law --

16              THE COURT:  Lower your voice.

17              MR. SIBERT:  Sorry.  The legal definition under

18      securities law of an affiliate is a control person.  I can

19      ask him that.  I probably won't get that, but I would ask

20      the Court to instruct the fact that based upon an

21      affiliation -- I'm going to get a hiccup here because he's

22      going to say he's not a lawyer and he's going to sidebar me

23      about that, so I mean -- the rule --

24              THE COURT:  Isn't that why you would have --

25              MR. SIBERT:  Sure.  I have my expert, yes --

Direct - Sears

1          THE COURT:  -- your expert to say an affiliate is a

2     control person?  I don't think this person is competent to

3     testify --

4          MR. SIBERT:  I agree with the Court.

5          THE COURT:  All right.  Okay.

6          MR. SIBERT:  I'll work around it.

7          THE COURT:  All right.

8          MR. SIBERT:  Sorry.

9          THE COURT:  Okay.

10         (End of discussion at sidebar)

11         THE COURT:  All right.  You may resume, Mr.

12    Sibert.

13         MR. SIBERT:  Thank you.  And thank you for that

14    time.

15    BY MR. SIBERT:

16    Q.   Sir, just to quickly recap, what you've testified here

17    to under oath is that you had ownership in FusionPharm, and

18    you are saying regardless of what your plea agreement is,

19    that you were not an affiliate of FusionPharm?

20    A.   Once again, what I was saying -- what I did say is some

21    would say I was and some would say I wouldn't.  As I sit

22    here today, I'm quite confused about it, so --

23    Q.   I'm asking you not what others said and what --

24    A.   And I'm telling you I'm not sure.

25    Q.   So you have no clue what -- even though you had

1    ownership you don't understand your role, even though you

2    had ownership of FusionPharm of what --

3    A.   I understand my role, sir.  I think the question was

4    you're trying to -- am I an affiliate or not.  And as I

5    answered, some would say I was and some would say I wasn't.

6    Legal minds.  So that's -- I'm quite confused.

7    Q.   Well, you're familiar with the Rule 144 letter, would

8    you agree with me on that?

9    A.   Yes, I am, sir.

10   Q.   And what does the 144 letter usually say about

11   shareholder?

12   A.   144 legend can be removed after one year and a

13   shareholder cannot have more than 10 percent of a company.

14   I believe that would be subject to some other rules and

15   regulations with regard to liquidation.

16   Q.   Do you know if the 144 says that a shareholder can be

17   an affiliate or not an affiliate?

18   A.   It doesn't go into the definition of affiliate or

19   nonaffiliate on a certificate, it just says anybody owning

20   more than 10 percent, sir.

21   Q.   Okay.  All right.  So let's get back to this document,

22   page 2.  This second paragraph.

23   A.   I'm sorry, sir, which exhibit did you want me to look

24   at?

25   Q.   It's Government's Exhibit 40, page 2.  I'm circling the

Direct - Sears

1    second paragraph on the screen.  Can I have that blown up,

2    please.

3    A.    Okay.

4    Q.    So we just went through a lot of questions about your

5    role at FusionPharm and you're obviously confused.  But

6    obviously it's fair to say you were getting paid a salary?

7    A.    Yes, sir.

8    Q.    And what was your salary?

9    A.    It varied, but tried to keep it at 5,000 a month.

10   Q.    Okay.  What's your salary, according to this document?

11   A.    It says 5,000.

12   Q.    And that's since January 2011 through March 1st, 2012.

13   A.    That's what the e-mail says.

14   Q.    And that's with FusionPharm.

15   A.    Yes, sir.

16   Q.    And the first page, please.

17         You're the one sending the e-mail, correct?

18   A.    Yes, I am, sir.

19   Q.    Okay.  Can I have Exhibit 229, please.

20         And, again, sir, can you -- do you recognize

21   Government Exhibit 229?

22   A.    I don't have it in my thing here.

23   Q.    It's on your screen right there.

24   A.    I know, but I want to make sure that it's the one that

25   I signed, sir, with all due respect.

Direct - Sears

1          Yes, I do.

2     Q.   And what is Government Exhibit 229?

3     A.   It is an e-mail.

4     Q.   Okay.  And, again, sir, who wrote the e-mail?

5     A.   I wrote the e-mail.

6     Q.   And who were you writing the e-mail to?

7     A.   Andrew Duke.

8     Q.   Okay.  And who was Andrew Duke?

9     A.   Andrew Duke was an employee of FusionPharm.

10    Q.   Okay.  And, in fact, there's Andrew Duke's

11    FusionPharm's address, correct?

12    A.   Indeed, sir.

13    Q.   E-mail address.

14    A.   Yes, sir.

15    Q.   And what are you telling Andrew Duke in this e-mail?

16    A.   I was telling him I was disturbed about an e-mail and I

17    wanted to separate our other business interests from

18    FusionPharm.

19    Q.   But you're actually saying, "Let's part ways in regards

20    to your business with FusionPharm"; isn't that right?

21    A.   Yes, because I was doing other business with him and

22    other deals.

23    Q.   In fact, it's right here; is that correct?

24    A.   Yes, "Let us part ways with regard to our business

25    regarding FusionPharm and continue our friendship."

                    Direct - Sears

1   Q.   So part of your role was that you could tell people to

2   part ways from the company.

3              MR. GOODREID:  Objection --

4              THE WITNESS:  No, that's --

5              MR. GOODREID:  Objection.  Leading.

6              THE COURT:  Sustained.

7   BY MR. SIBERT:

8   Q.   Did you have the ability to let people go from

9   FusionPharm?

10  A.   No, I did not.

11  Q.   So based upon this e-mail, you're not telling -- what

12  are you telling Mr. Duke, then, in this e-mail?

13  A.    I really don't recall.  I don't think it was our

14  business regarding FusionPharm, that's between he and I.  As

15  I said, Andrew and I had a few other transactions and

16  companies we were dealing with at that time, and I didn't

17  want it to muddy everything else.

18  Q.   What does "part ways" mean to you?

19  A.   To part ways, go separate ways.

20  Q.   Was Mr. Duke allowed to work at FusionPharm anymore?

21  A.   I have no idea.  I don't recall this e-mail precisely.

22  Q.   Is that your phone number at the bottom of that e-mail?

23  A.   Yes, it is.

24  Q.   Can I have Government Exhibit 372-II.

25              Do you recognize Government Exhibit 372-II?

Direct - Sears

1    A.   Yes, sir.

2    Q.   Okay.  And who wrote this e-mail?

3    A.   I wrote it.

4    Q.   And who are you writing it to?

5    A.   Mr. Cliffe Bodden.

6    Q.   Okay.  He's here now working with you regarding

7    FusionPharm.

8    A.   Yes.  He was working -- yes.

9    Q.   So he's not disappeared.

10   A.   Not on that day.

11   Q.   Okay.  Right below your e-mail, who's sending that

12   e-mail?

13   A.   Cliffe Bodden.

14   Q.   And who's he sending that e-mail to?

15   A.   Guy Jean-Pierre.

16   Q.   Can you scroll up a little bit on that e-mail, please.

17   Right there, please.

18        Okay.  And at the bottom, there's another e-mail;

19   is that correct?

20   A.   Yes, sir.

21   Q.   Okay.  And who's sending that e-mail?

22   A.   Guy Jean-Pierre.

23   Q.   And who's he sending it to?

24   A.   Myself.

25   Q.   Okay.  And what's the subject?

Direct - Sears

1    A.    Certificate of designation.

2    Q.    Okay.  And what is the e-mail discussing that Mr. Guy

3    Jean-Pierre is sending you?

4    A.    Judging by the e-mail, it says there was no certificate

5    of designation and I'll have to create one.

6    Q.    And what else is he talking about here?

7    A.    He's talking about one of the language -- he's talking

8    about the language in the sent certificate saying that no

9    one will be able to convert for more than 9.9 percent of the

10   outstanding common stock of the company.

11   Q.    So it's fair to say he's talking to you about

12   certificate designation and the stock in FusionPharm?

13   A.    Yes, sir.

14   Q.    Is Scott Dittman on that e-mail?

15   A.    I don't see him on this particular one, no, sir.

16   Q.    Can I have Government Exhibit No. 372-MM.  Okay.

17         Again, sir, do you recognize Government Exhibit

18   372-MM?

19   A.    Yes, I do.

20   Q.    Okay.  And the same questions:  Who is the e-mail

21   written from and to?

22   A.    The e-mail was written from myself to Mr. Cliffe

23   Bodden.

24   Q.    Okay.  And, again -- and you would agree with me that

25   Mr. Cliffe Bodden has not disappeared at this time.

Direct - Sears

1    A.   Apparently not.

2    Q.   And this is June 18th, 2012?

3    A.   Yes, it is, sir.

4    Q.   Okay.  And this is regarding -- what's the subject?

5    A.   Form D.

6    Q.   And what's the attachment?

7    A.   It's a Form D.

8    Q.   And who creates the Form Ds?

9    A.   Individuals, lawyers.

10   Q.   What's the e-mail say, Mr. Sears?  You attached this.

11   You just testified --

12   A.   You didn't say who did create, you said who does.  I'm

13   trying to answer your questions as specifically as I can.

14   Q.   What did you write on the attachment?

15   A.   It says Form D, sir.

16   Q.   What does it say before that?

17   A.   "As discussed, attached please find the bare-bones SEC

18   Form D.  Let's go over it in an hour or so."

19   Q.   What does the SEC mean to you?

20   A.   The Securities and Exchange Commission.

21   Q.   And was this for FusionPharm?  Take your time and look

22   at the attachment.  Does that refresh your memory?

23   A.   No, it doesn't.  But -- okay.  It would appear it would

24   be for a corporation -- or a company or --

25   Q.   Is Mr. Scott Dittman on that e-mail?

Direct - Sears

1    A.   No, he's not, sir.

2    Q.   Okay.  Can I have Exhibit 254, please.  Can I have the

3    top blown up.  Thank you.

4         Okay, sir, do you recognize Government Exhibit 254?

5    A.   No, I don't.  This one I didn't initial.

6    Q.   Can you look on your screen.  It's on the screen as

7    well.

8    A.   I see the screen, but this is not one I initialed so I

9    can't honestly say I looked at it or perused it.

10   Q.   Who wrote the e-mail?

11   A.   It says I did.

12   Q.   Do you recognize the e-mail address?

13   A.   Yes, I do.

14   Q.   Whose e-mail address is that?

15   A.   That would be my e-mail address.

16   Q.   Okay.  And who are you sending the e-mail to?

17   A.   Sending the e-mail to Mr. Cliffe Bodden.

18   Q.   And do you know Mr. Cliffe Bodden?

19   A.   Yes, I do know who Mr. Cliffe Bodden is.

20   Q.   And is that his e-mail?

21   A.   That was one of them, yes.

22   Q.   Can you scroll up on that exhibit to this point right

23   here, please.

24        Do you see an e-mail there in the middle of that

25   screen?

Direct - Sears

1    A.    Yes, I do.

2    Q.    And who's the e-mail from?

3    A.    That's from Mr. Bodden.

4    Q.    To who?

5    A.    To myself.

6    Q.    And what is Mr. Bodden telling you?

7    A.    He's telling me not to use my nonaffiliated FusionPharm

8    because it could create a problem because Mr. Jean-Pierre --

9    well, that's what he told me to do.

10   Q.    Okay.  So the communication, if I understand correctly,

11   is that Mr. Bodden -- what is Mr. Bodden saying how to

12   respond to Mr. Nick?  Who is Nick?

13   A.    It was a gentleman by the name of Nick Maleno.

14   Q.    And did you communicate with Mr. Nick Maleno?

15   A.    Yes, I did.

16   Q.    Okay.  And so what is Mr. Bodden telling you in this

17   e-mail?

18   A.    Not to use the FusionPharm e-mail.

19   Q.    Well, let's read it all correctly.

20   A.    "Make sure you correspond with Nick only through your

21   nonfusion affiliated e-mail."

22   Q.    Affiliated e-mail?

23   A.    Indeed, sir.

24   Q.    Can you go back up to the top, please, and scroll in.

25         And what are you telling Cliffe here?

Direct - Sears

1    A.    I said yes -- this one -- I said, "Yes, indeed... I

2    only did this as a response to you.  I never use this one.

3    Only you do... MoMo."

4    Q.    And what are you talking about there?

5    A.    I'm talking about -- can I explain the whole situation

6    or you --

7    Q.    I'm asking you a question.  What --

8    A.    Talking about the nonaffiliated FusionPharm e-mail that

9    I shouldn't have used after I was told that it was stuck on

10   my computer, and when I hit the button it goes to a

11   default --

12   Q.    You had a FusionPharm e-mail on your computer?

13   A.    At one time I did, yes, sir.

14   Q.    And you actually -- would you -- you're agreeing with

15   Mr. Bodden here, correct?

16   A.    Absolutely.

17   Q.    And the date of this is June 19th, 2012?

18   A.    Yes, it is.

19   Q.    May I please have Government Exhibit 372-OO.  Okay.  We

20   just went through some e-mails June.  Here we are at the end

21   of June 2012.  Do you recognize Exhibit 372 zero zero -- or

22   excuse me, OO?

23   A.    Yes, I do.

24   Q.    Can you tell the jury what it is?

25   A.    It is another e-mail.

Direct - Sears

1   Q.   From who?

2   A.   Myself.

3   Q.   What e-mail account are you using?  What e-mail account

4   are you using?

5   A.   My FusionPharm e-mail.

6   Q.   So would you agree with me what you just testified back

7   in June 11th, 2012, the exhibit we just looked at, how many

8   weeks had gone by now?

9   A.   It looks like about a week and a half.  And I was still

10  on the same computer apparently.

11  Q.   You're using the same e-mail.

12  A.   It happens.

13  Q.   Who are you e-mailing to?

14  A.   Scott Dittman.

15  Q.   CEO of FusionPharm?

16  A.   Yes, sir.

17  Q.   What e-mail are you using?  You sent him an e-mail.

18  A.   It's the same e-mail.  I'm sorry, I --

19  Q.   What e-mail are you e-mailing Scott Dittman to?

20  A.   The FusionPharm e-mail.

21  Q.   And what's the subject?

22  A.   Forwarding a FSPM Thaden opinion letter.

23  Q.   Okay.  And we've been through this yesterday.  What is

24  FSPM?

25  A.   It's the trading symbol for FusionPharm, Inc.

Direct - Sears

1    Q.   And then it says Thaden opinion letter, right?  LTR.
2    What does that mean to you?
3    A.   It's an opinion letter based on securities.
4    Q.   Who writes the opinion letter?
5    A.   This particular one was Mr. Jean-Pierre.
6    Q.   And so FusionPharm Thaden opinion letter, would you
7    agree with that?
8    A.   Yes, sir.
9    Q.   And then you have attached.  What's attached to this
10   e-mail?
11   A.   It is a letter of opinion.
12   Q.   Who did you send all your letter of opinions to when
13   they needed to either be reviewed or drafted?
14   A.   Depending on the period of time, this --
15   Q.   On 2011 to 2013.
16   A.   The beginning of '13 would be Guy Jean-Pierre.
17   Q.   May I have Government's Exhibit 372-PP.  All right.
18        Can you tell the grand -- do you see that -- do you
19   have Government Exhibit 372-PP in front of you?
20   A.   Yes, I do.
21   Q.   And what is it?
22   A.   It is an e-mail -- it's an e-mail.
23   Q.   Okay.  And, sir, who wrote the e-mail?
24   A.   I wrote the e-mail.
25   Q.   All right.  And who did you send it to?

1   A.   I sent it to Scott Dittman.

2   Q.   Okay.  So now we're using the *williamjsears.com*

3   address; is that correct?

4   A.   Yes, sir.

5   Q.   But we're still sending an e-mail to Scott Dittman

6   under his FusionPharm address; is that correct?

7   A.   Absolutely.

8   Q.   And what are you attaching to the e-mail?

9   A.   An exclusive licensing agreement.

10  Q.   For what?

11  A.   For my company Vertifresh.

12  Q.   Your company Vertifresh?

13  A.   My company Vertifresh.

14  Q.   Can I have Government Exhibit 372-RR.  Before we get to

15  that, can I have that taken down, please.

16       Can you tell the jury what role Mr. Guy Jean-Pierre

17  played with the Vertifresh agreement.

18  A.   Business lawyer.

19  Q.   What does that mean?

20  A.   Handling any -- any legal -- any legal needs for the

21  company.

22  Q.   Did you write the agreement?

23  A.   No, I did not.

24  Q.   Who wrote the agreement?

25  A.   I don't know.  I think it was a boilerplate.  That's --

1   possibly Cliffe pulled down.

2   Q.   Did you have anyone review the agreement?

3   A.   Yes.

4   Q.   Who?

5   A.   I had Mr. Stuart Leudan review the agreement and also

6   Guy Jean-Pierre.

7   Q.   Can I have Exhibit 372-RR up, please.

8        Okay, sir, do you have 372-RR in front of you?

9   A.   Yes, I do.

10   Q.   Do you recognize this?

11   A.   Yes.

12   Q.   Okay.  And can you tell the jury what it is.

13   A.   It is another e-mail.

14   Q.   Okay.  And who wrote the e-mail?

15   A.   I did.

16   Q.   Do you like going to the dentist, sir?

17   A.   Excuse me?

18   Q.   Do you like going to the dentist?  When I asked you for

19   a document, could you describe what the document is and who

20   wrote it and who sent it?

21   A.   Sure.

22   Q.   Thank you.

23   A.   Not a problem.

24   Q.   And who did you send it to?

25   A.   I sent it to Scott Dittman.

1  Q.   Okay.  Again, we're looking at these e-mails.  You're

2  not using your FusionPharm e-mail on that; is that

3  correct?

4  A.   No, I am not.

5  Q.   What e-mail are you using?

6  A.   *william@williamjsears.com*.

7  Q.   And what e-mail are you sending it to for Scott

8  Dittman?

9  A.   *scottdittman@fusionpharminc.com*.

10  Q.   Okay.  And what are you telling the CEO of FusionPharm

11  to do here?

12  A.   I'm asking him to inform me about a specific

13  certificate.

14  Q.   You're not asking him to send something to the transfer

15  agent?  Look on your screen, sir, I circled.  I made it easy

16  for you.

17  A.   Yes, I am.

18  Q.   What are you telling Scott Dittman to do?

19  A.   Telling him I would like to be informed when

20  certificate number 11156 in the name of Morningstar Holdings

21  is presented for transfer.

22  Q.   Sir, please read the line underneath "Scott."

23  A.   "Please send to Amanda Martin at Pacific Stock

24  Transfer."

25  Q.   So you can't tell what your role is here today, yet

1    you're telling the CEO.  What are you telling the CEO of

2    FusionPharm stock to do?

3    A.    Inform me about a transfer.

4    Q.    You're not telling him to send something?

5    A.    Apparently I am.  I don't remember the transaction,

6    sir.  I don't know what --

7    Q.    You would at least agree with me that the chief

8    executive officer is the boss of a company?

9    A.    Absolutely.

10   Q.    I'll take Government Exhibit 372 -- excuse me, 372-TT.

11          Do you recognize Government Exhibit 372-TT?

12   A.    Yes, I do.

13   Q.    All right.  Can you tell the jury what this is about.

14   A.    The subject matter is about issuances.  It says, "Guy,

15   please find attached letter to the transfer agent dated last

16   year.  The issuances were to be for two-year 144 as this was

17   an employee issuance.  Can you make sure the transfer agent

18   is aware of this and it is on the books as such.  Many

19   thanks in advance."

20   Q.    Okay.  What are "issuances"?

21   A.    To issue securities.

22   Q.    What are "securities"?

23   A.    Shares in a public company.

24   Q.    Okay.  All right.  Let's go back to the top questions.

25   You wrote this e-mail?

1   A.   Yes, I did.

2   Q.   You're e-mailing.  Who are you e-mailing?

3   A.   I'm e-mailing Mr. Guy Jean-Pierre and carbonning Scott

4   Dittman.

5   Q.   Okay.  And what e-mail are you sending to the CEO of

6   FusionPharm?

7   A.   *william@williamjsears.com.*

8   Q.   What e-mail are you using for the CEO?

9   A.   *sdittman@fusionpharminc.com.*

10  Q.   Again, this is your phone number?

11  A.   Yes, it was.

12  Q.   And so what are you directing Mr. Guy Jean-Pierre to do

13  in this e-mail?

14  A.   I'm asking Mr. Jean-Pierre to -- actually, I'm

15  conveying to Mr. Jean-Pierre to check on the transfer of the

16  securities.

17  Q.   Read that second sentence.

18  A.   "Can you make sure the transfer agent is aware of this

19  and it is on the books as such."

20  Q.   So in your mind, did you want Mr. Guy Pierre to call

21  the transfer agent?

22  A.   That's what I was probably instructed to do.

23  Q.   Can I have Government Exhibit 396.  I'm sorry, 372-YY.

24       Okay, sir, do you recognize Government

25  Exhibit 372-YY?

1   A.   Yes, I do, sir.

2   Q.   Okay.  And what is Government Exhibit 372-YY?

3   A.   It is an e-mail from myself at

4   *william@williamjsears.com*.  It was sent on December 11th,

5   2012.  It was to Scott Dittman.  It was forwarding leasing

6   and financing documentation.

7   Q.   And what's attached to the e-mail?

8   A.   Would be a propaganda from a company that did

9   leasing -- or did leasing financing.

10  Q.   Can you scroll down that, please, to where -- let me

11  circle.  Thank you.  I'm sorry, can you bring it up a little

12  bit.

13       Now, you have that document in front of you, I also

14  have it on the screen.  The e-mail below, who wrote that

15  e-mail?

16  A.   Guy Jean-Pierre.

17  Q.   Okay.  And to refresh your memory, can you take a look

18  at what Mr. Guy Jean-Pierre is e-mailing.

19  A.   He's -- excuse me, he's e-mailing the information about

20  a company that does equipment financing.  He's basically --

21  he's saying that it would be equipment financing and it's a

22  loan of some sort that I -- that's what he's saying.

23  Q.   So what is Mr. Guy Jean-Pierre e-mailing you and the

24  CEO about?

25  A.   Financing for equipment.

1     Q.   Okay.  For what company?

2     A.   This would be for both Vertifresh and FusionPharm.

3     Q.   Thank you.  Okay.  Can I have Government Exhibit 396.

4          Do you have 396 in front of you?

5     A.   Yes, I do, sir.

6     Q.   What is that?

7     A.   That is another e-mail.  It's from myself at my

8     Vertifresh e-mail.  It was sent on Thursday, February 28th,

9     2013.  It was to Scott Dittman at his FusionPharm e-mail,

10    and it's forwarded -- I'm forwarding the amended and

11    reinstated articles of incorporation.

12    Q.   Okay.  So the highlight here, you now have a new e-mail

13    address; is that correct?

14    A.   Yes, I do, sir.

15    Q.   And that's your -- what company are you saying that

16    e-mail is related to?

17    A.   Vertifresh.

18    Q.   Okay.  Can you scroll to the middle of that document,

19    please.  A little bit down.  I'm sorry, can you scroll to

20    where it begins with, "Guy" -- right there, thank you.

21         Now, below your e-mail, who's sending you -- who's

22    sending you an e-mail?

23    A.   Guy Jean-Pierre.

24    Q.   Is Scott Dittman on the e-mail that he's sending?

25    A.   No, he is not.

1    Q.   Okay.  And at the bottom e-mail there, that's you

2    e-mailing Guy; is that correct?

3    A.   Yes, it is, sir.

4    Q.   And nowhere is Scott Dittman copied on that e-mail?

5    A.   No, he is not.

6    Q.   And just to confirm, these are the two e-mails for Guy

7    Jean-Pierre; is that correct?

8    A.   Yes, sir.

9    Q.   And what does Series A Preferred mean to you?

10   A.   A series of security.

11   Q.   And that means stock?

12   A.   Yes, sir.

13   Q.   Okay.  Can I have Government Exhibit 397.

14        Do you have Government Exhibit 397 in front of you?

15   A.   Yes, I do, sir.

16   Q.   What is Government Exhibit 397?

17   A.   It is an e-mail that was forwarded -- I was forwarding.

18   It's from myself *@williamjsears.com*, Monday, March 4th,

19   2013, to Mr. Dave Roy, references forwarding FSPM.

20   Q.   So I circled on the screen there, you have -- what's

21   the date?

22   A.   March 4th.

23   Q.   All right.  And, sir, I'm sorry, I know the testimony

24   is long and can get a little warm in this courtroom --

25   A.   That's okay.

Direct - Sears

1    Q.   -- but I need you to speak up.

2    A.   Not a problem.

3    Q.   Can you go to page 2 of that e-mail, please.

4    A.   Yes, sir.

5    Q.   Can you blow this section up, please.  Can you scroll

6    down a little bit.  Okay, thank you.

7         Who's sending you an e-mail based upon page 2 of

8    this document?

9    A.   There's two, but Guy Jean-Pierre.

10   Q.   And that's to you; is that correct?

11   A.   Yes, sir.

12   Q.   Can you look on the screen.  Can you read what I

13   circled there.

14   A.   Yes.  It says, "Also pass on my apologies to Mr. Roy

15   and Mr. Dittman.  I think their e-mails probably went to

16   spam since I don't often receive e-mails from them and my

17   website manager had changed something.  I can't recall the

18   word in my web mail to filter out unwanted e-mails."

19   Q.   So what is Mr. Guy Jean-Pierre telling you about

20   e-mails that he receives from Mr. Scott Dittman?

21   A.   That I'm usually the go-between for communications

22   through them in corporate matters.  That's why all the

23   e-mails say "forward."

24   Q.   What does this say right here?

25   A.   "Since I don't often receive e-mails from them."

Direct - Sears

1    Q.   Who's "them"?

2    A.   Mr. Roy and Mr. Dittman.

3    Q.   Thank you.

4    A.   You're welcome.

5    Q.   Can I have Government Exhibit 372-GGG.  That's triple

6    G.

7         Do you recognize Government Exhibit 372-GGG?

8    A.   Yes, I do, sir.

9    Q.   Okay.  Can you tell the jury what that is.

10   A.   It's an e-mail from myself.  E-mail address was at

11   *william@williamjsears.com*.  It was Friday, April 26th, 2013,

12   was to Scott Dittman at his FusionPharm e-mail address.

13   Subject matter is:  I'm forwarding a PPM working draft.  And

14   attachment is a revised FusionPharm Reg D offering

15   memorandum.

16   Q.   Now, can you scroll up on that e-mail, please.  Can

17   you -- thank you.

18         Okay.  There's a below e-mail in that chain; is

19   that correct?

20   A.   Yes, sir.

21   Q.   Okay.  Who sent you -- who is sending that e-mail?

22   A.   Mr. Jean-Pierre.

23   Q.   And who's that e-mail to?

24   A.   Myself.

25   Q.   Okay.  Now, this says April 26th, 2013; is that

Direct - Sears

1   correct?

2   A.   Yes, it is.

3   Q.   Okay.  And what e-mail is Mr. Sears using?

4   A.   He --

5   Q.   I'm sorry, what --

6   A.   Mr. Guy Jean-Pierre.

7   Q.   What e-mail is Mr. Jean-Pierre using?

8   A.   This is why I kept it.  William --

9   *wsears@fusionpharminc.com.*

10  Q.   Your FusionPharm e-mail address?

11  A.   The old FusionPharm e-mail, yes, sir.

12  Q.   Okay.  Is -- now, the subject, what's the subject here?

13  A.   Forward PPM working draft.

14  Q.   And what does "PPM" mean?

15  A.   Private placement memorandum.

16  Q.   Okay.  So -- and what is Mr. Pierre telling you about

17  the private placement?

18  A.   "Work in progress.  Call me as soon as possible."

19  Q.   Is Mr. Scott Dittman on that e-mail?

20  A.   No, he is not.

21  Q.   Can you go back to the top.  Okay.  And can I --

22  A.   What's at the top --

23  Q.   Can I have Government Exhibit 397 brought back up,

24  please.

25          Now, can you take a look at 397 again.

1    A.    Yes, sir.

2    Q.    We just discussed this exhibit, correct?

3    A.    Uhm-hum.  Yes, we did.

4    Q.    And you would agree with me that page 2 is the

5    indication where Mr. Guy Jean-Pierre doesn't receive many

6    e-mails from Scott Dittman.

7    A.    Yes, sir.

8    Q.    And can you just scroll up a little bit.  Keep going.

9    Good.  Can you focus in on here, please.

10           What's the date?

11   A.    February 25th, 2013.

12   Q.    Okay.  Can I have page 2, please.  Okay.  Can you

13   please focus there.

14           Again, what's the date here?

15   A.    February 25th, 2013.

16   Q.    When did Mr. Guy Jean-Pierre start doing work for

17   FusionPharm?

18   A.    The end of 2010.

19   Q.    And this is now February 25th, 2013?

20   A.    Yes, sir.

21   Q.    And that's the date he's telling you he doesn't receive

22   many e-mails from Scott Dittman?  Just look down the e-mail.

23   A.    Yes, sir.

24   Q.    Can I have Government Exhibit 372-PPP.

25           Do you have that in front of you?

Direct - Sears

1    A.   Yes, I do.

2    Q.   Do you recognize that document?

3    A.   Yes, I do.

4    Q.   All right.  And can you tell me, essentially, what is

5    that document?

6    A.   It is an e-mail sent from *william@williamjsears.com*,

7    which is myself.  It was sent Friday, September 13th, 2013,

8    at 8:45.  It was to Scott Dittman at FusionPharm, Inc.

9    Subject:  Copy paste to Joanna.

10   Q.   Okay.  And who is -- do you know who Joanna is?

11   A.   She would have been an individual at a stock transfer

12   agency.

13   Q.   Okay.  Can you scroll up there, please.  I'm sorry,

14   come back to the top.

15        Is this another example of you drafting an e-mail

16   for Mr. Scott Dittman?

17   A.   I can't sit here and say as I said -- as I sit here

18   today that it was me drafting the e-mail.  I might have just

19   been forwarding what I was told to do.

20   Q.   Well, who's sending the e-mail?

21   A.   I'm sending the e-mail.

22   Q.   And who are you sending it to?

23   A.   Sending it to Mr. Dittman.

24   Q.   And who's it addressed to in the body of the e-mail?

25   A.   Joanna.

Direct - Sears

1    Q.    And, again, who's that?

2    A.    That would be myself.

3    Q.    And your phone number.

4    A.    Yes, sir.

5    Q.    All right.

6              THE COURT:  All right, Mr. Sibert, why don't we

7    pause there for our morning break.

8              MR. SIBERT:  Perfect.  Thank you.

9              THE COURT:  Ladies and gentlemen of the jury, I

10   need to take a 20-minute break for this morning, given some

11   other matters I need to attend to.  So we will be in recess

12   for 20 minutes.

13        (Jury left the courtroom at 10:20 a.m.)

14             THE COURT:  All right, Mr. Sears, again, I need to

15   advise you, since you're in the middle of your testimony, I

16   direct you not to speak with any of the lawyers during the

17   recess.

18        (Recess 10:21 a.m.)

19        (Proceedings were held outside the presence of the jury

20   at 10:49 a.m.)

21             THE COURT:  Before we bring in the jury, Mr.

22   Sibert, I just want to clarify what you're intending to do

23   with these exhibits.  You know, we got those two e-mails you

24   sent to chambers yesterday evening.  They appear to be

25   different.  One you're talking about a first block, second

1    block, third block.  That was the e-mail sent at 6:11 p.m.

2    And then at 10:47 p.m., you sent another e-mail talking

3    about a first batch, second batch, third batch.  So I'm

4    confused -- oh, and then I get a handwritten list with more

5    than -- with more exhibit numbers.  So which is it going to

6    be?

7              MR. SIBERT:  Well, Your Honor, I apologize.  I'm

8    trying to do my best to meet the Court's needs and defense

9    counsel needs.

10             THE COURT:  Well, I'm not asking for anything

11   extraordinary here, sir.  All I'm asking is let's just take

12   them in chunks, you know, half a dozen at a time, maybe even

13   more, as long as everybody knows what's coming, we get it on

14   the record.

15             It's just that yesterday when you just sprung those

16   25 on us, all mixed up in alphanumeric order, and -- and

17   defense counsel didn't even know whether, in fact, they were

18   stipulated, that's what I'm trying to avoid.

19             So, you know, I would recommend that, as you've

20   done already, you give defense counsel advance notice of

21   which you're going to use, they can make sure that, in fact,

22   those exhibits are stipulated to, and then you move for

23   their admission in batches, and that's very easy to do.

24             My question is:  I have two e-mails with two

25   different groupings, so which -- and then the handwritten

1    one from earlier -- so which are we going to use, which are

2    we going to go with?

3           MR. SIBERT:  The next ones we're going to use are

4    the ones that are in numerical order that the Court

5    requested that they be made in.  So during the break, I put

6    the next batch in numerical order.

7           THE COURT:  So the handwritten one.

8           MR. SIBERT:  The handwritten note.

9           THE COURT:  Okay.  So, all right, does defense

10   counsel have a copy of this?

11          MR. GOODREID:  I do, Your Honor.  And my

12   understanding, to address the Court's question, is we've

13   been driving off the 6:11 e-mail, with the respect to the

14   blocks that you mentioned.  And I think the handwritten, as

15   I understand, is just the first block on the 6:11 e-mail,

16   put in numerical order is my understanding.

17          THE COURT:  Okay.  So what --

18          MR. GOODREID:  And we're good with all this.

19          THE COURT:  What do we do with the later e-mail?

20   Do we just ignore that, Mr. Sibert?

21          MR. SIBERT:  That's going to be for another

22   witness.  I was trying to give some advance notice.

23          THE COURT:  Oh, another -- okay.  Oh, that's not

24   clear from the -- okay.  Well, then we'll put this aside for

25   now.

1          All right.  Okay.  Let's bring in the jury.

2          (Jury was present at 10:53 a.m.)

3          THE COURT:  All right.  Mr. Sears, I remind you you

4    remain under oath.

5          Mr. Sibert, you may resume your examination.

6          MR. SIBERT:  Okay.  Thank you, Your Honor.

7    BY MR. SIBERT:

8    Q.   Sir, could you please look at Exhibits 158 through 166.

9    A.   I don't have those in front of me.  Okay.  Yes, I have

10   them.  Yes, sir.

11   Q.   Do you recognize those exhibits?

12   A.   Yes, those are checks.

13   Q.   Can I have Exhibit 158, please, on the screen.  Thank

14   you.

15         Okay, sir, can you please look at your screen here.

16   I'm showing you what's been marked 158.  Whose signature is

17   that?

18   A.   That is mine.

19   Q.   Who are you making this check out to?

20   A.   Jean-Pierre & Jean-Pierre.

21   Q.   And why double names?

22   A.   That was the name of the law firm.

23   Q.   And essentially how much?

24   A.   $2,500.

25   Q.   And where is this check made out of?

Direct - Sears

1    A.    Bayside Realty Holdings.

2    Q.    What's the address?

3    A.    4920 Morton Road, New Bern, North Carolina.

4    Q.    I'm going to need you to slow down a little bit.

5    A.    4920 Morton Road, New Bern, North Carolina.

6    Q.    Can you make out the bank?

7    A.    Wells Fargo.

8    Q.    And, finally, the date?

9    A.    10-14-2011.

10   Q.    Was this for a FusionPharm expense?

11   A.    I don't recall.

12   Q.    Was your mother involved with FusionPharm?

13   A.    For a very short period of time.  No, she was

14   involved -- yes, for a very short period of time.

15   Q.    What was her role?

16   A.    She was a placeholder as a corporate secretary because

17   you needed two directors at that time.

18   Q.    What were her duties?

19   A.    She had none.

20   Q.    So is it fair -- she didn't have any duties?

21   A.    Not at FusionPharm, no.  She was a placeholder, sir.

22   Q.    What is a placeholder?

23   A.    A placeholder.

24   Q.    What does that mean?

25   A.    I don't know how to describe it to you.  It was just

Direct - Sears

1   someone that needed to be on the paperwork for a short

2   period of time until the proper individual was -- it was

3   only for the reorg of the shell, actually, because it was

4   Baby Bee Bright, it went to FusionPharm, so while that

5   transition was happening, my mother was corporate secretary.

6   Q.   Okay.  So as corporate secretary, what were her duties?

7   A.   Once again, she didn't do anything, sir.  She was a

8   placeholder.

9   Q.   Is it fair to say you just used her name?

10  A.   As a placeholder at that time, yeah, because the deal

11  hasn't -- hadn't consummated yet.

12  Q.   Did she ever come out here to Denver, Colorado, and

13  work for FusionPharm?

14  A.   No.  To see me, but not to work for FusionPharm.

15  Q.   Fair point.

16  A.   Thank you.

17  Q.   Did Guy Jean-Pierre know that you were -- were you

18  involved in Bayside?

19  A.   In the very beginning, yeah.

20  Q.   Did --

21  A.   When I set up the account --

22  Q.   -- your mother know that?

23          MR. GOODREID:  Objection.  Calls for speculation.

24          THE COURT:  If you know.

25          THE WITNESS:  I don't recall.

Direct - Sears

1          THE COURT:  Okay.

2     BY MR. SIBERT:

3     Q.   166, please -- I'm sorry, 159.  Okay.

4          Again, sir, I'm showing you what's marked

5     Government Exhibit 159.  Do you recognize this?

6     A.   Yes, I do.

7     Q.   And who signed that check?

8     A.   I did.

9     Q.   Okay.  And what does this state down here in the

10    memo?

11    A.   "January payment."

12    Q.   To who?

13    A.   Jean-Pierre & Jean-Pierre.

14    Q.   And what's the date?

15    A.   3-12-12.

16    Q.   And, again, who's making the payment?

17    A.   Bayside Realty Holdings.

18    Q.   Can I have Government Exhibit 160.

19         I'm showing you Government Exhibit 160.  Do you

20    recognize Government Exhibit 160?

21    A.   Yes.  It's a check.

22    Q.   Okay.  I'm showing you the date here.

23    A.   5-14-12.

24    Q.   All right.  And then what does the memo say here?

25    A.   "Adams Letter of Opinion."

Direct - Sears

1    Q.   What does "Adams Letter of Opinion" mean to you?

2    A.   An individual to whom he did a letter of opinion.

3    Q.   Okay.  And are you talking about a legal letter of

4    opinion?

5    A.   Yes, sir.

6    Q.   So what was Mr. Guy Jean-Pierre being paid for?

7    A.   To write a letter of opinion on securities, I would

8    imagine.

9    Q.   And who signed the check?

10   A.   I did.

11   Q.   And who wrote the check?

12   A.   Bayside Realty Holdings.

13   Q.   Can I have 161, please.

14        And I'm showing you Government Exhibit 161.  Who's

15   writing the check?

16   A.   Bayside.

17   Q.   And to who?

18   A.   Jean-Pierre & Jean-Pierre.

19   Q.   And who signed the check?

20   A.   I did.

21   Q.   And what's the date?

22   A.   5-25-12.

23   Q.   Can I have Government Exhibit 162.

24        Okay, sir, do you recognize Government Exhibit 162?

25   A.   Yes, I do.

1    Q.    Okay.  And what's the date of that check?

2    A.    6-20-12.

3    Q.    Okay.  Again, who wrote the check?

4    A.    Bayside Realty Holdings.

5    Q.    And who signed the check?

6    A.    I did.

7    Q.    Okay.  And who are you paying?

8    A.    Jean-Pierre & Jean-Pierre.

9    Q.    Can I have Government Exhibit 163.

10           Okay.  Now, what's the date of this check --

11   A.    7-8-12.

12   Q.    I'm sorry, say that again.

13   A.    July 8th, 2012.

14   Q.    Okay.  And who is writing out the check?

15   A.    Bayside Realty Holdings.

16   Q.    Okay.  Who is signing the check?

17   A.    I did.

18   Q.    Okay.  Now, let's look down here at the memo.  What

19   does the memo say?

20   A.    "Abbott 144."

21   Q.    And what does that mean to you, "Abbott 144"?

22   A.    That would be securities.

23   Q.    What do you mean by securities?

24   A.    Well, 144 rule is a rule that's put on securities.

25   Q.    So why would you pay Mr. Jean-Pierre -- pay him $500

Direct - Sears

1    for a securities Rule 144?

2    A.    Because it was a transfer.  That particular one was a

3    transfer of private securities to another individual.

4    Q.    Okay.  So what exactly is a 144, based upon this check?

5    A.    Probably, if my memory serves me correctly, to have a

6    letter of opinion drawn to remove the 144 legend.

7    Q.    Okay.  So it was another legal letter?

8    A.    Yes, sir.

9    Q.    Can I have the next exhibit, please, 16- -- I think

10   it's 3.  Excuse me, 164.

11           I'm showing you 164.  What's the date now?

12   A.    11-18-12.

13   Q.    Okay.  And where is the check being ran out of?

14   A.    The company that's writing the check is Bayside Realty

15   Holdings.

16   Q.    Okay.  Who signed the check?

17   A.    I did, sir.

18   Q.    Okay.  And who's getting paid?

19   A.    Jean-Pierre & Jean-Pierre.

20   Q.    Okay.  And how much?

21   A.    $500.

22   Q.    How much did you charge Mr. Jean-Pierre to write legal

23   letters?

24   A.    I didn't charge him to write legal letters.

25   Q.    Okay.  How much did you pay Mr. Jean-Pierre to write

Direct - Sears

1    your legal letters?

2    A.   It depended.  Usually it was, I think, 500 a letter.

3    Q.   How much is this check for?

4    A.   $500.

5    Q.   How much was 163 -- Exhibit 163 for?

6    A.   $500.

7    Q.   And what's the memo say there?

8    A.   Excuse me?

9    Q.   What does the memo say on 163?

10   A.   Memo says "Abbott 144."

11   Q.   Okay.  Can I have Exhibit 165.

12        Okay.  Again, sir, what's the date of this check?

13   A.   3-6-13.

14   Q.   Okay.  And who signed the check?

15   A.   I did.

16   Q.   And who are you paying?

17   A.   Jean-Pierre & Jean-Pierre.

18   Q.   And where is the check being ran out of?

19   A.   Bayside Realty Holdings.

20   Q.   Okay.  And, finally, can I have Exhibit 166.

21        And what's the date of this check?

22   A.   8-19-13.

23   Q.   Okay.  And who signed the check?

24   A.   It's written from Bayside Realty Holdings.  I signed

25   the check.

1    Q.   Okay.  And who's being paid?

2    A.   Jean-Pierre & Jean-Pierre.

3    Q.   And for how much?

4    A.   $500.

5    Q.   Okay.  Who controlled Bayside Realty Holding?

6    A.   Depending on -- depends on what time period.

7    Q.   Okay.  Who lives in New Bern, North Carolina?

8    A.   My mother does.

9    Q.   Can I have Government Exhibit 16 -- I'm sorry, 158.

10        Okay.  This was the first check I showed you.

11   What's the date of that?

12   A.   10-14-11.

13   Q.   Okay.  Can I have Government Exhibit 166.

14        And what's the date of the last check I showed you?

15   A.   8-19-2013.

16   Q.   So for over almost two years, who paid Jean-Pierre from

17   Bayside Realty Holding?

18   A.   From the checks that you produced, Bayside Realty

19   Holdings paid them.

20   Q.   Who signed the checks?

21   A.   I signed the checks.

22   Q.   All right.

23        MR. SIBERT:  Your Honor, at this time, the

24   Government would like to admit into evidence another batch

25   of exhibits.

Direct - Sears

1          THE COURT:  All right.

2          MR. SIBERT:  And as previously provided to defense

3    counsel and this Court, the Government would like to

4    introduce in numerical order for the purposes of putting

5    into evidence 170, 171, 173 through 175, 177, 249, 258, 372.

6    And there are several letters that we're going to submit for

7    372.  And those include C as in Charlie, E as in echo, F as

8    in foxtrot, R as in Romeo, X as in X-ray, B as in bravo

9    bravo, D as in Delta Delta, F as in foxtrot foxtrot, G as in

10   golf golf, H as in hotel hotel, K as in kilo kilo, Q as in

11   Quebec Quebec, V as in Victor Victor, C as in Charlie

12   Charlie Charlie --

13         THE COURT:  So triple C.

14         MR. SIBERT:  Yes, sir.

15         THE COURT:  All right.

16         MR. SIBERT:  E as in echo echo echo, H as in hotel

17   hotel hotel, India [sic] as in India India India, K as in

18   kilo kilo kilo, and O as in Oscar Oscar Oscar.

19         THE COURT:  And what about -- go ahead.

20         MR. SIBERT:  And in addition to those, 384, 385,

21   391, 398, 399.  I need to make a correction, I'm actually

22   misreading my own handwriting here.  I need to strike 372

23   Victor Victor and replace that with 372 uniform uniform.

24         THE COURT:  So UU instead of VV.

25         MR. SIBERT:  Yes, sir.

Direct - Sears

1          THE COURT:  All right.  And all these have been

2     stipulated to with respect to admissibility?

3          MR. SIBERT:  They have, Your Honor.

4          MR. BARNARD:  Your Honor, if I may.  175 was not on

5     the original list and has not been stipulated to.  175 is

6     not on last night's list and hasn't been stipulated to.

7          THE COURT:  All right.

8          MR. SIBERT:  And, Your Honor, Mr. Barnard is

9     correct.  That was actually an added exhibit after the

10    stipulation process, so I apologize.

11         THE COURT:  All right.  Well, then I'm going to

12    keep it out right now.  You're free to move for its

13    admission subject to an objection from the defendant at

14    another time.

15         All right.  Given the stipulation of the parties,

16    the following Government exhibits are admitted into

17    evidence:  170, 171, 173, 174, 177, 249, 258, 372-C, E, F,

18    R, X, BB, DD, FF, GG, HH, KK, QQ, UU -- two Us -- CCC, EEE,

19    HHH, III, KKK, OOO, 384, 385, 391, 398, and 399.  All right.

20    Those are all in evidence.

21         (Government's Exhibits received)

22         MR. SIBERT:  Your Honor, again, I have those

23    exhibits printed out.  I don't know if the Court agrees with

24    my practice, but --

25         THE COURT:  So you select -- you pulled these out

1    from the binders and organized them in this fashion?

2              MR. SIBERT:  That's correct, Your Honor.

3              THE COURT:  All right.  So hand them to my

4    courtroom deputy and she'll give them to the witness as they

5    become appropriate to do so.

6              MR. SIBERT:  Okay.  Thank you very much.

7    BY MR. SIBERT:

8    Q.   Okay.  Sorry.

9              Can I please have Government Exhibit 372-C

10   published for the jury.

11             And also, sir, can you please look at Government

12   Exhibit 372-C.  Have you had a chance to look at that?

13   A.   Yes, I have.

14   Q.   Do you recognize what Government Exhibit 372-C is?

15   A.   It is an e-mail.

16   Q.   Okay.  Can you tell the jury what the e-mail -- who

17   wrote the e-mail and who received the e-mail.

18   A.   The e-mail is from *william@williamjsears.com* sent

19   Wednesday, July 20th, 2011.  It was to Scott Dittman at

20   FusionPharm, Inc.

21   Q.   All right.  Can you please scroll down on Government

22   Exhibit 372-C.

23   A.   And Scott's other e-mail.  Okay.

24   Q.   Okay.  Now, there's -- obviously the first e-mail of

25   this chain is below that e-mail, would you agree with me?

Direct - Sears

1    A.   Yes, sir.  The top one, it's my -- no -- yes, the
2    bottom one, July 12th.  Yes, sir.
3    Q.   All right.  So who -- what e-mail -- who's writing that
4    e-mail and to --
5    A.   I am, sir, from *william@williamjsears.com.*
6    Q.   Here you're writing the e-mail to?
7    A.   Guy Jean-Pierre.
8    Q.   All right.  And what's the subject matter?
9    A.   "FSPM Disclosure Statement_6 30 11."
10   Q.   Okay.  And, again, FusionPharm disclosure statement,
11   would you agree with that?
12   A.   That's what it says, sir.
13   Q.   Okay.  And what is the disclosure statement?
14   A.   A statement that discloses the structure and situation
15   of a company.
16   Q.   And who do you have to disclose that to?
17   A.   That gets -- it depends on -- you know, it could be the
18   FCC, could be FINRA, could be OTC BB --
19   Q.   Let's talk --
20   A.   -- depending on where --
21   Q.   Let's talk about FusionPharm in this statement.
22   A.   That would be the OTC bulletin board news service.
23   Q.   What does OTC stand for?
24   A.   Over-the-counter.
25   Q.   Okay.  And it says, 06-30-11.

1   A.   Yes, sir.

2   Q.   What does that date mean to you, basically --

3   A.   That would be the period ending June 30th, 2011.

4   Q.   And you're sending this disclosure statement to Mr. Guy

5   Jean-Pierre?

6   A.   Indeed, I am.

7   Q.   Do you know who drafted the initial information and

8   disclosure statements for FusionPharm?

9   A.   I don't remember off the top of my head.

10  Q.   All right.  Well, this e-mail is, you would agree with

11  me, on July 12th, 2011, correct?

12  A.   Yes, sir.

13  Q.   Okay.  Now, did you ever transfer stock -- FusionPharm

14  stock to any family members around this time?

15  A.   I don't recall.

16  Q.   Did you ever transfer FusionPharm stock to any of your

17  family members?

18  A.   Yes, I have.

19  Q.   And what family members did you transfer FusionPharm

20  stocks to?

21  A.   To my brother-in-law, Robert Dittman.

22  Q.   What is La Di Da?

23  A.   That was a corporation that my younger brother-in-law

24  was supposed to take over to receive said stock.  Never

25  managed to, so it was eventually put into his personal name.

Direct - Sears

1    Q.   Okay.  And, sir, you're married; is that correct?

2    A.   Indeed, I am.

3    Q.   Who are you married to?

4    A.   Sandra Sears, my wife.

5    Q.   So your wife and mother have the same name; is that

6    correct?

7    A.   And the same middle initial.

8    Q.   Okay.  All right.  Did you ever transfer preferred

9    shares to La Di Da?

10   A.   Yes, I did.

11   Q.   Okay.  So you transferred -- and do you recall how many

12   preferred shares, roughly?

13   A.   No, I don't.

14   Q.   Do you have an estimate?

15   A.   Don't want to guess, sir.

16   Q.   Do you want to refresh your memory?

17   A.   If you feel it's relevant, please do.

18          MR. SIBERT:  Your Honor, may I refresh this

19   witness's memory regarding the preferred shares?

20          THE COURT:  What are you going to be using?  What

21   document do you have?

22          MR. SIBERT:  I'm sorry, Your Honor, his plea

23   agreement.

24          THE COURT:  The plea agreement again?  All right.

25   Hand it to my courtroom deputy, she'll hand it to the

Direct - Sears

1    witness.

2          MR. SIBERT:  And this has been shown to the defense

3    counsel.

4          THE COURT:  All right.  Well, I'm assuming they

5    have a copy.

6          MR. SIBERT:  I have also shown them the page.

7          THE COURT:  Okay.

8    BY MR. SIBERT:

9    Q.   Does that refresh your memory?

10   A.   Not really, but okay.

11   Q.   It doesn't refresh your memory?

12   A.   Not the exact number of shares, but it is what it is.

13   Go ahead.

14   Q.   Okay.

15         MR. BARNARD:  Your Honor, can I ask the witness to

16   speak more directly --

17         THE WITNESS:  I said -- I'm sorry, it is what it

18   is, but go ahead.

19   BY MR. SIBERT:

20   Q.   Sir, I'm not asking a question.  I just need --

21   A.   And I'm answering it.  I don't recall the transaction

22   fully, but if that's what it says, okay, let's assume it is.

23         MR. SIBERT:  Your Honor, the Government would ask

24   for the witness to be able to read paragraph I believe 15 on

25   page 20 of his plea agreement for past recollection

Direct - Sears

1    reported.

2           THE COURT:  Is there an objection?

3           MR. GOODREID:  Well, if counsel is asking him to

4    read it himself, I think that's perfectly fine.  The

5    document, itself, doesn't come substantively in as evidence.

6    It's designed to refresh his recollection.  Either it does

7    or it does not.

8           THE COURT:  That's how I understood you were using

9    this document.  He's reviewed it.  And, actually, once you

10   reviewed it, Mr. Sears, you should put it down, turn it

11   over, so you're not reading from it.

12          But -- so the request for the witness to read from

13   this document is denied.  The objection, rather, is

14   sustained.

15          MR. SIBERT:  Can I take the document back, again,

16   Your Honor?

17          THE COURT:  Sure.

18   BY MR. SIBERT:

19   Q.   All right.  To recap, you transferred preferred shares

20   to your wife's company and to your brother-in-law, Robert

21   Dittman.

22   A.   Yes.  Due to the wife's company was to be Robert

23   Dittman's.

24   Q.   And after attempting to refresh your memory, under oath

25   you don't recall approximately how many preferred shares?

1    MR. GOODREID:  Objection.  Asked and answered

2    repeatedly.

3    THE COURT:  I'll let it go this one more time.

4    Go ahead, sir.

5    THE WITNESS:  Well, it says 1,000 something, 400.

6    There's three different numbers in there.

7    BY MR. SIBERT:

8    Q.   All right.  Well, it's fair to say that if you look at

9    the attachment of Government Exhibit 372-C, none of those

10   transfers to either your wife's company or to Robert Dittman

11   are in it; is that correct?

12   MR. GOODREID:  Objection.  Leading.

13   THE COURT:  Sustained.

14   BY MR. SIBERT:

15   Q.   Are there any transfers to your family members in

16   document 372-C?

17   A.   It wouldn't be in 372-C because 372-C is a company --

18   Q.   That's not my question.  Is it in this document?

19   A.   No, it's not in here because it wasn't supposed to be

20   in here.

21   Q.   It's not in the document?

22   A.   No, it's not, because it didn't have to be.

23   Q.   Thank you.  And you sent this document to Mr. Guy

24   Jean-Pierre to review?

25   A.   Indeed.  I would have forwarded this document to him

1    because it says "forwarded."

2    Q.   Now, may I have you look at Government Exhibit 384.  Do

3    you recognize Government Exhibit 384?

4    A.   Yes, sir.

5    Q.   And what is Government Exhibit 384?

6    A.   It is an e-mail sent from myself, from William Sears at

7    FusionPharm, Inc., Tuesday, July 12th, 2011, to

8    *scottdittman@fusionpharminc.com*.  Subject:  Forward:

9    Information and Disclosure Statement.

10   Q.   And so this is after you forwarding the disclosure

11   statements to Guy Jean-Pierre, correct?

12   A.   No, this one is before -- was that the one we just

13   looked at?  This one says July 20th and this one that you're

14   asking says July 1st, so that would be before.  Unless I'm

15   misunderstanding your question.

16   Q.   What's the date on the e-mail?

17   A.   Which one, sir?

18   Q.   Government Exhibit 384.

19   A.   384 is July 12th.

20   Q.   Thank you.

21   A.   Thank you.

22   Q.   Okay.  And, again, recalling this is -- the date is

23   July 12th, 2011; what e-mail are you using?

24   A.   *wsears@fusionpharminc.com*.

25   Q.   And based upon your prior testimony, that's the same

Direct - Sears

1    e-mail you used in 2013?

2    A.    Yes.

3    Q.    And also 2012?

4    A.    Yes.  I did say that.

5    Q.    Government Exhibit 372-E.

6           MR. GOODREID:  Counsel, E?

7           MR. SIBERT:  E.

8    BY MR. SIBERT:

9    Q.    Do you recognize Government Exhibit 372-E?

10   A.    Yes.  It is an e-mail.  It's from myself using my

11   *william@williamjsears.com* e-mail, Sunday, July 17th, 2011.

12   It's to Guy Jean-Pierre at the law firm of Jean-Pierre, and

13   Guy Jean-Pierre Yahoo, carbon copy to Scott Dittman at

14   FusionPharm, Inc.

15   Q.    And what are you writing Mr. Guy Jean-Pierre?

16   A.    It says, "Scott lands in LAX at one thirty.  So if the

17   Lawyer can meet him somewhere close to the airport it would

18   be ideal."

19           I'm e-mailing Mr. Jean-Pierre obviously to

20   coordinate a meeting.

21   Q.    And who are you coordinating the meeting with?

22   A.    The lawyer, I -- if my recollection serves me would be

23   with Anthony DiTommaso.

24   Q.    Okay.  Can I have Government Exhibit 372-F.  And can I

25   have the middle, please, of that exhibit.

Direct - Sears

1           Do you recognize the -- first, do you recognize

2   Government Exhibit 372-F?

3   A.   Yes, it's an e-mail from myself at the FusionPharm,

4   Inc., e-mail, Monday, July 18th, 2011, to Scott Dittman,

5   FusionPharm, Inc., and I'm forwarding an e-mail to Guy

6   Jean-Pierre.

7   Q.   And I focused in on your screen on the middle part of

8   that e-mail.

9   A.   Yes, sir.

10  Q.   And what is that discussing?

11  A.   It's discussing that he left me a note on Skype

12  detailing the attorney in question was amenable to meeting

13  the next day at 2:30 p.m. by the airport.  And he's leaving

14  it up to Mr. Dittman to propose where they should meet.

15  Q.   Okay.  So based upon the prior exhibit that we just

16  looked at and this exhibit, who was in charge of

17  coordinating the meeting?

18  A.   I don't know who was in charge of coordinating.  I was

19  definitely part of it, but I was forwarded the e-mail.

20  Q.   Okay.  You were part of coordinating.  Who else was

21  part of coordinating the meeting?

22  A.   Yes, sir.  Mr. Dittman and Mr. Jean-Pierre.

23  Q.   And this was a meeting with who?

24  A.   I -- I believe Anthony DiTommaso.

25  Q.   Can I have Exhibit 385, please.

1          Can you please look at Government Exhibit 385.  Do

2     you recognize Government Exhibit 385?

3     A.    Yes, it's an e-mail, and it was from

4     *guy@lawfirmofjeanpierre*, it was sent Monday, July 18th,

5     2011, it was to Scott Dittman at

6     *scottdittman@fusionpharminc.com*, and the subject matter was

7     "Meeting with attorney RE Pink Sheets Opinion letter."

8     Q.    Okay.  And can you discuss the body of that e-mail.

9     A.    It looks like the time and place for the -- Mr. Dittman

10    and Mr. DiTommaso to meet were confirmed, and Mr. Dittman

11    received Mr. DiTommaso's telephone number in case there was

12    any problems with their coordination.

13    Q.    Okay.  And what is Mr. Scott Dittman's telephone

14    number?

15    A.    It says here 303-419-6352.

16    Q.    All right.  Can I have Government Exhibit 372-QQ.  Do

17    you recognize Government Exhibit 372-QQ?

18    A.    Yes, I do, sir.  It's an e-mail sent from myself,

19    *william@williamjsears.com*, Wednesday, July 20th, 2011, to

20    Scott Dittman at his FusionPharm e-mail.  Also he is cc'd at

21    his personal e-mail, *echomesscott@yahoo*.  Subject is "FSPM

22    Disclosure Statement 6 30 11," and there's an attachment to

23    it.

24    Q.    And what's the attachment?

25    A.    Excuse me -- yes, I was forwarding the -- the

1    attachment was the information and disclosure statement for

2    the period ended June 30th, 2011, so --

3    Q.   Can you please scroll down, please, on that exhibit.

4    Okay.  Who's this e-mail from?

5    A.   From myself.

6    Q.   Okay.  And who are you e-mailing to?

7    A.   Hold on one second.  I'm e-mailing to

8    *guyjeanpierre@yahoo.com*,

9    guyjeanpierre@lawfirmofguyjeanpierre.com.

10   Q.   And what are you e-mailing?

11   A.   The FSPM disclosure statement of 6-30-11.

12   Q.   What are you asking him to review?

13   A.   Review and advise.

14   Q.   Can I have exhibit Government Exhibit 372-R.

15          Okay.  Can you look at this.  Do you have 372-R in

16   front of you?

17   A.   Yes, I do, sir.

18   Q.   And what is 372-R?

19   A.   It is an e-mail sent from myself using my FusionPharm

20   e-mail address.  And it was sent on Thursday, October 27th,

21   2011.  It was to Scott Dittman at FusionPharm, Inc., carbon

22   copy was Andrew Duke at FusionPharm, Inc.  Subject was

23   forwarding a Revised NCND agreement, and the attachment was

24   an FSPM Non Circumvention document.

25   Q.   Okay.  And can you scroll -- excuse me, give me a

Direct - Sears

1    second, Your Honor.

2          Can you scroll down that e-mail, please.

3          Okay, sir, can you look on your screen here.

4    A.   Yes, sir.

5    Q.   Now, there's a chain, like we've been reviewing.  Who

6    sent that e-mail?

7    A.   From *guy@lawfirmofjeanpierre.com*.

8    Q.   And to who?

9    A.   Sent it to myself.

10   Q.   And what's the subject --

11   A.   At the e-mail address listed.  Subject is "Revised NCND

12   Agreement, FusionPharm."

13   Q.   Okay.  And what is Mr. Guy Jean-Pierre telling you?

14   You can look on your screen, sir.  Just read the bottom.

15   A.   I understand that.  I'd like to look at the document,

16   too, please.

17   Q.   Okay, sir --

18   A.   "Please find revised NCND agreement.  Call me if you

19   wish to discuss."

20   Q.   So Mr. Guy Jean-Pierre's forwarding you the revised

21   agreement.

22   A.   He's -- excuse me?

23   Q.   He's forwarding you the revised agreement.

24   A.   Yes, sir.

25   Q.   Again, this is his office location, correct?

Direct - Sears

1    A.    Yes, sir.

2    Q.    Can I have Government Exhibit 170.

3          Do you recognize Government Exhibit 170?

4    A.    Yes, I do, sir.

5    Q.    Okay.  What is 170?

6    A.    It is an e-mail.  It's from myself at

7    *william@williamjsears.com*, sent on November 28th, 2011.  It

8    was to Scott Dittman at his FusionPharm e-mail, Guy

9    Jean-Pierre at his Yahoo.com e-mail, and carbon copied was

10   Mike Kocinski, an accountant at *mikekosinski@aol.com*, and I

11   am forwarding the financial statements.

12   Q.    Okay.  So the subject's "Financial Statements,"

13   correct?

14   A.    Yes, sir.

15   Q.    All right.  And in the body here, what are you telling

16   those -- Mr. Dittman and Mr. Guy Jean-Pierre and Mr.

17   Kocinski about what -- what's your message to them?

18   A.    This was -- if you notice the font is different.  This

19   was a cut-and-paste that Mr. Kocinski had sent to me to give

20   to Mr. Scott to have re-reviewed the finanical --

21   Q.    I'm not asking you what you wrote in the body --

22   A.    I'm telling you what I wrote in the body of the e-mail,

23   and I cut and paste what's in there.  It says, "Good

24   afternoon.  Please remember the statement of changes in

25   stockholder's equity and the notes to financial statements.

1  The notes to the statement " --

2        MR. SIBERT:  Your Honor --

3        THE WITNESS:  -- "of cash flows are" --

4        THE COURT:  Hold on.  Let him finish his answer.

5        THE WITNESS:  --  "are:  Row 123 and 126 must be a

6  negative number because it was the purchase from the

7  company.  Row 128 must be in capitol letters.  Row 133 -

8  must be $40,160.29.  Kindly contact us if you require

9  anything further."

10        And that one says Guy Jean-Pierre, Regards.

11  Q.   So pick up from where you were.  Mr. Guy Jean-Pierre

12  wrote a long e-mail suggesting changes; is that correct?

13  A.   On that one, yes.

14  Q.   About the financial statements in November -- around

15  the time frame of November 28, 2011.

16  A.   Yes, he did write an e-mail.

17  Q.   All right.  So now let's go back up to the top of the

18  e-mail.  And I asked you just to read what you wrote the

19  group that you e-mailed to.

20  A.   I was forwarding --

21  Q.   What did you write, sir?

22  A.   I was forwarding the e-mail, and I said, "I think we

23  have some issues to address," referencing the e-mail that

24  was sent.

25  Q.   All right.  So that's what you wrote.

Direct - Sears

1    A.   That is what I wrote, yes, sir.  Thank you.

2    Q.   Can I have Government Exhibit 391.  Can you bring that

3    back up large, please.

4         Sir, I want you to look at your screen.  Do you

5    recognize Government Exhibit 391?

6    A.   Yes, I do.

7    Q.   All right.  I circled something on the screen there.

8    Do you recognize what I circled?

9    A.   Yes.

10   Q.   What is that?

11   A.   It is an e-mail.

12   Q.   Okay.  From who --

13   A.   From *guyjeanpierre@fusionpharminc.com*.

14   Q.   To who?

15   A.   To Mr. William Sears *@fusionpharminc.com* on December

16   5th, 2011.  Subject:  Re:  "FSPM Information and Disclosure

17   Statement."

18   Q.   Okay.  And what's the date of the e-mail?

19   A.   December 5th, 2011.

20   Q.   Okay.  And what is Mr. Guy Jean-Pierre telling you in

21   his e-mail?

22   A.   Find a draft of the proposed disclosure statement.

23   Q.   Okay.  And what is he asking you to do?

24   A.   "Take a look and give me a call so that we can

25   discuss."

Direct - Sears

1    Q.   So Mr. Jean-Pierre wanted you to call him and discuss

2    this document.

3              MR. GOODREID:   Objection.   Calls for speculation.

4              THE COURT:   And it's leading.   Sustained.

5    BY MR. SIBERT:

6    Q.   Did you ever call Mr. Guy Jean-Pierre to talk about

7    that statement that he -- like he requested?

8    A.   I don't recall, sir.   It was 2011.   If it was anything

9    detailed about financial statements, no, or disclosure, I

10   wouldn't have made that call.

11   Q.   Can I have Government Exhibit 372 -- excuse me, 171.

12             All right, sir, you have 171 in front of you?

13   A.   Yes, I do, sir.

14   Q.   And what is that?

15   A.   That is an e-mail from -- the heading of it is from

16   *william@williamjsears.com*, Thursday, December 22d, 2011.   It

17   is to Scott Dittman and Guy Jean-Pierre.   Mr. Dittman is

18   using his FusionPharm e-mail, Mr. Jean-Pierre is using both

19   his law firm at Jean-Pierre and *guy@fusionpharminc.com*.   The

20   subject is a forward, referring to financial statements of

21   FusionPharm.

22   Q.   Okay.   And for what quarter is that?

23   A.   That would be third quarter 2011, it says.

24   Q.   Okay.   And then can you scroll down, please.

25   A.   Uhm-hum.

Direct - Sears

1    Q.   Not so far.  A little bit up, please.

2         All right.  Can you look on your screen.  I'm

3    circling an e-mail here.  Who's Mike Kocinski?

4    A.   Mike Kocinski was the old CPA for the Baby Bee Bright

5    Corporation, which Scott chose to keep on board because he

6    was familiar with the company's financial status.

7    Q.   And he sent you this e-mail, is that correct?

8    A.   That's right.

9    Q.   And then what is he stating in his body about what he

10   is sending?

11   A.   He's sending attached the financials of 9-30-2011,

12   along with the shareholders' statement and notes.  He's made

13   some changes to the notes and would suggest that I have

14   Scott review note No. 8 on a shareholders' info, he doesn't

15   have the latest shareholder list with him, and to make the

16   necessary changes.

17   Q.   So as you testified, if you go to the top, you are

18   forwarding his e-mail; is that correct?

19   A.   Yes, sir.

20   Q.   You're forwarding all his attachments.

21   A.   Yes, sir.

22   Q.   And you sent those attachments to Scott Dittman and Mr.

23   Guy Jean-Pierre.

24         MR. GOODREID:  Objection.  Leading.

25         THE COURT:  Sustained.

Direct - Sears

BY MR. SIBERT:

Q.   Who did you send the attachments to?

A.   I sent these attachments to Scott Dittman and Guy
Jean-Pierre.

Q.   Can I have Government Exhibit 372-X.  Okay.  Can you
scroll down, please.  All right.

          Do you recognize Government Exhibit 372-X?

A.   Yes, I do, sir.

Q.   All right.  Can you look at your screen, please.  I'm
circling an e-mail -- who's that e-mail from?

A.   That e-mail is from *guy@fusionpharminc.com*, it was sent
Friday, December 23d, 2011, it was to myself, Scott Dittman,
Guy Jean-Pierre.  I would -- and the subject matter was:
"9_30_11 Information and disclosure statement."

Q.   And what is Guy Jean-Pierre writing you?

A.   It says, "Please see attached."  Note that he has added
language to section B of the MD&A, item 16.  If that's okay,
he thinks he's -- we're good to go.

Q.   So he's -- what quarter information and disclosure
statement is Mr. Guy Jean-Pierre sending you?

A.   That would be the third quarter of 2011, I believe.

Q.   And when does that quarter end?

A.   9-30-2011.

Q.   Can I have Government Exhibit 372-BB.

          Do you have 372-BB there?

1    A.    Yes, I do.

2    Q.    Do you recognize Government Exhibit 372-BB?

3    A.    Yes, I do, sir.

4    Q.    Okay.  And can you tell the jury -- scroll it up.

5    372-BB.  Let me move on for a second.

6          Can I have Exhibit 372-DD.  Can you look at that

7    one.  Keeping 372-BB on the side.  Do you have 372-DD in

8    front of you.

9    A.    Yes, I do, sir.

10   Q.    And do you recognize what that is?

11   A.    Yes, sir.  It is an e-mail.  It is from

12   *guy@lawfirmofjeanpierreinc.com*, it was sent Wednesday, March

13   14th, 2012.  It was sent to myself at

14   *william@williamjsears.com*.  Scott Dittman was cc'd at

15   *fusionpharm.com*.  The subject is FSPM - Oxford Capital

16   opinion letter.

17   Q.    Okay.

18   A.    And --

19   Q.    What is attached to that e-mail?

20   A.    An opinion letter for Oxford Capital.

21   Q.    What does Mr. Guy Jean-Pierre state in that e-mail?

22   A.    "Attached please find the FSPM - Oxford Capital pin

23   letter.  I am still awaiting the non-affiliation form for

24   Mr. Adams.  Give me a call when you have a chance.  Guy

25   Jean-Pierre."

Direct - Sears

1    Q.   Can we try to get up 372-BB again.  Okay.  Okay, let's
2    take a look at Government Exhibit 173.
3             Do you recognize Government Exhibit 173?
4    A.   Yes, I do.
5    Q.   Okay.  What is Government Exhibit 173?
6    A.   It is an e-mail from myself, *william@williamjsears.com*,
7    to Mike Kocinski, *mkocinski@aol.com*, Scott Dittman at his
8    FusionPharm e-mail.  Subject was 12-31-12 financials.  Date
9    was Sunday, March 25th, 2012.
10   Q.   All right.  Now you took over Baby Bee Bright in the
11   early part of 2011; is that correct?
12   A.   I would say midyear.
13   Q.   Okay.
14   A.   More midyear.
15   Q.   But before 2012.
16   A.   Oh, yeah.
17   Q.   And you just --
18   A.   You said 2012 or '11 Baby Bee Bright.  I'm sorry, sir.
19   I just want to be correct.
20   Q.   Well, let me ask you:  When did you take over Baby Bee
21   Bright to make it FusionPharm?
22   A.   I can't say I ever really took over Baby Bee Bright,
23   quite frankly, to use your phrase.  But I adminned the
24   company from mid-'11 to the end of 2011.
25   Q.   All right, so 2011.  And this e-mail is from 2012; is

Direct - Sears

1    that correct?

2    A.    Yes, sir.

3    Q.    In fact, the end of 2012.

4    A.    Yes, sir.

5    Q.    All right.  And you're still talking to the old

6    financial person under Baby Bee Bright; is that correct?

7    A.    Yes, sir.

8    Q.    You're actually sending him an e-mail?

9    A.    Yes, sir.

10   Q.    All right.  Did you deal with Mr. Kocinski regarding

11   getting financials reviewed?

12   A.    Yes.  I was the go-between between him and Scott

13   Dittman.

14   Q.    All right.  This was for FusionPharm; is that right?

15   A.    That is right, sir.

16   Q.    All right.  Can I have Government Exhibit 177.

17           Do you recognize Government Exhibit 177?

18   A.    Yes, sir, I do.

19   Q.    Okay.  And can you tell the grand jury what -- excuse

20   me, the jury what this is about?

21   A.    This e-mail is sent from myself at

22   *william@williamjsears.com*, Thursday, June 7th, 2012.  It was

23   sent to Scott Dittman at FusionPharm, Guy Jean-Pierre at

24   FusionPharm, Guy Jean-Pierre Yahoo, and Guy Jean-Pierre at

25   the law firm of --

1          THE COURT:  Mr. Sears.  When you're reading the

2    document, it's human nature, we all do it, when we read from

3    documents, we speak much faster than we do in normal speech.

4          THE WITNESS:  Sorry.  I apologize.

5          THE COURT:  So slow down when you read from the

6    document.

7          THE WITNESS:  I apologize, Your Honor.

8          And under the subject matter, I was forwarding FSPM

9    financial statements as of 3-31-12.

10   BY MR. SIBERT:

11   Q.   Okay.  And so what quarter would those financial

12   statements go to?

13   A.   Excuse me?

14   Q.   What quarter would those financial statements go to?

15   A.   That would be the first quarter -- the end of the first

16   quarter of 2012.

17   Q.   And these are the FusionPharm financial statements?

18   A.   Yes, sir.

19   Q.   Can you scroll down, please, on this document.

20          Sir, if you can look to your screen.  Can you

21   discuss the e-mail that -- just below the one you just

22   discussed.

23   A.   That one, it's another e-mail and from Mike Kocinski at

24   his AOL e-mail address.  It was sent Thursday, June 7th,

25   2012.  It is to *guy@fusionpharminc.com*.  Myself was copied,

Direct - Sears

1    at *fusionpharminc.com*, and also my

2    *william@williamjsears.com*.  Scott Dittman was carbon copied

3    also at his *fusionpharminc.com*, and his subject was FSPM

4    financial statements as of 3-31-12.

5    Q.   Okay.  Since you were copied on this e-mail, what is

6    Mr. Kocinski telling you in the body of the e-mail?

7    A.   I don't really know because it says, "Dear sir, I am

8    the accountant that assisted with the preparation of the

9    financial statements."

10         I don't really under -- I don't know.

11   Q.   Okay.  Well, he's --

12   A.   He's saying he's the accountant that assisted with the

13   financial statements.

14   Q.   For what company?

15   A.   FusionPharm.

16   Q.   And for what period?

17   A.   For 3-31-12.

18   Q.   And how is he saying they were prepared?

19   A.   He said he prepared the statements in accordance to

20   GAAP.  He's -- okay.

21   Q.   Can I have Exhibit -- can you please look at Government

22   Exhibit 174.

23         Do you recognize Government Exhibit 174?

24   A.   Yes, sir.  It is an e-mail.  It's from myself at

25   *william@williamjsears.com* and it was sent to

Direct - Sears

1    *guy@fusionpharminc.com.*

2    Q.   Sir, can you please follow the Court's instruction and

3    just slow down, and keep your volume up.

4    A.   It was sent to *guy@fusionpharminc.com*, carbon copied

5    was Mike Kocinski at his AOL e-mail.  The subject is FSPM,

6    and it's dated Tuesday, April 3d, 2012.

7    Q.   Okay.  And what are you writing in the body of this

8    e-mail?

9    A.   I am asking the gentlemen to communicate directly so I

10   am not the go-between.

11   Q.   And what are you asking them to communicate about?

12   A.   The preparation of the financial statements for the

13   company.

14   Q.   And for what report?

15   A.   For the 12-31-12 financial statements.

16   Q.   Would that be the annual report for 2012?

17   A.   An annual report, I believe, was a different filing.  I

18   don't remember.

19   Q.   Okay.

20   A.   I think they are two different filings, sir.

21   Q.   And you provided phone numbers; is that correct?

22   A.   That's right.

23   Q.   And what is Mr. Guy Jean-Pierre's phone number?

24   A.   305-929-3652.

25   Q.   Can I have Government Exhibit 372-FF.  I'm going move

Direct - Sears

1    on from that one, Your Honor.  Some of these files are large

2    and they don't come up on the screens.  Can I have

3    Government Exhibit 372-GG.

4         Do you recognize Government Exhibit 372-GG?

5    A.   Yes, I do.  This is an e-mail that is sent from myself

6    at my *william@williamjsears.com* e-mail.  It was sent

7    Tuesday, June 5th, 2012.  It was to

8    *scottdittman@fusionpharminc.com*.  The subject was forwarding

9    FSPM.  The attachment is FusionPharm, Inc., shareholder

10   report common, 3-31-12.

11   Q.   And so if I understand this e-mail right, what are you

12   forwarding to Mr. Scott Dittman?

13   A.   A shareholder report.

14   Q.   For what company?

15   A.   FusionPharm, Inc.

16   Q.   Can you go down a little bit on this document, please,

17   on the screen.

18   A.   Yes, sir.

19   Q.   The e-mail below, who wrote that e-mail?

20   A.   It is from William Sears at *william@williamjsears.com*.

21   It was sent Wednesday, May 23d, 2012, to Guy Jean-Pierre,

22   *guymjeanpierre@yahoo.com*, also his *guy@fusionpharminc.com*

23   e-mail.  Carbon copied was Mr. Cliffe Bodden at

24   *cbodden@gscventures* on Microsoft, and the subject was FSPM

25   forward.

Direct - Sears

1    Q.   Okay.  And when you say William Sears, you're talking

2    about yourself.

3    A.   Yes, sir.

4    Q.   I just want to make sure there's not another William

5    Sears.  And FSPM is FusionPharm?

6    A.   Yes, sir.

7    Q.   All right.  Please, to the staff, Government Exhibit

8    175 has not been introduced into evidence, so if you can

9    please take it down so the jury can't see it.

10            Can you please --

11            MR. GOODREID:  Your Honor, I'll make this easy.

12   The Government -- excuse me, the Government -- the defense

13   stipulates to the admission of this document.

14            THE COURT:  All right.  Excellent.  Given the

15   stipulation, Government Exhibit 175 is admitted into

16   evidence and may be published to the jury.

17        (Government's Exhibit 175 received)

18   BY MR. SIBERT:

19   Q.   Thank you.  Can I please have that brought back up.

20   Thank you.

21            Can you take a look at Government Exhibit 175.

22   A.   Yes, sir.

23   Q.   Okay.  Can you tell the jury what this e-mail

24   references.

25   A.   The reference is financials.  It's sent from myself,

1   which is *william@williamjsears.com*.  It was to Michael

2   Kocinski, *mikekocinski@aol.com* --

3   Q.   And what are you telling Mike?

4   A.   The subject is the financials and it was June 7th,

5   2012.  "Mike, Just need it as you did last quarter as this

6   is now required every quarter."

7   Q.   So in this e-mail, who's providing directions to Mike?

8   In this e-mail.

9   A.   Apparent -- in this particular e-mail, apparently

10  from -- I am.

11  Q.   Can I have Government Exhibit 372-HH.

12          Do you recognize Government Exhibit 372-HH?

13  A.   Yes, I do.

14  Q.   Okay.  What is that?

15  A.   It is another e-mail sent from

16  *william@williamjsears.com*.  I sent it on Thursday, June 7th,

17  2012.  It was sent to *scottdittman@fusionpharminc.com*,

18  *guy@fusionpharminc.com*, *guymjeanpierre@yahoo.com*,

19  *guyjeanpierre@lawfirmofjeanpierre.com*.  Subject was

20  forwarding FSPM financial statements as of 3-31-12.

21  Q.   Okay.  Can you scroll down that e-mail, please.  Okay.

22          And can you look at your screen.

23  A.   Yes, sir.

24  Q.   And you are cc'd on that e-mail; is that correct?

25  A.   Yes, myself and Mr. Dittman.

Direct - Sears

1    Q.   Okay.  And who wrote the e-mail?

2    A.   Michael Kocinski.

3    Q.   And who's he writing the e-mail to?

4    A.   *guy@fusionpharminc.com*.

5    Q.   Okay.  Can I have Government Exhibit 249.

6         Do you have 249 in front of you

7    A.   Yes, I do, sir.

8    Q.   Okay.  And what is that exhibit?

9    A.   That is an e-mail.  It was from myself,

10   *william@williamjsears.com*, Tuesday, June 12th, 2012.  It was

11   to Mr. Cliffe Bodden at gscventure dot on -- on

12   Microsoft.com.  The subject was forwarding FSPM OTC market

13   opinion letter.

14   Q.   And can you look down that e-mail.  I'm circling it on

15   the screen.  What are you forwarding, based upon the e-mail

16   below?

17   A.   I was forwarding from Mr. -- from

18   *guy@lawfirmofjeanpierre.com* on June 11th, 2012, sent to

19   myself, *william@williamjsears.com*.  Subject matter, Forward:

20   "FSPM OTC market's opinion letter."  And --

21   Q.   So based upon this e-mail, who sent you the FSPM OTC

22   market's opinion letter?

23   A.   Guy Jean-Pierre.

24   Q.   And what does Mr. Guy Jean-Pierre tell you in the body

25   of his e-mail?

1    A.    "Attached please find the FSPM OTC's markets opinion

2    letter together with accompanying signature page.  Call me

3    if you wish to discuss."

4    Q.    Can I have Government Exhibit 32 -- excuse me, 372-KK.

5          Do you recognize Government Exhibit 372-KK?

6    A.    Yes, I do, sir.

7    Q.    All right.  Can you describe to the jury what

8    Government's Exhibit 372-KK is.

9    A.    It is an e-mail from myself, *william@williamjsears.com*.

10   It was sent Thursday, June 14th, 2012, it was to

11   *sdittman@fusionpharminc.com*.  It says forward:  "FSPM OTC

12   Markets Opinion Letter."  It has an attachment that says

13   "FusionPharm's OTC Markets Opinion Letter."

14   Q.    Okay.  And based upon you being involved with these

15   e-mails, what does the OTC markets letter mean?

16   A.    It's a letter stating that the attorney has reviewed

17   all the documentation that is going to be uploaded to the

18   news service and is in agreement with it.

19   Q.    Okay.  Can you scroll down there, please.

20          Sir, if you look at your screen, who wrote this

21   e-mail?

22   A.    *guy@lawfirmofguyjeanpierre.com*.

23   Q.    Okay.  And who did he write this to?

24   A.    To myself.

25   Q.    Okay.  And what was the subject?

Direct - Sears

1    A.    Forward:  "FSPM OTC's Markets Opinion Letter."

2    Q.    Okay.  And so just like the last exhibit, or exhibit

3    back, it's Mr. -- who's sending you opinion letters?

4    A.    Guy M. Jean-Pierre.

5    Q.    So based upon reviewing these exhibits, these are --

6    what firm are these opinion letters for?

7    A.    FusionPharm, Inc.

8    Q.    And who is not on the e-mail that is being sent from

9    Mr. Guy Jean-Pierre that has a role with FusionPharm?

10    A.    It's a chain.  Mr. Dittman wasn't on that one.  It's a

11    chain.  It was forwarded.

12    Q.    Okay.

13    A.    Okay.

14    Q.    So Mr. Jean-Pierre doesn't send any letters to Scott

15    Dittman?

16    A.    He sends them to everybody.

17    Q.    Okay.  Well, in the last couple of exhibits we just

18    reviewed, who did he send them to?

19    A.    Excuse me?

20    Q.    Who did he send them to in the last couple of exhibits

21    we just went over?

22    A.    Myself.

23    Q.    And not Mr. Scott Dittman.

24    A.    No, he didn't.

25    Q.    And can I please have Government Exhibit 258.

Direct - Sears

1       Do you recognize Government Exhibit 258?

2   A.   Yes, I do.

3   Q.   And what is Government Exhibit 258?

4   A.   It is an e-mail from myself using

5   *william@williamjsears.com*.   It was sent Tuesday, August 7th,

6   2012.   It was to Cliffe Bodden at a GSC Venture e-mail

7   address, Guy Jean-Pierre at *guymjeanpierre@yahoo.com*,

8   *guyjeanpierre@lawfirmofjeanpierre.com*.   Forward:   "FSPM

9   6-30-12 share holders list."

10  Q.   Okay.   So what quarter would this shareholders list be

11  for?

12  A.   6-30-12 would be the end of the second quarter, I

13  believe.

14  Q.   And can you scroll up on that e-mail, please.   Thank

15  you.   Can you scroll a little bit -- so we have -- there.

16  Okay.

17       Sir, if you look at your screen, who received the

18  e-mail I just circled?

19  A.   I did.

20  Q.   And who is that from?

21  A.   Amanda Martin.

22  Q.   Okay.   And who is Amanda Martin?

23  A.   She's a clerk at Pacific Stocks Transfer, I would

24  imagine.

25  Q.   Okay.   Why would she be e-mailing you?

Direct - Sears

1    A.   Because I would have asked her for something.

2    Q.   Okay.  And what --

3    A.   It says "I have attached the common shareholder report

4    you requested for Fusion Pharm, Inc."

5    Q.   Okay.  So you asked Ms. Martin for the FusionPharm

6    shareholders' report for the end of June 2012.

7              MR. GOODREID:  Objection.  Leading.

8              THE COURT:  Sustained.

9    BY MR. SIBERT:

10   Q.   All right.  What shareholders -- okay.  What did you

11   ask to be sent from Ms. Martin?

12   A.   Shareholder report.

13   Q.   For what time period?

14   A.   6-30 -- hold on -- 6-30-2012.

15   Q.   Okay.  And for what company?

16   A.   FusionPharm, Inc.

17   Q.   So you're the person that contacted the transfer agent?

18   A.   Apparently so.  I've had contact with that transfer

19   agent for six years prior.

20   Q.   Okay.

21   A.   And many other companies.

22             MR. SIBERT:  Your Honor, can the witness not go

23   further than what's asked.

24             THE COURT:  Mr. Sears, just answer the questions

25   that's posed.

Direct - Sears

BY MR. SIBERT:

Q.   Can I have Government Exhibit 372-CCC.

       Do you have Government Exhibit 372-CCC in front of you?

A.   Indeed, I do, sir.

Q.   And what is Government Exhibit 372-CCC?

A.   It is an e-mail sent from myself using the *wsears@vertifresh.com* e-mail address.  It was sent Wednesday, February 27th, 2013.  It was addressed to Guy Jean-Pierre, which was *guyjeanpierre@yahoo.com*, a *michaelkocinski@aol.com*, Scott Dittman, which is *sdittman@fusionpharminc.com*, and subject was 12/31s.

Q.   And what are you telling Guy in your e-mail?

A.   I'm telling him that Michael's going through the financials now and he is going to send him the e-mail once he's satisfied.

Q.   And how long -- how long of a term was that?

A.   Oh, I also put in the e-mail, "Should be 48 hours."

Q.   Can I have Government Exhibit 372-EEE.

       Do you recognize Government Exhibit 372-EEE?

A.   Yes, I do, sir.

Q.   Okay.  What is that?

A.   It's an e-mail from myself using the *vertifresh.com* e-mail address.  It was sent on Tuesday, March 5th, 2013, and was to *scottdittman@fusionpharminc.com*.  Subject matter

Direct - Sears

1    was "FSPM Debt Conversion Opinions Update."

2    Q.    Okay.  What's the date of it again?

3    A.    March 5th, 2013.

4    Q.    And what's the subject?

5    A.    "Debt Conversion Opinions Update."

6    Q.    For what company?  I'm asking you what does this

7    subject say --

8    A.    From Bayside Realty Holdings.

9    Q.    What does the subject say on the line of the e-mail?

10   Look at your screen, sir.  What did I circle?  Sir, look at

11   your screen.

12   A.    I see it.

13   Q.    Okay.  What company is it --

14   A.    Forward:  "FusionPharm Debt Conversion Opinions

15   Update."

16   Q.    Can you scroll up, please.  A little more.

17          Now, sir, can you look at your screen here?  I just

18   circled an e-mail.  Who's sending that e-mail?

19   A.    *guymjeanpierre@yahoo.com.*

20   Q.    Okay.  What is Mr. Guy Jean-Pierre telling you in that

21   e-mail?

22   A.    He sent three of the opinion requests with full backup

23   documentation for three companies to Mr. DiTommaso, as

24   expected -- I've got to read it off the sheet, the screen's

25   too fuzzy, my friend.

Direct - Sears

1          Three opinions by Wednesday.  He might even have

2     them tomorrow.  With respect to the remaining two, StarCity

3     and Vera, he hasn't been able to send it because it appears

4     he doesn't have the STAs pertaining to those two purchasers.

5     And he's asking me to send him some missing documentation.

6     Q.   So --

7     A.   And then he was going to send them with full backup to

8     Mr. DiTommaso.

9     Q.   Who was Mr. Guy Jean-Pierre communicating with

10    regarding this missing documentation?

11    A.   Myself.

12    Q.   Okay.  Can you look at your screen here and look at the

13    e-mail.

14    A.   Uhm-hum.

15    Q.   And who sent that e-mail?

16    A.   I sent that e-mail.

17    Q.   To who?

18    A.   To Guy Jean-Pierre.

19    Q.   Okay.  And what is the subject line?

20    A.   The debt conversion opinions.

21    Q.   For what company?

22    A.   FusionPharm, Inc., and Bayside Realty Holdings.

23    Q.   Okay.  And there's no -- is the CEO from FusionPharm on

24    this e-mail?

25    A.   No, it is not.

Direct - Sears

1    Q.    And what's your body here?

2    A.    I just sent it all again.

3    Q.    What do you mean by that?

4    A.    Probably means he might have got it before.

5    Q.    Okay.  Well, what do you mean, sent -- just sent all

6    again?

7    A.    I imagine he would have -- I -- to guess, I would have

8    sent him the full documentation and I re-sent it, whatever I

9    sent him prior.

10   Q.    So you sent him documentations?

11   A.    Yeah.

12   Q.    Can you scroll back up, please.

13         Sir, can you look at your screen.  Can you bring

14   this e-mail . . .

15         This is the e-mail after the e-mail you sent Mr.

16   Guy Jean-Pierre that you sent it all again, correct?

17   A.    I need look at the dates.

18         Yeah.  Yes, March 5th, it's after the 4th.  Yeah.

19   Q.    Okay.  And who did he send the e-mail to?

20   A.    *williamsears@vertifresh.com.*

21   Q.    Did he send it to Mr. Scott Dittman?

22   A.    No.

23   Q.    Okay.  And, again, what's the subject line?

24   A.    The debt conversion opinion letters updates for the

25   Bayside and FusionPharm.

1    Q.   What are the letters before the debt?

2    A.   Subject:  RE:  "FSPM Debt Conversion Opinions."

3    Q.   As you testified under oath, FSPM is FusionPharm.

4    A.   Indeed, sir.

5    Q.   Okay.  And what is Mr. Guy Jean-Pierre telling you?

6    A.   He received, and everything has been sent to Mr.

7    DiTommaso for final review and execution.  "Absent unusual

8    circumstances, we should have all five opinions Wednesday,

9    maybe even tomorrow if the gods are smiling."

10        Then he goes on to say in another paragraph:  On a

11   related note, he does have the Roy opinion letter on hand.

12   Will forward to me and Mr. Roy when he's received payment.

13   Q.   So when will Mr. Guy Jean-Pierre send you the Roy

14   letter?

15   A.   When he receives payment for it from Mr. Roy or

16   whomever who's paying him.

17   Q.   And then you have five opinions that I'm underlining

18   here on your screen.

19   A.   Uhm-hum.

20   Q.   What do you mean -- what do you believe the opinion to

21   be?

22   A.   To deposit or transfer any securities on the OTC

23   markets.  In the stock market in general, you need a legal

24   letter of opinion to do so, otherwise it's useless.  So

25   anything having to do with securities that's in a physical

Direct - Sears

1    form, it has to accompany a letter of opinion.

2    Q.   And so you have Mr. Jean-Pierre's talking to you about

3    opinion letters.

4    A.   Yes, sir.

5    Q.   And this is dealing with the subject of FSPM debt

6    conversion opinion letters.

7    A.   Yes.

8    Q.   And this date is March 5th, 2013.

9    A.   Yes, sir.

10   Q.   And so we're dealing with debt of FusionPharm based

11   upon the subject, but no Scott Dittman on the e-mail.

12   A.   No Scott Dittman.  He was representing the debtholder,

13   also.

14   Q.   Can I have Government Exhibit 398.

15        Do you recognize Government Exhibit 398?

16   A.   Yes, I do.

17   Q.   Okay.  What is 398?

18   A.   398 is an e-mail that is from myself using the

19   Vertifresh e-mail.  It was sent Friday, March 8th, 2013.  It

20   was sent to Scott Dittman sdittman@fusionpharminc.  Subject

21   matter, forward:  "FSPM OTC's Markets Opinion Letter."  The

22   attachment was "FusionPharms OTC Markets Letter" of 3-7-13.

23   Q.   Can you please zoom in on the screen to that second

24   e-mail.

25        All right, sir, can you look at what I'm circling

1   on the screen.  Who's sending that e-mail?

2   A.   Yes, sir.  The e-mail is coming from the address of

3   *marcelo1@the deallawyer.com*.  The date is March 6th, 2013.

4   It's to myself using the Vertifresh e-mail.  And the

5   subject, once, again is forward:  "FSPM OTC Markets Opinion

6   Letter."

7   Q.   Okay.  And who is Marcelo 1?

8   A.   That would be, to my knowledge, Mr. Guy Jean-Pierre.

9   Q.   Okay.  And, again, what is Mr. Guy Jean-Pierre asking

10  you or telling you in this e-mail?

11  A.   Mr. Sears -- he's telling me that I should see the FSPM

12  OTC markets opinion letter that he attached.  "Kindly advise

13  if anything further is required.  Thank you as always."

14  Q.   And, again, what's your understanding about what a

15  markets opinion letter is in this e-mail?

16  A.   In this e-mail, markets opinion letter would be an

17  opinion letter that is provided to the news service company

18  to verify the information that is being given to said news

19  service company.

20  Q.   And what are -- what is the opinion letter supposed to

21  verify?

22  A.   Pretty much the -- everything about the company.  Is it

23  in good standing, financials, shareholder equity.  Just

24  everything about the -- they have a boilerplate form that's

25  filled out and the lawyers have to verify it all.

Direct - Sears

1   Q.   Do you know if that disclosure has to be true?

2   A.   I would imagine so, yes.

3   Q.   And, again, is Mr. Dittman e-mailed this FSPM OTC

4   markets opinion letter from Mr. Guy Jean-Pierre?

5   A.   No.  Not on that specific e-mail that you're --

6   Q.   Can I have Government Exhibit 372-HHH.

7        Do you recognize Government Exhibit 372-HHH?

8   A.   Yes, I do.

9   Q.   And what is that?

10  A.   That is an e-mail.  It is sent from myself using

11  *wjsears66@icloud.com*.  It was sent Friday, June 28th, 2013,

12  to Scott Dittman at *dittman@fusionpharminc.com*.  Subject is

13  forward:  "Pink Sheets filing for FSPM."  The attachment is

14  an "FSPM Officers and Director Questionnaire."

15  Q.   Okay.  Do you know who sent you those attachments

16  before you forwarded it on to Mr. Scott Dittman?

17  A.   It says from *marcelo1@thedeallawyer.com*.

18  Q.   And as you testified just previously, who's that?

19  A.   Mr. Guy Jean-Pierre.

20  Q.   And here's another phone number, is that correct, from

21  Mr. Guy Jean-Pierre?

22  A.   That's the same one as previously in the document, I

23  would imagine so.

24  Q.   Okay.  Could I have Government Exhibit 399.

25        THE COURT:  Before we do that, Mr. Sibert, why

Direct - Sears

1    don't we pause there for our lunch recess.

2              MR. SIBERT:  Thank you, Your Honor.

3              THE COURT:  Ladies and gentlemen of the jury, we

4    are going to take our lunch recess now.  I ask you to be

5    back in the jury deliberation room by 1:15.  We will resume

6    at 1:20.  I have a matter to raise with the lawyers, so the

7    lawyers will stay put, but the jury is released until 1:20.

8              (Jury left the courtroom at 12:09 p.m.)

9              THE COURT:  All right, Mr. Sears, same drill as

10   before:  Don't speak with any of the lawyers.  I ask you to

11   be back outside the courtroom here by 1:15.  You're released

12   for now.

13             THE WITNESS:  Thank you.

14             THE COURT:  Okay.  I am prepared to rule on the

15   issue of the admissibility of the evidence the Government

16   has summarized with respect to the Florida disbarment of the

17   defendant, as well as his SEC suspension.

18             There are two events at issue here:  the state of

19   Florida disbarment of the defendant and the SEC's suspension

20   of the defendant's privilege to practice before the

21   commission.  I see each of these two from -- I see each of

22   these from two perspectives:  First, the reasons underlying

23   the action and, second, the action, itself.

24             I will first address the reasons underlying the

25   Florida disbarment.  According to the case of *United States*

Direct - Sears

1  *v. Irving*, 665 F.3d 1184, Tenth Circuit opinion from 2011 at

2  page 1212, the Court states, "If the contested evidence is

3  intrinsic to the charged crime, then Rule 404(b) is not even

4  applicable."

5       As I understand the Government's proffer, the

6  allegations that eventually led to the defendant's Florida

7  disbarment are allegations also at issue in this case,

8  specifically concerning opinion letters that the defendant

9  wrote related to FusionPharm.  So those matters are

10 intrinsic and Rule 404(b) analysis in my view is not

11 necessary.

12      As to the disbarment itself, this, again, can be

13 broken up into two subissues:  the investigation and the

14 actual disbarment.  Neither one, in my view, is a prior

15 crime, wrong, or other act by the defendant, so, again, Rule

16 404(b) analysis is unnecessary.  But the defendant also

17 makes a relevancy objection and an objection under Rule 403

18 of undue prejudice.

19      Concerning the investigation, to the extent a

20 witness's testimony cannot be understood without bringing

21 out the witness's knowledge of the bar investigation and

22 understanding of it, the witness may testify about his or

23 her understanding of those matters.  In my view, that is

24 relevant and not unduly prejudicial because that

25 understanding is based on matters intrinsic to the crimes

1    being prosecuted here.  But I find that the outcome of the

2    investigation, namely, the disbarment, itself, is unduly

3    prejudicial because it shows another official body finding

4    the defendant in the wrong on matters directly related to

5    this prosecution.

6         With respect to the SEC suspension, I will first

7    address the underlying reasons and the suspension, itself.

8    As to the underlying reasons, my understanding of the

9    Government's proffer is that the Florida disbarment was the

10   reason.  So I will exclude it for the same reason I excluded

11   the disbarment directly.  As for the fact of an SEC

12   investigation, it may come in to the extent a witness's

13   testimony cannot be understood without bringing out the

14   witness's knowledge of the investigation.  But the

15   Government must be very careful about asking for the

16   witness's understanding of the reasons for the

17   investigation.  If the immediate reason was the Florida

18   disbarment, that may not come in.  But if the witness

19   understood the reasons behind the Florida disbarment, that

20   is, the suspect opinion letters, that witness's

21   understanding of those opinion letters is admissible.

22        As to the outcome of the SEC's investigation,

23   itself, I again find it unduly prejudicial.  It is, again,

24   another official body finding the defendant in the wrong on

25   matters directly related to this prosecution.

Direct - Sears

1    With respect to the Government's arguments about

2    recordings it intends to play of the defendant saying

3    something to the effect that he is no longer a securities

4    lawyer, the Government has not convinced me that these

5    recordings will be incomprehensible without also

6    understanding the defendant's disbarment or suspension.  I

7    therefore find that the probative value of that evidence is

8    outweighed by the undue prejudice already mentioned if the

9    jury were to learn of the fact of disbarment or the fact of

10   suspension.

11       Finally, I note that the defendant's papers,

12   specifically ECF 164, contain a timeliness objection.  That

13   objection is grounded in Rule 404(b)(2)'s notice requirement

14   as well as my orders about pretrial disclosure of Rule

15   404(b) evidence.  But the matters related to the Florida

16   disbarment and the SEC suspension are either intrinsic to

17   the prosecution or not the defendant's own prior crimes,

18   wrongs, or acts.  So in my view, Rule 404(b) and associated

19   notice requirements do not apply.  For this reason, I am

20   overruling the defendant's timeliness objection.

21       In a moment, my judicial assistant will bring out a

22   copy of this order for each of you so that you have it in

23   written form.  That you're getting it in written form is not

24   an invitation for me to hear more argument on this issue.  I

25   ruled -- I have ruled and we will not revisit these issues

                       Direct - Sears

1    any further.

2              All right.  We will be in recess until 1:20.

3         (Recess at 12:16 p.m.)

4                        AFTERNOON SESSION FSPM

5         (Jury was present at 1:26 p.m.)

6              THE COURT:  Mr. Sears, I remind you you remain

7    under oath.

8              THE WITNESS:  Yes, sir.

9              THE COURT:  Mr. Sibert, you may resume your

10   examination.

11             MR. SIBERT:  Thank you, Your Honor.

12   BY MR. SIBERT:

13   Q.   Sir, I want to try to have you go back -- I was having

14   some issues before lunch when it came to some of these

15   larger exhibits.  Could you please look at Exhibit 372-BB,

16   and can I have that brought up on the screen.

17   A.   Yes, sir.  It's not on the screen but I have it here.

18   Sorry.

19   Q.   Can I have it --

20             COURTROOM DEPUTY:  Are you guys plugged in back

21   there?  There we go.

22   BY MR. SIBERT:

23   Q.   Okay.  Sorry about that, Your Honor.

24             Do you recognize Government Exhibit 372-BB?

25   A.   Yes, sir.

Direct - Sears

1    Q.   Okay.  Now, what is this?

2    A.   This is an e-mail from myself using the

3    *william@williamjsears.com* e-mail, and it was sent on

4    Tuesday, January 3d, 2012.  It was to Scott Dittman at

5    *fusionpharminc.com*, and also carbon copy to

6    *guy@fusionpharminc.com*.  Subject matter was forward:  "FSPM

7    12-30-11."  Attached is a FusionPharm, Inc., shareholder

8    report dated 12-31-2011.

9    Q.   Okay.  Now, this is something that you forwarded on to

10   Mr. Dittman, and who else was cc'd to this?

11   A.   Beth Looker and Leslie Eldridge.

12   Q.   Okay.  Who's cc'd on the top of this?

13   A.   *guy@fusionpharminc.com*.

14   Q.   Okay.  At the time period that you said was for 12-30

15   at 2011; is that correct?

16   A.   That's correct, sir.

17   Q.   That would be the end of the year 2011.

18   A.   Yes, sir.

19   Q.   Okay.  And it's a shareholders report; is that

20   correct?

21   A.   Yes, sir.

22   Q.   All right.  Now you have that attachment in front of

23   you; is that right?

24   A.   Yes, sir.

25   Q.   Can you just approximately -- you might be able to see

Direct - Sears

1    a page number -- do you know how many pages that

2    shareholders list is?

3    A.   Last page says 138.

4    Q.   Okay.  Do you know if you're listed anywhere in that

5    shareholders list?

6    A.   No, I do not.

7    Q.   Could you look to see if you are.

8              THE COURT:  You want him to look through 138 pages?

9              MR. SIBERT:  It's in alphabetical order, Your

10   Honor.

11             THE COURT:  All right.

12             THE WITNESS:  No, I do not see my personal name

13   listed in this report.

14   BY MR. SIBERT:

15   Q.   Okay.  Thank you.  Can you please look at Government

16   Exhibit 372-FF.

17             And may I have that on the screen, please.  And can

18   you blow up the front part.  Thank you.

19   A.   Excuse me.

20   Q.   Do you have 372-FF there?

21   A.   Yes, I do.

22   Q.   And can you tell the grand -- or the jury what that is?

23   A.   This is an e-mail from myself using the

24   *william@williamjsears.com* address.  It was sent on

25   Wednesday, May 23d, 2012, at 9:36 in the morning.  It was to

Direct - Sears

1    Scott Dittman at FusionPharm, Inc., also Guy Jean-Pierre,

2    which was *guyjeanpierre@yahoo.com*, and also the

3    *guy@lawfirmofjeanpierre&jeanpierre.com*.

4    Q.   What's the subject?

5    A.   Forward:  "FSPM."

6    Q.   And what is attached?

7    A.   "FusionPharm, Inc., shareholder common 12-31-11."

8    Q.   And the date, as you stated, was May 23d, 2012,

9    correct?

10   A.   Yes, sir.

11   Q.   All right.  Now, are you -- do you know if at times

12   financials were always at the precise time when a quarter or

13   the annual ended?

14   A.   Nothing was ever precise.

15   Q.   Was there a lag time?

16   A.   Usually, there always is.

17   Q.   When it -- when it came to filing disclosures?

18   A.   Yes.

19   Q.   And so if you're looking at the date of the

20   shareholders report, that would be the end of 2011, correct?

21   A.   One second, please.  Yes, through 12-31-11.

22   Q.   Okay.  So it covers a couple of months.

23   A.   Yes, sir.

24   Q.   Can you look at page 13 of that shareholders list.

25   A.   Yes, sir.

1    Q.   Can you zoom in on where I circled?

2         Okay.  You can look on your screen here, I'm

3    circling as well.  Based upon that report, how many common

4    shares does Bayside hold?

5    A.   It holds a total of 210 active, 40,000 restricted.

6    It's 210, but 40,000 of them are restricted.

7    Q.   170,000 freely tradable?

8    A.   That's what it says.

9    Q.   And this -- based upon this report, this was the same

10   time that you were writing checks to Mr. Guy Jean-Pierre,

11   correct?

12   A.   As a signer of the checking account, yes.

13   Q.   And if we go back to the top page here, Mr. Guy

14   Jean-Pierre got a copy of the shareholder report.

15   A.   Yes, sir.

16   Q.   Can I have Exhibit -- can you please look at Exhibit

17   372-UU .

18   A.   Okay.

19   Q.   Okay.  Sir, do you recognize Government Exhibit 372-UU?

20   A.   Yes, I do.

21   Q.   And could you describe to the jury what this exhibit

22   is.

23   A.   It is an e-mail from *guy@lawfirmofjeanpierre.com*.  It

24   was sent Monday, November 26th, 2012.  It is to myself using

25   the *william@williamjsears.com* address.  Carbon copied is

1    Scott Dittman using *fusionpharminc.com* e-mail.  The subject

2    matter is "Pink Sheets Opinion Letters, Officers Certificate

3    and Other Letters."  Attached is a forwarded message

4    referring to Pink Sheets opinion letter and other matters,

5    FSPM officers and director questionnaire.

6    Q.   All right.  And we've had discussions based upon this

7    e-mail.  What do you believe the opinion letter is

8    attached?

9    A.   On this one -- okay, this one would probably be for a

10   end-of-quarter.

11   Q.   And that would go to where?  The opinion letter.

12   A.   Pink Sheets, the OTC markets new service.

13   Q.   And that's the legal opinion letter?

14   A.   Yes.

15   Q.   Okay.  And I just want you to look here on the first

16   couple of lines.  Where does Mr. Guy Jean-Pierre state he

17   is?

18   A.   In Santo Domingo in the Dominican Republic.

19   Q.   And what is Mr. Guy Jean-Pierre asking for in this

20   second paragraph that I circled?

21   A.   If possible, have the person who prepared the

22   financials send him an e-mail stating that he or she has

23   prepared it and that it was done in accordance with GAAP.

24   Q.   Do you know why Mr. Guy Jean-Pierre would request that?

25   A.   I believe it's required.

Direct - Sears

1    Q.   Required for what?

2    A.   For the -- whatever document that they're uploading to

3    OTC.   Whoever's going to be certifying the financials.

4    Q.   Okay.  So why would the corporate counsel and legal

5    secretary -- or, excuse me, corporate secretary and legal

6    counsel need the accounting information?

7    A.   Maybe he forgot.  I don't know.

8    Q.   Who was drafting the disclosures?

9    A.   Excuse me?

10   Q.   Who was drafting your disclosures?

11   A.   Mr. Jean-Pierre.

12   Q.   Okay.  I think I was stopped before lunch.  Could you

13   look at Exhibit 399?

14          And could I have 399 up, please.

15   A.   Okay, I've got it.

16   Q.   All right.  Could you -- do you recognize this exhibit?

17   A.   Yes, I do.  It is an e-mail.  It's from myself using

18   *williamjsears.com*, sent on Friday, the 28th -- June 28th,

19   2013, to Mr. Dittman at FusionPharm, Inc.  Subject matter is

20   Forward:  "Pink Sheets Opinion Letter and other matters."

21   Attachment was:  "FSPM Law Firm Attorney Letter."

22   Q.   Okay.  And can we scroll down this, please.  Okay.

23          And the e-mail that came before that, who's sending

24   that e-mail?

25   A.   *guy@lawfirmofjeanpierre.com*.

Direct - Sears

1    Q.   Okay.  And who's he sending it to?

2    A.   Myself and Mr. Dittman.

3    Q.   Okay.  And essentially the same subject?

4    A.   Yeah, referencing Pink Sheet's opinion letter and other

5    matters.

6    Q.   And what was Mr. Guy Jean-Pierre telling you in this

7    e-mail?

8    A.   He's saying given the urgency, he has begun preparing

9    the backup documentation and proposed Pink Sheets opinion

10   letter for Mr. DiTommaso's signature letter, even though he

11   won't be able to secure a signed opinion without prior

12   payment therefore.

13   Q.   And, again, it's your reference that the Pink Sheets

14   opinion letter -- where are those disclosed?

15   A.   On the OTC -- on the OTC Pink Sheets new service.

16   Q.   And who's able to view those letters once they're

17   posted?

18   A.   The public.

19   Q.   Can I have Exhibit 372-III.

20        Do you have that in front of you?

21   A.   Yes, I do.

22   Q.   Okay.  And can -- do you recognize that document?

23   A.   Yes, sir.

24   Q.   And can you tell the jury what that document is.

25   A.   This is an e-mail sent from myself using

Direct - Sears

1      *wjsears66@icloud.com.*
2      Q.   Let me just stop you there.  That's a different e-mail
3      account that I haven't seen before; is that correct?
4      A.   I mentioned it a couple of times in this testimony --
5      Q.   Okay.  Very well.  I'm sorry.
6      A.   That's okay.  It was sent Saturday, June 29th, 2013.
7      It was to Scott Dittman to his FusionPharm address.
8      Subject:  Forward:  "FSPM Pink Sheets Quarterly Report."
9      Q.   Okay.  And then if you can concentrate on this e-mail,
10     please.  Okay.  Do you recognize the e-mail that's below
11     that?
12     A.   Yes, sir.
13     Q.   Okay.  And what is that e-mail?
14     A.   It says it's from *marcelo1@thedeallawyer.com*.  It was
15     sent on June 29th, 2013, sent to myself at the
16     *wjsears66@icloud.com* address.  The subject was "FSPM Pink
17     Sheets Quarterly Statement."  Excuse me, report.
18     Q.   Okay.  Now, a couple of questions.  We had talked about
19     this, but, again, who's Marcelo 1?
20     A.   Marcelo 1 would be Mr. Guy Jean-Pierre.
21     Q.   Okay.  And, again, he's sending you FusionPharm Pink
22     Sheets quarterly report?  He's sending that to you, not
23     Scott Dittman.
24     A.   Indeed he is, in this particular e-mail.
25     Q.   And what is Mr. Guy Jean-Pierre telling you here?

214

Direct - Sears

1    A.    To his knowledge, he still hasn't received the

2    documents from Mr. Dittman.  He called him a couple of times

3    yesterday but he did not pick up and didn't return the

4    calls.  Maybe I can try to track them down for him and let

5    him know.

6    Q.    So when he -- it's fair to say -- who would he call if

7    he couldn't get ahold of Mr. Dittman?

8    A.    Like everybody else, they would call me.

9    Q.    Okay.

10   A.    I was the --

11   Q.    And then let's look at this phone number here.  Whose

12   phone number is that?

13   A.    That would be Mr. Guy Jean-Pierre's.

14   Q.    All right.  Government Exhibit 372-KKK.

15   A.    Okay.  I have it.

16   Q.    Can we start down in the middle of this document, the

17   front page.  Right there.  Thank you.

18        Can you look on your screen here, sir.

19   A.    Yes, sir.

20   Q.    I assume you recognize this document as one you

21   reviewed?

22   A.    Yes, sir.

23   Q.    Okay.  And can you talk about the e-mail that I just

24   circled on the screen.

25   A.    The e-mail is from Scott Dittman -- yeah,

Direct - Sears

1   *scottdittman@yahoo.com*.  Its date was June 30th, 2013.  And

2   it says to *scottdittman@fusionpharminc.com* twice.  The

3   subject is forward:  Financials.  Reply to

4   *scottdittman@yahoo.com*.  And it says "Guy, Here are the

5   financials.  They will be uploaded to the OTC markets today.

6   Thank you for your assistance.  Always, Scott."

7         And it looks like there was an attachment of a

8   quarterly report.

9   Q.  Can we start from the top again, please.

10   A.  From *william@williamjsears.com*, sent Sunday, June 30th,

11   2013, at 7:10 p.m.  It was sent to

12   *scottdittman@fusionpharminc.com*, cc'd was Guy Jean-Pierre at

13   *guyjeanpierre@yahoo*, *guy@lawofficeofjeanpierre.com*,

14   *marcelo1@thedeallawyer.com*, and Bill Sears at

15   *fusionpharminc.com*.  Subject is "Financials."

16   Q.  Did you post the financials for FusionPharm on the OTC

17   Pink web page?

18   A.  Sometimes I would upload them.

19   Q.  Do you know whose account the OTC Pink -- what page for

20   FusionPharm it was listed under?

21   A.  No, I don't.

22   Q.  Okay.  At this time, do you know where your

23   brother-in-law, Scott Dittman, is living?

24   A.  June 30th, '13.  Franktown, maybe.  I don't -- I don't

25   recall.  He's moved a couple of times.

Direct - Sears

1    Q.   You're married to his sister.

2    A.   Yeah.

3    Q.   Okay.

4    A.   So I'm going to keep track of him three or four times?

5    The guy's moved around a bit.  I don't remember.  He moved

6    two times in one year.  I don't know if it was Franktown or

7    Castle Pines, sir.

8    Q.   Where is Franktown?

9    A.   That would be in Colorado.

10   Q.   Okay.  Where is Castle Rock?

11   A.   That would be in Colorado.

12   Q.   Okay.  Anywhere else besides Colorado?

13   A.   He had moved to Pennsylvania, but I'm unsure of the

14   exact date of that.

15   Q.   Can I have Government Exhibit 372-OOO.

16        Do you recognize Government Exhibit 372-OOO?

17   A.   Yes, sir, I do.

18   Q.   Okay.  Let's just look down here in the middle.  Can

19   you zoom in on the middle e-mail.

20        All right.  Do you recognize the e-mail that's in

21   the middle?

22   A.   Yes, I do.

23   Q.   Okay.  And who was sending that e-mail?

24   A.   *advisor@flbusinesshelp.com*.

25   Q.   Who do you know *advisor@flbusinesshelp.com* would be?

Direct - Sears

1    A.    Mr. Guy Jean-Pierre.

2    Q.    And who is he sending the e-mail to?

3    A.    He's sending it to myself using the

4    *wjsears66@icloud.com* e-mail account.

5    Q.    And, again, what is Mr. Guy Jean-Pierre requesting?

6    A.    Subject:  "RE:  6-30-13."  And he's saying, "Okay.

7    Please have Mr. Dittman sign the attached questionnaire and

8    get it back to me ASAP.  Then I should be able to get you

9    the opinion by Friday.  Thank you, as always."

10   Q.    Do you know what he's talking about regards to

11   "opinion"?

12   A.    Probably for a quarterly financial.

13   Q.    Which would end when?

14   A.    On the 6-30-2013s.

15   Q.    Can we just go to the top.

16         And, sir, as you stated, essentially where is this

17   e-mail sent from and to?

18   A.    It is sent from -- at the top, from

19   *williamjsears66@icloud.com*, and was sent Wednesday, August

20   21st, 2013, to *scottdittman@fusionpharminc.com*.  Subject

21   matter was forward:  "6-30-2013."  Attached:  "FSPM Officers

22   and Directors Questionnaire."

23   Q.    Okay, sir, we just went through over 20-some documents

24   and essentially a lot of these documents -- who forwarded

25   these documents on to Mr. Dittman?

Direct - Sears

1    A.   Excuse me?

2    Q.   Who would forward -- who would forward the documents

3    on --

4    A.   I would.

5    Q.   Okay.  And where would you get all these documents?

6    A.   From Mr. Jean-Pierre.

7    Q.   And what do these documents essentially detail

8    regarding the e-mails --

9    A.   Overall --

10   Q.   Subjects --

11   A.   -- condition of the company from financial to whatever,

12   it would seem.

13   Q.   And how about disclosures to OTC?

14   A.   Yes.  That's part of the quarterly reports.

15   Q.   So if I understand you correctly, you would agree with

16   me that most of these deals with financials and what was

17   being disclosed to OTC.

18   A.   Yes, sir.

19   Q.   All right.

20        MR. SIBERT:  Your Honor, at this time, I'm going to

21   move to my fourth batch of exhibits that have been

22   stipulated to.

23        THE COURT:  All right.  One second.

24        MR. SIBERT:  The good news is the piles are getting

25   smaller.

Direct - Sears

1           THE COURT:  So are we reading off your --

2           MR. SIBERT:  How about I -- these are actually in

3     order.  It would be --

4           THE COURT:  Hold on.  Are we using the listing from

5     your 6:11 p.m. e-mail from yesterday?

6           MR. SIBERT:  Yes, sir.

7           THE COURT:  So which block -- you called them

8     blocks.  What block are you on now?

9           MR. SIBERT:  The one that starts with Exhibit 140.

10          THE COURT:  They begin -- okay.  So your second

11    block.  All right.  Go ahead.

12          MR. SIBERT:  So at this time, the Government would

13    like to introduce Exhibit 140, Exhibit 141, 142, Exhibit

14    143, and Exhibit 144 into evidence.

15          THE COURT:  And these are stipulated to?

16          MR. SIBERT:  Yes, Your Honor.

17          THE COURT:  All right.  Given the stipulation of

18    the parties, Government Exhibits 140, 141, 142, 143, and 144

19    are admitted into evidence and may be published to the jury.

20       (Government's Exhibits 140 thru 144 received)

21          MR. SIBERT:  And, Your Honor, may I approach your

22    courtroom deputy with the next package?

23          THE COURT:  Yes, you may.

24          MR. SIBERT:  Thank you.

25    BY MR. SIBERT:

Direct - Sears

1    Q.   Okay, sir, can you please take a look at Government

2    Exhibit 140.

3         And may I have that brought up on the screen.

4    A.   Yes, sir.

5    Q.   Do you recognize Government Exhibit 140?

6    A.   Yes, I do.

7    Q.   And what is Government Exhibit 140?

8    A.   It is an e-mail sent from myself.  It doesn't detail

9    which e-mail address.  Sent Tuesday, April 19th, 2011, to

10   Guy Jean-Pierre and no e-mail address was listed.  Carboned

11   to *guymjeanpierre@yahoo.com*, and *richscholz@gmail.com*.

12   Subject matter was "FSPM" and attachments are scans of

13   "Dahlman Resignation and BBYB Preferred Stock Origin."

14   Q.   So essentially you're writing an e-mail to Mr. Guy

15   Jean-Pierre; is that correct?

16   A.   Yes, sir.

17   Q.   And attached being copied on this e-mail is a Mr. Rich

18   Scholz; is that right?

19   A.   Yes, sir.

20   Q.   Okay.  What do you mean by -- who is your associate,

21   Mr. Richard Scholz?

22   A.   A long-time friend.

23   Q.   Okay.  And what are you asking Mr. Guy Jean-Pierre to

24   provide to him?

25   A.   A letter of opinion, I would imagine.  I can't see --

Direct - Sears

1    yes, letter of opinion.  A letter of opinion for this
2    securities deposit.
3    Q.   When you say "securities deposit," what do you mean?
4    A.   He had a paper certificate and wanted to put it into
5    the system whereas you have to have a letter of opinion to
6    do so.
7    Q.   Okay.  Does that mean shares of stock?
8    A.   Yes, sir.
9    Q.   Can you look at the third sentence here.  I highlighted
10   it for you.  Where did those shares of stock derive from?
11   A.   They were derived from the preferred Series A of Baby
12   Bee Bright Corporation.
13   Q.   Okay.  And where are those shares transferred to at one
14   time?
15   A.   The shares were transferred to Microcap Management as
16   free trading, and Microcap did the same to Prestige for
17   services.
18   Q.   All right.  Can we have Exhibit 141.
19        Sir, could you please take a look at Exhibit 141.
20   A.   Yes, sir.  I have it.
21   Q.   All right.  Can we have the middle -- thank you.
22        Okay.  Sir, if you could look on your screen here,
23   I just circled an e-mail.  Would you tell the jury what that
24   e-mail is about.
25   A.   It is an e-mail from *guy@lawfirmofjeanpierre.com*.  It

Direct - Sears

1    was dated October 19th, 2011.  It was to myself at

2    *william@williamjsears.com*.  And the subject matter is:

3    "Proposed Agreement referencing purchase of MicroCap."

4    Q.   So it's -- what type of agreement is this?

5    A.   An agreement to purchase a corporation.

6    Q.   Whose corporation?

7    A.   My corporation, MicroCap Management.

8    Q.   Okay.  So you're selling your corporation?

9    A.   Yes, the interest in the company.

10   Q.   And who's doing the paperwork to help you sell that

11   corporation?

12   A.   Guy Jean-Pierre.

13   Q.   Okay.  At this time, you state in this e-mail was

14   October 19th, 2011.

15   A.   Yes, sir, the specific e-mail.

16   Q.   Was this at the time of the FINRA inquiry into

17   FusionPharm?

18   A.   I have no idea.

19   Q.   Do you know if Mr. Guy Jean-Pierre knew anything about

20   the FINRA inquiry?

21        MR. GOODREID:  Objection.  Calls for speculation.

22        THE COURT:  If you know.

23        THE WITNESS:  I don't recall at this time.

24   BY MR. SIBERT:

25   Q.   Let's look at    e 7 of this agreement.

223
Direct - Sears

1      Can you blow up article 1, paragraph 1.

2      You stated you were selling your company; is that

3   correct?

4   A.   Yes.

5   Q.   What were you -- how much were you selling your company

6   for?

7   A.   I don't recall.  It wasn't much.

8   Q.   Why don't you read paragraph 1.

9   A.   $10.

10  Q.   Can I have page 12, please.

11      In addition to selling your company for $10, if you

12  look at your screen, what else were you selling with that

13  company for $10?  Sir, I've circled it on the screen for

14  you.  What was included in the sale?

15  A.   That's not a signed agreement.

16  Q.   I'm just saying --

17  A.   Because I'm just saying, if we're going to talk about a

18  document, I want to be clear, sir.

19  Q.   What's in this document?

20  A.   That particular document says, "including any and all

21  brokerage accounts in the name of MicroCap to Richard

22  Scholz."

23  Q.   Thank you.

24  A.   That's why it wasn't signed.

25  Q.   Could I have Government Exhibit 142.

Direct - Sears

1      Do you recognize Government Exhibit 142?

2    A.   Yes, sir, I do.

3    Q.   Okay.  And what is Government Exhibit 142?

4    A.   From myself.  It was sent Tuesday, November 8th, 2011,

5    *richardscholz@gmail.com* is the recipient.  The subject says

6    "Docs."  Attachment, "Company purchase RS.pdf; Share

7    Purchase Agreement RS.pdf."

8    Q.   Okay.  Can we go to page 6 of the attachment, please.

9    A.   Yes, sir.

10   Q.   It's going to come up on your screen, sir.  Whose

11   signature is on that page?

12   A.   That would be mine.

13   Q.   Can I have Government Exhibit 143, please.  I'm sorry,

14   I want to go back to that.  Can I go back to that real

15   quick?  And page 6 again.  And can you zoom in on the

16   signatures.  Go to page 1, please, of the attachment.  Can

17   you zoom in on the top here, please.

18      Could you tell me the date that this agreement was

19   made?

20   A.   The 9th of May, 2011.

21   Q.   So correct me if I'm wrong, we just looked at an

22   agreement that Mr. Guy Jean-Pierre sent you on October 19th,

23   2011 --

24   A.   Uhm-hum.

25   Q.   -- and we just looked at your signed agreement that's

Direct - Sears

1   dated --

2   A.   Uhm-hum.

3   Q.   -- November 9, 2011.  Or, excuse me, May --

4   A.   May 9th, 2011.

5   Q.   -- 9th, 2011.  You would agree with me that November

6   and October come after --

7   A.   Absolutely.

8   Q.   You would agree with me that May comes before October?

9   A.   Absolutely.

10  Q.   Can I have Exhibit 144.  Can you please blow up the

11  whole e-mail.

12          Do you recognize this exhibit?

13  A.   Yes, I do.

14  Q.   And what is this exhibit?

15  A.   This is an e-mail from myself.  It was sent Thursday,

16  February 7th, 2013.  It was to *casskri1120@aol.com*, which is

17  my mother's e-mail address.  Carbon copied was

18  *richscholz@gmail.com*.  Subject matter is "Scottsdale."

19  Q.   Okay.  So right here I'm circling on the screen for

20  you, whose e-mail is that?

21  A.   That would be my mother's.

22  Q.   And that's Ms. Sandra Sears?

23  A.   Yes, sir.

24  Q.   Who is Scottsdale?

25  A.   That would have been Scottsdale Capital Advisor, a

Direct - Sears

1    broker/dealer in Scottsdale, Arizona.

2    Q.   A brokerage house.

3    A.   Yes, sir.

4    Q.   All right.  And based upon your understanding, what is

5    does a brokerage do -- a brokerage house like Scottsdale?

6    A.   As in all brokerage houses, they do many things, mostly

7    in the financial sectors.  They can buy and sell stocks,

8    bonds, provide banking services.

9    Q.   What are you telling your mom to do in this e-mail?

10   A.   I'm giving her explicit instructions on how to dial a

11   number because she's blind in one eye, and instruct her how

12   to empower Richard to trade the account for her.

13   Q.   Let's just work through this.  What do you mean by

14   here, "Dial this number, they will answer the phone

15   'Trading'"?

16   A.   That's the brokerage house's number, sir.

17   Q.   And what are you instructing your mom to do here?

18   A.   To identify herself with a specific account number so

19   they know who they're talking to.

20   Q.   Okay.  The account number is what?

21   A.   It looks to be from this one, 154204611.

22   Q.   Okay.  And that account number goes to account --

23   A.   I'm not sure.

24   Q.   -- regarding Bayside?

25   A.   Bayside.

Direct - Sears

1    Q.   You wrote this e-mail, right?

2    A.   Yes, indeed.

3    Q.   Okay.  And then you tell her what?

4    A.   "Tell them that you want to place a sell order."

5    Q.   So essentially you're telling her to sell Bayside

6    stock?

7    A.   Yes.  When Richard instructs her to do so, as he had --

8    he's a stock trader; that's what he does.

9    Q.   And you can -- you compare it to what?

10   A.   Excuse me?

11   Q.   You compare selling stock to what?

12   A.   To keep it simple for her understanding "like ordering

13   pizza," tell them what you want and that's what you will

14   get.

15   Q.   And this is your phone number down here?

16   A.   Yes, that was my number down there.

17   Q.   And this is Mr. Richard Scholz's phone number?

18   A.   Yes.

19   Q.   And can I have Exhibit 143.

20        Do you recognize Exhibit 143?

21   A.   Yes, sir.

22   Q.   Okay.  And what is Exhibit 143?

23   A.   It is an e-mail sent from myself, sent Monday, June

24   18th, 2012, to *richscholz@gmail.com*.  Subject matter is

25   "FSPM."  And the attachments are "M&C Due Diligence

Direct - Sears

1   6-18-12."

2   Q.   Again, FSPM is what?

3   A.   Oh, it's the trading symbol for FusionPharm, Inc.

4   Q.   And what does "M&C due diligence" mean?

5   A.   Give me a second, I'm familiarizing myself with the

6   e-mail.  M&C is a brokerage firm called Moors & Cabot in

7   Boca Raton.

8   Q.   What does "due diligence" mean?

9   A.   Background.

10  Q.   What do you mean by "background"?

11  A.   Background.  What it is that you're sending, just due

12  diligence, if you're looking into something.

13  Q.   About what?

14  A.   You would do your due diligence, that is a term that

15  can be used for anything, sir.  This particular e-mail would

16  be for, obviously, things that the brokerage firm would have

17  requested.

18  Q.   So --

19  A.   Or he requested.

20  Q.   -- is it dealing with documents with FusionPharm?

21  A.   It's dealing with certificates from MicroCap and

22  FusionPharm, yes, sir.

23       MR. SIBERT:  All right, Your Honor, at this time,

24  the Government would like to move for more exhibits to be

25  admitted into evidence.  I think this would be batch 3 on my

1    6:00 e-mail last night.

2            THE COURT:  What did you call it, the third block?

3            MR. SIBERT:  I believe so.

4            THE COURT:  Okay.

5            MR. SIBERT:  I have them in order, too.

6            THE COURT:  These are not in order -- in

7    alphanumeric order in the e-mail.

8            MR. SIBERT:  Right, I have them in numerical order

9    here.

10           THE COURT:  Have you given your listing in

11   alphanumeric order to defense counsel so they can follow

12   along?

13           MR. SIBERT:  I haven't yet, no.

14           MR. BARNARD:  Your Honor, we reviewed them in the

15   order -- in the e-mail --

16           THE COURT:  Okay.

17           MR. BARNARD:  -- and found them all to be

18   appropriate and stipulated.

19           THE COURT:  Stipulated?  Okay.

20           MR. BARNARD:  Yes.

21           THE COURT:  So actually for our records, though,

22   Mr. Sibert, so the courtroom deputy can follow along more

23   easily and keep track of what's coming in, why don't you

24   move the exhibits you have called third block in your

25   e-mail, but do it in alphanumeric order.

                         Direct - Sears

1            MR. SIBERT:  Yes, sir.

2            THE COURT:  All right, go ahead.

3            MR. SIBERT:  It's 69, 70, 74, 77, 81, 82 --

4            THE COURT:  Slow down.

5            MR. SIBERT:  -- 133, 155, 156, 245, 252, 268, 269,

6    270, 271, 272, 274, 372 and this will include several

7    subcategories.  Those are NN --

8            THE COURT:  You mean subcategories -- these are

9    separate exhibits but with 372 being the first numbers in

10   that exhibit?

11           MR. SIBERT:  Yes, sir.

12           THE COURT:  All right.  Go ahead.

13           MR. SIBERT:  372-NN, 372-XX, 372 alpha alpha

14   alpha --

15           THE COURT:  I think you can just say the letters.

16           MR. SIBERT:  Sure.  372-BBB, 372-DDD, 372-MMM, and

17   400.

18           THE COURT:  All right.  Given the stipulation of

19   the parties, the following government exhibits are admitted

20   into evidence and may be published to the jury:  69, 70, 74,

21   77, 81, 82, 133, 155, 156, 245, 252, 268, 269, 270, 271,

22   272, 274, and 372-NN, XX, AAA, BBB, DDD, MMM, and 400.

23       (Government's Exhibits received)

24           THE COURT:  Go ahead, counsel.

25           MR. SIBERT:  Your Honor, may I approach your

Direct - Sears

1    courtroom deputy --

2              THE COURT:  Yes, go ahead.

3              MR. SIBERT:  -- to swap?

4    BY MR. SIBERT:

5    Q.   Okay, sir, can you please take a look at Government

6    Exhibit 245.

7    A.   Yes, sir.

8    Q.   Do you recognize Government Exhibit 245?

9    A.   Yes, I do.

10   Q.   And can you tell the jury what that is.

11   A.   That is an e-mail sent from myself from

12   *wsears@fusionpharminc.com*, sent Monday, June 4th, 2012.

13   It's to Scott Dittman using his FusionPharm e-mail address.

14   I'm forwarding a draft note agreement, attach promissory

15   note, credit line agreement.

16   Q.   Okay.  And let's just go to the middle of that first

17   page there.  Do you recognize the e-mail from Mr. Cliffe

18   Bodden?

19   A.   Yes, I do.

20   Q.   He reappears in this e-mail.

21   A.   He reappears.  He's like Harry Houdini.

22   Q.   And who is he sending an e-mail to?

23   A.   He's sending it to myself using the

24   *wsears@fusionpharminc.com* e-mail.

25   Q.   And he sends you an e-mail to your FusionPharm e-mail

Direct - Sears

1     address?

2     A.    Yeah, even if he told me not to use it, yes, sir.

3     Q.    So this is after -- as you just stated, this is after

4     the date that Mr. Bodden said "don't use this e-mail

5     address;" is that what you just said?

6     A.    I think so.  I'll have to research the dates, but I

7     think so.

8     Q.    Okay.  And --

9     A.    Just so many e-mail addresses that everyone was using,

10    who could keep track.

11    Q.    The subject is draft note agreement; is that correct?

12    A.    It is -- excuse me?

13    Q.    What's the subject?

14    A.    Forward:  Draft note agreement.

15    Q.    No, no, I'm talking about the one that Mr. Bodden had

16    sent you.

17    A.    Subject:  Draft note agreement.

18    Q.    Okay.  And then let's look at the date here.  What's

19    the date?

20    A.    June 4th, 2012.

21    Q.    And you would not argue with me that that's the year of

22    2012.

23    A.    It says 2012.

24    Q.    And at the top of the e-mail -- can I get to the top of

25    the page, please -- again using your FusionPharm e-mail

Direct - Sears

1    account, who do you forward it to?

2    A.   Scott Dittman.

3    Q.   And essentially, again, what's attached?

4    A.   I'm forwarding a draft note agreement.

5    Q.   And you did it the same day.

6    A.   Yes, sir, a couple of minutes after, to be exact.

7    Q.   Can I have Exhibit 252.

8         Do you recognize Exhibit 252?

9    A.   Yes, I do.

10   Q.   And what is Exhibit 252?

11   A.   It is an e-mail from *william@williamjsears.com*, sent on

12   Sunday, June 17th, 2012, to Cliffe Bodden at GSC Ventures on

13   *microsoft.com*.  Subject is "FSPM."

14   Q.   All right, let's work from the bottom of the first page

15   here.  Can I have that brought up a little bit, please.

16        If you look on the screen, I'm circling an e-mail

17   from you.  Can you tell the jury about that e-mail.

18   A.   I don't remember it exactly, what it's pertaining to,

19   but it says, "Guys, Circle the wagons and get the rest to

20   our outstanding dove wrapped up."

21   Q.   Okay.  And you say, "guys" in there.  Who are you

22   referring to as "guys"?

23   A.   The original message was from myself to Guy M.

24   Jean-Pierre, to Guy Jean-Pierre, to Cliffe Bodden.  Subject

25   was:  "FSPM June 17th, 2012."

Direct - Sears

1   Q.   So essentially about 12 days after the previous e-mail.

2   About.

3   A.   Yeah, roughly.

4   Q.   And then here's the e-mail from Mr. Bodden, correct?

5   A.   Yes, sir.

6   Q.   And what's Mr. Bodden's response there?

7   A.   "Dove?"

8   Q.   And then you follow up with?

9   A.   "Docs.  Duh."

10   Q.   So you're correcting yourself?

11   A.   It would appear so.

12   Q.   So you're sending further docs to Mr. Guy Jean-Pierre?

13   A.   Yes, sir.

14   Q.   And with the subject "FusionPharm."

15   A.   Yes.

16   Q.   Can I have Government Exhibit 372-NN.  Can you start

17   from the bottom, please, on the screen.

18         Have you had an opportunity to look at Government

19   Exhibit 372-NN?

20   A.   Yes, I have.

21   Q.   Okay.  And do you recognize that document?

22   A.   Yes, I do.

23   Q.   All right.  Can you look on the screen and look at the

24   e-mail I just circled.

25   A.   Yes, sir.

Direct - Sears

1   Q.   Okay.  Could you tell the jury what that e-mail is

2   about.

3   A.   The e-mail is subject:  "Revised Articles and

4   Certificate of Designation of Series A Preferred Stock."  It

5   was to me.  Sent on a Tuesday, June 19th, 2012, from

6   *guy@lawfirmofjeanpierre.com*.

7   Q.   All right.  So do you know what Mr. Guy Jean-Pierre did

8   with this certificate of designation of preferred stock?

9   A.   I don't recall.  Change it, create it.  I don't know.

10  I don't remember.

11  Q.   You would agree with me he revised it?

12  A.   Yes.

13  Q.   And then what are you supposed to do if you have any

14  questions?  Or I guess I should say, when you have time.

15  A.   Give him a call when I have time.  He said, "Here's

16  the" -- "Attached please find the revised articles and

17  Certificate of Designation of Series A Preferred Stock,"

18  period.

19  Q.   And this is --

20  A.   "Also, give me a call as soon as you have a chance."

21  Q.   Okay.  And this is two days after the last exhibit we

22  just looked at.

23  A.   Yes, it is.

24  Q.   Can you go to the top of that exhibit for me, please.

25          And to remain consistent, what do you do once you

Direct - Sears

1    receive the e-mail from Guy Jean-Pierre?

2    A.    This is -- e-mail would be from myself,

3    *wsears@fusionpharminc.com*.  It was sent on Tuesday, July

4    19th at 2:12.  It was to Cliffe Bodden at GSCC Venture.

5    Subject:  Forward:  "Revised Articles and Certificate of

6    Designation of Series A Preferred Stock."  Attachment was

7    untitled something, and "Amended and Restated Articles."

8    Q.    372-XX.  And can you start at the bottom for me,

9    please.  Bring it out.  Bring it out a little bit more.

10         All right.  Can you look at Exhibit 372-XX.

11   A.    Yes.

12   Q.    Do you recognize that document?

13   A.    Yes, I do.

14   Q.    All right, sir, can you look on your screen.  I want to

15   discuss the e-mail that I just circled.  Who's writing that

16   e-mail?

17   A.    *guy@lawfirmofjeanpierre.com*.

18   Q.    And who is he sending it to?

19   A.    *wsears@vertifresh.onmicrosoft.com*.

20   Q.    That would be you?

21   A.    Yes, sir.

22   Q.    And what's the subject on there?

23   A.    "FSPM-Bayside."

24   Q.    So FusionPharm dash Bayside?

25   A.    Yes, sir.

1    Q.   Okay.  And what is Mr. Guy here telling you in his
2    letter -- or his e-mail?
3    A.   He's saying, "As discussed, attached please find the
4    non-affiliation form and officer's certificate to be signed
5    by the managing member of Bayside and Mr. Dittman,
6    respectively.  Once I received the attached properly
7    executed and arrangements have been made for payment, we'll
8    be able to proceed with the requested opinion in short
9    order."
10   Q.   Okay.  Can you stop right there?  So as you just read,
11   "as discussed," what conversations did you have with Mr. Guy
12   Jean-Pierre before this?
13   A.   I can't recollect, sir.  It was 2012.
14   Q.   But you would agree there was a prior conversation --
15   A.   Yes, sir, absolutely.
16   Q.   Now, he's e-mailing you -- can you read this third
17   paragraph?
18   A.   "Also, as we discussed on Friday, I think, please send
19   me copies of the evidence of funds disbursed by Bayside (and
20   other noteholders, if any.)  Once we have everything,
21   we should be able to turn around the opinion pretty quickly.
22   Thank you much, as always."
23   Q.   He's asking you about Bayside; is that right?
24   A.   Indeed, he is.
25   Q.   He's actually asking you for evidence from Bayside,

1    correct?

2    A.   Yes, he is.

3    Q.   As you testified, your mother was a placeholder and

4    Bayside wasn't yours.

5    A.   No, I testified that I was on Bayside in the very

6    beginning and then resigned.  My mother was a placeholder in

7    FusionPharm, I said, sir.

8    Q.   I'm sorry, I'm mistaken.  From the very beginning,

9    that's correct.

10         Well, if you look at the top of the e-mail, this is

11   December 2012.

12   A.   Okay.

13   Q.   It's not the beginning anymore.

14   A.   My mother owns the company and?

15   Q.   So why would Mr. Guy Jean-Pierre be reaching out to you

16   for documents from Bayside?

17        MR. GOODREID:  Again, objection --

18        THE WITNESS:  This -- I'll answer that one.

19        THE COURT:  Hold on.

20        MR. GOODREID:  Objection.  Based on speculation.

21        THE COURT:  Hold on.  Only if you know.

22        THE WITNESS:  You've listened to tapes on Sunday.

23   Nobody can -- no disrespect, sir, you can't understand him.

24   My mother's 71 years old.  How is she supposed to understand

25   him on the phone?

Direct - Sears

1    BY MR. SIBERT:

2    Q.   Well, sir, you testified your mother had no duties?

3    A.   Besides a holding company, it holds securities.  That's

4    what this is:  A note, convertible note.  Debt turns into

5    stock, stock can be sold.

6    Q.   So this is about a convertible note?

7    A.   That's what I would imagine this would be.  What else

8    would they be talking about debt and debtholders for, sir?

9    Q.   Okay.  And this is in 2012.

10   A.   Indeed.  December 8th is what the top of the page says.

11   Q.   Can I have Government Exhibit 69, please.  Can we start

12   at the bottom.  Can you blow that up, please.

13        All right, sir, do you recognize Government Exhibit

14   69?

15   A.   Yes, I do.

16   Q.   And let's start at the bottom here.  Do you recognize

17   that e-mail?

18   A.   Yes, I do.

19   Q.   Okay.  And what is that e-mail?

20   A.   That is Sandra Sears at *sandrasears1120@gmail.com*.

21   Q.   And who -- what Sandra Sears are we talking about?

22   A.   That would be my mother.

23   Q.   Okay.  That's a different e-mail address than before?

24   A.   It's gmail and they had acquired AOL, so I think she

25   had to do both or something like that.  I don't know, to be

Direct - Sears

1    honest with you.  For some reason she switched and then she

2    went back, so I don't know.

3    Q.   And who is she sending this e-mail to?

4    A.   Ms. Joanna DiBella.

5    Q.   Do you know who Ms. Joanna DiBella is?

6    A.   Yes, she's a security compliance supervisor at

7    Pacific -- was at Pacific Stock Transfer.

8    Q.   And this is regarding -- you're cc'd on this e-mail; is

9    that correct?

10   A.   That is correct.

11   Q.   And what is the e-mail -- or, excuse me, what is the

12   subject?

13   A.   Subject matter is the convertible note.

14   Q.   What is the date of that e-mail?

15   A.   December 24th, 2012.

16   Q.   And what does your mom tell Ms. DiBella?

17   A.   "Please find attached the revised letter of an

18   opinion," which means there was one previous.  "I have

19   already sent all the other docs" to you -- "docs you

20   requested.  Any chance of getting this out today?"

21   Q.   All right.  Well, you're cc'd on this e-mail, so what

22   does it mean to you by "letter of opinion"?

23   A.   It would be a letter of opinion to take paper

24   instrument, whether it's debt -- which is what this is

25   talking about -- and/or equity, being stocks, and deposit

Direct - Sears

1    them into -- get them into freely traded form to be entered

2    into the system.

3    Q.   So what kind of letter is this?

4    A.   A letter of opinion, sir.

5    Q.   Okay.  Is that a legal letter?

6    A.   Yes, it would be.

7    Q.   And -- all right.  Now, you've testified that your mom

8    didn't have a role, she's 71 years old, she's blind in one

9    eye, and you actually had to advise her about how to sell

10   stock in a prior e-mail because you made it easy for her

11   like ordering pizza?

12             MR. GOODREID:  Objection.  That is an

13   extraordinarily compound question.

14             MR. SIBERT:  I didn't even ask the question.

15             THE COURT:  I don't think I've heard the beginning

16   of the question.  There's just a lot of prefatory comment.

17             MR. GOODREID:  Then I modify my objection to

18   counsel's testifying, Your Honor.

19             THE COURT:  Let's start the question over and get

20   to the point.

21             MR. SIBERT:  Okay.  I was just refreshing the

22   witness about his mother.

23             THE COURT:  I think he knows his mother well.

24   BY MR. SIBERT:

25   Q.   So was your mother involved now with getting revised

1    letter of legal opinions to sell stock?

2    A.    Let's be clear:  We talked about my mother's

3    involvement in FusionPharm.  So you take that and you put

4    that aside.  We're talking about Bayside Realty Holdings

5    here, which is a holding company, which was a debtholder to

6    FusionPharm.

7             In order to do so, she has to go over documents.

8    And, no, it is not easy dealing with her at all on anything.

9    You'll see that soon enough.

10   Q.    My question was:  Did your mother work with a lawyer to

11   get a legal opinion letter?

12   A.    That's your question.  Yes, she did.

13   Q.    Who did she work with?

14   A.    She worked with Guy Jean-Pierre, sir.

15   Q.    Okay.  Let's go to the top here, please -- or middle, I

16   should say.

17            Do you recognize that e-mail there, sir, that I

18   circled on the screen?

19   A.    Yes, I do.

20   Q.    Okay.  What is that e-mail?

21   A.    That is an e-mail dated December 26th, 2012, from a Ms.

22   Joanna DiBella *@pacificstocktransfer.com*, and she wrote,

23   "Good afternoon Sandra, I have reviewed the documents

24   submitted by counsel and there is still not a clear

25   discussion of Rule 144(d)(3) and how it applies to this

Direct - Sears

1    transaction.  I also need to know if you are requesting that
2    we use your credit card to pay for your transaction."
3    Q.   All right.  So fair to say that there's an issue here
4    with the Rule 144 legal letter.
5    A.   She is the security supervisor, yes, sir.
6    Q.   Okay.  And I just want to backtrack here real quick.
7    You testified that your mother worked with Guy Jean-Pierre
8    to get legal letters.  And as you had testified prior, we
9    went through the documents 158 through 166 where you paid
10   Mr. Guy Jean-Pierre to write attorney letters.  Do you
11   recall those documents?
12   A.   Yes, I do.
13   Q.   So if Ms. -- you are -- do you assist your mother?
14   A.   Always.  If she ever asks me to, I would.
15   Q.   So you're writing checks from Bayside.
16   A.   I was a signer.
17   Q.   And your mother's using the lawyer that you used, Mr.
18   Guy Jean-Pierre, correct?
19   A.   She -- indeed.
20        Do you know -- if you know, before I get the
21   objection, if Mr. Guy Jean-Pierre knew that you were
22   assisting his mother with Bayside?
23   A.   Absolutely.
24   Q.   Can you come down to the top of that e-mail for --
25   again.  Thank you.

244

Direct - Sears

1       Okay.  Let's just talk about the beginning here.

2   How do you wrap up this chain of e-mails?

3   A.   Excuse me?

4   Q.   Okay.  Let's start from the top.  Who wrote the e-mail?

5   A.   Okay.

6   Q.   My question is:  Who wrote the e-mail?

7   A.   I heard you.  It's from myself at

8   *william@williamjsears.com*.  It was sent Wednesday, December

9   26th, 2012 --

10  Q.   Okay.  Stop.  Who did you send the e-mail to?

11  A.   That was the next line.  To Joanna DiBella,

12  *joanna@pacificstocktransfer.com*.

13  Q.   Okay.  Stop.  Same subject as down below, correct?

14  A.   Yes, sir.

15  Q.   Okay.

16  A.   Convertible note.

17  Q.   And now you are answering essentially for the company

18  that your mother runs; is that right?

19          MR. GOODREID:  Objection; leading.

20          THE COURT:  Sustained.

21  BY MR. SIBERT:

22  Q.   Is your mother --

23          THE COURT:  Hold on, counsel.  Hold on, Mr. Sears.

24  Let's rephrase.

25  BY MR. SIBERT:

245
Direct - Sears

1    Q.    Is your mother answering this e-mail?

2    A.    That particular one I am.  This was a very confusing

3    transaction --

4    Q.    You are --

5    A.    It took three months to finish, so you can't just say

6    that without going into --

7         MR. GOODREID:  Objection, Your Honor.  If counsel

8    will allow the witness to finish his answer before cutting

9    him off.

10        THE COURT:  Hold on, folks.

11        Mr. Sibert, let the witness complete his answer.

12        Are you done, sir?

13        THE WITNESS:  Yes.  Thank you, Judge.

14        THE COURT:  All right.

15   BY MR. SIBERT:

16   Q.    So the issues that your mother was having with the

17   transfer agent, who was the person that replied back to

18   them?

19   A.    That particular e-mail was myself.

20   Q.    Thank you.

21   A.    You're welcome.

22   Q.    Government Exhibit 70.  Okay.

23        So we just talked about the first e-mail that you

24   responded back to Mr. -- Mrs. DiBella on December 26th,

25   2012.  Do you recognize Government Exhibit 70?

                                Direct - Sears

1    A.    Yes.

2    Q.    And --

3    A.    70, correct.

4    Q.    70.

5    A.    Yes.

6    Q.    And can you pull up that section for me, please.

7          Who sent you an e-mail later on December 26th,

8    2012?

9    A.    Ms. Joanna DiBella.

10   Q.    And, again, what is Ms. Joanna DiBella talking about

11   here?

12   A.    She's talking about the original note that's dated 2011

13   that includes additional funds received all the way through

14   December.  The attorney states Rule 144(d)(3) is a holding

15   period discussion in one sentence --

16            THE COURT:  Slow down.

17            THE WITNESS:  Sorry.

18            THE COURT:  Go ahead.

19            THE WITNESS:  Now it says, "Rule 144(d)(3)

20   discusses the tacking of one security to another and we need

21   him to" clarify -- "clearly discuss this area and how it

22   relates to the promissory note and additional funding so

23   that he clearly defines what parameters of the Rule 144 he

24   is replying about."

25   Q.    Okay.  Thank you.

247

Direct - Sears

1    A.    And she asks for payment on the transaction again.

2    Q.    Okay.  So let's look at this real quick.  What is the

3    issue with this transfer?

4    A.    Some legal phrase that he -- that the lawyer would have

5    needed to clarify.  She wanted it written down in a certain

6    way, obviously.

7    Q.    And who's the lawyer?

8    A.    Mr. Guy Jean-Pierre.

9    Q.    All right.  And now she's asking you about payment

10   regarding this transaction, right?

11   A.    Uhm-hum.

12   Q.    Why would she be asking you about payment for your

13   mother's company?

14   A.    Because my mother would have given her authorization to

15   talk to me to handle it because it was too confusing to her.

16   Q.    Okay.

17   A.    This is confusing to everybody.

18   Q.    Can you go down to the top of the e-mail.  Okay.

19           Now, who responds back to Mrs. Joanna DiBella's

20   e-mail

21   A.    I did.

22   Q.    All right.  And then let's just look at the body here.

23   Based upon her e-mail, where were you going to forward her

24   comments?

25   A.    To the lawyer --

Direct - Sears

1    Q.   To who?

2    A.   "So I just forwarded your comments to the lawyer."

3    Q.   So who's the lawyer?

4    A.   Mr. Guy Jean-Pierre.

5    Q.   Isn't the lawyer Mr. DiTommaso?

6    A.   Mr. Guy Jean-Pierre, Mr. DiTommaso, it's the same

7    person.   All my correspondences went directly to Guy

8    Jean-Pierre.

9    Q.   Again, subject is the convertible notes?

10   A.   Yes, it is.

11   Q.   And the date is late in 2012, correct?

12   A.   That would be December 26th, 2012, sir.

13   Q.   Could I have Exhibit 268.

14        Do you recognize Government Exhibit 268?

15   A.   Yes, I do.

16   Q.   Okay.   Can we please start at the bottom.

17   A.   From Ms. Joanna DiBella, December 26th, 2012, to

18   myself, William at William J. Sears.   Subject is

19   "Convertible Note."

20   Q.   And this is the same e-mail that we just spoke about;

21   is that correct?

22   A.   I'm sorry, I'm just buried in paper here.   I'm trying

23   to --

24   Q.   Take your time.   It was --

25   A.   Yes, December 26th, 2012.

Direct - Sears

1    Q.   Okay.  Now, go to the top.  Can I have the top, please.

2    Okay.  And who do you -- oh, I'm sorry.

3            And in the middle here, what do you do with this

4    e-mail?

5    A.   I'm sending an e-mail to Mr. Jean-Pierre letting him

6    know I need to get this paperwork done because the TA is an

7    idiot.

8    Q.   Is that a person that you said that was head of

9    compliance, you're now calling an idiot?

10   A.   Right.  And she quit 30 days after.  She got the same

11   package five times and then was -- quit slash fired.

12   Q.   Okay.  But you're --

13   A.   It was a bit of a debacle.

14   Q.   You're not forwarding this to Mr. DiTommaso at all, are

15   you?

16   A.   No, I am not.

17   Q.   And then eventually you forward this on to Mr. Bodden;

18   is that correct?  It's right there at the top --

19   A.   It's not -- yes, *rbodden@meadpoint.onmicrosoft.com*.

20   Q.   And who is C. Bodden?

21   A.   That would be C. Randy Bodden.  That would be Cliffe

22   Bodden.

23   Q.   Do you know why he goes by Randy?

24   A.   Like everybody else with all their e-mails, I have no

25   idea.

Direct - Sears

1    Q.   Can I have Government Exhibit 269.

2         Do you recognize Government Exhibit 269?

3    A.   Yes, I do.

4    Q.   Can you please blow up this.

5         Who's this e-mail from?

6    A.   This e-mail is from *guy@lawfirmofguyjeanpierre.com.*

7    Q.   And when is that sent?

8    A.   December 27th, 2012.

9    Q.   And who is it to?

10   A.   *william@williamjsears.com.*

11   Q.   No Sandra Sears?

12   A.   No.

13   Q.   No Scott Dittman?

14   A.   No.  It's the same convertible note.

15   Q.   So the two owners of these companies aren't even

16   e-mailed by the corporation's lawyer.

17   A.   The corporation was the -- the lawyer was acting

18   independently of the corporation.  They were retained --

19   Q.   That's not my question how he was acting.  My

20   question --

21   A.   That was my answer.

22   Q.   My question is:  He was listed as the legal counsel for

23   the corporation, right?

24   A.   Yes, he was --

25         MR. GOODREID:  Objection.  Leading.

Direct - Sears

1              THE WITNESS:  For the corporation, yes.

2              MR. GOODREID:  Excuse me.  Objection.  Leading.

3              THE WITNESS:  Sorry.

4              THE COURT:  Sustained.

5     BY MR. SIBERT:

6     Q.   Okay.  Who was listed -- let's --

7     A.   I need a break for a minute.

8     Q.   Who was listed as the legal counsel for FusionPharm?

9     A.   Sorry, I'm not being rude, Judge, I --

10             THE COURT:  I didn't hear what you said.

11             THE WITNESS:  I said I'm not being rude, I just

12    need a second, sir.

13             THE COURT:  All right.

14             THE WITNESS:  Thank you.

15             THE COURT:  Let's dial down the temperature a

16    couple of degrees on both ends here, and let's wait for each

17    side -- each person to finish before the other one starts.

18             THE WITNESS:  Okay.  I'm sorry.  Please.

19    BY MR. SIBERT:

20    Q.   Who was listed in 2011 disclosures, and as you

21    testified, the legal counsel for FusionPharm?

22    A.   Guy Jean-Pierre.

23    Q.   And now my question was simple:  The legal counsel that

24    you just testified to as being the counsel for FusionPharm,

25    and also as you testified being the counsel for Bayside,

1    neither your mother or Scott Dittman is e-mailed regarding
2    this issue with the transfer agent in December 2012.
3    A.    On this particular e-mail, no.  None of them are on
4    this particular e-mail.
5    Q.    Thank you.  It went to you.
6    A.    Because I -- yes.  Yes, it went to me.
7    Q.    And, again, the subject is very clear, it's regarding
8    the same thing that we've been discussing, correct?  The
9    convertible note?
10   A.    I'm sorry.  I was looking at a different -- yes, sir.
11   Yes, sir.
12   Q.    Okay.  And what is Mr. Guy Jean-Pierre telling you in
13   his response?
14   A.    He thought about it last night and he was going to
15   send -- I'm sorry, I am going too fast -- "I thought about
16   it last night and I was going to send you a perfunctory
17   e-mail about the holding period of Rule 144 being one year
18   from the date of the first payment for the security acquired
19   and since the last trunch was more than a year ago, there
20   should be no issue."
21         Then it goes into -- do you want me to read the
22   rest or did you just want that?
23   Q.    Well, if you can summarize, that would be easier.
24   A.    I'd prefer not to summarize it because it goes into
25   legal terms.  Basically it's saying he's confused, doesn't

Direct - Sears

1    know what the TA is talking about either.  And it is his

2    view that -- opining counsel there's no tacking of one

3    security to another in this instance.  So, in fact, arguably

4    Rule 144(d)(3) does not specifically apply at all to this

5    note.

6            That is the -- one of the reasons it took so long

7    to resolve the change with opining counsel.

8    Q.   Okay.  And essentially he states right here at the top,

9    the date the payment for the security acquired.  Is that

10   right?

11   A.   Yes.

12   Q.   Can we go to the top of this e-mail.

13   A.   Did --

14   Q.   And essentially what do you do with Mr. Guy

15   Jean-Pierre's e-mail that he sent you?

16   A.   I forwarded it to Randy Bodden -- Cliffe Bodden.

17   Q.   That's Cliffe Bodden?

18   A.   Yes, sir.

19   Q.   All right.  But you didn't forward it to the two owners

20   of the companies.

21   A.   Not this specific e-mail, no.

22   Q.   Thank you.

23   A.   You're welcome.

24   Q.   Can I have Exhibit 270, please.  Okay.

25           Do you recognize Government Exhibit 270?

Direct - Sears

1    A.   Yes, I do.

2    Q.   All right.  And can you tell me what Government Exhibit

3    270 is.

4    A.   It is a Sears resignation letter.

5    Q.   Okay.  And who's it from?

6    A.   It's from Randy Bodden -- Cliffe Bodden.

7    Q.   Okay.  To who?

8    A.   To give to my mother.

9    Q.   No, no.  Who's he sending the e-mail to?

10   A.   He's sending it to me.

11   Q.   Okay.  And what's the subject?

12   A.   "Resignation Letter."

13   Q.   Okay.  And what's attached?

14   A.   A template for a resignation letter.

15   Q.   And so who drafted, based upon this e-mail, the letter

16   of resignation?

17   A.   Mr. Bodden was putting together end-of-year due

18   diligence for the company at the time and Mr. Dittman had

19   misplaced my mother's letter of resignation, so this was the

20   replacement letter for said letter.

21   Q.   All right.  I'm just asking a very simple question.

22   A.   And I answered you --

23   Q.   Who drafted the letter?

24   A.   That particular one, unsigned, is Cliffe Bodden, I

25   would imagine.

Direct - Sears

1    Q.   Okay.  And what is Mr. Bodden telling you to do with
2    the letter?
3    A.   "Please have this signed and that should complete the
4    package."
5    Q.   And what's the date of this?
6    A.   That would be December 27th, 2012, sir.
7    Q.   So the day after Christmas, you have three or four
8    e-mails regarding this convertible note and the issues that
9    you're having with the transfer agent, and then two days
10   later, Mr. Bodden is -- is drafting a letter for what?
11           MR. GOODREID:  Your Honor, I object to the form of
12   the question.  Counsel's testifying and just throwing
13   something at the end to make the question.  It's not a
14   proper question.  It's multipally compound.
15           THE COURT:  Hold on.  Let me look.  I don't think
16   it's a compound question, I think there's a single question.
17   But, again, there's all this prefatory comment, Mr. Sibert,
18   in the beginning of your question that I think may confuse
19   the record and confuse the witness.  So let's rephrase and
20   try to have crisper questions.
21           MR. SIBERT:  Okay.  Thank you, Your Honor.
22   BY MR. SIBERT:
23   Q.   How many e-mails on the 26th of December were you
24   involved in regarding this convertible note?
25   A.   I would have no idea.

Direct - Sears

1    Q.   Sir, you just went through them.

2    A.   There may be more.  If you asked me how many e-mails

3    e-mails I went through, that would be a proper question, and

4    I will count them for you --

5    Q.   How many did you go through today?

6    A.   -- if you'd like.

7              THE COURT:  One at a time, gentlemen.

8              THE WITNESS:  In what?  December 26th or -7th?

9    BY MR. SIBERT:

10   Q.   I asked you December 26th.

11   A.   One so far -- in front of me I have one.

12   Q.   You were only -- you only responded one time?

13   A.   Rephrase the question.  How many e-mails e-mails

14   December 26th did I what?

15   Q.   Were you involved in regarding this issue with Pacific

16   Stock Transfer Agency.

17   A.   Which issue?  The e-mail we were talking about had to

18   do --

19   Q.   With the --

20   A.   Excuse me, with the letter of resignation.  Now you're

21   going back to this one.  I'm getting a little confused.

22   Q.   How many times did you -- were either cc'd or wrote an

23   e-mail on the 26th of December, 2012, regarding the issue

24   that you were having with Ms. Joanna DiBella from Pacific

25   Stock Transfer regarding the issue of the Rule 144 opinion

Direct - Sears

1    letter?

2    A.    One that I can see that I have in my hand.

3    Q.    Only one time?

4    A.    That's the only one I see.

5    Q.    Okay.

6    A.    Unless I'm missing something.  Hold on.

7          268 -- okay that's December 27th.  I only see one

8    on the 26th, sir, unless I'm missing something.

9    Q.    All right, let's move on.  Back to this exhibit.

10   A.    What the hell was that for?

11   Q.    How many days went by before you received a draft of a

12   resignation letter for a Ms. Sandra Sears from the one time

13   that you responded to the issue that we just discussed?  How

14   many days went by?

15   A.    Can you rephrase "the issue"?  As in the -- I

16   apologize, it's getting late, I'm starting to fade, I got

17   sugar problems.  Just say it again.

18   Q.    Do you need a break?

19   A.    No.

20   Q.    Okay.  The issue that we discussed on December 26th

21   dealing with the Pacific Stock Transfer agent, Ms.

22   DiBella --

23   A.    And the 144 transaction.

24   Q.    That's correct.

25   A.    Okay.

Direct - Sears

1    Q.   How many days went by from you dealing --

2    A.   One.

3    Q.   How many?

4    A.   One.

5    Q.   Thank you.

6    A.   All right.

7    Q.   May I have Exhibit 271.

8            MR. SIBERT:  I would lead but I would be objected

9    on.  I told the Court I would lead quicker, but I would be

10   objected on.

11           THE COURT:  Well, that's the Rules of Evidence.

12           MR. SIBERT:  I hear you, Judge, I thank you,

13   though.

14   BY MR. SIBERT:

15   Q.   Can I have Exhibit 271, please.

16           Have you reviewed that?  Have you --

17   A.   I'm sorry, did you --

18   Q.   Do you recognize that document?

19   A.   Yes, I do.  Yes, I do.

20   Q.   All right.  Let's start down at the bottom again.

21   Okay.  Who's sending the e-mail?

22   A.   Ms. Joanna DiBella.

23   Q.   And what's the date?

24   A.   December 27th, 2012.

25   Q.   And who's receiving the e-mail this time?

1  A.   Myself and Mr. Dittman.

2  Q.   Okay.  And what is Mrs. DiBella discussing?

3  A.   "Good evening, counsel's response is below.  The

4  subject is under missing documents."

5  Q.   Okay.  What is she discussing in the e-mail she's

6  sending you?

7  A.   She's talking about the factual inaccuracies in the

8  opinions, such that it could not be relied upon.  The

9  relevant facts that are outlined in the opinion don't match

10  the documents, materials, for the transaction.  Specifically

11  Mr. DiTommaso opines that the indebtedness was incurred on

12  or about May 2d, 2011, which Mr. DiTommaso refers to as

13  record date.  However, the face of the note is clear the

14  full amount of the note was not lent to the issuer on that

15  date.

16          "Further, the draw down notices that were presented

17  to us are all on different dates (save the first one that

18  was dated May 2d, 2011).  Mr. DiTommaso" also "opines that

19  the holding period commences on the date when the full

20  purchase price or other consideration has been paid.  He

21  then goes on to opine that the holding period commenced as

22  of the Record Date.  As just" plain -- "As just explained

23  that is incorrect.

24          "We need some evidence that the monies were

25  actually lent to the company on the dates indicated by the

Direct - Sears

1    drawdown notices."  She'll be out of the office tomorrow and
2    back on Monday.
3    Q.   Do you know why Ms. -- Mrs. DiBella would give you such
4    a long e-mail about the legal issues in these opinion
5    letters when you weren't part of Bayside or FusionPharm?
6    A.   Because I was speaking for the debtholder being my
7    mother.  It's --
8    Q.   At the top --
9    A.   -- Bayside.
10   Q.   Okay.  What do you do when you receive that e-mail from
11   the Pacific Stock Transfer agent?
12   A.   I sent it to Guy Jean-Pierre and Randy Bodden.
13   Q.   And you sent it essentially about 15 minutes after you
14   received it?
15   A.   Yes, sir.
16   Q.   On the same date, December 27th, 2012?
17   A.   Yes, sir.
18   Q.   Can I have the e-mail from Ms. DiBella.
19           THE COURT:  Can we have a number so the record's
20   clear.
21           MR. SIBERT:  Just down below, Your Honor.
22           THE COURT:  All right.
23   BY MR. SIBERT:
24   Q.   So Mrs. DiBella specifically states Mr. DiTommaso in
25   her response to you on behalf of your mother.

Direct - Sears

1    A.    Uhm-hum.

2    Q.    And to your brother-in-law, Scott Dittman.

3    A.    Yes, sir.

4    Q.    And if you're acting in the best interests of your

5    mother, why didn't you send it to Mr. DiTommaso instead of

6    Mr. Guy Jean-Pierre?

7    A.    Excuse me?  Why would I -- I just didn't hear the back

8    part of it.

9    Q.    If you were acting on behalf of your mother for her

10   best interests, why would you send Mrs. Joanna DiBella's

11   issues that she's having with the transfer of stock from two

12   companies that you're not involved in to Mr. Guy Jean-Pierre

13   instead of the lawyer that she specifically states in her

14   response back to you?

15   A.    Because I have done nothing but send all my paperwork

16   to Mr. Guy Jean-Pierre whom worked in concert with Mr.

17   DiTommaso.  I sent Mr. DiTommaso one e-mail maybe and spoke

18   to him once for a very brief period of time a number of

19   years ago.

20   Q.    Can I have Government Exhibit 272.

21         Do you recognize Government Exhibit 272?

22   A.    Yes, sir.

23   Q.    All right.  Let's just start down at the bottom so

24   there's no confusion.  What are you doing at the bottom of

25   this e-mail?

Direct - Sears

1    A.    I'm forwarding the e-mail to Randy Bodden.

2    Q.    Can you go to the middle of 272 for me.

3    A.    Yes, sir.

4    Q.    And here I circled it for you so you know what I'm

5    talking about.

6    A.    Uhm-hum.

7    Q.    Okay.  What is Mr. Bodden telling you?

8    A.    He's telling me that she's "seeking additional

9    information in light that the face value of the note is less

10   than the sum of drawdowns made thereunder - presenting the

11   possibility that the note is still open and therefore the

12   full purchase price of the note hasn't been paid," and the

13   issue of not having dealt with the promissory note funded in

14   installments.

15          As he remembers in a "Capitoline due diligence

16   included a Letter of Authorization terminating the credit

17   line. . ."  "I think that should be referenced in the

18   opinion letter as a means of providing payment in full under

19   the terms of the note."

20          Do you want me to read the rest of this?

21   Q.    No, let's just look at the top now.  Can you tell the

22   jury what you mean by "Gee, that conversation sounds

23   familiar"?

24   A.    It just seemed like common sense to me that if a note

25   is open, you have to close the note regardless of the amount

Direct - Sears

1   that was drawn down on it, just like a line of credit.  If

2   you're given a line of credit for a hundred, you only use

3   75, if the note is done it's done.  That was the piece of

4   paper she was obviously looking for.

5   Q.   So we're still on December 22d --

6   A.   -7th.

7   Q.   -7th.  Who are you e-mailing your response to?

8   A.   Randy Bodden and Guy Jean-Pierre and Scott Dittman.

9   Q.   Now, can I have Government Exhibit 372-AAA.  Okay.  Can

10  you focus in on the top here, please.

11         Okay.  Do you recognize Government Exhibit 372-AAA?

12  A.   Yes, I do.

13  Q.   And what is it?

14  A.   It is an e-mail.

15  Q.   Okay.  And would you describe what the e-mail is.

16  A.   The e-mail is a forward -- I'm forwarding a board

17  resolution.  Attachment says "Board Resolution - Appointing

18  Officers."

19  Q.   All right.  And who are you sending this to?

20  A.   I'm sending it to Scott Dittman.

21  Q.   Can we go down here, please, in the e-mail.

22         Who sent you the draft of the board resolution?

23  A.   Randy Bodden.

24         MR. SIBERT:  Your Honor, may I have a minute?

25         THE COURT:  You may.  While you're doing that, I

Direct - Sears

1    just want to clarify something for the record so it's

2    crystal clear.

3              Mr. Sears, Randy Bodden and Cliffe Bodden are the

4    same person?

5              THE WITNESS:  Yes, sir.

6              THE COURT:  All right.

7    BY MR. SIBERT:

8    Q.   Okay, can we go back to Exhibit 272, please.  Is there

9    a page 2 for this?  Okay.  Thank you.

10             All right.  Can we look at Exhibit 342-BBB.  Do you

11   recognize Exhibit 372-BBB?

12   A.   Yes, I do.

13   Q.   Okay.  Can we focus in at the bottom of this e-mail.

14             Okay.  Sir, do you recognize this e-mail?

15   A.   Yes, I do.

16   Q.   Okay.  And who's this e-mail from?

17   A.   This is from myself.

18   Q.   Are you Eric Miller?

19   A.   No, I'm --

20   Q.   Are you looking at your screen?

21   A.   I am not.  I'm not trying to be rude, but I can't see

22   it.  It's fuzzy, for the 10th time, so I have to look at the

23   page.

24   Q.   That's okay, sir.

25   A.   It's not okay because you keep --

                          Direct - Sears

1    Q.   I actually --
2    A.   -- speaking to me very rude.
3    Q.   Can you look at the bottom of the e-mail where it
4    states, "From Eric Miller"?  Do you see that?
5    A.   Yes, now I see it clearly.  Thank you.
6    Q.   Okay.  You wrote that e-mail.  And what does that
7    e-mail concern?
8    A.   Mr. Eric Miller wrote it.  He wrote it to myself.  It
9    says Bayside Realty Holdings.
10             THE COURT:  Can you speak into the mic.
11             THE WITNESS:  Yes, I'm sorry.  The e-mail says,
12   "Bill, please carve up with file in to 4 or five pieces.  It
13   is when an individual EMAIL exceeds 10 megs that it gets
14   booted.  Send 5 emails e-mails we should be fine."
15   Q.   All right.  So who is Mr. Eric Miller?
16   A.   He is a -- an investment advisor at Scottsdale
17   Capital.
18   Q.   And let's just go to the top of the e-mail.  Who's
19   writing that e-mail?
20   A.   I'm writing that e-mail.
21   Q.   To who?
22   A.   To Eric Miller.
23   Q.   From Scottsdale Capital?
24   A.   Yes, sir.
25   Q.   And, again, you're working with the subject and

Direct - Sears

1    attachment.  What is the subject and what is the attachment?

2    A.    The subject is "Bayside Realty Holdings" and the

3    attachment is an account opening form, I would imagine, for

4    Alpine, which is a very complicated document.

5    Q.    Okay.

6    A.    Hence having to be broken up into four or five

7    different attachments.

8    Q.    What is DSR?  And I highlighted it underneath your

9    screen.

10   A.    Trying to remember.  I can't remember.  It's some kind

11   of background deposit security.  I don't know, it's some

12   kind of form to be filled out when you're making a deposit.

13   Q.    What is --

14   A.    It's an abbreviation.

15   Q.    What is SDA?

16   A.    I don't remember what they mean.  I'm sorry.

17   Q.    What is cert?

18   A.    That would indicate a stock certificate.

19   Q.    And stock power?

20   A.    Would be a document that is needed to deposit said

21   security certificate.

22   Q.    And corporate res for deposit?

23   A.    A corporate resolution defining that transaction.

24   Q.    Okay.  Again, do you know why Mr. Eric Miller from

25   Scottsdale Capital would be contacting you about your

1      mother's company, Bayside?

2      A.    Yes.   Because it's a very complicated document and my

3      mother is old and is showing signs of slipping over the last

4      couple of months, so I had to pick up the pace.

5      Q.    Okay.   And the date of this is January 22d, 2013.

6      A.    Yes.

7      Q.    Okay.

8      A.    Oh, she's going to --

9      Q.    And are you coordinating a deposit at Bayside deposit

10     into Scottsdale on --

11     A.    Indeed, I am, sir.

12     Q.    -- this day?

13            All right.   Can we flip back to 372-AAA, page 2.

14            Sir, I have it on the screen here for you.

15     A.    Okay.

16     Q.    Okay.   On the document that you forwarded to your

17     brother-in-law Scott Dittman, who's named as the secretary?

18     A.    Guy M. Jean-Pierre.

19     Q.    Thank you.   Can I have Exhibit 274.

20            Do you recognize Exhibit 274?

21     A.    Yes, I do.

22     Q.    And can you just go down to the bottom of this e-mail.

23     A.    Yes, sir.

24     Q.    Why are you sending an e-mail to Mr. Bodden?

25     A.    Subject matter is "FSPM - Bayside - StarCity."   I

Direct - Sears

1    believe in looking at this, this would be the sale of the

2    Bayside note to sell it --

3    Q.    So you're now selling your note for your mother's

4    company?

5    A.    Yes.  To end the transactions, yes.

6    Q.    And the date is around January 23d, 2013?

7    A.    Yes, sir.

8    Q.    Can you go to the top of that, please.  That document.

9    Thank you.

10          Again, why are you forwarding -- why are you doing

11   a forward to your brother-in-law, Scott Dittman, at

12   FusionPharm?

13   A.    Because the securities are from FusionPharm that

14   Bayside is holding and the -- the security owner should know

15   if a note can be sold or not.  I don't recall exactly, but I

16   think there were terms and conditions that the company had

17   to approve the sale so he would have to know.

18   Q.    Do you know if Mr. Guy Jean-Pierre was involved with

19   this Bayside note?

20   A.    Yes, he -- yes, I do, sir.

21   Q.    And what was his involvement?

22   A.    I believe from -- he helped -- the note sale or the

23   note itself, sir, to be clear?

24   Q.    I'm asking about Mr. Guy Jean-Pierre's involvement with

25   the Bayside note in the sale.

Direct - Sears

1    A.    In the sale.  Yes, he was involved in the sale.

2    Q.    And how was he involved?

3    A.    He was the attorney that put all the paperwork and

4    coordinated with the gentleman by the name of Mr. Wayne

5    Coleson.  Wayne Coleson --

6              THE COURT:  Can you stay close to the mic --

7              THE WITNESS:  Sorry.  Wayne Coleson represented the

8    purchasers.  And it was five different ones, I think, five

9    or six.

10   BY MR. SIBERT:

11   Q.    And since you're acting on behalf of your mother, I

12   assume, who did you work with when it came to the legal

13   issues of the sale of the note?

14   A.    Mr. Jean-Pierre.

15   Q.    And how about the creation of the note?

16   A.    That was between Mr. Bodden and Mr. Jean-Pierre.

17   Q.    Could I have Government Exhibit 74.

18         Can you look at Government Exhibit 74.

19   A.    Go ahead.

20   Q.    Do you recognize that document?

21   A.    Says "BSRH Note LOP.pdf."

22   Q.    And do you know what BSRH note LOP means?

23   A.    Probably Bayside Realty Holdings note.  LOP would be

24   letter of opinion, I'm guessing.

25   Q.    Letter of opinion?

Direct - Sears

1    A.    Yes, sir.

2    Q.    Do you know who signed that letter of opinion?

3    A.    Not off the top of my head without looking at it.

4    Q.    And who are you sending it to?

5    A.    Sending it to Ms. Joanna DiBella and I am carbon

6    copying Scott Dittman.

7    Q.    Could I have Government Exhibit 77.

8          Do you recognize Government Exhibit 77?

9    A.    Hold on one second, sir.  Yes, I do.

10   Q.    Okay.  Can you describe to me what Government Exhibit

11   77 is.

12   A.    This is an e-mail from myself using the Vertifresh

13   e-mail.  It was sent Thursday, April 11th, 2013.  It's to

14   Joanna at Pacific Stock Transfer, carbon copy to Scott

15   Dittman at FusionPharm.  The subject is "Meadpoint Venture

16   Partners FSPM."  Attachment, "J DiBella doc."

17   Q.    What are you telling Ms. DiBella in this e-mail?

18   A.    I'm asking her to find all the documentation that we

19   spoke about the week prior.

20   Q.    Okay.  And why are you sending all this documentation

21   to Ms. DiBella?

22   A.    This looks like a note and a note to convert.

23   Q.    Do you know what note it is?

24   A.    It would be the Meadpoint Venture Partners note, sir.

25   Q.    And essentially Meadpoint, that's your company; is that

Direct - Sears

1    correct?

2    A.   Yes, sir.

3    Q.   And essentially did your company loan FusionPharm

4    money?

5    A.   Originally the notes came from myself or one of my

6    companies, and when it was time to go ahead back in 2011, I

7    believe it was, to start to rectify the books of the

8    company, that was the trip that Mr. Jean-Pierre came out on,

9    I believe it was September or October --

10              MR. SIBERT:  Your Honor, I'm going --

11              THE WITNESS:  I can't just --

12              THE COURT:  Hold on.  Hold on.

13              THE WITNESS:  -- give you bits and pieces.  You got

14   to --

15              THE COURT:  Hold on.

16              THE WITNESS:  Sorry.

17              MR. SIBERT:  I'm going to ask that the witness is

18   not being responsive to the question.

19              THE COURT:  All right.  We've gone through this

20   before, Mr. Sears.

21              THE WITNESS:  Yes, sir.

22              THE COURT:  Please answer the question that's posed

23   and -- why don't we do this:  Why don't we take our

24   afternoon break.  Mr. Sibert, you can think about how you

25   might want to rephrase that question.

1            We're going to take a 15-minute break.  I have a

2    matter that I want to raise with the lawyers briefly, but

3    we'll let the jury start their recess.

4            (Jury left the courtroom at 3:05 p.m.)

5            THE COURT:  Mr. Sears, once again, you're in the

6    middle of your testimony, so I'm directing you not to confer

7    with any of the lawyers during the break.  You may step down

8    now for the recess.

9            All right.  I want to address the motion made

10   earlier this morning by the Government, which I took under

11   advisement, that being the motion to discharge Juror Tyler

12   Robinson.  What I've decided to do is when we recess for the

13   day at 5:00 or a little thereafter, I'm going to have Mr.

14   Robinson stay in the courtroom.  I'm going to ask him

15   questions about what it was that he was concerned about

16   yesterday when he spoke with my courtroom deputies, because

17   we -- right now, since I didn't talk to him yesterday we

18   have nothing on the record as to what his views and concerns

19   were yesterday.

20           I'm going to ask him questions regarding whether

21   his phase of anxiety has passed and whether he has

22   reconsidered his position as to whether he could, if the

23   evidence supported it, return a verdict of guilty against

24   the defendant on one or more of the counts.

25           I'm going to allow counsel -- both counsel to

1    question Mr. Robinson, and then I'm going to make a ruling

2    on the Government's motion to discharge him.

3            All right.  We will be in recess for 15 minutes.

4            MR. SIBERT:  Thank you, Your Honor.

5        (Recess 3:07 p.m.)

6        (Jurors were present at 3:27 p.m.)

7            THE COURT:  Mr. Sears, I remind you you remain

8    under oath.

9            THE WITNESS:  Yes, sir.

10           THE COURT:  Mr. Sibert, you may resume your

11   examination.

12           MR. SIBERT:  Okay, thank you, Your Honor.

13   BY MR. SIBERT:

14   Q.   Sir, let's go back here real quick and look at -- do

15   you have Government Exhibit 372-DDD in front of you?

16           MR. GOODREID:  I'm sorry, what --

17           MR. SIBERT:  372 David David David.

18           THE WITNESS:  I don't have the hard copy, but I can

19   try and make it out on the screen.

20   BY MR. SIBERT:

21   Q.   All right, let's just -- can we blow it up for Mr.

22   Sears.

23   A.   Okay.  Go ahead.

24   Q.   All right.  Now, obviously do you recognize the fact

25   that this is an e-mail that was sent by you?

Direct - Sears

1    A.    Yes.

2    Q.    And to who?

3    A.    Scott Dittman at FusionPharm, Inc.

4    Q.    And what is the subject of this e-mail?

5    A.    FSPM Vera.

6    Q.    Okay.  And we know what FSPM is, but what is Vera?

7    A.    Vera is a purchaser of the Bayside Realty note.

8    Q.    And, again, the date of this e-mail is in March 2013,

9    correct?

10   A.    March 1st, yes.

11   Q.    Okay.  And essentially, based upon your prior

12   testimony, I'm assuming that you forwarded this e-mail on to

13   Mr. Dittman?

14   A.    Yes, it says forward:  "FSPM Vera," yes, it does.

15   Q.    Can we just blow up this part of the exhibit.

16         Now, do you recall receiving this e-mail from Mr.

17   Guy Jean-Pierre?

18   A.    I see it.

19   Q.    Okay.  And can you take a minute and look at it?

20   A.    Okay.

21   Q.    And can you describe to me what is going on in this

22   e-mail.

23   A.    This would be saying he's attached a proposed officer's

24   certificate revis- -- regarding the five, or four,

25   conversions.  He looked pretty closely and what I sent

Direct - Sears

1    purportedly titled "Vera" seems to actually be a duplicate

2    of SGI, which I believe was another purchaser.  "Please send

3    me the agreement and conversion notice for Vera.  If, on the

4    other hand, there are only 4 converting shareholders, please

5    advise."

6    Q.   And, again, so this is going towards the legal opinion

7    letters that are required for these types of conversions?

8    A.   Yes, sir, they are.

9    Q.   And so Mr. Guy Jean-Pierre sends them to you, and who

10   do you forward them to?

11   A.   Scott Dittman.

12   Q.   All right.  Now, let's look at Government Exhibit 77

13   again.  Now, as you recall before we were taking a break --

14   this afternoon's break, you had described that this was

15   information that you were sending to Ms. Joanna DiBella at

16   Pacific Stock Transfer -- Transfer Agency regarding the sale

17   of the note; is that correct?

18   A.   That is correct.

19   Q.   And that's the Meadpoint note; is that right?

20   A.   Yes, it is.

21   Q.   Now, you are -- you were the owner at the time of

22   2013 -- April 11th, 2013, you were the owner of Meadpoint;

23   is that right?

24   A.   As my memory serves, yes, I believe so.

25   Q.   Okay.  And during that -- during some time prior to

Direct - Sears

1   that -- and how long did you own Meadpoint for?

2   A.   I don't recall.

3   Q.   You don't know how long you owned the company?

4   A.   No, I've had many companies, sir.

5   Q.   Did you ever give FusionPharm a loan when you were

6   controlling Meadpoint?

7   A.   Yes.

8   Q.   Where did you get the funds --

9   A.   Hold on, hold on, hold on.  I don't recall exactly

10  how -- if I could explain the transaction, or -- I can't

11  just answer your question that way, because you're going to

12  hammer me for not answering it clearly.

13  Q.   My question is -- the answer --

14  A.   I'm trying.

15  Q.   The answer was fine the first time.

16  A.   Well, there's more to it.

17  Q.   If you have to switch your answer, that's fine, too.

18  My question is:  When you owned Meadpoint, did you ever loan

19  FusionPharm -- did you ever provide FusionPharm a loan?

20  A.   Meadpoint wound up being the beneficiary, and I would

21  have to check the notes to see if it came from Meadpoint or

22  not.  I can't recall, I can't --

23  Q.   So you can't recall if you --

24  A.   Because as I explained in my previous testimony, the

25  note was mine and I split it up into two entities.  That's

Direct - Sears

1    the answer.  I'm sorry, it's not cut and dry.

2    Q.   Okay.  So you definitely gave some kind of loan though.

3    A.   Yes, I did, yes.

4    Q.   Where did you get the money to provide the loan?  Where

5    did you get the money to provide --

6    A.   From the bank.

7    Q.   -- the loan?

8    A.   From the bank.

9    Q.   And where did you get the money that you put in the

10   bank?

11   A.   From the sale of securities.

12   Q.   What securities?

13   A.   Various securities, but mostly FusionPharm.  Mostly

14   FusionPharm securities.

15   Q.   Okay.  So if I follow your testimony correctly --

16   A.   Uhm-hum.

17   Q.   -- the money that you received from selling FusionPharm

18   stock, you used to provide FusionPharm a loan?

19          MR. GOODREID:  Objection.  Leading.

20          THE COURT:  Sustained.

21   BY MR. SIBERT:

22   Q.   What money did you use to provide FusionPharm its loan?

23   A.   Money that was derived from the sale of securities from

24   the debt settlement agreement from Fred Dahlman to be exact,

25   I believe.

278

Direct - Sears

1    Q.   And how did you get that money from -- you got

2    securities from Fred Dahlman; is that correct?

3    A.   Yes, sir, free-trading securities.

4    Q.   Where did you get the money then?

5    A.   I'm sorry, I'm not following your question.

6    Q.   What did you do with those securities?

7    A.   Oh, okay.  I sold the securities and then after

8    settlement day I had capital.

9    Q.   And those securities -- those stocks from Baby Bee

10   Bright became FusionPharm's --

11              MR. GOODREID:  Objection.  Leading.

12              THE COURT:  I don't know if that was a question,

13   but to the extent it was, it's sustained.  Let's rephrase.

14   BY MR. SIBERT:

15   Q.   What did Baby Bee Bright stock become?

16   A.   Baby Bee Bright stock became -- well, Baby Bee Bright,

17   the company, became FusionPharm.

18   Q.   Okay.  And my question is:  What happened, then, to the

19   stock?

20   A.   Any stock that shareholders would have had at that time

21   would have been converted into FusionPharm.

22   Q.   Now, you sold the Meadpoint note; is that right?

23   A.   I don't recall.  I think -- no, I don't think I sold

24   the Meadpoint note.  I'm pretty sure I kept the Meadpoint

25   note and that was one that I used to liquidate into the

Direct - Sears

1   markets.  The Bayside note was sold sometime in the
2   beginning of '13.
3   Q.  Well, let me rephrase my question.  Did you ever sell a
4   portion of the Meadpoint note?
5   A.  I don't recall.  I might have.
6   Q.  All right.  Can I have Exhibit 400 up, please.
7        Do you recognize Government Exhibit 400?
8   A.  Yes, I do.
9   Q.  Okay.  And what is Government Exhibit 400?
10  A.  Exhibit 400 is an e-mail.  Do you want me to go through
11  the whole heading or . . .
12  Q.  Yeah.  Could you, please.
13  A.  Yeah.  It is an e-mail sent from myself using the
14  *william@williamjsears.com* e-mail.  It was sent Thursday,
15  August 8th, 2013.  I sent it to *guyjeanpierre@yahoo.com*,
16  guy@lawfirmofjeanpierre.com and *marcelo1@thedeallawyer.com*,
17  and Mr. Dittman at the FusionPharm was copied.  The subject
18  was "Meadpoint Letter of Opinion," and the attachment was
19  JoannaDiBelladoc.pdf.
20  Q.  And what are you asking Mr. Guy Jean-Pierre to provide
21  you in this e-mail?
22  A.  I said, "It would seem I would need another letter of
23  opinion for the note.  Please reference Meadpoint converting
24  it into the Name of Richard Scholz as in the documents."
25  Q.  Does this refresh your memory about you selling any

Direct - Sears

1    portion of the Meadpoint note?

2    A.    Yes, it does.  It doesn't refresh my memory, but --

3    because I can't honestly say I recall it, but . . .

4    Q.    Well --

5    A.    It is here.

6    Q.    Why would you need a legal letter -- an opinion

7    letter -- a legal opinion letter regarding Mr. Richard

8    Scholz with the Meadpoint?

9    A.    Once again, any type of security to be deposited into

10   the system or being accepted by a brokerage firm and/or bank

11   is going to require a legal letter of opinion.

12   Q.    Okay.  Did you give Mr. Scholz shares for free

13   concerning Meadpoint?

14   A.    I don't recall.  I might have.

15   Q.    Do you often give away your shares for free?

16   A.    Sometimes.

17   Q.    Do you give away your corporations for free?

18   A.    Depends on what's in them.

19   Q.    Do you know if you gave away your Meadpoint note for

20   free to Mr. Richard Scholz?

21   A.    I don't recall.

22   Q.    Can I have Government Exhibit 155.

23         Do you recognize Government Exhibit 155?

24   A.    Yes, I do, sir.

25   Q.    What is Government Exhibit 155?

Direct - Sears

1    A.    That is an e-mail sent from myself using

2    *william@williamjsears.com* e-mail, was sent Tuesday, August

3    13th, 2013, and it was sent to a Mr. Myron Thaden, carbon

4    copy with Scott Dittman FusionPharm, Inc.

5    Q.    And who is Mr. Thaden?

6    A.    Myron Thaden is a friend of mine, and he was ultimately

7    an investor in a company.

8    Q.    And how did he invest -- in what company?

9    A.    This particular August 13, '13, that would have been

10   Meadpoint, I believe.

11   Q.    Let's start at the bottom here.  Who's that an e-mail

12   from?

13   A.    From Mr. Thaden.

14   Q.    Okay.  And who's that to?

15   A.    Scott Dittman, and myself is carboned.

16   Q.    And what's the subject?

17   A.    FSPM.

18   Q.    And that's FusionPharm?

19   A.    Indeed, it is, sir.

20   Q.    Okay.  And what is Mr. Thaden telling you in this

21   e-mail?

22   A.    He thinks he's finally negotiated the terms for an

23   early maturity date liquidation.  More difficult is the --

24   it is more expensive than he originally anticipated.  That

25   being said, he wants to proceed.  And below he's giving the

Direct - Sears

1    information of his broker to accept certificates.

2    Q.    Okay.  What's he saying about the funds here?

3    A.    He said, "As I recall the funds go directly to

4    FusionPharm, Inc., which will use, 50,000 for marketing and

5    promotion for future sales of pods and" audits -- "for

6    Audits and legal fees associated with taking FSPM from the

7    pink sheet to the OTC Bulletin Board.  The remaining 50K

8    will be used to purchase part of the existing note owed by

9    Fusion to "Meadpoint" -- "Meadpoint will be used to purchase

10   part of the existing note by" -- I don't know.  I'm getting

11   confused here, I'm sorry.

12            Which -- "Meadpoint Venture Partners is going to

13   use those funds to purchase two fully functional pods from

14   FSPM for 50K to be placed in the new showroom.  In return I

15   will receive 1 million shares of FusionPharm, Inc.,

16   unencumbered," yadi-yadi-yada.

17            "My attorney suggested the agreement be between the

18   parties stating exactly that.  Please send draft."

19   Q.    Okay.  So right here, the purchase part of the existing

20   note, does that refresh your memory at all?

21   A.    As in purchasing part of the existing note?  Yes, it

22   does.

23   Q.    For Meadpoint?

24   A.    Yes, sir.

25   Q.    So you would now testify that you recall that a portion

Direct - Sears

1    of the Meadpoint note was sold?

2          MR. GOODREID:  Objection.  Leading.  And counsel is

3    testifying, "you would do the following."

4          THE COURT:  Sustained.

5    BY MR. SIBERT:

6    Q.   When I asked you before, and I just refreshed your

7    memory, did you sell a portion of the Meadpoint?

8    A.   Yes, I did.

9    Q.   So let's talk about:  What did you -- can I have this

10   taken down, please.

11         Where did the proceeds from the sale of the

12   Meadpoint note go?

13   A.   To Meadpoint Venture Partners.

14   Q.   And that's you?

15   A.   Yes, that was me.

16   Q.   Okay.  Can you put down that document.  And look at me

17   while I'm asking questions.  We're not going to focus on the

18   document right now.

19   A.   Yeah, it was me.

20   Q.   And when you got the majority of the funds, what did

21   you do with those funds?

22   A.   I went ahead and built a showroom and warehouse which

23   housed harem pods.  I would say a month later I had a grand

24   opening for that warehouse also.

25   Q.   Whose warehouse was it?

Direct - Sears

1    A.    It's my warehouse.  I leased it --

2    Q.    What company leased the warehouse?

3    A.    Meadpoint Venture Partners used the warehouse and

4    ultimately FusionPharm took it over.

5    Q.    So the money went --

6    A.    To Meadpoint.

7    Q.    If I'm understanding you correct, you sold the

8    Meadpoint -- a portion of the Meadpoint note.

9    A.    That's right, sir.

10   Q.    All right.  Where did you place that money?

11   A.    It should have gone to the Meadpoint Venture Capital --

12   Venture Partners account.  And if I remember correctly, I

13   went ahead and bought some equipment and warehouse and

14   leasehold a building in Commerce City that ultimately

15   FusionPharm took over.

16   Q.    And did you ever give tours of that warehouse?

17   A.    Absolutely.

18   Q.    And what uniform did you wear when you gave those

19   tours?

20   A.    It could have been a pharm pod uniform due to the fact

21   that I had the exclusive rights to sell the product.

22   Q.    Okay.  And so you're essentially making a deal with

23   FusionPharm with Meadpoint; is that right?

24   A.    In what sense, sir?

25   Q.    You're the owner of Meadpoint?

Direct - Sears

1    A.    Yes.

2    Q.    And you're making some type of deal with FusionPharm

3    concerning this warehouse.

4    A.    Yes.  My exclusive agreement was to expire the

5    following April, which was only a couple of months away, and

6    they were going to take it over and reimburse me supposedly

7    for all the expenses that I had put into the warehouse.

8    Q.    So you're making a deal with your brother-in-law?

9    A.    I'm making a deal with a public company FusionPharm,

10   who happens to be my brother-in-law, yeah.

11   Q.    And he's the CEO?

12   A.    Yes, he is.

13   Q.    Can I have Exhibit 156, please.  Can we focus on the

14   top, please.

15         All right.  Do you recognize Government Exhibit

16   156?

17   A.    Yes, I do.

18   Q.    And what is this?

19   A.    This is an e-mail.

20   Q.    And who's the e-mail from and to?

21   A.    It's from Myron Thaden to myself and Mr. Dittman.

22   Q.    And what is the subject of the e-mail?

23   A.    "Drafting an agreement."

24   Q.    All right.  And what's the date of this e-mail?

25   A.    August 14th, 2013.

Direct - Sears

1   Q.   Okay.  And essentially what is Mr. Thaden telling you

2   when he says, "Bill"?

3   A.   He wants to take half of his investment and have half

4   the securities in his name and the other half in his wife's

5   name.

6   Q.   Do you know a reason why he would want to do that?

7   A.   They're married, they live under the same roof.  I have

8   no idea.

9   Q.   Okay.  Can I have Exhibit 372-MMM.

10          Have you had a chance to look at this document?

11  A.   Yes, I did, sir.

12  Q.   And do you recognize this document?

13  A.   Yes, I do.

14  Q.   Let's start at the bottom.  I've circled it.  It's on

15  your screen.  The bottom e-mail.

16          Again, it's from *advisor@* -- I'm having trouble

17  reading this -- *fbusinesshelp.com*.

18  A.   Yes, sir.

19  Q.   Okay.  And who's it to?

20  A.   Myself.

21  Q.   Okay.  And who is sending you that e-mail?

22  A.   Mr. Guy Jean-Pierre.

23  Q.   And is that another e-mail associated to Mr. Pierre --

24  Jean-Pierre?

25  A.   Yes, sir.

Direct - Sears

1   Q.   And what is Mr. Guy Jean-Pierre telling you in this
2   e-mail?
3   A.   He reviewed the note again and everything seems fine
4   and exactly as we discussed earlier.  He does, however, have
5   a question for me on the original note and wanted to plan on
6   discussing it about 2:00 p.m. my time if it was
7   convenient.
8   Q.   Do you know what note he's talking about in his e-mail?
9   A.   Well, subject matter says forward forward:  "FSPM SGI
10  STA," I would imagine August 2013 would have to be something
11  to do with Bayside because those were the investors that
12  bought the note.
13  Q.   Sir, I need you to make sure you speak into the mic.
14  A.   I apologize.
15  Q.   We have a reporter.  I need to hear you, the jury needs
16  to hear you, the judge needs to hear you, and counsel need
17  to hear you, so just make sure you speak into that.
18        Okay.  And let's go up to the top here in the
19  e-mail.  I'm sorry, can we just go back down real quick.
20        And that's -- do you recognize that address?
21  A.   Now I don't recognize that particular address.  Not
22  Pompano.
23  Q.   Whose address do you believe that to be?
24  A.   I believe that to be Mr. Jean-Pierre's.
25  Q.   And that would include the phone numbers?

Direct - Sears

1    A.   Yes, sir.

2    Q.   And the fax number?

3    A.   The phone number, yes.  The fax number I never paid

4    attention to, honestly.

5    Q.   Okay.  Let's go to the top of the e-mail.  Okay.  And

6    once you received the e-mail from Mr. Guy Jean-Pierre, what

7    did you do with the e-mail?

8    A.   I forwarded it.

9    Q.   To who?

10   A.   Mr. Scott Dittman.

11   Q.   And why are you forwarding an e-mail from Guy

12   Jean-Pierre about the Bayside note?

13   A.   Because Bayside is holding securities in the public

14   company that Mr. Dittman is the CEO of.  I believe there

15   were terms in the note that said that the company had to

16   approve the sale of the note.  So, of course, he would have

17   to be copied in any and all things to do with the sale or

18   liquidation of the note.

19   Q.   Okay.  And this is during the same time frame, about

20   five days before the e-mail that you just discussed

21   regarding the Meadpoint note being sold.

22            MR. GOODREID:  Objection.  Leading.

23            THE WITNESS:  This --

24            THE COURT:  Sustained.

25   BY MR. SIBERT:

Direct - Sears

1      Q.   How many days before --
2      A.   It -- well, go ahead.  Ask your question.
3      Q.   What's the date of this e-mail?  What's the date of
4      this e-mail?
5      A.   Which one are you talking about now?  The August 19th,
6      2013?
7      Q.   Government Exhibit --
8      A.   372-MMM?
9      Q.   That's correct.
10     A.   It's August 19th.
11     Q.   Okay.  And what's the date of the e-mail that you were
12     discussing the sale, which is Exhibit 155?
13     A.   August 13th.  August 13th.
14     Q.   How many days in between the 15th and the 13th?
15     A.   That would be five.
16     Q.   There's five days between the 15th and the 13th?
17     A.   Two -- actually, it's not the 15th and the 13th, it's
18     the 19th.  Isn't it?  372-MMM is August 19th, and August
19     13th.
20     Q.   You're correct.  Five days?
21     A.   Yeah.
22     Q.   I'm sorry, it's wrong on my list.
23     A.   I was like, I know it's hot in here, but I can still
24     count.  I thought I got it wrong.
25     Q.   Can I have Exhibit 133, please.  All right.

Direct - Sears

1          Can you take a look at Government Exhibit 133.

2     A.   Yes, sir.

3     Q.   Do you recognize Government Exhibit 133?

4     A.   Yes, I do.

5     Q.   Let's focus on the bottom first.  Can you explain what

6     you're e-mailing to *144stock@scottsdalecapital.com*?

7     A.   The e-mail says, "This morning you will be" -- "This

8     morning you will be receiving the certificate and stock

9     power for the attached SCA named document."  I don't know

10    what that is.  "The other attachment is just the forwarded

11    thread from the last deposit.  I am drawing down from the

12    same note you already have on file.  Hopefully I got this

13    right the first time.  Thank you."

14    Q.   Okay.  I guess we need to go down one more.  If you

15    look at the screen, the one I'm circling.

16    A.   Okay.

17    Q.   What are you e-mailing the broker about?

18    A.   I was e-mailing Mr. Ashton saying I was wanting to

19    open -- I was planning to open an account with his firm.

20    Q.   For what?

21    A.   For Meadpoint Venture Partners.

22    Q.   And this is in April of 2013?

23    A.   April 12th.

24    Q.   And can we just go to the top.  Once you received an

25    e-mail back, you forwarded another e-mail to Scottsdale; is

Direct - Sears

1    that correct?

2    A.    This bottom one says April 12th and the top one's

3    August 19th.  I'm sorry, I'm not following, sir.

4    Q.    All right.  Well, let's just talk about the August

5    19th, 2013, e-mail.  What are you e-mailing Scottsdale

6    Capital there about?

7    A.    I'm letting them know that they will be receiving a

8    certificate and a stock power for the attached SCA named

9    document.  And I said the other attachment is just forwarded

10   from a thread, from the last deposit.

11            I'm sorry, I'm just not following the document.

12   Q.    What do you mean by "hopefully I got it right the first

13   time"?

14   A.    Probably exactly what I said.  Hopefully I got it right

15   the first time.  There seems to be so many problems with

16   notes and deposits and lawyers and they always need

17   something else, these brokerage firms.  And no matter what

18   you send them, they always need something else.  So I was --

19   hopefully I was trying to be efficient.

20   Q.    All right.  If you look on the screen there, I circled

21   the subject.  What's the subject say?

22   A.    Forward:  "Meadpoint Venture Partners FSPM."

23   Q.    So Meadpoint is you.

24   A.    Right.

25   Q.    And FusionPharm is your brother-in-law.

Direct - Sears

1    A.   FusionPharm is the security that I'm referencing in the

2    deposit of the certificate.

3    Q.   Okay.

4    A.   Which my brother is the CEO of, yes.

5    Q.   Thank you.  All right.  Can we look at Government

6    Exhibit 81.

7         Do you recognize this exhibit, sir?

8    A.   No, I don't.  It looks --

9    Q.   Who wrote the e-mail?

10   A.   It looks like it could be mine, but I didn't initial

11   this one, so I didn't -- I don't remember it.

12   Q.   Okay.  Well, we'll just work off -- is that your e-mail

13   address?

14   A.   Indeed, it is.

15   Q.   You've said that several times, right?

16   A.   Yes, sir, I did.

17   Q.   All right.  And when is the e-mail sent?

18   A.   Tuesday, August 27th, 2013.

19   Q.   And who are you sending the e-mail to?

20   A.   Joanna at Pacific Stock Transfer.

21   Q.   And what's the subject?

22   A.   MDPT, which would be Meadpoint.

23   Q.   And what are you attaching to the e-mail?

24   A.   The FSPM share to "Scholz, Thayden, Thayden, 8-26-13."

25   Q.   And can we look at Government Exhibit 82.  Do you

Direct - Sears

1    recognize Government Exhibit 82?

2    A.   Yes, I do.

3    Q.   And what is that?

4    A.   That is a e-mail.

5    Q.   And from who?

6    A.   Ms. Joanna DiBella at Pacific Stock Transfer.

7    Q.   All right.  Let's blow it up.

8         And what is Ms. DiBella telling you?

9    A.   Asking me for everything that I forgot that I thought I

10   was so efficient about in the first e-mail.  She needs the

11   following:  The note, the agreements between me and the

12   shareholders, an opinion letter that needs to be discussed,

13   the transaction, statements of nonaffiliation, documents for

14   Richard, instructions for delivery.

15   Q.   Okay.  All right.  I need to bring back up 156, please.

16   Can you look at Government Exhibit 156.

17   A.   Yes, I have it, sir.

18   Q.   Sir, if you look on your screen -- can you blow that

19   up, please -- what is Mr. Thaden telling you?

20   A.   He's telling me -- he said, "You guys figure it out.  I

21   just want to satisfy the broker of the trust where the funds

22   are coming from and where the" funds -- "stock certificates

23   are going into."

24   Q.   And that's Mr. Thaden to you; is that correct?  You're

25   Bill.

Direct - Sears

1    A.   Yes.

2    Q.   Okay.  And --

3    A.   Why would he want to satisfy the broker where the funds

4    are coming from?  That's his money --

5    Q.   What's your response back to Mr. Thaden?

6    A.   "Ok I have got it down on the paperwork.  Now as far as

7    the free, with 1 million shares in your name solely, you

8    would be subject to a trickle rule.  Basically considered an

9    insider.  We have only 5.6 issued and outstanding and 1

10   million puts you over the 10 percent realm.  So you need a

11   second company or persons name.  In addition, I'll need the

12   tax ID/SSN for the transfer agent.  I'll have it all wrapped

13   up next week.  Thank you."

14   Q.   And so Mr. Thaden couldn't take control of the note --

15   that portion of the note himself?

16   A.   He could have.

17   Q.   But then he would be over 10 percent.

18   A.   He's legally still over 10 percent because he and his

19   wife are together under the same roof, he still falls under

20   144, sir, so he decided to split it up.

21   Q.   But he split it up -- what I'm saying here is you were

22   advising him about that?

23   A.   Excuse me?

24   Q.   You were advising him about that?

25   A.   I was advising him because he wanted free trading

Direct - Sears

1    shares in an earlier e-mail is what he was asking for that

2    if he did indeed take it in his name, he would be subject to

3    a restriction.

4    Q.   Okay.  And who wrote the legal opinion letters for the

5    sale -- for the sale of the Meadpoint note?

6    A.   At this time, there was two legal opinions that were

7    written; one was by Mr. Jean-Pierre, the other one was

8    another securities lawyer.

9    Q.   So at least one was written by Mr. Guy Jean-Pierre?

10   A.   Yes.

11           MR. SIBERT:  Okay.  Your Honor, at this time, the

12   Government would like to introduce the next set of exhibits,

13   which is three exhibits.

14           THE COURT:  How have you labled that in your

15   e-mail?

16           MR. SIBERT:  I believe it's the fourth one.  It

17   starts with Exhibit 383.

18           THE COURT:  Oh, you called the fourth block.  Okay.

19   Go ahead.

20           MR. SIBERT:  Your Honor, at this time, the

21   Government would like to introduce Government Exhibits 383,

22   107, 393.

23           THE COURT:  And these are stipulated?

24           MR. SIBERT:  They are, Your Honor.

25           THE COURT:  All right.  Given the stipulation of

1    the parties, Government Exhibits 383, 107 and 393 are

2    admitted into evidence and may be published to the jury.

3        (Government's Exhibits 383, 107 and 393 received)

4            MR. SIBERT:  May I approached your courtroom deputy

5    to --

6            THE COURT:  Yes.

7            MR. SIBERT:  Thank you.

8    BY MR. SIBERT:

9    Q.   Okay, sir, can you please look at Government Exhibit

10   383.

11           MR. SIBERT:  Your Honor, may I have a moment?

12           THE COURT:  You may.

13   BY MR. SIBERT:

14   Q.   Do you recognize Government Exhibit 383?

15   A.   Yes, I do.  Yes, I do.

16   Q.   Okay.  And what is Government Exhibit 383?

17   A.   It is an e-mail, sir.

18   Q.   Okay.  And what does the e-mail -- who sent the e-mail?

19   A.   I sent the e-mail.

20   Q.   To who?

21   A.   Scott Dittman.

22   Q.   And what's the date?

23   A.   June 20th, 2011.

24   Q.   Okay.  And what is the subject about?

25   A.   Stock.

Direct - Sears

1    Q.   Okay.  Can you please explain to the jury what you're
2    writing in this e-mail to Mr. Scott Dittman.
3    A.   I'm writing to Mr. Dittman, I'm saying, "I guess I read
4    it wrong.  The cert for 182,050, it was late when I pulled
5    it out on Friday evening.  Any way, the deal will be
6    structured whereas we can have some free anyway.  It's just
7    something we need.  Sandy has the memory key."
8    Q.   Okay.
9    A.   I have no idea what this is on.
10   Q.   Do you understand what cert is?
11   A.   Yeah, it's a certificate.
12   Q.   Okay.  And so you're talking about a certification for
13   182,050.  What is 182,050?
14   A.   I'm not sure.  I would imagine it would probably be for
15   an amount of shares.
16   Q.   Okay.  Well, what's the subject of this e-mail?
17   A.   Stock.
18   Q.   And so you testified before, certification means
19   certifications for securities or stock.
20   A.   Sure, right.
21   Q.   Right?  So what do you believe 182,050 is?
22   A.   I just said, stock.
23   Q.   So you used the word, "we" correct?
24   A.   Yes, I did.
25   Q.   Have some free anyway.  What do you mean by "free

Direct - Sears

1    anyway"?

2    A.    That was probably -- I mean, I don't remember the exact

3    doc that we have -- there was many suitors flying around at

4    that time.  The only thing that I can remember that that

5    could be pursuant to was somebody trying to purchase the

6    company or take control of the company.  And any time you do

7    something to that effect, you want to make sure that you

8    have some equity that could be liquidated in case they run

9    the company into the ground.

10   Q.    Are you talking --

11   A.    That's just speculation because I don't remember this

12   document.

13   Q.    Are you --

14   A.    I'm just trying to help you out.

15   Q.    Are you talking about free shares?

16   A.    Indeed, sir.

17   Q.    Free stocks to be able to trade?

18   A.    Yes, sir.

19   Q.    And you said "we" --

20   A.    Yes.

21   Q.    -- that means you and who else?

22   A.    I -- me -- I don't know.  I don't remember the exact

23   transaction, sir.

24   Q.    Who is the e-mail to?

25   A.    It says to Scott Dittman.

Direct - Sears

1    Q.   What account are you using for Mr. Dittman?

2    A.   His FusionPharm account.

3    Q.   There's no one else on that e-mail, correct?

4    A.   No, there is not.

5    Q.   Can I have Government Exhibit 107.  Can you blow up

6    that top -- thank you.

7         Do you recognize Government Exhibit 107?

8    A.   One second, sir.  Yes, I do.

9    Q.   Okay.  And what is Government Exhibit 107?

10   A.   It is an e-mail.

11   Q.   And who wrote the e-mail?

12   A.   I'm writing it from yet another e-mail address at

13   *wjsears@gmail.com*.

14   Q.   Okay.  And who are you writing the e-mail to?

15   A.   Leslie at Pacific Stock Transfer.

16   Q.   And what are you -- what's the subject?

17   A.   "FSPM Preferred Stock Certificate."

18   Q.   FusionPharm preferred stock certificate?

19   A.   Yes, sir.

20   Q.   And what are you telling Ms. Leslie in your e-mail

21   there?

22   A.   That "The below shareholder has yet to receive his

23   certificate.  I was asked to follow up on it.  Was it sent

24   Fed Ex?"

25   Q.   Okay.  And who is Robert Dittman?

1    A.    That would be my brother -- other brother-in-law.

2    Q.    All right.  And so why are you contacting Pacific Stock

3    Transfer Agency about a certificate -- a stock certificate

4    for a Robert Dittman regarding FusionPharm?

5    A.    Once again, just like Mr. Kocinski and many of the

6    other things that went along with the public shell, I had

7    the relationship so we are the initial contact for.  So I

8    was the one that beared the duty of being Radar O'Reilly and

9    having to communicate all these messages.

10   Q.    You said bear the duty.  Who's bearing that duty?

11   A.    For some reason, everybody wanted me to always have to

12   communicate with these people.  It's like in the military,

13   you know -- you know what a glue man is?

14   Q.    Sir, I'm asking you a question.

15   A.    I'm answering your question.

16   Q.    Okay.  Well, you say "everyone."  Who do you mean by

17   "everyone"?

18   A.    Mr. Dittman, Mr. Jean-Pierre, Mr. Kocinski.  Anything

19   that had to do with anything that was previous to

20   FusionPharm.  Because I had already had the relationships,

21   everybody assumed that I should just keep going ahead and

22   communicating because I was the one that started it with

23   them before FusionPharm, you know, existed.

24   Q.    No one forced you to do this; is that right?

25   A.    No, sir.

Direct - Sears

1    Q.   Can I have Exhibit 393.

2         Do you recognize Exhibit 393?

3    A.   Yes, I do.

4    Q.   Okay.  And what is Exhibit 393?

5    A.   It is an e-mail.

6    Q.   Okay.  And from who?

7    A.   From myself using the William J. Sears account.

8    Q.   To who?

9    A.   Scott Dittman, FusionPharm.

10   Q.   On what date?

11   A.   That was on July 2d, 2012.

12   Q.   What are you talking to Scott Dittman about?

13   A.   I'm letting him know about a gross total amount of

14   capital.

15   Q.   Why don't you go into details about what you're telling

16   him about capital.

17   A.   Telling him how much -- how much was raised and what --

18   what would be taken out and what I would be able to pay.

19   Q.   So you're essentially, again -- this subject, what is

20   the subject?

21   A.   "Cash."

22   Q.   Okay.  Now, what is the 25 -- what is minus RS?

23   A.   That would be Richard Scholz's fee.

24   Q.   Is that $6,279?

25   A.   I would believe it is.

1    Q.   And why are you telling the CEO of FusionPharm that Mr.

2    Richard Scholz is being paid?

3    A.   I have no idea why I told him.  I think I was giving

4    him full disclosure as to how much money I had to pay him.

5    At this point, I believe I would have owed him money for

6    harem pods that needed to be built.

7    Q.   Did you ever --

8    A.   So he was constantly asking me for money to pay my

9    bill.

10   Q.   Okay.  So did you have a relationship with Mr. Richard

11   Scholz?

12   A.   Absolutely.  I've known Mr. Scholz since 1999.

13   Q.   Did you have a relationship with him here at this date?

14   A.   Indeed, I did, sir.

15   Q.   So do you know, was Mr. Richard Scholz doing -- what

16   was -- what type of work was Mr. Richard Scholz doing?

17   A.   Advertising and marketing.

18   Q.   For what?

19   A.   For the company.

20   Q.   And what was his -- what was he being paid to advertise

21   for the company?

22   A.   PharmPods.

23   Q.   No, I said:  What was he being paid to advertise for

24   the company?

25   A.   Cash.

Direct - Sears

1    Q.    Okay.  How much?

2    A.    Depended.

3    Q.    Depended on what?

4    A.    Depended on his performance.

5    Q.    Was it percentage or salary?

6    A.    It varied.  His -- you know, his bills varied each

7    month on what he did and how he did.

8    Q.    Okay.  And who was he advertising for?

9    A.    PharmPods.

10   Q.    Is that a company?

11   A.    It was the brand that I was representing that I had the

12   exclusive license to under Meadpoint.  I had the exclusive

13   license to sell the HID containers under Meadpoint.

14   Q.    Okay.  So you had a licensing agreement to sell; is

15   that right?

16   A.    That's right.  Exclusive.

17   Q.    And who gave you that exclusive licensing agreement?

18   A.    The public company that owns the product, FusionPharm.

19   Q.    So your brother-in-law, Scott Dittman, provided you

20   exclusive right to sell his containers?

21   A.    Yes, he did.  I paid for it.

22   Q.    All right.  Sir, can --

23            MR. SIBERT:  Actually, Your Honor, I've got --

24   we're coming towards the end of the exhibits here.  I have

25   one exhibit which I guess would be batch No. 5, which is

Direct - Sears

1  Exhibit 372-P --

2  THE COURT:  Is it stipulated?

3  MR. SIBERT:  It is, Your Honor.

4  THE COURT:  All right.  Given the stipulation of

5  the parties, Exhibit 372-P is admitted into evidence and may

6  be published to the jury.

7  (Government's Exhibit 372-P received)

8  MR. SIBERT:  Your Honor, may I approach the

9  witness.  This is the one that he signed and reviewed.

10  THE COURT:  All right.  Hand it to Ms. Frank.

11  MR. SIBERT:  I will.  Thank you.

12  BY MR. SIBERT:

13  Q.  Do you recognize Government Exhibit 372-P?

14  A.  Yes.

15  Q.  All right.  Now, let's focus on the bottom of the

16  e-mail, on the first page.  And it's up on your screen, so

17  we don't get confused.

18  A.  That's okay, it's the same document.

19  Q.  Okay.  Now, do you know who a Todd Kramer is?

20  A.  Yes, I do.

21  Q.  Who is Todd Kramer?

22  A.  He is a senior regulatory analyst.

23  Q.  For who?

24  A.  For FINRA.

25  Q.  And what is FINRA?

Direct - Sears

1    A.    It's an acronym for something.

2    Q.    Do you know what FINRA does?

3    A.    They regulate the stock market.

4    Q.    And do you know what particular stock market?

5    A.    The entire stock market.  Every broker/dealer has to

6    deal with them.

7    Q.    And according to this e-mail, Mr. Kramer sent an e-mail

8    to your brother in law, Scott Dittman; is that right?

9    A.    Yes, it is.

10   Q.    And what is he asking from Mr. Dittman?

11   A.    He's asking for Mr. Dittman to -- he's requesting some

12   more documents.  He wants all documents pertaining to his

13   acquisition of Baby Bee Bright and transfer agent

14   shareholders and positions report from a specific date of

15   March 1st, 2011, to September 30, 2011.

16   Q.    Okay.  Let's go back up to D.  What else is he asking

17   under D?

18   A.    Any correspondence with former CEO Fred Dahlman and

19   William Sears pertaining to the acquisition, including

20   e-mailse-mails et cetera.  D would be terms of acquisition

21   also, he was asking for.

22   Q.    Okay.  And also let's look at this important one.  How

23   about legal opinions?

24   A.    Legal opinions, that would be C.

25   Q.    Contracts?

Direct - Sears

1     A.    B.

2     Q.    And what's A?

3     A.    Signed agreements, A.

4     Q.    All right.  So looking for various documents.

5     A.    Yes, he is.

6     Q.    All right.  Can we go to the top of the e-mail, please.

7     And if you look on the screen here, just the top of that

8     e-mail we just went over, that was sent on what date?

9     A.    October 7th, 2011.

10    Q.    And then at 8:34 a.m.; is that right?

11    A.    Yes, sir.

12    Q.    Two minutes later on the same date, what do you receive

13    from your brother-in-law, Scott Dittman?

14    A.    It will be 12 minutes later, I get an e-mail from Scott

15    Dittman saying, FYI, need to get involved -- I need to get

16    Guy involved at this point.

17    Q.    What does FYI mean?

18    A.    For your information.

19    Q.    And what is Mr. Dittman asking you?

20    A.    Does he -- should he get, you know, Guy Jean-Pierre

21    involved at this point?

22    Q.    Okay.  Well, he didn't play any role in FusionPharm.

23    Why would the CEO be e-mailing you about a FINRA

24    investigation where a request from FINRA -- why would he be

25    e-mailing you asking you "Do we need to get the corporate

1    legal lawyer involved?"

2    A.   He was e-mailing me because I was the one that put the

3    deal together for him and Fred Dahlman in the first place.

4    Therefore, Mr. Dittman has no experience at that time

5    whatsoever in the securities industry or running a public

6    company and he's asking my opinion if he should get the

7    corporate lawyer involved.

8    Q.   And this is your FusionPharm e-mail address, right?

9    A.   Yes, it is.

10   Q.   Now, we went through some testimony earlier about

11   MicroCap.  You sold that MicroCap company approximately two

12   weeks, is that correct, from that date of the e-mail?

13   A.   That was earlier in the day, sir.  I don't know the

14   dates.  Say it is.

15   Q.   All right.  Well, can you recall the date that this is

16   October 7th, 2011?

17   A.   I sure can.

18         MR. SIBERT:  Your Honor, I believe this is batch 6,

19   starts with Government Exhibit 372-EEE.

20         THE COURT:  All right.  Go ahead.

21         MR. SIBERT:  And these have been stipulated to.

22   372-EEE, Exhibit 115, Exhibit 124, Exhibit 85.

23         THE COURT:  All right.  Given the stipulation of

24   the parties, Government Exhibits 372-EEE, 115, 124, and 85

25   are admitted into evidence and may be published to the

                            Direct - Sears

1     jury.

2          (Government's Exhibits 372-EEE, 115, 124, and 85

3     received)

4          MR. SIBERT:  May I approach your courtroom deputy

5     and hand the witness the documents?

6          THE COURT:  You may.

7          MR. SIBERT:  Thank you.

8     BY MR. SIBERT:

9     Q.   Okay, sir, can you please look at Government Exhibit

10    372-EEE.

11    A.   Yes, sir.

12    Q.   Do you recognize that document?

13    A.   Yes, I do.

14    Q.   All right.  Let me go ahead and -- can we go down to

15    the second page, please.  All right.  Let's start from the

16    second page of this document.  Now I'm going to circle --

17    can we have that blown up?  Shrink it a little bit.

18          Okay, sir, can you look on your screen here?

19    A.   I'm looking.

20    Q.   All right.  Do you recognize that e-mail?

21    A.   Yes, I do.

22    Q.   Okay.  And what is that e-mail pertaining to?

23    A.   That is an e-mail from the corporate lawyers Stuart

24    Leudan, to myself talking about opening up a bank account, I

25    should need the following.  And he goes into detail of the

Direct - Sears

1    documents that I will need to do so.

2    Q.   All right.  And why is Mr. Stuart e-mailing you about a

3    bank account?

4    A.   Because he set up the corporations to operate, so I

5    guess he was being thorough and let me see if I sent him

6    something prior.

7    Q.   What corporation are we talking about?

8    A.   That would be Vertifresh and its whole -- and its --

9    and VF Management, Inc.  I think Vertifresh was a wholly

10   owned subsidiary of VF Management.  I don't remember how

11   Stuart set it up, sir.  They were intertwined somehow.

12   Q.   Can we move this up a little bit, please.  To the top

13   of page 2.

14        Okay, sir, this is an e-mail being sent by you; is

15   that correct?

16   A.   Yes, sir.

17   Q.   To Mr. Stuart Leudan?

18   A.   Yes, sir.

19   Q.   And what are you just inquiring in there?

20   A.   It says, subject:  "RE Vertifresh."  There are no

21   attachments.

22   Q.   And this date is about March 9th, 2012?

23   A.   That's what it says.

24   Q.   Page 1, please, at the bottom.  Okay.

25        Just real quick, you have an e-mail again from Mr.

Direct - Sears

1    Stuart Leudan; is that correct?

2    A.   Yes, sir.

3    Q.   And who's he sending that e-mail to me?

4    A.   Myself.  And carboned Scott Dittman.

5    Q.   Again about Vertifresh?

6    A.   No, it was *william@williamjsears.com* is what it says.

7    To.

8    Q.   Okay, but cc, Scott Dittman?

9    A.   Yes, sir.

10   Q.   Can you go up, please.  Over this e-mail.  And just

11   down a little bit.

12          That's an e-mail by you; is that correct?

13   A.   Yes, sir.

14   Q.   March 22d, 2012?

15   A.   Yes, sir.

16   Q.   And who are you sending that e-mail to?

17   A.   *guy@fusionpharminc.com*.

18   Q.   Do you recall what you're sending him there?

19   A.   No, I don't.  I'm sorry.

20   Q.   What's the subject?

21   A.   Excuse me, sir?

22   Q.   What is the subject?

23   A.   Subject?

24   Q.   I circled it for you on the screen.

25   A.   I've got two circles.  Oh, forward:  "Vertifresh."

Direct - Sears

1    Q.   Okay.  Let's look at this e-mail.  Who's that e-mail

2    from?

3    A.   *guy@fusionpharminc.*

4    Q.   To who?

5    A.   *william@williamjsears.com.*

6    Q.   And what's the subject?

7    A.   "Vertifresh."

8    Q.   Okay.  And what is he sending you?

9    A.   "Attached please find the draft of the proposed SPA.

10   Call me if you wish to discuss."

11   Q.   What is SPA?

12   A.   Stock purchase agreement, I would imagine.

13   Q.   Okay.  So it was Mr. Guy Jean-Pierre that drafted this

14   agreement?

15   A.   It would appear so.

16   Q.   Do you recall the terms of the agreement?

17   A.   No, I do not, sir.

18   Q.   Okay.  Can you just go down to the top of this e-mail,

19   please.

20        And, finally -- finally, you get the FusionPharm

21   Dittman stock purchase agreement regarding Vertifresh; is

22   that correct?

23   A.   Yes.

24   Q.   And you're sending the e-mail --

25   A.   Yes.

Direct - Sears

1    Q.   -- to your brother-in-law, Scott Dittman?

2    A.   No, this document's for Robert Dittman, though.

3    Q.   Well, who are you sending it to?

4    A.   I sent it to Scott Dittman, but the document's for

5    Robert, as I look at it.

6    Q.   Do you have the document in front of you?

7    A.   Yeah, it's right here.

8         MR. SIBERT:  Your Honor, may I have a minute?

9         THE COURT:  You may.

10   BY MR. SIBERT:

11   Q.   All right, let's look at page 3 of the attachment.

12   A.   Okay.

13   Q.   Now, you stated earlier Vertifresh was your company; is

14   that right?

15   A.   Yes, it was.  For a period of time.

16   Q.   All right.  Can you focus in up here, please.

17        Now, this -- as you just testified to, this is the

18   stock purchase agreement that was sent to you by Mr. Guy

19   Jean-Pierre; is that right?

20   A.   Yes, sir.

21   Q.   All right.  And essentially the agreement is for -- why

22   don't you just read the underlining that I'm writing here on

23   the screen.

24   A.   VF Management, Inc., the owner of Vertifresh as seller,

25   the seller, Robert -- seller and Robert L. Dittman, an

Direct - Sears

1    individual.

2    Q.   So it's a purchase agreement between you, Vertifresh,

3    and Robert Dittman?

4    A.   VF Management, Inc., Vertifresh, and Robert Dittman,

5    yes, sir.

6    Q.   And this is what Mr. Robert Dittman would be

7    purchasing; is that correct?

8             MR. GOODREID:  Objection.  Leading.

9             THE WITNESS:  No.

10            THE COURT:  Sustained.

11   BY MR. SIBERT:

12   Q.   Okay.  Sir, what does this state in the line that I

13   just circled on your --

14   A.   You said the purchaser is purchasing.  The purchaser is

15   the owner of 175,480 shares, the shares of Class A preferred

16   stock of FusionPharm.  He owns it, he's not the purchaser,

17   sir.

18   Q.   I stand corrected.  So who owns 175,480 Class A shares

19   of FusionPharm?

20   A.   Robert Dittman.

21   Q.   That's your other brother-in-law?

22   A.   Indeed, it is.

23   Q.   What do the terms mean in the paragraph that I just

24   circled that starts with, "Whereas, purchaser"?

25   A.   It says, "The purchaser desires to purchase 50 percent

Direct - Sears

1    of the ownership of the seller's ownership interest sold and

2    the company and the seller desires to sell said ownership

3    interest sold to purchaser in exchange for the shares and

4    upon further terms and conditions herein set forth."

5    Q.   So correct me if I'm wrong, but if I understand what

6    you said, Mr. Robert Dittman is going to purchase 50 percent

7    of your company, Vertifresh, for all 175,000 preferred

8    Class A shares of FusionPharm?  Is that right?

9    A.   In this particular document, that's not executed,

10   there's a couple of copies of this, that went around that

11   got changed like all the other documents we ever did a

12   zillion times.

13   Q.   I'm asking about the documents in front of you.

14   A.   That's what this particular document says, yes, sir.

15   Q.   And so it was -- who drafted this document that made

16   the agreement that 50 percent of Vertifresh would be owned

17   by Robert Dittman for the equivalent of 17 million common

18   shares of FusionPharm stock?

19   A.   No, it's for 175,480 shares.

20   Q.   Of preferred.

21   A.   Which is -- okay.

22   Q.   All right.  Now, you know that --

23   A.   I'm just going by what the document said.

24   Q.   Do you know about a reverse split?

25   A.   I'm familiar with the term.

1   Q.   Do you know about a reverse split in FusionPharm?

2   A.   I'm familiar with it.

3   Q.   Do you recall what this reverse split was?

4   A.   No, I don't.

5   Q.   All right.

6   A.   It was pretty heavy, though.  It had to be.

7   Q.   What do you mean by heavy?

8   A.   I mean, the previous company had 190 bazillion shares,

9   so it had to be heavy.

10  Q.   I don't understand the terms of gravity and weight when

11  it comes to investments.  What do you mean by heavy?  Can

12  you give me an explanation --

13  A.   Had to be a large reverse, very hard reverse --

14         THE COURT:  You need to speak into the mic.

15         THE WITNESS:  It had to be a large reverse.

16  BY MR. SIBERT:

17  Q.   Okay.  And can you describe to me what you mean "large

18  reverse."

19  A.   Large reverse -- to keep the numbers simple, if

20  there's, you know, a thousand shares and you want to do a 10

21  to 1, simple math tells you it's -- how many do you have if

22  you reverse it?

23  Q.   Okay.  So can you give me an example?  If you had 10

24  preferred shares, according to your example, how many common

25  shares would you have?

Direct - Sears

1    A.    It all depends on what the -- the -- the certificate of

2    designation would define what the preferred converted into

3    common would be.  So whatever that number is, that was just

4    math.  So that's probably how you're getting your 17 million

5    whatever it is once it's converted.

6    Q.    All right.  Do you know essentially what one preferred

7    share was worth in FusionPharm in common stock?

8    A.    I don't remember off the top of my head.  It was either

9    2 or -- anywhere from 2 to 10 was the norm, I --

10   Q.    Two to 10 shares?

11   A.    Yeah, 2 to 10 shares.

12   Q.    Okay.

13   A.    Yeah.  It's pretty common.

14   Q.    Okay.  Can you please look at Government Exhibit 115.

15   A.    Yes, sir.

16   Q.    Do you recognize this document?

17   A.    Yes, I do.

18   Q.    Okay.  And can we -- what is this document?

19   A.    This is an e-mail sent from myself on July 31st, 2012,

20   to a Joslyn at Pacific Stock Transfer.  The subject matter

21   is FSPM cert.

22   Q.    And can we scroll down, please.  I'm sorry, can you go

23   back to the top.

24         Do you know what the document was scanned?

25   A.    Judging by its body, it says, "Please find attached the

1    complete due diligence file for the transfer.  Page eight is
2    the one you were looking for.  Many thanks in advance."
3    Q.   I want to go back.  Can you please bring up -- let me
4    check the list real quick before I show it to the jury, Your
5    Honor.
6           Your Honor, I'd like to show the jury Exhibit 92;
7    however, I'm not sure if that's been -- I know it's been
8    stipulated to, but it has not been offered, I don't believe,
9    at this point.
10          THE COURT:  Ms. Frank, do you show that being in?
11          COURTROOM DEPUTY:  I believe that it was yesterday.
12          THE COURT:  92?
13          COURTROOM DEPUTY:  Yes.
14          MR. SIBERT:  She would probably know better than I
15   would at this point.
16          THE COURT:  That's her job to keep track of that.
17   That's why we had you slow down when you were rattling off
18   those numbers.
19          MR. SIBERT:  I appreciate that.  Thank you.  Thank
20   you.
21   BY MR. SIBERT:
22   Q.   Can you -- can you scroll up to the second page of this
23   exhibit.
24          Can you zoom in here, please.  Okay.  May I have a
25   moment, Your Honor?

Direct - Sears

1              THE COURT:  You may.

2              MR. SIBERT:  Your Honor, I'm going to move on.

3     BY MR. SIBERT:

4     Q.   Can I have -- can we please look at Government Exhibit

5     124.

6              Sir, can you look at that exhibit.

7     A.   Yes, sir.

8     Q.   And do you recognize this exhibit?

9     A.   Yes, I do.

10    Q.   Okay.  And what is this exhibit?

11    A.   This is an e-mail.

12    Q.   Okay.  And what is the e-mail about?

13    A.   My e-mail is from myself at the william -- sorry,

14    *williamjsears.com* address.  It was sent Friday, August 10th,

15    2012, to *144stock@scottsdalecapital.com*, which is the

16    broker/dealer.  Subject:  "FSPM Deposit - Microcap

17    Management."

18    Q.   All right.  Can you look at the e-mail that Craig sent

19    you from Scottsdale Capital?  Do you have that section blown

20    up?

21             Okay.  And what is Craig D'Mura asking you about in

22    his e-mail?

23    A.   "I want to confirm we received the issuer certification

24    letter and that you deposit" -- your "deposit is pending

25    final legal review.  As a clarifying point, are you or your

Direct - Sears

1    company engaged in any type of stock promotion activity with

2    respect to FSPM?"

3    Q.   All right.  So you faded off there at the end.

4    A.   "Are you and your company engaged in any type of stock

5    promotion activity with respect to FSPM?"

6    Q.   And so essentially FSPM is FusionPharm?

7    A.   Yes, sir.

8    Q.   All right.  Can we go back to the top.

9         And we're talking about MicroCap here; is that

10   correct?

11   A.   That's right.

12   Q.   And your answer to his question?

13   A.   "No!!! On both."

14   Q.   And can I have Exhibit 85.

15        Do you recognize Government Exhibit 85?

16   A.   Yes, I do.

17   Q.   Let's start at the bottom.  Who's e-mailing you?

18   A.   A Ms. Lisa Upham.

19   Q.   Okay.  And what's the subject?

20   A.   "Issuances."

21   Q.   Okay.  And what is she asking you in the e-mail?

22   A.   The payment isn't making the balance in full, "but

23   here's a statement before I run the card payment so you can

24   make it current."

25   Q.   All right.  And how much is open?

A.    $918.86.

Q.    So what does this regard referring to payment with Pacific Stock Transfer agency?

A.    I don't know the exact trans- -- what the transfer was for directly, but if -- are you talking about the existing balance?

Q.    Well, maybe a better question is:  Why would Mrs. Lisa Upham be e-mailing you regarding payment?

A.    Because when I first took over -- or was going to take over the Baby Bee Bright shell before Scott Dittman and FusionPharm existed, I was owed a tremendous amount of money, and part of the deal was for me to squash down the debt, so I negotiated the debt down from about $45,000 to maybe 4- to 5 grand.

      Regardless of what happened with that vehicle, I guaranteed that I would pay that debt, so that debt followed me.

Q.    Do you have to pay the transfer agency?

A.    Excuse me?

Q.    Do you have to pay the transfer agency?

A.    As an individual?

Q.    Did you pay the transfer agency?

A.    Many times.

Q.    And is that what she's inquiring about?

A.    That's what she's inquiring about, sir.

Direct - Sears

1    Q.   Can you go up top, please.

2         And essentially here -- do you recognize that

3    e-mail?

4    A.   That is my e-mail.

5    Q.   And you're e-mailing Lisa Upham again?

6    A.   Yes, sir.

7    Q.   And what are you providing her when you're writing

8    "654"?

9    A.   A CCV code on the back of my credit card.

10   Q.   And that's like the three-digit code that allow for

11   someone to use a credit card?

12   A.   Yes, sir.

13   Q.   Okay.  Sir --

14        MR. SIBERT:  Your Honor, at this time, the

15   Government would like to move batch 8 of the exhibits that

16   were sent last night and it begins with Exhibit 389-A, and I

17   believe it runs through 389-D.

18        THE COURT:  And these are all stipulated to?

19        MR. SIBERT:  They are, Your Honor.

20        THE COURT:  All right, given the stipulation of the

21   parties, Government Exhibits 389-A, B, C, and D are admitted

22   into evidence and may be published to the jury.

23        (Government's Exhibits 389-A through 389-D received)

24        MR. SIBERT:  Your Honor, may I approach your

25   courtroom deputy to provide the documents?

Direct - Sears

1          THE COURT:  Yes.

2          MR. SIBERT:  Thank you.

3     BY MR. SIBERT:

4     Q.   Okay, sir, do you recognize Government Exhibits 389-A

5     through 389-D?

6     A.   I only see -- yes, I do.

7     Q.   Okay.  And it --

8     A.   Well --

9     Q.   -- what are those documents?

10    A.   These are transcriptions.

11    Q.   Of what?

12    A.   Of a conversation.

13    Q.   And how was the conversation being communicated?

14    A.   This, I believe, is -- this -- this, I believe, is via

15    Skype.  Excuse me.

16    Q.   So when you say "via Skype," do you mean Skype

17    messages?

18    A.   Yes, sir.

19    Q.   Okay.  Could you just blow up -- thank you.

20         Sir, can you look at the screen?  Who is wjsears66?

21    A.   I would assume it is myself.

22    Q.   All right.  Well, I don't want you to assume anything.

23    Can you look through these Skype messages and --

24    A.   There's a couple of different names that I recognize

25    that would have been mine, but that's why I'm saying

Direct - Sears

1    "assume."  There's a few of them here, sir.

2    Q.  Sir, do you recall reviewing these documents about two

3    days ago?

4    A.  I recall -- this was one of the very last ones and

5    skimming through it.

6    Q.  Did you mark that document?

7    A.  Yes, I did.  It was the very last one I did on that

8    day.

9    Q.  Okay.  Does that refresh your memory at all?

10   A.  I remember skimming through it.

11   Q.  So do you know who wjsears66 is?

12   A.  I would assume it is myself.

13   Q.  How about Mr. Don Marcusi?

14   A.  I would assume it is Mr. Jean-Pierre.

15   Q.  Why would you make that assumption based upon what you

16   see in this document?

17   A.  Because there are other screen names, for lack of a

18   better term, that I recall that were his.

19          THE COURT:  Can we get the exhibit -- the font

20   increased so that the jury can read the exhibit?

21          MR. SIBERT:  Yes, sir.  Can you increase that,

22   please.

23   BY MR. SIBERT:

24   Q.  Can you focus in on this area?

25   A.  Oh, much nicer.

Direct - Sears

1    Q.    Yeah.  Sorry about that, Your Honor.

2              So we just went through some questions regarding

3    essentially -- let's just talk about this.  This is the name

4    I was talking about, wjsears66; is that correct, the name

5    that I asked you about?

6    A.    Yes, it is.

7    Q.    And you're assuming that's you?

8    A.    Yes, sir.

9    Q.    When were you born?

10   A.    May 13th, 1966, sir.

11   Q.    And have you had a chance -- these are the messages; is

12   that correct?

13   A.    Yes.

14   Q.    Have you had a chance to review those messages?

15   A.    I perused them.

16   Q.    Does that help your memory --

17   A.    I didn't read every page and every message, sir, no.

18   Q.    The ones that you read, does that help your memory?

19   A.    Yes.  This sounds like a conversation that I would have

20   had.

21   Q.    Okay.  And who would you -- who would you have had the

22   conversation with?

23   A.    Guy Jean-Pierre.

24   Q.    And how do you know that's Mr. Guy Jean-Pierre?

25   A.    I don't know him as that screen name.  I'm assuming by

Direct - Sears

1    the familiarity of the message, itself.

2    Q.   Is there anyone else that you would have had a

3    conversation like in this exhibit?

4    A.   It sounds like -- it reads like a conversation I would

5    have had with Mr. Jean-Pierre.

6    Q.   So to the best of your memory, this is Mr.

7    Jean-Pierre's chat initiator?

8    A.   Yes, I believe that would be fair to say, sir.

9    Q.   Or maybe I'm not using the correct terminology.

10   A.   I don't know what it is either.

11   Q.   But is it confirmed as --

12   A.   Chat log.

13   Q.   Chat logs, chat --

14   A.   I'm guessing.

15   Q.   Okay.  Can you look at Exhibit 389-B.  And can we have

16   it blown up again?  Kind of the same thing.

17        Okay.  Do you know who billysears66 is?

18   A.   That's another one that I assume would be me.

19   Q.   And, again, same name from 389-A; is that correct?

20   A.   Yes, sir.

21   Q.   Okay.  And you would agree that billysears66 is under

22   the Chat Initiator; is that right?

23   A.   Yes, sir.

24   Q.   And this would be the message part, correct?

25   A.   Yes, it would.

Direct - Sears

1    Q.   And what is the message?

2    A.   Guy.

3    Q.   Is that Guy?

4    A.   Guy, as in Gee.

5    Q.   Can I have 389-C.  Same thing, please.  All right.

6         If you look on your screen there, do you know who

7    trader5280 is?

8    A.   That would have been mine.

9    Q.   That's yours?

10   A.   That one I remember.

11   Q.   You remember that one?

12   A.   Yes, I do.

13   Q.   Do you know who elcommandante1 is?

14   A.   Yes, Mr. Guy Jean-Pierre.

15   Q.   Okay.

16        MR. SIBERT:  Your Honor, there's three documents I

17   would like to show from another package.  They've already

18   been admitted into evidence.  It's a brief couple of

19   questions on these documents again.  May I approach your

20   courtroom deputy to hand to the witness?

21        THE COURT:  Yes, go ahead.

22        MR. SIBERT:  Thank you.

23        THE COURT:  So for clarity of the record, why don't

24   we identify which of the exhibits you just handed to Ms.

25   Frank.

Direct - Sears

1        MR. SIBERT:  Yes, Your Honor.  It's going to be

2   Government Exhibit 77, 81, and 133.

3        THE COURT:  All right.

4        MR. SIBERT:  Can I have 77 up again, please.

5   BY MR. SIBERT:

6   Q.   Sir, we talked about this e-mail, and I'm just going to

7   ask you a pretty -- real -- when you were sending that

8   e-mail to Mrs. -- *joanna@pacificstocktransfer.com*, where is

9   Pacific Stock Transfer?

10  A.   As my memory serves me, I believe it's in Las Vegas,

11  Nevada.

12  Q.   Okay.  Do you recall ever sending this e-mail in the

13  state of Nevada to Pacific Stock Transfer?

14  A.   I'm sorry?

15  Q.   Did you send this e-mail when you were in the state of

16  Nevada?

17  A.   I honestly couldn't tell you.

18  Q.   Did you ever do business from Nevada with Pacific Stock

19  Transfer on April 11th, 2013?

20  A.   I honestly don't recall, sir.

21  Q.   Where would you likely have sent this e-mail from?

22  A.   I have no -- I don't know.

23  Q.   Well, you testified --

24  A.   A computer, my house, my car.

25  Q.   Where is your house?

Direct - Sears

1    A.   Thornton, Colorado.

2    Q.   Is that where you sent most of your e-mailse-mails

3    April 11th, '13.  It would have either been in my home if it

4    was earlier in the morning, during the day -- '13 -- I

5    probably would have been at 4360 Vine Street, I believe, in

6    April of '13.

7    Q.   So either from your home in Thornton or in your office

8    in Denver?

9    A.   Or Commerce City, would have been my desk at Commerce

10   City.

11   Q.   And those are all in Colorado?

12   A.   Yes, sir.

13   Q.   Okay.  Can you look at Government Exhibit 81.  August

14   of 2013.  Where were you doing most of your e-mailse-mails

15   That probably would have been 4360 Vine Street, Commerce

16   City.

17   Q.   And Vine Street in Commerce City, that's Colorado?

18   A.   Yes, sir.  Sorry.  Vine Street would have been --

19   that's my mistake.  Vine Street is in Denver, not Commerce

20   City.  My mistake.

21   Q.   Okay.  But either way, from Colorado?

22   A.   Yes, sir.

23   Q.   And then this is to Pacific Stock Transfer; is that

24   correct?

25   A.   Yes, sir.

Direct - Sears

1    Q.   As you just testified, that's in Nevada?

2    A.   I believe so, yes, as I remember.

3    Q.   Can I have Government Exhibit 133.  Okay.  As you just

4    stated, this is an e-mail from August 13th, 2013.  I believe

5    you said you would either be on Vine Street in Denver,

6    Colorado, or your home?

7    A.   This is August 19th, sir.

8    Q.   August 19th --

9    A.   Right.

10   Q.   -- 2013?

11   A.   This one is August 27th.  Okay.  Go ahead.

12   Q.   And hopefully you didn't move, but based upon your

13   previous answer, you would be working out of the Vine

14   Street; is that right?

15   A.   If my memory serves me correctly, yes.

16   Q.   Or your home in Thornton?

17   A.   Yes, sir.

18   Q.   Both in Colorado?

19   A.   Yes, sir.

20   Q.   And where is Scottsdale Capital?

21   A.   Arizona.  Scottsdale, Arizona.

22   Q.   Thank you.

23   A.   You're welcome, sir.

24          MR. SIBERT:  Your Honor, may I approach?

25          THE COURT:  All right.  Counsel, all approach,

1    please.

2         (Sidebar conference held)

3         MR. SIBERT:  Your Honor, the last two exhibits when

4    it comes --

5         THE COURT:  Lower your voice, please.

6         MR. SIBERT:  The last two exhibits, when it comes

7    to the e-mails I would like to get through the witness, deal

8    with the affidavit that was -- that were written by the

9    employees on behalf of Mr. Guy Jean-Pierre with -- regarding

10   the Florida State Bar complaint.  I just want to let defense

11   counsel look at them again.

12        THE COURT:  Okay.

13        MR. SIBERT:  I've advised Mr. Sears, as the Court

14   instructed me, in the presence of Mr. Brown and Mr. Peter

15   Bornstein, his lawyer, about the instructions that the Court

16   gave me.  Mr. Peter Bornstein -- Mr. Peter Bornstein was in

17   the courtroom when the Court discussed the order.  And I

18   explained it to him that he cannot go any further than the

19   fact that there was a known complaint regarding the bar and

20   the SEC.

21        THE COURT:  Okay.  Have you reviewed these

22   exhibits?

23        MR. GOODREID:  Not recently.  I mean, at some

24   point, Your Honor.

25        THE COURT:  Okay.  All right.  So you asked for the

1     sidebar just to give --

2          MR. SIBERT:  Out of an abundance of caution, yes,

3     sir.

4          THE COURT:  That you're going to examine the

5     witness on these two documents?

6          MR. SIBERT:  Yes, sir.

7          THE COURT:  Do you want to say anything for the

8     record?  Do you want to see it?

9          MR. BARNARD:  Yes, please.

10          MR. GOODREID:  Okay.  So, Your Honor, I've studied

11     the exhibits and so -- I mean --

12          MR. BARNARD:  I've got a question.  It says we have

13     just been given Exhibits 236 and 237.  They both say

14     attachments.

15          MR. GOODREID:  Yeah.

16          MR. BARNARD:  Are the attachments -- or, excuse me,

17     236 says attachments.  Are the attachments what you wish to

18     admit and give to the witness?

19          MR. SIBERT:  I'm going to have to give the

20     attachments tomorrow because they're part of the bar package

21     and they're part of the SEC complaint package, and I can't

22     enter it -- obviously, the whole thing because of the

23     Court's ruling.  So I don't have time right now to pull out

24     the actual letters.  So eventually I will get the letters to

25     see if this witness recognizes them.

1      THE COURT:  Let's do this.  Since it's six minutes

2  to 5:00, why don't we pause.  And also we have to have a

3  colloquy with a juror.  Why don't we pause for now and then

4  I'd like all the four of you to put your heads together and

5  see if you can agree on how we're going to approach both

6  these two exhibits and the attachments and your testimony --

7  your testimony -- your questioning tomorrow and hopefully it

8  will be more smoothly done in the morning.

9      MR. SIBERT:  Yes, sir.  Thank you.

10     THE COURT:  Okay.

11     MR. GOODREID:  Yeah.

12     (End of discussion at sidebar)

13     THE COURT:  All right.  Folks, we're going to call

14  it a day.  Unfortunately, Mr. Sears, that means you have to

15  return tomorrow.  If you can return by 8:35 tomorrow.  And

16  why don't you just stay there for a moment.

17     THE WITNESS:  Yes, sir.

18     THE COURT:  Ladies and gentlemen of the jury, like

19  I did yesterday, I need to remind you, please do not do any

20  independent research into or discuss with anyone the fact,

21  the law, or the persons involved in this lawsuit.

22     As we did this morning, please plan on being back

23  in the deliberation room by 8:35.  We will endeavor to get

24  back to you by 8:45, but as you saw this morning, we can't

25  guarantee that.

1          Mr. Robinson, I'm going to ask you to stay behind

2     in the courtroom.  We're going to release the other 13.  I

3     have a couple of questions for you.  And -- and the lawyers

4     will, as well.

5          So the jurors, other than Mr. Robinson, are

6     released for the evening until tomorrow at 8:45.

7          (Jury left the courtroom at 4:55 p.m.)

8          MR. BROWN:  Your Honor, may Mr. Sears be excused?

9          THE COURT:  Hold on.  I know what I'm doing.

10         Mr. Sears, you're going to -- I'm releasing you for

11    the evening.  As I've instructed you before, please do not

12    discuss your testimony with any of the lawyers in this

13    litigation.  You're free, of course, to speak with your own

14    personal lawyer.

15         THE WITNESS:  Thank you.

16         THE COURT:  And like I said before, please be back

17    in the courtroom by 8:35 tomorrow morning.

18         THE WITNESS:  Yes, sir.

19         THE COURT:  All right.

20         THE WITNESS:  Thank you.

21         THE COURT:  Thank you.  All right.

22         Mr. Robinson, I want you to be at ease.  You've

23    done nothing wrong.  I know it could be a bit intimidating

24    right now that you're in this courtroom surrounded with all

25    these lawyers and this judge, and we're just trying to find

1    out what your concerns were yesterday and whether you

2    continue to have those concerns.

3            So let me ask it -- let me start by asking you

4    this:  I just want you to confirm on the record that you and

5    I did not have any discussion yesterday; is that correct?

6            THE JUROR:  Yes, sir.  Yes, sir.

7            THE COURT:  All right.  You did have a -- I

8    believe, two brief conversations with my two courtroom

9    deputies yesterday.

10           THE JUROR:  Yes, sir.

11           THE COURT:  Can you tell us in -- I don't want

12   anybody putting words in your mouth, tell us what your

13   concern was yesterday.

14           THE JUROR:  To be honest, it was just like -- when

15   we got in, you know, it's -- this is like my first, like,

16   actual, like, being a juror, and I just --

17           MR. BARNARD:  I'm sorry, Your Honor, could we see

18   if we have a microphone for the juror.

19           THE JUROR:  I can take one right here.

20           THE COURT:  Yeah, go ahead and take a mic.

21           MR. BARNARD:  Thank you, Judge.

22           THE JUROR:  Are we good?  Sorry.  Just initially

23   when I took the oath of being a juror, it just kind of -- it

24   was a slightly overwhelming -- you know, just like the

25   whole, like gravitas of the situation, you know, it's --

1    I'm, like, 28, but I still consider myself kind of a younger

2    person, just because like this is -- you know, the whole

3    process of growing up and doing all this real stuff, like I

4    was talking about civic duty, but like when it all came to

5    the front, it was just like very overwhelming and --

6              THE COURT:  Can you hold the mic just a little

7    further.  You have a strong voice.

8              THE JUROR:  Sorry, sorry.  It was just really

9    overwhelming.  And at the time, I just -- I felt like I -- I

10   just -- I just felt like kind of scared that -- like what if

11   the choice I make is the wrong choice, you know?  And I --

12   it was just a -- it was just a very overwhelming experience.

13   And I -- at the time, I felt like I -- just maybe I couldn't

14   have handled that because I don't -- you know, I didn't want

15   to, like, make -- it's kind of hard to put into words.  I

16   apologize.

17             I -- I just wanted to make sure that I was making

18   the best decision and I -- at the time, I was just afraid

19   that I -- I couldn't, you know, I -- it was just -- it felt

20   weird to me, just the whole concept, but, you know, sitting

21   here, you know, the last two days and trying to just, you

22   know, take, you know, very -- you know, detailed notes and

23   just try to keep -- you know, keep everything objective and

24   doing all that, I feel a lot -- I feel a lot better today.

25             I took your aide's words to heart, you know, what

1    you said, you know, just take a day, get through the first

2    thing, see how you feel, and then come into it, you know.  I

3    woke up this morning, I felt a lot better about, you know,

4    making a -- just coming in, I felt a lot better about the

5    whole process.  I think it was just the processes, it's

6    kinds of daunting, especially to someone, like -- you know,

7    I've never been, you know -- I did, like, went to jury duty

8    for like a -- like, county court once, you know, and I

9    didn't make it, you know.  So that was, like, my prior

10   exposure, and next thing you know it's like federal court,

11   it's like a big thing, like 11 days, it's just like very

12   overwhelming.  And I kind of -- I think I had like a mini,

13   like, panic attack just because I thought, This is real,

14   this is oh, gosh, you know, like --

15              THE COURT:  Right.  Well, that's what I said -- it

16   seems like longer ago than it is, but yesterday morning --

17              THE JUROR:  Yeah.

18              THE COURT:  I said this is -- you will have the

19   opportunity to make decisions that affect real persons and

20   have real-live consequences.

21              THE JUROR:  Yes, sir.

22              THE COURT:  All right.  Well, thank you for that

23   explanation.  Let me ask you, though, some follow-ups, very

24   specific questions.

25              THE JUROR:  Yes, sir.

1          THE COURT:  All right.  I think what I'm concerned

2   about, and I know the Government is concerned about, is the

3   following:

4          If -- and I emphasize "if" -- you and your 11

5   colleagues decide that with respect to one or more of the 29

6   counts that the Government has met its burden to prove

7   beyond a reasonable doubt all the elements of any one or

8   more of the counts, do you believe that you would be able to

9   return a guilty verdict, understanding that even though I

10   instructed you you are not to consider what sentence might

11   happen, obviously you're an intelligent person, you

12   understand there's a possibility that the defendant might

13   have a prison term.  And with that understanding, do you

14   feel that you are capable of returning a guilty verdict if,

15   if, the evidence supports such a verdict?

16          THE JUROR:  If the burden of proof were established

17   and all the necessary evidence was brought forward, I

18   believe that I could make that decision if I had to.

19          THE COURT:  All right.  I will allow questions from

20   the Government in follow-up of this juror.

21          MR. BROWN:  Mr. Robinson, yesterday -- or I guess

22   it was yesterday, it seems longer --

23          THE JUROR:  It really -- it's a long, arduous

24   process.

25          MR. BROWN:  Yesterday when we were doing the jury

1     selection you were called up towards the very end of the

2     process.

3              THE JUROR:  Yes, sir.

4              MR. BROWN:  And sometimes when that process goes

5     on, towards the end people are somewhat in a hurry and the

6     Judge, I -- we didn't -- Mr. Goodreid and I didn't get a

7     chance to talk to you ourselves, but the judge asked you a

8     question, something to the effect that:  Do you have any

9     beliefs or philosophical beliefs or otherwise against

10    sitting in judgment of someone?  And --

11             THE JUROR:  Yeah.

12             MR. BROWN:  -- you indicated that -- I believe you

13    indicated that you wouldn't have any answers different than

14    most of the other people.  And then later in the day, the

15    judge informed us that his staff informed him that you were

16    having some concerns.  I think the word "panic attack" may

17    have been used.  I'm not sure what that means, but -- I

18    don't disparage you, this --

19             THE JUROR:  No problems.

20             MR. BROWN:  -- that you would have a -- you felt

21    like you were being put in a position of having to possibly

22    make a finding that could cause someone to go to jail or be

23    incarcerated, and you didn't know if you could do that.

24    And, I mean, it's a concern probably to both sides.

25    Probably that aspect of it is most likely concerning us

1    because being fair as a juror is not being -- is being fair

2    to both sides.  You understand that, don't you?

3              THE JUROR:  Yes, sir.

4              MR. BROWN:  And, I mean, there's nothing wrong with

5    not being able to -- to having a personal belief that you

6    don't want to sit in judgment of someone else.  So I'm not

7    saying it -- that is -- we don't ask that question because

8    it's a bad question, because you're a bad person or

9    something wrong with that.  In fact, the world would be

10   probably better if most people were less judgmental than

11   they are.

12             THE JUROR:  Yeah.

13             MR. BROWN:  So what concerns us, and we -- I've

14   been doing this a long time, as you can probably tell by my

15   blond hair, but I've never talked to a juror in the middle

16   of a trial.

17             THE JUROR:  No problem.

18             MR. BROWN:  I want you to understand another thing;

19   it puts us in a somewhat difficult position because we're

20   sort of singling you out since you're the only one here.

21             THE JUROR:  No problem, sir.

22             MR. BROWN:  But it was important for the Court --

23   when you said that to the clerk, she had to tell the judge

24   because it --

25             THE JUROR:  Yeah.

1          MR. BROWN:  -- you know, I hope you understand

2     where we're coming from.

3          THE JUROR:  I do.  And I apologize for --

4          MR. BROWN:  No, you don't have to apologize.

5          THE JUROR:  I think when I answered the Judge's

6     question earlier before we took the oath, you know, I spoke

7     about civic duty and doing what's best for the -- for us,

8     for the Government, for everybody, and I -- I still feel

9     that I need to do that.

10          I think honestly, if I can chalk it up to anything,

11     I think it was just post, you know, the -- the taking of the

12     oath, that was -- it just got so real and it was just -- it

13     scared me, you know.  It was nerve-wracking because I -- you

14     know, I want to make -- I want to make the right decision.

15     I wanted to be -- I want to be fair to both parties, you

16     know.  I want to do -- be the best juror I can be, and I was

17     just afraid when I took the oath because it just added

18     the -- it was just -- have you ever -- you know, have you

19     ever had something where it's like you talk about something

20     and then it becomes real and then it's like a completely

21     different world in that sense?

22          Like it just -- once the oath happened, it was like

23     it's my responsibility to do the best thing I can do.  I

24     just was like, Oh, gosh, can I do this?  Like I want to do

25     the best I can do.  You know, I was scared.  I think

1    that's -- I hate to say it was just like nerves, because,

2    you know, after -- after I took Your Honor's advice and, you

3    know, just sat through the first day and, like, actually saw

4    the whole process, it lessened my kind -- my nerves,

5    because -- it wasn't as, you know, crazy as I had thought.

6             I think I had it up in my mind much more than I did

7    prior to coming into it.  And I apologize for whatever

8    issues that --

9             MR. BROWN:  As I recall the oath, and I'm

10   paraphrasing, so don't hold me to it --

11            THE JUROR:  No problem.

12            MR. BROWN:  -- the oath is you swear to render a

13   true verdict according to the law and the evidence.

14            THE JUROR:  Yes, sir.

15            MR. BROWN:  And if that is a guilty verdict, you're

16   following your oath, and if it's a not guilty verdict,

17   you're following your oath.  Do you understand that?

18            THE JUROR:  Yes.  I understand the oath I took and

19   I understand that my decision is important and I understand

20   that I need to make the best decision possible based on

21   solely the evidence provided, and if the burden of proof is

22   established, and I believe I can do that both ways.

23            MR. BROWN:  What exactly do you remember telling

24   the courtroom deputy when you expressed your concern?

25            THE JUROR:  I -- I think my lines were -- pardon my

1   French, like I think I said, something along the lines of,

2   "I'm a fuck-up.  I never had to make, like, decisions this

3   big before, you know."  Something along those lines.

4         And I think I referred to the defendant -- I said,

5   he seems like a cool guy, and he seems like a nice guy.  It

6   was just scary to, you know, like -- like you said, like

7   sitting in judgment of somebody, you know, doing that.

8   That -- when -- initially that came through, that was just

9   kind of a -- just kind of a scary experience, but --

10        MR. BROWN:  I mean we were picking a jury on the

11  day you were feeling this, not today.  So --

12        THE JUROR:  Well, I think --

13        MR. BROWN:  What I'm concerned about is -- I'm also

14  concerned about this process.

15        THE JUROR:  No, exactly.

16        MR. BROWN:  Having been singled out here in a way,

17  as the judge said, this is nothing against -- you didn't do

18  anything wrong.

19        THE JUROR:  Oh, yeah.

20        MR. BROWN:  Expressing your feelings is not wrong.

21  So do you -- this is probably an impossible question to ask,

22  but how do you feel right now having had to sit here and

23  listen to the judge and listen to me try to ask very

24  difficult questions?

25        THE JUROR:  Well, I -- I appreciate all of you guys

1    talking to me.  I really do.  If anything, this makes me

2    feel better than I was yesterday because it's nice -- sorry,

3    it's just -- it's kind of weird talking to everybody, it's

4    kind of scary.  I -- now I don't feel singled out, if

5    that's -- if that's what you're getting at.  I feel -- I

6    feel good with -- I feel good with where I'm at.  I'm sorry.

7    I kind of struggled along.  Would you repeat your question?

8    I apologize.

9              MR. BROWN:  I don't think I can remember.

10             THE JUROR:  It's a -- it's a weird experience to be

11   in a courtroom and answering on a mic in front of judges and

12   stuff, so I apologize if I'm -- if I seem nervous, it's just

13   new territory for me.

14             MR. BROWN:  No, I've never been a juror and I'll

15   never be a juror because of who I am.

16             THE JUROR:  Yeah.

17             MR. BROWN:  But I have -- with juries, I know they

18   deliberate and talk with each other.

19             THE COURT:  Don't be so sure, Mr. Brown, because

20   Judge Arguello and I have been on juries since we've been

21   judges.

22             MR. BROWN:  That's because you're fair.

23             I was -- well, in fact, I got a jury summons the

24   other day in the mail, so . . .

25             THE JUROR:  Are you, like, referring to like the

1    process of deliberation with the other jurors?

2              MR. BROWN:  Yeah.

3              THE JUROR:  I think --

4              MR. BROWN:  Do you think you can do that?

5              THE JUROR:  I think I could.  I -- I've -- I'm very

6    personable with other people and I'm willing to discuss

7    facts and things and see all different viewpoints and try to

8    reach a consensus with everybody.

9              THE COURT:  Any more questions, Mr. Brown?

10             MR. BROWN:  If -- you tell me what you think --

11   this is a hard question to answer, I also realize because

12   you don't -- you've only heard a day of testimony, but -- or

13   a couple of days -- based on what you felt yesterday when

14   you took the oath and -- if you're convinced beyond a

15   reasonable doubt of the elements of the offenses, there's

16   like five or six elements on each offense --

17             THE JUROR:  Yes.

18             MR. BROWN:  -- and it's beyond a reasonable doubt,

19   it's not beyond all doubt in the world, or shadow of a

20   doubt, or anything like that, will you have any problem

21   voting guilty?

22             THE JUROR:  No, sir.  If -- if the burden of guilt

23   has been established beyond a reasonable doubt, as you say,

24   then I would not have a problem reaching a guilty verdict.

25             MR. BROWN:  You won't lose sleep over it.

1          THE JUROR:  I won't lose sleep over it.  I think

2     now -- I think now that I've had a chance to, you know, sit

3     and see, you know, actually be a part of a trial and see

4     how, you know, the process goes, it's much more heartening

5     than I came into it yesterday.

6          THE COURT:  All right.  Any questions of Mr.

7     Robinson from the defendant?

8          MR. GOODREID:  Your Honor, just very briefly.

9          THE COURT:  All right.

10          MR. GOODREID:  Mr. Robinson, let me make this very

11     easy for you.  You've said that you don't have any trouble

12     if the Government establishes -- establishes beyond a

13     reasonable doubt each of the burdens of the crime, you will

14     not have any difficulty voting to find the defendant guilty,

15     right?

16          THE JUROR:  Yes.

17          MR. GOODREID:  And I assume the converse of that is

18     also true, that if the Government does not establish each

19     and every element of a given offense beyond a reasonable

20     doubt, you would not have any difficulty voting not guilty;

21     is that right?

22          THE JUROR:  No, if the burden of proof was not

23     established, and there was a reasonable doubt, I would

24     not -- I would feel compelled not to vote guilty because

25     there has been a doubt established.

1          MR. GOODREID:  Thank you.  That's all I have, Your
2    Honor.
3          THE COURT:  All right.  Thank you very much, Mr.
4    Robinson, for being so candid and honest with us.  We really
5    appreciate it.  And I appreciate how nervous you can be in
6    this situation.  I think if any of us were sitting where you
7    are now, we would feel similarly.
8          I have a -- it's more than a request, I have to
9    instruct you, please do not share any of our discussions
10   here in this courtroom with any of your colleagues.  All
11   right?
12         THE JUROR:  Yes, sir.
13         THE COURT:  Will you make that commitment to me?
14         THE JUROR:  I will, sir.
15         THE COURT:  All right.  Thank you.
16         THE JUROR:  And I  -- I'm sorry, I just want to say
17   again, I apologize for any -- for all this, for keeping you
18   guys later than you should be.  I apologize.  It was -- it
19   was just a -- like it was just a real gush of feeling that I
20   hadn't felt before, you know.  It was just kind of -- it was
21   scary, and I want to do my best and do my civic duty, and I
22   just -- I was scared at the time.
23         THE COURT:  Right.  Well, thank you, sir.  If you
24   could replace the mic, and you are released until tomorrow
25   morning.

1          THE JUROR:  Thank you.

2          THE COURT:  All right, thanks.

3      (Juror left the courtroom at 3:15 p.m.)

4          THE COURT:  All right.  Based on the colloquy with

5  the juror, it is my view that it is clear that he had a

6  passing anxiety yesterday, was concerned, as we can imagine,

7  when someone realizes the obligation he has undertaken by

8  his oath, but it is clear to me, given this discussion, that

9  he is prepared to return a guilty verdict or a not guilty

10  verdict on the counts at issue here based solely on the

11  evidence that's going to be coming in at trial.

12          And based on all that, the Government's motion to

13  discharge Juror Robinson is denied.  All right.  We will be

14  in recess until 8:45 tomorrow morning.

15      (Court adjourned at 5:16 p.m.)

16

17              *       *       *       *       *

18

19                          **INDEX**

20  Item                                              PAGE

21              GOVERNMENT'S WITNESSES

22  **WILLIAM SEARS**
    Direct Examination by Mr. Sibert              47
23

24

25

GOVERNMENT'S EXHIBITS

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|-----------|---------|----------|---------|------------|
| 69 | 229 | 230 | | |
| 70 | 229 | 230 | | |
| 74 | 229 | 230 | | |
| 77 | 229 | 230 | | |
| 81 | 229 | 230 | | |
| 82 | 229 | 230 | | |
| 85 | 308 | 308 | | |
| 107 | 247 | 247 | | |
| 115 | 308 | 308 | | |
| 124 | 308 | 308 | | |
| 133 | 229 | 230 | | |
| 140 | 219 | 219 | | |
| 141 | 219 | 219 | | |
| 142 | 219 | 219 | | |
| 143 | 219 | 219 | | |
| 144 | 219 | 219 | | |
| 155 | 229 | 230 | | |
| 156 | 229 | 230 | | |
| 170 | 159 | 159 | | |
| 171 | 159 | 159 | | |
| 172 | 159 | 159 | | |
| 173 | 159 | 159 | | |
| 174 | 159 | 159 | | |

| | GOVERNMENT'S EXHIBITS | | | | |
|---|---|---|---|---|---|
| EXHIBITS: | Offered | Received | Refused | Stipulated |
| 175 | 186 | 186 | | |
| 177 | 159 | 159 | | |
| 245 | 229 | 230 | | |
| 249 | 159 | 159 | | |
| 252 | 229 | 230 | | |
| 258 | 159 | 159 | | |
| 268 | 229 | 230 | | |
| 269 | 229 | 230 | | |
| 270 | 229 | 230 | | |
| 271 | 229 | 230 | | |
| 272 | 229 | 230 | | |
| 274 | 229 | 230 | | |
| 308 | 107 | 109 | | |
| 249 | 107 | 109 | | |
| 372-C | 159 | 159 | | |
| 372-E | 159 | 159 | | |
| 372-F | 159 | 159 | | |
| 372-P | 304 | 304 | | |
| 372-R | 159 | 159 | | |
| 372-X | 159 | 159 | | |
| 372-BB | 159 | 159 | | |
| 372-DD | 159 | 159 | | |
| 372-FF | 159 | 159 | | |

GOVERNMENT'S EXHIBITS

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|-----------|---------|----------|---------|------------|
| 372-GG | 159 | 159 | | |
| 372-HH | 159 | 159 | | |
| 372-KK | 159 | 159 | | |
| 372-NN | 229 | 230 | | |
| 372-QQ | 159 | 159 | | |
| 372-UU | 159 | 159 | | |
| 372-XX | 229 | 230 | | |
| 372-AAA | 229 | 230 | | |
| 372-BBB | 229 | 230 | | |
| 372-CCC | 159 | 159 | | |
| 372-DDD | 229 | 230 | | |
| 372-EEE | 308 | 308 | | |
| 372-HHH | 159 | 159 | | |
| 372-III | 159 | 159 | | |
| 372-KKK | 159 | 159 | | |
| 372-MMM | 229 | 230 | | |
| 372-OOO | 159 | 159 | | |
| 383 | 295 | 296 | | |
| 384 | 159 | 159 | | |
| 385 | 159 | 159 | | |
| 389-A | 321 | 321 | | |
| 389-B | 321 | 321 | | |
| 389-C | 321 | 321 | | |

351

GOVERNMENT'S EXHIBITS

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|-----------|---------|----------|---------|------------|
| 389-D | 321 | 321 | | |
| 391 | 159 | 159 | | |
| 393 | 295 | 296 | | |
| 398 | 159 | 159 | | |
| 399 | 159 | 159 | | |
| 400 | 229 | 230 | | |

\*     \*     \*     \*     \*

REPORTER'S CERTIFICATE


    I certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled matter.

    Dated at Denver, Colorado, this 25th day of March, 201.


_                                                          _

MARY J. GEORGE, FCRR, CRR, RMR