1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF COLORADO

3    Criminal Action No. 17-cr-0008-WJM

4    UNITED STATES OF AMERICA,

5    Plaintiff,

6    vs.

7    GUY JEAN-PIERRE a/k/a Marcelo Dominguez de Guerra,

8    Defendant.

9    ------------------------------------------------------------

10                   REPORTER'S TRANSCRIPT
                     (Jury Trial, Day 3)
11                        Volume III

12   ------------------------------------------------------------

13        Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

14   Judge, United States District Court for the District of

15   Colorado, commencing at 8:51 a.m., on the 16th day of

16   January, 2019, in Courtroom A801, United States Courthouse,

17   Denver, Colorado.

18                         APPEARANCES

19        JEREMY S. SIBERT and ROBERT M. BROWN, Assistant U.S.
     Attorneys, 1801 California Street, Suite 1600, Denver,
20   Colorado 80202, appearing for the plaintiff.

21        CLIFFORD J. BARNARD, Attorney at Law, 4450 Arapahoe
     Avenue, Suite 100, Boulder, Colorado 80303, AND
22        THOMAS E. GOODREID, Attorney at Law, 1801 Broadway,
     Suite 1400, Denver, Colorado 80202, appearing for the
23   defendant.

24                   MARY J. GEORGE, FCRR, CRR, RMR
                 901 19th Street, Denver, Colorado 80294
25          Proceedings Reported by Mechanical Stenography
                 Transcription Produced via Computer

Direct - Sears

1                P R O C E E D I N G S

2           (Proceedings were held in open court in the presence of

3      the jury at 8:51 a.m.)

4              THE COURT:  Good morning, ladies and gentlemen of

5      the jury.  Welcome back to day 3 of our jury trial.

6              Mr. Sears, I remind you you remain under oath.

7              THE WITNESS:  Yes, sir.

8              THE COURT:  Mr. Sibert, you may resume your

9      examination.

10             MR. SIBERT:  All right.  Thank you.  Good morning,

11     Your Honor.  Thank you.

12                  DIRECT EXAMINATION (Continued)

13     BY MR. SIBERT:

14     Q.   Good morning, Mr. Sears.

15     A.   Good morning, sir.

16     Q.   Can we have Government Exhibits 18 -- excuse me, let's

17     start -- I'm sorry, Government Exhibit 12 brought up on the

18     screen.  Excuse me.  I meant -- I meant to say Government

19     Exhibit 74, which has been admitted.

20             Okay, sir, again, along the question that we kind

21     of ended yesterday regarding where you did most of your

22     work, which was either in the Thornton area or downtown

23     Denver area.  Can you take a look at 74 again.

24     A.   Can I have the hard copies also?

25     Q.   I don't have -- you're going to have to rely on the

1    screen today.  I can try --

2    A.    It's a little fuzzy for me.

3            THE COURT:  We can get him the hard copy from the

4    court binder.

5            THE WITNESS:  That would be great, thank you.

6            Yes, sir.

7    BY MR. SIBERT:

8    Q.    Okay.  Do you recognize Government Exhibit 74 now?

9    A.    Yes, sir.

10   Q.    Okay.  And essentially that's just an e-mail that we

11   talked about yesterday?

12   A.    Okay.

13   Q.    That you sent.

14   A.    Okay.

15   Q.    Is that correct?

16   A.    Yes.

17   Q.    Okay.  And essentially as we discussed yesterday, you

18   sent these emails when you were either in your Thornton home

19   office or downtown Denver; is that consistent?

20   A.    Yes, sir.

21   Q.    And this went to Pacific Stock Transfer?

22   A.    Yes, sir.

23   Q.    All right.  Now, can you look at Government Exhibit

24   6 -- or 72.

25   A.    Okay.

Direct - Sears

1    Q.    Okay.  Can you look at page 16 for me in that exhibit.

2          Can I have 16 on the screen.

3    A.    Okay.  Okay.

4    Q.    Okay.  And I'm looking here, and I circled it on your

5    screen.  That's an e-mail from you to Ms. Joanna DiBella; is

6    that correct?

7    A.    Yes, sir.

8    Q.    Okay.  And, again, Ms. Joanna DiBella is an employee at

9    Pacific Stock Transfer agency.  Yes, sir.

10          THE COURT:  Hold on, Mr. Sibert.  Yes, Ms. Sewell.

11          THE JUROR:  We do not have that on our screens.

12          COURTROOM DEPUTY:  I do not have that admitted.

13          THE COURT:  That's correct, Your Honor.  This

14   exhibit has not been admitted into evidence or published, so

15   I just need the witness to testify about it before it will

16   be entered into evidence later.

17          THE COURT:  Okay.  I have just assumed that it had

18   been, that you were -- are you going to be using any other

19   exhibits that are not already in evidence?

20          MR. SIBERT:  I've got to check my list, but this is

21   one that I know of, and I think this might be the only one

22   for this morning.  I will be offering more exhibits.

23          THE COURT:  Right.  But you -- okay.  Check your

24   list because you need to know what you're going to start

25   examining on that isn't in evidence yet.  Ms. Frank caught

1    it, I didn't.  But that's why these exhibits don't go up on

2    the screen for the jury yet.

3           So I'm assuming then there's not a stipulation to

4    this exhibit; is that correct?

5           MR. SIBERT:  There is not, Your Honor.

6           THE COURT:  All right.  Lay your foundation and see

7    if there's an objection.

8    BY MR. SIBERT:

9    Q.   Okay.  All right.  Good morning, sir.  I need you to

10   look either at the binder or the screen, and on page 16.  Do

11   you recognize who sent this e-mail?

12   A.   It looks to be myself.

13   Q.   Okay.  And how do you know that?

14   A.   Well, it does bear my e-mail address.

15   Q.   Okay.  And who did you send it to?

16   A.   It would be Joanna DiBella.

17   Q.   Okay.  And who's Ms. Joanna DiBella?

18   A.   She's an employee over at Pacific Stock Transfer.

19          MR. SIBERT:  And, Your Honor, I guess I should

20   offer this into evidence.  I'm looking at my list now, and I

21   apologize, this has been stipulated to.  So I would ask we

22   move for admission into evidence.

23          THE COURT:  For the entirety of 72?

24          MR. SIBERT:  Yes.  For the entirety of the exhibit.

25          THE COURT:  Okay.  Given the stipulation of the

Direct - Sears

1    parties, Exhibit 72 is admitted into evidence and may be

2    published to the jury.

3            (Government's Exhibit 72 received)

4            MR. SIBERT:   Thank you, Your Honor.  I apologize

5    for that.

6            THE WITNESS:   Excuse me, do I get to look at these

7    prior?

8    BY MR. SIBERT:

9    Q.   I'm asking about page 16.  And you can go through the

10   exhibit, sure.

11   A.   This isn't one that I saw, then.

12   Q.   Okay.  So we were just discussing this e-mail; is that

13   correct?

14   A.   Yes, sir.

15   Q.   And, again, where was your place of business when you

16   were doing your emails?

17   A.   At that time, December 13th, 2012, that would have been

18   4360 Vine Street, as my memory serves.

19   Q.   Okay.  That's Denver, Colorado?

20   A.   Yes, it is.

21   Q.   Okay.  And, again, Pacific Stock Transfer is in --

22   A.   Las Vegas, Nevada.

23   Q.   Thank you.  And can I have page 17 of this exhibit.

24   And can I just have the top of it.

25           Can you see page 17 in your binder there?

1    A.   This was Exhibit 72?

2    Q.   Exhibit 72, page 17.

3    A.   Yes, sir.  Excuse me, yes, I do.

4    Q.   Okay.  Do you recall what -- after looking at page 17,

5    do you recall what Ms. DiBella was requesting from you from

6    Pacific Stock Transfer Agency?

7    A.   No, I do not.

8    Q.   All right.  Can you look at page -- essentially, can

9    you look at page 18.  Thank you.

10         Again, I'm circling on the screen here, this is a

11   e-mail from you; is that correct?

12   A.   Yes, it would appear to be.

13   Q.   All right.  If you look at your screen -- I've blown it

14   up for you -- what are you emailing Ms. DiBella about at

15   Pacific Stock Transfer?

16   A.   I'm emailing Ms. DiBella about a convertible note

17   between Bayside Holdings and FusionPharm, Inc.

18   Q.   Why would you be emailing her about a note from Bayside

19   Holdings and FusionPharm?

20   A.   As I explained yesterday, my mother is quite old, and

21   this is a very complicated transaction.  Due to her age

22   she's not really all there.  Shortly after that, if my

23   memory serves me, the note was sold at a discount so I

24   didn't have to deal with this mess anymore.

25   Q.   Okay.  So back to my question:  You were contacting Ms.

Direct - Sears

1  Joanna DiBella about selling the Bayside note?

2  A.   No, actually this -- this particular e-mail was in a

3  conversion.

4  Q.   Okay.  What's a conversion?

5  A.   Excuse me?

6  Q.   What is a conversion?

7  A.   Conversion is when you take a -- when you have debt and

8  you can convert it into equity as per the note that was

9  signed.

10  Q.   And so could you tell me who's getting equity -- equity

11  as part of this note?

12  A.   Bayside Realty Holdings.

13  Q.   Okay.  And what are they getting?

14  A.   They're getting stock, sir.

15  Q.   For what -- do you remember the price of that stock?

16  A.   No, I don't.

17  Q.   Why don't you look through that exhibit and see if it

18  refreshes your memory.

19        THE COURT:  How many pages is this exhibit?

20        THE WITNESS:  It's War and Peace.

21        THE COURT:  Sorry?

22        THE WITNESS:  It's large.

23        THE COURT:  Large?  Why don't we save some time.

24  If you want to direct him to a particular page, see if his

25  memory's refreshed.

Direct - Sears

1          MR. SIBERT:  Your Honor, I'll come back to it.

2          THE WITNESS:  I'm sorry, I didn't . . .

3     BY MR. SIBERT:

4     Q.   All right, sir, before we start going to some further

5     evidence, I just want to ask you some follow-up questions.

6     Well, let me show you an exhibit that was being tendered

7     yesterday, has been stipulated to, and offered into

8     evidence, which is Government Exhibit 236.

9          THE COURT:  Is that in evidence or -- I'm not clear

10    what you just said.

11         MR. SIBERT:  This is the one I approached with

12    yesterday.

13         THE COURT:  Okay.

14         MR. SIBERT:  I think the Court reserved the ruling

15    about admitting it into evidence.

16         THE COURT:  You're saying it's stipulated to now?

17         MR. SIBERT:  It's been stipulated to.

18         THE COURT:  Well --

19         MR. GOODREID:  Your Honor, maybe I misunderstand.

20    I don't agree with that.  I wonder if we would approach very

21    briefly.

22         THE COURT:  Didn't we talk about this yesterday?

23         MR. GOODREID:  We did.

24         THE COURT:  Why do we have to have a sidebar on the

25    same exhibit?  Do you stipulate to it or not?

Direct - Sears

1          MR. GOODREID:  No.

2          THE COURT:  All right.  If there's no stipulation,

3    you need to lay a foundation so you don't draw an objection.

4          MR. SIBERT:  Okay.  My misunderstanding, Your

5    Honor, because based upon what was said to the Court --

6          THE COURT:  He just said he's not stipulating.

7          MR. SIBERT:  Okay.  So he's changing his mind.

8          THE COURT:  Whatever.

9          MR. SIBERT:  May I approach your courtroom deputy?

10         THE COURT:  Why can't we just use the exhibits in

11   the binders?

12         MR. SIBERT:  Because the attachment's 900 pages.

13   As the Court requested, I printed out the relevant page so

14   the witness can have it.

15         THE COURT:  All right.

16   BY MR. SIBERT:

17   Q.   This is not published to the jury now, so can I have

18   236 up on the screen, please.

19         Okay.  Sir, I just handed you what's been marked as

20   Government Exhibit 236.  Do you recognize that document?

21   A.   Yes, I do.

22   Q.   Okay.  And essentially could you describe what the

23   first page of that document is.

24   A.   It's a e-mail, sir.

25         MR. SIBERT:  Okay.  And I apologize, Your Honor,

Direct - Sears

1    let me give you the pages that are relevant to the

2    attachment -- or document 236.

3              THE COURT:  Let me pull the binder first.

4              All right.  In my binder it's a three-page -- it's

5    a three-page exhibit.  Mr. Sibert, it's a three-page

6    exhibit, right?

7              MR. SIBERT:  Yes.

8              THE COURT:  All right.   --

9              MR. SIBERT:  I just want to make sure I had the

10   right exhibit from what we discussed yesterday, which is a

11   900-page document.

12             THE COURT:  Well, I don't recall you bringing in a

13   900-page document up to the bench yesterday.

14             MR. SIBERT:  I would not have.

15             THE COURT:  Yeah, you brought up -- I think what

16   you -- I didn't look at the label, but I believe what we

17   were referring to at the end of the day yesterday at the

18   sidebar was 236; isn't that correct?

19             MR. SIBERT:  That's correct, Your Honor.

20             THE COURT:  And that's a three-page exhibit.

21             MR. SIBERT:  That's right.

22             THE COURT:  All right.  Are you done laying your

23   foundation?

24             MR. SIBERT:  No, sir.

25             THE COURT:  All right, go ahead.

Direct - Sears

1      MR. SIBERT:  I just wanted to make sure the Court

2  has everything.

3      THE COURT:  Yeah, I have it.

4  BY MR. SIBERT:

5  Q.   Okay.  So can you tell me what the first page of the

6  document 236 is.

7  A.   It's an e-mail.

8  Q.   Okay.  And who sent the e-mail?

9  A.   I did.  I --

10  Q.   And how do you know that?

11  A.   It does bear my e-mail address.

12  Q.   Okay.  And who did you send it to?

13  A.   Mr. Cliffe Bodden.

14  Q.   Okay.  And can you look through that e-mail, including

15  the attachment.

16  A.   Yes, sir.

17  Q.   And does that e-mail and attachment reflect what you

18  sent on -- in March of 2011?

19  A.   That e-mail I'm familiar with this e-mail, it's been

20  brought to my attention before.  This e-mail --

21  Q.   I'm just asking --

22  A.   I'm answering the question.  This e-mail I forwarded

23  without even opening, like I did many of them.

24  Q.   So you --

25  A.   Like I did many emails, sir.

                            Direct - Sears

1    Q.   But that's an e-mail that you wrote.

2    A.   No, that's an e-mail that I forwarded.

3    Q.   Okay.

4    A.   I was not the originator of this e-mail.  I just want

5    to be clear about that.

6    Q.   An ee-mail that you forwarded.

7    A.   That's right.

8              MR. SIBERT:  Your Honor, at this time the

9    Government would move for admission of Government Exhibit

10   236.

11             THE WITNESS:  Do we have the original e-mail that

12   predecessed --

13             THE COURT:  All right, Mr. Sears.

14             THE WITNESS:  I'm sorry.

15             MR. GOODREID:  Your Honor, I want to be clear on

16   the offer, which is -- what we object to is the attachment

17   to the e-mail, not the face of the e-mail.

18             THE COURT:  Right.  The e-mail, itself, is seven

19   words.

20             MR. GOODREID:  Right.

21             THE COURT:  So it's the letter that's attached

22   you're objecting to.

23             MR. GOODREID:  Right.

24             THE COURT:  And your basis for your objection.

25             MR. GOODREID:  A, it's hearsay -- and, again, Your

Direct - Sears

1    Honor, I haven't checked whether this is in the James log or

2    not, I apologize, sorry for that -- A, it's hearsay, and B,

3    we object on relevance.

4              THE COURT:  I'm going to sustain the objection to

5    pages 2 and 3.  This is not the appropriate witness to get

6    this -- those two pages in through.  He's not the author of

7    that attachment.

8              MR. SIBERT:  It goes to the state of the mind and

9    why --

10             THE COURT:  The objection's sustained.

11             MR. SIBERT:  Thank you, Your Honor.

12             THE COURT:  You can try again with a different

13   witness.

14             MR. SIBERT:  That's fine.  Can I publish the first

15   page?

16             THE COURT:  You may.  So the record is clear, page

17   1 of Exhibit 236 is admitted into evidence.

18        (Government's Exhibit 236, page 1, received)

19   BY MR. SIBERT:

20   Q.   All right, sir, just for the jury, can you just

21   describe the first page and what is shown on the first page

22   at 236.

23   A.   It's from myself using the *william@williamjsears.com*

24   e-mail, Monday, March 14th, 6:18 p.m., to Cliffe Bodden at

25   *gsccventure.com*.

1    Q.   And, again, the year is 2011?

2    A.   2011.

3    Q.   All right.  Now, sir, can you -- if you take that down,

4    please.

5            Sir, why did you stop using Mr. Guy Jean-Pierre as

6    the corporation for FusionPharm's lawyer?

7    A.   That wasn't my decision to stop using Mr. Jean-Pierre

8    for FusionPharms --

9    Q.   All right.  Well, you used --

10   A.   -- so that's a question that Mr. Dittman could answer.

11   Q.   Okay.  Well, you stopped using him for Microcap.  Would

12   you agree with that?

13   A.   Yes, I do.

14   Q.   How about Meadpoint?

15   A.   Yes.

16   Q.   How about Vertifresh?

17   A.   Yes.

18   Q.   Okay.  Why did you stop using Mr. Guy Jean-Pierre?

19   A.   Because I was informed that he may have some regulatory

20   issues.

21   Q.   And what do you mean by "regulatory issues"?

22   A.   Just SEC inquiry.

23   Q.   Okay.  Were there any other inquiries?

24   A.   I'm not too sure, sir.

25   Q.   How about a Florida bar complaint?

Direct - Sears

1  A.  I heard rumor of such.

2  Q.  Okay.  And how about an SEC --

3        MR. GOODREID:  Your Honor, I object based on the

4  Court's ruling yesterday.

5        THE COURT:  Yeah, and leading.  Sustained.

6  BY MR. SIBERT:

7  Q.  What did you know about the SEC?

8        MR. GOODREID:  Same objection.

9        THE COURT:  Sustained.

10 BY MR. SIBERT:

11 Q.  Okay.  You said inquiries about the SEC.  What do you

12 mean by that?

13        MR. GOODREID:  Same objection.

14        THE COURT:  Well, you have to be very careful here,

15 Mr. Sibert, based on the rulings.  I think you've

16 established that there's an SEC -- there was an SEC inquiry.

17 I think to go much beyond that we risk some problems.  So --

18 BY MR. SIBERT:

19 Q.  Was it an SEC complaint?

20        MR. GOODREID:  Same objection, Your Honor.

21        THE COURT:  That I'm going to overrule.  You can

22 answer.

23        THE WITNESS:  I don't recall.

24 BY MR. SIBERT:

25 Q.  Okay.  But essentially you stopped using Mr. Guy

1    Jean-Pierre because he was facing some type of regulation

2    within the practice of law --

3              MR. GOODREID:  Objection.  Leading.

4              MR. SIBERT:  -- practice of law.

5              MR. GOODREID:  Leading.

6              THE COURT:  Sustained.

7    BY MR. SIBERT:

8    Q.   So why did these inquiries with the SEC lead you to not

9    use Mr. Guy Jean-Pierre?

10   A.   It's usually a general practice.  Anybody that has any

11   kind of an inquiry or anything to that effect, you take a

12   step back and take a look at things.

13   Q.   So why did you take a step back and take a look at

14   things?

15   A.   That was under advice of counsel that I did that.

16   Q.   Did -- would his inquiry have any effect with your

17   companies?

18   A.   Excuse me?

19   Q.   Would his inquiry with the SEC have any effect with

20   your companies?

21   A.   I think anybody who has an inquiry that has anything to

22   do with the SEC, the SEC will have a problem with anybody.

23   That's what I feel, sir.

24   Q.   Now, did Mr. Guy Jean-Pierre know about your prior

25   criminal history?

1    A.   Yes, he did.

2    Q.   So he knew you had a conviction in 2007 for security

3    fraud?

4    A.   Yes, he did.

5    Q.   Did you have any other jobs when you were working,

6    either with or for FusionPharm, including your entities

7    under Microcap, Meadpoint, your assistance with your mother

8    with Bayside --

9    A.   Vertifresh.

10   Q.   -- or Vertifresh?

11   A.   Not that I can recall.

12   Q.   So during the time of 2000 -- essentially the end of

13   2010 through 2014 time frame, those companies and

14   Vertifresh -- or, excuse me, FusionPharm, those were your

15   main concentration for employment?

16   A.   I believe so.

17   Q.   Did you do any other work with Mr. Guy Jean-Pierre

18   between the same time frame, 2010 through the time at --

19   actually, let me ask you this:  When did you stop using Mr.

20   Guy Jean-Pierre?

21   A.   I don't remember.  Some time between end of '12,

22   beginning of '13, in that time frame.  I can't give you -- I

23   don't remember exact dates, sir.

24   Q.   Okay.

25   A.   It was '12, '13.  I remember I got a memo August '13,

Direct - Sears

1   the end of August, that I think I looked for about a month

2   or two.

3   Q.   You said August 2013?

4   A.   Is when I got a new lawyer.  And I remember looking for

5   a couple of months, so . . .

6   Q.   So somewhere around after the new year of 2013?

7   A.   Could have been before, could have been after.  I'm not

8   exactly sure.

9   Q.   Okay.  And did you work with any other -- did Mr. Guy

10  Jean-Pierre do any other work for you besides your

11  affiliations with FusionPharm, Meadpoint, Microcap,

12  Vertifresh, and your assistance with your mother on Bayside?

13  A.   I don't remember.  That's a long time ago and there was

14  a lot of old -- I don't recall.

15  Q.   Okay.

16  A.   Sounds like I had a lot on my plate at that time, so I

17  wouldn't imagine so, but I don't recall.

18  Q.   But you remember seeing documents that said there were

19  several drafts?

20          MR. GOODREID:  Objection.  Leading.

21          THE COURT:  Sustained.

22  BY MR. SIBERT:

23  Q.   Do you recall that you were telling me about other

24  drafts of documents?  Do you recall those answers that you

25  were giving me?

1    A.    No.   Other drafts of which documents?   What are you --

2    Q.    For example, the e-mails?

3    A.    Yeah.

4    Q.    You said there was another e-mail; isn't that what you

5    stated?

6              MR. GOODREID:   Objection.   Leading.

7              THE WITNESS:   No, not this e-mail that I just went

8    over.

9              THE COURT:   Sustained.

10   BY MR. SIBERT:

11   Q.    All right.   Now, did you submit any of the OTC filings

12   for FusionPharm?

13   A.    I uploaded them to the news service, yes.

14   Q.    And essentially could you describe how you -- how one

15   goes about uploading a file to OTC?

16   A.    Just like you would Dropbox, sir.   You log in, you hit

17   the button, it uploads, and you're done.

18   Q.    Okay.   Well, I'm not very familiar with computers or

19   uploading documents, and I'm not sure how familiar the jury

20   is or counsel --

21             MR. GOODREID:   Objection to counsel testifying.

22             THE COURT:   Overruled.

23   BY MR. SIBERT:

24   Q.    So could you please describe in detail the steps one

25   would take to go ahead and upload files to the public

Direct - Sears

1   website for OTC.

2   A.   Everybody have a Dropbox or have ever uploaded a file

3   to your Facebook or any other kind of profile, it's exactly

4   like that.  You have your PDF file, you log into the

5   website, you hit upload, and that's pretty much it.  Under

6   the section that you want to upload that particular file to,

7   of course.

8   Q.   How would one upload -- excuse me, how would one enter

9   the website or the over-the-counter markets?

10  A.   Via computer.

11  Q.   Okay.  And can anyone enter the -- do you have to have

12  an account?

13  A.   Of course.

14  Q.   Okay.  Can you describe to me what it takes to enter

15  into your account for OTC?

16  A.   It's going to the website, putting in whatever the name

17  is, and then there's a password.

18  Q.   Okay.  So you just --

19          THE COURT:  Mr. Sears, you're fading.

20          THE WITNESS:  I'm sorry.

21          THE COURT:  You need to speak into the mic.

22  BY MR. SIBERT:

23  Q.   So you just testified that you uploaded some of the OTC

24  filings for FusionPharm.

25  A.   Yes, sir.

Direct - Sears

1    Q.   Okay.  Do you recall whose account -- essentially whose
2    name it was on there for the OTC account?
3    A.   I would imagine FusionPharm.  I mean, I don't recall.
4    I had originally set one up for the company back in 2010
5    when it was Baby Bee Bright, then FusionPharm took it over
6    when it became FusionPharm, so I don't know.
7    Q.   So how did you know how to log on to file these
8    documents?
9    A.   Because it says to use your password and log on.  It's
10   a very simple site, sir, it's self-explanatory.  It's just
11   like AOL.
12   Q.   Okay.  So FusionPharm, you stated it was turned over to
13   FusionPharm, if I understand you correctly.
14   A.   Yes.
15   Q.   So how did you know how to upload documents for
16   FusionPharm?
17   A.   What are you asking me?  I just answered that.  It's --
18   you upload the document and that's it.
19   Q.   So did you have the password?
20   A.   Of course.  That's how you get into the site, sir.
21   Q.   And did you know whose name the account was under for
22   FusionPharm?
23   A.   I don't recall.
24   Q.   What was the login name?  Did you have --
25   A.   I couldn't tell you.

Direct - Sears

1    Q.   But at the time you had all that?

2    A.   It was written down for me.

3    Q.   And when you uploaded these documents to the OTC

4    markets, where were you uploading these documents from?

5    A.   Depending on where I was at the time, I would imagine,

6    wherever that office was.

7    Q.   So somewhere here in Denver, Colorado, within the three

8    offices that we discussed?

9    A.   Yeah, probably.

10   Q.   Okay.  So we discussed in the last two days the types

11   of reports that have to be filed with the OTC.  And you

12   recall testifying to quarterly and annual reports; is that

13   right?

14   A.   Yes, sir.

15   Q.   All right.  Now, do you recall any of the ones that you

16   filed to OTC?

17   A.   Excuse me?

18   Q.   Do you remember which quarterly reports you filed?

19   A.   I don't remember any quarterly reports that I uploaded

20   to the OTC.  Basically it was done, they told me to upload

21   it, it was ready, and that was it.

22   Q.   Who uploaded the attorney opinion letters?

23   A.   Depends on who would have uploaded the financials with

24   them.  Wherever they were acquired, that would usually be

25   part of a report.  So I didn't do them all, so which one are

Direct - Sears

1    you talking about?

2    Q.   All right.  Well, we can go down the list.  How about

3    August 14, 2012?

4    A.   Couldn't tell you, sir.

5    Q.   Okay.  How about November 15th, 2012?

6    A.   I wouldn't know what I did last week.

7    Q.   How about March 6th, 2013?

8    A.   Couldn't tell you.

9    Q.   How about 7 -- July 5th, 2013?

10   A.   Maybe.

11   Q.   How about August 20th, 2013?

12   A.   I'm not going to be able to sit here and tell you any

13   given day from four years ago that I uploaded something,

14   sir.

15   Q.   You just asked me to tell you --

16   A.   Well, you were going to go down that path anyway,

17   so . . .

18   Q.   All right.  So it was either you that uploaded the

19   documents; do you know who else could have uploaded the

20   documents?

21   A.   Mr. Dittman, could have been Kelly Blume, and -- I

22   don't remember, I think Stuart Leudan did one or two.  I

23   can't think of anybody off the top of my head, anybody else

24   that's --

25   Q.   So those four people.

Direct - Sears

1    A.    Yeah.

2    Q.    Yourself, Mr. Scott Dittman, Mrs. Kelly Blume, and you

3    said someone else --

4    A.    Stuart Leudan.  He was a corporate attorney for a

5    while.  He was in town.  Maybe there was another office

6    woman, I can't remember her name, that Scott had.  I don't

7    know.  That's the best I can do with that.

8    Q.    Okay.  And do you recall any of these regarding the

9    current information letters?

10   A.    Excuse me?

11   Q.    Do you recall any of the dates regarding the current

12   information opinion letters?

13   A.    No, sir.  All I can tell you is the current information

14   documentation would probably be accompanied by the end of

15   year financials, so there wouldn't be many of those.  Those

16   usually go part and parcel, if I remember correctly.

17   Q.    Now, eventually there was a search warrant conducted in

18   2014.  Do you recall that?

19   A.    Yes, I do.

20   Q.    Okay.  Did you ever discuss that search warrant with

21   Mr. Guy Jean-Pierre after it was conducted?

22   A.    Not to my recollection, because it was sealed for a

23   very, very long time.  Nobody saw it.

24   Q.    So you never discussed the event that -- you knew about

25   the search --

Direct - Sears

1   A.   I discussed the event, sir.  I don't -- you asked me

2   about the warrant, specifically.

3   Q.   Okay.  So let me be a little bit more particular.

4   A.   Please.

5   Q.   Why don't you tell the jury what happened with the

6   search warrant.

7   A.   Could you care to elaborate?  What happened with the

8   search warrant?

9   Q.   Okay.

10  A.   I'm not trying to be difficult, but what do you mean

11  "what happened with the search warrant?"

12  Q.   Now, Mr. Sears, you're not difficult.

13  A.   Thank you.

14  Q.   Did you -- did FusionPharm -- was FusionPharm

15  searched?

16  A.   Indeed, it was.

17  Q.   By law enforcement?

18  A.   Indeed it was.

19  Q.   And do you know what happened as a result of that

20  search?

21  A.   No, that's what we're trying to figure out.

22  Q.   Okay.  Did you tell Mr. Guy that FusionPharm was

23  searched by the FBI?

24  A.   Indeed I did.

25  Q.   Okay.  And that was after the search had occurred?

Direct - Sears

1   A.   Yes, sir.

2   Q.   Sir, I want to turn your attention now to Government

3   Exhibit 1, 1-A, 1-B, when you have a moment.

4        Your Honor, may I approach your courtroom deputy.

5   These are dealing with electronic evidence that the

6   Government's going to try to introduce, which was reviewed

7   for the sake of essentially preparation for entry into

8   evidence.

9        THE COURT:   What exhibit are we talking about?

10       MR. SIBERT:   1, 1-A, 2, and these will also include

11  the 320-A series, the 322 series.

12       THE COURT:   What do you mean by the 320-A series?

13       MR. SIBERT:   So it goes 320-A, B, C --

14       THE COURT:   All right.   So the exhibits that begin

15  with 320.

16       MR. SIBERT:   That's correct, Your Honor.

17       THE COURT:   And then 322?

18       MR. SIBERT:   322.

19       THE COURT:   All right.   What else?

20       MR. SIBERT:   350, 351.   And there's a lot of clips

21  under --

22       THE COURT:   So what grouping are these exhibits

23  coming under from the e-mail you sent to defense counsel and

24  my chambers yesterday?

25       MR. SIBERT:   These weren't stipulated to so nothing

Direct - Sears

1    was sent.

2              THE COURT:  Oh, okay.  None referenced in the

3    e-mail.  All right.  These are all -- none -- let me state,

4    none of these have been stipulated that you're referencing

5    now.

6              MR. SIBERT:  That's correct, Your Honor.

7              THE COURT:  All right.  Do you have any after 351?

8              MR. SIBERT:  Yes, sir.

9              THE COURT:  Go ahead.

10             MR. SIBERT:  358, and there's a series under 358,

11   360, 361, 362 and the series of videos under 363-A, and that

12   goes from A to I.

13             THE COURT:  All right.  Since none of these are

14   stipulated to, you are going to need to lay the foundation

15   of each one of these.  So what -- I'm trying to understand

16   what is the efficiency we gain by you listing 14 disputed

17   instructions ahead of time.

18             MR. SIBERT:  Because they're all videorecordings

19   that have been reviewed and listened to by this witness.

20             THE COURT:  Okay.

21             MR. SIBERT:  And he can articulate that what is on

22   these DVDs are his -- is what are in the clips in the videos

23   and recordings.

24             THE COURT:  All right.  So all of these exhibits

25   that you've just listed are included in the DVD that you

1    have in your hand?

2            MR. SIBERT:  The two DVDs, yes, sir.

3            THE COURT:  Two DVDs.  All right.  Well, go ahead

4    and hand them to Ms. Frank.  You want her to give them to

5    the witness, I take it.

6            MR. SIBERT:  Thank you.

7    BY MR. SIBERT:

8    Q.   And just to be very clear on the record, Your Honor,

9    the DVD does not have Exhibit 1 -- 1-A or 1-B, but those

10   were reviewed by this witness prior to him taking the stand.

11           THE COURT:  1, 1-A and 1 -- oh, so now you're

12   adding 1-B?

13           MR. SIBERT:  Yes, sir.

14           THE COURT:  All right.  Well, okay, go ahead.

15           MR. SIBERT:  Thank you, Your Honor.

16   BY MR. SIBERT:

17   Q.   All right, sir, essentially you've been provided two

18   DVDs there.

19   A.   Yes.

20   Q.   Do you recognize those DVDs?

21   A.   Yes.

22   Q.   Okay.  And how do you recognize them?

23   A.   They appear to be the ones that I reviewed on the

24   19th.

25           THE COURT:  You need to speak into the mic, sir.

Direct - Sears

1        THE WITNESS:  They appear to be the ones I reviewed

2    on the 19th.

3        Sorry, Your Honor

4    BY MR. SIBERT:

5    Q.    What do you mean by "appear"?  How do you know that?

6    A.    I have -- there's a sticker on there with my signature

7    and the date.

8    Q.    And when did you sign and date that?

9    A.    The 13th of this month.  That would have been Sunday.

10   Q.    All right.  Let me make it easy:  Did you do it before

11   or after watching the videos and hear the recordings?

12   A.    After.

13   Q.    All right.  And then do you recall sitting and

14   listening to further phone calls that were on my -- on the

15   Government's computer?

16   A.    Yes, sir.

17   Q.    And did you listen to all the clips of the phone calls?

18   A.    I believe so, yes, sir.

19   Q.    Okay.  And the Government showed you those clips were

20   marked as Government Exhibit 2; is that correct?

21   A.    I don't remember that specific exhibit, sir, but --

22   Q.    All right.  Did you watch a video of you and some

23   undercover FBI agents at a warehouse?

24   A.    Yes, I did.

25   Q.    Okay.  And did that video truly and accurately reflect

Direct - Sears

1    what occurred on that day?

2    A.   Yes, it did.

3    Q.   And you were in that video?

4    A.   Indeed I was.

5    Q.   And also prior to going through these exhibits with the

6    Government on the 19th of January, these were also provided

7    to you ahead of time; is that right?

8    A.   Well, they attempted to provide them ahead of time.  A

9    lot of the files and clips that we were provided, some of

10   them were encrypted so we didn't really get to see them all.

11   Q.   So you're testifying today you didn't get to see them

12   all?

13   A.   Some of them were encrypted, the disks that you sent

14   over to Mr. Bornstein, so we looked at them at your office.

15   Q.   Okay.  So the ones that you were having issues with, we

16   looked at my office?

17   A.   Yes, sir.

18   Q.   All right.  But you actually came to our office and

19   picked up the disks; is that right?

20   A.   Yes, I did.

21   Q.   And you took them to your lawyer's office?

22   A.   Yes, I did.

23   Q.   All right.  And you and your lawyer both stated that

24   you reviewed everything in addition to what you couldn't

25   see.

Direct - Sears

1    A.    That we could, yes, sir.

2    Q.    It's the foundation.

3           MR. SIBERT:  All right.  At this time, the

4    Government would like to move into evidence Government

5    Exhibit 2-A through F.

6           THE COURT:  All right.  Just so I understand what

7    we're doing here, 2-A through F, are those video files that

8    are on the DVD?

9           MR. SIBERT:  These were not -- yes, the clips were

10   on the DVDs.  Yes, sir.

11          THE COURT:  2-A through 2-F?

12          MR. SIBERT:  Right.

13          THE COURT:  So how will you divide -- how are you

14   going to separate out these files on the DVD?  I mean, how

15   is --

16          MR. SIBERT:  I don't understand --

17          THE COURT:  We have the exhibit lists where you

18   have a description of certain recordings.  I'm assuming

19   those are separate video files on the DVD.

20          MR. SIBERT:  That's correct.

21          THE COURT:  So we could -- let's just assume I

22   allowed this to be entered into evidence, we could go

23   directly into the DVD to that file that contains 2-A through

24   2-F?

25          MR. SIBERT:  They are already uploaded onto the

Direct - Sears

1   computer, and they are already in the exhibit books on disk,

2   so if the jury wants to see them if they're admitted,

3   they're on the disk.

4           THE COURT:  All right.

5           MR. SIBERT:  So for the sake of flipping the disk

6   out, they've been uploaded.

7           THE COURT:  All right.  Now, let me ask Mr.

8   Goodreid, I'm assuming you've had an opportunity to review

9   these video files.

10          MR. GOODREID:  Yes, Your Honor, and I have a number

11  of objections if the Court would entertain.

12          THE COURT:  Okay.  Let's specifically just stay 2-A

13  through 2-F.

14          MR. GOODREID:  That's my understanding, Your Honor,

15  we're talking about just Exhibit 2 -- I mean, all the

16  numbers we just talked about.

17          THE COURT:  Right.

18          MR. GOODREID:  Yes.  So, No. 1, I did not -- I

19  suppose this could be cleared up -- No. 1, I did not hear

20  this witness -- Mr. Sibert asked him if he had watched the

21  video.  I don't know that he ever linked that specifically

22  to Exhibit 2.  So that maybe can be clarified but he said he

23  watched video, he didn't say that's Exhibit 2-A, B, C, D, E.

24  That's number 1.

25          No. 2, I also did not hear this witness say that he

Direct - Sears

1    reviewed the transcripts, that the transcripts matched in

2    fact what was on the video in his view.  That's No. 2.

3            THE COURT:  Now, the -- are we talking about the

4    captions?  Because we heard at the trial preparation

5    conference that one or more of these video files have

6    captioning in the file, itself.  Is that what --

7            MR. GOODREID:  I'm sorry, Your Honor, that is what

8    I mean, yes.  Yes.  The captioning.  I didn't hear him talk

9    about that in his view the caption accurately reflected what

10   was on the video.

11           THE COURT:  Okay.

12           MR. GOODREID:  And then, thirdly, as to that very

13   point, defense objects to the synced videos for this reason.

14   It's one thing to have an audio or a video in a transcript

15   on the side that is an aid to what's on there; however, at

16   the point that it gets synced on there, that's essentially

17   telling the jury, "Here's what the people are saying," as

18   opposed to the real evidence is the audio or the video that

19   the jury, themselves, can decide what's on there.

20           The point that it gets synced in there, that's

21   saying that's what they are saying; that may not be

22   accurate.  So we object to the synced video, as you call it

23   the -- Your Honor, you referred to it as the closed

24   captioning, we object to it being presented in that form.

25           THE COURT:  All right.  My understanding from the

Direct - Sears

1    trial preparation conference discussion was the captioning

2    was included because of the poor audio quality of these --

3    of this file and -- is that an accurate -- am I remembering

4    our discussion at the conference on this issue correctly?

5    Mr. Sibert?

6          MR. SIBERT:  Your Honor, my understanding is that's

7    correct.  And also I believe the fact that Mr. Guy

8    Jean-Pierre has a strong accent, that it would assist.  And

9    also goes to the weight.

10          THE COURT:  Okay.

11          MR. GOODREID:  Your Honor, may I respond on that?

12          THE COURT:  You may.

13          MR. GOODREID:  Well, Your Honor, the very fact that

14    the audio or -- I guess it's not video, the audio quality is

15    poor, or that the defendant can't be understood goes to the

16    heart of that objection.  It's like having a painting that's

17    blurry and then suddenly, you can't exactly tell what it is,

18    but then the Government has placed language in there to say,

19    "Oh, here's what this is a picture of."

20          Same thing with the audio, "We can't really tell

21    what he's saying, but we'll tell you what he's saying."

22          I think that's impermissible.

23          THE COURT:  All right.  Do we have someone that

24    could testify as to listening to the audio and then

25    preparing the captioning as accurately as he or she could

Direct - Sears

1  and could testify that it's an -- the captioning is an

2  accurate captioning of the audio that's included in these

3  files?

4  MR. SIBERT:  I do have that.  And I can also maybe

5  ask this witness that question, since he actually listened

6  to them, and was also looking at the caption as the video

7  was playing.

8  THE COURT:  All right.  Okay.  Let's put that aside

9  for a moment.  Mr. Goodreid had a good point in terms of

10  tying this witness to his observation of the video

11  specifically as to Exhibit 2, which is the 2-A through 2-F.

12  I don't believe that you connected that.

13  What was your second objection?  I'm sorry.

14  MR. GOODREID:  Your Honor, my second objection was

15  that I didn't hear him say that the closed captioning, based

16  upon his review, matched what he actually saw or heard in --

17  THE COURT:  Right.  Why don't you ask those

18  questions.

19  MR. SIBERT:  I can follow up.  And just so the

20  Court understands, and counsel also understands, Exhibits 1,

21  1-A, 1-B will be moved for admission, too.  We did not plan

22  to publish those to the jury because they're the whole

23  video.  Exhibits 2-A through 2-F are just clips of the whole

24  video.

25  THE COURT:  I understand.

Direct - Sears

1           MR. SIBERT:  Thank you.

2           THE COURT:  Why don't you ask the questions that

3     still remain to be asked with respect to the foundation.

4           MR. SIBERT:  Yes, sir.

5     BY MR. SIBERT:

6     Q.   Mr. Sears, now, back to the -- I have to ask you some

7     follow-on questions.  Now, you came into the United States

8     Attorney's Office this past Sunday; is that right?

9     A.   Yes, sir.

10    Q.   And who were you -- who was with you?

11    A.   My attorney, Mr. Peter Bornstein.

12    Q.   Okay.  And essentially what was the purpose of that

13    meeting?

14    A.   Pretrial prep, to look over some documents.

15    Q.   Okay.  And those were all the documents that you signed

16    and dated that we went through in the last two days?

17    A.   Most of them.  Some of them -- yeah.

18    Q.   Okay.

19    A.   Most.

20    Q.   And then also besides documents, what did you -- what

21    were you asked to do?

22    A.   Review video.

23    Q.   Okay.  And could you describe to the Court what this

24    video is.

25    A.   The video was of a -- a day down in Miami Beach with

Direct - Sears

1    regard to a meeting with Mr. Jean-Pierre and some undercover

2    agents --

3            THE COURT:  Can you speak into the mic, sir.

4            THE WITNESS:  I said it was a meeting that was

5    coordinated in Miami Beach, Florida, with myself, Mr.

6    Jean-Pierre, and some agents that worked for the federal

7    government.

8    BY MR. SIBERT:

9    Q.   All right.  And did you watch any other video?

10   A.   Yes, I did.

11   Q.   All right.  What was that video?

12   A.   That video was of an undercover agent that came into

13   4360 Vine Street one day.

14   Q.   Okay.

15   A.   I saw clips of it.

16   Q.   And that video was provided to you also as a whole; is

17   that correct?

18   A.   Yes, sir.

19   Q.   And did the clips meet what you watched in the whole

20   video?

21   A.   I watched so much.  I would imagine so.  I would guess

22   so, yeah.

23   Q.   Okay.  And did you get a chance to also see what we've

24   been calling the caption underneath --

25   A.   Yes, I did.

1    Q.   Okay.  And based upon you watching the video and

2    hearing yourself -- were you in that video?

3    A.   Yes, I was.

4    Q.   You were speaking in that video?

5    A.   Yes, I was.

6    Q.   And you were also speaking in the video in Miami; is

7    that right?

8    A.   Yes, I was.

9    Q.   And did the caption accurately reflect what you were

10   saying?

11   A.   To my recollection, yes.

12   Q.   And --

13        THE COURT:  What about what the other folks in the

14   video were saying?  I think we need to establish that.

15        MR. SIBERT:  Do you want me to ask the question

16   or --

17        THE COURT:  Yeah, I'm suggesting that's another

18   foundation question you need to ask.

19        MR. SIBERT:  All right.  Well . . .

20   BY MR. SIBERT:

21   Q.   And, sir, in that video -- let's talk about the video

22   at the warehouse.  Okay?

23   A.   Okay.

24   Q.   That was in the time frame of May 2014.

25   A.   Uhm-hum.

Direct - Sears

1   Q.   Is that right?

2   A.   Yes.

3   Q.   And you stated there was undercover agents; is that

4   right?

5   A.   Yes.  Yes, sir.

6   Q.   Did they speak in the video?

7   A.   Yes, they did.

8   Q.   And did the caption accurately reflect what they were

9   saying in the video?

10  A.   Yes.

11  Q.   And also there was Scott Dittman in that video; is that

12  correct?

13  A.   Yes, he was.

14  Q.   And did that caption reflect what Scott Dittman was

15  saying?

16  A.   Yes, sir.

17  Q.   Now, let's go down to the Miami video, okay?  Who

18  was -- well, let's do this.  Who was in the room of that

19  video?

20  A.   It was myself, another agent, and Mr. Guy Jean-Pierre.

21  Q.   Okay.  And there was an undercover agent in that room;

22  is that right?

23  A.   Yes, sir.

24  Q.   Did the video accurately reflect what that agent was

25  saying?

Direct - Sears

1    A.   It appeared to be, yes.

2    Q.   And the caption underneath?

3    A.   It appeared to be, yes.

4    Q.   And how about what you were saying?

5    A.   It appeared to be.

6    Q.   Okay.  And --

7    A.   I'm sorry, it was just a very difficult thing for me to

8    watch, so my attention was --

9    Q.   You have a personal interest.

10   A.   Yeah.

11   Q.   Brought back bad memories.

12   A.   Yeah.  And huge regrets, yeah.

13   Q.   And then also you stated Mr. Guy Jean-Pierre was in

14   that video; is that right?

15   A.   Yes, he was.

16   Q.   And did that caption accurately reflect what the

17   defendant said?

18   A.   To the best of my memory.

19   Q.   All right.  So just dealing with Exhibits 1, which was

20   the full DVD, and the clips that deal with Exhibit 2 and all

21   the subparts, based upon your viewing, did the video

22   accurately reflect what occurred that day when it was

23   recorded?

24   A.   I'm sorry.

25   Q.   Did the video accurately -- did it show what occurred

1    on the day it was recorded?

2    A.    Yes.

3             MR. SIBERT:  Your Honor, I move the Government

4    Exhibits 1, 1-A, 1-B and 2-A through 2-F.

5             MR. GOODREID:  Your Honor, may I voir dire briefly

6    on this?

7             THE COURT:  All right, you may.

8                      VOIR DIRE EXAMINATION

9    BY MR. GOODREID:

10   Q.    Mr. Dittman, I want to ask you just specifically about

11   the --

12   A.    Mr. Sears, sir.

13   Q.    Sorry.

14   A.    That's okay.

15   Q.    Beg your pardon.  Mr. Sears, I'm going to ask -- Mr.

16   Dittman is somebody entirely different.  You're entirely

17   right.

18             Mr. Sears, I want to ask you about just

19   specifically your viewing of the -- can we call it the Miami

20   undercover operation.  You know what I'm referring to?

21   A.    Yes, sir.

22   Q.    And that would be the recordings and the videos of your

23   discussions with the FBI agents and also with Mr.

24   Jean-Pierre; is that right?

25   A.    Yes, sir.

1    Q.   Okay.  Now, you indicated that you went through these
2    videos and looked at the closed captioning as you were
3    listening and watching the videos, right?
4    A.   Yes, sir.
5    Q.   And you said that you thought they were generally
6    accurate, right?
7    A.   Yes, sir.
8    Q.   But you, yourself, did not prepare the closed
9    captionings, did you?
10   A.   No, sir.
11   Q.   And you also indicated in the testimony earlier today
12   that Mr. Jean-Pierre is very difficult to understand; isn't
13   that right?
14   A.   Yes.
15   Q.   And so can you say conclusively, even though you
16   reviewed it, that the closed captioning accurately reflects
17   what Mr. Jean-Pierre was saying in those audios and videos,
18   even though he's very difficult to understand?
19   A.   I can't say word for word, sir.
20        MR. GOODREID:  Your Honor, in light of that, I
21   maintain my objection, at least, Your Honor -- let me narrow
22   the objection:  at least with respect to the Miami
23   undercover stuff.  I would withdraw my objection to the
24   other audio and video.
25        THE COURT:  All right.  This is what I'm going to

Voir Dire - Sears

1    do:  I am going to overrule those objections.  These files

2    will be allowed to be played to the jury but I'm going to

3    instruct the jury as follows, both orally and then you'll

4    get a written instruction to this effect in the final set of

5    instructions.  And that is:  The evidence consists of the

6    video you're going to see and the audio you're going to

7    hear.  The captioning you should not consider as evidence.

8    To the extent what you hear is different from what is in the

9    caption, what you hear is the evidence and is what you

10   should give weight to and not what's in the caption.

11        All right?  And I will include that in the final

12   set of jury instructions.  With that instruction to the

13   jury, 2-A and 2-F are admitted into evidence and may be

14   published to the jury.

15        (Government Exhibits 2-A through 2-F received)

16        MR. SIBERT:  And that also includes Exhibits 1, 1-A

17   and 1-B.  Those are the full audios and video.

18        THE COURT:  Mr. Goodreid?

19        MR. GOODREID:  Well, I just want to be clear here,

20   Your Honor.  My understanding of what Mr. Sibert said is

21   that Exhibits 2 -- meaning the whole series --

22        THE COURT:  Right.

23        MR. GOODREID:  -- is a subset of 1.  Is that

24   correct, Government counsel?

25        MR. SIBERT:  So to be clear, Exhibit 1 is just

1    audio.  Exhibits 1-A, 1-B because of the length of the video

2    and audio and the space, are the complete video and audio

3    into two disks.

4          THE COURT:  All right.  What is the relevance of

5    the entirety of the -- let me ask that question again.

6          I'm assuming you selected 2-A through 2-F, the

7    excerpts from the video files that is Exhibit 1, 1-A and 1-B

8    because it's relevant to the examination of this witness.

9    So what is the relevance of all the remainder of that -- of

10   that -- of those video files?

11         MR. SIBERT:  To prevent the defense from arguing

12   that we're hiding something from the jury.  If the jury

13   wants to go back and look, they can look at the whole video.

14         THE COURT:  All right.  Well, it sounds like a

15   completeness argument.  We talked about this at the

16   pretrial -- at the trial preparation conference.  I'm going

17   to not allow 1, 1-A or 1-B into evidence based on that.  If

18   the defendant and his counsel believe for some reason 2-A

19   and 2-F have been cherrypicked in such a way that they want

20   other portions of those files to come into evidence, then

21   they can bring that to my attention and we can reconsider it

22   at that point, but I don't hear them making that argument

23   right now.

24         So that request, that is preliminarily, at least,

25   rejected, and we will stick with 2-A through 2-F.

Voir Dire - Sears

1          MR. SIBERT:  Okay.  Thank you, Your Honor.

2          MR. GOODREID:  Your Honor, if I may, just while

3     we're on this.

4          THE COURT:  Yeah.

5          MR. GOODREID:  I mean, I will tell the Court right

6     now that our position is actually we agree with the

7     Government that 1 -- the 1s, shall we call them, that they

8     should come into evidence in the event that the jury, under

9     the rule of completeness, wants to have an expanded view of

10    what happened, they would have that opportunity to do so.

11         THE COURT:  All right.  Well, then that was not

12    what I understood what you -- I thought you were arguing

13    against the rest of this coming in and that you were not

14    agreeing with the completeness argument.

15         MR. GOODREID:  No, and if I -- if I was not clear

16    on that, Your Honor, I apologize.

17         THE COURT:  Okay.  So the defendant -- let's just

18    be clear.

19         MR. GOODREID:  Yeah.

20         THE COURT:  The defendant does take the position

21    that in order for the completeness of the -- of these files,

22    that it is in the interest of justice that the complete

23    video files come into evidence.

24         MR. GOODREID:  That is correct, Your Honor.

25         THE COURT:  All right.  Okay.  Well, then, there's

1    no -- that is another way of saying there's no objection to

2    that request, so Exhibits 1, and 1-A and 1-B are also

3    admitted into evidence and may be published to the jury.

4         (Government's Exhibits 1, 1-A and 1-B received)

5              MR. SIBERT:  Okay, thank you.

6              THE COURT:  All right.

7                   DIRECT EXAMINATION (Continued)

8    BY MR. SIBERT:

9    Q.   All right, sir, I want to turn your attention now to

10   2014.  Particularly when the undercover agents came over to

11   your warehouse with FusionPharm.  Do you recall that day?

12   A.   Yes.

13   Q.   All right.  And could you describe to the jury

14   essentially what the role of the undercover agents were

15   making to you as a representative of FusionPharm.

16   A.   I wasn't a representative of FusionPharm.  I was not

17   even supposed to be there that day.  I don't -- I was just

18   asked to take somebody for a tour of the lettuce pod that we

19   had just gotten back up and running.

20   Q.   All right.  Well, how did you introduce yourself and

21   what were -- what did you begin talking about?

22   A.   I don't recall.

23   Q.   Don't worry, we'll watch it.

24   A.   Please.

25   Q.   All right.

1          Can I have clip 2-A published and played for the

2     jury.

3          THE COURT:  Now, do you want them to be putting on

4     their headphones?

5          MR. SIBERT:  Yes, thank you, Your Honor.  I

6     appreciate that.  I guess I need to put on my headphones,

7     too.  This is new.

8          THE COURT:  Do what you need to do.

9          MR. SIBERT:  Thank you.  So at this time, Your

10    Honor, I would ask for a break to make sure everyone's

11    headphones are working.  And if I can warn the parties,

12    anything that is said or moved or paper shuffled will be

13    picked up and it comes very loud in the headphones.

14         THE COURT:  Okay.  What do you mean take a break to

15    see if the headphones are working?

16         MR. SIBERT:  I don't want to take a break, I just

17    want to make sure everyone has headphones on.  And I think

18    maybe the Court as well.

19         THE COURT:  Okay.

20         MR. SIBERT:  Including the witness.

21         THE COURT:  Yes.  All right.

22         MR. SIBERT:  So -- but no music listening.

23         THE COURT:  All right.  So let's do this.  Let's --

24    let's -- why don't we play like 15 seconds and stop and then

25    I'll ask the members of the jury if they're not hearing the

1    audio on these files.

2        MR. SIBERT:  Okay.  And just a little instruction,

3    there's a power button on the side of the headphones.  You

4    hold it down, the light should turn green.  If it's not

5    green, press Power button again to cycle through the colors

6    until it is green.  So green means go.

7        THE COURT:  So hold down the power.

8        MR. SIBERT:  Right.  And it should turn green.

9        THE COURT:  The green light should come on?

10       MR. SIBERT:  The green light should come on.

11       COURTROOM DEPUTY:  It's on the right side of your

12   headphone, Your Honor.

13       MR. SIBERT:  You have the green light, Your Honor.

14   And then volume control is on the side of the headphones.

15       THE COURT:  Okay.  But where does the light come

16   on --

17       MR. SIBERT:  You have the light on.  I saw it from

18   here.

19       THE COURT:  Hold on.

20       MR. SIBERT:  I can't see it because the knob on it.

21       THE COURT:  The power button is on one and, one --

22   okay.

23       THE WITNESS:  It's on the right side of your

24   headphone, sir.  Keep turning.  Keep turning.

25       THE COURT:  Where does the light come on?

1          THE WITNESS:  You just punched it.  You just rotate
2    it --
3          THE COURT:  Oh, okay, got it.  So do we have to
4    be holding down this power --
5          MR. SIBERT:  No, once the green light is on you've
6    got power for 35 hours.
7          THE COURT:  Okay.  Now I got a flashing blue
8    light.
9          MR. SIBERT:  Judge, you need some assistance?  I
10   will be happy to come up and help you.
11         THE COURT:  No.  No.
12         MR. SIBERT:  Just hit the power again.
13         THE COURT:  Okay.  Oh, there it goes.
14         MR. SIBERT:  You're good now.  Green is good.  All
15   right.
16         MR. SIBERT:  I'm trying not to date you, Your
17   Honor.  I'm trying my best here.
18         THE COURT:  Okay.
19         MR. SIBERT:  All right.  So does the court reporter
20   need one?
21         THE COURT:  No, she is not going to be transcribing
22   this.
23         MR. SIBERT:  Okay.  Thank you.  May I inquire to
24   the Court if the jury is good to go.
25         THE COURT:  Sorry, what?

1          MR. SIBERT:  May I inquire into the Court if the

2     jury is good to go?

3          THE COURT:  Does everybody have a green light on?

4     Okay.

5          Like I said, Mr. Sibert, let's do 15 seconds and

6     stop.

7          (Video played)

8          THE COURT:  Let's stop.  Whoa.  That's way too

9     loud, at least for me.  How do you reduce the volume?

10         MR. SIBERT:  So right where you have the power,

11    there's a volume to the left front.

12         THE COURT:  Okay.

13         MR. SIBERT:  It says volume minus, volume plus.

14         THE COURT:  So that -- anybody in the jury not --

15    did everybody hear the volume?  Anybody did not?

16         All right.  Go ahead.

17         MR. SIBERT:  Can I start backwards again?

18         THE COURT:  Sure.

19         MR. SIBERT:  Thank you.

20         (Video played)

21         MR. SIBERT:  That's the end of the first clip.

22         THE COURT:  Okay.

23         MR. SIBERT:  Okay.  So I'm just going to follow up

24    with some questions here.

25         THE COURT:  Okay.

1    MR. SIBERT:  Just for the Court's knowledge, this
2    will be kind of the routine.
3             THE COURT:  Okay.
4             MR. SIBERT:  Thank you.  I appreciate your
5    patience.
6             THE COURT:  And I think it would also help for the
7    record, like is that 2-A that we just heard?
8             MR. SIBERT:  I'm sorry, sir, that was 2-B.
9             THE COURT:  Okay.  Well, I'm glad I asked the
10   question.  You should -- you should state on the record --
11            MR. SIBERT:  I'm sorry, let me check.  I'm sorry.
12            It was 2-A, Your Honor.
13            THE COURT:  Okay.  You should state on the record
14   which sub-exhibit or -- yeah, sub, let's call it a
15   sub-exhibit, 2-A, which clip it was that we just saw before
16   you then ask questions -- about it.
17            MR. SIBERT:  Yes, sir.
18            THE COURT:  -- and it's clear for the record.
19            MR. SIBERT:  Yes, sir.  Thank you.
20            THE COURT:  All right.
21   BY MR. SIBERT:
22   Q.   Okay.  And as the Court just instructed, sir, we just
23   watched clip 2-A in the exhibit list.  Now I'd like to
24   follow along with some questions there.  Now you just
25   watched that video, correct?

1   A.   Yes, I did, sir.

2   Q.   Who was the blond gentleman with the gray sweatshirt?

3   A.   That was my brother-in-law, Scott Dittman.

4   Q.   Okay.  And where did this video occur?

5   A.   43 -- no, that was 5850 -- I can't remember -- Commerce

6   City.

7   Q.   Okay.  And could you describe the building that you

8   were --

9   A.   I was in the industrial warehouse.

10  Q.   That was the warehouse?

11  A.   Yeah.

12  Q.   And you came -- and where did you come out of when you

13  started speaking to the --

14  A.   The back of the warehouse.

15  Q.   Excuse me?

16  A.   Back of the warehouse.

17  Q.   Were you in an office?

18  A.   It was an office space, yeah.  Yeah.

19  Q.   And there was a female that was in the background on a

20  computer.  Do you know who that was?

21  A.   Uhm-hum.  Yes, that's my cousin, Amber.

22  Q.   Amber.  And what did Amber do?

23  A.   A little bit of everything.

24  Q.   She had an office?

25  A.   She had a desk.

Direct - Sears

1    Q.   Okay.  Well, was it -- was it in the open or was there
2    an office?
3    A.   It was an office space.
4    Q.   Okay.  Now, when you came out of the office, could you
5    describe to the jury what you were wearing there.
6    A.   I was wearing a PharmPods T-shirt, which was the brand
7    and the equipment that I had the exclusive rights to sell
8    for a couple of years.
9    Q.   Right.  Exclusive right to sell for who?
10   A.   FusionPharm.
11   Q.   And who was the CEO of FusionPharm?
12   A.   Scott Dittman, my brother-in-law.
13   Q.   Now, Mr. Dittman made a statement in there that you're
14   not around that often; is that right?
15   A.   That was correct at that time.
16   Q.   Okay.
17   A.   My licensing agreement was winding down and was --
18   expired sometime in April and I chose not to re-up.  I
19   couldn't afford it.  And the lettuce pod was put back on
20   line by the younger brother, Robert Dittman, so I was just
21   helping him set that back up.
22   Q.   Okay.  All right.  So then you were talking about some
23   investment or offshore accounts; is that right?
24   A.   No, not my offshore accounts.  I believe the undercover
25   agent brought something up about offshore and I recognized

Direct - Sears

1    some of the names that I'd read and knew about from years

2    gone by.

3    Q.   Okay.  Did the video help you refresh your memory about

4    who the undercover FBI agents were acting as?

5    A.   No, it didn't at that moment.

6    Q.   Okay.  All right.

7    A.   Probably investors I would imagine; somebody wanting to

8    do something.

9    Q.   Okay.  Well, let me ask you a different question.

10   Would you speak to anyone that entered your office space?

11   A.   You have no idea how many people walked into that

12   office space.

13   Q.   Well, let me ask you a different question.  Who brought

14   those people into your office space?

15   A.   I don't recall.  I came out of the back, if you see the

16   video.  I don't know who brought them in.  Scott was in the

17   back, too, so I don't know how they got in there.

18   Q.   Your testimony was Scott Dittman was in the back?

19   A.   It seems from the video he was.  I mean, I don't know

20   where he came from in the video.  You guys are just watching

21   it as I did.

22   Q.   You came out of the back room, you would agree with me

23   on that?

24   A.   Yes, sir, absolutely.

25   Q.   And you would also -- well, what was your morning like

1    that morning after watching that video?

2    A.   I have no idea.  I don't remember.

3    Q.   You don't remember after watching that video?

4    A.   What, what my morning was like?

5    Q.   Yes.

6    A.   No, I don't remember what my morning was like.

7    Q.   You don't recall talking about all of the phone calls

8    you got?

9    A.   No, I don't.

10   Q.   After just watching that video.

11   A.   I didn't hear anything about all the phone calls I got.

12   I didn't --

13   Q.   Do you need to watch it again?

14   A.   If you want to queue it up, please feel free.

15        I -- sorry, sir, I'm not being difficult, I

16   don't --

17        THE COURT:  No, you --

18        THE WITNESS:  I talk fast in general and I don't

19   listen to myself, so --

20        THE COURT:  You just testify to what you recall and

21   what you know.

22        THE WITNESS:  Let's rewind it.

23        MR. SIBERT:  All right.  At this time, Your Honor,

24   the Government would like to play Government's Exhibit 2-B,

25   which is the second clip for Exhibit 2.

Direct - Sears

1          THE COURT:  All right.

2      (Video played)

3          THE COURT:  Mr. Sibert, I did something and now

4    it's just flashing blue.

5          THE WITNESS:  Just hit the button again until you

6    see the green.  There you go.

7          MR. SIBERT:  I wish he was as easy with me as he is

8    with you.

9          THE COURT:  Okay.

10          THE WITNESS:  He's nice to me.

11    BY MR. SIBERT:

12    Q.   So -- all right.  So let's just talk about that video.

13    You got a clear understanding of that video?

14    A.   Absolutely.

15    Q.   Memory's good?

16    A.   Quite entertaining, yes, sir.

17    Q.   All right.  So you talked about -- you were talking

18    about some stocks and places to invest; would you agree with

19    me?

20    A.   Yes.  Yes.  He asked about offshore, so I was answering

21    his question, yes.

22    Q.   Okay.  And at the end of that video there, we kind of

23    see a checkered -- a gentleman wearing a checkered coat with

24    kind of slicked-back black hair?

25    A.   Yes.

Direct - Sears

1    Q.   Is that one of the undercover agents?

2    A.   That's the only guy, yeah, that I can remember.

3    Q.   Okay.  And so you talk about Boca.

4    A.   Yes, sir.

5    Q.   What do you mean by "Boca"?

6    A.   Boca Raton, Florida, sir.

7    Q.   Where is Mr. Guy Jean-Pierre's office located?

8    A.   Deerfield Beach, Florida.

9    Q.   Where?

10   A.   Deerfield Beach, Florida.

11   Q.   Okay.  And then your brother-in-law, Scott Dittman,

12   seems to be leaving there; is that correct?

13          MR. GOODREID:  Objection.  Leading.

14          THE COURT:  Sustained.

15   BY MR. SIBERT:

16   Q.   What's your brother-in-law doing in there?

17   A.   I don't recall.

18   Q.   You don't recall after watching that video?

19   A.   I didn't hear -- does anybody else hear what he said he

20   was doing that day?  He was going somewhere, obviously.  I

21   don't recall.  He said later on that day he was going to the

22   airport, but not at that moment.

23   Q.   Okay.  Well, do you know why he was going to the

24   airport?

25   A.   To go home.

Direct - Sears

1    Q.   And where was his home?

2    A.   At that point was Pennsylvania.

3    Q.   Okay.  So the CEO for FusionPharm lived in

4    Pennsylvania?

5    A.   Yes.

6    Q.   Okay.  And, in fact, do you remember -- what did Mr.

7    Dittman ask you to do when he was leaving that day?

8    A.   I didn't hear that part, no.

9    Q.   Just missed it?

10   A.   Do you want to play it again?  I'll listen to it and

11   then I can answer your question and we can get on with

12   this.

13        MR. SIBERT:  Your Honor, I ask permission to play

14   again.

15        THE COURT:  Sure, go ahead.

16        THE WITNESS:  Walked them around, toured the back.

17   Anything --

18   BY MR. SIBERT:

19   Q.   Are you answering me?  Hold on --

20   A.   I'm trying to save time.  Walked him around.  Walked

21   the guy around, toured the back, something like that, maybe.

22   Q.   Sir, let me explain something --

23   A.   Is that what I heard?

24   Q.   -- you're under oath --

25   A.   I'm trying to answer your question.

Direct - Sears

1    Q.   -- we're watching a video.

2           MR. GOODREID:  Your Honor, I object to counsel

3    instructing the witness.  I think it's supposed to be a Q

4    and A.

5           THE COURT:  Okay.  Everybody take a deep breath.

6    Don't talk over each other.  My court reporter can only take

7    one voice -- take down one voice at a time.

8           So you asked a question.  It was clear to me that

9    the witness didn't understand, or at least didn't remember

10   the part you were asking about.  You asked whether we can

11   replay it and I said yes, so let's replay it.  Or at least

12   the -- if you can chop it up and go to that portion --

13          MR. SIBERT:  I can't chop it up, Your Honor.

14          THE COURT:  Okay.  Well, then replay it.

15          THE WITNESS:  May I --

16          THE COURT:  No.  No question's pending, Mr. Sears.

17   Go ahead.

18          THE WITNESS:  Sorry.

19          MR. SIBERT:  Thank you, Your Honor.  Can we please

20   play for the record 2-B.

21       (Video played)

22   BY MR. SIBERT:

23   Q.   Okay.  For the record, 2-B was played for the second

24   time.

25          Did that refresh your memory?

Direct - Sears

1   A.   Your question was where was he going, correct?

2   Q.   Well --

3   A.   I didn't hear him say where he was going in that

4   particular clip.  He said something about what he had to do

5   on Friday, but you're asking me where he was going, why I

6   was there.  Am I correct in your question?

7   Q.   Did you know he was going to the airport?

8   A.   I was supposed to be taking him to the airport later,

9   but I wasn't leaving with him, therefore he wasn't going to

10  the airport at that time, correct.

11  Q.   Do you recall Scott Dittman saying he's trying to get

12  out of there in 35 minutes?

13  A.   I didn't hear that part.  But I heard him say I was

14  going to be taking him to the airport.

15           MR. SIBERT:  Your Honor, at this time, I would ask

16  that we treat this witness under the Rules of Evidence 615.

17           THE WITNESS:  Oh, my God, not again.

18           THE COURT:  Mr. Goodreid.

19           MR. GOODREID:  As the other day, I don't see any

20  basis for that.  I mean, my perception is this witness is --

21  he's trying to do the best he can to answer the questions.

22  I -- no disrespect to Government counsel, but the questions

23  are not always clear.  If he can't remember, he can't

24  remember.  I mean, I don't know that that makes him hostile.

25  He has a cooperation agreement with the Government as we

Direct - Sears

1    have already talked about.  I don't think he's established a

2    basis to lead him under 615.

3         THE COURT:  I agree.  The request is denied.

4    BY MR. SIBERT:

5    Q.   What did Scott Dittman ask you to do there in the

6    video?

7    A.   Walk them around manufacturing.

8    Q.   Okay.  And where was manufacturing?

9    A.   In that warehouse and also across the street.  We had

10   two warehouses.

11   Q.   So was Mr. Scott Dittman going to stay on the property?

12   A.   From what I could see in the video and my memory, he

13   was going somewhere in that moment, or had something to do.

14   I had to walk the gentlemen around myself.

15   Q.   Do you recall that he was buying a house?

16   A.   Yes, I do.

17   Q.   Okay.  And you stated he was buying a house in

18   Pennsylvania?

19   A.   Yes, sir.

20   Q.   So he can't stay in Colorado; would you agree with me?

21   A.   Yes, sir.

22   Q.   So essentially who left you in charge of showing these

23   gentlemen FusionPharm?

24   A.   Scott Dittman.

25         THE COURT:  Why don't we take a pause there, Mr.

Direct - Sears

1    Sibert.

2             Ladies and gentlemen of the jury, we're going to

3    take our morning recess.  We'll be in recess for 15 minutes.

4         (Jury left at 10:08 a.m.)

5             THE COURT:  Mr. Sears, you know the drill by now.

6             THE WITNESS:  Yes, sir.

7         (Recess taken 10:09 a.m. to 10:32 a.m.)

8             THE COURT:  Mr. Sears, you remain under oath.

9             And, Mr. Sibert, you may resume your examination.

10            MR. SIBERT:  Okay, thank you, Your Honor.  At this

11   time, the Government would like to play clip 2-C.

12        (Video played)

13   BY MR. SIBERT:

14   Q.   Okay, Mr. Sears, were you able to listen to that

15   video?

16   A.   Yes, sir.

17   Q.   All right.  So how many times did you mention Scott

18   Dittman, approximately, in that video?

19   A.   Two, three.  I don't know.  I didn't -- I wasn't

20   counting.  I don't know.

21   Q.   And you recall saying meatballs?

22   A.   Yes.

23   Q.   A couple of meatballs started this together?

24   A.   Yes.

25   Q.   Who's the meatballs?

                        Direct - Sears

1    A.   Scott -- I said that would be myself, Scott.

2    Q.   Okay.  And just to -- so to give a little introduction,

3    when you were outside walking across the driveway there,

4    what was the building you entered?

5    A.   Excuse me?

6    Q.   What was that building you entered?

7    A.   That was the warehouse across the street.

8    Q.   And then you recall about -- regarding a Rich.

9    A.   I didn't hear myself mention a Rich.

10   Q.   You didn't talk about a Rich?

11   A.   I didn't hear myself mention a Rich.  I'm sorry.

12   Q.   And so essentially now you gave a history there

13   about -- did you provide a history to the investigators?

14   A.   You could call it a history, I guess.

15   Q.   And you started from the beginning.

16   A.   I guess you could say that.

17   Q.   And so it's fair to say you were involved -- when

18   you -- you were involved from the start.

19            MR. GOODREID:  Objection.  Leading.

20            THE COURT:  Sustained.

21   BY MR. SIBERT:

22   Q.   When were you involved?

23   A.   At which part, sir?  It was a -- it was a -- if I can

24   finish -- it was a very constantly -- it was a living

25   business as it revolved, so, yes, I was involved in many

Case 1:17-cr-00008-WJM   Document 283   Filed 03/27/20   USDC Colorado   Page 65 of 232

Direct - Sears

1    aspects of it from the start, yes.
2    Q.   How many times -- how many times did you say "we," do
3    you know on that video?
4    A.   I said "we" a lot and "we" probably would have been my
5    group of people that I was working with Meadpoint and the
6    PharmPods and also "we" working with the FusionPharm
7    subcontractors to help improve the technology of the
8    equipment that I had the licensing agreement to.
9    Q.   Sure.  And so you weren't referring to Scott when you
10   said "we" all the time?
11   A.   He would be in the group of people as in "we."  We had
12   engineers and other people, too.  Electricians and --
13   Q.   And you -- but you have seen in the video, how many
14   people did you have total?
15   A.   No, in the video I said it would be 12 max at that time
16   and --
17   Q.   So -- how many people total?
18   A.   He asked for employees, not subcontractors and
19   everything else.
20   Q.   Okay.  But employees at FusionPharm, 12 people total?
21   A.   That would be max at full bore, that's what
22   I believe --
23   Q.   Excuse me?
24   A.   That would be max at full bore.  I believe that's what
25   I said in the video.

Direct - Sears

1    Q.   All right.  So not a very large company.

2    A.   No.

3    Q.   Easy to know everyone?

4    A.   Absolutely.

5         MR. SIBERT:  Okay.  Can we play clip 2-D.

6         (Video played)

7    BY MR. SIBERT:

8    Q.   Okay, sir, you were able to view that video.  And this

9    was video 2-D.  Just have some follow-on questions for that.

10        At one point, can you tell the jury what Scott

11   Dittman was showing those alleged investors from the FBI

12   before they came to the warehouse.

13   A.   Scott Dittman was showing them a piece of property that

14   was going to be an outside project, outside of anything I

15   was doing and he was doing.  It was a brand-new project

16   called Green Acres.  The concept, itself, was to take the

17   units that created a tremendous amount of heat, put them

18   with a thermal exchange unit, and attach a greenhouse on top

19   of it to bring down the costs -- the heating costs.  You

20   know, here in Colorado it gets cold and the heat goes

21   through the roof and that's a cost.  So using a thermal

22   exchange it would be much more efficient to be able to, you

23   know, grow.

24        That concept was to be for cannibas on one side and

25   also leafy greens and specialty microgreens and things to

Direct - Sears

1   that effect.

2           So that was going to be a separate public deal that

3   our old -- as you heard, our -- yeah.

4   Q.   Your deal.

5   A.   No, no.  As you saw on the video, it was Richard, Jim

6   Painter, Fred Lehrer was going to be the CEO, myself was

7   going to be in it, Scott was going to be involved.  I don't

8   know what capacity he was.

9   Q.   And you mentioned the name Fred Lehrer as the lawyer;

10  is that correct?

11  A.   Excuse me?

12  Q.   You mentioned the name Fred Lehrer as the lawyer in

13  that video?

14  A.   Yes, he is.

15  Q.   So this is after -- this, again, happened in 2014 in

16  this video.

17  A.   That video you -- what was the date on it?

18  Q.   I'm asking:  Do you remember when the video was made?

19  A.   It was in 2014.

20  Q.   Okay.  And that was after Mr. Guy Jean-Pierre?

21  A.   Yes, sir.  Yes, sir.

22  Q.   So you no longer were working with Mr. Guy

23  Jean-Pierre?

24  A.   To the best of my knowledge, no.

25  Q.   If I recall correctly, it was because of the SEC

Direct - Sears

1   complaint?

2   A.   Yes.

3   Q.   Okay.  Now, you said in the video, the goal was to run

4   five revenues off one stream, or words to that effect.

5   A.   It's called ancillary income.  You have one business,

6   you don't want to just be relegated to one set of income.

7   If something goes wrong at least you have other forms of

8   income coming in so you can pay your bills because things

9   just happen in life and businesses.

10   Q.   And so you also talked about a professor.

11   A.   Yes, Nicholas Carrell.

12   Q.   Okay.  And you said you talked to the professor?

13   A.   Yes.

14   Q.   Where was this professor from?

15   A.   CU university, Nicholas Carrell.

16   Q.   And who went up and talked with this professor?

17   A.   I spoke with him.  I met him at -- Scott went up and

18   met with him at CU.  I met him at a football game where we

19   sat down and spoke for a little period of time.

20   Q.   And who sat down with him?

21   A.   I did.

22   Q.   Anyone else?

23   A.   No, just me.

24   Q.   So you and Scott talked to the same professor?

25   A.   Yes, we did.

1    Q.   Okay.  About this business.

2    A.   No.  Not about that business.  That was about a robotic

3    system that he wanted to put in my lettuce pods.  With Scott

4    being the owner of the technology of course he would have to

5    sit with him.

6    Q.   And do you recall how many times you said "we" in that

7    video?

8    A.   I didn't count, sir.  I'm sure it would have been a

9    lot.

10   Q.   And you've mentioned that "We are going to rent

11   everything.  We are going to have a licensing agreements.

12   We're going to have a maintenance contract," and you went on

13   to say a couple more things.

14   A.   That goes with the ancillary income.

15   Q.   Who was the "we"?

16   A.   "We"?  The company that we were talking about, Mr.

17   Lehrer, myself, Jim Painter, would be the mother company,

18   itself, that would be selling these units.  If somebody

19   wanted to come in, we would sell them -- once again, we, the

20   group there, would sell them the nutrients that they needed,

21   all the equipment that they needed, you name it, soup to

22   nuts.

23   Q.   So you --

24   A.   We provide everything one-stop shop, turnkey.

25   Q.   You called it ground floor?

Direct - Sears

1    A.   Excuse me?

2    Q.   You called it the ground floor.

3    A.   What did I call the ground floor, sir?

4    Q.   I'm asking you.  You mentioned this is on the ground

5    floor.

6    A.   I don't recall saying the "ground floor."  Maybe the

7    ground floor opportunity.  I don't know what you're

8    referring to.

9    Q.   Okay.  Do you recall investors saying they needed to

10   contact you about putting in capital?

11   A.   Yeah.  That would be for the new company that I was

12   describing.

13   Q.   Okay.  And that had nothing to do with Guy Jean-Pierre.

14   A.   No, sir, it didn't.

15   Q.   Okay.  Now, you went back and you said, "We've been

16   hungry.  We know the business.  We've been there from the

17   beginning."  So not about the new company, what company are

18   you talking about there?

19   A.   Myself, Scott.  That company, individuals.  Because it

20   was a company, I would say --

21   Q.   And then finally, the undercover asked you, "We are

22   talking to the guy that runs the show here."

23        And what was your response?

24   A.   I said "No."  I said, "Let's" -- and then --

25   Q.   The follow-on was "50-50" --

Direct - Sears

1    A.    And I said no.

2    Q.    -- what was your response?

3    A.    I said "I'm the hand up Mona Lisa's skirt, let's put it

4    that way," and I laughed.

5    Q.    Okay.

6    A.    Would you like to know the relevance of that?

7    Q.    No.

8    A.    Oh, okay.  Just make something up.

9    Q.    Was -- just going back to this new -- going back to

10   this new company, I believe you called it Green Acres.

11   A.    Yeah, that was the concept name.  It wasn't an official

12   name.

13   Q.    Okay.  Were they going to use PharmPods, FusionPharm

14   pods?

15   A.    Yeah.  The concept was based on the container model.

16   Q.    So the pods would come from FusionPharm?

17   A.    Probably, yeah.  Through a licensing agreement of some

18   sort.

19         MR. SIBERT:  Okay.  At this time, the Government

20   would like to play 2-E.

21         (Video played)

22         MR. SIBERT:  For the record, that was 2-E.

23   BY MR. SIBERT:

24   Q.    Now, sir, you made a statement there regarding stock

25   and company.  What did you mean by "the day that the stock

Direct - Sears

1   takes care of the company you have bigger problems"?

2   A.   What I meant was -- prior to that I also -- he talked

3   about -- or I talked about campaigns and public relations, a

4   lot of small cap companies in the OTC bulletin board, put

5   out a tremendous amount of press releases and we call that

6   fluff.  They will put out two, three press releases a week

7   to try to hype their stock to get out of their paper.

8          We didn't have that situation, so when you have to

9   sell your stock and actively pump your stock and advertise

10  it, you don't really have much there.  If you take care of

11  your company and you do your business, your stock will take

12  care of itself because the earnings will drive it.

13  Q.   Okay.  Well, you testified previously the fact that

14  when you sold the Meadpoint note, which was stock in

15  FusionPharm --

16  A.   Yes.

17  Q.   -- you put that money back into FusionPharm.

18  A.   No, I put that money into Meadpoint by buying equipment

19  from FusionPharm.  If the money would have been put into

20  FusionPharm directly, that would have been a problem.

21  Q.   And you also say you never put out press releases; is

22  that right?

23  A.   No, there were -- press releases were put out.  The

24  company did put out press releases.  But I think they put 14

25  out in a period of -- how many years?  Four?  Meanwhile,

Direct - Sears

1    people put 14 out a month.

2    Q.   So what you told the alleged investors in here wasn't

3    correct.

4    A.   Excuse me?

5    Q.   What you told the FBI agents in this video was not

6    correct; in fact --

7    A.   In which respect?

8    Q.   That there was no press releases.

9    A.   In regard to the campaigning.  You're taking it out of

10   context.  He's talking about -- he's from New York and he's

11   a player, he's a hedge fund guy and it's an OTC bulletin

12   board stock where people put out, you know -- I don't know

13   if you guys are familiar with that industry -- they put out

14   press releases every other day for whatever reason.

15            So, you know, relevant to the conversation, no, we

16   don't put out press releases, you know.  Nobody -- there was

17   none of that unless it was relevant.

18            MR. SIBERT:  Okay.  Can I play Government Exhibit

19   2-F.

20        (Video played)

21   BY MR. SIBERT:

22   Q.   How much time did you spend at FusionPharm?

23   A.   FusionPharm, Meadpoint, VertiFresh -- you know,

24   FusionPharm owned the technology, you can't just say

25   FusionPharm.

Direct - Sears

1   Q.   My question is:  How much time did --

2   A.   De minimis time at FusionPharm.  I spent a lot of time

3   with Meadpoint and VertiFresh, which were the companies that

4   I was working with and for.

5   Q.   Well --

6   A.   For the relevant period, sir.

7   Q.   You stated in the video seven days a week, 12 hours --

8   A.   That's right.  Selling farm pods that I had the right

9   to sell through a licensing agreement through Meadpoint

10  Venture Partners?

11  Q.   With your brother-in-law?

12  A.   My brother-in-law, yes.  He did own the technology.

13          MR. SIBERT:  All right.  Your Honor, at this time,

14  the Government's going to move to admit further exhibits

15  that were -- the foundation was laid, and I believe -- I

16  might be mistaken, but the objections from defense, at least

17  regarding my --

18          THE COURT:  I didn't understand what you --

19          MR. SIBERT:  Let me just go through the exhibits

20  that we're going to introduce.  Government Exhibits 320-A

21  through 320-M.  In addition, 322-A through 322-R.

22          THE COURT:  Are these stipulated?

23          MR. SIBERT:  They are not stipulated.

24          THE COURT:  All right.

25          MR. SIBERT:  But I believe I laid the foundation

Direct - Sears

1    before, so I'm asking them now.

2            THE COURT:  I'm not understanding what you're

3    trying to do.

4            MR. SIBERT:  I'm asking to admit the evidence.

5            THE COURT:  Hold on.  320 and 322, yes, those were

6    among the 12 or so exhibits you informed me in advance that

7    you were going to move into evidence, and then we went to

8    Exhibit 2 with all these video clips, and we admitted 1 and

9    1-A and 1-B.  Now we're back to 320 and 322.  But I don't

10   recall you laying -- even discussing these exhibits or

11   laying any kind of foundation.

12           MR. SIBERT:  All right.  Let me refresh the

13   witness.

14   BY MR. SIBERT:

15   Q.   Sir, were you involved with an undercover operation in

16   2016?

17   A.   Yes, I was.

18   Q.   And what was your role in that undercover operation?

19   A.   To work with the federal government to bring back a --

20   an individual from the Dominican Republic.

21   Q.   And who was the individual?

22   A.   Mr. Guy Jean-Pierre.

23   Q.   Okay.  And what was essentially the plan regarding that

24   operation?

25   A.   The plan was to set up a company and have him put

Direct - Sears

1    together all the documentation that would be required to put
2    some notes together and get -- fast-track the company to the
3    markets.
4    Q.   I'm sorry, I missed your answer.  I couldn't hear over
5    the cough.
6    A.   I apologize.  I said the -- the -- his -- his role was
7    to prepare all the paperwork for the company for some
8    insiders, to be able to fast-track it on to the marketplace
9    to liquidate securities.
10   Q.   Okay.  And was this going to be a real company *per se*?
11   A.   No.
12   Q.   What was it going to be?
13   A.   If you could elaborate.  It was an operation.  It
14   wasn't going to be a real company.
15   Q.   Okay.
16   A.   I don't know what you're asking me.
17   Q.   Was the owner of the company -- the true owner of the
18   company going to be disclosed in this operation?
19   A.   No.
20   Q.   Who was going to be the owner?
21   A.   An individual that the undercover agent was going to
22   put in, a friend of his or something like that, if I
23   remember correctly.
24   Q.   Does the name Phil Morgan remind --
25   A.   Morgan, yes.

1   Q.   What does Mr. Phil Morgan know about the company?

2   A.   Not too much.  He was going to be a figurehead, so to

3   speak.

4   Q.   Okay.  Who was actually going to control the company?

5   A.   E.J. -- well, there's one agent, E.J., and myself.

6   Q.   Okay.  And what was the company going to be called?

7   A.   The -- you guys chose it to be VertiFresh.

8   Q.   When you say "you guys," who?

9   A.   United States Government, Agent Funk, and the other

10  agents.

11  Q.   So law enforcement agents doing the investigation?

12  A.   Yes, sir.

13  Q.   Not myself.

14  A.   Not you.

15  Q.   All right.  Or not any other prior Assistant United

16  States Attorney?

17  A.   Mr. Harmon was involved in it, yeah.  He knew all about

18  it.

19  Q.   Okay.  Good.  So now essentially were you going to be

20  disclosed owners in this company --

21  A.   No.

22  Q.   -- you and E.J.?

23  A.   No.  That was the objective was to not -- have us not

24  be disclosed.

25  Q.   Okay.  What was the purpose for you not to be

Direct - Sears

1   disclosed?

2   A.   Because we -- if I remember correctly, we said we had

3   bumps in the road and didn't want the press and wanted to be

4   able to -- yeah, wanted to be able to liquidate securities

5   and make money.

6   Q.   What did you mean by "bumps in the road"?

7   A.   Investigations, convictions, press.

8   Q.   What types of convictions?

9   A.   Any type of conviction.

10  Q.   And who was going to assist you with the paperwork in

11  this?

12  A.   Mr. Guy Jean-Pierre.

13  Q.   Okay.  And did Mr. Guy Jean-Pierre assist you with this

14  paperwork?

15  A.   Yes, he did.

16  Q.   Okay.  What did he do?

17  A.   He put together templates for all the documents that I

18  was asked to have him procure.

19  Q.   Do you recall some of the templates you asked Mr. Guy

20  Jean-Pierre to put together?

21  A.   It would have been in notes, purchase agreements --

22  wait a second.  Probably some regulatory paperwork for --

23  templates, mostly templates.  They would be boilerplate

24  templates because it was a timing issue.

25  Q.   How about legal opinion letters?

Direct - Sears

1   A.   Yes, sir.  Yeah, legal opinion letter templates.

2   Q.   Okay.  Now you talked about notes.  What type of note

3   was going to be set up in this operation?

4   A.   It was going to be an -- it was set up -- the

5   Government wanted me to establish that there was a handshake

6   deal done that needed to be authenticated and -- yeah.  It

7   was a hand -- it was a -- it was a cash deal note that I had

8   supposedly taken and that I wanted to be able to put -- the

9   agent, who was the owner, wanted to be able to put that on

10  the books as real debt to be able to get stock.

11  Q.   And so basically falsify the debt?

12  A.   Yes.

13  Q.   In order to be able to sell the stock.

14  A.   Yes.  That was the objective of the operation.

15  Q.   All right.  And you mentioned "note."  Was this note

16  convertible or nonconvertible?

17  A.   It wasn't a note, it was a cash payment that went from

18  one hand to the other, and the Government wanted it to be

19  structured in that way.

20  Q.   Okay.  And how were you going to get paid back?

21  A.   Cash.

22  Q.   And were you going to get any stock equity?

23  A.   Yes, but it wasn't going to be in anybody's name

24  directly.

25  Q.   Why is that?

1    A.   Because the Government said that's the way they wanted

2    it.

3    Q.   Okay.  And then so did Mr. Guy Jean-Pierre know

4    about -- about this cash deal that you just discussed?

5             MR. GOODREID:  Objection.  Calls for speculation.

6             THE COURT:  If you know.

7             THE WITNESS:  Yes.

8    BY MR. SIBERT:

9    Q.   In fact, do you recall discussing a holding period?

10   A.   Yes, I do.

11   Q.   Okay.  And do you recall talking about deposits that

12   you had to show proof of?

13   A.   No, that one I don't.  I don't.  It would -- probably

14   it would have come up in the course of a conversation, but I

15   don't remember it exactly.

16            THE COURT:  Who are we talking about in terms of a

17   conversation?  Between the witness and who else?

18            MR. SIBERT:  I was asking him if he recalled

19   deposits.  Cash deposits.

20            THE COURT:  You asked him:  Do you recall

21   discussing a holding period.  With whom does that question

22   reference?

23            MR. SIBERT:  I was referencing him if he

24   regarded -- remembering talking about a holding --

25            THE COURT:  Talking about with whom?

Direct - Sears

1      MR. SIBERT:  Well, the defendant.

2      THE COURT:  Talking to himself?  Or --

3      MR. SIBERT:  No, the witness and defendant talking

4  together.

5      THE COURT:  Okay.  All right.  Well, I think that

6  was missing in your question.

7  BY MR. SIBERT:

8  Q.   Okay.  Well, I guess -- I guess my question should have

9  been:  Do you remember a discussion regarding a holding

10  period?

11  A.   Vaguely, yes.

12  Q.   And who were you having that discussion with?

13  A.   Mr. Jean-Pierre and the FBI agent.

14  Q.   And do you recall how long the holding period had to

15  be?

16  A.   I don't recall.  I can speculate that any holding

17  period is going to be six months to a year on a company.

18  Q.   And why do you say six months to a year?

19  A.   Six months if you're -- it's six months if you're a 12G

20  fully reporting company.  However, if you're a lower-tiered

21  company on the OTC bulletin it is only one year.

22  Q.   All right.  And do you recall what kind of company this

23  was going to be?

24  A.   Brand-new company.

25  Q.   Was it going to be a --

Direct - Sears

1    A.   No, hold on.  Sorry.  It was going to be a shell

2    company.

3    Q.   What do you mean by "shell"?

4    A.   Shell company would be a publicly traded company to

5    where its core business failed.  Technically it could still

6    trade on the exchange even though it has no business

7    whatsoever because traders just keep making the markets to

8    make pennies, and they make a lot of money doing it,

9    actually.  So that's what they call a shell company.

10   Q.   Is that considered lower tier?

11   A.   Yes, that's -- yes, sir, that -- yes.  Very low.

12   Q.   So the holding period would have to be a year?

13   A.   Yes.  Unless it did a registration statement, then it

14   could be immediate.  You do a registration period, there

15   isn't a holding period, your stock is free right out of the

16   gate.  Or if you're minimum of a 12G reporting company, then

17   it's six months.

18   Q.   Do you know how much a registration statement is?

19   A.   It depends on the lawyer.  They can go for 150 grand

20   and they can go for 25 grand.

21   Q.   So expensive?

22   A.   Relatively.  I think the accounting is probably the

23   worst part of it.

24   Q.   All right.  And so you talked about -- did Mr. Guy

25   Jean-Pierre know that this company was going to be a shell

Direct - Sears

1    company?

2    A.   Yes, sir.

3    Q.   And did he know that Phil Morgan was going to be just

4    acting as a disclosed owner?

5    A.   Yes, sir.

6    Q.   Did he know if Mr. Phil Morgan would have any roles --

7    role to play in this or any roles within the company?

8    A.   I'm not really understanding your question to answer

9    properly.  He understood that he didn't have any day-to-day

10   duties.  Mr. Morgan was going to be a figurehead, sir.

11   Q.   So Mr. Guy Jean-Pierre understood that Phil Morgan was

12   a name?

13   A.   Yes, sir.

14        MR. GOODREID:  Your Honor, I'm going to launch a

15   continuing objection to the witness testifying as to what

16   Mr. Jean-Pierre knew unless an adequate foundation is

17   established.

18        THE COURT:  I agree with that objection.  And also

19   watch the leading form of the questions.

20   BY MR. SIBERT:

21   Q.   Who did you -- well, who did you discuss the setup of

22   this company with?

23   A.   The seller company?

24   Q.   The setup.

25   A.   Oh, the setup.  Specifically?  The Government, Mr.

Direct - Sears

1    Jean-Pierre.

2    Q.   Okay.  And when you said "the Government," who do you

3    mean by that?

4    A.   Numerous FBI agents; Mr. Harmon, the old AUSA.

5    Q.   How about E.J.?

6    A.   E.J.  He would be one of the Government agents.

7    Q.   In fact there was a meeting in Miami, correct?

8    A.   Yes, sir, there was.

9    Q.   Was that meeting recorded?

10   A.   Yes, it was, sir.

11   Q.   Okay.  And before that meeting, did you have other

12   meetings with Mr. Guy Jean-Pierre?

13   A.   Yes, I did, sir.

14   Q.   Okay.  And during those meetings, did you wear a wire?

15   A.   Yes, I did, sir.

16   Q.   Okay.  Were those meetings recorded?

17   A.   Yes, they were.

18   Q.   And before those meetings, you did a lot of phone

19   calls; is that correct?

20   A.   Yes, I did, sir.

21   Q.   Okay.  And were those phone calls recorded?

22   A.   Yes, they were.

23   Q.   Okay.  In addition to those phone calls and the

24   recordings and the wire, did you go ahead and do emails?

25   A.   Yes, I did, sir.

Direct - Sears

1    Q.   Okay.  And -- all right, I shouldn't say emails.  I'm

2    sorry.  Skype messages.

3    A.   As part of the sting?

4    Q.   As part of the undercover.

5    A.   I don't think I did a Skype message with him.

6    Q.   Okay.  How about Google?

7    A.   As an e-mail?

8    Q.   Right.

9    A.   Google.  Yes, e-mail.  There were e-mail messages that

10   had gone back and forth.

11   Q.   And I'm not very techno -- some form of an electronic

12   communication?

13   A.   There would have been emails, yes.  Gmail.  The

14   Government had me set up a specific gmail account for -- to

15   send communications.

16   Q.   Okay.  And where was Mr. Guy Jean-Pierre located when

17   you were conducting the phone calls?

18   A.   Dominican Republic.

19   Q.   And you were speaking directly with him?

20   A.   Yes, sir.

21   Q.   And how do you know he was in the Dominican Republic?

22   A.   On the telephone, the reception was horrendous, and I

23   dialed a Dominican Republic number.

24   Q.   And so essentially the phone call part -- the phone

25   calls was essentially one of the first parts of this

Direct - Sears

1   undercover investigation?

2   A.   Yes, sir.

3   Q.   All right.  Now was there anything else besides setting

4   up the shell company regarding laundering of money?

5   A.   Yes.

6   Q.   Okay.  And what did that involve?

7   A.   It involved setting up a -- an account in the Dominican

8   Republic so I could hold money offshore.

9   Q.   So you could hold money offshore?

10  A.   If I remember correctly, that's what they wanted me to

11  do.

12  Q.   Okay.  And why were you looking to hold money offshore

13  based upon this operation?

14  A.   Because I don't trust the Government.

15  Q.   All right.  Did Mr. Guy Jean-Pierre know that you were

16  still under investigation?

17  A.   Absolutely.

18  Q.   Okay.  Did you ever tell Mr. Guy Jean-Pierre why you

19  were going to send him money in the Dominican Republic?

20  A.   Yes.

21  Q.   And what did you say?

22  A.   I was -- this was going to be part of a consulting

23  agreement that we were going to get for setting this whole

24  thing up.

25  Q.   Okay.  So you weren't looking to hide money?

Direct - Sears

1    A.    Well, there's two facets to this.  There was the

2    consulting agreement money that was going in there and there

3    was money that -- as I said before, I was looking to put

4    money offshore.

5    Q.    Where were you allegedly -- where did you allegedly get

6    this money to put offshore?

7    A.    It's -- the Government wanted me to tell him that the

8    money was put -- was made from Bayside Realty Holdings and

9    was money that the Government didn't see, and I was holding

10   it in a friend's account and he was starting to get

11   aggravation from his wife so he had to get it out of the

12   account so I wanted to put the money offshore.

13   Q.    Okay.  And so if I understood you correctly, you said

14   it was money that the Government was looking to seize?

15   A.    Yes.

16   Q.    Okay.  And why did you have it in a friend's account?

17   A.    I don't remember what the story was they told me to

18   say.

19   Q.    Okay.  And essentially did you talk to Mr. Guy

20   Jean-Pierre about sending this money to him in the Dominican

21   Republic?

22   A.    Yes, sir.

23   Q.    And what was Mr. Jean-Pierre's response?

24   A.    He would go ahead and try to set something up.

25   Q.    Okay.  Was he going to get paid a fee for this?

Direct - Sears

1    A.   Yes, sir.

2    Q.   How much?

3    A.   I don't remember the exact amount, but it was a

4    percentage, I believe.  I could be wrong.

5    Q.   All right.  So I want to go back.  So essentially this

6    undercover operation began with a bunch of recorded phone

7    calls.

8    A.   Yes, sir.

9    Q.   Okay.  And who were those calls between?

10   A.   Myself and Mr. Jean-Pierre.

11   Q.   And have you had an opportunity to review these

12   recorded phone calls?

13   A.   Yes, I have.

14   Q.   And have you had an opportunity to review the clips of

15   these phone calls?

16   A.   Yes, I have.

17   Q.   And do the clips correctly reflect what was on the

18   whole phone call?

19   A.   Yes, sir.

20   Q.   And you recognized your voice on that phone call?

21   A.   I did.

22   Q.   Okay.  Who else did you recognize?

23   A.   Mr. Jean-Pierre.

24        MR. SIBERT:  Your Honor, at this point, the

25   Government would like to move into evidence Government

1    Exhibit 320-A through M, and 322-A through R.

2              THE COURT:  All right.  Just so the record is

3    clear, I'm looking from the Government's exhibit list, 320

4    are whole -- are recordings of phone calls; is that correct?

5              MR. SIBERT:  That's correct, Your Honor.

6              THE COURT:  And then 322 are recordings of phone

7    calls with a synced audio and transcript.

8              MR. SIBERT:  That's correct, Your Honor.

9              THE COURT:  So 320 does not have captions; is that

10   correct?

11             MR. SIBERT:  No, sir.

12             THE COURT:  That's not correct or it is correct?

13             MR. SIBERT:  I'm sorry.  I thought you asked if

14   they do not have captions.  320 does not have captions.

15             THE COURT:  Okay.  All right.  Just -- just so we

16   understand what we're dealing with.

17             All right.  Is there an objection to either 320-A

18   through M or 322-A through R?

19             MR. GOODREID:  Your Honor, I realize this is

20   unusual.  May I inquire of Government counsel with respect

21   to 320 if these are excerpts or are these the entirety of

22   the calls?

23             MR. SIBERT:  320 will be the entire -- the whole

24   calls.

25             MR. GOODREID:  Okay.  Your Honor, may I have just a

Voir Dire - Sears

1    moment, Your Honor?

2            THE COURT:  You may.

3            MR. GOODREID:  Your Honor, the defense has -- the

4    defense has stalled, Your Honor.

5            Your Honor, with respect to 320, the defense does

6    not have any objection.

7            THE COURT:  All right.

8            MR. GOODREID:  And with respect to 322, I might

9    wonder -- I wonder if I might voir dire on this.

10           THE COURT:  You may.

11                      VOIR DIRE EXAMINATION

12   BY MR. GOODREID:

13   Q.   Mr. Sears, with respect to the exhibits marked 322 --

14   and again these are synced exhibits, closed caption, if you

15   will, do you know what I mean?

16   A.   Yes, sir.

17   Q.   Okay.  When you did a review, did you also have

18   occasion to review whether the syncing accurately matched up

19   with what you were hearing and seeing?

20   A.   I can't honestly say I paid attention to that, sir.

21           MR. GOODREID:  Based on that response, Your Honor,

22   as well as my general objection that I stated earlier in

23   response to the other exhibits with the syncing, we will

24   object to the admission of 322.

25           THE COURT:  All right.  With respect to Exhibit

Direct - Sears

1    320-A through M, there being no objection, that exhibit is

2    admitted into evidence and may be published to the jury.

3         I'm going to overrule the objection to 322-A

4    through R.  That exhibit is also admitted into evidence and

5    may be published to the jury.

6         And as I did before, ladies and gentlemen of the

7    jury, I'm instructing you that the evidence in 322 is the

8    audio conversation, not the synced captioning.  To the

9    extent the captioning does not accurately, in your view,

10   correspond to what you're hearing in the audiotape, the --

11   your view of what the conversations consist of is to prevail

12   and that is the evidence.

13        All right.  With that caveat, those two exhibits

14   are admitted.

15        (Government's Exhibits 320-A through M and 322-A

16   through 322-R received)

17             MR. SIBERT:  Thank you, Your Honor.

18                  DIRECT EXAMINATION (Continued)

19   BY MR. SIBERT:

20   Q.   Okay, sir, what we did before, except this is just

21   going to be audio.  I would ask you to listen for each clip

22   and I might have some follow-on questions, okay?

23   A.   No problem.

24             MR. SIBERT:  All right.  Can we please play

25   Government Exhibit 322-A, starting at 8 minutes and 30

1    seconds.

2         (Audio played)

3    BY MR. SIBERT:

4    Q.   Did you listen to that clip there, sir?

5    A.   Yes.  Yes, I did.

6    Q.   Okay.  And who are you talking to in that audio?

7    A.   Mr. Guy Jean-Pierre.

8    Q.   Okay.  And what were you talking to him about?

9    A.   The weather at that point.

10   Q.   Okay.  And where were you talking about the weather?

11   A.   In the Dominican Republic, as I understood it.

12   Q.   All right.  And I just want to reach back.  Before this

13   operation started, who -- who was the person -- why did you

14   come to -- let me ask you this question:  How did this

15   operation begin, this undercover?

16   A.   I don't recall.  What do you mean by "how did it

17   begin"?  That sounds like that was the very first phone

18   call.

19   Q.   No, I guess -- let me back up.  Did you go to law

20   enforcement or did law enforcement come to you regarding

21   doing the undercover operation?

22   A.   I would think, if I remember -- if my memory serves me

23   correctly, I believe my lawyer was there, DOJ, which was Mr.

24   Harmon, Agent Funk, and a couple of others.  And I believe

25   Mr. Harmon's the one that mentioned something about Guy

Direct - Sears

1    Jean-Pierre and about how -- "Well, he's not here to defend

2    himself or whatever," and I said, "What if he was?"

3              And I think that was the genesis of it.

4    Q.   Was Mr. Guy Jean-Pierre looking for work -- securities

5    work?

6              MR. GOODREID:   Objection.   Calls for speculation.

7    BY MR. SIBERT:

8    Q.   If you know.

9              THE COURT:   If you know.

10             THE WITNESS:   He was looking for work in general.

11   BY MR. SIBERT:

12   Q.   How do you know that?

13   A.   Because I was in communication with him.

14   Q.   And so were you reaching out to Guy Jean-Pierre about

15   further securities work or was Guy Jean-Pierre reaching out

16   to you?

17   A.   I was keeping Mr. Jean-Pierre in my loop because of the

18   situation that had happened.   So I would, from time to time,

19   call him talking about securities work or any kind of work

20   just so I could keep in touch to know where he was in case I

21   needed him.

22   Q.   And so did you -- were you paying him at this time?

23   A.   I don't recall.   I might have loaned him some money,

24   but I don't -- I don't think so.   I don't think so.   I don't

25   think I had paid him in quite some time.   If it was, it was

Direct - Sears

1    would have just been a couple of hundred dollars maybe once

2    or twice, but I don't think so at that point.

3    Q.   So based upon your conversations with the defendant,

4    did you know his economic -- condition?

5    A.   Yes.

6    Q.   -- at the time?

7    A.   Yes.

8    Q.   What was that?

9    A.   He was not in very good financial shape.

10   Q.   Okay.  So is it fair to say he was looking for work?

11   A.   Yes, sir.

12            MR. SIBERT:  Okay.  I'm going to have to ask

13   Government Exhibit -- excuse me, Government Exhibit 322-B

14   played and, again, starting at 8:30.

15        (Audio played)

16   BY MR. SIBERT:

17   Q.   Okay.  Were you able to hear that whole deal?

18   A.   Yes, sir.

19   Q.   All right.  I just want to cover a couple of pieces

20   about that.  Do you recall where Mr. Guy Jean-Pierre is

21   speaking about Mr. Tod DiTommaso?

22   A.   Yes, sir.

23   Q.   And what did you learn about Mr. Tod DiTommaso from Mr.

24   Guy Jean-Pierre?

25   A.   He was agitated and incommunicado.

Direct - Sears

1    Q.   And why was that?

2    A.   Because the SEC was investigating him and giving him a

3    hard time about his business.

4    Q.   Okay.  And do you recall why the SEC was investigating

5    him?

6    A.   Because of the FusionPharm debacle.

7    Q.   Okay.  Now later on in that audio, you make a statement

8    to Mr. Guy Jean-Pierre, "Like we did at FusionPharm."

9    A.   You mean the one that was scripted by the FBI?  Now I

10   know why you did what you did with that.

11   Q.   Oh, are you upset at me?

12   A.   I'm very upset at you.

13   Q.   All right.  Well --

14          THE COURT:  Let's stop the commentary.  Let's stick

15   to questions and answers.

16   BY MR. SIBERT:

17   Q.   Okay.  Well, you stated the fact "like we did with

18   FusionPharm"; is that correct?

19   A.   As directed by the FBI, yes.

20   Q.   Okay.  And then how did Mr. Guy Jean-Pierre respond?

21   A.   I'm been kind of stymied since that part right there

22   when it clicked, so I can't really remember.  If you want to

23   play it again I would be more than happy to listen again,

24   sir.

25   Q.   Okay.  Well, we can get there.

1    So Mr. Guy Jean-Pierre later says that he can get

2    one.  Do you recall that?

3    A.   Get one what, sir?

4    Q.   Do you recall that he says he can get an attorney?

5    A.   Yes, I do.

6    Q.   Okay.  Do you know what Mr. Guy Jean-Pierre meant by

7    that?

8    A.   Yes.  Get another attorney that he can work with.

9    Q.   Okay.  Similar to how it was with Mr. DiTommaso?

10   A.   Yes, sir.

11   Q.   And then at the end there, Mr. Guy Jean-Pierre is

12   asking about the ownership of the shell.  Do you recall

13   that?

14   A.   Yes.

15   Q.   And what percentage was the shell going to be owned by

16   the undisclosed FBI agent and yourself?

17   A.   I didn't -- I don't recall the number.

18   Q.   Do you recall 98 percent?

19   A.   No, but . . .

20          MR. SIBERT:  Okay.  Can we continue playing 322

21   bravo, starting at 14 minutes.

22       (Audio played)

23   BY MR. SIBERT:

24   Q.   Okay, sir, did you get a chance -- can I start?  Thank

25   you.

Direct - Sears

1          Did you get a chance to listen to that audio

2     clearly?

3     A.   Yes, I did.

4     Q.   Okay.  And you inquire about if Mr. Guy Jean-Pierre can

5     arrange the paper where the loan is a convertible note.  Do

6     you recall that?

7     A.   Yes, I do.

8     Q.   And what was Mr. Guy Jean-Pierre's response to that?

9     A.   Yeah, he can do that.

10    Q.   Okay.  And what was required for him to have to be able

11    to do that?

12    A.   He was looking for aged debt.

13    Q.   Okay.  And do you know what he meant by that?

14    A.   Aged debt.

15    Q.   Besides aged debt, do you know why he would say that?

16    A.   For a convertible note debt has to be aged.

17    Q.   Do you know how long?

18    A.   Approximately one year.  It's much like a 144

19    subscription.  You go for a 144, it's normally a year from

20    the date that the money goes into the company.

21    Q.   In fact, Mr. Guy Jean-Pierre states "The note, itself,

22    has to be aged, if you know what I mean."

23    A.   From the day that the money goes into the company, yes.

24    Q.   Okay.  But there was no note at this time.

25    A.   No, there wasn't.  The premise was it was a handshake

1    deal and understanding, and it was to be papered up.

2    Q.    So when you say "papered up," it was just to be --

3    A.    Written up, formalized, memorialized.

4    Q.    So written up to meet these requirements?

5    A.    Excuse me?

6    Q.    Written up -- the paper written up to meet these

7    requirements?

8    A.    Yes, sir.

9    Q.    So Mr. Guy Jean-Pierre's telling you essentially the

10   security law, about the debt being aged; is that fair?

11   A.    Yes, sir.

12   Q.    And so he's agreeing to the fact to paper up -- based

13   upon your understanding with the conversations you've had

14   with him in this undercover, he was agreeing to paper up

15   this note that didn't exist to meet the age requirement?

16   A.    Yes, sir.   It --

17   Q.    And then he states -- you were talking about investors

18   when it came to VertiFresh; is that right?   So --

19   A.    Yes.   Yes.

20   Q.    Okay.   And then Mr. Guy Jean-Pierre says, "Well, if the

21   investors have a chance to be made whole, they'd be happy to

22   cooperate."

23   A.    Yes.   These were -- meaning these, as I said in the

24   video, these investors were from a couple of years ago,

25   which would have met the requirement of the aged debt, and

Direct - Sears

1    the fact that it wasn't papered into the convertible, they

2    would be willing to cooperate to do whatever they needed to

3    do to get paid.

4    Q.   To include violating securities laws?

5    A.   Well, I can't honestly say that at that moment because

6    he said aged debt.  I -- at that particular point in the

7    video and the audio, I said they were in for a couple of

8    years.  So at that point, he still thought it was aged debt.

9    Q.   But the note didn't exist.

10   A.   It was a undercover -- you've got to be more clear.

11   Q.   Okay.

12   A.   You're killing me over here.  You're killing me over

13   here.

14   Q.   Was there a note or paper at this point?

15   A.   No, because it didn't exist.  The whole thing didn't

16   exist.  It was a sting.

17   Q.   So based upon your understanding, what was Mr. Guy

18   Jean-Pierre going to do?

19   A.   He was going to paper up a note.

20   Q.   And was the note going to meet the requirements?

21   A.   Yes.

22   Q.   Even though it was being drafted then?

23   A.   Yes.  Because it was aged debt.  That's what he said.

24          MR. SIBERT:  Okay.  Can I have -- can we continue

25   playing 322-B.  And provide the court reporter a second to

1    turn off the transmitter.

2         (Audio played)

3    BY MR. SIBERT:

4    Q.   Okay.  So I want to start -- did you get a chance to

5    listen to that audio clearly?

6    A.   Yes, I did.

7    Q.   I want to start at the end of that.  Who's the one that

8    states that "I need to get my hands on a lawyer like Mr.

9    DiTommaso who will cooperate like Mr. DiTommaso"?

10   A.   Mr. Guy Jean-Pierre.

11   Q.   And he's talking about documents regarding FINRA.  What

12   were those documents that you were going to send him?

13   A.   I don't recall documents regarding FINRA.

14   Q.   Not about FINRA, what would be submitted to FINRA?

15   A.   Oh, I would imagine that would be part of the

16   registration requirements to get on the OTC.  There's always

17   some kind of a 211 short form or something to that effect.

18   Q.   So was he asking about what the corporation was going

19   to be doing?

20   A.   Not on that clip.

21   Q.   Okay.  And you stated in there, "like he did for Jan

22   and Baby Bee Bright back in the day."  Do you recall that

23   statement?

24   A.   Yes.

25   Q.   Okay.  And as you've testified, Baby Bee Bright was

Direct - Sears

1    your company eventually?

2    A.   For a short period of time, yes.

3    Q.   And this was also a prior company, Jan?

4    A.   I don't remember which company it was because I don't

5    know Jan.

6    Q.   Okay.  Do you recall what company you said in the

7    audio?

8    A.   No, I don't.

9    Q.   Okay.  But the point being is that you and Mr. Guy

10   Jean-Pierre have -- go back many years?

11   A.   I've known Mr. Jean-Pierre since 2010, I believe.

12   Q.   Okay.  And Mr. Guy Jean-Pierre states that he's not a

13   securities lawyer, he's a consultant, but he can prepare

14   everything.  Do you recall that statement?

15   A.   Yes, sir.

16   Q.   Okay.  So I guess my question would be, why would you

17   continue to use him in this undercover if he's not a

18   lawyer?

19   A.   Because I was instructed by the FBI to.

20   Q.   Okay.

21   A.   And he used to draw paperwork all the time for us.

22   It's the same price.

23   Q.   All right.  Do you know if Mr. Guy Jean-Pierre had ever

24   changed his name?

25   A.   I found at a later time, yeah.  As a matter of fact,

1    one of the recordings brings that recollection to me.

2    Q.   And, again, this happened in 2016; is that right?

3    A.   Yes, sir.

4    Q.   Do you remember the months?

5    A.   February through April.

6    Q.   So this was after the time that you knew about the SEC

7    complaint against Mr. Guy Jean-Pierre?

8    A.   Yes, sir.

9    Q.   And did his name change after that complaint?

10   A.   Indeed, it did.

11          MR. SIBERT:  Okay.  At this time, can we play

12   Government Exhibit 322-C.

13          (Audio played)

14   BY MR. SIBERT:

15   Q.   Okay.  So that was a brief clip.  Did you get to hear

16   that?

17   A.   Yes, I did.

18   Q.   Okay.  And Mr. Guy Jean-Pierre states he's down with

19   his brother in the DR.

20   A.   Yes, sir.

21   Q.   And you state that he was coming across kind of hard to

22   hear; is that right?

23   A.   Yes, sir.

24   Q.   Okay.  And to you, what's the DR mean?

25   A.   The Dominican Republic.

1           MR. SIBERT:  Okay.  Can I please have Government
2    Exhibit 322 played, D, starting at 55 seconds.
3         (Audio played)
4    BY MR. SIBERT:
5    Q.   Who stated that he wanted to get someone like Mr.
6    DiTommaso because he was cool?
7    A.   Mr. Jean-Pierre.
8    Q.   And who stated that Mr. DiTommaso did not do
9    double-checking, accepted things for what they were?
10   A.   Mr. Jean-Pierre.
11   Q.   And just to make clear for the jury, Mr. Guy
12   Jean-Pierre did not know that this was an undercover
13   operation going on.
14   A.   He did not.
15          MR. SIBERT:  Can you continue playing.
16        (Audio played)
17   BY MR. SIBERT:
18   Q.   Okay.  So after Mr. Guy Jean-Pierre stated that he
19   needed someone like Mr. DiTommaso because he was cool and
20   did not do a lot of double-checking, he stated that he was
21   trying, trying, trying.  What was he trying to do?
22   A.   Find another individual that would work with him.
23   Q.   And when you say another individual that would work
24   with him, what do you mean by that?
25   A.   Judging by the audio, because of his name, somebody

1    that, you know, would work with him.

2    Q.   Are you talking about a lawyer?

3    A.   Yes, sir.

4    Q.   Okay.  And who states in that video -- who questions in

5    that video how close, "Are you guys to assessing the shell?"

6    A.   Mr. Jean-Pierre.

7    Q.   And when you go on to explain the type of person E.J.

8    is portraying in this operation, Mr. Guy Jean-Pierre, what

9    did he state?

10   A.   I don't recall.

11   Q.   Do you recall he said, "Right, right, right"?

12   A.   Right.  Yes, acknowledging the fact that he understood

13   what type of individual this was.

14   Q.   So no disagreement from Mr. Jean-Pierre?

15   A.   No.

16   Q.   No hesitation?

17   A.   No, sir.

18          MR. SIBERT:  May I have 6:40 of that clip played.

19       (Audio played)

20   BY MR. SIBERT:

21   Q.   Okay.  So how did Mr. Guy Jean-Pierre want to be

22   paid?

23   A.   Ultimately, 50-50, half cash and half in stock in the

24   deal.

25   Q.   So stock down the road?

456
Direct - Sears

1   A.   Yes, sir.

2   Q.   Okay.  And -- and beginning, how was he going to -- how

3   did he want to be paid?

4   A.   In cash.

5        MR. SIBERT:  Okay.  Can I have 322-E played

6   starting at 2:30.

7        (Audio played)

8   BY MR. SIBERT:

9   Q.   Okay, sir, did you get a chance to hear that whole

10  deal?

11  A.   Yes, I did.

12  Q.   All right.  I want to talk to you -- essentially

13  there's one part of the audio in the beginning where you

14  state, "Me and You," regarding the company.

15  A.   Uhm-hum.

16  Q.   Do you recall that part of the video?

17  A.   Yes, I do.

18  Q.   Can you tell the jury --

19  A.   Audio.

20  Q.   -- what we're talking about there.

21  A.   Me and You is a company that was a placeholder called C

22  & C, which was going to be a consulting company that he and

23  I were going to have.

24  Q.   Okay.  And when you say "he and I," who do you mean?

25  A.   Mr. Jean-Pierre and myself.

1    Q.   Now, about 4:30, 5:06 in that clip, Mr. Guy asked for
2    you to get evidence of the debt.  Do you recall that?
3    A.   Yes.
4    Q.   And what did you take that to mean?
5    A.   He wanted some kind of documentation or proof that the
6    debt existed.
7    Q.   Okay.  And based upon your understanding, how far back
8    would that debt have to go?
9    A.   I had originally told him it was years in the audio
10   previously.
11   Q.   Okay.  But in this audio, I'm asking now.
12   A.   I don't remember talking about the audio -- I don't
13   remember hearing anything about the debt aged in this audio.
14   I didn't say anything, I don't think, about that.
15   Q.   Okay.  You don't recall Mr. Guy Jean-Pierre talking
16   about a debt a year out?
17   A.   That was the previous audio.  I thought you were
18   talking about this one.
19            MR. SIBERT:  All right.  Let's replay 4:30,
20   starting at 4:30 and we'll stop it at 5:06.
21        (Audio played)
22   BY MR. SIBERT:
23   Q.   Does that refresh at all?
24   A.   Yeah, it doesn't say anything about a year on that.
25   You asked me a specific question that's not on that audio,

Direct - Sears

1    sir.

2    Q.   Okay.  We'll move on for the audio again --

3    A.   I was trying to answer your question.

4    Q.   -- I  wanted to ask if you recall about equity for the

5    debt.

6    A.   Yes.

7    Q.   Okay.  And what is equity for the debt?

8    A.   Equity at that point would be securities.

9    Q.   And you can get shares of securities?

10   A.   Yes.

11   Q.   So stock.

12   A.   Yes.

13   Q.   So what does that mean?

14   A.   You get stock.

15   Q.   Instead of what?

16   A.   Well, actually, a promissory note can be either/or.

17   It's up to the person that holds the note, they can either

18   wait and take the interest on the note or they can take

19   equity.  It's up to the individual as to what they would

20   want, they have an option.

21   Q.   Okay.

22   A.   Much like a mortgage.  You know, it's the same thing,

23   it's -- it's -- essentially what a mortgage is is

24   convertible notes.

25   Q.   Okay.  And you stated they could either get interest

1    for a promissory note or get equity; is that correct?

2    A.    That's right, if they're in default.

3    Q.    So when you're saying "interest," you're meaning

4    payment back in cash to include the interest for the loan?

5    A.    I'm just saying payment in general.  And in a -- in --

6    are you asking me to explain the convertible note or are you

7    specific to the operation --

8    Q.    Okay.  I'm just asking --

9    A.    -- because I'm a little confused right now.

10   Q.    Okay.  Just follow-up on what you were talking about,

11   how someone can be paid back for a promissory note.

12   A.    Promissory note -- that's why they call it a

13   convertible note, okay?  When you get a convertible note,

14   it's like your bank giving you against your house.  If you

15   don't pay your bill, what happens?  They take your house.

16   It's the same thing.  If the public company doesn't pay its

17   bills you as the individual loaning them the money have the

18   opportunity to grab shares, recoup your investment.

19   Q.    So one way to recoup your investment is to get stock.

20   A.    That would be one way, or you can get -- you know, if

21   the company could write you a check and life would be good

22   there, too.

23   Q.    So you could get -- either get paid your loan -- so

24   when you have a promissory note, the person that gives the

25   note can either get paid back cash or stock.

                            Direct - Sears

1          MR. GOODREID:  Objection.  Leading.

2          THE COURT:  Sustained.

3    BY MR. SIBERT:

4    Q.   How can an individual or a company that provides a

5    promissory note be paid back?

6    A.   They can be paid back their principal, whatever the

7    amount was, plus the interest, as per the note, or they can

8    exercise the right as they would have in a note to get

9    securities in that company.

10   Q.   And that would be called equity.

11   A.   Yes, sir.

12   Q.   Thank you.

13   A.   Well . . .

14         MR. SIBERT:  Your Honor, I have a few more clips

15   here.  Do you want me to continue or do you want --

16         THE COURT:  Yes.  We'll go till 12:15.

17         MR. SIBERT:  Okay.  Can you please play 322-E

18   starting at 8:45.

19       (Audio played)

20   BY MR. SIBERT:

21   Q.   So you -- sir, did you have a chance to hear that

22   audio?

23   A.   Yes, I did.

24   Q.   And you're talking about $50,000 to be put into shell.

25   A.   Into a debt -- a debt instrument, yes.

1   Q.   Okay.  Can you explain that to the jury.

2   A.   Explain what, sir?

3   Q.   What you were going to do with $50,000 in this

4   operation.

5   A.   It was going to be listed on the books of the company

6   as in a form of an instrument called a convertible

7   promissory note.

8   Q.   On whose books?

9   A.   The company that the FBI directed us to, VertiFresh.

10  Q.   And so essentially VertiFresh is going to have a

11  $50,000 promissory note that they owed?

12  A.   Yes.

13  Q.   Okay.  And who were they going to owe this $50,000

14  promissory note to?

15  A.   Whomever was going to put their name on the document.

16  Q.   And also you stated that E.J. had a buddy that was

17  going to be a namesake for the company.

18  A.   Yes.

19  Q.   What did you mean by that?

20  A.   He was just going to be -- have his name on a piece of

21  paper and that was it.

22  Q.   Okay.  And so he would have no official role?

23  A.   No, he wasn't going to be growing any lettuce or

24  delivering the lettuce or anything to that effect.

25  Q.   Or making decisions on behalf of the company?

462

Direct - Sears

1    A.    No.

2    Q.    Not managing the company?

3    A.    No.

4    Q.    Not hiring or firing?

5    A.    No.

6    Q.    Not directing --

7    A.    We didn't go that far into it, sir.  He was just to be

8    a placeholder.  You know, we didn't go into the operations

9    of the company.

10   Q.    So you used the name "placeholder" before in your

11   testimony.

12   A.    Excuse me?

13   Q.    You've used the --

14   A.    Oh, yeah, the FBI furnished me with that -- it's a good

15   term.

16   Q.    But you've used "placeholder" before in your testimony

17   here before this --

18   A.    Absolutely.

19   Q.    In fact, it was regarding your mother with Bayside; is

20   that right?

21   A.    That would be correct, to the best of my

22   recollection.

23           MR. SIBERT:  Okay.  Can I have 11 -- excuse me,

24   Government Exhibit 322-E played, starting at 11:35.

25           (Audio played)

1          THE WITNESS:  Excuse me, sir, before you ask

2     another question, I'd like to change my -- my answer to his

3     last question was --

4          MR. SIBERT:  Your Honor, I'm --

5          THE WITNESS:  I used the term --

6          THE COURT:  Hold on.

7          THE WITNESS:  -- term Bayside --

8          THE COURT:  Hold on, Mr. Sears.  Mr. Sears.

9     Please.  When I start talking, please stop.

10          THE WITNESS:  Sorry, Your Honor.

11          THE COURT:  You were going to say, Mr. Sibert?

12          MR. SIBERT:  I would ask this witness not to be

13     able to provide any testimony without a question being

14     asked.

15          THE COURT:  All right.  You'll have an opportunity,

16     if defendant's counsel wants to ask you a question that

17     will allow you to explain, you can do it at that time, but

18     there's not a question pending from the prosecutor.

19          THE WITNESS:  It was in response to a previous

20     question.

21          THE COURT:  That's all right.  Okay.  But there's

22     not a question pending right now, so we'll go with the next

23     question, please.

24          MR. SIBERT:  Thank you, Your Honor.

25     BY MR. SIBERT:

464

Direct - Sears

1    Q.   Sir, did you have an opportunity to listen to that clip

2    clearly?

3    A.   Yeah.  My head was kind of buzzing because I gave you a

4    wrong answer before so . . .

5    Q.   Do you need it played again?

6    A.   No.  Go ahead, let's -- let's try.

7    Q.   Okay.  Who was talking in that clip?

8    A.   Mr. Jean-Pierre and myself.

9    Q.   Okay.  And who stated that a debt -- a convertible debt

10   was straightforward?

11   A.   Convertible debt was straightforward?  I believe it was

12   Mr. Jean-Pierre.

13   Q.   Okay.  And essentially Mr. Guy Jean-Pierre was asking

14   you for evidence of that debt.  Would you agree with that?

15   A.   Yes, sir.

16   Q.   And it was Mr. Guy Jean-Pierre -- was it Mr. Guy

17   Jean-Pierre that stated that he wanted this evidence so

18   there would be no questions raised with the SEC?

19   A.   Yes.

20   Q.   And that would include the debt being a year old?

21   A.   Yes.

22           MR. SIBERT:  Okay.  Can we begin again with 322-E,

23   starting at 15:57, playing until the end, which is

24   essentially around 17 minutes.

25           (Audio played)

Direct - Sears

1    BY MR. SIBERT:

2    Q.   Okay.  So essentially what were you asking Mr. Guy

3    Jean-Pierre to provide you by Friday?

4    A.   Before I answer that question, sir, may I have the

5    opportunity to -- I gave you an incorrect answer, so if it's

6    the truth you're looking for, I think you should have the

7    right answer.

8         MR. SIBERT:  Your Honor, I would ask the witness to

9    be instructed to answer the question.

10        THE COURT:  Okay.  Defense counsel, if they want

11   to, will give you the opportunity to explain your prior

12   answer.  For now, you have to answer the question that's

13   been asked by the prosecutor.

14        THE WITNESS:  Thank you, sir.

15   BY MR. SIBERT:

16   Q.   Now, did you get a chance to watch -- or listen to that

17   audio?

18   A.   Yes, I did.

19   Q.   Clearly?

20   A.   Pretty clearly.

21   Q.   Okay.  What -- what were you asking Mr. Guy Jean-Pierre

22   to get to you by Friday?

23   A.   Documentation.

24   Q.   And what documentation?

25   A.   Boilerplate templates.

Direct - Sears

1    Q.    For the convertible debt?

2    A.    For everything.

3    Q.    Do you recall that you specifically asked for

4    convertible debt?

5    A.    Yes.

6    Q.    Okay.  Now, you also inquired -- you asked essentially

7    Mr. Sears what fees he was owed for the legal work.  Do you

8    recall that?

9    A.    Yes.

10   Q.    And --

11            THE COURT:  You mean Mr. Jean-Pierre?

12            MR. SIBERT:  Yes, I'm sorry, Your Honor.

13   BY MR. SIBERT:

14   Q.    Mr. Guy Jean-Pierre.

15   A.    Yeah.

16   Q.    You inquired about legal fees; is that right?

17   A.    Yes, I did.

18   Q.    And what was that -- what were those legal fees for?

19   A.    Providing all the documentation.

20   Q.    Okay.  And how did Mr. Guy Jean-Pierre respond to

21   getting you those documents and the legal fees?

22   A.    I don't recall exactly.

23   Q.    Do you recall him saying, "Okay, all right, sounds

24   good"?

25   A.    Quickly.  He led me to believe it would be a quick

Direct - Sears

1    turnaround.

2    Q.   In fact, he said "Cool," right?

3    A.   I believe so.  I said I believe so.

4    Q.   Okay.  Now, at the end there, he was asking you again,

5    get him the evidence, regarding this convertible debt.

6    Would you agree with me?

7    A.   Yes.

8    Q.   And your response, if I recall correctly, was, that

9    these were handshake cash deals.

10   A.   Yes, sir.

11   Q.   Okay.  And how did Mr. Guy Jean-Pierre respond?

12   A.   He was set back a little bit by it, saying, "Oh, well."

13   Q.   He went "Oooooh," right?

14   A.   Yes.

15   Q.   And then essentially you inquired about -- that Mr.

16   Jean-Pierre went on to say that these had to be documented

17   well, right?

18   A.   Yes, sir.

19   Q.   And you inquired as to why?

20   A.   Yes, sir.

21   Q.   And what was his response?

22   A.   I'm sorry, I can't remember.

23   Q.   It was about the transfer agent, right?

24   A.   Yes, I -- it was -- transfer agent was mentioned.

25   Q.   And about someone took a close look?

468

Direct - Sears

1    A.    Yes.

2              THE COURT:  Are we done with that clip?

3              MR. SIBERT:  We are, Your Honor.

4              THE COURT:  All right, we're going to take our

5    lunch break.

6              Ladies and gentlemen of the jury, we're going to

7    take a recess until 1:20.

8         (Jury left the courtroom at 12:14 p.m.)

9              THE COURT:  All right, Mr. Sears, same instructions

10   as before.

11             THE WITNESS:  Yes.

12        (Recess taken 12:15 p.m.)

13                       AFTERNOON SESSION

14        (Jury was present at 1:26 p.m.)

15             THE COURT:  Mr. Sears, you remain under oath.  Mr.

16   Sibert, you may resume your examination.

17             MR. SIBERT:  Thank you, Your Honor.  And may I

18   request that all the headphones be turned back on.  And

19   we're going to -- I'm going to be asking to play Government

20   Exhibit 322-F.

21             And, Your Honor, you just hold the power button, if

22   you don't have a green light, and then if a different color

23   light comes on, you just hit the power button to go green.

24             THE COURT:  I've got a green light.

25             MR. SIBERT:  I'm just making sure everyone has a

Direct - Sears

1    green light.  Are you all good?

2         Okay, can we please play 322-F starting at 1:14.

3         (Audio played)

4         MR. SIBERT:  Now can you play Government Exhibit

5    322-F, starting at 4:18.

6         (Audio played)

7    BY MR. SIBERT:

8    Q.   Sir, were you able to hear that video clearly?

9    A.   Yes, I was.

10   Q.   The last two clips that were played?

11   A.   Yes, I did.

12   Q.   What do you mean by Phil Morgan being the beard only?

13   A.   Much like the term "placeholder."

14   Q.   Thank you.

15   A.   You're welcome.

16   Q.   When you were talking about having this cash and you

17   needed to move it and it was from stock that you sold, what

18   were you -- what was going on at that point?

19   A.   That was -- if you notice, I was stuttering a lot in

20   that particular one because the FBI was constantly putting

21   notes in front of me.  And, as you know, they scripted this

22   entire thing, so I was -- cash in the account from

23   Scottsdale, a trading account.

24   Q.   And what were you essentially asking Mr. Guy

25   Jean-Pierre to do?

Direct - Sears

1   A.   To find a home for it offshore.

2   Q.   So essentially hide the cash?

3   A.   Put the cash offshore.

4   Q.   Okay.  And you -- there was talk about the convertible

5   note being in the name of Thor.  Do you remember that?

6   A.   Uhm-hum.

7   Q.   And I need a yes or no.

8   A.   Oh, yes.

9   Q.   Okay.  And what was Thor?

10  A.   It was a company that the FBI made up.

11  Q.   Okay.  And who was going to own Thor?

12  A.   That was going to be beneficially owned by the FBI

13  agent undercover.

14  Q.   Okay.  Was that the company that was going to loan

15  VertiFresh the money?

16  A.   I don't recall if it was going to loan the money.  That

17  was the one that the -- that the convertible note was going

18  to be put in, so I would imagine that would have been it.

19  Q.   So as you discussed earlier with the promissory notes

20  that could be paid two ways, either through equity or

21  through cashing in -- on the interest --

22  A.   Uhm-hum.

23  Q.   -- what was Thor supposed to get in this undercover

24  operation?

25  A.   The whole premise was to get securities.

Direct - Sears

1   Q.   So equity.

2            THE COURT:   You have to respond yes audibly.

3            THE WITNESS:   Yes.   Yes.

4   BY MR. SIBERT:

5   Q.   And you mentioned you wanted to have the documents

6   templated, including the 144.  What's a 144 template

7   document?

8   A.   I have never seen a 144 template document.  It was

9   something that was made up.  So I would imagine by the

10  definition of template, it would just have a bunch of basic

11  legal jargon and names to be filled in and amounts later.

12  Q.   Okay.  So the rule -- the number 144 doesn't mean

13  anything to you?

14  A.   No, you asked me what a templated 144 was, sir.

15  Q.   I'm asking you a different question now.

16  A.   Thank you.

17  Q.   Does the number 144 mean something to you?

18  A.   Yes, indeed, it does.

19  Q.   And what does it mean to you?

20  A.   It means it's restricted -- it's a restriction on a

21  certificate.

22  Q.   Okay.  So what would be a -- in the concept of this

23  operation -- undercover operation, what were you asking

24  about when you stated a rule -- a 144 template?

25  A.   A letter -- a letter of opinion to remove the

1    restriction, the 144 restriction.

2        MR. SIBERT:  Okay.  At this time, can I get 322 --

3    or, excuse me, 7 -- 322-F starting at 7:43 played.

4        (Audio played)

5    BY MR. SIBERT:

6    Q.   Sir, that last clip, you were, again, talking about

7    getting cash out -- out of here.  Is that the same cash you

8    were talking about previously in the last clip?

9    A.   Yes.

10   Q.   Okay.  Did Mr. Guy Jean-Pierre ever give you any

11   indication that he wouldn't help you with this -- again,

12   this cash offshore?

13   A.   That he would not?  I didn't hear.

14   Q.   That he would not help you.

15   A.   No, he didn't.

16       MR. SIBERT:  Okay.  Can I have 322-G played

17   starting at 5:37.

18       (Audio played)

19   BY MR. SIBERT:

20   Q.   Okay, sir.  We hear a new voice in that recording.  Do

21   you know who that new voice is?

22   A.   That was a undercover FBI agent, his name was E.J., in

23   the op.

24   Q.   Okay.  And what did Mr. Guy Jean-Pierre respond to E.J.

25   when there was a request for hopefully future deals?

1   A.   It was -- I don't have it -- I don't remember verbatim,

2   but he was eager to proceed with -- in the future.

3   Q.   And do you know what Mr. Guy Jean-Pierre meant by a

4   "nice clean shell, not having skeletons"?

5   A.   That would be a company that doesn't have any lawsuits

6   or, you know, investigations, or anything to that effect.

7          MR. SIBERT:  Can I have Government Exhibit 322-H

8   played, starting at 4:55.

9        (Audio played)

10  BY MR. SIBERT:

11  Q.   Okay.  So do you know what Mr. Guy Jean-Pierre's

12  talking about the last day of the debt?

13  A.   No, I was quite confused at that point.

14  Q.   Okay.  So you don't understand that part?

15  A.   No, I'm still up in the air about that one.

16  Q.   Okay.  And so when you said you got money recently, do

17  you know why Mr. Guy Jean-Pierre said, "Oh, oh, I hope no

18  one is listening to this phone call"?

19  A.   Basically because we were going to -- the entire thing

20  was to get securities and cash out.

21  Q.   And was it your understanding that the debt had to be a

22  year old?

23  A.   Yes.

24  Q.   So if you --

25  A.   All debt should be a year old.

1   Q.   If you got money recently, that would not be a year

2   old?

3   A.   No, that would not be, no, sir.

4   Q.   And so was -- did it seem to you, based upon your

5   hearing of this and talking to him, that Mr. Guy Jean-Pierre

6   was worried when you said you got the money recently?

7   A.   Yes, sir.

8           MR. SIBERT:   Can I have the same clip, 322-H,

9   starting at 7:15.

10          (Audio played)

11  BY MR. SIBERT:

12  Q.   Sir, were you able to hear that audio clearly?

13  A.   Yes, I was.

14  Q.   Okay.  Do you know why Mr. Guy Jean-Pierre was

15  suggesting an odd number instead of $50,000?

16  A.   No.

17  Q.   You -- do you recall him saying "suspicious"?

18  A.   In the -- yes, in the audio.  Just to keep it as an odd

19  number.  So the impression I got was to -- just -- wouldn't

20  get a second eye, I guess.

21  Q.   And you mentioned a 144 nonaffiliate opinion in that

22  audio.

23  A.   Yes.

24  Q.   What did you mean by that?

25  A.   Well, the FBI scripted it and wanted me to put in the

1    non-144 affiliate thing in there.

2    Q.    Well, based upon your past work with Mr. Guy

3    Jean-Pierre and your cooperation with the Government at this

4    point, why would a 144 nonaffiliate be important?

5    A.    Well, because it would mirror the FusionPharm case.

6    They put that in the last minute.

7    Q.    And what do you mean by that?

8    A.    They wanted to look -- it's just my opinion.

9    Q.    Okay.  And --

10    A.    That's what it is.

11    Q.    -- who stated that "all the pains in evidence was sent

12    to DiTommaso and I did all the work"?

13    A.    Mr. Guy Jean-Pierre.

14         MR. SIBERT:  Can I have Government Exhibit 322-H

15    played from 3 -- excuse me, from 13:25.

16         (Audio played)

17    BY MR. SIBERT:

18    Q.    Okay.  Were you able to hear clearly that -- clearly

19    that audio?

20    A.    Most of it.

21    Q.    All right.  Did you miss any parts that we need to go

22    back over?

23    A.    I couldn't tell you what I missed until you ask me.

24    Q.    Okay.  Do you recall the point about the

25    Meadpoint-Bayside conversions that you were discussing with

1      Mr. Guy Jean-Pierre --

2      A.   Yeah.  That was carefully scripted by the FBI.  Yeah.

3      Q.   And, Mr. Sears, I understand this whole undercover

4      operation is scripted.

5      A.   I just want to make that clear.  Good.

6      Q.   And so did Mr. Guy Jean-Pierre ever say that that --

7      those conversions didn't happen?

8      A.   No, not to my recollection.

9      Q.   Did he ever disagree with you about those conversions?

10     A.   No.

11     Q.   In fact, his answer was "okay."  Do you recall that on

12     the video?

13     A.   Yes.

14     Q.   So no pushback when you were talking about these

15     conversions with Meadpoint and Bayside --

16     A.   No.

17     Q.   -- with Mr. Guy Jean-Pierre?

18     A.   No, sir.

19     Q.   Okay.  And, finally, that video -- that audio ended

20     talking about a trust account.  Do you know what Mr. Guy

21     Jean-Pierre was talking about a trust account in the

22     Dominican Republic?

23     A.   Yes.

24     Q.   And what was he talking about?

25     A.   Setting up a trust account.

Direct - Sears

1    Q.   For what purpose?

2    A.   Holding money.

3    Q.   And is that the money that you were scripted to get

4    offshore?

5    A.   Yes, sir.

6          MR. SIBERT:   Can I have Government Exhibit 322-H

7    played from 16:16.

8          (Audio played)

9          MR. SIBERT:   Okay.   And can I please have the same

10   Exhibit 322-H played from 19:20.

11         (Audio played)

12   BY MR. SIBERT:

13   Q.   Who advised you that big amounts could draw attention

14   when it comes to wiring money to the Dominican Republic?

15   A.   Mr. Jean-Pierre.

16         MR. SIBERT:   Can I have Government Exhibit 322-I,

17   played, starting at 3:30.

18         (Audio played)

19   BY MR. SIBERT:

20   Q.   Okay, sir, were you able to hear that audio clearly?

21   A.   Yes, I was.

22   Q.   What did you mean when you stated, "Get the thing in

23   the air"?

24   A.   The cashier's check.

25   Q.   Okay.   And could you just describe to the jury

1    essentially about this cashier's check, your role in it.
2    A.    The -- it started out as 250,000, was going to go into
3    a wire.  And then I got that script changed and we were
4    putting cashier's checks in the air, that was supposed to be
5    in the amount of $10,000.  And then I had to tell him that
6    it was only 5.  And the United States Government had to go
7    ahead and get it into a Fed Ex and get it out to him on the
8    island so he could set up the account and make the
9    deposit.
10   Q.    So your understanding is that there was actually a
11   check sent to Mr. Guy Jean-Pierre?
12   A.    Yes, sir.
13   Q.    And it was through Fed Ex?
14   A.    One of the carriers.  I can't say it was Fed Ex.  I
15   don't know who they used ultimately, but it was going to be
16   a carrier.
17   Q.    At the end of that audio there, Mr. Guy Jean-Pierre was
18   asking that he could pick something up at Fed Ex?
19   A.    Yes.
20        MR. SIBERT:  Okay.  Can I have Government Exhibit
21   322-J played.
22        (Audio played)
23        MR. SIBERT:  Can we have Government Exhibit 322-K
24   played.
25        (Audio played)

Direct - Sears

1            MR. SIBERT:  Can I have Government Exhibit 322-L

2     played.

3            (Audio played)

4     BY MR. SIBERT:

5     Q.   Okay, sir, we listened to three clips there.

6     Essentially what is the focus of all three of those clips?

7     A.   Getting money deposited.

8     Q.   Okay.  And as you say "getting money deposited," are

9     you talking about the check that we've discussed --

10    A.   Yes.

11    Q.   -- the cashier's check?

12    A.   Yes.

13    Q.   Okay.  And then you talk about a tracking number.  What

14    were you -- what were you referring to that?

15    A.   Tracking number that would be provided by the courier

16    that was bringing the check to the destination.

17    Q.   Okay.  And when was Mr. Guy Jean-Pierre supposed to

18    take that check?

19    A.   That Tuesday, I believe, from what he said.

20           MR. SIBERT:  Can I have Government Exhibits 322-M

21    played starting at 1:25.

22           (Audio played)

23           MR. SIBERT:  Okay, can I please have Government

24    Exhibit 322-N played from 3:12 to 6:36.

25           (Audio played)

1    BY MR. SIBERT:

2    Q.   Sir, did you get an opportunity to hear that audio?

3    A.   Yes, I did.

4    Q.   Okay.  And who's talking about setting up these opinion

5    letters?

6    A.   Mr. Jean-Pierre.

7    Q.   And do you recall at the end of that clip what Mr.

8    Jean-Pierre's worry was?

9    A.   That part was really fuzzy.  I didn't hear that part

10   too well, sir.

11   Q.   Was he worried about his name being associated to these

12   opinion letters?

13   A.   Yes.

14          MR. SIBERT:  Can I have Government Exhibit 322-N

15   from 6:52 to 7:10 played.

16       (Audio played)

17   BY MR. SIBERT:

18   Q.   Who inquired about meeting -- there was other documents

19   needed for the shell company?

20   A.   I did.

21   Q.   Okay.  And who responded to you?

22   A.   Mr. Jean-Pierre.

23          MR. SIBERT:  And, finally, can I have Government

24   Exhibit 322-N played from 8:06.

25       (Audio played)

481

Direct - Sears

1    BY MR. SIBERT:

2    Q.   Okay.  Who states that the opinion letters were

3    identical "because I wrote them"?

4    A.   Mr. Jean-Pierre.

5            MR. SIBERT:  Can I have Government Exhibit 322-O

6    played.

7        (Audio played)

8    BY MR. SIBERT:

9    Q.   Okay, Mr. Guy Jean-Pierre states that he's been out of

10   the United States for a while.  Do you know what this

11   conversation was about?

12   A.   Yes, him flying to Miami.

13   Q.   Okay.  Can you speak into the mic.  It's hard to hear

14   you.

15   A.   Yes, him flying into Miami.

16   Q.   Okay.  What was the purpose for Mr. Guy Jean-Pierre to

17   be flying into Miami?

18   A.   To meet with E.J.

19   Q.   Okay.  And who else?

20   A.   Myself.

21   Q.   And E.J. is the undercover FBI agent?

22   A.   Yes, he is.

23           MR. SIBERT:  Can I have 322-P played.

24       (Audio played)

25   BY MR. SIBERT:

482

Direct - Sears

1    Q.   And, again, sir, what was that conversation essentially
2    about?
3    A.   Banking.
4    Q.   And the cashier's check that was going -- that you
5    wanted Mr. Guy Jean-Pierre to deposit for you?
6    A.   Yes, sir.
7         MR. SIBERT:  Can I have 322 -- let's play 322-R.
8         (Audio played)
9    BY MR. SIBERT:
10   Q.   Okay, sir, in that clip, who indicated that the check
11   was deposited?
12   A.   Mr. Jean-Pierre.
13   Q.   Okay.  Sir -- can we take down the clips?
14        All right.  Now, as you stated previously, did Mr.
15   Guy Jean-Pierre ever make it to Miami?
16   A.   Yes, he did.
17   Q.   Okay.  And can you describe to the jury -- let me --
18   was he picked up?
19   A.   Yes, he was.
20   Q.   Who picked him up?
21   A.   I was a passenger in the seat and a undercover agent
22   from the United States Postal Service was the driver.
23   Q.   Okay.
24   A.   He was posing as an Uber driver.
25   Q.   An Uber driver?

1    A.    Yes.  He was a United States Postal Service employee

2    who was posing as an Uber driver taking me to pick up Mr.

3    Guy Jean-Pierre.

4    Q.    Okay.  Were you wearing a wire at that time?

5    A.    Indeed, I was.

6    Q.    All right.  And now where did you go from the airport

7    once you picked up Mr. Guy Jean-Pierre?

8    A.    Back to the hotel.

9    Q.    Okay.  And did you talk to Mr. Guy Jean-Pierre at the

10   hotel?

11   A.    Yes.

12   Q.    Okay.  And during the whole time that you were with Mr.

13   Guy Jean-Pierre, were you wearing a wire?

14   A.    Yes, sir.

15   Q.    Okay.  And then what happened after he got to the

16   hotel?

17   A.    If my memory serves me, we checked in, came down, met

18   in the lobby, and had a conversation.

19   Q.    Okay.

20          THE COURT:  Mr. Sibert, can we establish when this

21   happened?

22          MR. SIBERT:  Absolutely.  My understanding was the

23   witness testified between -- well, let me get --

24   BY MR. SIBERT:

25   Q.    You stated earlier in your testimony that this

Direct - Sears

1    undercover went essentially from February 2006 to about May
2    2016; is that correct?
3    A.   No.  It was done by April.
4    Q.   Okay.  Finished by April?
5    A.   Yes, sir.
6    Q.   Okay.  Thank you.  And do you recall the time frame of
7    when Mr. Guy Jean-Pierre was picked up at the Miami
8    airport?
9    A.   Roughly, give or -- 5, 6, in that area.
10   Q.   Excuse me?
11   A.   5:00 or 6:00 in the afternoon.
12   Q.   Okay.  Do you remember the date?
13   A.   No, I don't.
14   Q.   Do you remember what month?
15   A.   It was April.
16   Q.   Okay.  So was it at the end of the undercover
17   operation?
18   A.   It was the very end of the undercover operation, sir.
19   Q.   Okay.  And this was April 2016?
20   A.   Yes, it was, sir.
21   Q.   All right.  So now once you met Mr. Jean-Pierre down in
22   the hotel lobby, what occurred that night?
23   A.   We had a conversation.
24   Q.   All right.  And what was that conversation about?
25   A.   I don't recall specifics, probably just going over the

Direct - Sears

1    transaction, the deal, and past histories, and, you know,

2    small talk.

3    Q.   What do you mean by the "transaction deal"?

4    A.   The transaction that we were down there for.

5    Q.   And what was that transaction?

6    A.   The transaction with the undercover FBI agent.

7    Q.   Dealing with the shell company?

8    A.   Dealing with the check, the shell company, yes.

9    Q.   So dealing with the offshore account for the check --

10   A.   Everything that we just talked about.

11   Q.   Okay.  And then so you had dinner that night as well?

12   A.   Yes, we did.

13   Q.   And who was at dinner?

14   A.   Myself, Mr. Jean-Pierre, and another undercover agent,

15   his name was E.J.

16   Q.   Okay.  Were you wired for recording?

17   A.   Yes, I was.

18   Q.   And that was for recording?

19   A.   Yes, sir.

20   Q.   And were you wired the whole night?

21   A.   Yes, I was.  Until I was ready to go sleep and then, of

22   course, not.

23   Q.   Okay.  And as part of your preparation here today,

24   you're also given the ability to hear those recordings; is

25   that correct?

Direct - Sears

1    A.   That is correct.

2    Q.   Okay.  And were you able to listen to those recordings?

3    A.   Yes, I was.

4    Q.   Okay.  And just like in the past few recordings that we

5    just went over, you also got to see the transcript; is that

6    correct?

7    A.   Yes, sir.

8    Q.   Okay.  And did the transcript match the recording?

9    A.   To my recollection, I believe so.

10   Q.   Okay.  And were you able to listen to the whole

11   recording from the airport up till the end of the night

12   where you went to dinner with Mr. Guy Jean-Pierre and E.J.?

13   A.   There was a lot of dead spots in it, but yeah.  I can't

14   say I listened to every single second because there was a

15   lot of dead time in the car.

16   Q.   Okay.  Where there was no talking?

17   A.   Yes, sir.

18        MR. SIBERT:  So, Your Honor, at this time the

19   Government would like to move for admission Government

20   Exhibit 350.  That would be the entire recording from the

21   Miami airport to the hotel.

22        THE COURT:  One second.  All right, this is an

23   audio file with captions; is that correct?

24        MR. SIBERT:  That's correct, Your Honor -- this --

25   350 is just the audio.  The complete audio.

Direct - Sears

1           THE COURT:  All right.  Well, okay, what goes along

2      with that, though?

3           MR. SIBERT:  As I stated, Government Exhibit

4      351-A --

5           THE COURT:  I don't think you stated that.

6           MR. SIBERT:  Okay.  351-A through Exhibit 351-H.

7           THE COURT:  You definitely didn't say that.

8      Exhibit 350.  And you're offering 350 and then 351-A through

9      H?

10          MR. SIBERT:  That's correct.

11          THE COURT:  All right.  So the record is clear, 350

12     is the complete audio file, 351-A through H is the audio

13     file synced with a caption.

14          MR. SIBERT:  That's correct, Your Honor.

15          THE COURT:  All right.  Is there an objection from

16     the defendant?

17          MR. GOODREID:  Yes, Your Honor.  Two-fold.  No. 1,

18     I heard this witness say that he had listened to audio of

19     these events, but I never heard him link that to these

20     exhibits.  That's No. 1.

21          Secondly, I have -- I would restate my earlier

22     objections to the syncing that I've stated in response to

23     earlier document -- or, excuse me, earlier video and audio.

24          THE COURT:  All right.  I think Mr. Goodreid has a

25     point in terms of the testimony of the witness being linked

Direct - Sears

1   directly to 351-A through H, so I think you have more
2   foundation to lay.
3                   MR. SIBERT:  Okay.  Thank you, Your Honor.
4   BY MR. SIBERT:
5   Q.   Essentially the conversation from the airport to the
6   hotel that was recorded, you had stated that you had
7   listened to the recording; is that right?
8   A.   Yes, sir.
9   Q.   Did the recording match what you stated in the
10  transportation from the airport to the hotel?
11  A.   To the best of my recollection.
12  Q.   Okay.
13  A.   I wasn't really paying attention to look for that.  I
14  was listening.
15  Q.   Okay.  Was that your voice in the recording?
16  A.   Yes, sir, it was.
17  Q.   Okay.  And then also in the lobby of the hotel, the
18  conversations that you had in the lobby of the hotel with
19  the defendant, did that conversation match the recording?
20  A.   Once again, I was more listening to the conversation as
21  I remember it.  I wasn't paying attention that I had to sync
22  the words.
23  Q.   But nowhere in that recording did you think it was
24  someone else's voice besides yours?
25  A.   That was my voice, sir.

Direct - Sears

1    Q.    And that would include the ride from the airport to the

2    hotel?

3    A.    I believe so, yes.

4              MR. SIBERT:  Your Honor, at this time I move to

5    admit the previous exhibits that are requested.

6              THE COURT:  All right.  I'm going to overrule the

7    defendant's objections to 351-A through H.  And I assume, as

8    before, there was no objection to 350; is that correct?

9              MR. GOODREID:  That is correct, Your Honor.

10             THE COURT:  All right.  So --

11             MR. GOODREID:  Your Honor, I'm sorry, except

12   insofar -- I don't believe 350 has a sync, so no objection.

13             THE COURT:  Yeah, right.

14             MR. GOODREID:  Okay.

15             THE COURT:  350 is just the audio.

16             MR. GOODREID:  Right.

17             THE COURT:  Okay.  So there being no objection,

18   Exhibit 350 is admitted into evidence and may be published

19   to the jury.  I'm going to overrule the defendant's

20   objection to Exhibit 351-A through H.

21             And, again, ladies and gentlemen of the jury, I'm

22   instructing you the evidence here is the audio and the

23   caption is there for your convenience.  And to the extent

24   you believe the caption is not an accurate summary of the

25   audio, the audio is to prevail as that is the evidence.  All

Direct - Sears

1      right.  You may proceed, Mr. Sibert.

2              (Government Exhibits 350 and 351-A through 351-H

3      received)

4              MR. SIBERT:  Your Honor, at the same time the

5      Government -- let me just follow along with some questions

6      regarding Government's Exhibits 357, Exhibits 358-A through

7      N, as in November.

8              THE COURT:  And what do you want to do with these?

9              MR. SIBERT:  I'm going to -- I plan on offering

10     them into evidence, if I could just do a little bit more

11     foundation with the witness.

12             THE COURT:  You haven't done any foundation with

13     these exhibits, so go ahead.

14     BY MR. SIBERT:

15     Q.   Okay.  As I stated before, sir, you stated that you

16     were on a wire at the dinner; is that correct?

17     A.   That is correct.

18     Q.   Okay.  And so as you stated before, that recording went

19     through the night; is that right?

20     A.   Yes, sir.

21     Q.   Okay.  And as I also asked, you listened to those

22     recordings, correct?

23     A.   Yes, sir.

24     Q.   Okay.  And did those recordings from that night when

25     you went to dinner with Mr. Guy Jean-Pierre and Mr. -- and

Direct - Sears

1    E.J., undercover agent, did that recording match the

2    conversation that occurred when you went to dinner?

3    A.    To my memory, yes, sir.

4    Q.    Okay.  At any time when you were listening to that

5    recording, did you have any doubt that that was not you

6    speaking --

7    A.    No.

8    Q.    -- in that recording?

9    A.    No.

10           MR. SIBERT:  Your Honor, at this time, the

11   Government would like to -- oh, and before I forget.

12   BY MR. SIBERT:

13   Q.    You also listened to the clips of that recording; is

14   that right?

15   A.    Yes.

16   Q.    And those clips had a caption transcript being played

17   with it.

18   A.    Yes.

19   Q.    And did that transcript correctly transcribe what was

20   being said in the recording?

21   A.    Once again, sir, I wasn't paying attention to the

22   transcript.  I was listening to the audio, so I can't . . .

23           MR. SIBERT:  Okay.  Your Honor, at this time the

24   Government would like to move for -- into evidence

25   Government Exhibits 357, 358-A through 358-N.

Direct - Sears

1        THE COURT:  Any objection from the defendant?

2        MR. GOODREID:  Yes, Your Honor.  Again, on my

3   standard -- I guess we'll call it my syncing objection, but,

4   again, I did not hear this witness link his review to those

5   particular exhibit numbers.  Foundationally.

6        So I -- foundation objection.

7        THE COURT:  All right.  And no objection to 357?

8        MR. GOODREID:  Correct, Your Honor.

9        THE COURT:  All right.  Government Exhibit 357 is

10  admitted into evidence and may be published to the jury.  I

11  agree with Mr. Goodreid, Mr. Sibert, you need to lay

12  additional foundation with respect to any specific audio

13  files through this witness.

14       (Government's Exhibit 357 received)

15  BY MR. SIBERT:

16  Q.   Okay.  And I apologize, but -- again, sir, you listened

17  to the pieces of the recording regarding the dinner meeting;

18  is that correct?

19  A.   Yes, sir, it is.

20  Q.   Okay.  And, in fact, you did that over at our office on

21  Sunday; is that right?

22  A.   Yes, sir.

23  Q.   Okay.  And did those pieces of the dinner meeting, the

24  clips of the dinner meeting, did they correctly reflect what

25  was on Exhibit 357, which was the entire recording of the

Direct - Sears

1    dinner meeting?

2    A.   Yes, sir.

3    Q.   And at any point, did you ever have any doubt the voice

4    on those recordings was not yours?

5    A.   No, no doubt, sir.

6          MR. SIBERT:   Your Honor, I, at this time, would

7    like to move into evidence Government Exhibits 358-A through

8    N.

9          THE COURT:   All right.   I'm going to overrule the

10   defendant's objection.   Exhibit 358-A through N are admitted

11   into evidence.

12         Members of the jury, the same instruction with

13   respect to the audio and the captioning of that audio.

14      (Government's Exhibits 358-A through 358-N received)

15   BY MR. SIBERT:

16   Q.   And undoubtedly, sir, the next day, did you participate

17   in a breakfast meeting?

18   A.   Yes, I did.

19   Q.   Okay.  Who was at the breakfast meeting?

20   A.   Myself, an undercover agent known as E.J., and Mr. Guy

21   Jean-Pierre.

22   Q.   Okay.  And were you able to watch a recording of that

23   breakfast meeting?

24   A.   Yes, sir.

25   Q.   Okay.  And based upon your watching that recording, did

1    that recording and video correctly reflect what occurred at

2    the breakfast meeting?

3    A.   Yes, it did.

4    Q.   Okay.  And this occurred in Miami?

5    A.   Yes, it did.

6    Q.   Within a Miami hotel room?

7    A.   Yes, sir.

8    Q.   Okay.  And there's actually audio and video; is that

9    correct?

10   A.   That is correct.

11   Q.   And were you able to listen and watch both of these --

12   A.   Yes, sir.

13   Q.   -- recordings?

14   A.   Yes, sir.

15   Q.   Okay.  Anything in the recording or audio that was

16   different than what occurred in the hotel room?

17   A.   Not to my recollection.

18   Q.   And you were present in the hotel room?

19   A.   Yes, I was, sir.

20   Q.   And everything that's on that audio and recording was

21   correctly recorded based upon what you stated and did in

22   that hotel room?

23   A.   As to my recollection.

24   Q.   Okay.  And now also you got to watch video clips that

25   also had audio and video of that breakfasting meeting; is

Direct - Sears

1   that right?

2   A.   Yes.

3   Q.   Okay.  And did those clips match the complete video and

4   audio recording?

5   A.   Yes.

6   Q.   Okay.

7   A.   To the best of my recollection.

8   Q.   And those clips, like we've seen before, and like

9   you've been asked before, had a caption that transcribed

10  what was going on of what was being said in that hotel room;

11  is that correct?

12  A.   Yes, sir, it did.

13  Q.   Did that transcription correctly reflect what was being

14  said in the hotel room?

15  A.   Unfortunately, as before, I wasn't paying attention to

16  the transcript, I was busy watching the video, so I can't

17  say that.

18       MR. SIBERT:  Your Honor, at this time the

19  Government would like to move into evidence Government

20  Exhibits 360, 361, 362, 363-A through 363-I.

21       THE COURT:  All right.  And just to clarify the

22  record, for the record 360, 361, 362 are audio and visual

23  files that do not contain captions; is that correct?

24       MR. SIBERT:  So, Exhibit 360 does not have the

25  transcript --

Direct - Sears

1          THE COURT:  All right.

2          MR. SIBERT:  Government Exhibit 361 is synced with

3     a transcript.  And --

4          THE COURT:  Okay.  There's -- oh, so 361 is the --

5     has the caption with the transcription of the entirety of

6     360?

7          MR. SIBERT:  Yes, sir.

8          THE COURT:  All right.  And is that -- and is 362

9     just the audio -- the video file without the caption?

10         MR. SIBERT:  Yes, sir.

11         THE COURT:  All right.  All right.  Is there an

12    objection from the defendant to any of these proffered

13    exhibits?

14         MR. GOODREID:  Your Honor, I maintain my syncing

15    objection to 361.  Not to 360.  And if I understood

16    Government counsel correctly, 362 is not synced, so we don't

17    object to that.  And I'm not sure, was there another exhibit

18    after that?

19         THE COURT:  363-A through I.

20         MR. GOODREID:  Oh, and so my syncing objection to

21    those.  So not to repeat that, no objection to 360 and 362.

22    My syncing objection to 361 and the 363 series.

23         THE COURT:  All right.  There being no objection,

24    Government Exhibits 360 and 362 are admitted into evidence

25    and may be published to the jury.

Direct - Sears

1          Exhibits 361 and 363-A through I are admitted into
2     evidence over the defendant's objection.  The defendant's
3     objections to those two exhibits are overruled.  And, again,
4     members of the jury, same instruction with respect to the
5     captioning transcript of those two exhibits.
6          (Government's Exhibits 360, 361, 362, 363-A thru 363-I
7     received)
8          MR. SIBERT:  May I proceed, Your Honor?
9               THE COURT:  You may.
10              MR. SIBERT:  Thank you.
11          Can we please have Government Exhibit 358-A played.
12          (Audio played).
13              MR. SIBERT:  I'm sorry, Your Honor.  Can I have the
14    time shown?
15          (Audio played)
16              THE COURT:  Why did we play that twice?
17              MR. SIBERT:  I needed the time to show on my
18    monitor.
19              THE COURT:  Why are we spending trial time, court
20    time, going through this small talk?
21              MR. SIBERT:  Because it is showing -- I'm sorry,
22    Your Honor, I don't believe it is small talk.  I think it
23    shows an introduction --
24              THE COURT:  That's the definition of small talk.
25    Can we just -- I mean, you know, you got -- we don't have

Direct - Sears

1    the 13 days we originally hoped to have for this trial, we

2    have 11 days.  I'm concerned about the pace that the

3    evidence is coming in, and taking up limited court time on

4    small talk gibberish like this I don't think is advancing

5    anything.

6             So let's get to the files that have what you

7    believe are evidence in support of the Government's counts.

8             MR. SIBERT:  Okay.  Can I please have Exhibit 358-B

9    played.

10        (Audio played)

11   BY MR. SIBERT:

12   Q.   Okay, sir, can you quickly summarize what that

13   conversation was about.

14   A.   Moving money offshore into a third party account.

15   Q.   Okay.  Now, you stated previously in your testimony

16   that you were working off a script that the FBI wrote you.

17   A.   Yes.

18   Q.   There's no FBI agent in this -- at this part of the

19   recording; is that right?

20   A.   That is correct.

21   Q.   You're on your own?

22   A.   Well, I was coached prior, thoroughly.

23   Q.   But there's no one writing you anything at this

24   point?

25   A.   No.

1    Q.   Okay.   Mr. -- you state that there's 245 left.   What

2    does that mean?

3    A.   That would be from the original 250,000 that was

4    scripted that I was to tell him we sent in the cashier's

5    check for $5,000 now with 245,000.

6    Q.   What did Mr. Guy Jean-Pierre mean when he said 25?   To

7    start with 25?

8    A.   I would imagine $25,000 in a wire transfer.

9    Q.   All right.

10            MR. SIBERT:   Your Honor, may I have a moment?

11            THE COURT:   You may.

12            MR. SIBERT:   Your Honor, I'll pass the witness.

13            THE COURT:   Cross-examination.

14            MR. GOODREID:   Yes, thank you, Your Honor.

15                        CROSS-EXAMINATION

16   BY MR. GOODREID:

17   Q.   Good afternoon, Mr. Sears.

18   A.   Good afternoon, sir.

19   Q.   Could we pull up Government Exhibit 372-CCC, please.

20            Mr. Sears, are you able to see that clearly or do

21   you need to see it in hard copy?

22   A.   I can see clearly, this particular one.

23   Q.   All right.   Do you see down -- can we scroll down to

24   the middle of the page, please -- where it starts with the

25   language, on January 14th.   I'm sorry, I've got one too many

1    Cs in there, I apologize.  It should be 372-CC.  That's my

2    mistake.  Beg your pardon.  Okay.  Okay.  And if we can go

3    to the middle there.

4         Can you see that clearly, Mr. Sears?

5    A.   Yes, I can.

6    Q.   See in the middle there where it says "on January 14th,

7    2012"?

8    A.   Yes.

9    Q.   And it says -- and this is an e-mail you got from Mr.

10   Jean-Pierre, right?

11   A.   Yes, sir.

12   Q.   And it says, "also, since" -- you see where it says

13   "since I am still in the DR, you can try to reach me on my

14   cell phone . . . Of course, since I'm going into surgery

15   this morning I doubt they're going to permit me use of my

16   cell phone for a while"?

17   A.   Yes, sir.

18   Q.   You recall the context of that was Mr. Guy Jean-Pierre

19   had been in a serious auto accident; is that right?

20   A.   Yes.

21   Q.   And, in fact, he had suffered a serious head injury as

22   the result of that accident, right?

23   A.   Two cerebral hematomas from what I remember.

24   Q.   Thank you.  Take that down.

25        So do you recall an exchange -- I want to ask you

1     some questions now about the sting operation.  Do you recall

2     an exchange you had with Mr. Sibert on your direct

3     examination where he asked you about the language in one of

4     these recordings about "just like we did with FusionPharm"?

5     A.    Indeed.

6     Q.    Do you remember that?

7     A.    Yes.

8     Q.    And you said that that was -- that the FBI had scripted

9     that; isn't that correct?

10    A.    That is right.

11    Q.    Does that mean that you take some disagreement with the

12    sting operation being "just like we did with FusionPharm"?

13    A.    Yes, I take -- yes.

14    Q.    And could you explain that disagreement, please.

15    A.    I believe the entire thing was scripted to be like

16    that, to mirror it, to try to make the FusionPharm ordeal be

17    something that it wasn't, in my opinion.

18    Q.    Okay.  How was it -- how was FusionPharm not like that?

19    A.    Because -- because none of it was premeditated like

20    that.

21    Q.    All right.  And you also said in that exchange with Mr.

22    Sibert that you were upset with the Government.  Could you

23    explain that, please.

24    A.    If you could elaborate on what part, sir.

25    Q.    Well, you were talking about the "just like we did with

1    the FusionPharm," and Mr. Sibert asked you were you upset

2    and you said, "I'm upset with you, sir."

3              What did you mean by that?

4    A.   Well, honestly, when we did our prep on Sunday, this

5    would go a certain way, as I told those -- things were going

6    to go and it was anything but, so . . .

7    Q.   And how did it not go the way you thought it was going

8    to go?

9    A.   I was told I was to identify emails and there was this,

10   and sign off, and that was the end of it, and we weren't

11   going to worry about content.  And now as I sit here, I feel

12   like I'm the one on trial.

13   Q.   Now you also today on a break said something to Mr. --

14   to Mr. Sibert to the effect that he was off script; isn't

15   that right?

16   A.   Indeed, sir.

17   Q.   And what did you mean by that?

18             MR. SIBERT:  Your Honor, may I approach on this,

19   please?

20             MR. GOODREID:  Judge, I think we're talking about a

21   script --

22             THE WITNESS:  My exact --

23             THE COURT:  Hold on, hold on.

24             THE COURT:  You better have a very good reason for

25   asking for a sidebar.

1          (Discussion at sidebar)

2          MR. SIBERT:  Your Honor, as an officer of the

3    Court, you gave the order to the witness not to discuss any

4    testimony or talk --

5          THE COURT:  Lower your voice.

6          MR. SIBERT:  -- or not talk to any counsel.

7          THE COURT:  Right.

8          MR. SIBERT:  As I was leaving for lunch -- or

9    actually the restroom, Mr. Sears held the door open for me.

10   As I walked through the door, Mr. Sears --

11         THE COURT:  Mr. Sibert, please lower your voice.

12         MR. SIBERT:  I wrote you a message.

13         THE COURT:  I got it.

14         MR. SIBERT:  So you know what he said.

15         THE COURT:  And you think this is an appropriate

16   time to raise that --

17         MR. SIBERT:  Absolutely.

18         THE COURT:  -- to break up this cross-examination?

19         MR. SIBERT:  Absolutely.  It's contempt of court.

20   He didn't obey the Court's order.  And now I informed the

21   defense as a -- as a officer of the court that there was a

22   violation of the court order, and now they're turning it

23   around to use it in a cross-examination.  So they're going

24   to use a violation of the Court's order against the

25   Government's case in chief.

1      THE COURT:  Okay.  I don't know how many times I

2   have to tell you to lower your voice.

3      I'll hear from you, Mr. Goodreid.

4      MR. GOODREID:  Your Honor, I can't imagine why this

5   is improper.  We're talking about this witness said that he

6   thought there was a scripted arrangement between him and the

7   Government.  I'm inquiring about that.  His comment to Mr.

8   Sibert relates directly to the script.

9      THE COURT:  Right.  Okay.  Is this your

10  handwriting?

11     MR. SIBERT:  That's my handwriting, Your Honor.

12     THE COURT:  All right, so I'm -- I don't know if

13  you've seen this.  We might as well put it on the record.

14     So you handed Ms. Frank, my courtroom deputy, this

15  note that she passed to me that you're telling me that this

16  is what the witness, Mr. Sears, told you during the break

17  when you were holding the door open --

18     MR. SIBERT:  When he was holding the door for me.

19     THE COURT:  All right.  Is that correct?

20     MR. SIBERT:  Yes.

21     THE COURT:  Okay.  And the note states, "Why didn't

22  you stick to the script, dickhead?"

23     Now, I'm not happy that that kind of exchange took

24  place, but I don't believe that it is in violation of my

25  order in that the -- my order was directed to any discussion

1    about the substance of his testimony with counsel.  So to

2    have a discussion with you as opposed to having -- to making

3    an ad hominem attack, which, again, I am not agreeing is

4    appropriate and is very inappropriate, but I don't believe

5    it to be a violation of the Court order.

6              And so beyond that, you asked for a sidebar.  I'm

7    assuming you're objecting to the last question.

8              MR. SIBERT:  Right.  I did not want to raise that

9    in front of the jury.  And the reason why is I don't know if

10   he's talking about -- what script he's talking about.  And

11   if you're talking about the scripted testimony, then that

12   would be a violation about talking about -- off the bench

13   about testimony.

14             THE COURT:  Mr. Goodreid.

15             MR. GOODREID:  Your Honor, no offense to counsel,

16   I'm not sure he understands that.  I stand on my position.

17   He testified on direct -- he has now talked about a script.

18   I want to know what script he's talking about.  If there's a

19   script between him and the Government on his testimony, I

20   think we're entitled to hear about it.

21             THE COURT:  Right.  I agree.  Did you hear what he

22   just said?

23             MR. SIBERT:  No.

24             THE COURT:  Let me paraphrase it.  You correct me

25   if I'm misstating it.

1          MR. GOODREID:  Please.

2          THE COURT:  Mr. Goodreid believes, and I agree,

3   that the defendant is entitled to know whether the script

4   that he's referring to in the question was a reference to a

5   script that you had for his testimony as opposed to a script

6   for the discussion of the events that took place during

7   the --

8          MR. SIBERT:  Okay.  Fair point.  But can we do this

9   outside the presence of the jury?  Because the answer, if

10  it's a script to the testimony, then it does go against your

11  order about discussing testimony.

12         THE COURT:  No, no, no, no.  His question about --

13  when he testified earlier that he was testifying according

14  to the script, right?  And Mr. Goodreid asked, "What script

15  are you talking about?"

16         MR. SIBERT:  So we're not talking -- the way I

17  understood the question was it was after the testimony

18  that Mr. -- that the witness approached Mr. Sibert about the

19  script.  And that's why I asked for a sidebar.

20         THE COURT:  No.  That's not what I'm understanding

21  the question is about.

22         MR. GOODREID:  No.

23         THE COURT:  The question is whether the Government

24  has provided a script for this witness for his testimony.

25         MR. SIBERT:  Okay.  So it has nothing to do, then,

1    about what occurred after we took a break for chow -- for
2    lunch?
3              MR. GOODREID:  Well, look, Judge, I'm sorry, but
4    there's two different issues, again.  Whether this witness
5    disobeyed the Court's order is one question; the substance
6    of what he said is a different issue.  In the substance of
7    what he said, even if it violates the Court's order, is fair
8    grounds for cross-examination.  It's his remark.
9              THE COURT:  I agree.  I -- Mr. Sibert, here's the
10   point --
11             MR. SIBERT:  Where did the script come up in
12   testimony?  We didn't talk about testimony, fine.  But the
13   only reference I remember about script --
14             THE COURT:  Lower your voice.
15             MR. SIBERT:  The only time --
16             THE COURT:  Lower your voice.
17             MR. SIBERT:  I'm sorry, it's the Marine Corp in
18   me.
19             THE COURT:  You're not in a Marine Corps base,
20   you're in a courtroom.
21             MR. SIBERT:  I can't yell at a general either, so I
22   apologize.
23             So the only time I remember any point where a
24   script came up besides conversation about getting in and out
25   of evidence, is when he called me dickhead about the script.

1          THE COURT:  No, no.  Then you're not remembering
2    what he had -- he has testified in direct -- in response to
3    direct examination that he was stating things to Mr.
4    Jean-Pierre according to the Government's --
5          MR. SIBERT:  Oh.
6          MR. GOODREID:  According to the script.
7          MR. SIBERT:  Fair point.
8          THE COURT:  And this is --
9          MR. SIBERT:  I don't think --
10         THE COURT:  No, it's not, but that's not what he's
11   asking about.  He gets to ask whether that is, in fact, what
12   the -- he meant by that script, where's -- or he's
13   referencing some kind of script that the Government has
14   scripted for his testimony in this trial.
15         MR. SIBERT:  Okay, so this -- if this is allowed
16   in, the question that when he was -- when I was leaving the
17   courtroom --
18         THE COURT:  No, this is -- he's not asking anything
19   about --
20         MR. SIBERT:  Are you going to go into about
21   after -- what happened after court?
22         MR. GOODREID:  This is no different than if this
23   witness left the courthouse last night and yelled something
24   at the Government that related to his testimony.  Of course
25   I can inquire about that.  It's relevant, it's on point.

1    MR. SIBERT:  But that's about the testimony.  If
2    you're saying the script was part of the testimony, then
3    that is a violation of your order talking about the
4    testimony.
5    MR. GOODREID:  But that doesn't matter.
6    THE COURT:  But that doesn't matter.
7    MR. GOODREID:  That's a different issue.
8    MR. SIBERT:  I think it opens doors.
9    THE COURT:  Okay.  The -- the objection by the
10   Government's overruled.  Are you going to need the question
11   re- --
12   MR. GOODREID:  Please, Your Honor.
13   (End of discussion at sidebar)
14   THE COURT:  All right.  Let's give a minute to Ms.
15   George to find the -- that question so she can reread it.
16   The objection's overruled.
17   (Question read)
18   BY MR. GOODREID:
19   Q.   And when you made that remark to Mr. Sibert, what did
20   you mean, Mr. Sears?
21   A.   My exact words were, "What happened to the script?"
22   And what I meant was when I went in for my pretrial prep, I
23   was asked to go over documents, initial them.  Was that my
24   e-mail address, was it not?  And that was going to be --
25   that's how I was briefed and that's what I -- how I was told

1    this was going to go.

2            And as I sit here on my, whatever this is, second

3    or third day, my head spinning, I don't remember, I feel

4    like I'm the one on trial here, so . . .

5    Q.   So to follow up on that, do you feel that in some way

6    the Government has deviated from what they -- what they

7    promised you or what you thought was going to happen in this

8    trial?

9    A.   From what he told me was going to happen here.  I was

10   told I was to review emails, was this my e-mail?  They

11   weren't going to go into content.  My lawyer was there with

12   me.  And now I'm Pearl Harbored.

13   Q.   All right, Mr. Sears, let's talk about some of the

14   various -- I know you've heard a lot of -- you've seen a lot

15   of recording, you've seen a lot of audio -- and I say you've

16   seen it, you've seen transcripts, you recall we have been

17   going through the last several hours, don't you?

18   A.   Yes, sir.

19   Q.   Okay.  Do you remember at one point on one of those

20   early -- early calls, there was 322-B, that doesn't

21   necessarily mean anything to you, but there was a discussion

22   between you and Mr. Jean-Pierre about aged debt?

23   A.   Yes, sir.

24   Q.   And you remarked with a response to a question that

25   aged debt, and as long as it was aged appropriately enough,

1  that was fine, right?

2  A.  Yes, sir.

3  Q.  And at the time that you were making the comments to --

4  or having conversation with Mr. Jean-Pierre, he did not know

5  that the age of the debt was being -- that aged debt, that

6  there was something wrong with that, right?  You didn't tell

7  him that, did you?

8  A.  Not at that point of the conversation, I don't believe.

9  I think I was still saying it was old, at that point.

10 Q.  That it was old?

11 A.  At that point.

12 Q.  And you also recall the different part of the

13 transcript where he said, "I'm not a securities lawyer, I'm

14 a consultant."  You recall that, don't you?

15 A.  Yes, I do, sir.

16 Q.  And you recall Mr. Sibert asked you some questions

17 about that.

18 A.  Yes.

19 Q.  And you said in response to his questions that -- that

20 people draw up paper for lawyers all the time; isn't that

21 right?

22 A.  That's right, sir.

23 Q.  What did you mean by that?

24 A.  Paralegals draw paperwork for lawyers to sign off on

25 every day, as far as I know.

1    Q.   And in terms of your experience with securities, which

2    is fairly vast, that happens on a regular basis?

3    A.   Yes.  Even my defense lawyers that I have had.

4    Q.   Now, you recall -- and, again, I'm sure you don't

5    remember the bartender, but in 322-E when you're having a

6    conversation with Mr. Jean-Pierre, he asked you for evidence

7    of the debt; isn't that right?

8    A.   Yes, sir.

9    Q.   Now, he asked for evidence of the debt, but he didn't

10   say to you, "Hey, I'll just make up all these documents with

11   respect to debt," did he?

12   A.   No, he didn't --

13   Q.   He wanted that information from you, right?

14   A.   Yes, sir.

15   Q.   Now, at another point during your direct examination --

16   and I believe it was in the context of Mr. Sibert had asked

17   you questions about a placeholder; do you remember that?

18   A.   Indeed I do.

19   Q.   And you asked if you could change your answer to

20   something and you were denied the opportunity at that point.

21   Was there something that you wanted at this point to change

22   your answer about placeholder or something else in that

23   area?

24   A.   Thank you, yes.  Mr. Sibert wanted to make a point to

25   say that my mother was a placeholder in Bayside Realty

1    Holdings and I had testified to that which, indeed, I did

2    not.  I said it was in FusionPharm in the very beginning

3    when I was taking over the shell to clean it up.  She was a

4    placeholder as a secretary, as I recall, not Bayside.

5    Q.   Now, there was a comment on -- I'm going back now

6    before the sting operation, but you remember some of the

7    videos that took place out at FusionPharm?

8    A.   Yes, sir.

9    Q.   And there was a notable quote that you made in one of

10   those.  You said that you had the -- you were the hand up

11   Mona Lisa's skirt, do you remember that?

12   A.   Yes, sir.

13   Q.   And you asked if you could explain that.  You didn't at

14   that time.  What did you mean by that originally when you

15   said it?

16   A.   Originally, because Scott is the organ grinder, if

17   you're familiar with the monkey and the organ grinder, the

18   monkey is the one that makes everybody laugh and the organ

19   grinder is the one who plays the music and makes it happen,

20   he's running the show, the hand up Mona Lisa's skirt are --

21   I'll have to say it again.

22        A monkey and an organ grinder is the monkey is the

23   entertainment, makes everybody smile, much like a hand up

24   Mona Lisa's skirt, that's what makes her smile.  But the

25   monkey is the monkey.

1    Q.   So you were analogizing to that in this remark?

2    A.   Yes, sir.

3    Q.   Okay.  Different topic here now.

4         You noted in response to Mr. Sibert's questions

5    that at some point you stopped using -- in your various

6    corporate endeavors, stopped using Mr. Jean-Pierre as

7    counsel, right?

8    A.   Yes, sir.

9    Q.   And you indicated that you started using a different

10   attorney by the name of Fred Lehrer; do you recall that?

11   A.   Yes, I do, sir.

12   Q.   And you certainly recall who Mr. Lehrer was, don't

13   you?

14   A.   Yes, I do.

15   Q.   In fact, he's a respected SEC attorney, formerly worked

16   for the SEC --

17        MR. SIBERT:  Objection, Your Honor.  Bolstering the

18   witness -- bolstering the evidence, I should say.  And also

19   to knowledge.

20        MR. GOODREID:  Your Honor, I'm not understanding

21   the objection.  Certainly I'm entitled to inquire of this

22   witness' knowledge of a person he mentioned.

23        THE COURT:  I agree.  Overruled.

24   BY MR. GOODREID:

25   Q.   All right, let me start over.  So you remember who Mr.

1    Lehrer was, right?

2    A.   Yes, I do.

3    Q.   He's a securities attorney, right?

4    A.   Yes, he is.

5    Q.   An as far as you know, he's a well-regarded securities

6    attorney?

7    A.   Yes, sir.

8    Q.   In fact, Mr. Lehrer you know formerly worked for the

9    SEC himself; isn't that right?

10   A.   Yes, sir.

11   Q.   Okay.  And after you no longer were using Mr.

12   Jean-Pierre, you retained Mr. Lehrer to write opinion

13   letters for your various corporate entities; isn't that

14   right?

15   A.   That is a fact.

16   Q.   And, in fact, a number of those opinion letters were

17   very similar to what Mr. DiTommaso had written for your

18   entities earlier; isn't that right?

19   A.   Yes, sir.

20           MR. GOODREID:  Your Honor, may I have just a

21   minute?

22           THE COURT:  You may.

23           MR. GOODREID:  Your Honor, certainly I don't want

24   to dictate the Court's schedule, but we're close to a break

25   and I think we could make the rest of the cross-examination,

Cross - Sears

1  to the extent there is any, very efficient if we broke at

2  this point, if that would be all right with Your Honor.

3            THE COURT:  Yes, I think that's a good suggestion.

4            All right, members of the jury, we will be in

5  recess for 15 minutes.

6       (Jury left the courtroom at 3:05 p.m.)

7            THE COURT:  Same restrictions during the recess,

8  Mr. Sears.

9            THE WITNESS:  Yes, sir.

10      (Recess 3:06 p.m.)

11      (In the presence of the jury at 3:23 p.m.)

12           THE COURT:  All right, Mr. Sears, once again, you

13  remain under oath.

14           Mr. Goodreid, you may resume your examination.

15           MR. GOODREID:  Thank you, Your Honor.

16                CROSS-EXAMINATION (Continued)

17  BY MR. GOODREID:

18  Q.   All right.  If we could go back to Exhibit 372-CC,

19  which has been admitted into evidence.  Please be kind

20  enough to pull that up.

21           And, again, you -- can you see that, Mr. Sears?

22  A.   It's really fuzzy, sir.

23  Q.   Well, you recall this is the e-mail I asked you about

24  earlier where you had an exchange with Mr. -- with Mr.

25  Jean-Pierre about the accident he had, right?

1   A.   Yes, sir.

2          THE COURT:  Is there a portion you want blown up

3   because it's -- the font's very tiny right now.

4   BY MR. GOODREID:

5   Q.   Well, yes, if we could -- if we could highlight the

6   middle of that -- not highlight, but blow up the middle

7   portion.  That's great.  Thank you, Your Honor.

8          THE COURT:  All right.

9   BY MR. GOODREID:

10  Q.   So you recall me asking you questions about this before

11  the break, don't you, Mr. Sears?

12  A.   Yes, sir.

13  Q.   And you noted that Mr. Jean-Pierre had, as a result of

14  his accident, two subdural hematomas, correct?

15  A.   Yes, sir.

16  Q.   And you can see from this e-mail that the e-mail,

17  itself, is dated January 2012, right?

18  A.   Yes, sir.

19  Q.   And your understanding is the accident that he had was

20  shortly before the time of this e-mail, correct?

21  A.   Yes.  Or some time before.

22  Q.   Some time before.

23  A.   Yeah.

24         MR. GOODREID:  Those are all the questions that I

25  have, Your Honor.

Redirect - Sears

1          THE COURT:  All right.  Redirect.

2          MR. SIBERT:  Thank you, Your Honor.

3                    REDIRECT EXAMINATION

4     BY MR. SIBERT:

5     Q.   Okay, Mr. Sears, on cross-examination, you indicated

6     that the FBI had a script for you and what they believed had

7     occurred or took place at FusionPharm.

8          MR. GOODREID:  Objection.  Leading.

9          THE COURT:  I'll -- to speed things up I'll let

10    this one go.  Go ahead.

11    BY MR. SIBERT:

12    Q.   Do you recall those questions?

13    A.   Yeah, I didn't say they had a script, I said it was

14    scripted.  It wasn't a physical script.  They were writing

15    and ad libbing and putting a note in front of me and things

16    to that effect.  It was a very specific way I was to do

17    things.

18    Q.   And you were upset because you felt like they scripted

19    it for what they -- for what they believed occurred at

20    FusionPharm.

21         MR. GOODREID:  Objection.  Leading.

22         THE COURT:  Sustained.

23    BY MR. SIBERT:

24    Q.   Why were you upset about the script?

25    A.   I'll just say because I felt like I was lied to in a

1    lot of different ways and we'll leave it at that.

2    Q.   All right.  Well, how were you lied to?

3    A.   The entire ordeal.

4    Q.   And tell me what part --

5    A.   Every part of it.

6    Q.   Okay.  What part --

7    A.   We'll start from the back, you know.  Yourself, on

8    Sunday, telling me what curriculum was going to be

9    supposedly that we were going over, none of which happened.

10   Everything.

11   Q.   Okay.  Well, you responded to Mr. Goodreid's question

12   indicating that you did not believe that FusionPharm was

13   like the script that the FBI was asking you to follow.

14   Isn't that how you responded?

15   A.   No, that's not what I meant.  That's maybe what you're

16   reading.  I think the FBI -- and I can't believe I didn't

17   see this one -- put this whole thing together, my undercover

18   sting to almost try to make it like that's exactly what

19   happened with FusionPharm, hence why they used the names

20   Bayside, why they wanted the names VertiFresh.  They could

21   have used any other name.  Why use the same name for a

22   sting?

23        None of it corresponded, none of it -- why do that

24   unless you're trying to set a point or set somebody's state

25   of mind for something?

1   Q.   And that's why you're upset?

2   A.   I'm real upset about it, because one -- one is fiction,

3   and the other one you're saying is real, so you're trying to

4   make them like they're both, you know, one and the same.

5   It's clearly what you're trying to draw here, so it's, you

6   know -- so I'm upset about it, yeah.  I'm really upset about

7   it.

8   Q.   And you're upset about what they portrayed to be real

9   with what occurred at FusionPharm.

10              MR. GOODREID:  Objection.  Leading.

11              THE WITNESS:  Because that's not what happened at

12  FusionPharm, sorry.

13              THE COURT:  Mr. Sears -- Mr. Sears, when there's an

14  objection, please don't start your answer until I've had an

15  opportunity to rule on it.

16              THE WITNESS:  Yes, sir.

17              THE COURT:  Objection sustained.  Next question.

18  BY MR. SIBERT:

19  Q.   So you stated that you -- you just stated that one was

20  fiction, one was real.  Well, what are you talking about

21  there?

22  A.   Actually, that's probably a bad choice of words.

23  Q.   Okay.  Go ahead and explain yourself.

24  A.   Well, I'd prefer not to at the moment because I

25  probably am not going to come out with the right words

1    and --

2              MR. SIBERT:  I would ask the witness to be -- if he

3    can, respond to my question about what he meant.  And if he

4    has a better indication to what his answer was regarding one

5    was real and one was fiction.

6              THE WITNESS:  I think that you, the Government, set

7    this sting up to show what they feel their version of the

8    events that happened at FusionPharm to make it try to show

9    like it was mimicked in this sting, when that is indeed not

10   the fact.

11   BY MR. SIBERT:

12   Q.   Okay.  In the very beginning of your testimony, you

13   signed the plea agreement in this case -- a plea agreement

14   in your criminal case; is that correct?

15   A.   That is correct.

16   Q.   And you pled guilty to conspiring to commit securities

17   fraud relating to FusionPharm stock trading activity; is

18   that right?

19   A.   That --

20             MR. GOODREID:  Objection.  Beyond the scope.

21             THE COURT:  How is this within the scope of

22   cross-examination?

23             MR. SIBERT:  Your Honor, on cross-examination,

24   counsel got out in direct questioning that this witness was

25   upset because of the sting operation was set up as the FBI

Redirect - Sears

1    thought was of the place -- of the events being taken place

2    at FusionPharm.  And that he thought it was essentially, for

3    lack of a better term, not the correct event.

4              THE WITNESS:  Right.

5              MR. SIBERT:  He's now entered a plea agreement that

6    has the facts, that he's pled true and correct to, regarding

7    the events of his criminal activity with FusionPharm.

8              THE COURT:  I see.  I see.  Overruled.

9    BY MR. SIBERT:

10   Q.   All right.  So -- thank you, Your Honor -- and so

11   you've pled guilty in a written plea agreement regarding

12   your conspiracy, your conspiring, to securities fraud

13   relating to FusionPharm stock; is that right?

14             MR. GOODREID:  Objection.  Leading.

15             THE COURT:  Sustained.

16             MR. SIBERT:  It's essentially the same question.

17             THE COURT:  Sustained.

18             MR. SIBERT:  Your Honor, at this time the

19   Government would move to introduce at least the factual

20   basis in Mr. Sears' plea agreement or the entire plea

21   agreement, and we've marked it as Government Exhibit 446.

22             THE COURT:  Are you sure you want to do that?

23             MR. SIBERT:  Yes, sir.

24             THE COURT:  Is there an objection?

25             MR. GOODREID:  Yes, Your Honor.  I don't entirely

Redirect - Sears

1   understand the basis for admitting it, but we object on any
2   number of grounds, not the least of which is relevance.  He
3   certainly can ask the witness about what's in the document,
4   but it doesn't -- I don't know that it has anything to do
5   with the charges in this case.  It's not proper substantive
6   evidence, it's not relevant.
7           THE COURT:  I think there's another way you can
8   cross-examine this witness about what he stipulated to in
9   his plea agreement without us having to admit the plea
10  agreement into evidence, and I would prefer we go that
11  route.
12  BY MR. SIBERT:
13  Q.   All right.  Well the facts in this, sir, are pages 12
14  through 41; is that correct?
15          THE COURT:  Does he have a copy of the plea
16  agreement with him?
17          MR. SIBERT:  I can give it to the courtroom --
18          THE COURT:  You only have one copy?
19          MR. SIBERT:  I have one copy.  We did not have it
20  marked until the door was opened.
21          MR. GOODREID:  Your Honor, as a matter of
22  professional courtesy, I have a copy I will be happy to give
23  to Government counsel.
24          MR. SIBERT:  Do you want me to hand the witness --
25          THE COURT:  Hold on, hold on, hold on.  Let Mr.

1    Goodreid find his copy.

2            MR. SIBERT:  Thank you.

3            THE COURT:  All right.  And then if you'll hand the

4    original to Ms. Frank, she'll give it to the witness.

5            MR. SIBERT:  And, Your Honor, before I continue,

6    under Rule 805, past recollection recorded, I'm going to ask

7    if this -- either we be allowed to enter the document into

8    evidence or allow this witness to be able to read the

9    factual basis because that's his past recollection reported

10   under Rule 805 where these facts were made at a time and

11   place that were closer to the events and what he's -- that

12   was particularly described in the past.  And that's the

13   whole purpose of Rule 805.

14           THE COURT:  You want him to read all the stipulated

15   facts from his plea agreement?

16           MR. SIBERT:  I don't want him to read it, but if

17   the Court is not going to allow me to enter it in as

18   evidence, then yes.

19           THE COURT:  I'm suggesting -- well, first of all,

20   another problem is I don't have a copy of this exhibit, and

21   if you want to put it into evidence, we need copies for

22   the -- and if I allowed it into evidence, the jury's going

23   to have to see and they're going to have to have copies of

24   it.

25           So what I'm recommending -- that's why I

1    recommended an easier way to do this, which would be to

2    proceed with your cross-examination --

3              MR. SIBERT:  I have a copy for the Court.

4              THE COURT:  All right.  I would like to see that,

5    please.  One second.

6              Well, this is -- the factual stipulations go on for

7    pages and pages, so he's not going to be reading it, the

8    past recollection recorded.  You want to -- you want to

9    offer this into evidence for what purpose?

10             MR. SIBERT:  Past -- well, at this point, I believe

11   the witness has qualified under Rule 615, so I would declare

12   he is adverse, so it would be past recollection recorded

13   under 805, therefore not being hearsay and being allowed to

14   be introduced into evidence to contradict the past testimony

15   that he just provided to the jury.

16             THE COURT:  What about the fact that we don't have

17   copies for the jury?

18             MR. SIBERT:  Well, I think before the jury receives

19   the evidence, it will be very easy to get a copy put into

20   the exhibit binders.

21             THE COURT:  Mr. Goodreid.

22             MR. GOODREID:  Your Honor, I also have -- I

23   maintain my relevance objection.  I also would add the

24   bolstering objection.  This is a written recordation of what

25   apparently -- the witness can subscribe to it or not, but

Redirect - Sears

1    it's basically a written record then in his testimony,

2    that's getting pretty close to be giving a transcript of the

3    testimony.  Your Honor said on the very first day of trial

4    we don't give that to the jury, so . . .

5              THE COURT:  But this is not a transcript of his

6    testimony.

7              MR. GOODREID:  It is a record, Your Honor, of what

8    apparently he thinks happened in his case.

9              THE COURT:  Right.  Okay.  All right.  Well, I'm

10   going to overrule those objections.  You know, I gave you

11   the opportunity to think twice about whether you wanted to

12   do this, but you wanted to proceed, so I'm going to overrule

13   the objection.  How are we going to label this?

14             MR. SIBERT:  I believe the copy the witness has is

15   Government Exhibit 346.

16             THE COURT:  346.  All right.  346 is admitted into

17   evidence.  We don't have copies for the jury at this time.

18   We will have to make -- this evening we'll have to --

19   counsel will have to make copies to add to the Court --

20             MR. SIBERT:  Your Honor, I'm sorry, it's 446.

21             THE COURT:  Exhibit 446 is admitted into evidence.

22             I'm sorry, ladies and gentlemen of the jury, we

23   don't have copies for you at this time, but they -- this

24   exhibit will be added to the official court set of exhibits

25   that will be -- go back with you for your deliberation and

Redirect - Sears

1    review.

2         (Government's Exhibit 446 received)

3              THE COURT:  And so the Government will have those

4    additional sets made and added to the court binder and my

5    binder -- well, I guess we can just use this one here.

6    We'll add it, Ms. Frank, this evening.  If you could add

7    this to the bench's set of exhibits so I have a full set

8    here, 446.

9              And you may proceed.

10             MR. SIBERT:  All right, Your Honor.  May I have a

11   moment, please?

12             THE COURT:  Yes.

13             MR. SIBERT:  I don't have any further questions,

14   Your Honor.

15             THE COURT:  We went through all that and now you

16   have no questions?

17             MR. SIBERT:  Yes, sir.  I got in what I need for

18   the evidence.

19             THE COURT:  May this witness be excused?

20             MR. SIBERT:  The witness can be excused, Your

21   Honor.

22             THE COURT:  All right.  For the defendant?

23             MR. GOODREID:  Yes, Your Honor.

24             THE COURT:  All right.  All right, Mr. Sears, you

25   are excused.  You may step down.

Direct - Dahlman

1          THE WITNESS:  Thank you, sir.

2          THE COURT:  Government may call its next witness.

3          MR. SIBERT:  Your Honor, at this time the

4    Government would like to call Mr. Dahlman, Frederick

5    Dahlman.

6          COURTROOM DEPUTY:  Will you please stand and raise

7    your right hand.

8        FREDRICK DAHLMAN, GOVERNMENT'S WITNESS, SWORN

9          COURTROOM DEPUTY:  Please be seated.  If you could

10   scoot your chair up close to the microphone.  And please

11   state and spell your name for the record.

12         THE WITNESS:  Okay.  My name is Fred Dahlman.

13   D-a-h-l-m-a-n.

14         MR. SIBERT:  May I approach, Your Honor?

15         THE COURT:  Yes, you may.

16                    DIRECT EXAMINATION

17   BY MR. SIBERT:

18   Q.   Okay.  Good afternoon, sir.  Can you please tell the

19   jury where you're currently -- currently living.

20   A.   I'm living in Old Hickory, Tennessee.  That's just

21   outside of Nashville, Tennessee.  And --

22   Q.   How long have you lived there?

23   A.   I have lived in Old Hickory for about -- since 2003.

24   And I've been living in Nashville since 1960.

25   Q.   Okay.  And could you please describe your background,

Direct - Dahlman

1   to include your education and some of the fields that you
2   worked in your past.
3   A.    Okay.  I graduated from high school in '57.  Went to
4   Clarkson College for a year and a half and transferred back
5   to Corning, New York, to go finish up in a junior college
6   as -- as mechanical technology, getting an associate's
7   degree there.  Then I transferred down to Vanderbilt
8   University and got my BE in mechanical engineering and
9   electrical engineering.  And then I got my MS in materials
10  science and chemistry.  And then I did graduate work toward
11  my doctorates.
12  Q.    Did you ever finish your doctor's --
13  A.    No, I did not.
14  Q.    And what did you do after your education?
15  A.    Well, while I was a -- working on my doctorate, I was
16  working for Avco Corporation as a research engineer in
17  metallurgical science.
18  Q.    And eventually did you start your own company?
19  A.    After I left Vanderbilt I did start my own company,
20  which was in plastic molding -- injection molding.
21  Q.    All right.  Now I'd like to turn your attention to
22  2003.
23  A.    Okay.
24  Q.    Did you become involved with a company named Baby Bee
25  Bright?

1   A.   Yes, I did.

2   Q.   Can you tell the jury how your involvement began in

3   this company.

4   A.   I had hired a couple people that needed to have a job,

5   and in doing so, I suggested to -- one person was in sales

6   and, anyways, we were looking -- he said we ought to make a

7   product of our own and actually market it.  We got talking

8   about the prenatal education to -- that was in colleges and

9   universities and so on.  So we decided to make a prenatal

10   educator for the -- for sale on the open market.

11   Q.   Okay.  And can you describe what this machine was.

12   A.   The prenatal educator was a belt with a CD player.

13   That was one of the main ways that we were able to

14   communicate nicely was with the CD player playing CDs.  And

15   it played music to the baby in the womb.  You had two

16   speakers that were placed on the mother's stomach.  The belt

17   acted as a support for the stomach, itself.  And you could

18   play the CDs and the baby could hear it.  Also the mother

19   could hear it, too, because we had speakers where they --

20   she could listen to the music as well.  And then we had a

21   microphone which the family could talk to the baby in the

22   womb also.  And we started marketing that.

23   Q.   Okay.  Did Baby Bee Bright ever become a public

24   company?

25   A.   Baby Bee Bright started out as a Tennessee corporation

1    first and then it was transferred over into a public company

2    on the Pink Sheets.

3    Q.   When you say Pink Sheets, what do you mean?

4    A.   The -- it will be over-the-counter sales.

5    Q.   Are you familiar with the over-the-counter sales Pink

6    Sheets?

7    A.   Basically, those that are not on the regular markets

8    and so on are considered over-the-counter to my -- to the

9    best of my knowledge, and we were in that kind of a

10   business.

11   Q.   And was your business smaller in size?

12   A.   The Baby Bee Bright, it was basically very small.  I

13   used my dominant industry, which was the plastic molding

14   company, to actually operate out of, and also where we

15   stored the merchandise.

16        And then it was -- the company was actually

17   developed by means of outside sources being able to market

18   it on the open market.  And we had people around the country

19   that were working.  We actually set up some videos which

20   were played on TV.  We had a phone system being able to send

21   them out to the people.

22        And we were just getting our sales moving and then

23   we were informed by the Federal Trade Commission that we

24   needed to do some research on the actual item to prove that

25   it would educate the baby in the womb.

Direct - Dahlman

1          We went through several months of that where we
2    were told to cease sales, trying to prove to the -- this is
3    the Federal Trade Commission -- this is the Federal Trade
4    Commission, really.  And, anyway, we were showing where they
5    were -- all this research was actually done in the colleges
6    and universities.  And New York University was very heavily
7    involved in it, and several other universities around the
8    country.
9          But they said, Well, we have to do the research
10   with our particular unit to prove that it works.  And in
11   doing so, we were able to sell, but we could not sell as a
12   prenatal educator.  We could sell it as a unit that would
13   broadcast information to the baby, and music, and such as
14   that, but -- so that kind of wrecked all our sales because
15   all our advertisement was actually set up as a prenatal
16   educator.
17   Q.   All right.  Let me stop you there.  Do you remember the
18   time period that Baby Bee Bright became public?
19   A.   At the present time, I couldn't really tell you.  It
20   was within the first few years of the operation.
21   Q.   Okay.  And when did Baby Bee Bright begin?
22   A.   Well, I thought it was closer to around 2005.  I'd have
23   to check my information about it.  It's been a long time.
24   Q.   Was it a public corporation before 2010?
25   A.   It was a public corporation before 2010, yes.

Direct - Dahlman

1    Q.   Okay.  And what was your role at Baby Bee Bright?

2    A.   I was the president and CEO of the company.

3    Q.   And did anyone help Baby Bee Bright keeping their

4    corporate financial statements?

5    A.   You mean doing the bookkeeping and such as that?

6    Q.   Yes, sir.

7    A.   It was done with -- by a person called Kocinski down in

8    Florida.  And I sent the records down to him and he would

9    actually file them.  And also they were filed on the open

10   market, that is -- as we had to do every quarter on our

11   corporate listing and so on.

12   Q.   And he -- where were these documents filed?

13   A.   They -- well, as far as that goes, I kept the files,

14   but the copy of the files were actually listed in the -- on

15   the Pink Sheets.

16   Q.   So on the OTC marketplace?

17   A.   In the open marketplace, yes.  So anybody could go on

18   the open marketplace and read the information, see where the

19   status of the company was, and see what the -- what was --

20   what the company was doing.

21   Q.   So after the FTC basically told your company you

22   couldn't advertise these monitors as educational -- or for

23   educational purposes, did Baby Bee Bright ever make money?

24   A.   We basically were losing money.  I was trying to keep

25   it going, but we were looking for somebody to actually

Direct - Dahlman

1    possibly sell the corporation to as -- and maybe change

2    how -- change the product line such as that, because we

3    didn't have money enough to do the research and do the

4    follow-up of everything that we had.

5    Q.   Do you recall what happened to the Baby Bee Bright

6    stock price?

7    A.   Baby Bee Bright stock, it fluctuated, but it went down

8    to fractions of the cent and such as that in the later

9    years.  And -- but it was still trading and --

10   Q.   So if I understand you correctly, at some time the

11   stock at Baby Bee Bright was not even worth one cent?

12   A.   Well, that was pretty much toward the very end before

13   it was actually taken over by another company, so . . .

14   Q.   Did you have anyone promoting the stock for Baby Bee

15   Bright?

16   A.   I had a company called -- what was it called? --

17   MicroCap.  Something like that.  I can't think of the name

18   of it right now.

19   Q.   Did you say MicroCap?

20   A.   Yeah, I think it's -- well, something like that, yes.

21   Q.   Do you know who --

22   A.   And they were out of Denver, Colorado, here.

23   Q.   Do you know who owned the company MicroCap?

24   A.   It was owned by William Sears.

25   Q.   Now, after the -- did Mr. Sears promote Baby Bee

Direct - Dahlman

1   Bright's stock after the FTC made a finding about the
2   educational purpose of your device?
3   A.   I think he was promoting it before all this actually
4   happened, but I can't say for sure.  But I know that it
5   was -- he was promoting it and we were getting some sales --
6   it was showing some improvement, but not a whole lot.
7   Q.   Did he continue promoting after the FTC became
8   involved?
9   A.   I don't know.
10  Q.   Okay.  Sir --
11  A.   I think at that time, we were actually looking into
12  stopping the sales and -- because we couldn't legally sell
13  it.  We couldn't really do it as a listening device for
14  babies; people weren't interested in that too much.  So at
15  that time, we started looking for another outlet to use the
16  corporate entity and maybe -- since it was set up for sales,
17  stock and everything else, it had some value just as a
18  corporate entity, itself.
19  Q.   All right, sir.  I'd like to turn your attention to
20  September 2010.  Could you please look -- there's an exhibit
21  notebook.  Could you look at Exhibit 32.
22  A.   Is this it right here?
23  Q.   Sir, I'm not sure.  I think that the courtroom deputy's
24  going to assist you.
25  A.   Oh.  Yes.

Direct - Dahlman

1          MR. SIBERT:  Your Honor, before I continue my

2     questions, I would like to move into evidence Government

3     Exhibit 32, 33, 34, 35, and 36.  And, I'm sorry, 37, all of

4     which have been stipulated to.

5          THE WITNESS:  This 32 is the first one?

6          THE COURT:  Hold on, Mr. Dahlman.

7          Ms. Frank, aren't some of these already in

8     evidence?

9          COURTROOM DEPUTY:  The only one that is not in yet

10    is 34.

11         THE COURT:  Okay.  So all the others are already

12    in, Mr. Sibert.  So you're moving Exhibit 34, then?

13         MR. SIBERT:  Your Honor, my understanding -- just

14    to be clear, I don't want to violate the Court's rules, but

15    my understanding is they have been stipulated to, but I have

16    not offered them into evidence.

17         THE COURT:  Well, that's not what Ms. Frank has

18    said.

19         COURTROOM DEPUTY:  They were offered on Day 1.

20         MR. SIBERT:  Okay.  Thank you.  My apologies.

21         THE COURT:  All right.  Are you offering -- and

22    what you said is true, the fact that an exhibit is just

23    stipulated does not mean that it's in evidence, but 32, 33,

24    35, 36, and 37 are already in.  So are you moving to admit

25    34?

Direct - Dahlman

1          MR. SIBERT:  Yes, sir.

2          THE COURT:  And is this stipulated?

3          MR. SIBERT:  It is stipulated.

4          THE COURT:  All right.  Given the stipulation,

5    Exhibit 34 is admitted into evidence and may be published to

6    the jury.

7          (Government's Exhibit 34 received)

8          MR. SIBERT:  Thank you, Your Honor.

9    BY MR. SIBERT:

10   Q.   Can you just look at that first page of Government

11   Exhibit 32.  Can you -- thank you.

12          Do you recognize that first page?

13   A.   Page -- it just says No Subject, William Sears, and was

14   sent on 9-14-2010.  And it was to Fred Dahlman -- Fredrick

15   A. Dahlman.

16   Q.   Okay, sir.  I'm going to ask you just to look at that

17   binder.  There's an attachment that is part of that exhibit.

18   A.   This one?

19   Q.   Yes, sir.  Or -- I'm sorry.

20   A.   Okay.  This is that debt settlement agreement.

21   Q.   Okay.  Do you recognize this debt settlement agreement?

22   A.   Yes, I do recognize the settlement agreement.  This is

23   the debt that was involved from the promotion of the Baby

24   Bee Bright and -- anyways, it was -- $350,000 shares was

25   supposed to be there.

Direct - Dahlman

1    Q.    Okay.  Sir.

2    A.    Yes.

3    Q.    If you look at that top paragraph, it says, "This debt

4    settlement agreement."

5    A.    Right.  And that was MicroCap Management, LLC.

6    Q.    Okay.  And so are you saying here on September 7, 2010,

7    Baby Bee Bright entered into a debt settlement agreement

8    with MicroCap Management?

9    A.    Yes, I believe at that particular time, what was

10   happening is William Sears was trying to get the corporation

11   free of debt, and one of the big debts was the corporation's

12   debt to him due to the promotion of the stock and such as

13   that.

14   Q.    Okay.

15   A.    And --

16   Q.    So you entered this agreement based upon Mr. Sears'

17   promotional work?

18   A.    I agreed upon this because the company owed MicroCap

19   Management a fair amount of money, as is stated here.  And,

20   anyways, for the company to be transferred over into another

21   company it had to be debt free, or that's what they're

22   stating.

23   Q.    Who was stating that?

24   A.    William Sears was stating that we needed to get all the

25   debt taken out of the company so that it would not have to

1    be passed on to the new owners.

2    Q.   Okay.  Would you have paid Mr. Sears $350,000 in

3    cash?

4    A.   I couldn't do it; I'd be giving him a transfer of

5    stock.

6    Q.   Okay.  Even if you could --

7    A.   It was from the actual corporation that was in debt to

8    him.

9    Q.   Okay.  Even if you could pay him, did he do $350,000 of

10   work?

11   A.   Well, I had the debt, and, therefore, it had to be done

12   somehow.  And it's -- it was a lot of money and I don't

13   think that I really got the full value out of it, but

14   it's -- had to be done.

15   Q.   Okay.  So you don't think Mr. Sears did $350,000 of

16   work for you?

17   A.   Well, I couldn't prove it, but also we had the Federal

18   Trade Commission get into the whole situation, which kind of

19   changed the value of what he was doing.

20   Q.   I guess I'm just asking you:  Based upon what Mr. Sears

21   did for your company, was it valued at $350,000?

22   A.   Well, it wasn't valued at that except for that's what

23   was agreed on originally.

24   Q.   Okay.  So if it wasn't valued at $350,000, his work --

25   Mr. Sears' work, why did you agree to a debt settlement

1    agreement for that amount?

2    A.    The reason why is because we were trying to actually

3    sell the corporation to another company and he was handling

4    the sales of work.  And he said this had to be done in order

5    to make the company -- the actual entity of the corporation

6    saleable to the people that would be buying it.

7    Q.    And do you recall what company that was?

8    A.    Well, at that time, it was a company that William Sears

9    was working with, and I think it was something like Mountain

10   Top something or another, which later on was switched over

11   to -- to another company, and it was a marijuana company.

12   Q.    Do you know what the company was going to do once they

13   got your entity, Baby Bee Bright?

14   A.    What they were going to do is have a trading

15   corporation in which they could raise money to be able to do

16   their -- originally pharmaceutical marijuana pills and such

17   as that, that was supposedly legal in Denver because --

18   other than that I didn't really know a whole lot about it.

19   They were growing marijuana and also changing the name to

20   medical products.

21   Q.    Okay.  And just -- can I have page 3 of the attachment.

22        One more, please.  Can you blow that up?  Thank

23   you.

24        Sir, can you see on your screen there?

25   A.    My signature is the top signature under Baby Bee Bright

Direct - Dahlman

1    Corporation.

2    Q.   And what date was this debt settlement agreement

3    signed?

4    A.   9-7-2010.

5    Q.   And whose signature is below that?

6    A.   Signature below that I believe is, according to this,

7    William L. Scotts -- Sears, rather.

8    Q.   Okay.

9    A.   Yeah.

10   Q.   And then can I just have the first page, please.

11   A.   What?

12   Q.   I'm sorry, I'm talking to . . .  Can I have the e-mail.

13        And, sir, who sent you this debt agreement?

14   A.   That was sent by William Sears through MicroCap

15   Management who was actually handling the sales of

16   everything.

17   Q.   All right.  Thank you.  Now, sir, can I ask you to flip

18   to the next exhibit, Exhibit 33.  Do you recognize

19   Government Exhibit 33?

20   A.   Okay.  Yes, that's how he wanted me to split up the

21   stock.  We had preferred share stocks that would have to go

22   into the new company, otherwise I would not -- otherwise,

23   I'd be owning the whole company.  And, anyways, 10,000

24   shares was going to be remaining in my name, 50,000 was

25   going to MicroCap Management, and the balance was going to

542
Direct - Dahlman

1   Salt Investment, LLC.

2   Q.   Let's just take a minute here.  Who sent you this

3   e-mail?

4   A.   This was sent to me by William Sears.

5   Q.   And, again, the date this e-mail was sent, do you see

6   that?

7   A.   It's 11-8-2010.

8   Q.   Okay.  And then as you just described, were you talking

9   about the middle of this e-mail regarding the preferred

10  shares; is that correct?

11  A.   I'm -- I didn't understand you.  Say it once again.

12  Q.   Can you look at your screen right there.

13  A.   Yes.

14  Q.   That's -- you described $10,000 preferred shares to

15  you --

16  A.   Right.

17  Q.   -- 50,000 to MicroCap Management?

18  A.   That is correct.

19  Q.   -- and then the remaining to Salt Investments?

20  A.   Which was 1,440,000 shares to Salt Investments, LLC.

21  Q.   Okay.  And that's in the middle of the e-mail?  That's

22  the --

23  A.   Pardon?

24  Q.   That's what's stated in the e-mail?

25  A.   Yes.  Yes.

543

Direct - Dahlman

1    Q.   So who is directing you where to move the shares?

2    A.   Right.

3    Q.   Who is doing that?  Who's directing you?

4    A.   Yes, he was directing me to -- how the shares should be

5    split up and --

6    Q.   And when you say "he," who do you mean?

7    A.   I meant William Sears, yes.

8    Q.   Okay.  And can you now, please, look at Government

9    Exhibit 3 -- excuse me, Government Exhibit 34.

10   A.   Okay.

11   Q.   Now, do you recognize what Government Exhibit 34 is?

12   A.   This is to inform the management that Fredrick A.

13   Dahlman, Jr. -- that's me -- has resigned as president of

14   Baby Bee Bright Corporation, and Belle C. Dahlman -- that's

15   my wife -- has resigned as vice president/secretary, and

16   treasurer of Baby Bee Bright Corporation and turn over

17   office to the new officers in the corporation in November

18   15th, 2015.

19        And that's signed by me as the CEO and also by

20   Belle as -- the remainder.  And was notarized at our bank.

21   Q.   Can I have the whole document shown.

22        All right.  And if you look on your screen here,

23   sir, your computer screen --

24   A.   Yes.

25   Q.   -- that's your signature?

544
Direct - Dahlman

1   A.   That is my signature.

2   Q.   And this is your wife's signature?

3   A.   That's her signature.

4   Q.   And you just read this paragraph up here; is that

5   correct?

6   A.   Right.   That's correct.

7   Q.   So why were you resigning your position with Baby Bee

8   Bright on November 15th -- or, excuse me, March -- no, no,

9   I'm sorry -- the 11th day of December, 2010?

10  A.   Because the corporation was being changed over to the

11  new corporation.

12  Q.   And to the best of your memory, who was running this

13  new corporation?

14  A.   It was William Sears' brother-in-law, and I thought it

15  was his wife, but I found out it was his mother.

16  Q.   Okay.   And so the people running the corporation was

17  Mr. Sears' brother-in-law and his mother?

18  A.   As I understand, yes.

19  Q.   Okay.   Sir, can you please look at Government Exhibit

20  35 now.

21  A.   Okay.

22  Q.   Now do you recognize Government Exhibit 35?

23  A.   This is, again, the split-up of the preferred shares.

24  Apparently the first time it was not actually function -- or

25  followed through with because now we have the same shares

Direct - Dahlman

1    and it's going to be 10,000 to myself -- or my -- to Belle

2    and myself; 100,000 to MicroCap Management, LLC; 25,000 to

3    Robert L. Dittman, and he was running the new corporation;

4    and the balance of 1,365,000 shares was going to Salt

5    Investment, LLC.

6    Q.   Do you know who Salt Investments is?

7    A.   I have no idea who Salt Investment is.

8    Q.   Okay.  And, again, who was sending you this e-mail?

9    A.   These were being sent to me by William Sears to be

10   acted upon.

11   Q.   And are we talking about preferred shares again?

12   A.   This is preferred shares, yes.

13   Q.   Okay.  And can I have that taken down, please.

14        Why are preferred shares so important?

15   A.   Well, preferred shares, they hold their value and,

16   also, they are -- when they're turning to common stock, they

17   have a value of -- I forgot what it was, it was in the

18   corporate records.  It was either 10 to 1 or 100 to 1.  And

19   I couldn't tell you which one it is right now.

20   Q.   So when you say 100 to 1 or 10 to 1, what do you mean

21   by that?

22   A.   I mean for one preferred share, it would turn into that

23   number of common shares.

24   Q.   Okay.

25   A.   And so --

Direct - Dahlman

1    Q.   Now, do you recall during this time period where

2    your -- you're essentially turning your company over; is

3    that right?

4    A.   Yes.  The company was being turned over to the new

5    owners, which was a company owned by Robert L. Dettman --

6    Dittman --

7    Q.   And let me ask you:  Do you recall a -- if there was

8    ever a reverse split?

9    A.   Just at the turnover, there was a reverse split of one

10   share was issued out for every 2,000 shares, I believe, of

11   common stock.

12   Q.   Was it 2,000 or 200?

13   A.   Maybe it was 200.  200 to 1, I think.  Yeah, you're

14   right.  I don't know.

15   Q.   So if it was 200 to 1, would you tell the jury what

16   that means.

17   A.   Okay.  Anybody that had 200 shares, they would now get

18   one share of stock.

19   Q.   So --

20   A.   And it's called a reverse stock.

21   Q.   Does it affect the preferred shares?

22   A.   It would not affect the preferred shares at all.

23   Q.   Okay.  So if I --

24   A.   Because under corporate ruling, and so under the

25   corporate charter, they would not be affected by any

Direct - Dahlman

1   increase in shares of common stock or any decrease in shares
2   of common stock.
3   Q.   All right.  So if I understand you correctly, if you
4   were a shareholder having 200 common shares when this
5   reverse split went through, that same shareholder would only
6   have one?
7   A.   That is correct.
8   Q.   Can you look at Government Exhibit -- Exhibit 37.  I'm
9   sorry, sir, I skipped an exhibit.  Can you look at -- look
10  at Government Exhibit 36.
11  A.   36.  Is there another page to this?
12  Q.   There should be two pages.
13  A.   Okay.  There is another page now.  And here we're
14  talking about the --
15  Q.   Sir, hold on for a second.  First, let's just start
16  out.  Who is sending you an e-mail?
17  A.   The e-mail is sent by William Sears.  It's
18  instructions, preferred stock transfers, and how it should
19  be broken up.
20  Q.   Okay.  Can I have page 2 --
21  A.   This means that none of the preferred stock transfers
22  that were stated before were ever done, so -- because we
23  only have so much preferred stock.
24  Q.   And based upon the letter that Mr. Sears sent you, how
25  were the preferred shares supposed to be broken up?

Direct - Dahlman

1    A.    In this case?

2    Q.    Yes.

3    A.    In this case, it was 1,365,000 shares to Salt

4    Investment; 100,000 shares to MicroCap Management; and

5    50,000 shares to Robert Dittman.  And then the remaining

6    10,000 shares was left in my name.

7    Q.    Okay.  Thank you.  And now can you look at Government

8    Exhibit 37.

9    A.    Okay.  This is another --

10         THE COURT:  Sir, there's not a question pending.

11         THE WITNESS:  Pardon?

12         THE COURT:  Sir.  There's not a question pending.

13         THE WITNESS:  Oh.

14   BY MR. SIBERT:

15   Q.    Sir, so you have to wait for me to ask you a question.

16   A.    Okay.

17   Q.    So do you recognize Government Exhibit 37?

18   A.    Yes.  This is another directive from William Sears.

19   It's dated 3-1-11.

20   Q.    And what is Mr. Sears telling you in the body of the

21   e-mail?

22   A.    "As per our conversation, please see attached and

23   forward to" -- that was a transfer agent who handles the

24   stock transfer.

25   Q.    And are you saying Ms. DiBella is the transfer agent?

1  A.    Yes.  She was one of the transfer agents up in my

2  transfer company.  It wasn't mine, but it was one I worked

3  through.

4  Q.    Do you recall the name of that transfer company?

5  A.    Right now it's slipped my mind.  I'm just not thinking

6  clearly right now.

7  Q.    Okay.  Well, let's look at page 2.

8  A.    Okay.

9  Q.    And, sir, can you look at the top here.  And I've

10 circled on the screen, does that help you remember the

11 transfer company?

12 A.    Yeah, Pacific Stock Transfer.

13 Q.    And can I have the body, please.

14 A.    Oh, okay.  It says, "Please transfer One Hundred Eighty

15 Five Thousand" shares of "preferred shares of BBYB" --

16 that's my Baby Bee Bright stock, "from certificate" whatever

17 it was, "to MicroCap Management.

18       "The remaining Fifteen Thousand shares are to be

19 left in the name of Fredrick A. Dahlman and also Belle C.

20 Dahlman" and to be sent to our address on file."  Our

21 registration was "effective as of November 15, 2010 so the

22 above mentioned shares should be transferred free of any

23 restrictions."

24 Q.    Okay.  And down here, sir, whose phone number is

25 listed?

Direct - Dahlman

1    A.    Okay.  It says, Mr. Sears's -- okay, "onetime use of

2    credit card authorized" from the pay for -- well, Mr. Sears

3    and it has the direct line for him.  In other words, to use

4    his credit card to do it.

5    Q.    Okay.  And that's his phone number that he puts down

6    there?

7    A.    It probably was that phone number at the time, so . . .

8    Q.    And, sir, just to be clear, the resignation was

9    November 15th, 2010.

10   A.    Right.

11   Q.    And that's when you resigned from Baby Bee Bright?

12   A.    That is correct.  Well, whatever it was that I

13   resigned.  We did an earlier thing there.

14   Q.    Okay.  Thank you, sir.  I'm sorry, I'd like to ask you

15   some follow-up questions before we get into the next

16   exhibit.

17   A.    Okay.

18   Q.    Do you know -- did you know if Mr. Sears had had a

19   conviction for securities -- for a security fraud?

20   A.    No, I did not -- well, I heard after all this was all

21   done that he had some security fraud, not in this country

22   but somewheres else.

23   Q.    But prior to going to this case, did you know anything

24   about his --

25   A.    No, I did not.

1    Q.   Okay.  Did you know Mr. Guy Jean-Pierre?

2    A.   I talked to him once on the phone.

3    Q.   And why did you talk to him?

4    A.   He was introduced to me by William Sears and that's --

5    in that way, he called me, apparently, as I remember.

6    Q.   Was he ever your lawyer or corporate counsel?

7    A.   As I understand, he was the lawyer that was actually

8    handling the transfer of the corporation from Baby Bee

9    Bright to whatever it was going to be transferred to at the

10   time.

11   Q.   Did you ever meet him in person?

12   A.   No, I never met him in person.

13   Q.   Okay.  You said you talked to him on the phone; is that

14   correct?

15   A.   Yes.

16   Q.   Could you describe that conversation.

17   A.   It was very hard for me to understand him and he had a

18   very heavy accent and -- anyways, I finally did my

19   communications through his assistant, which was a lady.  And

20   I couldn't tell you her name right now.

21   Q.   Okay.  Did you ever receive any correspondence from Mr.

22   Guy Jean-Pierre's law firm?

23   A.   I got a thank-you letter from his assistant thanking us

24   to -- for the business that we will be doing as far as the

25   transfer of the corporation from Baby Bee Bright to whatever

Direct - Dahlman

1      it's going to.

2      Q.   Did you have any further communications directly with

3      either Mr. Guy Jean-Pierre or his law firm?

4      A.   Not that I can remember.

5      Q.   Okay, sir -- all right, sir --

6            MR. SIBERT:   Your Honor, at this time, I'd like to

7      move into evidence Government Exhibit 61 and Government 63.

8      And they have both been stipulated to

9            THE COURT:   All right.  Given the stipulation of

10     the parties, Exhibits 61 and 63 are admitted into evidence

11     and may be published to the jury.

12          (Government's Exhibits 61 and 63 received)

13     BY MR. SIBERT:

14     Q.   All right, sir, do you recall reviewing these documents

15     last night?

16     A.   I'm sorry?

17     Q.   Do you see document 61 in front of you?  Can you look

18     at document 61?

19     A.   I'm looking at it and that's where it says Baby Bee

20     Bright -- what is that last part there?  Had a loss?

21     Q.   Okay, let me just -- let me ask you questions.  Do you

22     recall going over these documents last night?

23     A.   I do not remember any like these.

24     Q.   Okay.  Can you turn to page 7 of document 61.

25     A.   Okay.

Direct - Dahlman

1   Q.   Now, do you recall looking at this document last
2   night?
3   A.   Okay, this is dated December 30th, 2010, and it's from
4   a Pacific Stock Transfer agent.
5   Q.   Okay.  And essentially who is writing this letter,
6   sir?
7   A.   It has my letterhead on top of it.
8   Q.   Okay.  And what are -- what is the letter directing
9   Pacific Stock Transfer Company to do?
10  A.   In reference to the conversation with William Sears in
11  which he discussed the new rulings and the waiting period of
12  the stock -- transfer stock prior to the reversal.  "Mr.
13  Sears wanted us to change the November 27th letter of
14  authorization as follows:
15        And "Please let this letter act as a letter of
16  authorization for you to transfer the portion of the
17  above-referenced shares to the following company:
18        "1,300,000 shares to Salt Investment, LLC.
19  Remaining 200,000 shares" left to Fredrick A. Dahlman, Jr.,
20  and Belle C. Dahlman, and then transfer the 1.3 million
21  shares to Salt Investment is to be effective immediately,
22  recorded on the books of the records of your firm.
23  Q.   So, sir, you were asking the transfer agent to
24  essentially transfer 1.3 million preferred shares?
25  A.   Right.

1   Q.   To Salt Investments.

2   A.   Right.

3   Q.   And what's the address of Salt Investments?

4   A.   It's 2233 Ponderosa Road, Franktown, Colorado 80116.

5   Q.   And then this was your address at the time?

6   A.   That was my address at the time.

7   Q.   And that's in Tennessee?

8   A.   That is in Tennessee.

9   Q.   Okay.  And can you just scroll to the signature part,

10 please.

11   A.   Okay.

12   Q.   And, sir, on your screen, is this your signature?

13   A.   That's my signature.

14   Q.   And, finally, can you go back to the top, please.

15   A.   Okay.

16   Q.   And Pacific Stock Transfer, where were they located?

17   A.   Las Vegas, Nevada.

18   Q.   And, finally -- well, let's go to -- if you can flip,

19 sir, to Government Exhibit 63.

20          Okay, sir, do you have document 63 in front of you?

21   A.   Yes, I do.

22   Q.   Okay.

23          MR. SIBERT:  Your Honor, may I have a minute?

24          THE COURT:  You may.

25          MR. SIBERT:  I didn't pull the document -- can you

555

Direct - Dahlman

1    go to page 12 of Government Exhibit 63.

2              THE WITNESS:  Okay.

3    BY MR. SIBERT:

4    Q.   Okay.  Do you -- can you take a look at page 12 and let

5    me know if you recognize this letter.

6    A.   Well, this is another letter that we sent to the

7    transfer agent.

8    Q.   Okay.  What are you asking the transfer agent to do in

9    this letter?

10   A.   "Please transfer One Hundred Eighty Five Thousand

11   Series "A" Preferred shares of" Baby Bee Bright from the

12   "certificate number 1012 to the following:

13              "Microcap Management," and it gives his address.

14   "The remaining Fifteen Thousand shares are to be left in the

15   name of Fredrick A. Dahlman and Belle C. Dahlman, JT TEN and

16   are to be sent to the addresses."

17   Q.   And, sir, again, is this Mr. Sears' phone number listed

18   on this document?  If you look on your screen.

19   A.   If it's -- yeah, that's probably it at that time.

20   Q.   And where was this certificate supposed to be sent to?

21   A.   Thornton, Colorado.

22   Q.   And can you scroll down to the bottom, please.

23   A.   Yes.

24   Q.   Is this your signature?

25   A.   It is my signature.

1    Q.   And, again, no change of state for you in this

2    document?  You still were living in Tennessee?

3    A.   Yes, I still lived in Tennessee, same house and such as

4    that.

5    Q.   Does the name FusionPharm mean anything to you, sir?

6    A.   The corporation that it was sold to was changed to the

7    name of FusionPharm.

8    Q.   When you said "the corporation that it was sold to" --

9    A.   In other words, Baby Bee Bright was transferred over to

10   the corporation and it had the name FusionPharm at that

11   particular time -- or it was changed to FusionPharm.

12   Q.   Is that the name that you couldn't remember earlier in

13   your testimony?

14   A.   Earlier they had -- I think, Mountain Top.  But I think

15   that was changed to FusionPharm after a bit.

16   Q.   Okay.  And does the name Leslie Dinwood mean anything

17   to you?

18   A.   I don't know.

19        MR. SIBERT:  Okay.  May I have a moment, Your

20   Honor?

21        THE COURT:  You may.

22   BY MR. SIBERT:

23   Q.   Sir, the letters that you just reviewed that you

24   directed the stock to go to the transfer agents to be

25   transferred, No. 61 and 63 that we just reviewed in those

Direct - Dahlman

1    exhibits, do you recall those letters?

2    A.    I remember sending them out and signing them, yes.

3    Q.    And do you know if you drafted those letters or did Mr.

4    Sears draft them for you?

5    A.    They were drafted by Mr. Sears as instructions to how

6    the transfer -- how the stock should be divided up.

7    Q.    Okay.  And he sent them to you via e-mail?

8    A.    Yeah.  Yeah.

9    Q.    Okay.

10            MR. SIBERT:  Your Honor, I'll pass the witness.

11            THE COURT:  All right.  Cross-examination.

12            MR. GOODRIED:  Your Honor, I don't have any

13    questions for this witness.

14            THE COURT:  All right.  May this witness be excused

15    for the Government?

16            MR. SIBERT:  Yes, Your Honor.  Thank you.

17            THE COURT:  For the defendant?

18            MR. GOODREID:  Yes, Your Honor.

19            THE COURT:  All right.  Mr. Dahlman, thank you for

20    your testimony.  You're excused and you may step down.

21            THE WITNESS:  Thank you.

22            THE COURT:  Government may call its next witness.

23            MR. SIBERT:  Your Honor, at this time the

24    Government would like to call Scott Dittman.

25            COURTROOM DEPUTY:  If you'll step up right here.

                        Direct - Dittman

1    Will you please raise your right hand.

2              SCOTT DITTMAN, GOVERNMENT'S WITNESS, SWORN

3              COURTROOM DEPUTY:  Would you please sit down and

4    scooch your chair there.  And please state your full name

5    and spell it for the record.

6              THE WITNESS:  Excuse me.  Scott Dittman.

7    S-c-o-t-t, D-i-t-t-m-a-n.

8                         DIRECT EXAMINATION

9    BY MR. SIBERT:

10   Q.   Okay, good afternoon, sir.

11   A.   Good afternoon.

12   Q.   Okay.  Sir, can you explain to the jury where you're

13   currently living.

14   A.   Yes.  I live in Oley, Pennsylvania, about an hour north

15   of Philadelphia.

16   Q.   Okay.  Sir, how long have you lived there?

17   A.   We moved to Pennsylvania in 1993.

18   Q.   Okay.  Have you been residing in Pennsylvania since

19   1993?

20   A.   Yes.

21   Q.   Did you ever reside anywhere in Colorado from 2010 to

22   2014?

23   A.   Yes.  I resided in Colorado most of my life before

24   Pennsylvania, and 2010 to 2014, entirely in Colorado.

25   Q.   Okay.  And so when I asked you did you reside anywhere

Direct - Dittman

1    else besides Pennsylvania, I guess maybe I didn't phrase my

2    question correctly.  But have you always been in

3    Pennsylvania since 1993?

4    A.    Oh, I'm sorry, I thought you said 2013.  No.

5    Pennsylvania since 2013.  From 1974 to 2013 with the

6    exception of four years in San Francisco right after

7    college, I was in Colorado the whole time.

8    Q.    Okay.  And, sir, are you currently working?

9    A.    I am a semi-employed consultant and a stay-at-home

10   dad.

11   Q.    Okay.  What do you consult?

12   A.    I'm consulting currently with an Israeli company on an

13   industrial hemp and lettuce project in the nation of

14   Gibraltar.

15   Q.    When you say "hemp," can you tell me what you mean by

16   that?

17   A.    Sure.  Industrial hemp is a plant of the -- from the

18   same family of plants as marijuana.  As people would know

19   that, hemp has no THC, which is the psychoactive compound in

20   marijuana.  It's grown all around the world and legally in

21   the U.S. now.

22   Q.    I'm going to ask you just to slow down.  We have a

23   court reporter here and also I need to hear you, the jury

24   needs to hear you, the parties need to hear you.

25   A.    Understood.

1    Q.   Okay.  All right, sir.  I want to take you back

2    essentially to 2010.  Or, actually, 2010, 2011 time frame.

3    All right?  Did you begin a company known as FusionPharm?

4    A.   I did --

5    Q.   And can you tell the jury what FusionPharm was about.

6    A.   Fusionpharm was a -- what in the beginning we called a

7    cannabis support company.  Our initial business model was

8    providing equipment into the cannabis cultivation space.

9         I invented a product that we called the grow pod.

10   It was a shipping container-based plant-cultivation room.

11   We used them, sold them to cannabis growers in Colorado,

12   eventually across the United States, and up into Canada.

13   Q.   All right.

14   A.   Do you want me to go on to the rest of the --

15   Q.   No.

16   A.   Okay.

17   Q.   You summarized it well.

18        And before you started FusionPharm, can you tell me

19   what -- now, you say you lived four years in San Francisco.

20   What did you do in San Francisco?

21   A.   I was a -- I worked for Arthur Anderson, which is a --

22   at the time was a Big Eight public accounting firm.  I was

23   a -- my first year I was in audit services and my last 2 1/2

24   years I was in a group called Enterprise Consulting, which

25   was a small business consulting arm.

Direct - Dittman

1    Q.   And by way of education, do you have a -- what's called

2    a CPA?

3    A.   I do -- well, I did have a CPA, yes.

4    Q.   And that's a certified public accountant?

5    A.   Certified public accountant, yes.

6    Q.   You had a CPA?

7    A.   I did.

8    Q.   I assume you don't have a CPA anymore?

9    A.   No.  I received my CPA in, I believe, the end of 1993

10   or the beginning of 1994, and I retired from public

11   accounting in the spring of 1995.

12   Q.   Okay.  And I assume you just didn't keep up your

13   license?

14   A.   Correct, yeah.

15   Q.   All right.  Now, you said that you started the company

16   FusionPharm.  What was your role at FusionPharm?

17   A.   I was the CEO.

18   Q.   Okay.  Did you partner with anyone with -- at

19   FusionPharm?

20   A.   Partner, no.  FusionPharm was a corporation, so I think

21   I need maybe a more specific question.

22   Q.   Okay.  Can you look at Government Exhibit 150.

23   A.   How do I do that?  Oh, sorry, I do --

24   Q.   I'm going to ask for the assistance.

25            It's going to be on your screen.  If you can't see

Direct - Dittman

1       it on your screen, please let me know.

2       A.    I see it.  The beginning of it, anyway.  Okay.

3             MR. SIBERT:  And, Your Honor, I'd like to introduce

4       this into evidence.  This has been stipulated to.

5             THE COURT:  All right.  Given the stipulation of

6       the parties, Government Exhibit 150 is admitted into

7       evidence and may be published to the jury.

8             (Government's Exhibit 150 received)

9             MR. SIBERT:  And, Your Honor, I need to come clean

10      with the Court.  The exhibit numbers I sent last night to

11      the Court and to counsel, I actually forgot my copy here for

12      court, and, unfortunately, can't bring it up on my computer

13      because I'm not hooked up to our web, so I believe counsel

14      had an extra copy.

15            THE COURT:  Well . . .

16      BY MR. SIBERT:

17      Q.    All right, sir, I'm going to show you what's been

18      marked -- you're looking at what's been marked as Government

19      Exhibit 150.  I want you to focus in on the top part of this

20      document.  That's an e-mail, that's the address, subject

21      line; is that correct?

22      A.    Correct.

23      Q.    And who's sending that e-mail?

24      A.    That's me.

25      Q.    Okay.  And this is your FusionPharm e-mail address?

Direct - Dittman

1    A.    It is.

2    Q.    Okay.  And the date of this e-mail is what?

3    A.    April 21st, 2011.

4    Q.    And the subject is what?

5    A.    FusionPharm.

6    Q.    Okay.  And for some reason, you sent it to yourself?

7    A.    Apparently, yes.

8    Q.    And if you look here, if you read that line there --

9    could you read that line there?

10   A.    "Recently, I have partnered with my brother-in-law

11   William Sears, and we have acquired and moved our operations

12   into a publicly traded company:  FusionPharm, Inc."

13   Q.    So you just stated that you didn't partner with anyone

14   and here's a document that you just stated you sent through

15   e-mail where essentially it states that you have just

16   partnered with your brother-in-law, William Sears.  Is that

17   right?

18   A.    It does say that, yes.

19   Q.    Thank you.  And then can I have the second page of

20   that, please.  And that would be the last part, the

21   signature part of that letter -- or document.

22              THE COURT:  Is there a question?

23   BY MR. SIBERT:

24   Q.    I asked him if that's the last part of this document

25   where his signature -- where his name -- where it says

1      "Scott Dittman, CEO"?

2    A.    It appears to be, yes.

3    Q.    Do you need to look at the document?

4    A.    No, I'm assuming that's the second page of the first

5    page.  I trust you.

6    Q.    Okay, sir, based upon that, was your brother-in-law,

7    William Sears, ever paid by FusionPharm?

8            MR. BARNARD:  Your Honor, I object.  I would like a

9    statement as to what "that" is.

10   BY MR. SIBERT:

11   Q.    Okay.  Based upon that press clipping, where there's a

12   document stating from you that you partnered with your

13   brother-in-law, was Mr. William Sears ever paid by

14   FusionPharm?

15   A.    I'm not sure, based on that document, but I do know

16   that he was paid by FusionPharm at one point in 2011, yes.

17   Q.    Okay.  Do you know how much?

18   A.    Not exactly, no.

19   Q.    Did you have a payroll processor at FusionPharm?

20   A.    Yes.

21   Q.    Okay.

22   A.    More than one over the years.

23   Q.    Okay.  Do you know who your payroll processor was in

24   September of 2011?

25   A.    I think it was Paychecks, but I -- I'm not certain.

Direct - Dittman

1    Q.   All right.  Now, essentially could you describe what

2    roles -- did Mr. Sears work at FusionPharm?

3    A.   For a period of time in 2011, as a salesman, yes.

4    Q.   Did he have any other roles?

5    A.   Paid roles at FusionPharm, no.

6    Q.   And -- I'm sorry, did he have payrolls is what you

7    said?

8    A.   Paid roles.  His job.

9    Q.   Okay.  So I'm confused because I just asked you if Mr.

10   Sears got paid and you said yes, and now you're saying he

11   didn't have any paid roles?

12   A.   His paid role was a salesman in 2011.

13   Q.   And that was the only job he had?

14   A.   That he was being paid for, yes.

15   Q.   Okay.  Did he have other jobs that he wasn't being paid

16   for at FusionPharm?

17   A.   He helped the company out in a number of ways, yes.

18   Q.   Can you tell me which ways Mr. Sears helped out the

19   company?

20   A.   Well, he helped to form the company, so from the

21   beginning -- excuse me, Bill was the stock guy.  Stock

22   companies and Pink Sheet stocks are not my background, so

23   Bill and Mr. Jean-Pierre worked together to transition the

24   company that was Baby Bee Bright into the company that

25   became FusionPharm.  That took four or five months from the

Direct - Dittman

1   fall of 2010 until the spring of 2011.

2          Mr. Sears -- he had a number of roles.  Would you

3   like me to just try to run through all of them?

4   Q.   Actually, let's stop there for a second.

5   A.   Okay.

6   Q.   You called your brother-in-law the stock guy.

7   A.   Yes.

8   Q.   What does that mean?

9   A.   Well, it means he was familiar with stocks and publicly

10  traded companies and all of the -- everything that had to do

11  with that side of the business.

12  Q.   Okay.  So how did he impact FusionPharm being the stock

13  guy?

14  A.   Well, he formed the company with Guy.  He handled all

15  the paperwork, handled all the communication with the

16  various government entities.  I'm not sure I actually know

17  what government entities needed to be contacted, but

18  whatever needed to happen in that interim period, he worked

19  with Guy to handle that paperwork.

20         During the time that FusionPharm was in existence,

21  Bill did things -- stock things like handling the paperwork

22  for new investors who were investing in the 144 shares,

23  contacting the transfer agent if we needed -- excuse me --

24  if we needed paperwork or if we needed reports.  So, you

25  know, just about anything stock oriented, I delegated to

Direct - Dittman

1     Bill.

2     Q.   Okay.  Now, you just mentioned that it was Bill and Guy

3     that helped set up the paperwork, and I believe it was

4     regarding the change of corporation entities.

5     A.   Correct.

6     Q.   Okay.  And those corporation entities, were those Baby

7     Bee Bright to FusionPharm?

8     A.   Correct.

9     Q.   Okay.  And when you said "Guy," who are you talking

10    about?

11    A.   Guy Jean-Pierre.

12    Q.   Okay.  Do you see Mr. Guy Jean-Pierre here in the

13    courtroom?

14    A.   I do.

15    Q.   And can you please point him out and identify something

16    he's wearing.

17    A.   Right there in the gray suit with the clean-shaven

18    head.

19    Q.   Okay.  All right.  So now as the stock guy and setting

20    up this corporation -- so it's fair to say that Mr. Sears

21    knew Fusion -- well, did Mr. Sears know that you were going

22    to be the CEO of FusionPharm?

23    A.   Oh, of course.

24    Q.   And did Mr. Guy Jean-Pierre know that you were going to

25    be the CEO of FusionPharm?

Direct - Dittman

1   A.   Yes.

2   Q.   Okay.  Now, do you know who Salt Investments --

3   A.   Salt Investments?

4   Q.   Yes, sir.

5   A.   Yes.

6   Q.   What is Salt Investments?

7   A.   It's an LLC that I owned in my construction and

8   home-building businesses before these entities, before

9   FusionPharm.

10  Q.   Okay.

11  A.   And ultimately I think I held my stock in that entity.

12  Q.   Okay.  So when you say you held your stock, what are

13  you talking about?

14  A.   Well, as the CEO and majority owner of FusionPharm, I

15  had -- I think 1.5 million restricted shares, and rather

16  than holding them in my personal name, I held them in my

17  LLC's name, which was Salt Investments.

18  Q.   Do you recall how many shares you actually had?

19  A.   I think it was 1.5 million, to begin with.  But maybe

20  ended up at 1.47 something.

21          MR. SIBERT:  Can I have a moment, Your Honor?

22          THE COURT:  You may.

23          MR. SIBERT:  Your Honor -- actually, I'll do this

24  this way -- can I have Government Exhibit 61 brought back

25  up?  I believe have page 6.  Make that page 7.

Direct - Dittman

BY MR. SIBERT:

Q.    Okay, sir, now, you didn't -- you didn't work with the transfer agency during your time with FusionPharm, did you?

A.    Well, yes, sometimes.

Q.    Sometimes?

A.    Yeah.

Q.    Who mainly handled the transfer agency?

A.    Mostly Bill.

Q.    For FusionPharm?

A.    Yes.  And Guy.

Q.    And who?

A.    And Guy.

Q.    So just to be clear on the record, when we talk about Guy, we're talking about Mr. Guy Jean-Pierre?

A.    Yes.

Q.    All right.

A.    Would you prefer that I refer to it that way from now on?

Q.    If you could.

A.    Okay, sure.

Q.    I know it's a lot --

A.    No, that's okay.

Q.    I understand the difficulties.

A.    I'll try.

Q.    Thank you.

Direct - Dittman

1   A.   You bet.

2   Q.   All right.  So now can you just look here in the

3   middle -- I'm going to have it blown up for you -- okay,

4   does this refresh your memory of how many shares you started

5   out with with FusionPharm?  And if we scroll up, I can show

6   you the date of this letter.

7   A.   No, I don't know that I've ever seen this letter.

8   Q.   Okay.  Are you saying 1.3 million would not be correct?

9   A.   No, maybe 1.3 million is correct.  1.5 total with the

10  other 200,000; yes, I think 1.3 million is correct.

11  Q.   Okay.  And then just to clarify, this address -- does

12  that address have a relationship to you?

13  A.   Yes.  That was my home in Franktown.

14  Q.   Okay.  And did you live there in 2010?

15  A.   I did.

16  Q.   And how long did you live there for?

17  A.   We moved there in -- either 2008 or 2009 until we moved

18  to Pennsylvania, so until 2013.

19  Q.   Thank you.

20  A.   You're welcome.

21  Q.   Okay.  Now, do you know what happened -- you stated 1.5

22  total.  So if 1.3 went to you, do you know where the rest of

23  the 200,000 went of preferred shares?

24  A.   Ultimately, 185,000 to my little brother, Bob, and

25  15,000 to Fred Dahlman kept as part of the transaction.

1    Q.   Okay.  And you said "ultimately."

2    A.   Right.

3    Q.   It finally went to your brother Robert Dittman?

4    A.   Correct.

5    Q.   Where did it -- did it go somewhere else before Mr.

6    Robert Dittman had those shares?

7    A.   I believe it did.

8    Q.   Do you know where?

9    A.   I'm not sure I know the exact order, but subsequent to

10   the investigation, I have been through that quite a number

11   of times, so yes, I do now.

12   Q.   Okay.  And what's your understanding?

13   A.   I think that it went to MicroCap first, then to an

14   entity that my sister owned named -- called La Di Da, and

15   then to my little brother.

16   Q.   Okay.  And do you know who owned MicroCap?

17   A.   My understanding -- it was Billy's company to begin

18   with, but my understanding at the time of FusionPharm was

19   that he had transferred that to a gentleman named Richie

20   Scholz in Florida.

21   Q.   Okay.  Who helped with the distribution of shares when

22   they were transferred from MicroCap to La Di Da to your

23   brother Robert Dittman?

24   A.   Honestly --

25            MR. BARNARD:  Your Honor, I object.  Lack of

1    foundation.

2          THE COURT:  Do you have personal knowledge of how

3    this happened?

4          THE WITNESS:  I don't.

5          THE COURT:  Okay.  Sustained.

6    BY MR. SIBERT:

7    Q.   Now, you stated -- I'll move on here.

8          Now, do you know that Mr. Sears -- we were going

9    through some of his duties.  Did Mr. Sears ever assist with

10   what's considered the business plan for FusionPharm?

11   A.   Yes.  In writing the business plan?

12   Q.   Writing it, revising --

13         MR. BARNARD:  Your Honor, object.  Leading.

14         THE COURT:  Sustained.

15   BY MR. SIBERT:

16   Q.   Did Mr. Sears have any input on the business plan for

17   FusionPharm?

18   A.   Yes.

19   Q.   And what types of activities or inputs did he have with

20   the business plan?

21   A.   Well, the -- I certainly would have consulted Bill

22   about the business plan.  Make no mistake, it was my

23   business plan.  FusionPharm was my invention, my creation,

24   and my company, but I certainly would have consulted him.

25         Ultimately he brought in Cliffe Bodden to help

1    write the business plan, but previous to that, we had hired

2    a professional business plan writer that he suggested.  I

3    don't recall where she was from.  She didn't do a very good

4    job.  And then I think we ultimately ended up with Cliffe

5    helping with the business plan.

6    Q.   Okay.  And I guess you stated -- I just want to make

7    sure it's clear -- that you would -- when you said you would

8    consult with Mr. Sears about the business plan, could you

9    describe to me, essentially, kind of how that would go

10   about?

11   A.   Honestly, I don't remember specifically, but it

12   wouldn't have been at all unusual for me to bounce ideas off

13   of Billy, both as to things I was thinking about doing with

14   the business and, you know, more technical, you know, actual

15   making sure that the business plan, you know, was good type

16   of questions.

17   Q.   Okay.  Now, I guess that brings up another point.  In

18   order for Mr. Sears to be able to provide his input to the

19   business plan for you, Mr. Sears had to know essentially the

20   foundation and building blocks of the company.

21   A.   Certainly.

22   Q.   Did he also have to understand how the company was

23   operating?

24   A.   Operating in what -- I'm not sure exactly I understand

25   that question, sir.

Direct - Dittman

1    Q.   Okay.  Well, was -- let me just ask maybe a little bit
2    more straightforward:  How often was Mr. Sears around either
3    the offices or the facilities, warehouses, at FusionPharm?
4    A.   Quite a lot.
5    Q.   Okay.  And when you say "quite a lot," can you give an
6    example?
7    A.   It varies.  So in the beginning, back in 2011, the
8    first office, it's difficult to say exactly, but he was
9    probably in the office half the time, I would imagine, and
10   even before he officially became a sales employee.  And then
11   as the business progressed and as he ultimately became
12   MeadPoint, then we had co-office space together, so he was
13   in the office virtually all the time.  And that lasted all
14   the way through until the spring of 2014 when he wasn't.
15   Q.   Okay.  And you bring up a good point, MeadPoint.  What
16   was your understanding of MeadPoint?
17   A.   MeadPoint -- as it relates to FusionPharm, MeadPoint
18   was our distribution company.  So we sold containers to
19   MeadPoint and MeadPoint in turn sold containers into the
20   marketplace.  They were like a distributor.
21   Q.   Okay.  And who owned MeadPoint?
22   A.   Billy and his mother, I believe.  In the beginning.
23   Q.   And do you know who was on the official paperwork in
24   the beginning for FusionPharm?
25   A.   On the paperwork for FusionPharm?  Myself.  Other than

Direct - Dittman

1    that page that you just showed me, I'm -- the ownership of

2    FusionPharm would have been all the stockholders and

3    everything else.  There's 835 of them.  I'm not sure I can

4    answer that question directly.

5    Q.    Let me try to tailor my question.

6    A.    Please.

7    Q.    How about corporate paperwork for FusionPharm?

8    A.    Who was on corporate paperwork for FusionPharm?

9    Q.    Yes, sir.

10   A.    Again, are you looking for something specific?  But, I

11   mean, generally myself is the answer to your question.

12   Q.    Okay.  Okay.  Now, in October of 2011, FusionPharm was

13   contacted by FINRA.  Do you recall that?

14   A.    I do.

15   Q.    Okay.  And, essentially, do you recall who contacted

16   you from FINRA?

17   A.    A gentleman named Kramer.

18   Q.    Okay.  And can you explain what Mr. Kramer was

19   contacting you -- did he contact you directly?

20   A.    The first phone call was received by the office by Andy

21   Duke, I believe, but subsequently I spoke to him directly,

22   yes.

23   Q.    Okay.  And what types of questions did Mr. Kramer want

24   to know about FusionPharm through you as the CEO?

25   A.    He asked a lot of questions about FusionPharm and what

1    it did and its products and its customers.  And he asked me

2    a lot of questions about press releases that we had put out

3    up to that point in time, the deals that we had been

4    negotiating, and he was looking for paperwork and backup and

5    support for all of those things.

6           And that he started asking, at the end, questions

7    about the stock and if I knew who was trading the stock.

8    Q.   Okay.  And you just mentioned "the press releases that

9    we were putting out."

10   A.   Yes.  "We" is FusionPharm.

11   Q.   Okay.  I just wanted to clarify that.

12   A.   Understood.

13   Q.   Okay.  And do you recall the questions about did Sandra

14   Sears ever own FusionPharm?

15   A.   I don't believe that was ever asked, no.

16   Q.   Okay.  How about did Mr. Kramer ever ask you about Mr.

17   William Sears' role in FusionPharm?

18   A.   I don't think he did, no.

19   Q.   And do you recall any questions regarding the stock

20   questions that Mr. Kramer was asking you?

21   A.   I do.

22   Q.   And could you tell me what those questions were.

23   A.   He ran through a long list of names, asking me if I

24   knew the names of people.  Presumably, I guess, people who

25   were trying to get the stock.  There must have been two

1    dozen of them, at least.  I didn't know any of them.  And

2    then he asked me about my brother-in-law, Bill Sears.

3    Q.   Okay.  So now you recall the fact that he did ask you

4    about Mr. William Sears.

5    A.   Oh, I'm -- I didn't realize I didn't recall that

6    before.

7    Q.   I asked you if he asked you any questions regarding Mr.

8    Sears.

9    A.   You asked me if he asked questions about Mr. Sears'

10   role in FusionPharm and he did not.

11   Q.   Okay.  I'm sorry.  So he was asking you about Mr.

12   Sears' involvement with selling FusionPharm stock?

13   A.   He asked me that, yes.

14            MR. SIBERT:  Your Honor, again, as we did for the

15   last three days, I have a list -- a laundry list of exhibits

16   that I'll be showing this witness.  I know we're late in the

17   day.

18            THE COURT:  Now, this is the list that you e-mailed

19   to defense counsel and my chambers last night?

20            MR. SIBERT:  Yes, sir.

21            THE COURT:  Okay.  Are there any changes to that?

22            MR. SIBERT:  Right now, there's no changes.

23            THE COURT:  All right.  Well, why don't we just use

24   that tomorrow when we resume the examination with Mr.

25   Dittman.  It is 5:00.

1          MR. SIBERT:  Thank you, Your Honor.  I appreciate

2    that.

3          THE COURT:  All right.  All right, ladies and

4    gentlemen of the jury, we're going to call it a day.

5          Hold tight, sir.

6          THE WITNESS:  Of course.

7          THE COURT:  As I had already mentioned to you

8    twice, and I'll do it again, please do not do any

9    independent research into or discuss with anyone the facts,

10   the law, or the persons involved in this courtroom.  We will

11   be in recess, again, for the same time and resume our trial

12   at the same time as we've done today, at 8:45 tomorrow.

13   I'll ask you to be back in the deliberation room by 8:35.

14         We will be in recess until 8:45 tomorrow morning.

15         (Jury left the courtroom at 5:01 p.m.)

16         THE COURT:  All right, Mr. Dittman, since you're in

17   the middle of your testimony, I direct you not to speak with

18   any of the lawyers during the recess between now and

19   tomorrow morning.

20         THE WITNESS:  Understood.

21         THE COURT:  If you'll be back here in the courtroom

22   by 8:35 tomorrow morning.

23         THE WITNESS:  Okay.

24         (Proceedings concluded at 5:02 p.m.)

25

1                    *        *        *        *        *

2                                    **INDEX**

3      <u>Item</u>                                                    <u>PAGE</u>

4                         <u>GOVERNMENT'S WITNESSES</u>

5          **WILLIAM SEARS**
           Direct Examination by Mr. Sibert (Cont'd)      353
6          Voir Dire Examination by Mr. Goodreid           393
           Direct Examination by Mr. Sibert (Cont'd)      398
7          Voir Dire Examination by Mr. Goodreid           441
           Direct Examination by Mr. Sibert (Cont'd)      442
8          Cross-examination by Mr. Goodreid               499
           Redirect Examination by Mr. Sibert             518
9
           **FREDERICK DAHLMAN**
10         Direct Examination by Mr. Sibert               528

11         **SCOTT DITTMAN**
           Direct Examination by Mr. Sibert               558
12

13                         <u>GOVERNMENT'S EXHIBITS</u>

14     <u>EXHIBITS:</u>        <u>Offered</u>     <u>Received</u>  <u>Refused</u>    <u>Stipulated</u>

15     1                  393          398

16     1-A                393          398

17     1-B                393          398

18     2-A                393          395

19     2-B                393          395

20     2-C                393          395

21     2-D                393          395

22     2-E                393          395

23     2-F                393          395

24     61                 537          537

25     63                 537          537

GOVERNMENT'S EXHIBITS

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|-----------|---------|----------|---------|------------|
| 72 | 356 | 357 | | |
| 150 | 562 | 562 | | |
| 236,p.1 | 364 | 365 | | |
| 320-A | 440 | 442 | | |
| 320-B | 440 | 442 | | |
| 320-C | 440 | 442 | | |
| 320-D | 440 | 442 | | |
| 320-E | 440 | 442 | | |
| 320-F | 440 | 442 | | |
| 320-G | 440 | 442 | | |
| 320-H | 440 | 442 | | |
| 320-I | 440 | 442 | | |
| 320-J | 440 | 442 | | |
| 320-K | 440 | 442 | | |
| 320-L | 440 | 442 | | |
| 320-M | 440 | 442 | | |
| 322-A | 440 | 442 | | |
| 322-B | 440 | 442 | | |
| 322-C | 440 | 442 | | |
| 322-D | 440 | 442 | | |
| 322-E | 440 | 442 | | |
| 322-F | 440 | 442 | | |
| 322-G | 440 | 442 | | |

GOVERNMENT'S EXHIBITS

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|-----------|---------|----------|---------|------------|
| 322-H     | 440     | 442      |         |            |
| 322-I     | 440     | 442      |         |            |
| 322-J     | 440     | 442      |         |            |
| 322-K     | 440     | 442      |         |            |
| 322-L     | 440     | 442      |         |            |
| 322-M     | 440     | 442      |         |            |
| 322-N     | 440     | 442      |         |            |
| 322-O     | 440     | 442      |         |            |
| 322-P     | 440     | 442      |         |            |
| 322-Q     | 440     | 442      |         |            |
| 322-R     | 440     | 442      |         |            |
| 350       | 486     | 490      |         |            |
| 351-A     | 487     | 490      |         |            |
| 351-B     | 487     | 490      |         |            |
| 351-C     | 487     | 490      |         |            |
| 351-D     | 487     | 490      |         |            |
| 351-E     | 487     | 490      |         |            |
| 351-F     | 487     | 490      |         |            |
| 351-G     | 487     | 490      |         |            |
| 351-H     | 487     | 490      |         |            |
| 357       | 491     | 492      |         |            |
| 358-A     | 493     | 493      |         |            |
| 358-B     | 493     | 493      |         |            |

| | GOVERNMENT'S EXHIBITS | | | | |
|---|---|---|---|---|---|
| EXHIBITS: | Offered | Received | Refused | Stipulated | |
| 358-C | 493 | 493 | | | |
| 358-D | 493 | 493 | | | |
| 358-E | 493 | 493 | | | |
| 358-F | 493 | 493 | | | |
| 358-G | 493 | 493 | | | |
| 358-H | 487 | 490 | | | |
| 358-I | 493 | 493 | | | |
| 358-J | 493 | 493 | | | |
| 358-K | 493 | 493 | | | |
| 358-L | 493 | 493 | | | |
| 358-M | 493 | 493 | | | |
| 358-N | 493 | 493 | | | |
| 360 | 495 | 497 | | | |
| 361 | 495 | 497 | | | |
| 362 | 495 | 497 | | | |
| 363-A | 495 | 497 | | | |
| 363-B | 495 | 497 | | | |
| 363-C | 495 | 497 | | | |
| 353-D | 495 | 497 | | | |
| 353-E | 495 | 497 | | | |
| 353-F | 495 | 497 | | | |
| 353-G | 495 | 497 | | | |
| 353-H | 495 | 497 | | | |

1                        GOVERNMENT'S EXHIBITS

2      EXHIBITS:          Offered    Received   Refused    Stipulated

3      353-I              495        497

4      446                522        526

5                            *      *       *       *       *

6

7                        REPORTER'S CERTIFICATE

8           I certify that the foregoing is a correct transcript

9      from the record of proceedings in the above-entitled matter.

10          Dated at Denver, Colorado, this 25th day of March,

11     2020.

12

13

14                        Mary J. George

15                        _____
                          MARY J. GEORGE, FCRR, CRR, RMR
16

17

18

19

20

21

22

23

24

25