IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 17-cr-0008-WJM

UNITED STATES OF AMERICA,

Plaintiff,

vs.

GUY JEAN-PIERRE a/k/a Marcelo Dominguez de Guerra,

Defendant.

------------------------------------------------------------

REPORTER'S TRANSCRIPT
(Jury Trial, Day 4)
Volume IV

------------------------------------------------------------

Proceedings before the HONORABLE WILLIAM J. MARTINEZ, Judge, United States District Court for the District of Colorado, commencing at 9:02 a.m., on the 17th day of January, 2019, in Courtroom A801, United States Courthouse, Denver, Colorado.

APPEARANCES

JEREMY S. SIBERT and ROBERT M. BROWN, Assistant U.S. Attorneys, 1801 California Street, Suite 1600, Denver, Colorado 80202, appearing for the plaintiff.

CLIFFORD J. BARNARD, Attorney at Law, 4450 Arapahoe Avenue, Suite 100, Boulder, Colorado 80303, AND
THOMAS E. GOODREID, Attorney at Law, 1801 Broadway, Suite 1400, Denver, Colorado 80202, appearing for the defendant.

MARY J. GEORGE, FCRR, CRR, RMR
901 19th Street, Denver, Colorado 80294
Proceedings Reported by Mechanical Stenography
Transcription Produced via Computer

```
 1                    P R O C E E D I N G S
 2         (Proceedings were held in open court outside the
 3    presence of the jury at 9:02 a.m.)
 4              THE COURT:  Mr. Dominguez de Guerra, what was your
 5    explanation for being 20 minutes late?
 6              THE DEFENDANT:  I'm sorry, Your Honor, I had missed
 7    the bus that I went to take, and in my hurry I got the wrong
 8    bus and I had to go to -- I apologize.
 9              THE COURT:  You know --
10              THE DEFENDANT:  It won't happen again, Your
11    Honor.
12              THE COURT:  We're pressed for time as it is today.
13    I want to inform counsel that we're going to go 10 minutes
14    to 5:00 because I have another matter I have to deal with.
15              THE DEFENDANT:  Okay.
16              THE COURT:  But you need to leave your residence
17    early.  You have to be here on time.  We can't go forward
18    without you.  I mean --
19              THE DEFENDANT:  Absolutely, Your Honor.  I
20    understand.  I apologize.
21              THE COURT:  Okay.
22              THE DEFENDANT:  It won't happen again.
23              THE COURT:  Make sure it doesn't happen again.
24              THE DEFENDANT:  Absolutely.
25              THE COURT:  A couple of things I want to discuss in
```

1    addition to that.  One of our jurors, Ms. Cox, began a phone
2    conversation with Ms. Frank very early in this morning, I
3    think before 7:00.  She was not feeling well, she wasn't
4    sure what exactly it was.  Apparently she's someone that is
5    an expert in food nutrition and self-diagnosed herself to
6    have some kind of food ailment.  In other words, that she
7    believed that she was not infectious.  And I instructed Ms.
8    Frank to instruct her that if she was not feeling well, or
9    if she felt that she was in any way infectious, as with a
10   cold, flu, cough-like symptoms, for her not to come in and
11   get the rest of the jury ill.  And that I would raise with
12   counsel the issue of them -- we would release her and then
13   one of the alternates would become a permanent member of the
14   jury.
15        As the morning progressed, she then informed Ms.
16   Frank that she was feeling better, that she did not believe
17   she was infectious, and she is here today -- she is here
18   now.  She is feeling better.  I just wanted to advise
19   counsel of that.  If she does, during the day, develop some
20   kind of condition where she's not feeling well, I don't want
21   to risk the health of the remainder of the jury.  So my
22   inclination, assuming there's no objection from counsel,
23   would be to release her.  And then what I would do, my --
24   what I've done in the past is because the juror in seat 2 --
25   originally seat 2, Ms. Sylvester, that is -- seat 2 is the

1    location of the alternate for all my criminal trials that

2    are five days or less.  So seat 11 is only added when we

3    have -- when I have jury trials of six days or more.  So if

4    we were to release Ms. Cox, I'm advising counsel, then, per

5    my practice, I will see if there's no objection, but I would

6    then continue with Ms. Sylvester as our single alternate and

7    Mr. Jones will become a permanent deliberating member of the

8    jury.

9            Last thing I want to raise is the defendant's

10   motion for reconsideration of admission of Exhibit 446,

11   which was filed yesterday evening.  I think there are some

12   points that are well-taken in the motion.  I'm going to

13   direct a response from the Government by the end of the

14   lunch recess today and then I would caucus with my law clerk

15   during the afternoon break and make a ruling at that time.

16   I direct counsel not to publish or discuss 446 prior to my

17   ruling in the afternoon session.  All right.

18           MR. BROWN:  Your Honor -- Your Honor -- sorry -- I

19   know you don't like people's making requests contrary to

20   your ruling, but I am just wondering if it would be

21   possible -- since this exhibit won't be published in its --

22   hasn't been published --

23           THE COURT:  Right, here we're --

24           MR. BROWN:  I wondered --

25           THE COURT:  We're in the unfortunate situation of,

1    if an error was made, in unringing the bell.

2            MR. BROWN:  Just asking the Court if it would

3    permit us to file a response either by midnight tonight or

4    midnight Friday, because -- I mean, obviously, we're trying

5    to keep this moving, and on breaks we do need to try to

6    arrange -- that way we -- I mean, since it won't be

7    published, I don't think it would matter whether it's by

8    noon today or --

9            THE COURT:  All right.  Well, I just was putting it

10   at an earlier deadline because in case I was going to deny

11   the motion, it would reduce the amount of time that you

12   would be precluded from publishing the exhibit to the jury.

13   But if you're telling me you have no plans to publish 446

14   before the weekend, then -- is that your representation?

15           MR. BROWN:  I believe that's correct -- yes, Your

16   Honor, that's right.

17           THE COURT:  Okay.

18           MR. BROWN:  Could we have Saturday?

19           THE COURT:  Well, then, you can -- you can publish

20   it any time through Sunday, and then we'll look at it.  And

21   Tuesday, we're not going to be in trial -- Monday, we're not

22   going to be in trial because of the Dr. King birthday

23   holiday, and I will make my ruling some time on Tuesday.

24           MR. BROWN:  Okay.  So could we have until Saturday

25   to file a response?

Direct - Dittman

1        THE COURT:  I just said Sunday.

2        MR. BROWN:  Oh, okay.  Thank you.

3        THE COURT:  All right.  Unless you want less time.

4   All right.

5        All right, let's bring in the jury.

6        MR. SIBERT:  Your Honor, may we put Mr. Dittman on

7   the stand?

8        THE COURT:  Sure.

9        MR. SIBERT:  Thank you.

10       (Jury was present at 9:09 a.m.)

11       THE COURT:  Good morning, ladies and gentlemen of

12   the jury.  Welcome back to day 4 of our jury trial.

13       Mr. Dittman, I remind you that you remain under

14   oath.

15       THE WITNESS:  Yes, thank you.

16       THE COURT:  All right.  Mr. Sibert, you may resume

17   your examination.

18       MR. SIBERT:  Okay, thank you, Your Honor.

19            DIRECT EXAMINATION (Continued)

20   BY MR. SIBERT:

21   Q.   Good morning, sir.  All right.  So we left off

22   yesterday afternoon just doing essentially a little

23   introduction to your role at FusionPharm.  I just want to

24   back up a little bit, and you stated that you worked for

25   Arthur and Anderson in San Francisco; is that correct?

Direct - Dittman

1    A.   Arthur Anderson, yes.

2    Q.   Could you just describe, I guess, a little bit more in

3    detail the type of work that you did for them in the

4    accounting when you were in the accounting world?

5    A.   Sure.  My first year, I worked in San Francisco office

6    in a -- in a group called Audit Services.  We basically went

7    in and did audits of companies.  And after my first year, I

8    transferred into the Oakland office into a group called

9    Enterprise Consulting and we did small business consulting

10   services.

11   Q.   Okay.  And so when you were with the audit group doing

12   the audits of companies, did you have to look through the

13   corporation paperwork?

14   A.   No, not really.  First years pretty much do simple

15   things like bank statements and stuff like that.

16   Q.   Okay.  So financial statements?

17   A.   No, not really.  The -- you know, first years aren't

18   trusted with stuff like that; that's for people who are much

19   further along the line in Arthur Anderson.

20   Q.   Okay.  So how about later when you were in Oakland?

21   A.   Did I ever look at financial statements?

22   Q.   Yes.

23   A.   Sure.

24   Q.   And corporate records?

25   A.   No, not so much.  Not really part of what we did.

Direct - Dittman

1    Q.   Did you ever have to look at the records that were

2    published by the corporations regarding their finances?

3    A.   I'm not sure I understand the question, sir.

4    Q.   Well, like you're familiar with the SEC, correct?

5    A.   Sure.

6    Q.   And corporations need to go ahead and disclose their

7    finances with the SEC.

8    A.   Publicly traded companies, yes.

9    Q.   Okay.  Did you ever look at some of those records

10   during your time when you were working as a CPA?

11   A.   If I did, then not very much.  Enterprise Consulting is

12   a small business service so I don't think we had any public

13   companies.  But certainly Arthur Anderson had lots of public

14   companies.

15   Q.   All right.  Well, to pass the CPA exam you would have

16   to know something about the corporate documents; fair to

17   say?

18   A.   Yes.

19   Q.   All right.

20        MR. SIBERT:  Your Honor, at this time -- this has

21   not been admitted into evidence -- I would like the witness

22   to look at Government Exhibit 374.  374 is a very large

23   document.  I've provided the attachments that we plan to use

24   in this document, if I could get it into evidence, and it

25   starts at page 304 and 305 of document 374.

Direct - Dittman

1      And I provided a copy to the Court along with

2 counsel.  And I can bring it up on the screen.

3      THE COURT:  All right.  So -- all right.  So 374 is

4 not stipulated to.

5      MR. SIBERT:  That is not stipulated to.

6      THE COURT:  Okay.  And you are -- you're going to

7 begin a foundation examination with this witness, and it's

8 your goal to admit all of the exhibit or just pages 304 and

9 305?

10      MR. SIBERT:  Just pages 304 and 305 of Exhibit 374.

11      THE COURT:  All right.  Okay.  So do you have them

12 pulled out or should --

13      MR. SIBERT:  Your Honor, I can bring it on the

14 screen for --

15      THE COURT:  Oh, just on the -- all right.  Just

16 dealing with only two pages, that's fine.  Go ahead.

17      MR. BARNARD:  Your Honor, we would stipulate to the

18 admission of those two pages.

19      THE COURT:  All right.  Well, that's helpful.

20      MR. SIBERT:  Makes my job easier.

21      THE COURT:  All right.  Given the stipulation of

22 the parties, pages 304 and 305 only of Exhibit 374 are

23 admitted into evidence and may be published to the jury.

24      (Government's Exhibit 374, pages 304 and 305 received)

25      MR. SIBERT:  Could I have that published, please.

Direct - Dittman

1          THE COURT:  Sure.

2          MR. SIBERT:  Thank you.

3     BY MR. SIBERT:

4     Q.   Sir, can you see the exhibit on the screen that is

5     appearing before you now?

6     A.   I can.

7     Q.   All right.  Now, I just want to -- if you could take a

8     look through.

9          Can you pull up the second page, please.  And go to

10    the signature.

11         Now, that's your signature on that; is that

12    correct?

13    A.   It is.

14    Q.   Okay.  And can we go back to the first page.  And I

15    just want to point out this top part here.

16         All right, sir, this letter is addressed to the

17    Florida Bar.  Do you see that?

18         MR. BARNARD:  Your Honor, object.  Leading.

19         THE COURT:  It's introductory; I'll overrule it.

20         THE WITNESS:  Yes.

21    BY MR. SIBERT:

22    Q.   Okay.  And do you know why you were writing a letter to

23    the Florida Bar?

24    A.   As I recall, Guy had called and was in a disagreement,

25    as he described it, with another lawyer in Florida and he

1   asked me if I would write a letter of recommendation for

2   him.

3   Q.   Okay.  And just for the record, to be clear, when you

4   say "Guy," you're talking about the defendant --

5   A.   Yes, Mr. Jean-Pierre, yes.

6   Q.   And I just want to see -- can you reference what the

7   "RE" is in the letter?

8   A.   The bar complaint file Number 2011-51, 158(17D).

9   Q.   Okay.  And then can you look at the date of the letter

10  for me.

11  A.   April the 7th, 2011.

12  Q.   Okay.  Can you please scroll down to the second

13  paragraph on the first page.  Thank you.

14       Okay.  Now, Mr. Guy Jean-Pierre was the legal

15  counsel, corporate secretary, for FusionPharm; is that

16  correct?

17  A.   Legal counsel, yes; corporate secretary might have come

18  slightly later.

19  Q.   Okay.  So definitely the corporate counsel, then?

20  A.   Yeah, oh, for sure.

21  Q.   The lawyer.

22  A.   Yes, definitely.

23  Q.   Okay.  So let me ask you:  Can you read this sentence

24  here.  I just want to ask you a follow-on question once

25  you're finished.

1   A.   Yes.   "We then contacted Mr. Jean-Pierre and he advised

2   us that he could not furnish the Pink Sheets opinion letter,

3   but could review the Company's disclosure on Pink Sheets to

4   make sure it meets the required guidelines, do all due

5   diligence and make sure everything was ready for an opinion

6   to be issued."

7   Q.   Do you know why Mr. Guy Jean-Pierre could not furnish

8   opinion letters to Pink Sheets?

9   A.   Do I know now or did I know then?

10   Q.   Did you know then?

11   A.   As it was described to me then, it was all part of the

12   same issue that he was having with the bar.

13   Q.   Okay.  Okay.  Can I have the second page, please.  Blow

14   up -- thank you.

15        Can you take a look at this sentence.  If you can't

16   see it, I can erase the line.

17   A.   I'm sorry, starting and ending at "providers"?

18   Q.   I'm sorry.  "An associate."

19   A.    "An associate told us said that Pink Sheets said the

20   reason his letters of opinion were not acceptable was that

21   he had been placed on the list of unacceptable providers."

22   Q.   And then?

23   A.    "At that point we began asking questions.  The

24   responses that was given was that he did not answer Pink

25   Sheet inquiries in a timely manner.  This is strange as we

Direct - Dittman

1    thought Pink Sheets was only a third party information

2    service."

3    Q.   Okay.  Now Pink Sheets is essentially OTC markets; is

4    that right?

5    A.   That's correct.

6    Q.   And those were the disclosures that you had to make.

7    What did you have to do with OTC Markets?

8    A.   We had to make an annual disclosure, what's called an

9    information and disclosure statement, once a year.  We

10   actually were making it quarterly, I believe, in 2011.  And

11   quarterly we had to upload financial statements to OTC

12   Markets website.

13   Q.   Okay.  Do you know where your disclosures were placed?

14   A.   I'm not sure I understand the question.

15   Q.   Do you know where OTC placed your disclosures about

16   your company, FusionPharm?

17   A.   On their website.

18   Q.   Okay.  And who could see those disclosures?

19   A.   Anybody.

20   Q.   So it was for public viewing?

21   A.   Yeah.

22   Q.   So the public could learn about your company?

23   A.   Yes.

24   Q.   And learn about your financials?

25   A.   Yes.

1    Q.   Okay.  So now you obviously had a personal interest in
2    the success of your company, FusionPharm?
3    A.   Certainly.
4    Q.   And this was very important to you.
5    A.   Yes.
6    Q.   Were you working any other jobs at the time?
7    A.   Oh, no.
8    Q.   Was this your career at the time?
9    A.   Yes.
10   Q.   All right.  So your corporate counsel, you learn in
11   2011, in April, is having difficulties submitting the
12   paperwork essentially for the platform that shows the public
13   what your company is about; is that fair to say?
14   A.   Yes.
15   Q.   And you still kept Mr. Guy Jean-Pierre as your
16   corporate counsel even after knowing this?
17   A.   Yes.  Well, I mean, we -- at the time, we believed it
18   was a temporary thing that would ultimately get fixed, and
19   Mr. Jean-Pierre had another lawyer partner that he worked
20   with who was capable of signing those, and so they worked
21   together and we were able to get done what we needed to get
22   done.
23   Q.   We'll get back to that.  Okay.  Based upon your
24   experience there; is that correct?  Is that what you're
25   writing there?

Direct - Dittman

1   A.   Yes.

2   Q.   All right.  Well, when did Mr. Guy Jean-Pierre start

3   doing work with FusionPharm?

4   A.   In the fall of 2010.

5   Q.   Okay.  Well, my understanding is FusionPharm didn't

6   come into existence until 2011.

7   A.   Well, that's true, but he handled the transition from

8   Baby Bee Bright to FusionPharm.

9   Q.   Okay.  And who handled that transition with Mr. Guy

10  Jean-Pierre?

11  A.   Bill Sears, primarily.

12  Q.   And so when -- I guess a better question is, as I said

13  before, when did Guy Jean-Pierre start doing work for

14  FusionPharm?

15  A.   Well, I don't think FusionPharm came into existence

16  officially until maybe the 3d of April.  So just before this

17  letter.

18  Q.   So just before this letter.  And so based upon the

19  company that you ran, four days later all that experience is

20  why you're writing this letter for Mr. Guy Jean-Pierre?

21  A.   Well, no.  He handled the transition for the previous

22  six months and as part of this was explained to me at the

23  time, sir, the complaint that he was dealing with in Florida

24  with the bar had to do with him overcharging clients and

25  that was part of the issue.

1     I think maybe that's referenced somewhere in the

2    letter, although I have not seen this letter in a very long

3    time

4    Q.   But you just stated it was William Sears and Mr. Guy

5    Jean-Pierre that handled the prior six months --

6    A.   I wasn't completely uninvolved.  I had documents to

7    sign, I needed to know what was going on.  I was -- you

8    know, I was paying attention.  And when we were done,

9    everything, you know, seemed to be handled well.  I had no

10   reason not to recommend Guy at this point in time.

11   Q.   So no more than six months.

12   A.   Yes.  Correct.

13   Q.   Do you know who drafted this letter?

14   A.   Guy drafted the first version.

15   Q.   So you basically signed a letter that was drafted by

16   the defendant in this case?

17   A.   No, I think we modified it somewhat.  Took out things I

18   wasn't comfortable with in the first version.

19   Q.   All right, sir.  Can you take that down.  Thank you.

20        Now, in November 2010, the time frame essentially

21   when Baby Bee Bright was taken over by FusionPharm, who was

22   listed as an officer for FusionPharm?

23   A.   In 2010?  Well, there was no FusionPharm in 2010.

24   Q.   Okay.  Based upon your memory, whenever FusionPharm

25   started, who was listed as officers?

1    A.    Myself and Sandra Sears.

2    Q.    Okay.  And who is Sandra Sears?

3    A.    Bill's mother.

4    Q.    Okay.  And does she work at FusionPharm?

5    A.    No.

6    Q.    So can -- why was she listed as an officer?

7    A.    She was listed for the simple fact that during that

8    transition phase, when the stock certificates were issued,

9    when the first certificates went from being Baby Bee Bright

10   to being FusionPharm, it required two signatures on the

11   certificate and we had to have both a, you know, president's

12   or CEO and the corporate secretary.

13   Q.    Okay.  So why would you choose William Sears' mother?

14   A.    For -- Bill recommended it.  It was -- it was a, you

15   know, we'll put her on there until, you know, the company is

16   done formed and we replace her sort of thing.

17   Q.    But you just testified that it was Mr. Sears working

18   with the defendant, Mr. Guy Jean-Pierre, setting up this

19   corporation.

20   A.    Yes.

21   Q.    You were involved.

22   A.    Yes.

23   Q.    Okay.  So you have three people that you know that

24   understand this transition process; is that fair?

25   A.    Correct.

1    Q.   Why didn't you just put William Sears on the paperwork?

2    A.   I already knew that Bill was never going to be an

3    officer or director of the company because of his previous

4    felony.

5    Q.   Okay.  And what was his previous -- what was his

6    previous felony?

7    A.   He was -- he pled guilty to a commercial bribery

8    charge, as I understood it, which is, as I understand now, a

9    securities fraud violation, years before I knew him.

10   Q.   Okay.  And did Mr. Guy Jean-Pierre know about that

11   securities violation?

12   A.   Yes.

13            MR. BARNARD:  Objection, Your Honor.  Foundation --

14            THE COURT:  Hold on.

15            THE WITNESS:  Sorry.

16            MR. BARNARD:  -- and calls for speculation.

17            THE COURT:  Mr. Dittman, when you hear an

18   objection, please pause --

19            THE WITNESS:  Sorry, sir.

20            THE COURT:  -- let me rule on it before you answer.

21            That objection is -- well, it's sustained insofar

22   as I think you need to lay more foundation that this witness

23   has a basis to have personal knowledge of this.

24            MR. SIBERT:  Okay.

25   BY MR. SIBERT:

Direct - Dittman

1    Q.   Sir, you just stated -- you just wrote a letter of

2    recommendation for Mr. Guy Jean-Pierre based upon your

3    extensive relationship in six months, stating he's a

4    qualified lawyer and you were supporting him against the bar

5    complaint; is that right?

6    A.   Yes.

7    Q.   He was -- what was his role, as you stated before, in

8    FusionPharm?

9    A.   He was the corporate counsel.

10   Q.   And did you consult with him about the corporate

11   paperwork?

12   A.   Yes.

13   Q.   And did that include the names that needed to be on the

14   corporate paperwork?

15   A.   Yes.

16   Q.   Okay.  Did Mr. Guy Jean-Pierre know your concerns

17   regarding Mr. Sears?

18   A.   Yes.

19   Q.   And what advice did Mr. Guy Jean-Pierre provide you

20   about your concerns about William Sears' securities fraud

21   violation -- crime from 2007?

22   A.   That's a broad question.  There's -- I mean --

23   Q.   Did he -- did Mr. Guy Jean-Pierre recommend to put Mr.

24   William Sears down as an officer or director?

25   A.   To put him down as -- to --

Direct - Dittman

1    Q.   To put him in writing as an officer and director.

2    A.   No.

3    Q.   And why did he advise you not to do that?

4              THE COURT:  Hold on.

5              MR. BARNARD:  Objection.  Foundation.

6              THE COURT:  That's overruled.  I think sufficient

7    foundation has been laid.

8              If you know.  Don't speculate or guess.

9              THE WITNESS:  Understood.

10             Can you repeat the question?

11   BY MR. SIBERT:

12   Q.   Sure.  You just stated that Mr. Guy Jean-Pierre told

13   you not to put Mr. Sears down as a director or officer of

14   FusionPharm.

15   A.   I'm not sure I would characterize it exactly like that.

16   We certainly discussed, Bill and Guy and I, and the --

17   that -- to -- if Bill were to be an officer or director of

18   FusionPharm, that it would require disclosure of his past

19   felony, and that was something that I was simply not willing

20   to have involved with my business, period.  So . . .

21   Q.   And why didn't you want that involved in your business?

22   A.   Why didn't I want to disclose a felon as a officer or

23   director of my business?

24   Q.   Yes.

25   A.   Well, for all of the reasons that you might expect.

1    It's a brand-new business.  It's in the marijuana support

2    industry.  There was a great deal of concern about the

3    federal government in that industry back in 2011.  It's not

4    good for business in general; it certainly is not good for

5    credibility, probably isn't good for the stock.

6          I mean, there's no good reason to put a felon on as

7    an officer or director of a brand-new company.

8    Q.  So one of the concerns was the stock price for your

9    company?

10   A.  It was one of the concerns, certainly.

11   Q.  Now you testified that it was William Sears' suggestion

12   to put Sandra Sears down as the -- as one of the officers or

13   directors, as one of the two names you needed?

14   A.  As I recall, yes.

15   Q.  Okay.  Did Mr. Guy Jean-Pierre know that?

16   A.  I don't know.  I don't recall speaking to Guy about

17   that.

18   Q.  Okay.  Did -- do you know if Mr. Guy Jean-Pierre

19   reviewed the paperwork?

20   A.  I can't say for certain, but I have to believe that he

21   did.  It was a long time ago.

22   Q.  So you are not sure if your corporate counsel reviewed

23   the start-up paperwork for your company?

24   A.  Well, there was a lot of start-up paperwork that was

25   coming back and forth.  I don't know specifically with that

Direct - Dittman

1    piece of paperwork, but I have -- I certainly believe that
2    he did, but I can't tell you that I recall the conversation
3    or the specific time Guy might have sat down and discussed
4    that particular thing in 2011.
5    Q.   All right.  Well, what would you expect your corporate
6    counsel, that you're paying, to do?
7    A.   Sir, I would expect him to have reviewed it.  I have
8    said that.  I just don't recall specifically having that
9    conversation.
10   Q.   But you believe he did?
11   A.   I do believe he did.
12   Q.   Okay, sir, do you recall a reverse split that happened
13   with your company, FusionPharm?
14   A.   Yes.
15   Q.   Okay.  Do you know whose suggestion it was to conduct a
16   reverse split?
17   A.   As I recall, it was Billy and Guy at the time.  That
18   was something that was discussed fairly early on.
19   Q.   Okay.  And, again, when you say "Guy," you're referring
20   to --
21   A.   Yes, sorry.  Mr. Jean-Pierre.  Yes.  Apologies.
22   Q.   That's okay.  Now, do you know what happened with the
23   reverse split in this case?
24   A.   It -- do I know what it was --
25   Q.   Sure.

Direct - Dittman

A.   -- the amount?  I believe it was a 200-for-1 reverse

split.

Q.   Okay.  And can you tell the jury what that means.

A.   Yeah.  So in a situation like this one where the

publicly traded company like Baby Bee Bright is becoming a

new publicly traded company -- I'm going to get some of

these figures slightly wrong, but there were somewhere in

the neighborhood of 170 million shares of stock of Baby Bee

Bright outstanding.  Baby Bee Bright was a company that was

on its last breath and it was failing.  The way the

transaction worked -- am I giving too much detail or is this

okay?

Q.   You can keep going.

A.   The transition from Baby Bee Bright to FusionPharm with

170 million shares of stock outstanding -- understand that

FusionPharm is my business, we are moving it -- we are

transitioning Baby Bee Bright into FusionPharm.  Clearly I

want to own FusionPharm, this is my business.  If I were to

move into FusionPharm and leave 170 million shares

outstanding, then I would only -- the very best I could have

owned less than half of the company and that wouldn't make

any sense.  I would never have done the transaction.

     So the way these transactions typically work,

because those shareholders of the Baby Bee Bright are

already -- sorry, I'm looking for a euphemism that doesn't

Direct - Dittman

1    include a curse -- are already in trouble, you know,

2    they're -- basically are not going to get anything because

3    Baby Bee Bright is essentially dead.  You do a reverse stock

4    split to bring that number of shares way down relative to

5    the preferred shares that I would own, so in the end when I

6    took over the company, I owned, in concert with my little

7    brother who got the shares as we discussed yesterday,

8    somewhere around 97 percent of the shares, which it makes

9    sense for me to do the transaction and take over the

10   company, basically.  So the reverse split's necessary to

11   bring the shareholder number down.

12   Q.   Okay, great.  So thank you for that answer.

13   A.   Sure.

14   Q.   So just -- just so I make sure I understand, if you had

15   Baby Bee Bright shares --

16   A.   Uhm-hum.

17   Q.   -- your shares were reduced after the reverse merger --

18   or reverse split?

19   A.   Yes.

20   Q.   And can you tell me by how many?

21   A.   200-to-1.

22   Q.   So if you had 200 shares, you now own one?

23   A.   Correct.

24   Q.   Okay.  Did the reverse split affect the preferred

25   shares?

1   A.   No.   Preferred shares are exempt from the reverse

2   split.

3   Q.   So this only had to do with common shares?

4   A.   Yes, I believe that's correct.

5   Q.   Okay.   And, again, I assume there was paperwork when it

6   came to the reverse split?

7   A.   I'm sure.

8   Q.   Okay.   Do you know who assisted you with the paperwork

9   in the reverse split?

10  A.   Mr. Jean-Pierre and Bill Sears.

11  Q.   Okay.   Sir, we started out with the attorney letter

12  that you -- or, excuse me, the letter that you wrote on

13  behalf of the defendant to the Florida Bar.   Based upon an

14  April 7th, 2011 -- after that date, was the defendant able

15  to sign the letters that were submitted to the OTC Markets

16  for publication to the public?

17  A.   No; Mr. DiTommaso signed those.

18  Q.   And who was Mr. DiTommaso?

19  A.   He was another attorney that worked with Guy -- with

20  Mr. Jean-Pierre.

21  Q.   Okay.   And did you ever meet Mr. DiTommaso?

22  A.   I did.

23  Q.   Okay.   How many times did you meet him in person?

24  A.   Face to face, one time.

25  Q.   Okay.   And where did this happen?

1    A.   In Los Angeles, where his office was, near the

2    airport.

3    Q.   Okay.  And how long was that meeting?

4    A.   My recollection, a few hours.

5    Q.   Okay.  And do you recall who arranged the meeting for

6    you to meet Mr. DiTommaso?

7    A.   I -- I think Mr. Jean-Pierre.  He certainly made the

8    introduction, so I assume he arranged the meeting.

9    Q.   Okay.  Can you look at Exhibit 385 for me?

10             Can I have 385 brought up?

11             MR. SIBERT:  Your Honor, 385 is -- check my

12   list --

13             THE COURT:  Is it already in, Ms. Frank?

14             COURTROOM DEPUTY:  Yes, it is.

15             MR. SIBERT:  I believe it's already admitted, Your

16   Honor.  Thank you.

17             THE COURT:  It is.

18   BY MR. SIBERT:

19   Q.   Okay.  Can you just blow up the top of that e-mail.

20             Do you recognize who is sending you this e-mail,

21   Mr. Dittman?

22   A.   I do.

23   Q.   And who's sending you the e-mail?

24   A.   Mr. Jean-Pierre.

25   Q.   Okay.  And obviously the date of this e-mail is July

1    18th, 2011?

2    A.   It is.

3    Q.   All right.  And what's the subject?

4    A.   "Meeting with attorney re Pink Sheets Opinion letter."

5    Q.   Essentially can you just take a look at that e-mail for

6    a second.  Okay.  Does that refresh your memory?

7    A.   Yes.

8    Q.   Okay.  Who arranged the meeting?

9    A.   Mr. Jean-Pierre.

10   Q.   And he provided you Mr. Tod DiTommaso's contact

11   information?

12   A.   He did.

13   Q.   Thank you.  Was there a requirement for you to meet

14   with Mr. DiTommaso pursuant to the OTC Markets, basically,

15   policies before documents are posted?

16   A.   Yes.

17   Q.   And you stated that you only met with him one time in

18   person?

19   A.   Correct.

20   Q.   And obviously that was in July 2011?

21   A.   Yes.

22   Q.   Did you conduct any calls with Mr. DiTommaso?

23   A.   Yes.

24   Q.   Do you know how many?

25   A.   Not exactly, but a few.  I generally only spoke to Mr.

1    DiTommaso when we had to post an OTC opinion letter to the

2    OTC Markets' website.  We had --

3    Q.   When you say "a few," what do you mean?

4    A.   I would guess somewhere between three and five.  Every

5    time we had to post one, which would be annually, but we

6    were posting them quarterly in the beginning, mistakenly,

7    apparently, so we might have done that, I'm not sure

8    exactly, four or five times, maybe.

9    Q.   Okay.

10   A.   There's a checklist that he would go through on the

11   phone with me, questions he had to ask, et cetera,

12   et cetera.

13   Q.   Now, did you ever discuss with Mr. DiTommaso regarding

14   the information that was being filed after you met with him

15   in 2011?

16   A.   I'm sorry, I don't understand the question.

17   Q.   Did you ever discuss the disclosures, what was in the

18   disclosures, with Mr. DiTommaso after your meeting in

19   2011?

20   A.   Yes.  Every time we had to put them up, he had a

21   checklist he went through with me on the phone.

22   Q.   Can I have Exhibit 385 up again, please.  And can I go

23   to page 3.  And can you focus in on the bottom.

24          Can you look at that bottom piece there that's

25   blown up on your screen.

Direct - Dittman

1    A.    Yes.

2    Q.    That's an e-mail from you; is that correct?

3    A.    Yes.

4    Q.    And do you know who you're e-mailing?

5    A.    I can't see who -- exactly, I think it's probably above

6    what I can see on my screen.  Somebody at Pacific Stock

7    Transfer, but I don't know who.

8    Q.    Okay.  So a representative from the transfer agency?

9    A.    Yes.

10   Q.    Okay.  What are you telling the transfer agency in this

11   e-mail?

12   A.    To allow Mr. Jean-Pierre access to the company's

13   documents, so the transfer agent share structure.

14   Q.    So essentially you're allowing -- you're essentially

15   providing permission for Mr. Guy Jean-Pierre to represent

16   your company with the transfer agency?

17   A.    Yeah, to get -- for the transfer agency to give Mr.

18   Jean-Pierre information that he's asking for.

19   Q.    Okay.  So since you spoke to Mr. DiTommaso and Mr.

20   DiTommaso's doing the filings, you had to do filings with

21   the transfer agent as well; is that correct?

22   A.    Well, I don't think the -- not really.  I don't think

23   the company did any filings with the transfer agency.

24   Q.    You don't need legal letters for the transfer agency?

25   A.    Legal letters regarding what, exactly, sir?

1   Q.   The sale of stock.

2   A.   Well, maybe.  If you're referring to the conversion --

3   144 conversion letters, the answer is yes, but those aren't

4   company -- you know, the company doesn't request those.

5   Those -- whoever's asking to convert their stock gets those

6   letters and does that outside of the company.

7   Q.   Right.  But brokers rely on those letters; you would

8   agree with me on that.

9   A.   I don't know that I would.  I don't know that a broker

10  would know anything about that letter.  I mean, if -- I'm

11  not being argumentative, sir, but if a shareholder who has

12  restricted 144 stock wants to get his stock into trading

13  stock, they need an attorney opinion letter.

14  Q.   Okay.  Well, is it -- do you know what a broker relies

15  on, like Oppenheimer or Scottsdale?

16  A.   Not exactly, no.

17  Q.   Okay.  So you can't speak about that?

18  A.   Correct.

19  Q.   Do you know what the transfer agent requires when it

20  comes to a party being able to sell shares of your company?

21  A.   Not exactly, but I know the attorney opinion letter is

22  part of the package.

23  Q.   Okay.  And so do you know if Mr. Guy Jean-Pierre ever

24  provided attorney opinion letters to the transfer agency for

25  shares to be sold from your company?

1   A.   I don't believe so.

2   Q.   Do you know why?

3   A.   For the same reason that he wasn't able to sign the

4   information and disclosure statement, I believe.

5   Q.   Okay.  And you knew this in 2011.

6   A.   Yes.

7   Q.   Okay.  So you meet with Mr. DiTommaso for the purposes

8   of being able to meet the lawyer to file the Pink Sheets --

9   or the legal letters to the Pink Sheets or OTC Marketplace,

10  right?

11  A.   Correct.

12  Q.   But then in 2011, same time frame, why did you contact

13  the transfer agent and provide them Guy Jean-Pierre to be

14  able to be contacted regarding legal matters with

15  FusionPharm?

16  A.   Well, because we contact the transfer agent for a lot

17  of things that don't have to do with the attorney opinion

18  letters.  The transfer agent provides the share account --

19  in the early going after the transition, there was a

20  discrepancy in the total number of shares, that it took Guy

21  and Billy, as I recall, six months to sort out with the

22  transfer agency.  I suspect this was actually regarding

23  that, although I can't tell you for sure.

24         There was -- there were a lot of things that we got

25  from the transfer agency:  total number of shareholders,

1    breakdowns by, you know, who owned what -- who owned what,

2    and preferred stock, common stock, you know.  There was a

3    lot of information we got from the transfer agency.

4    Q.   Okay.  So Mr. Guy Jean-Pierre would be very familiar,

5    then, based upon his knowledge and what was going on, as you

6    just described, all those things with the transfer agency,

7    about your firm and the stock.

8    A.   I would think so, yes.

9    Q.   Including the parties.

10   A.   Would -- which parties exactly, sorry?

11   Q.   The parties that want to sell stock.  Your stock.

12   FusionPharm stock.

13   A.   That want to convert stock.

14   Q.   Yes.

15   A.   Yeah -- yes.

16   Q.   Okay.  And he would also be familiar with you as the

17   issuer, FusionPharm, of how much stock is on the books.

18            MR. BARNARD:  Objection.  Leading.

19            THE COURT:  Sustained.

20   BY MR. SIBERT:

21   Q.   Would Mr. Guy Jean-Pierre know about the shareholders

22   and the preferred and common stocks?

23            MR. BARNARD:  Objection.  Lack of foundation and

24   calls for speculation.

25            THE COURT:  All right.  If you know, sir.

1     THE WITNESS:  I don't honestly know.  He certainly

2   could know.  He had access to that information.

3     Do I know if Guy ever looked at that in detail?  I

4   don't, particularly.  I mean, it was -- it was part of our

5   financials and he certainly looked at those, but I don't

6   know if Guy specifically, you know, read through reports of

7   shareholders or anything of that nature.

8   BY MR. SIBERT:

9   Q.   Well, would you expect the person that you trusted,

10  worked with the transfer agent as your corporate counsel, to

11  be familiar with that information as the CEO of your

12  company?

13  A.   Familiar, yeah.

14  Q.   Or know it?

15  A.   I don't know about "know it."  It wasn't --

16  Q.   This is your company.

17  A.   I understand, sir, but it's supremely important to

18  understand, you know -- there's 800-and-whatever

19  shareholders and a couple hundred million shares out.  I'm

20  not sure exactly, you know, at what level Guy may have ever

21  needed to review that information.

22     It's not -- for the most part, it's not very

23  important to what we're doing around there day-to-day.

24  Q.   So the people who hold a certain percentage of stock

25  isn't important to you?

1    A.   Oh, that's important.

2    Q.   Because you just testified it was important for you to

3    get all the stock, right?

4         MR. BARNARD:  Your Honor, object.  That's a

5    misstatement of his testimony.

6         THE COURT:  Sustained.

7    BY MR. SIBERT:

8    Q.   You -- correct me if I'm wrong:  What did you say about

9    why you did the reverse split?

10   A.   It was important, yes, that I controlled the majority

11   of the shares of stock, for sure.

12   Q.   All right.  So knowing where the shares of stock go

13   shows who owns the company, controls it.

14   A.   Yes.  But to be not overly simplistic, 98 percent was

15   in the hands of myself and my little brother.  And anything

16   less than 10 percent is of very little concern in the

17   universe of, you know, disclosures in publicly traded

18   companies, so it was pretty easy to know where the stock

19   was.

20        And, again, I'm not being argumentative or simplistic,

21   that's just -- it wasn't the rest of everybody else in the

22   universe that isn't named Scott Dittman and Bob Dittman, you

23   know; it was a couple percent of the shares in the company.

24   Q.   You didn't care about those people.

25   A.   No, of course I cared, they're my shareholders; don't

1    characterize it like that.  I just don't -- it's not germane

2    to the disclosures.  The disclosures, you know, are -- you

3    know, people who are more than 10 percent owners are control

4    people.  And there were only two for the entirety of the

5    time that I owned the company.

6    Q.   So you understand the importance, then, of knowing the

7    volumes, because you had to disclose if you're over 10

8    percent; is that right?

9    A.   That's correct.

10   Q.   And also do you understand the importance of what's

11   considered a holding period?

12   A.   Related to 144?

13   Q.   Yes, sir.

14   A.   Yes.

15   Q.   Okay.  And what's your understanding about that?

16   A.   In our case, I think there are some differences among

17   companies.  I'm not a securities lawyer, but in our case 144

18   stock had a one-year holding period.

19   Q.   Okay.  And who was your securities lawyer?

20   A.   Mr. Jean-Pierre.

21   Q.   Okay.  And that's the person you relied on when it came

22   to issues like the holding period and volume; is that right?

23   A.   Sure.

24   Q.   Okay.  And how about -- let's talk about one other

25   topic, affiliation.  That's another legal term; would you

Direct - Dittman

1    agree with me?

2    A.   Yes.

3    Q.   Okay.  And based upon your layman CEO knowledge, what

4    do you think the definition of "affiliate" is?

5    A.   That's a little -- definition of affiliate is maybe a

6    little more legal than I'm capable of, but I can give you my

7    layman's understanding of affiliate, if you'd like.

8    Q.   No, that's okay.  So we can agree that it's a legal

9    issue.

10   A.   Yes.

11   Q.   And because you were the CEO of FusionPharm, who did

12   you rely on when it came to the legal issues dealing with

13   affiliation of your company?

14   A.   My securities attorneys.

15   Q.   Okay.  And who was one of those attorneys?

16   A.   Mr. Jean-Pierre.

17   Q.   Okay.  And he was your attorney from 2011 through 2013.

18   A.   Correct.

19   Q.   All right.  Can I have that down -- thank you.

20        All right, sir, can we take a couple of minutes now

21   and walk through essentially how your company posted the

22   financials to the OTC Markets.  So could you explain to the

23   jury essentially how you'd file what you have described as

24   the annual and quarterly reports.

25   A.   Yup.  So OTC Markets has a website.  This changed --

Direct - Dittman

1    not to get too detailed, but it changed somewhere in the

2    course of 2011 to 2014.  In the beginning, they issued you a

3    little -- kind of hard to describe -- a little electronic

4    key, essentially, that had, like, a little small LCD window,

5    and when you needed to upload something to their website,

6    they had a procedure where they would send you a code to

7    your specific key so that somebody couldn't impersonate you

8    and upload stuff to their website or whatever.

9              So you had to have that key and go through -- I'm

10   not sure exactly what procedure you had to go through to get

11   them to send you the signal on the key, then you would input

12   the signal and upload your financials to their website or

13   your disclosure statement.

14   Q.   I guess in today's technology, instead of a card you

15   had a certain key to be able to open whatever account to be

16   able to file.

17   A.   Correct.

18   Q.   Okay.  And then in -- you said that process changed?

19   A.   Yeah.  At some point they stopped having that little

20   electronic key, and I think they actually e-mailed you or,

21   you know, did a text verification or something else.  The

22   little -- you didn't have to know where that key was, which

23   was good because it was hard to keep track of.

24   Q.   So it was essentially saying there was a verification

25   process.

Direct - Dittman

1    A.    Yes.

2    Q.    And part of that verification process to be able to

3    file things on the OTC Marketplace, was a user name and

4    password required?

5    A.    I believe so.  I'm honestly not a hundred percent

6    sure.

7    Q.    Okay.  And do you know what name was registered for the

8    OTC account for FusionPharm?

9    A.    I don't.

10   Q.    Was it your name as the CEO?

11   A.    I don't recall.  I don't know.  I generally didn't

12   upload them.  Billy -- in the beginning Billy uploaded them

13   and later -- well, I think maybe Shane uploaded them in the

14   very beginning, then Billy uploaded them and then Craig

15   Dudley uploaded them.  I don't know that I ever uploaded

16   them personally.

17   Q.    Okay.  So someone in your company uploaded the

18   disclosures annually and quarterly for FusionPharm.

19   A.    Correct.

20   Q.    And essentially FusionPharm met their -- excuse me, met

21   their requirements to be -- for those disclosures that were

22   posted.

23   A.    Yes.

24   Q.    All right.  And so now, did you, as the CEO, provide

25   that -- I guess for lack of a better term, did you give that

1    order for your employees to upload these disclosures?

2    A.   Yes.

3    Q.   Okay.  So Mr. Sears had permission to upload the

4    disclosures?

5    A.   Yes.

6    Q.   And, I'm sorry, you said two other names.  Could you

7    tell me those names?

8    A.   Yes.  Shane Bohlender, he was the CFO of the company in

9    the very beginning, for a quarter or two in September

10   2011 -- or beginning of 2011; and then at the time period

11   from end of 2013 through the raid on the company in May of

12   2014, Craig Dudley was the acting CFO of the company and he

13   handled it then.

14   Q.   Okay.  So at the end of 2013?

15   A.   Yeah.

16   Q.   So essentially both of the times -- both of the times

17   when you stated that Shane Bohlender -- I think his names is

18   what you said --

19   A.   Uhm-hum.

20   Q.   -- and Mr. Dudley --

21   A.   Uhm-hum.

22   Q.   -- was doing the uploading, Mr. Guy Jean-Pierre wasn't

23   corporate counsel for FusionPharm?

24   A.   I'm sorry, did you say wasn't or was?

25   Q.   Was not, during those times.

1    A.    No, when Shane was there he certainly was.

2    Q.    So at least in the beginning?

3    A.    Yeah, Craig would have been after Mr. Jean-Pierre.

4    Q.    Okay.  Now, you had an uploading on July 2d, 2011.

5    A.    Okay.

6    Q.    Do you recall what that would be?

7    A.    Not off the top of my head, no.  It probably would have

8    been July -- I'm sorry, what date?

9    Q.    July 2d, 2011.

10   A.    Probably was first quarter of 2011.

11   Q.    And when does that end?

12   A.    March 30th.

13   Q.    Okay.  And essentially do you know who would have

14   uploaded the OTC disclosures then?

15   A.    I think that was Shane and I.

16   Q.    Shane and you?

17   A.    Yeah.

18   Q.    Okay.  And then after the disclosures are posted, is

19   there a requirement to upload a current information letter?

20   A.    Yes.

21   Q.    And that's the legal letter.

22   A.    Yes.

23   Q.    And so every time -- most of the time when there's a

24   quarterly disclosure, it's followed with the current

25   information letter; is that correct?

1   A.   In the beginning, yes, but then we realized or figured

2   out that we didn't need to do it on a quarterly basis; we

3   only needed to do it at the end of the year.  So I think we

4   did it every quarter in 2011 and then after that only at

5   year-end when it was required.  I believe.

6   Q.   So based upon your postings, there -- there was a

7   current information letter posted on July 22d, 2011.  Do you

8   know what that current information or legal letter would be

9   for?

10   A.   I would imagine that was also for the first quarter of

11   2011.

12   Q.   Okay.  And who would upload those legal letters?

13   A.   That was probably Shane or Shane and I, at that time,

14   as well.  I don't recall, but I would guess.

15   Q.   Okay.  How about December 29th, 2011?

16   A.   Is the question what quarter or who uploaded?  Sorry.

17   Q.   You had an uploaded disclosure statement at that point.

18   A.   Okay.

19   Q.   Do you know what that would be?

20   A.   I would guess that's quarter three, ending September

21   30.

22   Q.   Okay.  And do you know who uploaded that?

23   A.   In that time frame, probably Bill Sears.

24   Q.   Okay.  And that was followed with a current

25   information, or otherwise known as the legal letter, on

1    December 30th, 2011?

2    A.    Same question?

3    Q.    Yes, sir.

4    A.    I would, again, assume Bill Sears.  I don't honestly

5    remember any of these things.  It's not like it was a

6    humongously important, you know -- it wouldn't stop the

7    office to upload an opinion letter or anything, but I would

8    imagine it was Bill because he always kept the key at that

9    point in time.

10   Q.    Okay.  So -- so you're saying it wasn't important.

11   It's not important to make sure that information about your

12   company and that the company's doing things correctly is

13   posted to the open marketplace?

14   A.    No, of course that's important.  The act of uploading

15   it to the website is not earth shattering.  Doing the work

16   and getting the financials done, that's a different matter.

17   Q.    Okay.  But is it important to you to make sure that

18   those disclosures are correct?

19   A.    Of course.

20   Q.    Okay.  As the CEO, wouldn't you want to have the last

21   review of all those disclosures and legal letters?

22   A.    Yeah.  Absolutely.

23   Q.    Okay.  So I guess I'm a little confused because it

24   seems like you just handed this job off, and you're saying

25   it wasn't really important to you if you actually did the

1    uploading?

2    A.    No, sir; what I said was the actual uploading to the

3    website I didn't do myself.  That's in -- in my mind, that's

4    a menial task, you know.  I certainly could have taken the

5    time to figure out how to use the key and sit down at the

6    computer and uploaded the financials to the website.  They

7    weren't uploaded without my knowledge, you know.  Nothing --

8    you know, there's not a thing that went up there that I

9    didn't authorize.

10         But the actual act of uploading it -- which is what

11   I thought you were asking me, you know.

12   Q.    So what was your verification?  Did you check to make

13   sure things were uploaded?

14   A.    Probably.  Generally, yeah.

15   Q.    That has to be important to you, correct?

16   A.    Sure.

17   Q.    Because if you don't post, you're in violation.

18   A.    Yes.  Well, there's degrees of violation.  The company

19   was in violation for much of 2011, I think, anyway.  It took

20   us a long time to get our stuff together and become current

21   filers, as I recall, and whatnot.

22         But certainly, yes, uploading to OTC Markets was --

23   and doing our financials and trying to do them on time --

24   which we were often late because we were always

25   understaffed -- but still, was it important?  Yes, it was

1    definitely important to me.

2    Q.    Okay.  And you bring up a good point.  You were

3    understaffed.  How big was your company in the beginning?

4    FusionPharm.

5    A.    In the very beginning?

6    Q.    Yes, sir.

7    A.    There was me and Shane.

8    Q.    And then after that?

9    A.    Then, you know, Bill came on doing marketing, as we

10   discussed yesterday, or sales for a little while.  And then

11   I hired an outside guy named Gino Rodriguez with a company

12   called MJ Business Solutions to be our distribution partner,

13   but he was not a company employee.

14          The next company employee, I guess, would have been

15   Kelly Blume working part-time for the company.  So, you

16   know, in the beginning there was, you know, two or three of

17   us at the most.

18   Q.    And how long did that last?

19   A.    Oh, you know, most of the first year, you know.  In the

20   second year when we made the switch to lettuce, Andy Duke

21   came on, we got a new secretary, we had more people -- a few

22   more people then, but the company -- until 2015, you know,

23   the company probably never had more than five, six, seven

24   employees.

25   Q.    Okay.

1          THE COURT:  Mr. Sibert, one second.

2          MR. SIBERT:  Yes, sir.

3          THE COURT:  Ms. Cox, are you with us?

4          THE JUROR:  Yes, I am.  Thank you.

5          THE COURT:  How are you feeling?

6          THE JUROR:  I'm feeling okay.

7          THE COURT:  All right.  But you've got to be --

8          THE JUROR:  I know.

9          THE COURT:  You know, you took an oath -- you have

10   to listen to the evidence and pay attention to the evidence.

11         THE JUROR:  Yes, sir.

12         THE COURT:  All right.  Go ahead.

13         MR. SIBERT:  Thank you, Your Honor.

14   BY MR. SIBERT:

15   Q.   Okay.  Sir, I guess maybe I can -- you don't -- I think

16   it's fair to say that you don't recall every quarter or

17   annual report that was uploaded to OTC, who did it.

18   A.   Specifically, no, correct.

19   Q.   But if I went through the list, would you know if these

20   were the reports that were put on OTC Marketplace?

21   A.   I'm not a hundred percent sure I understand your

22   question.

23   Q.   So if I went through the list of all the reports that

24   were posted, would you know if those were the -- that they

25   were reported at that time frame?

1    A.    Well, not exactly, no.  But I could reasonably observe

2    and assume that they were.  I mean, we filed quarterly, you

3    know.  We didn't always file on time, but there would be a

4    report every quarter, and then information and disclosure

5    statement every year.

6    Q.    And how about the annuals?

7    A.    Same.  Same thing.

8    Q.    All right.  So how about the annual report?  That's a

9    little big bit bigger, would you agree, than the quarterly

10   report?

11   A.    No, same report.

12   Q.    So it wouldn't have more information in it than just

13   the quarterly report?

14   A.    No, I don't think so.  I think it was exactly -- I

15   mean, it was a template, you know.  We just updated it

16   quarter to quarter.  I don't think it was any different at

17   all.

18   Q.    So you just used a template to tell the public about

19   your company?

20   A.    Every company uses a template.  You don't rewrite the

21   report every quarter.  You take last quarters and you update

22   the numbers and you put it out for this quarter.

23   Q.    So it's your opinion that every company just uses a

24   template?

25   A.    Yeah.  I would be shocked if every company didn't use a

Direct - Dittman

1    template, yes.

2    Q.   How would you know that?

3    A.   Well, I worked for Arthur Anderson.  The companies had

4    financial reports.  Whether they were public or not, we were

5    doing financial reports, and every single time, we took last

6    quarter's numbers and we updated it to this quarter's

7    numbers.  No need to rewrite and start from scratch on a

8    quarterly basis.

9    Q.   So kind of going back to the beginning of your

10   testimony, that yes, you did have some experience regarding

11   the financials of the corporations and reporting.

12   A.   Well, yes.  But there's a huge difference between being

13   responsible for -- being a publicly traded company and being

14   a small business that's a -- you know, that's looking for a

15   loan, but yes, when we did audit, we audited financial

16   statements.  That's all we did was audit financial

17   statements.

18   Q.   And what are the financial statements?

19   A.   Balance sheet, income statement, cash flow statement,

20   notes to the financial statements.

21   Q.   Let's talk about the cash flow statement.  What's in

22   the cash flow statement?

23   A.   Well, it's a statement of cash flow, so it shows where

24   you started with cash at the beginning of the time period

25   and all the transactions that affected your cash and what

1    your cash is at the end of the time period.

2    Q.   And one of those big things that affect your cash flow

3    statement is revenue.

4    A.   Yes.   Certainly.

5    Q.   Okay.   And also long-term, short-term debt?

6    A.   Sure.

7    Q.   So it's basically like what you make, what you spend,

8    bottom line.

9    A.   Yeah.   Debt and -- and/or equity would, I think, be the

10   other piece, right.   If you have investors put money in,

11   then you have more cash.   I think those are kind of the

12   pieces.   Operations, debt, equity.

13   Q.   I got a C in accounting.

14   A.   What's that?

15   Q.   I got a C in accounting.

16   A.   I did, too.

17   Q.   All right.   Sir, can I have --

18            MR. SIBERT:   And, Your Honor, let me -- maybe this

19   is a good time to pause before I start getting into some

20   exhibits.   I'd like to move into evidence the following

21   exhibits.   And I sent a new revised list last night.   If the

22   Court doesn't have that, I have one for the Court.

23            THE COURT:   I have that right up here with me.

24   Which section -- now you're calling them sections.   Which

25   section are you going to --

Direct - Dittman

1    MR. SIBERT:  It will be section 2, Your Honor.

2    THE COURT:  All right.  And all of them -- well,

3    we'll list them in a moment, but all of them in this section

4    are stipulated to except for Exhibit 404, and 385, as we've

5    discussed, is already in, so you don't have to re-move its

6    admission.  So --

7    MR. SIBERT:  Yes, sir.

8    THE COURT:  Okay.  Go ahead.  Put it on the record.

9    MR. SIBERT:  So at this time, the Government would

10   like to move for admission into evidence Government Exhibit

11   25, 169, 263, 272 -- or, excuse me, 372-Y, 372-Z, 372-AA,

12   372-SS, 372-VV, as in Victor, 372-WW, 372-ZZ, 372-FFF,

13   372-JJJ, 372-LLL, 372-NNN, 394, 395.

14   THE COURT:  All right.  Given the stipulation of

15   the parties, the following Government Exhibits are admitted

16   into evidence and may be published to the jury:  Exhibits

17   25, 169, 263, 372-Y, 372-Z, 372-AA, 372-SS, 372-VV, 372-WW,

18   372-ZZ, 372-FFF, 372-JJJ, 372-LLL, 372-NNN, 395 -- sorry,

19   394 and 395.

20       (Government's Exhibits received)

21   MR. SIBERT:  May I proceed, Your Honor?

22   THE COURT:  You may.

23   MR. SIBERT:  Thank you, Your Honor.

24   BY MR. SIBERT:

25   Q.   Okay, sir -- can I please have Government Exhibit 169,

633

Direct - Dittman

1    page 2, please.  Can we start at the bottom.

2           Sir, if for any reason if you can't see that on the

3    screen, please let me know.  We have hard copies and I can

4    blow this up as well.

5    A.   I can see it fine.

6    Q.   Okay.  Thank you.

7           All right, I'm focusing on here.  I'm going to

8    circle this first e-mail.  Essentially, do you know who

9    essentially -- I'm just going to ask you, could you explain

10   the chain with this e-mail based upon the title?

11   A.   Yes.  It's an e-mail from Bill Sears to Mike Kocinski

12   and myself.

13   Q.   Okay.  And who is Mike Kocinski?

14   A.   Mike Kocinski was the outside company accountant, if

15   you will, so he was the accountant for Baby Bee Bright

16   before it became FusionPharm, and I kept him after the

17   transition to review financials and bounce questions off of

18   and things like that.

19   Q.   Okay.  Okay.  And do you know what the conversation is

20   being discussed here in this e-mail?

21   A.   It looks like Bill is asking Mike how his review of the

22   financials are coming because he's looking to get them

23   uploaded before Thanksgiving.

24   Q.   Okay.  Can we move back down -- I guess to the top.

25   Okay.

1    Essentially, I don't have the top of this e-mail,
2    but could you take a look at that body and tell me what that
3    e-mail is regarding.
4    A.   He's responding and talking about his review, letting
5    me know that there should be an accrual for interest income
6    or expense regarding notes, or asking perhaps if we should.
7    And stating that we can do an entry for fourth quarter to
8    reflect any impact that it has on the period 2011.
9    Q.   And you stated "he."  Who do you mean by "he"?
10   A.   Mr. Kocinski.
11   Q.   Can I have page 1, please.
12        And, again, he -- I'm sorry -- again, he forwards
13   this e-mail to both you and Mr. Sears; is that correct?
14   A.   Correct.
15   Q.   And this is your FusionPharm e-mail address?
16   A.   It is.
17   Q.   Keep going up.  Okay.
18        Essentially the top of this exhibit is -- could you
19   describe what the top e-mail is in Exhibit 169.
20   A.   From and to?
21   Q.   Yes, sir.
22   A.   Yeah, so it's from me to Mr. Kocinski, Bill Sears, and
23   Guy.
24   Q.   Okay.  And, again, we know who Mr. Sears is and we know
25   who Mr. Kocinski is.  Guy in this --

Direct - Dittman

1    A.    Mr. Jean-Pierre.

2    Q.    Okay.  And at this point, he has a FusionPharm

3    address -- e-mail address; is that right?

4    A.    Correct.

5    Q.    And, again, this is dated November 23d, 2011?

6    A.    Correct.

7    Q.    Okay.  And then what are you stating here in this first

8    sentence?  What is your message to the group that you're

9    e-mailing?

10   A.    I'm asking Mike to make a series of adjustments to the

11   financials and return them to everybody cc'd on the e-mail.

12   Q.    Why are you cc'ing Mr. Guy Jean-Pierre?

13   A.    Because he's the company's security counsel.  He, I

14   think, was cc'd on all financial reports and things like

15   that, anything that went up to OTC Markets, anything that I

16   needed his input on.

17   Q.    So you are making him aware what's going on in

18   FusionPharm?

19   A.    Sure.

20   Q.    Okay, sir.

21         Can you please -- can I please have 372-Y

22   published.  And we'll start with the first page.

23         Okay, sir, could you explain what 372-Y is.

24   A.    That's an e-mail from myself to Bill and Guy on the

25   information and disclosure statement.

1    Q.   Okay.  Do you know for what disclosure statement?

2    A.   Well, it only says -- in the attachment it says

3    disclosure statement 12-26-2011, which at that time should

4    be the end of quarter 3 financials.

5    Q.   And that's September 30th?

6    A.   Correct.

7    Q.   Okay.  And at this time, you're e-mailing Mr. Sears

8    with his FusionPharm address; is that right?

9    A.   Yes.

10   Q.   Which is different than the e-mail I just -- that you

11   used last time?

12   A.   I think the last one was from him that I replied to,

13   but he certainly had both e-mails.

14   Q.   And here what are you stating to the group that you're

15   e-mailing?

16   A.   That I made some small changes to the disclosure

17   statement, and nothing that I thought we needed to hash out,

18   and I think they're ready to go up, and I presume asking

19   Billy if he's ready to post them.

20   Q.   And so when you do Billy, question mark, are you asking

21   for Billy's input there?

22   A.   I -- it's -- it is possible, but I doubt it.  Billy

23   wasn't, you know, very technical or very into reading

24   details.  I think I'm just asking him more if he's ready to

25   do the posting.

Direct - Dittman

1    Q.   So just read what you write.  Starting with the second
2    sentence.
3    A.   "I think we're good.  Billy?"
4    Q.   All right.
5         Can I have page 10 of that attachment.  Can we just
6    blow up the body.  All right.
7         All right.  Just so you can see it a little bit
8    more, I'll just have it blown up.  Do you recognize what
9    page this is of the quarterly report?
10   A.   No.  Not really.
11   Q.   Okay.  Let me have page 9.  Can you blow that section
12   up?
13        Do you recognize this section now?
14   A.   Yes.
15   Q.   Okay.  And what section is it?
16   A.   Management Structure.
17   Q.   Okay.  And what did you have to disclose based upon
18   what you knew about management structure when it came to
19   filing?
20   A.   The full name, business address, employment history,
21   and board members and other affiliations.
22   Q.   Okay.  And who would assist you if you had any
23   questions about what needed to go into these filings when it
24   came to the management structure?
25   A.   Oh, it could have been Mr. Jean-Pierre or Mr.

Direct - Dittman

1    DiTommaso.  I mean, this is one of the documents that I did

2    go through with Mr. DiTommaso every time it had to go up.

3    Q.   All right.  So you also stated this is something that

4    you would go through with Mr. Guy Jean-Pierre; is that

5    right?

6    A.   Yeah, that's -- yeah.  I'm sorry, I thought I said

7    that, yes.

8    Q.   All right.  So now you're familiar with what we're

9    looking at?

10   A.   I am.

11   Q.   Can we go to page 10.

12        And who's listed here under the management

13   structure of FusionPharm?

14   A.   Myself, Mr. Jean-Pierre, and Andrew Duke.

15   Q.   And how is Mr. Guy Jean-Pierre listed?

16   A.   Corporate secretary.

17   Q.   Okay.  So September 30th, 2011, you list -- in your

18   quarterly report, you list him as corporate secretary.  But

19   you've testified here today from -- and, in fact, you wrote

20   a letter for him in April of 2011 stating that he's the

21   legal counsel for FusionPharm.  Why aren't you listing him

22   truthfully as the corporate counsel?

23   A.   I don't think corporate counsel is an officer

24   disclosure in this section.  Corporate secretary is.

25   Q.   How about legal counsel?

1    A.   I don't -- to my understanding, it's -- that's not

2    required, not part of this section.

3    Q.   Not part of it?

4    A.   Correct.

5    Q.   How sure are you?

6              MR. BARNARD:  Your Honor, I object.  They --

7              THE COURT:  Sustained.

8              MR. SIBERT:  Okay.  Thank you, Your Honor.

9    BY MR. SIBERT:

10   Q.   All right, can I have -- can we go to the next page,

11   please.  Page 11.  Can you blow up section B here.

12             Do you see section B there, sir?

13   A.   I do.

14   Q.   Okay.  What is that?

15   A.   Legal/Disciplinary History.

16   Q.   Okay.  And is there anyone listed in your September

17   30th, 2011, report for your company regarding

18   legal/disciplinary history?

19   A.   No.

20   Q.   Do you know who you would have to list there?

21   A.   Any officer from the previous page, I presume, that had

22   been convicted of a criminal proceeding or named as a

23   defendant in a pending proceeding.

24             You want me to read 2 through 4?  2, 3, and 4?  Do

25   you want me to read those for you?

Direct - Dittman

1  Q.   No, I'm just asking if you have knowledge of what is
2  listed in there.  I'm not asking you to read the document
3  now.  If you knew as the CEO on September 30th, 2011, what
4  was required to be in there.
5  A.   I would know by reading the questions 1, 2, 3, and 4.
6  Q.   Can I have page 12.  Please -- can you blow up Family
7  Relationships.
8         Now, under this, you have a disclosure; is that
9  correct?  Under the family relationships section?
10  A.   Yes.
11  Q.   Okay.  And who did you disclose?
12  A.   My little brother.
13  Q.   Okay.  And why are you disclosing him?
14  A.   Because he owns 12 percent of the company stock.
15  Q.   Okay.  Can you tell me why Sandra Sears isn't disclosed
16  here?
17  A.   Because she does not own more than 10 percent of the
18  company stock.
19  Q.   So your understanding is you just have to own stock to
20  be under the disclosure of family relationships?
21  A.   Yes.  As it says here, my understanding, greater than
22  10 percent is the requirement for disclosures.
23  Q.   Okay.  Well, let's look at the next section.  How about
24  Related Party Transactions?
25  A.   Okay.

Direct - Dittman

1  Q.   Do you list anyone there?

2  A.   No.

3  Q.   All right.  Now, do you -- in your opinion, do you

4  think it's important that the public would need to know that

5  another officer that is on the corporate paperwork is

6  essentially Ms. Sandra Sears, your mother-in-law by

7  marriage?

8  A.   I'm sorry, I didn't -- I'm not sure I followed the

9  question.  Could you ask that again?

10  Q.   Yeah.  In your opinion --

11  A.   Uhm-hum.

12  Q.   -- do you think it's important as a CEO of the company

13  that the public should know that your fellow officer/

14  director is Ms. Sandra Sears, your mother-in-law by

15  marriage?

16  A.   I think at this point she's no longer an officer.  Guy

17  had replaced her at this point; that's why he's disclosed as

18  corporate secretary.  Sandra Sears was corporate secretary

19  in the beginning and then Guy replaced her sometime in 2011.

20  I'm not sure exactly when, but presumably before this date.

21  Q.   Okay.  So Guy replaced Mr. Sears's mother-in-law --

22  A.   Mother.

23  Q.   -- mother.

24          THE COURT:  Why don't we take a pause there, Mr.

25  Sibert, and take our morning break.

Direct - Dittman

1          MR. SIBERT:  All right.  Thank you, Your Honor.

2          THE COURT:  All right.  Ladies and gentlemen of the

3   jury, we will be in recess for 15 minutes.

4        (Jury left the courtroom at 10:18 a.m.)

5          THE COURT:  Mr. Dittman, again, during the recess,

6   do not speak with any of the lawyers.

7        (Recess taken 10:18 a.m.)

8        (Jury entered at 10:39 a.m.)

9          THE COURT:  All right, Mr. Dittman, I remind you,

10  you remain under oath.

11         THE WITNESS:  Yes, sir.

12         THE COURT:  You may resume your examination, Mr.

13  Sibert.

14         MR. SIBERT:  Okay.  Thank you, Your Honor.

15  BY MR. SIBERT:

16  Q.   Okay.  Can I have -- I think we were going through

17  Exhibit 372-Y.  Can I have page 11, please.

18         Okay, sir, I just want to highlight a couple more

19  things here.

20         Can you have that blown up.

21         All right, sir.  The document says, essentially,

22  anyone, an officer or director or a control person of the

23  company, when it comes to the legal and disciplinary

24  history.  All right?  Do you know what control person means?

25  A.   I believe somebody who owns more than 10 percent of the

1      company stock.

2      Q.    Okay.  And where are you getting that definition?

3      A.    From my securities attorneys in the past and from that

4      previous page of the document that asked that question.

5      Q.    Okay.  And when you say "securities attorneys in the

6      past," who are you talking about?

7      A.    Mr. Jean-Pierre, Mr. DiTommaso, Mr. Lehrer.

8      Q.    And is there any other definition that you know that

9      regards control person?

10     A.    I don't believe so, no.

11     Q.    So just 10 percent?

12     A.    Yes.

13     Q.    And let me put it this way:  If you had to disclose --

14     if Mr. Sears was put on -- as you testified before, you

15     didn't want to disclose Mr. Sears because of his criminal

16     history.  If he was on the paperwork for FusionPharm, is

17     this the section that you would have to disclose him under?

18     A.    Presuming he was an officer or a control person, the 10

19     percent stock owner, would he need to be disclosed here?  Is

20     that the question?

21     Q.    Or director.

22     A.    Yes, I think that's correct.

23     Q.    So essentially Sandra Sears was the director.  You

24     would agree with me on that, right?

25     A.    Director, no; she was the corporate secretary.

1    Q.   Okay.  And so she would be an officer.

2    A.   Yes.

3    Q.   Okay.  So if -- instead of putting Mrs. Sears down, as

4    you stated, she was just put on there as a second person for

5    the paperwork because you didn't want to disclose Mr.

6    William Sears.  If --

7    A.   Oh, wow --

8    Q.   -- Mr. William Sears was posted as a corporate

9    secretary, he would have to be disclosed here.

10   A.   Yes.

11   Q.   Did you ever disclose anyone in all your filings with

12   OTC, anyone from your company relating to a officer,

13   director or control person in this section?  Specifically

14   2011 through 2013.

15   A.   Did we ever -- did I ever disclose -- was there anybody

16   listed in that section, is that the question?

17   Q.   That's right.  Did you ever list a person --

18   A.   I don't believe so, no.

19   Q.   Can I have page 12, please.  And just -- can you blow

20   up those sections.

21        So, again, similar questions:  Family

22   relationships, you disclosed Robert Dittman.  Did you ever

23   disclose any other party in that section?

24   A.   I don't believe so, no.

25   Q.   Okay.  And how about Disclosure of Related Party

1    Transactions?  Did you ever disclose any related party

2    transactions in that section?

3    A.    I don't believe so, no.

4    Q.    And any disclosure of conflicts of interest?

5    A.    I don't believe so, no.

6    Q.    So your -- besides Robert Dittman for the family

7    relationships, no one else was ever disclosed from 2011

8    through 2013 regarding those three sections?

9    A.    I don't believe so, no.

10    Q.    Okay.  And I just want to make sure I understood.  And

11    I think you correctly corrected myself with my question.

12    When it came to the filing of these reports, you stated

13    there was a different person at the end of 2013 that did the

14    filings; is that correct?  Dudley?

15    A.    Yes.  Craig Dudley.

16    Q.    That was at the end of 2013?  2013?

17    A.    He started working for FusionPharm as a rent-a-CFO, if

18    you will, right at the end of 2013 through spring of 2014,

19    and did the -- both the year-end financials 2013 and the

20    first quarter 2014.

21    Q.    Okay.  And this all, you testified, the annuals for

22    2013 wouldn't be reported or published until 2014.

23    A.    Correct.

24    Q.    There's a delay in all the filings.

25    A.    Yeah.  It takes time to close the books and do the work

1    and whatever.  I think you have 90 days after the end of the

2    year, or maybe a little bit more.

3    Q.    Okay.  So usually you have a three-month delay?

4    A.    Give or take.

5    Q.    Give or take?

6    A.    Yeah.

7    Q.    Okay.  And was that -- when Mr. Dudley did those

8    filings, was Mr. Guy Jean-Pierre still your corporate

9    secretary or legal counsel?

10   A.    No.

11   Q.    Okay.  Can I have page 13, please.

12          THE COURT:  Is this still 372-Y?

13          MR. SIBERT:  It is, Your Honor.

14          THE COURT:  Okay.  Thank you.

15          MR. SIBERT:  Thank you.

16   BY MR. SIBERT:

17   Q.    Okay.  So let's just talk up here.  And this is maybe

18   where I also messed up.  And so here you're listing,

19   essentially -- what are you listing under Item 14,

20   beneficial owners?

21   A.    What -- what or who?

22   Q.    Why are you listing, I guess, yourself and Mr. Robert

23   Dittman?

24   A.    Honestly I'm not sure exactly the definition of

25   beneficial owners.  But I believe it has the same, you know,

Direct - Dittman

1    10 percent threshold, but I'm not a hundred percent sure.

2    Q.   Okay.  And going back to maybe where I messed up.  Your

3    concern as a CEO was who had over 10 percent because that is

4    what was required to be reported?

5    A.   Correct.

6    Q.   Okay.  And so I apologize.  Your concern for

7    shareholders deals with the 10 percent volume, because it's

8    important --

9    A.   Disclosure of shareholders, yes.

10   Q.   Okay.  Thank you.  Now, did you know -- I just want to

11   come back to this -- do you know how many shares Mr. Robert

12   Dittman received in the beginning of FusionPharm?

13   A.   Not exactly.  Maybe 185,000?  But maybe 185,000 less a

14   thousand or two.

15   Q.   Okay.  So somewhere in the 180,000.

16   A.   Yes.

17   Q.   So more than the 178,670 listed here.

18   A.   Yes.

19   Q.   Do you know at the time that Robert Dittman either

20   received his 180,000 shares, or above, or at this time when

21   you're doing September 30th quarterly reporting, what

22   FusionPharm's stock was being traded at?

23   A.   I don't --

24   Q.   Price --

25   A.   In terms of the price, I don't.  Maybe around a buck

1    and a half or something at that point.  I don't remember

2    honestly.

3    Q.   Okay.  And as the -- you might be better at this than

4    me -- but 183,000 preferred shares, based upon what we've

5    discussed with the reverse split and conversions here, how

6    many common shares would that be?

7    A.   Preferred shares convert at a hundred to 1, so that

8    would be roughly 17 million common shares.

9    Q.   And in this reporting period?

10   A.   18 -- yes, uhm-hum.

11   Q.   And when you had what you testified to, about 183, give

12   or take a thousand --

13   A.   18 million-ish.

14   Q.   Did Mr. Dittman pay for his stock?

15   A.   Not at FusionPharm.  He invested in my previous

16   businesses that became FusionPharm.

17   Q.   Okay.  And for the record, I said did Mr. Dittman.

18   Since I'm talking to Scott Dittman, I should be clearer.

19   Did Robert Dittman ever pay for the record --

20   A.   No.  Yes, I understood.  No.

21   Q.   And you answered the question.  Did you ever -- did he

22   ever -- did Robert Dittman ever sell the stock for his own

23   benefit?

24   A.   I don't believe so, no.

25   Q.   Did you have any knowledge that Mr. Sears was using

1      shares in the name of Robert Dittman to raise money for

2      FusionPharm?

3      A.    Oh, that's a little --

4                  MR. BARNARD:  Your Honor, I object.  Leading.

5                  THE COURT:  Sustained.

6      BY MR. SIBERT:

7      Q.    Okay.  Did you -- well, did you know that William Sears

8      was selling Robert Dittman's stocks?

9                  MR. BARNARD:  Your Honor, leading again.  And

10     asking -- well, leading.

11                 THE COURT:  All right.  Sustained.

12     BY MR. SIBERT:

13     Q.    All right.  Well, did you know -- who was selling

14     FusionPharm stocks?

15     A.    I'm not sure I understand that question --

16     Q.    Let me rephrase that question.

17     A.    Many, many people were selling FusionPharm stock.

18     Q.    In 2011, do you know how FusionPharm was raising money?

19     A.    We raised money in a number of ways.  We raised money

20     through the 504 offering -- I believe it's 504 -- the $1

21     million offering with restricted stock.

22                 I raised investment money from a dozen or maybe 20

23     friends and family members.  We raised money from a few

24     random investors.

25     Q.    Now, did you -- so was any of the revenue or proceeds

1    from FusionPharm in 2011 based upon the sale of stock?

2    A.   In a roundabout way, yes.

3    Q.   All right.  And do you know if -- do you know if Mr.

4    William Sears sold any FusionPharm stock?

5         MR. BARNARD:  Your Honor, leading again.

6         THE COURT:  That's not leading.  Overruled.

7         THE WITNESS:  In the 2011 time period?

8    BY MR. SIBERT:

9    Q.   Yes, sir.

10   A.   Yes.  I know that he was selling stock to Richie Scholz

11   in 2011.

12   Q.   Do you know if he ever sold stock that was held by

13   Robert Dittman?

14   A.   Eventually, he did.  Did that happen in 2011?  I'm not

15   entirely sure.

16   Q.   Do you know approximately when he sold the stock that

17   was being held by Robert Dittman?

18   A.   I would -- not exactly, but I would estimate maybe

19   towards the end of 2011 or into 2012.

20   Q.   Okay.  And did the proceeds from the sale of that stock

21   benefit FusionPharm?

22   A.   In a roundabout way, yes.

23   Q.   Now, did Robert Dittman ever loan you money -- I think

24   that's what you stated -- for your previous company?

25   A.   Loan me money, no.  But he invested money in the

1  previous company.

2  Q.  I'm sorry, I misunderstood.  So he never loaned you

3  money?

4  A.  Me personally?

5  Q.  Yes, sir.

6  A.  I don't think so.

7  Q.  How about your companies?

8  A.  In the form of a loan?

9  Q.  In the form of a loan or a note.

10  A.  I think he did once.  I don't honestly remember.  It

11  may have been -- it may have been in the form of a note

12  previous to FusionPharm.

13  Q.  Okay.  Do you know how much?

14  A.  Not exactly.  8- to 12,000, somewhere in there.

15  Q.  So 8- to 12,000.  And what was his investment in your

16  previous company?

17  A.  That same number.

18  Q.  So 8- to 12,000?

19  A.  Right.

20  Q.  And he is now in 2011 holding the value of

21  essentially -- you said the stock was trading at $1, about

22  $1 -- let's just low-ball it and say $1 -- he's holding

23  $18 million of shares?

24  A.  No.  The market doesn't work that way.

25  Q.  Okay.  But the -- if he could sell all the shares, it

1    would be worth $18 million?

2    A.   If he could sell them at a dollar, but to --

3    Q.   So for a loan --

4    A.   -- you couldn't --

5    Q.   So for a loan or investment, 8- to $12,000, Robert

6    Dittman got essentially the equivalent of $18 million of

7    shares?

8    A.   No, that's not even remotely correct; I'm sorry.

9    Q.   Well, you just testified that he had 176,000 shares in

10   September 30th quarterly report.

11   A.   Yes, sir, I understand the math.

12   Q.   And you stated -- as -- I hope as a CPA.

13   A.   Thank you.

14   Q.   And then later on -- you stated earlier he had above

15   that, he had 183.  So that's about 7,000 -- 7,000 share

16   difference from September 30th to what you had testified

17   what he received at the beginning.

18   A.   That's okay.  Okay.

19   Q.   All right.  So even if those -- whatever happened with

20   those shares, even with those shares, that's the value of

21   $7,000 based upon the low-balling of the stock price at $1,

22   right?

23   A.   Well, no, not really.  That's -- you know, the reason

24   the answer to your question is not what you're looking for

25   is yes, my little brother owned the equivalent of 18 million

Direct - Dittman

1    shares and I owned the equivalent of 130 million shares, but

2    in the stock market as it existed at that point in time, if

3    you sold 10,000 shares, it would drive the stock price down

4    to next to nothing because there was no activity in the

5    stock.

6          For the benefit of the jury the way that market

7    works in the stock market, it's not like -- it's not like

8    we're Apple or something, right?  There's not people out

9    there who understand what FusionPharm is and are buying lots

10   of FusionPharm stock.  FusionPharm stock some days would

11   trade zero; nobody would buy any FusionPharm stock.

12         For the vast majority of the time that's in

13   question here, from 2011 until the end of 2013, FusionPharm

14   was thinly traded all of the time.  So, you know, if anybody

15   tried to sell a lot of stock in the market, number one,

16   there weren't any buyers; and number two, it would just

17   drive the stock down to, you know, next to zero.

18         So, you know, the value of the company at the time,

19   Mr. Sibert, might have been, who knows, it's difficult to

20   value because we barely were making any revenue and

21   whatever, so, you know, you can debate all day whether, you

22   know, three times revenue or something to value the company

23   and, therefore, Bobby's holdings would have been, you know,

24   10 percent of that number.

25         But there's simply no way -- listen, if I could

Direct - Dittman

1    have sold $136 million worth of stock in 2011, I would have
2    been super happy about that, but it just doesn't work that
3    way.  I'm not trying to be glib, I'm just explaining --
4    Q.   That's fair.  And you're the one running the company,
5    so I'm sure you knew it.  But it's fair to say, though, as
6    you said, you understand math, you gave 12 percent of your
7    company for an $8,000 loan to Robert Dittman.
8    A.   Yeah.  And to my little brother, and for other
9    reasons.
10   Q.   And did you know if Billy Sears was selling stock in
11   2011?  FusionPharm stock?
12   A.   I don't think so.  I mean, he was selling to Richie
13   Scholz and Richie Scholz was selling stock, but I don't
14   think Billy Sears was selling stock in the market in 2011,
15   no.
16   Q.   And you testified about a dollar, and then you went
17   down to zero.  But FusionPharm was never at zero between
18   2011 and 2013.  You would agree with me on that.
19   A.   Certainly.
20   Q.   Okay.  In fact, it went up as high as like 5, $6?
21   A.   No, it did that in 2014, but not in --
22   Q.   It got up to $3, $4?
23   A.   Maybe.  Maybe for one trade or something, maybe for an
24   aberrant trade, but it was not -- the stock was not seldom
25   valued like that.

Direct - Dittman

Q.   Okay, sir, let's look at page 13.  And I'm just going
to circle here.  This is essentially outside providers in
Item 15; is that correct?

A.   Yes.

Q.   And who's Mak Consulting?

A.   That's Mr. Kocinski, the accountant from the previous
e-mails.

Q.   All right.  Can I just ask, why did you need an outside
accounting firm when you have a CPA background?

A.   Well, I've been retired as a CPA for 20 years at that
point, and it's good to have somebody who's looking at your
financials and giving you good advice.  I was never
particularly comfortable doing it myself.

Q.   Okay.  And here we have the legal counsel listed -- the
outside legal counsel listed as Mr. Tod DiTommaso.

A.   Correct.

Q.   Okay.  Can I have 372-AA brought up, please.  Before I
show that, can I have that taken down real quick.

        And, sir, I just want to ask you real quick, you've
talked about security lawyers and you've obviously -- we've
talked about Mr. DiTommaso and the defendant in this case,
Mr. Guy Jean-Pierre, but could you tell the jury essentially
who was the person between Mr. Tod DiTommaso and Mr. Guy
Jean-Pierre that you received legal advice from?

A.   Between Tod DiTommaso and Guy Jean-Pierre?

Direct - Dittman

1    Q.   Yes, sir.

2    A.   I don't think there was anybody between those two.

3    Q.   Well, between Mr. DiTommaso or Mr. Guy Jean-Pierre, who

4    would you go to for legal advice?

5    A.   Oh, Mr. Jean-Pierre.

6    Q.   Okay.  And then essentially the conversations, how

7    would you describe the conversations that you had with Mr.

8    DiTommaso when you had those three or -- three to five phone

9    calls?

10   A.   They were specifically about the information in the

11   disclosure statement form that you put up earlier, so we

12   really just covered the information on the information and

13   disclosure statement.

14   Q.   Okay.  But it didn't really go into depth; would you

15   agree with me on that?

16   A.   Yeah, for the most part, I mean, it wasn't -- most of

17   that information's not very deep.

18   Q.   So it was just overlooking it?

19   A.   Yeah.  I mean, he actually had, like, a form that I

20   think he was required to ask me specific questions about for

21   that thing, so it was -- you know, it was kind of -- kind of

22   by rote, you know.  That he would -- he would call, we would

23   go through the same questions every time, go through the

24   disclosure statement and that was that.

25   Q.   I don't want to put words in your mouth.

Direct - Dittman

1          MR. SIBERT:  Your Honor, can I refresh the
2    witness's memory?
3          THE COURT:  With what?
4          MR. SIBERT:  His interview with the Bureau of
5    Investigation dated July 6th, 2017.
6          THE COURT:  All right.  These are notes prepared by
7    the agent?
8          MR. SIBERT:  That's correct.
9          THE COURT:  Mr. Barnard, is there an objection?
10          MR. BARNARD:  Your Honor, I don't believe these are
11    notes that have been adopted by this witness.  I would
12    object.
13          THE COURT:  Yeah.
14          MR. SIBERT:  Your Honor, they're quoted, and my
15    understanding from my recollection, any, any piece of -- any
16    material, piece of paper, or anything can -- if it can help
17    the witness refresh his memory can be used.
18          THE COURT:  Right.  It doesn't have to be
19    admissible, that's correct.  Do you have a copy of these
20    agent interview notes, Mr. Barnard?
21          MR. BARNARD:  Your Honor, what was the date of
22    the --
23          MR. SIBERT:  I have a copy for you.
24          MR. BARNARD:  And, Your Honor, I would object to --
25    there's --

Direct - Dittman

1      MR. SIBERT:  What page are you on?

2      MR. BARNARD:  Okay.

3      MR. SIBERT:  And these reports have, obviously,

4   Your Honor, been provided in discovery.

5      THE COURT:  Right.  But, I mean, you've not

6   previously labeled them as an exhibit, right?  I'm assuming.

7      MR. SIBERT:  That's right, because I don't plan on

8   introducing them into evidence at all.

9      THE COURT:  No, I understand.  But you're

10   requesting to refresh the recollection of the witness and

11   you don't have copies that defense counsel can follow along

12   with, so that's one problem.  And, you know --

13      MR. SIBERT:  Well, Your Honor --

14      THE COURT:  -- part of the -- you know, part of the

15   issue here is if -- you have to anticipate if you're going

16   to be -- if there are certain documents that you may be

17   using for refreshing of recollection that -- I'm willing to

18   forego my copy, I don't really need to have a copy, but at

19   least defense counsel needs to have a copy to see if the

20   examination is appropriate.

21      MR. SIBERT:  Well, I hope for their sake, they knew

22   this witness was going to take the stand and would have a

23   copy of the interviews for their cross-examination.

24      THE COURT:  That's -- you can't expect them to do

25   your job for you.  Are you telling me that's the only copy

Direct - Dittman

1       you have?

2               MR. SIBERT:  With me presently.  Yes, sir.

3               THE COURT:  Okay.  Now, so -- how long are you

4       going to have Mr. Dittman on the stand?

5               MR. SIBERT:  I'm hoping he's finished by lunch.

6               THE COURT:  All right.  So you don't have --

7               MR. SIBERT:  I can do it at lunch, I can get

8       another copy.  Again, they've had them for over a year,

9       these statements.

10              THE COURT:  Do you have them with you -- do you

11      have your copy with you, Mr. Barnard?

12              MR. BARNARD:  Your Honor, I don't have a copy of

13      that interview.  That was dated August 8th or -- I believe

14      it was.

15              MR. SIBERT:  July 6th, 2017.

16              MR. BARNARD:  July 6th, no.

17              THE COURT:  All right.  Why don't we all take a

18      pause.  Why don't you hand that copy to Ms. Frank, I'll ask

19      Ms. Frank to go into chambers and make a copy, and then

20      we'll come back.

21              MR. BARNARD:  Your Honor, before we continue, too,

22      I would object that I don't believe the witness has

23      indicated that he doesn't recall.  So for refreshing a

24      person's recollection, that first requires him not to

25      recall.

Direct - Dittman

1          THE COURT:  That's true.  Although I believe he did
2     state -- well, Mr. Sibert, what was the question that you
3     believe --
4          MR. SIBERT:  Your Honor, let me just -- I'm going
5     to make it very easy.  I don't want to put words in his
6     mouth.  He gave a direct quote when we -- during the
7     investigation.  I just want to refresh on what he told the
8     investigating agency.
9          THE COURT:  Well -- but Mr. Barnard is right.  If
10    you are trying to do this as a refresh recollection, he has
11    to first say that he does not have a present memory of it
12    and then you show him a document -- which I agree does not
13    have to be admissible into evidence -- he reviews it, he
14    turns it over, and then he answers your question.  That's
15    how -- that's how it's generally done.  So what is the
16    question --
17         MR. SIBERT:  The question would be this.
18    BY MR. SIBERT:
19    Q.   Sir, do you recall what you told the FBI agents when it
20    came to your conversations with Mr. DiTommaso in July of
21    2017?  The exact words?
22    A.   That -- that seems like that was quite a long
23    conversation, so I would have to say no.
24         THE COURT:  All right.  Okay.  So --
25         MR. BARNARD:  Your Honor, that's -- that's an

Direct - Dittman

1    end-around in doing this.  It's not whether he recalls a

2    specific statement he made to an agent at some point; it's

3    whether or not the content of the statement is something

4    that he doesn't remember.

5                 THE COURT:  Well, I think that's what you were

6    responding to.  You don't recall the content, Mr. Dittman,

7    of your -- you don't recall your answer -- or your

8    statement, rather?

9                 THE WITNESS:  There was -- it was kind of a long

10   conversation, Judge.  There was a lot of questions and a lot

11   of answers around Tod DiTommaso, so I don't know

12   specifically what the counsel is referring to, no.

13                MR. BARNARD:  Your Honor, I'm not talking about the

14   recalling the statement to the agent; I'm talking about the

15   content of what the statement, itself, is supposed to be

16   saying.  In other words --

17                THE COURT:  The underlying statement.

18                MR. BARNARD:  Hhm?

19                THE COURT:  The underlying statement.

20                MR. BARNARD:  The underlying statement, yes.

21                THE COURT:  That's a fair point.  It's one thing --

22   I guess, then, on cross-examination you can examine this

23   witness as to whether what he says he told the agent was, in

24   fact, what he recollects of the underlying statement.

25   And -- but in any event -- so I'm going to permit it for the

Direct - Dittman

1    limited purpose of refreshing recollection.

2          So why don't you hand the copy to Ms. Frank, we'll

3    all wait here.  She'll make a copy to give to Mr. Barnard,

4    and then we will proceed.

5          (Pause)

6          MR. SIBERT:  Your Honor, I understand the Court's

7    purpose for copying.  Can I receive those copies back?

8          THE COURT:  You'll get your -- well --

9          MR. SIBERT:  All my copies back.

10         THE COURT:  You only gave her one copy.

11         MR. SIBERT:  I know, but when the copies come

12   forward, can I have all the copies back?

13         THE COURT:  We're not going to keep them.  Yeah,

14   you'll get your copy back.

15         MR. SIBERT:  Thank you.  And . . .

16         (Pause)

17         MR. SIBERT:  My -- I should have just asked to hand

18   this to the witness.

19         THE COURT:  Yeah, go ahead.

20   BY MR. SIBERT:

21   Q.   Sir, can you just look at page 2, that first paragraph.

22   See if that refreshes your memory.

23   A.   Okay.

24   Q.   And does that refresh your memory?

25   A.   Well, I don't specifically recall the part in

Direct - Dittman

1    quotations, but that doesn't -- you know, it's not something

2    that strikes me as at all out of the realm of

3    possibilities.

4                THE COURT:  All right.  Sir, you should review it.

5    Once you're done reviewing it, then turn it over.  You

6    shouldn't be testifying from the document.  You should then

7    testify from your memory as it's refreshed from the

8    document.  All right?

9                THE WITNESS:  Mr. Sibert, we're specifically

10   talking about the quotation, "more cursory than not"?

11               MR. BARNARD:  Your Honor --

12               THE COURT:  Don't read from the document.

13               THE WITNESS:  Sorry, Your Honor.

14   BY MR. SIBERT:

15   Q.   I'm asking you to look at the first paragraph, the

16   sentence that's highlighted and the two sentences

17   underneath.  And as the judge said, don't make any

18   statements until --

19   A.   There are two highlighted sections.

20   Q.   Excuse me?

21   A.   There are two highlighted sections.  I just wanted to

22   make sure --

23   Q.   The first highlighted section on top of the page.

24   A.   And the two sentences next to it?

25   Q.   Yes, sir.

Direct - Dittman

1    A.   Thank you.

2    Q.   Have you had time to refresh your memory?

3    A.   Yes.

4    Q.   I saw that you flipped that document over.  You're not

5    looking at that document anymore.

6    A.   That's correct.

7    Q.   Did that document help refresh your memory?

8    A.   Not really.  I don't remember that specific sentence,

9    but I don't think it's -- it's not unreasonable that I would

10   have said that.  That is more or less how I feel, yes.

11   Q.   And that's how you were describing your testimony

12   before?

13   A.   Yes.

14   Q.   And what was the word?

15           MR. BARNARD:  Your Honor, I'm going to object to

16   "what's the word?"  He said he doesn't recall making that,

17   so it's improper now to use these words --

18           THE COURT:  Yes, I agree.  So his memory's

19   refreshed.  Now with a refreshed memory, if you want to ask

20   him that question again, what is his --

21           MR. SIBERT:  Thank you, Your Honor.

22           THE COURT:  -- present sense, then he can answer.

23           MR. SIBERT:  Thank you.

24   BY MR. SIBERT:

25   Q.   So could you just describe essentially the

Direct - Dittman

1    conversations -- how you -- how you described your
2    conversations with Mr. DiTommaso.
3    A.   Well, we would go through the checklist on the phone
4    and the information on the information and disclosure
5    statement --
6    Q.   I'm not saying what you did, I'm asking how you
7    described it.
8            MR. BARNARD:   Your Honor, I'm -- just to clarify, I
9    am understanding the question is how did he describe it
10   today, is that --
11           THE COURT:   Right.  Sir --
12           THE WITNESS:   I'm sorry, Your Honor.
13           THE COURT:   You've now read this.  Your memory is
14   refreshed --
15           THE WITNESS:   Yes.
16           THE COURT:   Now the question is being re-asked,
17   What is your testimony today?  How would you characterize it
18   today?  And you -- to answer that question, you have the
19   memory you came into the courtroom with, plus what you've
20   read.  With all that together, what is your answer to that
21   question today?
22           THE WITNESS:   Got it.  Yes, they were not
23   enormously in-depth conversations.
24   BY MR. SIBERT:
25   Q.   Fair.  Thank you.  Okay.  Can I have --

1          MR. SIBERT:  And, Your Honor, I'm going to trust

2     the witness, if we could just leave that there overturned --

3          THE COURT:  Or we can have Ms. Frank retrieve it

4     for him.

5          MR. SIBERT:  Thank you.  Can I have Government

6     Exhibit 372-AA published?

7     BY MR. SIBERT:

8     Q.   Do you recognize Government Exhibit 372-AA?

9     A.   Yes.

10    Q.   And let's just start down at the bottom.  Okay.  Here

11    can you tell the jury what e-mail that you're receiving?

12    A.   This is an e-mail from Issuer Services at OTC Markets

13    to myself and Mr. DiTommaso.  Subject is:  "Information

14    Posted to OTC Markets.com for Current Disclosure - Fusion

15    Pharm, Inc., (FSPM)."

16    Q.   And essentially what are they asking here in this first

17    paragraph?

18    A.   They are asking for some additional information

19    required for the attorney opinion letter.

20    Q.   Can you please go to the top of that document and can I

21    just have the bottom part of the top of the e-mail that we

22    just went over.  Can you -- there you go, thank you.

23          I'm sorry; I just forgot to ask you:  What day was

24    this sent?

25    A.   Thursday, December 29, 2011.

667

Direct - Dittman

1    Q.    What's the time?

2    A.    12:11 p.m.

3    Q.    Can you go to the top, please.  Okay.

4          Do you recognize what e-mail you're sending here at

5    the top?

6    A.    Yes.

7    Q.    And what is it?

8    A.    It is -- I'm forwarding the same e-mail for the request

9    for information.

10   Q.    And same date?

11   A.    Same date, yes.

12   Q.    And 2:04 p.m.

13   A.    Correct, a couple of hours later.

14   Q.    Okay.  And who are you sending it to?

15   A.    To Guy Jean-Pierre and Bill.

16   Q.    And then you're telling them what?

17   A.    It says, "Looks like one more?  Or did you get this

18   already?  See below."

19   Q.    So instead of contacting Mr. DiTommaso here, you e-mail

20   your brother-in-law, William Sears, and Guy Jean-Pierre?

21   A.    Yes.  Looks -- oh.

22   Q.    Can I have document 372-Z.  Or -- excuse me, yeah,

23   372-Z.  Can we go to the top here again, please.  Okay.

24         This is another e-mail from you; is that correct?

25   A.    Yes.

1    Q.   And essentially same date?

2    A.   Same date.

3    Q.   Approximately 12 minutes later?

4    A.   Yes.

5    Q.   And so based upon the body of the language -- of the

6    e-mail that you're sending, what did you do after you

7    received this notification from OTC Markets at 12:11 p.m. on

8    the 29th of December?

9    A.   It appears I must have called them to clarify exactly

10   what they were looking for, and then I sent that information

11   to Bill Sears, Mr. Jean-Pierre, Mr. DiTommaso.

12   Q.   Okay.  Can I have 372-SS.  Start in the middle.

13        Okay, sir, you are receiving an e-mail in this.  Do

14   you recognize this e-mail up top here?

15   A.   I do.

16   Q.   And what is this e-mail about?

17   A.   This is Mr. Bodden, Cliffe Bodden, forwarding quarterly

18   report for the period ended June 30, 2012, for review.

19   Q.   Okay.  And he also includes financial statements that

20   end in these two years; is that correct?

21   A.   Yes.

22   Q.   The year back.

23   A.   Yeah, all the financial statements are two-year

24   financial statements.

25   Q.   And what was sent to Mr. Guy Jean-Pierre?

1    A.    Also attached the shareholders list for Guy's review to
2    confirm number of shareholders.
3    Q.    Can you go to the top of the e-mail.  And you're
4    writing an e-mail here; is that correct?
5    A.    Correct.
6    Q.    Okay.  And who are you writing the e-mail to?
7    A.    Mr. Bodden, who sent the first e-mail, and Mr.
8    Jean-Pierre and Mr. Sears.
9    Q.    And what e-mail are you using for Mr. Sears?
10   A.    That's his VertiFresh e-mail.
11   Q.    So you're sending a draft quarterly report to Mr.
12   William Sears at a different company?
13   A.    Yes, apparently.
14   Q.    So why as the CEO would you send a draft quarterly
15   report about your company, a publicly traded company, to
16   your brother-in-law that is now supposedly running a
17   separate company?
18   A.    For the same reason that I sent it to him every quarter
19   before and after that.  He was still updating these things.
20   He probably posted it.  You know, the fact that I used his
21   VertiFresh e-mail, I mean, he wasn't an employee of
22   FusionPharm in the previous quarters either.  And I'm not
23   saying it's right, I'm just saying it didn't occur to me --
24   you know, all these things went to Guy and Bill.
25   Q.    Okay.  So do you think the public, in your opinion,

Direct - Dittman

1    would want to know that you're sending draft quarterly

2    reports?  Do you think it's important for the public, in

3    your opinion, that the public should know that you're

4    sending draft quarterly reports to your brother-in-law that

5    is supposedly running a different company?

6    A.    Important for the public?  No, not particularly, but I

7    don't think it's a good idea.

8    Q.    You don't think, in your opinion, that people would

9    want to know that someone else in a different company is

10   reviewing your -- your public disclosures?

11   A.    Well, it wouldn't -- I mean, no, I don't -- for the

12   public -- for the public market?  I don't -- no, I don't

13   really understand why that would be an issue for the public.

14   Q.    Okay.  Well, I guess more importantly, you copy Mr. Guy

15   Jean-Pierre on this e-mail; is that correct?

16   A.    Yes.

17   Q.    And so now, just like you now, he can see what is being

18   sent.

19   A.    Correct.

20   Q.    And do you know that in the -- in the OTC Markets, that

21   relationships regarding in-laws need to be disclosed?

22   A.    No.  I don't -- I'm not certain that that's true.

23   Q.    Okay.  And since you're not certain, were you -- did

24   you know that in 2011-2013?

25   A.    No.  I did not believe that to be the case.

Direct - Dittman

1    Q.   Okay.  And who did you rely on for that not being the

2    case?

3    A.   Mr. Jean-Pierre and Mr. DiTommaso.

4    Q.   But as we discussed, your conversations were not

5    in-depth with Mr. DiTommaso, correct?

6    A.   Other than the one at Panera, correct.

7    Q.   Okay.  And, in fact, you testified earlier that when

8    you sought legal advice -- and I asked specifically, I asked

9    you between Mr. DiTommaso and Mr. Jean-Pierre, you said the

10   legal advice came from Mr. Guy Jean-Pierre.

11   A.   That's true, correct.

12   Q.   And you would think that what needs to be -- would you

13   consider what needs to be put into an OTC report or

14   disclosure to the public, the terms and the understandings,

15   and what parties need to be listed, is that something that

16   you would rely on for -- by Mr. Guy Jean-Pierre?

17   A.   Yes.

18           MR. SIBERT:  I'm sorry, Your Honor, my exhibits

19   dropped here.

20           Have that taken down, please.  Can I have

21   Government Exhibit 372-SS.  I'm sorry -- I'm sorry, I just

22   did that one.  Can I have Government Exhibit 263.

23   BY MR. SIBERT:

24   Q.   Okay.  Let's go and start in the middle of this

25   document.  Okay.  Now, do you recognize this e-mail that I'm

Direct - Dittman

1    circling on the screen?

2    A.    I do.

3    Q.    Okay.  And who's this e-mail -- what's this e-mail

4    about?

5    A.    This is from Cliffe Bodden to myself, Bill Sears, Mike

6    Kocinski, and Mr. Jean-Pierre.  It is -- appears to be a

7    draft quarterly report for September 30, 2012.

8    Q.    Okay.  Now, this is -- did you say Cliffe Bodden?

9    A.    Yes.

10   Q.    Do you know why it is from Randy Bodden?

11   A.    I think Cliffe is his -- the name he goes by.  Randy, I

12   think, is his formal name.

13   Q.    Okay.  So just same person, though?

14   A.    Same person, yes.

15   Q.    So Randy Bodden, Cliffe Bodden --

16   A.    Same guy, yes.

17   Q.    So now, as you stated, we're talking about the

18   quarterly reports, again from September, 2012; is that

19   right?

20   A.    Yes.

21   Q.    And those were the ones we just discussed in the

22   previous exhibit.

23   A.    Okay, yes.

24   Q.    Do you need to look at that exhibit again?

25   A.    No, I'll trust you.  I wasn't paying attention to what

Direct - Dittman

1    time period, but that's -- okay.

2    Q.   Okay.  And do you recall the date of that e-mail from

3    the previous exhibit?

4    A.   December something of -- December -- late December.

5    Q.   All right.  Let's just bring that back up real quick.

6    Can I have Government Exhibit 372-SS.

7    A.   I guess -- is he -- that's a different time period.

8    This is June 30th.  The next one you're on is September 30.

9    Q.   September 30, okay.  But that e-mail was from August

10   8th, 2012?

11   A.   Yes.

12   Q.   Okay.  Can I have 263 again.

13        And now we're in November; is that correct?

14   A.   Yes.

15   Q.   Can you blow -- actually, let me go back down here.  So

16   we're talking about the next quarterly report.

17   A.   Yes.

18   Q.   All right.  And that's what's being sent; is that

19   right?

20   A.   Correct.

21   Q.   All right.  And, again, who are the parties that are

22   receiving this?

23   A.   Myself; Mr. Sears; Mr. Kocinski, the accountant; and

24   Mr. Jean-Pierre.

25   Q.   Okay.  And, again, we're using Mr. Sears' VertiFresh

1    e-mail account, correct?

2    A.    Yes.

3    Q.    And VertiFresh is Mr. Sears' company, right?

4    A.    Correct.

5    Q.    All right.  And then we're e-mailing Mr. Guy

6    Jean-Pierre, the defendant in this case, correct?

7    A.    Yes.

8    Q.    No Mr. DiTommaso.

9    A.    No.

10   Q.    Okay.  Can we go to the top, please.  All right.

11          So now do you recall the last exhibit was the

12   August 8th time frame, 2012, correct?

13   A.    Yes.

14   Q.    So this is essentially, oh, roughly three months later.

15   A.    Yes.

16   Q.    Is that correct?

17   A.    That's correct.

18   Q.    And you're writing this e-mail?

19   A.    Yes, I am.

20   Q.    Who are you sending the e-mail to?

21   A.    Mr. Bodden, looks like -- looks like the last one, sir,

22   Mr. Bodden, Mr. Sears, Mr. Kocinski, and Mr. Jean-Pierre.

23   Q.    Okay.  And then regarding -- again, we're using Mr.

24   Sears' VertiFresh e-mail.

25   A.    Yes.

1    Q.    So now we have two quarters where you're disclosing

2    FusionPharm's quarterly reports to your brother-in-law that

3    is with a different company.

4    A.    Yes.

5    Q.    Drafts.

6    A.    Yes.

7    Q.    For your public company.

8    A.    Yes.

9    Q.    And all that is being shown to your corporate counsel

10   that you rely on legal advice with.

11   A.    Yes.

12   Q.    Can I have Government Exhibit 372-VV.  And so let's

13   start down here, please.

14         Now, you're cc'd on the bottom e-mail; is that

15   correct?

16   A.    Yes.

17   Q.    And what does this e-mail -- what is this e-mail

18   about?

19   A.    This is Mr. Kocinski sending a statement that I

20   believe -- that needed to be uploaded to OTC Markets, or

21   maybe included as part of the information and disclosure

22   statement.

23   Q.    Okay.  And who's he sending it to?

24   A.    To Guy and cc'ing myself -- sorry, Mr. Jean-Pierre and

25   cc'ing Bill Sears, myself, and Cliffe Bodden.

1    Q.   Now we're over three months with this e-mail; is that
2    correct?
3    A.   Since the -- since the August e-mail, yes.
4    Q.   Okay.  And so we saw two previous examples that were
5    prior to this e-mail with Mr. William Sears.  Do you recall
6    what that e-mail address was?
7    A.   The last one was his VertiFresh e-mail.
8    Q.   And the one before?
9    A.   Also VertiFresh, I believe.
10   Q.   Okay.  And now you have the outside accountant that you
11   hired e-mailing Mr. William Sears at what e-mail address?
12   A.   The FusionPharm e-mail address.
13   Q.   Three months later from when Mr. Sears was using the
14   VertiFresh e-mail.
15   A.   Yes.
16   Q.   And I guess for this case, who also knows about this?
17   A.   Mr. Jean-Pierre.
18   Q.   I guess -- why is Mr. Sears having a FusionPharm
19   address if he has his own company VertiFresh?
20   A.   I suspect that's a carryover from back in 2011 when he
21   had it.  And I suspect Mr. Kocinski -- probably just was the
22   first thing that filled in when he, you know, started typing
23   the e-mail address, would be my guess.
24   Q.   Okay.  Let's talk about what's being sent.  Could you
25   explain to the jury what is being sent to Mr. Guy

1    Jean-Pierre that you're copied on.

2    A.    It's a -- you want me to read the subject or the

3    e-mailed body or --

4    Q.    Could you just explain what the -- what essentially --

5    if you understand -- I'm assuming you understand GAAP, being

6    the prior CPA, could you --

7    A.    I understand what GAAP is, yes.

8    Q.    Can you tell the jury what Mr. Kocinski is sending you

9    here in the body.

10   A.    Yes, he's sending a statement that states that the

11   financial statements were prepared in accordance with

12   GAAP.

13   Q.    What does that mean to you?

14   A.    That means that he reviewed the financial statements

15   and he thinks they're properly prepared.

16   Q.    And he goes on -- he goes on to say what?

17   A.    "I'm an accountant that has been providing accounting

18   services for over 25 years.  Please let me know if you need

19   anything further."

20   Q.    He's an accountant.  Do you know anything about his

21   background?

22   A.    I don't.

23   Q.    Do you know if he's a CPA?

24   A.    I don't.

25   Q.    You don't know anything about the outside services,

1  accounting service, that you're relying on for your company?

2  A.   I might assume that he's a CPA, but I don't want to say

3  that here as I'm sitting here.  He's running an accounting

4  firm and he was the accounting firm that did it for the

5  previous public company that was the same public company, so

6  I didn't have a whole lot of reason to doubt his credibility

7  coming into it.

8  Q.   Okay.  And can you go to the top of that document,

9  please.  Okay.

10       Essentially this is an e-mail by you; is that

11  correct?

12  A.   Yes.

13  Q.   And that's to Mr. Guy Jean-Pierre?

14  A.   Correct.

15  Q.   Okay.  And then -- only to him; is that correct?

16  A.   Yes.

17  Q.   All right.  And then -- so what are you telling Mr. Guy

18  Jean-Pierre about?

19  A.   Just forwarding the accountant's statement as

20  requested.

21  Q.   Okay.  But if you go down below, we also have him in

22  this e-mail as well, right?

23  A.   Correct.

24  Q.   Did you ever --

25       Can I have that taken down?

1   Did you -- obviously when it comes to accounting,

2   you would agree that there's a lot of documents?

3   A.   In accounting in general?

4   Q.   Yes.

5   A.   Yes.

6   Q.   Okay.  When you're doing more -- so more documents for

7   a company or for an individual filing dealing with

8   accounting purposes?  Based upon your experience.

9   A.   Well, generally, a company, I would say.

10  Q.   Did you ever send, yourself, Mr. Kocinski the documents

11  for him to do the quarterly and annual financial reports?

12  A.   Did I ever send Mr. Kocinski --

13  Q.   FusionPharm corporate documents for him to do the

14  reports, like the one he sent you in this previous exhibit.

15  A.   He didn't -- I never sent him -- he didn't prepare the

16  reports, he only reviewed the reports.

17  Q.   Okay.  So did he have any documents, do you know?

18  A.   He --

19  Q.   Corporate documents?

20  A.   Depend -- I'm not sure what you mean by "corporate

21  documents."  You mean like Articles of Incorporation or are

22  you talking about specific things that are in the

23  financials?  I'm not sure what you mean, Counselor.

24  Q.   Did you ever send him financial documents relating to

25  FusionPharm in the business that happened in between the

1    quarters and at the end of the year for Mr. Kocinski to

2    review and use when he was reviewing your report?

3    A.    Sometimes, but not frequently.

4    Q.    What would you send him?

5    A.    I don't recall specifically.  I recall the -- needing

6    for him to book my depreciation at one point and sending him

7    a list of what was in the depreciable assets.  I don't

8    know -- I don't specifically recall anything else, but if he

9    needed to see something, I certainly would have sent it to

10   him.

11   Q.    So you sent him a list?

12   A.    Well --

13   Q.    At least one time?

14   A.    Anything he wanted to see, you know.  If he asked me

15   for something, I would certainly send it to him.

16   Q.    But he had to ask you; you never took the initiative to

17   send him the financials?

18   A.    Well, I sent him the financial statements, but I didn't

19   send him all the QuickBooks, if that's what you're asking,

20   or the stuff, like that, no.  He wasn't -- he didn't do the

21   detailed accounting.

22   Q.    Okay.  QuickBooks.  What are QuickBooks?

23   A.    QuickBooks are a software program that keeps track of

24   business finances.

25   Q.    Okay.  Essentially the accounting records for a

Direct - Dittman

1   corporation?

2   A.   Yeah.

3   Q.   Now, you're a CPA.

4   A.   I was 20 years ago.

5   Q.   Okay.  All right.  But when you prepared financials,

6   you needed records; would you agree with me on that?

7   A.   Yes.

8   Q.   Did you ever send QuickBooks to Mr. Kocinski?

9   A.   No.

10  Q.   Can I have 372-WW.  I'm going to start down at the

11  bottom.

12          Do you recognize the e-mail at the bottom of the

13  document 372-WW?

14  A.   Yes.

15  Q.   And what is this e-mail?

16  A.   That's an e-mail from myself to Mr. Jean-Pierre.

17  Subject:  "E-mailing officer/director questionnaire,

18  11-14-2012."

19  Q.   Okay.  And essentially the body is, you're saying --

20  you're giving a "thank you" to Mr. Guy Jean-Pierre?

21  A.   Yeah, apparently I'm sending him a draft for him to

22  look at or something he wanted to look at.

23  Q.   And you know that because of the body?

24  A.   Yes.

25  Q.   Mr. DiTommaso's not on this e-mail.

1    A.    That's correct.

2    Q.    Can you go up to the top, please.  And can you tell me

3    what the reference of the e-mail at the top is.

4    A.    I'm sorry, what the reference?  What --

5    Q.    Or can you tell me about the e-mail on the top of this

6    document?

7    A.    Okay.  From myself to Mr. Jean-Pierre, cc'ing Bill

8    Sears, also about the officer/director questionnaire for the

9    same time period.  Maybe when I sent it the first time -- it

10   looks like from the body of the e-mail it wasn't legible so

11   maybe Guy had requested it again.

12   Q.    Okay.  And so you're saying this officer/director

13   questionnaire is relating to FusionPharm?

14   A.    Yes.

15   Q.    Where you're the CEO?

16   A.    Yes.

17   Q.    And logically, you're sending it to your lawyer for the

18   corporation; is that right?

19   A.    Yes.

20   Q.    But you also sent it to your brother-in-law, Mr.

21   William Sears.

22   A.    Yup.

23   Q.    Okay.  So -- and look at the date here, November 29th,

24   2012.

25   A.    Yes.

1    Q.   Again, over, now, almost four months where Mr. Sears is

2    using a VertiFresh e-mail for his company; however, as the

3    CEO, you're still informing your brother-in-law about --

4    you're still informing your brother-in-law; is that

5    correct?

6    A.   Yes.  That's not his VertiFresh, that's his personal

7    e-mail, but yes.

8    Q.   But you're telling your brother-in-law about what's

9    going on at VertiFresh dealing with the -- your role as a

10   CEO?

11   A.   Well, I'm cc'ing him on the correspondence that

12   ultimately would be going back and forth between Guy and Mr.

13   DiTommaso and whomever, which I often did.  He --

14   Q.   Where is Mr. DiTommaso in this e-mail?

15   A.   He's not included in this one.

16   Q.   All right.  And, in fact, you sent it -- you send this

17   e-mail to your lawyer; so the same e-mail that you're

18   relying on your lawyer, you send to your brother-in-law.

19   A.   He is cc'd, yes.

20   Q.   Can I have page 3, please, of that exhibit.

21        So this is for the end of November, I assume -- or,

22   excuse me, the end of September 30th, 2012, that needs to be

23   disclosed.  Can you just tell the jury essentially what

24   you're checking "yes" to.

25   A.   It says, if -- previously it says "Have you read the

1    proposed disclosure statement and accompanying financial

2    statements for the period ended September 30, 2012, for

3    FusionPharm, Inc?  If yes, do you believe, after appropriate

4    due diligence, that all statements and information contained

5    therein are accurate in all respects?"

6    Q.    And you checked yes.

7    A.    Correct.

8    Q.    Can I have 372-ZZ.

9          Okay, sir, can you tell me what this e-mail is

10   about.

11   A.    That is from me to Bill Sears, Cliffe Bodden again, Mr.

12   Jean-Pierre.  The subject is Reg A, and there's an

13   attachment.

14   Q.    And do you know what that attachment is?

15   A.    Presumably the Reg A.

16   Q.    Okay.  Do you know what Regulation A is?

17   A.    At the moment, no.

18   Q.    Okay.  Let me just have page 1 quickly of the

19   attachment.  Does that refresh your memory?

20   A.    Yes.

21   Q.    And what is it?

22   A.    It's a securities offering document.

23   Q.    Okay.  Can I have back the -- thank you.

24         Now, again, let's just talk about who are you

25   sending this securities regulation document to.

Direct - Dittman

1    A.    To Mr. Sears, Mr. Bodden, and Mr. Jean-Pierre.

2    Q.    Okay.  And, again, is Mr. DiTommaso on this e-mail?

3    A.    No.

4    Q.    Okay.  And -- but Mr. Guy Jean-Pierre is; is that

5    right?

6    A.    Yes.

7    Q.    Okay, again, now we're on December 18th, 2012, when you

8    sent this e-mail, right?

9    A.    Yes.

10   Q.    Now we're over four months of the August e-mail that we

11   had VertiFresh for your brother-in-law, Mr. Sears; is that

12   right?

13   A.    Yes.

14   Q.    So now, again, you're e-mailing your brother-in-law at

15   VertiFresh dot -- at VertiFresh; is that right?

16   A.    Yes.

17   Q.    So you're sending him a security regulation form for

18   your brother-in-law at a different company.

19   A.    Yeah.

20   Q.    And that's the same form that you're sending to your

21   corporate counsel at VertiFresh.

22   A.    Yeah.  I suspect that -- I don't know.  I -- I suspect

23   probably that Bill and Cliffe filled it out or wrote it in

24   the first place.

25   Q.    Do you know?

Direct - Dittman

1    A.    Do I know?  No, I don't know.

2    Q.    Let me ask you this question:  When was it that Mr. Guy

3    Jean-Pierre was not FusionPharm's legal counsel?

4    A.    Sometime -- excuse me, sometime in the early -- first

5    half of 2013.

6    Q.    First half of 2013.

7    A.    Yup.

8    Q.    I've got to grab a sip of water, so if you need . . .

9          And -- I'll come back to that time frame.

10         The first half of 2013.  Can I show the witness

11   Exhibit 395.

12         And, sir, if you need -- I'm going to flip through

13   a couple of these pages here, so if you can't see, let me

14   know.  But do you recognize what Government Exhibit 395 is?

15   A.    That is the annual information and disclosure statement

16   for the December 31, 2012.

17   Q.    So this would be the information and disclosure

18   statement that covers the whole 2012 time frame.

19   A.    Correct.

20   Q.    Can I please have page 12.  And can I have the top of

21   it, please.

22         Now, do you need to know what section this is

23   under?

24   A.    I don't think so.

25   Q.    Do you know where Mr. Guy Jean-Pierre is listed as

1   legal counsel?  What section it's under?

2   A.   No, not off the top of my head.

3   Q.   Can I have page 11.  Can I have the bottom of it.

4   Excuse me, I'm sorry, mid-point.

5        Do you remember discussing this previously?

6   A.   I do.

7   Q.   Okay.  Do you recall the section now?

8   A.   I do.

9   Q.   And what section is that?

10  A.   Management Structure and Financial Information.

11  Q.   Okay.  And then -- can I have that next page, please.

12       So I guess my follow-on question is:  Who's listed

13  as your legal counsel?

14  A.   Mr. Jean-Pierre.

15  Q.   And that's different than corporate secretary.

16  A.   It is.

17  Q.   Okay.  Can I have page -- or, excuse me, can I have

18  Exhibit 25.

19       And, again, do you recognize what's been marked as

20  Government Exhibit 25?

21  A.   Appears to be the same thing, the December 31st, 2012,

22  information and disclosure statement.

23  Q.   Okay.  Can I have page 11, please.

24       THE COURT:  Hold on, I'm confused.  Why does the

25  same document have two different exhibit numbers?

Direct - Dittman

1           MR. SIBERT:  If the Court would entertain my

2    questioning a little bit more, I believe the Court will --

3    the question will be answered.

4           THE COURT:  All right.  So it's your representation

5    that they're not the same document.

6           MR. SIBERT:  That's correct.

7           THE COURT:  All right.  Go ahead.

8    BY MR. SIBERT:

9    Q.   Okay.  Again, do you recall Section D?

10   A.   I do.

11   Q.   Okay.  And, again, where is your legal counsel in this

12   document?

13   A.   Unless he's below that I can't see, he appears to not

14   be there any longer.

15          THE COURT:  Hold on, hold on.  You're asking him

16   questions to be looking through a document.  Are you -- so

17   that means he needs the actual physical exhibit in front of

18   him if you want him to be looking through a document to see

19   where he finds something.

20          MR. SIBERT:  Okay.

21   BY MR. SIBERT:

22   Q.   Well, let me rephrase my question.  Under part D of the

23   management structure for FusionPharm, do you have a legal

24   counsel listed?

25          MR. BARNARD:  Your Honor, could we have designated

1    what document we're talking about and what page we're on?

2    I'm confused.

3            THE COURT:  All right.  I think with multi-page

4    documents, if you're going to be asking questions that it's

5    not clear what page it's on, I would prefer for the witness

6    to have the paper documents so you have the whole document

7    in front of you.

8            If you need -- if you think in order to answer a

9    question you need to look at the entirety of the document or

10   more of the document than just what's on the screen, go

11   ahead and do so.  So my courtroom deputy is going to get

12   that for you.

13           And to Mr. Barnard's point, Mr. Sibert, what page

14   are we talking about?

15           MR. SIBERT:  As I stated, we're looking at

16   Government Exhibit 25, page 11.

17           THE COURT:  All right.

18           MR. SIBERT:  Or, excuse me, page -- yeah, page 11.

19   Government Exhibit 25.

20           THE COURT:  All right.  Then your question is?

21   BY MR. SIBERT:

22   Q.   Sir, have you had time to review that document as the

23   Court requested?

24   A.   Yes, page 11 and 12, yes.

25   Q.   Page 11 and 12, that's of document 25.

Direct - Dittman

1    A.   Yes.

2    Q.   Okay.  Now, as you testified, is the annual disclosure

3    statement from 2012 in document 25?

4    A.   Yes.

5    Q.   Do you have a legal counsel listed under Directors and

6    Management as we looked at in the prior exhibit?

7    A.   On this one, no.

8    Q.   Who's the only officer and director listed?

9    A.   Myself.

10   Q.   Do you know why Mr. Guy Jean-Pierre was removed from

11   this annual disclosure in 2012?

12   A.   I don't from memory, but I can surmise an answer to

13   that question.

14   Q.   Well, I guess the -- I'm asking you based upon what you

15   remember.  Do you know why he was removed from the annual

16   disclosure of FusionPharm in 2012?

17   A.   No, I don't remember.  I don't remember the change.  I

18   don't remember this, no.

19   Q.   Did it have something to do with the SEC complaint?

20   A.   I would --

21            MR. BARNARD:  Your Honor, object.  Leading.

22            THE COURT:  Sustained.

23   BY MR. SIBERT:

24   Q.   Did you learn anything else besides Mr. Jean-Pierre's

25   issues with the Florida State Bar?

691

Direct - Dittman

1   A.   Yes.

2   Q.   What did you learn?

3   A.   Yeah, I learned that he had an SEC issue in the early

4   part of 2013.

5   Q.   And as you had testified before, there's a little bit

6   of lag time when it comes to the filing of these

7   documents?

8   A.   Yup.

9   Q.   Do you recall now why Mr. Guy Jean-Pierre was not put

10  in his annual disclosure -- in your annual disclosure

11  statement for FusionPharm?

12  A.   I don't recall it at the time, Mr. Sibert, but, again,

13  I can imagine why he was removed.

14  Q.   And what is your belief of why he was removed?

15  A.   Well --

16       MR. BARNARD:   Your Honor, I object to

17  speculation.

18       THE COURT:   Right.   Don't speculate or guess, sir.

19       THE WITNESS:   Sorry, Your Honor.

20       THE COURT:   Testify from personal knowledge.

21  BY MR. SIBERT:

22  Q.   You can't remember?

23  A.   I don't -- I don't specifically remember.

24  Q.   Okay.

25  A.   No.

Direct - Dittman

1    Q.   Okay.  Can you blow up the Legal Disciplinary Action?

2         Now, you recall this section as well; is that

3    correct?

4    A.   Yes.

5    Q.   Is anyone disclosed under Legal Disciplinary History?

6    A.   No.

7         MR. BARNARD:  Your Honor, which exhibit are we on?

8         MR. SIBERT:  Same exhibit.

9         THE COURT:  I'm assuming we're still on 25.

10        MR. BARNARD:  Still on 25.

11        MR. SIBERT:  We're just right below where we were.

12        THE WITNESS:  No.

13        MR. SIBERT:  Could I have a minute, Your Honor?

14        THE COURT:  You may.

15   BY MR. SIBERT:

16   Q.   Okay, sir, let's go back to Exhibit 25.  I just want to

17   look at page 12.

18        Can you blow up the top, please.

19        All right.  Do we have any disclosures relating to

20   party transactions?

21   A.   No.

22   Q.   And can we go down that page to Beneficial Owners.  Do

23   you see this document here?

24   A.   I do.

25   Q.   Okay.  And can we just look at the preferred shares

Direct - Dittman

1    here.

2    A.    Yes.

3    Q.    Okay.  And who is basically owning all of the preferred

4    shares as the corporation?

5    A.    Still myself and my little brother, Robert Dittman.

6    Q.    All right.  Now you have to sign an officer disclosure

7    statement that these things are correct; is that correct?

8    A.    That's correct.

9    Q.    These disclosures are correct.  And you also sent them

10   to Mike -- you actually pay Mike Kocinski down -- he was in

11   Florida; is that right?

12   A.    Yes.

13   Q.    Did you pay him for his services to review these?

14   A.    Some -- sometimes, yes.

15   Q.    Can you tell me if this math makes sense?

16   A.    No, it looks like an addition error in the bottom

17   column.

18   Q.    Can you go to page 14, please.  I just want to spend a

19   minute here.  You're dealing with -- as you stated before,

20   these disclosure statements deal with revenue and your

21   finances of FusionPharm; is that right?

22   A.    Some of it, yes.

23   Q.    All right.  Well, here you're reporting in 2012 a

24   revenue of $808,000 -- or, excuse me, $808,398.  Is that

25   correct?

Direct - Dittman

1    A.   Yes.

2    Q.   And based upon this report, that's an increase of 255

3    percent from last year.

4    A.   Yes.

5    Q.   Can we please go to page 10 of Government Exhibit 25.

6    Can you zoom in on that.

7         Now, do you see a paragraph F here?

8    A.   I do.

9    Q.   The first sentence states, "The issuer's largest" co

10   company.  When we're talking about the issuer --

11            THE COURT:  It's customer.  Largest customer.

12   BY MR. SIBERT:

13   Q.   Excuse me.  Customer.  Who's the issuer?

14   A.   FusionPharm.

15   Q.   Okay.  And who's FusionPharm's largest customer?

16   A.   VertiFresh.

17   Q.   And as you testified before, VertiFresh is whose

18   company?

19   A.   VertiFresh was owned by Bill Sears.

20   Q.   Okay.  And it accounted for 90.8 percent of your

21   revenue for 2012 is what this statement states; is that

22   correct?

23   A.   Yes.

24   Q.   Can you go up, please.  I need paragraph -- oops, here,

25   I'll circle it.

Direct - Dittman

1        In fact, it states it was March -- when did you

2   enter an exclusive licensing agreement with VertiFresh?

3   A.   March 2012.

4   Q.   So in about 10 months, your brother-in-law's company

5   accounted for 90 percent of your revenue in 2012 for

6   FusionPharm?

7   A.   Yes.

8   Q.   Based upon this document.

9   A.   Yes.

10  Q.   And can we look at Meadpoint.  You entered a licensing

11  agreement with them; is that correct?

12  A.   Yes.

13  Q.   That was even later, in November 2012, correct?

14  A.   Yes.

15  Q.   Meadpoint Venture Partners is the company.

16  A.   Yes.

17  Q.   A company that your FusionPharm entered a licensing

18  agreement into, right?

19  A.   Correct.

20  Q.   Who owns Meadpoint?

21  A.   Bill Sears and his mother, Sandra.  At this point.

22  Q.   I'm sorry, I want to go back to Government Exhibit 25.

23       Can I have page 21 of Government Exhibit 25.

24       Now, sir, do you recognize page 21 of Government

25  Exhibit 25?

Direct - Dittman

1    A.   It appears to be the balance sheet.

2    Q.   Let's blow it up.

3    A.   Yes.  Balance sheet from December 31st, 2012.

4    Q.   And you're familiar with a balance sheet, being a prior

5    CPA, right?

6    A.   Yes.

7    Q.   Okay.  Can we go down to Liabilities and Stockholders

8    Equity.  Can you just tell me what the long-term liabilities

9    are.

10   A.   That's a notes payable to -- do you want to know who to

11   or you just want to know what it is?

12   Q.   I just want to know how the long-term liabilities are

13   listed.

14   A.   As a notes payable.

15   Q.   Okay.  Thank you.

16        Okay.  And then can we go back up, please.  What is

17   cash for FusionPharm?  What is your cash balance for

18   FusionPharm at the end of 2012?

19   A.   $340.

20   Q.   So that's not $340,000.

21   A.   Nope.

22   Q.   $340.

23   A.   All of these numbers are in exact numbers, yes.

24   Q.   So your company in 2012 did not have any cash.

25   A.   It had $340.

Direct - Dittman

1   Q.   And you would -- you would agree with me that's not a
2   lot of cash for a company.
3   A.   That's not a lot of cash for a company.
4   Q.   Okay.  Thank you, sir.
5            Can I have page 10 on that exhibit, please.
6            And, again, remember this section we went through
7   about related party transactions?
8   A.   Yes.
9   Q.   VertiFresh wasn't listed; would you agree with that?
10  A.   Correct.
11  Q.   And neither was Meadpoint?
12  A.   Correct.
13  Q.   Even though you had licensing agreements with
14  VertiFresh and Meadpoint.
15  A.   Correct.
16  Q.   And even though you had -- even though VertiFresh was
17  90 percent of your revenue for 2012?
18  A.   Correct.
19  Q.   Can I ask you:  Where did your brother-in-law get
20  $720,000 to basically pay you -- pay your company as
21  revenue?
22  A.   Was 750,000, not to split hairs, but just so we're
23  accurate.
24  Q.   I'll take the bigger amount.
25  A.   Yeah, exactly.  And the amount that he actually put

Direct - Dittman

1    into the company that he actually paid in that year was only
2    250,000.  The rest of it is notes receivable that you can
3    see back on the balance sheet of $500,000.

4              So the way this agreement worked, it was a
5    three-location agreement, Colorado being first.  So he paid
6    $250,000 for Colorado and the rest was to be done down the
7    road.

8    Q.   So you're filing revenue for the public to see, for
9    your corporation, you're booking revenue for 2012 that your
10   company doesn't even have.

11   A.   Well, yes, we booked the revenue and the receivable and
12   disclosed the nature of the agreement.  I'll grant you, Mr.
13   Sibert, that we restated this in 2014 when my new CFO, Craig
14   Dudley, thought it was too aggressive.  We went back and
15   voluntarily corrected this before the Government raid, by
16   the way.

17   Q.   Okay.  But at the time your legal counsel is reviewing
18   these documents, as you testified to, you booked over --
19   about $500,000 of revenue that FusionPharm didn't even have.

20   A.   Have, yes.  But that's why you put a receivable on the
21   books.  The question might be better asked "earned" rather
22   than "have."

23   Q.   But how is it booked?

24   A.   It was booked as revenue.

25   Q.   And I think you've answered me, but did your corporate

1    counsel, Mr. Guy Jean-Pierre, review this annual report?

2    A.   I'm sure he did.  I'm sure he was included.

3    Q.   So -- and going back to the money, where did Billy

4    Sears get the $250,000 to pay you in 2012?

5              MR. BARNARD:  Your Honor, foundation.

6              THE COURT:  We'll get to this quicker:  If you

7    know.  Don't speculate or guess.

8              THE WITNESS:  I know that -- I may not be able to

9    say all of it, but I know that most of it came from his sale

10   of FusionPharm stock.

11   BY MR. SIBERT:

12   Q.   So as you already stated, FusionPharm stock wasn't

13   doing -- wasn't lighting up the skies when it came to the

14   price.  In fact, you pushed back when it got up to the 2 to

15   $3 point.  So for Mr. Sears to provide you, would you say a

16   majority of that 250 came from Sears?

17   A.   I'm sure, yes.

18   Q.   Okay.  So essentially, Mr. Sears, just based upon your

19   testimony -- how many shares of stock, approximately, would

20   Mr. Sears had to sell to be able to fund you $250,000?

21   A.   Depends exactly on the price that they were sold,

22   obviously, but if the stock was between a dollar and 2 in

23   that time frame, then it was probably somewhere in there,

24   you know, a hundred to 200,000 shares.

25   Q.   A hundred to 200,000 common shares of FusionPharm

1    stock.

2    A.   Yes.

3    Q.   That he put back into your company, FusionPharm.

4    A.   That he used to purchase assets from the company, which

5    was an important distinction made by Mr. Jean-Pierre.

6    Q.   But that was never disclosed it was your

7    brother-in-law.

8    A.   Correct.

9    Q.   And, again, when you relied on what needed to be filed

10   in the OTC Markets regarding disclosures and to the legal

11   issues, who did you refer it to?

12   A.   Mr. Jean-Pierre.

13   Q.   And would that include related parties?

14   A.   Certainly.  We discussed this one in great detail.

15   Q.   How about related party transactions?

16   A.   Yes.

17   Q.   And what would you describe the licensing agreement

18   between you FusionPharm, and your brother-in-law VertiFresh?

19   A.   I understood it to not qualify as a related party

20   transaction.

21   Q.   And who gave you that advice?

22   A.   Mr. Jean-Pierre.  And other counsel as well.  Mr.

23   DiTommaso didn't disagree when I explained that to him.

24   Q.   Okay.  But like -- as we've talked about, you didn't go

25   into detail with Mr. DiTommaso, did you?

Direct - Dittman

1    A.   When I met with him --

2    Q.   You met with him one time in 2011 --

3             MR. BARNARD:   Your Honor, if the witness can finish

4    his sentence --

5             THE COURT:   Please let him --

6             THE WITNESS:   That's fair.   That would have been

7    before VertiFresh.   That's a fair point.

8    BY MR. SIBERT:

9    Q.   Fair point?

10   A.   Yes.

11   Q.   VertiFresh didn't exist.

12   A.   No, didn't exist, correct.   Well, different issue, but

13   you're correct.

14   Q.   So what are you saying I'm correct on?

15   A.   Yes, I wouldn't have spoken in detail with Mr.

16   DiTommaso about VertiFresh.

17   Q.   So the only legal advisor that you were relying on was

18   your corporate counsel, the defendant, Mr. Guy

19   Jean-Pierre?

20   A.   For VertiFresh, yes.

21   Q.   Can I have Government Exhibit 394.

22             Sir, can you just -- can you just take a look at --

23   I'm not sure if he can see it, but I'll just kind of blow it

24   up for you.   Can you shrink it in a little bit?

25             Okay.   So do you recall this e-mail?

1    A.    I recall seeing it, yes.

2    Q.    Okay.  And essentially, can you tell the jury what this

3    e-mail is about.

4    A.    This is an e-mail from myself dated Wednesday, the 13th

5    of February, 2013, to David Roy, Bill Sears, and Mr.

6    Jean-Pierre.

7    Q.    Okay.  So I'm going to ask you:  No Mr. DiTommaso.

8    A.    No.

9    Q.    Okay.  And, again, we're talking to Mr. William Sears

10   at VertiFresh.

11   A.    Yes.

12   Q.    And we're talking about FusionPharm.

13   A.    Yes, we're talking about Mr. Roy's stock certificate,

14   specifically.

15   Q.    So you're talking to your brother-in-law, that you've

16   now stated at least he's cc'd on this, regarding FusionPharm

17   stock with a Mr. David Roy.

18   A.    Well, yeah, converting Mr. Roy's certificate, yes.

19   Q.    Well -- and then I just want to point out here, who is

20   the legal counsel for FusionPharm?

21   A.    Mr. Jean-Pierre.

22   Q.    And you actually state that to Mr. Roy; is that

23   correct?

24   A.    Yes.

25   Q.    And this is February 2013.

Direct - Dittman

1    A.    Yes.

2    Q.    And, in fact, Mr. David Roy had a previous conversation

3    with Mr. Sears regarding his FusionPharm certificates or

4    stocks.

5    A.    Yeah, I think this is the top of a long-ish string of

6    e-mail, mostly between David Roy and Bill.  I think this

7    is -- I think, as it says here, Bill went on vacation and I

8    tried to jump in.  David Roy is my cousin Chad's business

9    partner and kind of a friend of Bill.

10   Q.    Can I have 372-FF.  Can we focus in on the middle.

11         Do you know who Ms. Martin is from Pacific Stock

12   Transfer?

13   A.    Yes.

14   Q.    Okay.  And let me do this:  Let's go ahead -- do you

15   know what the importance of the e-mail was with Mr. Sears

16   and Ms. Martin?

17   A.    I don't, no.

18   Q.    Okay.  Can we go to the top.

19         Now, you're cc'd on this e-mail; is that correct?

20   A.    Yes.

21   Q.    And do you know why you're being cc'd on this e-mail?

22   A.    Presumably because they're asking the -- or have gotten

23   a shareholder report for the period ending March 31st, 2012,

24   from the transfer.

25   Q.    Okay.  Who is Mr. Sears e-mailing?

1    A.    Myself, Mr. Jean-Pierre.

2    Q.    Okay.  And so no Mr. DiTommaso.

3    A.    No.

4    Q.    And, again, we're here in May 2012; is that correct?

5    A.    Yes.

6    Q.    And Mr. Sears is still involved with FusionPharm

7    issues.

8    A.    Yes.

9    Q.    And, sir --

10            MR. SIBERT:  Excuse me, Your Honor; I might have

11   misspoke.  I think I said 372-FF.  That was Exhibit 372-FFF.

12            THE COURT:  All right.  Thank you for that

13   clarification.

14            MR. SIBERT:  I apologize.

15   BY MR. SIBERT:

16   Q.    And as we have seen in several e-mails --

17            Actually, I need -- I'm sorry.  I think my

18   courtroom help actually put up 372-FF.  Can I have 372-FFF.

19   I apologize.  Can I have the middle e-mail, please.

20            Okay.  Here, you're sending an e-mail to a Mike.

21   Do you know who -- oh, Mike Kocinski; is that correct?

22   A.    Yes.  Mike Kocinski, yes.

23   Q.    Okay.  What's this about?

24   A.    Subject is "December 31st, 2012 Financials."

25   Q.    So this would be the -- is this the end of the year of

1    2012 financials or would this be the end of the quarter in

2    September?

3    A.   Well, same thing.  Yes to both questions.  Not

4    September, this is -- this would be 12-31 quarter and

5    annual.

6    Q.   Okay.  And who's being e-mailed?

7    A.   Mr. Sears, Mr. Jean-Pierre, and myself -- no, I'm

8    sorry, that's me sending it to Mr. Kocinski and then cc'ing

9    Bill and Mr. Jean-Pierre.

10   Q.   Right.  And you're actually sending again another draft

11   to Mr. Sears at VertiFresh.

12   A.   Yup.

13   Q.   Can we go to the top, please?

14   A.   Looks, actually, Counselor -- sorry, it looks like I'm

15   responding to something because it's an RE.

16   Q.   You want to go back down and explain?

17   A.   No, I don't know.  I'm just saying that I may be

18   replying to an e-mail that came originally from the -- Bill

19   or Mr. Kocinski with everybody on it.  I'm not sure exactly,

20   just --

21   Q.   Let's look at the body of the e-mail.

22   A.   Uh-huh.  Would you like me to read it?  --

23   Q.   Could you read it?  Yeah.

24   A.   Sure.  "Mike, Great work.  Agree with all changes

25   suggested (updating tables and notes to agree with final

1    financials).  Awaiting the source documents now (I only have

2    it in .pdf) and will forward the same to you and to Guy

3    Jean-Pierre (cc'd here) as soon as they are completed."

4    Q.   Okay.  So, again, acknowledging that you're providing

5    Mr. Guy Jean-Pierre documents regarding the financials to be

6    reviewed.

7    A.   Yes.

8    Q.   All right.  And can we just go to the top.

9         And, again, Mr. Guy Jean-Pierre is sending you an

10   e-mail; is that right?

11   A.   Yes, and cc'ing Mr. Sears.

12   Q.   Okay.  And where is he cc'ing Mr. Sears?

13   A.   VertiFresh e-mail.

14   Q.   So the corporate counsel for FusionPharm is now

15   disclosing draft quarterly reports to Mr. Sears, your

16   brother-in-law, at a different company.

17   A.   Yes.

18   Q.   Do you know why?

19   A.   Because Billy would have been the one who uploaded them

20   once they were done.  Billy tended to play secretary in all

21   of these matters.  All of the financials look, I would

22   assume, exactly like this in terms of e-mail string:  myself

23   to Billy to Guy to Mike Kocinski and around and back.

24        THE COURT:  Mr. Sibert, would this be a good time

25   to take a pause for lunch?

Direct - Dittman

1    MR. SIBERT:  It would be a great time for me, Your

2  Honor.

3    THE COURT:  All right.

4    MR. SIBERT:  Thank you.

5    THE COURT:  All right, ladies and gentlemen of the

6  jury, we're going to take our lunch recess.  We will be in

7  recess until 1:15.

8    (Jury left the courtroom at 12:13 p.m.)

9    THE COURT:  All right, Mr. Dittman, same limitation

10  during the lunch recess.

11    (Recess at 12:14 p.m.)

12                    AFTERNOON SESSION

13    (In open court in the presence of the jury at 1:20

14  p.m.)

15    THE COURT:  Mr. Dittman, I remind you you remain

16  under oath.

17    THE WITNESS:  Yes, sir.

18    THE COURT:  Mr. Sibert, you may resume your

19  examination.

20    MR. SIBERT:  Thank you, Your Honor.

21                  DIRECT EXAMINATION (Continued)

22  BY MR. SIBERT:

23  Q.  Can I please have Government Exhibit 25, page 30,

24  brought back up.

25    Okay, sir -- excuse me, let me just start from page

Direct - Dittman

1    1 so that the witness -- again, we've looked at this

2    document.

3        Do you recognize this document?

4    A.   Yes.

5    Q.   Okay. And it's the disclosure for FusionPharm from

6    2012; is that right?

7    A.   Correct.

8    Q.   Can I have page 30, please. Just please focus here.

9        Okay, sir, could you just explain to the jury what

10   is stated regarding the notes. What are the titles of your

11   notes?

12   A.   There's a summary notes payable, and then a breakdown

13   into short-term notes, short-term loans, and notes

14   payable.

15   Q.   Okay. Thank you. And can I have the top of that page?

16        And what's the title of this page?

17   A.   FusionPharm, Inc., formally Baby Bee Bright

18   Corporation, Notes to Financial Statements (Unaudited),

19   December 31st, 2012.

20   Q.   Okay. Thank you. Okay.

21        Can I please have 372-NN.

22        Okay, sir, can you --

23        Thank you -- I'm sorry. I need 372-NNN.

24        Okay, sir, can you tell me what this e-mail is

25   about, Government Exhibit 372-NNN?

1    A.    It is from myself to Bill Sears, dated August 20, 2013.

2    Subject is "Financials, Quarterly Report, 6-30-2013."

3         Would you like me to read it, Counselor?

4    Q.    So let me just go through this.  So now we're in August

5    of 2013?

6    A.    Yes.

7    Q.    Okay.  And are you talking about the quarterly report

8    for June 2013?

9    A.    Yes.

10   Q.    For what company?

11   A.    FusionPharm, I presume.

12   Q.    Did you have any other companies?

13   A.    No.

14   Q.    And what are you asking Mr. Sears to do?

15   A.    "Please read carefully, make sure I updated all the

16   dates from last year (you missed quite a few, smiley face).

17   Let me know if you have the OTC form that needs to be filled

18   out and attached to this."

19   Q.    So essentially the second quarter of 2013 -- 2013, you

20   are still having Mr. William Sears review the financials of

21   FusionPharm?

22   A.    Yes.

23         MR. SIBERT:  Your Honor, so the courtroom deputy

24   knows, I'm going to be asking this witness about Exhibit

25   404.  This has not been stipulated to and is not yet

Direct - Dittman

1    admitted into evidence.

2            THE COURT:  All right.

3    BY MR. SIBERT:

4    Q.   Okay.  Can I please have the witness shown Government

5    Exhibit 404.

6            Okay, so I'm going to blow this up.  If you can't

7    see it, I can request the binder.  Do you know what

8    Government Exhibit 404 is?

9    A.   It appears to be a press release.

10   Q.   Okay.  And what is the press release about?

11           MR. BARNARD:  Your Honor, we are now asking for the

12   witness to talk about a document that's not in evidence

13   yet.

14           THE COURT:  Let's just -- Mr. Dittman, let's

15   describe it generally without going into the contents of the

16   document.

17           THE WITNESS:  Does that mean read the --

18           THE COURT:  Well, just what generally -- just what

19   is this document about, without going into the contents that

20   it contains.

21           THE WITNESS:  Appears to be a press release about

22   the sale of some PharmPods.

23   BY MR. SIBERT:

24   Q.   And for which company?

25   A.   For FusionPharm.

Direct - Dittman

1    Q.   And that's the company that you own.

2    A.   Correct.

3    Q.   And what is the date of the press release?

4    A.   February 6, 2013.

5    Q.   And can you take a look at that press release and tell

6    me if what's written in it, that press release, is correct

7    and accurate.  And if you need the hard copy, I can ask --

8    A.   That might be a little easier, actually.  It's a little

9    blurry in the small print on the screen.

10           Okay.

11   Q.   Have you had a chance to review that?

12   A.   I did.

13   Q.   And does it correctly state what is written in the

14   release?

15   A.   Do you mean do I think the release is accurate?  Is it

16   truthful?  I'm not sure I understand the question.

17   Q.   Yes.

18   A.   I believe so, yes.

19           MR. SIBERT:  Your Honor, at this time the

20   Government would move into evidence Government Exhibit

21   404(b), self-authenticating under 902(6).

22           THE COURT:  Is there an objection?

23           MR. BARNARD:  Your Honor, it is -- it is -- I

24   object as hearsay and I don't believe it is

25   self-authenticating.

Direct - Dittman

1    THE COURT:  I agree.  Sustained.  404 is refused.

2    BY MR. SIBERT:

3    Q.   Okay, sir, did you sell pods in 2013?

4    A.   Yes.

5    Q.   Okay.  And who did you license to sell those pods to?

6    A.   Meadpoint Venture Partners.

7    Q.   Okay.  And who controlled that company?

8    A.   Bill Sears.

9    Q.   Okay.  And who else did you -- did you license to sell

10   containers to anyone else?

11   A.   No.

12   Q.   So just Meadpoint?

13   A.   Yes.

14   Q.   In 2013.

15   A.   In 2013, correct.

16   Q.   How much were the pods being sold for?

17   A.   I don't know exactly.  Would you like me to ballpark?

18        MR. BARNARD:  Your Honor, I believe the witness is

19   still looking at the exhibit.  I would request that that not

20   occur.

21        THE COURT:  Okay.  Why don't you answer the

22   question from your personal knowledge and your memory.  The

23   exhibit that was in front of you, or is in front of you, was

24   not admitted into evidence.

25        THE WITNESS:  Got it.

Direct - Dittman

1     These eight containers that I believe this order is
2     referencing -- there are a variety of -- a variety of use
3     and a variety of sizes here, so these are not all one thing.
4     So not to be difficult, but I imagine the total was maybe
5     250,000-ish.
6     BY MR. SIBERT:
7     Q.   For all the containers?
8     A.   Yeah.
9     Q.   Okay.  So how much would the container average price go
10    for?
11    A.   Depended.  So in this particular order, if I have the
12    order right, this would have been to --
13         MR. BARNARD:  Your Honor, I think the witness is
14    confused.  He's still answering a previous question as
15    opposed to the specific question now.
16         THE COURT:  Well, how do you know what he's
17    answering?
18         MR. BARNARD:  Well, I thought he was talking about
19    pursuant to some order, and I don't think we've had a
20    question about any kind of an order.
21         THE COURT:  Right.  We're not referencing any
22    particular specific order.
23         THE WITNESS:  Okay.  Containers on the low end,
24    excuse me, generally speaking, would be in the low $20,000
25    range to start, and 40-foot containers, depending on their

1    configuration and lighting and computer controls and

2    whatever, could push 60,000 or more.

3    BY MR. SIBERT:

4    Q.    Okay.  And this is a price range for the various

5    components that each container provided the customer.

6    A.    Yes.

7    Q.    Okay.  And in this case, you stated you sold some

8    containers to Meadpoint in 2012.

9          Sir, don't look at the document.  Can you close the

10   binder.

11   A.    Sorry.  I thought it was 2013.

12   Q.    And so my understanding is you made some sales of

13   containers in 2012 or 2013.

14   A.    Yes.

15   Q.    Okay.  And what was the average price -- was -- did the

16   price stay the same throughout 2011 through 2013?

17   A.    No.

18   Q.    Okay.  Can you tell me what occurred with the prices.

19   A.    Generally they went up, like everything does, because

20   the containers got more complicated, the better built, et

21   cetera, et cetera.

22   Q.    So a container at your bottom end, lowest level, type

23   of car that is beat up, how much would that go for?

24   A.    Oh, we didn't sell any beat-up ones.  They're all

25   brand-new, but, you know, around 20 grand would be about

1    the -- about the bottom end.

2    Q.   And then as you stated, the highest amount, somewhere

3    in the 60,000 range?

4    A.   Yeah.

5    Q.   Now, you stated there was a sale to Meadpoint.  Do you

6    recall how many containers?

7    A.   I know we sold all of the containers to Meadpoint, then

8    Meadpoint in turn sold them on to the end-use customers.

9    Q.   Do you know how much -- how many containers were sold

10   to Meadpoint?

11   A.   Up until May of 2014, I think the number was 57.

12   Q.   Okay.  Do you know how much in the beginning of 2013,

13   essentially first quarter?

14   A.   Total first quarter?  I don't.  I know -- I mean, I

15   know what I just read off that press release, but I don't

16   know if that was all that was sold in the first quarter.

17   Q.   So 56 containers at the lowest end, $20,000.  Do you

18   know how much money that is?

19   A.   56 at $20,000, right around 1 million 120.

20   Q.   How much?

21   A.   1.12 million.

22   Q.   Okay.  And, again, I think you testified Meadpoint was

23   your brother-in-law's company, Billy Sears's.

24   A.   Yes.

25   Q.   Can I have Exhibit 372-OOO.  Can you start at the

1   bottom?  I'm sorry, can we get to the middle.

2          All right.  Again, do you recognize Advisor -- this

3   Advisor e-mail?

4   A.   I don't.

5   Q.   Can we go to the top of the e-mail.

6          Can you tell me about the top of this e-mail.

7   A.   Yeah.  That's Bill Sears and myself.

8   Q.   Okay.  And what is the date?

9   A.   Wednesday, August 21st, 2013.

10  Q.   And what is the subject?

11  A.   "Officers and directors questionnaire, 6-30-13."

12  Q.   Another form that you have to file with OTC regarding

13  your role and the officer and director's roles within

14  FusionPharm?

15  A.   I guess, although honestly I don't know why we would

16  have been filing one in midyear in 2013 since it's an

17  end-of-year document.

18  Q.   All right.  This was forwarded to you; is that

19  correct?

20  A.   Yes, by Mr. Sears.

21  Q.   Okay.  And can we just have the middle, please.

22          And based upon that, you have the e-mail chain

23  here.  Who provided that document to Mr. Sears?

24  A.   Mr. Jean-Pierre.

25  Q.   Okay.  And so how do you know that?

Direct - Dittman

1    A.    Because it's his name in the signature block at the

2    bottom.

3    Q.    So whose e-mail do you think this is?

4    A.    I would assume that's Mr. Jean-Pierre's.

5    Q.    And what is Mr. Guy Jean-Pierre asking Mr. Sears to do?

6    A.    "Have Mr. Dittman sign the attached questionnaire and

7    get it back to me ASP."

8    Q.    Okay.  And it goes on.

9    A.    Yes, sir.  "Then I should be able to get" it -- "get

10   you the opinion by Friday.  Thank you much and, as always."

11   Q.    And do you know what he means by "the opinion"?

12   A.    I don't.  Because of the time of the year, I -- we

13   wouldn't need a -- I'm -- we wouldn't need that form in

14   midyear, so I'm not sure that I do know what.

15   Q.    You wouldn't need the questionnaire -- director's

16   questionnaire form; is that --

17   A.    At midyear, right, I think that's an end-of-year thing.

18   Q.    How about a legal opinion letter?

19   A.    That could be.

20   Q.    And you need those in your quarterly reports?

21   A.    No.  We don't need legal opinion letters at all in the

22   quarterlies.

23   Q.    Okay.

24   A.    I thought you meant for a stock transaction of some

25   nature.

1       MR. SIBERT:  Okay.  Can I have Exhibit 172?

2       And, Your Honor, maybe this is another good time to

3   introduce a batch of exhibits that have all been stipulated

4   to.

5       THE COURT:  All right.

6       MR. SIBERT:  And I'm going to start -- this would

7   be Section 3, and it begins with 19-A, 172, 230, 372-JJ.

8       THE COURT:  All right.  Given the stipulation of

9   the parties, the following Government Exhibits are admitted

10  into evidence and may be published to the jury:  Exhibits

11  19-A, 172, 230, and 372-JJ.

12      (Government's Exhibits 19-A, 172, 230, and 372-JJ

13  received)

14  BY MR. SIBERT:

15  Q.  Okay, sir, can you please take a look at the top of

16  this document.  And describe the e-mail that's being

17  referred to in Government Exhibit 172.

18  A.  It's an e-mail from myself on Wednesday, March 28th,

19  2012 -- excuse me -- to Mr. Kocinski.  The subject is

20  "Financials," and an attachment entitled "FSPM financials,

21  12-31-11."

22  Q.  Okay.  And FSPM is what?

23  A.  That is the ticker symbol for FusionPharm.

24  Q.  Okay.  And so this is essentially for -- we're talking

25  about financials here, for what year?

1    A.    Year-end 12-31-2011.

2    Q.    And can you scroll up, please.

3          What do you mean by having "a large note payable to

4    a friendly company who isn't charging us interest yet"?

5    A.    We had a large note payable to a friendly company,

6    specifically two of Bill Sears or Bill Sears' mother's

7    companies who weren't charging us interest yet.

8    Q.    And do you know what company that is?

9    A.    It would have been Bayside and Meadpoint.

10   Q.    So Bayside or Meadpoint?

11   A.    Correct.

12   Q.    And how would you have known about the Bayside note?

13   A.    Because we had a line of credit with them and we were

14   borrowing money from them.

15   Q.    Okay.  So who did you talk to about borrowing money

16   from that company, Bayside?

17   A.    Meaning on the Bayside side?

18   Q.    Yes.

19   A.    Bill Sears.

20   Q.    So you never spoke to his mother?

21   A.    I spoke to his mother, but -- about the loan from

22   Bayside specifically, I don't recall -- I doubt it.

23   Q.    So you didn't speak to the owner of the company

24   regarding the loan?

25   A.    No, Bill handled all of his mother's stuff.

720
Direct - Dittman

1    Q.    Is it fair to say that Mr. Sears controlled Bayside?

2    A.    As far as transactions he was dealing with me, yes.

3    Q.    Okay.  Now, just so the jury is clear, in your -- could

4    you describe what essentially a note is.

5    A.    Sure.  A note is a -- just like you would have for your

6    car, your house, right?  You borrow money from them, and owe

7    the money, we signed a note.

8    Q.    Thank you.

9    A.    Sure.

10   Q.    Okay.  Can I please have Exhibit 230 published.  And

11   can we start down here at the bottom.

12            Okay, do you know who a Mr. A.R. Duke is?

13   A.    Yes.

14   Q.    And who is that?

15   A.    Andy Duke.

16   Q.    Okay.  Do you know who a Mr. Lawrence Ditkoff is?

17   A.    I do not.

18   Q.    Okay.  And do you recall why Mr. Duke is e-mailing you

19   here?

20   A.    Mr. Duke was hired to raise money, so I presume he was

21   having conversations with somebody about investing in the

22   company.

23   Q.    Could you go to the top of the e-mail.  And at the top,

24   this is your response to Mr. Duke; is that right?

25   A.    Yes.

1    Q.   And essentially what are you telling Mr. Duke about

2    your loans in 2011?

3    A.   The loans specifically that he was asking about, or the

4    loans in general, what I'm saying is the vast majority is a

5    loan received in installments throughout 2011, friends and

6    family loan.

7    Q.   Okay.  That would be Bayside and Meadpoint again?

8    A.   Yes.

9    Q.   Can you go through the previous exhibit again; that

10   would be page 172, and bring up page 4.

11          And do you recognize what page 4 is of Government

12   Exhibit 172?

13   A.   Yes.

14   Q.   And what is it?

15   A.   It's the year-end balance sheet of FusionPharm for the

16   period 12-31-2011.

17   Q.   Okay.  Can you go down here to the liabilities and

18   equity.  And are your -- how is your debt written out?

19   A.   Notes payable - long-term.

20   Q.   And how much are they?

21   A.   $269,497.

22   Q.   And that's the money that your brother-in-law

23   supposedly loaned FusionPharm?

24   A.   I don't think the entire amount is that, but the vast

25   majority, yes.

722
Direct - Dittman

1    Q.    Can I have Government Exhibit 19-A published.

2          Do you recognize Government Exhibit 19-A?

3    A.    Yes.

4    Q.    Okay.  And what is 19-A?

5    A.    It is the FusionPharm quarterly report for the period

6    ended March 31st, 2012.

7    Q.    Can I have page F-10.

8          Your Honor, may I have a moment?

9          THE COURT:  You may.

10   BY MR. SIBERT:

11   Q.    The pages might not correlate to -- can you scroll down

12   there, please?

13         Okay.  Under section 4, how are your long-term

14   notes titled?

15   A.    Unsecured credit line, including interest at 10 percent

16   of 182,697, unsecured credit line including interest at 10

17   percent of 86,800, for a total of 269,497.

18   Q.    And this is the first quarter of 2012, correct?

19   A.    Correct.

20   Q.    Can the witness please be shown Government Exhibit 177.

21   Can you go down to the bottom of that exhibit.  Okay.

22         Again, do you recall why this e-mail would be sent

23   to Mr. Sears in 2012 under a FusionPharm e-mail address?

24   A.    I am presuming because that's the address Mr. Kocinski

25   had for Bill, the first one that probably came up when he

Direct - Dittman

1    was typing the e-mail address.

2    Q.    Okay.

3    A.    Or actually all of his addresses are there.

4    Q.    What is your accountant sending Mr. Guy Jean-Pierre and

5    Mr. Sears?

6    A.    He is sending the statement that he makes for the

7    information and disclosure form.

8    Q.    Okay.  And what disclosure is this for?

9    A.    Financial statements 3-31-12.

10   Q.    So this would be for the first quarter?

11   A.    Yes.

12   Q.    So you used your outside accountant to review these

13   financials statements --

14   A.    Yes.

15   Q.    -- for the first quarter 2012?

16   A.    Yes.

17   Q.    And what we just looked at in previous exhibits,

18   correct?

19   A.    Yes.

20   Q.    And you're not anywhere e-mailed as a CEO of

21   FusionPharm when the accountant is sending the financial

22   statement.

23   A.    I'm cc'd there on the third e-mail address.

24   Q.    I'm sorry.  Right here.

25   A.    Yes.

Direct - Dittman

1   Q.   But also your accountant has both e-mail addresses for

2   Mr. Sears.

3   A.   Yes.

4   Q.   Can we go to the top, please.

5        And, again, who's writing this e-mail?

6   A.   Bill Sears.

7   Q.   And he's sending it to you?

8   A.   Yes.  And Guy --

9   Q.   Along with who else?

10  A.   Mr. Jean-Pierre.

11  Q.   And no Mr. Dittman regarding the financials?

12  A.   I'm sorry, I missed that last part.

13  Q.   No Mr. Tom DiTommaso when it comes to the financials.

14  A.   Correct.

15  Q.   So, sir, we've looked through several of these e-mails

16  now regarding several of the quarters and annual reports.

17  A.   Uhm-hum.

18  Q.   Nowhere was Mr. DiTommaso ever e-mailed on any of the

19  financials, out of the ones you looked at today.

20  A.   Correct.

21  Q.   He's never been e-mailed any of the financials.

22  A.   Not the ones that we've seen today.

23  Q.   Right.  And so -- so the lawyer that you dealt with,

24  all of -- where were all of the financials sent regarding

25  the legal counsel that you used with FusionPharm?

Direct - Dittman

1    A.    To Mr. Jean-Pierre.

2    Q.    Okay.  And based upon what you know when you were the

3    CEO of FusionPharm, did Mr. Guy Jean-Pierre review the

4    financials?

5    A.    Yes.

6    Q.    Before they were filed.

7    A.    Yes.

8    Q.    Okay.  Can we please go back to Government Exhibit

9    372-NNN.  Can I have page 9, please.

10        Okay.  Now -- we might have to go back.  I'm sorry.

11   Can we have page 1, just so the witness knows what exhibit

12   we're looking at.

13        We're looking at the quarterly report for

14   6-30-2012.

15   A.    2013.

16   Q.    2013.

17   A.    Yes.

18   Q.    Thank you.  Okay.  Now page 9.  You have a revenue of

19   $330,000.

20   A.    Yes.

21   Q.    Where did that revenue come from?

22   A.    Sale of pods.

23   Q.    Okay.  And is that the pods that were sold to

24   Meadpoint?

25   A.    Well, yes, all the pods went through Meadpoint.

Direct - Dittman

1    Q.   Okay.  Where did Meadpoint, Mr. Sears, get $330,000 to

2    buy the pods?

3              MR. BARNARD:  Objection.  Lack of foundation.

4              THE COURT:  Don't speculate or guess, only if you

5    know.  If you have personal knowledge.

6              THE WITNESS:  Well, it could happen a couple of

7    different ways.  Either from the end customer, themselves,

8    which was very often the case -- most often the case, or if

9    he was financing them, which he did in a couple of cases

10   earlier on in the company -- earlier than this -- he would

11   have probably used money that he got from stock sales to buy

12   the pods and then finance them to the end-use customer.

13   Q.   So stock sales -- what stock sales?

14   A.   FusionPharm.

15   Q.   So he sold your company stock to be able to purchase

16   pods from your company?

17   A.   And --

18   Q.   Is that right?

19   A.   And finance -- well, to finance them to a third party,

20   yeah.  I mean, he didn't hold them, but yes.

21   Q.   But for you to basically sell them to Meadpoint, he

22   used the proceeds of the stock sale.

23   A.   Yes.

24   Q.   And to be clear, FusionPharm stock.

25   A.   So far as I know, yes.

Direct - Dittman

1    Q.   Okay.

2         MR. SIBERT:  Your Honor, at this time, Section 7

3    the Government would move into -- well, my sticker might be

4    wrong.  It should be Section 5.  I'd like to move into

5    evidence Exhibits 100, 123, 151.

6         THE COURT:  All right.  Given the stipulation of

7    the parties, the following Government exhibits are admitted

8    into evidence and may be published to the jury:  100, 123,

9    and 151.

10        (Government's Exhibits 100, 123, 151 received)

11   BY MR. SIBERT:

12   Q.   Okay.  Can we please -- can we please show the witness

13   Government Exhibit 100.

14        Sir, can you tell me about this e-mail that you're

15   sending to Pacific Stock Transfer agency.

16   A.   It's an e-mail from myself to Leslie at Pacific Stock

17   Transfer.  The subject is "cert order."  The date is Monday,

18   May 16th, 2011.  Would you like me to read it?

19   Q.   Well, actually, what I would like you to do is do you

20   mind taking a look at Government Exhibit 100 in the binder

21   and just review it before we go through it.  It should

22   be nine pages.

23   A.   Okay.

24   Q.   Okay.  Can you look at -- can we have the witness shown

25   page 4.

728
Direct - Dittman

1       Okay, sir, this is a letter that you sent Ms.
2  Leslie Eldridge; is that correct?
3  A.   It is.
4  Q.   Okay.  What is the date of the letter?
5  A.   May 9th, 2011.
6  Q.   And essentially what are you asking within this letter?
7  A.   I'm asking Mrs. Eldridge to issue stock shares from the
8  common treasury.
9  Q.   Okay.  How many shares are you asking the transfer
10  agent to send Todd Abbott?
11  A.   40,000 shares.
12  Q.   Okay.  Can you look at page 5.  And what type of shares
13  are these?
14  A.   Restricted with a standard 144 legend.
15  Q.   Okay.  And what does "restricted shares" mean?
16  A.   Means restricted shares with the 144 legend are non --
17  you can't sell them for one year.  They have a one-year
18  holding period.
19  Q.   Okay.  And can you please look at page 6.  Do you
20  recognize what page 6 is?
21  A.   Yes.
22  Q.   Okay.  What is page 6?
23  A.   It's the written consent of the board of directors in
24  lieu of a special meeting to issue the stock shares from the
25  previous documents.

1    Q.   And can you go down to the bottom of that.

2            Okay.  What's the date of this?

3    A.   May 16th, 2011.

4    Q.   So the board had a meeting on May 16th, 2011?

5    A.   Apparently, yes.

6    Q.   And who are the board of directors?

7    A.   Myself and Sandra Sears.

8    Q.   So you wrote a letter to the Pacific Stock Transfer

9    agency nine days before the board approved the transfer

10   these shares?

11   A.   I don't remember the date of that other letter -- you

12   can show it to me.

13   Q.   May 16th, 2011.

14   A.   Yeah.

15   Q.   Can we go back to page 4.

16   A.   Yup.  It appears so.

17   Q.   Okay.  And you are asking for restricted shares to be

18   issued.  Is that the only type of shares that FusionPharm

19   can issue?

20   A.   Yes.

21   Q.   Can I have the witness -- can I have Exhibit 151 shown

22   to the witness.

23           Okay, sir, I'm just going to start here at the top.

24   Do you recognize the e-mails in this document?

25   A.   Yes.

1    Q.   Okay.  And who are those e-mails?

2    A.   From myself to Todd Abbott.

3    Q.   And who is Todd Abbott?

4    A.   Todd Abbott is my little brother's best friend.

5    Q.   Okay.  And is that the same Todd Abbott that you

6    requested to receive 40,000 restricted shares?

7    A.   Yes.

8    Q.   Okay.  And what is the date of this e-mail?

9    A.   Wednesday, June 1st, 2011.

10   Q.   Can I please have page 3.  And, I'm sorry, can we just

11   start with page 2.  At the bottom.

12        Right here, that's your e-mail address?

13   A.   Yes.

14   Q.   Okay.  Can I have page 3.  At the top.

15        What are you writing in this e-mail?

16   A.   Sorry, would you like me to read it?

17   Q.   Sorry, do you recognize this e-mail that's coming to

18   you?

19   A.   I assume it's -- yeah, I assume it's the one -- I think

20   that's the one he's sending me actually, right?

21   Q.   Yes, sir.

22   A.   Yes.

23   Q.   And can you tell me why you're writing this e-mail?

24   A.   I'm telling Todd to hold his 144 cert and I was going

25   to meet him to trade it out for a nonrestricted cert the

1    following week.

2    Q.   Okay.  So we just talked about the Exhibit 4 being in

3    May 2011, and I just showed you on page 3 this e-mail that

4    you wrote that started on May 25th, 2011; is that right?

5    A.   Yes.

6    Q.   Okay.

7                THE COURT:  Mr. Sibert, you said Exhibit 4.

8                MR. SIBERT:  I'm sorry, page 4.

9                THE COURT:  Of?

10               MR. SIBERT:  Exhibit 151.  Thank you, Your Honor.

11   BY MR. SIBERT:

12   Q.   Can I have the witness shown Government Exhibit 123.

13   Can I have the whole thing; at least put the signature.

14               Can you see that document, sir?

15   A.   I can see it, but I can't read it, as small as it is on

16   the screen.

17   Q.   Can I have the witness shown Government Exhibit 123 in

18   the binder, please.

19   A.   Okay.

20   Q.   All right.  Have you had time to look at that

21   exhibit?

22   A.   Yes.

23   Q.   And can you tell me why -- based upon reading that last

24   exhibit, why would you swap out Mr. Abbott -- his restricted

25   shares with unrestricted shares?

Direct - Dittman

A.   Well, technically I didn't swap out Mr. Abbott's
shares.  Bill -- or maybe Richie, I'm not exactly sure --
and it wasn't only Mr. Abbott that we did this for.  The
situation with this transaction was these guys had invested
in my previous company as well, so they'd been invested for
a while.

When I owed them money, Mr. Abbott had a note
payable, as did Mr. Stecklenberg -- and maybe Mr. Vora, I
don't remember exactly -- but they had been invested for
some time.  The company issued them restricted stock in
order to cancel the obligations that were brought into the
company.  They wanted free trading shares.  Billy offered to
swap their shares out.

That's a transaction that I discussed at great
length with Billy.  I'm honestly not a hundred percent sure
if I discussed that with Mr. Jean-Pierre directly.  I --
it's just too long ago, I can't remember.  I'm sure Billy
would have told me he discussed it with Guy, but I can't
honestly tell you that I discussed it directly with Guy.

But Billy traded them out their share certs for
certs that they could sell and then Billy held onto them and
converted them later.

Q.   Okay.  So essentially what you're saying, if I
understand you clearly, it was Mr. Sears that provided you
40,000 unrestricted shares to swap out with Todd Abbott's

Direct - Dittman

1    restricted shares?

2    A.    Yeah.  And I think in the end Billy actually swapped

3    them out with Todd.  Billy knew Todd as well.  I don't think

4    I actually ever saw Todd -- not that it's important -- I

5    just think Billy actually did it, but I knew it happened.

6    Q.    You knew it happened?

7    A.    Yes.

8    Q.    And that's clear with your e-mails that you sent Mr.

9    Abbott?

10   A.    Oh, yes.

11   Q.    So you knew this swap was going to occur.

12   A.    I did.

13   Q.    Okay.  So did you ever check with Mr. Guy Jean-Pierre

14   if you could swap out restricted shares after just telling

15   me you got to hold those shares for a year?

16   A.    As I said earlier, I don't -- I can't recall that I

17   spoke with Guy directly.  I know that I spoke with Billy.  I

18   may have spoken with Guy.  Or I may have spoken with both of

19   them, but I honestly just -- it's just too long ago.

20          I don't know if we all had that call or if I only

21   heard it from Billy that it was okay with Guy.  I can tell

22   you that I felt it was okay with Guy and that was the

23   transaction described to me that Billy can do whatever he

24   wants with his shares and trade them with anybody that he

25   wants.  But I honestly, sir, can't recall if I spoke with

1    Guy directly about that.

2    Q.    Okay.  This is May 2011, correct?

3    A.    Yeah.  That's May 2011 -- well, this is August of 2012,

4    but the swap-out is May 2011, yes.

5    Q.    Okay.  Well, you hadn't even owned the firm for a year,

6    FusionPharm.

7    A.    No -- yeah, barely a month.

8    Q.    So barely a month.  And who knew that?

9    A.    I'm sorry?

10   Q.    Who knew that you only owned FusionPharm for about a

11   month?

12   A.    I imagine lots of people.  Is there a --

13   Q.    Did Billy Sears know that?

14   A.    Sure.

15   Q.    So he had FusionPharm shares that he was swapping out?

16   A.    He had free trading shares from a debt settlement

17   agreement with the old company, so he had free trading

18   shares separately from -- they weren't issued by the

19   company -- had nothing to do with the company -- he had free

20   trading shares from a debt settlement agreement with the old

21   company having, you know -- FusionPharm didn't issue him the

22   shares that he is swapping out, he had those shares through

23   another transaction.

24   Q.    Okay, sir.  We've gone through numerous e-mails in your

25   testimony here today.  Who are the -- who are the two people

Direct - Dittman

1    you usually e-mailed about anything regarding FusionPharm?

2    A.    Anything regarding FusionPharm stock or FusionPharm --

3    Q.    All the e-mails we saw today.

4    A.    Well, they were all in one -- I mean, I sent an awful

5    lot of e-mails at FusionPharm, so that's a really broad

6    question that you're asking me.

7    Q.    I'm asking about the e-mails we reviewed today.

8    A.    Okay.  Those are Guy Jean-Pierre and Bill Sears.

9    Q.    And so you would agree with me when it came to the

10   finances, or -- well, you would agree with me -- when would

11   you e-mail Mr. Sears and Guy Jean-Pierre?

12   A.    Oh, any time I had a question about stock, disclosures,

13   anything of that nature.

14   Q.    Okay.  And obviously this is a stock transaction.

15   A.    Yes.

16   Q.    So who do you think you discussed this with?

17   A.    Guy and Billy, like I said, but I can't specifically

18   recall a conversation with Guy on this specific transaction.

19   Q.    Can I have Government Exhibit 123.

20         Now, do you recognize Government Exhibit 123?

21   A.    Yes, I have that in front of me here.

22   Q.    Okay.  This is the letter that you wrote, correct?

23   A.    Yes.

24   Q.    Who's this letter to?

25   A.    Scottsdale Capital Advisors.

736

Direct - Dittman

1    Q.    And who is Scottsdale Capital Advisors?

2    A.    I believe that's a brokerage firm in Arizona.

3    Q.    Okay.  And what is the subject under "RE:"?

4    A.    "Security description:  Company:  FusionPharm; number

5    of shares, 40,000; Certificate No. 11176; Holder Name,

6    Microcap Management.

7    Q.    And who is Microcap Management?

8    A.    Microcap Management was Richie Scholz, was my

9    understanding.

10   Q.    So are these the same 40,000 shares, do you know, that

11   you provided that Mr. Sears swapped Mr. Abbott?

12   A.    I am guessing that they were.  I would think that they

13   were, although -- yes, sorry, there it is, right there.

14   They are the same.

15   Q.    They're the same, it says it right here, right?

16   A.    Yes, right, yup.

17   Q.    Okay.  So this is 2012, correct?

18   A.    Correct.

19   Q.    So essentially, just based upon what you told us, how

20   much would 40,000 shares be worth?

21   A.    Same answer that we had earlier.  You know, there's a

22   trading price during the day.  I don't know what it was in

23   the summer of 2012, but, again, probably between a dollar

24   and 2, so probably 40- to $80,000.

25   Q.    Okay.  And as you testified, it was Mr. Sears that did

Direct - Dittman

1    the swap?

2    A.   Yes.

3    Q.   And now the holder is Microcap Management.

4    A.   Yes.

5    Q.   And then, finally, in No. 4 here, what are you stating

6    in your letter to Scottsdale Capital?

7    A.   "The Parties are not, or were not 90 days prior to the

8    sale, a director, officer, or an 'Affiliate' of the Company

9    as that term is used in paragraph (a) of Rule 144 of the

10   Securities Act of 1933, (a person or entity that directly or

11   indirectly through one or more intermediaries, controls, or

12   is controlled by, or is under control with the Company)."

13   Q.   So based upon reading that and being an educated

14   person, what is an affiliate based upon your understanding

15   of the letter you just wrote?

16   A.   What is an affiliate based on my understanding of the

17   letter that I just wrote?

18   Q.   Well, you wrote this letter, correct?

19   A.   Yes.

20   Q.   All right.  So --

21   A.   Yeah.

22   Q.   -- give me the definition of "affiliate" that you

23   described in this letter.

24   A.   An affiliate would be a company that owns more than 10

25   percent of -- or person that owns more than 10 percent of

1    the company stock.  And I'm sure there are other

2    descriptions for "affiliate" that I'm less familiar with.

3    Q.   Can I have this blown up, please.

4         You write "i.e."; is that correct?

5    A.   I'm sorry?

6    Q.   You write, "i.e." in your letter.

7    A.   In Section 4?

8    Q.   In paragraph 4.  You can look on the screen; I even

9    underlined it for you.

10   A.   Oh, yes.  Sorry, I see it.

11   Q.   Okay.  And so you're defining in this sentence

12   "affiliate"; is that right?

13   A.   Yes.  I mean, I'm sure I didn't write this letter, Mr.

14   Sibert, but, I mean, it's a form letter.  I certainly didn't

15   sit down and write all of what you're seeing here, but I

16   signed it for sure.

17   Q.   So do you usually sign letters that you don't read?

18   A.   No, I didn't say I didn't read it; I said I didn't

19   write it.

20   Q.   But based upon this letter, what is an "affiliate"?

21   A.   A person or entity that directly, or indirectly,

22   through one or more intermediaries, controls or is

23   controlled by, or is under control with the company.

24   Q.   If you don't think you wrote this letter, who would

25   have written this letter for you at FusionPharm?

1    A.   Well, I would suspect it either came from Billy or it

2    came from the -- came from Scottsdale as a form letter that

3    they needed to have for their files, would be my guess, but

4    I don't -- you know -- I was probably given it by Bill.

5    Q.   Well, let me ask you this question:  If you had a

6    concern about the legal definition of "affiliate," who would

7    you have gone to?

8    A.   I would have asked Guy.  I didn't have any concern

9    about the definition of "affiliate" as it pertained to Bill

10   Sears or Todd Abbott at this point.

11            MR. SIBERT:  Your Honor, at this time the

12   Government would like to move into evidence -- I'm sorry,

13   I'm just looking at my list here -- section 6, that would be

14   Exhibits 135, 136, 372-S, 372-W, and those have been

15   stipulated to.

16            THE COURT:  All right.  Given the stipulation of

17   the parties, the following Government exhibits are admitted

18   into evidence and may be published to the jury:  135, 136,

19   372-S, and 372-W.

20        (Government's Exhibits 135, 136, 372-S, and 372-W

21   received)

22            MR. SIBERT:  Thank you, Your Honor.

23   BY MR. SIBERT:

24   Q.   Okay.  Can the witness be shown Government Exhibit 135.

25            Okay, sir, can we look at the bottom of this

Direct - Dittman

1    document.  Do you recognize this e-mail?

2    A.    I do.

3    Q.    Okay.  And can you tell the jury what this e-mail is

4    about.

5    A.    It's an e-mail from Todd Kramer at FINRA.  Sent

6    Wednesday, October 5th, 2011, to myself.  The subject is

7    "Email from Todd Kramer at FINRA regarding Fusion Pharma" --

8    it's misspelled, misspoken.

9           The e-mail reads, "Mr. Dittman, my name is Todd

10   Kramer and I work at FINRA.  You can check our website

11   listed below, but our role is to regulate the stock markets.

12          "We conduct routine reviews of thousands of issuers

13   each year due to a variety of factors including news, price

14   and volume increase, etc.  I have been trying to reach you

15   for a few weeks but up until today I never was able to reach

16   someone at the corporate number.  The telephone number just

17   rang with no way to leave a message.  However, I left a

18   message for you with Andrew Duke today and asked that he

19   pass on my information.

20          "I want to set up a time to speak to you about

21   Fusion Pharma this week if possible.  I would think the call

22   would take an hour maximum.  Please contact me so we can

23   schedule the call."

24   Q.    Okay.  And then the top of that e-mail, you're just

25   responding back to Mr. Kramer; is that correct?

Direct - Dittman

1    A.    Yes.

2    Q.    Can I have page 23, please.

3          Can you just look at that top e-mail and tell me

4    what this e-mail is about.

5    A.    This is an e-mail from myself, dated Monday, November

6    14th, 2011, to Todd Kramer.  The subject is:  "Forward:

7    FSPM Documents," with some attachments that Mr. Kramer had

8    requested, I presume.

9    Q.    Okay.  And you're -- essentially what are you telling

10   Mr. Kramer regarding a Mr. Dahlman?

11   A.    It says, "There was no contract or written agreement

12   with Mr. Dahlman when we changed the entity from Baby Bee

13   Bright to FusionPharm, just a conversation between Mr.

14   Dahlman and William Sears."

15   Q.    Okay.  So essentially the take-over of Baby Bee Bright

16   was negotiated between Mr. Dahlman and Mr. Sears.

17   A.    Yes.

18   Q.    You did not have any involvement in that?

19   A.    No.  I spoke to Mr. Dahlman one time, but it was

20   relatively short and it was after he and Mr. Sears had

21   pretty much completed the negotiations.

22   Q.    Can I have page 25.  Have the bottom blown up.

23   Actually, let's -- can we start from the top.

24         This is a notification form that needs to be sent

25   to FINRA; is that correct?

Direct - Dittman

1    A.   Yes.

2    Q.   And down here is the company information; is that

3    right?

4    A.   Yes.   That's the Baby Bee Bright company information.

5    Q.   Okay.   And what is the address?

6    A.   13762 Colorado Boulevard, Number 124-203, Thornton,

7    Colorado.

8    Q.   And do you recognize this phone number here?

9    A.   I do not.

10    Q.   Okay.   And can you go down to the bottom now.   Okay.

11          You have contact information; is that correct?

12    A.   Yes.

13    Q.   Who's listed there?

14    A.   William Sears.

15    Q.   Okay.   And what is his title?

16    A.   Administrative officer.

17    Q.   Okay.   And who are the officers and directors of this

18    company?

19    A.   Myself as director; myself as president; and Bill's mom

20    as treasurer and secretary; and Bill's mom as director.

21    Q.   So who controls -- does the director and president

22    control the administrative officer, or does the

23    administrative officer control a director or president of a

24    company?

25    A.   Well, the director and president would control an

Direct - Dittman

1   administrative officer in general.

2   Q.   Thank you.  Can the witness be shown 372-P.

3        Okay, sir -- in fact, let me have page 2.

4        Do you recognize the top part of this e-mail?

5   A.   I do.

6   Q.   Okay.  What is this top part in reference to?

7   A.   It is an e-mail from myself, dated Thursday, October

8   6th, 2011, to Todd Kramer.  Subject is "First Docs."  And I

9   appear to be sending him a bunch of documents that he had

10  asked me for in my phone call with him.

11  Q.   Okay.  And can I have page 1, please.  And bottom.  Can

12  you go up a little bit.  Thank you.

13       So the next day, what happens in this e-mail?

14  A.   Mr. Kramer, on Friday, October 7th, responding to

15  myself says, "Thank you for the first batch of documents,"

16  and proceeds to request a few more documents, including from

17  the "acquisition of Baby Bee Bright including but not

18  limited to:  signed agreements; contracts; legal opinions;

19  any correspondence with former CEO Fred Dahlman and William

20  Sears"; "terms of the acquisition.

21       "Stock Transfer Agent shareholder position reports

22  for the . . . dates March 1st, 2011, and September 30th,

23  2011."

24  Q.   So Mr. Kramer is specifically asking for some legal

25  opinions and information regarding Mr. Sears; is that right?

744
Direct - Dittman

1    A.    No, I don't think he's -- oh, well, legal -- I'm not

2    sure if the legal opinions are related to -- I don't know if

3    C is related to D in this context.

4    Q.    I didn't say Guy, I was just asking about legal

5    opinions.

6    A.    I know, but you said "related to Mr. Sears," and the

7    legal opinions is C and the Mr. Sears part is D, and I don't

8    think the two are necessarily related.

9    Q.    Okay.  But he is looking for information regarding

10   both.

11   A.    Yes.

12   Q.    Okay.  This is October 7th, 2011, at 8:34 a.m.

13   A.    Yes.

14   Q.    Can you go to the top of the e-mail.

15         So a few minutes later, who do you e-mail?

16   A.    Bill Sears.

17   Q.    And how many minutes later after you receive the e-mail

18   from Mr. Todd Kramer?

19   A.    12.

20   Q.    Okay.  And what is your question to Mr. Sears?

21   A.    "FYI.  Need to get Guy involved at this point."

22   Q.    And who's Guy?

23   A.    Mr. Jean-Pierre.

24   Q.    And can I please have Government Exhibit 135 shown

25   again.  Page 2.  Can you blow up this, please.

Direct - Dittman

1       What is Mr. Kramer's title at FINRA?

2    A.   Senior Regulatory Analyst, FINRA Office of Fraud

3    Detection and Market Intelligence.

4    Q.   Thank you.  Can I have Government Exhibit 372-S.  Can

5    we start down at the bottom again.

6        And, sir, what is this e-mail about that you're

7    sending to Mr. Kramer?

8    A.   It's from myself on Monday, October 24th, 2011, to Todd

9    Kramer.  The subject is forwarding the report request.

10   "Todd, please find the shareholder requests attached.

11   Working on other doc request and will forward once it's

12   complete.  Best regards."

13   Q.   And the top, please.

14       And what do you do with that e-mail you just sent

15   Mr. Kramer?

16   A.   Well, nine -- looks like nine days later I sent it to

17   Bill on the 3d of November.

18   Q.   Why would you --

19   A.   With an attachment of the shareholders' report.  I

20   don't know if that's the same attachment or not.  I can't

21   see the bottom anymore.

22   Q.   Why would you be sending this to Mr. Sears?

23   A.   Could be a number of reasons.  One, he was -- he and

24   Guy handled the transaction with Baby Bee Bright to

25   FusionPharm.  Two, they're asking specifically about Bill.

Direct - Dittman

1    Q.   Okay.  Can I have Government Exhibit 372-W.  Can we
2    start at the bottom again.
3         Okay.  Do you recognize this e-mail?
4    A.   I do.
5    Q.   Okay.  And who is sending you this e-mail?
6    A.   Guy Jean-Pierre.
7    Q.   And he's using his FusionPharm e-mail address?
8    A.   Yes.
9    Q.   Okay.  And what is he stating in this e-mail to you?
10   A.   He's attaching a letter that he proposed to send to Mr.
11   Kramer, asking me to take a look at it.
12   Q.   Okay.  And can we go to the top of the e-mail, please.
13        And what was your response to his request?
14   A.   "Looks good to me, Guy.  Send away."
15   Q.   All right.  Let me -- and also who's copied on this?
16   A.   Bill Sears.
17   Q.   Can we go down to the bottom, please, of that e-mail.
18        Okay. So essentially in the bottom e-mail there,
19   you're requesting to him to speak with Guy; is that correct?
20   A.   Requesting for Guy to speak to Mr. Kramer.
21   Q.   So what does this mean, "let's talk"?
22   A.   Oh, yeah, well, that's me wanting to talk to Guy, too.
23   Q.   All right.  So when an investigator, Mr. Kramer,
24   contacts your company, who did you go to to inform them
25   about this investigation?

747
Direct - Dittman

1   A.   Mr. Jean-Pierre.

2   Q.   Okay.  And who else?

3   A.   Bill Sears.

4   Q.   Okay.  And can the witness be shown Government Exhibit

5   136.

6            And, sir, I'm going to ask you to look at the hard

7   copy because it's a few pages.

8            Can he be shown 136, please.

9            Have you had time to read that document?

10  A.   Yes.

11  Q.   Okay.  Can you look at page 7 of that document.

12           Mr. Kramer's e-mailing you in this -- in the top of

13  page 7 of document 136; is that right?

14  A.   Yes.

15  Q.   And who is he requesting information about?

16  A.   Bill Sears.

17  Q.   Okay.  And also what entity is he requesting

18  information about?

19  A.   Microcap Management.

20  Q.   Okay.  And what is he specifically asking you to

21  provide proof about to FINRA?

22  A.   The sale of his entity, Microcap, and how he no longer

23  has ownership of FSPM stock or Microcap Management brokerage

24  accounts.

25  Q.   Okay.  And what's the date of this e-mail?

1    A.    November 14th, 2011.

2    Q.    Can you turn to page 11.

3          Okay, sir, you're cc'd on this e-mail; is that

4    right?

5    A.    Yes.

6    Q.    Who's sending the e-mail?

7    A.    Guy Jean-Pierre.

8    Q.    Okay.  And who's he sending it to?

9    A.    Todd Kramer.

10   Q.    Can you please go down to the sixth paragraph.

11         Sir, can you just read the 6th paragraph and what

12   Mr. Guy Jean-Pierre's response is to Mr. Kramer.

13   A.    "Upon review of the above e-mail message, I found it

14   incredulous that Mr. Dittman would have committed to obtain

15   non-Company information regarding a particular shareholder,

16   in this instance, Microcap Management ("Microcap"), the

17   ownership thereof and corporate action pertaining to such

18   corporate shareholder notwithstanding whatever personal

19   relationship Mr. Dittman may or may not have with a prior

20   owner of Microcap (in this instance, Mr. Sears)."

21   Q.    So essentially what do you mean -- what do you

22   understand that to mean?

23         MR. BARNARD:  Your Honor, I object.  This witness'

24   understanding is irrelevant.

25         THE COURT:  You're not asking him what Mr. -- the

Direct - Dittman

1    defendant intended, right?

2            MR. SIBERT: No, I'm asking what his understanding

3    of what I had him just read means to him as the owner of

4    FusionPharm, with his corporate counsel writing the letter.

5            THE COURT: All right. Well, what -- however you

6    understood this letter to mean. Go ahead.

7            THE WITNESS: Yeah. So at this point, we had

8    provided a lot of information to Mr. Kramer at the -- at

9    FINRA, and he continued to ask for more information. He

10   asked for what he's talking about here and what we read in

11   that previous e-mail for me to provide him documents about

12   the sale of Microcap and that sort of thing.

13           And when I relayed that to Guy, Mr. Jean-Pierre, he

14   kind of found that incredulous and, you know, told me that I

15   could get sued for providing documents like that, if I even

16   had them, which I didn't, and so it's at that point that he

17   wrote this letter back to FINRA.

18   BY MR. SIBERT:

19   Q.   All right. Because essentially the noncompany

20   information -- based upon your understanding, who is that?

21   A.   Microcap.

22   Q.   Okay. So the noncompany information being Microcap?

23   A.   Right.

24   Q.   Okay. And so, therefore, you, as the owner of

25   FusionPharm, could not provide FINRA any information.

1      MR. BARNARD:  Your Honor, I object.  Leading.

2      THE WITNESS:  Right.

3      THE COURT:  Sustained.

4   BY MR. SIBERT:

5   Q.  What was your understanding, since Microcap wasn't your

6   company?

7   A.  Yeah, that I couldn't provide documents that I didn't

8   have and weren't mine to provide in the first place.

9   Q.  Okay.  And at the time of this investigation when it

10  started October 6th, whose company was Microcap?

11  A.  I believe Richie Scholz.

12  Q.  On October 6th of 2011?

13  A.  Yes.

14  Q.  And so going back to Government Exhibit 123, again,

15  we're talking about the 40,000 shares that your

16  brother-in-law, Billy Sears, swapped out with Todd Abbott,

17  correct?

18  A.  Correct.

19  Q.  And those are under the Microcap in 2012, right?

20  A.  Yes.

21  Q.  Okay.

22      MR. SIBERT:  Your Honor, at this time the

23  Government would like to move into evidence section 7 of my

24  list, which are Exhibits 387, 388, 392.

25      THE COURT:  Given the stipulation of the parties,

Direct - Dittman

1    Government Exhibits 387, 388, and 392 are admitted into

2    evidence and may be published to the jury.

3         (Government's Exhibits 387, 388, and 392 received)

4              MR. SIBERT:   Thank you, Your Honor.

5    BY MR. SIBERT:

6    Q.   Can the witness be shown Government Exhibit 387.

7              Okay, sir, this is an e-mail by you; is that

8    correct?

9    A.   Yes.

10   Q.   Okay.  And essentially can you tell me what this e-mail

11   is about in October 18, 2011.

12   A.   Yes, it's an e-mail from myself to Richard Rhodes.  The

13   subject is "Skype."  The date is October 8, 2011.  The

14   e-mail reads, "I don't have a camera hooked up to my new

15   monitor, so let's use Billy's computer today.  His Skype is

16   Trader5280."

17   Q.   Okay.  So whose Skype handler's name is trader5280?

18   A.   Apparently Bill Sears.

19   Q.   And can you please look at Government Exhibit 388.

20   Sir, you're receiving this e-mail; is that correct?

21   A.   Yes.

22   Q.   And who are you receiving it from?

23   A.   Mr. Jean-Pierre.

24   Q.   Okay.  And what is Mr. Guy Jean-Pierre telling you in

25   this e-mail?

Direct - Dittman

1    A.    Looks like he's giving me his Skype address.

2    Q.    Okay.  And what is that Skype address?

3    A.    Elcommandante1.

4    Q.    And then you also provide Mr. Guy Jean-Pierre your

5    Skype address; is that correct?

6    A.    Correct.

7    Q.    And what is yours?

8    A.    Scott.dittman2.

9    Q.    Thank you.  Okay, sir, can you look at Government

10   Exhibit 38 -- excuse me, 392.  And, again, I would ask you

11   to look at this as a hard document.  It consists of several

12   pages of Skype messages.

13         Do you recognize that document?

14   A.    No.

15   Q.    Okay.  Well, let's just work through this a little bit.

16         Can you blow up kind of like we did yesterday?

17   Okay.

18         So under here, the author's name is scott.dittman2.

19   A.    Yes.

20   Q.    Is that your Skype?

21   A.    Yes.

22   Q.    Okay.  And do all the pages have scott.dittman2 related

23   to these Skype messages in this document?

24   A.    I'm sorry, in the binder?

25   Q.    In the binder.  It's probably about 35 pages.

1     A.    No.

2     Q.    Not as the author, but either as a recipient, author,

3     or profile's name.

4     A.    It's a lot of pages.  Do you want me to look through

5     every single page?

6     Q.    Well, do you deny the fact that Scott D. Dittman is on

7     many of these pages?

8     A.    No -- yes, it definitely is.

9     Q.    Okay.  And would you agree that the ones that have your

10    scott.dittman2 are some type of messages that you either

11    wrote or received?

12    A.    I have no idea, honestly.  I don't -- I've never seen

13    this.  I don't know where it is; I don't know where it came

14    from.

15    Q.    Did anyone else use your Skype account?

16    A.    Not to my knowledge, no.

17    Q.    Okay.  Thank you.

18          Can I have Exhibit 167 shown to the witness.  Can

19    we start at the bottom, please.

20          Sir, I just want to talk about this e-mail here.

21    Who is writing this e-mail?

22    A.    My little brother.

23    Q.    And that's Robert Dittman?

24    A.    Correct.

25    Q.    Okay.  And it's to a Jamey?

754

Direct - Dittman

1    A.   Jamey Fader, yes.

2    Q.   And you're cc'd as Scott Dittman; is that right?

3    A.   Yes.

4    Q.   I made a mess there.  Is that right?

5    A.   Correct.

6    Q.   Subject:  "VertiFresh," correct?

7    A.   Yes.

8    Q.   Billy Sears e-mailed on this?

9    A.   No.

10   Q.   William Sears?

11   A.   No.

12   Q.   W.J. Sears?

13   A.   No.

14   Q.   Sears@fusionpharm?

15   A.   No.

16   Q.   Sears@vertifresh?

17   A.   No.

18   Q.   Any other e-mails that you knew that Mr. Sears went by?

19   A.   No.

20   Q.   Can you read that first sentence of the second

21   paragraph.

22   A.    "Scott, my brother and William my brother in-law have

23   started a vertical farming company producing mainly leafy

24   greens (not hippy lettuce) named VertiFresh and we all met

25   last week to discuss further entrance into the food market

Direct - Dittman

1        here in Denver."

2    Q.   Okay.  Can we go to the top of that e-mail.

3              COURTROOM DEPUTY:  Just so you're aware, this is

4        not admitted into evidence.

5              THE COURT:  I haven't gotten any objection so far,

6        but --

7              MR. SIBERT:  I can lay the foundation, Your Honor.

8              THE COURT:  Well, let me find out, maybe there's

9        not going to be an objection because I haven't heard any so

10       far.

11             MR. SIBERT:  I believe it's stipulated to.

12             THE COURT:  Okay.

13             MR. BARNARD:  Correct.  No objection.

14             THE COURT:  What exhibit are we talking about?

15             MR. SIBERT:  I'm sorry, Your Honor, 167.

16             THE COURT:  I thought you were going to be

17       examining on 387, 388, and 392.

18             MR. SIBERT:  I already have.

19             THE COURT:  Okay.  167 --

20             MR. SIBERT:  Section 4, sir.

21             THE COURT:  Oh, there it is.  Okay.  All right.  It

22       is stipulated.  Okay.  So given the stipulation of the

23       parties, Government Exhibit 167 is admitted into evidence

24       and may be published to the jury.

25             (Government's Exhibit 167 received)

1    BY MR. SIBERT:

2    Q.   Let me just go back to that.  Can we start at the

3    bottom again.

4         Again, can you just read this sentence here, as you

5    did before.

6    A.   "Scott, my brother and William my brother-in-law have

7    started a vertical farming company producing mainly leafy

8    greens (not hippy lettuce) named VertiFresh and we all met

9    last week to discuss further entrance into the food market

10   here in Denver."

11   Q.   Okay.  And, again, so the jury can see it -- I'm

12   sorry -- but the subject is VertiFresh.

13   A.   Yes.

14   Q.   That's the company.

15   A.   Yes.

16   Q.   And you're cc'd to this e-mail.

17   A.   Yes.

18   Q.   And it's being sent, as you testified, by your little

19   brother.

20   A.   Yes.

21   Q.   Okay.  And nowhere here, as you testified to, is Mr.

22   William Sears; is that correct?

23   A.   Correct.

24   Q.   Under his various e-mail accounts.

25   A.   Correct.

1    Q.   Including his William Sears VertiFresh account.

2    A.   Correct.

3    Q.   Can you go to the top of the e-mail.

4         Sir, and again, you actually drafted this e-mail;

5    is that correct?

6    A.   Yes.

7    Q.   And you're talking about VertiFresh; is that right?

8    A.   Yes.

9    Q.   And, again, you're e-mailing your little brother; is

10   that right?

11   A.   Yes.

12   Q.   What are you telling -- is it Jamey?

13   A.   Jamey.

14   Q.   Okay, what are you telling Jamey?

15   A.   "Jamey, Bob's brother here.  We had exchanged messages

16   a few times several months back on the same subject.  Now we

17   are actually growing for and shipping to local restaurants.

18         "Would still really value your input and would love

19   to get a sense of 'interest factors' from a high end

20   restaurant perspective."

21   Q.   So your little brother, with you cc'd on the e-mail,

22   states that you and Mr. Sears are starting the company

23   VertiFresh.

24   A.   That's what he says, yes.

25   Q.   Okay.  Nowhere did you decline it.

Direct - Dittman

1    A.   I didn't realize I had to decline everything that was

2    misstated in an e-mail.

3    Q.   Okay.  Well, you actually respond back; isn't that

4    right?

5    A.   I certainly did, yes.

6    Q.   And you actually talk about growing lettuce.

7    A.   Yes, we were growing lettuce.

8    Q.   And you're mentioning the subject VertiFresh.

9    A.   Yes.

10   Q.   And nowhere here is Mr. Sears.

11   A.   The subject -- I responded to the e-mail, he wasn't in

12   the first one, so I did not add his name.  The subject

13   VertiFresh was already the subject, it's just RE:

14   VertiFresh now.

15   Q.   You're now sending e-mails on behalf of your brother's

16   company, VertiFresh.

17   A.   I don't see that I said anything on behalf of

18   VertiFresh in this e-mail.  No.

19   Q.   And, in fact, VertiFresh, as we discussed, was

20   90 percent of your revenue in 2012.

21   A.   That much is true.

22   Q.   Can I have Government Exhibit 19 shown.

23             MR. SIBERT:  And this has been stipulated to, Your

24   Honor.  I don't think it has been put into evidence, so I

25   would like to move into evidence Government Exhibit 19, 40,

759
Direct - Dittman

1    390.   That's section 8, Your Honor.

2              THE COURT:   Section 8?

3              MR. SIBERT:   Yes, sir.   Sorry.

4              THE COURT:   All right.   Given the stipulation of

5    the parties, Government Exhibits 19, 40, and 390 are

6    admitted into evidence and may be published to the jury.

7    (Government's Exhibit 19, 40, and 390 received)

8              MR. SIBERT:   Your Honor, may I have a moment?

9              THE COURT:   You may.

10             MR. SIBERT:   Actually, I'm okay.   I'm sorry.

11   BY MR. SIBERT:

12   Q.   Can I have -- let me get the hard copy.   I'm sorry.

13   Can I have the witness shown page 13 -- I'm sorry, actually,

14   before we do that, go ahead and just blow that up for me.

15   Not the top.

16             And what is this document, Government Exhibit 19?

17   A.   It's the annual information and disclosure statement

18   for FusionPharm dated December 31st, 2011.

19   Q.   So the annual -- the annual report being submitted to

20   OTC Markets for 2011?

21   A.   Yes.

22   Q.   Can I have page 13?   Can you blow this up, please?

23             What is your annual salary, sir?

24   A.   $60,000.

25   Q.   Can I have Exhibit 40 shown, please.   Can I have page 2

1      of Exhibit 40.

2              Okay, sir, you stated that Mrs. Blume worked for

3      you; is that correct?

4      A.    She did.

5      Q.    And this is a letter to -- Mrs. Blume is writing on

6      behalf of FusionPharm; is that right?

7      A.    It appears so.

8      Q.    And this is January 30th, 2012?

9      A.    Yes.

10     Q.    Okay.  And how much is Mr. Sears being paid since

11     January 2011 by FusionPharm?

12     A.    According to Ms. Blume, 5,000 per month, but I don't

13     think that's accurate.

14     Q.    Okay.  Well, how much is 5,000 times 12?

15     A.    Excuse me?

16     Q.    How much is 5,000 times 12?

17     A.    60,000.

18     Q.    So that would be the same salary, if this is right, as

19     you were being paid?

20     A.    If it were right, yes.

21     Q.    Can I have Exhibit 390.  Oh, I'm sorry, I'm sorry,

22     let's go back to 40, page 3.

23     A.    Can we go back to that for one second, please?

24     Sorry.

25     Q.    I'm going to show you page 3 of Exhibit 40.  This is a

Direct - Dittman

1    FusionPharm check; is that right?

2    A.    It is.

3    Q.    And it's dated January 27th, 2012; is that right?

4    A.    That's correct.

5    Q.    Whose signature is this?

6    A.    That's mine.

7    Q.    Who's the check made to?

8    A.    Bill Sears.

9    Q.    How much?

10    A.    5,000.

11    Q.    Thank you.  Can I have page 390.  Can we have this

12    blown up, please.  I'm sorry, can you just go up a little

13    bit.

14          You're receiving an e-mail; is that correct?

15    A.    Yes.

16    Q.    And what is this about?

17    A.    It's from Connie Rutherford at Paychex, saying, "Hi,

18    Scott, are the salaries the same for you and William?  Are

19    we okay to date the checks for tomorrow?"

20    Q.    Can you go to the top, please.

21          You replied back, is that correct, in an e-mail?

22    A.    I did.

23    Q.    And your response is what?

24    A.    Yes and yes.

25    Q.    Salaries are the same is what you said, yes?

Direct - Dittman

1    A.   Yes.

2    Q.   Could you please take that down.  Could we go back two

3    exhibits to that letter from Kelly Blume.  I have some

4    follow-up questions here.

5    A.   Okay.

6    Q.   Did Mr. Guy Jean-Pierre know about your

7    brother-in-law's William Sears' felony conviction?

8    A.   Yes.

9    Q.   Did Mr. Guy Jean-Pierre know that Robert Dittman was

10   holding shares of FusionPharm?

11   A.   Yes.

12   Q.   How many times did you meet with Mr. Guy Jean-Pierre in

13   person?

14   A.   Two, maybe three.

15   Q.   And did Mr. Guy Jean-Pierre come out to see FusionPharm

16   in 2011?

17   A.   He did.

18   Q.   Okay.  Was Mr. Sears -- Mr. Williams Sears -- was he

19   selling FusionPharm stock in the year of 2011?

20   A.   I think Richie Scholz was selling stock for Bill Sears

21   in 2011.

22   Q.   All right.  My question was William Sears.

23   A.   My answer is not to my knowledge, no.

24   Q.   Okay.  Was Mr. Sears selling FusionPharm stock in 2012?

25   A.   I believe so.

Direct - Dittman

1    Q.   Was he selling FusionPharm stock in 2013?

2    A.   I believe so.

3    Q.   Did Mr. Guy Jean-Pierre know this?

4    A.   Yes.

5    Q.   And how do you know?

6    A.   Because we discussed it many times.

7    Q.   Okay.  So there was an open discussion?

8    A.   Very.

9    Q.   Okay.  And how did those discussions go?

10   A.   From the very beginning, I knew that Billy had had

11   stock from the original transaction between Baby Bee

12   Bright -- excuse me -- between Baby Bee Bright and

13   FusionPharm that he got from a debt settlement from Fred

14   Dahlman.

15        He received some stock out of, I believe my little

16   brother's share, as his fee for transacting the transaction.

17   And from the very beginning when I first met Mr.

18   Jean-Pierre, we discussed -- I met Richie Scholz on the same

19   trip, I think, that I went to Florida to meet Mr.

20   Jean-Pierre the first time.

21        Mr. Scholz was introduced to me as the broker who

22   would be the -- selling Mr. Sears' stock, and I discussed

23   with Mr. Sears and Guy that transaction.

24   Q.   Okay.  And you raised a good point.  You actually went

25   down to Florida to meet Mr. Guy Jean-Pierre; is that right?

Direct - Dittman

1    A.    I did.

2    Q.    And that was the first time you met him?

3    A.    Yes.

4    Q.    So two times in person definitely; when he came to

5    Colorado, and you went to Florida.

6    A.    Right.

7    Q.    Okay.  And I think we spoke about this earlier, but I

8    just want to make sure I'm clear.  The sale of FusionPharm

9    stocks by your brother-in-law, William Sears, eventually

10   came back to FusionPharm; is that right?

11   A.    In the form of loans from Baby Bee Bright -- or, sorry,

12   from Bayside and Meadpoint, yes.  In the form of the

13   licensing agreement from VertiFresh, yes.

14   Q.    And did Guy Jean-Pierre know about this money coming

15   back --

16   A.    Yes.

17   Q.    He did?

18   A.    Yes.

19   Q.    And let me just -- you raise a good point.  And before

20   I forget to ask you:  The filings that were done, we talked

21   a lot about those in the beginning of your testimony

22   regarding over-the-counter markets.  I know various people

23   file them, including yourself.  Were they all done from

24   FusionPharm's offices here in Colorado?

25   A.    So far as I know, yes.

1    Q.   Well, you talked about this key thing, correct?

2    A.   Correct.

3    Q.   Where was the key kept?

4    A.   Usually in our office in Colorado.  I don't know that

5    it ever left.

6    Q.   Okay.  And all three of the people that you spoke

7    about, including Mr. Sears, did their business in the

8    offices at FusionPharm?

9    A.   Who's the third, I'm sorry?

10   Q.   Mr. Dougherty at the end of 2013?

11   A.   Oh, Mr. Dudley, yes.

12   Q.   Dudley, Sorry.

13   A.   Yes.

14   Q.   So essentially everything -- those three people all did

15   their work out of the offices from FusionPharm in Colorado?

16   A.   Yes.  Mr. Bohlender, in the beginning, was in Arizona

17   most of the time, but came to the office.  If we were

18   filing, he would have been in the office to file.

19   Q.   Okay.  So to the best of your recollection, all the

20   filings occurred from FusionPharm here in Colorado.

21   A.   Yes.

22   Q.   Now, did Mr. Guy Jean-Pierre know that Mr. Sears was

23   VertiFresh, Meadpoint, and essentially acting as Bayside?

24   A.   Yes.

25   Q.   And did Mr. Guy Jean-Pierre also know that Billy was

Direct - Dittman

1   working for FusionPharm to include, essentially, working

2   with the company's financials regarding advances of

3   investors?

4   A.   I'm not sure about that last part.

5   Q.   Or in advance of investors?

6   A.   I'm still not sure I understand the question, sir.  Can

7   you try that again?

8   Q.   I'm sorry, I'm getting a little tired.

9        So let me just ask you --

10  A.   I understand.

11  Q.   -- we had a lot of questions regarding these e-mails

12  that went back and forth.  A lot of them dealt with the

13  filings of the disclosures, a lot of them dealt with the

14  financials of the disclosures, what was in the disclosures,

15  member to relating parties, transactions, the criminal

16  history, the officers and directors.  You remember all those

17  questions, right?

18  A.   Yes.

19  Q.   All right.  And then you told me that Mr. Sears also

20  was involved in the stocks, is that right, of FusionPharm?

21  A.   Yes.

22  Q.   Promoting it, marketing it, I think --

23  A.   No.

24  Q.   I think you used the word "marketed."

25  A.   No, he worked -- marketed pods.

Direct - Dittman

1    Q.   Okay.  Marketed pods.

2    A.   Right.

3    Q.   So he had various jobs at FusionPharm.

4    A.   Yes.

5    Q.   Involvement.

6    A.   Yes.

7    Q.   Stocks, marketing for the company, being e-mailed

8    between the corporate lawyer and the CEO on several things.

9    A.   Yes.

10   Q.   So he had a lot of knowledge.

11   A.   Yes.

12   Q.   Did Mr. Guy Jean-Pierre know all that?

13   A.   Yes.

14   Q.   Who was responsible for providing the OTC attorney

15   letters to OTC Marketing for your firm?

16   A.   Mr. DiTommaso.

17   Q.   Okay.  And do you know who drafted those letters?

18   A.   I believe he did, Mr. Jean-Pierre.

19   Q.   And do you know who uploaded those letters?

20   A.   Not necessarily.  It could have been my -- I would

21   suspect Bill, but I'm not certain.

22   Q.   Okay.  And do you know how Mr. Sears received those

23   letters?

24   A.   I would suspect via e-mail.

25   Q.   By who?  Would you have sent the e-mails?

Direct - Dittman

1    A.    Would I have sent e-mails?  If they came to me first,

2    yes.

3    Q.    Do you know how Bill got those letters through e-mail?

4    A.    No.  Specifically, no.

5    Q.    Okay.

6              MR. SIBERT:  Your Honor, may I have a moment,

7    please?

8              THE COURT:  Yes.

9              MR. SIBERT:  Your Honor, I'll pass the witness.

10             THE COURT:  All right.  Why don't we take our

11   afternoon break.  It's going to be a little bit early.

12             Members of the jury, I want to inform you what I

13   told the lawyers first thing this morning, that today we're

14   going to go until 10 to 5:00.  All right?

15             We'll be in recess for 15 minutes.

16        (Jury left the proceedings at 2:58 p.m.)

17             THE COURT:  You know the drill now, Mr. Dittman.

18             THE WITNESS:  Yes, sir.

19        (Recess taken 2:59 p.m.)

20        (Jury entered at 3:18 p.m.)

21             THE COURT:  Mr. Dittman, you remain under oath.

22             MR. SIBERT:  Your Honor, during the break I spoke

23   to counsel.  I forgot to ask three questions and so Mr.

24   Barnard was going to let me --

25             THE COURT:  Okay.

Direct - Dittman

1           MR. SIBERT:  -- carry forward real quick.

2                DIRECT EXAMINATION (Continued)

3       BY MR. SIBERT:

4       Q.   Sir, as part of your testimony here today, you were

5       able to listen to some videos regarding a conversation that

6       occurred in July of 2014 at a Starbucks; is that correct?

7       A.   That's correct.

8       Q.   Okay.  And were you able to view the whole entire

9       video?

10      A.   I was.

11      Q.   And there was two of them; is that right?

12      A.   In Starbucks, yes.

13      Q.   Okay.  And would you tell me who were in the -- who

14      participated in those recordings?

15      A.   Myself and the undercover agent.

16      Q.   Okay.  And were you able to also hear what was in the

17      video?

18      A.   Yes.

19      Q.   Okay.  And I can't remember, was there a caption below

20      the video that transcribed what was being said?

21      A.   I don't know.  There was no -- like closed captioning,

22      like the words?

23      Q.   Yes, sir.

24      A.   No.

25      Q.   What was being said in the Starbucks, what was

Direct - Dittman

1  discussed in the Starbucks in that recording, was that what

2  was said during the day that you met with the undercover

3  agent?

4  A.   Yes.

5  Q.   Okay.  And was there any differences between what

6  happened in the Starbucks and what you saw on the

7  recordings?

8  A.   No.

9       MR. SIBERT:  Your Honor, at this time, the

10  Government would move to admit Government Exhibit 5-A and

11  5-B, which are recordings regarding this meeting at

12  Starbucks.

13       THE COURT:  All right.  Any objection?

14       MR. BARNARD:  Your Honor, if counsel will certify

15  or assure us that there are no captions or syncing on it,

16  there is no objection.  If there is syncing on, it we would

17  object for the same reasons we objected before.

18       MR. SIBERT:  Your Honor, my notes say they are

19  synced.

20       THE COURT:  That they are.

21       MR. SIBERT:  Yes, sir.

22       THE COURT:  Okay.  All right.  Well, the

23  objection's overruled.  The Government Exhibits 5-A and 5-B

24  are admitted into evidence and may be published to the jury.

25       And like I instructed you folks yesterday, the

1    evidence is the oral statements on the file.

2         (Government's Exhibits 5-A and 5-B received)

3              MR. SIBERT:  I'm not going to publish them right

4    now, Your Honor.

5              THE COURT:  All right.

6    BY MR. SIBERT:

7    Q.   And, finally, my last question, would be, sir:  Did you

8    plead guilty to your role involved in the FusionPharm case?

9    A.   I did.  I pled guilty to backdating a modified

10   promissory note.

11   Q.   And was part of that a conspiracy charge regarding

12   securities fraud?

13   A.   It was.

14              MR. SIBERT:  Thank you, Your Honor.

15              THE COURT:  Cross-examination.

16                        CROSS-EXAMINATION

17   BY MR. BARNARD:

18   Q.   Mr. Dittman, we'll begin with talking about a few of

19   the things that were discussed right at the end, and then

20   I'm going to go back more or less to the beginning to

21   yesterday and ask you some questions.  So with regard to one

22   of the last questions you were asked before the break was

23   you were asked did Mr. Jean-Pierre know all of "that," and

24   then counsel listed a number of different things and a

25   number of different topics and areas.  And you said yes.

Direct - Dittman

1          Now, you only met with Mr. Jean-Pierre on three

2     different occasions?

3     A.    I believe that's correct.

4     Q.    And you talked to him on the telephone how many times?

5     A.    Difficult to say.  So long ago, but probably a few

6     dozen, maybe.  A couple dozen.

7     Q.    And is it from your conversations on the telephone with

8     Mr. Jean-Pierre and your meetings with him that makes it so

9     that you would testify that it is your -- based on your own

10    knowledge that Mr. Jean-Pierre was, in fact, aware of and

11    familiar with all of those different items that -- of which

12    counsel spoke?

13    A.    Yes.

14    Q.    So all of those topics were covered.  So you discussed

15    with Mr. Jean-Pierre every one of the financials?

16    A.    Oh, no.  Every financial statement?  No.  No.

17    Q.    How about every one of the quarterlies?  Did --

18    A.    No.

19    Q.    How about the -- the information about whether or not

20    Sears was associated with or owned Meadpoint?

21    A.    Yes.

22    Q.    Okay.  And so you had some discussions with him but not

23    about everything.

24    A.    Correct.

25    Q.    All right.  And we'll get back to some of that.

Direct - Dittman

1    One of the other things that counsel asked you was

2    did Mr. Jean-Pierre know that Mr. Sears was Meadpoint,

3    VertiFresh, et cetera, and that Mr. Sears was working for

4    FusionPharm on, I believe you said, the information

5    documents and things like that, right? You remember that

6    question somewhat to that effect?

7    A.    Yes.

8    Q.    In the years -- well, let me go back. Beginning

9    about -- and you tell me when -- beginning about when in

10   2011 and then '12 and '13, was Mr. Sears working for

11   FusionPharm?

12   A.    Working for FusionPharm as an employee or --

13   Q.    Yes. Working for. As an employee.

14   A.    As a paid employee? Probably in part of -- for a few

15   months in 2011 and maybe into the beginning of 2012 based on

16   that check that I just saw, as a paid employee. But he

17   was -- you know, we shared office space for the vast

18   majority of that time.

19   Q.    Well, Mr. Sears is your brother-in-law.

20   A.    Correct.

21   Q.    And so you would socialize with Mr. Sears as a -- at

22   family affairs.

23   A.    Certainly.

24   Q.    You have had a number of years of contact with him over

25   time.

Direct - Dittman

1    A.   Yes.

2    Q.   And is it fair to say that over the years, you and Mr.

3    Sears have developed somewhat of a friendship relationship?

4    A.   Yes.

5    Q.   So when Mr. Sears was helping you do some of these

6    documents and some of these things, was he being -- after --

7    except for the times you were talking about, was he being

8    paid for them?

9    A.   No.

10   Q.   So would it be fair to say that, in fact, based on your

11   family relationship, friendship, he was helping you out

12   significantly?

13   A.   Yes.

14   Q.   And he, in fact, had somewhat of a financial interest

15   in seeing FusionPharm succeed based on his own businesses,

16   correct?

17   A.   Correct.

18   Q.   Because, in fact, FusionPharm and some of these other

19   businesses, Meadpoint or VertiFresh, were related in their

20   business dealings.

21   A.   Correct.

22   Q.   And, in fact, VertiFresh, for example, was

23   FusionPharm's biggest customer.

24   A.   In 2012, correct.

25   Q.   In 2012.  And I may get back to this as I go through

1    some of the specifics, but counsel was asking you in his
2    examination as to whether or not you disclosed the fact that
3    your biggest customer for FusionPharm was VertiFresh, asking
4    if you disclosed that on your disclosures to the OTC,
5    correct?
6    A.    I think we -- I think we saw the VertiFresh
7    disclosures, I think maybe he was asking if we disclosed
8    Bill Sears specifically.
9    Q.    Right.  And he was asking specifically if you had
10   disclosed him because of VertiFresh being your biggest
11   customer.
12   A.    Correct.
13   Q.    To the best of your understanding and knowledge, were
14   you required to disclose who ran and who owned your
15   customers' companies?
16   A.    No.
17   Q.    At the -- near the end, counsel asked you about Mr.
18   Sears selling FusionPharm stock in 2011 and you said no.
19   And 2012 and '13, you said yes.
20   A.    Correct.
21   Q.    To the best of your knowledge, while Mr. Sears was an
22   employee -- an employee of FusionPharm, did he sell any
23   stock?
24   A.    I honestly don't -- I honestly don't know, sir.  That's
25   going to be right near that time frame; right end of 2011

Direct - Dittman

1    and into 2012, and I'm not sure -- I'm just not sure.

2    Q.   When Mr. Sears was receiving some paycheck -- a check

3    of 5,000 --

4         If we could have Exhibit 40, please.  And I believe

5    it's page 3.

6         It says "January 2012 payroll."  Do you remember

7    who prepared this -- this check, itself, and put the January

8    12, 2000 [sic] payroll?

9    A.   I don't.  But at the time, it was probably -- it was

10   probably Kelly Blume.

11   Q.   And at this time, to the best of your recollection, was

12   Mr. Sears actually on the payroll?

13   A.   Well, based on this, I'd have to say yes, but --

14   Q.   No, I'm asking not based on that; I'm asking based upon

15   your recollection and your knowledge.

16   A.   No, I would think not.  And also -- also just -- if I

17   may, as part of the reason I think that, this is -- a

18   payroll check is for $5,000 and the check is for exactly

19   $5,000 as opposed to having -- you know, having withholdings

20   done and all that kind of stuff.

21   Q.   All right.  To the best of your knowledge, did Mr.

22   Sears receive any paid -- payroll check in December of 2011?

23   A.   I don't -- I don't know, sir.

24   Q.   Do you have any belief as to whether or not he was?

25   A.   I would think not, but I'm not certain.

777
Direct - Dittman

1    Q.   And -- I'm sorry, I didn't mean to cut you off.

2    A.   I said but I'm not certain.

3    Q.   And how about February of 2012, to the best of your

4    recollection?

5    A.   No, I don't think so.

6    Q.   And, in fact, you don't even really remember him being

7    on the payroll in January of 2012.

8    A.   That's correct.

9    Q.   Although it does have your signature --

10   A.   Oh, it does.

11   Q.   It does have your signature on it.

12   A.   Yes.

13   Q.   All right.  Now, when you began both Baby -- when you

14   acquired Baby Bee Right -- Bee Bright and transferred and

15   transformed it into FusionPharm in 2010-'11, this was a real

16   company, wasn't it?

17   A.   Before and after -- you mean as Baby Bee Bright?  As

18   FusionPharm?  What --

19   Q.   Once you became FusionPharm, this was a real company,

20   right?

21   A.   Yes, for sure.

22   Q.   Okay.  So Baby Bee Bright was a shell, or like that.

23   A.   Yes.  Sorry, I know there is a very specific legal term

24   to the word "shell," so I want to be careful not to say

25   something that I know is incorrect, because I was always

1    answering that "shell" question back in the day.

2    Q.    Let me rephrase the question.

3          Baby Bee Bright was really an inactive corporation.

4    A.    Yes.  Yes.

5    Q.    And so you purchased it and then made it into

6    FusionPharm.

7    A.    Correct.

8    Q.    For the purpose of doing a real business.

9    A.    Yes.

10   Q.    You hired people.

11   A.    Yes.

12   Q.    You rented out space.

13   A.    Yes.

14   Q.    You built things.

15   A.    Yes.

16   Q.    You -- you sold items that you built.

17   A.    Yes.

18   Q.    And you discussed at length, with various different

19   people, business plans and how to make your business work.

20   A.    Yes.

21   Q.    So for -- from 2010 until 2014, you were attempting to

22   make this into a viable working company.

23   A.    Oh, yes.

24   Q.    And you were spending your full time on it.

25   A.    More than full time.

1    Q.    Now, do you recall approximately how much total Mr.

2    Sears was paid in salaries as an employee of FusionPharm or

3    while -- yeah, of FusionPharm?

4    A.    I don't.  But I would be surprised if it was, you know,

5    more than $20,000, maybe.

6    Q.    Now, let me go back, then, before we continue on that.

7    Let me go back to one of the earlier items that we were --

8    that was discussed this morning so I can clarify this.  And

9    I'm talking about the distinction between Exhibit 25 -- and

10   I believe you need to have the actual document 25 in front

11   of you to take a look at that.  And Exhibit -- Government

12   Exhibit 395, both of which have been admitted into evidence.

13            COURTROOM DEPUTY:  Sorry, what was the second one?

14            MR. BARNARD:  The first one was 25 and the -- or

15   the other one was 395.

16   BY MR. BARNARD:

17   Q.    And if you could look at both of them next to each

18   other, please.  And I note that both Exhibit 25 and

19   Exhibit 395 state that they are the FusionPharm Annual

20   Information and Disclosure Statement for December 31st,

21   2012.  Correct?

22   A.    Yes.

23   Q.    And that on Exhibit --

24            THE COURT:  Mr. Barnard, do you want to have the

25   jury look at any -- either of these --

1      MR. BARNARD:  I'm about to get there, Your Honor.

2      THE COURT:  Okay.  Just so you know, there's

3    nothing on their screen.

4      MR. BARNARD:  Thank you.

5    BY MR. BARNARD:

6    Q.   And on Exhibit 395, page 12, please.

7         Let me see if we can't just ask this without even

8    looking at it.  On -- you look at 12 and it says Mr. Guy

9    Jean-Pierre was legal counsel, correct?

10   A.   Correct.

11   Q.   And look on the other exhibit, the Exhibit 3 -- 3 --

12   or, excuse me, Exhibit 25.  On 25, he's not listed as legal

13   counsel, correct?

14   A.   Correct.

15   Q.   Which is the one that was submitted as the actual

16   annual information report?

17   A.   I don't know.

18   Q.   Do you -- you were asked by counsel about reasons why

19   maybe Mr. Jean-Pierre was taken off at that time.  And isn't

20   December -- the end of December the time that Mr.

21   Jean-Pierre, in fact, was in a very serious automobile

22   accident?

23   A.   It was.

24   Q.   Could that, or did that, have something to do with why

25   he then, for a period of time, would not be listed as

Direct - Dittman

1    corporate counsel?

2    A.   I don't remember -- excuse me, I don't remember that,

3    sir, but the -- I can't say.  I don't recall that

4    specifically.

5    Q.   So after Mr. Jean-Pierre was no longer corporate

6    counsel, he still did do some advising for you, correct?

7    A.   He did.

8    Q.   And he did some advising for you into the middle of

9    2013.

10   A.   Correct.

11   Q.   Now, when he was doing that, he was not acting as legal

12   counsel anymore, was he?

13   A.   No.

14   Q.   So -- and, in fact, while he was preparing or gathering

15   documents to submit to Mr. DiTommaso, he was not necessarily

16   doing legal work at that point either, was he?

17   A.   Well, maybe not -- you know, no longer as officially

18   FusionPharm's corporate counsel, no.

19   Q.   But he was doing things for them.

20   A.   Yes.

21   Q.   For example, he was gathering documents.

22   A.   Yes.

23   Q.   Gathering information.

24   A.   Yes.

25   Q.   And submitting that information to Mr. DiTommaso.

Direct - Dittman

1    A.    Yes.

2    Q.    And sometimes even preparing drafts.

3    A.    I'm not sure I can speak to that precisely, but it

4    wouldn't surprise me.

5    Q.    Actually, I was speaking very generally about drafts.

6    During that period of time, he -- he created some drafts of

7    different documents for -- for your corporation.

8    A.    Do you have something in particular?  I mean, I

9    wouldn't be surprised, but I'm not sure I could name one.

10   I'm not trying to be difficult, sir; I'm just wanting to be

11   specific.

12   Q.    Well, I guess that would be a question.  Can you name

13   anything that -- can you name any document that, during the

14   year 2012, Mr. Jean-Pierre actually submitted, signed by

15   himself as an attorney, presenting it as an attorney's

16   document?

17   A.    Now you said 2012.  Do you mean 2013?

18   Q.    No, I mean 2012 right now.

19   A.    Sorry.  Submitted himself and signed himself as

20   attorney's document in 2012?  None that I can think of.

21   Q.    And 2013?

22   A.    Same answer.

23   Q.    How about 2011?

24   A.    Probably the same answer.

25   Q.    So isn't it fair to say that a lot of the things that

Direct - Dittman

1   Mr. Jean-Pierre was doing was, in fact, doing paralegal

2   kinds of work?

3   A.   I'm not -- I don't know that I know what a paralegal

4   does so I'm not sure that I can answer that question either.

5   I'm not trying to avoid the question, I just -- I'm just not

6   sure I'm equipped to answer that.

7   Q.   Let me ask it a different way.  It was clerical work,

8   wasn't it, just getting the documents?

9   A.   Some of it was, yes.

10  Q.   Well, let's talk in particular about financial

11  statements.  Mr. Jean-Pierre didn't put the numbers in the

12  financial statements, did he?

13  A.   No.

14  Q.   So he didn't create those?

15  A.   No.

16  Q.   But you asked him to look at them?

17  A.   Yes.

18  Q.   So he reviewed the things that you had -- you or your

19  accountant or somebody else from FusionPharm had prepared.

20  A.   Yes.

21  Q.   And to the best of your information and knowledge with

22  regard to the attorney opinion letters that went to Mr.

23  DiTommaso, that also was what he was doing.  He was

24  submitting the documents and possibly a form letter to Mr.

25  DiTommaso to -- for Mr. DiTommaso to then review and submit.

Direct - Dittman

1    A.    Yes.

2    Q.    And that would include the OTC information documents.

3    A.    Yes.

4    Q.    And on any of the OTC information documents, if there

5    was a requirement to disclose other people who helped to

6    create it, that would be the obligation of Mr. DiTommaso,

7    too, because he signed it, right?

8    A.    I presume so, yes.

9    Q.    On -- if you recall on Exhibit 395, page 12, you were

10   asked about and pointed out that it stated that Mr.

11   Jean-Pierre as legal counsel had a $30,000 annual salary.

12   A.    Yes.

13   Q.    Did Mr. DiTommaso -- excuse me, did Mr. Jean-Pierre --

14   did I say DiTommaso before?  Oh.  Did Mr. Jean-Pierre

15   receive his $30,000 annual salary?

16   A.    No.

17   Q.    Do you know approximately how much from 2010 to the end

18   of 2013 Mr. Jean-Pierre was paid by FusionPharm?

19   A.    I don't exactly, but --

20   Q.    Do you know -- could you give us an estimate or a

21   number over which you're sure it is not?

22   A.    I would be shocked if it was over $15,000.

23   Q.    Do you know whether or not he also received

24   information -- excuse me, received funds from Bayside for

25   writing opinion letters for them?

Direct - Dittman

1    A.   I believe so.

2    Q.   All right.  So if we saw some checks -- I'm sorry, do

3    you know how much Bayside may have paid him?

4    A.   I think he charged $500 for an opinion letter.

5    Q.   And do you know if he paid Mr. DiTommaso, then, any

6    funds out of that?

7    A.   I do not know.

8    Q.   Okay.  You were asked about -- on several occasions, on

9    several documents you were shown places where it talked

10   about disciplinary or legal actions and the -- and on those

11   disclosure statements it was saying "none."

12   A.   Yes.

13   Q.   To -- when you filed those documents, to the best of

14   your knowledge, had anybody already been the subject of

15   disciplinary or legal actions at that time?

16   A.   No.

17   Q.   You were asked about revenues and finances with regard

18   to the December 31st, 2012, disclosure -- information --

19   annual information and disclosure statement.  Do you recall

20   that?

21   A.   I do.

22   Q.   And you were asked about the -- the purchase of items

23   from your brother-in-law's company, from VertiFresh.

24   A.   Purchases from VertiFresh?  Or by --

25   Q.   Excuse me, the sales to VertiFresh.  Thank you.

Direct - Dittman

1    A.    Yes.

2    Q.    To the best of your knowledge, is there anything --

3    there isn't anything illegal to sell a pharm pod to your

4    brother-in-law's company, is it?

5    A.    No.

6    Q.    You were asked -- now we're going back more to the

7    beginning.  You were asked about Sandra Sears being an

8    officer of FusionPharm for a few months in 2011.

9    A.    Yes.

10   Q.    And she was Mr. Sears' mother.

11   A.    Correct.

12   Q.    Do you -- there's nothing illegal in having your

13   brother-in-law's mother as a corporate officer, is there?

14   A.    Not to my knowledge.

15   Q.    Nothing improper on that?

16   A.    Not to my knowledge.

17   Q.    You were asked about a reverse stock split of 200 to 1

18   reverse stock split.

19   A.    Yes.

20   Q.    There's nothing illegal about that, is there?

21   A.    Not to my knowledge, no.

22   Q.    In fact, isn't that a -- a mechanism that is often used

23   in circumstances such as this with corporations?

24   A.    Yeah, I think that's pretty common in reverse purchases

25   like that, yeah.

Direct - Dittman

1    Q.   Now is 200 to 1 unusual?

2    A.   I don't know.  It's my only experience.

3    Q.   All right.  So when you talked to -- excuse me -- you

4    talked to Mr. DiTommaso, I believe you said, every time

5    before you filed one of the necessary documents to either

6    the OTC website or for your financial statements, correct?

7    A.   Yes.

8    Q.   And why did you talk to him?

9    A.   I think that was a requirement, just like meeting a

10   securities attorney in person is a requirement.  I think he

11   was required to go through a checklist with me every time.

12   Q.   And you were calling him to see if he had questions.

13   A.   Yes.

14   Q.   And if he had had questions, you would have then

15   pursued to -- and attempted to get those questions answered?

16   A.   Certainly.

17   Q.   Didn't Mr. DiTommaso on a few occasions, in fact, state

18   that he needed additional documents?

19   A.   I don't honestly recall.

20   Q.   All right.  So with regard to these documents -- and

21   Government's counsel has gone through repeatedly the fact

22   that you were not communicating very often in preparation of

23   filing these different necessary filings -- you weren't in

24   communication with Mr. DiTommaso, but rather you were in

25   communication more often with Mr. Jean-Pierre and/or Mr.

Direct - Dittman

1    Sears.

2    A.    Correct.

3    Q.    And why were you in communication with them as opposed

4    to Mr. DiTommaso at those times -- those preparatory

5    times?

6    A.    Well, because they knew a lot more about the subject

7    matter, a lot more about what was going on.

8    Q.    They were the people that were gathering together the

9    documents to give to Mr. DiTommaso?

10   A.    Sure.

11   Q.    And your brother-in-law was -- was, in effect, helping

12   you out at that -- doing that.

13   A.    Yes.

14   Q.    Partially because of his relationship and partially

15   because of his knowledge about these things.

16   A.    Yes.

17   Q.    Did you consider him -- "him" being Mr. Sears, your

18   brother-in-law, William Sears -- did you consider him to be

19   a person in charge of your FusionPharm company?

20   A.    No.

21   Q.    Did you consider Mr. Sears being a person who could

22   hire or fire somebody in the FusionPharm company?

23   A.    Not without my nod.

24   Q.    Well, so he could recommend somebody.

25   A.    Yes.

Direct - Dittman

1    Q.   But you would have to be doing the hiring or the

2    firing.

3    A.   Yeah, although once or twice, not only Billy but once

4    or twice other people hired people in FusionPharm.  I wasn't

5    the only person, but not without my knowledge or my consent

6    by any -- never.

7    Q.   All right.  Didn't turn out to be a problem?

8    A.   Did it turn out to be a problem?

9    Q.   It didn't turn out to be --

10   A.   No.  No.

11   Q.   All right.  And you said several times that it was your

12   company.

13   A.   Substantially, yes.  I mean, I owned the vast majority

14   of the shares.

15   Q.   Your company because you owned the very large majority

16   of the shares.

17   A.   Yes.

18   Q.   With regard to the issue of affiliation, you were asked

19   what this meant, and you said it was a legal issue and you

20   relied on security attorneys, plural, I believe you said,

21   correct?

22   A.   Yes.

23   Q.   And who -- how many attorneys and what attorneys?

24   A.   Over the years, we had three:  Mr. Jean-Pierre, Mr.

25   DiTommaso, and then Mr. Fred Lehrer.

1    Q.   Did any of them disagree as to the definition of an
2    affiliate and affiliation?
3    A.   No, not for anything that we posted in the financials.
4    Q.   With regard to the financials, a number of them were
5    both sent to and from Mr. Kocinski.
6    A.   Yes.
7    Q.   And, in fact, Mr. Kocinski was the person who was
8    responsible for preparing and filling out and putting the
9    information into those financials while he was -- while that
10   was his position.
11   A.   That was mostly me.  He was allowed to review.  I
12   prepared them, or Cliffe for a period of time, Cliffe Bodden
13   prepared them.  Mr. Kocinski reviewed them.  He never
14   prepared them.
15   Q.   And Mr. Jean-Pierre, although he may have reviewed them
16   some, he was not reviewing them to confirm the dollar
17   numbers or the -- those contents?
18   A.   That's correct.
19   Q.   He was not responsible for the numbers on the
20   financials.
21   A.   That's correct.
22   Q.   On many occasions, the counsel for the Government was
23   pointing out the various different people who are on e-mails
24   and numbers of times it was just listed for four or five
25   different people, but it wasn't distinguished between who

1    was actually the recipient and who was the cc on it,

2    correct?  Times it was and times it wasn't, right?

3    A.   Okay, yes.

4    Q.   So when you put the cc's to Mr. Sears, what was the

5    reason for that?

6    A.   With the financials specifically?

7    Q.   Financials, let's start with.

8    A.   Primarily administrative.  I don't really think Billy

9    read them.  He's not an accountant, but he knew, you know --

10   when the whole thing started, you know, Billy knew the old

11   company, Billy knew Mr. Kocinski, Billy knew Mr.

12   Jean-Pierre, you know, Billy knew everybody, so he just kind

13   of acted as secretary, for lack of a better term.

14   Q.   But not as an employee?

15   A.   Not regarding the financials, no.  Not in that

16   capacity.

17   Q.   Is it against the law to ask your brother-in-law to

18   give you advice?

19   A.   Not to my knowledge.

20   Q.   Counsel asked you a number of times about how you were

21   disclosing this information, financials and otherwise, to

22   your brother-in-law who wasn't a part of your company.  Do

23   you know if there's anything in your corporate minutes or

24   articles of incorporation or any directives from your

25   corporation that would have instructed you not to tell your

Direct - Dittman

1   brother-in-law this information?

2   A.   Not that I'm aware of, no.

3   Q.   And you would be aware of it, wouldn't you, because you

4   were the person who was in charge of doing those things?

5   A.   I didn't read them daily, but I should be, yes.

6   Q.   But to -- do you say with pretty good confidence that,

7   in fact, you didn't violate any duty or any nondisclosure

8   clause by telling your brother-in-law about what -- these

9   different matters?

10  A.   I think that's fair.

11  Q.   And I'm not seeing it here, so I can't tell you exactly

12  where it was, but maybe you can remember and we'll see if we

13  can look at this together.  But there was at one point in

14  one of the communications where you talked about my --

15  excuse me, your brother, Robert Dittman, talked about how --

16  how "Scott, my brother, and William my brother-in-law have

17  started a company," right?  Remember that -- that one --

18  A.   VertiFresh.  Yes.

19  Q.   That was your brother who wrote that, not you.

20  A.   Yes.

21  Q.   Although you afterwards said something like yes and

22  yes, or you kind of -- you didn't correct it, did you?

23  A.   Correct.

24  Q.   But was that correct?  Was that true?

25  A.   No.

Direct - Dittman

Q.   And what -- what was the truth?  What was the fact?

A.   Well, Billy -- Billy started VertiFresh.  FusionPharm,

my company, started building shipping containers that could

grow lettuce and basil.  In 2012 we got away from --

started -- tried to get away from the cannabis industry and

focus on vertical farming instead.  And so I modified the

containers to grow lettuce and basil.  That's actually what

the patent was filed for.

     And in 2012, I was looking to license the product

to growers, and Billy became -- raised his hand, you know,

said he wanted to do that, and he became VertiFresh.  And I

certainly provided his equipment.  I had certainly tried to

sell to other people, too.  I had several other deals that I

thought would get done, and they didn't, but that's neither

here nor there, but VertiFresh was certainly his company.

Q.   So when your brother was saying that you started the

company together, that was just a generalization on his part

that -- did that trigger anything with you as being an

important statement?

A.   No.  That was just a mischaracterization on his part.

Q.   So --

     MR. BARNARD:  Your Honor, may I have a moment,

please?

     THE COURT:  You may.

BY MR. BARNARD:

Direct - Dittman

1    Q.   Mr. Dittman, did Mr. Jean-Pierre ever receive any stock

2    in FusionPharm as a payment for the work that he did for

3    FusionPharm?

4    A.   No.

5    Q.   And a final question:  Whose company -- who controlled

6    FusionPharm?

7    A.   I did.

8            MR. BARNARD:  No further questions.

9            THE COURT:  Redirect.

10           MR. SIBERT:  Thank you, Your Honor.

11                      REDIRECT EXAMINATION

12   BY MR. SIBERT:

13   Q.   Okay, Mr. Dittman, you were asked about essentially Mr.

14   Sears' salary, a variety of salaries, regarding Mr. William

15   Sears.  Can I have page -- or Exhibit 390 brought up again.

16   Can you blow that up.  Thank you.

17           You testified before Ms. Connie Rutherford asked

18   you a question; is that right?

19   A.   Yes.

20   Q.   And one of those questions was:  Is your salary the

21   same as William Sears?

22   A.   Yes.

23   Q.   And what did you reply?

24   A.   Yes.

25   Q.   Okay, sir.  You were asked about essentially what the

Direct - Dittman

1    defendant did when it came to these legal letters either to

2    OTC or to the brokerage house, otherwise known as Rule 144

3    attorney letters.  Do you recall that line of questioning?

4    A.    Yes.

5    Q.    And you stated that -- correct me if I'm wrong, but

6    that you believe that it was Mr. Guy Jean-Pierre that did

7    the drafting and then later it was Mr. DiTommaso that did

8    the signature.

9    A.    I believe that to be true.

10   Q.    All right.  Well, you knew -- in fact, we went through

11   the years -- counsel went through the years 2011, 2012, and

12   2013; is that right?  Do you recall those lines of

13   questioning regarding the letters?

14   A.    The information disclosure statement letters or the 144

15   stock letters?

16   Q.    Both letters.  Both set of letters.

17   A.    The information disclosure we discussed at length.  The

18   opinion letters I don't think we looked at or had a draft

19   of.

20   Q.    Your testimony just regarded towards the legal opinion

21   letters that went to OTC.

22   A.    Those, too, but -- no, the others, too.  I believe it

23   was Guy who drafted the 144 letters, too.

24   Q.    You also knew when you hired Mr. Guy Jean-Pierre -- you

25   went down to Florida, right?  You did basically what was

1    considered an interview; is that a good way of saying that?

2    A.    Sure.

3    Q.    Okay.  And a month after he was hired by you to do

4    legal work, you wrote a letter to the Florida State Bar on

5    his behalf; isn't that right?

6    A.    Yes.

7    Q.    But you also knew at that point he was banned from

8    writing those letters.

9    A.    Yes.  My understanding was that was, you know, some

10   form of paperwork problem technicality that was being

11   repaired at the time.

12   Q.    Okay.  But you understood that you hired a lawyer that

13   could not submit letters on behalf of your firm.

14   A.    Yes.

15   Q.    Now, you talked about Mr. Fred -- I'm sorry, who was

16   the lawyer that you stated, Fred?

17   A.    Lehrer.

18   Q.    Lehrer.  Now, Mr. Fred Lehrer was hired after Mr. Guy

19   Jean-Pierre.

20   A.    Correct.

21   Q.    Okay.  So, in fact, it was when you were under the

22   advice of Mr. Fred Lehrer when you reinstated your

23   financials for 2012.

24   A.    That was actually Mr. Dudley's advice.

25   Q.    Okay.  But was that still during the same time as Mr.

1    Fred Lehrer?

2    A.    Yes.

3    Q.    Because Mr. Jean-Pierre was no longer with you; is that

4    correct?

5    A.    Correct.

6    Q.    Can I have Government Exhibit Number 394.

7          Now you were asked some questions about the annual

8    disclosure statements, about why Mr. Guy Jean-Pierre was not

9    listed as a corporate legal counsel on one of those copies.

10   Do you recall that question?

11   A.    Yes.

12   Q.    And that was 2012's annual report; is that right?

13   A.    Yes, I have it open right here.

14   Q.    All right.  Well, in this e-mail -- this e-mail is

15   dated when?

16   A.    February 13th, 2013.

17   Q.    And who are you stating is the company counsel?

18   A.    Mr. Jean-Pierre.

19   Q.    So that would be after the annual report.

20   A.    Well, the annual report is for December 31st, 2012, but

21   probably wasn't filed until April of 2013, if we did it on

22   time.

23   Q.    But all the way through -- but the annual report only

24   covers 2012.  You would agree with that, right?

25   A.    Yes.

Direct - Dittman

1   Q.   So in 2013, Mr. Guy Jean-Pierre's still your corporate

2   counsel.

3   A.   Yeah.

4   Q.   Even in February.

5   A.   Yeah, well, at least -- yes.  For purposes of doing the

6   144, yes.

7   Q.   All right.  Now, you stated that Mr. Guy Jean-Pierre

8   came to visit FusionPharm in Denver, Colorado; is that

9   right?

10  A.   Yes.

11  Q.   Was Mr. Sears there when Mr. Guy Jean-Pierre visited

12  Denver, Colorado?

13  A.   Yo.

14  Q.   And correct me if I'm wrong, but it was your

15  brother-in-law, Mr. Sears, that -- who introduced you to Mr.

16  Guy Jean-Pierre?

17  A.   Bill Sears.

18  Q.   And that's when you went down to Florida?

19  A.   Yes.

20  Q.   In 2011.

21  A.   Correct.

22  Q.   Can I have Government Exhibit 159.

23       You stated that Mr. Guy Jean-Pierre, you believe,

24  got paid $500 for an opinion letter; is that right?

25  A.   That's my understanding, yes.

Direct - Dittman

1   Q.   I'm showing you a check for $2500.  Do you see that

2   check?

3   A.   I do.

4   Q.   All right.  Who signs this check?

5   A.   That looks like Bill Sears.

6   Q.   Okay.  And essentially from Bayside Holding; is that

7   right?

8   A.   That's correct.

9   Q.   All right.  Now, you're the CEO of the company.  Did

10  you know that there was no opinion letters written in

11  January of 2012 when that check was written?

12  A.   I had no idea that check was written, and no, I don't

13  necessarily know when opinion letters are getting written.

14  I don't particularly pay attention to opinion letters.

15  Q.   You would agree that's more than $500?

16  A.   Yes.  That was $2,500, yes.

17  Q.   You were asked some questions about VertiFresh.

18  A.   Yes.

19  Q.   Where was VertiFresh's offices located?

20  A.   Bill's office was in our office, and the containers

21  that they were growing lettuce in were inside of our

22  building.

23  Q.   So you shared office spaces.

24  A.   The entire time, yes.

25  Q.   Do you know how much money Mr. DiTommaso was paid by

1    your firm?

2    A.    I don't.

3    Q.    So as a CEO, you don't know how much one of your

4    lawyers was being paid?

5    A.    Correct.

6    Q.    Can I have Government Exhibit 25.

7          Again, do you recognize what Government Exhibit 25

8    is?

9    A.    Yes.  I have it open.

10   Q.    And what is it?

11   A.    It's the annual information and disclosure statement,

12   December 31st, 2012.

13   Q.    Can I have page 12.

14         You testified you did not know essentially what was

15   a related party transaction to counsel's question; is that

16   correct?

17   A.    Yeah -- I -- maybe not specifically -- yes.  I don't

18   recall the specific question.

19   Q.    All right.  Well, look right down here.  Can you read

20   Number 5 for me.

21   A.    "Any member of the immediate family (including spouse,

22   parents, children, siblings and in-laws) of any of the

23   foregoing persons."

24   Q.    In-laws.

25   A.    I see that.

1  Q.  William Sears was your brother-in-law.

2  A.  This is true.

3  Q.  And he did 90 percent of business with you that year

4  with VertiFresh.

5  A.  In 2012, yes.

6  Q.  And it was never disclosed anywhere in there.

7  A.  Correct.

8  Q.  Sir, would your firm have survived if it wasn't for Mr.

9  William Sears selling FusionPharm stock?

10  A.  I think it would have survived.  It would have taken a

11  different trajectory but, yeah, I think it would have

12  survived.

13  Q.  You had 390 -- $340 in that bank account?

14  A.  I understand; the company was always short of cash

15  because it was a start-up in a growing company.  I spent

16  every dollar that the company brought in on growing the

17  company.

18  Q.  Sir, my last question for you is you stated earlier you

19  pled guilty in this case; is that right?

20  A.  Well, in a related case.

21  Q.  Okay.  In a related case.  As you stated, there's

22  nothing against giving advice to your brother-in-law; is

23  that right?

24  A.  So far as I know.

25  Q.  And what charge did you plead guilty to?

Direct - Dittman

1   A.   It was a conspiracy -- conspiracy count.  I don't know

2   exactly.

3   Q.   Conspiracy to commit securities fraud?

4   A.   Yes.

5   Q.   Who did you conspire with in that plea agreement?

6   A.   I pled guilty to signing a backdated promissory note.

7   Q.   Who did you plead guilty to conspiring with?

8   A.   I'm answering your question, sir.  I was very specific

9   in my plea and I'm not going to misstate what my plea said.

10  Q.   You would agree with me to conspire, you had to do it

11  with someone.

12  A.   That's not how it was explained to me by my attorneys

13  when I pled.

14  Q.   Did you conspire with your brother-in-law, William

15  Sears?

16  A.   No.

17          MR. SIBERT:  Your Honor -- can I have a minute,

18  Your Honor?

19          THE COURT:  You may.

20          MR. SIBERT:  Your Honor, no further questions.

21          THE COURT:  All right.  May this witness be

22  excused?  For the Government?

23          MR. SIBERT:  Yes, sir.

24          THE COURT:  For the defendant?

25          MR. BARNARD:  Yes, Your Honor.

Direct - Dittman

1          THE COURT:  All right.  Mr. Dittman, thank you for

2    your testimony.  You're excused.  You may step down.

3          THE WITNESS:  Thank you, Judge.

4                    *      *      *      *      *

5      (The sealed portion of the trial is contained in a

6    separate transcript, pages 804 through 809)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Direct - Undercover Agent 1

1          (Jury was present at 4:16 p.m.)

2              THE COURT:  Thank you for your patience, ladies and

3     gentlemen of the jury.  All right.  The Government may call

4     its next witness:

5              MR. SIBERT:  Your Honor, at this time the

6     Government would like to call Undercover Agent No. 1.

7              COURTROOM DEPUTY:  Please stand behind the witness

8     stand here and raise your right hand.

9         UNDERCOVER AGENT NO. 1, GOVERNMENT'S WITNESS, SWORN

10             COURTROOM DEPUTY:  Please be seated.

11             MR. SIBERT:  May I approach, Your Honor?

12             THE COURT:  You may.

13                          DIRECT EXAMINATION

14    BY MR. SIBERT:

15    Q.   Good afternoon, sir.

16    A.   Good afternoon.

17    Q.   Okay, sir, could you please tell the jury where you're

18    currently employed.

19    A.   I'm employed at the FBI.

20    Q.   Okay.  And can you tell the jury some of your roles

21    that you do within the FBI.

22    A.   Yes.  I often work as an undercover agent for the FBI.

23    Q.   Okay.  And essentially when you work undercover, do you

24    conceal your identity?

25    A.   Yes.

Direct - Undercover Agent 1

1    Q.   Your true identity.

2    A.   Yes.

3    Q.   Okay.  All right.  Now, in 2014, did you work an

4    undercover case regarding a investigation into FusionPharm?

5    A.   I did.

6    Q.   Okay.  And what were your duties regarding that

7    undercover investigation in 2014?

8    A.   I was introduced as a potential investor in

9    FusionPharm.

10   Q.   As an investor in FusionPharm?

11   A.   Uhm-hum.  Yes.

12   Q.   I'm going to ask you to speak up.  It's hard for me to

13   hear you.  And obviously, as you know, we're making a record

14   here.

15          All right.  So you were requested to pose as a

16   potential investor?

17   A.   That's correct.

18   Q.   Who did you meet with regarding potentially investing

19   in FusionPharm?

20   A.   Scott Dittman.

21   Q.   Okay.  And how many times did you meet with Scott

22   Dittman?

23   A.   Four, I think.

24   Q.   Okay.  And did you meet with any other employees from

25   FusionPharm?

1   A.   Yes, I went to FusionPharm and I met a few of the admin

2   staff or employees, but one, particularly, named Bill Sears

3   spent some time with me.

4   Q.   Okay.  What did Mr. Sears do with you when you met with

5   him?

6   A.   He showed me around the plant and showed me some of the

7   products and was kind of like a salesperson for the company.

8   Q.   Okay.  And when you discussed -- how many -- let me go

9   back to Mr. Dittman.

10       You stated that you met with him four times; is

11  that correct?

12  A.   Yes.

13  Q.   And how many times did you meet with Mr. Dittman before

14  meeting with Mr. Sears?

15  A.   That was on my third visit with him, I believe.

16  Q.   That was the third visit with Mr. Dittman --

17  A.   With Mr. Dittman and then Mr. Sears was introduced

18  during that visit.

19  Q.   Okay.  And how long were your prior two meetings with

20  Mr. Dittman before being introduced to Mr. Sears?

21  A.   How -- I'm sorry, I don't understand.

22  Q.   Essentially how long were those meetings?  You said you

23  met with him two times prior.

24  A.   Oh, prior.  We met for coffee the first time, maybe

25  lasted an hour.  And then the second time, we had lunch and

1    then he took me to a marijuana shop and showed me the shop.

2    And then he took me to a grow facility and showed me where

3    people were growing marijuana and how it worked because I

4    didn't know anything about it.

5    Q.   Okay.  Now -- and also what were you -- what was your

6    alleged investment that you were trying to make or

7    attempting to -- or maybe making with FusionPharm?

8    A.   1.5 million.

9    Q.   Okay.  And after -- so after you met with Scott Dittman

10   on two occasions and then you got a tour of the warehouse,

11   based upon your conversation with both of those parties, who

12   do you think -- who do you think the owners of FusionPharm

13   were?

14          MR. BARNARD:  Your Honor, I object.  I don't think

15   that's a proper question.  There's not a sufficient

16   foundation for it.

17          THE COURT:  I agree.  You need to lay more

18   foundation.

19   BY MR. SIBERT:

20   Q.   Okay.  Well, how did Mr. Scott Dittman introduce

21   himself?

22   A.   As the founder of FusionPharm.

23   Q.   Okay.  And did he also state his role within

24   FusionPharm?

25   A.   I'm sure he did, but I thought he was the owner of it.

Direct - Undercover Agent 1

1    I don't remember exactly how he titled himself, but I

2    thought it was his company.

3    Q.   Okay.  And then -- and that's essentially what Mr.

4    Dittman told you?

5    A.   Yes.

6    Q.   Okay.  And then how about Mr. Sears?  When you had the

7    tour of the warehouse, did you have a conversation with Mr.

8    Sears?

9    A.   Yes.

10   Q.   And what did Mr. Sears state about his role in the

11   company?

12   A.   He kept saying, "We did this and we did that," and it

13   looked as though it was his company with -- it was the two

14   of them together and in business together, Scott and Bill.

15   Q.   Okay.  And, in fact, that day that you were taken out

16   to the warehouse, did Mr. Dittman stay with you?

17   A.   No.  He had to leave.  He left me with Bill.

18   Q.   Okay.  And where did Mr. Dittman go?

19   A.   To the airport.

20   Q.   Do you know why he was going to the airport?

21   A.   He was flying home to Pennsylvania to buy a house.  I

22   think he was closing on a house that day or the next day.

23   Q.   And so then he left you in trust with Mr. Sears?

24             MR. BARNARD:  Your Honor, leading.

25             THE COURT:  I'll let this one go.

Direct - Undercover Agent 1

1        Go ahead, you may answer.

2        THE WITNESS:  He did leave me with Bill Sears,

3    yes.

4    BY MR. SIBERT:

5    Q.   Knowing that you were a potential investor willing to

6    put $1.4 million into FusionPharm.

7    A.   Yes.

8    Q.   Now, when was the last time that you met with Mr.

9    Dittman?

10   A.   I think it was July 18th of 2014.

11   Q.   Okay.  And where did you meet Mr. Dittman?

12   A.   At Starbucks.

13   Q.   Okay.  And who requested that meeting?

14   A.   He did.

15   Q.   Okay.  And do you know why Mr. Dittman contacted you to

16   meet with you again?

17   A.   I assumed it was to try and get me to invest with them.

18   Q.   Okay.  Was this meeting recorded?

19   A.   Yes.

20   Q.   Okay.  And can you explain to me how it was recorded.

21   A.   With audio and video both.

22   Q.   Okay.  And who was wear -- were you wearing --

23   A.   Oh, it was on me.  Yes, I'm sorry.

24   Q.   Okay.  All right.

25        MR. SIBERT:  Your Honor, at this time the

Direct - Undercover Agent 1

1   Government would like to publish Government Exhibit 5-A to

2   the jury.

3           THE COURT:  All right.

4           MR. SIBERT:  And if we can just have a minute so

5   everyone can put their headphones on.

6           THE COURT:  Okay.

7           MR. SIBERT:  Do you have a pair of headphones

8   there, sir?

9           COURTROOM DEPUTY:  Sorry.

10          THE WITNESS:  I don't know.  Thank you.

11          MR. SIBERT:  Everyone have green lights?

12          THE DEFENDANT:  No.

13          MR. SIBERT:  You got a green light, sir.  Just --

14          THE COURT:  He has a green light.  He has a green

15  light.  He's ready.  Let's go.

16          MR. SIBERT:  No, I'm waiting for counsel.

17          MR. BARNARD:  Your Honor, I'm still on red.

18          MR. SIBERT:  Can you press the power button a

19  couple of times?

20          MR. BARNARD:  Thank you.

21          MR. SIBERT:  Are you okay, Mr. Barnard?

22          MR. BARNARD:  Ready.

23          MR. SIBERT:  Okay.  Can you please play the video.

24      (Video played)

25  BY MR. SIBERT:

1    Q.   Okay, sir, what was -- who was that in the video?

2    A.   Scott Dittman.

3    Q.   And what was Mr. Dittman talking to you about?

4    A.   It sounded like they -- I don't know what the hack case

5    was that he was describing, but some kind of trouble that

6    they'd gotten into.

7    Q.   Who got into?

8    A.   He and Bill.

9    Q.   Okay.

10   A.   Bill Sears.  I'm sorry.

11   Q.   Okay.  Can I have 5-B played, please.

12        (Video played)

13   BY MR. SIBERT:

14   Q.   So, sir, based upon that conversation with Mr. Dittman,

15   who was the owner of MeadPoint?

16   A.   Yes.

17        MR. BARNARD:  Your Honor, I think the conversation

18   stands for itself.

19        THE COURT:  Overruled.

20   BY MR. SIBERT:

21   Q.   Sir, I just need you to speak up.

22        Who was the owner of MeadPoint?

23   A.   Bill Sears.

24   Q.   Okay.  And who stated that his company could not

25   survive but for Mr. Sears?

Cross - Undercover Agent 1

1    A.    That's what Scott said, yes.

2    Q.    And when you say "Scott," who is "Scott"?

3    A.    Scott Dittman.

4          MR. SIBERT:  I'll pass the witness, Your Honor.

5          THE COURT:  Cross-examination.

6          MR. BARNARD:  Thank you, Your Honor.

7                     CROSS-EXAMINATION

8    BY MR. BARNARD:

9    Q.    Agent, you testified that in the first segment, I

10   believe you said that Mr. Dittman was talking about trouble

11   he and Mr. Sears had had.

12   A.    That's what it sounded like, yes.

13   Q.    Could you -- what trouble was Mr. Sears having,

14   according to what you heard?

15   A.    I didn't know what the hack piece he was talking about.

16   I didn't know what he was describing.

17         MR. BARNARD:  No further questions.

18         THE COURT:  Redirect.

19         MR. SIBERT:  No, sir.

20         THE COURT:  May this witness be excused for the

21   Government?

22         MR. SIBERT:  Yes, sir.

23         THE COURT:  For the defendant --

24         MR. BARNARD:  Yes, sir.

25         THE COURT:  -- Mr. Barnard?

Direct - Bohlender

1          Special Agent, thank you for your testimony, you

2     may step down.

3              THE WITNESS:  Thank you.

4              THE COURT:  Government may call its next witness.

5              MR. BROWN:  Your Honor, the Government calls Shane

6     Bohlender.

7              COURTROOM DEPUTY:  If you can stand behind the

8     stand and raise your right hand, please.

9          SHANE BOHLENDER, GOVERNMENT'S WITNESS, SWORN

10             COURTROOM DEPUTY:  Okay.  If you can take a seat

11    and scoot your chair up a bit.  Please state your full name

12    and spell it for the record.

13             THE WITNESS:  Shane Bohlender.  S-h-a-n-e,

14    B-o-h-l-e-n-d-e-r.

15                      DIRECT EXAMINATION

16    BY MR. BROWN:

17    Q.   Mr. Bohlender, could you tell us where you live, sir?

18    A.   I live in Canada; Calgary.

19    Q.   And how long have you lived in Calgary?

20    A.   About four years.

21    Q.   Where do you -- what is your profession up in Calgary?

22    A.   I head up finance and accounting for a food company.

23    Q.   And what's the name of the company you work for?

24    A.   Called JBS Food Canada.

25    Q.   And what do you actually do for them?

Direct - Bohlender

1   A.    Prepare financial statements; operating results weekly,

2   daily; visibility into expenses; track what profit -- what

3   lines are profitable; where we're making money; where we're

4   losing money.  Looking for cost-saving opportunities.

5   Q.    And clients hire your company to do that for them, I

6   take it?

7   A.    Sorry?

8   Q.    Clients hire your company to do that, to -- for them?

9   A.    Well, our company produces food, beef.  And so I handle

10  all the --

11  Q.    I'm just concerned about what your company actually

12  did.

13  A.    Oh, yeah.  They process beef.  We process about 40

14  percent of Canada's beef.

15  Q.    Oh.  Canada.

16  A.    In Canada.

17  Q.    Okay.  What's your educational background, sir?

18  A.    Undergraduate degree in business and an MBA.

19  Q.    Where did you get your undergraduate degree at?

20  A.    Boulder, Colorado.

21  Q.    And where did you get your MBA?

22  A.    Phoenix, Arizona.

23  Q.    What year was your -- did you graduate from CU?

24  A.    1991.

25  Q.    And when did you get your MBA?

Direct - Bohlender

1    A.    2012 -- 2011, I think it was.

2    Q.    That's close enough.  Do you know a person by the name

3    of Scott Dittman?

4    A.    I do.

5    Q.    How do you -- when did you know -- or when did you

6    first meet him?

7    A.    Probably my junior year in university, Colorado;

8    Boulder.

9    Q.    Okay.  And did you become friends -- close friends?

10   A.    Yeah.

11   Q.    Did he graduate the same year you did, do you know?

12   A.    Yeah.

13   Q.    After you graduated college, did you stay in touch with

14   Mr. Dittman?

15   A.    Yeah.  Yeah, we moved out to California together, were

16   roommates for a couple of years.

17   Q.    And at some point did you sort of separate ways, at

18   least geographically?

19   A.    Yeah.  I was in California, I was in San Francisco for

20   about four years, and then moved overseas to England.

21   Q.    Did you stay in touch with Mr. Dittman?

22   A.    Yeah.

23   Q.    Did there come a time where Scott Dittman suggested you

24   may want to do some work for him or be employed by him?

25   A.    Yes.

Direct - Bohlender

1   Q.   Could you tell us how that came to be.

2   A.   Yeah.  I was in Phoenix working on some -- doing some

3   consulting for various companies, and he engaged me in some

4   work for his business that he was starting up.

5   Q.   Okay.  What was your undergraduate degree?  You may

6   have told me --

7   A.   Business administration.

8   Q.   And how -- what -- how did Scott contact you?  By

9   phone, e-mail?

10  A.   I don't recall.  It might have been e-mail.  We stayed

11  loosely in touch for several years, so it was likely e-mail.

12  Q.   What -- what opportunity did he suggest to you?

13  A.   He needed some help with some financial transactions,

14  accounting, reporting, stuff like this, for his new

15  business, and so I -- I got involved with him to help him

16  out with some of that.

17  Q.   Do you remember approximately when this was?

18  A.   It must have been around 2011.

19  Q.   And were you able to help him out from Phoenix or did

20  you have to come to Denver?

21  A.   I made one trip to Denver.

22  Q.   Did you help him out before you came to Denver?

23  A.   Yeah.  On both sides of that trip, I offered some help,

24  some guidance, around how to account for different things:

25  Business receipts, getting into the QuickBooks -- QuickBooks

Direct - Bohlender

1   file they were using.  Looking at some revenue projections

2   for -- for a product they were developing.

3   Q.   And you were doing this sort of remotely from Phoenix?

4   A.   Yeah, most of that work was remote.

5   Q.   And were you able to accomplish that, give him some

6   help?

7   A.   Yeah.  Yeah, I think I helped him a bit.

8   Q.   And what caused you to come up to Denver?

9   A.   He wanted to -- he was interested in having me as his

10  CFO and I made a visit out to Denver, met him, William

11  Sears, and Kelly, and got a tour of their operation, looked

12  at what they were doing, that section, when I did some work

13  with him, face-to-face on some revenue projections for costs

14  and revenues on some GroPods that he was developing.

15  Q.   With regard to the company -- what was the name of the

16  company that he had?

17  A.   FusionPharm.

18  Q.   Okay.  When you came to Denver, how long -- how many

19  days were you here?

20  A.   It was probably two days.  It was a pretty short trip.

21  Q.   And the idea of possibly becoming a CFO was in the mix?

22  A.   Yeah.

23  Q.   Could you tell us what a CFO is.

24  A.   Well, CFO is the -- the top level of all the finance

25  and business processes, and basically providing financial

Direct - Bohlender

1   information about the health of the company, the revenues,

2   the expenses, the balance sheet position, the liquidity of

3   the company.

4   Q.   Means chief financial officer?

5   A.   Yes.  Yeah.

6   Q.   And in a typical corporation, is a CFO pretty high up

7   in the level of the structure of the company?

8   A.   Yeah.  Typically it's the second spot.

9   Q.   Okay.  The chief CEO, the chief executive officer, is

10  the top spot?

11  A.   Correct.

12  Q.   And when you're doing this tour in Denver of -- not

13  tour -- this examination of the business opportunity, you

14  said you worked -- or you looked at their site.  Do you

15  remember generally where it was in Denver?  You probably

16  don't have an address, but --

17  A.   Yeah, I remember it was off of -- it wasn't too far

18  from I-70.

19  Q.   That's fine.

20  A.   Yeah.

21  Q.   Was it a -- describe the office facility, itself.

22  A.   It was kind of an industrial area.  The office, itself,

23  was two floors, upstairs and downstairs; one -- kind of

24  conference room on the bottom level and some desks upstairs

25  were -- where the people would work.

1    Q.   Okay.  And how many people did you see working at the

2    company?

3    A.   Three people:  Scott, William, and Kelly.

4    Q.   And I presume, since you had done some work remotely,

5    you knew sort of the structure of the company and who worked

6    there before all this -- before you came to Denver.

7    A.   Yes.

8    Q.   Who did you meet at the facility -- did you meet Kelly

9    and --

10   A.   And Bill, yes.

11   Q.   -- Bill Sears?

12   A.   Yeah.

13   Q.   How long did you talk to Billy Sears, would you say?

14   A.   Not much.  My interaction with him was pretty limited.

15   I worked more -- mostly with Scott, some with Kelly.

16   Q.   Just generally, what did you and Scott discuss?

17   A.   We talked about -- well, we talked about revenue

18   opportunities and opportunities -- strategy and where the

19   company was going and how the company was going to make

20   money.  That was a large part of what we talked about.

21   Q.   At this stage, was the business sort of just getting

22   started?

23   A.   Yeah.  Very, very introductory.  No revenues yet.  They

24   had a seed canister, large metal canister to ship product

25   overseas that had been converted into a growing -- interior

Direct - Bohlender

1    growing facility --

2    Q.   Was that what your understanding of the company, what

3    it was going to sell or market?

4    A.   That was their primary product.

5    Q.   Okay.  And you indicated you did some projections of

6    what might be able to occur if certain things happened.  Why

7    don't you just tell us what you did.

8    A.   Yeah, we sketched out how many of these could fit in a

9    warehouse, how much that warehouse would cost, how much it

10   would cost to get these containers, how much it would cost

11   to fit them out with all the electronics, et cetera.  How

12   much revenue he thought he could generate for each of these

13   containers.  And we kind of projected out what would be a

14   break-even area.  How much profit would this generate under

15   different assumptions.

16   Q.   Okay.  Was this a business plan to present to people

17   who would buy these pods or was it a business plan to

18   FusionPharm to actually grow the product themselves?

19   A.   Yeah, just internal to look at what did this strategy

20   look like?  What did the business plan look like in terms of

21   profitability, cash flow?

22   Q.   And were you able to help him fix up their accounting

23   software?

24   A.   Somewhat, yeah.  Kelly did most of that.  I answered

25   questions --

1    Q.   And it was a three-person firm.  Did they have much of

2    a need at that point for all the accounting software?

3    A.   No.  Well, they -- they needed an accounting software,

4    something to track all the expenses and -- they don't

5    need -- they didn't need anything fancy.

6    Q.   Did they have a fair amount of expenses at the time,

7    but no income?

8    A.   There was some expenses.  I wouldn't say a fair amount.

9    There was some expenses.  They had payroll.  I helped them

10   figure out how to do the payroll so that they can do

11   withholdings and submit those withholdings to the

12   government, and also have them record various expenses that

13   they were, you know -- Kelly would ask me questions like,

14   What is this?  How do I record this?  And --

15   Q.   Can you do payroll and stuff through QuickBooks, or

16   some people hire an outside firm?

17   A.   It's possible to do it in QuickBooks.  You can do it --

18   you can do it any way you want.  You can do it just on

19   paper, if you wanted to.  Outside services make it pretty

20   easy, though.  They'll withhold the money, they'll calculate

21   how much needs to be withheld, submit those funds for you.

22   Q.   And after -- how much time would you say you spent at

23   their offices in talking to Mr. Dittman those two days?

24   A.   Full days.  So probably 8 to 10 hours each day.

25   Q.   Okay.  And I think you said you had been living and

Direct - Bohlender

1    working in Phoenix.  Did you decide to take the job as a

2    CFO?

3    A.    No, I did not.

4    Q.    And why was that?

5    A.    I had some concerns with Billy Sears' role.

6    Q.    Why was that?

7    A.    Well, he seemed to be making some decisions or seemed

8    to hold a position of authority in the company, but he was

9    not an executive.

10   Q.    Why do you say it seemed like he had some role?

11   A.    Well, when I would talk to Scott, he would sometimes

12   refer to needing to talk to Billy about things.  He -- it

13   wasn't a, you know, sort of an air of Scott makes the final

14   decision; it was more of he needs to consult with Billy on

15   various things.

16   Q.    And did you -- were you able to meet with Billy Sears

17   very much?

18   A.    Just a bit.

19   Q.    Was there anything about your interaction with him that

20   supported your concern?

21   A.    No.  My interaction with him was so limited, I didn't

22   really have any impression.

23   Q.    Was there any other basis -- if Billy Sears was simply

24   not listed as an executive, why would that be a concern?

25   A.    Scott told me that there was something about Billy's

Direct - Bohlender

1    past that he could not be an executive in the company and --

2    and that's -- that was fine with me if he didn't have the

3    kind of authority that an executive would have.  But he

4    seemed to have the kind of authority that an executive would

5    have, so it seemed like a disconnect between what his role

6    actually was and what we were saying his role was.

7    Q.   And as a CFO, second in command of the company, why

8    would that concern you?

9    A.   Well, I didn't feel like I would be able to be a CFO,

10   even if I had the title.  I felt like that Billy would have

11   more authority than I and I wouldn't be able to make

12   decisions.

13   Q.   Okay.  And you were a -- you were a friend of Scott

14   Dittman at the time.

15   A.   That's correct, yes.

16   Q.   So did you explain this to him?

17   A.   Yeah.  I had some sort of conversation.  I don't

18   remember specifically, but I shared openly with him my

19   thoughts.

20            MR. BROWN:  May I have one second, Your Honor?

21            THE COURT:  You may.

22   BY MR. BROWN:

23   Q.   Were you involved at all in your interaction with --

24   that you've described in terms of selling stock or reporting

25   OTC or any of those types of issues?

Cross - Bohlender

1    A.    No.

2    Q.    You were just more of the financial person?

3    A.    Just looking at the accounting.  There was a -- my

4    involvement was a very short time frame, so I was not

5    involved in any of the reporting or disclosures.

6    Q.    And the -- typically in a company, is a CFO involved in

7    it disclosures and --

8    A.    Absolutely.  Yeah.

9    Q.    Okay.

10            MR. BROWN:  That's all I have, Your Honor.

11            THE COURT:  All right.  Cross-examination.

12            MR. GOODREID:  Yes.  Thank you, Your Honor.

13            THE COURT:  How much do you have, Mr. Goodreid?

14            MR. GOODREID:  Your Honor, I believe we can finish

15   by the appointed hour.

16            THE COURT:  Okay.

17            MR. GOODREID:  I will do my very best.  Although

18   for the court reporter's sake, I won't talk too fast.

19                        CROSS-EXAMINATION

20   BY MR. GOODREID:

21   Q.    Good afternoon, Mr. Bohlender.

22   A.    Good afternoon.

23   Q.    When, exactly, in terms of what year -- what year was

24   it when you came up to FusionPharms?

25   A.    I would have to look through e-mails or something to

1   recall exactly.  I'm thinking it was around 2010, 2011.

2   Q.   So the 2010-2011 time frame?

3   A.   I believe so.

4   Q.   And you came -- you made a single visit up here, right?

5   A.   That's correct.

6   Q.   And you said you spent, what, approximately two rather

7   lengthy days with Mr. Dittman?

8   A.   Yes, correct.

9   Q.   And during that time frame, you helped -- you looked at

10  accounting -- excuse me, you looked at accounting systems,

11  right?

12  A.   Yup.

13  Q.   You talked to Mr. Dittman.  You may have had some brief

14  interaction with Mr. Sears, right?

15       I'm sorry, you have to say it --

16  A.   Yes.

17  Q.   -- audibly?

18  A.   Yes, correct.

19  Q.   All right.  And at the conclusion of those two days,

20  you decided, I don't want to be in this deal; is that right?

21  A.   I had some significant concerns.  I don't believe it

22  was -- it was -- it was around that time frame, it may have

23  been shortly after I came back to Phoenix.

24  Q.   Okay.  But as a result of the two days you spent here,

25  you decided, I don't want to be a part of this operation; is

Cross - Bohlender

1    that right?

2    A.   Yeah.   That's a fair statement.

3    Q.   And you also said that as a CFO, if you had taken the

4    position, you would have been involved in uploading --

5    reviewing financials, perhaps providing them the OTC, doing

6    that sort of thing; is that right?

7    A.   Yeah.

8    Q.   But you didn't do that in this case, right?

9    A.   No.

10   Q.   And I take it you also never had any interaction with

11   the defendant in this case, Mr. Guy Jean-Pierre; is that

12   right?

13   A.   No.

14   Q.   Never had a chance to review any of his work product?

15   A.   No.

16   Q.   Didn't have anything to do with that?

17   A.   No.

18        MR. GOODREID:   That's all I have, Your Honor.

19        THE COURT:   All right.   Redirect.

20        MR. BROWN:   No redirect, Your Honor.

21        THE COURT:   All right.   May this witness be

22   excused, for the Government?

23        MR. BROWN:   Yes.

24        THE COURT:   For the defendant?

25        MR. GOODREID:   Yes.

833

1         THE COURT:  Mr. Bohlender, thank you for your

2    testimony.  You're excused.  You may step down.

3         THE WITNESS:  Thank you.

4         THE COURT:  All right.  Well, that just about

5    brings us to 10 to 5:00.  Folks, like every day, I need to

6    remind you please do not do any independent research into or

7    discuss with anyone the facts, the law, or the persons

8    involved in this suit.

9         Please be back in the deliberation room by 8:35

10   tomorrow morning.  And we will be in recess until 8:45

11   tomorrow morning.

12       (Court concluded at 4:49 p.m.)

13                            **INDEX**

14   Item                                            PAGE

15                  GOVERNMENT'S WITNESSES

16   **SCOTT DITTMAN**
     Direct Examination by Mr. Sibert              589
17   Cross-examination by Mr. Barnard              771
     Redirect Examination by Mr. Sibert           794
18
     **UNDERCOVER AGENT NO. 1**
19   Direct Examination by Mr. Sibert              810
     Cross-examination by Mr. Barnard             818
20
     **SHANE BOHLENDER**
21   Direct Examination by Mr. Brown              819
     Cross-examination by Mr. Goodreid           830
22

23                  GOVERNMENT'S EXHIBITS

24   EXHIBITS:     Offered   Received  Refused   Stipulated

25   5-A          770       770

GOVERNMENT'S EXHIBITS

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|-----------|---------|----------|---------|------------|
| 5-B | 770 | 770 | | |
| 19 | 758 | 759 | | |
| 19-A | 718 | 718 | | |
| 25 | 632 | 632 | | |
| 40 | 758 | 759 | | |
| 100 | 727 | 727 | | |
| 123 | 727 | 727 | | |
| 135 | 739 | 739 | | |
| 136 | 739 | 739 | | |
| 151 | 727 | 739 | | |
| 167 | 755 | 755 | | |
| 169 | 632 | 632 | | |
| 172 | 718 | 718 | | |
| 230 | 718 | 718 | | |
| 263 | 632 | 632 | | |
| 372-S | 739 | 739 | | |
| 372-W | 739 | 739 | | |
| 372-Y | 632 | 632 | | |
| 372-Z | 632 | 632 | | |
| 372-AA | 632 | 632 | | |
| 372-JJ | 718 | 718 | | |
| 372-SS | 632 | 632 | | |
| 372-VV | 632 | 632 | | |

835

GOVERNMENT'S EXHIBITS

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|-----------|---------|----------|---------|------------|
| 372-WW | 632 | 632 | | |
| 372-ZZ | 632 | 632 | | |
| 372-FFF | 632 | 632 | | |
| 372-JJJ | 632 | 632 | | |
| 372-LLL | 632 | 632 | | |
| 372-NNN | 632 | 632 | | |
| 374 (304,305) | 592 | 592 | | |
| 387 | 750 | 751 | | |
| 388 | 750 | 751 | | |
| 390 | 758 | 759 | | |
| 392 | 750 | 751 | | |
| 394 | 632 | 632 | | |
| 395 | 632 | 632 | | |
| 404 | 713 | | 714 | |

\*      \*      \*      \*      \*

REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Dated at Denver, Colorado, this 25th day of March, 2018.

MARY J. GEORGE, FCRR, CRR, RMR