836

```
              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLORADO

Criminal Action No. 17-cr-0008-WJM

UNITED STATES OF AMERICA,

Plaintiff,

vs.

GUY JEAN-PIERRE a/k/a Marcelo Dominguez de Guerra,

Defendant.
------------------------------------------------------------
                    REPORTER'S TRANSCRIPT
                     (Jury Trial, Day 5)
                         Volume V
------------------------------------------------------------
```

Proceedings before the HONORABLE WILLIAM J. MARTINEZ, Judge, United States District Court for the District of Colorado, commencing at 8:53 a.m., on the 18th day of January, 2019, in Courtroom A801, United States Courthouse, Denver, Colorado.

                         APPEARANCES

JEREMY S. SIBERT and ROBERT M. BROWN, Assistant U.S. Attorneys, 1801 California Street, Suite 1600, Denver, Colorado 80202, appearing for the plaintiff.

CLIFFORD J. BARNARD, Attorney at Law, 4450 Arapahoe Avenue, Suite 100, Boulder, Colorado 80303, AND
THOMAS E. GOODREID, Attorney at Law, 1801 Broadway, Suite 1400, Denver, Colorado 80202, appearing for the defendant.

                    MARY J. GEORGE, FCRR, CRR, RMR
                 901 19th Street, Denver, Colorado 80294
                Proceedings Reported by Mechanical Stenography
                   Transcription Produced via Computer

1              P R O C E E D I N G S

2       (Proceedings were held in open court outside the

3   presence of the jury at 8:53 a.m.)

4           THE COURT:  We were telling Ms. Frank yesterday

5   that this is her first trial with me, she just started four

6   weeks ago, and I can't believe how much has gone on in this

7   trial and most of it very -- of a very difficult

8   complicating matter.

9           So we have to discuss something this morning.

10  Instead of me bringing it up second- or third-hand, I'm

11  going to have Ms. Frank tell us what the juror, Mr. Luka,

12  told her this morning.

13          COURTROOM DEPUTY:  I was approached by Mr. Luka.

14  He said that he was waiting at the lightrail station last

15  night and the defendant approached him and asked him if he

16  was waiting in line.  Mr. Luka said no, and walked away.

17          THE COURT:  Mr. Jean-Pierre Dominguez de Guerra,

18  could I have been any more clear --

19          THE DEFENDANT:  Your Honor --

20          THE COURT:  Let me talk.  Don't talk over me.  I'm

21  really upset.  I could not have been clearer Monday morning

22  when I said there's to be no contact, zero, nada, zilch,

23  between a party, a lawyer, and a witness and a juror.  I

24  couldn't have been clearer.  And now there you go, make --

25  and I even use the word "small talk" when I talk to the

1    jurors, that they shouldn't be offended if you didn't

2    exchange small talk with them.  Could I -- could I have made

3    that any clearer?

4          THE DEFENDANT:  Your Honor, if I may, I did not

5    recognize him.  There was some people waiting in line.  I --

6          THE COURT:  You have been staring at this jury for

7    a week and you didn't recognize the juror?

8          THE DEFENDANT:  No, sir, I did not.  I was simply

9    asking the person who I thought may have been in line

10   because I was taking my place in line, if he was within line

11   and he said no.  And that's it.  That was it.  I'm sorry.

12   Maybe I should have, but I did not recognize him.

13         THE COURT:  First let me get on the record, do you

14   agree what Ms. Frank stated is true?

15         THE DEFENDANT:  Well, I agree that I -- I go in

16   line, I saw someone and I wasn't sure they was in line, to

17   take my place.  I asked him if he was waiting in line.

18         THE COURT:  Okay.  Did you say anything else to

19   him?

20         THE DEFENDANT:  No, sir.

21         THE COURT:  All right.  Did you pursue him in any

22   way?

23         THE DEFENDANT:  No, sir.  I just took my place

24   because he wasn't in line.

25         THE COURT:  When he walked away, that was the last

1    communication you had with him?

2            THE DEFENDANT:  Absolutely.  And I had no idea he

3    was a juror until you mentioned it just now.  Well, I'm

4    sorry, Your Honor --

5            THE COURT:  All right.

6            THE DEFENDANT:  -- but that's --

7            THE COURT:  I'll get input from counsel as to what,

8    if anything, we should do about this.  The Government.

9            MR. SIBERT:  Your Honor, I think the Court's

10   addressed it.  I think the jury's waiting.  I think we need

11   to get on with the trial.  I appreciate it.  Thank you.

12           THE COURT:  All right.  The defendant?

13           MR. BARNARD:  Your Honor, I -- it doesn't seem like

14   any damage has been done.  I would tell the Court that I,

15   outside of the courthouse, don't talk to anybody because,

16   even though I've been looking at the jurors, sometimes I

17   don't recognize them either.  And it's -- I think it

18   happens, and there's no damage.  I think we should just,

19   again, as counsel says, bring the jury in and proceed.

20           THE COURT:  All right.  I'm going to think about

21   whether at some point I want to get Mr. Luka's -- I mean, in

22   eight years this is only the second time I examined a juror

23   during the trial.  This will be the first time that I might

24   examine a second juror during a trial.

25           I'm going to think about whether I want to get Mr.

1    Luka out here at some point -- we're going to start up --

2    but at some point during the break, lunch, or at the end of

3    the day, and get his version and get him to state on the

4    record that the exchange will not impact his ability to be

5    fair and impartial in this case.  I'll give some thought to

6    that.

7              So -- and also I've been told, Mr. Jean-Pierre,

8    that you've been very friendly in opening doors for folks,

9    holding doors and, you know, stop that.  All right?  You're

10   the defendant.  You should have the lowest profile in this

11   courtroom in this courthouse.  Okay?

12             You're not -- you know, you have to realize the

13   gravity of the situation you're in and the position that

14   you're in.  And this is not the time to be chummy with

15   folks, whether it's other lawyers, witnesses, the court

16   security officers, anyone.  Is that understood?

17             THE DEFENDANT:  Yes, sir.  I wasn't trying to be

18   chummy.  That's the way I am.  I'm polite and hold doors --

19             THE COURT:  That's the --

20             THE DEFENDANT:  I'm sorry --

21             THE COURT:  You've got to realize you're in a

22   Federal courthouse in the United States.  We do things

23   differently than in Haiti or the DR.  All right?  We're not

24   in Guayaberas just walking around chatting up folks.

25             THE DEFENDANT:  Your Honor, I didn't chat up

Direct - Blume

1   anyone.  I apologize.  I normally open doors for anyone

2   who's waiting.  I will not do that anymore.

3           THE COURT:  Stop doing it.

4           THE DEFENDANT:  I will not do it anymore.

5           THE COURT:  All right.  Let's bring in the jury.

6       (Jury was present at 8:59 a.m.)

7           THE COURT:  Good morning, ladies and gentlemen of

8   the jury.  Welcome back to day 5 of our jury trial.

9           All right, the Government may call its next

10  witness.

11          MR. BROWN:  Your Honor, the Government calls Kelly

12  Blume.

13          COURTROOM DEPUTY:  Will you please stand behind the

14  witness stand and raise your right hand for me, please.

15           KELLY BLUME, GOVERNMENT'S WITNESS, SWORN

16          COURTROOM DEPUTY:  Okay.  Just take a seat here.

17  And scoot your chair up towards the microphone.  And please

18  state your full name and spell it for the record.

19          THE WITNESS:  Kelly Blume, K-e-l-l-y, B-l-u-m-e.

20                       DIRECT EXAMINATION

21  BY MR. BROWN:

22  Q.   Ms. Blume, I know you're a little nervous so just

23  relax, okay?  Nobody's going to bite you.

24  A.   Okay.

25  Q.   Where do you live, ma'am?

Direct - Blume

1    A.   I live in Vancouver, Washington.

2    Q.   Maybe you can move that microphone a little bit closer

3    to you.

4         And how are you employed?  Who do you work for?

5    A.   I currently work for Unified.

6    Q.   What is Unified?

7    A.   It's a canvas company.

8    Q.   Okay.  And is that -- where does that company do

9    business?

10   A.   Currently here in Denver, Portland, and in Canada.

11   Q.   And you live in Vancouver, Washington; is that pretty

12   close to Portland?

13   A.   It's eight miles from Portland.

14   Q.   So you work in the Portland facility, I presume.

15   A.   Correct.

16   Q.   What kind of -- what type of work do you perform for

17   that company?

18   A.   I'm the head of cultivation.

19   Q.   As the head of cultivation, what are your

20   responsibilities?

21   A.   I'm responsible for all of the garden compliance, all

22   the plants inside the facilities, staffing.

23   Q.   What is your educational background?

24   A.   I have a master's degree in agriculture.

25   Q.   Where did you obtain that master's degree?

Direct - Blume

1    A.   Colorado State University.

2    Q.   And when did you obtain that degree?

3    A.   2014.

4    Q.   Obviously you would have had a bachelor's degree before

5    that, I presume.

6    A.   Correct.

7    Q.   What was that in?

8    A.   It's a bachelor's in accounting from Washington State

9    University.

10   Q.   Are you from the Pacific Northwest?

11   A.   I am.

12   Q.   You indicated -- what year was your bachelor's degree

13   in accounting?

14   A.   I graduated in 2007 with that degree.

15   Q.   2007?

16   A.   Correct.

17   Q.   Okay.  Between approximately 2010, 2011, and mid-2013,

18   were you employed by Scott Dittman and a company that became

19   to be known as FusionPharm in Denver, Colorado?

20   A.   Yes.

21   Q.   And did you obtain -- who was the CEO of FusionPharm?

22   A.   Scott Dittman.

23   Q.   Did you begin working for Scott Dittman prior to the

24   formation of the company FusionPharm?

25   A.   Yes, I did.

1    Q.   What year did you begin working for him?

2    A.   2010.

3    Q.   I'm sorry?

4    A.   2010, I believe.  Yeah.

5    Q.   Tell us how you became to work for him.

6    A.   I met him through his then business partner, Jay Berry.

7    Q.   Jay Berry?  How -- you knew Jay Berry as a friend

8    or --

9    A.   I met him at our children's school.

10   Q.   Okay.  And what was the name of the company when you

11   started to work for him?

12   A.   Mountain High Wellness.

13   Q.   What type of company was that?

14   A.   It was a cannabis company.

15   Q.   I'm sorry?

16   A.   Cannabis company.

17   Q.   I'm sorry, I don't hear too well.  I apologize.

18   A.   That's okay.

19            THE COURT:  That seems to be a problem.  Go ahead.

20            MR. BROWN:  I wish I was wearing those ear phones.

21   BY MR. BROWN:

22   Q.   At the time you began working for Mr. Dittman in the

23   cannabis company he had, had medical use of marijuana been

24   legalized in Colorado?

25   A.   Yes.

Direct - Blume

1   Q.   And was he in business with your acquaintance Jay?

2   A.   Yes.

3   Q.   Did there come a time when those -- how long did you

4   work for the two of them?

5   A.   They weren't together for very long.  Maybe a few

6   months before they parted ways.  And Mountain High Wellness

7   had two licenses, a dispensary and a grow that they were

8   applying for.  And Jay Berry took the dispensary and Scott

9   took the grow.

10  Q.   Okay.  By "dispensary," is that a retail

11  establishment?

12  A.   Correct.

13  Q.   Okay.  And when you say the word "grow," tell us what

14  you mean by that.

15  A.   The cultivation side of the cannabis licensing is the

16  grow license.

17  Q.   Okay.  I'm not sure I asked you this, but when did you

18  start working for the two of them?

19  A.   It was in 2010, the beginning of 2010.

20  Q.   And when they split up, did you work for one or the

21  other or both?

22  A.   I stayed working with Scott.

23  Q.   Okay.  Did you have to move out of the location you

24  were in or did you move to a new business facility?

25  A.   The dispensary was never -- I never worked in it, so

Direct - Blume

1   Jay kept that location and we stayed in the grow spot,

2   yes.

3   Q.   Did something -- did something catastrophic occur that

4   caused that business to change to a different business?

5   A.   Yes.

6   Q.   What happened?

7   A.   We were robbed out of the facility.  One evening the

8   police called me and I showed up to the facility.  The

9   alarms were going off and all of the plants and all of the

10  materials from the facility were gone.

11  Q.   By "robbed," you mean someone broke in --

12  A.   Correct.

13  Q.   Was anyone there when they broke in?

14  A.   Not to my knowledge.  When I arrived at the facility,

15  the landlord and the police were there.

16  Q.   So what did that do to the business that you and Scott

17  were employed in?

18  A.   Financially wrecked us at that point.  I mean, it was

19  everything we had to sell.  All of the inputs into the

20  business were at that point harvested and being ready, you

21  know, to sell, and --

22  Q.   Okay.  When?

23  A.   -- was gone.

24  Q.   When this occurred -- well, when you were with -- in

25  the business with Scott at that location, how many people

Direct - Blume

1    worked for the business?

2    A.   Me.  Just myself.  One.

3    Q.   Just you?  Okay.  And because of your -- I guess you

4    got your master's later, but were you fairly knowledgeable

5    about growing?

6    A.   Uhm-hum.  Yes.

7              THE COURT:  You have to -- yes or no.

8              THE WITNESS:  Sorry.  Yes.

9    BY MR. BROWN:

10   Q.   After the burglary or robbery, did the business

11   continue in the same shape it had been in?

12   A.   No.  We merged into what became FusionPharm with

13   Scott's brother-in-law.

14   Q.   And who was Scott's brother-in-law?

15   A.   William Sears.

16   Q.   When did you meet William Sears?

17   A.   Sometime around the end of 2010, beginning of 2011.

18   Q.   Had you known him before that -- obviously --

19   A.   No.

20   Q.   -- I'd asked you if you met him so obviously you

21   wouldn't.

22             What was the new -- was the new company, or the new

23   plan, going to continue to grow marijuana?

24   A.   No.

25   Q.   What was the new business plan?

Direct - Blume

1    A.    The new business plan was to move into the edibles

2    market, MIPs products.  Build GroPods for cannabis -- or

3    PharmPods.  And then the GroPod being a cultivation of

4    produce, moving into a produce realm rather than just

5    staying in cannabis.

6    Q.    Was any part of the plan to grow marijuana and sell it

7    to retail marijuana sales?

8    A.    No, not out of the Vine Street, no.

9    Q.    Do you know why you weren't planning on doing that

10   since you had been in that business?

11   A.    Because the way that we were going to bring money into

12   the company was through the stock market, so we couldn't

13   produce cannabis, is my understanding.

14   Q.    You can't be on the stock market if you're producing

15   cannabis?  Is that what --

16   A.    That was my understanding, yeah.  That if we wanted to

17   publicly trade, then we couldn't be growing and retailing

18   cannabis.

19   Q.    Were you -- as this business developed, did you stay in

20   the same location or did you move?

21   A.    We had -- we left the original facility and moved into

22   a warehouse on Vine Street.  And then there was a kitchen

23   facility for the MIP placements that was originally on

24   Welton Street and it moved to 44th Street.

25   Q.    Were you a part of the process of developing the

Direct - Blume

1    corporate paperwork or not?

2    A.    I wasn't part of developing it, no.

3    Q.    Okay.  How about did you have to -- did you also do

4    administrative work?

5    A.    I did do administrative work, yes.

6    Q.    And were you involved in creating documents for the

7    formation of the corporation or did someone else do that?

8    A.    Somebody else was doing that.

9    Q.    Okay.  When this company developed, what was your role

10   as time went along?

11   A.    My role as time went along, being the only person

12   there, mostly I was in charge of operations, but I did

13   everything from, you know, office work, running around town,

14   researching for equipment, pretty much jack of all trades in

15   the business.

16   Q.    You said "since I was the only one there."  Was Mr.

17   Sears and Mr. Dittman also at the facility?

18   A.    Most days, yes.

19   Q.    Tell us what you can about what you observed to be

20   their roles in the company.  First Mr. Dittman.

21   A.    Scott's role in the company, he was the CEO, you know,

22   putting together presentations.  A lot of the beginning was

23   looking for funding to work on the technology to do these

24   GroPods and PharmPods and eventually build urban food

25   gardens with the GroPods.  So he did a lot of networking for

Direct - Blume

1    that.

2    Q.   Okay.  You mentioned the GroPods.  Were there -- were

3    there -- was it just one type of GroPod that you were

4    marketing?

5    A.   Well, initially, there was the PharmPod, which was

6    being designed for cannabis growing, and then there were the

7    GroPods that we were designing for agriculture -- all

8    agriculture, but for food-growing purposes.

9    Q.   And just to make clear, there's -- when you say

10   "PharmPods," a lot of people think of farms, but was this

11   like p-h-a-r-m pods?

12   A.   Correct.

13   Q.   Okay.  Like pharmacy?

14   A.   Uhm-hum.  Well, yeah.

15   Q.   And the GroPods, then -- the PharmPods were for growing

16   marijuana?

17   A.   Correct.

18   Q.   And the GroPods, what were they for?

19   A.   For produce.

20   Q.   And as a part of the marketing of this, did you have to

21   actually grow things to show your customers that they would

22   work?

23   A.   Yes.

24   Q.   And what was grown?

25   A.   Primarily I was growing three different varieties of

Direct - Blume

1    lettuce.  We had basil, cilantro, and all of those items,

2    actually sold.  And then I did RMD on arrugula and some

3    other leafy greens.

4    Q.   Okay.  Or -- what type of pods was the -- I guess the

5    agriculture grown in?

6    A.   The GroPods were 250-foot standard shipping containers

7    with metal-racking systems on either side and an aisle down

8    the middle.  So there would be a light fixture and then a

9    run of hydroponic channels full of plants, a light fixture

10   underneath, so there were five levels on each side.  And it

11   fit the equivalent of an acre of food inside the shipping

12   container.

13          And then it was all hooked up to a recirculating

14   hydroponic system.

15   Q.   And what was different between those pods and the pods

16   that grew marijuana?

17   A.   The pods for marijuana had different lighting systems

18   and they weren't set up with the racks because of the nature

19   of the way those plants grow.

20   Q.   What's the difference between the way marijuana -- some

21   people may know this, but I don't -- but what's the

22   difference between the way the marijuana grows and the

23   agricultural lettuce and cilantro grows?

24   A.   Cannabis is a herbaceous plant, and the leafy greens

25   aren't growing feet and feet tall.  So in the agricultural

Direct - Blume

1    pod, you're looking for plants that we could keep at a

2    certain height.  And in cannabis production, unless you have

3    vast amounts of space to do maybe a sea of green style crop,

4    there wasn't enough space in the pod to grow at a very

5    profitable rate, I guess, for the cannabis plants, just --

6    Q.   You couldn't grow an acre of marijuana in one of these

7    pods?

8    A.   Absolutely not.

9    Q.   How much -- how much could you grow?

10   A.   In a 20-foot standard shipping container, it would

11   depend on the grow style.  Maybe eight large plants, or you

12   could have more if they were -- it would just depend on the

13   grow technique.  But from what I've seen in my experience

14   over the last 10 years, it's not an extremely successful

15   method doing shipping containers -- using the shipping

16   containers to grow cannabis.

17   Q.   And now you work primarily in that field; is that

18   right?

19   A.   Correct.

20   Q.   But did the company have to actually grow marijuana and

21   the produce to market the pods to show that they worked?

22   A.   Well, we weren't growing -- no, we never grew marijuana

23   to show that it worked in a pod.  We were growing the

24   produce to show that those worked.

25   Q.   Were you -- were you -- the -- the produce you grew,

Direct - Blume

1    were you -- you said that you grow an acre in one of these

2    pods.  Were you trying to market that produce?

3    A.    Yes.

4    Q.    Was that very successful?

5    A.    It was, you know, a -- it could have been.  It was

6    starting to be.  We had three different restaurants that we

7    were taking produce to, MADgreens was -- had signed up to

8    buy from us, and they were doing a dollar surcharge because

9    we were marketing ourselves on the fact that we could

10   harvest the food 48 hours prior to people being able to eat

11   it.  So the food's more calorie-rich, the faster you can eat

12   it from the time it's harvested.  So it was a really good

13   idea.  And had they continued to put efforts into it, maybe

14   it could have been something bigger than it was, but it was

15   small while I was there still.

16   Q.    Okay.  With regard to other than MADgreens, you

17   mentioned three restaurants that you were able to sell to.

18   Do you know who operated those restaurants or who was the

19   part of the business of those three restaurants?

20   A.    I know that -- I don't know who operated the them.  I

21   know that Scott's brother was associated with all those

22   restaurants and that's how we were able to get in there and

23   start getting the produce to those locations.

24   Q.    And you were -- were those the only three restaurants

25   that you were able to sell the produce to?

Direct - Blume

1    A.    Yes.

2    Q.    As long as we're on that topic, you have some admin --

3    or administrative duties since you were sort of the only

4    employee other than the other two; is that right?

5    A.    For the first few months, yeah.  When -- as we were

6    FusionPharm.  Once FusionPharm started, there were other

7    employees -- well, other workers around.

8    Q.    Okay.  Did you do some of the company's books,

9    yourself?

10   A.    I -- I entered receipts into all of the books, yes.

11   Q.    Okay.  In terms of the success of the GroPod operation

12   of actually selling agriculture products, I asked you how

13   successful that was.  Do you know how much income

14   FusionPharm brought in from selling the agriculture products

15   during the entire time you were there, approximately?

16   A.    I think maybe between 3- to $5,000 tops while I was

17   there.

18   Q.    Okay.  And you were there for over three years; is that

19   right?

20   A.    Yes.  Yes.

21   Q.    You mentioned earlier in your testimony that the only

22   way the company could go get into the -- be a publicly

23   traded company, a publicly owned company, was to be on the

24   stock market, and you couldn't grow marijuana.  Were you

25   part of the marketing of selling shares of the stock,

Direct - Blume

1  yourself?

2  A.   I'm -- I don't understand the question.

3  Q.   Okay.  Well, let me ask it a different way.

4       Who is in charge, based on your observation of the

5  company, of trying to market the stock of the company?  The

6  shares.

7  A.   Market the stock?

8  Q.   Yeah.

9  A.   Billy.

10 Q.   And was Billy there -- was Billy and Scott Dittman at

11 the company almost every day?

12 A.   Billy -- yes, most days Scott was there less than

13 Billy.  He was out running around a lot more.  Billy was

14 there every morning before I got there, upstairs in his

15 office.

16 Q.   Okay.  And what -- if you know, and if you don't know,

17 just say so -- what did you observe Billy to be doing in

18 terms of trying to market the stock?

19 A.   He was reaching out to his contacts and setting things

20 up.

21 Q.   Okay.  How do you know that?

22 A.   Conversations I had with him about his friend, Richie,

23 on the East Coast who was helping him set up our stock.

24 Q.   Was Billy part of the corporate structure?  Did he have

25 any official title?

856

Direct - Blume

1    A.    No.

2    Q.    Okay.  Do you know why that was?

3    A.    We had a conversation at one point and he told me that

4    he wasn't going to be on the corporate paperwork because he

5    had had an issue with the SEC in his past.

6    Q.    Okay.  As a person who conducted the -- I guess the

7    bookwork or the accounting for the company, were you -- was

8    one of your responsibilities to write checks for the

9    company?

10   A.    Yes.  I would cut checks and then set them on Scott's

11   desk for signature when they would ask me to.

12   Q.    Did you have respons- -- did you have the authority to

13   sign the check, yourself?

14   A.    No.

15   Q.    Did you make salary -- write salary checks to the three

16   of you at first?

17   A.    Yes.

18   Q.    Could you take a look at Government Exhibit 41.  Which

19   is -- I think it's in front of you there.

20             Maybe you could pull that up.

21             MR. BROWN:  It's already been admitted, Your Honor.

22             THE COURT:  Okay.

23             COURTROOM DEPUTY:  I don't --

24             THE WITNESS:  This says Government Exhibit 40 on

25   it.

Direct - Blume

1          MR. GOODREID:  Your Honor, I don't think it has, in

2     fact, been admitted, but the defense does not object to it

3     coming in.

4          MR. BROWN:  I'm sorry.

5          THE COURT:  We only had two to deal with, so --

6          MR. BROWN:  Let's go back to Exhibit 40.  Let's try

7     that first.

8          THE WITNESS:  Exhibit 40?

9          MR. BROWN:  I believe that's the one that was

10    admitted.

11         THE WITNESS:  Okay.

12         THE COURT:  You get one shot out of two.

13         MR. BROWN:  Your Honor, Mr. Dittman and Mr. Sibert

14    had Cs in accounting and I never took accounting.  I'm not

15    sure recognizing a number is accounting, but in any case.

16         THE COURT:  All right.  Okay.  So is Exhibit 40 in,

17    Ms. Frank?  Yes?  Okay.  So proceed with 40.

18    BY MR. BROWN:

19    Q.   Could you -- there's a hard copy in front of you, which

20    is probably a little bit easier to see.

21    A.   Uhm-hum.

22    Q.   Maybe we could -- I don't think Exhibit -- if we could

23    go to the second page of Exhibit 40, please.

24    A.   Okay.

25    Q.   Maybe we could -- if we could expand the text.  Could

Direct - Blume

1   you just tell us what -- if you recognize that.

2   A.   Yes.

3   Q.   Is that your signature at the part -- on the document?

4   A.   It is.

5   Q.   And I won't have you read it, but would it -- just tell

6   us what that was.

7   A.   This is a letter that Billy asked me to write showing

8   proof of income for a child custody issue.

9   Q.   Okay.  You indicate -- in the second full paragraph of

10  that, I just want to ask you to explain what that means.  It

11  indicates that he's a 1099 employee and then became -- in

12  March 2001 you're going to move to a payroll system.  Can

13  you just tell us what that means.

14  A.   Sure.  So as we were tracking the salaries that we were

15  paying ourselves in the company; we weren't set up as W-2

16  employees.  So the first year I worked for them, we were

17  issued 1099s, so responsible to pay our own taxes.  And it's

18  just indicating that that was the gross amount that he was

19  being paid and he had to pay his own taxes from it.  Excuse

20  me.  And then we were moving to be W-2 employees.

21  Q.   And that came later in 2012?

22  A.   Correct.

23  Q.   Did that actually happen?

24  A.   Yes, it did.

25  Q.   And in terms of that, were you paying yourself and Mr.

Direct - Blume

1    Dittman the same way as 1099 employees?

2    A.    Correct.

3    Q.    Thank you.  You can take that down.

4          I guess as long as we're on that, why don't you

5    take a look at Government Exhibit 41, which the defendant --

6    I move for the admission of that, Your Honor.

7          THE COURT:  All right.  Given the stipulation of

8    the party, Government Exhibit 41 is admitted into evidence

9    and may be published to the jury.

10         (Government's Exhibit 41 received)

11   BY MR. BROWN:

12   Q.    Maybe we could just blow up the text part.  I should

13   say expand, probably.

14         Could you just tell us what that is, without

15   reading it to us.

16   A.    Tell us -- sorry, repeat the question.  I was reading

17   it.

18   Q.    Without reading it out loud, could you tell --

19         THE COURT:  It's in evidence, so she can do

20   whatever you want to.

21         MR. BROWN:  I know, but it sort of speaks for

22   itself.

23         THE COURT:  Okay.

24   BY MR. BROWN:

25   Q.    You're -- I'll just ask you:  You were indicating you

Direct - Blume

1    paid a Verizon bill.  Can you explain how that occurred?

2    A.    Based on reading this, and having it be so long ago, it

3    looks like I paid a bill with Billy's card and I had already

4    cut checks for Scott to sign, so I'm just letting him know

5    that . . .

6    Q.    Were there company business cards -- or credit cards,

7    or do you remember?

8    A.    I don't recall if the cards said FusionPharm on them.

9    I don't.  I just know that they each had a card.  I did not

10   have a card, but in this case, it looks like our bill -- or

11   our phones were going to be shut off, so I used a card to

12   pay it for them.

13   Q.    You indicated Scott Dittman typically paid bills by

14   check; is that correct?

15   A.    Correct.

16   Q.    But in this instance, you had to use a credit card?  Do

17   you remember why?  I'm sure you don't -- it was only 2011.

18   A.    It says that they were going to shut our phones off in

19   the e-mail, so I would think that that would indicate that I

20   was doing a bill-pay over the phone at that time, but I

21   really can't recall those specifics of this.

22   Q.    You mentioned that you paid -- or you wrote checks for

23   salaries that Scott Dittman signed.  Was that true with

24   other expenses of the company?

25   A.    Yes.

Direct - Blume

1    Q.   What were some of those expenses, if you can recall?
2    A.   We had the largest expenses -- the largest checks I saw
3    go out were for all of the patents that were trying to be
4    obtained for the pod technology.  Regular, you know, paying
5    for rental payments, utilities, our salaries, building
6    materials related to the company.
7    Q.   Based on your memory, it would have occurred back then
8    in your position writing checks and -- did you also -- was
9    part of your responsibility banking, receiving deposits from
10   customers, or otherwise?
11   A.   Yes.
12   Q.   What would you -- how successful would you say your
13   company was in terms of the checks coming in and the checks
14   going out?
15   A.   What's -- what do you --
16   Q.   Let me ask you:  You indicated earlier that the grow
17   operation netted 3- to $5,000 over two years.  What about
18   the pod operation?  Were you aware of how successful that
19   was?
20   A.   In the first year we had one sale to a company that I
21   believe was in Arizona, which was an exciting day.  But the
22   majority of the checks that I saw coming in were from either
23   the -- the investor checks that were coming in that I
24   photocopied or from the MeadPoint or the Bayside companies
25   that were Billy's other companies.  So I'm sure how the

1   money worked, but as far as money coming in from sales while

2   I was there, not -- not a lot.

3   Q.   Okay.  Could it cover the expenses that was going out

4   or --

5   A.   No.

6   Q.   -- money -- with regard to -- maybe you can just tell

7   us how -- actually the details of it, or at least summarize

8   them.  You didn't have check-writing authority or signature

9   authority.  Were you -- did you have the authority to

10  deposit checks that came in?

11  A.   Yes.

12  Q.   And you mentioned investor checks.  How would you know

13  something was an investor check?

14  A.   So when an investor check would come, Billy would have

15  me photocopy a packet, photocopy the check, and then put it

16  in a file.  And then, you know, whatever bank account that

17  it was to go to, I would have a deposit slip and just drop

18  it off at the bank.  So how do I know that it was an

19  investor check?  Because it -- any time it was an investor

20  check, there was a packet associated with that check.

21  Q.   What was in this packet?

22  A.   I don't know.  It was investor packets with people's

23  signatures and the paperwork.

24  Q.   Okay.

25  A.   I didn't read it, really, thoroughly.  I just

1    photocopied it all.

2    Q.   Maybe you could ask -- I'll just ask you some

3    general -- a couple of general questions.  You indicated

4    that other people -- as time went along other people came to

5    work at the facility.  Was there more than one company sort

6    of with that facility as the address?

7         Other than FusionPharm, were there other entities,

8    business entities, that you know of?

9    A.   Like the VertiFresh?

10   Q.   Well, you just tell me.  I --

11   A.   VertiFresh, but that was part -- I mean, that was part

12   of FusionPharm, but not to my knowledge, no.

13   Q.   Okay.  Who did -- were these people that worked there,

14   were they employees?  Do you remember who they were?

15   A.   Mark Anderson was not an employee.  He --

16   Q.   I'm sorry, Mark Anderson?

17   A.   Mark Anderson.  He helped with all of the construction.

18   So his construction crew came in all the time, but they

19   weren't employees.  We were cutting Mark's -- Mark a check

20   and he was paying his workers that he brought in.

21        Frank Faulkner worked in the warehouse for a while.

22   Andy Duke, but he never worked in the warehouse.

23   Q.   Was there another office?

24   A.   There was another office.  After a while, they rented

25   an additional office space on Wynkoop, so it expanded to

Direct - Blume

1      three spots.

2      Q.   What was the function of the other office?

3      A.   It was just a corporate headquarters; like a nicer spot

4      to have people come than the warehouse, itself, I suppose.

5      Q.   Was that in downtown Denver?

6      A.   It was.

7      Q.   Okay.  Had you -- did you go there occasionally?

8      A.   I did.

9      Q.   Okay.  Did you have to pay rent there, too, I presume?

10     A.   Yes, we did.

11     Q.   What was your assessment of the roles of Billy Sears

12     and Scott Dittman?

13     A.   The roles?  They were my bosses.  They were the owners

14     of the company.

15     Q.   Would you sit down -- would you get together and sit

16     down in meetings with them?

17     A.   Yes.

18     Q.   What were -- what were some of those type of meetings?

19     A.   Gosh, everything.  You know, day-to-day operation

20     meetings.  We did a trip to an investor meeting where we set

21     up a booth.  Just overall company information type meetings.

22     Q.   Did you ever have to travel out of town for the

23     company?

24     A.   Yes.

25     Q.   Where did you go?

Direct - Blume

A.    I was sent to Arizona to meet with some vendors on my

own to look for equipment.  I was sent to Nevada on my own

to then procure the equipment and make sure that everything

was going to go with that transaction.  And then we all went

to Arizona together for an investor's type booth.  Everyone

was setting up their booth and pitching their ideas to

people who were looking to invest in companies.

Q.    Did you work in the pods themselves that will try to

grow things?

A.    I -- yes, I worked in the pods primarily.  That's what

I was doing was growing the lettuce every day, or the basil,

or whatever crop that I had, just managing all of that.

Q.    With regard to the -- the -- I guess the hierarchy of

the company, was either Billy Sears or Dittman sort of the

boss, the big boss, or what would you say the difference in

their roles was, or their responsibility?

A.    I think the only difference is that Scott signed the

checks and Billy didn't.  They seemed to be equally in

charge, as far as I was concerned.

Q.    When did you leave the company?

A.    I left the company at the end of 2012, I think.

Somewhere in 2012.

Q.    Okay.  Had you been pursuing your master's degree at

the same time you were working at the company?

A.    Yes.

Direct - Blume

1   Q.   Was your experience at the company part of -- have any

2   part of your master's degree?  Or at least your experience

3   in growing, as you were growing?

4   A.   I don't understand the question.

5   Q.   What -- did you have -- was part of your job -- your

6   function at FusionPharm, was that any part of your master's

7   program, your experience there?  Or was that part of the

8   decision-making process that you --

9   A.   I wanted to go back to school so that I could be better

10  at my job.  They -- Scott and Billy met a gentleman --

11  excuse me -- named Chris Hawdad [phonetic] and he came in,

12  and it just became really evident to me that I needed to be

13  better at my job and get some more formal training, so I

14  started going to school.

15          And I was stretched really thin.  I didn't plug a

16  pump in, and I ended up killing two acres of food.  Two of

17  the pods didn't run and I went to Scott and said, you know

18  what, this was a huge mistake, it's my fault and I think

19  that I need to bow out and just focus on my education and

20  that's why I left, because he had Chris and Chris' brother,

21  John Paul, and we overlapped for a couple of months.  And I

22  was really only working on the weekends because I was

23  driving from Denver to Fort Collins Monday through Friday to

24  do all of my classes and that's why I eventually left.

25  Q.   And just for the record, Colorado State University is

Direct - Blume

1    in Fort Collins, and that's --

2    A.    Correct.

3    Q.    How far away from Denver is that?

4    A.    I believe it was like 64 miles from my door to campus.

5    Q.    Okay.  Okay.  Let me have one moment.

6          When you first -- when the companies first started

7    its -- when you were beginning -- moving from the old

8    company into the new company, how did you become aware that

9    they intended to go public, sell?  Was that told to you by

10   Billy Sears or by Scott Dittman or do you remember?

11   A.    I don't recall.  You know, it's been so many years, it

12   just -- the -- literally this burglary happened and then

13   within a week, you know, sort of like here's Billy and he's

14   a business guy and we're going to take it in this new

15   direction, and it happened pretty rapidly.

16         It -- I don't recall specific details as to how it

17   happened.

18   Q.    Okay.  Did you know that -- well, never -- I'll

19   withdraw that question.

20         You mentioned a company named VertiFresh.  Did you

21   ever hear or see any documents under the companies

22   MeadPoint, Bayside or MicroCap Management?  Do those ring a

23   bell?

24   A.    I don't understand -- all of those companies ring a

25   bell.  I'm not sure I understand what the question is,

Direct - Blume

1     though.

2     Q.   Which bell do they -- how do you know anything about

3     MeadPoint?

4     A.   MeadPoint is -- was one of Billy's companies that he

5     had that was writing checks to FusionPharm when we needed

6     money.

7     Q.   Okay.  Who was writing the checks?

8     A.   Billy.

9     Q.   Was writing the checks from MeadPoint to FusionPharm?

10    A.   And I would deposit them.

11    Q.   And you would deposit them.  What about Bayside?

12    A.   Same thing.

13    Q.   Okay.  What about MicroCap Management?  Do you remember

14    that name?

15    A.   Yes.

16    Q.   What was that?

17    A.   The similar situation.  As I understood it, FusionPharm

18    was this corporate shell and there were entities around --

19    other entities that Billy had, and somehow everything was

20    going to funnel into FusionPharm.

21    Q.   Did you ever meet a person by the name of Guy

22    Jean-Pierre?

23    A.   No.

24    Q.   Did you ever hear that name?

25    A.   Yes.

1    Q.   How did you hear that name?

2    A.   I would hear Billy always had his Bluetooth in his ear,

3    and when he'd get a call, he'd go, "Guy," or "Richie," and

4    he'd hold his hand out and put his deal up, even if he was

5    in the middle of a sentence talking to you.  So it's an

6    unusual name, so yes, I remember him saying it.

7    Q.   But you never met this person --

8    A.   No.

9    Q.   -- that you know of?  Okay.

10            Okay.  Thank you.

11   A.   Uhm-hum.

12            THE COURT:  Cross-examination.

13            MR. GOODREID:  Yes, thank you, Your Honor.

14                      CROSS-EXAMINATION

15   BY MR. GOODREID:

16   Q.   Good morning, Ms. Blume.

17   A.   Good morning.

18   Q.   Now, you indicated before that you started working for

19   what was actually FusionPharm in 2010; is that right?

20   A.   No, I don't believe FusionPharm wasn't until 2011.

21   Q.   Oh, okay.  So it started in 2011 with what was actually

22   FusionPharm --

23   A.   I believe that's correct, yes.

24   Q.   -- is that -- and then you left at some point in 2012;

25   is that right?

1   A.    That's correct.

2   Q.    Now, you said a moment ago in response to one of Mr.

3   Brown's questions that you thought that FusionPharm was a

4   corporate shell; is that what -- was that your words?

5   A.    Yes.

6   Q.    Okay.  But during the time you were there, this entity,

7   FusionPharm, was actually doing real business, or trying to

8   do real business; isn't that right?

9   A.    Yes.

10  Q.    In other words, in -- and you talked about that, for

11  example, on the produce, that FusionPharm was actually

12  trying to sell produce to restaurants, albeit they had

13  limited success; is that fair?

14  A.    Yes.

15  Q.    Okay.  And same thing with respect to the pods.  The

16  pods, the company was actually trying to market those pods

17  and sell them; isn't that right?

18  A.    That's correct.

19  Q.    In fact, you said that with respect to the sale of the

20  one to Arizona, that was a big day, everybody remembered it,

21  right?

22  A.    Yes.

23  Q.    Okay.  So when you say "a shell," I just want to be

24  clear, you're not suggesting that FusionPharm, itself,

25  wasn't actually a real business.

Cross - Blume

1   A.   No.

2   Q.   Okay.  Now, you said that Mr. Sears was there at the

3   facility early in the morning and that he would often be

4   talking to his friend Richie on the East Coast; is that

5   right?

6   A.   Uhm-hum.

7   Q.   When you say "Richie," was that Richard Scholz?

8   A.   I couldn't tell you that, sir.

9   Q.   Oh, so you did not actually meet this Richie person?

10  A.   No.

11  Q.   Okay.  And you indicated that you heard the name "Guy

12  Jean-Pierre"; is that right?

13  A.   Uhm-hum.

14  Q.   But you did not ever actually --

15       THE COURT:  Ma'am, ma'am, you have to say yes or

16  no.

17       THE WITNESS:  I'm sorry, yes.

18       MR. GOODREID:  Sorry, Your Honor.

19  BY MR. GOODREID:

20  Q.   You did not actually ever meet Mr. Jean-Pierre?

21  A.   No.

22  Q.   And I take it you did not ever review any work that he

23  had done; is that right?

24  A.   No.

25       MR. GOODREID:  Your Honor, that's all I have.

Redirect - Blume

1          THE COURT:  All right.  Redirect.

2          MR. BROWN:  Just to clear something up.

3                    REDIRECT EXAMINATION

4     BY MR. BROWN:

5     Q.   Ms. Blume, you indicated just a little while ago, when

6     Mr. Goodreid was asking you a question, that the company was

7     trying to market the pods that you described.  I won't go

8     through that again.  But while you were there, what -- you

9     indicated, as Mr. Goodreid also brought out, it was a big

10    date when that one was sold to the company in Arizona.

11    A.   Uhm-hum.

12    Q.   If you can -- during the time that you were there, how

13    many pods would you say were actually sold, or leased out?

14    A.   I can't remember a specific number.  I would say no

15    more than six.

16    Q.   But they were trying to sell them.

17    A.   Absolutely.

18    Q.   Do you -- did you have to do anything to help the

19    facility?  For example, if a customer was coming in to look

20    at these pods?

21    A.   Sure.  I would -- you know, make sure everything was

22    tidied up and, you know, be ready to walk through and answer

23    questions about the functioning produce pods.

24    Q.   And -- but customers would come occasionally to cause

25    you to do this?

Redirect - Blume

1    A.    There were a few people that walked through, yes.

2    Q.    What do you mean by "a few"?

3    A.    It was a handful of -- it wasn't, you know, every day

4    we had people coming in looking at these things.  It was a

5    handful of people.

6    Q.    All right.

7            MR. BROWN:  That's all, Your Honor.  Thank you.

8            THE COURT:  May this witness be excused, for the

9    Government?

10           MR. BROWN:  Yes, sir.

11           THE COURT:  For the defendant?

12           MR. GOODREID:  Yes, Your Honor.

13           THE COURT:  Ms. Blume, thank you for your

14   testimony.  You're excused.  You may step down.

15           THE WITNESS:  Okay.  Thank you.

16           THE COURT:  Government may call its next witness.

17           MR. SIBERT:  Thank you, Your Honor.  At this time,

18   the Government would like to call Liz Heese.

19           THE COURT:  All right.

20           COURTROOM DEPUTY:  Just stand by the witness stand

21   here and raise your right hand, please.

22           LIZ HEESE, GOVERNMENT'S WITNESS, SWORN

23           COURTROOM DEPUTY:  Please be seated.  And scoot

24   your chair up, if you will.  And also please state and spell

25   your full name for the record.

Direct - Heese

1          THE WITNESS:  My name is Elizabeth Heese.

2    E-l-i-z-a-b-e-t-h, H-e-e-s-e.

3          MR. SIBERT:  May I proceed, Your Honor?

4          THE COURT:  You may.

5          MR. SIBERT:  Thank you.

6                    DIRECT EXAMINATION

7    BY MR. SIBERT:

8    Q.   Good morning, ma'am.

9    A.   Good morning.

10   Q.   And, Ms. Heese, can you please explain to the jury

11   where you're currently employed.

12   A.   Yes, I work for OTC Markets Group in Washington, D.C.

13   Q.   I'm going to ask you two things.  We have a court

14   reporter and she needs to record all this, so if you could

15   just slow down a little bit.

16   A.   Sure.

17   Q.   And as I'm told, you need to speak up a little bit --

18   A.   Okay.

19   Q.   -- and everyone can hear you.  Okay.  If you need to,

20   just adjust the microphone.

21   A.   All right.  It's good.

22   Q.   All right.  And so you say you work with OTC Markets

23   Groups.

24   A.   That's correct.

25   Q.   Okay.  And what does OTC Markets Group do?

Direct - Heese

1    A.   We operate a stock market for 10,000 securities that

2    trade in the United States but they're not listed on NASDAQ

3    or the New York Stock Exchange.

4    Q.   And so it's another platform where companies can put

5    public stocks up for investors to buy?

6    A.   Yes.

7    Q.   And so how long have you worked there?

8    A.   Since 2003.

9    Q.   So -- and has there been any breaks in that time, or

10   have you consistently worked there throughout?

11   A.   I've been there the entire time.

12   Q.   Okay.  Now, as part of this public platform for

13   investors to invest into companies at the OTC Markets Group,

14   essentially what does OTC ensure the public when it comes to

15   these?

16            MR. BARNARD:  Your Honor, object.  Leading.

17            THE COURT:  That's overruled.

18            You may answer, ma'am.

19            THE WITNESS:  I'm sorry, can you re-ask the

20   question.

21   BY MR. SIBERT:

22   Q.   Sure.  Does OTC have a duty to ensure that the public

23   receives information about companies?

24   A.   We do not have a duty to do that.  We do have a scheme

25   where we identify companies that do provide information for

1    investors.

2    Q.   Okay.  And can you talk about that.

3    A.   Sure.  We identify companies -- companies that are

4    traded on our market as providing current information,

5    limited information, or no information.  And we have a -- we

6    have a set of guidelines that companies can follow to --

7    that tells them what kind of information is appropriate to

8    make available for investors, and including financial

9    information, information about who -- who controls the

10   company, what the company's business plan is, that type of

11   information.

12           And they -- they publish that information through a

13   website that we operate and it's immediately available for

14   investors.  And based on that information -- the provision

15   of that information, we will label a company -- will put it

16   in one of those categories:  Current information, if they

17   have it available, and it's recent; limited information, if

18   it's -- if it's some portion of that information is

19   available, but it's maybe not so recent; and then no

20   information for companies that don't have any information

21   available for investors in the last six months.

22   Q.   And essentially, then, OTC Markets provides a platform

23   where investors then can read about companies in the

24   information that's been posted?

25   A.   Yes.

Direct - Heese

1    Q.    Who's responsible for the integrity of the information

2    that companies post?

3    A.    The companies are putting information together pursuant

4    to our guidelines and then there is -- our processing

5    includes a requirement for an attorney -- an attorney to

6    either help the company put the disclosure together or to

7    review it afterwards to make sure that it complies with our

8    guidelines and that there -- the company is making all the

9    information available that an investor might need to make an

10   informed decision.

11   Q.    Okay.  And when you say "all the information," do

12   you -- I guess you said a lawyer needs to review what is

13   posted; is that correct?

14   A.    Yes.

15   Q.    Okay.  And who are you relying on to make sure the

16   information is -- is trustworthiness, or is honest?

17   A.    In that case, the attorney.

18   Q.    And are there different types of tiers within OTC

19   Markets?

20   A.    There are.  We have three tiers:  We have our top tier

21   companies are OTC QX market; our medium tier companies are

22   OTC QB; and then our -- our lowest tier companies is on our

23   Pink Market and the Pink Market is sort of further divided

24   into those three categories I was just speaking about a

25   moment ago:  the current information, limited information,

Direct - Heese

1    and no information.

2    Q.   Okay.  And could you describe the difference

3    essentially between OTC QX, QB, and Pink.

4    A.   Sure.  OTC QX is for companies that meet certain

5    financial and corporate governs requirements.  Generally

6    speaking, they're companies that -- that, you know, could be

7    on -- listed on a NASDAQ or New York Stock Exchange if

8    they -- if they chose to be.

9         Our OTC QB market is for companies that are fully

10   reporting with the SEC or with some other kind of -- or

11   through some other kind of reporting scheme.  And they

12   have -- there's a minimum bid price.  And then there's some

13   other -- a few other requirements around it.  It's fairly

14   low and it's mostly about disclosure.

15        And then our lower tier is our Pink market, and

16   there are absolutely no requirements to be on that.

17   Companies do not have to make information available to

18   investors, they're -- there are no requirements whatsoever.

19   It's just a open-trading platform for any kind of company.

20   And we just designate -- so that investors have a little bit

21   more information, we just designate whether they should be

22   able to find information about the company or not.

23   Q.   All right.  So could you describe to the jury

24   essentially the classification of companies that usually are

25   in the Pink section of OTC?

Direct - Heese

A.    Sure.  Because it is sort of an open market and there are no requirements, there's a pretty wide range of types of companies that are on there.  There are -- everything from they're big giants, international companies, Roche and Adidas and companies like that, that just -- they have -- they don't need to use the U.S. markets for their reporting scheme, so they are quoted in our Pink Market.

There are a bunch of community banks and companies like that that are, you know, small, trustworthy community kind of companies.  There are a bunch of -- there are a bunch of companies that have sort of fallen on hard times and been delisted from Exchange, so it's a place for companies to drop down to.

And then there's a large group of companies that are really just small -- very small businesses, and either they're -- either they're -- they're just small companies and they don't meet the requirements of the Exchange, or -- or they don't want to make the information public, or they're -- a lot of them are sort of, you know, companies that have gone dark or defunked and they're no longer really companies, they're -- really still have stock trading.  So there's just a wide range of types of companies.

Q.    All right.  And what does it take to become through -- to have the -- I guess the listing of current -- Pink current?

1    A.    So in order to be in the current information category,

2    our Pink Market, you can do a few things.  You can be SEC

3    reporting, you can be on an inter -- a qualified

4    international exchange and be current with your

5    international exchange, for example, the -- you know, the

6    Toronto Stock Exchange.  You can be a bank, as I mentioned,

7    and be -- banks are required to make current information

8    available with federal banking regulators.  So all of those

9    kinds of companies have sort of external reporting schemes

10   where investors can get information about them.

11          And then the fourth group that I mentioned are the

12   companies that don't -- that don't fit into any of those

13   categories and they don't have an obligation to file with

14   the SEC.

15          So OTC Markets has created a set of disclosure

16   guidelines saying, you don't -- you're not required to

17   report this information to anyone, but we think that this is

18   the information that a responsible public company should

19   make available to investors, so that investors can have the

20   information that they really need to make an informed

21   decision.

22   Q.    Okay.  And what type of disclosures do you require for

23   that fourth type of company regarding providing investors

24   information?

25   A.    Generally, it's quarterly and annual reports.  There's

1    financial information in there, you know, a balance sheet,

2    an income statement, a cash-flow statement.  There are just

3    general information about the business plan of the company,

4    who the control persons are, who the major shareholders are.

5    Any just sort of material information that a company -- that

6    an investor might, you know, be interested in knowing when

7    they're deciding whether or not to invest in the company.

8              THE COURT:  Mr. Sibert, let me jump in.  I -- just

9    for clarity, Ms. Heese, will you just state in terms of the

10   disclosure requirements for which tier company is that?

11             THE WITNESS:  The ones that I'm just now describing

12   are for companies that are on our Pink Market.

13             THE COURT:  Pink Market.  Okay.

14             THE WITNESS:  Uhm-hum.  That's the information that

15   they need to provide in order to qualify to be labeled

16   current information.

17             THE COURT:  Okay.

18   BY MR. SIBERT:

19   Q.   And so if OTC Markets -- I assume that OTC Markets

20   needs -- regardless of what tier, QX, QB, or even Pink, the

21   information needs to be truthful that the companies are

22   providing?

23   A.   Yes.

24   Q.   Okay.  And so even with your higher QX, I guess,

25   category categorization, it doesn't even matter, though,

Direct - Heese

1  even at the Pink level, it doesn't relieve the truthfulness

2  of the information?

3  A.   No, it does not.

4  Q.   What happens if QT -- or, I'm sorry, OTC Markets finds

5  out or is notified that the information that a company is

6  being -- that is being posted under Pink, and they have a

7  current status, what happens to that company?

8  A.   If we find that we cannot rely on that information or

9  the letters that attorneys have written to us, we might do a

10  variety of things.  We might go back to the issuer and ask

11  them specifically to explain or to provide more information

12  about something.  We might make a referral to regulators, or

13  one of the things that -- that we do that's sort of in our

14  control is we have a designation when we believe that

15  there's a significant public interest concern about a

16  company, we will put a warning for investors, and it's

17  actually a little skull-and-crossbones warning.

18  Q.   So -- so obviously the risk is higher probably -- would

19  you agree that a risk of investing in the Pink category is

20  higher?

21  A.   Yes.

22  Q.   But it doesn't disclose -- it doesn't disregard the

23  honesty that needs to be put in there.

24  A.   No.

25  Q.   It's just less information.

1    A.    It's less -- I'm sorry, it's less information than

2    what?

3    Q.    It's less than a reporting company with the SEC.

4    A.    It -- yes, it is less information.

5    Q.    Okay.  And just to summarize, anyone on the Pink that

6    receives a current status -- which is the highest; is that

7    right?

8    A.    Yes.

9    Q.    -- needs to file annual and quarterly reports,

10   financials, and that would include the basic accounting,

11   balance sheet, cash flow statement --

12              MR. BARNARD:  Your Honor, he's leading the witness.

13              THE COURT:  I think he's just summarizing what

14   she's already testified to.  Go ahead.  Overruled.

15              MR. SIBERT:  Thank you, Your Honor.

16   BY MR. SIBERT:

17   Q.    So, I'm sorry, so it -- quarterly, annual reports,

18   financials, balance sheet, cash flow sheet, and was there

19   other --

20   A.    And income statement and changes in shareholders

21   equity.

22   Q.    Okay.  And equity, we're talking about usually the

23   beneficial people involved in the company that have shares?

24   A.    That is part of the quarterly and annual disclosure,

25   yes.

Direct - Heese

1    Q.    Does it also include all the other shareholders?

2    A.    Typically, we ask the companies to disclose any -- the

3    shareholdings of all the officers and directors.  And in

4    addition to that, to any shareholder who owns more than 5

5    percent of the outstanding shares.

6    Q.    Okay.  And why 5 percent?

7    A.    The idea is that if you own a significant portion of

8    shares of a company, that you have a controlling interest,

9    either -- either you have some sort of direct relationship

10   or even voting interest.

11   Q.    And when you mean voting interest, essentially --

12   A.    At a shareholders meeting, you would have the power to

13   sway a vote to vote in directors or officers of the company

14   or vote them out.

15   Q.    All right.  Thank you.  Now, is there any symbol when a

16   company is listed on the current -- that has a ranking of

17   current in the Pink category?

18   A.    Today -- today, we display just the word "Pink."  It's

19   sort of neutral.  Once upon a time, I -- many years ago I

20   think we had a Pink check mark.

21   Q.    A Pink check mark?

22   A.    I believe it was a check mark.

23   Q.    Do you know if that check mark was in there between

24   2011 and 2013?

25   A.    I believe so.

Direct - Heese

1    Q.   And what's the second tier of the Pink category?

2    A.   It's the no-information tier.

3    Q.   Okay.  And could you describe to the jury what -- how a

4    company gets the no-information tier.

5    A.   How they get into the no-information tier, is that what

6    you said?

7    Q.   Yes, ma'am.

8    A.   Typically it's a company that -- one of two ways,

9    either they're just late in their reporting, they don't make

10   their quarterly report in the allotted time frame, so they

11   drop down to limited information, or they provide an

12   incomplete disclosure document.

13         For instance, they might provide a quarterly report

14   or annual report, but not the follow-on attorney letter

15   saying that the company's disclosure meets our guidelines.

16   So those -- so they just sort of provide a partial

17   disclosure.

18   Q.   Okay.  And does OTC Markets use a symbol when a company

19   is in the -- in that category?

20   A.   Yes, we have a yellow yield sign for limited

21   information companies.

22   Q.   And then you stated about being late on reporting their

23   quarterly and annual reports.  Could you describe to the

24   jury the time frame that a company needs to be within the

25   reporting requirements.

Direct - Heese

1    A.    Sure.  Within 45 days after the end of the fiscal

2    quarter end, that's when the disclosure is required.  For an

3    annual report, they have 90 days.

4    Q.    Okay.  And if a company is a few weeks or they miss a

5    quarter, does that automatically reduce them into the

6    limited?

7    A.    It does.  If they miss the deadline, they will

8    automatically go down to the limited.  And then after --

9    when their disclosure is six months old, they'll

10   automatically go down to the no-information.

11   Q.    And then if they report again, what happens?

12   A.    Well, my staff would get an alert and we would review

13   it.  And as long as all of the, you know, major elements are

14   there, and it's current information, we would move them up

15   to the current-information tier.

16   Q.    Okay.  And then, finally, can you tell the jury about

17   the no-information category.

18   A.    Sure.  That is for companies that haven't provided any

19   disclosure within the last six months.

20   Q.    Okay.  And does OTC Markets have a symbol for the

21   no-information market?

22   A.    We do.  We use a red stop sign on our website to

23   describe that.

24   Q.    Okay.  And then after the quarterly and annual reports

25   are filed, you were talking about this legal opinion letter.

Direct - Heese

A.     Uhm-hum.

Q.     Sometimes it's called a legal opinion letter, sometimes
I think it's called a current information letter.  Can you
discuss that letter.

A.     Sure.  We call it an attorney letter with respect to
adequate current information.  And the purpose of the letter
is to -- for an attorney to document that they have reviewed
the company's disclosure and that it meets all of the
requirements that we have laid out for companies in our
disclosure guidelines.  And that in providing that
information, the company is providing information within
a -- or pursuant to SEC Rule 15c2-11, and also all of the
information is sufficient to meet the requirements of Rule
144.

Q.     And, briefly, can you just talk about the Rule 144.

A.     Yeah.  I'm not a securities attorney, so I -- I don't
know very -- too much about it, but basically it's a -- it
says that the company has provided material information
publicly that an investor would need to make a decision and
that -- I -- that's the gist of it.

Q.     And I assume that needs to be information -- that
information needs to be correct information.

A.     It does.  And I can add to that just a little bit, if
it's helpful.  It's -- the purpose of it is so that insiders
and people with restricted stock aren't trading on

Direct - Heese

1    information that isn't publicly available to other

2    investors.

3    Q.   Okay.  So it's a safeguard for the public?

4    A.   Yes.

5    Q.   Okay.  And you stated Rule 144.  Do you know whose rule

6    it is?

7    A.   It's an SEC rule.

8    Q.   Okay.  And, finally, I missed -- I heard that there's

9    the current Pink.  So they get -- that's the best rating for

10   Pink section.  And then you have limited information, you

11   get a yield sign.  And then no information, my understanding

12   is there's some type of stop sign symbol, I guess, a

13   warning.

14   A.   That's correct.

15   Q.   But you talked about this skull and crossbones.

16   A.   Uhm-hum.

17   Q.   When is that applied?

18   A.   The skull and crossbones we put on companies no

19   matter -- it can be in any of those categories; current,

20   limited or no information.  But it's when something sort of

21   extraordinary is going on that we think is a significant

22   public interest concern.  And it's more than just there's no

23   information available for this company, it's -- something's

24   happening and we use it in cases where there's just crazy,

25   unexplained trading for a stock.  If we have reason to

Direct - Heese

1    believe that there's significant problems with the company's

2    disclosure; if there's a lot of stock promotion going on in

3    a security, those are examples, or if there's some kind of

4    SEC action or investigation that's been announced.

5         Those are examples of when we would put the skull

6    and crossbones on.

7    Q.   Okay.  Thank you.

8         Now, as -- are you familiar with the attorney

9    letter agreements?

10   A.   Yes, I am.

11   Q.   And can you just briefly explain what they are.

12   A.   Sure.  This is the agreement that an attorney -- so an

13   attorney writes us a -- writes a letter to OTC Markets

14   saying that they've reviewed the company's disclosure and

15   that it meets our requirements and it's sufficient to cause

16   us to put the company in our current information tier.

17   Excuse me.

18        Before an attorney can write that letter to us, we

19   require them to sign an agreement with us.  And it's just a

20   one-page, two-page agreement that says what the condition --

21   what the requirements are for the attorney -- that the

22   attorney has to follow in order to provide this letter.

23        It includes things like they have to be, you know,

24   barred in good standing and -- or they need to be in good

25   standing with the state bar or whatever state they're

Direct - Heese

1    practicing in.  It -- they have to be a U.S. citizen, some

2    things like that.  Just basic requirements for the attorney,

3    themselves.

4         And then it lays out some of the information that

5    is required to be included in the letter.  And the attorney

6    agrees to all of these conditions.  And once they do, they

7    say, "I'm going to start writing attorney letters for this

8    company," and they send us a -- this agreement.

9    Q.   Okay.  And if you need a drink of water and a pause,

10   just let me know.

11   A.   Thank you.

12   Q.   Sure.  Okay.  And if the attorney that signs this

13   agreement with OTC Markets, if they do not follow -- or he

14   or she, do not follow the -- their requirements, what

15   happens to the attorney?

16   A.   Typically we work with an attorney at times.  If we see

17   errors or problems we'll point them out and there's some

18   back-and-forth.

19        If it becomes obvious that an attorney's not doing

20   the work that they say that they're doing in their letters

21   and their agreement with us, we will ultimately -- if it

22   gets to that point, we will prohibit from writing future

23   letters.

24        MR. BARNARD:  I'm sorry, could the witness please

25   speak up.  I missed that last --

                            Direct - Heese

1           THE WITNESS:  Yes.

2           THE COURT:  Just stay real close to the mic.

3           THE WITNESS:  So we typically will -- if it -- if

4    we reach the decision where we cannot rely on the work that

5    the attorney is doing or the letters that they are writing

6    to us, we will prohibit them from writing future letters for

7    any company.

8    BY MR. SIBERT:

9    Q.   So if an attorney makes a mistake or isn't complying

10   with the regulations, OTC Markets will reach out to that

11   attorney to figure out what is going on.

12   A.   Yes.

13   Q.   So it's not like you just ban an attorney --

14   A.   No.  We typically send a warning letter sort of

15   outlining the things that we've been seeing, things that we

16   have been talking to the attorney about, and we -- you know,

17   "This is" -- say, "This is" -- "We're giving you another

18   chance."

19   Q.   So I guess it's fair to say you probably write some

20   letters and still be working with OTC Markets with all the

21   mistakes I make.

22   A.   Perhaps.

23   Q.   All right.  Anyway -- so, anyway, it's just not a

24   one-mistake-you're-gone from writing these letters?

25   A.   Generally, no.

Direct - Heese

1    Q.   Can I have Government Exhibit 53 up, please.

2              MR. SIBERT:   And, Your Honor, this has been

3    stipulated to and, at this time, the Government would like

4    to move for admission into evidence.

5              THE COURT:   Given the stipulation of the parties,

6    Government Exhibit 53 is admitted into evidence and may be

7    published to the jury.

8         (Government's Exhibit 53 received)

9    BY MR. SIBERT:

10   Q.   Okay, ma'am, do you recognize -- I have it on your

11   screen.   If for some reason you cannot see it clear

12   enough -- and I'll focus in on some areas -- let us know.

13   There's always a hard copy in the binders.

14             But do you recognize what Government Exhibit 53 is?

15   A.   Yes.

16   Q.   And what is Government Exhibit 53?

17   A.   This is the attorney letter agreement.

18   Q.   Okay.   And this is what you just spoke about is sent to

19   attorneys that want to represent companies writing the

20   attorney letter for the company to OTC Markets?

21   A.   That's correct.

22   Q.   And I guess before I go down the road too far, you

23   spoke about these quarterly and annual reports.   When is the

24   attorney letter, the current -- saying that the information

25   is current in the company -- when is that sent to OTC

1    Markets?

2    A.    So our -- excuse me -- our requirement is that -- it's

3    typically set within a few days or a few weeks after the

4    quarterly or annual report is provided.  We have a 30-day

5    window where we give 30 days after the quarterly or annual

6    report are due for the attorney to review the information

7    and write this letter, after which we will say that it's not

8    been provided and we will move them down to our limited

9    information tier.

10   Q.    Thank you.

11             MR. SIBERT:  Can I have a minute, Your Honor?

12             THE COURT:  You may.

13   BY MR. SIBERT:

14   Q.    All right.  Now, you were talking about this

15   information -- or, excuse me, the attorney letter agreement.

16   The first two pages of this agreement -- the first page --

17   let's just talk about the first page.  What is, essentially,

18   the first page of this agreement explaining to the attorney?

19   A.    This is just sort of the business of the contract --

20   excuse me.  It's saying -- like identifying the parties and

21   saying that the -- it includes the requirements that the

22   attorney is agreeing to as part of this agreement.

23   Q.    Okay.  Let me just focus in on some areas.

24   Specifically, this paragraph I'm circling.  What is

25   essentially Exhibit A?

1    A.    Exhibit A is attached to the back of this agreement,

2    typically, and it -- it is the -- it is the part of the

3    document that describes all of the information that

4    specifically needs to be included in the letter.

5    Q.    So essentially the guidelines that the attorney must

6    follow?

7    A.    Uhm-hum.

8    Q.    The regulations.

9    A.    Yes.

10   Q.    Can I have Section 1 brought up, please.  Okay.  Can we

11   just focus on this first sentence here.

12        Can you tell me -- tell the jury essentially what

13   OTC is demanding from the attorney there.

14   A.    Sure.  We are saying that not only will the company's

15   disclosure be available publicly, but the letter that the

16   attorney writes is also publicly available.  And the

17   attorney is consenting to that being publicly available.

18   Q.    Okay.  And you talked about the jurisdictions where the

19   attorney is legally licensed to practice law.  Is that in

20   this section here?

21   A.    Yes.

22   Q.    And then Section 4, what does that allow OTC Markets to

23   do?

24   A.    This is -- this allows us not to accept a letter and

25   then not to consider a company based on this particular

Direct - Heese

1    attorney's letter for current information, based on the

2    provision of the letter by an attorney that we've decided

3    not to accept letters from any longer.

4    Q.   Can I have page 2, please.  Can you just zoom out a

5    little bit.

6         Okay.  Essentially what are those lines where it

7    says "In witness whereof," and it has "The Attorney"?

8    A.   This is the attorney where he's signing, agreeing to

9    all of these terms and conditions.  And also it has a

10   section for OTC Markets to countersign the document.

11   Q.   And that's this section here?

12   A.   Uhm-hum.

13   Q.   Okay.  Can I have page 3 of that document.  Okay.  I'd

14   like to look at the second paragraph.

15        This paragraph talks about the role of the

16   attorney.  Can you describe what OTC Markets, in your

17   requirement section of this agreement, needs the attorney to

18   do regarding the company's information.

19   A.   Yeah.  It explains that the attorneys are a very

20   important part of the disclosure process and that we -- we

21   have to be able -- they're providing information for

22   investors and that we have to be able to rely on the

23   information that they're providing and their integrity in

24   this process.  And not just OTC Markets need to rely on it

25   but, obviously, ultimately investors need to be able to rely

Direct - Heese

1   on it.

2   Q.   So, in fact, you label the word -- how do you describe

3   their role?

4   A.   We say that it's crucial.

5   Q.   And then, again, whose integrity are you counting on?

6   A.   The attorney's integrity.

7   Q.   Okay.  Can you please look at -- can we have

8   paragraph 2 blown up down here.  Can you focus in on what

9   OTC means by "The attorney must be a U.S. resident and

10  retained specifically by the issuer"?

11  A.   They have -- there needs to be some sort of agreement

12  between the issuer and the attorney that the issuer is

13  hiring an attorney to provide the service to them.

14  Q.   Okay.  And when OTC Markets kind of looks into if an

15  attorney is retained, what is the most common practice that

16  OTC Markets looks for between a company and a attorney that

17  they retained?

18  A.   Well, typically, we look for the attorney to say that

19  they have been retained by the issuer, and we also look to

20  make sure that usually the company will list that lawyer as

21  a service provider on their sort of public profile and in

22  their disclosure documents.

23  Q.   And how about payment?

24  A.   The payment is between the issuer and the attorney.  We

25  are not -- OTC Market is not a party to that agreement.

1    Q.   Okay.  I'd like to look at 4.  Can we just hit the

2    first part of 4, please.

3    A.   The -- in part of the letter the attorney says which

4    jurisdictions he is authorized to practice law in.

5    Q.   And can I have page 4, please.  And I really want to

6    focus on the last part of paragraph 4.

7         Can you describe to the jury what OTC Markets

8    requires when a lawyer relies on the work of another lawyer?

9    A.   Certainly.  If -- if -- when writing this document --

10   writing this letter, you're reviewing the documents of the

11   company, and you're talking to the officers and the

12   directors of the company.  If you -- if part of that review

13   is relying on the work that other attorneys have done, it

14   just needs to be explained in the letter.

15   Q.   Okay.  And if the lawyer that is submitting the letter

16   to OTC Markets relies on either drafts or the work of an

17   in-house counsel, does the in-house counsel need to be

18   listed in the letter?

19   A.   Typically, they would be, but it's not -- it's not

20   spelled out here.

21   Q.   So what does it mean, "such other counsel must be

22   identified"?

23   A.   Yeah, it's -- excuse me -- it's not really spelled out.

24   If they're relying on work that some other counsel has done,

25   either in opinions or decisions that they've made, I would

1    expect that they would include that in the letter.
2    Q.   Okay.  And if you found out that that -- that they --
3    if a counsel was not relying -- or was relying on the work
4    of another lawyer and that other lawyer wasn't being
5    identified, what would OTC Markets request?
6    A.   We would ask them to revise the letter.
7    Q.   And what would you need to be put into the letter?
8    A.   Who the other attorney was and what information that
9    they relied on from them.
10   Q.   Okay.  So essentially identifying.
11   A.   Uhm-hum.
12            THE COURT:  Mr. Sibert, would this be a good time
13   to pause for a morning recess?
14            MR. SIBERT:  Yes, sir.
15            THE COURT:  All right.  All right, ladies and
16   gentlemen of the jury, we're going to take our morning
17   recess of 15 minutes.
18       (Jury left the courtroom at 10:19 a.m.)
19            THE COURT:  Ms. Heese, since you're in the middle
20   of your testimony, I direct you not to speak with any of the
21   lawyers during the recess.  All right.
22       (Recess 10:20 a.m. to 10:40 a.m.)
23            THE COURT:  Ms. Heese, Ms. Heese, I remind you you
24   remain under oath.
25            Mr. Sibert, you may resume your examination.

1    MR. SIBERT:  Thank you, Your Honor.

2    BY MR. SIBERT:

3    Q.   Ma'am, I was asking you some follow-on questions,

4    specifically to paragraph 4 of the -- of the -- I guess the

5    Exhibit A -- or appendix A of the attorney letter agreement.

6    If -- let me ask you, if the in-house counsel was

7    essentially drafting a entire opinion letter, did he submit

8    it on behalf of the company, and outside counsel was

9    essentially just putting on a letterhead and a signature

10   block, would you want to know who the in-house counsel was

11   when that letter was being submitted?

12   A.   Yes.

13   Q.   Can I have paragraph 12 -- or, excuse me, let me --

14   paragraph 8.

15        You touched on this a little bit, but essentially

16   could you just tell -- give an overview of what OTC Markets

17   means by the "adequate current information" or public

18   information?

19   A.   Sure.  It's a -- it's a concept within U.S. Securities

20   laws.  It says this is -- this is the information that an

21   investor needs to make an informed investment decision.

22   Q.   Okay.

23   A.   And we sort of have adopted that standard for our

24   disclosure guidelines.

25   Q.   Can I have paragraph 12, please.  And can you just talk

Direct - Heese

1    about -- regarding the 5 percent again.

2    A.    Sure.  This is the idea that an important piece of

3    information for investors to know is who is controlling the

4    company.  And we have drawn a line at 5 percent, so we

5    expect the disclosure to contain the identity and the

6    shareholdings of any person that owns more than 5 percent of

7    the securities.

8    Q.    And so that would include, as you say, managers --

9    management and directors?

10   A.    All officers and directors, no matter what their

11   holdings are, even if it's zero, plus any -- any -- anybody

12   that owns at least 5 percent of the outstanding stock should

13   be disclosed.

14   Q.    How about a -- you said all officers.  Would that

15   include a administrative officer?

16   A.    An executive officer of the company.  So any -- anybody

17   who's listed on the -- for example, the corporation records

18   of a company as an executive officer in the company.

19   Q.    And the corporation records, would you include the

20   records that are submitted to FINRA when a corporation's

21   being set up?

22   A.    They're submitted to the U.S. Secretary of State,

23   typically, the -- all -- where this -- they track the state

24   of incorporation.  That's where we go to verify who the

25   officers and directors of a company are.

Direct - Heese

1    Q.   All right.  Thank you.

2            Now, as part of your preparation in this case --

3    can I have that taken down, please.  As part of your

4    preparation in this case, did you review the documents and

5    information in the file regarding the firm FusionPharm?

6    A.   Yes, I did.

7    Q.   Okay.  Now, can you -- and also as part of this case,

8    were you asked to look over anything that a lawyer by the

9    name of Guy Jean-Pierre submitted to OTC Markets, to include

10   the attorney agreement letters?

11   A.   Yes, we did.

12   Q.   Okay.  Could you look at Exhibit 8, which is going to

13   be in binder 1.

14           MR. SIBERT:  And, Your Honor, based upon my

15   understanding, these exhibits -- this exhibit has not been

16   admitted into evidence at this point, and it has not been

17   stipulated to either.

18           THE COURT:  All right.

19   BY MR. SIBERT:

20   Q.   And, ma'am, if you need to, you can pull out Exhibit 8.

21   It -- I'm going to ask you to review all the documents in

22   Exhibit 8.

23   A.   Okay.

24   Q.   Do you recognize those documents?

25   A.   I do.

Direct - Heese

1    Q.    And have you had a chance to review those documents

2    before your testimony here today?

3    A.    Yes, I looked at them recently.

4    Q.    Okay.  And could you tell us what those -- essentially

5    in general terms, what those documents are?

6    A.    Certainly.  These are the attorney letter agreements

7    that Mr. Guy Jean-Pierre provided to OTC Markets over, I

8    think, a period of years.  There's one for each of the

9    companies that he was representing and writing attorney

10    letters to OTC Market for.

11    Q.    Let me ask you:  How do you know that these are Mr. Guy

12    Jean-Pierre's letters -- or agreements?

13    A.    They're all -- they're signed by him.

14    Q.    Okay.

15    A.    And his firm.

16    Q.    And how do you know they're from OTC Market?

17    A.    Many of them have my signature as the --

18    countersigning the document, and I'm very familiar with the

19    document.  And we produced it.

20    Q.    And did you also produce the -- did OTC Markets produce

21    these documents regarding the investigation --

22    A.    Yes.

23    Q.    -- in this case?

24    A.    Yes, we did.

25                MR. SIBERT:  Your Honor, at this time the

Direct - Heese

1  Government would move to admit Government Exhibit 8 into

2  evidence.

3          THE COURT:  Any objection?

4          MR. BARNARD:  No objection, Your Honor.

5          THE COURT:  All right.  There being no objection,

6  Government Exhibit 8 is admitted into evidence and may be

7  published to the jury.

8      (Government's  Exhibit 8 received)

9          THE COURT:  And Ms. Heese, I just want to inform

10  you that you have a very soft voice --

11          THE WITNESS:  Oh.

12          THE COURT:  -- and I noticed that when you start

13  going through the exhibits, you were pulling away from the

14  mic, so keep your voice up, keep close to the mic, even as

15  you are going through the documents.

16          THE WITNESS:  I will do that.

17          THE COURT:  All right.

18  BY MR. SIBERT:

19  Q.   Okay.  Thank you.  So this is essentially the first

20  page of Exhibit 8; is that correct?

21  A.   Yes.

22  Q.   Okay.  And this is essentially the same agreement that

23  we just walked through in Exhibit 53; is that right?

24  A.   Yes, it is.

25  Q.   That first page?

Direct - Heese

1      And can I have the second page, please.  Page 3,

2   please.  And page 4.

3      Now, page 4, we have a different signature here; is

4   that correct?

5   A.   Yes.

6   Q.   Do you know why that is?

7   A.   This -- I believe that this is for a company that -- I

8   think it was accidentally attached to the other attorney

9   letter agreements when they were originally scanned into our

10  system, you know, eight years ago.

11  Q.   Okay.  So just to be clear, page 3 and 4 have nothing

12  to do with Mr. Guy Jean-Pierre?

13  A.   No, they do not.

14  Q.   Okay.

15      THE COURT:  Then why was it included in this

16  exhibit?

17      MR. SIBERT:  So I just wanted to make sure it was a

18  full disclosure of the truth, in case the defense was going

19  to ask on cross-examination that there was another letter

20  that was provided that didn't have anything to do with the

21  defendant.  And I did not want the Government to look as if

22  we were hiding anything.

23      THE COURT:  Who -- who -- that the defendant would

24  contest that what was not complete?

25      MR. SIBERT:  That the exhibits -- that the

1    documents that were provided by OTC Markets to the

2    Government on behalf of this investigation, the -- and what

3    we produced in discovery over a year ago --

4              THE COURT:  Okay.

5              MR. SIBERT:  -- was not --

6              THE COURT:  Why didn't you just explain to defense

7    counsel, "Hey, we took out pages 3 and 4 because it has

8    nothing to do with this case"?

9              MR. SIBERT:  Because that was not my strategy.

10             THE COURT:  Go ahead.

11   BY MR. SIBERT:

12   Q.   Can I have page 5, please.  Okay.  First page again; is

13   that correct?

14   A.   Yes.

15   Q.   And can I have page 6, please.  And can we blow up the

16   signature part.

17             And, again, this is what you were describing is

18   where the lawyer signs?

19   A.   Yes, this is the agreement that the lawyer provides.

20   Q.   Okay.  And this is your signature here?

21   A.   Yes, it is.

22   Q.   Okay.  And is that consistent throughout Government

23   Exhibit 8, except for pages 3 and 4?

24   A.   Yes, it is.

25   Q.   And that was just a mistake by your part -- by OTC

Direct - Heese

1    Markets when they provided the documents --

2    A.    It was.  It was accidentally included.

3    Q.    And can you tell me the time frame that these letters

4    from Mr. Guy Jean-Pierre run through?

5    A.    2008, 2009, and I think early 2010.

6    Q.    At any time did that letter -- the agreement -- the

7    attorney letter agreement, did that change between the

8    lawyer and OTC Markets in that time period?

9    A.    I'm sorry, can you --

10   Q.    Were any changes made to this letter for --

11   A.    They were not material changes.

12   Q.    Okay.  How about the example that you went over that

13   was not signed, Government Exhibit 53?  Are those -- are the

14   agreements essentially similar?

15   A.    I believe that that was a current -- that was one that

16   we use current.  And it's remained largely the same over the

17   years.

18   Q.    And in Government Exhibit 8, I don't see the last two

19   pages that you went over with the requirements, which would

20   be, I think, appendix A.

21   A.    Uhm-hum.

22   Q.    Why isn't appendix A included in Government Exhibit 8?

23   A.    It's -- it's included by -- it's included in reference

24   on the first page of this document, of each of the

25   agreements.  But we did not require the attorney -- when

Direct - Heese

1    they're sending us the agreement, we did not require them to

2    send the exhibits because there were no signatures or no

3    other information that was provided on the exhibit.

4    Q.   Can I have page 5, please.  Have that blown up, please.

5              And that's where Exhibit A's referenced.

6    A.   Yes.  It's incorporated by reference in that paragraph.

7    Q.   Okay.  So the attorneys that make these agreements with

8    OTC Markets, they don't have to send back Exhibit A.

9    A.   That's correct.

10   Q.   Do some attorneys send back Exhibit A?

11   A.   Yes, sometimes they do.  It's two more pages to fax.

12   Q.   Okay.  Okay.  Can I have that taken down, please.

13             MR. SIBERT:  Your Honor, the next exhibits the

14   Government would like to introduce -- I believe these are

15   stipulated to --

16             THE COURT:  Okay.

17             MR. SIBERT:  They are stipulated to.  Is Government

18   Exhibits 54 through 57.

19             THE COURT:  All right.  Given the stipulation of

20   the parties, the following Government exhibits are admitted

21   into evidence and may be published to the jury:  54, 55, 56,

22   and 57.

23        (Government's Exhibits 54 through 57 received)

24   BY MR. SIBERT:

25   Q.   Okay, ma'am, can you please take a look through

Direct - Heese

1   Government's Exhibits 53 through 57.  And they're going to

2   be in --

3   A.   In here?

4   Q.   They're going to be in the second binder.

5   A.   Okay.

6   Q.   Okay.  Do you recognize Government Exhibits 54 through

7   57?

8   A.   Yes, I do.

9   Q.   And essentially what are those exhibits?

10  A.   These are the guidelines that we provide to companies

11  that describe all of the information that we want them to

12  include in their quarterly and annual reports.

13  Q.   Okay.  Specifically would this include companies in the

14  Pink category?

15  A.   Yes.

16  Q.   Okay.  Can I please have Government Exhibit 54

17  published.  Okay.

18       Essentially the title of this is what?  What does

19  OTC call these reporting requirements?

20  A.   The Alternative Reporting Standard, Guidelines for

21  Providing Adequate Current Information.

22  Q.   Okay.  Why is OTC Markets using alternatives?

23  A.   Because this is not -- these are the guidelines that

24  we're providing for companies that are not traditionally

25  required to report under a different regulatory regime.

1    Like, as I mentioned earlier, they're not required to report
2    to the SEC or banking regulator, for example, so in the
3    alternative we have put together some -- what we think makes
4    sense for companies to disclose.
5    Q.   Okay.  And, again, we see the term "adequate current
6    information."
7    A.   Uhm-hum.
8    Q.   Same term you used in the lawyer's agreement with OTC
9    Markets.
10   A.   That's correct.
11   Q.   Okay.  And that's mentioned throughout your guidelines?
12   A.   Uhm-hum.
13   Q.   I need a yes or no.
14   A.   Yes, it is.  It's a founding principle of our
15   disclosure guidelines.
16   Q.   All right.  Can I please have page 11 shown.  And can
17   we focus in on part D.
18        Okay.  Can you explain to the jury what OTC Markets
19   is requiring from a company when it comes to management
20   structure and financial information?
21   A.   Sure.  This is the section of the disclosure where we
22   ask a company to provide a list of all of the officers and
23   directors in the company.  It's basic information about them
24   that we think would be useful to investors, what their --
25   what their history -- you know, their business history is,

1   how -- the idea is to understand what their qualifications

2   are for that position.  We ask for their compensation and

3   any -- what their position is in terms of how many

4   securities they own for the company.

5   Q.   Okay.  Can we come down a little bit, please.

6   A.   And this is the -- the -- we ask for the legal and

7   disciplinary history also for all of the officers and

8   directors.

9   Q.   And how long back do you need the legal disciplinary

10  history for?

11  A.   We ask for everything that -- for this disclosure of

12  any legal and disciplinary history, over the last five

13  years.

14  Q.   And so if someone -- if I provided you an example, if

15  someone was convicted in 2007, when would they have to

16  disclose that criminal conviction up till?

17  A.   For -- up until 2012.

18  Q.   And can I please focus back in here.

19       You specifically called this the goal; is that

20  right?

21  A.   Yes.

22  Q.   And, again, why are you using such strong language when

23  it comes to notifying a company of what's required?

24  A.   Well, it's -- it's just critical that investors have an

25  understanding of who is -- who's controlling the company,

Direct - Heese

1   you know, who's making the decisions for the company.

2   Q.   And you actually provide some detail here, which is

3   more than just an officer and director.  In fact, it goes

4   into --

5   A.   Yeah.

6   Q.   -- it goes into those that manage, control, or even

7   advise the corporation.

8   A.   Yes.

9   Q.   Okay.  Okay.  Can I have page 12, please.  I want to

10   talk about paragraph C.

11        Can you describe what OTC is telling a corporation

12   to disclose regarding family relationships.

13   A.   Sure.  The -- we're required to be disclosed if you

14   have a family relationship with -- it says describe any

15   family relationships among and between the issuers,

16   directors, officers, persons nominated or chosen by the

17   issuer to become directors or officers or beneficial owners

18   of more than 5 percent of any of the class of the equity --

19   issuer's equity securities.  And the idea there is it's

20   important to understand if people have sort of alliances or

21   relationships where they might act together to control an

22   issue.  Even if maybe individually they don't have a huge

23   say in the company, perhaps together they might have more

24   influence.

25   Q.   Okay.  And I just want to jump down while we're on this

Direct - Heese

1    page regarding disclosure of related-party transactions.

2    Can you describe what OTC Markets is requesting from

3    companies when it comes to disclosures of related-party

4    transactions.

5    A.    Yes.  We're -- it's the same idea.  We're looking for

6    transactions that the company's entered into, perhaps with a

7    vendor, perhaps with somebody who's providing funding to the

8    company.  But any kind of -- any kind of transaction between

9    parties that have a significant relationship to the

10   issuer.

11   Q.    Can you go down to the bottom of that page, please.

12   There's a footnote.

13   A.    Yeah.

14   Q.    What does the footnote define?

15   A.    It defines family relationships.  So it's basically

16   saying that if you have a family relationship that is a

17   relationship by blood, marriage, or adoption, and not more

18   remote than a first cousin, you need to disclose that

19   relationship.

20   Q.    Would that include in-laws?

21   A.    Yes.

22   Q.    And including father-in-laws, mother-in-laws,

23   sister-in-laws, brother-in-laws?

24   A.    Those are all relationships by marriage, so yes.

25   Q.    And can we just go back up real quick.  And stop.

Direct - Heese

1    Thank you.

2            And that's marking the footnote down below; is that

3    correct?

4    A.    Yes.

5    Q.    Okay.  Can I have page 13.  Can we blow up the text.

6            So page 13 essentially -- what is page 13 relating

7    to in regards to disclosure of family relationships and

8    disclosures of related party?

9    A.    It's sort of more details and more instructions that --

10   to help you decide what kinds of relationships and

11   transactions would need to be disclosed.

12   Q.    Okay.  So it's giving companies more information if

13   they have questions?

14   A.    Uhm-hum.  Yes.

15   Q.    Including -- including the in-house counsel?

16   A.    Yes.

17   Q.    Okay.  So page 13, the first paragraph here defines

18   related persons; is that correct?

19   A.    Yes.

20   Q.    Okay.  And can you tell the jury what a related person

21   is.

22   A.    It's -- I mean, any director, executive officer,

23   someone who's been nominated for a director, a beneficial

24   owner of more than 5 percent of the securities -- issuer of

25   securities, immediate family members, or people sharing the

Direct - Heese

1  same households.  Those are the kinds of relationships that

2  we're looking -- that describe what a related person is.

3  Q.   Okay.  So, for example, if a wife is living with a

4  owner of a corporation and there's some involvement with the

5  company, the wife needs to be listed?

6  A.   Yes, if she has a -- if -- yes.  There is.

7  Q.   If there's a related-party transaction?

8  A.   Uhm-hum.

9  Q.   And so, essentially, the wife needs to be listed for

10  two reasons under your guidelines.

11  A.   If there is a related-party transaction?

12  Q.   Yes, ma'am?

13  A.   If she was specifically involved in, then yes.  Or if

14  she also was a beneficial holder of more than 5 percent.

15  Q.   Okay.  And also if she was living in the same house and

16  had a related transaction, correct?

17  A.   Yes.

18  Q.   So she falls under the same-house category and the

19  family category.

20  A.   Yes.

21  Q.   And then I just want to go down to the bottom of the

22  page.  There's a footnote, and the footnote defines what is

23  an immediate family member; is that correct?

24  A.   Yes, it does.

25  Q.   And can you read what an immediate family member is.

Direct - Heese

1    A.    Any child, stepchild, parent, stepparent, spouse,

2    sibling, mother-in-law, father-in-law, son-in-law,

3    daughter-in-law, brother-in-law, or sister-in-law.

4    Q.    Thank you.  Okay.  And can we just go back to page 12.

5    Excuse me, 11.  I'm sorry, you had it right the first time,

6    12.  It's hard to see on the screen.  Can you blow this up,

7    please.

8          So once we get into the second page, it gives a

9    little bit more guidance, as you stated.  But then there's

10   further guidance that needs to be disclosed when there's a

11   related-party transaction; is that right?

12   A.    Yes.

13   Q.    Okay.  And what are those further guidances -- further

14   information that needs to be disclosed?

15   A.    Well, it says if there is a related person or a

16   related-party transaction, then this is the information that

17   you need to provide.  You need to provide their identity and

18   how they're related to the issuer.  You need to -- what

19   their interest is in the transaction, so how they're related

20   to the transaction; and the dollar value involved in the

21   transaction.

22   Q.    Okay.  Page 13 now.

23          And then it carries over to 4 and 5; is that right?

24   A.    Yes.

25   Q.    Okay.  And what's the fourth requirement?

Direct - Heese

1   A.   The fourth is the approximate dollar value of the --

2   excuse me, value of the related-person's interest in the

3   transaction.  And 5 is just sort of a catch-all.  It's any

4   other -- any other information that would be material to

5   investors.  So anything else that might be important for

6   them to understand the transaction.

7   Q.   If you had two brother-in-laws, each owning different

8   companies, doing business together, would that be something

9   that needs to be disclosed under related-party transactions?

10  A.   That would be a related-party transaction, yes.

11  Q.   And so, therefore, both of their names would have to be

12  disclosed, what each party's interests were, the value of

13  the transaction, the money associated with that transaction?

14  A.   Yes, I would expect that information to be included in

15  a disclosure provided by the company.

16  Q.   Okay.  Can I have page 15, please.

17          And can you briefly describe what item 12 is

18  discussing.

19  A.   Yes.  This is the financial reports that the company is

20  required to provide with the quarterly and annual reports.

21  They're -- they're standard financial reports that every

22  public company typically provides.  They have to be prepared

23  according to U.S. GAAP, and they have to include the balance

24  sheet and income statement, cash flow statement, changes in

25  shareholders' equity, and they need to include any kind of

1   financial notes or any kind of information that is related

2   to the numbers that are in the reports.  And if they're

3   audited, we ask for the audit letter.

4   Q.   Page 16, please.  And can we go down to beneficial

5   owners.

6        I want to talk about item 14 and item 15.  Can you

7   tell the jury what OTC Markets is required -- requiring

8   companies to disclose in this -- in these two sections?

9   A.   Sure.  This is the section I -- sometimes beneficial

10  owners are included in the earlier section about officers

11  and directors, but to the extent that they are not also an

12  officer or director, this is the area where we're asking

13  companies to disclose who their beneficial owners are.  So,

14  again, that's anyone that owns more than 5 percent of the

15  company's outstanding securities.

16  Q.   Okay.  So when you get into item 15, when does that

17  information have to be disclosed?

18  A.   Item 15 is asking for the identity of any service

19  providers of the company.  So it's -- it's if they have an

20  investment banker, if they -- who their secure outside

21  counsel is.  If they have an investor relations firm.  Who

22  their auditor or accountant is.

23       So those kinds of professional services that the

24  company might use would need to be disclosed here.

25  Q.   So if someone is down here, you have No. 2, promoter.

Direct - Heese

1    A.    Uhm-hum.

2    Q.    If someone is promoting a stock of a company, is that

3    person supposed to be listed in the disclosures?

4    A.    Yes, they should be.

5    Q.    Can I have page 27, please.  Okay.

6          And essentially you talked about quarterly

7    reporting.  Is this the section that goes over what needs to

8    be in these quarterly reports?

9    A.    Yes, it is.

10   Q.    Okay.  And then can I have page 29.

11         And the section I circled titled Annual Reporting

12   Obligations, is this the section under Guidelines that

13   provides the information companies must disclose when it

14   comes to the annual reports?

15   A.    Yes.

16   Q.    All right.  And essentially we just went over

17   Government Exhibit 54, at least the portions I have with it.

18   Can you look at 55 for me.

19         Is that essentially the same document as 54?

20   A.    It is.  There were -- periodically we review our

21   disclosure guidelines.  And we make up dates, if there's new

22   information that we think should be disclosed or if

23   something's been unclear, we'll -- we clarify occasionally.

24   Q.    Okay.  Any major changes in 5- -- between 54 and 55?

25   A.    I'm comparing the table of contents from Exhibit 54 and

Direct - Heese

1    55, and I don't see any significant changes.

2    Q.   It's just a updated version?

3    A.   Yes.

4    Q.   Okay.  Can you take a look at Exhibit 56 and 57.  Can I

5    have 56 on the screen, please.  Okay.

6         This document is titled -- titled what, ma'am?

7    A.   OTC Pink Basic Disclosure Guidelines.

8    Q.   Okay.  And what's the difference between the guidelines

9    that we just went over in Exhibit 54 and the Pink Basic

10   Disclosure Guidelines in 56 and 57?

11   A.   It's an updated version.  It is the main difference.

12   Q.   Okay.  But same type of requirements?

13   A.   It's the same -- the same idea; exactly, the same type

14   of information.

15   Q.   Okay.  Can you please look through Government Exhibits

16   19, including 19A through C.

17        MR. SIBERT:  Your Honor, these exhibits have been

18   stipulated and, at this time, the Government would move to

19   admit into evidence.

20        THE COURT:  One second.  Something tells me that

21   some or all of this is already in, but we'll find out.

22        COURTROOM DEPUTY:  Just 19 and 19A are already in,

23   so that would be B and C.

24        THE COURT:  C.  My memory hasn't failed me that

25   badly.

Direct - Heese

1          MR. SIBERT:  Mine has.

2          THE COURT:  19 and 19A are in, so you're moving for

3     19B and C?

4          MR. SIBERT:  Yes, sir.

5          THE COURT:  And they're stipulated?

6          MR. SIBERT:  They are.

7          THE COURT:  All right.  Given the stipulation of

8     the parties, Government Exhibits 19B and 19C are admitted

9     into evidence and may be published to the jury.

10         (Government's Exhibits 19B and 19C received)

11    BY MR. SIBERT:

12    Q.   Thank you.  Have you had time to review those

13    documents?

14    A.   Yes, I reviewed them.

15    Q.   And you reviewed these documents prior to your

16    testimony here today?

17    A.   Yes, I did.

18    Q.   Okay.  Can you now look at Government Exhibits 12

19    through 15.

20         MR. SIBERT:  And, Your Honor, as the witness is

21    going through those documents, I would ask that those

22    documents, which are stipulated to, they be admitted into

23    evidence.  12 through 15.

24         THE COURT:  You're having the witness look at 19B

25    and C --

Direct - Heese

1            MR. SIBERT:  She already reviewed those.

2            THE COURT:  Oh, okay.  And you're not going to ask

3    her any questions about it?

4            MR. SIBERT:  I'm just going to try to get all the

5    evidence in first.  She's reviewed all these documents and

6    we have a summary chart.

7            THE COURT:  Okay.  All right.  So Exhibits 12

8    through 15, are those stipulated?

9            MR. SIBERT:  They are.

10           THE COURT:  All right.  Given the stipulation of

11   the parties, Government Exhibits 12 through 15 are admitted

12   into evidence and may be published to the jury.

13       (Government's Exhibits 12 through 15 received)

14   BY MR. SIBERT:

15   Q.   Okay.  And, last, let me ask you the same questions I

16   asked you for Government Exhibit 19:  Have you had an

17   opportunity to review 12 through 15 just now in the

18   courtroom?

19   A.   Yes, I reviewed them.

20   Q.   And you recognize those documents?

21   A.   I do.

22   Q.   And you reviewed those documents before coming to court

23   here today?

24   A.   Yes, I did.

25   Q.   Okay.  And can I have Government Exhibits -- can you

Direct - Heese

1    please review Government Exhibits 17 through 31.

2               MR. SIBERT:  And, again, Your Honor, 17 through 31,

3    minus Government Exhibit 19, have been stipulated to.

4               THE COURT:  Okay.  And you're moving for their

5    admission into evidence?

6               MR. SIBERT:  Yes, sir.

7               THE COURT:  All right.  Given the stipulation of

8    the parties, the following Government Exhibits are admitted

9    into evidence and may be published to the jury:  17, 18, 20,

10   21, 22, 23, 24, 25, 26, 27, 28, 29, 30, and 31.

11        (Government's Exhibits 17, 18, 20 through 31 received)

12   BY MR. SIBERT:

13   Q.   Okay, ma'am -- you got a couple more?

14   A.   All right.

15   Q.   Okay.  And have you had a chance to look through

16   Government Exhibits 12 through 15 and 17 through 31,

17   understanding you already looked through Government Exhibit

18   19?

19   A.   Yes.

20   Q.   And can you tell the jury essentially what all those

21   Exhibits, 19, 12 through 15, 17, 18, and 20 through 31 are?

22   A.   Yeah, these are the quarterly and annual reports

23   provided by the company -- published by the company between,

24   I think 2009, 2011.  And they also include the -- the

25   exhibits also include the attorney letters that were written

Direct - Heese

1    for each -- for each quarterly or annual report that was
2    submitted.
3    Q.   Okay.  And you said "the company."  What company are
4    you talking about?
5    A.   I'm sorry, FusionPharm.
6    Q.   And specifically with some of the exhibits in 12
7    through 15, sometimes the reports look different.  Some are
8    just -- some are longer, some are shorter.  Can you explain
9    to the jury why.
10   A.   Sure.  Our disclosure guidelines just outline what
11   information needs to be included and generally in what form.
12   We don't -- it's not a form that a company fills out.  And
13   sometimes they -- you know, they use their own -- it just --
14   they just look different and sometimes the documents -- the
15   disclosure documents and all the different financial
16   statements are included in one document, in one PDF, and
17   sometimes they're provided separately.
18            So there's a variety of ways of providing the
19   disclosure represented in these documents for FusionPharm,
20   and that is all okay by OTC Markets.  We're looking to make
21   sure that the information is available, not necessarily the
22   format that its provided in.
23   Q.   And you just testified that these were the reports --
24   quarterly and annual reports by FusionPharm from the years
25   2009 through 2011; is that correct?

Direct - Heese

1   A.    I need to double-check the dates.  There's some 2012,

2   2011.  Sorry, they're not really in date order.  It does

3   include 2012 data as well.

4   Q.    Let me ask you:  Did you create a summary chart based

5   upon the review of the documents that were just submitted

6   into evidence?

7   A.    I did.  There's a lot of information.  This is hundreds

8   of pages.  And I made a chart.

9   Q.    Okay.  Can I please have the witness look at Exhibit 9

10  in the binder.

11          MR. SIBERT:  And, Your Honor, at this time, the

12  Government would move to admit Government Exhibit 9, which

13  is the OTC summary chart.  And there's been a stipulation to

14  this.

15          THE COURT:  Now, my copy has handwriting on the

16  right margin.  Is that supposed to be included in the

17  exhibit?

18          MR. SIBERT:  Yes, sir.  There was a change to the

19  chart in preparation of testimony.  And a copy has been

20  provided to defense and there was no objection by the

21  defense.

22          THE COURT:  All right.  Let me just confirm that.

23  There's no objection by the defendant including the

24  handwritten marginalia.

25          MR. BARNARD:  That is correct.

Direct - Heese

1        THE COURT:  All right.  Given the stipulation of

2   the parties, Exhibit -- Government Exhibit 9 is admitted

3   into evidence and may be published to the jury.

4        (Government's Exhibit 9 received)

5   BY MR. SIBERT:

6   Q.   May I have the overhead, please.

7        Okay.  I'm sorry for the inconvenience, but can I

8   go back to the computer and we'll come back in a second to

9   the overhead.  Can I have Government Exhibit 9, please.

10  Okay.

11       Ma'am, this is your exhibit summary chart; is that

12  correct?

13  A.   Yes, it is.

14  Q.   And there was a change made to this, which I just

15  showed on the overhead; is that correct?

16  A.   That's correct.

17  Q.   And essentially there's just another column here?

18  A.   Yes.

19  Q.   Okay.  For the purposes of testimony, I'm going to use

20  the computer screen for the main part of the chart and we'll

21  go back to the last column on the overhead.

22  A.   Okay.

23  Q.   All right.  Let's just go ahead and zoom in on the

24  first three lines.  And while that's being brought up, could

25  you tell the jury what this summary chart captures.

1    A.    Sure.    There is a row of data for each reporting

2    period, so for each quarterly or annual report.  And that --

3    the first column tells you what period they're reporting

4    for.  And the second column tells you what date the company

5    published the information out to -- out to make it available

6    publicly for investors.

7         The third column, for each one of these recording

8    periods, includes the officers, directors, and control

9    persons that were disclosed in the company's reports.

10   Q.    Okay, let me just slow you down -- slow you down real

11   quick.

12   A.    Sure.

13   Q.    So the first column is what?

14   A.    Oh, it is the reporting period.

15   Q.    And then what's the title of the second column?

16   A.    It's the publish date.

17   Q.    What do you mean by "publish date"?

18   A.    So in order to make these reports available to

19   investors, the company -- we provide -- we provide a logon,

20   we provide a secure -- a secure credentials to log on to a

21   web portal, and the company will -- will use their

22   credentials, they will log on, and they will publish an

23   annual or quarterly report, or the third report that we're

24   talking about is the attorney letters.  Those are three of

25   the types of reports that they can publish.

Direct - Heese

1          And once they do that, the reports are displayed on

2     our public website along with the -- along with a corporate

3     profile and trading information and other data about the

4     company.  So it's out there publicly for investors to look

5     to -- look at and review, and it's -- once it's out there,

6     that's what we are using to determine whether the company is

7     eligible for the current or the limited information tiers.

8     Q.   Okay.  Now, you testified that the quarterly and annual

9     report is -- usually comes in first.

10    A.   Yes.

11    Q.   And then the attorney letter comes in a little bit

12    later; is that correct?

13    A.   That is the way it works, yes.

14    Q.   Okay.  What publish date are you referencing in this

15    column of your chart?

16    A.   This column is the date that the actual quarterly or

17    annual report was published.

18    Q.   Okay.  And then let's talk about the next column.

19    A.   So the next column is -- I included all of the

20    officers, directors, and control persons that were disclosed

21    in the quarterly and annual reports for FusionPharm.

22    Q.   And could you tell the jury what OTC Markets looks for

23    when it comes to a control person.

24    A.   A control person is -- we define as a beneficial owner

25    of 5 percent or more of the stock or somebody who has some

928

Direct - Heese

1    other form of control of the company.  Again, if it's

2    somebody that's -- if it's somebody that has a significant

3    role in managing the company.

4    Q.    Okay.  And then we have beneficial owners.

5    A.    So the beneficial owners are -- again, they're the 5

6    percent shareholders that are not officers and directors.

7    Q.    And then what is that column describing?

8    A.    Yeah, it's describing any -- anybody that was listed in

9    the company's quarterly and annual reports as a beneficial

10   owner, so anybody that owned more than 5 percent of the

11   securities.

12   Q.    And then relation -- family relationships; is that

13   correct?

14   A.    Yes.  Family relationships, that is the legal

15   disciplinary column and the family relationship.  It's a

16   listing of all of the information that was included in the

17   quarterly and annual reports under those sections of the

18   disclosure.

19   Q.    Okay.  And then in -- the one that was amended, was

20   your handwriting --

21   A.    Uhm-hum.

22   Q.    -- what is that column?

23   A.    That is the date that the attorney letter was

24   published.

25   Q.    Okay.  And so essentially, as you explained with the

Direct - Heese

1    publishment of the quarterly and annual reports, the date

2    the attorney letter can be viewed by the public?

3    A.    Exactly.

4    Q.    Okay.  So let's just go down.  Why don't we just start

5    with the first one and work our way across, and I can write

6    in the date.

7          So can you start with the first time -- I'm sorry,

8    let me ask you:  What company is this for?

9    A.    This is for FusionPharm.

10   Q.    Okay.  So can you start with the first report on your

11   list here that begins on June 30th, 2012.

12   A.    Do you want me to read through it?

13   Q.    Sure.

14   A.    Okay.  So the June 30th quarterly report was published

15   on our website on June 21st, 2011, and it was published in

16   parts.  Some of the disclosure documents were published on

17   the 21st and some more information was published on

18   September 30th.

19         The officers, directors, and control persons

20   disclosed was Scott Dittman, the director, CEO and

21   president; he -- Scott Dittman was also disclosed as the

22   beneficial owner of more than 5 percent of the company

23   securities.

24         The legal and disciplinary history of the officers,

25   directors and control persons was disclosed as none.  And

Direct - Heese

1    that word "none" was actually written in the disclosure.

2           That the family relationships section of the

3    disclosure for this particular report had no information in

4    it.

5    Q.   And then based upon the copy that you have, what was

6    the date the attorney letter was published?

7    A.   The attorney letter was published on July 22d of

8    2011.

9    Q.   And that's what's consistent in your handwriting?

10   A.   Yes.

11   Q.   Now, is that essentially the way this first page of

12   your summary chart flows?

13   A.   Yes, it's that same information, the information that

14   was disclosed in all of these many, many documents for each

15   reporting period.

16   Q.   Okay.  And then just with the overhead, please.

17          And essentially these are all the published dates

18   for the attorney letter?

19   A.   Yes.

20   Q.   Which is essentially about a week or so after the

21   reports are filed?

22   A.   Typically, it's any day -- any time from, you know, a

23   day to a few weeks after.

24   Q.   Okay.  And just for clarification, this is March the

25   11th?

1    A.    Yes, it is.

2    Q.    All right.  Can I have page 2 on the computer for

3    Government Exhibit 9.  Okay.

4          Can you describe for the jury essentially what page

5    2 is showing in your summary chart.

6    A.    Okay.  So it's a continuation of the first page.  It's

7    just more data points for each of those reporting periods.

8    Q.    And so essentially your column 1 does not change?

9    A.    No.  The column 1 is the same as on the first page, it

10   just is telling you what quarterly or annual report it's --

11   this information is from.

12   Q.    And column 2.

13   A.    Column 2 is going to be a description of any

14   related-party transactions that were disclosed.

15   Q.    Okay.  And we have outside.

16   A.    This is a disclosure of any promoters or investor

17   relations, service providers, that were included.

18   Q.    Outside counsel.

19   A.    If there was an outside counsel listed in the service

20   provider section, it would be included in that column there.

21   Q.    And just to be clear, an outside counsel for OTC

22   Markets, that's a counsel that does -- where does that

23   counsel work?

24   A.    It's -- that's a term that's not specific to OTC

25   Markets.  It's just there's in-house counsel, and if

Direct - Heese

1    in-house counsel, it's typically an employee; it's an

2    employee of the company, versus outside counsel, an attorney

3    that the company hires for, you know -- in this case, to

4    help them put their disclosure together and write this

5    attorney letter.

6    Q.    And you have outside accountant and auditor?

7    A.    Yes.  These three columns, the outside promoters,

8    investor relations, outside counsel, and outside accountant

9    or auditor, those are the sort of professional third parties

10   that the company's using to -- to help run their business

11   and put their disclosure together.

12   Q.    And then, finally, revenue, correct?

13   A.    Yes, that was reported in the -- in that particular

14   quarterly or annual report.

15   Q.    Okay.  Let's start from the beginning and just run

16   across like we did for the first one.

17   A.    For June 30th, 2011, FusionPharm did not have any

18   information under the related-party transaction section of

19   the disclosure.  They did not provide any information under

20   outside promoters or investor relations.

21        Under outside counsel, they -- the -- not

22   applicable.  This was written in their disclosure.  Their

23   outside accountant or auditor was listed as Mak Consulting

24   Services.  And they -- their financial statements included

25   zero revenue.

1    Q.   All right.  And I just want to summarize quickly:  Did

2    they ever disclose any related-party transactions under this

3    column?

4    A.   They never did.

5    Q.   Did they ever list any outside promoters or

6    investment-relation personnel?

7    A.   They did not.

8    Q.   Okay.  Who did they list for the outside counsel?

9    A.   Some of them -- some of the reports have none

10   disclosed, or N/A written in that section.  A number of them

11   included the outside counsel as the Law Office of Tod

12   DiTommaso.

13   Q.   And then who is listed as outside accountant?

14   A.   Again, for a number of periods, there was none

15   disclosed, and for -- but for a majority of them, Mak

16   Consulting Services was disclosed as the accountant.

17   Q.   Okay.  And, again, just to be clear, this is the second

18   page in your summary chart for which firm?

19   A.   For FusionPharm.

20   Q.   Okay.  And then, finally, I just want to talk -- can we

21   go to the revenue, please.  The first time that $750,000 of

22   revenue is listed is June 30th, 2012; is that correct?

23   A.   Yes, there is $750,000 of revenue listed in the June

24   12th quarterly report.

25   Q.   And, again, it looks like only an increase of $341 came

Direct - Heese

1    in between June and September of 2012; is that right?

2    A.   It's -- it's a separate number.  That's the revenue

3    during that quarter ending September 30th.

4    Q.   Okay.  And then total revenue for the year, 2012.

5    A.   The total revenue for the year is listed as 808,398.

6    Q.   Okay.  Anywhere -- when the increase in revenue is

7    shown, are there any disclosures of related-party

8    transactions?

9    A.   No, there are not.

10             THE COURT:  Mr. Sibert, one second.

11             MR. SIBERT:  Yes, sir.

12             THE COURT:  Ms. Cox.  Ms. Cox.  Can you stay with

13   us, please?

14             THE JUROR:  Yes, sir.

15             THE COURT:  How are you feeling?  How are you

16   feeling?

17             THE JUROR:  I'm okay.

18             THE COURT:  All right.  Please stay with us.

19             THE JUROR:  I will.

20             THE COURT:  Go ahead, Mr. Sibert.

21             MR. SIBERT:  Thank you.

22   BY MR. SIBERT:

23   Q.   Can I please have page 3.  Thank you.  Can we pull that

24   up any more?

25             Okay.  Again, this is page 3 of your summary chart;

Direct - Heese

1    is that correct?

2    A.    Yes, it is.

3    Q.    And it's for the firm FusionPharm?

4    A.    Yes.

5    Q.    Okay.  Can -- again, column 1 is just the reporting

6    period?

7    A.    Uhm-hum.

8    Q.    Is that a yes?

9    A.    Yes.  Yes, it is.

10   Q.    And what does column 2 show?

11   A.    Column 2 shows the net income from the income statement

12   in that quarterly or annual report.

13   Q.    And what does column 3 show?

14   A.    Column 3 is a description of one of the -- one of the

15   pieces of data that's included in -- typically included in

16   financial reports.  It's a description of the long-term

17   debt.

18   Q.    And, again, what does the last column show?

19   A.    The last column shows the identity of the attorney that

20   submitted the attorney letter that states that they reviewed

21   the disclosure that the company posted and that it complies

22   to our guidelines.

23   Q.    Okay.  All right.  I just want to do the same thing

24   quickly.  Can we just go through the top line here, just so

25   everyone is on the same page of what is happening.

Direct - Heese

1    A.    Okay.  So June 30th quarterly report, the company

2    reported a net loss of 87 -- net income, negative $87,486.

3    Q.    So does that mean they're in the -- in lack of better

4    words, they're not making any money?

5    A.    That is what that means generally speaking.

6    Q.    Okay.

7    A.    The next column describes the -- you know, what

8    verbiage was included in the reports to describe their

9    long-term debt.  And in this case, for June 30th, it said

10   notes payable long-term debt of $181,897.  And the last

11   column identifies that Tod DiTommaso is the attorney that

12   submitted the letter to OTC Markets on behalf of FusionPharm

13   for that quarter-end date of June 30th, 2001.

14   Q.    Did Mr. Tod DiTommaso submit the attorney current

15   information letter for FusionPharm on every quarter?

16   A.    Except for September 30th, 2012.  We did not receive a

17   letter from anyone that quarter.

18   Q.    Okay.  Thank you.  And then I want to ask you -- if we

19   go to your description of long-term debt -- and can I have

20   that section blown up, please.  And can you move up a little

21   bit.

22          Is December 31st, 2012, the first time FusionPharm

23   notes that the debt is in the form of convertible promissory

24   notes?

25   A.    Yes, that's the first time that -- in this -- in these

Direct - Heese

1   reports that it was identified as convertible promissory

2   notes.

3   Q.   And that's right here; is that correct?

4   A.   Yes.

5   Q.   And those are with Bayside Realty Holdings and

6   MeadPoint Venture Partners.

7   A.   Yes.

8   Q.   And the price is $175,547 for Bayside, and 88,000, if I

9   understand this correctly, for Meadpoint.

10  A.   That's correct.

11  Q.   And so nowhere before December 31st, 2012, to include

12  the quarterlies in June, September 2011, the annual in 2011,

13  and the first three quarters of 2012 is the -- are the

14  FusionPharm's long-term debt noted as convertible promissory

15  notes.

16  A.   That's correct.

17  Q.   And do you know what a convertible promissory note is?

18  A.   Generally speaking, yes.

19  Q.   And can you give me your general definition of a

20  convertible promissory note.

21  A.   Sure.  Generally it's provided to -- when there's --

22  when someone loans money to a company and they're given a

23  promissory note saying that the company will pay it back,

24  and they are paying it -- it's convertible into stock of the

25  company.  So they usually include details about how they

Direct - Heese

1    will be converted, you know, what the price will be, when,
2    and how much of it can be converted at a time.
3         There's a lot of information that might be included
4    in it, but generally it's saying that we promise to repay
5    you in stock.
6    Q.   Equity.
7    A.   Equity.
8    Q.   Okay.  Now, you talked about -- earlier about some of
9    the security methods that a company uses to be able to
10   upload this to OTC Markets; is that correct?
11   A.   Uhm-hum.  Yes, I did.
12   Q.   Okay.  In 2011, do you recall the process regarding
13   some type of key?
14   A.   Yes.  So for every company that gains access -- in
15   order to gain access to our system to publish this financial
16   information, we have -- you know, we have some things in
17   place to make it as secure as possible and to make sure that
18   only authorized -- only authorized people at each company
19   are able to upload documents.
20        So we give each -- we give each person at the
21   company that is entitled to publish these documents their
22   own user ID, and they choose a password.  And we also use a
23   multi-factor authentication method.  And at the time that
24   these documents were uploaded, that was in the form of a
25   little key fob and it was a little electronic device that

1    would generate a six digit number.  And I think it updated

2    that number every 60 seconds.

3          So when you log into the system, you put your user

4    ID, you put your password in, it verifies those things, and

5    the system will ask you for your PIN code that you have to

6    actually read from this little key fob and type in.

7    Q.   And after did the key fob eventually go away?

8    A.   Eventually.

9    Q.   Okay.  And what replaced it?

10   A.   We have just sort of more modern methods.  It's the

11   same idea, you're getting a -- I think a -- you get a text

12   message or phone call or something like that to some

13   predetermined communication method, and you have to enter

14   that code in instead.  So instead of having a physical

15   device, it's maybe coming over your phone or your e-mail or

16   something like that.

17   Q.   Okay.  And for preparing for your testimony here today,

18   were you also asked about when a company uploads information

19   to OTC Markets, essentially how that information ends up at

20   OTC Markets?

21   A.   Uhm-hum.

22   Q.   You were?

23   A.   I'm sorry, did I --

24   Q.   I need a yes or no.

25   A.   I'm sorry, did I --

Direct - Heese

1    Q.   Did you look into how --

2    A.   Yes, I did.

3    Q.   -- the process of documents are uploaded to OTC

4    Markets?

5    A.   Yes, I did.

6    Q.   Okay.  And what did you learn about that process?

7    A.   So the web servers that OTC Markets maintains are

8    located in -- during this time they're located in

9    New Jersey, and --

10   Q.   So from 2011 to 2013?

11   A.   They were located in the state of New Jersey.  So every

12   document that no matter where in the world was submitted to

13   OTC Markets pursuant to this disclosure scheme, would have

14   gone through our servers in New Jersey.

15   Q.   Okay.  And then once they go through your servers in

16   New Jersey, where do they go?

17   A.   They go out onto the web, onto the internet, for

18   anybody to look at.  And we have staff in New York and in

19   Washington, D.C., that actually review the documents and

20   discuss them with issuers or the attorneys.

21   Q.   So at the very least, they went from New Jersey to D.C.

22   or New York, no one looked at these documents?

23   A.   That's correct.

24   Q.   Okay.  And how about the attorney opinion letters?

25   A.   The attorney opinion letters, the TPN letters,

Direct - Heese

1    themselves -- the attorney letters, themselves, they are

2    uploaded exactly the same way.  So they end up -- they're,

3    you know, PDF documents that are uploaded through OTC

4    Market's web servers which are located in New Jersey.

5         The agreements, however, the ones that the lawyer

6    signs and we countersign, would have come in through a

7    different way.  They were typically either e-mailed or faxed

8    to us.  And those came through our servers in New York.

9    Q.   Okay.  But the letters, themselves, are uploaded and go

10   through the servers in New Jersey --

11   A.   That's correct.

12   Q.   And then once they're uploaded, they can be seen

13   anywhere in the world?

14   A.   They're on the web, yes.

15   Q.   Can you please look at Government Exhibit 10.

16        MR. SIBERT:  Your Honor, this has not been admitted

17   and it has not been stipulated to.

18        THE COURT:  All right.

19   BY MR. SIBERT:

20   Q.   Can I have that on the screen, please.

21        Do you recognize Government Exhibit 10?

22   A.   I do.

23   Q.   And generally can you describe what Government Exhibit

24   10 is.

25   A.   Yes.  This is a letter that OTC Markets wrote to Mr.

Direct - Heese

1    Jean-Pierre telling him that we would no longer accept

2    attorney letters from him and that we were adding him to our

3    list -- our publicly displayed list of attorneys that we

4    have --

5             MR. BARNARD:  Your Honor, the -- I object.  The

6    witness is testifying to the contents before it's admitted.

7             THE COURT:  Right.  Ma'am, for now, because it's

8    not admitted into evidence, just describe the letter

9    generally without going into the contents, please.

10            THE WITNESS:  Okay.  This is a letter that OTC

11   Markets wrote to Mr. Jean-Pierre on April 2, 2010.

12   BY MR. SIBERT:

13   Q.   Okay.  And how do you know it's a letter from OTC

14   Markets?

15   A.   It's on our letterhead and it's signed by somebody on

16   my staff.

17   Q.   And do you know that person on the staff?

18   A.   I do.

19   Q.   And who is that person?

20   A.   His name is Mike Vasilios.

21   Q.   And did you receive a copy of that letter from him for

22   the purposes of this trial?

23   A.   Yes.

24   Q.   And where did you provide this letter to?

25   A.   I'm sorry, I don't understand the question.

943
Direct - Heese

1    Q.   Did you provide this letter to the United States
2    Government as part of our case?
3    A.   Yes.  With all these other documents.
4    Q.   And so essentially you got this letter from an employee
5    at OTC Markets?
6    A.   Yes.
7    Q.   The person that signed the letter?
8    A.   Yes.
9            MR. SIBERT:  Your Honor, and --
10   BY MR. SIBERT:
11   Q.   And it refers -- this letter refers to the defendant in
12   this case, Mr. Guy Jean-Pierre?
13   A.   Yes, it does.
14           MR. SIBERT:  Your Honor, at this time, the
15   Government would move into evidence Government Exhibit 10.
16           THE COURT:  Is there an objection?
17           MR. BARNARD:  No objection, Your Honor.
18           THE COURT:  All right.  There being no objection,
19   Exhibit 10 is admitted into evidence and may be published to
20   the jury.
21       (Government's Exhibit 10 received)
22   BY MR. SIBERT:
23   Q.   Okay.  Essentially, ma'am, you can now go ahead and
24   describe what Government Exhibit 10 is in detail.
25   A.   Okay.  It is a -- it's a letter, again, that we wrote

Direct - Heese

1    to Mr. Jean-Pierre in April of 2010 saying that -- sort of
2    describing the process a little bit and what we expect
3    attorneys to do and the work we expect them to do to be able
4    to write the letters that they write to us.  It describes a
5    warning letter that we sent to Mr. Jean-Pierre in September
6    of 2009 saying that we -- the letter -- some of the letters
7    that he had written for a variety of companies were
8    inadequate and, you know, we gave him a warning saying that
9    "This is something that you need to do better or we will
10   prohibit you."

11           And then it describes that we continued to see some
12   of that same kind of behavior with inadequate -- letters
13   being written to us describing -- in support of companies
14   with inadequate disclosure.  It gives some examples.

15           And then ultimately it says that based on -- based
16   on that experience, we have determined to prohibit Mr.
17   Jean-Pierre and not permit him to write letters to OTC
18   Markets anymore on behalf of issuers that are providing
19   disclosure to be -- to get into our current information
20   tier.

21   Q.   Okay.  And the date of this letter is April 21st,
22   2010?

23   A.   That's correct.

24   Q.   And then the paragraph that I'm circling, can I have
25   that blown up.

Direct - Heese

1    A.    Yes.

2    Q.    Okay.  What are you informing Mr. Guy Jean-Pierre

3    there?

4    A.    This is saying, you know, we -- "We have already given

5    you a warning and the inconsistencies and inadequate

6    disclosure has continued despite that warning."

7    Q.    And the warning came --

8    A.    On September 2d of 2009.

9    Q.    So about six months prior to being --

10   A.    Yes.

11   Q.    And then can I have this pulled up a little bit.

12            These are some of the examples that you provided?

13   A.    Yes.  Those are examples of disclosure that -- in

14   the -- subsequent to the -- to the warning letter, these are

15   some examples of disclosure we found that was inadequate

16   that Mr. Jean-Pierre had written letters for.  And in those

17   letters, he stated that they complied with our disclosure

18   requirements.

19   Q.    Can I have page 2, please.  Can I have the top.

20            Can you please read the first paragraph here.

21   A.    Sure.  It says --

22   Q.    It's document 10, if you need it to read off the paper.

23   A.    It's just starts in the middle of the sentence.  It

24   says, "Centriforce" -- "An example is Centriforce Technology

25   Corp," the ticker symbol is CNFO, and the description says,

Direct - Heese

1    "Their disclosure statement did not provide adequate current

2    information about its officers and the beneficial owners of

3    the company as per our guidelines.  An email regarding the

4    insufficient information provided was sent to you and the

5    company on February 2d, 2010."

6    Q.   Okay.  And essentially this is the person in your

7    company that signs the letter?

8    A.   Yes, that's correct.

9    Q.   And so, therefore, once Mr. Guy Jean-Pierre received

10   this letter, he will no longer -- OTC Markets won't accept

11   his attorney opinion letters?

12   A.   That's correct.

13   Q.   So what happens if a company uses Mr. Guy Jean-Pierre

14   and an attorney letter is sent in with his signature on it?

15   A.   We would call the company and tell them that we cannot

16   accept that.

17   Q.   So their disclosures would be taken down?

18   A.   We wouldn't remove them; we just would not use that

19   information in order to put them in current information.

20   Q.   Okay.  So they wouldn't get a high listing.

21   A.   That's correct.

22   Q.   Okay.  And can you --

23        MR. SIBERT:  Again, Your Honor, Government Exhibit

24   11 has not been introduced into evidence and is not

25   stipulated to.

Direct - Heese

1    BY MR. SIBERT:
2    Q.   May I please have Government Exhibit 11 put up on the
3    screen.  Can I have the top blown up.
4             THE COURT:  Wow.
5             MR. BARNARD:  Your Honor --
6             THE COURT:  Is it possible to make the font any
7    smaller?
8             MR. SIBERT:  Your Honor, I only work with the
9    documents that I receive.
10            THE COURT:  My God.  This is a 2 font.
11            MR. BARNARD:  Your Honor, we will stipulate to the
12   admission of Exhibit 11.
13            THE COURT:  To the extent anybody can read it.
14            All right.  Given the stipulation, Exhibit 11 is
15   admitted into evidence and may be published to the jury.
16       (Government's Exhibit 11 received)
17            MR. SIBERT:  All right.  So we've blown up
18   Government Exhibit 11 now, and I think it's more readable,
19   hopefully more that the Court will accept.  Sir, can you see
20   that, Your Honor, on the screen?
21            THE COURT:  Yes, I can.  Thank you.
22            MR. SIBERT:  Yes, sir.
23   BY MR. SIBERT:
24   Q.   Okay.  Can you just go up here.
25            Can you describe what Government Exhibit 11 -- what

Direct - Heese

1    you're e-mailing here in Government Exhibit 11.

2    A.   Yeah, this is a letter to -- it's an e-mail letter that

3    I wrote to somebody at FINRA after he contacted me asking

4    for some information on Mr. Jean-Pierre.

5    Q.   Okay.  And why would you write an e-mail to FINRA?

6    A.   FINRA is the organization -- they're a regulatory

7    organization for the Securities industry, and they -- they

8    have -- they have rules and regulations and surveillance

9    activities around the trading and the over-the-counter

10   markets.

11   Q.   Okay.  What's the date of that e-mail?

12   A.   It is June 6th, 2011.

13   Q.   And what is the subject?

14   A.   The list of prohibited attorneys, dot MSG.  I'm sorry,

15   that's the attachment.  It says Guy Jean-Pierre and his

16   successors.

17   Q.   And what do you mean by "successors"?

18   A.   What I meant by that is the attorneys that sort of took

19   over providing -- writing letters for the companies that he

20   had previously written them for before he was prohibited

21   from writing anymore.

22   Q.   Okay.  So I don't have it all on the screen right here,

23   but would you agree that there's three blocks to this

24   e-mail?

25            MR. BARNARD:  Your Honor, I apologize.  I'm sorry.

Direct - Heese

1    I -- I incorrectly and inadvertently stipulated to the

2    admission of this document.  May we approach the bench?  And

3    ask the document be taken off the screen.

4         THE COURT:  All right.  Let's take down the

5    exhibit.

6         (Discussion at sidebar)

7         THE COURT:  This is the smallest font I've ever

8    seen.

9         MR. SIBERT:  Judge.

10        THE COURT:  I know.

11        MR. SIBERT:  Sorry, but I can't help what we get.

12        THE COURT:  I know.  Go ahead.

13        MR. BARNARD:  I'm trying to read to make sure I --

14   my concern and potential objection would be with regard to

15   the second category down which refers -- which refers to

16   Leslie Dinwoodie.  And these are letters, then, that I

17   believe would be involved in the New York conviction.  And I

18   just want to make sure that questions on those letters not

19   be asked with regard to the New York conviction.

20        MR. SIBERT:  I'm not going into the conviction.

21        THE COURT:  Why are you over there?

22        MR. SIBERT:  He can't hear.

23        MR. BROWN:  I'm sorry.

24        MR. GOODREID:  He's changing teams, Judge.

25        MR. SIBERT:  He doesn't like me anymore.

Direct - Heese

1              MR. BROWN:  I couldn't hear.

2              THE COURT:  Going over to the defense.  They have a

3      prevalence of hearing issues in this trial.

4              Go ahead.  You were saying.

5              MR. SIBERT:  I am not introducing 404(b) in regards

6      to his -- his conviction at all.  I'm just going to ask her

7      why she put those letters --

8              THE COURT:  Lower your voice.

9              MR. SIBERT:  Why did she submit those letters or at

10     least the titles of those letters to FINRA.

11             THE COURT:  Okay.  If he makes no reference --

12     obviously no one reading this is going to infer anything

13     about any New York conviction unless it's brought up.

14             MR. GOODREID:  Right.

15             MR. BARNARD:  Right, yes.

16             THE COURT:  So if he represents he's not going to

17     make any -- he's not going to examine this witness with

18     respect to anything in that section in the context of the

19     New York conviction, are you okay with that?

20             MR. BARNARD:  Yes.  That's fine.  That's all I

21     wanted --

22             MR. SIBERT:  Just so the parties know, I think this

23     witness is going to say that Leslie Dinwoodie had also a

24     Jean-Pierre last name and that's why she submitted those

25     letters to FINRA.  It was based upon a name search.

951

Direct - Heese

1           THE COURT:  Did you talk to her --

2           MR. SIBERT:  I did talk to her last night.

3           THE COURT:  -- about not bringing up the New York

4     conviction.

5           MR. SIBERT:  I don't think she knows about it.  I

6     didn't bring it up with her, but I did not discuss it with

7     her because --

8           THE COURT:  Okay.  If she -- she wouldn't have

9     reason to know about it.

10          MR. SIBERT:  Not that I know of.

11          MR. BARNARD:  So, Your Honor, do you want me to

12    withdraw any objection on the record or how do you want --

13          THE COURT:  I'll just state that --

14          MR. BARNARD:  It is stipulated to.

15          THE COURT:  Yeah.  Why don't you withdraw your

16    remarks -- it will make more sense to the jury to withdraw

17    your objection and we'll just go forward.

18          MR. BARNARD:  Okay.

19       (End of discussion at sidebar)

20          THE COURT:  All right, Mr. Barnard.

21          MR. BARNARD:  Yes, Your Honor, the defense would

22    withdraw any objection to Government's Exhibit 11 and

23    stipulate to its admission.

24          THE COURT:  All right.  Thank you for that.  Let's

25    put the exhibit back on the monitors, and you may resume

Direct - Heese

1    your examination, Mr. Sibert.

2    BY MR. SIBERT:

3    Q.   Okay.  Can you just leave it like that for a second.

4            As the judge said, this is probably the smallest

5    print that the Government has seen in a while.  But your

6    e-mail was broken up into three categories; is that correct?

7    A.   That's correct.

8    Q.   Can we please just focus on the first category.

9            Okay.  And, ma'am, can you please tell me why you

10   listed the names of these companies.

11   A.   Well, these are the names of the companies that we had

12   Mr. Jean-Pierre identified in our system as outside counsel

13   for.

14   Q.   I'm sorry, I couldn't hear you.

15   A.   These are the names of the companies in our Pink Market

16   that we had Mr. Jean-Pierre linked as the counsel for.

17   Q.   So just so I understand the ban, if you received

18   another letter for Mr. Guy Jean-Pierre in any of these

19   companies, that letter would not be accepted.

20   A.   That is correct, for any of these companies or any

21   other company.

22   Q.   And then the company would lose their status on the

23   Pink?

24   A.   Unless they -- yes.  They -- we would not -- we would

25   not put the company in current information based upon

Direct - Heese

1    anything included in that letter.

2    Q.   Okay.  Okay.  And can I have the second part blown up.

3         Okay.  Can you explain to the jury why you picked

4    these companies with the name Leslie Dinwoodie.

5    A.   Sure.  Immediately -- or shortly after we prohibited

6    Mr. Jean-Pierre from writing attorney letters to us, we

7    received a whole bunch of attorney letter agreements from a

8    lawyer named Leslie Dinwoodie.  And her identification also

9    included -- I can't remember right now if it's her middle

10   name or last name, the name Jean-Pierre.

11        And so we were able to -- we assumed that they were

12   related, and we were concerned that, you know, to find out

13   and to make sure that she would be doing her own -- that she

14   was qualified and that she would be doing her own work on

15   these companies and writing the letters and not be acting at

16   the behest of Mr. Jean-Pierre.

17   Q.   Okay.  So it was essentially the last name of Mr.

18   Jean-Pierre, the defendant in this case, that it was either

19   Ms. Leslie Dinwoodie's last name, or maybe maiden name, that

20   caused OTC Markets to bring up these companies?

21   A.   Yes.

22   Q.   And, again, you said these were legal -- excuse me,

23   lawyer agreements that were received shortly after OTC

24   Markets banned Mr. Guy Jean-Pierre from writing attorney

25   letters?

Direct - Heese

1    A.    That's correct.

2    Q.    Okay.  And can you explain your third step.

3    A.    So the third section is a list of the companies that we

4    continue to receive attorney letters for that Mr. -- Mr.

5    Jean-Pierre had formally written attorney letters for these

6    companies and they were -- they -- the company continued to

7    provide disclosure and continued to provide attorney letters

8    in order to qualify for the current-information tier and

9    these -- the last column in this list are the attorneys that

10   were writing those letters.  And they're Mr. Jean-Pierre's

11   previous client.

12          THE COURT:  Mr. Sibert, even with the

13   amplification, it's still too, too, too small to read, at

14   least for me.  Can members of the jury read what's on that?

15          MR. SIBERT:  I'm working on it, Your Honor.  She

16   described it.

17          THE COURT:  All right.

18   BY MR. SIBERT:

19   Q.    So let me bring this up -- give me a chance, all right?

20          So I just blew up the last column; is that correct?

21   A.    Yes.

22   Q.    Okay.  And you stated -- who are these attorneys?

23   A.    These are the -- these are the law firms that replaced

24   Mr. Jean-Pierre in writing attorney letters.

25   Q.    Okay.  And so these are the newer attorneys for the

1    companies that Mr. Guy Jean-Pierre used to write attorney

2    letters for?

3    A.    Yes.

4    Q.    Okay.  And can -- do you know how many times the law

5    office of Mr. Tod DiTommaso is listed under your list?

6    A.    I think -- I think three or four times.  Yeah.  Three.

7    Q.    Three times?

8    A.    Uhm-hum.

9    Q.    And just for the Court's entertainment, can you see if

10   we could get that bigger.  Is that better, Your Honor?

11              THE COURT:  Go ahead.

12              MR. SIBERT:  And, again, can you blow up the

13   e-mails.

14   BY MR. SIBERT:

15   Q.    And here we have a Tod Anthony DiTommaso e-mail; is

16   that correct?

17   A.    Yes.

18   Q.    And his quarterly with those three times that you saw

19   before?

20   A.    Yes.

21              MR. SIBERT:  Your Honor, I'll pass the witness.

22              THE COURT:  All right.  Cross-examination.

23                    CROSS-EXAMINATION

24   BY MR. BARNARD:

25   Q.    Do you pronounce it Hess or Heese?

Cross - Heese

1    A.    Hess.

2    Q.    And, Ms. Heese, you testified several times about

3    companies being required to make disclosures if a -- there

4    was a 5 percent share ownership, correct?

5    A.    That's correct.

6    Q.    Was there ever previously, in fact, a 10 percent

7    ownership cutoff that -- as opposed to a 5?

8    A.    I believe that a very long time ago our guidelines

9    might have had a cutoff at 10 percent.

10   Q.    And there are other categories, other circumstances, in

11   which 10 percent could be the cutoff as opposed to a 5

12   percent that --

13   A.    Not for OTC Markets disclosure guidelines.

14   Q.    All right.  And with regard to the attorney letter

15   agreement, that Exhibit 53, if you recall --

16   A.    Uhm-hum.

17   Q.    -- the form letter that you testified about, that is a

18   letter to be signed by the attorney who is submitting the

19   material.

20   A.    That's correct.

21   Q.    And the person, then, who has signed that letter is

22   stating that that person, that that attorney, is going to be

23   responsible for the filings.

24   A.    They're saying that they are submitting a letter to OTC

25   Markets, yes, saying that they have reviewed the disclosure

Cross - Heese

1   and that it's -- it is compliant with our secure guidelines.

2   Q.   And they also say that they have reviewed the

3   attachment A.   That was part 1 --

4   A.   It is incorporated in the agreement, yes.

5   Q.   Incorporated in the agreement, but not attached to the

6   agreement typically that is submitted.   The signed agreement

7   that's submitted typically not does not attach, correct?

8   A.   It often does not come back to us, that's correct.

9   Q.   And, in fact, in all of the agreements with regard to

10  Mr. Jean-Pierre, it was not included.

11  A.   That is correct.

12  Q.   Now, when a person signs the attorney agreement, they

13  say that -- and refer to the attachment A in the agreement,

14  as we just discussed.

15  A.   So what --

16  Q.   The attorney -- the -- I'm sorry.   The attorney letter

17  agreement says and refers to the attachment A, just as we

18  discussed.

19  A.   Yes.   The -- just to clarify, the attorney letter

20  agreement includes all of those pages, including Exhibit A.

21  When they print it off of our website and fill it out and

22  sign it in, often they're only returning the first two

23  pages.

24  Q.   So if they wanted to, they could return the, what, five

25  or six pages, something --

Cross - Heese

1    A.   They could.

2    Q.   Now, it did not -- or, excuse me, the attorney -- the

3    attorney letter agreements do not include the guidelines

4    that you discussed and went over in Exhibits 54, 55, 56, and

5    57.

6    A.   They are also incorporated by reference in the

7    agreement.  It does not include the guidelines exactly, no,

8    or specifically.

9    Q.   And they are not attached to it either -- to the

10   attorney letter.

11   A.   They're not attached, they're included by reference.

12        MR. BARNARD:  Your Honor, may I have a moment,

13   please?

14        THE COURT:  You may.

15   BY MR. BARNARD:

16   Q.   So just to be sure that I'm clear on this, it -- in

17   your Exhibit 9 chart where you listed the -- the different

18   reporting periods ending from June 30th, 2011, until June

19   30th, 2013, you also listed the person or the attorney who

20   had submitted the current information letters in the last

21   column.

22   A.   That's correct.

23   Q.   And in every one of those occasions, except for once on

24   September 30th, 2012, those letters were submitted by Tod

25   DiTommaso.

1    A.    That's correct.

2    Q.    None of those letters were submitted by Mr. Guy

3    Jean-Pierre.

4    A.    That's correct.

5    Q.    So Mr. Tod DiTommaso was the person responsible for the

6    contents and the accuracy of the information submitted in

7    those documents.

8    A.    Yes, he's responsible for the statements in them.

9              MR. BARNARD:   Thank you.   No further questions.

10             THE COURT:   Redirect.

11             MR. SIBERT:   No, Your Honor.

12             THE COURT:   All right.   May this witness be excused

13   for the Government?

14             MR. SIBERT:   Yes, sir.

15             THE COURT:   For the defendant?

16             MR. BARNARD:   Yes, Your Honor.

17             THE COURT:   Ms. Heese, thank you very much for your

18   testimony.   You may step down.

19        All right, this will be a good time to take our

20   lunch break, folks.   We will be in recess until 1:15.

21        (Recess 12:10 p.m.)

22                         AFTERNOON SESSION

23        (Jury was present at 1:18 p.m.)

24             THE COURT:   Government may call its next witness.

25             MR. SIBERT:   Your Honor, at this time the

Cross - Heese

1    Government would like to call Ms. Claiborne to the stand.

2              THE COURT:  Does she have a first name?

3              MR. SIBERT:  Joslyn Claiborne.

4              Your Honor, just to provide a little bit more room.

5    I can move the binders.  Can we have the --

6              THE COURT:  Yes, Ms. Frank, if you could clear up

7    the binders --

8              MR. SIBERT:  Thank you.

9              THE COURT:  -- from the witness stand.

10             MR. SIBERT:  Thank you.

11             COURTROOM DEPUTY:  Please stand behind the witness

12   stand here and raise your right hand for me.

13         JOSLYN CLAIRBORNE, GOVERNMENT'S WITNESS, SWORN

14             COURTROOM DEPUTY:  Please be seated.  You want to

15   scoot your chair up, if you can.  And please state and spell

16   your full name on the record -- for the record.

17             THE WITNESS:  Joslyn G. Claiborne.

18             COURTROOM DEPUTY:  I'm sorry, can you spell it as

19   well.

20             THE WITNESS:  Joslyn, J-o-s-l-y-n, Claiborne,

21   C-l-a-i-b-o-r-n-e.

22             MR. SIBERT:  May I approach, Your Honor?

23             THE COURT:  You may.

24                           DIRECT EXAMINATION

25   BY MR. SIBERT:

Direct - Claiborne

1    Q.   Okay, good afternoon, ma'am.  How are you?

2    A.   Fine.

3    Q.   Okay.  I'm going to need you to speak into that

4    microphone.  And have -- all the parties need to hear you,

5    so if you could just keep your voice up a little bit, I

6    would appreciate that.

7         Sir -- or, ma'am, where do you currently work?

8    A.   Pacific Stock Transfer.

9    Q.   And what is your job with Pacific Stock Transfer?

10   A.   Managing director of Pacific Stock Transfer.

11   Q.   Okay.  And is that similar to being the director of

12   operations for Pacific Stock?

13   A.   It's above.  I got promoted.

14   Q.   Okay.  So before you were director of operations and

15   you received a promotion.

16   A.   That is correct.

17   Q.   Okay.  Congratulations.

18   A.   Thank you.

19   Q.   Okay.  And can you tell the jury where Pacific Stock

20   Transfer Agency is located.

21   A.   It is located in Las Vegas, Nevada.

22   Q.   Okay.  And can you provide the jury a understanding of

23   what a transfer agency company such as Pacific Stock

24   Transfer Agency does.

25   A.   Pacific Stock Transfer is a recordkeeper.  We keep

Direct - Claiborne

1    records of microcap companies.

2    Q.   Okay.  And can you describe some of the -- I guess

3    procedures or tasks that you help microcap companies out

4    with these records.

5    A.   The debits and credits of their shares; we account for

6    the authorized shares and the issued and outstanding

7    shares.

8    Q.   And would that also include, as you say, the issuing of

9    shares, also the transfer of shares?

10   A.   Yes.  We also transfer shares.

11   Q.   Okay.  And how long have you been with Pacific Stock

12   Transfer?

13   A.   Nine years.

14   Q.   And could you describe some of the positions that

15   you've had within the company.

16   A.   I was hired to be the executive administrative

17   assistant.

18   Q.   And apparently based on your current position you've

19   been promoted a few times.

20   A.   Correct.  The company determined that they did not need

21   an admin and so, therefore, I was reassigned as a transfer

22   agent.

23   Q.   Okay.  And can you describe some of the roles that you

24   did as a transfer agent.

25   A.   I learned how to transfer shares.  I learned about what

Direct - Claiborne

1    a transfer agency does.

2    Q.   And then so through that job after being a transfer

3    agent, where did you go next in the company?

4    A.   To being a senior transfer agent.

5    Q.   Okay.  Did the duties change there from being a

6    transfer agent?

7    A.   Yes.  It was a little more responsibility.

8    Q.   Okay.  And what additional responsibilities did you

9    hold?

10   A.   More complex transfers.

11   Q.   Okay.  And when you say "complex," could you provide me

12   an example.

13   A.   A complex transfer would be a transfer that was not

14   from broker to broker, it would require more documentation

15   or to -- or to find out from the presenter of the transfer

16   agent, and ask them for additional documentation because the

17   item was not presented in a good order to process.

18   Q.   Okay.  So based upon that role, from the way I

19   understand your answer, you've had several conversations

20   when it comes to companies that are issuing shares -- or

21   transferring shares.

22   A.   As a senior transfer agent, I did.

23   Q.   Okay.  And that would be -- involved assisting those

24   companies and making sure they had all the necessary

25   documents to be able to either transfer or issue shares of

Direct - Claiborne

1    stock?

2    A.    To transfer shares.  I did not issue shares as a senior

3    transfer agent.

4    Q.    Okay.  When -- did you -- do you have experience when

5    it -- regarding the issuing of shares within -- within

6    Pacific Stock in your company?

7    A.    I do have experience now.

8    Q.    Okay.  And when did you develop that experience and

9    what position were you?

10   A.    When I became director of securities and shareholder

11   services.

12   Q.    Okay.  And in preparation for your testimony here

13   today, were you provided several documents to review?

14   A.    Yes.

15   Q.    And look through regarding --

16   A.    Yes.

17   Q.    -- testimony?

18   A.    Yes.

19   Q.    Okay.  And as you stated, is this an unusual event

20   based upon your daily job at Pacific Stock Agency --

21   Transfer Agency?

22   A.    Is what an unusual event?

23   Q.    Looking through multiple documents.

24   A.    No, this is not an unusual event.

25   Q.    Give the jury some perspective on -- when you're

1    looking through documents at Pacific Stock Transfer Agency,

2    how many documents do you look through when it comes to

3    several of these types of transactions?

4    A.   A lot.  A specific number or a stack, documentation can

5    be as thick as a magazine or a catalog, sometimes.

6    Q.   Okay.  And I think you disclosed to me that you have a

7    rubber thumb.

8    A.   Yes.

9    Q.   Okay.

10   A.   To flip pages.

11   Q.   Okay.  So in preparation of your testimony here --

12          MR. SIBERT:  Your Honor, at this time the

13   Government is going to admit Government Exhibits 72, 73, 76,

14   77, 78, 79, 80, 81, 84, 116, 1 -- I'm sorry, 114, and 117.

15   All of which have been stipulated to.

16          THE COURT:  All right, given the stipulation of the

17   parties, the following Government Exhibits are admitted into

18   evidence and may be published to the jury:  72, 73, 76, 77,

19   78, 79, 80, 81, 84, 114, 116, and 117.

20          (Government's Exhibits received)

21          MR. SIBERT:  Thank you, Your Honor.

22   BY MR. SIBERT:

23   Q.   Okay.  Ma'am, I'm going to show you what's been marked

24   as Government Exhibit 72.  It's going to appear on the

25   screen.  If for some reason you can't see it clearly on the

Direct - Claiborne

1    screen, I can blow up sections of this so it's a little bit

2    better, but let me know because we also have binders that

3    have the hard copy of the document as well.

4           Now, do you recognize the top part of what's been

5    marked Government Exhibit 72?

6    A.   Yes, it's a trans- --

7           THE COURT:  Can you speak into the mic, ma'am.

8           THE WITNESS:  Sorry.  It's a transaction journal.

9    BY MR. SIBERT:

10   Q.   What is the transaction number?

11   A.   12986.

12   Q.   Now, ma'am, I think that microphone can bend over a

13   little bit, if it would be easier for you to be closer to

14   the monitor, and when you're looking.

15          All right.  And then also what is the certificate

16   number?

17   A.   11208.

18   Q.   Okay.  And can you tell me what is going on with this

19   transaction regarding Bayside Realty Holdings.

20   A.   It says that it is a new issue.

21   Q.   And when you say "new issue," are you referring to a

22   new issue of shares?

23   A.   Yes.  That's what the transaction journal is showing.

24   Q.   Okay.  And in this case, it's 140,000 shares of stock?

25   A.   That is correct.

Direct - Claiborne

1    Q.    And can I have page 2, please.

2          We just turned off your phone, just so you know.

3    A.    Sorry.

4    Q.    All right.  Page 2, do you recognize what page 2 is?

5    A.    Yes.

6    Q.    Okay.  And what is page 2 showing of Government Exhibit

7    72?

8    A.    It's a FedEx shipment receipt.

9    Q.    And where was this transaction package sent to?

10   A.    William Sears, Bayside Realty Holdings, and the street

11   address 13442 Jackson Drive, Thornton, Colorado 80241.

12   Q.    Great.  And what company sent that package?

13   A.    Pacific Stock Transfer.

14   Q.    And then this number that I'm circling, that's

15   essentially the tracking number?

16   A.    That is correct.

17   Q.    Can I have page 3, please.  Okay.

18         Do you recognize what is in page 3?

19   A.    Yes.

20   Q.    And what is page 3 showing?

21   A.    It is a log sheet.

22   Q.    Okay.  And what's the purpose of the log sheet at

23   Pacific Stock Transfer Agency?

24   A.    To show what has been processed.

25   Q.    Okay.  And in this case, what has been processed?

Direct - Claiborne

1    A.   Transaction 12986.

2    Q.   And that's the number right here?

3    A.   Yes.

4    Q.   And for what company?

5    A.   FusionPharm.

6    Q.   Can you see that right here?

7    A.   Yes.

8    Q.   And then essentially is this telling what happened to

9    the package?

10   A.   Yes.

11   Q.   Okay.  And why would the package be sent to Bayside

12   instead of FusionPharm?

13   A.   I don't know at this time.

14   Q.   Okay.  Can you look at page -- can I have page 16,

15   please.

16        All right.  So, ma'am -- can I have the bottom of

17   page 16, please.

18        You were cc'd on the e-mail here; is that correct?

19   A.   Yes.

20   Q.   Okay.  Can you just take a minute and look at this.

21   And if you need me to go to page 17, let me know when you're

22   ready.

23   A.   I'm finished.

24   Q.   Okay.  And that's the rest of the e-mail.

25   A.   I'm finished.

969
Direct - Claiborne

1    Q.   All right.  Could you tell me what is essentially being

2    written to you in that e-mail.

3    A.   I am copied on this e-mail.  It appears that the e-mail

4    is being sent to another individual and I was copied on it

5    so that I would know what was sent to that individual.

6    Q.   Okay.  And do you recognize the list of things that was

7    sent to -- well, who was this e-mail sent to?

8    A.   Could you flip the page back?

9    Q.   Sure.

10   A.   William Sears.

11   Q.   Okay.  And do you know what Mr. Sears was being sent?

12   A.   No.  Not at this time.

13   Q.   All right.  Did you read -- can we have the next page.

14   Page 17.  Thanks.

15        Is that the list you were referring to?

16   A.   Yes.  That's a list that was sent to William Sears.

17   Q.   Okay.  And can you generally describe what information

18   is being sent to Mr. Sears.

19   A.   It looks like a list of instructions.

20   Q.   And what are these instructions?  Do you know what

21   these instructions are dealing with?

22   A.   Regarding the request he probably sent in.

23   Q.   And do you know what request Mr. Sears might have sent

24   in?

25   A.   No.

Direct - Claiborne

1   Q.   Can you -- can we have page 18, please.

2        You were cc'd on this e-mail; is that correct?

3   A.   Yes.

4   Q.   And who sent the e-mail?

5   A.   William Sears.

6   Q.   And can you take a second and look at the body of that

7   e-mail.

8   A.   I'm finished.

9   Q.   Okay.  What is Mr. Sears requesting from Pacific Stock

10  Transfer?

11  A.   It looks like he wants to have a certificate generated.

12  Q.   And do you know why he needs a certificate generated?

13  A.   No, I don't.

14  Q.   Okay.  Do you know what the certificate involves?

15  A.   No, I don't.

16  Q.   Do you know what it means by the attached convertible

17  note between Bayside Realty Holding and FusionPharm,

18  Incorporated?

19  A.   At that time, I was not aware of what the policy and

20  procedure was for what they're asking on this e-mail.

21  Q.   Okay.  Based upon your current position at Pacific

22  Stock Transfer Agency, do you know the -- what's being asked

23  now?

24  A.   Yes.

25  Q.   And what is that?

1    A.    It appears to be a issuance of shares based on a debt

2    conversion.

3    Q.    Okay.  And who would be issuing the shares?

4    A.    Pacific Stock Transfer.

5    Q.    To who?

6    A.    I don't know.  I would need to go back and see --

7    Q.    Okay.  And then the last sentence here, what is Mr.

8    Sears representing?

9    A.    That he would be the point person for what he is

10   requesting in this e-mail.

11   Q.    Can I have page 29, please.

12         Do you recognize what's in page 29?

13   A.    Yes.

14   Q.    And can you tell the jury what page -- what is being

15   shown on page 29.

16   A.    It appears to be an opinion letter.

17   Q.    Okay.  And can you describe generally what opinion

18   letters are used for regarding your company.

19   A.    To issue shares, sometimes.

20   Q.    And so as you stated, this was a issuing of shares

21   regarding a convertible note; is that right?

22   A.    That's what it appeared to be, yes, from the e-mail.

23   Q.    Okay.  And based upon your position at Pacific Stock

24   Transfer, could you take a look at this document and tell me

25   essentially what's happening based upon the first paragraph

Direct - Claiborne

1    here.

2    A.   Counsel is stating that he is discussing the ability of

3    FusionPharm to issue shares of common stock without

4    restriction.

5    Q.   Okay.  So who's the counsel for -- when you say

6    "counsel," you mean lawyer, correct?

7    A.   Correct.

8    Q.   Okay.  And do you -- if we look at the -- who's the

9    company issuing shares?

10   A.   FusionPharm.

11   Q.   And who's going to be the -- who's going to receive

12   these shares without restriction?

13   A.   It appears that Bayside will be the recipient.

14   Q.   So let me just have this off the screen quickly.

15           So when there's an issuing of shares regarding a

16   note like this -- and as you stated it appears that

17   FusionPharm in this case is issuing shares to Bayside Realty

18   Holding; is that a fair summary.

19   A.   That's what it appears to show, yes.

20   Q.   What's needed for a Pacific Stock Transfer Agency to go

21   ahead and issue those shares in -- to Bayside based upon the

22   legal letter by --

23   A.   I don't --

24   Q.   -- as in your position today?

25   A.   I don't know what the policy and procedure was at that

Direct - Claiborne

1    time.

2    Q.    Okay.  How about today?

3    A.    Today there is policy and procedures that I am familiar

4    with.

5    Q.    Okay.  And what's that policy and procedure?

6    A.    That counsel would need to write a legal opinion in

7    order to speak regarding the company --

8                THE COURT:  Ma'am, can you speak into the mic,

9    please.

10               THE WITNESS:  Oh.  Regarding the company and the

11   shareholder had met the requirements of the SEC or the OTC

12   Markets to issue shares.

13   BY MR. SIBERT:

14   Q.    And do you know what some of those requirements are?

15   A.    For the company to be fully reporting and not be a

16   shell.

17   Q.    Are there any other requirements?

18   A.    To meet the parameters of the safe harbor for Rule 144

19   or whatever exemption that the shareholder and counsel deem

20   necessary for the shares to have the restricted ledger

21   removed.

22   Q.    Okay.  So you mentioned the safe harbor Rule 144.  Is

23   that an exception?

24   A.    It's an exemption.

25   Q.    Okay.  Exemption.  Exemption to what?

Direct - Claiborne

1   A.   It is an exemption as to how shares can be issued.

2   Q.   Okay.  And what are the requirements that need to be

3   met in order for shares to be issued under the safe harbor

4   Rule 144?

5   A.   The company must not be a shell.

6   Q.   Is there any other requirements?

7   A.   The holding period should have been met.

8   Q.   What's the holding period?

9   A.   It depends on whether the company is fully reporting or

10  not.

11  Q.   How about if it's a nonreporting company?

12  A.   Then the shares must be held for a year if they've

13  never been a shell company.

14  Q.   So one year?

15  A.   If the company has never been a shell.

16  Q.   Okay.  And are there any further requirements?

17  A.   That the shareholder not be an affiliate.

18  Q.   And do you know -- do you have an understanding what an

19  affiliate is?

20  A.   Yes.

21  Q.   And can you describe, based upon your understanding,

22  what an affiliate is.

23  A.   An officer or director of the company.

24  Q.   Okay.  How about a controlling person?

25  A.   Well, a person that has 10 percent or more of the

Direct - Claiborne

1    shares.

2    Q.   And is there any -- do you know if there's any

3    reference to a person that has control of the company?

4    A.   I don't know.

5    Q.   Okay.  Okay.  So, you talked about two requirements --

6    or three requirements.  Is there a volume limitation under

7    Rule 144 safe harbor rule?

8    A.   If the shareholder is an affiliate, yes.

9    Q.   Okay.  And what is that rule?

10   A.   That they only can clear 1 percent of the total

11   outstanding each quarter.

12   Q.   Each quarter only 1 percent of the shares?

13   A.   1 percent of the total outstanding.

14   Q.   Outstanding common shares?

15   A.   Yes.

16   Q.   All right.  Can we go back to this Exhibit 72, page 29.

17   Have that blown up, please.

18            Okay.  So based upon your understanding in

19   reviewing Government Exhibit 72, how many shares is Bayside

20   seeking to convert?

21   A.   The opinion letter states 140,000 shares.

22   Q.   And that's equivalent to $1400 of indebtness --

23   indebtness?

24   A.   That's what the opinion letter states, yes.

25   Q.   Okay.  And then can you bring up the last paragraph.

Direct - Claiborne

1    I kind of highlighted the beginning of the

2  sentence.  It's talking about the 12-month holding period.

3  Based upon this letter and your role at Pacific Stock

4  Transfer Agency, what does that mean to you, that sentence?

5  A.    The letter is stating that the debt holder -- the

6  shareholder has met the holding period.

7  Q.    Okay.  In this case, that would be Bayside Reality --

8  or Realty?

9  A.    Yes, I believe that is, yes.

10  Q.    When it's talking about the one-year holding period,

11  does that mean Bayside Realty has held FusionPharm shares

12  for over 12 months?

13  A.    That's what the opinion letter states.

14  Q.    Okay.  Can I have page 30, please.  And can I have B

15  blown up.

16    And based upon where I've highlighted, can you tell

17  me what that sentence is representing to Pacific Stock

18  Transfer Agency based upon your position with that company?

19  A.    My position as?

20  Q.    As a director of operations.

21  A.    What this is representing is the counsel is stating

22  that he relied, or she, relied on representation of the

23  company, meaning, that the company supplied information that

24  the shareholder is not now, nor has ever been, during 90

25  days preceding the date an affiliate or control person at

977
Direct - Claiborne

1    the company.

2    Q.    Okay.

3    A.    That --

4    Q.    I'm sorry?

5    A.    I'm sorry.

6    Q.    I asked you what it meant by control person.  Is that

7    another requirement under the safe harbor Rule 144?

8    A.    Yes.

9    Q.    Okay.  So if -- if Bayside Realty was a control person,

10   there would be additional requirements in order for

11   FusionPharm stock to issue shares.

12   A.    Yes.

13   Q.    But this letter is saying that Bayside Realty was never

14   an affiliate or control person within FusionPharm?

15   A.    That's what the company represented to counsel.

16   Q.    And who's the company that's representing that?

17   A.    FusionPharm.

18   Q.    Okay.  So let me just ask you -- can I have that taken

19   down, please -- let me ask you some follow-on questions to

20   that.

21            If an example where we -- that example dealt with

22   the note conversion, would you agree with me on that?

23   A.    That's what it said, yes.

24   Q.    Okay.  And if -- you stated there would be -- if

25   Bayside Realty was an affiliate, what would be required for

1    Pacific Stock Transfer Agency to convert that note, based

2    upon your position now as a director of operations?

3    A.   Based on my position now, the shareholder or the

4    company, or whoever presented that to Pacific Stock Transfer

5    for processing, would have to have a legal opinion, a

6    statement of affiliation to be completed by the broker and

7    the shareholder, and turned into the SEC that this person is

8    a control person or an affiliate, and it would show the

9    percentage, the 1 percent that the shareholder would be

10   selling in a broker-dealer transaction.

11   Q.   So based upon the letter that was submitted to Pacific

12   Stock Transfer regarding Government Exhibit 72 stating that

13   Bayside Realty was not a affiliate, would that transaction

14   have gone through if Pacific Stock Transfer Agency knew that

15   that was incorrect, that Bayside Realty was actually an

16   affiliate, or control person?

17   A.   I don't know what their policy and procedure was at

18   that time.

19   Q.   Okay.  How about now?

20        MR. BARNARD:  Your Honor, I'm going to object.  I

21   don't think that the present-day policy is relevant.

22        THE COURT:  Mr. Sibert.

23        MR. SIBERT:  Well, let me -- can I do a follow-on

24   question here?

25        THE COURT:  Go ahead.

1  BY MR. SIBERT:

2  Q.   Do you know if the policies and procedures have

3  changed, based upon your training and experience at Pacific

4  Stock Transfer Agency since 2011 until now, regarding legal

5  letters?

6  A.   I don't know.

7  Q.   Okay.  Fair point.

8  A.   At that time.

9  Q.   All right.

10        MR. SIBERT:  I'll strike the question, Your Honor,

11  and I'll move on.

12        THE COURT:  All right.

13  BY MR. SIBERT:

14  Q.   Can you please look at -- can I please have Government

15  Exhibit 81 on the screen.

16        Ma'am, you're -- I believe you're e-mailed on this

17  exhibit; is that correct?

18  A.   No -- am I on this e-mail?  No.

19  Q.   Oh, I'm sorry, that's the wrong -- I'm sorry.  I

20  apologize.  Showing you the wrong exhibit.

21        Okay.  Can you please -- can I please have

22  Government Exhibit 116 up.

23        Okay.  Do you recognize the front page of 116?

24  A.   Yes.

25  Q.   Okay.  And can you describe to the jury what page 116

Direct - Claiborne

1     is.

2     A.    It's a log sheet.

3     Q.    Okay.  And what's contained in the log sheet?

4     A.    The information about the item that was processed.

5     Q.    Okay.  And can you describe to me what the items are on

6     the log sheet that's being processed.

7     A.    A certificated [sic] legend removal.

8     Q.    And what does that mean?

9     A.    That means that there was a certificate that came in

10    for processing.

11    Q.    And do you know what certificate came in for

12    processing?

13    A.    7385.

14    Q.    Okay.  And do you know the transaction number?

15    A.    12964.

16    Q.    And that's the transaction number there?

17    A.    Yes.

18    Q.    Thank you.  And then who was that sent to?

19    A.    William Sears at 4360 Vine Street, Denver, Colorado

20    8- --

21    Q.    And that was from -- how was it sent?

22    A.    FedEx.

23    Q.    And is that the tracking number?

24    A.    Yes.

25    Q.    Okay.  Can I have page 3, please.

Direct - Claiborne

1        Okay.  Now, at the bottom here, do you recognize
2    this e-mail?
3    A.    Yes.
4    Q.    Okay.  Can you tell the jury what this e-mail is about.
5    A.    This is an e-mail that I sent to William Sears.
6    Q.    And why did you send it to Mr. William Sears?
7    A.    Because he did not provide the shipping instructions.
8    Q.    And when you say "did not provide the shipping
9    instructions," what -- for what was he supposed to provide
10   the shipping instructions for?
11   A.    I don't quite remember, but it looks like I'm asking
12   him to confirm the address that the certificate is to be
13   sent to.
14   Q.    Okay.
15   A.    And -- at -- he had two different addresses and I
16   didn't know which address to send the certificate to.
17   Q.    He had a New Bern address and --
18   A.    Correct.
19   Q.    -- and an address with Colorado Boulevard?
20   A.    Correct.
21   Q.    Can we have the top, please.
22        And is this Mr. Sears' response?
23   A.    Yes.
24   Q.    Okay.  And where does Mr. Sears say to ship the
25   certification?

982
Direct - Claiborne

1    A.   To him personally at 4360 Vine Street, Denver,
2    Colorado, 80216.
3    Q.   Okay.  What's the date here?
4    A.   August 1st, 2012.
5    Q.   Can I have page 4, please.  Okay.
6         Can you describe essentially what's being shown on
7    page 4 regarding the FedEx shipment receipt.
8    A.   That the certificate was shipped to William Sears at
9    4360 Vine Street, Denver, Colorado 80216-3820.
10   Q.   And it's being shipped from who?
11   A.   Pacific Stock Transfer.
12   Q.   Okay.  Thank you.  Can I have page 9, please.
13        Now, you worked on this transaction with Mr. Sears;
14   is that correct?
15   A.   I was learning at this time to work on these type
16   transactions.
17   Q.   Okay.  So you have more familiarity with the
18   transaction?
19   A.   A little bit more, yes.
20   Q.   Okay.  So what's being shown on page 9 here?  And
21   specifically the first paragraph.
22   A.   Counsel is speaking about certificate 7385,
23   representing 40,000 shares for a shareholder, Todd Abbott,
24   to have the restricted legend removed and to be able to sell
25   or dispose of all or a portion of the shares without the

Direct - Claiborne

1    need of registration or any specific exemption from

2    registration requirements of the Securities Act of '33.

3    Q.   So who's requesting that the restrictive legend on Mr.

4    Todd Abbott's certificate be taken off?

5    A.   FusionPharm.

6    Q.   And essentially if the restriction's removed, what does

7    that mean?

8    A.   That the shares are no longer restricted and they can

9    be sold on the open market.

10   Q.   Okay.  And can they be sold through -- will a broker

11   sell those shares if there's no restricted legends?

12   A.   I don't know.  It doesn't show who can -- the manner of

13   sale.  It just says that the legend can be removed in that

14   paragraph.

15   Q.   Okay.  And can I have page 10 shown.  And can I have

16   paragraph B.  That's good.

17         Can you tell the jury what paragraph B is saying in

18   this letter from counsel?

19   A.   Counsel is stating that:  We understand neither the

20   shareholder, nor the transferee, is an affiliate within the

21   preceding 90 days, or control person.

22   Q.   And who's the shareholder in this letter?

23   A.   Could you flip back to page 1?

24   Q.   Sure.  And there's a hard copy.

25         Can we get the witness a hard copy of Government

Direct - Claiborne

1    Exhibit 116?  Which is in binder 4.

2    A.    What page?

3    Q.    Page 9 of Exhibit 116.

4          Can you tell me who the shareholder is?

5    A.    The shareholder, Todd Abbott.

6    Q.    And can you tell who the transferee is?

7    A.    FusionPharm.

8    Q.    And so this paragraph is stating that the transferee

9    has never been an affiliate or control person of what

10   company?

11   A.    FusionPharm.

12   Q.    Okay.  Can I have page 11, please.

13         Who signed this document?

14   A.    Tod Anthony DiTommaso.

15   Q.    Can you just make sure you speak into the microphone.

16   A.    Tod Anthony DiTommaso.

17   Q.    You say the transferee is FusionPharm.  Are you sure

18   it's not MicroCap?

19   A.    It says the transferability of shares originally owned

20   by Todd Abbott.

21   Q.    If you look -- can I have page 1, please.  Thank you.

22   It's actually page 9.

23         It states right here, "transferee."

24   A.    Ah, okay.  Transfer the shares to MicroCap Management,

25   the transferee.

Direct - Claiborne

1    Q.   So were you mistaken by saying FusionPharm was the

2    transferee?

3    A.   Yes.

4    Q.   According to the letter?

5    A.   Yes.

6    Q.   And so who's the transferee?

7    A.   The transferee is -- the shareholder is Todd Abbott and

8    he transferred the shares to MicroCap Management.

9    Q.   Okay.   And then what's happening now with the shares

10   with MicroCap Management?

11   A.   He transferred --

12   Q.   -- according to the letter?

13   A.   He transferred the shares to the --

14   Q.   I didn't hear you, ma'am.

15   A.   He transferred the shares to MicroCap Management.

16   Q.   Okay.   And so MicroCap Management is holding the shares

17   at this moment?

18   A.   At the completion of this, yes.

19   Q.   Okay.   And essentially what's being requested is for

20   the restricted legend to be removed?

21   A.   That is correct.

22   Q.   But going back to paragraph B on page 10, it's stating

23   that MicroCap Management was never an affiliate or control

24   person for what company?

25   A.   FusionPharm.

986
Direct - Claiborne

1    Q.   And can you look at page 12 for me, please.  Do you

2    know what this letter is saying, based upon the work that

3    you did on this package?

4    A.   It appears to be a letter stating that it's a

5    certificate being presented for legend removal and asking if

6    there's any other documentation needed.

7    Q.   And who's writing the letter?

8    A.   William Sears.

9    Q.   And what letterhead is Mr. Sears writing this letter

10   on?

11   A.   MicroCap Management.

12   Q.   And, more importantly, what is the date?

13   A.   July 24th, 2012.

14   Q.   Thank you.  Can you look on page 18, please.  I'm

15   sorry, 17.  Can you start with 17, please.

16        Do you recognize the letter on page 17?

17   A.   Not really.  I mean, to remember it or -- it's a

18   letter.

19   Q.   Okay.  Do you recognize what the letter is asking from

20   Pacific Stock Transfer?

21        MR. BARNARD:  Your Honor, I object.  She has not

22   been able to identify it's something that she's familiar

23   with.

24        THE COURT:  I agree.  Unless you get her to state

25   that she's -- has any knowledge of this document, I don't

Direct - Claiborne

1    see how you can question her on it.

2           MR. SIBERT:  It's in evidence, number one.  And

3    number two --

4           THE COURT:  Right, but you're using it -- but the

5    objection was not that it was in evidence, but that you're

6    using it for questioning of a witness that says she has no

7    knowledge of this document.

8           MR. SIBERT:  Okay.  I'll follow on with some

9    questions --

10          THE COURT:  Unless you get her to change her mind

11   and say she does recognize the document.

12   BY MR. SIBERT:

13   Q.   Okay.  Do you understand what the subject is being

14   asked to do in the letter?

15   A.   Yes.

16   Q.   Okay.  And what is this person, Todd Abbott, asking

17   Pacific Stock Transfer to do?

18          MR. BARNARD:  Your Honor, again, she hasn't

19   acknowledged any personal knowledge of this letter.

20          THE COURT:  This is the same objection because it

21   was the same question.

22          MR. SIBERT:  I asked about the subject matter in

23   the letter.  I don't care about Todd Abbott.  I'm not asking

24   for the purposes that Todd Abbott wrote this letter, I'm

25   asking for the purposes of what's being requested by the

Direct - Claiborne

1    author of the letter.  If she has knowledge of that.

2                THE COURT:  All right.  Go ahead, ma'am.

3                THE WITNESS:  It says that he is --

4                MR. BARNARD:  Your Honor --

5                THE COURT:  I ruled.  Let's -- ask -- you can

6    answer, ma'am.

7                THE WITNESS:  It says pursuant to a stock purchase

8    agreement he is presenting a certificate -- certificate

9    7385, 40,000 shares of FusionPharm to be transferred.

10   BY MR. SIBERT:

11   Q.   And where is he asking it to be transferred to?

12   A.   He's presenting the certificate to be transferred to

13   MicroCap Management.

14   Q.   And what's the certificate, based upon your experience

15   at Stock -- at Pacific Stock Transfer Agency?

16   A.   It is a instrument that shows the name of the

17   registered shareholder and the amount of shares that they

18   have for that particular company that's on the face of the

19   certificate.

20   Q.   And as you stated, one of the things Pacific Stock

21   Transfer Agency does is transfer certificates.

22   A.   That is correct.

23   Q.   Can you look at page 18, please.  Do you recognize what

24   document is on page 18?

25   A.   Yes.  This is a legal opinion.

1    Q.   Okay.  And what's being requested in the legal opinion

2    based upon the first paragraph?

3    A.   That the restricted legend be removed from certificate

4    7385.

5    Q.   And is that the certificate number that you just went

6    over in the letter that we just looked at on page 17?

7    A.   Yes.

8    Q.   Now, can you go down to the last paragraph.  Can you

9    tell me what this sentence means regarding the one-year

10   holding period?

11   A.   It's saying that the shareholder has met the holding

12   period.

13   Q.   Okay.  And was -- can you remember if that was in the

14   prior letter that we just reviewed in the same transaction

15   package, starting on page 9?

16   A.   Yes.

17   Q.   Yes, what?

18   A.   Yes, they are basically the same paragraph.

19   Q.   Okay.  Is there any differences?

20   A.   Yes.  The one-year is underlined on one, and on the

21   other one is not underlined.

22   Q.   Okay.  Can we have page 19, please.  Can I have B blown

23   up.

24        And, again, can you tell me what B is stating in

25   the legal letter.

990
Direct - Claiborne

1    A.    On page 19, correct?

2    Q.    Yes, ma'am.

3    A.    They're stating that the shareholder is not now, nor

4    has ever been, such at any time.  It's stating that the

5    shareholder has not been an affiliate or control person

6    within the past 90 days and that their shares are less than

7    10 percent of the total number shares currently issued and

8    outstanding.

9    Q.    Okay.  And can you please go back to page 2, please.

10   Can you read off that tracking number?

11   A.    That's 800575942347.

12   Q.    Okay.  And can I have page 1.  And is that the same

13   number that you just read as a tracking number?

14   A.    Yes.

15   Q.    And, I'm sorry, can I have Government Exhibit 72 put

16   back up on the screen.  Page 2, please.

17         What's the tracking number on page 2 of Government

18   Exhibit 72?

19   A.    794557022916.

20   Q.    I don't mean to jump around, ma'am, but on -- for

21   Government Exhibit 116, the transaction that we just went

22   over, you worked on that transaction; is that correct?

23   A.    That is correct.

24   Q.    Did you, yourself, in a role with Pacific Stock

25   Transfer Agency, rely on that legal letter with those

Direct - Claiborne

1    exceptions regarding the holding period and the

2    nonaffiliation to allow this transaction to proceed forward

3    in removing the restrictions?

4    A.   On this transaction, I processed it only.  I did not

5    review it for processing to determine whether it was in good

6    order or not.

7    Q.   Who reviewed it?

8    A.   Joanna DiBella, most likely, or maybe Leslie Eldredge.

9    Q.   Okay.  Can I have Exhibit 114 shown to this witness.

10        Can you read this tracking number for me, please.

11   A.   800575942347.

12   Q.   Okay.  And who is this shipment going to?

13   A.   William Sears.

14   Q.   And where's he located?

15   A.   FusionPharm, Inc., 1610 Wynkoop Street, Suite 110,

16   Denver, Colorado.

17   Q.   Okay.  And who sent the package?

18   A.   Pacific Stock Transfer, Amanda Martin.

19   Q.   Okay.  Can I have Exhibit 117, please.

20        Can you see the tracking number there?

21   A.   798688446223.

22   Q.   Okay.  And who's the shipper?

23   A.   Pacific Stock Transfer.

24   Q.   Okay.  And who's the receiver of the package?

25   A.   William Sears, 4360 Vine Street, Denver, Colorado

Direct - Claiborne

1    80216.

2    Q.   And can I please have Exhibit 116, page 1, brought up.

3         What's the transaction number here?

4    A.   12964.

5    Q.   And, again, what's the tracking number?

6    A.   798688446223.

7         MR. SIBERT:   Your Honor, may I have a minute?

8         THE COURT:   You may.

9    BY MR. SIBERT:

10   Q.   Can you look at Government Exhibit 79, please.

11        Okay.   Do you recognize the first page of 79?

12   A.   Yes.   It's a transaction journal.

13   Q.   Okay.   And can you describe what the transaction

14   journal is showing?

15   A.   That there was a new issuance of shares.

16   Q.   Okay.   And for who?

17   A.   MeadPoint Venture Partners.

18   Q.   And then is this the transaction number?

19   A.   Yes.   13002.

20   Q.   And dealing with what certificate?

21   A.   11227.

22   Q.   Can I have page 2 of that exhibit.

23        Do you know what page 2 is showing?

24   A.   It's a shipment receipt.

25   Q.   Okay.   And what's being received?

Direct - Claiborne

1   A.   The shares are being shipped to William Sears at Mead
2   -- attention William Sears, MeadPoint Venture, Partners at
3   13762 Colorado Boulevard, Thornton, Colorado.
4   Q.   Okay.  And can you read the tracking number.
5   A.   796476186341.
6   Q.   Okay.  Who sent that package?
7   A.   Pacific Stock Transfer.
8   Q.   And page 3, please.
9        I need you to have binder -- I need you to have
10  binder 3 of 14 in front of you.  And it's going to be
11  Exhibit 79, ma'am.
12  A.   Yes, it is the same tracking number.
13  Q.   Okay.  That you just read on page 2?
14  A.   That is correct.
15  Q.   Okay.  Can you please look at Government Exhibit 80.
16       Can you read the tracking number on Government
17  Exhibit 80.
18  A.   796476186341.
19  Q.   Okay.  And who is sending that package in this exhibit?
20  A.   Pacific Stock Transfer.
21  Q.   And to who?
22  A.   To the attention of William Sears, MeadPoint Venture
23  Partners, 13762 Colorado Boulevard, No. 124-203, Brighton,
24  Colorado.
25  Q.   And, ma'am, just to be easy, can you just keep that

Direct - Claiborne

1    page open with your hand and look back at Exhibit 79 and

2    tell me if those two tracking numbers meet -- are the same.

3    And it will be page 2 of Exhibit 79.

4    A.   Yes, they are the same.

5    Q.   Okay.  Thank you.

6           MR. SIBERT:  And one last exhibit, Your Honor --

7    actually, one last exhibit, Your Honor, that I would like to

8    show this witness that has not been put into evidence and

9    has not been stipulated to.

10          THE COURT:  All right.

11   BY MR. SIBERT:

12   Q.   Can I please have Government Exhibit 90 placed on the

13   screen.

14          Do you recognize Government Exhibit 90?  It's also

15   in your binder No. 4.

16   A.   Yes.

17   Q.   Okay.  And can you generally describe, without going

18   into detail, the general nature of what Government Exhibit

19   90 is.

20   A.   It's an internal control of attorneys that are on the

21   heightened scrutiny list.

22   Q.   When you say "internal control," who's the internal

23   control for?

24   A.   The employees and staff of Pacific Stock Transfer.

25   Q.   Okay.  And who maintains control of this document

Direct - Claiborne

1      within Pacific Stock Transfer Agency?

2      A.    I do now.

3      Q.    Okay.  And who upkeeps this document for Pacific Stock

4      Transfer Agency?

5      A.    I do now.

6      Q.    And who did you provide this document to for the

7      purposes of this case?

8      A.    You.

9      Q.    Okay.  All right.

10            MR. SIBERT:  Your Honor, at this time, the

11     Government would move into admission Government Exhibit

12     90.

13            THE COURT:  Is there an objection?

14            MR. BARNARD:  Your Honor, one moment, please.

15            THE COURT:  Sure.

16            MR. BARNARD:  No objection.

17            THE COURT:  All right, there being no objection,

18     Government Exhibit 90 is admitted into evidence and may be

19     published to the jury.

20         (Government's Exhibit 90 received)

21            MR. SIBERT:  Thank you, Your Honor.

22     BY MR. SIBERT:

23     Q.    Can I have that published, please.

24            Okay, ma'am, can you tell the jury in detail now

25     what this document is showing?

Direct - Claiborne

1    A.   It's showing attorneys that have been designated as bad

2    actors with the SEC, or has had litigation against them, or

3    potential litigation may be forthcoming, or that they did

4    something that drew news attention that -- to be careful

5    when these type of letters come in from these individuals,

6    that they should be reviewed at a higher level.

7    Q.   A higher level of scrutiny?

8    A.   Yes.  A higher level of scrutiny.

9    Q.   Okay.  And can you list -- can you tell me, is Mr. Guy

10   Jean-Pierre -- is Mr. Guy Jean-Pierre in this document?

11   A.   Yes.

12   Q.   Okay.  And when was Mr. Guy Jean-Pierre placed on this

13   document?

14   A.   August 31st, 2009.

15   Q.   Okay.  And can you tell me why he is in red and not in

16   black ink?

17   A.   Because whomever put him on the list, there was

18   something more than just a casual mention, that there may

19   have been some wrongdoing on his part.

20   Q.   So red is a higher scrutiny?

21   A.   Yes.

22   Q.   As opposed to being in black ink?

23   A.   That is correct.

24        MR. SIBERT:  I'll pass the witness, Your Honor.

25        THE COURT:  Cross-examination.

997
Cross - Claiborne

1    MR. BARNARD:  Thank you, Your Honor.

2    CROSS-EXAMINATION

3    BY MR. BARNARD:

4    Q.   Could I have Exhibit -- admitted No. 90, please.

5         Are you -- could you clear --

6         MR. SIBERT:  Bottom right-hand corner.

7         MR. BARNARD:  That's what I tried.  There we go.

8    BY MR. BARNARD:

9    Q.   So with regard to this list, is an attorney by the name

10   of Tod DiTommaso listed?

11   A.   Could you scroll?  I don't see him on there.

12   Q.   Do you see a name -- an attorney by the name of

13   Frederick Lehrer on that list?

14   A.   No.

15   Q.   Thank you.

16        Ms. Claiborne, with regard to Exhibit 72 on page

17   30, in subsection B -- if we could just have that blown up,

18   please -- do you recall counsel for the Government asking

19   you whether or not section B stated that -- that it's -- it

20   stated that the shareholder had now, and had never been, an

21   affiliate or control?  Do you recall that -- the Government

22   asking you that in that way?

23   A.   Yes.  I believe so.

24   Q.   And, in fact, that's not what it says, is it?  Doesn't

25   it say, nor has ever been such at any time during the 90

1   days preceding the date hereof?  Isn't -- as opposed to
2   never at all?
3   A.   I didn't read the whole thing.  I just looked at it --
4   Q.   No, I'm not -- I'm not challenging you or asking you.
5   I'm just asking you, doesn't that -- this, in fact, say not
6   that a person was not an affiliate ever, never, but, rather,
7   doesn't it just say that the shareholder is not now, nor has
8   ever been, such at any time during the 90 days preceding the
9   date hereof?
10  A.   That's what it says.
11  Q.   Right.  So it's only talking about not having been such
12  during the previous 90 days, correct?
13  A.   Correct.
14  Q.   And isn't that true for Exhibit 116, page 10 --
15  A.   Yes.
16  Q.   -- correct?
17          So that the shareholder didn't have to have never
18  been an affiliate, but just this is an -- attesting that the
19  shareholder hadn't been an affiliate for the previous 90
20  days.
21  A.   Correct.
22          MR. BARNARD:  Thank you.  No further questions.
23          THE COURT:  Redirect.
24          MR. SIBERT:  I don't have any redirect, Your
25  Honor.

1          THE COURT:  All right.  May this witness be

2     excused, for the Government?

3          MR. SIBERT:  Yes, Your Honor.

4          THE COURT:  For the defendant?

5          MR. BARNARD:  Yes, Your Honor.

6          THE COURT:  All right.  Ms. Claiborne, thank you

7     for your testimony.  You're excused.  You may step down.

8          Government may call its next witness.

9          MR. SIBERT:  Your Honor, at this time the

10    Government would like to call Joanna DiBella.

11         THE COURT:  All right.

12         THE WITNESS:  Do I come . . .

13         COURTROOM DEPUTY:  Through here is fine.  If you'll

14    stand at the witness stand here and raise your right hand,

15    please.

16         JOANNA DiBELLA, GOVERNMENT'S WITNESS, SWORN

17         COURTROOM DEPUTY:  Please take a seat.  Scooch up

18    and try and speak into the microphone.

19         THE WITNESS:  Okay.

20         COURTROOM DEPUTY:  Please spell and state your full

21    name for the record.

22         THE WITNESS:  Joanna DiBella.  J-o-a-n-n-a,

23    D-i-b-e-l-l-a.

24         THE COURT:  One second, counsel.  Ma'am, that's

25    usually referred to as the hot seat for a reason,

1    depending --

2              THE WITNESS:  It's a little warm now.

3              THE COURT:  -- on how the questions come at you,

4    you might get pretty warm.  Don't you want to take off your

5    jacket -- your coat?

6              THE WITNESS:  Oh, I'm okay.

7              THE COURT:  All right.  Go ahead, counsel.

8              MR. SIBERT:  You tried, Your Honor.

9                        DIRECT EXAMINATION

10   BY MR. SIBERT:

11   Q.   All right.  Good afternoon, ma'am.  Can you please

12   introduce yourself to the jury and explain where you're

13   currently living.

14   A.   My name is Joanna, I live in Las Vegas.

15   Q.   Okay.  And what is your current employment right now in

16   Las Vegas?

17   A.   Right now, I work for the Nevada System of Higher

18   Education.

19   Q.   Okay.  And I assume when you say Las Vegas, we're

20   talking Las Vegas, Nevada.

21   A.   Yes.

22   Q.   And previously to that employment, did you work at a

23   company named Pacific Stock Transfer Agency?

24   A.   Yes.

25   Q.   Okay.  And can you describe some of your roles that you

Direct - DiBella

1    had with Pacific Stock Transfer Agency.

2    A.    In terms of titles or in terms of function?

3    Q.    Titles and functions.

4    A.    I was a receptionist, I was a transfer agent, I was a

5    supervisor, and I was a director.

6    Q.    Okay.  So you also worked your way up the chain in the

7    company.

8    A.    Yes.

9    Q.    All right.  And how long -- could you provide me the

10   years that you were with Pacific Stock Transfer Agency?

11   A.    I started in the end of 2007 and I left in September of

12   2013.

13   Q.    All right.  And as part of your testimony here today,

14   have you been interviewed and reviewed some documents

15   regarding what's considered transfer packages from Pacific

16   Stock Transfer Agency?

17   A.    A long time ago, yes.

18   Q.    Okay.  When you say "a long time ago," when was that?

19   A.    With you, about a year and a half ago.

20   Q.    All right.  Now, could you tell the jury, based upon

21   your understanding, what essentially are the key functions

22   for a transfer agency like Pacific Stock.

23   A.    A transfer agent is responsible for keeping the books

24   and records for different issuers.

25   Q.    When you say "issuers," what do you mean?

1 A. It could be a public company, it could be a private

2 company.  It's the books and records of their shareholders.

3 Q. Okay.  And do you -- are functions such as issuing

4 shares or transferring shares part of the job that Pacific

5 Stock Transfer Agency works with the companies in

6 conducting?

7 A. Yes.

8 Q. And also removing restrictive legends from certificates

9 of stocks?

10 A. Yes.

11 Q. All right.  Tell the jury what a restrictive legend

12 does when a party holds a certificate of stock that is what

13 we -- what is known as restricted.

14 A. The restricted legend means that the shareholder cannot

15 sell the shares.

16 Q. And forever?

17 A. Well, so it depends on the restricted legend.  I mean,

18 in itself, it says these shares have not been registered

19 with the Securities and Exchange Commission and cannot be

20 sold, transferred, or otherwise -- et cetera, et cetera.

21 But there are different legends that some shares have that

22 say different things.

23 Q. Okay.  So it kind of depends on what the share is and

24 what type of company, and essentially the exact transactions

25 being done; is that fair to say?

Direct - DiBella

1    A.    Yes.

2    Q.    So it just depends?

3    A.    Yes.

4    Q.    All right.  Now, can you look at Government Exhibit 72

5    for me.  And it's going to come up on your screen here.  The

6    screen's a little blurry.  We can blow them up, but if you

7    still can't see --

8    A.    Whoa.

9    Q.    -- there's a hard binder.  And for purposes of this

10   witness, probably hard binder 3 and 4 again.

11   A.    Okay.

12   Q.    Thank you, Your Honor.

13   A.    Should I be looking through?

14   Q.    Yeah.  If you want to take a quick look at Government

15   Exhibit 72.

16         Are you familiar with this transaction that

17   occurred in Government Exhibit 72?

18   A.    What do you mean by "familiar"?

19   Q.    Did you work on this transaction, based upon the

20   documents in it?

21   A.    That's what the documents show, yes.

22   Q.    Okay.  Let's start out with page 1 of Government

23   Exhibit 72.  All right.  Can you tell the jury what is being

24   shown on page 1 of Government Exhibit 72?

25   A.    I don't remember what the document is called, but it's

1    the final sheet that we put on top of a transaction when

2    it's completed that shows what happened.

3    Q.   Okay.  In this case on page 1, what happened with this

4    transaction?

5    A.   It looks like Bayside Realty Holdings got a stock

6    certificate for 140,000 shares of free-trading stock.

7    Q.   And the transaction number is 12986?

8    A.   Yes.

9    Q.   And the certificate number is what?

10   A.   11208.

11   Q.   Okay.  And can you look at page 2.

12   A.   Yes.

13   Q.   And that's just a -- where the package was shipped to?

14   A.   Yes.

15   Q.   Page 3.  It's just a log sheet?

16   A.   Yes.

17   Q.   All right.  Can you look at page 6.  Can you take a

18   second to review that e-mail on page 6.

19   A.   Okay.

20   Q.   Do you know a gentleman, based upon your work at

21   Pacific Stock Transfer Agency, named William Sears?

22   A.   I recognize this name from previous documents, yes.

23   Q.   Okay.  And why would you recognize -- I assume you

24   dealt with thousands of documents at your time there.  Why

25   would you recognize Mr. William Sears?

1    A.    Because this case has been a part of my life for the

2    last three years, so I remember it from that.

3    Q.    Fair point.

4    A.    Okay.

5    Q.    All right.  And do you know what you're being e-mailed

6    here from Ms. Sandra Sears?

7    A.    It looks like the delivery instructions for the

8    certificate when the transaction is done.

9    Q.    Okay.  And what were those instructions?

10   A.    To send the certificate to Bayside Realty, care of

11   William Sears, this address here in Colorado.

12   Q.    Can we go to page 16, please.

13         And you might want to start on page 18 and work

14   your way backwards -- 18 through 16.

15         Do you recognize those e-mails?

16   A.    They look like e-mails that I sent or was included on.

17   Q.    Okay.  And what are you sending Mr. Sears, according to

18   your e-mail?

19   A.    It looks like on page 16 and 17, I'm sending him the

20   basic instructions for how to issue free-trading shares.

21   Q.    And can you discuss in a little bit more detail what

22   you mean by sending those instructions regarding

23   free-trading shares.

24   A.    Yeah, I should clarify, this is the standard list of

25   instructions for issuing shares, not just free-trading;

Direct - DiBella

1    free-trading and restricted.

2    Q.   Can you go into a little bit more detail about those

3    instructions.

4    A.   You can see it's -- there's items 1 through 7 of what

5    we're required.  This is a standard e-mail that I would send

6    when people ask the question about the shares.

7    Q.   Do you recall if Mr. Sears had a lot of questions with

8    Pacific Stock Transfer Agency?

9    A.   I don't recall him having any more questions than any

10   other issuer would.

11   Q.   Okay.  Now, look at the top of page 16, please.

12            And who's e-mailing you?

13   A.   It looks like William Sears is e-mailing me.

14   Q.   Okay.  And what is the message Mr. Sears is telling

15   you?

16   A.   "Joanna, good afternoon, I do believe this is

17   everything you will need and then some."

18   Q.   Okay.  And part of that package, would that include

19   what's called an attorney opinion letter?

20   A.   If -- I mean, if he's trying to issue free-trading

21   shares, yes.

22   Q.   Okay.  And based upon what you just testified, this was

23   to remove a restrictive -- remove the restriction off a

24   certificate, did I hear you right, about this transaction.

25   A.   So your terminology and my terminology are a little bit

1    different.  When you say "remove it off of a certificate,"

2    in this case there was no certificate to remove it.

3    Q.    Okay.  So maybe I misunderstood you, but you said to

4    allow the shares to be issued free-trading.

5    A.    Exactly.

6    Q.    All right.  And so they're not restrictive shares

7    anymore.

8    A.    Correct.

9    Q.    So when a transaction like -- so when that type of

10   transaction is happening, is an attorney opinion letter

11   needed?

12   A.    Yes.

13   Q.    All right.  Can you look at page 29.  And can you just

14   blow up the first half of that, please.

15          Can you tell the jury what is being stated

16   regarding the attorney opinion letter that Pacific Stock

17   Transfer Agency received for this transaction?

18   A.    In the first paragraph?

19   Q.    Yes, ma'am.

20   A.    Do you want me to read it --

21   Q.    Can you summarize it, based upon your experience?

22   A.    It's the beginning of the opinion letter where the

23   attorney is breaking down the transaction, who the shares

24   will be issued to, the name of the issuer.  He's giving a

25   little bit of information about the notice of conversion and

Direct - DiBella

1   how much money is being converted into how many shares.

2   Q.   Okay.  And in this case, who is the -- who is the

3   company that's going to issue the shares?

4   A.   The shares are being issued for FusionPharm,

5   Incorporated.

6   Q.   And who's going to go ahead and be the shareholder of

7   the shares?

8   A.   Bayside Realty Holdings, LLC.

9   Q.   And how many shares are going to be issued through

10  Bayside Realty Holding?

11  A.   140,000 shares.

12  Q.   And now can I focus your attention on the second

13  paragraph here.  Do you know why this sentence regarding the

14  holding period is important for a transaction like this?

15  A.   Yes, because it's a requirement of Rule 144.

16  Q.   Okay.  And can you talk about what requirement we're

17  speaking about.

18  A.   Part of Rule 144's requirement is that shares need to

19  have been held for a period of time to meet the holding

20  period to have a -- the shares be issued for trading.

21  Q.   Do you know how long it is for a nonreporting company?

22  A.   From what I remember, it's a year.

23  Q.   Okay.  And -- and is this what the attorney is stating

24  has been met?

25  A.   Yes.

Direct - DiBella

1   Q.   Okay.  And so from your understanding, for my

2   understanding, the juror understanding, Bayside Realty

3   Holding has now held shares of FusionPharm for over a year?

4   A.   Yes.  Shares -- shares via debt, but shares.

5   Q.   Okay.  So you've mentioned an important word, "debt."

6   What does Pacific Stock Transfer Agency need to see with

7   regard to a convertible note with the debt?

8   A.   From what I recall when I was there, most promissory

9   notes have a date on them in the first place.  So if the

10  promissory note is dated a year ago, that would indicate

11  that a year ago John Smith gave money to the issuer.

12  Q.   Okay.  And what would be the issuer -- or what would

13  John Doe, in your example, receive?

14  A.   He would get a promissory note that he could then

15  convert on later.

16  Q.   Okay.  And that promissory note has to be a year old?

17  A.   For -- for a nonreporting company, yes.

18  Q.   Okay.  Okay.  And can you talk about paragraph B on

19  page 2 -- I'm sorry, I said page 2, I meant page 30.  But

20  the second page of the attorney letter.  In this paragraph

21  right here.

22       Do you recognize what that paragraph means, based

23  upon what the attorney's writing?

24  A.   Yes.

25  Q.   Okay.  And why is that important to Pacific Stock

Direct - DiBella

1    Transfer Agency?

2    A.   You know, I -- I don't recall what area that falls into

3    in terms of an opinion letter.

4    Q.   Do you recall the affiliation status?

5    A.   Yes.

6    Q.   Okay.  Now, I might have misspoken earlier today, but

7    is there a time requirement that the person that's either

8    receiving the shares, in this case Bayside -- could Bayside

9    be an affiliate or a control person to FusionPharm 90 days

10    prior to the transfer of these shares?

11    A.   I'm sorry, I don't understand the question.

12    Q.   What's your understanding about the affiliation and

13    control person in this paragraph?

14    A.   Well, so part of the -- part of Rule 144 is that in

15    order to have free-trading shares, the shareholder cannot be

16    an affiliate of the company in the last 90 days.

17    Q.   Okay.  So I probably misspoke earlier but the time

18    limit is 90 days.

19    A.   Well, we're talking -- we're talking different things,

20    though, when you say that.  When you -- when you say what

21    you said earlier, are you meaning --

22    Q.   Okay.  Under 144, you just stated the shareholder

23    couldn't be an affiliate for 90 days prior; is that

24    correct?

25    A.   Correct.

Direct - DiBella

1    Q.   Or control person.

2    A.   Correct.

3    Q.   Okay.  So if it was 110 days, this application wouldn't

4    comply?

5    A.   Well, it would still need to be said in the opinion

6    letter, even if it didn't apply.

7    Q.   Okay.  And why is that?

8    A.   Because part of Rule 144 says that the shareholder

9    cannot be an affiliate of the company for the last 90 days.

10   Q.   Okay.  So it doesn't matter, it just can't be within 90

11   days?

12   A.   Correct.

13   Q.   90 days is the cutoff.

14   A.   Correct.

15   Q.   Okay.  And in this case, Bayside couldn't have been an

16   affiliate or controller for FusionPharm?

17   A.   According to this paragraph, the attorney relied on

18   representations from FusionPharm that the shareholder was

19   not an affiliate.

20   Q.   Okay.  And you say affiliate, or control person.

21   A.   Correct.

22   Q.   Can you turn to page 32.  And can you see who signed

23   that letter?

24   A.   Tod Anthony DiTommaso.

25   Q.   You just want to look at page 63.  And there's several

Direct - DiBella

1  bank deposits that go back to page 75.  Do you know why bank

2  deposits are placed into a package -- a transaction package

3  like this for Pacific Stock Transfer Agency?

4  A.   No.

5  Q.   Okay.  Does proof have to be shown if there's a

6  drawdown on a credit in debt?

7  A.   Not usually, no.  Not in my experience.

8  Q.   Okay.  Let me have Government Exhibit 76 brought up.

9       Okay, another transaction; is that correct?

10 A.   Correct.

11 Q.   Okay.  Can you just tell me what's going on based upon

12 the first part of this page.

13 A.   It's an issuance of free-trading shares to five

14 different shareholders.

15 Q.   Okay.  And what's the transaction number?

16 A.   12992.

17 Q.   And what's the -- can you just go through quickly the

18 certification numbers associated with this transaction.

19 A.   Certificate numbers 11214 through 11218.

20 Q.   Okay.  And it goes in order?

21 A.   Correct.

22 Q.   Okay.  And these are the groups that are going to be

23 issued the shares?

24 A.   Correct.

25 Q.   And, I'm sorry, in Government Exhibit 76, I meant -- I

Direct - DiBella

1    forgot to ask you:  There's three attorney letters -- excuse
2    me -- in Government Exhibit 72, there's three attorney
3    letters in that exhibit.  Do you know why some transaction
4    packages would have more than one attorney letter?
5    A.   Could you point me to the pages you're talking about so
6    I can follow along with you?
7    Q.   Absolutely.  So it will be page 29, page 41, and page
8    57.
9    A.   If -- I can't really answer the why with a definitive
10   why, but I -- I have a suspicion.
11   Q.   All right.  Well, not a suspicion.  Can you give me,
12   based upon your experience, what you believe was occurring?
13   A.   I believe that Mr. Sears sent a whole packet full of
14   information and included previous opinion letters.  Because
15   if you look at them, they're all dated differently.  So this
16   transaction was in January and there's an -- two opinions
17   from December and then one from January.
18   Q.   Okay.  All right.  Well, let's take a look -- now that
19   that's fresh in your mind, can you look at Exhibit -- I've
20   got to make sure this is in evidence.
21            MR. SIBERT:  Can I have a minute, Your Honor?
22            THE COURT:  You may.
23            MR. SIBERT:  Can I have Exhibit 60 through 63
24   admitted?  They have been stipulated to.
25            THE COURT:  All right.  Given the stipulation of

Direct - DiBella

1    the parties, Government Exhibits 60, 61, 62, and 63 are

2    admitted into evidence and may be published to the jury.

3              MR. SIBERT:  Okay.  And, again, the -- to continue

4    so I don't have to pause here, Your Honor, can I have

5    Exhibits 65 through 71, also admitted.  All stipulated to.

6              THE COURT:  None of them are in yet?

7              MR. SIBERT:  That's correct, Your Honor.

8              THE COURT:  Okay.

9              COURTROOM DEPUTY:  Oh, no.  Some are in.

10             THE COURT:  Oh, those numbers look familiar.

11             MR. SIBERT:  Sorry.

12             MR. BARNARD:  Your Honor, is there --

13             THE COURT:  Hold on.  Let Ms. Frank tell us what's

14   admitted.

15             COURTROOM DEPUTY:  So 61 is admitted, 63 was

16   admitted, 69 is admitted, 70 was admitted.

17             THE COURT:  Okay.  So in the first batch, then,

18   we're only newly admitting Exhibits 60 and 62.  And then --

19   well, Mr. Barnard, did you have something you wanted to say

20   at this point?

21             MR. BARNARD:  Yeah.  In my exhibit list, there is

22   no -- nothing for Exhibit 68.

23             THE COURT:  Okay.

24             MR. SIBERT:  That's correct.

25             THE COURT:  All right.  Then why did you say 65

1    through 71?

2            MR. SIBERT:  I didn't catch the -- we made blanks

3    sometimes, so I didn't catch the blank.

4            THE COURT:  All right.  Let's start over.  Exhibits

5    62 -- 60 and 62 are newly admitted and may be published to

6    the jury.  Exhibits 65, 66, 67, and 71 are admitted into

7    evidence and may be published to the jury.

8        (Government's Exhibits received)

9            MR. SIBERT:  Thank you, Your Honor.

10   BY MR. SIBERT:

11   Q.   Can you look at Exhibit 66, please.  It's going to pop

12   up on your screen.

13           Do you recognize the e-mail in Government Exhibit

14   66?

15   A.   It looks like an e-mail that I sent.

16   Q.   Okay.  And who are you sending it to?

17   A.   To Mr. Dittman.

18   Q.   Okay.  And what is this e-mail about?

19   A.   It just looks like I'm forwarding this on to him to

20   make him aware.

21   Q.   And this is a follow-up e-mail; is that correct?

22   A.   I'm not sure what you mean by "follow-up."

23   Q.   If you look at the second page.  Again, this is the

24   list that you were talking about before; is that correct?

25   A.   Correct.

1    Q.    And that's the e-mail that you're sending to Mr. Sears?

2    A.    Correct.

3    Q.    May I have you look at Government Exhibit 67 now.

4    Okay.  Can I zoom in the middle here, please.  Starting at

5    the top of the e-mail, in the middle.  Thank you.

6          Do you recall this e-mail that you're sending?

7    A.    It looks like an e-mail I sent.

8    Q.    And what does the e-mail reference?

9    A.    It references documents that are needed for an

10   issuance.

11   Q.    And, again, do you know what this issuance is about?

12   A.    From this e-mail, no.

13   Q.    How about the subject?

14   A.    The subject is "convertible note."

15   Q.    Okay.  Can I have page 69, please.

16         THE COURT:  Page or exhibit?

17         MR. SIBERT:  I'm sorry, Exhibit 69.

18   BY MR. SIBERT:

19   Q.    Okay.  Can you look at this section here and read it

20   and let me know what you're telling Ms. Sandra Sears.

21         Do you know what you're telling Ms. Sandra Sears in

22   that e-mail?

23   A.    It looks like I'm telling her that the opinion letter

24   is still missing a clear discussion of Rule 144(d)(3) and

25   how it applies to the transaction.

Direct - DiBella

1   Q.   Can you look at the date of that e-mail?

2   A.   Yes.

3   Q.   Okay.  Now can you go to Government Exhibit -- if you

4   look on your screen, I'm going to bring up Government

5   Exhibit 72, page -- page 41.

6        What's the date of that attorney letter?

7   A.   December 13th, 2012.

8   Q.   And so are you referencing this attorney letter in your

9   e-mail in Government Exhibit 69?

10  A.   I can't say for sure.

11  Q.   How would you know for sure?  You would have to see the

12  package of Government Exhibit 72?

13  A.   If this e-mail was included in it, yes.

14  Q.   Okay.  Can we go to page 26 of 72.

15       MR. BARNARD:  I'm sorry, which exhibit are we on

16  now?

17       MR. SIBERT:  Exhibit 72, page 26.

18  BY MR. SIBERT:

19  Q.   Same e-mail, right?

20  A.   Same e-mail from Exhibit 69?

21  Q.   I'm sorry, let me go one more page farther.  Let me

22  have you look at -- now I've confused myself.

23       Let me have you look at page 2 of Exhibit 69.  Can

24  you look at the date of your e-mail?

25  A.   Yes.

Direct - DiBella

1    Q.   Okay.  And that's the same date regarding the attorney

2    letter that we just looked at?

3    A.   Which -- which date for which attorney letter?

4    Q.   Well, let me -- I'm going to have to do this -- if you

5    hold your page on Government Exhibit 69, page 2 --

6    A.   Yes.

7    Q.   -- and we look at Government Exhibit 72, page 20, on

8    the screen -- page 20 -- you're e-mailing the same parties,

9    aren't you?

10   A.   I can't say that for sure that I was e-mailing the same

11   parties that are on this page that are on page 2 of --

12   Q.   All right.  Tell me what's different in this e-mail and

13   the e-mail that you're looking at in Government Exhibit 69,

14   page 2.

15   A.   So there's a few differences.  The e-mail that's on the

16   screen has a date of 4:31 p.m., the e-mail here in the

17   exhibit is dated 5:30 p.m.  The e-mail on the screen has

18   listed e-mail addresses that are not visible on page 2 of

19   Exhibit 69 to know who, in fact, that e-mail is sent to.

20   Q.   Okay.  My apologies.

21        Can you look at Government Exhibit 70 for me.  This

22   is another e-mail that you wrote?

23   A.   Yes.

24   Q.   Okay.  Can you tell me what the body you're discussing

25   here?

Direct - DiBella

1    A.    Can you repeat the question?

2    Q.    What are you telling Mr. Sears in this e-mail?

3    A.    I'm telling him that the opinion letter still needs to

4    be more clear and something about a credit card.

5    Q.    Okay.  And what do you mean by the opinion letter?

6    A.    The attorney opinion letter.

7    Q.    Okay.  And what are your reasons for making the

8    attorney opinion letter clearer?

9    A.    My e-mail says that the attorney states Rule 144(d)(3)

10   has a holding period in one sentence, and then I clarify to

11   state that Rule 144(d)(3) discusses the type -- I was just

12   reading it from the screen.

13   Q.    Where did you leave off?

14   A.    I'm not sure -- discusses this area and how it relates

15   to the promissory note and additional funding so that he

16   can -- or so he can -- he clearly defines what parameters of

17   Rule 144 he is relying upon.

18   Q.    Do you know what that means still, based upon your

19   e-mail back in 2012?

20   A.    No.

21   Q.    Okay.  And did Mr. Sears respond to you?

22   A.    I -- I can't see from that page.

23   Q.    Oh, I'm sorry.

24   A.    Yes.

25   Q.    So what does he say?

Direct - DiBella

1    A.    He says he forwarded my comments to the lawyer and

2    something else about this credit card.

3    Q.    Okay.  Can you please look at Government Exhibit 71.

4          And you're e-mailing, again, Mr. Sears; is that

5    correct?

6    A.    Yes.

7    Q.    What are you e-mailing Mr. Sears about?

8    A.    The opinion letter.

9    Q.    Okay.  And what are you telling Mr. Sears in this

10   e-mail on December 27th, 2012?

11   A.    That the one sentence in the opinion letter that the

12   attorney uses is not enough.

13   Q.    Okay.  Why are you saying that?  Do you know?

14   A.    I don't really know.

15   Q.    Okay.  So if you look at Exhibit 69, page 3 -- and can

16   I have Exhibit 72, page 27 on the screen.  Page 27.  Have

17   that blown up, please.

18         That matches; is that correct?

19   A.    Yes, it does.

20   Q.    All right.  Sorry about that.

21   A.    That's okay.

22   Q.    A lot of e-mails.

23   A.    Yes, I know.  I remember.

24   Q.    So now this whole discussion in this thread of e-mails

25   that we just went through, does it relate to this

Direct - DiBella

1    transaction package on Government Exhibit 72?

2    A.    Yes.

3    Q.    Okay.  And essentially you're telling Mr. Sears there's

4    an issue with the attorney letter; is that right?

5    A.    I'm telling him that these are the standard

6    instructions for an issuance of shares, and until I receive

7    an opinion letter, I can't tell them what else we'll need.

8    Q.    Okay.  And then if I recall your testimony in follow-up

9    e-mails, you were telling Mr. Sears there was an issue with

10   the opinion letter regarding these transactions with the

11   holding period.

12   A.    Yes.

13   Q.    Okay.  So can you look at page 29 on Government Exhibit

14   72.

15          THE COURT:  Before we go to any page, counsel, can

16   we pause here for our afternoon break?

17          MR. SIBERT:  Yes, sir.  Thank you.

18          THE COURT:  All right.  Ladies and gentlemen of the

19   jury, we'll be in recess for 15 minutes.

20       (Jury left the courtroom at 3:11 p.m.)

21          THE COURT:  Ms. DiBella, since you're in the middle

22   of your testimony, I direct you not to speak with any of the

23   lawyers during the recess.

24          THE WITNESS:  Okay.

25       (Recess taken 3:12 p.m. to 3:32 p.m.)

Direct - DiBella

1        THE COURT:  Ms. DiBella, I remind you you remain

2    under oath.

3            You may resume your examination, Mr. Sibert.

4        MR. SIBERT:  All right, thank you, sir.

5    BY MR. SIBERT:

6    Q.   Can you please -- can I please have Government Exhibit

7    72, page 57 up, please.

8            And you stated this is an attorney letter; is that

9    correct?

10   A.   Yes.

11   Q.   Okay.  And can you say the date of that attorney

12   letter.

13   A.   January 4th, 2013.

14   Q.   And can I have page 2 of that, please.

15           And right there, that's stating that the debt was

16   over a year old; is that correct?

17   A.   It's -- it says that the last disbursement date

18   occurred in the year before, in December of 2011.

19   Q.   Okay.  So that would be over a year old?

20   A.   Yes.

21   Q.   Okay.  Can I have page 59 of this exhibit.

22           And paragraph B, that's essentially saying the

23   shareholder 90 days before this transaction wasn't an

24   affiliate or control person.

25   A.   Which paragraph?

Direct - DiBella

1    Q.   Paragraph B.

2    A.   Okay.  Yes.

3    Q.   Those are two requirements that are -- that are needed

4    for a 144 letter to go -- to be accurate, to be -- to be

5    correct for a transaction like this?

6    A.   Which two requirements?

7    Q.   The -- that the shares were held for a year or the debt

8    was a year old, and that the shareholder wasn't an affiliate

9    90 days prior?

10   A.   Correct.

11   Q.   Okay.  Can I have Exhibit 74, please.

12        Can you explain what Mr. Sears is sending you at

13   Pacific Stock Transfer Agency in this e-mail?

14   A.   He's sending an e-mail with an attachment.

15   Q.   Okay.  And what's the attachment?

16   A.   The title of the attachment is BSR 8 -- I'm sorry, BSRH

17   note LOP dot PDF.

18   Q.   Do you know what LOP would mean?

19   A.   No.

20   Q.   Can I have page 2 of that exhibit.

21        Do you recognize that first page of the attachment?

22   A.   It's an opinion letter.

23   Q.   Okay.  And so that's what was attached to that e-mail?

24   A.   I don't know that I can say that for certain.

25   Q.   Can we go back to page 1.

1     That was your e-mail; is that correct?

2  A.   I -- that was the e-mail that they were sending it to

3  me, yes.

4  Q.   Is that your e-mail at Pacific Stock Transfer Agency?

5  A.   I believe so, yes.

6  Q.   Can I have Government Exhibit 75 -- or, excuse me, 76.

7  Okay.  Can I have the second page of this exhibit.  The

8  third page, I'm sorry.

9     Are those your initials there?

10  A.   Yes.

11  Q.   So you -- this was a transaction that was conducted by

12  you at Pacific Stock Transfer Agency?

13  A.   Was a transaction that was assigned to me, yes.

14  Q.   Can we have page 1 of this exhibit again.

15     Can you tell the jury what is going on in this

16  transaction based upon the first page.

17  A.   It's an issuance of free-trading shares to five

18  shareholders.

19  Q.   Okay.  Who are the shareholders?

20  A.   SGI Group, LLC; Star City Capital, LLC; Vera Group,

21  LLC; Alexandra Maurello, the Black Arch Opportunity Fund,

22  LP.

23  Q.   You went over the certificate numbers, and are these

24  the shares that are being issued?

25  A.   Yes.  In the issued column.

Direct - DiBella

1    Q.    Can I have page 46 of this exhibit.

2          Okay.  Page 46, do you recognize what that is?

3    A.    It's an attorney opinion letter.

4    Q.    Okay.  And this is regarding the new shareholder; is

5    that correct, that's going to be issued the shares?

6    A.    Yes.

7    Q.    And that's Vera Group --

8    A.    Yes.

9    Q.    -- LLC?

10   A.    Yes.

11   Q.    And as you stated before, it's Bayside Realty Holding

12   that's going to be the issuer of the shares, or is selling

13   the note?

14   A.    That I said before?  I'm sorry, what did I say before?

15   Q.    I thought you said Bayside Realty was the issuer of the

16   shares for this note.

17   A.    In that previous transaction, they were listed in the

18   opinion letter.

19   Q.    Okay.

20   A.    I don't know if they were the issuer of the note.

21   Q.    I'm talking about page 1 of this transaction that we

22   just went over.

23   A.    Page 1 of this exhibit?

24   Q.    Yes, ma'am.

25   A.    I don't see anything about Bayside Realty on page 1 of

Direct - DiBella

1    the exhibit.

2    Q.   Okay.  So can you explain this transaction that you

3    handled regarding the first paragraph of the opinion letter?

4    A.   Can I have a moment to read it?

5    Q.   Yes.

6    A.   Okay.  Am I allowed to look at other pages in this

7    document or just this page?

8    Q.   You can look at anything to refresh your memory.

9    A.   Okay.  What -- I'm sorry, what was the question?

10   Q.   All right.  Do you know if Bayside Realty Holding is

11   selling a portion of the note regarding this transaction

12   with it in this attorney opinion letter?

13   A.   Yes.

14   Q.   Okay.  And they're selling a portion of the note that

15   was owed to them by FusionPharm; is that right?

16   A.   Correct.

17   Q.   Okay.  Can you look at the third paragraph of this

18   opinion letter.  And specifically at this sentence I'm

19   underlining.  Sorry.

20   A.   That's okay.

21   Q.   I'm not John Madden.

22   A.   Okay.

23   Q.   Does that mean the holding period has been met,

24   according to this attorney, of one year?

25   A.   Your question is does this paragraph give me the cause

1    to move forward based on this paragraph saying that it's

2    been a year?

3    Q.    It's been a year since Bayside Realty Holding has held

4    those shares?

5    A.    No.

6    Q.    So what's it talking about, more than a year?

7    A.    It's talking about another opinion letter that explains

8    that.

9    Q.    Okay.  And what opinion letter is that talking about?

10   A.    It's referencing an opinion letter from January 4th,

11   2013?

12   Q.    Okay.  That's back in Government Exhibit 7, correct?

13   A.    Correct.

14   Q.    And that's the one we just looked at, put on the

15   screen?

16   A.    Correct.

17   Q.    And so let me just make sure we're talking about the

18   same thing because there's a lot of documents.  Can I have

19   Government Exhibit 72, page 57 published.  And can I have

20   the --

21          MR. SIBERT:  I'm sorry, Your Honor, could I have a

22   moment?

23          THE COURT:  You may.

24   BY MR. SIBERT:

25   Q.    Sorry, it took me a second to find it on this one.  Can

1    I have page 58 of Government Exhibit 72, the third paragraph

2    blown up.

3              And this is the opinion about the one-year holding

4    period; is that correct?

5    A.    The -- the sentence says that the shareholder has met

6    the applicable 12-month holding period.

7    Q.    And that's to be able to convert the shares; is that

8    right?

9    A.    Meaning the -- I don't understand the question.

10   Q.    Well, what does the 12-month holding period mean to you

11   under the opinion letter?  Would you take these shares

12   unrestricted now?

13   A.    Not just with that one sentence, no.

14   Q.    So what else would you need?

15   A.    Well, which transaction are we talking about?  Are we

16   talking about this transaction in Exhibit 76?

17   Q.    Okay.  Well, you said -- if I followed you correctly --

18   the sale of the Bayside note in 76 relied on the opinion

19   letter of January 4th, 2013.

20   A.    That's what the opinion letter says.

21   Q.    Okay.

22   A.    Yes.

23   Q.    That's what the lawyer's saying to Pacific Stock

24   Transfer?

25   A.    Correct.

1029

Direct - DiBella

1   Q.   I'm asking you:  Is that what the Pacific Stock
2   transfer agent relied on to be able to sell this note?
3   A.   Are you asking if this Pacific Stock would have relied
4   on the opinion letter from January or the opinion letter
5   from March, for the transaction in Exhibit 76?
6   Q.   I'm asking you to answer that question.  I'm not -- I
7   don't know the answer to that.  What opinion letter would
8   they rely on?
9   A.   For which -- but which transaction are we talking
10  about?  That's where I'm not sure I understand your
11  question.
12  Q.   Okay.  Let's look at the transaction on Exhibit 76.
13  A.   Okay.
14  Q.   The sale of the note.  And we were looking at the Vera
15  Group, page 46.
16  A.   Uhm-hum.  So based on the dates of these opinion
17  letters, the opinion letter that would have been relied upon
18  for the part of this transaction that belongs to Vera Group
19  is on page 42.
20  Q.   Okay.  And if you look at page -- but that's an
21  unsigned letter; is that right?
22  A.   No.
23  Q.   44 --
24  A.   The signature page is on page 45.
25  Q.   Can I have page 42 brought up.  And go down.

Direct - DiBella

1    And, again, can you read this paragraph?

2    A.   Would you like me to read it out loud?

3    Q.   No.   Just can you tell me what opinion letter you had

4    to go -- to refer to before the sale went through.

5    A.   Can I say something that doesn't answer your question?

6    Q.   Well, I'm -- what does it mean by the January 4th,

7    2013, opinion letter?

8    A.   I don't know.   I didn't write the opinion letter.

9    Q.   Who wrote the opinion letter?

10   A.   This Tod DiTommaso.

11   Q.   Okay.   What would Pacific Stock Transfer Agency need to

12   get this transaction to go through?

13   A.   This opinion letter in addition to other documentation.

14   Q.   Okay.   And what in this opinion did you need to see?

15   A.   I would have needed to see the promissory note, the

16   notice of conversion, the securities transfer agreement.   I

17   would have needed the other standard documents that we get

18   for any issuance.

19   Q.   Okay.   And then what in the letter -- the attorney

20   letter would you need?

21   A.   I would -- in terms of tacking back a holding period to

22   one year?

23   Q.   I'm asking you what you need to see in the attorney

24   letter to allow this transaction to go through.

25   A.   Okay, well my familiarity with Rule 144 is a little bit

1    rusty.  Let's say five years rusty.  But we certainly need

2    some proof that the debt that's being converted is one year

3    old.  And in the second paragraph it refers to the credit

4    line dated May 2d, 2011.

5    Q.   And would you need proof to know the credit line was

6    over a year old?

7    A.   We would need the promissory note that it's

8    referencing.

9    Q.   Okay.  And so you -- that's the holding period that you

10   would need?

11   A.   Correct.

12   Q.   Okay.  And that's what it states in this letter?

13   A.   Correct.

14   Q.   And since it states that in this letter, Pacific Stock

15   Transfer Agency was able to do this transaction --

16   A.   Well, specifically for this person getting the shares,

17   there would have been some more that would have been needed.

18   Q.   In the letter?  In the attorney letter?

19   A.   Not in the letter, no; with the other supporting

20   documentation.

21   Q.   So for this letter, for the shares that Bayside is

22   selling to Vera Group, the main important part is the

23   holding period.

24   A.   So in this case, there's two parts of a holding period

25   that need to be met.

Direct - DiBella

1    Q.   Okay.  Can you describe what those are.

2    A.   Okay.  So Bayside Realty held the promissory note in

3    May of 2011 and at some point the securities transfer

4    agreement that's here dated January 23d, 2013, transferred

5    some of these shares to Vera Group.  We would need something

6    in the opinion letter that states that there was no

7    additional consideration given between Vera Group and

8    Bayside Realty so that shares weren't again repurchased to

9    not be able to tack back a holding period.

10   Q.   Okay.  And what do you rely on the attorney letter for

11   verification?

12   A.   The attorney letter on page 43 in the second paragraph

13   under holding period --

14   Q.   43 up, please.  You said second paragraph?

15   A.   Yes.

16   Q.   Okay.

17   A.   It says something to the effect that the full purchase

18   price or other consideration has been paid.  And it talks

19   about tacking it back to the record date.

20   Q.   Okay.  I'm going to let you play John Madden Football.

21        You have page 43 on your screen.

22   A.   Yes.

23   Q.   If you touch it, can you show me where you're reading

24   on that page 43?

25   A.   You mean like make a circle like you were doing?

Direct - DiBella

1    Q.   Sure.

2    A.   Okay.

3              THE COURT:   There should be a stylus up there.

4              MR. SIBERT:   I got it, Your Honor.

5    BY MR. SIBERT:

6    Q.   Is that the paragraph?

7    A.   That's it.

8    Q.   Can I have that blown up, please.

9              Okay.   This is the two sentences that you were

10   talking about --

11   A.   Correct.

12   Q.   -- regarding 12-month holding period?

13   A.   Correct.

14   Q.   And that's what you relied on?   That's what -- I

15   shouldn't say "you," but that's what Pacific Stock Transfer

16   Agency relies on?

17   A.   In terms of -- in addition to where the attorney

18   opinion letter says that the original debt occurred in May

19   of 2011 and this sentence, because of how the shares were

20   being issued to the person who's not holding the promissory

21   note.

22   Q.   And that letter is the January 4th, 2013, letter --

23   attorney letter, as -- if you look at page 42 --

24   A.   This is dated March 13th, 2013.

25   Q.   I know.   But give me a second.

1    You're relying on this letter for that information?

2    A.   No.

3    Q.   Why do you have that -- why is that letter in there, do

4    you know?

5    A.   I don't know.

6    Q.   Okay.  Just the attorney.

7    A.   Correct.

8    Q.   I'm sorry.  So correct me, then, how do you prove that

9    point in this letter -- in the attorney letter, the second

10   requirement?

11   A.   To prove which point?

12   Q.   So we went through the 12-month period and you said you

13   also needed something else.

14   A.   Right.  The paragraph that I circled.

15   Q.   Right.  Is there anything else that you need in the

16   attorney letter?

17   A.   To issue free-trading shares?

18   Q.   Yes, ma'am.

19   A.   Of course.  There would need to be the representations

20   that the shareholder's not an affiliate.

21   Q.   And that's in paragraph B; is that right?

22   A.   Correct.

23   Q.   And that's there.

24   A.   Correct.

25   Q.   So two things in the opinion letter.

Direct - DiBella

1    A.   I'm sure there's more, but if there are I can't really

2    remember them.

3    Q.   Okay, but two things that you remember regarding Rule

4    144.

5    A.   Yes.

6    Q.   The holding period, one year, and then -- for

7    nonreporting companies; and then nonaffiliation for the

8    shareholder receiving the shares?

9    A.   Correct.

10   Q.   That was a lot for that.

11   A.   Sorry.

12   Q.   That's okay.  It's been five years.

13   A.   Thank you.  It has been five years.

14   Q.   77, please.  Okay.

15        Can you just look at the top of this e-mail.  Do

16   you recognize that e-mail?

17   A.   It looks like an e-mail that Bill Sears sent to me.

18   Q.   Okay.  And essentially what is the subject?

19   A.   The subject is MeadPoint Venture Partners FSPM.

20   Q.   Okay.  And do you recognize what No. 6 is?

21   A.   The letter of opinion.

22   Q.   Okay.  Can you look at page 19.  I'll put it on the

23   screen for you of -- of Exhibit 77.

24        Is that the letter opinion?  Again, it's Exhibit --

25   I'm sorry, 77, page 19.

Direct - DiBella

1     A.   It is an opinion letter.  I don't know what transaction

2     it goes with.

3     Q.   Okay.  But it's one that is part of the e-mail --

4     A.   I can't say that it was part of the e-mail for certain.

5     Q.   All right.  Well, it's attached to that exhibit; is

6     that correct?

7     A.   Correct.

8     Q.   Okay.  Can I please have Government Exhibit 78 brought

9     up.

10         Now, this transaction deals with MeadPoint Venture

11    Partners; is that correct?

12    A.   Correct.

13    Q.   And that was the same name that was attached to the

14    e-mail we just looked at?  77, ma'am.

15    A.   Yes.

16    Q.   Okay.  And then it's -- FusionPharm is still in the

17    transaction?

18    A.   FusionPharm is the issuer, yes.

19    Q.   And transaction number is 12998?

20    A.   Yes.

21    Q.   Okay.  Can I have page 3 of this exhibit.

22         This is your log sheet, right?

23    A.   Yes.

24    Q.   And these are your initials?

25    A.   Yes.

Direct - DiBella

1    Q.   So it was assigned to you?

2    A.   Yes.

3    Q.   Okay.  Can we look at page 15, please.

4         Do you recognize what that is?

5    A.   It's an attorney opinion letter.

6    Q.   And that's for MeadPoint Partners, correct?

7    A.   As the shareholder, yes.

8    Q.   To receive shares?

9    A.   Correct.

10   Q.   Okay.  Can I have page 16.

11        And this is the paragraph that Pacific Transfer

12   Stock Agency relies on the attorney regarding the holding

13   period; is that right?

14   A.   Not -- not -- not by itself.  Let me look at this.

15        So the paragraph that would have been relied upon

16   for the holding period is actually on page 15.

17   Q.   Okay.

18   A.   It's the middle paragraph.

19   Q.   Okay.  Go back one page.  This paragraph?

20   A.   Correct.

21   Q.   Okay.  Can you just tell me how that shows the one-year

22   holding period.

23   A.   Well, the -- it says that the convertible promissory

24   note was dated December 8th, 2011, the opinion letter's

25   dated March 31st of 2013.  It's definitely been at least one

Direct - DiBella

1     year.

2     Q.   Okay.  Very well.  And page 2 is the lawyer just saying

3     the holding period has been met?

4     A.   It's -- the page 2 is saying that no additional

5     consideration has been given.

6     Q.   Okay.  And then the affiliation that we've been talking

7     about, that's on page 16, paragraph B; is that correct?

8     A.   Correct.

9     Q.   And that's saying that MeadPoint couldn't be an

10    affiliate or a control person 90 days prior to this

11    transaction?

12    A.   It's saying that they are not and have not been an

13    affiliate during the last 90 days.

14    Q.   And that's being a affiliate or controlling person in

15    the FusionPharm?

16    A.   Correct.

17    Q.   And essentially this is what Pacific Transfer Agency

18    relies on the attorney letter to meet those two

19    requirements?

20    A.   Yes.

21    Q.   For Rule 144 purposes?

22    A.   Yes.

23    Q.   Can I have package -- excuse me, Exhibit 79.  Can we

24    just go to page 3 quickly.

25              Again, this is another transaction that was

Direct - DiBella

1    assigned to you?

2    A.    Yes.

3    Q.    Can we just go to page 1.  Okay.

4          This is transaction No. 13002?

5    A.    Yes.

6    Q.    Okay.  And what's going on here?

7    A.    MeadPoint Venture Partners is receiving 500,000 shares

8    of free-trading stock for FusionPharm.

9    Q.    Can we go to page 17.

10         Do you recognize what page 17 is?

11   A.    It's an attorney opinion letter.

12   Q.    Okay.  I'm sorry, can you go to the top of that.

13         What's the date of that?

14   A.    August 13th, 2013.

15   Q.    Okay.  And this paragraph is telling you what?

16   A.    That the promissory note is dated December 8th, 2011.

17   Q.    So that's over a year?

18   A.    Yes.

19   Q.    Okay.  And then let's go to page 2.  I'm -- well, we

20   can hit on this.  I'm not sure I covered this.  Can you zoom

21   in.

22         This is the Federal Express that Pacific Stock

23   sends; is that right?

24   A.    Yes.

25   Q.    And it went to Mr. William Sears?

Direct - DiBella

1    A.    Yes.

2    Q.    And that's the tracking number?

3    A.    Yes.

4    Q.    796476186341?

5    A.    Yes.

6    Q.    I'm sorry, can we go to page 18 of this document.

7          And that's the paragraph that says no new

8    conversions have happened in the year?

9    A.    It says no additional consideration has been given in

10   the last 12 months.

11   Q.    Okay.  And then paragraph B, that's your affiliation

12   part; is that correct?

13   A.    Correct.

14   Q.    So, again, the same two things that needed to be met in

15   the attorney letter for Pacific Stock Transfer to go ahead

16   and approve this transfer, dealt with the Rule 144 holding

17   period and then the nonaffiliation?

18   A.    Correct.

19   Q.    Or control.

20   A.    Correct.

21   Q.    And, finally, can you look at Exhibit 84.  I'm sorry,

22   can you go to 81 first.

23          Is this an e-mail that Mr. Sears sent you?

24   A.    Yes.

25   Q.    Okay.  And the subject is MDPT?

Direct - DiBella

1    A.    Yes.

2    Q.    And then there's attachments; is that correct?

3    A.    Yes.

4    Q.    Would you look at the second page of this exhibit.

5          Based upon what you see, do you know what that is?

6    A.    It's an attorney opinion letter.

7    Q.    And the names in that attorney opinion letter match the

8    name on the subject line for the e-mail; is that correct?

9    A.    They match the names on the attachment line of the

10   e-mail.

11   Q.    Thank you.  And can we go to 84, please.  Can you just

12   go to page 4 of this.

13         And this transaction was assigned to you; is that

14   right?

15   A.    Yes.

16   Q.    Can you go to page 1, please.

17         Okay.  Can you tell the jury who is being issued

18   shares of FusionPharm stock here?

19   A.    Myron Thaden, Sharon Thaden, and Richard Scholz.

20   Q.    Okay.  And the transaction is 1303 -- excuse me, 13003?

21   A.    Yes.

22   Q.    And the certifications are here?

23   A.    Yes.

24   Q.    And essentially that's 11228 through 11230?

25   A.    Yes.

Direct - DiBella

1    Q.    And how many shares are being issued?

2    A.    1.5 million.

3    Q.    Can I have page 11, please.  Okay.

4          Again, Mr. Sears sends you another e-mail; is that

5    right?

6    A.    Yes.

7    Q.    And asking you to find the attached documents; is that

8    right?

9    A.    Yes.

10   Q.    And the MDPT?

11   A.    Yes.

12   Q.    And can you go to page 1055 of that document.

13         What is on page 1055?

14   A.    An attorney opinion letter.

15   Q.    What is on page 105 of Exhibit 84?

16   A.    An attorney opinion letter.

17   Q.    In a general sense, what is this attorney opinion

18   letter discussing?

19   A.    A transaction of a promissory note to some

20   shareholders.

21   Q.    Okay.  And the shareholders being Mr. Richard Scholz

22   and the two Thadens?

23   A.    Yes.

24   Q.    And MeadPoint is going to go ahead and issue those

25   shares?

1043

Direct - DiBella

1    A.   Yes.

2    Q.   And, again, the paragraph I circled, does that meet the

3    one-year holding period requirement for the attorney letter?

4    A.   Would it be okay if I looked at this for just a minute?

5    Q.   Absolutely.

6    A.   Okay.

7    Q.   Ma'am, I'll just ask you some questions about the

8    attorney letter.

9    A.   The one from DiTommaso or the ones from Frederick

10   Lehrer?

11   Q.   From Mr. DiTommaso.

12   A.   Okay.

13   Q.   All right.  So, can you just ask -- can I just ask you,

14   is this paragraph satisfying Pacific Stock's transfer

15   agent's requirements when it comes to the one-year holding

16   period of the note?

17   A.   Not for this transaction, no.

18   Q.   Okay.  What else in this letter shows that has been

19   met?

20   A.   This letter would not have been relied upon.

21   Q.   Okay.  And why is that?

22   A.   Because it's not signed.

23   Q.   Okay.  And who didn't sign the letter?

24   A.   Tod Anthony DiTommaso.

25   Q.   Okay.  Well, was the letter submitted to -- submitted

1044
Direct - DiBella

1    to the Pacific Stock Transfer Agency?

2    A.    It looks like it, yes.

3    Q.    Okay.  And was it for the purposes to be submitted as

4    an opinion letter?

5    A.    I can't speak to what the purpose was of someone else

6    submitting the document to Pacific Stock.

7    Q.    Okay.  Based upon your experience, what would you take

8    this to be?

9    A.    A document that somebody wanted us to rely upon to

10   proceed with the transaction.

11   Q.    Specifically what part of it would you rely on?

12   A.    What part of it would be --

13   Q.    No, no, what party -- is this the legal letter?

14   A.    This is an opinion letter from an attorney to Pacific

15   Stock for this transaction.

16   Q.    Okay.  And then what requirements was this letter

17   trying to satisfy for Pacific Stock Transfer Agency?

18   A.    It would have been trying to tack back the holding

19   period of the debt to a one-year period and it would have

20   been wanting to say that the shareholders are not affiliates

21   and haven't been affiliates or control persons in the last

22   90 days.

23   Q.    Okay.  And those were the two requirements under 144,

24   if you had relied on this letter, in order for this

25   transaction to go forward; is that right?

Cross - DiBella

1  A.  Those are two of the requirements.  I think there were

2  more, but I don't recall precisely.

3  Q.  But the two requirements in this letter?

4  A.  Yes.

5  Q.  Okay.  And then, again, the letters that we all

6  reviewed, they dealt with the shares of FusionPharm; is that

7  right?

8  A.  Yes.

9       MR. SIBERT:  Okay, I'll pass the witness.

10       THE COURT:  Cross-examination.

11       MR. BARNARD:  Thank you, Your Honor.

12                   CROSS-EXAMINATION

13  BY MR. BARNARD:

14  Q.  Ms. DiBella, in the -- this last Exhibit 84, can you --

15  you wanted to look at some of the other pages in the

16  exhibit, correct?

17  A.  Correct.

18  Q.  And the exhibit, in fact, consists of 108 pages, or

19  thereabouts, right?

20  A.  Correct.

21  Q.  Now, with regard -- excuse me, Your Honor -- with

22  regard to these 108 pages, I'm a little unclear.  Are all

23  108 pages the actual -- the certificate transaction journal?

24  I'm looking at page 1, which says Pacific Stock Transfer

25  Company Certificate Transaction Journal, right?

1   A.   Right.

2   Q.   And then there are 107 more pages.

3   A.   Yes.

4   Q.   And my question for you is:  Is this packet of 108

5   pages what makes up the certificate transaction journal?

6   A.   No, sir.

7   Q.   So in -- what is actually in the certificate

8   transaction journal?

9   A.   The certificate transaction journal is just that one

10  single page.

11  Q.   Oh, I'm sorry.  I thought you said that this was what

12  was put on top of the journal.  So let me ask it this way:

13  Are the 108 pages the file with regard to this transaction?

14  A.   Yes.

15  Q.   And so all of these pages are in the Pacific Stock

16  Transfer file?

17  A.   If that's what they produced as part of the record,

18  yes.

19  Q.   All right.  And you found, in -- noticed that, in fact,

20  in this transaction, that was finalized with the cover page

21  1, finalized on September 3d, 2013, that there was a -- an

22  opinion letter by a Frederick Lehrer.

23  A.   Yes.

24  Q.   So -- so this transaction, in fact, ended up having an

25  additional attorney letter?

1047
Cross - DiBella

1   A.   I wouldn't say additional.

2   Q.   It had more than one.

3   A.   Well, the other opinion letter was unsigned so I

4   wouldn't call that an actual opinion letter.

5   Q.   All right.  So -- so -- so it would be simply something

6   that was rejected because it's unsigned and then -- then

7   when the Frederick Lehrer letter arrived, that was then what

8   was considered?

9   A.   Correct.

10  Q.   And Mr. Lehrer, the attorney in -- on page 78 of that

11  document -- if I could have page 78 of document -- excuse

12  me, Exhibit 84.  And there are -- pages 78, 79, and 80 make

13  up that opinion letter?

14  A.   Yes.

15  Q.   And so it would be on this opinion letter, plus other

16  documents, that then would end up in the completion of this

17  transaction and the transfer of the shares?

18  A.   That -- as far as I can see, yes.

19  Q.   All right.  So just one other question for you:

20  Earlier -- or early, very early on in your testimony, you

21  were talking about restricted legends on stock certificates.

22  A.   Yes.

23  Q.   And you testified that if there was a restriction on

24  the stock, then that typically would mean that that stock

25  could not be sold --

1048
Cross - DiBella

1    A.    Yes.

2    Q.    -- because it was restricted.

3            But isn't it true that, in fact, what the

4    restricted stock limitation is, is that it can't be sold in

5    the public market?

6    A.    I don't know that I have the expertise to say that as

7    an answer.

8    Q.    Do you know whether or not a restricted stock can be

9    sold privately between individuals?

10   A.    I believe it can, yes.

11           MR. BARNARD:  Thank you.  No further questions.

12           THE COURT:  Redirect?

13           MR. SIBERT:  No redirect, Your Honor.

14           THE COURT:  All right.  May this witness be excused

15   for the Government?

16           MR. SIBERT:  She can, Your Honor.

17           THE COURT:  All right.  For the defendant?

18           MR. BARNARD:  Yes, Your Honor.

19           THE COURT:  All right.  Ms. DiBella, thank you for

20   your testimony.  You're excused.  You may step down.

21           THE WITNESS:  Thank you.

22           THE COURT:  Who's the Government's next witness?

23           MR. SIBERT:  I'm sorry, Your Honor, I was just

24   waiting for the Court.  Katie Saia.

25           THE COURT:  Okay.

                          Direct - Saia

1        COURTROOM DEPUTY:  Just stand there on the witness
2    stand here and raise your right hand, please.
3            KATIE SAIA, GOVERNMENT'S WITNESS, SWORN
4        COURTROOM DEPUTY:  Please be seated.  And you want
5    to scoot your chair up to the microphone.  And please state
6    your full name and spell it for the record.
7        THE WITNESS:  Sure.  Kathleen Saia.
8    K-a-t-h-l-e-e-n, S-a-i-a.
9                      DIRECT EXAMINATION
10   BY MR. SIBERT:
11   Q.   You stated Saia?
12   A.   Saia.
13   Q.   Totally mispronounced that, I apologize.
14            Okay.  Good afternoon, ma'am.
15        MR. SIBERT:  I'm sorry, Your Honor, can I proceed?
16        THE COURT:  Yes, you may.
17   BY MR. SIBERT:
18   Q.   Good afternoon, ma'am.  Could you explain to the jury
19   where you're currently employed and the location.
20   A.   Oppenheimer Company, Inc., in Boca Raton, Florida.
21   Q.   What does Oppenheimer do?
22   A.   It's a brokerage firm.
23   Q.   Okay.  And what does a brokerage firm do for the
24   public?
25   A.   Financial institution, so sell securities, financial

Direct - Saia

1    advice, investments, financial planning.

2    Q.   Now -- and how long have you worked with -- how long

3    have you worked in Oppenheimer?

4    A.   23 years.

5    Q.   Okay.  And what is your role at Oppenheimer -- at

6    Oppenheimer?

7    A.   Currently I'm a regional compliance officer.

8    Q.   Okay.  And what does that mean?

9    A.   I have -- my branches are from Philadelphia down to

10   Florida.  And any compliance issues are escalated to myself.

11   I review U-4s of new candidates, review any issues at the

12   branch level.

13   Q.   So compliance means -- sounds to me like follow the

14   rules, regulations?

15   A.   Supervisory.

16   Q.   Okay.  So when there might be a violation of the rules

17   or regulations, is that when you get involved?

18   A.   Yes.  Sometimes.

19   Q.   Okay.  Would those include the regulations and laws

20   surrounding securities?

21   A.   We have a legal department, so it depends on, you know,

22   what you're referring to.  It's between like the compliance

23   department and the legal department.

24   Q.   Okay.  So it depends on what the issues are?

25   A.   Correct.

Direct - Saia

1    Q.   But in that area of -- of -- I guess that area of -- in
2    the investment banking world?
3    A.   Yes.
4    Q.   Okay.  Now, one of the things that you said is
5    Oppenheimer deals with securities and stocks; is that
6    correct?
7    A.   Correct.
8    Q.   Is there a place where an individual can open up a
9    brokerage account to be able to either trade or purchase
10   shares of stock?
11   A.   Yes.
12   Q.   Okay.  At one time, did Oppenheimer participate in
13   what's known as the microcap or the penny stock exchanges?
14   A.   Yes.
15   Q.   And do you know what years that occurred in?
16   A.   I believe from 2006 to maybe 2012, approximate.  I'm
17   not accurate -- you know, those dates might not be accurate.
18   Q.   Okay.  And now you've been asked to review some
19   documents and produce documents for this case; is that
20   correct?
21   A.   Yes.
22        Okay.  Can you look at Government Exhibit 47 for
23   me.
24        MR. SIBERT:  Your Honor, this has not been admitted
25   into evidence or stipulated.

Direct - Saia

1    I'm sorry, can we hand her binder No. 1.  This is

2    rather a large document.  It's volume 2.

3    BY MR. SIBERT:

4    Q.   Do you recognize Government Exhibit 47?

5    A.   Yes.

6    Q.   Okay.  And the general nature, without going into

7    specific detail, can you tell me what this document is in

8    regards to Oppenheimer?

9    A.   This is an LLC.

10   Q.   Okay.  And what is the LLC?

11   A.   A limited liability company authorization form.

12   Q.   Okay.  So this -- these are the forms that deal with a

13   LLC that Oppenheimer requires?

14   A.   I don't know if this is an Oppenheimer form.

15   Q.   You don't know if this is an Oppenheimer form?

16   A.   I don't know if this is an Oppenheimer form.

17   Q.   Okay.  I apologize, I can't hear you.  Can you speak

18   into the microphone, please.

19   A.   Sure.  I don't know -- I don't recall if this is an

20   Oppenheimer form.

21   Q.   Okay.  Well, would you mind taking a look through

22   Government Exhibit 45 -- or, excuse me, 47.

23   A.   Yes.

24   Q.   Okay.

25   A.   This looks like the documents from the LLC company.

Direct - Saia

1    Q.    Okay.

2    A.    Not Oppenheimer's documents.

3    Q.    So are these documents that Oppenheimer had to provide

4    regarding a investigation?

5    A.    The client would provide Oppenheimer these documents if

6    they opened an LLC account with that.

7    Q.    Can you look down at the bottom of the page there,

8    there's a symbol.  What's the symbol?

9    A.    On the first page?

10   Q.    Yes, ma'am.  And above the 1.

11   A.    OPCO.  O-P-C-O, uhm-hum.

12   Q.    Do you know what that means?

13   A.    I would think that's short for Oppenheimer Company.

14   Q.    And now you stated that the first -- these would be

15   documents that the company would provide Oppenheimer; is

16   that right?

17   A.    Correct.

18   Q.    Why would a company provide these documents to

19   Oppenheimer?

20   A.    To show who's authorized on the account.

21   Q.    And what do you mean by "authorized" --

22   A.    Authorized person of the client.  So if they opened an

23   LLC with Oppenheimer, we would need to see who the

24   authorized person is for the account.  Signer.

25   Q.    All right.  And this is -- does this paperwork have an

Direct - Saia

1   account number associated to it?

2   A.   It does.

3   Q.   And what's the account number?

4   A.   G51-1429990.

5   Q.   And is this the number that Oppenheimer keeps its

6   account under?

7   A.   Yes.

8   Q.   And, again, these are documents that are kept in the

9   regular course of business with Oppenheimer?

10  A.   Yes.

11        MR. SIBERT:   Your Honor, at this time, I'd like to

12  move for admission into evidence Government Exhibit 47.

13        THE COURT:   Is there an objection?

14        MR. BARNARD:   Your Honor, I do object.   These are

15  not records from Oppenheimer, these are all hearsay records,

16  and they're not business records of Oppenheimer.

17        THE COURT:   Mr. Sibert.

18        MR. SIBERT:   Your Honor, the witness clearly

19  testified that -- I agree with the fact that these are not

20  records of Oppenheimer, that Oppenheimer produced, but these

21  are records that Oppenheimer requires companies to be --

22  have an account under Oppenheimer.   And the witness clearly

23  testified that these are records that are kept in the

24  regular course of business.   And that would be a hearsay

25  exception.

1    THE COURT:  All right.  I know that.

2    Ma'am, have you had a chance to go through all

3    these pages to confirm that all of these documents are from

4    an Oppenheimer file?

5    THE WITNESS:  Yes.  So anything with the

6    Oppenheimer account number would be from the Oppenheimer

7    file.

8    THE COURT:  And these would be kept -- these are

9    documents kept for an account holder?

10   THE WITNESS:  Correct.

11   THE COURT:  And who's the account holder that these

12   documents were derived from?

13   THE WITNESS:  MicroCap Management, LLC.

14   THE COURT:  Were these documents kept under your

15   supervision?

16   THE WITNESS:  At the branch, yes.

17   THE COURT:  All right.  The objection's overruled.

18   Exhibit 47 is admitted into evidence and may be

19   published to the jury.

20   (Government's Exhibit 47 received)

21   MR. SIBERT:  Thank you, Your Honor.

22   BY MR. SIBERT:

23   Q.   May I have page 1 of Exhibit 47.

24   Ma'am, you just testified the company that was

25   opening an account with -- or had an account with

1    Oppenheimer was MicroCap Management; is that correct?

2    A.    Correct.

3    Q.    And right here, there's listed a name.  Whose name is

4    listed there.

5    A.    William J. Sears.

6    Q.    And who's that person based upon this paperwork?

7    A.    That would be the authorized signer on this MicroCap

8    Management LLC, account.

9    Q.    Okay.  Can I have that taken down for a second.

10         Now, were you asked -- was Oppenheimer asked to

11   produce some documents regarding trades regarding MicroCap

12   Management in the --

13   A.    Yes.

14   Q.    And do you recall the approximate time frame when

15   Oppenheimer was asked to disclose documents regarding

16   MicroCap Management?

17   A.    Approximately a year ago -- six months to a year.

18   Q.    Okay.  And do you recall why Oppenheimer was asked to

19   disclose these documents?

20   A.    Regarding the forgery of a signature --

21   Q.    Okay.

22   A.    -- on an opinion letter.

23   Q.    All right.  And did these documents that you produced,

24   does that -- do these documents have that opinion letter

25   within the set of -- does this exhibit have an opinion

Direct - Saia

1    letter?

2    A.   I'm sure.

3    Q.   Can you look at pages 34 and 35.

4    A.   Yes.

5              THE COURT:  Do you want any of the exhibit

6    published to the jury?

7              MR. SIBERT:  I'm just going to ask some follow-on

8    questions.

9              THE COURT:  Okay.

10             MR. SIBERT:  Thank you.

11   BY MR. SIBERT:

12   Q.   Can I have that taken down, please.  Okay.

13             Is this the opinion letter that you were talking

14   about?

15   A.   Yes.

16   Q.   Okay.  And do you know why opinion letters were needed

17   for Oppenheimer?

18   A.   To ensure the security was able to be sold.

19   Q.   Okay.  And is that to ensure that there was no

20   restrictions on the -- on the stock, and if there was

21   restrictions, the proper exceptions were met?

22   A.   Correct.

23   Q.   Okay.  And in this case, it dealt with the Rule 144

24   restrictions; is that right?

25   A.   Yes.

Direct - Saia

1     Q.    And have you had time to review this opinion letter

2     before today's testimony?

3     A.    Yes.

4     Q.    Okay.  And essentially, two areas of importance with

5     this attorney letter regarding the Rule 144 to remove the

6     restricted legend was the one-year holding period, along

7     with the nonaffiliation or control persons; is that right?

8     A.    Correct.

9     Q.    Okay.  Can I please have page 34 of Government Exhibit

10    47 brought up, please.

11          And essentially this is the letter that you were

12    talking about just a second ago?

13    A.    Correct.

14    Q.    Okay.  And who's the letter made out to?

15    A.    Dear Sirs.

16    Q.    I'm sorry, the address.

17    A.    PacWest Transfer.

18    Q.    Do you know who PacWest Transfer is?

19    A.    I do not.

20    Q.    And do you see the title here?

21    A.    Complete Legal Solutions, Inc.

22    Q.    And do you know -- can you tell me what this "Re:" is?

23    A.    I'm sorry?

24    Q.    Can you tell me what it states in the "Re:" of the

25    letter.

Direct - Saia

1    A.    In the -- I'm sorry?

2    Q.    I'm sorry.  If you look on your screen right here.

3    A.    Oh, okay.

4    Q.    The "Re."

5    A.    "BBY stock to be registered to MicroCap Management,

6    LLC."

7    Q.    All right.  And can I have page 2 of this -- or, I'm

8    sorry, that would be page 35 of this exhibit.

9            And under B here, is that the paragraph -- I'm

10   sorry, C -- under C, is that the paragraph regarding the

11   nonaffiliation or control person status?

12   A.    Yes.

13   Q.    And at the bottom of this paragraph -- excuse me, at

14   the bottom of this page, who's signing the letter?

15   A.    Leslie Dinwoodie.

16   Q.    And now -- may I have a moment, Your Honor?

17            THE COURT:  You may.

18   BY MR. SIBERT:

19   Q.    And can I have page 34 of this exhibit.

20            And, ma'am, if you look on the screen, I'm circling

21   the paragraph to be blown up.  Starting with that sentence,

22   to the end, that's the sentence that is stating the holding

23   period has been met, these are free restrictions of these

24   shares?

25   A.    Yes.

1060

Direct - Saia

1    Q.   Okay.  And my understanding is this was -- based upon
2    this letter, this was to allow shares of Baby Bee Bright to
3    be transferred to MicroCap Management, the shareholder?
4    A.   Yes.
5    Q.   Okay.  And to free restrictions?
6    A.   Correct.
7    Q.   And the amount of shares is 4 million?
8    A.   Yes.
9    Q.   Okay.  Can you look at page 54 -- or, excuse me, page
10   45 to 46.  I'm sorry, page 54.  I was right the first time.
11        This is the attorney letter, again?
12   A.   Yes.
13   Q.   And can we have page 55.
14        And this letter, there's no signature to it; is
15   that correct?
16   A.   Correct.
17   Q.   Okay.  Can I have page 73 to 74.
18        Is this the same letter again?
19   A.   Yes.
20   Q.   And can I have page 74, down to the bottom.
21        Again, the letter is signed by Leslie Dinwoodie?
22   A.   Yes.
23   Q.   And then, finally, down to page 96 through 97.  Have
24   you had a chance to look at that?
25   A.   Yes.

Cross - Saia

1    Q.   Same letter again?

2    A.   Yes.

3    Q.   And second page --

4    A.   Yes.

5    Q.   -- so -- so 97, please, at the bottom.

6    A.   Yes.

7    Q.   Signed by Leslie Dinwoodie?

8    A.   Yes.

9    Q.   So this letter, for purposes of Oppenheimer, signed by

10   a Leslie Dinwoodie, was used to allow Oppenheimer to free

11   the shares of Baby Bee Bright Corporation from their shares

12   to allow MicroCap Management to have 4 million shares free

13   of restrictions?

14   A.   Correct.

15   Q.   If Oppenheimer didn't have this letter, would that --

16   would the restrictions on any of the shares from Baby Bee

17   Bright be lifted to be given to MicroCap Management?

18   A.   No.

19              MR. SIBERT:  I'll pass the witness.

20              THE COURT:  Cross-examination.

21              MR. BARNARD:  Thank you, Your Honor.

22                       CROSS-EXAMINATION

23   BY MR. BARNARD:

24   Q.   Ms. Saia, you just testified that this file includes

25   this -- these -- this attorney opinion letter fully on three

1    separate locations, and page 1 on a fourth location.

2    A.    Yes.

3    Q.    Why are there four different copies in this file?

4    A.    I'm not sure.

5    Q.    Now, you said that this file was one that you could

6    recognize as an Oppenheimer file that was kept in the

7    regular course of business.

8    A.    Correct.

9    Q.    But this was not an Oppenheimer file.  This was the

10   file that MicroCap supplied to Oppenheimer.

11   A.    Right, so that becomes Oppenheimer's files.

12   Q.    So when you said that -- excuse me, Oppenheimer, not

13   Ope-enheimer.

14         You said that the way that -- that you could tell,

15   and, in fact, what would show this was that -- to be an

16   Oppenheimer file, it would say account G51-1429990.  And

17   that's -- it says that on page 1, right?

18   A.    On page -- let me just go back.  Yes.

19   Q.    Page 1 of Exhibit 4 -- excuse me, 47.

20   A.    Correct.

21   Q.    And it says it on pages 2, 3, 4, 5, 6, 7, 8, 9, 10, 11,

22   through page 26 -- excuse me, 28, right?

23   A.    Correct.

24   Q.    Page 29, does it have that number on it?

25   A.    Page 29 is the certificate?

Cross - Saia

1    Q.   Right.  Is there the account number on that?

2    A.   Yes.

3    Q.   Where?

4    A.   In the middle, underneath --

5    Q.   Oh, okay.  And maybe I missed these.  Page 30, is there

6    that account number?

7    A.   No.

8    Q.   Page 31 has got the account number again, right?

9    A.   Yes.

10   Q.   Page 34 doesn't have the account number, does it?

11   A.   No.

12   Q.   Page 35 doesn't have the account number.

13   A.   No.

14   Q.   And those are the pages that had that letter,

15   correct -- correct?

16   A.   Correct.

17   Q.   Pages 37 through 44 don't have that account number.

18   A.   Right.  But it's part of the packet of page 31, and

19   that's the first page of the entire packet, which has the

20   account number on the top.  So on page 45 --

21   Q.   Slow down for a second.  So you say page 31 is what?

22   A.   So page 31 is the first page of this packet.  You go to

23   page 45, that would be the start of the second packet.  So

24   all the paperwork would be for that account number.

25   Q.   Well, how do we know that pages 32 through 44 are the

1    pages in that -- in that packet that you are calling packet

2    No. 1?

3    A.   Because those are the paperwork that's required by

4    Oppenheimer.  And this is the cover sheet that would have to

5    be checked off, and all the documentation to follow is

6    behind it.  And this paperwork would be sent up to the

7    executive services department to review the opinion letter.

8    Q.   Well, I understand that paperwork that arrives gets

9    sent up and gets reviewed, et cetera, but how -- from what

10   we're looking at here, how do we know pages 32 through 44 in

11   fact were those pages that were part of what you were

12   calling No. 1?

13   A.   Well, that's how we, you know, handle the paperwork.

14   This was the cover sheet and everything behind it would be

15   part of the packet.

16   Q.   And what I'm asking is:  How do we know these pages

17   behind it were the ones that were in the packet?

18   A.   Oppenheimer's the one who gave these documents to the

19   attorneys.

20   Q.   You -- excuse me.  You were asked that without this

21   letter -- the opinion letter that we've discussed and you've

22   looked at that was in the packet, you said that without this

23   letter, the -- Oppenheimer could not have issued or

24   permitted these shares to be transferred and to be issued in

25   the name of the recipient, right?

Cross - Saia

1    A.   Correct.

2    Q.   So it -- you are actually -- all you're really saying

3    is that without an opinion letter, it couldn't have been

4    done?

5    A.   Correct.

6    Q.   So it's the existence of a valid opinion letter that

7    would cover the appropriate factual -- requirements for the

8    exemption that you needed?

9    A.   Yeah, opinion letter is required to be reviewed for

10   clearance of the --

11   Q.   This opinion letter or some other opinion letter that

12   had also --

13   A.   Correct.

14             MR. BARNARD:  Your Honor, may I have a moment,

15   please?

16             THE COURT:  You may.

17             MR. BARNARD:  No further questions.  Thank you,

18   Your Honor.

19             THE COURT:  All right.  Redirect.

20             MR. SIBERT:  No redirect, Your Honor.

21             THE COURT:  May this witness be excused for the

22   Government?

23             MR. SIBERT:  Yes, Your Honor.

24             THE COURT:  For the defendant?

25             MR. BARNARD:  Yes, Your Honor.

                         Direct - Leslie Jean-Pierre

1        THE COURT:  Ms. Saia, thank you very much for your

2   testimony.  You're excused.  You may step down.

3        Government may call its next witness.

4        MR. BROWN:  Your Honor, the Government calls Leslie

5   Jean-Pierre.

6        COURTROOM DEPUTY:  Please stand behind the witness

7   stand and raise your right hand.

8      LESLIE JEAN-PIERRE, GOVERNMENT'S WITNESS, SWORN

9        COURTROOM DEPUTY:  Please be seated.  Scoot up your

10  chair a little bit to speak into the microphone.

11       THE WITNESS:  Okay.

12       COURTROOM DEPUTY:  Please state your full name and

13  spell it for the record.

14       THE WITNESS:  Leslie Jean-Pierre.  L-e-s-l-i-e.

15  J-e-a-n-P-i-e-r-r-e.

16                         DIRECT EXAMINATION

17  BY MR. BROWN:

18  Q.   Good afternoon, ma'am.

19  A.   Good afternoon.

20  Q.   Where do you live, ma'am?

21  A.   I live in El Paso, Texas.

22  Q.   And did you fly up here yesterday to testify?

23  A.   Yes.

24  Q.   What is your profession?

25  A.   I'm an attorney.

Direct - Leslie Jean-Pierre

1    Q.   How long have you been an attorney?

2    A.   Since 2006.

3    Q.   And where do you work right now?

4    A.   I work for the City of El Paso in the city attorney's

5    office.

6    Q.   And what do you do for them?

7    A.   I'm a transactional attorney.

8    Q.   How long have you worked for the city attorney's office

9    in El Paso?

10   A.   One year and five months.

11   Q.   Where did you work prior to that?

12   A.   I worked for the Texas Department of Public Safety.

13   Q.   How long did you work for them?

14   A.   A little over eight years.

15   Q.   Since you became a lawyer, can you just briefly -- very

16   briefly, describe your -- what jobs you've held before you

17   started with the Department of Public Safety in Texas.

18   A.   Before the Texas Department of Public Safety, I worked

19   in insurance defense for a firm in California.

20   Q.   Okay.  What states are you licensed to practice law

21   in?

22   A.   California and Texas.

23   Q.   I'd like to focus your attention on the years, say,

24   2009 to 2012.  Where were you practicing -- I'm not very

25   good at math, but where were you practicing then?

Direct - Leslie Jean-Pierre

1    A.   I was in El Paso with the Texas Department of Public

2    Safety.

3    Q.   Did you have -- have you ever had any experience in

4    securities law?

5    A.   No, I have not.

6    Q.   Have you ever had a different last name than you have

7    now?

8    A.   Yes.  It was Dinwoodie.  I was married.

9    Q.   Could you spell that for us, please.

10   A.   D-i-n-w-o-o-d-i-e.

11   Q.   And when did you have that name?

12   A.   From 2006 to September of 2010.

13   Q.   Are you related to the defendant, Guy Jean-Pierre?

14   A.   Yes, he's my uncle.

15   Q.   And is he the father of your mother or your father or

16   is he the brother of your mother?

17            THE COURT:  Whoa.

18            MR. BROWN:  Something like that.

19            THE COURT:  I know it's late, Friday afternoon, but

20   my gosh.  All right.  You want to restate that question?

21   BY MR. BROWN:

22   Q.   Is he the brother of your father?

23   A.   He's the brother of my father.

24   Q.   Thank you very much.  It would have been easier if I

25   asked you.

1069
Direct - Leslie Jean-Pierre

1          Where does your father live?

2    A.   My father lives in El Paso.

3    Q.   Is your father a lawyer, too?

4    A.   No, he's a physician.

5    Q.   Okay.  Have you ever practiced law with the defendant?

6    A.   No, I've not.

7    Q.   Have you ever had an occasion to discuss with him

8    helping him out in his practice?

9    A.   Yes, I have.

10   Q.   When was that?

11   A.   It was back in 2010.

12   Q.   Do you know approximately when in 2010?

13   A.   I believe it was the spring, maybe March, April.

14   Q.   Okay.  How did that come up?

15   A.   My father had recently visited my uncle in Florida

16   where he was residing.  And after his trip, my dad suggested

17   that I do some work for my uncle for additional income and

18   as a way to expand my legal career.

19   Q.   And did you have conversations with your uncle?

20   A.   Yes.  I called him to let him know that I was

21   interested in doing some work for him and he said that he

22   was really busy and could use some assistance.

23   Q.   Did he indicate what type of assistance you would

24   provide?

25   A.   Yes.  He indicated that I would help him write legal

Direct - Leslie Jean-Pierre

1   opinion letters for, I guess SEC -- I'm sorry, I'm not

2   familiar with the area, but for his practice.  So I informed

3   him that I had no knowledge of securities law and that he

4   said that he would help me -- walk me through it.  That I

5   would do research, attend client meetings, compile

6   information.  And -- yeah, I would start -- we would start

7   that way.

8   Q.   And was this in one conversation or multiple

9   conversations?

10  A.   That was in our first conversation.

11  Q.   And did you have further conversations about doing what

12  he suggested in the first conversation?

13  A.   Yes.  He informed me that he is -- his practice was

14  really busy and that he needed to divide his practice by

15  forming a corporation and that he needed me -- my assistance

16  in forming that corporation.

17          And so he asked for a copy of my driver's license

18  and three copies of my signature.

19  Q.   Did you -- how were you supposed to provide that to

20  him.

21  A.   I faxed him copies of both.

22  Q.   Just a photocopy of your driver's license?

23  A.   Yes.

24  Q.   The Texas driver's license, I assume?

25  A.   Yes.

1071
Direct - Leslie Jean-Pierre

1    Q.   And you said three signatures?

2    A.   Three copies of my signature.

3    Q.   How did you do that?  Did you --

4    A.   I photo -- I faxed it to him.  I photocopied my

5    driver's license and I wrote my signature down three times

6    on a sheet of paper and I faxed it over to his office.

7    Q.   Did he tell you why he needed those documents?

8    A.   He said that he needed those documents to establish the

9    corporation, and also that it would make it easier when we

10   were preparing documents -- legal documents rather than

11   sending the documents back and forth for signature, he would

12   just -- once we completed the documents, he would affix my

13   signature to the documents.

14   Q.   Okay.  Did he also ask you for information about

15   your -- whether you had a business address or an address

16   where you receive mail in El Paso?

17   A.   Yes.

18   Q.   Did you give him one?

19   A.   Yes.

20   Q.   What address did you use?  Where you were living or a

21   different address?

22   A.   It was a P.O. Box at a UPS store.  It was 300 North

23   Mesa, Suite A-2, Box 136, El Paso, Texas.

24   Q.   Maybe could you maybe move the microphone a little bit

25   closer to you, or maybe you -- I guess the mic doesn't move,

Direct - Leslie Jean-Pierre

1    so . . .

2    A.   All right.  Okay.  Is that good?

3    Q.   Could you give us the address again, please.

4    A.   3800 North Mesa, Suite A-2, Box 136, El Paso, Texas

5    99002.

6    Q.   Did you fax that information to him, too, or did you

7    just --

8    A.   I don't recall.

9    Q.   Okay.  Is that a business of yours or what is that post

10   office box?

11   A.   It was a post office box that I shared with my father.

12   Q.   Because of the Suite A-2, Box 136, is that like a -- is

13   that an official post office or is it a different type of

14   establishment?

15   A.   It's a strip mall, so that's the suite of the UPS

16   store.

17   Q.   Did you ever -- were you ever informed by the defendant

18   that this corporation had been formed?

19   A.   Yes.  He sent me copies of the articles of

20   incorporation.

21   Q.   And how many times did you do legal work for him?

22   A.   Zero.

23   Q.   Did you ever go to Florida to check out this legal

24   corporation that you became a part of?

25   A.   No.

Direct - Leslie Jean-Pierre

1    Q.   Did you ever review opinion letters?

2    A.   No.

3    Q.   Did he ask you to do any legal research?

4    A.   No.

5    Q.   Did you ever attend a meeting?

6    A.   No.

7    Q.   Okay.  And this was back in 2000 --

8    A.   '10.

9    Q.   Did you ever call him and say, "Hey, where's all the

10   work," or --

11   A.   No.

12   Q.   You were fully employed at the time, correct?

13   A.   Yes.  And I wasn't really interested.

14   Q.   Did the topic -- what was the name of the company?

15   A.   Complete Legal Solutions.

16   Q.   Did the topic of Complete Legal Solutions come to your

17   attention in early May of 2011?

18   A.   Yes, it did.

19   Q.   How did that come up?

20   A.   I received a grievance complaint from the Texas Bar.

21   Q.   And what was the subject of that complaint?

22   A.   The subject of the complaint was that a woman by the

23   name of Mrs. Hamilton had filed a complaint against me

24   saying that I had violated various SEC violations.

25   Q.   And did you receive some information from the Texas Bar

Direct - Leslie Jean-Pierre

1  with more details?

2  A.   Yes.  I received a packet that Ms. Hamilton had

3  submitted to the Texas Bar with several legal opinion

4  letters with my signature on them, and then some other

5  various documents with regards to -- I think it was called

6  Pink Sheets.

7  Q.   Pink Sheets?

8  A.   Yeah.  Pink Sheets.  And OTC or something like that.

9  Q.   Did they show you any documents that had your signature

10  on them?

11  A.   Yes.  Legal opinion letters with my signature on them.

12  Q.   Did it appear to be your signature?

13  A.   Yes.

14  Q.   Did you sign the document?

15  A.   No.

16  Q.   And what did you respond to the Texas Bar?

17  A.   I responded back to the bar that I had no knowledge of

18  these letters, nor did I -- nor did I give anyone authority

19  to affix my signature to those letters.

20  Q.   Did you have to -- were you able to handle this without

21  legal representation yourself?

22  A.   Yes.

23  Q.   And did you get a similar complaint filed -- you

24  indicated you were licensed in California.  Did -- were you

25  also given --

Direct - Leslie Jean-Pierre

1    A.    Yes.  I received --

2    Q.    -- a complaint in California?

3    A.    Sorry.  Yes, I received a grievance complaint from the

4    California Bar as well.

5    Q.    Did you submit an explanation of how this could have

6    occurred?

7    A.    I submitted the same explanation that I submitted to

8    the Texas Bar.

9    Q.    What was the result of your explanation to both the

10   Texas and California Bar?

11   A.    Both were dismissed.

12   Q.    Okay.  I'm going to ask you to -- well, before I ask

13   you to look at the documents -- after the complaints were

14   dismissed against you by the bar associations -- or by the

15   Texas Bar and the California Bar, was that the end of your

16   being questioned about this?

17   A.    No, it was not.

18   Q.    When was the next time?

19   A.    I was contacted by the SEC, I'm not exactly sure when.

20   Q.    It was some months or -- some months later or some

21   years later?

22   A.    Probably -- some months later.

23   Q.    Okay.  And did you -- did they contact you and

24   basically inquire about the same subject?

25   A.    Yes, they did.

Direct - Leslie Jean-Pierre

1    Q.   And did you have to subject yourself to an interview by

2    them?

3    A.   Yes, I was -- I -- I was subjected to a deposition.

4    Q.   Okay.  And this deposition, you had to swear to tell

5    the truth?

6    A.   Yes.

7    Q.   Was that in New York or was this in -- did they come to

8    your location?

9    A.   We did it by video conference in El Paso, federal

10   building.

11   Q.   Did you hire a lawyer to help you with that?

12   A.   Yes.

13   Q.   Why did you hire a lawyer if you -- were you concerned?

14   A.   Yes.

15   Q.   Were you advised what -- that you could be the subject

16   of discipline by the SEC?

17   A.   Yes.

18   Q.   But you had never practiced securities law in your

19   life, correct?

20   A.   Correct.

21   Q.   Okay.  Did you have to -- were you contacted by another

22   agency in New York --

23          MR. BARNARD:  Your Honor, I object to this line of

24   questioning and ask that we be able to approach the bench.

25          THE COURT:  First of all, we're not going to go

Direct - Leslie Jean-Pierre

1    into anything we discussed at sidebars.  Is that correct?

2              MR. BROWN:  No, not with this witness, Your Honor.

3              THE COURT:  All right.  Do you still need a

4    sidebar?

5              MR. BARNARD:  I'm sorry, I -- yes, I do.

6              THE COURT:  Okay.

7         (Discussion at sidebar)

8              MR. BROWN:  Your Honor -- go ahead.

9              MR. GOODREID:  And, Your Honor, maybe I'm just

10   misunderstanding what -- where Mr. Brown is going, but from

11   what we had talked about before, I thought he was now going

12   to go into the investigation and being called to testify in

13   matters in a New York criminal case.  And if that's not what

14   we're talking about, then that's fine, but that's what I

15   thought this was going to.

16             MR. BROWN:  Your Honor, I'm not going to go this

17   deep, but this witness testified before a grand jury in New

18   York City to -- the state district attorney's office in

19   Manhattan.  The defendant was indicted and pled guilty to

20   the misdemeanor that we filed the 404(b) on.

21             I'm not going to ask her if she testified in front

22   of a grand jury, I'm going to ask if she gave information to

23   the authorities in New York about this particular issue.

24             THE COURT:  Go ahead.

25             MR. BARNARD:  I think that's getting right in --

Direct - Leslie Jean-Pierre

1    exactly into the whole issue of the New York prosecution and

2    eventual conviction.  I don't think that it is relevant to

3    any of the matters that are before the Court on this case.

4            The one document that has already been discussed,

5    the opinion letter in '84, is, I believe, a separate issue.

6    I think that any talking about going in front of a grand

7    jury to testify about matters would be more prejudicial and

8    would be probative.

9            THE COURT:  All right.  I thought that the

10   Government was withdrawing its intent to inquire into these

11   matters and that's why we didn't discuss them in the

12   arguments around the -- what I'll call the 404(b) issues and

13   what I issued my oral ruling on and gave you a copy of.  And

14   it was because it was represented to me by the Government

15   that the first of those three topics that had -- originally

16   had been raised on this issue were not going to be gone

17   into.

18           And I agree, Mr. Barnard, that that's exactly what

19   it sounds like you're trying to do.  So I'm going to --

20           MR. BROWN:  Yeah --

21           THE COURT:  Hold on.  I'm going to sustain the

22   objection because I don't want to risk going into matters

23   that could be very highly prejudicial.  I'm going to grant

24   the -- sustain the objection and allow you to make an offer

25   of proof.

1     MR. BROWN:  Your Honor, my only comment on that is

2     my -- I could be wrong because I'm obviously second chair

3     here, but it was my impression that the Court's 404(b)

4     ruling was on the two issues of the bar --

5     THE COURT:  Right, but that's the point.  I only --

6     I only addressed those and analyzed those and made a ruling

7     on them because there were originally three issues.  The

8     New York conviction was the first.  And it was represented

9     to me that the Government was abandoning -- or was not going

10    to examine on the first issue.  And that's why my ruling was

11    limited to the SEC complaint and the Florida Bar

12    disciplinary action.

13    MR. BROWN:  Okay.

14    THE COURT:  So I'll give you one last opportunity.

15    Do you want to make an offer of proof?

16    MR. BROWN:  On the 404(b) issue?

17    THE COURT:  On this -- on the issue that I'm

18    precluding you from going into, the New York investigation

19    and conviction.

20    MR. BROWN:  Well, I mean, it's our impression

21    that -- well, okay.  I mean, I would submit that the -- what

22    has occurred here is obviously clear that the defendant

23    forged her signature on a number of documents --

24    THE COURT:  Right, but you don't need to go into

25    the New York complaint to establish that.

Direct - Leslie Jean-Pierre

1    MR. BROWN:  That's what he was actually convicted

2    of, I believe, is forgery.

3    THE COURT:  But that was -- that's --

4    MR. BROWN:  I'm not going to ask --

5    THE COURT:  You don't need to make your case based

6    upon another jurisdiction's conviction.  You're making --

7    you're trying your own case and putting on your own

8    prosecution.  And I think you have plenty of evidence to use

9    other than the New York investigation and conviction.  So

10   I've made my ruling, I'm not --

11   MR. BROWN:  Okay.

12   THE COURT:  Do you want to make an offer of proof

13   or not?

14   MR. BROWN:  No.

15   THE COURT:  Okay.

16      (End of discussion at sidebar)

17   THE COURT:  Ms. Frank.  The objection's sustained.

18   How much longer do you have, Mr. Brown?  Are we

19   going to be able to allow the witness to go home today?  I

20   have to stick around here --

21   MR. BROWN:  I'm willing to stay as long as you're

22   willing to stay.

23   THE COURT:  Well, my question is, how much longer

24   do you have?

25   MR. BROWN:  Maybe 15 minutes, maybe.

Direct - Leslie Jean-Pierre

1    THE COURT:  And how much are we going to have on
2    cross-examination?
3    MR. BARNARD:  Very short.
4    THE COURT:  All right.  This is what I'm going to
5    do.  I'm going to let you go until 5:15 on your examination
6    and I'm going to give five minutes to the defendant for
7    cross-examination.  And then will that be sufficient?
8    MR. BARNARD:  Yes, Your Honor.
9    THE COURT:  All right.  And then one minute of
10   redirect.  And then we'll go home.
11   All right.  Go ahead, Mr. Brown.
12   MR. BROWN:  Okay.
13   BY MR. BROWN:
14   Q.   Could we have -- could you take a look at Government
15   Exhibit 11, which has already been admitted.  Actually, we
16   may have to show it on the screen.  If we could enlarge the
17   sort of whiter portion in the middle.
18   Ms. Jean-Pierre, can you read that?  Is that big
19   enough?
20   A.   Yes.  Thank you.
21   Q.   With regard to the list of companies on the left side
22   of that portion of the exhibit, have you ever heard of any
23   of those companies?
24   A.   No.
25   Q.   Okay.  Thank you.  You can take that down.

Direct - Leslie Jean-Pierre

1      Will you take a look at -- it might be best to take

2   volume -- binder 1, I believe -- or maybe -- binder 2.

3      Take a look at Government Exhibit 47.

4   A.   Okay.

5   Q.   Could you take a -- turn to -- there's a page numbering

6   system in the middle of that document at the bottom of the

7   first page, it says OPCO and underneath that is a 1.

8   A.   Okay.

9   Q.   Could you go to page 34 of that document -- or of that

10  exhibit.  I'm sorry.

11  A.   I'm there.

12  Q.   Okay.  Could you -- maybe if we could just maybe even

13  expand the upper right portion of that where it says

14  "Complete Legal Solutions, Inc.," and show it on the big

15  screen.

16     Your address in El Paso, Texas, I believe you

17  indicated was 3800 North Mesa, A-2, No. 136; is that right?

18  A.   Correct.

19  Q.   And the address here is 3800 North Main, Suite A.

20  You've lived in El Paso a long time.  Is there a 3800 North

21  Main Street in El Paso?

22  A.   There is a Main Street, I don't know the numbers.

23  Q.   Does it go east or west or north and south?

24  A.   I don't know.

25  Q.   Okay.  But, anyway, you did not reside at 3800 North

Direct - Leslie Jean-Pierre

1    Main Street?

2    A.    No.

3    Q.    If mail was sent to 3800 North Main Street, would you

4    receive it?

5    A.    No.

6    Q.    But is that your -- other than the "Main Street," is

7    that your address -- or the P.O. Box that you gave?

8    A.    Yes.

9    Q.    Are either of those telephone numbers any phone numbers

10   you have been associated with?

11   A.    No.

12   Q.    Do you know the area codes for either one of those two

13   numbers, 561 or 917?

14   A.    I'm sorry, can you repeat the question?

15   Q.    Do you know, is -- are you familiar with the area codes

16   listed on the --

17   A.    Yes.

18   Q.    -- phone numbers?

19   A.    561 is Florida.

20   Q.    Is either one of these area codes western Texas?

21   A.    No, it's not an El Paso area code.

22   Q.    Could you take a look at the e-mail address.  Obviously

23   your first name is Leslie.  Have you ever had that e-mail

24   address?

25   A.    No.

Direct - Leslie Jean-Pierre

1    Q.   Okay.  We can take the expansion down anyway.

2         Could you go to the first page of that document --

3    or page -- page 34.  Can you bring that back up.

4         In terms of Exhibit 47, could you look at page 34

5    again.

6    A.   Okay.

7    Q.   Have you ever heard of BBYB as a stock symbol?

8    A.   No.

9    Q.   Have you ever heard of MicroCap Management?

10   A.   No.

11   Q.   Have you ever heard of PacWest Transfer?

12   A.   No.

13   Q.   Could you look at the second page of that document and

14   look at the signature block.  Is that your signature or does

15   it -- I know this is a copy.

16   A.   Yes, that was my own signature.

17   Q.   Okay.  Is that similar to the signature that you faxed

18   to your uncle?

19   A.   Yes.

20   Q.   And is that the correct spelling of your name?

21   A.   Yes.

22   Q.   There are -- previous testimony there are other copies

23   of those two pages in this Exhibit 47, but given time

24   constraints I won't go into those.  Did you sign that

25   letter?

Direct - Leslie Jean-Pierre

1    A.    No.

2    Q.    Did you ever authorize your uncle or anyone else to use

3    your signature on that letter?

4    A.    No.

5    Q.    Did you ever authorize your uncle to use your signature

6    on the corporate formation documents on anything?

7    A.    No.

8    Q.    And your uncle -- where does your uncle live, as far as

9    you know?

10   A.    At this time?

11   Q.    What state is he living in?

12   A.    Florida.

13   Q.    Okay.  Did you ever -- was that his area code that you

14   remember?  I know it was a long time ago.

15   A.    The 561?

16   Q.    Yeah.

17   A.    I don't know.

18   Q.    Okay.  Could you take a look at Government Exhibit

19   52 -- actually, before we -- yeah, go to that exhibit.

20          MR. BROWN:  This document has not been admitted,

21   Your Honor.

22          THE COURT:  All right.

23          THE WITNESS:  I'm there.

24   BY MR. BROWN:

25   Q.    That's a -- about a 73-page document.  I don't want you

Direct - Leslie Jean-Pierre

1    to describe what's -- the contents of -- the specific

2    contents, but do you know what those are?

3    A.   By their title, attorney letter agreements.

4             MR. BROWN:  Okay.  Is this -- with regard to that

5    document, Your Honor, based upon the admission of Government

6    Exhibit 25, and the signature pages contained on 52, I would

7    move for the admission of Government Exhibit 52.

8             THE COURT:  Is there an objection?

9             MR. BARNARD:  Your Honor, I do object to this

10   document.  The --

11            THE COURT:  Well, what's your objection?

12            MR. BARNARD:  I understand.  It's -- first of all,

13   it's a 72-page document, and there has been no foundation

14   laid for the admission of this document.  It's simply

15   hearsay at this point.

16            MR. BROWN:  Your Honor --

17            THE COURT:  Well, hold on.  I don't -- I mean, I

18   want to accommodate Ms. Jean-Pierre, but, you know, I also

19   can't preclude the Government from putting on the evidence

20   it needs to put on.  So if we had more time, we would be

21   able to put -- to lay a foundation for the admission of

22   this --

23            MR. BROWN:  Your Honor, the -- to answer your

24   question, the only foundation I'm going to lay is what I've

25   laid.  I believe the -- if you look at Government Exhibit

Direct - Leslie Jean-Pierre

1   25, which was admitted and is already an exhibit -- which I

2   also asked the Court to consider for the foundation -- you

3   can see what this is without broadcasting it out here.

4          If you look at the second page of that document and

5   the second page of all the documents, you can tell how they

6   would be relevant.

7          THE COURT:  But I'm not understanding how you use

8   one exhibit to use as a grounds for the admission of another

9   exhibit.  That's --

10          MR. BROWN:  Your Honor, Government Exhibit 25 has

11   been testified to be a -- the form that's used for attorney

12   letter agreements and the Pink Sheets.

13          THE COURT:  All right.

14          MR. BROWN:  And that's exactly what this is.

15          THE COURT:  Ms. Jean-Pierre, I'm sorry, but you're

16   going to have to come back on Tuesday.  I am just -- I'm not

17   comfortable cutting off the discussion or the examination in

18   this way.  So we'll just have to call it a day, call it a

19   week.  And, ma'am, you'll have to return here by 8:45 on

20   Tuesday.

21          THE WITNESS:  Okay, Judge.

22          THE COURT:  All right.  All right, folks, you just

23   heard me say, we're going to call it a week.  The happy news

24   is that Monday is a -- everybody can sit down.  The happy

25   news is that Monday is a federal holiday, so you can relax.

Direct - Leslie Jean-Pierre

1    And please don't let the additional time be further

2    temptation to jump on Google and look at any of this stuff.

3    So please, again, don't do any independent research into or

4    discuss with anyone the facts, the law, or the persons

5    involved in this lawsuit.

6            Please be back to the jury deliberation room by

7    8:40 on Tuesday.  We will be in recess until 8:45 Tuesday

8    morning.

9        (Jury left the courtroom at 5:16 p.m.)

10           THE COURT:  Ms. Jean-Pierre, because you're in the

11   middle of your testimony, I direct you not to speak with any

12   of the lawyers involved in this case while the Court is in

13   recess.

14           THE WITNESS:  Yes, Your Honor.

15           THE COURT:  All right.

16           MR. SIBERT:  Your Honor, before the Court goes, is

17   it okay to speak to this witness just about travel

18   arrangements?

19           THE COURT:  I would prefer if you do that, you do

20   that in the presence of defense counsel so we all know that

21   you're not getting into substantive matters.

22           MR. SIBERT:  Okay.  Thank you, Your Honor.

23           THE COURT:  All right.

24       (Proceedings concluded at 5:17 p.m.)

25

Direct - Leslie Jean-Pierre

1

2

3

4

5                                **INDEX**

6   Item                                                    PAGE

7                       GOVERNMENT'S WITNESSES

8   **KELLY BLUME**
    Direct Examination by Mr. Brown                         841
9   Cross-examination by Mr. Goodreid                       869
    Redirect Examination by Mr. Brown                       872
10
    **LIZ HEESE**
11  Direct Examination by Mr. Sibert                        874
    Cross-examination by Mr. Barnard                        955
12
    **JOSLYN CLAIBORNE**
13  Direct Examination by Mr. Sibert                        960
    Cross-examination by Mr. Barnard                        997
14
    **JOANNA DiBELLA**
15  Direct Examination by Mr. Sibert                        1000
    Cross-examination by Mr. Barnard                        1045
16
    **KATHLEEN SAIA**
17  Direct Examination by Mr. Sibert                        1049
    Cross-examination by Mr. Barnard                        1061
18
    **LESLIE JEAN-PIERRE**
19  Direct Examination by Mr. Brown                         1066

20

21                     GOVERNMENT'S EXHIBITS

22  EXHIBITS:        Offered    Received   Refused   Stipulated

23  8                902        903

24  9                924        924

25                     GOVERNMENT'S EXHIBITS

Direct - Leslie Jean-Pierre

| | EXHIBITS: | Offered | Received | Refused | Stipulated |
|---|---|---|---|---|---|
| 1 | | | | | |
| 2 | 10 | 943 | 943 | | |
| 3 | 11 | 947 | 947 | | |
| 4 | 12 | 920 | 921 | | |
| 5 | 13 | 920 | 921 | | |
| 6 | 14 | 920 | 921 | | |
| 7 | 15 | 920 | 921 | | |
| 8 | 17 | 921 | 921 | | |
| 9 | 18 | 921 | 921 | | |
| 10 | 19B | 919 | 920 | | |
| 11 | 19C | 919 | 920 | | |
| 12 | 20 | 921 | 921 | | |
| 13 | 21 | 921 | 921 | | |
| 14 | 22 | 921 | 921 | | |
| 15 | 23 | 921 | 921 | | |
| 16 | 24 | 921 | 921 | | |
| 17 | 25 | 921 | 921 | | |
| 18 | 26 | 921 | 921 | | |
| 19 | 27 | 921 | 921 | | |
| 20 | 28 | 921 | 921 | | |
| 21 | 29 | 921 | 921 | | |
| 22 | 30 | 921 | 921 | | |
| 23 | 31 | 921 | 921 | | |
| 24 | 41 | 859 | 859 | | |
| 25 | | | | | |

GOVERNMENT'S EXHIBITS

Case 1:17-cr-00008-WJM   Document 286   Filed 03/27/20   USDC Colorado   Page 256 of 257

Direct - Leslie Jean-Pierre

| | EXHIBITS: | Offered | Received | Refused | Stipulated |
|---|---|---|---|---|---|
| 2 | 47 | 1054 | 1055 | | |
| 3 | 52 | 1086 | | | |
| 4 | 53 | 892 | 892 | | |
| 5 | 54 | 907 | 907 | | |
| 6 | 55 | 907 | 907 | | |
| 7 | 56 | 907 | 907 | | |
| 8 | 57 | 907 | 907 | | |
| 9 | 60 | 1013 | 1015 | | |
| 10 | 62 | 1013 | 1015 | | |
| 11 | 65 | 1014 | 1015 | | |
| 12 | 66 | 1014 | 1015 | | |
| 13 | 67 | 1014 | 1015 | | |
| 14 | 71 | 1014 | 1015 | | |
| 15 | 72 | 965 | 965 | | |
| 16 | 73 | 965 | 965 | | |
| 17 | 76 | 965 | 965 | | |
| 18 | 77 | 965 | 965 | | |
| 19 | 78 | 965 | 965 | | |
| 20 | 79 | 965 | 965 | | |
| 21 | 80 | 965 | 965 | | |
| 22 | 81 | 965 | 965 | | |
| 23 | 84 | 965 | 965 | | |
| 24 | 90 | 995 | 995 | | |
| 25 | | | GOVERNMENT'S EXHIBITS | | |

Direct - Leslie Jean-Pierre

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|-----------|---------|----------|---------|------------|
| 114 | 965 | 965 | | |
| 116 | 965 | 965 | | |
| 117 | 965 | 965 | | |

*     *     *     *     *

REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Dated at Denver, Colorado, this 25th day of March, 2020.

_____

MARY J. GEORGE, FCRR, CRR, RMR