IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 17-cr-0008-WJM

UNITED STATES OF AMERICA,

Plaintiff,

vs.

GUY JEAN-PIERRE a/k/a Marcelo Dominguez de Guerra,

Defendant.

------------------------------------------------------------

REPORTER'S TRANSCRIPT
(Jury Trial, Day 6)
Volume VI

------------------------------------------------------------

Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

Judge, United States District Court for the District of

Colorado, commencing at 8:49 a.m., on the 22d day of

January, 2019, in Courtroom A801, United States Courthouse,

Denver, Colorado.

APPEARANCES

    JEREMY S. SIBERT and ROBERT M. BROWN, Assistant U.S.
Attorneys, 1801 California Street, Suite 1600, Denver,
Colorado 80202, appearing for the plaintiff.

    CLIFFORD J. BARNARD, Attorney at Law, 4450 Arapahoe
Avenue, Suite 100, Boulder, Colorado 80303, AND
    THOMAS E. GOODREID, Attorney at Law, 1801 Broadway,
Suite 1400, Denver, Colorado 80202, appearing for the
defendant.

MARY J. GEORGE, FCRR, CRR, RMR
901 19th Street, Denver, Colorado 80294
Proceedings Reported by Mechanical Stenography
Transcription Produced via Computer

1    P R O C E E D I N G S

2    (Proceedings were held in open court outside the

3    presence of the jury at 8:49 a.m.)

4    THE COURT:  All right.  I understand counsel wanted

5    to raise something with me before we brought in the jury.

6    MR. BARNARD:  Yes, Your Honor.  Thank you.

7    THE COURT:  Yes, Mr. Barnard.

8    MR. BARNARD:  In particular, when we adjourned on

9    Friday, we were discussing the admissibility of Exhibit 52.

10    THE COURT:  52, uhm-hum.

11    MR. BARNARD:  And at that point, I had made

12    objections to it by lack of foundation and we started that

13    discussion, but ran out of time.

14    THE COURT:  Yeah.

15    MR. BARNARD:  There is an additional objection to

16    it, which is that I believe that it is 404(b) evidence of

17    other bad acts and, as such, it is both cumulative because

18    it refers to a number of other letters that are not

19    intrinsic or a part of this case, but other letters that Mr.

20    Jean-Pierre is alleged to have forged the signature of the

21    witness, Ms. Jean-Pierre, on these letters.  But -- and

22    those were some of the subject matters of the New York

23    prosecution.

24    So that the -- first of all, they're not part of

25    this case.  The one letter that was admitted that was used

1    for the transforming Baby Bee Bright -- Bee Bright into

2    FusionPharm has been admitted and that would be intrinsic to

3    this case, but the rest of these letters are not.

4           THE COURT:  You're saying all of the letters in

5    52 -- I'll get Government's position in a moment -- but all

6    the letters in 52, attorney letter agreements, are

7    referencing transactions that had -- that are not charged

8    conduct?

9           MR. BARNARD:  Correct.  And relate to other

10   corporations, not any of the corporations that are involved

11   with FusionPharm.

12          THE COURT:  Okay.

13          MR. BARNARD:  And as an -- as an additional, not

14   404(b) evidence -- or 404(b) objection, the Exhibit 52 is 72

15   pages long and, as I can best see from it, it actually has

16   12 letters, but each of the 12 letters seem to be in there

17   three times, so that as an exhibit -- even if admissible, I

18   would object to that with multiple copies --

19          THE COURT:  So you've gone through, each letter

20   appears three times?

21          MR. BARNARD:  I --

22          THE COURT:  Each letter agreement?

23          MR. BARNARD:  Let me put it this way:  I know that

24   there are only 12 different letters in there that I can

25   discern.

1          THE COURT:  Okay.

2          MR. BARNARD:  And there are either two, three, or

3    four duplicates of those.  I'm not sure they're all three of

4    each.

5          THE COURT:  Okay.  All right.  What about Mr.

6    Brown's point Friday afternoon that we've already let in --

7    I can't recall if you didn't object or you objected and I

8    overruled, or whether you stipulated to 53?

9          MR. BROWN:  Your Honor, I believe 53 was stipulated

10   to, but I don't want to speak for the defense.

11         MR. BARNARD:  Okay.  53, as I understand it -- 53

12   is simply a form attorney -- attorney letter agreement --

13   excuse me, 5 -- yeah, 53, I believe, is just a form.

14         THE COURT:  Yeah.  It's the letter agreement.

15         MR. BARNARD:  It's just a form.

16         THE COURT:  Okay.

17         MR. BARNARD:  And, I'm sorry, so what's the

18   Court --

19         THE COURT:  So what's your response to the

20   Government's position that in terms of the content of these

21   letters -- albeit obviously without the forged signature,

22   that the content of these letters's already into evidence

23   per your stipulation?

24         MR. BARNARD:  53 has nothing to do with these

25   letters.  It's merely a form letter.  It doesn't relate to

1    the specific letters that are set forth in 52, which then

2    are filled in and have these other companies that are not a

3    part of the -- of this case.

4                THE COURT:  All right.  Okay.  Let me first ask Mr.

5    Brown:  Were you planning on asking more questions to lay

6    further foundation with Ms. Jean-Pierre this morning or are

7    you prepared to conclude your arguments on 52 and ask a

8    ruling from me?

9                MR. BROWN:  Your Honor, with regard to the

10   foundation, I was planning on asking a few more questions.

11   I think because I was trying to get her on and off --

12               THE COURT:  Right, I understand.

13               MR. BROWN:  -- it was my mistake --

14               THE COURT:  That's why I decided in the end not to

15   press the situation because, like I said, I think the

16   Government has the right to put on its case.  And I'm just

17   asking you if you have more foundational questions, then I

18   obviously can't rule right now because you have more

19   foundation to lay and you will make further arguments, but

20   maybe to make any sidebar after that briefer, if we have a

21   sidebar on this, can you respond to the arguments that Mr.

22   Barnard raised this morning so we don't have to reargue

23   those once you're done with your foundation.

24               MR. BROWN:  Your Honor, I'm sorry, did -- on the

25   foundation or the 404(b)?

1          THE COURT:  Can you respond to Mr. Barnard's
2     objections this morning he's just articulated so when you're
3     done with your foundation questions of Ms. Jean-Pierre, we
4     don't have to reargue those.
5          MR. BROWN:  Okay.  With regard to the foundation,
6     Your Honor, I don't know what the answer's going to be
7     because I haven't talked to her over the weekend, obviously,
8     but the Government will ask her about -- to -- as she's
9     already testified rather quickly, and I'm not going to start
10    with Exhibit 52, I'm going to go back aways.
11         THE COURT:  All right.
12         MR. BROWN:  So what she has testified to in -- I
13    won't -- I know that there's four instances in Exhibit 47
14    where Ms. Dinwoodie's signature was forged according to
15    her -- or, actually, three instances.  One letter didn't
16    have a signature page.
17         THE COURT:  Is 47 in?
18         MR. BROWN:  47 is admitted.  If you want to look at
19    page 54 of Exhibit 47, is one example of her signature.  53
20    is the other letter.
21         THE COURT:  What page?
22         MR. BROWN:  Page 54 of Exhibit 47.  That's what's
23    generally been referred to as an opinion letter.
24         THE COURT:  How -- there are literally four
25    different paginations running through that exhibit.

1            MR. BROWN:  At the -- the one in the very center,
2     Your Honor.
3            THE COURT:  OPCO?
4            MR. BROWN:  Yeah.  It says . . .
5            THE COURT:  There's no signature on 54, at least --
6     page 54 of Exhibit 47?
7            MR. BROWN:  I believe so.  Let me . . .
8            I may have it wrong.
9            Why don't we go to 74, Your Honor --
10           THE COURT:  74.  Okay.
11           MR. BROWN:  Some of the others -- if you look at
12    there's also a signature on page 35 and one on page 97.
13           THE COURT:  All right.  Well, doesn't that bolster
14    Mr. Barnard's argument that that makes Exhibit 52 not only
15    404(b) evidence of other bad acts, but also cumulative,
16    because you already have into evidence examples of an
17    alleged forged signature on letters respecting transactions
18    that are charged conduct?
19           MR. BROWN:  Well, I -- if I -- my argument on the
20    404(b) is that if you look at the -- this sort of combines
21    the foundation.  If you look at the -- those exhibits I just
22    referenced -- or the pages of Exhibit 47 I just
23    referenced --
24           THE COURT:  Right.
25           MR. BROWN:  -- are opinions letters.  Ms. Heese

1  testified that in order for the OTC to accept the opinion

2  letters, the attorney has to have accepted -- or at least

3  submit an attorney letter agreement.  And we have an example

4  of the blank, as Mr. Barnard referred to Exhibit 53 as a

5  blank --

6        THE COURT:  The template, right.

7        MR. BROWN:  -- template.

8        And if you look at Exhibit 8, that's a whole bunch

9  of pages of attorney letter agreements signed by the

10  defendant for his ability to -- at least prior to his ban,

11  to submit attorney letter agreements and then the opinion

12  letters to the OTC.  Those exhibits are already in.  And --

13        THE COURT:  Okay.

14        MR. BROWN:  If I could finish.  So Exhibit 52 is

15  just for the purposes of the -- Mr. Barnard's correct, when

16  we got these documents there was three-pages of basically

17  the same thing.  They're not necessarily in order, but there

18  are -- my belief, based on the testimony of Ms. Heese is

19  that these attorney letter agreements were submitted, we

20  allege, by the defendant.  They were sent back to OTC

21  because he was on the suspect list, as exhibited by

22  Government Exhibit 11.  That's the one no one can read --

23        THE COURT:  Right.  The microscopic font, yeah.

24        MR. BROWN:  That's a good reference point.  He's on

25  the banned list.

1    THE COURT:  Right.

2    MR. BROWN:  And, therefore, these exhibits in 52

3    were not accepted by the OTC, therefore, the apparently

4    three triplicate copies were kept in the records.  They were

5    not sent back to the defendant -- to the defendant, or

6    Corporate Legal Solutions.

7    And if you look at the signature pages on 52, if --

8    if the issue of -- if the issue of duplication is important,

9    the Government has copies of Exhibit 52 which it can replace

10   that are just one copy of each letter.

11   But with regard to the 404(b), it's not -- it's

12   intrinsic to this -- he's banned in --

13   THE COURT:  But how is that, if these are allegedly

14   forged signatures on letter agreements with respect to

15   transactions that are not charged conduct?

16   MR. BROWN:  Well, it's part of the scheme, Your

17   Honor.  What he's doing here is he's banned in the -- in

18   May -- or I forget, March or April of 2011, where OTC says,

19   "You can't submit opinion letters anymore."

20   He calls his niece and he says, "I want to form a

21   corporation here and you can be my assistant, send me your

22   signatures and send me your driver's license."

23   We don't know necessarily if he formed a

24   corporation or not, but she sends that away and a year later

25   she's called before the Texas Bar for signing what's in

1  |  Government Exhibit 47, or similar documents.  I don't think
2  |  the ones exactly in 47 were the subject of the complaint,
3  |  but ones just like it --
4  |          THE COURT:  Okay.
5  |          MR. BROWN:  -- were.
6  |          And so she finds that out.  And the testimony of
7  |  Ms. Heese is in order for Corporate Legal Solutions and
8  |  Leslie Dinwoodie to sign an attorney opinion letter, she has
9  |  to have a attorney letter agreement on file.  And that's
10 |  what Exhibit 52 is, is copies of various companies -- and if
11 |  you look at the signature block, it's exactly the same.  I
12 |  mean, it's exactly the same on all -- it's either her
13 |  signature copied and -- or scanned or pasted, however they
14 |  do it these days with computers --
15 |          THE COURT:  Yeah, okay.
16 |          MR. BROWN:  -- but it's exactly the same signature.
17 |  If you look at 47, they are a little bit different, or at
18 |  least they're bigger.
19 |          THE COURT:  All right.  So you're saying that the
20 |  Government views these letters that are -- were rejected
21 |  because he -- the defendant was on the banned list, are
22 |  intrinsic to the conspiracy charge in Count 1?
23 |          MR. BROWN:  It's intrinsic to the conspiracy and
24 |  the fraud because what he has to do is convince OTC that
25 |  it's not him.

1            THE COURT:  All right.  So which count are you -- I

2    have the second superseding indictment in front of me.  And

3    most of your counts on your wire and mail fraud counts are

4    specific to discrete individual transactions.

5            MR. BROWN:  Your Honor, that's correct.  I mean,

6    not every piece of evidence goes to a particular mailing or

7    wire.

8            THE COURT:  No, I understand.  But clearly Count 1

9    doesn't; that's your general conspiracy count.  Is there --

10            MR. BROWN:  No, even in the mail fraud and wire

11    fraud, we have to describe the fraud, which Mr. Harmon and

12    Mr. Sibert did extensively.

13            THE COURT:  What is your securities fraud --

14            MR. BROWN:  And the securities fraud count.  So we

15    have --

16            THE COURT:  Which one is it so I can find it in

17    the -- oh, it's 21 to 23.

18            MR. BROWN:  But the -- I mean, the scheme, Your

19    Honor, is he'll do whatever it takes to get these opinion

20    letters to the SEC.

21            THE COURT:  Okay.

22            MR. BROWN:  Or to the OTC, I'm sorry.

23            THE COURT:  Let me ask Mr. Barnard, what about

24    that?  What about the contention of the Government that --

25    amongst other things, that these are not cumulative because

1   53 is a template only and, in any event, they're intrinsic

2   to at least Count 1 and Counts 21 through 23, because those

3   counts go to a scheme to commit fraud, and that this is part

4   and parcel of that scheme?

5           MR. BARNARD:  And, Your Honor, the -- with regard

6   to them being intrinsic to the scheme, the scheme is one to

7   defraud FusionPharm and, therefore, the page -- the letter,

8   which is three or four times placed into Exhibit 47 with Ms.

9   Dinwoodie's signature, the ones that are on 34, 35, 54, 73,

10  74, 96, and 97, all being the same letter -- copies of the

11  same letter, those are intrinsic to this scheme because

12  those were used within the scheme to -- to defraud the

13  public with regard to FusionPharm.

14          All of the other letters that are in Exhibit 52 --

15  excuse me, all of the letters that are in Exhibit 52 do not

16  go to that scheme because they weren't used in any form or

17  fashion --

18          THE COURT:  But he tried to -- the Government's

19  theory is that he tried to use those letters to effectuate

20  the scheme.  And the only reason that they weren't used is

21  because the OTC Markets folks rejected them because he was

22  on the banned -- their banned list.

23          MR. BARNARD:  Two different things.  One is I'm

24  looking at -- and it's very difficult to read -- but I'm

25  seeing that the letter -- well, looking at 52, the letters

1    are involving Cloud Centric Systems, Inc. --

2              THE COURT:  Well, I didn't hear the Government

3    denying that these letter agreements are not specific to

4    FusionPharm.  I don't hear them saying that.  His argument

5    is is that these letters are intrinsic to the fraud scheme

6    that your client is charged with, which is to commit the --

7    this fraud and but for the fact that they were rejected

8    because he's on the banned list, they weren't able to be

9    used for the purpose for which he intended.

10             MR. BARNARD:  First of all, the testimony of Ms.

11   Heese did not go to Exhibit 52.  My notes don't indicate

12   that she referred to Exhibit 52 whatsoever.  She did not

13   describe anything on 52.  She talked about 53, 54, 55, which

14   did not relate to those specific letters.

15             THE COURT:  Right.  Right.

16             MR. BARNARD:  So that also will be a foundation

17   issue, too, that they haven't been authenticated as in fact

18   being rejected.  And it is not my recollection that she

19   testified that all of these were rejected.  We also don't

20   have the dates on them and Exhibit 52 does not have the

21   dates.

22             But from my understanding, these all occurred prior

23   to any kind of -- any kind of transition of Baby Bee Bright

24   to FusionPharm.  And furthermore, I don't believe the

25   testimony was --

1    THE COURT:  Well, you're saying all of the letters

2    in 52 are -- per the Government's theory, contained the

3    forged signature of Ms. Jean-Pierre at a period of time

4    prior to FusionPharm coming into existence.

5    MR. BARNARD:  I believe so.  And I could be wrong,

6    and counsel could have more information, but that is my

7    understanding and my belief.

8    THE COURT:  Is that the case, Mr. Brown?

9    MR. BROWN:  Your Honor, if you look at -- there --

10   Mr. Barnard's correct, there's no dates on the signatures in

11   the Exhibit 52; however, there are dates at the top of

12   Exhibit 52 of when those were transmitted to the OTC by the

13   law firm of Jean-Pierre & Jean-Pierre, LLC, to Ms. Heese, so

14   the dates are on there.  And also if you look at --

15   THE COURT:  But these are all -- these are all sent

16   May of 2010.

17   MR. BROWN:  That's correct.

18   THE COURT:  Which is pre-FusionPharm.  Right?

19   MR. BROWN:  Yes, that's during the time when Baby

20   Bee Bright was being transferred into FusionPharm.

21   THE COURT:  It looks like it was before that

22   time.

23   MR. BROWN:  I'm sorry, Your Honor?

24   THE COURT:  It looks to me like it was before that

25   time.

1    MR. BROWN:  It was during the process of all --

2    THE COURT:  The process took eight months, nine

3    months, to -- for FusionPharm to effectively acquire -- or

4    take over Baby Bee Bright --

5    MR. BROWN:  I believe the evidence shows it started

6    as far back as that.  I mean, the process of Mr. --

7    THE COURT:  All right.

8    MR. BROWN:  I --

9    THE COURT:  Let me raise a question with Mr.

10   Barnard.  What about the fact that one could argue that 52

11   is not hearsay in the sense that it's not being introduced

12   for the truth of the matter asserted, that is, that Ms.

13   Dinwoodie signed these letters and submitted them to the OTC

14   but, in fact, the -- to prove that it's not true?  So that

15   to prove the fact of forgery as opposed to proving that

16   anything in that letter is true, so that it's not -- so it

17   doesn't fit the definition of hearsay?

18   MR. BARNARD:  And by that definition, that would

19   then clearly make -- put it into the 404(b) bad act

20   category.  But with --

21   THE COURT:  Well, not if -- hold on.  Please don't

22   talk over me.  Not -- that response is not accurate if I

23   agree with the Government that these letters go to the

24   scheme of committing the securities fraud that's charged in

25   21 through 23 and the overall conspiracy to defraud that's

1   captured by Count 1.

2          MR. BARNARD:  And the -- the Government is offering

3   it, I believe, to establish that, in fact, it's a forgery.

4   I would agree with the Court on that.  And in -- so in --

5          THE COURT:  So if it's not being introduced to

6   prove the truth of the matter asserted, it's not hearsay.

7          MR. BARNARD:  The -- the truth of the matter

8   asserted is --

9          THE COURT:  By the document, not by the -- not by

10  the Government.  So, you know, you look at the document --

11  you look at the thing that's alleged to be hearsay, the

12  statement, it's a written statement, an oral statement.  To

13  be hearsay that statement, in this case these pieces of

14  paper, have to be introduced to prove the truth of the

15  matter asserted.  And what about the argument that's not

16  what they're being introduced for?

17         MR. BARNARD:  Well, and I think that is accurate

18  that's not the reason they're being introduced, so I

19  understand the Court's analysis that it would not be

20  hearsay.  That still doesn't go -- and so that issue, I

21  don't have an argument with what the Court is saying.

22         THE COURT:  Okay.

23         MR. BARNARD:  So I rely and go back to my other two

24  arguments, one is the 404(b) --

25         THE COURT:  404(b).

1           MR. BARNARD:  And, in particular, that this is

2     before the -- but before the scheme with regard to

3     FusionPharm began.  But, second of all -- and this is

4     somewhat related but it goes to foundation -- we don't have

5     any testimony with regard to Exhibit 52 being the documents

6     that were received by the OTC Market, or Pink Markets, or --

7     or rejected.

8           Counsel also has --

9           THE COURT:  Yeah, but you conceded earlier that 53

10    is a template of that letter and this is, at first blush, of

11    the same -- or substantially the same letter.  So under the

12    residual clause, can I look at these letters and say that

13    there's sufficient indicia of trustworthiness because

14    they're exactly the same -- or nearly exactly the same as a

15    template letter that was identified by a Government witness

16    and was admitted into evidence per your stipulation?

17          MR. BARNARD:  I don't disagree that they are

18    substantially the same as Exhibit 53 or -- or even the

19    letter that would be in 47.  What I'm saying is that there

20    isn't sufficient foundation to establish that these were the

21    letters that were submitted that then would connect to

22    Exhibit 11 where there's the list of the 12 different

23    companies that are related to Leslie Dinwoodie.

24          And, second of all, the -- there has been no

25    testimony as far as them being rejected, which has been

1    testified -- or, excuse me, as counsel has argued.  So I

2    think that there has not been a sufficient foundation laid

3    to what they are, when they were, and -- and they're also,

4    as I said, cumulative.

5         And I think that with regard to 404(b), that they

6    are certainly more prejudicial than they are probative.

7         THE COURT:  Okay.  The jury's been waiting a half

8    an hour.  Let me ask one final question and then I'm going

9    to cut off this discussion.

10        This temporal issue -- and maybe I should just ask

11   Mr. Sibert, because I recognize that Mr. Brown -- I'm not

12   trying to make any statements here, I just -- obviously Mr.

13   Sibert's been living this case two years and you just got on

14   it.

15        The Count 1 for the conspiracy charge, the grand

16   jury charged the conspiracy started in March of 2011 and

17   Counts 21 through 23 which are the only other possible

18   counts that you could argue, I think, this is not 404(b)

19   evidence of other bad acts, says that the scheme to commit

20   securities fraud began in April of 2011, all of which are

21   approximately a year after the latest date that these

22   letters -- these letters could not have been created any

23   later than May of 2011 because that's when they were faxed

24   to the SEC, or whomever they were faxed to.

25        MR. SIBERT:  So to -- I guess to answer the Court's

1    question, as the Court knows, both parties have stipulated

2    to a on-or-about instruction.

3              THE COURT:  Right.

4              MR. SIBERT:  Nothing says -- in the Tenth Circuit

5    case law that says a scheme -- we can't prove some earlier

6    acts to prove that the scheme was a continuation of the

7    dates that we charged certain offenses.  This is a buildup,

8    as the Court understands, when it comes to the intrinsic

9    value of the fraudulent scheme in the conspiracy count, in

10   addition to the securities fraud.

11             And I would also argue that under the facts of the

12   wire fraud regarding the actual filing of these letters, so

13   the computer -- as the Court knows, we've asked several

14   interstate-nexus questions when it comes to the -- how these

15   letters were filed, that's all part of the scheme.

16             I would -- I would disagree with Mr. Barnard in the

17   fact that in Exhibit 11, Mrs. Heese did talk about the

18   companies.  Those companies are already in.  Ms. Leslie

19   Dinwoodie was banned, that middle paragraph.  Those

20   companies have already been introduced in evidence.  The

21   jury's going to be able -- has been published to the jury.

22   And this is just a continuation of those companies regarding

23   the testimony that Mrs. Heese talked about, the legal

24   opinion agreements that she said that were filed by Leslie

25   Dinwoodie, which caused her to pull those letters because

1    the last name Guy Jean-Pierre.

2              So it's just a continuation of the evidence that

3    was presented by Ms. Heese to show the essential conclusion

4    of those agreements that she informed FINRA about.  So --

5              THE COURT:  Okay.

6              MR. SIBERT:  -- it will go back to the intrinsic.

7    But thank you, Your Honor.

8              THE COURT:  All right.  Mr. Brown, I'll let you

9    have the last --

10             MR. BROWN:  Two sentences -- or maybe three

11   sentences.

12             THE COURT:  All right.

13             MR. BROWN:  Your Honor, if you look at the forgery,

14   which -- the forgeries, which are in Exhibit 47, which I

15   showed you 34, 35, 54, 70, you know, those pages.

16             THE COURT:  Right, uhm-hum.

17             MR. BROWN:  Those were submitted by -- with the

18   packet that was submitted by William Sears in a letter dated

19   in April and May of 2011, so the forgery that is the crux of

20   this was in 2011.  But it's clear that the forged documents

21   that Jean-Pierre, the defendant, obtained from his daughter

22   was before that, but they were used in the scheme.  That's

23   when MicroCap was buying the Baby Bee Bright shares that

24   were converted to FusionPharm.

25             THE COURT:  Okay.  All right.  Let's bring in the

Direct - Leslie Jean-Pierre

1    jury.

2         (Jury was present at 9:20 a.m.)

3         THE COURT:  Good morning, ladies and gentlemen of

4    the jury.  Welcome back to day 6 of our jury trial.  I hope

5    you had a restful, pleasant, long weekend.  And I do

6    appreciate your patience.  We were dealing with matters that

7    had to be discussed outside your presence, the lawyers and

8    I.  I assure you, we weren't doing crossword puzzles out

9    here, we were busy, and I appreciate your patience.

10         All right.  Ms. Jean-Pierre, you may resume the

11    stand.  And I remind you, ma'am, that you are under oath.

12         THE WITNESS:  Yes, thank you.

13         THE COURT:  Mr. Brown, you may resume your

14    examination.

15         MR. BROWN:  Thank you, very much, Your Honor.

16              DIRECT EXAMINATION (Continued)

17    BY MR. BROWN:

18    Q.  Ms. Jean-Pierre, I think I was trying to rush your

19    testimony on Friday to try to help you get out of town, and

20    I didn't succeed in both fronts.  So I'd like to, if I

21    could step back a little bit --

22    A.  Okay.

23    Q.  -- and take it a little bit slower.  I apologize for

24    your inconvenience.

25         You testified that you had been an attorney since,

Direct - Leslie Jean-Pierre

1    I think, 2007?

2    A.    Yes.

3    Q.    And you're -- I believe you testified you're licensed

4    in California and Texas.  Could you -- we sort of assume

5    people know things.  Can you tell us the process of becoming

6    licensed to practice law in either one of those states.

7    A.    Well, we have to graduate from an accredited law school

8    and then you have to take the state's bar examination --

9    Q.    Okay.

10   A.    -- and pass.

11   Q.    And in those states, you did that, correct?

12   A.    Yes.

13   Q.    Does each state in the United States, as far as you

14   know, license attorneys and have their own rules based on

15   what they think is important in their state?

16   A.    Yes.

17   Q.    You mentioned that you received a complaint -- what

18   year was the complaint received in -- from Texas?

19   A.    2011.

20   Q.    2011.  Okay.  Did -- when you received that complaint,

21   you indicated it was from the state bar.  Was that the state

22   licensing authority in Texas?

23   A.    Yes.

24   Q.    When an attorney receives such an inquiry from the

25   state bar, did you feel that was pretty serious?

Direct - Leslie Jean-Pierre

1    A.    Yes.

2    Q.    What could be the sanction that could be imposed upon

3    you by the state bar?

4    A.    My license could be suspended and I would no longer be

5    able to practice in that state.

6    Q.    Okay.  Do you know what the -- we referred to the term

7    in this trial, and I think we probably know, but what the

8    term "disbarred" means?

9    A.    It means your license is suspended or revoked.

10   Q.    When you -- you testified concerning the process of

11   the -- your uncle requesting your signature and your --

12   copies of your signature and your driver's license -- a copy

13   of your driver's license.  When he did that, what was the

14   purpose he expressed to you that he needed those for?

15   A.    To establish the corporation.

16   Q.    Okay.  Do you know if the corporation was ever

17   established?

18   A.    Yes.

19   Q.    Did you see corporate documents?

20   A.    Yes.

21   Q.    Okay.  And was the signature that you prepared and sent

22   to him on those corporate documents that you remember?

23   A.    I don't recall seeing them.

24   Q.    By the way, when you -- you indicated you signed your

25   name -- well, I'll move on.  You've already answered that

Direct - Leslie Jean-Pierre

1    question.

2         When you testified on Friday, I asked you to

3    specifically refer to some pages on Government Exhibit 47,

4    which I think is in that binder to your right.  Maybe you

5    could take a look at that.  Hopefully it's . . .

6         I think there are tabs with numbers on them.

7    A.    Okay.

8    Q.    Just to refresh your recollection -- could we have --

9    this is already admitted, could we have Exhibit 47, page 34,

10   on, published to the jury.

11        And just to refresh everyone's recollection, is

12   that the document that was -- or a document similar to that

13   the subject of the Texas Bar complaint?

14   A.    Yes.

15   Q.    Okay.  And I believe you testified that other copies of

16   that document were contained in Exhibit 5 -- or Exhibit 47,

17   I'm sorry.

18   A.    Sorry, could you repeat the question?

19   Q.    Do you remember whether I asked -- I think I asked you

20   a question without looking at the pages, whether a similar

21   document was also contained in that pages.  Could you also

22   look -- I won't put them on the screen at this time, just to

23   save time -- but could you take a look at page 34 -- 54, I

24   believe.

25   A.    Okay.

                              Direct - Leslie Jean-Pierre

1    Q.   Maybe we could put that page up, just so everybody

2    knows what we're talking about.

3             Is that also the first page of the letter -- a

4    letter that was similar to the one that you were subject to,

5    a complaint about -- by the Texas Bar?  Just page 54.

6    A.   I -- I can't recall.

7    Q.   Okay.  Could you take a look at page 7- --

8             MR. BARNARD:  Your Honor, asked and answered.

9             MR. BROWN:  I --

10            THE COURT:  How do you know what page he's going

11   to?  He's going to a different page.  Overruled.

12            I believe you're going to a different page, right?

13            MR. BROWN:  I was, Your Honor.

14            THE COURT:  Yeah.

15   BY MR. BROWN:

16   Q.   Take a look at page 73.

17            THE COURT:  Are we still on Exhibit 47?

18            MR. BROWN:  Yes, of Exhibit 47.

19            MR. BARNARD:  Object, Your Honor.  Asked and

20   answered on Friday.

21            THE COURT:  I'll give him -- we discussed what's

22   happened.  That's overruled.

23            MR. BROWN:  Your Honor, I don't believe she

24   examined the pages --

25            THE COURT:  It's overruled.  Go ahead.

Direct - Leslie Jean-Pierre

1         MR. BROWN:  Sorry.  I apologize.

2    BY MR. BROWN:

3    Q.   Can you take a look at Government Exhibit 47, page 73

4    and 74.

5    A.   73 and 74?

6    Q.   Yes, ma'am.

7    A.   Okay.

8    Q.   Is the legal address on page 73 of that the same one

9    that was on 34 that was the subject of your -- the Texas Bar

10   Association complaint, Complete Legal Solutions,

11   Incorporated?

12   A.   On page 34?

13   Q.   Page 73.

14   A.   Okay.  Repeat the question, I'm sorry.

15   Q.   Is the return address of Complete Legal Solutions the

16   same as the documents that were the subject of the Texas Bar

17   Association complaint against you?

18   A.   Yes.

19   Q.   Okay.  And could you look at page 74.

20   A.   Okay.

21   Q.   Could you look at the document at the bottom.  Is that

22   your signature?

23   A.   Yes.

24   Q.   Did you actually sign that document?

25   A.   No.

Direct - Leslie Jean-Pierre

1    Q.   Did you authorize anyone to place your signature on it

2    or sign it for you?

3    A.   No.

4    Q.   Okay.  Could you look at Government Exhibit 47, page

5    96.  I'm sorry, 9- -- yeah, 96.  And 97.

6    A.   Okay.

7    Q.   Is -- are those two pages copies similar to the basis

8    of the Texas Bar Association complaint against you?

9    A.   Yes.

10   Q.   Is the signature on page 97 your signature?

11   A.   Yes.

12   Q.   Did you sign that document?

13   A.   No.

14   Q.   Did you authorize anyone to either sign it for you or

15   to place your signature on that document?

16   A.   No.

17   Q.   Okay.  Thank you.  Since your signatures in Exhibit 47,

18   I'd like to ask you some other questions about Exhibit 47.

19   Could you look at page 31.

20           Maybe we could have that published for the jury.

21           That is titled a -- at least there's a big title on

22   it called Incoming Stock Clearance.  Actually, what I should

23   ask -- tell you is:  When I ask page 31, it's the page

24   that's in the very middle of the page.  I think that might

25   be confusing.

1120

Direct - Leslie Jean-Pierre

1  A.  Okay.  I'm there.

2  Q.  Okay.  Do you know what that document is?

3  A.  No.

4  Q.  Have you ever heard of the company, MicroCap

5  Management?

6  A.  No.

7  Q.  Have you ever heard of the company Baby Bee Bright

8  Corporation?

9  A.  No.

10  Q.  Have you ever heard of the company FusionPharm?

11  A.  No.

12  Q.  Had you ever heard of Pacific West Transfer, LLC?

13  A.  No.

14  Q.  Had you ever seen any stock certificate with the number

15  71421?

16  A.  No.

17  Q.  Could you look at page -- two pages before that, page

18  29.

19       Maybe we could -- I don't know if we could -- have

20  you ever seen a Baby Bee Right [sic] Corporation stock

21  certificate 7142?

22  A.  No.

23  Q.  Could you look at page 34 of -- excuse me -- yeah, page

24  34 of that document.  I'm sorry, 31.  I'm going backwards.

25       With regard to that document, have you ever signed

Direct - Leslie Jean-Pierre

1    a document or had any connection with the legal

2    representation of an entity that was transferring 20,000

3    shares in a reverse split as noted in the bottom portion of

4    that document?

5    A.   No.

6    Q.   Could you look at page 33.  You indicated that you had

7    never heard of a company named MicroCap Management.  There

8    is a letter there to Oppenheimer & Company.  Had you ever

9    dealt with a -- in your legal capacity, Oppenheimer &

10   Company?

11   A.   No.

12   Q.   Do you know what Oppenheimer & Company is?

13   A.   No.

14   Q.   Could you look at the signature block of that page.  Do

15   you know anyone named William Sears?

16   A.   No.

17   Q.   With regard to the -- could you just take a quick read

18   of the text of that letter.

19        In your capacity as an attorney, have you ever been

20   involved in the transfer from Baby Bee Bright to MicroCap

21   Management, 4 million shares of FusionPharm.

22   A.   No.

23   Q.   Do you know what a preferred split is?

24   A.   No.

25   Q.   With regard to pages 34 and 35, the letter that you

Direct - Leslie Jean-Pierre

1    previously described, could you take a look at that -- page

2    34, the second full paragraph.

3    A.    Where it starts, "In our opinion"?

4    Q.    "In our opinion," yes.  And if we could expand that.

5    Page 34.

6          In that paragraph, there's a reference to the

7    removal of a restricted legend.  Based on your legal

8    experience, do you have any idea what that's about?

9    A.    No.

10   Q.    Have you ever read Rule 144 of the Securities and

11   Exchange Act?

12   A.    No.

13   Q.    Do you -- are you aware of anything about a one-year

14   holding period under Rule 144?

15   A.    No.

16   Q.    Okay.  Could you look -- turn to -- well, before we

17   turn to the next page, under a holding period right before

18   that, there's a discussion in this letter, supposedly signed

19   by you, about Rule 144.  Could you just take a quick read of

20   that.  I won't read it to you, but . . .

21   A.    Holding period?

22   Q.    Yes.  Could you just read the first paragraph under

23   that to yourself.

24   A.    Okay.

25   Q.    Does the information contained in that paragraph -- do

Direct - Leslie Jean-Pierre

1   you have any idea what that's talking about?

2   A.   No.

3   Q.   Then we could turn to page 35.  There's a reference in

4   the -- there's a -- at the top of the page starts with the

5   paragraph, and then there's colons with A through E.  Could

6   we look at paragraph A first.

7        With regard to this letter, did you review any

8   documents that were submitted to any person or agency, as

9   that suggests?

10  A.   No.

11  Q.   With regard to paragraph B, would you take a quick look

12  at that and tell me when you're finished.

13  A.   Okay.

14  Q.   The company -- the words, "the Company," in paragraph B

15  on page 1 is referred to as Baby Bee Right Corporation.  Did

16  you ever speak to anyone associated with Baby Bee Right?

17  A.   No.

18  Q.   And, therefore, did anyone make any representations to

19  you?

20  A.   No.

21  Q.   Okay.  Paragraph C, would you take a quick look at

22  that.  Or as long as you need, actually.

23  A.   Okay.

24  Q.   There's a reference to "affiliate," and your opinion.

25  Do you have any idea what "affiliate" means in securities

Direct - Leslie Jean-Pierre

1   law?
2   A.   No.
3   Q.   Is securities law a fairly specialized area of the law?
4   A.   I believe so.
5   Q.   Okay.  You've never practiced securities law?
6   A.   No.
7   Q.   Paragraph D, could you read that to yourself.
8   A.   Okay.
9   Q.   Did you make an independent investigation about any of
10  the subject matter on pages 34 and 35?
11  A.   No.
12  Q.   Would you take a look at paragraph E.
13  A.   Okay.
14  Q.   Are you admitted to practice in New York or Florida?
15  A.   No.
16  Q.   Okay.  With regard to -- I won't ask these about every
17  one of these letters in the exhibit, but with regard to the
18  other letters that you've earlier described contained in
19  Exhibit 47, which were similar to the two pages you just
20  looked at, would your answers be the same?
21  A.   Yes.
22  Q.   Could you look at page 45 of this exhibit.  I won't go
23  through all the questions I asked you before, but with
24  regard to this exhibit, do you recognize any of the names
25  that are referred to on this page?

Direct - Leslie Jean-Pierre

1   A.   No.

2   Q.   In this -- could we expand the area near "quantity."

3        When I asked you about the similar document earlier

4   that referred to 4 million and then 20,000 shares, were you

5   involved in any transfer of 65,000 shares of Baby Bee

6   Right --

7   A.   No.

8   Q.   -- Corporation?

9   A.   No.

10  Q.   Take a look at page 46, please.  Have you ever seen

11  or -- anything like that, or similar to that, the stock

12  certificate of 65,000 shares of Baby Bee Right?

13  A.   No.

14  Q.   Could you look at page 49.  Is that a letter of

15  reference to 65,000 shares?

16  A.   Yes.

17  Q.   And you've already testified concerning those two

18  entities and individual listed; I won't ask you that again.

19       Would you look at pages 50 through 53.  You don't

20  have to read them all, but just take a quick -- it's

21  entitled Debt Settlement Agreement.  Have you ever seen this

22  document?

23  A.   No.

24  Q.   On page 51, there are two references to two companies,

25  La Dee Da and MicroCap Management.  Have you ever dealt --

Direct - Leslie Jean-Pierre

1    you already indicated you haven't dealt with or heard of

2    MicroCap.  Have you ever heard of La Dee Da?

3    A.    Sorry.  No.

4    Q.    Other than the phrase.

5    A.    No.

6    Q.    Page 52, there's a signature at the top under La Dee Da

7    with no name on it.  Well, there's no typed name but there's

8    a signature.  Do you recognize that signature?

9    A.    No.

10   Q.    Page 73 and 74 you've already identified.  Maybe we

11   could just bring it back up to refresh where we are on this

12   document.  Could you go back to page 64.

13           Could you take a look at that document.  That has a

14   reference of 80,000 shares.  You've already testified

15   concerning some of the identity -- or the entities.  Do you

16   know what that document is?

17   A.    No.

18   Q.    Could you look at page 65.  Do you know what that is?

19   A.    No.

20   Q.    This is upside down.  All right.  I'll turn it over.

21   Okay.

22           Do you know what that is?

23   A.    No.

24   Q.    Would you look at page 69.  It's a letter dated May

25   11th, 2011, from William Sears to Oppenheimer.  Did you

Direct - Leslie Jean-Pierre

1   ever -- were you ever involved in a transaction involving

2   80,000 shares of FusionPharm, Incorporated?

3   A.   No.

4   Q.   Could we -- could you look at page 76 through 83.

5   Don't necessarily read them, just take a look at those

6   pages.

7        Is that -- it's labeled a Consulting Agreement.

8   Were you ever involved in that consulting agreement between

9   Baby Bee Right Corporation and MicroCap Management?

10  A.   No.

11  Q.   Could we look at page 83, which is the last page of

12  that document.  Could we expand the signature areas.

13       Do you know -- on the left-hand side of the page,

14  do you know anybody named Frederick Dahlman, Jr.?

15  A.   No.

16  Q.   Had you ever represented anybody by that name?

17  A.   No.

18  Q.   Had you ever dealt with anybody by that name in your

19  legal capacity?

20  A.   No.

21  Q.   With regard to the letter that is -- that we just --

22  supposedly from you --

23       THE COURT:  Which letter are we referring to?

24       MR. BROWN:  I'm sorry, Your Honor, I'm trying to

25  find the page number.  I'm sorry.

Direct - Leslie Jean-Pierre

1    BY MR. BROWN:

2    Q.   Page 73.  What's the date on that letter?

3    A.   June 17th, 2010.

4    Q.   You indicated you never signed that letter.  Is that

5    after or before the time frame that the Texas Bar

6    Association complaint was being brought to your attention?

7    A.   I believe it's before.

8    Q.   Was it after the -- I'll strike that.  You answered.

9         If you look at pages 96 and 97, please.  Is that

10   the letter you've previously identified as not bearing your

11   signature even though it bore your name?

12   A.   Correct.

13   Q.   What's the date of that letter?

14   A.   June 17th, 2010.

15   Q.   Could you take a look at page 85 of Exhibit 47.

16   A.   Okay.

17   Q.   Is that a similar document to the others you referred

18   to in your testimony, only change being 150,000 shares under

19   "quantity"?

20   A.   Yes.

21   Q.   Would you look at page 89.  Were you involved in the --

22   a capacity as an attorney regarding this transaction

23   involving 150,000 shares?

24   A.   No.

25   Q.   Thank you.  Would you look at page 91.  It's referred

Direct - Leslie Jean-Pierre

1   to as the Debt Settlement Agreement.  Could you tell us what

2   entity that is between, if you look at the first paragraph.

3   A.   MicroCap Management, LLC, and La Dee Da, a Colorado

4   LLC.

5   Q.   What does "LLC" mean to you?

6   A.   Limited liability company.

7   Q.   Okay.  That's dated when?

8   A.   September 7th, 2010.

9   Q.   Could you look at page 95.  Could you reference the

10  third paragraph down.

11  A.   The first --

12  Q.   "Whereas, the Company authorizes."

13  A.   Okay.

14  Q.   Just take a look at that.  Could you take a look at the

15  signature block of that document.

16  A.   Okay.

17  Q.   Maybe we could expand the signature block.

18       Do you know anyone named Scott Dittman?

19  A.   No.

20  Q.   Did you ever do any legal work for him?

21  A.   No.

22       MR. BROWN:  May I have one second, Your Honor?

23       THE COURT:  Okay.

24       MR. BROWN:  I think we're done with Exhibit 47.

25  BY MR. BROWN:

1130
Direct - Leslie Jean-Pierre

1    Q.   You indicated that when you received the complaint from
2    the Texas Bar about your signatures being on certain
3    documents, the Texas Bar sent you a copy of the complaint?
4    A.   Yes.
5    Q.   Okay.  And when you saw those documents and saw -- I
6    won't show them up again just to save some time -- but when
7    you saw the documents that had the Complete Legal Solutions,
8    Incorporated signed to that, did you remember that?
9    A.   Yes.
10   Q.   Do you remember the entity Complete Legal Solutions?
11   A.   Yes.
12   Q.   Okay.  And that -- that complaint was -- did the term
13   "attorney opinion letters" arise in your discussions with
14   the Texas Bar Association?  Did they use that term?
15   A.   It was in Mrs. Hamilton's complaint.
16   Q.   I'm sorry?
17   A.   The term was in Ms. Hamilton's complaint agreements.
18   Q.   Who was the name -- who was the name of the person who
19   made the complaint?
20   A.   Ms. Hamilton.
21   Q.   Okay.  Do you remember her first name?
22   A.   No.
23   Q.   Okay.  Were you aware of any requirements to submit an
24   attorney opinion letter to the OTC back in 2011?
25   A.   I'm sorry, repeat that.

Direct - Leslie Jean-Pierre

1    Q.   Were you aware of any -- either requirements to submit

2    an opinion letter to the OTC regarding Pink Sheet companies?

3    A.   No.

4    Q.   Did you know, or do you know now, generally what a Pink

5    Sheet company is?

6    A.   Not really.

7    Q.   Have you ever heard of the term "attorney letter

8    agreement"?

9    A.   Yes.  In the context of my profession.

10   Q.   Okay.  Have you ever heard the term "attorney letter

11   agreement" with regard to the over-the-counter market, or

12   OTC?

13   A.   No.

14   Q.   Were you aware of any requirement of the OTC about

15   what's required to do before you can submit an attorney

16   opinion letter about Rule 144?

17   A.   No.

18   Q.   So have you ever signed something called an attorney

19   letter agreement for the OTC?

20   A.   No.

21   Q.   Could you take a look at -- I think it might be in that

22   binder, Exhibit 53, which has already been admitted.  Just

23   take a look at it and tell me when you think you've

24   satisfied -- if you could read . . .

25          Okay.  Have you ever seen a form like that?

Direct - Leslie Jean-Pierre

1    A.    No.

2    Q.    Have you ever signed a form like that?

3    A.    No.

4    Q.    Okay.  Could you take a look at Government Exhibit 8,

5    page 9, which has already been admitted.  And I think we can

6    show it to you on the screen next to you.  Let me know if

7    you can -- page 9 and 10.

8          Can you read that or is it too blurry?

9    A.    Could you -- that's --

10   Q.    I'm --

11   A.    That's good.

12   Q.    Maybe we could just scroll down -- scroll to the next

13   page.

14          MR. BARNARD:  I'm sorry, which exhibit is this?

15          MR. BROWN:  8.

16          MR. BARNARD:  Has 8 been admitted?

17          THE COURT:  Has it, Ms. Frank?

18          COURTROOM DEPUTY:  Uhm-hum.

19          THE COURT:  Yes.

20   BY MR. BROWN:

21   Q.    With regard to Exhibit 8, page 10, the signature block

22   you're seeing, it says name of firm, Jean-Pierre &

23   Jean-Pierre, LLC.  Do you know whose firm that is?

24   A.    I believe it's Guy Jean-Pierre's.

25   Q.    Your uncle?

Direct - Leslie Jean-Pierre

1  A.   Yes.

2  Q.   Because there's two names, Jean-Pierre.  You were not

3  one of those names, were you?

4  A.   No.

5  Q.   You can take that down.

6       Did you examine Government Exhibit 11, which might

7  be useful to see the hard copy since it's so hard to read.

8  Maybe we could publish that.  Could we expand the -- I guess

9  the To and From in the e-mail portion of the heading at the

10 top.

11      At the top of that exhibit, which has been

12 admitted, there's a person -- a reference from Liz Heese.

13 Do you know her?

14 A.   No.

15 Q.   How about anyone named Michael Malone?

16 A.   No.

17 Q.   And Michael Malone's e-mail address is at FINRA --

18 f-i-n-r-a -- dot org.  Do you know what FINRA is?

19 A.   No.

20 Q.   Okay.  Could we expand the middle, I guess, grouping of

21 names.

22      There's a reference in the middle of that to Leslie

23 Dinwoodie.  Was that your name when you were married?

24 A.   Yes.

25 Q.   And to the right of that, there is a e-mail address --

Direct - Leslie Jean-Pierre

1    if I can read it -- it says leslie@thedeallawyer.com.  Did

2    you ever have an e-mail address like that?

3    A.   No.

4    Q.   Could we expand the text right below that grouping that

5    we just saw.  Is there a way we can get rid of the

6    background?

7    A.   Okay.

8    Q.   I have a question.  We just have to do a few technical

9    things.

10          There is a reference in that text -- in fact, it

11   begins, "We subsequently banned Ms. Dinwoodie."  "We" being

12   FINRA.  Were you ever aware that you were banned from

13   anything by FINRA?

14   A.   No.

15   Q.   And there's also a reference at the bottom of that page

16   to a reference to an attorney named Brenda Hamilton.

17   A.   I see that.

18   Q.   Was that the person who made the complaint about you to

19   the Texas Bar Association?

20   A.   Yes.

21   Q.   There's a reference in the middle paragraph -- maybe we

22   could -- I mean -- I'm sorry, the middle grouping of the

23   text right above the middle grouping of those companies.

24          It indicates, "We received agreements from Leslie

25   Dinwoodie for the following list of companies," and then it

                            Direct - Leslie Jean-Pierre

1   lists the companies.

2            Maybe you could expand the list of companies again.

3            Yeah.  You made a reference -- the reference is

4   that you -- "We proceeded to receive agreements from Leslie

5   Dinwoodie between 5-7-2010 through 5-10-2010" for those

6   companies listed on the left side of that page.  Have you

7   ever done any legal work for any of those entities?

8   A.   No.

9   Q.   Had you ever sent -- even if you weren't doing legal

10  work for them, did you ever send any agreement to any

11  organization on behalf of those entities?

12  A.   No.

13  Q.   Okay.  Thank you.

14           MR. BROWN:  I think I mentioned earlier that --

15  something about a ban from FINRA, but I meant to say ban

16  from OTC, Your Honor.  I apologize.

17           THE COURT:  Okay.

18  BY MR. BROWN:

19  Q.   When you -- during the course of -- during the course

20  of your life, have you ever been aware that your uncle was

21  banned from OTC from submitting letters?

22  A.   After I received the grievance complaints from the bar.

23  Q.   You learned it afterwards.

24  A.   Yes.

25  Q.   Could you take a look -- I think it might be in the

Direct - Leslie Jean-Pierre

1    other book that's to your right -- at Government Exhibit 52.

2    And it's not been admitted so we can't publish it.  Could we

3    also bring up page 9 of Government Exhibit 8 and put it on

4    the screen for comparison purposes.

5         With regard to Exhibit 52 and what's on the screen

6    to your right, which is the first page -- the first page of

7    Exhibit 52, I'm sorry -- which -- and what's on the screen,

8    which is the first page of -- or the ninth page of

9    Exhibit 8, could you just compare -- read it over and

10   compare what is on the screen to what's in front of you,

11   Exhibit -- the first page of Exhibit 52.

12   A.   It looks similar.

13   Q.   Okay.  Is it the same except one's more blurry?

14   A.   Yes.  Except for the hard copy has a Section 4 at the

15   bottom and this --

16   Q.   I'm sorry, I can't hear you.

17   A.   The hard copy right here, Exhibit 52, has Section 4.

18   The exhibit on the screen only has Section 3 at the

19   bottom.

20   Q.   There's some language at the very bottom that's

21   different --

22   A.   Yes.

23   Q.   -- but the text is the same.

24   A.   Yes.

25   Q.   Okay.  Could you look at page 2 of Exhibit 52.  But

Direct - Leslie Jean-Pierre

1   don't tell us anything that's on the page.

2           Is there a reference to a particular entity after

3   the phrase "Name of Issuer" colon?

4   A.   Yes.

5   Q.   Could you take a look -- could we bring back up on the

6   screen the middle portion of Government Exhibit 11.  Could

7   we expand the list of companies.

8           Is the name that's on page 2 also on Government

9   Exhibit 11?

10  A.   Yes.

11  Q.   Could you take a look at -- continuing in Exhibit 52,

12  could you look at page 10.

13          Is there a company named on page 10?

14  A.   Yes.

15  Q.   Is that company, without identifying it, also listed on

16  Government Exhibit 11?

17  A.   Yes.

18  Q.   Could you do the same thing with regard to page 20.

19  A.   Yes.

20  Q.   Is that the same -- is that company also listed on

21  Government Exhibit 11?

22  A.   Yes.

23  Q.   Could you take a look at the company named on page 22.

24  Is that company listed on page -- on Exhibit 11?

25  A.   Yes.

Direct - Leslie Jean-Pierre

1    Q.    What about page 24?

2    A.    That company is listed on Exhibit 11.

3    Q.    Thank you.  How about page 26.

4    A.    That company is listed on Exhibit No. 11.

5    Q.    How about page 28.

6    A.    That company is listed on Exhibit 11.

7    Q.    How about the company listed on page 34.

8    A.    That company's listed on Exhibit 11.

9    Q.    With regard to all the pages you've already examined,

10   those even numbered pages, is the page right before those

11   pages -- I should have asked you this while we were looking

12   at them -- but is the page right before those pages the same

13   as what you've described as page 1 of Exhibit 52?

14   A.    Yes.

15         MR. BROWN:  Your Honor, at this time with -- based

16   upon the testimony of this witness and the previous

17   admissions of Government Exhibit 8, 11, and 53, the

18   Government moves for admission of 52.

19         THE COURT:  Mr. Barnard, the defendant has the same

20   objections and the same grounds for the objections as we've

21   discussed outside the presence of the jury?

22         MR. BARNARD:  That is correct.

23         THE COURT:  Okay.  And, Mr. Brown, the Government

24   has the same responses to those objections as we've

25   discussed previously on the record outside the presence of

Direct - Leslie Jean-Pierre

1    the jury?

2              MR. BROWN:  Yes, Your Honor.

3              THE COURT:  All right.  I'm going to overrule the

4    objection.  I find that Exhibit 52 is not hearsay because it

5    is not being introduced for the truth of the matter

6    asserted.  I also find that it is not violative of Rule

7    404(b)'s injunction against the introduction of extrinsic

8    evidence of other bad acts in that it contains -- these

9    letters have evidence in them that support the allegations

10   in the second superseding indictment, Counts 1 and 21

11   through 23 for the reasons I discussed in the counsel --

12   colloquy with counsel outside the jury's presence.  I also

13   find that it's not cumulative of other exhibits.

14             So it is admitted and may be published to the jury

15   with one provision:  That the Government cull out all

16   duplicative pages in this exhibit -- because it's been

17   represented to me by defense counsel, who's gone through it

18   carefully -- that there's a lot of repetitive and

19   duplicative pages, that those all be removed and that each

20   page appear only once in Exhibit 52, and that those pages be

21   given to the defense for the defense to look at, and then

22   provided to my courtroom deputy for -- to substitute into

23   the Court's exhibit binder.

24             We'll take a pause now for our morning recess and I

25   have a matter to raise with the lawyers, so we'll let the

Direct - Leslie Jean-Pierre

1    jury start its recess.

2         (Government's Exhibit 52 received)

3         (Jury left the courtroom at 10:13 a.m.)

4         THE COURT:  Ms. Jean-Pierre, you can step down and

5    you may start your recess, but I do remind you not to speak

6    with any of the lawyers during the recess.

7         THE WITNESS:  Okay.

8         THE COURT:  All right.  All right, I'm prepared to

9    rule on the defendant's motion for reconsideration on No.

10   187.  The defendant's motion for reconsideration deals with

11   the admission of Government's Exhibit 446.  I note for the

12   record that the exhibit had previously been admitted into

13   evidence, but I also note for the record that it has not

14   to-date been published to the jury.

15        The motion argues that the exhibit in question,

16   which is Mr. Sears' plea agreement, does not qualify as a

17   past recollection recorded under Rule 803(5), and is

18   otherwise unduly prejudicial to the defendant.  The

19   Government has no response to defendant's Rule 803(5)

20   argument other than lack of memory about whether the

21   questions asked and answers given established a proper

22   foundation for that exception hearsay.

23        But I agree, in any event, with the defendant that

24   the foundational elements were not satisfied, particularly

25   because it appears Sears was not failing to remember, but

Direct - Leslie Jean-Pierre

1    refusing to agree.  That is the stuff of impeachment, not

2    past recollection recorded.

3         The Government points out that the Tenth Circuit

4    permits the prosecution to introduce a cooperating witness'

5    plea agreement on direct examination.  This comes from cases

6    such as *United States v. Harlow*, 444 F.3d at 1255, a 2006

7    opinion from that court, and *United States v. Lord*, 907 F.2d

8    1028, a 1990 opinion from the Tenth Circuit.

9         But the rationale behind those decisions is that

10   the Government is entitled to preemptively draw the sting,

11   so to speak, of the negative inferences that defense counsel

12   would surely bring out on cross-examination about the

13   motives of a witness within a plea agreement.  In other

14   words, the Government may head off certain lines of

15   impeachment and allow the jury to assess for itself the

16   cooperating witness' credibility in light of the plea

17   agreement.

18        The Government says that it made a tactical

19   decision not to introduce the plea agreement on direct

20   examination.  Be that as it may, the Government has given me

21   no authority that it can then introduce the plea agreement

22   on redirect examination when the rationale of the *Harlow* and

23   *Lord* cases no longer applies.  The Government surely could

24   have used portions of the plea agreement to impeach Mr.

25   Sears on redirect, but the Government chose not to do so.

Direct - Leslie Jean-Pierre

1    It instead simply wants the jury to view the detailed

2    Government-drafted version of the facts in the plea

3    agreement as a substitute for Mr. Sears' testimony.

4         The Court agrees with the defendant under the

5    circumstances that this is unduly prejudicial under Rule

6    403.

7         The Government also briefly argues that the plea

8    agreement has been docketed and so that I may take judicial

9    notice of it.  The Government fails to address the fact that

10   it has been docketed under restricted access.  Moreover,

11   although I may take judicial notice of its existence and

12   contents, judicial notice does not extend to accepting its

13   contents as true.

14        For all these reasons, I grant the defendant's

15   motion for reconsideration, ECF 187, and I, therefore, on

16   reconsideration sustain the defendant's objection to

17   Exhibit 446.  That exhibit is excluded.

18        Ms. Frank, the exhibit will stay in the official

19   set of court exhibits, but it will not go back to the jury.

20        All right.  We'll be in recess for 15 minutes.

21        (Recess 10:18 a.m. to 10:36 a.m.)

22        MR. SIBERT:  Your Honor, before the jury comes

23   in --

24        THE COURT:  I'm not going to hear reargument.

25        MR. SIBERT:  I'm not going to reargue, I'm going to

Direct - Leslie Jean-Pierre

1    ask permission for my agent to go home.  She's not feeling

2    well.  She is sick today.  I'm asking her to be excused.

3              THE COURT:  That's fine.

4              MR. SIBERT:  Thank you.

5              THE COURT:  I hope you feel better soon.

6         (Jury was present in the courtroom at 10:37 a.m.)

7              THE COURT:  Ladies and gentlemen of the jury, I

8    know jurors notice everything that goes on in the courtroom.

9    So you may notice, if you haven't already, that Agent Funk

10   is no longer with us.  She was not feeling well today and I

11   granted her request to go home for the day.  Hopefully

12   she'll feel better by tomorrow.  You should not infer

13   anything else or make any other conclusions that anything

14   else is going on other than the fact she's not feeling well.

15             All right, Ms. Jean-Pierre, I remind you that you

16   remain under oath.

17             Mr. Brown, you may resume your examination.

18   BY MR. BROWN:

19   Q.   Ms. Jean-Pierre, since Exhibit 52 has been admitted,

20   I'm going to ask you to look again at pages 1 and 2, and

21   I'll only ask you about those two pages, and ask that

22   those -- the first page be published.

23             And can you -- could we just sort of scroll through

24   that so we know what it is.  Go to the page 2.

25             Do you see a signature on page 2 of Government

Direct - Leslie Jean-Pierre

1    Exhibit 52?

2    A.    Yes.

3    Q.    Does that appear to be your signature?

4    A.    Yes.

5    Q.    Or your signature at the time that was your name?

6    A.    Yes.

7    Q.    Did you sign that?

8    A.    No.

9    Q.    Did you authorize anyone to sign it for you?

10   A.    No.

11   Q.    Did you authorize anyone to use your signature in place

12   of you signing it yourself?

13   A.    No.

14   Q.    And with regard to your earlier testimony, I asked you

15   to look at, I think, 12 separate signature pages in this

16   exhibit.  Would your answer be the same about those pages?

17   A.    Yes.

18   Q.    Were they different with regard to the name of the

19   issuer located below your signature?

20   A.    Yes.

21   Q.    And with regard to the pages you identified earlier,

22   without talking about before the exhibit was admitted, did

23   you ever do any legal work for any of those companies on

24   those pages?

25   A.    No, I did not.

                        Direct - Leslie Jean-Pierre

1   Q.   With regard to the exhibit, again, there's a portion
2   of -- referring to Complete Legal Solutions, with an address
3   in El Paso.
4            Could we expand the address, please.
5            Where, again, did you have a post office box in
6   El Paso?
7   A.   3800 North Mesa, Suite A-2, Box 136.
8   Q.   And could we make -- could we expand the e-mail
9   address.
10           I believe you may have testified about this, but
11  have you ever used that e-mail address,
12  leslie@thedeallawyer.com?
13  A.   No.
14  Q.   When you communicated with your uncle, would it be by
15  telephone or e-mail?
16  A.   Both.
17  Q.   Okay.  When you received the complaint from the Texas
18  Bar Association and the California Bar Association, and when
19  you were questioned by the SEC, had you -- did you tell your
20  uncle about it?
21  A.   Yes.
22  Q.   Did you -- what did you tell him?  Describe the
23  conversation, if you remember.
24  A.   What I recall is that I told him I had these complaints
25  filed against me and that the SEC wanted to depose me.  I

1146

Direct - Leslie Jean-Pierre

1    asked him what was going on.  Actually, I'll start with the
2    bar.
3            I asked him what was going on.  I think he said --
4    oh, with regards to the bar complaints, he said that Ms.
5    Hamilton was just a disgruntled -- she was being sued for
6    some reason and that she was going around filing complaints
7    against attorneys across the country and not to worry about
8    it.  I had -- yeah, I think that was with the complaint.
9    With the -- I'm sorry, it's kind of mixed up.  It's been a
10   while.
11           I asked him how did my name get on those letters.
12   He said that -- something along the lines, "I thought you
13   understood."
14           I told him I would never agree to anything like
15   that and that he needed to fix this and that he needed to
16   shut down the corporation.  And he agreed to do that.  And
17   he sent me the document showing that the corporation had
18   been dissolved.  He apologized.
19   Q.   Okay.  When you were communicating with him by e-mail,
20   I'm going to ask you if you recognize these e-mail
21   addresses.  And so it's all one continuous letters,
22   guymjean-pierre@yahoo.com.  Do you remember that, or do you
23   have any memory of that?
24   A.   No.
25   Q.   What about guy -- g-u-y -- @lawfirmofjean-pierre.com?

Direct - Leslie Jean-Pierre

1    A.   No.  No.

2    Q.   If you need a minute, that's okay.

3    A.   Thanks.  Okay.

4    Q.   How about guy@fusionpharminc.com?

5    A.   No.

6    Q.   Could we bring up Government Exhibit 398, please.  It's

7    already been admitted.

8    A.   Let me --

9    Q.   Expand or enlarge the middle portion, not the top

10   portion.

11        Starting with From and ending with Pierre.  Did you

12   ever correspond with him at the e-mail address of

13   marcelo1@thedeallawyer.com?

14   A.   I can't remember.

15   Q.   Okay.  When's the last time you saw your uncle before

16   Friday?

17   A.   I think it was like February or March of 2016.

18   Q.   Okay.  And what -- what -- what was that occasion?

19   A.   Excuse me.  My immediate family, we went to the

20   Dominican Republic to meet my brother's fiancé's family at

21   the time.  Her family was -- is Dominican, so we went to

22   meet the family due to the engagement.  And my uncle was

23   living in the Dominican Republic at the time and I think he

24   came to a family dinner and that's when I saw him.

25   Q.   Did you talk about this or anything, or that this

1148

Direct - Leslie Jean-Pierre

1    occurred?

2    A.   No.

3    Q.   Okay.  When you went through all this with the bar

4    association -- or the bar and the SEC, did you hire an

5    attorney to help you out?

6    A.   I hired an attorney for the SEC.

7    Q.   But you dealt with the bar on your own?

8    A.   Yes.

9    Q.   Do you know -- with regard to the e-mail address

10   marcelo@thedeallawyer.com, do you know whether or not your

11   uncle has or is in the process of changing his name?

12   A.   Yes, I believe he changed it.

13   Q.   Do you remember what he changed it to?

14   A.   Something Marcelo de Guerra, something like that.

15   Q.   Okay.  I'm sorry you've been through all this, but the

16   person you've referred to as your uncle and as Guy

17   Jean-Pierre, is he in the courtroom today?

18   A.   Yes.

19   Q.   Could you just point out where he's sitting for the

20   record.

21   A.   He's on my right.  First gentleman on my right.

22          MR. BROWN:  Your Honor, if the record could reflect

23   identification of the defendant.

24          THE COURT:  The record will so reflect.

25          MR. BROWN:  I have no other questions.

1149

Direct - Leslie Jean-Pierre

1    THE COURT:  All right.  Cross-examination.

2    MR. BARNARD:  Your Honor, we have no questions for

3    this witness.

4    THE COURT:  All right.  May the witness be excused

5    for the Government?

6    MR. BROWN:  Yes, Your Honor.

7    THE COURT:  For the defendant?

8    MR. BARNARD:  Yes, Your Honor.

9    THE COURT:  Ms. Jean-Pierre, thank you so much for

10   your testimony.  You're excused.  You may step down.

11   THE WITNESS:  Thank you.

12   THE COURT:  Government may call its next witness.

13   MR. SIBERT:  Your Honor, at this time the

14   Government would like to call Mr. Cruz -- I believe it's

15   Michael Cruz.

16   THE WITNESS:  Thanks.  I got a little disoriented

17   when I walked in here.

18   COURTROOM DEPUTY:  Please stand behind the witness

19   stand and raise your right hand.

20   THE WITNESS:  Yes.

21    MICHAEL CRUZ, GOVERNMENT'S WITNESS, SWORN

22   COURTROOM DEPUTY:  Okay.  Please be seated.  If you

23   want to move your chair up close to the microphone.  Please

24   state and spell your full name for the record.

25   THE WITNESS:  My full name is Darrel Michael Cruz.

Direct - Cruz

1  D-a-r-r-e-l, Michael, M-i-c-h-a-e-l, last name Cruz,

2  C-r-u-z.

3       MR. SIBERT:  May I proceed, Your Honor?

4       THE COURT:  You may.

5                    DIRECT EXAMINATION

6  BY MR. SIBERT:

7  Q.   All right.  Good morning, sir.

8  A.   Good morning.

9  Q.   Can you please explain to the jury where you're

10  currently employed.

11  A.   Yes.  I am -- I'm corporate counsel for Alpine

12  Securities Corporation and Scottsdale Capital Advisors.

13  Both of those are affiliated broker dealers.

14  Q.   When you say affiliated broker dealers, for someone

15  that doesn't work in the world of investments, can you

16  explain to the jury essentially what Alpine and Scottsdale

17  would do for individuals --

18  A.   Well --

19  Q.   -- the companies.

20  A.   Sure.  Affiliate just means they have common ownership.

21  Both of them are broker dealers.  They're engaged in a niche

22  business dealing with the deposit, liquidation, and sale of

23  restricted stock securities.

24  Q.   And what do you mean by restricted stock securities?

25  A.   These are -- these are shares that are not registered.

Direct - Cruz

1    They weren't -- they weren't brought into the marketplace

2    through an initial private -- or public offering.  I mean,

3    these are -- these are securities that were acquired by

4    companies that provide services to the issuer.  By "issuer,"

5    I mean a company who issues stock that trades public in the

6    market.

7            And so our customers are typically those that

8    provide financings for these small companies, that provide

9    professional services.  They could be accountants, they

10   could be attorneys, they could be business consultants.  And

11   these securities are unique because these, for us, is --

12   they were called low-price securities, sometimes they call

13   them penny stocks.  And unlike larger securities that trade

14   on exchanges, these trade in what's called the

15   over-the-counter market.

16   Q.   All right.  All right.  And how long have you been

17   employed with Alpine/Scottsdale?

18   A.   Well, I started off as general counsel for just

19   Scottsdale Capital, in 2008.  Subsequently the owners

20   acquired Alpine, which is also a broker dealer and a

21   clearing firm.  I took on the role of being the top legal

22   advisor in 2015 for both firms.

23   Q.   And essentially -- so when you say you're the counsel

24   for both firms, you're the in-house lawyer for Scottsdale

25   and Alpine?

Direct - Cruz

1    A.   Yes.

2    Q.   Okay.  Now, before your testimony here today, were you

3    asked to review several documents regarding Alpine and

4    Scottsdale?

5    A.   Yes.

6    Q.   Okay.  And were those documents provided as part of

7    either a grand jury subpoena or an investigation request

8    from law enforcement regarding these documents?

9    A.   Yes.

10   Q.   And were they turned over to the Government?

11   A.   Yes.

12   Q.   And you've had a chance before today to review all

13   these documents?

14   A.   Yes, that's correct.

15   Q.   All right.

16            MR. SIBERT:  Your Honor, my understanding is that

17   these documents were stipulated to, essentially,

18   authentication prior to the testimony here today; however,

19   they have not been entered into evidence.  No stipulation

20   into evidence.

21            THE COURT:  So just authenticity, but not

22   admissibility?

23            MR. SIBERT:  That's correct.  So --

24            THE COURT:  All right.

25            MR. SIBERT:  My understanding is foundation is not

1153
Direct - Cruz

1    needed.
2           THE COURT:  Okay.  And what exhibits are we talking
3    about?
4           MR. SIBERT:  I'm going to start with Exhibit 120.
5           THE COURT:  All right.  Okay.  So you want to do
6    exhibit by exhibit?
7           MR. SIBERT:  Yes, sir.
8           THE COURT:  Okay.
9           MR. SIBERT:  I can give you a few numbers --
10          THE COURT:  No, that's fine, that's fine, go ahead.
11          MR. SIBERT:  Thank you, sir.
12   BY MR. SIBERT:
13   Q.   Sir, can I please have Government Exhibit 120
14   published, but this has not been admitted, so not to the
15   jury.  And if you can't read the screen, sir, I'll ask the
16   courtroom deputy for assistance when it comes to the hard
17   copy.
18   A.   Okay.  Here we go.
19   Q.   Do you recognize Government Exhibit 120?
20   A.   Yes.
21   Q.   Okay.  In general terms, can you explain to -- can you
22   explain what is -- essentially Government Exhibit 120 is.
23   A.   Sure.  It's basically the compliance checklist for a
24   new account application.  The new account application is
25   just the process by which a person becomes a customer of

Voir Dire - Cruz

1   Scottsdale Capital Advisors for purposes of doing securities
2   business.
3   Q.   Okay.  And can you look at the binder for me, please.
4   I'm going to ask you to flip through 120 to see what the
5   date is.
6   A.   Okay.
7   Q.   Okay.  And do you recognize the documents that are in
8   120?
9   A.   Yes, this appears to be the complete new account
10  application for MicroCap Management.
11  Q.   And do you know who was opening that account under
12  MicroCap Management?
13  A.   Yes.  The authorized person would be William Sears.
14          MR. SIBERT:  Your Honor, at this time the
15  Government would like to move into evidence Government
16  Exhibit 120.
17          THE COURT:  Any objection?
18          MR. GOODREID:  Your Honor, may I voir dire very
19  quickly with respect to this exhibit?
20          THE COURT:  Sure, you may.
21          MR. GOODREID:  Okay.
22                      VOIR DIRE EXAMINATION
23  BY MR. GOODREID:
24  Q.   Mr. Cruz, could you please take a look at page -- I
25  believe it's page 20 of that exhibit.

Voir Dire - Cruz

1   A.   Okay.

2   Q.   And do you see -- again, I won't ask you too much of

3   the content, but do you see where it says OFAC -- OFAC

4   Search Tool?

5   A.   Yes.

6   Q.   And if you look briefly -- flip through the following

7   pages, please, just the next several pages.  Two, three,

8   four, five, is probably enough.

9   A.   Okay.  Yes, I see.

10  Q.   So this portion of the document, what is that?  What is

11  the OFAC Search Tool?

12  A.   Sure.  Under -- under broker dealer rules and

13  requirements, we're, you know, we're subject to the

14  anti-money-laundering BSA requirements.  And part of those

15  requirements is that we conduct an OFAC search for each

16  customer that seeks to open an account.

17  Q.   So -- so this search that's in here would be reflective

18  of the search that you did as part of this application; is

19  that fair?

20  A.   Yes.  It should be.

21  Q.   Okay.

22           MR. GOODREID:  Your Honor, based on that response,

23  we have no objection to admissibility.

24           THE COURT:  All right.  Thank you.

25           Given that there's no objection, Exhibit 120 is

Direct - Cruz

1    admitted into evidence and may be published to the jury.

2         (Government's Exhibit 120 received)

3              MR. SIBERT:  May I proceed, Your Honor?

4              THE COURT:  You may.

5              MR. SIBERT:  Thank you.

6                   DIRECT EXAMINATION (Continued)

7    BY MR. SIBERT:

8    Q.   Can I please have page 2 published to the jury.

9              Okay, sir, I play John Madden a lot here, so if you

10   look on your screen, I'm going to ask you -- essentially you

11   had just testified that this was an account opening for

12   MicroCap Management and with Mr. William Sears.  Is this

13   essentially the introduction to the application that Mr.

14   Sears is sending in to Scottsdale or Alpine?

15   A.   Yes.

16   Q.   And, I'm sorry, maybe I'm confused.  Is it Scottsdale

17   now?  Can we just go by Scottsdale, meaning everything that

18   would have Alpine is now Scottsdale; is that correct?  Or

19   everything that was Scottsdale is now Alpine?

20   A.   Yes.  No, that's -- that's fair.  Just -- Alpine --

21   Scottsdale Capital clears through Alpine.  So they provide

22   all the back-office settlement services.  They have very --

23   they have parallel mirrored books and records requirements.

24   So any information that Scottsdale would have regarding a

25   customer, that would typically be submitted to Alpine as

Direct - Cruz

1   well in connection with opening an account.

2   Q.   Okay.  So Alpine is actually -- the opening of the

3   account would come to MicroCap in this case?

4   A.   Well, yes.  They both have that, but Scottsdale as the

5   introducing broker dealer has the regulatory requirement to

6   know your customer.

7        That's why you see on the top of this form -- we

8   call it KYC, but it basically just stands for Know Your

9   Customer.  And Scottsdale would be the entity that would

10  have the day-to-day contact with the customer, they'd be

11  responsible for knowing the customer's investment needs and

12  objectives and making recommendations in securities in

13  accordance with those -- with the background of the

14  customer.

15  Q.   Okay.  Fair point.  All right, so, who's the owner,

16  based upon this paperwork, of MicroCap?

17  A.   The owner of this company would be William Sears.

18  Typically -- it doesn't -- there's not a section in here

19  that says ownership, but if there were other owners, that

20  would have been noted on the KYC form.

21  Q.   Let me address the page -- page 2 on your screen.  Who

22  submits this top part on page 2?

23  A.   The top part on page 2 is done by the -- basically the

24  sales or support staff that's opening the account on behalf

25  of MicroCap.  This is -- this is the Scottsdale employee and

Direct - Cruz

1  their registered person, licensed securities professional.

2  And it's their responsibility to go through the form and ask

3  the questions that they need to get familiar with the

4  customer.

5  Q.  Okay.  And so who would have -- the representative for

6  Scottsdale, where would they have received the answers to

7  fill out this form?

8  A.  This would have been through direct contact with the

9  customer, most typically done by phone.

10  Q.  Okay.  And based upon this form, who's the owner?

11  A.  William -- William Sears.

12  Q.  Can I have page 3, please.  Okay.

13        Again, sir, I'm going to direct you -- if you look

14  on your screen here, again the top portion, what firm is

15  this form?

16  A.  MicroCap Management, LLC.

17  Q.  Okay.  And what's the address -- the registered

18  address?

19  A.  The registered address is listed on the form as 13762

20  Colorado Boulevard and -- I believe that's Thompson,

21  Colorado -- or Thornton, Colorado.

22  Q.  Okay.  And then what's the mailing address?

23  A.  As indicated on the form it's 4920 Morton Road, New

24  Bern, North Carolina.

25  Q.  And, finally, what are the phone numbers and e-mail

Direct - Cruz

1    associated to this account?

2    A.   The -- the primary contact phone is 303-518-3174.  And

3    the mobile phone that was provided in this case was

4    303-518-3174.  And it looks like owner provided an e-mail as

5    well, william@williamjsears.com.

6    Q.   Okay.  And then who is the primary authorized person

7    for this account?

8    A.   William Sears.

9    Q.   Can I have page 4, please.

10        Okay, sir, can you tell me essentially what the

11   information is being placed here on page 4 regarding Alpine

12   Securities.

13   A.   This is just some additional background information

14   concerning the customer's affiliations, identifying whether,

15   you know, their -- where they do -- where they have their

16   primary banking account relationship, whether there's any

17   sort of securities industry affiliation, and whether they

18   work for the government or not.

19        Some of these -- some of the answers to these

20   questions can trigger certain requirements on our part.

21   Q.   Okay.  And, sir, what bank is being requested in this

22   form for Mr. Sears?

23   A.   Mr. Sears is disclosing that he -- he owns MicroCap,

24   discloses that they did business with Wells Fargo Bank in

25   Denver, Colorado.

Direct - Cruz

1    Q.    I'm sorry, and what city and state?

2    A.    Denver, Colorado.

3    Q.    Thank you.  Can I have page 5.

4          Can you tell the jury a little bit what's listed on

5    page 5 of this account opening document.

6    A.    Yeah, again, this is the typical background financial

7    condition and investment objectives type information that

8    would be solicited from just about any customer that's

9    seeking to open a brokerage account in the U.S.

10          And so here we go through -- we look at the annual

11   income and net worth, try to get an idea of their source of

12   their funds; a little idea of their tax status and what

13   their liquidity needs are.

14   Q.    And how much money is Mr. Sears stating his annual

15   income is?

16   A.    He has the box checked over -- checked 200,000 K, and

17   there's a note on the side that says 500K.

18   Q.    And do you know why there would be a note of 500K?

19   A.    Generally some of these questions is -- the more

20   detailed that we have the better.  Over 200K is sort of

21   broad.  And it could have been that the registered person

22   was trying to solicit more specific information out of the

23   customer to get an -- to get a better idea of the customer's

24   financial condition.

25   Q.    Okay.  So where would the 500K information come from?

Direct - Cruz

1    A.   It would come from the customer.

2    Q.   And in this case, Mr. Sears?

3    A.   Yes.

4    Q.   Okay.  What's the estimated net worth?

5    A.   The box is checked for 100 to 500K with a note of

6    400K.

7    Q.   Again, that note would have been -- that information in

8    the note would have been provided by Mr. Sears?

9    A.   Yes.

10   Q.   Okay.  And, finally, what's the liquid net worth?

11   A.   The liquid net worth is zero to 25,000.  And there's a

12   note on the side that indicates 25K.

13   Q.   Can I have page 7, please.  I'm bringing these pages

14   also up on the screen if you need to see them on the screen.

15        Can you just describe what page 7 essentially is in

16   this application.

17   A.   Sure.  This is additional background on the customer.

18   Like I said, you know, you have to look at financial

19   condition, and then the specific financial objectives of the

20   customer.

21        And so here this is just sort of getting an idea of

22   what their objectives are and risk tolerances.

23   Q.   Okay.  And based upon this application, what is Mr.

24   Sears' objectives and risk tolerance?

25   A.   The -- the investment objective that's checked is

Direct - Cruz

1    "speculation," and the risk tolerance and experiences is

2    "significant risk."

3    Q.   And can you scroll up, please.

4         And I'm circling a box that has "investment

5    experience."  What -- why do you ask about investment

6    experience to the customer?

7    A.   Yes, because in -- especially in -- especially in our

8    line of business dealings with these penny stocks, these

9    are -- these are very risky -- these are very volatile

10   stocks.  We -- we typically require only one customers that

11   would have a speculation investment objective and that can

12   demonstrate some sort of experience in dealing with

13   investing in penny stocks.

14   Q.   Okay.  And based upon Mr. Sears' answers, how many

15   years of experience does he have regarding what you refer to

16   as "in penny stocks"?

17   A.   He has 20 years checked off for stocks.  It looks like

18   there's a specific note for penny stocks, which also

19   indicates 20 -- 20 years.

20   Q.   Can I have page 8, please.

21        Okay, sir, can I have the -- thank you --

22   essentially what's being -- essentially this is a signature

23   page; is that correct?

24   A.   Yes.

25   Q.   Okay.  And signed to open this account with Alpine?

Direct - Cruz

1    A.   Yes.

2    Q.   Okay.  Who signed to open a MicroCap investment fund

3    with Alpine?

4    A.   Yeah, this appears to be a signature of William Sears.

5    Q.   Okay.  And what's the printed name next to the

6    signature?

7    A.   William Sears.

8    Q.   And what's the date?

9    A.   7-13-12.

10   Q.   So that means essentially this is the time frame that

11   Mr. Sears was asking to open an account in the name of

12   MicroCap with Alpine?

13   A.   Yes.

14   Q.   July 2012.

15   A.   Yes, that's correct.

16   Q.   Can I have page 14, please.  Can I have the whole page,

17   please.

18        Okay, sir, this looks like a banking statement; is

19   that correct?

20   A.   Yes.

21   Q.   Why would Alpine need a -- at least a page from a

22   banking statement?

23   A.   This is -- it's really two purposes.  It confirms some

24   of the information that was provided in the application

25   regarding where the account banks at, and it also serves as

Direct - Cruz

1    the address verification that's required by broker dealers

2    to get.

3    Q.    And the address verification is right below the title

4    of Wells Fargo; is that correct?

5    A.    Yes.

6    Q.    Okay.  Can I have that blown up, please.

7          And what's the address associated to this banking

8    document?

9    A.    Yes.  4920 Morton Road, New Bern, North Carolina.

10   Q.    Okay.  Now, I'm sorry, could we go back to page 13.

11         It might be a little bit hard to see, but can you

12   identify the document on page 13?

13   A.    Yes.  This -- oh, it's a little clearer here on the

14   screen.  But this is basically the copy of the driver's

15   license for -- it's a Colorado driver's license for William

16   Joseph Sears.

17   Q.    And what's the address associated to Mr. Sears'

18   driver's license?

19   A.    The address indicated on the driver's license is 13442

20   Jackson Drive, Thornton, Colorado.

21   Q.    Okay.  And why do you require identification before

22   opening an account?

23   A.    Yes, those are -- that's required by -- by regulatory

24   requirements that broker dealers are subject to.  So

25   basically we have to get a copy of an ID, whether it's a

Direct - Cruz

1    driver's license or a passport, and some sort of
2    documentation that verifies the address.
3    Q.   Can I have page 16, please.
4         Okay, sir, do you recognize what's on page 16 of
5    Government Exhibit 120?
6    A.   Just give me a moment here.
7         Okay.  Now I do.
8    Q.   Okay.  What is essentially document 16 -- or, I'm
9    sorry, not document 16, page 16?  What's the document that
10   you show on page 16 of Government Exhibit 120?
11   A.   Yeah, this appears to be part of the independent due
12   diligence the -- that would have been conducted by the back
13   office of Scottsdale.  This appears to be a -- a Secretary
14   of State printout of a record showing the managers for
15   MicroCap Management, LLC.
16   Q.   Okay.  And who is listed as a manager in this document?
17   A.   William J. Sears.
18   Q.   And do you know what state this document is essentially
19   from?
20   A.   Yes, there's a stamp that indicates it's from the
21   Secretary of State, State of Nevada.
22   Q.   And if you just look through your binder there through
23   the next several pages, does that result in due diligence
24   when it comes to Alpine's request regarding the corporation
25   documents for Microsoft -- or, excuse me, MicroCap?

Direct - Cruz

1    A.   Yes.   That's the -- yes, that's what it appears.   I

2    mean, these could have been -- these could have been

3    obtained directly from the Secretary of State website or

4    they could have been requested from the customer to provide.

5    Q.   Are there any other names listed besides Mr. William

6    Sears?

7    A.   Other than organizer on page 17, Doug Ansell, but these

8    are typically not the person that establishes the

9    corporation.   You pay somebody as an organizer, and when the

10   articles and the bylaws are set up and approved, then that

11   organizer turns it over to the true owner.

12   Q.   Okay.   And based upon your review of those documents,

13   who was the true owner of MicroCap?

14   A.   William Sears.

15   Q.   Can I have page 38, please.   Can you take a moment and

16   look through page 38 for me.

17   A.   Okay.

18   Q.   Okay.   Essentially Alpine is sending Mr. Sears an

19   e-mail; is that correct?

20   A.   Yes.

21   Q.   Okay.   And what is Alpine requesting from Mr. Sears?

22   A.   Well, it's just -- just back up and correct that.

23        So basically the communication is between Eric

24   Miller, a registered rep at Scottsdale Capital Advisors, and

25   he's asking for information regarding the copy of the

Direct - Cruz

1    driver's license and getting some additional information
2    about MicroCap Management's LL- -- LLC's income, net worth,
3    and liquid net worth.
4    Q.   And what does Mr. Sears -- if I could have the bottom
5    blown up, please.
6         What does Mr. Sears tell Alpine where the shares
7    for MicroCap came from?
8    A.   Yeah, the -- according to the e-mail, it appears that
9    the shares derived from the debt settlement agreement, it
10   doesn't really -- and that MicroCap acquired the shares,
11   that looks -- yeah, so basically looks like they derived it
12   from a debt settlement agreement.
13   Q.   Okay.  Sir, can you look at document 121.
14            MR. SIBERT:  Again, Your Honor, for the record,
15   these documents -- this document has been stipulated to
16   authentication, but not to stipulation into evidence.
17            THE COURT:  Okay.
18            MR. GOODREID:  Actually, Your Honor, I'll make this
19   one easier for counsel.  We don't object to its
20   admissibility.
21            THE COURT:  Okay.  Excellent.
22            MR. SIBERT:  Move --
23            THE COURT:  Given that there's no objection,
24   Exhibit 121 is admitted into evidence and may be published
25   to the jury.

Direct - Cruz

1    (Government's Exhibit 121 received)

2         MR. SIBERT:  Thank you, Your Honor.

3    BY MR. SIBERT:

4    Q.   Can I have Government Exhibit 121 published.

5         Okay, sir, can you tell me -- essentially the title

6    of this is labeled Security Deposit Agreement.  What does

7    that mean for Alpine or Scottsdale?

8    A.   Yes.  Basically any -- any customer that's seeking to

9    make a deposit of a -- of a low-price security through

10   Scottsdale is required to sign a security deposit

11   agreement.

12   Q.   So when you say a "deposit," can you give a little bit

13   of detail, essentially what the customer is asking or

14   agreeing to do with Scottsdale or Alpine, when it comes to

15   stating -- the security deposit agreement.

16   A.   Yes.  Sure.  No -- like I -- like I said before, we

17   basically have one line of business and that involves the

18   clearance, settlement, and liquidation of low-price

19   securities.  So these are customers that have acquired

20   shares in some form or manner like I described before.

21        In many cases they received a certificate and now

22   they're seeking to deposit that certificate so that it can

23   trade in the open marketplace.  Now, before that can happen,

24   there has to be a certain amount of vetting and due

25   diligence to ensure that it's not restricted.  But this sort

1    of -- this agreement sort of initiates that process.

2             So it tells us, "I'm seeking to deposit.  Here's my

3    signed agreement.  I'm going to agree to abide by the

4    terms," and from there we'll go through the process of

5    clearing the security that he seeks to deposit and sell.

6    Q.   Okay.  So when you're saying the brokerage firm,

7    Alpine/Scottsdale, you say they clear the stocks or shares.

8    A.   Yes.

9    Q.   Does that mean that the shares and stocks are no longer

10   restricted?

11   A.   Yes.

12   Q.   And so there's essentially, as you stated, a due

13   diligence process by the brokerage house, Scottsdale, to

14   make sure these shares or stocks can be put on the OTC

15   Market?

16   A.   Yes, that is correct.

17   Q.   And one of those requirements is to make sure the

18   certificate, the stocks, are not restricted?

19   A.   Yes.

20   Q.   Okay.  All right.  Now, who's requesting -- based upon

21   the front part of -- or page 1 of this document 12 --

22   Exhibit 121, who is requesting a deposit of securities?

23   A.   This would be William Sears on behalf of MicroCap

24   Management.

25   Q.   Okay.  And where are the securities -- where were they

Direct - Cruz

1    issued from?

2    A.   The issuer -- or company in this case is FusionPharm,

3    Inc., and during this time period they traded under the

4    symbol FSPM.

5    Q.   And that symbol is directly in the middle there of

6    that -- of the top part of the page?

7    A.   Yes.

8    Q.   And then how many shares is Mr. Sears asking to be

9    deposited in his account with Scottsdale or Alpine?

10   A.   He's seeking to deposit 16,273 shares.

11   Q.   So 16,273 shares of FusionPharm stock?

12   A.   Yes.

13   Q.   Thank you.  And, I'm sorry, can we go to the bottom.

14        Whose signature is at the bottom of that first

15   page?

16   A.   Yes, this appears to be a William Sears signature.

17   Q.   And what's the date of this deposit?

18   A.   July 12th, 2012.

19   Q.   Can we have page 2 of document -- or of Exhibit 121.

20   I'm going to need that blown up.  Thank you.  Can I have the

21   top part blown up, please.

22        Okay, sir, I've blown up the top part.  You can see

23   it.  I know it's probably small in the binders, too?

24   A.   Okay, I can see it.

25   Q.   Again, who owns the shares of FusionPharm stock?

Direct - Cruz

1    A.    This would be MicroCap Management.

2    Q.    Okay.  And, again, we talked about the 16,273 shares,

3    correct?

4    A.    Yes.

5    Q.    Of FusionPharm stock.

6    A.    Yes.

7    Q.    Shares outstanding, why is that listed there?

8    A.    The shares outstanding, or the issued and outstanding,

9    is -- is critical as part of the vetting process to

10   determine ownership and -- and to our analysis as to whether

11   the person making the deposit is a potential affiliate or

12   not.

13   Q.    So I want to slow down here.  You said this is

14   important to your process when it -- when you're trying to

15   consider if the person that's depositing these shares is an

16   affiliate; is that correct?

17   A.    Yes.

18   Q.    Okay.  Who at -- an affiliate has a broad term; is that

19   correct?

20   A.    Yes.  That's correct.

21   Q.    Does it also include a control owner?

22   A.    Yes.

23   Q.    Can you tell the juror what an affiliate or a control

24   owner is for the purposes of being able to clear stock to

25   allow it to be traded on the over-the-counter markets?

Direct - Cruz

1    A.   Sure.   In terms of ownership -- and there's other ways
2    you can be a control person, but in terms of ownership, if
3    you own 10 percent more of the issued and outstanding, under
4    the securities laws that we operate under you're going to be
5    presumed to be a -- an affiliate, a control person.   A lot
6    of times those words are used synonymously.
7    Q.   You said 10 percent.
8    A.   Or more, yes.
9    Q.   Of owning the shares of stock.
10   A.   10 percent of the issued and outstanding.
11   Q.   Okay.   And in this case, this would be FusionPharm
12   stock?
13   A.   Yes.
14   Q.   Okay.   Are there any other things that define what an
15   affiliate or control person could be, besides the volume of
16   10 percent?
17   A.   Sure.   There's -- you know, it's a
18   facts-and-circumstances analysis, but over time, there's
19   been interpretations and court rulings.   And essentially if
20   you're a director, a senior officer of a firm, you're going
21   to be deemed a control person of that issuer.
22        You can -- you can also be deemed a control person
23   by contract, as you were -- if you are -- if you were under
24   some sort of arrangement when you're exercising control of
25   the company.   But those -- but those are the primary things.

Direct - Cruz

1    Either a senior officer or director or a 10-percent-or-more
2    shareholder.
3    Q.    How about a senior management level in a firm?
4    A.    Absolutely, it could be.  It would just depend on the
5    circumstances.
6    Q.    How about a senior advisor to the directors and
7    officers?
8    A.    Yes, depending on the type of influence that person
9    could wield to the directors or the senior management,
10   yes.
11   Q.    If the -- if a partner of a firm, would that be
12   considered a control person?
13   A.    Yes.  Absolutely.
14   Q.    Ownership?  Owner?
15   A.    Yes.
16   Q.    Okay.  But for the purposes of this form, you're
17   looking at the 10-percent volume; is that correct?
18   A.    Yes.
19   Q.    Relating to how many shares are being deposited versus
20   to how many shares are outstanding?
21   A.    Correct.
22   Q.    All right.  Can I please now have -- let me just ask
23   you about this:  What does the public float mean?
24   A.    The -- the public float indicates the number of shares
25   that are free-trading in the open marketplace.

1174

Direct - Cruz

1     Q.   So all the shares that essentially the public --

2     investors that have shares are putting their shares on the

3     OTC Marketplace?

4     A.   Yes.  In essence, once this deposit gets approved, that

5     float would be increased by the 16,273 shares that were

6     going to approve, or not approve, depending on the case.

7     Q.   And what's the market value of these 16,000-plus

8     shares?

9     A.   This information is provided by the customer, but it's

10    generally based on the last closing price of the security

11    and, as indicated on this form, the customer indicated a

12    value of 37,427 and 90 cents.

13    Q.   Okay.  Can I have -- can you please zoom in on box 13

14    on page 2 of this form.

15         Okay.  Box 13 -- box 13 is confirming what?

16    A.   This -- this is a question designed to solicit the

17    total ownership of FusionPharm so that we can do our

18    affiliate analysis.  So just because he's depositing 16,273

19    shares, the customer may own other shares through his wife,

20    through his kids, through other entities.  All those need to

21    be aggregated for purposes of determining the 10 percent

22    ownership analysis.

23    Q.   And how many shares is Mr. Sears stating that he owns

24    at FusionPharm stock?

25    A.   According to the answer provided here, he's indicating

Direct - Cruz

1    that he owns 16,273, which is the amount being deposited.

2    Q.   Okay.  Can I please have box 14 blown up.  Okay.

3         Now, this box has 5 percent listed on it.  Can you

4    explain to the jury the purpose of this box, box 14, on page

5    2 of Government Exhibit 121.

6    A.   Yes.  The first part is pretty clear.  We talk about

7    officers, directors, affiliate, control persons, which is

8    what we're trying to identify.  The 5 percent owner doesn't

9    coincide, I know, to the 10 percent owner, but it's still a

10   significant ownership, so it would still be an issue of

11   concern that might trigger additional due diligence on our

12   part.  Even though it doesn't meet the affiliate threshold,

13   we would still consider the person a significant owner in

14   the security.

15        In addition, the 5 percent could trigger other

16   regulatory responsibilities that large shareholders are

17   subject to.

18   Q.   Okay.  So essentially the 5 percent raises a red flag

19   for your firm?

20   A.   Yes, I -- don't -- I'll use that shorter answer next

21   time, but yes.

22   Q.   Okay.  Also, is this consistent with the percentage

23   required by over-the-counter markets, if you know?

24   A.   The percentage of over-the-counter markets for -- I'm

25   sorry.

1176

Direct - Cruz

1    Q.    When they're looking for percentage of ownership of

2    shares, do you know what their requirement is?

3    A.    No, but 5 percent is not uncommon, if I -- only because

4    for certain types of issuers, 5 percent triggers additional

5    reporting responsibilities.  And so, you know, that's a

6    number that they will -- will trigger on, but -- you know,

7    it's my understanding that pretty much the industry, in

8    terms of affiliate status, it's going to be 10 percent or

9    more.

10   Q.    And Mr. Sears's answer on this form was what?

11   A.    No.

12   Q.    And can I please have box 15 blown up.

13         And why is Alpine concerned about the number of

14   shares sold before this deposit?

15   A.    Two reasons.  It gives us -- it gives us an idea if

16   this customer has experience trading with these securities,

17   but, more specifically, if the customer is an affiliate,

18   they'd be subject to certain volume limitations.  And the

19   number provided there would be factored in in determining

20   what the -- how those volume limitations would apply to the

21   customers -- an affiliate customer seeking to sell the

22   securities.

23   Q.    Do you know what those volume limitations are for an

24   affiliate?

25   A.    Yes.

Direct - Cruz

1   Q.   And can you tell the jury what those volume limitations

2   are.

3   A.   Sure.   It's 1 percent for any 90-day period.

4   Q.   So --

5   A.   1 percent of the issued and outstanding, I should -- I

6   should say.

7   Q.   Okay.   So 1 percent -- in this case with FusionPharm, 1

8   percent of the outstanding shares -- that 1 percent of the

9   FusionPharm outstanding shares are not being held by

10  FusionPharm?

11  A.   Right.   So whatever -- so -- so let me explain that

12  maybe a little -- a little differently.   So as we mentioned

13  before, we had the issued and outstanding, so you just take

14  1 percent of that, and that number would represent the

15  amount that an affiliate can sell under any 90-day, or

16  three-month, period.

17  Q.   So anyone that's an affiliate or, as you described it,

18  control person, like director, an officer, a senior manager,

19  someone that can make important decisions on behalf of a

20  company, would only be allowed to sell 1 percent of the

21  outstanding issued shares?

22  A.   Yes.   Assuming they met other requirements --

23          THE COURT:   Every 90 days, right?   That wasn't in

24  your question.

25          MR. SIBERT:   I was getting there, Your Honor.

                              Direct - Cruz

1           THE COURT:  Let's get it --
2           MR. SIBERT:  I'm trying to teach --
3           THE COURT:  Let's get a question that accurately --
4           MR. SIBERT:  Okay, well --
5           THE WITNESS:  I'm sorry, I'll wait.
6    BY MR. SIBERT:
7    Q.   Okay.  Sir, so let me start over real quick.  I feel
8    like Uncle Vinny sometimes.
9           So going back to it, any affiliate or control
10   person, and as you defined control person, a director,
11   officer, senior manager, someone that can make important
12   decisions for a company, those -- those people are only
13   allowed to sell 1 percent of the issued and outstanding
14   shares of their company every 90 days?
15   A.   Yes.
16   Q.   Thank you.  Okay.  And then can I have -- let's just
17   blow up 17, please.
18          What are you asking, in this case Mr. Sears,
19   regarding box 17, if relying on Rule 144 for resale?
20   A.   Yes.  So question 17 is seeking to get a history of the
21   stock and where it came from for purposes of establishing
22   the holding period that's applicable to Rule 144.
23   Q.   Okay.  Are there any reasons listed or is there any
24   history listed by Mr. Sears in this document?  I guess on
25   page 2.

Direct - Cruz

1   A.   No, there -- it doesn't appear that that question was

2   answered.

3   Q.   Can I have page 3, please.  Can I have the text blown

4   up.  Again, very small writing here.  Essentially can I have

5   the top portion blown up.

6         Again, this is page 3 of the -- essentially the

7   owners agreement with Alpine when it comes to depositing

8   shares?

9   A.   Yes.  And I should note this is an Alpine form as

10  opposed to a Scottsdale Capital form.

11  Q.   Okay.  And can you just tell the jury, essentially in

12  general terms, what this -- what paragraphs 1 through 6 are

13  telling the client.

14  A.   Essentially it's -- it's attempting to explain Alpine's

15  role as a clearing firm, that they may only do the

16  settlement and the clearing process of it.  It's asking the

17  customer to -- you know, it's advising the customer its

18  requirement to cooperate in the event there are information

19  requests.

20        It provides for certain indemnifications and, more

21  importantly, it's -- it's putting a requirement on the

22  customer to update the firm, Alpine in this case, if there's

23  any changes in the information provided in this document.

24  Q.   So the client has a responsibility to keep your

25  brokerage firm updated on information?

Direct - Cruz

1   A.   Yes.

2   Q.   That includes affiliation and control person status?

3   A.   Yes.

4   Q.   And can you go to the bottom, please.

5        Who signs this form?

6   A.   The customer, William Sears.

7   Q.   And the date?

8   A.   July 12th, 2012.

9   Q.   Can I have page 4, please.

10       Sir, do you know who -- excuse me -- Oppenheimer

11  is?

12  A.   Yes.  Oppenheimer is another self-clearing broker

13  dealer.

14  Q.   Okay.

15  A.   I think they operate out of New York.

16  Q.   And do you know why Oppenheimer would have a page in

17  this request to deposit shares with Alpine Securities -- or

18  Brokerage, I should say?

19  A.   As I recall, the circumstances of the deposit, this

20  document was provided as part of the background information

21  that's part of the due diligence, the vetting process that

22  we discussed.

23  Q.   Okay.  And so essentially what does this document from

24  Alpine show -- not Alpine, Oppenheimer?

25  A.   So basically the history of this stock is that it came

Direct - Cruz

1   from another broker dealer, in this case, Oppenheimer.  So
2   prior to coming to Scottsdale Capital, the customer had an
3   account at Oppenheimer and deposited those shares through
4   Oppenheimer.
5   Q.   Okay.  So in layman's terms, a transfer from one
6   brokerage house to your brokerage, Alpine/Scottsdale?
7   A.   Yes.
8   Q.   Okay.  Does that affect the way you conduct your due
9   diligence regarding the restriction of shares?
10  A.   For -- for low-price penny stocks, not -- not -- not
11  really.  Even though technically coming from a broker
12  dealer, they'd already been vetted, they're already
13  free-trading, but just because of the unique regulatory
14  environment concerning these securities, we do our own due
15  diligence.  It gives us some comfort, but we're still going
16  to do due diligence to verify the history and background of
17  the stock and make sure that it's not restricted.
18  Q.   So based upon your answer there, do you know if
19  Oppenheimer did a due diligence regarding the restriction of
20  these securities?
21  A.   I do not.
22  Q.   All right.  Can I have page 5, please.
23        Okay.  Here's -- essentially could you tell me
24  the -- the importance of the checklist that is being titled
25  here on page 5.

Direct - Cruz

1    A.   Sure.  This is the -- this is -- this is -- this is our
2    document that we use that -- that verifies the due diligence
3    steps that we took to determine the free-trading status of
4    the securities being deposited -- or, in essence, verifying
5    that the stock is not restricted.  So not -- it kind of
6    walks us through the analysis to make sure it's done right.
7    It also provides our regulatory requirement to show that we
8    actually conducted these steps.
9    Q.   All right.  So, again, to remain consistent, what firm
10   is requesting the deposit of shares?
11   A.   MicroCap Management.
12   Q.   In the name of who?
13   A.   William Sears.
14   Q.   And the shares that are being requested to be
15   free-trading shares?
16   A.   FusionPharm, Inc.
17   Q.   Okay.  And now let's just walk through each section of
18   this checklist.  First section is titled what?
19   A.   Affiliate/Control Person.
20   Q.   Okay.  And can you tell essentially why -- well, can
21   you explain -- there's numbers here, 1, 2, 3, regarding the
22   lines.  What is Scottsdale looking at here when it comes to
23   affiliation status?
24   A.   Sure.  This is -- this is the first part of the
25   analysis.  It's probably one of the more important aspects

1    of the analysis.  And here we're trying to determine

2    control; the control for purposes of whether we need to

3    treat MicroCap Management as an affiliate of the issuer,

4    which is FusionPharm.

5              And so, you know, we first flat-out ask the

6    question:  Are you a 10 percent owner or an affiliate or

7    control person?

8    Q.   So who are you relying on for the answer when it comes

9    to line 1?

10   A.   Line 1, this is our -- this is our own analysis, so

11   this is based on the documentation that was provided by the

12   customer in connection with the deposit.  It also may

13   reflect our own independent due diligence to verify to the

14   extent that we can.  So, in other words, we could go to the

15   issuer and get some information to them, or the transfer

16   agent, which would be outside of the customer relationship.

17   Q.   Okay.  And essentially No. 1, you're looking again at

18   that volume; is that correct?

19   A.   Yes.

20   Q.   Where do you find information -- we talked about

21   control person.  Where do you find the information regarding

22   if -- if Mr. Sears is a control person of FusionPharm?

23   A.   Well --

24   Q.   His role, *per se*.

25   A.   Yeah.  That -- like I said, that primarily comes from

Direct - Cruz

1    the deposit security request form that we discussed earlier,

2    the legal -- and the legal opinion.

3    Q.   Okay.  So the information that the client gives you, in

4    this case, Mr. Sears, and also you stated the information

5    that's placed in the legal opinion?

6    A.   Yes.

7    Q.   Okay.  Can I -- let's talk about box 2 here, 144

8    holding period.  Can you describe to the jury essentially

9    the importance of the 144 holding period.

10   A.   Yes.  The rule -- 144 is referring to Rule 144.  And

11   that's -- and that's one of the exemptions that we rely on

12   to determine whether a stock is free-trading or not.  It's

13   not the only one, but it's the primary one that we look at.

14        And Rule 144 has certain holding requirements that

15   are set forth right on the rule, depending on whether the

16   company is reporting or nonreporting.  And that just means

17   whether the company makes regular 10-K reports with the

18   Securities and Exchange Commission, or whether it makes

19   alternative filings with something that's called the Pink

20   Sheets, or OTC Markets.

21        So if it's a nonreporting company, which is the

22   case here for FusionPharm, the holding period is going to be

23   one year.

24   Q.   When you say "holding period is going to be one year,"

25   what is being held?

Direct - Cruz

1    A.    Yes.  So basically the holding period refers to the
2    amount of time that the investor is -- has held the
3    securities.
4    Q.    Okay.  The stock.
5    A.    Yes.  The stock.
6    Q.    Okay.  And just to back you up, you were talking about
7    the Securities and Exchange Commission.  That's also known
8    as the SEC?
9    A.    Yes.
10   Q.    Okay.  And you mentioned a company versus a
11   nonreporting company.  A reporting company needs to make
12   disclosures to the SEC.
13   A.    Yes.
14   Q.    A nonreporting company, where do they make their
15   disclosures?
16   A.    Generally the industry practice is that those
17   disclosures are made in the OTC Markets website.
18   Q.    What's the purpose for a nonreporting company to make
19   those disclosures with the OTC Markets?
20   A.    Those are -- the -- it's -- basically it's a -- it's a
21   regulatory requirement.  It doesn't necessarily have to be
22   at OTC Market, that -- just by industry practice, that is
23   going to become the default location.  But, you know,
24   it's -- it's basically a statutory requirement that if
25   they're publicly traded that this information -- I mean,

Direct - Cruz

1    it's Rule 15c2-11, but I don't really need to go into that.

2    Q.   Okay.

3    A.   But it's basically a securities regulatory requirement.

4    They still have to make some sort of disclosures to the

5    public -- to the investing public so they can make a

6    decision on whether to purchase or not purchase the issuer

7    securities.

8    Q.   Okay.  So it doesn't matter reporting or nonreporting,

9    if they're trading shares to the public, there needs to be

10   some type of disclosure?

11   A.   Yes.

12   Q.   Okay.  Finally, can I have the bottom section that says

13   Shell Company.

14        What's going on with the due diligence when it

15   comes to Alpine looking into a shell company?

16   A.   Basically for shell companies, if the -- if the company

17   was a prior shell -- or if the company is a shell, let's

18   just start with there -- the Rule 144 would not be available

19   as an exemption.

20   Q.   Okay.  What do you mean by "shell company"?

21   A.   A shell company is basically an issuer that was set up

22   without any assets or business operations.

23   Q.   Okay.  And so it -- if I understand you correctly, if

24   Alpine or Scottsdale determines that the company requesting

25   these -- these shares would be freely traded is a shell

1   company, you can't rely on the Rule 144 exceptions?

2   A.   Yes, that's right.

3   Q.   Can I have page 2, please.  I'm sorry, I need page 6,

4   which is page 2 of . . .

5        Okay.  This is a continuation of your checklist; is

6   that correct?

7   A.   Yes.

8   Q.   Okay.  What did -- what are you looking for here when

9   you're looking at current information available?

10  A.   Yes.  And essentially under certain conditions under

11  Rule 144, there is a requirement that current information be

12  available.  And current information is just referring to the

13  management, the business operations, and the financial

14  condition of the company.  Those are the three main areas.

15  Q.   Okay.  And where would Scottsdale look to see -- where

16  would Scottsdale look for this information regarding

17  FusionPharm?

18  A.   The first place we go to, actually, for this would be

19  the OTC Markets, or the SEC filings, to see if the -- if the

20  company is current with the information that's available.

21  We may also ask the attorney writing the opinion and the

22  customer to provide some sort of opinion in that regard as

23  well.

24  Q.   All right.  So when -- if I understand you correctly,

25  FusionPharm was a nonreporting company; is that right?

Direct - Cruz

1    A.    Yes.

2    Q.    And so as a nonreporting company, where would you have

3    to look for your due diligence when it came to current

4    information?

5    A.    Yeah, typically the only place we can go in that case

6    would be the Pink Sheets.  So here you can see on line 2, it

7    indicates exactly where we got it.  PS stands for Pink

8    Sheets.  That's the prior name.  It's now called OTC

9    Marketplace.

10            So basically there was a PS attorney letter that

11   was on file there, and it was dated June 14th, 2012, whereby

12   it expressed some opinion as to the current information that

13   is available.

14   Q.    All right.  So what is -- what do you mean by PS

15   attorney letter?

16   A.    That's basically describing the document that was filed

17   with OTC Markets.  PS, Pink Sheets, like I said before, used

18   to be called Pink Sheets.  So PS is just short for Pink

19   Sheets.  And --

20   Q.    Actually --

21   A.    And they actually just called the document attorney

22   letter.

23   Q.    Okay.  And so why do you specifically look at the

24   attorney letter at OTC Markets for FusionPharm and not other

25   documents?

Direct - Cruz

A.    Actually, we would look at the other documents.  It's

just -- the reviewer in this case noted that there were a

specific letter that pertained to current information in the

filings.  But generally as part of our procedures, the

attorney doing the review would have pulled the -- would

have looked at all the information that's filed with Pink

Sheets.

Q.    Okay.  And what does -- based upon your experience,

what's the attorney saying regarding the Pink Sheets

attorney letter regarding the current information of the

company, in this case, FusionPharm?

A.    From what I recall in these letters -- it's been a

while since I looked at it -- it will set forth the

requirements of Rule 211, and just kind of walk through how

that information that's required is -- is present and

available on the company's public filings.

          So basically it's just referring to what's already

been filed with Pink Sheets.  So if -- someone could really

just write their own letter by reviewing those filings and

make a determination.  And we're looking, like I said, for

three things:  One, we want to make sure the management is

disclosed so we know who the president and director is.  We

want to know what business that they do, and we want to see

the financials.

Q.    So you wanted to know who the people are running the

Direct - Cruz

1    company?

2    A.    Yes.

3    Q.    Okay.  What's the importance of the legal opinion?

4    A.    That's the next item on the review checklist.  And so,

5    like I said, the deposited security request and the legal

6    opinion really kind of form the whole basis of the analysis

7    that we're going to do to verify that the stock is

8    free-trading.

9            One, we're not -- not only are we relying on the

10   opinions being made, but it gives us the background of the

11   security of how the customer acquired it, and it's walking

12   us through the history of the -- of the stock.  And based on

13   that, that's -- that's -- we'll sort of kind of mirror what

14   the attorney does, look at the same documents that the

15   attorney looked at, and ensure that there's no

16   inconsistencies.

17   Q.    So in this case, legal opinion, is this a letter that

18   you receive as part of a package when it comes to depositing

19   shares with Alpine or Scottsdale?  Is that a legal letter?

20   A.    Yes.

21   Q.    Who writes that letter?

22   A.    Generally an attorney that's engaged by the counsel --

23   or I mean by the investor, or sometimes it could be the

24   issuer's counsel, as well.

25   Q.    So the -- you're relying largely on what the attorney

Direct - Cruz

1    is submitting in that letter regarding Rule 144?

2              MR. GOODREID:  Objection.  Leading.

3              THE COURT:  Sustained.

4    BY MR. SIBERT:

5    Q.   Why is the attorney letter important to you as a

6    brokerage -- Alpine Securities, Scottsdale, why is that

7    attorney letter important to you when it comes to 144 --

8    Rule 144 in clearing this stock?

9    A.   Sure.  I mean, we -- as we're -- we're relying on that

10   opinion because it's a -- it's a -- it's a -- it's a -- it's

11   a third-party source, coming from a professional who has

12   a -- has a -- has a legal and professional responsibility.

13   And not just to the client, but as well to the securities

14   marketplace.

15             So to us, it -- it has weight and importance.  It's

16   not the only thing that we looked at, but it's -- it's a

17   critical document in our analysis.

18   Q.   All right.  Let's look at disciplinary background.  You

19   have some names here.  Can you just talk about this box

20   here, please.

21   A.   Sure.  Disciplinary background, here we're looking for

22   background and history that might be a red flag.

23   Specifically we're looking for regulatory backgrounds.  Has

24   the person been barred by the SEC or some other regulatory

25   agency, or maybe even some sort of criminal action?  So we

                                Direct - Cruz

1   want to make sure that the customer and the key officers

2   that are involved with the issuer do not have any of these

3   disciplinary disclosures.

4   Q.   Okay.  When you say "issuer," in this case it's

5   FusionPharm; is that right?

6   A.   Yes.

7   Q.   Okay.  So you look at each of these names individually;

8   is that correct?

9   A.   Yes.

10  Q.   Okay.  One of these names is Guy Jean-Pierre.

11  A.   Yes.

12  Q.   Okay.  Do you look -- do you know if Alpine or

13  Scottsdale looks into if lawyers are being investigated by

14  the SEC or complaining -- or if there's complaints by the

15  SEC or state bars?

16  A.   Well, that's part of the search.  It's mainly done

17  online through -- through Google.  But we do specifically go

18  to the SEC website, type in each one of those person's

19  names.  And then we'll also do a general Google search.

20  And, based on that, depending on the types of hits that we

21  get, you know, we may do some additional inquiries or ask

22  for some additional information from the customer.

23  Q.   And when the search was conducted, I assume there's no

24  hits that were found?

25  A.   Yes, that's what's indicated on the form.

Q.   Okay.  And the date of this form being signed is what?

A.   It -- it was approved on August 6th, 2012.

Q.   Okay.  And do you know this person by the name of
Tim -- is it Scarpino?

A.   Yes.

Q.   And who -- do you know who that person is?

A.   Yes, he's a person that was registered at Scottsdale
Capital and basically he's one of our customer relations
representatives.

Q.   Okay.  And can you go down to the bottom of that page,
please.

There's some notes being made here.  Do you know
the importance of these notes?

A.   Yes.  Those are actually my handwritten notes.
Basically, I -- I would work the -- I had somebody on my
legal team that would go through all the steps, review all
the documents, fill in the checklist, and that person would
come into my office as a secondary review, discuss what he
would -- what that reviewer had found.  And so these are
just sort of -- my sort of checklist of basic questions that
I would ask of the attorney that actually completed the
checklist.

Q.   And so you said questions, but essentially what are you
writing here when you say "no affiliate, no shell,
consulting services"?

Direct - Cruz

1    A.   Yes.  So basically the -- you know, the first two lines

2    sort of give us a quick synopsis of where the securities

3    came from.  It's my shorthand, "Aged cert held one plus year

4    by client."  Consulting services is -- basically indicates

5    how the -- how the customer acquired it, as opposed to

6    buying the security, or receiving it in connection with a

7    convertible note.  No affiliate, it just evidences that we

8    discussed it.  And I was comfortable that he was not an

9    affiliate.  And the same goes, no shell.  That I was

10   satisfied with the due diligence that was done, and making a

11   determination that the company was not a shell.

12   Q.   Okay.  And, I'm sorry, can you scroll up -- is that

13   your note, N/A?

14   A.   Yes.

15   Q.   Do you know why you noted N/A under legal opinion?

16   A.   Well, yes, because the -- the securities that came into

17   us were -- were supposedly already free-trading because they

18   came from another broker dealer, Oppenheimer, and they

19   tacked back to a note, or a -- or a stock certificate that

20   was actually dated a long time ago, so we were able to

21   independently verify that to the transfer agent.  And so in

22   this case, the security -- the opinion that was provided, it

23   was -- it was -- it was the older opinion that maybe that

24   was provided when they did the Oppenheimer deposit.

25            And N/A, I was just sort of checking it off that we

Direct - Cruz

1    weren't going to require a new opinion be issued.  We

2    were -- we were satisfied with the history of this stock and

3    we were going to make the determination for it to be

4    approved.

5    Q.    You relied on that legal opinion letter?

6    A.    Yes.

7    Q.    Okay.  And you keep saying the securities were cleared.

8    What does that mean?

9    A.    That means they were -- that -- cleared itself means

10   that they were in a location that could be traded by the

11   broker dealer, now it's --

12   Q.    Are restricted securities cleared?

13   A.    They can be, but they shouldn't be.

14   Q.    And why is that?

15   A.    Well, because restricted securities are not permitted

16   to be put in the marketplace.

17   Q.    So --

18   A.    I mean, I'm simplifying the -- you know, basically the

19   step is that it gets -- clearing is a technical term that

20   means it's sold and registered in a street name through the

21   DTC, which is probably, you know -- we don't really probably

22   need to go here -- go there for this purpose, but it

23   basically allows broker dealers to trade securities

24   electronically, so without having the -- without having to

25   deliver a physical certificate, had it repapered in the name

Direct - Cruz

1   of the person who's purchasing it.  All of this is done

2   electronically, book entry -- book entry form through the

3   Depository Trust Company, DTC.

4   Q.  And when you say "this transfer agent," do you know who

5   you were relying on in -- regarding FusionPharm when you get

6   documents from the transfer agent?

7   A.  Sure.  The transfer agent -- we identify that on the

8   checklist, it's the last box.  Looks like it was Pacific

9   Stock.

10  Q.  Okay.  And can you look at page 13 of document --

11  excuse me, document 121.  Do you recognize Exhibit -- what's

12  on page 13?

13  A.  Yes.

14  Q.  And can you look at page 14.

15  A.  Yes.

16  Q.  Is that the second page of a legal opinion letter?

17  A.  Yes, I believe so.

18  Q.  Okay.  Is this the legal opinion letter that you --

19  that your firm relied on when it came to, essentially, your

20  due diligence?

21  A.  Yes.

22  Q.  And so what's important when you receive one of these

23  legal letters?  What are you looking for in that legal

24  letter specifically when it comes to being able to clear

25  these certificates of shares to be traded?

Direct - Cruz

1    A.   Typically the -- the legal opinion must specifically

2    identify which exemption is being relied upon.  In this

3    case, it's Rule 144.  And then from there, we would expect

4    an analysis that conforms with the Rule 144 requirements.

5    And like I mentioned before, that generally deals with

6    affiliate status, holding period, and shell status, and

7    sometimes current information.

8    Q.   Okay.  Okay.  Can you -- can I have page 1 -- excuse

9    me, not page 1, but I need page 13.

10   A.   I'm sorry, what page?

11   Q.   Page 13.  Which is the first page of the legal opinion

12   letter.

13   A.   Okay.

14   Q.   Can you circle on your screen essentially where you're

15   looking at for the holding period regarding the 144 -- Rule

16   144 requirements.  And if you touch your screen --

17   A.   I can circle that?

18            THE COURT:  You should have a stylus up there.

19            COURTROOM DEPUTY:  I can't find it.

20            MR. SIBERT:  They go missing, Your Honor.

21            THE WITNESS:  There is a red mark that --

22            THE COURT:  Hold on, hold on, hold on.

23            Ms. Frank, do you have anything over there at your

24   station?

25            COURTROOM DEPUTY:  I don't.

Direct - Cruz

1    THE COURT:  All right.

2    BY MR. SIBERT:

3    Q.   If you do --

4    THE COURT:  Make a note to get yourself some.

5    Okay.

6    All right.  Go ahead, sir.

7    BY MR. SIBERT:

8    Q.   If you do your best, I'll try --

9    A.   It's -- there's like a little header, it's about a

10   little bit past halfway down.

11   Q.   Can I have this blown down, please.

12   A.   Yes, it's called holding period.  Not all attorneys are

13   nice enough to put little headers so it's easy to find.

14   They know we're going to be looking for that information so

15   it helps if we can go right to it.

16   But essentially this -- this paragraph presumably

17   would set forth the holding requirement and how that holding

18   requirement was met.

19   Q.   Okay.  So going back to what you testified before, this

20   would show that Mr. Sears, through this letter, held the

21   shares of FusionPharm for one year to meet the 144

22   exceptions to be able to clear these shares?

23   MR. GOODREID:  Objection.  Leading.

24   THE COURT:  Sustained.

25   BY MR. SIBERT:

1    Q.    Okay.  Can you tell me what the holding period means

2    for Mr. Sears in this legal opinion letter?  Or let me back

3    up.

4           Why is the holding period in this legal letter

5    critical for Scottsdale/Alpine?

6    A.    Well, it's -- it -- it's important because that's

7    what -- like I said, that's one of the primary elements for

8    Rule 144.  If you meet the holding -- Rule 144 is a safe

9    harbor exemption.  If you meet the -- if you meet the

10   holding period requirement, you're not going to be deemed an

11   underwriter or person who purchased with a view towards

12   distribution, which is what this whole analysis is seeking

13   to achieve.

14          And here, the opinion is specifically stating the

15   Rule 144 requires a one-year holding period, and he

16   stated -- and he stated the requirement of when that begins,

17   which is when the purchase price is fully paid for.

18   Q.    Okay.  And this letter, who would have to hold

19   FusionPharm for one year?

20   A.    Yes.

21   Q.    Who would?

22   A.    Oh, the -- the -- the seller's basically the customer,

23   the person who's seeking to deposit and sell the shares.

24          Now, there is --

25   Q.    And do you remember in this package who that was?

Direct - Cruz

1     A.    Yes.

2     Q.    Who was that?

3     A.    William Sears.

4     Q.    Okay.  If you didn't have this paragraph in this legal

5     opinion letter, would you allow these shares to be traded,

6     or in your words, cleared?

7     A.    Well, it doesn't need to be written this way, but it

8     needs to address holding period in some way.

9     Q.    Okay.  So if there's no mention of holding period,

10    would your firm allow these shares to be traded on the OTC

11    Markets?

12    A.    No.  It probably -- we probably would seek some

13    clarification.  Probably ask for the opinion to be

14    rewritten, otherwise we would not accept the deposit.

15    Q.    And then can I have page 2, please.  Can I have

16    paragraph C blown up.

17          Okay.  What is paragraph C in this legal opinion

18    letter telling your brokerage form regarding the ownership

19    of these shares?  Or maybe I should say affiliation of these

20    shares.

21    A.    Yes.  So -- so basically this is the -- the opinion

22    part of the letter as opposed to the factual and rule

23    background.  And so he's stating in a series of conclusions,

24    one of which is subparagraph C, and is basically opining

25    based on representation that he received, I guess, that the

1201
Direct - Cruz

1    shareholder is not now and nor has he been an affiliate for

2    the past 90 days.

3    Q.   Okay.  And who's the shareholder with this package?

4    A.   William Sears.

5    Q.   Okay.  And he has not been an affiliate for what

6    company?

7    A.   FusionPharm.

8    Q.   Has not been a control person as well?

9    A.   Correct.

10   Q.   If -- if this was not in the legal opinion letter,

11   would you be able to clear these shares when it came to not

12   knowing the status of Mr. Sears' affiliation with

13   FusionPharm?

14   A.   No, we would -- we would deem the legal opinion

15   defective.

16   Q.   Okay.  And can I just have page 1 real quick.  I'm

17   sorry, right -- thank you, page 13, I should say.

18        Who's sending, essentially, this legal letter?

19   A.   Yeah, it appears it's coming from Complete Legal

20   Solutions.

21   Q.   Okay.  And then who's it being sent to?

22   A.   To the transfer agent.

23   Q.   And who's the transfer agent -- can I have that blown

24   up, please.

25        Who's the transfer agent?

Direct - Cruz

1    A.    Yeah, in this case -- or during this time that this

2    opinion is written in 2010, it indicates it was PacWest

3    Transfer.

4    Q.    Do you know who PacWest was?

5    A.    I -- I don't recall them, but it's not uncommon for

6    issuers to change transfer agents.

7    Q.    Okay.  And can you just -- the "Re:" line here.

8    A.    Yes.  This is regarding BBYB stock to be registered to

9    MicroCap Management, LLC.

10   Q.    And can I have page 14, please.

11         Who's the attorney signing this letter?

12   A.    Leslie Dinwoodie.

13   Q.    Thank you.  Now, if Mr. Sears wasn't listed as a

14   nonaffiliate as stated in this legal letter, but was

15   actually an affiliate to FusionPharm, would there be

16   additional requirements?

17   A.    Yes, absolutely.

18   Q.    Okay.  And what would those additional requirements be

19   in order for the shares not to be registered -- or for the

20   shares not to be restricted?

21   A.    Basically -- so basically all the other requirements

22   besides holding period become applicable, and this

23   includes -- this includes current information and volume

24   limitations -- and I almost forgot and the requirement to

25   file a form 144 with the SEC.

Direct - Cruz

1    Q.   So there's -- there's an increase in due diligence?

2    A.   Increase in due diligence and reporting requirement on

3    behalf of the affiliate or control person.

4    Q.   So instead of reporting to the over-the-counter

5    markets, what's the agency Mr. Sears would have to report

6    to?

7    A.   The SEC.

8    Q.   And those requirements were not required in this case

9    in this deposit because of why?

10   A.   Because of the determination that he was a

11   nonaffiliate.

12           MR. SIBERT:  Your Honor, this might be a good time

13   to stop for lunch, if the Court would entertain that.

14           THE COURT:  Okay.  That's fine.  All right, ladies

15   and gentlemen of the jury, we'll take our lunch recess.  Why

16   don't we plan on resuming at 1:15.

17       (Jury left the courtroom at 12:07 p.m.)

18           THE COURT:  All right.  I need to tell you, since

19   you're in the middle of your testimony, you're not to speak

20   with any of the lawyers during the recess.

21           THE WITNESS:  Okay.  Yes, Your Honor.

22       (Recess taken 12:08 p.m.)

23                    AFTERNOON SESSION

24       (Jury was present at 1:19 p.m.)

25           THE COURT:  Mr. Cruz, I remind you you remain under

1204

Direct - Cruz

1    oath.

2                THE WITNESS:  Yes, Your Honor.  I understand.

3                THE COURT:  Okay.  Mr. Sibert, you may resume your

4    examination.

5                MR. SIBERT:  Thank you, Your Honor.

6    BY MR. SIBERT:

7    Q.   Can I please have Government Exhibit 121 back on the

8    screen.  And can you please go to page 13.

9                Okay, sir, we were talking about this legal opinion

10   letter in reference to -- I just want to blow up the first

11   portion here.

12               All right, sir, this legal opinion letter basically

13   says it's a transfer of shares between Baby Bee Bright, the

14   company; is that right?

15   A.   Yes.

16   Q.   To MicroCap?

17   A.   Yeah, that's correct.  Baby Bee Bright is the company

18   issuer, it's -- it's the former -- it's the predecessor name

19   to FusionPharm.

20   Q.   Okay.  So I just want to make clear that essentially

21   the legal letter, even though it says Baby Bee Bright

22   Corporation as the company, in reality when it came to

23   taking the restrictions off the shares, it was regarding the

24   shares of FusionPharm?

25   A.   Yes.  Correct.

Direct - Cruz

1    Q.   Okay.  Thank you.  Can I please have page 23 brought

2    up.

3              Do you recognize the certificate on page 23?

4    A.   Yes, this appears to be the certificate that's

5    contained in our due diligence package.

6    Q.   Okay.  And when you say "certificate," what are you

7    referring to?

8    A.   This is a certificate of 144,000 FusionPharm common

9    shares that are issued in the name of MicroCap Management,

10   and it's dated March 1st, 2012.

11   Q.   Okay.  And this is the amount of shares, is that

12   correct, on the top right-hand corner?

13   A.   Yes.

14   Q.   And then this is the certificate number?

15   A.   Yes.

16   Q.   Okay.  Now, we had a little discussion about

17   affiliation.  You talked about volume; is that -- do you

18   recall that testimony?

19   A.   Yes.

20   Q.   When it came to affiliation?

21   A.   Yes.  We talked about volume and issued and

22   outstanding.

23   Q.   Okay.  And if the person was known as an affiliate that

24   was trying to take the restrictions off the shares, the

25   limit will be 1 percent; is that correct?

1206

Direct - Cruz

1    A.    Yes.

2    Q.    Of the outstanding shares.

3    A.    Correct.

4    Q.    All right.  The outstanding shares, if I recall

5    correctly, from your testimony, was 2 million -- 2,833,000.

6    If you need to refresh, it's page 2.

7    A.    Yes, that's correct.

8    Q.    Okay.  Now, you might be like I am on math, but do you

9    know what percentage 140,000 shares is of 2,833,000?

10   A.    It would -- I don't know if I got my decimals wrong,

11   but it would be something rather small, like 28,000 shares.

12   Q.    28,000 -- I'm asking you about the percentage.  Do you

13   know what percentage 144,000 shares is of the 2.8 million

14   outstanding?

15   A.    Oh, I'm sorry.  I thought -- I'm not quite sure on the

16   math, but I believe it would be over 1 percent.

17   Q.    Would a calculator assist you?

18   A.    Yes.

19         MR. SIBERT:  Your Honor, can I give the witness a

20   calculator to do the calculation?

21         THE COURT:  Sure.

22         THE WITNESS:  I get 4.9 percent.

23   BY MR. SIBERT:

24   Q.    So --

25   A.    And I got that by dividing 144,000 shares by the 2.8

                         Direct - Cruz

1    million shares.

2    Q.   You said 4.9 percent?

3    A.   Correct.

4    Q.   So that's right under your threshold of 5 percent that

5    would cover in your checklist?

6    A.   Yes.

7    Q.   Okay.  And now if you knew Mr. Sears was an affiliate,

8    essentially, based upon your testimony, he would be above

9    the 1 percent?

10   A.   Yes.

11   Q.   4.9 percent is above 1 percent.

12   A.   Correct.

13   Q.   Therefore, you would need the additional documentation

14   that you talked about if he was an affiliate -- Mr. Sears

15   was an affiliate of FusionPharm?  Or controller.

16   A.   Yes.  He would be -- he would be subject to the volume

17   limitations and he would have to make those other

18   disclosures by filing form 144 with the SEC.

19   Q.   Okay.  In this case, based upon your calculation there,

20   he would be above the 1 percent?

21   A.   Yes.

22   Q.   Okay.  Can you look at Government Exhibit 126.

23            MR. SIBERT:  Your Honor, my understanding is, based

24   upon disclosure of these exhibits to the defense, this --

25   the defense is now stipulating to the admissibility, but I

1    just want to make sure that's correct regarding

2    Exhibit 126.

3              THE COURT:  Is that correct?

4              MR. GOODREID:  Yeah, that is correct.

5              THE COURT:  All right.  Given the stipulation of

6    the parties, Exhibit 126 is admitted into evidence and may

7    be published to the jury.

8         (Government's Exhibit 126 received)

9    BY MR. SIBERT:

10   Q.   May I please have page 2 of Government Exhibit 126

11   published to the jury.

12             Actually, I'm sorry, I want to start -- excuse me,

13   I'm going to start with Government Exhibit 122.  I don't

14   think there's any objection to the admissibility of this

15   exhibit as well.

16             THE COURT:  Is that correct?

17             MR. GOODREID:  It is, Your Honor, yes.

18             THE COURT:  All right.  Exhibit 122 is also

19   admitted into evidence and may be published to the jury.

20        (Government's Exhibit 122 received)

21             MR. SIBERT:  Thank you, Your Honor.

22   BY MR. SIBERT:

23   Q.   Okay.  Can you just look at the top part of

24   Exhibit 122.

25   A.   Yes.

Direct - Cruz

1    Q.    Okay.  Can you just tell the jury what this is.

2    A.    This is a checklist that pertains to a deposit of

3    40,000 shares of FusionPharm by Micro Management, LLC.

4    Q.    Who is the owner of Micro Management?

5    A.    William Sears.

6    Q.    Is this essentially the same type of documentation --

7    due diligence package that you just testified regarding

8    Government Exhibit 121?

9    A.    Yes.

10   Q.    Okay.  And can you tell the jury what legal letter your

11   firm, Scottsdale, relied on to take the restrictions of

12   these 40,000 shares.

13   A.    Yes.  The legal opinion, among other documents,

14   identified in this checklist.

15   Q.    Okay.  Can you tell me who signed the legal opinion

16   letter in this package?

17   A.    If I can find it.

18         Okay.  The -- yes, the legal opinion's contained on

19   page 15.  It's written by the law office of Tod A.

20   DiTommaso.

21   Q.    Okay.  Can I have page 15 brought up, please.

22         Okay.  Now, essentially can you take a look at the

23   two pages for this legal opinion letter.

24   A.    Yes.  Okay.

25   Q.    Okay.  Can you tell me what role Mr. Sears, under

Direct - Cruz

1    MicroCap Management, is relying on to take the restriction

2    off these shares to be able to trade them?

3    A.   Well, based on the -- based on the legal opinion and

4    our checklist, it's pursuant to 144.

5    Q.   Okay.  Can you tell me what requirements are being told

6    to your firm -- what requirements are being met under 144 in

7    order for Scottsdale to take the restrictions off these

8    40,000 shares?

9    A.   In this -- in this case, because the -- the customer

10   indicated that he's not an affiliate, nor did our due

11   diligence reveal that he was, it essentially turns out to --

12   turns out the shell analysis and holding period, and because

13   of -- those requirements were met, he was -- the 144

14   exemption applies, and based on that, we cleared the stock

15   for sale.

16   Q.   So if I understand you right, there was three things

17   that your brokerage was relying on in this letter:  the

18   shell status of FusionPharm; is that correct?

19   A.   Yes.

20   Q.   The holding period that MicroCap under Mr. Sears held

21   the shares?

22   A.   Yes.

23   Q.   And also if Mr. Sears was an affiliate within 90 days

24   of this letter to FusionPharm?

25   A.   Yes.

Direct - Cruz

1   Q.   And I say "affiliate"; that would also include a
2   control person?
3   A.   Correct.
4   Q.   Okay.  Can you zoom in on that part of the letter,
5   please.
6           And if you look on the screen there, sir, where
7   I've kind of highlighted, is that the sentence -- what's
8   that sentence telling your brokerage firm regarding the
9   holding period?
10  A.   So the --
11  Q.   If you start with the "We."
12  A.   Sure.  So basically the attorney's expressing his or
13  her view that they are of the opinion, as it states, "We are
14  further of the view that the Shareholder has met the
15  applicable one-year holding period," and then paren,
16  "reviewed in detail below, applicable to the Shares insofar
17  as the Shareholder has held shares from and as of the Record
18  Date to the date hereof."
19  Q.   Okay.  Can I -- excuse me, can I have page 16.  Can I
20  have paragraph B blown up.
21          And what is paragraph B telling your brokerage firm
22  in order to take the restriction off these 40,000 shares?
23  A.   Yes.  The opinion is expressing that the shareholder is
24  not an affiliate nor has it been in the previous --
25  preceding 90 days.

Direct - Cruz

1    Q.    Again, who's the shareholder when it comes to this
2    transaction?
3    A.    Well, this -- in this -- in this case, this -- this --
4    this opinion was written for Todd Abbott.  That's the person
5    from whom MicroCap Manage [sic] purchased the securities
6    from.
7    Q.    Okay.  Can you explain that for me, please.
8    A.    Sure.  And so under -- under Rule 144, there's a
9    principle called tacking.  So even though you didn't hold
10   the securities for the holding period, you can tack on the
11   holding period of a prior holder so long as they're a
12   nonaffiliate to your holding period in order to meet the
13   Rule 144 requirement.  So that's exactly what -- the case
14   here.
15          So the securities were actually held one year by
16   Todd Abbott, who is a nonaffiliate.  And based on that,
17   MicroCap Management could tack Todd Abbott's holding period
18   to its own holding period for purposes of meeting Rule 144.
19   Q.    Do you know how Microcap Management received the 40,000
20   shares from Mr. Todd Abbott in this case?
21   A.    He purchased them in a private sale.
22   Q.    Okay.  If Mr. Todd Abbott was an affiliate, could he
23   sell those shares to MicroCap in a private sale?
24   A.    He could, but those would be restricted shares.
25   Q.    Okay.  In this case, because Mr. Todd Abbott is a

Direct - Cruz

1    nonaffiliate, when he sold them to MicroCap, they're not

2    restricted?

3    A.    Correct.

4    Q.    So that's why the holding period could be tacked back?

5    A.    Yes.

6    Q.    Now, if Mr. Abbott, as you stated, was an affiliate

7    when he sold those shares to MicroCap, the restriction would

8    not be taken off the shares?

9    A.    Yes.   That would be correct.

10   Q.    And the holding period would have to start over?

11   A.    Yes.

12   Q.    Thank you.   And can I have page 3 -- or, excuse me, 17.

13   And, again, who is the lawyer signing this legal opinion

14   letter?

15   A.    Tod Anthony DiTommaso.

16   Q.    Thank you.   Okay.   Now, I'd like to publish

17   Exhibit 126, please.

18         Do you recognize Government Exhibit 126?

19   A.    Okay.   I'm going to have to go off the screen.   It's

20   not in my book.

21   Q.    Okay.   We can get that for you.   Can I have page 2.

22         I'm showing you page 2 on your screen.

23   A.    Yes.   Okay.

24   Q.    All right.   Do you recognize what Government Exhibit

25   126 is?

Direct - Cruz

1    A.    Yes.   This is -- this is the Know Your Customer cover

2    page to the new account application for Bayside Realty

3    Holdings.

4    Q.    Okay.  And can you just take a look through Government

5    Exhibit 126 for me.

6    A.    Okay.

7    Q.    All right.  Is this very similar to the new application

8    that we went through regarding Exhibit 120 with MicroCap for

9    William Sears?

10   A.    Yes.

11   Q.    All right.  Same types of documents and questions that

12   your firm would ask a new individual opening an account?

13   A.    Yes.

14   Q.    Let's just look at the screen here.  Who's the owner of

15   this company requesting an account to be opened in your

16   firm?

17   A.    Sandra Sears.

18   Q.    Okay.  And let's have page 3, please.

19             What's the name of the firm?

20   A.    Bayside Realty Holdings, LLC.

21   Q.    Okay.  And essentially what is the address for that

22   firm?

23   A.    The address is 4920 Morton Road, New Bern,

24   North Carolina.

25   Q.    Thank you.  Okay.  Can I have page 4, please.

Direct - Cruz

1    And similar to what we saw with MicroCap, what is

2    this page 4 showing?

3    A.   Basically the banking relationships for the customer.

4    Q.   Okay.  And what customer -- what is Ms. Sears telling

5    you about her bank?

6    A.   That she banks at Wells Fargo Bank in Denver, Colorado.

7    Q.   Okay.  Again, can you tell me where the firm is -- the

8    address the firm provided you for mailing the registration?

9    A.   New Bern, North Carolina.

10   Q.   New Bern, North Carolina isn't Denver, Colorado?

11   A.   No, it's not.

12   Q.   Can I have page 5.  Okay.

13        Again, what is Mrs. Sears' annual income based upon

14   these documentations on page 5?

15   A.   Over -- over 200,000 with a note indicating 200K.

16   Q.   Okay.  And what is her net worth?

17   A.   The over 1 million with a note indicating 1.5 million.

18   Q.   Okay.  What is her liquid net worth?

19   A.   25- to 100,000 with a note indicating 75K.

20   Q.   Can I have page 7, please.

21        Okay.  Can you tell me, based on page 7, how much

22   investment experience Mrs. Sears is representing to your

23   firm -- your brokerage?

24   A.   Five -- five years, as indicated in the notes, which is

25   making reference to our penny stock disclosure document.

1216

Direct - Cruz

1    Q.   Okay.  So five years with penny stocks?

2    A.   Yes.

3    Q.   And can I have page 8, please.

4         Again, who's signing this new application?

5    A.   Sandra Sears.

6    Q.   And what is the date?

7    A.   December 14th, 2012.

8    Q.   Thank you.  Can I have page 16, please.

9         Okay, sir, what is page 16 showing your firm?

10   A.   16 is a picture of Sandra Sears' driver's license,

11   issued by the state of North Carolina.

12   Q.   And then can I have -- can I have a minute, Your Honor?

13            THE COURT:  You may.

14   BY MR. SIBERT:

15   Q.   Let me just go back to page 5 real quick.  When it

16   comes to the top portion here, how does either Alpine or

17   Scottsdale verify annual income, net worth, and liquidation

18   net worth?

19            THE COURT:  Liquidation?

20            THE WITNESS:  Liquid net worth.

21            THE COURT:  Liquid net worth.

22   BY MR. SIBERT:

23   Q.   What does liquid net worth mean?

24   A.   Basically the net worth minus the residence, for the

25   most part.

1217
Direct - Cruz

1    Q.   Okay.  And how do you -- how does Scottsdale or Alpine
2    verify that information?
3    A.   In this case, at the -- at this stage of the
4    relationship, we're relying on the representation made by
5    the customer.
6    Q.   Okay.  All right.  Can I have page 18, please.  Okay.
7         Do you recall what page 18 is in a new application?
8    A.   Yes.  These are -- these are the Secretary of State
9    filings regarding Bayside Realty Holdings.
10   Q.   Okay.  Do you know what state Bayside Realty Holdings
11   is incorporated in?
12   A.   Yes.  State of Nevada.
13   Q.   May I have page 19, please.
14        Again, as you testified before, this is a bank
15   statement that you acquire when an individual or company is
16   opening an account with Scottsdale or Alpine?
17   A.   Yes.
18   Q.   Okay.  And what bank is being used here?
19   A.   Wells Fargo.
20   Q.   Okay.  And, again, what is the address being listed?
21   A.   4920 Morton Road, New Bern, North Carolina.
22   Q.   Okay.  That's different than what was listed in the
23   earlier page of the application; is that correct?
24   A.   On the Secretary of State filing page?
25   Q.   No, on page 4.

1218

Direct - Cruz

1  A.   Yes, the new account application said the bank officed
2  out of Denver, Colorado.
3  Q.   And now the statement is saying New Bern,
4  North Carolina?  On page --
5  A.   Well, with respect to the address for Bayside Realty
6  Holdings, it does -- it does appear to say on the -- on the
7  bank statement on page 19 that this is a Wells -- that this
8  is a Denver, Colorado, branch of Wells Fargo Bank.
9  Q.   All right.  Can I have page 24, please.  Can you focus
10  in on the middle here.
11       Sir, who's listed as the customer ID verification?
12  I have it marked on the screen, sir.
13  A.   Yes, I see it.  I'm just trying to -- okay.
14  Q.   Who's the person marked as the customer ID
15  verification?
16  A.   Yes.
17  Q.   Who is that?  Who's listed?
18  A.   Sandra Sears.
19  Q.   Okay.  And, again, from New Bern, North Carolina?
20  A.   Yes.
21  Q.   Okay.  Who's listed on the residential address detail?
22  A.   William Sears.
23  Q.   And what's his address?
24  A.   The same, 420 Morton Road, New Bern, North Carolina.
25  Q.   And the relationship is spouse; is that correct?

1219

Direct - Cruz

1    A.    Yes.

2    Q.    Can I have page 38.  Can I have the text blown up,

3    please.

4          All right.  Sir, do you recognize the document on

5    page 38?  It's also on your screen.

6    A.    Yes.

7    Q.    And what's the document on page 38?

8    A.    This is a limited trading authorization form, which

9    grants certain persons limited trading authorization in the

10   account.

11   Q.    Okay.  And, sir, if you look at your screen, what

12   authorizations are being provided in this document?

13   A.    Basically, it's -- basically, pertaining to buying and

14   selling and trading securities.

15   Q.    Okay.  And who's given that authorization?

16   A.    Sandra Sears.

17   Q.    And who's -- who is Sandra Sears giving authorization

18   to trade and sell stock?

19   A.    William Sears.

20   Q.    Can I have --

21         MR. SIBERT:  Your Honor, at this time, the

22   Government would move to admit Government Exhibit 127.  I

23   believe, again, this has been stipulated to now.

24         THE COURT:  Is that accurate, counsel?

25         MR. GOODREID:  No, Your Honor, it has not.  In

1    fact, if I might --

2          THE COURT:  Well, go ahead and make your objection.

3          MR. GOODREID:  I wasn't going to state an objection

4    but depending on what foundation counsel raises, I wanted to

5    voir dire on the document.  But if -- maybe he'll address my

6    concerns.

7          THE COURT:  Okay.  So there's no stipulation.  So

8    lay your foundation.

9          MR. SIBERT:  No stipulation to evidence, but my

10   understanding was to authentication before this trial, that

11   these were the business records.

12         THE COURT:  All right.  I didn't hear you say that.

13   But in any event, all right.  We know that authenticity is

14   stipulated to.  Go ahead and lay your foundation for

15   admission.

16         MR. SIBERT:  Okay, sir, thank you.

17   BY MR. SIBERT:

18   Q.   All right.  So obviously we don't want this published

19   to the jury.

20         Can you take a look at Government Exhibit 127 in

21   your binder.

22   A.   Yes.

23   Q.   Okay.  And can you tell me what Government Exhibit 127

24   is.

25   A.   Yes.  It appears to be a due diligence deposit file

Direct - Cruz

1    relating to the deposit of 140,000 shares, FusionPharm,

2    Bayside Realty Holdings.

3    Q.   Okay.  And when you say a deposit, is this a deposit

4    request form, securities request form?

5    A.   Yes.

6    Q.   Similar to the request form that we just went through

7    with MicroCap?

8    A.   Yes.

9    Q.   Okay.  Did these documents come from your -- from

10   Alpine Securities?

11   A.   Yes, Alpine Securities and Scottsdale Capital.

12   Q.   Okay.  And you stated this is a request by what

13   company?

14   A.   Bayside Realty Holdings.

15   Q.   And what type of shares are they trying to deposit in

16   order to sell them -- to be able to sell on the markets?

17   A.   140,000 common shares of FusionPharm.

18             MR. SIBERT:  Your Honor, at this time I would move

19   to admit Government Exhibit 127.

20             THE COURT:  Any objection?

21             MR. GOODREID:  And then at this point, Your Honor,

22   may I voir dire?

23             THE COURT:  You may.

24             MR. GOODREID:  Thank you.

25                      VOIR DIRE EXAMINATION

1222

Voir Dire - Cruz

1    BY MR. GOODREID:

2    Q.   So, Mr. Cruz, could you please turn to page 21 of that

3    document.

4    A.   Of Exhibit 127?

5    Q.   Yes, sir.

6    A.   Okay.

7    Q.   And don't describe much of the content.  You would

8    agree, would you not, that this appears to be a letter?

9    A.   Yes.

10   Q.   Okay.  Do you see at the bottom there's -- the bottom

11   of that page is something highlighted -- excuse me,

12   underlined, I beg your pardon -- and it looks like the word

13   "exemption" is written there -- handwritten?

14   A.   Yes.

15   Q.   Do you know whose handwriting that is?  Well, let me

16   broaden my question, all right?  This letter, you agree,

17   goes on for three pages, does it not?  Take a minute to flip

18   through there.

19   A.   Yes.

20   Q.   And there is some handwriting on all three of those

21   pages, right?

22   A.   Yeah, it appears to be.

23   Q.   And some underlining?

24   A.   Correct.

25   Q.   Do you know whose handwriting that is or who did the

1223

Voir Dire - Cruz

1    underlining?

2    A.    It would have been the person who was probably

3    reviewing the file.

4    Q.    Okay.  But do you know who specifically that is?

5    A.    I don't recall with specific recollection, but based on

6    the checklist and the verification that was done, the

7    initials T.A. appear, and that would have been Ted Ashton,

8    which would have been one of our attorneys working for us

9    during the time period.

10   Q.    Okay.  And do you know why Mr. Ashton wrote the

11   particular things that he wrote on these three pages -- the

12   three pages of this letter?

13   A.    I don't -- I don't -- I don't -- I don't recall.

14   Q.    Okay.  All right.  Similarly, let's go to page 25.

15         Do you see that document?

16   A.    Yes.

17   Q.    And do you see the handwriting on the side of this one

18   that says -- I'm not going to read the words, but do you see

19   the handwriting that's written there?

20   A.    Yes.

21   Q.    Do you know why those words -- those handwritten words

22   appear there?

23   A.    No, but they appear -- like in the prior letter, they

24   appear to be highlighted, and the same issues that we review

25   during the due diligence process:  affiliate status, shell

1    status, tacking, et cetera.

2    Q.   Okay.  And then let's go to page 48 of this document.

3    A.   Okay.

4    Q.   Do you have that in front of you?

5    A.   Yes.

6    Q.   Okay.  And you also see some handwriting on this page?

7    A.   Yes.

8    Q.   And do you see on the handwriting on the right-hand

9    side of the page, it says something "obligation."  Do you

10   know what that word is above the word "obligation," the

11   handwritten word?

12   A.   Valid.

13   Q.   Okay.  And is it your belief, Mr. Cruz, that, again,

14   much as you testified the other pages, that this handwriting

15   was put in there by the attorney from your company that

16   reviewed this?

17   A.   Yes, that's myself.

18   Q.   Okay.  And then one final page, if we could go to 57,

19   please.

20           And do you see the handwriting on the left-hand

21   side there?

22   A.   Yes.

23   Q.   And based upon your knowledge of this document and what

24   it says there, do you also believe that that was written by

25   the attorney reviewing this?

Direct - Cruz

1    A.    Yes.

2    Q.    Okay.

3             MR. GOODREID:   Your Honor, in light of those

4    answers, I withdraw any objections to admissibility.

5             THE COURT:   All right.   Thank you for that.

6             Government Exhibit 127 is admitted into evidence

7    and may be published to the jury.

8        (Government's Exhibit 127 received)

9             MR. SIBERT:   Thank you, Your Honor.

10                 DIRECT EXAMINATION (Continued)

11   BY MR. SIBERT:

12   Q.    And just to follow up on some of the questions before

13   the document is published, you just testified that these --

14   these notes were probably made by an attorney in Scottsdale;

15   is that correct?

16   A.    Yes.

17   Q.    And then after that attorney makes his or her notes on

18   the due diligence package, including the legal opinion

19   letter, you review it.

20   A.    Yes.

21   Q.    So it goes to the two-attorney review process?

22   A.    Yes, that's common, correct.

23   Q.    And would that be the same for the package that we

24   looked at before regarding MicroCap, the deposit of those

25   shares?   How --

Direct - Cruz

1    A.   Yes, I -- that was what I recall our practice at the

2    time.

3    Q.   Okay.  So not one attorney, but two attorneys reviewed

4    these packages before shares are cleared?

5    A.   Specifically the ones that we looked at, yes.  But it

6    could have been the case that there was a senior principal

7    that might have looked at it who's not an attorney.

8    Q.   Thank you.  Can I have the first page of 127 published.

9         Okay, sir, again, I'll just focus on the top.  Do

10   you recognize what this document is?

11   A.   Yes, this is the deposited securities request form for

12   Bayside Realty Holdings, deposit of 140,000 shares of

13   FusionPharm.

14   Q.   This is the name of the firm, is that correct, Bayside

15   Realty Holdings?

16   A.   Yeah, that's the name of our customer, the owner of the

17   security.

18   Q.   And they're looking to take their restrictions of

19   FusionPharm shares of stock?

20   A.   Yes.

21   Q.   And then, as you stated, 140,000?

22   A.   Yes.

23   Q.   Okay.  Finally, what's this certificate number?

24   A.   Certificate No. 11208.

25   Q.   Okay.  And much like you testified before concerning

1    MicroCap, again you compared the number of shares that are

2    being requested to trade versus the outstanding shares; is

3    that correct?

4    A.    Yes.

5    Q.    And what's the purpose of that?

6    A.    Determine aggregate ownership for purposes of making

7    the affiliate status determination.

8    Q.    And, again, can I just have the full page here.

9           And this is the very similar checklist, or exact --

10   or, excuse me, the request being made by the representative

11   of the firm regarding depositing the shares with your --

12   with Scottsdale; is that correct?

13   A.    Yes.  Just so it's clear, the request form is completed

14   by the customer and the checklist is completed by Scottsdale

15   Capital staff.

16   Q.    Okay.  Very good.  So the answers that are being put in

17   this box, who's answering those questions?

18   A.    The customer seeking to deposit the shares.

19   Q.    In this case, that would be Bayside Realty Holding?

20   A.    Correct.

21   Q.    And can I have page 2, please.

22          And, again, very similar to what you testified

23   before, this is the agreement between the customer and your

24   firm?

25   A.    Yes.

Direct - Cruz

1   Q.   And who signs this document?

2   A.   Sandra Sears.

3   Q.   And what's the date of signing that document?

4   A.   January 21st, 2013.

5   Q.   And that's the date that Ms. Sears is requesting to --

6   for your brokerage firm to clear these stocks for trading?

7   A.   Yes, that's close proximity to the time that we

8   reviewed it.

9   Q.   Okay.  And can I just go back to page -- page 1.  Can

10  you blow up that bottom piece, please.

11        Sir, what does convertible promissory executed May

12  2d, 2011, mean in box 17?

13  A.   So basically -- so basically the customer is indicating

14  this is the security to which they seek to tack for holding

15  purposes.  So it's not the date of the certificate that was

16  issued that's identified on the top part of this exhibit,

17  but, instead, she's saying she has securities derived from a

18  convertible promissory note dated May 2d, 2011.

19  Q.   All right.  So Bayside -- so where is Bayside Realty

20  saying these shares -- where these -- where did these

21  FusionPharm shares come from?

22  A.   Basically these shares came from a conversion of a note

23  presumably held by Bayside Realty.

24  Q.   And what does it mean by conversion of a note?

25  A.   Yeah, so basically conversion is a process by which you

Direct - Cruz

1    can convert the balance owed on a note, could be principal

2    and interest or both, into securities.  So in lieu of

3    receiving cash, the note holder is accepting securities in

4    accordance with the conversion features that are contained

5    in the note.

6    Q.    All right.  And regarding the one-year holding period

7    for nonreporting companies under Rule 144, when would the

8    holding period begin regarding these shares?

9    A.    Sure.  So for purposes of Rule 144, the holding period

10   would begin when the -- when the promissory note was fully

11   funded and paid for.  So it's another form of tacking that

12   takes place with conversion.  So under the law, it's

13   basically the same securities, it's just changing form.

14   It's going from a convertible note to shares.  And based on

15   that theory, you can -- you can tack a holding period of the

16   convertible note to your shares.

17   Q.    And can you please look at page 4.

18         Sir, can you tell me what is on the top of page 4,

19   what that is showing.

20   A.    This -- this appears to be a transfer agent document

21   that we obtained during the due diligence process.

22   Q.    Okay.  And do you know essentially what this

23   transaction journal is stating about Bayside Realty Holding?

24   A.    It appears to be confirming that they are the holder,

25   the shareholder of record for certificate CS2 No. 11208 in

Direct - Cruz

1     the amount of 140,000 shares.

2     Q.   Okay.  And regarding a certificate; is that right?

3     11208?

4     A.   Yes.

5     Q.   And can you flip to page 5.  Can you tell me what is on

6     page 5.

7     A.   This appears to be an actual copy of certificate 11208,

8     of FusionPharm issued to Bayside Realty Holdings.

9     Q.   And, again, that's the number of shares on the

10    right-hand corner?

11    A.   Yes, 140,000.

12    Q.   And this is the certificate number?

13    A.   11208.

14    Q.   Okay.  And, again, it -- the number of shares is

15    written down here in the center of the certificate?

16    A.   Yes.

17    Q.   And then, again, the company that issues those shares

18    is listed there?

19    A.   Yes.  FusionPharm, Inc.

20    Q.   Can I have page 8, please.

21         Okay, sir, is this your securities checklist

22    similar to the one that we went through regarding MicroCap

23    securities?

24    A.   Yes.

25    Q.   Okay.  And in looking at this checklist, are all major

1    areas that we talked about listed in this checklist

2    concerning the affiliate/control person?

3    A.    Yes.

4    Q.    How about the current information?

5    A.    Yes.

6    Q.    And keep going down.

7          And then, again, the shell company; is that

8    correct?

9    A.    Yes.

10   Q.    And page 9, please.

11         And, again, the same three areas as we discussed

12   before concerning the client background, legal opinion, and

13   other exemptions?

14   A.    Yes.

15   Q.    Okay.  And can I have the bottom of that page, please.

16         And do you know whose notes those are?

17   A.    Yes, those are mine.

18   Q.    Okay.  Similar to the notes that you made before in the

19   MicroCap document; is that correct?

20   A.    Correct.

21   Q.    Okay.  And can you just tell the jury again what you're

22   indicating in these notes.

23   A.    Basically those are my talking points with the

24   reviewer, and basically it's following the critical elements

25   that we discussed numerous times here during my testimony.

Direct - Cruz

1    I write down Rule 144.  CPM stands for convertible
2    promissory note, held one-plus year.  Next line, all
3    advances made one-plus year, which means it was paid for.
4    No affiliates.  No shell.
5    Q.   Okay, sir, can you look at page 21 through 24 of this
6    document.
7    A.   Okay.
8    Q.   All right.  Do you know what document is being -- that
9    is -- excuse me, do you know what document is being shown on
10   pages 21 through 24?
11   A.   Yes.  This appears to be the legal opinion that
12   specifically relates to the deposit of 140,000 shares of
13   FusionPharm by Bayside Realty Holdings.
14   Q.   Okay.  You testified earlier that the legal opinion was
15   critical when it came to removing restricted shares.  Was
16   this legal opinion critical in your firm's ability to remove
17   the restricted legend from the 140,000 FusionPharm shares
18   that Bayside was trying to trade?
19   A.   Yes.  We would not have accepted the deposit without
20   the legal opinion.
21   Q.   Okay.  And can I have page 22, please.
22           Sir, if you look at the bottom of page 22.  Can I
23   have the top -- thank you.  The paragraph that I'm circling
24   on your screen --
25   A.   Okay.

Direct - Cruz

1    Q.   -- that starts out with Rule 144.  What is that
2    paragraph telling you in regards to being able to qual- --
3    what's that paragraph telling you?
4    A.   It's basically -- it's basically just reciting the
5    requirement under Rule 144 that the stock must be held one
6    year and that holding period commences on the date when the
7    full purchase price or other consideration has been paid.
8    Q.   All right.  If you didn't have this paragraph, or if
9    the legal opinion letter did not address the holding period
10   one year, would you have been able to clear these shares to
11   be able to -- for Bayside to sell on the market under Rule
12   144?
13   A.   Yeah, if it didn't have this analysis, the legal
14   opinion would be defective and we could not accept the
15   deposit.
16   Q.   Okay.  Therefore, you couldn't remove the restriction
17   of the shares?
18   A.   Correct.
19   Q.   Can I have page 23.  Can you blow up B, please.
20          And what is paragraph B telling your brokerage
21   firm?
22   A.   B is a -- is a -- is a representation or opinion that
23   the investor, or the shareholder seeking the deposit to
24   sell, is not an affiliate of the issuer.
25   Q.   Okay.  And here the shareholder is Bayside?

Direct - Cruz

1   A.   Yes.

2   Q.   And the company that -- regarding affiliation is

3   FusionPharm?

4   A.   Yes.

5   Q.   90 day -- 90 days prior, correct?

6   A.   Yes.

7   Q.   Okay.  And so basically what is this paragraph saying

8   about Bayside?

9   A.   That Bayside is a nonaffiliated, noncontrol person.

10  Q.   And same set of questions:  If your brokerage firm did

11  not have the nonaffiliation of Bayside in this legal opinion

12  letter, would you be able to take the restrictive legend off

13  the shares?

14  A.   No.

15  Q.   So, therefore, these 140 shares could never have been

16  sold on the OTC Markets with the restriction?

17  A.   They possibly could have been sold, but they would have

18  been subject to additional restrictions like the volume

19  limitation and the filing of the Rule 144.

20  Q.   And, again, if you didn't have this nonaffiliation

21  representation in this legal letter, would you have removed

22  the restriction of these shares?

23  A.   No.

24  Q.   Okay.

25          MR. SIBERT:  Can you -- can I have a minute, Your

Direct - Cruz

1    Honor?

2              THE COURT:   You may.

3    BY MR. SIBERT:

4    Q.   Can you look at page 53 of this document.   Can you blow

5    up that e-mail, please.

6              Can you take a minute and look at that e-mail.

7    A.   Sure.   Okay.

8    Q.   Can you just explain to the jury essentially what

9    Scottsdale was asking Ms. Sandra Sears regarding the e-mail

10   on page 53.

11   A.   Sure.   So the -- so the reviewer in this case -- which

12   is Ted Ashton, that's his e-mail up on top -- was asking

13   Sandra Sears questions about the convertible promissory note

14   balance.

15   Q.   Okay.   And specifically about what in the balance?

16   A.   Looks like he was trying to get some clarification on

17   the amount, that might have been some sort of typo that the

18   amount was stated at 187.3 million as opposed to 187,343,

19   and -- and looks like he was seeking to get some clarity on

20   what portion of that was principal and what portion of that

21   was interest that was accrued.

22   Q.   Okay.   And essentially this is a note.   Do you know who

23   this note is between?

24   A.   Well, based on the checklist and the due diligence

25   document, the -- this is referring to the note held by

Direct - Cruz

1    Bayside, the convertible note that was used to convert and

2    obtain the 140,000 shares.

3    Q.   For what firm?

4    A.   Bayside Realty.

5    Q.   Okay.  And what shares did they obtain?

6    A.   FusionPharm.

7    Q.   So the note would have been with FusionPharm?

8    A.   Yes.

9    Q.   Okay.  Can you please -- can I have -- you don't need

10   to flip, sir.

11          Can I please have Government Exhibit 126, page 38

12   shown again.  Can I have the bottom, please.

13          Sir, you stated page 38 was the -- essentially

14   the -- Sandra Sears giving the approval of William Sears to

15   be able to trade Bayside/FusionPharm shares; is that

16   correct.

17   A.   Yes.

18   Q.   All right.  What date did Sandra Sears give Mr. Sears

19   that ability?

20   A.   February 4th, 2013.

21   Q.   Thank you.  All right.  Can I please have Government

22   Exhibit 129.

23          MR. SIBERT:  This has not been admitted into

24   evidence, but -- I might be wrong, Your Honor, but I believe

25   there's a stipulation to Government Exhibit 129.

Direct - Cruz

1    THE COURT:  On both authenticity and admissibility?

2    MR. SIBERT:  Definitely on authentication, but I do

3    believe on admissibility as well now.

4    THE COURT:  All right.

5    MR. GOODREID:  That is correct, Your Honor.

6    THE COURT:  All right.  Thank you.

7    Given the stipulation of the parties, Exhibit 129

8    is admitted into evidence and may be published to the jury.

9    (Government's Exhibit 129 received)

10   BY MR. SIBERT:

11   Q.   Okay.  Sir, can you just take a minute and look through

12   Government Exhibit 129.

13   A.   Okay.

14   Q.   Okay.  Can I please have Government Exhibit 4 -- or,

15   excuse me, page 4 of Government Exhibit 129.

16   Okay.  After looking through Government Exhibit

17   129, can you tell the jury what this documentation regards.

18   A.   Sure.  This is a new account application file for

19   MeadPoint Venture -- Venture Partners, LLC.

20   Q.   Okay.  And I just want to take a minute here.  Can you

21   tell me what it means to link to MicroCap Management?

22   A.   Yes.  This was a process we had in place at that time

23   where we conducted a specific review to link accounts to

24   other accounts that might have common ownership or control.

25   Q.   Okay.  Can you look at page 5 for me.  Page 5, please.

1238

Direct - Cruz

1    Can you tell me who's opening up MeadPoint Venture

2    Partners?

3    A.   Yes, William Sears.

4    Q.   Okay.  And is that the link between MicroCap and

5    MeadPoint Venture Partners?

6    A.   Yes.

7    Q.   Okay.  And just to be clear, what is MeadPoint Venture

8    Partners, with the owner William Sears, requesting from

9    Scottsdale?

10   A.   To open a new account.

11   Q.   Can I please have page 6.

12   What's the address associated to MeadPoint Venture

13   Partners?

14   A.   The -- well, there's a registered address and a mailing

15   address listed.

16   Q.   Okay.  So what's the registered address?

17   A.   2360 Corporate Circle, Henderson, Nevada.

18   Q.   Okay.  And what's the mailing address?

19   A.   4360 Vine Street, Denver, Colorado.

20   Q.   Can I have page 7, please.

21   Again, what bank is MeadPoint using in its

22   application?

23   A.   A Wells Fargo with a branch location out of Denver,

24   Colorado.

25   Q.   Can I have page 8, please.

Direct - Cruz

1    Again, similar questions to the application package
2    concerning MicroCap and Bayside, what is Mr. Sears' annual
3    income, estimated net worth, and liquid net worth?
4    A.   Sure.  The -- based on the notes, the annual income is
5    250,000; estimated net worth 500,000; liquid net worth
6    55,000.
7    Q.   Can I have page 10, please.  Can I have the middle,
8    please.
9    A.   Yes.
10   Q.   How many years of experience does Mr. Sears now
11   represent that he has in trading penny stock?
12   A.   15 years trading penny stocks.
13   Q.   Do you recall what he said in microcap?
14   A.   I believe it was 20.
15   Q.   Based upon what you recall, it was 20 years?
16   A.   Yes.
17   Q.   That's different than 15 years, right?
18   A.   Yes.
19   Q.   Again, can I have page 11.
20        Who's signing this document?
21   A.   William Sears.
22   Q.   And what is the date?
23   A.   April 11, 2013.
24   Q.   Can I have page 22, please.
25        What's the address of the Wells Fargo Bank

Direct - Cruz

1    statement that's submitted in this application.

2    A.    Like before, it lists MeadPoint Venture Partners at

3    4360 Vine Street, but it does indicate a P.O. Box address

4    for Wells Fargo in Denver, Colorado.

5    Q.    Thank you.  And can I have page 25.

6          Again, what is the document on page 25 showing?

7    A.    These are the articles of organization for the limited

8    liability company, MeadPoint Venture Partners, as filed with

9    the Secretary of State of Nevada.

10   Q.    So MeadPoint is incorporated in Nevada?

11   A.    Yes.

12   Q.    Can I have that taken down, please.  And before we move

13   on, can I have page 38 of 129.

14   A.    Okay.

15   Q.    I'm sorry, I'll strike that.

16         MR. SIBERT:  All right.  Your Honor, at this time,

17   the Government would like to introduce into evidence

18   Government Exhibit 131.  I might be wrong, but for

19   authentication it's been stipulated to.  I'm not sure of

20   stipulation for admitting into evidence.

21         MR. GOODREID:  Your Honor, we'll stipulate to

22   admissibility also.

23         THE COURT:  All right.  Thank you.

24         MR. SIBERT:  Thank you.

25         THE COURT:  Given the stipulation of the parties,

Direct - Cruz

1   Exhibit 131 is admitted into evidence and may be published
2   to the jury.
3        (Government's Exhibit 131 received)
4   BY MR. SIBERT:
5   Q.   Can I please have the first page of Government Exhibit
6   131 brought up.  Can I have the top blown up.
7        Again, sir, can you tell the jury what Government
8   Exhibit 131 is showing.
9   A.   Yes.  This is the deposited securities checklist
10  evidencing a due diligence review of a deposit of 475,000
11  shares of FusionPharm by MeadPoint Venture Partners.
12  Q.   And do you know what percentage of 475,000 shares is of
13  the 5.6 million outstanding?
14  A.   Based on our due diligence conducted at the time, it
15  appears to be 8.4 percent.
16  Q.   Okay.  So it's above what you, in layman terms, agreed
17  with me is a red flag?
18  A.   Yes.
19  Q.   And why is that?
20  A.   Because it exceeds the 5 percent or more threshold.
21  Q.   And just for -- the 8.4 percent is on the top
22  right-hand of that document; is that correct?
23  A.   Yes.
24  Q.   Okay.  So what would your brokerage firm do now since
25  it's 8.4 percent of the outstanding shares?

Direct - Cruz

A.   In this -- in this case -- I guess I should say more

generally, it really depends on the -- on the circumstances.

I don't recall anything specifically that we might have done

in this deposit.

        I would have noted that -- I would have been less

concerned because the company is not reporting, so there's

not that Section 13 requirement to file with the SEC.  But

nonetheless, it was -- it was a larger deposit.

Q.   Would the attorney opinion letter in this package be

critical in determining to take off the restriction of these

475,000 shares?

A.   Yes.

Q.   All right.  Now, as you stated in your previous

testimony regarding MicroCap and Bayside, this is

Scottsdale's checklist; is that right?

A.   Yes.

Q.   All right.  We've gone over these sections.  Any

different sections in this checklist than what you have

testified previously?

A.   It appears to be the same form.

Q.   Okay.  So you're doing the due diligence on all those

sections; is that correct?

A.   Yes.

Q.   Can I have page 2, please.  At the bottom.  There's

some notes here.  Do you know what those notes are

Direct - Cruz

1    indicating?

2    A.   Yeah.   These are -- these were -- these were notes that

3    were made by Henry Dinkman, which is one of the general

4    principals at the firm during this time period.

5    Q.   Is that someone that reviews -- that does these due

6    diligence reviews underneath you?

7    A.   Yes.   As a -- as a senior officer, he would have

8    authority to sign off on due diligence and deposits like

9    this during this time period.

10   Q.   Okay.   And essentially the time period that we're

11   talking about is April 2013; is that right?

12   A.   Yes.

13   Q.   All right.   And would there be further reviews after he

14   did his checklist?

15   A.   Generally not, but there could have been.

16   Q.   Could you look at page 13.   And I should ask you to

17   look at pages 13 through 16.

18   A.   Okay.

19   Q.   Okay.   What is the rule -- essentially what is the rule

20   being relied on to remove the restriction regarding this

21   deposit?

22   A.   On the third paragraph of the first page, the writer

23   indicates Rule 144 is being relied upon.

24   Q.   Okay.   And who's the writer of this document?

25   A.   The law office of Tod A. DiTommaso.

Direct - Cruz

1    Q.   Okay.  Can you look at the following paragraph.

2          Again, what requirement is being shown to have been

3    met under Rule 144 exception in order to remove the

4    restriction of these shares?

5    A.   Yes.  Here, the attorney's making specific reference to

6    the 12-month holding period applicable to this deposit.

7    Q.   Can I have page 14, please.  Page -- paragraph B,

8    please.

9          Again, what requirement is being met in order to

10   meet the 144 -- Rule 144 exception to remove the restriction

11   of these shares?

12   A.   The nonaffiliate status of the shareholder, or seller

13   in this case.

14   Q.   And the shareholder, again, in this case is who?

15   A.   MeadPoint Venture Partners.

16   Q.   And who owns that?

17   A.   William Sears.

18   Q.   And essentially this paragraph is saying that Mr. Sears

19   was never an affiliate or control person for FusionPharm?

20   A.   Yes.

21   Q.   In the previous 90 days.

22   A.   Yes.

23   Q.   And, again, similar question that I've asked you before

24   regarding MicroCap and Bayside:  If these two requirements

25   were not met, would Scottsdale allow these shares to be --

1245
Direct - Cruz

1    to have been traded -- or remove the restriction of these
2    shares?
3    A.    No.
4    Q.    Okay, sir, can you please look at Government Exhibits
5    432 through 437.
6            MR. SIBERT:  And, Your Honor, the witness is going
7    to need a different binder.
8            THE COURT:  Okay.  Are these in?
9            MR. SIBERT:  Your Honor, I believe I've requested
10   to see if there was a stipulation.  I know for
11   authentication there is, but I'm not sure for when it comes
12   to --
13           THE COURT:  So these are not in evidence.
14           MR. SIBERT:  Not at this point, Your Honor.
15           THE COURT:  Well, let's start with the question:
16   Is there a stipulation to the admission of any of these
17   documents, Mr. Goodreid?
18           MR. GOODREID:  Your Honor, may I have just a
19   second, please?
20           THE COURT:  Yeah.
21           MR. GOODREID:  Your Honor, I believe there is with
22   the exception of -- there are a couple of them where the
23   Court remembers from the pretrial conference that there's
24   the paper exhibit and then there's attached.  The Court
25   allowed some of that to be electronic.  So with respect to

1  the ones in this series that are only paper, yes, there is a
2  stipulation to admissibility.
3          THE COURT:  On all 432 to 437?  I just want to be
4  clear.
5          MR. GOODREID:  Your Honor, I can go one by one and
6  tell you which one has the -- which ones have the disks
7  associated with them.
8          THE COURT:  Okay.  So you're not stipulating to the
9  disks.
10          MR. GOODREID:  Correct.  At least not without some
11  foundation.
12          THE COURT:  Okay.
13          MR. GOODREID:  So it looks like, Your Honor, based
14  on my cursory flip-through here, these are the ones that do
15  not appear to have disks:  435 does not, 436 does not, 437
16  does not.  So those three we would stipulate to.
17          THE COURT:  Okay.  Okay, so it's just 432, 433, and
18  444 -- 434 that you're stipulating only to the paper
19  exhibit.
20          MR. GOODREID:  That is correct, Your Honor.  Yes.
21          THE COURT:  All right.  Let's recap it now.  Given
22  the stipulation of the parties, Exhibit -- the only -- only
23  the paper hard copy pages of the following exhibits that
24  have been printed and included in the exhibit binders are
25  admitted into evidence and may be published to the jury, but

                                Direct - Cruz

1   the DVD of these three exhibits have -- are not yet into

2   evidence.  And those are Exhibits 432, 433, and 444.

3           With respect to Exhibits 435, 436, and 437, they

4   are admitted into evidence and may be published to the jury.

5        (Government's Exhibits 432 through 437 received)

6           MR. SIBERT:  Thank you, Your Honor.

7           THE COURT:  All right.

8           MR. SIBERT:  Can I have a moment?

9           THE COURT:  Sure.

10  BY MR. SIBERT:

11  Q.   All right, sir, I need to go back real quick.  Can you

12  please look at Government Exhibit 134.

13          MR. SIBERT:  This has not been stipulated to in

14  evidence at this time, Your Honor.

15          THE COURT:  Okay.

16          MR. SIBERT:  For authentication, it has.

17  BY MR. SIBERT:

18  Q.   Do you recognize what Government Exhibit 134 is?

19  A.   Yes.

20  Q.   Okay.  Can you tell me what that is.

21  A.   Yes, this is a deposited securities checklist for

22  MeadPoint Venture Partners, deposit of 500,000 shares --

23          THE COURT:  Hold on.  Let's not go into the

24  contents, just describe it generally.  Because, sir, it's

25  not in evidence yet, so we're just laying a foundation.

                          Direct - Cruz

 1              THE WITNESS:  Okay.

 2              THE COURT:  Next question.

 3    BY MR. SIBERT:

 4    Q.   Okay.  So let me just -- this is a deposited securities

 5    checklist; is that correct?

 6    A.   Yes.

 7    Q.   Okay.  And for what firm?

 8    A.   For MeadPoint Venture Partners.

 9    Q.   Okay.  And what security -- it's stipulated for

10    authentication, Your Honor.

11              THE COURT:  I understand.

12              MR. SIBERT:  So --

13    BY MR. SIBERT:

14    Q.   And what shares are being asked to be deposited into

15    MeadPoint's account?

16              THE COURT:  Wait, hold on.  Authenticity is

17    stipulated to, but it's still not admitted into evidence and

18    we can't -- you can't go into the contents of this

19    exhibit --

20              MR. SIBERT:  Okay, I'm sorry, Your Honor.

21              THE COURT:  -- with the witness.

22              MR. SIBERT:  I --

23              THE COURT:  Are you done with your foundation?

24              MR. SIBERT:  Yeah, I'm finished with the foundation

25    for purposes --

1249

Direct - Cruz

1    THE COURT:  Is there an objection?

2    MR. GOODREID:  There is not, Your Honor.

3    THE COURT:  All right, there being no objection,

4    Exhibit 134 is admitted into evidence and may be published

5    to the jury.

6    (Government's Exhibit 134 received)

7    MR. SIBERT:  All right, thank you, Your Honor.

8    BY MR. SIBERT:

9    Q.   Again, sir, can you just -- can I have page 1 of this

10   exhibit shown.  Can I have the top.

11   Okay, sir, can you just go ahead and now state

12   essentially what the first page of 134 is showing.

13   A.   Sure.  This is the first page of our checklist that --

14   that we use to evidence our review to determine that the

15   securities can be cleared and traded into the -- into the

16   open marketplace.

17   Q.   Okay.  And who's depositing securities, again?

18   A.   MeadPoint Venture Partners.

19   Q.   And the owner is William Sears?

20   A.   Yes.

21   Q.   And it's for shares of FusionPharm?

22   A.   Yes.

23   Q.   Okay.  And how many shares?

24   A.   500,000.

25   Q.   And what percentage of that -- how many -- what

1    percentage is 500,000 of the total outstanding shares?
2    A.   Based on our analysis done at the time, that would be
3    8.8 percent.
4    Q.   Okay.  And, again, sir, can you just look at the first
5    two pages, 1 and 2.  You say that's your checklist; is that
6    correct?
7    A.   Yes.
8    Q.   And same -- same form that we've discussed for the
9    previous documents, including Exhibit 131?
10   A.   Yes.
11   Q.   Looking at all the major subsections; is that
12   correct?
13   A.   That's correct.
14   Q.   Again, sir, can you look at Government Exhibit -- or,
15   excuse me, page 14 through 17 of this document.  Can you
16   tell me what document is being shown there.
17   A.   Yes.  This is the legal opinion that relates to the
18   deposit described on the checklist.
19   Q.   As you testified previously, is this document critical
20   to be able to remove the restricted legend for these 500,000
21   shares of FusionPharm stock?
22   A.   Yes.
23   Q.   Okay.  And what rule, based upon this letter, is the
24   attorney relying on to remove the restricted -- the
25   restriction on the shares?

1251

Direct - Cruz

1    A.    Rule 144.

2    Q.    Okay.  And what requirements are being met in order to

3    allow that restriction to be removed?

4    A.    In this case, that the shares -- the securities have

5    been held for the applicable holding period of 12 months,

6    and the shareholder's not an affiliate, and the company is

7    not a shell.

8    Q.    Okay.  And the shareholder would be MeadPoint Venture

9    Partners?

10   A.    Yes.

11   Q.    And the company being FusionPharm?

12   A.    Yes.

13   Q.    Stating that Mr. Sears or MeadPoint was not a

14   controlling person the previous 90 days?

15   A.    Yes.

16   Q.    And, again, similar questions:  If these two

17   requirements were not met based upon the opinion of this

18   letter, would Scottsdale -- would they have -- would your

19   firm have -- excuse me, would your firm remove the

20   restriction of these 500,000 shares?

21   A.    No.

22   Q.    Therefore, these shares -- the restriction -- I'm

23   sorry, I'll strike that.

24          All right.  Now, I'm sorry, can you go back to

25   Government Exhibit 432 through 437.

Direct - Cruz

1    A.    My -- oh, I'm sorry.  142 or --

2    Q.    Excuse me, 432.

3    A.    432.  Okay, I have it here.

4    Q.    All right.  Can you just look through the paper copy of

5    Government Exhibit 432.

6    A.    Okay.

7    Q.    And can you tell -- can you tell the jury essentially

8    what the paper copy of Government Exhibit 432 is.

9    A.    Yes.  This is a accounts statement report for the

10   period of April 1st, 2013, to May 30th, 2014, for MeadPoint

11   Venture Partners.

12   Q.    And what is this statement showing for that time

13   period?

14   A.    Basically it shows all the security and cash balances

15   that occurred in the -- in the -- cash balances and activity

16   that occurred during the time period.

17   Q.    Account balances and activity?  What do you mean by

18   "activity"?

19   A.    Activity with respect to securities are purchases and

20   sales.  With respect to cash, it would be debits and

21   credits, withdrawals and deposits, basically.

22   Q.    Okay.  Would it also show what shares were sold?

23   A.    Yes.

24   Q.    Okay.  So purchases, selling of shares?

25   A.    Yes.

Direct - Cruz

1    Q.   Can you look at Government Exhibit 433, the paper

2    copies.

3         THE COURT:  Mr. Sibert, do you want him to look at

4    particular pages of these exhibits to publish to the jury?

5         MR. SIBERT:  No, sir, not at this time.

6         THE COURT:  You're just going to examine him --

7    okay.

8    BY MR. SIBERT:

9    Q.   Have you had time to look at the paper copies of 433?

10   A.   Yes.

11   Q.   And do you recall what Government Exhibit 433 is?

12   A.   Yes.  This is the account statement for the period

13   January 1st, 2010, through November 16, 2012, for MicroCap

14   Management, LLC.

15   Q.   Okay.  And what is this statement showing for that time

16   period?

17   A.   Sure.  It shows all the purchases and sales of

18   securities in the accounts and all debits and credits of

19   cash in the account as well.

20   Q.   Okay.  And can you look through Government Exhibit 434.

21   A.   Okay.

22   Q.   And can you tell the jury what Government Exhibit 434

23   is showing.

24   A.   This is the account statement for the period December

25   1st, 2012, to May 30th, 2014, for Bayside Realty Holdings.

Direct - Cruz

1  Q.   Okay.  And what is this statement -- what does this

2  statement show in the paper copies?

3  A.   It shows purchases and sales of securities and debit

4  and credits of cash.

5  Q.   Okay.  Can you look through Government Exhibit 435.

6  A.   Okay.

7  Q.   Have you had time to look through that exhibit?

8  A.   Yes.

9  Q.   Okay.  And what is Government Exhibit 435 showing?

10  A.   Now, this is Alpine Securities' wire request form.

11  Q.   Okay.  And can you explain to the jury what a wire

12  request form is.

13  A.   This is basically the form that must be completed and

14  signed by the customer in order to initiate a wire transfer

15  of cash out of the account.

16  Q.   All right.  Can I have page 1 of 435 published, please.

17         Okay.  Can you just kind of walk the jury through

18  what's being shown on page 1 here.

19  A.   Sure.  On the top, you got the date of the request,

20  9-26-2011.  Below that you can see the account number.

21  Below that is the amount of transfer, which is 4,800.  And

22  then right below that you see the bank routing information

23  at Wells Fargo.  And then it also indicates the customer's

24  name, which is MicroCap Management, in this case, and the

25  customer's bank account number.

Direct - Cruz

1    Q.   Okay.  And then you say Microcap Management is the
2    customer's name; is that correct?
3    A.   Yes.
4    Q.   Okay.  And then this box out here, do you know what
5    signature that's representing?
6    A.   Yes.  That should be the customer's signature.
7    Q.   Okay.  And do you recall who the customer was of
8    Microcap Management?
9    A.   Yes.
10   Q.   Who's that?
11   A.   William Sears.
12   Q.   All right.  Now, can I have Government Exhibit -- or,
13   excuse me, page 5 shown.  Okay.
14        And, again, what's being shown on page 5 of this --
15   of this document?
16   A.   This is a wire request transfer form dated September
17   10th, 2012, for Microcap Management.
18   Q.   Okay.  So I just want to say now, what's the date?
19   A.   September 10th, 2012.
20   Q.   Okay.  And can I get to the bottom of the box, please.
21        Who's signing?
22   A.   William Sears, the customer.
23   Q.   Okay.  Can I have page 7.
24        Again, can you quickly tell me what's on page 7.
25   A.   This is a federal wire transfer request form dated

1256
Direct - Cruz

1  September 19, 2012, for Microcap Management.

2  Q.  All right.  And, again, who is signing this?

3  A.  This should be by William Sears, the control person for

4  Microcap Management.

5  Q.  Okay.  Can you look through pages 9 through page 24 of

6  that document.

7  A.  Okay.

8  Q.  Are those all -- are those all wire transfer requests

9  from Microcap Management?

10  A.  Yes.

11  Q.  And do they all happen in the year 2012?

12  A.  Yes.

13  Q.  Okay.  And is there any other signature besides Mr.

14  William Sears in these documents?

15  A.  They all appear to be the same signature by William

16  Sears.

17  Q.  So Mr. Sears was making wire transfer requests from

18  your brokerage firm from September 2011 through, at least in

19  this document, December 14, 2012?

20  A.  Yes.

21  Q.  Okay.  Again, can I just have the first page of

22  Government Exhibit 436 published.  And can you tell the jury

23  what page 1 of Government Exhibit 436 is showing.

24  A.  This is an Alpine form similar to the prior one.  It

25  looks like Alpine, I believe, makes some modifications, but

1257

Direct - Cruz

1    it's basically a wire request form.

2    Q.    And for -- who's making the request?

3    A.    On Exhibit 436, first page, that would be MeadPoint

4    Venture Partners.

5    Q.    Okay.  And where are they asking the money to go to?

6    A.    To their Wells Fargo bank in Denver, Colorado.

7    Q.    Okay.  And can you go down to the signature, please.

8          Who's making this request?

9    A.    William Sears.

10   Q.    Can you look through the rest of that document.

11   A.    Okay.

12   Q.    Are those other wire requests from MeadPoint Venture

13   Partners?

14   A.    Yes.

15   Q.    Okay.  And is it Mr. Sears making those requests?

16   A.    Yes, it appears so.

17   Q.    Okay.  And essentially those requests run from May 2013

18   through approximately December 2013?

19   A.    Yes.

20   Q.    And essentially all the same bank account, Wells Fargo

21   Bank, No. 121000248?  That's the bank APA number?

22   A.    That's the APA routing number, yes.

23   Q.    And no difference in the bank account number of

24   6020559917?

25   A.    That's correct.

Direct - Cruz

1    Q.   Can I please have the first page of Government Exhibit
2    437 brought up.
3         Okay.  Again, can you take a look at the first page
4    and tell the jury what is being shown in Government Exhibit
5    437, page 1.
6    A.   This is a Alpine wire request form for Bayside Realty
7    Holdings.
8    Q.   Okay.  And essentially this request is being made in
9    February of 2013?
10   A.   Yes.
11   Q.   Okay.  And what bank is the money being requested to be
12   wired to?
13   A.   Wells Fargo.
14   Q.   Okay.  And -- and what's the city and town?
15   A.   Thornton, Colorado.
16   Q.   I should say city and state.  And what's the account
17   number?
18   A.   The account number?  3905862037.
19   Q.   Who's making the request?
20   A.   Bayside Realty Holdings.
21   Q.   And who signed for the request?
22   A.   In this case, it would be Sandra Sears.
23   Q.   And can I have page 2, please.  Can you just tell the
24   jury what the journal is showing on page 2.
25   A.   Yes.  This was just part of the operational process to

Direct - Cruz

1    confirm that the wire went out and the applicable fees were

2    charged.

3    Q.   So the top line there where it states Cash

4    Disbursement, that's the money that was sent to that bank

5    account?

6    A.   Yes.

7    Q.   So in this case, $6,996.20?

8    A.   Yes.

9    Q.   Okay.  And then what's the -- what's the second $25

10   fee?

11   A.   That would be Scottsdale's wire fee.

12   Q.   Okay.  And then what's the $50 fee?

13   A.   Alpine's wire fee.

14   Q.   Okay.  Are those transactions -- the journal

15   transactions that we just went through, essentially behind

16   each and every one of the wire requests transfers that we've

17   seen in Government Exhibits 435, 436, and now 437?

18   A.   Yes.

19   Q.   Sir, in Government Exhibit 437, is it essentially the

20   same bank account number for the wires being requested from

21   February 2013 through April 2013?

22   A.   Yes.

23   Q.   Same city and state of Thornton, Colorado?

24   A.   That's correct.

25             MR. SIBERT:  Your Honor, may I have a moment?

1260

Direct - Cruz

1    THE COURT:  You may.

2    BY MR. SIBERT:

3    Q.   Okay, sir, essentially on -- you might know this or you

4    might not -- but on Government Exhibits 432, 433, 434, did

5    you provide all the trading activity regarding MeadPoint,

6    MicroCap, and Bayside to the Government for the time

7    frames -- essentially when the first account was opened from

8    MicroCap through the last account with MeadPoint?

9    A.   I --

10   Q.   Sir, let me strike --

11   A.   Well --

12   Q.   Let me strike the question.

13   A.   Okay.

14        MR. SIBERT:  Your Honor, can we approach please,

15   briefly?

16        THE COURT:  All right.

17        (Sidebar conference at bench)

18        MR. GOODREID:  Regarding Exhibits 432, 433, 434,

19   the Government relied on the defense's stipulation prior to

20   this trial not to bring the records custodian in based upon

21   the fact they stipulated to the evidence and authentication

22   of the business records.  We're going to have an expert

23   later talk about his summary charts and what he relied to

24   build these summary charts on, which regards all the trading

25   activity for the MeadPoint, Bayside, and MicroCap trades.

1261

1          THE COURT:  Okay.

2          MR. SIBERT:  The CDs are such -- every damn trade

3    that went --

4          MR. GOODREID:  I'm sorry, counsel, I didn't hear

5    that.  What did you say?

6          MR. SIBERT:  The CDs have every trade that was ever

7    made.  The paper copies are for the charges in the

8    indictment.

9          THE COURT:  Okay.

10         MR. SIBERT:  So we relied on the stipulation prior

11   to trial regarding the evidence, not only authentication of

12   the records, but also the stipulation that the

13   multi-hundreds of pages of trading records were what they

14   were.

15         THE COURT:  Okay.

16         MR. SIBERT:  Based upon the pretrial court order

17   about cutting down the paper, we put those on CDs.

18         THE COURT:  Okay.

19         MR. SIBERT:  So I guess for the purposes of our

20   summary -- or our summary expert witness that relied on

21   those records, I would like to move those into evidence

22   based upon the defense's stipulations, the CDs as well.

23         THE COURT:  Okay.  All right.  So that there's --

24   when he testifies that his summary exhibit is based on the

25   entirety of the trades that are in the CDs --

1262

1           MR. SIBERT:  That's correct, Your Honor.

2           THE COURT:  Okay.

3           MR. GOODREID:  So, Your Honor, I'm not trying to

4    jam the Government up here.  I just wanted some explanation

5    as to what -- because what I have is these are spreadsheets,

6    and the paper document is a printout of transaction after

7    transaction.  The contrast, the CD contains an Excel

8    spreadsheet.  So if we can just get some explanation, I

9    mean, maybe this guy could testify to it, that the

10   spreadsheets are simply a reflection and they're the same

11   thing, if you will, of what's in the paper, and then I won't

12   object.

13          THE COURT:  Okay.

14          MR. SIBERT:  He's not going to be able to do that,

15   unless we bring a custodian up.  The spreadsheet -- the

16   spreadsheet is how -- that's how the information -- they

17   give it to you -- I mean, there are volumes of this, so the

18   spreadsheet is what they produce and then we ask

19   specifically, for our charges, the statements and the

20   account statements for those dates, otherwise we would

21   have -- I don't know how many pages.

22          THE COURT:  Okay.  Can the export -- did the

23   expert -- who prepared the spreadsheets?

24          MR. GOODREID:  That's what I want to know.

25          MR. SIBERT:  I don't know the answer to that

1  question, Your Honor.  I just -- I can't remember right now.

2  Did I -- what I can tell you is that our expert from FINRA

3  relied on all the trades and transactions that were

4  occurring on those accounts, which are on the disk.

5          THE COURT:  Right, I understand.  But -- but from

6  what Mr. Goodreid just said, there's more than just the raw

7  transaction documents, there's a spreadsheet --

8          MR. SIBERT:  Yeah, the spreadsheet --

9          THE COURT:  -- on the CD.  So who prepared it?

10          MR. SIBERT:  I believe we got those from

11  Scottsdale/Alpine.

12          THE COURT:  Scottsdale prepared a spreadsheet?

13          MR. SIBERT:  I think that's how they provided the

14  records.

15          THE COURT:  Why wouldn't he be able -- if that's

16  the case --

17          MR. SIBERT:  Because he's the lawyer, he's not the

18  record custodian.

19          THE COURT:  Oh, okay.

20          MR. SIBERT:  And I relied on the stipulation so we

21  wouldn't have to bring --

22          THE COURT:  The stipulation that you -- which

23  stipulation did you rely on?

24          MR. SIBERT:  Both, authentication and into

25  evidence.  We stipulated to it.

1264

1       THE COURT:  To admissibility of the CDs?

2       MR. SIBERT:  Absolutely, to the document.

3       THE COURT:  Is that your recollection?

4       MR. BARNARD:  If I could check the record.

5       THE COURT:  Okay.  So you don't know who prepared

6    these --

7       MR. SIBERT:  I can't remember, Your Honor.  I don't

8    want to mislead you.

9       THE COURT:  Yeah.

10      MR. SIBERT:  It's been a while since I remembered

11   what we received.

12      MR. GOODREID:  Can we have a second, Judge?

13      THE COURT:  Sure.

14      THE WITNESS:  Your Honor, can I go to the restroom?

15      THE COURT:  Sure.  Go ahead.

16      (Pause)

17      THE COURT:  How much more do you have?

18      MR. SIBERT:  This is it.

19      THE COURT:  Okay.

20      MR. BARNARD:  Part of the problem is that -- what

21   we were stipulating certainly to some of the documents, but

22   we didn't have -- and we were agreeing to stipulate to what

23   we understood and knew about.  The problem is that we're now

24   hearing about the underlying things which wasn't -- I don't

25   know what it is.  I still don't know what it is and didn't

1    know what it is --

2              MR. GOODREID:  Right.

3              MR. SIBERT:  Here's how I think we can handle this,

4    Judge.  If I can make a suggestion.  The expert's going to

5    testify, and he's going to put up a graph.  I'm going to ask

6    him what he relied on.

7              THE COURT:  Right.

8              MR. SIBERT:  He's going to say the transaction

9    records from Scottsdale and Alpine.  If he says that, I

10   think it goes to the point that these are the records he

11   relied on for 432, 433, 434.  The defense had had these

12   records and, as we stated in pretrial, and everyone was on

13   board, and no objections, that we were just going to show

14   the jury the relevant portions for essentially the charges

15   in this case which show the transactions.

16             THE COURT:  Uhm-hum.

17             MR. SIBERT:  Everything else goes to the summary.

18   It's like bank records.  There's no reason to enter

19   thousands of documents that no one's going to look at and is

20   too complicated for the jury.

21             THE COURT:  Right.

22             MR. GOODREID:  But you are now trying to enter

23   them, aren't you?

24             MR. SIBERT:  Well, for the purposes of to get the

25   summary, because I know Mr. Barnard's going to say at the

1266

1    end of the trial that if the evidence is not admitted, the

2    summary -- there's a cautionary instruction.  And that's

3    what you're requesting in the jury instructions.  But in

4    this case, I'm saying you've stipulated to it, the evidence

5    should come in based upon your stipulation and the fact that

6    the cumulative of all of the evidence under 1006, the

7    summary chart can summarize all this.

8                    THE COURT:  One second.

9                    MR. SIBERT:  1006, Your Honor.

10                   THE COURT:  Yeah, that's what I'm looking at.

11                   All right.  I'm -- I think what we're going to do

12   to move this along now, I'm going to reserve ruling on this,

13   although I will note that it was my recollection, because

14   otherwise the rule serves little purpose, but the 1006

15   summary does not require that the underlying documents that

16   are being summarized already be in evidence in any event.

17                   MR. SIBERT:  I agree with you, but at the end of

18   the trial if they're going to move for an instruction to

19   recall the exhibits -- the summary chart based upon which

20   ones that were not admitted into evidence to be applied to

21   certain summary exhibits.  The summary exhibit was based

22   upon what they've stipulated to according to the records.

23                   THE COURT:  Okay.  All right.  Well, I'm --

24                   MR. SIBERT:  I can move on now.

25                   THE COURT:  I'll reserve ruling on that, but I

1267

1    understand your points.  All right.

2              MR. SIBERT:  Thank you.

3         (End of discussion at sidebar)

4              THE COURT:  All right, Mr. Sibert, do you have

5    anything further of this witness?

6              MR. SIBERT:  I'll pass the witness, Your Honor.

7    Thank you.

8              THE COURT:  All right.  Before -- does the

9    defendant have cross-examination?

10             MR. GOODREID:  We can confer.  Did the Court want

11   to break now --

12             THE COURT:  Yeah, if we're not going to cross, we

13   can let this witness go.

14             MR. GOODREID:  If we're going to break now, we can

15   confer and it would certainly make it more efficient, if --

16             THE COURT:  All right.

17             MR. GOODREID:  -- at all.  So, yes.

18             THE COURT:  All right.  So before we go into a

19   possible cross-examination, we're going to take our

20   afternoon recess.  Ladies and gentlemen -- oop, there's the

21   mic.

22             Ladies and gentlemen of the jury, what I said was

23   that before we start a possible cross, we're going to take

24   our afternoon break.  We will be in recess for 15 minutes.

25        (Jury left the courtroom at 3:02 p.m.)

1    THE COURT:  Mr. Cruz, just like before, don't speak
2    with any of the lawyers.
3            THE WITNESS:  Yes, I understand that.
4            MR. SIBERT:  Your Honor.  Your Honor.
5            THE COURT:  Yeah.
6            MR. SIBERT:  Before you go, I just want to let the
7    Court know, this is outside the presence of the jury, if
8    Government Exhibit 429 in our exhibit is discussed, there's
9    a declarations regarding authentication of the records as
10   well.
11           THE COURT:  Say that again.
12           MR. SIBERT:  It's the declaration of the records
13   that we were talking about at the sidebar, and it's the CD
14   that actually contains -- the CD actually contains the Excel
15   files regarding the declaration that was provided by
16   Scottsdale.
17           THE COURT:  The declaration by a custodian?
18           MR. SIBERT:  That's correct, Your Honor.
19           THE COURT:  And have you moved 429 into evidence?
20           MR. SIBERT:  I didn't know the Court would --
21   because they were stipulated to, I didn't see the need, but
22   I can -- I can quickly do that before cross-examination, if
23   that's going to make a factor in the Court's ruling.
24           THE COURT:  Well, but there's not going to be -- if
25   there's no cross, there's no redirect.  We don't have -- if

1269

1    you want to make that -- let's sit down.

2              MR. SIBERT:  I appreciate it, Your Honor.

3              THE COURT:  All right.  So 429 has what?

4              MR. SIBERT:  Sir, 429 --

5              THE COURT:  So is this the foundational declaration

6    that can be used in lieu of the testimony of the custodian

7    of records?

8              MR. SIBERT:  That's correct, Your Honor.  And I --

9              THE COURT:  For which documents?

10             MR. SIBERT:  That would be documents 432, 433, 434.

11   And --

12             THE COURT:  For all the documents that -- including

13   the documents that are on the CD only in 432, 433 and 434?

14             MR. SIBERT:  That's correct, Your Honor.

15             THE COURT:  Regarding -- the declaration regarding

16   the authenticity of the documents.

17             MR. SIBERT:  Yes, sir.

18             THE COURT:  Okay.  Is there an objection to the

19   admission of 429?

20             MR. GOODREID:  Your Honor, still just to be clear,

21   so the declaration that is 429 here references a series of

22   Bates ranges, and I won't bore you with the numbers on here

23   but I don't know how the Bates ranges corresponds to the

24   spreadsheet.

25             So, in other words, on 429, the custodian is

1  talking about -- it's SEC, DOJE, blah blah blah, 31, 43

2  through another number, and then another series of Bates

3  numbers.  I don't know, as I stand here, how the Bates

4  ranges relate to the information that's contained in the

5  Excel spreadsheets of those three exhibits.

6  THE COURT:  Right.  But we have the representation

7  from Mr. Sibert as an officer of the court that the

8  declaration goes to the authenticity of the documents

9  contained, in their whole, in 432 through 434.  Is that

10  accurate?

11  MR. SIBERT:  That's right, Your Honor.  And also

12  attached to the -- to the -- to the -- excuse me,

13  authentication of records, the second page of 429 is the --

14  is an actual disk, and it -- I might -- it's a copy,

15  essentially, of what we got back from Scottsdale that is now

16  copied, which contains the Excel spreadsheets.

17  THE COURT:  Okay.  But -- oh, all right.  But -- so

18  are you moving for just the declaration or for the --

19  MR. SIBERT:  I'm moving for all.  429 through 432,

20  433, 434.

21  THE COURT:  But why -- but isn't that what we were

22  just discussing with respect to 432 and 434?  You have those

23  documents in the three CDs for these three exhibits that I

24  said I would reserve ruling on, and now you're trying to get

25  it in all in one huge --

1271

1    MR. SIBERT:  No, sir.  What I'm just telling you is

2    for authentication purposes --

3    THE COURT:  Right.

4    MR. SIBERT:  -- the copy of the disk with the

5    signature of the record custodian has all the records.  So

6    it's just authenticating that the records on the disk that

7    we sent them are the same records on 432, 433, 434.

8    THE COURT:  That's what I'm saying.  The -- 429 has

9    all of the documents that are contained in 432 through 434

10   that I reserved ruling on for purposes of admissibility.

11   MR. SIBERT:  Right, but there's no disk.  It's just

12   a photocopy of the disk.

13   THE COURT:  Wow, am I confused.

14   MR. SIBERT:  Let me just show you.  It's easier to

15   look at the document.  It's --

16   THE COURT:  I can --

17   MR. SIBERT:  It's -- it's just a photocopy of the

18   disk.

19   THE COURT:  Okay.  Photocopy of what disk?

20   MR. SIBERT:  That's the disk that has all the Excel

21   spreadsheets on with the Bates ranges.

22   THE COURT:  In the court set, it would be the

23   actual disk of 429?

24   MR. SIBERT:  The actual disk will be 432, 433, 434.

25   THE COURT:  So why would you have a -- what --

1    MR. SIBERT:  Because when you're trying to prove
2    authentication, you have to show the custodian actually
3    looked at all the documents.  So what I did was I put all
4    the documents on one disk instead of three separate disks
5    for three different accounts.  The custodian --
6    THE COURT:  Oh, I see.  I see.
7    MR. SIBERT:  Custodian looked at this and says,
8    "Yup these are our documents."
9    THE COURT:  So the declaration is in reference to
10   all the documents contained in that disk, but that disk is
11   located where?  That's in 429 of the Court's set of -- Ms.
12   Frank, can you look at the binder under 429.
13   MR. SIBERT:  There might be a disk in there, Your
14   Honor.
15   THE COURT:  Well, hold on.  Yeah, what else
16   would --
17   COURTROOM DEPUTY:  There is.
18   THE COURT:  Is there a disk?  Okay.  Well, so
19   that's what my point is.  You're trying to get in through
20   429 on that disk what I just told you I'd reserve ruling on,
21   432 through 434.
22   MR. SIBERT:  All I was telling the Court is not
23   only is there a piece of paper with Bates numbers, but
24   there's also a disk that was authenticated to -- with all
25   those documents for 432, 433 through 434.

1          So if Mr. Goodreid doesn't understand what the

2     Bates numbers are, the custodian had already authenticated

3     that.

4          THE COURT:  All right.  This is what we're going to

5     do.  The declaration page only, Ms. Frank, in 429 is

6     admitted into evidence for now.  With respect to the CD with

7     the documents in 429, similarly as I did with 432 through

8     434, I'm reserving a ruling under admissibility.

9          We'll be in recess for 15 minutes.

10          (Recess taken 3:10 p.m. to 3:27 p.m.)

11          THE COURT:  Cross-examination.

12          MR. GOODREID:  Your Honor, no cross-examination.

13     But there is a point I'd like to bring to the Court's

14     attention I think will make life easier for all of us.

15          THE COURT:  All right.

16          MR. GOODREID:  On the matter that we were

17     discussing before the break, and I understand the jury's

18     here, but I've talked to Mr. Sibert, I'm going to take

19     Exhibit 429 home tonight, look at it, and see if the things

20     we've been talking about are on there.  As long as they're

21     on there then we'll stipulate to admission.

22          THE COURT:  Excellent.  That's a great idea.  Okay.

23          Since there's no cross-examination, we'll first ask

24     the Government, may this witness be excused, for the

25     Government?

1    MR. SIBERT:  Yes, Your Honor.  Thank you.

2    THE COURT:  All right.  For the defendant?

3    MR. GOODREID:  Yes, Your Honor.

4    THE COURT:  Mr. Cruz, thank you so much for your

5    testimony.  You're excused.  You may step done.

6    THE WITNESS:  Thank you, Your Honor.

7    THE COURT:  All right, Government may call its next

8    witness.

9    MR. SIBERT:  Your Honor, at this time the

10   Government will call Todd Abbott to the stand.

11   THE COURT:  All right.

12   COURTROOM DEPUTY:  Just stand right by the witness

13   stand here and raise your right hand.

14   TODD ABBOTT, GOVERNMENT'S WITNESS, SWORN

15   COURTROOM DEPUTY:  Please be seated.  Scoot your

16   chair up to the microphone.  And please say and state your

17   full name and spell it for the record.

18   THE WITNESS:  My name is Todd Abbott.  T-o-d-d,

19   A-b-b-o-t-t.

20   THE COURT:  Mr. Sibert.

21   MR. SIBERT:  May I proceed, Your Honor?

22   THE COURT:  You may.

23   MR. SIBERT:  Thank you.

24                    DIRECT EXAMINATION

25   BY MR. SIBERT:

Direct - Abbott

1    Q.   Good afternoon, sir.  All right, sir, can you just tell

2    the jury where you're currently living.

3    A.   I live here in Denver.

4    Q.   All right.  And, sir, are you originally from the

5    Denver, Colorado --

6    A.   Yes, I am.

7    Q.   So you've lived here your whole life?

8    A.   Yes.

9    Q.   All right.  Can you tell the jury a little bit about

10   yourself, including your educational background and your

11   current employment.

12   A.   I currently bartend here in Denver.  I grew up here.  I

13   went to school, graduated high school, and went to some

14   college at Colorado School of Mines.

15   Q.   Okay.  And, sir, where are you bartending right now?

16   A.   Elway Steakhouse.

17   Q.   And now, having grown up in Denver, Colorado, did you

18   become friends with a gentleman by the name of Robert

19   Dittman?

20   A.   Yes, I did.

21   Q.   All right.  And can you tell the jury when you first

22   met Robert Dittman.

23   A.   About eighth grade, about 1988, '89.

24   Q.   Okay.  And have you remained lifelong friends?

25   A.   We have.

1276

Direct - Abbott

1    Q.   Up to present day?

2    A.   Still currently, yes.

3    Q.   All right.  Do you know what Mr. Robert Dittman was

4    doing in the years 2010 through 2015?

5    A.   I believe he was bartending.

6    Q.   And when you say you believe, why do you say "believe"?

7    A.   We were -- we were friends at that time.  He worked at

8    Lola, a bar here in Denver.

9    Q.   All right.  And how often did you get to see Robert

10   Dittman --

11   A.   I see him every couple of weeks.

12   Q.   Okay.  How about in the time period 2010 through 2015?

13   A.   Probably about the same.

14   Q.   All right.  And do you know what Robert Dittman is

15   doing now for employment?

16   A.   He's waiting tables.

17   Q.   All right.  And so if you had to give the jury a

18   description of Robert Dittman, how would you describe him?

19   A.   He's a good friend and a sharp guy.

20   Q.   And when you say "sharp," could you just tell me what

21   you mean by that.

22   A.   He graduated college with, I believe, honors.  He's a

23   smart guy.

24   Q.   And he's always been a smart, sharp guy?

25   A.   Yeah.

Direct - Abbott

1    Q.   All right.  Now, did you also -- in your time of being
2    friends with Robert Dittman, did you get a chance to meet a
3    gentleman by the name of Scott Dittman?
4    A.   Yes, I have.
5    Q.   Okay.  And essentially could you just describe how you
6    became --
7    A.   Scott is his older brother.  Just met him socially
8    through knowing Bob.
9    Q.   Okay.  And did you have the same type of friendship
10   with Scott Dittman as you did with Robert Dittman?
11   A.   No.
12   Q.   All right.  So could you just explain the difference.
13   A.   Just -- I mean, again, he was older than us.  I just
14   knew him through Bob.  I mean, certainly friendly, but
15   never -- never on a calling basis or anything like that.
16   Q.   Okay.  And can you just tell me who's older, Scott or
17   Robert?
18   A.   Scott is older.
19   Q.   And do you know by how many years?
20   A.   I think about six years.
21   Q.   Okay.  Now, did you ever have a chance to invest money
22   into one of Scott Dittman's businesses?
23   A.   Yes, I did.
24   Q.   And do you recall what business that was?
25   A.   It was going to be a marijuana -- medical marijuana

Direct - Abbott

1   dispensary.

2   Q.   Okay.  And do you recall the name of the business?

3   A.   I -- I do not -- I do not recall the name of the

4   business.

5   Q.   Did you ever invest money into the business?

6   A.   I did.

7   Q.   And do you know how much your investment was?

8   A.   $10,000.

9   Q.   Do you know the time period that you made this --

10  A.   Around 2010.

11  Q.   -- investment?

12          Now, did you ever sign any paperwork with Scott

13  Dittman regarding this investment of $10,000?

14  A.   I did.  A promissory note.

15  Q.   Now, are you aware that business you invested in with

16  Scott Dittman, do you know what happened with the business?

17  A.   Not exactly.  It fell through.  He and his partner had

18  split up and so that -- that business fell through.

19  Q.   All right.  And when you say "fell through"?

20  A.   It just -- I don't know exactly what, but they weren't

21  doing the dispensary anymore.

22  Q.   Did you ever make your investment back?

23  A.   I did not.

24  Q.   With that business.

25  A.   No.

1279

Direct - Abbott

1    Q.   Okay.  And, I'm sorry, you stated that you invested the

2    $10,000 and there's a promissory note.  Do you remember the

3    terms of your $10,000 investment?

4    A.   It was supposed to be repaid, I believe within one

5    year, at a 20 percent rate.

6    Q.   So you invest $10,000 on January 1st and by the next

7    January 1st you get $12,000 back?

8    A.   Essentially, yes.

9    Q.   All right.  Now, did Mr. Scott Dittman ever start a new

10   business?

11   A.   Yes.

12   Q.   Okay.  And do you recall the name of that business?

13   A.   I believe it was FusionPharms.

14   Q.   All right.  Do you know what that business was about?

15   A.   It was GroPods.

16   Q.   And when you say "GroPods," did you know any details

17   about them?

18   A.   Essentially shipping containers converted into

19   growing -- you can grow anything in there from vegetables

20   to -- or anything you wanted, but shipping containers

21   converted into growing containers.

22   Q.   All right.  Now, once Mr. Scott Dittman started this

23   FusionPharm business, did you ever meet a gentleman by the

24   name of Mr. William Sears?

25   A.   Yes, I did.

Direct - Abbott

1    Q.   Okay.  And can you describe how you ended up meeting
2    Mr. Sears.
3    A.   I -- to my knowledge, William -- William was Scott's
4    partner, he was also their -- Scott and Bob's
5    brother-in-law.  They -- he married their sister, Sandy.
6    Q.   Okay.
7    A.   William married their sister Sandy, so Bob and Scott's
8    sister -- older sister, Sandy, married William Sears, and
9    then Scott and William entered into a partnership, to my
10   understanding.
11   Q.   Okay.  And what business was this partnership?
12   A.   I -- the FusionPharms.
13   Q.   And when you say "Sandy," does she also go by the name
14   Sandra Sears?
15   A.   Yes.
16   Q.   Now, did you ever learn about Mr. William Sears's
17   criminal conviction?
18   A.   I was aware that he had been to -- been to jail or
19   prison.
20   Q.   Okay.  And how did you become aware of that?
21   A.   I -- I don't know exactly.  Just generally through --
22   through Bob.
23   Q.   Okay.  And when you say "Bob," who do you mean?
24   A.   Robert Dittman.
25   Q.   Okay.  So Robert Dittman, your friend?

Direct - Abbott

1    A.    Yes.

2    Q.    All right.  And he also goes by the name of Bob

3    Dittman?

4    A.    Yes, he does.

5    Q.    Now, did you know with -- based upon your friendship,

6    did Mr. Robert Dittman have any role in FusionPharm?

7    A.    Not to my knowledge.

8    Q.    Okay.  And during the time that you knew about

9    FusionPharm, what was Mr. Robert Dittman doing?

10   A.    Bartending.

11   Q.    Okay.

12   A.    And really if he did work there, maybe one summer

13   helping out cleaning pods and things for his brother.  But

14   I -- he never -- he was bartending then during those times.

15   Q.    All right.  Well, what was his full-time job?

16   A.    Bartending.

17   Q.    Okay.  And did that include that one summer that he

18   assisted in --

19   A.    I believe so.

20   Q.    Okay.  And now, with your $10,000 investment, did you

21   lose your investment with Scott Dittman based upon his old

22   business?

23   A.    No.

24   Q.    Okay.  So did you receive shares of FusionPharm stock

25   based upon your investment?

1282

Direct - Abbott

1    A.   Yes, I did.

2              MR. BARNARD:  Object.  Leading.

3              THE COURT:  Sustained.

4    BY MR. SIBERT:

5    Q.   So you didn't say you lost your investment.  Did your

6    investment carry forward?

7    A.   Yes, it did.

8    Q.   Can you tell the jury how your investment was carried

9    forward.

10   A.   Into 40,000 shares of FusionPharm stock.

11   Q.   So instead of any cash or interest on the cash, you

12   received shares of stock in FusionPharm?

13   A.   Yes, I did.

14   Q.   And who did you make that arrangement with?

15   A.   Scott Dittman.

16   Q.   All right, sir --

17             MR. SIBERT:  I'm sorry, Your Honor, I don't have my

18   sheet, I just want to make sure.

19   BY MR. SIBERT:

20   Q.   Can you look at Government Exhibit 151.

21             MR. SIBERT:  And, Your Honor, this has been

22   admitted into evidence, so can I have it published.

23             THE COURT:  Okay.  One second.

24   BY MR. SIBERT:

25   Q.   Do you recognize Government Exhibit 151?

Direct - Abbott

1    A.   Yes, I do.  Yes, I do.

2    Q.   And this is an e-mail between you and Scott Dittman; is

3    that correct?

4    A.   Yes.

5    Q.   All right.  And you've had an opportunity to look

6    through this exhibit prior to your testimony here today?

7    A.   I have.

8    Q.   All right.  Can I have page 2 of this exhibit.

9         It's -- sir, if you look at the top of your screen

10   there, I'm circling an e-mail.  That's an e-mail that you

11   wrote Mr. Dittman; is that right?

12   A.   Yes.

13   Q.   Okay.  What do you mean when you're referring to

14   certificates?

15   A.   Well, I had -- I had received through the FusionPharm

16   stock, they were restricted shares that I could not trade.

17   Q.   Okay.  So your understanding -- let's go back a little

18   bit.

19        The shares that you received from Scott Dittman

20   with FusionPharm, you called them restricted shares.

21   A.   Yes.

22   Q.   And so what did that allow you to do with these shares?

23   A.   Essentially nothing.  I, with my investment was just --

24   in my mind, I guess, on hold.

25   Q.   And did you have a broker?

Direct - Abbott

1    A.   I -- yes.  I personally did, yeah, but they -- I wasn't

2    able to do anything with this -- with the restricted shares.

3    Q.   You couldn't trade those shares?

4    A.   No.

5    Q.   All right.  So is that what you were meaning when you

6    were talking about getting together and discussing these

7    certs?

8    A.   Yes.  Yes, it was.

9    Q.   And what are you referring to when you said, you're

10   "looking at Pink Sheets right now, 2.05, yeah"?

11   A.   Pink Sheets was the site where the stock was being

12   traded and it was $2.05.

13   Q.   Okay.  And why was that an interest to you?

14   A.   Well, because I had essentially bought my shares for 25

15   cents.

16   Q.   So if you were able to -- if you didn't have restricted

17   shares, how much would your shares be worth at 2.05?

18   A.   It was -- I mean, that would have been 80,000, a little

19   more.

20   Q.   So $80,000 based upon a $10,000 investment?

21   A.   Yes.

22   Q.   That's better than 12,000, would you agree?

23   A.   It is.

24   Q.   All right.  And, then, let's look at page 1.  And how

25   did Mr. Dittman respond to you?

```
                       Direct - Abbott
```

1    A.    "Can I call you on my drive home?"

2    Q.    And then -- so essentially he was replying that he

3    would get back to you?

4    A.    Yes.

5    Q.    All right.  Did Mr. Dittman get back to you?

6    A.    Yes.

7    Q.    You can put down that exhibit.

8          Do you recall -- can I have that taken down -- do

9    you recall what Mr. Dittman talked to you about regarding

10   these restricted shares?

11   A.    That he -- they were going through a deal and needed a

12   few more days and would get back with me.  I think he

13   mentioned that they could buy me out for my initial

14   investment or I could hold onto them and wait and see what

15   happened.

16   Q.    Okay.  And you say they were going to deal.

17   A.    Him and William.  But Scott Dittman.

18   Q.    Okay.  And when you say "William," you're talking about

19   Mr. Sears?

20   A.    Mr. Sears.

21   Q.    Did you see any difference between Mr. Scott Dittman's

22   role and Mr. William Sears's role at FusionPharm?

23   A.    Excuse me.  I -- I assumed that they were partners.

24   Q.    Okay.  Can you look at Government Exhibit 152.  And

25   it's --

Direct - Abbott

1    MR. SIBERT:  Your Honor, this has not been admitted

2    into evidence but it has been stipulated to.

3    THE COURT:  All right.  Given the stipulation of

4    the parties, Exhibit 152 is admitted into evidence and may

5    be published to the jury.

6    (Government's Exhibit 152 received)

7    MR. SIBERT:  Thank you, Your Honor.

8    BY MR. SIBERT:

9    Q.   All right, sir, I'm just blowing up this e-mail.

10   You've had a chance to look at 152; is that correct?

11   A.   Yes.

12   Q.   Okay.  And can you just tell the jury essentially what

13   Mr. Dittman is talking to you about.

14   A.   So this is just where he's saying that they can either

15   buy back my -- my stock with interest or if I want to hold

16   on for a couple of days while they work on this deal, I can

17   hold onto the stock and see what happens to the share price.

18   Q.   Okay.  And are you making reference to this last

19   paragraph that I'm circling on your screen?

20   A.   Yes.

21   Q.   And do you know what it means by 144 stock?

22   A.   I do not.

23   Q.   Okay.  So essentially you had two options.

24   A.   Yes.

25   Q.   And that was either -- what were those options?

Direct - Abbott

1    A.    Either sell back my stock and get the 20 percent and

2    get 12,000 or wait a couple of days to what I'm thinking and

3    make more money than that.

4    Q.    What did you choose?

5    A.    I waited on it.

6    Q.    Door No. 2?

7    A.    Yes.

8    Q.    All right.  So you waited.  All right.

9          Can I please have Government Exhibit 116.  Okay.

10   Can I have page 17, please.

11         All right, sir, do you recognize the letter on page

12   1 -- excuse me, on page 17 of Government Exhibit 116?

13   A.    Yes.

14   Q.    Okay.  And can you tell the jury what this letter is

15   regarding.

16   A.    It is the stock purchase agreement.

17   Q.    Okay.  And do you know what stock purchase agreement is

18   being mentioned here?

19   A.    Pacific Stock Transfer -- oh, the certificate number

20   3785.

21   Q.    Okay.  And that's -- you're going by right there?

22   A.    Representing, yeah, 40,000 shares of FusionPharm.

23   Q.    Okay.  Are those your 40,000 shares of FusionPharm?

24   A.    I believe -- yes.

25   Q.    And who's this letter being sent to?

Direct - Abbott

1    A.    Pacific Stock Transfer.

2    Q.    Okay.  And who are you selling your shares to?

3    A.    MicroCap Management.

4    Q.    Okay.  And where's Microcap Management located?

5    A.    North Carolina.

6    Q.    Is that New Bern, North Carolina?

7    A.    Yes, it is.

8    Q.    Do you know anyone in North Carolina?

9    A.    I do not.

10   Q.    Do you know anyone in New Bern, North Carolina?

11   A.    I do not.

12   Q.    This is your address at the top of that letter?

13   A.    Yes, it is.

14   Q.    Okay.  And what's the dates of this letter?

15   A.    September 8th, 2011.

16   Q.    And you're writing a letter regarding a stock purchase

17   agreement; is that correct?

18   A.    Yes.

19   Q.    Okay.  And you -- is that your signature?

20   A.    Yes, it is.

21   Q.    Did you draft this letter?

22   A.    I did not.

23   Q.    Do you know who drafted this letter?

24   A.    I don't know exactly.  I assume either Scott Dittman or

25   William Sears.

Direct - Abbott

1    Q.   Okay.  And why do you assume that?

2    A.   That's who it was given to me by.

3    Q.   That's who gave you the letter?

4    A.   Yes.

5    Q.   And then you signed the letter?

6    A.   Yes.

7    Q.   And just one last question:  That's your phone number

8    in there; is that correct?

9    A.   Yes.

10   Q.   Okay.  Can I have page 24 of this exhibit.  Okay.  All

11   right.

12        What's the title of this document?

13   A.   Share Purchase Agreement.

14   Q.   Okay.  And do you know who this share purchase

15   agreement -- oops -- do you know who this share purchase

16   agreement is between?

17   A.   Myself and Microcap Management.

18   Q.   And, again, is that the same address for Microcap

19   Management?

20   A.   I --

21   Q.   From the previous document?

22   A.   Yes.  It appears to be, yes.

23   Q.   Okay.  And essentially what does the purchaser and

24   seller agreement do?

25   A.   The purchaser acquires from seller 40,000 shares of

Direct - Abbott

1    FusionPharm stock, common shares.

2    Q.   Okay.  And can you tell me the details of this purchase

3    agreement.

4    A.   Sale of stock, the seller shall sell the purchaser

5    40,000 common shares of FusionPharm, and then the purchase

6    price, purchaser shall purchase the shares for $40,000.

7    Q.   Okay.  So if I understand this agreement correctly,

8    you're agreeing to sell your 40,000 shares of MicroCap

9    stock; is that correct -- or, excuse me, of FusionPharm

10   stock to MicroCap?

11   A.   Yes.

12   Q.   And what is MicroCap supposed to give you?

13   A.   It says $40,000.

14   Q.   Okay.  Did you ever receive $40,000 from MicroCap?

15   A.   No, I did not.

16   Q.   Okay.  And can you look down here at the bottom of this

17   page.  Who's signing that document?

18   A.   I did and William Sears.

19   Q.   Okay.  And William Sears is -- what role is Mr. Sears

20   in MicroCap?

21   A.   Managing member.

22   Q.   Okay.  Did Mr. Sears ever pay you $40,000?

23   A.   No.

24   Q.   Okay.  And then can you go back to the top.

25        What's the date of this agreement?

```
                          Direct - Abbott
```

1    A.   September 11th, 2011.

2    Q.   Okay.  So the date this purchase -- share purchase

3    agreement, is that the same date that you signed this

4    letter?

5    A.   I'm assuming so.

6    Q.   Do you recall signing this letter before the

7    purchase -- the purchase agreement before it was put on

8    paper?

9    A.   No.

10   Q.   Did you ever agree to this purchase agreement before it

11   was put on paper?

12   A.   I don't believe so.

13   Q.   Okay.  So can you just hold page 24 in your hand there.

14   Can I go back to page 17, please.  Can you blow this up,

15   again.  Thank you.

16            How are you writing about a purchase stock

17   agreement on September 8th --

18            THE COURT:  Hold on.  I don't think he has the

19   exhibit in front of him.

20            MR. SIBERT:  Thank you, Your Honor.

21   BY MR. SIBERT:

22   Q.   And that's Exhibit -- I'm sorry, 116, page 42.  Or

23   excuse me, 24.

24   A.   Okay.

25   Q.   Do you have that agreement in front of you now?

1292

Direct - Abbott

1    A.    Yes.

2    Q.    Okay.  So your -- on document -- on page 17, you're

3    writing a letter to Pacific Stock Transfer about a purchase

4    agreement on September 8th, 2011.  That's three days before

5    the date of this sale purchase agreement ever existed.

6    A.    I didn't write these letters.

7    Q.    Okay.  And to the best of your knowledge, who wrote

8    these -- who provided you these letters?

9    A.    Scott Dittman.

10   Q.    Can I have page 21 of Government Exhibit 116.

11         Do you recognize what this document is?

12   A.    Debt settlement agreement.

13   Q.    Okay.  Do you understand the terms of this debt

14   settlement agreement?

15   A.    Yes.

16   Q.    Okay.  And what were those terms?

17   A.    I was receiving the 40,000 shares.

18   Q.    And you were receiving 40,000 shares based upon what?

19   A.    Of my $10,000 investment.

20   Q.    Okay.  And what's the date of this agreement?

21   A.    May 3d, 2011.

22   Q.    All right.  And that matches the top date; is that

23   correct?

24   A.    Yes, it does.

25   Q.    Okay.  And who signed these documents?

1293

Direct - Abbott

1    A.    Myself and Scott Dittman.

2    Q.    Okay.

3          MR. SIBERT:  Your Honor, at this time the

4    Government would like to move into evidence Government

5    Exhibit 291, which has been stipulated to.

6          THE COURT:  All right, given the stipulation of the

7    parties, Government Exhibit 291 is admitted into evidence

8    and may be published to the jury.

9          (Government's Exhibit 291 received)

10   BY MR. SIBERT:

11   Q.    And I don't need to publish right now, but can the

12   witness have Government Exhibit 291, please.

13         All right, sir, can you look at page -- essentially

14   2 of Government Exhibit 291.

15   A.    Okay.

16   Q.    Can you tell me essentially what the price of

17   FusionPharm shares was being sold at on May 3d, 2011.

18   A.    $1.30.

19   Q.    All right.  Can I have page 2 of Government Exhibit

20   291.  Can you scroll up, please.  Stop.

21         Is that where you're getting the price?

22   A.    Yes.

23   Q.    So the day that you entered this debt agreement with

24   Mr. Scott Dittman, how much was your $10,000 investment

25   worth?

Direct - Abbott

1    A.    13,000.

2    Q.    Okay.  So more than 10,000.

3    A.    Yes.

4    Q.    All right.  Now I'd like you to look -- could you tell

5    me, based upon looking through that document, 291, what was

6    the price of FusionPharm shares on September 11th, 2011?

7    A.    What day again?

8    Q.    September 11, 2011.

9    A.    $2.50.

10   Q.    All right.  Can I have page 4 of this document.  Blow

11   that top part up.

12         All right.  Now there's no September 11, 2011, on

13   there; is that correct.

14   A.    No.

15   Q.    All right.  So where are you getting $2.25?

16   A.    $2.25.  That's the price on 9-9.

17   Q.    Okay.  And what's the price on 9-13?

18   A.    $2.24.

19   Q.    All right.  So between September 9th and September

20   13th, FusionPharm was -- a share of FusionPharm was being

21   sold for over $2.

22   A.    Yes.

23   Q.    So that would make your investment worth how much, if

24   you had 40,000 shares?

25   A.    80 -- 84,000, something -- somewhere in there.  About

1295

Direct - Abbott

1     $80,000.

2     Q.   So over $80,000.

3     A.   Yes.

4     Q.   All right.  I can have that taken down.  Can we go back

5     to page 17.  Or, excuse me, page 24.  Document 116.

6          All right.  You recall talking about this share

7     purchase agreement, with Mr. Sears, that you signed,

8     correct?

9     A.   Yes.  Yes.

10    Q.   And this was dated September 11th, 2011.

11    A.   Yes.

12    Q.   And this agreement was for 40 shares of $40,000; do you

13    recall that?

14    A.   Yes.

15    Q.   And you signed this agreement?

16    A.   I did.

17    Q.   Do you like losing over $45,000 to Mr. Sears?

18    A.   No.

19    Q.   Can you tell me why you signed this agreement?

20    A.   I -- I guess I didn't understand it at the time.

21    Q.   What do you mean you didn't understand?

22    A.   I didn't prepare this paper, I thought this was all the

23    process of receiving my shares of FusionPharm.

24    Q.   Well, you already received 40,000 shares; isn't that

25    what you testified to?

Direct - Abbott

1    A.    It was -- it was to get those -- to the -- to be the

2    unrestricted shares.

3    Q.    Okay.  So he was -- who was the party at FusionPharm

4    working with you when it came to getting these shares

5    unrestricted?

6    A.    Scott Dittman and William Sears.

7    Q.    And they're the ones that were providing you the

8    paperwork?

9    A.    Yes.

10   Q.    All right.  Can you have that taken down?

11         Do you know a Mr. Richard Scholz?

12   A.    I do not.

13   Q.    Have you ever dealt with Mr. Richard Scholz either in

14   person, over e-mail, or via telephone?

15   A.    Not to my knowledge, no.

16   Q.    Do you recall a Mr. Richard Scholz being introduced to

17   you through Mr. Sears -- William Sears or Mr. Scott Dittman?

18   A.    No.

19   Q.    I'm sorry, can I have Government Exhibit 116 brought

20   back up.  And can I have page 18.

21         Do you know essentially what this document is on

22   page 18?

23   A.    Transferability of shares originally owned by Todd

24   Abbott.

25   Q.    Okay.  My question is:  Do you know what this document

Direct - Abbott

1    is?

2    A.    No, not exactly.

3    Q.    Can you take a look at that page 18 and page 19 of

4    Government Exhibit 116 in your binder.

5    A.    And what was that?

6    Q.    All right.  Can you just take a look at the document

7    that begins on page 18, and will go on for two or three

8    pages.

9    A.    Yes.

10   Q.    Do you know what this document is?

11   A.    Not -- I mean, I guess I don't understand.  I don't

12   know exactly what this document is.  It --

13   Q.    Do you -- let me ask you another question.  Do you know

14   Mr. Tod DiTommaso?

15   A.    I do not.

16   Q.    Did you ever contact Mr. Tod DiTommaso to draft a

17   document like this?

18   A.    No.

19   Q.    Can you just -- can I have page -- this paragraph blown

20   up for you.

21         Can you look at the first paragraph of that

22   document.

23   A.    Yes.

24   Q.    You're mentioned in the first paragraph.  Do you see

25   your name there?

1298

Direct - Abbott

1     A.    Yes, I do.

2     Q.    Do you know why your name is being mentioned in this

3     document that you don't recognize?

4     A.    I assumed it was for the --

5              MR. BARNARD:  Your Honor, I object to assumptions,

6     and there's not sufficient foundation for this witness to

7     testify about this.

8              THE COURT:  All right.  That's sustained.  Sir --

9     Mr. Abbott, please testify only from personal knowledge.

10    Don't guess or speculate or assume.

11             THE WITNESS:  Okay.

12             THE COURT:  All right?

13    BY MR. SIBERT:

14    Q.    Let me ask you this:  Do you know why your name is in

15    this document?

16    A.    Because my shares of FusionPharm stock.

17    Q.    Okay.  And, again, your name's in this document but you

18    never had contact with Mr. Tod DiTommaso?

19    A.    Not to my knowledge, no.

20    Q.    All right.  Did you ask Mr. Tod DiTommaso ever to do

21    anything with your shares?

22    A.    No.

23    Q.    Who were the only two people that you spoke to

24    regarding your shares?

25    A.    Scott Dittman and William Sears.

Cross - Abbott

1    MR. SIBERT:  I'll pass the witness.

2    THE COURT:  Cross-examination.

3    MR. BARNARD:  Thank you, Your Honor.

4                    CROSS-EXAMINATION

5    BY MR. BARNARD:

6    Q.   Mr. Abbott, during 2009, '10, '11, did you hang out at

7    the FusionPharm business on a regular basis?

8    A.   No.

9    Q.   Did you hang out at the FusionPharm business on an

10   occasional basis?

11   A.   I had been there.

12   Q.   How many times?

13   A.   I believe once.  Maybe twice.

14   Q.   For approximately how long?

15   A.   Just not long.

16   Q.   When you say "not long," were you talking about 5

17   minutes, 10 minutes, two hours?

18   A.   Maybe one occasion of two hours.

19   Q.   And on that occasion, did you see Scott Dittman there?

20   A.   I'm -- I very well could have.

21   Q.   And do you remember, did you see --

22   A.   I do not remember seeing him there.

23   Q.   Do you remember whether you saw William Sears there?

24   A.   I think I did.

25   Q.   Wouldn't it be fair to say that almost all of your

Redirect - Abbott

1    discussions and negotiations with regard to the matters to

2    which you testified happened with Scott Dittman?

3    A.    Yes.

4           MR. BARNARD:   Thank you, Your Honor.   No further

5    questions.

6           THE COURT:   Redirect?

7                    REDIRECT EXAMINATION

8    BY MR. SIBERT:

9    Q.    Do you remember receiving a tour of the warehouse at

10   FusionPharm?

11   A.    Yes.

12   Q.    Who gave you that tour?

13   A.    It -- either Scott Dittman or William Sears.

14   Q.    And, again, you testified previously, was Mr. Scott

15   Dittman the only person that provided you paperwork

16   regarding your shares?

17   A.    I believe so, yes.

18   Q.    Okay.   Thank you.

19          THE COURT:   May this witness be excused for the

20   Government?

21          MR. SIBERT:   Yes, sir.

22          THE COURT:   For the defendant?

23          MR. BARNARD:   Yes, Your Honor.

24          THE COURT:   All right.   Mr. Abbott, thank you for

25   your testimony.   You're excused.   You may step down.

Redirect - Abbott

1           THE WITNESS:  Thank you.

2           MR. BROWN:  Your Honor, the Government calls Todd

3    Kramer.

4           THE COURT:  I didn't hear what you said, Mr. Brown.

5           MR. BROWN:  I'm sorry.

6           THE COURT:  I said I didn't hear -- you were

7    talking -- you weren't near a mic so I didn't hear what you

8    said.

9           MR. BROWN:  Okay.  Todd Kramer, Your Honor.

10          THE COURT:  Todd Kramer.

11          COURTROOM DEPUTY:  If you could just stand behind

12   the witness box here and raise your right hand.

13           TODD KRAMER, GOVERNMENT'S WITNESS, SWORN

14          COURTROOM DEPUTY:  Okay.  Take a seat, and move up

15   towards the microphone.  And please state and spell your

16   full name for the record.

17          THE WITNESS:  Okay.  It's Todd Kramer.  T-o-d-d,

18   K-r-a-m-e-r.

19          MR. BROWN:  Your Honor, with this witness, the

20   Government is going to ask to move to admit two stipulated

21   exhibits.

22          THE COURT:  All right.

23          MR. BROWN:  135 and 136.  We will also ask to be --

24   asking him about three nonstipulated exhibits, 137, '38 --

25   or 137, 138 and 139.  And if the courtroom deputy would at

1302
Direct - Kramer

1  least provide that hard copy to the witness.

2           THE COURT:  Of which one?

3           MR. BROWN:  All of those documents are in the same

4  binder.

5           THE COURT:  All right.  Well, then, let me first

6  get on the record Exhibits 135 and 136, given the

7  stipulation of the parties, are admitted into evidence and

8  may be published to the jury.

9       (Government's Exhibit 135 and 136 received).

10          THE COURT:  And we'll see what you do with the

11  other three exhibits.

12                     DIRECT EXAMINATION

13  BY MR. BROWN:

14  Q.   Sir, what is your profession?

15  A.   I'm a investigator.

16  Q.   Who do you work for?

17  A.   The Financial Regulatory Agency, FINRA is the -- it's

18  what we go by.

19  Q.   Okay.  And where do you live?

20  A.   I live in Gaithersburg, Maryland.

21  Q.   Is that -- I guess that's where your employer's

22  located?

23  A.   Yes.  Our offices are in Rockville, Maryland.

24  Q.   Is that a suburb of Washington, D.C.?

25  A.   Yes, it is.

Direct - Kramer

1    Q.   Can you tell us what FINRA is.

2    A.   We're a self-regulatory organization, so what we do --

3    or what we were created to do by the brokerage industry is

4    to regulate stock brokers and brokerage firms and we were

5    created for that purpose.

6         Then as we progressed over time, we now have

7    contracts with the various stock markets, such as the New

8    York Stock Exchange, NASDAQ, and we also surveil -- or

9    essentially watch the trading and what's going on in the

10   markets for all the stock markets to make sure nothing bad

11   is happening or, you know, new investors are taken advantage

12   of.

13   Q.   How long have you worked for FINRA?

14   A.   15 years.

15   Q.   You mentioned that it -- well --

16        THE COURT:  Mr. Brown, we're already at day 6 and

17   no one has yet told me or told the jury what FINRA is an

18   acronym for, so can you tell us.

19        THE WITNESS:  Yeah, Financial Industry --

20        THE COURT:  Talk into the microphone.

21        THE WITNESS:  Okay, sorry.  Financial Industry

22   Regulatory Authority.

23        THE COURT:  Thank you.

24        MR. BROWN:  Thank you, Your Honor.

25   BY MR. BROWN:

Direct - Kramer

1    Q.   Is FINRA part of the Government?

2    A.   No, we're not.  As I said, we're a self-regulatory

3    organization, so we -- we have nothing to do -- well, not

4    nothing to do with the Government.  We're not part of the

5    Government.  The SEC does its oversight over FINRA, so they

6    come in and make sure that -- you know, they kind of do

7    audits and then make sure that we're enforcing our own

8    rules, to make sure that we're doing what we're supposed to

9    be doing.

10        But other than that, we have no direct relationship

11   with the Government other than the fact that if we find

12   wrongdoing going on or -- within the markets, and we don't

13   have jurisdiction over the certain person or individual,

14   then we would refer any conduct that we find to the -- to

15   the proper people, whether it be the SEC or the FBI or

16   Department of Justice, whoever -- whatever would be the best

17   place to send it.

18   Q.   So is FINRA part of the -- I guess the regulatory

19   framework of the securities industry?

20   A.   Yes.  It -- yeah, absolutely.

21   Q.   But it's not a law enforcement --

22   A.   No.  We don't have subpoena power or anything like

23   that.  We just have regulation or -- I should say

24   jurisdiction over our members.  So our members are any

25   brokerage firm, like Merrill Lynch or Etrade or Goldman

Case 1:17-cr-00008-WJM  Document 287  Filed 03/27/20  USDC Colorado  Page 213 of 252

1305
Direct - Kramer

1    Sachs, or anything like that, or any broker that's
2    registered with FINRA.  So if you want to be in the
3    regulatory -- if you wanted to sell stocks or work for a
4    brokerage firm, you need to register with FINRA.
5            So we have jurisdiction over all those people and
6    firms because of the -- because they're part of our
7    membership.
8    Q.   Okay.  And I guess -- what is the -- what is the
9    mission of FINRA, if you can call it that?
10   A.   Well, our mission, you know, is to protect the public
11   from any wrongdoing.  We are there to -- like to deal with
12   our members.  So what we do is we create laws and we enforce
13   those laws with anybody that's part of FINRA, who's
14   registered with FINRA.  Like I said, a broker or brokerage
15   firm.
16           We also write all the rules.  We also audit the
17   brokerage -- the brokerage industry, itself, so we'll go out
18   and conduct an exam of whatever firm -- and I'm just
19   making -- Goldman Sachs, say, and it's on a scheduled basis,
20   just to make sure that they're following our rules properly.
21   We also look at the various registered representatives that
22   work with those firms just to make sure that, of course,
23   they're following our rules as well.
24           Then we also create an -- in the service of
25   educating the public, we've created, you know, educational

Direct - Kramer

1    assistance for the public to educate them on just the stock
2    market in general, what investing, that type of thing.
3         And then we also -- because we have contracts with
4    various broke- -- with the various stock markets, we have --
5    we actually surveil all the markets.  So we basically look
6    at all the markets, all the trading that's going on out
7    there to make sure that there's no wrongdoing, the public
8    isn't harmed.  And by doing that, we are essentially, I
9    guess, following our contracts with the various stock
10   markets to help them, because they can't do it themselves;
11   so somebody has to.
12   Q.   Okay.  Is -- what regulatory authority do you have?
13   You indicated you're not a law enforcement agency.
14   A.   Well, so what we have is -- we have authority over the
15   brokerage firms or the registered representatives.  So what
16   we can do -- if we identify any wrongdoing by a firm or a
17   registered representative, we will -- we have the -- we can
18   compel them to come in and talk to us.  We can compel them
19   to provide information that we request.  And if they don't,
20   then they're obviously in violation of being registered with
21   us so we can kick them out.  But our -- basically our
22   punishments:  We can bar somebody, which is kicking them
23   out, meaning that they're stripped of all their licenses and
24   they can't -- can no longer work in the brokerage industry.
25   We can fine them.  We can suspend them.  We can even -- for

Direct - Kramer

1    firms, we can even sort of force them to, I guess you --
2    upgrade their policies and procedures to make sure that
3    whatever might have happened will never happen again,
4    so . . .
5    Q.   You mentioned you regulate registered representatives
6    and brokerage firms.  Could you tell the jury what a
7    brokerage firm is.  You've identified some, but what does a
8    brokerage firm do?
9    A.   Essentially a brokerage firm -- it's a company that --
10   like I said, a couple of examples I've had are Goldman or
11   Morgan Stanley.  They are entities that they -- their
12   business is trading stocks, or helping -- helping investors
13   invest.  They hire and train registered representatives or
14   brokers.  And they have a variety of different types of
15   businesses.  They have just the trading part, which
16   everybody knows about.  You know, you can call your broker
17   up and say, "Hey, I'd like to make a trade in IBM," or
18   whatever company it might be and they'll do that for you.
19          They also have services such as financing, services
20   for large companies where they will actually help a large
21   company raise money for their -- for their -- for their
22   business needs.  So they're called -- it's called investment
23   banking.  And then they have a lot of, you know, other types
24   of finance type stuff that they do as well.
25   Q.   With regard to brokerage firms and FINRA, does being a

Direct - Kramer

1    member of FINRA enhance a brokerage firm to --

2    A.   Well, they have to be a member.  In order to be in the

3    brokerage industry, they have to be a member of FINRA.  And

4    if they're not, then they can't -- you can't trade stocks or

5    you can't --

6    Q.   Is that a requirement -- is that a legal requirement?

7    A.   Yes.

8    Q.   Okay.  It's not a requirement of FINRA?  I mean --

9    A.   I mean, legal -- they have to -- in order to be able to

10   be in the brokerage industry, they have to be registered

11   with FINRA.  So they have to pay to register whatever their

12   licenses are and the fees, and so we can have oversight.

13   Q.   Okay.  Does FINRA have jurisdiction over all types of

14   sellers -- or brokers or securities from the very biggest,

15   Exxon, Apple, down to the penny stocks?

16   A.   Well, like I said, we have contracts with the various

17   stock markets.  So they've basically charged us with

18   essentially looking at the trading activity that happens in

19   the market.  So like you were just mentioning Exxon, so

20   Exxon's traded on some of the bigger markets, I'm not sure

21   NASDAQ, New York Stock Exchange.  So we do look at all the

22   trading activity on all those exchanges.  We also look at,

23   as you mentioned, the Pink Sheets and over-the-counter.  We

24   look at those as well.

25            At one point, the OTC Markets just sort of -- we

Direct - Kramer

1  handle the trading activity on that, so we look at that, and
2  then we handle the Pink Sheets, we look at those as well
3  because we need to look at the entire market and -- in order
4  to make sure that investors aren't being harmed.
5  Q.   Okay.  You mentioned "handle" trading activity.  What
6  do you mean by that?
7  A.   For FINRA -- well, I think the OTC Markets a while ago
8  was part of FINRA, so it just -- it was -- I mean, the
9  trading activity comes through FINRA, so we can see the
10 trading that's coming in, but it's handled -- it's just a
11 smaller market -- a much smaller market.
12 Q.   Just describe -- you -- have you been an investigator
13 your entire time with FINRA?
14 A.   Yes.
15 Q.   Describe the investigative authority that FINRA has.
16 A.   Okay.  So what we do is, if you get a -- for whatever
17 reason, you might get a case or an investigation starts.  So
18 what you would do is look at the -- how we can get our
19 information.  We can do it for multiple ways.  So we can
20 send request letters to the brokerage firms to get
21 information regarding whatever might have piqued our
22 interest, whether it be trading or certain entities or
23 accounts at the firms.  So we can send letters to them.  And
24 they have to provide whatever we're asking for.
25           Another part of our investigative tools is when we

1    are looking at a specific company, we can -- especially

2    the -- we send letters to the company as well asking for

3    information.  Another thing I do is I will call the

4    companies, themselves, and try and talk to the CEO or, you

5    know, whatever officer might be available, a president.  And

6    I will do an interview over the phone and ask them any

7    number of questions based on, you know, just trying to get

8    information about that specific company, get background

9    information.  I might have some concerns or something like

10   that regarding a company.  And obviously it's specific to

11   each instance.  And I might be asking questions about that

12   to get a better understanding what that -- what that --

13   those areas of concern are.

14           Also with those companies, I can actually ask them

15   to provide us documentation.  If they're trading on the

16   bigger markets like the NASDAQ or New York market, New York

17   Stock Exchange, because of our contracts those companies are

18   forced to provide us that information, so they have to

19   provide the information, they have to talk to us.  If they

20   don't talk to us, provide the information, they could get

21   delisted, which means they could get taken off of the Stock

22   Exchange, itself, because it's part of the listing

23   standards.  They're on the Exchange, they agree to a set of

24   rules, and one of the rules is they need to talk to FINRA if

25   we want to talk to them.  So it makes it helpful for us to

1311

Direct - Kramer

1    get the information we need.

2           Smaller companies, someone that might be on the

3    Pink Sheets or OTC Markets, over-the-counter markets, we do

4    call them as well, do the same approach.  Ask for

5    information, and in those instances they do provide it.

6    Q.   You mentioned that you were just discussing

7    investigating companies but you indicated your authority is

8    over brokers.  How does -- if your authority is over the

9    brokers, how do -- maybe you could explain the connection of

10   how these can be investigating companies that are publicly

11   traded.

12   A.   Okay.  Sure.  So obviously our jurisdiction -- our

13   sanctioning ability has to do with the brokers and the

14   registered -- and the brokerage firms that are registered

15   with us, because essentially in order to be trade -- in

16   order to be within industry, they have to register with us,

17   so there's rules.

18          But we do have authority over these companies

19   because we -- we have the contracts with the different --

20   the different stock markets.  So because of that, we can

21   actually go out and ask them all these questions and request

22   documentation and they will provide it.

23          Now, the difference is if we find wrongdoing by a

24   brokerage firm or stockbroker, we can obviously sanction

25   them ourselves, right?  We can, you know -- as I said

1312

Direct - Kramer

1    before, we can, you know, fine them, suspend them, and

2    revoke their licenses.  If we were to find wrongdoing by an

3    individual or a publicly traded company, you know, or

4    somebody that might be trading, we don't have jurisdiction

5    over them because they're not with -- they're not registered

6    with FINRA.

7          So what would happen in those instances is then we

8    would essentially make a referral and then that would go

9    over -- in most cases it goes to the SEC, and then they

10   would take it because the SEC has jurisdiction over

11   everybody.  And they can go and look and do whatever they

12   want to do and perhaps use our investigation as a basis to

13   do it.  But, you know, in some instances we might send it to

14   other -- other agencies.

15   Q.   Since you mentioned that, could you describe what you

16   know of the authority of the SEC to investigate and impose

17   any kind of sanction on a publicly traded company.

18   A.   Okay.  I'm not an expert, but the SEC has jurisdiction

19   over any publicly traded company.  They have jurisdiction

20   over us because they come in and audit us.  They have

21   jurisdiction over publicly traded companies because they

22   look at the trading activity that goes on.  It's the

23   Securities and Exchange Commission.  So they have juris- --

24   and they make the rules for trading activity, what can go

25   on, what happens, definitions of what violations are.  So

Direct - Kramer

1     those rules enable them to go after essentially anybody who

2     might be doing something wrong within the stock markets.

3     And it allows them to impose sanctions.

4              So their sanctions, because they are the

5     government, and they have, you know, subpoena power, their

6     sanctions can involve, you know, fines, they can basically

7     make you give back all your ill-gotten gains, so if somebody

8     were to make a million dollars on something that was

9     illegal, they could make you give the million dollars back

10    and then also fine you whatever.  They can put you in jail.

11    And they have a lot more -- they have subpoena power, which

12    is what we do not have.

13    Q.   Tell us about yourself at FINRA.  You indicated you're

14    an investigator.  Tell us -- well, tell us what you do now

15    first.

16    A.   Okay.  So my 15 years have been there, so now I work in

17    the offerings -- offerings group.  And essentially what we

18    look at is we look at the potential manipulation or suspect

19    trading activity surrounding public offerings by publicly

20    traded companies.

21             So what that means is essentially we look at if

22    there's any kind of crazy stock increases, price increases,

23    around when a publicly traded company might want to have an

24    offering to raise money for their company.

25             And what that would sort of look like is

Direct - Kramer

essentially if you -- if you think about it, if a company
wants to raise money, they raise money by selling shares.
And if they're at the stock prices a dollar today and the
stock price goes -- and then they -- when they sell shares
they typically have to sell it at a discount so if it's a
dollar a day, they would have to sell to you all -- or to
whoever would want to buy the shares, you know, at a
discount, so 75 cents a share.

So in some instances the companies might be --
might try to artificially make the stock price go up so that
they get the stock price to go to $2, then they can sell it
to the public for a dollar 75.  So they would make a lot
more money on the offering if they could raise the stock
price, so that's what I kind of look at now.

Q.   And how long have you been in that section?

A.   I've been in that section for five years.

Q.   And what section were you in before that?

A.   Before that, I was in fraud surveillance.  And in that
group, we looked at any kind of fraud you could think of,
from, you know, like manipulation where a company will send
out false press releases or you might get like professional
e-mails where it might say, "Hey, this stock is going to the
moon," or, you know, "This stock is going to be $30 in a
week -- you know, in a week," and it's trading at a penny or
something like that.

Direct - Kramer

1   We look at anything like that.  And it was a
2   position that you sort of kind of looked at everything.  It
3   was kind of a -- you know, one person kind of did
4   everything.
5   Q.   And how -- when you worked in that section, I take it
6   you investigated a company called FusionPharm, right?
7   A.   Yes.
8   Q.   Were you in that section you just described when you
9   were investigating FusionPharm?
10  A.   Correct.
11  Q.   Apart from FusionPharm, could you tell us in general
12  how you -- or you or FINRA becomes aware of something to
13  investigate.  I mean, for example, if someone's house was
14  broken into, they would call the police and the police would
15  investigate.  But how does FINRA know when to investigate
16  something?
17  A.   Okay.  So at FINRA we have a bunch of different ways
18  that we get our investigations.  We have internal systems;
19  they're just computer systems that are -- I guess they run
20  on algorithms, so there's different ones for different types
21  of things.  So there might be something that has to do
22  with -- if the stock price goes up a certain percentage,
23  then that will kick out an alert.  If the stock price drops
24  a certain percentage, that will kick out an alert.
25  We'll get -- you know, if there's news out there,

Direct - Kramer

1   if there's promotional activity out there, we'll get alerts.

2   The system knows.  So that's one way.

3            Another way is we'll get customer complaints.

4   We'll get investor tips.  We'll get internal tips from FINRA

5   employees.  We might get tips from other departments.  So

6   another department might handle something completely

7   different, and when they're doing their own investigation,

8   they might identify something that they don't handle or have

9   no expertise with and then they would refer to us.

10           And other times, we would get direct referrals

11  from, like, the markets, themselves.  So like the NASDAQ,

12  they might see something weird going on with a certain

13  company, they would refer that conduct to the -- to us, and

14  then we would take a look at it.

15  Q.   With regard to companies who are in the

16  over-the-counter market, is there any other things that you

17  look at or is it basically the same type of thing --

18  A.   Well, once we get the -- get the case, then yes, we

19  would look at a lot of different things compared to things

20  might -- compared to companies that are listed on the higher

21  exchanges.

22  Q.   Did you become involved in an investigation of a

23  company called FusionPharm?

24  A.   Yes.

25  Q.   When was that?

1    A.    I think the case was opened in like June of 2011.

2    Q.    When -- maybe I'll backtrack one question.

3          Would -- I say you investigate, do you have teams

4    of investigators, you all work together, or do you

5    individually work on your own assigned case?

6    A.    Yeah.  So once I get assigned the case, I work on it by

7    myself.  Obviously you have input from your manager.  Like

8    at any job, your manager's -- what they say goes.  But,

9    yeah, we typically work on cases by ourselves.

10         And I decide what direction I want to go in, what I

11   want to do with the case, and obviously with input in the

12   end with -- from my manager.

13   Q.    They generally give you the authority to --

14   A.    Yes, they give me the authority to do what I think is

15   right.  I sort of create an investigative plan and go from

16   that.  Whatever I find -- I mean, obviously you never know

17   what you might find and so you might go -- you know, you

18   might think you're going left and then you end up going

19   right, and that's my decision to make.

20   Q.    How did FusionPharm come to your attention?

21   A.    We -- well, we had had a case that was created because

22   there was some suspicious, like, message-board postings

23   about it.

24   Q.    What do you mean by "message-board postings"?

25   A.    Okay.  So a message board's -- I'm sure many of you

1318

Direct - Kramer

1    know, is you can have message boards on Yahoo Finance or

2    Google, or there's other specialty ones that are just for

3    like the finance markets.  So there's one called

4    InvestorsHub, so there you can go and post information.

5          A lot of times these different message boards that

6    are housed -- so Yahoo, you can go in and put any stock and

7    typically the stock will come up, there will be like a whole

8    profile page, but then there will be a message board link,

9    and you can hit on it.  And it will come up and it will be

10   message-board post by anyone, really, about Stock XYZ.  And

11   they might say, "Hey," you know, there might be posts that

12   say, "This could be a great company," anything, any

13   information on there.

14         And so when we saw the message board post saying

15   that FusionPharm was the subject of a pump-and-dump scheme,

16   and based on that, we opened the case and -- to look into it

17   further.

18   Q.   Okay.  What is a pump-and-dump scheme?

19   A.   So a pump-and-dump scheme is -- back when I was in

20   fraud surveillance, it's something we would routinely see.

21   It's the situation where a company -- so a company can -- it

22   can be -- it can go a couple of different ways.  So the

23   company, itself, could actually put out a bunch of press

24   releases about itself, whether it be that the company was

25   doing, you know -- just, for example, a company makes tires

Direct - Kramer

1  today.  But then they put out a press release saying that,

2  you know, "Now we've got the cure for cancer."  So it's

3  obviously changed its business, it's making an outlandish

4  claim.

5        Then they can put out other press releases.  You

6  know, "We've got a contract with IBM," or "We have a hundred

7  million in revenue coming in," or whatever.

8        So the company's making crazy claims in order to

9  build awareness about the company, itself, because before,

10  there's probably no awareness about the company.

11       The other piece of the pump-and-dump is like a lot

12  of times those companies will hire what they call

13  promotional -- promotion -- stock promoter, promotional

14  websites, and they hire them to create like a promotional

15  campaign, kind of like -- you know, like your local

16  supermarket sends out mailers to you and it shows you what's

17  on sale that week.  That's the same thing with this

18  promotional campaign.

19       You get mailers that might say, you know, "This

20  company," you know, "has the cure for cancer."  Or "This

21  company's stock price is going to go from a penny to $20 in

22  two weeks.  We guarantee it."

23       And it will give outlandish, you know, revenue

24  projections and crazy claims, that kind of stuff.  So the

25  company, itself, oftentimes hires these promoters, and most

Direct - Kramer

1    of the time pays them in stock in order to do what they're

2    doing.  They'll even sometimes hire -- to call people like

3    robocall, and this -- just to tell you, "Hey, this stock is

4    coming," just to make people look.  So it's anything to

5    build a profile of the company.

6            So once all that's done, then the profile company's

7    out there, investors or people who maybe don't know any

8    better are going, "Gosh, this company sounds really good.  I

9    can buy it at 10 cents and they're saying it's going to go

10   to $20 in two weeks."  So, you know, why not buy it?  So

11   that's what they want.

12           And then what else happens is that whoever's behind

13   the scheme, the pump-and-dump scheme, could be the company,

14   could be shareholders, could be a stock promoter all by

15   themselves, they then start buying the stock to show that

16   the stock is actually -- has a market.  Because, you know, a

17   lot of times these companies that are pump -- subject of a

18   pump-and-dump are penny stocks that really don't have -- you

19   know, they might trade a hundred shares a day or a thousand

20   shares in a week, something like that.  So you got to show

21   that there's trading in the stock for somebody to want to

22   buy it because if you look at it and go, It hasn't traded in

23   three months, you know, you wouldn't want to buy it.

24           So they'll get in there and they'll start buying

25   the stock, and they might have friends help them buy it;

Direct - Kramer

1    they might buy it in multiple accounts throughout the

2    market; they might buy it in one account, who knows.  And

3    they start buying, buying, buying.

4          So then with all the promotion, all the news, all

5    the positive information and the stock price, by buying it,

6    makes the stock price goes up because, really, there's

7    nothing going on in the market before, so the stock

8    wasn't -- was really low, most often.  So then what happens

9    is that the investing public, who now believes that this is

10   all true because, you know, they've seen it, they've read

11   it, they all then start buying themselves.

12         So then they see the stock prices, say it was at

13   10 cents when this started.  Through the buying activity now

14   it's moved it a dollar, now more people are buying, now it's

15   moved to $2.  Now it's moved to $5.  Now it's maybe moved to

16   $20.  So the people that are now behind it, they're like,

17   "Okay, we think we might have moved it to as high as we can

18   get it," they start dumping.  So then the pump is what I

19   just talked about.  So now the dump is:  So whatever

20   accounts were sort of buying the stock to help it go up,

21   they might -- they probably had a whole lot of stock to

22   begin with.  In some instances, you might see people that

23   have, you know, 50 million shares, you know, one million

24   shares, whatever.  And then they'll go and they'll just dump

25   everything, they'll sell everything out they can.

Direct - Kramer

1    And obviously if the stock goes from 10 cents to
2    $10 -- $5, even $1, or, you know, $20, there's a lot of
3    money to be made.  So in these types of schemes, what
4    happens is they get out, they might -- they could make
5    millions of dollars within a couple of days, which who
6    wouldn't want to make millions of dollars in a couple of
7    days, but it's illegal.
8    They're -- what they're doing is all based on false
9    statements.  So once they sell everything, then the stock
10   price goes -- say it got to $10, it goes all the way back
11   down to 10 cents where it was to begin with.  And whoever
12   bought shares, the investing public, loses all their money
13   because a lot of people will buy them at the $5 or the $10
14   or the $20, and then when the stock price goes to 10 cents
15   and they have nothing left.
16   So the pump-and-dump scheme is a way for people to
17   sort of take -- capitalize on investors who just aren't
18   aware what's going on.
19   Q.   In this case, you indicated that -- with regard to
20   FusionPharm, you indicated that you had seen a board post.
21   What -- did you have to do something -- I mean, these posts
22   can be -- are anonymous, generally.  They could just be
23   totally made up?
24   A.   Right.
25   Q.   So was there something more to this than just one post

Direct - Kramer

1    that you saw?

2    A.    Well, you know, we get a lot of different cases, so

3    some cases don't lead to anything.  We might look into it

4    and nothing's going on.  In this case, FusionPharm, I

5    think -- I think it started trading in like April of 2011.

6    So it was like at 10 cents or something like that and I

7    think by June it was up to like $3, right around $3.

8            So the fact that there was a message board post in

9    June saying this is a subject of a pump-and-dump, and the

10   fact that you saw the stock price rise from 10 cents to 3 --

11   it was like 3.05 --

12   Q.    How are you able to see that?

13   A.    Well, we can look at -- I mean, all the trading data is

14   out there for the public.  So you can look at Yahoo Finance

15   and put in the FusionPharm symbol, or the name, and then it

16   will -- you can see the ending price each day and intraday

17   trading activity, so you can see all that.

18   Q.    Do you have computer tools at FINRA to look a lot

19   deeper than just looking at the price --

20   A.    Yes.

21   Q.    -- over certain days?

22   A.    Yes.

23   Q.    Did you look at those in this case?

24   A.    I did.  Like another -- another -- so once you -- you

25   get the case assigned to you, you kind of have to take a

Direct - Kramer

1    cursory look at what's going on.  So like I just said there,

2    so the price went from 10 cents to 3.05.  And then based on

3    the message board post that said it was a pump-and-dump,

4    there was a couple of news press releases that were put out.

5    And I did a -- we have -- FINRA has a bunch of systems

6    within -- internal to FINRA computer systems where we can

7    pull information regarding the trading activity.

8         We can get -- there's a report called a Volume

9    Concentration Report, which is a report that essentially

10   allows you -- because we can see the trading activity that's

11   happened in the market.  And what it does is it actually --

12   the bottom report looks at it by broker dealer, so I can put

13   for a certain period of time, whatever period it might be,

14   whatever the review period I decide.  And it kicked out a

15   report like -- volume concentration report, and it has by a

16   percentage.

17        So if you're looking for a pump-and-dump, if you're

18   looking for something like that, you're looking for specific

19   firms that might have a lot of selling activity in the

20   stock, because obviously the person who's dumping the stock

21   would be selling.

22        So what you look for in this instance -- there was

23   a firm called Oppenheimer & Company that made up 65 percent

24   of the volume concentration for the selling activity, just

25   to give you some sort of base -- baseline of what we see

Direct - Kramer

1    typically -- what we used to see typically is that typically

2    it's 25 percent, sort of the high for like -- to make up of

3    selling activity, or buying activity, for that matter.

4              So in this instance, because it was 65 percent,

5    that was sort of obviously quite outside the norm.  And

6    because of that, it -- it made me send out information --

7    you know, requests to that Oppenheimer firm.

8    Q.   Okay.  So if I understand what you're saying, is this

9    computer system you have, it searches -- you can search by

10   all kinds of variables --

11   A.   Right.

12   Q.   -- is that right?

13             And one of their variables is who the broker is on

14   sales.

15   A.   Right.

16   Q.   Who the broker is on buys.

17   A.   Correct.

18   Q.   And typically they're not over the limit like 65

19   percent.

20   A.   Right.  I mean, there's no specific limit, but it's

21   when you look at them all the time and you see that for the

22   most part everything's under 25 percent, sometimes it can

23   hit 30, but 65 was -- is a lot.

24   Q.   Why -- explain, if you can -- maybe you might want to

25   slow down a little bit for the court reporter -- and for the

Direct - Kramer

1    rest of us --

2    A.    Okay.

3    Q.    -- but why would that raise a flag other than the fact

4    that it's unusual that one broker does all that?  What

5    would -- what could that mean?

6    A.    Well, when you're looking for where -- because what you

7    want to do in an instance where you're trying to see if

8    there's any wrongdoing or any trading manipulation is you're

9    trying to figure out what accounts are trading in the stock.

10   So by being able to look at the volume concentration report

11   and seeing that it says 65 percent of the activity is coming

12   from Oppenheimer, and then essentially the rest, you know,

13   the other 35 percent, it's kind of spread across many

14   different firms, it shows that probably any suspect accounts

15   that I need to look for are at Oppenheimer.

16         So then I, therefore, would go to Oppenheimer,

17   which is under our jurisdiction, and request information

18   regarding the trading activity in FusionPharm, so that I can

19   identify if there's any suspicious activity going on.

20   Q.    And did you do that in this case on more than one time?

21   A.    Yes, I sent multiple -- multiple e-mails -- or not

22   e-mails, multiple requests to Oppenheimer.

23   Q.    Okay.  Could you take a look at Government Exhibit 138,

24   which I think is in the very end of the first binder you

25   have.

1327
Direct - Kramer

1    A.    Okay.

2    Q.    Without telling us the contents of that exhibit, could

3    you just look through it and tell us whether or not that was

4    something Oppenheimer provided to FINRA in response to your

5    first -- or one of your requests?

6    A.    Yes, it is.

7    Q.    Okay.  And could you also look at Government Exhibit

8    139, which should be a number of --

9    A.    I have a disk.

10   Q.    Is there a -- is there a tab that --

11   A.    It is a tab, but it's a disk.  It's only a disk --

12   Q.    Okay.

13   A.    -- marked Exhibit 139.

14         MR. BROWN:  Your Honor, could I --

15   BY MR. BROWN:

16   Q.    Is the disk marked Exhibit 139?

17   A.    Yes.

18         MR. BROWN:  Your Honor, could I ask the courtroom

19   deputy to hand the witness a copy of -- a hard copy of 139?

20         THE COURT:  All right.  But -- hold on.  Do you

21   remember our discussion at the final trial prep -- our

22   discussion at the trial preparation conference?  So what are

23   we doing here?  Is this -- were there portions that you

24   wanted to make as hard copies that were going to be admitted

25   or is it the entirety of that CD or DVD?

Direct - Kramer

1      MR. BROWN:  Your Honor, my copy of 139 is a hard

2    copy.  I'm not --

3      THE COURT:  Well, why is -- here.  Let me look and

4    see what I have.

5      MR. BROWN:  I'm not sure.  There may have been a

6    mix-up with our creation of 139 --

7      THE COURT:  All right.  My set of exhibits -- set

8    of binders has a CD for 139.  All right.  Well, you have

9    identified Exhibits 137 as documents he received from

10   Oppenheimer pursuant to his document request.

11     MR. BROWN:  I believe he looked at 138 just now.

12     THE COURT:  I'm confused.  Which one did you look

13   at, sir?

14     THE WITNESS:  138.

15     THE COURT:  Okay.  You've not looked at 137.

16   Because I thought, Mr. Brown, you said 137, 138, and 139,

17   you were going -- were not stipulated to but you were going

18   to --

19     MR. BROWN:  That's right, Your Honor.  I haven't

20   asked about 137.

21     THE COURT:  Okay.  All right.  So 138 he's

22   identified as documents FINRA received from Oppenheimer

23   pursuant to a FINRA document request.  Okay.  139 is a CD

24   that -- I don't have copies of the document, neither does

25   the witness, unless you can hand -- hand it to him, but the

Direct - Kramer

1    defense -- does defense counsel have hard copies?

2              MR. BARNARD:  I have the disk, Your Honor.

3              THE COURT:  Just the disk.

4              MR. BROWN:  Well, I'll ask about exhibits that we

5    do have.

6              THE COURT:  All right.  Go ahead.

7    BY MR. BROWN:

8    Q.   With regard to Exhibit 138, you indicated that that was

9    a -- in response to your request from Oppenheimer?

10   A.   Yes.

11   Q.   When FINRA receives documents from a broker or other

12   company that it is -- sends out an investigative request,

13   what does FINRA do with those documents?

14   A.   We retain them.  We have a system that we download

15   the -- if we receive it via e-mail, or we scan them in and

16   they go into our internal system.

17   Q.   Okay.  Since you have been subpoenaed in this case, and

18   have been asked about this case for a few years, are

19   these -- are the records contained in 138 a portion of the

20   records received -- at least a portion of the records

21   received from Oppenheimer?

22   A.   Yes.

23   Q.   And are those records maintained in the regular course

24   of business of FINRA?

25   A.   Yes.

Voir Dire - Kramer

1  Q.  And when they are received, are they input by someone

2  who has the job of inputting these records into the computer

3  system?

4  A.  In our case, we actually -- each investigator inputs

5  the records ourselves into our own cases, and then it's an

6  internal system that -- I guess it's called a case tracking

7  system, so it has all the documents from every case.

8  Q.  Okay.  And are the documents contained in 138, were

9  those the documents that you received from FINRA, at least

10  during a portion of your request from --

11  A.  Yes.

12       MR. BROWN:  Your Honor, I'd move for the admission

13  of 138.

14       MR. BARNARD:  If I may voir dire.

15       THE COURT:  You may.

16                    VOIR DIRE EXAMINATION

17  BY MR. BARNARD:

18  Q.  Mr. Kramer, Exhibit 138 is 233 pages, isn't it,

19  approximately?

20  A.  Okay.  Sure.

21  Q.  All right.  And when you were asked if this document

22  138 -- Exhibit 138 was the file that you had received from

23  Oppenheimer, you were asked to take a look at it and to see

24  if it was the file you had gotten from Oppenheimer.

25  A.  Correct.

1331

Voir Dire - Kramer

1 Q. And about five seconds later, you said it was.

2 A. Correct.

3 Q. So what -- my first question is:  Is every page of

4 these 233 pages documents you received from your several

5 requests from Oppenheimer?

6 A. So you're just -- just to qualify, you're saying is it

7 all the documents I received --

8 Q. Are all 233 pages in Exhibit 138 documents you received

9 from Oppenheimer?

10 A. Yes.

11 Q. And let me correct that 233.  Isn't, in fact, the last

12 page numbered 256?

13 A. Yeah.  That's why I paused when you said that.

14 Q. And page 238 -- do you see page 238, without --

15 A. I'm getting there.  I'm getting there.

16 Q. Yeah, I'm sorry.

17 A. Yes, I'm there.

18 Q. And that's something from FINRA.

19 A. What it is is --

20 Q. No, no, that's something from FINRA, isn't it?

21 A. Yes.

22 Q. And my question to you is:  Was this document submitted

23 to you, then, by Oppenheimer?

24 A. Yeah, a lot of times the firms, when I send a request,

25 their response includes my request.

1    Q.   Well, my question to you is:  Is this something that

2    was a part of what you received back from Oppenheimer?

3    A.   To the best of my knowledge, yes.

4    Q.   Okay.  And on direct examination, you were asked

5    whether or not Exhibit 138 was a portion of the records you

6    got from Oppenheimer.  Do you remember that question?

7    A.   Yes.

8    Q.   And my question to you is:  Is Exhibit 138 a portion of

9    the documents or is it what you received from Oppenheimer?

10   A.   I believe it's a portion, because I believe there's

11   other exhibits that contain more stuff from Oppenheimer.

12   Q.   So this would be an incomplete record of what you got

13   from Oppenheimer?

14   A.   I didn't say that.  I said --

15   Q.   I'm asking.

16   A.   Right.  Well, what I'm saying is it's -- the

17   determination -- the exhibits were created not by me,

18   they're created by the Government.  So I didn't -- I didn't

19   create them, so they might have decided not to show -- not

20   to put every single piece of -- every single response I got

21   from Oppenheimer into each -- in one exhibit.  They might

22   have created multiple exhibits to have multiple -- you know,

23   to include everything.

24   Q.   All right.  So with regard to these 250-some pages, did

25   you review them prior to your testimony to determine that,

Voir Dire - Kramer

1   in fact, these were all pages from your Oppenheimer file?

2   A.    Yes.

3            MR. BARNARD:  Your Honor, may I have just a moment?

4            THE COURT:  You may.

5            MR. BARNARD:  No further questions.  No objection.

6            THE COURT:  No objection.  And just before I rule,

7   it's implicit, but I think it's been many, many minutes now

8   since someone has asked you:  This is the -- the documents

9   you received from Oppenheimer pursuant to your document

10  request in the context of your investigation of FusionPharm?

11           THE WITNESS:  Yes.

12           THE COURT:  All right.  Exhibit 138 is admitted

13  into evidence and may be published to the jury.

14       (Government's Exhibit 138 received)

15           MR. BROWN:  Thank you, Your Honor.

16                  DIRECT EXAMINATION (Continued)

17  BY MR. BROWN:

18  Q.    Before we publish anything, based upon your review of

19  this computerized spreadsheet you talked about, what role

20  did Oppenheimer play in the marketing or -- well, just tell

21  us:  What did Oppenheimer -- what role did Oppenheimer play?

22  A.    In terms of the FusionPharm investigation?

23  Q.    Yes.

24  A.    Well, Oppenheimer just played the role of the broker

25  dealer.  They housed accounts that were trading in

Voir Dire - Kramer

1  FusionPharm, and when I requested documentation, they
2  provided it as they were -- as they have to. But they just
3  played the role as being the place where the accounts that
4  were trading in FusionPharm were housed.
5  Q.   And when you received the initial production from
6  Oppenheimer shortly after you began the investigation, did
7  that cause you to take further investigative steps?
8  A.   Yes.  So what I did initially, once I -- once I decided
9  to go out and send a request to Oppenheimer, I decided to
10 request certain documentation to identify if there's
11 anything going on.
12       So what I did is I requested a trade blotter from
13 Oppenheimer.  And a trade blotter is essentially just a list
14 of accounts that traded in FusionPharm.  It gives the name,
15 account number, you know, price they bought the stock, or
16 sold the stock, how many shares, all that stuff, so you can
17 identify who's buying and selling.
18       I requested also the new account forms for each
19 account that they identified in their response.  I did that
20 because new account forms, when -- if you've ever opened up
21 a brokerage account, you have to fill out new account forms,
22 and  those forms essentially you have to put in all your
23 information, your name, your account number, you know, what
24 your reasons for investing are.  And then also in the case
25 of an entity -- so say it wasn't a person's name, it was

Voir Dire - Kramer

1   like Blue Bird, Incorporated, they would have to, you know,

2   open an account.  They would put Blue Bird, Incorporated,

3   but it would also list the names of the people who are

4   affiliated with Blue Bird, Incorporated.  It would actually

5   say, you know, X, Y and Z are the people that actually have

6   trading authority that could make trades or that own the

7   account.

8            And then I also requested, eventually, wiring

9   information for a specific account, MicroCap Management,

10  because in looking at the account documents I noticed that a

11  lot of money was getting wired out of the account.  So what

12  you do is you request the wiring instructions, so that way

13  you can kind of see where the money goes.  Sometimes it will

14  say, like, "Hey, I'm wiring money to Todd Kramer, I'm wiring

15  money to whomever," so you can actually find out where the

16  money goes.  So I requested all that information.

17           And upon review, I noticed that there were -- there

18  was an account that was selling a lot of stock.

19  Q.   And describe your -- how you approach an investigation.

20  You described that you -- how you came about starting to

21  look at FusionPharm, and then you explained obtaining

22  records that might help you in trying to figure out what's

23  going on, from Oppenheimer in this case.  Do you, for

24  example, immediately contact the company, itself?

25  A.   Well, it depends.  It depends on the situation.  In

Voir Dire - Kramer

1   this specific situation, no, I didn't.  I was trying to do a

2   complete review to identify any problematic issues, because,

3   you know, I didn't have anything specific to begin with when

4   I opened the case.  So I tried to do my entire -- sort of my

5   investigation prior to calling FusionPharm because I wanted

6   to, you know, get a feel for what was going on with the

7   company.  Get a feel for if there was suspicious trading

8   activity, to see if there really was any promotional

9   activity or any signs of a pump-and-dump scheme like the

10  message boards post said.

11          So in that instance, because it wasn't -- because I

12  didn't know, I tried to gather all the information first,

13  and then when -- and before I contacted the company, so I'd

14  have the -- be able to have educated questions to ask the

15  person, rather than just come out of the blue.

16          Sometimes, though, if a stock is going through the

17  roof, like something really bad is happening right away, we

18  might call immediately.  We might not investigate; we might

19  just call the company.  But in this instance, I did not.

20  Q.   In this instance, you were trying to gather

21  information.

22  A.   Right.

23  Q.   You mentioned one particular company in terms of the --

24  that came to your attention or made you inquire further

25  about it.  I believe you called it Microcap Management.

Voir Dire - Kramer

1    A.    Yes.

2    Q.    How did that -- why did that come to your attention

3    based on what you reviewed?

4    A.    Well, based on the information I did receive from

5    Oppenheimer, also we have a way to sort of -- because we're

6    using that volume concentration report that I discussed

7    previously, like I only kind of went out to Oppenheimer

8    because that seemed to be an area to start.  But sometimes

9    people might have accounts throughout the market.  So, like,

10   say, you know, they have an account at Oppenheimer, but then

11   they might have an account at Etrade or whatever, any other

12   firm.

13          So once I sort of had the information from

14   Oppenheimer, we did what's called blue sheeting the market.

15   And the term "blue sheet" is essentially because way back in

16   the day, they used to request trading information from the

17   entire market, and they used to come back on blue sheets of

18   paper.  I don't know if anybody's old enough to remember

19   those, but it was just get reams of paper.  It was terrible

20   back then.  But -- so they're called blue sheets.

21          So essentially we have a system that you can

22   actually go to and request trading activity from the entire

23   market.  You pick the time, the date -- the time period and

24   then you send out -- the system itself sends out all the

25   requests and then all those firms then just respond, and

1    then they send back all their responses.

2           And then once everything is in, you can actually

3    download all the trading activity from the entire market,

4    not just Oppenheimer, and you can see everything.  And in

5    that instance --

6    Q.   Can I stop you for a second?

7    A.   Sure.

8    Q.   I'm not quite sure I understand what you just said.

9    You send out a request to the entire FINRA members?

10   A.   Right.

11   Q.   And what does -- how do you do that?

12   A.   It -- you just go to a system like -- luckily -- and

13   you don't have to send a letter to every single firm, it

14   just generates a letter, itself, and then those people will

15   essentially get the request and then they respond back with

16   the trading activity that their firm -- that happened at

17   their firm during that period.

18          And then when it comes -- then they just submit it

19   through the system, so it's all kind of in one place, makes

20   it nice and easy.  And then you can download the whole thing

21   and it comes out in -- I mean, it makes it nice and easy, I

22   should say, but it could be 65,000 lines or it could be 10

23   lines, you never know.

24          So by getting all that information back, you can

25   then see if, you know, people are -- have accounts

Voir Dire - Kramer

1     throughout, you know, different areas, different firms.  So

2     they could have -- could identify that there's three

3     different accounts at three different firms under the same

4     name, whereas if I would were to just, you know, rely on the

5     Oppenheimer response, I wouldn't know, like, that it was

6     anywhere else, that kind of thing.  So we used that.

7          And that blue sheet information, coupled with the

8     Oppenheimer information, showed that the biggest seller in

9     the market account-wise was the Microcap Management

10    account.

11    Q.   And that's based on the -- not just Oppenheimer, just

12    based on the entire --

13    A.   Right, the entire marketplace.

14    Q.   Why did that cause you concern?

15    A.   Well, again, like -- if you see one account trade -- or

16    trading hot, whether it be buying or selling, but in this

17    case selling, that is -- that raises red flags because then

18    you have to decide, is there a relationship with the

19    company, itself, that it's trading on?

20          I mean, is it -- is it behind the pump-and-dump

21    scheme?  You know, is that the account, or people who own

22    that account, is that behind the pump-and-dump scheme?  So

23    it's sort of -- it's a -- you know, it raises red flags.

24    Q.   Did you make some effort to find out who -- what

25    Microcap Management was?

1    A.   Yeah, I did a Google search just like everybody else

2    can do these days.  I did a Google search and identified

3    that Microcap Management was called a -- I believe it was

4    called like a consulting marketing company for the OTC stock

5    market, or stock companies.  And that it -- I identified

6    that Microcap Management had a relationship or was hired by

7    Baby Bee Bright, which was the previous name of FusionPharm,

8    to provide consulting and marketing services for the

9    company.  And it, like, entailed, you know, doing a road

10   show or just raising awareness about Baby Bee Bright,

11   itself.  And --

12   Q.   Why is that important?

13   A.   Because it tied Microcap Management to FusionPharm

14   because of the previous relationship with the previous name

15   of the FusionPharm.

16   Q.   Were you able to obtain -- or based upon the records

17   you obtained from Oppenheimer, were you able to put some

18   connection between Baby Bee Right and -- or Baby Bee Bright,

19   sorry -- and FusionPharm?

20   A.   Yes.  They provided -- because there was some stock --

21   stock deposits into the Oppenheimer Microcap Management

22   account, and when you deposit stock, you need to prove

23   that -- to the brokerage firm, not to me, but to the

24   brokerage firm -- that the shares are freely tradable, or

25   whatever type of activity, and where the shares came from.

Voir Dire - Kramer

1   So in Oppenheimer's response, there's like a --
2   like an internal Oppenheimer worksheet where they sort of,
3   you know, write down all the pertinent information regarding
4   any stock deposit.

5   So on the worksheet, it said that Microcap
6   Management received the shares from a consulting service --
7   consulting agreement with Baby Bee Bright, obviously that
8   they provided consulting services.  Also they provided the
9   consulting service agreement with Baby Bee Bright, because
10  they -- because when you deposit the shares, you need to
11  prove everything; you need to provide evidence.  So they
12  provided the evidence which included the consulting
13  agreement.  And it showed that Baby Bee Bright did, indeed,
14  hire Microcap Management for, I guess, consulting services,
15  or marketing services.
16  Q.   Did the Oppenheimer records also disclose other trades
17  involving Microcap Management?
18  A.   It did.
19  Q.   And did you make some effort to identify who was behind
20  Microcap Management?
21  A.   Yes.
22  Q.   How did you do that?
23  A.   Well, I -- well, the Google search also uncovered the
24  name, so it was William Sears, but then also the Oppenheimer
25  documents showed that William Sears was the person -- the

1342

Voir Dire - Kramer

1  control person for the Microcap Management account.  And

2  then there are some other documents regarding the name

3  change from Baby Bee Bright to --

4  Q.   Okay.  We'll get into those.

5  A.   Okay.

6        THE COURT:  Mr. Brown, would this be a good time to

7  pause for the day?

8        MR. BROWN:  Oh, yes, Your Honor.

9        THE COURT:  It's after 5:00.

10        MR. BROWN:  That would be fine.

11        THE COURT:  All right, folks, we're going to call

12  it a day.  Again, I have to remind you, please don't do any

13  independent research into or discuss with anyone the facts,

14  the law, the persons involved in this lawsuit.

15        Just as we've been doing, please be back here in

16  time so we can start at 8:45.  I hope to start at 8:45 with

17  you, unless the lawyers delay me and then I'll blame them

18  for the delay.

19        All right.  We will be in recess for -- until

20  tomorrow morning at 8:45.

21      (Jury left the courtroom at 5:04 p.m.)

22        THE COURT:  All right, Mr. Kramer, since you're in

23  the middle of your testimony, I direct you not to speak with

24  any of the lawyers while the Court is in recess, and I ask

25  you to be back by 8:40 tomorrow morning.  All right.

1343

1         (Proceedings concluded at 5:05 p.m.)

2

3                     **INDEX**

4   Item                                                            PAGE

5               GOVERNMENT'S WITNESSES

6   **LESLIE DINWOODIE (Continued)**
    Direct Examination by Mr. Brown (Cont'd)   1113

7
    **MICHAEL CRUZ**
8       Direct Examination by Mr. Sibert   1150
    Voir Dire Examination by Mr. Goodreid   1154
9       Direct Examination by Mr. Sibert (Cont'd)   1155
    Voir Dire Examination by Mr. Goodreid   1222
10      Direct Examination by Mr. Sibert (Cont'd)   1225

11      **TODD ABBOTT**
    Direct Examination by Mr. Sibert   1275
12      Cross-examination by Mr. Barnard   1299
    Redirect Examination by Mr. Sibert   1225
13
    **TODD KRAMER**
14      Direct Examination by Mr. Brown   1301
    Voir Dire Examination by Mr. Barnard   1330
15      Direct Examination by Mr. Brown (Cont'd)   1333

16              GOVERNMENT'S EXHIBITS

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|-----------|---------|----------|---------|------------|
| 52        | 1138    | 1139     |         |            |
| 120       | 1154    | 1155     |         |            |
| 121       | 1167    | 1167     |         |            |
| 122       | 1208    | 1208     |         |            |
| 126       | 1208    | 1208     |         |            |
| 127       | 1219    | 1225     |         |            |
| 129       | 1236    | 1237     |         |            |
| 131       | 1240    | 1240     |         |            |

1344

1                          GOVERNMENT'S EXHIBITS

2      EXHIBITS:          Offered     Received   Refused    Stipulated

3      134                1248        1249

4      135                1301        1302

5      136                1301        1302

6      138                1330        1333

7      152                1285        1286

8      291                1293        1293

9      432                1245        1246

10     433                1245        1246

11     434                1245        1246

12     435                1245        1246

13     436                1245        1246

14     437                1245        1246

15     446                                       1142

16                    *       *       *       *       *

17                       REPORTER'S CERTIFICATE

18          I certify that the foregoing is a correct transcript

19     from the record of proceedings in the above-entitled matter.

20          Dated at Denver, Colorado, this 25th of March, 2020.

21

22

23

24     _                                                     _

25                       MARY J. GEORGE, FCRR, CRR, RMR