1345

1    IN THE UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF COLORADO
2
     Criminal Action No. 17-cr-0008-WJM
3
     UNITED STATES OF AMERICA,
4
         Plaintiff,
5
     vs.
6
     GUY JEAN-PIERRE a/k/a Marcelo Dominguez de Guerra,
7
     Defendant.
8    ------------------------------------------------------------
9
                   REPORTER'S TRANSCRIPT
10                  (Jury Trial, Day 7)
                       Volume VII
11
     ------------------------------------------------------------
12

13        Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

14   Judge, United States District Court for the District of

15   Colorado, commencing at 8:47 a.m., on the 23d day of

16   January, 2019, in Courtroom A801, United States Courthouse,

17   Denver, Colorado.

18                        APPEARANCES

19        JEREMY S. SIBERT and ROBERT M. BROWN, Assistant U.S.
     Attorneys, 1801 California Street, Suite 1600, Denver,
20   Colorado 80202, appearing for the plaintiff.

21        CLIFFORD J. BARNARD, Attorney at Law, 4450 Arapahoe
     Avenue, Suite 100, Boulder, Colorado 80303, AND
22        THOMAS E. GOODREID, Attorney at Law, 1801 Broadway,
     Suite 1400, Denver, Colorado 80202, appearing for the
23   defendant.

24               MARY J. GEORGE, FCRR, CRR, RMR
              901 19th Street, Denver, Colorado 80294
25          Proceedings Reported by Mechanical Stenography
                Transcription Produced via Computer

1    P R O C E E D I N G S

2        (Proceedings were held in open court in the presence of

3    the jury at 8:47 a.m.)

4        THE COURT: Mr. Kramer, I remind you that you

5    remain under oath. All right. Mr. Brown, you may resume

6    your examination.

7        MR. BROWN: Thank you very much, Your Honor.

8                DIRECT EXAMINATION (Continued)

9    BY MR. BROWN:

10   Q.   Good morning, Mr. Kramer.

11   A.   Good morning.

12   Q.   When we left off yesterday, I believe I had

13   indicated -- or you had indicated that your investigation

14   had proceeded to the stage of obtaining some records from

15   Oppenheimer Brokerage Company. And you had focused on,

16   based upon your analysis of a process where you obtained

17   records from every brokerage company or trading company,

18   records of the sales or -- or -- sales of FusionPharm stock.

19   And you indicated MicroCap Management was a very high -- if

20   I'm wrong, just stop me. I'm just trying to set where we're

21   going -- MicroCap Management was one of the larger -- or the

22   largest share owner or purchaser of shares; is that fair to

23   say?

24   A.   They were the largest seller.

25   Q.   Okay. Sorry. Did you look at record -- I believe you

Direct - Kramer

1    were indicating some other companies, and I may have cut you

2    off.  Were there other large sellers?

3    A.   No.  It's -- essentially it was MicroCap Management was

4    the largest.  I think --

5    Q.   Did you come across either the name Bayside or

6    MeadPoint that you remember?

7    A.   I don't remember.

8    Q.   Okay.  With regard to the -- your identification in the

9    investigation you were doing, I believe yesterday you

10   indicated that you had written to -- or at least

11   communicated with Oppenheimer to send you some records

12   because they had done 65 percent of the transactions, which

13   was -- you thought was high.  And I tried to show you an

14   exhibit marked 139 and you told us it was a compact disk.

15   A.   Yes.

16   Q.   I've -- now would like to show you Government Exhibit

17   139, which hopefully is a bunch of hard copies of paper

18   documents.

19   A.   It is.

20   Q.   Is -- is that group of documents among the documents

21   you received from Oppenheimer?

22   A.   Yes.

23   Q.   And I believe you testified yesterday with regard to

24   Exhibit 138 that -- about the record-keeping, how you

25   received those.  Did you receive these records in the same

1348

Direct - Kramer

1   fashion?

2   A.   Yes, I think -- yeah, we received them and we stored

3   them within our case tracking system.

4   Q.   Okay.  And are those records maintained in the regular

5   course of business of FINRA?

6   A.   Yes.

7   Q.   And I believe you indicated you were the person that

8   actually received them and input them?

9   A.   Correct.

10  Q.   Is that part of your duties?

11  A.   Yeah, whenever -- you know, whoever's assigned the

12  case, whatever records we receive from whomever, whether it

13  be a broker dealer or the company, or wherever we get any

14  information, then we input them within the system so that

15  the case file's kept.

16  Q.   And that's something you do on a regular basis with

17  regard to records you receive?

18  A.   Correct.

19  Q.   And is it your practice to input all of the records you

20  receive and not cull through them and see which ones are

21  important?

22  A.   No, because we need to maintain the integrity of the

23  case file, so we need to keep everything that we get.

24  Q.   Okay.  And do these records refer to the matters which

25  you've been testifying about yesterday?

1349
Voir Dire - Kramer

1    A.    Yes.

2          MR. BROWN:  Your Honor, I'd move for the admission

3    of Government Exhibit 139.

4          THE COURT:  Is there an objection?

5          MR. BARNARD:  Your Honor, if I may voir dire?

6          THE COURT:  You may.

7                    VOIR DIRE EXAMINATION

8    BY MR. BARNARD:

9    Q.    Mr. Kramer, Exhibit 139 contains many of the same

10   documents that were in Exhibit 138, correct?

11   A.    I think so.

12   Q.    And so in Exhibit 139, what are the new documents?

13   A.    I don't know right off the top of my head.  I think one

14   of the exhibits have more of the wiring instructions and one

15   doesn't.

16   Q.    All right.

17   A.    I believe.  I'm not sure.  This one is less, so it

18   might be this one doesn't have the wiring instructions.

19          THE COURT:  When you're saying "this one," sir, for

20   clarity --

21          THE WITNESS:  I'm sorry, 139.

22          THE COURT:  Okay.

23   BY MR. BARNARD:

24   Q.    For example, on Exhibit 139, page 37, it says Incoming

25   Stock Clearance, No. 3.

Voir Dire - Kramer

1    A.    Okay.  Yes.

2    Q.    Correct?

3    A.    Correct.

4    Q.    And that -- that No. 3 packet was also contained in

5    Exhibit 138?  In particular, I refer you to 138, page 74.

6    A.    Thank you.  Let me see.

7             Yes.

8    Q.    And with regard to 139, page 69, there's a letter

9    there.

10   A.    69?

11   Q.    On the bottom of 69.

12   A.    Okay.  Yes.

13   Q.    And that's the same -- the same letter that was

14   contained in Exhibit 138?

15   A.    What page is that?

16   Q.    In Exhibit 138.  I'm sorry.

17   A.    Okay.  I -- yes.

18   Q.    So can you estimate approximately how many of the pages

19   in 139 are new, if you know?

20   A.    I don't know.

21             MR. BARNARD:  No further questions.

22             I have no objection, Your Honor.

23             THE COURT:  All right.  Let me ask Mr. Brown, why

24   do we have two exhibits that are, to some degree,

25   overlapping or cumulative?

1    MR. BROWN:  Your Honor, with regard to that, this

2    witness testified, I believe, yesterday that he had -- well,

3    the exhibits --

4    THE COURT:  He didn't put together the exhibits so

5    he can't answer my question, only you can answer my

6    question.  Why do we have two exhibits, one of which

7    contains most of another one?

8    MR. BROWN:  Your Honor, in -- the testimony will be

9    that this Exhibit 139 is the first -- the receipt of --

10   based upon his first submission.  He's been testifying

11   about --

12   THE COURT:  His first submission, what do you mean?

13   MR. BROWN:  First submission to Oppenheimer.  This

14   is the return that he got and it's --

15   THE COURT:  It's what he received in response to

16   his first -- I'll call it a document request.

17   MR. BROWN:  Yes, Your Honor.  And as you can see,

18   it's -- I think it's about around 80 -- well, about 80

19   pages.  And his later submissions to Oppenheimer he received

20   additional documents including some, if not all, of the ones

21   in 139, because Oppenheimer was being complete in their

22   later submissions.

23   What I'm trying to get forward is the process of

24   his investigation.  As a matter of fact, these documents

25   from Oppenheimer have already been identified by other

1    witnesses in other exhibits because, for example, Pacific

2    Stock Transfer has some of the same exhibits; and some of

3    the other witnesses have examined those documents and

4    have -- so, I mean, the fact that the same documents are in

5    various places, it simply shows the various trails of what a

6    company will keep and maintain in their records.

7         THE COURT:  All right.  I'm just trying to keep

8    down the size of the mountain of paper that the jury's going

9    to have to go through when they're deliberating.  And if

10   you're representing to me that there's some significance to

11   the fact that 138 and 139 are different because they are

12   documents that were received at different points of time in

13   the investigation, then I'll let them both go in.

14        I'm just suggesting, for example, if all of 138 is

15   in 139, do we need 138?

16        MR. BROWN:  Well, there are additional documents in

17   138.

18        THE COURT:  All right.  So 139 does not contain all

19   of 138?

20        MR. BROWN:  No.

21        THE COURT:  And vice versa --

22        MR. BROWN:  The --

23        THE COURT:  -- 138 does not contain all of 139?

24        MR. BROWN:  I haven't examined every page, so I

25   can't tell you, Your Honor.

Direct - Kramer

1      THE COURT:  Okay.  Because then it would be the
2    same exhibit.  All right.  Okay.
3          There's no objection, Exhibit 139 is admitted into
4    evidence and may be published to the jury.
5        (Government's Exhibit 139 received)
6          MR. BROWN:  Thank you, Your Honor.
7              DIRECT EXAMINATION (Continued)
8    BY MR. BROWN:
9    Q.   Sir, can you take a look at Government Exhibit 139, the
10   first page, and we can just publish that.  Maybe we could
11   just blow up the text portion of the document.
12         You can either look at the hard copy or the screen,
13   whichever is clearer to you.  What is page 1?
14   A.   Page 1 is a response letter from Oppenheimer that they
15   sent to me, it's like a cover letter that they send with
16   the -- and obviously the rest of the documents are attached.
17   Probably in this case, an e-mail.
18   Q.   I believe you described yesterday what your first
19   request was for, but could you tell us again what it was
20   for.
21   A.   Sure.  Essentially requested trade blotter that -- that
22   showed the -- what accounts were trading in this stock in
23   FusionPharm at Oppenheimer.  And then I also asked for new
24   account documents, which are the documents that have -- that
25   any account holder has to fill out at a brokerage firm with

Direct - Kramer

1    all their pertinent information so that the brokerage firm

2    has a idea of who that person is.

3    Q.    Okay.  And you mentioned trade blotter.  Could you just

4    tell us what a trade blotter is.

5    A.    Sure.  It's a -- essentially a summary of the trading

6    activity that happened at that specific firm.  So it would

7    have -- you know, if there were 10 accounts that traded at

8    the firm, they would have the accounts all listed out.  And

9    typically a trade blotter is by, you know, date and time.

10   So it would sort of be chronological in order.

11          So you would have the different account names, the

12   prices that they have bought or sold the stock, the date,

13   the time, how many shares, and then the cost or proceeds

14   that they received from buying or selling.

15   Q.    And when you made this request, did Oppenheimer -- was

16   Oppenheimer able to respond all at once or did they sort of

17   provide you information with regard to your first request

18   and subsequent requests?

19   A.    Yeah.  So based on -- they provided everything I

20   requested, and then based on that response, then I created

21   another -- you know, other requests after that to request

22   additional information based on what I was seeing in their

23   initial responses.

24   Q.    With regard to Government Exhibit 139, page 1, when was

25   the first day they responded to you in that letter?

1    A.    Well, it looks like the letter's dated July 19, 2011.

2    Q.    Okay.  Could you take a look at that document.  I'm not

3    going to -- I started with page 1, but I'm not going to go

4    through 2 through 81, so you don't have to worry about that.

5    A.    Okay.

6    Q.    Could you look at -- first, just look to your -- for

7    yourself, maybe, in the larger -- in the volume, pages 4,

8    then page 18, then page 37 -- I'll slow down -- and then

9    page 58.

10   A.    Okay.

11   Q.    And could we publish page 4, please, to the jury.

12         Mr. Kramer, with regard to page 4, could you tell

13   us what that is.

14   A.    That's an internal document for Oppenheimer.  They --

15   they used it -- it's called an Incoming Stock Clearance, I

16   guess; their internal form.  And what they appear to have

17   done is they've captured all the information related to the

18   account that incoming shares were coming for.

19   Q.    And do the documents in Government Exhibit 139, with

20   regard to Exhibit -- or pages 4, 18, 37, and 58, are all

21   those basically the same -- are the same type of document?

22   A.    Correct.

23   Q.    Incoming stock clearance?

24   A.    What they mean by incoming stock clearance is that

25   shares of whoever -- in this case, FusionPharm -- were being

1   deposited into the account, they had to keep a record --

2   Q.   In the account of MicroCap Management?

3   A.   Correct.

4   Q.   And do each of 4, 18, 7 -- 37 and 58, on those pages,

5   are those group of documents related to the particular

6   transaction?  For example on page 4, 4 million shares

7   converted into 20,000 shares?

8   A.   Yes.

9   Q.   Okay.  With regard to page 4 on -- or with regard to

10  the documents at page 4, could you take a quick look at page

11  6.

12          And we can publish that.

13          Could you tell us what that is.

14  A.   That's a letter from MicroCap Management to Oppenheimer

15  asking --

16          MR. BARNARD:  Your Honor, I'm going to object to

17  this line of questioning.  It's -- it is -- it's already

18  been asked and answered.  These are the same documents to

19  which he testified with regard to Exhibit 138.

20          THE COURT:  This does appear to me to be

21  cumulative, Mr. Brown.

22          MR. BROWN:  I don't believe he's testified to any

23  of this.  He didn't testify yesterday about this.

24          THE COURT:  I'll let you go a little further.

25          MR. BROWN:  Okay.

Direct - Kramer

1    THE COURT: You may get the same objection later.

2    MR. BROWN: Okay. Other witnesses have, Your

3    Honor. I realize that.

4    BY MR. BROWN:

5    Q. I'm not sure if you answered what page 6 was.

6    A. It's a letter from MicroCap Management to Oppenheimer

7    asking them to deposit the 4 million shares of FusionPharm,

8    formerly Baby Bee Bright Corporation, into the MicroCap

9    Management account. And the letter's from a person named

10   William Sears.

11   Q. Okay. Could you tell us what pages 7 and 8 of Exhibit

12   139 is?

13   MR. BARNARD: Your Honor, object again.

14   Cumulative.

15   THE COURT: What witness was this gone through

16   within your -- in your view?

17   MR. BARNARD: I'm sorry, Your Honor?

18   THE COURT: With which witness, in your view, was

19   this already -- these documents already covered?

20   MR. BARNARD: I believe this witness testified

21   about this document. I may be wrong on that.

22   MR. BROWN: Your Honor, this exhibit wasn't in

23   yesterday, so he couldn't --

24   THE COURT: No, but most of the documents in 139

25   was in 138, which was in.

Direct - Kramer

1    MR. BROWN:  And I don't believe I asked him about

2    any specific document in 138 yesterday.  I know this

3    document has been testified about with other witnesses, I

4    understand that.

5    THE COURT:  I don't have a specific recollection of

6    this with this witness, so I'll let it go.  Go ahead.

7    MR. BROWN:  I'll move -- I'll cut it short, Your

8    Honor, but I just have a couple of more questions with

9    regard to this.

10   THE COURT:  All right.

11   BY MR. BROWN:

12   Q.   I'm sorry, what is page 7 and 8?

13   A.   Appears to be an opinion letter indicating that the

14   shares are freely tradable, I think.

15   Q.   Is that document important in your analysis of what was

16   going on?

17   A.   Yes, because when shares are deposited into an account,

18   they can be restricted shares, meaning that the person can't

19   sell the shares or you can't do anything with the shares

20   until the restriction is lifted.  In this instance, it

21   indicates that they're not restricted.  So that means that

22   the shares, once they're deposited, they can be sold

23   immediately or given to whoever right away.

24   Q.   Is -- based on your experience in the industry, is

25   it -- is that important for an investor to have free-trading

Direct - Kramer

1    shares as opposed to restricted shares?  And if so, why?
2    A.   Yes.  Well, obviously the restricted shares they can't
3    sell, so you can't, you know -- if the price goes up or goes
4    down, you can't really sell it to protect -- they make
5    additional funding because the shares are going up in price
6    or to save your investment because the shares are going
7    down.
8            So if you don't have an opinion letter indicating
9    that it's freely tradable, it would be important to know.
10   And the letter allows the shares to be sold.
11   Q.   And with regard to that distinction between free
12   trading and restricted shares, is that significant in the
13   microcap environment?
14   A.   In the microcap stock environment, you mean?
15   Q.   Yeah.
16   A.   Yes.
17   Q.   Not MicroCap Management, sorry.  Why is that?
18   A.   Well, because, you know, if the stocks are sort of very
19   volatile -- in many cases meaning they go up and down in
20   price a lot -- and the fact of the matter is if you can't --
21   if they're restricted, you can't sell them, you -- you're
22   sort of left on the hook if the price goes down a lot, or if
23   it goes up you obviously can't profit from that.
24           So it's important -- typically restrictions,
25   depending on the type of restriction, they last a year,

Direct - Kramer

1   depends on how you get the shares and that type of thing.

2   Q.   With regard to this -- I won't go into the details of

3   the opinion letter.  With regard to this letter and your

4   investigation in this case, did you look into the background

5   of either Complete Legal Solutions, Incorporated, or Leslie

6   Dinwoodie, who signed -- allegedly signed the page 8?

7   A.   No.

8            THE COURT:  Mr. Brown, do you want this page down?

9            MR. BROWN:  Yes, Your Honor.

10            THE COURT:  All right.

11   BY MR. BROWN:

12   Q.   Maybe we could just publish pages 7 and 8 real quickly.

13   Page 8 with the signature line.  Okay.  Thank you.

14            And with regard to page 11 -- or pages 10 through

15   17 of Government Exhibit 139, what is that?  Why is that

16   significant, if it was?

17   A.   So that's a consulting agreement between Baby Bee

18   Bright, which is a publicly traded company, which is the

19   prior name to FusionPharm, and a -- and MicroCap Management,

20   LLC.

21   Q.   Is there anything -- and how does that relate to the

22   other documents that you've already described this morning?

23   A.   Essentially when you -- when you're depositing shares

24   into an account, you need to provide -- whoever's doing the

25   depositing -- in this case it's MicroCap Management -- they

Direct - Kramer

1    need to provide evidence that shows if the share -- you

2    know, where -- the origin of the shares, how they received

3    the shares.  They need to show sometimes the stock

4    certificates -- often the stock certificates, and then any

5    opinion letters, which is what we saw, indicating, you know,

6    if they're free trading or restricted or whatever.

7           So this -- this is the agreement that MicroCap

8    Management provided, so that's the -- the significance is it

9    shows that the shares came from Baby Bee Bright specifically

10   for consulting services.

11   Q.   Consulting services by whom?

12   A.   By MicroCap Management.

13   Q.   And MicroCap Management is, based on your

14   investigation, who?

15   A.   William Sears.

16   Q.   Is there anything in that consulting agreement that

17   raised a red flag to you or caused some concern?

18   A.   We -- yes.  Part of the concern -- well, it --

19   Q.   Which page are you --

20   A.   I'm sorry.  Page 11.

21   Q.   Okay.  Could we have page 11 of that document

22   published.

23          And which portion of page 11?

24   A.   Okay.  The top, it's called Consulting -- it's

25   Consultant Services.  It just sort of spells out what

Direct - Kramer

1   MicroCap Management is supposed to do for the company.  So,
2   you know, it talks about, you know, disseminating press
3   releases, it talks about personal consulting services,
4   generating fees -- lead generation programs, printing,
5   electronic media, advertising, newsletter production,
6   electronic public relations campaign, direct mail campaigns.
7   So to me that indicates it's sort of a -- a stock promoter,
8   because a lot of the different things aren't -- like if
9   you're just a typical consulting company, you might not be
10  sending out mass mailings, things like that.
11          The other thing that's interesting, too, is the
12  compensation piece.
13  Q.   Is that in Section 4 at the bottom of the document?
14  A.   Correct.  Section 4 at the bottom.
15          And so for all that -- for all those services --
16  because I guess at the time Baby Bee Bright didn't really
17  have any financial stability to give them cash.  It shows
18  that the -- the initial payment is going to be $140,000.
19  You can see it right there.  And payable in the form of
20  common stock.
21          Like I said yesterday, a lot of the microcap
22  companies don't really have enough, you know, cash laying
23  around that they can actually pay promotional companies or
24  anybody in cash, so they pay the companies in company stock.
25          So this one, it's a $140,000 initial payment, but

Direct - Kramer

1    it's valued in company stock.  And it sort of tells you

2    that, you know, the company's common stock for the 20-day

3    period is sort of an average, and then that's how much stock

4    they get.  So, say, the stock is trading at a dollar, that's

5    what the average is, they would get 140,000 shares of stock.

6         In this instance, I think it was trading a lot less

7    than that, so, I mean, if they were trading at a penny, they

8    could get 140 million shares or more.  So that was kind of

9    interesting.

10        And then also -- that's in A.  But in B, so the

11   company agrees to issue and deliver to the consultant

12   $70,000 monthly payment payable in the form of shares of

13   common stock.  So if you sort of, you know, do the math, it

14   ends up between 140 for the first month and then 70,000 for

15   each month after, so that's 11 months, that's like $910,000

16   in stock for just sort of providing like public relations,

17   sort of trying to build awareness about the company.

18        So that's --

19   Q.   Why did that raise a red flag to you?

20   A.   That's a lot of money to just sort of mail out, you

21   know, press releases or -- or, you know, hire somebody to do

22   calls or things like that.  It's kind of not a tangible, I

23   guess, service you can kind of say.  So it's a lot of money

24   to spend -- it's almost a million dollars, so . . .

25   Q.   With regard to -- I won't ask you any more about that

Direct - Kramer

1   first transaction.  And I won't ask you details of the other

2   ones you emphasized other than the amount of shares.

3           With regard to this particular transaction from

4   page 4 through 17 -- if you go back to page 4, how many

5   shares of stock did that -- or how many shares of Baby Bee

6   Right [sic], the new name of FusionPharm, how many shares of

7   stock did that involve?

8   A.   It looks like 4 million.

9   Q.   Okay.  And there was a --

10  A.   Then there was a reverse -- there was a reverse split,

11  so it -- they -- which just means it was -- I think it was

12  -- they're saying one for 200, so 4 million.  So they just

13  give him 20,000 shares.

14  Q.   What's the date of that document at the bottom?

15  A.   You mean on No. 4?

16  Q.   Yes, sir.

17  A.   It's dated -- well, it's signed 4-18-11.

18  Q.   Okay.  And how many shares of stock does page 18 and

19  the following -- pages following that refer to?

20  A.   Page 18 is 65,000 shares.

21  Q.   And what's the date at the bottom, at least, of the

22  signatures?

23  A.   The signatures look like 5-2-11.

24  Q.   Could you look at page 37.  And ask you how many shares

25  that incoming stock clearance involves.

Direct - Kramer

1    A.    80,000 shares.

2    Q.    What's the date of that?

3    A.    5-13-11.

4    Q.    Could you look at page 58.  And tell us how many shares

5    that incoming stock transfer -- or stock clearance refers

6    to.

7    A.    150,000 shares.

8    Q.    What's the date on -- of the signatures on that

9    document?

10   A.    6-7-11.

11   Q.    Thank you.  Do all the documents after pages 18 and

12   after page 37 and after 58 have similar documents that

13   you've described in more detail after the ones on page 4?

14   A.    Yes.

15   Q.    Okay.  After you got all this information and the other

16   information you obtained later on, the stock blotter,

17   et cetera, did you feel a need to contact FusionPharm

18   individuals?

19   A.    Yes.  Once I continued -- or once I essentially

20   completed my initial sort of dive into the company to see

21   what was -- if there was anything to be concerned about,

22   then once I gathered all that info, I then made a decision

23   to contact the CEO of the company.

24   Q.    Do sometimes in your investigations, you look at the

25   information and you don't go that far?

Direct - Kramer

1    A.    Yes.  Yeah, if we go out there and look and there's

2    really nothing there, then, correct, we would just perhaps

3    shut it down and not even call the company.

4    Q.    What efforts did you take to contact whoever was

5    running FusionPharm?

6    A.    Well, I -- I found -- I need the contact information

7    for FusionPharm and I called the number to try and talk to

8    Scott Dittman, who was the CEO of the company at the time.

9    And it took over -- I think a course of a couple of weeks, I

10   never got any contact -- I wasn't able to get in contact

11   with him.

12          The number, I think, that was listed as the

13   company's corporate number, didn't work.  It -- sometimes it

14   rang, sometimes it didn't, but you weren't allowed to leave

15   a message until finally one day one of the numbers worked,

16   and I was able to speak to somebody, I guess, that worked at

17   the company.  And they provided the contact information for

18   Scott Dittman.

19   Q.    Okay.  What type of contact information did --

20   A.    I believe they gave me his e-mail and also his

21   telephone number.

22   Q.    Okay.  Was your first -- in addition to the attempts

23   that you've already testified to, was your first attempt to

24   contact him by -- was by his cell phone or was it by --

25   A.    Yeah, I think it was -- I think I was given a cell

Direct - Kramer

1    phone.

2    Q.   Okay.  Did you contact him in person or did you send an

3    e-mail first?

4    A.   Well, because of my issues with the telephone number, I

5    sent -- I sent an e-mail introducing myself, saying who I

6    was, and asked if we could set up a call to -- to discuss

7    the company.  And then I also left a voice mail for him as

8    well.  I think I probably called and left a voice mail,

9    didn't get in contact -- had to leave a voice mail, and then

10   I sent the e-mail as well.

11   Q.   This was eight years ago, almost.

12   A.   Correct.

13   Q.   Could you take a look at 136, page 1.

14            MR. BROWN:  And 136 has already been admitted, Your

15   Honor.

16            THE COURT:  Okay.

17            THE WITNESS:  Okay.

18   BY MR. BROWN:

19   Q.   What is -- could we have that published -- I guess it

20   is published.  We could expand it so it might be -- well,

21   why don't we just start with the top.

22            Just tell us what it is.

23   A.   It's my initial e-mail to Scott Dittman.  Like I said,

24   I -- you know, if you don't ever get in contact with the

25   company, you do sort of tell them who you are and what you

Direct - Kramer

1    do, so that's what I did with -- in this instance to Scott.

2    Q.   What was the date of this?

3    A.   October 5th, 2011.

4    Q.   I don't think I asked you this yesterday, but when you

5    were doing this investigation in your -- at FINRA, do you

6    have other investigations going on at the same time?  Do you

7    have a lot on your plate, or do you just focus on one thing

8    at one time?

9    A.   I wish.  No, we have a lot on our plate.  We have a lot

10   of different cases to look at at the same time.

11   Q.   All right.  Thank you.

12              Maybe we could just enlarge the text portion of

13   Exhibit 136, page 1.

14              I won't have you read that because everyone can

15   read, but I just have -- what was your purpose in the

16   e-mail -- sending the e-mail in the format you did, using

17   the language you did?

18   A.   Well, I just wanted to let him know that I was -- I had

19   been trying to contact him for some time and that, you know,

20   we wanted to talk to him.  And that I just wanted to sort of

21   give him an expectation of how long, hence I told him an

22   hour, so that way, you know, when and if he got back to me,

23   he could have the expectation that I would need an hour and

24   be able to schedule accordingly.

25   Q.   And you identified who you worked for and what your --

Direct - Kramer

1    A.    Right.

2    Q.    -- purpose was in case he didn't know what FINRA was?

3    A.    Correct.

4    Q.    You indicated in the second paragraph that this was

5    a -- why don't you explain why you phrased this e-mail in

6    that fashion, in terms of the first sentence.

7    A.    Well, I might have said it yesterday, but when we do

8    reach out to companies, we don't really tell them what our

9    concern is.  We want to get them to talk to us to be able to

10   provide, you know, a complete response, to be at ease when

11   they're on the phone with us, if that's -- if we get to talk

12   to them.

13          So you don't go out and say, "Hey, we're really

14   concerned about X, Y and Z."  We sort of want them to answer

15   the questions and help us understand what our concerns might

16   be, so that way they can sort of give a complete response

17   rather than being, oh, all worried about -- if I would have

18   said, you know, "I'm very concerned about this specific

19   situation," they might not be -- they might not want to talk

20   about it.

21          Also, I don't really want to give them any

22   information as to why I'm calling because it's better to be

23   more candid; you get a better response.

24   Q.    Did you get a response either by e-mail or did you talk

25   to him before you got an e-mail from him, or do you recall?

Direct - Kramer

1    A.   I believe Scott called me and we were able to set up a
2    time to talk.
3    Q.   Could you look at Government -- well, you know, do you
4    remember when you talked to him?
5    A.   I think he called me, it might have even been that day
6    or the day after.  It was pretty quick.
7    Q.   And you set up a time to have more time to talk?
8    A.   Right.
9    Q.   And how much later was that, would you say?
10   A.   I think it was within a few days.  It was either the
11   next day or the day after.  It was very close.  He responded
12   once he got that and received my voice mail because, prior
13   to that, he was not getting any of my -- there was no way to
14   contact him.
15   Q.   Why don't we just go straight to your first
16   conversation with Scott Dittman.  What -- describe that, if
17   you could.
18   A.   Well, I talked to -- essentially when we do a phone
19   interview with a company, you know, I'll -- based on what I
20   already know, I'll sort of make up an outline of questions
21   to ask whoever I'm talking to.
22        They -- he was more than happy to talk to me.  And
23   he essentially gave me a summary of sort of what the origin
24   of Baby -- of FusionPharm, I should say.  He told me that
25   his brother-in-law, William Sears, helped facilitate like a

Direct - Kramer

1    reverse merger, essentially, so with -- between

2    FusionPharm -- FusionPharm and Baby Bee Bright.

3         He said that the history of Baby Bee Bright was the

4    previous name and then they changed the name to FusionPharm.

5    And he said that the previous owner -- I can't remember his

6    name at this second -- but -- Fred Dahlman, he -- that no

7    money changed hands.  Fred Dahlman was allowed to keep 15 --

8    I think it was 15,000 preferred shares, and then the rest of

9    the company essentially went to Scott Dittman.

10        And then he gave me a brief background of his work

11   history.  And Scott indicated that I think he was at Arthur

12   Anderson, and that he created his own construction company.

13   But due to the economic downturn, he decided to, I guess,

14   start FusionPharm and get into the medical marijuana

15   industry, because it was a hot sector at the time.  You

16   know, a lot of excitement around it.

17        And his discussion about that sort of dovetailed

18   into the fact that I guess at the time I spoke with him, he

19   said that because there was a whole lot of red tape and, you

20   know, regulation and all that kind of stuff around the

21   medical marijuana, that they decided to -- rather than be a

22   medical marijuana consulting company, to go into like -- I

23   believe it was like food -- like local foods, growing foods,

24   that kind of thing, and kind of transition out of medical

25   marijuana.

1    And so I found that to be interesting because

2    FusionPharm was sort of talking about being medical

3    marijuana in a lot of their press releases.  And then he

4    told me that -- that, you know, he owned, I think he said,

5    90 percent of the voting shares in the company; that he had

6    raised a little bit of money to help with the company,

7    itself, to help it get off the ground.  I think it was about

8    $150,000 worth through like friends and family.

9    And then we discussed, you know, what -- some of

10   the press releases.  So we went over the different press

11   releases that the company had disseminated out to the

12   public.

13   Q.   You indicated that he told you that his brother --

14   well, did you know William Sears was his brother-in-law at

15   that time?

16   A.   No, I did not.

17   Q.   You indicated in your testimony that Mr. Dittman told

18   you that William Sears had facilitated the transition

19   between Baby Bee Bright and FusionPharm.  Did he tell you

20   whether William Sears had had any other role, whether he was

21   employed by the company or not?

22   A.   Employed by Baby Bee Bright?

23   Q.   No, by FusionPharm.

24   A.   Yes.  He told me that William was a part-time sales --

25   salesperson for FusionPharm.

Direct - Kramer

Q.   Okay.  And did you inquire at that time whether or not William Sears was involved with any -- any of the stock that was being marketed or sold?

A.   Yeah.  I asked him if he knew an entity called MicroCap Management, because, obviously, through my investigation I had identified that it was trading in stock.

          And typically what we do in our investigation is we'll identify any accounts that might be trading, or look a little suspicious.  And then what we typically do is we'll ask, you know, the CEO of whatever company we're talking about if they are familiar with any of the names.  Sometimes they are, sometimes they're not.

          In this instance, he said yes, he knew what MicroCap Management was.  He thought it was -- he said it was his brother-in-law's company, William Sears.

Q.   Okay.  Did he indicate whether or not he knew that Microcap had been involved in the transactions that you previously testified in Government Exhibit 139?

A.   No.  He said he was unaware that William Sears, or MicroCap Management, was selling -- or trading in the stock, and he also was unaware that it -- that MicroCap Management, or William Sears, had any stock in FusionPharm.

Q.   During this -- was it during this conversation or later that he indicated to you about William Sears' continued investment in Microcap, if anything?

1   A.   Well, I think -- I requested information regarding

2   MicroCap Management and -- from him.  And he indicated

3   that -- once I receive that back, he said that, to his

4   knowledge, that William Sears had sold his interest in

5   MicroCap Management and owned no stock.

6   Q.   He told you that in person or over the phone?

7   A.   On the phone.

8   Q.   All right.  You never met Mr. Dittman, I take it?

9   A.   No.  No.

10  Q.   Could you take a look at -- we'll briefly go through

11  some of the e-mail traffic between you and Mr. Dittman in

12  Government Exhibits 135 and 136.

13       And I apologize for having to jump back and forth,

14  but could you look at Government Exhibit 135, page 1, the

15  upper portion.

16  A.   Yes.

17  Q.   Could we have that published in the upper portion.

18       What is that?

19  A.   That's an e-mail from Scott Dittman to me.  And he

20  provided some photos regarding the grow pods that

21  FusionPharm had.

22  Q.   And there were photographs attached to that e-mail?

23  A.   Yes.

24  Q.   Okay.  Can you look at Government Exhibit 135, page 6.

25  The upper portion, if you could publish that.

Direct - Kramer

1    Could you tell us what that -- is that an e-mail
2    also from Scott Dittman to you?
3    A.   Yes.  It was an e-mail from him to me providing any
4    additional information.  He had some -- the press releases
5    that he had -- well, the one thing, too, Scott told me was
6    that he was the one that created them and disseminated all
7    the press releases for the company.
8         And so this e-mail is a -- when I talked to him,
9    essentially -- you know, obviously people can put out any
10   kind of press releases but it might not be true.  So what we
11   typically do, and what I did in this instance, was asked him
12   to provide all the agreements to back up, to give evidence,
13   to the press releases.  And so this is an e-mail that
14   contains two of the agreements that were discussed in a
15   couple press releases.
16   Q.   With regard to -- I won't go into all the details of
17   what he sent you -- but with regard to the first line, LOI
18   from Lehi Roller Mills and the Cannabis Planet licensing
19   agreement, had there been some press release involving those
20   two topics?
21   A.   Yes.  They had issued a press release regarding Lehi
22   Roller Mills, which was a company that, I guess,
23   manufactured wheat or flour, and then they sold it on the --
24   in the retail market.  So they had announced that they had a
25   preliminary LOI, which is letter of intent, to, I guess,

Direct - Kramer

1    purchase or -- part of the company.  So he provided that --

2    that agreement.

3          And then there's another press release indicating

4    that they had purchased a company called Cannabis Planet TV.

5    And so he provided that agreement.  But he told me, I

6    remember when we were -- when we spoke about the specific

7    cannabis planet, he indicated that they actually didn't buy

8    the company, they actually bought a -- I guess a TV show --

9    or the rights to a TV show to put on TV in Colorado.  But he

10   didn't have a carrier yet.  I guess -- I think he bought

11   like 13 episodes, something like that.

12   Q.   The FusionPharm had bought --

13   A.   Correct.

14   Q.   And were there some documents attached to this e-mail,

15   too?

16   A.   Right.  The agreements.

17   Q.   Can you take a look at Government Exhibit 135, page 23.

18   Maybe we could expand the upper portion of that document.

19          This is an e-mail to you from Scott Dittman?

20   A.   Correct.

21   Q.   What's the date on it?

22   A.   November 14th, 2011.

23   Q.   It makes a reference to the first of three e-mails.

24   Was this in response to a question of yours?

25   A.   Yes.  I think I requested information regarding the

1    name change from Baby Bee Bright to FusionPharm.

2    Q.   And -- okay.  In fact, could you scroll down to the

3    bottom of that exhibit, please.

4         Was this attached to the exhibit that he had sent

5    you or not?

6    A.   Oh, this is the e-mail, so all the attachments were

7    attached in the e-mail.

8    Q.   But was the e-mail from Guy Jean-Pierre attached to the

9    e-mail?

10   A.   Yes.

11   Q.   I guess it's forwarded --

12   A.   Yeah, it was just forwarded to me.

13   Q.   Okay.  Had you known who Guy Jean-Pierre was prior to

14   that --

15   A.   No.

16   Q.   And was one of the letters -- one of the attachments to

17   this exhibit page 24 of that exhibit?

18   A.   Yes.

19   Q.   Put that up, please.

20   A.   Yes, it was.

21   Q.   And what's the purpose of this -- what is this in

22   response to, I guess?

23   A.   This is in response to asking for information regarding

24   the name change from Baby Bee Bright to FusionPharm.

25   Essentially when a company -- when an OTC-type company --

Direct - Kramer

1    over-the-counter company -- wants to change its name, they

2    need to submit paperwork to FINRA, actually, our

3    operations -- our market operations area.  And the paperwork

4    needs to come in indicating that, you know, the company

5    wants to change its name.  To provide information about the

6    people, you know, behind the company, who's running it, the

7    officers, directors.  And also they ask for, you know,

8    different stock symbols because, obviously, you know, you

9    might want a certain symbol, but it might already be taken.

10         So it gets submitted -- all this paperwork gets

11   essentially rolled up, packaged, submitted to FINRA.  And

12   then, you know, unless there's something, you know, out of

13   the ordinary, they'll typically approve the name change.

14   Q.   Okay.  And you indicated in your earlier testimony that

15   this e-mail and its attachments were one of three e-mails

16   that were sent to you.  Since you're on that exhibit, I

17   won't have you jump back and forth, could you look at page

18   38.

19         Maybe we could have that up -- displayed, please.

20   I'm sorry, page -- yeah, 38.

21         Is that an e-mail that just basically is the same

22   string that says e-mail No. 2?

23   A.   Yes.

24   Q.   And were there a number of attachments to that?

25   A.   Yes.  I think the reason why he did it in a couple of

Direct - Kramer

1  different e-mails is because it was too much stuff to attach

2  and come through.  So I think I might -- it would have

3  bounced back to him.

4  Q.  Okay.  Could you look at page 39.  Was that one of the

5  attachments?

6  A.  Yes, it was.

7  Q.  And what -- do you know what that is?  If you don't,

8  that's okay.  I was just asking.

9  A.  I think this is just -- this is a filing with the State

10  of Nevada to -- for a name -- for their name -- getting an

11  amendment for incorporation, I think.

12  Q.  But it's one of the documents -- it's from the Nevada

13  Secretary of State?  Okay.  And it's one of the documents

14  that was forwarded to you?

15  A.  Correct.

16  Q.  And the name "Guy Jean-Pierre" is on there for some

17  reason.  Okay.

18         And since we're still -- since we still have that

19  exhibit in front of you, can you look at page 46.  Could you

20  tell us what that is.

21  A.  That's just the third e-mail, and that contains

22  additional information regarding the name change.

23  Q.  Page 55 of that exhibit, could we just expand the box

24  portion of that.

25         Could you just tell us what that is.

Direct - Kramer

A.    That -- that's just a summary of the -- well, they call
it History of Corporate Action is what it says on the top,
but it's a summary of what the original -- it starts all the
way back from the original name of the company and then it
chronicles any type of major, you know, like happenings
within the company, whether it be a name change, which you
can see the name changed a couple of times; it tells you
where it was incorporated initially; it also talks about
like a large corporate action, like a stock split.  In this
instance, I think I testified before, saying that the stock
was 200 -- or 20 to 1 reverse split or 1 for 100 reverse
splits --

Q.    It gets down to the bottom where FusionPharm becomes
the name on March 3d, 2011?

A.    Correct.

Q.    And that was submitted to you by Scott Dittman?

A.    Correct.

Q.    Okay.  Just to make things in a little bit better
context, I'm going to ask you now to move to 136 for -- you
can -- I don't think I'll be asking you to look at 135
anymore, so you can move that out of your way.  I only have
a few pages to ask you questions about.

      This is a little -- it's not in chronological
context from what you just described, but could you look at
page 136 -- or page 7 of Exhibit 136.  Actually, look at

1    page 3 first.

2            I'm asking you -- when I refer to the page, there's

3    a lot of pages on this, so it's the lowest page number in

4    the bottom center.

5            Could you expand that, please, maybe just the text

6    with the e-mail address and the time -- or the date.

7            What is -- what is this?

8    A.   It's an e-mail from me to Scott Dittman on October 7th

9    of --

10   Q.   Would that have been the first subsequent e-mail you

11   sent to him?  I mean, other than the introductory e-mail on

12   this -- on the 6th?

13   A.   Yes.  I believe -- because I asked him initially during

14   our telephone call for the different documents that I

15   wanted, and then he did provide some.  And then based on

16   his -- what he provided, then I asked for more -- more

17   information.

18   Q.   Okay.  I believe that his first e-mail to you referred

19   to some photos of pods and such things and you wanted these

20   documents on -- that you've described in page -- on page 3?

21   A.   Correct.  It was essentially the documents we just

22   walked through, but it -- I wanted to -- any information he

23   had regarding the name change and then any correspondence

24   between the former, I guess, president of Baby Bee Bright

25   and William Sears, since he'd indicated in our call that

Direct - Kramer

1    William Sears and Fred Dahlman had -- you know, had

2    facilitated the name change and the change to the company to

3    him.

4    Q.   On page -- or on that -- in that document on, I guess,

5    paragraph 2 of your -- No. 2 of your e-mail, you asked for

6    Stock Transfer Agent shareholder position reports.  What are

7    those?

8    A.   So transfer agents are essentially -- each company has

9    a transfer agent, and the transfer agent for each specific

10   company knows the shareholder positions at certain times of

11   the year.  I mean, they know -- so if you had a stock

12   certificate, it would have to go to them to be -- to get the

13   restriction removed and then moved to an account.  But I was

14   asking to see who the shareholders were at the two specific

15   dates to see who owned the shares at certain times.

16   Q.   Based on your experience, would a -- would a company

17   typically have those documents?

18   A.   Oh, yes.  The transfer agent would have it.

19   Q.   Okay.  Could you take a look at Government Exhibit 136,

20   page 7.  Was this in response to the three separate e-mails

21   you received from Scott Dittman?

22   A.   Yes.

23   Q.   And is this from you to Scott Dittman on November 14th?

24   A.   Yes.

25   Q.   What are you asking for here?  What's the purpose in

Direct - Kramer

1    asking for it?

2    A.   Well, he had provided me everything that I had

3    requested other than the fact that during our conversations

4    he had indicated that William Sears owned MicroCap

5    Management, and then he had indicated that he had sold it

6    and he didn't have any stock in FusionPharm.  So he had

7    indicated during our conversations that he could provide

8    information as to, you know, who William Sears sold MicroCap

9    Management to and, of course, the shares were sold as well.

10            And he hadn't done that yet, so I was -- well, I

11   had expected it already because it had already been -- you

12   can see it's November 14th, so I guess I talked to him

13   probably in October 5th or 6th, and so it was over a month

14   and he was pretty fast getting other information to me, so I

15   just wanted to sort of remind him to provide that info.

16   Q.   You're asking for some fairly specific information in

17   paragraph 3, are you not?

18   A.   Yes.

19   Q.   Who he sold MicroCap Management to, when he sold it,

20   how many shares were sold.  What does it mean when you ask,

21   "Did he give up ownership of all brokerage accounts in the

22   name of MicroCap Management?"

23   A.   Well, when I received the information from Oppenheimer,

24   there's an account under -- in the name of MicroCap

25   Management, and then there was some of the information that

Direct - Kramer

1    Oppenheimer provided.  It was like -- it was letters or

2    e-mails from Scott -- or William Sears to Oppenheimer

3    indicating, "Please deposit these shares.  Please wire, you

4    know, wire funds out."

5         So I needed to know, you know, did he still own

6    that account?  Because it was under the name of MicroCap

7    Management, so if he had sold the -- sold the entity to

8    somebody, did he actually sell the rights to the brokerage

9    account?  Was he -- was it like, you know, if any shares

10   were in there, did he own them still or did he sell them to

11   somebody else?  Or when the stock was sold or when the money

12   was wired out, was that his money or was that, you know,

13   going to somebody else?

14   Q.   Okay.  In your telephone conversation with Scott

15   Dittman, did you tell him why this was important to you or

16   did you just tell him you're asking for the information?

17   A.   Yeah, I just told him I was asking for the information.

18   I mean, I think when I asked about the -- you know, did he

19   know anything about MicroCap Management, and he came out and

20   said, "Oh, yeah, that's my brother-in-law who used to own

21   it."  He said his brother-in-law, he thought, was in some

22   kind of financial business, so he kind of knew, you know, I

23   was trying to get more information about MicroCap

24   Management.

25   Q.   Did he ask you why in the world you wanted to know

Direct - Kramer

1    that?

2    A.    No.

3    Q.    Before -- in case I forget to ask you, I need to -- I'm

4    only going to ask you about three more -- or maybe three or

5    four more communications.  With regard to the information

6    requesting about Microcap from Scott Dittman, did you ever

7    receive the information that you were asking for?

8    A.    No.

9    Q.    Could you take a look at Government Exhibit 136, page

10   9.

11         Is this a response to your e-mail on the 14th -- or

12   was this the next response you received, at least via

13   e-mail, from your e-mail on the 14th

14   A.    Yes.

15   Q.    And what is he telling you in this --

16   A.    Obviously it was November 23d, so that was right around

17   Thanksgiving, so he was just indicating he'd be out of town

18   for the holidays, but if I needed anything while he was out

19   of town, to contact his corporate secretary, which was Guy

20   Jean-Pierre.

21   Q.    He asked Mr. Guy Jean-Pierre to follow up with you in

22   the interim?

23   A.    Right.  Or if I needed -- I think I read it if I needed

24   anything, to follow up with him because Scott would be out

25   of town and unavailable.

Direct - Kramer

1  Q.  Did he give you a telephone number for Mr. Jean-Pierre?

2  A.  No.  He just said to contact via e-mail.

3  Q.  Okay.  And Mr. Jean-Pierre's e-mail at FusionPharm,

4  Inc., was on -- was -- he was copied -- Mr. Jean-Pierre was

5  copied on this e-mail; is that right?

6  A.  Right.

7  Q.  Okay.  Could you take a look at Government Exhibit 136,

8  page 10.

9        I guess you were working on the Friday after

10  Thanksgiving.  What did you send to Mr. Dittman with a copy

11  to Mr. Jean-Pierre?

12  A.  I just wanted to -- why I hadn't received anything else

13  in the meantime, since he was gone.  And I just wanted to

14  just sort of set a call for the following week after the

15  holiday to just go over any -- you know, the last things I

16  was waiting for, which was the William Sears MicroCap

17  Management information, and I cc'd Mr. Jean-Pierre because

18  he had indicated to do that as well, which is just keep

19  everybody involved.

20  Q.  Were you intend- -- were you trying to make it more

21  urgent in their mind?

22  A.  Well, it was more -- you know, it was -- he was gone,

23  and it had been now -- you know, since my initial contact

24  was like October 5th to now was almost going on two months,

25  I wanted to sort of get everything completed, get all the

Direct - Kramer

1    information in that I needed to make a determination.

2    Q.   And you indicated in your second letter -- or your

3    second sentence of your e-mail, that the main thing is an

4    explanation of who your brother-in-law sold his entity,

5    MicroCap Management, to.  Why was that the main thing?

6    A.   Why was that what?

7    Q.   Why was that the main thing you were looking for?

8    A.   Well, he'd already replied to everything else, so he

9    had provided all the information I had requested, which was

10   good.  So that was the only thing I was awaiting.  And given

11   the fact that, you know, based on my investigation, the

12   MicroCap Management account was the most suspect, you know,

13   it had traded, I think it sold during the period something

14   like 250,000 shares, roughly, and then it -- and for, like,

15   $500,000 in profit -- well, in proceeds, so it was a lot of

16   money and you kind of want to know -- especially when the

17   CEO of the company tells you that, you know, it's his --

18   it's his brother-in-law's -- where he thought his

19   brother-in-law had it and then sold it, and the fact that

20   the brother-in-law worked with the company in some capacity,

21   helped facilitate the name change, sold -- and then on the

22   name change documents, it indicated that, you know, William

23   Sears was the -- I think they called it the corporate

24   contact or something, and then I guess William Sears' wife

25   is also an officer of the company.

Direct - Kramer

1    So kind of just wanted to -- in that instance, you

2    want to make sure, you know -- see if he really is part of

3    the company or if he's not.  Because if you're trading stock

4    and you're an affiliate of a company, or even control of the

5    company, you know inside information, you know what's coming

6    up, what's going with the company, you know, how -- you

7    know, before press releases went out, so technically, you

8    know, you can't trade on inside information or nonpublic

9    information.  So it was important to figure out, you know,

10   what William Sears' role was

11   Q.   You knew that Scott Dittman was listed as a CEO.

12   A.   Right.

13   Q.   Isn't he the controlling person?  Is there one

14   controlling person in the company?

15   A.   Well, I mean, he -- he's the CEO, but, you know, if --

16   if I'm -- you know, if William Sears is an officer of the

17   company, then he also is an insider.  And then if he's an

18   insider, he can't really trade on stock if you know

19   information that the public doesn't know because that would

20   be illegal, obviously.

21   Q.   What about the -- you -- you talked about a term called

22   "affiliate."  What is that?

23   A.   Yeah.  Well, affiliates are people who, you know,

24   either are large shareholders of a company, or, you know,

25   work at the company, or are officers of the company.

Direct - Kramer

1   And then so those people are -- have different

2   rules in terms of what they can do with their stock.  You

3   can't just arbitrarily sell your stock, because, for

4   instance, if you know the company's going to have really bad

5   financials, like a really bad quarter and the stock price

6   likely would go down, well, you can't -- you can't -- nobody

7   else knows, so you can't trade -- you can't sell a bunch of

8   stock and basically protect your investment.  You -- it's

9   just part of the SEC rules.

10   So that's why, you know, if he was truly an

11   affiliate -- because like I said on the name change forms, I

12   think it said he was the company contact, or corporate

13   secretary or something like that, and then his wife, I think

14   even was listed as a treasurer, secretary, something like

15   that.

16   Q.   Could a person be a control person without being listed

17   in the -- as an officer?

18   A.   Yes, they can.  I mean, depending on the company.  I

19   mean, most companies know, but that's kind of what I was

20   trying to dig to see if he was indeed in charge of what was

21   going on because some companies don't list it and hide who's

22   in charge.

23   Q.   Going back to -- actually, before I get back to the

24   exhibit, you mentioned some -- some stock trading.  Were you

25   monitoring the price of FusionPharm during your

Direct - Kramer

1    investigation --

2    A.    We --

3    Q.    -- volume?

4    A.    Yes.  You know, kind of -- it made its run to like $3

5    in June, from -- I believe was like 10 cents, and then it

6    sort of kind of plateaud out.  There wasn't as much news

7    until, I think, like August where the next press release is.

8    And there was a few in the fall as well, but it kind of

9    plateaud out.  It stopped, like -- you know, kind of went

10   up, and I think it went down -- back down.

11   Q.    Do you have the ability to, based on your testimony

12   obviously, but how -- what's your ability to monitor the

13   price of stock historically?

14   A.    I mean, we have systems that I can pull information

15   from the marketplaces and it will show the -- you know, the

16   high during -- you know, so like today, we can go in there

17   and look and see, it will say, you know, opened at -- you

18   know, when the market opened it was a dollar.  The high for

19   the day was like $1.30, and whatever the low is 80 cents,

20   and then it closed, and that's the closing price at the end

21   of the day.

22   Q.    And you can monitor the volume, how many shares are

23   sold per day --

24   A.    Yes.

25   Q.    -- per week?

Direct - Kramer

1      And that's significant in your investigation

2   A.   Yeah.  I mean, if -- for instance, if, for like --

3   if -- in June, if it hit $3 and then it continued to go to 5

4   and, you know, $10 or something like that, that would make

5   it more of a hot-button issue, and we would have to get on

6   it very quickly.  But the fact that it kind of stalled --

7   the price stalled out, it sort of allowed me to take a

8   deeper dive and, you know, it wasn't as pressing, let's put

9   it that way.

10  Q.   There wasn't any pressing pumping?

11  A.   Right.

12  Q.   Maybe I could -- you indicate in your e-mail on the

13  10th, which you copied to Mr. Jean-Pierre, you explained the

14  need for your information and the details.  Well, actually

15  you sent a copy of your previous e-mail; is that right?

16  A.   Yes.  Because I just wanted to remind him that I'd

17  already asked for the follow-up question, and I just wanted

18  to remind him that, you know, this is what I'm waiting for

19  and if you could please provide it.

20  Q.   Did you get any more e-mails from Mr. Dittman in your

21  investigation?

22  A.   No.

23  Q.   That was the last one?  What was the next thing you did

24  get?

25  A.   I received an e-mail from Mr. Jean-Pierre.

Direct - Kramer

1  Q.  Is that on page 11 of Government Exhibit 136?

2  A.  Yes.

3  Q.  And maybe we could -- this was the response to your

4  last e-mail; is that correct?  Would you say?

5  A.  Correct.

6  Q.  Based on the timing, this was on what day?

7  A.  November -- November 30th.

8  Q.  So that was the Wednesday after Thanksgiving.

9       Could you just characterize this response as you

10  viewed it.

11  A.  Well, first off, when I -- I guess when Scott went

12  away -- he had said in the interim when he was going away,

13  to contact Mr. Saint Pierre, but then I took that as I could

14  talk to -- that, you know, once Scott returned then he

15  would -- I would be dealing with him again.  So then I -- so

16  then I received this e-mail and not -- obviously it wasn't

17  from Scott.

18  Q.  Okay.  And what did you take the contents of this

19  letter to mean relative to your investigation?

20  A.  I took it that essentially we received everything that

21  we were -- requested.  That's sort of what he indicated.

22  And he also introduced himself as the new corporate

23  secretary of FusionPharm.  But then he did not want to

24  provide any information regarding Scott -- William Sears and

25  MicroCap Management because it was -- what -- he used -- he

1  used the word "incredulous" that I would have asked for

2  that.

3          And he didn't think Mr. Dittman would even -- he

4  said Mr. Dittman didn't remember saying he would provide

5  that information.

6  Q.   Maybe we could expand paragraph 2 just for a couple of

7  questions.  Maybe you could just look at that paragraph.

8          Is he basically telling you that he has all the

9  information that FusionPharm has about Microcap and Mr.

10 Sears?

11 A.   No.  He -- he just said that he provided us, me, with

12 everything I asked for regarding FusionPharm.  But down

13 below, he says that --

14 Q.   Okay.  Why don't we go to the second paragraph from the

15 bottom.

16         What did you take this to mean when you received

17 this e-mail?

18 A.   Well, I took it to mean that he wasn't going to give me

19 any information that I had requested and that Scott Dittman

20 had promised me.  And then also I took it as indicating that

21 the last line -- it was -- notwithstanding whatever personal

22 relationship Mr. Dittman may or may not have with a prior

23 owner of Microcap, in this instance, Mr. William Sears.

24         So I took that as them indicating that Mr. Sears

25 had sold his interest because they call him a prior owner.

1    Q.   Okay.  And with regard to the bottom paragraph, there's
2    a reference to Mr. Dittman confirming he had no recollection
3    of a commitment.  Was this a commitment to you to provide
4    information?
5    A.   Yes.  On multiple occasions when I talked to him, he
6    committed to provide that information.  I wouldn't have been
7    asking for it had he not.
8    Q.   And it had been described to you that Mr. Jean-Pierre
9    was a corporate counsel?
10   A.   Yeah, just in this e-mail --
11   Q.   At least he was an attorney.
12   A.   Right.
13   Q.   And could we go to page 2, please.  Could we just
14   expand -- expand the top paragraph first.
15        What is Mr. Jean-Pierre telling you here?
16   A.   Well, he was telling me that, to his knowledge, they
17   provided everything that I'd asked for regarding
18   FusionPharm, but if I wanted any additional information
19   regarding William Sears or MicroCap Management, I would have
20   to contact him directly.
21        And also he'd indicated, I think in the paragraph
22   above, that because of the misunderstanding with Mr.
23   Dittman, that any further requests be put in writing to
24   his -- to Mr. Jean-Pierre's attention.
25   Q.   Could we expand the last -- the bottom paragraph --

Direct - Kramer

1      text.

2              I won't have you read this to us, but it indicates

3      that there's a reference to, "I trust this brings to a

4      conclusion your interest in the Company."  What did you take

5      that to mean?

6      A.   I just took that to mean that they were -- they had

7      completed everything they were going to provide me and, you

8      know, essentially my contact with them was over.

9      Q.   Okay.  When a -- when a person you're dealing with

10     about a company has a lawyer all of a sudden contact you, do

11     you stop -- do you have a -- is it your practice to stop

12     contacting the person that you were already -- you had been

13     contacting?

14     A.   Yes.  If -- sometimes when we do call -- when I do call

15     a company, you know, they might say, "Hey, can I have -- can

16     I have other individuals on the call?"

17             They might have an attorney on the call.  If they

18     do get an attorney involved and the attorney is providing

19     information to us, then yes, we would go through the

20     attorney first and, you know, send requests or, you know --

21     if I wanted to talk to the individual again, obviously, you

22     call the attorney first to let them -- to have them

23     hopefully help you set it up.

24     Q.   Okay.  One second.

25             Mr. Kramer, I'd like to ask you a few more

1    questions.

2            Could we bring up on the screen Government Exhibit

3    435 first.  435 -- I'm sorry, 435.  Could we just sort of

4    expand the -- well, I guess that's as expanded as we can

5    get.

6            Just take a look at that.  Do you know what that

7    is?  If you don't tell me.

8    A.    Yes.  It's a wire transfer for MicroCap Management.

9    Q.    And what's the date on it?

10   A.    It's September 26, 2011.

11   Q.    Okay.  And who is it signed by?  Does it appear to you,

12   or can you tell what that signature is?

13   A.    It appears to be William Sears.

14   Q.    Pardon -- or, yeah, the signature of the -- when it

15   says -- when it says -- try this.  Maybe we can expand that.

16           THE COURT:  Could you speak up, Mr. Brown.

17   BY MR. BROWN:

18   Q.    Maybe what -- we could expand what I described --

19   highlighted?

20   A.    Yeah, it looks like William Sears' signature.

21   Q.    Okay.  And that's 9-26-2011?

22   A.    Yes.

23   Q.    Go to page --

24   A.    It looks like it was an account at Alpine Securities,

25   too, I think.

Direct - Kramer

1   Q.   Could you look at page 3 of that document.

2        And is that a similar document to which you

3   described on the previous page -- or the previous two

4   pages -- the page before?

5   A.   Yes.  It's a wire transfer request to wire money out

6   of -- looks like an Alpine Securities account for MicroCap

7   Management.

8   Q.   Okay.  Is this -- who's making the request?  MicroCap

9   Management or --

10  A.   Well -- yes, MicroCap Management, whoever's in

11  control --

12  Q.   Through the customer of Alpine?

13  A.   Correct.

14  Q.   Could you scroll down just a little bit.

15       Could you tell who this -- what the signature is?

16  A.   It looks like William Sears, again.

17  Q.   And that's in 2012.  This is after -- this was in --

18  A.   August 2012.

19  Q.   And could you look at page 5 of that exhibit, please.

20  Is that a similar document dated a different date?

21  A.   Yes.  It's dated September 10, 2012, and it's

22  requesting, I guess, $4600 be wired out.

23  Q.   Okay.  Could we scroll down to the signature block.

24       Does that have a signature and a printed name?

25  A.   Yes.  The printed name is William Sears.

Direct - Kramer

1   Q.   Okay.  Is this -- the dates of these transfers, does
2   that reflect whether or not -- an indication that William
3   Sears was not involved in MicroCap or sold his interest?
4   Would that have been --
5           MR. BARNARD:  Your Honor --
6           THE COURT:  Let him finish his question.
7           MR. BROWN:  I'll rephrase it, Your Honor.
8           THE COURT:  Rephrase it and a little louder,
9   please.
10  BY MR. BROWN:
11  Q.   Had you been aware of that information would that have
12  caused some concern to you?
13  A.   Yes.  Because it would indicate that William Sears was
14  still indeed the owner of MicroCap Management during my
15  investigation, and it would have, you know, like I said,
16  raised red flags because if he was working at FusionPharm
17  and he was selling stock, he might have inside information
18  and would be an affiliate of the company.
19  Q.   Okay.  Could we look at Government Exhibit 433, page 3.
20  Why don't we start with page 1 so we can see what this is.
21          Based on your experience, do you know what this
22  type of document is?
23  A.   It's an account statement for an account at Scottsdale
24  Capital Advisors for MicroCap Management, LLC.
25  Q.   Okay.  And based on your experience in the industry,

1    what is a -- is it like an account that is sort of like a

2    bank statement will be sent out to you?

3    A.    Right.  Depending on the firm, but most firms send out

4    where you get a monthly statement for your brokerage

5    account.  And the monthly statement will list out all your

6    stock positions.  So that just means, you know, if you have

7    a hundred shares of IBM, it will show that you have a

8    hundred shares of IBM.  And then it will also show any

9    transactions throughout that month, whether it be -- you

10   know, you put money into the account, you take money out of

11   the account, which is wiring money in and out.  Or buying or

12   selling any type of security or stock, or if you received

13   any stocks, you know, like a stock certificate, you would

14   want deposited into your account.

15          So it gives you a snapshot of just like a bank

16   account statement that you get on a monthly basis.

17   Q.    Okay.  Could we look at page 3 of that document.

18   And -- oh, I'm sorry, I should have asked you:  Who's the

19   account for?  If we go back to page 1.

20   A.    MicroCap Management, LLC.

21   Q.    Okay.  Why don't we go to page 3 now.  Could you expand

22   the area that shows August 31st.  Of 2012, I'm sorry.  Could

23   we expand the whole line so we can see what it is.  Why

24   don't you expand the area above -- like three -- three or

25   four trades around it.

Direct - Kramer

1    Is there a reference to a trade -- any trading of

2    FusionPharm stock -- well, let's blow it up so we can see.

3    A.    Yes, even above that it shows a deposit of a whole -- I

4    can't do the math in my head, but a whole bunch of shares of

5    FusionPharm above that, and then it shows a bunch of trading

6    activity down below.

7    Q.    Are those sales of FusionPharm stock?

8    A.    Yes.   Those are sales that are highlighted now.

9    Q.    By MicroCap Management?

10   A.    Correct.

11   Q.    You didn't have access to these types of documents in

12   your investigation --

13   A.    No.

14   Q.    -- because this occurred in 2012.

15   A.    Right.   We didn't go to Scottsdale and request any info

16   or see that there was an account at Scottsdale by MicroCap

17   Management.

18   Q.    Would that information have been significant to

19   continuing on with the investigation?

20   A.    Yes.   If we knew that there were multiple accounts for

21   MicroCap Management around the -- you know, around the

22   street, which is essentially around the different brokerage

23   firms, around the -- you know, that trade, that would have

24   been significant because it's not -- you know, it's not

25   unusual, but it's -- it raises a red flag if you have

Direct - Kramer

1    multiple accounts because, in some instances, you know,

2    it's -- it's -- you know, my experience, people do that to

3    sort of hide that they're trading, you know -- or trying to

4    make money without us knowing.

5    Q.   Okay.  Could we go to page 25 of Exhibit 135, which has

6    already been admitted.  Scroll down to the contact

7    information -- first of all, tell us what that is, if you

8    could look at the whole page.

9    A.   This is the paperwork that a company who wants to

10   change their name -- or do some kind of action with the

11   company, sometimes the actions might be a name change,

12   sometimes the actions might be like a reverse stock split or

13   a forward stock split, so the reverse stock split is

14   making -- you know, you get less shares because there's too

15   many shares out there.  You still are seeing value, but it's

16   just less shares.

17           So, in this instance, this is what somebody would

18   have to file with the market operations department of FINRA.

19   Q.   Could you expand the contact information.

20           This is for Baby Bee Bright, correct?

21   A.   What's the -- this paperwork is for the name change

22   from Baby Bee Bright to --

23   Q.   To FusionPharm?

24   A.   -- to FusionPharm.  And it indicates there in the

25   contact that William Sears is the administrative officer.

1  Q.   Okay.  Did you have this information when you were

2  conducting this investigation?

3  A.   Yes.

4  Q.   At some point -- the letter you have -- got from Mr.

5  Jean-Pierre, was that the last -- last thing you received

6  from FusionPharm?

7  A.   Yes.

8  Q.   I believe you indicated you didn't get any information

9  from them any -- any further information about William

10  Sears?

11 A.   Correct.

12 Q.   Did you follow up with Microcap to try to find out

13 anything directly from them?

14 A.   No, because as I -- when I testified yesterday, we

15 don't have jurisdiction.  We only have jurisdiction over,

16 you know, brokers and brokerage firms.  And since they --

17 you know, he's -- MicroCap Management is not a brokerage

18 firm or broker, and neither is William Sears, we had no way

19 to really contact him.

20 Q.   And at some point, did you -- it was -- the FINRA

21 investigation side closed?

22 A.   Yes.

23 Q.   What was the next -- your next hearing about

24 FusionPharm from any agency?

25 A.   So we -- we ended up closing our investigation because

1    the price had sort of plateaud out and gone down, and the

2    press releases, themself, weren't so craze -- didn't have

3    the, you know, "We're in revenues of $100 million," that

4    kind of thing.

5         And the fact that they, you know, indicated that

6    William Sears no longer had had anything to do with MicroCap

7    Management, so we -- we closed it based on that.  And so the

8    next we heard about it, the stock price started moving

9    again, I think in early 2012.  And we were going to look to

10   reopen the case and get into it further because at the time

11   we didn't have enough to refer it to the Securities and

12   Exchange Commission.

13        But then once the stock price started moving again,

14   the SEC, themselves, opened up their own independent

15   investigation of FusionPharm and essentially, since we don't

16   have jurisdiction over FusionPharm, it would kind of be --

17   you know, it wouldn't make sense for us to essentially

18   reopen an investigation when the only thing that we could do

19   was refer it to the SEC anyway.  So to not duplicate efforts

20   we didn't open up anything else.

21   Q.   You indicated you have a lot on your plate at any one

22   time?

23   A.   Correct.

24   Q.   You've told us just in the last few minutes about some

25   things you would have -- I've just shown you that would be

1  important to your investigation.  You indicated that the

2  last you received was the contact from Guy Jean-Pierre.  Did

3  you ever meet him or talk to him on the phone?

4  A.    No.  You know -- well, I didn't get his telephone

5  number ever.  In the e-mail he had sent me there was no

6  contact information other than, you know, his e-mail address

7  and his indication that any further contact would only be

8  via in writing, so no, I never contact- -- talked to him in

9  person.

10  Q.    Could we put back and publish -- find the page -- it's

11  Government Exhibit 139, page 54, I think.  Maybe not 54.

12  I'm sorry.  Page 46 and 47.

13       I think you testified about this opinion letter

14  earlier.  You just basically described what it was.  It was

15  fairly early on in the information in your investigation

16  that you received this, correct?

17  A.    Correct.

18  Q.    And you got this letter from Guy Jean-Pierre by e-mail

19  telling you what it says.  I won't repeat it, or

20  characterize it.  If you knew that the Complete Legal

21  Solutions was a company formed by Guy Jean-Pierre, would

22  that have been important to you?

23  A.    Yes.

24  Q.    And if you had learned that Leslie Dinwoodie was Guy

25  Jean-Pierre's niece, would that have been important to you?

1   A.   Absolutely.

2   Q.   And if you knew that Leslie Dinwoodie's signature on

3   this document was forged, would that have been important to

4   you?

5   A.   Absolutely.

6           MR. BROWN:  That's all the questions I have, Your

7   Honor.

8           THE COURT:  All right.  Is there going to be any

9   cross-examination, Mr. Barnard?

10          MR. BARNARD:  Your Honor, I believe there will be.

11   But --

12          THE COURT:  Okay.  Well, all right.  Then we'll

13   take our morning break before we start cross.

14          All right, ladies and gentlemen of the jury, we'll

15   be in recess for 15 minutes.

16      (Jury left the courtroom at 10:19 a.m.)

17          THE COURT:  Mr. Kramer, same instruction as before.

18      (Recess 10:20 a.m.)

19      (In open court outside the presence of the jury at

20   10:41 a.m.)

21          THE COURT:  Mr. Sibert, I understand there's a

22   matter you wanted to raise before the Court.

23          MR. SIBERT:  Yes, sir, thank you.  I spoke to Mr.

24   Goodreid today and I think we have, I guess, part 2 of the

25   stipulation regarding Exhibits 42, 43 -- or, excuse me, 432,

1    433, 434.

2              THE COURT:  Okay.

3              MR. SIBERT:  And my understanding now, after

4    talking to Mr. Goodreid, is that those exhibits are again

5    stipulated to and so I don't know if the Court would want me

6    to do it in front of the jury or just here outside the

7    presence, but I would ask we move those into evidence.

8              THE COURT:  That's good.  So, Mr. Goodreid, you had

9    a fun time yesterday evening reading scintillating

10   documents, at least these three exhibits.

11             MR. GOODREID:  Your Honor, I don't know if I would

12   characterize it as fun, but it certainly was productive.

13             THE COURT:  All right.  Okay.  That's actually good

14   to hear.  We can do it outside the presence of the jury.

15             Given the stipulation of the parties, Government

16   Exhibit 432, 433 and 434 are all admitted into evidence and

17   may be published to the jury.

18        (Government's Exhibits 432 through 434 received)

19             THE COURT:  All right.  Let's bring in the jury.

20             MR. SIBERT:  Thank you, Your Honor.

21             THE COURT:  Uhm-hum.

22        (Jury was present at 10:42 a.m.)

23             THE COURT:  Is there going to be cross-examination,

24   Mr. Barnard?

25             MR. BARNARD:  Yes, Your Honor.

1    THE COURT:  Okay.  Let's go ahead.  Mr. Kramer, I
2    remind you you remain under oath.
3                   CROSS-EXAMINATION
4    BY MR. BARNARD:
5    Q.   Mr. Kramer, you indicated that during the November 23d
6    through the 29th, or so, period of time in 2011, that Scott
7    Dittman was not going to be available, so he referred you to
8    corporate counsel, Mr. Jean-Pierre.
9    A.   I guess you call him the corporate secretary.
10   Q.   The secretary.
11   A.   Yeah.
12   Q.   And it's not unusual for a CEO of a company to direct
13   you to either counsel or secretaries who would have -- have
14   some of the documentation that you were seeking.
15   A.   Correct.
16   Q.   Now, in Exhibit 136, on page 1 -- if we may have
17   Exhibit 136, page 1.  Which has been admitted.  Excuse me,
18   page 2.  I'm again wrong.  It's 11.
19        So this was the letter from -- or, excuse me, the
20   e-mail from Mr. Jean-Pierre to you, correct?
21   A.   Correct.
22   Q.   And basically in this first page of the e-mail, Mr.
23   Jean-Pierre told you to contact Microcap for the information
24   that -- and the documents on Microcap.
25   A.   Correct.

Cross - Kramer

1    Q.   And you had asked previously for a person of, let's

2    say, Company A, FusionPharm, to give you information and

3    documents about Company B, Microcap.

4    A.   Correct.

5    Q.   And Mr. Jean-Pierre told you to contact Mr. Sears or

6    Microcap, i.e., Company B, for the information and the

7    documents on that company?

8    A.   Correct.

9    Q.   And shortly after this, you closed the investigation.

10   A.   Correct.

11   Q.   And you did not contact Mr. Sears, or MicroCap, for the

12   documents?

13   A.   Correct, because we don't have jurisdiction over

14   them.

15   Q.   And you testified before, and you just stated it again,

16   you didn't contact Mr. Sears or MicroCap because FINRA

17   doesn't have jurisdiction over them.

18   A.   Correct.

19   Q.   FINRA didn't have jurisdiction over FusionPharm or Mr.

20   Dittman, did it?

21   A.   No.

22   Q.   But you contacted them.

23   A.   Correct.  Because they're a publicly traded company and

24   we surveil the publicly traded market.

25   Q.   No further questions.

Redirect - Kramer

1        THE COURT:  Redirect.

2                    REDIRECT EXAMINATION

3   BY MR. BROWN:

4   Q.    It's been a while ago, but I think yesterday afternoon,

5   sometime around 4:00, I asked you sort of a similar

6   question.  Why -- Mr. Barnard just asked you about how is it

7   you're able to contact companies about stock trading as a

8   FINRA investigator.

9   A.    Well, number one, we have contracts with the exchanges,

10  themselves, which gives us the authority to request

11  information and contact any company that's listed on the

12  specific exchanges we have agreements with, which were

13  essentially every exchange.  And they have to provide us the

14  information or else they risk delisting, meaning that they

15  would get kicked off the market.

16            It's part of their contract with the market that

17  they need to be forthcoming if there's -- if we have any

18  request because we're -- we have a agreement with the NASDAQ

19  or NYSC.  But in the case of Pink Sheets, companies listed

20  on the Pink Sheets, or the over-the-counter market, we have

21  no agreements with them.  But because we surveil the entire

22  stock market, we review those companies.

23            Those companies can decide not to provide

24  information, not be responsive, not call us back.  And,

25  believe me, that happens.  But most are forthcoming and most

Redirect - Kramer

1    want to help.  Most want to justify the fact that they are a

2    legitimate company.  And, hence, in this instance, Mr.

3    Dittman did speak with me, provided the information I asked,

4    for the most part.

5    Q.   Okay.  And with regard to the letter that Mr. Barnard

6    referred to from Guy Jean-Pierre, had Mr. Dittman made a

7    representation to you that he would attempt to try to

8    provide the information about MicroCap --

9    A.   Yes.  Through our conversations, he -- once I asked

10   about the MicroCap Management entity, he indicated that his

11   brother owned it -- or brother-in-law, I should say, owned

12   it, and then he said that he would provide me information as

13   to, you know, that -- because I think the first call was

14   saying that he thought his brother owned it, but he would

15   check into it.

16        Talked to him again and he said that William Sears,

17   his brother-in-law, informed him he had sold the company and

18   he had no interest in the company at all, and that he had no

19   FusionPharm shares.

20        So then he told me given -- given what he said, he

21   could provide a written statement indicating that from

22   William Sears.

23   Q.   Okay.  And Mr. Dittman had told you William Sears was a

24   part-time salesman at FusionPharm?

25   A.   Correct.

Direct - Scholz

1    Q.    Thank you.

2               THE COURT:  May this witness be excused, for the

3    Government?  Mr. Brown?

4               MR. BROWN:  Yes, Your Honor.

5               THE COURT:  All right.  For the defendant?

6               MR. BARNARD:  Yes, Your Honor.

7               THE COURT:  Mr. Kramer, thank you for your

8    testimony.  You're excused and you may step down.

9               Government may call its next witness.

10              MR. SIBERT:  Thank you, Your Honor.  At this time

11   the Government would like to call Richard Scholz.

12              COURTROOM DEPUTY:  Please stand in the back of the

13   witness box and raise your right hand.

14         RICHARD SCHOLZ, GOVERNMENT'S WITNESS, SWORN

15              COURTROOM DEPUTY:  Okay.  Please be seated.  You'll

16   wand to scoot your chair up closer to the microphone.  And

17   please state and spell your full name for the record.

18              THE WITNESS:  It's Richard Scholz, S-c-h-o-l-z.

19              MR. SIBERT:  May I proceed, Your Honor?

20              THE COURT:  You may.

21                       DIRECT EXAMINATION

22   BY MR. SIBERT:

23   Q.    Good morning, sir.

24   A.    Good morning.

25   Q.    Can you please tell the jury where you're currently

Direct - Scholz

1   living.

2   A.   Orlando, Florida.

3   Q.   And that's Orlando, Florida?

4   A.   Correct.

5   Q.   Okay.  And, sir, how long have you lived in Orlando,

6   Florida?

7   A.   Since 1991.

8   Q.   Okay.  Have you -- where did you live before moving to

9   Orlando, Florida?

10  A.   I lived in south Florida, Fort Lauderdale, for a couple

11  of years.  Originally from New York; I was born in New York.

12  Q.   That explains that New York accent I hear.

13  A.   Yeah, absolutely.

14  Q.   All right.  Okay.  Could you explain to the jury a

15  little bit about yourself, to include some of your education

16  and prior employment experience.

17  A.   Went to Nassau College in New York.  Got a business

18  degree.  Came to Florida.  Worked for a company called

19  International Media Solutions.

20  Q.   All right.  What was International Media Solutions?

21  What kind of company was it?

22  A.   It was a marketing company, promotion company.

23  Q.   Okay.  And what kind of marketing, slash, promotions

24  did you do?

25  A.   Stock promotions.

Direct - Scholz

1  Q.  Okay.  And promoting stock, what type of essential

2  stocks did International Media Solutions focus?

3  A.  Smaller OTC companies.

4  Q.  Okay.  Smaller OTC companies?

5  A.  Yes.

6  Q.  Otherwise known as microcap companies?

7  A.  Correct.

8  Q.  All right.  During the time that you were working with

9  International Media Solutions, did you ever meet a gentleman

10 by the name of Mr. William Sears?

11 A.  Yes.

12 Q.  Do you recall the time frame that you met Mr. William

13 Sears?

14 A.  Early 2000s.  2002, 2003, somewhere in that range.

15 Q.  All right.  And do you recall how -- or the situation

16 of why you met Mr. Sears?

17 A.  Mr. Sears had companies that needed promotional

18 exposure in the market.

19 Q.  Okay.  Were these, as you described, smaller companies,

20 microcap companies?

21 A.  Correct.

22 Q.  And is there another name associated to microcap

23 companies?

24 A.  Penny stocks.

25 Q.  Okay.  And did Mr. Sears have a reputation in the early

1414

Direct - Scholz

1    2000s?

2    A.    Yeah, he was known to have companies that -- that

3    needed exposure, deals -- you know, deals.

4    Q.    Okay.  And did he go -- did he have -- did people call

5    him a surname, as kind of a nickname, for Mr. Sears?

6    A.    A nickname?

7    Q.    Yes, sir.

8    A.    Not that I'm -- not that I'm familiar with.

9    Q.    Does deal guy --

10           MR. BARNARD:  Your Honor, object.

11           THE COURT:  Basis of your objection?

12           MR. BARNARD:  Leading.  Sorry.

13           THE COURT:  Sustained.

14   BY MR. SIBERT:

15   Q.    You said he did deals?

16   A.    Yes.

17   Q.    Okay.  Did he do -- what kind of deals did Mr. Sears

18   do?

19   A.    He had -- he brought companies that needed exposure in

20   the market.  You know, that's -- that was -- he brought

21   deals to the table.

22   Q.    Okay.  Did he bring a lot of deals?

23   A.    I didn't -- wasn't familiar with him that much back in

24   the early 2000s.  I worked for the company, so I didn't have

25   direct dealings with him, so . . .

1  Q.  So you worked for International Media Solutions and not

2  for Mr. Sears?

3  A.  Correct.

4  Q.  All right.  Now, did you ever end up working for Mr.

5  William Sears?

6  A.  Yes.

7  Q.  Okay.  When did you start working with Mr. Sears?

8  A.  Early 2011.

9  Q.  Okay.  Could you explain how you became -- began a

10  working relationship with Mr. Sears.

11  A.  I was contacted by him, and he said he had a company

12  called FusionPharm that he wanted or needed exposure for.

13  Q.  Okay.  So he was calling you essentially to promote

14  FusionPharm?

15  A.  Correct.

16  Q.  When he said he had a company, how did you take that?

17  A.  That it was his company.

18  Q.  That FusionPharm was Mr. Sears' company?

19  A.  Correct.

20  Q.  Okay.  Now, did you know the situation regarding

21  FusionPharm stock in 2011?

22  A.  Not understanding the question.

23  Q.  Okay.  You came in to promote the company?

24  A.  Correct.

25  Q.  All right.  And so essentially what is your job when it

Direct - Scholz

1    comes to promoting a company like FusionPharm?

2    A.   Do some research on the company, take a look at it,

3    find out what the company does and so on and so forth, and

4    then reach out to brokers that might have clients that would

5    buy smaller stocks.

6    Q.   Okay.  And when you reach out to brokers, what type of

7    information are brokers looking for when it comes to a

8    company like FusionPharm in order to recommend an

9    investment?

10   A.   You know, what they do, an overview of the company,

11   financials, you know, everything.

12   Q.   All right.  How about their stock prices?

13   A.   Correct.

14   Q.   How about the volume of stock being moved?

15   A.   Correct.

16   Q.   Okay.  Did you know the situation regarding

17   FusionPharm's stock when you began working as a promoter --

18   A.   It was a -- when I looked at it, it was a shell company

19   called Baby Bee Bright.

20   Q.   All right.  And so what did you learn about that stock?

21   A.   That it was something else before, that it was a shell,

22   and they were going to merge FusionPharm into that -- into

23   that company.

24   Q.   Did you look at the trading of Baby Bee Bright stock?

25   A.   Yes.

Direct - Scholz

1   Q.   All right.  And what did you learn when you looked into

2   the trading volume of Baby Bee Bright?

3   A.   Nonexistent.

4   Q.   I'm sorry, nonexistent?

5   A.   Yeah, nonexistent, didn't trade at all.  You know,

6   illiquid.

7   Q.   Okay.  And was that the -- was that the same situation

8   when Baby Bee Bright -- did Baby Bee Bright become

9   FusionPharm?

10  A.   Correct.

11  Q.   All right.  And was that the same situation when

12  FusionPharm essentially took over Baby Bee Bright when it

13  came with the stock?

14  A.   Yes.

15  Q.   So there was no movement?

16  A.   None.

17  Q.   Okay.  No trading of FusionPharm stock?

18  A.   None.

19  Q.   All right.  After kind of looking into FusionPharm, did

20  you agree to assist Mr. Sears?

21  A.   Yes.

22  Q.   All right.  And essentially what did you do for Mr.

23  Sears regarding his company, FusionPharm?

24  A.   Started to -- reaching out to brokers and promoting the

25  company.  Just sent brokers materials about the company,

1    overview of the company, what it did, what they expected to

2    do, where they were going.

3    Q.   All right.  So you sent brokers information about

4    FusionPharm including materials and along with their

5    information.  Where did you learn about FusionPharm?

6    A.   I got that information from William Sears.

7    Q.   Okay.  And was FusionPharm posting any disclosures at

8    this time in 2011 when you began working with them?

9    A.   Yes.

10   Q.   Okay.  And do you recall where they were posting their

11   disclosures?

12   A.   OTC Markets.

13   Q.   Okay.  And what is your understanding of OTC Markets?

14   A.   It's the company's post-information about the companies

15   on this -- on this site.

16   Q.   Okay.  And who -- do you know who views the OTC

17   Markets?

18   A.   You know, anybody that wants to take a look at the

19   company or is interested in investing in the company.

20   Q.   All right.  Now, you say that it was Mr. Sears that was

21   providing you the information of FusionPharm.

22   A.   Correct.

23   Q.   Now, would you ever have discussions with Mr. Sears

24   regarding the details of this information?  And I believe

25   you said the financial statements and essentially what

1    FusionPharm as a company was trying to do?

2    A.    Yes.

3    Q.    All right.  And what would you discuss with Mr. Sears

4    in those conversations?

5    A.    You know, what kind of money that they were looking to

6    bring in, or anything that -- they had sales, you know,

7    sales that were going to be coming in, potential sales.  Any

8    kind of information that I could pass along that could show

9    growth of the company.

10   Q.    All right.  Would this also include future potential

11   transactions that FusionPharm might have with other

12   companies?

13   A.    Yes.

14   Q.    All right.  Did you ever learn about a VertiFresh

15   licensing agreement?

16   A.    Yes.

17   Q.    Who told you about the VertiFresh licensing agreement?

18   A.    William Sears.

19   Q.    Okay.  And what was your understanding about the

20   VertiFresh licensing agreement?

21   A.    That VertiFresh was a company that was growing

22   different lettuce, herbs, and so on and so forth, in these

23   pods that Fusion had retrofitted.

24   Q.    Okay.  And how was it going to help out FusionPharm's

25   growth?  If you know.

Direct - Scholz

1    A.    Basically proof of concept.  It was all brand-new and
2    they were going to show it as -- that these pods actually
3    work.
4    Q.    Okay.  And when you say "they were going to show that
5    these pods actually work," who are you referring to?
6    A.    William Sears, Scott Dittman.
7    Q.    Okay.  What was your understanding of Mr. Scott
8    Dittman?
9    A.    Scott Dittman was the president of the company.
10   Q.    Okay.  And what was your understanding of Mr. Sears'
11   specific role with FusionPharm?
12   A.    He was involved in the company, but he didn't have a
13   title.
14   Q.    Did you see any difference between Mr. Scott Dittman's
15   role and Mr. William Sears' role when you were involved with
16   FusionPharm?
17   A.    No.
18   Q.    How would you characterize both of those individuals?
19   A.    Mr. Dittman did a lot of the roadshow, going to
20   different states, different trade shows, showing their
21   product, so on and so forth.
22         Mr. Sears was more of the hands-on who took care of
23   the day-to-day operations of FusionPharm.
24   Q.    Including the financials?
25   A.    From what I understand, correct.

Direct - Scholz

1    Q.    Would you regard them as partners?

2    A.    Yes.

3    Q.    All right.  So did you ever get a chance to get any

4    investors interested in FusionPharm?

5    A.    Yes.

6    Q.    All right.  And what would you do if the investors had

7    further questions that you could not answer about

8    FusionPharm?

9    A.    If there was information that I didn't have, then I

10   would call William Sears and say, "I have somebody that, you

11   know, needs more information, or wants to talk to somebody

12   directly with the company."

13   Q.    Okay.  And so when there's a potential investor that

14   was going to essentially -- what did investors do for

15   companies?

16   A.    Invest in the company so the company can grow.

17   Q.    And when you say just so people that understand how

18   investments work, what do, usually, investors provide to the

19   company?

20   A.    Money to buy into the stock or invest in the company

21   directly, or both.

22   Q.    And so when you had people that were interested in

23   providing either -- either by purchasing shares of

24   FusionPharm or giving money to FusionPharm, and you couldn't

25   answer their questions, who did you send them to?

Direct - Scholz

1    A.    William Sears.

2    Q.    Okay.  Now, could you discuss how you were paid by

3    FusionPharm.

4    A.    Yes.  We received checks on a weekly basis.

5    Q.    Okay.  What was your arrangement when it came to either

6    your promotion salary or percentages?

7    A.    Whatever it came in on the stock, I would receive 25

8    percent, 75 percent would go to FusionPharm.

9    Q.    Okay.  And you're from Philadelphia, I understand some

10   of the New York lingo I'm hearing, but when you said coming

11   in on the stock, can you describe that for the jury what --

12   A.    Brokers -- brokers who had investors that were looking

13   for smaller companies, something like this, and they bought

14   the shares of the company on the open market.

15   Q.    So when shares were bought for FusionPharm, you

16   received a 25 percent commission essentially?

17   A.    Correct.

18   Q.    And who did you make that arrangement with?

19   A.    William Sears.

20   Q.    Did you ever receive payment directly from investors,

21   themselves?

22   A.    No.  Never.

23   Q.    Did you ever have a written agreement with Mr. Sears

24   about your percentage -- the 25 percentage?

25   A.    No.

1   Q.   All right.  Do you know where the FusionPharm stock was

2   coming from that you were promoting?

3   A.   No.

4   Q.   Do you know if it was coming from Mr. William Sears?

5   A.   Yes.

6   Q.   Okay.  And how do you know that the FusionPharm stock

7   that you were promoting was coming from Mr. Sears?

8   A.   He told me.

9   Q.   Who told you?

10  A.   William Sears.

11  Q.   Do you know how Mr. Sears acquired that stock?

12  A.   No, I do not.

13  Q.   All right.  Could you tell the jury essentially in the

14  time period of 2011 through 2014, what was your relationship

15  with Mr. William Sears?

16  A.   It was a friendly relationship.  Spoke to him on a

17  regular basis numerous times a day.

18  Q.   Okay.  And would you say it was more than just a

19  business relationship?

20  A.   Yeah.  Yes.

21  Q.   And so when you say a friendly relationship, were you

22  friends?

23  A.   Considered so at the time, yes.

24  Q.   Okay.  At that time.

25  A.   At that time.

Direct - Scholz

1    Q.    Okay.  And you stated that you spoke to him several

2    times a day.  How would you speak with Mr. Sears?

3    A.    He would call, ask how it was going, you know, if I

4    needed anything.  You know, were there any investors that

5    needed questions answered?

6    Q.    All right.  So you were living in Orlando, Florida; is

7    that right?

8    A.    Correct.

9    Q.    And do you know where Mr. Sears was living?

10   A.    Colorado, here, Denver.

11   Q.    Okay.  Who would initiate these phone calls with you on

12   a daily basis?

13   A.    William Sears.

14   Q.    And how many times on an average day would Mr. Sears

15   call you?

16   A.    It varied.

17   Q.    Okay.  Can you give the jury an example as the most

18   versus the least?

19   A.    You know, anywhere from five times a day to -- if the

20   stock was moving up, it could be 20-plus times a day.

21   Q.    So a lot of contact about what was going on with the

22   promotion of FusionPharm and the stock --

23   A.    Yes.

24   Q.    -- to deal with the stock prices?

25   A.    Yes.

Direct - Scholz

1   Q.   All right.  Did you ever get to see him in person, Mr.
2   William Sears?
3   A.   Yes.
4   Q.   Okay.  How often would you see Mr. Sears in person?
5   A.   He would come to Orlando every couple of months.
6   Q.   Okay.  And when you saw him in person, what did Mr.
7   Sears and you discuss in the years between 2011 and 2014?
8   A.   What the company had going on.  You know, if they had
9   orders or, you know, if they were selling pods, any kind of
10  improvements in the company.
11  Q.   Okay.  And just to be clear, what company are we
12  talking about?
13  A.   FusionPharm.
14  Q.   All right.  Did you ever meet Scott Dittman in person?
15  A.   Yes.
16  Q.   Do you recall when you met Mr. Dittman?
17  A.   Met him with William Sears in 2011.
18  Q.   And how often did you speak with Mr. Dittman in the
19  time period of 2011 and 2014?
20  A.   It wasn't -- it wasn't on a daily basis.  You know,
21  maybe -- within those years, maybe talked to Mr. Dittman --
22  I don't know, maybe 20, 30 times.
23  Q.   Okay.  So if I understand you correctly, between Mr.
24  Sears and Mr. Dittman, who did you speak to more?
25  A.   William Sears.

1  Q.  Who did you see more regularly in person?

2  A.  Mr. Sears.

3  Q.  When you met Mr. Dittman in person, was Mr. William

4  Sears present?

5  A.  Yes.

6  Q.  All right.  Did you ever come from Florida out to

7  Colorado to see FusionPharm?

8  A.  Twice.

9  Q.  Okay.  And can you tell the jury when you came out to

10  Colorado.

11  A.  2012, I believe.

12  Q.  Okay.  And why did you decide to come out to Colorado

13  to see FusionPharm?

14  A.  Wanted to see for myself what was going on.  Wanted to

15  see what they were doing, what -- any kind of progress

16  or . . .

17       To see it directly.

18  Q.  So you had some interest?

19  A.  Yeah.  I thought it was -- you know, with what was

20  going on in the state of Colorado, the marijuana industry, I

21  thought there was huge potential there.

22  Q.  So were you interested in potentially being an

23  investor?

24  A.  I was.  I was.

25  Q.  Now, when you came out to Colorado, who did you meet

1    with?

2    A.   William Sears.

3    Q.   And what did Mr. Sears -- well, when you met with Mr.

4    William Sears, I assume -- did you see FusionPharm --

5    A.   Correct.  I took a tour of the facility, yes.

6    Q.   Okay.  And who gave you that tour?

7    A.   Mr. Sears.

8    Q.   All right.  Do you know if Mr. Sears at one point

9    between 2011 -- I tell you what, let me have Exhibit 140.

10            MR. SIBERT:  I believe that's been admitted into

11   evidence, but let me check, Your Honor.

12            THE COURT:  Mr. Sibert, Ms. Frank put it up.  If

13   you see it up over there on the large screen --

14            MR. SIBERT:  Yes, sir.  Sorry.

15            THE COURT:  -- that means it's in.

16            MR. SIBERT:  That's all I was checking.  So I'm

17   assuming since it's up, it's in.

18            THE COURT:  Okay.

19            MR. SIBERT:  So I apologize.

20   BY MR. SIBERT:

21   Q.   All right, sir, can you just take a minute and can I

22   have the full page -- or, actually, can I have the bottom of

23   the page, please.

24            MR. SIBERT:  Let me have a minute, Your Honor.

25            THE COURT:  All right.

Direct - Scholz

1    BY MR. SIBERT:

2    Q.   Thank you.  All right.  Let me have page 1 of 140 up

3    again.  And can I have the top blown up, please.

4         All right, sir, can you just take a look at this

5    e-mail for a second before I ask you questions.

6         All right.  You're mentioned in this e-mail; is

7    that correct?

8    A.   Yes.

9    Q.   All right.  Do you recall why your name is being

10   mentioned in the e-mail sent by Mr. Sears to a Guy

11   Jean-Pierre?

12        MR. BARNARD:  Your Honor, objection.  Calls for

13   speculation.

14        THE COURT:  All right.  If you know, sir.  Please

15   testify by -- or from personal knowledge only.  Don't guess

16   or speculate.

17        THE WITNESS:  It was asking Mr. Pierre for a letter

18   of opinion for deposit of shares.

19   BY MR. SIBERT:

20   Q.   Okay.  Do you know where Mr. Sears was trying to

21   deposit these shares?

22   A.   No, I do not.

23   Q.   All right.  Can I have it taken down, please.

24        Did you have a company in 2011 through 2014?

25   A.   Yes.

Direct - Scholz

1    Q.   What was the name of your company?

2    A.   Prestige Media.

3    Q.   And I'm assuming, based on what you were working on

4    with Mr. Sears regarding FusionPharm, was your company based

5    upon promoting microcap companies?

6    A.   Yes.

7    Q.   Now, in April of 2011, was there any time that Mr.

8    Sears asked you or requested that 80,000 shares be

9    deposited -- FusionPharm shares, into your company,

10   Prestige?

11   A.   Yes.

12   Q.   Okay.  Do you know why Mr. Sears was asking for 80,000

13   shares of FusionPharm to be deposited into your company?

14   A.   At the time, he explained that he was trying to hide

15   assets from -- I guess a woman from his past showed up with

16   a 15-year-old son and was trying to sue him for back child

17   support, and he couldn't show any assets.

18   Q.   So Mr. Sears' words to you was to hide assets --

19   assets?

20   A.   Correct.

21   Q.   All right.  Can I have page 1 brought back up on

22   Exhibit 140.  And could you have the top blown up again.

23        You stated the name of your firm.  What I have

24   underlined on that e-mail, is that your firm?

25   A.   Yes.  Prestige.

Direct - Scholz

1  Q.   And what type of shares, do you know, were going to be

2  transferred from Mr. Sears into your company?

3  A.   FusionPharm shares.

4  Q.   Do you know if they were restricted shares?

5  A.   I believe so.

6  Q.   All right.  Can I have that taken down, please.

7       Who was in charge of trying to get these 80,000

8  shares of FusionPharm stock into your company?

9  A.   Who was asking?  Is that what you're --

10  Q.   Who was in charge?

11  A.   William Sears.

12  Q.   All right.  Was there any paperwork associated with

13  this transaction?

14  A.   Yes.

15  Q.   And who was doing the paperwork?  Who was essentially

16  creating the paperwork to allow 80,000 shares to be in your

17  company?

18  A.   Mr. Sears.

19  Q.   Did you ever pay Mr. Sears for the 80,000 shares of

20  FusionPharm stock?

21  A.   No.

22  Q.   Did you owe Mr. Sears anything that would -- or, I'm

23  sorry, did Mr. Sears owe you anything in way of a debt that

24  these 80,000 shares would be payment for?

25  A.   No.

Direct - Scholz

1  Q.  Do you know what happened to these shares?

2  A.  The shares got sent back to Mr. Sears.

3  Q.  And do you know why?

4  A.  The -- the broker dealer wouldn't take the shares.

5  Q.  When you say broker dealer, who was the -- who are you

6  talking about?

7  A.  I had a broker dealer and they wouldn't deposit the

8  shares -- you have to deposit the shares first to turn them

9  into tradable shares.

10  Q.  Okay.  And your broker would not accept these shares?

11  A.  No.

12  Q.  Do you know who transferred the paperwork -- I'm sorry,

13  who drafted the paperwork to transfer these shares back --

14  where did these shares go to once your broker wouldn't take

15  them?

16  A.  They went back to William Sears.

17  Q.  Do you know who drafted the paperwork to allow these

18  80,000 shares of FusionPharm to go back into Mr. Sears'

19  name?

20  A.  He did.

21  Q.  All right.  Now, were you ever on the paperwork for

22  Mr. Sears' Oppenheimer account?

23  A.  Yes.

24  Q.  Okay.  And why were you put on the documents for Mr.

25  Sears' brokerage account with Oppenheimer?

1   A.   To call in trades if he was busy or unavailable.

2   Q.   All right.  So what authority did you have?  What

3   authority did Mr. Sears provide you?

4   A.   Just trading authority.

5   Q.   And why would you initiate trades for Mr. Sears?

6   A.   If the stock -- you know, if there was an article that

7   came out about the marijuana industry and it was a day where

8   all the stocks were going up and he wasn't available, then I

9   would call in to execute the trades.

10  Q.   All right.  And when you say "the stock," what stock

11  are you talking about?

12  A.   FusionPharm.

13  Q.   All right.  And do you know why Mr. Sears would be too

14  busy for him to call his own trades in?

15  A.   Day-to-day operations of running FusionPharm.

16  Q.   Now, did you ever take control of a company called

17  MicroCap?

18  A.   Yes.

19  Q.   All right.  Do you recall when this occurred?

20  A.   '11 or '12.

21  Q.   Okay.  And can you tell the jury essentially how it

22  came about that you took control of MicroCap.

23  A.   William Sears had had a company called MicroCap, and he

24  wanted it transferred -- he wanted me to take over the

25  company.

1  Q.   All right.  Do you know why Mr. Sears was asking you to

2  take over the company MicroCap?

3  A.   The same reason he wanted to put the shares with me; he

4  was afraid of showing that he owned anything or had stock

5  interest, so on, so forth.

6  Q.   Okay.  And so he was trying to hide further assets?

7  A.   Correct.

8  Q.   All right.  And based upon your knowledge, essentially

9  what was MicroCap, his company?  What was Mr. Sears' --

10  A.   He had mentioned it was a newsletter company.  He was

11  doing a newsletter for microcap companies.

12  Q.   Okay.  And do you know, did MicroCap have any -- was it

13  holding any shares of FusionPharm stock?

14  A.   I wasn't aware at the time.

15  Q.   Okay.  Now, you stated that you took control sometime

16  in 2011, 2012.  Did you have total control of MicroCap?

17  A.   No.

18  Q.   Who maintained control of MicroCap after -- after Mr.

19  Sears asked you to take --

20  A.   He did.  William Sears.

21  Q.   All right.  And when you say -- when you agreed to

22  maintain -- that Mr. Sears maintained control, do you know

23  the years that Mr. Sears continued to control MicroCap

24  Management?

25  A.   He had -- he had it from before he came to me with, you

1  know, asking me to do that.  He had it before then, and

2  after me.  So probably '11, '12, probably right into '15.

3  Q.   All right.  So at the -- at the very -- so essentially

4  the only thing that potentially was -- the only thing that

5  potentially that you owned from MicroCap was the fact it was

6  in your name?

7  A.   Correct.

8  Q.   Okay.  Who made all the decisions regarding MicroCap?

9  A.   Mr. Sears did.

10 Q.   And did this include the FusionPharm stock that

11 MicroCap held?

12 A.   Correct.

13 Q.   And did it include the brokerage accounts that were

14 associated to MicroCap?

15 A.   Yes.

16 Q.   Did you ever open a brokerage account for MicroCap?

17 A.   Yes.

18 Q.   Do you know which one?

19 A.   I believe it was through -- I can't think of the firm

20 right now.

21 Q.   All right.  Did you control that brokerage account?

22 A.   No.

23 Q.   Who controlled that brokerage account?

24 A.   William Sears.

25 Q.   Whose company was MicroCap?

Direct - Scholz

1   A.   William Sears.

2   Q.   Even after it was transferred to you?

3   A.   Correct.

4   Q.   All right.  Now, was there ever a agreement for the

5   purchase of this company between you and Mr. Sears?

6   A.   Yes.

7   Q.   And who sent you that agreement?

8   A.   Bill Sears.

9   Q.   Can I have Exhibit 141, please.

10          Now, sir, can you just tell me, are you on the

11   chain of e-mails at the top here?

12   A.   Yes.

13   Q.   Is that -- Richard Scholz, that's you?

14   A.   Correct.

15   Q.   Who's sending you this e-mail?

16   A.   William Sears.

17   Q.   Okay.  And what's the subject of the e-mail?

18   A.   Proposed agreement purchase of MicroCap.

19   Q.   And then there's that attachment.

20   A.   Yes.

21   Q.   Can I have page -- can I have page 4, please.  Can I

22   have the bottom blown up, please.

23          Can you take a look at that e-mail for a second.

24   A.   Okay.

25   Q.   Okay.  And essentially -- do you know who Guy is?

Direct - Scholz

1    A.    Yes.

2    Q.    Who is Guy?

3    A.    Mr. Sears' attorney.

4    Q.    Okay.  And this is you -- is Mr. Richard Scholz?

5    A.    Yes.

6    Q.    And essentially what is being told here in this

7    paragraph -- this e-mail from Mr. Sears?

8    A.    It's -- I'm on the e-mail chain and it's to Guy Pierre,

9    for an agreement showing that I'm going to take over control

10   of MicroCap Management.

11   Q.    And what's the date that you were supposed to be taking

12   control of it?

13   A.    May 9th, 2011.

14   Q.    Can you scroll up, please, on this page.  In fact, I

15   need to go to page 3 at the bottom.  Okay.

16         Now, as part of this chain, there was a response;

17   is that correct?

18   A.    Yes.

19   Q.    And who's the response from?

20   A.    Guy Pierre.

21   Q.    Okay.  And to who?

22   A.    William Sears.

23   Q.    All right.  And I know it's broken, can we just bring

24   it up so the whole body of the e-mail is in?  Thank you.

25         Can you take a look and read over that e-mail for a

Direct - Scholz

1    second.

2    A.    Okay.

3    Q.    All right.  What is Mr. Guy Jean-Pierre asking Mr.

4    Sears about the agreement?

5    A.    What are the -- what's the terms of the takeover?

6    Did -- did he buy -- meaning me -- or did you buy, you know,

7    the shares?  Simply -- did you simply assign the shares to

8    him?  Meaning did Mr. Sears assign the shares to me?

9    Q.    Okay.  And do you know what kind of shares we're

10   talking about here?

11   A.    FusionPharm shares.

12   Q.    Okay.  Can -- I'm sorry, sir, I can't hear you.

13   A.    FusionPharm shares.

14   Q.    Okay.  Can you please go to page 2.  Can I have the

15   middle e-mail blown up, please.  This is a continuation of

16   the chain.

17        What is Mr. Sears telling the -- his lawyer?

18   A.    The -- he said it's a simple assignment.  The

19   assignment is for the company and the asset -- and the

20   accounts only.  He says only assets will remain with me.

21   Q.    Okay.  And what is your understanding in seeing this

22   agreement, what does Mr. Sears mean by "assets"?

23   A.    Shares in the company, stock shares.

24   Q.    Okay.  And when you're saying stock shares, for what

25   company?

Direct - Scholz

1    A.    FusionPharm.

2    Q.    Okay.  Can you just focus in on the top of this e-mail,

3    please.

4          How does Mr. Guy Jean-Pierre, Mr. Sears' lawyer,

5    respond back?

6    A.    He's asking, "Can I have a copy of that agreement?"

7    Q.    And we're talking about the agreement of you taking

8    over MicroCap and Mr. Sears keeping all this stock?

9    A.    Correct.

10   Q.    Can I have page 1.

11         How does Mr. Sears respond back?

12   A.    He's stating on here he doesn't have one.  "This is

13   what I will need you to create."

14   Q.    Okay.  So importantly, what's the date of this e-mail?

15   A.    October 17th, 2011.

16   Q.    All right.  That's about five months after, supposedly,

17   you agreed to a deal of May 9th, 2011, to do this agreement?

18   A.    Correct.

19   Q.    And based upon Mr. Sears' e-mail to Guy in October,

20   there's no agreement on paper.

21   A.    That's what it says, "I don't have one.  This is what I

22   need you to create."  That's right.

23   Q.    So Mr. Sears is directing his lawyer to make this

24   agreement happen?

25   A.    Correct.

Direct - Scholz

1    Q.   Okay.  Did you know -- at the time frame of October

2    2011, did you know FusionPharm was being investigated by

3    FINRA?

4    A.   No.

5    Q.   All right.  Just can I have page 1 of that, please.

6    And, again, just to be clear -- can I have that blown up --

7    on October 29th -- or, excuse me, October 9th, 2011, what is

8    being sent to you?

9    A.   It's coming from William Sears, the proposed agreement.

10   Q.   And can I have the last -- I'm sorry, can I have page 4

11   again.  Can I have just that last e-mail blown up.

12           May 9th, 2011, was essentially the effective date

13   when you took over the company, based upon Mr. Sears'

14   representation; is that right?

15   A.   Correct.

16   Q.   Did you ever take over MicroCap on May 9th, 2011?

17   A.   No.

18   Q.   And when is the first time you learned about this

19   agreement based upon the e-mails that you received in this

20   chain?

21   A.   In October.

22   Q.   Of 2011?

23   A.   Yes.

24   Q.   Okay.  Can I have that down, please.

25           All right.  In 2000 -- you had mentioned you had

Direct - Scholz

1    helped set up a brokerage account.  In 2012 -- let me ask

2    you:  Do you recall essentially when you assisted Mr. Sears

3    in setting up a brokerage account.

4    A.    Yeah, around 2012.

5    Q.    And do you know what broker you assisted Mr. Sears with

6    regarding this brokerage account?

7    A.    I believe it was Moors & Cabot.

8    Q.    And essentially what were you going to do in assisting

9    Mr. Sears in opening up this account -- brokerage account?

10    A.    Transfer shares of FusionPharm into this account.

11    Q.    Can you tell me why you agreed to assist Mr. Sears in

12    setting up -- trying to set up this brokerage account?

13    A.    He asked me for the same reason:  It would go back to

14    he didn't want to show anything in his name.

15    Q.    What happened when you attempted to set up a brokerage

16    account for Mr. Sears with Moors & Cabot?

17    A.    Moors & Cabot refused to take the stock.

18    Q.    And do you know why Moors & Cabot refused to take the

19    stock?

20    A.    From what I understand, they didn't want to take in

21    microcap stocks or OTC stocks.

22    Q.    Okay.  So they weren't going to deal with the penny

23    stocks, this brokerage --

24    A.    Correct.

25    Q.    That was the only account that you assisted Mr. Sears

Direct - Scholz

1     in attempting to set up?

2     A.    Yes.

3     Q.    Now, did you have any dealings with a Mr. Tod

4     DiTommaso, or Guy -- Guy Jean-Pierre in preparing any types

5     of legal letters?

6     A.    No.

7     Q.    Did you ever have any involvement in setting up a debt

8     settlement agreement?

9     A.    Yes.

10    Q.    Okay.

11    A.    Yes.

12    Q.    Can you tell the jury what your involvement was with

13    that.

14    A.    William Sears wanted to transfer shares into my name as

15    part of this debt settlement agreement.

16    Q.    And who was -- who was in charge of setting up these

17    transactions to put FusionPharm shares in your name?

18    A.    William Sears.

19          MR. SIBERT:  Your Honor, may I have a moment?

20          THE COURT:  You may.

21    BY MR. SIBERT:

22    Q.    All right, sir, can you -- I'm going to ask you -- and

23    let me see if this is in evidence.  May I please have 84

24    published.

25          All right, sir, can you just look at this first

Direct - Scholz

1     page.  That's your name here; is that correct?

2     A.    Correct.

3     Q.    Okay.

4     A.    Yes.

5     Q.    And you recognize what the first page of 84 is?

6     A.    Yes.

7     Q.    And what is the first page of 84?

8     A.    It's a transaction sheet for -- or journal that they

9     would call for the transfer agent --

10    Q.    Okay.

11    A.    -- transfer of shares.

12    Q.    All right.  And what kind of shares are we talking

13    about here in this --

14    A.    FusionPharm shares.

15    Q.    And how many shares did you receive?

16    A.    500,000.

17    Q.    And that's right there?

18    A.    Correct.

19    Q.    And what's the date of this transaction?

20    A.    9-3 of 2013.

21          MR. SIBERT:  And, Your Honor, may I have just

22    another moment?

23          THE COURT:  Yes.

24    BY MR. SIBERT:

25    Q.    Okay.  Can I have page 3 of this document.

Direct - Scholz

1    Is that your address right there?

2    A.   Correct.

3    Q.   Okay.  Did you ever receive anything from Pacific Stock

4    Transfer Agency?

5    A.   Yes.

6    Q.   Do you recall what you received?

7    A.   Stock certificate.

8    Q.   Okay.  And essentially what stock was on the

9    certificate?

10   A.   FusionPharm.

11   Q.   May I have page 22 of this document.

12        Sir, can you take a look at page 22 for a minute.

13   A.   Yes.

14   Q.   Do you recognize what page 22 is?

15   A.   It's a seller's record -- representation letter.

16   Q.   Okay.  And what are you stating in this letter that you

17   signed?

18   A.   Basically that I propose to -- the referenced shares I

19   am -- as far as the shares, are mine, basically, taking

20   ownership of the shares.

21   Q.   You're taking ownership of these 500 shares from

22   FusionPharm?

23   A.   500,000, yes.

24   Q.   500,000.  Can I have page 23, please.

25        Do you recognize what -- whoops -- can I have the

Direct - Scholz

1    whole page, please.  Actual listing, we can go -- since

2    we're having a little trouble with the computer, let's go

3    from -- whoa, it's worse than John Madden.  All right.  Can

4    we focus in on the top here, please.

5            Okay.  Can you take a look -- and essentially

6    what's the title of this document?

7    A.   Share Purchase Agreement.

8    Q.   All right.  And can you tell the jury what you're

9    agreeing to do here.

10   A.   Purchase 500,000 shares of FusionPharm.

11   Q.   Okay.  And who are you purchasing -- who are you buying

12   these shares from?

13   A.   MeadPoint Venture Partners.

14   Q.   And then can you -- I don't know if you can blow this

15   up -- can we blow up 1 and 2, please.

16           And essentially what is the agreement that you're

17   agreeing to in this document?

18   A.   That I'm purchasing 500,000 common shares of

19   FusionPharm for $50,000.

20   Q.   I'm sorry, can you please focus in at the bottom of

21   that page.

22           And whose signatures are at the bottom agreeing to

23   this purchase agreement?

24   A.   Myself and William Sears.

25   Q.   And this is your signature?

1445

Direct - Scholz

1  A.  Correct.

2  Q.  And whose signature is this?

3  A.  William Sears.

4  Q.  And can I just go back to page 22, please.

5        I'm sorry, I forgot to ask you this.  Whose

6  signature is at the bottom of page 22?

7  A.  My signature.

8  Q.  All right.  Can I have that brought down, please.

9        Okay.  Now, did you ever pay Mr. Sears $50,000 for

10 those shares?

11 A.  No.

12 Q.  Can you tell the jury why you didn't pay $50,000 for

13 those shares?

14 A.  I wasn't buying the shares.  He was creating it so it

15 looked like I was purchasing shares, but I wasn't.

16 Q.  Okay.  So on this paperwork, that share purchase

17 agreement, where you signed it and Mr. Sears signed it,

18 there was no agreement for you to pay $50,000?

19 A.  No.

20 Q.  So you weren't being honest when it came to where those

21 shares were going.

22 A.  Correct.

23 Q.  Who else wasn't being honest?

24 A.  William Sears.

25 Q.  All right.  All right.  So can I have page 19 of

Direct - Scholz

1    Government Exhibit -- sorry, Government Exhibit 7 -- excuse

2    me, 84.  Government Exhibit 84, page 19, and -- page 19.

3    And can I ask for the hard copy to be shown to the witness

4    so he can look through a couple pages.

5           Can you look through pages 19 through 21 of

6    Government Exhibit 84.  Do you recognize what those pages

7    are?

8    A.   Yes.

9    Q.   What are those pages?

10   A.   It's asking for the removing -- removal of the

11   restrictions on the shares of FusionPharm.

12   Q.   Okay.  And what's the date of that letter?

13   A.   August 28, 2013.

14   Q.   And can you just focus in here on this paragraph,

15   please.  The top two paragraphs, actually.

16          Can you see that on your screen, sir?

17   A.   Yes.

18   Q.   Okay.  Can you tell the jury essentially what the

19   letters state in those two paragraphs?

20   A.   It's basically saying -- asking for the -- it's asking

21   for an opinion letter that was submitted to -- you know, to

22   remove the restriction of the 500,000 shares so they could

23   be traded in the open market for a price of 50,000.

24   Q.   All right.  And can you look at page 21 of that

25   paragraph -- 21 of that.

Direct - Scholz

1    Q.    And who's signing this opinion letter?

2    A.    Frederick Lehrer.

3    Q.    Do you know who he is?

4    A.    Yes.

5    Q.    And who's he?

6    A.    He's an attorney.

7    Q.    Okay.  For who?

8    A.    He is an attorney for William Sears.

9    Q.    Okay.  I thought you testified that Mr. Guy Jean-Pierre

10   was Mr. William Sears' lawyer.

11   A.    Yes.

12   Q.    Okay.  Do you know what happened with Mr. Guy

13   Jean-Pierre in August 28, 2013?

14   A.    No.

15   Q.    But he's not used in this document?

16   A.    No.

17   Q.    And you were never asked for Mr. Sears to talk to Mr.

18   Guy Jean-Pierre, his lawyer, that you knew from the past?

19   A.    No.

20   Q.    Were you aware of any SEC complaint against Mr. Guy

21   Jean-Pierre?

22   A.    I found out in -- about end of 2013, somewhere around

23   there.

24   Q.    Okay.  And do you recall when the letter -- this letter

25   was dated?

1448

Direct - Scholz

1    A.    It was in August.

2    Q.    Of what year?

3    A.    2012.  Correct?

4    Q.    Can I have page --

5    A.    2013, I'm sorry.

6    Q.    Okay.  So just to be clear, can you look at Government

7    Exhibit 84, page 19.  What's the date of this legal opinion

8    letter?

9    A.    August 28th, 2013.

10   Q.    And when did you find out about Mr. Guy Jean-Pierre's

11   complaint with the Securities Exchange Commission?

12   A.    Late in 2013.

13   Q.    All right.  And he wasn't your lawyer?

14   A.    No.

15   Q.    Whose lawyer was he?

16   A.    William Sears.

17   Q.    Can I have that down, please.

18         Now, you stated that you never paid for these

19   shares with Mr. Sears and Mr. -- Mr. Frederick Lehrer wrote

20   an opinion letter regarding the transfer of those shares; is

21   that right?

22   A.    Yes.

23   Q.    All right.  And can you tell the jury essentially what

24   the agreement -- the true agreement was between you and Mr.

25   Sears regarding these 500,000 shares of FusionPharm?

1449

Direct - Scholz

1    A.   Basically they were his shares, but they were showing

2    that I was buying those shares.

3    Q.   Okay.  And what do you mean they were his shares?

4    A.   He had ownership of those shares.  It was just for

5    showing on paper that I was taking over the shares.

6    Q.   Okay.  And who sold the shares?  Were those shares ever

7    sold?

8    A.   The 500,000?

9    Q.   Yes.

10   A.   Yes.

11   Q.   Who was selling those shares?

12   A.   Mr. Sears.

13   Q.   Okay.  And who helped sell those shares?

14   A.   I'm sorry?

15   Q.   Who helped him sell those shares?

16   A.   Myself.

17   Q.   All right.  Did you receive a commission for selling

18   those shares?

19   A.   I did.

20   Q.   And how much?

21   A.   25 percent of what was sold.

22   Q.   Okay.  And how much would Mr. Sears get?

23   A.   75 percent.

24   Q.   Okay.  So he -- so 75 percent of whatever was sold?

25   A.   Correct.

Direct - Scholz

1  Q.   Do you recall how much money Mr. Sears received

2  regarding these 500,000 shares?

3  A.   Don't know the exact amount.

4  Q.   Would anything refresh your memory?

5          MR. SIBERT:  Your Honor, may I have a minute?

6          THE COURT:  You may.

7          THE WITNESS:  Are you asking how much I made total?

8  BY MR. SIBERT:

9  Q.   Well, we can ask that question.  How much did you make

10  total -- well, that's a good question.

11          From the time you started working in 2011 with

12  FusionPharm through the time you ended promoting shares and

13  helping Mr. Sears sell those shares, how much did you make?

14  A.   Over $400,000.

15          MR. SIBERT:  Your Honor, can I hand your courtroom

16  deputy what's been marked Government Exhibit 145.  And it's

17  not been entered into evidence, and it's not stipulated to.

18  I'm using this document for basically refreshing the

19  witness' memory --

20          THE COURT:  Well, if it's already -- I mean, a

21  labeled exhibit, we can just use the copy in here.

22          MR. SIBERT:  To assist, I highlighted page 6, the

23  essential portion.  It's a long document.

24          THE COURT:  Is there any objection?

25          MR. BARNARD:  No objection, Your Honor.

Direct - Scholz

1      THE COURT:  All right.

2    BY MR. SIBERT:

3    Q.   Sir, can you just take a look at that document on page

4    6 there and see if that basically refreshes your memory

5    regarding the amount Mr. Sears made on the sale of the

6    500,000 shares?

7    A.   Approximately 84,831.

8           MR. BARNARD:  Your Honor, I object to the witness

9    reading from the document.

10          THE COURT:  All right.  Just review the document

11   and then turn it over, Mr. Scholz, and then --

12   BY MR. SIBERT:

13   Q.   Has that -- is document --

14          THE COURT:  Hold on.

15          MR. SIBERT:  Sorry.

16          THE COURT:  And testify from your refreshed memory.

17          MR. SIBERT:  May I proceed, Your Honor?

18          THE COURT:  You may.

19          MR. SIBERT:  I apologize.

20   BY MR. SIBERT:

21   Q.   Did that document assist in refreshing your memory?

22   A.   Yes.

23   Q.   How much money did Mr. Sears make when you assisted him

24   in selling those 500,000 shares?

25   A.   Over $84,000.

Direct - Scholz

1    MR. SIBERT:  Can I have a minute, Your Honor?

2    THE COURT:  You may.

3    BY MR. SIBERT:

4    Q.   All right, sir, do you know if Mr. Sears -- William

5    Sears was named in brochures and disclosures that you spoke

6    to us about regarding FusionPharm?

7    A.   No, he was not.

8    Q.   Do you know why?

9    A.   Didn't want to show interest in the company.

10   Q.   All right.  And do you know why a person that is

11   getting you involved in promoting what you testified as to

12   his company, didn't want to disclose that he had an interest

13   in the company?

14   A.   I mean, he'd be considered an insider.

15   Q.   Okay.  And also did you -- were you aware Mr. Sears'

16   criminal background?

17   A.   I found out later.

18   Q.   Okay.  And what did you learn about his criminal

19   background?

20   A.   I tried to look it up.  It was something about a $5,000

21   situation and the FBI was involved.

22   Q.   Do you know if he had a conviction?

23   A.   Yes.

24   Q.   A felony conviction?

25   A.   Yes.

Cross - Scholz

1    Q.   Do you recall the name of the account that you were

2    allowed to trade Mr. Sears' -- I'm sorry, let me rephrase.

3         Do you recall what company the entity that was

4    named in Mr. Sears' Oppenheimer account, where you were

5    allowed to trade FusionPharm stock?

6    A.   MeadPoint.  Or MicroCap.  I'm not sure which one.

7    Q.   So it was either MeadPoint or MicroCap?

8    A.   Correct.

9    Q.   All right.  Sir, has this -- I'll pass the witness,

10   Your Honor.

11        THE COURT:  All right.  Cross-examination.

12        MR. BARNARD:  Thank you, Your Honor.

13                    CROSS-EXAMINATION

14   BY MR. BARNARD:

15   Q.   Mr. Scholz, you did not deal with Mr. Jean-Pierre or

16   Mr. DiTommaso at all in drafting the attorney opinion

17   letters, correct?

18   A.   Correct.

19   Q.   In fact, you never even spoke to Mr. Jean-Pierre on the

20   telephone.

21   A.   Correct.

22   Q.   In fact, you never met with Mr. Jean-Pierre.

23   A.   Correct.

24   Q.   You never saw Mr. Jean-Pierre either at FusionPharm or

25   in Orlando or anywhere else?

1    A.    No, I did not.

2    Q.    You said that you made approximately $400,000 on your

3    dealings with Mr. Sears in selling the stock, receiving your

4    25 percent, correct?

5    A.    Correct.

6    Q.    In fact, wasn't that number closer to 488,000?

7    A.    Somewhere in that, yes.

8    Q.    Would you please look at Exhibit 145, page 7, to see if

9    that refreshes your recollection.

10            I'm sorry, I thought he already had it in front of

11   him.

12            THE COURT:  Well, hold on.  Mr. Scholz, what does

13   the exhibit label say?  What exhibit number are you holding?

14   Look at the first page of the . . .

15            THE WITNESS:  145.

16            THE COURT:  Okay.

17   BY MR. BARNARD:

18   Q.    Would you look at page 7, paragraph 20.

19            THE COURT:  Can you twist the mic closer to you.

20            THE WITNESS:  Yes.

21            THE COURT:  No, actually I was talking to Mr.

22   Barnard.  You both can do it.

23   BY MR. BARNARD:

24   Q.    Would you look at Exhibit 145, page 7, paragraph 20,

25   and see if that refreshes your recollection.

Redirect - Scholz

1    A.   Yes.

2    Q.   All right.  Putting that document down -- face down for

3    a moment, then, so what is your recollection as to how much

4    money you made from your selling of stock for Mr. Sears?

5    A.   488,000.

6              MR. BARNARD:  Thank you.  No further questions.

7              THE COURT:  Redirect?

8                       REDIRECT EXAMINATION

9    BY MR. SIBERT:

10   Q.   Sir, you were asked if you ever met Guy Jean-Pierre or

11   talked to Mr. Guy Jean-Pierre.  Do you recall those

12   questions?

13   A.   Yes.  Yes.

14   Q.   Do you recall one time in Florida where you were

15   supposed to meet with Mr. Guy Jean-Pierre?

16   A.   Yes.

17   Q.   Okay.  And what happened with that meeting?

18   A.   I was there with Mr. Sears in Fort Lauderdale.  We were

19   supposed to meet with Mr. Pierre, and he didn't show up.

20   Q.   Now, just to be clear, Mr. Barnard asked you about how

21   much you made, which was approximately $488,000.

22   A.   Correct.

23   Q.   What time span was that over?

24   A.   From 2011, '12, '13.

25   Q.   Okay.  So it wasn't that you made $488,000 on this sale

1456

Redirect - Scholz

1     of this 500,000 shares of FusionPharm and Mr. Sears only

2     made 84,000.

3     A.     No.   That was over a period of years.

4     Q.     Okay.   And so your profit from the sale of those

5     500,000 shares of FusionPharm was 25 percent and Mr. Sears

6     got 75 percent.

7     A.     Correct.

8     Q.     And Mr. Sears' amount was about $84,000.

9     A.     Correct.

10    Q.     Yours would have been less.

11    A.     A lot less.

12          MR. SIBERT:   Thank you, Your Honor.

13          THE COURT:   All right.   May this witness be excused

14    for the Government?

15          MR. SIBERT:   Yes, sir.

16          THE COURT:   For the defendant?

17          MR. BARNARD:   Yes, Your Honor.

18          THE COURT:   All right.   Mr. Scholz, thank you for

19    your testimony.   You're excused.   You may step down.

20          Government may call its next witness.

21          MR. BROWN:   May I please check to make sure who's

22    here?

23          THE COURT:   All right.

24          MR. BROWN:   One second.   Your Honor, the --

25          THE COURT:   Hold on.   One second.   Ms. Frank has to

Direct - Coleson

1    give you back your 145.

2         MR. SIBERT:  Thank you, Your Honor.

3         THE COURT:  Who's your next witness?

4         MR. BROWN:  Wayne Coleson, Your Honor.

5         THE COURT:  All right.

6         COURTROOM DEPUTY:  Would you please stand behind

7    the witness stand here and raise your right hand.

8         THE WITNESS:  Over here?

9         COURTROOM DEPUTY:  Just behind there is great.

10   Raise your right hand.

11        WAYNE COLESON, GOVERNMENT'S WITNESS, SWORN

12        COURTROOM DEPUTY:  Please be seated.  You will want

13   to move your chair up towards the microphone.  Please state

14   and spell your full name for the record.

15        THE WITNESS:  My full name.

16        COURTROOM DEPUTY:  Yes, please.

17        THE WITNESS:  Wayne Harold Coleson.  W-a-y-n-e,

18   H-a-r-o-l-d, C-o-l-e-s-o-n.

19                      DIRECT EXAMINATION

20   BY MR. BROWN:

21   Q.   Mr. Coleson, could you tell us where you live, please.

22   A.   Decatur, Georgia.

23   Q.   How long have you lived in Decatur, Georgia?

24   A.   Two years.

25   Q.   Where did you live prior to that?

1  A.    Santa Fe, New Mexico.

2  Q.    And you -- how long did you live there?

3  A.    Two years.

4  Q.    And did you ever live in Denver?

5  A.    Yes.

6  Q.    Was that before Santa Fe?

7  A.    Before and after Santa Fe.

8  Q.    What years did you live in Denver?  In general.

9  A.    2012 through '14, '15, maybe.

10 Q.    And did you -- was that the only time you lived in

11 Denver?

12 A.    No.

13 Q.    When did you live in Denver before that?

14 A.    I lived -- I lived in Denver before I went to Atlanta

15 for three months.

16 Q.    Okay.  Could you tell us a little bit about yourself,

17 including your educational level, your present employment,

18 and just in general terms your profession before your

19 present employment, if you're employed.

20 A.    I've -- my educational level is a BA from the

21 University of Georgia.  My employment history is I've been

22 in the financial -- the financial services industry since

23 1988.  I have -- I have founded and run four hedge funds

24 previously.  I'm not a hedge fund manager today.  Today, I

25 am -- I'm a private investor that invests mine and my

1459

Direct - Coleson

1     family's capital.

2     Q.   And do you have -- are you part of a company that you

3     own yourself?

4     A.   My wife and I own the company called Vera Group, LLC.

5     Q.   How long have you had that group?

6     A.   I think it was formed in around 2007.

7     Q.   And are you and your wife the only two in the group?

8     A.   Yes.

9     Q.   Okay.  Has that been your primary source of income for

10    how many years?

11    A.   Since probably 2008.

12    Q.   Okay.  You said Vera Group's an LLC.  Is it

13    incorporated?

14    A.   No.

15    Q.   Okay.  Just describe to the jury what an LLC is,

16    please.

17    A.   It's a limited -- LLC stands for limited liability

18    company.

19    Q.   Okay.  What's the focus of Vera Group's practice?

20    A.   Makes investments in a variety of fields and -- and

21    structures.

22    Q.   How do you decide what deals to get involved in?  What

23    do you do?

24    A.   Well, typically we do due diligence.  We -- we get our

25    deal flows from a variety of sources, agents, brokers,

Direct - Coleson

1    investment bankers, friends, colleagues.

2    Q.   Okay.  Did you ever become involved with looking into a

3    company called FusionPharm?

4    A.   Yes.

5    Q.   When was that, approximately, if you recall?

6    A.   Mid-2013.

7    Q.   How did you become aware of FusionPharm?

8    A.   Somebody had -- had referred me to a gentleman by the

9    name of William Sears that was an investor in FusionPharm.

10   Q.   You don't remember who that was?

11   A.   No, I'm sorry, I do not.

12   Q.   And just tell us what you did in terms of -- after you

13   obtained that information, did you contact Mr. Sears or did

14   you do some investigation?

15   A.   Well, Mr. Sears and I -- I think we initially met for

16   coffee to learn a little better, myself, to learn a little

17   bit about FusionPharm, the company.  His perspective as an

18   investor.

19        In addition to that, I also checked out the company

20   and the financials that they had released on -- on a website

21   or -- a website called OTC Markets, which is specifically

22   for small microcap companies.  They're not fully reporting

23   to the SEC.

24   Q.   What did you find out about the company, that you

25   recall -- I know it's been a long time ago -- when you

1    examined the reports on the OTC Market website?

2    A.   Well, they were current with all of their reporting

3    requirements.  They had some revenue.  They had a very

4    interesting business model.  They were reconditioning old

5    shipping containers to become hydroponic farming pods and

6    had -- actually had some revenue associated with that.  They

7    were growing -- in these pods, they were growing herbs and

8    some vegetables such as lettuce, and was actually selling

9    the product to restaurants in the Denver area.

10   Q.   When you look at the OTC website, you indicated that

11   they had some revenue.  How do you -- how do you find out

12   how much revenue they have?

13   A.   It will be on their income statement.

14   Q.   Okay.  And how often is an income statement put out on

15   the OTC website?

16   A.   Every three months.  Quarterly.

17   Q.   And just based on your knowledge of the industry, do

18   you know the source of the information that's put on the

19   quarterly reports?

20   A.   In FusionPharm's case, it -- it's a voluntary reporting

21   standard, so the company -- the company, itself, and not an

22   outside auditor's, responsible for the accuracy of the

23   information.

24   Q.   When you do that, do you -- when you find that out

25   about a company you might be interested in, or are

Direct - Coleson

1   interested in, do you take any personal steps, yourself, to

2   attempt to see if any of that is correct?

3   A.    To actually -- or are you asking me to actually

4   ascertain if the revenue is real?

5   Q.    Correct.

6   A.    No.

7   Q.    And you indicated you became aware of this from Mr.

8   Sears.  How -- had you known Mr. Sears before this?

9   A.    No.

10  Q.    And you met for -- in a coffee shop.  What do you

11  recall about the first meeting, what he told you about

12  FusionPharm?

13  A.    I don't recall much other than he was -- he was an

14  investor.  He had loaned the company some money, and, you

15  know, they were trying to -- trying to accelerate this

16  business of creating these farming pods.

17  Q.    You indicated he told you he was an investor in

18  FusionPharm?

19  A.    Yes.

20  Q.    And I'm not quite sure if I heard you correctly.  Did

21  you say he loaned them some money?  Is that what you said?

22  A.    Yes.

23  Q.    And after this -- how long was this meeting and how

24  long did you talk about FusionPharm?  I know it's been a

25  long time.

Direct - Coleson

1    A.   Maybe 30 minutes to an hour.

2    Q.   Did Mr. -- Mr. Sears had -- you sort of had gotten this

3    introduction -- or he had been introduced to you through

4    another person who you don't remember.  Did Mr. Sears

5    explain to you who he was or what his background was?

6    A.   No.  Not that I recall.

7    Q.   Okay.  So you basically relied on your friend as sort

8    of a --

9    A.   Yes.

10   Q.   -- reason to meet with this person?

11   A.   Yes.

12   Q.   Did you continue to speak with Mr. Sears about

13   FusionPharm?

14   A.   Yes.

15   Q.   After you talked to Mr. Sears, is that when you did

16   your research on the internet about FusionPharm or did you

17   do that beforehand, or if you remember?

18   A.   Not sure I exactly remember, but yes, the due diligence

19   and the research would have been ongoing after -- certainly

20   after the meeting.

21   Q.   And as based on your past experience in this area, did

22   you think it was worth pursuing a little bit farther?

23   A.   Yes.

24   Q.   And what did you do to investigate further?

25   A.   I scheduled a meeting with Sears and company

1464

Direct - Coleson

1    management.  I went down to see their operation and actually

2    see the pods in different stages of completion and also

3    producing produce.

4    Q.    Where was this location?

5    A.    Somewhere in Denver.  I don't recall where.

6    Q.    And who -- when you took the -- well, when you

7    inspected the site, who was with you?

8    A.    Sears and the CEO, Dittman.

9    Q.    Scott Dittman?

10   A.    Yes.

11   Q.    Did you know at the time that -- whether or not William

12   Sears and Scott Dittman were related in any way?

13   A.    I don't think so.

14   Q.    Did you later learn they were?

15   A.    Yes.

16   Q.    Did you express an interest to them when you were

17   looking at the facility?

18   A.    Yes.

19   Q.    What about the facility and the business plan

20   interested you?

21   A.    It was a warehouse.  They had -- they had plenty of

22   room to -- you know, to recondition the pods for -- for the

23   grow op.  If I recall correctly, the -- the cost to

24   rehabilitate a pod and get it ready for farming was not

25   extreme.  It was -- it was pretty -- fairly minor.  It

Direct - Coleson

1    seemed like something that really could be a worthwhile

2    business venture.

3    Q.   What -- did you do any more investigation or due

4    diligence, as you might say, about this before you made a

5    decision or determination to invest in this company?

6    A.   You know, other than -- you know, other than just

7    the -- reviewing the financials, whatever questions I might

8    have had regarding that, and actually seeing that there was

9    a bona fide operation, you know, that was probably it.

10   Q.   If you had questions about the operation of

11   FusionPharm, who did you ask?

12   A.   I most likely -- most likely asked Sears.

13   Q.   And there was a time when you did invest some money

14   into this operation?

15   A.   Yes.

16   Q.   How did that come about?  How did you -- was that you

17   contacting them or did -- did William Sears contact you?

18   A.   I'm not sure who contacted who, but the -- the basis of

19   my investigation and Bill and I getting together was based

20   upon the fact that somebody was looking for money.

21   Q.   Is that common in your field?

22   A.   Yeah.

23   Q.   Somebody was trying to make money, too.

24   A.   Yeah.  Yes.

25   Q.   Okay.  Could you describe the vehicle that you either

Direct - Coleson

1    chose or was offered to you to invest in this company, or

2    the mechanism?  I think that's a better --

3    A.    Okay.  Well, there was a -- the company had -- had

4    previously issued to a couple of parties a convertible

5    promissory note, and we were offered to actually buy a

6    portion of a currently existing convertible promissory note.

7    Q.    And who brought this type of investment up to you?

8    A.    Sears.

9    Q.    And could you just describe your understanding of a

10   convertible promissory note at the time.

11   A.    Sure.  The note is convertible into common stock of the

12   corporation that issued it at some rate.  And it would have

13   had also some type of interest rate attached to it.  Accrued

14   interest is usually convertible into the common stock as

15   well.

16   Q.    And with regard to this, were you involved with other

17   people who were similar people to you that were in -- or

18   other groups, I guess, that were interested in investing in

19   this convertible promissory note?

20   A.    Yes.

21   Q.    And how did that come to be?

22   A.    Other friends of mine that we just shared deal flow, an

23   idea, investment ideas with.

24   Q.    Okay.  You have a number of -- I guess in the industry

25   you have a number of friends that if you have a good idea,

Direct - Coleson

1    you share it?

2    A.   Yes.  It's my practice.

3    Q.   Was there some reason you needed more than just

4    yourself going in on this?  Was there something about the

5    note that was required or were you just giving a good idea

6    to your acquaintances?

7    A.   Just giving a good idea to the -- to my friends.

8    Q.   In terms of the -- the vehicle -- or the process of

9    investing in this convertible promissory note, describe, if

10   you can, what you give up and what you get.

11   A.   Could you -- you give up cash and you receive either

12   the whole promissory note owned by a third party or a

13   portion of that financial instrument.

14   Q.   Okay.  And Mr. -- you indicated that William Sears

15   suggested this to you.  What was the name of the company

16   that had the note?

17   A.   Bayside -- something -- Holdings.

18   Q.   Bayside Realty?

19   A.   Yes.

20   Q.   Did you look into Bayside Realty before you decided to

21   do this or what was your understanding of what Bayside

22   Realty was?

23   A.   No, I did not look into Bayside Realty.  I don't know

24   what point it was, you know -- we came to the understanding

25   that the principal behind it was a lady by the name of

Direct - Coleson

1     Sandra Sears, that at some point I found out was William

2     Sears' wife.

3     Q.   Who's the only -- did you ever have dealings with

4     Sandra Sears about Bayside Realty?

5     A.   No.

6     Q.   Who's the only person you dealt with with regard to

7     Bayside Realty?

8     A.   William Sears.

9     Q.   And what were the -- do you remember the names of the

10    other people or groups that were part of the investment that

11    you were involved with?

12    A.   I think I do.

13    Q.   Okay.  Could you tell us --

14    A.   Alexandra Moriello, Star City Capital, Black -- Black

15    Arch Opportunity Fund, SGI Group, Vera Group.

16    Q.   Were -- are these entities -- were these people you

17    knew who had names on companies that they -- sort of like

18    Vera Group?

19    A.   Yes, correct.

20         MR. BROWN:  Your Honor, at this point, I would

21    intend to ask the witness to view a number of exhibits.  It

22    might be appropriate time to just pause.

23         THE COURT:  Okay.  We will take our lunch recess,

24    ladies and gentlemen of the jury.  We will be in recess

25    until 1:20.

Direct - Coleson

1     (Jury left the courtroom at 12:12 p.m.)

2          THE COURT:  Mr. Coleson, since you're in the middle

3     of your testimony, I direct you not to speak with any of the

4     lawyers during the lunch recess.  And I ask you to be back

5     here in the courtroom by 1:15.

6          THE WITNESS:  Okay.  Thank you.

7     (Recess taken 12:14 p.m.)

8                    AFTERNOON SESSION

9     (Outside the presence of the jury at 1:24 p.m.)

10          THE COURT:  Mr. Coleson, this does -- all this is

11    not going to involve you, but you can just stay there and

12    just listen along.

13          So I wanted to raise with counsel the issue of the

14    second superseding indictment and it going back to the jury.

15    The defense withdrew its objection to modifying -- or

16    amending the indictment to change the dates on, I think,

17    five of the counts.  But the discussion at that time already

18    indicated to me that there's going to be no agreement

19    between the parties as to whether the indictment should, in

20    fact, go back to the jury.

21          So we've started to look at the issue and some

22    things are clear from the circuit case law.  One is that it

23    would not be error for me to refuse to send the indictment

24    to the jury at all.  I don't have to do it.  And there's no

25    requirement.  There's, of course, a practice -- a general

Direct - Coleson

1     practice to do so.

2           The other thing that is clear is that when a --

3     when an indictment is as detailed and exhaustive as this

4     one, which is probably the most exhaustive one I've had in

5     many of my criminal cases that have gone to trial, I think

6     the likelihood is fair to good that there will be some

7     factual assertions in the indictment that will not have been

8     supported by the evidence in the case.

9           And so one can make the argument that that

10    indictment -- the indictment should not go back because it

11    contains those additional details.  Although there are other

12    cases that talk about the fact that even when an indictment

13    has matters that have not been proven up in evidence, as

14    long as the jury is instructed, as I have already done --

15    and would do if I were to give the indictment to the jury, I

16    would do it again, as long as they're instructed that the

17    indictment is not evidence, then it would not be error to

18    send back an indictment that contains -- that even contains

19    factual assertions have not been proven up by the evidence

20    in the case.

21          But be that as it may, that would still raise

22    from -- for me a concern about the prejudicial effect to the

23    defendant even if I were to do -- to send it back, knowing

24    that the good folks across the street could not -- or most

25    likely would not find error in me doing so.  Nonetheless, I

1    still think that that raises some issues that I individually

2    have some concern with in terms of prejudice to the

3    defendant of -- in that instance.

4             So that's a long way of giving the -- a background

5    to -- for me to say the following:  I'm going to direct

6    counsel between now and Sunday evening, put your heads

7    together and see if you can come up with an agreed

8    streamlined substitute document that contains the -- those

9    portions of the indictment that you both can agree will go

10   back to the jury.

11            Failing which, if you don't, then I'll just have to

12   decide what I'm going to do.  And I think there's incentive

13   for both sides to come to an agreement because, for the

14   defendant, if you don't agree with the Government on -- on a

15   document that can substitute for the second superseding

16   indictment, I might be sending back an indictment that has

17   more detail in there than you would like.

18            For the Government, the incentive for you is that

19   if there's not an agreement, it's very easy for me to just

20   refuse to send anything back in the form of an indictment to

21   the jury because, again, as I said in my first statement,

22   there's no law to support the proposition that it's error

23   for the trial judge not to send back an indictment.

24            So both sides have considerable reason and interest

25   in coming to an agreement on that.  I'll give you until

Direct - Coleson

1    the -- Sunday evening to get that to us.  Again, failing

2    which, you both then risk that I make a decision that you

3    won't be happy on with respect to the indictment.

4              All right.  Let's bring in the jury.

5         (Jury was present at 1:30 p.m.)

6              THE COURT:  Thank you for your patience, members of

7    the jury.  Again, I was discussing matters with the lawyers

8    that had to be discussed outside your presence.

9              Mr. Coleson, I remind you that you remain under

10   oath.

11             All right.  Mr. Brown, you may resume your

12   examination.

13             MR. BROWN:  Thank you, Your Honor.

14   BY MR. BROWN:

15   Q.   Mr. Coleson, shortly before we took our lengthy noon

16   recess, you were discussing that --

17             THE COURT:  I don't think it was that lengthy.

18   It's a regular lunch recess.  Maybe it was lengthy for you.

19   I could have used double that amount of time to catch up on

20   stuff back in chambers because, believe it or not, this is

21   not the only case I have.  Go ahead.

22             MR. BROWN:  Seems like it now, Judge.

23   BY MR. BROWN:

24   Q.   Sorry.  I was -- a moment of less seriousness than you

25   probably need.  But thank you.  On my part, not the Judge's

1473

Direct - Coleson

1    part.

2              Mr. Coleson, I was mention- -- I was having you

3    describe the agreement you entered with Bayside Realty

4    concerning how it came to be that Vera Group was able to

5    acquire shares of FusionPharm.  Rather than listen to my

6    tortured questions, could I ask you to take a look --

7    there's an exhibit -- a book -- binder in front of you that

8    is, I believe, labeled Exhibit 76, that contains Exhibit 76.

9    Can you see that, sir?

10   A.   Yes.

11   Q.   Can you turn to page 50 of that, please.  It's already

12   admitted, so could we have page 50 published.

13   A.   I don't understand what you're asking me to do.

14   Q.   I'm sorry, I didn't explain this very well.

15             On that exhibit, it's the very -- the lowest number

16   at the bottom in the center is the page number.  The one

17   you're looking for probably has a 1 on it, if --

18   A.   That's correct.

19   Q.   Okay.  Could you turn to page 50 of that group of

20   numbers.  There's also a version of -- a portion of that

21   page on the screen to your left, but sometimes it's not the

22   clearest.

23   A.   Okay.

24   Q.   I am not going to ask you to go through every page of

25   this agreement, but could you tell us what page 50 shows

Direct - Coleson

1   you.

2   A.   Yes.  It appears to be the page 1 of the securities

3   transfer agreement, which is the agreement that was utilized

4   to personally -- to -- excuse me, to purchase a portion of

5   the Bayside Realty convertible promissory note issued by

6   FusionPharm.

7   Q.   Okay.  And this is called a securities transfer

8   agreement; is that right?

9   A.   Yes.

10  Q.   And it's between Bayside Realty Holdings, LLC, and Vera

11  Group, LLC?

12  A.   Correct.

13  Q.   I've asked you some questions earlier today about

14  Bayside Realty and I didn't give the entire name.  Is that

15  the same company that you were negotiating with when you

16  were talking to William Sears about the transaction you're

17  about to describe?

18  A.   Well, I was -- I was negotiating with William Sears --

19  Q.   Was he --

20  A.   -- in general --

21  Q.   Go ahead.

22  A.   In general, but it wasn't -- I don't know at what point

23  in time in the discussions that Bayside was disclosed as the

24  holder of the note.

25  Q.   Okay.  Okay.  Were you negotiating the process you were

1475

Direct - Coleson

1     going through in terms of purchasing a note with William

2     Sears?

3     A.    Correct.

4     Q.    Okay.  Since it's been so long ago, I won't ask you

5     these questions about dates, but with regard to this --

6     what's in front of you in Government Exhibit 76, page 50 --

7     I'm not going to ask you the whole thing, but the -- does

8     the second paragraph, third paragraph, fourth paragraph, and

9     fifth paragraph basically -- take your time to look at

10    those -- do they basically describe the transaction?

11    A.    Yes.  That's correct.

12    Q.    Okay.  So at the -- as long as we're on that page,

13    could -- or on that exhibit, could you turn to page 62.

14    Could we have that enlarged, please, and published.

15    A.    Yes.

16    Q.    Is this the signature line of the same document your --

17    or the same page number that you talked about, page 50

18    through 62?

19    A.    Yes.

20    Q.    And is your signature on there?

21    A.    Yes.

22    Q.    Under the term "Vera Group"?

23    A.    Yes.

24    Q.    Who signed on behalf of Bayside Realty Holdings?

25    A.    Sandra Sears.

Direct - Coleson

1    Q.   And maybe we could scroll down.  There's a section

2    called "Company acknowledgment and consent."  Was that --

3    who signed that?

4    A.   Scott Dittman.

5    Q.   Were -- did you all get together and sign this all at

6    once or was it faxed back -- or sent back and forth?

7    A.   Sent back and forth.

8    Q.   Okay.  We could take that down.

9         With regard to this transaction, what did Vera

10   Group, your organization or company, pay for what you

11   received, approximately?  If you have to look at page 1, go

12   ahead.  Page 1 of Exhibit 76.

13   A.   That page doesn't have the purchase price.

14   Q.   Okay.  Maybe we could enlarge page 1, Government

15   Exhibit -- page 50 --

16   A.   Excuse me?

17   Q.   Page 50.

18        MR. BROWN:  I'm sorry, Your Honor.

19   BY MR. BROWN:

20   Q.   Page 1 of the agreement.  Sorry.  Could you expand the

21   fourth paragraph.

22   A.   $15,625.

23   Q.   Okay.  And how did you -- you paid Bayside Realty

24   Holdings, LLC, that amount?

25   A.   Excuse me?  Can you repeat that?

Direct - Coleson

1    Q.   You paid Bayside Realty Holdings that amount?

2    A.   Yes.

3    Q.   How did you pay that?  Was it by wire, check, cash?

4    A.   Wire transfer.

5    Q.   And who instructed you on how to wire that money into a

6    Bayside Realty Holdings, LLC, account?  Would that --

7    A.   It could be part -- the wiring instructions could be

8    part and parcel to this agreement, or I would have gotten

9    those from instructions from William Sears.

10   Q.   Okay.  And was William Sears the only person you ever

11   spoke to about this transaction, at least on behalf of

12   Bayside?

13   A.   Yes.

14   Q.   And you paid 15,625 by wire transfer.  What did you

15   receive?

16   A.   I received 15,625 principal of the Bayside note.

17   Q.   Okay.  And was that note -- that -- thank you for

18   clarifying that.  Was that converted into shares of

19   FusionPharm?

20   A.   Yes.

21   Q.   And do you recall how many shares of FusionPharm you

22   received?

23   A.   No.

24   Q.   Okay.  Did you do a conversion of the price basically

25   in your head the other day?  Was that 40 cents a share,

Direct - Coleson

1     approximately?

2     A.    That sounds about right.

3     Q.    Okay.  And if you did that multiplication, would that

4     amount to approximately 41,100 shares of stock?

5     A.    Correct.

6     Q.    Does that sound familiar with what you remember about

7     the transaction?  Although I'm sure you've done quite a few

8     transactions since.

9     A.    Yes, that sounds fairly accurate.

10    Q.    And this may be an obvious question, but were these

11    shares of FusionPharm restricted shares or were they

12    unrestricted?

13    A.    Unrestricted.

14    Q.    Common stock?

15    A.    Common stock.

16    Q.    And by "unrestricted," they were free-trading stock?

17    A.    Yes.

18    Q.    You could trade them the minute you got them if you

19    chose to?

20    A.    Yes.

21          MR. BROWN:    Thank you very much, sir.

22          THE COURT:    Cross-examination.

23          MR. GOODREID:    Yes, Your Honor.  Thank you.

24          THE COURT:    All right.

25                         CROSS-EXAMINATION

Cross - Coleson

1    BY MR. GOODREID:

2    Q.   So Mr. Coleson, you recall that Mr. Brown just asked

3    you -- excuse me -- some questions about the share price.

4    Do you recall that?

5    A.   No.  He made out the conversion price.

6    Q.   Okay.  Well, he mentioned to you that you thought that

7    the -- roughly the share price for these shares was

8    approximately 40 cents a share; do you recall that?

9    A.   Yes.

10   Q.   And you agreed that that was right?

11   A.   Yes.

12   Q.   Okay.  And you've had, sir -- over the years, you've

13   had extensive experience in the market; is that fair to say?

14   A.   Yes.

15   Q.   Okay.  And it is true, for example, that -- just give

16   you an example -- if a person has a hundred shares of Apple

17   stock, he can get online, see what the price is in the

18   market, and trade those immediately for that price; isn't

19   that right?

20   A.   Yes.

21   Q.   In other words, there's not going to be trouble finding

22   a buyer for Apple stock, right?

23   A.   Correct.

24   Q.   Now, with microcaps -- well, let's call them penny

25   stocks, you know what I'm referring to?

1480
Cross - Coleson

1    A.    Yes.

2    Q.    Okay.  With penny stocks, the situation's a little bit

3    different, isn't it?  Because isn't it true that under

4    certain circumstances, even if there's a price out there,

5    you may not necessarily be able to find a buyer for the

6    shares; isn't that right?

7    A.    Yes.

8    Q.    So it's not the same as Apple where if a -- if a stock

9    costs -- costs -- with Apple, as we said, it cost $100, you

10   could sell on the market immediately, right?

11   A.    Correct.

12   Q.    But with penny stocks, even though there's a price in

13   the market on a given day, a person may or may not be able

14   to sell it for that price because there may not be a buyer;

15   is that right?

16   A.    Yes.

17            MR. GOODREID:  That's all I have, Your Honor.

18            THE COURT:  All right.  Redirect.

19            MR. SIBERT:  May we have a minute, Your Honor?

20            MR. BROWN:  No redirect, Your Honor.

21            THE COURT:  All right.  May this witness be

22   excused, for the Government?  May this witness --

23            MR. BROWN:  Yes, Your Honor.

24            THE COURT:  All right.  For the defendant?

25            MR. GOODREID:  Yes, Your Honor.

1481
Direct - Thaden

1     THE COURT:  All right.  Mr. Coleson, thank you for
2  your testimony.  You're excused.  You may step down.
3     All right.  The Government may call its next
4  witness.
5     MR. SIBERT:  Your Honor, at this time the
6  Government would like to call Myron Thaden to the stand.
7     THE COURT:  All right.
8     COURTROOM DEPUTY:  Stand behind the witness stand
9  here.  Please raise your right hand.
10     MYRON THADEN, GOVERNMENT'S WITNESS, SWORN
11     COURTROOM DEPUTY:  Okay.  Please be seated.  You
12  might need to pull up your chair --
13     THE WITNESS:  Okay.
14     COURTROOM DEPUTY:  And can you please state and
15  spell your name for the record.
16     THE WITNESS:  Myron Thaden.  First name is
17  M-y-r-o-n, last name is T-h-a-d-e-n.
18     MR. SIBERT:  May I proceed, Your Honor?
19     THE COURT:  You may.
20                         DIRECT EXAMINATION
21  BY MR. SIBERT:
22  Q.   Good afternoon, Mr. Thaden.
23  A.   Yeah.
24  Q.   Can you please tell the jury where you're currently
25  living.

Direct - Thaden

1    A.    5229 Fairway Oaks, Winderrmere, Florida.

2    Q.    Okay.  And how long have you resided in Florida?

3    A.    About 30 years.

4    Q.    All right.  Can you give the jury a little bit of

5    background regarding your employment and what you've been

6    doing the last few years in Florida.

7    A.    Pretty much retired.  I managed some office buildings

8    just before I retired.

9    Q.    Okay.  And so did you own these buildings -- office

10   buildings?

11   A.    Yes.

12   Q.    Okay.  And obviously you didn't hire an outside

13   management firm --

14   A.    No, I managed it myself.

15   Q.    All right.  Now, during your days of being a office

16   manager, did you get a chance to meet a Mr. Richard

17   Scholz?

18   A.    He was a tenant of mine.

19   Q.    Okay.  And how long was Mr. Scholz a tenant for you?

20   A.    Maybe three years.

21   Q.    All right.  Now, do you know what Mr. Scholz did for a

22   living when he was a tenant for you?

23   A.    Not really.

24   Q.    All right.  Now, did Mr. Scholz ever approach you

25   regarding a potential investment into a company called

Direct - Thaden

1    FusionPharm?

2    A.    Yeah.   That was several years after he was a tenant.

3    Q.    Okay.   Do you recall when Mr. -- or how it came about

4    that Mr. Scholz --

5    A.    I just ran into him in the community and we started

6    talking, talking about what he was doing.   And he'd asked me

7    if I ever invested in penny stocks.   I said no, I didn't

8    know anything about them.   And then he proceeded to tell me

9    about this company, FusionPharm.   Gave me some brochures to

10   look at.

11   Q.    All right.   And essentially what did you learn about

12   FusionPharm through Mr. Scholz's introduction of it --

13   A.    Well, I went on the internet and looked a little bit

14   there and -- with the brochures that he had, it looked like

15   a very interesting business model to me.

16   Q.    When you went on the internet, did you look at

17   FusionPharm's information that they posted on what's called

18   the over-the-counter markets?

19   A.    No.

20   Q.    All right.   Where did you find --

21   A.    Just -- I think their website they had at the time.

22   Q.    Okay.   And so why did you find FusionPharm interesting?

23   A.    Well, at that time, it was a lot of hype about

24   marijuana and the growth of it and the different states that

25   were going to vote it into -- making it legal for marijuana

Direct - Thaden

1    in those states.  And I thought there was probably some
2    future in it.
3    Q.   All right.  Now, do you recall approximately the time
4    frame of when Mr. Scholz introduced you to this company
5    called FusionPharm?
6    A.   Maybe 2011, 2010.  Somewhere in that range, I think.
7    Q.   All right.  And do you know where the company was
8    located?
9    A.   Yeah, here in Denver.
10   Q.   So after you learned about the company through Mr.
11   Scholz, did you take progressive steps to continue your due
12   diligence outside of what Mr. Scholz told you in your
13   internet research?
14   A.   Limited, yes.  I did more investigation a little bit
15   later.
16   Q.   Okay.  And --
17   A.   After making that initial investment.
18   Q.   All right.  So let's talk about -- did you eventually
19   invest money into FusionPharm?
20   A.   Yes.
21   Q.   All right.  And how much money did you invest?
22   A.   At that time, $25,000, because it was 100,000 shares
23   for $25,000.  And I think that was the minimum you could
24   invest.
25   Q.   Okay.  And who did you speak with in FusionPharm

1   regarding this investment?

2   A.   A fellow by the name of Scott Dittman and William

3   Sears.

4   Q.   Are those the two gentlemen that you dealt with when it

5   came to discussing investments in FusionPharm?

6   A.   Yes.

7   Q.   All right.  Before you made your first $25,000

8   investment for 100,000 shares of FusionPharm stock, did you

9   have discussions with Mr. Dittman and Mr. Sears?

10  A.   I may have.  I don't recall.  But if I -- if I did, it

11  was probably brief.

12  Q.   All right.  Did you see Mr. Dittman and Mr. Sears as

13  equals in the FusionPharm?

14  A.   I assumed they were, yes.

15  Q.   And what do you mean, you assumed that they were

16  equals?

17  A.   I talked to both of them and they both answered

18  questions that I had, and both of them would come to Orlando

19  occasionally after that.  They were kind of investigating

20  whether Florida was going to go with marijuana, legalize it,

21  and so they would come to town occasionally and then

22  would -- if they were in town they might call me up and ask

23  me out for lunch.

24  Q.   Okay.  So based upon your conversations with both Mr.

25  Sears and Mr. Dittman, you decided to invest $25,000 in the

Direct - Thaden

1    FusionPharm?

2    A.    Yes, I did.

3    Q.    All right.  And did you ever meet them in person?

4    A.    Yes.  They --

5    Q.    Before the initial investment, I should say.

6    A.    No.

7    Q.    Okay.  So it was after your initial investment is

8    when --

9    A.    Yes.

10   Q.    -- you met them?

11             And that was in Florida?

12   A.    Yes.

13   Q.    Were they always together?

14   A.    No.

15   Q.    All right.  So at certain times, would you meet each

16   one of them separately?

17   A.    Yes.

18   Q.    And then other times, would they be together?

19   A.    There might have been a time or two they were together,

20   but typically they were separate.

21   Q.    Okay.  Now, can you discuss essentially how your first

22   investment went with FusionPharm.

23   A.    Well, first of all, that was my first venture into

24   something like that.  And they had mentioned to me that you

25   had to hold the stock a year before you could sell it, which

Direct - Thaden

1    I didn't rely understand that. But when it came time to --

2    after I'd had it for the initial holding period, I went to

3    my broker at Merrill Lynch and he said, "You've got to get

4    ahold of the people at FusionPharm so they can find a way to

5    get the" -- I guess it's called "the legend off of it."

6             And so I called them --

7    Q.   Let me stop you there. A restricted legend?

8    A.   I guess it is, yeah.

9    Q.   Okay.

10   A.   Yeah. And so I called them and they either mailed me

11   or wire -- e-mailed me forms to fill out and told me to fill

12   those forms out, put my certificate with those forms, and a

13   check for $500, and mail it to this company in south

14   Florida.

15   Q.   When you say they sent you documents for you to fill

16   out, who are you talking about "they"?

17   A.   I don't remember if it was Dittman or Sears, but one of

18   the two.

19   Q.   So did you fill out the paperwork?

20   A.   I filled out all the paperwork, made out the check,

21   enclosed the whole package, sent it to this guy in south

22   Florida, this guy, Pierre.

23   Q.   And what was that gentleman's name?

24   A.   Something Guy Pierre.

25   Q.   Okay. And do you know who he was?

Direct - Thaden

1    A.    No.

2    Q.    Did you ever meet this Guy Pierre in person?

3    A.    No.

4    Q.    All right.  And so do you know why you were instructed

5    to send it to Guy Pierre?

6    A.    I was under the impression that his company was the one

7    that would remove the legend from the certificate.

8    Q.    Okay.  And why were you under that belief --

9    A.    That's where they told me to send it to get that done.

10   Q.    All right.  And so what happened after you sent this

11   package of paperwork --

12   A.    About six -- about six weeks went by, I heard nothing

13   from anyone, and I got a little upset.  And I called

14   FusionPharm again.  And I don't recall which one of the two

15   I talked to, but I told them it's been six weeks and I

16   haven't gotten my certificate back.  And they said, "Well,

17   we'll check it out."

18          They called me back a day or two later and said,

19   "Your original package is going to be returned to you.  We

20   want you to re-fill the papers out again, make a new check

21   out to a different company in Nevada, and send the package

22   to them," which I did.

23   Q.    All right.

24   A.    It was some type of a clearinghouse in Nevada.

25   Q.    All right.  So my understanding is when -- again,

1  you're saying "they," are you talking about either Mr. Sears
2  or Mr. Dittman --
3  A.   Right, correct.
4  Q.   So you had to send the first package with a check of
5  $500 --
6  A.   Uhm-hum.
7  Q.   -- and then you were asked to do a second package, send
8  another check, and send that package to Nevada?
9  A.   Right.  The first check was never cashed, the entire
10 package came to me just the way I sent it out.
11 Q.   Okay.  And that second package you said went to a
12 clearinghouse in Nevada?
13 A.   Yes.
14 Q.   All right.  And then what happened after you did the
15 second package?
16 A.   About 2 1/2 weeks later I received a certificate in the
17 mail.
18 Q.   All right.  And at that point, were you able to --
19 A.   I deposited it with Merrill Lynch.
20 Q.   Your shares in FusionPharm stock?
21 A.   Yes, sir.
22 Q.   All right.  Now, did you ever make another investment
23 into FusionPharm?
24 A.   Yes, I did.
25 Q.   All right.  So let's talk about that.  How much did you

Direct - Thaden

1    invest in FusionPharm?

2    A.   $100,000.

3    Q.   All right.  So based upon your conversation, that first

4    investment, when it came time to get your free-trading

5    shares, it didn't seem like it went too well.

6    A.   That's true.

7    Q.   So why did you choose to invest $100,000, which is

8    $75,000 more than your first investment?

9    A.   This was sometime later and I had done a little more

10   investigation because I was interested in that industry and

11   what was going to happen.  They were having a convention in

12   Las Vegas and I decided that I would go out there and look

13   at the convention and walk around and see what was going on.

14        And FusionPharm had a display there and I was --

15   quite honestly, I was very impressed with it.  They probably

16   had some of the largest gatherings in front of their

17   exhibit.

18   Q.   Okay.  And could you tell me how many shares you

19   received from your $100,000 investment?

20   A.   1 million shares.

21   Q.   Okay.  And were those shares divided at all?

22   A.   Pardon me?

23   Q.   Did -- did those shares all come to you?

24   A.   Half of them went in my wife's account and half of them

25   went in my account, and those were from FusionPharm.

Direct - Thaden

1    Q.   Okay.  And do you know essentially the vehicle or means

2    of how you were able to acquire these shares of FusionPharm

3    with either Scott Dittman or Billy Sears?

4    A.   I think they came from Bill Sears.  And I don't

5    understand the total transaction, but my understanding was

6    these were shares that he owned that he was selling to me

7    personally.

8    Q.   Okay.  Can you look at Government Exhibit 84, and I

9    want to ask for page 81 be published.

10             MR. BROWN:  And, Your Honor, this has been admitted

11   into evidence.

12             THE COURT:  Right.

13   BY MR. SIBERT:

14   Q.   All right, sir, I'm going to ask you to look at the

15   screen.  I'm going to blow up a portion of this document.

16   If you can't see on the screen, please let me know, we can

17   get you a hard copy as well.

18   A.   I can see it.

19   Q.   All right.  If you look here in the top, is this the

20   agreement regarding the $100,000 for a million shares?

21   A.   I can't really see it good.

22   Q.   I'm going to show you another page --

23   A.   Yeah, could be.

24   Q.   All right.  Let me -- let me just back up real quick.

25   A.   This is a long time ago.  But, yeah.

Direct - Thaden

1    Q.   I understand.  Can I have page 1 of Government Exhibit

2    84.

3         Sir, I'm circling two names.  Is that yourself and

4    your wife?

5    A.   Yes.

6    Q.   And can you tell me the date that's on this document?

7    A.   Wait a minute.  Why is Richard Scholz's name on here?

8    Q.   Well, sir, just -- you don't need to worry about that.

9    A.   Okay.

10   Q.   Let's just focus on the questions I'm asking you.

11   A.   Okay.

12   Q.   Those are -- that's your wife; is that correct?

13   A.   That's correct.

14   Q.   And yourself; is that right?

15   A.   That is correct.

16   Q.   Okay.  And then here are the shares that you were being

17   issued.

18   A.   That is correct.

19   Q.   What is the date?

20   A.   9-3-23 -- 13.  2013.

21   Q.   And essentially it's regarding FusionPharm stock --

22   A.   Yes.

23   Q.   -- is that right?

24   A.   Correct.

25   Q.   All right.  Let me just show you page 50 of this

1493

Direct - Thaden

1    document.

2    A.   I can't read it -- oh.

3    Q.   Can we blow up the text here.

4         All right, sir, can you take a minute and read

5    that.

6    A.   Okay.  Okay.

7    Q.   All right.  And essentially is that your wife being

8    mentioned?

9    A.   Yes.

10   Q.   Okay.  And she was supposed to receive 500,000 shares

11   of FusionPharm, right?

12   A.   That's correct.

13   Q.   And that's consistent with what you told me about being

14   divided between you and your wife?

15   A.   That is correct.

16   Q.   All right.  All right.  So let's go back to page 84.

17   Can we have that blown up again, with the signature.

18        And how many shares were you supposed to receive?

19   A.   500,000.

20   Q.   And do you know who is signing this document?

21   A.   That's not my signature.

22   Q.   Okay.  Let's go to page 81.

23   A.   I don't even remember this document.

24   Q.   What's this document titled, sir?

25   A.   Shares Purchase Agreement.

1494
Direct - Thaden

1    Q.   Okay.  And who is this share purchase agreement

2    between?

3    A.   It says MeadPoint Venture Partners, a Nevada Limited

4    Liability Company.

5    Q.   And who else?

6    A.   And myself.

7    Q.   Okay.  And then can I have 1 and 2 blown up, please.

8         And what's the nature of the agreement under --

9    A.   Sale of stock --

10   Q.   Can you see that okay?

11   A.   Yeah.  Pretty good, yeah.  Okay.

12   Q.   So who was selling the stock?

13   A.   Pardon me?

14   Q.   Who was selling the stock?

15   A.   Who?

16   Q.   Yeah, according to this agreement.

17   A.   MeadPoint.

18   Q.   Okay.  And who was purchasing the stock?

19   A.   I was.

20   Q.   Okay.  And how many shares were you buying from

21   MeadPoint?

22   A.   500,000.

23   Q.   And how much were you paying for those shares?

24   A.   50 -- $50,000.

25   Q.   Okay.  And who signed this document at the bottom?

1495

Direct - Thaden

1    A.    I did.

2    Q.    And who else?

3    A.    It says William Sears.

4    Q.    Okay.  So that's consistent with your testimony --

5    A.    Yeah.  I mean, when you -- I was buying the shares from

6    him, but I guess they were -- belonged to MeadPoint, whoever

7    that was.

8    Q.    Okay.  Do you recall this agreement being about buying

9    a portion of a promissory convertible note?

10   A.    No.

11   Q.    Okay.  And, again, this was back in 2013?

12   A.    Yeah.

13   Q.    All right.  All right, so tell me what happened after

14   you made this investment into FusionPharm.

15   A.    What do you mean, what happened?

16   Q.    Well, how did your investment go?

17   A.    I don't remember if it was 2014 when -- I think it was

18   in January -- I can't remember, if it was 2014, 2015, must

19   have been -- if these was bought in '13, then it must have

20   been in '14.

21          In January, I recall that it seemed that every

22   newspaper in the country and every TV station in the country

23   was talking about marijuana and how many states were going

24   to approve -- legalize marijuana.  And all of a sudden, the

25   market started going crazy.

Direct - Thaden

1        It was actually my broker from Merrill Lynch that

2    called me and said, "Do you see what's going on?"

3        And I said, "What?"

4        And he says, "The stocks are going crazy."  And he

5    says, Yours is going up, too."

6        And so at that point in time, we started selling.

7    Q.   All right.  Were you able to sell all your shares?

8    A.   No.

9    Q.   Why?

10   A.   Because, well, my broker told me, he says, "You know,

11   don't sell too many shares at any one time because you don't

12   want to affect the sale price."  And he said, "So, just sell

13   like 5,000 shares or 10,000 shares at a time."

14       And I only -- I think I sold just a little over

15   half of my stock.

16   Q.   Okay.  And then what happened with the other half of

17   your stock?

18   A.   It still is sitting with Merrill Lynch and is worth

19   zilch.

20   Q.   When you say zilch, what do you mean?

21   A.   Zero, I think.

22   Q.   Okay.

23   A.   I don't think there's a market anymore.

24   Q.   Do you know why?

25   A.   Well, yeah, because of what happened to them.

Direct - Thaden

1  Q.   Okay.  Were you -- did you make another investment in
2  FusionPharm later on?
3  A.   Yeah.  Well -- yes, it was just before -- it was in
4  March of that year.  And I got a call from Bill Sears and he
5  said to me -- obviously he knew I had just made some money
6  selling my -- some of my stock, and he said -- he had a
7  major problem.  He said he had an investor that was going to
8  put a million dollars in the company for expansion and they
9  were going to open another -- another facility in the
10 northeast and he had given several press releases.  And that
11 if the guy that was putting the money in put in 350,000 and
12 was supposed to put the rest in a couple of weeks and when
13 it came time to put the rest in, whoever the investor was
14 backed out and said that he couldn't do it.  And I don't
15 know for what reason, but he couldn't -- he couldn't do it.

16        And Bill said to me, "If I don't find an investor
17 that will put 3- -- or $650,000 in the company," he said,
18 "I -- with all of these pre- -- press releases I've done,"
19 he said, "it's going to affect the company dramatically."
20 And he says, "The stock will go way down and you're going to
21 lose everything you have with the stock that you have
22 remaining."
23 Q.   So what did you decide to do once he told you this?
24 A.   Well, probably the worst decision in my life.  I -- I
25 gave him the money and he gave me -- I told him I only

Direct - Thaden

1    wanted tradable stock but he said, "Well," he says, "I'm in

2    the process of doing a family trust," and he says, "all my

3    stock is currently being converted over to the name of the

4    trust."  And he said I can't even get ahold of my stock for

5    a couple, two, or three weeks.  So he said, "I will give you

6    restricted stock as collateral and I will give you a letter

7    of guarantee."  And he said, "I will have it notarized."

8            And the letter -- I think you got a copy of it --

9    the letter of guarantee states that he was giving me 325,000

10   shares at $2, and that he would replace it with

11   nonrestricted stock no later -- no sooner than May 1st and

12   no later than May 30th of that year.  And this took place in

13   late March.

14   Q.   Did you ever get the shares that you were looking to

15   receive?

16   A.   No.  I got the restricted ones, but I never got the

17   replacement shares.

18   Q.   Okay.  And do you know why the shares that you had went

19   down to zero?

20   A.   Yeah.  Because the federal government -- or SEC or

21   somebody went in and, I guess, closed them down.

22   Q.   And based upon that -- that action by the federal

23   government, what happened to FusionPharm stock?

24   A.   Well, I guess it went down to zero.  I kind of stopped

25   following it.

Cross - Thaden

1       MR. SIBERT:  May I have a moment, Your Honor?

2       THE COURT:  You may.

3       MR. SIBERT:  I'll pass the witness, Your Honor.

4       THE COURT:  Cross-examination.

5                   CROSS-EXAMINATION

6    BY MR. GOODREID:

7    Q.   Good afternoon, Mr. Thaden.

8    A.   Hi.

9    Q.   Could we please pull up Government Exhibit's 84, page

10   78.   And -- yeah, if we blow up the body, please.  Actually,

11   let's first go to the top and highlight the -- sort of the

12   letterhead portion, if we could.  I want to have you blow it

13   up a little bit.  Yeah.

14       Let me ask you, can you see that, Mr. Thaden?

15   A.   Yes, sir.

16   Q.   Does that -- that's the name of an attorney, is it not?

17   A.   Pardon me?

18   Q.   That appears to be the name of an attorney, doesn't it?

19   A.   Yes, it is.

20   Q.   Okay.  Is that -- is that an attorney -- is that a name

21   you recognize --

22   A.   Yes, it is.

23   Q.   -- in connection with any of these things we've talked

24   about?

25   A.   Yes, it is.

Cross - Thaden

1   Q.   How do you recognize Mr. Lehrer's name?

2   A.   I believe that was someone that William Sears or -- I

3   think it was William Sears was going to use in -- with his

4   company.  But he did introduce me to the gentleman.

5   Q.   He did introduce you?

6   A.   Yeah.

7   Q.   Okay.  And did you have an understanding that Mr.

8   Lehrer would be involved in some capacity with the legal

9   underpinnings of any of these stock transactions you were

10  doing?

11  A.   No, I didn't -- I didn't know what this job was.

12  Q.   Okay.  All right.  Let me ask if we could blow up -- if

13  we can enlarge that first paragraph under, "Dear sir or

14  madam."

15  A.   Uhm-hum.

16  Q.   Do you see that -- do you see that language, Mr.

17  Thaden?

18  A.   Uhm-hum.

19  Q.   And that appears to reference you, does it not?

20  A.   Yes, it does.

21  Q.   Okay.  And, again, does seeing that -- have you ever

22  seen this letter before?

23  A.   I don't recall.

24  Q.   Okay.  So you didn't see this at the time in connection

25  with any of the stock transactions we've been talking about?

Cross - Thaden

1    A.   I don't recall that.

2    Q.   Okay.  All right.  We can take that down.  Thank you.

3             So let me direct your attention, Mr. Thaden, to

4    another matter.  Remember when counsel asked you about the

5    first set of shares that you had bought?

6    A.   Yes, sir.

7    Q.   Okay.  And remember, you indicated that you were told

8    that you could not trade these shares for a year, correct?

9    A.   One year, yes.

10   Q.   One year.  And you didn't understand what that was

11   about --

12   A.   Well, I -- I guess they told me that that's what you

13   had to do with that type of stock.

14   Q.   Okay.  So as a result of that, I take it after a year

15   passed, you wanted the restriction lifted; isn't that

16   right?

17   A.   Yes.

18   Q.   Okay.  And you indicated that based upon the directions

19   of Mr. Sears and/or Mr. Dittman, you wound up sending your

20   shares -- or sending the restricted legend, at least, to

21   somebody in Florida, right?

22   A.   That's correct.

23   Q.   And that was this person named -- did you say Guy

24   Pierre?

25   A.   Yes, sir.

Cross - Thaden

1    Q.   Okay.  And you said you sent that and then along with a
2    check, right?
3    A.   Yes, sir.
4    Q.   And with -- who was the check made out to; do you
5    recall?
6    A.   I believe it was made out to him, but I don't really
7    recall because it was several years ago.
8    Q.   Out to Mr. Pierre, as best you can recall?
9    A.   I think so, yes.
10   Q.   So you sent that, and then you said six weeks went by,
11   nothing had happened, right?
12   A.   Correct.
13   Q.   You called FusionPharm and talked to Sears or Dittman
14   to complain, understandably, right?
15   A.   Yes.
16   Q.   Okay.  And then as a result of that, your original
17   package came back to you, correct?
18   A.   That's correct.
19   Q.   Including the check, which was uncashed?
20   A.   Yes, sir.
21   Q.   All right.  So is it fair to say that the net result of
22   that transaction, if you will, other than the loss of the
23   six weeks, was nothing?
24   A.   Correct.
25            MR. GOODREID:  That's all I have, Your Honor.

1503
Redirect - Thaden

1          THE COURT:  All right.  Redirect.

2                    REDIRECT EXAMINATION

3     BY MR. SIBERT:

4     Q.   Can I have page 18 of Government Exhibit 84.  I'm

5     sorry, let me . . .

6          Excuse me, Government Exhibit 78.  And page 18 of

7     Government Exhibit 78.

8          MR. GOODREID:  I'm sorry, counsel, what page?

9          MR. SIBERT:  18.

10         MR. GOODREID:  18.  Thank you.

11    BY MR. SIBERT:

12    Q.   You state this is MeadPoint; is that correct?

13    A.   Yes, sir.

14    Q.   Do you know a Mr. Tod DiTommaso?

15    A.   No, sir.

16         MR. SIBERT:  Thank you.

17         THE COURT:  All right.  May this witness be

18    excused, for the Government?

19         MR. SIBERT:  Yes, sir.

20         THE COURT:  For the defendant?

21         MR. GOODREID:  Yes, Your Honor.

22         THE COURT:  All right.  Mr. Thaden, thank you for

23    your testimony.  You're excused.

24         THE WITNESS:  Thank you.

25         THE COURT:  You may step down.

1504

Redirect - Thaden

1    The Government may call its next witness.

2    MR. BROWN:  Michael Kocinski, Your Honor.

3    THE COURT:  Okay.

4    COURTROOM DEPUTY:  Would you please stand behind

5    the witness stand and raise your right hand.

6    MICHAEL KOCINSKI, GOVERNMENT'S WITNESS, SWORN

7    COURTROOM DEPUTY:  Okay.  Please be seated.  You

8    need to scoot your chair up towards the microphone.  Please

9    state and spell your name for the record.

10   THE WITNESS:  Excuse me?

11   COURTROOM DEPUTY:  Please state and spell your name

12   for the record.

13   THE WITNESS:  Michael, M-i-c-h-a-e-l, Kocinski,

14   K-o-c-i-n-s-k-i.

15                    DIRECT EXAMINATION

16   BY MR. BROWN:

17   Q.   Good afternoon, Mr. Kocinski.  If at some time during

18   this -- my examination of you, you don't hear or understand

19   my questions, just ask me to repeat it.  Sometimes my voice

20   drops.

21   A.   And my hearing's not that good.

22   Q.   Okay.  Neither is mine.  Can you tell us where you

23   live, sir.

24   A.   Coconut Creek, Florida.

25   Q.   How long have you lived in Florida?  How long have you

1505

Redirect - Thaden

1       lived in Florida?

2       A.    Over 30 years.

3       Q.    Could you tell us a little bit about your background,

4       your education, where you went to Florida from, your present

5       employment, if you have any, or your profession.  And a

6       little bit about your background in terms of employment.

7       A.    I graduated at Seton Hall University from South Orange,

8       New Jersey.  I have a degree in accounting.  I've spent the

9       majority of my life working in the aviation industry.  I

10      have worked for companies as internal auditors, worked as

11      accounting staff, worked as general managers, and worked in

12      airport airfield operations.

13            I've had experience with major companies in the

14      aviation industry in terms of running fuel farm facilities,

15      and into plane fueling operations.  I've also spent periods

16      of time working for Knight Ridder, the parent company of

17      Miami Herald, as a specialist in research, and then also in

18      real estate working with a rental placement company in Boca

19      Raton, Florida, called Florida Rent Finders.

20      Q.    You indicated you had an accounting degree.  As you've

21      described a lot of professions, or employment, could you

22      tell us how much of your employment has been in the field of

23      accounting, would you say?

24      A.    Probably more than 50 percent of it.  Part of my actual

25      work experience has been airport operations, which came

1    about through the first company I went to work with that

2    was -- which was known as Butler International at the time

3    and had a subsidiary known as Butler Aviation.  I worked in

4    their accounting department and then transferred into

5    operations at their facility in Miami, Florida, with a

6    transfer from New Jersey back in 1982.  I spent time in

7    operations through 1990 or so, and did work with some

8    aircraft engine overhaul companies as a controller and chief

9    financial officer in South Florida.  And then also

10   transitioned over into management with the fuel farm

11   facility at Miami International Airport, wearing a dual-hat

12   role as both financial director and also overseeing

13   operations.

14   Q.   Have you formed a company or an LLC called MAK

15   Consulting?

16   A.   When I was employed by the real estate company for

17   about approximately four years, the 2007 downturn in the

18   economy eventually forced me to be relieved of my duties at

19   the company because they couldn't afford to continue to keep

20   me hired.

21        They had at one point in time 15 different offices

22   and they closed them rather rapidly and probably got down to

23   less than three or four before they let me go.  When that

24   happened, the gentleman that I was working for there,

25   William Buckman, he was the financial director of the

Redirect - Thaden

1    company and basically their source of finance.  He also left

2    the company at about the same time, or just previous to me,

3    and had gone into an investment company up in Washington,

4    D.C., that worked in the Pink Sheets, and decided that he

5    was going to go into different ventures.  And that's why he

6    left the company, and that eventually folded.

7         But he reached out to me after he left the company

8    and said that if I'm having difficulty, he could possibly

9    get me some accounting business.  "Why don't you start a

10   little company and I can probably get you some clients."

11        That's when I formed MAK Consulting back in 2007.

12   And he was able to steer in my direction a handful of

13   companies that were not well-financed, but were looking for

14   someone that could provide them affordable accounting

15   resources, helping them prepare financial statements and any

16   other type of accounting work that involved accounting.

17   Q.   Sir, are you a certified public accountant?

18   A.   Excuse me?

19   Q.   Are you a certified public accountant --

20   A.   No, I am not.

21   Q.   When you formed the -- your company, what's called MAK

22   Consulting, did you come into contact with a person by the

23   name of Fred Dahlman?

24   A.   I most certainly did.  That was one of the first

25   individuals that Mr. Lockman introduced me to.  At that

1    time, Mr. Lock- -- Mr. Dahlman had a company by the name of

2    Baby Bee Bright.  And he had literally no real financial

3    records that were reliable.  And he and I conversed on the

4    phone a number of times.  I never met him personally.

5         But what I did was helped him actually build a

6    financial structure for his company in terms of taking the

7    information that he had had organized, so to speak, on a lot

8    of notes and documents that were not, you know, formally put

9    together in terms of financial statements.  And I actually

10   built from the ground up his general ledger and profit and

11   loss statements in QuickBooks so that he now had a reliable

12   financial source to know exactly where he stood with his

13   company.

14   Q.   Other than his knowing where he stood, was there any

15   other necessity for him to have the ability to access his

16   financial -- financial statements you described?

17   A.   I'm sorry, what was that again?

18   Q.   Okay.  Let me start over.  Other than his own knowledge

19   of his company, which you helped him do with the analysis

20   you did, were there any legal requirements that he had to --

21   in terms of filing financial documents that you were aware

22   of?

23   A.   No.  No, I did nothing of any type of legal work for

24   him whatsoever.  It was primarily constructing all of his

25   financial information so that he actually had a set of

Redirect - Thaden

1    records that represented an actual balance sheet and profit

2    and loss statement for his company year-by-year and built

3    period by period so that all the information consecutively

4    rolled forward from one period to the next.

5    Q.   Do you know approximately when you started doing this

6    for him, what year?

7    A.   It was probably the latter part of 2007, since as I

8    recall being relieved of my duties at Florida Rent Finders,

9    Jordan Taylor Properties was back in, like, May of 2007.

10   Q.   And did Fred Dahlman -- you indicated he had a company

11   called Baby Bee Bright.  Was that a publicly traded company

12   or was it a privately held company?

13   A.   I believe that he had some shares out there on the

14   market, but it was very little, and he got very little

15   financing from it.  I may be incorrect in that, but I don't

16   recall him having had the type of financial input from any

17   type of sources other than his own pocket.

18   Q.   Did there come a time when Mr. Dahlman and Baby Bee

19   Bright transitioned into another company?

20   A.   Yes.  Mr. Dahlman informed me that he was speaking with

21   a gentleman by the name of William Sears who was interested

22   in taking over his company as a method for him to be able to

23   get a shell, as they say, to be used to start trading on the

24   Pink Sheets for a company that he was starting called

25   FusionPharm.

1   Q.   Okay.  Mr. Sears -- did you ever talk to Mr. Sears at
2   this point?
3   A.   Once Mr. Dahlman instructed me of what was going to
4   transpire, he put me in touch with Mr. Sears and gave me his
5   direct number so that I could speak with Mr. Sears regarding
6   what it is that he was looking to accomplish when it came to
7   the transition of one company to the next.
8   Q.   Were you involved in the -- any of the paperwork that
9   caused the -- that helped cause the transition from Baby Bee
10  Bright to FusionPharm?
11  A.   Yes.  What I had done was took the transactions that
12  Mr. Sears and Mr. Dahlman agreed to and recorded those in a
13  manner so that we could transition the titled company of
14  Baby Bee Bright into FusionPharm, with the proper financial
15  entries to reflect that through the QuickBooks program that
16  I had.
17  Q.   Okay.  And after this change took place, did you
18  continue to work for FusionPharm?
19  A.   Mr. Sears asked me to continue working for him in terms
20  of preparing quarterly reports and preparing notes to
21  financial statements.  I had been doing a very limited
22  amount of that work for Mr. Dahlman, but Mr. Sears had seen
23  what I had done already for Mr. Dahlman and asked if I would
24  continue to do that.
25       It wasn't as though I needed to really keep --

Redirect - Thaden

1   continue to do the business, but Mr. Sears asked me if I
2   would do him that favor to help him through the transition
3   since he did not have a financial staff at his ready
4   disposal to do this type of work for him.
5   Q.   Okay.  And when you started doing this, did you contact
6   anybody else in the company?
7   A.   Through Mr. Sears, he did give me the name of a Scott
8   Dittman, who was at one point in time a chief financial
9   officer, from what I understood, for his company.  Had very
10  limited contact and communication with that individual.  I
11  did most of my communications through William Sears.  Each
12  and every time that I did do any type of communication, Mr.
13  Sears was always involved, or copied in on it.
14  Q.   Okay.  Did you ever -- other than Mr. Dittman, did you
15  contact anybody else with the company?
16  A.   There was one other individual that Mr. Sears told me
17  was a gentleman that was handling some legal work for him,
18  Jean Guy Pierre.  And he asked me on one or two occasions to
19  make sure I copied him on any e-mails that contained
20  financial quarterly statements.
21  Q.   How much did you -- did you charge for the services you
22  provided?
23  A.   Roughly somewhere between 200 to $300 per quarterly
24  statement.
25  Q.   How much time would it -- well, before I ask that, what

Redirect - Thaden

1    time frame are we talking about now that it's FusionPharm?

2    A.    Probably 2000 -- late 2008 or 2009 through maybe 2012

3    was the period of involvement.

4    Q.    Okay.

5    A.    The -- you know, specifics are a little bit hard for me

6    to recall since it's been almost a decade already.  But it

7    was, you know, a period of no more than two to three years,

8    if that.

9    Q.    You mentioned how much you charged.  About how much

10   time would it take you to do whatever it was you were

11   producing each quarter?

12   A.    It would vary from maybe four to eight hours, depending

13   on the amount of detail that had transpired during that

14   quarterly period of time for me to be able to go through and

15   double-check all the numbers, and then get back with Mr.

16   Sears and whoever else I needed to contact, to have any

17   questions that I might have answered.

18   Q.    I'm going to ask you to look at -- if the courtroom

19   deputy could provide you -- I don't know which volume it's

20   in but it's Government Exhibit 262.  And we'll try to blow

21   it up on the screen to your left, but it's a bit hard to

22   read sometimes.  I'll show you the hard copy in a second.

23         Could you take a look at page 2 of that document --

24   or that Exhibit 262, please.

25   A.    Okay.

1513
Redirect - Thaden

1    Q.   Is -- while you're at it, why don't you just glance

2    through that document also to pages 9, 10, 11, and 12

3    through 14.

4              MR. BROWN:   Your Honor, I would move for the

5    admission of 262; it's stipulated but not admitted.  That

6    was my error.

7              THE COURT:   All right.  Given the stipulation,

8    Exhibit 262 is admitted into evidence and may be published

9    to the jury.

10             (Government's Exhibit 262 received)

11   BY MR. BROWN:

12   Q.   Okay.  Sir, have you looked at that document?  Have you

13   looked at that document?

14   A.   Yeah, uhm-hum.  Yes.

15   Q.   Could you look at the -- well, why don't we just look

16   at page 2 to start with.  Could we maybe just expand the

17   columns and -- not expand, but show the columns.

18             Does this document reflect some of the types of

19   work that you would do for the company?

20   A.   Yes.

21   Q.   In terms of the other pages, I believe I could display,

22   just for example, page 13 in that exhibit.

23             Was such a document as page 13 also in the

24   documents that you either saw or prepared?

25   A.   Yes.

Redirect - Thaden

1    Q.   Tell us how, during the time period you worked for

2    FusionPharm, you would input the numbers -- you mentioned

3    that when you worked for Mr. Dahlman at one time he sent you

4    a whole bunch of --

5    A.   Notes.

6    Q.   -- notes and financial documents to back up what you

7    were doing.

8         With regard to FusionPharm, did you get the same

9    type of information from FusionPharm --

10   A.   No, actually --

11   Q.   -- or what would you do?

12   A.   What FusionPharm would do, since I had done the

13   platform in QuickBooks, they followed suit and used the same

14   type of financial statement platform that I had been using

15   for Mr. Dahlman.  They had put their month-to-month records

16   in that format and then would send me a quarterly printout

17   of their activities for that period and then I would take

18   that information and put it together with the previous

19   quarter to make the next quarter's documents then correspond

20   with the transactions that had happened in the interim

21   period, and then follow through to make sure that the

22   transaction flow matched with the information that they

23   provided to me.

24   Q.   Okay.  With -- you mentioned QuickBooks.  Could you

25   give us a sort of a brief, very brief, synopsis -- I mean,

Redirect - Thaden

1    what is QuickBooks?  Is that --

2    A.   It's basically a software that's used for accounting

3    purposes to record financial transactions and allow small

4    companies to generate a profit and loss statement balance

5    sheet and any other related financial documents that they

6    needed in order to support their business.

7         I worked pretty much with QuickBooks from the last

8    decade or more.  It has become a very widely used tool for

9    small companies because it allows them to easily enter

10   documents, easily enter transactions, and produce financial

11   statements at a very low cost because the software, itself,

12   is not that expensive and it has become used rather widely

13   throughout a lot of small companies.

14   Q.   So the input -- you input as it happens, let's say

15   somebody --

16   A.   Right.

17   Q.   -- buys a Coke for 50 cents, you can input that --

18   A.   You can generate an -- you can just go into the system

19   and generate an invoice, you can enter an invoice from a

20   vendor in order to record a cost and expense.  And then it

21   all tracks it and categorizes it so that when you want to

22   put together a financial statement, or even just run it, the

23   information is already there because it's been inputted into

24   a platform that properly codes it in terms of its financial

25   categories.  And then this way, you have a readily available

1    tool to determine profit and loss and balance sheet
2    information.
3    Q.   So at the end of whatever you want to do, you can just
4    look for a period and it prints out this rather --
5    A.   Yeah.
6    Q.   -- precise --
7    A.   Various codings that happen with each transaction.  So
8    it properly classifies it into a category, whether it be a
9    revenue and expense, an asset or a liability, so that you
10   always have a matching -- when you do your financial
11   statements and when you produce them, they come out
12   balanced.
13   Q.   Does it rely on how it goes in?  I mean, for example,
14   if I'm doing that and I put down a trip to -- or I put down
15   a bill from Yellow Cab and I input it as my mortgage, does
16   it still go in as mortgage?
17   A.   Well, if you -- that's why I always looked at the line
18   item activity from one quarter to the next to make sure that
19   the information made a sensible flow.  In other words, there
20   were proper categorizations, and you would look at a
21   increase-decrease between various levels of income and
22   expense from one quarter to the next --
23   Q.   When you --
24   A.   -- in terms of reasonableness.
25   Q.   When you did this work for FusionPharm, you indicated

Redirect - Thaden

1     in your earlier testimony that you would receive data that

2     had -- did you receive raw data?

3     A.    No.    They would produce an actual interim statement for

4     me to examine and then I would go on that to look at the

5     flow of activity from one quarter to the next to see whether

6     or not the actual numbers were in a format that made sense.

7              In other words, there weren't anything that would

8     catch my eye that didn't seem to flow properly without

9     proper explanation.

10    Q.    Were -- would you receive these -- I presume you

11    received these by e-mail?

12    A.    Yeah.   E-mail the whole time.

13    Q.    And would it be like a PDF document that you couldn't

14    change?

15    A.    Yeah, it would be a PDF that I would get and I would

16    drop it into my own format at home, because I had my own

17    QuickBooks platform at home to generate the statements for

18    FusionPharm.

19    Q.    Would it -- would you receive sort of basically the

20    final numbers of what was sent to you from --

21    A.    Correct.

22    Q.    -- FusionPharm?

23    A.    Uhm-hum.

24    Q.    And you -- you indicated that you did this to make sure

25    it flowed from quarter to quarter to quarter to quarter.

Redirect - Thaden

1    A.   Right.

2    Q.   And is -- was there any regulatory activity or did

3    these quarterlies have to be filed somewhere, to your

4    knowledge, with the --

5    A.   Yes.

6    Q.   -- regulatory agency?

7    A.   Once I finished with the statements, I would send them

8    back to Mr. Sears who was actually using them to post on the

9    Pink Sheet platform.

10   Q.   Was your function to make sure -- I think you've

11   described your function.  Would you make sure that there was

12   nothing out of the ordinary from one quarter to the next?

13   A.   Correct.

14   Q.   Were you involved in actually filing documents with

15   the --

16   A.   No.

17   Q.   -- OTC or any other agency?

18   A.   No.  Not at all.

19   Q.   You just send it back to the client --

20   A.   All I would do is return it via e-mail to Mr. Sears and

21   it was left in his hands to do whatever.

22            MR. BROWN:  Your Honor, could I have one second.

23   BY MR. BROWN:

24   Q.   Did you deal with Mr. Sears primarily?

25   A.   I'm sorry?

1519

Redirect - Thaden

1    Q.   Did you deal with Mr. Sears primarily, you --

2    A.   Yes.

3    Q.   Could you take a look at -- and I'll show it to you on

4    the screen to your left, Government Exhibit 169.  Let me

5    make sure it's been admitted.  I believe that's already been

6    admitted.  Can you blow up the top portion of that document,

7    please.  Actually, why don't we begin at the bottom because

8    these e-mails start at the bottom and go upwards.  Is there

9    a second page to Government Exhibit 169?  Okay.  Maybe we

10   could expand the . . .

11        Can you tell us what this e-mail -- why don't you

12   just take a look at that e-mail string, if you could.  Is

13   that an e-mail that you received from William Sears, the

14   bottom portion?

15   A.   Yes.  That is an e-mail I received from him.

16   Q.   And was he -- was this an inquiry about the documents

17   you were going to provide?

18   A.   Yes.

19   Q.   Maybe we could scroll up.  I think at the top of that

20   page and the bottom of the first page is your response.  Is

21   that correct?  Is that a response that you made --

22   A.   Yes.

23   Q.   -- to --

24   A.   Yes, that is.

25   Q.   -- to Mr. Sears?

Redirect - Thaden

1    A.    Uhm-hum.

2    Q.    And could we look at the top of that page.

3          Is that a continuation of this e-mail string that

4    involves Scott Dittman asking you to do some things to

5    whatever the document is that you're talking about?

6    A.    Yes.    There was a e-mail correspondence between myself

7    and Scott Dittman.

8    Q.    I'm -- you probably don't have any specific

9    recollection of this, but what would the phrase, "Collapse

10   the 2 revenue line items into 1...just call it sales," what

11   does that mean to you?

12   A.    They had two categories, I guess, that were classified

13   as sales and they wanted to just report one line item rather

14   than two.

15   Q.    Okay.  And if you were requested to do that -- you did

16   not have the backup information to determine whether --

17   A.    No.

18   Q.    -- that was appropriate or not, right?

19   A.    No, I did not.

20   Q.    Okay.  Thank you.  We can take that down.

21         Did you receive a number of e-mails between

22   yourself and Mr. Sears, primarily, over the course of your

23   employment -- not employment, but your --

24   A.    Yeah.    There would be e-mails between the two of us on

25   a, you know, somewhat repetitive nature basis.

Redirect - Thaden

1  Q.  Every -- you had to file these -- these had to be filed

2  every quarter?

3  A.  I'm sorry, what was that again?

4  Q.  These had to be filed every quarter?

5  A.  Yes.

6  Q.  And sometimes you were in a hurry and sometimes you

7  weren't?

8  A.  Well, I had to do a quarterly and year-end, so there

9  would be three quarterlies plus a year-end financial as

10  well.

11  Q.  Would you take a look at Government Exhibit 174,

12  please.

13       MR. BROWN:  Let me check and see if this has been

14  admitted, Your Honor.  I think it has.

15       THE COURT:  It's on the large screen.

16       MR. BROWN:  Okay.  This has been admitted, Your

17  Honor, 174.

18       THE COURT:  All right.

19  BY MR. BROWN:

20  Q.  Could you take a look at that one-page e-mail.

21  A.  Yes.

22  Q.  Maybe just the top.  What is this e-mail that -- if you

23  can remember, what it was about?

24  A.  There was -- I guess from William Sears to myself

25  because I was copied on it, along with Guy --

1522

Redirect - Thaden

1    Q.   Okay.

2    A.   -- Jean-Pierre.

3    Q.   And that's to guy@fusionpharminc.com?

4    A.   Uhm-hum.

5    Q.   And it indicated -- well, it speaks for itself, but

6    what did you take this to mean?

7    A.   I'm sorry, what was that?

8    Q.   What did you take this e-mail to you to mean?

9    A.   That he also wanted to have Jean Guy Pierre -- Guy

10   Jean-Pierre included with himself on any of the further

11   information e-mails that I would send to him regarding the

12   financial statements.

13   Q.   Okay.  Could you take a look at Government Exhibit 171,

14   please, which I believe has already been admitted.  Can you

15   scroll down a little bit.

16        Is this -- could you just take a look at that and

17   take your time reading it over.  Is that an e-mail

18   consistent with what you've been describing as contact with

19   William Sears?

20   A.   Yeah.  That is.

21   Q.   That was in 2011?

22        MR. BROWN:  Your Honor, I would -- I'm going to ask

23   the defendant -- or, excuse me, the witness to look at 168,

24   176, 178, and 179 and move for their admission.  They have

25   been stipulated to but they're not in evidence.

```
                                                              1523
                         Redirect - Thaden
```

 1              THE COURT:  All right.  One second.

 2              MR. GOODREID:  Could I have the exhibit, please?

 3              THE COURT:  All right, all four of these are

 4    stipulated?

 5              MR. BROWN:  Yes, Your Honor.

 6              THE COURT:  All right.  Given the stipulation of

 7    the parties, Government Exhibits 168, 176, 178, 179 are

 8    admitted into evidence and may be published to the jury.

 9          (Government's Exhibits received)

10    BY MR. BROWN:

11    Q.   Can you take a look at Government Exhibit 168.  Is that

12    another one of the e-mails that you had contact with William

13    Sears --

14    A.   Yes, it is.

15    Q.   -- and copied to Scott Dittman regarding financials you

16    filed for September's --

17    A.   Yes.

18    Q.   -- of --

19    A.   That is -- this is an e-mail that went between back and

20    forth between us.

21              THE COURT:  Mr. Kocinski -- Mr. Kocinski, over

22    here.  Over here.  Please wait for the lawyer to finish his

23    question before you answer.  You're talking over him and the

24    court reporter can only take down one voice at a time.  So I

25    know that's not how we naturally converse, but I think --

Redirect - Thaden

1     let him finish his question and then he'll let you finish

2     your answer before he asks his next question.

3              THE WITNESS:  Sure.

4              THE COURT:  Okay.  Go ahead, Mr. Brown.

5              MR. BROWN:  Thank you, Your Honor.

6     BY MR. BROWN:

7     Q.   I showed you an e-mail earlier with the name of Guy

8     Jean-Pierre, but I didn't ask you if this is the time it

9     was -- we can take this down, this exhibit that's on the

10    screen -- I didn't ask you about what you knew of him.

11             Did you know what his role with the company was?

12    A.   To the best of my recollection, Mr. Sears indicated to

13    me that he was the legal consultant that was working for him

14    on FusionPharm.

15    Q.   With regard to Mr. Jean-Pierre, did you ever have a

16    conversation with him?

17    A.   To my knowledge, I didn't have any direct conversations

18    with him at all.

19    Q.   Did you ever share any e-mails directly with him --

20    A.   Occasionally.  Maybe one or two, to the best of my

21    recollection.

22    Q.   Can you take a look at Government Exhibit 177.

23             Could you take -- could you tell us what the date

24    of that -- well, why don't we scroll down to the bottom so

25    we can get the context.

Redirect - Thaden

1    Does the bottom of Exhibit 177, does that show an
2    e-mail from you to guy@fusionpharminc.com with a copy to
3    William Sears and Scott Dittman?
4    A.   Yes, that is.
5    Q.   There's a -- the phrase, "Dear sir, I'm the
6    accountant," et cetera, "that assisted in the preparation of
7    the financial statements."  Why did you send that e-mail to
8    them, if you know?
9    A.   Mr. Sears was asking for me to be as elaborate as
10   possible in terms of how these statements were prepared.
11   And we discussed this wording as being the best and most
12   appropriate for the methodology that I was using in order to
13   help him produce his financial statements.
14   Q.   Would you take a look at Government Exhibit 175,
15   please.  I believe that's been admitted.  And could you
16   scroll to the second page of that document.  Maybe we could
17   put that on the screen.  And if we could -- I guess the
18   e-mail starts on the bottom of page 1.  Maybe we could bring
19   that up.
20        If you look at the very bottom of page 1, does it
21   appear to you the e-mail string is beginning where it says,
22   "Original message from William Sears?"  Do you see that at
23   the bottom?
24   A.   I'm sorry, could you repeat that?
25   Q.   Do you see the e-mail that I'm showing you on the

1  screen, which is the bottom half of page 1 of Exhibit 175

2  that says From William Sears to Mike Kocinski, with copies

3  to Jean-Pierre?

4  A.   Yes, I see that.

5  Q.   And could we scroll to the next page that has -- which

6  has the body of that e-mail.  Maybe we could blow up --

7  yeah.

8  A.   Oh.

9  Q.   Can you read that e-mail and tell us if you remember

10  that.

11  A.   Yes.  That is an e-mail I received.

12  Q.   This e-mail, who is it from?

13  A.   I'm sorry?

14  Q.   Who sent the e-mail to you?

15  A.   William -- it looks like it was from Jean Guy Pierre.

16  Q.   Look at the -- we can look at the bottom of page 1

17  again.

18       Could you tell us who that e-mail to you is from?

19  A.   This one appears to come to me from William Sears.

20  Q.   Maybe we could scroll to the text on the bottom -- on

21  the -- on page 2.

22       And the text of the message says, "This is the

23  final format, I need you to send e-mails, as you did last

24  quarter, to Guy Jean-Pierre stating you are a CPA and are

25  prepared in accordance with GAAP," et cetera.

Redirect - Thaden

1       Did you inquire of Mr. Sears why he wanted you to

2   send that?

3   A.    I didn't make a direct inquiry.  I looked at the

4   information that he sent to me and either called him or

5   e-mailed him back in regards to the request.

6   Q.    And could we scroll up to page 1, the e-mail at the

7   bottom third of that page.  Does that contain your response?

8   A.    Yes, that is my response to that request.

9   Q.    And you indicated you're not a CPA and you couldn't

10  fulfill the request from the earlier e-mail indicating you

11  were a CPA; is that right?

12  A.    That is correct.  I could not reply to that request in

13  that format.

14  Q.    There's a reference there to -- in accordance with

15  GAAP.  What is GAAP?

16  A.    Generally Accepted Accounting Principles.

17  Q.    And why is that in all caps?  Is that a common --

18  A.    It's kind of like a shorthand for that phrase that I

19  just explained to you, which primarily means that people

20  that are putting together financial records use a format and

21  a methodology that follows certain guidelines in the

22  recording of revenues, expenses, and assets and liabilities

23  that the accounting board that oversees rules and

24  regulations would expect to be followed in a normal course

25  of preparing a statement.

1    Q.   And with regard to that, they were asking you to send

2    this quotation to Guy Jean-Pierre with every future --

3    excuse me, Mr. Sears was asking you to send that language to

4    Mr. Jean-Pierre with regard to future quarterly filings; is

5    that correct?

6    A.   Yes, that's correct.

7    Q.   And did you do that?

8    A.   Whatever else -- the ones I did, I believe I sent him

9    in that format, or that statement that would be included

10   when I sent the financials.

11   Q.   And did you -- the financials you sent, again, you

12   utilized the -- I guess the final numbers that you were

13   provided; is that right?

14   A.   Yes.

15   Q.   And you were basically making sure they rolled over

16   sequentially?

17   A.   Yes.

18   Q.   Typically would a -- I mean, if you were at their

19   office or had had access to all the hard copy -- or the raw

20   data, would you be able to present a more accurate picture,

21   or at least a more complete picture?

22   A.   I would not necessary prepare a more accurate picture.

23   I would be possibly more well-informed of what it was that

24   they used this basis for conducting their transactions, but

25   not having been afforded the luxury of enough income from

Cross - Kocinski

1    working for Mr. Sears, I never had the opportunity actually

2    to have an on-site visit with him at his facility or at his

3    offices to be able to do that type of an examination.

4    Q.    And they never sent you the raw --

5    A.    Excuse me?

6    Q.    They never sent you the raw data to --

7    A.    No, never.

8    Q.    -- to do --

9              MR. BROWN:  Can I have one moment, Your Honor?

10             THE COURT:  You may.

11   BY MR. BROWN:

12   Q.    And the raw data would be the information that was

13   imported -- or put into the QuickBooks system; would that be

14   correct?

15   A.    Yes.

16             MR. BROWN:  I think that's all I have, sir.  Thank

17   you.

18             THE COURT:  Cross-examination.

19             MR. GOODREID:  Yes, Your Honor, thank you.

20                         CROSS-EXAMINATION

21   BY MR. GOODREID:

22   Q.    Good afternoon -- good afternoon, sir.  Is your last

23   name -- is it pronounced Kocinski with a soft C?

24   A.    Kocinski.

25   Q.    Kocinski.  All right.  So, Mr. Kocinski, you recall

Cross - Kocinski

1    that Government counsel asked you questions about various

2    e-mails, some of which Mr. Guy Jean-Pierre was cc'd on.

3    A.    Yes.

4    Q.    You recall him asking you about that?

5    A.    Yes.

6    Q.    And you indicated that Mr. Jean-Pierre was cc'd on some

7    of the e-mails, correct?

8    A.    Yes.

9    Q.    Okay.  So if we could pull up Government Exhibit 262,

10   please, page 1.  And if we could enlarge the top portion,

11   the From, Sent, that sort of thing.  And -- I'm sorry, do I

12   have the wrong number?

13          MR. GOODREID:  Your Honor, may I have a moment?  I

14   think I have the wrong number.  Pardon me.

15          THE COURT:  Sure.

16   BY MR. GOODREID:

17   Q.    All right.  I apologize, Mr. Kocinski.  I had the wrong

18   number.  Let's go to 169, please.  If we could highlight

19   that top portion with the From and To.

20          Mr. Kocinski, do you recall being asked about this

21   exhibit?

22   A.    I'm sorry, could you speak up a little bit?

23   Q.    Sure.  Do you recall being asked by Government counsel

24   about this exhibit, this e-mail?

25   A.    Yes.  Yes, I do.

1  Q.   And this is an example, isn't it, of an e-mail where

2  Mr. Guy Jean-Pierre was cc'd, correct?  You see on the cc

3  line?

4  A.   Yes.

5  Q.   Okay.  Now, if we could go to page 13 in that document.

6  All right.  Well, we can use another exhibit.

7       You recall, don't you, that -- again, he was cc'd

8  on some of the e-mails?  We just talked about that, right?

9  A.   I'm sorry, could you repeat that?

10 Q.   Mr. Guy Jean-Pierre was cc'd on some of the e-mails.

11 We just talked about that, right?

12 A.   Yes, some.

13 Q.   Okay.  Now, with respect to the financials, you

14 indicated that the -- you prepared the financial documents

15 based upon the information that FusionPharm people had

16 provided you, right?

17 A.   Correct.

18 Q.   And that would have been Mr. Dittman or Mr. Sears?

19 A.   Yes.

20 Q.   Okay.  And there were not any instances that you can

21 recall where Mr. Guy Jean-Pierre was involved in actually

22 providing you with financial information; isn't that

23 right?

24 A.   That is correct.  I never recall him providing me any

25 information.

Cross - Kocinski

1  Q.   Okay.  And there also were -- back to the e-mails,

2  there were a number of e-mails that you had between you and

3  Mr. Sears or Mr. Dittman in which Mr. Guy Jean-Pierre was

4  not even copied on those e-mails, right?

5  A.   Correct.

6  Q.   Okay.  In fact, if we pull up Government Exhibit 168,

7  please.  And, again, do you see that, Mr. Kocinski?

8  A.   I'm sorry, can you repeat that?

9  Q.   Yeah.  Do you see that document?

10 A.   Yes.

11 Q.   Government Exhibit 168?  And this is an example --

12 well, first of all, the subject, it says September 30th,

13 right?

14 A.   Correct.

15 Q.   Okay.

16 A.   That's correct.

17 Q.   And this is an e-mail from you, right?

18 A.   Yes.

19 Q.   And this would be an example of an e-mail dealing with

20 financials where Mr. Guy Jean-Pierre was not even copied on

21 the e-mail, correct?

22 A.   That is correct.

23        MR. GOODREID:  Your Honor, I have no additional

24 questions.

25        THE COURT:  All right.  Thank you.  Redirect?

1           MR. BROWN:  None, Your Honor.  Thank you.

2           THE COURT:  Okay.  May this witness be excused?

3           MR. BROWN:  Yes, sir.

4           THE COURT:  All right.  For the defendant?

5           MR. GOODREID:  Yes, Your Honor.

6           THE COURT:  All right.  Mr. Kocinski, thank -- Mr.

7   Kocinski, thank you for your testimony.  You're excused, you

8   may step down.

9           THE WITNESS:  Thank you.

10          THE COURT:  Government may call its next witness.

11          MR. SIBERT:  Your Honor, at this time the

12  Government would like to -- the Government would like to

13  call Miss Sandra Sears.  And this would be the mother of

14  William Sears.

15          THE COURT:  Okay.

16          COURTROOM DEPUTY:  If you'll please stand behind

17  the witness stand here and raise your right hand.

18          THE WITNESS:  Here?

19          COURTROOM DEPUTY:  Yeah, just right there.  Thank

20  you.

21           SANDRA SEARS, GOVERNMENT'S WITNESS, SWORN

22          COURTROOM DEPUTY:  Please be seated.  If you'll

23  please state and spell your name for the record.

24          THE WITNESS:  Sandra Sears.  S-a-n-d-r-a,

25  S-e-a-r-s.

Direct - Sandra Sears

1    THE COURT:  Ms. Sears, Ms. Sears.  You need to push
2    your -- pull your chair up much closer to the mic.  Can you
3    do that?
4              THE WITNESS:  Yeah.
5              THE COURT:  And you have a very soft voice, I can
6    already tell, so you have to speak up and speak into the mic
7    or we won't be able to hear you.
8              THE WITNESS:  Okay.
9              MR. SIBERT:  Sir, may I begin?
10             THE COURT:  Yes, you may.
11             MR. SIBERT:  Thank you.
12                        DIRECT EXAMINATION
13   BY MR. SIBERT:
14   Q.   Good afternoon, ma'am.
15   A.   Good afternoon.
16   Q.   All right, ma'am, can you please tell the jury where
17   you currently reside, live.
18   A.   New Bern, North Carolina.
19   Q.   All right.  Are you a Bears fan?
20   A.   No.
21   Q.   You don't like the Bears in New Bern?
22   A.   No.
23   Q.   All right.  Did you make out okay in the storm this
24   fall?
25   A.   Yes, I did.

Direct - Sandra Sears

1  Q.  All right.  You got -- that area got hit very rough,

2  didn't it?

3  A.  Very bad, uhm-hum.

4  Q.  All right.  Ma'am, could you currently tell the jury

5  what you do now for employment.

6  A.  I'm 75 years old.  I don't do anything.

7  Q.  Okay.  Good for you.  Now, could you tell the jury what

8  you did prior to being retired?

9  A.  I worked for Prudential Insurance.

10  Q.  Okay.  And what was your job at Prudential Insurance?

11  A.  Customer service.

12  Q.  Okay.  And could you tell me essentially a little bit

13  of what is involved with customer service with your job at

14  Prudential Insurance.

15  A.  It's handling phone calls, handling death claims.  If

16  people need some assistance from an agent, connecting them

17  with their agent.

18  Q.  All right.  So you were not an agent that either sold

19  insurance or dealt with insurance --

20  A.  No.

21  Q.  -- you're handling all the complaining people like

22  myself calling --

23  A.  Yes.

24  Q.  -- in --

25  A.  Yes.

Direct - Sandra Sears

1    Q.   Okay.  Now, also as part of that job, how long were you

2    with Prudential Insurance?

3    A.   Seven years.

4    Q.   Okay.  And was that your last job that you had --

5    A.   That was the last one, yes.

6    Q.   So when did you retire?  Do you remember what year?

7    A.   No.

8    Q.   Excuse me?

9    A.   No.

10   Q.   Okay.

11   A.   I'm sorry.

12   Q.   I'm sorry?

13   A.   I'm sorry, no, I don't remember.

14   Q.   Okay.  Do you know if it was before you turned 70 years

15   old?

16   A.   Yes, it was.

17   Q.   Okay.  Now, was this -- did you work at the Prudential

18   Insurance agency in New Bern, North Carolina?

19   A.   No.  It was in Levittown, New York.

20   Q.   Okay.  And after you finished working for Prudential

21   Insurance, did you move to North Carolina?

22   A.   Yes.

23   Q.   All right.  Are you married, ma'am?

24   A.   Yes.

25   Q.   Okay.  And can I ask you what Mr. Sears does?

Direct - Sandra Sears

1    A.   He works for Harris Teeter.  He's a baker.

2    Q.   And does he work for Harris Teeter there in

3    North Carolina?

4    A.   Yes.

5    Q.   You can tell him he's a doing a good job.

6         All right.  Now, ma'am, I'd like to ask you some

7    questions.  Let me just back up real quick.  Before you

8    worked for Prudential Securities, did you have other

9    employment in New York?

10   A.   Yes.

11   Q.   And --

12   A.   I worked for --

13   Q.   Who did you work for prior to Prudential --

14   A.   Bulova Watch.

15   Q.   I'm sorry?

16   A.   Bulova Watch Company.

17   Q.   It's a watch company?

18   A.   Bulova.

19   Q.   Okay.  And what did you do for that watch company?

20   A.   I was a -- like a secretary.

21   Q.   Okay.  A secretary?

22   A.   Yeah.

23   Q.   All right.  I'm sorry, can you just -- I know it's

24   hard, this courtroom is large, apparently a lot of people

25   have bad hearing, including myself, so could you just keep

1538
Direct - Sandra Sears

1     your voice up, please?

2     A.    I'll try.

3     Q.    Okay.  Thank you.

4           All right.  Now, is it fair to say that nowhere in

5     your background you had any experience running investment

6     companies?

7     A.    That's fair to say that.

8     Q.    Were you ever a CEO or owner of an investment company?

9     A.    No.

10    Q.    Okay.  Did you ever handle -- did you ever work in a

11    company that was considered a shell company for holding

12    shares?

13    A.    Yes.

14    Q.    All right.  Do you know the name of that?

15    A.    Bayside.

16    Q.    Okay.  And what did Bayside do?

17    A.    Holding company.

18    Q.    Okay.  For what kind of shares?

19    A.    I believe it was -- I have to go back and think.  It's

20    a lot of years ago.

21    Q.    Okay.  When did you do this?

22    A.    A lot of years ago.  I can't give you an exact date.  I

23    don't remember.

24    Q.    You don't remember when you ran a company holding

25    shares of stock?

1   A.   Yeah.  I don't remember the exact date.  I . . .

2   Q.   Okay.  Do you know what kinds of -- so you don't know

3   what kind of shares your company, Bayside, held?

4   A.   I think FusionPharm.

5   Q.   Do you know --

6   A.   I think.

7   Q.   Okay.  You think it was FusionPharm?

8   A.   I think.

9   Q.   Any other shares?

10  A.   I don't remember.  I -- I don't remember a lot of

11  things back then.

12  Q.   Ma'am, how much money did you make when you were

13  working as a customer service representative for Prudential

14  Insurance?  Do you remember that?

15  A.   No.

16  Q.   Do you know how much your husband makes being a baker

17  for Harris Teeter --

18  A.   Very little.

19  Q.   Did you -- did you make over $200,000 as a customer

20  service representative for Prudential Insurance?

21  A.   No.  Those are the agents that made that kind of money.

22  Q.   The agents made that kind of money.

23  A.   Yes.

24  Q.   Okay.  So the people that worked hard like yourself,

25  you didn't make over 200,000.

Direct - Sandra Sears

1    A.   No, they sold it and we did all the paperwork and

2    corrections and whatever.

3    Q.   And, ma'am, is your retirement right now -- do you have

4    a net worth of over a million dollars?

5    A.   No.

6    Q.   Now, I'm sorry for those questions.

7         Now, did you ever provide in your life a loan of

8    $36,700?

9    A.   I may have.

10   Q.   Okay.  How about did you provide a month later a loan

11   of $14,000?

12   A.   I -- I don't know.

13   Q.   Okay.  A month after providing the $14,000, do you know

14   if you provided another $10,000 loan?

15   A.   I don't know.  I -- I could just tell you that was

16   whatever loans or whatever was going on, I have very little

17   knowledge remembering it.  My -- my mom was sick, she was in

18   and out of hospital, she passed away.  Things are not very

19   clear in my brain anymore.

20   Q.   Okay.  And --

21   A.   I'm sorry.

22   Q.   No, that's okay, ma'am.  Being truthful is never being

23   wrong.

24   A.   Yeah.

25   Q.   Now, did you -- did you ever provide yourself any type

1541

Direct - Sandra Sears

1  of loan through your company Bayside?

2  A.  Myself?

3  Q.  Yes.

4  A.  No.  I don't think so.  No.

5  Q.  Can I ask you, ma'am, if you would have had the

6  controlling ability to authorize loans, if you made loans

7  for Bayside?

8  A.  I would have or I would have given my son permission.

9  Q.  And I understand you have three children.  Who --

10  A.  There's only one boy.

11  Q.  Excuse me?

12  A.  There's only one boy.

13  Q.  Can you tell me who -- the name of your son.

14  A.  William.  William Sears.

15  Q.  Okay.  And did Mr. Sears assist you on a lot of the

16  duties when it came to Bayside?

17  A.  Yes.  If I asked him to.

18  Q.  And where did Mr. Sears live when he assisted you with

19  Bayside?

20  A.  I believe he was in Colorado.

21  Q.  Okay.  Ma'am, do you know a firm named Star City

22  Capital?

23  A.  I -- I don't know.

24  Q.  Do you know a firm named Vera Group?

25  A.  I'm not -- I don't know.

1    Q.   Do you know a Black Arch Opportunity Fund?

2    A.   Black Art?

3    Q.   Arch.  A-r-c-h.

4    A.   Oh, Arch.  I don't know.

5    Q.   Do you know an SGI Group?

6    A.   I don't -- I don't -- I don't remember.  I don't know.

7    Q.   Do you know what a preferred share of stock is?

8    A.   Not really.

9    Q.   Do you know what the difference between a preferred

10   share of stock and a common share of stock?

11   A.   Not really.

12           THE COURT:  Mr. Sibert, would this be a good time

13   for our afternoon pause?

14           MR. SIBERT:  Yes, sir.  Thank you.

15           THE COURT:  All right.  Members of the jury, we are

16   going to take our afternoon recess.  We will be in recess

17   for 15 minutes.

18        (Jury left the courtroom at 3:09 p.m.)

19           THE COURT:  Ms. Sears, since you're in the middle

20   of your testimony, I direct you not to speak with any of the

21   lawyers during the break.  Did you understand me?

22           THE WITNESS:  I don't even know who the lawyers

23   are.  Okay.

24           THE COURT:  Well, then the best course of action is

25   not to speak with anyone.  All right.

Direct - Sandra Sears

1    THE WITNESS:  Okay.

2        (Recess taken 3:10 p.m. to 3:29 p.m.)

3        THE COURT:  Ms. Sears.  Ms. Sears.

4        THE WITNESS:  Yes.

5        THE COURT:  Over here.

6        THE WITNESS:  Oh.

7        THE COURT:  I remind you that you remain under

8    oath.

9        THE WITNESS:  Yes.

10        THE COURT:  All right.  Mr. Sibert, you may resume

11   your examination.

12        MR. SIBERT:  Okay.  Thank you, sir.

13   BY MR. SIBERT:

14   Q.   Ma'am, is your middle initial L, as in --

15   A.   Yes.  Yes.

16   Q.   Okay.

17        MR. SIBERT:  Your Honor, at this time, the

18   Government would move to admit Government Exhibit 91, 106,

19   108 --

20        THE COURT:  Slow down.

21        MR. SIBERT:  Okay.  I'll start over.

22        THE COURT:  No, I've got those three.  Go on.

23        MR. SIBERT:  109, 110.  They've all been stipulated

24   to.

25        THE COURT:  All right.  Given the stipulation of

1    the parties, Government Exhibits 91, 106, 108, 109, and 110

2    are all admitted into evidence and may be published to the

3    jury.

4         (Government's Exhibits received)

5    BY MR. SIBERT:

6    Q.   Okay.  I'm going to hold off on publishing.

7              Ma'am, do you know a Mr. Fred Dahlman?

8    A.   I don't know.

9    Q.   Do you know a company named Baby Bee Bright

10   Corporation?

11   A.   Baby Bee Bright?

12   Q.   Yes, ma'am.

13   A.   I don't know.

14   Q.   Can I just have page 1 of Government Exhibit 91 up.

15   Can you scroll up, please.  Oops, stop.

16             Do you know why you were named a -- or elected as a

17   director of Baby Bee Bright?

18   A.   No.

19   Q.   Thank you.  Ma'am, do you know a Todd Abbott, Craig

20   Dooley?  Do you know either of those names?

21   A.   They don't sound familiar.

22   Q.   Can I have page 4 of Government Exhibit 108.

23             Do you know why your company, Bayside, is issuing

24   20,000 shares of FusionPharm stock to Craig Dooley and

25   40,000 shares to Todd Abbott?

Direct - Sandra Sears

1    MR. GOODREID:  Your Honor, if I may ask for some

2    clarity for this witness.  Counsel's asking his questions in

3    the present tense.  This is a historical document.  And I

4    think for this witness, who's been a bit confused, perhaps

5    that could be clarified.

6    THE COURT:  All right.  I think that's a fair

7    point.  Do you want to rephrase?

8    MR. SIBERT:  Sure.

9    BY MR. SIBERT:

10   Q.   In 2011 -- September 2011, do you know why your

11   company, Bayside Realty Holdings, transferred shares of

12   20,000 and 40,000 to the two individuals you stated you did

13   not know?

14   A.   I don't -- I don't know.  2011.  That's a long time

15   ago.

16   Q.   It was 2011, ma'am.

17   A.   Yeah.

18   Q.   Okay.  Can I have document -- Exhibit 109, please, page

19   7.  Thank you.

20       Ma'am, if you look at the top of this document,

21   that's the company that you testified was your company?

22   A.   Right.

23   Q.   Okay.  And this letter is dated October 28, 2011,

24   correct?

25   A.   Yes.

Direct - Sandra Sears

1    Q.   Is that your signature on this letter?

2    A.   Looks like it.

3    Q.   Do you know why in October 2011 -- October 28th, 2011,

4    you're asking for 70,000 shares of FusionPharm stock to be

5    transferred to MicroCap Management?

6    A.   No.

7    Q.   Thank you.  Ma'am, do you know a Mr. Guy Jean-Pierre?

8    A.   I don't know him personally.

9    Q.   Have you ever spoken to him?

10   A.   Yes.

11   Q.   How have you spoken to him?

12   A.   I believe I -- I believe it was -- I was in a bank.  I

13   think I gave him --

14           MR. BARNARD:  I'm sorry, Your Honor, I can't hear

15   the witness.

16           THE WITNESS:  I'm sorry, I'm trying.

17           THE COURT:  That's all right, ma'am.  Please keep

18   your voice up and speak into the microphones.

19           THE WITNESS:  Okay.  That's because I can't look at

20   you and talk.

21   BY MR. SIBERT:

22   Q.   I'm not that ugly, am I --

23   A.   No, it's just this -- anyway.  Could you repeat that,

24   please?

25   Q.   Yes, ma'am.  I believe I asked you if you had ever met

Direct - Sandra Sears

1    in person Mr. Guy Jean-Pierre and I believe you were

2    saying --

3    A.   No, I never met him in person.

4    Q.   So you never ran into him in the bank?

5    A.   No.

6    Q.   And do you -- did you ever have any other conversations

7    with him via telephone or e-mail?

8    A.   I did have a telephone, I believe.

9    Q.   Okay.

10    A.   Yeah.  A long time ago.

11    Q.   A long, long time ago?

12    A.   I think, yeah.

13    Q.   You think.

14    A.   I think.

15    Q.   You're not sure?

16    A.   I don't know what to tell you.  Yeah.

17    Q.   Okay.  And do you know what Mr. Guy Jean-Pierre does?

18    A.   I believe he's a lawyer.

19    Q.   Have you talked to your son, William Sears, about his

20    testimony in this case?

21    A.   A little bit.

22    Q.   And did it involve -- did that conversation involve Mr.

23    Guy Jean-Pierre?

24    A.   No.

25    Q.   Now, do you know how much you paid Mr. Guy Jean-Pierre

Direct - Sandra Sears

1    through your company?

2    A.    No.

3    Q.    Can you look at Government Exhibit 158, please.

4              Do you see this check on Government Exhibit 158?

5    A.    Yes.

6    Q.    That's your company; is that correct?

7    A.    Yes.

8    Q.    And who are you -- who is your son making this check

9    out to?

10   A.    Jean-Pierre.

11   Q.    Okay.  Do you know what that's for?

12   A.    It was probably for some help with something.  He's a

13   lawyer.

14   Q.    Okay.  Just help?

15   A.    I'm assuming, and gave advice.  It was for, you know,

16   legal advice.

17   Q.    That's in October 2011?

18   A.    That's what it says, yeah.

19   Q.    Can I have Government Exhibit 159.

20             Again, do you know why your firm is paying Mr.

21   --Jean-Pierre Jean-Pierre in March of 2012?

22   A.    Again, I'm assuming it's for legal advice.

23   Q.    Do you know what legal advice?

24   A.    Not really.  I don't remember.

25   Q.    All right.  Let's go to 2013.  Can I have Government

1549
Direct - Sandra Sears

1    Exhibit 166.

2              Again, your firm, correct?

3    A.    Yes.

4    Q.    And you're making another check out to Mr. Guy

5    Jean-Pierre.  Is that right?  Or Jean-Pierre-Jean-Pierre?

6    A.    Yes.

7    Q.    Do you know why your company's paying him $500 in 2013?

8    A.    I'm assuming it's going to be for the same reason.

9    Q.    Do you know what specific legal advice?

10   A.    No.

11   Q.    Ma'am, is it fair to say that your son, William Sears,

12   ran your company, Bayside?

13   A.    No.  He did help with things, you know.

14   Q.    I'm sorry, ma'am --

15   A.    He did help with things.

16   Q.    He helped with a lot of things.  He -- you would agree

17   with me on that, right?

18   A.    He did help with things, yes.

19   Q.    Okay.  And he did all the account -- he was -- he also

20   sent checks, money, right?

21   A.    Well, the -- that was his signature on it, wasn't it?

22   Q.    You tell me.

23              Can I have 158 up here.

24   A.    That --

25   Q.    What's that, ma'am?

1550

Direct - Sandra Sears

1    A.   Doesn't that look like William?

2    Q.   Let's look at it.  Who's signing that check?

3    A.   I don't know.

4    Q.   So you don't know who signed your company's checks?

5    A.   That doesn't -- it looks like William, I mean, to me.

6    Q.   All right.  159.

7    A.   He did have my permission to sign checks, you know.

8    Q.   Do you know whose signature that is?

9    A.   It's the same one as the other one.

10   Q.   And see this note here, it says January payment,

11   correct?

12   A.   Yes.

13   Q.   So you don't remember what Mr. Guy Jean-Pierre did when

14   he was on a monthly payment for your company?

15   A.   No, I don't.

16   Q.   You would agree the finances of a company are very

17   important?

18            MR. GOODREID:  Objection.  Leading.

19            THE COURT:  Sustained.

20   BY MR. SIBERT:

21   Q.   Do you think the finances of a company are important?

22   A.   I'm sorry?

23   Q.   Do you think the finances of a company are important?

24   A.   Yes.

25   Q.   But you don't know what your son's spending money on?

Direct - Sandra Sears

1    A.    I --

2            MR. GOODREID:  Objection.  A, it's leading; and, B,

3    it's mischaracterizing prior testimony.

4            THE COURT:  I'll sustain on the leading, A.

5    BY MR. SIBERT:

6    Q.    Do you know what your son was paying money for

7    specifically to Mr. Jean-Pierre-Jean-Pierre?

8    A.    I'm assuming it was for legal advice.

9    Q.    But do you know what legal advice?

10   A.    No.

11           MR. GOODREID:  Objection, asked and answered.  This

12   is badgering this witness.

13           THE COURT:  All right.  Are you done, Mr. Sibert?

14           MR. SIBERT:  I'll pass the witness.

15           THE COURT:  All right.  Cross-examination.

16           MR. GOODREID:  Your Honor, defense has no questions

17   for this witness.

18           THE COURT:  All right.  May this witness be excused

19   for the Government?

20           MR. SIBERT:  Yes, Your Honor.

21           THE COURT:  For the defendant?

22           MR. GOODREID:  Yes, Your Honor.

23           THE COURT:  All right.  Ms. Sears, you are excused.

24   And you may step down.

25           THE WITNESS:  Thank you.

Direct - Sandra Sears

1          THE COURT:  Thank you.

2          Government may call its next witness.

3          MR. SIBERT:  Your Honor, at this time the

4    Government would like to call Sandra Sears, the wife.

5          THE COURT:  Okay.

6          COURTROOM DEPUTY:  If you could please stand behind

7    the witness stand here and raise your right hand.

8          SANDRA SEARS, GOVERNMENT'S WITNESS, SWORN

9          COURTROOM DEPUTY:  Please be seated.  You may need

10   to scoot your chair up a bit.  And please state and spell

11   your name for the record.

12         THE WITNESS:  Sandra Sears.  S-a-n-d-r-a,

13   S-e-a-r-s.

14         MR. SIBERT:  May I proceed, Your Honor?

15         THE COURT:  Yes, you may.

16                    DIRECT EXAMINATION

17   BY MR. SIBERT:

18   Q.   Good afternoon, ma'am.  Can you please tell the jury

19   where you are currently living.

20   A.   In Westminster.

21   Q.   Okay.  Westminster?

22   A.   Colorado.

23   Q.   Okay.  And how long have you lived in Westminster?

24   A.   About two years.

25   Q.   Okay.  Where did you live before living in Westminster,

Direct - Sandra Sears

1    Colorado?

2    A.   We were in Broomfield and then in Thornton.

3    Q.   Okay.  And the years between 2010 and 2015, were you

4    living in Colorado?

5    A.   I was.

6    Q.   Do you recall the town?

7    A.   In 2010, I was still in Thornton.

8    Q.   Okay.  And how about the '11, '12, '13?

9    A.   I was still in Thornton.

10   Q.   So consistently in Thornton, Colorado, between 2010 and

11   2014?

12   A.   That's correct.

13   Q.   All right.  Now, ma'am, you're married to William

14   Sears; is that correct?

15   A.   That's correct.

16   Q.   And your brother is Scott Dittman.

17   A.   That's correct.

18   Q.   You also have another brother, Robert Dittman?

19   A.   That's correct.

20   Q.   Now, let's -- what do you do for a living?

21   A.   I'm a flight attendant.

22   Q.   Okay.  For what airline?

23   A.   Southwest Airlines.

24   Q.   Okay.  And have you always been with Southwest

25   Airlines?

1    A.    No.   I was with Frontier Airlines prior.

2    Q.    Okay.   And how long were you with Frontier Airlines?

3    Do you remember the years?

4    A.    Uhm-hum.   January 2000 to October of 2015.

5    Q.    I'm sorry, I missed the first year.

6    A.    January of 2000.

7    Q.    Okay.   Okay.   So 15 years.

8    A.    Uhm-hum.

9    Q.    And then you went over to Southwest Airlines?

10   A.    No, I was working for the City and County of Denver for

11   a year and a half in between.

12   Q.    Okay.   And then you picked back up with the airlines.

13   A.    That's correct.

14   Q.    What's better, Frontier or Southwest?

15   A.    Southwest.

16   Q.    All right.   All right.   At this point, can -- I believe

17   it's in evidence, but Government Exhibit 97.

18            MR. GOODREID:   Your Honor, my records, at least, do

19   not reflect that 97 is in.   I --

20            MR. SIBERT:   That's correct, Your Honor.   It's

21   stipulated to.   At this time the Government would move for

22   admission.

23            THE COURT:   All right.   Given the stipulation of

24   the parties, Exhibit 97 is admitted into evidence and may be

25   published to the jury.

1        (Government's Exhibit 97 received)

2    BY MR. SIBERT:

3    Q.   Can I have the first page of Government Exhibit 97.

4             Okay, ma'am, do you recognize this name, La Dee Da?

5    A.   Yes, I do.

6    Q.   Okay.  Was that your company?

7    A.   So I hold a cosmetology license in Colorado, and at one

8    point I retrieved a tax ID number and I was going to open my

9    own business -- skincare business.

10   Q.   Okay.

11   A.   And I named it La Dee Da.

12   Q.   Okay.  This might be a surprise to you.  Can you

13   explain to me what cosmetology --

14   A.   Yes.  It's -- you can do hair and skin care.

15   Q.   Okay.  And so you opened a -- is it an LLC?

16   A.   Yes.

17   Q.   Okay.  And that's here in the state of Colorado?

18   A.   That's correct.

19   Q.   And so what was the purpose, again, for you to open --

20   A.   It was a skincare company.  I would be doing facials

21   and cos- -- you know, chemical peels and things like that.

22   Q.   Okay.  Did you ever go ahead and essentially formulate

23   a skincare company that you worked at?

24   A.   So I -- I started to and then I ended up working for

25   someone else for a short time, another day spa, and so it

1556

Direct - Sandra Sears

1    just kind of went dormant, if you will.

2    Q.    Okay.  And do you recall the time frame that you opened

3    up your La Dee Da, LLC?

4    A.    I don't remember specifically.  I would -- if I had to

5    guess, I would say probably maybe 2010, '09 or '10.

6    Q.    Okay.  You stated you started working for someone else;

7    is that correct?

8    A.    Yes.

9    Q.    Do you recall when that was?

10   A.    It was around that same time frame in there -- probably

11   within that year.

12   Q.    In 2010 when you started the LLC with the name La Dee

13   Da --

14   A.    Uhm-hum.

15   Q.    -- it was essentially dormant from the time you

16   formulated the company?

17   A.    So I actually rented a room for the company and set it

18   up and then I was approached by someone in that same

19   building to come to work for them instead.

20   Q.    Okay.  How long after you set up the room did you go

21   work for the other person?

22   A.    Within probably a month or two.

23   Q.    So this is all into the year 2010?

24   A.    I really do not remember correct- -- you know, the

25   year.  I'm -- that's my guess.  I cannot really remember.

Direct - Sandra Sears

1    Q.   I understand.  So from 2011, is it fair to say from

2    2011 to 2014, it was a dormant company as far as you were

3    concerned?

4    A.   Yes.

5    Q.   What -- by the way, your background, what is your

6    educational background?

7    A.   I graduated high school.

8    Q.   Okay.  Was that the highest level of education?

9    A.   Yes.

10   Q.   Do you have any specialized training or professional

11   license?

12   A.   I went to cosmetology school.

13   Q.   And how long is that?  I mean --

14   A.   How long does it take?

15   Q.   Yes, ma'am.

16   A.   A -- anywhere between a year and a year and a half.

17   Q.   Okay.  And any other professional licenses or

18   specialized licenses?

19   A.   No.

20   Q.   Okay.  Do you have any licenses in the financial

21   industry known as a Series 7 or something like that?

22   A.   I do not.

23            MR. SIBERT:  Can I have a minute, Your Honor?

24            THE COURT:  You may.

25   BY MR. SIBERT:

1  Q.  Now, can I have page 2 of Government Exhibit 97.  Can I
2  have -- thank you.
3       Ma'am, if you look on your screen, again, you see
4  the name of your company.  Was that the address that you
5  were living at in Thornton, Colorado?
6  A.  Yes.
7  Q.  Do you know who Pacific Stock Transfer Agency is?
8  A.  I do not.
9  Q.  Do you know what Pacific Stock Transfer Company does?
10 A.  Transfers stock.
11 Q.  Are you taking that from the title?
12 A.  That's -- yes.  That's going to be my guess is that's
13 what they do.  It says transfer agent Pacific Stock --
14 Q.  All right.  Before -- but for --
15 A.  -- Transfer Company.
16 Q.  Sure.  But prior to looking at that title, did you know
17 what they did prior to seeing that title?
18 A.  No.
19 Q.  Okay.  Have you ever had any contact with Pacific Stock
20 Transfer Agency?
21 A.  I don't recall.
22 Q.  Okay.  Can I have page 3 of that exhibit.  And can you
23 just zoom in here.  Can you take out the top.
24      Ma'am, do you know what's happening on this
25 document, page 3 of Government Exhibit 97?

1559
Direct - Sandra Sears

1    A.    Stock is transferred.

2    Q.    Okay.  Do you know who MicroCap Management is?

3    A.    I -- I've heard that name.

4    Q.    Okay.  How have you heard that name?

5    A.    Through my husband.

6    Q.    Okay.  And why have you heard that name through your

7    husband?

8    A.    It's a company that I believe he purchased and sold.

9    Q.    Okay.  Do you know Prestige Media?

10   A.    I don't recall.

11   Q.    Can I have the whole page again -- or just the top

12   portion of it so we can see everything.

13         Do you know what transaction No. 12868 is dealing

14   with?

15   A.    That's a stock transfer.  I don't know.

16   Q.    Do you know what stock transfer -- can I have that

17   taken down?

18         Do you know what stock transfer that number relates

19   to?

20   A.    If I can recall, there was a time that my little

21   brother was to be taking over the company, and he didn't or

22   couldn't.

23   Q.    Let me have --

24   A.    And I believe it was stock transferred into his name.

25   Q.    Let me have page 3 back up, please, of Exhibit 97.

Direct - Sandra Sears

1    Do you know why your husband's company, MicroCap
2  Management, is transferring your company 183,550 preferred
3  shares?
4  A.   Again, the only thing that I can recall is when Bobby
5  was supposed to take over the company and couldn't.
6  Q.   Okay.  But I'm not talking about Bobby, I'm talking
7  about your company, La Dee Da.
8  A.   Yes.  He was to take over La Dee Da.
9  Q.   Okay.  Does he have a cosmetic license?
10 A.   He does not.
11 Q.   Okay.  Do you know the difference between a preferred
12 share and a common share?
13 A.   I do not.
14 Q.   Can I have Government Exhibit 47 published, page 50.
15    Do you know when -- you testified that your company
16 started in 2010; is that right?
17 A.   I can't quite remember the exact date, sir.
18 Q.   Okay.  Do you know when your little brother, Bobby, was
19 supposed to take over your company?
20 A.   I do not recall.
21 Q.   Was it after 2010?
22 A.   I don't recall.
23 Q.   Okay.  Can I please have this blown up.
24    Do you know why your company, on September 7th,
25 2010, entered into a debt settlement agreement with MicroCap

Direct - Sandra Sears

1    Management, your husband's company?

2    A.    I know that there was stock being transferred, Bobby

3    was to take over the corporation.  And I believe because La

4    Dee Da was dormant at the time and he did not want to start

5    a new corporation, that it was being transferred into his

6    name there.

7    Q.    Okay.  Can I have this paragraph blown up.

8          Did you ever pay your husband's company in 2010

9    $350,000?

10   A.    No.

11   Q.    Can I have page 3, please.  I'm sorry, page 52.

12         There's two numbers on these things.  Whose

13   signature is that?

14   A.    I do not recognize that signature.

15   Q.    That is not your signature, Sandra Sears?

16   A.    That is not my writing.

17   Q.    Okay.  Let me ask you this -- can I have that page back

18   up, please.  Exhibit 47, page 52.

19         Do you recognize that signature underneath MicroCap

20   Management?

21   A.    I do.

22   Q.    Whose signature is that?

23   A.    That's my husband's.

24   Q.    So your testimony here today is a debt settlement

25   agreement where your name and your company is mentioned in

1562
Direct - Sandra Sears

1  the document where you would pay your husband's company
2  $350,000 for 700 shares, that's not your signature?
3  A.   It is not.
4  Q.   Can I have Exhibit 1 -- 101.
5       MR. SIBERT:  And, Your Honor, this is not in
6  evidence, but the Government would at this time -- it's
7  stipulated to -- move into evidence.
8       THE COURT:  Given the stipulation of the parties,
9  Exhibit 101 is admitted into evidence and may be published
10 to the jury.
11      (Government's Exhibit 101 received)
12 BY MR. SIBERT:
13 Q.   Again, ma'am, on the first page, that's the name of
14 your company; is that correct?
15 A.   Yes.
16 Q.   Can I have page 10 of this document -- have that blown
17 up.  Okay.  Again -- can I have the signature, please.
18      Is that your signature?
19 A.   That is my signature.
20 Q.   Do you know why you're transferring back the 183,550
21 shares to your husband's company, MicroCap Management?
22 A.   Again, the only time that I can recall stock being
23 transferred was because of when Bobby was to take over the
24 company and stock was -- they didn't want anything in my
25 name and it was going to Bobby.

1563

Direct - Sandra Sears

1   Q.   Okay.  Fair point.  However, MicroCap Management, as

2   you testified, was your husband's company, right?

3   A.   Yes.

4   Q.   So I just showed you a transaction where MicroCap

5   transferred you 180-plus thousand shares, and now your

6   company is sending it right back to MicroCap Management.

7   A.   Okay.

8   Q.   So that has nothing to do with Robert Dittman.  It has

9   something to do with your husband, William Sears, right?

10          MR. GOODREID:  Objection.  Leading.

11          THE COURT:  Sustained.

12  BY MR. SIBERT:

13  Q.   Whose company did you testify to is MicroCap

14  Management?

15  A.   It was my husband's.

16  Q.   Did your husband know that you had a corporation named

17  La Dee Da?

18  A.   Yes.

19  Q.   Thanks.

20          MR. SIBERT:  I'll pass the witness, Your Honor.

21          THE COURT:  Cross-examination.

22          MR. GOODREID:  Your Honor, the defense has no

23  questions for this witness.

24          THE COURT:  All right.  May this witness be

25  excused, for the Government?

Direct - Duke

1          MR. SIBERT:  Yes, Your Honor.

2          THE COURT:  For the defendant?

3          MR. GOODREID:  Yes, Your Honor.

4          THE COURT:  All right.  Ms. Sears, thank you for

5   your testimony.  You're excused.  You may step down.

6          Government may call its next witness.

7          MR. SIBERT:  Your Honor, at this time -- I'm sorry,

8   I was just getting the first name -- can I call Mr. Andrew

9   Duke.

10          THE COURT:  All right.

11          COURTROOM DEPUTY:  Come this way.  If you will

12   stand by the witness stand and raise your right hand,

13   please.

14          THE WITNESS:  Thank you.  Right here?

15          COURTROOM DEPUTY:  Yeah.

16           ANDREW DUKE, GOVERNMENT'S WITNESS, SWORN

17          COURTROOM DEPUTY:  Okay.  Please be seated.  Please

18   state your full name and spell it for the record.

19          THE WITNESS:  Andrew Duke.  A-n-d-r-e-w, D-u-k-e.

20          MR. SIBERT:  May I proceed, Your Honor?

21          THE COURT:  Yes, you may.

22          MR. SIBERT:  Thank you.

23                        DIRECT EXAMINATION

24   BY MR. SIBERT:

25   Q.   Good afternoon, sir.

Direct - Duke

1     A.   Good afternoon.

2     Q.   Sir, can you please tell the jury where you're

3     currently living.

4     A.   I currently live here in Denver.  Do you need my

5     specific address for the record?

6     Q.   No, sir.

7     A.   Thank you.

8     Q.   How long have you lived in Denver, Colorado?

9     A.   I got here when I was four with my mother.  When you're

10    four, you don't get to make your travel plans.  Left for

11    college.  I spent a few years out of town, but basically

12    I've lived in Denver all my life.

13    Q.   All right.  Native?

14    A.   No, I got here when I was four.

15    Q.   Four.  Sorry.  Where did you come from?

16    A.   Baltimore.

17    Q.   Not by choice.

18    A.   No.

19    Q.   All right.  Now, could you provide the jury a little

20    introduction about yourself, including your educational

21    background, and basically the summary of your career as

22    well.

23    A.   Sure.  I went to -- I grew up in Denver.  I was a

24    troubled youth.  I went to Colorado Academy and ended up

25    going into business school back in Wellsey called Babson.

Direct - Duke

1    When I finished my undergraduate and graduate
2    studies there I had been offered the job in the securities
3    business in Baltimore.  I declined in order to come home and
4    work with my grandfather.
5    At the time, I worked at the Oxford Hotel, and I
6    was a sergeant at arms at the legislature, and then I got
7    hired in the securities business.  I moved to Las Vegas,
8    Nevada, to be in the securities business.  Came home and
9    continued in that business.  Left that business and then
10   ultimately went and spent a year -- after some period of
11   time, I spent a year in San Diego, and tested back into the
12   business.
13   So when you are in the business, you have to have a
14   Series 7 license.  I had --
15   THE COURT:  Mr. Duke.
16   THE WITNESS:  Go ahead.
17   THE COURT:  Sorry to interrupt.  Can you slow down
18   just a tad because my court reporter is great, but, you
19   know, you're talking very fast.
20   THE WITNESS:  I'm sorry, Your Honor.
21   THE COURT:  She's trying to keep up with you.
22   THE WITNESS:  I figured these people have been here
23   so long.  I apologize.
24   BY MR. SIBERT:
25   Q.   Don't apologize.

Direct - Duke

A.    I'm sorry.  I -- when I got back from San Diego, I went
back into the securities business.  I tested back in and had
a Series 7 again.  In the fullness of time, I left the
securities business and I managed a foundry -- we had some
assets that we had acquired through people who failed to
pay, and so one of these assets was a foundry.  I ran that
while it was in a bankruptcy.  I ended up in Iraq for a
while.  Then I came home and that's when I got to work with
Bill and with Scott.

Q.    Okay.  All right.  That's quite a summary.  You grew up
in Colorado, you speak like an East Coast --

A.    Can't help it.

Q.    All right.

A.    Can't help it.  I'm sorry.  I've tried to shake it.  I
also can't get rid of being an Oriole's fan.

       THE COURT:  Well, he doesn't have the East Coast
accent but he has the East Coast speed, that's for sure.

       THE WITNESS:  Oh -- may I?

       THE COURT:  No, you may --

       THE WITNESS:  I'm sorry.  I -- when I got to
Colorado -- I went to college.  I called 9-1-1 -- 411, the
information, to ask where a cousin of mine -- for the phone
number, and the woman spoke so fast that I didn't realize I
had actually gotten Information and I had to say, "Please, I
don't understand what you said."

Direct - Duke

1    So, yeah, I'm sorry.  I'm very sympathetic to this.

2    I'll slow down.

3    BY MR. SIBERT:

4    Q.   All right.  Well, let's get back on focus.  I

5    appreciate the summary of your background.

6    A.   You bet.

7    Q.   Now, you stated that you started working with two

8    gentlemen, one named Scott and the other one named Bill.

9    Can you put last names to those two gentlemen.

10   A.   Yeah, that would be Scott Dittman and Bill Sears.

11   Q.   Okay.  And can you tell me how you began working with

12   them after your extensive career, including a few rounds of

13   the security investment business?

14   A.   Smoke cigars, and so Scott's father smoked cigars and

15   there aren't many places you can smoke cigars.  And so we

16   met through enjoying cigars together.  When you smoke a

17   cigar with somebody and you do it over a period of time, you

18   come to know them because conversation is an important

19   aspect of all this.

20   Q.   All right.  And so when you're enjoying your cigar, you

21   met Mr. Dittman.  Do you recall Mr. Dittman's first name?

22   A.   Bob.  Bob, Sr.

23   Q.   All right.  And I'm assuming that when you're speaking

24   to Mr. Robert Dittman, Sr. -- or Bob Dittman, Sr., somehow

25   that correlates into a discussion about what one of his sons

Direct - Duke

1    was doing?

2    A.   Bob told me he had a son who was involved with a public

3    company and that they were in the marijuana business, which

4    at that time was right at the very bleeding edge of

5    acceptable business.

6         I mean, it -- if you think there's a cutting edge,

7    the marijuana business, this was really the inception, and

8    this was pretty close to the bleeding edge.

9    Q.   All right.  And do you recall around what time period

10   this was?

11   A.   2011.

12   Q.   And so could you explain to me how Mr. Dittman -- Scott

13   Dittman's father, introduced yourself and Mr. Scott Dittman.

14   A.   I don't have a lot of details, but it was basically as

15   a father would introduce his son to his friend.  "This is my

16   friend, Scott" -- I'm sorry, "Scott, this is my friend Andy.

17   You know, maybe there's something you guys could do

18   together.  Do you think there's anything you can?"

19        And we talked for a while, and I -- I am -- I am

20   now, and was at the time, impressed with the technology that

21   these guys were working and were using.  These guys really

22   had science on their side.  They had a deep and broad handle

23   on what they were trying to accomplish in terms of the

24   science of it all.

25   Q.   Okay.  And was part of the reason Mr. Dittman, Scott

Direct - Duke

1    Dittman's father, introduced you to his son was based upon

2    your background?

3    A.    Absolutely.  Oh, no question.

4    Q.    Okay.  So your investment Series 7 background --

5    A.    Well, yeah.  Exactly.  I mean, I have -- I have a

6    reasonable knowledge of the markets, how the markets work.

7    I had done a lot of due diligence on companies

8    professionally while I was in the business, and so we had a

9    lot in common when it came to -- I was intrigued.  I

10   don't -- I don't have children, so I don't have a lot of

11   anticipatory fear.  And so I was willing to take on

12   something like a FusionPharm project and look at it.

13   Q.    All right.  And did you have experience with what's

14   known in the investment world with microcap companies?

15   A.    Yes, oh, absolutely.  I mean, Denver was the hub of the

16   penny stock industry, which was a business where you would

17   sell a half a million dollars worth of stock at a penny.

18   And if the business worked, it worked, if it didn't work, so

19   sorry.  I mean, so, yeah.

20   Q.    Okay.  And you used the term "penny stock."  Is penny

21   stock the same thing -- the street name for microcap

22   companies?

23   A.    I believe it's still the term.  I mean, that was the

24   term, in fact, the first time I went through, so . . .

25   Q.    All right.  And did you eventually go to work for

Direct - Duke

1    FusionPharm?

2    A.   Yeah.  I -- when I went over to talk to Scott, we were

3    talking, and he said, "You know, we want you.  What do you

4    want to be?"

5         And I said, "Scott, you know, looking around your

6    office suite, you've got you, you've got Billy, and that's

7    about it.  And Billy can't be an officer, director,

8    controlling shareholder, so you need an executive vice

9    president.  I'll be your EVP."

10   Q.   All right.  So let me back you up here.  Who hired you

11   for FusionPharm?

12   A.   Well, Scott's the only person who could have hired me.

13   Q.   Okay.  And can you tell me the location of FusionPharm

14   when you went into the office space --

15   A.   We had a beautiful space downtown on Wynkoop and, I

16   think, 16th.

17   Q.   All right.  Can you please look at Government Exhibit

18   225.

19   A.   Is this going to come up on the screen or you going to

20   hand it to me?

21   Q.   It's on the screen in front of you.  I just need to

22   make sure --

23   A.   Good.

24        MR. SIBERT:  Your Honor, this has not been admitted

25   into evidence, but there is a stipulation to it.  So I would

Direct - Duke

1    like to move into evidence now Government Exhibit 225.

2              THE COURT:  All right.  Given the stipulation of

3    the parties, Exhibit 225 is admitted into evidence and may

4    be published to the jury.

5         (Government's Exhibit 225 received)

6              MR. SIBERT:  Thank you, Your Honor.

7    BY MR. SIBERT:

8    Q.   Sir, this might be a bad decision by me, but if you

9    touch the screen, you can mark it.  All right.  And so --

10             THE COURT:  Do we have a stylus?  Oh, great.

11   BY MR. SIBERT:

12   Q.   All right.  So as soon as you hit that screen, it's

13   going to mark it.  So if you can just kind of follow my lead

14   here and we'll see how this goes.

15   A.   Okay, let's go.

16   Q.   All right.  So tell me -- it's a long day, this is

17   going to end hopefully well.  Can you tell me where the door

18   is, please.

19   A.   Yeah, the door is right here.

20   Q.   All right.  I'm going to go ahead and erase your marks.

21             And go ahead and tell me where Mr. Scott Dittman's

22   office was.

23   A.   That would be right here.

24   Q.   All right.  And can you tell me where Mr. William

25   Sears' office is.

Direct - Duke

1    A.   That would be right there.

2    Q.   Okay.  And where were you located?

3    A.   Right here.

4    Q.   So you didn't have an office?

5    A.   When you're -- I'm sorry, you're an attorney, you have

6    a lot of structure in your life.  When you're in a microcap

7    business, the only way you can possibly follow what's going

8    on is to be as close to where everything is happening as you

9    can.  So if you notice, my desk is out here in what would be

10   called the bullpen.  And that way I can be involved in

11   whatever these guys are talking about because that's where I

12   sit.

13   Q.   Okay.  So it was a good central location?

14   A.   Exactly.

15   Q.   Okay.  And when you said working for a microcap

16   company, in your mind, FusionPharm was a microcap company?

17   A.   I don't think you can characterize it any other way.

18   Q.   Okay.  And let me just clear a little bit.

19        What is this object that you drew?

20   A.   That's the secretary's desk.

21   Q.   Okay.  Do you know who sat there when you were there --

22   A.   Ann sat there and Kelly sat there.

23   Q.   Okay.  Ann, do you know Ann's last name?

24   A.   No, I'm sorry, I can't remember.  I apologize.

25   Q.   That's okay.  Do you know Kelly's last name?

1574

Direct - Duke

1   A.   No, I'm sorry, I can't remember.

2   Q.   Okay.  And then, more importantly, what was this office

3   space?

4   A.   That was Frank Falconer's office.  That was a -- that

5   was the third used office.

6   Q.   Was Frank there the whole time you were there?

7   A.   He started a little bit after I did, when they started

8   trying to bulk up.  He was -- he was -- he came on a little

9   after I did.

10  Q.   Okay.  To be honest with you, I thought that said

11  "food," but --

12  A.   No, huh-uh.

13  Q.   All right.  So it's Frank.

14  A.   Yes.

15  Q.   Okay.  And how about this office?

16  A.   That's storage.

17  Q.   All right.  Now, you spoke about being in the center of

18  attention --

19  A.   Not of attention.

20  Q.   Okay.

21  A.   Please.

22  Q.   All right, center of the office?

23  A.   Center of location.  Strategically located.

24  Q.   Strategically located.  Were you able to hear

25  conversations within the offices?

Direct - Duke

1   A.   Yeah, absolutely.  I mean, this was -- I don't have
2   dimensions on there, but it was a relatively small office.
3   I mean, you know, the -- it -- it was a relatively small
4   space, I'm trying to figure out something that would be
5   analogous in here.
6   Q.   Okay.  Well, small space.  You know, that's your
7   terminology.  We'll go with it.  How about the thickness of
8   the walls?
9   A.   I believe those walls were probably soundproof.
10  Q.   Okay.
11  A.   But there was glass in -- next to the doors, so you --
12  so you couldn't do things that were untoward in your
13  office.
14  Q.   Okay.  Could you hear conversations when doors were
15  shut?
16  A.   I don't know.  I don't -- I never tried to hear a
17  conversation.
18  Q.   You didn't want to hear a conversation?
19  A.   I never tried to hear a conversation.
20  Q.   How about if the doors were open?
21  A.   Oh, then that's fair game.
22  Q.   Okay.  And you could hear conversations easily --
23  A.   Absolutely.
24  Q.   Okay.
25  A.   Well, because if the door's open, they're making no

1    attempt for you not to hear a conversation.

2    Q.    Okay.  And you said the doors were glass; is that

3    correct?

4    A.    No.  There was a glass section next to the door.

5    Q.    All right.

6    A.    So you could approach the office and see if there are

7    people in there and . . .

8    Q.    All right.  Well, go ahead and mark on the exhibit

9    where the glass would be.

10   A.    I haven't been in that office in a million years, but I

11   would guess that it would be right about here.  And then --

12   I think there was a glass panel there.  If it wasn't there,

13   it was on this side.  Or this side.

14            I mean, there was just a -- it was a small glass

15   panel.

16   Q.    All right.  And just so the jury knows, whose artwork

17   is this?

18   A.    That's mine.

19   Q.    All right.  Thank you.

20   A.    That's how come I can read the handwriting.

21   Q.    Okay.  All right, sir, can you tell me essentially how

22   the business of FusionPharm was explained to you?

23   A.    Well, the idea of FusionPharm was that the marijuana

24   space was taking off.  That one of the issues that was --

25   that there were two issues in the business that were

Direct - Duke

1    important:  security and custody.  And that the -- that the

2    grow pod that FusionPharm was working on would supply --

3    would satisfy all of the security and custody issues.  And

4    one of the custody issues was seed-to-sale.

5         And the only reason that's important is because

6    that gets back to all of the different technologies that

7    these guys actually had managed to agglomerate.  They really

8    were -- had a lot of -- when you are growing anything, you

9    have to grow test batches, and they had great technologies,

10   so . . .

11   Q.   And these pods, were they converted shipping

12   containers?

13   A.   Yes.

14   Q.   All right.

15   A.   And they were going for a patent on this.

16   Q.   You're beating me to the punch.

17   A.   Sorry.

18   Q.   That's okay.  So essentially was Scott Dittman and

19   William Sears looking to patent this technology that you've

20   been discussing?

21   A.   Absolutely.  And they had -- they had other

22   technologies that they had an exclusive to that they were

23   putting into this.

24   Q.   All right.  And were they working with what is known in

25   my field as patent lawyers?

1578
Direct - Duke

1    A.    Absolutely.  I attended meetings with a patent attorney
2    along with Scott.
3    Q.    And did those lawyers -- they weren't the corporation's
4    lawyer, they were lawyers that helped Scott Dittman and
5    Billy Sears with the patent technology?
6              MR. BARNARD:  Objection.  Leading.
7              THE COURT:  Sustained.
8    BY MR. SIBERT:
9    Q.    What was the role of the patent attorneys?
10   A.    Well, you -- I'm sorry you mischaracterized it in your
11   question.
12   Q.    Okay.
13   A.    The attorney was working for FusionPharm, not Bill and
14   Scott.  This was not a personal attorney for them, this was
15   a corporate attorney for FusionPharm.
16   Q.    Okay.  And what was the -- this attorney's
17   concentration, the meetings that you went to?
18   A.    First of all, the question -- the question and issue of
19   patentability and, second, the issue of the form of that
20   patent.  In other words, this wasn't a process patent, this
21   was going to be a mechanical patent or what -- form the
22   patent was going to take.
23              So we did explore in-depth the actual different
24   aspects of what might be patentable inside of the unit --
25   the grow pod.

Direct - Duke

1   Q.   And the lawyer that you attended meetings with that

2   discussed the patent -- the patent that Scott and Mr. Sears

3   were working to get on the technology, did that lawyer do

4   any of the corporation --

5   A.   Not that I know of.

6   Q.   Let me finish my question.  Corporation legal issues?

7   A.   No, not at all.

8   Q.   And when I say corporation, FusionPharm.

9   A.   I understand.

10  Q.   And I was just making sure that patent lawyer never did

11  any of the corporate work for FusionPharm.

12  A.   As far as I know from the meetings I attended and

13  correspondence that I -- that was made available to me, this

14  fellow was focused entirely and strictly on corp- -- on

15  corporate issues as they were related to a patent and no

16  other business-related issues that would affect the

17  corporation.

18  Q.   Thank you.  Now, you were given a title, I believe you

19  testified, as executive vice president?

20  A.   Yes.

21  Q.   So the new guy from the block got one of the bigger

22  titles?

23  A.   There were only two guys on the block and so I had the

24  other title.

25  Q.   Okay.  And so why was Mr. William Sears left without a

Direct - Duke

1    title?

2    A.   As I understood it at the time, Mr. Sears had been

3    barred, banned, or somehow was unable to participate as an

4    officer or director.  I don't know about controlling

5    shareholder of a public company.  Now, whether that bar was

6    permanent or temporary or whatever was governing those

7    circumstance, I have no direct knowledge.

8    Q.   But there was some issue --

9    A.   Absolutely.

10   Q.   -- that prevented him from being known as a director or

11   officer?

12   A.   There was some issue that prevented him being known as

13   part of the company.

14   Q.   Okay.

15   A.   Which goes beyond what you defined, in my mind.

16   Q.   Okay.  Fair point.  What were your main duties once you

17   were hired by FusionPharm?

18   A.   It seemed that what -- that my main duty became to try

19   to raise money.

20   Q.   And who did you work for when you were hired at

21   FusionPharm?

22   A.   When you ask that question, it's unclear to me.

23   There's only two guys, it's me and Scott.  Scott's the

24   president.  I mean, they're -- I'm sorry.

25              Now, are you -- are you going into who had span of

Direct - Duke

1  control over my action that was outside of the company?

2  Then you're falling into Billy.  I mean, you know, in other

3  words, Billy was -- Billy had an office, Billy -- this was

4  the ultimate corporate Chinese Wall.  Here's the guy, here's

5  his thoughts, here's his actions, and you're supposed to

6  respond but you're not responding officially.

7          So what Billy says theoretically comes through

8  Scott, although there's no -- it's like, "Tell your mother

9  to tell your father," you know.  It doesn't -- it just

10  doesn't . . .

11          They were the same.  They had -- they had the same

12  voice, in effect, without having the same authority on

13  paper.

14  Q.   Is it fair to say without having the same disclosure on

15  paper?

16  A.   There was no disclosure.  Billy was a ghost.  He did

17  not exist.

18  Q.   And Scott did and knew this?

19  A.   Yes.

20  Q.   Now, I'm sorry, sir --

21  A.   No, but I mean -- I'm sorry, Scott would encourage this

22  because as -- as the officer and the president on the

23  ground, Scott was supposed to be completely in control,

24  himself.  The fact that he was deferring to Billy indicates

25  that Billy had an authority that was beyond that which was

Direct - Duke

1    disclosed in public documents.

2    Q.    All right.  And did Mr. Scott Dittman ever talk about

3    this with you regarding Mr. --

4    A.    It was made clear in word and deed, in every

5    conceivable way.  There was no ambiguity on this.

6    Q.    And as you stated, Mr. Sears' role was essentially a

7    ghost officially.

8    A.    Well, Mr. Sears' role was to help raise money.  So what

9    Bill was doing is he was -- I mean, you want me to move this

10   forward towards the subject or where do you want to go?

11   Q.    Well, you stated essentially Mr. Scott Dittman and Mr.

12   William Sears were the same.

13   A.    In terms of trying to raise money for the company,

14   yeah.  Scott, on the other hand, because he had, in my --

15   what appeared to be a more inquisitive mind, Scott actually

16   wanted to understand the technology and the business and all

17   this other stuff.  So Scott had the science in hand.  I

18   don't know that Billy had the same knowledge of the

19   science.

20   Q.    And so what was Mr. William Sears' focus?

21   A.    Mr. Sears was focused on raising money.  Now, again,

22   because FusionPharm was a public company, there was a market

23   for the securities.

24   Q.    All right.  Well, let me -- we'll get to that.  Did you

25   see Mr. Scott Dittman and Mr. William Sears as partners?

Direct - Duke

1    A.   They are brother-in-laws.  I saw them intimately

2    engaged in business as brother-in-laws.

3    Q.   Okay.  And --

4    A.   Along with their brother -- their brother -- Scott's

5    brother, Bob, who's also Billy's brother-in-law.

6    Q.   Okay.  Now, essentially when -- as you stated several

7    times, it was Scott Dittman and William Sears at FusionPharm

8    when you walked in the doors.

9    A.   That's correct.

10   Q.   No one else?

11   A.   That's correct.

12   Q.   All right.  Can you please look at Government Exhibit

13   227.

14        MR. SIBERT:  Your Honor, this has been not admitted

15   but it has been stipulated to.  I would like to move for

16   admission.

17        THE COURT:  Given the stipulation of the parties,

18   Government Exhibit 227 is admitted into evidence and may be

19   published to the jury.

20        (Government's Exhibit 227 received)

21   BY MR. SIBERT:

22   Q.   Okay.  Can we start at the bottom.

23   A.   I'm not getting --

24   Q.   I'm sorry.  At the top of this.  Okay, sir, I'm just

25   going to try to blow this up.

Direct - Duke

1      Okay, this is an e-mail from Mr. Dittman sent to

2  you and Mr. Sears; is that correct?

3  A.   Yes.

4  Q.   Okay.  And essentially what is Mr. Dittman explaining

5  in this e-mail?

6  A.   This is a business plan update.

7  Q.   Okay.  And do you recall what FusionPharm was working

8  on?

9  A.   Yeah.  We were trying to -- we had a filing that was

10  due, as -- or we had -- for some reason, we were creating a

11  business plan, and all this other stuff that was going to

12  surround my trip to New Orleans and also to help with

13  raising money.  And the idea was that we were working on

14  this at the time and trying to tweak it up to be the best

15  document possible.

16  Q.   All right.  And so Mr. Sears is being made aware of the

17  business plan?

18  A.   Absolutely.  And, by implication, I mean made aware of

19  Mr. Sears' involvement.

20  Q.   Okay.  And this was on October 12th, 2011.

21  A.   That's correct.

22  Q.   Can I have Government Exhibit 228.

23      MR. SIBERT:  Again, Your Honor, this has been

24  stipulated to but not moved into evidence, and at this time

25  I'd like to move it into evidence.

1585

Direct - Duke

1    THE COURT:  All right.  Given the stipulation of

2    the parties, Government Exhibit 228 is admitted into

3    evidence and may be published to the jury.

4    (Government's Exhibit 228 received)

5    BY MR. SIBERT:

6    Q.   Okay.  Again, sir, another e-mail from Mr. Scott

7    Dittman; is that right?

8    A.   Yeah.

9    Q.   Okay.  And you're e-mailed on it, along with Mr. Sears?

10   A.   Yes.  And now Scott has joined the team, Mr. Falconer.

11   Q.   Okay.  That's his e-mail?

12   A.   Yeah.  I would say that's Frank.  Frank's Frank

13   Falconer.

14   Q.   So essentially about eight days later?

15   A.   Yeah.

16   Q.   And, sir, can you tell me essentially what Mr. Dittman

17   is talking to yourself and Mr. Sears and Frank about in this

18   e-mail.

19   A.   Yeah.  This was an aspirational event that Scott wanted

20   to hold.  The idea was that we would get out of town for a

21   retreat.  I thought that that was a bunch of nonsense and so

22   we ended up having a nice lunch in a private room at the

23   Palm.

24   Q.   Okay.  So the point, though, is what was the -- why was

25   Scott Dittman trying to have this retreat?

1  A.   Well, because, as he says, so that we can solve world

2  hunger, cure global climate change, and get stinking filthy

3  rich.  We all were aware of the fact that as of -- as a

4  cannabis company with the laws having changed, there was

5  going to be an opportunity.

6         Now, where that opportunity would emerge, nobody

7  knew, but we knew that at FusionPharm, we're trying to

8  address the custody issue of seed-to-sale with the grow

9  pods.

10 Q.   Okay.  So --

11 A.   Now --

12 Q.   Again, more strategy for the business?

13 A.   Well, to expand on one of the things that I was there

14 to do, when I say to raise money, one of the things that

15 Scott and Bill were talking about was they were talking to a

16 bunch of leasing companies about leasing these grow pods to

17 potential customers who were growing commercially, and would

18 have the seed-to-sale issue.

19        And the leasing companies, of course, weren't

20 willing to accept a grow pod as collateral, so then it

21 became how do you -- I mean, these were just things that

22 were going on around us.  And one of the things that came up

23 was that they could lease them to people in the vegetable

24 business, which is why they started the grow facilities for

25 the lettuce.

Direct - Duke

1    Q.   Okay.  But to summarize all that answer, in the e-mail

2    here that Scott is sending, this all has to do with the

3    strategy of FusionPharm, the business.

4    A.   Well, yeah.

5    Q.   Okay.  And Mr. Sears is being included --

6    A.   Absolutely.

7    Q.   All right.  Okay.  Can you please look at Government

8    Exhibit 229.

9          MR. SIBERT:  And this has been admitted into

10   evidence.

11   BY MR. SIBERT:

12   Q.   Can you take a look at this e-mail.

13   A.   Yes.

14   Q.   Does that refresh your memory?

15   A.   That was significantly after the date of the previous

16   one.

17   Q.   Right.  That's March 23d, 2012.

18   A.   Yeah.

19   Q.   Okay.  So what is Mr. Sears e-mailing you in this

20   e-mail?

21   A.   He's telling me to get lost, that I'm fired.

22   Q.   All right.  So essentially Mr. Sears in this e-mail is

23   firing you from FusionPharm?

24   A.   That's correct.

25   Q.   All right.  Thank you.

Direct - Duke

1    A.    Now --

2    Q.    I'm going to keep moving here.  I --

3    A.    I know.  I understand.  So . . .

4    Q.    I'm trying to see if I can stream your testimony.

5          Now, how much were you going to get paid as the

6    executive vice president of FusionPharm?

7    A.    About 10 -- I was supposed to get paid 10,000 a month.

8    Q.    Okay.  Did you receive that payment?

9    A.    I received 10,000 for the first month, but I received

10   it after a couple of months, I think.  And then I received

11   20,000 shares of FusionPharm stock.

12   Q.    Okay.

13   A.    That was restricted under Rule 144.

14   Q.    All right.  So let's back up a little bit.  You got --

15   your salary was going to be $10,000 a month and -- correct

16   me if I'm wrong -- you received it one time?

17   A.    That's correct.

18   Q.    So you were paid one time your salary of $10,000.

19   A.    That's correct.

20   Q.    Do you remember what month that was?

21   A.    I'm sorry, I don't.

22   Q.    The year 2011?

23   A.    Yeah.

24   Q.    All right.

25   A.    Pretty sure about that.

Direct - Duke

1    Q.   And then you're paid $20,000 in shares?

2    A.   No, I was paid 20,000 shares.

3    Q.   Oh, that's right.  20 somehow --

4    A.   Which at the time had a value of roughly $40,000.

5    Q.   $40,000.  So four months' salary.

6    A.   Exactly.

7    Q.   All right.  Now, you stated the shares were restricted.

8    A.   Yes.

9    Q.   All right.  What do you mean by that?

10   A.   Under -- under the rules promulgated under the various

11   laws, there's a restriction on your shares, which is called

12   144.  And 144 means that you can't sell your stock for two

13   years from the date that it is handed to you.

14        Now, that has a whole different movie going because

15   at the end of the 144 period, you have to find an attorney

16   who will write the opinion saying that you've now held it

17   sufficiently long.

18   Q.   All right.  So you cannot sell these shares of stock

19   when they -- when, I guess, either Billy or Scott was paying

20   you?

21   A.   That's right.

22   Q.   All right.  So there was some risk in the fact of what

23   the value of the stock would be after the holding period?

24   A.   Yes.  It's the risk that's concurrent with taking a job

25   at a microcap and accepting stock.

Direct - Duke

1    Q.   All right.  Do you know where the 20,000 shares of

2    FusionPharm stock came from?

3    A.   I haven't the foggiest notion.  As far as I was

4    concerned, they had to have come from the company because

5    they were issued in my name.

6    Q.   All right.  And then why were you paid 20,000 shares of

7    FusionPharm stock instead of the $10,000 salary either in

8    check or cash, I assume?

9    A.   Because the cash wasn't available.

10   Q.   I see.

11   A.   And checks don't clear just because you've written

12   them.

13   Q.   Okay.  Sometimes they do until you get caught.

14        All right.  So when you said the cash is not

15   available, can you explain that to the jury.

16   A.   Sure.  I took Billy to go meet a well -- an attorney in

17   this town that's -- that practices securities law.  And one

18   of the questions that he asked Billy over lunch is he said,

19   "Well, are you guys trying to raise money?"

20        Bill looked at him with a straight face and said,

21   "Of course.  We're a small company.  We would be lying if we

22   didn't say we were always trying to raise money.  When

23   you're a small company, you're always trying to raise

24   money."

25   Q.   All right.  So it was your understanding that when you

Direct - Duke

1   received the 20,000 shares of FusionPharm stock, FusionPharm

2   did not have the money to pay you your $10,000 salary?

3   A.   I have -- I have belief but not knowledge that that's

4   correct.

5   Q.   Okay.

6   A.   I did not have access to the bank records in any way,

7   shape or form.

8   Q.   Who kept the bank records?

9   A.   Scott.

10  Q.   Okay.  Now, did you ever learn -- well, let me ask you

11  this:  If you had to give Scott Dittman and William Sears

12  titles, besides what you were told, how would you label

13  them?

14  A.   I think I've -- I think in the past I may have

15  characterized it that Scott was clearly the president, but

16  Bill would be characterized -- in my mind characterized as

17  the chief executive officer, or CEO.

18  Q.   Okay.  And based upon your experience in the corporate

19  world and investment world, what is the C- -- the chief

20  executive officer rank in a company?

21  A.   Rank?  I'm sorry, I thought you -- okay.  Right below

22  the president.  I mean, this is clearly the guy.  This is

23  the fellow who's supposed to execute what are the strategic

24  plans of the company.

25  Q.   Did you ever learn about William Sears selling

1    FusionPharm stock?

2    A.    Bill made no secret of the fact that he, Bill, felt

3    that through his contacts in Florida, Bill had had a strong

4    handle on where the market was.  When I valued those shares

5    at $2 apiece, Bill had been holding the price at $2 a piece

6    for a period of some time.

7    Q.    Okay.  I'm going to back you up.

8    A.    Go ahead.

9    Q.    What do you mean by Bill was holding the price of $2

10   apiece with the FusionPharm stock?

11   A.    In -- in the stock market world, there's bid and an

12   offer.  The bid is the price that somebody will pay you.

13   The offer is the price that you're expected to pay.

14         Bid -- Bill had managed to find people who were

15   willing to take stock at $2 apiece -- at $2 a share on --

16   on -- acting on their own, apparently.

17   Q.    And when you said Mr. Sears made no secret about this

18   stock -- selling the stock, how would you know that?

19   A.    He would talk about it in the office with -- he would

20   come into what I had earlier called the bullpen and talk

21   about it.

22   Q.    Did you ever learn or see who Mr. Sears was selling

23   stock to?

24   A.    It was my understanding that it was a group of brokers

25   out of the Boca Raton area in Florida.

1593

Direct - Duke

1    Q.   All right.  You stated there was a person by the name

2    of Ann.  She was the secretary; is that correct?

3    A.   Yes.

4    Q.   Do you know if she was ever sold stock --

5    A.   Absolutely, she was.  She -- her husband had -- had a

6    real job doing something and was -- Ann had come in to help

7    out as our secretary and Ann ended up buying about $5,000

8    worth of stock.  And I don't remember whether that was 2500

9    shares or 2,000 shares, but she -- she and her husband

10   committed some money to the company.

11   Q.   Okay.  And who did she buy stock from?

12   A.   My presumption would be that she --

13             MR. BARNARD:  Your Honor --

14             THE WITNESS:  -- through her broker dealer.  I have

15   no idea.

16             THE COURT:  Hold on, sir.

17             MR. BARNARD:  I object to speculation.

18             THE COURT:  Mr. Duke, please answer only from

19   personal knowledge, not speculation.

20             THE WITNESS:  I have -- I have no idea how her

21   family conducts their security business.

22   BY MR. SIBERT:

23   Q.   Okay.  Do you know if William Sears sold her stock?

24   A.   I have no idea who was the counterparty on the

25   transaction.  I would presume it was Mr. Sears, but I have

1594

Direct - Duke

1     no knowledge.

2              MR. BARNARD:  Your Honor, again, I object to --

3              THE COURT:  All right.

4              THE WITNESS:  I'm sorry, Your Honor.  If that was

5     offensive, I apologize.

6              THE COURT:  It's not offensive, it's just the rules

7     of evidence we have to enforce here.  Just stick with

8     personal knowledge.

9              THE WITNESS:  Thank you.

10    BY MR. SIBERT:

11    Q.   Remember all that structure?

12    A.   Pardon?

13    Q.   We got to obey by all that structure that you talked

14    about in my field.

15    A.   Okay.  Yes.

16    Q.   Okay?  Now, Ann -- do you know what happened with Ann's

17    employment at FusionPharm?

18    A.   Yes.  I terminated her.

19    Q.   Okay.  And why did you -- when you say "terminated,"

20    that's a rough word.  Does that mean you had to let Ann go

21    from FusionPharm?

22    A.   Yes.

23    Q.   Okay.  And why did you have to let Ann go?

24    A.   There was no cash to pay Ann.

25    Q.   Did anyone replace Ann?

Direct - Duke

1    A.    Kelly, who had -- who I have both knowledge and belief
2    was running a candy factory for FusionPharm, came in and
3    worked at the receptionist's job.
4    Q.    During the time period -- well, let me ask you this:
5    You were hired in -- at least according to the e-mails, in
6    October 2011 you were there.  When did you leave
7    FusionPharm?
8    A.    Well, Bill's -- Bill's e-mail was in March.  Scott and
9    I continued to talk and see each other.  I don't -- I have a
10   receipt from one of the lunches that he had and I did
11   together, but I -- it was -- it was sometime months after
12   that that Scott and I came to an understanding that I was no
13   longer in any way, shape or form involved with FusionPharm.
14   Q.    Okay.  During your time -- the several months, at
15   least, that you were not let go by William Sears at
16   FusionPharm, what was the capital -- what was the cash
17   capital like at FusionPharm?
18   A.    As I said before, I had no access to the books of
19   record -- the cash accounts, the bank accounts, even of that
20   sort of stuff.  But I would say that the -- that the
21   circumstances always seemed to be -- I wouldn't use the word
22   "dire," but "severe" comes to mind.
23   Q.    Severe in a good way or in a bad way?
24   A.    Severe has no good use that I know of.  I don't know
25   how to make severely favorable.

Direct - Duke

1    Q.   And now did you ever travel for work with -- for

2    FusionPharm?

3    A.   As I mentioned, I went down to New Orleans on the

4    company's behalf.

5              THE COURT:   Sir, can you speak into the mic.

6              THE WITNESS:   I'm sorry.   I went down to

7    New Orleans on the company's behalf to attend a high-end

8    investor's conference.   And I -- I was there on behalf of

9    FusionPharm.   And I also went to -- I think was Phoenix,

10   Arizona, to a similar conference, and there was the entire

11   suite of management from FusionPharm.

12   Q.   Okay.   So the New Orleans trip, did you go alone?

13   A.   Yes, I did.

14   Q.   Okay.   And then you stated you went to Arizona.   Did

15   you go to Phoenix?

16   A.   I believe so.

17   Q.   Okay.   And you stated the whole management of

18   FusionPharm was there?

19   A.   Yes.

20   Q.   And when you say "the whole management," who are you

21   talking about?

22   A.   Well, Bill, Scott, and myself, Frank, and even Kelly

23   was along with us.

24   Q.   Now, during your time at FusionPharm, did you have any

25   luck at raising money?

1    A.    No.  No luck at all.

2    Q.    And can you explain why you didn't have any luck in

3    raising money for FusionPharm.

4    A.    I think that because -- even though we had the science

5    on our -- on our side, the marijuana industry was new and --

6    I don't -- I don't know.  In hindsight, when you look at it,

7    I don't know.

8    Q.    All right.  Can you look at Government Exhibit 230.

9    And this has been produced in evidence.  I want to start at

10   the bottom.  There might be a second page to the --

11   A.    Oh, yeah.  Okay.

12   Q.    All right, sir, do you -- you're being sent an e-mail

13   here.

14   A.    Yes.

15   Q.    From a Larry -- I can't read --

16   A.    Laurence Ditkoff.

17   Q.    Okay.  Sorry.

18   A.    With Southridge Capital Partners.

19   Q.    Okay.  What is Larry Ditkoff e-mailing you about?

20   A.    When Scott and I were talking about the science, one of

21   the names that came -- one of the names that came up was

22   Stevia as being an agricultural-based plant.  I did some

23   research on Stevia investors and I discovered Mr. Ditkoff's

24   firm.

25           And so I had been talking to Mr. Ditkoff about his

Direct - Duke

1    firm and becoming involved with FusionPharm as they had done

2    with Stevia.

3    Q.   As a potential investor?

4    A.   Exactly.

5    Q.   Okay.  And so what was he asking you about regarding

6    the OTC Markets and a $269,000 debt?

7    A.   There was a $269,000 debt that had been revealed by

8    research on the OTC Market service, apparently, that showed

9    that we had a $269,000 debt.

10   Q.   Okay.  So FusionPharm posted a report on OTC --

11   A.   I can't -- I can't recollect the source of OTC.  I

12   don't know the source of their information, I'm sorry.

13   Q.   You didn't have anything to do with the postings of

14   FusionPharm's disclosures on OTC?

15   A.   No.

16   Q.   Okay.  Let me ask you, why is that?  You were the vice

17   executive president.

18   A.   I am not technologically savvy.

19   Q.   Can we go to the middle, please.

20   A.   Certainly.

21   Q.   So when you got the -- the question, who did you go to

22   about receiving an answer?

23   A.   Scott.

24   Q.   And what did Mr. Dittman tell you?

25   A.   That it was a religious -- a residual balance.

Direct - Duke

1   Q.   Can you go down here to the top of the e-mail.  Is this

2   Mr. Dittman's response to you?

3   A.   It's above his signature, so yes.

4   Q.   Okay.  And when he -- what type of -- who gave the loan

5   to FusionPharm, according to Scott Dittman?

6   A.   Friends and family.

7   Q.   Did you ever hear -- take that down, please.  Thank

8   you.

9        Did you ever hear Mr. William Sears talking about

10  selling blocks of FusionPharm's stock?

11  A.   Absolutely.  He solicited Mr. Falconer for a block of

12  stock.

13  Q.   How many times would you -- did you hear Mr. William

14  Sears talking about selling blocks of FusionPharm stock?

15  A.   It was an ongoing conversation.

16  Q.   And when you say "ongoing," it wasn't unusual for Mr.

17  Sears --

18  A.   Not at all.  I mean --

19  Q.   Let me ask you this:  What was Mr. William Sears like

20  on a daily basis at FusionPharm?

21  A.   He was very excited.  I mean, he was -- he is

22  something -- he's -- in my opinion, he's somewhat manic.  He

23  can be very up and very down and it just happens.  I mean,

24  sometimes he's very enthusiastic and sometimes he's somewhat

25  morose.

Direct - Duke

1    Q.    All right.  Now, regarding the FusionPharm stock, did

2    you ever learn about Robert Dittman, Scott Dittman's

3    brother, holding FusionPharm stock?

4    A.    Subsequent to my time at FusionPharm, and in the

5    fullness of that time, I came to understand the -- that

6    Bobby Dittman was a big holder of FusionPharm as a nominee.

7    Q.    Okay.  And who told you that -- you referred to him as

8    Bobby, is that Robert Dittman, the younger brother?

9    A.    That would be Robert Dittman, Jr.  My friend was Bob

10   Dittman, so his son would naturally be referred to in our

11   conversations as Bobby, so that's how I continued to refer

12   to him and think of him.

13   Q.    Okay.  I'm sorry for this question, I just need --

14   A.    No, I'm with you.

15   Q.    All right.  So who informed you that that Robert

16   Dittman, Jr., controlled FusionPharm stock -- or excuse me,

17   had a block of FusionPharm stock in his name?

18   A.    I think I got that from his father, Bob.

19   Q.    Okay.  And do you recall what his father told you

20   about --

21            MR. BARNARD:  Your Honor, I object.  Hearsay.

22            MR. SIBERT:  I'm not offering for the truth of the

23   matter asserted, Your Honor.

24            THE COURT:  All right, overruled.

25   BY MR. SIBERT:

Direct - Duke

1    Q.   And do you recall what Mr. Dittman, Robert Dittman's
2    father, told you about his son holding a block of
3    FusionPharm stock?
4    A.   Just that he had it.  I -- I --
5    Q.   Did this concern you?
6    A.   Well, yeah, because if you have the stock, you have the
7    tax consequences if it's sold.
8    Q.   Okay.  So what were you worried about when you heard
9    Robert Dittman, Sr., tell you about his son holding a large
10   amount of FusionPharm stock?
11   A.   It has been my experience personally and professionally
12   that if you're holding the stock of some other company as a
13   nominee, you're going to have tax consequences.  And so I
14   advised him that he needed to make sure that Bob -- Bobby
15   did something to make sure that if any of this stock was
16   sold, and he was not the direct beneficiary, that he at
17   least avoid the tax consequences.
18   Q.   Okay.  Was he known as Bobby the bartender?
19   A.   Well, that's how I referred to him with Scott and with
20   Bill and with Bob, Sr.
21   Q.   And why was he called Bobby the bartender?
22   A.   Because he was working as a bartender at the time and
23   here he is holding a big position in a public company and
24   he's Bobby the bartender.  So if he gets the tax
25   consequences as a bartender, he's going to get -- he doesn't

Direct - Duke

1    have the wherewithal to defend himself.  He's just going to

2    be steamrolled, so he's got to do something.

3    Q.   Okay.  And -- so his full-time employment at this

4    period of time was being a bartender?

5    A.   Yeah.  He wasn't -- he wasn't a sophisticated investor,

6    he wasn't an active investor; he was a passive nominee, from

7    what I heard directly.

8    Q.   And who did you hear this from directly?

9    A.   Bob Dittman, Sr., and obviously Bob, Jr., at a time

10   subsequent when everybody was together.  They were talking

11   about Bob having -- Bob, Jr., having stock that would have

12   to be moved if a block was sold.

13   Q.   Okay.  And what do you mean by passive -- I missed the

14   term that you used in referencing Robert Dittman, Jr.  You

15   called him a passive something.

16   A.   I called him a passive owner as opposed to an active

17   owner.  If you own mutual funds, you are a passive investor

18   in the stocks that it holds.  If you own a portfolio of

19   stocks that you pick and choose yourself, you're an active

20   investor by definition.

21   Q.   So essentially Mr. Robert Dittman, if I understand you

22   correctly, didn't have a control of this stock that was in

23   his name?

24   A.   You're referring to Junior, correct?

25   Q.   That's correct.

Direct - Duke

1    A.    Okay.  As far as I understood, Mr. Dittman, Jr., had no

2    direct -- I'm sorry.  I don't know what Mr. Dittman, Jr.'s

3    arrangements were with the brokerage firm or with whoever

4    was the custodian for the stock.  I'm sorry.

5    Q.    Okay.  All right.  Now, were you aware of Mr. -- did

6    you ever meet a gentleman through your time at FusionPharm,

7    an individual by the name of Guy Jean-Pierre?

8    A.    Yes, I did.

9    Q.    And do you see him here today in the courtroom?

10   A.    Yes, I do.

11   Q.    And can you point him out and identify something that

12   he's wearing.

13   A.    He's the -- he's the handsome and distinguished

14   gentleman in the brown suit at the end of the table.

15          MR. SIBERT:  Your Honor, may the record reflect

16   that this witness identified the defendant in the case.

17          THE COURT:  The record will so reflect.

18   BY MR. SIBERT:

19   Q.    All right.  And tell the jury how you -- how you know

20   Mr. Guy Jean-Pierre.

21   A.    Mr. Jean-Pierre was an associate of the company's

22   before I got there.  And when Mr. Jean-Pierre was coming to

23   visit, this was considered to be an event of great moment

24   for the company.

25   Q.    Okay.  Let me grab a sip of water.

1604

1    A.    Please.

2    Q.    When you said he was an acquaintance of the company

3    before your time, do you know who he knew at FusionPharm?

4    A.    I'm trying to figure out how to say this without -- my

5    presumption was he knew Bill, but I have no direct knowledge

6    whether he knew Scott or Bill first, or Bill -- you know, I

7    don't know.  This was a preexisting relationship that

8    predated me.

9    Q.    And now you stated when you -- when Mr. Guy Jean-Pierre

10   came out to Colorado, it was a big event.

11   A.    It was considered to be an important event in the

12   company.

13   Q.    Okay.  Let me back you up.  Where was Mr. Guy

14   Jean-Pierre coming from?

15   A.    I believe somewhere in the -- in the Florida area.

16   Q.    Okay.

17   A.    It could have been the islands.  It could have been

18   Florida.

19   Q.    Okay.  And do you know why there was going to be this

20   big event regarding Mr. Guy Jean-Pierre's visit to Colorado?

21   A.    Absolutely.

22   Q.    Can you explain what that was.

23   A.    Sure.  It goes directly to the idea of 144 stock.  Mr.

24   Jean-Pierre's an attorney; it takes an attorney's opinion to

25   lift the legend on 144.

1605

Direct - Duke

1    Q.    Okay.  And so do you know what type of attorney Mr. Guy

2    Jean-Pierre was in 2011 when you met him?

3    A.    I have no knowledge of what his basic practice was, but

4    I was led to believe that a great deal of his practice was

5    in the securities area.

6    Q.    Do you know the purpose of him coming to Colorado

7    specifically regarding the 144 -- the Rule 144 securities

8    legends?

9    A.    I was never in a direct conversation where Mr.

10   Jean-Pierre received direct specific instruction.

11   Q.    Okay.

12   A.    Or whether he -- or where he was solicited for direct

13   and specific response.

14   Q.    Okay.  Why weren't you present?

15   A.    Because those meetings were held without me.  They were

16   Bill, Scott, and Jean-Pierre -- and Jean-Pierre.

17   Q.    Do you know why you were not included in those

18   meetings?

19   A.    Sure.  Because Bill doesn't exist.

20   Q.    Okay.  Can you clarify that a little bit for me?

21   A.    Yes.  If three guys are talking and one of them doesn't

22   exist, they don't want a third guy in there.

23   Q.    And what do you mean by that?

24   A.    In other words, I wasn't invited because I would be a

25   witness to something that might not -- I presume, I do not

Direct - Duke

1    have direct belief, direct knowledge -- I presume that if

2    they were going to do anything that I shouldn't know about,

3    they wouldn't want me in the room when they're discussing

4    it.

5    Q.    Okay.  And how many days was Mr. Guy Jean-Pierre in

6    Denver?

7    A.    Under a week, about two or -- about three days.

8    Q.    Okay.  And did you ever -- were you ever -- did you

9    ever participate in any meetings or events when Mr. Guy

10   Jean-Pierre came to visit FusionPharm?

11   A.    Yes.  We had one all-hands-on-deck meeting and then we

12   had a subsequent dinner event.

13   Q.    Okay.  So at the all-hands, meaning, I'm assuming, that

14   Mr. Scott Dittman and Mr. William Sears was at that meet- --

15   or at that meeting?

16   A.    Yes, of course.

17   Q.    How many other people at that time?

18   A.    Again, the cast of characters is Mr. -- Mr. Dittman,

19   Mr. Sears, Mr. Duke, Mr. Falconer and Kelly, whatever the

20   last -- her last name is.  I think -- I think it's Blume.

21   Q.    Blume is your --

22   A.    Yeah.  And then there was an intern that we picked up

23   for a little while.

24   Q.    Okay.  And --

25   A.    But I don't --

Direct - Duke

1    Q.   How about at dinner?  Who attended the dinner with the

2    FusionPharm corporation employees?

3    A.   I know that it would be Mr. Jean-Pierre, myself, Mr.

4    Dittman, Mr. Sears, I believe Mr. Falconer who was there.  I

5    do not know whether -- I do not recall whether Ms. Blume was

6    there.  And I don't know whether the intern came.

7    Q.   Do you know how Mr. Guy Jean-Pierre was paid for -- by

8    the company?

9    A.   I have no knowledge.

10   Q.   Did Mr. Sears ever discuss in your presence with Mr.

11   Guy Jean-Pierre about his role with FusionPharm being

12   undisclosed?

13   A.   His, Mr. Sears', role being undisclosed?

14   Q.   Yes, sir.

15   A.   I don't -- I don't remember a specific conversation

16   along those lines.

17   Q.   All right.  I want to turn your attention now to a time

18   when you were working at FusionPharm.  Did you ever speak to

19   a representative from the organization known as FINRA,

20   otherwise known as a Financial Industry Regulation

21   Authority?

22   A.   Yes, I did.

23   Q.   And could you go ahead and explain how you became

24   involved with speaking from a representative of FINRA.

25   A.   They called in, I answered the phone.

Direct - Duke

1   Q.   Okay.  And what did FINRA want when you answered the
2   phone?
3   A.   They wanted somebody who could speak knowledgeably on a
4   few questions that they had, about which I had no knowledge,
5   and -- at all.  And so I referred the call to Scott by
6   note.
7   Q.   Did you -- were you aware of who FINRA was before
8   answering --
9   A.   Absolutely.
10  Q.   Okay.  Let me just finish my question for the record.
11          Were you aware of who FINRA was before you answered
12  the telephone that day?
13  A.   I was aware of who FINRA was before I answered the
14  phone.
15  Q.   Okay.  And what was your understanding of FINRA?
16  A.   FINRA is one of the regulatory authorities, like the
17  NASD, and like the SEC, that anybody who's transacting
18  business in securities has to be aware of.
19  Q.   Okay.  And when they were -- who -- do you recall what
20  FINRA was asking about on the phone call?
21  A.   I'm sorry, as I said, I -- I don't recall specifically,
22  but I know that at the time I thought that they -- these
23  questions were well beyond anything I could legitimately
24  answer and so I referred the call to Scott by note.
25  Q.   Okay.

Direct - Duke

1    A.    Which is to say I gave him a note saying that they had

2    called with the phone number.

3    Q.    Did you give it to him personally?

4    A.    Absolutely.

5    Q.    And did Mr. Scott Dittman have a reaction when you gave

6    him that note?

7    A.    Yeah.  He said, "Don't worry about it.  I've got it

8    handled.  It has to do with Baby Bee Bright."

9          And that was the end of it.

10   Q.    All right.  Did you have any worry, as an employee at

11   FusionPharm, regarding this phone call from FINRA?

12   A.    As an officer of the company, yes, I did.

13   Q.    Okay.  And why did you have concerns as an officer of

14   the company when FINRA called?

15   A.    Because FINRA's not a call that you receive in the

16   ordinary course of business as a public company.

17   Q.    And so can you elaborate -- can you -- can you

18   essentially -- so FINRA doesn't call often.  Why would that

19   concern you, then?

20   A.    That's the point.  FINRA doesn't call often.  You -- in

21   the course of your ordinary life, you don't meet a lot of

22   traffic policemen unless you happen to do something that

23   involves traffic policemen.  FINRA is the same way.  You

24   don't really have a broad acquaintanceship among people who

25   work at FINRA professionally.  It's not something that you

Direct - Duke

1    do.  FINRA calls you not with, "Oh, Merry Christmas," they

2    call you with, "Oh, come on down.  We need to figure this

3    out and you need to explain it to us."

4    Q.   Okay.  After you provided the note to Mr. Dittman, were

5    you ever again involved in the FINRA matter?

6    A.   No.

7    Q.   Do you know who was involved with those matters?

8    A.   I would presume --

9            MR. BARNARD:  Again, object to any speculation.

10           THE COURT:  Just from personal knowledge.

11           THE WITNESS:  I have no knowledge of how any FINRA

12   matters were handled.

13   BY MR. SIBERT:

14   Q.   Okay.

15           THE COURT:  Why don't we pause there, Mr. Sibert,

16   for the day.

17           MR. SIBERT:  Okay.  Thank you, Your Honor.

18           THE COURT:  All right.  All right, ladies and

19   gentlemen of the jury, we're going to call it a day.  Again,

20   as I have to -- I know you're sick of hearing it from me,

21   but I have no choice -- please do not do any independent

22   research into or discuss with anyone the facts, the law, or

23   the persons involved in this lawsuit.

24           We'll start again tomorrow at 8:45.  And we will be

25   in recess until then.

1611

Direct - Duke

1    (Jury left the courtroom at 5:04 p.m.)

2        THE COURT:  All right, Mr. Duke, because you're in

3    the middle of your testimony, I'm directing you not to speak

4    with any of the lawyers while the Court is in recess.  And

5    if you could be back in the courtroom by 8:40 tomorrow

6    morning.

7        THE WITNESS:  Thank you, Your Honor.

8        THE COURT:  All right.

9    (Proceedings concluded at 5:05 p.m.)

10

11                            **INDEX**

12   Item                                              PAGE

13                 GOVERNMENT'S WITNESSES

14   **TODD KRAMER, (Continued)**
     Direct Examination by Mr. Brown (Cont'd)      1346
15   Voir Dire Examination by Mr. Barnard          1349
     Direct Examination by Mr. Brown (Cont'd)      1353
16   Cross-examination by Mr. Barnard              1407
     Redirect Examination by Mr. Brown             1409
17
     **RICHARD SCHOLZ**
18   Direct Examination by Mr. Sibert              1411
     Cross-examination by Mr. Barnard              1453
19   Redirect Examination by Mr. Sibert            1455

20   **WAYNE COLESON**
     Direct Examination by Mr. Brown               1457
21   Cross-examination by Mr. Goodreid             1479

22   **MYRON THADEN**
     Direct Examination by Mr. Sibert              1481
23   Cross-examination by Mr. Goodreid             1499
     Redirect Examination by Mr. Sibert            1503
24
     **MICHAEL KOCINSKI**
25   Direct Examination by Mr. Brown               1504
     Cross-examination by Mr. Goodreid             1529

Direct - Duke

**INDEX**

| Item | | | PAGE |
|---|---|---|---|

GOVERNMENT'S WITNESSES

**SANDRA SEARS**
Direct Examination by Mr. Sibert        1534

**SANDRA SEARS**
Direct Examination by Mr. Sibert        1552

**ANDREW DUKE**
Direct Examination by Mr. Sibert        1564

GOVERNMENT'S EXHIBITS

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|---|---|---|---|---|
| 91 | 1543 | 1543 | | |
| 97 | 1554 | 1554 | | |
| 101 | 1562 | 1562 | | |
| 106 | 1543 | 1543 | | |
| 108 | 1543 | 1543 | | |
| 109 | 1543 | 1543 | | |
| 110 | 1543 | 1543 | | |
| 139 | 1349 | 1353 | | |
| 168 | 1522 | 1523 | | |
| 176 | 1522 | 1523 | | |
| 178 | 1522 | 1523 | | |
| 179 | 1522 | 1523 | | |
| 225 | 1571 | 1571 | | |
| 227 | 1583 | 1583 | | |
| 228 | 1584 | 1584 | | |

1613

Direct - Duke

1    GOVERNMENT'S EXHIBITS

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|-----------|---------|----------|---------|------------|
| 262 | 1513 | 1513 | | |
| 432 | 1406 | 1406 | | |
| 433 | 1406 | 1406 | | |
| 434 | 1406 | 1406 | | |

7                    *      *      *      *      *

8                    REPORTER'S CERTIFICATE

9

10        I certify that the foregoing is a correct transcript

11   from the record of proceedings in the above-entitled matter.

12        Dated at Denver, Colorado, this 25th day of March,

13   2020.

14

15

16

17   _                                          _

18            MARY J. GEORGE, FCRR, CRR, RMR