1614

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 17-cr-0008-WJM

UNITED STATES OF AMERICA,

Plaintiff,

vs.

GUY JEAN-PIERRE a/k/a Marcelo Dominguez de Guerra,

Defendant.

-------------------------------------------------------------

REPORTER'S TRANSCRIPT
(Jury Trial, Day 8)
Volume VIII

-------------------------------------------------------------

Proceedings before the HONORABLE WILLIAM J. MARTINEZ,
Judge, United States District Court for the District of
Colorado, commencing at 8:52 a.m., on the 24th day of
January, 2019, in Courtroom A801, United States Courthouse,
Denver, Colorado.

APPEARANCES

JEREMY S. SIBERT and ROBERT M. BROWN, Assistant U.S.
Attorneys, 1801 California Street, Suite 1600, Denver,
Colorado 80202, appearing for the plaintiff.

CLIFFORD J. BARNARD, Attorney at Law, 4450 Arapahoe
Avenue, Suite 100, Boulder, Colorado 80303, AND
THOMAS E. GOODREID, Attorney at Law, 1801 Broadway,
Suite 1400, Denver, Colorado 80202, appearing for the
defendant.

MARY J. GEORGE, FCRR, CRR, RMR
901 19th Street, Denver, Colorado 80294
Proceedings Reported by Mechanical Stenography
Transcription Produced via Computer

1    P R O C E E D I N G S

2         (Proceedings were held in open court outside the

3    presence of the jury at 8:52 a.m.)

4         THE COURT:  Agent Funk, it's good to see you here

5    this morning.  I trust that that means that you're feeling

6    better.

7         AGENT FUNK:  Yes, thank you.

8         THE COURT:  Great.  That makes me happy.

9         We have at least one, if not more, jurors still to

10   get here because of the inclement weather and I thought we'd

11   make use of the time for a couple of things.  One is that

12   you will recall I mentioned to all of you that at the trial

13   preparation conference that our conversion of this courtroom

14   from analog to digital was to commence this Monday.  The

15   more I thought about it, the more I thought that it would be

16   just a really huge inconvenience for everyone, so I told our

17   Clerk of Court, Jeff Colwell that I did not want to move and

18   I asked him to inform our contractors to start on Wednesday.

19   So we can stay in this courtroom through Tuesday.  So that's

20   the good news to start with.

21        The second thing I want to raise is where we are

22   with the trial.  Can I get a sense from the Government --

23   I'm not going to hold you to anything right now, but I just

24   want to get a sense of when you think you'll be done and

25   resting.

1    MR. SIBERT:  Your Honor, I'm hoping either late
2    Monday afternoon or early Tuesday morning.
3    THE COURT:  Whoa.
4    MR. SIBERT:  I'm trying to -- we have two big
5    witnesses today.  If these go quickly, I think we'll be
6    finished Monday.
7    THE COURT:  Well, you're going to have to finish on
8    Monday because here's -- here's -- well, first, thank you
9    for that.  Let me say something to the defendant -- the
10   defense counsel.  And there's always the unknown, slash,
11   uncertainty, slash, tension, obviously the defendant does
12   not want to tip his hand as to whether he's going to testify
13   and/or whether you're going to have any witnesses testify
14   for the defense.  But unless at some point you tell me that
15   you are, then I can't reserve any time for you to put on
16   your case, in which case I'll allow the Government to use up
17   all the time that we have allocated for evidence.
18   So, you know, I'm not asking you to make any
19   commitment now or say anything, but just so you know, we
20   have an understanding that unless and until I hear from
21   defense counsel that you do expect to put on some evidence,
22   then I will allow the Government to take up all the time
23   that we have for evidence.
24   MR. BARNARD:  Your Honor, I would tell the Court at
25   this point that we do expect to be putting on at least the

1   expert witness -- the defense expert witness to testify, so

2   we will need some time.

3           THE COURT:  Okay.

4           MR. BARNARD:  And possibly as much as four hours.

5           THE COURT:  Wow.  So this is for the one witness,

6   four hours?

7           MR. BARNARD:  Possibly, yes.  I don't know that it

8   will take that long.  I hope it won't take that long --

9           THE COURT:  You're talking about direct?  Just

10  direct?

11          MR. BARNARD:  No, I think that that whole -- I

12  would -- should be able to be both direct and cross.  And

13  with regard to the defendant testifying, that is still up in

14  the air --

15          THE COURT:  Of course, yeah.

16          MR. BARNARD:  -- of course.

17          THE COURT:  Sure.  Wow.  Okay.

18          MR. SIBERT:  Your Honor, if it would help the

19  Court, I think our expert, Mr. Thel -- Professor Thel, I

20  think he will be shorter than what we put on the time sheet.

21  And I'm -- I believe that is -- we've already had some

22  discussions about what Rule 144 is and the requirements that

23  have to be met under Rule 144.  So I don't know if I have to

24  start from, you know, letter A.  I think we can start --

25          THE COURT:  I'm not going to tell you how to put on

1    your case, but don't start from scratch with him.

2              MR. SIBERT:  Right.

3              THE COURT:  I mean --

4              MR. SIBERT:  I agree with the Court.

5              THE COURT:  I think you've heard me say this

6    before, I know Mr. Brown has heard me say this, that I've

7    gone back and talked with all of my juries in all of my

8    almost-60 trials since I've been on the bench.  The one

9    thing they tell me every single trial is, "Why did the

10   lawyers have to repeat the same thing 17 times?  We got it

11   after the third time."  So I'm not telling you how to put on

12   your case, but just word to the wise.

13             But going back to our timing, I think at the

14   latest, Mr. Sibert, the Government has to plan on resting by

15   mid-morning Monday.  That is the latest.  And I'll have to

16   impose a trial time clock on the Government because I'm not

17   going to preclude the defense from putting on its one or

18   more witnesses.

19             All right.  Why don't we take a recess and then

20   when we have all 14 jurors accounted for, we'll come back

21   out and start up the evidence -- is Mr. Duke here?

22             MR. SIBERT:  He's not.  From my understanding, he's

23   not here.  Obviously I haven't spoken to him.

24             THE COURT:  Okay.  Why don't you ask your --

25             MR. SIBERT:  She -- I know he was on his way.  I

1    think she's checking.

2         THE COURT:  Okay.  So -- well, then, obviously,

3    we'll have to wait until all 14 are -- all 14 jurors and Mr.

4    Duke are present because we can't go forward without him.

5    All right, we will be in recess.

6         MR. SIBERT:  Since we don't have the jury here, Mr.

7    Bodden is going to be testifying today.

8         THE COURT:  Yeah.

9         MR. SIBERT:  He'll be the third witness.

10        THE COURT:  Okay.

11        MR. SIBERT:  I don't expect the first two being

12   very long.

13        THE COURT:  Okay.

14        MR. SIBERT:  So I guess I'm asking how would the

15   Court like to handle his entrance into the courtroom.

16        THE COURT:  Well, is he -- is he restrained in any

17   way?

18        MR. SIBERT:  I don't know the answer to that.

19        THE COURT:  Okay.  If he is restrained and you

20   don't want to -- then obviously we don't want the jury

21   seeing him being unrestrained in the courtroom and then

22   taking the stand.  We'll just have -- we'll take -- we'll

23   excuse the jury for a couple minutes, have him come out, and

24   then when they come out, he'll be --

25        MR. SIBERT:  Is it okay if I just tell the Court, I

1   don't know, "It's that time, Your Honor, that I need to
2   discuss something," or --
3           THE COURT:  Or, no, just say -- just say if -- if
4   that's the case, just say, "Our next witness is Cliffe
5   Bodden, and we will have to take a brief recess at this
6   time."
7           MR. SIBERT:  Okay.  Great.  Thank you.
8           THE COURT:  And that will be the cue.  If he's
9   unrestrained and in civilian clothes, I'm fine with him
10  coming through those doors like any other witness.
11          MR. SIBERT:  I agree with the Court.  I just -- I
12  think it's because he's still officially in custody.  My
13  understanding was he's going to have to come through the
14  marshal's entry.
15          THE COURT:  Okay.  So why don't you caucus with the
16  marshals -- he won't be coming -- he won't be testifying
17  before morning break, right?
18          MR. SIBERT:  He might.
19          THE COURT:  He might?
20          MR. SIBERT:  Depending on when we start.
21          THE COURT:  Okay.  Then let's do this.  So it's Mr.
22  Duke.  Who's after that?
23          MR. SIBERT:  Mr. Dittman -- Robert Dittman.
24          THE COURT:  Robert Dittman.  And then it will be
25  Cliffe Bodden.

Direct - Duke

1    MR. SIBERT:  Yes, sir.

2    THE COURT:  All right.  Then why don't we just do

3    this:  Why don't we just -- I'll just tell the jury that

4    we'll have to excuse them for five minutes after Mr. Robert

5    Dittman is done, and then we'll just see where we are with

6    the marshals and Mr. Bodden in terms of being restrained or

7    unrestrained.

8    MR. SIBERT:  Great.  Thank you.

9    THE COURT:  All right.  We will be in recess -- oh,

10   ma'am, is he here yet?

11   UNIDENTIFIED SPEAKER:  He's not here yet and he did

12   not answer his phone.

13   THE COURT:  Great.

14   MR. SIBERT:  Smoking a cigar, and driving.

15   THE COURT:  All right.  Okay.  We'll be in recess.

16   (Recess 9:00 a.m.)

17   (In the presence of the jury at 9:28 a.m.)

18   THE COURT:  Good morning, ladies and gentlemen of

19   the jury.  Welcome back to day 8 of our jury trial.

20   Mr. Duke, I remind you you remain under oath.

21   Mr. Sibert, you may resume your examination.

22   MR. SIBERT:  Thank you, Your Honor.

23   DIRECT EXAMINATION (Continued)

24   BY MR. SIBERT:

25   Q.   Good morning, Mr. Duke.

Direct - Duke

1    A.   Good morning, Mr. Sibert.  Your Honor.

2    Q.   I'm going to pick up from essentially where we left off

3    yesterday, which we were talking about when Mr. Guy

4    Jean-Pierre came to Denver, Colorado, and visited

5    FusionPharm.  Do you recall the line of questioning there?

6    A.   Yes.

7    Q.   All right.  And if I believe I remember your testimony

8    correctly, you said that Mr. Guy Jean-Pierre came out for

9    approximately three days.

10   A.   That's correct.

11   Q.   And during those three days, where did Mr. Guy

12   Jean-Pierre -- well, let me ask you:  Did you go to work all

13   three days at FusionPharm?

14   A.   Yes.

15   Q.   Okay.  And was Mr. Guy Jean-Pierre at FusionPharm's

16   office space during the working hours for those three

17   days?

18   A.   For periods of time throughout the day, he -- I noticed

19   that he was in our offices.

20   Q.   And during those periods of time, who was Mr. Guy

21   Jean-Pierre speaking with?

22   A.   Bill or Scott, or both.

23   Q.   Now, you stated yesterday that your location in the

24   office was centrally located and you were able to basically

25   understand and hear things that were going on in the office.

Direct - Duke

1   Before Mr. Guy -- well, before Mr. Guy Jean-Pierre came to

2   FusionPharm, even after the time period after Mr. Guy

3   Jean-Pierre left the office, did you ever hear any

4   discussions regarding Mr. Guy Jean-Pierre?

5   A.   In what regard, please?

6   Q.   Well, did you ever hear any conversations with Mr.

7   Scott Dittman or Mr. William Sears discussing Guy

8   Jean-Pierre?

9   A.   The only discussion I heard that really resonated was

10  that there was a discussion of fees and payment.

11  Q.   And what was that discussion about?

12  A.   A dispute.  And I have no details.

13  Q.   Okay.  And did that dispute also occur -- do you know

14  if that dispute also occurred when Mr. Guy Jean-Pierre

15  visited FusionPharm?

16  A.   That was -- it became a dispute and it continued at our

17  end.  In other words, it was -- there was dialogue

18  post-encounter.

19  Q.   And then do you recall how Mr. Guy Jean-Pierre appeared

20  the day that he was leaving FusionPharm?  When he was

21  leaving Colorado, essentially, to go back to Florida.

22  A.   Exactly as he appeared when he came.

23  Q.   Okay.  And was there any disagreement among Mr. Scott

24  Dittman, William Sears, and Mr. Guy Jean-Pierre when he was

25  leaving?

Direct - Duke

A.   These are -- these are professional men who are
friendly.  If there was a fee dispute, it was disputed
privately to a great extent.  Because of my seat, I happened
to have good seats at the show, but, you know, it wasn't --
it wasn't public -- it wasn't something where they were
screaming at each other in the hallway.

Q.   And now, you also stated because of your seat, you
could hear things from time to time.  But maybe you weren't
part of the conversation, but you overheard?

A.   That's why I specified yesterday that because of my
seat, there were conversations that were clearly public,
which is -- are ones that were held in the bullpen, or
semi-public, which were ones that were held with the door
clearly open as opposed to closed, or even partially closed,
which was the indicator of an expectation of greater
privacy.

Q.   And my understanding also, do you know how Mr. William
Sears would speak on the telephone when he wasn't in his
office?

A.   Bill has a very boisterous personality and he is not
unwilling to allow that side to take him over.

Q.   Okay.  Maybe -- did Mr. Sears use any type of Bluetooth
device to be able to speak on the telephone?

A.   Of course.  I mean, you know, he would -- and he would
shout in the office.

Direct - Duke

1    Q.   And during any of those phone calls, did you ever hear

2    Mr. Guy Jean-Pierre's name mentioned?

3    A.   I'm sure I did.

4    Q.   And do you know during the time there as the vice

5    executive president -- vice executive president, excuse

6    me -- do you know what role Mr. Guy Jean-Pierre was with --

7    or what role Mr. Guy Jean-Pierre held with FusionPharm?

8             MR. BARNARD:   Your -- object.   Lack of foundation.

9             THE COURT:   If you know.

10            THE WITNESS:   Okay.   Thank you.   It was executive

11   vice president.   And Guy Jean-Pierre was presented as

12   securities counsel to the company.

13   BY MR. SIBERT:

14   Q.   Okay.   And essentially who did you see communicating

15   with Guy Jean-Pierre?

16   A.   Bill and Scott.

17   Q.   And who did you hear communicating the name Guy

18   Jean-Pierre?

19   A.   Bill and Scott.

20            MR. SIBERT:   I'll pass the witness, Your Honor.

21            THE COURT:   All right.   Cross-examination.

22            MR. BARNARD:   Thank you, Your Honor.

23                         CROSS-EXAMINATION

24   BY MR. BARNARD:

25   Q.   If I could have previously admitted Exhibit 225,

Cross - Duke

1    please.

2         Mr. Duke, this is a diagram that you prepared with

3    regard to the offices at FusionPharm.

4    A.   That's correct, counsel.  Counsel, we haven't been

5    introduced.  I'm Andrew Duke.

6    Q.   My name is Cliff Barnard.

7    A.   Mr. Barnard.

8    Q.   I represent Mr. Jean-Pierre.

9    A.   I understood that.  Thank you, Mr. Barnard.

10   Q.   Mr. Duke -- excuse me, with regard to this exhibit, in

11   the bottom right-hand corner, you say that that is the

12   office of Fred -- Frank.

13   A.   Frank Falconer, yeah.

14   Q.   When did you start working at FusionPharm?  September

15   of 2011?

16   A.   Yeah.  And then Frank followed shortly thereafter.

17   Q.   And how long is "shortly thereafter"?

18   A.   I would guess within a month, maybe --

19   Q.   Within a month?

20   A.   -- maybe longer.  Maybe a little less, maybe within two

21   weeks.

22   Q.   You don't remember?

23   A.   I'm sorry, sir, it wasn't important at the time.  It

24   certainly is not important now.

25   Q.   You don't remember.

1    A.   I don't remember.

2    Q.   All right.  So when you got there, Fred -- Frank was

3    not a member of the staff at FusionPharm.

4    A.   That's correct.

5    Q.   So Frank was not in that office in the down -- the

6    corner office down on the right of this diagram.

7    A.   You have a perfect understanding -- one moment.

8         When I started -- you have a perfect understanding

9    of the matter.  Frank did not occupy that office.  At the

10   time --

11   Q.   So --

12   A.   At the time she --

13   Q.   So was that office unoccupied or did you occupy it --

14   A.   I never occupied an office while I was there.

15   Q.   I'm sorry, could you wait until I'm finished --

16            THE COURT:  Gentlemen, one voice at a time.

17            THE WITNESS:  I'm sorry, Your Honor.

18            THE COURT:  Mr. Duke, let counsel complete his

19   question, and he'll wait for you to complete your answer

20   before he asks his next question.

21            THE WITNESS:  Thank you, Your Honor.

22   BY MR. BARNARD:

23   Q.   So when you first got there and Mr. Falconer was not

24   yet an employee, did you occupy the bottom right-hand corner

25   office?

Cross - Duke

1    A.   No, sir.

2    Q.   All right.  So you at all times were in the bullpen?

3    A.   That's correct, sir.

4    Q.   And you were there approximately six months.

5    A.   That's correct, sir.

6    Q.   From late September until late March.

7    A.   Actually, I continued to be --

8    Q.   I'm sorry, let me -- let me restate my question.  From

9    late September 2011 until March 23d --

10   A.   At least March 23d.

11   Q.   I'm sorry.  That was the period you were there,

12   correct?

13   A.   No, sir.  I was there additional to that.  Which --

14   what event in March would you believe was propitious enough

15   to cause my departure?

16   Q.   So you were fired by Mr. Sears on March 23d, 2012,

17   correct?

18   A.   No.  That's not correct, your -- sir.

19   Q.   Let me ask you a question differently, then.

20        You were given the e-mail --

21   A.   That's correct, sir.

22   Q.   Let me finish my question.

23   A.   I'm sorry, sir.

24   Q.   You were given the e-mail from Mr. Sears on March 23d

25   telling you that you were fired.

Cross - Duke

1    A.    That's correct, sir.

2    Q.    And you stayed on, then, for some time afterwards until

3    maybe a couple more months; is that correct?

4    A.    That's correct, sir.

5    Q.    All right.  And you -- it is true that you told the FBI

6    agent, that you were interviewed by, that you worked there

7    for approximately six months.

8    A.    Yes, sir.

9    Q.    Now, with regard to your location in the bullpen --

10   A.    Yes, sir.

11   Q.    -- you said on your testimony yesterday, and again this

12   morning, that you could hear conversations when the doors

13   were open.

14   A.    That's correct, sir.

15   Q.    And you couldn't hear conversations when the doors were

16   closed.

17   A.    That's correct, sir.

18   Q.    Now, during the six months that you were at

19   FusionPharm, there were a number of different people who

20   came who then went in and had closed-door conversations

21   either with Mr. Dittman or with Mr. Sears.

22   A.    Absolutely correct, sir.

23   Q.    And can you estimate at how many times that occurred?

24   A.    I wouldn't have the remotest idea.

25   Q.    Do you think it was more than five?

Cross - Duke

1    A.    I would say it was not an infrequent event.

2    Q.    Do you think it was more than five?

3    A.    I can't speak to that.

4    Q.    What do you mean by "not an infrequent event"?  Let me

5    ask it differently.  So it was a frequent event.

6    A.    That's correct.

7    Q.    And during those conversations when somebody was

8    inside -- what -- what -- strike that.

9          Who had private conversations with Mr. Sears that

10   you couldn't hear?

11   A.    Anybody that would go into their office.

12   Q.    I'm asking you specifically to name a person.

13   A.    I wouldn't have the remotest idea at this point in

14   time.  I could tell you that many times there were

15   closed-door meetings with both of them and Kelly.

16   Q.    And --

17   A.    And individually with Kelly.

18   Q.    And you can't remember any other meetings or who they

19   were other than Ms. Kelly?

20   A.    I -- they had closed-door meetings with Mr. Falconer

21   and some of the associates he brought into the office.

22   Q.    And did they have closed meetings with investors?

23   A.    I have no knowledge, sir.

24   Q.    So with -- and you had no knowledge about what they

25   were discussing in those closed-door meetings.

1   A.   I'm sorry, sir, you're the gentleman who objected to me

2   presuming yesterday.

3   Q.   I'm asking you whether or not you heard and were

4   therefore aware of what happened and what was discussed in

5   those closed-door meetings.

6   A.   No, if it was a closed-door meeting, I was not aware.

7   Q.   Now, may I --

8            MR. BARNARD:  Your Honor, I would like to move for

9   the admission of Exhibit 226.  I don't believe it has been

10  admitted yet.

11           THE COURT:  All right.  I'm assuming the Government

12  doesn't object to its own exhibit.

13           MR. SIBERT:  Can I have a moment?

14           THE COURT:  All right.

15           COURTROOM DEPUTY:  It's admitted, Your Honor.

16           MR. SIBERT:  It's admitted.

17           THE WITNESS:  It is admitted.

18           THE COURT:  Is it?  All right.

19  BY MR. BARNARD:

20  Q.   If we could have Government Exhibit 226, page 2.

21  A.   Can we make it bigger for me, please?

22  Q.   Yeah, I'm asking that --

23  A.   Thank you.

24  Q.   Oh, I'm sorry -- no, I was correct.

25  A.   Okay.

Cross - Duke

1    Q.   And you could see on this exhibit that --

2    A.   Hold on.  Where's it going?  I can't see anything

3    except Fort Lauderdale, Hollywood, to Denver, Colorado.

4    Q.   And you see that an airplane was leaving Fort

5    Lauderdale and going to Denver, Colorado, at 4:00 p.m.,

6    correct?

7    A.   Apparently so.  Now, it looks like it left at 1:35 and

8    arrived in Denver at 4:00 p.m.

9    Q.   I stand corrected, yes.  Thank you.

10        So this airplane arrived in Denver at 4:00 p.m. on

11   Monday, October 10th.

12   A.   That's correct.  I hope.

13   Q.   All right.  And it would appear that this airplane

14   departed Denver on Wednesday, October 12th, at 5:25.

15   A.   Okay.

16   Q.   Correct?

17   A.   Presumptively.

18   Q.   All right.

19   A.   Counsel, was I involved with this flight?

20   Q.   And, Mr. Duke, from 4:00 p.m. on October 10th until

21   5:25 p.m. on October 12th, is how much time?

22   A.   10th to the 12th is two days, that would be 48 hours.

23   Q.   Or maybe 49.  But, in fact, a person who takes a flight

24   has to get there earlier, right?

25   A.   I didn't go to Florida.

Cross - Duke

1     Q.   You've taken a flight before, haven't you?

2     A.   Yes, I have --

3     Q.   And you have to get --

4     A.   You have to get there in advance, sir.

5     Q.   So whoever this person was who took this trip, the

6     longest they were in Denver was for 24 -- or 48 hours.

7     A.   Okay.

8     Q.   So if this were Mr. Jean-Pierre, he wasn't in Denver

9     for two, three days, he was there for two days, correct?

10    A.   Fine.

11    Q.   You would agree with that, right?

12    A.   If that was his flight, yes, it probably is correct.

13    Q.   All right.  Now, you said --

14    A.   And if you were on the flights you just gave me.

15    Q.   You said that when Mr. Jean-Pierre was at the

16    FusionPharm office, he met with Mr. Sears and Mr. Dittman

17    behind closed doors.

18    A.   Correct.

19    Q.   So when that meeting went on, you don't know if they

20    were discussing how poorly the Orioles were doing that year.

21    A.   Sadly, the Orioles had a terrible year, but I wouldn't

22    have the foggiest notion.

23    Q.   You wouldn't have the foggiest notion if they were

24    discussing that you seem to have had halitosis that day?

25    A.   How poorly my mother had dressed me, perhaps.

Cross - Duke

1   Q.   You wouldn't have been able to -- you didn't know

2   whether or not they were discussing whether or not you had

3   halitosis that day, correct?

4   A.   That's correct.

5   Q.   You didn't know what they were discussing.

6            THE COURT:   Counsel, I think it's been established

7   that he does not know -- have any personal knowledge of what

8   happened or what was said behind closed-door meetings.   How

9   many times are we going to go through this?

10           MR. BARNARD:   I'm just about finished, Your Honor.

11  BY MR. BARNARD:

12  Q.   So yesterday when you speculated about what was being

13  discussed behind those doors, that was a mere speculation.

14  A.   Thanks to a careful direction, there was no speculation

15  yesterday.

16  Q.   Now, you had a brain injury due to a fall, correct?

17  A.   That's correct.

18  Q.   And you reported to the FBI that that's caused you some

19  memory issues.

20  A.   Absolutely.

21  Q.   But you told the agent that you remembered these

22  things, these items, correct?

23  A.   Which items specifically?

24  Q.   That to which you testified today, for example.

25  A.   With -- with some understanding of what the Florida

Cross - Duke

1    trip was about, yeah, I think I got through that okay.

2    Q.   Okay.

3    A.   And I did work in the bullpen, so we're fine.

4    Q.   So you -- you can understand certain things correctly.

5    A.   Reasonably.

6    Q.   Excuse me, you can remember certain things correctly

7    with your -- despite your injury.

8    A.   Memory has been proven to be an imperfect thing.  So I

9    don't know that any -- unless it -- there's empirical data

10   in support, I don't know anything would be perfect in a

11   result.  But to the extent that I can, my memory is

12   reasonable.

13   Q.   So you can remember -- you can't remember some things

14   correctly --

15   A.   I don't know whether I remember them correctly or not.

16   Ordinarily, it doesn't matter.

17   Q.   So, in fact, you -- do you remember what things you

18   can't remember correctly?

19   A.   No one can, sir.

20            MR. BARNARD:  Your Honor, if I may have a moment.

21            THE COURT:  You may.

22            MR. BARNARD:  No further questions.  Thank you,

23   Your Honor.

24            THE COURT:  All right.  Redirect.

25            MR. SIBERT:  Thank you, Your Honor.

1       Can I have Government Exhibit 135 published and

2   focus at the bottom of it.

3       THE COURT:  Can we get these marks off -- okay,

4   there we go.

5                    REDIRECT EXAMINATION

6   BY MR. SIBERT:

7   Q.   Okay, sir, as you testified, you were employed by

8   FusionPharm essentially from September 2011 through sometime

9   after March of 2012.  I'm going to circle on the screen

10  there, do you recognize the "To" e-mail?

11  A.   Yes, I do.

12  Q.   And do you recall whose e-mail that is?

13  A.   That was Mr. Dittman's e-mail --

14  Q.   Okay.

15  A.   -- at FusionPharm.

16  Q.   And this e-mail that he's receiving is on October 5th,

17  2011?

18  A.   Yes, it is.

19  Q.   And, again, you mentioned you had some knowledge about

20  FINRA.  Would you agree that's a FINRA e-mail?

21  A.   That would appear to be an @finra.org, so it's a

22  Government e-mail.

23  Q.   All right.  Do you recall the name of the person you

24  spoke to --

25       MR. BARNARD:  Your Honor --

Redirect - Duke

1          THE WITNESS:  Not a chance.

2          MR. BARNARD:  -- this is beyond the scope of

3    cross-examination.

4          THE COURT:  Sustained.

5          MR. SIBERT:  Your Honor, it goes to the date that

6    Mr. Barnard talked about with the airlines, the two days

7    that he inferenced that Mr. Guy Jean-Pierre was coming to

8    Denver.  I'd like to make a point.

9          THE COURT:  You're asking a question about when the

10   witness had a conversation with the FINRA representative.

11         MR. SIBERT:  Absolutely.  And I think the date's

12   very relevant.

13         THE COURT:  All right.  I'll let you go for a bit.

14         MR. SIBERT:  Thank you, Your Honor.

15         THE WITNESS:  I think that if you're looking for

16   the answer, was it early on in my relationship with

17   FusionPharm, yes, it was.  And so certainly this date would

18   fall well inside that window.

19   BY MR. SIBERT:

20   Q.   So Mr. Dittman's receiving an e-mail from the FINRA

21   representative on October 5th, 2011.

22   A.   I mean, that's -- that's inside a recent employment

23   window in my mind.

24   Q.   Can I have that taken down, please.

25              And you were just asked some questions regarding a

Redirect - Duke

1    travel reservation that's in evidence regarding a Frontier

2    reservation that was from October 10th, 2011, through

3    October 12th, 2011.  Do you recall that?

4    A.   I have none --

5    Q.   Do you recall those questions?

6    A.   Oh, I recall the questions, quite clearly.

7    Q.   Okay.  And, again, yesterday you testified that Mr. Guy

8    Jean-Pierre came to Colorado for either essentially two to

9    three days.

10   A.   Yeah.

11   Q.   So 48 hours --

12   A.   Could have been as long as a week.  I -- but I would

13   have no knowledge.  I mean, he was around for a few days.

14   Q.   Sure.  So 48 hours, 49 hours like Mr. Barnard asked

15   you, that wouldn't be outside the scope of your answer that

16   you provided yesterday.

17   A.   Absolutely.

18   Q.   Okay.  And --

19   A.   I didn't make the reservations so I have no knowledge.

20   Q.   And you would agree with me that if the point Mr.

21   Barnard was making that the October 10th, 2011, reservation

22   from Fort Lauderdale Florida, to Colorado was two days that

23   Mr. Guy Jean-Pierre came to FusionPharm to visit, that was

24   essentially five days later -- five days after that e-mail

25   from FINRA to Scott Dittman.

Redirect - Duke

1   A.   I'll call your attention to the e-mail to Scott

2   Dittman.  I'm not cc'd on it.

3   Q.   Okay.  But you saw the date on that e-mail?

4   A.   I saw the date.

5   Q.   It was October 5th, 2011.

6   A.   Okay.

7   Q.   And you were asked a series of questions about Fort

8   Lauderdale; Colorado; that that was Mr. Guy Pierre's ticket,

9   he would have only been here two days.

10   A.   Okay.

11   Q.   Is that correct -- that's what --

12   A.   Yes, that's correct.  Now --

13   Q.   And the question is:  There's only five days in between

14   October 5th and October 10th, 2011?

15   A.   Okay.

16   Q.   Is that correct?

17   A.   Yes.

18   Q.   Anything in your memory -- due to your injury, anything

19   that you've testified that you believe is not correct based

20   upon your memory after your injury?

21   A.   Well, the memory tests that have been done on me

22   indicate that my memory is approximately 95 percent

23   recovered.  So if that's statistically significant, then,

24   yeah, I'm pretty accurate.

25   Q.   All right.  Thank you, sir.

                            Redirect - Duke

1           THE COURT:  May this witness be excused, for the
2      Government?
3           MR. SIBERT:  Yes, sir.
4           THE COURT:  For the defendant?
5           MR. BARNARD:  Yes, Your Honor.
6           THE COURT:  Mr. Duke, thank you very much for your
7      testimony.  You may step down.
8           THE WITNESS:  Thank you very much, Your Honor.
9           THE COURT:  Government may call its next witness.
10          MR. SIBERT:  Your Honor, at this time the
11     Government would like to call Robert Dittman.
12          THE COURT:  All right.
13          COURTROOM DEPUTY:  Please stand behind the witness
14     stand and raise your right hand.
15          ROBERT DITTMAN, GOVERNMENT'S WITNESS, SWORN
16          COURTROOM DEPUTY:  Okay.  Please be seated.  You
17     may need to scoot your chair up to the microphone.  And
18     please state and spell your name for the record.
19          THE WITNESS:  Robert Dittman.  R-o-b-e-r-t.
20     D-i-t-t-m-a-n.
21          MR. SIBERT:  May I proceed, Your Honor?
22          THE COURT:  You may.
23          MR. SIBERT:  Thank you.
24                        DIRECT EXAMINATION
25     BY MR. SIBERT:

Direct - Robert Dittman

1  Q.  All right.  Good morning, sir.  Can you please tell the

2  jury where you are currently living.

3  A.  Yes, I live at 1742 Champa Street, Denver, Colorado,

4  80202.

5  Q.  Have you always lived at that address?

6  A.  I have not.

7  Q.  Okay.  What was your previous address going back into

8  2010-2015 time period?

9  A.  Well, there would have been a couple of different ones.

10  I lived at 3240 South Elm; I also resided with my sister for

11  a while, but I don't remember what the address is there.

12  Q.  Where did your sister live?

13  A.  Up north off of like 144th and I-25.

14  Q.  Okay.  So is that in Thornton?

15  A.  I -- it might be in Westminster, somewhere around

16  there.

17         THE COURT:  Sir, can you keep your voice up and

18  speak -- and -- you know, it might be easier for you,

19  instead of having to -- yeah, just lean forward.  You can

20  put your elbows up there and just speak like that.

21         THE WITNESS:  Okay.

22         THE COURT:  Keep your voice up.

23  BY MR. SIBERT:

24  Q.  And do you recall any other addresses?

25  A.  Not during that time, no.

Direct - Robert Dittman

1   Q.   How about 469 West 41st Avenue, Denver, Colorado?

2   A.   2469 on 41st, yeah.

3   Q.   Now, sir, what do you do for employment right now?

4   A.   I'm a server at the Denver Chophouse at DIA.

5   Q.   Okay.  And in the time period of 2011 through 2014,

6   what was your employment?

7   A.   2011 through '14, I worked at a restaurant named Lola

8   here in Denver.

9   Q.   All right, sir, and what did you do for Lola?

10  A.   I was a bartender there.

11  Q.   All right.  And if I remember correctly, you also

12  managed the bar?

13  A.   I did for a time, yeah.

14  Q.   All right.  Is that a pretty busy job?

15  A.   It was a busy restaurant, yeah.

16  Q.   Okay.  And as a bar manager, can you describe some of

17  the duties that you have to do.

18  A.   Inventory the bar, hiring, training; just working

19  behind the bar on a daily basis.

20  Q.   Are you responsible for schedules?

21  A.   I was some.  It was kind of a co-managed situation.

22  Q.   Are you also responsible for the different varieties of

23  liquor or beers that your bar would have?

24  A.   I -- I was in control of the inventory, yeah.

25  Q.   Approximately could you tell me how many bottles of

Direct - Robert Dittman

1    liquor your bar carried?

2    A.    Oh, geez.  I don't know.  I think at one point we had

3    like 200 tequilas.

4    Q.    200 tequilas?  What's the best tequila?

5    A.    Oh, geez.  I guess that's a matter of personal

6    preference.  I'm . . .

7              To me --

8    Q.    Sure.

9    A.    -- there was one named Grand Mayan back in the days

10   when I used to drink.

11             THE COURT:  Mr. Sibert, I trust this is going to

12   lead us to something that's relevant to this case.

13             MR. SIBERT:  Yes, sir, I hope it does.

14             THE COURT:  All right.  Well, let's do it soon.

15   BY MR. SIBERT:

16   Q.    How much does a shot of that tequila go for?

17   A.    I don't -- I really don't remember.  $12, $15, maybe.

18   Q.    Okay.  All right.  I'll move on here.

19             All right.  Now, do you own any stocks right now?

20   A.    Do I own any stocks?

21   Q.    Yes, sir.

22   A.    I believe I own stock in a company named GolfBoard that

23   I bought a handful of years ago.

24   Q.    And when did you buy that stock?

25   A.    I don't remember exactly.

Direct - Robert Dittman

1    Q.    And do you have a brokerage account right now?

2    A.    I do not.

3    Q.    Have you ever had a brokerage account?

4    A.    I have not.

5    Q.    You've never had a brokerage account?

6    A.    (Shook head)

7    Q.    That's a no?

8    A.    That's a no.

9    Q.    I'm sorry, sir, I just -- we need to make a record, so

10   I know that you're saying no, but we need to hear it.

11   A.    Okay.

12   Q.    So I apologize if I'm looking like I'm asking you a

13   pretty simple question.

14          Now, do you know the difference between what a

15   preferred share of stock is versus a common share of stock?

16   A.    Not exactly, no.

17   Q.    May I have Exhibit 106 published, please.

18          Sir -- maybe page 2.  And one more page, page 3.

19          Do you know who La Dee Da is?

20   A.    I -- I feel like we have been through this before and

21   my answer is no, still.

22   Q.    Okay.  You don't know who La Dee Da is?

23   A.    I do not.

24   Q.    Okay.  And, I'm sorry, sir, I know you said we've been

25   through this before, that's when you've talked to the

Direct - Robert Dittman

1    investigators in this case; is that correct?

2    A.    Yeah.

3    Q.    And I think I was present for one of those interviews,

4    do you recall that?

5    A.    Okay.

6    Q.    Okay.  So we're at a trial now, so I need to ask you

7    similar questions.  So I'm not trying to insult you or waste

8    your time, but there's a reason why we're going forward with

9    potentially some of the same questions you've heard before.

10   A.    Okay.

11   Q.    Okay?  So I apologize, but this is part of our judicial

12   system.

13          Since you don't know who La Dee Da is, do you know

14   why La Dee Da gave you 178,000 shares of FusionPharm stock?

15   A.    Again, I -- I don't recall.

16   Q.    What do you mean, you don't recall?

17   A.    Well, this was during a period of time which I've said

18   before that I was a very heavy and severe drinker and

19   there's two seizures that I've had since 2014 that affect my

20   memory greatly.  Not just according to this case, but a lot

21   of other things in my life.  And part of this that I've

22   answered before is that I don't remember.

23   Q.    All right.  You just remembered your previous

24   addresses.

25   A.    Uhm-hum.

Direct - Robert Dittman

1    Q.   And you just remembered that your bar had 200 bottles

2    of tequila.

3    A.   Uhm-hum.

4    Q.   And you just remember what you believe was the best

5    tequila that you serve?

6    A.   Uhm-hum.

7    Q.   I need you to say -- and you also remembered

8    essentially how much that -- a shot of that tequila cost.

9    A.   Okay.

10   Q.   So you do have a memory.

11   A.   Well, I -- I wish that I could, you know, bring it back

12   specifically to everything.  I -- I don't have control of

13   that.  And it's very painful for me and it's very painful in

14   a lot of ways.

15   Q.   Well, let me ask you these questions, kind -- can I

16   have you take that down.

17        Is Scott Dittman your brother?

18   A.   Scott Dittman is my brother.

19   Q.   Is William Sears your brother-in-law?

20   A.   William Sears is my brother-in-law.

21   Q.   And is Sandra Sears your sister?

22   A.   Sandra Sears is my sister.

23   Q.   And -- Sandra Sears, your sister, is married to William

24   Sears?

25   A.   That is true.

Direct - Robert Dittman

1    Q.   Can I have just page 10 of Exhibit 106.  Exhibit 106,
2    page 10.  I'm sorry.  Can I have this blown up, please.
3          Do you recognize that e-mail address that I
4    circled?
5    A.   Yeah, that is my sister's e-mail address.
6    Q.   How long has she had that e-mail address?
7    A.   I think since she started working as a flight attendant
8    at Frontier.
9    Q.   And that goes back to 2000?
10   A.   I'm not sure exactly when she started.
11   Q.   Do you recall when she started; do you know how long
12   it's been?
13   A.   She doesn't work for Frontier anymore, but I don't
14   remember the year in which she started, no.
15   Q.   Do you have any recollection of how long she was with
16   Frontier?
17   A.   I think like a decade.
18   Q.   Okay.  So more than 10 years ago.
19   A.   Right.
20   Q.   So, again, you remember the e-mail over 10 years old?
21          Can I have page 18.  Can I have the e-mail blown
22   up.
23          MR. BARNARD:  Excuse me, what exhibit are we on?
24   106?
25          MR. SIBERT:  We're on 106, Your Honor -- or Mr. --

Direct - Robert Dittman

1     MR. BARNARD:  I only have 12 pages -- oh, I'm

2     sorry.  Wrong exhibit.

3     MR. SIBERT:  That's okay.

4     BY MR. SIBERT:

5     Q.   I'm sorry, can I just have the body of the e-mail blown

6     up.

7     Do you know why your brother-in-law is asking about

8     a share certificate on your behalf?

9     A.   Again, I -- I don't -- I don't remember.

10    Q.   But you do remember this was your address, correct?

11    A.   Yes, sir.

12    Q.   Can I have Exhibit 110, please.  Can I have page 3.

13    Do you know who William Adams is?

14    A.   I have no idea.

15    Q.   Do you know why you're transferring him 50 shares of

16    FusionPharm stock?

17    A.   I do not.

18    Q.   Do you know who Bayside Realty Holdings is?

19    A.   Also I do not.

20    Q.   And same question:  Do you know why you gave them 1700

21    shares of FusionPharm stock?

22    A.   I do not.

23    Q.   Do you recall ever holding any FusionPharm stock?

24    A.   Physically holding in my hand?

25    Q.   No, having it in your name.

Direct - Robert Dittman

1   A.   I -- a lot of this, again, I feel like I've answered

2   before, and I don't recall.

3   Q.   So you don't recall holding over 180,000 shares of

4   preferred stock for FusionPharm?

5   A.   I don't.  And I feel like I've answered this before to

6   the people before, and Agent Funk.  And several times.

7           THE COURT:  All right, Mr. Dittman, let me explain

8   something to you.

9           THE WITNESS:  Uhm-hum.

10          THE COURT:  You may have answered a question a

11  thousand times before; it's the first time you're answering

12  it in this trial, so that's not a proper response.

13          THE WITNESS:  Okay.

14          THE COURT:  And I'm directing you to answer the

15  questions.

16          THE WITNESS:  Okay.

17          MR. SIBERT:  Thank you, Your Honor.

18  BY MR. SIBERT:

19  Q.   Again, sir -- can I have Exhibit 111, please.  And can

20  I have this blown up, please.

21          Again, sir, this is your address?

22  A.   Yes, it is.  Or was.

23  Q.   Can I have page 5, please.  That was your old

24  address -- I'm sorry, can I have page 6.

25          MR. SIBERT:  And, Your Honor, Government Exhibit

Direct - Robert Dittman

1     111 is not admitted, but it's stipulated to.  Can we move

2     for admission of that exhibit.

3            THE COURT:  All right.  Given the stipulation of

4     the parties, Government Exhibit 111 is admitted into

5     evidence and may be published to the jury.

6          (Government's Exhibit 111 received)

7            MR. SIBERT:  Thank you, Your Honor.

8     BY MR. SIBERT:

9     Q.   Can I have page 12 of this letter -- or of this

10    document.

11           Okay, sir, again, that's your name and your old

12    address; is that correct?

13    A.   Yes.

14    Q.   Okay.  Do you know who Pacific Stock Transfer Company

15    is?

16    A.   I'm familiar with the name Pacific Stock Transfer.

17    Q.   Okay.  How are you familiar with that name?

18    A.   I just feel like I've seen it before on these

19    documents.

20    Q.   Okay.  But at the time in 2012, before we spoke about

21    these documents, did you know who Pacific Stock Transfer

22    was?

23    A.   Again, I don't have any specific recollection of the

24    date or of this document.

25    Q.   Okay.  And do you know who Microcap Management is?

1   A.   I do not.

2   Q.   Okay.  And do you know why you're asking for 144,000

3   shares of FusionPharm stock to be transferred to Microcap

4   Management?

5   A.   I do not.

6   Q.   And, again, this letter has your name at the bottom; is

7   that correct?

8   A.   That's true.

9   Q.   Did you write this letter?

10  A.   I mean, I feel like I've -- I must have, but I don't --

11  I don't recall.

12  Q.   Okay.  All right, so how about with the 144 shares --

13  144,000 shares?

14  A.   What about it?

15  Q.   Why would you be transferring those shares?

16  A.   I -- I -- I do not recollect.

17  Q.   When you're a bartender and someone orders a drink, do

18  you give the drink away for free?

19  A.   Sometimes.

20  Q.   Okay.  Do you always give the drinks away for free?

21  A.   No.

22  Q.   So what do you require from a customer?

23  A.   I'm sorry, what?

24  Q.   What do you require from the customer?

25  A.   Payment.

Direct - Robert Dittman

1    Q.    Okay.  Did you get any money from Microcap Management

2    for those 144,000 shares?

3    A.    No.

4    Q.    Can I have page 14, please.

5          Okay, sir, I want to focus in on the bottom part of

6    this e-mail -- well, let me do the top, just so you'll

7    understand who this is going to.

8          Robert L. Dittman, this is your e-mail address; is

9    that correct?

10   A.    That's true.

11   Q.    Okay.  And you have a Leslie Eldridge e-mailing you; is

12   that correct?

13   A.    Okay.  Yes.

14   Q.    Do you know who a Leslie Eldridge is?

15   A.    No.

16   Q.    Can we go down to the bottom, please.  A little bit

17   more.  Thank you.

18         Do you know why Ms. Eldridge would be e-mailing you

19   this information?

20   A.    I have no idea.

21   Q.    Do you know why she would be asking you for the date

22   the shares were acquired by you?

23   A.    I do not.

24   Q.    And how about the price per share?

25   A.    No.

Direct - Robert Dittman

1    Q.   And the top of the e-mail.

2         Why did you send her back an e-mail saying that you

3    bought the shares on February 28, 2010, for 3 cents per

4    share?

5    A.   I -- I don't remember.

6    Q.   Did you write this e-mail?

7    A.   I -- I guess I must have.

8    Q.   All right.  Why do you say "guess"?

9    A.   Well, because I don't remember.  So -- but it has my

10   name and it has, you know, my e-mail address, and . . .

11   Q.   Do you remember anything about holding FusionPharm

12   stock shares?

13   A.   Other than the fact that I had them, no.  I mean, I

14   don't remember --

15   Q.   So when I asked you if you ever had shares before, you

16   said you couldn't remember; now you remember you had shares?

17   A.   Well, only after you had said that I did, and I've been

18   looking at this, yeah.

19   Q.   So all these documents have made you remember?

20   A.   No.  I don't remember any of this.

21   Q.   So you don't remember ever holding FusionPharm stock

22   shares?

23   A.   Okay.  I don't remember.

24   Q.   I'm asking that question.

25   A.   No, I -- I -- and I'm trying to answer the best that I

1  can based upon the fact that I can't go back and remember

2  this, and so I'm sorry if it seems like I'm not answering it

3  right, I'm saying no, I don't remember.

4  Q.   Do you ever remember a deal where you were willing to

5  sell essentially 17 million common shares of FusionPharm for

6  50 percent into VertiFresh, a company that your

7  brother-in-law operated?

8  A.   No.

9  Q.   Do you remember an e-mail where you were announcing the

10  startup of VertiFresh?

11  A.   No.  Is there -- is it somewhere?

12  Q.   You don't remember it?

13  A.   No.  Is it --

14  Q.   Okay.  Do you recall VertiFresh?

15  A.   I do.

16  Q.   Okay.  What was VertiFresh?

17  A.   It was a company that was hydroponically growing

18  lettuce to provide to restaurants around town.

19  Q.   And who owned that company?

20  A.   My brother, I think.

21  Q.   So you know the company, but you don't know who owned

22  it?

23  A.   I mean, I wasn't -- I necessarily -- no, I don't -- I

24  don't know.  I don't remember.

25  Q.   You don't have a role -- you don't have a role in that

1    company.

2    A.    I did somewhat, trying to help that and trying to

3    provide restaurants in -- or sorry, lettuce to the

4    restaurants in the restaurant group that I was working for.

5    Q.    So were you trying to help your brother sell lettuce

6    that he was growing?

7    A.    Correct.

8    Q.    Did you ever receive an offer for ownership in that

9    company?

10   A.    Not that I recall.

11   Q.    And, again, it's your testimony that VertiFresh was

12   your brother's company, Scott Dittman's?

13   A.    It -- to my memory, yeah.

14              MR. SIBERT:  May I have a moment, Your Honor?

15              THE COURT:  You may.

16   BY MR. SIBERT:

17   Q.    Sir, between -- if I recall your testimony, between

18   2011 and 2014, you don't remember owning any FusionPharm

19   stock?

20   A.    Correct.

21   Q.    So if you didn't own any stock of FusionPharm, there

22   was no way for you to be able to sell that stock; is that --

23   would you agree with me?

24   A.    Well, I don't remember.

25   Q.    Okay.

Direct - Robert Dittman

1    MR. BARNARD:  Your Honor, I object.  That is
2    misstating the evidence.  The evidence is he doesn't
3    remember and now he's asking him about owning.
4    THE COURT:  Well, he's asking if the witness agrees
5    with him or not.  The witness can agree or not agree.  You
6    may answer the question, sir.
7    MR. SIBERT:  Thank you, Your Honor.
8    BY MR. SIBERT:
9    Q.  You don't recall owning any FusionPharm stock; is that
10   correct?
11   A.  Yeah, I don't remember.
12   Q.  Okay.  Therefore, if you don't remember owning any
13   stock, you would agree with me that you don't remember or
14   could not have sold any FusionPharm stock.
15   A.  I mean, I don't remember.
16   Q.  Did Mr. William Sears or your brother, Scott Dittman,
17   ever direct you to sell any FusionPharm stock?
18   A.  Not that I remember.
19   MR. SIBERT:  I'll pass the witness, Your Honor.
20   THE COURT:  All right.  Cross-examination.
21   MR. BARNARD:  No questions, Your Honor.
22   THE COURT:  All right.  May this witness be
23   excused, for the Government?
24   MR. SIBERT:  Yes, sir.
25   THE COURT:  All right.  For the defendant?

1    MR. BARNARD:  Yes, Your Honor.

2    THE COURT:  All right, Mr. Dittman, thank you for

3    your testimony.  You are excused.  You may step down.

4    Ladies and gentlemen of the jury, given the late

5    start, this is going to be a -- somewhat early to take a

6    morning recess, but we have -- I had a discussion with

7    counsel earlier and we had to take care of a matter and we

8    have to take care of it now, so we'll just combine it.

9    We'll take care of that matter that we were discussing and

10   then have our morning recess at the same time.

11   We'll be in recess for 15 minutes.

12   (Jury left the courtroom at 10:18 a.m.)

13   THE COURT:  Mr. Sibert, why don't you have Mr.

14   Bodden at the witness stand when we resume after the

15   recess.

16   MR. SIBERT:  Thank you, sir.  I appreciate that.

17   (Recess taken 10:19 a.m. to 10:37 a.m.)

18   THE COURT:  So when the jury comes sits down, I'll

19   just say, "Ms. Frank, just go ahead and swear in the

20   witness."  I won't ask who's the next witness for the

21   Government is, and then obviously he'll identify himself.

22   All right.  Let's get the jury.

23   MR. SIBERT:  Thank you, Your Honor.

24   THE COURT:  Yeah.

25   (In open court in the presence of the jury at 10:38

Direct - Bodden

1    a.m.)

2              COURTROOM DEPUTY:  Raise your right hand.

3              CLIFFE BODDEN, GOVERNMENT'S WITNESS, SWORN

4              COURTROOM DEPUTY:  Be seated.  And you might need

5    to scoot your chair up a bit.  And please say your name --

6    or state and spell your name for the record, please.

7              THE WITNESS:  Right, Cliffe -- Cliffe Bodden,

8    C-l-i-f-f-e, B-o-d-d-e-n.

9                        DIRECT EXAMINATION

10   BY MR. SIBERT:

11   Q.   Good morning, sir.

12   A.   Good morning.

13   Q.   I notice that you were taken aback by the loudness of

14   the mic.  Louder is better.

15   A.   Okay.

16              THE COURT:  But not too loud.  I don't think we

17   have to be concerned with this witness.

18   BY MR. SIBERT:

19   Q.   Listen to the Court --

20   A.   Okay.

21   Q.   -- it's his courtroom.

22              So, sir, could you please introduce yourself to the

23   jury, providing them a little bit of background information

24   regarding your accounting experience and some of the

25   companies that you've worked for in the past.

Direct - Bodden

A.    Okay.  Yes.  My name is Cliffe Bodden.  My accounting
experience is basically that which I learned on my own and
for -- well, the five years prior to coming to prison, I
worked within a -- and was partners within a business
venture with a CPA firm and a -- and the head of that
firm.

Q.    Okay.  So you stated that you learned accounting on
your own.  Can you discuss essentially what experience
assisted you with the accounting --

A.    Right.

Q.    -- position --

A.    Since about 2002, I've been involved in reverse
mergers, different corporate activities with regard to
stocks; and during that time we prepared balance sheets.
And some of the services that I provided was actually going
in and doing reports for companies, primarily all of them
I've been principally involved in, some of them just as a
consultant and putting together those quarterly reports, and
part of that experience was actually putting together the --
or reconciling and putting together accounts that they might
have already had.  So all of that experience had to do with
actual kind of hands-on experience doing deals, so to
speak.

Q.    Okay.  And so prior to 2002, all right, did you -- was
there ever a mentor in your career that assisted you in

Direct - Bodden

1    learning the accounting principles?

2    A.    No.    The mentoring was -- happened when I was working

3    in Orlando.    I was primarily -- my accountant partner, Jack

4    Owens, when we would do these deals, he would be someone I

5    would go to if I needed to clarify something or something I

6    didn't know.    And, you know -- or he would tell me where to

7    look and how to research the information and so forth.

8    Q.    Okay.    Now, when you're stating -- you mentioned a

9    couple of times doing deals.

10   A.    Uhm-hum.

11   Q.    Could you describe what type of deals essentially you

12   were associated with.

13   A.    Primarily reverse mergers, where we would take a

14   private company and merge it with a public company and that

15   way taking that private company public.

16   Q.    Okay.    And essentially what are the sizes of these

17   companies?

18   A.    They're very small.    In some cases were just beyond

19   startup.    Small companies.

20   Q.    Okay.    Otherwise known as Microcap --

21   A.    Microcaps, penny stocks.    You know, that's the term

22   used for these companies.

23   Q.    Okay.    Prior to getting into the field of working with

24   these Microcap companies, did you ever have experience

25   working in one of the bigger investment banks or accounting

Direct - Bodden

1    firms?

2    A.   Investment banks, I worked for both Bear Sterns as a

3    registered rep, or stockbroker, and I also worked for

4    Shearson Lehman, and then Smith Barney Shearson and Lehman,

5    as also a stockbroker, yes.

6    Q.   Did you also have to pass any type of professional

7    licensing --

8    A.   Yeah, I had both a Series 7, which is a registered

9    representative within the SEC, and Series -- I think a 24,

10   if memory serves, which allows you to manage an office.

11   Q.   Okay.  And as a stockbroker, you were under some

12   regulations; is that correct?

13   A.   That's correct, yes.

14   Q.   And who -- who sets forth those regulations?  Do you

15   know the agency?

16   A.   The NASD and the SEC, but primarily the NASD.

17   Q.   How about FINRA --

18   A.   FINRA.  FINRA actual -- actually FINRA was developed

19   after I kind of got out of that.  But FINRA would be there

20   now, yes.

21   Q.   All right.  So you made a transition from, essentially,

22   being a stockbroker into doing what you described as deals

23   with Microcap companies and bringing them public?

24   A.   Correct.

25   Q.   All right.  And you've been doing -- you were doing

Direct - Bodden

1   that essentially from 2002 --

2   A.   A little before 2002, really started in the late '90s.

3   We -- I was involved, but not as a principal, you know.   I

4   worked on something with some other people, but since 2002,

5   I've been principally involved in doing these deals, yes.

6   Q.   All right.  And now you mentioned quickly in your

7   introduction that you did some prison time?

8   A.   I did, yes.

9   Q.   What was that for?

10  A.   That was for wire fraud and conspiracy to commit wire

11  fraud.

12  Q.   Okay.  And what did this wire fraud conviction have --

13  what was the essentially underlying --

14  A.   The underlying was falsifying account statements --

15          THE COURT:  Sir, Mr. Bodden, Mr. Bodden.

16          THE WITNESS:  Yes, sir.

17          THE COURT:  You've done it a couple of times now.

18  Wait for counsel to finish his question --

19          THE WITNESS:  Okay.

20          THE COURT:  -- before you start because our court

21  reporter can't take down two voices at the same time.  And

22  you need to let him finish his question, he'll wait until

23  your answer's completed before he asks you the next

24  question, so taking turns.

25          THE WITNESS:  Yes, Your Honor.

Direct - Bodden

1    THE COURT:  All right.

2    MR. SIBERT:  Thank you, Your Honor.

3    BY MR. SIBERT:

4    Q.   And let me just repeat:  What was essentially the

5    underlying script that led you to this wire fraud

6    conviction?

7    A.   The underlying script?  Oh, the offenses were

8    falsifying account statements and misappropriating or

9    misidentifying funds, where those funds were actually put.

10   Q.   And what type of -- did this deal with a company?

11   A.   This dealt with a company in New York, which was

12   associated with a broker dealer, Lambert Brothers, and a

13   company that we were doing a reverse merger -- or we were

14   organizing at that time called International Solubles in

15   Orlando.

16   Q.   Okay.  Now, did you ever start working for a company

17   named FusionPharm?

18   A.   I have, yes, I did.

19   Q.   Okay.  And can you tell the jury essentially how you

20   started working -- doing work for FusionPharm.

21   A.   I was asked initially to prepare a business plan for

22   the company by a long-time associate, William Sears, and his

23   brother-in-law, Scott Dittman.  They flew to Orlando and

24   wanted to hire me to do that.

25   Q.   Now, you stated that you knew Mr. William Sears as a

Direct - Bodden

1    long-time associate.  Can you describe your past

2    relationship with Mr. Sears.

3    A.    Sure.  I met him in -- right around, I believe, 1992.

4    We were both working for a investment firm in Atlanta at

5    that time by the name of Camelot Investments.  We later

6    moved to the Cayman Islands where I was born.  And we

7    operated an investment firm there called Growth Planning.

8    He -- he left, at that time I stayed in Cayman, he went to

9    Australia.

10         We kind of got back together in early 2000s with

11   a -- with another company -- a reverse merger, Blue Planet

12   Research & Technology.  Went on to several other companies.

13   Silver Star, Green Street.  At that time, when he left Green

14   Street, he began a company called MicroCap Management.  I

15   did some work for that as well, and then FusionPharm.

16   Q.    Okay.  So essentially Mr. Scott Dittman and William

17   Sears came to Orlando, Florida, to see if you would do some

18   work for them regarding FusionPharm; is that right?

19   A.    That's correct.

20   Q.    Do you recall what year this was?

21   A.    This was in 2011.

22   Q.    And I assume since they came to Orlando, you were

23   living in Florida?

24   A.    I was, yes.

25   Q.    And now, do you know if Mr. Guy Jean-Pierre was

Direct - Bodden

1    involved with FusionPharm?

2    A.   Yes.  Guy was involved.  At that time his title was

3    legal counsel and corporate secretary.

4    Q.   Can I have exhibit --

5         MR. SIBERT:  Your Honor, I need to get my exhibit

6    sheet just to make sure.

7    BY MR. SIBERT:

8    Q.   Can I have Exhibit 238 published.  Can I have it

9    smaller?  Yeah.

10        All right, sir, can you please take a look at the

11   bottom of this e-mail.

12   A.   Okay.

13   Q.   All right.  And do you recall what this e-mail was

14   about?

15        And can you scroll to the top, please.

16   A.   Yes.  This was a e-mail from Guy to William Sears where

17   he's providing the corporate documents for a company called

18   Baby Bee Bright.  The BBYB is their ticker symbol at the

19   time.

20   Q.   Okay.  And when you say corporate documentation, do you

21   regard -- do you recall what type of documentation?

22   A.   Well, from the attachment, it would be the articles of

23   incorporation and a host of supporting documents.

24        MR. SIBERT:  Your Honor, at this time, can I ask

25   your courtroom deputy to assist the witness by providing

Direct - Bodden

1     binder -- the binder that would have 239 -- Government

2     Exhibit 239.

3          THE COURT:  All right.

4     BY MR. SIBERT:

5     Q.   I'm sorry, I -- I'm saying 239.  I meant to say 238.

6     Government Exhibit 238.

7     A.   Okay, I have it.

8     Q.   Okay.  And can you just take a quick look through that

9     document, the attachments.  Are those the articles of

10    incorporation?

11    A.   Yeah, these are the articles of incorporation for Baby

12    Bee Bright and its predecessors.  And I see there's some

13    meet -- minutes of meetings of board of directors also

14    involved.

15    Q.   Okay.  So it was Mr. Guy Jean-Pierre providing those

16    documentations to Mr. Sears?

17    A.   That's correct.

18    Q.   And those were sent on to yourself as well; is that

19    correct?

20    A.   That's correct.

21    Q.   Why were these documents being sent from Mr. Guy

22    Jean-Pierre to you on behalf of FusionPharm?

23    A.   One of the things that I was doing for FusionPharm is

24    putting together their quarterly reports, which they were

25    submitting to Pink Sheets.  And as such, I would need to

Direct - Bodden

1    have these documents because one of the things that you

2    report is the company and all its predecessor names, like

3    this one starting out with Argent Capital, and then became

4    something else and became something else.  That's laid out

5    in the quarterly reports.

6    Q.   Okay.  So was Baby Bee Bright the company before

7    FusionPharm?

8    A.   That was the -- yeah, that was the name of the company

9    before they changed it to FusionPharm.

10   Q.   All right.  Now, you can stop looking at that document.

11            Can you tell me essentially what were you paid to

12   work or do work for FusionPharm?

13   A.   Each quarter that I did, I was paid approximately

14   $1,000.

15   Q.   And can you tell the jury your understanding of what

16   FusionPharm's business model was?

17   A.   FusionPharm was manufacturing GroPods, or PharmPods

18   they called it, which were hydroponic growing systems that

19   were made from old shipping containers.

20   Q.   Okay.  Now, did you ever make it to Colorado to see the

21   company, FusionPharm?

22   A.   Yes.  Each quarter I would go out.

23   Q.   Each quarter?

24   A.   From there on out, yeah.

25   Q.   Okay.  So how many times approximately would that be?

Direct - Bodden

1    A.    I want to say seven or eight times.

2    Q.    Okay.  And where did you stay since you were living in

3    Orlando, Florida, area?  Where would you stay when you came

4    to Colorado?

5    A.    I stayed at William Sears' residence.

6    Q.    Now, could you tell the jury who else worked at

7    FusionPharm when you came and visited.

8    A.    Okay.  Well, it kind of moved around.  But at first

9    there was William Sears and Scott Dittman, Kelly Blume,

10   Frank Falconer, and Andrew Duke when they were in the

11   offices on Wynkoop.  Later on, Andrew Duke went away and so

12   did Frank Falconer towards the -- I think the second -- I

13   think 2012 or so.  But Kelly Blume, William Sears, and Scott

14   Dittman stayed -- were there throughout.

15   Q.    Okay.  And who -- do you know anyone else that did work

16   for FusionPharm that essentially wasn't located at the

17   business?

18   A.    Well, with -- the corporate documents stated that Guy

19   worked as well as the corporate secretary and -- the

20   corporate secretary and legal counsel.

21   Q.    Okay.  Now, how would you describe Mr. Sears' and Mr.

22   Dittman's business -- well, how would you describe Mr. Sears

23   and Mr. Scott Dittman's role within FusionPharm?

24   A.    I regarded them as partners.  They worked as

25   partners.

Direct - Bodden

1    Q.   And if you had questions about the accounting work that
2    you were doing for FusionPharm, who did you go to?
3    A.   I would initially go to William Sears and, if need be,
4    Scott Dittman.  It was just a proximity thing.  I worked in
5    the desk -- when I would come to Colorado, I worked at a
6    desk right near William Sears, so if I had a question going
7    through something, I would -- I would ask him initially.
8    And if we need to, we got Scott involved.
9    Q.   Okay.  Now, my understanding, as you testified, they
10   had an office on Wynkoop Street, and that was here in
11   Denver, Colorado?
12   A.   That's correct.
13   Q.   And then did they change locations eventually?
14   A.   Yes.  And they moved to a warehouse on Vine Street.
15   Q.   All right.  Now, were all the people that you
16   described, were all those people disclosed on the
17   FusionPharm's financials that were eventually filed on the
18   OTC Markets?
19   A.   No.  William Sears was not disclosed.  I don't think
20   Kelly Blume or Andrew Duke were as well.
21   Q.   Do you know why Mr. Sears, William Sears, was not
22   disclosed?
23   A.   Yes.  Because his criminal -- he had a criminal
24   conviction that would be problematic if disclosed, and he
25   was -- and the nature of what he was doing for the company

1    required him not to be an affiliate.

2    Q.   All right.  So let's just back up.  You said it would

3    be a problem if Mr. Sears' conviction was disclosed.  Why

4    would it be a problem?

5    A.   Because the corporate documents would have to disclose

6    his conviction -- his federal convictions, which I believe

7    were securities fraud and commercial bribery.

8    Q.   Okay.  So why would that affect FusionPharm?

9    A.   Well, it would make it difficult for -- to raise

10   capital.  It would be disclosed to investors that possibly

11   would buy the stock on the open market; it obviously would

12   taint the company.

13   Q.   Now, were you familiar with a company called Bayside

14   Realty Holdings?

15   A.   Yeah.  That was one of the -- lack of a better word,

16   shell companies that -- that William Sears controlled.

17   Q.   Okay.  And when you say "lack of better word, shell

18   company," can you describe a little bit more in-depth what

19   you're talking about?

20   A.   Well, the purpose of the company was to hold stock,

21   which was -- FusionPharm stock, which was being sold to

22   raise capital for FusionPharm.

23   Q.   And you stated who essentially owned that company?

24   A.   William Sears.

25   Q.   Okay.  Was -- do you know if Bayside Realty Holdings

1    was in Mr. Sears' name?

2    A.   I don't know if it was -- it was two companies, Bayside

3    and MeadPoint.  One was in Mr. Sears' name, one was in his

4    mother's name.

5    Q.   Okay.  Do you know if his mother ever had anything to

6    do with either MeadPoint or Bayside?

7    A.   Not that I'm aware of.

8    Q.   All right.  Do you recall any other businesses

9    operating out of the FusionPharm business space?

10   A.   Yeah, they operated a company called VertiFresh.

11   Q.   Okay.  And do you recall any other companies?  You

12   mentioned MeadPoint.

13   A.   MeadPoint, yeah.  Other than MeadPoint, Bayside,

14   VertiFresh, and FusionPharm are the companies that I knew

15   were out of that office.

16   Q.   All right.  How about Microcap?

17   A.   I didn't see -- I knew about Microcap, but I didn't see

18   any MicroCap business being transacted there, no.

19   Q.   Okay.  And what was your understanding about

20   VertiFresh?

21   A.   VertiFresh was a grower of hydroponic lettuce using the

22   PharmPods that FusionPharm made.  It was owned by -- well,

23   Mr. Sears was its, you know, president, CEO, and it was

24   owned by a company, which I understood would be -- I think

25   BF Management, which was -- I was told was owned by Mr.

Direct - Bodden

1    Sears and Mr. Dittman.

2    Q.   And how about MeadPoint?  Could you tell us what

3    MeadPoint was.

4    A.   MeadPoint was another shell company that owned stock

5    and later notes of FusionPharm.

6    Q.   All right.  And you say later notes.  Was there any

7    other company that held notes for FusionPharm?

8    A.   Bayside also held notes.

9    Q.   All right.  So in the beginning, to be clear, in

10   2011 -- this is -- Bayside and MeadPoint were shell

11   companies that held FusionPharm stock.

12   A.   Correct, yes.

13   Q.   Okay.  And then later Bayside, MeadPoint, held what's

14   called notes?

15   A.   Correct.

16   Q.   All right.  Now, do you know how -- you were doing the

17   finances for FusionPharm; is that correct?

18   A.   That's correct.

19   Q.   Do you know how profitable VertiFresh was?

20   A.   VertiFresh wasn't that profitable.  It probably -- the

21   entire time there, if -- maybe a thousand dollars or so

22   worth of lettuce it sold.

23   Q.   Okay.  You bring up a good point.  You started doing

24   work in 2011.  How long did you assist FusionPharm with

25   their financials?

Direct - Bodden

A.    Until -- until January of 2013, or -- maybe into
February of 2013.  But I went to prison in February 22d of
2013.

Q.    And that was due to the conviction that you discussed
prior?

A.    That's correct.

Q.    All right.  And so the whole time that you were there
from essentially 2011 through January 2013, VertiFresh made
only about $1,000?

A.    Yeah.  It wasn't -- it wasn't very much.  I -- I don't
know the number exactly, but . . .

Q.    Okay.

A.    It wasn't a substantial amount.

Q.    All right.  Did the lettuce always come from the
pods?

A.    No, no.  It was -- it was mixed -- sometimes it was
some -- what's the name of the store?  King Soopers lettuce
was mixed in when there wasn't enough to go around.

Q.    All right.  So when the pods didn't produce enough
lettuce, where did FusionPharm or VertiFresh get their
lettuce?

A.    King Soopers.

Q.    How do you know that?

A.    Because I went there with Bill to buy it on occasions.

Q.    And do you know where this supposedly pod-grown lettuce

Direct - Bodden

1    was being sold to?

2    A.    This was being sold to a company called MADgreens for

3    the Alford Packer Salad during that time.

4    Q.    I see.  So if you had had a MAD greens salad between

5    2011 and 2013, you might not be eating VertiFresh organic

6    lettuce, but King Soopers --

7    A.    You were eating mostly VertiFresh organic

8    hydroponically grown lettuce, yes.

9    Q.    All right.  Now, can you just give the jury a little

10   understanding -- we've thrown out some names here.  Did you

11   see any real difference when it came to corporate structure

12   regarding FusionPharm, VertiFresh, MeadPoint, or Bayside?

13   A.    No.  It -- they -- basically they had different

14   functions, but it -- it -- again, it's -- just seemed like a

15   partnership that -- that -- just elements of one business,

16   so to speak.

17   Q.    And essentially what was the focus business?

18   A.    Yes.

19   Q.    What business was the focus?

20   A.    The focus -- the focus was on initially the pods,

21   getting the pods -- FusionPharm pods.  VertiFresh was set up

22   to basically be a purchaser of pods for the lettuce for

23   the -- to grow lettuce.  And Bayside and MeadPoint sold

24   stock, which was then put back into FusionPharm.

25   Q.    So sold FusionPharm stock?

1    A.   Sold FusionPharm stock, correct.

2    Q.   And the proceeds went back into FusionPharm?

3    A.   The proceeds were put back into FusionPharm and then

4    Bayside and MeadPoint was issued notes to -- for that money.

5    Q.   Okay.  All right.  Let's look at Exhibit 235.

6         MR. SIBERT:  And, Your Honor, this has been

7    admitted.

8    BY MR. SIBERT:

9    Q.   Can you take a look at this e-mail.

10   A.   Yes.  That's an e-mail from William Sears to Scott

11   Dittman and which I'm copied.

12   Q.   Okay.  And what is Mr. Sears telling you in this

13   e-mail?

14   A.   He's basically telling us all to start communicating

15   regarding putting together a business plan, PowerPoint, and

16   offering documents, and saying that he needs it right away

17   and the same format we're using at Green Street, and they

18   need them both in PDF and Word doc for revisions.

19   Q.   And can you explain to the jury what 2K means?

20   A.   $2,000 with a -- 500 as a retainer and a balance to be

21   paid when the documents were finished.

22   Q.   Thank you.  And, I'm sorry, again, this is the phone

23   number that you knew Mr. Sears to go by?

24   A.   Right.  Yeah.

25   Q.   And these were -- this was Scott Dittman's phone

Direct - Bodden

1    number?

2    A.    That's correct, yes.

3    Q.    All right.  Now, let's talk about what's called

4    over-the-counter market filings, or disclosures.  Did you

5    put together those disclosures -- over-the-counter market

6    disclosures for FusionPharm?

7    A.    For Fusion, I did it beginning in -- I think middle of

8    2011, or could be the third quarter of 2011 through 2012,

9    yes.

10   Q.    Okay.  And essentially what was your main duties when

11   it came to putting together these disclosures that went to

12   over-the-counter markets?

13   A.    Well, when I would arrive, I would first start with the

14   accounts, getting the financial accounts up-to-date, bank

15   statements reconciled and so forth.  Put together the

16   financial accounts.  Then I would put together the

17   disclosures that went into the report, basically company

18   update; you know, its history, what stock was outstanding at

19   the time and so forth.  And putting all that together for it

20   to be submitted to -- so it could be submitted to Pink

21   Sheets.  But I prepared it for Scott to do that.

22   Q.    And when you say Pink Sheets, that's the Pink Sheets

23   under over-the-counter markets?

24   A.    Over-the-counter market, that's correct.  It's the

25   lower rung of over-the-counter market.

Direct - Bodden

1   Q.   Okay.  Where did you usually get the information for
2   you to be able to do your reports?
3   A.   Usually from the files.  And if there was anything --
4   any information missing -- which usually there was -- I
5   would ask William Sears or Scott Dittman.
6   Q.   All right.  And then who entered the reports into
7   QuickBooks?  Do you know?
8   A.   I entered the information into QuickBooks.  Some
9   information would be already there, which I believe Kelly
10  Blume would do, because I was only there a few days at the
11  end of the quarter -- or after the quarter end.  So some
12  information would already be in there, so I don't -- I would
13  update whatever wasn't there.
14  Q.   All right.  Did anyone assist you with figuring out the
15  bank statements in QuickBooks?
16  A.   If I had questions, I would either ask Bill or --
17  primarily I think I didn't really have to ask Scott, I asked
18  Bill how things would be treated, like if there was
19  sometimes deposits that weren't identified where the money
20  came from and so forth.
21  Q.   Okay.  And when you were doing the financials, what did
22  you see as far as money coming into FusionPharm?
23  A.   Money was coming in various amounts at basically
24  various times.
25  Q.   Okay.  And can you describe in a little bit more detail

1    what you were seeing.

2    A.    Well, you would just see random deposits.  You know,

3    25,000, 9,000.  This was -- it's -- basically what -- what

4    was happening is when stock was sold, the proceeds from that

5    stock sale would be transferred in either at the bank or

6    sent in to the FusionPharm accounts from MeadPoint or

7    Bayside, whoever's account sold the stock.

8              So when these would come in, they would be

9    deposits.  Sometimes they were labeled which one it came

10   from, MeadPoint or Bayside.  Sometimes I'll have to ask

11   where it came from.

12   Q.    Okay.  And do you know where -- what bank FusionPharm

13   was using --

14   A.    Wells Fargo.

15   Q.    Wells Fargo?  So the money was all in Wells Fargo --

16   A.    Yeah.  Yeah.  I think also MeadPoint and Bayside had

17   accounts at Wells Fargo because there was some just

18   countertransfers there as well.

19   Q.    So essentially if I understand you correctly, the

20   revenue that was coming in was mainly from stock sale?

21   A.    Mainly from stock sales, yeah.

22   Q.    And when I say "stock sales," FusionPharm stock?

23   A.    FusionPharm stock sales, correct, from MeadPoint or

24   Bayside.

25   Q.    Billy Sears' companies?

1    A.    That's correct.

2    Q.    Did you see any -- I guess, for lack of better terms,

3    did you ever see true revenues such as like the lettuce

4    being sold coming in?

5    A.    Well, the lettuce revenue would come into VertiFresh,

6    not FusionPharm, but yeah, you would see that -- I would

7    also see them -- well, one occasion I wrote to a dispensary

8    and I understood that the cash that was paid to them was for

9    the -- for a PharmPod that they had sold to that dispensary.

10   Q.    Okay.  So how did the revenue that was from third

11   parties compare to the revenue that was coming in from the

12   Bayside and MeadPoint?

13   A.    Oh, it was -- it's substantially less than what was

14   coming in from the stock sales.  Yeah.

15   Q.    All right.  Could you walk the jury through essentially

16   how an annual report was recreated -- was created.  Let's

17   start with 2011, and then later financial reports.

18   A.    Well, at first to -- you had to go back and see

19   where -- because this company changed from -- from Baby Bee

20   Bright to FusionPharm, so they had some disclosures already

21   there.  It was pretty minimal compared to what they asked me

22   to do.

23          But anyway, we had to get all the corporate

24   documents.  Basically the format which it has to go is

25   pretty laid out in terms of what information they're looking

Direct - Bodden

1    for in terms of disclosures.  So where that information

2    isn't -- and kind of -- back up and say that not all

3    companies on the Pink Sheets are reporting.  Some of them

4    don't report, some of them report just a few, you know,

5    details.

6           We made -- started making a -- pretty extensive

7    reports in terms of what we were disclosing.  So at first I

8    had to go gather all that information.  And -- and then it

9    was some -- you know, the -- the principals give an update

10   of the business, some of the plans that they were -- you

11   know, what the business plans were, who were the

12   stockholders; primarily who were the holders of over 5

13   percent of the issued and outstanding stock; management

14   bios; you know, just a wide range of information.  Just

15   everything you would need to know to make a decision whether

16   you want to invest in this company or not.

17          Later on after that, it was just updating that

18   information on a quarterly basis.

19   Q.   All right.  And I need to go back.

20          MR. SIBERT:  Can I have -- Your Honor, I'm going to

21   ask to move for admitting into evidence Government Exhibit

22   257.  It's been stipulated to.

23          THE COURT:  All right.  Given the stipulation of

24   the parties, Exhibit 257 is admitted into evidence and may

25   be published to the jury.

Direct - Bodden

1     (Government's Exhibit 257 received)

2   BY MR. SIBERT:

3   Q.   Sir, I'm looking at an e-mail that was sent by you to

4   Mr. Sears.  Is this essentially what you were talking about

5   regarding the deposits?

6   A.   Yes.  That's correct.  When I was reviewing -- or

7   reconciling the bank accounts, I would come upon a deposit

8   with sometimes no information to guide me as to, you know,

9   what those monies were -- how those monies were to be

10  credited.  And so this e-mail is basically asking Mr. Sears,

11  "I have these deposits, these were the dates that they were

12  deposited, this was the information as far as a payer,

13  attached deposit or bank originating credit, meaning there

14  was no -- there was no advice in terms of where the money

15  came from, so how should I treat these?"

16  Q.   Okay.  And page 2, please.

17       MR. SIBERT:  I'm sorry, Your Honor, I thought there

18  was a second page, but I have two pages.  There's only one

19  actually page.

20  BY MR. SIBERT:

21  Q.   So this is the example that you would actually send Mr.

22  Sears this e-mail to see how to book it?

23  A.   That's correct.

24  Q.   All right.

25       MR. SIBERT:  Can I move for admission into evidence

Direct - Bodden

1    Exhibit 240.  Again, this has been stipulated to.

2              THE COURT:  All right, given the stipulation of the

3    parties, Exhibit 240 is admitted into evidence and may be

4    published to the jury.

5         (Government's Exhibit 240 received)

6    BY MR. SIBERT:

7    Q.   Thank you.

8              Sir, you're sending an e-mail to Mr. Scott Dittman

9    and Mr. Sears.  Can you discuss essentially the context of

10   this e-mail.

11   A.   Okay.  This is for the annual report, which is a little

12   more detailed than just quarterly reports.  And in that,

13   this is the annual report that we're doing for the end of

14   the year for 2011, December 31st, 2011.  This e-mail's from

15   me to Scott Dittman and William Sears.  Attached the -- the

16   annual -- the annual report, and the disclosure statements.

17             I've -- I'm telling them I've made the necessary

18   changes to reflect the report changes made to the financial

19   statements.  Obviously they had been back and forth and some

20   changes made to the financial statements, in regards to

21   notes on your -- on the draft version.  So I had received a

22   draft version and some notes were attached to it, so I'm

23   telling them what I changed in terms of responding to their

24   notes, which would be mechanics of conversion, change of

25   control, R&D expenses, employees, and dependents on one or a

Direct - Bodden

1    few major customers.

2    Q.   All right.  So you were just referring some questions

3    back --

4    A.   Correct, correct.  I was giving them an updated

5    version, yeah.

6    Q.   And can I have page 13 -- or -- it might be page 15.

7    It's the bottom.

8             All right.  Now, sir, part D of this exhibit -- of

9    the attachment, what are you listing under part D?

10   A.   This is where you list the --

11   Q.   If you go down -- I'm sorry, just so -- for your

12   reference, we're going to use the bottom number.

13   A.   15.

14   Q.   Yes, sir.

15   A.   Yes.

16   Q.   Thank you.

17   A.   For Scott, this is where we -- you would disclose the

18   officers and the directors of the corporation.  I have there

19   Scott Dittman, Andrew Duke, and Guy Jean-Pierre.

20   Q.   Okay.  And can we have the page 16, please.

21            And you said you had Mr. Guy Jean-Pierre; is that

22   right there?

23   A.   That's correct.

24   Q.   And that's where he's listed as the corporate secretary

25   and legal counsel?

Direct - Bodden

1    A.   That's correct.

2    Q.   All right.  Let me ask you:  Why is there no William

3    Sears under this section?

4    A.   William Sears was not to be included in this.  He was

5    not -- he said he was not a director or officer of the

6    company.

7    Q.   Okay.  Is that because of his criminal history?

8    A.   That's correct.  He -- it wasn't the first time.  There

9    had been a number of companies that he'd been a part of

10   prior to that he chose not to disclose his -- his

11   involvement in.

12   Q.   But if FusionPharm was being honest to the public in

13   this disclosure, where should Mr. Sears have been listed?

14   A.   He should have been somewhere in the executive

15   officer -- as executive officer.  That's the way he was

16   acting.

17   Q.   Okay.  Can we go to part B.

18        Again, at the end of 2011, in the annual report,

19   why isn't Mr. Sears listed there?

20   A.   Because I was told not to put him in there.

21   Q.   And who told you not to put him --

22   A.   Himself.

23   Q.   Can I have page 17, please.

24        Okay, sir, can you tell why you put Robert Dittman

25   into disclosure of family relationship.

Direct - Bodden

1    A.   Because it requires that any family relationship

2    that -- the report requires that any family relationship be

3    disclosed.

4    Q.   Okay.  And so your understanding, who was Robert

5    Dittman?

6    A.   Scott Dittman's brother.

7    Q.   Okay.  And when I asked you about the people involved

8    with FusionPharm when you visited FusionPharm and also

9    communicated with other people associated with FusionPharm,

10   the one name I did not hear was Mr. Robert Dittman.

11   A.   That's correct, yes.

12   Q.   Okay.  Can you discuss Robert Dittman's relationship

13   with FusionPharm.

14   A.   Robert really had no relationship other than he was

15   holding stock for William Sears.  He was a bartender and --

16   at a downtown -- that was his primary occupation.

17   Q.   Okay.  And do you recall essentially how many shares he

18   acquired be held in -- for William Sears?

19   A.   That's correct.  My understanding was those were --

20   Bill's shares?

21   Q.   And do you know how many approximately?

22   A.   It says here 176,504.

23   Q.   Okay.  And based upon your experience working with

24   FusionPharm, do you remember the conversion rate?

25   A.   It was like a hundred to 1.

Direct - Bodden

1    Q.   And so how many common shares would that be equivalent

2    to?

3    A.   17.6 million.

4    Q.   Okay.  Were there any disclosures made regarding

5    related-party transactions?

6    A.   Okay.  Disclosures -- no disclosures were made

7    regarding related-party transactions, no.

8    Q.   And that requirement includes in-laws; is that

9    correct?

10   A.   That does include in-laws.

11   Q.   Okay.  Can I go down to the bottom of page 17.

12         Can you talk to the jury about why these people are

13   listed underneath beneficial owners.

14   A.   Yes.  The requirement is that each person that owns 5

15   percent of the company's common stock, it's any person

16   acting as a director or executive officer has to be

17   disclosed so that the -- basically so the public knows who's

18   controlling the company, or has a material interest in it;

19   thus the 5 percent threshold.

20   Q.   But here Bayside Realty Holding, if I understand you

21   correctly, was Mr. Sears.

22   A.   That's correct, yes.

23   Q.   Okay.  But I thought you were told not to list Mr.

24   Sears on this disclosure.

25   A.   No, but the company -- the -- the company he had,

1    Bayside Realty, which had his mother's address in

2    North Carolina.

3    Q.    So it has his mother's name --

4    A.    His mother's name, yeah, that's correct.

5    Q.    Okay.  And also Mr. Robert Dittman's listed.  Is that

6    because he had those 176,000?

7    A.    That's correct.  Yes.

8    Q.    Okay.

9    A.    That was, at the time, 11.8 percent of the issued and

10   outstanding, so that would be over the 5 percent threshold.

11   Q.    Okay.  But if I understood your testimony correctly,

12   Mr. Dittman wasn't controlling those shares.

13   A.    No, those shares were controlled by Mr. Sears.

14   Q.    So who should have been listed there?

15   A.    Mr. Sears.

16   Q.    Can I have page 18, please.

17          There's no promoter listed; is that correct?

18   A.    No.  There's none.

19   Q.    Do you know why?

20   A.    Although the company's stock was being promoted, my

21   understanding was the promoter was working actually for Mr.

22   Sears himself.

23   Q.    Okay.  And who was the promoter?

24   A.    Richard Scholz.  Also out of Orlando.

25   Q.    Can you just scroll down, please.  That's good.

Direct - Bodden

1    Who's outside counsel listed on this report?

2    A.   Tod DiTommaso.

3    Q.   Okay.  Do you know why FusionPharm is a very small

4    company would need outside counsel when Mr. Guy Jean-Pierre

5    was the secretary and a legal officer?

6    A.   My understanding was that they needed outside

7    counsel --

8         MR. BARNARD:  Excuse me, Your Honor.  Object.

9    Foundation.

10        THE COURT:  Mr. Sibert.

11        MR. SIBERT:  He's worked there -- he worked there

12   for 2 1/2 years.

13        THE COURT:  Yeah, right.

14        MR. SIBERT:  I think the basis is very clear if he

15   has knowledge.

16        THE COURT:  All right.  If you -- if you know.  You

17   may answer if you know the answer.

18        THE WITNESS:  Yes.  The outside counsel would need

19   to provide a legal opinion with this report and while -- my

20   understanding is Mr. Jean-Pierre could not do that.

21   Q.   Okay.  And why couldn't defendant Guy Jean-Pierre

22   couldn't write those legal opinions?

23   A.   Because my understanding of -- my knowledge was that he

24   was barred from making those opinions to Pink Sheets.

25   Q.   Can I have that back, please.  Thank you.

Direct - Bodden

1         And an outside accountant is listed here.  Sir,

2    you've testified you had a tremendous amount of experience,

3    especially since 2002, dealing with these small type

4    companies.

5    A.    Right.

6    Q.    Why would FusionPharm again -- again, it's a small

7    company, not having really good revenue, need an outside

8    accountant?

9    A.    Well, I was acting as a -- I was kind of the

10   bookkeeper, so to speak.  MAK Consulting -- and the name

11   escapes me as to the gentleman who runs it, but he had been

12   involved in this company prior to it becoming FusionPharm.

13   And my instructions were to prepare the accounts and send it

14   to him to review prior to -- which I was comfortable with

15   because I'm not a formally trained accountant, and that only

16   makes sense that it would go to him before it would be

17   uploaded.

18   Q.    Okay.  Can I have page 24, please.  Can I have this

19   section blown up, please.

20         Okay, now, this is the 2011 annual report; is that

21   right?

22   A.    Yes.  This is the accounts at the end of December 31st,

23   2011.

24   Q.    Okay.  And essentially $269,497 are listed as notes

25   payable.

Direct - Bodden

1    A.    Correct.

2    Q.    What did you understand about this debt at this time?

3    A.    That the debt was what was owed to MeadPoint and

4    Bayside for the monies that they had invested in the

5    company.

6    Q.    Okay.  So that's from the stock sales --

7    A.    From the sale of FusionPharm stock, correct.

8    Q.    Okay.  Any time in 2011 before doing this annual

9    report, or whether you're looking through paperwork of

10   annual reports, was there any mention about -- or any

11   indication that this debt, the note, was listed as

12   convertible notes?

13   A.    No.  The notes were not convertible.

14   Q.    And so your understanding is this debt was owed to Mr.

15   William Sears for selling his FusionPharm stock?

16   A.    That's correct, yes.

17   Q.    Under the shell entities of Bayside and MeadPoint.

18   A.    That's correct.  Bayside and MeadPoint.

19   Q.    Can I have that down, ma'am, please.  Thank you.

20         Okay.  Now, we went through a whole annual report.

21   That report would finally end up where?

22   A.    It would be under the -- the -- you would pull up the

23   company on Pink Sheets and this report would be under

24   Disclosures.  It would be a section that you would go to to

25   find these types of reports.

Direct - Bodden

1    Q.   Excuse me.  And now obviously you would have to look

2    under the company's name; is that right?

3    A.   That's right.  You would have to be under the -- look

4    up the company's ticker symbol and be -- sent to where all

5    the company information would be, press releases, the quotes

6    on, you know, the -- the price quotes on the company.

7         There will be a section there for -- that they

8    would have, you know, pertinent information like the -- the

9    officers and so forth, and also you would have a section

10   where all these -- all of these reports are in chronological

11   order.

12   Q.   All right.  Now, do you remember the ticker symbol for

13   FusionPharm?

14   A.   FSPM.

15   Q.   All right.  And who was the final review, slash,

16   approval authority for FusionPharm when it came to -- before

17   these disclosures were posted?

18   A.   Scott Dittman.

19   Q.   Okay.  And then do you know who filed -- or who

20   actually did the uploading of the reports?

21   A.   I assume -- I wasn't -- usually they were filed

22   while -- when I went back to Florida, but my -- my -- my

23   understanding was it was Scott Dittman was filing.  He had

24   the -- the credentials, so to speak, that could access the

25   site.  This is restricted; you have to have a -- an

Direct - Bodden

1   encrypted fob to upload these.

2   Q.   Okay.  I think you previously mentioned this briefly,

3   but when I was asking you about MAK Consulting, does the

4   name Mike Kocinski --

5   A.   Kocinski, yeah.

6   Q.   Kocinski.  Does --

7   A.   That's my -- yes, that's who -- who ran MAK Consulting.

8   Q.   Okay.  What was his role when it came to these

9   disclosures before they were loaded onto the

10  over-the-counter markets?

11  A.   His role would be to -- was to review my work and

12  suggest any changes and then to provide, I guess, a -- a

13  confirmation, which then would go to the attorney writing

14  the opinion letter.  Each of these reports has to be

15  accompanied by a legal opinion that there were -- gives

16  assurances that they're -- they conform to certain rules.

17  Q.   Okay.  And that's going to lead me into my next

18  question, then.  What was Mr. Guy Jean-Pierre's role --

19  A.   I was told to send this information to Mr. Jean-Pierre

20  so that he could review them also.

21  Q.   Okay.  So part of the review process before any of

22  these reports were filed with over-the-counter market was

23  FusionPharm's legal counsel and corporate secretary, Mr. Guy

24  Jean-Pierre?

25  A.   That's correct.

Direct - Bodden

1   Q.   Do you know what Mr. DiTommaso's role was?

2   A.   His -- by postings, his job was to write the legal

3   opinions.  He would provide the legal opinions that were

4   posted along with the reports.

5   Q.   Do you know who wrote those legal opinions?

6   A.   I do not, no.

7   Q.   Okay.  So his name was on the legal --

8   A.   His name was on the list, yes, that's correct.

9   Q.   But you don't know who wrote them?

10  A.   I don't know.  I wasn't involved in that process.

11  Q.   And would this be the same process essentially for the

12  annual reports and the quarterly reports?

13  A.   Yes.  Every quarterly or annual report had to be

14  accompanied by -- had to go through this process and to be

15  accompanied by a legal opinion.

16  Q.   Okay.  So Mr. Guy Jean-Pierre was involved with every,

17  essentially, reporting period?

18  A.   That's correct.

19          MR. SIBERT:  Okay.  Your Honor, at this time, I'm

20  going to move -- ask to be moved into evidence a few

21  exhibits.  And I believe they have all been stipulated to.

22          THE COURT:  All right.

23          MR. SIBERT:  Government Exhibit 243, 258, 259 --

24  excuse me, 258's already in evidence -- so 259, 260, and --

25  that's it for now.

Direct - Bodden

1       THE COURT:  And you say they're -- all three are

2   stipulated?

3       MR. SIBERT:  Yes, sir.

4       THE COURT:  All right.  Given the stipulation of

5   the parties, Government Exhibits 243, 259 and 260 are

6   admitted into evidence and may be published to the jury.

7       (Government's Exhibits 243, 259 and 260 received)

8       MR. SIBERT:  Thank you.

9   BY MR. SIBERT:

10  Q.   Can I please have Government Exhibit 243 brought up.

11       Okay.  Again, sir, could you just take a minute and

12  look at this e-mail.

13       And can I have that blown up for him?

14       If you can't see it, you might not have this in

15  your binder -- can I ask that binder be replaced with the

16  binder that would have Government Exhibit 243 in it.

17       THE WITNESS:  Thank you.

18  BY MR. SIBERT:

19  Q.   Have you had time to look at that?

20  A.   Yes, I have.

21  Q.   Okay.  And, sir, essentially could you just explain to

22  the jury what this e-mail is referring to.

23  A.   These -- the e-mail's referring to the financial

24  statements for the period ending March 2012.  I sent -- this

25  is the workbook, or the -- the work, the copies, that I'm

Direct - Bodden

1    sending along to Scott Dittman and William Sears.

2    Q.   Okay.  And could you look at page 2 of this document.

3    It should be the first page of your attachment.

4             And can we have the middle, please.  Keep going

5    down to the Liabilities.  And begin right here.

6             So if I understand you correctly, in May 25th,

7    2012, you would be working on the first quarter for 2012

8    financials.

9    A.   Correct.  The -- the -- the quarter January, February,

10   and March of 2012.

11   Q.   Okay.  And, again, the notes are just labeled Payable;

12   is that correct?

13   A.   That's correct.  Long-term liabilities.

14   Q.   Okay.  And is there a note from FusionPharm in there?

15   A.   Not that I'm aware of, no.  I've got the notes, but no.

16   Q.   And, again, your understanding about where this

17   money -- what -- who was owed this money?

18   A.   Bayside and MeadPoint.

19   Q.   Okay, sir, I'm going to ask you similar questions.  Can

20   I please have Exhibit 258 brought up.  Can I have this blown

21   up, please.  I'm sorry, can we go down to the bottom of the

22   page.

23             All right.  Do you know why Ms. Amanda Martin would

24   be e-mailing Mr. Sears an e-mail that was eventually

25   forwarded to you?

Direct - Bodden

A.   Yeah.  As part of the -- the reporting, you have to get
an update, which has -- update of the shareholders, the
current shareholders list, and amount of shares.  And that
has to come directly from the company's transfer agent.  So
she would be sending that information to Mr. Sears so that
that can be confirmed in the legal opinion.  And, of course,
put into the -- so I could double-check it and put it into
the reports.

Q.   Okay.

A.   But the -- the requirement that it come directly from
the transfer agent is one of the things you need for the
legal opinion at that time.

Q.   Okay.  Can you go to the top of the e-mail, please.

     And so information that had to be put in the legal
opinion was sent to Mr. Guy Jean-Pierre; is that correct?

A.   That's correct.  He's on the -- he was -- myself and he
was copied -- or sent this e-mail.

Q.   Okay.  And so, again, as you stated, the information
that needed to be in the legal opinion, there's no Mr.
DiTommaso in this e-mail.

A.   No.  No, he didn't send it to Mr. DiTommaso.

Q.   Okay.  And this is on August 7th, 2012?

A.   Correct.  Yes.

Q.   So probably working on the second quarterly reports for
2012?

Direct - Bodden

1    A.    Right.  If this was the -- the subject -- on the

2    subject line, you can see that she's sending the

3    shareholders list as it was on June 30th of 2012.

4    Q.    Okay.  Thank you.  Can I have Exhibit 259.

5          Okay, sir, you're sending an e-mail, at the top of

6    this.  Who are you sending the e-mail to?

7    A.    I'm sending it to Scott Dittman and copies to Guy

8    Jean-Pierre and William Sears.

9    Q.    Okay.  And what are you sending to Mr. Dittman and Mr.

10   Guy Jean-Pierre?

11   A.    I'm sending them the -- the quarterly reports for the

12   June 30, 2012, and the financial statements for June 30th,

13   '12, and '11.  I've also attached shareholders lists for

14   Guy's review to confirm the number of shareholders.

15   Q.    And that's right here?

16   A.    Right.  That's what -- and basically saying if anybody

17   has any problems with it, let me know.

18   Q.    So you're putting all these parties on notice?

19   A.    Correct.  Yeah.  I was giving -- I'm giving these --

20   this information for all of them to review.

21   Q.    And that includes the corporate secretary and legal

22   counsel for FusionPharm?

23   A.    Correct.

24   Q.    All right.  Can I have page 19 of that exhibit.  And

25   down to long-term debt -- or, excuse me, long-term notes.

Direct - Bodden

1    Can I blow this up, please.

2             Okay, sir, essentially the first line of long-term

3    notes states, "Unsecured credit line, including interest at

4    10 percent, for $151,600."  And the second line says,

5    "Unsecured credit line, including interest at 10 percent, at

6    $88,887."

7             At this time, for the second quarter of 2012, did

8    you think this debt was convertible into 26 million shares

9    of common stock at this time?

10   A.   No.

11   Q.   Do you know the number -- if you can look through that

12   report -- do you know the number of outstanding common

13   shares that was -- for FusionPharm?  And when I say

14   "outstanding," essentially the number of shares that had

15   been issued, common shares.

16   A.   I'd have to go back to the -- oh, here it is.

17   Q.   I think if you look on page 13, you'll find it.

18   A.   13?  1,487,330.

19   Q.   Okay.  So essentially a little over 1.4 million?

20   A.   That's correct.

21   Q.   All right.  Can I have Exhibit 260 brought up, please.

22   Okay.

23            Can you tell the jury why you're cc'd on this

24   e-mail from Mr. Mike Kocinski?

25   A.   Yeah.  Basically I guess I'm -- just for my information

Direct - Bodden

1    because I'm putting together these reports, but this is Mike

2    Kocinski confirming that the financial statements for

3    FusionPharm for the period June 30th were prepared according

4    to GAAP, which is one of the -- again, one of the

5    requirements that -- for the legal opinion the accountant

6    has to confirm to legal that -- basically that the -- the

7    financial statements were prepared in accordance to

8    accounting principles.

9    Q.    So not only -- and Mr. Guy Jean-Pierre is actually the

10   recipient of this e-mail; is that right?

11   A.    That's right.  It would be something he would confirm

12   to legal, not to us.

13   Q.    So not only is the corporate secretary and legal

14   counsel for FusionPharm receiving the financials, he's now

15   getting the statement as needed for the over-the-counter

16   markets' legal letter regarding the qualifications and the

17   standards the financials have --

18   A.    Right.  And you can tell that because Mr. Kocinski's

19   confirming that he has 25 years of accounting service

20   experience and he wouldn't -- you know, so it's pretty

21   formal in its intent.

22   Q.    All right.  So -- you can take that down.

23              If I understand correctly, Mr. Guy Jean-Pierre was

24   being sent the financials, drafts of disclosures, the

25   shareholders list, and now the standard that the accounting

Direct - Bodden

1    was -- was done in for FusionPharm.

2    A.   Correct.  Yeah, he was confirming that.  Yes.

3    Q.   Okay.  And this is all before anything is disclosed to

4    over-the-counter markets?

5    A.   That's correct.

6    Q.   Can I have Exhibit 262, please.

7         Can you take a look at this e-mail and tell the

8    jury essentially what this e-mail is referring to.

9    A.   Yes, I'm attaching a draft of the quarterly report for

10   the next quarter, which is September 30th, 2012.  I'm

11   sending it to Scott Dittman, William Sears, Mike Kocinski,

12   and Guy Jean-Pierre.

13   Q.   All right.  So this is the draft of your report for now

14   the third quarter of 2012.

15   A.   Correct.

16   Q.   Okay.  And who is cc'd to this e-mail?

17   A.   Mike Kocinski and Guy Jean-Pierre.

18   Q.   All right.  So much like the second quarter at the end

19   of March, the corporate counsel and corporate -- or the

20   legal counsel and the corporate secretary, Mr. Guy

21   Jean-Pierre, is receiving these documents before they are

22   posted onto the OTC Markets?

23   A.   That's correct.  That was my instructions.

24   Q.   Okay.  Can I have page 4 published.  Can I have this

25   blown up, please.

Direct - Bodden

1    So, sir, you were working the financials in 2011,
2  and, obviously, you're sending this as a draft.  Where did
3  the $750,341 of revenue come from, if you know?
4  A.   That was an agreement between VertiFresh and
5  FusionPharm that VertiFresh would be buying -- it's sort of
6  like a package, you would get a certain territory for
7  FusionPharm -- from FusionPharm along with, I think it was,
8  five PharmPods.  And for that, you would pay, I believe it
9  was -- I think $250,000, or some amount.  I can't remember
10  the amount exactly.  But VertiFresh had agreed to -- to buy
11  these from FusionPharm and -- and put this as revenue.
12  Q.   Can I have page 12, please.  Can I have the top blown
13  up, please.
14    So, sir, how much essential revenue was related to
15  VertiFresh?
16  A.   Almost all of it.
17  Q.   And what was FusionPharm's net income with VertiFresh?
18  A.   Net income with VertiFresh was $423,509.
19  Q.   And that's --
20  A.   With -- with the revenue for VertiFresh.
21  Q.   Okay.  And what was it without VertiFresh?
22  A.   Probably -- because operating expenses were, that
23  period, 259,000, so that probably would be mostly a loss if
24  not for the VertiFresh revenue.
25  Q.   And how much loss?

1    A.    About $250,000 loss.

2    Q.    All right.  And VertiFresh was essentially, as you

3    stated, Mr. Sears' company?

4    A.    Correct.

5    Q.    Was there anywhere disclosed in that quarterly report

6    that information about Mr. Sears --

7    A.    No, no.  The fact that this was not a handshake -- I

8    mean, a -- a arm's length transaction, there wasn't anything

9    disclosed.

10   Q.    And based upon your understandings of having experience

11   in microcap companies and filings with OTC, is this

12   something that OTC would require to be filed?

13   A.    Yes.  Yes.

14   Q.    Okay.  And this draft was sent to Mr. Guy Jean-Pierre?

15   A.    That's correct.  It would be considered a related-party

16   transaction.

17   Q.    Okay.  And Mr. Guy Jean-Pierre was the corporate

18   secretary along with the legal counsel; is that right?

19   A.    That's correct.

20   Q.    In fact, he's a securities counsel.

21   A.    Yes, he's a securities lawyer.

22   Q.    Can I have Exhibit 263 brought up.  Okay.

23         And can you just tell me what Mr. Scott Dittman is

24   e-mailing you about.

25   A.    Yes.  He's saying that the quarterly report for

Direct - Bodden

1    September 2012 looks good.  He's asking Mike -- which is
2    Mike Kocinski -- if he has any questions or concerns.
3    Q.   Okay.  And then, again, who's again cc'd on this
4    e-mail?
5    A.   Mike Kocinski and Guy Jean-Pierre.
6    Q.   All right.  So the CEO is sending his approval and then
7    also having the accountant and the corporate secretary and
8    legal counsel e-mailed on it?
9    A.   Correct.
10   Q.   You can have that taken down, please.
11        Do you know later on -- obviously you have -- you
12   have first filed the disclosures that you've been talking
13   about; is that correct?
14   A.   That's correct, yes.
15   Q.   Afterwards, the OTC Markets' opinion letter -- the
16   legal opinion letter was filed; is that right?
17   A.   That's correct, yes.
18   Q.   Do you know if the process was similar, that once there
19   was a draft of an opinion letter, it kind of went through a
20   review process?
21   A.   I didn't really know anything about the opinion letters
22   other than they were needed and that was kind of handled
23   separately.  Usually, like I said, they filed it, I would
24   imagine, days after I finished my work and I was usually
25   back in Florida.

Direct - Bodden

1    Q.   Can I have Exhibit 249 up, please.  Okay.

2         And I know it's been a while --

3    A.   Uhm-hum.

4    Q.   -- but can you tell me what Mr. Guy Jean-Pierre is

5    sending to Mr. Sears?

6    A.   Oh, yes.  This is the -- the OTC Markets' opinion

7    letter together with the company's signature page.

8    Q.   That would be the subject here?

9    A.   That's correct.

10   Q.   And this probably would be for the first quarter of

11   2012?

12   A.   Yes.

13   Q.   Okay.  Because it's a June 11th --

14   A.   June 11th.  And the second quarter wouldn't have ended

15   yet, yes.

16   Q.   And he sends that to Mr. Sears; is that correct?

17   A.   That's correct, yes.

18   Q.   And then Mr. Sears forwards it to you?

19   A.   Correct.  Yes.

20        MR. SIBERT:  Okay, Your Honor, at this time, I'd

21   like to do another batch.

22        THE COURT:  All right.

23        MR. SIBERT:  These exhibits have been stipulated

24   to.  I'm going to move -- ask for them to be moved into

25   evidence.  That's Exhibit 239, 242, 244, 246, 247, 250, 251.

Direct - Bodden

1     THE COURT:  Something tells me some of these are

2 already in.  Ms. Frank, are any of these already in?

3     COURTROOM DEPUTY:  Hhm-uhm.

4     THE COURT:  No?  Okay.  I'm imagining things.  All

5 right, given the stipulation of the parties, the following

6 Government exhibits are admitted into evidence:  239, 242,

7 244, 246, 247, 250, and 251.

8     (Government's Exhibits received)

9     MR. SIBERT:  And, Your Honor, I'm sorry, while

10 we're at a pause here, can I do 255, which is stipulated to,

11 and 256 as well.

12     THE COURT:  All right, given the stipulation of the

13 parties, Government Exhibits 255 and 256 are admitted into

14 evidence and may be published to the jury.

15     (Government's Exhibits 255 and 256 received)

16 BY MR. SIBERT:

17 Q.   I just want to back up.  We spoke about VertiFresh and

18 that was 90 percent of the revenue.  Do you recall that line

19 of questioning with VertiFresh?

20 A.   I do.

21 Q.   Okay.  How was VertiFresh funded if FusionPharm was

22 being funded by Bayside and MeadPoint sales of FusionPharm

23 stock?

24 A.   I can't recall exactly how VertiFresh was being funded,

25 but there wasn't a -- I can't recall where they got their

Direct - Bodden

1     money.

2     Q.   Okay.  Who was doing the accounting for VertiFresh?

3     A.   I was doing the accounting for VertiFresh, too.  I

4     didn't think there was a whole lot of money being spent, but

5     the principal source of money there was the -- the sale of

6     FusionPharm stock, whether it was given to FusionPharm or

7     VertiFresh.

8     Q.   And that's based upon your testimony essentially

9     that -- regarding third-party revenue?

10    A.   That's correct, yes.

11    Q.   Okay.

12    A.   The only other -- the only other monies that would flow

13    into FusionPharm would be the money they had gotten from the

14    sale of the pods that they did sell to third parties, which

15    I know what -- there was one.  And VertiFresh would be, you

16    know, the revenue from MADgreens.

17    Q.   Okay.  And do you recall how much revenue they were

18    bringing in from MADgreens?

19    A.   Maybe a couple hundred dollars a month.  It's not very

20    much.

21    Q.   I have to ask you, did MADgreens have any clue King

22    Soopers lettuce was being used?

23    A.   No, no.  They -- there was a promotion -- and the -- to

24    be fair, it wasn't a whole lot of King Soopers lettuce being

25    used.

Direct - Bodden

Q.   Boy.  All right.  All right, so -- and just to -- you
stated based upon your knowledge, FusionPharm had only sold
one pod?

A.   That's all I've ever seen collected on was one pod.
They may have sold more, but that's all I know about just
because I -- I accompanied Mr. Sears as he went to pick up a
payment.

Q.   Now, do you recall a potential deal with Capital Line
with Nick Malino in mid-2012?

A.   I do, yes.

Q.   Can you tell the jury what you knew about this
potential deal with Nick Malino?

A.   Nick Malino was a referral of mine, actually, from a
previous deal.  He funded -- or provided financing for penny
stocks, or small Microcap stocks, or any private companies.
At that time, right around the first part of -- or first
part of the second quarter, FusionPharm needed money and the
free-trading stock, or the stock that could be sold, was --
they didn't have any.  They were running out of it.

        So they started exploring other financing, the
options.  We -- I sent the information to Nick Malino.  Like
I said, I knew him from a previous company we were trying to
get financed.  And so we were basically trying to work a
financing deal with Capital Line, which was out of New York
City.

Direct - Bodden

1    Q.   Okay.  You stated FusionPharm was running out of

2    free-trading stock.  Could you explain what free-trading

3    meant to you regarding FusionPharm stock they were using

4    to --

5    A.   Well, when you buy stock not on the market from a --

6    privately from a company, it's -- it's restricted unless

7    you -- you know, buy it as -- so free-trading means that

8    it's -- it's a stock held in certificate form that you're

9    able to deposit at your broker, and then that can be sold at

10   the market, rather than restricted stock which would have to

11   be hold for a certain period before you could get the

12   restriction lifted and then you could -- you could sell that

13   at the market as well.

14        So the stock that could be sold that -- of

15   FusionPharm by MeadPoint and -- and Bayside, were running

16   out.  So because they had no more stock that was -- that

17   could -- that the restriction could be lifted, then that's

18   what I meant, they were running out of free-trading stock.

19   They had lots of stock, but it was all restricted.

20   Q.   Okay.  And essentially the stock -- a lot of that stock

21   was being held by Mr. Scott Dittman.

22   A.   That's correct.  Yes.

23   Q.   And as the named CEO, the disclosed person, he's

24   considered what?

25   A.   He's considered an insider, a -- a -- there's a legal

Direct - Bodden

1    word for it, but, yeah, an insider.

2    Q.   All right.  Control person?

3    A.   Control person.  Correct.

4    Q.   Affiliate?

5    A.   Yes, he is an affiliate.  Yeah.

6    Q.   Okay.  And are his stocks subject to more restrictions?

7    A.   Right.  Insiders, or control people, or management,

8    directors, holders of more than 5 percent of the stock, they

9    can sell stock just like the -- the CEO of Facebook, but

10   they can only sell a certain amount based on the -- the

11   volume which is -- of that stock.  So basically they can't

12   unload -- the rules are set up so they can't unload stock on

13   the market and drive the price down, just because usually

14   these founders and people that hold all of this stock have a

15   great deal of it and they could basically tank the market if

16   they wanted to get out of all these shares.

17          So the -- the rules are set up so they can only

18   sell a percentage.  And that percentage, when the company's

19   fully reporting, has to be reported -- what they're selling

20   has to be reported.

21   Q.   So you talked about one reason why Mr. William Sears

22   wasn't disclosed, which was his criminal conviction.

23   What --

24   A.   Right.

25   Q.   -- was this other reason --

Direct - Bodden

1     MR. BARNARD:  Your Honor, objection.  Leading.

2     THE COURT:  Sustained.

3    BY MR. SIBERT:

4    Q.   Were there any other reasons why Mr. Sears wasn't

5    disclosed?

6    A.   I believe I said earlier he was -- because he did not

7    want to be an affiliate of the company.  That would preclude

8    him from selling shares.

9    Q.   And so by him not being named an affiliate, no one

10   would know he was subject to these further restrictions?

11         MR. BARNARD:  Objection, again.  Leading.

12         THE COURT:  Sustained.

13   BY MR. SIBERT:

14   Q.   Okay.  Because he's not disclosed, does that change his

15   affiliation?

16   A.   Right.  If -- there will be no way to know he was an

17   affiliate or the transfer agent wouldn't be able to know he

18   was an affiliate.

19   Q.   But if Mr. Sears was controlling all these shares under

20   Bayside and MeadPoint --

21   A.   He was, yes.

22   Q.   And --

23   A.   In fact, he was.

24   Q.   All right.  And as you stated, no one knew that, but

25   does that change his status under the law?

Direct - Bodden

A.   Oh, no.  Under the law, it doesn't change his status.

Q.   So he would have been an affiliate.

A.   That's correct.  Because you're an affiliate -- because
he was acting as a control person on a daily basis.

Q.   All right.  And now back to Mr. Nick Malino.  You were
trying to put together a deal with Mr. Nick Malino.  Why did
you go to Mr. Malino?

A.   Because I knew he financed these types of companies,
early-stage companies.

Q.   Can I have Exhibit 239, please.

Okay, sir, can you explain to the jury essentially
what you're sending Mr. Malino in this e-mail.

A.   Yeah.  Because -- like I said, he was my referral to
FusionPharm, I'm making the introduction in this e-mail.
I'm sending him basically a summary of the company, the
investor presentation that we had put together, so that he
could get an idea of what the company did, you know, in --
whether he was interested in the deal or not.

Q.   And then you're making the introduction, and the
introduction obviously you're making with -- is regarding
Mr. Sears; is that right?

A.   Correct.  Yes.

Q.   And no Mr. -- I don't see Mr. Dittman on there; is that
right?

A.   No.  Sort of the division of responsibilities, Bill

1   handled pretty much all the financing transactions.  I

2   really didn't work with Scott -- I mean, obviously Scott had

3   to approve anything that it would ultimately enter into it,

4   but if it came to stock or financing, usually Bill was the

5   one that was heading up the -- the effort.

6   Q.   And then behind that e-mail, that's your presentation;

7   is that correct?

8   A.   That's correct.

9   Q.   And that's all these pages that you put together?

10  A.   Right.

11  Q.   So basically a really nice done PowerPoint?

12  A.   Correct, yes.

13  Q.   Okay.  Can I have Government Exhibit 242.

14          Okay, can you quickly summarize what this e-mail is

15  about.

16  A.   Okay.  I'm sending Nick Malino the company's financial

17  projections and I'm cc'ing Scott Dittman and William Sears

18  on this.  And then I'm also providing Mr. Malino with their

19  direct contact information, just in case he wanted to follow

20  up, you know, so he didn't have to kind of go through me if

21  he wanted to talk with them directly.

22  Q.   Okay.  Your previous e-mail was March and now this

23  e-mail is in April -- beginning of April; is that right,

24  2012?

25  A.   Correct.

Direct - Bodden

1    Q.    Okay.  Can you take that down, please.

2          Okay.  Now, as I recall correctly, you're

3    approaching Mr. Nick Malino because now FusionPharm is

4    looking to raise more money.

5    A.    Correct.

6    Q.    And did you ever discuss this deal with Mr. Guy

7    Jean-Pierre?

8    A.    I don't recall ever discussing it, no.

9    Q.    Did you ever go down to Florida in 2012?

10   A.    Oh, yes.  Yeah.  We had a meeting in Boca Raton,

11   Florida, me, Bill and Guy.

12   Q.    And why -- okay, let me back up.  Why Boca Raton,

13   Florida?

14   A.    That's where Guy was located.

15   Q.    Okay.  And who went with you on this trip?

16   A.    William Sears.

17   Q.    Okay.  And what did you, Mr. Sears, and Mr. Guy

18   Jean-Pierre discuss in Boca Raton, Florida?  Do you recall

19   when in 2012?

20   A.    I -- I don't know.  I know that I set it up with

21   e-mail, but it was -- I couldn't say specifically.  I

22   remember the place, Mizner Park, but I don't remember the

23   date.

24   Q.    Okay.  And what did you discuss at this meeting?

25   A.    I really didn't discuss anything.  It was basically

Direct - Bodden

1   Bill and Guy discussing financing, like I said, that would

2   be what Bill -- the mainstay, the -- what was going on in

3   terms of how the company was -- was trying to raise money.

4         Obviously this transaction came up.  And Bill would

5   give Guy an overview of -- of what was going on in the

6   company as well, business-wise and so forth.

7   Q.   Was there a discussion about free-trading shares?

8   A.   I can't remember specifically.

9   Q.   Okay.  Any discussion about opinion letters?

10  A.   I'm -- I can't recall, but I imagine that would be part

11  of it, correct.

12        MR. BARNARD:  Your Honor, object and ask that the

13  speculation be stricken.

14        THE COURT:  One second.  Overruled.  Next question.

15  BY MR. SIBERT:

16  Q.   Okay.  Thank you, Your Honor.

17        Now, speaking of Mr. Guy Jean-Pierre, do you see

18  Mr. Guy Jean-Pierre here today in the courtroom?

19  A.   Yes, I do.

20  Q.   And can you point him out and describe something that

21  he's wearing.

22  A.   He's sitting there in the gray jacket.

23        MR. SIBERT:  Your Honor, can the record reflect

24  that this witness identified the defendant in this case?

25        THE COURT:  The record will so reflect.

1       MR. SIBERT:  Thank you, Your Honor.

2    BY MR. SIBERT:

3    Q.   Did Mr. Sears discuss with Mr. Guy Jean-Pierre

4    FusionPharm's need to get money?

5    A.   Yeah.  Money was always a need.  It was particularly a

6    need during that time, yeah.

7    Q.   Can I have Exhibit 244 brought up, please.  And can we

8    start at the bottom, please.

9         Can you tell me what you're sending an e-mail to

10   Mr. Guy Jean-Pierre about?

11   A.   Yes.  I'm informing him that Bill and I will be down in

12   Boca Friday morning and suggesting we get together.

13   Q.   Okay.  And what's the date of this e-mail?

14   A.   May 30th.

15   Q.   Of what year?

16   A.   Of -- sorry, 2012.  May 30th of 2012.

17   Q.   And, again, Mr. Sears is e-mailed here as well?

18   A.   Yes.  I sent it to Guy Jean-Pierre and William Sears.

19   Q.   Okay.  And how did Mr. Guy Jean-Pierre respond back?

20   A.   He wrote back, "Sounds good.  Will meet and then go

21   over everything.  Also any particular time in the morning in

22   mind?  Please advise."

23   Q.   So there's going to be a discussion about everything?

24   A.   Yes.

25   Q.   Is that regarding FusionPharm?

Direct - Bodden

1   A.   FusionPharm, correct.

2   Q.   Okay.  And can you go to the top.  And essentially what

3   are you telling Mr. Guy Jean-Pierre?

4   A.   That Bill's en route.  He was flying into Orlando right

5   now, and when he lands, I'll find out what his schedule is

6   and try to get a time for him.

7   Q.   All right.  And so I'm assuming you live in Orlando?

8   A.   I did, yes.

9   Q.   You drove?

10  A.   We drove from Orlando down to Boca Raton.

11  Q.   And Mr. Sears is flying into Orlando?

12  A.   Right.  He was in Colorado -- lived in Colorado.

13  Q.   So you got to drive with him from Orlando --

14  A.   Correct, yes.

15  Q.   How was that drive?

16  A.   A lot of financing talk, yes.  He's one-dimensional.

17  Q.   When you say that, where's his focus?

18  A.   His focus is on getting money for the company.

19  Q.   On FusionPharm?

20  A.   On FusionPharm, correct.

21  Q.   Okay.  Can I have that down, please.  Thank you.

22       Okay.  Regarding this deal with Mr. Malino, was

23  there a required due diligence package?

24  A.   Yes.  Yes.  Capital Line sent us a pretty extensive due

25  diligence request for documents and information.

1717

Direct - Bodden

1    Q.   Okay.  Was there a discussion regarding note
2    agreements?
3    A.   Yeah.  Well, note agreements would be part -- any --
4    any financing vehicles, any debt that the company had, and
5    so forth, would be part of the due diligence.
6    Q.   Can I have Exhibit 245 published, please.  Can you
7    start in the middle.
8         Sir, can you take a look in the middle of 24 -- I
9    said 245.  In the middle of 245.  Can you explain to me what
10   you're telling Mr. Sears.
11   A.   Yes.  Okay.  I'm sending a -- this is to William Sears.
12   "Bill, please review the attached and" I will review a draw
13   down request -- "and I'll draft the drawdown request to
14   match the dates."
15        Yeah, this -- the -- the monies that were reported
16   as notes in the financial statements, really -- there wasn't
17   any actually physical notes, so basically a debt.  And that
18   was just said.
19        So as part of this due diligence, we'd have to
20   actually show documentation on the debt that the company
21   had.  So we -- I put together the promissory notes and a
22   credit line agreement, which I'm sending him right now.
23        What I'm referring to as a drawdown request is --
24   because the monies was already in the account, then we have
25   to ask for a credit line - a drawdown on a credit line

Direct - Bodden

1    because you ask your bank for maybe a drawdown on a personal
2    credit line to match the dates where monies were already
3    deposited.
4    Q.   Okay.  And can you go to the top of the e-mail, please.
5    Okay.
6            And this is all happening in the beginning of June
7    4th, 2012?
8    A.   Correct.
9    Q.   Okay.  That was the date after meeting with the
10   defendant, Mr. Guy Jean-Pierre, in Boca Raton, right?
11   A.   That's correct, yes.
12   Q.   Okay.  Can I have page 1 -- or, excuse me, I guess --
13   let me have page 4.  Thank you.
14           And, sir, on your screen -- if you can't see it in
15   your binder -- that's -- what is this document?
16   A.   These are the actual promissory notes, credit line
17   agreements, I was referring to earlier.
18   Q.   Okay.  No convertible feature?
19   A.   No convertible feature.
20   Q.   Okay.  So let me slow down a little bit.  You stated
21   that as part of this due diligence package, the company Nick
22   Malino ran wanted to see what's called a -- wanted to see
23   more about the notes that were listed in the 2011
24   financials.
25   A.   Correct.

Direct - Bodden

1     Q.    And that would also include the first quarter, at least
2     at this time, for 2012.
3     A.    That's correct.  Yes.
4     Q.    Okay.  And so how were they listed again in the reports
5     in 2011 --
6     A.    Just unsecured -- unsecured notes.
7     Q.    And, again, based upon your testimony, that was
8     essentially debt.
9     A.    Debt.  FusionPharm debt that owed to MeadPoint and
10    Bayside.
11    Q.    Who was owned by Billy Sears.
12    A.    Owned by Bill Sears, correct.
13    Q.    So the company owned its owner debt?
14    A.    Yes.
15    Q.    So Billy Sears's own company, FusionPharm, owed him
16    money through Bayside and MeadPoint?
17    A.    Correct.  Yes.
18    Q.    Whew.  All right.  And then -- but just having it
19    listed as debt wasn't good enough.
20    A.    Well, yeah, it wouldn't be good enough for a financing
21    deal because they'd have to know the terms of what this debt
22    was, who was it owed to.  All that would have to be flushed
23    out in due diligence.  They want -- they want to have an
24    accurate picture of the company's financial condition --
25    Q.    Okay.

Direct - Bodden

1   A.   -- who it owed money to, what are the terms of the --

2   of those transactions.

3   Q.   So you had to do what's called, as you explain, a

4   credit line agreement?

5   A.   Credit line agreement, right.

6   Q.   Okay.  And so was that based upon the deposits that

7   were made in 2011?

8   A.   Well, the problem with just saying it's debt is that

9   the monies didn't come in one lump sum.  Like I said, they

10  came in in various amounts at various times.  So the only

11  vehicle that kind of matched that type of drawdown -- again,

12  we're putting this together after the fact -- is -- would be

13  like a credit line because, if anything else, you can't --

14  it would seem nonsensical to have, you know, eight different

15  note agreements and so forth.

16          So what we decided was to use a credit line.  That

17  way you'd put a certain sum out there that was presumably

18  made available to the company and the company would draw

19  down what it needed from time to time.

20  Q.   Okay.  And who was making -- based upon the note that

21  you drafted, who was making the credit line available to

22  FusionPharm?

23  A.   MeadPoint and Bayside had the notes.

24  Q.   Okay.  Can I have Exhibit 257 brought back up, please.

25  Can I just zoom in on this box.

Direct - Bodden

1    MR. SIBERT:  Your Honor, could I just have a minute

2    and then --

3    THE COURT:  You may.

4    MR. SIBERT:  -- maybe ask for a break at that

5    point?

6    THE COURT:  You may.

7    MR. SIBERT:  Thank you, Your Honor.  I appreciate

8    that.

9    BY MR. SIBERT:

10   Q.   And, again, when you were saying that money was coming

11   into FusionPharm, you were talking about these deposits?

12   A.   Correct.  Yeah.  These and others.  These are just the

13   ones that I -- I -- it wasn't obvious where they were coming

14   from.

15   Q.   Right.  And so there will be some before and after

16   these dates?

17   A.   Correct, yes.

18   Q.   And where did these deposits come from?

19   A.   MeadPoint and Bayside.

20   Q.   And so these deposits, were these deposits, or similar

21   deposits, were -- were these the deposit that you used as

22   part of creating this credit line?

23   A.   Correct.  These -- these were the monies that were

24   covered by the credit line.

25   Q.   So basically you had to come up with a way to explain

Direct - Bodden

1   the debt?

2   A.   Explain how the money got there, correct.  Yeah.  Or --

3   well, it was already explained as debt.  It had to be

4   formalized with a document saying, okay, this is -- that you

5   can show somebody asking what's this debt about, here's the

6   document that explains what the debt --

7   Q.   And because --

8   A.   -- is and who owns it.

9   Q.   And because of the way the money was coming into

10  FusionPharm based upon stock sales, it's not like a note

11  when you buy a house, you get it all at once?

12  A.   Right.  No, it's not like borrowing $100,000, somebody

13  gives you 100,000.  This came in 9,000, 15,000, 25,000, you

14  know, weeks apart, or sometimes, you know, in a regular time

15  kind of periods.

16  Q.   So you don't think Mr. Malino would have thought there

17  was -- well, you didn't want to create 15 or 20 notes?

18  A.   Right.  If this was -- this was -- I mean, if -- he

19  could have had a problem with this as well, but it seemed

20  less of a problem than, you know, having, you know -- at

21  least I would say, 10 or 15 different notes on different

22  dates.

23          MR. SIBERT:  Your Honor, thank you for that little

24  additional time.  I think this is -- probably would be a

25  good time for our lunch hour.

Direct - Bodden

1        THE COURT:  Okay.

2        MR. SIBERT:  And if you want to go longer -- I

3   disagree with my cocounsel, the hour goes too quick.

4        THE COURT:  Well, I agree, it goes very fast, but

5   we got going.  All right.  We'll take our lunch recess at

6   this time, ladies and gentlemen.  We'll be in recess until

7   1:30.

8        MR. SIBERT:  Thank you, Your Honor.

9        (Jury left at 12:19 p.m.)

10       THE COURT:  All right.  Two things.  First, Mr.

11  Bodden, although you probably won't have much of an

12  opportunity to do so, I'm instructing you not to speak with

13  any of the lawyers during the lunch recess.

14       THE WITNESS:  Okay.

15       THE COURT:  Mr. Sibert -- there you are -- when

16  he's done, do you want me to have the jury out of the

17  courtroom while he's escorted out of the courtroom?

18       MR. SIBERT:  Yeah, I --

19       THE COURT:  Or does it matter to you?

20       MR. SIBERT:  If the Court would entertain that.

21  Because I think they understand he has a conviction, but I

22  don't think they understand he's in custody --

23       THE COURT:  Yeah.

24       MR. SIBERT:  -- at this point.

25       THE COURT:  Do you think that's really --

Direct - Bodden

1        MR. SIBERT:  Do I think it's important at this

2    point?

3        THE COURT:  -- important at this point?  I mean,

4    I'll do it if you want.  I'll just ask them to step outside

5    for two minutes.

6        MR. SIBERT:  Let me just see how it's going and if

7    I don't think we need to break, I'll just roll and say I'll

8    pass the witness, or I'll finish --

9        THE COURT:  No, no, I'm saying -- I'm going to ask

10   you may this witness be excused?

11       MR. SIBERT:  Yes, sir.

12       THE COURT:  So how do I know if you want the jury

13   to be on the other side of that door?

14       MR. SIBERT:  Yeah, I would rather the jury to be

15   outside the presence of --

16       THE COURT:  All right.  I'll tell them to step

17   outside for two minutes.

18       MR. SIBERT:  I appreciate that, Your Honor.  Your

19   Honor, thank you.

20       THE COURT:  We're in recess.

21       (Recess taken 12:21 p.m.)

22                   AFTERNOON SESSION

23       (In open court in the presence of the jury at 1:33

24   p.m.)

25       THE COURT:  Mr. Bodden, I remind you you remain

1    under oath.

2              THE WITNESS:  Yes, Your Honor.

3              THE COURT:  All right.  Mr. Sibert, you may resume

4    your examination.

5              MR. SIBERT:  Thank you, Your Honor.

6    BY MR. SIBERT:

7    Q.   All right.  Good afternoon now, Mr. Bodden.

8    A.   Good afternoon.

9    Q.   We were -- we left off before the lunch break regarding

10   some discussion about a note agreement with a line of credit

11   that was going to a Mr. Nick Malino, and this was being

12   created shortly after you came back from Boca -- came back

13   from Florida after seeing Mr. Guy Jean-Pierre with William

14   Sears.

15             Can you look at Government Exhibit 246 for me.

16             Can I have that published.

17   A.   Yes, I have it.

18   Q.   Okay.  And essentially can you tell the jury what

19   you're talking about, what your -- your subject in this

20   e-mail is the Bayside loan document, followed with the

21   attachments of loan drawdown request.

22   A.   Yes.  What I've sent to William Sears here is the --

23   the loan documents and the drawdown request.  So basically

24   it's the promissory and credit line, the other exhibit, but

25   these drawdown requests are requests for money that

1   FusionPharm would be making to, in this case, Bayside based
2   on the deposits that were already made previously.
3   Q.  Okay.  And the date of this e-mail is June 6th, 2012?
4   A.  Yes, sir.
5   Q.  All right.  Can you look at page 3 of that document.
6   Can I have that published.
7           Okay.  So can you tell me what's on page 3 here.
8   A.  This is one of the -- the drawdown requests, basically,
9   for -- wish to borrow a loan in the following terms,
10  drawdown for $92,000.  Gives the FusionPharm bank account,
11  and it's for Scott Dittman to sign.
12  Q.  Okay.  So essentially this document is what you're
13  providing Mr. Nick Malino to show the first drawdown; is
14  that correct?
15  A.  Correct, yes.
16  Q.  And the line of credit?
17  A.  The line of credit, right.
18  Q.  So let's slow down.  So it's going to be from
19  FusionPharm; is that right?
20  A.  It's going to be from FusionPharm to Bayside.
21  Q.  All right.  And then why is the date -- you're writing
22  these e-mails in June 2012.  Why is the date May 2d, 2011?
23  A.  Because the dates had to match the actual date the --
24  or near the date that the company got the money, because the
25  money was already in the account.

Direct - Bodden

1    Q.   All right.  And so essentially what you're saying is

2    the $92,000 -- excuse me, 9- -- excuse me, 92- -- I never

3    make this kind of money -- so $92,250, that was put into the

4    FusionPharm bank account?

5    A.   Those amounts were already paid, yes.

6    Q.   Okay.  That's why you had to backdate it to May 2d,

7    2011.

8    A.   That's correct.

9    Q.   And then, again, the bank account is Wells Fargo and

10   the account number is right there.

11   A.   Yes, sir.

12   Q.   Can you just look through the remaining three pages of

13   that document?

14        THE COURT:  What exhibit are we on, Mr. Sibert?

15   What exhibit are we on?

16        MR. SIBERT:  246, Your Honor.

17        THE COURT:  246.

18   BY MR. SIBERT:

19   Q.   Can you just look through pages 4 through 8.

20   A.   Yes.

21   Q.   Essentially, are those the same type of letters?

22   A.   Same letters, yeah.  These would be the other date that

23   monies were deposited starting, I guess, December 1st of

24   2011 -- or maybe September, and then June 1st, 2011.  These

25   were where monies were already deposited in the accounts so

Direct - Bodden

1    the drawdown request were matching those deposits.

2    Q.   Let me have page 4 up real quick.  All right.  Now, the

3    date does not change; is that correct?

4    A.   The -- the drawdown request of the -- the date, yeah,

5    it says from FusionPharm, Bayside, this one is dated June

6    1st, 2011.

7    Q.   Okay.  Maybe I didn't ask the correct question.  Why is

8    a dated promissory note and credit line agreement dated May

9    2d, 2011?

10   A.   Because that would be prior to the first drawdown

11   happening, so you would have to have the agreement in place

12   before any of the deposits hit the account.

13   Q.   So this agreement never existed --

14   A.   No.  No, no documentation whatsoever were for the --

15   existed when I got there for the deposits.

16   Q.   All right.  And, again, this e-mail is in June 2012, so

17   now you're talking about an agreement that was made up

18   sometime in 2012, but backdated to May 2d, 2011?

19   A.   Yes, sir.

20   Q.   Okay.  And then as you stated, the last of that page 3

21   was May, this one is now the June deposit; is that

22   correct?

23   A.   Correct, yes.

24   Q.   And then the rest of the pages, no changes with the

25   account number or the bank number.

Direct - Bodden

1    A.   No.  No changes for the -- I don't think so.  No.

2    Q.   Just --

3    A.   No change to the bank, just the dates that the

4    drawdowns were being made.

5    Q.   And just the amounts?

6    A.   And just the amounts, correct.

7    Q.   Okay.  Okay.  Can you look at page -- or, excuse me,

8    Exhibit 47.  I say Exhibit 47 -- Government Exhibit 247.

9    A.   Okay.

10   Q.   So what are you sending Mr. Sears in this e-mail?

11   A.   This -- the very same thing, only for the company

12   MeadPoint instead of Bayside this time.

13   Q.   Okay.  Again, this is happening on June 6th, 2012?

14   A.   Correct, yes.

15   Q.   And then can I have page 3, please.  Okay.  So can you

16   explain to the jury what page 3 is showing.

17   A.   Page 3 is a drawdown request, again for $50,000, dated

18   June 15th, 2011.  It will be -- because the credit line --

19   the promissory note and credit line agreement's dated also

20   June 15th, this would be the first drawdown covered under

21   that agreement to -- from FusionPharm to MeadPoint asking

22   for monies to be advanced under this credit line.

23   Q.   I see.  Just so I understand, June 15th, 2011, at the

24   top, is the date of what?

25   A.   It's the date of the drawdown and the date of the

Direct - Bodden

1      agreement.

2      Q.   And then the promissory note and credit line agreement

3      is dated June 15th, 2011?

4      A.   Correct.

5      Q.   We're in June 6th, 2012?

6      A.   Yeah.  A year later.

7      Q.   All right.  So did that document exist?

8      A.   No, it didn't.  None of the -- no documents existed for

9      the MeadPoint deposits either.

10     Q.   Okay.  And we're looking at the amount here.

11     A.   50,000.

12     Q.   And then, again, the bank information with the bank

13     account number.

14     A.   Correct.

15     Q.   Can I have page 4 -- or page 5.

16          And quickly on page 5, it shows a different date

17     for the deposit.

18     A.   Right.  December 1st, 2011.

19     Q.   Okay.  But the same date for the promissory note and

20     credit line agreement?

21     A.   Correct, yes.

22     Q.   And with a different amount being deposited?

23     A.   Yeah, in this case, $8,000.

24     Q.   Okay.  That would be the same for the next -- that was

25     the last one.  There was only two --

Direct - Bodden

1    A.   There were three, the 50,000; page 4, which is the
2    15,000; and then that one for 8,000 on December 1st.
3    Q.   Okay.  All right.  Can I have Government Exhibit 250.
4    All right.
5         What are you sending in this e-mail Mr. Bodden?
6    A.   This e-mail -- okay.  It's from me to William Sears and
7    Scott Dittman and Guy Jean-Pierre.  I'm basically explaining
8    that most of the due diligence questions that Capital Line,
9    or Nick Malino's firm, has sent me I can answer from the
10   filings or information I already have, but I need their -- I
11   need them to provide me with the following information, 1
12   through 7, as soon as they could.
13   Q.   All right.  And so this subject here is that due
14   diligent package for the note that you created in June of
15   2012 regarding Mr. Nick Malino; is that correct?
16   A.   Correct, yes.
17   Q.   And Mr. Guy Jean-Pierre is being cc'd on this e-mail.
18   A.   Yes, he is.
19   Q.   So is it -- you're essentially keeping Mr. Dittman and
20   Mr. Pierre, I guess, for lack of a better term, in the
21   know-all of what is happening with --
22   A.   Yeah.  Also asking for -- letting them know the
23   information I need also, because some of this information
24   would have been -- you know, might have been known --
25   especially Guy, because he was -- you know, he -- he had had

Direct - Bodden

1   knowledge of this company prior to it being FusionPharm,

2   some of these things have to do with stock, like documents

3   and -- and forms that might have been filed prior.

4   Q.   Okay.  But there's no hiding Mr. Sears' --

5   A.   No.

6   Q.   -- Mr. Sears' involvement --

7   A.   No, no.  Mr. Sears is -- he's my primary -- like I

8   said, he was my primary point of contact for any -- he was

9   spearheading any of these finance transactions, whether they

10   be with Nick Malino or anybody else.

11   Q.   Okay.  And then not only are you relying on Guy

12   Jean-Pierre's present knowledge, but you're also potentially

13   trying to figure out his historic -- any historical

14   information that he may know.

15   A.   Correct, yes.

16   Q.   Can I have Government Exhibit 251, please.

17        Okay, sir, can you tell me in this e-mail what

18   you're sending Mr. Sears, cc'ing Mr. Dittman on.

19   A.   Okay.  This is a follow-up, I guess.  It says, "In

20   addition to what I've already asked for in the previous

21   page, please provide these documents," the list of

22   documents, "or tell me if they need to be created."

23   Q.   And so why are you requesting a letter of resignation

24   from Ms. Sandra Sears?

25   A.   Because she was listed earlier on as a director of the

1  corporation, but she never -- there was no -- in the

2  corporate documents, there was no evidence that she had ever

3  resigned.  And because she's on -- I forget which one of the

4  Bayside or MeadPoint, that would make her still a -- she

5  would have to resign that position, and then after a period

6  of time be able to transact -- do this transactions because

7  her name is also on one of the parties that have the notes.

8  Q.   So she couldn't have her name on both companies?

9  A.   On both companies, and not be an affiliate.

10 Q.   Okay.  So if she was on the name for the paperwork for

11 FusionPharm?

12 A.   On FusionPharm at first, yes.  They did take her off,

13 but they -- there was no evidence of her actually ever

14 resigning.

15 Q.   Okay.  And regardless of how -- regardless of how big a

16 corporation is, the requirements do not change; is that

17 correct?

18 A.   No, they're the same whether it's FusionPharm or

19 Microsoft.

20 Q.   Okay.  Which means you have to show the paper trail.

21 A.   Correct.

22 Q.   And so here you're looking for the resignation of Ms.

23 Sandra Sears, because if you look at 4 -- or 7, she's going

24 to come up under Bayside.

25 A.   Right.  She's going to -- presumably Nick Malino or his

1734

Direct - Bodden

1    lawyers are going to -- they're doing the due diligence --
2    are going to scrutinize the documents saying, Well, she's
3    part of the company and part of the Bayside and MeadPoint.
4    Q.   Okay.  Can I have Exhibit 252, please.  And can you
5    start at the bottom of the e-mail.
6         Okay.  You're being sent an e-mail along with Mr.
7    Guy -- or Guy Jean-Pierre.  Can you tell me what this e-mail
8    is regarding.
9    A.   Yeah.  It was sent from -- the original one sent from
10   Bill to Guy and to myself, says -- now he's saying, "Circle
11   the wagons.  Get the rest of our outstanding dove" -- which
12   was clarified as docs -- "wrapped up."
13        Basically saying let's get this thing done
14   Q.   Okay.  And so let's go to the top real quick.  All
15   right.  And so, again, you kind of question what "dove"
16   meant, right?
17   A.   Right.  Yes.
18   Q.   And Mr. Sears responds back, "docs."
19   A.   Docs.  Right.
20   Q.   All right.  But when he said, "let's get this thing
21   done," what does Mr. Sears mean?
22   A.   The -- the due diligence, everything we need to -- to
23   satisfy, presumably, what Nick Malino needs to make a
24   funding decision or get -- or do the funding.
25   Q.   And the only two people that Mr. Sears sends this

Direct - Bodden

1    e-mail to are who?

2    A.    Myself and -- and Guy.

3    Q.    Okay.  And then who's going to be funded by this note

4    that you're trying to have Mr. Malino buy?

5    A.    Correct, yes.

6    Q.    Who is going to be funded if that note --

7    A.    FusionPharm.

8    Q.    Can I have Exhibit 255, please.

9          All right, sir, can you explain to me essentially

10   this e-mail that you're sending and all the attachments in

11   the e-mail.

12   A.    Yes.  This is from me to Scott Dittman, copied to Guy

13   at -- and Mr. Sears.  It's -- it's basically the information

14   that Capital Line requested in their due diligence package.

15   I'm telling Scott that -- because he would be the one

16   forwarding it, as -- obviously as representative of the

17   company, to Nick Malino, attached -- you know, various

18   documents that Capital Line -- that they requested as part

19   of their due diligence and exhibits.  If it's acceptable, I

20   will follow -- I will forward it to Nick Malino.

21         So I'm basically asking him to check out what I've

22   done.  Make sure that if he has any questions or it's

23   complete, and if it's acceptable to him, let me know and I

24   will forward it on.

25   Q.    Okay.  And why is Mr. Guy Jean-Pierre cc'd on this

1736

Direct - Bodden

1    e-mail?

2    A.   Because in -- in -- he's the legal counsel for the

3    company, or legal advisor of the company, and corporate

4    secretary.

5    Q.   Was he aware of this deal regarding this note with Nick

6    Malino?

7    A.   Yeah, I would imagine so because he's been copied on it

8    a number of times.

9            MR. BARNARD:   Your Honor, I object to the testimony

10   of "imagining," too.

11           THE COURT:   Right.

12           MR. BARNARD:   I think it must be of his own

13   knowledge, otherwise --

14           THE COURT:   Sustained.  Sustained.  Let's ask that

15   again.  And answer affirmatively only if you know that to be

16   a fact.

17           MR. SIBERT:   Yes, sir.  Thank you, Your Honor.

18   BY MR. SIBERT:

19   Q.   Sir, do you know if Mr. Guy Jean-Pierre understood the

20   terms of the note regarding Mr. Nick Malino?

21   A.   The particulars were sent to him.  I don't know if he

22   understood it.

23   Q.   All right.  Can I have page 4, please.  Can we look at

24   paragraph 16, please.

25           Under paragraph 16, who are the names of the

Direct - Bodden

1    directors of the company?

2    A.   This is all current directors:  Scott Dittman, Sandra

3    Sears as of 2010.  The resignation, then, of Sandra Sears

4    June 10 of 2011.

5    Q.   Who's the secretary of FusionPharm?

6    A.   Secretary -- the last line is November 15 appointing

7    Scott Dittman president/treasurer of the company and Guy

8    Jean-Pierre secretary of the company.  And that's attached

9    to this as Exhibit G.

10   Q.   Can I have page 5 and can I have paragraph 18 blown up.

11        Sir, can you just tell me what all these numbers

12   are.

13   A.   Okay.  This is the -- the question asks for all

14   companies and individuals who the company, being you, being

15   the company FusionPharm, has entered into a financing

16   transaction with for that past year.

17        With regard to the common stock, which is that

18   first graph starting with Mark Habeggar, those were people

19   that we had sold shares privately to -- FusionPharm had sold

20   shares privately to.  And in the second graph, all the

21   Baysides and the MeadPoints, that would be the drawdowns

22   under the credit line agreement.

23   Q.   And that's what we -- that's what you discussed

24   before -- right after the lunch here regarding the

25   drawdowns?

Direct - Bodden

1    A.    That's correct.  All those paper works and drawdown
2    requests.
3    Q.    All right.  Can I have page 20 -- or hold on.  Page 6,
4    paragraph 22.
5          Who's the name of the outside counsel?
6    A.    Tod DiTommaso.
7    Q.    Can I have page 7, No. 30.
8          What does it mean by this question, "Are all the
9    notes and conversions disclosed?"
10   A.    Meaning have we disclosed all the notes that the
11   company has issued and any conversions, what I assume would
12   be conversions of notes or conversions of -- in the case of
13   preferred stock, that they are all disclosed.
14   Q.    Okay.  So as of 6-20 of 2012, FusionPharm is
15   representing to Nick Malino that any notes or conversions
16   have been made?
17   A.    That's correct.
18   Q.    No --
19   A.    Yes.  They -- that they are representing to Nick Malino
20   that all the notes the company has and any conversions that
21   the company has made of any security has been disclosed in
22   this due diligence.
23   Q.    Were there any convertible notes?
24   A.    There was no convertible notes at this time, no.
25   Q.    And just so the jury understands, what's your

Direct - Bodden

1   understanding of conversions?

2   A.   Conversions could be any security that is convertible

3   into another security.  In this case, the note, which is a

4   debt that is convertible into equity or ownership, which is

5   stock.  So a note that's convertible into stock is a

6   convertible note.

7   Q.   And none of those existed at this time?

8   A.   No, they did not.

9   Q.   Can I have page 8, No. 32.  Sir, can you tell me who's

10  requesting copies of the promissory notes.

11  A.   It would be Capital Line requesting it.  They're -- the

12  due diligence question asks if this is a sale of promissory

13  note.  I mean, if we're trying to sell them a promissory

14  note, they want -- proof of payment or receipt of funds by

15  the borrower must be provided.  Meaning if -- if -- they

16  want to make sure that the company actually got the money

17  for the note that we're trying to sell to them.

18  Q.   All right.  Can I have page 9, No. 32.  That's good.

19       Sir, can you see page 3 -- excuse me, page 9,

20  paragraph No. 32 -- or, excuse me, page -- I guess this is a

21  carryover from page 8, paragraph No. 32.  That's a

22  continuation on page 8 -- or page 9; is that correct?

23  A.   Correct, yes.

24  Q.   Okay.  Can I have page 9, number 6 blown up.

25       Who's listed as being -- as being an employee,

Direct - Bodden

1    officer, director, or married to an officer or director?

2    A.   Okay, yeah, is the current holder an employee, officer,

3    director?  Sandra Sears --

4    Q.   Okay.

5    A.   -- as the manager of Bayside Realty Holdings, served as

6    a director of the company FusionPharm, from November 15,

7    2010, to June 8, 2011.

8    Q.   All right.  But you didn't get that -- when we go back,

9    from what you discussed, that letter of resignation didn't

10   come until 2012.

11   A.   That's correct.  Yes.  There was no -- there was no

12   letter of resig- -- no evidence of her being -- having

13   resigned.

14   Q.   Can I have page 10, No. 34(a).

15        Okay.  And who are the names and officers and

16   directors being listed here under this paragraph?

17   A.   Scott Dittman, a director, president, chief executive

18   officer, chief financial officer; and Guy Jean-Pierre,

19   secretary.

20   Q.   Okay.  And this was for FusionPharm?

21   A.   This is for FusionPharm.

22   Q.   All right.  Who did you understand at that time to be

23   FusionPharm's primary security lawyer?

24   A.   At this -- this time, I kept sending things to Guy.

25   Q.   Okay.  And when you say "Guy," is that Mr. --

Direct - Bodden

1    A.    Guy Jean-Pierre.  Sorry, yes.

2    Q.    That's okay.  Thank you.

3          Let me ask you:  This document, we talked about

4    Sandra Sears.  Can you tell me why Mr. William Sears wasn't

5    listed for MeadPoint?

6    A.    Well, MeadPoint -- I'm not sure why he wasn't listed.

7    One was controlled by him and the other was controlled by

8    his mom.

9    Q.    Okay.  So --

10   A.    I can't remember why he set it up that way.

11   Q.    All right.  But he's not listed under either Bayside or

12   MeadPoint in this disclosure package that you're doing for

13   due diligence regarding Mr. Nick Malino --

14   A.    I believe he is listed as the -- as the -- on page 9

15   for MeadPoint Venture partners, attention William Sears, as

16   a point of contact.

17   Q.    Okay.  But under -- let me bring up 6 again, then --

18   A.    Uhm-hum.

19   Q.    -- of 9.  Page 9, paragraph 6.

20         Shouldn't Mr. William Sears be listed under

21   paragraph 6 --

22   A.    Yes, he should -- he should be there, as at least an

23   employee, if not more.

24   Q.    Okay.  And why wasn't he listed?

25   A.    Same reason as before.  The due diligence would pick up

1742

Direct - Bodden

1    his criminal conviction and he would be -- he would have to

2    explain his role in the company.

3    Q.   Can I have page 12, please.

4         Sir, is this the signed promissory note?

5    A.   Correct.  Yes.

6    Q.   And there was no conversion option in that note.

7    A.   No, no.  These notes were not convertible at that time.

8    Q.   Okay.  Can you please look at Exhibit 256 quickly.

9         Can you just explain that e-mail that you're

10   sending to Mr. Nick Malino.

11   A.   Okay.  It's a -- "Please find attached" -- right.  I'm

12   sending this off to Nick Malino, copy to William Sears

13   and -- and Milton Barbarosh.  I'm asking Nick to confirm

14   that -- here's the -- basically here's the due diligence you

15   asked for.  Please let me know you have it -- or me and

16   Scott know that you received it.  And let me know if you

17   have -- if you require any additional information, I'll try

18   to get it for you -- or I'll run it down, as I said.

19   Q.   So this was essentially the same exact -- all the

20   attachments on here were exactly the same as the ones we

21   just went over in Government Exhibit 25- --

22   A.   Correct, those are the ones I sent previously to

23   everyone to -- to basically review and get back to me for

24   anything -- if they needed anything else.

25   Q.   Okay.  So this was essentially the final package for

Direct - Bodden

1       Mr. Nick Malino's review?

2       A.    Correct.

3       Q.    In order to see if he would buy the note?

4       A.    Right.  And I said, "Once you've completed a review, we

5       can discuss the next steps," which is presumably getting

6       into the terms of a deal.

7       Q.    Okay.  So can you tell me what happened with this

8       promissory note through Bayside with Mr. Nick Malino.

9       A.    I don't -- I don't remember precisely why it fell

10      apart.  I think it had something to do with price, but it

11      never materialized.  He -- he didn't -- he didn't want to do

12      it.

13      Q.    Okay.  So the deal was not accepted?

14      A.    That's correct, yes.

15      Q.    Okay.  So did FusionPharm receive any money?

16      A.    No, from Nick Malino, no.  Or not to my knowledge, no.

17      Q.    Do you know when this deal fell through, did

18      FusionPharm try to raise money through a 504 offering?

19      A.    Right.  Yes.  It did.  We -- it was a -- a priority to

20      get a -- the offering document updated, 504, which is a

21      private offering document, to try to sell company shares

22      that way.

23      Q.    Okay.  Explain to me what it means by a private

24      offering.

25      A.    Well, unlike an IPO, which is an offering to the

1    public, you can sell shares to individuals if they meet

2    certain criteria regarding net worth, income, investment

3    sophistication, and so forth, privately in a private

4    transaction, meaning you can just sell it, you know, without

5    going through an exchange or over-the-counter market.

6    Q.   And FusionPharm sold shares privately?

7    A.   It did, yes.

8    Q.   Okay.  What would happen to -- are those shares

9    free-trading or what --

10   A.   Those would be restricted, right.

11   Q.   Okay.  And are they restricted because it's a private

12   sale?

13   A.   Correct, yes.  It is a -- it is a holding period which

14   would have to be -- you would have to hold it a certain

15   amount of time before you could get it -- get the

16   restriction lifted so that you could sell it at -- you know,

17   through your broker.

18   Q.   Is it harder to sell restricted shares than

19   free-trading shares?

20   A.   Oh, quite a bit, just because people have to hold it

21   for a -- I think it's a year, a holding period and anything

22   could happen with these small companies in a year.  Whereas

23   free-trading shares gives a person instant liquidity.  Any

24   time you want to sell it, they can go to the market and tell

25   their broker to sell it.

Direct - Bodden

1    Q.   So there's -- in a 504 private offering, the selling of
2    restricted shares, risk is higher?
3    A.   The risk is higher, right, because you have to hold it
4    for a certain period of time.
5    Q.   Can I have Exhibit 253, please.
6              And, sir, what are you sending Mr. Guy Jean-Pierre
7    in this e-mail?
8    A.   The copies -- I was asked to draft a 504 offering
9    document.  This is what I'm sending Mr. -- Mr. Jean-Pierre
10   right there.  I had -- "Guy, Bill asked me to forward these
11   for your review."
12             MR. SIBERT:  Okay.  Your Honor, I think at this
13   time, I need to probably move this into evidence.  It's been
14   stipulated to.
15             THE COURT:  We're talking about 253?
16             MR. SIBERT:  Yes, sir.
17             THE COURT:  All right.  Given the stipulation of
18   the parties, Exhibit 253 is admitted into evidence and may
19   be published to the jury.
20        (Government's Exhibit 253 received)
21             MR. SIBERT:  Can I just have a second, Your Honor?
22             THE COURT:  You may.
23             MR. SIBERT:  Your Honor, in addition to that
24   exhibit, these exhibits have been stipulated to and I would
25   like to move them into evidence at this time, starting with

Direct - Bodden

1    Exhibit 265, 266, and 273.

2         THE COURT:  Given the stipulation of the parties,

3    Exhibits 265, 266, and 273 are admitted into evidence and

4    may be published to the jury.

5         (Government's Exhibits 265, 266, and 273 received)

6         MR. SIBERT:  Thank you, Your Honor.

7    BY MR. SIBERT:

8    Q.   All right.  Can I have that e-mail published again --

9    thank you.  All right.

10        I circled this e-mail on the screen.  So could you

11   just, again, repeat:  You're sending Mr. Guy Jean-Pierre an

12   e-mail; is that correct?

13        THE COURT:  Hold on, hold on, counsel.  You just --

14   we were just talking about four different exhibits, so which

15   one are we on?

16        MR. SIBERT:  I'm sorry, what's being published is

17   Exhibit 253.

18        THE COURT:  All right.

19        MR. SIBERT:  I just looked at the screen.  I

20   apologize, Your Honor.

21        THE COURT:  That's all right.  That's all right,

22   but we have to have the -- make the record clear.

23        MR. SIBERT:  I understand.  Thank you.

24   BY MR. SIBERT:

25   Q.   Okay.  So just -- just to be clear, we're looking at

Direct - Bodden

1    Exhibit 253, page 1, and I'm asking you about the top
2    portion of the exhibit, which is an e-mail.  Can you
3    describe why you're e-mailing Mr. Guy Jean-Pierre.
4    A.    Because Bill -- William Sears has asked me to forward
5    the drafts of the 504 offering documents to Guy for his
6    review.  That's what I'm doing right there.
7    Q.    All right.  So it says see -- or you said "Bill," is
8    that William Sears?
9    A.    That's correct.
10   Q.    So he wants Mr. Guy Jean-Pierre to review these
11   documents?
12   A.    Review the 504 documents, correct.
13   Q.    Can we look at page 4 -- can you look at page 48.  Can
14   you blow up the bottom, please.
15          All right.  So this e-mail has a pretty large
16   attachment; is that correct?
17   A.    Right.  It has the -- the actual 504 document, or
18   draft.
19   Q.    Okay.  And essentially can you tell the jury what
20   you're giving regarding this 504 document, why such a
21   large --
22   A.    Well, because you're laying out everything an investor
23   might need to make a decision whether they want to invest in
24   this company -- the company's business.  Again, you know,
25   its debt -- its financial condition, its management,

1    shareholders, every -- just about -- quite a bit of

2    information about its business and its business plans going

3    forward.  And also a 504 would have -- unlike the reports,

4    would have risk disclosures, basically you could lose all

5    your money and all these bad things could happen to the

6    company or the company's business, and this is how it could

7    go out of business, or -- so basically gives you an idea of

8    what's going on with the company, who's running it, what's

9    its financial condition, and what could go -- what the

10   company thinks could go wrong.

11   Q.   And this would include disclosing officers and

12   directors of the company?

13   A.   That's correct.

14   Q.   Okay.  And blow up the section here.

15        Mr. Guy Jean-Pierre is listed as the corporate

16   secretary and legal counsel; is that right?

17   A.   That's correct.

18   Q.   And this is as of June 2012 now.

19   A.   Right.

20   Q.   Okay.  And it lists here that he specializes in what

21   type of law?

22   A.   Specializes in corporate transactional and securities

23   law matters for small- and medium-sized businesses.

24   Q.   Okay.  And as you go down, it gives a breakdown of his

25   experience; is that correct?

Direct - Bodden

1    A.    That's correct.

2    Q.    Okay.  And then it states he was actually a senior

3    attorney for the Federal Deposit Insurance Corporation.

4    A.    Right.  Yes.

5    Q.    Okay.  And, finally, it tells that he holds a JD from

6    Columbia University School of Law.

7    A.    That's correct.

8    Q.    And bachelor of arts degree from Amherst College.

9    A.    Correct, yes.

10   Q.    And can I have page 49.  Can you please blow up Family

11   Relationships.

12         Are there any family relationships listed in this

13   disclosure?

14   A.    No, there's no family relationships between the

15   management and directors.

16   Q.    And as you've testified, Robert Dittman was William

17   Sears' brother-in-law.  Why wasn't that disclosed?

18   A.    Consistent with every other reporting, Bill did not

19   want to be mentioned in this or any other corporate

20   documents of the company.

21   Q.    Thank you.

22         Okay.  So we talked about this promissory note,

23   that was a Bayside promissory note that was trying to be

24   sold to Mr. Nick Malino.

25   A.    Correct.

1    Q.   Now, at some time, did FusionPharm decide to make these
2    notes convertible?
3    A.   It was right -- around the time after the -- the -- the
4    transaction with Capital Line, Nick Malino, fell through,
5    the 504 offering, obviously wasn't -- money was tight.  They
6    weren't raising any -- much from the 504, and so the
7    decision was made to turn the notes into convertible notes.
8    That way they could be converted and you would have
9    free-trading stock because you could convert the notes
10   because, under certain circumstances, you convert those
11   notes to stock, and if you get that stock cleared, you could
12   do like you've done before, which is sell stock to fund the
13   company through MeadPoint and Bayside.
14   Q.   So what would these convertible promissory notes allow
15   FusionPharm to do?
16   A.   The convertible -- the promissory notes would allow
17   MeadPoint and Bayside to convert their notes into stock and
18   free up that stock.  They would, again, like they were doing
19   at first, sell that stock in the open market and then put it
20   back into FusionPharm.
21   Q.   Okay.  And is there a holding period regarding a
22   convertible promissory note in reference to specifically
23   with the stock?
24   A.   It would be the same as a stock, so if you -- the
25   promissory note would fall under the same holding period as

Direct - Bodden

1  a stock.  So if you had to hold a stock a year, you would

2  have to hold a promissory note a year.

3  Q.   Okay.  How about if there's a drawdown of a line of

4  credit regarding the deposit for a certain amount of stock?

5  A.   Then it would depend whether -- it depended when the --

6  the facility was closed.  Then the start date -- the -- my

7  understanding of the law is that the holding period doesn't

8  start in a case like this until the facility's closed,

9  meaning you said that's -- you've gotten all the money we're

10  going to get, or you've reached a -- your limit, and then

11  that facility's closed and then -- then the holding period

12  would start after that.

13  Q.   Okay.  So when you're talking about when it's closed,

14  are you talking about when it's the last time a deposit --

15  A.   The last time the company requests money, right, or

16  when it's reached its limit.  Whatever limit the facility

17  was given to it.  If -- if it is a Wells Fargo $250,000

18  facility, then when you've borrowed $250,000 and that

19  facility will be closed, and then the note -- your holding

20  period for that note would start then.

21       If the $250,000 note -- you only need $100,000, you

22  said that's all we need, thank you very much, then you would

23  close it, and then the holding period would start again.

24  That was my understanding.

25  Q.   And that's in order for the company that gets the

Direct - Bodden

1    shares -- in this case Bayside-MeadPoint, that's so the

2    shares are not restricted any longer?

3    A.   That's -- that's -- that's correct.  That's so that

4    the -- bond holder who now has stock can take it to the

5    transfer agent and get the restriction removed because it

6    will be issued with a restriction, the stock.

7         So to get the -- whether you're doing that over a

8    period of time or you're doing that the same time you're

9    converting, if the holding period has -- has -- has been

10   completed, then you could get that restriction removed and

11   it will be free-trading.

12   Q.   Can we look at Exhibit 265.

13        Okay, sir, I see this e-mail from Randy Bodden.

14   A.   Uhm-hum.

15   Q.   Who is Randy Bodden?

16   A.   That is my -- well, that's what my family calls me,

17   Randy Bodden.  That's me.

18   Q.   All right.  So Randy Bodden is the same person as what

19   we've seen in the past?

20   A.   That's correct.  Cliffe Bodden.

21   Q.   All right.  So why did you start going by Randy Bodden?

22   A.   Because this is November 2012.  I had, by that time,

23   pleaded guilty to wire fraud and -- well, my Google profile

24   wasn't the best.

25   Q.   It wasn't being lit up --

Direct - Bodden

1  A.   I was -- uh-huh.  I Googled it -- I Googled like a

2  nightmare.

3  Q.   Okay.  All right.  So it calls less attention to

4  yourself if you're going by Randy?

5  A.   That -- that's correct, yes.  Yeah.

6  Q.   All right.  I appreciate your candor.  All right.  So

7  who are you sending this e-mail to?

8  A.   I'm sending that to William Sears -- Bill.

9  Q.   Okay.  And what's the more important subject and what

10  is attached?

11  A.   "Please see the attached," which would be the

12  convertible now, promissory notes.  And I'm telling them

13  these notes now work with the existing drawdown request.  So

14  we had the drawdown request, like the earlier exhibits, for

15  the notes as they were at that time.  So I'm just basically

16  saying that this new note also works with those drawdown

17  requests.

18  Q.   So you -- for a person like me in order to understand,

19  you didn't recreate the wheel?

20  A.   No.  They asked -- they asked that the notes now be

21  convertible, so I just went on and got a convertible note

22  template and -- and provided that to them, and making sure

23  that it was a similar type of facility.

24  Q.   Okay.  And, again, the deposit dates were the same as

25  the one previous for Bayside and MeadPoint?

Direct - Bodden

1    A.   Correct.  Yeah.  Because the -- the constant in all

2    this was the date that the money actually showed up on the

3    bank accounts.

4    Q.   Can we look at page 3, please.  Or give me a minute.

5         Can we have page 5, please.  I'm sorry, can we go

6    back to 3.  Can you get rid of the red?  Thanks.

7         Okay.  Again -- again, we have a title 10%

8    Convertible Promissory Note; is that right?

9    A.   That's correct.

10   Q.   And Line of Credit Agreement.

11   A.   Right.  It's still had to be the same line of credit

12   agreement for the reasons I stated earlier, how the money

13   came in.

14   Q.   All right.  The date of the note, May 2d, 2011.

15   A.   Right.  That was the -- the -- the date where the first

16   drawdown or the first time the company got money.

17   Q.   Okay.  So why are you dating the note May 2d, 2011,

18   when this e-mail is being sent November 26th, 2012?

19   A.   It's being backdated to match the previous note, which

20   was backdated to match the date the company actually started

21   receiving money from -- from this -- in this instant -- or

22   in this instance, Bayside.

23   Q.   All right.  Because Bayside here is agreeing to give

24   how much to FusionPharm?

25   A.   Up to $275,000.

Direct - Bodden

1   Q.   And Bayside, again, is who?

2   A.   William Sears.

3   Q.   Can I have page 5, please.  Okay, can I have this first

4   paragraph blown up.

5        This is the conversion paragraph; is that right?

6   A.   That's correct, yes.

7   Q.   What is Mr. Sears' option to convert debt into equity,

8   or debt into shares, what would it cost Mr. Sears under

9   Bayside to purchase a share of FusionPharm stock?

10  A.   1 cent per share.

11  Q.   That's right there, right?

12  A.   Yeah.  But I'm -- at his option, he could convert the

13  principal and any unpaid interest on the date of conversion

14  by 1 cent.

15  Q.   So any time Mr. Sears wanted to convert this Bayside

16  note, could he get one common share of stock for 1 cent?

17  A.   Correct, yes.

18  Q.   And in your experience, is that a good conversion

19  rate?

20  A.   That's a very good conversion rate.

21  Q.   Why do you say "very good"?

22  A.   Because the -- public stock price at this time was a

23  bit high -- a bit higher than that, if I recall correctly.

24  Q.   Well, this note is being made up in June of 2012; is

25  that right?

Direct - Bodden

1    A.    Correct, yes.

2    Q.    11-26-2012.  That's the date of the e-mail, right?

3    A.    Right.  Yes.

4    Q.    And can I have Government Exhibit 291 shown, please.

5    Can I -- can you flip through the page.  I'm going to need

6    to go -- another page, please.  Can I have the next page,

7    next page.  Next page, please.  And one more.  Can you go up

8    a little bit?  And one more page.  Okay.  Actually -- go

9    back down.

10         Actually, in between November 21st and November

11   27th, 2012, FusionPharm stock was trading at between $1.30

12   and $1.40, right?

13   A.    That's correct, yes.

14   Q.    And Mr. Sears now has the option to buy for a penny?

15   A.    For a penny.

16   Q.    Okay.  Can I go back to Government Exhibit -- well,

17   let's just stay on this real quick.  We'll go -- let's go to

18   Exhibit 265.  And can I have page 11.

19         Okay, sir, can you explain to the jury what they're

20   looking at here on the screen.

21   A.    This is a similar note, only this one is for MeadPoint

22   Venture partners.

23   Q.    Okay.  And who's MeadPoint?

24   A.    MeadPoint is -- well, Bill Sears.

25   Q.    Okay.  And, again, what's the date of this note?

Direct - Bodden

1     A.    June 15th, 2011.

2     Q.    And is that a backdated --

3     A.    It is backdated to match the previous promissory note,

4     which was backdated to match the first time the company got

5     monies from -- from MeadPoint.

6     Q.    Can I have page 13, please.  And can I have the

7     conversion rate blown up.

8           And if Mr. Sears, through MeadPoint, wants to

9     convert his debt into equity in FusionPharm shares, what's

10    his conversion rate?

11    A.    1 cent per share.

12    Q.    And, again, this note that you sent was on November

13    26th, 2012?

14    A.    Correct, yes.

15    Q.    And as we just looked at, the stock was being sold for

16    between $1.30 and $1.40.  Did you know of any other

17    shareholders at this time that was getting a conversion rate

18    of point 01 cent?

19    A.    No.   There was no other notes that were convertible.

20    Q.    And the major change in these two notes that we just

21    discussed was adding that convertible feature.

22    A.    Correct.  That's what was requested to make the notes

23    convertible.

24    Q.    Okay.  So once these -- can you bring this down,

25    please.

Direct - Bodden

1    What happened after these notes were drafted to

2    include the convertible option?

3    A.   I sent them to -- to Bill to basically review, I

4    think.

5    Q.   And why was Mr. William Sears involved?

6    A.   Like I said, anything to do with -- with financing,

7    and, plus, he actually would be the one -- anything to do

8    for financing with FusionPharm, Bill was spearheading

9    anyway, but he would be the actually -- the actual one using

10   these -- these notes because he was in control of MeadPoint

11   and Bayside.

12   Q.   All right.  Now, did these -- were there ever packages

13   sent to the transfer agent regarding these convertible notes

14   requesting stocks of share to be placed -- to be converted

15   into stocks for Bayside and MeadPoint?

16   A.   Yeah.  Yeah.  The -- the whole point of the exercise

17   was that he could revert back to the -- to the method he was

18   raising money for the company before, which was to sell --

19   to convert now the notes back into free-trading shares and

20   then begin to sell those shares again to raise money for the

21   company.

22   Q.   Okay.  And these packages that were sent to the

23   transfer agent, would they require an opinion letter from

24   the lawyer?

25   A.   Yes.  Yes.  The -- the transfer agent would usually

Direct - Bodden

1    require -- or I've never seen them not require a legal

2    opinion for anybody, actually, trying to remove a

3    restrictive legend off the stock.

4    Q.   Okay.  Can I have page -- or, excuse me, can I have

5    Exhibit 226 -- or two six six.

6         Okay, sir, you're sending an e-mail to Mr. Dittman

7    and the subject is Letter of Authentication.  Can you

8    explain what this letter of authentication is.

9    A.   This letter that I sent is a letter of authorization.

10   So basically, like I was explaining before, the promissory

11   note needs to be closed before the holding period begins.

12   This was a -- they needed a letter draft -- drafted to

13   basically do that.  So what I'm sending him is a letter

14   which would confirm that he needs no more money from Bayside

15   under the promissory note.  And I was -- asked him if it's

16   acceptable to him, please print it on his letterhead and

17   sign.

18   Q.   Okay, I'm sorry, I just want -- I said authentication.

19   After looking at the screen it's called authorization.

20   A.   Authorization, right.

21   Q.   Can I have the next page, please.  Can you go up,

22   please.

23        Okay.  Is this the letter you drafted from Mr.

24   Dittman?

25   A.   Correct, yes.

Direct - Bodden

1    Q.    Okay.  The letter is dated December 5th, 2011?

2    A.    2011.

3    Q.    Okay.  And you're talking, again, about the promissory

4    note dated May 2d, 2011.

5    A.    Correct.

6    Q.    And --

7    A.    So --

8    Q.    --right here is what you're talking about closing the

9    line of debt?

10   A.    That's what I was referring to, right.

11   Q.    Okay.  So once Mr. Dittman -- do you know if Mr.

12   Dittman signed this letter?

13   A.    I believe he did, yes.

14   Q.    Okay.  So December 5th becomes an important date; is

15   that correct?

16   A.    Yes, it does.

17   Q.    Okay.  Why is that date important?

18   A.    Because that date would be -- would signal when the

19   holding period starts, because that day he said

20   FusionPharm -- in the letter, it reads, "FusionPharm no

21   longer intends to request" any -- should be any, it says

22   "and further drawdowns under the promissory note."

23         So basically he's closing the -- the credit

24   facility and that would be when the holding period for the

25   convertible note starts.

Direct - Bodden

1    Q.   So Bayside now has shares of stock.

2    A.   It has the ability, yes.  It has --

3    Q.   Shares of stock --

4    A.   -- to convert into shares of stock, right.

5    Q.   And so now what this letter is doing is it's going to

6    tell the transfer agent that December 5th, 2011, is the

7    starting date for the one-year holding period?

8    A.   Right.  That's when FusionPharm has closed their

9    facility.

10   Q.   Okay.  So when could the shares not be restricted for

11   Bayside holding FusionPharm stock?

12   A.   December -- if it's a year, a holding period December

13   5, 2012, or December 6th, 2012, however that works.

14   Q.   So we know from the previous exhibits that we just

15   spoke about, these notes were drafted in June of 2012.

16   A.   Right.  Yes.  The first note was drafted and then

17   changed again later in that year to the convertible notes.

18   Q.   The backdating was important.

19   A.   The backdating, yes.

20   Q.   And why was it important?

21   A.   Because it would have to be -- what they're trying to

22   do is to convert notes into free-trading shares, so they

23   would have to evidence that they've held that note for over

24   a year to do that, to get past the transfer agent.

25   Q.   Can I have Exhibit 268, please.  Okay.

1      I'm going to ask you to take out of your binder

2   Exhibit 268 and start on page 6.  And take a --

3          MR. SIBERT:  Your Honor, can I have a minute for

4   this witness to just read through this exhibit?

5          THE COURT:  Why do you want him to take it out of

6   the binder?

7          MR. SIBERT:  It will be easier to move the pages,

8   because it's a chain e-mail.

9          THE COURT:  Okay.

10  BY MR. SIBERT:

11  Q.   And can you just review that exhibit quickly here.

12  A.   Okay.

13  Q.   All right, does that e-mail refresh your memory of what

14  was happening with the transfer agent?

15  A.   Yes, it does.

16  Q.   Can you explain to the jury why Mr. Sears is sending

17  you an e-mail -- forwarding an e-mail from the transfer

18  agent on December 27, 2012, regarding a convertible note?

19  A.   On December 27th, he's saying -- he's -- he's sent this

20  to me after sending it, I guess, earlier the previous day to

21  Guy.  He's gotten a response from the transfer agent, which

22  basically raises questions -- she has questions whether or

23  not the -- the -- he's able to do what he wants to do.

24  Basically convert the notes into shares.

25          It -- I kind of go through it.  He's -- he sent the

Direct - Bodden

1    information on to her on December 12th, which Bayside

2    Holdings has chosen to exercise the option to convert to

3    shares.  He said, "Aside from the legal opinion they needed

4    payment.  What else would be required?"

5           She's responded and given him some requirements,

6    but she says until the opinion letter's received with an

7    overview of the transaction, they don't know what other else

8    they might need.

9    Q.   Let me just stop you there.

10   A.   Uhm-hhm.

11   Q.   Your understanding is once -- the transfer agent was

12   not going to take off the restricted shares unless they

13   received what?

14   A.   An opinion letter.  Yeah, they --

15   Q.   Legal opinion letter?

16   A.   Legal opinion letter, yes.

17   Q.   Okay.  Let me just focus you on the screen here.

18          Who does Mr. Sears send this chain e-mail to?

19   A.   He sends this one to Guy Jean-Pierre.

20   Q.   In Mr. Sears' fashion --

21   A.   Eloquent.

22   Q.   He doesn't have a high regard for the transfer agent.

23   A.   "I need it yesterday.  This transfer ATA is an idiot."

24   Yes.

25   Q.   Okay.  And then you're forwarded this e-mail as well,

Direct - Bodden

1   right?

2   A.   That's correct, yes.

3   Q.   Okay.  Let's put that down and let's look at

4   Exhibit 269.  Are you all back together there?

5   A.   Yes.  I didn't put them back.  I put them back the way

6   I had them --

7   Q.   The Court is probably right, I should have just kept

8   them in the binder.

9        Okay.  Do you know what Mr. Guy Jean-Pierre is

10  sending Mr. Sears in this letter -- or in this e-mail?

11  A.   I think he's sending a response to the -- I know he's

12  sending a response to the questions that the transfer agent

13  was talking about.

14  Q.   Okay.  So is it fair -- and can you go to the top of

15  this e-mail, please.

16  A.   Uhm-hum.

17  Q.   And were you cc'd -- or forwarded this Mr. Guy

18  Jean-Pierre -- or Mr. Guy Jean-Pierre's response to Mr.

19  Sears' issues with the transfer agent; is that right?

20  A.   That's correct, yes.

21  Q.   Was Mr. Guy Jean-Pierre working on the issues that the

22  transfer agent was having regarding the package and opinion

23  letter?

24  A.   Yes, he was.  Yes.  Bill had asked -- basically sent

25  the -- the questions that the transfer agent had to Guy for

                        Direct - Bodden

1    comment or, you know, to work out.  That previous e-mail
2    said that.
3    Q.   All right.  And let's look at page -- or Exhibit 270.
4    What are you sending Mr. Sears now regarding a letter of
5    resignation?
6    A.   Which one is this?
7    Q.   Exhibit 270.
8    A.   270.  Oh.  Sorry.  Sears' letter of resignation Sandra
9    Sears' letter of resignation.
10   Q.   Okay.  Do you know why you were sending this to Mr.
11   Sears on December 27th, 2012?
12   A.   I imagine -- well, let me -- let me not imagine.
13   Again, because one of the issues is that -- that Sandra
14   Sears is listed as -- as the manager on -- on, I think
15   Bayside or MeadPoint, and -- but she's also of record as
16   being a director of FusionPharm.
17   Q.   Okay.  So is this a conflict for the transfer agent?
18   A.   Same -- yeah, the same as it would be under the Malino
19   transaction, yes.  You can't -- she had to have -- they have
20   to know when she resigned to see if she was still an
21   affiliate.
22   Q.   Can I have page 2 of this document.  Okay.
23            And, again, this is the letter that you drafted?
24   A.   That's correct.
25   Q.   And is that the right date?

Direct - Bodden

1    A.    No.  No.  This was -- this was backdated as well.

2    There was no evidence of her having resigned when I got

3    there.

4    Q.    Can I have Government Exhibit 271.  Okay.

5          Sir, you're forwarded an e-mail from Mr. William

6    Sears in this exhibit.  Do you know what the problem the

7    transfer agent was having now with the package?

8    A.    She was having problems with what she described as --

9    in the e-mail as factual inaccuracies in the legal

10   opinion.

11   Q.    Okay.  And then if we come up here, who has Mr. Sears

12   relied on to fix these issues?

13   A.    He's -- e-mails sent to Mr. Guy Jean-Pierre and myself.

14   Q.    And, again, this is all about the convertible

15   promissory note?

16   A.    That's correct, yes.

17   Q.    And this is going to be -- this will allow the

18   restriction of shares -- the restriction to be taken off the

19   FusionPharm shares?

20   A.    Right.  This will allow them to basically convert those

21   notes into free-trading shares of FusionPharm.

22   Q.    Can I have Exhibit 272.

23         All right, Mr. Bodden, you sent Mr. Sears a long

24   e-mail.  Can you discuss what this e-mail's about.

25   A.    Yes.  I basically said that Joanna -- my reading of the

Direct - Bodden

1   situation is that Joanna is -- which is the transfer

2   agent -- representative of the transfer agent, that she's

3   seeking additional information.  That because the face

4   value -- or the amount that was on the note, the $275,000,

5   is not the amount that the company has received, it is a

6   possibility that -- that the note is still open and,

7   therefore, if the note is still open, then there's

8   been no -- holding period hasn't started yet.  And --

9   Q.   Okay.

10  A.   -- then you can't convert.

11  Q.   All right.  So -- and what did the transfer agent rely

12  on when it came to relying on when the line of credit was

13  closed?

14  A.   Well, the -- they would rely on the documentation.

15  Q.   And how about the opinion legal letter?

16  A.   The opinion letter would speak to the -- to the

17  documentation as well, yes.

18  Q.   And can you go to the top, please.

19       And then Mr. Sears forwards this to -- he responds

20  back to you, but also cc's Mr. Guy Jean-Pierre; is that

21  right.

22  A.   That's correct.  He cc's Guy Jean-Pierre and Scott

23  Dittman.

24  Q.   Can I have Exhibit 273, please.

25       Okay.  And what are you e-mailing Mr. Guy

Direct - Bodden

1    Jean-Pierre in this e-mail?

2    A.    The drawdown request and -- the drawdown -- all the

3    drawdown requests and receipt confirmations.

4    Q.    Okay.  And do you recall -- and this is for the Bayside

5    note; is that correct?

6    A.    That's correct, yes.

7    Q.    Okay.  And just real quick, new e-mail from Mr. --

8    guyjeanpierre@yahoo.com?

9    A.    Yes.

10   Q.    Okay.  Can I have page 2 of this exhibit.  And so these

11   are the documents that you're forwarding to defendant Guy

12   Jean-Pierre; is that correct?

13   A.    That's correct, yes.

14   Q.    Okay.  And, again, backdated deposit?

15   A.    Right.  Backdated drawdown --

16   Q.    Backdated --

17   A.    -- and the actual Wells Fargo statement.

18   Q.    Okay.  But -- so backdated drawdown --

19   A.    Uhm-hum.

20   Q.    -- for $92,000 --

21   A.    Correct.

22   Q.    -- correct?

23          And also backdated promissory note with a line of

24   credit agreement.

25   A.    Correct, yes.

Direct - Bodden

1    Q.   And just so -- I'm just going to show page 3.  You

2    actually sent the bank statement -- have this blown up,

3    please.

4         And you're showing basically the amount of money

5    that was deposited in the accounts; is that right?

6    A.   That's correct.  Yes.

7    Q.   Okay.  Can we just have this blown out again.  And,

8    again, can you just focus here.

9         And basically just showing that this is a bank

10   statement, correct?

11   A.   That is a bank statement, yes, Wells Fargo.

12   Q.   And that would be FusionPharm's bank statement?

13   A.   FusionPharm, right, is the account holder.

14   Q.   And then can I have page 15.  Can you blow up that

15   deposit.

16        What's the date of the last deposit that you're

17   showing Mr. Guy Jean-Pierre?

18   A.   12-29.

19   Q.   Of what year?

20   A.   Of 2011.

21   Q.   Okay.  So, therefore, when did the -- based upon the

22   notes that were backdated, when was the last line -- when

23   was the last draw from the line of credit regarding the

24   Bayside note?

25   A.   December 29th, 2011.

Direct - Bodden

1    Q.   Okay.  And so, therefore, when does the year time
2    period start?
3    A.   December 30th, 2011.
4    Q.   All right.  So the TA could not free the shares until
5    when?
6    A.   December 30th, 2012, a year later.
7    Q.   Now, I said TA, I mean the transfer agent.
8    A.   Transfer agent, yes.
9    Q.   And all this information is now being sent to Mr. Guy
10   Jean-Pierre regarding the backdating documents?
11   A.   That's correct, yes.
12   Q.   Okay, sir, I just want to ask you:  Do you recall the
13   sale of the Bayside note?
14   A.   The sale of the Bayside note?  I know there was some
15   talk of the Bayside note being sold in the winter of that
16   year, just prior to me going to prison in February of 2013.
17   Q.   Do you recall any discussion with the Coleson Group?
18   A.   Yeah.  There was a Coleson Group under -- they're doing
19   it under another name, but yeah, the transaction was
20   closing, I think, on that February -- or the monies had been
21   received just before I was sentenced.
22   Q.   Do you know who facilitated the sale of the note?
23   A.   Bill was working on it, yeah.
24   Q.   All right.  Can we look at Government Exhibit --
25            MR. SIBERT:  Let me check, Your Honor, my page.

Direct - Bodden

1    Your Honor, at this time, the Government would like to move

2    into evidence Government Exhibit 275.  It's been stipulated

3    to.

4           THE COURT:  All right.  Given the stipulation of

5    the parties, Government Exhibit 275 is admitted into

6    evidence and may be published to the jury.

7           (Government's Exhibit 275 received)

8    BY MR. SIBERT:

9    Q.   All right.  Before I do that, can I have Government

10   Exhibit 274, please.  Is this Government Exhibit 274?  Can I

11   have that back up.  Can we focus here.  Keep going down.

12   Great.

13          Do you know what Mr. Sears' is e-mailing you here?

14   A.   Yes.  Yeah, this was the -- the transaction we were

15   talking about, this is Star City is the name I was trying to

16   remember.  He's sending me the -- the -- the agreement with

17   Star City with regard to the sale of the note.

18   Q.   And just -- can I have page 2, please.

19          And this is the agreement that Mr. Sears was

20   sending you?

21   A.   Right.  The securities transfer agreement between

22   Bayside and Star City Capital.

23   Q.   And when you say securities transfer agreement, that's

24   just a fancy way of saying Mr. Sears wanted to sell the

25   Bayside note?

Direct - Bodden

1     A.   Right.  He's going to transfer it to them, they'll
2     transfer him money.
3     Q.   Okay.  May I have Exhibit 275, please.
4          Can you look at the top part of that e-mail.  Do
5     you know what Mr. Sears is now e-mailing you?
6     A.   A markup copy of the same stock transfer agreement.
7     Q.   Okay.  And just -- can I have page 2, please.
8          So just a different version?
9     A.   That's correct.  Yes.  I can't -- I can't see it.
10    Q.   Okay.  Sir, did you ever write an affidavit, a letter,
11    on behalf of Mr. Guy Jean-Pierre to the Florida State Bar?
12    A.   I did, yes.
13    Q.   And was this based upon a complaint that there was
14    against Mr. Guy Jean-Pierre in the Florida State Bar?
15    A.   That's what I was told, yes.
16         MR. SIBERT:  Your Honor, I'm going to show the
17    witness Government Exhibit 236.  This has not been submitted
18    into evidence.
19         THE COURT:  Is it stipulated to?
20         MR. SIBERT:  It is not, Your Honor.
21         THE COURT:  All right.
22         MR. SIBERT:  So I'm going to set a foundation here.
23         THE COURT:  Go ahead.
24    BY MR. SIBERT:
25    Q.   Okay.  I believe the first -- actually, the first page

Direct - Bodden

1   is -- sir, can you just look on your screen here.  Mr. Sears

2   is sending you an e-mail; is that correct?

3   A.   That's correct, yes.

4   Q.   Okay.  And he's saying he needs it back to Guy as soon

5   as possible?

6   A.   That's correct.

7   Q.   And it has an -- attached is an affidavit, correct?

8   A.   Yes.

9   Q.   Okay.  Can you look at page 2 -- I'm going to bring it

10  up for you -- 2 and page 3 of this document.  And once

11  you've had time to look at 2, let me know and we'll put 3 up

12  there for you.

13  A.   Yes.

14  Q.   Okay.  Is that the letter that you wrote on behalf

15  of --

16  A.   I -- that's the letter that Bill sent me.

17  Q.   Okay.

18  A.   Sorry.

19  Q.   Okay.  And did you sign that letter?

20  A.   I did, yes.

21  Q.   Okay.  And so you would adopt this letter as your

22  letter --

23  A.   As my letter, correct, yes.

24        MR. SIBERT:  Your Honor, at this time the

25  Government would like to move into evidence Government

Direct - Bodden

1    Exhibit 236 in its entirety.

2              THE COURT:  Any objection?

3              MR. BARNARD:  No objection, Your Honor.

4              THE COURT:  All right.  There being no objection,

5    236 is admitted into evidence and may be published to the

6    jury.

7         (Government's Exhibit 236 received)

8    BY MR. SIBERT:

9    Q.   Okay.  Can I have Government Exhibit 237 brought up,

10   please.

11             MR. SIBERT:  And this has not been admitted into

12   evidence, but it is stipulated to, Your Honor, and I move

13   for admission at this time.

14             THE COURT:  All right.  Given the stipulation of

15   the parties, Government Exhibit 237 is admitted into

16   evidence and may be published to the jury.

17        (Government's Exhibit 237 received)

18   BY MR. SIBERT:

19   Q.   And how did Mr. Guy Jean-Pierre respond back to your

20   affidavit, the letter that you signed?

21   A.   He thanked me for it.  He said it looks good to him.

22             MR. SIBERT:  Your Honor, may I have a minute?

23             THE COURT:  You may.

24   BY MR. SIBERT:

25   Q.   Let me just ask you a couple last questions.  You wrote

1     a letter on behalf of Mr. Guy Jean-Pierre.  And -- and

2     about -- in responding to a Florida Bar complaint that was

3     made against Mr. Guy Jean-Pierre; is that correct?

4     A.    Yes, sir, that's correct, sir.

5     Q.    And you would agree with me it's a -- it's a pretty

6     positive letter on behalf of Mr. Guy Jean-Pierre.

7     A.    It is, yeah.

8     Q.    All right.  But you just testified here today about

9     backdating these notes, the fact that Mr. Guy Jean-Pierre

10    was sent financials, also stock shareholder accounts, in

11    addition to knowing essentially what was going on in the

12    FusionPharm.

13    A.    Right.  Yes.

14          MR. BARNARD:  Your Honor, I object.  I don't think

15    that is what the evidence showed.

16          THE COURT:  Can you rephrase?  I'm going to sustain

17    that objection.

18          MR. SIBERT:  Sure.

19    BY MR. SIBERT:

20    Q.    Well, you've testified to the fact that Mr. Guy

21    Jean-Pierre was sent financials, he was sent draft

22    disclosures, he was sent shareholders lists, he was also

23    sent accounting information, he was sent these notes,

24    several versions of them, with backdates on them, and you

25    even met him in Florida in 2012 to discuss these notes.

1    A.    Correct.

2    Q.    In your opinion, is backdating being honest?

3    A.    No.  No, backdating is deceptive.

4    Q.    Okay.  Is not disclosing William Sears being honest?

5    A.    That's also deceptive.

6    Q.    Okay.  And you would agree there are several deceptive

7    things here that we talked about.

8    A.    That's correct, yes.

9    Q.    So why would you write a letter on behalf of the lawyer

10   that knew all these deceptive things were going on about at

11   FusionPharm?

12           MR. BARNARD:  Your Honor -- Your Honor, I object.

13   That's a misstatement of the evidence.

14           THE COURT:  It's overruled.

15           THE WITNESS:  The -- what I remember around the --

16   the only thing that I considered with -- when I wrote

17   that -- when I -- the letter was drafted, when I signed the

18   letter, was that Bill had asked me to, and I had been doing

19   business with Bill.  I -- I didn't -- like a lot of this --

20   this -- like a lot of what I did for FusionPharm, I didn't

21   think about it in those terms.  I just did it because I was

22   asked to do it.

23   Q.    Okay.  And what was your situation going forward 2013?

24   A.    Oh, my situation was I got indicted in 2012, I was also

25   fighting my -- my own legal case, financially strapped,

Direct - Bodden

1    reliant on -- on Bill's business and a host of other people.
2    So anything I was basically being asked then I was -- I was
3    acquiescing to, yes, I would go along with.
4    Q.   Were you married?
5    A.   I am married, yes.
6    Q.   Okay.  And where did your wife -- what happened to your
7    wife when you went to jail?
8    A.   She moved back to her mother's house in Toledo.
9    Q.   Okay.  Did anyone make promises about helping you out
10   when you were in jail?
11   A.   Yes.  Yes.  Bill -- the old -- the real reason -- I
12   guess my motivation wasn't for the money, because it was not
13   a lot of money around when I was working at FusionPharm.
14   When I realized I was going to prison, Bill had promised not
15   only to take care of my wife, Kelly, but also when I got
16   out, I would have a position with the firm and -- and for
17   what I -- what I was seeing, you know, things were -- it
18   might seem small, you know, but -- you know, they were
19   actually making lettuce deliveries and this company was
20   actually, you know, starting to show some promise.  And so I
21   thought it was going to be something pretty significant at
22   the end of my sentence.  So it was a business of
23   nest-feathering, I would imagine.
24   Q.   And essentially did the dishonesty of these disclosures
25   work out for FusionPharm?

Cross - Bodden

1    A.    No.  No, it did not.

2              MR. SIBERT:  I'll pass the witness, Your Honor.

3              THE COURT:  All right.  Cross-examination.

4              MR. BARNARD:  Thank you, Your Honor.

5                        CROSS-EXAMINATION

6    BY MR. BARNARD:

7    Q.    Mr. Bodden, you have now gone over a number of e-mails.

8    A.    Yes, sir.

9    Q.    Unfortunately, we have to go back over a number of

10   them.

11   A.    I expected as much, sir.

12   Q.    In particular, and beginning, I'd like to look at

13   Exhibit 235.  And Exhibit 235 is a -- an e-mail from Mr.

14   Sears to Mr. Dittman with you copied on it.

15   A.    Correct.

16   Q.    And this is dealing with a business plan.

17   A.    Correct.

18   Q.    Back in March of 2011.

19   A.    That's correct.

20   Q.    And Mr. Jean-Pierre is not copied on this e-mail, is

21   he?

22   A.    No, he's not.

23   Q.    If we could have Exhibit 239, page 1, please.  The top

24   part.  Thank you.

25              This is a March 24th, 2012, e-mail from you to Mr.

1    Malino regarding FusionPharm private investor presentation.

2    A.    Correct.

3    Q.    And Mr. Jean-Pierre is not cc'd or sent a copy of this

4    e-mail or the attached documents.

5    A.    Correct.  He's not.

6    Q.    Exhibit 240.  Top section, please.

7          This is an e-mail from you on March 31st, 2012, to

8    Mr. Scott Dittman and William Sears regarding the annual

9    report for 2012.

10   A.    That's correct.

11   Q.    Neither this document -- excuse me --

12   A.    2011.  2011 this one.

13   Q.    Excuse me.  Yes.  2011.  Neither this document nor the

14   attachments regarding the 2011 annual report were sent to

15   Mr. Jean-Pierre.

16   A.    No, they're not.

17   Q.    Next, Mr. Bodden, please let's look at Exhibit 242.

18         Top again.  Thank you.

19         And, Mr. Bodden, this, again, is a matter dealing

20   with the Nick Malino matter, correct?

21   A.    Correct, yes.

22   Q.    An e-mail from you on April 4th, 2012, to Scott Dittman

23   and William Sears.

24   A.    Correct.

25   Q.    And has financials attached to it.  Financial

1780

Cross - Bodden

1     projections?

2     A.   Projections, correct.

3     Q.   These are -- these financial projections are things

4     that you had been working on, that you had been doing?

5     A.   That's correct.

6     Q.   And this was -- this -- this e-mail and these

7     attachments were not sent to Mr. Jean-Pierre.

8     A.   No, they were not.

9     Q.   Exhibit 243.  This is an e-mail from you to Mr.

10    Dittman, carb- -- cc'd to Mr. Sears, regarding financial

11    statements.  Would those be -- for what period?

12    A.   The period ending March 2011.

13    Q.   So when it says on the bottom, 3-2012, and 3-2011 --

14    A.   Oh, sorry, March 31st, 2012, and March 31st, 2011.

15    Q.   So these would be quarterly reports.

16    A.   That's correct, yes.

17    Q.   And this e-mail was not sent to Mr. Jean-Pierre.

18    A.   No, it wasn't.

19    Q.   Exhibit 245.  This is a -- an e-mail from Mr. Sears

20    sent to Mr. Dittman on June 4th, 2012, correct?

21    A.   That's correct.

22    Q.   And this is talking about the note -- of a draft of a

23    note agreement, correct?

24    A.   That's correct.

25    Q.   Do you recall which note that was?

Cross - Bodden

1   A.   That was the original promissory notes, not the

2   convertible promissory notes that came later.

3   Q.   And this was talking about drawdowns.

4   A.   Yes.  Draft drawdown request to match the date amount

5   of the deposits.

6   Q.   And this was something that later was a part of what

7   was used with regard to a backdating of a note.

8   A.   These -- this note was already backdated.  Yeah, this

9   was used with that backdated note, correct, the drawdowns

10  were used with the backdated notes.

11  Q.   And this -- this e-mail, and these attachments, did not

12  go -- with a promissory note or credit line agreement, did

13  not go to Mr. Jean-Pierre?

14  A.   No, it didn't -- it did not.

15  Q.   Exhibit 246.  246 was an e-mail from you to Mr. Sears

16  relating to the Bayside loan documents with numbers of

17  attachments to that, correct?

18  A.   Yes.  This is the actual drawdown -- each of the

19  drawdown requests.

20  Q.   And so this document was sent from you to Mr. Sears,

21  but not sent to Mr. Jean-Pierre.

22  A.   That's correct.

23  Q.   And page 2 was -- excuse me, page 3 is one of the

24  drawdowns for the -- for the May 2, 2011, drawdown, correct?

25  92,000.

Cross - Bodden

1    A.   92,250, correct.

2    Q.   And this was -- this was part of the e-mail that was

3    not sent to Mr. Jean-Pierre.

4    A.   That's correct, no.

5    Q.   And the next page was talking about a drawdown of

6    36,700 for Bayside.  This was not sent to Mr. Jean-Pierre

7    for his review.

8    A.   That's correct, yes.

9    Q.   And the next page, page 5 of Exhibit 246, it's another

10   one of the drawdowns, a $14,000 drawdown regarding Bayside

11   Realty, this was not sent to Mr. Jean-Pierre.

12   A.   That's correct.  None of those attachments went to him,

13   in this e-mail.

14   Q.   So that would be true for the next two attachments

15   dated October 3 on page 6, and page 7 for the other drawdown

16   of 15,000, those were not sent to Mr. Jean-Pierre either.

17   A.   No.

18   Q.   With regard to Exhibit 247, 247 is an e-mail from you

19   to Mr. Sears -- William Sears again, correct?

20   A.   That's correct.

21   Q.   June 6th, 2012; is that correct?

22   A.   That's correct.  Oh, sorry, yes.

23   Q.   And this one is dealing with the MeadPoint loan

24   documents and the loan drawdowns.

25   A.   That's correct.  It's drawdowns and agreement for the

1  MeadPoint loan documents.

2  Q.  Right.  And so the documents then that were dated with

3  regard to each of the drawdowns that were attached to this

4  also did not go to Mr. Jean-Pierre.

5  A.  No, they did not go to this e-mail, no.

6  Q.  In Exhibit 251, this is -- could I have the top,

7  please.  This is an e-mail from you to Mr. Sears and Mr.

8  Dittman regarding due diligence items, correct?

9  A.  That's correct.

10  Q.  And these are due diligence items for what purpose?

11  A.  This was for -- I believe the Capital Line, Nick

12  Malino, transaction.

13  Q.  And this was June 15th, 2012.

14  A.  Correct.

15  Q.  And this document -- this e-mail, excuse me, did not go

16  to Mr. Jean-Pierre.

17  A.  It did not.

18  Q.  Then on Exhibit 256 -- could I have the top, please.

19       This was an e-mail from you to Mr. Malino.

20  A.  Correct.

21  Q.  And this actually has the due diligence request and

22  attachments.

23  A.  That's correct.  The response:  The due diligence

24  information that you requested.

25  Q.  And this did not go to Mr. Jean-Pierre.

Cross - Bodden

1    A.    No, it did not.

2    Q.    Exhibit 265.  Exhibit -- may I have -- thank you.

3          Exhibit 265 is an e-mail from you to Mr. Sears on

4    November 26th, 2012, correct?

5    A.    That's correct.

6    Q.    And this is regarding a convertible promissory note.

7    A.    Correct.

8    Q.    This is regarding a convertible promissory note that

9    you prepared.

10   A.    Correct.

11   Q.    That you prepared and at the request of Mr. Sears.

12   A.    That's correct.

13   Q.    And you sent it to Mr. Sears.

14   A.    Correct.

15   Q.    For him to look at.

16   A.    Correct.

17   Q.    And you had put in the terms in that promissory note

18   pursuant to direction from Mr. Sears?

19   A.    That's correct.

20   Q.    This e-mail and this convertible promissory note was

21   not sent to Mr. Jean-Pierre on this e-mail.

22   A.    It was not, no.

23   Q.    Exhibit 266.  This was from you to Mr. Dittman on

24   December 27th, 2012, regarding a letter of authorization.

25   A.    Correct.

1    Q.   And Mr. Jean-Pierre was not included in the
2    dissemination of these documents or this information.
3    A.   He was not, no.
4    Q.   Exhibit -- and in -- I'm sorry, could we have 266
5    again.  I'm sorry, 265.  And 265 -- could I have the top,
6    thank you.
7         265 regarding the convertible promissory note, this
8    was the convertible promissory note that you had backdated
9    at Mr. Sears' -- pursuant to Mr. Sears' instruction.
10   A.   That's correct.
11   Q.   Now, Exhibit 270.  And the top of it, please.
12        So this one, again, is from you to Mr. Sears
13   regarding Sandra Sears' resignation letter, which is
14   backdated.
15   A.   Correct.
16   Q.   And the letter of resignation that's backdated was
17   prepared by?
18   A.   I prepared it.
19   Q.   And this December 27th, 2012, e-mail and backdated
20   Sears resignation letter was not sent to Mr. Jean-Pierre.
21   A.   It was not.
22   Q.   Exhibit 274.  The top, please.
23        This was from Mr. Sears to Mr. Dittman regarding
24   the Bayside Star City matters and the -- and what -- remind
25   us what was -- remind me, what was that?

Cross - Bodden

1    A.    That was the sale of the Bayside note to Star City

2    Capital.

3    Q.    And this information -- this e-mail and attachments

4    were not sent to Mr. Jean-Pierre?

5    A.    No, this was not.

6    Q.    Nor Exhibit 275, which is -- the top, please -- an

7    e-mail from you on January 31st, 2013, to Mr. Sears and Mr.

8    Dittman regarding the same matter --

9    A.    That's correct.

10   Q.    -- right?

11         With regard to the matters that you did forward to

12   Mr. Jean-Pierre --

13   A.    Yes.

14   Q.    -- Isn't it true that for most, if not all of them --

15   let's say most of them, you have no idea if Mr. Jean-Pierre

16   ever actually looked at the e-mail or reviewed the

17   document?

18   A.    I have no idea.

19         MR. BARNARD:   Your Honor, if I may have a moment,

20   please.

21         THE COURT:   You may.

22         MR. BARNARD:   No further questions, thank you.

23         THE COURT:   We're going to take our afternoon

24   recess before the redirect.

25         Ladies and gentlemen of the jury, we'll be in

1787

1    recess for 15 minutes.

2        (Jury left the courtroom at 3:11 p.m.)

3            THE COURT:  Mr. Bodden, same instructions as

4    before.

5            THE WITNESS:  Yes, Your Honor.

6        (Recess taken 3:12 p.m. to 3:31 p.m.)

7            THE COURT:  I wanted to let counsel and members of

8    the jury know that we're going to go until 10 after 5:00

9    today.

10            Mr. Bodden, I remind you that you remain under

11    oath.

12            THE WITNESS:  Yes, Your Honor.

13            THE COURT:  Redirect.

14            MR. SIBERT:  Yes, sir, thank you.

15                    REDIRECT EXAMINATION

16    BY MR. SIBERT:

17    Q.   Okay, sir, you talked about your trip to Florida.  Your

18    trip happened in May 2012; is that correct?

19    A.   That's correct.

20    Q.   Okay.  And, again, those discussions were surrounding

21    the financials of FusionPharm.

22    A.   That's correct.

23    Q.   And would that include discussion of these potential

24    notes?

25    A.   Yeah.  That's correct, yes.  We --

Redirect - Bodden

1    Q.   Who was there --

2    A.   Bill would discuss all -- like I said, his -- his sole

3    job there was to find money for the firm and -- and make

4    stock primarily not only then, but prior to then and other

5    deals he had -- this was his preferred way of raising

6    capital was for a sale of free-trading shares.

7    Q.   And who did you go visit for this meeting?

8    A.   Guy.  Guy Jean-Pierre.

9    Q.   So you went -- Mr. Sears and you went to Mr. Guy

10   Jean-Pierre?

11   A.   We met him at a restaurant, yes.

12   Q.   Okay.  All right.  And now was that the only time you

13   went down to Florida to visit Mr. Guy Jean-Pierre?

14   A.   No.  I -- I visited him once previously on our own

15   business, meaning non-FusionPharm, on Green Street business.

16   And in January -- I think it was January -- pretty sure it

17   was January of 2013, we met in Fort Lauderdale, Florida, at

18   the Sheridan, I believe, Hotel Bill and I were staying at.

19   Q.   Okay.  So, again, it was a second meeting in January

20   2013 with yourself, Mr. Sears, and Mr. Guy Jean-Pierre?

21   A.   Yes.  That's correct.

22   Q.   And what was that meeting about?

23   A.   That was about financing as well.  The sale of the

24   notes -- the -- the deals.  And there were not only the two

25   that we have documents for, but there was a couple of

Redirect - Bodden

1    others, as I recall, being discussed.

2    Q.   All right.  So the first meeting was about the creation

3    of the notes?

4    A.   That's correct.  The -- the -- the first meeting was

5    about a number of things, was -- we discussed our -- the --

6    the 504 offering, we discussed the -- the notes, we

7    discussed all -- everything to do with the company update,

8    everything to do with financing and where FusionPharm was at

9    that time.

10   Q.   And then this January 2013 meeting was about the sale

11   of the notes?

12   A.   I recall it being sale of the notes.  The -- Bill and

13   Guy, he was back from Dominican Republic and they had some

14   personal, you know, conversations at first and then he went

15   into what his plan was.  Bill, then, speaking with Guy.

16   Q.   Okay.  And during your time at FusionPharm, was e-mail

17   the only way that employees communicated?

18   A.   Oh, no.  No.  We spoke -- I spoke on the phone on a

19   daily basis with Bill, pretty much.

20   Q.   So there was also telephone.

21   A.   That's correct, yes.

22   Q.   Telephone calls.

23   A.   Correct.  Yes.

24   Q.   Okay.  And then do you recall the laundry list of

25   exhibits that Mr. Barnard went through with you on his

1    cross-examination?

2    A.    Yes.  Yes.

3    Q.    Can I have Government Exhibit 274 up.

4          And do you recall the point that Mr. Barnard was

5    making that Mr. Guy Jean-Pierre was not on this e-mail?

6    A.    Yes.  That's correct.  He -- that e-mail did not

7    include him.  It was sent from Bill to Scott.

8    Q.    It might not include him, but it definitely includes a

9    GJP document; is that right?

10   A.    That's correct, yes.

11   Q.    Guy Jean-Pierre?

12   A.    I don't know what those initials stand for, but yes,

13   that would -- could be the initials.

14   Q.    Okay.  And can you look at Government Exhibit 262.

15   I'll bring it up on the screen for you.

16         Okay.  Now, this would be for the September 30th

17   quarterly reports, correct?

18   A.    Correct.

19   Q.    That would be the third quarter of 2012?

20   A.    Correct, yes.

21   Q.    And here Mr. Guy Jean-Pierre is attached to this

22   e-mail, correct?

23   A.    That's correct.

24   Q.    Can I have page 20 of this, please.

25         Now, November -- November 20th, 2012, was after

Redirect - Bodden

1    your meeting in May of 2012 with Mr. Guy Jean-Pierre about

2    the finances and notes; is that correct?

3    A.   That's correct.

4    Q.   Okay.  In the quarterly disclosures that were being

5    sent to Mr. Guy Jean-Pierre in November of 2012, is there

6    any mention of convertible promissory notes?

7    A.   No, there's no mention of the notes.

8             MR. SIBERT:  Thank you, Your Honor.

9             THE COURT:  All right.  May this witness be excused

10   for the Government?

11            MR. SIBERT:  Yes, Your Honor.

12            THE COURT:  For the defendant?

13            MR. BARNARD:  Yes, Your Honor.

14            THE COURT:  All right.  Members of the jury, I need

15   to deal with something with the lawyers for just like two or

16   three minutes, so we're going to excuse you -- you don't

17   even have to go back into the room, just stay in the hallway

18   there.  And we'll be back to you, I promise, no later than

19   three minutes from now.

20        (Jury left the courtroom at 3:37 p.m.)

21            THE COURT:  All right.  While we're doing that, we

22   might as well bring in the next Government witness.  You

23   have time now.

24            MR. SIBERT:  Yes.  Sir, can we take up one matter,

25   when you're ready?

Redirect - Bodden

1       THE COURT:  I promised them three minutes.

2       MR. SIBERT:  This will take two seconds.

3       THE COURT:  Okay, go ahead.

4       MR. SIBERT:  Can I withdraw the material with this

5   motion now, that the Court granted for Mr. Bodden?

6       THE COURT:  What do you mean, withdraw --

7       MR. SIBERT:  I move --

8       THE COURT:  I'm not following you.

9       MR. SIBERT:  I move this Court to give Mr. Bodden

10  material status.  The Court --

11      THE COURT:  Oh, I see.

12      MR. SIBERT:  I'm asking the Court to withdraw the

13  material witness motion that I filed, or deny it as being

14  moot at this point, so that Mr. Bodden can be --

15      THE COURT:  All right.  Defendant want to be heard

16  on this?

17      MR. BARNARD:  No objection to that.

18      THE COURT:  All right.  Okay.  I'll deny it then as

19  moot.  Do you need anything in writing from me?  If you do,

20  then you need to submit a proposed --

21      MR. SIBERT:  I'll submit something to chambers,

22  Your Honor.

23      THE COURT:  Send a proposed order.

24      MR. SIBERT:  All right.

25      THE COURT:  Can we have the next witness come

                         Redirect - Bodden

1    forward.  And let's get the jury.

2         (Jury was present at 3:39 p.m.)

3              COURTROOM DEPUTY:  Stand right there and raise your

4    right hand.

5              THE WITNESS:  Okay.

6              TOD DiTOMASSO, GOVERNMENT'S WITNESS, SWORN

7              COURTROOM DEPUTY:  Please be seated.  Scoot your

8    chair up toward the microphone.  And please state and spell

9    your name for the record.

10             THE WITNESS:  Tod, T-o-d, Anthony A-n-t-h-o-n-y,

11   DiTommaso.  D-i-t-o-m-m-a-s-o.

12             MR. SIBERT:  All right.  Your Honor, before I

13   proceed, can I move into evidence a number of exhibits?

14             THE COURT:  All right.

15             MR. SIBERT:  All of which have been stipulated

16   to.

17             THE COURT:  All right.

18             MR. SIBERT:  Can I have Exhibit 180, 181, 182, 183,

19   184, 186, 186-A, 186-B, 186-C, 186-D, 186-E, 186-F, 186-G,

20   186-H.  I'm going to pause there for a moment.  And at the

21   start of the testimony, can I have Government Exhibits --

22             THE COURT:  Oh, so is --

23             MR. SIBERT:  I have more.

24             THE COURT:  Is there more?

25             MR. SIBERT:  But I need to get a couple more in to

Direct - DiTommaso

1    start his examination.

2              THE COURT:  All right.  All right, given the

3    stipulation of the parties, the following government

4    exhibits are admitted into evidence and may be published to

5    the jury:  180, 181, 182, 183, 184, 186, 186-A, 186-B,

6    186-C, 186-D, 186-E, 186-F, 186-G and 186-H.

7         (Government's Exhibits received)

8              MR. SIBERT:  In addition to those, could I move for

9    218 and 219.

10             THE COURT:  Are they stipulated as well?

11             MR. SIBERT:  They are, Your Honor.

12             THE COURT:  All right.  Given the stipulation of

13   the parties, Government Exhibits 218 and 219 are also

14   admitted into evidence and may be published to the jury.

15        (Government's Exhibits 218 and 219 received)

16             MR. SIBERT:  Thank you.

17                       DIRECT EXAMINATION

18   BY MR. SIBERT:

19   Q.   All right.  Good afternoon, sir.

20   A.   Good afternoon.

21   Q.   And can you please state to the jury where you're

22   currently living.

23   A.   I live in the Bay Area of San Francisco, California.

24   Sausalito, specifically.

25   Q.   Okay.  Have you always lived in the San Francisco,

Direct - DiTommaso

1   California, area?

2   A.   No, I have not.  I moved up there in 2015.  Before that

3   I lived in Los Angeles.

4   Q.   Can you tell the jury a little bit about yourself, and

5   include your education and what you have done in your career

6   as a lawyer.

7   A.   I went to the University of Southern California for my

8   undergrad.  I was a history major.  I graduated in 1984.

9   And then I went to the University of California at Davis for

10  law school.  I graduated in 1987.

11         After that, I moved to Malibu, California.  Lived

12  there, practiced law.  Doing mostly business litigation,

13  some insurance defense.

14         Worked for different firms.  The last firm I worked

15  at was Steve Garber & Associates.  And that was in Century

16  City, California.  And after that, around 2008 I started

17  working for myself doing business litigation and then

18  started doing securities law.

19  Q.   So you've been essentially practicing law since 1984?

20  A.   Since 1987.

21  Q.   1987.  Thank you.  All right.

22         Sir, did you get a -- your involvement in this

23  case, did you happen to meet a person named Guy Jean-Pierre?

24  A.   Not in person, just over the internet and by phone.

25  Q.   Okay.  And can you tell the jury how your introduction

1    was made with Mr. Guy Jean-Pierre?

2    A.    A friend of mine, David Adams, a broker, he told me

3    that he had someone that needed to have an attorney help him

4    out with some securities letters.  And he sent -- I believe

5    it was by e-mail both to myself and to Guy introducing us.

6    Q.    Okay.  Do you know how Mr. Adams knew Mr. Jean-Pierre?

7    A.    I'm not sure how they met.

8    Q.    And, again, what was your relationship with Mr. Adams?

9    A.    He's my friend.

10   Q.    And do you know what Mr. Adams did for employment?

11   A.    Yes, he's a stockbroker.

12   Q.    And so it was your understanding that Mr. Jean-Pierre

13   was looking for some help regarding securities law?

14   A.    That's what my understanding was, yes.

15   Q.    Okay.  And so why did you agree to reach out to Mr.

16   Jean-Pierre?

17   A.    For -- to be hired as an attorney to help with drafting

18   opinion letters.

19   Q.    Okay.  And is it usual for -- to partner with someone

20   in the practice of law that you've never met in person?

21   A.    I've done that several times, yes.

22   Q.    Okay.  And what was your experience like in the past

23   when you partnered with a lawyer that you never met?

24   A.    I have no problems with it at all.  I've -- I've done

25   several different things.  Sometimes it has been contract

Direct - DiTommaso

1   work, sometimes I did ghostwriting letters and drafts,

2   motions, previously for different lawyers.

3   Q.   All right.  Do you recall when you started working for

4   Mr. Jean-Pierre?

5   A.   I do not remember the exact date.  I believe it was

6   most likely in 2010 sometime.

7   Q.   Okay.  And do you recall the type of work you assisted

8   Mr. Jean-Pierre do?

9   A.   There's two different types of letters.  One is a

10  current information letter that's posted with the OTC

11  Markets and it says that the corporation has current

12  information regarding its members, its board of directors,

13  its stockholders, and major events, its financials.  And the

14  other type of letter was a Rule 144 letter, which is a

15  letter used to help the company sell stock without the need

16  for registration with the SEC.

17  Q.   All right.  And did you have experience in the past

18  with securities and securities law?

19  A.   I started getting experienced in 2008.

20  Q.   And so what were you doing here in 2010 with your

21  practice concerning securities law?

22  A.   Doing the same thing, just different opinion letters,

23  mostly based on Rule 144.

24  Q.   Okay.  Did you have a big securities practice?

25  A.   Not large.  It was probably -- I don't remember exact

Direct - DiTommaso

1    size, but it was small.

2    Q.   Is it a field of law that you wanted to grow your --

3    were you practicing by yourself when you were in your law

4    firm?

5    A.   In 2008 going forward, yes.

6    Q.   Okay.  Is it an area of law that you wanted to grow

7    your law -- your practice of law in?

8    A.   Yes.  That is true.

9    Q.   Okay.  So did you have many clients in 2008 through

10   2010?

11   A.   I don't know -- I don't remember the exact number.  I

12   probably -- probably 15, 20 different clients.

13   Q.   All right.  And, sir, when you did securities work for

14   your prior clients, what were you charging them?

15   A.   I believe at -- during 2008 through 2010, around $350

16   per opinion letter.

17   Q.   Okay.  And did that go up?

18   A.   Over the years, it went up, yes.

19   Q.   And so what was the max amount that you would charge

20   for an opinion letter?

21   A.   When I stopped doing opinion letters in 2016, it was

22   about $600 per letter.

23   Q.   All right.  So between 350 and $600 a letter for the

24   years 2008 through 2016?

25   A.   Correct.

Direct - DiTommaso

1    Q.   All right.  Can you explain to the jury what your

2    arrangements were regarding Mr. Jean-Pierre and the

3    securities work that you were assisting him with regarding

4    these opinion letters.

5    A.   Yes.  Mr. Jean-Pierre told me that he was corporate

6    counsel for various corporations and that he would like

7    outside attorney to prepare opinion letters, and he would

8    like it at a reduced rate.  So he came to the agreement

9    where I would charge $175 per letter and he would ghostwrite

10   the letters and then provide me all the supporting

11   documentation.

12   Q.   And essentially what would you do with the letters?

13   A.   I would review all the documentation, the supporting

14   documentation.  If it was satisfactory, I would put the

15   ghostwritten letter onto my letterhead and then sign it and

16   then e-mail it back to Guy.

17   Q.   Now who provided you all the documentation when it came

18   to these letters?

19   A.   All of it came from Mr. Jean-Pierre.

20   Q.   And once you were finished putting your letterhead and

21   your signature on these opinion letters, where would you

22   send the letters?

23   A.   I would e-mail them back.

24   Q.   E-mail them back to who?

25   A.   To Mr. Pierre.

Direct - DiTommaso

1   Q.   Okay.  And did you ever send a letter directly to

2   Over-The-Counter Markets, the current information letters?

3   A.   The only thing I sent directly to OTC Markets is an

4   attorney agreement that they have us sign before we can do

5   any opinion letters that are posted on OTC Markets.

6   Q.   Okay.  So the only document that you ever sent back

7   to -- and I guess I should clarify this a little bit, this

8   was when you were working for Mr. Guy Jean-Pierre, assisting

9   him.

10  A.   Correct.

11  Q.   All right.  So not when you were dealing with your own

12  clients.

13  A.   Well, even with my own clients, I would not post

14  directly to OTC Markets.  The corporation, itself, would do

15  it.

16  Q.   Okay.  So in the case with Mr. Guy Jean-Pierre, he

17  was -- you would send back the current information letters

18  and the Rule 144 -- 144 letters directly to Mr. Guy

19  Jean-Pierre?

20  A.   That is correct.

21  Q.   Okay.  So you never did the filing?

22  A.   I never did that.

23  Q.   Okay.  Do you recall how you were paid?

24  A.   I was usually paid by check and then occasionally by

25  wire transfer.

Direct - DiTommaso

1    Q.   And do you recall, did you provide Mr. Jean-Pierre an
2    invoice?
3    A.   Yes, I did.  I gave him a monthly invoice.
4    Q.   And the usual form of payment that you received was
5    check?
6    A.   Correct.
7    Q.   How often did you get to speak with Mr. Jean-Pierre on
8    the phone?
9    A.   I do not remember the number of times, but I would say
10   maybe once or twice a month.  A lot of times communication
11   by e-mail.
12   Q.   All right.  So you used phone and e-mails to
13   communicate with Mr. Jean-Pierre?
14   A.   That is correct.
15   Q.   And just tell the jury, was this a consistent -- was
16   this a consistent weekly phone call or did it come and go as
17   needed?
18   A.   It came and go as needed.
19   Q.   Okay.  And who would -- who would initiate the phone
20   calls, or e-mails?
21   A.   All the -- all of the communications over the phone or
22   e-mail was initiated by Guy.
23   Q.   And just -- I know that it gets tiring to say the last
24   name, but -- at times, but when you say "Guy," you're
25   referring to go Mr. Guy Jean-Pierre?

Direct - DiTommaso

1    A.   Correct.

2    Q.   Okay.  Can you please tell me -- and also the jury,

3    how -- how you were introduced essentially to writing

4    opinion letters for a company called FusionPharm.

5    A.   I cannot remember now whether it was a phone call first

6    or an e-mail first.  But at some point in, I believe it was,

7    July of 2011, I received a communication that Guy wanted me

8    to do a letter for OTC Markets for FusionPharm.

9    Q.   Okay.  So it was Mr. Jean-Pierre that reached out to

10   you for --

11   A.   Correct.

12   Q.   -- regarding the company, FusionPharm?

13   A.   Yes, it was.

14   Q.   Okay.  And now did you ever meet anyone from

15   FusionPharm?

16   A.   Yes, I did.  I met Scott Dittman.  He was the

17   president.

18   Q.   Okay.  And when -- could you tell the jury how you --

19   the arrangements regarding this meeting.

20   A.   I believe the arrangements were made by Mr.

21   Jean-Pierre, and there's a couple of e-mails that went back

22   and forth that show me that Mr. Dittman would be at LAX --

23   that's Los Angeles International Airport -- and a specific

24   date.  And we agreed to meet at a restaurant nearby, I

25   believe it's Panera Bread Company.

Direct - DiTommaso

1  Q.   Okay.  And did you actually get a chance to meet with
2  Mr. Scott Dittman?
3  A.   Yes, I did.  I met with him for approximately an hour,
4  hour and a half.  We sat down and discussed FusionPharm, the
5  company, what it does.  He brought a lot of books showing
6  the financials.  He explained the history of the company,
7  his involvement with it, what they were doing.
8  Q.   Okay.  So for about an hour, hour and a half, you met
9  with Mr. Scott Dittman.
10  A.   Correct.
11  Q.   What month was this?
12  A.   I believe it was July 2011.
13  Q.   Now, did you ever meet with Scott Dittman again in
14  person?
15  A.   I don't believe I did, no.
16  Q.   Did you ever meet with any other officer or directors
17  of FusionPharm in person?
18  A.   I never did.
19  Q.   Okay.  Do you recall how many times you communicated
20  with Scott Dittman after that July 2011 meeting in person?
21  A.   There wasn't very many times.  I do not remember the
22  exact number, but maybe two or three times by e-mail.
23  Q.   Two or three times by e-mail?
24  A.   I believe that's the -- I received e-mails through Mr.
25  Jean-Pierre that had Mr. Dittman as part of the e-mail

1804

Direct - DiTommaso

1 chain, but directly communication with us was one or two

2 times, I believe; two or three, things like that.

3 Q. Okay. Do you recall one of those communications being

4 about a shareholder?

5 A. Yes. A shareholder contacted me -- shareholder of

6 FusionPharm contacted me, wanted me to do the opinion

7 letter. So I contacted Mr. Dittman to ask him if that was

8 appropriate or whether it was really a stockholder that had

9 a couple of questions, and Mr. Dittman e-mailed me back

10 saying that I can go ahead and do that if I wanted to.

11 Q. So essentially out of those two or three times that you

12 spoke to Mr. Dittman, either over the phone or through

13 e-mail, one of those times dealt with a conversation

14 regarding a stockbroker that wanted to speak with you?

15 A. Correct.

16 Q. All right. So did you agree to assist FusionPharm in

17 the 144 and over-the-counter current information letters?

18 A. I did.

19 Q. Okay. Can you walk me through the process regarding

20 how you would assist on the Over-The-Counter Market current

21 information letters with regards to FusionPharm.

22 A. Occasionally by phone, most often by e-mail, I would be

23 notified by Mr. Jean-Pierre that he wanted me to do a letter

24 for FusionPharm for OTC Markets, and then the e-mail would

25 also contain a draft letter for the letter I was to prepare

1   and also all the supporting documentation, usually -- or
2   sometimes he would just say it's posted on the OTC Markets.
3   And you go to the OTC Market's internet website and you can
4   get -- download all the documents from there.
5   Q.   Okay.  So he either -- Mr. Jean-Pierre would either
6   send you the documentation or he told you directly to look
7   at the OTC Markets?
8   A.   That is correct.
9   Q.   Okay.  So the disclosures were already posted at that
10   point when you went to the OTC Markets' web page?
11   A.   Yes, the financials and the disclosure statements were
12   always -- always posted before I prepared the opinion
13   letter.
14   Q.   So when you review -- when you had to review, then, on
15   the OTC Markets, you were no different than any other
16   individual that could go onto the web page?
17             MR. GOODREID:  Objection.  Leading.
18             THE COURT:  Sustained.
19   BY MR. SIBERT:
20   Q.   Who else could see the reports that you were looking at
21   on the OTC --
22   A.   All of the disclosure statements and the financials
23   that are posted by any corporation that sells stock over the
24   OTC Markets is open to the public.  You can go to the -- the
25   OTC Markets website, look up the company, and every single

Direct - DiTommaso

1     document they were posted is going to be on the website for

2     you to review or download.

3     Q.   So you weren't seeing anything that the public wasn't

4     already seeing.

5     A.   That is correct.

6     Q.   Okay.  Did you speak with or e-mail with anyone else

7     besides two or three times with Scott Dittman, and

8     conversations that you were -- or communications that you

9     were having with Mr. Jean-Pierre during the time that you

10    were assisting with the letters with FusionPharm?

11    A.   Through -- there might have been a direct communication

12    from the transfer agent, maybe one time with regard to the

13    documentation.  But pretty much everything else came

14    directly from Mr. Pierre.

15    Q.   Okay.  So you never spoke to a William Sears?

16    A.   No, I never did.

17    Q.   Never spoke to a Cliffe Bodden?

18    A.   Never did.

19    Q.   You never spoke to a Kelly Blume?

20    A.   I never did.

21    Q.   Never spoke to an Andy Duke?

22    A.   I never did.

23    Q.   Never spoke to a Mike Kocinski?

24    A.   I never did.

25    Q.   And only two or three times with the CEO, Scott

Direct - DiTommaso

1    Dittman?

2    A.    That is correct.

3    Q.    Okay, sir, prior to your testimony here today, were you

4    able to review several Over-The-Counter Market current

5    information letters, along with 144 letters that were

6    submitted with your signature on them on behalf of

7    FusionPharm?

8    A.    That is correct.  That occurred twice.  About a year --

9    approximately a year ago, maybe February of last year when I

10   came here and went over it, all the documentations that I

11   reviewed, the documents that the -- your office had, and the

12   documents that I brought with me on my computer to see if

13   they were all exactly the same ones, and then I signed the

14   corner of each of these documents saying that I had reviewed

15   them and that they were accurate and the same.

16   Q.    Okay.  And prior to your testimony here today, did you

17   review those letters again?

18   A.    Yes, this week I did.

19   Q.    Okay.  And how did you know they were essentially the

20   same letters?

21   A.    They were the exact same letters.  They had my

22   signature on it from a year ago.

23   Q.    Okay.  And you also helped produce some of those

24   letters; is that correct?

25   A.    That is correct.  All those documents I produced to the

1808

Direct - DiTommaso

1    Securities and Exchange Commission, I believe back in 2015
2    or 2016.
3    Q.   Okay.  So at one time in the past the Securities
4    Exchange Commission asked you for your legal work in --
5    relating to FusionPharm?
6    A.   That is correct.
7    Q.   Okay.  And, therefore, you supplied them the opinion
8    letters?
9    A.   Yes, I did.
10   Q.   And, essentially, you wrote these letters -- I know
11   that you met Mr. Scott Dittman in July of 2011.  Do you
12   recall when you continued -- how long did you write these
13   current information letters including the 144 letters on
14   behalf of FusionPharm?
15   A.   I worked with both types of letters with FusionPharm
16   from 2011 through 2013.
17   Q.   Do you know when in 2013?
18   A.   I do not remember the exact date, but it was probably
19   August or September, something like that.
20   Q.   Okay.  August or September of 2013?
21   A.   That is correct.
22   Q.   Now, what was -- how did Mr. Guy Jean-Pierre represent
23   himself to you regarding his role with FusionPharm?
24   A.   He told me that he was the corporate counsel for
25   FusionPharm.  I found out later that he was -- during those

1    years he was also one of the officers.

2    Q.   Okay.  So corporate counsel, and then you found out

3    later he was one of the officers?

4    A.   Yeah, by reviewing the documentation that was sent to

5    me regard to whatever 144 letter or the current information

6    letter that I was doing, some of those documentations

7    indicated that he was also an officer.

8    Q.   Okay.  So what did it mean to you regarding Mr. Guy

9    Jean-Pierre's role as corporate counsel?

10   A.   When you're corporate counsel, that means you're

11   intimately knowledgeable about all the workings of the

12   company.  You know all the directors, you know the major

13   shareholders, you know all the major events that are

14   happening, all the major contracts, whether employment or

15   otherwise that they have.  You're pretty knowledgeable about

16   the workings of the company.

17   Q.   Now, this isn't the first time that you've done legal

18   work regarding businesses.

19   A.   That is correct.

20   Q.   So --

21   A.   This -- oh, sorry.

22   Q.   Based upon your experience, have you worked with

23   corporations before?

24   A.   I have for many years.

25   Q.   And based upon your experience in working with other

1810

Direct - DiTommaso

1  companies, what did you see the corporate counsel doing?

2  A.   I've worked as corporate counsel for many years; it's

3  at least 1999 to the present.  And each time that I'm

4  working as corporate counsel, I'm aware of all the major

5  transactions and all because I see the board of directors

6  minutes, I see and have communications with the president of

7  the company.  I review and advise regarding different

8  employment contracts; buy-sell agreements.  Pretty much work

9  for all the different aspects of that company in its daily

10  operations what they're doing.

11  Q.   How about major security transactions?

12  A.   Same with major security transactions, whether they're

13  selling shares, you get to review what they're doing, why

14  they want to do it, to make sure that they're following the

15  SEC rules.

16  Q.   Okay.  And then lastly, could you give an example of

17  being a corporate counsel, what you consider a major

18  transaction versus what isn't a major transaction.

19  A.   A major transaction would be an employment contract

20  with an officer, or one of the -- you know, most important

21  employees.  It would involve buy-sell agreements, asset

22  purchase agreements.  It would involve selling the company

23  or buying another company, mergers and acquisitions.  Those

24  are all major transactions.

25  Q.   How about major business agreements?

Direct - DiTommaso

1  A.   All significant business agreements that are worth lots
2  of money would all be considered part of that, yes.  Loans
3  to employees, loans from other companies, loans from other
4  people, are all part of that as well.
5  Q.   Okay.  And that would also include convertible
6  promissory notes?
7  A.   That is correct.
8  Q.   Okay.  I assume that you -- based upon your prior
9  testimony, that Mr. Guy Jean-Pierre would send you draft
10  letters.  I'm assuming that you submitted the letters back
11  to him with your signature and letterhead on it.
12  A.   Every time that I was requested to do an opinion
13  letter, I would receive a draft letter plus the backup
14  documentation.  I would review the backup documentation, I
15  would put -- if it was agreeable I would put the letter onto
16  my letterhead, sign it, and then send it back to Guy.
17  Q.   Okay.  Sir, can you please -- I'm going to ask for the
18  binder with Exhibits 218 to be handed to the witness.
19       Sir, can you please look through Exhibits 218
20  through -- and 219.
21  A.   Okay.
22  Q.   Are those Exhibits 218 and 219 all the legal opinion
23  letters that you submitted on behalf of FusionPharm through
24  your agreement with Mr. Guy Jean-Pierre?
25  A.   These are the current information letters, yes.

1812

Direct - DiTommaso

1    Q.   Current information letters?  Government Exhibit 218?

2    A.   Correct.

3    Q.   All right.  All right, sir, I want to bring up

4    Government Exhibit 180.

5             Can I have that published, please.

6             And, sir, if you can't see the screen for some

7    reason, please let me know, we'll blow it up.  And if it

8    doesn't work, we can always get you a hard copy.

9    A.   I can see it.

10   Q.   Okay.  Can you tell the jury what you're looking --

11   what this document is in Government Exhibit 180.

12   A.   This document is a -- I'm sorry, this document is a

13   disclosure statement that the OTC Markets requires the

14   corporation to fill out and post on their website.

15   Q.   Okay.  And do you know what period this disclosure

16   statement is for?

17   A.   It's for the financial period ended June 30th, 2011.

18   Q.   Now, is this the type of thing that Mr. Jean-Pierre

19   would send you before submitting -- before you sent back a

20   current information to -- letter to him?

21   A.   I'm not sure if it happened every time, but a lot of

22   times Mr. Pierre would just say, "It's been posted on the

23   OTC website, and go look at it there."

24   Q.   And --

25   A.   I think sometimes he sent it to me, but most of the

Direct - DiTommaso

1    time it was posted on the OTC Markets, and that's where I

2    went to look at it.

3    Q.   Okay.  Now, can you look at pages 1 through -- 1

4    through 3 of Government Exhibit 218.

5    A.   Okay.

6    Q.   And can I have that posted, please.  Government Exhibit

7    218, page 1.

8         Do you recognize this letter?

9    A.   Yes, I do.

10   Q.   Okay.  And can you tell the jury what this letter is?

11   A.   This is a letter that's a current information letter

12   posted on the OTC Markets that basically says that the

13   company has posted current information regarding its

14   business for that investors to look at.

15   Q.   Okay.  And can you scroll down, please.  And can I have

16   the second page, please.  And keep going down to the bottom.

17        Sir, do you see where I underlined there?

18   A.   Yes, I see it.

19   Q.   Okay.  So what's this letter telling the public once

20   it's posted on OTC Markets?

21   A.   That the company has posted on OTC Market adequate

22   current public information regarding its business

23   operations.

24   Q.   Okay.  And then can you go down to the bottom of page

25   3.

1814

Direct - DiTommaso

1     Is that your signature?

2     A.    Yes, it is.

3     Q.    Okay.  Now, tell me how you would receive this letter.

4     A.    I would receive a draft of this letter from Mr. Pierre.

5     I would review it and -- along with a packet of

6     documentation.  And if I thought it was correct, then I

7     would put it on my letterhead, date it, and sign it and then

8     e-mail it back to Guy.

9     Q.    Okay.  And how long would it take you to put your

10    letterhead and signature on that -- on the letter that was

11    sent by Mr. Guy Jean-Pierre?

12    A.    For the letter all by itself, about 5 to 10 minutes.

13    Q.    Okay.  And did you ever make any major changes to the

14    letter that was posted for the -- for the June 30th, 2011,

15    disclosures by FusionPharm?

16    A.    I did not.

17    Q.    And the only changes that you made to that letter was

18    what?

19    A.    Put it on my letterhead, put the date on it, and then

20    sign it.

21    Q.    Okay.  Sir, can you look at pages 4 and 6 of Exhibit

22    218.

23          Can I please have up Government Exhibit 181 on the

24    screen.

25          Okay, sir, do you recognize this e-mail?

1   A.   Yes, I do.

2   Q.   Okay.  And tell the jury what this e-mail is about.

3   A.   This is a transmittal letter from Guy to myself and

4   it -- on it, it has an attachment which is the draft of the

5   letter -- the current information letter, and it says that

6   the -- all the information that's been posted on the OTC

7   Markets.

8   Q.   All right.  So you mentioned that the letter's attached

9   to that; is that correct?

10  A.   That is correct.

11  Q.   What's the date of the letter?

12  A.   The e-mail's December 27th, 2011.

13  Q.   Okay.  And so what quarter would that be for

14  FusionPharm?

15  A.   Well, it would have been for -- probably for the --

16  without looking at the letter, itself, I don't know exactly,

17  but probably for the period ended December 31st, 2011.

18  Q.   Okay.  Can you look at pages 4 to 6 of Government

19  Exhibit 218.

20  A.   Okay.

21  Q.   Okay.  And is that the letter that Mr. Guy Jean-Pierre

22  sent in that attachment.

23  A.   Yes, it is.

24  Q.   And what's the difference between the letter that

25  you're looking at and the letter that Mr. Guy Jean-Pierre

1816
Direct - DiTommaso

1    sent you?

2    A.    The one that he sent me did not have my letterhead, did

3    not have a signature on it.

4    Q.    Can I have Exhibit 218, pages 4 through 6 published.

5          So the only difference in the letter was your

6    letterhead?

7    A.    The letterhead and my signature.

8    Q.    Okay.  The last page, please.

9          That's your signature?

10   A.    Correct.

11   Q.    And sometimes, sir, in these letters, there's a blank

12   with your typed-out name followed by a signature with

13   your -- your letter.  Do you know why that happens?

14   A.    Yes.  At that time, I did not know how to scan the

15   letter with my signature on it all in one document.  So I

16   would send the letter without my signature and then the one

17   page I would sign it and send that as well.

18   Q.    And no major changes in this letter except --

19   A.    No.

20   Q.    -- for what we discussed?

21   A.    No changes except for what we discussed.

22   Q.    Can I have Government Exhibit 184 published.  Okay.

23         Sir, who's sending you an e-mail in this exhibit?

24   A.    It's an e-mail from Guy.

25   Q.    Okay.  It's coming to you?

Direct - DiTommaso

1    A.   And it's coming to me, yes.

2    Q.   And what is the attachment and the date?

3    A.   The date is April 6th, 2012, and the attachment is a

4    draft letter.

5    Q.   Okay.  And so would this letter be about the annual

6    report for December 30th, 2011?

7    A.   It's about the current information letter, which is

8    based on the annual report and other financial documentation

9    posted by the corporation on OTC Market.

10   Q.   Okay.  Can I have Government Exhibit 218, pages 7

11   through 10 published.  Can you look at that exhibit, sir.

12   A.   Okay.

13   Q.   All right, sir, so essentially, again, is this

14   essentially the same letter that Mr. Guy Jean-Pierre sent

15   you via e-mail that we just looked at?

16   A.   That is correct.

17   Q.   And what's the only change you made to this letter?

18   A.   This was placed on my letterhead and then I signed it.

19   Q.   Now, sometimes you -- remove that -- sometimes were you

20   sent more than one draft letter for Mr. Jean-Pierre?

21   A.   I'm -- do you mean revisions were made to letters?

22   Q.   Yes, sir.

23   A.   Yes, sir.  I prepare a letter, send it -- e-mail it to

24   Guy, and then either that day or the next couple of days

25   sometimes a revision needed to be made and so I would get a

Direct - DiTommaso

1    new draft letter with the revisions being --

2    Q.   Okay.  And so when you testified about preparing these

3    current information letters, were there times when you

4    received the first draft, signed it, sent it back, and you

5    would receive a second draft?

6    A.   That is correct.

7    Q.   Do you know why that happened?

8    A.   I don't remember any specific occasions.  I know I was

9    reviewing everything, I did see that -- sometimes because

10   probably one of the financials had to be reposted, and it

11   was posted on a different date, and so that different date

12   would have to be made in the opinion letter.

13   Q.   All right.  Let's just look at March 2012.

14        Can I have Government Exhibit 188 published.  Okay.

15        Can you tell me what Mr. Guy Jean-Pierre's sending

16   you in this e-mail.

17   A.   This e-mail is saying that the attachment is a

18   confirmation from the transfer agent regarding the share

19   information, which is basically the number of outstanding

20   shares that are out there.

21   Q.   Okay.  So this is one example where you received the

22   document from Mr. Guy Jean-Pierre.

23   A.   That's correct.

24   Q.   Okay.  This is April 11th, 2012?

25   A.   Actually, June 11th of 2012.

1          MR. SIBERT:  And, Your Honor, I guess I'm moving

2     along here, so I forgot that I'm past my numbers.

3          THE COURT:  You're what?

4          MR. SIBERT:  I need to admit more evidence.  So

5     these following documents have all been stipulated to:  187,

6     187-A through D, 188 through 191, 191-A, 192, 192-A, 192-B,

7     and 193, 193-A, 194, 195, 195-A through E, 196, 196-A, and

8     197.

9          THE COURT:  These are all stipulated to?

10         MR. SIBERT:  Yes, sir.

11         THE COURT:  All right.  Given the stipulation of

12    the parties, the following Government Exhibits are admitted

13    into evidence and may be published to the jury:  187, 187-A,

14    187-B, 187-C, 187-D, 188, 189, 190, 191, 191-A, 192, 192-A,

15    192-B, 193, 193-A, 194, 195, 195-A, 195-B, 195-C, 195-D,

16    195-E, 196, 196-A, and 197.

17        (Government's Exhibits received)

18         MR. SIBERT:  Thank you, Your Honor.

19    BY MR. SIBERT:

20    Q.   Okay, can I have published 188.

21         I'm sorry, sir, can you again summarize what Mr.

22    Jean-Pierre sent you in this e-mail.

23    A.   It's an e-mail from Mr. Pierre dated June 11th, 2012,

24    and it states that there's a confirmation from the transfer

25    agent regarding the share information for FusionPharm, and

Direct - DiTommaso

1    basically that's the transfer agent confirming the number of

2    outstanding shares.

3    Q.   Okay.  So this is -- like I asked you before, this is

4    one where you actually received the documentation from Mr.

5    Guy Jean-Pierre?

6    A.   That is correct.

7    Q.   Can I have Government Exhibit 183 published.  Okay.

8         What is Mr. Guy Jean-Pierre sending you now and as

9    of March 31st, 2012?

10   A.   That this is an e-mail from Mr. Pierre dated June 11th,

11   2012, stating that the financial statements as of March

12   31st, 2012, had been confirmed by the accountant and there

13   is an e-mail from the accountant, Mike Kocinski, stating

14   that he prepared the documents according to GAAP, and he's

15   the accountant that did it.

16   Q.   So it's Mr. Guy Jean-Pierre that's forwarding you, now,

17   accounting documentation regarding FusionPharm?

18   A.   That is correct.

19   Q.   And can I have Government Exhibit 189.

20        Okay.  And what is Mr. Guy Jean-Pierre now sending

21   you?

22   A.   This is an e-mail dated June 11th, 2012.  Attached to

23   it is the draft letter for me to look at.

24   Q.   Okay.  And what is Mr. Jean-Pierre telling you about in

25   this second paragraph?

Direct - DiTommaso

1    A.    That he intends to send me confirmations from the

2    transfer agent and the accountant regarding the financials.

3    And that was what we just saw earlier, the confirmation from

4    the transfer agent about the outstanding shares, and then

5    the confirmation by the accountant that he's the accountant

6    and prepared the financials.

7    Q.    Okay.  So this is an example where you actually

8    received documentations from Mr. Guy Jean-Pierre regarding

9    FusionPharm?

10   A.    That is correct.

11   Q.    And so at least two things:  something dealing with the

12   financials and the stockholders.

13   A.    Correct.

14   Q.    Now, was that essentially the process that you did for

15   Mr. Guy Jean-Pierre for March -- March 2012, June 2012, and

16   the current information for the annual report in December of

17   2012?

18   A.    That is correct.

19   Q.    Okay.  And so you -- every time you received a letter

20   and the only changes that you did to it was with your

21   letterhead and signature?

22   A.    That is correct.  Also sometimes a different date.

23   Q.    Sometimes a different date?

24   A.    Sometimes I received it and didn't get to it until the

25   next day.

Direct - DiTommaso

1   Q.   So you would just change the date to fit the day you

2   signed the letter?

3   A.   That is correct.

4   Q.   But no major changes in the body of the letter.

5   A.   That is correct.  I did no major changes to the body of

6   the letter.

7   Q.   Now -- I'm sorry, to follow up on that questioning:

8   Was that the same for March 2013 when it came to the current

9   information letters?

10  A.   Correct.

11  Q.   Let's look at -- I'm sorry --

12       MR. SIBERT:  Your Honor, can I move to admit into

13  evidence 200, 200-A, 200-B, 200-C, 201, 201-A, 201-B, 201-C,

14  202, 202-A, 202-B, 202-C, 203, 203-A through D, 204, 205,

15  205-A, 205-B, 206, 206-A through C, 207, 208, 209.  For this

16  month I need 212, 212-A, 212-B.

17       THE COURT:  Are these all stipulated to?

18       MR. SIBERT:  They are, Your Honor.

19       THE COURT:  All right.  Given the stipulation of

20  the parties, the following exhibits are admitted into

21  evidence:  200, 200-A, 200-B, 200-C, 201, 201-A, 201-B,

22  201-C, 202, 202-A, 202-B, 203, 203-A, 203-B, 203-C, 203-D,

23  204, 205, 205-A, 205-B, 206, 206-A, 206-B, 206-C, 207, 208,

24  209, 212, 212-A, 212-B.

25       (Government's Exhibits received)

                            Direct - DiTommaso

1           MR. SIBERT:  Thank you, Your Honor.

2    BY MR. SIBERT:

3    Q.   Can I publish 372-LLL, which is in evidence already.

4           Okay, sir, can you look at the top of the e-mail.

5    A.   Yes.

6    Q.   I have to pull it up here.

7           The attachment is a FusionPharm opinion letter?

8    A.   That is correct.

9    Q.   Okay.  Can I have the next page, please.  Okay.

10          Okay, sir, and is this the letter that you did for

11   March 2013?  And if you need to, I can flip to the next page

12   when you're ready.

13   A.   The letter's dated July 1st, 2013.  I recognize it as

14   one of my letters.

15   Q.   And -- can I have the last page.  Is that your

16   signature?

17   A.   That is correct.

18   Q.   Okay.  And that matches -- that letter matches what's

19   in page 23 through 26 of Exhibit 218?

20   A.   Yes.  Sorry, yes.

21   Q.   All right.  And just to be clear, there's no major

22   changes from the letter that Mr. Guy Jean-Pierre sent you

23   and the one that you submitted back to him?

24   A.   That is correct.

25   Q.   Okay.  Can we have Government Exhibit 212 published.

1824

Direct - DiTommaso

1      Okay.  This e-mail is August 22d, 2013; is that
2  right?
3  A.   That is correct.
4  Q.   And what is Mr. Guy Jean-Pierre sending you in this
5  e-mail?
6  A.   In this e-mail, it appears that he's sending me a draft
7  letter -- opinion letter, the disclosure statement that we
8  saw earlier and also a shareholder report.
9  Q.   Okay.  Can I have 212-A, please.
10     And is that the shareholder report that was
11  attached to that e-mail?
12  A.   That is correct.
13  Q.   Okay.  And can I have 212-B.  Okay.
14     You also received an officer and directors
15  questionnaire; is that correct?
16  A.   That is correct.
17  Q.   And, again, these were documents that were provided by
18  Mr. Guy Jean-Pierre regarding FusionPharm?
19  A.   That is correct.
20  Q.   Okay.  And the letter that you submitted on behalf of
21  FusionPharm to Mr. Guy Jean-Pierre, were there any major
22  changes from the draft that you submitted -- or the draft
23  that he submitted and the one that you signed and put your
24  letterhead on?
25  A.   The only changes would be placing it on my letterhead,

Direct - DiTommaso

1    me signing it, and maybe changing the date if it was

2    necessary.

3    Q.   Okay.  And can you just look at your binder to assure

4    that, in Exhibit 219, pages 1 through 4.

5         THE COURT:  While he's doing that, Mr. Sibert, I

6    just want to ask you:  My very careful courtroom deputy

7    pointed out that I might have missed an exhibit when I

8    listed the exhibits that were admitted.  Did you include

9    202-C in your list?

10        MR. SIBERT:  I did.

11        THE COURT:  All right.  Which -- and I did not, so

12   she's right.  202-C is also admitted into evidence.

13        (Government's Exhibit 202-C received)

14        MR. SIBERT:  Trust me, Your Honor, I'm happy she's

15   here as well for me.

16        THE COURT:  That makes two of us.

17        MR. SIBERT:  While we have a pause, I'm trying to

18   clean up this so we don't have to make too many more pauses.

19   So maybe it's a good time just to submit everything that

20   this witness might testify to.

21        That would include 19- -- this has all been

22   stipulated to 197-A, 197-B, 198, 199, 211 -- wait, I'm

23   sorry, Your Honor -- 204, 205 --

24        THE COURT:  Hold on.  So after 199, we go to 204?

25        MR. SIBERT:  I lost track, to be honest with you,

Direct - DiTommaso

1    on my sheet.

2            THE COURT:  204 was already in the prior group.

3            MR. SIBERT:  Okay.  Do you know what the last one

4    was I ended with in that number stream?

5            THE COURT:  In the prior group that was already

6    admitted?

7            MR. SIBERT:  Yeah.

8            THE COURT:  212-B.

9            MR. SIBERT:  Thank you.  I'm sorry, Your Honor.

10           THE COURT:  So after 199, what's next?

11           MR. SIBERT:  213, 214, 215, 215-A through D --

12           THE COURT:  Through B or D --

13           MR. SIBERT:  D as in David.

14           THE COURT:  Yeah.  That makes sense.

15           MR. SIBERT:  216, 217, 220.  I think that's it.

16           THE COURT:  I hope so.  Given the stipulation of

17   the parties, the following exhibits are also admitted into

18   evidence and may be published to the jury:  197-A, 197-B,

19   198, 199, 213, 214, 215, 215-A, 215-B, 215-C, 215-D, 216,

20   217, 220.

21          (Government's Exhibits received)

22           MR. SIBERT:  Okay, thank you, Your Honor.  I

23   appreciate the patience.

24   BY MR. SIBERT:

25   Q.   Did you get a chance to look at 219, pages 1 through

Direct - DiTommaso

1    4?

2    A.    Yes, I did.

3    Q.    And that letter matches what was shown and published to

4    the jury?

5    A.    That is correct.

6    Q.    Thank you.  All right, let's go to your work with Rule

7    144 opinion letters, as they're known.  Can you just, again,

8    describe to the jury the difference between what we just

9    went over, current information letters --

10   A.    The current information letters are posted on OTC

11   Markets to tell investors that the company has kept current

12   with its -- all the basic information regarding its

13   operations, its directors, its shareholders.  The Rule 144

14   letters are used to find an exemption to registration with

15   the Securities and Exchange Commission for purposes of

16   selling shares.

17   Q.    Okay.  And just to be -- so I understand correctly, the

18   opinion letters for OTC, they're posted after the

19   disclosures are made?

20   A.    That is correct.

21   Q.    And Rule 144 opinion letters, these aren't published

22   anywhere.

23   A.    Not normally.

24   Q.    And who usually receives the Rule 144 letters?

25   A.    I would receive drafts from Mr. Jean-Pierre along with

1     backup documentation.
2     Q.   I understand in this case, but where do -- where are
3     144 opinion letters usually used by?
4     A.   They're used by the shareholder, the stockbroker, any
5     potential sellers or -- I'm sorry, any potential buyers.
6     Q.   Okay.  How about transfer agents?
7     A.   Oh, yes, also transfer agents.
8     Q.   Okay.  Do you know why transfer agents need to look at
9     Rule 144 opinion letters?
10    A.   The transfer agents have a responsibility of actually
11    issuing a stock certificate.
12    Q.   And so before they issue the stock certificate, why are
13    they using the 144 opinion letter?
14    A.   To make sure that the stock transfer -- or, sorry,
15    transaction meets the requirements of the SEC rules, and
16    either they're registered properly or there's an exemption.
17    And most of the times in these cases Rule 144 was the
18    exemption.
19    Q.   Okay.  And what does Rule 144 -- the 144 exemption do
20    about a holder of a stock certificate to do?
21    A.   When a stockholder has held the shares for a
22    significant amount of time and -- right, currently the rules
23    are six months if they're a reporting company, and one year
24    if it's a nonreporting company.  And then there's a couple
25    of other requirements that they have to follow, but you meet

Direct - DiTommaso

1    all those requirements, then you can freely sell your shares

2    on the open market.

3    Q.   Otherwise known as take the restrictions off the

4    shares?

5    A.   Correct.

6    Q.   Okay.  And you mentioned there were some other

7    additional requirements.  Is one of those requirements

8    regarding the affiliate status of the stockholder?

9    A.   The affiliate status or nonaffiliate status determines

10   basically what requirements are needed to have a Rule 144

11   exemption.  There's different requirements for affiliated as

12   opposed to nonaffiliated shareholders.

13   Q.   Okay.  How about a holding period?

14   A.   For nonaffiliated shares of a nonreporting company is

15   one year.

16   Q.   So if I understand you correctly, a person that's a

17   nonaffiliate of a company has to have possession of the

18   stock for one year before the restriction is taken off?

19   A.   Typically, that is correct.  But you can also tack on

20   the other shareholders -- or other debtholders holding the

21   property if they're nonaffiliates as well.  So multiple

22   people, multiple entities, can tack on the holding period

23   between them all.

24        If it's only one person having it or one entity

25   having it for the time period, then it's one year that you

Direct - DiTommaso

1    have to own that debt.

2    Q.   Okay.  And what happens if an affiliate is giving

3    someone else a share or a stock?

4    A.   Well, that affiliate is involved, there's additional

5    rules.  One of them's to file a document with SEC concerning

6    the transfer -- or the transaction.  There's restrictions

7    with regard to volume of the number of shares being sold by

8    the corporation and owned by the affiliate.

9    Q.   All right.  Let's go ahead and start looking at some of

10   these Rule 144 opinion letters.  Can I have Government

11   Exhibit 187 published.

12          Okay, sir, can you describe to the jury what is

13   being shown in 187.

14   A.   This is an e-mail from Mr. Jean-Pierre to me dated June

15   6th, 2012.  The attachments are a draft opinion letter and

16   then there's the supporting documentation.  There's a

17   shell -- or officer's certificate -- officer's certificate

18   just typically says we're not a shell company, that the

19   shares are being sold by a proper transaction.  If it's not

20   an affiliate, that certificate will say the shareholders not

21   an affiliate.

22   Q.   And you stated "opinion letter," but specifically what

23   type of opinion letters?

24   A.   This -- in this case, a Rule 144 opinion letter.

25   Q.   Can I have Government Exhibit 187-A.  Okay.

Direct - DiTommaso

1       And can you tell the jury what Government Exhibit

2    187-A is.

3    A.   This is a stock certificate -- excuse me, stock --

4    FusionPharm stock cert No. 11167 concerning 190,000 shares.

5    Q.   Can I have Government Exhibit 187-B.  Thank you.

6       Okay, can you tell me what 187-B is -- is telling

7    you when you're working on these 144 rule opinion letters.

8    A.   Yes.  This is a statement by the shareholder, which in

9    this case is Microcap Management, and its owner, Richard

10   Scholz.  And it's stating that -- it's describing the

11   transaction, that they want an exemption from registration

12   by Rule 144.  It also states that the company -- and that

13   means FusionPharm -- is not a blank check or shell company,

14   and that they are not an affiliate, meaning Microcap is not

15   an affiliate.

16   Q.   All right.  And you stated they wanted an exemption

17   from registration.  Can you tell the jury what that means.

18   A.   Typically when shares are sold, they're restricted or

19   they have to be registered with the Securities and Exchange

20   Commission.  In these cases here, like with FusionPharm,

21   they're not registering with the SEC, therefore, they need

22   to have an exemption in order to allow them to sell the

23   shares on the open market.  There's a number of different

24   exemptions.  Rule 144s are the ones that are used the most.

25   Q.   Now, this says that Microcap is a nonaffiliation,

1  correct?

2  A.  That's correct.

3  Q.  Nonaffiliation to who?

4  A.  Nonaffiliate to FusionPharm.

5  Q.  It also says Microcap is owned by a Richard Scholz; is

6  that right?

7  A.  That's what it says at the bottom, yes.

8  Q.  Did you ever speak to a Richard Scholz?

9  A.  No, I did not.

10  Q.  Okay.  Did you ever speak to anyone from Microcap?

11  A.  No, I did not.

12  Q.  Okay.  And who was the only person you spoke to

13  regarding FusionPharm with this document?

14  A.  The only person I communicated with is Mr. Jean-Pierre.

15  Q.  Did you know in June of 2012 that Microcap was owned by

16  William Sears -- or controlled by William Sears?

17  A.  I did not.

18  Q.  Okay.  If Microcap was truly known as being controlled

19  by Micro- -- by William Sears, what if -- and -- well, let

20  me ask you this question:  Did you know Mr. William Sears

21  was a partner, slash, owner in FusionPharm?

22  A.  I do today.  I did not know that until after 2015.

23  Q.  And so if you had known the true ownership of Microcap

24  being Mr. Sears and his role with FusionPharm, would he have

25  qualified for nonaffiliation status?

Direct - DiTommaso

1    A.    He would not have.

2    Q.    Can I have Government Exhibit 187-C.

3          Okay.   You mentioned an officer certificate.   Can

4    you explain to the jury essentially what this certificate is

5    telling you regarding the drafting of a Rule 144 opinion

6    letter?

7    A.    This is a letter from the officer of FusionPharm

8    stating that they're not a shell company, that Microcap as a

9    shareholder is not an affiliate of FusionPharm, and has not

10   been an affiliate for at least 90 days before the

11   transaction.   And also describes the transaction as taking

12   place.

13   Q.    And so paragraph 3 is stating that Microcap was not an

14   affiliate to FusionPharm 90 days prior to this letter dated

15   June 5th, 2012?

16   A.    That is correct.

17   Q.    Okay.   And, finally, can I have Exhibit 187-D, please.

18         And can you tell the jury what Government Exhibit

19   187-D is.

20   A.    That would be a copy of the draft that Mr. Jean-Pierre

21   would send to me regarding this transaction and Rule 144.

22   Q.    Okay.   And there's no letterhead; is that correct?

23   A.    That is correct.

24   Q.    Okay.   And can I have the last page of 187-D, please.

25   And there's no signature; is that correct?

1834

Direct - DiTommaso

1    A.    That is correct.

2    Q.    Okay.  Now, you looked -- let me ask you a real quick

3    question.

4              Can I have Government Exhibit 143, please.

5    A.    I've looked at it.

6    Q.    You've looked at this e-mail prior; is that correct?

7    A.    Yes.

8    Q.    And can I go to page 6 of this exhibit.

9              Okay.  Now, that letter that we just looked at on

10   187-D, is this -- you've looked at this previously.  Is this

11   the same letter?

12   A.    It's the same letter with my letterhead and my

13   signature.

14   Q.    And we're talking the letterhead -- and can I have the

15   last page, please.  And that's your signature?

16   A.    That is correct.

17   Q.    And you've compared that letter on 143 with the letter

18   that was in 187-D, as in David.

19   A.    Yes.

20   Q.    And there was no major changes except for what you're

21   testifying regarding your letterhead and your signature?

22   A.    That is correct.

23   Q.    Can I have 192, please.

24              Who's sending you an e-mail on July 21st, 2012?

25   A.    That is correct.

Direct - DiTommaso

1    Q.   Who's sending you that e-mail?

2    A.   Mr. Jean-Pierre is sending me an e-mail.

3    Q.   And what's attached to the e-mail?

4    A.   There's a draft of the opinion letter plus all the

5    necessary backup documentation.

6    Q.   Okay.  Can I have 192-A, please.

7         Can you tell me what this letter is saying.

8    A.   It's a letter from Todd Abbott describing the

9    transaction that he intends to do and it's sent to the

10   transfer agent.

11   Q.   Okay.  And can you tell me what the transaction's going

12   to be that Mr. Todd Abbott is asking to be done.

13   A.   It's -- Mr. Abbott is stating that he is sending a copy

14   of his -- or not the copy, but his actual stock certificate

15   and he wants that -- the shares, 40,000 of them, of

16   FusionPharm to be transferred to Microcap.

17   Q.   And can I have page 2 of 192-A.  Can you blow this up,

18   please.

19        Okay.  This is a share purchase agreement?

20   A.   That is correct.

21   Q.   Okay.  Tell me who is selling shares and who's buying

22   shares.

23   A.   Todd Abbott is selling 40,000 shares of FusionPharm to

24   Microcap.

25   Q.   Okay.  And can we go to the bottom of this document.

1    Who owns Microcap?

2    A.   Well, this doesn't say who owns Microcap but what it

3    says is that William Sears is the managing member.

4    Q.   Okay.  Would you consider a managing member a

5    controlling person in an office -- or a company?

6    A.   Yes, I would.

7    Q.   All right.  So this -- this e-mail and the attachments

8    that were sent to you occurred on July 21st, 2012.

9    A.   That's correct.

10   Q.   And Mr. Guy Jean-Pierre sent you that e-mail with the

11   attachments.

12   A.   That is correct.

13   Q.   Okay.  We just looked at 187 -- Exhibit 187, which was

14   an e-mail from Guy Jean-Pierre to you regarding a Microcap

15   opinion letter dated June 6th, 2012.

16   A.   Correct.

17           MR. GOODREID:  Objection.

18           MR. SIBERT:  Do you want to make an objection,

19   counsel?

20           MR. GOODREID:  No.

21           MR. SIBERT:  Are you sure?

22           THE COURT:  Next question.

23   BY MR. SIBERT:

24   Q.   Okay.  Okay.  And June 6th, 2012, if you recall, 187

25   bravo, who was the owner of Microcap according to that

Direct - DiTommaso

1    document?  I can have it brought up again.  187-B, please.

2    A.    Oh, Richard Scholz says that he's the owner.

3    Q.    Okay.  And as we just saw on July 21st, the letter that

4    Mr. Guy Jean-Pierre provided you, who was the managing

5    member of Microcap?

6    A.    William Sears.

7    Q.    So less than -- just over a little -- a month, MicroCap

8    Management, there's different names involved; is that

9    correct?

10   A.    That is correct.

11   Q.    Who provided you that information?

12   A.    Mr. Guy provided that to me.

13   Q.    Can I look at Government -- Exhibit 192-B, please.

14         And can you tell the jury what 192-B is.

15         Can I just have it blown out, please.

16         Can you see that, sir?

17   A.    Yes, I can see it.

18   Q.    Okay.  And can I have the second and third page shown

19   to the witness.  And, finally, the fourth page.

20   A.    Okay, I saw it.

21   Q.    All right.  Again, no letterhead, correct?

22   A.    Correct.

23   Q.    No signature.

24   A.    Correct.

25   Q.    What is this document?

Direct - DiTommaso

1    A.   That's a draft of the opinion letter that Mr. Pierre

2    wanted me to prepare on my letterhead.

3    Q.   Okay.  And can you look at Exhibit 219 in your binder,

4    pages 12 through 14.

5         Can I have that published, please.

6    A.   Okay.  Okay.

7    Q.   Okay.  And what is that document that you're looking at

8    in Exhibit 219, pages 12 through 14?

9    A.   That's taking the draft that I received from Mr. Pierre

10    and putting it on my letterhead and then signing it.

11    Q.   Okay.  And you -- prior to your testimony here today,

12    you compared this letter in Exhibit 219 with the letter in

13    Exhibit 198; is that correct?

14    A.   Correct.

15    Q.   What were the only differences between the letters?

16    A.   My letterhead and my signature, I believe.

17    Q.   Thank you.  Can I have Exhibit 195, please.  Okay.

18         Again, who's sending you information regarding a

19    Bayside 144 debt conversion opinion letter?

20    A.   Mr. Jean-Pierre sent this e-mail to me, and it's

21    attached to -- it would be backup documentation as well as a

22    draft opinion letter.

23    Q.   Okay.  So there's documentation that's attached to

24    this?

25    A.   Correct.

Direct - DiTommaso

1    Q.   Okay.  Can I please have Government Exhibit 195-A.

2    What was the first attachment that was sent to you from Mr.

3    Guy Jean-Pierre?

4    A.   That's a promissory note that -- FusionPharm recently

5    got a loan from the debt holder.

6    Q.   Okay.  And you said "promissory note," but what kind of

7    promissory note?

8    A.   It's a convertible promissory note, which means that

9    debt can be converted into shares at some time after this

10   happens.

11   Q.   And this was a convertible promissory note between what

12   companies?

13   A.   Bayside Realty Holdings is the lender and then

14   FusionPharm was the one that took out the loan.

15   Q.   And, again, who sent you this document?

16   A.   Mr. Jean-Pierre sent that document to me.

17   Q.   Okay.  The date that he sent that to you was December

18   13, 2012?

19   A.   I believe that's correct.

20   Q.   Can I have Government Exhibit 195-B.  Okay.

21        Can you tell me essentially what is being sent to

22   you here regarding Bayside Realty Holdings?

23   A.   This is a conversion notice stating the transaction

24   that Bayside wants to convert $1,400 of the debt that is

25   owed to them by FusionPharm into 140,000 free-trading

Direct - DiTommaso

1    shares.

2    Q.   And what must -- can Bayside be an affiliate for these

3    shares to be cleared without restriction?

4    A.   Well, under Rule 144, you can be an affiliate but you

5    have a lot of other requirements that you don't have to do

6    if you're not an affiliate.

7         In this case, Bayside is claiming that they're not

8    an affiliate so that way you don't have to have those other

9    requirements.

10   Q.   Okay.  So Bayside in this documentation is saying that

11   they're a nonaffiliate of FusionPharm?

12   A.   That is correct.

13   Q.   Can I have 195-C, please.

14        And what is this document being shown in 195-C?

15   A.   This is a notice of conversion debt sent by the

16   shareholder, in this case Bayside, to FusionPharm saying

17   that they elected to convert $1,400 of their debt into

18   140,000 shares of common stock.

19   Q.   And that's what the conversion option of this note

20   allows Bayside to do?

21   A.   That is correct.

22   Q.   And, finally, can I have 195-D, please.

23        And this is an officer's certificate, as you

24   discussed before; is that right?

25   A.   That is correct.

Direct - DiTommaso

1  Q.   And what is FusionPharm representing in this

2  certificate?

3  A.   The two major statements they're making is that the

4  shareholder is not an affiliate and has not been for at

5  least 90 days prior to the transaction; and that the

6  company, FusionPharm, is not a shell company.

7  Q.   Okay.  And can I have 195-E, please.

8        Do you recognize this attachment to the e-mail that

9  Mr. Guy Jean-Pierre sent to you?

10  A.   Yes.  That's a draft of the opinion letter that Mr.

11  Jean-Pierre wanted me to put on my letterhead.

12  Q.   Now, based upon the documentation that you were sent

13  there by Mr. Guy Jean-Pierre, who was the owner of Bayside?

14  A.   I'd have to look at the document.

15  Q.   Okay.  Let me have 195 bravo.  I'm sorry, 195-C.  Can

16  you keep going gown down, please?

17  A.   This document states that the owner of Bayside -- or at

18  least one of the owners is Sandra Sears.

19  Q.   Okay.  And, again, as you testified, what documents

20  were you relying on when you put your letterhead and

21  signature on these draft letters?

22  A.   I relied on each of the documents that we just saw, the

23  conversion notice, the officer's certificate, and the

24  promissory note.

25  Q.   Okay.  And, again, who provided you all those

1842

Direct - DiTommaso

1    documentations?

2    A.    Each of those documents were provided to me by Mr.

3    Jean-Pierre.

4    Q.    Okay.  Can I have Government Exhibit 219 published.

5          And, sir, can you look at 219, pages 15 through 18.

6    A.    Okay.

7    Q.    Does that document match the opinion letter sent to you

8    by Mr. Guy Jean-Pierre?

9    A.    Yes.

10   Q.    Okay.  And the only thing different in that letter is

11   the letterhead and the date?

12   A.    The letterhead, the date, and my signature.

13   Q.    Okay, sir, can we just have 219 brought up quickly,

14   again.  And can I have paragraph -- or page -- page 1.

15   Thank you.  Can I have this last paragraph blown up, please.

16         We talked about the holding period.  Do you recall

17   that discussion?

18   A.    That is correct.

19   Q.    I picked the wrong paragraph here.  One second.  Can I

20   have page 2, please.  I need Government Exhibit 219, pages

21   12 to 14.

22         Okay.  What does it mean by this sentence regarding

23   the holding period that I've marked on Government Exhibit

24   219, pages 12 through 14?

25   A.    In this case -- or this transaction, it's stating that

1    the shareholder, who's not an affiliate, and, therefore, had

2    to hold it for at least one year, did, in fact, do that.

3    Q.   Okay.  And then can I have page 2, please -- or, I

4    guess, page -- sorry -- page 13.

5         Again, we're talking about the affiliation control

6    status here.

7    A.   Correct.

8    Q.   Okay.  What is this paragraph referencing?

9    A.   This is stating that the shareholder and the

10   transferee, neither one of them is an affiliate of

11   FusionPharm, and it goes to show some -- some types of

12   things that can show affiliate status.  One is a shareholder

13   owns over 10 percent of the shares of the company.

14   Q.   And the other thing, a control person can be an

15   affiliate; is that right?

16   A.   A control person is considered an affiliate.  A control

17   person would be an officer of the company, a shareholder

18   that holds 10 percent or more of the shares, or any type of

19   person or entity that has some ability to control the

20   operations of the company.

21   Q.   Can I have Government Exhibit 219, pages 15 through --

22   15 up, please.  Okay.

23        This letter is your Bayside debt conversion letter.

24   A.   Correct.

25   Q.   Can you tell me again what this is telling the transfer

1    agent and broker.

2    A.    Again, this is stating that the shareholder has had the

3    debt for at least 12 months.

4    Q.    Okay.  So Bayside -- the company, Bayside, has held the

5    last withdrawal debt for over -- for over 12 months -- for a

6    year?

7    A.    That is correct.

8    Q.    And so when you hold the debt like that for a year, you

9    meet the requirements under 144?

10   A.    That is one of the requirements, yes.

11   Q.    Okay.  And then can I have page 16.

12        In here, in B, this paragraph is saying that

13   Bayside, 90 days prior to this letter, was not an affiliate

14   of FusionPharm?

15   A.    That is correct.

16   Q.    Did you know anything about the backdating of the

17   Bayside promissory convertible note?

18   A.    I did not until I found out later.

19   Q.    And so Mr. Guy Jean-Pierre never mentioned anything

20   about backdating the promissory convertible note with

21   Bayside?

22   A.    That is correct.

23   Q.    He just gave you these documents?

24   A.    That is correct.

25   Q.    And can I have Government Exhibit 196 up, please.

Direct - DiTommaso

1    And can you tell me who's sending you an e-mail

2  here and what's attached.

3  A.   This is an e-mail from Mr. Jean-Pierre dated December

4  21st, 2012, and it's sending me a draft opinion letter.

5  Q.   Okay.

6  A.   A revised draft opinion letter.

7  Q.   Okay.  So why would it -- Mr. Guy Jean-Pierre send you

8  a revised draft opinion letter?

9  A.   There's some type of change that had to be made to the

10  original opinion letter.

11  Q.   Okay.  You've testified now that essentially what

12  you've done with the opinion letter is you just added your

13  letterhead and signature; is that correct?

14  A.   In addition to also reading it, but that is correct,

15  yes.

16  Q.   And you didn't change the body at all.

17  A.   If there were any changes, it would have been made by

18  Mr. Pierre.

19  Q.   So something happened with the first letter.

20  A.   Correct.  I do not remember what changes had to be made

21  but it was some change that needed to be made.

22  Q.   Can I have 196-A, please.

23    And do you recognize Government Exhibit 196-A?

24  A.   Yes.  That is a draft of an opinion letter sent to me

25  by Mr. Jean-Pierre.

1846

Direct - DiTommaso

1    Q.   Okay.  Let's go down to the second paragraph, page 1 of

2    196-A.

3              Can you tell me -- do you recall now regarding the

4    12-month holding period with this Rule 144 letter?

5    A.   Yes.

6    Q.   Is that different than the first edition?  Do you

7    recall?

8    A.   I would have to look at the letters side-by-side,

9    but --

10   Q.   Okay.  You have it in your binder there.  It's Exhibit

11   219, pages 15 through 18.

12             Sir, if you just focus in on this reference

13   paragraph --

14   A.   Okay.

15   Q.   -- on Government Exhibit 219, on page 15, I think it

16   will help you out.

17   A.   Yeah.  Yes, there's an additional description of what

18   was going on.

19   Q.   So there was something wrong with the holding period in

20   the first letter?

21   A.   It appears probably the transfer agent, maybe

22   stockbroker, wanted to have more in-depth discussion on the

23   holding period.

24   Q.   Okay.  And who sent you the changes?

25   A.   Mr. Jean-Pierre did.

1847

Direct - DiTommaso

1   Q.   Okay.  And you've made a comparison with the second

2   draft on 196 with the one in your exhibit notebook, Exhibit

3   219, pages 19 through 22; is that correct?

4   A.   Correct.

5   Q.   And the only difference in the second draft is your

6   letterhead and your signature?

7   A.   Correct.

8   Q.   And you've had time to review the exhibit again, there

9   was actually a third edition; is that correct?

10   A.   That's correct.

11   Q.   Okay.  And can I have 197-A, please.

12        Is that the third edition of the letter?

13   A.   I believe that is correct.

14   Q.   And can I have Exhibit 197-B.

15        Can you tell the jury what this letter is stating

16   to the transfer agent.

17   A.   This is a letter from Scott Dittman of FusionPharm to

18   Bayside Realty Holdings, which is the shareholder.  And

19   they're referring to a promissory note.  And it's -- and

20   it's stating in there that FusionPharm will no longer

21   draft -- or take any more drawdowns of debt from Bayside

22   Realty.

23   Q.   Okay.  What's the date of that letter?

24   A.   December 5, 2011.

25   Q.   Okay.  Why is that important to you?

Direct - DiTommaso

1    A.    It's a reference date for calculating the one-year

2    holding period.

3    Q.    And so essentially there's three -- you reviewed all

4    three of these drafts; is that right?

5    A.    Correct.

6    Q.    And what changed in all three of these letters?

7    A.    Well, as the letters progressed, they got a better

8    description of the holding period.

9    Q.    Okay.  And who provided you the better description of

10   the holding period?

11   A.    Mr. Jean-Pierre did.

12   Q.    You didn't make those changes?

13   A.    I did not.

14   Q.    Okay.  And, finally, the letter in Government Exhibit

15   219, page 23 to 27, that's the letter that has your

16   letterhead and signature on it.

17   A.    That is correct.

18   Q.    Any major changes in the body?

19   A.    Not in the body, just my letterhead and my signature.

20            THE COURT:  Maybe that's a good place to pause, Mr.

21   Sibert.

22            MR. SIBERT:  Yes, sir.  Thank you.

23            THE COURT:  All right.  All right, members of the

24   jury, we're going to call it a day.  Again, I need to remind

25   you please do not do any independent research into or

1849

1    discuss with anyone the facts, the law, or the persons

2    involved with this lawsuit.  Please be back in the

3    deliberation room by 8:45 and we will attempt to start at

4    8:45 tomorrow morning.

5              We're in recess until 8:45 tomorrow morning.

6          (Jury left the courtroom at 5:08 p.m.)

7              THE COURT:  Mr. DiTommaso, since you're in the

8    middle of your testimony, I direct you not to speak with any

9    of the lawyers while court is in recess.

10             THE WITNESS:  Yes, Your Honor.

11             THE COURT:  All right.  And if you'll be back here

12   in the courtroom by 8:40 tomorrow morning.

13             THE WITNESS:  I will.

14             THE COURT:  All right.  Thank you.

15         (Proceedings concluded at 5:09 p.m.)

16                            **INDEX**

17   Item                                              PAGE

18                  GOVERNMENT'S WITNESSES

19   **ANDREW DUKE (Continued)**
     Direct Examination by Mr. Sibert (Cont'd)      1621
20   Cross-examination by Mr. Barnard               1626

21   **ROBERT DITTMAN**
     Direct Examination by Mr. Sibert               1641
22
     **CLIFFE BODDEN**
23   Direct Examination by Mr. Sibert               1658
     Cross-examination by Mr. Barnard               1778
24   Redirect Examination by Mr. Sibert             1787

25   **TOD DiTOMMASO**
     Direct Examination by Mr. Sibert               1794

1850

                         GOVERNMENT'S EXHIBITS

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|-----------|---------|----------|---------|------------|
| 111 | 1650 | 1650 | | |
| 180 | 1793 | 1794 | | |
| 181 | 1793 | 1794 | | |
| 182 | 1793 | 1794 | | |
| 183 | 1793 | 1794 | | |
| 184 | 1793 | 1794 | | |
| 186 | 1793 | 1794 | | |
| 186-A | 1793 | 1794 | | |
| 186-B | 1793 | 1794 | | |
| 186-C | 1793 | 1794 | | |
| 186-D | 1793 | 1794 | | |
| 186-E | 1793 | 1794 | | |
| 186-F | 1793 | 1794 | | |
| 186-G | 1793 | 1794 | | |
| 186-H | 1793 | 1794 | | |
| 187 | 1819 | 1819 | | |
| 187-A | 1819 | 1819 | | |
| 187-B | 1819 | 1819 | | |
| 187-C | 1819 | 1819 | | |
| 187-D | 1819 | 1819 | | |
| 188 | 1819 | 1819 | | |
| 189 | 1819 | 1819 | | |
| 190 | 1819 | 1819 | | |

1851

GOVERNMENT'S EXHIBITS

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|-----------|---------|----------|---------|------------|
| 191 | 1819 | 1819 | | |
| 191-A | 1819 | 1819 | | |
| 192 | 1819 | 1819 | | |
| 192-A | 1819 | 1819 | | |
| 192-B | 1819 | 1819 | | |
| 193 | 1819 | 1819 | | |
| 193-A | 1819 | 1819 | | |
| 194 | 1819 | 1819 | | |
| 195 | 1819 | 1819 | | |
| 195-A | 1819 | 1819 | | |
| 195-B | 1819 | 1819 | | |
| 195-C | 1819 | 1819 | | |
| 195-D | 1819 | 1819 | | |
| 195-E | 1819 | 1819 | | |
| 196 | 1819 | 1819 | | |
| 196-A | 1819 | 1819 | | |
| 197 | 1819 | 1819 | | |
| 197-A | 1825 | 1826 | | |
| 197-B | 1825 | 1826 | | |
| 198 | 1825 | 1826 | | |
| 199 | 1825 | 1826 | | |
| 200 | 1822 | 1822 | | |
| 200-A | 1822 | 1822 | | |

1852

GOVERNMENT'S EXHIBITS

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|-----------|---------|----------|---------|------------|
| 200-B | 1822 | 1822 | | |
| 200-C | 1822 | 1822 | | |
| 201 | 1822 | 1822 | | |
| 201-A | 1822 | 1822 | | |
| 201-B | 1822 | 1822 | | |
| 201-C | 1822 | 1822 | | |
| 202 | 1822 | 1822 | | |
| 202-A | 1822 | 1822 | | |
| 202-B | 1822 | 1822 | | |
| 202-C | 1822 | 1822 | | |
| 206 | 1822 | 1822 | | |
| 206-A | 1822 | 1822 | | |
| 206-B | 1822 | 1822 | | |
| 206-C | 1822 | 1822 | | |
| 207 | 1822 | 1822 | | |
| 208 | 1822 | 1822 | | |
| 209 | 1822 | 1822 | | |
| 212 | 1822 | 1822 | | |
| 212-A | 1822 | 1822 | | |
| 212-B | 1822 | 1822 | | |
| 213 | 1825 | 1826 | | |
| 214 | 1825 | 1826 | | |
| 215 | 1825 | 1826 | | |

1853

GOVERNMENT'S EXHIBITS

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|---|---|---|---|---|
| 215-A | 1825 | 1826 | | |
| 215-C | 1825 | 1826 | | |
| 215-D | 1825 | 1826 | | |
| 216 | 1825 | 1826 | | |
| 217 | 1825 | 1826 | | |
| 218 | 1794 | 1794 | | |
| 220 | 1825 | 1826 | | |
| 219 | 1794 | 1794 | | |
| 236 | 1774 | 1774 | | |
| 237 | 1774 | 1774 | | |
| 239 | 1705 | 1705 | | |
| 240 | 1682 | 1582 | | |
| 242 | 1705 | 1705 | | |
| 243 | 1693 | 1694 | | |
| 244 | 1705 | 1705 | | |
| 246 | 1705 | 1705 | | |
| 247 | 1705 | 1705 | | |
| 250 | 1705 | 1705 | | |
| 251 | 1705 | 1705 | | |
| 253 | 1745 | 1745 | | |
| 255 | 1705 | 1705 | | |
| 256 | 1705 | 1705 | | |
| 257 | 1680 | 1680 | | |

1854

1    GOVERNMENT'S EXHIBITS

2    EXHIBITS:       Offered    Received   Refused    Stipulated

3    259             1693       1693

4    260             1693       1693

5    265             1746       1746

6    266             1746       1746

7    273             1746       1746

8    275             1771       1771

9              *       *       *       *       *

10                 REPORTER'S CERTIFICATE

11

12        I certify that the foregoing is a correct transcript

13   from the record of proceedings in the above-entitled matter.

14        Dated at Denver, Colorado, this 26th day of March,

15   2020.

16

17

18

19   _                                              _

20              MARY J. GEORGE, FCRR, CRR, RMR

21

22

23

24

25