IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLORADO

Criminal Action No. 17-cr-0008-WJM

UNITED STATES OF AMERICA,

Plaintiff,

vs.

GUY JEAN-PIERRE a/k/a Marcelo Dominguez de Guerra,

Defendant.
------------------------------------------------------------

                         REPORTER'S TRANSCRIPT
                          (Jury Trial, Day 9)
                              Volume IX

------------------------------------------------------------

     Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

Judge, United States District Court for the District of

Colorado, commencing at 8:59 a.m., on the 25th day of

January, 2019, in Courtroom A801, United States Courthouse,

Denver, Colorado.

                            APPEARANCES

     JEREMY S. SIBERT and ROBERT M. BROWN, Assistant U.S.
Attorneys, 1801 California Street, Suite 1600, Denver,
Colorado 80202, appearing for the plaintiff.

     CLIFFORD J. BARNARD, Attorney at Law, 4450 Arapahoe
Avenue, Suite 100, Boulder, Colorado 80303, AND
     THOMAS E. GOODREID, Attorney at Law, 1801 Broadway,
Suite 1400, Denver, Colorado 80202, appearing for the
defendant.

                      MARY J. GEORGE, FCRR, CRR, RMR
                 901 19th Street, Denver, Colorado 80294
                 Proceedings Reported by Mechanical Stenography
                    Transcription Produced via Computer

1                  P R O C E E D I N G S

2       (Proceedings were held in open court outside the

3  presence of the jury at 8:59 a.m.)

4         THE COURT:  I understand that Ms. Frank informed

5  you of -- one of our jurors will be late because of a car --

6  we've had everything in this trial.  But to use the time

7  while we wait for her, I wanted to inform counsel and the

8  parties the following:  I've decided that, based on the

9  discussion we had yesterday with regard to how much evidence

10  still needs to come in for the Government, and the

11  defendant's representation of how much time he will need,

12  that I am going to move around my schedules for later in the

13  week, and I'm going to extend this trial by one day.

14        So I'm going to push some -- so when you folks are

15  on the -- on the other cases that are getting bumped by

16  criminal jury trials, you'll understand why these things

17  happen and you'll be more sympathetic.

18        So this is what we're going to do:  I have mapped

19  out a partial schedule here that we're going to adhere to.

20  The Government will rest at 3:15 Monday at the time that we

21  take our afternoon recess.  We'll take our afternoon recess

22  and then I will hear the Rule 29 motion, if there's one to

23  be made.  We will send the jury home for that day.  We'll

24  have argument and I'll have a ruling.

25        Assuming that the Rule 29 is not granted in whole,

1    Tuesday -- and I get to break this down -- I'm going to wait

2    until Monday at the end of the testimony on Monday at -- at

3    the end of the day, after the testimony and the Rule 29, to

4    map out exactly how we're going to apportion on Tuesday, but

5    I'm just going to tell you what's going to happen on

6    Tuesday.

7            On Tuesday, defendant will put on his case and,

8    depending on what comes in on that case, I will allow a very

9    brief Government rebuttal.  Again, I don't have the

10   apportionments yet.  After that, we'll send the jury home.

11   We'll have the jury charge -- jury instruction charging

12   conference, and we will go through the exhibits that are to

13   be going back to the deliberation room so that we're all in

14   agreement on that.  Wednesday morning, we're going to start

15   at 8:30.  I will read the jury instructions -- the final set

16   at 8:30, followed immediately thereafter by the closing

17   arguments.  And then the case will go to the jury.

18           Because I've already ordered all of you not to

19   speak with the jurors, I know that none of you will inform

20   them of this extra day until I tell them -- and I don't plan

21   on telling them until the end of the day today, so they

22   don't stew about it during the day and they go home during

23   the weekend and --

24           MR. BROWN:  There would be more accidents.

25           THE COURT:  -- and they get over it and come back

1   Monday morning.  Any questions on that?

2         MR. SIBERT:  No questions on that, Your Honor.

3   Just one thing I would like to raise with the Court, before

4   the jury comes in.

5         THE COURT:  First let me ask --

6         MR. SIBERT:  Yes, sir.

7         THE COURT:  -- if the defendant has any questions.

8         MR. BARNARD:  No questions on that, Your Honor.

9         THE COURT:  Okay.

10        MR. BARNARD:  I have one minor thing to raise with

11  the Court.

12        THE COURT:  Okay.  All right.  Mr. Sibert.

13        MR. SIBERT:  Your Honor, before I had to do a quick

14  laundry list of evidence, these -- these Government exhibits

15  have been stipulated to.  I spoke to defense this morning,

16  and I would ask if I could just move them into evidence

17  right now.

18        THE COURT:  Sure.  Might as well use the time.  Go

19  ahead.

20        MR. SIBERT:  It's 209-A through D --

21        THE COURT:  All right.

22        MR. SIBERT:  -- 210, 210-A, 210-B, 211, 211-A and

23  B.  And that should be the last exhibits for the witness Mr.

24  DiTommaso.

25        THE COURT:  So you're not sure or you're sure?

1    MR. SIBERT:  I'm sure.

2    THE COURT:  You --

3    MR. SIBERT:  After last night's review, I'm hoping

4    I don't have to interrupt again.

5    THE COURT:  All right.  Given the stipulation of

6    the parties, Government Exhibits 209-A, B, C, and D, 210,

7    210-A and B, 211, 211-A and B are admitted into evidence and

8    may be published to the jury.

9    (Government's Exhibits received)

10    MR. SIBERT:  Thank you for letting me do that.

11    THE COURT:  Mr. Barnard, you have a matter.

12    MR. BARNARD:  Yes, Your Honor.  The anticipated

13    third witness today is going to be a Mr. Scoufis, who has

14    also been designated as an expert, and so I've arranged for

15    Professor Eric Gerding to be present for his testimony, and

16    I would like to be able to -- well, get him in here, first

17    of all, but then have him seated next to me where Mr.

18    Jean-Pierre is, and then move Mr. Jean-Pierre over to the

19    other side.

20    THE COURT:  That's fine.  I don't -- I don't

21    control how the parties and counsel want to apportion the

22    seating at their tables, so you sit people where you want

23    them to be seated.

24    MR. BARNARD:  And my -- actually, the greater issue

25    was that I would need to be able to -- or we would have to

1       be able to go get him --

2               THE COURT:  Well, we have -- my understanding is

3       from the first morning of trial, that there was an agreement

4       that expert witnesses were exempted from the exclusion

5       order, so he's -- it's Erik, right?  It's a man?

6               MR. BARNARD:  Yes.

7               THE COURT:  Yeah.  He is free to be in the

8       courtroom at any time.

9               MR. BARNARD:  And I guess, really, what I'm saying

10      is one of us is going to have to let him go out --

11              THE COURT:  That's fine.  That's no problem.

12              MR. BARNARD:  Thank you.

13              THE COURT:  All right.  We will be in recess until

14      Ms. Tannenbaum arrives.

15          (Recess taken 9:06 a.m.)

16          (In open court in the presence of the jury at

17      9:14 a.m.)

18              THE COURT:  Good morning, ladies and gentlemen of

19      the jury.  Welcome back to day 9 of our jury trial.

20              Ms. Tannenbaum, I was sorry to hear that you were

21      in a car accident, but very relieved to hear that you're all

22      right.  Thank you for making the effort to rejoin us this

23      morning.

24              Mr. DiTommaso, I remind you that you remain under

25      oath.

Direct - DiTommaso

1    THE WITNESS:  Yes, Your Honor.

2    THE COURT:  Mr. Sibert, you may resume your

3    examination.

4    MR. SIBERT:  Okay, thank you, Your Honor.

5    DIRECT EXAMINATION (Continued)

6    BY MR. SIBERT:

7    Q.   Good morning, Mr. DiTommaso?

8    A.   Good morning.

9    Q.   We left off yesterday and I believe we were just

10   wrapping up some Rule 144 opinion letters that were

11   essentially drafted based upon your testimony by the

12   defendant, Mr. Guy Jean-Pierre, and forwarded to you for

13   your signature and letterhead.  I'd like to pick up from

14   that testimony.  I'd like to start out with some opinion

15   letters that you were involved in regarding the sale of the

16   Bayside Realty Holdings note.  Okay?

17   A.   Okay.

18   Q.   All right.  So could you please -- could I please have

19   Government Exhibit 200 on the screen, please.

20        Okay, sir, Mr. -- now, do you recognize this e-mail

21   here at the top?

22   A.   I believe it belongs to Guy Jean-Pierre.

23   Q.   And, again, the bottom of this e-mail, whose name is

24   that?

25   A.   That's Guy Jean-Pierre.

Direct - DiTommaso

1     Q.    Okay.  And based upon you received it March 2013, what

2     is Mr. Guy Jean-Pierre sending you and what is attached to

3     the e-mail?

4     A.    He's sending me some -- draft opinion letter along with

5     supporting documentation.

6     Q.    Okay.  So it's just one draft opinion letter; is that

7     correct?

8     A.    That is correct.

9     Q.    And it's for a company named Star City?

10    A.    Correct.

11    Q.    Can I have Government Exhibit 200-A, please.  Can you

12    focus on the top part, please.  Thank you.

13          Sir, do you recognize this document?

14    A.    Yes, I do.  It says securities transfer agreement.

15    Q.    Okay.  And can you tell the jury who's involved with

16    this securities transfer agreement.

17    A.    Bayside Realty Holdings is the seller and Star City

18    Capital is the purchaser.

19    Q.    Okay.  And what is Star -- what is Bayside Realty

20    Holdings selling?

21    A.    It -- excuse me, Bayside has -- or holds debt belong --

22    or owed by FusionPharm.

23    Q.    Okay.  And, again, do you recall what kind of debt

24    Bayside is holding regarding the debt owed to them by

25    FusionPharm?

Direct - DiTommaso

1    A.    In this instance, it's a promissory note and it was a

2    loan of money to -- by Bayside to FusionPharm.

3    Q.    Okay.  And can you explain to the jury essentially how

4    a sale of what is considered debt, the note, is being

5    transpired here under this securities transfer agreement?

6    A.    Bayside is selling a portion of the debt to Star City.

7    Q.    And what specifically is Bayside Realty Holdings -- or

8    Bayside Realty Holdings selling when you say "a portion of

9    the debt"?  Is that the -- what portion of that debt are

10   they selling?

11   A.    From this document, it shows that $12,885 debt is being

12   sold for $55,000.

13   Q.    Okay.  And that's the second portion.  What's the first

14   portion?

15   A.    Oh, I -- all right, the first portion is a $116,875

16   debt being sold for that exact same amount, and the two

17   portions together is $171,875.

18   Q.    Okay.  And you talked about yesterday that this debt

19   was a convertible promissory note; is that correct?

20   A.    Correct.

21   Q.    So when you sell the note in a situation like this,

22   does that conversion option sold -- is that also sold with a

23   portion of the note?

24   A.    The option is sold, yes.

25   Q.    Okay.  So Star City will have -- if they buy this note,

1    Star City will have the option to convert that debt into
2    shares of stock?
3    A.    That is correct.
4    Q.    And so basically shares of FusionPharm stock.
5    A.    Yes.
6    Q.    Thank you.  Can I have Government Exhibit 200-B.
7          Okay, sir, can you just explain -- can you explain
8    essentially what this letter is to FusionPharm, via e-mail.
9    A.    It's a notice of conversion.  This is where the
10   shareholder -- not the shareholder yet, but the debt holder
11   wants to trend -- or confer the debt into the shares of
12   stock.
13   Q.    Okay.  So -- so the buyer of this note is telling
14   FusionPharm they want to convert the portion of the debt
15   they're buying into stock?
16   A.    Correct.  And they want to convert $12,885 of debt into
17   137,500 shares of FusionPharm stock.
18   Q.    And is this part of a package that needs -- is this a
19   letter that needs to be sent with a package to the transfer
20   agent?
21   A.    I don't think it's necessarily required to be sent to
22   the transfer agent, but the more documentation supporting
23   the transaction, the better.
24   Q.    Okay.  This was sent to you so you could essentially
25   review the -- the legal opinion letter sent to you by Guy

1   Jean-Pierre and then attach your signature?

2   A.   That is correct.

3   Q.   And can I have Government Exhibit 200-C.

4        Do you recognize Government Exhibit 200-C?

5   A.   Yes, I do.  It's a draft opinion letter.

6   Q.   Okay.  And, again, who sent you this draft opinion

7   letter?

8   A.   Mr. Jean-Pierre.

9   Q.   Now, can I just have this taken down for a second.

10       I just want to ask you:  Here, based upon your

11  review of this letter, is Star City considered an affiliate

12  when they're purchasing this note regarding FusionPharm?

13  A.   I believe that Star City claimed that it was not an

14  affiliate of FusionPharm.

15  Q.   Okay.  If Bayside Realty Holdings was an affiliate to

16  FusionPharm, would Star City then be an affiliate to

17  FusionPharm?

18  A.   Not necessarily.  Star City and Bayside are two

19  separate entities.

20  Q.   Okay.  All right.  Now, let's talk about the holding

21  period.  If Bayside Realty Holdings was a affiliate of

22  FusionPharm, how long would someone -- how long would Star

23  City have to hold the shares before they were free-trading

24  when they bought this note?

25  A.   If Star City was not an affiliate but Bayside was, then

Direct - DiTommaso

1   Star City would have to hold it for one year from the date
2   they purchased it before they could free-trade the shares.
3   Q.   Okay.  So if Bayside Realty Holdings was labeled an
4   affiliate, Star City can't -- what's considered in the
5   trading world of securities, tack onto their holding
6   period?
7   A.   They would not be able to tack on Bayside's holding
8   period, no.
9   Q.   Can I have 200-C back up, please.  Can you please blow
10  up this bottom portion.
11       Okay, sir, in this letter, this opinion letter --
12  at the bottom paragraph, it mentions that January 4th, 2013,
13  opinion letter.  Do you see that?
14  A.   Yes, I do.
15  Q.   Can you explain to the jury why a January 4th, 2013,
16  opinion letter is mentioned into the opinion letter
17  regarding the sale portion of the note for Bayside?
18  A.   The January 4, 2013, opinion letter had more details
19  about the transaction than the transaction.
20  Q.   Okay.  Do you recall those details?
21  A.   Not as I sit here right now.
22  Q.   Okay.  Can I please have Government -- or page -- page
23  2 of 200-C.  Can I have this paragraph blown up.
24       Okay, sir, the draft that you were sent started
25  with "As."  This sentence talks about the 12-month holding

Direct - DiTommaso

1    period; is that correct?

2    A.   That is correct.

3    Q.   And what's the opinion being rendered that brokers will

4    rely on?

5    A.   That is correct.

6    Q.   Okay.  And brokers will rely on this holding period in

7    order to take the restriction off the shares?

8    A.   Actually, the transfer agent would take the restriction

9    off the shares.

10   Q.   Okay.  And then the broker would also conduct a review

11   regarding the holding period?

12   A.   That is correct.

13   Q.   Okay.  So essentially what you're stating is -- who's

14   the original holder?

15   A.   Bayside is the original holder.

16   Q.   And what is this sentence saying about the original

17   holder?

18   A.   That the original holder is a nonaffiliate of

19   FusionPharm and neither is the shareholder.

20   Q.   Okay.  So this letter is saying Bayside was never --

21   was a nonaffiliate 90 days prior to this letter?

22   A.   Correct.

23   Q.   Now, I want to just reference some of those questions I

24   asked you before.

25           If Bayside was an affiliate, would the 12-month

1    period have been met on March 6th, 2016, the time frame
2    around when this transfer was occurring?
3    A.    I do not believe so, no.
4    Q.    Well, why is that?
5    A.    Because if Bayside was an affiliate, then the
6    shareholder would not have been able to tack on the time
7    that Bayside held the debt.
8    Q.    Thank you.  And, again, who sent you this opinion
9    letter?
10   A.    Mr. Guy Jean-Pierre.
11   Q.    And just quickly, can I have Exhibit 219, page 23,
12   published.  Okay.  I'm going to ask for page 24.  I'm sorry,
13   25.  Can you blow up the top, please.
14         Sir, do you see Government Exhibit 219 in your
15   binder there?  And can you just look at page 23 first for
16   me.
17   A.    Okay.
18   Q.    Okay.  And essentially what opinion letter is being
19   displayed in Exhibit 219 on page 23?
20   A.    It's a January 4th, 2013, opinion letter.
21   Q.    Okay.  For -- and what is this opinion regarding?
22   A.    Bayside Realty Holdings as a shareholder.
23   Q.    Okay.  And can you just quickly explain what the legal
24   opinion regarding this legal letter is referring to with
25   Bayside Realty Holdings.

Direct - DiTommaso

1    A.    It refers to the 275,000 promissory note.

2    Q.    Okay.

3    A.    And it talks about -- and it talks about the date that

4    the part of the debt was exchanged.

5    Q.    Okay.  And what's happening regards to the transaction

6    in the first paragraph?

7    A.    The shareholder wants to convert $1,400 of the debt

8    into 140,000 shares.

9    Q.    So this is a conversion of Bayside holding that note to

10   convert into FusionPharm shares; is that right?

11   A.    That is correct.

12   Q.    And part of that is the affiliation status; is that

13   right?

14   A.    That's an important part of it, yes.

15   Q.    Okay.  Can you pull up this section, please.

16         Okay.  And what does the January 4th, 2013, opinion

17   letter state about the affiliation regarding Bayside with

18   FusionPharm 90 days -- up to 90 days prior of this letter?

19   A.    That paragraph states that the shareholder is not an

20   affiliate of the company or a control person of the company.

21   Q.    And who's the shareholder?

22   A.    I believe in this case, it would be Bayside Realty.

23   Q.    Okay.  And that's the letter that you were discussing

24   in the Star City purchase --

25   A.    That's correct.

Direct - DiTommaso

1　Q.　Okay.　Okay.　And, again, who sent you the January 4th,

2　2013, letter saying that Bayside was not an affiliate to

3　FusionPharm?

4　A.　The draft opinion and the supporting documentation came

5　from Mr. Jean Guy Pierre.

6　Q.　And do you recall who owned Bayside?

7　A.　I do not remember who owns Bayside.

8　Q.　Okay.　All right.　And then can we just have --

9　essentially we looked at 200-C.　Can I just have that

10　published quickly again.

11　　　　　　And is this the draft letter that Mr. Guy

12　Jean-Pierre sent you?

13　A.　That is correct.

14　Q.　Okay.　And then can I please have on the monitor

15　Exhibit 219, 36 -- page 36.　And just keep it like that.

16　　　　　　Do you see -- can you just look at your binder,

17　pages 36 to 39.

18　A.　Okay.

19　Q.　And that's the -- essentially is that the same letter

20　that Mr. Guy Jean-Pierre sent you?

21　A.　He sent me the draft of this and I placed my letterhead

22　and signed it.

23　Q.　Okay.　Did you make any changes in the body?

24　A.　Just placing the letterhead and signing it.　That was

25　the only changes.

Direct - DiTommaso

1    Q.   And you were able to compare this letter with the

2    letter I just showed you, the draft, on 200-C?

3    A.   That is correct.

4    Q.   Okay.  And can you tell me -- can you just look through

5    the next -- how I'm going to do this -- essentially starting

6    at page 32.  Can you look at that letter.  In Exhibit 219.

7    A.   Okay.

8    Q.   And can you look at the next letter on page 28 of 219.

9    A.   Okay.

10   Q.   And can you look at page 40 of Exhibit 219.

11   A.   Okay.

12   Q.   And, finally, can you look at page 44 of Exhibit 219.

13   A.   Okay.

14   Q.   Are those all letters that you received from Guy

15   Jean-Pierre?  Is that correct?

16   A.   I did receive the draft of the opinion letters from Mr.

17   Pierre, yes.

18   Q.   And they deal with the other four buyers regarding the

19   Bayside note, the other four companies; is that right?

20   A.   That is correct.

21   Q.   Okay.  And the only changes that you made to those

22   letters involved what, sir?

23   A.   Putting my letterhead on it and signing them.

24   Q.   Okay.  And how about potentially some of the dates?

25   A.   That would be possible.  I don't have that memory of

Direct - DiTommaso

1    that today, but if I drafted the letter -- or prepared the

2    letter a day after Mr. Pierre sent them to me, then I would

3    change the date.

4    Q.   By one day?

5    A.   Correct.

6    Q.   All right.  And your testimony would remain consistent

7    that with all those letters that you just reviewed in

8    Government Exhibit 219, who sent you the supporting

9    documentation?

10   A.   All the -- all of them were sent to me by Guy

11   Jean-Pierre.

12   Q.   And the only changes that were made to the letter that

13   was sent to you by Mr. Guy Jean-Pierre regarding those four

14   companies was essentially that you put your letterhead and

15   signature on them?

16   A.   That is correct.

17   Q.   Okay, sir, can you -- can you take a look at Government

18   Exhibit 215, please.  It's going to come on your screen.

19   And can you keep page 75 open for Exhibit 219.  I'm sorry,

20   can I have this taken down.  May I have Exhibit 210

21   published.

22        Okay, sir, can you explain essentially why Mr. Guy

23   Jean-Pierre is sending you another version of an opinion

24   letter for -- what's titled Black Arch?

25   A.   It would appear to -- that Mr. Guy Jean-Pierre was --

Direct - DiTommaso

1    needed to have the opinion letter revised and he was sending
2    me the revised draft of that opinion letter.
3    Q.   Okay.  And, again, he's sending you some attachments in
4    this e-mail; is that correct?
5    A.   That is correct.  That would be the supporting
6    documentation.
7    Q.   Can I have Exhibit 210-A, please.
8             Okay, you've reviewed this exhibit before your
9    testimony here today.
10   A.   That is correct.
11   Q.   Is there any way we can blow that up a little more?
12            Do you know what Mr. Scott Dittman is sending to
13   the transfer agent in this letter?
14   A.   It appears to be a cover letter sent by Mr. Dittman
15   that would have all the supporting documentation for this
16   transaction.
17   Q.   Okay.  And what is Mr. Dittman telling the transfer
18   agent under A and B?
19   A.   Stating that one of the requirements for a Rule 144 is
20   that you can't have additional consideration and monies paid
21   to the company by the original holder or the new
22   shareholder.  And -- but this document is stating that --
23   from Mr. Dittman is that that in fact is the correct -- what
24   took place is no more additional consideration was paid for
25   those shares.

1    Q.   Okay.  So you're speaking in securities.  Can you try

2    to explain that in a little bit more of a lay opinion way.

3    A.   Okay.  In order -- in order to transfer debt to another

4    person or entity and have Rule 144 apply, the person that is

5    receiving the debt -- or the converted shares cannot pay to

6    the company any additional money.

7         So, for instance, if someone paid Bayside $100 for

8    shares, that person cannot also pay $50 to FusionPharm,

9    otherwise, you would not have the Rule 144 apply.

10   Q.   Okay.  So is it fair to say the buyer of the note that

11   can be converted into shares of stock for FusionPharm can't

12   provide FusionPharm any more money?

13   A.   Correct.

14   Q.   And, again, when the debt is being sold, FusionPharm is

15   not drawing down anymore; is that correct?

16   A.   That is correct.

17   Q.   So they're finished taking their line of credit?

18   A.   FusionPharm is stating that they're finished taking any

19   more money, any more additional loan funds.

20   Q.   Okay.  Can I have Government Exhibit 210-B, B as in

21   bravo.  Can you zoom back out.

22        Okay, do you recognize what this opinion letter is?

23   A.   Yes, I do.

24   Q.   Okay.  Can you tell the jury what it is.

25   A.   It's a draft opinion letter that shows the revisions to

Direct - DiTommaso

1    the original opinion letter that was sent out earlier.

2    Q.    Okay.  Did you make your revisions in this letter?

3    A.    I did not.

4    Q.    Who made the revisions?

5    A.    I believe that Mr. Guy Jean-Pierre did.  That's who I

6    received it from.

7    Q.    Again, Mr. Jean-Pierre just sent you the draft letter

8    regarding Mr. Dittman's communications with the transfer

9    agent?

10   A.    Correct.

11   Q.    Okay.  And now can you look in your binder on Exhibit

12   219, page 64.

13         Can I have that published, Exhibit 219, page 64.

14   A.    Okay.

15   Q.    All right.  Do you recognize this opinion letter?

16   A.    Yes, I do.

17   Q.    And what opinion letter is this?

18   A.    This would be the revised opinion letter.

19   Q.    For what company -- what's happening in this opinion

20   letter?

21   A.    Black Arch is the shareholder and they're converting

22   part of the debt -- $1,172 of the debt into one -- 12,500

23   shares of common stock.

24   Q.    For what company?

25   A.    For FusionPharm.

Direct - DiTommaso

1    Q.   Okay.  And this is the draft -- this is the letter that

2    Mr. Guy Jean-Pierre sent you both for your letterhead and

3    signature on the last page?

4    A.   This would -- he sent me the draft and I put it on my

5    letterhead, yes.

6    Q.   Okay.  And you know that by your signature down here at

7    the bottom?

8    A.   Yes.  This is when I first reviewed it, yes.

9    Q.   Okay.  And can I have the last page of 210-B.

10             And, again, you talked about your signature.  Is

11   that your signature?

12   A.   That is correct.

13   Q.   Okay.  Can you look at Exhibit 219 in your book.  All

14   right.  Exhibit 219, pages 48 through 63.

15   A.   Okay.

16   Q.   Okay.  And, again, you reviewed these documents prior

17   to your testimony.  Can you tell the jury what those opinion

18   letters are?

19   A.   This one here is an opinion letter with the

20   shareholder, Alexandra Morellio.  And this person purchased

21   the debt from Bayside Realty Holdings and then converted it

22   $2,343 of debt into 25,500 shares of FusionPharm.

23   Q.   And can you just discuss who the second letter is for.

24   A.   The -- who it's for?

25   Q.   Is there a second letter after that letter?

1    A.    The next letter is for the shareholder, Vera Group,

2    LLC.  And the same transaction, basically.

3    Q.    Okay.

4    A.    Vera Group is converting -- seeking to convert $1,172

5    of debt into 12,500 shares of FusionPharm.

6    Q.    All right.  Give me a second, Mr. DiTommaso.  You spoke

7    about the first letter.  The second letter starts on page

8    52; is that correct?

9    A.    Correct.

10   Q.    And that's between Vera Group and Bayside; is that

11   right?

12   A.    Correct.

13   Q.    Can you go to page 56.

14   A.    This letter deals with the shareholder Star City

15   Capital.  And Star City, like the other shareholders, is

16   purchasing debt to Bayside Realty and choosing to convert it

17   into common shares of FusionPharm stock.

18   Q.    Okay.  And, finally, can you look at page 60.

19   A.    Yes.  And this is another letter from the same type of

20   transaction.  In this case, it's SGI Group purchasing -- or

21   wanting to convert $1,172 of debt that it purchased from

22   Bayside Realty into 12,500 shares of FusionPharm's stock.

23   Q.    Okay.  So you just spoke about four attorney opinion --

24   Rule 144 attorney opinion letters; is that right?

25   A.    Correct.

1878
Direct - DiTommaso

1    Q.    Can I have Exhibit 209 up, please.

2           Okay.  Can you tell me who is sending you this

3    e-mail?

4    A.    Mr. Jean-Pierre sent me that e-mail.

5    Q.    And what's the subject?

6    A.    The revised opinion letters that we just discussed.

7    Q.    And so those letters that you just discussed, those

8    four letters, those were essentially the same letters that

9    Mr. Guy Jean-Pierre sent you.  What was the only difference?

10   A.    The only difference would be placing it on my

11   letterhead and then signing it.

12   Q.    Okay.  Can I please have Exhibit 211.

13          Okay, sir, again, who's e-mailing you now on March

14   30th, 2013?

15   A.    Mr. Jean-Pierre sent me that e-mail.

16   Q.    Okay.  And what is he sending you in this e-mail?

17   A.    It's a draft opinion letter plus the supporting

18   documentation.

19   Q.    Okay.  And what opinion letter -- is this opinion

20   letter titled anything?

21   A.    It -- on the title of the attachment is MeadPoint, so

22   MeadPoint would be the shareholder.

23   Q.    Can I have 211-A, please.

24          Can you tell the jury what supporting documentation

25   is being shown in 211-A that Mr. Guy Jean-Pierre sent you.

Direct - DiTommaso

1    A.    This is a letter from Scott Dittman of FusionPharm to

2    the transfer agent, Pacific Stock Transfer.

3    Q.    Okay.  And what's the letter stating?

4    A.    It's giving permission -- FusionPharm's saying that

5    it's authorizing the conversion of debt into its shares.

6    Q.    And, more importantly, what is Mr. Dittman representing

7    about MeadPoint's --

8    A.    That MeadPoint -- that MeadPoint is not and has never

9    been an affiliate of the company.

10   Q.    And what company are we talking about?

11   A.    The company would be FusionPharm.

12   Q.    Can I have 211-B, please.

13         Again, sir, can you tell the jury what this draft

14   letter is.

15   A.    It's a draft opinion letter regarding that transaction

16   received from Mr. Jean-Pierre.

17   Q.    And under this paragraph, what did Mr. Guy Jean-Pierre

18   draft about the holding period?

19   A.    That the converted debt had been held for 12 months.

20   Q.    Okay.  And this date up here, when was the last time

21   there was a, drawdown according to Mr. Guy Jean-Pierre, on

22   that debt by MeadPoint?

23   A.    According to this letter, December 8th, 2011.

24   Q.    Can you do a -- if the drawdown -- if the letter was

25   actually -- if the agreement in this letter, the debt, was

1   created in 2012, would the one-year holding period have been
2   met as of March 13th, 2013?
3   A.   The debt took place on December 8th, 2011, like it
4   states.  And then the letter was over a year past that,
5   December 12th, 2012, then that would indicate that the
6   one-year holding period had occurred.
7   Q.   Okay.  But what would happen if the debt was created in
8   2012?
9   A.   If it was less than a 12-month holding period, then
10  this letter would be incorrect and the Rule 144 would not
11  apply.
12  Q.   Okay.  And -- and Mr. Guy Jean-Pierre is saying in the
13  draft that represents the debt occurred on December 8th --
14  or the last drawdown was December 8th, 2011.
15  A.   Correct.
16  Q.   Okay.  And then can I have page -- can I have page 2 of
17  that.
18          MR. GOODREID:  Sorry, counsel, which exhibit?
19          MR. SIBERT:  Excuse me.  211-B.
20          MR. GOODREID:  Thank you.
21  BY MR. SIBERT:
22  Q.   And, again, what is Mr. Guy Jean-Pierre representing in
23  paragraph B in this letter that he drafted to you?
24  A.   That MeadPoint was not an affiliate of FusionPharm.
25  Q.   For the 90 days prior to this letter?

Direct - DiTommaso

1    A.   Correct.

2    Q.   And, finally, sir, can you look at Exhibit 219, page

3    71.  If I could have that up, please.

4    A.   Okay.

5    Q.   And do you recognize that opinion on Exhibit 219, page

6    71?

7    A.   Yes, I do.

8    Q.   Okay.  And just tell the jury again what this letter

9    is.

10   A.   This letter is concerning MeadPoint as the shareholder

11   of FusionPharm, and it's -- the shareholder wanted to

12   convert $4,750 of debt into 475,000 shares of FusionPharm

13   stock.

14   Q.   What is different about this letter and the letter that

15   Guy Jean-Pierre sent you?

16   A.   The only differences would be my letterhead and my

17   signature.

18   Q.   And can I please have Government Exhibit 215.

19        Okay, sir, can you tell the jury what Mr. Guy

20   Jean-Pierre's e-mailing you about regarding the e-mail sent

21   to you on August 26th, 2013.

22   A.   That would be a draft opinion letter along with the

23   supporting documentation.

24   Q.   Okay.  And can you tell me what the supporting

25   documentation is attached to this?  Can you see that?

Direct - DiTommaso

1    That's all right.  I'll introduce it.

2              Can I have 215-A, please.

3              Okay.  What attachment is being shown to you by Mr.

4    Guy Jean-Pierre in this letter?

5    A.   This is a letter from William Sears to the transfer

6    agent, and it's stating that MeadPoint is not an affiliate,

7    it describes the transaction taking place.

8    Q.   Where's it saying that MeadPoint is not an affiliate?

9    A.   That's my mistake.  It doesn't say that.

10   Q.   Okay.  So what is this letter stating then, again?

11   A.   It's just describing the transaction by Richard Scholz.

12   Basically it is debt that's held by MeadPoint and it's being

13   sold to Richard Scholz, who's going to then convert that

14   into shares of FusionPharm stock.

15   Q.   Okay.  And what's the conversion rate for Mr. Scholz?

16   A.   1 cent per share.

17   Q.   Okay.  Can I have Exhibit 215-B, please.

18             Can you tell me what Mr. Scott Dittman is

19   representing to Pacific Stock Transfer in this letter

20   regarding this sale of the MeadPoint note?

21   A.   This is regarding Myron Thaden and his purchase of debt

22   from MeadPoint and converting it into shares of common stock

23   of FusionPharm at 1 cent per share.

24   Q.   And what does this say in this letter about MeadPoint?

25   A.   This is FusionPharm stating that MeadPoint is not and

1    never has been an affiliate in the company and the company

2    is FusionPharm.

3    Q.   Can I have 215-C, please.

4         And can you summarize this letter from Scott

5    Dittman going to the transfer agent.

6    A.   This is a similar letter, but this one refers to

7    Sharryn Thaden.

8    Q.   When you say "similar letter," similar letter to 215-B

9    regarding Myron Thaden?

10   A.   Correct.  This is describing the transaction and also

11   stating that MeadPoint is not and never has been an

12   affiliate of FusionPharm.

13   Q.   And so that would be for 90 days prior to August 23d,

14   2016?

15   A.   Correct.

16        THE COURT:  You mean 2013.

17        MR. SIBERT:  Thank you, Your Honor.

18        THE WITNESS:  Actually, the letter states that

19   MeadPoint has never been, so that would be forever.  But for

20   Rule 144, it's only necessary that it be true for 90 days

21   prior to that conversion.

22        MR. SIBERT:  Good catch, sir.  I appreciate that.

23   BY MR. SIBERT:

24   Q.   And can I have 215-D, please.

25        And can you tell the jury what this letter is.

Direct - DiTommaso

1  A.   This is a draft opinion letter that was sent to me by

2  Mr. Jean-Pierre.

3  Q.   Okay.  And the opinion letter is regarding the sale of

4  the MeadPoint note; is that correct?

5  A.   Correct.  And those three individuals.

6  Q.   All right.  So Mr. Guy Jean-Pierre sent you those three

7  letters regarding Mr. Scholz and the Thadens, along with the

8  draft attorney opinion letter?

9  A.   Correct.

10  Q.   Okay.  And can you look at Government Exhibit 219, page

11  75 through 78.  Can I have Exhibit 219, page 75 published.

12  A.   Okay.

13  Q.   Do you recognize this letter, sir?

14  A.   Yes, I do.

15  Q.   Okay.  And -- I'm sorry, I put up the wrong document.

16  Can I have Exhibit 219, page 79.

17       And can you look at 79.  Sir, can you tell me, is

18  this the opinion letter that was sent to you from -- by Mr.

19  Guy Jean-Pierre regarding those three parties buying

20  MeadPoint note?

21  A.   Mr. Jean-Pierre sent me the draft and I put it on the

22  letterhead.

23  Q.   Okay.  And so this is the letter that you put on the

24  letterhead?

25  A.   Correct.

Direct - DiTommaso

1    Q.   Okay.  And the last page, which would be 81.  One more

2    page.  82.

3             I'm sorry, this is your signature block; is that

4    right?

5    A.   That is, correct.

6    Q.   Do you know why your signature is not there?

7    A.   I do not know.

8    Q.   Okay.  But essentially it's the same letter but for

9    your letterhead?

10   A.   That is correct.

11   Q.   Okay.  Any changes in the body of the letter?

12   A.   No.

13   Q.   And, finally, can you just look -- can I have 219, page

14   75, published.

15            Can you look at 219 -- Exhibit 219, page 75 through

16   78.

17   A.   Okay.

18   Q.   Does this Rule 144 letter regard a conversion -- excuse

19   me, essentially a conversion of 500 shares from MeadPoint

20   into -- or, excuse me, $50,000 of debt into $500,000 shares

21   from MeadPoint?

22   A.   This letter is MeadPoint converting its debt -- $5,000

23   of its debt into 500,000 shares of FusionPharm stock.

24   Q.   Okay.  So I might have misspoke there.  Basically

25   MeadPoint is converting $5,000 of debt that FusionPharm owes

Direct - DiTommaso

1    them into 50,000 -- or 500,000 shares of common stock.

2         MR. GOODREID:  Objection.  Leading.

3         THE COURT:  Sustained.

4    BY MR. SIBERT:

5    Q.   Okay.  I'm sorry, sir, can you just, again, explain

6    what MeadPoint is doing in this opinion letter.

7    A.   MeadPoint is the shareholder that's seeking to convert

8    $5,000 of a debt that FusionPharm owes MeadPoint into

9    500,000 shares of FusionPharm stock.

10   Q.   They're converting the debt into stock?

11   A.   Correct.

12   Q.   And then can I have this paragraph blown up.

13        Okay.  What is being represented here about the

14   holding period?

15   A.   That the shareholder, MeadPoint, has held the debt for

16   over 12 months.

17   Q.   Okay.  And then can I have page 76.  And what is the

18   opinion letter stating about the affiliation of MeadPoint to

19   FusionPharm?

20   A.   That MeadPoint has not been an affiliate of the company

21   for at least 90 days prior to the letter.

22   Q.   All right.  And then, again, you've looked at pages 75

23   through 78; is that correct?

24   A.   That is correct.

25   Q.   Who provided you a draft of this letter?

Direct - DiTommaso

1    A.   Mr. Jean-Pierre provided it to me.

2    Q.   Okay.  And did you make any changes to this opinion

3    letter except for your letterhead and your signature?

4    A.   I did not.

5    Q.   Thank you.  Okay, sir, in the beginning of your

6    testimony yesterday, we talked about, essentially, you

7    providing invoices to Mr. Guy Jean-Pierre; is that

8    correct?

9    A.   That is correct.

10   Q.   Okay.  And, again, how much did you charge Mr. Guy

11   Jean-Pierre for each letter?

12   A.   Most of the time, I did $175 per letter.

13   Q.   Did you charge for revisions that Mr. Guy Jean-Pierre

14   sent you?

15   A.   I did.  I charged $25 for each revision.

16   Q.   Okay.  And do you remember who paid you?  Was it

17   FusionPharm or Mr. Guy Jean-Pierre?

18   A.   All the funds came from Mr. Jean-Pierre either by check

19   or wire transfer.

20   Q.   And do you recall what account the wire transfers came

21   to you?

22   A.   I don't remember the exact title, but I know it was

23   from Jean-Pierre.

24   Q.   Do you know what bank you were banking at at the

25   time?

Direct - DiTommaso

1    A.   My bank was Union Bank.  I do not know what bank -- I
2    do not remember what bank Jean-Pierre was using.
3    Q.   I did not hear what bank.
4    A.   My bank was Union Bank.
5    Q.   Union Bank?
6    A.   Yeah -- yes.
7    Q.   Can we look at Exhibit 220, please.
8            I'm just showing you the first page of 220.  Can
9    you describe to the jury what page 220 is.
10   A.   That's an invoice that I sent to Mr. Jean-Pierre.
11   Q.   Okay.  And essentially an invoice, for those that don't
12   know, it's a bill.
13   A.   Correct.
14   Q.   And, sir, can you explain why there are blackouts on
15   the invoices?
16   A.   The blacked out parts belong to other clients and I
17   blacked them out based under the attorney-client privilege.
18   Q.   So privacy issues.
19   A.   Privacy issues as well, but the main reason was the
20   attorney-client privilege.
21   Q.   And, again, as you stated -- can I have that blown up,
22   please -- okay.
23           Can you describe essentially what you're billing
24   $175 to Mr. Guy Jean-Pierre for?
25   A.   That's -- $175 is billed for one opinion letter.

1    Q.   Okay.  And who's the opinion letter for?

2    A.   FusionPharm.

3    Q.   Okay.  And where's the opinion letter going to?

4    A.   In this case, it's a current information letter that's

5    going to be posted on the OTC Markets.

6    Q.   Can I have page 3 of that exhibit.  Again, sir, another

7    invoice for January 15, 2013; is that correct?

8    A.   That is correct.

9    Q.   Okay.  Can we have this blown up.

10        Okay.  Again, sir, can you explain the charge for

11   December 13, 2012.

12   A.   That's $175 with regard to the Bayside opinion letter.

13   Q.   And would this be a Rule 144 letter?

14   A.   That is correct.

15   Q.   Okay.  And then I see a $25 charge down here on

16   December 22d, 2012.

17   A.   That is correct.  That would be for revising the

18   original 12-13-12 letter.

19   Q.   And that's where you have a "redo"?

20   A.   Correct.

21   Q.   I just want to be very clear.  When you're charging $25

22   for a redo, you're not making revisions yourself to the body

23   of the letter; is that correct?

24   A.   That is correct.

25   Q.   Who made the changes?

Direct - DiTommaso

1    A.    I received the revised opinion -- draft opinion letter

2    from Mr. Jean-Pierre.

3    Q.    All right.  Thank you.

4          And, finally, I just want to ask you:  Remember the

5    five Rule 144 opinion letters that we talked about that

6    regarded Star City and Vera Group and the other groups?

7    A.    Yes, I do.

8    Q.    Okay.  Did you charge Mr. Guy Jean-Pierre your standard

9    rate of 175 for those letters?

10   A.    I did not.  I gave him a reduced amount.  I believe it

11   was $120 per letter.

12   Q.    Why did you provide a letter at a reduced amount?

13   A.    Mr. Jean-Pierre requested it.  And since they're all

14   based on the exact -- basically the exact same transaction,

15   I thought that was appropriate.

16   Q.    Okay.  All right.  And now after -- when did you stop

17   doing opinion letters and current information letters for

18   FusionPharm?

19   A.    I don't remember the exact month, but it was probably

20   August or maybe September of 2013.

21   Q.    Okay.  After you stopped working and doing letters for

22   Mr. Guy Jean-Pierre for FusionPharm some time in late summer

23   of 2013, did any regulatory agency contact you?

24   A.    I was contacted by SEC, Securities and Exchange

25   Commission, I believe it was 2014.  Maybe 2015, but one of

Direct - DiTommaso

1   those years with regard to FusionPharm.
2   Q.   Okay.  And do you -- can you tell me why the Securities
3   Exchange Commission contacted you?
4   A.   They sent me a letter demanding that I ensure that all
5   the documents that I have regard to FusionPharm are
6   protected and not destroyed.  And it said in there because
7   they were doing an investigation of FusionPharm.
8   Q.   Okay.  And so what did you do regarding your
9   documentation and work that you had done of FusionPharm
10  through Mr. Guy Jean-Pierre?
11  A.   Well, the SEC requested I send them copies of
12  everything, and so I did do that with the exception of
13  attorney-client privileged materials.
14  Q.   Okay.  And except for the attorney-client privileged
15  material, did you eventually supply that material?
16  A.   Yes, I did.  At some point Scott Dittman and
17  FusionPharm decided to waive the attorney-client, in which
18  case there was -- the privilege didn't apply anymore, so I
19  gave the SEC all the documentation with regard to
20  FusionPharm.
21  Q.   So you cooperated with the SEC's demands?
22  A.   Yes, I did.
23  Q.   Okay.  After you cooperated by providing them
24  documentations, did you have any further involvement
25  regarding the Securities and Exchange Commission?

Direct - DiTommaso

1   A.   Yes, I did.

2   Q.   Okay.  And what was that involvement?

3   A.   I was charged by the SEC of trading -- insider trade,

4   basically, of preparing these letters, when an affiliate --

5   the affiliate status was wrong.  I claimed that it was --

6   all the different shareholders were not affiliates but, in

7   fact, most of them were affiliated one way or another with

8   FusionPharm.

9   Q.   Okay.  And as you testified, you never drafted that

10  language; is that right?

11  A.   That is correct.

12  Q.   Who drafted that language about -- who drafted that

13  language about affiliation?

14  A.   I believe that Jean-Pierre did.  I do not know for

15  sure, but I did receive all those drafting letters and the

16  supporting documentation from Mr. Jean-Pierre.

17  Q.   Okay.  And so how did you manage the charge that the

18  Securities Exchange Commission was making on you regarding

19  these Rule 144 letters?

20  A.   We had a trial and I was found guilty of -- of these

21  letters.

22  Q.   Okay.  And so did you have to go through a deposition?

23  A.   Yes, I did have a deposition taken.

24  Q.   Okay.  Tell the jury what happened in that deposition.

25  A.   The deposition, I believe, took place in January of

Direct - DiTommaso

1    2015.  I was at the SEC offices in Los Angeles.  And the
2    deposition took about one day.
3              They asked me a lot of questions about FusionPharm
4    and Mr. Guy Jean-Pierre and Scott Dittman, and then they
5    went through all these documents that we've been going
6    through here at trial.  We went through every single letter
7    that I did for FusionPharm, went through all the backup
8    documentation for any letter that I did for FusionPharm.
9    Q.   Okay.  So you went through a lot of the supporting
10   documentation as well?
11   A.   That is correct.
12   Q.   Did you go through additional documentation than what's
13   been provided to you?
14   A.   There was other documents that we didn't talk about in
15   this trial, yes.
16   Q.   Okay.  All right.  So let me ask you:  When you were
17   notified first by the Securities and Exchange Commission to
18   preserve all your work that you had done on behalf of
19   FusionPharm and the documentation that Mr. Guy Jean-Pierre
20   sent you, what were your thoughts at that time?
21   A.   I was really taken by --
22             MR. GOODREID:  I'm going to object on relevance
23   grounds of where this is going.  What difference does it
24   make what his thoughts were at the time?
25             THE COURT:  Overruled.  You may answer.

1894

Direct - DiTommaso

1    BY MR. SIBERT:

2    Q.   Thank you.

3    A.   I was taken really aback by surprise.  Well, even when

4    the SEC first contacted me about FusionPharm, I still did

5    not know what the purpose was and why the SEC was

6    investigating.  It was not until I got to the deposition and

7    they started pointing out all these letters and showing how

8    the connections of all the different people and how they

9    were really affiliates when at -- the whole time when I

10   thought they were nonaffiliates, it was a huge surprise to

11   me.

12   Q.   Why was it such a big surprise to you?

13   A.   For each of these transactions, I prepared the opinion

14   letters as a separate transaction.  I did not compare

15   previous transactions I did for FusionPharm.  But when you

16   put all the transactions together, then you see red flags

17   everywhere.  And you see different -- like William Sears all

18   over the place.  And I did not know who William Sears was.

19   I did not know that his mother was also involved.  I did not

20   know that William Sears was one of the -- a control person

21   or a significant shareholder of FusionPharm.  I did not know

22   that at the time.

23   Q.   Did you know anything about MeadPoint?  Did you know

24   about MeadPoint at that time?

25   A.   I did not know at the time that William Sears also owns

Direct - DiTommaso

1    MeadPoint or his mother did, and all these people were all
2    involved together.  And every one of these transactions were
3    talked about, they -- the wording about the affiliate status
4    was incorrect because, in reality, each time that
5    stockholders were affiliates.
6    Q.   Okay.  If you had known that information when those
7    draft letters were sent to you, would you have attached your
8    letterhead and signature to them?
9    A.   I would have not done so, no.
10   Q.   Okay.  And who did you trust about the information that
11   was being sent to you?
12   A.   I trusted Mr. Guy Jean-Pierre.
13   Q.   And, again, it might be hard for some people to
14   understand:  Why did you trust another lawyer?
15   A.   I trusted Mr. Guy Jean-Pierre for two reasons:  One was
16   my good friend, David Adams, who is a stockbroker,
17   recommended him, and I -- it's -- since he's a good friend
18   of mine there's no way that my friend would have introduced
19   me to someone who was not a truthful person.
20   Q.   Okay.  And how about Mr. Guy Jean-Pierre being a
21   lawyer, himself?
22   A.   It -- he still told me that he was a lawyer for several
23   corporations, and is a corporate lawyer.  I usually trust
24   other lawyers to begin with anyways, and there's no reason
25   for me not to trust them.  And -- because the FusionPharm is

Direct - DiTommaso

1   not the only company that I had dealings with Mr.

2   Jean-Pierre and there's no other issues on the others, as

3   far as I know.

4   Q.   And I think you stated yesterday you had done work with

5   other lawyers before that you had not met; is that

6   correct?

7   A.   Correct.

8   Q.   Did you have any issues with those lawyers?

9   A.   I've never had any problem with any attorney when

10  dealing with opinion letters before, no.

11  Q.   Okay.  And when you became an attorney, did you have to

12  take an oath?

13  A.   Yes, sir.

14  Q.   And is part of that oath to be ethical and honest?

15  A.   That's correct.

16  Q.   Do you expect other lawyers to comply by that oath?

17  A.   I always do.  Even if they're adversaries, we still are

18  ethical to each other.

19  Q.   And did that -- was that part of your factor when you

20  agreed to assist Mr. Guy Jean-Pierre?

21  A.   Absolutely.

22  Q.   What happened to you after your trial with the SEC?

23  A.   I was fined a civil fine and also had to repay back the

24  amount of monies -- or not pay back, but give to the SEC the

25  amount of monies that I had received from Guy Jean-Pierre.

Cross - DiTommaso

1    Q.   Okay.  After all this -- after all this essential

2    regulatory and trial and the fine that you were issued by

3    the SEC, were you able to maintain your license to practice

4    law?

5    A.   Yes.

6              MR. SIBERT:  I'll pass the witness, Your Honor.

7              THE COURT:  Cross-examination.

8              MR. GOODREID:  Yes.  Thank you, Your Honor.

9                        CROSS-EXAMINATION

10   BY MR. GOODREID:

11   Q.   Good morning, Mr. DiTommaso.

12   A.   Good morning.

13   Q.   Now, you testified on direct yesterday, did you not,

14   that you graduated from law school in 1987; isn't that

15   right?

16   A.   Correct.

17   Q.   And that you started doing securities work in 2008,

18   right?  Give or take?

19   A.   Approximately 2008 or 2009, I do not remember the exact

20   year.

21   Q.   So if we use 2008 as the operative date by the time you

22   started doing securities work, you'd already been practicing

23   law approximately 20 years; isn't that right?

24   A.   Correct.

25   Q.   And so even though you hadn't done securities work by

Cross - DiTommaso

1    that point in 2008 or 2009, you certainly knew how to deal
2    with clients, didn't you?
3    A.   Correct.
4    Q.   You'd done business -- general business work, you said?
5    A.   Yes.
6    Q.   You had interacted with clients, with legal
7    professionals, that sort of stuff, right?
8    A.   Yes.
9    Q.   Okay.  Now in 2008 you decided to expand your practice
10   of law to go into the securities area -- or 2009, somewhere
11   in there, right?
12   A.   Correct.
13   Q.   Okay.  And you mentioned, did you not, that in order to
14   do OTC information letters, you had to enter into an
15   agreement with OTC, right?
16   A.   Correct.
17   Q.   And, in fact, that's called -- that's an attorney --
18   you had to enter into an attorney letter agreement, right?
19   A.   Correct.
20   Q.   Can we pull up Exhibit 53, please -- Government's --
21   this is already in evidence.
22        And I don't know, Mr. DiTommaso, if you can see
23   that well enough up on the screen.  If you can't, perhaps
24   the courtroom deputy will provide you with a hard copy.  It
25   might be easier for you to see.

Cross - DiTommaso

1    A.    Okay.

2    Q.    And that document there is -- is about five pages long,

3    would you agree?  Why don't you just glance through it and

4    I'm going to ask you some questions about it.

5    A.    Correct.

6    Q.    That appears to be, does it not, the attorney letter

7    agreement that an attorney has to fill out in order to

8    provide current information and letters to OTC Markets that

9    we've just been talking about, right?

10   A.    Correct.

11   Q.    Okay.  So let's go through this now, okay?  So if you

12   go down to Section 3, okay?  You see on the first page

13   there -- if can we highlight Section 3?  Thanks.

14   A.    Correct.

15   Q.    And you say -- it says, "Attorney warrants and

16   represents that the document review and other duties

17   required by the guidelines have been competently performed

18   in connection with the preparation of each letter posted

19   through the OTC disclosure and news service," right?

20   A.    That's what it states.

21   Q.    Okay.  And that's part of what you agreed to when you

22   entered into this attorney letter agreement; isn't that

23   right?

24   A.    Correct.

25   Q.    Okay.  Now, let's go down a little farther.  Let's go

Cross - DiTommaso

1    to -- a couple more pages, please, to Exhibit A.

2    A.    I'm sorry, what page?

3    Q.    Well, it's the third page of this document.  Do you see

4    if you go to Exhibit A?

5    A.    Oh, okay, I see it now.

6    Q.    It says, "Letters with respect to adequate current

7    representation."

8    A.    Correct.

9    Q.    Okay.  So if we could blow up the end of the first

10   paragraph, please.

11        And do you see that -- let's go to the penultimate

12   sentence there, the second to last sentence.  Do you see

13   that language?  It says, "We recognize that forms for such

14   letters" -- meaning the information letters -- "may vary

15   among law firms and attorneys.  You should use the form

16   prescribed by your firm provided that all of the matters

17   required below are addressed."

18        Do you see that?

19   A.    Correct.

20   Q.    And you recall Mr. Sibert asking you questions about a

21   template for a letter, don't you?

22   A.    I'm not sure what you mean, "a template."

23   Q.    Irrespective what Mr. Sibert asked you, it is true,

24   isn't it, that most of the current information letters, if

25   not all that we've looked at that you looked at on direct

Cross - DiTommaso

1   examination, appear to have a form or a template, right?

2   The language in them was very similar, correct?

3   A.   That's correct.

4   Q.   Okay.  And you would agree, would you not, that this

5   language, "We recognize that forms for such letters" appears

6   to contemplate such a template, does it not?

7   A.   Correct.

8   Q.   And in -- with respect to the letters that you got, the

9   draft letters you got from Mr. Jean-Pierre, as I said a

10  moment ago, they were relatively consistent in form, right?

11  A.   Correct.

12  Q.   So it's fair to say from that, isn't it, that you were

13  effectively adopting his draft letter as your template for

14  the current information letters; isn't that right?  Because

15  you kept using them.

16  A.   Correct.

17  Q.   Okay.  And, again, this language, Exhibit A, appears to

18  contemplate using a template, right?

19  A.   Yes.

20  Q.   And -- all right.  Let's go down, then, to paragraph 3,

21  same page.  Let's blow that up.

22       And, again, this attorney -- this says the -- "The

23  letter" -- again talking about attorney information

24  letter -- "must state that counsel has examined such

25  corporate records and other documents and such questions of

Cross - DiTommaso

1    law as the counsel consider necessary or appropriate for

2    purposes of rendering the letter."

3         Do -- you see that, don't you?

4    A.    I see it.

5    Q.    And you agreed to do that by entering into this

6    agreement, didn't you?

7    A.    Yes.

8    Q.    Okay.  Now, let's go to paragraph 4.  Let's start at

9    the end of that same page, that page 3.  And do you see -- I

10   want to focus on the very end of that page.  You see on the

11   screen, Mr. DiTommaso, where it's blown up on the screen?

12   A.    Yes.

13   Q.    It says -- I'm just focusing on those last three

14   words -- it says, "and if the," and then let's go to the

15   next page, and highlight the rest of that for us.  Thank

16   you.  All right.

17        So "If the letter relies on the work of other

18   counsel, such other counsel must be identified and such

19   counsel's letter must be attached and adhere to the

20   requirements set forth herein."

21        You see that language, right?

22   A.    Correct.

23   Q.    And you agreed to that, didn't you?

24   A.    I did.

25   Q.    But in the case of Mr. Jean-Pierre, you chose -- in all

1    those letters that you signed, you chose not to identify

2    him; isn't that right?

3    A.    I did not identify him.

4    Q.    That was your decision as a signatory on the letter,

5    right?

6    A.    I did not identify him.

7    Q.    Okay.  All right.  Let's go down to paragraph 6, then,

8    on this same page.  And enlarge that, please.

9            And you see there it says, "As to matters of fact,

10   counsel may rely on information obtained from public

11   officials, officers of the issuer, and other sources, but

12   must represent that all such sources were believed to be

13   reliable."  Right?

14   A.    That's what it states.

15   Q.    So you agreed in -- you agreed with respect to these

16   letters that you could rely upon, among other matters here,

17   officers of the issuer and other sources as long as you

18   believe they were reliable, right?

19   A.    I believe both Mr. Dittman and Mr. Jean-Pierre, that

20   what they were stating to me were the truth, yes.

21   Q.    Exactly.  Right.  Okay.  All right.  And let's go down

22   farther down to paragraph 11 in this document.

23            Do you see that language -- it gets blown up on

24   your screen, Mr. DiTommaso.

25   A.    I see that paragraph, yes.

Cross - DiTommaso

1   Q.   Do you see it says, "The letter must state that counsel

2   for sub I has personally met with management and a majority

3   of the directors of the issuer."  And then goes on to talk

4   about reviewed certain information.  And then sub 3 says,

5   "Discussed the information with management and a majority of

6   the directors at issue."

7        That's what it says, right?

8   A.   Correct.

9   Q.   And that's what you agreed to do, didn't you?

10  A.   Correct.

11  Q.   All right.  We can take that down, please.

12        THE COURT:  Mr. Goodreid, could you just tell me

13  again what exhibit that was?

14        MR. GOODREID:  Sure, Your Honor, I didn't say it

15  clearly --

16        THE COURT:  You did say it, I just --

17        MR. GOODREID:  Oh, 53, Your Honor.

18        THE COURT:  53.  Great, thanks.

19  BY MR. GOODREID:

20  Q.   Now, Mr. DiTommaso, there's some discussion by

21  Government counsel with you about the rates that you charged

22  Mr. Guy Jean-Pierre.  Do you recall that?

23  A.   Yes.

24  Q.   And you charged him, in general, $175 a letter with the

25  exception of those few letters you mentioned at the end,

1    right?

2    A.    Correct.

3    Q.    Okay.  And was this a slightly lower rate per letter

4    than you charged some other clients?

5    A.    It was significantly lower.

6    Q.    Okay.  And you did that because Mr. Jean-Pierre was an

7    attorney, right?

8    A.    He was an attorney who was representing several

9    clients.

10   Q.    Right.  So you're hoping giving him a lower rate was --

11   that he would give you other business, which, in fact, he

12   did, right?

13   A.    Correct.

14   Q.    Okay.  Now, in terms of your interactions with Mr.

15   Jean-Pierre and the communications you had with him, there

16   were occasions, were there not, when you actually turned his

17   request down to do a letter; isn't that right?

18   A.    Yes.

19   Q.    Okay.  And it wasn't always the case that you just

20   simply put your name -- put your letterhead and signed it.

21   And, in fact, sometimes you followed up and made changes on

22   the letters; isn't that right?

23   A.    I don't remember making changes, but if I saw something

24   that didn't seem correct, I would contact Mr. Jean-Pierre

25   and explain my concern and he would take care of that.

1  Q.  Okay.  Well, you mentioned on your direct examination

2  that you gave a deposition to the SEC in connection with

3  your proceedings before them back in 2015; isn't that

4  right?

5  A.  Correct.

6  Q.  Okay.  Well, you told the SEC that you had made changes

7  to his letters on occasions; isn't that right?

8  A.  I don't remember what I said in 2015.

9  Q.  Okay.

10  A.  If that's what it says, that's what I said.

11  Q.  So you're acknowledging that perhaps you did say that

12  to them?

13  A.  Any changes would have been made -- I'm sorry, any

14  changes would have been made because I talked to Mr.

15  Jean-Pierre first.

16  Q.  All right.  So you recall being asked, don't you --

17  first of all, the deposition you gave in 2015, that was

18  actually four years ago, right?  You would agree with that?

19  A.  Correct.

20  Q.  So --

21  A.  Correct.

22  Q.  So that was four years closer in time to the events

23  underlying this than today, right?

24  A.  Correct.

25  Q.  Okay.  And you remember being asked, don't you, that --

Cross - DiTommaso

1   "Do you recall instances where you made no changes to the
2   draft of the attorney letters that Mr. Jean-Pierre provided
3   to you?"
4           And you said, "There's a few times that I made no
5   changes.  There's quite a few times where I made changes or
6   I requested more information."
7           That's what you said, didn't you?
8   A.   I don't have the transcript in front of me --
9   Q.   I'll tell you what.  I'll help you out.  This is not
10  for publication to the jury, it's not in evidence, but it is
11  Government Exhibit 443.  Pull that up for the witness only.
12          MR. SIBERT:  No objection, Your Honor.  And I would
13  just ask if the counsel asks the witness a question, allow
14  the witness to answer it before the next question.
15          THE COURT:  All right.  Ms. Frank, can we get 443
16  in front of the witness, please.
17          COURTROOM DEPUTY:  443?
18          MR. GOODREID:  443, uhm-hum.  Oh, it's a disk?
19          COURTROOM DEPUTY:  But I have it blocked for the
20  jury, so if you can pull it up.
21          MR. GOODREID:  Your Honor, I can do this either
22  way.  I have a hard copy here, it's highlighted, We can do
23  it on the Elmo if he can see it on there.
24          THE COURT:  Let's do it that way.
25          MR. GOODREID:  I can do it, Your Honor.  I can see

Cross - DiTommaso

1   it clearly enough.

2               THE COURT:  Okay.

3               MR. GOODREID:  All right.  So if we could go to --

4   it's actually -- it's deposition page 62, but it's 16 of

5   this exhibit.  Yeah, if we can enlarge page -- that mini

6   page 62, please -- well, this is the first half of the Q and

7   A.  Right there, yeah, that's great.

8               Okay.  Do you see that language, Mr. DiTommaso?

9   A.   I'm sorry, I'm reading it.

10  Q.   Okay.  We're talking about the first Q and A.  Let me

11  run that by you again.

12  A.   I see it.

13  Q.   "Do you recall instances where you made no changes to

14  the draft of the attorney opinion letters that Mr.

15  Jean-Pierre provided to you?"

16              And you said, "There's a few times that I made no

17  changes.  There's quite a few times where I made changes or

18  I requested more information."  Right?

19  A.   That's what it states.

20  Q.   That's a statement that you gave under oath, right?

21  A.   That's what it states, yes.

22  Q.   Okay.  And you also said immediately prior to that --

23  let's just hold that right there -- you said -- "Who drafted

24  those letters?"  You said, "Part of my deal for doing such a

25  low rate was that Jean-Pierre would draft the letter" --

Cross - DiTommaso

1       MR. SIBERT:  Your Honor, improper testimony at this

2   point.  If he's going to refresh the witness' memory, he can

3   use the document to refresh it, but he should not be

4   testifying --

5       MR. GOODREID:  Your Honor, I'm not.  May I respond?

6       THE COURT:  Go ahead.

7       MR. GOODREID:  I'm not refreshing his recollection,

8   Your Honor.  I'm trying to impeach him based on his answer

9   as to what he did.  This is prior inconsistent statement.

10      MR. SIBERT:  He's reading a document that's not in

11  evidence.

12      THE COURT:  Well, now -- well, can we blow that up

13  so I can see what that question is again.

14      MR. GOODREID:  And, Your Honor, the part I'm

15  referring to now actually is the preceding -- the page right

16  above -- no, it's above that.  Page 61.  And, yeah, if you

17  get the question as well.

18      THE COURT:  All right.  I agree with defense

19  counsel.  This goes to his prior statements of -- the

20  objection's overruled.  Go ahead.

21      MR. GOODREID:  So, Your Honor, I prefer to ask him

22  about it before having to read it, if he says he can't --

23  doesn't recall it.  So I would prefer to go in that order,

24  if that's all right.

25      THE COURT:  That's fine.  Go ahead.

Cross - DiTommaso

1    BY MR. GOODREID:

2    Q.   So, Mr. DiTommaso, you told the SEC, "Jean-Pierre would

3    draft the letter.  Then I'd go over it.  I would look at all

4    the documentation.  I would do any other investigation that

5    was required.  And if I thought it was good, then I would

6    take what he wrote, and I would make it mine."

7         That's what you said, right?

8    A.   Correct.  I testified that Jean-Pierre drafted the

9    opinion letters, ghostwrote them for me, and I put them on

10   my letterhead.

11   Q.   After you investigated them, right?  That's what you

12   told the SEC.

13   A.   After I reviewed all the supporting documentation, yes.

14   Q.   Right.  And after you investigated the matters, yes?

15   A.   I said if I thought it was necessary to make another

16   investigation, I would.  If I didn't find it necessary, I

17   would not.

18   Q.   All right.

19        THE COURT:  Mr. Goodreid, when would be a good time

20   to pause for our morning break?

21        MR. GOODREID:  Your Honor, that would be a good

22   spot right there, actually.

23        THE COURT:  Okay.  All right.  Ladies and gentlemen

24   of the jury, we're going to take our morning recess.  We

25   will be in recess for 15 minutes.

Cross - DiTommaso

1    (Jury left the courtroom at 10:28 a.m.)

2         THE COURT:  Same restriction during the recess, Mr.

3    DiTommaso.

4         THE WITNESS:  Yes, Your Honor.

5    (Recess taken 10:29 a.m.)

6    (Jury entered the courtroom at 10:47 a.m.)

7         THE COURT:  Mr. DiTommaso, I remind you that you

8    remain under oath.

9         THE WITNESS:  Yes, Your Honor.

10        THE COURT:  All right.  Mr. Goodreid, you may

11   resume your cross-examination.

12        MR. GOODREID:  Thank you, Your Honor.

13   BY MR. GOODREID:

14   Q.   Mr. DiTommaso, you recall yesterday Mr. Sibert asked

15   you questions about the role of corporate counsel.  Do you

16   remember that?

17   A.   Correct.

18   Q.   And you indicated, didn't you, that in your view, a

19   corporate counsel should know a lot about the underlying

20   company, right?

21   A.   Correct.

22   Q.   In fact, you said that corporate counsel should know

23   who the officers and directors were, should know about

24   employment matters, the financial condition of the company,

25   and several other matters, right?

Cross - DiTommaso

1    A.    Correct.

2    Q.    In fact, Mr. DiTommaso, there's a distinction to be

3    drawn between and among different types of corporate

4    counsel; isn't that right?

5    A.    I'm not sure what you're talking about.

6    Q.    Well, for, example, somebody who, say, is a general

7    counsel of Apple, right, might have a lot of information

8    about the company because that's that person's full-time

9    job.  That's all they do is the general counsel for Apple.

10   You would agree with that, wouldn't you?

11   A.    I would have no idea what Apple's counsel has known

12   about.

13   Q.    You certainly have experience with dealing with counsel

14   whose full-time job is to work for a single company, don't

15   you?

16   A.    I am aware that takes place.  I don't know anyone who

17   does that.

18   Q.    So you never interacted with somebody who's a general

19   counsel for a company?

20   A.    You stated that someone's only job is that one company

21   and nothing else.

22   Q.    Correct.

23   A.    And your question is what?

24   Q.    Well, let me try this a different way.  You, for

25   example, have represented a number of different companies at

Cross - DiTommaso

1    a  time, correct?

2    A.    Correct.

3    Q.    Okay.  And it's fair to say, isn't it, that your

4    knowledge of any one of those clients is likely to be less

5    than somebody whose only job is to work for a single

6    company?  That's true, isn't it?

7    A.    I do not know the answer to that.

8    Q.    You have no idea?

9    A.    I think I know a lot about the companies that I work --

10   that are my clients.  A lot.

11   Q.    But probably less than somebody who worked for a single

12   company full-time; is that right?

13   A.    I wouldn't know.

14   Q.    All right.  Let's take a look at Government Exhibit 20,

15   which is in evidence.  If we could bring that up, please.

16           And, again, Mr. DiTommaso, if the screen is not

17   clear, you certainly can look at this document in hard copy

18   if that will be easier for you.  Do you have that in front

19   of you?

20   A.    I see it, yes.

21   Q.    Okay.  And those three pages, that's an example --

22   well, first of all, that's a letter dated December 29th,

23   2011, right?

24   A.    Correct.

25   Q.    That's one -- I'm sorry, is there something else?

1    A.   Correct.

2    Q.   That's an example, isn't it, of one of the current

3    information letters that you wrote in working with Mr. Guy

4    Jean-Pierre; isn't that right?

5    A.   That is correct.

6    Q.   Okay.  So let's take a little -- take a look at a

7    little bit of the content of this letter.

8            If we can enlarge that first paragraph under the

9    word, "Gentlemen," please.

10           And do you see the sentence there that -- the

11   second full sentence that starts with, "OTC Markets Group,

12   Inc."?  Do you see that

13   A.   I see it.

14   Q.   Okay.  And it says, "OTC Markets Group is entitled to

15   rely on this letter in determining whether the issuer has

16   made adequate current information publicly available within

17   the meaning of Rule 144."  Right?

18   A.   That's what it states.

19   Q.   And you wrote the letter.

20   A.   I typed Jean-Pierre's draft and I made it mine, yes.

21   Q.   Okay.  So you adopted it, you signed it, right?

22   A.   Correct.

23   Q.   You're the letter -- you're the lawyer and the captain

24   of the ship, right?  It's your letter.

25   A.   I --

Cross - DiTommaso

1    Q.   Okay.  Let's go down to paragraph 1 at the bottom and
2    enlarge that, please.
3              And you said in this letter in that first sentence,
4    "In connection with rendering this opinion, I have
5    investigated such matters and examined such documents, as
6    I've deemed necessary."
7              That's what you said, didn't you?
8    A.   That's what I said and that's what I -- I reviewed the
9    supporting documentation that was posted on OTC Markets.
10   Q.   Okay.  So you stand by what you said in there, right?
11   A.   Correct.
12   Q.   Okay.  And then if we go -- if we go a little further
13   in that same paragraph, you said, "Nothing came to my
14   attention during the course of my investigation that led me
15   to conclude that any such documents were not genuine or
16   authentic," right?
17   A.   That's correct.
18   Q.   And you meant that when you said it, didn't you?
19   A.   That's correct.
20   Q.   Okay.  Let's go to the next page, please, under
21   paragraph -- start at the top, paragraph 2, and enlarge --
22   yes, that first paragraph.
23             All right.  You see that first sentence there,
24   don't you, Mr. DiTommaso?
25   A.   Yes, I do.

Cross - DiTommaso

1    Q.    "As to matters of fact upon which I have relied and

2    obtained from officers and directors of the Company and

3    other sources, I have believed such sources to be

4    reliable."  Isn't that right?

5    A.    I did at the time, yes.

6    Q.    Okay.  And then the next sentence, "I have examined

7    such corporate records and other documents and such question

8    as I deemed necessary or appropriate for purposes of

9    rendering the letter."  Right?

10   A.    Correct.

11   Q.    That's what you said.  And you meant it, didn't you?

12   A.    Yes, I did.

13   Q.    All right.  And let's go down to the bottom of that

14   paragraph 3.  If we could enlarge that, please, at the very

15   bottom.  No, not there.  I'm sorry, the next one up.  Yeah,

16   right there.

17         Okay.  And the beginning of that under Conclusions,

18   "Based on the examination and inquiry set forth above, I am

19   of opinion that the information constitutes adequate current

20   public information."  Right?

21   A.    Correct.

22   Q.    And, again, that's what you said and that's what you

23   meant, didn't you?

24   A.    At the time, yes.

25   Q.    Okay.  We could take that down, please.

Cross - DiTommaso

1       Now, in the context of these letters, both these
2   letters and the Rule 144 letters, you've made it clear,
3   haven't you, Mr. DiTommaso, that you were relying upon the
4   information that Mr. Guy Jean-Pierre gave to you, right?
5   A.   That is correct.
6   Q.   And so if you wrote a letter, for example, to a stock
7   transfer agent, you were effectively the conduit, right, of
8   information from Guy Jean-Pierre on to the stock transfer
9   agent, right?  You were relying upon that information,
10  right?
11  A.   I relied on the information provided by Jean-Pierre,
12  yes.
13  Q.   Right.  And as far -- and that was the role as the
14  attorney signing the letters, right?
15  A.   I reviewed the supporting documentation for whatever
16  type of letter; in other words, a current information letter
17  or if it was the Rule 144 letter.
18  Q.   Right.  And so to the extent necessary, you felt that
19  you could rely upon the information that Mr. Guy Jean-Pierre
20  provided to you, right?
21  A.   Correct.
22  Q.   Now, as far as you knew -- as far as you knew at the
23  time, Mr. Guy Jean-Pierre, as a lawyer, was also serving as
24  a conduit of information from his client on to you; isn't
25  that right?

Cross - DiTommaso

1    A.   That's correct in part.  In this case, FusionPharm, Guy

2    Jean-Pierre was also an officer of the corporation.

3    Q.   All right.  Fair enough, fair enough.  He is an officer

4    of the corporation and also as corporate counsel, right?

5    A.   Correct.

6    Q.   So, again, just to recap, you're serving as a conduit

7    of his information to either OTC Markets or to a stock

8    transfer agent, depending on what kind of letter it is,

9    right?

10   A.   That's correct.  All -- I did have no personal

11   knowledge of the underlying facts.

12   Q.   Okay.

13   A.   I had to rely on the officers of the corporation and

14   their corporate counsel with regard to whether those facts

15   are true or not.

16   Q.   All right.  So let's pull up Exhibit 72, which is in

17   evidence, please.

18            MR. GOODREID:  Oh, Your Honor, we're apparently

19   having technical difficulties.

20            THE COURT:  Oops.  That's no good.  Hold on.

21   Where's the problem?  On your end?

22            MR. SIBERT:  I think it's our computer, Your Honor,

23   so . . .

24            THE COURT:  Okay.

25            MR. SIBERT:  Trying to assist Mr. Goodreid with the

1    overhead with -- he has the binders.

2           THE COURT:  Right.  So it's not just a coincidence

3    this happens during his examination.

4           MR. SIBERT:  It was actually during mine, it's

5    going back and forth.  This isn't the first day we've had

6    issues.

7           THE COURT:  I was just kidding.  I'm not making any

8    allegations --

9           MR. SIBERT:  I don't know this Court to kid very

10   much.  Sorry.

11          THE COURT:  All right.  Well, if we are having

12   computer problems, we're having -- can you -- can we use the

13   Elmo, the overhead?

14          MR. GOODREID:  I could, Your Honor, although given

15   the nature of these questions, it may not be necessary to --

16          THE COURT:  So if he just has --

17          MR. GOODREID:  He can see it --

18          THE COURT:  -- hard copy in front of him?

19          MR. GOODREID:  I think hopefully the jury will get

20   my point.  I don't know that they necessarily need to see

21   it.

22          THE COURT:  All right.

23          MR. GOODREID:  Okay.

24   BY MR. GOODREID:

25   Q.   All right.  Mr. DiTommaso, again, since the jury

Cross - DiTommaso

1  doesn't have this in front of them, you would agree this is
2  a December 22d, 2012, letter that you wrote to Pacific Stock
3  Transfer, right?
4  A.   That is not what is in front of me.  I have Exhibit
5  72.
6  Q.   Yes.
7  A.   It appears to be a -- something from the transfer
8  agent.
9  Q.   Are you on page 29?
10  A.   Oh.
11  Q.   Maybe I didn't make that clear.
12  A.   Okay, I have it.  It's a letter dated December 22d,
13  2012.
14  Q.   Yeah.  All right.  And have you refreshed your
15  recollection about the general nature of that?
16  A.   Correct.
17  Q.   Again, since the jury can't see it, it's a letter from
18  you to Pacific Stock Transfer, right?
19  A.   And also to Scottsdale Capital Advisors.
20  Q.   All right.  To both those parties, okay.  And let me
21  ask you to focus at the bottom of the first page of the
22  letter, which is page 29 of this exhibit.
23  A.   Okay.
24  Q.   Do you see the language in the paragraph that starts
25  with, "In our opinion based on the information"?

Cross - DiTommaso

1    A.   Correct.

2    Q.   Okay.  And you said, "We are further of the view that

3    the debt holder and, therefore, the shareholder has met the

4    applicable 12-month holding period"?

5    A.   Correct.

6    Q.   You made that statement based upon what Mr. Jean-Pierre

7    had provided to you?

8    A.   Correct.

9    Q.   And as best you knew at the time, Mr. Jean-Pierre made

10   that -- made those statements to you based upon what his

11   client had provided him, right?

12   A.   That's what I assumed, yes.

13   Q.   Okay.  All right.  If -- are we completely down?  Oh.

14            MR. GOODREID:  Your Honor, may we pause for just a

15   moment?  I'm advised that we may have visual here --

16            THE COURT:  All right.

17            MR. GOODREID:  -- in a second.  I'm sorry.

18            Your Honor, I can proceed.  Again, I think --

19            THE COURT:  I think we need to press forward.

20            MR. GOODREID:  Yeah, we can keep going.  Okay.

21   BY MR. GOODREID:

22   Q.   Mr. DiTommaso, do you have in front of you -- or can

23   you get in front of you, Government Exhibit's 209, which is

24   also in evidence.

25   A.   Okay.  I have Exhibit 209.

Cross - DiTommaso

1    Q.   Okay.  And you recall Mr. Sibert asked you about this
2    exhibit, right?
3    A.   Correct.
4    Q.   And, again, just for the jury's benefit since they
5    can't see it, this is an e-mail from Mr. Guy Jean-Pierre to
6    you dated March 12th, 2013, right?
7    A.   That is correct.
8         MR. GOODREID:  And, Your Honor, given that the jury
9    can't see it, if I could just read it.  It's very short.
10        THE COURT:  Go ahead.
11   BY MR. GOODREID:
12   Q.   So it says, "Mr. DiTommaso:  Further to my e-mail of
13   earlier this afternoon, attached please find the additional
14   four revised opinion letters with respect to FSPM."  That is
15   FusionPharm.
16        Then I want to ask you the next part.  It says,
17   "Kindly contact me if you require anything further or
18   otherwise wish to discuss."
19        That's what it says, right?
20   A.   That's what it says.
21   Q.   It doesn't say, "Mr. DiTommaso, here's the letters.
22   Sign them," does it?
23   A.   Nope, I don't believe he ever sent an e-mail that said,
24   "Here's the letters, sign it."
25   Q.   Never sent you a letter like that?

1    A.   Nope, never did.

2    Q.   In fact, this language was actually part of his

3    standard language, wasn't it?  "Kindly contact me if you

4    require anything further or otherwise wish to discuss," that

5    was his standard language to you, wasn't it?

6    A.   Without reading all the e-mails, I would -- I'm not

7    sure, but probably.

8    Q.   Well, let's take a look at another one, okay?  Why

9    don't you take a look at 18 -- Government Exhibit 187, which

10   is also in evidence.  And Mr. Sibert asked you about it this

11   morning.

12   A.   I do not have 187.

13            MR. SIBERT:   Volume 6.

14   BY MR. GOODREID:

15   Q.   I suspect you will shortly have it.

16            Do you have it in front of you, Mr. DiTommaso?

17   A.   I have it now.

18   Q.   Okay.  That's another e-mail from Mr. Guy Jean-Pierre

19   to you.  This one's dated June 6th, 2012, right?

20   A.   Correct.

21   Q.   And it references some attachments, right?

22   A.   Correct.

23   Q.   In fact, it says, "Attached please find the FSPM

24   opinion letter for Microcap Management with its

25   corresponding documents."

Cross - DiTommaso

1    And it then says, "Please prepare and return as
2    soon as practicable.  Kindly contact me if you have any
3    questions."
4        That's what it says, doesn't it?
5    A.    That's what it says.
6    Q.    Now, you indicated on your direct examination that you
7    did a lot of work with Guy Jean-Pierre that had nothing to
8    do with FusionPharm and these other related entities, right?
9    A.    That is correct.
10   Q.    And you also stated, didn't you, that you didn't have
11   any issues with any of those companies or your work with Guy
12   Jean-Pierre and these other matters, right?
13   A.    I'm not aware of any.
14       MR. GOODREID:  Your Honor, may I have just a
15   moment?
16       THE COURT:  You may.
17       THE WITNESS:  If I may, I'd like to change my
18   testimony, because I do remember one instance --
19       MR. GOODREID:  Mr. --
20       THE COURT:  Counsel.
21   BY MR. GOODREID:
22   Q.    Mr. DiTommaso, Government counsel will have an
23   opportunity to raise any other --
24       MR. GOODREID:  I have no other questions for this
25   witness.

1          THE COURT:  Thank you.  Redirect.

2          MR. SIBERT:  Please, Your Honor.  I know we're back

3     up live --

4          THE COURT:  What a coincidence.

5          MR. SIBERT:  To avoid the Court's sarcasm and to

6     play fair, I'll use the binders like old school.

7          THE COURT:  No, no, no, use what you need to use.

8          MR. SIBERT:  Okay.  So no inference will be taken?

9          THE COURT:  No, no.

10         MR. GOODREID:  Except by defense counsel.

11         MR. SIBERT:  And rightly deserved.

12                    REDIRECT EXAMINATION

13    BY MR. SIBERT:

14    Q.   All right, sir, let me just clean up real quick.  A

15    little housekeeping.

16         Mr. Goodreid didn't give you the opportunity to

17    clarify what you wanted to testify to.  Go ahead and explain

18    what you were the -- or the part of the testimony that you

19    wanted to change.

20    A.   I remembered that there was one instance where I was

21    contacted by some attorneys for a stockholder with regard --

22    I don't remember what company it was now, but it was not

23    FusionPharm, but it was regard to FINRA and some type of

24    action that was taken.  And they were asking me about if I

25    had any knowledge about that issue.  So there was another

1     company that had a problem with Mr. Guy Jean-Pierre.
2     Q.   Okay.  So if I understand your testimony correctly, why
3     are you -- what were you referring back to by changing your
4     testimony regarding Mr. Goodreid's question?
5     A.   Whether or not I had any -- aware of any problems with
6     any of the other companies that Mr. Guy Jean-Pierre was an
7     attorney for and I did some opinion letters for.
8     Q.   Okay.  And what is your memory that you wanted to
9     clarify?
10    A.   There was an issue with FINRA.  I do not remember what
11    those initials stand for, but it's another governmental type
12    agency in the securities field, and there was some type of
13    issue with changing their name or using FINRA for one of the
14    transactions.  And I was contacted by an attorney for one of
15    the shareholders to ask whether I had any information with
16    regard to their transaction.  I did not, so that was where
17    it ended.
18    Q.   Okay.  And do you remember approximately when this was?
19    A.   It was sometime like 2014.
20    Q.   Okay.  And -- and following up on Mr. Goodreid's
21    question, that was a long time ago.
22    A.   That is correct.
23    Q.   All right.  So to the best of your recollection, that's
24    why you wanted to change your testimony?
25    A.   That is correct.

Redirect - DiTommaso

1    Q.   All right.  Can I have -- well, let me ask you this:

2    You were asked a couple of questions about Government

3    Exhibit 209 and Government Exhibit 187 regarding how Mr. Guy

4    Jean-Pierre sent you an e-mail with the attached opinion

5    letters.

6    A.   Correct.

7    Q.   Okay.  And you recall you were asked about how Mr. Guy

8    Jean-Pierre was signing off or writing in that e-mail; is

9    that right?

10   A.   Correct.

11   Q.   Are you aware that Mr. Guy Jean-Pierre, in an

12   undercover operation advised the undercover FBI agent, and

13   William Sears, to be careful about how one would write an

14   e-mail and what to put in an e-mail?

15   A.   I'm aware of it now.

16   Q.   Were you aware of it when you were receiving Mr. Guy

17   Jean-Pierre's e-mails between 2011 and 2013?

18   A.   At that time, I did not know about it.

19   Q.   So you didn't know that Mr. Guy Jean-Pierre cautioned

20   other parties that were going to commit a potential fraud to

21   be careful about how to address language in an e-mail?

22   A.   That is correct.

23   Q.   Okay.  Can I have Government Exhibit 72, page 29

24   published.  And can I have the bottom paragraph.

25           Sir, if you look on your screen, do you recall Mr.

Redirect - DiTommaso

1    Goodreid speaking about specifically this last sentence

2    regarding the holding period and making a point, emphasizing

3    the "we"?

4    A.    Yes, I do.

5    Q.    Okay.  And this is the letter, if you recall from your

6    testimony, to OTC -- or a Rule 144 letter that you put your

7    letterhead and signed and dated?

8    A.    That is correct.

9    Q.    Okay.  So this is the letter that you actually signed,

10   correct?

11   A.    Correct.

12   Q.    And your prior testimony was that you didn't change any

13   of the body; is that right?

14   A.    That is correct.

15   Q.    Okay.  Can I have Government Exhibit 196-A, please.

16   Well -- and let me back up real quick.  Can I have

17   Government Exhibit 196.

18          Again, who's sending you the e-mail?

19   A.    Mr. Jean-Pierre's sending it to me.

20   Q.    And it attaches what?

21   A.    There's a draft opinion letter attached.

22   Q.    Can I have 196-A, please.  Can I have the second page,

23   please.  I'm sorry -- I'm sorry, the previous -- first page.

24   I cannot see these screens.

25          Thank you.  Okay.  Second page, please.

                         Redirect - DiTommaso

1         This is the same exact sentence; is that correct?

2    A.   That is correct.

3    Q.   No changes made by you?

4    A.   No changes.

5    Q.   So the letter was sent by Guy Jean-Pierre with the "we"

6    in it?

7    A.   That is correct.

8    Q.   All right.  You stated you were asked a few questions

9    about Apple, the board of directors and officers, and I

10   think Mr. Goodreid was trying to make a point about having

11   to know and converse with the company and their board of

12   directors and managers.  Do you recall those questions?

13   A.   I do.

14   Q.   Okay.  And based upon the review of the documents that

15   were posted on OTC Markets, weren't many officers or

16   directors in FusionPharm, were there?

17   A.   No, there were not.

18   Q.   In fact, sometimes there was only two listed; is that

19   correct?

20   A.   That is correct.

21   Q.   So when you're talking to Mr. Guy Jean-Pierre, you're

22   talking to 50 percent of the officers and directors.

23   A.   Correct.

24   Q.   At times.  FusionPharm wasn't a large company like

25   Apple.

Redirect - DiTommaso

1      A.   Not even close.

2      Q.   At times, only one officer was disclosed:  Mr. Scott

3      Dittman.

4      A.   When I first met Mr. Dittman, that is the case.

5      Q.   Right.  And even through all the trouble that occurred

6      after Mr. Guy Jean-Pierre sent you all this information,

7      nothing was wrong with you just meeting with the officer,

8      Mr. Scott Dittman, one time?

9              MR. GOODREID:  Objection.  Leading.

10             THE COURT:  Sustained.

11     BY MR. SIBERT:

12     Q.   Did you ever get in trouble for meeting with Scott

13     Dittman, the CEO, owner of FusionPharm, one time?

14     A.   I did not get in trouble because of the meeting that

15     one time, no.

16     Q.   One time was enough?

17     A.   Correct.

18     Q.   Can I have Government Exhibit 8 published, please.  And

19     can I have page 5.  Well, let me just start with the first

20     page here.

21             These are the attorney letter agreements; is that

22     correct?

23     A.   That is correct.

24     Q.   Page 5, please.

25             And this is the first page of the attorney letter

Redirect - DiTommaso

1     agreement?

2     A.    Correct.

3     Q.    Okay.  And that first page on that paragraph right

4     there, can I have that blown up.

5           It references Exhibit A; is that correct?

6     A.    That is correct.

7     Q.    Can I have page 6, please.

8           Who's signing this attorney letter agreement with

9     OTC Markets?

10    A.    That appears to be Guy's signature.

11    Q.    When you say "Guy," can I have the last name, please.

12    A.    Guy Jean-Pierre.

13    Q.    Okay.  Can I have Government Exhibit 53.

14          Now, you recall being asked questions and shown

15    this exhibit by Mr. Goodreid; is that correct?

16    A.    Yes.

17    Q.    And you were asked about the paragraph 4 regarding

18    placing the name of a counsel that assisted you; is that

19    right?

20    A.    That is correct.

21    Q.    This is appendix A; is that correct?

22    A.    Yes, that's Exhibit A, yes.

23    Q.    And can I have page 3.

24          Do you remember you were asked -- here's Exhibit A;

25    is that right?

Redirect - DiTommaso

1    A.    Correct.

2    Q.    And that's what's in the first page of the attorney

3    agreement letter referring to; is that right?

4    A.    That is correct.

5    Q.    And that's an agreement Mr. Guy Jean-Pierre signed,

6    right?

7    A.    Correct.

8    Q.    Okay.  And so he was under the same obligations that

9    Mr. Goodreid asked you in paragraph 4.

10            MR. GOODREID:  Objection.  Leading.

11            THE COURT:  Sustained.

12   BY MR. SIBERT:

13   Q.    Was Mr. Guy Jean-Pierre under the same obligations?

14   A.    Yes, he was.

15   Q.    Can I have page 4, please.

16            And, again, remember the top part here about

17   putting a name of the counsel that assists with the OTC

18   letters.  Do you remember that line of questions?

19   A.    Yes, I do.

20   Q.    Okay.  And you testified truthfully that you didn't put

21   Mr. Guy Jean-Pierre's name in the letter --

22            MR. GOODREID:  Your Honor, objection to the adverb,

23   "he testified truthfully."  That's classic bolstering.

24            THE COURT:  Sustained.  Sustained.  Let's rephrase.

25            MR. SIBERT:  I'm sorry, Your Honor.

Redirect - DiTommaso

1    BY MR. SIBERT:

2    Q.   And you testified that you did not put Mr. Guy

3    Jean-Pierre's name in the letters.

4    A.   That is true.

5    Q.   Any of the draft letters that you received from Mr. Guy

6    Jean-Pierre, he was also under the same obligations.  Was

7    his name put in the drafts?

8    A.   No, it was not.

9    Q.   Okay.  Did you know Mr. Guy Jean-Pierre was banned from

10   writing current information letters for OTC Markets?

11   A.   I do today.

12   Q.   Did you know back in 2011 through 2013?

13   A.   I did not.

14   Q.   Do you know why he decided -- why the legal counsel for

15   FusionPharm and the corporate secretary for FusionPharm, who

16   was a securities lawyer, could not write and sign the

17   letters?

18   A.   I did know that he was banned by the SEC from preparing

19   the letters.

20   Q.   Okay.  Did you know back then that he was banned?

21   A.   I did not.

22   Q.   Okay.  So why would you -- did you ever ask Mr. Guy

23   Jean-Pierre why he couldn't just sign and -- and put his

24   letterhead on the letter?

25   A.   I never asked that question.

Redirect - DiTommaso

1    Q.   Did Mr. Guy Jean-Pierre ever tell you why he needed

2    you?

3    A.   He just said that he was corporate counsel and he

4    preferred to have outside counsel do the letters.

5    Q.   Now, you were asked about your SEC deposition.  Do you

6    recall that line of questioning there?

7    A.   Correct.

8    Q.   And you stated that was the first time when everything

9    was truly disclosed to you?

10   A.   That is correct.

11   Q.   Were you upset once you realized what was happening

12   during that deposition?

13   A.   Yes, I was.  I felt blindsided.

14   Q.   And why did you feel blindsided?

15   A.   I was aware that FusionPharm was under SEC

16   investigation.  I was not informed of why or the reasons for

17   it.  I found out at the deposition.

18   Q.   Okay.  And essentially you reviewed your own

19   deposition, I'm sure, before your testimony here today; is

20   that right?

21   A.   Yes.

22   Q.   How many pages is that deposition?

23   A.   I don't remember exact number.  There's a lot.

24   Q.   Would you say more than 50 pages?

25   A.   Yes.

Redirect - DiTommaso

1    Q.   And so you were only asked about one or two paragraphs

2    of that whole deposition; is that right?

3    A.   That is correct.

4    Q.   And, in fact, your testimony was -- the question was:

5    "Do you recall instances where you made changes to the draft

6    of the attorney letters that Guy Jean-Pierre provided you?"

7         That was the question you were asked in your

8    deposition, right?

9    A.   Correct.

10   Q.   Okay.  He never just said "FusionPharm letters"; is

11   that right?

12   A.   That was correct.  They were asking about all the

13   different corporations that Guy represented.

14   Q.   Okay.  And so as we discussed prior to your testimony

15   here today, you saw the draft letter that Mr. Guy

16   Jean-Pierre sent you; is that right?

17   A.   That is correct.

18   Q.   Through his e-mail account.

19   A.   Correct.

20   Q.   And then you compared that draft with the letter that

21   you signed; is that right?

22   A.   That is correct.

23            MR. GOODREID:  Objection -- objection.  Leading.

24            THE COURT:  Sustained.

25   BY MR. SIBERT:

Redirect - DiTommaso

1    Q.   What letter did you compare the -- what letter did you

2    compare with the letter Mr. Guy Jean-Pierre sent you?

3    A.   Throughout the -- today's testimony, we -- I compared

4    the letter that -- the draft opinion letter that was sent to

5    me by Guy -- or Jean -- Jean-Pierre, along with the letter

6    that I put my letterhead on and signed, and they were

7    exactly the same.

8    Q.   Okay.  So when you said that at times you made few or

9    no changes, that was not a lie?

10            MR. GOODREID:  Objection.  Leading.

11            THE COURT:  Sustained.

12   BY MR. SIBERT:

13   Q.   Were you being untruthful when you provided your answer

14   to the SEC about, at times, there was no changes or few

15   minor changes?

16   A.   I testified truthfully to the SEC.

17   Q.   Okay.  And specifically to FusionPharm opinion letters

18   that came from Mr. Guy Jean-Pierre.

19   A.   Correct.

20   Q.   Sir, I just want to end your testimony -- you were

21   asked a question about turning down signing letters for Mr.

22   Guy Jean-Pierre after 2015.  Do you recall that testimony?

23   A.   Yes.

24   Q.   Did Mr. Guy Jean-Pierre ever try to contact you after

25   the time of FusionPharm asking you to write further

Redirect - DiTommaso

1   letters -- or sign further letters?

2   A.   I can't remember the exact date of the last letter that

3   I did for Mr. Pierre from one of the other corporations.

4   There might have been one or two times after the end of

5   FusionPharm.

6   Q.   Well, let me ask you this question:  After you were

7   notified by the SEC regarding the FusionPharm issues and

8   your involvement, were you ever contacted by Mr. Guy

9   Jean-Pierre to further put your letterhead and signature on

10   opinion letters?

11   A.   I was contacted one time after that when Mr.

12   Jean-Pierre asked me to do another opinion letter and I told

13   him I did not want to.

14   Q.   Okay.  Why didn't you want to assist Mr. Guy

15   Jean-Pierre?

16   A.   Because of the SEC investigation.

17   Q.   So essentially you working with Guy Jean-Pierre, what

18   happened with you?

19   A.   Well, I got in trouble with the SEC for violating SEC

20   rules.

21   Q.   And is that why you didn't want to work with him

22   anymore?

23   A.   That's not the only reason.  It's also because he was

24   untruthful to me and you can't rely on anything that he

25   says.

Direct - Ivanich

1           MR. SIBERT:  Thank you, Your Honor.

2           THE COURT:  May this witness be excused, for the

3    Government?

4           MR. SIBERT:  Yes, sir.

5           THE COURT:  For the defendant?

6           MR. GOODREID:  Yes, Your Honor.

7           THE COURT:  All right.  Mr. DiTommaso, thank you

8    for your testimony.  You're excused.  You may step down.

9           THE WITNESS:  Thank you, Your Honor.

10          THE COURT:  Government may call its next witness.

11          MR. BROWN:  Your Honor, the Government calls Joe

12   Ivanich.

13          COURTROOM DEPUTY:  I'll move these binders out of

14   your way here.  If you want to stand right over here by the

15   witness stand, please.  Are you able to raise your right

16   hand?

17          JOE IVANICH, GOVERNMENT'S WITNESS, SWORN

18          COURTROOM DEPUTY:  Thank you.  You may be seated.

19   You want to scoot your chair up.  And please state and spell

20   your name for the record.

21          THE WITNESS:  My name is Joe Ivanich.

22   I-v-a-n-i-c-h.

23                    DIRECT EXAMINATION

24   BY MR. BROWN:

25   Q.   Good morning, sir.  Where do you currently reside?

Direct - Ivanich

1    A.    Butte, Montana.

2    Q.    How long have you lived in Butte, Montana?

3    A.    About 70 years.

4    Q.    And Butte's in the, I guess, southwest part of

5    Montana?

6    A.    It is.

7    Q.    Is Butte one of the larger towns in Montana?

8    A.    It -- it isn't the largest, it's probably about the

9    fourth largest community in Montana.  They're all pretty

10   small cities.

11   Q.    How many -- what's the approximate population of Butte?

12   A.    35,000.

13   Q.    And what do you -- could you tell us a little bit about

14   yourself, your background, your education.  What you do for

15   a living, how you support yourself.

16   A.    Sure.  I graduated from Butte High School, went to the

17   University of Montana.  Got my bachelor's of science degree

18   in accounting.  Then I got my master's in business

19   administration degree.  Got my CPA exam.  Got married.

20   Started building a family.

21        Went to work for the Anaconda Company, a copper

22   mining company, doing business in Butte.  Worked there for a

23   few years and had -- had a chance to travel a lot, see a lot

24   of the operations.  And then the Chilean government

25   expropriated the copper mine in Chile.  And I decided that I

Direct - Ivanich

1    was -- time to move on and find a job that would -- had a

2    probably better future.

3         So I got an offer from the local utility company

4    called Montana Power Company.  Worked there for about 25

5    years.  Started out auditing, moved into developing computer

6    systems, bringing them up on time and under budget and fully

7    operational.

8         After about 25 years, the management of the utility

9    company decided to go into telecom business and I,

10   therefore, had an opportunity to do a lifelong wish of mine

11   was to get into the brokerage business.  So I started with a

12   small company doing mutual funds and annuities.  They were a

13   subsidiary of Smith Barney.

14        Decided to get closer to stocks and bonds, and so I

15   went to work for a regional brokerage house called Piper

16   Jaffray.  Piper Jaffray was purchased by UBS.  Worked for

17   UBS for a while and they decided to move their operation out

18   of Butte.  And so I took an opportunity to go to work for

19   ING Financial Services.  They were bought out by Voya

20   Financial Services, and today I'm an independent

21   representative for Voya Financial Services.

22   Q.   Do you have -- are you -- you act as sort of an

23   independent broker for that company?

24   A.   Yes.

25   Q.   We've been listening to testimony for nine days about

Direct - Ivanich

1    the stock market and securities markets.  Why was that your
2    lifelong dream, sir?
3    A.    I -- I saw it as an opportunity to -- one, I am -- if
4    the job was digging ditches, it would be a lot tougher for
5    me, but -- I saw this as an opportunity where I could visit
6    with clients and help them make money and be able to have an
7    enjoyable retirement.
8    Q.    Tell us about -- how long is it -- I think you may have
9    said, but how long has it been that you've been basically an
10   independent broker?
11   A.    About 18 years.
12   Q.    Do you have an office or how do you --
13   A.    I do.
14   Q.    And tell us about how you get clients, how they come to
15   you, and what you do for them.  Just in general.
16   A.    In general, I -- I get clients, one, because I know
17   people and have friends and -- and also a lot because they
18   talk to people and refer clients to me.
19   Q.    Okay.  And have you done pretty well as an independent
20   broker?
21   A.    Yeah, I have -- I've enjoyed doing it and it's been
22   rewarding, both financially as well as humanly.
23   Q.    Okay.  That's good.  I want to take you back a few
24   years, back to around 2012, 2013, 2014.  At that time, you
25   were in the independent -- you were in the brokerage

Direct - Ivanich

1    business?

2    A.   Yes.

3    Q.   Did -- while you were in the brokerage business, did

4    you also make personal investments in various stocks?

5    A.   Yes, I did.

6    Q.   That's based on your experience and what you learned

7    and what you know?

8    A.   Yeah.  My -- just very simply, my -- my theory in the

9    brokerage business has been to diversify clients, get them

10   into good quality stuff, and want to make dividends and have

11   capital gains and do well.  And I try and follow my own

12   rules.

13   Q.   In 2012 and 2013, did you look into the idea of the

14   viability of investing into marijuana-related businesses or

15   public companies?

16   A.   I did for two reasons.  One, marijuana was very much in

17   the news, Colorado's very much in the news, and I had

18   particularly one client who was very interested in -- in

19   getting into that business sector.  And so he asked me to do

20   some research, and that kind of focused my -- my interest on

21   the cannabis business and Fusion.

22   Q.   With regard to that, did -- back in 2013, 2012, 2014,

23   Colorado passed a -- medical marijuana was legal, correct?

24   A.   Correct.

25   Q.   This is prior to recreational marijuana being legal.

Direct - Ivanich

1    So at this time, medical marijuana was, for lack of better

2    terms, legal in Colorado for personal use for that purpose.

3    And why did you think there would be an opportunity to

4    invest in that area?

5    A.    Well, it was a growing segment, meaning that you had

6    more and more states looking at, considering, and -- and

7    passing medical and/or recreational utilization of

8    marijuana.  And I think probably by the end of '14, we must

9    have had like 15 states or so that -- that were -- that had

10   some access available for marijuana.

11          And it just -- it was growing and so you could see

12   potential for people to make money in an industry that was

13   growing.

14   Q.    In the -- frankly, I don't know the answer to this

15   question, so I'm going to ask you:  Back then -- I mean,

16   right now like there are companies that sell cigarettes that

17   are publicly traded; is that right?

18   A.    Yes.

19   Q.    Do you -- if a company, let's say, R.J. Reynolds,

20   decided to -- I think that's the tobacco company -- if they

21   decided to start growing marijuana instead of tobacco, could

22   they be publicly traded back then or do you know?

23   A.    If they met the listing requirements they could be

24   publicly traded.

25   Q.    Okay.  But if there was any -- was there any

Direct - Ivanich

1   prohibition on incorporating and selling public stock in

2   companies all they did was grow and sell marijuana?  To your

3   knowledge.

4   A.   As far as I know, the stock market did not limit

5   listing in terms of their business, but more their financial

6   situation.

7   Q.   Okay.  But you're aware that at least federally

8   possession and sale of marijuana is against federal law?

9   A.   Absolutely.

10  Q.   Okay.  You indicated that you developed this interest

11  by contact -- one of your clients contacted you and you

12  thought it would be worthwhile to look into.  Tell us the

13  steps you took to look into this industry.

14  A.   Well, I looked, one, at marijuana in general.  What was

15  happening and where it was happening, and -- and how fast

16  things were moving.

17       Looked at -- frankly, I was looking to try and find

18  a company that was diversified; meaning, for example, that

19  sold cigarettes, as well as marijuana.  And I don't mean to

20  emphasize cigarettes at all, but where they had some

21  diversity and didn't depend on marijuana a hundred percent.

22  Q.   Why was that?

23  A.   Well, because I think it's far safer to put a client

24  into a company that does multiple things as opposed to one

25  thing.

Direct - Ivanich

1    Q.   And in doing this research, could you tell us -- I

2    mean, other than -- you're obviously a lot of knowledge

3    about such things -- or at least the stock market and how to

4    invest, how do you go about researching a company you hear

5    of to determine whether it's a good enough thing you should

6    be pursuing?

7    A.   Utilize the -- the internet a lot.  See what's --

8    what's out there in terms of news, both generally in terms

9    of the business sector as well as companies trying to see

10   who's doing what and where, and what's happening in terms of

11   government regulations.  You know, looking, for example, at

12   Canada that was really starting to push things.

13   Q.   Did -- in your search to try to help your client out,

14   did you come across a company named FusionPharm?

15   A.   I did.

16   Q.   In your search -- or at least your discovery of that

17   corporation, had you been contacted by anyone soliciting you

18   for FusionPharm?

19   A.   I wasn't.

20   Q.   Had you been contacted by any officer or director of

21   that company?

22   A.   No.

23   Q.   How did you find it?

24   A.   Just searching through the internet and reading news

25   stories and looking on otcmarkets.com, that they've got a

Direct - Ivanich

1    lot of companies, and some of them were marijuana companies.
2    And so I tried to see what each one was doing and -- and
3    trying to see if I could see some nice features in companies
4    that I thought maybe gave them an advantage for an investor.
5    Q.   What about what you read and discovered on the internet
6    attracted you to FusionPharm?
7    A.   They -- they were doing multiple things.  One, they
8    weren't selling marijuana and so I thought that increased
9    their safety position.  They -- their objective was to go
10   ahead and sell pods to many companies.  And, accordingly, I
11   thought that if a company that they were doing business with
12   had a problem from an investor standpoint, it would be more
13   like a fender bender rather than a -- a devastation of your
14   vehicle.
15   Q.   Okay.  And the fact that they weren't actually selling
16   marijuana, itself, was more -- you felt it was more secure?
17   A.   Right.  And I didn't -- and I didn't see anybody else
18   that was really going to be able to -- to make money by
19   enabling you to grow flowers, marijuana, and other things.
20   So I thought that they had a competitive advantage.
21   Q.   Okay.  In addition to finding out about this company on
22   the internet, did you read, like, press releases from the
23   company, itself?
24   A.   I did.
25   Q.   And did you also conduct your own investigation with

1    regard to -- we've heard about OTC filings --
2    A.   I --
3    Q.   -- view the financials?
4    A.   Wherever and whenever there were filings, I read them.
5    I mean, I would tell you that I'm probably one of the few
6    people that really reads a 10-K.
7    Q.   I'm sorry, what?
8    A.   I'm probably one of the few brokers that reads a 10-K.
9    And the reason I read it is because I'm looking for an
10   advantage for the company as opposed to just looking at
11   statistics.
12   Q.   Could you tell us what a 10-K is.
13   A.   That's the annual filing of financial statements.
14   Q.   Okay.  Is that the -- if you have -- in a large
15   company, is that one of those things that's like --
16   A.   That's it --
17   Q.   -- that thick and you get it in the mail and you throw
18   it away?
19   A.   Yeah.
20   Q.   Okay.  With regard to this case, is there a source for
21   finding out that information on the internet?
22   A.   A source for what?
23   Q.   Finding out the financial information that you said you
24   researched.
25   A.   Well, you know, you can -- you can get -- get to their

Direct - Ivanich

1   10-K.  You've got address information so that you can go
2   ahead and -- and call or write and get a 10-K delivered and
3   be able to read through it.  Same thing with 10-Qs and
4   10-Ks, reports that they file so you have some idea what
5   direction they're going, what's happening to the company.
6   Q.   And can you access directly the OTC website and look up
7   the quarterly filings?
8   A.   Yes.
9   Q.   Okay.  And did you do that in this case?
10  A.   Fusion really wasn't well-known for doing quarterly
11  filings.
12  Q.   At the time you were looking at them?
13  A.   Yeah.  They weren't -- they put out a little financial
14  information.  In terms of what they were doing, what I
15  remember probably most vividly, because I thought it was an
16  important news item, was the disclosure by the CEO that they
17  were going to hire an independent auditor and get out their
18  quarterlies.
19  Q.   Okay.  And that was -- how did you learn about that?
20  On the internet?
21  A.   Yeah, the internet.  I think that there was a video
22  presentation that I watched where Scott Dittman spoke about
23  moving Fusion forward.
24  Q.   Okay.  Was this independent auditor, was that going to
25  be, I guess, a CFO of the company?

Direct - Ivanich

1   A.   He -- I never saw him really -- I can't remember him

2   disclosing who it was going to be and, in fact, I can't

3   remember an article where -- where they really got an

4   independent auditor.  And then -- just -- they didn't get

5   financial statements out.

6   Q.   Okay.  Could you take a look at -- we can show this to

7   you.  There's a monitor on your left there that is sometimes

8   a little bit hard to read, but could you take a look at

9   Government Exhibit 25.  Actually, it might be better if I

10  showed it to you.  It's a multi-page document.  Maybe if you

11  could -- we'll show you a hard copy in a binder.  It should

12  be volume No. 1.  I'll ask -- 25.

13       Sir, I'm going to show you a hard copy of that

14  document that you can look at.  It's probably a little

15  easier to look at.  Can you take a quick glance through that

16  document.  I don't need you to read through every page,

17  although I think you're meticulous, but just so you

18  understand what that document is.

19       Sir, you've looked at a few of the first pages of

20  that document.  Do you know what kind of document that is?

21  A.   Yes.  It's -- it's a basic preliminary filing giving

22  you a look at the profile of the company and shareholdings.

23  Q.   Do you remember whether or not -- I know it's been a

24  long time -- do you remember whether or not you actually

25  looked up this document on the internet for the OTC?

1  A.   I -- I really can't remember looking it up, and
2  probably because I didn't really start looking at Fusion
3  until 2013.
4  Q.   But you didn't look back at the former years' annual
5  report?
6  A.   I cannot remember looking back at this document.
7  Q.   Actually, it's not an annual report.  I misspoke.
8  Annual information and disclosure statement.
9  A.   Yes.
10  Q.   Okay.  You can close up that exhibit if you want.
11       As you were looking at this stock, did -- I presume
12  you had the ability to find out what a stock is trading for
13  at any given moment?
14  A.   Yes.
15  Q.   Whether it's a small stock like this or whether it's,
16  as we kept saying, Apple.
17  A.   Yes.
18  Q.   And you can just do that on the internet and it will
19  tell you what you can -- what you have to pay for it and
20  what you can sell it for; is that right?
21  A.   Yes.
22  Q.   Okay.  And did you sort of -- can you also look at a
23  historical price on the internet?  Can you find out what
24  it's been doing for the last six months or year or
25  whatever?

Direct - Ivanich

1    A.   Five years, if they've been around long enough, yes.

2    Q.   And did you do that in this case?

3    A.   I -- I did look at it.  I would relate to you that I

4    was looking a lot more to what they were going to do as

5    opposed to what they had done.

6    Q.   That's because you hadn't bought any of that, right?

7    A.   Right.

8    Q.   Probably more important to see the price after you buy

9    it than before; is that --

10   A.   Well, I -- you know, I looked at the -- when I started

11   looking at the price of Fusion, it was in the plus $2 range.

12   Q.   Okay.  You also indicated that you read a number of

13   press releases about the company.  And you've been in this

14   business a long time.  How do you -- based on your

15   experience, how do you discern whether a press release is

16   just some kind of puffing or whether it's something you can

17   rely on?

18   A.   That's really a good question and I would relate to you

19   that it -- probably the thing that influences me the most

20   generally is if I've got independent activity.  One company

21   with another, if I'm looking at the company and other

22   companies have and are looking, I -- I feel a lot more

23   confident if other companies feel it's a good company as

24   opposed to only me.

25   Q.   How do you find out if another company feels it's a

Direct - Ivanich

1    good idea?

2    A.    Well, if -- you got news that they're going -- they're

3    looking at doing a -- a merger or a purchase, and -- and,

4    obviously, if that comes through and they do it, it gives

5    you generally some confidence that -- that both companies

6    are reasonably reliable and things are going to happen.

7    Q.    In your practice back at this time, were you more in

8    the practice of buying stocks on the larger markets or did

9    you do a lot of work on the Over-the-Counter Markets, the

10   Pink Sheets?

11   A.    A lot more with the larger companies.

12   Q.    Have you ever heard of the phrase pump-and-dump scheme?

13   A.    Yeah.

14   Q.    And I -- well, I won't ask you that.

15         With regard to the press releases you have seen,

16   could you -- I'm going to ask the courtroom deputy to show

17   you a -- an exhibit, which has not been admitted into

18   evidence so it shouldn't be displayed -- Government Exhibit

19   404.

20         Actually, as long as you're standing up, could you

21   show him Exhibit No. 27.  I'll go back to 404.  You can

22   leave that.

23         Could you -- Exhibit 27 has previously been

24   described as a March 30th, 2013, quarterly disclosure of

25   FusionPharm.  Do you know whether or not you ever looked at

1   that document?

2   A.   I would be pretty confident -- I've looked at a lot of

3   their stuff and I -- so I tell you that I'm pretty confident

4   that I did because this -- this is dated March 31st, and,

5   therefore, I, probably in April -- and I -- I was looking at

6   a lot of Fusion -- you know, information, and I -- I'm sure

7   that I looked at it and dug at it.  I saw them to be a very

8   new company and I was concentrating mostly on what they were

9   going to do because their balance sheet was -- was -- was

10  kind of small and wasn't a lot to look at for safety.

11  Q.   Could I have one moment.  Just need to look up a page

12  number.

13           THE COURT:  You may.  Mr. Ivanich.  Mr. Ivanich.

14  Hello.  Mr. Ivanich.

15           THE WITNESS:  I'm sorry.

16           THE COURT:  Could you focus on where you are as

17  compared to the mic, so you're speaking away from the mic

18  and your voice was trailing.  So could you have -- you

19  can -- you can twist the mic over to you if you're looking

20  over to your right or left.  Okay.

21           THE WITNESS:  Okay, thank you.

22           THE COURT:  Try to stay closer to the mic.

23           THE WITNESS:  You bet.

24  BY MR. BROWN:

25  Q.   I won't go into a lot of detail, but could you take a

Direct - Ivanich

1     quick look -- if you could look at -- there's a page number

2     at the very bottom of that document which is right in the

3     center, and it's the lowest number in the center.  Could you

4     look at page 8, just for example.

5          Could we have that published, please.

6     A.   Okay.  I am on 8.

7     Q.   Okay.  And could we just blow up the first -- or the

8     top -- where the figures are like the top quarter, I

9     suppose -- that's good.

10         I am not going to ask you a bunch of questions

11    about accounting, so are these figures that you look at on

12    the internet important to you in your analysis of the

13    company to some degree?

14    A.   Importance in the sense that it reflected that they had

15    started doing some business, but they -- the size of the

16    numbers was extremely small and it didn't give me

17    confidence -- I wasn't looking for small numbers, I was

18    looking for expectations going forward.

19    Q.   And I think there's been testimony about what revenue

20    means, but in this -- it appears that the revenue went about

21    $100,000 for one year.  This is just for one quarter, I

22    understand, but --

23    A.   Yes.

24    Q.   Okay.  But that is something at least you examined in

25    your analysis; is that right?

1955
Direct - Ivanich

1    A.    Yes.

2    Q.    Now we can go back to Exhibit 405.

3          You were discussing press releases -- or that's not

4    admitted again.

5          Could you just -- I know it's extremely --

6          THE COURT:    404 or 405?

7          MR. BROWN:    404, I'm sorry, Your Honor.    Thank you

8    very much.

9          THE COURT:    All right.

10   BY MR. BROWN:

11   Q.    And just the first page of that document.    It is

12   extremely hard to read.

13   A.    Yes.

14   Q.    If you didn't need reading glasses before, you will

15   now.

16         Could you just take a look at that and read it to

17   yourself.    Just the first two paragraphs will probably be

18   fine.

19   A.    Got it.

20   Q.    Okay.    Is that one of the press releases you reviewed

21   in your examination of -- in making your decision whether or

22   not to invest in FusionPharm?

23   A.    Yes.    I thought they had some potential.

24   Q.    Okay.

25         MR. BROWN:    Your Honor, the Government moves for

Direct - Ivanich

1    admission of 404, not for the truth of the matter, but for

2    the -- this witness' course of conduct in making his

3    decision.

4              THE COURT:  Any objection to 404?

5              MR. GOODREID:  Your Honor, not on that basis for

6    admission, no.

7              THE COURT:  All right.  There being no objection,

8    Exhibit 404 is admitted into evidence and may be published

9    to the jury.

10             (Government's Exhibit 404 received)

11   BY MR. BROWN:

12   Q.   Could we -- could I have that published and the -- I

13   guess the -- well, before I have a part of it expanded, Mr.

14   Ivanich, when you would get press releases, is there a

15   typical website that -- where press releases land and then

16   get disseminated to the public, including yourself?

17   A.   Yahoo was a site that gets an awful lot of the news and

18   it gives you some really good search abilities, and so I

19   picked up a lot of stuff by going through the -- through the

20   Yahoo.com.

21   Q.   Do you use search engines such as Google and things

22   like that?

23   A.   I rarely use Google for -- for stock stuff.  I usually

24   am looking at the -- you know, the financial news media, or

25   the otcmarkets.com or the New York stock exchanges.

Direct - Ivanich

1    Q.   Do those -- whatever you call those things, whatever

2    they are -- do they have the ability to search -- like if I

3    typed in FusionPharm, would that be able to bring up

4    articles or issues or press releases on those subjects?

5    A.   Yes, well, at least it would bring you directly to the

6    company and its news, and then you could search through

7    pieces to find if there's something in the news.

8    Q.   And is that where you would have found this particular

9    press release?

10   A.   Yes.

11   Q.   Okay.  Maybe we could -- maybe you could just -- since

12   it's now admitted, maybe you could describe just generically

13   what this is.

14   A.   Well, it -- it's an article that reflects that they're

15   able to sell their pod containers.

16   Q.   Okay.  Is this a press release, basically, from

17   FusionPharm?

18   A.   I guess -- yeah.  And it is by FusionPharm.

19   Q.   Okay.  Maybe we could attempt to expand -- why don't we

20   just expand the first part down to the bottom of the

21   headline.

22            MR. BROWN:  I'm sorry, Your Honor.

23   BY MR. BROWN:

24   Q.   And on that screen to your left, that's the headline of

25   the press release?

1958

Direct - Ivanich

1  A.   Yes.

2  Q.   Okay.  Maybe we could now expand just the first two

3  paragraphs.

4       I won't challenge you to read it out loud, but is

5  there a reference in this press release to a company called

6  MeadPoint Venture Partners?

7  A.   There is.

8  Q.   And what about this press release that you read, at

9  least in the hard copy, a long time ago, did that help you

10 or give you positive information about the FusionPharm?

11 A.   I didn't find anything about MeadPoint.  I -- and I

12 didn't know anything about MeadPoint.  I just saw that we

13 had a sales contract and I thought it was positive, but no

14 information about MeadPoint.

15 Q.   Did you try to investigate what MeadPoint was, or would

16 you have if --

17 A.   I -- I don't think I did anything.  In fact, I was

18 more -- I think I was really looking to be able to see

19 additional articles of the same nature but different

20 companies.

21 Q.   Okay.  And were you able -- did you -- well, before I

22 go there, I'll ask you:  This press release indicates that

23 MeadPoint had completed a deal with FusionPharm to purchase

24 eight HI, high-intensity, containers, and possibly buy up 50

25 more containers in 2013 and 2014.

Direct - Ivanich

1    Would that information, if true, have been -- would

2    be -- would that be a positive about the company?

3    A.   Yes.  Because that information would make a significant

4    difference in terms of their operating results.

5    Q.   Okay.  While we're on that, in terms of just

6    researching this, did you do something besides just look on

7    the internet and find good or bad things about FusionPharm?

8    A.   Fusion was a over-the-counter stock and there isn't a

9    lot of listing requirements and you -- it's very difficult

10   to find an awful lot of information about an OTC stock,

11   particularly a --

12   Q.   Did you call Scott Dittman, the person you saw on the

13   video?

14   A.   I had called multiple times and I never got to speak to

15   him personally because I was told he was out of the office.

16   Q.   Did you ever go to their warehouse?

17   A.   I did.  Went to Commerce City.

18   Q.   That's sort of the north part of Denver?

19   A.   Yeah.

20   Q.   Did you come from Butte to Commerce City just to look

21   at FusionPharm?

22   A.   My son lives in Denver and I've got grandkids here,

23   too.

24   Q.   So when you were down here, you thought you'd go take a

25   look at it?

1960

Direct - Ivanich

1    A.    Yes.

2    Q.    And did someone give you a tour?

3    A.    Yes.

4    Q.    Do you remember who that was?

5    A.    You know, I can't remember his name. I -- I asked him

6    a lot of questions. I -- my recollection is that he -- that

7    he had the word "engineer" in his title, but when I was

8    asking about the lighting that they were using and what were

9    they doing in terms of new lightings, he just did not seem

10   to be very knowledgeable.

11   Q.    Okay. Do you remember the name -- well, do you

12   remember the name William Sears?

13   A.    Yes.

14   Q.    Okay. From back then, did he give you the tour?

15   A.    No. I didn't see him at all. The -- my exposure to

16   the name William Sears is through -- is from my -- much

17   later when problems were discovered.

18   Q.    Okay. Okay. You didn't know William Sears -- you

19   weren't introduced to anyone named William Sears at the

20   time?

21   A.    I was not.

22   Q.    Do you remember, did you -- and you -- did you ever

23   meet Scott Dittman either, in trying to call him?

24   A.    No.

25   Q.    Let's go back to this press release. You indicated

Direct - Ivanich

1   that this press release referenced MeadPoint Ventures.  And

2   you did not do any research into MeadPoint Ventures, I

3   believe you indicated.

4          If you had known at the time that -- at the time

5   that MeadPoint Ventures was a company who listed William

6   Sears as an officer in its corporate paperwork and who --

7   and William Sears had to go in to write checks on the

8   checking account of MeadPoint Ventures, and that William

9   Sears was -- I won't use legally appropriate terms, but

10  I'll -- a significant part of FusionPharm, who's a

11  significant part of MeadPoint and FusionPharm, would this

12  press release have meant much to you?

13  A.   It probably wouldn't have -- would not have meant very

14  much to me because I took it to be two -- two independent

15  companies having a meeting of minds.

16  Q.   If you had been made aware of or knew somehow that

17  MeadPoint was selling FusionPharm stock and booking that --

18  sales of that stock as revenue on FusionPharm's balance

19  statements, which you looked at earlier, would that have

20  raised a red flag on whether you should buy this stock or

21  not?

22  A.   Yes, sir.

23  Q.   Why is that?

24  A.   Because it -- that sort of stuff should not happen.

25  The -- the whole articles are reflecting two companies

1    trying to do business together, and to have a -- really a
2    nonindependent transaction is no transaction.
3    Q.   Because you're selling stuff to yourself.
4    A.   Right.
5    Q.   Anyway, you didn't know that.  And you did some more
6    research.  Did you ever tell the customer that you were --
7    you started all this with, that that would be a good stock
8    to buy?
9    A.   I did a little bit later.  Not quite this early, but,
10   yes, later.
11   Q.   Did you personally make a decision to buy stock?
12   A.   I did.
13   Q.   And tell us about that.  Was it like one big lump sum
14   or how did you do it?
15   A.   I bought it in a lot of small pieces.  Like I would buy
16   500 or a thousand shares and let it sit for a while and --
17   would do new -- with new news hitting the wire, I saw that
18   there was potential and I bought some more stock, and I did
19   so from like 2013 to early 2015.
20   Q.   And did you just buy -- what was the volume that you
21   would buy at any one given time?  Just in general.  I know
22   it's been a long time.
23   A.   I think the biggest piece I bought would have been
24   about, say, 1200 shares.  More often more like 300, 500.
25   Q.   Did you buy and sell or did you just buy?

1    A.    I bought.

2    Q.    Okay.  And did you follow -- after you bought the

3    stock, did you follow the price closer?

4    A.    I did.

5    Q.    Okay.  And what would pique your interest and cause you

6    to buy more every once in a while?  The price or the volume

7    or more information you obtained?

8    A.    I think two things in particular.  One was developments

9    in the cannabis industry.  And, two, Scott Dittman was --

10   was on -- I'll say TV, but I mean videos frequently that you

11   could see through the cannabis station.  And he seemed to

12   know what he was doing and he was talking about doing a lot,

13   so I -- I guess I was maybe overly influenced by what he

14   said he was going to do.

15   Q.    And you indicated that you bought a lot of stock and

16   you never sold any, right?

17   A.    Correct.  Well, I -- I started to sell, but like the

18   price got to $5 and I thought it was time to go ahead and

19   lock in some profit.

20         And then about that time, the SEC closed down

21   trading on a lot of cannabis stocks.

22   Q.    And was this one of them?

23   A.    Yes.

24   Q.    How much money would you say you invested in

25   FusionPharm stock?

Direct - Ivanich

1    A.    About 80,000.

2    Q.    What's it worth today?

3    A.    Almost nothing.  A penny, I'm sure.

4    Q.    Sounds like you've been fairly successful at your

5    business.  How has losing $80,000 impacted your life?

6    A.    Well, it's impacted my life just like it would impact

7    anybody's.  The -- probably the biggest impact would relate

8    to you is that I saw Fusion selling for $5 and then you take

9    the shares and the value of the account, what -- I mean, I

10   lost a lot more than 80,000 because I didn't sell when it

11   was like at $5.

12   Q.    Thank you, sir.

13             THE COURT:  Cross-examination.

14             MR. GOODREID:  Your Honor, the defense has no

15   questions for this witness.

16             THE COURT:  All right.  May this witness be excused

17   for the Government?

18             MR. BROWN:  Yes, sir.

19             THE COURT:  For the defendant?

20             MR. GOODREID:  Yes, Your Honor.

21             THE COURT:  All right.  Mr. Ivanich, thank you for

22   your testimony.  You're excused.  You may step down.

23             THE WITNESS:  Uhm-hum.

24             THE COURT:  One second.  I want to give Ms. Frank

25   an opportunity to clear out all the binders here.

Direct - Scoufis

1    All right.  The Government may call its next

2  witness.

3    MR. SIBERT:  Your Honor, at this time the

4  Government would like to call Alex Scoufis.

5    COURTROOM DEPUTY:  Please stand here and raise your

6  right hand.

7    ALEX SCOUFIS, GOVERNMENT'S WITNESS, SWORN

8    COURTROOM DEPUTY:  Please be seated.  You might

9  need to scoot your chair up towards the microphone.  And

10  please state and spell your name for the record.

11    THE WITNESS:  Okay.  Alex, A-l-e-x, Scoufis,

12  S-c-o-u-f-i-s.

13    THE COURT:  You may proceed, Mr. Sibert.

14    MR. SIBERT:  I just am checking with counsel.  Mr.

15  Barnard, are you all ready with your --

16    MR. BARNARD:  We're ready.  Thank you.

17    MR. SIBERT:  All right.  Thank you, Your Honor.

18    DIRECT EXAMINATION

19  BY MR. SIBERT:

20  Q.   All right, good morning, sir.  As you stated your name,

21  could you please tell the jury essentially what organization

22  you work for.

23  A.   Yeah.  I work for FINRA.

24  Q.   Okay.  And what does FINRA stand for?

25  A.   FINRA is the Financial Industry Regulatory Authority.

1   Q.   Okay.  And do you work for a specific section within

2   FINRA?

3   A.   Yeah.  I work for what's called the Criminal

4   Prosecution Assistance Group, shortened CPAG, C-P-A-G.

5   Q.   Sir, it's been kind of a long morning, but I need to

6   have your voice raised --

7   A.   Oh, yeah.

8   Q.   -- so you need to move that mic.

9        And, I'm sorry, you said you worked for FINRA's

10  Criminal Prosecution Assistance Group?

11  A.   Correct.

12  Q.   Essentially can you tell the jury what is the mission

13  regarding FINRA's Criminal Prosecution Assistance Group?

14  A.   Yeah.  So we are just tasked with assisting criminal

15  investigators, prosecutors, that are looking into potential

16  securities law violations.  And then kind of going forward

17  from there, analyzing information related to securities law

18  violations, and eventually testifying to that.

19  Q.   Okay.  And how long have you been employed with FINRA?

20  A.   I've been employed for about 3 1/2 years.

21  Q.   Okay.  And could you describe your educational

22  background.

23  A.   Sure.  I have an undergrad degree from Colorado State

24  University in political science and economics.  And I have a

25  law degree from George Washington University where I

Direct - Scoufis

1    concentrated in financial regulation.

2    Q.   Okay.  Now, have you always been part of FINRA's

3    Criminal Prosecution Assistance Group?

4    A.   No.  I've been with CPAG for just over two years.

5    Prior to that I was in what's called the Office of Fraud

6    Detection and Market Intelligence, or OFDMI.

7    Q.   What does that group do within FINRA?

8    A.   That group has a few different divisions.  Particularly

9    I was in what's called the Insider Trading Group, and I

10   investigated potential insider trading violations.

11   Q.   Okay.  And we've talked about your specific sections

12   regarding FINRA.  Could you briefly describe the

13   organization's mission as a whole.

14   A.   Yeah.  FINRA exists -- it's not the Government, it's a

15   self-regulatory organization that exists to protect

16   investors and ensure market integrity.

17   Q.   All right.  And does that include the market integrity

18   regarding the OTC Markets?

19   A.   Yeah, absolutely.  All public markets, exchanges,

20   over-the-counter market, yes.

21   Q.   Now, have you ever testified before in a criminal

22   security fraud trial?

23   A.   I have, yes.

24   Q.   Okay.  And how many times have you testified?

25   A.   This is my ninth.

Direct - Scoufis

1    Q.   Your ninth time testifying?

2    A.   Correct.

3    Q.   Okay.  How many times in Federal District Court?

4    A.   All -- all nine of those.

5    Q.   Okay.  So your entire experience as a witness has been

6    in federal court.

7    A.   Correct.

8    Q.   And have you been qualified in the past as an expert in

9    testifying about security manipulation and detection?

10   A.   Yes, I have.

11   Q.   And how many times have you been qualified as an

12   expert?

13   A.   Once.  I usually come in as a summary witness, but I

14   have been qualified as an expert.

15   Q.   Okay.  And do you recall where you were qualified as a

16   expert to testify regarding security manipulation and

17   detection?

18   A.   Yes.  It was in the Northern District of Georgia.

19   Q.   All right.  And were you asked to look at documents

20   relating to this case, particularly FusionPharm?

21   A.   Yes, I was.

22   Q.   Okay.  And can you describe essentially the documents

23   that you reviewed regarding your testimony here today.

24   A.   Sure.  Let's see.  So what I received from your office

25   included primarily transfer agent records and brokerage firm

1   records.  I also, from public sources, received

2   information -- price/volume information, corporate action

3   calendar from Bloomberg, as well as filings off the

4   Over-the-Counter Markets' website.

5   Q.   Okay.  Now, you stated price/volume information.  Can

6   you describe essentially what price/volume information is.

7   A.   Sure.  Price/volume information refers to trading in a

8   specific security, a stock, a company stock.  So price

9   refers to generally the closing last sale price on a given

10  trade day, so the last price that a stock traded at.  And

11  volume refers to the amount of shares that traded in the

12  public markets during the day.

13       So price/volume information is going to be one day;

14  it's going to have two numbers.

15  Q.   And as part of this investigation, you looked into that

16  information; is that correct?

17  A.   Correct.

18  Q.   And have you used that information in the past,

19  including the nine trials that you've testified in?

20  A.   Whether it was used in all nine, I don't know.  But it

21  is a common -- it's commonly used in securities fraud cases,

22  yes.

23  Q.   Okay.  And I just want to touch a little bit more on

24  your background.  When you were within the -- I believe you

25  stated that you did some investigations regarding inside

Direct - Scoufis

1    trading; is that correct?

2    A.    Correct.

3    Q.    Okay.  And can you explain essentially how many cases

4    you approximately looked into that might have dealt with

5    inside trading?

6    A.    Yeah.  We looked at the trading of about 20 to 30

7    different companies.

8    Q.    Okay.  And could you describe the type of documents you

9    had to review when it came to those investigations.

10   A.    Sure.  Starting with press release or a filing the

11   company's public news announcement.  From there, looking at

12   price/volume information -- publicly available price/volume

13   information.  And then moving on to requesting trading

14   records from brokerage firms, often referred to as blue

15   sheets.

16   Q.    Okay.  So you've had experience with what's called blue

17   sheeting; is that the general term?

18   A.    Yeah.  Yup.  I have.

19   Q.    And, again, you mentioned Bloomberg a few times.  Can

20   you tell the jury why Bloomberg is important.

21   A.    Yeah.  Bloomberg is important because they are probably

22   the biggest -- biggest company in the industry for compiling

23   financial data, including price/volume information, press

24   releases, filings, that sort of thing.  And then it's

25   available on what's called the Bloomberg Terminal, which

Direct - Scoufis

1   it's all public information, though you do have to pay to

2   use the Bloomberg terminal.

3   Q.   And has FINRA paid their subscription in a timely

4   manner?

5   A.   Yeah.  We have a -- we have a number of terminals, yes.

6   Q.   Okay.  And are you familiar with the terms -- regarding

7   your past experience in investigations and your current

8   employment in the section assisting the criminal prosecution

9   group, are you familiar with the terms pump-and-dump?

10  A.   Yes.

11  Q.   Market manipulation?

12  A.   Yes.

13  Q.   Are you familiar with restricted versus unrestricted

14  shares?

15  A.   Yes.

16  Q.   How about the rules that deal with some exceptions when

17  there's no registration statement by a company to include

18  Rule 144 safe harbor exception rule?

19  A.   I am, yes.

20  Q.   Okay.  And does a lot of your work involve either the

21  Rule 144 or dealing with investigations involving the street

22  terms of pump-and-dump and market manipulation?

23  A.   Yes.

24       MR. SIBERT:  Your Honor, at this time, the

25  Government would move to admit Mr. Scoufis as an expert in

Voir Dire - Scoufis

1    security manipulation and detection.

2              THE COURT:  Is there an objection?

3              MR. BARNARD:  Your Honor, may I voir dire?

4              THE COURT:  You may.

5                   VOIR DIRE EXAMINATION

6    BY MR. BARNARD:

7    Q.   Mr. Scoufis, you said that you have a law degree?

8    A.   I do, yes.

9    Q.   And that law degree is from the University of George

10   Washington in Washington, D.C.

11   A.   Yeah, George Washington University, correct.

12   Q.   George Washington University.  And when did you receive

13   that degree?

14   A.   2015.

15   Q.   So you've been a lawyer for 4 years and a -- or 3 1/2.

16   A.   Yup.  Some -- something like that, yeah.

17   Q.   And in that period, how many occasions have you

18   investigated and looked at pump-and-dump issues?

19   A.   Pump and dumps, say 15 to 20.

20   Q.   And market manipulation.

21   A.   I would say roughly the same.  I mean, pump and dumps

22   being a market manipulation.

23   Q.   So what percentage of your 3 1/2 years in this field

24   has your reviewing of pump-and-dump matters -- what

25   percentage of that 3 1/2 years has dealt with pump-and-dump?

Voir Dire - Scoufis

1    A.    Certainly my time in CPAG, probably about 75 percent of

2    that time at CPAG is pump and dumps.  And then when I'm

3    in -- when I was in OFDMI, that was not so much pump and

4    dumps, but looking at trading out of public news

5    announcements.

6    Q.    And market manipulation.

7    A.    Generally, no.  No.

8    Q.    I'm sorry, generally no, what?

9    A.    That insider -- when I'm looking at insider trading,

10   it's not market manipulation.

11   Q.    Oh, my question is what percentage of your time have

12   you spent working on or looking at market manipulation

13   during your 3 1/2 years?

14   A.    Sure.  Probably just a bit over two years, then.

15   Q.    Full-time two years?

16   A.    So when I've been in CPAG, I've probably spent about

17   75 percent of the time looking at pump-and-dump market

18   manipulations.

19             MR. BARNARD:  Your Honor, may I have a moment,

20   please?

21             THE COURT:  You may.

22             MR. BARNARD:  Nothing further.  We -- no objection.

23             THE COURT:  All right.  There being no objection,

24   Mr. Scoufis is qualified under Federal Rule of Evidence 702

25   to provide expert opinion testimony in the fields of

1    security manipulation and detection.

2              And maybe before we get into the substantive

3    questions on his expertise, it might be a good time to pause

4    for our lunch recess.

5              MR. SIBERT:  That will be great, Your Honor.  Thank

6    you.

7              THE COURT:  All right.  Members of the jury, we're

8    going to take our lunch recess.  We will be in recess until

9    1:20.

10        (Jury left the courtroom at 12:18 p.m.)

11             THE COURT:  Mr. Scoufis, since you're in the middle

12   of your testimony, I direct you not to speak with any of the

13   lawyers during the time the Court is in recess, and I ask

14   you to be back in the courtroom by 1:15.

15             THE WITNESS:  Okay.

16        (Recess taken 12:19 p.m.)

17                       AFTERNOON SESSION

18        (Jury was present at 1:26 p.m.)

19             THE COURT:  All right, Mr. Scoufis, I remind you

20   that you remain under oath.

21             Mr. Sibert, you may resume your examination.

22             MR. SIBERT:  Okay, thank you, Your Honor.

23                  DIRECT EXAMINATION (Continued)

24   BY MR. SIBERT:

25   Q.   Good afternoon, sir.

Direct - Scoufis

1    A.    Good afternoon.

2    Q.    All right, so just before lunch, we were just doing

3    some foundational questions and I'd like to start now with

4    essentially your examination in this trial.

5          Now, part of your job with FINRA at this point,

6    does your work now include assisting law enforcement and

7    prosecutors regarding the over-the-counter marketplace and

8    fraud-related type investigations?

9    A.    Yeah.  That's -- that's definitely a big part of my

10   work now.

11   Q.    All right.  And are you familiar with the term

12   "microcap companies"?

13   A.    Yes.

14   Q.    Okay.  And can you describe to the jury essentially

15   what microcap companies are.

16   A.    Sure.  Microcap companies in the securities industry

17   refers to companies -- the smallest companies.  So they're

18   definitely traded on over-the-counter markets.  They're

19   going to be characterized by having low market

20   capitalization, so low value -- a low value, low revenues,

21   low assets.  Just very small companies.

22   Q.    And have you seen these companies with essentially only

23   one -- how many boards of directors and officers have you

24   seen regarding these microcap companies?  The lowest amount

25   to maybe the greatest amount.

Direct - Scoufis

1    A.   Let's see.  Tough to say.  It's not something I
2    normally concentrate on.  I wouldn't really be able to
3    answer that.
4    Q.   Okay.  Fair point.  And are these microcap companies
5    similar to penny stock companies?
6    A.   Yes.  Yeah.  Penny stock companies are considered
7    microcap companies.
8    Q.   All right.  Now, as part of your job, you get to
9    analyze various stocks regarding companies.
10   A.   Yes.
11   Q.   And can you tell me essentially -- you stated earlier
12   that you were familiar with the term "market manipulation."
13   Can you tell me essentially your understanding of what that
14   term means.
15   A.   Sure.  All right, so market manipulation is used to
16   describe some sort of illegal activity to increase or
17   decrease the price of a stock or another -- or a different
18   security.  So examples of market manipulation would be match
19   or wash trading.  So setting a certain price or creating
20   appearance of volume.  Another big market manipulation would
21   be, for example, a pump-and-dump.
22   Q.   And so you used the term "pump-and-dump."  Describe
23   what a pump-and-dump is.
24   A.   Okay.  All right.  So a pump-and-dump is a form of
25   market manipulation.  And what typically happens -- and they

Direct - Scoufis

1    all vary a little bit -- but what typically happens is an

2    individual or a group of individuals gain control of a

3    company, so they're going to control kind of the officer's

4    position, CEO, the board of directors.  They're also going

5    to acquire most of the stock, if not all of the stock.  And

6    they are going to want to have close to a hundred percent

7    control of the free-trading, unrestricted stock.

8           After that happens, they're going to issue press

9    releases, make filings, and otherwise promote the stock.

10   Usually the press releases and filings contain false or

11   misleading information.  That causes the stock price to

12   increase.  That's the pump.  So there's a lot of investor

13   demand, it increases the stock price.

14          As the stock price increases, they sell out that

15   free-trading stock into the market, and that causes the

16   price to then decrease.  So you've got the pump and then the

17   dump.

18   Q.   So who makes the money essentially in the pump-and-dump

19   scheme?  Who usually makes the money in the pump-and-dump

20   scheme?

21   A.   Yeah, the purpose of the pump-and-dump scheme is for

22   the people that got control of this public company, this

23   penny stock, they're going to be the ones that make money.

24   Q.   And maybe -- I think I misread my own question.

25   Essentially do you know what the difference between the

1   board of directors and company officers is when it comes to
2   one of these smaller type companies?
3   A.    Sure.  Public companies have a board of directors, they
4   have officers.  The board of directors are elected by the
5   shareholders and they kind of oversee the big-picture items
6   at the company.  They set the direction.  They might approve
7   mergers or acquisitions, contracts.  They're also going to
8   hire the officers.
9        Officers, then, they oversee more of the day-to-day
10  items at a company.  So chief executive officer, CEO; chief
11  financial officer, the CFO, those are examples of officers.
12  Q.    Okay.  And if I heard you correctly, the public -- or
13  the board of directors were the ones that essentially are
14  the larger shareholders?
15  A.    Excuse me?
16  Q.    Can you explain the board of directors again.
17  A.    Sure.  Yeah, the board of directors, they are kind of
18  the highest level at the company.  They're -- they're
19  setting -- they're kind of telling the officers how to -- or
20  what to implement as a long-term strategy.  They are hired
21  by the shareholders.
22  Q.    Okay.  And do you know the difference between preferred
23  stock and common stock?
24  A.    Yeah.  Both are examples of securities.  Common stock
25  is kind of the -- the individuals that own the company.

Direct - Scoufis

1    They own -- at the end of the day, they're the investors of
2    the company.

3            Preferred stock can vary with each issuance. And
4    it might -- it might look like common stock, but they're
5    going to have special kind of preferred rights. They might
6    receive a dividend before a common stockholder, they might
7    have a higher claim on the assets than a common stockholder.
8    But they -- it varies with each issuance.
9    Q.   Okay. And as you've described, the board of directors
10   are hired by the shareholders; is that correct?
11   A.   Correct.
12   Q.   Okay. And how do the shareholders hire the board of
13   directors, usually?
14   A.   So they'll vote on -- on the board of directors, on
15   hiring the board of directors.
16   Q.   Okay. And is this -- is there an -- a difference when
17   it comes to voting rights between preferred shareholders
18   that hold preferred stock versus shareholders that hold
19   common shares?
20   A.   Generally, yeah, there would be a difference. You
21   know,  as I -- as I mentioned, each issuance of the
22   preferred stock can vary. So preferred stockholders could
23   potentially be given voting rights, the same as common
24   stockholders; just depends on the company.
25   Q.   All right. Now, are you familiar with the term

Direct - Scoufis

1    restricted versus unrestricted shares?

2    A.    I am.

3    Q.    All right.  Can you explain to the jury essentially the

4    difference between restricted and unrestricted shares.

5    A.    Sure.  All right.  So kind of even before restricted

6    and unrestricted, I think there's an important concept to

7    keep in mind.  In the securities world, in the securities

8    industry, shares that -- a share transaction needs to be

9    registered with the SEC or you need to find an exemption to

10   registration.

11          When companies issue shares, so they sell shares to

12   investors, there's the same standard.  They need to register

13   those shares or find an exemption.  Shares that are

14   registered would be considered unrestricted, free-trading

15   shares.  Those that were exempted from registration, they're

16   going to be stamped with a restricted legend and -- now, the

17   difference between them is free-trading, unrestricted shares

18   can be sold into public markets; whereas restricted shares

19   cannot be sold into the public markets.

20          So it's important for people that hold restricted

21   shares to eventually remove that legend -- that restricted

22   legend.

23   Q.    All right.  Great.  Thank you.

24          Okay.  Now, are you familiar with the 144 safe

25   harbor exception rule?

Direct - Scoufis

1     A.    Yes.

2     Q.    Okay.  Now, could you describe how Rule 144, as it's

3     commonly called, too, essentially impacts what you described

4     as one of the exceptions if you don't have a registration

5     statement for your company.

6     A.    Yeah.  All right.  So I mentioned when we're talking

7     about restricted shares, they can't be sold into the public

8     markets.  And that's something that investors usually really

9     want access to.  So they have to find a way to lift that

10    restricted legend from their securities.  And probably the

11    most common way is what's called Rule 144.

12          Rule 144 looks at a couple of things.  There's two

13    main parts.  The first part actually involves lifting the

14    restricted legend and that requires an investor in an

15    over-the-counter stock to hold onto the stock -- or, really,

16    the company that doesn't file reports with the SEC to hold

17    the stock for one year, and it also requires that the

18    company has been making information public.  So there's kind

19    of two parts there.

20          The second part of Rule 144 involves affiliates.

21    And so people that are considered affiliates have -- have to

22    deal with further limitations.  If you're an affiliate, you

23    have to adhere to three different things:  manner of sale,

24    so they have to sell that stock -- that free-trading stock

25    through a brokerage firm like, say, Charles Schwab, and then

Direct - Scoufis

1       in the public markets.

2               The second part is that they have to adhere to

3       volume limitation.  So they can't sell over 1 percent of the

4       outstanding shares during any three-month period.

5               And then the third part is that they have to notify

6       the SEC if they sell over $50,000 of stock or -- or 5,000

7       shares.

8       Q.   And now you used the term "a company that does not

9       report to the SEC."  Is that commonly known as a

10      nonreporting company?

11      A.   Correct.

12      Q.   Now, you went over -- you went over the further

13      restrictions when -- regarding an affiliation.  How about

14      when either a company or a individual is considered a

15      nonaffiliate?

16      A.   Yeah.  So if somebody is not an affiliate of the

17      company, they don't have to adhere to that second part, the

18      manner of sale and volume limitations.  They only would have

19      to -- if they had restricted shares, they'd have to hold

20      those shares for one year for a nonreporting company, and

21      the public -- and the public company needs to be making

22      certain information public.

23      Q.   And what type of information does the public company

24      have to -- what kind of information needs to be made public?

25      A.   Yeah.  The SEC lists specific items.  It's going to

Direct - Scoufis

1    include roughly who the officers, the directors are, the
2    control people.  It's going to include kind of the
3    business -- some sort of financials.  Just enough
4    information, really, for the public to kind of make a
5    decision when they're buying stock in public markets.
6    Q.   Okay.  And, sir, you explained affiliation.  Do you
7    know -- let me ask you:  Do you know the definition of an
8    affiliate?
9    A.   Yes.
10   Q.   And what is your understanding of a definition for an
11   affiliate?
12   A.   Yeah.  Affiliate's defined by the SEC -- by the
13   Securities and Exchange Commission -- to be somebody who
14   controls a company or is under control of the company.
15   Q.   So I guess that leads me to my next question:  How does
16   the SEC define "control"?
17   A.   Yeah.  All right.  So separate definition then.  So
18   control refers to somebody's ability to influence or direct
19   the management or policies of the company.  And so that
20   definition looks at, really, what an individual is doing.
21   It doesn't look at the CEO and CFO and say they can -- they
22   can direct the company.  Certainly those people would be
23   considered control people and affiliates, but it also looks
24   at anybody that can control a company.  This would also
25   include large shareholders as they can direct the company

1     through voting rights.

2          But, really, it's kind of a facts and circumstances

3     analysis.

4     Q.   Okay, sir, how about undisclosed people that have the

5     type of control abilities to influence the company's

6     decision-making?  Would they be considered affiliates if

7     they meet that definition that you just described?

8     A.   Sure.  When you say "undisclosed," do you mean --

9     Q.   So there's an officer or a director that is not

10    disclosed --

11    A.   Yeah.

12    Q.   -- a hidden officer or director, or a hidden control

13    person.

14    A.   Sure.  I mean, anybody that can control the company, if

15    they are acting as a CEO, even though their title is not

16    CEO, they're certainly going to be a control person.

17    Q.   So it doesn't really matter about the title, it more

18    matters about the role?

19    A.   Exactly.

20    Q.   All right.  Now, you stated that you looked through

21    many documents regarding FusionPharm before your testimony

22    here today.

23          Well, before I get to that, what is -- do you know

24    what the terms "nominee" and "straw shareholders" means?

25    A.   Yeah.  Yeah.

Direct - Scoufis

1    Q.    Can you explain that.

2    A.    Sure.  All right, so a nominee shareholder is somebody

3    that has securities in their name, but they do not actually

4    receive the economic benefits of the securities; somebody

5    else kind of controls the securities.

6          In the -- in the securities industry, there are

7    totally legal purposes for having shares in a nomine's names

8    to help facilitate trading.  But they -- using a nominee is

9    also common in pump and dumps to kind of cover up the true

10   owners of securities.  So there's kind of a lawful reason

11   and an unlawful reason.

12   Q.    Okay.  And what's a "straw shareholder"?

13   A.    Yeah, straw shareholder -- sorry -- really, the same as

14   a -- as a nominee.  Although a straw shareholder is probably

15   going to only be used to refer to the unlawful use of a

16   nominee.

17   Q.    All right.  And, I'm sorry, I started asking you about

18   the documents that you reviewed before your testimony here

19   today.  And I think you've mentioned that you reviewed

20   brokerage records, Bloomberg records, and some of the

21   records that were provided by my office before your

22   testimony; is that correct?

23   A.    That's correct.

24   Q.    Okay.  And also before your testimony here today, were

25   you also provided documents that were introduced into

Direct - Scoufis

1 evidence by the Government in this case regarding some of

2 the summary charts that you prepared for your testimony?

3 A.    Yes.

4 Q.    Okay.  And essentially how long have you been assisting

5 the Government regarding analyzing the stock and -- stock

6 activity regarding FusionPharm in this case?

7 A.    All right.  I believe I was first asked to assist -- I

8 believe October 2017, or sometime in late 2017.

9 Q.    It's fair to say you've been contacted several times

10 when either myself or the investigating agencies had

11 questions regarding issues or questions regarding the stock

12 and the changes that were in the stock regarding the

13 FusionPharm case?

14 A.    Yeah.  We've had many discussions.

15 Q.    Okay.  All right.  Now, could you please take a look at

16 Government Exhibit 284.

17        MR. SIBERT:  Your Honor -- I'm sorry, 284.  This

18 has been stipulated to, but has not been admitted into

19 evidence.

20        THE COURT:  All right.  Give --

21        MR. SIBERT:  I'd like to move into evidence

22 Government Exhibit 284 at this time.

23        THE COURT:  All right.  Given the stipulation of

24 the parties, Government Exhibit 284 is admitted into

25 evidence and may be published to the jury.

Direct - Scoufis

1    (Government's Exhibit 284 received)

2    MR. SIBERT: And since we're -- can I also have

3    Government Exhibit 286 and Government Exhibit 287 for now.

4    And they've both been stipulated to --

5    MR. BARNARD: Your Honor, we did stipulate to 286.

6    We're withdrawing the stipulation to 287.

7    THE COURT: All right. So -- but you continue to

8    stipulate to 286?

9    MR. BARNARD: Yes.

10   THE COURT: All right. So 286 is also admitted

11   into evidence given the stipulation of the parties. 287 you

12   will have to lay a foundation for.

13   (Government's Exhibit 286 received)

14   MR. SIBERT: I will proceed to try to lay that

15   foundation, but I'd like the Court to know that we went

16   forward preparing based upon the defense's stipulation.

17   THE COURT: I can't force parties to stipulate to

18   anything.

19   MR. SIBERT: Very well, Your Honor.

20   BY MR. SIBERT:

21   Q.   Can I please have 284 published.

22   And, sir, can you -- do you recognize Government

23   Exhibit 284?

24   A.   Yes, I do.

25   Q.   Okay. And essentially did you create this exhibit?

Direct - Scoufis

1    A.   I did.

2    Q.   All right.  So let's go ahead and walk through this

3    exhibit with the jury.

4         Essentially given the title up here, FusionPharm

5    Common Stock with Converted Preferred Stock as of June 30th,

6    2011.  Can you describe what you're talking about by giving

7    this diagram that title.

8    A.   Yeah.  All right.  So this chart looks at the ownership

9    of the common stock and the ownership of preferred stock.

10   And then what it does is actually convert the preferred

11   stock.  Each share of preferred stock could be converted

12   into a hundred shares of common stock.

13        And then that's exactly what's happened here.

14   Certain individuals and entities are noted, their ownership

15   is noted.

16   Q.   Okay.  So now when you were looking at FusionPharm,

17   what was the conversion rate for common stock to preferred

18   stock?

19   A.   So preferred stock can be converted to common stock,

20   one share of preferred stock into a hundred shares of common

21   stock.

22   Q.   Okay.  All right.  And that's what you're showing here,

23   essentially the conversion from preferred to common?

24   A.   Correct.  Along with the existing common stock.

25   Q.   All right.  So who is -- who owns 85.7 percent of the

Direct - Scoufis

1    company as of June 30th, 2011?

2    A.   Yeah.  So if we've converted the preferred stock, then

3    we're looking at Scott Dittman through Salt Investments

4    owning 85.7 percent of the company.

5    Q.   And you have here 130 million common shares?

6    A.   Correct.

7    Q.   Okay.  And you converted that from preferred shares; is

8    that right?

9    A.   That's right.

10   Q.   And that's essentially 1.3 million preferred shares?

11   A.   130 million preferred --

12   Q.   130 --

13   A.   Oh, 1 point --

14   Q.   -- common --

15   A.   Yeah, it's converted from 1.3 million preferred shares.

16   If that's your question.

17   Q.   Right.  So that came from 1.3 million preferred shares,

18   which equals 130 million common shares.

19   A.   Right.

20   Q.   Okay.  And how about Sandra Sears?  Essentially how

21   much -- what is the percentage that Sandra Sears owns in

22   this company?

23   A.   All right.  She owns -- Sandra Sears owns 12 percent of

24   the company, 18,205,000 shares.

25   Q.   Okay.  And is 12 percent important to you?  Is that an

Direct - Scoufis

1    important percentage?

2    A.    12 percent is -- is definitely up there, yeah.  So

3    commonly when you're looking at control, there's certain

4    thresholds that are used.  And as we talked about control

5    and affiliate, no threshold is laid out in the laws, but 5

6    or 10 percent is generally used in the industry as showing

7    control.  So having 12 percent definitely passes that

8    threshold.

9    Q.    Okay.  So based upon the industry and the regulation

10   regarding securities, it's -- it's -- what is 12 percent

11   known to show?

12   A.    Yeah, just in the industry, generally -- again, it's

13   not in the rules, but the industry goes by thresholds of 5

14   to 10 percent.  So 12 percent would give you an ownership

15   level that would make you an affiliate.

16   Q.    And so based upon the industry, would Sandra Sears need

17   to be shown in the disclosure?

18        MR. BARNARD:  Your Honor, I object.  This witness

19   has not been qualified as an expert in the industry.

20        THE COURT:  All right.  I think it's within the

21   subject matters that he was qualified under Rule 702, so

22   that objection's overruled.

23        You may answer.

24        THE WITNESS:  Okay, can you --

25   BY MR. SIBERT:

Direct - Scoufis

1    Q.   Sure.  I'll repeat the question.

2         Because Sandra Sears owns 12 percent of

3    FusionPharm, would Sandra Sears need to be disclosed if this

4    public company was filing reports to the public?

5    A.   Yeah, that 12 percent, as it gets past the 5 or 10

6    percent threshold, 12 percent would be disclosed, generally,

7    as a control person.

8    Q.   Okay.  And can you tell me who these shareholders are

9    that own 1.3 percent of the company.

10   A.   Yeah.  I mean, I've labeled it as "other" and so,

11   really, it's people that are not on the -- this pie chart.

12   It's not Scott Dittman or Sandra Sears or Fredrick Dahlman.

13   These are just other shareholders.

14   Q.   And, again, you labeled Fred Dahlman.  He only owns 1

15   percent of FusionPharm?

16   A.   Yup.

17   Q.   Okay.  So based upon this graph, who's essentially the

18   owners of FusionPharm?

19   A.   Yeah.  If I'm looking at who controls and owns

20   FusionPharm, I'd go right to Scott Dittman and Sandra Sears

21   through their convertible shares.

22   Q.   Okay.  And then essentially because of the amount of

23   shares, who controls FusionPharm?

24   A.   Through their amount of shares, yeah, that -- not

25   limited to, but Scott Dittman and Sandra Sears through their

Direct - Scoufis

1    preferred shares are control people of FusionPharm.

2    Q.   All right.  Can I please have Government Exhibit 286

3    published.

4         Okay, sir, a similar graph.  Did you create this

5    graph for testimony here today?

6    A.   Yes, I did.

7    Q.   Okay.  And can you describe to the jury essentially

8    what this graph is displaying?

9    A.   All right.  So we're looking at a very similar chart to

10   what we just looked at, but this one is for December 31st,

11   2011.  And, again, we're looking at the common stock and the

12   preferred stock if it were converted.

13   Q.   And so this is for the end year of 2011; is that right?

14   A.   Yeah.  Yeah.  End of year of 2011, right.

15   Q.   Okay.  And can you describe to the jury essentially who

16   now is considered owners based upon their percentages of

17   shares.

18   A.   Do you mean control people?

19   Q.   Yes, sir.

20   A.   Sure.  All right.  So Scott Dittman, again, through

21   Salt Investments, owns nearly 86 percent; and Robert Dittman

22   owns 11.7 percent.

23   Q.   And we see someone new here.  Sandra Sears; is that

24   correct?

25   A.   Yes, Sandra Sears through Bayside.  That was not on the

Direct - Scoufis

1    last chart.

2    Q.   And how much -- how many shares does Sandra Sears own

3    through Bayside?

4    A.   210,000 shares.

5    Q.   Okay.  Again, no change in ownership for Mr. Dahlman.

6    A.   Yeah, we're still at that 1 percent level.

7    Q.   And then, finally, these are all the other shareholders

8    that have shares of FusionPharm?

9    A.   Correct.

10   Q.   So when you were talking about the pump-and-dump

11   earlier, and you said it was important for individuals to

12   gain control of the company, who in this graph would be able

13   to have that control needed for a pump-and-dump?

14   A.   Yeah.  I mean, so we're looking at control of the

15   company and control of the free-trading stock.  Those are

16   two main things.

17          So just based on this chart, I wouldn't go all the

18   way, but Scott Dittman and Robert Dittman have a good start

19   on -- on their way to a pump-and-dump.  Of course, at this

20   point in time, the preferred stock needs to be converted to

21   be sold, but this is a good start for control.

22   Q.   And when you said conversion -- the preferred stock

23   would have to be converted, if -- also if Mr. Scott Dittman

24   is a owner of FusionPharm, his stock would be what?

25   A.   So he -- so Scott Dittman is going to be considered an

Direct - Scoufis

1    affiliate and would be subject to Rule 144 affiliate

2    restrictions in an amount that could be sold and the manner

3    of sale.

4    Q.   And, again, because Robert Dittman has 11.7, would he

5    also be considered an affiliate?

6    A.   Correct.

7    Q.   And he would be restricted to the amounts to be able to

8    be sold?

9    A.   Correct.

10   Q.   However, Ms. Sandra Sears and Bayside, would she be

11   considered an affiliate?

12   A.   Yeah, based on this chart, Sandra Sears would not be

13   considered an affiliate, just from share ownership.

14   Q.   Okay.  So as long as she didn't have any controlling

15   roles within FusionPharm, she wouldn't be considered an

16   affiliate?

17   A.   Exactly.

18   Q.   So her shares wouldn't be subject to the restricted

19   legend.

20   A.   Well, assuming that she is not an affiliate, then she

21   would not have that affiliate status.  Of course, whether

22   you're an affiliate or not an affiliate, shares that are

23   stamped "restricted" still need to have the restriction

24   removed.

25   Q.   Okay.  And that holding period would apply if you got

Direct - Scoufis

1   them from the -- from an affiliate from FusionPharm?

2   A.   Correct.

3   Q.   Okay, sir, can you please look at Government Exhibit

4   287.  This hasn't been admitted into evidence.

5        Do you recognize Government Exhibit 287?

6   A.   Yes, I do.

7   Q.   Okay.  And did you create the chart on Government

8   Exhibit 287?

9   A.   Yes, I did.

10  Q.   Okay.  And can you tell the Court essentially the

11  information that you relied on to create this chart.

12  A.   Sure.  So it relies on transfer records.  So

13  shareholder lists and transfer packets that I had viewed for

14  two notes:  the Bayside note and the MeadPoint note.

15  Q.   Okay.  And is it your understanding that the Bayside

16  note and MeadPoint note have now been both put into evidence

17  in this case?  Or at least the transfer packages have been

18  introduced into evidence?

19  A.   I believe so.

20  Q.   Okay.  And, again, you looked at the transfer packages

21  for this exhibit, MeadPoint and Bayside note.  Did this

22  concern the company FusionPharm within this transfer

23  packages?

24  A.   Yes.

25        MR. SIBERT:  Your Honor, at this time, the

1996
Voir Dire - Scoufis

1    Government would like to move into evidence Government

2    Exhibit 287.

3              THE COURT:  What's the objection?

4              MR. BARNARD:  Your Honor, if I may voir dire?

5              THE COURT:  You may.

6                   VOIR DIRE EXAMINATION

7    BY MR. BARNARD:

8    Q.   Exhibit 287 is talking about common stock with regard

9    to Bayside and MeadPoint notes.

10   A.   Yeah.  Yes.

11   Q.   And nowhere on this chart does it say anything about

12   Scott Dittman or any of his ownership.

13   A.   Yes, Scott Dittman is not mentioned.

14   Q.   And Robert Dittman is not mentioned.

15   A.   Correct.

16   Q.   Whereas just on the previous exhibit, Exhibit 286, both

17   of them were not only mentioned, but their interests, in

18   fact, totaled 97.5 percent of the stock.

19   A.   They are not mentioned -- yeah.  That percentage sounds

20   right.

21             MR. BARNARD:  Your Honor, I object to 287 as a

22   misleading document.  It is not a chart that would help the

23   jury to understand better the facts in this case.

24             THE COURT:  Well, I don't see this pie chart as

25   purporting to demonstrate the distribution of all

1   FusionPharm stock, just -- and correct me if I'm wrong,

2   sir -- what this pie chart is depicting is the volume and

3   percentage of FusionPharm shares that were converted from

4   the Bayside and MeadPoint promissory notes; is that correct?

5        THE WITNESS:  Yes.  Yeah, so it's the common stock

6   plus the Bayside and MeadPoint notes if they were converted.

7        THE COURT:  All right.  But -- and it's not the

8   intent to, in this pie chart, that -- to show the ownership

9   of all the flow in the shares.

10       THE WITNESS:  Yes.  So it's just the notes compared

11  to the common stock as it exists on December 31st, 2012.

12       THE COURT:  All right.  Okay.  I think with that

13  understanding, the objection's overruled, and 287 is

14  admitted into evidence and may be published to the jury.

15       (Government's Exhibit 287 received)

16                DIRECT EXAMINATION (Continued)

17  BY MR. SIBERT:

18  Q.   Okay, sir, as the Court just questioned you, can you

19  please tell the jury -- now that it's being published, can

20  you tell me what this graph is showing that you created for

21  your testimony here today.

22  A.   Yeah.  So this looks very similar to the last two

23  exhibits we just viewed.  So we're looking at the common

24  stock, but instead of looking at the converted preferred

25  shares, we're looking at converted notes -- or -- or notes

Direct - Scoufis

1    if they were converted.

2          So specifically there's two notes, and the first

3    one is Sandra Sears through Bayside, that's that orange

4    color, owning 60 percent; and William Sears, through

5    MeadPoint, owning 30 percent.

6    Q.   Okay, sir, if you need to, as you're explaining, you

7    can actually mark your monitor.

8    A.   Okay.

9    Q.   And it's kind of like John Madden, whatever you touch,

10   it's going to cause friction.

11         THE COURT:  Do you have a stylus up there?

12         THE WITNESS:  Oh.

13         THE COURT:  There you go.

14         THE WITNESS:  Yup.

15         MR. SIBERT:  Thank you, Your Honor.

16   BY MR. SIBERT:

17   Q.   All right, sir, I just want to do a little bit of

18   backtracking.

19         You talked about promissory notes.  Do you recall

20   what type of promissory notes that Baypoint and Meadside

21   [sic] notes were.

22   A.   Sure.  Specifically these are convertible promissory

23   notes, which means that they can be converted into common

24   stock.  If you look in that lower right-hand side, it

25   actually gives the conversion rates, the amount of debt,

Direct - Scoufis

1     and -- and what it's converted at.  So each penny of debt

2     can be converted into one share of common stock.

3     Q.   All right.  So I had this bottom corner blown up.

4     Okay.

5          So can you explain essentially both of the Bayside

6     and MeadPoint note regarding how these notes can be

7     converted.

8     A.   Sure.  All right.  So if we start with the top one, the

9     May 2d, 2011, Bayside note, there's $176,950 of debt.  That

10    can be converted at 1 penny per share.  And then it's -- so

11    if we converted it all, that would be converted into

12    17,695,000 shares, as you can -- yeah -- see in that orange

13    part of the pie circle.

14    Q.   And then would that be the same breakdown for the

15    MeadPoint note?

16    A.   Yup.  Exactly.  So the December 8th MeadPoint note,

17    $88,000 of debt, convertible at the same rate, so it can be

18    converted into 8.8 million shares.

19    Q.   Okay.  And the outstanding common stock at this point

20    of time on December 31st, 2012, is 29.3 million common

21    shares?

22    A.   Right.

23    Q.   Okay.  So as you stated, if the whole Bayside note was

24    converted to common shares, it would be -- it would be 60.3

25    percent ownership of the common shares outstanding?

Direct - Scoufis

1    A.   Exactly.

2    Q.   For FusionPharm.

3    A.   Correct.

4    Q.   And that would be similar to if the whole MeadPoint

5    note was converted, the MeadPoint note converted would equal

6    30 percent of the outstanding common shares for FusionPharm?

7    A.   Correct.

8    Q.   And then let's just look here real quick.  These are

9    all the other stockholders besides William Sears and

10   Fredrick Dahlman that have common stock for FusionPharm?

11   A.   Correct.

12   Q.   And then how many common stock shares does Mr. Sears

13   own through Microcap?

14   A.   All right.  64,500 shares.

15   Q.   And that comes out to be point 2 percent?

16   A.   Correct.

17   Q.   Now, you have ownership of MeadPoint:  Mr. William

18   Sears; is that correct?

19   A.   Correct.

20   Q.   So just based upon -- how did you know MeadPoint was

21   Mr. William Sears?

22   A.   All right, yeah, so when I'm looking at what I based

23   this off of were shareholder lists and two transfer packets,

24   one for Bayside and one for MeadPoint.  William Sears

25   appears to own MeadPoint in the transfer packet.

Direct - Scoufis

1    Q.   Okay.  And so if you add up Mr. William Sears'

2    ownership of MeadPoint with Mr. Sears' ownership in

3    MicroCap, he basically owns 30.2 percent of the common

4    share.

5    A.   Sure, yeah, if that note was converted.  Yup.

6    Q.   Okay.  And then you have a Sandra Sears owning the

7    additional 60 percent; is that right?

8    A.   Correct.

9    Q.   So at least one last name, Sears, owned over 90 percent

10   of the common stock for FusionPharm as of December 31st,

11   2012?

12   A.   Correct.

13   Q.   And just -- I want to ask you the same question:  How

14   did you learn about Ms. Sandra Sears for Bayside?

15   A.   Same way with William Sears, just looking at the

16   transfer packet.  That's the name that appears.

17        MR. SIBERT:  Your Honor, I'd like to introduce into

18   evidence 289.  It was stipulated to, but there might be a

19   change.

20        MR. BARNARD:  No objection.

21        THE COURT:  All right.  Exhibit 289 is admitted

22   into evidence and may be published to the jury.

23        (Government's Exhibit 289 received)

24        MR. SIBERT:  Thank you, Your Honor.

25   BY MR. SIBERT:

Direct - Scoufis

1    Q.   Okay, sir, can you please explain what you prepared in
2    Government Exhibit 289 for your testimony here today.
3    A.   Sure.  All right.  So this is a similar looking pie
4    chart.  We're looking at the outstanding common stock as of
5    September 3d, 2013.
6         Now, this chart is a little different than the last
7    three we looked at.  It doesn't have any converted preferred
8    shares and it doesn't have any converted notes.  This is
9    just the outstanding common stock.  And other than that,
10   then it's set up the same way.
11   Q.   Okay.  So let me just ask you, Myron and Sharryn
12   Thaden, they own 13 percent of the common stock; is that
13   correct?
14   A.   Correct.
15   Q.   All right.  Now, again, is 13 percent a important
16   figure in the industry of securities?
17   A.   Sure.  Yeah, as we just discussed earlier, there's that
18   5 or 10 percent threshold.  13 percent's above 5 or 10
19   percent, so they would be considered control people.
20   Q.   And then can you tell me the MeadPoint 500 shares --
21   500,000 shares, with the Richard Scholz shares, how much
22   percentage of that is the common stock?
23   A.   All right.  Yeah, the 500,000 shares held by Richard
24   Scholz is 6.5 percent worth of common stock.
25   Q.   And how much is owned by MeadPoint in your draft?

Direct - Scoufis

1    A.    6.5 percent as well.

2    Q.    If you added up MeadPoint and Richard Scholz's shares,

3    what percentage is that?

4    A.    All right, yeah, we would get to 13 percent.

5    Q.    So these two added up equals 13 percent; is that right?

6    A.    That's right.

7    Q.    That's terrible handwriting.  All right.

8          All right.  And then -- so again, if -- if these

9    shares for MeadPoint and for Mr. Scholz were controlled by

10   the same person, regardless of the names, is -- would that

11   be important to know?

12   A.    Yeah.  Yeah.  I mean, that would be important to a lot

13   of parties, definitely public investors.  They'd want to

14   know that sort of information.

15   Q.    And, again, is that because it's over the 10 percent

16   ownership volume?

17   A.    Yeah.  Definitely, because, you know, they -- since

18   they're over 10 percent, they are control people.

19   Q.    Okay.  And then hanging out here is MicroCap; is that

20   correct?

21   A.    Correct.

22   Q.    And as you testified before in your previous draft,

23   MicroCap is William Sears?

24   A.    Correct.

25   Q.    And MeadPoint was William Sears.

2004

Direct - Scoufis

1    A.   Correct.

2    Q.   Okay.  And then we have Scott Dittman with 26 percent

3    of the unrestricted; is that right?

4    A.   Right.

5    Q.   And so I don't mess up the math again, essentially

6    these parties on the -- pretty much the right side of the --

7    of your graph, what's the percentage of ownership?

8    A.   Yeah.  Let's see, 52 percent, roughly, 53.

9    Q.   All right.  So approximately 52, 53 percent.

10   A.   Right.

11   Q.   Of the company for FusionPharm common shares at this

12   time?

13   A.   Right.

14        MR. SIBERT:  Your Honor, I'd like to admit into

15   evidence Government Exhibit 290.  This has been stipulated

16   to.

17        THE COURT:  Given the stipulation of the parties,

18   Exhibit 290 is admitted into evidence and may be published

19   to the jury.

20        (Government's Exhibit 290 received)

21   BY MR. SIBERT:

22   Q.   All right, sir, a little bit different diagram that

23   you've created here for Exhibit -- Government Exhibit 290.

24   Let's just start with the title.  Can you explain to the

25   jury what you're showing in this diagram.

Direct - Scoufis

1    A.    Yeah.   I mean, so this is a price and volume chart, and
2    along with that volume, I've included volume that is from
3    specific accounts that I referred to as selected accounts.
4    Q.    Okay.   And when you say price and volume analyst, what
5    company are you referring to regarding the stock price in
6    volume?
7    A.    Yeah, this is for FusionPharm trading in the public
8    markets from March 31st, 2011, through June 29th, 2011.
9    Q.    All right.   I'm sorry, I -- just to be clear on the
10   record, March 31st, 2011, through June 29th, 2011.
11   A.    Yeah.   Sorry.
12   Q.    That's all right.
13          Can we blow up this box, please.   Okay.
14          Can you explain what you termed as "selected
15   accounts"?
16   A.    Yes.   All right.   So this pink box contains the
17   accounts that I included as selected accounts.   So if we
18   just look at the -- this first one -- let's see here --
19   MeadPoint, that is -- that's the name of the brokerage
20   account -- or short name of the brokerage account.   And then
21   ALPS refers to the brokerage firm, which is Scottsdale, but
22   it clears through Alpine.   And then the four numbers are the
23   last four digits of the account number.
24   Q.    So this -- these four digits are the account number for
25   the brokerage account in Alpine or Scottsdale from

1    MeadPoint?

2    A.   Right.  Yeah.  I missed a closed parentheses, but . . .

3    Q.   All right.  I'll get them.

4    A.   Yes.

5    Q.   Let's just go ahead and keep up here with MicroCap.

6    A.   Sure.  All right.  Yeah, as we move along, we're

7    looking at the same type of thing.  We've got MicroCap,

8    brokerage firm is Oppenheimer, last four of the account

9    number is 9990.

10        Moving on, MicroCap, an account held at Scottsdale

11   clearing through Alpine, last four numbers of the account

12   are 7090.  Moving on --

13   Q.   Let me stop you real quick.  So based upon your

14   research and requests in this case, you were able to

15   associate MicroCap to two different brokerage firms?

16   A.   Right.  Yup.

17   Q.   Okay.  So essentially two separate accounts for the

18   same company.

19   A.   Yeah.  Yeah.  I mean, yeah, MicroCap held two different

20   accounts -- an account at two different brokerage firms.

21   Q.   Okay.  And then I didn't mean to cut you off, but let's

22   stop at Bayside.  Why don't you explain that.

23   A.   Okay.  All right.  Bayside, that's the name of the

24   account, held at Scottsdale through Alpine, last four of

25   that account number are 4611.

Direct - Scoufis

1    Q.   Okay.  And, finally, now, you don't have a name of an

2    entity, you have an individual's name, Mr. William Sears.

3    Can you explain that?

4    A.   Sure.  Yeah.  So William Sears had a personal account,

5    not through an entity, had a personal account at Etrade,

6    that's ETRS, the last four of the account number 1511.

7    Q.   Can I have that shrunk.  Thank you.

8         Okay.  Now, you have a nice colorful graph here.

9    What does the blue line represent?

10   A.   All right.  That solid blue line represents the closing

11   last sale price on a specific trade date.  So this chart

12   covers only the days that FusionPharm traded.  Stocks trade,

13   typically, Monday through Friday, except for a few holidays,

14   and the last trade on a trade date is what the industry

15   usually looks at historically when they're looking at a

16   stock price over a period of time.

17        And so that blue line tracks that last price.

18   Q.   Okay.  And the -- give a review here.  The prices are

19   in the right-hand column; is that correct?

20   A.   Yup.  Yeah.  That's right.  So that corresponds to --

21   the blue line corresponds to that right-hand side.

22   Q.   Okay.  And then what are these numbers that are on the

23   horizontal lines?

24   A.   All right.  So that's the share volume.  That's the

25   total amount of shares that traded on a given trade date.

2008

Direct - Scoufis

1    And that corresponds to the vertical bars, as you move
2    across the chart.
3    Q.   That would be these bars?
4    A.   Yeah.  I'm actually referring you to like --
5    Q.   Okay.
6    A.   -- these ones.
7    Q.   All right.
8    A.   So if you look at that first one, this one, that's what
9    may be trading at about 3- -- it had 3,000 shares traded on
10   April 7th, 2011.
11   Q.   Okay.  All right.  Now tell me the difference
12   between -- I'm going to pick -- let's just pick this center
13   one here.  What is the difference between the red and the
14   green in your vertical bars?
15   A.   Okay.  All right.  So to start, when we look at
16   volume -- and let's just say roughly for that -- for that
17   bar, there's about 12,000 shares traded during that day,
18   that means 12,000 people bought shares and 12,000 people
19   sold shares.
20          The selected accounts are -- I'm looking at only
21   their sale volume during this period, and putting it in this
22   chart as the red vertical bars, anything that's left over is
23   going to be in green.
24          So if we're looking at that specific bar, you could
25   read that as the selected accounts on that date -- it looks

Direct - Scoufis

1    think like right around May 20th -- they sold about

2    10,000 -- maybe a little bit over 10,000 shares.  The rest

3    of the market sold a couple more thousand shares.  And

4    then -- and then there were buyers as well on the other

5    side.  But this selected account sold a vast majority of the

6    shares on that day.

7    Q.   And just to be clear, you said 12,000.  You're talking

8    about 12,000 stocks being traded.  12,000 shares of stock,

9    not 12,000 people trading shares of stock.

10   A.   Correct.  Yeah.  Just the amount of shares that traded

11   during the day.  I -- this chart doesn't say how many

12   individuals traded in the market.

13   Q.   Okay.  And, I'm sorry, but you keep saying selected

14   accounts are the red.  You're referring to the selected

15   accounts that we just went over?

16   A.   Exactly.

17   Q.   And that would be MeadPoint, MicroCap, Bayside, and

18   William Sears?

19   A.   Correct.

20   Q.   So -- and, again, just to give the layout, these are

21   the specific dates that you have at the bottom?

22   A.   Yes.  And there's not room for each date to be put in

23   there, so it's -- sometimes you have to estimate when that

24   trade date is.

25   Q.   And so let me just ask:  So here could you give another

1    example regarding what you mean when it comes to selected

2    accounts versus other trades happening with FusionPharm

3    stock?

4    A.   Sure.  All right.  All right.  So for that day, that --

5    the total volume was just over 25,000 shares.  And looking

6    at that red portion of the selected accounts, they accounted

7    for probably about 17-, 18,000 shares of the about 25,000

8    shares total sold.

9    Q.   So that's just for the selected accounts here.  And

10   then the green portion would be what --

11   A.   That would be the rest of the market.  Somebody who's

12   not one of the selected accounts.

13   Q.   So anyone else that's selling FusionPharm stock on that

14   day.

15   A.   Correct.

16   Q.   Now, based upon your experience, can you provide me if

17   this is common for a certain few accounts -- selected

18   accounts, as you call it, to have such a high trading

19   volume?

20   A.   With my experience, it is common because it's common in

21   pump-and-dumps, but it's not common in the market

22   generally.

23   Q.   So would this be an indication of any type of security

24   manipulation going on at this time frame?

25   A.   Well, yeah, this is -- I mean, there's really two parts

1    here.  The large amount of sales, that's what you would see

2    in a pump-and-dump market manipulation, that high volume of

3    sales -- high percentage of sales, as well as that price,

4    just increasing as we go along.

5    Q.   Okay.  And when you -- talking about the price

6    increasing, there's a gradual climb; is that correct?

7    A.   Correct.

8    Q.   So -- so when you say this is essentially the pump,

9    what is the trading volume for these type of accounts doing

10   to the public's interest when it comes to FusionPharm stock?

11   A.   Yeah, so generally when you're looking at the price,

12   it's really the issue of supply and demand.  So the stock

13   price is going to increase as -- in a pump-and-dump, as the

14   controllers of the company issue press releases and filings,

15   and then as that price is increasing, they'll start selling

16   their stock, as we see here.

17          So what I would expect to see is as we move along

18   in time, that that -- as the sales continue, that the price

19   starts decreasing.

20   Q.   Okay.  So -- so essentially what you're saying is when

21   the -- there's continued sales, so these lines -- or

22   vertical lines continue to get bigger; is that fair --

23   A.   Not -- it could be.  Not necessarily.  Sure, there

24   could be more volume, but you'd expect the volume of the

25   selected accounts, the people that control the company, to

1    stay up there, to stay high, as the pump-and-dump goes on.

2    Q.    So as the pump goes up, the reds just continue to

3    remain high and eventually when, as you've referred, the

4    dump --

5    A.    Yeah.

6    Q.    -- the price will fall and so will the red.

7    A.    Correct.

8    Q.    And, sir, is part of the pump-and-dump sometimes

9    promotion of a stock?

10    A.    Absolutely, yeah.  That's -- that in some shape or form

11    a promotion is essential to a pump-and-dump.

12    Q.    Okay.  And can you explain how a promotion can cause

13    a -- a -- gather interest with a microcap stock such as

14    FusionPharm.

15    A.    Sure.  You know, just looking at -- at how the

16    securities markets work, the securities industry, the laws

17    are designed to have public companies make information to

18    investors.  A big part of that is truthfulness.  They have

19    to be truthful.  There's a lot of anti-fraud provisions.

20    Investors analyze, they digest, all of that information

21    that's made public, whether it's through public filings,

22    press releases, so whatever set of those filings or press

23    releases are going to influence investors.

24          On top of that, pump-and-dumps will use another

25    kind of promotion, typically through e-mail blasts or chat

Direct - Scoufis

1    rooms, that sort of thing, stock chat rooms, where they

2    tout, then, what is in the public filings or the press

3    releases.  So that's -- that's generally what you would see

4    in a -- in a pump-and-dump.  All of that is going to just

5    encourage investors -- increase their interests in the stock

6    and get them to buy the stock.

7    Q.   How about individuals that are hired to promote the

8    stock?  Can that also cause a increase price regarding the

9    stock?

10   A.   Yeah.  That's -- that's typically how the promotions

11   work, is somebody hires a stock promoter to tout the stock.

12   Q.   And can you -- what does -- you talked about the press

13   releases, you talked about these e-mails, these chat rooms.

14   How does a promoter, an individual, help generate the

15   excitement and increase the price of the stock?

16   A.   Yeah, I mean, their whole goal is to get everyday

17   investors to look at this stock, look at its filings, its

18   press releases, and make them think that it is a good

19   purchase.

20          Promoting the stock is not necessarily illegal, but

21   oftentimes promoters will use false information from the

22   press releases or the filings to tout the stock.  So that's

23   why it's a common part of a pump-and-dump.

24   Q.   All right.  So can I please have Government Exhibit 291

25   published.

Direct - Scoufis

1    Okay, sir, I just want to walk you through this
2    draft that you created for your testimony.  Let's just focus
3    on the title.  Can you explain to the jury essentially what
4    you're displaying in this chart.
5    A.   Sure.  We are looking at a very similar chart to the
6    last one.  It's just that the time -- the period has
7    changed, so we're looking at FusionPharm Company stock.
8    And, again, this is a price-volume analysis with those same
9    selected accounts, with the red bars, and it's for the
10   period of March 25th, 2011, through July 16th, 2013.
11   Q.   Okay.  So essentially March 25th, 2011, was your start
12   date -- or, sorry, let me -- yeah, it was your start date on
13   the prior exhibit that we looked at.  But now it's -- now it
14   expands to July 16th, 2013; is that right?
15   A.   That's right.
16   Q.   And, again, we had this box of selected accounts.  Any
17   changes in that box from the last exhibit?
18   A.   No.  Those are the same five accounts we were looking
19   at before.
20   Q.   So MeadPoint, MicroCap, MicroCap, Bayside, and William
21   Sears?
22   A.   Correct.
23   Q.   Now, essentially -- it's a little bit hard to see --
24   why don't we just kind of focus, if we can, just for a
25   second, if we can just kind of zoom in on that area.  And

Direct - Scoufis

1    just do the dates, too, please.

2              All right.  To give a quick survey, again, what is

3    listed here on the right side?

4    A.   Yup, that's the share price on the right side.  And it

5    corresponds to that blue -- that solid blue line going

6    across.

7    Q.   Okay.  And then what are these numbers on the left

8    column?

9    A.   All right, that's the total share volume for a specific

10   day, and that corresponds to those vertical green and red

11   bars.

12   Q.   Okay.  So very similar.  And, finally, just down here

13   below?

14   A.   Yup.  That's the date range.  Same as before, just a

15   longer time period.

16   Q.   All right.  So very similar to the previous chart?

17   A.   Yes.

18   Q.   Okay.  Now, a little faded on -- at least the screens,

19   all right --

20   A.   Yeah.

21   Q.   -- can you indicate what you're seeing throughout this

22   time period of March 25th, 2011, through July 16th, 2013?

23   A.   Yeah, sure.  It is definitely a bit faded.  And so what

24   comes through is just a lot of red, possibly even equal red

25   and equal green.

1    And we can see, again, that the selected accounts

2    were a big part of the sale volume for this period.

3    Q.   Okay.  And now as the price starts coming down, what

4    happens to the selected accounts activity?

5    A.   All right.  Yeah, the price decreases.  We can see a

6    little kind of a period of time that the selected accounts

7    stop selling where it's that solid green right here.

8    Q.   Right in this area?

9    A.   Yes.

10   Q.   And then as you're stating, as the price continues to

11   rise, the selected accounts, what is their volume?  The

12   very --

13   A.   Very high.

14   Q.   Very high compared to the total volume trading?

15   A.   Correct.  Yes.

16   Q.   Okay.  Can I have that full graph now.

17           Is this blue line consistent with what you've

18   referred to as a pump-and-dump?

19   A.   Exactly.  Yeah.  I mean, the stock increases and

20   eventually it kind of comes back to reality, and that's

21   where it decreases.

22   Q.   Sir, there's 13-pages.  Can I just have page 1 behind

23   this graph -- or page 2.  There's 13 pages.

24           Can you explain to the jury essentially what the

25   next 13 pages of your graph show in these columns that you

1   set up on this table.

2   A.   Sure.  All right.  So we're looking at the price and

3   volume data for FusionPharm.  This data comes from

4   Bloomberg -- the Bloomberg terminal, and it's for the period

5   of January 3d, 2011, through January 5th, 2014.  And the way

6   pretty -- I think it's pretty straightforward to read it.

7   If we just look at this first line as an example --

8   Q.   Can you just blow it up.  Thank you.

9   A.   All right.  So if we start with the date column, this

10  is the trade date of January 3d, 2011.  The closing price,

11  point 001, so less than a penny.  And on that date, the

12  market volume total amount of shares bought and sold,

13  34,322.

14  Q.   Okay.  And just to be very clear, this is not your

15  selected contacts, this is the total volume.

16  A.   Correct.

17  Q.   So that would be, as you saw on the bar graphs, the top

18  of your green bar?

19  A.   Yes.  Now, this isn't -- this isn't the left-over

20  amount of shares; this is the total market volume.  So if we

21  took this and turned it into a price-volume chart, the

22  entire bar would be 34,322.

23  Q.   Okay.  Thank you.

24       MR. SIBERT:  Your Honor, may I -- I just need to

25  retrieve my outline real quick.

Direct - Scoufis

1    BY MR. SIBERT:

2    Q.   Okay, sir, I'm going to have you look at Government

3    Exhibit 300.

4          MR. SIBERT:  This has been stipulated to, Your

5    Honor, and at this time, the Government would like to move

6    it into evidence.

7          THE COURT:  Given the stipulation of the parties,

8    Exhibit 300 is admitted into evidence and may be published

9    to the jury.

10        (Government's Exhibit 300 received)

11   BY MR. SIBERT:

12   Q.   All right.  Can we just blow up -- thank you.

13        Okay, sir, can you please explain to me what you're

14   showing regarding FusionPharm's trade summary -- trading

15   summary between the dates of March 25th, 2011, and May 11th,

16   2014.

17   A.   Yes.  All right.  So what this looks at are those --

18   those five accounts that were the selected contacts in the

19   previous two exhibits:  MeadPoint, two MicroCap accounts,

20   and Bayside and William Sears.

21   Q.   So those are the accounts right there?

22   A.   Exactly, yup.

23   Q.   So otherwise known as the selected accounts, right?

24   A.   Exactly, yes.

25   Q.   I cannot write with this thing.

Direct - Scoufis

1    A.   Okay.  So the way to read this, if you start -- if we
2    look at just Mead --
3    Q.   Let me blow it up for you.
4         Can we zoom in maybe on the top one, please.
5    A.   All right.
6    Q.   I'm sorry -- thank you.  She's going to put the top --
7    A.   Sure.  See, we were looking at, in the previous two
8    exhibits those red bars that were the shares sold by the
9    five accounts.  This separates them out by each account and
10   sums up their trading for this time period.
11        As we go across for MeadPoint, we see the account
12   number, account, brokerage firm -- Alpine -- and then
13   account number 7669.  We see the shares bought by this
14   account during that entire time period is zero, the shares
15   sold during that time period, about 3.2 million shares.
16   Then the value of the shares bought, which is zero.  And the
17   value of the shares sold, which for MeadPoint is $10.2
18   million of shares sold, and then the net proceeds between
19   the shares sold, shares bought.  Since no shares were bought
20   for this situation -- for this account, it's $10.2 million
21   of net proceeds.
22   Q.   All right.  Let me just stop you.  You said 10.2
23   million.  You're going to be cross-examined here, so I want
24   to make sure it's correct.  It's a little bit less than 10.2
25   million?

2020

Direct - Scoufis

1    A.   Yeah, I rounded up.  So specifically it's $10,188,925.

2    Q.   So MeadPoint never bought a share of FusionPharm stock.

3    A.   It did not buy a share of FusionPharm stock in the

4    public markets, and that's what this looks at.  This is only

5    public market trading.

6    Q.   But -- can I have that back up, please.

7         But they sold 3.19 million shares in the public

8    market.

9    A.   Correct.

10   Q.   And, again, MeadPoint was William Sears; is that right?

11   A.   That's right.

12   Q.   Okay.  Let's just take a look at MicroCap.  Can I have

13   both of those blown up.

14        Okay, let's talk about MicroCap's Oppenheimer

15   account.

16   A.   Okay.

17   Q.   And how many shares bought in the public market?

18   A.   Zero.

19   Q.   How many shares sold?

20   A.   678,727 shares.

21   Q.   How much money did MicroCap bring in for the shares

22   sold?

23   A.   $1,510,478.

24   Q.   Since there were no shares sold in the public market --

25   or bought in the public market, the net proceeds are 1.5

1    million.

2    A.    Correct.

3    Q.    All right.  And then we just run through the same thing

4    with MicroCap's Alpine account, 56,273 shares?

5    A.    Correct.

6    Q.    And that resulted in $84,385 of net profit?

7    A.    Yeah, net proceeds were $84,385.

8    Q.    Again, who did you know MicroCap to be owned by?

9    A.    William Sears.

10   Q.    All right.  Can we look at Bayside, please.  And,

11   again, consistent with the other three firms, there were no

12   shares publicly bought with Bayside; is that right?

13   A.    That's right.

14   Q.    Okay.  And essentially 140,000 shares sold.

15   A.    That -- that's right.

16   Q.    And that resulted in a net proceed of $75,000.

17   A.    Correct.

18   Q.    And, again, based upon the records that you looked at,

19   who was the owner of Bayside?

20   A.    Sandra Sears.

21   Q.    Okay.  And, finally, William Sears, himself, in his

22   Etrade account.  And can you just explain essentially --

23   there's a little bit of difference here now; is that

24   correct?

25   A.    Yeah, so William Sears, through his Etrade account --

Direct - Scoufis

1      this is the only account of the selected accounts that
2      during this time period actually bought shares.  William
3      Sears bought 13,985 shares and sold 18,352 shares.  Net
4      proceeds from that, $7,869.
5      Q.   I just want to back up here.  Can I have the chart
6      again, please.
7            So you have Bayside, MeadPoint, and two MicroCap
8      accounts that never bought shares in the public market.
9      A.   That's right.
10     Q.   If these entities did not buy shares in the public
11     market, where would they get over 4 million shares of
12     FusionPharm stock?
13     A.   Yeah, obviously it has to come from somewhere.  And if
14     it doesn't come from the public markets, it's going to be
15     issued -- it's going to be stock issued by the company --
16     in some way it's going to be issued by the company.  It
17     could be common stock issued directly by the company, it
18     could be preferred shares that are converted, or it could be
19     convertible notes that are, again, converted.
20            And then once they're converted, or bought from the
21     company, then they're sold into the public markets like
22     we're seeing here.
23     Q.   Okay.  And following -- let's just look at the total.
24     I don't need it blown up -- all right.
25            Go ahead and tell me essentially how many shares of

1    FusionPharm were totally bought by these five entities.

2    A.   All right, so total of 13,985 shares were bought.

3    Q.   And the amount of shares sold.

4    A.   4,83,666 shares.

5    Q.   And let's just get to the important part.  What were

6    the net proceeds of this share activity?

7    A.   Yeah.  Net proceeds were $11,867,244.

8    Q.   Thank you.  All right, sir, I'd like you to look at

9    Government Exhibit 294.

10          MR. SIBERT:  Your Honor, this is not stipulated to,

11   and, therefore, is not entered into evidence at this time.

12          THE COURT:  Okay.

13   BY MR. SIBERT:

14   Q.   Okay, sir, do you recognize Government Exhibit 294?

15   A.   I do.

16   Q.   Okay.  And who created the draft -- or I guess I should

17   say the diagram on Government Exhibit 294?

18   A.   I did.

19   Q.   Okay.  And can you tell the Court essentially the

20   documents that you use in order to be able to create the

21   diagram on Government Exhibit 294.

22   A.   Okay.  Yeah, I used records from transfer agent,

23   transfer packet, brokerage records, and an OTC filing.

24   Q.   And that would include Exhibits 116, 25, and 433, all

25   of which are -- have now been admitted into evidence.

Direct - Scoufis

1    A.    Those are the exhibits that I relied on, yes.

2    Q.    I'm sorry, I didn't hear you.

3    A.    Yeah, those are the exhibits I relied on.  I don't know

4    if they're in evidence, but . . .

5    Q.    Okay.  And your diagram is regarding FusionPharm; is

6    that right?

7    A.    Yes.  That's right.

8    Q.    And it's talking about a transaction regarding 40,000

9    restricted shares of FusionPharm stock.

10          MR. BARNARD:  Your Honor, I object.  We're going

11   into the contents of the unadmitted exhibit.

12          THE COURT:  That's true.

13          MR. SIBERT:  All right, Your Honor, then I think

14   I've laid the proper foundation.  Essentially this diagram

15   is based upon records that have already been admitted into

16   evidence and this witness has reviewed those and has

17   essentially used those exhibits to create this diagram.  So

18   I would ask at this time to be allowed this evidence to be

19   moved into -- or allow this exhibit to be moved into

20   evidence.

21          THE COURT:  All right.  I haven't pulled it out in

22   front of me.  Is it a one-page --

23          MR. SIBERT:  It's one page, Your Honor.

24          THE COURT:  This is the entire exhibit?

25          MR. SIBERT:  Yes, sir.

Direct - Scoufis

1           THE COURT:  Is there an objection?

2           MR. BARNARD:  There is an objection, Your Honor.

3           THE COURT:  Okay.

4           MR. BARNARD:  This is not a proper summary exhibit

5      pursuant to Rule 1006.  This may be a demonstrative exhibit

6      that could be used for demonstrative purposes, but should

7      not be admitted as an actual -- as evidence.  It -- it does

8      not prove the content of voluminous writings that cannot be

9      conveniently examined in court.  In fact, we have already

10     examined those documents in court through admitted Exhibits

11     116, 125, and 433.

12          THE COURT:  Your response, Mr. Sibert.

13          MR. SIBERT:  Brokerage records, Your Honor, on 433.

14     Essentially the argument that the defense did not want to

15     allow me to introduce into evidence the CDs.  If I printed

16     out the Excel spreadsheet we would be looking --

17          THE COURT:  But I thought we ended up agreeing --

18          MR. SIBERT:  433 is on a CD; however, only two

19     pages are being displayed for the charges under 22, 21 and

20     23 of the indictment.

21          This record is based upon brokerage records that

22     are of a voluminous nature along with transfer packages that

23     are anywhere from 40 to 200 pages long.

24          THE COURT:  This just has to do with the Abbott

25     40,000 share transaction, right?

1          MR. SIBERT:  Yes, sir, and the transaction packages

2    are long.

3          THE COURT:  So everything you just described is for

4    this one transaction that's included in the Abbott transfer

5    package?

6          MR. SIBERT:  Sir, if I'm recalling the exhibits

7    correctly, yes.

8          THE COURT:  All right.  So tell me again which were

9    the exhibits that this is based on.

10          MR. SIBERT:  116, 25, and 433.

11          THE COURT:  And 433?  We've only printed out -- you

12    say printed out two pages but it's on the CD that has how

13    many pages?

14          MR. SIBERT:  Excel spreadsheet that probably can go

15    around the world.

16          THE COURT:  And did you -- are those documents that

17    you've reviewed?

18          THE WITNESS:  Yeah.  So transfer packet, brokerage

19    records, and then OTC filing for this specific one.

20          THE COURT:  All right.  I'm satisfied that those

21    are voluminous enough.  The objection's overruled.

22          Exhibit 294 is admitted into evidence and may be

23    published to the jury.

24        (Government's Exhibit 294 received)

25          MR. SIBERT:  Thank you, Your Honor.

Direct - Scoufis

1    BY MR. SIBERT:

2    Q.   Okay, can we just try to blow that up a little bit,

3    please.

4            Okay.  Sir, can you start with the title here,

5    please.

6    A.   Sure.  All right, so this is FusionPharm and this is

7    the Todd Abbott/MicroCap Stock Issuance, and the date is

8    August 1st, 2012.

9    Q.   All right.  So before we go into each individual box,

10   can you give an overview of what you're showing the jury in

11   this diagram.

12   A.   Yeah.  All right.  So this is kind of the life cycle of

13   40,000 shares that were issued to Todd Abbott that went to

14   MicroCap and that were then sold into the public markets.

15   Q.   Okay.  Now, importantly, let's look at the first box.

16   Is this where the shares essentially begin when it goes --

17   before they're sold in the public market?

18   A.   Yeah.  So the 40,000 shares that don't exist, there's

19   just a debt between Todd Abbott and FusionPharm, which is

20   referred to as Baby Bee Bright.  At that point in time that

21   was the name -- or that's what's referred to in the debt

22   settlement agreement.

23   Q.   Now -- and what's your understanding of Baby Bee

24   Bright?

25   A.   Baby Bee Bright is the precursor to FusionPharm, same

Direct - Scoufis

1    legal entity, different name.  Baby Bee Bright turns into
2    FusionPharm.
3    Q.   And, again, what's the importance regarding restricted?
4    A.   Yeah.  So, 40,000 restricted shares were issued.  Of
5    course, as we've discussed, the restricted cannot be sold
6    into the public markets until that restriction is removed.
7    Q.   Okay.  And who received -- Mr. Abbott received these
8    shares in May 16th, 2011?
9    A.   Correct.
10   Q.   And based upon that, the agreement states that Mr.
11   Abbott is forgiven the $10,000 debt?
12   A.   Yes.  That was the agreement.
13   Q.   Okay.  So explain to me now this middle section with
14   your arrow, the stock certificate, and the opinion letter.
15   A.   All right.  So that first blue box, that's the 40,000
16   restricted shares that Todd Abbott owns.
17          As we go down into the second box, MicroCap
18   receives those 40,000 shares but, as a result of DiTommaso
19   Rule 144 attorney opinion letter, those 40,000 shares become
20   free-trading and unrestricted.
21   Q.   Okay.  And you just have a little stock symbol there.
22   What are you trying to tell the jury with the stock symbol?
23   A.   Yeah, just that the stock is flowing down.  It's going
24   from Todd Abbott to MicroCap.
25   Q.   And so that's your best attempt to show what you would

2029

Direct - Scoufis

1    see in some of these packages as a certificate?

2    A.    Yeah.  Yeah.  It's tough to -- it's tough to --

3    Q.    You did --

4    A.    -- with me, so that's my best attempt.

5    Q.    Just making sure there was an understanding.

6    A.    Yup.

7    Q.    All right.  So MicroCap, which is Mr. William Sears,

8    what does he end up with?

9    A.    All right.  MicroCap ends up with free-trading,

10   unrestricted shares and that was as a result of a share

11   purchase agreement where MicroCap paid Todd Abbott $40,000.

12   And following that share purchase agreement, MicroCap

13   receives those free-trading shares and they go into his

14   brokerage account, so they're ready to be sold into the

15   market.

16   Q.    Okay.  When you say it goes into his brokerage account,

17   we're talking about Mr. William Sears' Scottsdale's

18   brokerage account?

19   A.    Yes, yup.

20   Q.    And so what happens once -- that stock certificate is

21   unrestricted at this point?  Is that correct?

22   A.    That's right.

23   Q.    So what can be done now with those shares of stock?

24   A.    All right.  Now that they're free-trading, unrestricted

25   shares, they can be deposited into the brokerage account,

Direct - Scoufis

1    MicroCap's brokerage account and be sold into the market,

2    and that's what that lower blue box is showing, that

3    MicroCap did, indeed, sell the 40,000 shares into the

4    Over-the-Counter Markets and then received $55,000 for -- as

5    proceeds for the sales.

6    Q.   And your $1 bill here is representing $55,000?

7    A.   Yes.

8    Q.   Okay.  And just to be clear, what is the broker,

9    Scottsdale?  What are they relying on to show that the

10   restricted legend has been removed?

11   A.   Yeah.  All right, so what is the brokerage account --

12   Q.   What -- not the brokerage account, what did the

13   brokers --

14   A.   Or the -- yeah.

15   Q.   -- rely on to show evidence that the restricted legend

16   could be removed?

17   A.   Brokerage firms, when they're receiving shares into

18   their account that have gone from restricted to

19   free-trading, they also want to review the same information

20   that the transfer agent reviewed to ensure that the

21   requirements of Rule 144 were met.  And that's going to

22   include that DiTommaso Rule 144 attorney opinion letter.

23   Q.   And so this letter is very important to the transfer

24   agent to remove the restrictions?

25   A.   Yes.  Very important.

2031

Direct - Scoufis

1    Q.   And also very important to the brokerage --

2    A.   Yes.

3    Q.   Sir, I'd like you to look at Government Exhibit 295.

4             This is not in evidence.

5             Okay, sir, did you create Government Exhibit 295?

6    A.   Yes, I did.

7    Q.   Okay.  And, again, based upon your graph here, your

8    diagram, you're relying on at least two exhibits that have

9    been admitted into evidence; is that right?

10   A.   Yeah.  Here I'm relying on transfer packet -- or a

11   transfer packet and brokerage records, and -- so those are

12   the two.  The last one relied on an OTC filing.  But that's

13   not needed for this exhibit.

14   Q.   Okay.  And prior to these exhibits being entered into

15   evidence, did you rely on other records as well to confirm

16   that these exhibits matched those records?  Would that

17   include the whole brokerage record?

18   A.   Did I look at the whole -- yeah, I mean --

19   Q.   Okay.  And let me just make sure I understand.  What

20   brokerage account were you looking at?

21   A.   All right, so this is Bayside's brokerage account held

22   at Scottsdale.

23   Q.   And, again, you created this diagram yourself after

24   reviewing those records?

25   A.   Correct.

Voir Dire - Scoufis

1     MR. SIBERT:  Your Honor, at this time I would like

2  to move into evidence Government Exhibit 295.

3     MR. BARNARD:  Your Honor, may I voir dire, please?

4     THE COURT:  You may.

5     VOIR DIRE EXAMINATION

6  BY MR. BARNARD:

7  Q.   I'm a little unclear as to what the basis for this

8  exhibit is.  You said that you reviewed Exhibits 72 and 434.

9  Correct?

10 A.   Correct.

11 Q.   And then my understanding was you said that 434 really

12 wasn't even part of the basis for this, it wasn't necessary,

13 or did I misunderstand?

14 A.   So I said specifically that the OTC filings are not the

15 basis for this --

16 Q.   All right.

17 A.   -- exhibit.  And I actually don't know what 72 and 434

18 correspond to.

19 Q.   So what did you -- what did you rely upon to come up

20 with this information?

21 A.   Yeah.  So I can tell you if I had a exhibit list.

22 But -- so those two exhibits refer to brokerage records,

23 Bayside's Scottsdale account, and then a transfer packet

24 from Pacific Stock Transfer.

25 Q.   And the bottom line question is -- or the -- yeah, the

2033
Voir Dire - Scoufis

1    bottom line question is:  Those documents are not
2    particularly voluminous, are they?
3    A.   No, I think that they are.  I mean, it's not just
4    one --
5    Q.   I'm sorry -- excuse me, go ahead.  I didn't mean to
6    interrupt.
7    A.   Well, yeah, brokerage records are -- there's -- there's
8    a number of pages to brokerage records, as well as the
9    transfer packets, probably --
10   Q.   When you say "a number of pages," you mean 10,000,
11   50,000?
12   A.   For this, for Bayside -- I mean, they could be.  For
13   this, no, they were not 5- or 10,000 pages.
14   Q.   5 or 10 pages?
15   A.   Total brokerage records for Bayside, I'm guessing it
16   was probably in the hundreds.
17   Q.   So -- so how many pages would you say you had to rely
18   on to get this information?  Hundreds?
19   A.   I think that's a tough question to answer without
20   looking at it.  I mean, if you pinpoint all of the
21   information that's within the -- a lot of voluminous
22   records, and just pulled out those pages, I'd -- I don't
23   know, maybe you could get it in 20, 25 pages.  But, again,
24   you have to read all of those records to kind of know which
25   documents to pull out.

Direct - Scoufis

1    Q.   But the documents, themselves, that you were relying
2    upon are maybe 25 pages.
3    A.   I -- maybe.  I don't -- I would have to look at all of
4    the documents again.
5         MR. BARNARD:  Your Honor, again, I would object to
6    this.  I don't think it qualifies as a summary chart, that
7    the evidence regarding these matters have already been
8    introduced also, to the best of my understanding.  And so
9    this, again, could be a demonstrative chart but not a
10   summary chart to be admitted as an exhibit.
11        THE COURT:  All right.  I disagree.  While the
12   actual data may have -- may be present in 20 or 25 pages, I
13   think it's clear from the witness' testimony that he had to
14   review, among other things, a transfer packet that was
15   hundreds of pages in volume.
16        So the objection's overruled.  And 295 is admitted
17   into evidence.
18        (Government's Exhibit 295 received)
19        MR. SIBERT:  Thank you, Your Honor.
20             DIRECT EXAMINATION (Continued)
21   BY MR. SIBERT:
22   Q.   All right, sir, a similar diagram to what we looked at
23   in 294.  Let's just start from the top.  Just give a layout
24   here, an understanding to the jury, of what we're looking at
25   in your diagram.

Direct - Scoufis

1    A.    Okay.  All right.  So this is FusionPharm -- we're
2    looking at FusionPharm.  This is a stock issuance from
3    FusionPharm to Bayside, so Bayside stock issuance.  And it
4    occurred on January 18th, 2013.
5    Q.    And let's go ahead and start with the first box.  Can
6    you describe what's going on in the top box there.
7    A.    All right.  So, yeah, Bayside, with Sandra Sears listed
8    as the owner and controller of Bayside, enters into a
9    convertible promissory note, so a debt agreement with
10   FusionPharm.
11   Q.    Okay.  So a convertible promissory note basically tells
12   you what regarding FusionPharm stock?
13   A.    All right, so that's -- that's the basis for, as we
14   flow down that -- Bayside had loaned FusionPharm money.
15   That's the note, that's the debt agreement, and that -- that
16   debt could be converted into common shares.
17   Q.    Okay.  And so explain your little middle section here
18   when you have a note with an arrow going to "stock."
19   A.    All right.  So that -- that arrow is going from the
20   promissory note and then, as that's converted into the
21   stock, that's kind of the process as we go down.
22         And then with that -- on the other side of that
23   arrow -- or of the straight arrow, the DiTommaso Rule 144
24   attorney opinion letter is used to convert the promissory
25   note into free-trading shares.  And that's what we'll see in

1    this middle blue box.

2    Q.   Let's just go there.  So what are we seeing in the

3    middle blue box?

4    A.   Okay.  All right.  So Bayside converts $1400 of the

5    note, so not the total note, but just part of the note, into

6    140,000 unrestricted shares.  That unrestricted part comes

7    from the lifting of the Rule 144 restricted legend.  And

8    then those shares are deposited into Bayside's Scottsdale

9    account.

10   Q.   Okay.  And so here goes the shares into the account; is

11   that correct?

12   A.   Yup.  That's right.

13   Q.   And then what results once it gets put into the

14   brokerage account for Bayside?

15   A.   Yeah, so after they're deposited in, 140,000 shares are

16   sold into the over-the-counter markets, and Bayside receives

17   $75,000 for those sales.

18   Q.   And where does the $75,000 go?

19   A.   That goes into Bayside's brokerage account.

20   Q.   Thank you.  Okay, sir, can you look at Government

21   Exhibit 296.

22            This has not been offered into evidence.

23            THE COURT:  It is not stipulated?

24            MR. SIBERT:  It is not stipulated to, Your Honor.

25            THE COURT:  All right.

Direct - Scoufis

1    BY MR. SIBERT:
2    Q.    Okay, sir, did you prepare the diagram?
3    A.    Yes, I did.
4    Q.    Okay.  And can you explain what documents you relied on
5    in preparing this diagram.
6    A.    All right.  This looks at just the transfer agent
7    packet for the conversion.
8    Q.    Okay.  And that transfer agent package --
9            MR. SIBERT:  Can I have a minute, Your Honor?
10           THE COURT:  Yes.
11   BY MR. SIBERT:
12   Q.    The transfer agent package is about 187 pages?
13   A.    Sounds right.
14   Q.    Okay.  And you relied on that information to create
15   your diagram?
16   A.    Correct.
17           MR. SIBERT:  Your Honor, at this time the
18   Government would like to move into evidence Government
19   Exhibit 296.
20           THE COURT:  Do you have the same objection?
21           MR. BARNARD:  Same objection, Your Honor.
22           THE COURT:  All right.  That objection's overruled
23   for the same reason.  I believe the voluminous requirement
24   of Rule 1006 is satisfied.  And 296 is admitted into
25   evidence and may be published to the jury.

2038

Direct - Scoufis

1          (Government's Exhibit 296 received)

2              MR. SIBERT:   Thank you, Your Honor.

3      BY MR. SIBERT:

4      Q.   All right, sir, let's just kind of walk through the

5      same process, since this is a very similar diagram.  Let's

6      start with the sale now of the converted -- excuse me,

7      convertible promissory note dealing with the Bayside note.

8      A.   Okay.

9      Q.   And when was this note, based upon your review of the

10     package?  When did this happen?

11     A.   Yeah, the shares were issued, then, on March 14th,

12     2013.

13     Q.   All right.  And let's just start at your top box here.

14     A.   All right.

15     Q.   Okay.  Can you explain what's going on at this point.

16     A.   All right.  Yeah, so just like the last exhibit, this

17     is Bayside's convertible promissory note agreement with

18     FusionPharm.  Bayside had loaned FusionPharm money and --

19     and it's -- and was able to turn that debt, then, into

20     common shares, the convertible promissory note.

21     Q.   Now, that's the money that you're -- that's the money

22     that you're showing when they converted a portion of the

23     note; is that right?

24     A.   No.  All right.  So if we look at the promissory note

25     going down and the money going up, so that's a portion of

Direct - Scoufis

1    the promissory note that is sold to five different parties.

2    And in return for selling that portion of the note, Bayside

3    receives $250,000.  So that money is not coming from that

4    Over-the-Counter Markets like we saw on the last two charts,

5    it's coming from the sale to private parties.

6    Q.   Okay.  So there's -- there's how many parties that are

7    buying this note?

8    A.   Five different parties.

9    Q.   Okay.  And so when they buy that -- when they divide

10   that note up and purchase it, the money goes back to

11   Bayside?

12   A.   Correct.

13   Q.   And so what happens once the note is sold?

14   A.   All right.  Yeah, so pursuant to the stock transfer

15   agreement, as the note's sold, it is also converted into

16   free-trading shares for these five parties and then, yeah,

17   so converted into the free-trading shares using a DiTommaso

18   Rule 144 attorney opinion letter.

19   Q.   Okay.  And you have listed under here several names.

20   Are these the five parties that received an unrestricted

21   stock --

22   A.   Yes, that's --

23   Q.   -- for purposes of the note?

24   A.   Correct.

25   Q.   All right.  So I just got a couple of questions here.

Direct - Scoufis

1    Did you review an attorney opinion letter on January 4th,

2    2013, regarding Bayside's conversion of 140 shares?

3    A.    Did I review an attorney opinion letter --

4    Q.    In the transfer package, do you recall the attorney

5    opinion letters?

6    A.    For the last exhibit we looked at?

7    Q.    Yes, sir.

8    A.    Yes.

9    Q.    Okay.

10            THE COURT:  You mean 140,000 shares?

11            MR. SIBERT:  Yes, sir.  Thank you, Your Honor.

12   BY MR. SIBERT:

13   Q.    Did you review that attorney opinion letter for the

14   140,000 shares?

15   A.    Yes, I did.

16   Q.    All right.  In that letter, Bayside was listed as a

17   nonaffiliate; is that correct?

18   A.    Correct.

19   Q.    Nonaffiliate to FusionPharm, right?

20   A.    Right.

21   Q.    Is that important when it comes to being able to get

22   the shares unrestricted regarding the sale of the note?

23   A.    Yes.  So as this sale happened, the shares were -- they

24   were actually issued as free-trading shares, but if we

25   remember Rule 144's requirement that an individual or entity

1      hold the shares -- or that security for one year.

2             Now, in a transaction, it's possible to do what's

3      called tacking back, so you tack back to the prior holder.

4      But you can only tack to the prior holder if the prior

5      holder is a nonaffiliate.  And you can use -- if you can

6      tack the prior holder is a nonaffiliate, you can use that

7      time that the prior holder held the shares to qualify for

8      that one-year period.  So Bayside, being a nonaffiliate, was

9      used in the holding period.

10     Q.   And so because Bayside was listed as a nonaffiliate,

11     these parties could tack onto the time Bayside held the

12     shares.

13     A.   Correct.

14     Q.   But if Bayside was listed as an affiliate to

15     FusionPharm, could you tack on that time period?

16     A.   No.

17     Q.   And so when would the holding period for these five

18     companies start?

19     A.   Yeah, it would have started as of the date of the

20     transaction.  The shares were issued on March 14th, 2013,

21     right around there, I think the date of the transaction

22     might be slightly different, but, yeah, right around March

23     14th, 2013.

24     Q.   Thank you.

25             THE COURT:  Will this be a good time for our

Direct - Scoufis

1    afternoon break?

2         MR. SIBERT:  Sir, I need an afternoon break, so

3    yes.

4         THE COURT:  I guess we all do.

5         All right, ladies and gentlemen of the jury, we'll

6    take a 15-minute recess.

7         (Jury left the courtroom at 3:12 p.m.)

8         THE COURT:  Mr. Scoufis, same restriction as

9    before.

10        THE WITNESS:  Okay.

11        (Recess taken 3:12 p.m.)

12        (In open court outside the presence of the jury at 3:38

13   p.m.)

14        THE COURT:  This is Ms. Frank's first trial, and

15   she's thinking she's jinxing this whole thing for me.  I

16   assure her this is not her, it's just -- I've never had a

17   jury do this.  So who's the death in the family?

18        COURTROOM DEPUTY:  Mr. Coomer's grandmother.

19        THE COURT:  Okay.  Who just informed Ms. Frank that

20   he can't pay attention anymore, can't listen to the

21   evidence, and wants to leave.  So we have -- the lawyers

22   have to make a choice.  If I dismiss him, he will

23   obviously -- and we continue forward, he can't be in the --

24   he can't be in the jury -- it's not like a -- an alternate

25   that we release and then -- which I've already had in

1    another trial -- call back if something happens to the 12

2    that are deliberating.  He's -- if we release him, he's

3    gone, and we're going forward with one alternate.

4            Alternatively, if we want to reserve two

5    alternates, then we would have to call it a day today and --

6    but I'm not going to extend the day -- the trial any further

7    than one day, so we're going to -- I'll have to keep the

8    Government to its limit of resting at 3:15 on Monday.

9            So I'll take input from counsel as to how you want

10   to proceed.

11           MR. SIBERT:  Can I have a minute, Your Honor,

12   please?

13           THE COURT:  Yeah.

14           MR. SIBERT:  Your Honor, I think the Government's

15   fine with releasing him and rolling the dice with 13.

16           THE COURT:  Yeah.  I think we're close enough to

17   the end that I think that's a reasonable approach.  Let me

18   hear from defense counsel.

19           MR. GOODREID:  Your Honor, may we have a minute to

20   continue to confer?

21           THE COURT:  Sure.

22           MR. SIBERT:  Your Honor, can I have one minute

23   after they do to raise an issue with the Court?

24           THE COURT:  Okay.

25           MR. SIBERT:  I'd like to get to -- try to get in

2044

Direct - Scoufis

1   some evidence while the jury's out that --

2           THE COURT:  All right.

3           MR. SIBERT:  -- to keep it flowing.

4           THE COURT:  Okay.

5           MR. GOODREID:  Your Honor, I've just been

6   informed I'm the jury guy, so -- from my cocounsel.  Your

7   Honor, the defense would just as soon keep him and offer

8   this as an alternative, if it's acceptable to the Court and

9   the Government.  What if instead of compelling the

10  Government to rest at 3:15 on Monday, then they are allowed

11  to have the entire day?  Is that maybe too tight after that?

12          THE COURT:  Well, that means on Tuesday, we would

13  have to do the Rule 29 arguments, we'd -- you'd have to put

14  on your case, the Government would have to put on its

15  rebuttal, we would have to have the jury instruction

16  charging conference.  That's -- that's just way too much for

17  one day, I think.

18          I think you have to choose between one of the two

19  alternatives and I'll have to decide.

20          MR. GOODREID:  Your Honor, the defense would just

21  as soon keep him.

22          THE COURT:  All right.  I'm going to -- given that

23  we have -- we're 80-plus percent of the way through, I think

24  it's -- it's a risk, but I think it's a reasonable risk,

25  that we proceed forward with one alternate because I don't

2045

Direct - Scoufis

1    want to preclude the Government from putting on the case

2    that it needs to take.  And there are other judges that

3    always have just one alternate juror, even for multi-week

4    trials.

5          So that's what -- I'm going to discharge him and,

6    just so that we're all on the same page, as I mentioned to

7    you before when we thought Ms. Cox was going to be the one

8    that was going to give us problems, we will be keeping Mr.

9    Jones.  All right?  We will be keeping Mr. Jones.  He will

10   be deliberating the verdict.

11         The reason -- my rationale for that is Ms.

12   Sylvester is the juror that was in seat No. 2, and seat No.

13   2 is the juror that is always the alternate, even for my

14   five days or less single-week trials, so I'll keep to that.

15         All right.  So let's bring in Mr. Coomer and then

16   we can talk with him and discharge him.  Oh, sorry.  You --

17   Mr. Sibert had something --

18         MR. SIBERT:  Yeah, two quick things.  One, I didn't

19   bring my biohazard suit, so Mrs. Funk -- or Agent Funk is

20   going to sit in the back.  She's just starting to feel a

21   little bit bad.  She doesn't want to be disruptive.

22         THE COURT:  Okay.

23         MR. SIBERT:  All kidding aside, that's why she's

24   back there.

25         THE COURT:  That's fine.

Direct - Scoufis

1          MR. SIBERT:  Also I'd like to move into evidence

2     the following exhibits that have been stipulated to:  303,

3     309 -- well, actually, strike 309.  I'm going to let Mr.

4     Brown handle that.  406, 407, 408-A through 408-G, 410-B,

5     410-C, 410-D through 410-K, 410-N, as in November, 410-O,

6     410-P, 411.

7          THE COURT:  These are all stipulated?

8          MR. SIBERT:  They are stipulated to.

9          THE COURT:  Okay.  Given the stipulation of the

10    parties, the following exhibits are admitted into evidence

11    and may be published to the jury:  Exhibits 303, 406, 407,

12    408 and save some time 408-A through G, 410-B, C, and D --

13    well, B through K, right?  Or are you excluding E?

14         MR. SIBERT:  410-B through K, yes, Your Honor.

15         THE COURT:  All right.  410-B through K, 410

16    nine -- N, 410-N, 410-O, 410-P, and 411.  All right, so

17    let's bring in Mr. Coomer.

18         (Government's Exhibits received)

19         MR. GOODREID:  Your Honor, may I ask real quickly:

20    I assume explicit in the Court's ruling, since we are

21    dismissing this juror, that in fact the Government's time

22    deadline is the same as what you said previously?

23         THE COURT:  Yes.

24         MR. GOODREID:  Okay, thank you.

25         (In open court in the presence of Mr. Coomer at 3:46

2047

Direct - Scoufis

1    p.m.)

2              THE COURT:  Mr. Coomer, would you take your seat.

3    Everybody else sit down, please.

4              I understand -- we all now understand that you

5    received some very bad news this afternoon.

6              THE JUROR:  Yes, Your Honor.

7              THE COURT:  And I'm very sorry for the death of

8    your grandmother.  So if you -- this is -- this is your

9    choice, and we'll respect your choice.  If you feel that you

10   really need to leave, as you heard me on the first day, we

11   have alternates and we will continue forward.  If you do

12   leave now, then you will not be on the jury to deliberate a

13   verdict because you will then not be hearing certain

14   evidence and we can't have -- all the jurors that deliberate

15   the verdict have to have heard all of the evidence.

16             So it was my understanding from Ms. Frank, but I

17   want to hear it from you directly, that you do -- would

18   prefer to leave; is that correct?

19             THE JUROR:  I need to go home.

20             THE COURT:  Okay.  All right.  Well, I want to

21   thank you very much for your service.  You have really

22   contributed to our criminal justice system and you have the

23   appreciation of all of the lawyers, the parties, and myself,

24   and our condolences to you and your family.  And you are now

25   discharged.

2048

Direct - Scoufis

1            THE JUROR:  Thank you.

2            THE COURT:  All right.  Thank you, sir.

3            Let's bring in the rest of the jury.

4       (Jury was present at 3:50 p.m.)

5            THE COURT:  All right, members of the jury, I

6    assume that you have heard that Mr. Coomer lost his

7    grandmother this afternoon.  Oh, was this not discussed back

8    there?  Oh.  Well, that's why we had to -- he informed us

9    that he could not continue to deliberate, so I've discharged

10   him.  We're going to continue with the 13 of you.  The good

11   news, the silver lining in all this bad news, is that there

12   will only be one of you that I will have the displeasure of

13   having to discharge after closing arguments -- or not

14   discharge, release, instead of two of you.  So 12 of the 13

15   of you will be deliberating our verdict.

16           All right.  You may proceed, Mr. Sibert.

17           MR. SIBERT:  Okay, thank you, Your Honor.

18   BY MR. SIBERT:

19   Q.   Okay, sir, could you please look at Government Exhibit

20   297.

21           This is not admitted into evidence.

22           Okay, sir, same type of foundation questions.  Did

23   you create the diagram that's on Government Exhibit 297?

24   A.   Yes, I did.

25   Q.   And can you tell the Court essentially the exhibits

1    that you relied on, and what they are, to --

2    A.    Sure.

3    Q.    -- create this diagram?

4    A.    Yeah.  All right.  So this exhibit relies on a transfer

5    packet and brokerage records.

6    Q.    Okay.  And would that be Exhibit 78 and 432?

7    A.    Yes, that's right.

8            MR. SIBERT:  Your Honor, at this time the

9    Government would move into admission Government Exhibit 297

10   into evidence.

11           MR. BARNARD:  Same objection.

12           THE COURT:  Same objection?  Were the documents you

13   reviewed, including the transfer agent package, of similar

14   volume as the prior ones?

15           THE WITNESS:  Yes.

16           THE COURT:  All right.  All right, the objection's

17   overruled.  Exhibit 297 is admitted into evidence and may be

18   published to the jury.

19        (Government's Exhibit 297 received)

20   BY MR. SIBERT:

21   Q.    Okay, sir, I think this is probably the fourth or fifth

22   diagram that's similar.  Let's go ahead and explain to the

23   jury what's happening on April 12th, 2013.

24   A.    Okay.  Yeah, same sort of diagram.  And this is looking

25   at MeadPoint's stock issuance.

Direct - Scoufis

1          So if we go to that first blue box, we have
2    MeadPoint through William Sears, who had entered into a
3    convertible promissory note agreement with FusionPharm.
4    Q.   And so what happens here in the middle section?
5    A.   All right.  So this is the conversion of the note and
6    using the 144 opinion letter to turn that debt into
7    free-trading, unrestricted stock, as we can see in that
8    middle blue box.
9    Q.   And that's the note-to-stock arrow?
10   A.   Yup.  That's it.
11   Q.   And then what happens once the note is converted into
12   stock?
13   A.   Okay.  So MeadPoint converted $4750 of that note into
14   475,000 unrestricted shares.  Those shares were deposited
15   into MeadPoint's Scottsdale account.  And from the account,
16   the shares were sold -- as we go down into the third box,
17   the shares were sold into the Over-the-Counter Markets, and
18   MeadPoint received proceeds of $117,000.
19   Q.   And, again, the -- the 144 attorney opinion letter had
20   a critical role in removing the restricted legend to the
21   stock?
22   A.   Well, yes.  So we had talked about the holding period
23   earlier.  This is a little different here.  MeadPoint was
24   represented as not an affiliate and that allowed those
25   shares to be deposited into Scottsdale -- into the

2051
Direct - Scoufis

1   Scottsdale account and then sold into the markets.

2   Q.   And so if I understand you correctly, MeadPoint, Mr.

3   William Sears, was represented as not being an affiliate of

4   FusionPharm?

5   A.   Correct.

6   Q.   And that also allowed these shares to be unrestricted

7   so they could be deposited into a brokerage account?

8   A.   Correct.

9   Q.   And eventually sold.

10  A.   Correct.

11  Q.   Okay, sir, can you look at Government Exhibit 298.

12          This is not admitted into evidence at this point.

13          Do you recognize Government Exhibit 298?

14  A.   Yes, I do.

15  Q.   Okay.  And did you create this diagram on Government

16  Exhibit 298?

17  A.   Yes.

18  Q.   Okay.  And, again, did you rely on a transfer package

19  and brokerage records to create this diagram?

20  A.   Yes, I did.

21  Q.   And were both of those exhibits extensive in size?

22  A.   Yes.

23  Q.   And did you have to look through many of those pages in

24  order to prepare this diagram on -- in Government Exhibit

25  298?

Direct - Scoufis

1   A.   Yes.

2           MR. SIBERT:  Your Honor, at this time the

3   Government moves into evidence Government Exhibit 298.

4           THE COURT:  Same objection?

5           MR. BARNARD:  Same objection, Your Honor.

6           THE COURT:  All right.  The -- for the same

7   reasons, the objection's overruled.  Exhibit 298 is admitted

8   into evidence and may be published to the jury.

9       (Government's Exhibit 298 received)

10          MR. SIBERT:  Thank you, Your Honor.

11  BY MR. SIBERT:

12  Q.   Okay, sir, can you explain to the jury what is

13  happening on August 15th, 2013, regarding the MeadPoint

14  convertible promissory note.

15  A.   All right.  So starting with the top blue box,

16  MeadPoint -- again, owned by William Sears -- entered --

17  they had entered into a convertible promissory note

18  agreement with FusionPharm.

19          And then as we move down just as we've seen before,

20  that -- some of that note is turned into stock.  And using a

21  DiTommaso Rule 144 attorney opinion letter, it's turned into

22  free-trading, unrestricted stock.  And that's what we see in

23  that middle blue box.  So it's $5,000 of debt of the note

24  that was converted into 500,000 free-trading shares,

25  unrestricted shares.  And, again, those shares are deposited

Direct - Scoufis

1    into a brokerage account and, specifically, MeadPoint's

2    Scottsdale brokerage account.

3           Keep going down, similarly, the stock has been sold

4    into the public markets, into the Over-the-Counter Markets,

5    and -- and then they received proceeds of $156,000.

6    Q.   And, again, what was the affiliation status regarding

7    MeadPoint in this 144 attorney opinion letter?

8    A.   Yeah, MeadPoint was not an affiliate.

9    Q.   Of FusionPharm.

10   A.   Correct.

11   Q.   Sir, can you please look at Government Exhibit 299,

12   which is not into evidence.

13          Sir, do you recognize Government Exhibit 299?

14   A.   Yes, I created it.

15   Q.   Okay.  And very similar diagram to the last few that

16   we've looked at; is that correct?

17   A.   Yeah.  Pretty similar.  This one's got a little twist

18   in it, but pretty similar.

19   Q.   Okay.  And did you have to rely on Government Exhibit

20   84, which has been moved into evidence at this point?

21   A.   Yes.

22   Q.   Okay.  And do you recall how big Government Exhibit 84

23   is?

24   A.   It's the same as the other transfer packets, between 75

25   or 150 pages.

2054

Direct - Scoufis

1    Q.   Okay.

2            MR. SIBERT:  Your Honor, at this time the

3    Government would like to move into evidence Government

4    Exhibit 299.

5            THE COURT:  What is the different twist to this

6    exhibit?

7            THE WITNESS:  All right, so it's pretty similar,

8    but we just -- it's a note sale from MeadPoint to three

9    parties.  So this is similar to, I think, the second exhibit

10   we looked at where they were sold to five parties.

11           THE COURT:  Five parties?

12           THE WITNESS:  Yeah.

13           THE COURT:  All right.  Is there an objection from

14   the defendant?

15           MR. BARNARD:  Same objection, Your Honor.

16           THE COURT:  All right.  For the same reasons, the

17   objection's overruled.  Exhibit 299 is admitted into

18   evidence and may be published to the jury.

19       (Government's Exhibit 299 received)

20           MR. SIBERT:  Thank you, Your Honor.

21   BY MR. SIBERT:

22   Q.   All right, sir, you stated this diagram has a little

23   twist to it.  So can you tell me what is going on with the

24   MeadPoint note on September 3d, 2013, regarding a Scholz and

25   Thaden stock issuance.

Direct - Scoufis

A.    Sure.  All right, so we'll start on the top blue box.
MeadPoint, control known by William Sears, enters into a
convertible promissory note agreement with FusionPharm.  And
as we move down, we've got a promissory note transferring,
and then cash being paid for that promissory note.

So in the second blue box, MeadPoint enters into a
share purchase agreement with three different parties:
Richard Scholz and Myron and Sharryn Thaden.

Q.   So they -- based upon your diagram here, Scholz and the
Thadens buy a portion of the MeadPoint note; is that
correct?

A.   Correct.

Q.   And that portion they buy, they -- they have to give
cash to MeadPoint?

A.   That's right.

Q.   Or William Sears.

A.   Right.  Yes.

Q.   Okay.  And then go ahead and explain what happens after
they receive a portion of the note.

A.    All right.  Yeah, so now as we're going down into the
third box, we have that similar curved arrow going from the
promissory note into stock, so we've got a conversion.  And
using a Rule 144 attorney opinion letter, it -- the three
parties are issued -- well, Richard Scholz is issued 500,000
free-trading shares, and then Myron and Sharryn Thaden --

Direct - Scoufis

1    and my understanding is they are married -- receive 1

2    million unrestricted shares.

3    Q.    Okay.  So a couple of follow-on questions here.

4    MeadPoint was represented as a nonaffiliate to FusionPharm;

5    is that correct?

6    A.    Correct.

7    Q.    All right.  And that's stated in the attorney letter?

8    A.    Correct.

9    Q.    Okay.  And so if MeadPoint was an affiliate of

10   FusionPharm, when would the holding period begin for Mr.

11   Scholz and the Thadens?

12   A.    Yeah, just as we had discussed this concept earlier, so

13   Scholz and the Thadens would be unable to tack, their

14   holding period would start as soon as they acquired those

15   shares, prob- -- right around September 3d, 2013.  They --

16   Q.    So they -- I'm sorry to cut you off.  Could you finish

17   your answer?

18   A.    Yeah.  So their holding period would start right around

19   September 3d, 2013.

20   Q.    And so when you say the holding period begins on

21   September -- or around September 3d, 2013, when could the

22   Thadens and Scholz be able to take their shares and deposit

23   it into the brokerage account to be able to trade?

24   A.    Yeah, so we -- for example, if the date were September

25   3d, 2013, we would just go one year later, September 3d,

1    2014.

2    Q.   But because MeadPoint was represented as a

3    nonaffiliate, they were able to tack on the time that

4    MeadPoint held the note?

5    A.   Correct.

6    Q.   All right, sir, could you please look at Government

7    Exhibit 301.

8            This is not into evidence at this point.

9            Essentially, sir, could you describe -- let me ask

10   you this:  Did you create the table of dates and numbers

11   that are on Government Exhibit 301?

12   A.   Yes, I did.

13   Q.   Okay.  And can you tell the Court essentially what

14   documents you relied on to be able to create this table of

15   dates and numbers.

16   A.   Okay.  This relies on OTC Market filings --

17           MR. BARNARD:  Your Honor, we would stipulate to its

18   admission.

19           THE COURT:  All right.  Thank you for that.

20           Given the stipulation of the parties, Exhibit 301

21   is admitted into evidence and may be published to the jury.

22       (Government's Exhibit 301 received)

23           MR. SIBERT:  Thank you, Your Honor.

24   BY MR. SIBERT:

25   Q.   Without going to the foundation now, could you explain

1    to the jury essentially what you're showing in your table

2    here in Government Exhibit 301.

3    A.    Sure.  Okay.  So, we talked earlier about Rule 144

4    requirements, and one of those is a limitation that an

5    affiliate can sell at most 1 percent of the outstanding

6    shares in an over-the-counter company.

7    Q.    So let's just work through a line.

8    A.    Okay.

9    Q.    And we'll just go slow.

10   A.    So --

11   Q.    Can I have that blown up, please.  The date and with

12   the title.

13         Let's just first talk -- what are you representing

14   the date as?

15   A.    All right.  June 30th, 2011.  And the rest of the

16   dates, these are just quarter ends, so I just chose four

17   dates for a year and these are dates that I have chosen.

18         And what we're doing is looking back 90 days

19   from -- for example, the first one, June 30th, 2011.

20   Q.    Okay.  So let me slow you down.  June 30th, 2011,

21   that's the end of the second quarter for 2011.

22   A.    Correct.

23   Q.    Okay.  And can you just tell the jury -- some people

24   might not know this -- what are the quarters when it comes

25   to the financial world involving securities?

2059
Direct - Scoufis

1   A.   Yeah.  Companies report -- they make annual and
2   quarterly reports on their financials and business activity
3   four times a year, so we refer to quarterly reports.  And
4   then at the end of their fiscal year, they'll make an annual
5   report, which is a little bit more detailed.
6   Q.   And so what are those -- could you just tell the dates
7   quickly when quarters end for the financial world of
8   companies.  When is the first quarter?
9   A.   Yeah, so, actually, companies can choose whenever they
10  want their quarters to end and when they want to do their
11  annual report.  It just has to be consistent.  Just has to
12  be quarterly.
13  Q.   In the case of FusionPharm.
14  A.   Yeah, a lot of companies do just your standard quarter,
15  so end of March, end of June, end of September, and end of
16  December.  Really, here, we're just looking at certain
17  points in time, and I wanted to just kind of have some
18  consistency, some sort of overlap with when there are
19  filings.  So these dates don't necessarily correspond to
20  anything specific about FusionPharm.  They're just looking
21  at specific points in time.
22  Q.   All right.  Can you tell me now, then, you picked June
23  30th, 2011, as a starting point.  Let's talk about the
24  three-month volume limit.  Can you describe what the 9,600
25  represents.

Direct - Scoufis

1   A.   Sure.  All right, so what Rule 144 asks you to do is to

2   look at public -- the most recent public filing and look at

3   the outstanding share amount.  So as of 6-30-2011, one

4   percent of that outstanding share amount is 9,600 shares.

5   And what that means is an affiliate under Rule 144 on June

6   30th, 2011, is only allowed to sell 9,600 shares.

7   Q.   Can you explain to me what the selected accounts shares

8   sold means.

9   A.   Sure.  Selected accounts, those are the same five

10  accounts that we've been looking at in earlier charts.

11  MeadPoint, Bayside, two MicroCap accounts, and William Sears

12  account, his individual account.  These are the total of

13  those five accounts, the shares sold during -- during the

14  three-month period prior to June 30th, 2011.

15  Q.   And what are you explaining in your percentage of

16  volume limit?

17  A.   All right.  So as we talked about on June 30th, 2011,

18  affiliates are only allowed to sell 9600 shares in the three

19  month prior to that -- in the three months prior to that.

20       The selected accounts sold 262,794 shares, and

21  that's 2,737 percent of that volume limitation.  That's how

22  much they exceeded it.

23  Q.   So if I understand you correctly, if one of these

24  accounts, MicroCap, MeadPoint, Bayside, or William Sears --

25  and to be clear, the two MicroCap accounts,

Direct - Scoufis

1    or Mr. William -- or were affiliates to FusionPharm, the

2    most they could sell is 9,600 shares in the previous three

3    months.

4    A.    Correct.   And when we're looking at the selected

5    accounts sold, the five accounts combined together, that is

6    because Rule 144 asks for groups, individuals that are under

7    common control or acting together, for you to combine up

8    those shares.

9         So as William Sears appears to control Bayside,

10   MeadPoint, and MicroCap, and, of course, his individual

11   account, I felt it appropriate to add them all up into one

12   number.

13   Q.    So you're essentially regarding those entities as

14   one?

15   A.    Yes.   Exactly.

16   Q.    For purposes of your Rule 144 affiliation volume?

17   A.    Correct.

18   Q.    And so based upon the shares that were sold in the

19   previous three months, the 262,794 shares, that would be

20   2,737 percent above the 9,600 allowed?

21   A.    Exactly.

22   Q.    All right.   Let's just do another example for the jury.

23   Could we have 9-30-2013 blown up.

24        Now, you picked the date September 30th, 2013,

25   which would mark, based upon your picking of the date, the

Direct - Scoufis

1    end of the third quarter for 2013.

2    A.    Yes.

3    Q.    Okay.  And, again, 56,757 would be the 1 percent volume

4    limitation that an affiliate could sell regarding

5    FusionPharm stock in the last three months?

6    A.    That's right.

7              MR. BARNARD:  Object.  Leading.

8              THE COURT:  Sustained.

9    BY MR. SIBERT:

10   Q.    What does 56,757 represent?

11   A.    All right.  So that is the total amount of shares that

12   an affiliate can sell on September 30th, 2013, for the

13   preceding 90 days.

14   Q.    Okay.  And what does 2 million-plus shares show here in

15   your diagram?

16   A.    All right.  Yeah, that's the total amount of shares

17   sold by the -- by MeadPoint, MicroCap, Bayside, and

18   Williams.  Should be noted 1.5 million of those shares were

19   not sold in the public markets, they're -- they are the

20   shares sold to Myron and Sharryn Thaden and Richard Scholz,

21   but Rule 144 asks for them all to be combined together.

22   Q.    And then since they were sold, what is the percentage

23   over the 1 percent amount allowed?

24   A.    All right.  So that's 3,585 percent.

25   Q.    All right.  Thank you.

Direct - Scoufis

1          And, sir, can you look at Government Exhibit 303.

2    Did you create Government Exhibit 303?

3    A.   Yes, I did.

4    Q.   Okay.  And essentially what records did you rely on to

5    create Government Exhibit 303?

6    A.   Brokerage records for the five accounts we've

7    discussed.

8    Q.   And that would include the Oppenheimer, Scottsdale, and

9    Alpine brokerage accounts?  I'm sorry, the MeadPoint,

10   MicroCap, MicroCap, Bayside, and William Sears accounts.

11   A.   Correct.

12   Q.   And those came from the brokerage accounts associated

13   to each account?

14   A.   That's right.

15   Q.   And how many records are in those brokerage accounts

16   that you reviewed to create this diagram?

17   A.   Hundreds, if not thousands.

18          MR. SIBERT:  Your Honor, at this time the

19   Government would like to move into evidence Government

20   Exhibit 303.

21          THE COURT:  Is there an objection?

22          MR. BARNARD:  No objection.

23          THE COURT:  There being no objection, Government

24   Exhibit 303 is admitted into evidence and may be published

25   to the jury.

Direct - Scoufis

1    (Government's Exhibit 303 received)

2    BY MR. SIBERT:

3    Q.   Okay, sir, I'm just going to start.  I'm going to kind

4    of piece this all a little bit.

5         Can we just kind of have the first section blown up

6    here, please.

7         Okay, sir, can you just discuss your title and what

8    you're showing regarding your table that includes the date,

9    the amount, sender, and where it went.

10   A.   Yes.  All right.  So we're looking at the wire

11   transfers out of those five accounts that we just discussed.

12   As the wire transfers show up in the brokerage statements,

13   I've just included the date, the amount, and what account it

14   came from in the sender column, the third column, and where

15   that money is going in the fourth column, the recipient

16   column.

17   Q.   Okay.  So if I understand you correctly, this is the

18   date when the money goes to where?

19   A.   All right, so on April 5th, 2011, if we look at that

20   first row, $2,682.66 is sent -- is wired from MicroCap's

21   Oppenheimer account to his account -- or MicroCap's account

22   at Wells Fargo.

23   Q.   Okay.  And so just for -- on May 2d, 2011, how much is

24   wired from the brokerage account to the Wells Fargo account?

25   A.   On May 2d?  All right.  $5,000 is sent from MicroCap to

Direct - Scoufis

1    Wells Fargo -- to his Wells Fargo account.

2    Q.   Okay.  And, again, you're saying "he."  Who -- based

3    upon your review of the documents, who is MicroCap?

4    A.   William Sears.

5    Q.   Okay.  And then can I just have page 2 quickly, please.

6         You see Bayside in the middle.  Again, essentially

7    the same thing regarding the date, the amount of money

8    that's wired, but instead of MicroCap, we're dealing with

9    Bayside; is that correct?

10   A.   That's correct.

11   Q.   And so it goes from Bayside to a Wells Fargo account?

12   A.   Correct.

13   Q.   Can I have page 3, please.

14        Okay, sir, can you explain your summary that you

15   presented in this table.

16   A.   Sure.  So we've been talking about five accounts.  This

17   is four accounts because William Sears' account at Etrade

18   did not wire out money.  So we're looking at four accounts,

19   and we're just summing up each account line by line.  So

20   MeadPoint is the sender, the recipient is Wells Fargo,

21   account ending in 9917, and the amount that's transferred,

22   wired, is $10,178,830.

23        And then we just repeat that -- those calculations

24   for MicroCap, Oppenheimer, MicroCap at Alpine, and Bayside.

25        MR. SIBERT:  Your Honor, may I have a moment?

Cross - Scoufis

1          THE COURT:  You may.

2          MR. SIBERT:  Your Honor, I'll pass the witness.

3          THE COURT:  Cross-examination.

4          MR. BARNARD:  Thank you, Your Honor.

5                       CROSS-EXAMINATION

6     BY MR. BARNARD:

7     Q.   Mr. -- is it Scoufis or Scoo-fis?

8     A.   Scoufis.

9     Q.   Scoufis.  Could we please have Exhibit 300.

10         Exhibit 300 shows the trading summary that you --

11    you found through your extensive studies in looking at the

12    records?

13    A.   Yes.

14    Q.   And the trading summary indicates that MeadPoint showed

15    3 mill- -- or, excuse me, sold 3- -- approximately 3.2

16    million shares.

17    A.   Correct.

18    Q.   The first -- and the first MicroCap account sold

19    approximately 679,000.

20    A.   Correct.

21    Q.   And the second one about 56,000.

22    A.   Correct.

23    Q.   And Bayside, 140,000.

24    A.   Correct.

25    Q.   And Mr. William Sears sold 18,352?

Cross - Scoufis

1   A.   Correct.

2   Q.   And in the far column, it's -- it shows the net

3   proceeds, and the net proceeds are the amounts that were

4   received by each of those entities or individuals

5   corresponding with the sales of those stocks.

6   A.   Correct.

7   Q.   Now, you surely also ran to determine how many shares

8   Mr. Guy Jean-Pierre sold, correct?

9   A.   If I -- if the question is if I looked for his name,

10  yes, I did.

11  Q.   And, in fact, when you looked for his name, he didn't

12  sell one share, did he?

13  A.   I do not recall seeing his -- his name in brokerage

14  records, no.

15  Q.   Well, you were preparing this in preparation for this

16  case dealing with Mr. Guy Jean-Pierre, correct?

17  A.   Correct.

18  Q.   And so if he had shown up as having sold shares, you

19  would have put him in there in big letters, wouldn't you?

20  Or at least put him there.

21  A.   If -- yeah, if he had shown up, I think he would be in

22  here, yeah.

23  Q.   So -- and when you were doing this document, you went

24  through a tremendous number of -- of documents, correct?

25  A.   Correct.

Cross - Scoufis

1    Q.   You went through the trading records, you went through

2    the various packets that we've talked about, and don't you

3    believe that if Mr. Guy Jean-Pierre had sold one share or

4    more of stock, it would have turned up in your -- from your

5    searches?

6    A.   Yeah.  I mean, if -- if Guy Jean-Pierre was trading in

7    his name, yeah, I would have seen it.

8    Q.   And so you would agree with me that Mr. Guy Jean-Pierre

9    did not trade any stock in his name from FusionPharm?

10   A.   Yeah, I -- I do not recall seeing Guy Jean-Pierre in

11   any of the brokerage records, no.

12   Q.   And, therefore, Mr. Guy Jean-Pierre received zero

13   dollars from any sale or any dump-and-pump --

14           THE COURT:  You mean pump and dump.

15   BY MR. GOODREID:

16   Q.   -- pump-and-dump scheme if there was one, correct?  If

17   there was one?

18   A.   Can you repeat that?

19   Q.   Mr. Jean-Pierre -- you testified that you were looking

20   for a pump-and-dump scheme, correct?

21   A.   Yeah.  That's what I was looking at, yes.

22   Q.   And so you didn't find any evidence that he made any

23   money from any kind of scheme or nonscheme with regard to

24   the sale of FusionPharm stock.

25   A.   With regard -- yeah, if I saw anything -- you know, I

Cross - Scoufis

1    have to -- I don't think so, but --

2    Q.   Let me ask it differently.  You got a trading summary

3    here, and you list all the people that you think were a part

4    of some sort of a scheme, right?  Entities and people that

5    made -- that sold FusionPharm stock.

6    A.   These are people that sold FusionPharm stock, correct.

7    Q.   And Mr. Guy Jean-Pierre did not sell any stock and did

8    not receive a penny for the sale of FusionPharm stock, that

9    you know of.

10   A.   That I know of, I -- I don't know -- yeah, I -- he -- I

11   didn't see his name in the stock and I don't think that I

12   saw payment information, no.

13   Q.   And you have no reason to think that -- or let me

14   change that.

15       You have no evidence that Mr. Guy Jean-Pierre sold

16   any stock in somebody else's name.

17   A.   Correct.

18   Q.   Now -- thank you.

19       Let's take a look at Exhibit 281.  This is an

20   example of several different pie charts that you made.

21   A.   Correct.

22   Q.   And in the making of these pie charts, you did some

23   analysis of a large amount of documentation.

24   A.   Correct.

25   Q.   Now, it took you a lot of time and a lot of work to

Cross - Scoufis

1    prepare this and the other charts.

2    A.   Yes.

3    Q.   This wasn't just a simple "whip it up in five minutes"

4    kind of a deal.

5    A.   Not for me, no.

6    Q.   In fact, you used the computer to help you, right?

7    A.   Yes.

8    Q.   Both in producing the chart, but also in doing your

9    search of that massive quantity of information that you used

10   to prepare this chart.

11   A.   Yes.

12   Q.   You lose -- you used algorithms to search for things?

13   A.   Yeah.  Yes.

14   Q.   Did you use a specific program?

15   A.   Yes.  I used multiple programs.

16   Q.   You used multiple programs.  And could you name a few

17   of them.

18   A.   Sure.  Microsoft Excel, Microsoft Word, and Microsoft

19   Access.  And I suppose I used Google Chrome as well.

20   Q.   I'm sorry, did you use any programs that specifically

21   searched the -- your document and databases?

22   A.   I mean, I've searched through PDFs, if that's what

23   you're referring to.

24   Q.   I'm asking you.  How -- did you use any kind of a

25   special program?

2071
Cross - Scoufis

1    A.    Sure.  Adobe Acrobat for PDFs.

2    Q.    And so you needed these -- the programs to do it,

3    right?

4    A.    Needed them?  That's -- yeah, I -- I mean, I suppose I

5    could have --

6    Q.    Because the document -- the information you were

7    seeking, in fact, was spread out in many different places.

8    A.    Correct.

9    Q.    And you did all of these documents -- when I say

10   "documents," I mean Exhibit 281 and the other pie charts in

11   particular right now -- you did these all after the fact.

12   In other words, after all of the activity that was being --

13   that's been put in it had completed.

14   A.    Right.  This was all historical for me.

15   Q.    So it would have been much more difficult, wouldn't it,

16   to have been able to have created this at -- in real time?

17   A.    I don't know.  I don't know that I can agree with that.

18   I think that this could be created in real time --

19   Q.    Okay.

20   A.    -- sure.

21          I mean, I looked at three years, so that amount of

22   time spread over three years, it could happen, sure.

23   Q.    All right.  And do -- go back to some of the material

24   that you used for either this pie chart or some of the other

25   charts you created.

2072

Cross - Scoufis

1      You took information from, I believe you were

2   saying, numbers of times from the transfer packages?

3   A.   Correct.

4   Q.   You used information from brokerage records.

5   A.   Correct.

6   Q.   And the information that you used from the transfer

7   packets and the brokerage records, you subpoenaed or -- you

8   or somebody subpoenaed those records, right?

9   A.   Yeah.  I think somebody did.  It wasn't me, but, yeah,

10  somebody did.

11  Q.   Somebody had to subpoena those records.

12  A.   Yes.

13  Q.   Those records are not open to the public.

14  A.   Yeah, the transfer records and brokerage firm records

15  are not, no.

16  Q.   Thank you.  You can take that down.

17       May I have -- excuse me, Exhibit 287, please.

18       So this is a document that you've called Common

19  Stock with Converted Bayside-MeadPoint notes, correct?

20  A.   Correct.

21  Q.   And on the bottom of it, in the bottom right-hand

22  corner -- can I have that blown up, please -- you say that

23  these numbers were based upon outstanding common stock of

24  29,356,650 shares, right?

25  A.   Right.

2073
Cross - Scoufis

1    Q.   And this was as of 12-31-12.

2    A.   Correct.

3    Q.   The end -- the last day of December 2012.

4             So if I could have Exhibit 286, please.

5             286, same date, right?

6    A.   That's one year earlier.

7    Q.   The same -- let's go to Exhibit 288.

8             288 is six months later, right?

9    A.   Correct.

10   Q.   Six months later, how many outstanding shares are

11   there?

12            MR. SIBERT:  Your Honor, the testimony is about

13   evidence that's not admitted into evidence.

14            MR. BARNARD:  Oh, Your Honor, I'm sorry.

15            THE COURT:  288 is not in evidence?

16            MR. BARNARD:  Your Honor, I would move for the

17   admission of 288.

18            THE COURT:  All right.  I assume the Government --

19            MR. SIBERT:  That's fine, Your Honor.

20            THE COURT:  -- won't object to its own exhibit.

21            MR. SIBERT:  No objection.

22            THE COURT:  There being no objection, Exhibit 288

23   is admitted into evidence and may be published to the jury.

24         (Government's Exhibit 288 received)

25   BY MR. BARNARD:

1    Q.   So Exhibit 288 is a -- I asked you a moment ago, was

2    from June 30th, 2013, correct?

3    A.   Correct.

4    Q.   And if I could have the bottom one blown up, please.

5         As of that date, there were 151,409,650 common

6    stock shares outstanding, correct?

7    A.   Well, that number --

8    Q.   Isn't that what it says?

9    A.   Well, that's half of it.  But it says --

10   Q.   No, no, isn't that what it says?

11              THE COURT:  Let the witness --

12              MR. SIBERT:  Your Honor, let --

13              THE COURT:  I know what I'm doing.  Let the witness

14   finish his answer.

15              THE WITNESS:  Okay.  So if you read the whole

16   sentence, it's calculations based on 1,467,330 preferred

17   shares that are converted.  So those preferred shares are

18   converted into common shares and then added to the existing

19   common shares, for 151,409,650 common stock outstanding.  So

20   that's -- it's two different numbers.

21   Q.   So -- so -- but as of June 30th, 2013, there are 151

22   million outstanding shares.

23   A.   No.  This is a hypothetical.  If they were converted.

24   Q.   So -- so this chart is a hypothetical chart?

25   A.   Yes.  If the preferred stock was converted, this is

Cross - Scoufis

1    what the common shares would look like.

2    Q.   Take the box down, please.  Going back to Exhibit 286.

3    286.

4         Now, this was the one we were talking about before

5    that was a year before 12-31-12; this is 12-31-11.

6    A.   Correct.

7    Q.   And down in the bottom here, we have 151 million of

8    common stock outstanding, correct?

9    A.   Correct.

10   Q.   Is this just a hypothetical, too?

11   A.   Yes, this is exactly the same as the 2013 chart we were

12   looking at in that we're converting the preferred shares --

13   or if they were converted.

14   Q.   Can I -- may I have Exhibit 289, please.

15        289 is on September 3d, 2013, right?

16   A.   Correct.

17   Q.   And this one is only talking now about 7,676,650

18   outstanding FSPM common stock to shares; is that right?

19   A.   That's right.

20   Q.   Is this a hypothetical, too?

21   A.   No, these are the outstanding common stock -- this is

22   outstanding common stock as of September 3d, 2013.

23   Q.   Where's Salt Investment on this one?  Didn't Salt

24   Investment own something then?

25   A.   I do not see Salt Investment on here.

1    Q.    If we can have Exhibit 288.

2            Doesn't Exhibit 288, three months earlier -- less

3    than three months earlier, on 6-30-2013, doesn't it indicate

4    Salt Investment was 128 million shares?

5    A.    Yes.  So this is the common stock with converted

6    preferred shares as opposed to the chart we just looked at

7    on September 3d, which is just the outstanding common

8    stock.

9    Q.    If I could have Exhibit 290, please.

10           Now, if I understood your testimony correctly, you

11   were talking about how some of these numbers here in the

12   beginning was an indication of the pump -- potential pump of

13   a pump-and-dump scheme, correct?

14   A.    Can you repeat that?

15   Q.    When -- on direct examination, didn't you say that some

16   of this information in the circled area was indicating the

17   possibility of the pump part of that pump-and-dump scheme?

18   A.    I don't know about the circled area.  What I'm

19   referring to as the start of the pump-and-dump scheme is,

20   really, we're watching the stock price increase over time.

21   Q.    So the stock price increasing over time, if -- in a

22   pump-and-dump situation, is typically, first of all --

23   let's -- let's go back to what you said at the beginning of

24   your testimony.

25           In a pump-and-dump scheme, the first thing is the

1  individuals gain control of the vast majority of the

2  stock -- or they want to, correct?

3  A.   Correct.

4  Q.   So then they acquire stock so they can get all or

5  almost all of it.

6  A.   Correct.

7  Q.   Then they promote the stock through press releases or

8  other different things that will cause the price to go up.

9  A.   Correct.

10 Q.   And then once the stock prices have increased, they

11 sell.

12 A.   Correct.

13 Q.   And then those people who are doing this scheme make

14 their money because they own the stock and they can sell

15 high before the price falls.

16 A.   Yes --

17 Q.   They dump and make money.

18 A.   That would be the ideal situation.

19 Q.   That's the goal.

20 A.   That's -- that's the goal.  But I don't want to just

21 limit it to selling at the high point.  They have -- people

22 that are doing a pump-and-dump have no reason to only sell

23 at a high point.  They're usually getting shares for

24 fractions of what they're selling it at and they would --

25 they're fine with selling it at any point in time.  It's

2078
Cross - Scoufis

1    just usually with the promotions, you see the stock
2    increase.
3    Q.   Okay.  The -- the Exhibit 290 with the various things
4    that are on it, has the blue line which is the stock price,
5    correct?
6    A.   Correct.
7    Q.   And the green and the red are the stock sales, correct?
8    A.   Pretty much.  So the red is -- are the sales from the
9    selected accounts, and the rest of the bars that are green,
10   you can look at it as two things:  That green bar are the
11   market -- the rest of the market sales, but we have to
12   remember that for every sale, there's a buyer.  And volume
13   is both buy and a sell.  So what this is saying is that the
14   selected accounts accounted for a lot of the sales during
15   this time period, and that the market -- if you just looked
16   at the buys, it would look all green.
17        There were no -- there were no shares bought by the
18   selected accounts.
19   Q.   So the buyers that are on this, by your own definition,
20   on the bottom, are the sale volume -- the sell volume from
21   both selected accounts plus other market volume, correct?
22   Each bar, we understand that's got two colors.
23   A.   Correct.
24   Q.   And so each bar indicates the sales for that -- that
25   time for all of the stock.

Cross - Scoufis

1    A.    Correct.

2    Q.    And are -- are you telling us that there's some

3    correlation here with the sale price going up and

4    manipulating the price by the sales of the stock by the

5    selected accounts?

6    A.    No, that is not what I'm saying.

7    Q.    All right.  So, in fact, there is no -- this -- this

8    diagram does not show any market manipulation, does it?

9    A.    I can't agree with that.

10   Q.    Where's the correlation that shows that?

11   A.    Well, we see the price rising.  This chart doesn't show

12   why the price is rising, but the price is rising, so I

13   can't -- I have my beliefs.  They're not on this chart.

14   Q.    Well, no, I asked you if this chart shows it; not your

15   beliefs.  Does this chart show a market manipulation by the

16   information on this chart?

17   A.    Well, the stock price is increasing.

18   Q.    And, therefore, it -- are you telling me that every

19   time the stock price increases, that means there's been

20   market manipulation?

21   A.    No, that is not what I'm saying.

22   Q.    Okay.  So -- so did some of the information you used

23   come from Bloomberg?  You testified, I think, about

24   Bloomberg, correct?

25   A.    Correct.

1    Q.    And that your company has an account with Bloomberg.

2    A.    Correct.

3    Q.    Or several.

4    A.    Several.

5    Q.    And Bloomberg is a font of information.

6    A.    A what?

7    Q.    Has a lot of information, right?

8    A.    Right.

9    Q.    How much does it cost for each month, to Bloomberg, for

10   an account, if you know?

11   A.    I don't know the exact cost, but Bloomberg terminals

12   are expensive.

13   Q.    So the average run-of-the-mill Joe is not going to

14   have -- is not likely to have a Bloomberg account.

15   A.    A Bloomberg terminal account, no.  But the information

16   that's -- that I pulled from the terminal is all publicly

17   available information that can be seen on many different

18   platforms, including, for example, like Yahoo Finance.

19   Q.    If one knows to search those places and to do the work.

20   A.    Sure.

21   Q.    May I have Exhibit 292, please.

22         This is a price/volume analysis, correct?

23   A.    Correct.

24         And both the price and the sale really spiked

25   here --

1          MR. BARNARD:  Your Honor, is there -- is this
2     admitted?  I would move for the admission of 292.
3          THE COURT:  I assume no objection.
4          MR. SIBERT:  No objection, Your Honor.
5          MR. BARNARD:  May it be published?
6          THE COURT:  Hold on.
7          MR. BARNARD:  Oh, sorry.
8          THE COURT:  Given that there's no objection,
9     Exhibit 292 is admitted into evidence and may be published
10    to the jury.
11         (Government's Exhibit 292 received)
12         MR. BARNARD:  Thank you.
13    BY MR. BARNARD:
14    Q.   So Exhibit 292 is a price/volume analysis over a
15    three-year two-month -- almost two-month period?
16    A.   Correct.
17    Q.   And in that -- in fact, we can see that the price went
18    up early in 2011.  It went across, somewhat plateauing, then
19    it went down, somewhat plateaud, and then in 2- -- the end
20    of 2013, it just jumped dramatically.
21    A.   Yes.
22    Q.   And when it jumped dramatically in 2013, there were a
23    number of people who sold, correct?
24    A.   Correct.
25    Q.   And weren't almost all of the sellers then not the

Cross - Scoufis

1   selected accounts?

2   A.   Almost all of the sellers?

3   Q.   Weren't the vast majority of the sellers not red lines,

4   the selected accounts, but, rather, green lines, the other

5   stockholders?

6   A.   Yeah.  When we look at that -- when we compare the

7   amount of volume to the chart we just previously looked at,

8   during that large spike during 2014, we can see that much

9   less of the volume is due to the selected accounts.

10  Q.   Thank you.  We can take that down.  May I have Exhibit

11  301, please.

12          Exhibit 301 is your Rule 144 affiliate volume

13  calculation, correct?

14  A.   Correct.

15  Q.   And the column here is talking about the three-month

16  volume limit, correct?

17  A.   Correct.

18  Q.   Rule 144 -- Rule 144 regarding limitation on the

19  amounts of securities sold in fact sets forth the three --

20  the volume -- three-month volume rule, correct?

21  A.   Correct.

22  Q.   Subsection E(1), sound about right?

23  A.   I don't know which subsection, no.

24  Q.   All right.  Isn't it true that for the limitation on

25  the amount of securities sold, Rule 144 says that you --

1    that the "Sale of securities of the same class sold for the

2    account of such person within the preceding three months

3    shall not exceed the greatest of:  One, 1 percent of shares

4    or other units of the class outstanding as shown by the most

5    recent report or statement published by the issuer,"

6    correct?  And that's what you testified about.

7    A.    Correct.

8    Q.    But then it says:  "Or 2, the average weekly reported

9    volume of trading in such securities on all of the national

10   securities exchanges and/or reported through the automated

11   quotation system of a registered securities association

12   during the four calendar weeks preceding the filing of

13   notice required by paragraph H, or if no such notice is

14   required, the date of receipt of the order to execute the

15   transaction by the broker or the date of execution of the

16   transaction directly with a market maker."

17        That's 2, isn't it?  That's another option.

18   A.    For some companies, it is another option, but it is

19   not --

20   Q.    And then it -- I'm sorry.

21   A.    It's not an option for over-the-counter companies.

22   Q.    Then it has three.  "The average weekly volume of

23   trading in such securities" reported to -- "pursuant to the

24   effective transaction reporting plan, or an effective

25   national market system plan, as those terms are defined in

Cross - Scoufis

1    Section 242.600 of this chapter, during the four-week period

2    specified in paragraph E(1)(ii) of this section."

3            That's a third choice, too, right?

4    A.   Sure.  Again, not applicable for over-the-counter

5    companies.

6    Q.   With regard to this column, you combined a number of

7    different entities and people.

8    A.   Correct.

9    Q.   And you said that you felt it was appropriate to

10   consider them all as one.

11   A.   Correct.

12   Q.   And you did this based upon -- well, let me go back.

13           Was this a chart that you were able to put together

14   early in your investigation?

15   A.   Was I -- yeah.  Probably, yes.

16   Q.   So you -- you would -- you didn't have -- you already

17   had all this information, you already knew to put them all

18   together early on?

19   A.   Sure.  I mean, it -- yes.  I could put it together

20   early on.  Yes.

21   Q.   And early on for you, though, was, what, about -- what,

22   a year and a half ago, or two years ago?

23   A.   Yeah.  Probably about a year and a half ago.

24   Q.   All right.  So after everything was already done.

25   A.   What do you mean --

2085
Cross - Scoufis

1    Q.   Historic -- everything was historical.  Nothing was
2    still ongoing.
3    A.   Correct.
4    Q.   And you -- you knew, or you chose to, to feel it was
5    appropriate to consider all of these as one based upon your
6    extensive education, experience, and constant daily --
7    literally daily work in this field.
8    A.   Yes, that's my experience.
9    Q.   You testified with regarding to shell companies,
10   correct?  In the beginning, the very beginning, you talked
11   about what they were.
12   A.   Sure, yeah, I think so.
13   Q.   Having a shell company is not illegal, is it?
14   A.   No.
15   Q.   You talked about -- well, a private company purchasing
16   a shell company is not illegal, is it?
17   A.   No.
18   Q.   Failure to comply with all of the 144 requirements,
19   again, is not illegal in and of itself, is it?
20   A.   Can you repeat that?
21   Q.   Failure to comply with all of the Rule 144 requirements
22   is not in and of itself illegal; it's not a crime.
23   A.   It's not a crime to fail to comply?
24   Q.   With all the 144 regulations --
25   A.   The rule is there for a reason; it needs to be complied

2086
Cross - Scoufis

1    with.

2    Q.   And if somebody doesn't comply with it, aren't -- don't

3    they normally get notice and say, "Please give us this or

4    that so that you can comply"?

5    A.   I don't know.  I mean, that's -- that's not my

6    experience.

7    Q.   But your experience is dealing with the criminal side,

8    right?

9    A.   Correct.

10   Q.   All right.  Issuing a press release in and of itself is

11   not criminal, is it?

12   A.   No.

13   Q.   In fact, many and most companies do it.

14   A.   Correct.

15   Q.   Have you ever personally been out in the business world

16   working as a securities attorney being requested to file 144

17   opinion letters?

18   A.   No, I've always worked for FINRA.

19   Q.   And you have a salary that comes to you from FINRA.

20   A.   Correct.

21            MR. SIBERT:   Objection, Your Honor.  Relevancy.  I

22   think beyond --

23            THE COURT:   Yeah, what's the -- I mean --

24            MR. SIBERT:   I think it's beyond --

25            THE COURT:   The jury can assume he's not working

1    for free.  Next question.  At least he's not part of the
2    Government, so he's not part of the shutdown.
3              MR. SIBERT:  I'm not receiving a salary.
4              THE COURT:  Any more questions, Mr. Barnard?
5              MR. BARNARD:  Hhm?
6              THE COURT:  Any more questions?  It's 5 to 5:00.
7              MR. BARNARD:  I understand.  May I have just a
8    moment?
9              THE COURT:  Yes.
10             MR. BARNARD:  If I may have a moment.
11             THE COURT:  You may.
12   BY MR. BARNARD:
13   Q.   Final question.  Mr. Guy Jean-Pierre, to the best of
14   your knowledge, made no money from the sale of FusionPharm
15   stock.
16   A.   Yeah, I did not see money go to Guy Jean-Pierre.
17             MR. BARNARD:  Thank you.  No further questions.
18             THE COURT:  All right.  Mr. Sibert, are we going to
19   conclude the redirect so Mr. Scoufis can go home or does he
20   have to come back on Monday?
21             MR. SIBERT:  I'm hoping I can do this in about
22   seven minutes.
23             THE COURT:  All right.
24             MR. SIBERT:  Maybe 7 to 10 minutes.
25             THE COURT:  I'll give you 10.  We'll go to 5 after

2088
Redirect - Scoufis

1    5:00.

2              MR. SIBERT:  I appreciate that, sir.

3                       REDIRECT EXAMINATION

4    BY MR. SIBERT:

5    Q.    You were asked two very long questions about the

6    securities law regarding three options.  And Mr. Barnard

7    probably relied on the expert to phrase those sections of

8    the law, which was essentially B and C, if I recall

9    correctly.

10             Do you recall those two options that he asked you

11   about?

12   A.    Yes.  Yeah.

13   Q.    And those sections were very long and in terminology

14   that we haven't discussed at all in direct; is that correct?

15   A.    Correct.

16   Q.    All right.  And can you explain to the jury in your

17   terms why those two sections did not apply regarding the

18   facts in this case with FusionPharm being the focus company

19   regarding Mr. Guy Jean-Pierre's involvement as the secretary

20   and legal counsel for the corporation?

21   A.    Okay.  So Rule 144 has different provisions for how

22   you're going to calculate the total amount of shares you can

23   sell during a certain period as an affiliate.

24             As we heard, there's three options.  They involve

25   different types of companies.  So in -- under a big

Redirect - Scoufis

1    umbrella, all FusionPharm and, say, Amazon are all public

2    companies.  But as we look further into it, Amazon is traded

3    on the national exchange, like the New York Stock Exchange

4    or NASDAQ.  And Rule 144 allows for those types of companies

5    to calculate their volume differently.

6           For over-the-counter companies, they can only do it

7    for the 1 percent of the outstanding shares.

8    Q.   Okay.  And does that explain why those two sections

9    don't apply in this case?

10   A.   Yes.

11   Q.   In your expert opinion?

12   A.   Yes.

13   Q.   Can I please have Government Exhibit 292 up.  Can I

14   have that portion blown up there.

15          Now, when you're looking into stocks -- stock

16   activity, do you also look for an event that might affect

17   the price and the increase in volume of a stock?

18   A.   Absolutely.  Yes.

19   Q.   What occurred, essentially, somewhere in this time

20   frame, in the state of Colorado?

21   A.   Yeah, so from my research, I believe what caused a

22   lot -- well, there -- Colorado legalized marijuana during

23   this time period, so I think that really increased interest

24   in FusionPharm.

25   Q.   And that's your expert opinion?

2090

Redirect - Scoufis

1    A.    Yes.

2    Q.    The legalization of marijuana?

3    A.    Yeah.  As FusionPharm was kind of marketed towards that

4    industry, yeah.

5    Q.    And it's hard to see here, there's more volume, but

6    those entities -- the selected entities Mr. Barnard wouldn't

7    let you answer.  In your opinion, in your expert opinion, is

8    that still a large portion of the selling of shares?

9    A.    Yes.  What we were looking at before, that's a huge

10   portion, and this is a very notable portion of the volume.

11   Q.    And, again, the red just means selling.

12   A.    Correct.

13   Q.    Selling of FusionPharm stock.

14   A.    Correct.

15   Q.    By those entities:  MeadPoint, Bayside, MicroCap,

16   MicroCap, and William Sears.

17   A.    Correct.

18   Q.    No buying.

19   A.    So if you actually zoom out -- or, yeah, go back to the

20   full chart, and look at the bottom right-hand corner.  We

21   can see that during -- oh, no, you know what, I'm sorry.

22   This is a little different.  Actually, we're looking at the

23   salmon-colored, pink-colored box.

24         We can see that they bought almost 14,000 shares.

25   And then right above that, we see that they sold over

Redirect - Scoufis

1    4 million shares.

2    Q.   Okay.

3    A.   So yeah, they mostly sold; very little buying.

4    Q.   Okay.  And you were asked about Government Exhibit 287.

5    Can I have that up, please.

6          Okay.  When you read your titles to your pie

7    charts, it explains exactly what the pie chart is showing;

8    would you agree?

9    A.   Yeah, I think so.

10   Q.   Okay.  Can I have 286, please.

11         And the reason why you converted the preferred

12   stock in this pie graph to the common stock conversion --

13   why did you do that?

14   A.   Okay.  A couple of reasons.  First, this is to look at

15   ownership and control.  When we're looking at control --

16   Q.   So let me just stop you right there.  You converted the

17   first stock to control -- to common stock; is that right?

18   A.   Right.

19   Q.   And the purpose of that was to show control?

20         MR. BARNARD:  Your Honor, object.  Leading.

21         THE COURT:  Sustained.

22   BY MR. SIBERT:

23   Q.   Okay.  Why did you convert the shares from preferred to

24   common?

25   A.   Yeah, so I'm trying to look at control.

2092
Redirect - Scoufis

1    Q.   Who controlled what?

2    A.   At who controls FusionPharm.

3    Q.   Okay.  Did Scott Dittman always have his preferred

4    shares, based upon the records you looked at?

5    A.   Yeah.  I think if we go through this, we'll see Scott

6    Dittman have those 130 million shares.

7    Q.   1.3 million preferred shares?

8    A.   Yes.  1.3 million preferred shares.

9    Q.   And if you did the conversion of -- 100 to 1 equals 130

10   million common shares?

11   A.   That's right.

12   Q.   In your expert opinion, is getting conversion -- when

13   you convert stock for a penny, when the stock is being sold

14   for over a dollar, is that a -- what you call a fraction, a

15   good deal?

16               MR. BARNARD:  Objection.  Leading.

17               THE COURT:  Sustained.

18   BY MR. SIBERT:

19   Q.   You recall asking about the pump-and-dump and the

20   controllers usually get shares at the fraction of cost.  Do

21   you recall that?

22   A.   Yes, I do.

23   Q.   Okay.  In your expert opinion, if you could convert

24   shares for one cent, and the stock is being sold over a

25   dollar, what would you regard that when you're speaking

Redirect - Scoufis

1    about a pump-and-dump?

2    A.    Well, yeah --

3    Q.    When a control owner or control person will get a share

4    for 1 cent and the stock is being sold for over a dollar, in

5    your expert opinion, is that a good deal?

6    A.    Yes.  That would be a very good deal.

7    Q.    And you were asked about what records are public and

8    what records aren't.  Now, as FINRA, you can get broker

9    records because that's part of the agreement with you and

10   FINRA; is that right?

11   A.    So the rest of FINRA can.  I am actually walled off

12   from the rest of FINRA and I cannot ask for a brokerage

13   firm's records.  I only look at what is provided to me or by

14   the Government or public records.

15   Q.    Okay.  Would you agree with me that the secretary --

16   the person that holds the office of a secretary of a

17   corporation, and the legal counsel for a corporation --

18   specifically FusionPharm in this case -- in your opinion

19   would that person be able to get the brokerage records for

20   that account or the trading records for that company?

21   A.    They would not be able to get the brokerage records.

22   They would be able to get the transfer agent records and --

23   remember that the company's very important in the Rule 144

24   process, so certainly they could ask additional questions

25   about -- about trading before they sign off.

Redirect - Scoufis

1          THE COURT:  Mr. Sibert, it's 5 after 5:00, I'll let

2     you have one more question.

3     BY MR. SIBERT:

4     Q.   Based upon your experience and in your expert opinion,

5     do all members of a security fraud scheme have to sell

6     shares of stock to participate?

7     A.   Can you repeat that?

8     Q.   Do all members of a security fraud scheme have to be

9     selling stock in order to be a member of the fraud?

10    A.   Absolutely not.

11         MR. SIBERT:  Thank you, Your Honor.

12         THE COURT:  All right.  May this witness be

13    excused, for the Government?

14         MR. SIBERT:  Yes, sir.  Thank you.

15         THE COURT:  For the defendant?

16         MR. BARNARD:  Yes, Your Honor.

17         THE COURT:  All right.  Mr. Scoufis, thank you so

18    much for your testimony.  You're excused.  You may step

19    down.

20         THE WITNESS:  Thank you.

21         THE COURT:  Thank you.  All right.  Ladies and

22    gentlemen of the jury, I've been discussing with the lawyers

23    outside your presence how much more testimony they believe

24    they have.  And my job, my paramount job is to be fair to

25    both sides in this case.  And I have decided, based on

Redirect - Scoufis

1   what's been represented to me by the lawyers, that I have to

2   add a -- I have to lengthen the trial by one day.  So we are

3   going to go until Wednesday.

4          So I ask you to plan your personal affairs

5   accordingly.  But the case will get to you to start your

6   deliberations after closing arguments on Wednesday morning.

7          I have to remind you again, please don't do any

8   independent research into or discuss with anyone the facts,

9   the law, or the persons involved in this case.  We will be

10  in recess until Monday at 8:45.

11         (Proceedings concluded at 5:08 p.m.)

12

13                              **INDEX**

14  Item                                                    PAGE

15                    GOVERNMENT'S WITNESSES

16  **TOD DiTOMMASO (Continued)**
    Direct Examination by Mr. Sibert                        1861
17  Cross-examination by Mr. Goodreid                       1897
    Redirect Examination by Mr. Sibert                      1925
18
    **JOE IVANICH**
19  Direct Examination by Mr. Brown                         1938

20  **ALEX SCOUFIS**
    Direct Examination by Mr. Sibert                        1965
21  Voir Dire Examination by Mr. Barnard                    1972
    Direct Examination by Mr. Sibert (Cont'd)               1974
22  Voir Dire Examination by Mr. Barnard                    1996
    Direct Examination by Mr. Sibert (Cont'd)               1997
23  Voir Dire Examination by Mr. Barnard                    2032
    Direct Examination by Mr. Sibert (Cont'd)               2034
24  Cross-examination by Mr. Barnard                        2066
    Redirect Examination by Mr. Sibert                      2088
25

2096

Redirect - Scoufis

1                           GOVERNMENT'S EXHIBITS

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|-----------|---------|----------|---------|------------|
| 209-A | 1858 | 1859 | | |
| 209-B | 1858 | 1859 | | |
| 209-C | 1858 | 1859 | | |
| 209-D | 1858 | 1859 | | |
| 210-A | 1858 | 1859 | | |
| 211-A | 1858 | 1859 | | |
| 211-B | 1858 | 1859 | | |
| 284 | 1886 | 1986 | | |
| 286 | 1987 | 1987 | | |
| 287 | 1987 | 1997 | | |
| 288 | 2073 | 2073 | | |
| 289 | 2001 | 2001 | | |
| 290 | 2004 | 2004 | | |
| 292 | 2080 | 2081 | | |
| 294 | 2024 | 2026 | | |
| 295 | 2031 | 2034 | | |
| 296 | 2037 | 2037 | | |
| 297 | 2049 | 2049 | | |
| 298 | 2052 | 2052 | | |
| 299 | 2054 | 2054 | | |
| 300 | 2018 | 2018 | | |
| 301 | 2057 | 2057 | | |
| 303 | 2046 | 2046 | | |

Redirect - Scoufis

1                 GOVERNMENT'S EXHIBITS

| 2 | EXHIBITS: | Offered | Received | Refused | Stipulated |
|---|---|---|---|---|---|
| 3 | 404 | 1955 | 1956 | | |
| 4 | 406 | 2046 | 2046 | | |
| 5 | 407 | 2046 | 2046 | | |
| 6 | 408 | 2046 | 2046 | | |
| 7 | 408-A | 2046 | 2046 | | |
| 8 | 408-B | 2046 | 2046 | | |
| 9 | 408-C | 2046 | 2046 | | |
| 10 | 408-D | 2046 | 2046 | | |
| 11 | 408-E | 2046 | 2046 | | |
| 12 | 408-F | 2046 | 2046 | | |
| 13 | 408-G | 2046 | 2046 | | |
| 14 | 410-B | 2046 | 2046 | | |
| 15 | 410-C | 2046 | 2046 | | |
| 16 | 410-D | 2046 | 2046 | | |
| 17 | 410-E | 2046 | 2046 | | |
| 18 | 410-F | 2046 | 2046 | | |
| 19 | 410-G | 2046 | 2046 | | |
| 20 | 410-H | 2046 | 2046 | | |
| 21 | 410-I | 2046 | 2046 | | |
| 22 | 410-J | 2046 | 2046 | | |
| 23 | 410-K | 2046 | 2046 | | |
| 24 | 410-N | 2046 | 2046 | | |
| 25 | 410-O | 2046 | 2046 | | |

2098

Redirect - Scoufis

GOVERNMENT'S EXHIBITS

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|-----------|---------|----------|---------|------------|
| 410-P     | 2046    | 2046     |         |            |
| 411       | 2046    | 2046     |         |            |

*       *       *       *       *

REPORTER'S CERTIFICATE

     I certify that the foregoing is a correct transcript
from the record of proceedings in the above-entitled matter.
     Dated at Denver, Colorado, this 26th day of March,
2020.


                         MaryJGeorge
          _                                              _
                    MARY J. GEORGE, FCRR, CRR, RMR