2099

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
2
   Criminal Action No. 17-cr-0008-WJM
3
   UNITED STATES OF AMERICA,
4
   Plaintiff,
5
   vs.
6
   GUY JEAN-PIERRE a/k/a Marcelo Dominguez de Guerra,
7
   Defendant.
8
   -----------------------------------------------------------
9
                    REPORTER'S TRANSCRIPT
10                   (Jury Trial, Day 10)
                        Volume X
11
   -----------------------------------------------------------
12

13      Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

14  Judge, United States District Court for the District of

15  Colorado, commencing at 9:56 a.m., on the 28th day of

16  January, 2019, in Courtroom A801, United States Courthouse,

17  Denver, Colorado.

18                        APPEARANCES

19      JEREMY S. SIBERT and ROBERT M. BROWN, Assistant U.S.
    Attorneys, 1801 California Street, Suite 1600, Denver,
20  Colorado 80202, appearing for the plaintiff.

21      CLIFFORD J. BARNARD, Attorney at Law, 4450 Arapahoe
    Avenue, Suite 100, Boulder, Colorado 80303, AND
22      THOMAS E. GOODREID, Attorney at Law, 1801 Broadway,
    Suite 1400, Denver, Colorado 80202, appearing for the
23  defendant.

24              MARY J. GEORGE, FCRR, CRR, RMR
            901 19th Street, Denver, Colorado 80294
25      Proceedings Reported by Mechanical Stenography
              Transcription Produced via Computer

1              P R O C E E D I N G S

2         (Proceedings were held in open court outside of the

3    presence of the jury at 9:56 a.m.)

4              THE COURT:  So given the mess this morning, and the

5    delay, I've decided to give the Government 45 minutes extra

6    at the end of the day -- you can sit down, Mr. Brown.

7              MR. BROWN:  Oh.

8              THE COURT:  I said please be seated.  I didn't say

9    please be seated except Mr. Brown.

10             MR. BROWN:  I don't get to stand up very often.

11             THE COURT:  Okay.  At least not in this trial.

12             So Friday I said that I was going to have the

13   Government rest at 3:15 and then we would start our

14   afternoon break.  We're going to take our afternoon break

15   between 3:15 to 3:30, then I'll let the Government, if it

16   needs it, go from 3:30, to 4:15.  And then we'll go straight

17   into the Rule 29 argument.

18             All right, let's bring in the jury.

19        (Jury was present at 9:57 a.m.)

20             THE COURT:  Good morning, ladies and gentlemen of

21   the jury.  Welcome back to day 10 of our jury trial.  What a

22   mess out there this morning, huh?  I thank all of you for

23   your perseverance in getting here.

24             All right.  The Government may call its next

25   witness.

Direct - Funk

1          MR. SIBERT:  Thank you, Your Honor.  At this time,

2     Government would call Special Agent Kate Funk to the stand.

3          THE COURT:  All right.

4          COURTROOM DEPUTY:  Please stand there and raise

5     your right hand.

6          KATE FUNK, GOVERNMENT'S WITNESS, SWORN.

7          COURTROOM DEPUTY:  Okay, please be seated.  State

8     and spell your name for the record.

9          THE WITNESS:  Sure.  My name is Kate Funk.

10    K-a-t-e, F-u-n-k.

11         MR. SIBERT:  May I proceed, Your Honor?

12         THE COURT:  You may.

13                    DIRECT EXAMINATION

14    BY MR. SIBERT:

15    Q.   Good morning, Special Agent Funk.  Could you please

16    tell the jury where you're currently employed.

17    A.   I'm a special agent with the FBI here in Denver.

18    Q.   And how long have you been a special agent with the

19    FBI?

20    A.   Since 2010.

21    Q.   Okay.  And what are your primary duties as a special

22    agent with the FBI?

23    A.   I work on a white-collar squad.

24    Q.   Okay.  And what does white-collar mean?

25    A.   Securities fraud, mortgage fraud, investment fraud,

Direct - Funk

1    those types of cases.  Market manipulation.

2    Q.   Okay.  And how long have you -- as you stated, you've

3    been stationed here in Denver, Colorado; is that correct?

4    A.   Yes.

5    Q.   So your investigations regard cases or investigations

6    for the District of Colorado?

7    A.   Yes.

8    Q.   All right.  Did you become involved in a case -- an

9    investigation regarding FusionPharm?

10   A.   Yes.

11   Q.   Okay.  Can you provide an overview of this

12   investigation.

13   A.   Sure.  The case opened in late 2013 as a referral from

14   the Securities and Exchange Commission.  They had received a

15   complaint from an employee of FusionPharm indicating that

16   employees of FusionPharm were misleading investors, so we

17   had a parallel investigation with them.

18           MR. SIBERT:  Your Honor, do you mind if I hand the

19   witness her water jug?

20           THE COURT:  No.

21           MR. SIBERT:  She's had that cold.

22           THE COURT:  Thank you.

23           THE WITNESS:  Thank you.

24   BY MR. SIBERT:

25   Q.   So you mentioned a parallel investigation.  Can you

Direct - Funk

1    just kind of summarize what that means.

2    A.    Sure.  So typically a parallel investigation with the

3    SEC means we'll work our criminal investigation kind of

4    parallel to their civil investigation.  We don't jointly

5    work the case, but we work kind of at the same pace, like

6    when we do our -- when we did a search warrant, they did a

7    trading suspension at the same time, so we kind of stay

8    covert at the same pace.

9    Q.    And can you explain to the jury essentially what type

10   of evidence that you reviewed regarding your investigation

11   of FusionPharm.

12   A.    Sure.  So in May 2014, we executed a search warrant at

13   FusionPharm.  Prior to that, we reviewed bank records,

14   broker records.  We interviewed a number of ex-employees.

15   We ran an undercover investigation.  That's -- that's the

16   primary information.

17   Q.    Were you able to conduct any seizures in this

18   investigation?

19   A.    Yes.  So on May 16th, 2014, at the time that we

20   executed the search warrant on FusionPharm's business, we

21   also did a seizure warrant -- or a number of seizure

22   warrants for approximately $8 million.

23   Q.    Okay.  Now, as part of your investigation, you stated

24   you interviewed employees; is that correct?

25   A.    Yes.

Direct - Funk

1   Q.   And can you tell the jury essentially what employees
2   that you interviewed.
3   A.   We interviewed the original complainant to the SEC, as
4   well as Kelly Blume.
5   Q.   Okay.  Now, did your investigation lead to what's known
6   as proffers?
7   A.   Yes.
8   Q.   Okay.  Do you -- can you tell the jury who made --
9   what, essentially, is a proffer when it comes to somebody
10  speaking with the FBI?
11  A.   Well, when they come in on a proffer, they have
12  basic -- I think they're called a Queen for the Day letter,
13  that whatever they say to us during that time we will not
14  use that against them as long as it's not inconsistent with
15  later statements that they make, so they have to be
16  truthful.
17  Q.   So it's an opportunity for individuals to speak to law
18  enforcement truthfully having that information used against
19  the person.
20  A.   Yes.
21  Q.   All right.  Now, could you tell the jury if you
22  provided proffers in your investigation regarding
23  FusionPharm?
24  A.   The main proffers were both Scott Dittman and Bill
25  Sears.

1    Q.   Okay.  Now, essentially what did Mr. Sears state about

2    his role with FusionPharm?

3              MR. GOODREID:  Objection.  Calls for hearsay.

4              MR. SIBERT:  I'm not offering it for the truth of

5    the matter asserted, Your Honor, I'm offering it --

6              THE COURT:  What are you offering it for?

7              MR. SIBERT:  I'm offering it for the fact of where

8    the investigation led after Mr. Sears spoke with the FBI.

9              THE COURT:  All right.  Overruled.

10             You may answer, Ms. Funk.

11             THE WITNESS:  Sorry, can you ask that question

12   again?

13   BY MR. SIBERT:

14   Q.   Sure.  What did Mr. Sears admit to regarding his role

15   at FusionPharm during his proffer?

16   A.   He came around to basically saying that he was an

17   undisclosed affiliate of FusionPharm.

18   Q.   Okay.  And also did Mr. Scott Dittman -- did he

19   state -- what did he admit to in his proffer letter -- or

20   proffer offer?

21             MR. GOODREID:  Same objection, Your Honor.

22             THE COURT:  Overruled.

23   BY MR. SIBERT:

24   Q.   You can answer.

25   A.   He later admitted to backdating the promissory notes.

1    Q.   Okay.  And were you able to relate the fact that --

2    based upon these proffers, was there any relationship

3    between Mr. Scott Dittman and William Sears regarding after

4    they spoke to the FBI in their proffers regarding

5    FusionPharm?

6    A.   Sorry, could you ask that question again?

7    Q.   Sure.  After you spoke to Scott Dittman and William

8    Sears, was the FBI -- did they understand the relationship

9    that they had regarding their roles in FusionPharm?

10   A.   Yes.

11   Q.   Okay.  What were the roles in FusionPharm?

12   A.   As -- essentially partners.  That's -- I think Bill

13   Sears would say that.  Scott, I'm not sure that he's

14   completely come around to that.

15   Q.   Okay.  And now based upon Mr. Sears' offer, did your --

16   and his statement that he was basically an undisclosed

17   affiliate, did that lead to corroboration with Mr. Sears?

18   A.   Yes.

19   Q.   Cooperation, I should say, not corroboration.

20   Cooperation.

21   A.   Yes.

22   Q.   How did Mr. Sears offer to cooperate with the FBI?

23   A.   At the end of his first proffer session, he indicated

24   that he had been in communications with Guy Jean-Pierre

25   during the time -- I think his proffer was in February of

Direct - Funk

1    2016.  We had executed our search warrant in May of 2014.

2    So between that time he had been in communication with Guy

3    Jean-Pierre and they had been talking about doing some

4    additional securities work.

5    Q.   Okay.  And so essentially at that point when you knew

6    that Mr. Guy Jean-Pierre and Mr. Sears were still in contact

7    after the search warrant, essentially how did the FBI move

8    forward with Mr. William Sears' wanting to cooperate with

9    his case and with your investigation?

10   A.   We decided to do an undercover operation with Bill

11   Sears' cooperation.

12   Q.   Okay.  And can you explain to the jury essentially the

13   details of this undercover operation.  That --

14   A.   Sure.  So we sat down with Mr. Sears; his attorney; the

15   prosecutor at the time, Ken Harmon; and myself, and we

16   discussed a plan for an undercover operation.  And that plan

17   included taking the company, VertiFresh, and pitching it as

18   a company that wanted to become publicly traded.

19        And we wanted to do some of the things that we

20   thought we -- we believed happened in the FusionPharm case,

21   which was to backdate convertible notes in order to get

22   around the required holding periods, as well as to have Bill

23   Sears running this company again, but not to be disclosed on

24   the financials of the -- of the new company.  As well as

25   just to enlist Guy Jean-Pierre to play that role again of

Direct - Funk

1    being the company attorney who would liaison with a licensed

2    attorney to get opinion letters signed.

3    Q.   Okay.  Who was the target of this undercover

4    investigation?

5    A.   Guy Jean-Pierre.

6    Q.   Okay.  And was there any -- was there anyone from law

7    enforcement that was going to act in that undercover

8    capacity?

9    A.   We also had an FBI undercover.

10   Q.   Okay.  And what was the FBI undercover's role going to

11   be?

12   A.   He was going to be another partner in the business with

13   Billy, but he -- with Mr. Sears, but he would not be

14   disclosed as well.

15   Q.   And what was the goal of the undercover regarding Mr.

16   Guy Jean-Pierre's assistance with security paperwork?

17   A.   So Mr. Sears asked Billy -- asked Mr. Guy Jean-Pierre

18   in the undercover to start to create some of the documents

19   required to get some of the stock free-trading.

20   Q.   Okay.  And what was Mr. Guy Jean-Pierre made known of

21   regarding Mr. Sears' role and the undercover's role, E.J.?

22   A.   I'm sorry, could you repeat the question?

23   Q.   What was Mr. -- what was -- what was told to Mr. Guy

24   Jean-Pierre regarding the undercover's role and Mr. Sears'

25   role?

2109

Direct - Funk

1      MR. GOODREID:  Again, objection, based on hearsay.

2      THE COURT:  Let me read this question.  Who are we

3  talking about?  Who told -- I'm confused by this question.

4  Why don't you --

5      MR. SIBERT:  Can I just rephrase it, Your Honor?

6      THE COURT:  Yes.

7      MR. SIBERT:  Thank you.

8  BY MR. SIBERT:

9  Q.   Now, part of the undercover operation, was

10  communication made with the defendant in this case, Mr. Guy

11  Jean-Pierre?

12  A.   Yes.

13  Q.   Okay.  Can you explain to the jury how the

14  communication was done in the undercover.

15  A.   Sure.  So we started off with a number of phone calls.

16  And so what would happen was myself, and typically another

17  agent, would go and meet Mr. Sears.  We would discuss kind

18  of the plan for what we would want to discuss during the

19  conversation.  And we would sit with Mr. Sears while he made

20  that call.

21      After the call was made, we would typically follow

22  up with an e-mail, kind of reiterating some of the

23  information discussed during the call.

24  Q.   All right.  So let me ask you:  Where were the phone

25  calls being made to be able to reach Mr. Guy Jean-Pierre?

Direct - Funk

1   A.   They were all made from Colorado.

2   Q.   Okay.  And do you know where Mr. Guy Jean-Pierre was

3   located, based upon those phone calls?

4   A.   He was in the Dominican Republic.

5   Q.   Okay.  Now, you testified that after the phone calls a

6   lot of times there was an e-mail sent as a follow-up; is

7   that correct?

8   A.   Yes.

9   Q.   Why was -- why were the e-mails sent?

10  A.   Just to make sure that everything that was relayed in

11  the phone conversation was clear.

12  Q.   Okay.  And could you tell the jury essentially how --

13  well, could you tell the jury essentially what was provided

14  to Mr. Sears prior to the phone calls or the e-mails to Mr.

15  Guy Jean-Pierre.

16  A.   Prior to the phone calls, we would meet with Mr. Sears

17  and we would discuss what we would like to -- for him to

18  discuss in the call with Guy Jean-Pierre.  He'd often

19  provide feedback, too, about what would make sense based on

20  his relationship with Guy Jean-Pierre, and how it would

21  make, then, sense to relay that information.

22        As far as e-mails, I would typically draft the

23  e-mail and then I would send it to Mr. Sears to make sure

24  that it looked like it was coming from him and not from me,

25  as we communicate a little differently.  So -- and then I

2111

Direct - Funk

1   would send the e-mail

2   Q.   So who provided input when it came to these discussions

3   with Guy Jean-Pierre besides the FBI?

4   A.   Mr. Sears provided a lot of feedback as well.

5   Q.   And so did Mr. -- what did Mr. Guy Jean-Pierre know

6   about this VertiFresh company?

7           MR. GOODREID:  Objection.  Calls for speculation.

8           THE COURT:  Sustained.

9   BY MR. SIBERT:

10  Q.   What was Mr. Guy Jean-Pierre told about VertiFresh and

11  E.J. and Mr. Sears' role?

12          MR. GOODREID:  Objection.  Calls for hearsay.

13          THE COURT:  Sustained.

14          MR. SIBERT:  Your Honor, I would ask that that be

15  allowed since it's not being offered for the truth of the

16  matter.  It's going to go to the defendant's knowledge of

17  what was happening.

18          THE COURT:  Well, first of all, who are we talking

19  about?  Who made this communication?  And how it --

20          MR. SIBERT:  Mr. Sears --

21          THE COURT:  How did this witness know about that

22  communication?

23          MR. SIBERT:  I'll rephrase.

24  BY MR. SIBERT:

25  Q.   When Mr. Sears was making these phone calls, were you

Direct - Funk

1    in the presence of Mr. Sears?

2    A.    Often I was.

3    Q.    Okay.  And if you weren't in the presence, who was?

4    A.    Kristen Varel, another agent.

5    Q.    And were you able to read her reports on these e-mails,

6    or the phone calls?

7    A.    Yes, I was.  I listened to the calls.

8    Q.    Okay.  So you're aware of what the conversation was

9    between Mr. Sears and Mr. Guy Jean-Pierre?

10   A.    Yes.

11   Q.    Okay.  And what was Mr. Guy Jean-Pierre told about Mr.

12   Sears' role?

13   A.    He was told that Mr. Sears would be running VertiFresh

14   along with E.J., but did not want to be on any of the

15   documents -- the formal documents representing VertiFresh.

16   Q.    Okay.  And how about regarding the notes that were

17   supposed to be set up with VertiFresh?  What was Mr. Guy

18   Jean-Pierre told then?

19            MR. GOODREID:  Objection.  Based on hearsay.

20            THE COURT:  Are we talking about what did Mr. Sears

21   tell --

22            MR. SIBERT:  Yes.  Mr. Sears.

23            THE COURT:  Let's include the speaker in the

24   question --

25            MR. SIBERT:  Yes, sir.

Direct - Funk

1          THE COURT:  -- and we're not -- is it -- are you
2     offering this for the truth of the matter?
3          MR. SIBERT:  No, sir.
4          THE COURT:  All right.  Okay.  Let's rephrase.
5     Let's include the speaker.  And then on that basis the
6     objection is overruled.
7          MR. SIBERT:  Thank you.
8     BY MR. SIBERT:
9     Q.   What did Mr. Sears tell Mr. Guy Jean-Pierre regarding
10    the notes in this undercover operation regarding VertiFresh?
11    A.   I -- originally I think he told him that the money
12    coming in was over a year old.  Then his story is -- as his
13    position changed with Guy, is Guy -- Mr. Jean-Pierre was
14    asking about time for these deposits.
15         Mr. Sears told him that the money -- some of the
16    money was recent money, some of it was hand-shake deals,
17    some of it was cash, indicating basically that the money had
18    not been -- all the money had not been promised to him from
19    E.J. within -- over a year.
20    Q.   Okay.  And do you recall how Mr. Guy Jean-Pierre
21    reacted when he heard that the money wasn't over a year old?
22    A.   I believe he said something along the lines of, "I hope
23    no one's listening."
24    Q.   And now also essentially when it came to the lawyer,
25    what did Mr. Sears communicate to Guy Jean-Pierre regarding

1    having another lawyer sign the Rule 144 letters?

2    A.   Mr. Sears indicated that he knew Guy Jean-Pierre could

3    not sign the letters that would be required -- the opinion

4    letters, and that he was asking Guy if he had another

5    attorney that would be able to assist him with that similar

6    to how DiTommaso helped in the FusionPharm case.

7    Q.   Okay.  And how did Mr. Guy Jean-Pierre respond to Mr.

8    Sears' request regarding the lawyer?

9    A.   Originally, he said he would work on it and then he did

10   finally identify an attorney.

11   Q.   Now, based upon this undercover operation regarding

12   VertiFresh, how did you -- why did the FBI come up with this

13   plan with Mr. Sears and Undercover Agent E.J. in using this

14   company, VertiFresh, as a company that was wanting to go

15   public?

16   A.   Well, Mr. Sears and Mr. Jean-Pierre had been talking

17   about an actual company that was looking to go public and

18   for Guy Jean-Pierre to do the work for that company, but

19   obviously it wouldn't make sense for the FBI to work an

20   undercover with an actual publicly traded company.  We would

21   be creating additional victims.  So we had to kind of create

22   a new scenario.

23   Q.   All right.  So essentially it was safeguarding the

24   investigation not to allow any further victims in a real

25   company?

Direct - Funk

1    A.    Yes.

2    Q.    All right.  Can you look at Government Exhibit 323.

3          Okay.  Do you recognize Government Exhibit 323?

4          THE COURT:  She doesn't have it.  Oh, I thought --

5          THE WITNESS:  I can see it.  I really can't read it

6    on the screen, so she's --

7          THE COURT:  Hold on.  Did you want her to have the

8    hard copy?

9          MR. SIBERT:  We can get the hard copy, too, but I

10   was just talking about the screen.  I'm sorry.

11         THE COURT:  It's just one page.  Okay.

12         MR. SIBERT:  And I was just going to move to admit

13   it into evidence since it's stipulated to.

14         THE COURT:  First, let me find out, is there an

15   objection to 323?

16         MR. GOODREID:  There's not, Your Honor.

17         THE COURT:  There being no objection, Exhibit 323

18   is admitted into evidence and may be published to the jury.

19       (Government's Exhibit 323 received)

20   BY MR. SIBERT:

21   Q.    Okay.  Do you recognize Government Exhibit 323?

22   A.    Yes, I do.

23   Q.    Okay.  And can you tell the jury essentially what

24   Government Exhibit 323 is.

25   A.    This is the e-mail exchange between the -- the e-mail

Direct - Funk

1    account I had set up for Bill Sears and Guy Jean-Pierre from

2    March through late April 2016.

3    Q.    Okay.  And why did you set up the e-mail account for

4    Mr. Sears?

5    A.    Because I wanted to be able to monitor it.

6    Q.    So essentially controlling Mr. Sears?

7    A.    I wanted to be able to control the e-mail

8    communication.

9    Q.    Okay.  Now, you heard Mr. Sears testify in this case;

10   is that correct?

11   A.    Yes.

12   Q.    Okay.  And there was various questions about a script;

13   is that -- do you recall those questions?

14   A.    Yes.

15   Q.    Okay.  Could you just tell the jury -- could you

16   explain to the jury, each time Mr. Sears had communication

17   with the defendant in this case, what was provided to Mr.

18   Sears?

19   A.    During the phone conversations, he -- we sat down and

20   we discussed high-level items that we wanted him to discuss

21   with Guy Jean-Pierre on the phone.  For e-mail

22   conversations, like I said, I would often draft it, send it

23   to Mr. Sears, he would modify it, make it look like it was

24   coming from him, use lingo that he used with Guy and send it

25   back to me.

2117

Direct - Funk

1    Q.   Was he -- did he ever stick to a disciplined script,
2    *per se*?
3    A.   No.
4    Q.   Okay.  So who added input when there was communication
5    between Mr. Sears and Mr. Guy Jean-Pierre?
6    A.   Mr. Sears added quite a bit of input.
7    Q.   All right.  So I just want to just focus here real
8    quick.  Can I have -- just have that blown up, please.
9           Is this the e-mail account, wjsears513@gmail.com,
10   is that the e-mail that you set up for Mr. Sears when he was
11   cooperating with law enforcement?
12   A.   Yes.
13   Q.   And then looking at this e-mail,
14   advisor@flbusinesshelp.com, do you know whose e-mail that
15   is?
16   A.   That's the e-mail for Guy Jean-Pierre.
17   Q.   All right.  Can we please go to -- can we scroll up a
18   little bit.  Can we just focus in on March 7th and 8th,
19   please.
20          Okay.  Do you recognize Government Exhibit -- or,
21   excuse me, do you recognize the conversations going on here
22   on March 7th, 2016, and March 8th, 2016?
23   A.   I do.
24   Q.   Can you tell the jury essentially what is being
25   communicated between Mr. Sears and Mr. Guy Jean-Pierre.

Direct - Funk

1    A.    When we discussed bringing VertiFresh back and making

2    it a potentially publicly traded company, Guy Jean-Pierre

3    requested to review the business plan and so we sent that to

4    him.

5    Q.    What is attached to the e-mail regarding March -- March

6    8th, 2016?

7    A.    That's the VertiFresh business plan.

8    Q.    All right.  Can you -- can I please have Government

9    Exhibit 324 for the witness.

10         Do you recognize Government Exhibit 324?

11   A.    I do.

12   Q.    And what is Government Exhibit 324?

13   A.    That's the business plan that we sent him.

14   Q.    And when you sent him, you're talking about March 8th,

15   2016?

16   A.    Yes.

17         MR. SIBERT:  Your Honor, at this time the

18   Government would like to move into evidence Government

19   Exhibit 324.

20         THE COURT:  Is there an objection?

21         MR. GOODREID:  No, Your Honor.

22         THE COURT:  All right.  There being no objection,

23   Exhibit 324 is admitted into evidence and may be published

24   to the jury.

25         (Government's Exhibit 324 received)

Direct - Funk

1    BY MR. SIBERT:

2    Q.   Okay.  Essentially, Agent Funk, this document is

3    approximately 25 pages long.  Why was the business plan for

4    VertiFresh sent to Mr. Guy Jean-Pierre?

5    A.   He requested it.

6    Q.   Okay.  And do you know why Mr. Guy Jean-Pierre

7    requested this business plan?

8    A.   Probably he just wanted to get up to speed on the new

9    business.

10   Q.   All right.  Can I have Government Exhibit 323 back,

11   please.  And can we just focus in on the bottom, please.

12            Okay.  Do you recognize the date of this e-mail

13   being March 11, 2016?

14   A.   Yes.

15   Q.   All right.  And you reviewed these e-mails prior to

16   your testimony today; is that correct?

17   A.   Yes.

18   Q.   Can I have page 2 of 323, please.  Can you please focus

19   in on these two paragraphs.  I need -- I need this blown up.

20   Whoop.

21            Okay.  Agent Funk, can you explain essentially what

22   Mr. Sears is communicating to Mr. Guy Jean-Pierre regarding

23   this e-mail starting with "The CEO."

24   A.   Sure --

25            THE COURT:  Excuse me, Ms. Funk.  Can we get this

Direct - Funk

1    any larger?

2              MR. SIBERT:  I don't know, Your Honor.

3              THE COURT:  That's why I'm asking.

4              MR. SIBERT:  I think that helps, but can we try to

5    blow it up, just these two?  That's as big as it gets?

6              This is as big as it gets, Your Honor.

7              THE COURT:  All right.

8    BY MR. SIBERT:

9    Q.   All right.  So can you just communicate to the jury

10   essentially what Mr. Sears is telling Mr. Guy Jean-Pierre in

11   this paragraph.

12   A.   Sure.  So Mr. Sears is telling Guy Jean-Pierre that

13   they're going to be putting Phil Morgan in as the CEO of

14   VertiFresh, but E.J., who's the FBI undercover, as well as

15   Sears, are actually going to be the ones running things, and

16   Phil is just going to be there for the paper.

17   Q.   And that's stated right here where it says "E.J. and I

18   are going to be running things but Phil will be on paper"?

19   A.   That's right.

20   Q.   Okay.  And this is going to Mr. Guy Jean-Pierre --

21   A.   Yes.

22   Q.   -- the e-mail?

23         Okay.  All right.  And what else does it say in

24   that paragraph?

25   A.   "Once the shell is confirmed, we're going to need to

Direct - Funk

1    get shares to E.J. and me," so basically they're talking

2    about wanting to get stock right away and Mr. Sears talks

3    about wanting to get his offshore.

4    Q.   Okay.  And what was the purpose of getting stock right

5    away?

6    A.   They indicated they needed cash.  Mr. Sears indicated

7    he didn't -- he needed cash as well as E.J.

8    Q.   Okay.  Was this going to be restricted stock or stock

9    that could be traded, free and clear?

10   A.   They were looking to get free-trading stock right

11   away.

12   Q.   And what does Mr. Sears tell Guy Jean-Pierre about his

13   role?

14   A.   They're going to be using Guy Jean-Pierre for all the

15   legal documents.

16   Q.   Okay.  Can I please go down -- can I scroll up a little

17   bit, please, to March 30th, 2016.  Can you try to blow that

18   up, please.  Okay.

19         Have you reviewed the March 30th, 2016, e-mail from

20   Mr. Sears?

21   A.   Yes.

22   Q.   Or, excuse me, from Guy Jean-Pierre.

23   A.   Yes.

24   Q.   Okay.  Can you tell the jury what Mr. Guy Jean-Pierre's

25   telling Mr. Sears.

Direct - Funk

1    A.    He's attaching a consulting agreement.

2    Q.    Okay.  And do you know why Mr. Guy Jean-Pierre was

3    sending a consulting agreement to Mr. Sears?

4    A.    Yeah, they had discussed a way for both Mr. Sears and

5    Guy Jean-Pierre to have documents showing why they're

6    getting paid by the company VertiFresh.

7    Q.    And it's in the first line where Mr. Guy Jean-Pierre

8    talks about this consulting agreement; is that right?

9    A.    Yes.

10   Q.    Okay.  And this is the attachment?

11   A.    Yes.

12   Q.    Can you please look at Government Exhibit 325.

13         Do you recognize Government Exhibit 325.

14   A.    I do.

15   Q.    And what is Government Exhibit 325?

16   A.    It's the drafted document for Mr. Sears and Guy

17   Jean-Pierre to be consultants to VertiFresh.

18   Q.    And how did you receive this -- who -- excuse me, how

19   did you receive Government Exhibit 325, the VertiFresh

20   consulting agreement?

21   A.    That was attached to the e-mail.

22   Q.    From who?

23   A.    From Guy Jean-Pierre.

24         MR. SIBERT:  Your Honor, at this time the

25   Government would like to introduce Government Exhibit 325

2123
Direct - Funk

1    into evidence.

2              THE COURT:  Any objection?

3              MR. GOODREID:  No, Your Honor.

4              THE COURT:  All right.  There being no objection,

5    Exhibit 325 is admitted into evidence and may be published

6    to the jury.

7         (Government's Exhibit 325 received)

8              MR. SIBERT:  Thank you.

9    BY MR. SIBERT:

10   Q.   So this is a document that Mr. Guy Jean-Pierre created

11   and sent to Mr. Sears during the undercover operation?

12   A.   Yes.

13   Q.   Thank you.  Can I have page 3 of Government Exhibit

14   323.  I'm going to need -- can you come out.  Can you blow

15   up this paragraph, please.  That's as big as you can go?

16   Thank you.

17              All right.  Have you had time to review the e-mail

18   for Mr. Sears to Mr. Guy Jean-Pierre on March 31st, 2016?

19   A.   Yes.

20   Q.   Okay.  And I'd like you to focus on the first couple of

21   lines.  Can you tell the jury what Mr. Sears is telling Mr.

22   Guy Jean-Pierre.

23   A.   They're talking about drafting a convertible note to

24   allow both Mr. Sears and E.J. to receive free-trading stock

25   as soon as they've acquired the shell.

Direct - Funk

1    Q.   What's the conversion rate?

2    A.   The conversion rate is a penny a share, whichever is

3    greater, the penny or the average closing bid price.

4    Q.   Okay.  And who's going to -- who's going to receive

5    payment regarding these shares of stock?

6    A.   So this will be for both E.J., the FBI undercover, as

7    well as Mr. Sears and Mr. Guy Jean-Pierre to get paid.

8    Q.   Okay.  And how much will E.J. receive?

9    A.   They're going to split it.  E.J. would get half and

10   then Mr. Sears and Guy Jean-Pierre would get the other

11   half.

12   Q.   Okay.  And can you tell the jury what is being said in

13   paragraph A.

14   A.   Mr. Sears is asking if he's -- can identify an attorney

15   that can sign the opinion letters prior to their visit --

16   their trip to Miami.

17   Q.   Can I have page 4, please.  Can you scroll down,

18   please.  Okay.  Can you blow up the first paragraph, right

19   here.  That's as big as it gets?

20        Okay.  Agent Funk, can you tell me what Billy Sears

21   is stating in this first sentence here.

22   A.   So he's talking about the -- the business name that

23   E.J.'s going to be using for the note so that he says it's

24   Thor Investments International.  That's a company for E.J.,

25   And then signing for VertiFresh will be Phil Morgan.

Direct - Funk

1  Q.  All right.  So can you explain to me essentially how

2  this is similar to what was being -- what happened in your

3  investigation regarding FusionPharm?

4  A.  So the -- I guess the similarity is that VertiFresh

5  is -- being the CEO of VertiFresh is Phil Morgan, and

6  there's no disclosure of Mr. Sears running the company or

7  E.J. running the company.  As well as the note is for a

8  penny a share, similar to FusionPharm, and also similar in

9  that we're asking Guy Jean-Pierre to start putting together

10  some of these documents.

11  Q.  All right.  And so what is Thor doing for VertiFresh?

12  A.  Thor's going to be the lender on the note.

13  Q.  Okay.  And then what kind of note is Thor going to

14  receive from VertiFresh?

15  A.  They're going to get a convertible note that's

16  convertible into stock.

17  Q.  Okay.  And what's the conversion rate for Thor to

18  convert their note into shares of stock?

19  A.  A penny a share.

20  Q.  Okay.  And who's going to get these shares of stock?

21  A.  They're going to go into the name Thor Investments

22  International, but they're going to disburse the profits 50

23  percent to E.J., and the other 50 percent shared between Guy

24  Jean-Pierre and Mr. Sears.

25  Q.  Thank you.  Okay.  And can you tell the grand jury --

Direct - Funk

1    or, excuse me, the jury what's going on in C here.
2    A.   So Mr. Sears is talking about the money.  So often when
3    you have a note -- or when we looked at the FusionPharm
4    case, when they had a convertible note, the transfer agent
5    asked for proof of the funding of the note, and so he's
6    anticipating that they're going to need to do that again.
7    The attorney transfer agent when they present this
8    convertible note is going to say, "Where's the $50,000?
9    When did it come in?  We need to make sure it's over a year
10   old."
11         So Billy in the e-mail says, "I know you were
12   concerned about the authentication for the transfer agent
13   being the cash payments and the timing of such.  I have
14   other deposits from different deals that I can point to and
15   use for authentication purposes when the time comes to
16   submit to the transfer agent."
17         So he's representing that the money is not from
18   E.J., but, rather, from different deals.  But that they
19   would use that when the transfer agent asked for proof of
20   funding from E.J.'s company.
21   Q.   And who is Mr. Sears telling this to?
22   A.   That's to Guy Jean-Pierre.
23   Q.   And then can you touch on paragraph 3 for the jury,
24   what Mr. Sears is telling Mr. Guy Jean-Pierre in
25   paragraph 3.

Direct - Funk

1    A.   So he's following up on the phone conversation, but

2    he's talking about his last bit of FusionPharm stock sales

3    cash that he had a friend holding onto, but he needs to get

4    it moved out of that account and he's willing to pay Mr. Guy

5    Jean-Pierre a fee for that -- for moving the money for him.

6    Q.   And where is he discussing to move the money to,

7    regarding this paragraph?  Where is Mr. Sears wanting to

8    move the money to?

9    A.   Somewhere where it's safe.

10   Q.   Okay.  And based upon your undercover, where is that?

11   A.   The Dominican Republic.

12   Q.   Okay.  And who's going to help control where the money

13   goes, based upon your undercover?

14   A.   Guy Jean-Pierre would help him with that.

15   Q.   And what percentage was Mr. Guy Jean-Pierre going to

16   receive for helping Mr. Sears move this money to the

17   Dominican Republic?

18   A.   A 5 percent fee.

19   Q.   Can you please go -- scroll down, please.

20        Can you tell the jury essentially what is going on

21   with this e-mail from Mr. Sears to Mr. Guy Jean-Pierre.

22   A.   Guy is telling Mr. Sears that he has successfully found

23   an attorney who would be able to handle the 144 opinion

24   letter.

25   Q.   Okay.  So this is an e-mail from Mr. Guy Jean-Pierre to

1    Mr. Sears; is that right?

2    A.    Yes.

3    Q.    And essentially what does Mr. Guy Jean-Pierre tell

4    Sears?

5    A.    That he's found an attorney to handle the 144 opinion

6    letter.

7    Q.    And what did -- as an investigator in this undercover,

8    why was this important that Mr. Guy Jean-Pierre sent this

9    e-mail telling you that there was an attorney found for the

10   144 letters?

11   A.    Well, because he would be able to have someone --

12   help -- help facilitate getting those letters signed.

13   Q.    Okay.  And essentially what does the 144 -- what would

14   the 144 letter allow E.J. and Sears to do in this undercover

15   case?

16   A.    Right.  So as soon as they present that convertible

17   note to a transfer agent, they would be looking for an

18   opinion letter, and that would be the only way they would be

19   able to get that stock free-trading.

20   Q.    So to get the stock unrestricted?

21   A.    Yes.

22   Q.    Okay.  Can I have page 5, please.  Can you scroll down

23   to April 14th.  And can you -- is that as big as it gets?

24   Okay.

25              Can you tell the jury what Mr. Sears is telling Guy

1    Jean-Pierre in the first sentence and this third sentence of
2    paragraph 1.
3    A.   So he's saying -- he's telling him who the parties are
4    of the note, and that would be Thor Investments
5    International and VertiFresh, and signing for VertiFresh
6    would be Phil Morgan.  The note's for $50,000 with a
7    conversion rate at a penny a share.
8         And then he says, "As for the note date, I have a
9    cash deposit into VertiFresh's bank account on April 21st,
10   2015, so that we can use that as proof of funding.  It's not
11   from E.J., but since it's cash, we should be able to tie it
12   to the note, right?"
13   Q.   So why is this "it's not from E.J." important?
14   A.   Well, the money has to be from the party that is on the
15   note.  And he's saying that it's not from him.
16   Q.   So Mr. Sears is telling Guy Jean-Pierre that the money
17   is actually from a deposit he made -- Mr. Sears made?
18   A.   I think he's not clear about that.  He's just saying
19   it's a cash deposit into VertiFresh's bank account, but it's
20   not from E.J.
21   Q.   Okay.  Thank you.  Can I have paragraph -- or, excuse
22   me, page 6, please.  Okay.  Can you tell the jury what Mr.
23   Guy Jean-Pierre tells Mr. Sears in the e-mail regarding
24   April 15th, 2016, regarding the bank account.
25   A.   He's telling him that he can use -- I'm sorry, Guy

Direct - Funk

1    Jean-Pierre is telling Mr. Sears that they can use a regular
2    bank account in the DR to move the money that Mr. Sears has
3    in his friend's account, the last of FusionPharm stock
4    sales.
5    Q.   Okay.  And essentially what is Mr. Guy Jean-Pierre
6    providing Mr. Sears?
7    A.   His bank account information in the Dominican Republic.
8    Q.   And he also provides phone numbers; is that correct?
9    A.   Yes.
10   Q.   Now, was -- based upon your undercover operation, was a
11   check ever mailed regarding a deposit into this bank
12   account?
13   A.   Yes.
14   Q.   And for how much?
15   A.   $5,000.
16   Q.   Okay.  And do you know where that check came from?
17   What bank?
18   A.   I believe it was First Bank here in Colorado.
19   Q.   And do you know if it was a check?  What was the
20   instrument?
21   A.   It was a cashier's check.
22   Q.   Okay.  And then do you know how it was sent to the
23   Dominican Republic?
24   A.   Via FedEx.
25   Q.   Okay.  From where?

Direct - Funk

1    A.    From Colorado to the Dominican Republic.

2    Q.    And do you know if it was for deposit into this

3    account?

4    A.    Yes, it was.

5    Q.    All right.  Can I please have -- can you please go

6    down -- scroll down a little bit.  Can you scroll up a

7    little bit?  Thank you.

8              Okay.  And what is -- what is Mr. Guy Jean-Pierre

9    telling Mr. Sears in this April 19th, 2016, e-mail?

10   A.    He's telling him he'll be sending the documents

11   tomorrow.

12   Q.    Okay.  And what are these -- do you know what documents

13   Mr. Guy Jean-Pierre's referencing based upon the

14   conversations Mr. Sears had with Mr. Guy Jean-Pierre?

15   A.    Mr. Sears had requested a drafted convertible note, as

16   well as a nonaffiliate letter, and also an attorney opinion

17   letter, drafts.

18   Q.    Okay.  And who was -- what parties were going to be in

19   this convertible note?

20   A.    Thor Investments International and VertiFresh.

21   Q.    Can I have page 7 of Government Exhibit 323.

22             Okay.  And can you scroll down a little bit,

23   please.  Can you scroll down a little bit more.  Thank you.

24   Whoop.  Right there.  Thank you.

25             All right.  Now, have you reviewed the e-mail from

2132
Direct - Funk

1   Mr. Guy Jean-Pierre on April 23d, 2016?
2   A.   Yes.
3   Q.   Okay.  And what is Mr. Guy Jean-Pierre telling Mr.
4   Sears in this e-mail?
5   A.   He's attaching a revised note together with the
6   proposed conversion box.
7   Q.   Okay.
8   A.   And he also says that there's some holes to be filled
9   and they should be obvious.
10  Q.   And can you look at what is being attached.
11  A.   There's a convertible note as well as a nonaffiliate
12  letter.
13  Q.   Can I have Government Exhibit 328, please.
14       Do you recognize Government Exhibit 328.
15  A.   Yes.
16  Q.   And what is Government Exhibit 328?
17  A.   It's the nonaffiliate letter.  It's -- I'm sorry, it's
18  also a document to be presented to the transfer agent
19  regarding the drawdowns.
20  Q.   Drawdowns of what?
21  A.   Of stock from the note.
22       MR. SIBERT:  Your Honor, at this time the
23  Government would like to move for admission Government
24  Exhibit 328.
25       THE COURT:  Any objection?

2133

Direct - Funk

1      MR. GOODREID:  No, Your Honor.

2      THE COURT:  There being no objection, Exhibit 328

3  is admitted into evidence and may be published to the jury.

4      (Government's Exhibit 328 received)

5  BY MR. SIBERT:

6  Q.  And, essentially, again who sent you this

7  nonaffiliate -- who sent Mr. Sears this nonaffiliation

8  letter?

9  A.  Guy Jean-Pierre.

10  Q.  Okay.  And that was on April 23d, 2016?

11  A.  Yes.

12  Q.  Okay.  Can I have the witness please shown Government

13  Exhibit 327.

14      Do you recognize Government Exhibit 327?

15  A.  Yes.

16  Q.  And what is being shown in Government Exhibit 327?

17  A.  It's a draft convertible promissory note.

18  Q.  Okay.  And, again, who sent this draft convertible

19  promissory note?

20  A.  Mr. Guy Jean-Pierre.

21  Q.  To who?

22  A.  Mr. Sears.

23      MR. SIBERT:  Your Honor, at this time the

24  Government would like to move into evidence Government

25  Exhibit 327.

2134

Direct - Funk

1      THE COURT:  Any objection?

2      MR. GOODREID:  No, Your Honor.

3      THE COURT:  There being no objection, Exhibit 327

4  is admitted into evidence and may be published to the jury.

5      (Government's Exhibit 327 received)

6  BY MR. SIBERT:

7  Q.   Can you please blow that up.

8      How much is the note for?

9  A.   $50,000.

10  Q.   And who would receive the $50,000?

11  A.   VertiFresh.

12  Q.   Okay.  And who would be the holder of the note?

13  A.   Thor Investments International.

14  Q.   Okay.  Can I have Government Exhibit 323 up again,

15  please.  Page 7.  And can you go to the bottom of that page,

16  please.

17      Okay.  Agent Funk, can you please tell me what Mr.

18  Guy Jean-Pierre is telling Mr. Sears on April 23d, 2016, at

19  6:53 p.m. in the e-mail?

20  A.   So he says that he -- he realized that he neglected to

21  send the proposed agreement tying us to Thor, and he's

22  forwarding that now.  Says it's pretty basic, bare bones,

23  and can be extended upon if need be.

24  Q.   So he doesn't use the word -- what word does he use for

25  who's being tied to Thor?

Direct - Funk

1    A.    "Us."

2    Q.    How did you take that when -- regarding the use of "us"

3    when Mr. Guy Jean-Pierre sent that in your undercover

4    operation?

5    A.    Guy Jean-Pierre and Mr. Sears.

6    Q.    And can I please have Government Exhibit 329 shown to

7    the witness.

8          Do you recognize Government Exhibit 329?

9    A.    Yes.

10   Q.    Okay.  And what is 329?

11   A.    That's a purchase and assignment agreement that

12   enables -- sorry -- the seller is the beneficiary of a

13   hundred percent of the ownership interest in Thor

14   Investments International, and is selling 50 percent of that

15   business -- of ownership interest.

16         MR. SIBERT:  Your Honor, at this time the

17   Government would move into evidence Government Exhibit 329.

18         THE COURT:  Is there an objection?

19         MR. GOODREID:  There is not, Your Honor.

20         THE COURT:  There being no objection, Exhibit 329

21   is admitted into evidence.

22       (Government's Exhibit 329 received)

23   BY MR. SIBERT:

24   Q.    Okay.  You were talking about the agreement; is that

25   correct?

Direct - Funk

1    A.    Yes.

2    Q.    And is that where you're getting the language from the

3    agreement?

4    A.    Yes.

5    Q.    Okay.  And could you tell me essentially who sent you

6    this document -- who sent Mr. Sears this document via

7    e-mail?

8    A.    Guy Jean-Pierre.

9    Q.    Okay.  Can I have Government Exhibit 323 brought back

10   up, page 8.  Can you focus on the bottom.  Thank you.  Okay.

11         Can I have from "advisorflbusiness" on Sunday,

12   April 24th, 2016, at 5:54.  So can you go down, please.  All

13   right.  Right there.  Thank you.

14         All right.  Can you tell the jury what Mr. Guy

15   Jean-Pierre is telling Mr. Sears in the first part of this

16   e-mail.

17   A.    So he's sending Mr. Sears the sketch of what the 144

18   debt conversion would look like if he were still in the

19   business of writing opinions.  And so he attaches a drafted

20   attorney opinion letter.

21   Q.    Okay.  And can you tell what Mr. Guy Jean-Pierre is

22   telling Sears -- Mr. Sears in the second paragraph.

23   A.    So he's basically saying that he wants to emphasize

24   that the lawyer that he's contacted for purposes of writing

25   these letters will have his own approach for writing that

1     letter.

2     Q.   Did Mr. Guy Jean-Pierre stick to that statement?

3     A.   No.   That changed during the meeting in Miami.

4     Q.   Okay.   How did that change?

5     A.   He said that he hoped to eventually be drafting these

6     letters again.

7     Q.   Okay.   And can you -- do you see this attachment here?

8     A.   Yes.

9     Q.   And what is that attachment that Mr. Guy Jean-Pierre's

10    sending?

11    A.   It's a drafted 144 opinion letter -- attorney opinion

12    letter.

13    Q.   Could I have Government Exhibit 330, please.

14         Do you recognize Government Exhibit 330?

15    A.   Yes.

16    Q.   And what is that?

17    A.   That's an opinion letter.

18    Q.   Okay.   And who drafted this opinion letter?

19    A.   Guy Jean-Pierre.

20         MR. SIBERT:   Your Honor, may I please have

21    Government Exhibit 330 placed into evidence.

22         THE COURT:   Any objection?

23         MR. GOODREID:   Excuse me.   None, Your Honor.

24         THE COURT:   All right.   There being no objection,

25    Exhibit 330 is admitted into evidence and may be published

Direct - Funk

1    to the jury.

2         (Government's Exhibit 330 received)

3    BY MR. SIBERT:

4    Q.   Okay.  Again, who is the -- essentially who is the

5    shareholder in this drafted 144 Rule opinion letter?

6    A.   Thor Investments International.

7    Q.   Okay.  And what was the debt agreement here?

8    A.   $50,000 convertible promissory note dated April 21st,

9    2015, the record date.

10   Q.   Okay.  Thank you.  Okay.  Agent Funk, can you please

11   look at Government Exhibit 409, which has not been admitted

12   into evidence.

13   A.   Sorry, can I just make one comment about the e-mail?

14   Is the --

15   Q.   Let me go back.  Can I have -- let me have Government

16   Exhibit 323 up, please.  Page 8.  Okay.

17         What -- now, I said -- essentially Mr. Guy

18   Jean-Pierre was sending a template 144.  Was there something

19   else that -- based upon your investigation that you wanted

20   to tell the jury --

21   A.   I just wanted to point out that some of the later

22   e-mails in late April were drafted by another agent, Kristen

23   Varel, on my squad.

24   Q.   Okay.

25   A.   Not by myself.

Direct - Funk

1    Q.   And do you know how many those were?

2    A.   Probably two or three.

3    Q.   Okay.  Did you review those e-mails?

4    A.   Yes.

5    Q.   Okay.  Before they were sent?

6    A.   Yes.

7    Q.   So sometimes you had help in your investigation?

8    A.   Yes.

9    Q.   All right.  Can I have Government Exhibit 40- -- excuse

10   me, 409 shown to the witness.

11             This has not been admitted into evidence.

12             Do you recognize Government Exhibit 409?

13   A.   Yes.

14   Q.   Okay.  And did you create the summary on 409?

15   A.   Yes.

16   Q.   And can you tell the Court essentially what documents

17   you used to create the summary in Government Exhibit 409.

18   A.   Transfer agent documents; over-the-counter, OTC,

19   filings; e-mails; disclosure statements; things along those

20   lines.

21   Q.   Okay.  Everything that's in Government Exhibit 409, do

22   you know if that's been admitted as evidence in this case?

23   A.   I believe so.

24   Q.   Okay.  And, essentially, how many pages of exhibits or

25   documents did you have to look through to create Government

Direct - Funk

1    Exhibit 409?

2    A.    Hundreds of pages.

3              MR. SIBERT:  Your Honor, at this time the

4    Government would move into evidence Government Exhibit 409

5    as a summary exhibit under Rules of Evidence 1006.

6              THE COURT:  Any objection?

7              MR. GOODREID:  Your Honor, defense's position is

8    this is not a proper summary exhibit.  And if I may focus

9    the Court on -- well, let's start with page 5, if I may.

10             THE COURT:  Okay.  Let me -- I'll have to pull it

11   up.

12             MR. GOODREID:  Sure.

13             THE COURT:  What volume is that, Mr. Sibert?

14             MR. SIBERT:  I'm cheating, Your Honor.  I have my

15   own little notebook.  So it's going to be -- one second --

16   it's going to be volume 13, Your Honor.

17             THE COURT:  Oh, here it is.  Over there.

18             MR. SIBERT:  I have a copy if you need to see it.

19             THE COURT:  No, I found it.

20             Go ahead, Mr. Goodreid.

21             MR. GOODREID:  Actually, Your Honor, I beg your

22   pardon.  If I could go to page 4 to start with.

23             THE COURT:  All right.

24             MR. GOODREID:  So, for example -- and, again, I

25   don't want to give too much of the contents, it's not in

1    evidence, but if you look at the first sub-bullet point, it
2    says they discussed, blah blah blah.  Next one says Sears
3    indicated, blah blah blah.  Mr. Morgan, the next one, would
4    be listed.  These are not voluminous writings.  I mean, this
5    is not a series of e-mails, a series of transactions.  This
6    is just statement of facts.  This is a functional equivalent
7    of "The car crossed the road.  The light was green."  The --
8    it's a summary of what -- what this agent might testify and
9    say she was testifying in front of a grand jury.  This is a
10   summary of what she would testify to.  It's not a proper
11   summary exhibit.
12        Your Honor, I can go on with -- it might be a
13   proper demonstrative aid, but it shouldn't come in as
14   substantive evidence.  The same thing -- Your Honor, I can
15   go on if the Court would like, but on page 5, Jean-Pierre
16   assisted, dun, dun, dun.  That's just a statement of fact.
17   That's not a voluminous summary.
18        And that is -- those sorts of assertions -- this
19   document is replete with those sorts of assertions.  So our
20   position, again, it's not a proper 1006 summary.
21        MR. SIBERT:  Can I inquire of the agent about the
22   undercover operation?
23        THE COURT:  Well, first why don't you respond to
24   counsel's objection.
25        MR. SIBERT:  It's voluminous if you read 1006, a

Direct - Funk

1    summary, which essentially can prove the contents of

2    voluminous writings, recordings -- including recordings --

3    that cannot be conveniently examined throughout the process

4    of the court.

5           All the originals have been placed and given to the

6    defense ahead of this trial.  And I did not ask this

7    witness, but I can ask the witness about how many hours of

8    video and recordings there were in the undercover

9    approximately.

10          THE COURT:  Well, that may be, but I think Mr.

11   Goodreid's primary point is that the -- some of the

12   statements here -- not all, but some of these statements are

13   not appropriate 1006 summaries of voluminous documents in

14   that they are -- they are a summary of selected

15   communications or statements -- rather, statements, and

16   communications; for example, like statements pulled out from

17   e-mails.

18          MR. SIBERT:  Okay, well, which ones are those

19   because the -- the summary here is a summary of the

20   discussion that maybe took 30 to 45 minutes on the video or

21   recording.  And so if Mr. Goodreid's objecting, that goes

22   more towards the weight than admissibility under 1006.

23          MR. GOODREID:  Your Honor, I respectfully disagree.

24   I mean, what Mr. Sibert is saying is that there are a lot of

25   facts in this case and he's summarized some of the facts in

Direct - Funk

1    the document.  That's not a proper 1006 summary.  To say

2    that there's a lot of evidence, and "I've culled some of the

3    evidence into a document," that's not a proper 1006 summary.

4    A proper 1006 summary is, as we've seen in other,

5    if there's a lot of financial records, if there's a lot of

6    e-mails, that sort of stuff.  To say, again, the example he

7    used before, these are statements of fact, again, "The car

8    crossed the road, the light was red, the person ran across,"

9    this is not a proper summary of the document.

10    THE COURT:  Right.  I agree with that.  I'm going

11    to sustain the objection.  I will, however, allow 409 to be

12    used as a demonstrative exhibit.  So you can publish it to

13    the jury now, you can examine the witness over this

14    demonstrative exhibit.  You can use the demonstrative

15    exhibit in your closing argument, but it won't -- it will

16    not go back to the jury as an exhibit in evidence.  So

17    409 -- the objection to it is sustained.

18    MR. GOODREID:  And, Your Honor, may we have just an

19    instruction to the jury that they understand this is a

20    demonstrative aid, but not substantive evidence?

21    THE COURT:  Right.  Ladies and gentlemen of the

22    jury, what you're going to see in Exhibit 409 is a

23    demonstrative aid, which is -- the law allows counsel to use

24    when the Court permits it -- permits him or her to do so.

25    And it will -- he can use this exhibit, as you heard me say,

2144

Direct - Funk

1   with -- this exhibit with this witness and you may or may

2   not see this again in closing argument, but it will not be

3   in evidence when you're deliberating.

4           Go ahead, Mr. Sibert.

5           MR. SIBERT:  Can I move for admission of Government

6   Exhibit 408-A through G.  All of those have been stipulated

7   to.

8           THE COURT:  408-A through?

9           MR. SIBERT:  G, golf.

10          THE COURT:  They're already in?  They're already

11  in.

12  BY MR. SIBERT:

13  Q.   You created Government Exhibits 408-A through 408-G; is

14  that correct?

15  A.   Yes.

16  Q.   In the same fashion you created Government Exhibit 409?

17  A.   Those were more focused on e-mails and Skype messages.

18  Q.   Okay.  All right.  Let's talk about Government Exhibit

19  409.  All right, what is Government Exhibit 409?  Why did

20  you create this demonstrative piece of evidence regarding

21  Mr. Guy Jean-Pierre's work relating to FusionPharm?

22  A.   I summarized by year some of the things that Guy

23  Jean-Pierre was doing for FusionPharm.

24  Q.   All right.  And let's just hit -- essentially can you

25  tell the jury essentially what you focused on early in 2011.

Direct - Funk

1    A.    The acquisition of Baby Bee Bright and moving it into
2    FusionPharm.
3    Q.    Okay.  And who was he working with -- who was Guy
4    Jean-Pierre working with during this early period of
5    acquiring Baby Bee Bright into FusionPharm?
6    A.    Almost exclusively Bill Sears.
7    Q.    All right.  And you have here essentially a meeting
8    between Mr. Scott Dittman and Mr. DiTommaso.  Why did you
9    include this July 2011 meeting?
10   A.    Because Mr. Guy Jean-Pierre had made that introduction
11   to Mr. DiTommaso.
12   Q.    Okay.  And, again, what is the importance of when Mr.
13   Guy Jean-Pierre visited FusionPharm?
14   A.    He visited FusionPharm early October 2011.  FINRA had
15   just contacted Scott Dittman on October 5th of 2011, and we
16   know that Guy was -- Mr. Jean-Pierre was aware of that by
17   October 5th.
18   Q.    And then so what's the importance of now including the
19   change of ownership regarding Microcap Management?
20   A.    FINRA's questions were regarding Microcap Management
21   and FusionPharm stock sales, and the timing is questionable
22   as far as transfer of ownership from Microcap Management two
23   weeks after they're getting calls from FINRA.
24   Q.    And you who reviewed the e-mail that Mr. Sears had sent
25   Mr. Guy Jean-Pierre; is that correct?

Direct - Funk

1    A.    I'm sorry, can you say that again?

2    Q.    You reviewed that e-mail that Mr. Sears sent Mr. Guy

3    Jean-Pierre regarding the transfer of Microcap?

4    A.    Yes.

5    Q.    Okay.  What date was that e-mail, do you recall?

6    A.    October 19th, 2011.

7    Q.    Okay.  And what was Mr. Sears asking Guy Jean-Pierre to

8    do in that e-mail?

9    A.    To draft an agreement to transfer ownership of MicroCap

10   and date it back to May 2011.

11   Q.    Okay.  And how did Mr. Guy Jean-Pierre first respond

12   regarding this agreement?

13   A.    I think he was confused.  I think he thought the

14   agreement existed and then Billy -- Mr. Sears responded,

15   "No, I need you to create it," and so he created a document,

16   backdated it to May 2011 to transfer MicroCap to Richard

17   Scholz for $10.

18   Q.    And, again, you have here October 5th.  You mean

19   October 5th, 2011?

20   A.    Yes.

21   Q.    Okay.  And that's when Mr. Sears discussed the FINRA

22   inquiry with the defendant, Mr. Guy Jean-Pierre?

23   A.    Yes.

24   Q.    So there's -- after FINRA contacted FusionPharm about

25   Mr. Sears' role with MicroCap and the selling of FusionPharm

1    stock, who -- who got involved with switching ownership of

2    MicroCap?

3    A.    Guy Jean-Pierre did.

4    Q.    Okay.  And what's the importance of 2011, November?

5    A.    That's when Mr. Guy Jean-Pierre responds to Todd Kramer

6    at FINRA.

7    Q.    And do you recall essentially again what that

8    conversation was with Mr. Guy Jean-Pierre to Mr. Kramer?

9    A.    I -- the big take-away was that he said that Mr. Sears

10   was the prior owner of MicroCap.

11   Q.    Okay.  Why is it important that Mr. Guy Jean-Pierre

12   knew about -- or assisted in drafting of the two disclosure

13   statements?

14   A.    Because Mr. Sears is not disclosed in those disclosure

15   statements.

16   Q.    Okay.  And how about Mr. Sears' criminal conviction?

17   A.    That's also not disclosed.

18   Q.    How about the drafting of the two current information

19   letters to OTC Markets?  Why is that important in 2011?

20   A.    Because they're opining that the information on the OTC

21   Market is adequate current information and it does not

22   include Mr. Sears.

23   Q.    Okay.  Anywhere in the 2011 documents or the notes

24   labled as convertible?

25   A.    No.

Direct - Funk

1    Q.   And who received information regarding the financials

2    in 2011 from FusionPharm?

3    A.   Guy Jean-Pierre received those financials.

4    Q.   And, more importantly, how is Mr. Guy Jean-Pierre

5    listed?

6    A.   Corporate secretary and legal counsel.

7    Q.   For what firm?

8    A.   FusionPharm.

9    Q.   Okay.  Can I have page 2, please.

10        Okay.  Can you tell the jury why this agreement

11   regarding VertiFresh is noted in your demonstrative

12   evidence, Government Exhibit 409.

13   A.   It's important because in March 2012, that's when

14   FusionPharm purportedly entered into this licensing

15   agreement with VertiFresh for $750,000.  As we've heard from

16   witnesses, VertiFresh was not a profitable business.  They

17   made thousands of -- a couple thousand dollars.  To pay

18   $750,000 for the technology seems to be overly stated.

19        And then March 23d, 2012, we see an e-mail from Guy

20   Jean-Pierre to Sears where he drafts this stock purchase

21   agreement to transfer Robert Dittman, the brother of Scott,

22   his preferred shares, 175,000 preferred shares, for 50

23   percent ownership of VertiFresh.

24   Q.   Okay.  Let me just pause you there.  175,000 preferred

25   shares of what company?

1    A.    FusionPharm.

2    Q.    Okay.  And for 50 percent owner -- not even a hundred

3    percent -- 50 percent ownership of VertiFresh.

4    A.    That's right.

5    Q.    So the most we heard VertiFresh make was $3,000, so for

6    a company that -- for a $1500 interest?

7    A.    That's right.

8    Q.    And how much were those shares worth during this time

9    period?

10   A.    Approximately -- you know, I don't know that he could

11   have sold all of those shares.  I'm certain that he

12   couldn't, but it was close to $13 million, or 10 percent --

13   over 10 percent of the company, FusionPharm.

14   Q.    All right.  Now why do you have on here 2014 it was

15   adjusted to the amount 2- -- by $250,000?

16   A.    So in 2014, they restated the $750,000 they had

17   originally recognized as revenue for VertiFresh down to

18   $250,000.

19   Q.    Okay.  And was Guy Jean-Pierre part of FusionPharm at

20   that point?

21   A.    He was not.

22   Q.    When did -- based upon your investigation, when did he

23   leave FusionPharm?

24   A.    Approximately August 2013.

25   Q.    And so essentially what happened on May 31st, 2012?

Direct - Funk

1    A.    Robert Dittman transferred half of his shares to

2    VertiFresh.

3    Q.    So close to $6.5 million?

4    A.    I'm not sure what it was trading at that date, but

5    probably close to that.

6    Q.    Okay.  Why is it important that in May there's this

7    meeting?

8    A.    Because it's right around the time that they start

9    talking to this investor, Nick Malino, and they draft the

10   first versions of the debt, which is a nonconvertible note.

11   And it's also important because Scott Dittman is not at that

12   meeting and they're discussing FusionPharm.

13   Q.    And why is it important about the 10 drafted attorney

14   opinion letters regarding the drawdown of MicroCap, Bayside

15   convertible notes?

16   A.    Well, because Mr. Jean-Pierre would know that Mr. Sears

17   was MicroCap and also Mr. Sears -- Guy Jean-Pierre

18   communicated with Mr. Sears about the Bayside note.

19   Q.    And also how about Bayside?  Who paid Guy Jean-Pierre

20   in checks?

21   A.    A lot of people, to include Bayside.  FusionPharm and

22   Bayside.

23   Q.    Okay.

24   A.    I believe MicroCap as well.

25   Q.    And these attorney letters were drafted after this

1    May 30th, 2012, meeting; is that right?

2    A.   Yeah, I believe they were all after that time frame.

3    Q.   Okay.  And can you tell the jury essentially why is it

4    important for the three current information letters drafted

5    to OTC Markets?

6    A.   Again, because Mr. Sears is not part of those

7    disclosures.

8    Q.   Now -- and that would include his criminal history?

9    A.   Yes.

10   Q.   How about this transaction with VertiFresh?

11   A.   That's also not disclosed.  It's a related party

12   transaction.

13   Q.   So Mr. Guy Jean-Pierre, who's drafting the agreement,

14   doesn't include it in the draft disclosures for OTC Markets

15   in his drafts.

16   A.   I'm not sure that he drafted those, but he definitely

17   reviewed them, and there's no mention of VertiFresh being

18   Mr. Sears.

19   Q.   But in the letter he's saying all the information in

20   those disclosures are accurate and correct?

21   A.   Adequate and current.

22   Q.   Thank you.  And why is it important, essentially down

23   here, that he's not listed in the 2012 annual report as the

24   corporate secretary and legal counsel?

25   A.   Because he's still functioning as that.

Direct - Funk

1    Q.   Okay.  And do you know what happened regarding Mr. Guy

2    Jean-Pierre with a complaint with the SEC in 2012?

3            MR. GOODREID:  Objection, Your Honor, based on the

4    Court's prior ruling.

5            THE COURT:  Mr. Sibert.

6            MR. SIBERT:  I'll rephrase.

7            THE COURT:  Okay.

8    BY MR. SIBERT:

9    Q.   What occurred with Mr. Guy Jean-Pierre in December of

10   2012 with the SEC?

11           MR. GOODREID:  Same objection, depending upon what

12   he's trying to elicit here, Your Honor.

13           MR. SIBERT:  I'll lead her to avoid any mistake.

14           THE COURT:  Will you agree to that, just so we know

15   we don't --

16           MR. GOODREID:  Yes, Your Honor --

17           THE COURT:  -- cross any lines?

18           MR. GOODREID:  Yes.

19           THE COURT:  Let's do that.

20   BY MR. SIBERT:

21   Q.   Was a complaint filed by the SEC against Mr. Guy

22   Jean-Pierre in December of 2012?

23   A.   Yes.

24   Q.   Okay.  That's a public document?

25   A.   Yes.

Direct - Funk

1    Q.   Okay.  Can I have page 3, please.  All right.

2         Can we walk through essentially the importance of

3    2013, Mr. Guy Jean-Pierre's role in FusionPharm 2013.

4    A.   Again, the meeting is important because Mr. Bodden and

5    Mr. Sears are discussing FusionPharm business with Guy

6    Jean-Pierre, but Mr. Dittman is not there.

7    Q.   Okay.  And, as you stated, he wasn't listed on the

8    documents at the end of 2012, the disclosures; is that

9    right?

10   A.   That's right.

11   Q.   Who is he still meeting with regarding FusionPharm's

12   ownership?

13   A.   Mr. Sears and Guy Jean-Pierre are meeting.

14   Q.   Okay.  And how about April of 2013?

15   A.   He's reviewing a FusionPharm private placement

16   memorandum.

17   Q.   Okay.  And is that the 504 memorandum that was spoken

18   about by Mr. Bodden?

19   A.   I believe so.

20   Q.   The private -- trying to raise money through private

21   equity?

22   A.   Trying to raise money through restricted stock.

23   Q.   And essentially what happens after April 2013?

24   A.   This is throughout 2013, he drafted 14 different

25   attorney opinion letters for FusionPharm shareholders to

1    include MeadPoint and Bayside.

2    Q.   And did this include the sale of these notes?

3    A.   Yes.

4    Q.   And, again, what happened -- what did Mr. Guy

5    Jean-Pierre do in 2013 regarding OTC Markets?

6    A.   Drafted two current information letters for OTC

7    Markets.

8    Q.   Okay.  And there's also an e-mail from Mr. Dittman in

9    2013; is that correct?

10   A.   Sorry.  Can you say that again?

11   Q.   There was an e-mail from Mr. Dittman regarding Mr. Guy

12   Jean-Pierre's role in 2013?

13   A.   Yes.

14   Q.   What did Mr. Dittman state in that e-mail of 2013?

15   A.   I believe he refers to Mr. Jean-Pierre as the company's

16   attorney.

17   Q.   Okay.  And can we go ahead and just quickly go to the

18   last page, page 4.

19        And can you just quickly describe essentially why

20   you included the 2016 undercover starting April 2016 in this

21   Exhibit 409.

22   A.   Well, I think it goes to show that he's doing kind of

23   the same thing again in the undercover that he did with

24   FusionPharm.  He's in e-mail communication and telephone

25   communication with William Sears and they talk about

1    acquiring a new publicly traded company, a new shell

2    company, and merging VertiFresh into that company, similar

3    to what they did with FusionPharm.

4         And Sears is indicating he's going to be running

5    this new company with E.J., but they don't want to be listed

6    on any of the company documents and they're going to put

7    kind of a placeholder or nominee, I think they referred to

8    them as the beard and as the control person, although that

9    person will not be running things, or making decisions for

10   the company.

11   Q.  Based upon your role listening to all the tapes and

12   watching the video of the undercover, did Mr. Guy

13   Jean-Pierre ever push back regarding the nondisclosures of

14   E.J. or Mr. Sears?

15   A.  No.

16   Q.  And how about drafting these backdated documents?

17   A.  No.

18   Q.  And how about having a lawyer sign the 144 letters

19   after essentially doing the work?

20   A.  That originally he did say that the attorney would be

21   doing his own work and have his own template, but that did

22   kind of change as the undercover progressed.

23   Q.  Okay.  What -- do you know how Mr. Guy Jean-Pierre

24   reacted when it was explained to him that Mr. Phil Morgan,

25   the beard of this VertiFresh company, would not have any

Direct - Funk

1    knowledge about the true operation of the company or

2    ownership of the company?

3    A.   I believe his response was, "Excellent."

4    Q.   Okay.  And did he make any physical movements?

5    A.   Maybe a fist pump with Mr. Sears.

6    Q.   Okay.  And do you know how Mr. Guy Jean-Pierre reacted

7    regarding -- do you know what Mr. Guy Jean-Pierre stated

8    about the knowledge of the lawyer that was going to be used

9    regarding VertiFresh?

10   A.   He would not be passing that information to the

11   attorney.

12   Q.   So --

13   A.   That -- the CEO of the company was not truly running

14   things and didn't know anything about the company.

15           THE COURT:  Mr. Sibert, why don't we pause there.

16   We're going to take a shorter morning break.  Members of the

17   jury, given our late start, we will be in recess for 10

18   minutes.

19           (Recess taken 11:10 a.m.)

20           (Proceedings outside the presence of the jury at 11:23

21   a.m.)

22           THE COURT:  Government wanted to have a word before

23   we brought in the injury.

24           MR. SIBERT:  Yeah, thank you, Your Honor, for the

25   time.

Direct - Funk

1          Quickly, I know the Court has provided us time due

2     to the delay yesterday and given us time today, but I'm

3     asking for a little additional time.  We're an hour and a

4     half late starting this morning.  In addition --

5          THE COURT:  No, that's not true.  We started at --

6          MR. SIBERT:  We started at 10:00.

7          THE COURT:  Hold on.  What time did we start, Mary?

8          Okay.  We started an hour and 11 minutes.

9          MR. SIBERT:  Okay, so the Court gave us 45 extra

10    minutes.

11         THE COURT:  Right.

12         MR. SIBERT:  And so we're getting killed -- hey,

13    these are important.  And also the defendant was late one

14    morning.  That caused a delay.  None of the delays have been

15    caused by the Government.  We've been here every morning at

16    8:45, ready to start.  I'm asking -- the fact that I know we

17    have a Rule 29, I think based upon the documents we

18    submitted that should not be a very long procedure for this

19    Court.  Something can either be done at -- quickly after

20    5:00 or quickly in the morning at 8:00 where counsel can be

21    present.

22         THE COURT:  I never had 29s go quickly, and

23    especially in terms of my rulings for 29 counts.  That's a

24    lot of counts.  And so I will give you until -- we'll go to

25    4:45 and then I'll send the jury home and that's -- that's

Direct - Funk

1    all I'm going to give you.  And I think I've been more than

2    fair on that.

3              And I don't want to have to revisit this point.

4              MR. SIBERT:  Okay.  And my only thing I need to

5    facilitate on the record is if we have extended cross, how

6    would the Court handle that?

7              THE COURT:  What's that?

8              MR. SIBERT:  If we have extended

9    cross-examination --

10              THE COURT:  I will be the judge if the cross is

11    extended to eat up unnecessary time or whether it's fair and

12    proper cross-examination.

13              MR. SIBERT:  Thank you, Your Honor.  I appreciate

14    that.

15              THE COURT:  All right.  Let's bring in the jury.

16         (In open court in the presence of jury at 11:25 a.m.)

17              THE COURT:  Agent Funk, I remind you you remain

18    under oath.

19              THE WITNESS:  Yes.

20              THE COURT:  You may proceed, Mr. Sibert.

21              MR. SIBERT:  Thank you, Your Honor.

22              Your Honor, at this time the Government would like

23    to move into evidence Government's Exhibits 75, 93, 154,

24    372-A, 372-G, and 372-LL, all which have been stipulated.

25              THE COURT:  All right.  Given the stipulation of

Direct - Funk

1    the parties, the following exhibits are admitted into

2    evidence and may be published to the jury:  Exhibit 75, 93,

3    154, 372-A, 372-G, and 372-LL.

4        (Government's Exhibits received)

5    BY MR. SIBERT:

6    Q.   Okay, Agent Funk, I need to backtrack.  I skipped

7    something in Government Exhibit 323.  Can I have that

8    brought up on page 3 here.  Okay.  Can I have the bottom --

9    thank you.  All right.

10           Can you tell me essentially what Mr. Guy

11   Jean-Pierre is sending Mr. Sears in an e-mail on April 1st,

12   2016?

13   A.   Guy Jean-Pierre is saying that he needs cash, and he

14   says that he can make the deposit into his Chase account

15   "but for ongoing future matters where I will be receiving

16   real income," he definitely wants to use his DR account --

17   Dominican Republic account.

18   Q.   What's he attaching in this e-mail?

19   A.   "This morning, I was totally focused on trying to get

20   you at least a proposed convertible debt instrument before

21   your call later on today with E.J.  It's attached."

22   Q.   Okay.  And can I have Government Exhibit 326 published.

23           And this isn't in evidence at this point.

24           Do you recognize Government Exhibit 326?

25   A.   Yes.

2160

Direct - Funk

1    Q.   And what is this?

2    A.   That is the first draft of the convertible note that

3    Mr. Jean-Pierre sent to Sears -- Mr. Sears.

4    Q.   All right.  We looked at a convertible note in

5    Government Exhibit 327; is that correct?

6    A.   Yes.

7    Q.   And that -- what was that note?

8    A.   That was the note sent after this one to include -- I

9    think he included parties' names; for example, Thor

10    Investments International is in the second version.

11    Q.   So Mr. Guy Jean-Pierre made changes in Government

12    Exhibit 327 compared to what's shown on 326?

13    A.   Yes --

14          MR. GOODREID:  Objection.  Objection, leading.

15          THE COURT:  Sustained.

16    BY MR. SIBERT:

17    Q.   Okay.  What's the difference between Government Exhibit

18    327 and Government Exhibit 326?

19    A.   In the second version that was sent, he included the

20    date April -- I believe it was April 21st, 2015, which was

21    the date Mr. Sears said he received that cash deposit he

22    could use to prove -- prove the money was actually provided

23    to him.

24          MR. SIBERT:  Okay.  Can I move into evidence

25    Government Exhibit 326.

2161

Direct - Funk

1        THE COURT:  Is there an objection?

2            MR. GOODREID:  There is not, Your Honor.

3            THE COURT:  There being no objection, Exhibit 326

4    is admitted into evidence.

5        (Government's Exhibit 326 received)

6    BY MR. SIBERT:

7    Q.    Okay.  As you described, what's the date of this

8    convertible promissory note?

9    A.    February 28th, 2015.

10   Q.    All right.  And can I have that taken down, please.

11           All right.  Can you tell the grand jury -- or can

12   you tell the jury what the initials WJS stands for?

13   A.    Mr. William Sears.

14   Q.    Can you tell the jury what the initials SMD stand for.

15   A.    Scott Dittman.

16   Q.    All right.  How about regarding the indictment in this

17   case, do you know who Co-conspirator A is?

18   A.    That's Mr. Cliffe Bodden.

19   Q.    Do you know who Co-conspirator B is?

20   A.    Tod DiTommaso.

21   Q.    Okay.  Regarding the indictment, do you know who

22   Individual A is?

23   A.    Richard Scholz.

24   Q.    Do you know who Family A is?

25   A.    Sandra Sears, mother of William Sears.

2162

Direct - Funk

1    Q.    How about Mr. Guy Jean-Pierre's family?

2    A.    That's his niece, Leslie -- Leslie Jean-Pierre.

3    Q.    And does she go by a different name during your

4    investigation?

5    A.    She went by the name Leslie Dinwoodie.

6    Q.    And do you know who the Individual Shareholder TA is in

7    the indictment?

8    A.    Todd Abbott.

9    Q.    All right.  And, ma'am, quickly, can we please have the

10   first page of Government Exhibit 408 published.  408-A.  And

11   can I have this top -- thank you.

12          And can you tell the jury essentially what you

13   summarized in this exhibit.

14   A.    I summarized a number of e-mails relating to the

15   transition of Baby Bee Bright to FusionPharm.

16   Q.    Okay.  And what is being disclosed with a Y or an N in

17   your fourth column?

18   A.    That deciphers whether or not Guy Jean-Pierre is

19   included in the e-mail as the person sending the e-mail,

20   receiving, or just cc'd on the e-mail.

21   Q.    So if there's a Y, there's some involvement with the

22   defendant, Mr. Guy Jean-Pierre?

23   A.    That's right.

24   Q.    All right.  And in this -- and this exhibit just deals

25   with transition of Baby Bee Bright.

Direct - Funk

1    A.    Yes.

2    Q.    All right.  Can I have Government Exhibit 408-B,

3    please.  And can I focus on the top here again, thank you.

4          All right, what does Government Exhibit 408-B

5    summarize?

6    A.    That summarizes Mr. Sears' role at FusionPharm.

7    Q.    Okay.  And can you pull -- can I have the whole page,

8    please.

9          Again, what is your fourth column showing?

10   A.    That is whether or not Guy Jean-Pierre is a party to

11   the e-mail.

12   Q.    Can I have Government Exhibit 408-C, please.

13   A.    And this -- these exhibits include both Skype messages

14   and e-mails.

15   Q.    And what are you summarizing in 408-C?

16   A.    Mr. Sears' role with FusionPharm stock.

17   Q.    And, again, can I have that pulled out, please again.

18         Your fourth column is indicating what?

19   A.    Whether or not Mr. Guy Jean-Pierre is a party to the

20   e-mail.

21   Q.    Okay.  Can I have Government Exhibit 408-D, please.

22         Okay.  What are you summarizing in 408-D?

23   A.    Mr. Sears' role with the filings -- OTC filings of

24   FusionPharm.

25   Q.    What does OTC stand for?

2164

Direct - Funk

1    A.   Over-the-counter market.

2    Q.   And then, again, what is your fourth column indicating?

3    A.   Whether or not Guy Jean-Pierre is a party to the

4    e-mail.

5    Q.   Can I have Government Exhibit 408-E, please.  What are

6    you summarizing in 408-E?

7    A.   Mr. Sears' role with payments to Guy Jean-Pierre.

8    Q.   And, again, what is your fourth column?

9    A.   Whether or not Mr. Jean-Pierre was a party to the

10   e-mail.

11   Q.   Can I have Government Exhibit 408-F, please.  What are

12   you summarizing in 408-F?

13   A.   Mr. Sears' role with the Bayside and MeadPoint notes.

14   Q.   Okay.  And, again, in your fourth column.

15   A.   Whether or not Guy Jean-Pierre is party to the e-mail.

16   Q.   All right.  And, finally, can you look at 408-G,

17   please.

18   A.   That's Mr. Sears' role with FINRA.

19   Q.   Okay.

20   A.   The FINRA investigating inquiry in October 2011.

21   Q.   And, again, your fourth column is indicating what?

22   A.   Whether or not Mr. Jean-Pierre is a party to the

23   e-mail.

24   Q.   And can you just look at Government Exhibit 411,

25   please.  Can I have that published.

Cross - Funk

1        What does Government Exhibit 411 show?

2    A.    That shows that FusionPharm was a nonreporting company

3    with the SEC.

4    Q.    And where did you get the certificate?

5    A.    From the SEC.

6    Q.    And what does SEC stand for?

7    A.    I'm sorry.  The Securities and Exchange Commission.

8    Q.    And, briefly, we went over all the e-mails regarding

9    undercover and Government Exhibit 323.  Where were those

10   e-mails sent from?

11   A.    The e-mails were sent here from Colorado.

12            MR. SIBERT:  Thank you.  I'll pass the witness,

13   Your Honor.

14            THE COURT:  Cross-examination.

15            MR. GOODREID:  Yes, thank you, Your Honor.

16                      CROSS-EXAMINATION

17   BY MR. GOODREID:

18   Q.    Good morning, Special Agent Funk.

19   A.    Good morning.

20   Q.    Now, you indicated on your direct examination that you

21   were -- you were heavily involved, in fact, lead case agent

22   with respect to what I'll call the sting operation, right?

23   A.    The 2016?

24   Q.    Yes.

25   A.    Yes.

Cross - Funk

1    Q.   So when I refer to the sting operation, it's what Mr.

2    Sibert referred to as the undercover operation, just so we

3    know what we're talking about.

4    A.   Sure.

5    Q.   Okay.  All right.  So in that instance, the goal in

6    part was to get Mr. Guy Jean-Pierre back from the Dominican

7    Republic back to the United States so he could be arrested;

8    isn't that right?

9    A.   I don't know that that was the goal.

10   Q.   Well, it certainly was easier for the Government to

11   arrest him in -- in the -- inside the United States than it

12   would have been in the Dominican Republic; that's fair,

13   isn't it?

14   A.   Yes.

15   Q.   Okay.  So you set up this operation -- this sting

16   operation.  And as part of the -- of that operation working

17   with Mr. Sears, the Government authorized Mr. Sears to make

18   various false statements to Mr. Guy Jean-Pierre, right?

19   That's part of the deal, right?

20   A.   In that it was a fictitious company, yes.

21   Q.   Exactly, right?

22   A.   Yes.

23   Q.   So when Mr. Sears is making these statements, with the

24   Government's permission about how he was going to do this,

25   that and the other, those were false statements, right?

1   A.   It was a fictitious scenario, yes.

2   Q.   Exactly.  Fictitious.  Sorry.  So could we pull up

3   Government Exhibit -- I'm sorry, one other question on that,

4   so just to be clear.  The FBI knew what was going on, Mr.

5   Sears knew what was going on, Mr. Guy Jean-Pierre did not

6   know what was going on, correct?

7   A.   That's correct.

8   Q.   Okay.  So could we pull up Government Exhibit No. 323,

9   please.

10          MR. GOODREID:  Your Honor, may I retrieve my water?

11          THE COURT:  Sure.

12          MR. GOODREID:  Thank you.

13   BY MR. GOODREID:

14   Q.   And -- excuse me, if we could go to page 4, please.

15   All right, let's go to the bottom then, I know it's not very

16   easy to see because it's so small.  As much as we could,

17   blow up the bottom.

18          Do you see that, Special Agent Funk?

19   A.   Yes.

20   Q.   All right.  So you see the language there, don't you --

21   and this is an e-mail dated April 6th, 2016.  And, again,

22   just to be clear, this is in the course of the sting

23   operation, right?

24   A.   That's correct.

25   Q.   Okay.  And so Mr. -- this is an e-mail that Mr. Guy

Cross - Funk

1    Jean-Pierre wrote, right?

2    A.    Yes.

3    Q.    Okay.  So he says in there -- to start with, he says,

4    "I just wanted to tell you that I finally had success

5    getting an attorney who would be able to handle the 144

6    opinion letter."  You see that, right?

7    A.    Yes.

8    Q.    And then he says -- and I want to focus on this

9    language, "Assuming, of course, that everything is in order

10   with respect to the note and the backup documentation."  You

11   see that, right?

12   A.    Yes.

13   Q.    Okay.  So Mr. Guy Jean-Pierre doesn't say that he will

14   make sure that everything is correct with respect to the

15   note and the backup documentation.  He doesn't say that,

16   does he?

17   A.    No, he doesn't.

18   Q.    Okay.  So let's go, then -- on 323, let's go to page 8,

19   please.  And let's go to the second to last e-mail at the

20   bottom if we could, please.  The one that's dated Sunday,

21   April 24th, 2016, at 5:45 p.m.

22         Do you see that, Special Agent Funk?  I know it's

23   not easy --

24   A.    Yes, I see it.

25   Q.    All right.  And you talked a little bit about this and

1   how Mr. -- you said that Mr. Guy Jean-Pierre may have

2   changed his view later on in the operation, right?

3   A.   Yes.

4   Q.   But do you see the second -- the second paragraph

5   there.  It says, "Moreover I want to emphasize that the

6   lawyer, which I had contacted for purposes of preparing

7   opinions for the issue, will have his own approach of

8   writing opinions, which may or may not be markedly different

9   from what I would write if I were in the business of writing

10  opinions."  You see that, right?

11  A.   Yes.

12  Q.   Okay.  All right.  So you've got Guy Jean-Pierre here

13  saying on April 24th -- he's advising Mr. Sears, isn't he,

14  that "No matter what I write, the attorney who actually

15  signs the letter may take a different position, different

16  approach," right?  That's what he says?

17  A.   Yes.

18  Q.   Okay.  We can take that down.

19       Now, Special Agent Funk, you've been involved with

20  the investigation of this case since the beginning; is that

21  fair?

22  A.   Yes.

23  Q.   Okay.  And so when, based upon your investigation, just

24  to recap, did -- to your knowledge, did Mr. Guy

25  Jean-Pierre's interactions with Baby Bee Bright or

1    FusionPharm begin, approximately?  Can you give us a year?
2    A.    2010.
3    Q.    Okay.  And Mr. Sibert asked you this question on
4    direct, but I forgot what your answer was.  And when did you
5    say it ended with FusionPharm?
6    A.    The investigation?
7    Q.    No, no, no, when -- when, according to your
8    investigation, did Mr. Guy Jean-Pierre's time or dealings
9    with FusionPharm end?
10   A.    He --
11   Q.    Approximately.
12   A.    He stopped writing any kind of opinion letters around
13   August or September 2013.
14   Q.    Okay.  So we're talking about roughly a three-year
15   period; is that right?
16   A.    Yes.
17   Q.    Actually, four different years, right?  '10, '11, '12,
18   '13, right?
19   A.    Yes.
20   Q.    And according to your investigation -- well, let's back
21   up a step.  So Mr. Guy Jean-Pierre's office was in -- was in
22   Florida, right?
23   A.    I believe he had an office in Florida.
24   Q.    Okay.  But he was not primarily, to your knowledge, was
25   not based in Colorado, right?

Cross - Funk

1   A.   That's correct.

2   Q.   FusionPharm was based in Colorado?

3   A.   Yes.

4   Q.   Okay.  So in the course of this three- to four-year

5   period, according to your investigation, how many times did

6   Mr. Guy Jean-Pierre meet with Mr. Sears, let's say, during

7   that time period?  In person.

8   A.   I would guess probably between three to six times that

9   I'm aware of.

10   Q.   Okay.  Okay.  So three to six times over the course of

11   three to four years, right?

12   A.   Yes.

13   Q.   Okay.  And other than those in-person meetings, to the

14   best of your knowledge Mr. Guy Jean-Pierre communicated with

15   Mr. Sears, let's say, from a distance, right?  He's in

16   Florida, Mr. Sears is in Colorado --

17   A.   Yes.

18   Q.   -- right?

19   A.   Yes.

20   Q.   And the FBI does not -- oh, and so they communicated,

21   we know, via e-mail, correct?

22   A.   Yes.

23   Q.   Okay.  And they also, to the best of your knowledge,

24   may have communicated over the telephone; isn't that

25   right?

1    A.    Yes.

2    Q.    The FBI does not have a recording of every single

3    instance in which Mr. Sears and Mr. Guy Jean-Pierre

4    interacted, correct?

5    A.    Yes, that's correct.

6    Q.    In fact, I'm not talking the sting operation, but

7    during that 2010 to 2013 period, the FBI or the Government

8    does not have a recording of any phone calls between Mr.

9    Sears and Mr. Guy Jean-Pierre, right?

10   A.    That's correct.

11   Q.    Okay.  So it's fair to say, then, isn't it, that the

12   Government doesn't have knowledge or doesn't have evidence

13   specifically what Mr. Sears and Mr. Guy Jean-Pierre talked

14   about, right?

15   A.    I'm sorry, can you repeat that question?

16   Q.    Sure.  The -- you says -- you said a second ago that

17   the Government doesn't have recordings of telephone

18   conversations between Mr. Guy Jean-Pierre and Mr. Sears

19   during this 2010-2013 time frame, right?

20   A.    Yes.

21   Q.    Okay.  So based on that, other than what Mr. Sears may

22   have told you later, the Government doesn't have any

23   specific evidence of what Mr. Sears and Mr. Guy Jean-Pierre

24   may have talked about during the course of those three to

25   four years over the telephone, right?

2173

Cross - Funk

1    A.    That's correct.

2    Q.    All right.  Let's take a look at a couple of summary

3    exhibits that Mr. Sibert asked you about.  Could we pull up

4    408-B, please.  And just to refresh the jury's recollection,

5    and perhaps mine, Special Agent Funk, what is this a summary

6    of again?

7    A.    This is a summary of Mr. Sears' role at FusionPharm.

8    Q.    Okay.  And that exhibit is how many pages?

9    A.    Five.

10   Q.    Okay.  So -- and as Mr. Sibert asked you, the last

11   column reflects instances where either Mr. Guy Jean-Pierre

12   was cc'd, given a copy, or not given a copy of each one of

13   those e-mails, correct?

14   A.    It's whether or not he replied to or was a party to the

15   e-mail.

16   Q.    Okay.  Fair enough.  And you would agree, wouldn't

17   you -- and you don't need to count, but you can glance

18   through this -- you would agree that in this particular

19   exhibit, there are approximately 20 instances where you put

20   "no" in that last column, meaning that Mr. Guy Jean-Pierre

21   didn't respond, didn't answer, that sort of thing, with

22   respect to these e-mails, right?  Approximately 20?

23   A.    I'm looking at the first page and there's five no's on

24   the first page.

25   Q.    And feel free to glance through the other pages if you

Cross - Funk

1    need to.  Again, hard copy if we have it.  Electronically

2    if -- do you have a hard copy?

3              THE COURT:  Which exhibit are we looking at, Mr.

4    Goodreid?

5              MR. GOODREID:  Your Honor, 408-B, as in boy.

6              THE COURT:  B.

7    BY MR. GOODREID:

8    Q.   Do you have the hard copy, Special Agent Funk?

9    A.   I do have the hard copy.

10   Q.   Okay, I'm not asking you for precisely --

11   A.   Right, right --

12   Q.   Approximately 20 times?

13   A.   Yes.

14   Q.   That's correct?

15   A.   Yes, that's correct.

16   Q.   All right.  And, similarly, let's take a look at 408-F.

17   And, again, it may be easier, Special Agent Funk, for you to

18   have it in hard copy.

19             And, again, can you just remind the jury what 408-F

20   represents?

21   A.   This is Bill Sears' role with the MeadPoint and Bayside

22   notes.

23   Q.   Okay.  And, again, this last column represents what?

24   A.   Whether or not Guy Jean-Pierre is a party to the

25   e-mail.

2175

Cross - Funk

1    Q.    Okay.  And that exhibit is how many pages?

2    A.    Four pages.

3    Q.    Okay.  And you would agree with me, wouldn't you, that

4    there are approximately -- in that exhibit, there are

5    approximately 25 no's with respect to Mr. Guy Jean-Pierre,

6    right?  Give or take?

7    A.    That's possible.  I haven't counted them, but yes,

8    probably.

9    Q.    Can you take a quick look and --

10   A.    Yeah.

11   Q.    -- agree or disagree with me there's approximately 25

12   no's on there.

13   A.    Yes.

14   Q.    Okay.  So you would agree, wouldn't you, based upon

15   looking at those last two exhibits, that although there are

16   a lot of communications that Guy Jean-Pierre participated

17   in, there's a significant number of those that he did not,

18   right?

19   A.    That's correct.

20   Q.    Okay.  Now, you indicated before, did you not, Special

21   Agent Funk, that at some point the FBI and -- I don't know

22   if you said the SEC also, but had executed some seizure

23   warrants, right?

24   A.    Yes.

25   Q.    And that was to seize money that was, what, primarily

                         Cross - Funk

1       in the name of FusionPharm; is that right?

2       A.   Some of the money was in the name FusionPharm.  There

3       were other entities holding the cash as well.

4       Q.   Okay.  Well, let's explore that a little bit.  You said

5       on direct, didn't you, that it seized approximately -- was

6       it $8 million?

7       A.   Yes.

8       Q.   And can you name some of the entities or individuals

9       from whom you seized that $8 million.

10      A.   MeadPoint, and I believe Bill Sears' mother's

11      account --

12      Q.   Okay.

13      A.   -- Sandra Sears.

14      Q.   And some from FusionPharm as well?

15      A.   Yes, some from FusionPharm as well.

16      Q.   Okay.  And you did not seize any money from any

17      accounts held by Mr. Guy Jean-Pierre, did you?

18      A.   That's correct, we did not.

19      Q.   All right.  And you also, in the course of your

20      investigation, learned what, for example, Mr. Sears and Mr.

21      Dittman had done with some of their ill-gotten gains; isn't

22      that right?

23      A.   Yes.

24      Q.   What they had done with the money?  And, in fact, Mr.

25      Sears -- excuse me, some money -- some of the -- again, of

Cross - Funk

1    the unlawful proceeds were used to pay off Mr. Dittman's

2    mortgage, right?

3    A.    I think he purchased a house with them --

4    Q.    Okay.

5    A.    -- with the proceeds.

6    Q.    He purchased a house?

7    A.    Yes.

8    Q.    Okay.  All right.  And also to pay off Mr. Sears'

9    house, right?

10   A.    Yes.

11   Q.    And, in fact, you also learned in your investigation

12   that Mr. Sears used some of the money to buy Rolex watches,

13   right?

14   A.    I believe so, yes.

15   Q.    Okay.  You don't have any -- you didn't uncover any

16   evidence in this case that, for example, a Rolex watch was

17   ever given to Mr. Guy Jean-Pierre for his work, right?

18   A.    No.

19   Q.    All right.  And you also didn't find any evidence that

20   any money had been paid -- had been used to pay off a

21   residence of Mr. Guy Jean-Pierre, right?

22   A.    No.

23        MR. GOODREID:  Your Honor, may I have just a minute

24   to confer with counsel?

25        THE COURT:  You may.

Redirect - Funk

1          MR. GOODREID:  Thank you.

2          Your Honor, I have no additional questions for this

3     witness.

4          THE COURT:  All right.  Redirect.

5          MR. SIBERT:  Yes, Your Honor.

6                    REDIRECT EXAMINATION

7     BY MR. SIBERT:

8     Q.   Agent Funk, you testified that Mr. William Sears and

9     Scott Dittman gave debriefs or proffers to the FBI; is that

10    correct?

11    A.   Yes.

12    Q.   When did the investigation turn its focus onto Mr. Guy

13    Jean-Pierre?

14    A.   Roughly February 2016.

15    Q.   So after the search warrant of 2014?

16    A.   Well, you know, I don't know that I would say that it

17    turned to him.  I think he was always a potential subject in

18    this case from the --

19    Q.   How about focus?

20    A.   He was not the focus until February 2016.

21    Q.   Okay.  And then you stated that the FBI didn't have any

22    recordings of telephone calls between Mr. Guy Jean-Pierre

23    and Mr. Sears based upon Mr. Goodreid's questioning.  Do you

24    agree with that?

25    A.   From 2011 through 2013 -- or 2010 through 2013.

2179
Redirect - Funk

1    Q.   So the undercover, what did you have?

2    A.   Lots of recorded conversations.

3    Q.   Okay.  But prior to the undercover, what forms of

4    communication did you have regarding Mr. Guy Jean-Pierre's

5    role in FusionPharm?

6    A.   E-mails and Skype messages.

7    Q.   Okay.  How about debriefs?

8    A.   Oh, and debriefs from witnesses.

9    Q.   Okay.  And essentially how about the people that

10   controlled FusionPharm, did they provide debriefs?

11   A.   Yes.

12   Q.   And who were they?

13   A.   Scott Dittman and Bill Sears.

14   Q.   Okay.  And did they talk about Mr. Guy Jean-Pierre's

15   role?

16          MR. GOODREID:  Objection.  Calls for hearsay.  And

17   it's coming in for the truth of the matter -- I'm sorry.

18          THE COURT:  Mr. Sibert.

19          MR. SIBERT:  I'm -- no, specifically it's coming in

20   for the fact of what communications did they know about

21   FusionPharm having with Guy Jean-Pierre.  That's going right

22   to the point of Mr. Goodreid's question.  I'm not offering

23   it for what was said, I'm offering it for the fact that the

24   investigation -- the investigators knew what was happening

25   based upon further communications.

1          THE COURT:  All right.  With that understanding,
2     the objection's overruled.
3          And it might be a good idea to ask the special
4     agent to describe or define what "debriefs" are.
5          MR. SIBERT:  Okay.
6          THE COURT:  The jurors may not know what that
7     means.
8          MR. SIBERT:  Thank you, Your Honor.  I appreciate
9     that.
10    BY MR. SIBERT:
11    Q.   Essentially what is a debrief?
12    A.   We will bring a witness in and discuss what happened
13    during the time of our investigation.
14    Q.   Similar to a proffer?
15    A.   Yes.
16    Q.   Okay.  And essentially the only difference between a
17    proffer and debrief is what?
18    A.   Sometimes they don't have that Queen for a Day letter.
19    Q.   Okay.  So get out of jail card.
20    A.   That's right.
21    Q.   All right.  As known between law enforcement and people
22    that are targeted in an investigation?
23    A.   Yes.
24    Q.   Okay.  All right.  So before I was -- the objection,
25    can you answer the question:  Who provided proffers

Redirect - Funk

1    regarding Mr. Guy Jean-Pierre's role to the FBI?

2    A.   Mr. Bill Sears did, Scott Dittman, Cliffe Bodden, and

3    we had debriefs with numerous witnesses to include Richard

4    Scholz, Tod DiTommaso, Andy Duke.

5    Q.   Okay.  And then you were asked that -- based upon Mr.

6    Goodreid's question, he asked about the goal of getting Mr.

7    Guy Jean-Pierre back in the U.S. to arrest him; is that

8    correct?  Do you recall that --

9    A.   He asked that question, yes.

10   Q.   All right.  And you stated it was not the main goal.

11   Was that your answer?

12   A.   Yes.

13   Q.   Okay.  At the time that Mr. Guy Jean-Pierre came back

14   to the U.S., was there an arrest warrant outstanding for the

15   matters in this case regarding these charges?

16   A.   No, there was not.

17   Q.   Where was the arrest warrant out of?

18   A.   New York.

19   Q.   Do you know what it was for?

20   A.   Identity theft and forgery.

21           MR. SIBERT:  No further questions, Your Honor.

22           THE COURT:  All right.  Special Agent, you may step

23   down.  Thank you for your testimony.

24           Government may call its next witness:

25           MR. BROWN:  Your Honor, the Government calls Luis

Redirect - Funk

1   Reyes.

2          THE COURT:  I'm not seeing this individual on your

3   witness list, Mr. Brown.

4          MR. BROWN:  Your Honor, Mr. Reyes has disappeared.

5   So --

6          THE COURT:  Okay.  I guess that solves the problem

7   with him not being --

8          MR. BROWN:  Your Honor, he was here earlier and I

9   think he just stepped away.

10         THE COURT:  All right.  Then the problem remains, I

11  don't see him as a disclosed witness.

12         MR. BROWN:  Pardon me?

13         THE COURT:  I don't see him as a disclosed witness

14  on your --

15         MR. BROWN:  Your Honor, on the witness list, he's

16  referred to as an agent for Bank of America.  I'm sorry.  I

17  should have made that clear.  We didn't know the identity --

18         THE COURT:  Oh, Bank of America custodian.

19         MR. BROWN:  Yes.

20         THE COURT:  Okay.

21         MR. BROWN:  I guess we'll go with someone else at

22  this point.

23         MR. SIBERT:  Okay, at this time the Government

24  would like to call Kristen Varel to the stand.

25         THE COURT:  All right.

Direct - Varel

1          COURTROOM DEPUTY:  Stand here and raise your right
2     hand.
3          KRISTEN VAREL, GOVERNMENT'S WITNESS, SWORN
4          COURTROOM DEPUTY:  Please be seated.  You may need
5     to scoot your chair up close to the microphone.  And please
6     and spell your name for the record.
7          THE WITNESS:  Kristen Varel.  K-r-i-s-t-e-n,
8     V-a-r-e-l.
9          MR. SIBERT:  May I proceed, Your Honor?
10          THE COURT:  You may.
11                    DIRECT EXAMINATION
12    BY MR. SIBERT:
13    Q.   Good afternoon, Special Agent Varel.  Can you tell the
14    jury where you currently are employed?
15    A.   I work for the Federal Bureau of Investigation.
16    Q.   Okay.  What is your role with the Federal Bureau of
17    Investigation, otherwise known as FBI?
18    A.   Yes.  I'm a special agent on the Public Corruption and
19    Civil Rights Squad.
20    Q.   Okay.  How long have you been employed as a special
21    agent by the FBI?
22    A.   Six years.
23    Q.   And where are you currently stationed?
24    A.   Here in Denver.
25    Q.   Okay.  And does your work involve investigations within

2184

Direct - Varel

1    the District of Colorado?

2    A.    Yes.

3    Q.    All right.  Now, in 2016, did you assist in a

4    undercover operation against a targeted individual named Mr.

5    Guy Jean-Pierre?

6    A.    Yes, I did.

7              MR. SIBERT:  Your Honor, may I have a second?

8    BY MR. SIBERT:

9    Q.    Do you see Mr. Guy Jean-Pierre today in the courtroom?

10   A.    I do.

11   Q.    Can you point him out and identify something he's

12   wearing.

13   A.    He's this gentleman sitting right here in front of me

14   in a suit.

15             MR. SIBERT:  Your Honor, may the record reflect

16   that this witness identified the defendant.

17             THE COURT:  Well, there's three gentlemen with --

18   each one wearing a suit, so --

19             MR. SIBERT:  Fair point.

20             THE COURT:  Can we have another description.

21   BY MR. SIBERT:

22   Q.    May we have the color of the suit and shirt?

23   A.    He's the gentleman directly in front of me.

24             THE COURT:  Closest to you?

25             THE WITNESS:  Yes.

2185
Direct - Varel

1    THE COURT:  The record will so reflect.

2    MR. SIBERT:  All right.  Thank you, Your Honor.

3  BY MR. SIBERT:

4  Q.   I'm sorry, I see the pointing.  I know the record

5  doesn't -- doesn't facilitate pointing, so I apologize.

6    Okay.  And can you describe to the jury essentially

7  your role with the undercover here in Denver, Colorado, and

8  then later in Miami, Florida.

9  A.   Yes.  So my role was more of an administrative role in

10  helping to prepare for the operation.  I met a few times

11  with Mr. William Sears here in Colorado to observe and

12  listen to some of the recorded phone calls setting up the

13  meetings that were to take place in Miami.  And then once we

14  were in Miami, I was there to help facilitate and make sure

15  everything went as planned.

16  Q.   Okay.  Now, as you stated, you had some -- you did some

17  work regarding e-mails; is that right?

18  A.   Oh, yes.  I also helped facilitate some e-mail

19  conversation between Mr. William Sears and Mr. Guy

20  Jean-Pierre, also setting up the meeting in Miami.

21  Q.   Okay.  And what was your role regarding these e-mails?

22  A.   I would take the e-mails that we had discussed with Mr.

23  Sears and with Agent Kate Funk, and we would draft them and

24  then send them on to Guy Jean-Pierre.

25  Q.   Okay.  Where would you send these e-mails from?

Direct - Varel

1    A.    From an e-mail that appeared to be from Mr. William

2    Sears.

3    Q.    Okay.  What state did you send these e-mails from?

4    A.    From here in Colorado.

5    Q.    Okay.  Now, did you also have a role regarding a

6    cashier's check?

7    A.    Yes, I did.

8    Q.    Okay.  Can you describe to the jury what the cashier's

9    check was for.

10   A.    Yes.  As part of their conversations, Mr. William Sears

11   had told Mr. Jean-Pierre that he had some money that a

12   friend of his was holding here in Colorado for him, that

13   were -- was monies, they're proceeds, of the FusionPharm

14   transactions that had taken place previously.  And he was

15   trying to hide them from the -- the different agencies

16   that -- and the different authorities that were trying to

17   seize his funds.  And so as part of that conversation, Mr.

18   Jean-Pierre offered that he could put it into an account in

19   the Dominican Republic.

20          And so Mr. William Sears had arranged to send a --

21   somewhat of a test transaction in a small amount for $5,000

22   down to Mr. Jean-Pierre in the Dominican Republic.  And so

23   my role was to get a cashier's check.

24          I went to the bank, purchased the cashier's check,

25   and then sent it to Mr. Jean-Pierre using the address that

Direct - Varel

1    he had provided in an e-mail, I believe, or text message, to

2    Mr. Sears.  And then on the back of that check prior to

3    sending, I put "for deposit only" to the account number that

4    was also provided by Mr. Jean-Pierre.

5    Q.   All right.  Can you please look at Government Exhibit

6    65.

7              MR. SIBERT:  Your Honor, based upon the

8    stipulation, I would move into evidence Government

9    Exhibit -- excuse me -- 365 and 366.

10             THE COURT:  Are they both stipulated?

11             MR. SIBERT:  They are, Your Honor.

12             THE COURT:  All right.  Given the stipulation,

13   Exhibits 365 and 366 are admitted into evidence and may be

14   published to the jury.

15        (Government's Exhibits 365 and 366 received)

16   BY MR. SIBERT:

17   Q.   Can I please have Government Exhibit 365 published.

18   Can I just have the top portion -- thank you.

19             All right.  Do you recognize the check that's being

20   shown on Government Exhibit 365?

21   A.   Yes.  I do.

22   Q.   And I say "check," what kind of, essentially, check is

23   this?

24   A.   It's a cashier's check.

25   Q.   Okay.  And is this the check that you assisted the

1    undercover in getting from First Bank?

2    A.   Yes, I did.

3    Q.   So who instructed the bank to put in all this

4    information?

5    A.   I did.

6    Q.   And additionally how much, again, was the check for?

7    A.   It was for $5,000.

8    Q.   All right.  Now, you stated -- can I have the bottom,

9    please?  The back of the check.

10          Now, you stated you wrote on the check; is that

11   correct?

12   A.   Yes.

13   Q.   Okay.  Wow, that's hard to see.  Is there any way to

14   turn that?  One more.  All right.  Thank you.

15          Okay.  Can you essentially -- there should be a

16   pointer for you.  Could you circle what you wrote on the

17   back of the check.

18          Thank you.

19   A.   I need to erase that.

20   Q.   So let me help you out.

21   A.   Thank you.  It's just this --

22   Q.   You don't qualify to do it.

23          Is that what you wrote there on the back of the

24   check?

25   A.   Yes, that is.

Direct - Varel

1    Q.   And that is the account number that you wrote?

2    A.   Yes.

3    Q.   Where did you get the account number from?

4    A.   That was provided by Mr. Jean-Pierre.

5    Q.   Okay.  And how was that provided?

6    A.   Either in an e-mail or in a text message.  I can't

7    recall.

8    Q.   Okay.  All right.  Can I have that taken down, please.

9         So after you got this cashier's check from First

10   Bank, how did you send it to Mr. Guy Jean-Pierre, as you

11   testified to?

12   A.   I went to a FedEx facility and overnighted it and -- to

13   an address and name provided to -- by Mr. Jean-Pierre.  Sent

14   it to Marcello Dominguez in the Dominican Republic.

15   Q.   Where did you send this check via FedEx from?

16   A.   From here in Colorado.  Here in Denver, actually.

17   Q.   Okay.  Now, could you -- you talked about assisting in

18   this undercover here with e-mails regarding Mr. Sears and

19   also down in Miami; is that correct?

20   A.   Yes.

21   Q.   Can you tell the grand -- or can you tell the jury

22   essentially what type of instructions that you would provide

23   Mr. Sears before he committed to doing his undercover

24   portion?

25   A.   Yeah.  We would have discussions with Mr. Sears

Direct - Varel

1    regarding what points of interest that we wanted discussed

2    in the different meetings.  Usually giving him a few items

3    that we really wanted to focus on.  And then he would come

4    up with his own plan for how he would have that covered in

5    the conversations.

6    Q.   Okay.  And once Mr. Sears, for lack of a better terms,

7    was turned loose outside of your presence in this undercover

8    operation, how did he respond to your instructions prior to

9    him acting in the undercover?

10   A.   He generally would cover all of the points that we

11   discussed by adding a lot of additional color and details

12   and -- in his own method of getting those points across.

13   Q.   And was -- were those colors and details part of the

14   instructions that you provided Mr. Sears?

15   A.   Not generally.

16   Q.   Okay.  And can you give the general nature of Mr. --

17   based upon your observations, can you give the general

18   nature of Mr. Sears' conduct in relationship with Mr. Guy

19   Jean-Pierre based upon what you observed?

20   A.   Yeah.  Upon my observations, it appeared they were very

21   friendly.  They hadn't seen each other in a bit so they were

22   catching up.  Had conversations about family, what they'd

23   been doing for the last few years.  Religion.  All kinds of

24   different topics that you would see from friends that are

25   catching up.

Direct - Varel

1    Q.   Okay.  Now, the portion of the undercover operation in
2    Miami, was that recorded?
3    A.   Yes.
4    Q.   Can you tell the jury how the undercover in Miami was
5    recorded.
6    A.   Yes.  We had -- so there were multiple meetings, so Mr.
7    Jean-Pierre flew into the Miami airport where Mr. Sears
8    picked him up in an Uber that was driven by another federal
9    agent, and brought them back to the airport.  That entire
10   conversation was recorded audio -- with just audio.
11            And then they -- after they got to the hotel, they
12   went and freshened up.  Then they met again prior to a
13   dinner meeting and that conversation was also recorded with
14   audio.  They went to a dinner meeting where we had audio
15   recordings as well.  I think there were videorecordings that
16   didn't work out quite well.
17            And then the next morning, they met for a breakfast
18   meeting in the hotel room of the undercover, and that room
19   was set up for audio and videorecording.
20   Q.   Okay.  Do you recall the time frame when the undercover
21   portion of this operation happened in Miami?
22   A.   I think it was the end of April 2016.
23   Q.   Okay.  And when you said the ride from the airport to
24   the hotel and the meeting in the hotel before dinner, and
25   then dinner was recorded by audio, how were those

Direct - Varel

1    recorded -- how were those recordings made?

2    A.    They were using FBI recording equipment, and then we

3    also had live transmissions where we were able to listen to

4    the entire recording as it was taking place.

5    Q.    Was there a particular individual wearing the recording

6    devices?

7    A.    Yeah, Mr. Sears had all of the recording equipment.

8    Q.    Okay.  So as Mr. Sears was wearing this recording

9    equipment, who could hear also?

10   A.    Yes, myself, as well as a few other agents that were

11   with me on the operation.

12   Q.    Okay.  Now, could you tell the jury what the purpose of

13   recording a trip from the airport to the hotel was for.

14   A.    It is general policy that any time a source or an

15   individual working with the Government is meeting with a

16   subject, we record everything just for protection.

17   Q.    Okay.

18   A.    Coverage.

19   Q.    So there was no, as Mr. Sears would like to call,

20   script from the Miami airport to the hotel?

21   A.    No script.

22   Q.    Okay.  All right.  And then how about -- you stated

23   that they met again in the hotel prior to dinner; is that

24   right?

25   A.    Yes.

2193
Direct - Varel

1  Q.  Okay.  Was there a focus of that recording?

2  A.  Just general conversation, catching up.  I think

3  they -- you know, they talked about some -- the check that

4  was sent and some dealings that Mr. Sears and Mr.

5  Jean-Pierre had done prior, and then what was going to be

6  happening at the meeting once they met the undercover.

7  Q.  Okay.  So why was the dinner conversation recorded as

8  part of the undercover operation?

9  A.  Because we knew that there would be points where they

10 would be discussing what was going to happen in the deal.

11 Q.  Okay.  And how did you know that?

12 A.  Because those were some of the things that we had

13 directed Mr. Sears to talk about.

14 Q.  Okay.  And who was Guy Jean-Pierre going to meet at the

15 dinner conversation -- or the dinner?

16 A.  They were going to meet with a third party who was an

17 FBI undercover, and he was supposed to be another individual

18 coming in to help fund a deal.

19 Q.  Okay.  And do you recall what the FBI undercover went

20 by?

21 A.  He went by E.J.

22 Q.  And then you stated that they -- that the recording of

23 the dinner, but then the next morning there was a breakfast

24 meeting; is that correct?

25 A.  Yes.

2194

Direct - Varel

1    Q.   What was the purpose of recording the breakfast meeting

2    with video and audio as part of the undercover?

3    A.   That was also to gather additional evidence regarding

4    what exactly Mr. Jean-Pierre's role was going to be in this

5    deal and which -- you know, to gather additional information

6    with the points that we had wanted Mr. Sears and the

7    undercover to make in what Mr. Jean-Pierre was going to do

8    for them regarding the VertiFresh deal.

9    Q.   All right.  Thank you.

10            MR. SIBERT:  Your Honor, at this time, I'm going to

11   ask the jury to listen to some video clips, audio, of the --

12   of these meetings.  I'm not sure if the Court wants me to

13   start this process now or --

14            THE COURT:  Yeah.  Yes.  Because we're going to go

15   for a bit yet.  So --

16            MR. SIBERT:  Great.

17            THE COURT:  Are these audio --

18            MR. SIBERT:  These are audio.  The ear phones are

19   going to be needed.

20            THE COURT:  What exhibit are we talking about?

21            MR. SIBERT:  Everything that's been introduced into

22   evidence.  351-A, 358-C, and then 363-A, several of 363.

23   And everything's been admitted into evidence.

24            THE COURT:  All right.  Well, it may be in

25   evidence, but we need to have a clear record of what's --

Direct - Varel

1              MR. SIBERT:  And I'll --

2              THE COURT:  Hold on, hold on.  We'll need to have a

3    clear record of what is being played to the jury and what

4    they're listening to.  So it's 351-A, 358-C, 363-A --

5              MR. SIBERT:  And I'm going to have to announce

6    these from my audio, so I'm going to make a record of it.

7    But it's 363-B, 363-C, 363-D, and 363-E and F.  And G.

8              THE COURT:  Any more?

9              MR. SIBERT:  Not right now.

10             THE COURT:  All right.  Are these all in evidence?

11   Okay.

12             And are these also captioned?

13             MR. SIBERT:  Yes, sir.

14             THE COURT:  All right.  So they're audio.  All

15   right.  So what are we going to be -- are we going to be

16   seeing a caption or transcript on the screen?

17             MR. SIBERT:  Yes, sir.  Yes, sir.

18             THE COURT:  All right.

19             MR. SIBERT:  On all these, there will be a caption

20   at the bottom.

21             THE COURT:  All right.  So same instruction as

22   before, ladies and gentlemen of the jury:  To the extent

23   what you hear is not what's in the transcript, the evidence

24   is the actual conversation.

25             Go ahead.

Direct - Varel

1          MR. SIBERT:  Your Honor, I'm just waiting on

2     defense counsel, make sure they're okay.

3          THE COURT:  All right.

4          MR. SIBERT:  Can I please have Government Exhibit

5     351-A, please.  Can we stop, Your Honor?  One of the juror's

6     headsets isn't working.

7          THE COURT:  Okay.

8          MR. SIBERT:  May I ask help from the courtroom

9     deputy?

10          THE COURT:  Sure.  Who's that for?  Oh.

11          Do you have a green light there?

12          THE JUROR:  Yes, sir.

13          THE COURT:  Okay.  It looks like we're ready to go.

14          MR. SIBERT:  All right.  Thank you, Your Honor.

15     Again, can I have Government Exhibit 351-A played.

16          (Audio played)

17     BY MR. SIBERT:

18     Q.   Okay.  I asked you about the recordings and the

19     relationship that Mr. Sears and Mr. Guy Jean-Pierre had.

20     Essentially, what you heard in the clip 351-A, was that

21     similar to the type of relationship that you described

22     before?

23     A.   Yes.

24     Q.   Okay.  And, again, did you listen to the rest of the

25     recording from the ride from the airport to the hotel?

Direct - Varel

1    A.   Yes, I did.

2    Q.   Any changes in mannerisms regarding their relationship

3    or conversation?

4    A.   No.

5    Q.   So how would you categorize, again, their conversation,

6    based upon listening to this recording, where Mr. Sears is

7    picking up Mr. Guy Jean-Pierre?

8    A.   It was very relaxed and friendly.

9    Q.   Okay.  And, in fact, Mr. Sears makes a lot of comments

10   about Mr. Guy Jean-Pierre's weight; is that correct?

11   A.   Yes.

12   Q.   Indicating that he has seen Mr. Guy Jean-Pierre in the

13   past.

14   A.   Yes.

15   Q.   Okay.  Can I have Government Exhibit 358-C played.

16        (Audio played)

17   BY MR. SIBERT:

18   Q.   All right.  Can you tell the jury essentially what that

19   clip -- where that clip was being recorded.

20   A.   Yes.  That was recorded as Mr. Sears and Mr.

21   Jean-Pierre were walking from their hotel to a hotel down

22   the street with a restaurant inside.  That's where they were

23   meeting E.J. for dinner.

24   Q.   Okay.  And do you know what was being referred to

25   regarding the 5 percent plus the 1 percent in bank costs?

Direct - Varel

1    A.   That was the costs or the fees that Mr. Sears was going

2    to be paying Mr. Jean-Pierre for helping him to essentially

3    clean his money or protect the money that he had here in the

4    states and put -- by putting it into the Dominican Republic

5    so that the U.S. authorities could not access it.

6    Q.   All right.  Now, did you listen to the rest of the

7    recordings regarding the dinner meeting?

8    A.   Yes, I did.

9    Q.   And approximately how long were those recordings?

10    A.   They're about -- I think it was like 2 1/2 to 3

11    hours.

12    Q.   Okay.  And who did Mr. Guy Jean-Pierre meet during the

13    dinner meeting?

14    A.   It was Mr. Sears, Mr. Jean-Pierre, and E.J., the FBI

15    undercover.

16    Q.   Okay.  Was there any discussion in that dinner meeting

17    about what was going to take place the next morning that

18    was -- what is being called the breakfast meeting?

19    A.   Yes.  They discussed that -- you know, some high-level

20    topics at dinner, and then that they were going to go into

21    detail in discussing the forms and the documents that Mr.

22    Jean-Pierre had emailed E.J. earlier in preparation for the

23    meeting and the documents that he was going to be supplying

24    them for the VertiFresh deal.

25    Q.   Okay.  So besides a general overview of the breakfast

1    meeting and the documents, and the introduction with E.J.,
2    was there any further conversation regarding the undercover
3    operation at dinner?
4    A.    No details, really.
5    Q.    Okay.  And so what was the rest of the time spent
6    talking about?
7    A.    Getting to know each other.  They talked about a lot
8    of, you know, sports, the NFL draft was going on at the
9    time.  They were talking about different places that they
10   had lived.  I think all of them have lived in California at
11   some point, and spent a bit of time discussing different
12   areas in California, discussed Boca, different areas in
13   Florida that they had lived and different work that they had
14   done in the past.
15   Q.    Was there any reference regarding Mr. Sears' and Mr.
16   Guy Jean-Pierre's past relationships?
17   A.    Yes, there was.
18   Q.    And what did that -- do you recall what that discussion
19   was about?
20   A.    They talked about how they had done the deal with
21   FusionPharm, and I think some of Mr. Sears' family members
22   and Mr. Sears being too close to that deal.
23   Q.    All right.  Can I please have Government Exhibit 363-A
24   played starting at 1:32.
25         (Video played)

Direct - Varel

1   BY MR. SIBERT:

2   Q.   Okay.  Can you just leave that up there for a second.

3        If you look on your screen, okay, who's sitting

4   here at the breakfast table?

5   A.   That's Mr. Sears.

6   Q.   Okay.  And who is sitting back here?

7   A.   That's Mr. Jean-Pierre.

8   Q.   Okay.  And who is this gentleman sitting on the

9   couch?

10  A.   That's E.J.

11  Q.   Okay.  And that's the undercover?

12  A.   Yes.

13  Q.   Okay.  And essentially where's this taking place?

14  A.   That's in E.J.'s hotel room.

15  Q.   Okay.  And where is this hotel room?

16  A.   In Miami.

17  Q.   Okay.  And you just listened to that clip.  Essentially

18  who was talking about being able to liquidate paper quickly

19  in order to get stock?

20       MR. GOODREID:  Your Honor, I'm going to object to

21  this line of questioning.  I mean, the jury just heard it;

22  they can make their own assessment, this is -- as to who

23  said what.  We just saw the clip and we watched the whole

24  thing.

25       THE COURT:  I agree.  Why are we doing that?

Direct - Varel

1          MR. SIBERT:  Your Honor, based upon -- these would

2     be statements made by the defendant and regarding the

3     subject matter of the clip -- the purpose of the clip.  And

4     I'd like to make -- emphasize the point that the defendant

5     in this case is making certain acknowledgments I think that

6     should be allowed, going to his understanding of the law.

7     And the fact that the whole point of the undercover is to

8     show that he knows the law, but he's going to bypass the law

9     for money.

10          THE COURT:  Well, I'll allow it if it's limited to,

11    you know, the salient points and not to, you know, the --

12    some of the more minor issues that have been discussed, you

13    know, in terms of the --

14          MR. SIBERT:  I don't care about social talk.  I

15    want to talk about the law.

16          THE COURT:  All right.  Go ahead.

17    BY MR. SIBERT:

18    Q.   Okay.  So who was talking about being able to liquidate

19    paper in order to get stock?

20    A.   Mr. Jean-Pierre.

21    Q.   Okay.  And who also was discussing the Rule 144

22    exception regarding nonreporting companies?

23    A.   Mr. Jean-Pierre.

24    Q.   Okay.  And also who was giving E.J. the understanding

25    about how a convertible note can be converted into equity

2202

Direct - Varel

1    form of stock?

2    A.   Mr. Jean-Pierre.

3    Q.   And also, did Mr. Guy Jean-Pierre discuss the holding

4    period of that note before it can become free-trading

5    shares?

6    A.   Yes, he did.

7    Q.   All right.  Can I have the video played at 5 minutes,

8    please.  This is still Exhibit 363-A.  At 5 minutes.

9         (Video played)

10   BY MR. SIBERT:

11   Q.   Okay.  Based upon the clip there, why was Mr. Guy

12   Jean-Pierre telling E.J. and Sears to round out $50,000?

13            MR. GOODREID:  Objection.  Calls for speculation.

14            THE COURT:  Sustained.

15   BY MR. SIBERT:

16   Q.   Based upon what Mr. Guy Jean-Pierre said --

17            MR. GOODREID:  Same objection.

18            THE COURT:  Sustained.

19   BY MR. SIBERT:

20   Q.   What did Mr. Guy Jean-Pierre say when he was talking

21   about why the $50,000 had to be rounded out?

22   A.   He said that it would draw too much attention.

23   Q.   Who stated that the convertible feature of a note must

24   be created at the time of debt?

25   A.   Mr. Jean-Pierre.

2203
Direct - Varel

1    Q.   Okay.  And, again, who's Mr. Guy Jean-Pierre concerned
2    about in this video regarding a review of the paperwork?
3    A.   He talked about the SEC and FINRA.
4    Q.   Okay.  Can I have 363-B played at -- I'm sorry, at 2
5    minutes.
6         (Video played)
7    BY MR. SIBERT:
8    Q.   Okay.  Whose -- who did -- who is Mr. Sears referencing
9    when he said he gave him cash?
10   A.   E.J. gave Mr. Sears cash.
11   Q.   Okay.  And where does Mr. William Sears state that the
12   bank deposits will come from?
13   A.   From other deals that he had made previously.
14   Q.   And what is -- how does Mr. Guy Jean-Pierre respond
15   when he hears that the cash is coming from other deals?
16   A.   He acknowledges this and says okay.
17   Q.   Can I have Government Exhibit 363-C played, starting at
18   50 seconds.
19        (Video played)
20   BY MR. SIBERT:
21   Q.   Okay.  Mr. Guy Jean-Pierre is talking in that clip.  Do
22   you know, based upon your four hours of listening -- did you
23   listen to the whole recording on the breakfast meeting?
24   A.   Yes.
25   Q.   How long is the breakfast meeting?

2204

Direct - Varel

1    A.    It's three, four hours.

2    Q.    Okay.  And do you know what Mr. Guy Jean-Pierre is

3    talking about regarding the clock starts when the last

4    deposit comes in, based upon you listening to this recording

5    and also listening to this live?

6    A.    Yes.  So when he mentions the clock starts ticking,

7    there's a one-year holding period from the time that your

8    last deposit is made with the convertible note, and you

9    cannot trade it until that one year is up.

10   Q.    When you say "the one year is up," from the time the

11   last deposit was made?

12   A.    Yes.

13   Q.    Can I have the same clip, 363-C, played starting at

14   5:30.

15         (Video played)

16   BY MR. SIBERT:

17   Q.    Based upon review of that video and also listening to

18   it, who states the paperwork has to appear clean?

19   A.    Mr. Jean-Pierre.

20   Q.    And who says the SEC is not going to be overjoyed about

21   backdating?

22   A.    Mr. Jean-Pierre.

23   Q.    And who says you don't want to do anything that draws

24   attention?

25   A.    Mr. Jean-Pierre.

2205

Direct - Varel

1    Q.   Can I have Government Exhibit 363-D played, starting at

2    30 seconds.

3         (Video played)

4    BY MR. SIBERT:

5    Q.   All right.  Do you recall -- what is Mr. Sears talking

6    about regarding the transactions, based upon your review of

7    these videos and also being there listening live?

8    A.   He was talking about separate transactions of deposits

9    that had come into his account.

10   Q.   Okay.  So based upon their conversation, have these

11   transactions been made yet?

12   A.   Yes, they have.

13   Q.   Okay.  And when Guy Jean-Pierre is asked about how many

14   transactions there should be on the note, what does Mr. Guy

15   Jean-Pierre state?

16   A.   It could be as many as you want.

17   Q.   Okay.  And how does he respond when Mr. Sears -- he

18   says about five or six?

19   A.   He said, "Yeah, but it could be more if you need."

20   Q.   Can I have the same clip, 363-D played, at 7:30.

21        (Video played)

22   BY MR. SIBERT:

23   Q.   Okay.  Who's Mr. Sears speaking about with Mr. Guy

24   Jean-Pierre regarding this new guy?

25   A.   They were talking about a guy named Steve Mills out of

2206

Direct - Varel

1     Tennessee.

2     Q.   Okay.  And what was his role?

3     A.   He was going to be the attorney that was going to be

4     signing the opinion letter.

5     Q.   And how does Mr. Guy Jean-Pierre respond when Mr. Sears

6     asked him if this lawyer will do everything that Mr. Guy

7     Jean-Pierre wants?

8     A.   He said he will.

9     Q.   Okay.  And then how -- basically what did Mr. Guy

10    Jean-Pierre state about Mr. DiTommaso?

11    A.   He said he had something over him that made him do the

12    same thing.

13    Q.   Okay.  And do you recall on that video where he asked

14    Mr. DiTommaso -- he had worked with Mr. DiTommaso for a

15    while before getting in the pool?

16    A.   Yes.

17             THE COURT:  Why don't we take a pause there, Mr.

18    Sibert.

19             MR. SIBERT:  Okay.  Thank you, Your Honor.

20             THE COURT:  One second.  All right, ladies and

21    gentlemen of the jury, we're going to take our lunch break.

22    We will be in recess until 1:35.

23        (Jury left the courtroom at 12:39 p.m.)

24             THE COURT:  Special Agent, since you're in the

25    middle of your testimony I direct you not to speak with any

1    of the lawyers while the court is in recess.

2         (Recess taken 12:39 p.m.)

3                          AFTERNOON SESSION

4         (In open court outside the presence of the jury at 1:38

5    p.m.)

6         THE COURT:  All right.  Before we -- I need to take

7    a two-minute recess.

8         (Recess taken 1:39 p.m. to 1:41 p.m.)

9         THE COURT:  Sorry about that.  All right.

10        As we're preparing back in chambers for the Rule

11   29, I have a question for you, Mr. Sibert, in terms of what

12   the Government's theory is on the securities fraud Counts 21

13   through 23.  So is it -- when is the -- in the Government's

14   view, when does the criminal violation take place?  When the

15   shares become free-trading and deposited in a brokerage

16   account because of the Rule 144 letter, or the fraud is not

17   completed until the shares are actually sold publicly on the

18   market?  So when -- when does the crime occur?

19        MR. SIBERT:  Well, as the indictment states, Your

20   Honor, on or about.  So I think it can --

21        THE COURT:  It's not so much the date.  I don't

22   care about the date, but what event, in the Government's

23   theory, is the securities fraud in those three counts?  When

24   does that -- what event is the criminal act?

25        MR. SIBERT:  I think it's exactly how it states in

1     the indictment:  When the sale of 5,036 shares, sale of

2     2,085 shares, and the sale of the 21,676 shares.

3              THE COURT:  So when the shares are actually sold on

4     the market -- not that they get deposited falsely, being

5     represented as free-trading stock in the Alpine -- for

6     example, in the Alpine account with the 144 letter?  So

7     there's no crime then -- as of then, and the crime only

8     happens when -- in other words, if those -- if those shares

9     get accepted by Alpine as freely tradable shares because of

10    the opinion letter, and let's say, hypothetically, those

11    shares are never sold, is it the Government's theory that

12    there's no crime?  There's no criminal securities fraud

13    violation?

14             MR. SIBERT:  No.

15             THE COURT:  So when -- so it happens when they're

16    deposited --

17             MR. SIBERT:  I think -- I don't think there's a

18    time frame there.  I think you're asking a question --

19             THE COURT:  It's not the -- it's -- we're reviewing

20    what evidence --

21             MR. SIBERT:  Okay.  Well, the evidence is in there

22    about the sale.  That's under 433, 434, 435.  The sale of

23    shares.  And we've had evidence of the deposits as well.  So

24    there's been evidence on both sides.

25             THE COURT:  Okay, but when -- what is the

1    Government's -- when does the --

2              MR. SIBERT:  Because the -- here's the theory:  The

3    theory is Alpine or Scottsdale would not accept the shares

4    unless the 144.

5              THE COURT:  Right.

6              MR. SIBERT:  So that's -- that's one part.

7              But the public also -- the shares are now part of

8    the public OTC Markets --

9              THE COURT:  Right.

10             MR. SIBERT:  -- they're also relying on the fact

11   that these shares are correctly unregistered and

12   free-trading without any interruption.

13             THE COURT:  I understand all that.  So in my

14   hypothetical again, so you had restricted shares --

15             MR. SIBERT:  Yes, sir.

16             THE COURT:  -- okay, that were MeadPoint and

17   Bayside shares that are restricted.

18             MR. SIBERT:  Yes, sir.

19             THE COURT:  Because of the 144 letter, which the

20   Government's theory has failed to disclose the holding

21   period -- or falsely disclosed that the holding period

22   was -- of one year was met, and -- and failed to disclose

23   the affiliate status of Mr. Sears, that because of that 144

24   letter with those deficiency -- legal deficiencies, Alpine

25   accepted those shares as freely tradable stock into its

1    account.  All right?

2            And my -- my question is:  Hypothetically if those

3    shares never got sold, is the Government's theory there's

4    already securities fraud?

5            MR. SIBERT:  I believe so under the law of 10b-5

6    because 10b-5 talks about a scheme.  And there's just not

7    one -- it's not one time of the act; it's the scheme to

8    defraud.  So I'm having -- I guess to be honest with the

9    Court, I'm having a hard time understanding the Court's

10   question because under 17 CFR 240.10b-5, which is the

11   charge --

12           THE COURT:  Right.

13           MR. SIBERT:  -- that it's unlawful for any person,

14   directly or indirectly, by the use of any means or

15   instrumentality of interstate commerce, or of the mail in

16   connection with the purchase or sale of a security to employ

17   any device, scheme.  So there's not one time frame.

18           THE COURT:  All right.

19           MR. SIBERT:  It's the whole purpose --

20           THE COURT:  So it's the Government's theory that

21   the -- that the scheme was encompassed by both of that sets

22   of conduct -- the -- according to the Government, the

23   alleged fraudulent deposit of the shares and there's a

24   subsequent sale.

25           MR. SIBERT:  Right.  And I would further, under

24 -- paragraphs 24 of the indictment, it's the -- the --
it's the deceptiveness of the whole thing where even under
17 240.10b -- 10b-5, to make any untrue statement of a
material fact or to omit to state a material act necessary
in order to make the statements made, in the light of the
circumstances under which they were made, not misleading.

So, I mean, I think that's why if you read the
indictment under paragraph 24, you have to look more to --
than just what the counts are saying under 21 and 23.  It
incorporates the whole --

THE COURT:  The prior -- from paragraphs 2 on.

MR. SIBERT:  Well, that, and also even in
paragraph 24, it lays out that manipulative and deceptive
devices, employing devices, schemes.  So it even talks about
the scheme at paragraph 24 relating to charges of 21 and 23.

THE COURT:  Okay.  All right.

MR. SIBERT:  So I don't mean to not answer the
Court, but --

THE COURT:  No, I think you've answered it.  I
think you've answered the question.

MR. SIBERT:  Thank you.

THE COURT:  I understand.  All right.

Let's bring in the jury.

(Jury was present at 1:47 p.m.)

THE COURT:  Agent Varel, I remind you you remain

Direct - Varel

1      under oath.

2              THE WITNESS:  Thank you.

3              THE COURT:  All right.  Mr. Sibert, you may resume

4      your examination.

5              MR. SIBERT:  Okay.  Thank you, Your Honor.

6      BY MR. SIBERT:

7      Q.   Okay.  Can I please have -- I would ask that everyone

8      put on their headphones.  We're back to the video/audio.

9              I don't think Mr. Barnard has his on.

10             Okay now can I please have Government Exhibit --

11     sorry -- 36-D at 7:30 played.

12         (Video played)

13             MR. SIBERT:  Okay.  I need to correct myself, Your

14     Honor.  I said 36-D.  I meant to say 363-D for that clip.

15             THE COURT:  I was just going to point that out.  Go

16     ahead.

17     BY MR. SIBERT:

18     Q.   And -- okay, I'm sorry, Agent.  Can you please tell me

19     essentially in that clip, they're talking about a Mills.

20     Who is Mills?

21     A.   He was an attorney in Tennessee that was going to be

22     signing the opinion letter.

23     Q.   Okay.  And how does Mr. Guy Jean-Pierre respond when

24     Sears says that Mr. Guy Jean-Pierre will put together the

25     disclosure statements and information, the new lawyer will

2213

Direct - Varel

1    just sign it?

2    A.    He said he will.

3    Q.    Okay.  Okay.  Can I have the same clip, 363-D, at 9:45

4    played.

5         (Video played)

6    BY MR. SIBERT:

7    Q.    Okay.  How does Guy Jean-Pierre respond when he's asked

8    what E.J. needs to do to not to be the company or an

9    affiliate?

10   A.    He needs to appear not to have any control.

11   Q.    Okay.  And how about his name on the paperwork?

12   A.    He wouldn't be listed.

13   Q.    And when you say "he wouldn't be listed," who are you

14   talking about?

15   A.    E.J.

16   Q.    Okay.  And also besides being in control, what else --

17   what other advice does Guy Jean-Pierre state about

18   insulating E.J. from being in control?

19   A.    I don't remember any other specific statements.

20   Q.    Do you recall the stock percentage --

21        MR. GOODREID:  Objection.  Leading.  She just said

22   she doesn't recall.

23        THE COURT:  Sustained.

24        MR. SIBERT:  May I replay the video starting at

25   9:45?

2214

Direct - Varel

1        MR. GOODREID:  Judge, that seems like bolstering

2   upon bolstering.

3        THE COURT:  I mean, just because it's recorded, we

4   can't have testimony twice.  She can't recall what she just

5   heard, so next question.

6        MR. SIBERT:  Well, can I refresh the witness'

7   memory?

8        THE COURT:  No.

9        MR. SIBERT:  There's over four hours of video.

10        THE COURT:  We're talking about something we just

11   listened to.

12        MR. SIBERT:  I'm just saying there's four hours of

13   video.  This agent is talking about 15 seconds that I'm

14   playing her.

15        THE COURT:  You have my ruling.  Next question.

16   BY MR. SIBERT:

17   Q.   All right.  Can I play from -- where did we stop,

18   10:45?  Okay.  Can I start playing at 10:45 on 363-D.

19        (Video played)

20        THE COURT:  Hold on.  Aren't we just replaying what

21   I told you not to replay?

22        MR. SIBERT:  Your Honor, I asked for 10:45.  I'm

23   sorry.  All right?  I'm trying to get to 11 minutes.  All

24   right?  I didn't ask them to play anything before.

25   Sometimes the recording starts before.

2215
Direct - Varel

1          THE COURT:  Well, but this --

2          MR. SIBERT:  And there was -- it wasn't replayed.

3          THE COURT:  All right.  Go ahead.

4     BY MR. SIBERT:

5     Q.   Okay.  Is that the end of that -- can I have that clip

6     for 11 minutes -- at 11 minutes.  Starting at 11 minutes.

7          (Video played)

8     BY MR. SIBERT:

9     Q.   So how does Mr. Guy Jean-Pierre discuss about hiding

10    E.J.'s role as an undisclosed owner in that clip?

11    A.   He wants him to be a consultant.

12    Q.   Can I have the next video, 363-D, played at 13

13    minutes -- starting at 13 minutes.

14         (Video played)

15    BY MR. SIBERT:

16    Q.   Okay.  How does Guy Jean-Pierre respond when E.J.

17    states that he controls Phil Morgan?

18    A.   He says "Okay."

19    Q.   Can I keep playing this video at 13:37.

20         (Video played)

21    BY MR. SIBERT:

22    Q.   What does Guy Jean-Pierre state regarding Mr. Sears'

23    prior involvement with FusionPharm?

24    A.   He was too close of a personal relationship to the

25    owner.

Direct - Varel

1    Q.   Can I have the next video at -- 363-D, and at 19

2    minutes.  Start at 19 minutes.

3         (Video played)

4    BY MR. SIBERT:

5    Q.   Okay.  How does Mr. Guy Jean-Pierre respond when he's

6    told Phil does not know jack shit?

7    A.   He said "Excellent."

8    Q.   Okay.  And how does he react with Mr. Sears?

9    A.   He gives him a fist bump.

10   Q.   Okay.  And who says Steve Mills won't know either?

11   A.   He said --

12   Q.   Do you know --

13   A.   I don't know the exact words, but he agreed that was

14   good.

15   Q.   Okay.  And who made the statement that Steve Mills, the

16   lawyer, "won't know anything either from me"?

17   A.   Mr. Guy Jean-Pierre.

18   Q.   Can I have the same Exhibit 363-D played at 21:40.

19        (Video played)

20   BY MR. SIBERT:

21   Q.   And what advice does Mr. Guy Jean-Pierre give E.J.

22   regarding e-mails?

23   A.   He tells him to not give any indication that he's in

24   control or manages it, so he gives him words to use such as

25   "per your request."

2217

Direct - Varel

1    Q.   And when he says, "PER your request," who uses that

2    type of language in e-mails?

3    A.   Mr. Guy Jean-Pierre.

4    Q.   Okay.  Can I have that -- can you keep playing that

5    video, please.  Just give me a second so I can put my

6    headphones on.  Okay.

7         (Video played)

8    BY MR. SIBERT:

9    Q.   What does Guy Jean-Pierre state about transferring

10   large sums of money?

11   A.   They shouldn't do it.

12   Q.   Okay.  And when they say "they shouldn't do it," who's

13   Guy Jean-Pierre referring to?

14   A.   E.J. and Sears in relation to VertiFresh should not be

15   sending a lot of money to Phil Morgan.

16   Q.   Can I have the same exhibit, 363-D, at 25:45.

17        (Video played)

18   BY MR. SIBERT:

19   Q.   Okay.  Regards to putting the money into a third party

20   in order to get more control of the company, what does Guy

21   Jean-Pierre say about the third party he knows?

22   A.   That he can trust him.

23   Q.   Can I have -- can I have 30:20 played, please.

24        (Video played)

25   BY MR. SIBERT:

1    Q.   Okay, who's explaining to E.J. about writing that he's

2    not an affiliate of the company?

3    A.   Sorry, can you repeat the question.

4    Q.   Who's explaining to E.J. that he needs to do a letter

5    explaining that he's not an affiliate of the company?

6    A.   Oh, Mr. Guy Jean-Pierre.

7    Q.   And also who explains that E.J. is not a 10 percent

8    owner of the company?

9    A.   Mr. Guy Jean-Pierre.

10   Q.   Can you keep playing that, please.

11       (Video played)

12   BY MR. SIBERT:

13   Q.   Could -- okay, essentially how does Guy Jean-Pierre

14   explain to E.J. where this letter comes from?

15   A.   He was telling him it comes from Thor, the

16   nonaffiliated company.

17   Q.   All right.  And can I have Government Exhibit 363-E.

18   And can we play that clip starting at 13 seconds.

19       (Video played)

20   BY MR. SIBERT:

21   Q.   Who's going to be the point guy between Mr. Sears and

22   E.J. and the attorney?

23   A.   Mr. Guy Jean-Pierre.

24   Q.   Can I have 363-E, please, at 5:30.  363-E.  It might be

25   F.  I'm sorry.  363-F at 5:30.

Cross - Varel

1     MR. SIBERT:  Your Honor, can I have a moment?
2          THE COURT:  You may.
3          MR. SIBERT:  Your Honor, can I have 363-G at 5:30.
4     (Video played)
5     BY MR. SIBERT:
6     Q.   Okay.  Essentially what is being stated about who's
7     running the show in that clip?
8     A.   Mr. Sears states that Mr. Sears and E.J. will be the
9     ones running the show.
10    Q.   And who's that in front of?
11    A.   In front of Mr. Guy Jean-Pierre.
12         MR. SIBERT:  Can I have a minute, Your Honor?
13         THE COURT:  You may.
14         MR. SIBERT:  I'll pass the witness.
15         THE COURT:  Cross-examination.
16         MR. GOODREID:  Yes, Your Honor.  Thank you.
17                   CROSS-EXAMINATION
18    BY MR. GOODREID:
19    Q.   Good afternoon, Special Agent.  And is your last name,
20    is it pronounced Varel?
21    A.   Yes.
22    Q.   Varel?  Okay.  Pull up Exhibit 365, please.  And,
23    again, can we rotate that so that the back of the check is
24    straight up and down.  Okay, then can we enlarge the back of
25    the check, please.

2220
Cross - Varel

1      Special Agent Varel, you remember talking about
2  this check, don't you?
3  A.   Yes.
4  Q.   I just want to ask you about the back to clarify again.
5  So you said you wrote "For deposit only" on that, correct?
6  A.   Yes.
7  Q.   And then you also wrote the account -- the word
8  "account" and then the number, right?
9  A.   Yes.
10 Q.   But you obviously didn't endorse it, right?
11 A.   Correct.
12 Q.   And then that number that's below that, the 421262, do
13 you see that?
14 A.   Yes.
15 Q.   You didn't put that number on there, did you?
16 A.   I did not.
17 Q.   Okay.
18      MR. GOODREID:  That's all the questions I have,
19 Your Honor.
20      THE COURT:  All right.  Redirect.
21      MR. SIBERT:  Your Honor, can I offer into evidence
22 Government Exhibit 370?  It's been stipulated to.
23      THE COURT:  All right.  Given the stipulation of
24 the parties, Exhibit 370 is admitted into evidence and may
25 be published to the jury.

Redirect - Varel

1    (Government's Exhibit 370 received)

2                    REDIRECT EXAMINATION

3    BY MR. SIBERT:

4    Q.   Can you just focus on here, please.  Okay.

5         Is this the FedEx form that you filled out?

6    A.   Yes, it is.

7    Q.   Okay.  And this is the FedEx form that you filled out

8    regarding that check; is that right?

9    A.   Yes.

10   Q.   Okay.  And who's it supposedly from?

11   A.   From William Sears.

12   Q.   Okay.  And where is it going to?

13   A.   Marcello Dominguez de Guerra at Avenue Padre Ramon

14   15 -- I have no idea how to pronounce that next line --

15   Metropolitanos, Santiago, Dominican Republic.

16             MR. SIBERT:  All right.  Thank you.

17             Thank you, Your Honor.

18             THE COURT:  May this witness be excused for the

19   Government?

20             MR. SIBERT:  Yes, Your Honor.

21             THE COURT:  For the defendant?

22             MR. GOODREID:  Yes, Your Honor.

23             THE COURT:  All right.  Special Agent, thank you

24   for your testimony.  You are excused.  You may step down.

25             Government may call its next witness.

2222

1          MR. BROWN:  Your Honor, the Government calls Luis
2     Reyes, who's noted on the witness list as Bank of America.
3          THE COURT:  All right.
4          COURTROOM DEPUTY:  Would you please stand back here
5     and raise your right hand.
6               LUIS REYES, GOVERNMENT'S WITNESS, SWORN
7          COURTROOM DEPUTY:  Please be seated.  You may need
8     to scoot your chair up towards the microphone.
9          THE WITNESS:  Yes.
10         COURTROOM DEPUTY:  And please state and spell your
11    name for the record.
12         THE WITNESS:  Yes.  My name is Luis, L-u-i-s,
13    Reyes, R-e-y-e-s.
14         MR. BROWN:  Your Honor, this witness will be
15    discussing Government Exhibit 367, which is not admitted,
16    but I invite the Court maybe to -- it may want to look at
17    the hard copy of that exhibit.
18         THE COURT:  Well, is there going to be an
19    objection?
20         MR. BROWN:  It wasn't stipulated to, I don't
21    believe.
22         THE COURT:  Right.  I figured if it had been, you
23    would have told me, so I was assuming that there's not -- is
24    there going to be an objection to 367?
25         MR. BARNARD:  Your Honor, no objection to its

2223
Direct - Reyes

1    admission.

2              THE COURT:  All right.  There being no objection,

3    Exhibit 367 is admitted into evidence and may be published

4    to the jury.

5         (Government's Exhibit 367 received)

6              MR. BROWN:  Okay.

7                        DIRECT EXAMINATION

8    BY MR. BROWN:

9    Q.   Mr. Reyes, where do you live, sir?  Where do you live?

10   A.   I live in Los Angeles, California.

11   Q.   Did you come to Denver yesterday?

12   A.   I did.

13   Q.   How do you like the snowstorm?

14   A.   Well, it's not something we usually get over in LA,

15   so . . .

16              I don't know that I was prepared for it.

17   Q.   Your hotel wasn't too far away.

18   A.   No.

19   Q.   How are you employed, sir?

20   A.   I am an employee of Bank of America National

21   Association.

22   Q.   How long have you worked for Bank of America?

23   A.   Since February of 2010.

24   Q.   And I assume you work for Bank of America in

25   Los Angeles?

2224

Direct - Reyes

1    A.    I do.

2    Q.    Prior to work -- how long -- how long have you worked

3    in the banking industry, would you say?

4    A.    Since 2004.

5    Q.    And what other banks have you worked at?

6    A.    Washington Mutual Bank, and I also worked for

7    Countrywide Home Loans.

8    Q.    In your -- what's your current position with Bank of

9    America?

10   A.    I'm an assistant vice president with the Legal Order

11   and Case Resolution Operations.

12   Q.    I won't repeat that, but what do you do the -- with

13   that portion of the Bank of America?

14   A.    Sure.  I manage a portfolio of litigated cases.  I

15   refer those matters to counsel.  I provide research,

16   settlement authority; whatever may be needed to settle a

17   case.  And, of course, I also make appearances for the bank

18   on litigated matters, depositions, sometimes trials.

19   Q.    Have you --

20   A.    Mediations and --

21   Q.    In your history with the banking industry, have you

22   always done that type of work or have you had other

23   positions?

24   A.    I've had other positions, but mainly this has been my

25   type of work that I have done.

Direct - Reyes

1    Q.   Was a subpoena issued to Bank of America for any
2    records with -- relative to Government -- there's --
3    actually there's a hard copy to the -- to your right on that
4    little shelf.  Could you take a look at Government Exhibit
5    367.
6    A.   Yes, sir.  In front of me.
7    Q.   Did Bank of America produce that document as a result
8    of a subpoena served on Bank of America?
9    A.   Yes, sir.
10   Q.   Could we look at page 2.
11   A.   Yes.
12   Q.   Actually, while you're looking at it, it's also being
13   shown on a large screen to your left, but I think the large
14   screen is probably a little bit blurry, so maybe we could
15   scroll down and see a little bit above what's above the
16   check.  Okay.  First of all -- you don't need to blow that
17   up right away, but . . .
18          What is this a photocopy of?
19   A.   This is a cashier's check issued by First Bank, paid to
20   the Guy M. Jean-Pierre.
21   Q.   That is not a cashier's check of Bank of America?
22   A.   No, it is not.
23   Q.   Could you tell us if this is a cashier's check of First
24   Bank, how did -- how did this check come into the records of
25   Bank of America?

Direct - Reyes

1    A.    Yes.   Bank of America is the correspondent bank who --
2    Q.    Just stop there.   What is a correspondent bank?
3    A.    A correspondent bank is a bank that is authorized to
4    provide services on behalf of another bank, usually a
5    foreign bank.   So foreign banks will usually handle money
6    transfers, deposits, other type of process for a foreign
7    bank.
8    Q.    Does that go both ways, both to and from the foreign --
9    if it is a foreign bank, the -- the Bank of America
10   processes money going to the foreign bank, and money coming
11   back from the foreign bank into the U.S. banking system?
12   A.    Yes.   Correct.
13   Q.    With regard to that -- maybe without going into a lot
14   of detail, what type of records does Bank of America keep
15   with regard to each banking transaction that goes through
16   their system?
17   A.    Yes.   Normally we do keep an electronic copy of the
18   check in our business records.
19   Q.    And if you have -- like if someone had a Bank of
20   America checking account, you would have all their records
21   also?
22   A.    That's correct.
23   Q.    Okay.   So -- but in this case, this was not a Bank of
24   America check and you were about to explain how this
25   photocopy of this check came into Bank of America's system.

Direct - Reyes

1    A.    Yes.  So this particular bank was -- the Bank of First
2    Deposit is Banco, B-a-n-c-o, Popular, popular, spelled same,
3    in the Dominican Republic.
4    Q.    How do you know that?
5    A.    Our business records reflect that this check came in
6    and Bank of America was the correspondent bank who cleared
7    the check on behalf of Banco Popular.
8    Q.    Okay.  Maybe we could expand the -- the whole exhibit
9    wherever the writing is.  Just -- down below.  Just -- maybe
10   I'm not being very clear.  Maybe we could just expand the
11   entire exhibit, including all of the writing both above and
12   below the copy of the check.  Could you expand the writing
13   that's below the check, too.  Below the endorsement signing.
14           With regard to this photocopy of the check, there's
15   a check in the middle and then there's some writing both
16   above the check and below the check.  Could you explain how
17   that writing gets in the Bank of America's records.  It
18   actually looks like typing, but it's --
19   A.    Yes.  You'll notice on the top portion of the check --
20   Q.    Maybe we could blow that up.  Okay.
21           Tell us what this is.
22   A.    Sure.  You have the -- you have the amount of the
23   check, $5,000; you have the account number, which is the
24   account for First Bank; and then you have the bank number,
25   which is the routing number for this particular bank; and

2228

Direct - Reyes

1    then you have the sequence number, which is the identifier

2    for this particular instrument -- or payment instrument.

3    Q.   Is that how Bank of America finds it in their system,

4    the sequence number?

5    A.   Correct.

6    Q.   With regard to the -- you indicated this was a -- you

7    mentioned this was an account number for First Bank -- I

8    don't draw too well -- but is this drawn on an account at

9    First Bank because it's a cashier's check?

10   A.   Yes.   These are what we called certified funds; the

11   cashier's check to be exact.   And they are guaranteed by the

12   issuing bank.

13   Q.   Maybe we could expand the check, itself, again.   Just

14   the first page of the check.

15            You said a certified funds.   This is not drawn on a

16   particular checking account on First Bank, is it?

17   A.   I'm sorry, can you repeat the question?

18   Q.   This is not drawn on someone's particular individual

19   checking account.

20   A.   No.   This is particularly the bank's account.   And they

21   are certifying the funds, guaranteeing the funds.

22   Q.   So the bank guarantees the funds, you don't have to

23   wait for it to clear, you can just -- at least in the United

24   States, you can go to a bank and you cash it.

25   A.   Yes.   That's usually the case.

2229

Direct - Reyes

1    Q.    If you identified yourself.  Okay.

2          Maybe we could now expand the lower portion of the

3    typing -- that part of the check as well as the printing

4    below the check.

5          With regard to the numbers down in this area -- why

6    don't we just blow that up.

7          You can probably see it better on the hard copy in

8    front of you, but could you tell us what these writings --

9    or printing down here means.

10   A.    Yes.  So you have the date -- the date of the -- the

11   check was captured.  You have, again, the sequence number,

12   same sequence number we talked about earlier; that doesn't

13   change.  And you have the bank number, which is the Bank of

14   America routing number.  Of course, the actual name of the

15   bank, Bank of America, N.A.

16   Q.    And you indicated this Bank of America was acting as a

17   correspondent bank for the bank in the Dominican Republic.

18   Does Bank of America have a relationship with that bank to

19   clear funds that go to and from that bank within the United

20   States?

21   A.    Yes.

22   Q.    Okay.  So can you tell whether or not funds represented

23   by the $5,000 that this check represented, went back to the

24   bank in the Dominican Republic?

25   A.    Yes.  Our records indicate this -- this check cleared

Direct - Reyes

1    and the funds went back to Banco Popular.

2    Q.   Okay.  And based upon your -- could we blow up the

3    endorsement side of the check.

4    A.   Yes.

5    Q.   Based on your experience in the banking industry, would

6    that -- what is the "for deposit only" account number?  What

7    does that typically represent?

8    A.   Well, that is usually written by the bank who received

9    the check initially.  This case, it's for deposit and it

10   specifies an account number.

11   Q.   Okay.  That account number is the 768192916?

12   A.   Correct.

13   Q.   Is that correct?

14   A.   Yes.

15   Q.   And the number below the signature, do you have any

16   idea what that number is?

17   A.   I am not certain, sir.

18   Q.   Okay.  Could you take a look at -- we could take that

19   down.  Thank you.

20        Could you take a look -- and we'll blow it up on

21   the screen next to you because I don't have a hard copy in

22   front of you -- Government Exhibit 323, page 6.

23        Could we expand the -- sort of the indented third

24   paragraph down.  Can we expand this area right here.

25        This indicates a SWIFT number.  Do you know what a

Direct - Reyes

1    SWIFT number is?

2    A.   Yes.   The SWIFT number is the business-identifying code

3    for -- to identify banks -- or financial institutions

4    globally.   So they are assigned a SWIFT number -- each bank

5    is assigned a SWIFT number.

6    Q.   So in a -- typically a foreign transaction, is a SWIFT

7    number important to know which bank funds should go to?

8    A.   Yes.   And the SWIFT number is specified towards the

9    middle of the e-mail, they are there, starting with a BPD.

10   Q.   That's the SWIFT number -- or at least a portion of the

11   SWIFT number for the bank you described -- that I probably

12   would butcher if I pronounced it -- in the Dominican

13   Republic?

14   A.   Yes.

15   Q.   Okay.   Thank you, sir.   That's all I have.

16             THE COURT:   Cross-examination.

17             MR. BARNARD:   Thank you, Your Honor.

18                         CROSS-EXAMINATION

19   BY MR. BARNARD:

20   Q.   May I have Exhibit 367, page 2, please.   And -- thank

21   you.

22             Mr. Reyes, you said that the account number is

23   ending with 0336, correct?

24   A.   This is the -- the account number for First Bank, yes.

25   Q.   And that matches the account number for First Bank,

Direct - Reyes

1    correct?

2    A.    Correct.

3    Q.    And you -- and now may I have page 1, please.

4          And that would correspond, then, with the number

5    0336.  On page 1 of Exhibit 367.

6    A.    Yes.

7    Q.    And on this page -- this is your affidavit of Bank of

8    America, correct?

9    A.    Yes, this is an affidavit that was provided last year.

10   Q.    From -- from Bank of America.

11   A.    From Bank of America, yes.

12   Q.    And in this affidavit, it says the title of the account

13   is Mr. Jean -- Guy Jean -- Guy M. Jean-Pierre.  Correct?  I

14   just circled it on the -- on there?

15   A.    Oh, yes.

16   Q.    So your affidavit says that the bank -- First Bank

17   account is Mr. Jean-Pierre's account?

18   A.    No.

19   Q.    What does this say?  Account title, account number.

20   It's not saying that's Mr. Jean-Pierre's account?

21   A.    It's identifying the -- the request for the account

22   number ending in 0336.

23   Q.    It's -- I'm sorry, say that again.

24   A.    It's identifying an account number ending in 0336.

25   That's all I can tell.

Direct - Reyes

1   Q.   And it says the account title is Guy M. Jean-Pierre.

2   A.   Yes.

3   Q.   But I thought we had just established the account is --

4   0336 was a First Bank account.

5   A.   That's correct.

6   Q.   Where on the affidavit does it say Banco Popular?

7   A.   I don't believe that it does.

8   Q.   May I have page 2 of Exhibit 367.

9        Where on page 2 of 367 does it say Banco Popular?

10  A.   It doesn't.

11  Q.   So -- so, in fact, Exhibit 367 does not show that

12  this -- that this transaction dealt with Banco Popular;

13  isn't that true?

14  A.   No.

15  Q.   Where on this does it establish that Banco Popular

16  received this check?

17  A.   Well, if you were to look at the bank number -- and,

18  again, from my review of the business records, you -- I'm

19  sorry.

20       The -- from my review of the business records, I

21  was able to determine that --

22  Q.   Well, no, my question is from Exhibit 367 where can you

23  determine it?

24  A.   Oh.  I cannot, no.

25  Q.   So that information does not come from Exhibit 367,

2234

Redirect - Reyes

1    correct?

2    A.    Correct.

3            MR. BARNARD:   Thank you.   No further questions.

4            THE COURT:   Redirect?

5                         REDIRECT EXAMINATION

6    BY MR. BROWN:

7    Q.    With regard to the affidavit on the first page of 367,

8    was that an affidavit you prepared or somebody else at Bank

9    of America prepared?

10   A.    That was somebody else.

11   Q.    Okay.   Could you look at page 2 of that exhibit again.

12   A.    Yes.

13   Q.    And with regard to the bank at the top portion of the

14   check, who's the check payable to?

15   A.    It's payable to Guy M. Jean-Pierre.

16   Q.    If Bank of America received a subpoena that had a

17   reference to Guy M. Jean-Pierre and Bank of America did a

18   search of their computer system, would this check come up if

19   it went through Bank of America?

20   A.    Yes.

21   Q.    And based upon your examination of Bank of America

22   records, did you determine that this check that went through

23   Bank of America's system, a correspondent of Banco de

24   Popular, actually came from that bank?

25   A.    That's correct, yes.

Redirect - Reyes

1   Q.   Based on the records of Bank of America?

2   A.   Yes.

3   Q.   Not necessarily on this -- did -- your examination of

4   Bank of America records established that this check came

5   from the bank that we just described in the Dominican

6   Republic.

7   A.   Correct.

8   Q.   Not necessarily this one page --

9   A.   Correct.

10  Q.   -- of the records?

11           Okay.  Thank you.

12           THE COURT:  All right.  May this witness be excused

13  for the Government?

14           MR. BROWN:  Yes, Your Honor.

15           THE COURT:  For the defendant?

16           MR. BARNARD:  Yes, Your Honor.

17           THE COURT:  All right.  Mr. Reyes, thank you for

18  your testimony.  You're excused.  You may step down.

19           THE WITNESS:  Thank you, Your Honor.

20           THE COURT:  The Government may call its next

21  witness.

22           MR. BROWN:  Erin Newton.  E-r-i-n.

23           COURTROOM DEPUTY:  Would you stand there and raise

24  your right hand, please.

25           ERIN NEWTON, GOVERNMENT'S WITNESS, SWORN

Direct - Newton

1      COURTROOM DEPUTY:  Please be seated.  You may need
2    to scoot your chair up to the microphone.
3           THE WITNESS:  Okay.
4           COURTROOM DEPUTY:  And please state and spell your
5    name for the record.
6           THE WITNESS:  My name is Erin Newton.  It's
7    E-r-i-n, N-e-w-t-o-n.
8           MR. BROWN:  Your Honor, before examining this
9    witness, the Government would move for the following
10   stipulated exhibits into evidence:  311, 312, 313, 314, and
11   316.  They've been stipulated to.
12          THE COURT:  All right.  Given the stipulation of
13   the parties, Government Exhibits 311, 312, 313, 314, and 316
14   are admitted into evidence and may be published to the jury.
15      (Government's Exhibits 311 through 316 received)
16          MR. BROWN:  Thank you, Your Honor.
17                   DIRECT EXAMINATION
18   BY MR. BROWN:
19   Q.   Ms. Newton, could you tell us what your profession is.
20   A.   I'm a forensic accountant.
21   Q.   And who do you work for?
22   A.   I work for the FBI.
23   Q.   How long have you worked for the FBI?
24   A.   About three years.
25   Q.   What's your educational background?

Direct - Newton

1    A.    I have a bachelor's degree in accounting and finance

2    from Berry College in Georgia.

3    Q.    Do you hold any professional licenses or status in

4    accounting?

5    A.    Yes.  I'm a CPA.

6    Q.    That's a certified public accountant; is that

7    correct?

8    A.    Yes.

9    Q.    Where were you employed prior to your employment with

10   the FBI?

11   A.    Immediately prior to working for the FBI, I was an

12   auditor for the Department of Defense for five years.  And

13   then for the six years prior to that, I was in public

14   accounting as an auditor.  And for the majority of that time

15   I worked for Deloitte and Touche.

16   Q.    And is Deloitte and Touche a large accounting firm

17   nationwide?

18   A.    Yes, it's one of the largest for public accounting

19   firms in the nation.

20   Q.    In this trial we've heard from CPAs and accountants

21   that are not CPAs.  What does a forensic accountant do?

22   A.    A forensic accountant is someone who leads the

23   financial analysis of an investigation.  For the FBI, we do

24   all sorts of investigations, anything from like health-care

25   fraud to counterterrorism investigations.  I mainly focus on

Direct - Newton

1   white-collar investigations, and that includes taking a

2   multitude of financial documents and interviews and kind of

3   bringing it -- summarizing it to a product that can be used

4   by everyone in the investigation, to kind of make sense of a

5   lot of really mundane information.

6   Q.   Have you done that for as long as you've worked for the

7   FBI?

8   A.   Yes.

9   Q.   And I take it -- are you stationed in Denver?

10  A.   Yes.

11  Q.   Did you become part of the investigation involving

12  stock issues surrounding investigation of a company called

13  FusionPharm between 2011 and 2014 or '15?

14  A.   Yes.

15  Q.   And what was the source of information that you based

16  your analysis on?

17  A.   Mainly bank statements from several different banks,

18  Wells Fargo, JP Morgan Chase, transfer agent documentation,

19  and e-mails, interviews, things included in the file -- in

20  the investigative file.

21  Q.   Did you also have access to the case files, the written

22  interviews, and things like that, or do you keep your

23  analysis to the hard documents?

24  A.   I had access to the entire file.

25  Q.   What part does the human element play in your analysis?

Direct - Newton

1   A.   It is important to understand what's -- it's important

2   to understand who the players are, who the people involved

3   in the investigation, kind of what we're looking at.

4   Because it allows me to focus, you know, just on the time

5   period that I'm looking on, focusing on certain

6   transactions, or certain types of things that are important,

7   and not spin my wheels doing things that aren't going to

8   have any value.

9   Q.   In terms of this case, how big of an investigation --

10   how many documents were available to you to examine if you

11   chose to examine all of them?

12   A.   Oh --

13   Q.   If you know.

14   A.   Probably hundreds of thousands of pages.

15   Q.   And how did you focus on what to look for?

16   A.   I've -- I focused, you know, mainly on financial

17   records.  And then if I had anything else that I needed

18   to -- to look for, I was able to search.  They have a

19   keyword search that you can find other things, you don't

20   have to really go digging too much.

21   Q.   Did -- do you have some tools available to help you

22   search or do you have to just look at every page and see if

23   it's important?

24   A.   There's a search tool where you can search and then

25   also it's indexed.

                        Direct - Newton

1    Q.   Okay.  Have you -- in your looking at all of these

2    documents and records, did you create a number of summary

3    charts so we don't have to hear from a few dozen more

4    witnesses in this case?

5    A.   Yes.

6    Q.   And did you summarize that evidence into charts that

7    you made yourself?

8    A.   Yes.

9    Q.   Let me ask you to look at Government Exhibit 314.  And

10   if you want, I can show you a hard copy of it, if it's

11   easier to see on the screen.  If you could just hang on a

12   second.

13        Could you just sort of briefly describe what this

14   summary exhibit was -- shows and was designed to show.

15   A.   This shows the signers for all of the checks drawn on

16   FusionPharm Wells Fargo account ending 0090.  It summarizes

17   by signer on the left and along the top by month --

18   Q.   Okay.

19   A.   -- from March 2011 to February 2013.

20   Q.   One thing you might do is you might turn that mic more

21   towards the screen since --

22   A.   Okay, is that better?

23   Q.   Try to keep your voice up.

24   A.   Sure.

25   Q.   Something I should tell myself to do, but . . .

2241

Direct - Newton

1    Did FusionPharm have one checking account during

2 that time frame?

3 A. They had one main checking account and this was at

4 their main operating account.

5 Q. That was at Wells Fargo?  What does -- you have -- in

6 the middle of your chart, you have three names:  Scott

7 Dittman, William Sears, and Sandra Sears.  Tell us what

8 those lines across the middle show you.

9 A. I'm sorry, which line?

10 Q. The three lines that are in the middle of the page go

11 horizontally.  What are you showing?

12 A. Okay.  So the first line is all of the checks that

13 Scott Dittman signed for each of those months.  So, for

14 example, April 2011, he signed three checks, and so on.  So

15 the next line is how many checks William Sears signed.  And

16 then the third line, how many checks Sandra Sears signed by

17 month.

18 Q. Okay.  And they go all the way across?  What -- there's

19 a red block in the middle of the page with a vertical red

20 dotted line that goes down the middle.  What does that

21 represent?

22 A. That represents the initial contact from FINRA to Scott

23 Dittman.

24 Q. Okay.  Did you have access to reports that reflected

25 the date --

2242

Direct - Newton

1    A.    Yes.

2    Q.    -- 10-5-11?

3          And what happened after 10-5-11 with regard to the

4    signers on the checking account?

5    A.    So prior to October 5th, 2011, the vast majority of the

6    checks were signed by Mr. Sears.  And then after October

7    5th, 2011, the vast majority of the checks were signed by

8    Scott Dittman.

9    Q.    You got this information from looking at all of those

10   months of checking records from that account?

11   A.    Yes.

12   Q.    Okay.  Could we move on to Government Exhibit 316.

13   Maybe we could blow that up.

14         That might be in the book also if you need it.  If

15   you don't, that's okay.  I guess it's in a different book.

16         Could you tell us what Government Exhibit 316 is.

17   What -- first of all, did you create that chart?

18   A.    Yes.

19   Q.    Okay.  Is that part of the investigation that you've

20   told us about?

21   A.    Yes.

22   Q.    Could you just tell us what this is.

23   A.    This chart compares reported revenue on the left in the

24   blue box, and that's reported revenue per the income

25   statement that was filed by FusionPharm.  And then on the

1    right are total cash inflows into FusionPharm bank accounts
2    for the same time period.  And that's not just cash, it's
3    physical deposits of cash, deposits of checks, wire
4    transfers, things like that, and anything that would cause
5    the bank account to increase.
6    Q.   Okay.  And, again, you looked at the -- well, you tell
7    me where you obtained this information.
8    A.   The information in the blue box was obtained from the
9    financial statements filed with OTC Markets for the end of
10   the year 2011.  And the information on the right was
11   obtained from the Wells Fargo bank account for FusionPharm
12   account 0090.
13   Q.   With regard to the information on the left in the blue
14   box, did you have to do an analysis of these figures or did
15   you just obtain them from the OTC reports that were filed?
16   A.   I just pulled them from the income statement on the OTC
17   filing.
18   Q.   Okay.  And what was the source of information for the
19   numbers in the green box to the right?
20   A.   It was the Wells Fargo bank account for FusionPharm
21   account 0090.
22   Q.   With regard to -- did you attempt to make some type of
23   analysis of whether the revenue figure on the annual report
24   for 2011 was -- matched the -- with the source of incoming
25   cash into the bank accounts?

Direct - Newton

1    A.    Yes.  I was interested to see of all these cash

2    flows -- cash inflows, what could be considered business

3    revenue.  So from what I could tell, only cash and other

4    deposits, pod-lease deposits, and payments from related

5    parties would be something that I would consider business

6    revenue.

7    Q.    When you say "cash or other deposits," just for those

8    of us who are not accountants, when you say cash, do you

9    mean like somebody walks into a bank and deposits just cash?

10   A.    In that case, yes, that's what case means.

11   Q.    And other deposits would have been checks and other

12   documents?

13   A.    Checks and small deposits, yes.

14   Q.    Did -- there are no credit card receipts for

15   FusionPharm, correct?  Or you --

16   A.    No.

17   Q.    -- they didn't receive money by credit card?

18   A.    No.

19   Q.    What, in your opinion, as a accountant -- a forensic

20   accountant, tell us the difference between the revenue for

21   2011 and the nonstock proceeds or investor contribution

22   income -- or not income, but -- into the checking account?

23   A.    From what I can tell, I could only identify roughly

24   $32,000 worth of potentially business-related revenue as

25   compared to $227,000 reported on the financial statements.

1    Q.   Could you look at the second page of that document.   Is

2    that for the following year?

3    A.   Yes, this is for 2012.

4    Q.   And could you go through the same analysis or verbalize

5    the same analysis in terms of the difference between revenue

6    and what you could see that should have been treated as

7    revenue.

8    A.   So total restated revenue for FusionPharm as reported

9    was $308,000.  And then --

10   Q.   As an accountant, what does it mean when it says

11   "restated"?

12   A.   It means that they initially reported $808,000 in

13   revenue and then they -- and that was not correct, so then

14   they corrected it and then restated their revenue.

15   Q.   So the figure that actually got reported was 308,000?

16   Or the other way around?

17   A.   It was initially reported at the -- in the year-end

18   financial statements at $808,000.  And then the next

19   quarter's financial statements they restated it as $308,000

20   in revenue.

21   Q.   And then the cash inflows to the bank, tell us in your

22   own words what the discrepancy was in your mind.

23   A.   It looks like that they had potential business revenue

24   of approximately $44,000; deposits from other

25   Sears-controlled bank accounts and other cash deposits of,

2246

Direct - Newton

1    approximately, $90,000, which seems to me to be -- which is
2    less than what they reported on their financial statements
3    as business revenue.
4    Q.   But their incoming -- the cash inflows, at least from
5    stock sales and investor contributions, was noted in the
6    checking account records?
7    A.   Yes.
8    Q.   Thank you.  May we go to the third page for the
9    following year.
10         Tell us briefly, if you can, if there was any
11   differences that you noticed also in 2013.
12   A.   In 2013, they reported $330,000 as business revenue on
13   their year -- second quarter 2013 financial statements.  Of
14   that, I determined that potential business revenue, about
15   $82,000; cash and other deposits about $15,000; and payments
16   from related parties, about $700.  So of that, I could see
17   potentially $97,000 worth of business revenue.
18   Q.   And this particular report in the blue box is only up
19   until June 30th; is that right?
20   A.   That's correct.
21   Q.   Can you take a look at Government Exhibit 313, please.
22         Could you describe briefly what this describes, or
23   what this shows.
24   A.   This shows the flow of FusionPharm stock sale proceeds
25   from --

2247

Direct - Newton

1    Q.   How did you obtain those?

2    A.   I obtained those from transfer agent records.

3    Q.   Go ahead.  Just describe what the chart shows.

4    A.   So it shows FusionPharm stock sales.  The stock was

5    sold by companies that were controlled by Bill Sears.  And

6    what I show on the left in the green box is how the stock

7    sale proceeds moved from the brokerage accounts into

8    MicroCap, 0560, that it moved into that account.  And then

9    further they flow into the FusionPharm main operating

10   account, and then to -- and to other FusionPharm related

11   parties.

12   Q.   And the brokerage accounts were primarily from

13   Oppenheimer; is that correct?

14   A.   For 2011, it was from Oppenheimer.

15   Q.   And it goes to MicroCap, who is involved in the

16   sales -- how does -- where does it go from MicroCap?

17   A.   From MicroCap, it flows either directly to the

18   FusionPharm main operating account or the second asterisk

19   details how some of the money went from the MicroCap account

20   into another Bayside account, and then to FusionPharm main

21   operating account, or directly from MicroCap to Bill Sears,

22   then into the FusionPharm main operating account, and

23   then -- and so on.

24        So money flowed from the MicroCap account to

25   Richard Scholz's control bank accounts and --

Direct - Newton

1    Q.   Okay.  Just for -- who is Laura Dittman?  That's in the

2    third box from the bottom on the right.  Do you know who

3    that is?  Is that Scott Dittman's wife, or --

4    A.   Yes.

5    Q.   Okay.  Can you take a look at the next page for 2012.

6         Can you tell us what this shows.

7    A.   This chart does the same, just for 2012.  It just shows

8    the money flowing from the brokerage for the sale of

9    FusionPharm stock into the MicroCap account and then into

10   FusionPharm main operating account and FusionPharm-related

11   parties.

12   Q.   But in terms of the accounts on the right, for example,

13   Richard Scholz, did you do an analysis of his account to see

14   where that went or did you stop at these accounts?

15   A.   I think I stopped once I saw that it went into --

16   Q.   All right.

17   A.   -- his account.

18   Q.   With regard to the -- as long as we're on that page,

19   you indicate that the stock flows -- you have a percentage

20   on the right-hand -- to the far right of the total that goes

21   out of MicroCap.  For example, on this page, it's 41

22   percent -- a little more than 41 percent goes to FusionPharm

23   directly.  Okay.

24        Could you take a look at page 3, which looks a

25   little bit more complicated.  Could you explain that,

Direct - Newton

1   please.

2   A.   This chart does the same thing the other two charts --

3   only in -- the first through the third quarter of 2013, a

4   sale -- sales of FusionPharm stock went into the MeadPoint

5   account and Bayside account.  In addition, you had the sales

6   of the MeadPoint convertible note, that money went into the

7   MeadPoint bank account.

8        And then on the bottom left, you have the sale of

9   the Bayside convertible note, and those proceeds were

10  deposited into the Bayside account.  From there, the funds

11  flowed to the FusionPharm main operating account and

12  FusionPharm related parties.

13  Q.   I note on this particular page for 2013 there's no more

14  MicroCap; is that right?

15  A.   That's correct.

16  Q.   Were you able to look at -- for example, the upper left

17  where that $100,000 came from?

18  A.   Yes.

19  Q.   Where did that come from?

20  A.   That came from Myron Thaden.

21  Q.   And in the lower left corner, there's a reference to

22  250,000 from investors.  Do you know what that was?

23  A.   Yes.  Those are proceeds from the Coleson Group.

24  Q.   Okay.  Is that sort of the five groups that Mr. Coleson

25  talked about?

1    A.    Yes.

2    Q.    Okay.  Thank you.

3          And, again, after these funds went to both Bayside

4    and MeadPoint, they went -- did your analysis show the funds

5    going on?

6    A.    Yes.

7    Q.    And your diagram on the right, I won't -- for the sake

8    of time I won't go through all those, but, again, there's 55

9    percent to FusionPharm directly, it's going up a little bit

10   from the years before.  Okay.

11         Could you take a look at Government Exhibit 311,

12   please.  Could you tell us what this exhibit shows.

13   A.    This exhibit shows each line item related to

14   FusionPharm that was contained within the invoices from Tod

15   DiTommaso to Guy Jean-Pierre.

16   Q.    Okay.  And where did you get this information from?

17   A.    I obtained this information from invoices obtained from

18   Tod DiTommaso.

19   Q.    Okay.  Was a subpoena issued to Tod DiTommaso to

20   provide these records?

21   A.    Yes.

22   Q.    And by "invoices," tell us what you mean.

23   A.    I mean it's -- it's a listing of the services provided

24   by Tod DiTommaso for Guy Jean-Pierre, so it lists everything

25   that he did and --

Direct - Newton

1   Q.   Tod DiTommaso would send out a bill and he would

2   have --

3   A.   Yeah, it's a bill.

4   Q.   -- something on the invoice what it would pertain to?

5        So the total during the period of time that you

6   described in this exhibit, August of 2011 until September

7   2013, how much did Tod DiTommaso bill directly for

8   FusionPharm type services?

9   A.   $4800.

10  Q.   Also could you go -- blow up what you just blew up.

11       Did you actually see a -- an invoice for only $25?

12  A.   No.

13  Q.   Okay.  How did you obtain that one $25 that I circled?

14  A.   That was detailed on the invoice.

15  Q.   Okay.  So the invoice indicated it's a $25 bill?

16  A.   Yes.

17  Q.   And did you write down -- did your exhibit contain the

18  quotation from the invoices, such as OTC Market opinion

19  letter, redo, or Thaden opinion letter?

20  A.   Yes.

21  Q.   And you said the total was $4800.

22  A.   Yes.

23  Q.   This is just with regard to FusionPharm-related line

24  items; is that right?

25  A.   Yes.

Direct - Newton

1   Q.   Would you take a look at page 2 of that exhibit.  Maybe
2   we could just blow the upper portion of it so we can see it.
3          What is this exhibit?
4   A.   This exhibit details all payments from Guy Jean-Pierre
5   to Tod DiTommaso from January 2011 through the end of 2013.
6   Q.   And I don't know if we can -- tell us basically how you
7   prepared this by just focusing on one line that goes all the
8   way through.
9          Maybe we could blow it up so we can see -- maybe
10  one or two lines of the text.
11  A.   So, for example, for the first line there, I was able
12  to identify, by looking at the Bank of America bank account
13  records and check copies for Jean-Pierre, Jean-Pierre LLC
14  account ending 4688.  I was able to identify check No. 1405
15  as being payable to the Law Office of Tod DiTommaso.  And I
16  could see that amount and that check being drawn in that
17  amount.
18         Then I had the Office of Tod DiTommaso's Wells
19  Fargo account, 6933, and I was able to see that check being
20  deposited into that account
21  Q.   So you not only examined the Bank of America checks of
22  Jean-Pierre's account, but you also examined the checks --
23  or the checking account of Tod DiTommaso?
24  A.   Yes.
25  Q.   And the -- do they match up?

Direct - Newton

1    A.    Yes.

2    Q.    And what was the total bill during the same time period

3    you described on page 1 for all of the billing of -- or at

4    least all the checks paid to Tod DiTommaso for services he

5    rendered to Guy Jean-Pierre?

6    A.    $42,531.85.

7    Q.    Would you take a look at Government Exhibit -- before

8    we get to 310, you indicated you looked at a lot of

9    financial records.  Did you look at any other records other

10   than financial records as part of your forensic

11   examination?

12   A.    Yes.

13   Q.    And you -- I think you mentioned telephone records and

14   things like that.  Those are not necessarily financial

15   records, but what part did they play in your analysis?

16   A.    I was able to look at phone records -- telephone

17   records and identify calls between individuals pertinent to

18   the investigation.

19   Q.    Okay.  And so in addition to financial records, you

20   also looked at other records that might be important.  Could

21   you take a look at Government Exhibit 310, please.

22            MR. BROWN:  Your Honor, I don't think I mentioned

23   310 when I was moving for everything, so --

24            THE COURT:  No, you didn't.

25            MR. BROWN:  So if I --

Direct - Newton

1      THE COURT: Is this also stipulated?

2      MR. BROWN: I would -- yes, it is. I would move

3   for the admission of 310.

4      THE COURT: Given the stipulation of the parties,

5   Exhibit 310 is admitted into evidence and may be published

6   to the jury.

7      (Government's Exhibit 310 received)

8   BY MR. BROWN:

9   Q.   This will be a -- probably a simpler one. Can you just

10  tell us what this exhibit represents.

11  A.   This chart summarizes phone calls between Guy

12  Jean-Pierre's Google Voice account and -- phone calls

13  between Guy Jean-Pierre's Google Voice account and phone

14  numbers used by individuals significant to the

15  investigation.

16  Q.   And why was -- why did you believe this to be

17  important? What were you trying to show?

18  A.   It just shows the level of communication between Guy

19  Jean-Pierre and different parties.

20  Q.   Using Google Voice records -- what are Google Voice

21  records?

22  A.   Google Voice is like using the telephone over your

23  computer. So it's like your cell phone, but you -- just

24  over your computer.

25  Q.   So you don't have to have a phone or -- if you don't

1    want to?  Okay.
2           And this shows contact between Guy Jean-Pierre,
3    William Sears, Tod DiTommaso, and Scott Dittman during the
4    time period that you reflected --
5    A.    Yes.
6    Q.    -- in the exhibit?
7           And what is page 2 of that exhibit?
8    A.    Well, it is the same data, just summarized by --
9    instead of having the duration of the calls by minutes, it
10   has it by hours.  So it has the name of the party that
11   was -- that called or was called by Guy Jean-Pierre, the
12   number of calls, and then the duration of those calls.
13   Q.    Okay.  Did you also take a look at Tod DiTommaso's
14   wireless telephone records?
15   A.    Yes.
16   Q.    Could you take a look at Government Exhibit 312.
17          Could you tell us what this is?
18   A.    This summarizes Tod DiTommaso's Verizon Wireless cell
19   phone account, and it summarizes the number of calls between
20   Verizon cell phone account and phone numbers used by Guy
21   Jean-Pierre and Scott Dittman from November 15th, 2010, to
22   May 16th, 2014.
23   Q.    And on the left and the lower left, you have three
24   different numbers for Guy Jean-Pierre.
25   A.    Yes.

1    Q.   And just one phone number for Mr. Dittman.  Where did
2    you obtain the Verizon Wireless records?  Were those Tod
3    DiTommaso's account?
4    A.   Yes.  Those --
5    Q.   How did you find out that these phone numbers go with
6    these people, the bottom?
7    A.   The numbers were identified I think from a variety of
8    sources, from letterhead, e-mail signatures, and then other
9    sources that identified those numbers as belonging to those
10   folks.
11              MR. BROWN:   Okay.  May I have one second?
12              THE COURT:   You may.
13              MR. BROWN:   Thank you.  That's all the questions I
14   have.
15              THE COURT:   Cross-examination.
16              MR. BARNARD:   Thank you, Your Honor.
17                        CROSS-EXAMINATION
18   BY MR. BARNARD:
19   Q.   If I may have page 1 of Exhibit 313, which is admitted.
20              So Exhibit 313 is a compilation that you made
21   showing the 2011 MicroCap flow of stock sale profits.
22   A.   Correct, yes.
23   Q.   And this shows that FusionPharm got 513,000, or
24   514,000, approximately.
25   A.   Yes.

1    Q.   And Richard Scholz received almost 285,000.

2    A.   Yes.

3    Q.   And Sandra Sears received 31,400, correct?

4    A.   Correct.

5    Q.   And then some other amounts for smaller numbers,

6    including a 350 number, correct?

7    A.   Correct.

8    Q.   So when you include for Robert Dittman $350, you do

9    that -- you did that because you were including proceeds --

10   sale profits that were distributed to everybody, right?

11   A.   Yes.

12   Q.   And on Exhibit 313 for 2011, page 1, it does not

13   indicate any stock sale profits being distributed to Mr. Guy

14   Jean-Pierre.

15   A.   Correct.

16   Q.   If I may have page 2 of Exhibit 313.

17            Same thing, we have FusionPharm getting 200,000,

18   right?

19   A.   Yes.

20   Q.   Richard Scholz getting 122,000; Scott Dittman getting

21   11,540, down to Robert Dittman getting 500, right?  And some

22   other individuals in between, smaller amounts.

23   A.   Yes.

24   Q.   So in 2012, MicroCap stock sales did not have any

25   distribution of funds to Mr. Guy Jean-Pierre.

2258
Cross - Newton

1    A.    Yes.

2    Q.    May I have page 3, please.

3              So, again, we have large distributions of 320,000,

4    Mr. Scholz getting 45,000, and then other smaller amounts of

5    10,000 and under, but this time being MeadPoint and Bayside

6    stock, and no sale profits, right.

7    A.    Right.

8    Q.    And, again, Mr. Guy Jean-Pierre did not receive any

9    funds from these sales.

10   A.    Correct.

11   Q.    Thank you.

12             MR. BARNARD:  Your Honor, I would move for the

13   admission of Government's Exhibit 315 and Exhibit 309.

14             THE COURT:  I assume the Government doesn't object

15   to its own exhibits.

16             MR. BROWN:  That's fine, Your Honor.

17             THE COURT:  All right.  Given that there's no

18   objection, Exhibits 309 and 315 are admitted into evidence

19   and may be published to the jury.

20        (Government's Exhibits 309 and 315 received)

21   BY MR. BARNARD:

22   Q.    If Exhibit 309, page 1, could be published.

23             Exhibit -- Government's Exhibit 309 indicates --

24   excuse me, let me go back.

25             This is a chart also, correct?

1    A.    Correct.

2    Q.    And you've prepared this chart.

3    A.    Yes.

4    Q.    And you prepared this chart by running through your

5    program Mr. Jean-Pierre's name to determine how much money

6    he received as payments from January 1st, 2011, to December

7    31st, 2013.

8    A.    Yes.

9    Q.    And you were looking from not just one account, but

10   from any accounts that were dealing with FusionPharm or were

11   related to FusionPharm.

12   A.    Yes.

13   Q.    So you looked for FusionPharm, Bayside, MicroCap, and

14   possibly several different accounts for some of those same

15   entities, right?

16   A.    Yes.

17   Q.    And it then gave -- in the -- in the -- so you saw what

18   dates certain things -- funds came in -- or, excuse me, went

19   to Mr. Jean-Pierre, and you recorded them over in the amount

20   column, correct?

21   A.    Yes.

22   Q.    And you did that for all of the payments that you could

23   find.

24   A.    Yes.

25   Q.    And you came up with, then, a total of amounts.  May I

1    have this number enlarged, please.

2           So the total amount from all of these entities that

3    Mr. Jean-Pierre received from FusionPharm, Bayside,

4    MicroCap, was a total of 33,000 from January 1st, 2011, to

5    December 31st, 2011.

6           MR. GOODREID:  '13.

7    BY MR. BARNARD:

8    Q.  '13, excuse me.  2013.

9    A.  Yes.

10   Q.  Thank you.  May I have Exhibit 315.

11          And, again, 315 is another chart that you prepared.

12   A.  Yes.

13   Q.  And this chart is showing expenses paid from MeadPoint,

14   MicroCap, Bayside, and VertiFresh to various different

15   people or entities.

16   A.  Yes.

17   Q.  And the total amount paid to Mr. Jean-Pierre, as shown

18   on this document, would be right here, wouldn't it, 21,500?

19   A.  Yes.

20   Q.  Now, what were these payments for?

21   A.  I don't -- I didn't have access to the invoices, so I

22   don't know.

23   Q.  These payments were part of what was in Exhibit 309

24   showing the 33,000 amount, correct?

25   A.  Correct.

2261
Redirect - Newton

1    Q.   So this is not additional monies, this is just a

2    different subcategory.

3    A.   Yes.

4    Q.   Thank you.

5         MR. BARNARD:  Your Honor, if I may have a moment,

6    please.

7         THE COURT:  You may.

8         MR. BARNARD:  No further questions.  Thank you.

9         THE COURT:  All right.  Mr. Brown, how much

10   redirect do you have?

11        MR. BROWN:  Briefly, Your Honor.

12        THE COURT:  Okay.

13                     REDIRECT EXAMINATION

14   BY MR. BROWN:

15   Q.   Bring up 309 again, please.  With regard to -- maybe we

16   could blow up the lower left-hand corner.

17        Did you do an analysis -- since you put it in your

18   chart, I assume you did, but did you do an analysis of who

19   was allowed to sign on each of these accounts for these

20   companies?

21   A.   Yes.

22   Q.   And for FusionPharm, at a certain period of time, and

23   MeadPoint, MicroCap, and Bayside, was William Sears a signer

24   on their checking accounts?

25   A.   Yes.

Redirect - Newton

1   Q.   With regard to the exhibit that -- we can take that --
2   we don't have to enlarge that anymore.
3          With regard to -- maybe we can just go back to 313
4   real quickly.
5          313, I believe you indicated, showed funds from
6   sales of FusionPharm stock that went through MicroCap and
7   then went to all these various ins- -- individuals or
8   companies, correct?
9   A.   Correct.
10  Q.   And I believe you indicated, at least with regard to
11  Richard Scholz and Sandra Sears, you didn't analyze their
12  bank accounts to see where it went from there; is that
13  right --
14  A.   That's correct.
15  Q.   -- basically?  Okay.
16         But 309, which defense counsel showed you -- can
17  you bring up 309 again -- that did show certain payments to
18  Guy Jean-Pierre from FusionPharm.
19  A.   Yes.
20  Q.   On both pages.  I won't go through all of them, just to
21  save some time.  But there were payments to Guy Jean-Pierre
22  from these accounts directly?
23  A.   Yes.
24         MR. BROWN:  Can I have one second, Your Honor?
25         THE COURT:  You may.

2263

Redirect - Newton

1    BY MR. BROWN:
2    Q.   Defense counsel moved to admit 315.  I don't -- maybe
3    we can just bring that up so you can explain what that is.
4         Can we just bring that up on the screen.
5         That was admitted by defense, but you didn't get a
6    chance to explain it.  Could you just explain what that
7    is.
8    A.   This chart summarizes expenses that I identified as
9    being related to FusionPharm business expenses that were
10   paid out of accounts of -- where Bill Sears is the signer
11   from MeadPoint, MicroCap, Bayside, and VertiFresh.  Then I
12   summarized it by year and by major category of expense.
13   Q.   And these were payments to FusionPharm related
14   expenses?
15   A.   Yes.
16   Q.   Those were not from FusionPharm accounts?
17   A.   Correct.
18             MR. BROWN:  I think that's all I have.  Thank you.
19             THE COURT:  All right.  May this witness be
20   excused, for the Government?
21             MR. BROWN:  Yes, Your Honor.
22             THE COURT:  For the defendant?
23             MR. BARNARD:  Yes, Your Honor.
24             THE COURT:  All right, Ms. Newton, thank you so
25   much for your testimony.  You may step down.  You're

1    excused.

2              All right, we're going to take our afternoon break.

3    We will be in recess until 3:35.

4         (Recess taken 3:23 p.m. to 3:38 p.m.)

5              THE COURT:  All right, members of the jury, just so

6    you have a heads-up, I've agreed with the Government that

7    the Government's going to rest at 4:45.  You'll get to go

8    home early today.  The lawyers and I will stay here for, I

9    think, quite a bit of time after that.

10             If I forget to mention, please, tomorrow, the roads

11   still look bad.  I ask all of you, especially those of you

12   who take buses and those of you that live in the outer

13   limits of the metro area, please, please, earlier than you

14   have been.  We still have a lot to cover tomorrow and we

15   just can't afford to start at 9:30 or 10:00.

16             All right.  Government will call its next witness.

17             MR. SIBERT:  Thank you, Your Honor.  The Government

18   would like to call Steven Thel to the stand.

19             COURTROOM DEPUTY:  Please stand and rise your right

20   hand.

21          STEVEN THEL, GOVERNMENT'S WITNESS, SWORN

22             COURTROOM DEPUTY:  Please be seated.  You may need

23   to scoot your chair towards the microphone.  And please

24   state and spell your name for the record.

25             THE WITNESS:  My name is Steve Thel.  Steven with a

Direct - Thel

1    V, last name T-h-e-l.

2                    DIRECT EXAMINATION

3    BY MR. SIBERT:

4    Q.   And I apologize, sir, I called you Thel.  I know it's

5    Theel, but --

6    A.   It's not the first time.

7              MR. SIBERT:  May I proceed, Your Honor?

8              THE COURT:  You may.

9    BY MR. SIBERT:

10   Q.   All right.  Mr. Thel, could you please tell the jury

11   where you currently work.

12   A.   I'm a professor at Fordham Law School in New York City.

13   Q.   What is your educational background?

14   A.   I went to high school in Hawaii.  I went to college at

15   North Texas State University, and law school at Harvard Law

16   School.

17   Q.   And after you received your law degree, could you

18   explain to the jury a summary of your former employment.

19   A.   After I received my law degree, I became a clerk for a

20   federal judge -- a federal appellate judge, which is in

21   Atlanta, Georgia.  After that, I went to work as a lawyer in

22   the General Counsel's Office of the SEC, the Securities and

23   Exchange Commission.

24              After that, I decided I wanted to teach and do

25   private practice, so I went to a corporate law firm in

Direct - Thel

1    Georgia where I was a member of the bar.  And at the end of
2    that -- at the end of six years, which was actually a long
3    time, I became a law professor at the University of
4    Mississippi, was there for three years.  Went to Fordham
5    where I've been and am a tenured professor and holding down
6    a chair.
7          I've also taught at Cornell, NYU, and Columbia,
8    New York.
9    Q.   Okay.  You hold a chair; is that correct?
10   A.   Yes.
11   Q.   Can you explain what that means.
12   A.   That means that -- so there are people who donate money
13   to fund these chairs and I get paid a little better than
14   other people that -- and get a little extra money for
15   projects.  It's because the Dean thought I did a good job.
16   Q.   Okay.  And what do you specifically concentrate your
17   teaching of law on at Fordham University?
18   A.   Always I've focused on two areas:  contract law, the
19   enforcement of promises; and securities law and corporate
20   law.
21   Q.   And do you belong to any professional organizations or
22   hold positions within the -- in those professional
23   organizations?
24   A.   I'm in the American Bar Association Business Law
25   Section Committee on stock trading, I'm on the city bar of

Direct - Thel

1   New York General Securities Law Committee.  I was the -- a

2   board member of the American Association of Law Schools

3   Contracts Section.  I may have done some others from time to

4   time.

5   Q.   Okay.  And as a professor, have you been published?

6   A.   Yes.

7   Q.   Okay.  And essentially what specific field have you

8   been published on?

9   A.   I've been -- I've had -- I have a book in contract law,

10  a book in investment management law, articles on contract

11  law, and articles on securities law.

12  Q.   Okay.  Have you been published regarding securities

13  regulations or otherwise known -- under the section 10b of

14  securities law?

15  A.   Yes.  I think I can say that Rule 10b-5 is the most

16  important fraud -- rule about fraud.  And I've written

17  pretty extensively about that rule and section of 10b of the

18  Securities Exchange Act, which authorizes the rule.

19          My first article -- first big article as a law

20  professor was an article in the Columbia Business Law Review

21  on that.  Another article in the Stanford Law Review on

22  that.  An article on Cornell Law Review about -- on that.

23  Another Columbia Business Law, Vanderbilt, Fordham, some

24  others.

25  Q.   And have you testified in court regarding securities

2268

Direct - Thel

1    and also, essentially, the exceptions when it comes to

2    registration regarding securities?

3    A.    Yes, I have.

4    Q.    Okay.  And how many times have you testified in court?

5    A.    All together, probably -- in the securities area,

6    about -- about 20 or 30.

7    Q.    Okay.  And for your testimony here today, are you being

8    paid?

9    A.    I am.

10   Q.    Okay.  And what is your pay rate for your testimony?

11   A.    In this case, I think it's $330 an hour.

12   Q.    And have you been qualified as an expert in court

13   before?

14   A.    Yes, I have.

15   Q.    And how many times have you been qualified as an

16   expert?

17   A.    I think between courts and arbitrations and

18   international functions, 40 times or so.

19   Q.    And have you been qualified as an expert in federal

20   court -- U.S. Federal Court?

21   A.    Yes, I have.

22   Q.    And do you recall how many times you've been an expert

23   in U.S. Federal Court?

24   A.    No.  I think probably 10 times in federal criminal

25   cases, where I've been retained by the Government.  Four or

1    five times in federal criminal cases where I've been

2    retained by defendants.  Four or five times in cases where

3    I've been retained by the Securities and Exchange

4    Commission, either their administrative agencies or in

5    federal courts.  I think that's about right.

6    Q.   So it's fair to say at this point in your testimony

7    you've testified for the Government and the defense?

8    A.   Yes.

9    Q.   Okay.

10        MR. SIBERT:  Your Honor, at this time the

11   Government would move for Mr. Thel to be -- Professor Thel

12   to be considered an expert in security law for the purposes

13   of this case.

14        THE COURT:  Is there an objection?

15        MR. BARNARD:  No objection.  Excuse me, Your Honor,

16   no objection.

17        THE COURT:  All right.  There being no objection,

18   Professor Thel is qualified under Federal Rule of Evidence

19   702 to provide expert opinion testimony in the field of

20   securities law.

21        MR. SIBERT:  Thank you, Your Honor.

22   BY MR. SIBERT:

23   Q.   Sir, I'm going to have you look at Government Exhibit

24   444, which has not been introduced into evidence.

25        And could I ask for the hard copy, please, as well.

Direct - Thel

1      All right.  Do you recognize Government Exhibit

2   444?

3   A.   Yes, I do.

4   Q.   Okay.  And could you just explain in general terms what

5   Government Exhibit 444 is.

6   A.   Well, I'm looking at a set of papers that are shown on

7   my screen, but it says -- it's a -- the papers are a

8   reproduction of a PowerPoint screen of some information

9   about registration of securities under the securities laws.

10  Q.   Okay.  And have you had an opportunity to review this

11  exhibit before your testimony here today?

12  A.   Yes, I have.

13  Q.   Okay.  Also did you assist in creating Government

14  Exhibit 444?

15  A.   Yes.  Someone -- who I think was you -- sent me a copy

16  of the -- of your efforts and I changed it some.

17  Q.   Okay.  And your changes and your corrections to this

18  exhibit, was it made after you looked at several documents

19  regarding this case provided to you by the Government?

20  A.   Yes.

21  Q.   Could you discuss what some of those documents were.

22  A.   I think there were probably about 400 pages.  There

23  were some Rule 144 opinions and some drafts of Rule 144

24  opinions, some promissory notes and promissory notes that

25  included language that had convertible securities.  I think

1     two or three versions of the criminal complaint, and other

2     documents.

3     Q.    Okay.  Did that include also e-mails that were

4     disclosed to you as well?

5     A.    Yes.  E-mails and -- I think maybe Skype transcripts.

6     Q.    And you stated about 400 pages of documents?

7     A.    Roughly about that.

8     Q.    Okay.  Have you reviewed the law in this Exhibit 444?

9     A.    Yes.  It's -- it makes references to the securities

10    laws, and I've looked at that law.

11    Q.    And based on that review of this law and Government

12    Exhibit 444, do you believe that the law is correctly

13    stated?

14    A.    Yes.

15          MR. SIBERT:  Your Honor, at this time the

16    Government would like to move into evidence Government

17    Exhibit 444.

18          THE COURT:  Is there an objection?

19          MR. BARNARD:  Your Honor, the defense does object

20    to this.  This is a PowerPoint presentation dealing with

21    certain issues, specifically with law.  And I think that the

22    proper place for the law to be presented to the jury's

23    through the jury instructions, not through a PowerPoint

24    presentation.

25          And it also appears to me to have certain spots

Direct - Thel

1    where factual statements are being made that do not come

2    from reviewing the 400 pages.  So I don't think it is a

3    proper 1006 summary.

4            THE COURT:  Well, I don't think it purports to be a

5    1006 summary, but I'm going to overrule that objection.  I

6    don't believe that the purpose of the testimony of this

7    witness is for the witness to be instructing the jury on

8    what the law is because that is my sole function, but that

9    it will seek to elicit his expert opinion analysis -- or

10   interpretation and understanding of what the law is.  So

11   that objection is overruled.

12           You may proceed, Mr. Sibert.

13           MR. SIBERT:  All right, thank you, Your Honor.  May

14   I please have Government Exhibit 444 published.

15           THE COURT:  I forgot to say, Exhibit 444, over that

16   objection, is admitted into evidence and may be published to

17   the jury.

18       (Government's Exhibit 444 received)

19           MR. SIBERT:  Thank you, Your Honor.

20   BY MR. SIBERT:

21   Q.   All right, sir, I'd like to take a few minutes and go

22   through the exhibit.  Could you essentially explain to the

23   jury what is being described on page 1 of Government Exhibit

24   444.

25   A.   Yes.  Do I -- do I understand that the jury sees it?

2273

Direct - Thel

1    Q.   They do see it now.

2    A.   The Securities Act of 1933 was adopted in 1933 at the

3    very beginning of the New Deal under President Roosevelt.

4    And this Section 5 is the linchpin of it.  And it says that

5    it is unlawful for anyone to use jurisdictional means, that

6    is, interstate telephone calls or the mails, or interstate

7    communications, to offer or sell any security unless that

8    security is registered with the Securities and Exchange

9    Commission.

10          The only person that can register a security with

11   the Securities and Exchange Commission is the issuer of the

12   security, so if you think Microsoft, Microsoft Company.  And

13   to register with the security costs an incredible amount of

14   time and money.

15   Q.   Okay.  So the key here is registration; is that

16   correct?

17   A.   That's correct --

18          MR. BARNARD:  Objection.  Leading.

19          THE COURT:  Sustained.

20          THE WITNESS:  So what it says --

21   BY MR. SIBERT:

22   Q.   I've got to rephrase my question.

23          What's the most important thing regarding slide 1

24   of Government Exhibit 444 for the jury to understand?

25   A.   I think that it --

2274

Direct - Thel

1   Q.   In your opinion.

2   A.   In the page I see, there's a green underline. Do you

3   see -- does the jury see the green underline?

4   Q.   Sure.

5   A.   So it's either registered with the SEC or it qualifies

6   for an exemption or safe harbor.

7   Q.   How much does it usually -- how much money does it

8   usually cost to be able to register with the SEC?

9   A.   I think a registration statement with the SEC for an

10  operating company could cost 500,000, a million dollars,

11  taking many, many months. It could cost $10 million. It

12  cost a tremendous amount of money.

13  Q.   Okay. And is that -- you gave the example of

14  Microsoft. Is that registration statement good for every

15  issuance that Microsoft wants to make --

16  A.   No.

17  Q.   -- with their stock or do they have to re-register

18  every time they issue stock?

19  A.   It is not for the whole class of stock, it's only for

20  what they plan to sell and it's only good for one sale. So

21  when Microsoft files a registration statement, Microsoft can

22  sell the stock, but the next day if you buy some in the

23  public offering and you want to sell, that registration

24  statement doesn't help you. You have to find your own

25  exemption or get another registration statement, which

1    you're not going to do.

2         And if Microsoft wants to sell more stock later, it

3    has to sell -- do another registration statement.  It's not

4    once-registered-always-registered.  It's registration of

5    specific shares for a specific deal.

6    Q.   But very expensive even one time?

7    A.   Yes.  It's very expensive.

8    Q.   Okay.  Can I have page 2, please.

9         Okay.  So essentially I want to talk about, just a

10   little bit more -- you were talking about the registration.

11   Essentially what does that mean when it comes to stocks?

12   A.   This Section 5 applies to all securities, that includes

13   stocks, bonds, certain kinds of notes.  But for stocks, they

14   have to be -- any time anybody's going to sell a stock, it

15   either has to be registered or you have to find an exemption

16   for registration or it's a crime.  So you can see on CNBC

17   and all those people jumping around on the New York Stock

18   Exchange, every one of those trades has to be registered or

19   exempt.  It turns out most are exempt, but you have to have

20   an exemption or registration or it's a violation of the law.

21   Q.   So that summarizes right down here at the bottom; is

22   that correct?

23   A.   That's correct.

24   Q.   And so what you mean is either registration -- if

25   there's not a registration, what do you have to do?

Direct - Thel

1    A.   You have to prove -- you have to prove the exemption,

2    and there are a number of them.  But if it's not registered

3    and it's not exempt, then if you used jurisdictional means,

4    the mails, interstate telephone calls, it's unlawful.

5    Q.   And when you say interstate means, you use telephone

6    calls and the computer, does that also include e-mails?

7    A.   Yes.  So long as they -- anything that crosses state

8    lines, which e-mails almost always do.

9    Q.   Can I have page 3 of this exhibit.

10          So I just want to break down essentially what you

11   mean by the "issuer" and "everyone else."

12   A.   Okay.  So a person -- the -- one person who wants to

13   sell securities is the issuer of securities.  Microsoft

14   wants to sell securities, Apple wants to sell securities.

15   And when they do, they typically don't have an exemption

16   except for sales to very wealthy people.  And so they're the

17   ones who do registration statements.  So that's the issuer.

18          In this case, I think the relevant issue would be

19   FusionPharm, though I have no firsthand knowledge of that.

20   Everybody else who wants to sell stock is not the issuer.

21   That could include Bill Gates, himself, who is a big owner

22   of Microsoft.  But it could include some of us who somehow

23   or another come in contact with it and we want to sell it

24   again.

25          The issuer has one path forward and everybody else

2277

Direct - Thel

1    is treated differently.

2    Q.   Okay.  Can I have page 4, please.  So you said you

3    reviewed documents in preparation for your case.

4    A.   Yes.

5    Q.   Okay.  And you said you don't have first-hand

6    knowledge.  What do you mean by that?

7    A.   I don't know who William Sears is, I've never met him.

8    I received documents from you, which I believe to be

9    genuine, that they are the documents you say they are.

10   I'm depending on you for that.

11   Q.   Okay.  So you're reading these names off the documents

12   you reviewed.

13   A.   Correct.

14   Q.   Okay.  All right, sir, in this case, who is the issuer?

15   A.   So the issuer is -- of the securities being sold are

16   FusionPharm.  Excuse me.

17        Some of the other intermediary issuers, such as

18   LLCs, might have had securities being issued also, but

19   that's not what I think is at issue here.  The issuer is

20   FusionPharm.

21   Q.   Okay.  And can I have just have Government Exhibit 411

22   put up on the screen for the witness.  Can you just blow

23   that up, please.

24   A.   Okay.

25   Q.   And based upon your understanding of this case, was

Direct - Thel

1    FusionPharm registered to sell -- did FusionPharm have a

2    registration statement with the SEC to be able to sell

3    shares?

4    A.    No.    This appears -- I'm sorry, this appears to be an

5    attestation from the SEC that they never received the

6    registration statement.    And you cannot -- you cannot sell

7    under Section 5 until that goes effective.

8              If they never received it, there was no

9    registration statement, according to this.

10   Q.    Can I go back to Exhibit 444.    And can I have page 5.

11             So what happened -- what does the law say happens

12   when a company, an issuer, or a person that's trying to sell

13   shares of stocks doesn't have a registration statement?

14   A.    Well, there are other ways for the issuer to sell

15   stock.    They could do it in a private placement, very

16   sophisticated persons, or institution or investors.

17             But once that stock gets out, the question becomes

18   everybody else, people who have it and want to resell the

19   stock.    And the people who want to resell the stock

20   typically rely on an exemption from Section 5, which is an

21   exemption stated in Section 4(a)(1), which states that the

22   transactions by persons other than issuer, underwriter or

23   dealer are exempt.

24             And so what that is is that's not a

25   securities-exempt or a person, it's a transaction.    So

1    offers in sales by persons -- by persons other than issuer,

2    underwriter or dealer are exempt.  So if I own $100 shares

3    of Microsoft in my account and call my broker and tell him

4    to sell it, I am exempt because I'm not the issuer, I'm not

5    an underwriter and I'm a dealer.  Now, the dealer, when

6    he takes it down to the market --

7              THE COURT REPORTER:  I'm sorry, I need you to slow

8    down.

9              THE WITNESS:  I'm -- I was trying, now that I'm in

10   Denver, not to slip into a full New York.

11             I'm not -- I am not an issuer, I am not a dealer, I

12   am not an underwriter, so I have an exemption.  Now when

13   the -- when my stockbroker takes it down to the floor and

14   wants to sell it for me, he needs his own exemption, which

15   he will also get.

16   BY MR. SIBERT:

17   Q.   Okay.  So the issuer, based upon the documents you

18   reviewed in this case, is who?

19   A.   FusionPharm.

20   Q.   Okay.  And now, why is an underwriter important in this

21   case?

22   A.   Well, an underwriter is sort of the linchpin of

23   restricting this.  An underwriter is a person who buys a

24   security from an issuer to sell to the public, or helps the

25   issuer sells to the public, or buys a security from an

Direct - Thel

1     affiliate, that is, a person who is going to control a

2     relationship with the issuer, or helps that person sell to

3     the public.  And those set of people --

4     Q.    Let me just stop you real quick.

5           Can I have page 6.  Okay.

6           Can you go back and determine how the law defines

7     an underwriter.

8     A.    Sure.  So as I said, but to repeat, an underwriter is a

9     person, No. 1, who buys securities from an issuer.  In this

10    case, that would be a person who bought from FusionPharm,

11    with a view to selling those to the public, or who helps

12    FusionPharm sell to the public.  That's one set of

13    underwriters.

14          The other is any person who buys securities from a

15    control person of FusionPharm, or the other company, or --

16    with a view to selling to the public or helps that person

17    make a sale to the public.  So an underwriter is not an

18    investment bank.  An investment bank is an underwriter, but

19    an underwriter is much broader.

20          An underwriter is a person who is a conduit by

21    which either the issuer or its control people, people who

22    control the issuer or are controlled by the issuer, sells

23    securities to the public.  And if there's an underwriter in

24    the transaction, either a person who bought from the issuer

25    with the view of selling to the public, or is helping an

Direct - Thel

1    affiliate of the issuer, a person who controls the issuer,

2    sell to the public, the exemption is gone because there's

3    a -- an underwriter in the transaction.

4        So you would have to worry about whether the person

5    who bought the securities and is selling to the public is an

6    underwriter, or whether the broker, who is helping the

7    issuer or the affiliate sell to the public, is an

8    underwriter because they're helping them distribute to the

9    public, and if they are, the exemption is gone.

10   Q.   So you looked at the documents in this case.  Why is

11   the focus really on No. 2 regarding the control person?

12   A.   Because many of the securities that were being sold --

13   the common stock that was being sold was not coming out of

14   FusionPharm, it was coming out of people who held positions,

15   except for the common stock that came after -- on

16   conversions with certain notes.  That stock did come from

17   the company, but then would be resold to the public by the

18   noteholders.

19       So in all of that, what we have is the reseller

20   problem.  We're not focusing on the company's violation,

21   we're focusing on when people resold their stock, they were

22   underwriters or their helpers were underwriters.  And that

23   particularly matters when you -- if Mr. Sears was a control

24   person or an affiliate of FusionPharm, any broker who helped

25   him sell it in the market was an underwriter and, therefore,

Direct - Thel

1   there was no exemption.

2   Q.   All right.  So for -- in order for a broker to sell

3   shares of stock at FusionPharm that Mr. Sears was giving to

4   the brokerage house, what would the broker need to know

5   about Mr. Sears?

6   A.   Well, he'd need to know a lot of things.  They would

7   need to know what the relationship of the company is, who he

8   had gotten the stock, how long he'd held the stock.

9   There -- the typical way, and for many purposes, the only

10  way is to comply with the safe harbor the SEC has created

11  called Rule 144.

12  Q.   I just want to back up here real quick.  To include the

13  transfer of Baby Bee Bright and the notes.  I just want to

14  start out with what's been labeled at BBYB.

15          Do you remember going through the documents

16  regarding Baby Bee Bright?

17  A.   Yes.  As I recall, the -- early in this set of

18  transactions, BBYB was already a publicly held company.  It

19  was acquired to join in with what eventually became

20  FusionPharms to be a publicly traded.

21  Q.   Okay.  And what does that mean to you in the world of

22  securities?

23  A.   That is not unlawful.  So it is oftentimes -- so you

24  can imagine Singer Sewing Machine Company is probably a

25  publicly traded company that has no business anymore -- or

Direct - Thel

1    is -- that's not good.  The Typewriter Company is a public

2    company that has no business anymore, so someone might go

3    and find people who own the old typewriter company and

4    create a new business within it, and so that would already

5    be public.

6              They wouldn't be able to raise any money from the

7    public that way, but the company would already be public and

8    there would be existing shareholders, and stock brokers

9    might want to trade that.

10             Sometimes called going public through the back

11   door.  You go public by merging with a public company rather

12   than by filing a registration statement.

13   Q.   Can I have page 7, please.

14             So this is kind of a review.  Essentially can you

15   just quickly give the review when it comes to Section 5, and

16   where you need to go from Section 5 if you don't have a

17   registration statement?

18   A.   Okay.  So Section 5 says no offer or sale can be made

19   until the registration statement's been filed and is

20   effective.  It is satisfied here that there were no

21   registration statements for any of these transactions.

22             That means anybody attempting to resell the stock

23   that they had, or stock that they received upon conversion

24   of promissory notes of FusionPharm, would have to find an

25   exemption and that exemption would be for 4(a)(1).  The

1    complication in that exemption, if it's not available, is

2    because there's an underwriter in there.  Either Mr. Sears

3    bought the stock from -- Mr. Sears, or anybody else who was

4    selling the converted stock, bought it for distribution, had

5    a sale to the public -- which would make him an underwriter,

6    no exemption -- or the brokers who helped Mr. Sears were

7    underwriters if Mr. Sears was in a control relationship.

8    And since the brokers were underwriters for him, he couldn't

9    sell because there's an underwriter in the transaction.

10            This sort of statutory scheme is:  The issuer and

11   its affiliates can only sell to the public through a

12   registration statement and these were fairly complicated

13   rules -- are designed to make sure they don't get around

14   that -- by selling to an affiliate and having him pass it on

15   to the public.

16   Q.   And what do you mean by the safe harbor Rule 144?

17   A.   And so to make sure that either the person selling the

18   stock to the public is not an underwriter, or the person

19   helping an affiliate, a control person, sell to the public

20   not an underwriter, the SEC has a Rule 144 which is a safe

21   harbor.  It says if you meet certain conditions, which it

22   describes, neither the seller nor his broker's an

23   underwriter, and since there's no underwriter in the

24   transaction, 4(a)(1) will be available for the reseller, and

25   the broker will still have his own exemption.  But the

1   brokers are exempt so long as they are not acting as

2   underwriters.

3   Q.   Can I have the next page, please.

4        And that's a quick flow chart of what we just

5   discussed, do you agree?

6   A.   Yes, it is.

7   Q.   Can I have the next page, please.  Okay.

8        Essentially -- could you describe essentially the

9   key parts of the Rule 144 safe harbor rule.

10  A.   Well, 144 is designed to make sure that there are no

11  underwriters.  And, remember, always we have two people who

12  might be an underwriter:  Either the person who bought from

13  the issuer and is selling to the public, or the person who

14  is helping an affiliate sell to the public, or buying from

15  an affiliate and selling to the public.  So those are two

16  sets of people who may be underwriters.

17       And Rule 144 says if you meet these conditions,

18  you're not an underwriter, and hence will have 4(a)(1)

19  exemptions.  It treats the exemptions differently depending

20  whether the seller is an affiliate -- whether the problem is

21  we have an affiliate or whether the problem is we've had

22  somebody who's bought from the company.

23       When a person's bought from the company, the

24  restrictions are fairly minor.  They simply -- you have to

25  hold for a period of time.  When there's an affiliate

Direct - Thel

1    involved, the restrictions are much more substantial.  And
2    so we need to know what an affiliate is, and an affiliate
3    here is a person that directly or indirectly, through one or
4    more instrumentalities, controls, is controlled by, or is
5    under common control with the issuer.  So this is a fairly
6    standard definition throughout the securities law.

7         An affiliate is a person who controls the issuer,
8    is controlled by the issuer, or is under common control with
9    the issuer.

10   Q.   Okay.  The next page, please.  Page 10.  Okay.

11        Can you tell how rule -- essentially, how "control"
12   is defined under this securities law.

13   A.   Yeah.  Well, here is another SEC rule under the same
14   statute, saying, Control means the possession, indirect or
15   direct, of the power to direct or cause the direction of a
16   management of a company, whether by share ownership
17   agreement, or otherwise.  It's a factual question.  Does the
18   individual at issue have the power to, directly or
19   indirectly, cause or direct the conduct or management of the
20   company?

21   Q.   Okay.  Now, my understanding is that there's no
22   defined -- solidly defined definition when it comes to the
23   securities world when it comes to what a control person is.

24   A.   Yes.  It turns on facts.

25   Q.   Okay.  And so what is the usual standard when it comes

2287

1    to volume of shares owned by a person of a company?

2    A.    Well, if -- there's another set of rules that says if a

3    person owns 10 percent of a public company, they have

4    substantial obligations, and I think it is -- certainly,

5    universal practice is to teach a person who -- treat a

6    person who owns 10 percent of the stock of a company to be

7    an affiliate.

8    Q.    Okay.  Could you provide some examples of what would

9    make a person a control person within the company

10   regarding -- excuse me, their duties or roles within the

11   company?

12   A.    So I think that -- I mean, typically people will treat

13   all directors as affiliates; they would treat all

14   substantial shareholders as affiliates.  The only

15   legislative history on this is that since an affiliate will

16   have to get a registration statement, the question is could

17   they have gotten the issuer to make a registration

18   statement?

19         So if a person at the company plays a substantial

20   role in their capital market's access in raising money,

21   almost anybody would say they were an affiliate.  If they

22   could get the company to do things, if they could get the

23   company to sell more securities, if they could get the

24   company to offer new facilities, if they could get the

25   company to -- they have influence in setting the price when

Direct - Thel

1    the company sells facilities, so that would all be the power
2    to direct the management or policies of the issuer.
3    Q.   Is a control person, slash, affiliate, is it limited to
4    one person in a corporation?
5    A.   No.  No.  Virtually every corporation has -- has many
6    affiliates.  And you can imagine if you have a company with
7    a subsidiary, each subsidiary is an affiliate of each other,
8    and they're all affiliates of the parent, and all affiliates
9    of the directors and controlling shareholders of the
10   parents.
11   Q.   And does it matter what the person's title is within a
12   company?
13   A.   No.
14   Q.   And, sir, you reviewed some e-mails prior to your
15   testimony today; is that correct?
16   A.   Yes, I did.
17   Q.   All right.  Can you please look at Government Exhibit
18   389-D, which has been offered into evidence.  Page 21,
19   please.  And can I have July 12th, 2011.  Okay.
20        Did you read this e-mail from Mr. Sears prior to
21   your testimony?
22   A.   Yes, I did.
23   Q.   Okay.  And what, essentially, is a 211-A?
24   A.   So this -- FusionPharm is not traded on the New York
25   Stock Exchange or on NASDAQ, it's traded on -- which -- all

Direct - Thel

1    of which are called stock exchanges.  But it's traded on the

2    over-the-counter market, which is a thinner market, and less

3    regulated.  And there's no requirement that the company --

4    it -- to be on an exchange, the company is subject to much

5    heavier regulation.  A broker cannot publish quotations on

6    this over-the-counter market; cannot say, "I'll buy for $10

7    and sell for $11."

8        So it can't be any trades unless he publishes

9    those, and a broker cannot publish it unless he has certain

10   information.  And that information is set out in section --

11   in Rule 15c2-11 -- 15c2 hyphen 11, of the Securities

12   Exchange Act.  And which is one of my favorite rules, but is

13   sort of a preposterous thing for everybody to hear about.

14       But he has to have a lot of information before he

15   has that -- has that -- can make a quote, and it lists the

16   regulation he has.  Now where can he get the regulation?

17   Typically the companies want there to be some trading

18   market, so the companies will send what is colloquially

19   called a c2-11, from the end of that, to the company which

20   includes all that information.  It has to include its

21   directors, where its plant is, financial statements.  The

22   kind of information that's similar to what would be in a

23   registration statement.

24   Q.   Okay.  And can -- so you see the name William Sears

25   here; is that correct?

2290

Direct - Thel

1    A.    Correct.

2    Q.    Okay.  And can I just have this section blown up here,

3    please.

4          Essentially there's a name again, Mr. Sears, and

5    the date.  And the e-mail -- this was a Skype message; is

6    that correct?

7    A.    I -- that's what I recall this as when I thought I

8    understood this.

9    Q.    Okay.  Thank you.  Can I have Government Exhibit 372-D.

10   Okay.

11         Here, again, you reviewed another e-mail from Mr.

12   Sears; is that correct?

13   A.    Correct.

14   Q.    And it's going to a Mr. Guy at a law firm?

15   A.    Yes.

16   Q.    And can you tell the jury what's being discussed based

17   upon your understanding of the documents in your case and

18   your knowledge of securities law with a 506 and a 504.

19   A.    This is one of the ways that a company can sell stock

20   directly to people.  And it's called a private placement.

21   And it's either a small amount or a sale to very

22   sophisticated people.  And a 504 offering is a small amount.

23   It's pretty easy to sell, but you can only sell a million

24   dollars.

25         A 506 is an unlimited amount of sales, so it's --

Direct - Thel

1    all hedge funds are sold under 506 because they're sold to

2    rich people.

3            Here, Mr. Sears is writing, "We have decided" -- so

4    he -- and what they have contemplated, and I've seen

5    documentation of that fact, of doing an offer directly to

6    the public.  "We've decided to move ahead with our plan for

7    doing the 506, and I want you to close the 504."

8            So he says, "We've moved from a small deal to a

9    larger deal.  I will send the subscription documents for the

10   subscribers of the 504 so we can do this."  Our --

11           THE COURT REPORTER:  I'm sorry, can you slow down.

12           THE WITNESS:  I'm sorry, yes.

13           "I will prepare most of the 506 documents as I have

14   a template I like."

15   BY MR. SIBERT:

16   Q.   Okay.  Now, you reviewed other e-mails from Mr. Sears

17   regarding, essentially, the raising of capital; is that

18   right?

19   A.   Yes.

20   Q.   Okay.  Based upon your review of those e-mails and

21   e-mails -- and Skype messages I just showed you, in your

22   expert opinion, was Mr. Sears a control person at

23   FusionPharm?

24   A.   Yes.  If these are authentic, it indicates that he is

25   calling the shots on how to do a distribution of securities;

1    that he's calling those shots in consultation with a lawyer
2    for the company.
3              I've seen where he has received documentation
4    prepared that isn't even sent to anybody else within the
5    company.  And so here, in terms of running the capital --
6    company's capital structure and preparing SEC documents, he
7    plays a dominant role, and that is the paradigm, the primary
8    case, of being a control person.
9    Q.   Okay.  Now, can we go back to Government Exhibit 444.
10   And can I have page 11, please.
11             So if Mr. Sears is a control person, he qualifies
12   as an affiliate under the securities law; is that right?
13   A.   Correct.
14   Q.   Okay.  Let's talk about the impact of being an
15   affiliate under Rule 144, the safe harbor.
16   A.   All right.  So when an affiliate is selling his
17   securities, he's worried about two things.  Either he is,
18   himself, an underwriter because he got those from the issuer
19   and is going to sell them, and more importantly and more
20   uniquely, that his broker is an underwriter because he's
21   helping an affiliate sell to the public.
22             So if he acquired the securities from the issuer,
23   he has to hold them for one year.  There's a holding period.
24   Q.   And that's the holding period right here on the first
25   note?

1    A.    Yes.

2    Q.    Okay.

3    A.    He has to file a Form 144 with the SEC if he is going

4    to sell more than 5,000 shares or more than 50,000 shares of

5    stock over three Mondays.  So this is a Form 144 filed with

6    the SEC, which will create a record that he is the affiliate

7    selling it, and they also require certain disclosures that

8    he didn't have any inside information.  So that's the form.

9          He also --

10   Q.    That's your second point here?

11   A.    That's the second point.

12   Q.    Okay.

13   A.    He is also limited to the amount of stock he can sell.

14   He can sell, over a three-month period, 1 percent of the

15   outstanding stock sold through all of his 144 sales.  It's

16   not 1 percent for one broker, another percent for another

17   broker.  All his sales cannot exceed 1 percent of the stock

18   outstanding.  So that's volume limitations.

19         The next is that he has to sell through a brokers'

20   transaction.  He has to sell in a transaction where he goes

21   to a broker and the broker doesn't find buyers.  There's no

22   sales business.  The broker just finds buyers out there.  He

23   cannot go seek out buyers.  There has to be an interest in

24   the market.  And the broker, himself, to have his own

25   broker's exemption, has to do that.  These have to be

1    brokers' transactions.  They have to be transactions in

2    which the stock is exposed to the market, they say, "We're

3    willing to sell it," but they don't go find people to come

4    and buy it.

5    Q.   And essentially what does the broker rely on?

6    A.   Well, so the broker is really on the hook here.  To be

7    a brokers' transaction the rule says they have to

8    investigate and make sure that everything is okay.  They

9    need to investigate:  Is the person an affiliate?  They will

10   only do this -- once they find out that they have an

11   affiliate, then they do this and investigate how much stock

12   is outstanding, how much is he selling?  How did he get the

13   stock?  What other relationship it does.

14        The -- the rule says that the broker has to do an

15   investigation.  It says you may want to consider these

16   things, but does not have an exhaustive list.

17   Q.   Okay.  What is one of the things that the brokers rely

18   heavily on when it comes to being able to release these

19   stocks onto the market?

20   A.   Well, the way the broker will typically rely on this,

21   for sales for affiliates, and the transfer agent who has to

22   also approve the transfer is to insist upon a letter from a

23   lawyer.  These are called 144 letters.  And when affiliates

24   sell the stock of their company, they do 144 letters.

25        When stock of a -- restricted stock that's been

Direct - Thel

1    bought in a private placement has been sold, there are also

2    144 letters.

3    Q.   And also part of that due diligence are letters called

4    affiliation letters; is that correct?

5    A.   They will be -- people will represent that they are not

6    affiliates.

7    Q.   And who are the people that usually represent they're

8    not affiliates?

9    A.   I hope people who are not affiliates, people who have

10   private placement, and have no affiliation with the company.

11   If they represented otherwise and they're an affiliate, that

12   would be an untrue statement.

13   Q.   And unlike this case where you've looked through over

14   4- and 500 pages of documents, they're -- the due diligence

15   for a broker is far less when it comes to getting clear --

16   getting the stock onto the market --

17   A.   Yeah, the -- the broker and the market -- the broker

18   who wants to sell stock and the transfer agent typically

19   rely on the lawyers who are providing the 144 letters.

20   Q.   Okay.

21            THE COURT:  Mr. Sibert, just -- just so we've a

22   chance to finishing up when I told the jury we would finish

23   with them, I'm going to let you go until 4:30, so that the

24   defense has time for cross-examination.

25            MR. SIBERT:  I'm sorry, Your Honor.  I thought I

2296

Direct - Thel

1    had to 4:45.

2              THE COURT:  I said we would be done at 4:45.

3    There's a cross examination, too.

4              MR. SIBERT:  I --

5              THE COURT:  How could you possibly be done at 4:45?

6              MR. SIBERT:  Because I thought you meant my direct.

7    I misunderstood the Court.  I apologize.

8              THE COURT:  Did you not hear me tell the jury that

9    I would be releasing them at 4:45?

10             MR. SIBERT:  Yes --

11             THE COURT:  I --

12             MR. SIBERT:  I don't want to waste time, Your

13   Honor.

14             THE COURT:  All right.

15             MR. SIBERT:  I would like to go forward --

16             THE COURT:  At 4:30, you're done.

17             MR. SIBERT:  Yes, sir.

18   BY MR. SIBERT:

19   Q.   So essentially the brokers and transfer agent rely on

20   this 144 record essentially to take off the restrictions of

21   the shares; is that right?

22   A.   Correct.

23   Q.   All right.  Can I have the next page, please.

24             Now, you talked about the volume limitation.  Is

25   that what you cited for 1 percent?

Direct - Thel

A.    Yes.

Q.    Is that volume limitation specifically for issuers that
trade on the Pink Sheets market?

A.    It's available to all issuers.  There's some
alternatives that are available to stocks traded on the
stock exchange, but the only one available to Pink Sheet
stocks is this 1 percent.

Q.    Okay.  And can you tell me what the difference is
between a sale by an affiliate of securities versus a
nonaffiliate.

A.    Well, the affiliate sale, when used as a broker, is
going to have to have limited volume, have to report to the
SEC if you're selling more than 50,000 or 5,000 shares; have
to -- volume limitations, I think that covers them.

      Volume limitations, information about the issuer
has to be available, that 15c2-11 information.  The selling
through brokers' transactions and reporting to the SEC if
it's not a de minimis transaction.

Q.    Okay.  In this case, why is it a problem for Mr.
Sears -- William Sears to sell the shares of FusionPharm
stock and put the proceeds back into FusionPharm?

A.    Well, that would make him an underwriter.  There's
no -- there's no mechanism -- if he was selling the stock
and then giving money to the company, then he was
essentially selling the company stock and he was an

Direct - Thel

1    underwriter.

2            What's more, the source of funds to the company

3    needs to be disclosed in his financials and it would have to

4    be disclosed as loans made possible by constant sales of

5    stock acquired from the company in conversions of notes.

6    Q.   Okay.  Why is it an issue for William Sears' mother,

7    Sandra Sears, to sell FusionPharm stock and provide the

8    proceeds back to FusionPharm?

9    A.   Well, I think again, that would make her -- if she was

10   getting them on a conversion of note, that would make her an

11   underwriter, herself, and those sales would have been

12   illegal.

13           Also that if she was giving the money to the -- to

14   FusionPharm, that's a source of funds that FusionPharm --

15   that needs to be disclosed in its financial statements.

16   Q.   Now, you've reviewed several e-mails, messages,

17   documents, regarding this case; is that right?

18   A.   Yes, I have.

19   Q.   And you stated earlier that Mr. William Sears would be

20   an affiliate/control person in FusionPharm; is that right?

21   A.   That's how I read it, yes.

22   Q.   And you've reviewed several documents regarding

23   communications between Mr. William Sears and Mr. Guy

24   Jean-Pierre; is that right?

25   A.   Yes, I have.

Direct - Thel

1    Q.   Okay.  In your opinion -- well, essentially, do you

2    know the role that Mr. Guy Jean-Pierre, the defendant in

3    this case, played for FusionPharm?

4    A.   I understand he's their internal counsel.

5    Q.   And what types of things would you expect that

6    corporate counsel or a director or officer of the

7    corporation to understand regarding the corporation?

8    A.   Well, I think in a small corporation, I would expect

9    them to understand who controlled the corporation and

10   influenced its operations; how it was raising capital.

11        That the capital-raising process appears to be much

12   more substantial than the business practice here.  I

13   understand it to be a very small business at the time, at

14   least the numbers I've seen.  And so I would expect him to

15   know -- and also -- I would expect him to know who was in

16   control and also to make sure that if he was sending

17   important corporate documents on to someone who was not

18   named as a director, that he revisit his opinion about who

19   actually was in control.

20   Q.   Okay.  In your expert opinion, would you expect Mr. Guy

21   Jean-Pierre to know that William Sears was an affiliate?

22        MR. BARNARD:  Your Honor, lack of foundation, and

23   speculation.

24        THE COURT:  Overruled.

25        THE WITNESS:  Yes.  The documents I -- the e-mails

2300

Direct - Thel

1   and other documents I saw caused me to think that any
2   reasonable person in his position would have understood that
3   Mr. Sears was an affiliate.
4   BY MR. SIBERT:
5   Q.   And looking back at the notes, do you recall the sale
6   of the Bayside note and the promissory convertible notes?
7   A.   You're going to have to -- yeah, I recall it
8   generally.
9   Q.   Do you recall Bayside being owned by Sandra Sears?
10  A.   Yes.
11  Q.   Okay.  And do you recall the fact that that note -- if
12  you're saying that Sandra Sears was an affiliate of
13  FusionPharm, what's the problem there?
14  A.   Well, then upon the conversion of the note, the --
15  anybody who bought that note was buying a security from an
16  affiliate, and their holding period would have to start all
17  over again.
18  Q.   Okay.
19  A.   Because they have -- it would have to be one year past
20  after you buy the security from the company or an affiliate.
21  So if they bought from an affiliate, they have to wait for a
22  year to sell the converted stock, is a problem with that.
23  Q.   So it wouldn't matter if Bayside was owned by Mr. Sears
24  or Mr. Sears' mother.  During the sale of that note,
25  whenever that note was sold, the new owner of that note

1    would have to wait a year?

2    A.    From that date.

3    Q.    Okay.  And as you just stated, that Mr. Guy Jean-Pierre

4    should have known that Mr. William Sears was a affiliate or

5    control person at FusionPharm, in this case, you just talked

6    about some very specific security law -- security laws.

7    What is legal counsel's duties to advise, slash, inform the

8    controller of the companies when it comes to the obligations

9    of these securities laws?

10   A.    Well, I think it is their -- if they are the principal

11   legal officer, they're obliged to explain Section 5; obliged

12   not to conspire with the company or affiliates of the

13   company to violate the law; and certainly not to participate

14   in violation of the law of their companies.

15   Q.    Okay.  And if the control people of the organization

16   continued to want to violate the security laws, what do you

17   expect as an expert for the corporate counsel to do

18   regarding his role or affiliation with the organization?

19   A.    Well, first, to advise not to violate the law.  I --

20   then I think to disassociate yourself and not participate

21   with any of those violations.

22         At some point, counsel can turn in their clients to

23   law enforcement if there are ongoing violations.  But they

24   have to be very, very careful about that because the lawyer

25   has the duty of confidentiality.  But the lawyer needs to

Cross - Thel

1    report up to the people in the firm and to desist from

2    assisting in the violations.

3    Q.   So should the lawyer continue to assist control owners

4    to be able to sell shares without listing themselves as an

5    affiliate?

6    A.   No.  As a lawyer, he should not do that.  And also if

7    they're doing that, they're being part of a conspiracy

8    violating securities laws.

9              MR. SIBERT:  I have no further questions.  I'll

10   pass the witness.

11             THE COURT:  Cross-examination.

12             MR. SIBERT:  Finished three minutes early, Your

13   Honor.

14             THE COURT:  Yup.

15             MR. BARNARD:  Thank you, Your Honor.

16                      CROSS-EXAMINATION

17   BY MR. BARNARD:

18   Q.   Professor Thel, I'd like to start off right where you

19   left off.  You said -- or close to where you left off, get

20   to the end there.

21             You said that in making certain opinions or -- or a

22   basis for some of your opinions, that was based on you

23   having looked at thousands of documents, correct?

24   A.   No, I don't think -- about 400 pages of documents.

25   Some of which were multi -- one multi-page document, others

1    were lists of e-mail communications.  I wouldn't say

2    thousands.

3    Q.   All right.  And so your hundreds of pages of documents

4    that you looked at, these were culled documents that were

5    supplied to you by the prosecution.

6    A.   Yes.  In some cases, I asked for documents; in many

7    cases they gave me -- they chose which documents to give

8    me.

9    Q.   Additional documents that you thought might be

10   pertinent?

11   A.   Yes.

12   Q.   And these documents that you were given encompassed

13   e-mails between various people.

14   A.   Included e-mails, yes.

15   Q.   And it included specific documents themselves that had

16   been prepared?

17   A.   Yes.

18   Q.   And --

19   A.   Let me say, I think always prepared by -- not by the

20   Government, prepared by witnesses, yes.

21   Q.   So, in other words, witness statements.

22   A.   No, I used the wrong -- no.  So I saw drafts and final

23   144 letters and documents that were not prepared by the

24   Government, but the Government gave me.

25   Q.   I understand.  And some of those documents -- well, did

1    you know who prepared those documents?

2    A.    I understood -- I was not certain -- but I understand

3    who had.

4    Q.    You understood, but you weren't certain?

5    A.    Yes.  Yeah, I have no -- I mean, these could all be

6    forgeries for me.

7    Q.    So you didn't know personally.

8    A.    Correct.

9    Q.    Now, with regard to these various e-mails and these

10   documents, do you know whether or not Mr. Guy Jean-Pierre

11   had access to or saw -- and let me just -- first of all,

12   have access to every one of these items?

13   A.    He -- the ones that I am thinking about in this -- in

14   connection with this part of my testimony, he is listed as a

15   sender or recipient.

16   Q.    On every single e-mail that you saw?

17   A.    Every single e-mail that I saw in connection with my

18   opinion on this matter.  I'm not sure if I saw other ones.

19   Q.    Well, let me go and figure out which opinion you're

20   talking about.  You gave an opinion specifically with regard

21   to -- to Mr. Sears, and him being a control person.  Mr. Guy

22   Jean-Pierre was not a recipient of every single e-mail that

23   you used to come to that conclusion.

24   A.    That's correct.

25   Q.    And he was not -- Mr. Guy Jean-Pierre was not

1    necessarily -- or was not the author of every document that

2    you used that helped to cause you to conclude that Mr. Sears

3    was a control person.

4    A.    No, not -- not the author of every document like that.

5    Q.    Now, when you then talked about corporate counsel, you

6    said corporate counsel in a small corporation should

7    understand who's controlling, correct?

8    A.    Yes.

9    Q.    And that corporate counsel would be expected to know

10   the -- who's controlling and who is in charge.

11   A.    Yes.

12   Q.    Were you aware that Mr. Jean-Pierre had had only

13   visited FusionPharm on one occasion over a three-year

14   period, four-year period?

15   A.    That rings a bell, that he hadn't been there very much.

16   Q.    You were aware that he was living in Florida.

17   A.    Yes.

18   Q.    And he had his office in Florida.

19   A.    Yes.

20   Q.    So that he was not at the offices of FusionPharm,

21   certainly not on a regular basis at all.

22   A.    Yeah, my understanding.

23   Q.    And that over a three- to four-year period.

24         Mr. -- were you aware that Mr. Jean-Pierre received

25   a total compensation of $33,000 for a number of different

Cross - Thel

1    jobs that he did?

2    A.    I wasn't aware of that, but I think I expected it was

3    in that area.

4    Q.    Now, have you ever, yourself, been in -- worked as a

5    transactional lawyer on securities transactions in private

6    practice?

7    A.    Yes.

8    Q.    How long did you do that?

9    A.    Two years.

10   Q.    When you did that for the those two years, how long ago

11   was that?

12   A.    Probably '85, '86.  I would have to tell you how long

13   ago that was, too.  It was quite awhile ago.

14   Q.    Did you ever conduct due diligence as a transactional

15   lawyer?

16   A.    Yes.

17   Q.    Did you ever draft or sign an opinion letter?

18   A.    I drafted -- yes, including 144.  I drafted 14- -- they

19   had me sign, my partners, so I drafted 144 letters.

20   Q.    So you drafted it.

21   A.    Yes.

22   Q.    And you drafted it because back in those days, you were

23   one of the lesser lawyers that you were doing things for

24   the -- the higher-ups?

25   A.    Yeah, that -- you mentioned it -- many firms, partners

1    do it themselves because there's a lot of gravy in that kind

2    of work, but I've had -- drafted for other lawyers to sign.

3    Q.   And was your name disclosed as having worked on them?

4    A.   The two that -- yes, to the clients; and, yes, to the

5    partner, but it was not on the letter.

6    Q.   When a opinion letter is posted, the public is relying

7    upon the attorney who signed the letter, correct?

8    A.   I don't know what you mean by "when it is posted."  You

9    mean when it is mailed?

10   Q.   When the opinion -- the opinion letters become public

11   information for investors to see, correct?

12   A.   I don't think 144 letters do.

13   Q.   Oh.  So would the same things that we're talking

14   about -- well, let's go to current information letters,

15   then.  Do those get posted?

16   A.   I -- those would be given to the broker, who is

17   obligated to give them to anybody else who asks, I believe.

18   Maybe just other brokers, so those would be available.

19   Q.   So the opinion letters aren't posted on the OTC Market?

20   A.   The OTC Market -- I don't know whether they post them.

21   Q.   All right.  Anybody who is going to be getting those

22   letters will be relying upon the author of the letter as the

23   person who is giving them reassurances.

24   A.   I'm not sure about the author, but the signer.  I

25   believe if you say the signer, that's who you're relying on.

2308

Cross - Thel

1    Q.    The signer of it.  So it is that person who has put

2    their name on it, and that's the person, then, that is

3    certifying that the information is correct and that they

4    have done whatever they say they have done within the

5    document.

6    A.    Yes.

7    Q.    Now, with regard to Rule 10b-5 violations, it requires

8    a certain kind of state of mind in order to be a -- to be a

9    criminal violation, correct?

10   A.    Yes.

11   Q.    It requires more than mere negligence.

12   A.    Yes.

13   Q.    It, in fact -- and mere negligence would be failure to

14   take reasonable care; is that a close enough definition?

15   A.    Failure to take reasonable care would not be enough to

16   satisfy the scienter requirements of criminal 10b-5.

17   Q.    Right.  But it would be negligence.

18   A.    I suppose with that definition, yes.

19   Q.    All right.  So to be criminally liable under section 10

20   of the Exchange Act and Rule 10b-5, a person must act

21   willfully, correct?

22   A.    A person must act with scienter.

23   Q.    And that scienter is willfulness, isn't it?

24   A.    I'm happy to debate this.  I'm not sure that I --

25              THE COURT:  Go ahead --

Cross - Thel

1          THE WITNESS:  No --

2          THE COURT:  -- and answer --

3          THE WITNESS:  It is willful disregard could be

4    scienter.  Willfulness is other violations of the statute

5    and so the meaning of wilfulness has gotten complicated in

6    securities laws.

7          I would say knowing the statements made are false

8    or willfully ignorant of their truth are the standard

9    stories of scienter and 10b-5.  But I also want to be clear

10   that I assume if this goes to a jury, the judge is going to

11   define that and that's what controls.

12   BY MR. BARNARD:

13   Q.   Being negligent or sloppy doesn't mean that person

14   acted willfully?

15   A.   I'm not using willfully, but does not mean they acted

16   with scienter -- with the requisite scienter.

17   Q.   Have the appropriate state of mind, scienter is state

18   of mind?

19   A.   Yes.  If all that they do is act negligently, they do

20   not have the required state of mind for a criminal law --

21   Q.   So being sloppy and being duped by his colleagues, or

22   sloppy in letting himself be duped, that would not be --

23   would not constitute the necessary state of mind to be

24   criminally liable under Rule 10b-5?

25   A.   I think sloppiness would not; willful ignorance, seeing

2310
Cross - Thel

1    things that should be followed up is sufficient scienter, as

2    I understand it.

3    Q.   In order for there to be a violation under Rule 144,

4    there first of all has to be a statement or admission of the

5    fact, is the first step you look at, correct?  You see that

6    there is a statement of fact.

7    A.   No.  There's no such thing as a violation of Rule 144.

8    144 is just a safe harbor.  If you don't violate it, it just

9    goes away.  You don't violate it.

10   Q.   Rule 144 has certain -- certain things that -- excuse

11   me.  Let's talk about Rule 10b-5.

12   A.   Okay.

13   Q.   Rule 10b-5 requires a statement or an admission of a

14   fact as the first thing you look for.

15   A.   By and large, that's correct.

16   Q.   Second, for criminal liability, it has to be false.

17   A.   Yes.

18   Q.   And, third, then --

19   A.   False -- false or misleading.  That's the omission

20   language.

21   Q.   False or misleading.

22            And, third, it has to be material.

23   A.   False statement of, yes, material fact.

24   Q.   And the person who is doing that, to be criminally

25   liable, would have to have the appropriate mental state of

1    mind, which you're saying is not willful, but is -- is --

2    A.   Knowing or reckless disregard of the truth.  Knowing

3    falsehood or reckless disregard of the truth.

4    Q.   The mere fact that multiple purchases and sales of

5    securities re- -- restricted securities have happened, that

6    doesn't necessarily, by itself, mean that a crime has been

7    committed.

8    A.   Oh, yeah -- no, I think that does.  But that crime is a

9    violation of the --

10   Q.   I'm sorry, what?

11   A.   Yes, but that crime is a violation of Section 5.

12   Q.   Multiple purchases and sales of restricted securities

13   by itself is a crime?

14   A.   Without -- without an exemption.

15   Q.   No.

16   A.   Okay.  So, no, so multiple sales of restricted

17   securities are not a crime if there's -- if they're all

18   exempt.

19   Q.   And it is legal to purchase or set up a number of

20   companies with few employees or access.  Nothing illegal

21   about that.

22   A.   Not by itself, no.

23   Q.   A quick resale of restricted securities is not

24   necessarily illegal; is it?

25   A.   It is illegal unless you sell to people who the issuer

2312

Cross - Thel

1    could have sold it to himself; a sophisticated

2    wealthy individual.  If you're selling into the public, it

3    is illegal.

4    Q.   In and of itself, though, it's not always illegal, is

5    it?

6    A.   No.

7    Q.   And a quick resale of restricted securities is not

8    necessarily always fraudulent or criminal then.

9    A.   No.

10            THE COURT:  How much longer do you have, Mr.

11    Barnard?

12            MR. BARNARD:  I'm sorry, what was that?

13            THE COURT:  How much longer do you have?

14            MR. BARNARD:  Just a couple of minutes, Your Honor.

15            THE COURT:  All right.

16            MR. BARNARD:  I'm just finishing up.

17            THE COURT:  All right.

18            THE WITNESS:  You know I can always talk faster.

19            THE COURT:  I don't think Ms. George would

20    appreciate that.

21    BY MR. BARNARD:

22    Q.   Going back to some of the things we've already talked

23    about, a failure of a lawyer to perform adequate due

24    diligence is not necessarily fraudulent.

25    A.   Correct.

Cross - Thel

1    Q.    Lawyers get sued in civil lawsuits for failing to
2    perform due diligence.
3    A.    I -- yes, I'm familiar with that having happened.
4    Q.    And they could be civilly liable for failure -- failing
5    to perform certain things, but that doesn't necessarily mean
6    that they committed a crime.
7    A.    That's correct.
8    Q.    If I may have page 11 of Exhibit 444, please.
9          On direct examination, you had said that brokers
10   rely on attorney letters, Rule 144 legal matters, right?
11   A.    Right.
12   Q.    Those -- those brokers who are relying on that are
13   relying on the attorney who signed the letter.
14   A.    Yes.
15         MR. BARNARD:  Your Honor, if I may have just a
16   moment.
17         THE COURT:  You may.
18   BY MR. BARNARD:
19   Q.    In your experience, have you ever seen any companies
20   and lawyers ever make errors -- significant errors with
21   regard to compliance with the 144 requirements?
22   A.    I'm not sure that I have or haven't.  There are certain
23   cases where people -- I'm familiar with recording cases
24   which people try to comply with 144 and didn't.  I'm not
25   sure the role of lawyers, so it won't surprise me.  I can't

Redirect - Thel

1     answer that question.

2     Q.   So this would be the first case in which you've ever

3     seen where, in fact, lawyers had problems with complying

4     with some of the Rule 144 requirements?

5     A.   Yes, the first one I can recall.

6               MR. BARNARD:   No further questions.

7               THE COURT:   All right.   Mr. Sibert, I will give you

8     five minutes --

9               MR. SIBERT:   Thank you, Your Honor.

10              THE COURT:   -- on redirect.

11                        REDIRECT EXAMINATION

12    BY MR. SIBERT:

13    Q.   You stated you drafted at least two 144 letters when

14    you were practicing law back in '85, '86; is that correct?

15    A.   I don't think I said two.   I'm sure it was more than

16    two.

17    Q.   Okay.   And you were an associate at that time; is that

18    right?

19    A.   That's correct.

20    Q.   And so you gave these letters to what's called a

21    partner in a law firm; is that right?

22    A.   Correct.

23    Q.   That's your boss?

24    A.   Sure.

25    Q.   Does your boss rely on what you wrote in the 144 letter

1   to be true or incorrect?

2   A.   Yes.   And I sent them a letter where I got my facts.

3   Q.   Okay.   Were you banned from writing these letters by

4   either the over-the-counter markets or having them accepted

5   by transfer agents?

6   A.   No.

7   Q.   Okay. So if you just wrote the letter, yourself, and

8   then had your partner sign off on it, no one would have not

9   accepted your letter?

10  A.   No, that's correct.   I think they would have accepted

11  the letter if I had signed it.   It was the firm's decision

12  to have a partner sign it.

13  Q.   Okay.   And, finally, you stated essentially that you

14  thought Mr. Guy Jean-Pierre should be -- should have known

15  that Mr. Sears was an affiliate in this case.

16  A.   Yes.

17  Q.   Why do you believe that he should be held accountable

18  for his lack of due diligence?

19              MR. BARNARD:   Your Honor, I object.

20              THE COURT:   Sustained.

21  BY MR. SIBERT:

22  Q.   So I guess counsel left off about -- is this the first

23  time that you've ever heard of a lawyer getting in trouble

24  regarding the 144 exception?   Is that correct?

25  A.   That's where he left off, yeah.

Redirect - Thel

1    Q.    Okay.  Do you know of other cases that have been

2    prosecuted across the country regarding lawyers?

3    A.    I'm not sure about cases prosecuting lawyers.  I am

4    familiar with cases prosecuting investors who -- whose

5    lawyers hadn't done their work right.

6            There are -- I tell my students that the big

7    brokerage firms have whole groups of people do nothing but

8    Rule 144 letters, and that that would be a horrible job and

9    they should study hard so they don't have to have it.  It's

10   a giant industry of writing 144 letters.

11   Q.    But it's not an excuse, just because that's your job,

12   not to follow the law?

13   A.    No.  When you're a lawyer it's worse and not an excuse;

14   all of us have the obligation to follow the law.  When you

15   have a lawyer, you have heightened obligations, you have

16   professional obligations not to participate in criminal

17   activities.

18   Q.    And why is that in your expert opinion?

19   A.    Because -- because the rules say that and it makes

20   sense in society when we trust lawyers to have a lot of

21   power that they not be able -- a lawyer as part of a

22   conspiracy is a particularly dangerous thing because they --

23   you know, know how to manipulate the law.  We're sort of

24   seeing that on the national stage, if I may volunteer.

25            MR. SIBERT:  Thank you.  Thank you, Your Honor.

1              THE COURT:  And on that note, may this witness be
2       excused for the Government?
3              MR. SIBERT:  For direct examination; however, I
4       request that he be here if the defense is going to call
5       their expert for his testimony.
6              THE COURT:  All right.  So you want to reserve
7       Professor Thel for rebuttal?
8              MR. SIBERT:  That's correct, Your Honor.  And also
9       to assist the Government regarding any -- if the defense
10      decides to put on a case and they have an expert regarding
11      securities law, to assist the Government --
12             THE COURT:  All right.  Okay.  Then I can't release
13      you, Professor, you're going to have --
14             THE WITNESS:  Thanks for trying.
15             THE COURT:  I did my best.
16             All right.  Given our prior discussion, Mr. Sibert,
17      the Government rests?
18             MR. SIBERT:  The Government does rest, Your Honor.
19             THE COURT:  All right.  If you just hold tight,
20      Professor.
21             All right, members of the jury, we're going to let
22      you go home early.  Again, I have to remind you please do
23      not do any independent research into or discuss with anyone
24      the facts, the law, the persons involved in this lawsuit.
25      And, again, as I asked you before, please, please leave

1    yourself a lot of time tomorrow morning.  I really do want

2    to start at 8:45, and we have a lot of ground to cover.  And

3    I trust that you will make it home safely tonight, and

4    safely back here tomorrow morning.

5           All right, the jury is released until 8:45 tomorrow

6    morning.

7         (Jury left the courtroom at 4:48 p.m.)

8           THE COURT:  All right, Professor, you may step

9    down.

10          THE WITNESS:  Thank you.

11          THE COURT:  All right, please be seated.

12          MR. SIBERT:  Your Honor, may I just have a second

13   with this witness real quick?

14          THE COURT:  Sure.

15          MR. SIBERT:  Thank you.  We're going to start at

16   0845 tomorrow?

17          THE COURT:  Right.  Assuming everybody gets here on

18   time.

19          MR. SIBERT:  Thank you.

20          THE COURT:  All right.  Is there a motion from the

21   defendant?

22          MR. BARNARD:  Yes, Your Honor.

23          MR. SIBERT:  Your Honor, may I have a minute, real

24   quick?

25          THE COURT:  Yes.  Why don't you get yourself

1    situated, Mr. Barnard.  And, Mr. Sibert, let us know when
2    you're ready to proceed.
3            MR. SIBERT:  Okay, Your Honor, I'm sorry.  I have
4    what I kind of need now.  Thank you.
5            THE COURT:  Are you ready to go forward?
6            MR. SIBERT:  I am, Your Honor.  Thank you.
7            THE COURT:  All right.  All right, Mr. Barnard.
8            MR. BARNARD:  Your Honor, pursuant to Rule 29, the
9    defense makes a motion for judgment of acquittal with regard
10   to Counts 1 through 23, in particular.
11           THE COURT:  In particular or is that what your
12   motion --
13           MR. BARNARD:  Those counts.
14           THE COURT:  So Counts 1 through 23 only.  All
15   right.
16           MR. BARNARD:  And with regard to conspiracy, the
17   defense contends that the Government's proof has been --
18   even in the light most favorable to the prosecution, it has
19   failed to prove that Mr. Jean-Pierre agreed with any other
20   person to violate the law.  That the proof has been
21   insufficient to prove that he knew the essential objective
22   of the conspiracy, and that he knowingly -- and insufficient
23   to show that he knowingly and voluntarily participated in
24   it, or that he intended to act together for a shared mutual
25   benefit.

1        If the Court were to find, then, that Mr.

2   Jean-Pierre -- or the evidence is insufficient with regard

3   to conspiracy, then Counts 2 through 23 would -- would apply

4   to Mr. Jean-Pierre not through a Pinkerton potential

5   vicarious liabilities theory; it would be that Mr.

6   Jean-Pierre would have had to have aided and abetting --

7   aided and abetted the various individuals who, in fact, did

8   perform the acts that are designated in Counts 2 through

9   23.

10        THE COURT:  So let me stop you there.

11        MR. BARNARD:  Sure.

12        THE COURT:  So it's your contention that --

13   defendant's contention that with respect to Counts 2 through

14   23, the only possible viable theory of violation is an

15   aiding and abetting theory --

16        MR. BARNARD:  That is --

17        THE COURT:  -- as opposed to a straight-up

18   substantive violation of 2 through 23?

19        MR. BARNARD:  That is correct, because in Counts 2

20   through 7, the specific acts were done by either Mr. Dittman

21   or Mr. Sears.  In Counts 8 through 11 for wire fraud, the

22   specific listed acts again were done by either Mr. Dittman

23   or Sears.

24        It appears, but not -- there's no evidence that Mr.

25   Jean-Pierre did any of -- either the wire fraud counts that

1    are listed in -- in Counts 2 through 11.  With regard to the

2    wire fraud in 2 through 16, those were specifically done by

3    William Sears.  With regard to the mail fraud counts, 17

4    through 20, that was FusionPharm mailing stock transfer

5    packets and -- for each of the 17 through 20.  Again, not

6    Mr. Jean-Pierre having participated in or performed any of

7    those acts.

8           With regard to 21 through 23, the documents that

9    are in -- and the documents that form the basis for those

10   counts were executed by MicroCap, Bayside Realty, and

11   MeadPoint.  Again, not by Mr. Jean-Pierre.

12          THE COURT:  Okay.  So I understand what your

13   argument.  So my -- the question -- that, of course, all

14   begs the question:  How can I find that no reasonable juror

15   could conclude that, viewing the light most favorable to the

16   nonmovant, that your client was not aiding and abetting in

17   violation of Counts 2 through 23?

18          MR. BARNARD:  The -- and it is simply that we don't

19   think that the -- the Government has met their burden of

20   establishing that he, in fact, aided and abetted on all of

21   these counts.

22          THE COURT:  All right.  Is that the extent of your

23   argument?

24          MR. BARNARD:  That is the extent.

25          THE COURT:  Okay.  Anything further?

1          MR. BARNARD:  I'm sorry, nothing further, Your

2     Honor.

3          THE COURT:  All right.  Okay.  Let me hear from the

4     Government in response.  And I have a couple things to start

5     off with.

6          So obviously you don't have to respond on Counts 24

7     through 29 because the defendant did not move against those

8     counts, but the -- my colloquy with Mr. Barnard was on a

9     point that's much in my mind, which is:  Does the Government

10    agree that on Counts 2 through 23, that it's pursuing a

11    theory of violation on a aiding and abetting theory only?

12    Or is aiding and abetting an alternate theory of violation

13    on any one or more of those 22 counts?

14         MR. SIBERT:  First, under the Tenth Circuit case

15    law, it's not an alternate theory, it will be a separate

16    charge.

17         THE COURT:  Well, it --

18         MR. SIBERT:  So --

19         THE COURT:  Is it -- well, let me ask it this way:

20    Is aiding -- on Counts 2 through 22 --

21         MR. SIBERT:  Yes, sir.

22         THE COURT:  -- is it the Government's position that

23    aiding and abetting is the exclusive theory of violation

24    under those counts?

25         MR. SIBERT:  No, sir.

1              THE COURT:  All right.  And -- and first explain to
2    me why that is the case, and is that your answer as to all
3    22 counts, 2 through 23?  Or do you concede that some of
4    them factually make -- factually would be limited to an
5    exclusive aiding and abetting theory?
6              MR. SIBERT:  Well, I -- let me just -- let me try
7    to argue the Government's theory on why it would be aiding
8    and abetting first, and if I can have a minute, obviously
9    I've got to look at a lot of counts here, quickly.
10             THE COURT:  Right.
11             MR. SIBERT:  But I can let the Court know my theory
12   on that.
13             But the thing with the wire fraud, Your Honor, on
14   the Tenth Circuit case law, it's obviously a scheme.  And a
15   lot of things go into a scheme under case law in the Tenth
16   Circuit.  And it's not knowing, forcing -- Mr. Guy
17   Jean-Pierre doesn't have to be the person that actually does
18   the transmission of the wire.  He just has to be a person
19   under the scheme that helped facilitate that transmission.
20             And you can't transmit, essentially, reports for
21   Counts 2 through 7, if -- if you look at the evidence here,
22   those reports -- through several exhibits and witnesses,
23   those reports were actually drafted by -- some of those
24   reports were drafted by Guy Jean-Pierre and some of those
25   reports were obviously reviewed.  They included the

1    financials, the shareholders, who the officers and directors

2    were, and that's shown through e-mail.  All right?  And

3    that's shown through Mr. Sears sending these to Mr. Guy

4    Jean-Pierre, Mr. Guy Jean-Pierre is sending these to Sears

5    or Dittman.

6              There's been several transactions and obviously I

7    can't sit here and go through every one in my head, but I

8    put together, actually, a outline that composes some of

9    those e-mails.

10             But you can't submit an OTC report if you don't

11   have the information.  And Mr. Sears and Mr. Dittman were

12   relying on their corporate representatives, including Mr.

13   Guy Jean-Pierre, to provide information for that report, and

14   also to act as a reviewer of that report.

15             So the actual transmission, it's just a small part

16   of the entire scheme --

17             THE COURT:  I don't understand how you -- the

18   second part, reviewing and approving, I understand that --

19   you know, quarterly reports, annual reports.  I can

20   understand that theory -- that interpretation of the facts.

21             I don't understand how you're saying that the

22   evidence established that the defendant provided the

23   information that was included in the quarterly and annual

24   reports.

25             For example, the revenues, for one.  How -- how is

1    it that someone in Florida, who's not present in Colorado,

2    would give the information to include in those reports to

3    the CEO and the nondisclosed -- allegedly nondisclosed

4    affiliate/control person, Sears?

5              MR. SIBERT:  Can I just have a minute, Your Honor?

6              THE COURT:  Yup.

7              MR. SIBERT:  All right.  I guess going back to the

8    Court, I think it even expands on the fact that the scheme

9    causes electronic communications.  Like I said, it's the

10   information that is being sent to OTC "causes to be

11   transmitted."  You -- under the law, under 13- -- 18-13-43,

12   it's not fraudulent pretenses, representations or promises;

13   "transmits or causes to be transmitted."

14             His representation and what reviewed, and also what

15   he acknowledged to -- regarding the shareholders list and

16   the letters, that is what FusionPharm sent to OTC.  If he

17   doesn't represent that to the owners through his e-mail or

18   through a phone call or through some kind of communication,

19   that would never go forward to OTC based upon the facts of

20   this case.  It doesn't mean transmit.

21             I mean, that -- obtaining money or property by

22   means of false or fraudulent pretenses, representations, or

23   promises, transmits or causes to be transmitted by means of

24   wire, radio or television.  So the means of false and

25   fraudulent pretenses under the law is what Mr. Sears -- what

1    Mr. Guy Jean-Pierre knows.  And the biggest one is:  Who
2    isn't disclosed in these reports?  William Sears.
3            I just had an expert on saying that, in his expert
4    opinion, Mr. Guy Jean-Pierre, through his association of
5    FusionPharm, should have known that William Sears was an
6    affiliate.  Nowhere was that in any of the disclosures.
7            So, yes, his -- his knowledge in not communicating,
8    or not -- his legal advice -- his wrongful legal advice to
9    the owners of FusionPharm caused reports to be transmitted.
10           He didn't transmit it; I agree with that.  I've
11   never argued that in this case.  I never said that it was
12   Mr. Guy Jean-Pierre that was the transmitter.  But he did
13   help facilitate these reports -- quarterly and annual
14   reports, be transmitted based upon false information.
15           THE COURT:  How did the -- what evidence would you
16   say there is in the record that the defendant devised or
17   intended to devise the scheme you're talking about which is
18   relevant to Counts 2 through 16?
19           MR. SIBERT:  How did he devise it?
20           THE COURT:  Yes.  As opposed to aiding and abetting
21   a scheme.
22           MR. SIBERT:  Well, he met with Billy Sears and
23   Cliffe Bodden down in Florida.  He met with Scott Dittman
24   and Billy Sears to be hired.  He visited FusionPharm to
25   understand who -- what was happening during FINRA in that

1    closed-door conversations.  He sent several e-mails

2    regarding the investigation of FINRA, representing

3    FusionPharm.  Essentially his legal representation is

4    enough.

5              THE COURT:  But you're -- I think you continue to

6    conflate an aiding and abetting theory with the straight-up

7    liability for -- or a liability, let's use that term -- for

8    a individual liability under a devising or intending to

9    devise a scheme.

10             You know, I think one of the reasons the defendant

11   didn't move against the 2016 wire fraud counts -- I think

12   appropriately -- is because there's more evidence, in my

13   view, that -- from which a jury could conclude that the

14   defendant devised or intended to devise a scheme.

15             MR. SIBERT:  Your Honor --

16             THE COURT:  Where I'm -- where I'm -- what's

17   troubling me is, again, distinguishing between an aiding and

18   abetting theory with the theory of the violation straight-up

19   under Counts 2 through 16, which require -- and it's from

20   your stipulated jury instruction -- that the jury find that

21   the defendant, himself, devised the scheme or intended to

22   devise the scheme, as opposed to what seems to me to be most

23   of the testimony -- I think that's why Mr. Sears got so

24   frustrated because he felt he was on trial, because I think

25   a huge chunk of the testimony was how he devised the scheme,

2328

1    and then went about trying to effect it through the various

2    means.

3              MR. SIBERT:  May I address the Court?

4              THE COURT:  Sure.

5              MR. SIBERT:  The reason why Mr. Sears was called to

6    the stand was to -- essentially to show his control and to

7    get a lot of evidence in.  I can't tell you what goes on

8    with Mr. Sears' mind.

9              THE COURT:  Right.

10             MR. SIBERT:  It goes both ways, depending on who's

11   asking the questions.

12             But going to Mr. Guy Jean-Pierre, the focus on the

13   point with evidence in the light most favorable to the

14   Government, Mr. Guy Jean-Pierre in 2011, in the beginning of

15   FusionPharm, he was the person who drafted the first two

16   disclosure statements representing to the public what

17   FusionPharm was.

18             THE COURT:  Well, that was one of the mechanisms by

19   which the scheme was perpetuated allegedly.

20             MR. SIBERT:  So he has -- that's a way to devise.

21   That's a way -- that's his role.

22             THE COURT:  So are you saying that anyone that

23   assists in the carrying out of a scheme intended -- devised

24   or intended that scheme?

25             MR. SIBERT:  I don't understand the Court's

1    question.

2           THE COURT:  Your jury instructions say, for Counts

3    2 through 16, the second element is that the defendant acted

4    out -- first element is the defendant devised or intended to

5    devise a scheme to defraud.  What you seem to be saying is

6    that anyone that comes along later and assists in effecting

7    that scheme, is -- that is also evidence of them devising

8    the scheme, or intending to devise the scheme.

9           MR. SIBERT:  I'm not talking about anyone, I'm

10   talking about Mr. Guy Jean-Pierre.  What I'm saying is in

11   2011, you have Scott Dittman and Billy Sears, the owners of

12   FusionPharm, go to Guy Jean-Pierre to be their legal --

13   corporate legal counsel and also their corporate secretary.

14          Shortly afterwards, Guy Jean-Pierre is the one that

15   drafts the disclosure statements that are sent to OTC

16   Markets.  Those disclosure statements are in evidence, along

17   with the ones that were filed.  The jury now can weigh what

18   Mr. Guy Jean-Pierre drafted and what was sent to OTC Markets

19   to devise his role into this scheme so that Mr. William

20   Sears had no disclosed ownership.  I mean, that's the key of

21   Mr. Sears.

22          I mean, that is the key essential scheme of this

23   whole thing --

24          THE COURT:  I agree that that absolutely is

25   evidence of aiding and abetting a scheme.  My question is:

1    How is that evidence of devising a scheme?  At least the

2    FusionPharm scheme as opposed to the scheme in the sting or

3    undercover operation, which I think the evidence is very

4    different, and probably why you didn't draw a motion on

5    those counts.

6            MR. SIBERT:  Okay.  Well, I mean, it's devising the

7    scheme because even though he's not considered an owner or

8    an affiliate in this part, he's a participant.  He's hiding

9    the fact that William Sears is undisclosed.  That's the

10   scheme.  That's part of the scheme to defraud the public.

11           So, yes, I mean, his role of not disclosing Mr.

12   Sears, along with his conviction, and they've had this

13   relationship.  I know the Court got frustrated with me about

14   playing videos about the relationship, but the relationship

15   was in the past.  That's why we touched on it.

16           He also was the one who helped assist Mr. Sears

17   setting up FusionPharm, knowing that he was going to be the

18   one controlling -- the controlling person.  So the fact that

19   he understood this in the very beginning, even before Scott

20   Dittman got involved, it -- it's way before other

21   participants came in.

22           He was assisting Mr. Sears to create FusionPharm

23   with this -- with this undisclosed part of Sears and he

24   devised it because he continued to hide it.  He continued to

25   help produce and get paid for doing it, the whole scheme of

1    not disclosing Mr. Sears as a owner of FusionPharm.
2    Absolutely, he helped devise that.

3              THE COURT:  Well, why -- address the same point
4    with respect to the securities fraud counts, 21 through 23.
5    How -- what evidence is there, looking at it in the light
6    most favorable to the Government, that apart from aiding and
7    abetting securities fraud, that the defendant devised the
8    scheme or intended to devise the scheme of committing
9    securities fraud under 21 through 23?

10             MR. SIBERT:  Okay.  Again, it goes to being able to
11   get these securities clear, as the Court knows.  If you look
12   at the MicroCap ones, they go back to Leslie Dinwoodie.  The
13   evidence in this case is that Mr. Guy Jean-Pierre -- who
14   also said he was sorry, which in some form of testimony is a
15   confession -- saying that he knew that the letter that he
16   submitted to Oppenheimer was a fraudulent letter regarding
17   the fact that Mr. Sears was not an affiliate.  All right?

18             So the fact that Mr. Guy Jean-Pierre knew from the
19   very beginning, even with the MicroCap shares, that now are
20   being sold later in 2012-'13 time frame, it goes again to
21   show that Mr. Guy Jean-Pierre is not disclosing the honest
22   truth, the -- essentially the fraudulent pretenses, the
23   representations, which are the factors.  I mean, that's the
24   law.  Representations and false -- fraudulent pretenses,
25   which is that Mr. Sears was a nonaffiliate of FusionPharm.

2332

1           Now, when you're hiding that in a 144 letter, and

2     your letters are no longer accepted because your -- you have

3     a complaint and you're banned from writing these letters,

4     you start -- you come up with a way of what Mr. Guy

5     Jean-Pierre did, is to hopefully have another lawyer trust

6     you and then sign the letters on behalf, even though

7     everything that was drafted was exactly the same except for

8     the letterhead and the signatures.  And, again, the jury has

9     all the letters that they can compare.

10           So for MicroCap, for MeadPoint, and for Bayside,

11     the fact that he is selling these notes again -- or Mr.

12     Sears is selling these notes to a broker, and the transfer

13     agent and the brokers, Scottsdale and Oppenheimer, rely on

14     these letters, the Rule 144 letters, is essential due

15     diligence investigation, that's the main part of that

16     investigation, saying that Mr. Sears is not an affiliate of

17     FusionPharm, that goes to the heart of the fraudulent

18     misrepresentation.

19           And then, I guess for the securities fraud, as

20     stated under the instruction we submitted, that in

21     connection with the purchase of sale of securities, employed

22     any device, any device, any scheme to defraud.  It doesn't

23     have to be just one thing; it can be anything.

24           And the Court has to look at that in the light most

25     favorable to the Government.  And the way we're saying that

1    is that the -- the scheme or device was these false 144

2    letters that clearly do not show Mr. Sears as an affiliate

3    to FusionPharm.

4         Also the holding period was never met because,

5    remember, part of the scheme was they met in Florida where

6    these notes were discussed.  In 2012, there was no notes,

7    there were just long-term debt that came from the sale of

8    stock in 2011, but they listed it as notes.  Something that

9    he was aware of through the filings; also the e-mails that

10   they sent regarding the financials.

11        2012 comes.  He goes down to Florida and visits

12   with -- or he's in Florida and Mr. Sears and Mr. Bodden come

13   to visit him.  "We're cash strapped.  We need money."  Let's

14   talk about these notes.  And then when the buyer doesn't buy

15   the note because there's no convertible feature, then the

16   convertible feature is added.  Again in 2013, shortly before

17   the notes for sale, there's another visit.  And so --

18        THE COURT:  So you're saying that evidence of this

19   defendant's devising of a scheme or intending to devise of a

20   scheme, at least with respect to the securities fraud

21   counts, the evidence of that, in part, is that the -- it was

22   after he became involved that the scheme was devised to

23   backdate and create promissory notes with the conversion

24   feature, notes which did not exist at the time that Baby Bee

25   Bright was acquired by FusionPharm.  Is that what you're

2334

1        arguing?

2                MR. SIBERT:  I would say in 2011, the convertible

3        notes did not exist.

4                THE COURT:  Right.

5                MR. SIBERT:  I'm hesitant --

6                THE COURT:  The idea -- the origin of the idea, in

7        part, was the Florida meeting in 2012 with the defendant.

8                MR. SIBERT:  No, it goes further than that.  It

9        goes to the fact -- when you say he got involved, he's been

10       involved since Day 1 with FusionPharm because he was helping

11       Sears out with Baby Bee Bright.

12               Also he drafted the first disclosure statements, he

13       also drafted the OTC current information letters that say

14       all the information that is being posted is adequate for the

15       public's viewing, that includes the financials which he was

16       copied on and sent e-mails on.

17               So based upon the evidence in the light most

18       favorable to the Government, Mr. Guy Jean-Pierre received

19       information, e-mails, regarding those cash statements and

20       balance sheets that show just notes in 2011.

21               I don't know if he looked at them.  That's not my

22       job.  My job here is to show that he at least was sent them.

23       And if you look at that in the light most favorable to the

24       Government, you would hope a corporate lawyer that's being

25       sent information that's going to go out to the public about

2335

1    the corporation that he represents actually does due
2    diligence and looks at those documents.

3        That's my argument to the jury.  Obviously I'm
4    making my argument to you, but he's part of this.  And the
5    security -- going back to the security counts, it's to
6    employ any device or scheme, make any -- make any, any,
7    untrue statement, any untrue statement of material fact.

8        We put Mr. Cruz on the stand to say, "What did you
9    rely on?"

10       "We relied these 144 letters."

11       "If you knew Sears was an affiliate, or Bayside was
12   an affiliate, or MeadPoint was an affiliate of FusionPharm,
13   would you have freed the shares of stock for trading?"

14       "No."

15       "If you knew the holding period didn't last for a
16   year, would you have freed the restriction and trade?"

17       "No."

18       The material fact is not disclosed that William
19   Sears either controlled these entities or were these
20   entities and was, in fact, an affiliate of FusionPharm.

21       So, I mean, I'm just citing the law here for the
22   securities count, because I know the Court had a concern
23   about that, but, Untrue Statement of Material Fact:  Any
24   device or scheme regarding an untrue statement or -- of
25   material fact.  It doesn't get more material than the

2336

1     affiliation.  That is the whole crux of the case.  And he's

2     known that since Day 1.  He's known that since Sears took

3     over Baby Bee Bright.

4              THE COURT:  Okay.  Anything else?

5              MR. SIBERT:  I -- I don't know if I answered all

6     the questions --

7              THE COURT:  No, you gave -- I needed to get your --

8     your --

9              MR. SIBERT:  And can I --

10             THE COURT:  -- your view and your theory on this.

11             MR. SIBERT:  Can I have a moment to consult with my

12    co-counsel?

13             THE COURT:  Sure.

14             MR. SIBERT:  Thank you, Your Honor.  I appreciate

15    it.

16             MR. SIBERT:  That's it, Your Honor.  Thank you.

17             THE COURT:  All right.  Mr. Barnard, I'll let you

18    have the last word on your motion, since you're the movant.

19             MR. BARNARD:  Your Honor, I believe that Mr. Sibert

20    is suggesting to the Court that, in fact, to be criminally

21    liable under both the mail fraud, 1341, and 1343 wire fraud

22    statutes, that -- that mere participation equals devising.

23    And I don't think that that's what those statutes say.

24             They say whoever having devised or intended to

25    devise any scheme.  Devising doesn't mean merely being a

1    participant; it means the creator of it.  And --

2                    THE COURT:  Do you have any case law for that?

3                    MR. BARNARD:  I don't have it handy.  I'm just

4    reading it from the statute, which specifically says, and

5    it's both of them start with, Whoever having devised or

6    intended to devise any scheme.

7                    THE COURT:  I mean, because -- I mean, taken to its

8    extreme, what you're saying is that the only individual that

9    could ever be charged with a theory, other than aiding and

10   abetting, under wire or mail fraud is the person in whose

11   mind the idea first germinates.

12                   MR. BARNARD:  Well, no, I think that it goes toward

13   those, so to speak, conspirators or those participants who

14   join together and did devise the scheme.  And so it can be a

15   number of different people.  And it doesn't necessarily mean

16   that there's just one instant when somebody devises it, it

17   can happen over a period of time.

18                   But it requires -- it requires more than mere later

19   participation in those schemes.

20                   THE COURT:  What more does it require?

21                   MR. BARNARD:  Well, it requires to be in on the --

22   the -- the original planning and devising of this scheme.

23   Not coming in, then, as a -- an aider and abetter, somebody

24   who is -- who has been recruited in -- to be a participant

25   through their assistance.  And I think that --

2338

1          THE COURT:  But isn't Mr. Sibert right, that your

2     client has been in the mix or in the picture since -- since

3     2010?

4          MR. BARNARD:  Well, the -- the answer to that is

5     that certainly Mr. Jean-Pierre was in the picture from 2010

6     on, but the evidence, even in the light most favorable to

7     the prosecution, really is -- is not that this scheme was

8     created in 2010 and that certain things -- for example, the

9     trans- -- the transferring of or -- let me change, that the

10    converting Baby Bee Bright into FusionPharm, I don't think

11    there's evidence that that was a part of a scheme to

12    defraud.

13         I think the evidence is that that scheme to defraud

14    occurred later.  That Mr. -- Mr. Sears devised it and then

15    worked with other people to do it.  But that just because

16    Mr. Jean-Pierre was assisting him in actually legal

17    activities beforehand doesn't -- doesn't mean that he, then,

18    participated in the actual creation of and formulation of

19    the scheme, itself.  That happened in 2011, maybe late 2011

20    and thereafter.

21         THE COURT:  All right.  Anything else?

22         MR. BARNARD:  Nothing further.

23         THE COURT:  All right.  We were going -- we will be

24    in recess and I will come back with my ruling.  And while

25    I'm off the bench, Ms. Frank is going to discuss with

1    counsel some discrepancies she has noticed in Exhibit 444.

2    We'll be in recess.

3         (Recess taken 5:21 p.m. to 6:00 p.m.)

4         THE COURT:  All right.  I'm prepared to rule on the

5    defendant's Rule 29 motion.

6         This matter is before me on the defendant's oral

7    mid-trial motion for judgment of acquittal under Federal

8    Rule of Criminal Procedure 29 (a), in which the defendant

9    moved against Counts 1 through 23 only.  For the reasons

10   that follow, I grant the motion in part and deny it in part.

11        In considering defendant's Rule 29(a) motion, the

12   Court is required to consider the evidence presented in the

13   light most favorable to the Government and may enter a

14   judgment of acquittal only if no reasonable jury could find

15   guilt beyond a reasonable doubt.  In making its

16   determination, the Court is not permitted to weigh

17   conflicting evidence or consider the credibility of

18   witnesses, as that is the province of the jury.  This from

19   *United States v. White*, 673 F.2d 299, at 301, a Tenth

20   Circuit decision from 1982.

21        The Government bears the burden of establishing

22   each element of the crime charged beyond a reasonable doubt.

23        Count 1 of the indictment charges a violation of

24   Title 18 United States Code Section 371, which makes it a

25   crime to conspire to commit an offense against the United

1    States or to defraud the United States or an agency of the

2    United States, in this case the Securities and Exchange

3    Commission.  The Government must prove each of the following

4    beyond a reasonable doubt:

5         First, the defendant agreed with at least one other

6    person to violate any one of the laws described or to

7    defraud the SEC as described above.

8         Second, at least one of the conspirators engaged in

9    at least one overt act furthering any of the conspiracy's

10   objectives.

11        Third, the defendant knew the essential objective

12   of the conspiracy.

13        Fourth, the defendant knowingly and voluntarily

14   participated.

15        And, fifth, there was an interdependence among the

16   members of the conspiracy; that is, the members in some way

17   or manner intended to act together for their shared mutual

18   benefit within the scope of the conspiracy charged.

19        As to the first element, the testimony of William

20   Sears, Scott Dittman, and Cliffe Bodden, among others, would

21   permit the jury to find that the defendant agreed at least

22   with William Sears to make false statements and material

23   omissions of -- material omissions that act as a fraud on

24   the SEC and its statutory responsibility to ensure market

25   transparency.

1            As to the second element, there were numerous overt

2       acts.  For example, the defendant himself produced Rule 144

3       letters and current information letters, misrepresenting

4       matters such as the length of the holding period and Mr.

5       Sears' true status with FusionPharm.  And Mr. Sears uploaded

6       this information for public consumption by the market.

7            As to the third and fourth elements, the testimony

8       of Mr. Sears, Scott Dittman, and Cliffe Bodden, among

9       others, would permit the jury to reasonably infer that the

10      defendant knew the essential objectives of the conspiracy

11      and participated willingly.

12           Fifth, interdependence existed because, at a

13      minimum, William Sears needed the defendant's services to

14      obtain Rule 144 opinion letters and current information

15      letters in the proper form.

16           Rule 29 judgment of acquittal is, therefore, not

17      appropriate on Count 1.

18           The defendant is charged in Counts 2 through 16

19      with wire fraud in violation of Title 18 United States Code

20      Section 1343, or aiding and abetting this offense in

21      violation of Title 18 United States Code Section 2(a).  This

22      law makes it a crime to use interstate wire communication

23      facilities in carrying out a scheme to defraud.  The

24      Government must prove each of the following beyond a

25      reasonable doubt:

1          First, the defendant devised or intended to devise

2   a scheme to defraud as alleged in the indictment;

3          Second, the defendant acted with specific intent to

4   defraud;

5          Third, the defendant used interstate wire

6   communication facilities, or caused another person to use

7   interstate wire communication facilities, for the purpose of

8   carrying out the scheme;

9          Fourth, the scheme employed false or fraudulent

10  pretenses, representations, or promises that were material.

11         I'll start with the third and fourth elements.

12  Counts 2 through 11 are supported by uploads to the OTC link

13  web portal that were introduced through, respectively,

14  Exhibits 19-B, 19-C, 25, 27, 30, 29, 24, 26, 28, and 31.

15  Counts 12 through 14 and Count 16 are supported by e-mails

16  from William Sears to Pacific Stock Transfer introduced

17  through, respectively, Exhibits 72, 76, 77, and 78, and also

18  81 and 84.  Count 15 is supported by William Sears' e-mail

19  to Scottsdale Capital admitted as Exhibit 133.

20         Each one of these exhibits included falsities or

21  material omissions, or both.  As to the uploads to the OTC

22  link website, the misrepresentations often included the

23  adequacy of current information, and the omissions included

24  matters of affiliate status and Mr. William Sears' actual

25  role with the company.  As to the e-mails to Pacific Stock

1    Transfer and Scottsdale, they included the Rule 144 letters

2    drafted by the defendant that a jury could find to

3    misrepresent the true nature of the matters asserted in

4    those letters.

5              Returning now to the first and second elements, the

6    Court need only discuss the first element requiring the

7    defendant devised or intended to devise a scheme to defraud

8    as alleged in the indictment.  Even looking at the evidence

9    in the light most favorable to the Government, I find that

10   the Government has not introduced evidence from which a

11   jury -- reasonable jury could find against the defendant on

12   the first element of any of Counts 2 through 16.  The matter

13   might be different if the indictment had alleged wire

14   communications the defendant himself made to Mr. DiTommaso

15   because there's evidence from which the jury could conclude

16   that the defendant himself devised the scheme to have

17   another attorney put his letterhead and signature on the

18   defendant's letter.  But the indictment alleges wire

19   communications made by William Sears as part of a scheme

20   that he devised.  There is simply, in my view, not enough

21   evidence to go to the jury on the notion that the defendant

22   participated in devising the scheme.

23             However, I reject the defendant's argument that the

24   Government has failed to meet its burden as to aiding and

25   abetting liability for Counts 2 through 16.  A jury could

2344

find, at least, that William Sears committed the complete
crimes charged in Counts 2 through 16.  This is supported by
all the exhibits mentioned previously, as well as the
testimony of, at least, Mr. Sears himself, Scott Dittman,
and Cliffe Bodden.

The jury could also find that the defendant
consciously shared Mr. Sears' knowledge of the underlying
criminal act and intended to help him.  This is also
supported by the testimony of, at least, Mr. Sears, Mr.
Dittman, Cliffe Bodden, Mr. DiTommaso, and Michael Kocinski.

Accordingly, a jury could find that -- the
defendant liable on Counts 2 through 16 on an aiding and
abetting theory.

Consequently, Rule 29 judgment of acquittal is
appropriate to the extent Counts 2 through 16 allege direct
culpability, but not to the extent they allege aiding and
abetting culpability.

The defendant is also charged in Counts 17 through
20 with mail fraud in violation of Title 18 United States
Code Section 1341, or aiding and abetting this offense in
violation of Title 18 United States Code Section 2(a).  This
law makes it a crime to use the mails in carrying out a
scheme to defraud.  The Government must prove each of the
following beyond a reasonable doubt:

First, the defendant devised or intended to devise

2345

1    a scheme to defraud, or for obtaining money or property by

2    means of false or fraudulent pretenses, representations, or

3    promises, or attempting to do so;

4            Second, the defendant acted with a specific intent

5    to defraud;

6            Third, the defendant mailed something or caused

7    another person to mail something through a commercial

8    interstate carrier for the purpose of carrying out the

9    scheme;

10           Fourth, the scheme employed false or false

11   pretenses, representations, or promises that were material.

12           I will start again with the third and fourth

13   elements.  The fourth counts are -- these four counts are

14   supported by the defendant's mailings to and from the

15   Pacific Stock Transfer introduced at, respectively,

16   Government Exhibits 114 and 116, and 117, 72, and 73, and 79

17   and 80.

18           The documents mailed by Mr. Sears, as charged in

19   Count 17, contained information the jury could find to be

20   false, including the Rule 144 opinion letter drafted by the

21   defendant.  The stock certificates mailed back from Pacific

22   Stock Transfer, as alleged in Counts 18, 19, and 20, were

23   the fruits of the overall scheme, so Mr. Sears could be

24   deemed to have caused Pacific Stock Transfer to use the

25   mails in furtherance of his scheme.

1          Returning to the first and second elements, as

2     before, I agree with the defendant that the Government has

3     not met its burden to show the first element requiring that

4     the defendant devise or participate in devising that scheme.

5     This is so for the same reasons previously explained with

6     regard to the wire fraud counts.

7          But, again, I disagree that the Government has

8     failed to meet its burden as to aiding and abetting

9     liability.  That form of liability is supported by the

10    testimony of Mr. Sears himself, as well as that of Joslyn

11    Claiborne, Todd Abbott, Joanna DiBella, Mr. Sears' mother,

12    Sandra Sears.

13         A jury could further find that the defendant

14    consciously shared Mr. Sears' knowledge of the underlying

15    act and intended to help him.  This is supported by the

16    testimony of at least Messrs Sears, Dittman, Bodden, and

17    DiTommaso.

18         For these reasons, Rule 29 judgment of acquittal is

19    appropriate to the extent Counts 17 through 20 allege direct

20    culpability, but not to the extent that they allege aiding

21    and abetting culpability.

22         Counts 21 through 23 charge the defendant with

23    committing securities fraud or aiding and abetting the

24    commission of securities fraud relating to FusionPharm

25    stock.  The Government must prove each of the following

1    beyond a reasonable doubt:

2            First, the defendant knowingly employed any devise,

3    scheme, or artifice fist to defraud; or, B, made any untrue

4    statement of a material fact; or, C, omitted to state a

5    material fact necessary in order to make the statements made

6    in the light of the circumstances under which they were made

7    not misleading; or, D, engaged in a transaction, practice,

8    or course of business which operated or would operate as a

9    fraud and deceit on any person.

10           Second element -- the second element of these

11   counts is that the defendant did so in connection with the

12   purchase or sales of securities;

13           Third, the defendant made use of, or caused the use

14   of, A, any means or instrumentality of interstate commerce;

15   or, B, of the mails; or, C, of any facility of any national

16   securities exchange in connection with the purchase or sales

17   of securities;

18           And, fourth, the defendant acted with the intent to

19   defraud.

20           As to the first element, a jury could find that the

21   defendant made false statements and material omissions in

22   the Rule 144 opinion letters that permitted Mr. Sears to

23   deposit FusionPharm stock with his Scottsdale Capital.

24           As to the second element, the defendant's Rule 144

25   letters may be deemed in connection with the purchase or

2348

1    sale of securities because the purpose of providing those

2    Rule 144 letters was to enable the securities to be

3    free-trading and, consistent with that purpose, they were

4    later traded in the amounts and on the dates alleged in

5    Counts 21 through 23.

6           As to the third element, the defendant used e-mail

7    to transmit the Rule 144 letters.

8           As to the fourth element, the jury could find that

9    the defendant drafted the Rule 144 letters with intent to

10   deceive.

11          Alternatively, a jury also could find that Mr.

12   Sears committed the fraud alleged in Counts 21 through 23

13   and that the defendant aided and abetted him.  Mr. Sears

14   transmitted the Rule 144 letters knowing they contained

15   untrue statements of material fact and material omissions,

16   and he did so for the purpose of making the FusionPharm

17   shares free-trading by means of false pretenses.  And those

18   shares were traded in the amounts and on the dates alleged

19   in Counts 21 through 23.

20          Finally, a jury could find, based on the testimony

21   of Mr. Sears, that the defendant knew why he was drafting

22   the Rule 144 letters and so participated in Mr. Sears'

23   scheme as he would in something he wished to bring about.

24          Judgment 29 -- Rule 29 judgment of acquittal in my

25   view is, therefore, not appropriate on any of Counts 21

2349

1    through 23 either under the -- a direct culpability theory

2    or a -- or an aiding and abetting theory.

3         For all these reasons, the defendant's Rule 29

4    motion is granted in part and denied in part.

5         A couple of things to discuss before we recess for

6    the evening.  Have we rectified the situation with

7    Exhibit 144 -- 444?  Ms. Frank?  Yes.  Okay.

8         All right.  We need to discuss the schedule for

9    tomorrow.  Defense counsel -- what are we looking at in

10   terms of how many witnesses and how much time?

11        MR. BARNARD:  Your Honor, at this point, there will

12   be one or two witnesses.  The one witness we will have will

13   be the expert witness, Mr. Gerding -- Professor Gerding --

14        THE COURT:  Is he the gentleman that's been sitting

15   at your table?

16        MR. BARNARD:  That's been sitting here.  And I

17   don't think that he will take two hours.  In fact, I think

18   that would be --

19        THE COURT:  In your direct examination?

20        MR. BARNARD:  No, I -- no, I don't think --

21        THE COURT:  Total.

22        MR. BARNARD:  Total.  Okay.

23        THE COURT:  In fact, I think previously you

24   estimated four hours.

25        MR. BARNARD:  And that was also when Government was

1      estimating other things --

2              THE COURT:  Okay.

3              MR. BARNARD:  So I think that it's going to be

4      streamlined down so that it won't take so long.  I still

5      need to talk with Mr. Jean-Pierre about whether or not he's

6      going to testify.  If he were to testify on direct, I think

7      two hours would be the maximum.  I don't know what the

8      Government would do.

9              THE COURT:  All right.  Well, let's work backward.

10     This is what we're going to do:  I don't mind personally and

11     I know Mr. Hawkins doesn't, but I can't speak for the rest

12     of my staff about how much they enjoy staying this late.  So

13     I don't want to reprise this schedule tomorrow.  Hopefully

14     the jurors will all be here and we can start promptly at

15     8:45.  But we are going to be done with all evidence by no

16     later than 4:00 tomorrow because tomorrow, then, after the

17     evidence, we have to have the jury charging conference,

18     which, given the fact that all 29 counts remain in play, is

19     not going to be an insignificant undertaking.

20             Then we have to go through which of the exhibits

21     have been admitted into evidence and rectify any

22     inconsistencies there.  So working backwards, I think what

23     I'm going to have to do, then, is wait to see how long the

24     defendant's case takes in terms of how much time I'm going

25     to give to the Government for rebuttal.

1          What is the Government thinking -- well, first,

2    before I say -- ask you how long you are thinking in terms

3    of rebuttal, let me just tell you, my view on rebuttal is

4    that I only permit true rebuttal, all right?  So true

5    rebuttal, in my view -- and I apply this in civil -- all my

6    civil and criminal trials -- is not to rehash matters that

7    you already had raised before or had -- could have

8    anticipated, but only with respect to those matters that you

9    could not -- that the Government in this case could not have

10   anticipated that were a surprise from the defendant in the

11   defendant's case in chief, in my mind constitute true

12   rebuttal.

13         So understanding that limitation, I guess it's

14   difficult for the Government to put a time on how long

15   rebuttal will take, but what we will do is -- and I'll

16   revisit this again at lunchtime tomorrow, but effectively we

17   won't -- the Government's rebuttal case will have to be --

18   would have to take place in between the time the defendant

19   rests and 4:00.  That's as best as I can go.  And then after

20   that, we will release the jury for the day.

21         Looking at Wednesday morning, what we're looking at

22   is I'm going to ask the jury to get here early, hopefully we

23   won't have any more inclement weather.  I'm likely to start

24   at 8:30, start reading the instructions, and then we'll go

25   into closing arguments.

2352

1       Tomorrow you're going to need to tell me how much
2   time you want for closing arguments.  Let me just say this:
3   I've never allowed more than 75 minutes in the closing
4   argument.  And even those were for a couple of criminal
5   trials that went further -- longer in time and, in my view,
6   were more complex than this case.  But there are a lot of
7   details in this case and I might be persuaded to go a little
8   bit beyond 75 minutes, but I'm not going to give two hours
9   or 90 minutes or anything like that.
10      Then the Government will have to decide, again --
11  or not again, but will have to also decide how much it will
12  reserve for rebuttal.  One-third is the maximum on that.
13      All right.  Any questions about at least for the
14  schedule for tomorrow, from the Government?
15      MR. SIBERT:  No questions, Your Honor.
16      MR. BROWN:  No, Your Honor.
17      THE COURT:  For the defendant?
18      MR. BARNARD:  Your Honor, the only thing I'm
19  wondering is that if we do take two hours for Mr. -- or for
20  Professor Gerding, and if the defendant doesn't testify,
21  what would that do to or --
22      THE COURT:  Does or does not?  I didn't hear --
23      MR. BARNARD:  No, if he does not.  If he does, I
24  think the 4:00 time frame is something that comes into play.
25  But if he doesn't, we could -- we could be done with

2353

1    testimony in the morning.

2              THE COURT:  If we're done with testimony in the

3    morning, then I'm going to have to then ask the jury to cool

4    its heels and -- while we do our charging conference.  I'm

5    just concerned that the charging conference could take a

6    while.  And it might not, but it might.

7              And -- because if we -- if we finish by, say,

8    lunch, then I don't want to just send the jury home then.  I

9    think we should then have them stick around, we'll do our

10   charging conference, and we'll agree on the instructions,

11   and then I will at least read the instructions to the jury

12   tomorrow afternoon.

13             I think just so that counsel can know when they

14   need to be prepared for closing argument, I think I will

15   safely say that we will not have closing arguments before

16   first thing Wednesday morning.  So being as optimistic as we

17   can in terms of the schedule, I think the most we will get

18   through tomorrow will be the Court's reading of the jury

19   instructions.  And as you know from my practice standards,

20   and from -- the prosecution attorneys have done trials

21   before me, previously, they know that I read the

22   instructions first so that you're then given copies of the

23   unannotated set of instructions, which you're free to use in

24   your closing arguments.

25             Mr. Brown.

2354

1              MR. BROWN:  Your Honor, I just have two things that
2       aren't very important.
3              THE COURT:  All right.
4              MR. BROWN:  They might be important, but one is I'm
5       not sure when the Court wanted this, but the parties weren't
6       able to agree on the issue of not sending the indictment
7       back to the jury.  But I -- I don't want to say anything
8       more because I don't want to influence the Court on -- maybe
9       it thinks one party's being in bad faith and the other one
10      is not.
11             THE COURT:  Okay.  But you weren't able to --
12             MR. BROWN:  I just wanted --
13             THE COURT:  You were not able to agree to a
14      streamlined or revised version?  All right.
15             MR. BROWN:  On that issue, I know the Court most
16      likely does not want any argument because the Court already
17      indicated that it had done some research --
18             THE COURT:  We have done research, right.
19             MR. BROWN:  What I would like to do is hand your
20      staff a case that was decided -- briefly, on that issue, it
21      was decided after we started this trial.  So --
22             THE COURT:  All right.  Does it -- this is what I
23      am interested to know.  It does -- first of all, from what
24      court?
25             MR. BROWN:  The Third Circuit.

1           THE COURT:  Does it hold that it's error not to
2     give the indictment to the jury?
3           MR. BROWN:  No, it holds that it's not error to
4     send it back.
5           THE COURT:  Well, that I know.  I mean, we -- I
6     told you we were -- I was aware of that and we've done
7     research on that and that's -- I mean, still -- you can
8     still hand it to Mr. Hawkins.  But I'm aware that -- of
9     the --
10          MR. BROWN:  Right.
11          THE COURT:  -- there are several Tenth Circuit
12    decisions on that.  I was --
13          MR. BROWN:  I don't --
14          THE COURT:  What I wanted to know is if there was
15    any case law going the other way.
16          MR. BROWN:  I don't -- from what I -- my -- in this
17    case, I'm going to give your staff, if you let me --
18          THE COURT:  Sure.
19          MR. BROWN:  -- the National Defense Association
20    filed an amicus brief, and they didn't cite any cases on the
21    issue either, so I think there's no cases that find it error
22    to do one way or the other.
23          THE COURT:  Well, I think what the Tenth Circuit
24    says is if -- if an indictment goes back, the jury has to be
25    instructed up and down and sideways that it's not

1    evidence --

2               MR. BROWN:  Oh, I agree with that.

3               THE COURT:  Yeah.  And then it's not -- and because

4    those are the cases in -- which raise the specific issue

5    that I raised, which is -- and that maybe is sometimes an

6    argument for why it's best to have a more abbreviated and

7    less detailed indictment if you want to -- if you're looking

8    forward ahead enough to a trial as the Government, to ensure

9    that it goes back, because the more detailed, the more

10   facts, the longer the indictment is, the more likely it

11   could be that one or more factual statements in that

12   indictment are not supported by the evidence, and then that

13   raises the issue.

14              Where the -- if it were more of a bare-bones

15   indictment, we wouldn't have this issue.  So -- but yes,

16   you're free to hand it to Mr. Hawkins when I get off the

17   bench and we need to --

18              MR. BROWN:  You're Honor, the only other thing I

19   need to -- if we don't send the indictment back, I don't

20   know how the jury's going to decide which count is which.

21              THE COURT:  Well, let me just say this:  We will

22   not send nothing back on this point.  Whether it's going to

23   be a very abbreviated -- you know, chopped up, very

24   streamlined bare-bones replica of what is in the indictment

25   or we're just going to come up with some other freestanding

1    instruction, I agree that there -- that there has to be some

2    document that gives the jury a roadmap, if you will, of the

3    29 counts in terms of what's alleged.

4          And also I caught in some of the preliminary sets

5    of instructions that we've been going through that there's

6    at least one, if not more, instructions that reference the

7    indictment, that say "And in the indictment that you read,"

8    or "that you've seen, X, Y, Z."

9          So if a summarized indictment is not sent back to

10   the jury, we're going to have to work on those instructions.

11   Which is why, again, I don't want to start the -- instruct

12   the -- starting the charging conference any later than 4:00

13   because I think it's going to take us a while.

14          MR. BROWN:  I don't want to speak for the defense,

15   but I think their argument was the defendant -- any

16   redaction or change in the indictment would somehow impact

17   his right to be indicted by a grand jury, so -- but I'm not

18   going to speak for them.

19          THE COURT:  Okay, well --

20          MR. BROWN:  The other totally really insignificant

21   matter was, in sum, I know last year when we did sort of a

22   similar case -- not to this, but similar time --

23          THE COURT:  Yes.  Which also had some connection to

24   the Dominican Republic as I recall.

25          MR. BROWN:  It did.  Anyway, I -- the only thing --

2358

1      this may sound like a totally idiotic offer, but I was going

2      to offer when the Court does have the final instructions, to

3      actually make individual copies for the jurors so they can

4      read along because this is a lot of stuff.

5                THE COURT:  You mean have --

6                MR. BROWN:  The Government would do that --

7                THE COURT:  Well, as you know, my practice is

8      always to give -- to make a copy of the instructions --

9      individual copies -- there will be 12 --

10               MR. BROWN:  Okay.  So --

11               THE COURT:  -- copies of the instructions in the

12     deliberation room.  What you're asking for is for them to

13     have it while I'm reading it to them?

14               MR. BROWN:  So they can follow it along, because my

15     guess is -- I've never been on a jury and I never will be --

16     if you read the instructions, the first thing they do when

17     they go back there is, "What was he talking about?"

18               I mean, if they read along with it, they would --

19               THE COURT:  I'll give it some thought.  I mean, I

20     think the way -- the way I do it is such that they listen,

21     hopefully -- and this has been a pretty attentive jury --

22     that they're listening to me as I'm reading it to them, and

23     then they'll have it in writing, each one will have their

24     own set.  So I'll give that some thought, but I don't

25     know.

1          MR. BROWN:  Sorry I went on but Mr. Sibert wouldn't

2     let me talk much in this case.

3          THE COURT:  All right.  Let me hear from defense

4     counsel as to this issue about the -- "unfortunately, we

5     weren't able to agree on what goes back to the jury in terms

6     of the indictment."  What's the defendant's position as to

7     whether -- well, let me just -- let me hear what defense

8     counsel's position is on this.

9          MR. GOODREID:  Your Honor, with respect to which

10    part in particular?

11         THE COURT:  Well, my standard -- my practice, as

12    most federal judges do, is to send back the jury

13    instruction -- the indictment with an instruction.  As I've

14    already told them before, that the indictment is not

15    evidence.  I've raised the issue that you heard me now raise

16    again.  That's why I invited both sides to see if they could

17    agree to a redacted summarized indictment.  You have not

18    been able to do so.

19         So what is your position now as to what I should

20    do?  It's either send the indictment back -- the second

21    superseding indictment, with the instruction that it's not

22    evidence; not send anything at all, which I think I've

23    already signaled I'm not going to do; and the third is to

24    come up with some kind of substitute summary of the

25    indictment that omits maybe some of the more problematic

1    factual statements.

2            MR. GOODREID:  So let me take each of those in

3    turn, if I may, Your Honor.

4            THE COURT:  Okay.

5            MR. GOODREID:  First one was our first choice, of

6    course, as I noted at the beginning of the trial was not to

7    send it back at all.  The Court --

8            THE COURT:  Right.

9            MR. GOODREID:  -- and so we stated the objection.

10   At that point we stand on that objection.  However to the

11   extent the Court is not inclined to go along with that, then

12   our second choice would be to send it back with the

13   instruction that you've already mentioned that, look, this

14   is not evidence, as you said, sideways, upside down, this is

15   not evidence, this is a charging document only.

16           And with respect to the third option, Your Honor,

17   that is some sort of substitute, we're not in favor of that

18   because as Mr. Brown correctly cited our position, I think

19   it does impact the defendant's right to be indicted by a

20   grand jury.  Anything that is a substitute or explanation

21   strikes me as either a constructive or an actual amendment

22   to the indictment, to which we do not agree.

23           THE COURT:  Okay.  Well, actually in some ways

24   you've made it pretty easy then.

25           MR. GOODREID:  Okay.  Well --

1          THE COURT:  We're going to -- and just so we're all

2     in agreement, because you withdrew your objection, this is

3     the second superseding indictment with the corrected dates

4     in I think Counts 12 through 16, correct?

5          MR. GOODREID:  I'm not sure I understand about

6     withdrawing our objection?

7          THE COURT:  You -- okay, on the first day of trial

8     the --

9          MR. GOODREID:  Oh, yes, yes, I understand, yes.

10          THE COURT:  You withdrew your objection to the

11     dates --

12          MR. GOODREID:  We did in fact, yes.  Yes.

13          THE COURT:  So that just so it's clear, you -- the

14     defendant has no objection to the second superseding

15     indictment revised with these corrected dates on the

16     impacted counts going back to the jury with -- with the

17     caveat instruction that it's not evidence.

18          And, actually, maybe I should better say, not that

19     you have no objection, you had an objection --

20          MR. GOODREID:  Yes.

21          THE COURT:  -- that it shouldn't go back at all.

22     But that of the two remaining options, the defendant would

23     prefer that the second superseding indictment go back to the

24     jury with the corrected dates with the instruction that the

25     indictment is not evidence and is only a charging document.

1        Is that -- did I state that accurately?

2                MR. GOODREID:  That's precisely it, Your Honor.

3        Yes, thank you.

4                THE COURT:  And, Mr. Brown, is that the

5        Government's preference as well?

6                MR. BROWN:  Yes, Your Honor.

7                THE COURT:  All right.  I think that does make it a

8        lot easier.  All right.  We will be in recess, hopefully,

9        until 8:45 tomorrow morning.

10               (Proceedings concluded at 6:32 p.m.)

11

12                              **INDEX**

13       Item                                          PAGE

14                      GOVERNMENT'S WITNESSES

15       **KATE FUNK**
         Direct Examination by Mr. Sibert            2101
16       Cross-examination by Mr. Goodreid           2165
         Redirect Examination by Mr. Sibert          2178
17
         **KRISTEN VAREL**
18       Direct Examination by Mr. Sibert            2183
         Cross-examination by Mr. Goodreid           2219
19       Redirect Examination by Mr. Sibert          2221

20       **LUIS REYES**
         Direct Examination by Mr. Brown             2223
21       Cross-examination by Mr. Barnard            2231
         Redirect Examination by Mr. Brown           2234
22
         **ERIN NEWTON**
23       Direct Examination by Mr. Brown             2236
         Cross-examination by Mr. Barnard            2256
24       Redirect Examination by Mr. Brown           2261

25

<pre>
 1                              INDEX

 2    Item                                           PAGE

 3                   GOVERNMENT'S WITNESSES

 4        STEVEN THEL
          Direct Examination by Mr. Sibert          2265
 5        Cross-examination by Mr. Barnard           2302
          REdirect Examination by Mr. Sibert         2314
 6

 7    RULE 29(a) MOTION:
      Mr. Barnard                                    2319
 8    Mr. Sibert                                     2322
      Mr. Barnard                                    2336
 9    FINDING BY THE COURT:                          2339

10

11                   GOVERNMENT'S EXHIBITS

12    EXHIBITS:      Offered   Received  Refused  Stipulated

13    75             2158      2159

14    93             2158      2159

15    154            2158      2159

16    309            2258      2258

17    310            2254      2254

18    315            2258      2258

19    323            2115      2115

20    324            2118      2118

21    325            2123      2123

22    326            2161      2161

23    327            2133      2134

24    328            2132      2133

25    329            2135      2135
</pre>

2364

GOVERNMENT'S EXHIBITS

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|---|---|---|---|---|
| 330 | 2137 | 2137 | | |
| 365 | 2187 | 2187 | | |
| 366 | 2187 | 2187 | | |
| 367 | 2222 | 2223 | | |
| 370 | 2219 | 2220 | | |
| 372-A | 2158 | 2159 | | |
| 372-G | 2158 | 2159 | | |
| 372-LL | 2158 | 2159 | | |
| 409 | 2140 | | 2143 | |
| 444 | 2271 | 2272 | | |

                    *      *      *      *      *

REPORTER'S CERTIFICATE


    I certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled matter.

    Dated at Denver, Colorado, this 26th day of March,

2020.


                    MARY J. GEORGE, FCRR, CRR, RMR