2365

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
 2
     Criminal Action No. 17-cr-0008-WJM
 3
     UNITED STATES OF AMERICA,
 4
         Plaintiff,
 5
     vs.
 6
     GUY JEAN-PIERRE a/k/a Marcelo Dominguez de Guerra,
 7
         Defendant.
 8
     ------------------------------------------------------------
 9
                       REPORTER'S TRANSCRIPT
10                      (Jury Trial, Day 11)
                           Volume XI
11
     ------------------------------------------------------------
12
13        Proceedings before the HONORABLE WILLIAM J. MARTINEZ,
14   Judge, United States District Court for the District of
15   Colorado, commencing at 8:59 a.m., on the 29th day of
16   January, 2019, in Courtroom A801, United States Courthouse,
17   Denver, Colorado.
18                            APPEARANCES
19        JEREMY S. SIBERT and ROBERT M. BROWN, Assistant U.S.
     Attorneys, 1801 California Street, Suite 1600, Denver,
20   Colorado 80202, appearing for the plaintiff.
21        CLIFFORD J. BARNARD, Attorney at Law, 4450 Arapahoe
     Avenue, Suite 100, Boulder, Colorado 80303, AND
22        THOMAS E. GOODREID, Attorney at Law, 1801 Broadway,
     Suite 1400, Denver, Colorado 80202, appearing for the
23   defendant.
24                   MARY J. GEORGE, FCRR, CRR, RMR
                901 19th Street, Denver, Colorado 80294
25            Proceedings Reported by Mechanical Stenography
                   Transcription Produced via Computer
```

1                         P R O C E E D I N G S
2            (Proceedings were held in open court in the presence of
3       the jury at 8:59 a.m.)
4            THE COURT:  Good morning, ladies and gentlemen of
5       the jury.  Welcome back to day 11 of our jury trial.
6            All right, the defendant may call his first
7       witness.
8            MR. GOODREID:  Your Honor, may I retrieve the
9       witness, please?
10           THE COURT:  Sorry?
11           MR. GOODREID:  May I retrieve the witness?
12           THE COURT:  Okay.  And actually let me clarify --
13           MR. BARNARD:  First of all --
14           THE COURT:  Is there an opening statement you wish
15      to make?
16           MR. BARNARD:  First of all, the defense will waive
17      the opening statement.
18           THE COURT:  Okay.  We need to get that on the
19      record.
20           MR. BARNARD:  Yes.
21           THE COURT:  Yes, please go ahead.
22           MR. BARNARD:  And the defense would call Professor
23      Erik Gerding to testify.
24           COURTROOM DEPUTY:  Please stand and raise your
25      right hand.

Direct - Gerding

1          ERIK GERDING, DEFENDANT'S WITNESS, SWORN

2          COURTROOM DEPUTY:  Okay.  Please be seated.  You

3     may need to scoot your chair toward the microphone.  If you

4     could please state and spell your name for the record.

5          THE WITNESS:  My name is Erik Fredrick Gerding.

6     It's E-r-i-k, Frederick, F-r-e-d-e-r-i -- sorry,

7     F-r-e-d-e-r-i-c-k.  Gerding, G-e-r-d, as in David, i-n-g.

8          MR. BARNARD:  Your Honor, may I?

9          THE COURT:  Yes, you may proceed.

10         MR. BARNARD:  Thank you very much.

11                         DIRECT EXAMINATION

12    BY MR. BARNARD:

13    Q.   Professor Gerding, could you tell us a little bit about

14    your educational background.

15    A.   So I graduated from a public high school in New Jersey

16    in 1991.  I then got a bachelor's degree from Duke in 1994.

17    Afterwards, I got a law degree from Harvard in 1998.

18    Q.   Same law school as Professor Thel.

19    A.   That's correct.

20    Q.   So after you graduated from law school, what did you do

21    next?

22    A.   So I practiced for eight years as a transactional

23    attorney with a firm called Cleary Gottlieb in Boston and

24    Washington.

25    Q.   When you say as a transactional attorney, what does

Direct - Gerding

1    that mean?

2    A.   So I worked on a lot of complex corporate and financial

3    transactions.  A lot of them were securities transactions;

4    transactions that were both registered with the SEC and

5    transactions that were also exempt.

6    Q.   Did you prepare or work on any kinds of documents?

7    A.   Yes, I did.  I drafted disclosure for securities

8    offerings.  I drafted a lot of transactional contracts for

9    securities offerings.

10   Q.   When you say "disclosure documents," what are those?

11   A.   Those are documents that an issuer is either required

12   to or is asked by investors to give to investors to help

13   explain a company and the securities that they might be

14   offering.

15   Q.   All right.  And I interrupted you.  You were talking

16   about documents that you had drafted.

17   A.   Right.  So I would draft transactional documents.  It

18   might be loan agreements, it might be a bond indenture, it

19   might be the documents that define what kind of stock is

20   being offered.

21       I would also draft -- give a first draft or second

22   draft of opinion letters.

23   Q.   And as you went along, did you then become a supervisor

24   of any sort?

25   A.   I spent eight years at the law firm, so as I got more

1    senior, I began to supervise more junior attorneys and to

2    be -- take a more quarterbacking role in transactions.

3    Q.   And going back for a moment to the -- your work on

4    offerings, and in any kind of opinion letters, could you

5    estimate how many of those over that eight-year period you

6    worked on.

7    A.   How many opinion letters?

8    Q.   Yes.

9    A.   Dozens, perhaps.

10   Q.   All right.  Did you have anything to do with due

11   diligence?

12   A.   Yes.  So as a junior lawyer, that would be one of my

13   core duties is performing due diligence on either clients or

14   on counter-parties or on issuers in securities transactions.

15   And then as I got more senior, I would often be responsible

16   for leading a team of attorneys in performing due diligence

17   and, ultimately, I would have to train junior attorneys in

18   how to do that.

19   Q.   And after your eight years with Cleary Gottlieb -- you

20   said that was Washington, D.C.?

21   A.   I started in Washington.  I then followed my girlfriend

22   to New York, and practiced in the New York office of Cleary.

23   We got married and then I followed her back to Washington.

24   Q.   After your eight years with Cleary Gottlieb, what did

25   you do then?

Direct - Gerding

A.   I was lucky enough to get a law professor job.  So I
started teaching at the University of New Mexico in 2006.
And then in 2011, I moved to the University of Colorado and
am still there and still teaching securities law, corporate
law, banking law.

Q.   When you say teaching securities law and corporate law,
what -- what kinds of courses would those entail -- include?

A.   So I am most proud of -- and I teach almost every
year -- my securities regulation course, which I think is
one of the hardest -- I think -- maybe I'm too proud -- it's
one of the hardest in the law school.

Q.   And did you do any research?

A.   So that's a normal part of my job is doing research,
writing books, writing Law Review articles.  And I write
about securities regulation, including securities fraud and
Rule 10b-5.  That's one of the areas I focus on.

Q.   And you say you are writing.  Have you had any articles
or books published with regard to these matters?

A.   So my first law review article was on securities fraud.
That, I think, was in the Connecticut Law Review.  I've had
a couple articles that have dealt with securities fraud.
And I've also published a book in 2014, a major part of
which was also on securities and other financial fraud.

Q.   Are you familiar with securities law and the role of
security lawyers in transactions?

Direct - Gerding

1    A.   Yes.

2    Q.   Based on?

3    A.   Based on my own personal experience, based on my

4    research, based on what I teach law students.

5    Q.   Have you ever previously been qualified as an expert?

6    A.   No, I have not.

7    Q.   Have you ever testified, therefore -- therefore, you've

8    never testified as an expert in these fields?

9    A.   No, I have not.

10            MR. BARNARD:  Your Honor, I would ask that

11   Professor Gerding be qualified as an expert in securities

12   law and regulation, and in general professional standards

13   for securities and other transactional lawyers.

14            THE COURT:  One second.  General professional

15   standards for securities and other transactional lawyers.

16   Is that what you said?

17            MR. BARNARD:  Professional standards in drafting

18   securities disclosure -- excuse me, general professional

19   standards for securities and other transactional lawyers.

20            THE COURT:  Is there an objection?

21            MR. SIBERT:  I don't object to securities law.  To

22   the general practice of litigation -- of security lawyers

23   and transaction, I would object.

24            THE COURT:  I don't think -- correct me if I'm

25   wrong, Mr. Barnard, you're not seeking qualification of this

1    witness on the general practice of litigation, it's the
2    general professional standards for securities and other
3    transactional lawyers.  Isn't that what you said?
4           MR. BARNARD:  That is correct.
5           THE COURT:  All right.  With that clarification, do
6    you still have an objection, Mr. Sibert?
7           MR. SIBERT:  To the general standards, yes.
8           THE COURT:  All right.  All right.  That objection
9    is overruled.
10          Professor Gerding is qualified under Federal Rule
11   of Evidence 702 to provide expert opinion testimony in the
12   areas of securities law and regulation, as well as general
13   professional standards for securities and other
14   transactional lawyers.
15          MR. BARNARD:  Thank you, Your Honor.
16   BY MR. BARNARD:
17   Q.   Professor Gerding, I would like to -- well, let me
18   begin with, you were present during the testimony of FINRA
19   attorney Mr. Scoufis?
20   A.   Yes, I was.
21   Q.   You were present when he addressed Exhibits 290 and
22   291?
23   A.   Yes, I believe so.
24          MR. BARNARD:  Your Honor, may I have 290, please,
25   on the screen.

Direct - Gerding

1    BY MR. BARNARD:

2    Q.   And does this appear to be what Mr. Scoufis was

3    testifying with regard to price and volume analysis?

4    A.   Yes, it was.

5    Q.   And may I have Exhibit 291 for a moment.

6            And is this also an additional exhibit that Mr.

7    Scoufis testified with regard to price and volume analysis?

8    A.   Yes, it was.

9    Q.   All right.  For these -- may I have 290 again, please.

10           For both of these exhibits, did you find any

11   problem with these exhibits and Mr. Scoufis' conclusions?

12   A.   Well, I -- from what I remember, he was using these

13   exhibits as part of his testimony that he believed a

14   pump-and-dump scheme had occurred.  And, frankly --

15   Q.   Do you see the connection of pump-and-dump from the

16   chart in Exhibit 290?

17   A.   Not just from looking at the chart.  I -- this doesn't

18   necessarily show a pump-and-dump at all.  There's a couple

19   of things that I think really bothered me about the way that

20   he used this particular chart.  The first thing is from how

21   he described the pump-and-dump, which I think was more or

22   less accurate.

23           In a pump-and-dump, people will be buying or

24   holding a large stock to begin with, and then if they're

25   committing a fraud, they will be making public statements,

Direct - Gerding

1    and then ultimately selling the stock.

2    Q.   Does either 290 or 291 indicate that occurred?

3    A.   Well, I mean, if you're looking for the pump part of a

4    pump-and-dump, you're actually looking either for holding

5    stock or purchasing stock.  And from what I could tell from

6    the green and red bars, those were about sales of stock.

7    Q.   So those would not relate to the pump aspect of the

8    pump-and-dump?

9    A.   I was a little bit confused as to how they would.

10   Q.   All right.

11            THE COURT:  Mr. Barnard, you're asking this witness

12   questions about 290 and 291?

13            MR. BARNARD:  Yes, I am.

14            THE COURT:  Okay.  We only have 290 on the screen

15   and I don't think he has 291 in front of him.  So how are

16   you asking him about two different opinions -- two different

17   exhibits?

18            MR. BARNARD:  I was -- I will limit it to the one

19   that's on the screen.

20            THE COURT:  Yeah.  And you can ask the same

21   question on another exhibit, but I think it gets

22   confusing --

23            MR. BARNARD:  Right.

24            THE COURT:  -- if you're asking questions about

25   exhibits that are not in front of the jury or before the

Direct - Gerding

1    witness.

2              MR. BARNARD:  Yes.

3    BY MR. BARNARD:

4    Q.   And could we have Exhibit 291, please.

5              So with regard to Exhibit 291, how does it appear

6    to you with regard to any relevance with any potential

7    pump-and-dump scheme?

8    A.   Well, I mean, it appears to be the same basic exhibit.

9    There's the red and green bars, from what Mr. Scoufis

10   testified, are about sales of transactions, and the blue

11   line is about the price of a transaction.

12             And I frankly admit it's a little hard to read

13   what's happening at the bottom there.

14   Q.   The -- are you seeing a correlation between the sale of

15   the stock as shown in the bottom there with the red and

16   green -- not very bright line, but those lines and the price

17   of stock?

18   A.   Well, I mean, when you say "correlation," that has a

19   very technical mathematical or statistical definition.  I

20   mean, it's not something that I, as an expert, would feel

21   comfortable just looking at this and saying, "Okay, there's

22   a correlation between the red and green bars and the blue

23   line."

24             If you're actually looking for a correlation,

25   there's a mathematical or statistical way of doing that.

Direct - Gerding

1    If -- if you want to go back to the prior chart, I think if
2    you just eyeballed --
3    Q.   Just a moment.  May we have Exhibit 290, please.
4          All right.  Exhibit 290 is on the screen.  And are
5    you referring to any specific time period or are you talking
6    about the whole thing?
7    A.   Well, I -- again, I don't think you're supposed to, as
8    an expert, just eyeball a chart.  But even if you did sort
9    of an eyeball approximation, I'm not entirely sure what the
10   story that Mr. Scoufis is telling.  He seemed to be saying
11   that there's some relationship between the volume of sales
12   that were being done by what he called selected accounts,
13   and the price, or a price increase in FusionPharm stock.
14         And just eyeballing -- and, again, this is not --
15   you're not only supposed to eyeball it -- I don't totally
16   see that that story is consistent across this chart.
17         So if you look, for example, at May 2011 -- sort
18   of -- am I allowed to draw?
19         THE COURT:  Yeah.  One second.  Can we increase the
20   font -- or enlarge the lower portion?  Because if we're
21   going to be referring to certain time periods -- yeah.
22   There we go.
23   BY MR. BARNARD:
24   Q.   There.
25   A.   So if you look at this particular --

1   Q.   Can you speak a little bit more -- or bend the --
2   A.   Sure.  If you look at this period around May 9th, 2011,
3   you see a huge spike.  And then if you zoom out again, you
4   see a huge spike --
5   Q.   Let me stop you for a moment.  When you say "spike,"
6   you were talking about a spike in sales.
7   A.   Right.  You're talking about this particular increase
8   in the sales of FusionPharm stock.  But it doesn't look like
9   there's a huge jump in price at that point compared with a
10  later period in time -- again, it's a little hard to read --
11  but about a month later, there is this huge spike, but the
12  actual volume of sales of FusionPharm stock is not that
13  great.
14          So, again, if you just eyeball it -- and, again, I
15  don't think that that's enough from an expert -- I'm not
16  entirely clear what the story that he was telling in terms
17  of a relationship between sales and the price of FusionPharm
18  stock.
19  Q.   I -- excuse me.  When looking for the correlations, as
20  you're discussing, do you normally consider something about
21  causation?
22  A.   So one thing that you do, if you're trying to figure
23  out a story or a relationship between two variables -- let's
24  say the volume of stock being sold and the price of stock,
25  you look for correlation.  And correlation just means that

Direct - Gerding

1    there's a tight connection in that two variables are either

2    moving in a similar direction or moving in an opposite

3    direction.

4        Correlation alone is pretty easy to find -- not

5    easy, you need a little bit of data and you need a little

6    bit of statistical training, but it's something that you can

7    actually put in an Excel spreadsheet --

8    Q.    Is that --

9    A.    -- pretty easily.

10   Q.    Is that data that you referred to included in the

11   information set forth in Exhibit 290?

12   A.    Well, I -- the data, itself, is not.  I'm assuming that

13   Mr. Scoufis had the underlying Excel spreadsheet or chart,

14   what the volume was and what the price was.

15   Q.    No, I understand the volume and the price are there and

16   that it came from other data.  I thought that you were

17   saying that in order to -- to analyze whether there was a

18   correlation, you needed additional data, too.

19   A.    Well, you basically would plug it into an Excel

20   spreadsheet, and it's a pretty simple series of formulas

21   that you could use to show how tightly correlated volume and

22   price are.

23   Q.    And does Exhibit 290 -- and if I may have 291 for a

24   moment, please -- 291.  Which is just a -- somewhat of the

25   same analysis, but over a longer period.

1    Do these have the information so that you can see
2    any kind of a correlation between price and volume data?
3    A.   No.  And I should note that a correlation is not
4    usually enough.  I mean, a -- there's an old saying that you
5    sometimes hear even in college:  That correlation doesn't
6    imply causation.
7         So we don't have correlation here.  We also don't
8    have a potential causal story between -- or any kind of
9    causal data to show that the changes in the volume of sales
10   of FusionPharm stock caused the specific price increases or
11   price decreases of FusionPharm stock.
12   Q.   Thank you.  Changing the topic now, you said that you
13   had dealt with transactional matters.  And in your
14   experience, do some clients try to, or do they, manage their
15   transactional attorneys?
16   A.   The clients will manage attorneys all the time.
17   Q.   What does that mean when you say that?
18   A.   Well, they'll be very clear with an attorney about what
19   the scope of her or his work ought to be.  They'll say, "I
20   want you to do the following things for me."  And they'll
21   often put some limits, like, "This is the only thing I want
22   you to do for me."
23        And sometimes that makes quite a bit of sense, all
24   right?  A client is concerned about running up the meter,
25   not paying too much for a lawyer's services.

2380

1    Q.   And so does this, then, in different circumstances

2    change the types and the amount of work that a transactional

3    securities attorney may do on behalf of his client?

4    A.   Yeah, absolutely.  I mean, your -- as a transactional

5    attorney, you're not -- you're generally bound to be doing

6    what your client is asking.  So if a client says, "I only

7    want you to do the corporate work.  I don't want you to do

8    the tax work.  I don't want you to do any antitrust work,"

9    that's what you're supposed to be doing.

10              The problem is that sometimes when a -- and this is

11   both in my experience as a researcher and in my own personal

12   experience -- sometimes when a client is limiting the scope

13   of your services, it's not necessarily good for the client

14   and it's not necessarily good for you as an attorney beyond

15   the fact that you're not making as much money.

16              So it's not necessarily as good for the client

17   because if you were able to perform a greater scope of

18   services for the client, you might be able to help them

19   understand if what they're doing is a bad idea, if it's

20   going to run afoul of regulations that they're not aware of.

21              It's also not good for an attorney, not just

22   because they are not making as much money, but in -- it's --

23   sometimes would make me nervous both as a lawyer when I was

24   told, "I only want you to do this particular document,

25   prepare this particular document, and nothing else."

Direct - Gerding

1    Q.   And when an attorney is told to prepare this or that

2    document, what does a typical attorney do in order to

3    prepare such a document?

4         MR. SIBERT:   I would -- objection, except for his

5    personal knowledge, in his experience.

6         THE COURT:   All right.   With the understanding that

7    you're talking about your personal experience and personal

8    knowledge, go ahead and answer.

9         THE WITNESS:   Well, I do have -- I have seen in

10   research studies, as well how judge -- how lawyers have

11   gotten in trouble with limitations on the scope of their

12   work.

13        THE COURT:   All right.

14        MR. SIBERT:   I would object to his knowledge of

15   that research and the scope relevancy.

16        THE COURT:   So this is information you have

17   obtained through your research?

18        THE WITNESS:   Yeah.   I mean, one of the areas of my

19   research is looking at securities and financial fraud and

20   looking at -- also in my teaching, looking at ways in which

21   lawyers have committed malpractice, been sued in civil

22   suits, and even been party even -- or participants even

23   unwittingly in securities frauds.

24        THE COURT:   All right.   The objection's overruled.

25        You may answer -- you probably want the question to

1    be repeated at this point, but --

2    BY MR. BARNARD:

3    Q.    Do you recall the question?

4    A.    I'm sorry, I don't.

5    Q.    Could you tell us what that question was, please.

6          MR. BARNARD:   May I ask the court reporter to

7    refresh my recollection?

8          (Question on line page 2381, lines 5 through 7 read)

9          THE WITNESS:   Well, in terms of the mechanics of a

10   document, I mean, you look for a model or a precedent to

11   actually draft the document.   But a really good

12   transactional attorney, in the way that -- in which I train

13   my students, would not only sort of just mechanically

14   prepare the document, but also try to understand something

15   about the business of the client and what he or she is

16   hoping to accomplish with that document.

17         And sometimes that part of being an effective

18   lawyer is part of adding value to your client, it's part of

19   just progressing as a lawyer and being much more effective.

20   BY MR. BARNARD:

21   Q.    And can that -- is that, and can that, be a very

22   expensive project?

23   A.    Yeah.   I mean, clients, again, are often, for

24   completely understandable reasons, not really interested in

25   having you always understand exactly the why of a

Direct - Gerding

1    transaction, the business purposes of it; particularly true

2    for junior attorneys.  And normally that is completely

3    understandable.  It can cause headaches for an attorney

4    above and beyond just sort of not making more money.

5    Q.   Have you seen documents -- opinion letters in

6    particular?  Have you seen opinion letters that were less

7    exacting than the very well thought out, very well

8    researched opinion letter maybe that you were describing?

9              MR. SIBERT:  Leading, Your Honor.

10             THE COURT:  Overruled.

11             THE WITNESS:  I can answer that?

12             THE COURT:  Yes.

13             THE WITNESS:  So I've seen all sorts of opinion

14   letters.  I hope that the opinion letters that I drafted

15   were, you know, of a high professional quality.  I have seen

16   bad and poor opinion letters from other law firms.

17   BY MR. BARNARD:

18   Q.   Have you seen sloppy opinion letters that don't appear

19   to have been prepared with great precision or exactitude?

20   A.   Yes, I have.

21   Q.   When -- when you have prepared -- when you, yourself,

22   have been preparing opinion letters in your experience both

23   from the beginning and then later, who -- who would begin

24   the process of the opinion letter?

25   A.   So oftentimes a client or a counter-party would first

1    begin by providing a form or template opinion letter, and
2    say, you know, "This is what we need in this particular
3    transaction."
4         And that might be subject to some negotiation
5    between the client or counter-party and me and the law firm
6    that I worked for.
7    Q.   When -- when an opinion letter is being requested
8    repeatedly or subsequently by a client, do attorneys, in
9    your experience, tend to use the same template?
10   A.   Often, yeah.  If it's been used in the past and it's
11   been vetted in the past by the law firm, it was much more --
12   lawyers, partners, are much more comfortable using it again.
13   Q.   Or if it's been accepted by the brokerage firm?
14   A.   Right.  I mean, ultimately the person signing the
15   letter still has to look at the form and be comfortable with
16   what he or she is doing.
17   Q.   We'll get to that in a moment.
18        In preparing the letters, are paralegals used in
19   this?
20   A.   I mean, sometimes a paralegal might take the first stab
21   at making minor conforming changes.  So changing the names
22   of parties to a transaction, changing a company's name.  So
23   a paralegal might be involved in the first crack.  In my
24   experience that was up to a junior or mid-level lawyer at
25   the law firm to really look at the opinion in detail, make

Direct - Gerding

1   substantive changes, and make sure that what was ever -- was

2   in -- being said in the opinion not only conformed to that

3   particular transaction, but to any sorts of legal

4   requirements for the opinion.  And, more importantly, make

5   sure that either that attorney, she or he, or another

6   attorney in the firm, had actually done the kind of factual

7   investigation or legal investigation necessary to give the

8   opinions in that letter.

9   Q.   Do the writers of the letters rely on others for

10  supplying them, him or her, with the information and/or

11  documents that would be involved in the letter?

12  A.   So, I mean, there's a difference between the person who

13  might be drafting the letter doing the actual typing and the

14  person who's actually signing the letter.  Both of them

15  might be relying on other parties to provide information.

16  So it might be government officials, it might be company

17  officials, it might be public records, company records, that

18  are going into the actual opinion.  And it's important that

19  the lawyer review those particular records or have spoken to

20  those individuals, but ultimately it's the person signing

21  the letter who has to make sure that all that reliance is --

22  or he or she is comfortable with that reliance.

23          And, ultimately, it's the person signing the

24  letter, or the law firm who's signing the letter, whose car,

25  house, assets are at stake.  So if they are relying on

1    someone else, or if there are qualifications or exemptions

2    to the letter, it's really -- it's their incentive to

3    actually state what they relied on and what they are opining

4    about, and what they're not opining about pretty clearly in

5    the letter.

6    Q.   If there's some requirement to include the name of

7    another attorney who assisted in preparing the letter, who's

8    duty is it to include that in the letter?

9    A.   I mean, ultimately it's the law firm or the -- the law

10   partner who is signing the letter.  It's his or her name

11   that's at stake.  It's his or her -- potentially his or her

12   assets that are at stake.  He or she's representation that

13   investors or counter-parties are going to be relying on.  So

14   the ultimate responsibility, I think, is on the person

15   signing the letter.

16   Q.   And also ultimately be on the person signing the letter

17   to do the due diligence?

18   A.   Well, ultimately, he or she is responsible for the due

19   diligence.  They can delegate that due diligence to a junior

20   attorney, such as I was; they can delegate it to a team of

21   attorneys, but they need to know that they can rely on that

22   team of attorneys.  And they also -- good practice is that

23   the person signing the letter will ask questions, "Exactly

24   what did you do?  Why is the letter framed this way?  And

25   how do we know that this is true?"

Direct - Gerding

1    Q.   And -- but the ultimate -- ultimate responsibility is
2    on the attorney signing the letter.
3              MR. SIBERT:  Objection.  Leading.
4              THE COURT:  Sustained.
5    BY MR. BARNARD:
6    Q.   Whose ultimate responsibility is it with regard to the
7    matters set forth in the letters?
8    A.   Well, the marketplace, investors, or counter-parties,
9    are ultimately going to be relying on the name of the person
10   signing the letter or an -- potentially the letterhead of
11   the law firm where that person is working.
12             So given that, were I signing a letter, I would see
13   myself as being ultimately responsible.
14   Q.   You were aware that Mr. Jean-Pierre in this case has
15   been accused of securities fraud.
16   A.   Yes, I am.
17   Q.   And are you aware that -- that the statutes upon which
18   he is being charged with securities fraud would be 15 United
19   States Code 78j(b) and 78ff, and 17 Federal Regulations
20   240.10b-5, correct?
21   A.   Yes.
22   Q.   All right.  And are you familiar with 15 U.S.C. Section
23   78j?
24   A.   Yes, I am.  That's commonly referred to -- or was
25   originally referred to as Section 10 of the 1934 Act.  A

1   statute that was passed a year after the statute that

2   Professor Thel mentioned yesterday.

3   Q.   And are you familiar with 10b-5?

4   A.   Very much so.  So this has been a topic that I've

5   written in my academic research.  It's also a very, very

6   core part of the securities regulation course that I teach

7   to law students.

8   Q.   Are you familiar with 15 United States Code Section

9   78ff?

10  A.   Yes.  That's the criminal penalty provision -- a

11  criminal penalty provision in the securities laws.

12  Q.   Can -- in your opinion, can a criminal charge stand if

13  a person is only being brought pursuant to 77 -- or, excuse

14  me, Section 78j?

15  A.   So the criminal penalty -- the criminal penalty

16  provision is in 78ff.  And there's no criminal penalties

17  unless 78ff is followed.

18  Q.   All right.  So why don't you walk us through how these

19  three sections interact.

20  A.   Sure.  I mean, I apologize, because this is going to be

21  a little bit of a slog.

22  Q.   Well, pretend like you're talking to your first

23  semester law students -- no, we've had some experience here.

24  Talk to us like we're second semester law students.

25  A.   Yes.  Okay.  So 78f, as I mentioned, is -- you know,

Direct - Gerding

1    sort of inside baseball called Section 10 of the '34 Act.

2            And what 78f says is it makes unlawful any -- it

3    makes unlawful for a person who's using interstate commerce

4    in connection with the purchase and sale of securities to

5    use -- and I don't have the statute in front of me -- but

6    roughly any manipulation or contrivance that violates a rule

7    that the Securities and Exchange Commission has passed.

8            All of this manipulation or contrivance has to be

9    pursuant to a rule that the Securities and Exchange

10   Commission has passed, and it has to be in connection with

11   the purchase and sale of securities.

12           But it doesn't -- it doesn't define what is a

13   manipulative or deceptive device that's being -- what that

14   actually means.

15           Essentially what Congress has done is kicked the

16   can to the Securities and Exchange Commission to pass rules

17   and regulations to really flesh out what manipulation and

18   deceit means in this particular context.

19   Q.   And does that section include any type of scienter or

20   state of mind requirement?

21   A.   I mean, it only talks about -- I think the language is

22   manipulation or contrivance.  I might be confusing that with

23   a later statute.  But it's not -- it doesn't talk about

24   scienter or state of mind requirements beyond saying

25   manipulation or deceit, that kind of . . .

Direct - Gerding

1    Q.   All right.  And how is that related to the other?

2    A.   So 78f says that you can't violate rules that the

3    SEC --

4    Q.   I'm sorry, 78f or j?

5    A.   78j.  Says that it's unlawful to violate or

6    manipulate -- engage in a manipulative scheme in violation

7    of the SEC rules.

8         In the 1940s, the SEC then took up this duty and

9    passed Rule 10b-5.

10   Q.   All right.  And how does 78j and 10b-5 relate to 78ff?

11   And what does 78ff then do?

12   A.   Well, 78ff -- 78j and Rule 10b-5 simply make

13   manipulation or deceit or a material misstatement of a fact

14   or an omission of a fact that's misleading, those two

15   statutes -- that statute and that rule simply make it

16   unlawful.

17        The criminal penalties provision is the one that

18   actually says these -- you can be criminally liable and

19   criminal penalties can be assessed for violating either that

20   earlier statute or that Rule 10b-5.

21   Q.   So from your reading of these statutes and how they

22   relate to one another, is it necessary to have the 78ff

23   penalty statute included with regard to the alleged improper

24   behaviors set forth in 78j and 10b-5?

25   A.   Yeah, I think this is sort of a basic rule of law

1   matter.  I mean, you can't impose criminal penalties and you
2   can't have specific criminal penalties unless you define
3   what they are.  So not only what is unlawful, but talking
4   about the penalties and the ff provision not only talks
5   about what penalties can be imposed, unlike Section 10 of
6   the '34 act and the Rule 10b-5, it's much more explicit --
7   it is explicit about the state of mind that's necessary.
8   Q.   Is that true also with regard to 78j comparing --
9   A.   I mean, it only talks about manipulation.  It doesn't
10  talk about what state of mind a defendant or person has to
11  act with at least explicitly.
12  Q.   And what state of mind does 78ff require in order to
13  make it a criminal violation with regard to the unlawful
14  acts set forth in 78j and 10b-5, and 78ff?
15  A.   Part of it speaks about willfully, and then part of the
16  statute talks about willfully and knowingly acting.
17  Q.   So as the bottom line, what state of mind is required
18  in order to find a person criminally liable for securities
19  fraud?
20           MR. SIBERT:  Asked and answered, Your Honor.
21           THE COURT:  I'm going to overrule that, but I want
22  the jury to understand that you're going to get the
23  instructions from me as to what law applies and then what
24  we're hearing here is the professor's understanding of that
25  standard.

Direct - Gerding

1        Go ahead, sir.

2    BY MR. BARNARD:

3    Q.   And what is that state of mind?

4    A.   Willful -- I'll let the judge explain what willful

5    means.

6            MR. BARNARD:  Your Honor, if I may have a moment.

7            THE COURT:  You may.

8    BY MR. BARNARD:

9    Q.   Professor Gerding, in discussing willfulness, is

10   willfulness -- from your knowledge and in your understanding

11   of the law, is that the same as negligence?

12   A.   No.  I agree with what Professor Thel said yesterday in

13   his testimony.  I did hear that as well.  I would agree that

14   willfulness is not -- negligence alone cannot be

15   willfulness, so negligence is, roughly speaking, the

16   taking -- or lack of reasonable care in conducting yourself.

17           That alone, in my experience and in my knowledge of

18   the law, is not enough to be willful alone.

19   Q.   One other minor matter.  If a -- an attorney is

20   involved in preparing documents, in particular dealing with

21   promissory notes, is there anything illegal with backdating

22   those promissory notes?

23   A.   It kind of depends.  So backdating essentially means

24   when you have a transaction document and you write in a date

25   that happened the day before, months before.  Backdating,

1       alone, is not necessarily illegal.  It's not necessarily

2       fraudulent.  It's certainly sloppy practice and something

3       that I would counsel attorneys not to do.

4              The real question about -- you know, did you ask

5       whether it's illegal or criminal?  I can't remember.

6       Q.   I was asking -- well, I will ask:  Is backdating, by

7       itself, criminal?

8       A.   No.  I mean, the -- for it to be criminal, you have to

9       have a certain state of mind, you have to have a certain

10      intent that the reason that you're backdating, it is for

11      some improper or criminal purpose.

12             MR. BARNARD:  Thank you.  No further questions.

13             THE COURT:  All right.  Cross-examination.

14             MR. SIBERT:  Yes, sir.  Can I have a moment,

15      please?

16             THE COURT:  You may.

17                        CROSS-EXAMINATION

18      BY MR. SIBERT:

19      Q.   All right, sir.  I just want to start out kind of where

20      you left off.  And good morning to you.

21      A.   Hi.

22      Q.   You talked about essentially a little bit about the

23      scienter requirement under 78j.  Do you agree with that,

24      or --

25      A.   You mean the scienter requirement.

Cross - Gerding

1    Q.   Yes, sir.

2    A.   Right.

3    Q.   And actually you were calling it 78j(f) for a while.

4    A.   Yeah.   I have a little bit of a numbers aphasia.   I

5    mean, I'm probably not a professional --

6    Q.   But you're an expert in security law?

7    A.   I mean, the way that we normally teach these provisions

8    is we teach them in terms of the --

9    Q.   I'm just asking you a question, sir.

10              THE COURT:   Hold on.

11   BY MR. SIBERT:

12   Q.   I'm not asking how you teach --

13              THE COURT:   Hold on.   Let him finish his answer.

14              THE WITNESS:   We refer to them, when we teach these

15   courses, Section 10 of the '34 Act, we don't actually refer

16   to them by the U.S. Code provision, so that's why it's a

17   little bit of confusion.

18   BY MR. SIBERT:

19   Q.   But codes are important in this courtroom?

20   A.   Oh, it's still the same provision.

21   Q.   Okay.   Now, you said 10b has nothing about the state of

22   mind.   Do you recall that testimony?

23   A.   Well, it does talk about manipulation, it talks about

24   deceit, but it doesn't say a defendant must have -- or must

25   act with a certain amount of -- a certain state of mind or

Cross - Gerding

1    scienter.

2    Q.   Are you aware of any Supreme Court interpretations

3    regarding the state of mind under 10b?

4    A.   So what happened is --

5    Q.   I'm just asking:  Are you aware of any Supreme Court

6    cases regarding the state of mind in 10b, yes or no?

7    A.   In civil actions, the Supreme Court has several decades

8    of case law and opinions that talk about scienter or state

9    of mind for civil liability.

10   Q.   Okay.  Do you know the case law?

11   A.   I know quite a bit of the case law.

12   Q.   Do you know the case title?

13   A.   The case titles for scienter?

14   Q.   Yes, sir.  Under 10b.

15   A.   There's quite a bit of case law.

16   Q.   Okay.  Supreme Court case law.

17   A.   So there's case law that talks about for civil

18   liability in --

19   Q.   I'm asking:  Do you know the names?

20             THE COURT:  Are we talking about civil liability or

21   criminal?

22             MR. SIBERT:  I'm asking about 10b, state of mind.

23   If the Supreme Court has come out with a definition for 10b.

24             THE COURT:  Okay.

25             THE WITNESS:  You need -- there's *Ernst & Ernst v.*

Cross - Gerding

1    *Hochfelder.*

2    BY MR. SIBERT:

3    Q.   How did the Supreme Court treat the state of mind under

4    10b in that case?

5    A.   Well, that was a civil case.  So, for civil law, you do

6    need an intent to defraud or a deceptive intent, roughly

7    speaking.

8    Q.   Are you aware of *Aaron v. the SEC*?

9    A.   Roughly.  I did not look at that before I testified

10   today.

11   Q.   Do you know if that's a civil or criminal case?

12   A.   No, I don't remember.

13   Q.   So you have no clue how the Supreme Court treated the

14   state of mind under 10b regarding that case?

15   A.   If it's -- I don't remember that case.  I didn't look

16   at it recently.

17   Q.   All right, sir.  How big was your law firm that you

18   have worked in?

19   A.   At that time, it was about 400 to 500 attorneys.

20   Q.   So there's a lot of bureaucracy, is that correct, in a

21   large firm of 400 to 500 people?

22   A.   Yeah, I would say so.

23   Q.   And essentially the companies that you represented,

24   were they usually the large type companies such as

25   Microsoft, Fortune 500 companies?

Cross - Gerding

A.   A lot of them were.  I worked on a number of
transactions with smaller clients.  And, for me, they were
sometimes equally hard, equally difficult legal issues.  It
was just a matter of how many decimal points there were in
the transaction, or how many zeros were in the transaction.

Q.   All right.  You stated that you had drafted at least a
dozen opinion letters.  Do you recall that testimony?

A.   Yes, I do.

Q.   And you stated that you did it as a junior associate
for a law firm, and then as you kind of got a couple of
years of experience, you became kind of a supervisor for
younger attorneys; is that fair to say?

A.   That's true, yup.

Q.   Okay.  When you were drafting the legal opinions, what
documents did you rely on?

A.   A number of documents.  So it would start out with bar
association or bar association guidelines on what goes into
an opinion.  It would start out with precedence for previous
opinions that the Court had looked at.  That all sort of
went into the actual form of the opinion.

Q.   All right.  Let me ask you about the corporate
documents.  Did you rely on the corporation, the issuer?

A.   It depends on the opinion, but sometimes, yes.  I would
look at articles of incorporation, bylaws, even directors
minutes.

1    Q.   So when would you rely on -- when you say it depended
2    on the opinion, when would you rely on corporation documents
3    from the issuer?
4    A.   So, I mean, the clearest example is if you're giving an
5    opinion that a corporation is duly formed or that all
6    corporate steps have been taken in order to authorize that
7    transaction, then you have to sort of trace back to make
8    sure there is a corporation.  What do its articles and
9    bylaws say?  Who has the power to act for the corporation?
10   So that might mean tracing back from articles of
11   incorporation to bylaws, all the way to directors minutes.
12   And then there would be a host of other documents that you
13   might look at as well.
14   Q.   All right.  Let's talk about the specifics in this
15   case.  How about when it came to the issuer shares and
16   essentially trying to get restrictions taken off the shares
17   regarding the safe harbor Rule 144, what corporate records
18   at that point from the issuer would be important in your
19   opinion?
20   A.   They would be one of the things that would be
21   important.
22   Q.   Okay.  And also as you stated in your past experience,
23   you were a lawyer doing business transactions and security
24   transactions for a law firm; is that correct?
25   A.   Yes.

1    Q.    You were not a -- the corporation's legal counsel, were
2    you?
3    A.    No, I was not formally general counsel for any
4    corporation.
5    Q.    Were you ever the corporate secretary for a
6    corporation?
7    A.    No, I was not.
8    Q.    You would agree with me that the corporate secretary
9    and the legal counsel for the corporation would have these
10   type of documents -- corporate documents to allow a lawyer
11   to be used to be able to formulate an attorney opinion
12   letter, would you agree?
13   A.    Well, they would have a lot of documents about their
14   own corporation.  They wouldn't necessarily have documents
15   about other corporations, such as corporations investing in
16   them.
17   Q.    Unless they were very closely related.
18   A.    I mean, if they were subsidiaries, they would have
19   those documents.  If they were --
20   Q.    What do you mean by subsidiaries?  What do you mean by
21   that?
22   A.    Well, if we're only -- if we're talking, for example,
23   about Google, and Google had a wholly owned corporation,
24   Google Phone, I would expect that -- the general counsel of
25   Google to know that they had the documents for a wholly

Cross - Gerding

1    owned subsidiary, Google Phone or whatever.

2    Q.   All right.  And you would agree with me the processes

3    of a large corporation and relationships regarding a large

4    corporation are much, much different than when we're talking

5    about microcap companies where there could only be two to

6    three people involved?  Would you agree with me on that?

7    A.   Generally, yes.

8    Q.   Okay.  And especially shell companies that are

9    essentially just companies holding stock, there's a big

10   difference there, too --

11   A.   I don't --

12   Q.   They don't do anything, they don't make anything,

13   they're just, as we've heard in this case, a placeholder.

14   A.   I have seen shell companies, particularly for complex

15   securities agent vehicles where it is pretty complicated to

16   understand what's going on.  And that is an area of my

17   research, securitization --

18   Q.   It's not an area of your research --

19           THE COURT:  Mr. Sibert --

20           THE WITNESS:  It is an area of my research.

21           THE COURT:  Mr. --

22   BY MR. SIBERT:

23   Q.   It is --

24           THE COURT:  Mr. Sibert, let the witness finish the

25   answer.

1          MR. SIBERT:  I just didn't hear the witness.  I
2     apologize.
3          THE COURT:  He wasn't done with his answer.  Let
4     him finish with his answer.
5          Go ahead.
6          THE WITNESS:  So there are companies that are shell
7     companies where the financial transactions involved could be
8     completely legitimate, but also pretty complex.
9     BY MR. SIBERT:
10    Q.   Okay.  Have you reviewed documents in this case?
11    A.   Have I reviewed documents in this case?
12    Q.   Right.
13    A.   I've seen your indictment -- or at least several
14    versions of your indictment.  I have not looked at a lot of
15    factual documents in this case other than the exhibits that
16    I'm seeing your expert witnesses testify to.
17    Q.   So do you know that William Sears and Scott Dittman
18    owned FusionPharm?
19    A.   I wouldn't be able to say that.
20    Q.   Okay.  Did you know Bayside was owned by William Sears'
21    mother?
22    A.   I haven't -- I have no way of knowing that.
23    Q.   So you're not familiar at all with the facts of this
24    case?
25    A.   I'm certainly familiar with what the facts that you've

Cross - Gerding

1    alleged in your indictment and I'm familiar with the

2    exhibits that you presented -- or that your experts have

3    presented.

4    Q.   Okay.  So you've seen two witnesses and you read the

5    indictment.

6    A.   I've read a couple of other documents I think you've

7    offered, sir.

8    Q.   I've only offered one indictment in this case.

9    A.   But you've written several letters.  I think a *James*

10   proffer.  So I've seen several documents, but mainly the

11   indictment is what I've looked at.

12   Q.   So you can't make a comparison based upon your opinion

13   of complex shell companies versus the shell companies that

14   have been used in this case; is that fair to say?

15   A.   I haven't been asked to look at the companies in this

16   case or who owns them or what their share capitalization is.

17   Q.   So there's no way to make a comparison based upon your

18   research and your expertise in that field versus what

19   happened in this case because you haven't reviewed it.  Is

20   that fair to say --

21   A.   I have not been asked to review any of the corporate

22   documents --

23   Q.   -- to make the comparison?

24        THE COURT:  Mr. Sibert, how many times do I have to

25   tell you to let the witness finish his answer?  I'm really

Cross - Gerding

1    getting upset with this.

2            MR. SIBERT:  Okay.  Well, I'm sorry, Your Honor --

3            THE COURT:  Well, stop doing it.

4            MR. SIBERT:  I'm just trying to get him to answer

5    the question.

6            THE COURT:  Stop doing it.

7    BY MR. SIBERT:

8    Q.   Can you make a comparison?

9    A.   If I haven't looked at the underlying documents, the

10   corporate documents in that case, I really can't make a

11   comparison.

12   Q.   Thank you.  You know the term "noise traders," right?

13   A.   Yes, I do.

14   Q.   Okay.  And can you tell me what noise traders are?

15   A.   Noise traders is a concept from finance scholarship.

16   It refers to investors who are trading, making investment

17   decisions, buying and selling, not based on the fundamental

18   information of a company, but, rather, looking at stuff

19   that -- looking at information that has no bearing on the

20   long-term profitability of a company.

21   Q.   So they are usually attracted by the rising share

22   prices; would you agree with that?

23   A.   They -- the finance literature is that they often chase

24   trends.  So they might chase a trend up, they might chase a

25   trend down.

1   Q.   All right.  Well, you wrote an article -- in fact you

2   said it was your first law review article regarding

3   securities regulations, in the School of Law for -- I

4   believe this is the University of -- I'm sorry, I'll give

5   you the title -- the Next Epidemic:  Bubbles and the Growth

6   and Decay of Securities Regulations.

7   A.   That was in the Connecticut Law Review.

8   Q.   In the Connecticut Law Review.  There are symbols, NM.

9   I'm not sure why.

10  A.   I think -- I used to teach at the University of

11  New Mexico, so maybe you downloaded it off the New Mexico

12  website.

13  Q.   That's why I couldn't figure out, it was a Connecticut

14  Law Review.

15       But you stated in there that essentially noise

16  traders are attracted by rising prices, enter the market,

17  and begin bidding prices even higher.  So you would agree

18  with me that noise traders are attracted by rising share

19  prices.

20  A.   Yes.  Some noise traders are very much attracted to

21  higher prices and they will chase that.

22  Q.   And a lot of times this is after investors with

23  superior information make gains causing the share prices to

24  rise; is that right?

25  A.   Yes, so noise traders are not following the actual --

1    the idea is they're not actually following what's going on

2    with the company, so they're not necessarily following the

3    financials of a company, they're not necessarily following

4    any of the data or information about what we would think an

5    investor would rationally look at.  Is this company going to

6    be profitable or is it not going to be profitable in the

7    long run?

8    Q.   They're following a trend share price setting, "Hey,

9    this share's going up, I want to buy it and get on the

10   train."

11   A.   That's often the case.

12   Q.   Okay.  So insider investors that have the inside

13   information that essentially influenced the market by the

14   practice of knowing what's going to happen, can cause more

15   volume increase based upon noise traders following their

16   lead when they're trying to manipulate the market and cause

17   the price to go up.  Would you agree with that?

18   A.   It's not just insiders.  I mean, lots of parties,

19   whether -- what financial literature calls smart money --

20   could anticipate what noise traders are doing.  It's not

21   necessarily always illegal.

22            If you can anticipate what a noise trader is going

23   to do -- if you can anticipate that there's a certain herd

24   behavior that's starting, and either you have inside

25   information or you're just a smart person, you can

1    essentially trade ahead of the herd.

2    Q.   And so, in fact, even your law review article, you talk

3    about pump-and-dumps.  Do you recall your section about

4    pump-and-dumps in your law review article?

5    A.   Yes.  So pump-and-dumps are a scheme that --

6           MR. SIBERT:   Your Honor, I'm -- that's not my

7    question.

8           THE WITNESS:   Sorry.

9           MR. SIBERT:   I asked him if he recalled in his

10   article about pump-and-dumps.  I don't want to interrupt the

11   witness and have the Court yell --

12          THE COURT:   I agree.  I agree.  Go ahead with your

13   next question.

14   BY MR. SIBERT:

15   Q.   My question --

16          MR. SIBERT:   I would like the witness to answer my

17   first question.

18          Do you recall writing about pump-and-dumps in your

19   law review article to the University of Connecticut Law

20   Review?

21   A.   Yes, I do.

22   Q.   Okay.  And essentially you describe a pump-and-dump as

23   a group of stockholders publicly touting the basis

24   prospectus of a company and then secretly, secretly, selling

25   their shares as the stock rises.  Is that how you'd term a

1    pump-and-dump?

2    A.    Yes.

3    Q.    So secretly, being secretive, hiding information, is

4    important -- would you agree with me -- when it comes to the

5    pump-and-dump?

6    A.    Yeah, if you're disclosing what you're doing, the

7    market knows about it, it can't be fraudulent.

8    Q.    Right.  So disclosures are very important; would you

9    agree with me?

10   A.    Disclosures are incredibly important in the securities

11   laws.

12   Q.    And based upon your expert opinion, disclosures have to

13   be, what?

14   A.    I'm not sure I understand.

15   Q.    You would agree with me they have to be honest,

16   truthful; is that correct --

17   A.    I am --

18   Q.    -- about the company.

19   A.    Yes.

20   Q.    About the directors and officers -- has to list

21   honestly who the directors and officers are; would you agree

22   with me?

23   A.    Yes.

24   Q.    In fact, when you were doing your opinion letters,

25   other attorneys in your firm, when you were junior, relied

1    on what you wrote in the opinion letter to be correct and

2    truthful.

3    A.    Well, I was junior and then I stayed there for eight

4    years, but people were relying on each other in terms of

5    doing high-quality work.  You still had to ask people, "What

6    work did you do?  Did you do X, Y and Z?"

7         Because, ultimately I was concerned that people

8    were judging my work and I didn't want to say, "Well, I

9    just" -- I didn't want to sort of hang out a junior lawyer

10   to dry.  And I would hope that the partners who ultimately

11   signed the letters had that same attitude and they took

12   personal responsibility for this.

13   Q.    Did you ever -- did you ever put untruthful statements

14   in your opinion letters?

15   A.    No.

16   Q.    Were you ever banned from writing opinion letters by

17   any of the markets?

18   A.    No.

19   Q.    In fact, even in this law review, do you recall who you

20   quote as having an excellent understanding of the new SEC

21   regulations after the 1920 crash?

22   A.    That I have an excellent understanding?

23   Q.    Yes --

24   A.    The SEC regulations after the 1920 crash, the SEC

25   actually took quite a bit of time to actually start drafting

Cross - Gerding

1    regulations.  So we had the 1933 Act, the 1934 Act, and a

2    host of other securities laws.

3         But the SEC's rule-making process didn't actually

4    get up and running, based on my memory, for a bit

5    thereafter.

6    Q.   In fact, you even quoted Professor Thel in your law

7    review article, didn't you?

8    A.   Yes, I did.

9    Q.   And you cited saying that he provided what's

10   essentially a excellent recap of why the SEC went forward

11   with these new regulations to prevent fraud; is that fair to

12   say?

13   A.   Yes.

14   Q.   And, sir, even in your law review, you define

15   essentially what is material based upon the Supreme Court

16   when it comes to an investor.  And you would agree the fact

17   is that it's material if there's a substantial likelihood

18   that its disclosure would have been viewed by a reasonable

19   investor as having significantly altered the total

20   misinformation made available.

21   A.   Right.  That's in the basic opinion, if you're going to

22   ask me about that, in *TSC v. Northway.*

23   Q.   Okay.  So something that can alter an investor's

24   opinion can be considered material?

25   A.   Well, you have to go through all of the elements of

1    materiality.  There has to be a likelihood it has to have

2    significantly been a factor, and then there's a total mix

3    standard.  So it's a little bit more complicated than that.

4    Q.   Well, in your article, you even talk about the SEC

5    being overburdened, don't you?

6    A.   At that point, they were.

7    Q.   All right.  And so now they were overburdened and

8    basically doing regulations when it came to a rising stock

9    market; would you agree with that?

10   A.   So, I mean, in that article, which was looking at, I

11   believe, the late 1990s, and the beginning of 2000, I was

12   focused on SEC enforcement actions and not SEC rulemaking.

13   Q.   Okay.  So the enforcement of the SEC, though, was

14   overtaxed, would you agree with that?

15   A.   Yes, I would.

16   Q.   Okay.  And so that's because there was a lot of

17   increase in stock activity, the market was high, and,

18   therefore, the incentive to go ahead with these regulations

19   wasn't looked too fondly on, and also there was a lot of

20   fraud going on and chances of getting caught just wasn't

21   that high.

22   A.   So, I mean, the basic story was a little bit different.

23   The basic story was that the SEC's budget remained

24   relatively flat and that the market volume -- the volume of

25   transactions in that period -- and I frankly don't remember

1    when that period ended, sir -- in my study, but I believe

2    the article was 2006 or 2007 it was published, I might be

3    wrong about that.

4         Going back to the original story, the SEC's budget

5    remained relatively flat.  The market volume -- the sheer

6    number of transactions increased.  And I should say that I

7    do remember that the period I was looking at was the tech

8    stock bubble, so this was the late 1990s up until the

9    collapse of the tech stock bubble in roughly 2000, 2001.

10   Q.   But essentially now you're -- you're testifying on

11   behalf of the defendant regarding security fraud.  So what

12   you're writing about being overburdened, now you're

13   assisting on the other side.  You agree with me on that,

14   correct?  The enforcement was overburdened and now you're

15   testifying on the other half.

16   A.   Well, I'm not --

17        MR. BARNARD:  Your Honor -- Your Honor, I object.

18   I think that's misleading.

19        THE COURT:  I'll let him answer.  Then I need to

20   take an early morning recess, Mr. Sibert, so we'll let

21   you --

22        MR. SIBERT:  I'll move on, Your Honor.

23        THE COURT:  Well, if you're going to move on from

24   that, let me take an early morning recess and then you can

25   continue your cross-examination --

2412
Cross - Gerding

1          MR. SIBERT:  All right.  Thank you, sir.

2          THE COURT:  -- on the other side of the recess.  We

3   will be in recess for 15 minutes.

4          (Jury left the courtroom at 10:10 a.m.)

5          THE COURT:  Professor, since you're in the middle

6   of your testimony, I direct you not to speak with any of the

7   lawyers while the Court is in recess.

8          (Recess at 10:11 a.m.)

9          (Jury entered the courtroom at 10:34 a.m.)

10         THE COURT:  Professor, I remind you that you remain

11  under oath.

12         Mr. Sibert, you may resume your cross-examination.

13         MR. SIBERT:  All right.  Thank you, Your Honor.

14  BY MR. SIBERT:

15  Q.   Sir, essentially would you agree with me that if

16  there's no agreement in December 2011 regarding the note --

17  A.   I'm sorry, what?  I don't understand.

18  Q.   Okay.  Let me try to phrase the question so you'll

19  understand it.  If you don't understand, let me know.

20  A.   Okay.

21  Q.   If there is no agreement for a note on December 8th,

22  2011, no agreement at all, and then sometime in November

23  2012, an agreement is made for a note, but then the

24  agreement for the note in 2012 is backdated to December 8th,

25  2011, that would be fraud.

Cross - Gerding

1   A.   It would certainly be inappropriate.  I mean, so the

2   only way that that is -- it's always sloppy, but the way in

3   which it's legitimate is if you are memorializing a

4   transaction that already happened.

5   Q.   Right.  And as I stated to you, there's no agreement or

6   transaction in December 8th --

7   A.   No, I understand no agreement --

8   Q.   Nothing.

9   A.   I would agree with that.

10  Q.   So you would agree the fact that it was created in 2012

11  and backdated, that would be fraud?

12  A.   It could be, yes.

13  Q.   All right, sir, now, you stated you can't really

14  offer -- or weren't hired to offer an opinion in this case;

15  is that correct?

16  A.   What, about my opinions?

17  Q.   Regarding the facts of this case.

18  A.   I -- yes, I have not done a lot of factual

19  investigation other than looking at the exhibits that your

20  Government --

21  Q.   So because Professor Thel reviewed documents and looked

22  at the documents in this case, and made an opinion about the

23  essential role that Mr. Guy Jean-Pierre had based upon the

24  facts of this case, you can't disagree with him; is that

25  correct?

Cross - Gerding

1    A.   I haven't looked at the same materials that he has, so

2    I can't offer an opinion one way or another.

3    Q.   So, therefore, you can't disagree with him either.

4    A.   No.

5    Q.   All right, sir.

6          Can I please have Government Exhibit 219 published,

7    page 71.

8          Have you ever seen this document?

9    A.   I don't believe so.

10   Q.   Okay.  Do you know what this document is, based upon

11   looking at it?  If you need the hard copy, could I ask the

12   courtroom deputy to assist me, please.  Thank you.

13   A.   Yeah, I can't read it.  It's real fuzzy on my screen.

14   Q.   While she's getting that document, instead of wasting

15   time, let me ask you a question.  What was your billable

16   rate when you were drafting opinion letters?

17   A.   Well, I practiced for eight years, so my billable rate

18   varied quite a bit.

19   Q.   Okay.  Tell me the variation.

20   A.   Sorry?

21   Q.   Tell me the variation.

22   A.   I believe it went from $200 an hour up to 750.

23   Q.   So 200 to $750 an hour?

24   A.   Right.

25   Q.   Okay.  Can you look at document 219, page 71.  Do you

Cross - Gerding

1    recognize what that document is now?

2    A.   It looks like an opinion letter to the OTC, the

3    Over-the-Counter Markets.

4    Q.   Okay.  Can I have page 2 of that document.

5         Can you read the first sentence on page B.

6    A.   Page 2?

7    Q.   Excuse me, page 2, paragraph B.  Can you read the first

8    sentence.

9    A.   That's not corresponding to what I have here.  Like I

10   don't have an A, B, C, D, on this.

11   Q.   You might have to look at page 3.  Sometimes what's on

12   the computer doesn't line up to what the computer has.

13   A.   There are -- what's on my screen is not what's in front

14   of me.  But I can read what's on the screen, if you'd like.

15   Q.   Give me a minute, sir.  Are you on Government Exhibit

16   219, page 72 at the bottom?

17   A.   I'm on 219, it says Exhibit 219, there's page 1, 2, and

18   3.  But what's on my screen is not -- does not seem to

19   correspond to what's in this letter.

20   Q.   All right.  Government Exhibit page 219.  If you look

21   at the bottom page number, there should be a 272.

22   A.   I have 810, 811, 812, 813.  I'm not trying to be

23   difficult.  I'm --

24   Q.   No.  That's --

25   A.   Oh, I'm sorry.  I -- on page 6.

Cross - Gerding

1    Q.   No, center page -- can I assist the -- can I get the

2    page for the witness?

3              THE COURT:   Can you what?

4              MR. SIBERT:   Can I get the page for the witness?

5              THE COURT:   What?

6              MR. SIBERT:   Can I get the page for the witness?

7              THE COURT:   I don't understand your question.   Why

8    don't we ask Ms. Frank to assist the witness.

9              MR. SIBERT:   I'm just asking for Government

10   Exhibit -- bottom of the exhibit is 72.

11             THE COURT:   He's obviously having trouble finding

12   these documents -- these documents have sometimes triple

13   document indication numbers on them, so . . .

14             THE WITNESS:   Okay.   Sorry, I have it now.

15   BY MR. SIBERT:

16   Q.   Okay.   So you have page 72 of Government Exhibit 219.

17   A.   Yes.

18   Q.   All right.   Can you read the first sentence of B.

19   A.   B as in boy?

20   Q.   Yes, sir.

21   A.   "We have relied on representations of the

22   representatives of the Company that (i) the shareholder is

23   not now (nor has ever been such at any time during the 90

24   days preceding the date hereof) an affiliate or control

25   person of the Company; and (ii) the converted shares

1    represent less than one" -- and it says "10 percent of the"
2    -- I'm not sure what that means -- "of the total number of
3    shares of the Company issued and outstanding."
4    Q.   So you would agree with me at least the signer of this
5    letter is stating that he or she relied upon the
6    representations of the representatives of the company; would
7    you agree with me on that?
8    A.   Yes, that's what it says.
9    Q.   Okay.  Thank you.  Can I have that down, please.
10        MR. SIBERT:  That's all I need from that document,
11   Your Honor.
12        THE COURT:  Okay.
13   BY MR. SIBERT:
14   Q.   Can you shut that binder, please, sir.
15   A.   Sure.
16   Q.   Did you know before testifying that Mr. Guy Jean-Pierre
17   was the corporate secretary and legal counsel for
18   FusionPharm?
19   A.   I've heard you assert that in court, but I don't have
20   any independent knowledge of that.
21   Q.   And then as you stated in your law review -- and you
22   would agree with this statement -- that investors fear being
23   defrauded by issuers, which would mean companies.
24   A.   Uhm-hum.
25   Q.   Broker dealers, exchanges, or other market

1    intermediaries, or that the investments odds are otherwise

2    rigged, that investors will no longer invest in the stock

3    market.  You would agree with that statement?

4    A.    I think there might have been an "if" somewhere in that

5    sentence.  But, yeah, I think if -- if investors fear that

6    they are being manipulated, I think investor confidence in

7    stock markets is a serious concern of mine.

8    Q.    And that would include being defrauded by companies, or

9    otherwise known as issuers, correct?

10   A.    Right.

11         MR. SIBERT:  Thank you, Your Honor.

12         THE COURT:  All right.  Redirect.

13         MR. BARNARD:  I have no questions, Your Honor.

14         THE COURT:  All right.  May this witness be excused

15   for the defendant?

16         MR. BARNARD:  Your Honor, we are going to ask that

17   he be not excused yet depending upon whether or not

18   Professor Thel testifies on -- what -- so that he can --

19   excuse me.  I have no objection to him being excused, but I

20   would request that he be permitted to remain here to advise

21   me with regard to any testimony about Professor Thel if he

22   is going to testify in rebuttal.

23         THE COURT:  Okay.  Since there's not going to be a

24   surrebuttal, he is being excused as a witness, but you're

25   asking that he remain -- be allowed to remain in the

1      courtroom --

2                 MR. BARNARD:  Yes, Your Honor.

3                 THE COURT:  -- to assist you for the rebuttal

4      witness?

5                 MR. BARNARD:  That is what I was trying to request.

6                 THE COURT:  All right.  May this witness be excused

7      for the Government?

8                 MR. SIBERT:  Yes, Your Honor.  And the Government

9      does not anticipate calling Professor Thel again to the

10     stand in a rebuttable case.

11                THE COURT:  Okay.  All right.  All right.

12     Professor, thank you for your testimony.  You may step down.

13                All right.  The defendant may call his next

14     witness.

15                MR. BARNARD:  Your Honor, the defense rests at this

16     time.

17                THE COURT:  All right.  Does the Government have

18     rebuttal evidence it wishes to put on?

19                MR. SIBERT:  No, Your Honor.

20                THE COURT:  All right.  Well, you've concluded the

21     testimonial part of this case hours earlier than I had been

22     told.  So is there going to be any additional motions from

23     the defendant?  Mr. Barnard or Mr. Goodreid?

24                MR. GOODREID:  No, Your Honor.

25                THE COURT:  All right.  All right.  So, folks, at

this point, the lawyers and I have a lot of work to do with respect to finalizing jury instructions that are going to govern your deliberations in this case, and we have to discuss a number of other matters. So we're looking at sometime this afternoon for you coming back into the courtroom, and I'm going to read to you the jury instructions at that time. I don't know exactly right now. I can't predict with any precision how long it will take us, the lawyers and I, to get through the jury instructions and the other matters.

I would say safely I'll -- I'll allow you to leave the building if you'd like. You can go -- then go to lunch, as long as you're back -- I would say in the courtroom by -- or in the jury deliberation room by 1:00. I think we should -- we should be -- we should be doing well at that point. And we'll get back to you as soon thereafter as possible.

So the jury is released until 1:00.

(Jury left the courtroom at 10:46 a.m.)

MR. SIBERT: Your Honor, may I excuse Professor Thel?

THE COURT: Yes, you may.

MR. SIBERT: Thank you. I appreciate that.

THE COURT: All right, let's talk about the final arguments. If it were up to the lawyers, how much would you

1      like for closing argument?  Mr. Sibert or Mr. Brown?  I
2      don't want to presume who's going to do the closing.
3              MR. SIBERT:  I would like Mr. Brown to, he just
4      won't do it, Your Honor.
5              THE COURT:  Well --
6              MR. SIBERT:  You know, Your Honor, you know what I
7      feel about time, I've already kind of irritated the Court
8      before.  If the Court is going to be lenient on time, I
9      would ask for more time than 75 minutes, but I don't want to
10     irritate the Court anymore.  I'm just going off of what the
11     Court said yesterday.
12             THE COURT:  All right.  For the defendant.
13             MR. BARNARD:  30 minutes is sufficient.
14             THE COURT:  30.  Okay.  Now, you know, we're
15     talking about just maximum.  So just because I said a
16     certain amount doesn't mean you need to do anything like
17     that.
18             I will give each side up to 75 minutes for their
19     closing arguments, which we will do tomorrow morning, as I
20     represented to you.  Although everything got done so fast
21     this morning -- are you -- let me ask this:  Are counsel
22     prepared to do closing arguments this afternoon?  Mr.
23     Sibert?
24             MR. SIBERT:  No, Your Honor.
25             THE COURT:  No?  Okay.  So I will -- I made that

1    representation to you and I'll honor that.

2              MR. SIBERT:  Thank you.

3              THE COURT:  All right.  How much of the 75 minutes

4    do you wish to reserve for your rebuttal?

5              MR. SIBERT:  I guess as much as I can.  It's

6    two-thirds and if my math is --

7              THE COURT:  So one-third -- one-third is the

8    maximum you can reserve --

9              MR. SIBERT:  Okay.

10             THE COURT:  -- on rebuttal.  One-third of 75 is

11   25.

12             MR. SIBERT:  I'll reserve 25 minutes.

13             THE COURT:  So you know this, having done trials

14   before me.  So just so all counsel are aware, that if you

15   take -- for example, in that division 50 and 25, if you take

16   48 minutes, Mr. Sibert, that doesn't mean that you have 27

17   minutes in rebuttal.  You can never have more than 25.  So

18   we'll do 50 and 25.

19             Have you given thought to how much of a warning you

20   would like for each segment of your closing argument?

21             MR. SIBERT:  Your Honor, just a -- can I have a

22   five-minute warning on the first part of the closing and

23   again a five-minute warning on the rebuttal?

24             THE COURT:  All right.

25             MR. SIBERT:  Thank you.

1           THE COURT:  All right.  Ms. Frank, make a note of
2      that, five minutes.
3           Who's going to be doing closing argument for the
4      defendant?
5           MR. BARNARD:  Your Honor, I will be doing the
6      closing.  And --
7           THE COURT:  All right.  Doesn't sound like you're
8      going to be coming close to your 75 minutes, but just in
9      case you did get -- you do get a little loquacious on us,
10     how much of a warning do you want --
11          MR. BARNARD:  Five minutes.
12          THE COURT:  Five minutes as well.  All right.
13          All right.  At this time, we're going to go through
14     the --
15          MR. GOODREID:  Your Honor.  May I bring up another
16     timing issue?
17          THE COURT:  Yeah.
18          MR. GOODREID:  Belabor you with my personal
19     problems, but I've been dealing with a painful left foot for
20     the duration of this trial.  Hoping to see a doctor.  So I
21     wondered if after closing arguments, if the Court would
22     permit me to make a doctor's appointment, go to the
23     appointment, even if that were to -- I mean, if the verdict
24     were to come back, Mr. Barnard can certainly handle that or
25     any questions.

1              THE COURT:  Yes.  I have no problem with that.

2              Does the Government have any objection?

3              MR. SIBERT:  I have been waiting for this, Your

4    Honor.

5              No.  No, I don't have a problem.  Actually I have a

6    interview tomorrow I was hoping to make by 1:30, but no, I

7    don't.  Absolutely not.

8              THE COURT:  All right, sure.  We'll -- obviously as

9    long as one counsel is present, that's all we need.

10             MR. GOODREID:  Thank you, Your Honor.

11             THE COURT:  Sure.  All right.

12             We're going to go through the exhibits.  Since the

13   defendant has no exhibits, we will go now through, Ms.

14   Frank, record of what exhibit -- which exhibits have been

15   admitted into evidence and then we'll see if that comports

16   with the parties' records.

17             Are we ready on the Government side?

18             MR. SIBERT:  Your Honor, yes.  And based upon the

19   instruction of the Court, I'm going to ask that could we

20   just go somewhat a little bit slower than usual?

21             THE COURT:  Okay.  Sure.

22             MR. SIBERT:  Thank you.

23             THE COURT:  Are we ready to proceed, though?

24             MR. SIBERT:  I am, Your Honor.  Thank you.

25             THE COURT:  Okay.  Is the defendant ready to

1     proceed?

2             MR. BARNARD:  Your Honor, we are prepared to

3     proceed with regard to the exhibits.

4             When it comes to the jury instructions, just a very

5     brief break --

6             THE COURT:  We're not done with the jury -- you

7     guys told -- you first told me you were going to take four

8     hours, then you told me you were going to take two hours,

9     and then you ended up taking like 40 minutes.  So I -- we

10    relied on your representation as to how much time you're

11    going to put -- so the fact of the matter is I'm not done

12    finalizing the jury instructions back in chambers.  So

13    you're going to sit tight here for quite a while until I --

14    we come out with the instructions.

15            MR. BARNARD:  And I wasn't ready either.  That's

16    what I was -- that's fine.

17            THE COURT:  Okay.  All right.

18            MR. BARNARD:  Yes.

19            THE COURT:  So, Ms. Frank, we'll go through it and,

20    per Mr. Sibert's request, if you do so slowly, please.

21            COURTROOM DEPUTY:  Okay.  Admitted exhibits:  1,

22    1-A, 1-B, 2-A through 2-D, 2-E, 2-F, 5-A, 5-B, 8, 9, 10

23    through 15, 17, 18 --

24            MR. SIBERT:  Can you slow down a little bit,

25    please?

1          COURTROOM DEPUTY:  19, 19-A through C.  20 through

2     24, 25 through 34.  35 through 37, 40, 41, 47.  Exhibit 52

3     with duplicative pages removed, which are pages 3, 4, 7, 8,

4     11 through 18, and 37 through 72 removed.

5          THE COURT:  Okay.

6          COURTROOM DEPUTY:  53 through 57, 60, 61 through

7     63, 65 through 67, 69, 70, 71 through 78, 79 through 82, 84,

8     85, 90, 91 through 93, 97, 100, 101, 106 through 109, 110,

9     111, 114 through 117, 120 through 124, 126, 127, 129, 131 --

10          MR. BARNARD:  Excuse me.  Could you hold on for a

11     second?

12          COURTROOM DEPUTY:  Uhm-hum.

13          MR. BARNARD:  I'm sorry, could you resume at 129?

14          COURTROOM DEPUTY:  Yes.  129, 131, 133 through 135,

15     136, 138 through 142, 143, 144, 150 through 152, 154, 155,

16     156, 158 through 165, 166 through 173, 174 through 181.  182

17     through 184, 186, 186-A through 186-H, 187, 187-A through

18     187-D, 188 through 191.  191-A, 192, 192-A, 192-B, 193,

19     193-A, 194 through 195, 195-A through 195-E, 196, 196-A,

20     197, 197-A, 197-B, 198 through 201, 201-A through 201-C,

21     202, 202-A through 202-C, 203, 203-A through 203-D, 204,

22     205, 205-A through 205-B, 206, 206-A through 206-C, 207

23     through 209, 209-A through 209-D, 210, 210-A, 210-B, 211,

24     211-A, 211-B, 212, 212-A, 212-B, 213 through 214, 215, 215-A

25     through 215-D, 216 through 219, 220, 225 through 230, 235,

1    236 through 240, 242, 243 through 247, 249 through 251, 252

2    through 259, 260, 262 through 263, 265 through 266, 268, 269

3    through 275, 284, 286 through 289, 290 through 292, 294

4    through 299, 300, 301 303, 309 through 314, 315, 316, 320-A

5    through 320-M, 321-A -- oh, sorry, strike that.  Not 321.

6              THE COURT:  Hold on.  Why don't you back up a

7    couple, Ms. Frank.

8              COURTROOM DEPUTY:  Sorry, not 321-A.  It has not

9    been admitted.

10             MR. BARNARD:  320-M was, M as in --

11             COURTROOM DEPUTY:  320-M, as in Matt.

12             THE COURT:  I think you can go ahead.

13             COURTROOM DEPUTY:  322-A through 322-R, 323 through

14   328, 329, 330 --

15             MR. SIBERT:  Can you slow down.  I'm sorry.

16             COURTROOM DEPUTY:  350, 351-A through 351-H, 357,

17   358-A through 358-N, 360, 361, 362, 363-A through 363-I, 365

18   through 367, 370, 372, 372-A through 372-F --

19             MR. BARNARD:  Oh.

20             MR. SIBERT:  Your Honor, I don't have 372 --

21             THE COURT:  We'll go -- once she's done, we'll go

22   back and --

23             MR. SIBERT:  Okay.

24             THE COURT:  -- you'll let me know what doesn't

25   comport with your records.

1          MR. BARNARD:  I'm sorry, that was through 372-F?

2          COURTROOM DEPUTY:  Yes.

3          MR. BARNARD:  Is that where we are?  Okay.

4          COURTROOM DEPUTY:  And, sorry, since Mr. Sibert

5     brought it up, I misspoke.  372 is not admitted.  I

6     apologize.

7          THE COURT:  All right.

8          COURTROOM DEPUTY:  372-H through 7 -- 372-M, 372-P

9     through 372-Y, 372-Z, 372 --

10          MR. BARNARD:  Wait, wait, wait one second.  Okay.

11          COURTROOM DEPUTY:  372-AA through 372-ZZ.  372 --

12          MR. BARNARD:  Wait.

13          COURTROOM DEPUTY:  372-AAA through 372-PPP.  374,

14     pages 304 through 305 only.  380, 381, 382 through 385, 387,

15     388, 389-A through 389-D, 390 through 392, 393 through 400,

16     404, 406, 407, 408-A through 408-G.  409 was for

17     demonstrative purposes only.  410-B through 410-K, 410-N

18     through 410-P, 411.  429 was the declaration.  Only the

19     paper copy is to go back to the jury, not the CD.  432, 433,

20     434 through 437, 444.  And that's it.

21          THE COURT:  Okay.  Maybe we should have had a list

22     of what didn't get in.  All right.

23          Does that list comport with the Government's

24     records?

25          MR. SIBERT:  Your Honor, I need a minute.  I've got

2429

1       a couple of questions, I've just got to go find . . .

2                   THE COURT:  All right.

3                   MR. SIBERT:  Mr. Barnard, I just got a couple of

4       questions.  Are you ready?

5                   MR. BARNARD:  No.

6                   THE COURT:  See, that's why you lawyers need

7       paralegals to handle -- when I've had trials with the

8       paralegals doing this, it goes 10 times faster.

9                   All right.  What does the Government have to say?

10                  MR. SIBERT:  372-G we have in.  I didn't hear it.

11                  THE COURT:  372-G.

12                  COURTROOM DEPUTY:  I do not have it.  Let me -- I

13      have two lists.

14                  MR. BARNARD:  Your Honor, I had 372-G also as

15      admitted.

16                  THE COURT:  All right.

17                  COURTROOM DEPUTY:  Okay, yeah, actually I have two

18      lists and that was in with Ms. Funk, so . . .

19                  THE COURT:  That was what?

20                  MR. BARNARD:  It was in with Ms. Funk.

21                  THE COURT:  Okay.

22                  MR. SIBERT:  I just want to make sure.  I have 372

23      Q as in Qbert.  I also have that in.

24                  THE COURT:  As in what?

25                  MR. SIBERT:  Qbert.

1           THE COURT:  Is that a word or --

2           MR. SIBERT:  Qbert --

3           THE COURT:  What is that?

4           MR. SIBERT:  It's a game.  Way back.  Qbert.

5           THE COURT:  Whatever.  Okay.

6           MR. SIBERT:  Way before your time, Judge.  Way past

7   your time, I should say.

8           THE COURT:  After, right.

9           COURTROOM DEPUTY:  I believe I read that into the

10  record, 372-P through Z.

11          MR. SIBERT:  Okay.

12          MR. BARNARD:  Do you have through -- I didn't have

13  Q marked as well.

14          COURTROOM DEPUTY:  Q was Mr. Sears.

15          MR. SIBERT:  You have 200-A through C in; is that

16  correct?

17          MR. GOODREID:  What number?

18          MR. SIBERT:  200-A, alpha, 200-B, bravo, 200-C,

19  Charlie.

20          COURTROOM DEPUTY:  Correct.

21          MR. SIBERT:  That's all we have, Your Honor.

22          THE COURT:  All right.  Does Ms. Frank's records

23  comport with the defendant's records?

24          MR. BARNARD:  Unfortunately, no.  There are a

25  number of blanks that I have.  I did keep good notes and if

1    I could have maybe five minutes or so, or a few minutes to
2    see if there's anything that my notes would not show
3    comport.  And part of what I'm looking at, for example,
4    there's a section of like 20 of them that were right in a
5    row, and I suspect if I can just look, I believe it was
6    Agent Funk had the testimony, that would clear that up for
7    me in a moment.
8              I think we might have just failed to --
9              THE COURT:  Well, why don't you just tell us what
10   you think is in that Ms. Frank did not read and then we'll
11   see what the Government's records are and --
12             MR. BARNARD:  Okay.  To begin with, I had 122 not
13   being in.
14             THE COURT:  122.  Okay, let's hold on there.  What
15   does the Government have on 122?
16             MR. SIBERT:  I have that admitted through
17   Scottsdale, Mr. Cruz.
18             THE COURT:  Mr. Cruz.  Is that in?  Yes.  Okay.
19             COURTROOM DEPUTY:  Mr. Cruz.
20             THE COURT:  Through Mr. Cruz.
21             MR. BARNARD:  All right.  And Mr. Goodreid just
22   confirmed that one.
23             THE COURT:  All right.  That's why we do this.
24             MR. BARNARD:  Then the long string that I didn't
25   have was 158 through 166.

2432

1          THE COURT:  That you do not show it in your
2     records?
3          MR. BARNARD:  That I don't show in my records,
4     correct.
5          THE COURT:  Right.  What does the Government show?
6          MR. SIBERT:  I have all of those in through Mr.
7     Sears.
8          THE COURT:  All right.
9          MR. BARNARD:  And, Your Honor, I'm looking at what
10    they are.  I believe they -- I recall those now.
11         THE COURT:  Okay.  All right.
12         MR. BARNARD:  And 229 I don't have in.  It's an
13    e-mail from Sears to Duke dated 3-23-12.
14         THE COURT:  What does the Government show?
15         MR. BARNARD:  I'm sorry -- yeah, 229.
16         MR. SIBERT:  Yes, Your Honor.  I have that
17    through -- I have that in through Mr. Duke on his testimony
18    on the 23d.
19         THE COURT:  Ms. Frank, is that what you have?
20         COURTROOM DEPUTY:  I have 229 through Mr. Sears on
21    the 14th, so . . .
22         THE COURT:  Okay.
23         MR. SIBERT:  I actually --
24         MR. GOODREID:  And we don't have it at all.
25         MR. SIBERT:  We have that as well.  William Sears'

1    testimony.

2            THE COURT:  All right.  Are you satisfied, Mr.

3    Barnard?

4            MR. BARNARD:  Yes, Your Honor.

5            THE COURT:  Okay.

6            MR. BARNARD:  254.

7            THE COURT:  What about it?

8            MR. BARNARD:  I don't have that in.

9            THE COURT:  You do not have it in?  What does the

10   Government show?

11           MR. SIBERT:  I have that in through Mr. Sears.

12           THE COURT:  Ms. Frank?

13           COURTROOM DEPUTY:  That I have as well, Your Honor.

14           THE COURT:  Okay.

15           MR. BARNARD:  That's fine.  And I don't have 372-B

16   or C in.  Those are e-mails from Sears to Mr. Jean-Pierre

17   in --

18           THE COURT:  Are those the only 372s you don't have

19   in, because there were 60 or 70 of them because we got into

20   triple letters.

21           MR. BARNARD:  From 372 I don't show 372-B, as in

22   boy, C as in Cliff, M as in Mary, or Q as in the

23   quintessential.

24           MR. GOODREID:  Not Qbert?

25           MR. BARNARD:  Or II.  Or MM.

```
 1              THE COURT:  All right.  That's why I want to get
 2    all your 372s.
 3              MR. BARNARD:  And OO, PP, RR, TT, YY, GGG, and PPP.
 4    Apparently I wasn't taking good notes that period.
 5              THE COURT:  All right.  Let me hear from the
 6    Government.
 7              MR. SIBERT:  So for the single digit, I have
 8    everything but --
 9              THE COURT:  Single letters?
10              MR. SIBERT:  Yes, sir.  Except for N, as in
11    November, O.  Those are the only ones I don't have in.
12              THE COURT:  That you do not have in.  372-N.  So
13    let's stick with the single letters.
14              MR. SIBERT:  372-N and O.
15              THE COURT:  N and O.
16              MR. SIBERT:  Yes, sir.
17              MR. BARNARD:  Oh, I'm sorry --
18              COURTROOM DEPUTY:  I don't think those were ones
19    that Mr. Barnard listed.  But if we're just doing single
20    letter 372 that have not been admitted --
21              MR. BARNARD:  I'm sorry, I --
22              THE COURT:  Hold on, let her finish.
23              MR. BARNARD:  372-G was not admitted, 372-N was not
24    admitted and 372-O was not admitted.
25              THE COURT:  Okay.
```

2435

1          MR. SIBERT:  We just went through G.

2          THE COURT:  Huh?

3          MR. SIBERT:  We just went through G.  That was one

4     of the questions I had.

5          COURTROOM DEPUTY:  Oh, sorry.  I apologize.  I was

6     going through -- it's on my other chart.

7          THE COURT:  Okay.  You need to check on both.

8          COURTROOM DEPUTY:  Yes, I will update both.

9          THE COURT:  All right.  So -- all right.  So on the

10    Government's records of the single letters of 372, the only

11    exhibits that are not in are N and O; is that accurate?

12         MR. SIBERT:  That's right, Your Honor.

13         THE COURT:  All right.  Ms. Frank, does that

14    comport with your records?

15         COURTROOM DEPUTY:  That's what I have, Your Honor.

16         THE COURT:  All right.  Are you satisfied, Mr.

17    Barnard, that you just weren't taking careful enough notes?

18         MR. BARNARD:  That's fine.

19         THE COURT:  All right.  Let's go to the double

20    letters.  Let's ask it this way:  Which double letters of

21    372 does the Government show not coming in?

22         MR. SIBERT:  None, Your Honor.

23         THE COURT:  None.  All AA through double Z, is that

24    what you have, Ms. Frank?

25         COURTROOM DEPUTY:  That's correct.

1            THE COURT:  All right.  All right.  And then do you

2       want to press the issue on any of those, Mr. Barnard?

3       Because we can get more specifics on who it came in through

4       if you want.

5            MR. BARNARD:  No, Your Honor.  I'm satisfied with

6       regard to the double lettered 372s.

7            THE COURT:  Okay.  So it's 372 triple letters.  Per

8       the Government, which did not come into evidence?

9            MR. SIBERT:  None, Your Honor.

10            THE COURT:  None.  Okay.  Triple A through triple

11       Z, or at least when the triple letters ended.

12            Ms. Frank, what do you have?

13            MR. BARNARD:  And only --

14            THE COURT:  Hold on, hold on.  One at a time.

15            COURTROOM DEPUTY:  The triple letters, 372-AAA

16       through 372-PPP are admitted.  That is all of them.

17            THE COURT:  Okay.  So triple P was the last one.

18            MR. BARNARD:  That's fine.

19            THE COURT:  That's fine.  All right.  Wow.  I lost

20       my train of thought.  Were we still going through more of

21       yours, Mr. Barnard?  Or was that your last one?

22            MR. BARNARD:  410-K, Colorado Secretary of State

23       records for La Dee Da.

24            THE COURT:  You -- what, what about them?

25            MR. BARNARD:  I'm sorry, I don't have that as

2437

1    having come in.

2              THE COURT:  Okay.

3              COURTROOM DEPUTY:  410-K.

4              THE COURT:  What does the Government have?

5              MR. SIBERT:  I have it in, Your Honor.

6              THE COURT:  Through whom?

7              MR. SIBERT:  Stipulation.  I did it outside the

8    presence of the jury.

9              THE COURT:  Oh, okay.  Ms. Frank, what do you have?

10             COURTROOM DEPUTY:  I have that in as well.

11             MR. BARNARD:  No problem.

12             THE COURT:  All right.  Any other exhibits that you

13   have a quarrel with, Mr. Barnard?

14             MR. BARNARD:  No, that's all.

15             THE COURT:  All right.  We're done with that.

16   Okay.

17             As some of you know, my practice on the jury

18   instructions is that when we're -- when I've completed

19   reviewing them and we have our final set, my law clerk will

20   bring out two sets of instructions for both tables.  You'll

21   have 15 minutes to review them and then I'll come out on the

22   bench and we'll start our charging conference.

23             I don't know how long it will be until that is

24   ready, so at least one attorney from each side has to remain

25   in the courtroom during the recess.

1              All right, we'll be in recess until we're ready to
2    start the charging conference.
3              MR. BROWN:  Your Honor, could I bring up one thing?
4              THE COURT:  All right, go ahead.  Have a seat.
5              MR. BROWN:  After the Court's ruling on the Rule 29
6    motion yesterday, sort of --
7              THE COURT:  Why don't you take the lectern so I
8    can --
9              MR. BROWN:  Okay.  After the Court's ruling on the
10   Rule 29 motion last evening, I think both sides weren't
11   entirely sure what -- how to proceed on those elements.  I
12   attempted to draft a revision of the mail fraud and wire
13   fraud jury instructions.  And I didn't file it because I
14   wanted to talk to defense first.
15             THE COURT:  Okay.
16             MR. BROWN:  I have a hard copy if the Court wants
17   to at least look at it back in chambers and -- I mean, I
18   don't know if you were going to -- had any intention of
19   changing them after your ruling or not.  But I think I made
20   it simpler.
21             THE COURT:  Of course we were.  Do you think I'm
22   going to just idly do a Rule 29 ruling and then not have the
23   instructions comport with the ruling?
24             MR. BROWN:  No, I was just talking about what I'm
25   capable of knowing, Your Honor.

1              THE COURT:  Okay.  That's a separate question.

2              We've -- I got a note here from Mr. Hawkins that

3       we're already done revising those.  Thank you for the offer,

4       in any event.

5              Anything else from the Government before I take our

6       recess?

7              MR. BROWN:  No.

8              THE COURT:  For the defendant?

9              MR. BARNARD:  Yes, Your Honor.  Mr. Jean-Pierre

10      would request that he be excused from the charging

11      conference and not be required to return until 1:00 this

12      afternoon.

13             THE COURT:  All right.  I think that's fine.

14             All right.  We'll be in recess.

15          (Recess taken 11:23 a.m. to 12:38 p.m.)

16             THE COURT:  All right.  The record will reflect

17      that counsel have each -- each side have been provided with

18      two sets of the jury instructions and verdict form.  Counsel

19      had over 20 minutes to review the Court's final set of jury

20      instructions.

21             All instructions submitted to me by the parties

22      that were not included in the final set of instructions that

23      you received have either been rejected in whole or in part.

24      As is my practice, I'm going to read a summary of how the

25      Court has handled the various instructions that were

1    submitted.

2         With respect to the stipulated proposed

3    instructions, No. 1 was adopted; No. 2 was modified; 3

4    through 6 were adopted; 7 was rejected because there are no

5    stipulations; 8 through 13 were adopted; 14 was rejected as

6    there was no evidence admitted for a limited purpose; 15 was

7    adopted; 16 was modified; 17 through 20 were adopted; 21 was

8    rejected, because no such evidence came in; 22 through 25

9    were adopted; 26 through 27 were modified, 26 was

10   specifically modified to reflect the Court's ruling that

11   Counts 2 through 16 are going to go forward solely on an

12   aiding and abetting theory; and 28 -- and that's 26 is with

13   respect to the wire fraud element instructions; 28 was the

14   mail fraud elements instruction, and that similarly was

15   revised to reflect that those counts -- the mail fraud

16   counts are going forward only on an aiding and abetting

17   theory as well.  29 is no longer stipulated to; 30 through

18   33 were adopted; 34 was modified; 35 was adopted; 36 was

19   modified.  That's the -- that's all of the stipulated

20   instructions.

21        With respect to the Government's disputed

22   instruction No. 29, which is no longer stipulated to, that

23   was rejected in part and modified in part.  And I want to

24   clarify for the record what we did with that instruction.

25   The elements section was mostly rejected because, No. 1, no

1    need -- there's, in my view, no need to quote the statute

2    and regulation.  We don't do that for any other count at

3    issue here and we don't do it normally in any event.

4         Also, for the second reason that there's, in my

5    view, no need for commentary about the cause of action,

6    which is unnecessary, potentially confusing with the

7    elements instruction themselves.

8         And for the third reason, that there's no other

9    instruction that includes the Government's theory of the

10   case however it's characterized, so it's inconsistent, in my

11   view, to place it in this instruction.

12        The definitions section of this instruction was --

13   and that came from ECF No. 201, Exhibit 1 -- that definition

14   section was adopted, but modified for consistency with the

15   language of the remainder of that instruction.

16        And the aiding and abetting section of Government

17   disputed instruction 29 was adopted, but we streamlined the

18   language to avoid repetition.

19        With respect to the defendant's disputed

20   instruction A, that was rejected for precisely the same

21   reasons that I just outlined with respect to Government

22   disputed instruction 29.

23        With respect to defendant's disputed instruction B,

24   I rejected that proposed instruction as well.  In my view

25   the additional commentary on the theory -- on the party's

1    theory on the burden is not contained in any other
2    instruction.  It's my experience that doing things in one
3    place but not in another instruction tends to lead to juror
4    confusion because they would be left to parse the
5    instructions finally and wonder why something was repeated
6    and commented upon here but not in any other instruction.

7         Obviously, the defendant is free to argue this text
8    and this information in closing argument, but I believe that
9    the risk of confusion outweighs the benefit of including
10   this additional material in the jury instructions.

11        All right.  Let me first turn to the Government.
12   Are there any objections from the Government -- oh, and
13   before I ask that question:  As you obviously have seen, the
14   last 23 pages of this set -- or 22 pages are the second
15   superseding indictment revised to correct the dates as the
16   parties have agreed on certain counts.  But I also want to
17   make sure all of the counsel are aware that it is my
18   practice not to read the indictment when I read the jury
19   instructions to the jury later this afternoon.  Obviously
20   it's going back to the jury, but I will not be reading it.

21        All right.  Turning to the Government first, are
22   there any objections from the Government to the Court's
23   final set of instructions?

24        MR. SIBERT:  Your Honor, may I start first and then
25   turn it over to Mr. Brown?

1          THE COURT:  Sure.

2          MR. SIBERT:  First, I believe --

3          THE COURT:  Why don't you take the lectern.

4          MR. SIBERT:  Yes, sir.  Page 11, summaries and

5     charts, I believe all the summaries and charts have been

6     introduced into evidence except for 209 -- or 309, which is

7     the demonstrative evidence.

8          THE COURT:  409, you mean?

9          MR. SIBERT:  Excuse me?

10          THE COURT:  409?

11          MR. SIBERT:  409.  Yes, sir.  But that's not going

12     back anyway.

13          THE COURT:  Right.

14          MR. SIBERT:  It's demonstrative evidence so,

15     therefore, since all summaries and charts that have been

16     admitted into evidence, based upon the Tenth Circuit Jury

17     Instruction, there should be no instruction given.

18          THE COURT:  Hold on a second.  Well, I mean, we do

19     have the demonstrative exhibit summary 409, which is not

20     evidence, but was allowed to be used as a demonstrative

21     exhibit for the purpose of helping to explain other

22     evidence.  So -- and -- but it's accurate -- it's true that

23     all of the other summaries and charts were received into

24     evidence so we could revise this.  But I'm not going to

25     eliminate it because I think it still applies to

1    Exhibit 409.

2            MR. SIBERT:  That's fine, Your Honor.  I -- I'll --

3    I think a revisement would be needed since everything else

4    is in evidence.

5            THE COURT:  Yeah.  All right.  How about if we said

6    "Exhibit 409 was shown to you as a demonstrative exhibit to

7    help explain the evidence in this case," and then "Its only

8    purpose is to help explain the evidence."  And this chart --

9    "This summary," because it was not a chart, "This summary is

10   not evidence or proof of any facts."

11           MR. SIBERT:  No objection by the Government.

12           THE COURT:  All right.  What's the --

13           MR. GOODREID:  Your Honor, that's fine.  I think

14   that makes good sense.

15           THE COURT:  All right.  Did you get all of that,

16   Brian?

17           THE LAW CLERK:  Yes.

18           THE COURT:  Okay.  Great.  So we will revise page

19   11.

20           Any other objections from the Government to the

21   Court's final set of jury instructions?

22           MR. SIBERT:  Page 14.  No objections to the

23   instruction, just the title.  There's been no mention of

24   immunity in this case.  Co-conspirator, informant, yes, but

25   not immunity.

1          THE COURT:  Oh, that's a good point.  All right.
2     That objection is sustained.  And we will delete the word
3     "immunity" in the title of that instruction.
4          MR. SIBERT:  Page 17, impeachment by prior
5     conviction.  I don't recall any impeachment by the defendant
6     in this case regarding prior convictions.
7          THE COURT:  Okay.  What -- let me hear from the
8     defendant.
9          MR. GOODREID:  Your Honor, I think that's right.  I
10    had flagged this one as well.  I don't recall anybody --
11    it's not just defense, I don't think the Government
12    impeached anybody by prior conviction, either.
13         MR. SIBERT:  I agree.
14         MR. GOODREID:  Brought it up with respect to Mr.
15    Sears, but then it just didn't go anywhere, so he didn't ask
16    him any questions.
17         THE COURT:  All right.  I agree.  We will sustain
18    that objection, and page 17 will be deleted.
19         MR. SIBERT:  And the last one for Mr. Sibert here,
20    before I turn it over to Mr. Brown, would be page 18,
21    similar acts.  Again, 404(b) of Mr. Guy Jean-Pierre's arrest
22    came in, but not the conviction, so there's no evidence that
23    he was ever convicted or had any crimes similar to the ones
24    being charged here.
25         THE COURT:  Can I hear from the defendant.

2446

1      MR. GOODREID:  Your Honor, I'm not sure I
2  understand that last part.  Mr. Sibert, would you repeat
3  that, please?
4      MR. SIBERT:  I said there's been zero evidence --
5  there's never been a 404(b) instruction by the Court, we
6  never brought in the conviction, there's been zero evidence
7  of a conviction of any type of anything with Mr. Guy
8  Jean-Pierre regarding the charges in this case.
9      THE COURT:  Although this doesn't --
10     MR. GOODREID:  It doesn't say --
11     THE COURT:  -- have the word "conviction."
12     MR. GOODREID:  Right.
13     MR. SIBERT:  We never even talked about the acts,
14  Your Honor.
15     THE COURT:  Well, we talked about his conduct which
16  resulted in the Florida Bar proceedings and the SEC
17  complaint.
18     MR. SIBERT:  The only thing we talked about is that
19  there was a complaint.  We never got into what the details
20  of the complaint was or that there was a complaint against
21  the bar.  The Court wouldn't permit me to go any further, so
22  all we have is evidence of the fact that there was a
23  complaint out there by the SEC and the bar.  Nothing about
24  what the complaint was about.
25     THE COURT:  What about that, Mr. Goodreid?

1    MR. GOODREID:  I'm not sure I agree with that, Your
2    Honor.  And I know the Government may disagree with this,
3    but in some respect -- even the thing with respect to Ms.
4    Jean-Pierre could be argued to be a similar act because it's
5    outside the time frame of the conspiracy.  So I think the
6    instruction should stand.
7    THE COURT:  Yeah, I agree with the defendant.  That
8    objection's overruled.
9    MR. SIBERT:  That's all I have, Your Honor.
10   THE COURT:  Okay.  Let me hear from Mr. Brown.
11   MR. BROWN:  Your Honor, I don't have an objection,
12   or -- on behalf of the Government, but with regard to -- of
13   the Court's instructions provided to us just now, on pages
14   33 and 34, with regard to mail fraud, the only suggestion I
15   have -- I have a hard copy, but I -- what I would just
16   simply suggest is to make it simpler and a little bit
17   shorter, would be to combine all of the elements of -- this
18   is the mail fraud element instruction --
19   THE COURT:  Right.
20   MR. BROWN:  -- but it's only aiding and abetting at
21   this point, as I understand it.  I -- I'll just read what I
22   have.  Instead of -- this onlyapplies  to where the one,
23   two, three -- fourth paragraph where it starts with,
24   "First."
25   I would just put, "First, a person or persons

1    devised or intended to devise a scheme to defraud as charged
2    in the indictment.
3              "Second, that person or persons acted with specific
4    intent to defraud.
5              "Third, that person or persons mailed something,"
6    et cetera, as -- well, I'll read it, "mailed something or
7    caused another person to mail something through commercial
8    interstate carrier for the purpose of carrying out this
9    scheme.
10             "Fourth, the scheme employed false pretenses
11   representations, or promises that were material.
12             "And, Fifth, that the defendant intentionally
13   associated himself in some way with the crime and
14   intentionally participated in it as he would in" -- "in
15   something he wished to bring about.  This means the
16   Government must prove the defendant consciously shared the
17   other person's knowledge of the underlying criminal act and
18   intended to help that person."
19             The only thing I suggest -- I mean, the -- the
20   instruction the Court gave is sufficient under the law, but
21   I just -- it makes it all simpler because it puts all of the
22   elements of aiding and abetting and in someone else
23   committing the crime, in one, two, three, four, five.  It
24   might make it simpler.  And I have a version if the Court
25   wanted me to e-mail it to chambers.

1           THE COURT:  I don't.  I guess I'm not seeing how it
2    simplifies anything.
3           MR. BROWN:  Well, it puts it in five elements, much
4    the way it is now.  You indicate that the first person has
5    to aid and abet by first, and second.  And then in the
6    bottom of the first -- or page 33 and the top of page 34,
7    then you say -- we go into the fourth -- the way somebody
8    else does it.
9           I mean, it really doesn't matter that much, but it
10   just would be simply five elements and they can look at them
11   real quickly without probably having to think about it
12   twice.
13          But that's -- I mean, it's no big deal, but . . .
14          THE COURT:  Okay.  Hold on a second.  What's the
15   defendant's --
16          MR. GOODREID:  Your Honor, may I have just one
17   second to confer with counsel?
18          THE COURT:  Sure.
19          MR. GOODREID:  Your Honor, not surprisingly perhaps
20   the defense likes it the way it is.  I do have one
21   suggestion in the insertion of a single word.
22          THE COURT:  What's that?
23          MR. GOODREID:  On page 2 -- excuse me, page 34, the
24   second page of the instruction, under "First," I think to be
25   consistent with -- yeah, to be consistent with what's

1    elsewhere under "First," would be "someone else devised."

2    That's what the Court said on page 1.

3              THE COURT:  Yeah, I agree.  All right.  So we're

4    going to stick "else" in the -- on page 34 after "First."

5              I appreciate your proposal, Mr. Brown.  I don't

6    really know that -- I guess it does simplify it slightly,

7    but I think the defendant has a point that, more important

8    than simplification, is the separating out of what is a

9    Section 2 violation and then what constitutes the actual

10   crime someone else must have committed for them to -- for

11   this defendant to have aided and abetting -- aided and

12   abetted in that commission of a crime.

13             So I'm going to overrule that objection as well and

14   sustain -- I guess it wasn't an objection -- I'll adopt the

15   defendant's suggestion of inserting the word "else" in the

16   first element of the mail fraud count.

17             Any other objections, Mr. Brown?

18             MR. BROWN:  No, sir.

19             THE COURT:  All right.  Are there any objections

20   from the Government as to the Court's final verdict form?

21             MR. BROWN:  No, Your Honor.

22             THE COURT:  All right.  Are there any objections

23   from the defendant to the Court's final set of jury

24   instructions?

25             MR. GOODREID:  Yes, Your Honor.  And much like the

1    Government, we will transition.  I'll do the first half, Mr.

2    Barnard will do the second half.

3              THE COURT:  Okay.

4              MR. GOODREID:  Some of these, Your Honor, are less

5    objections than just maybe some typographical errors.

6              THE COURT:  Okay.  Point those out as well, sure.

7              MR. GOODREID:  Okay.  So the first is on page 6,

8    the second sentence.  I think it should be, "The indictment

9    is simply the description of the charges," plural.

10             THE COURT:  Okay.

11             MR. GOODREID:  And the other thing with respect to

12   this, Your Honor, it talks about the indictment.  The

13   document attached, of course, is the second superseding

14   indictment.  So I think either the second superseding

15   indictment title has to change in indictment or this should

16   be listed as second superseding indictment, just for

17   clarity.

18             THE COURT:  Let's see.  So do we have -- yeah, it

19   is -- okay.  So because the indictment that's appended has

20   the title Second Superseding Indictment, for clarity you

21   think in that second sentence it should read "the charges

22   against the defendant are contained in the second

23   superseding indictment"?

24             MR. GOODREID:  Precisely, Your Honor.

25             THE COURT:  Okay.  I agree.  We'll do that.  We

1   will include that as well.
2           MR. GOODREID:  And then, Your Honor, jumping
3   forward to -- I believe it's page 26, just a couple of
4   typographical errors under the paragraph Membership in
5   Conspiracy.
6           THE COURT:  All right.
7           MR. GOODREID:  The "next to determine whether the
8   defendant was a member of the conspiracy," there's a
9   semicolon.  I think that should be a colon because what
10  follows is not an independent clause.
11          THE COURT:  I'm sorry, start again.
12          MR. GOODREID:  I'm sorry, Your Honor.  The first
13  full sentence under Membership in Conspiracy, "if you
14  conclude" and it goes on from there.  It says, "Then you
15  must next determine whether the defendant was a member of
16  that conspiracy."  There's a semicolon.  I think that should
17  be a comma.
18          THE COURT:  I agree.
19          MR. GOODREID:  Okay.  And then there's a
20  typographical error, same paragraph, last sentence,
21  "However, the jury may infer" --
22          THE COURT:  Under Membership -- under the same
23  Membership?
24          MR. GOODREID:  Yes.
25          THE COURT:  Okay.

1          MR. GOODREID:  And you see where it says

2     defendant's there is an equal sign; I think it should be an

3     apostrophe.

4          THE COURT:  Sure.  Singular, possessive and

5     eliminate the equal sign.

6          MR. GOODREID:  Exactly, yes.

7          THE COURT:  I wonder how that got in there.  Okay.

8          MR. GOODREID:  And then the last one, Your Honor,

9     is a substantive one on page 27.  Under Unanimity of Theory,

10    no problem with the context of what it says here, but I

11    wonder in light of this instruction if it wouldn't make

12    sense for the verdict form to compel or to get the jurors to

13    agree on -- or to articulate which -- which, if any, of the

14    overt acts that they are unanimous about that are listed in

15    the indictment with respect to the conspiracy.

16         THE COURT:  So for the -- the jurors in the verdict

17    form to set out -- or set forth separately each individual

18    overt act that they're unanimous in concluding caused the --

19    or supports their finding of guilt?

20         MR. GOODREID:  Exactly, Your Honor, yes.

21         THE COURT:  What's the Government's position on

22    that?

23         MR. BROWN:  Your Honor, I think the instruction is

24    appropriate the way it is.  And if you ask them to, I

25    guess -- I don't know, pencil in the Count 1, which overt

1    act, that would -- I mean, if they find, you know, there

2    must be more than 50 overt -- I don't know how many overt

3    acts are alleged.

4              THE COURT:  Right.

5              MR. BROWN:  Secondly, we actually don't even have

6    to specify the overt acts, I don't think, in there, but we

7    have in this case -- but I think that would just overly

8    complicate matters because if you had to revise the verdict

9    form by putting Count 1 and then list every overt act, we

10   will be here for weeks.

11             THE COURT:  Right.  I agree.  I -- I think the --

12   the unanimity requirement is clear in the instruction and

13   it -- I don't see the need to complicate things

14   significantly by then also requiring the jury to set forth

15   separately in the verdict form those overt acts as to which

16   they are unanimous.  So that objection is overruled.

17             MR. GOODREID:  And, Your Honor, with that, I would

18   pass the baton to Mr. Barnard.

19             THE COURT:  Okay.

20             MR. BARNARD:  Your Honor, with regard to the --

21   page 36, the Securities Fraud Elements --

22             THE COURT:  All right.

23             MR. BARNARD:  -- the second paragraph talks about

24   willfully employing -- willfully making statements or

25   willfully engaging, which also corresponds with some of

1    the -- with, in particular, the first element, which is two

2    paragraphs down, where it says, "First:  The defendant

3    knowingly.  But it should, I believe, say, "knowingly and

4    willfully."

5           Both because I think that's the law and because

6    that would make it consistent.

7           THE COURT:  Wasn't this a stipulated instruction?

8           MR. BARNARD:  That -- no.

9           THE COURT:  Oh, this is the --

10          MR. BARNARD:  This is one of the --

11          THE COURT:  Oh, this is the one -- right.  Okay.

12          MR. BARNARD:  And we had in our -- in our

13   amended -- I believe it was amended A had a whole

14   different -- amended instruction A had a whole different

15   listing of elements, which included "willful" several times.

16          THE COURT:  All right, can I get the Government's

17   response?

18          MR. SIBERT:  May I have a minute, Your Honor?

19          THE COURT:  Sure.

20          MR. SIBERT:  Your Honor, we don't have an objection

21   if you put -- if I understand Mr. Barnard correctly, it

22   would read in the -- "First:  Defendant knowingly and

23   willfully"?

24          THE COURT:  I think that's what he was

25   suggesting.

2456

1           MR. SIBERT:  No objection.

2           MR. BARNARD:  That is what I was requesting.

3           THE COURT:  All right.  Do you have a -- what's

4    your authority for what you're requesting?

5           MR. BARNARD:  The authority for it was --

6    specifically would be the statute 15 U.S.C. 78ff, which

7    talks about willful violations.

8           THE COURT:  Do you have a Tenth Circuit opinion

9    that construes that language?

10          MR. BARNARD:  I have not got -- no, I do not have

11   one.

12          THE COURT:  I know that there's not an objection,

13   but I think we still need to be sure about those -- I'm

14   going to think about -- I'm going to consider this further,

15   so I'm going to reserve ruling on this one.

16          Let's move on to the next one.

17          MR. BARNARD:  And, Your Honor, also with regard to

18   Counts 21 through 23, and --

19          THE COURT:  Can you speak into the mic, please.

20          MR. BARNARD:  I'm sorry.  Also with regard to those

21   counts, as I said before, we had submitted a jury

22   instruction and the Court has already ruled with regard to

23   that instruction.  Just reaffirming our request for that

24   instruction.  I understand the Court has rejected it.

25          Now what I'm saying is I accept -- if the words

1    "and willfully" -- I accept the Court's instruction on page

2    36 through 39 as a substitute, but without -- without

3    waiving the prior proposed defense jury instruction.

4              THE COURT:  All right.  So that if I sustain your

5    objection and insert "willfully" then the -- you don't want

6    to waive your prior objection, but you have no objection to

7    this instruction going forward with that addition?

8              MR. BARNARD:  That's what I was trying to say,

9    yes.

10             THE COURT:  All right.  Any other objections from

11   the defendant to the Court's final set of jury instructions?

12             MR. BARNARD:  Yes.  On page 44.  And on page 44,

13   one of the things that -- the second paragraph as set forth

14   there, I just want to note that on the bottom it said

15   "defendant's proposed instruction B."  In fact, this is not

16   the defendant's proposed instruction B.  Defendant's

17   proposed instruction B had additional language, which we

18   still would request.

19             And I'm assuming that since the Court has ruled

20   with regard to that, that has been considered and has been

21   rejected, but I just want to --

22             THE COURT:  Okay.

23             MR. BARNARD:  -- again, reserve that objection.

24             THE COURT:  All right.  So then what we're going to

25   do is edit the footnote 29 to be the defendant's proposed

2458

1    instruction B, paren, modified, because it does contain
2    portions of what you proposed.
3              MR. BARNARD:  That is correct.  And it also has
4    portions of the Government's proposed jury instruction 32, I
5    believe it was.
6              THE COURT:  All right.  Then we will add the word
7    "modified" in parentheses.
8              MR. BARNARD:  And no other objections or --
9              THE COURT:  All right.  Any objections from the
10   defendant to the Court's verdict form?
11             MR. BARNARD:  The defendant's objection to the
12   verdict form would be the one that Mr. Goodreid was stating
13   before, that we would request the unanimity aspect of the
14   overt acts be added so that the jury would be required to
15   specify which -- specify which act -- overt act they had a
16   unanimous finding on.
17             THE COURT:  Okay.  Well, as I did before, that
18   objection is overruled.
19             Do counsel agree that, as I'm reading the
20   instructions to the jury, that I may make amendments which
21   may be required as a result of any typographical or clerical
22   or syntactical error that I notice as I'm reading?  Is there
23   an agreement from the Government that I do that?
24             MR. SIBERT:  That's fine, Your Honor.
25             THE COURT:  All right.  From the defendant?

1      MR. GOODREID:  Certainly, Your Honor.

2      THE COURT:  All right.  All right.  We will be in

3   recess briefly so I can consider the objection that I have

4   taken under advisement with respect to Counts 21 through 23

5   on the Securities Fraud Elements instruction.  We will be in

6   recess.

7      (Recess 1:09 p.m. to 1:37 p.m.)

8      THE COURT:  All right.  We've looked at this issue

9   further and I am going to sustain the defendant's objection,

10  which I note for the record the Government did not oppose.

11  And I will amend the first element of the securities fraud

12  instruction of Counts 21 through 23 to include the words

13  "and willfully" so that that sentence -- or the first clause

14  will read, "First:  The defendant knowingly and willfully,

15  A, employed any device, scheme, or artifice to defraud; or,"

16  et cetera.

17      All right.  I think that takes care of all the

18  issues from the charging conference.  We're in the process

19  of putting together the unannotated sets of instructions for

20  your use.  And so I would say let's plan on bringing the

21  jury out at 2:00.

22      Ms. Frank, if you could let them know that when

23  we're off the bench here.

24      And I'll do the -- read the instructions to the

25  jury at that time.  We'll be in recess until 2:00.

2460

1          (Recess 1:39 p.m. to 2:08 p.m.)

2          (In the presence of the jury at 2:08 p.m.)

3          THE COURT:  Thank you, ladies and gentlemen of the

4     jury, for your considerable patience.

5          All right.  At this time, I am going to read to you

6     the jury instructions that will govern your deliberations in

7     this case.

8          All right.  Members of the jury:  In any jury

9     trial, there are, in effect, two judges.  I am one of the

10    judges and you are the other.  I am the judge of the law.

11    And you, as jurors, are judges of the facts.  I presided

12    over the trial and decided what evidence was proper for your

13    consideration.  It is also my duty at the end of the trial

14    to explain to you the laws -- the rules of law that you must

15    follow and apply in arriving at your verdict.

16          In explaining the rules of law that you must

17    follow, first, I will give you some general instructions

18    which apply in every criminal case, for example,

19    instructions about the burden of proof and insights that

20    might help you to judge the believability of witnesses.

21    Then I will give you some specific rules of law that apply

22    to this particular case, and, finally, I will explain the

23    procedures you should follow in your deliberations and the

24    possible verdicts you may return.  These instructions will

25    be given to you for your use in the jury room so you need

1    not take notes at this time, although of course you're free

2    to do so.  You will each have your own separate set of

3    instructions.  There will be 12 sets in the deliberation

4    room at the time you begin your deliberations.

5            In reaching your decision as to the facts, it is

6    your sworn duty to follow all of the rules of law as I

7    explain them to you.

8            You have no right to disregard or give special

9    attention to any one instruction or to question the wisdom

10   or correctness of any rule I may state to you.  You must not

11   substitute or follow your own notion or opinion as to what

12   the law is or ought to be.  It is your duty to apply the law

13   as I explain it to you, regardless of the consequences.

14   However, you should not read into these instructions, or

15   anything else that I may have said or done, any suggestion

16   as to what your verdict should be.  That is entirely up to

17   you.

18           You are not to be concerned with the wisdom of any

19   rule of law stated by me.  It would be a violation of your

20   oath to base your verdict on anything other than the law as

21   presented in these instructions and the facts as you find

22   them.

23           Counsel may properly refer to some of the governing

24   rules of law in their arguments.  If there is any difference

25   between the law as stated by counsel or in the exhibits, and

1    that stated by me in these instructions, my instructions

2    prevail.  The law contained in these instructions is the law

3    that must govern your deliberations in this case.

4         Finally, it is your duty to base your verdict

5    solely upon the evidence without prejudice or sympathy.

6    That was the promise you made and the oath that you took.

7         You must make your decision based only on the

8    evidence that you saw and heard here in court.  Do not let

9    rumors, suspicions or anything else that you may have seen

10   or heard outside of court influence your decision in any

11   way.

12        The evidence in this case includes only what the

13   witnesses said while they were testifying under oath and the

14   exhibits that I allowed into evidence.

15        Nothing else is evidence.  The lawyers' statements

16   and arguments are not evidence, their questions and

17   objections are not evidence.  My legal rulings are not

18   evidence.  And my comments and questions are not evidence.

19        During the trial, I did not let you hear the

20   answers to some of the questions that the lawyers asked.  I

21   also ruled that you could not see some of the exhibits that

22   the lawyers wanted you to see.  You must completely ignore

23   all of these things.  Do not even think about them.  Do not

24   speculate about what a witness might have said or what an

25   exhibit might have shown.  These things are not evidence and

1    you are bound by your oath not to let them influence your

2    decision in any way.

3            There are, generally speaking, two types of

4    evidence from which a jury may properly determine the facts

5    of a case.  One is direct evidence, such as the testimony of

6    an eyewitness.  The other is indirect or circumstantial

7    evidence, that is, the proof of a chain of facts which point

8    to the existence or nonexistence of certain other facts.

9            As a general rule, the law makes no distinction

10   between direct and circumstantial evidence.  The law simply

11   requires that you find the facts in accord with all the

12   evidence in the case, both direct and circumstantial.

13           While you must consider only the evidence in this

14   case, you are permitted to draw reasonable inferences from

15   the testimony and exhibits, inferences that you feel are

16   justified in light of common experience.

17           An inference is a conclusion that reason and common

18   sense may lead you to draw from facts which have been

19   proved.  By permitting such reasonable inferences, you may

20   make deductions and reach conclusions that reason and common

21   sense lead you to draw from the facts which have been

22   established by the testimony and evidence in this case.

23           The defendant has been charged with a violation of

24   federal laws.  The charges against the defendant are

25   contained in the second superseding indictment.  The

1    indictment is simply the description of the charges made by

2    the Government against the defendant, and it is not evidence

3    of anything.  The defendant pleaded not guilty to the

4    charges and denies committing the offenses.  He is presumed

5    innocent and may not be found guilty by you unless all 12 of

6    you unanimously find that the Government has proved his

7    guilt beyond a reasonable doubt.

8            A separate crime is charged in each count of the

9    indictment.  You must separately consider the evidence on

10   each count and return a separate verdict.

11           Your verdict as to any one count, whether guilty or

12   not guilty, should not influence your verdict as to any

13   other count.

14           You are here to decide whether the Government has

15   proved beyond a reasonable doubt that the defendant is

16   guilty of the crimes charged.  The defendant is not on trial

17   for any act, conduct, or crime not charged in the

18   indictment.

19           It is not up to you to decide whether anyone who is

20   not on trial in this case should be prosecuted for any of

21   the crimes charged.  The fact that another person also may

22   be guilty is no defense to a criminal charge.

23           The question of the possible guilt of others should

24   not enter into your thinking as you decide whether this

25   defendant has been proved guilty of the crimes charged.

2465

1          The Government has the burden of proving the

2     defendant guilty beyond a reasonable doubt.  The law does

3     not require a defendant to prove his innocent -- innocence

4     or prove any evidence at all.  I'm sorry, let me state that

5     sentence again.

6          The law does not require a defendant to prove his

7     innocence or produce any evidence at all.  The Government

8     has the burden of proving the defendant guilty beyond a

9     reasonable doubt and if it fails to do so, you must find the

10    defendant not guilty.

11         Proof beyond a reasonable doubt is proof that

12    leaves you firmly convicted of the defendant -- firmly --

13    oops -- counsel agree that that should be "firmly

14    convinced"?

15             MR. BROWN:  Yes, Your Honor.

16             THE COURT:  All right.  Defendant?

17             MR. GOODREID:  Yes, Your Honor.

18             THE COURT:  All right.  All right.  Let me start

19    that sentence again.

20         Proof beyond a reasonable doubt is proof that

21    leaves you firmly convinced of the defendant's guilt.  There

22    are few things in this world that we know with absolute

23    certainty, and in criminal cases the law does not require

24    proof that overcomes every possible doubt.  It is only

25    required that the Government's proof exclude any "reasonable

1    doubt" concerning the defendant's guilt.  A reasonable doubt
2    is a doubt based on common -- on reason and common sense
3    after careful and impartial consideration of all the
4    evidence in this case.  If, based on your consideration of
5    the evidence, you are firmly convinced that the defendant is
6    guilty of the crimes charged, you must find him guilty.  If,
7    on the other hand, you think there is a real possibility
8    that he is not guilty, you must give him the benefit of the
9    doubt and find him not guilty.

10            During the trial, you heard sound recordings of
11   certain conversations.  These conversations were legally
12   recorded, they are a proper form of evidence and may be
13   considered by you as you would any other evidence.

14            Sometimes these recordings contained captioning.
15   Captions are not evidence.  They were given to you only as a
16   guide to help you follow what was being said.  The
17   recordings, themselves, are the evidence.  If you noticed
18   any differences between what you heard on the recordings and
19   what you read in the captions, you must rely on what you
20   heard and not what you read.  If you could not hear or
21   understand certain parts of the recordings, you must ignore
22   the captions as far as those parts are concerned.

23            Exhibit 409 was shown to you as a demonstrative to
24   help explain the evidence in this case.  Its only purpose is
25   to help explain the evidence.  This summary is not evidence

2467

1     or proof of any facts.

2              You are not required to accept all of the evidence

3     as true or accurate.  You are the sole judges of the

4     credibility or "believability" of each witness and the

5     weight to be given to that witness' testimony.  An important

6     part of your job will be making judgments about the

7     testimony of the witnesses who testified in this case.

8              You should think about the testimony of each

9     witness you have heard and decide whether you believe all or

10    any part of what each witness had to say and how important

11    that testimony was.  In making that decision, I suggest that

12    you ask yourself a few questions:

13             Did the witness impress you as honest?

14             Did the witness have any particular reason not to

15    tell the truth?

16             Did the witness have a personal interest in the

17    outcome in this case?

18             Did the witness have any relationship with either

19    party?

20             Did the witness seem to have a good memory?

21             Did the witness clearly see or hear the things

22    about which he or she testified?

23             Did the witness have the opportunity and ability to

24    understand the questions clearly and answer them directly?

25             And did the witness' testimony differ from the

2468

1    testimony of other witnesses?

2              When weighing the conflicting testimony, you should

3    consider whether the discrepancy has to do with a material

4    fact or with an unimportant detail.  And you should keep in

5    mind that innocent misrecollection, like failure of

6    recollection, is not uncommon.

7              In reaching a conclusion on a particular point, or

8    ultimately in reaching a verdict in this case, do not make

9    any decisions simply because there were more witnesses on

10   one side than the other.

11             A co-conspirator is one who joined with another in

12   committing a crime voluntarily and with common intent.  The

13   testimony of a co-conspirator may be received into evidence

14   and considered by you even though it is not supported by

15   other evidence.  You may decide how much weight it should

16   have.

17             You are to keep in mind, however, that

18   co-conspirator testimony should be received with caution and

19   considered with great care.  You should not convict a

20   defendant based on the unsupported testimony of an alleged

21   co-conspirator unless you believe the unsupported testimony

22   beyond a reasonable doubt.

23             An informant is someone who provides evidence

24   against someone else for a personal reason or advantage.

25   The testimony alone, if believed by the jury, may be of

1    sufficient weight to sustain a verdict of guilt, even though

2    not corroborated or supported by other evidence.  You must

3    examine and weigh an informant's testimony with greater care

4    than the testimony or evidence acquired as a result of

5    actions of an ordinary witness.  You must determine whether

6    the informant's testimony has been affected by

7    self-interest, by an agreement he has with the Government,

8    by his own interest in the outcome of the case, or by

9    prejudice against the defendant.

10         You should not convict a defendant based on the

11   unsupported testimony of an informant, unless you believe

12   the unsupported testimony or evidence beyond a reasonable

13   doubt.

14         The Government has called as witnesses alleged

15   accomplices, William Sears and Scott Dittman, who are

16   identified as co-conspirators in the conspiracy alleged in

17   the indictment.  The Government has entered into plea

18   agreements with them.  Plea bargaining is lawful and proper

19   and the rules of the court expressly provide for it.  An

20   alleged accomplice, including one who has entered into a

21   plea agreement with the Government, is not prohibited from

22   testifying.  On the contrary, the testimony of an alleged

23   accomplice may, by itself, support a guilty verdict.

24         You should never convict a defendant upon the

25   unsupported testimony of an alleged accomplice unless you

2470

1   believe that testimony beyond a reasonable doubt.  The act
2   that an accomplice has entered a guilty plea to the offense
3   charged is not evidence of the guilt of any other person.

4            The defendant did not testify and I instruct you
5   that you cannot consider the decision not to testify as
6   evidence of guilt.  You must understand that the
7   Constitution of the United States grants to a defendant the
8   right to remain silent.  That means the right not to
9   testify.  That is a constitutional right in this country, it
10  is very carefully guarded, and you should understand that no
11  presumption of guilt may be raised and no inference of any
12  kind may be drawn from the fact that a defendant does not
13  take the witness stand and testify.

14           You have heard evidence of other wrongful acts
15  engaged in by the defendant.  You may consider that evidence
16  only as it bears on the defendant's intent, preparation,
17  plan, or knowledge with respect to the crimes charged here
18  and for no other purpose.  Of course, the fact that the
19  defendant may have previously committed an act similar to
20  the one charged in this case does not mean that the
21  defendant necessarily committed the act charged in this
22  case.

23           In some cases, such as this one, scientific,
24  technical, or other specialized knowledge may assist the
25  jury in understanding the evidence or in determining a fact

1    in issue.  A witness who has the knowledge, skill,

2    experience, training or education may testify and state an

3    opinion concerning such matters.

4           During the trial, you heard the testimony of Alex

5    Scoufis, Steven Thel, and Erik Gerding who were designated

6    as expert witness.  You are not required to accept their

7    opinions.  You should consider opinion testimony just as you

8    would consider other testimony in this trial.  Give opinion

9    testimony as much weight as you think it deserves

10   considering the education and experience of the witness, the

11   soundness of the reasons given for the opinion, and other

12   evidence in the trial.

13          I allowed a Federal Bureau of Investigation

14   undercover agent, FBI UCA-1, to testify under a pseudonym,

15   which is a fictitious name, at trial.  You may not consider

16   the use of a pseudonym by an FBI undercover agent in your

17   deliberations.  You must not consider the use of the

18   pseudonym by the FBI undercover agent in your deliberations.

19          The weight of the evidence is not necessarily

20   determined by the number of witnesses testifying to the

21   existence or nonexistence of any fact.  You may find that

22   the testimony of a small number of witnesses as to any fact

23   is more credible than the testimony of a larger number of

24   witnesses to the contrary.

25          You are not bound to decide any issue in fact in

2472

1    accordance to the testimony of any number of witnesses that

2    does not produce in your minds belief in the likelihood of

3    truth, as against the testimony of a lesser number of

4    witnesses or other evidence producing such belief in your

5    minds.

6         The test is not which side brings the greater

7    number of witnesses or takes the most time to present its

8    evidence, but which witnesses and which evidence appeal to

9    your minds as being most accurate and otherwise trustworthy.

10        The lawyers for both sides objected to some of the

11   things that were said or done during the trial.  Do not hold

12   that against either side.  The lawyers have a duty to object

13   whenever they think that something is not permitted by the

14   rules of evidence.  Those rules are designed to make sure

15   both sides receive a fair trial.

16        Do not interpret my rulings on their objections as

17   any indication of how I think this case should be decided.

18   My rulings were based on the rules of evidence and not on

19   how I feel about this case.

20        That concludes the part of my instructions

21   explaining your duties and the general rules that apply in

22   every criminal case.  Now I will explain the elements of the

23   crimes charged in this case.

24        The defendant is charged in Count 1 with a

25   violation of Title 18 United States Code Section 371.  This

2473

1    statute makes it a crime to conspire to commit an offense

2    against the United States or to defraud the United States or

3    an agency of the United States, in this case the Securities

4    and Exchange Commission.

5           As alleged in the indictment, the defendant is

6    charged with conspiring with William J. Sears, Scott M.

7    Dittman and with others to commit securities fraud, a

8    violation of Rule 10b-5 of the Securities and Exchange --

9    counsel agree it should be Securities and Exchange

10   Commission?  Mr. Brown?

11          MR. SIBERT:  That's fine, Your Honor.

12          THE COURT:  Or, I'm sorry -- Rule 10b -- yeah, it's

13   a rule of the commission, not a statute or provision.

14          MR. SIBERT:  That's correct.

15          THE COURT:  Yeah.  So it should be Securities and

16   Exchange Commission.  Do you agree, Mr. Goodreid?

17          MR. GOODREID:  Yes, Your Honor.

18          THE COURT:  All right.  So I'm going to insert

19   "Commission."

20          All right, let me start that sentence again.  As

21   alleged in the indictment, the defendant is charged with

22   conspiring with William J. Sears, Scott M. Dittman and with

23   other persons to commit securities fraud, a violation of

24   Rule 10b-5 of the Securities and Exchange Commission and to

25   defraud the United States Securities and Exchange Commission

2474

1    by impeding, impairing, defeating or obstructing its lawful

2    functions.

3            To find the defendant guilty under Count 1, you

4    must be convinced that the Government has proved each of the

5    following beyond a reasonable doubt:

6            First:  The defendant agreed with at least one

7    other person to commit securities fraud, or to violate Rule

8    10b-5, as described later in these instructions, or to

9    defraud the Securities and Exchange Commission by impeding,

10   impairing, defeating, or obstructing its lawful functions;

11           Second:  At least one of the conspirators engaged

12   in at least one overt act furthering any of the conspiracy's

13   objectives;

14           Third:  The defendant knew the essential objective

15   of the conspiracy;

16           Fourth:  The defendant knowingly and voluntarily

17   participated;

18           Fifth:  There was interdependence among the members

19   of the conspiracy, that is, the members, in some way or

20   manner, intended to act together for their shared mutual

21   benefit within the scope of the conspiracy charged.

22           A conspiracy is an agreement between two or more

23   persons to accomplish an unlawful purpose.  It is a kind of

24   partnership in criminal purposes in which each member

25   becomes the agent or partner of every other member.  Once a

1    person becomes a member of a conspiracy, he is held legally

2    responsible for the acts of the other members done in

3    furtherance of the conspiracy, even though he was not

4    present or aware that the acts were being committed.  An

5    agreement to violate the law can be inferred by the conduct

6    of the parties, as well as the facts and circumstances of

7    the case.  Likewise, the jury may infer that a defendant is

8    a knowing and voluntarily participant in a conspiracy when

9    he acts in furtherance of the conspiracy's objectives.  But

10   mere similarity of conduct among various persons, and the

11   fact that they may have associated with each other, and may

12   have assembled together and discussed common aims and

13   interests, does not necessarily establish proof of the

14   existence of a conspiracy.

15           The evidence in this case need not show that the

16   members entered into any express or formal agreement.  Nor

17   is it necessary that the evidence show that the members

18   stated between themselves what their object or purpose was

19   to be, or the details thereof, or the means by which the

20   object or purpose was to be accomplished.  In order to

21   establish proof that a conspiracy existed, the evidence must

22   show beyond a reasonable doubt that the members in some way

23   or manner, or through some contrivance, expressly or

24   impliedly came to a mutual understanding to try to

25   accomplish a common and unlawful plan.

1    The Government must prove that at least one overt

2    act was committed by at least one co-conspirator.  An overt

3    act is an act done in furtherance of the conspiracy.  An

4    overt act does not itself have to be unlawful.  A lawful act

5    may be an overt act of a conspiracy if it was done for the

6    purpose of carrying out the conspiracy.  The Government is

7    not required to prove that each of the defendants personally

8    did one of the overt acts.  The Government need only prove

9    that at least one of the co-conspirators, including

10   uncharged co-conspirators, committed at least one overt act

11   in furtherance of the conspiracy.

12        If you conclude from the evidence beyond a

13   reasonable doubt that a conspiracy as charged did exist,

14   then you must next determine whether the defendant was a

15   member of that conspiracy; that is, whether the defendant

16   participated in the conspiracy with knowledge of its

17   unlawful purposes and in furtherance of its unlawful

18   objectives.  In determining whether the defendant was a

19   member of the conspiracy, the jury must consider only his

20   acts and statements.  The defendant cannot be bound by the

21   acts or declarations of other persons -- of other

22   participants until it is established that a conspiracy

23   existed and that he was one of its members.  A mere

24   association standing alone is inadequate.  However, the jury

25   may infer the presence of a conspiracy from the defendant's

2477

1    conduct and other circumstantial evidence indicating

2    coordination and concert of action.

3            To be a member of the conspiracy, the defendant

4    need not know all of the other members or all of the details

5    of the conspiracy, nor the means by which the objects were

6    to be accomplished.  Each member of the conspiracy may

7    perform separate and distinct acts.  It is necessary,

8    however, that for the defendant to be a member of the

9    conspiracy, the Government must prove beyond a reasonable

10   doubt that he was aware of the common purpose and was a

11   willing participant with the intent to advance the purposes

12   of the conspiracy.  In other words, while a defendant need

13   not participate in all the acts or statements of the other

14   members of the conspiracy to be bound by them, the acts or

15   statements must be interdependent so that each member of the

16   conspiracy depends upon the acts and statements of the other

17   conspirators to make the conspiracy succeed.

18           The extent of a defendant's participation in a

19   conspiracy is not relevant to whether he is guilty or not

20   guilty.  A defendant may be convicted as a conspirator even

21   though he plays a minor part in that conspiracy -- in the

22   conspiracy.

23           Your verdict must be unanimous.  Count 1 accuses

24   the defendant and/or his co-conspirators of committing

25   several overt acts in furtherance of the conspiracy.  The

1   Government does not have to prove all of these different
2   acts for you to return a guilty verdict on Count 1.  But in
3   order to return a guilty verdict, all 12 of you must agree
4   upon which of the listed acts, if any, the defendant and/or
5   his co-conspirators committed and that at least the
6   defendant and/or his co-conspirators committed at least one
7   of the acts listed.
8        The defendant is charged in Counts 2 through 16 and
9   24 through 28 with wire fraud in violation of Title 18
10  United States Code Section 1343, or with aiding and abetting
11  wire fraud in violation of Title 18 United States Code
12  Section 2(a).  Specifically, Counts 2 through 16 address
13  aiding and abetting wire fraud only, while Counts 22 to 28
14  address both wire fraud itself and, alternatively, aiding
15  and abetting wire fraud.  The law regarding wire fraud makes
16  it a crime to use interstate wire communication facilities
17  in carrying out a scheme to defraud or for obtaining money
18  or property by means of false or fraudulent pretenses,
19  representations, or promises, or attempting to do so.
20       To find the defendant guilty on any of Counts 24
21  through 28, you must be convinced that the Government has
22  proved each of the following beyond a reasonable doubt:
23       First:  The defendant devised or intended to devise
24  a scheme to defraud, or for obtaining money or property by
25  means of false or fraudulent pretenses, representations or

1     promises, or attempting to do so;

2              Second:  The defendant acted with the specific

3     intent to defraud;

4              Third:  The defendant used interstate wire

5     communication facilities, or caused another person to use

6     interstate wire communications facilities for the purpose of

7     carrying out the scheme;

8              Fourth:  The scheme employed false or fraudulent

9     pretenses, representations, or promises that were material.

10             A scheme to defraud is conduct intended to or

11    reasonably calculated to deceive persons of ordinary

12    prudence or comprehension.  A "scheme to defraud" includes a

13    scheme to deprive another of money, property, or the

14    intangible right of honest services.  An intent to defraud

15    means an intent to deceive or cheat someone.

16             A representation is "false" if it is known to be

17    untrue or is made with reckless indifference as to its truth

18    or falsity.  A representation would also be "false" when it

19    constitutes a half truth, or effectively omits or conceals a

20    material fact, provided it is made with intent to defraud.

21             A false statement is "material" if it has a natural

22    tendency to influence, or is capable of influencing, the

23    decision of the person or entity to which it is addressed.

24             What must be proved beyond a reasonable doubt is

25    that the defendant devised or intended to devise a scheme to

1    defraud that was substantially the same as the one alleged

2    in the indictment, and that the use of a wire was closely

3    related to the scheme -- to the scheme in that the defendant

4    sent a wire or caused a wire to be transmitted in an attempt

5    to execute or carry out the scheme.

6            To cause interstate wire communications facilities

7    to be used is to do an act with knowledge that the use of

8    the wire facilities will follow in the ordinary course of

9    business or where such use can reasonably be foreseen.

10           Title 18 United States Code Section 2 provides,

11   "Whoever commits an offense against the United States, or

12   aids, abets, counsels, commands, induces or procures its

13   commission, is punishable as a principal."  This law makes

14   it a crime to intentionally help someone else commit a

15   crime.

16           Under Counts 2 through 16, the defendant is charged

17   only with aiding and abetting the commission of wire fraud.

18           Under Counts 24 through 28, in addition to being

19   charged with wire fraud itself, the defendant is

20   alternatively charged with aiding and abetting wire fraud.

21           Counsel, how does your page 30 start?  What's at

22   the top?

23           MR. BROWN:  I'm sorry, Your Honor?

24           THE COURT:  Page 30.  What's at the top of your

25   page 30?

1          MR. BROWN:   "To find the defendant."

2          THE COURT:   Okay.  I'm missing . . .

3          Rescued by my court reporter.  All right.  I don't

4    know why my page 30 is missing a sentence.  All right.

5          To find the defendant guilty of aiding and abetting

6    wire fraud under any of the Counts 2 through 16 or 24

7    through 28, you must be convinced that the Government has

8    proved each of the following beyond a reasonable doubt:

9          First:  Someone else committed wire fraud as

10   charged in the indictment, under the elements described

11   previously; and

12         Second:  The defendant intentionally associated

13   himself in some way with the crime and intentionally

14   participated in it as he would in something he wished to

15   bring about.  This means that the Government must prove that

16   the defendant consciously shared the other person's

17   knowledge of the underlying criminal act and intended to

18   help that person.  The defendant need not perform the

19   underlying criminal act, be present when it's performed, or

20   be aware of the details of its commission to be guilty of

21   aiding and abetting.  But a general suspicion that an

22   unlawful act may occur or that something criminal is

23   happening is not enough.  Mere presence at the scene of a

24   crime and that a crime is being committed are also not

25   sufficient to establish aiding and abetting.

1          The use of interstate wire or radio (wireless)
2    communications are considered a use of an interstate wire
3    communications facility.
4          Interstate communications are communications that
5    cross state lines.
6          A "wire communication" includes telephone calls,
7    electronic signals sent by wire such as a fax or financial
8    wire, the use of the internet to send a message, such as an
9    e-mail, and communicating with a website via the internet.
10          The phrase "transmits by means of wire, radio, or
11    television communication in interstate commerce" means to
12    send from one state to another by means of telephone or
13    telegraph lines or by means of radio or television.
14          The phrase "transmits by means of wire, radio, or
15    television communication in interstate commerce" includes a
16    telephone conversation by a person in one state with a
17    person in another state.
18          The use of a wire, radio, or television
19    communication facility in interstate commerce is an
20    essential element of the offense of wire fraud.  But the
21    Government need not prove that the defendant or another
22    person specifically decided that he would further, advance,
23    or carry out the scheme or plan to defraud through wire,
24    radio, or television communications.  The Government must
25    prove beyond a reasonable doubt, however, that a

1    transmission by a wire, radio, or television communication

2    facility in interstate commerce was, in fact, used in some

3    manner to further, advance, or carry out the scheme to

4    defraud.  The Government must also prove that the use of the

5    wire, radio, or television communication in interstate

6    commerce would follow in the ordinary course of business, or

7    events, or that the use of the wire, radio, or television

8    communication facility in interstate commerce by someone was

9    reasonably foreseeable.

10           It is not necessary for the Government to prove

11   that the information transmitted by means of wire, radio or

12   television communications in interstate commerce itself was

13   false or fraudulent or contained any false or fraudulent

14   pretense, representation, or promise, or contained any

15   request for money or thing of value.  The Government must

16   prove beyond a reasonable doubt, however, that the use of

17   the wire, radio, or television communication in interstate

18   commerce furthered or advanced or carried out in some way

19   the scheme or plan to defraud.

20           The defendant is charged in Counts 17 through 20

21   with aiding and abetting mail fraud in the violation of 18

22   United States Code Section 1341 and Title 18 United States

23   Code Section 2(a).  The law regarding mail fraud makes it a

24   crime to use the mails in carrying out a scheme to defraud

25   or for obtaining money or property by means of false or

fraudulent pretenses, representations, or promises, or
attempting to do so.  And as I mentioned before, Title 18
United States Code Section 2 makes it a crime to
intentionally help someone else commit a crime.

To find the defendant guilty of aiding and abetting
mail fraud under any of Counts 17 through 20, you must be
convinced that the Government has proved each of the
following beyond a reasonable doubt:

First:  Someone else committed mail fraud as
charged in the indictment; and.

Second:  The defendant intentionally associated
himself in some way with the crime and intentionally
participated in it as he would in something he wished to
bring about.  Just as before, this means that the Government
must prove that the defendant consciously shared the other
person's knowledge of the underlying criminal act and
intended to help that person.

As I stated previously, the defendant need not
perform the underlying criminal act, be present when it is
performed, or be aware of the details of its commission to
be guilty of aiding and abetting.  But a general suspicion
that an unlawful act may occur or that something criminal is
happening is not enough.  Mere presence at the scene of a
crime and knowledge that a crime is being committed are also
not sufficient to establish aiding and abetting.

1          The first element of aiding and abetting mail fraud
2    requires the Government to prove that someone else committed
3    mail fraud.  To find as much, you must be convinced that the
4    Government has proved each of the following beyond a
5    reasonable doubt:
6          First:  Someone else devised or intended to devise
7    a scheme to defraud, or for obtaining money or property by
8    means of false or fraudulent pretenses, representations, or
9    promises, or attempted to do so;
10          Second:  That person acted with specific intent to
11    defraud;
12          Third:  That person mailed something or caused
13    another person to mail something through a commercial
14    interstate carrier for the purposes of carrying out the
15    scheme; and
16          Fourth:  The scheme employed false -- do counsel
17    agree that that should read the scheme employed false
18    pretenses without the word "or" in there?  Or is there a --
19    are we missing a word?
20          MR. BROWN:  Your Honor, I should say "false" or
21    fraudulent pretenses.
22          THE COURT:  False or fraudulent?
23          MR. BROWN:  Yes, sir.
24          MR. GOODREID:  I think that's right.
25          THE COURT:  You agree, Mr. Goodreid?

2486

1        MR. GOODREID:  I believe that's correct.

2        THE COURT:  How did we miss that word?

3        We'll make all these corrections in the sets you

4   get.  You folks will get a perfect set.  All right.  Let me

5   read that sentence again.

6        Fourth:  The scheme employed false or fraudulent

7   pretenses, representations, or promises that were material.

8        A "scheme to defraud" is conduct intended to or

9   reasonably be calculated to deceive persons of ordinary

10  prudence or comprehension.  A "scheme to defraud" includes a

11  scheme to deprive another of money, property, or the

12  intangible right of honest services.

13       An intent to defraud means an intent to deceive or

14  cheat someone.

15       A representation is "false" if it is known to be

16  untrue or is made with reckless indifference as to its truth

17  or falsity.  A representation would also be "false" when it

18  constitutes a half truth, or effectively omits or conceals a

19  material fact, provided it is made with intent to defraud.

20       A false statement is "material" if it has a natural

21  tendency to influence, or is capable of influencing, the

22  decision of the person or entry to which it is addressed.

23       What must be proved beyond a reasonable doubt is

24  that the person devised or intended to devise a scheme to

25  defraud that was substantially the same as the one alleged

1    in the indictment, and that the use of the mails was closely

2    related to the scheme in that the person either mailed

3    something or caused it to be mailed in an attempt to execute

4    or carry out the scheme.  To "cause" the mails to be used is

5    to do an act with knowledge that the use of the mails will

6    follow in the ordinary course of business or where such use

7    can reasonably be foreseen even though the defendant did not

8    intend or request that the mails to be used.

9         Counts 21 through 23 charge the defendant with

10   committing securities fraud in violation of Title 15 United

11   States Code Sections 78j(b), 78ff, and Title 17 Code of

12   Federal Regulations Section 240.10b-5, or aiding and

13   abetting this offense, in violation of Title 18 United

14   States Code Section 2(a).

15        These laws make it a crime to willfully employ a

16   device, scheme, or artifice to defraud, willfully make

17   statements or material omissions, or willfully engage in a

18   transaction or course of business which operated or would

19   operate as a fraud and deceit on any person, in connection

20   with the purchase or sale of any security.

21        To find the defendant guilty of this crime under

22   any of the Counts 21 through 23, you must be convinced that

23   the Government has proved each of the following beyond a

24   reasonable doubt:

25        First:  The defendant knowingly and willfully, A,

2488

1    employed any device, scheme, or artifice to defraud; or, B,

2    made any untrue statement of a material fact; or, C, omitted

3    to state a material fact necessary in order to make the

4    statements made, in the light of the circumstances under

5    which they were made, not misleading; or, D, engaged in a

6    transaction, practice, or course of business which operated

7    or would operate as a fraud and deceit on any person;

8         Second:  The defendant did so in connection with

9    the purchase or sale of securities;

10        Third:  The defendant made use of, or caused the

11   use of, A, any means or instrumentality of interstate

12   commerce; or, B, of the mails; or, C, of any facility of any

13   national securities exchange, in connection with the

14   purchase or sale of securities, and;

15        Fourth:  The defendant acted with the intent to

16   defraud.

17        Information is "material" if there is a substantial

18   likelihood that a reasonable investor would have considered

19   it important in deciding whether to buy, sell, or hold a

20   security and at what price to sell -- to buy, sell, or hold

21   the security.  In other words, there must be a substantial

22   likelihood that a reasonable investor would have viewed the

23   information at issue as significantly altering the total mix

24   of information available.  Materiality of information is

25   judged as of the time the information is used to trade.

2489

1      A person uses information in connection with
2   trading a stock or options when that information is a
3   factor, however small, in his or her decision to buy or sell
4   the stock or option.  You may find that a person's conduct
5   was "in connection with the purchase or sale of securities"
6   even if there was no evidence that other purchasers or
7   sellers were harmed.
8      "Intent to defraud" in the context of the
9   securities laws, means to act knowingly and with the intent
10  to deceive.  For a person to have acted with the intent to
11  defraud means that he must have known of the fraudulent
12  nature of the scheme and acted with intent that it succeed.
13     The question of whether a person acted knowingly
14  and with the intent to defraud is a question of fact for you
15  to determine like any other fact in question.  This question
16  involves one's state of mind.  The -- involves one's state
17  of mind.
18     The term "instrumentality of interstate commerce"
19  means instruments, devices, and means of conducting trade,
20  commerce, transportation, or communication among any two
21  states.  Instrumentality of interstate commerce includes the
22  use purely within one state of a telephone or any other
23  instrument used in the conduct of interstate commerce.
24     The term "facility of a national securities
25  exchange" includes any property or services maintained by

1    Over-the-Counter Markets.

2          It is not necessary that the defendant be directly

3    or personally involved in the use of an instrumentality of

4    interstate commerce or use of any facility of a national

5    security exchange.  It is enough for you to find that the

6    defendant was an active participant in a scheme and took

7    steps or engaged in conduct that he knew or reasonably -- or

8    reasonably -- or could reasonably foresee would naturally

9    and probably result in the use of an instrumentality of

10   interstate commerce or use of a facility of a national

11   securities exchange.  This includes placing a telephone

12   call, e-mail, or an order to a brokerage firm to buy or sell

13   securities.

14         It is not necessary that the communication over the

15   instrumentality of interstate commerce concern any

16   fraudulent material, or any -- or anything criminal or

17   objectionable.  The matter communicated may be entirely

18   innocent so long as it is in furtherance of a scheme to

19   defraud or fraudulent conduct.

20         The use of an instrumentality of interstate

21   commerce need not be central to the execution of the scheme

22   and may even be incidental to it.  All that is required is

23   that the use of an instrument of interstate commerce bore

24   some relationship to the object of the scheme or fraudulent

25   conduct.

1          Each specific use of an instrumentality of

2     interstate commerce in furtherance of a scheme to defraud

3     constitutes a separate and distinct criminal offense.

4          The defendant is alternatively charged with aiding

5     and abetting the commission of securities fraud, again under

6     Title 18 United States Code Section 2.  To find the

7     defendant guilty of aiding and abetting securities fraud

8     under any of Counts 21 through 23, you must be convinced

9     that the Government has proved each of the following beyond

10    a reasonable doubt:

11         First:  Someone commits securities fraud as charged

12    in the indictment, and

13         Second:  The defendant intentionally associated

14    himself in some way with the crime and intentionally

15    participated in it as he would in something he wished to

16    bring about.  As before, this means that the Government must

17    prove that the defendant consciously shared the other

18    person's knowledge of the underlying criminal act and

19    intended to help that person.

20         Again, the defendant need not perform the

21    underlying criminal act, be present when it is performed, or

22    be aware of the details of its commission to be guilty of

23    aiding and abetting.  But a general suspicion that an

24    unlawful act may occur or that something criminal is

25    happening is not enough.  Mere presence at the scene of a

1    crime and the knowledge that a crime is being committed are

2    also not sufficient to establish aiding and abetting.

3          Counts 21 through 23 of the indictment allege

4    certain types of fraudulent conduct "in connection with the

5    purchase or sale of any security."  The Government must

6    prove beyond a reasonable doubt, therefore, that there were

7    purchases or sales of securities and that the "fraud or

8    deceit" described in the indictment had had some

9    relationship to or was connected with these sales or

10   purchases.

11         The Government need not show, however, that the

12   defendant, or anyone associated with him, bought or sold the

13   securities in question.

14         It is sufficient to establish that there were

15   purchases or sales of both and that the conduct was of the

16   type that would cause reasonable investors to rely and that

17   some did so rely.

18         The term "interstate commerce" as used in these

19   instructions means trade or commerce in securities or any

20   transportation or communication relating to such trade or

21   commerce among the several states.

22         This element of the crime charged nay be

23   established if the Government proves beyond a reasonable

24   doubt that any means or instrumentality of interstate

25   transportation or communication, including the mails, or the

1    facilities of a national securities exchange, were, in fact,
2    used in the scheme or that such use was reasonably
3    foreseeable.
4          In this regard, however, it is not necessary for
5    the Government to prove that the defendant personally used
6    any means or instrumentality of interstate commerce or the
7    mails, or used a national exchange, or that such use was
8    contemplated or intended by anyone involved in any scheme.
9    It is sufficient for the Government to prove that the
10   defendant set forces in motion which foreseeably resulted in
11   such use.
12         The matter, material, or information mailed,
13   transported, or communicated need not itself contain a
14   threat -- a fraudulent representation or request money, but
15   must be a part of the overall scheme.
16         The securities laws relevant to this case have a
17   number of definitions that you must know.
18         The term "security" means any note, stock,
19   security-based swap, evidence of indebtedness, certificate
20   of interest or participation in any profit-sharing
21   agreement, transferable share, investment contract,
22   voting-trust certificate, certificate of deposit for a
23   security, any certificate of interest or participation in,
24   temporary or interim certificate for, read for, guarantee
25   of, or warrant or right to subscribe to or purchase any of

2494

1       the foregoing.

2              The term restricted securities means securities

3       acquired directly or indirectly from the issuer, or from an

4       affiliate of the issuer, in a transaction or chain of

5       transactions not involving any public offering.

6              The term "sale" or "sell" shall include every

7       contract of sale or disposition of the security or interest

8       in a security for value.  The term "offer to sell," "offer

9       for sale" or "offer" shall include every attempt or to have

10      to dispose of, or solicitation of an offer to buy, a

11      security or interest in a security for value.

12             The term "person" means an individual, a

13      corporation, a partnership, an association, a joint-stock

14      company, a trust, or any unincorporated organization

15      subdivision thereof.

16             The term "issuer" means every person who issues or

17      proposes to issue any security.

18             The term "underwriter" means any person who has

19      purchased from an issue with a view to, or offers or sells

20      for an issuer in connection with, the distribution of any

21      security, or participates or has a direct or indirect

22      participation in any such undertaking, or participates or

23      has a participation in the direct or indirect underwriting

24      of any such undertaking.

25             As used in this definition, the term "issuer" shall

include in addition to the definition of "issuer" above, any
person directly or indirectly controlling or controlled by
the issuer, or any person under direct or indirect common
control with the issuer.

Rule 144 under the Securities Act provides certain
requirements for resellers to avoid being classified as an
underwriter.  These rules vary on whether or not an
individual is classified as an "affiliate."  Rule 144(a)(1),
defines an "affiliate" to mean, "a person that directly or
indirectly through one or more intermediaries, controls, or
is controlled by, or is under common control with the
issuer."  Rule 405 under the Securities Act defines
"control" to mean, "the possession, direct or indirect, of
the power to direct or cause the direction of the management
and policies of a person, whether through ownership of
voting securities, by contract, or otherwise."

If a person is considered an affiliate, additional
requirements must be met in order to sell securities since
the securities will be termed "restricted securities" since
the securities are acquired directly or indirectly from the
issuer, or from an affiliate of the issuer, in a transaction
or train -- chain of transactions not involving any public
offering.  The additional requirements include a holding
period, limitation on amount of securities sold, manner of
sale, and requirement for brokers' transactions to include a

1    reasonable inquiry.

2            The defendant is charged in Count 29, which is the

3    last count, with money laundering in violation of Title 18

4    United States Code Section 1956(a)(3)(B), or aiding and

5    abetting this offense in violation of Title 18 United States

6    Code Section 2(a).

7            This law makes it a crime to knowingly use what is

8    represented to be the proceeds of specified unlawful

9    activity to conceal or disguise the nature, location,

10   source, ownership or control of the property believed to be

11   the proceeds of specified unlawful activity.

12           To find the defendant guilty under Count 29, you

13   must be convinced that the Government has proved each of the

14   following beyond a reasonable doubt:

15           First:  The defendant conducted or attempted to

16   conduct a financial transaction, or the defendant aided and

17   abetted others to conduct or attempt to conduct a financial

18   transaction;

19           Second:  The financial transaction involved

20   property that was represented by a person acting at the

21   direction of, or with the approval of, an agent of the

22   United States, to be the proceeds of specified unlawful

23   activity;

24           Third:  The financial transaction was believed by

25   the defendant to be the proceeds -- counsel, should that

1    be -- should be "the proceeds of wire fraud or securities

2    fraud"?  For the Government?  Mr. Brown?  Or what do you

3    have?

4              MR. BROWN:  I believe -- I believe so, Your Honor.

5              THE COURT:  So the word "of" after "proceeds"?  Mr.

6    Goodreid or Mr. Barnard?

7              MR. BARNARD:  We would agree.

8              THE COURT:  All right.  All right.  We'll add the

9    word "of."

10             Let me start that sentence again.

11             Third:  The financial transaction was believed by

12   the defendant to be the proceeds of wire fraud or securities

13   fraud:

14             Fourth:  The defendant conducted, or aided and

15   abetted others to conduct the financial transaction or the

16   attempted financial transaction with the intent to conceal

17   or disguise the nature, location, source, ownership, or

18   control of property believed to be the proceeds of wire

19   fraud or securities fraud.

20             The term "conducts" includes initiating,

21   concluding, or participating in initiating or concluding, a

22   transaction.

23             The term "financial transaction" means:  A, a

24   transaction involving the use of a final institution that is

25   engaged in, or the activities of which affect, interstate

1    commerce or -- interstate commerce in any way or degree; or,

2    B, a transaction that in any way or degree affects

3    interstate commerce, and that involves:  1, the movement of

4    funds by wire or other means; or, 2, one or more monetary

5    instruments; or, 3, the transfer of title to any real

6    property, vehicle, vessel, or aircraft.

7         The term "proceeds" means any property derived from

8    or obtained or retained directly -- or obtained or retained

9    directly or indirectly, through specified unlawful activity,

10   including the gross receipts of such activity.

11        "Interstate commerce" means commerce or travel

12   between the states, territories or possessions of the United

13   States, including the District of Columbia.  It is not

14   necessary that the defendant have intended or anticipated an

15   effect on interstate commerce.  All that is necessary is

16   that the natural and probable consequences of the acts the

17   defendant took would be to affect interstate commerce.

18        The defendant is alternatively charged with aiding

19   and abetting the commission of money laundering under the

20   same statute mentioned previously, Title 18 United States

21   Code Section 2.

22        To find the defendant guilty under Count 29 of

23   aiding and abetting money laundering, you must be convinced

24   that the Government has proved each of the following beyond

25   a reasonable doubt:

1        First:  Someone else committed money laundering as
2    charged in the indictment; and
3        Second:  The defendant intentionally associated
4    himself in some way with the crime and intentionally
5    participated in it as he would in something he wished to
6    bring about.  Once more, this means that the Government must
7    prove that the defendant consciously shared the other
8    person's knowledge of the underlying crime and -- underlying
9    criminal act, rather, and intended to help that person.
10        The defendant need not perform the underlying
11    criminal act, be present when it is performed, or be aware
12    of the details of its commission to be guilty of aiding and
13    abetting.  But a general suspicion that an unlawful act may
14    occur or that something criminal is happening is not enough.
15    Mere presence at the scene of a crime and knowledge that a
16    crime is being committed are also not sufficient to
17    establish aiding and abetting.
18        When the word "knowingly" is used in these
19    instructions, it means that the act was done voluntarily and
20    intentionally, and not because of mistake or accident.
21        Although knowledge on the part of the defendant
22    cannot be established merely by demonstrating that the
23    defendant was negligent, careless, or foolish, knowledge can
24    be inferred if the defendant deliberately blinded himself to
25    the existence of a fact.

1      Knowledge can be inferred if the defendant was
2   aware of a high probability of the existence of the fact in
3   question, unless the defendant did not actually believe the
4   fact in question.
5      The intent of a person or the knowledge that a
6   person possesses at any given time may not Ordinarily be
7   proved directly because there is no way of directly
8   scrutinizing the workings of the human mind.  In determining
9   the issue of what a person knew or what a person intended at
10  a particular time, you may consider any statements made or
11  acts done or omitted by that person and all other facts and
12  circumstances received in evidence which may aid in your
13  determination of that person's knowledge or intent.
14      You may infer, but you are certainly not required
15  to infer, that a person intends the natural and probable
16  consequences of acts knowingly done or knowingly omitted.
17  It is entirely up to you, however, to decide what facts to
18  find from the evidence received during this trial.
19      No matter what you infer, you must remember that
20  the burden is always on the Government to prove the elements
21  of the offense charged beyond a reasonable doubt.
22      If you find the defendant guilty, it will be my
23  duty to decide what the punishment will be.  You should not
24  discuss or consider the possible punishment in any way while
25  deciding your verdict.

2501

1          That concludes the part of my instructions
2   explaining the law that applies in this case.  Let me finish
3   up by explaining some things about your deliberations in the
4   jury room and your possible verdicts.
5          After the parties' closing statements, the bailiff
6   will escort you to the jury room and provide each of you
7   with a copy of the instructions that I have just read.  Any
8   exhibits admitted into evidence will also be placed in the
9   jury room for your review.
10          When you go to the jury room, you should first
11   select a foreperson, who will help to guide your
12   deliberations and will speak for you here in the courtroom.
13   The second thing you should do is review these instructions.
14   Not only will your deliberations be more productive if you
15   understand the legal principles upon which your verdict must
16   be based, but for your verdict to be valid, you must follow
17   the instructions throughout your deliberations.
18          To reach a verdict, whether not guilty or guilty on
19   any particular count, all of you must agree.  Your verdict
20   must be unanimous.  Your deliberations will be secret.  You
21   will never have to explain your verdict to anyone.
22          You must consult with one another and deliberate in
23   an effort to reach agreement if you can do so.  Each of you
24   must decide the case for yourself but only after an
25   impartial consideration of the evidence with your fellow

1    jurors.  During your deliberations, do not hesitate to

2    re-examine your own opinions and change your mind if you are

3    convinced that you were wrong.  But do not give up your

4    honest beliefs solely because of the opinion of your fellow

5    jurors or for the mere purpose of returning a verdict.

6            The Court has prepared a verdict form for your

7    convenience and it reads as follows.

8            Verdict form:  We, the jury, upon our oaths,

9    unanimously find the defendant Guy M. Jean-Pierre -- and

10   then there's a table.  And I won't read them all because

11   they are exactly the same, but as to each of the 29 counts,

12   there will be a table and in each horizontal row of that

13   table, it will read as follows.

14           For example, with Count 1:  As to conspiracy as

15   charged in Count 1 of the second superseding indictment, and

16   then there will be space for the jury to indicate not guilty

17   or guilty.  And that is repeated for Counts 2 through 29 in

18   the verdict form.

19           The form then concludes by saying the foreperson

20   must sign and date this verdict form and then give a note to

21   the bailiff stating that you have reached a verdict but do

22   not give this verdict form to the bailiff.  There will be

23   spaces for the foreperson to sign his or her name, and for

24   he or she to indicate the date and the time of the verdict.

25           After you have deliberated and consulted with each

2503

1   other, the foreperson will write the unanimous answer of the

2   jury in response to each question of the verdict form.

3        Only one copy of this verdict form will be provided

4   to you.  If you make an error on the form, please tell the

5   bailiff.  The bailiff will destroy the erroneous form and a

6   blank form will be provided to you.

7        If you want to communicate with me at any time

8   during your deliberations, please write down your message or

9   question, and give it to the bailiff, who will bring it to

10  my attention.  I will respond as promptly as possible either

11  in writing or by having you return to the courtroom so that

12  I can address you orally.  I caution you, however, that with

13  any message or question you might send, you should not tell

14  me any details of your deliberations or indicate how many of

15  you are voting in a particular way on any issue.

16       Let me remind you again that nothing that I have

17  said in these instructions, or anything I have said or done

18  during the trial was meant to suggest to you what I think

19  your decision should be.  That is your exclusive

20  responsibility.

21       And, finally, with respect to the indictment, the

22  portions of the indictment that you will need -- that you

23  will need to assist your deliberations are reproduced below

24  for your convenience.  You will note that the indictment

25  charges that crimes were committed on or about specified

1    dates.  The Government must prove beyond a reasonable doubt

2    that the defendant committed the crime reasonably near the

3    specified date.

4         Some counts of the indictment may accuse a

5    defendant of violating the same statute in more than one

6    way.  In other words, the indictment may allege that the

7    statute in question was violated by various acts which are

8    in the indictment joined by the conjunctive "and" while the

9    statute and the elements of the offenses are stated in the

10   disjunctive using the word "or."  In these instances, it is

11   sufficient for a finding of guilt if the evidence

12   established beyond a reasonable doubt the violation of the

13   statute by any one of the acts charged.  In order for you to

14   return a guilty verdict, however, all 12 of you must agree

15   that the same act has been proven.

16        Remember, please, that the defendant -- that the

17   indictment is not evidence.  You may not rely on anything

18   said in the indictment to find the defendant guilty on any

19   charge, and you must not let the indictment influence your

20   weighing of the evidence.  You are receiving the indictment

21   simply to help you understand what you are deliberating

22   about when you consider each count.

23        And then the instructions will conclude with the

24   second superseding indictment, which I know you will be

25   thankful I will not read at this time.

1          All right.  Folks, we're going to call it a day

2     after all of that.  I want all of you to be fresh and ready

3     to start your deliberations and to hear the closing

4     arguments tomorrow.  I did commit to the lawyers that they

5     did not have to be prepared to give you their closing

6     arguments until tomorrow morning and I will honor that

7     commitment that I made to them.  So you are being excused

8     for the day.

9          Again, I need to remind you please do not do any

10    independent research into, or discuss with anyone the facts,

11    the law, the persons involved in this case.  Please be back

12    in the deliberation room at our appointed time and I hope at

13    8:45 promptly to start with the parties' closing.  One

14    second.  Promptly start the -- the parties will start their

15    closing arguments and then at that time, I will have to then

16    inform one of you that you will not be deliberating the

17    case, and then we will start your deliberations.

18         Is there anything further that we need to deal with

19    today for the Government?

20              MR. BROWN:  No, Your Honor.

21              THE COURT:  For the defendant?

22              MR. GOODREID:  I don't believe so, Your Honor.

23    Thank you.

24              THE COURT:  All right.  We will be in recess until

25    8:45 tomorrow morning.

1          (Jury left the courtroom at 3:20 p.m.)

2              MR. BARNARD:  Your Honor.

3              THE COURT:  Yes.

4              MR. BARNARD:  A very small note, but I don't know

5     if it's in the other jury instructions.  On page 54 of the

6     jury instructions, it still -- my copy still has the Tenth

7     Circuit pattern instruction's footnote.

8              THE COURT:  Page 54?

9              MR. BARNARD:  Yeah, and mine, yes.

10             THE COURT:  Communications with the Court?

11             MR. BARNARD:  Yes.

12             THE COURT:  All right.  And your point is?

13             MR. BARNARD:  Well, I thought that the footnotes

14    were all --

15             THE COURT:  Oh, in your set.  Oh, I see.

16             MR. BARNARD:  Yeah, on my copy it has it.

17             THE COURT:  Okay.  Yeah.  Yeah, you should -- the

18    set that you received should be without annotations, so

19    that's a mistake we'll give you.  Is that the only page that

20    there's a footnote?

21             MR. BARNARD:  Yes, Your Honor.

22             THE COURT:  Mr. Brown, did you notice any other?

23             MR. BROWN:  No, I didn't, Your Honor, but on page

24    30 -- or 26, the second line reads, "Government is not

25    required to prove each of the defendants personally did one

1    of the overt acts."  That should probably read "each of the

2    conspirators" since there's only one defendant.

3              THE COURT:  Why don't you -- let's sit down.  All

4    right, so we need to -- in the sets of the instruction going

5    to the jury and for counsel, we need to delete the footnote

6    on page 54.  And go ahead, Mr. Brown.

7              MR. BROWN:  Your Honor, on page 26, the second --

8    the first full sentence reads, the defendant -- "The

9    Government is not required to" --

10             THE COURT:  Hold on, let me get there.  Hold on.

11             MR. BROWN:  Page 26.

12             THE COURT:  Yeah.

13             MR. BROWN:  The first full sentence at the top of

14   the page.  "The Government is not required to prove that

15   each of the defendants personally did one of the overt

16   acts."  I would simply suggest it read that each of the

17   co-conspirators personally did not do one of the overt acts"

18   since there's only one defendant charged in this case.

19             THE COURT:  Does the defendant agree?

20             MR. BARNARD:  Yes, Your Honor.

21             THE COURT:  Okay.  So it will be "not required

22   that" -- what's your suggested language?

23             MR. BROWN:  "Each of the conspirators personally."

24             THE COURT:  So swap out the word "conspirators" for

25   "defendants"?  Right?

2508

1        MR. BROWN:  Correct.

2        THE COURT:  Okay.  All right.  Anything else?

3        MR. BROWN:  No, sir.

4        THE COURT:  All right.  We will be in recess until

5   8:45 tomorrow morning.

6        (Proceedings concluded at 3:23 p.m.)

7                         **INDEX**

8   Item                                              PAGE

9                  DEFENDANT'S WITNESSES

10     **ERIK GERDING**
       Direct Examination by Mr. Barnard          2367
11     Cross-examination Mr. Sibert               2393

12  RECORD ON JURY INSTRUCTIONS:                  2439

13  READING OF JURY INSTRUCTIONS:                 2460

14              *     *     *     *     *

15                 REPORTER'S CERTIFICATE

16

17      I certify that the foregoing is a correct transcript

18  from the record of proceedings in the above-entitled matter.

19      Dated at Denver, Colorado, this 26th day of March,

20  2020.

21

22

23                _Mary J. George_

24        _                              _

25              MARY J. GEORGE, FCRR, CRR, RMR