IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 17-cr-0008-WJM

UNITED STATES OF AMERICA,

Plaintiff,

vs.

GUY JEAN-PIERRE a/k/a Marcelo Dominguez de Guerra,

Defendant.

------------------------------------------------------------

REPORTER'S TRANSCRIPT
(Jury Trial, Day 12)
Volume XII

------------------------------------------------------------

Proceedings before the HONORABLE WILLIAM J. MARTINEZ,
Judge, United States District Court for the District of
Colorado, commencing at 9:03 a.m., on the 30th day of
January, 2019, in Courtroom A801, United States Courthouse,
Denver, Colorado.

APPEARANCES

JEREMY S. SIBERT and ROBERT M. BROWN, Assistant U.S.
Attorneys, 1801 California Street, Suite 1600, Denver,
Colorado 80202, appearing for the plaintiff.

CLIFFORD J. BARNARD, Attorney at Law, 4450 Arapahoe
Avenue, Suite 100, Boulder, Colorado 80303, AND
THOMAS E. GOODREID, Attorney at Law, 1801 Broadway,
Suite 1400, Denver, Colorado 80202, appearing for the
defendant.

MARY J. GEORGE, FCRR, CRR, RMR
901 19th Street, Denver, Colorado 80294
Proceedings Reported by Mechanical Stenography
Transcription Produced via Computer

1                      P R O C E E D I N G S

2          (Proceedings were held in open court in the presence of

3    the jury at 9:03 a.m.)

4          THE COURT:   Good morning, ladies and gentlemen of

5    the jury.   Welcome back to day 12 of our jury trial.

6          So we're going to go into closing arguments.   A

7    couple of things I need to tell you:   Each side gets the

8    exact same amount of time.   I've told the lawyers that they

9    can take up to 75 minutes.   Because the Government has the

10   burden of proof, the law permits the Government to break up

11   its closing argument into an opening segment and a rebuttal.

12   The defendant, because the defendant does not have the

13   burden of proof, does not have that right, and so the

14   defendant's closing argument has to be in one segment.

15         We will hear the opening segment of the

16   Government's closing argument, we'll take a brief 10-minute

17   recess, and then we'll have the concluding -- or the closing

18   argument for the defendant and the rebuttal closing argument

19   for the Government.

20         All right.   Closing argument for the Government.

21         MR. SIBERT:   Yes, sir.   Thank you.   May it please

22   the Court, counsel, ladies and gentlemen of the jury.

23         If investors fear being defrauded by issuers,

24   companies, they will no longer invest in the stock market.

25   Those aren't my words.   Those were the words of the

1    defendant Guy Jean-Pierre's expert.

2          Fear of investment.  I told you in the beginning of

3    this case the market rises and falls with the confidence of

4    the investor.  And one of the key essential elements for

5    that confidence is trust in the companies, the issuers, that

6    put out statements and information that they disclose to the

7    public.  And those that are fraudulent, those that are

8    dishonest, those that don't want to make investors to invest

9    in the market are committing fraud.  They're lying.  They're

10   not telling the public the truth.  And a truthful market is

11   essential for our economy.  It's essential for people to be

12   able to trust in and be able to invest their money in for

13   retirement.  When you don't have that trust, and when you

14   have fraud like you have seen in this case, $12 million

15   ended up not in the investor hands, but in the hands of the

16   defendant and his co-conspirator, Scott Dittman and William

17   Sears.

18         The fraud in this case is like an onion.  There's

19   some layers to it and it can make people cry.  I want to go

20   back.

21         In 2009, Mr. Guy Jean-Pierre is told by the OTC

22   Markets, the marketplace for the small penny stocks, the

23   Microcap stock, that he's not doing a good job as a lawyer.

24   He needs to improve his work; his due diligence.  He doesn't

25   do it.  In fact, he continues to say -- and he's warned,

1    that the disclosure statements that he provides don't

2    support enough information about the company under the

3    guidelines.  But he doesn't quit.  And then he gets banned

4    from the OTC Markets.  They will no longer accept his

5    letters -- his current information letters, the letters that

6    OTC relies on to say that all the information that the

7    company posts, FusionPharm in this case, is current and

8    correct and is disclosing the right information.  He's

9    banned in 2010.

10           So we dive into the first layer.  The first layer

11   is that Mr. Guy Jean-Pierre then uses his niece at the time

12   Ms. Leslie Dinwoodie.  And he drafts a 144 letter using her

13   name for Microcap.  And who owns Microcap?  William Sears.

14   And he drafts that letter, forges his niece's name, and that

15   letter is used to transfer 4 million shares of Baby Bee

16   Bright into 20,000 shares after a reverse split of

17   FusionPharm stock.

18           He also, at that point in time, reaches out to a

19   gentleman that you heard also, Mr. Tod DiTommaso, the lawyer

20   from California.  And he gets him to start doing signatures

21   on letters based upon the information that Mr. Guy

22   Jean-Pierre sends him, for not companies of FusionPharm,

23   prior companies in 2010.

24           So he gets banned and he calls his niece and says,

25   "Hey, come on.  Join my law firm.  I need three copies of

your signature."

And he drafts that Leslie Dinwoodie letter that you see in Government Exhibit 47.  The Oppenheimer package, the brokerage package, the broker that relied on the attorney's opinion saying that these stocks were free and clear, they could be traded, that Billy Sears was not a control person of FusionPharm, was not an affiliate.

Then you have Mr. Tod DiTommaso he hires.  And you'll hear in that video he had to work with him a little bit, had to pull him in to gain his trust.  And then FusionPharm comes.

How do we know Sears is FusionPharm?  Well, can I please play 5-a, please.

(Video played)

MR. SIBERT:  There is no FusionPharm without Billy Sears.  You saw hundreds of e-mails that we provided in evidence, so you're going to have to look at that if you need to, that show William Sears is involved in everything with FusionPharm.  You heard multiple witnesses:  Mr. Duke; Mrs. Blume, Mr. Bodden; Billy Sears, himself.  You heard that he gave a statement to the FBI, he was an undisclosed affiliate.  You heard from Scott Dittman.  Everyone saying Mr. Sears was an equal owner in FusionPharm.

And who knows Mr. Sears?  Guy Jean-Pierre.  They go back to 2010, at least, in the evidence in this case.  They

1    had a prior relationship.  He helped Mr. Sears confer Baby

2    Bee Bright to FusionPharm.

3          In addition, in 2011, they start talking about the

4    disclosure statement.  There's two disclosure statements

5    that Guy Jean-Pierre sends to Mr. Sears, the disclosure

6    statements that go out to the Over-the-Counter Markets

7    saying, "This is who FusionPharm is."

8          And as you heard, Mr. Guy Jean-Pierre knew that Mr.

9    Sears had a felony conviction for securities fraud.  You

10   heard that through Mr. Dittman, you heard that through Mr.

11   Sears, himself.  Nowhere on those disclosures did the

12   Over-the-Counter Markets in 2011, September 2011, and June

13   2011, and all the way throughout until 2013, you never see

14   Mr. Sears' name on those disclosures.  The public has no

15   clue who William Sears truly is.  And it's because of Mr.

16   Guy Jean-Pierre.

17         And you heard Mr. Sears.  You're not going -- he

18   didn't hide it.  You know, you saw him on the video.  He's

19   walking around FusionPharm's warehouses with two

20   investors -- at least that's what he thinks they are.  He

21   works there seven days a week, 12 hours a day.  Scott

22   Dittman, the CEO, is flying out that day to his house in

23   Pennsylvania.

24         And, finally, ladies and gentlemen, you have heard

25   from Mr. Thel, an expert in securities law, that after

1    looking through some of the e-mails, the contacts in this

2    case, mostly regarding the financials.  There's no doubt in

3    his opinion that Mr. Sears was an affiliate, a control

4    person.

5            So what does Guy Jean-Pierre do for Mr. Sears and

6    FusionPharm and Scott Dittman?  Well, remember, it goes back

7    to the very beginning with Microcap, Mr. Sears' company, and

8    that Leslie Dinwoodie letter, and what that does -- that 144

9    letter.  Don't think about his law.  You heard from experts

10   in law.  In fact, the defense expert, he was great on law,

11   he knows security law, but you know what he doesn't know?

12   He doesn't know anything about this case.

13           I'm going to make it very easy.  I'm not going to

14   give you a lecture.  I'm going to give you a very simple way

15   to use and analyze a 144 letter.  It's a printing press.  It

16   takes paper, stock, that's restricted and it turns this

17   paper from one pocket and calls it a sale of stock and cash

18   to go into the other pocket.  It's a printing press.

19           Every time there's a 144 letter in this case,

20   drafted, forged by Mr. Guy Jean-Pierre, it turns restricted

21   stock into money.  It turns that stock that Mr. William

22   Sears holds in one pocket and puts the cash in his other

23   pocket.

24           You know who doesn't know where that cash is going

25   into Mr. Sears' pocket?  The public.  Because if they knew

1    that, if they knew the money in the stock that was being

2    sold and all that cash coming in, the $12 million, was going

3    right back into the pockets of people that were selling the

4    shares of stock, there would be no investors.  Why would you

5    invest to make someone else rich?

6            So it's a 144, it's a printing press.  Microcap,

7    the forgery of Leslie Dinwoodie, his own niece's signature.

8    And then what happens?  65 percent of the volume for

9    FusionPharm stock was coming from Microcap sales, from an

10   Oppenheimer brokerage account.  Exhibit 47.  That causes

11   FusionPharm to be put on a radar and that's when FINRA gets

12   involved and that's when Mr. Kramer says, "Something's going

13   on here."

14           You know, there's an old saying, "If it smells like

15   dog, it feels like dog, it's -- probably is dog."

16           All right.  So he starts investigating.  He calls

17   FINRA.  And the first thing that the CEO of FusionPharm

18   tells his brother-in-law in Government Exhibit 372-P, "Do we

19   need to get Guy involved?"

20           So they do get Guy involved.  And what does Guy

21   Jean-Pierre do?  He responds back and basically gives the

22   old, "get lost" letter, "I'm not answering anything about

23   Microcap.  How dare you contact us about Microcap?  We're

24   FusionPharm."

25           Professional.  Almost as professional as using his

1    niece's signature.

2          What do we see in evidence?  Look at 314, the

3    exhibit.  As soon as FusionPharm is investigated by

4    Microcap, all these checks that are being written by Mr.

5    Sears are now being written by Scott Dittman.  It was the

6    wake-up call.

7          Can I have Exhibit 290, please, published.

8          Okay, ladies and gentlemen, unfortunately, as

9    defense expert testified, he had no clue about the facts of

10   this case, but he's going to render an opinion about what he

11   thinks about the graph?  Okay, but remember, this Microcap

12   letter, the 144 letter, the printing press, all the red.

13   All that is is the sale of FusionPharm stock.  Not the --

14   not purchasing, the sale by these entities, MeadPoint,

15   Microcap, Microcap, and Bayside.

16         The green -- maybe if the expert had listened to

17   the whole case, the green is the sale and purchase of other

18   people trading.  So every time there's a sale, someone has

19   to buy the stock.  The red is just the sale of FusionPharm

20   stock.  The money.  The money.

21         And where's it going to?  Sears.  Why?  Because he

22   got the printing press, the 144 letter that was written and

23   forged by Mr. Guy Jean-Pierre.  That's what that graph

24   shows.  Not to mention anyone doesn't have to be an expert

25   to see the price going up.

1           And, finally, I want to capture on, "Well, how's

2    Mr. Guy Jean-Pierre know that Microcap's owned by Billy?"

3           He knows.  In June of 2012, he's drafting a 144

4    letter for Tod DiTommaso that Mr. Tod -- or, excuse me, Todd

5    Abbott, that Mr. Tod DiTommaso signs, in June of 2012.  A

6    month later he's drafting another 144 letter, another -- the

7    printing press is working again, overtime.  Blowing smoke.

8    Because more cash; need cash.

9           So what they do is they send in a letter saying

10   that Microcap is now owned.  By who?  The deal is selling by

11   who?  William Sears.  189, 187, 192 are those exhibits.  A

12   month later.  So Todd Abbott is selling shares to Microcap;

13   Microcap is listed as Billy Sears.  A month later, Microcap

14   is converting shares:  Billy Sears.

15          He's drafting those letters.  He exactly knows who

16   Microcap is.  Just like he knows who Bayside is.  You heard

17   Mrs. Sears, the mother.  I didn't want to put her on the

18   stand.  I didn't want to have to ask her tough questions.

19   But know who made me do it?  The co-conspirators in this

20   case:  Mr. Sears and the defendant, Guy Jean-Pierre.

21          Lets's talk about VertiFresh for a second.

22   VertiFresh, 2012, March.  March of 2012, VertiFresh deal.

23   Who's making the licensing agreement?  Who's sending this to

24   Mr. Sears?  Mr. Guy Jean-Pierre.

25          By the way, it doesn't only go to Mr. Sears, it

1    also goes to Scott Dittman.  Remember:  Sears, Dittman, Guy

2    Jean-Pierre.  It's not a big corporation.

3            That's March.  Then we have the exclusive licensing

4    agreement in July of 2012.  And then we have the

5    announcement in September 2012 saying that VertiFresh is

6    going to be Scott and William Sears.  Why is that important?

7    Because in 2012 disclosure to the public, after Guy

8    Jean-Pierre sends to Mr. Sears, who's not disclosed, but

9    Scott Dittman is, who's all on these packages, comes out in

10   2012 disclosure and says, "90 percent of the profits for

11   FusionPharm are because of the VertiFresh agreement."

12           And nowhere is it disclosed that Sears is involved

13   and nowhere is it disclosed there's a family transaction or

14   a closely tied transaction in those papers -- in the

15   paperwork to the investors that they see.  And who knows

16   this?  Mr. Guy Jean-Pierre.  And then who drafts the current

17   information letter that the lawyer Tod DiTommaso signs?  Mr.

18   Guy Jean-Pierre.  And who sends the documents to Mr. Tod

19   DiTommaso to review for the company before those disclosures

20   are sent out?  Mr. Guy Jean-Pierre, the corporate secretary,

21   the legal counsel.

22           He knew what was going on.  He drafts the documents

23   and he sends them to Sears and Dittman.  And then he only

24   gives what he wants Tod DiTommaso to see in order for him to

25   sign his draft letters.

1          Think of it this way:  Tax season's coming up.  If

2      a person files a W-2 in their working papers and what they

3      make per year to their accountant but forges that and says

4      their income is way less than what it is, and the accountant

5      relies on that paperwork, the accountant doesn't know the

6      paperwork's forgery; he isn't -- shouldn't be held

7      responsible.  It's the person that commits the fraud that

8      should be held accountable.  That's Mr. Guy Jean-Pierre.

9          Let's talk about these notes.  We made a lot of

10     argument about what was in 2011, and then what happened

11     later in 2012.  What happened in 2011 is that there were

12     notes and those notes were based upon the selling of

13     FusionPharm stock, and they had to book it somehow.

14         So Sears says, let's book it as loans from me,

15     Bayside and Microcap and MeadPoint, to FusionPharm, my

16     company.  Again, loaning himself money on the paperwork so

17     the public doesn't know what's going on.  Paperwork which

18     Mr. Guy Jean-Pierre saw as the legal counsel and corporate

19     secretary.

20         Then they're running out of the free-trading stock

21     in Microcap and all of a sudden they're on the radar with

22     FINRA.  So they're trying to figure out how do we get more

23     money?  How do we sell more shares?  "Well, let's try to

24     sell these notes.  Let's create these notes."

25         And you heard Mr. Bodden testify, so he does all

1    this work and he creates this due diligence package for Nick

2    Malino in May of 2012.  And look, 372 JJ, that's the due

3    diligence package.  And who's it sent to?

4    Guylawfirmofjean-pierre.com.  And it has the note in it.

5    And, I'm sorry, I said 372 JJ, but it's actually Government

6    Exhibit 255.  And it has the note in there.  And nowhere in

7    this note is a convertible feature of June 2012.  So at the

8    very earliest, it could be June 21st when they added the

9    convertible feature, which means when they sold those notes

10   in 2013, the earliest that that note could be free shares to

11   trade, taking the restrictions off because of the 144

12   exception that you heard about, would be June 21st, 2013.

13   But they sell those notes in January 2013, and later in that

14   spring for the MeadPoint note.

15          And they're saying that they were held for a year

16   because, remember, they backdated an agreement that never

17   existed.  And even the defense's expert stated that there's

18   no agreement in 2011, and there was no agreement until later

19   in November 2012, and they backdated it for 2011.  He had to

20   say yes, that would be fraud.  So he knows in June 2012

21   there's no convertible feature in these notes.

22          Can I please have Government Exhibit 36 -- 363-A

23   played starting at 5 minutes.

24      (Video played)

25          MR. SIBERT:  He knows the law.  He knows you can't

1    add that convertible feature.  Convertible feature must be

2    part of the debt.  He says it in the undercover.  So we know

3    in June 2012 when he's looking over his due diligence

4    package that he sent and are trying to sell this note to

5    Nick Malino, there's no convertible featured.  And then in

6    November 2012 is when Mr. Bodden testifies he starts seeing

7    e-mails and message traffic about the convertible feature of

8    the note where that note can be cashed in for shares of

9    stock, FusionPharm stock, not at the market rate, but at the

10   discount of 1 cent per stock.

11         Can I have the PowerPoint, please.

12         I want to talk about the charges in this case.

13   Wire fraud, Counts 2 through 16.  All the Government has to

14   show for you to find Mr. Guy Jean-Pierre to be guilty in

15   this case is that he aided and abetted these counts.  So

16   what does that mean?  Someone other than the defendant, Guy

17   Jean-Pierre, that wire fraud was committed.

18         What is wire fraud?  It is a devised, or intended

19   to devise a scheme to defraud or for obtaining money or

20   property by means of false, fraudulent pretense,

21   representation, or promise.  That that person -- and I'm

22   going to argue to you there's more than one, it's either

23   Scott Dittman or, more than likely, Mr. William Sears, acted

24   with a specific intent to defraud.

25         That there was a use of interstate commerce

1    facilities, or that someone else used interstate wire

2    commerce -- communication facilities for the purpose of

3    carrying out the scheme.  All that is, ladies and gentlemen,

4    is a wire transaction:  E-mail, transfer of the packages,

5    the disclosure statements, from here in Colorado to OTC.

6    Remember what Ms. Heese said in OTC?  Once it's posted, it

7    goes worldwide.  The world can see it.  That's interstate.

8    That's all that is.

9         If they didn't have to -- if they didn't have to

10   disclose those OTC disclosures via wire, then there might be

11   an argument, but as you heard, everything was uploaded.

12   That's called interstate commerce; that's called interstate

13   communications.

14        And the scheme was to employ -- the scheme that was

15   employed under false, fraudulent pretenses, the

16   representation or promises were material.  And I'm going to

17   argue to you the fact that this honesty and the lack of

18   trust in those disclosure statements in those legal opinion

19   letters, was material because it didn't tell the investor

20   the truth.  And they made decisions based upon what was in

21   those disclosures.

22        So look at the counts -- and I'm going to give you

23   some of the exhibits that the counts go to that you can look

24   at because there's over 500 exhibits.  And as you saw, it

25   was a mountain of a task to get all those in.

1          And I want to focus your attention.  Count 2, the
2     FusionPharm quarterly report for June 30th, 2012.  That's
3     19B.  That's the report.  Nowhere in that report will you
4     see Mr. William Sears.
5          Count 3, Exhibit 19-C, FusionPharm quarterly report
6     for September 30th, 2012.
7          Count 4, the annual report for 2012 for
8     FusionPharm, that's Exhibit 25.
9          Count 5, Exhibit 27, the quarterly report for
10     FusionPharm that ended on March 31st, 2013.
11          Count 6, Exhibit 30, that's the quarterly report
12     for the period ending June 30th, 2013.
13          Count 7, 29, you'll see through this, this is the
14     supplemental information, the OTC Pink basically disclosure
15     outlines that's submitted by FusionPharm.
16          Now, let's talk about the current information
17     letters.  And, again, why are these important?  Because this
18     is where the lawyer is saying everything that's been posted
19     is correct and true for that time period.
20          Count 8, 24 is the letter, and 193 is an e-mail
21     from Guy Jean-Pierre to Mr. DiTommaso with the shareholders
22     list.
23          Count 26 -- or, excuse me, Count 9 is Exhibit 26,
24     and Exhibit 27 is an e-mail from Guy Jean-Pierre.  And 26 is
25     the letter.

1          Count 10, 28 is the letter, 372-LLL, that's the

2     e-mail from Guy Jean-Pierre for forwarding to who?  Sears

3     and Dittman saying, "Here's the current information letter."

4          Count 11, Government Exhibit 31, that's the letter.

5     And then 212 is, again, an e-mail from who?  Mr. Guy

6     Jean-Pierre to Mr. Tod DiTommaso giving him the

7     shareholders' list, providing him the documents.

8          Now, remember, you were told, according to Mr.

9     DiTommaso, to go up and look at what's posted on the OTC

10    Market place.  Rely on the documents that are posted.  "I'm

11    the corporate secretary, I'm the legal counsel.  Look at

12    what the public's looking at.  It's all right."

13         That's not the truth.  That's not what happened.

14         Count 12, these deal with the 144 attorney letters,

15    the printing press.  The letters that caused paper to turn

16    into money.  72 is the package from Pacific Stock Transfer.

17    Look at pages 16 and 26.  That's the e-mail from Sears

18    sending on the 144 letter.  197 is the e-mail from Mr. Guy

19    Jean-Pierre that says, "Mr. Tod DiTommaso, here's the 144

20    letter."  197-A is the draft letter.  You can look at 219

21    and 197-A and compare these letters.  There is no difference

22    except for the letterhead and signature.

23         Again, Count 13, Government Exhibit 74 and 76 are

24    the packages to the Pacific Stock Transfer agents.  And then

25    the e-mail from Mr. Sears is in Exhibit 74, pages 5 to 11.

The letters and the e-mails from Mr. Guy Jean-Pierre to Tod
DiTommaso are 200, 200-C, 201, 201-C, 202, 20C, 203, 203-C,
and 206, 206-C.

The 144 letter for the issuance of 4,075 shares of
MeadPoint, that's the package of 77 and 78, Count 14; and
the letter is 211, 211-B.

The 144 regarding the letter of sale to MeadPoint
note, that's Exhibits 133, page 30, and 220 shows the
invoice of Mr. Tod DiTommaso billing Mr. Guy Jean-Pierre for
that letter.

And, finally, Count 16, e-mail from Sears to
Pacific Stock Transfer is 81, 84, and then the letters are
215 is the e-mail and the letter's 215-B.

And Exhibit 219 are the letters submitted by Tod
DiTommaso's signature.  Compare those letters.  They're the
same thing.

Mail fraud, Count 17 through 20.  Someone -- again,
all we have to prove is that Mr. Guy Jean-Pierre aided and
abetted, assisted someone, helped someone intentionally,
someone other than the defendant, committed mail fraud.
Well, what is mail fraud?  It's very similar to wire fraud
except it deals with the mail.  That someone devised or
intended to devise a scheme to defraud or for obtaining
money or property by means of false, fraudulent pretenses,
representations, or promises, that the person acted with a

1    specific intent to defraud, that the person used mail --

2    used the U.S. mail or Federal Express, or caused another

3    person to mail something through a commercial interstate

4    carrier for the purposes of the scheme.  And, finally, the

5    scheme employed a false, fraudulent pretenses,

6    representations, or promises that were material.

7         Ladies and gentlemen, I'm sorry, we had to put up

8    the transfer agents.  They were not a ball of fire.  But the

9    reason why we needed them was because we could get into the

10   evidence that showed these transfer packages and, more so,

11   the transfer packages that dealt with the Federal Express

12   that mailed these 144 letters and the stock certificates

13   that are now not restricted that turn into money.  And they

14   mailed them back to who?  William Sears.  And where does

15   Sears put them?  He put them into the brokerage house to be

16   sold.

17        And why were they allowed to do that?  Because of

18   the printing press, the 144 letters that Mr. Guy Jean-Pierre

19   wrote saying that William Sears was never an affiliate and

20   also the holding period of one year that was never met.

21        What are those exhibits?  And I'm not going to

22   spend time on the numbers.  You can look at these numbers.

23   They match.  Government Exhibits 114 and 116.  That's the

24   shipping from the Pacific Stock Transfer agent and that's

25   the FedEx receipt that showed it was shipped, so using the

1    mail.  116, 117 for Count 18.  Count 19, 72, 73.  And Count

2    20, 79 and 80.

3            Those exhibits will show you the shipping from

4    Pacific Stock Transfer Agency and it will also show -- the

5    second exhibit will show you the FedEx documentation that

6    the tracking number matches showing that those letters and

7    those free-trading certificates now, the money certificates,

8    were sent out, all because they relied on the 144 letters.

9    The printing presses saying that William Sears was never an

10   affiliate and those shares were held by a year.  None of

11   which were true.  None of it was true.

12           Remember, just so you understand, when -- the

13   Bayside and MeadPoint note, none of that was created until

14   November 2012.  They started converting those shares at the

15   end of 2012 and beginning of January 2013 because they

16   backdated the notes.  And then the letter, the 144 letter,

17   has the backdated dates in it, so it looks like the

18   convertible notes were there for a year.  Well, they were

19   never there for a year.

20           And not to mention, who owns MeadPoint?  William

21   Sears.  Who owns Bayside?  William Sears.  What does that

22   mean?  Bayside and MeadPoint are affiliated with

23   FusionPharm.  But yet Guy Jean-Pierre drafts letters saying

24   nonaffiliation to FusionPharm.  From this pocket back into

25   this pocket.

1          Securities fraud.  Here we have to prove beyond a

2     reasonable doubt that Guy Jean-Pierre knowingly and

3     willfully employed any device, scheme, or artifice to

4     defraud, or made an untrue statement or material fact.  I

5     think that's really easy.  Untrue statement.  What's the

6     untrue statement in this whole case?  That Mr. William Sears

7     was never an affiliate.  But that's who he worked with;

8     that's who he had a relationship with.

9          Omitted to state a material fact necessary in order

10    to make a statement made in light of circumstances under

11    which they were made not misleading.

12         Well, we know it was misleading because I asked Mr.

13    Cruz "If those 144 letters -- if you knew that William

14    Sears, Bayside, MeadPoint, was William Sears, an affiliate

15    of FusionPharm, would you have cleared that stock?"

16         What was his answer?  "No."

17         Who drafted that printing press?  Who drafted that

18    letter to make that money?  Mr. Guy Jean-Pierre.

19         Engaged in a transaction, practice or course of

20    business which operated or would operate as a fraud and

21    be -- act as a fraud or deceit on any person -- deceit on

22    any person.

23         Take your pick, ladies and gentlemen:  A through D.

24    Doesn't matter.  We just have to prove one.  I would argue

25    to you we proved all four.  That defendant Guy Jean-Pierre

1    did so in connection with the purchase or sale of the

2    securities.

3         Let me have Government Exhibit 433, please.  Can I

4    have Exhibit 433 -- oh, I'll hold off on that for a second.

5    I want to go back to the elements real quick.  I'm sorry.

6    I'm going to hold off on No. 2.

7         And the defendant, Guy Jean-Pierre, made use, or

8    caused to be used any means or instrumentality of interstate

9    commerce or the mails, or a facility of any national

10   securities exchange in connection with the purchase or sale

11   of securities, and that Mr. Guy Jean-Pierre acted with the

12   intent to defraud.  Well, we know that these stocks were

13   sold on the OTC Markets, but we also know that those 144

14   letters and the packages that Mr. Sears sent the brokers

15   held all them through wire or the mail.  So either way, we

16   meet both of those elements.

17        And why was it defrauding?  Well, because it wasn't

18   the truth.

19        And so let me have Government Exhibit -- let me

20   just hit real quick on page -- the next page, securities

21   fraud charges, because I want to show you where these

22   packages are.  It's Exhibit 120 through 122, and that deals

23   with Microcap, and you remember we went through all that

24   paperwork with Mr. Cruz; the opening of the account and then

25   the request to sell shares.  And remember, Microcap was Mr.

1    Sears.

2         Then Count 433 [sic] will show the transaction

3    where Scottsdale/Alpine traded and sold those shares of

4    FusionPharm.

5         Count 22, again, this is for Bayside.  We went

6    through the paperwork with Mr. Cruz.  That's 126 and 127.

7    And then the transaction of actually selling those stocks is

8    on the 434.

9         And then Count 3, the paperwork for MeadPoint is

10   129, 131, 133, 134, that's all the Alpine/Scottsdale

11   paperwork, and the transaction of sale is 432.

12        Can I have 433, page 4, please.  Can I have page 4.

13   Can I have 10-18.

14        And here's the sale.  Here's the sale.  Sold

15   FusionPharm stock, Microcap Management.

16        Can I have 434, page 4.  Exhibit 434, page 4.

17        Here's the sale of MeadPoint -- of Bayside.

18        And, finally, can I have Government Exhibit 432,

19   page 4.  And here's the sale.  21,576 shares of FusionPharm

20   stock.  MeadPoint.

21        Again, we can look at -- can I have the outline,

22   please.

23        Finally, we go to the outline regarding the wire

24   fraud counts for 24 through 28.  And this deals with

25   essentially the undercover.  And this deals with the four

1    counts of dealing with the information that Mr. Guy

2    Jean-Pierre sent to the undercover and Mr. Sears, now

3    cooperating with the Government, regarding this false

4    company, VertiFresh, that was going to be undisclosed by

5    E.J. and Mr. Sears, himself.  And Mr. Guy Jean-Pierre, as

6    you saw in the undercover and heard in the undercover, was

7    participating in that freely.

8         And that occurs -- can I have the bar explaining

9    the wire fraud elements to -- they don't change from the

10   first slide for 2 through 16.

11        Can I have Government Exhibit -- so if you look at

12   Government Exhibit 323, 323 is a list of the e-mails that

13   was done -- that were conducted by Agent Funk here and the

14   other agent regarding the e-mails that they were sending to

15   Mr. Guy Jean-Pierre in the DR.  And as you can see through

16   the Counts -- I'm going to show you Government Exhibits 325,

17   326, 328, 329, and 330.

18        Can I have the PowerPoint back up real quick.

19        These are the exhibits that show the consulting

20   agreement, the convertible promissory note, the two drafts

21   of it, the purchase and assignment agreement, and the form

22   of debt conversion opinion.  All drafted by Mr. Guy

23   Jean-Pierre from the DR sent via wire e-mail to the

24   undercover FBI agent's control in this operation.  Just

25   because it's an undercover doesn't mean there wasn't a crime

1    committed.  It's a scheme to defraud.  And Mr. Guy

2    Jean-Pierre was willfully -- willing to be involved in that

3    scheme.

4              Now, remember, it was Mr. Sears that was now being

5    sought after by Mr. Guy Jean-Pierre to do more securities

6    fraud work, after Mr. Guy Jean-Pierre knew about the search

7    warrant.  He just doesn't quit.  He's like the Energizer

8    bunny.  He just keeps going, going, going, and going.

9              He was told he can't do this and he just keeps

10   doing it.  You can't keep defrauding the people, the

11   investors, or what that expert wrote about, and spent his

12   life writing about will happen.

13             No one wants to be part of a market that isn't

14   based upon truth.  And lawyers like Mr. Guy Jean-Pierre that

15   know the law, that are well-educated, that are experts in

16   this field, just commits fraud.

17             COURTROOM DEPUTY:  Five-minute warning.

18             MR. SIBERT:  That goes against the truth.

19             Thank you.

20             I just want to spend on the last slide the money

21   laundering.  What does this mean?  Well, Mr. Guy

22   Jean-Pierre, as you heard in the undercover, agreed to help

23   Mr. Sears out with the $5,000 check.  In fact, it was

24   supposed to be more; it's supposed to be $100,000.  But

25   we're not going to use taxpayer's money to send to Guy

2534

1    Jean-Pierre $100,000.  So we used some of the money seized
2    in this case to go ahead and send a $5,000 cashier check
3    down to Guy Jean-Pierre.
4         And he understood where this money was coming from.
5    He understood, through Sears and the e-mails that this was
6    money left over from the FusionPharm, the selling of stock.
7    Taking the paper and putting the money in his pocket.  And
8    Mr. Sears didn't want law enforcement to get it.  And so he
9    agreed to take this money and hide it in the DR in a bank
10   that he had an account under.
11        And you saw the paperwork where the check came from
12   First Bank, was sent down there.  And we called a guy in
13   from Bank of America to show that that check was deposited
14   and First Bank covered it -- or, excuse me, Bank of America
15   covered that amount because it was a foreign bank and it had
16   a relationship here in the U.S.  It was Mr. Guy Jean-Pierre
17   that agreed to that.  He didn't do it for free.  He was
18   going to take 5 percent.  But he agreed to do it.  And you
19   can look at Government Exhibits 365 through 367 and 370 to
20   see evidence of that crime.
21        He worked for FusionPharm early in 2011.  He helped
22   with the FINRA name change, he helped with the FINRA
23   investigation.  He did the disclosures.  He set up the
24   meeting with Scott Dittman and Tod DiTommaso.  He came out
25   to Colorado to visit.

1            2012, Sears and Bodden go down to see Mr. Guy

2     Jean-Pierre, fall of 2013 to see Mr. Guy Jean-Pierre, every

3     time regarding the business, the money, the convertible

4     note, the selling of FusionPharm shares.  Money in all of

5     the pockets of Sears and FusionPharm, not in the pockets of

6     investors.  The printing press.  The 144 letters.

7            And in this dishonesty to the public in the

8     over-the-counter market letters, all of which he drafted and

9     sent to another attorney representing FusionPharm,

10    representing FusionPharm as a corporate secretary and legal

11    counsel, saying, "This is correct, this is true.  I need an

12    outside counsel to sign them, read them, and look at what's

13    posted on line."

14           Outside counsel, Mr. Tod DiTommaso, never knew Guy

15    Jean-Pierre was banned.  He relied on another lawyer.  He

16    didn't know he was banned.  And as you have heard, it wasn't

17    until his deposition with the SEC that all this came

18    together and he realized that -- who committed fraud on him?

19    Mr. Guy Jean-Pierre.

20           I argued to this jury that Mr. Guy Jean-Pierre

21    committed fraud on the public by being dishonest, by not

22    being truthful, by not disclosing Mr. William Sears' true

23    role as an affiliate with FusionPharm, about hiding him as a

24    nonaffiliate, by not posting him in the information that was

25    put out to the public, by not correcting the information in

1    the legal letter, and by telling the brokers and the

2    transfer agents that there was no relationship with Mr.

3    Sears, Bayside, MeadPoint, Microcap, to FusionPharm.

4           THE COURT:  I'll give you another minute, Mr.

5    Sibert.

6           MR. SIBERT:  I'm going to ask you at the end on

7    rebuttal to come back with a guilty count on all 29 charges

8    in this case because the truth is that Mr. Guy Jean-Pierre

9    committed fraud.  And the result of that, the $12 million

10   went into the wrong hands instead of the investors that

11   believed that information.

12          THE COURT:  All right.  Ladies and gentlemen of the

13   jury, as I told you earlier, we will now take a 10-minute

14   recess.

15       (Recess taken 9:57 a.m. to 10:09 a.m.)

16          THE COURT:  Ladies and gentlemen, I neglected to

17   tell you earlier, but I want to remind you that closing

18   arguments by counsel are not evidence.  All right.

19          Closing argument for the defendant.

20          MR. BARNARD:  Thank you, Your Honor.

21          THE COURT:  Mr. Barnard.

22          MR. BARNARD:  May it please the Court, counsel,

23   Jean-Pierre -- Guy Jean-Pierre.

24          Good morning, ladies and gentlemen of the jury.  As

25   you retire to the jury room for deliberations in this case,

1    I want you to keep in mind, among other things, three big

2    topics.  The first thing I want you to remember to look at

3    and consider carefully is follow the money.  The second item

4    is willfulness, intent to defraud.  And the third item is

5    the Government's burden in this case of proving each and

6    every element beyond a reasonable doubt.

7           Now, what is this case not about?  This case is not

8    about Scott Dittman or William Sears.  Neither of whom are

9    on trial here, although at times you may have thought that's

10   what it was about and was certainly a part of this case

11   because -- and the Government spent an extraordinary amount

12   of time -- excuse me -- on evidence dealing specifically

13   with them and specifically with William Sears.

14          With regard to the defendant, Mr. Guy Jean-Pierre,

15   not GuyPierre or some other pronunciation, but Guy

16   Jean-Pierre, he is on trial.  But it's not a trial for you

17   to determine whether he has been a good or bad lawyer.  In

18   fact, you already have seen, and it's pretty clear, that he

19   was not a very good lawyer.  He was a pretty sloppy, sloppy

20   lawyer.

21          This is not about whether or not Mr. Guy

22   Jean-Pierre did a terrible thing when he forged his niece's

23   signature.  He did that, but he's not on trial for that.

24   This case is about the 29-count indictment.  29 counts which

25   are charged in this case, and whether or not the Government

1     has proven each of those counts beyond a reasonable doubt.

2            The first count is a conspiracy count.  The

3     conspiracy count seems to morph from time to time as to what

4     the conspiracy is supposed to be and who are members of this

5     conspiracy.  We heard, certainly, during one portion of the

6     trial that the conspiracy was a conspiracy to pump-and-dump

7     stock.  That it was a fraudulent scheme so that the

8     conspirators could pump up the value of the stock so they

9     could dump it.

10           The Government in their presentation of evidence,

11    then, has also changed to, "Well, it's a scheme for

12    something else.  It's a scheme for -- just to defraud the

13    public."  It's a scheme that is one where, as counsel for

14    the Government repeatedly stated, $12 million were stolen

15    from the public.

16           Well, that's, again -- or that's -- not again, that

17    is one of the reasons why I say follow the money.  There was

18    $12 million taken in actions that were taken in this case.

19    But look at who got them and the timing of it.

20           In particular right now, I would like to address

21    the timing of it because if you recall from those charts,

22    Exhibit 291 in particular, the timing of most of that amount

23    of money came from Mr. Sears and his entities selling stock

24    after Mr. Jean-Pierre was out of the picture.

25           With regard to conspiracy:  The Government has to

1    prove that Mr. Jean-Pierre knew the essential objective of

2    the conspiracy.  And one of the things the Government had a

3    problem with, and continues to have a problem with, is this

4    objective of the conspiracy.  And when did this conspiracy

5    actually begin?

6            Well, they charge it in the -- in the indictment

7    with beginning in 2011 and going through 2014.  But when

8    did -- when did this agreement between the parties

9    supposedly happen?  And what were they agreeing?  I submit

10    to you that the Government has failed to show either that

11    there was a specific known and particularized objective of

12    the conspiracy, certainly as it related to Mr. Jean-Pierre.

13            There is certainly also a question as to whether

14    Mr. Jean-Pierre was knowingly and voluntarily participating

15    in this known conspiracy.  I submit that the Government has

16    not shown that.

17            And then the -- one of the last elements of

18    conspiracy is that the conspirators intended to act together

19    for their shared mutual benefit.  And, again, we go back to

20    follow the money.  What's the mutual benefit?  The mutual

21    benefit was Mr. Sears getting for himself $11.8 million.

22    That's not mutual.  That was particular and individual.

23            Counts 2 through 16 are wire fraud, 17 through 20

24    are mail fraud.  You already have seen that -- or, excuse

25    me, you've already been told that on these counts, you don't

1    have to consider anything but whether or not Mr. Jean-Pierre

2    aided and abetted somebody.  If you'll look at these Counts

3    2 through 7, the actions were electronic transmissions to

4    OTC link.

5         We don't know exactly who did that, but the

6    evidence does show one thing for sure, and that is, those

7    transfers were not done by Mr. Jean-Pierre.  Those

8    transactions were done from Colorado while Mr. Jean-Pierre

9    was in Florida.  So he didn't do them.

10        Counts 8 through 11, we have the same situation.

11   Electronic transfers to the OTC.  Mr. Jean-Pierre didn't do

12   those.

13        Counts 12 through 16, we have another situation;

14   the same -- the same thing.  E-mails from William J. Sears

15   to Pacific Stock Transfer Company.  Mr. Jean-Pierre wasn't

16   in Colorado; he was in Florida.  He didn't do those things.

17        Now, with regard to Count 12, there's a little

18   additional matter to look at here.  I'll do that right now.

19   And this is an interesting thing.  You'll note Count 12.

20   Count 12 talks about an e-mail from William J. Sears to

21   Pacific Stock Transfer Company on December 13th, 2013.

22   That's what the charge is.

23        Now, the evidence doesn't show -- doesn't show any

24   e-mail from Mr. Sears to Pacific Stock Transfer Agency on

25   December 13th, 2013.  If you look at the evidence, and hear

1    from the evidence, you may find that there was something

2    that may qualify for that done on December 13th, 2012, a

3    year before charged.  One of the instructions you will --

4    you have received from the judge is that the Court

5    instructed you that you will note that the indictment

6    charges that crimes were committed on or about specified

7    dates.  The Government must prove beyond a reasonable doubt

8    that the defendant conducted the crime reasonably near the

9    specified date.

10           I submit to you that December 13th, 2013, is not

11   reasonably near December 13th, 2012.  And for that reason,

12   alone, Count 12 should -- should qualify for a not guilty

13   verdict.

14           Count 17 through 20, we're back to the same theme.

15   These are not things that Mr. Jean-Pierre did.  These are

16   things that were done by FusionPharm or people at

17   FusionPharm, mailings and doing things.  He didn't do these.

18   He was in Florida.  They were in Colorado.

19           So the point of this is that although these charges

20   are charges and counts of aiding and abetting and that's why

21   the fact that somebody else did them makes it so that they

22   are charges of Mr. Jean-Pierre aiding and abetting them --

23   the question will be:  Did he -- did Mr. Jean-Pierre, in

24   doing these things, consciously share the other person's

25   knowledge of the underlying criminal act?  And did he intend

1    to help that person in the commission of a criminal act?

2           And, again, I submit the Government has not proven

3    that intent.  That goes back to the willfulness with regard

4    to securities fraud, the next few counts, and intent to

5    defraud with Counts 1 through 20.

6           On the securities fraud, again, we have the same

7    situation.  On these, these are sales of stock.  Mr.

8    Jean-Pierre didn't do that.  But a securities fraud, it's a

9    little different, they don't have to prove that he devised

10   or he did it, they just have to prove that he was a part of

11   this scheme.  But he has to be more than merely a part of

12   this scheme.  He has to have a specific mental state.  And

13   you have been instructed on that mental state.  And I just

14   remind you that the requirement is that these laws make it a

15   crime to willfully employ a -- to employ a device, scheme,

16   or artifice to defraud, willfully make statements or

17   material omissions or willfully engage in a transaction or

18   course of business which operated or would operate as a

19   fraud and deceit on any person.

20          And in the first -- in the first element, again, it

21   requires willful.  But willful isn't the only thing.  There

22   also must be, as set forth in the fourth element, an intent

23   to defraud.  The Government has to have proven that Mr.

24   Jean-Pierre willfully and with intent committed these

25   acts -- these acts or assisted somebody in committing these

1    acts.

2           Counts 24 through 28, again, are wire fraud counts;

3    similar -- similar elements.  And this deals with the 2016

4    matter.  And one of the things that the Government in its

5    argument presented to the -- to you, the jury, was a video

6    clip of -- with regard to a Miami meeting and talking about

7    Mr. Jean-Pierre's knowledge in 2016 or Mr. Jean-Pierre's

8    statements in 2016, and claimed that this is proving

9    something that occurred in 2012.  The Government is trying

10   to backdate their evidence as opposed to presenting the

11   evidence that, in fact, in 2012, Mr. Jean-Pierre, in the

12   transactions in question, in Counts 1 through 23, at that

13   time intended to defraud.

14          Counts 24 through 28, Mr. Billy Sears trying to

15   save himself.  It appears that the Government felt maybe

16   embarrassed or concerned that they didn't have sufficient

17   evidence to convict Mr. Jean-Pierre on Counts 1 through 23,

18   so they decided to manufacture a new case against him.  A

19   case dealing with an undercover.  Undercover, of course, is

20   legal.  Legal trickery and dishonesty.  It's ironic that the

21   Government is engaging in the same kinds of activities, but

22   legally, in order to try to arrest and charge Mr.

23   Jean-Pierre with new crimes.

24          I would submit that the Government's evidence on

25   these counts does not show completed acts; rather, it only

1    amounts to attempts and working toward acts.  And if that is

2    the case, then I would submit that the Government has failed

3    to prove these counts beyond a reasonable doubt.

4         Count 29 is a separate count.  Count 29 is the

5    money laundering count.  The Government's evidence in

6    Exhibit 367.  They presented evidence regarding the check.

7    And they talked about accounts and account numbers.  And

8    maybe I missed something, but I didn't hear or see the

9    connection -- the full connection to establish that these

10   funds were actually received by Mr. Jean-Pierre.

11        Furthermore, the Government's evidence failed to

12   prove that Mr. Jean-Pierre actually knew that these were

13   illegal proceeds.  They talked about -- excuse me, Mr. Sears

14   talked about how these came from proceeds from sales of

15   FusionPharm stock and that the IRS and the Government was

16   trying to find it, so he wanted to send it somewhere where

17   it would be safe where they wouldn't get it.  But that

18   doesn't show that that had to have been illegal funds.

19        The IRS was after him for funds because, according

20   to Mr. Sears, I believe, he owed taxes.

21        The evidence furthermore then failed to meet the

22   element that requires that Mr. Jean-Pierre believed that

23   these funds were illegal as opposed to funds that Mr. Sears

24   wanted to hang on to and -- and have transferred so that the

25   IRS wouldn't get them.

1        So overall, though, one of the things that with

2   regard -- in particular to Counts 1 through 23, is did the

3   evidence show that willfulness for Count -- for the

4   securities fraud?  Did the evidence show intent to defraud?

5   The evidence as presented by the Government, I submit, was,

6   at least to me, very confusing at many times.  It was

7   complicated dealing with securities law and the complicated

8   issues of securities law.  The Government presented such

9   terms like blue sheeting, a trade blotter, tacking back to a

10  note or stock certificate.  There's a beard.

11       Many of these items were talked about, but not all

12  explained or explained how they were particularly relevant.

13       The Government presented in Exhibit 271 an e-mail

14  from Mr. Sears to -- excuse me, an e-mail from Ms. Joanna

15  DiBella of Pacific Stock Trading to Mr. Sears in which she

16  started to go on and on about various different things.  And

17  you can read it yourself and see how confusing this is.

18  Again, this is Exhibit 371.

19       And where is Mr. Guy Jean-Pierre's response, his

20  knowledge, anything about what he did?  We see at the top

21  that we have To:  Mr. Guy Jean-Pierre, From:  William Sears,

22  that's there.  But we don't have anything on this e-mail

23  trail.  What we do have on this e-mail trail is we find out

24  that Mr. William Sears -- what does he do?  He sends that to

25  Mr. Bodden, and Mr. Bodden responds.  And Mr. Bodden

1    explains, and Mr. Bodden is the person who's doing this.

2           This is not Mr. Guy Jean-Pierre, although he is on

3    this one listed, which brings up another point.  The

4    Government presented a vast -- to put it mildly, vast number

5    of e-mails, and in some of these e-mails, Mr. Guy

6    Jean-Pierre was either the recipient or -- excuse me, the

7    addressee or cc'd on them.  And sometimes there was some

8    evidence that he actually saw them and responded.  But both

9    on many other occasions and on many of the other e-mails, as

10   was pointed out through some of the witnesses, Mr. Guy

11   Jean-Pierre was not, whatsoever, sent those e-mails.

12          But the Government will tell you -- or the

13   Government has been telling you, that Mr. -- Mr. Jean-Pierre

14   knew about all these things.  He was all-knowing.  He was

15   the corporate secretary, he was the corporate counsel, and,

16   therefore, he knew everything.  He knew what was going on,

17   or -- as actually one of the Government's own witnesses

18   said, "Well, he should have known."

19          Should have known.  Maybe he should have known, but

20   that's not proof that he did know.  The Government's case

21   really hinges on asking you to assume that Mr. Guy

22   Jean-Pierre, because of his position, knew everything that

23   was going on.  Assuming is not proving.

24          With regard to confusing and misleading, we had

25   Government's Exhibit 290.  The defendant in its opening

1    argument presented this to you also and suggested -- well,

2    I'm not quite sure what the Government was suggesting, but

3    we know that at least through their -- their witness, Mr.

4    Scoufis, from FINRA, they were trying to claim that there

5    was a -- that this was something that was showing stock

6    manipulation:  dump and pump.

7         And on being questioned, Mr. Scoufis came up with

8    some explanations that he claimed explained how this was

9    something that showed correlations.  If it shows

10   correlations, it was certainly not readily apparent to the

11   expert.  And I submit that it's not readily apparent in any

12   form or fashion that this shows a dump-and-pump correlation,

13   or something to show that -- that there was manipulation of

14   the market, and then taking advantage of it.  The whole

15   thing about the pump-and-dump is you're supposed to pump it

16   up and then dump it.

17        Look at the numbers that they're going across here.

18   They're not -- they're not showing a big dump.  The

19   bigger -- the bigger, longer exhibit of the same thing;

20   again, doesn't show any correlation.  This is both a

21   misleading and simply useless exhibit, these two of them.

22        But not only did Mr. Scoufis present useless and

23   misleading exhibits, he also presented something that -- and

24   talked about it for some length, this is 286.  And then he

25   presented 288.  And it was only during cross-examination

1      when he said, "Oh, oh, yeah, those are just hypotheticals."

2               Hypotheticals for what?  It didn't show anything.

3      It doesn't show any kind of state of mind by Mr. -- even Mr.

4      Sears, much less Mr. Jean-Pierre.

5               Professor Thel -- Thel -- excuse me, Professor Thel

6      didn't add a whole lot either to some of the aspects of this

7      case itself.  He said that he looked at a bunch of evidence

8      and then he came to some conclusions about affiliate and Mr.

9      Sears being an affiliate.  But when he was asked whether not

10     complying with Rule 44 was illegal, his answer was, "I don't

11     know."

12              Furthermore, amazingly enough, Professor Thel said

13     that this was the first case -- in his long history of

14     dealing with securities issues, this was his first case in

15     which a person failed to comply with 144.

16              Pretty amazing that that would be the case.  So if

17     nothing else, I -- I submit that raises some questions about

18     Professor Thel's testimony.

19              Now, with regard to the scheme, the -- going back

20     again to the secretary and -- and the -- being the secretary

21     and the legal counsel, the Government is asking you to

22     assume, therefore, that he knew everything.  But they failed

23     to prove what -- that he did know what was in many of those

24     documents.  They may have had some evidence or they have

25     some evidence to show that some documents he was aware of,

1    some documents he participated in, but they didn't prove to

2    you that he reviewed or even read many of those documents.

3    They need to prove that to be able to show that he had that

4    knowledge.

5         And we also know that Cliffe Bodden -- it's

6    not Mr. -- not Mr. Jean-Pierre, but Cliffe Bodden prepared

7    many of the documents in question.  The Government says,

8    "Oh, well, Mr. Jean-Pierre's corporate counsel and he was

9    cc'd on it so he -- and he sent those off to Mr. DiTommaso,

10   so, therefore, he knew."

11        The Government is asking you to assume evidence

12   that is not in evidence -- excuse me, assume facts that are

13   not in evidence.

14        Mr. Scholz, Mr. Richard Scholz, did most of the

15   financials, not Mr. Jean-Pierre.

16        Andrew Duke said that at the infamous two-day

17   meeting -- three-day, but then he went down to two days when

18   he was shown that, in fact, Mr. Jean-Pierre wasn't there for

19   three days, but he -- he -- what did he do?  He tried to

20   assume again.  He tried to do the same thing the Government

21   has been asking you to do:  To assume what was going on

22   behind closed doors.  He couldn't hear what was going on

23   behind closed doors, although he tried to assume he knew

24   what it was.

25        The Government also lumps everybody together -- all

1      of the attorney letters together as though they're all the
2      same or the similar things.  But you will recall that on
3      8-28-2013, neither Mr. DiTommaso nor Mr. Jean-Pierre were
4      involved in that opinion letter.  It was done by a different
5      attorney; that Mr. Jean-Pierre was no longer doing anything
6      after -- or as of -- well, with regard to attorney opinion
7      letters as of August 28th, 2013.  And you heard the
8      testimony that, in fact, he did nothing more for the firm
9      after, say, August or September of 2013.

10             This end of the securities market, as you have
11     heard from both witnesses and from the experts, that this is
12     a very complicated end of the securities market.  It
13     requires very specialized knowledge and requires a
14     significant amount of work to both keep up with it and to
15     know everything that should be done in order to be that type
16     of securities transaction attorney to which Professor
17     Gerding alluded and described.

18             Here we get back to:  Follow the money.  Mr.
19     Jean-Pierre was paid $33,000 over three years.  $33,000 over
20     three years doesn't allow for a whole lot of work from maybe
21     250 to -- or if you're in a big firm, up to $700 an hour
22     like Mr. -- or Professor Gerding.  That doesn't allow too
23     many hours.  It doesn't allow somebody to do the work that
24     maybe they should have done; but "should have done" is like
25     "should have known."  That's part of the issue here.  Sloppy

1    lawyerring, not knowing, not doing the work you're supposed

2    to do may be negligence and may have civil liabilities, but

3    that's not criminal and that does not amount to willfulness

4    or intent to defraud.

5         Mr. DiTommaso -- the Government says Mr. DiTommaso

6    was a victim.  Well, Mr. DiTommaso apparently was a victim

7    of sloppy lawyerring, too, on both his part and on the

8    material he got.  He was the person responsible, he was the

9    person who had to ensure things were accurate.  And if he

10   had done his job and done it properly, maybe some of this

11   information would have come to light, maybe some of the

12   information would have been revealed and the sloppy

13   lawyerring could have been fixed, and Mr. Sears may not have

14   been able to have accomplished what he did accomplish, which

15   goes -- let me go back for a moment to that conspiracy issue

16   I talked about.

17        You know, this dump-and-pump argument, this

18   defrauding argument is certainly -- even with Mr. Sears and

19   Mr. Dittman, is certainly significantly offset, if nothing

20   more, by the fact that, first of all, Mr. Dittman -- what

21   was he trying to do?  What was his goal?  His goal was to

22   make his dream come true.  He wasn't trying to pump up stock

23   to dump it.  He was trying to make it into a company, a real

24   company.  And he worked hard to try to do that.  He had some

25   expertise.  He was doing his life's dream.

1          What was Mr. Sears doing?  Mr. Sears was at times

2     taking stock which had been converted and he was selling it.

3     There's our victim issue.  And a question also is:  Where's

4     the evidence that Mr. Jean-Pierre knew about all of these

5     sales or how much money was being received by Mr. Sears?

6     But that's a different question.

7          Right now, I'm addressing what did Mr. Sears do

8     with a lot of those funds?  He pumped it right back into the

9     company.  Now the Government's saying, "Well, that's part of

10    the pump."  Certainly not what Mr. Dittman thought it was,

11    his alleged co-controller.  Mr. Dittman was trying to make

12    the company run.  The money was being put back in because

13    they were trying to make the company work.  They didn't have

14    a big dump-and-pump conspiracy going on.

15         And if they didn't have a pump-and-dump conspiracy

16    going on, Mr. Jean-Pierre couldn't have been a part of a

17    dump-and-pump conspiracy scheme.

18         So back to Mr. DiTommaso.  Mr. DiTommaso did what

19    he was told.  He was the conduit between just getting the

20    things done and putting his name on it.  He conveniently now

21    is saying, "Oh, it was all -- it's all their fault.  It's

22    all their fault.  I got everything -- I relied on Mr.

23    Jean-Pierre."

24         Well, in fact, the evidence also shows that Mr.

25    Jean-Pierre was relying on Mr. Scholz and Mr. Dittman and

1    Mr. Sears and -- and others.  Mr. Jean-Pierre, in fact, also

2    for many of these letters and many of these documents was

3    merely a conduit.  Sloppy lawyerring?  Yes.  Pink Sheet

4    people said he was a sloppy lawyer, too.  Inadequate

5    attorney letters.

6         Sears was happy, or appeared for several years to

7    be happy with Mr. Jean-Pierre and his sloppy lawyerring

8    because he got his way.  He got what he wanted.  But the

9    fact that Mr. Sears -- Mr. Sears was doing that suggests

10   that he was, in fact, duping Mr. Jean-Pierre also.  We don't

11   have evidence that Mr. Jean-Pierre was in behind closed

12   doors conspiring with Mr. Sears.

13        The Government makes a big point about how, "Oh,

14   well they go way back."

15        So they go way back, which is why Mr. Sears knew

16   that he could use this sloppy lawyer because he's been a

17   sloppy lawyer for years.  Mr. Sears would tell Mr.

18   Jean-Pierre to jump, and he'd jump.

19        In this case, what the Government is really asking

20   you to do is to trust them.  Trust them that Mr. Jean-Pierre

21   knew about these things.  Trust them that he was guilty.

22   They called several experts and asked you to trust those

23   experts.  But those experts, in fact, presented

24   hypotheticals, misleading charts.  Professor Thel said he'd

25   never seen anything like this before.  But trust him.  Trust

1    these experts.

2        Mr. -- the Government claims that because Mr.

3    Jean-Pierre was corporate counsel, he must have known

4    everything.  "Trust us on that.  Corporate counsel should

5    know, therefore, he does.  Trust us."

6        But there is a question about what that actually

7    does and what the Government has actually shown.  The

8    Government asks you to trust them and to then conclude that

9    basically because you suspect that Mr. Jean-Pierre should

10   know, he must have known.

11       That the Government -- excuse me, the Court has

12   instructed you that a general suspicion that an unlawful act

13   may occur, or that something criminal is happening is not

14   enough.  Mere presence at the scene of a crime or knowledge

15   that a crime is being committed are also not sufficient to

16   establish aiding and abetting.  But that's what the

17   Government is asking you to do.

18       Follow the money and actually follow the property.

19   In this case, the Government says that what the scheme was

20   was for Mr. Sears to be able to take the stocks to be able

21   to take them out, make money, and put the money in the other

22   pocket.  And in this scheme, however, what happened?

23       Mr. Dittman, he didn't get a lot of money.  He

24   received millions of shares of stock.  Mr. Sears received

25   hundreds of thousands of shares of stock, some of which he

1    then did transfer into or convert into money.  But, again,

2    his doing so -- both, when did that happen and with what

3    evidence do you have that Mr. Jean-Pierre was aware of it?

4    And when I say "aware of it," that's very telling.

5            Here is Exhibit 300.  This tells us what "it" was

6    for Mr. Sears.  Mr. Sears, through MeadPoint, Microcap,

7    Microcap, Bayside, and himself, received $11,867,244 from

8    the sales of stock.  Most of which, I would submit to you,

9    occurred -- and the sales of those stock occurred well after

10   Mr. Jean-Pierre was out of -- and not working for the

11   corporation.

12           So follow the money.  Mr. Sears gets almost 12

13   million.  Follow the money.  We heard Mr. Scholz say that he

14   got paid $488,000 for his actions in helping to sell the

15   stock.

16           Mr. Jean-Pierre, how many shares did he get?  Zero.

17   Mr. Jean-Pierre, how much was he paid over a three-year

18   period of time?  Exhibit 309.  Mr. Jean-Pierre was paid

19   $33,000.

20           In its opening, the Government said, "Well, that's

21   not a big deal.  Mr. Jean-Pierre would do what it takes to

22   get paid."

23           I guess that was meaning he'd do whatever it takes

24   to get paid over time his $33,000.  If Mr. Jean-Pierre would

25   do what it takes and was a part of this conspiracy, this

1    conspiracy, which eventually became a $12 million

2    conspiracy, according to the Government, why didn't he

3    demand a bigger cut out of that $12 million?  Because he

4    wasn't a part of it.  No person would join a multi-million

5    dollar conspiracy in order to get -- to be paid $30,000.

6            Ladies and gentlemen, there's a -- there's been a

7    large amount of evidence that Mr. Sears, and probably Mr.

8    Dittman, committed various and numerous crimes.  The

9    Government has been trying to connect Mr. Jean-Pierre

10   through association, inferences on inferences, assumptions

11   and innuendo.  Mere suspicion is simply not enough.

12           I submit to you that the Government in their case

13   has failed to prove the necessary intent in particular that

14   would connect Mr. Jean-Pierre to this conspiracy, that they

15   have failed to meet their burden, and request that you

16   render verdicts of not guilty on all counts.  Thank you very

17   much for your time.

18           THE COURT:  Thank you, Mr. Barnard.

19           Rebuttal closing argument for the Government.

20           MR. SIBERT:  Yes, Your Honor.  May I have a minute?

21           THE COURT:  You may.

22           MR. SIBERT:  Ladies and gentlemen, I want to speak

23   to you essentially a little bit about Mr. -- what Mr.

24   Barnard talked to you about.

25           Think of a bank robber.  The guy that drives the

1    get-away car.  The guy that robs the bank gets $10 million

2    and the guy that drives the car only gets 30,000 for his

3    part.  You know what the guy's guilty of driving the car:

4    Aiding and abetting the bank robber.

5            How about the guy that draws the diagram of the

6    bank for the guy that robs the bank?  You know what he's

7    guilty of?  Aiding and abetting the bank robbery.

8            It doesn't matter what you get paid.  What matters

9    is what you did.  And what Mr. Guy Jean-Pierre did was he

10   was the legal mind to circumvent the security laws to be

11   able to cause paper to be turned into money.

12           Now you can't disagree with Mr. Barnard.  He's not

13   going to get paid New York City law firm $700 an hour to

14   write opinion letters.  You know why?  Because his letters

15   are no good.  He's banned; can't write them.  Also can't

16   have communications with the Pacific Stock Transfer agents.

17   You know why?  He's highlighted; he's a red person.  They

18   know who he is.  They know his letters are no good.  They

19   don't want to communicate with him.

20           Skype messages -- can I have the overhead please,

21   from -- Sears to Guy Jean-Pierre.  "I understand that

22   start-ups and small companies don't have much cash to begin

23   with.  I expect, as everything gets better for the company,

24   it should get better for the attorney as well."

25           I can't sit here and tell you that I have every

1    communication that went on with Mr. Guy Jean-Pierre and Mr.

2    Sears and Mr. Dittman.  But what I can tell you is we put on

3    a nine-day case, we've given you over 500 exhibits, we've

4    probably beaten the horse to death and you probably were

5    sitting there going, Why is this Government counsel going

6    through this again and again and again?  Why do we need this

7    witness and witness and witness?

8            Two reasons:  One, because I have to prove the case

9    beyond a reasonable doubt and that's the law, and I'm not

10   going to disobey the law.  And, two, I want to make sure I

11   met that burden.  I'm not doing it to keep you here away

12   from your families, your work, or something better than

13   sitting in this courtroom.  I did it because I want to show

14   you that -- beyond a reasonable doubt that Mr. Guy

15   Jean-Pierre committed the fraud in the case.

16           Corporation documents.  Mr. Guy Jean-Pierre's

17   e-mail to Sears or Dittman.  2011 to 2013.  All in evidence.

18   Raising the money, forms that have to be submitted, FINRA

19   forms, everything.

20           OTC filings from 2011 to 2012 before we even

21   started the charges.  You know who did this?  Do you know

22   who drafted these?  Mr. Guy Jean-Pierre.  That's the

23   evidence.  You don't have to trust me.  Trust the evidence.

24           Can I have Government Exhibit 300, please.

25           How many shares sold?  Zero.  How much money

1    brought in?  11.8 million.  That's why I called the 144 the

2    press, because that allows stock to make money.  And that's

3    what Guy Jean-Pierre did.

4            Can I have Government Exhibit 202 -- or, excuse me,

5    292.  I'm going to remind you, I asked Mr. Scoufis from

6    FINRA:  Even if this was a lot of sales in the red --

7    remember, red means sales, not purchases or buys like the

8    green -- red, sales of MeadPoint, Microcap, and Bayside?

9    And his answer was yes.  Remember, this is the time frame

10   that remember that investor that came here, said he did all

11   the homework, he looked, he read the press releases, he

12   relied on all that?  Because, yeah, marijuana was the next

13   thing.  He was looking for an opportunity.  And it happened.

14   It happened right here for a very short time.  That's what

15   happened.  Marijuana came -- but look at this.

16           Can I have that blown up, please.

17           None of this can happen if Mr. Guy Jean-Pierre did

18   not draft the 144 letters to be able to convert these shares

19   free of restrictions, free of affiliation of William Sears.

20   They could not have sold 4 million and bought only 13,000

21   and make 11.8 million.  Couldn't have done it but for the

22   gateway, the printing press, the Rule 144 letters.

23           Can I have Exhibit 312, please.

24           Who did Mr. DiTommaso rely on?  Not the CEO.

25   Didn't even know Mr. Sears.  Relied on Mr. Guy Jean-Pierre.

1    136 versus 2.

2           Can I have the overhead real . . .

3           I want to talk about what we have to prove.

4    Defense counsel missed the fact that there's more to an

5    instruction than what he just states.  Mr. Guy Jean-Pierre

6    doesn't have to be anywhere near the fact that the wire

7    communication went through.  All that's required is that the

8    wire happened.  That was the normal course of business.  The

9    only way you can upload things to the OTC Markets was

10   through the wire; the upload process.  Remember that key and

11   the codes?

12          And then the only way the brokers got their things

13   and posted them on the exchanges is through wire.  Mr. Guy

14   Jean-Pierre doesn't have to be anywhere near them.  But

15   defense counsel forgot to tell you about that part of the

16   instruction.

17          The mailing.  Again, he forgot to highlight there's

18   more to the instruction.  It's not necessary for the

19   Government to prove that the defendant personally used any

20   means or instrumentality of interstate commerce or the

21   mails; just has to use the mail.  He doesn't have to do it.

22   Just the fact that his 144 letters, his over-the-counter

23   disclosures, or over-the-counter legal letters, were somehow

24   communicated either through wire or with the transfer

25   packages when it came to the free trade shares, that FedEx.

1           And, ladies and gentlemen, Mr. Barnard made a big

2     point that Mr. Guy Jean-Pierre was in Florida.  But look at

3     this case.  The only person here in Colorado was Mr. William

4     Sears.  Mr. Bodden doing the financials, he was down in

5     Florida.  Mr. Guy Jean-Pierre practiced in Florida.  Home

6     base.  But came here to Colorado.  Two times the corporation

7     came to him.  The CEO, the known party of FusionPharm.  Do

8     you know where he lived?  Pennsylvania.

9           Can I have Government Exhibit 399.  Can I have the

10    bottom, please.

11          Like I said, I can't show you every communication,

12    but e-mails have taken the place of phones.  You have over a

13    hundred e-mails.  This is November 2012, Pink Sheet opinion

14    letter.  Who's this from?  Guy.  To who?  Sears and Dittman.

15    What's it say?  "Given the urgency, I have begun preparing

16    the backup documentation and proposed Pink Sheet opinion

17    letter for Mr. DiTommaso."

18          That's what the evidence shows.  He created the

19    documents and he sent the documents.

20          Can I have the second page, please.

21          What are we talking about with Mr. Sears and Mr.

22    Dittman?  Microcap.  Why would Mr. Guy Jean-Pierre be

23    sending an e-mail about Microcap if supposedly Microcap was

24    owned by Richard Scholz?  Well, you heard Mr. Scholz come in

25    and testify.  He never had control of it.  It was always

1   controlled by Guy -- or Sears.  And you know who knew that?

2   Guy Jean-Pierre.

3          Look.  He's e-mailing about it.  And look what he

4   says.  "I will be sending you later the following

5   documents."  All the documents that need to go to the

6   transfer agent in order to do what?  Take the paper that's

7   restricted, unrestrict it so it can become cash and go in

8   the pockets.

9          Now, remember, Professor Thel said the problem with

10  that is because Sears, because he's an affiliate, becomes an

11  underwriter.  And you have Government Exhibit 444.  If

12  you're an underwriter, you don't get the exception and

13  you're violating securities law.

14         You get this case.  You've listened to the facts.

15  You're the experts.  You know about the affiliation now; you

16  know about the holding period.  You don't need experts up

17  there.

18         Dishonesty about the undercover operation?  That's

19  legal.  Well, swans don't swim in sewers.  Mr. Guy

20  Jean-Pierre's not going to play ball with the FBI.  He'll

21  play with Sears.  That's why we have to go undercover.

22         Can I have Government Exhibit 363-C, starting at

23  5:30 played.

24      (Video played)

25         MR. SIBERT:  Who's saying the paperwork has to

1    appear clean?  Mr. Guy Jean-Pierre.  Who says that the SEC,

2    the Security and Exchange Commission, that will look into

3    this paperwork if they see suspicious trading going on?  Mr.

4    Guy Jean-Pierre.  Mr. Guy Jean-Pierre did not change.  It's

5    not what appears to be known, it is what is known.

6         I'll tell you this:  What wasn't known was that Mr.

7    Guy Jean-Pierre didn't know he was being videotaped or audio

8    recorded.  That's who he is, and what he knows, and what

9    he's concerned about.  "Make sure the paperwork's good

10   because I don't want the SEC breathing down us.  It has to

11   look right, but I'll make it up to make it look right."

12        And, yes, of course we talked about William Sears

13   and Scott Dittman.  Of course we did.  Because that goes to

14   Count 1, the conspiracy.  Who did he work with?  Who did he

15   send e-mails to about Microcap, Bayside, MeadPoint?  Mr.

16   Barnard doesn't want to talk about those e-mails.  He just

17   wants to focus on one or two.  But even the ones that he

18   focused on -- can I have Government Exhibit 269.

19        That's an e-mail from William Sears -- or from Guy

20   Jean-Pierre to William Sears regarding issues with the

21   transfer agent.  Remember how he just wanted to show you

22   that was Mr. Bodden replying back?  Mr. Barnard doesn't want

23   to show you the other e-mails.

24        Let me have Government Exhibit 286, please.

25        What is going on?  There's no hypotheticals here.

1    All that happened here was that Mr. Barnard would just take

2    a second and look at the title.  Common stock converted.

3    Converted to -- from preferred stock.  So for one preferred,

4    a hundred common stock shows up in this now.

5           All this is saying is that, based upon the

6    ownership that Scott Dittman had, 1.3 million preferred

7    converts out to be 130 million common.  It's just a

8    conversion.  There's no hypothetical.  It's just showing who

9    controls FusionPharm.

10          The bank note, ladies and gentlemen.  Look at the

11   account number on the back of the check and look at

12   Government Exhibit 323.  Who gives the account number?  Mr.

13   Guy Jean-Pierre.  He gives the account number.  It matches.

14          Where did the money go?  It went to Mr. Dittman,

15   too.  Remember on cross-examination, Mr. Dittman bought a

16   house.  Where was that house?  Pennsylvania.

17          And, again, we're not showing you a case behind

18   closed doors.  We showed you a case that we could see

19   through the doors, through e-mails, through corporate

20   documents, everything that related to Mr. Guy Jean-Pierre.

21   Those years of 2011-2013, the doors were shut, but we

22   cracked them open with the paperwork we showed you in this

23   case.  But then we showed you who Mr. Guy Jean-Pierre truly

24   is.  He's a froster.  He's a liar.  That was shown in the

25   undercover.  What he didn't know was he was being recorded

1    as who he was.

2           Remember, when he was told Phil Morgan wasn't going

3    to know anything about E.J.'s role?  "Excellent" was the

4    words?  Remember I opened up with that.  "Excellent."  And

5    then he follows up in that video and says, "Neither will

6    Steve," or Mills, I can't remember if he calls him by his

7    last name or first name, but that's the lawyer that's going

8    to be the new Tod DiTommaso.

9           And at the end of the day it's people like the

10   gentleman from Montana that gets hurt.  He loses $88,000 of

11   all that money.  At least the paperwork that we were able to

12   see, Mr. Guy Jean-Pierre walked away with --

13           COURTROOM DEPUTY:  Five-minute warning.

14           MR. SIBERT:  -- positive, positive of 33,000.  And

15   that's just what we can show you.  But we know there was

16   communications also, "What's good for the goose is good for

17   the gander."  What happens with the company will hopefully

18   be good for the attorney.

19           If you follow the money, you look at the language,

20   you look at the conversations, there's absolutely fraud in

21   this case.  A conspiracy, yes, absolutely, with Mr. Dittman

22   and Mr. Sears involved as well.  And you heard that they

23   came here and both of them took plea agreements.  But they

24   also told you that Mr. Guy Jean-Pierre, their partner in

25   crime, knew that they were selling stock, advised them what

1      names to put it in, and knew where the money was going.

2      It's a lot more than their expert could ever say.

3              Remember, as I said, you're the experts.  You're

4      the experts in this case.  And guess what?  No one's going

5      to yell or scream about you watching those videos over or

6      over again, to show who Mr. Guy Jean-Pierre was.  It's in

7      evidence.  You can play them as many times as you want.

8              He's going to tell you how to hide control

9      ownership.  "Don't go above 10 percent in stock, don't act

10     as a control person, don't send large amounts of money."

11             "Oh, you're going to do a loan?  Don't make it an

12     even figure.  Give it an odd number so it doesn't draw

13     attention.  Make sure the paperwork is correct.  And then

14     also watch what you say in e-mails.  Be careful about what

15     you write in e-mails."

16             You have that video.  You get to play it again and

17     again.  And even though Mr. Guy Jean-Pierre doesn't want you

18     to hear it again, you get to.  He doesn't want you to hear

19     it again because he knows that it shows what he knew; that

20     he was committing fraud, securities fraud, violation of the

21     law.

22             And even when we're not on video, it's Mr. Guy

23     Jean-Pierre's drafting the documents to hide Mr. Sears'

24     role, to hide his conviction, and to hide his controlling

25     affiliation of FusionPharm, so they can make money, and the

1    gentleman from Montana can lose his money.

2              Ladies and gentlemen, this case has shown beyond a

3    reasonable doubt.  Thank you for your time, thank you for

4    your patience.  And I'm asking you to return a guilty

5    verdict on all 29 counts.

6              THE COURT:  All right.  Thank you, Mr. Sibert.

7              Ladies and gentlemen of the jury, as you will

8    recall way, way back 12 days ago, at day 1 of this trial,

9    that we were going to seat a jury of 12 with two alternates.

10   The alternates being seated per the requirements of the law

11   in case one or more of you could not continue to hear the

12   trial if you got ill or otherwise.  As you also will recall,

13   last week I had to discharge Mr. Coomer because of the death

14   in his family, but that means I still have to release one of

15   you at this time.

16             So unpleasant as this is for me to do, I'm going to

17   excuse Ms. Sylvester from this case.  I know you must be

18   very disappointed that you won't be able to deliberate the

19   verdict with your colleagues.  I also know that the lawyers

20   and the parties join me in sincerely thanking you for your

21   time and your effort and your patience these past 12 days

22   and your contribution to the criminal justice system that we

23   have here in this country.

24             So in a few moments, you will return back to the

25   deliberation room with your colleagues.  At that time please

1    collect your belongings, give your badge to Ms. Frank, and

2    make sure that she has your mobile number and a way to

3    contact you and then you may leave and go home.

4         It's very important, however, extremely important,

5    that you not speak with anyone, any of your colleagues,

6    before you leave the building about this case or, indeed,

7    with anyone else until you get a call from Ms. Frank

8    informing you that the jury has reached a verdict.  Why?

9    Because although it's not likely, it has already, in fact,

10   happened in one of my cases.  One of the 12 jurors may not

11   be able to complete the deliberations for one reason or

12   another, and we've had a lot of things happen with the 13 of

13   you over the course of the last 12 days.

14        If that comes to pass, then Ms. Frank will call you

15   and then you will come back and take your place -- the place

16   of the 12th juror.  That's why it's critical that you keep

17   insulating yourself from any communication because you could

18   be called back.

19        At the point the jury has returned a verdict, that

20   scenario will, of course, be past us and then you can

21   discuss this matter with whomever you wish.

22        All right.  So for the remaining 12 of you, in a

23   few moments you will be escorted to the jury deliberation

24   room to begin your deliberations.  You are now finally able

25   to start discussing this case with each other, but only when

1    all of you are present at the same time.

2              To ensure that your deliberations are private,

3    court security officers will serve as bailiffs and they will

4    be present outside the jury room to ensure that you're not

5    interrupted or disrupted by anyone.  Also the bailiffs will

6    collect your cell phones during the time that you are

7    deliberating.

8              You now also are able to take the notes that you

9    have been dutifully taking for the past 12 days back to the

10   deliberation room with you.  You need no longer leave them

11   out here in the jury box.

12             When you return to the deliberation room, you will

13   see 12 sets of the jury instructions I read to you yesterday

14   afternoon.  And then in a few moments later, Ms. Frank will

15   bring into the deliberation room a single set of all the

16   trial exhibits that have been admitted into evidence.  There

17   will also be a laptop in the deliberation room for you to

18   play the DVDs that have been admitted into evidence and that

19   you can use as Government counsel referenced.

20             And at least for today, there is such a thing as a

21   free lunch.  Lunch will be brought to you in the

22   deliberation room -- do we know what time?

23             COURTROOM DEPUTY:  At noon.

24             THE COURT:  At noon.  So you can continue your

25   deliberations without interruption.

1          All right.  Will the court security officers please

2     come forward.  Ms. Frank, will you please administer the

3     oath to the officers.

4          COURTROOM DEPUTY:  Would you please raise your

5     right hands:

6          (Court security officers sworn in)

7          THE COURT:  All right, members of the jury, if

8     you'll follow the bailiff.

9          (Jury left the courtroom at 11:25 a.m.)

10         THE COURT:  All right, counsel, if you haven't

11    already, please give Ms. Frank your mobile numbers so that

12    she can reach you in the event we have a question from the

13    jury or we have a verdict.

14         Please remain within 15 minutes of the courthouse

15    so we don't delay too much in responding to questions from

16    the jury or in receiving the verdict.

17         I remind counsel that there is a attorney lounge on

18    the third floor that has wi-fi, and you're free to use.  And

19    I also allow the parties to use that lounge during the time

20    the jury's in deliberation.

21         So what I do -- those of you who have had trials

22    before me know this -- but if the jury has not returned a

23    verdict by 5:00, I will release them for the day.  There

24    will be no need for you to be present and we won't go

25    through any formality releasing them.  Ms. Frank will just

1    allow them to leave.

2              I will -- they will be instructed to return

3    tomorrow at the same time.  We will bring them out into the

4    courtroom for 30 seconds to put on the record that all 12

5    are present and accounted for and then they will resume

6    their deliberations.

7              The one complication is which courtroom you're

8    going to be coming to tomorrow morning.

9              My name is mud right now with the -- our IT

10   department and the clerk's office because I've been holding

11   them off for the last three days.  As I told you before, the

12   conversion from the analog to digital electronics in this

13   courtroom should have started on Monday and I've been

14   fighting them off, but three days is all I can do.  I can't

15   do it any further.  So if we don't have a verdict today,

16   tomorrow you will need to go to courtroom 702, which is a

17   vacant courtroom at this time, where we will receive the

18   jury.

19             Ms. Frank will inform the jury 10 or 5 minutes to

20   5:00, if it's apparent they're not going to return a verdict

21   today, she will discuss with them their need to report to a

22   different floor, different deliberation room, and different

23   courtroom tomorrow.

24             All right.  And I want to thank counsel for your

25   zealous and professional representation of your clients.

1    Job well done.

2             All right.  Anything further that we need to

3    address today from the Government?

4             MR. SIBERT:  No, Your Honor.  Thank you for your

5    time, patience, and getting this case through.

6             THE COURT:  All right.

7             MR. SIBERT:  Appreciate it.

8             THE COURT:  Thank you.  You're welcome.

9             Anything further from the defendant?

10            MR. BARNARD:  Nothing further at this time.  Thank

11   you.

12            THE COURT:  All right.  We'll be in recess until we

13   have a question from the jury or a verdict.

14        (Recess taken 11:28 a.m.)

15                      AFTERNOON SESSION

16        (In open court outside the presence of the jury at 2:24

17   p.m.)

18            THE COURT:  All right, we're back on the record.

19   The record will reflect that AUSA Sibert is present, as well

20   as Mr. Barnard and the defendant.  Can I ask what the delay

21   was, Mr. Barnard?

22            MR. BARNARD:  Your Honor, Mr. Dominguez apparently

23   was too far away.  I've spoken to him about that and advised

24   him that he cannot be anywhere near as far away as he was

25   this time.

1          THE COURT:  All right.  Sir, I don't know how you

2     could have taken my admonishment to counsel in any way not

3     to apply to you, because the whole purpose of it was to

4     avoid these kind of delays.  It's been almost 45 minutes

5     since we got -- 40 minutes since we got the question from

6     the jury.  So let me be clear.  I'm speaking to you, Mr.

7     Dominguez, Mr. Pierre -- Jean-Pierre:  We can't have these

8     kind of delays.  The 15-minute limitation in terms of how

9     far you can go from the courthouse applies to you as well as

10    to your lawyers.  I yesterday gave leave to Mr. Goodreid to

11    go to the doctor so he's excepted from that in this

12    instance, but it applies to you.  Are we agreed -- do you

13    understand that?

14         THE DEFENDANT:  Yes, sir.

15         THE COURT:  Okay.  So let's not repeat that.

16         All right.  We have a note from the jury -- a

17    question.  We, the jury, have a question.  We need

18    clarification regarding page 72 of the jury instructions,

19    specifically Count 12 refers to date 12-13-13.  The

20    corresponding evidence is date -- is date -- is date 1-4-12.

21    Is there a possible typo on the date of the indictment,

22    Count 12?

23         Date and time:  January 30, 2019, at 1:44

24    p.m.,signed by the foreperson.  I can't make out the

25    signature.

1          All right.  I'll take input from counsel as to the

2     appropriate response.  For the Government.

3          MR. SIBERT:  Your Honor, I think -- it is a typo,

4     but I think the indictment is the indictment at this point

5     and the date probably should stay -- stay as 12-13-13.

6          THE COURT:  So what is your recommendation as to

7     the response?

8          MR. SIBERT:  I think the response is is that the

9     dates on the indictment are what -- the dates of the alleged

10    offense.

11         THE COURT:  Let me hear from Mr. Barnard.

12         MR. BARNARD:  Your Honor, I would -- I had -- along

13    similar lines, but I had suggest -- I had to suggest:  The

14    indictment states the charges against the defendant.

15         THE COURT:  All right.  Well, this is the point you

16    made in closing argument.  I don't know if they were

17    listening to you.  Apparently not.

18         MR. BARNARD:  Not very well.

19         THE COURT:  So just so I'm clear, Mr. Sibert,

20    the -- from the Government's position is that there -- that

21    the year '13 on count -- 2013 on Count 12 is a typo in the

22    indictment.

23         MR. SIBERT:  It is.  And I think this goes back to

24    what we said in the motion prior to the case and I don't

25    know why, and I didn't -- I probably should triple check it

1    again, but that change was never made for that charge.

2              THE COURT:  Yeah.  Now, you know, my memory's

3    refreshed, your motion to correct dates included 12 through

4    16.  So you already had a chance to correct the date and you

5    didn't correct the date -- or at least you didn't correct

6    the year.

7              MR. SIBERT:  Yeah.  I -- you're right, Judge.  And

8    my co-counsel, Mr. Brown, the beard, is -- was taking

9    that -- taking that task and --

10             THE COURT:  So you're putting the blame on him.

11             MR. SIBERT:  So, yeah, I'm throwing him under the

12   bus.

13             THE COURT:  All right.

14             MR. SIBERT:  I can't do it all, so, you know, it's

15   a mistake by us, and, you know, obviously the defendant

16   should -- we're the Government, so, he's the --

17             THE COURT:  I think the -- I think counsel are in

18   agreement with my view, which is the Government needs to

19   bear the consequences of this error and we're not going to

20   change the date.

21             So let me think.  How about something along the

22   lines:  The date in the indictment with respect to Count 12

23   is the date you must consider during your deliberations on

24   this count?  Is there any objection from the Government --

25             MR. SIBERT:  No, Your Honor.

2576

1              THE COURT:   -- To that?

2              For the defendant?

3              MR. BARNARD:   No, Your Honor.

4              THE COURT:   All right.   Can either of you make out

5    that signature?

6              MR. SIBERT:   No, Your Honor.

7              THE COURT:   All right.

8              MR. BARNARD:   No.

9              THE COURT:   All right.

10             MR. SIBERT:   Mr. or Mrs. --

11             THE COURT:   It will remain a mystery.

12             MR. BARNARD:   Unless it says William Sears, Your

13   Honor.

14             THE COURT:   No, we've seen that signature enough to

15   know that's not.   All right, I'll just read for the record

16   again what my response is to the jury.

17             The date in the indictment with respect to Count 12

18   is the date you must consider during your deliberations on

19   this count.

20             All right.   We will be in recess again until we

21   have a further question from the jury, or a verdict.

22         (Recess taken 2:31 p.m.)

23         (In open court out of the presence of the jury at 3:39

24   p.m.)

25             THE COURT:   All right.   The record will reflect

1     that the prosecutors are present, as are the case agents;

2     defense counsel's present as well as the defendant.

3            We have received a note to the Court.  We, the

4     jury, have reached a verdict.  Signed by the foreperson -- I

5     still can't figure out who that is -- dated today at 3:13

6     p.m.

7            All right, let's bring in the jury.

8         (In the presence of the jury at 3:40 p.m.)

9            THE COURT:  All right.  I've been informed by a

10    note from the jury's foreperson that the jury has reached a

11    verdict in this case.  Will the jury foreperson please

12    stand.  All right.  Mr. Collinson Robinson.  Has the jury

13    reached a unanimous verdict --

14           THE JUROR:  We have, Your Honor.

15           THE COURT:  Have you, as the jury foreperson,

16    signed and dated the verdict form?

17           THE JUROR:  We have -- yes, I have, sir.

18           THE COURT:  Okay.  Would you please hand the

19    verdict form to the bailiff who will hand it to me.

20           You can be seated, sir.

21           All right, I will now read the verdict.

22           In criminal case No. 17-cr-008-WJM, United States

23    of America, plaintiff, versus Guy M. Jean-Pierre, also known

24    as Marcello Dominguez de Guerra.  Verdict form.

25           We, the jury, upon our oaths, unanimously find the

2578

defendant, Guy M. Jean-Pierre as to conspiracy as charged in Count 1 of the second superseding indictment:  Guilty.

As to wire fraud as charged in Count 2 of the second superseding indictment:  Guilty.

As to wire fraud as charged in Count 3 of the second superseding indictment:  Guilty.

As to wire fraud as charged in Count 4 of the second superseding indictment:  Guilty.

As to wire fraud as charged in Count 5 of the second superseding indictment:  Guilty.

As to wire fraud as charged in Count 6 of the second superseding indictment:  Guilty.

As to wire fraud as charged in Count 7 of the second superseding indictment:  Guilty.

As to wire fraud as charged in Count 8 of the second superseding indictment:  Guilty.

As to wire fraud as charged in Count 9 of the second superseding indictment:  Guilty.

As to wire fraud as charged in Count 10 of the second superseding indictment:  Guilty.

As to wire fraud as charged in Count 11 of the second superseding indictment:  Guilty.

As to wire fraud as charged in Count 12 of the second superseding indictment:  Not guilty.

As to wire fraud as charged in Count 13 of the

1     second superseding indictment:  Guilty.

2              As to wire fraud as charged in Count 14 of the

3     second superseding indictment:  Guilty.

4              As to wire fraud as charged in Count 15 of the

5     second superseding indictment:  Guilty.

6              As to wire fraud as charged in Count 16 of the

7     second superseding indictment:  Guilty.

8              As to wire fraud -- as to mail fraud as charged in

9     Count 17 of the second superseding indictment:  Guilty.

10             As to mail fraud as charged in Count 18 of the

11    second superseding indictment:  Guilty.

12             As to mail fraud as charged in Count 19 of the

13    second superseding indictment:  Guilty.

14             As to mail fraud as charged in Count 20 of the

15    second superseding indictment:  Guilty.

16             As to securities fraud as charged in Count 21 of

17    the second superseding indictment:  Guilty.

18             As to securities fraud as charged in Count 22 of

19    the second superseding indictment:  Guilty.

20             As to securities fraud as charged in Count 23 of

21    the second superseding indictment:  Guilty.

22             As to wire fraud as charged in Count 24 of the

23    second superseding indictment:  Guilty.

24             As to wire fraud as charged in Count 25 of the

25    second superseding indictment:  Guilty.

1     As to wire fraud as charged in Count 26 of the

2     second superseding indictment:  Guilty.

3     As to wire fraud as charged in Count 27 of the

4     second superseding indictment:  Guilty.

5     As to wire fraud as charged in Count 28 of the

6     second superseding indictment:  Guilty.

7     As to money laundering as charged in Count 29 of

8     the second superseding indictment:  Guilty.

9     And the verdict form is signed by the jury

10    foreperson, Mr. Collinson Robinson, dated today, January

11    30th, 2019, at 3:13 p.m.

12    Is there a request from the Government for me to

13    poll the jury?

14    MR. SIBERT:  No, Your Honor.

15    THE COURT:  All right.  Is there a request from the

16    defendant for me to poll the jury?

17    MR. BARNARD:  Yes, Your Honor, please.

18    THE COURT:  All right.  All right, ladies and

19    gentlemen of the jury, when I call your name, will you

20    please stand.

21    Ms. Malone, is this your individual verdict in all

22    respects?

23    THE JUROR:  Yes.

24    THE COURT:  Thank you.  Ms. Cox, is this your

25    individual verdict in all respects?

1          THE JUROR:  Yes.

2          THE COURT:  Thank you.  Mr. Albright, is this your

3    individual verdict in all respects?

4          THE JUROR:  Yes.

5          THE COURT:  Thank you.  Mr. Luka, is this your

6    individual verdict in all respects?

7          THE JUROR:  Yes.

8          THE COURT:  Thank you.  Mr. Coyle, is this your

9    individual verdict in all respects?

10          THE JUROR:  Yes.

11          THE COURT:  Ms. Tenenbaum, is this your individual

12    verdict in all respects?

13          THE JUROR:  Yes.

14          THE COURT:  Thank you.  Mr. Collinson Robinson, is

15    this your individual verdict in all respects?

16          THE JUROR:  Yes.

17          THE COURT:  Thank you.  Mr. Jones, is this your

18    individual verdict in all respects?

19          THE JUROR:  Yes.

20          THE COURT:  Ms. Fries, is this your individual

21    verdict in all respects?

22          THE JUROR:  Yes.

23          THE COURT:  Thank you.  Mr. Abeyta, is this your

24    individual verdict in all respects?

25          THE JUROR:  Yes.

1              THE COURT:  Thank you.  Ms. Sewell, is this your

2       individual verdict in all respects?

3              THE JUROR:  Yes.

4              THE COURT:  Thank you.  Ms. Kuiken, is this your

5       individual verdict in all respects?

6              THE JUROR:  Yes.

7              THE COURT:  Thank you.

8              All right, ladies and gentlemen of the jury, you've

9       now completed your duties as jurors in this case and you are

10      discharged with the considerable thanks of the Court.  The

11      parties, lawyers, and I greatly appreciate the time and the

12      effort, the patience, and the effort and work that you have

13      expended in being our jury here for the last 12 days.  You

14      have earned all of our thanks and appreciation for your

15      role -- your significant role in continuing this great

16      system of criminal justice we have in this country.

17             Now, I hope you're not in too much of a hurry to

18      leave us because I would like to come back to the jury

19      deliberation room to meet with you for a few minutes.  We

20      have some certificates of appreciation that the Court gives

21      to jurors at the completion of their duties and I'd like to

22      hand out those certificates, and I'd like to chat with you

23      for a few minutes about your service on this case.

24             You may now be wondering whether the -- whether

25      you're able to discuss this case with others.  I should tell

1    you that the local rules of this court prohibit the parties

2    in this case from contacting you.  Now, apart from that,

3    whether you talk to anyone about your service on this jury

4    is entirely up to you.  You can talk with others as little

5    as you want or as much as you like about your deliberations

6    or the facts that influenced your decision.

7           If any person persists in discussing and attempting

8    to discuss this case with you over your objection, or

9    becomes critical of your service either before or after any

10   discussion has begun, please report it to my courtroom

11   deputy, who will report it to me and I will make sure that

12   that is brought to an end swiftly.

13          All right.  Very well.  The jury is now discharged.

14          (Jury left the courtroom at 3:49 p.m.)

15          THE COURT:  All right.  Let me hear from the

16   Government first as to the application of Section 3143 to

17   the defendant at this time.

18          MR. SIBERT:  Your Honor, I'm not going to make a

19   request by the Government to move the defendant into custody

20   at this time.  My recommendation is if he continues to

21   comply with his conditions on pretrial release now facing

22   sentencing, we don't have any objection to that.

23          THE COURT:  All right.  Let me hear from the

24   defendant.

25          MR. BARNARD:  Your Honor, we would request that Mr.

1     Jean-Pierre be continued on bond as he presently is, with

2     the conditions that are presently there.

3              THE COURT:  Okay.  All right.  I find from clear

4     and convincing evidence, most particularly the defendant's

5     conduct since he was released on bond after the detention

6     hearing that we had, that he does not pose a danger to the

7     community.  And I also find by clear and convincing evidence

8     that he is not likely to flee.  So I will allow the

9     defendant to remain free on bond until the sentencing

10    hearing.  All conditions set forth in the magistrate judge's

11    orders setting conditions of release shall continue to

12    apply.

13              The defendant is referred to the United States

14    Probation Office for preparation of the presentence

15    investigation report.  The probation office will conduct a

16    presentence investigation report and submit a presentence

17    investigation report as required by Rule 32.

18              So everybody get your calendars out and we need to

19    set the sentencing hearing.  I am looking at the week of

20    July 8th, particularly Wednesday, July 10th.  Is the

21    Government available for sentencing hearing on that date?

22              MR. SIBERT:  May I just have a second, Your Honor?

23              THE COURT:  You may.

24              MR. SIBERT:  Your Honor, July 10th is fine with the

25    Government.

2585

1              THE COURT:  All right.  For the defendant?
2              MR. BARNARD:  July 10th is fine.
3              THE COURT:  All right.  We will set the sentencing
4      hearing for July 10th, 2019, at 9:30 -- first, let me ask
5      Ms. Meador, does that -- are you going to be the officer
6      preparing the report?
7              PROBATION OFFICER:  Not necessarily, it's going to
8      go for assignment.
9              THE COURT:  You're here because you're the duty --
10             PROBATION OFFICER:  I'll let the person know,
11     whoever gets it.
12             THE COURT:  So we don't have to clear your
13     calendar.  All right.
14             So everybody is on board, so we will set the
15     sentencing hearing for Wednesday -- yes.
16             MR. SIBERT:  Your Honor, I didn't mean to interrupt
17     the Court.  I'm just trying to see if the related cases will
18     be before this date or after this date regarding Mr. Sears
19     and Mr. Dittman.
20             THE COURT:  I --
21             MR. SIBERT:  They are pending this case.
22             THE COURT:  Right.  I don't know off the top of my
23     head what their sentencing dates are.  I would think you
24     would know that better than I.
25             MR. SIBERT:  I don't think it's been set.

1           THE COURT:  I have a few other cases to be dealing

2      with.  What's that?

3           MR. SIBERT:  I don't think that date has been set.

4           THE COURT:  Oh, you don't -- I think that may be

5      accurate.  I think that we just held the dates of the

6      sentencing for those two defendants in abeyance pending this

7      trial.

8           MR. SIBERT:  Yes, sir.

9           THE COURT:  Are you the AUSA on those -- that's

10     right, now that --

11          MR. SIBERT:  Yes, Your Honor.

12          THE COURT:  Okay.  Well, you know, I would suggest,

13     then, you just file a motion to -- for the Court to set a

14     sentencing hearing for those two codefendants.  What is the

15     Government's preference in terms of before or after July

16     10th?

17          MR. SIBERT:  Yes, sir, I'm actually asking, if

18     possible, if that week is good for the Court, to try to

19     arrange them that week, because I know there's victims in

20     this case that have contacted our office and want to make

21     victim statements to this Court.  So if --

22          THE COURT:  Are they out of town?

23          MR. SIBERT:  They are out of town.

24          THE COURT:  Oh, okay.

25          MR. SIBERT:  So -- and they've been pretty

1    persistent.  So maybe if I can --

2            THE COURT:  Why don't you include that in your

3    motion and remind me of that request; I will -- if I can, if

4    my schedule permits it, I will try to accommodate that

5    request.

6            MR. SIBERT:  Yes, sir.  Thank you.

7            THE COURT:  All right.  All right.  So I think I

8    still haven't gotten that sentence out entirely.  So let me

9    try again.

10           Sentencing hearing is hereby set for this defendant

11   on July 10th, 2019, at 9:30 a.m.

12           All right.  To the extent there are any pending

13   motions still outstanding in this case, those motions are

14   denied as moot.

15           All right.  Is there anything further from the

16   Government at this time?

17           MR. SIBERT:  No, Your Honor.  Thank you.

18           THE COURT:  All right.  Is there anything further

19   from the defendant?

20           MR. BARNARD:  No, Your Honor.

21           THE COURT:  All right.  Thank you very much.  The

22   trial is concluded.

23        (Proceedings concluded at 3:55 p.m.)

24

25

2588

**INDEX**

Item                                                                    PAGE

CLOSING ARGUMENTS:
By Mr. Sibert                                                           2510
By Mr. Barnard                                                          2536
By Mr. Sibert                                                           2557


QUESTION FROM THE JURY:                                                 2573

VERDICT:                                                                2577

\*        \*        \*        \*        \*

REPORTER'S CERTIFICATE


     I certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled matter.

     Dated at Denver, Colorado, this 27th day of March,

2020.


_                                                                    _

            MARY J. GEORGE, FCRR, CRR, RMR