**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**June 15, 2021**

## UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT

Christopher M. Wolpert
Clerk of Court

_____

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

GUY M. JEAN-PIERRE, a/k/a Marcelo
Dominguez de Guerra,

      Defendant - Appellant.

No. 20-1039

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:17-CR-00008-WJM-1)**
_____

Megan L. Hayes, Laramie, Wyoming, for Defendant - Appellant.

Paul Farley, Assistant United States Attorney (Jason R. Dunn, United States Attorney,
with him on the brief), Denver, Colorado, for Plaintiff – Appellee.
_____

Before **TYMKOVICH**, Chief Judge, **McHUGH**, and **CARSON**, Circuit Judges.
_____

**McHUGH**, Circuit Judge.
_____

Guy M. Jean-Pierre, a corporate and securities attorney, aided an illegal stock

trading operation. Through a series of self-dealing transactions, Mr. Jean-Pierre and his

co-conspirators artificially inflated stock prices of a company they controlled. Mr. Jean-

Pierre sent letters on the company's behalf to the U.S. Securities and Exchange Commission ("SEC") that contained false and misleading information and omitted material information from disclosures to potential investors.

Mr. Jean-Pierre appeals his convictions for conspiracy to commit securities fraud and securities fraud as to four of the twenty-eight counts of conviction. He argues the district court erred in admitting evidence that he had previously used his niece's signature without her permission to submit attorney letters to a stock trading website. Mr. Jean-Pierre also argues that three of the four convictions—the securities fraud counts—should be reversed because the district court declined to give a requested instruction reiterating the government's burden as to a specific factual theory. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.   BACKGROUND

### A.   *Factual History*

**1.  Overview**

To situate this complex matter, we provide a brief overview of the criminal conduct and regulatory framework relevant to this appeal before providing a more detailed factual background. Mr. Jean-Pierre was an attorney licensed in New York, Florida, and California. He held himself out as specialized in corporate and securities law, with over two decades of experience. From 2010 or 2011 until 2013, Mr. Jean-Pierre worked with William Sears and Scott Dittman to manipulate the stock prices of a company known as "FusionPharm, Inc." Mr. Jean-Pierre's role in this scheme was to make FusionPharm stock appear valuable by obfuscating negative information and to

make the trades exempt from registration with the SEC by providing incomplete information.

### 2. Microcap Stock Trading

"Microcap" stocks are those traded by companies with a low total value of stock. *Microcap Stock: A Guide for Investors*, U.S. Securities and Exchange Commission (Sept. 18, 2013), https://www.sec.gov/reportspubs/investor-publications/investorpubs microcapstockhtm.html. Many microcap stocks are traded on over-the-counter ("OTC") markets, as opposed to on national securities exchanges. *Id.*

This case involves trades on a particular OTC market ("the OTC Market"), which is registered with the SEC as a broker-dealer and Alternative Trading System; it is also a member of the Financial Industry Regulatory Authority ("FINRA"). *See id.* The OTC Market has three market tiers: one for companies eligible to be listed on a national securities exchange, one for companies "that are fully reporting with the SEC or . . . through some other kind of reporting scheme," and another, called "Pink," for companies that do not need to satisfy any minimum financial standards or reporting requirements. ROA, Vol. IV at 971; *see also Microcap Stock: A Guide for Investors*, *supra*.

In the Pink tier, the OTC Market distinguishes between companies that provide adequate current information, companies that provide limited current information, and companies that provide no current information. To be listed as providing adequate current information, a company must furnish: (1) quarterly financial statements and (2) an annual disclosure statement including "the business plan of the company, who the control persons are, [and] who the major shareholders are." ROA, Vol. IV at 974. This

information is meant to help potential investors decide whether to purchase stock. The OTC Market is accessible to the general public for trading. Although stock may be purchased regardless of the amount of information disclosed, the OTC Market uses symbols on its website to indicate to investors that stock from a company listed as "current" is more desirable. *Id.* at 977–82 (the OTC Market representative's testimony that a yellow yield sign designates a company that provides limited current information, a red stop sign designates a company that provides no current information, and a skull and crossbones designates a company with inadequate disclosure, a governmental investigation, or other significant concerns). This system enables investors to make a more informed decision and reduces the risk that insiders may be trading on information that is not publicly available.

The OTC Market requires an "attorney letter with respect to adequate current information" by which an attorney affirms "that [the attorney has] reviewed the company's disclosure and that it meets all of the requirements [the OTC Market has] laid out for companies in [its] disclosure guidelines." *Id.* at 980. The attorney letter also certifies the information is sufficient to meet the requirements of SEC Rule 144. The OTC Market requires an attorney to submit an attorney letter agreement before it will accept attorney letters from that attorney.

**3. Mr. Jean-Pierre's Ban from the OTC Market**

Beginning in April 2010, the OTC Market refused to accept legal opinions from Mr. Jean-Pierre because repeated inconsistencies and omissions demonstrated he failed to draft attorney letters with due diligence. Shortly thereafter, Mr. Jean-Pierre submitted

twelve attorney letter agreements bearing the signature of his niece, Leslie Jean-Pierre

Dinwoodie.[1] Ms. Dinwoodie is also an attorney. In the spring of 2010, Mr. Jean-Pierre

asked Ms. Dinwoodie for help on legal opinion letters, telling her he would divide his

practice and set up a new corporation with her assistance. To do so, Mr. Jean-Pierre asked

for three copies of Ms. Dinwoodie's signature and she provided them. Ms. Dinwoodie

never did any legal work for Mr. Jean-Pierre. But Mr. Jean-Pierre nonetheless placed her

signature on the attorney letter agreements, without her authorization.

## 4.  Mr. Jean-Pierre's Work on FusionPharm

Mr. Jean-Pierre began working with Mr. Sears in 2010 or 2011. Mr. Sears has a

2007 felony conviction for securities fraud. He owned a company called MicroCap

Management.[2] In 2011, Mr. Sears took control of Baby Bee Bright Corporation, a

publicly traded company. Mr. Sears and his brother-in-law, Mr. Dittman, renamed Baby

Bee Bright to create FusionPharm, Inc. FusionPharm made hydroponic grow units.

Because of his prior conviction, Mr. Sears never disclosed his involvement with

---

[1] Ms. Dinwoodie has changed her surname back to "Jean-Pierre," which is her maiden name. To avoid confusion, and because her surname was "Dinwoodie" at the relevant time, we refer to her as "Ms. Dinwoodie."

[2] MicroCap is one of several companies controlled by Mr. Sears. *See, e.g.*, ROA, Vol. IV at 1330–31 (discussing Mr. Sears's opening of a company called MeadPoint Venture Partners, LLC); *id.* at 1307, 1311, 1763–64 (discussing Mr. Sears's involvement with a business called Bayside Realty Holdings, LLC, which was in Mr. Sears's mother's name). For the sake of simplicity, we discuss only the three companies that were major players in this scheme (MicroCap, FusionPharm, and a company called VertiFresh), but the scheme involved his other companies as well. These entities were all shell companies controlled by Mr. Sears.

FusionPharm to the public, even though he was heavily involved with its management and functionally controlled ninety percent of its stock. To avoid detection, Mr. Sears held sixty percent of the FusionPharm stock in his mother's name.

In 2010 or 2011, Mr. Jean-Pierre aided Mr. Sears in transforming Baby Bee Bright into FusionPharm. He advised Mr. Sears and Mr. Dittman that if Mr. Sears were listed as an officer or director of the company, Mr. Sears's felony conviction would need to be disclosed. Mr. Jean-Pierre filed the paperwork to formally change the company's name and handled stock transactions incident to its transformation. He became FusionPharm's legal counsel and corporate secretary.

FusionPharm was traded on the OTC Market. It regularly uploaded disclosures, allowing it to stay in the current information category of the Pink market. Mr. Jean-Pierre drafted the corresponding attorney letters and then sent them to another attorney—Tod DiTommaso—to place on Mr. DiTommaso's letterhead and sign. Once Mr. DiTommaso executed the letters, he would return them to Mr. Jean-Pierre.

In addition, Mr. Jean-Pierre failed to list Mr. Sears as an affiliate of FusionPharm on the forms submitted to obtain a Rule 144 exemption for FusionPharm stock. If Mr. Sears had been listed as an affiliate, the shares could not have been freely traded on the Pink market. Mr. Jean-Pierre also submitted several letters regarding Baby Bee Bright share transfers that not only omitted required information but also included Ms. Dinwoodie's signature without her authorization.

Around October 2011, FINRA began investigating sales of FusionPharm stock by MicroCap. Mr. Dittman falsely told FINRA that Mr. Sears was only a part-time salesman

at FusionPharm, and as far as Mr. Dittman knew, Mr. Sears did not own any FusionPharm stock. Mr. Jean-Pierre helped impede the investigation by drafting documents transferring MicroCap to Richard Scholz, and falsely backdating those documents to indicate the sale had occurred in May 2011 for $10. In fact, Mr. Sears continued to control MicroCap, even after it was ostensibly transferred to Mr. Scholz. Mr. Jean-Pierre also told FINRA that FusionPharm had provided all the information requested. Based on these misrepresentations, FINRA closed the investigation.

In the 2012 annual report, FusionPharm claimed its revenue saw a significant increase, due to a license agreement with a company called VertiFresh, to $808,398. But undisclosed in that report was the fact that Mr. Sears also controlled VertiFresh. Although prospects for FusionPharm looked bright to investors based on the 2012 annual report, circumstances soon changed. FusionPharm later restated the 2012 revenue, indicating it was half a million dollars less than previously reported, and FusionPharm was worthless by 2014. The net proceeds from sales of its stock over the prior three years, however, were $11,867,244, including a significant windfall for Mr. Sears and Mr. Dittman.

## 5.  The FBI Sting Operation

In 2016, the FBI conducted a sting operation targeting Mr. Jean-Pierre, who had by then moved to the Dominican Republic. Mr. Sears, now cooperating with the FBI, enlisted Mr. Jean-Pierre to arrange for VertiFresh to be publicly traded. As with FusionPharm, Mr. Sears instructed Mr. Jean-Pierre to conceal Mr. Sears's involvement with the company and to lie about other relevant information. Through Mr. Sears, the FBI

lured Mr. Jean-Pierre to the United States and recorded him making incriminating statements about the scheme. Mr. Jean-Pierre was then arrested.

## B.   Procedural History

A federal grand jury in the District of Colorado initially indicted Mr. Jean-Pierre on January 11, 2017. The operative Second Superseding Indictment charges Mr. Jean-Pierre with twenty-nine counts. These counts are: conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371 (Count 1); wire fraud relating to the FusionPharm trading, in violation of 18 U.S.C. §§ 1343 and 2 (Counts 2–16); mail fraud relating to the FusionPharm trading, in violation of 18 U.S.C. §§ 1341 and 2 (Counts 17–20); securities fraud relating to the FusionPharm trading, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2 (Counts 21–23); wire fraud relating to the sting operation, in violation of 18 U.S.C. §§ 1343 and 2 (Counts 24–28); and money laundering relating to the sting operation, in violation of 18 U.S.C. §§ 1956(a)(3)(B) and 2 (Count 29).

With regard to the securities fraud counts, the indictment charged that Mr. Jean-Pierre aided and abetted "(a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made . . . not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit" in connection with three sales of FusionPharm stock by Mr. Sears's other companies. ROA, Vol. I at 367–68. The indictment on these three counts incorporates the full factual background.

8

The matter proceeded to trial.

## 1.  Evidence of Mr. Jean-Pierre's Forgery of Ms. Dinwoodie's Signature

During the testimony of a representative of the OTC Market, the district court admitted Government Exhibit 11 ("Exhibit 11"), an email in which the OTC Market explained it banned Mr. Jean-Pierre from submitting attorney letters and shortly thereafter received attorney letter agreements from Ms. Dinwoodie, who was then also banned. Mr. Jean-Pierre stipulated to the admission of that exhibit. The OTC Market's representative testified that the OTC Market had noticed Ms. Dinwoodie's name, Leslie Jean-Pierre Dinwoodie, included Mr. Jean-Pierre's sur-name and "assumed that they were related." ROA, Vol. IV at 1046. As a result, the OTC Market wanted "to make sure that . . . [Ms. Dinwoodie] was qualified and . . . would be doing her own work" rather than "acting at the behest of Mr. Jean-Pierre." *Id.*

Ms. Dinwoodie also testified, stating she never signed the documents sent to the OTC Market and had not practiced securities law in any capacity. The government introduced a blank attorney letter agreement, which Mr. Jean-Pierre does not challenge on appeal. Ms. Dinwoodie testified she had never seen or signed such a form. Ms. Dinwoodie also testified she never submitted the attorney letter agreements referenced in Exhibit 11. Mr. Jean-Pierre did not object to that testimony.

The government next offered the attorney letter agreements bearing Ms. Dinwoodie's signatures that Mr. Jean-Pierre submitted to the OTC Market in 2010. Mr. Jean-Pierre objected, arguing as relevant here that the exhibit constituted evidence of other bad acts inadmissible under Federal Rule of Evidence 404(b). After the government

laid additional foundation, the district court overruled the objection. It held, as relevant here, that the exhibit did not violate Rule 404(b) because the letters are intrinsic evidence exempt from 404(b) analysis since they "have evidence in them that support[s] the allegations in . . . Counts 1 and 21 through 23." *Id.* at 1232. The district court admitted the attorney letter agreements as Government Exhibit 52 ("Exhibit 52").

## 2.  The Jury Instructions

The parties were able to stipulate to most of the jury instructions, leaving only two instructions in contention. The disputed instructions related to securities fraud, one setting forth the elements and the other discussing general principles. As relevant here, Mr. Jean-Pierre requested that the jury instructions clarify "the government must prove beyond a reasonable doubt . . . that Rule 144 was not complied with . . . [in addition to] a number of other elements." ROA, Vol. I at 636. Mr. Jean-Pierre construed the indictment as charging he "made a misstatement of material fact, namely that securities offered or sold by FusionPharm were exempted from registration with the [SEC] under Rule 144." *Id.* at 645. Based on this understanding, Mr. Jean-Pierre's Proposed Instruction B provided that to prove the alleged statement was untrue, "the government must prove beyond a reasonable doubt that the securities offered or sold by FusionPharm were *not* subject to an exemption under Rule 144 and that the securities were not otherwise registered with the [SEC] or exempt from registration." *Id.* at 646 (emphasis in original).

Although the district court adopted a general definition of Rule 144 from Mr. Jean-Pierre's Proposed Instruction B and the government's counterproposal, it did not include the language indicating the government was required to prove FusionPharm

failed to comply with Rule 144. The district court rejected that language, explaining "additional commentary on the theory . . . is not contained in any other instruction." ROA, Vol. IV at 2534–35. The district court was concerned this would "lead to juror confusion because they would be left to parse the instructions fin[e]ly and wonder why something was repeated and commented upon here but not in any other instruction." *Id.* at 2535. But it noted Mr. Jean-Pierre was "free to argue this text and this information in closing argument." *Id.*

When the district court asked for objections to the final instructions, Mr. Jean-Pierre's counsel noted the instruction defining Rule 144 indicated it was based on "'defendant's proposed instruction B.' In fact, this is not the defendant's proposed instruction B." *Id.* at 2550. Counsel continued:

> Defendant's proposed instruction B had additional language, which we still would request.
>
> And I'm assuming that since the Court has ruled with regard to that, that has been considered and has been rejected, but I just want to --
>
> THE COURT: Okay.
>
> [DEFENSE COUNSEL]: -- again, reserve that objection.

*Id.* The district court then edited the instruction to reflect it was modified from Mr. Jean-Pierre's Proposed Instruction B and contained portions of the government's Proposed Instruction 32.

## 3.  Conviction and Appeal

The jury found Mr. Jean-Pierre guilty of all but one count. The district court sentenced him to 60 months on Count 1 and 84 months on the other twenty-seven counts

of conviction, all set to run concurrently. The court entered judgment on February 3,

2020. Mr. Jean-Pierre filed a notice of appeal on February 11, 2020.

## II.    DISCUSSION

Mr. Jean-Pierre's appeal challenges only four of his convictions—Count 1 for

conspiracy to commit securities fraud and Counts 21, 22, and 23 for securities fraud.

Mr. Jean-Pierre makes two contentions. First, he argues the district court abused its

discretion in admitting the attorney letter agreements bearing Ms. Dinwoodie's signature.

We reject his argument because, even if we assume the letter agreements were

improperly admitted, any error is harmless. Second, Mr. Jean-Pierre argues the

instructions on Counts 21, 22, and 23 were erroneous because they failed to require the

jury to find the securities at issue were not exempt from Rule 144. We disagree because

the instructions taken as a whole adequately instructed the jury as to the elements of the

offense, and the district court reasonably concluded that further detail might cause

confusion.

### A.    Evidence

Mr. Jean-Pierre's first challenge on appeal is to the district court's admission of

Exhibit 52, the attorney letter agreements bearing Ms. Dinwoodie's signature. The district

court held these letters were intrinsic evidence of Counts 1, 21, 22, and 23, and thus not

subject to the Rule 404(b) analysis. On appeal, Mr. Jean-Pierre argues these letters were

extrinsic because they are not related to FusionPharm. Instead, the letters in Exhibit 52

provide information about companies unrelated to the offenses of conviction. He further

contends Exhibit 52 does not serve a proper purpose under Rule 404(b), and its unfair

prejudice substantially outweighed any probative value. Because we conclude the admission of Exhibit 52 was harmless, we need not decide whether the district court erred in admitting it.

## 1.  Standard of Review & Legal Background

"A non-constitutional error is harmless unless it had a substantial influence on the outcome or leaves one in grave doubt as to whether it had such effect." *United States v. Roach*, 896 F.3d 1185, 1194–95 (10th Cir. 2018) (quotation marks omitted). The government bears the burden of showing the error was harmless by a preponderance of the evidence. *Id.* at 1195. Often, the government accomplishes this showing by demonstrating the evidence of guilt is "overwhelming." *See, e.g.*, *United States v. Archuleta*, 737 F.3d 1287, 1296 (10th Cir. 2013). We have also held that erroneously admitted evidence of a prior bad act is harmless where "evidence of [the same act] was properly admitted elsewhere in the record." *United States v. Flanagan*, 34 F.3d 949, 955 (10th Cir.), *modified on reh'g* (Nov. 21, 1994).

## 2.  Analysis

Mr. Jean-Pierre claims he was harmed because Exhibit 52 "seriously and significantly damaged him in the jury's eyes and portrayed him as culpable for . . . the uncharged bad acts contained in the [twelve] forged attorney letter agreements." Appellant Br. at 18. We are not convinced Exhibit 52 had such impact, nor do we harbor any grave doubt that it influenced the outcome.

Before the government offered Exhibit 52, it introduced Exhibit 11 and testimony from a representative of the OTC Market and Ms. Dinwoodie. Exhibit 11 and the

testimony from the OTC Market's representative informed the jury that after Mr. Jean-Pierre was banned from providing attorney letters, attorney letters were submitted bearing the signature of Ms. Dinwoodie, his niece, with respect to twelve companies for which Mr. Jean-Pierre had previously submitted letters. And Ms. Dinwoodie's testimony established she did not sign any attorney letters, had no experience in securities law, and that Mr. Jean-Pierre had access to her signature. Together, this evidence demonstrated that Mr. Jean-Pierre used Ms. Dinwoodie's signature without her permission to submit attorney letters to the OTC Market.

Exhibit 52 contains a series of attorney letters bearing Ms. Dinwoodie's signature that, standing alone, did not allow the jury to infer that Mr. Jean-Pierre "took significant advantage of his family to benefit his own economic interests by submitting forged attorney letter agreements with multiple companies unrelated to FusionPharm." *Id.* Instead, any danger of such an inference arose from Exhibit 11, the OTC Market's representative's testimony, and Ms. Dinwoodie's testimony, all of which was received into evidence without relevant objection before Exhibit 52. Accordingly, any assumed error regarding the admission of Exhibit 52 was harmless. *See Flanagan*, 34 F.3d at 955.

### B. *Jury Instruction*

Mr. Jean-Pierre next argues the jury instructions failed to properly inform the jury that to find him guilty on Counts 21, 22, and 23, it needed to find beyond a reasonable doubt that the FusionPharm securities were not exempt under Rule 144, and were not otherwise registered with the SEC or exempt from registration. We disagree. The jury

instructions properly stated the law and the district court appropriately exercised its discretion in declining to give further instructions out of concern for confusing the jury.

## 1. Legal Background

As relevant here, 15 U.S.C. § 77e sets forth requirements relating to registration of securities. But 15 U.S.C. § 77d(a) provides exemptions from § 77e's requirements, including for "transactions by any person other than an issuer, underwriter, or dealer." 15 U.S.C. § 77d(a)(1). The SEC implemented this exemption through SEC Rule 144. *See* 17 C.F.R. § 230.144.

The securities fraud counts at issue in this appeal concern violations of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5.[3] 15 U.S.C. § 78j(b) proscribes

> us[ing] or employ[ing], in connection with the purchase or sale of any security[,] . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

17 C.F.R. § 240.10b-5 implements this provision, providing:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

---

[3] The charging document also refers to violations of 15 U.S.C. § 78ff, but that section merely provides the penalties for violations of § 78j(b).

> (c) To engage in any act, practice, or course of business which
> operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

Thus, to prove a person criminally liable under these provisions, the government must prove beyond a reasonable doubt that the defendant: "(1) made a misrepresentation or omission (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, and (5) by virtue of the requisite jurisdictional means." *United States v. Gordon*, 710 F.3d 1124, 1142 n.20 (10th Cir. 2013) (quotation marks omitted). With this background in mind, we turn to the underlying facts.

## 2. Waiver

The government argues Mr. Jean-Pierre waived a challenge to the jury instruction because his argument was not properly presented to the district court, and Mr. Jean-Pierre fails to argue on appeal that his challenge can succeed under the plain error standard. We disagree.

"A party who objects to any portion of the instructions or to a failure to give a requested instruction must inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate." Fed. R. Crim. P. 30; *see also* Fed. R. Crim. P. 51(b) ("A party may preserve a claim of error by informing the court—when the court ruling or order is made or sought—of the action the party wishes the court to take, or the party's objection to the court's action and the grounds for that objection."). We have held that "[m]erely tendering jury instructions, without any further objection, is

insufficient to preserve issues related to those jury instructions." *United States v. Lawrence*, 405 F.3d 888, 897 (10th Cir. 2005).

But that is not what happened here. Mr. Jean-Pierre's Proposed Instruction B included language requiring the government to prove the securities were not subject to an exemption under Rule 144. This proposed instruction was submitted with a filing explaining the reason for including such language. The district court rejected the requested language, stating "the additional commentary" Mr. Jean-Pierre included on the factual means of commission of the first element of securities fraud "is not contained in any other instruction." ROA., Vol. IV at 2534–35. The district court reasoned that including the requested language only in one instruction would "lead to juror confusion because they would be left to parse the instructions fin[e]ly and wonder why something was repeated and commented upon here but not in any other instruction." *Id.* at 2535.

When the district court asked for any objections to the final version of the instructions, Mr. Jean-Pierre's counsel took issue with the statement in the district court's proposed instructions that the instruction on Rule 144 was Mr. Jean-Pierre's Proposed Instruction B. Counsel noted the court had not adopted the entirety of Mr. Jean-Pierre's Proposed Instruction B and reiterated his position that the court should include that additional language. Counsel also stated he wished to reserve the position advanced in his written submission that the jury should be informed it must find beyond a reasonable doubt that no exception excused compliance with Rule 144.

We agree with Mr. Jean-Pierre that he adequately preserved this issue. Mr. Jean-Pierre provided the court with a detailed reason why he believed the language in his

Proposed Instruction B was necessary. When the district court provided its proposed jury instructions, Mr. Jean-Pierre's counsel correctly recognized the court had rejected that argument. Yet, counsel again noted his objection on the record and reaffirmed the request for the additional language. This was sufficient to preserve the issue.

### 3. Merits

#### a. *Standard of review*

This court "review[s] the jury instructions de novo . . . in the context of the entire trial to determine if they accurately state the governing law and provide the jury with an accurate understanding of the relevant legal standards and factual issues in the case." *United States v. Christy*, 916 F.3d 814, 854 (10th Cir. 2019) (quotation marks omitted). "In doing so, we consider whether the district court abused its discretion in shaping or phrasing . . . a particular jury instruction and deciding to give or refuse a particular instruction." *Id.* (omission in original) (quotation marks omitted).

#### b. *Analysis*

The instruction at issue informed the jury that the government needed to prove beyond a reasonable doubt the first element of securities fraud, specifically that Mr. Jean-Pierre:

> knowingly and willfully (a) employed any device, scheme, or artifice to defraud; or (b) made any untrue statement of a material fact; or (c) omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (d) engaged in a transaction, practice, or course of business which operated or would operate as a fraud and deceit on any person.

ROA, Vol. I at 902. The district court separately instructed the jury as to Rule 144.[4]

The gravamen of Mr. Jean-Pierre's argument is that the evidence in this case with respect to the first element of securities fraud was aimed at proving he made a materially false statement in representing that the securities FusionPharm offered and sold were exempt from registration under Rule 144. Therefore, Mr. Jean-Pierre maintains the jury should have been instructed that the government had to prove beyond a reasonable doubt that the securities were not exempt under Rule 144. Again, we disagree.

The district court instructed the jury that it could convict Mr. Jean-Pierre only if the government proved each element beyond a reasonable doubt. This included the first element, which can be satisfied by four disjunctive means. The instructions informed the

---

[4] The instruction on Rule 144 provided:

Rule 144 under the Securities Act provides certain requirements for resellers to avoid being classified as an underwriter. These rules vary on whether or not an individual is classified as an "affiliate." Rule 144(a)(1) defines an "affiliate" to mean "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with the issuer." Rule 405 under the Securities Act defines "control" to mean "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise."

If a person is considered an affiliate, additional requirements must be met in order to sell securities since the securities will be termed "restricted securities" since the securities are acquired directly or indirectly from the issuer, or from an affiliate of the issuer, in a transaction or chain of transactions not involving any public offering. The additional requirements include a holding period, limitation on amount of securities sold, manner of sale, and requirement for brokers' transactions to include a reasonable inquiry.

ROA, Vol. I at 910.

jury that, in order to convict him, the government must prove beyond a reasonable doubt Mr. Jean-Pierre (a) employed a scheme to "defraud"; (b) made a statement of material fact that was "untrue"; (c) omitted information necessary to make a material statement "not misleading"; or (d) engaged in a transaction, practice, or course of business that "operate[d] as a fraud and deceit." ROA, Vol. I at 902. Although Mr. Jean-Pierre sought further instructions focused on whether the securities at issue met the requirements of Rule 144, the evidence was not so limited—the jury could have convicted him on the ground that a different statement or act violated the first element of securities fraud. And the district court determined it would be confusing to separately instruct the jury on only one factual theory.

This was not an abuse of discretion. The district court accurately instructed the jury on the law and acted reasonably in rejecting Mr. Jean-Pierre's request for further instruction. *See United States v. Bowling*, 619 F.3d 1175, 1183–84 (10th Cir. 2010) ("While a defendant is entitled to an instruction on his theory of defense where some evidence and the law supports the theory, such an instruction is not required if it would simply give the jury a clearer understanding of the issues." (internal quotation marks omitted)).

Mr. Jean-Pierre argues the proposed instruction was necessary due to the complexity of the charges and was "integral to the government's actual burden [of proof] on the first element of securities fraud." Appellant Br. at 22. Mr. Jean-Pierre contends the government had requested a similar instruction, and the instructions as given failed to ensure "the jury fully and clearly understood the requirements of the first element." *Id.* at

22–23. In reply, he maintains "the jury was misled regarding the government's burden of proof on an element of the offense—that Mr. Jean-Pierre made an untrue statement or misstatement that securities offered or sold by FusionPharm were exempted from registration with the [SEC] under Rule 144." Reply Br. at 7.

As discussed, however, the instructions correctly set forth the first element of securities fraud, including four separate means of satisfying that element. *Cf. Mathis v. United States*, 136 S. Ct. 2243, 2248–49 (2016) (discussing the distinction between elements of a crime and factual means of committing an element of a crime). The district court also properly instructed the jury that the government must prove each element beyond a reasonable doubt. There is no requirement that the district court further instruct the jury that the government's burden applies to a specific means of satisfying that element. *See Bowling*, 619 F.3d at 1183–84. Rather, the district court acted well within its discretion in rejecting a request to instruct as to the government's burden on only one factual theory, thereby risking confusion as to application of the burden more generally.

## III.    CONCLUSION

Any assumed error in the admission of Exhibit 52 was harmless, and the jury instructions correctly stated the law.

We **AFFIRM.**

UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT
Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157
Clerk@ca10.uscourts.gov

Christopher M. Wolpert
Clerk of Court

Jane K. Castro
Chief Deputy Clerk

June 15, 2021

Ms. Megan L. Hayes
Attorney at Law
910 Kearney Street
Laramie, WY 82070-0000

**RE:**   **20-1039, United States v. Jean-Pierre**
Dist/Ag docket: 1:17-CR-00008-WJM-1

Dear Counsel:

Enclosed is a copy of the opinion of the court issued today in this matter. The court has entered judgment on the docket pursuant to Fed. R. App. P. Rule 36.

Pursuant to Fed. R. App. P. 40(a)(1), any petition for rehearing must be filed within 14 days after entry of judgment. Please note, however, that if the appeal is a civil case in which the United States or its officer or agency is a party, any petition for rehearing must be filed within 45 days after entry of judgment. Parties should consult both the Federal Rules and local rules of this court with regard to applicable standards and requirements. In particular, petitions for rehearing may not exceed 3900 words or 15 pages in length, and no answer is permitted unless the court enters an order requiring a response. *See* Fed. R. App. P. Rules 35 and 40, and 10th Cir. R. 35 and 40 for further information governing petitions for rehearing.

Please contact this office if you have questions.

Sincerely,

Christopher M. Wolpert
Clerk of Court

cc:      Paul Farley

CMW/sds